IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
RONALD CANTOR, et al.,                     :
                                           :
              Plaintiffs,                  :
                                           :        No. 97-CIV-586-KAJ
       v.                                  :
                                           :
RONALD O. PERELMAN, et al.,                :
                                           :
              Defendants.                  :
-------------------------------------------------------x
```

## COMPENDIUM OF UNREPORTED OPINIONS CITED IN DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO STRIKE PLAINTIFFS' JURY DEMAND

Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000
Attorneys for Defendants

DATED: October 21, 2005

## INDEX TO UNREPORTED CASES AND AUTHORITIES

CASES                                                                          TAB

Cantor Fitzgerald, L.P. v. Cantor,
    C.A. No. 16297, 2000 WL 307370 (Del. Ch. Mar. 13, 2000) ............................... 1

Cantor Fitzgerald, L.P. v. Cantor,
    C.A. No. 16297, 2001 WL 536911 (Del. Ch. May 11, 2001) ................................ 2

Cantor Fitzgerald, L.P. v. Cantor,
    C.A. No. 16297, 2003 WL 21488707 (Del. Ch. June 19, 2003) .......................... 3

Roy F. Weston Services, Inc. v. Halliburton NUS Envtl. Corp.,
    C.A. No. 91-1133, 1993 U.S. Dist. LEXIS 2841 (E.D. Pa. Mar. 5, 1993) ............ 4

Rush v. Scott Paper Co.,
    C.A. No. 93-5973, 1995 U.S. Dist. LEXIS 1249 (E.D. Pa. Feb. 1, 1995) ............. 5

Smith v. Shell Petroleum, Inc.,
    C.A. No. 8395, 1990 WL 186446 (Del. Ch. Nov. 26, 1990) ................................. 6

Rodman Ward, Jr. and Erin Kelly,
"Why Delaware Leads in the United States as a Corporate Domicile,"
9-FALL DEL. LAW. 15 (1991) ......................................................................................... 7

# EXHIBIT 5

*1995 U.S. Dist. LEXIS 1249, \*; 67 Fair Empl. Prac. Cas. (BNA) 1010*

CHARLES F. RUSH v. SCOTT PAPER COMPANY

CIVIL ACTION NO. 93-5973

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1995 U.S. Dist. LEXIS 1249; 67 Fair Empl. Prac. Cas. (BNA) 1010

February 1, 1995, Decided
February 1, 1995, FILED, ENTERED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a former employee, filed a motion to call a certain expert witness at trial. The employee brought the action against defendant, a former employer, claiming that he was fired in violation of the Age Discrimination in Employment Act, 29 U.S.C.S. § 621, et seq., the Employee Retirement Income Security Act, 29 U.S.C.S. § 1001, et seq., and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 951, et seq.

**OVERVIEW:** After receiving a poor evaluation, the employee was fired and replaced by a younger employee. Discovery lasted over 10 months, though originally scheduled to take five months. The employee notified the employer that he planned to call a certain expert witness at trial and provided a copy of the expert's resume and a two sentence summary of the matters on which he was to testify. Five days after the discovery deadline, the employee forwarded the expert report to the employer. The court denied the employee's motion. The court found that the employer would be severely prejudiced if the expert were allowed to testify. The employer would have been forced to reopen discovery in order to depose the witness. Further, the expert's testimony would only be relevant to the employee's newly conjured disparate impact theory. Given the fact that the trial was only a few weeks away, the employer would be unlikely to cure any prejudice without seeking a continuance of the trial. The original trial date had been pushed back many times already. The employee had not offered a substantial justification for his failure to identify the expert and provide his expert report within the discovery period.

**OUTCOME:** The court denied the employee's motion to call a certain expert witness at trial.

**CORE TERMS:** discovery, deadline, expert report, disparate impact, deposition, prejudiced, scheduling, disparate treatment, new theory, et seq, expert witness, instant motion, memorandum, post-deadline, scheduled, severely, ranking, fired, permitted to testify, original trial date, discovery process, expert testimony, willfulness, prejudicial, testifying, exchanged, pretrial, sentence, depose, severe

**LexisNexis(R) Headnotes**

Labor & Employment Law > Discrimination > Disparate Impact
*HN1* A trial court can bar a disparate impact claim raised after the close of discovery.

Evidence > Witnesses > Examination & Presentation of Evidence
*HN2* The Third Circuit Court of Appeals identified several factors to be considered in determining whether a belatedly announced witness may be excluded: bad faith on

the part of the party seeking to call the witness; ability of the party to have discovered the witness earlier; validity of the excuse offered by the party; willfulness of the party's failure to comply with the court's order; the party's intent to mislead or confuse his adversary; and the importance of the excluded testimony. Four basic considerations underlie these factors: (1) the prejudice or surprise in fact of the party against whom the excluded witness would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling the witness would disrupt the orderly and efficient trial of the case, and (4) bad faith or willfulness in failing to comply with the court's order.

**COUNSEL:** **[\*1]** For CHARLES F. RUSH, PLAINTIFF: NEIL A. MORRIS, NEIL A. MORRIS ASSOC., PHILA, PA. LLOYD T. HOPPE, JR., NEIL A. MORRIS ASSOCIATES, P.C., PHILA, PA.

For SCOTT PAPER COMPANY, DEFENDANT: STEVEN R. WALL, MARINA C. TSATALIS, MORGAN, LEWIS & BOCKIUS, PHILA, PA.

**JUDGES:** Donald W. VanArtsdalen, S.J.

**OPINIONBY:** Donald W. VanArtsdalen

**OPINION:** MEMORANDUM AND ORDER

VanARTSDALEN, S.J.

February 1, 1995

Before me is plaintiff's Motion to Call Dr. Seymour Wolfbein as an Expert Witness at Trial. For the reasons set forth in this Memorandum, the motion will be denied.

Factual Background

Plaintiff Charles Rush (Rush) brings this action against defendant Scott Paper Company, claiming that Scott Paper fired him in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq., the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq., and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 951, et seq. Plaintiff Rush was employed by Scott Paper for 25 years, rising to the level of regional controller in 1986. In late 1991, Scott Paper instituted a plan to cut costs and restructure. **[\*2]** As part of this plan, Scott Paper employees were placed in peer groups and ranked against group members. The lowest ranking employees were to be discharged. Apparently receiving a low ranking in his peer group, plaintiff Rush was fired in late January, 1992. Plaintiff was replaced by a younger employee.

Procedural History

After his discharge, plaintiff Rush filed a claim with the EEOC. After waiting the appropriate time, he brought the instant action in federal district court. Since its inception, this case has been characterized by the inappropriately combative approach to discovery adopted by counsel for both parties. To this point in the discovery process, I have been called upon to rule on several discovery-related motions, including a motion by defendant for sanctions against plaintiff and/or plaintiff's counsel for failure to appear for a deposition, a motion by plaintiff for sanctions against defendant and/or defendant's counsel, a motion by plaintiff to prohibit defendant's counsel from improperly contacting plaintiff's employer and for sanctions, a motion by plaintiff to compel answers to interrogatories and production of witnesses for deposition, a motion by plaintiff **[\*3]** for an extension of discovery, and the instant motion. Discovery tactics employed by counsel for both parties have resulted in three

separate amendments pushing back the dates set forth in the original scheduling order. The trial, originally listed for September, 1994, is currently scheduled for March, 1995. Discovery in this case lasted over ten months, though originally scheduled to take just over five months.

On November 11, 1994, plaintiff notified defendant's counsel that he planned to call Dr. Seymour Wolfbein as an expert witness at trial. Plaintiff included with this notice a copy of Dr. Wolfbein's resume and a two sentence summary of the matters on which Dr. Wolfbein was to testify. Pursuant to this court's Order of September 26, 1994, the deadline for discovery was November 25, 1994. On November 30, 1994, five days after the discovery deadline, plaintiff forwarded Dr. Wolfbein's expert report to counsel for defendant.

Defendant objected to plaintiff's attempt to name Dr. Wolfbein at such a late date in the discovery process. When counsel for plaintiff and defendant were not able to settle their differences on their own, I was called upon to hear the matter in a telephone **[*4]** conference. After hearing argument by both sides, I ruled that Dr. Wolfbein should not be permitted to testify at trial, as his expert report was not provided within the time for discovery. Plaintiff took exception to my ruling and filed the instant motion.

Discussion

Plaintiff argues that Dr. Wolfbein should be permitted to testify despite plaintiff's failure to provide defendant with Dr. Wolfbein's expert report within the discovery period. Plaintiff's argument rests primarily on two contentions. Plaintiff claims that Dr. Wolfbein's testimony is "key," and that it "goes to the heart" of his case. Plaintiff also claims that to allow Dr. Wolfbein to testify would not prejudice the defendant, as defendant knew of plaintiff's intention to call Dr. Wolfbein over three months before the case was scheduled for trial.

As a preliminary matter, I wish to clear up any confusion about the deadline for the submission of expert reports. In the first three scheduling orders I issued in this case, the deadline for identifying expert witnesses and providing opposing counsel with expert reports preceded the deadline for discovery, usually by several weeks. The July 7, 1994, stipulation that again **[*5]** amended the scheduling order, however, failed to mention a deadline for expert witnesses. Likewise, the final scheduling order of September 26, 1994, did not mention a deadline for expert witnesses.

In such circumstances, I conclude that the deadline for providing expert reports was some time prior to the discovery deadline. The discovery deadline is just that--a deadline. All discovery should be completed by the date established as the discovery deadline. If counsel provides the opposition with a new expert report on the final day of discovery, it would be nearly impossible for the opposition to take the necessary discovery regarding that witness before the close of discovery. It seems self-evident, then, that in order to observe the discovery deadline, counsel should provide the opposition with an expert report sufficiently in advance of the end of discovery to permit the necessary discovery relating to that expert.

Even if I were to conclude that the deadline for the submission of expert reports was the close of discovery, plaintiff still failed to meet the deadline. Without the agreement of the opposition, plaintiff failed to submit the expert report of Dr. Wolfbein until five **[*6]** days after the close of discovery.

Plaintiff argues that the defendant knew of plaintiff's intention to call Dr. Wolfbein several weeks in advance of the discovery deadline. This fact does not, however, alter the situation. Although the defendant may have known of plaintiff's intention to call Dr. Wolfbein, it did not have information sufficient to allow it to proceed with discovery relating to Dr. Wolfbein and his testimony. Counsel for the defendant can not be expected to depose Dr. Wolfbein armed only with the two sentence summary of the nature of his expected testimony provided them

by the plaintiff on November 11, 1994. It was not until defendant received the expert report that it could effectively proceed with discovery regarding Dr. Wolfbein. Plaintiff's failure timely to provide this report ensured that discovery would continue after the discovery deadline.

Plaintiff argues that breach of the discovery deadline is insignificant given that there were two depositions scheduled for after the close of discovery. In the case of the post-deadline depositions, however, both parties agreed to schedule them after the close of discovery. The defendant did not agree to the post-deadline **[\*7]** submission of any expert reports. Furthermore, there is no evidence that the post-deadline depositions would have engendered further discovery, while it is nearly certain that an expert report will require further discovery, producing further breaches of the discovery deadline.

Plaintiff argues that his case will suffer severe damage if the court refuses to permit Dr. Wolfbein to testimony on the grounds that plaintiff's counsel failed to provide the opposition with Dr. Wolfbein's expert report until after the discovery deadline. Plaintiff contends that such a measure would be an unduly harsh sanction for a simple violation of a timing requirement. While exclusion of a witness is a fairly severe measure, it is warranted in this case.

Plaintiff had over ten months to determine what expert testimony would be necessary. Plaintiff's counsel notes that only after review of discovered information were they able to determine that Dr. Wolfbein's testimony would be advantageous. The documents about which Dr. Wolfbein would testify, however, were all in plaintiff's possession by July of 1994. That it took plaintiff's counsel over three months to determine the need for Dr. Wolfbein's testimony **[\*8]** can not justify the conduct. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Notably, when I asked counsel for both parties about the status of discovery during a pretrial conference on September 26, 1994, both sides indicated that expert reports had been exchanged. Plaintiff's counsel made no mention of calling Dr. Wolfbein and gave no indication that they were considering additional experts to those whose expert reports had already been exchanged.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Dr. Wolfbein's testimony relates entirely to the disparate impact of Scott Paper's employee rating plan on older employees. Although expert testimony regarding such a plan might well be a "key" part of a disparate impact ADEA claim, plaintiff has raised no disparate impact claim at any point in this litigation prior to the instant motion. In the complaint, plaintiff claims a violation of ADEA based on a disparate treatment theory only. As the Third Circuit Court of Appeals noted in Josey v. John R. Hollingsworth Corp., 996 F.2d 632 (3d Cir. 1993), [HN1]a trial court can bar a disparate **[\*9]** impact claim raised after the close of discovery. The Third Circuit upheld the trial court's conclusion that allowing the new theory would have prejudiced the defendant, as the new theory "would have different burdens and defenses from those under the disparate treatment claim." Id. at 642.

Plaintiff can not proceed under a disparate impact theory of liability, as he failed to raise this theory until after discovery and has never raised this theory in a complaint. Dr. Wolfbein's testimony will not be central to plaintiff's case, as it relates only to plaintiff's disparate impact theory, and plaintiff will not be prejudiced by his exclusion.

Defendant, on the other hand, would be severely prejudiced if Dr. Wolfbein were allowed to

Get a Document - by Citation - 67 Fair Empl. Prac. Cas. (BNA) 1010

Case 1:97-cv-00586-SLR    Document 434-4    Filed 10/21/2005    Page 8 of 20

Page 5 of 6

testify in this case. If Dr. Wolfbein were allowed to testify, the defendants would be forced to reopen discovery in order to depose the witness. Furthermore, the defendants likely would have to find a rebuttal expert, whose deposition the plaintiff would want to take. Discovery could continue for quite a while, especially if it proceeds at the pace of prior discovery in this case. With a trail date of early March, defendants **[*10]** would have only a matter of weeks to complete discovery on this new claim and develop their case. The mere fact that the deadline for submission of the pretrial memorandums has already passed and that both parties have already submitted their pretrial memorandums reveals the prejudicial effect of proceeding with such a course of action.

Defendant would be severely prejudiced if Dr. Wolfbein were allowed to testify because his testimony would only be relevant to plaintiff's newly conjured disparate impact theory. Plaintiff states a disparate treatment claim in his complaint. Plaintiff did not raise a disparate impact claim until after the passing of the discovery deadline. To force defendant to have to respond to a new theory of liability on which the defendant has taken little, if any, relevant discovery would be prejudicial to the defendant.

Conclusion

In Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894 (3d Cir. 1977), overruled on other grounds, Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir. 1985), aff'd, 482 U.S. 656, 107 S. Ct. 2617, 96 L. Ed. 2d 572 (1987), $^{HN2}$the Third Circuit Court of Appeals **[*11]** identified several factors to be considered in determining whether a belatedly announced witness may be excluded:

> "bad faith on the part of the party seeking to call [the witness]; ability of the party to have discovered the witness[] earlier; validity of the excuse offered by the party; willfulness of the party's failure to comply with the court's order; the party's intent to mislead or confuse his adversary; and [] the importance of the excluded testimony."

Id. at 904 (citations omitted). The Court noted that four basic considerations underlie these factors:

> "(1) the prejudice or surprise in fact of the party against whom the excluded witness[] would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling [the] witness[] would disrupt the orderly and efficient trial of the case ..., and (4) bad faith or willfulness in failing to comply with the court's order."

Id. at 904-05.

To allow the plaintiff to call Dr. Wolfbein as a witness in this case would be severely prejudicial to the defendant. Furthermore, given the fact that the trial is only a matter of weeks away, the defendant would **[*12]** be unlikely to cure this prejudice without seeking a

Get a Document - by Citation - 67 Fair Empl. Prac. Cas. (BNA) 1010    Page 6 of 6

Case 1:97-cv-00586-SLR    Document 434-4    Filed 10/21/2005    Page 9 of 20

continuance of the trial. This case has already dragged on well beyond the original trial date, and the original trial date has been pushed back many times already. Another delay of this trial is not warranted. Although plaintiff does not appear to be guilty of bad faith or willful disregard of a court order, plaintiff has not offered a substantial justification for his failure to identify Dr. Wolfbein and provide his expert report within the discovery period.

For the foregoing reasons, plaintiff's motion is denied and Dr. Wolfbein will be prohibited from testifying at trial. An appropriate order follows.

ORDER

Upon consideration of the plaintiff's Motion to Call Dr. Seymour Wolfbein as an Expert Witness at Trial, and defendant's reply thereto,

It is ORDERED that the motion is denied; Dr. Seymour Wolfbein will be prohibited from testifying at trial in this case.

BY THE COURT:

Donald W. VanArtsdalen, S.J.

February 1, 1995

Service: **Get by LEXSEE®**
Citation: **1995 U.S. Dist. LEXIS 1249**
View: Full
Date/Time: Wednesday, October 19, 2005 - 12:15 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 6



Not Reported in A.2d

Not Reported in A.2d, 1990 WL 186446 (Del.Ch.), 59 USLW 2371

**(Cite as: 1990 WL 186446 (Del.Ch.))**

Page 1

▷
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
SMITH
v.
SHELL PETROLEUM, INC.
**Civ. A. No. 8395.**

Submitted: July 20, 1990.
Decided: Nov. 26, 1990.
Clark W. Furlow, Susan L. Parker, Lassen, Smith, Katzenstein & Furlow, Wilmington.

Richard L. Sutton, William O. LaMotte, III, Thomas C. Grimm, Luke W. Mette, Morris, Nichols, Arsht & Tunnell, Wilmington.

DECISION ON THE REMEDY AFTER TRIAL

HARTNETT, Vice-Chancellor.

*1 Still to be addressed in this suit is the appropriate relief to be awarded to the plaintiff Class following this Court's June 19, 1990 decision that the June 10, 1985 disclosure documents sent by defendant SPNV Holdings, Inc., now Shell Petroleum, Inc., to the former minority shareholders of Shell Oil Co. in connection with the June 7, 1985 cash-out merger contained material misdisclosures and omissions in violation of defendant's duty of complete candor.

Because the possible remedies were not adequately addressed in the post-trial briefs, the parties were directed to briefly submit suggestions as to potential remedies. See *Smith v. Shell Petroleum, Inc.,* Del.Ch., C.A. No. 8395-NC, Hartnett, V.C. (June 19, 1990), slip op. at 65.

After considering all the facts and circumstances, the Court finds that $2 per share should be paid to the shareholders who were sent the defective disclosure materials and have not sought an appraisal.

I
As its preferred remedy, defendant suggests that the Class members, after receiving supplemental disclosures from the defendant, should be required to promptly make an election either to continue to retain the merger consideration which they have already received or to give it up and receive a sum equal to the value of the Shell shares which this Court will determine in the pending appraisal proceeding, *In re Appraisal of Shell Oil Co.,* Del.Ch., C.A. No. 8080-NC. Under defendant's proposal, if the Class members choose to elect to receive the value as will be established in the appraisal action, they would have to return the merger consideration, with appropriate interest, at the time they make the election. If the members of the Class elected to return the merger consideration, with interest, they would eventually receive an amount equal to the net appraisal award, including any interest which may (or may not) be awarded, after the appraisal action (and perhaps any appeal) is concluded. Defendant claims that because the determination of the appraised value is *sub judice* and could be higher or lower than the merger consideration already received by the members of the Class, its proposed remedy is appropriate because it will give the Class members no more nor less than those who are entitled to an appraisal will receive.

The defendant further suggests that the supplemental disclosure information should include: (1) the June 19, 1990 Opinion in this matter; (2) a corrected version of the disclosures found to be misleading in the June 19, 1990 Opinion; (3) all previous disclosures regarding the cash-out merger; and (4) a description of the election being offered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1990 WL 186446 (Del.Ch.), 59 USLW 2371

(Cite as: 1990 WL 186446 (Del.Ch.))

Page 2

and the risks involved, including the uncertainty in amount and timing, which is inherent in electing to seek an appraisal.

Defendant also proposes two other possible alternative remedies. First, defendant requests that if its favored remedy is rejected, a trial relating to the appropriate remedy be held because it asserts that there is no other evidentiary basis for ascertaining damages. Such a trial, defendant contends, would have to consider the following factors:

*2 "1) The extent to which shareholders generally do elect an appraisal and the number of shareholders who chose appraisal here.

2) The extent of any causal relationship between the Court's disclosure findings and an actual change in decision for a 'reasonable' shareholder in the context of all of the material information properly supplied to the Class.

3) The effect of the 'primary' error was incorrectly to reduce a Company discounted estimated, future net cash flow ("DCF") of proved and probable reserves by approximately $1 billion or only about $3 per share. Even when corrected for that about $3 primary error, the 1985 DCF would still be about $9 per share (or about $3 billion) *lower* than the *comparable* Company 1984 DCF calculated when Goldman Sachs and the Special Committee determined that $70 was fair. PX 24 p. I-18.

4) The disclosure defects relate to liquidation analysis, only one of the valuation factors to be considered in an appraisal context.

5) An identifiable, substantial segment of the Class did not use the disclosure materials to make a choice of either appraisal or the extra $2 per share offered in lieu of appraisal.

6) The effect of the Class already having been offered $2 in settlement of appraisal claims.

7) The effect of having for five years the use of $60.

8) The 'inadvertence' of the primary error."

As a "last resort" remedy, the defendant proposes that the Class be decertified in accordance with a reservation made by the defendant in the Class Certification Order of September 1989. Defendant asserts that such an approach would then allow each Class member's claim for damages to be addressed in light of the particulars of its individual circumstances regarding causation and the amount of damage sustained, if any, despite that this would involve the testimony of thousands of former stockholders.

II

Plaintiffs counter that the appropriate remedy is for the Court to automatically award to the Class the difference between what they have already received as the merger consideration and the fair value of their shares as will be determined by this Court in the pending Shell appraisal proceeding. Plaintiffs contend that the Class should not be required to perform any "mechanical steps," such as revoking their prior tenders or demanding or electing appraisal prior to this Court's ruling on fair value in the appraisal action. This optimistically reflects plaintiffs confidence that the appraisal price, when it is determined by this Court, will be greater than the merger price. Plaintiffs argue that any requirement that a stockholder rescind his acceptance of the merger consideration would be inappropriate because in such a case Royal Dutch (SPNV Holdings' parent company) would have an opportunity "to again dissuade a sizeable number of shareholders from receiving fair value for their shares."

After reviewing the remedies proposed by the parties, the Court finds that none of them are appropriate.

III

Plaintiffs' proposed remedy (damages consisting of the difference between the sums already received by the members of the Class from their acceptance of the merger consideration, and the fair value of the Shell stock as determined in the pending appraisal proceeding), is rejected as being unfair and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 3

Not Reported in A.2d, 1990 WL 186446 (Del.Ch.), 59 USLW 2371

**(Cite as: 1990 WL 186446 (Del.Ch.))**

unsupported under Delaware law and the facts of this case.

*3 Under the Delaware appraisal statute, 8 *Del.C.* § 262, a shareholder deciding to seek an appraisal must forgo the merger consideration until after the appraisal action is completed. He therefore forgoes the use of his money while the appraisal action is pending. A shareholder seeking an appraisal also faces the risks inherent in such an action--such as, the likely long duration of the appraisal proceeding and the possibility that the Court may determine the fair value to be less than the merger consideration. He likewise must face the real possibility that because only a relatively few stockholders will seek an appraisal, it will not be economically feasible to mount an effective legal battle. In addition to considering whether the merger price is fair, he must weigh his own tax situation and his economic and investment goals and opportunities.

Plaintiffs' proposed remedy ignores these factors. Under the plaintiffs' proposal, the Class members would be far better off than those shareholders who actually elected to seek an appraisal in strict compliance with 8 *Del.C.* § 262, because the Class members have had the use of the merger consideration for over 5 years, without assuming any of the risks inherent in seeking an appraisal. Such a result would be unfair and cannot be reconciled with the statutory appraisal scheme under 8 *Del.C.* § 262.

In addition, plaintiffs' proposed remedy is apparently based on the mistaken assumption that all Class members would have sought an appraisal if Holdings had properly disclosed all material information in the June 10, 1985 disclosure documents. In light of the history of this case, however, such an assumption is clearly an over-generalization, which is not supported in the record.

In *Joseph v. Shell Oil Co.,* Del.Ch., 482 A.2d 335 (1984), this Court ordered that additional disclosures be made (including the existence of a $91 per share valuation) and that shareholders who had previously tendered be given the opportunity to

rescind their tender. However, only 1/2 of 1% (about 363,000 out of 78,277,566 shares) of the tendered shares were withdrawn after receipt of the revised disclosure documents. The low percentage of shares withdrawn after receipt of the revised disclosures indicates that, although the additional information disclosed was "material" in the legal sense of promoting full disclosure, there was little direct causal relationship between that information and the decision whether to tender.

That result is analogous to the present issue; yet plaintiffs' proposed remedy effectively assumes, without proof, a direct cause and effect relationship between the defective disclosure documents and each Class member's economic decision not to seek an appraisal. That assumption is unsound because, as indicated, there are numerous factors that influence a shareholder's decision to seek an appraisal (or accept the cash-out merger consideration) other than the quality of the disclosures made.

*4 In this case, the Court must additionally take into consideration that the primary disclosure violation was an inadvertent undervaluation of Shell's proved oil reserves. The value of proved oil reserves, by their very nature, is a matter of differing opinions. It seems highly likely that even if those shareholders of Shell who chose not to seek an appraisal in response to the June 10, 1985 disclosure documents had been provided with completely accurate disclosures, most of them would still have decided to accept the cash-out merger price rather than seek an appraisal. See *Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642-NC, Brown, C. (Jan. 30, 1985), slip op. at 23, *aff'd,* Del.Supr., 497 A.2d 792 (1985) (Order).

IV

Defendant's remedy proposals are also unfair. Defendant's primary proposal would allow the defendant to issue supplemental disclosure documents correcting the prior mistakes but would force the plaintiff Class members to decide whether to retain the merger consideration or to return it with appropriate interest, and then receive an amount equal to the net appraisal award, including

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1990 WL 186446 (Del.Ch.), 59 USLW 2371

**(Cite as: 1990 WL 186446 (Del.Ch.))**

Page 4

appraisal interest, if any.

Defendant's redisclosure remedy proposal would be unfair to the Class because the harm to the plaintiff Class occurred in June 1985 when Holdings inadvertently breached its fiduciary duty in making its disclosures and as a result the Class was denied the opportunity to make a fully informed decision whether to accept the cash-out merger consideration or to seek an appraisal.

Arguably, if it were still 1985, shortly after the cash-out merger, a redisclosure of accurate information might be a fair remedy to restore the opportunity lost by shareholders to make an informed choice in June, 1985. This was the procedure followed in *Joseph v. Shell Oil Co.,* Del.Ch., 482 A.2d 335 (1984). Over five years later, however, financial conditions and tax laws have changed, people have retired, died, and reinvested money in other enterprises, among other things. Defendant's proposal also assumes that a stockholder who would desire to rescind after receiving the additional disclosures would be financially able to return the sums received plus interest. Clearly, the defendant's plan would penalize the shareholders by forcing them to make a new election under conditions substantially different from June, 1985. It would also delay indefinitely a final decision in the appraisal action which has been pending for over five years.

In addition, the defendant's primary redisclosure remedy would be unfair because it would undermine a defendant's disclosure duties. Under defendant's theory, a majority shareholder (such as SPNV Holdings) could fail to properly comply with its fiduciary duty to disclose all material information, and then merely issue corrective disclosures five years later. Under such a scenario, majority shareholders would be less likely to meet their disclosures obligations. Furthermore, the defendant has not cited any authority indicating that its proposed redisclosure remedy is fair or reasonable.

**\*5** The defendant's two alternative remedies are also unsound, on their face, and, consequently, are

rejected.

V

Because the remedies proposed by the parties have been rejected, this Court must devise its own remedy. In doing so this Court, as a Court of Equity, must strive to find an equitable remedy and it traditionally has had broad discretion in doing so. *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497 (1981); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 714 (1983); *Wilmont Homes, Inc. v. Weiler,* Del.Supr., 202 A.2d 572 (1964); *Lichens Co. v. Standard Commercial Tobacco Co.,* Del.Ch., 40 A.2d 447 (1944).

Of particular importance in this case is that the primary disclosure violation was inadvertent and the disputed short-form merger was completed over five years ago. Rescission of the transaction therefore would be neither practicable nor equitable. *Smith v. Shell Petroleum, Inc.,* Del.Ch., C.A. No. 8395-NC, Hartnett, V.C. (June 19, 1990), slip op. at 65. See also DOBBS *Handbook on the Law of Remedies* § 256 (1973).

The injury has been proven here with certainty because the shareholders were deprived of their right to make an informed decision regarding a corporate transaction because of a disclosure failure. There is therefore ample precedent for awarding monetary damages to the Class. *Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642-NC, Brown, C. (Jan. 30, 1985), *aff'd,* Del.Supr., 497 A.2d 792 (1985) (Order); *In re: Tri-Star Pictures, Inc. Litigation,* Del.Ch., C.A. No. 9477-NC (Cons.), Jacobs, V.C. (June 14, 1990); DOBBS, supra.

*Weinberger* indicates, however, that where the harm consists solely of minor disclosure violations unaccompanied by any direct clearly discernible financial injury, the damage recovery may, in the court's discretion, be minimal. *Tri-Star,* supra, slip op. at 19. In *Weinberger,* the Court awarded damages of $1 per share. *Weinberger,* supra, slip op. at 26.

The primary disclosure violation in this case

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 1990 WL 186446 (Del.Ch.), 59 USLW 2371

**(Cite as: 1990 WL 186446 (Del.Ch.))**

occurred because the defendant failed to disclose the existence of proved oil and gas reserves having a value of approximately $1 billion. This equals approximately $3 per share. The understatement of proved reserves by approximately $1 billion, however, does not necessarily translate into an increase in the overall value of Shell Oil Company by $3 per share because of the many uncertainties regarding production of the oil (such as costs to produce the oil, oil prices, etc.).

The Court therefore finds that $2 per share is an appropriate measure of damages to be awarded to the plaintiff Class, especially because there were also other minor disclosure violations in the 1985 disclosure documents which were "indicative of a conscious decision of the defendant to be less than candid." *Smith v. Shell Petroleum, Inc.,* Del.Ch., C.A. No. 8395-NC, Hartnett, V.C. (June 19, 1990), slip op. at 49.

An appropriate order may be submitted.

Not Reported in A.2d, 1990 WL 186446 (Del.Ch.), 59 USLW 2371

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

9-FALL DELAW 15                                                                 Page 1
9-FALL Del. Law. 15
(Cite as: 9-FALL Del. Law. 15)

c

Delaware Lawyer
Fall, 1991
**\*15** WHY DELAWARE LEADS IN THE UNITED STATES AS A CORPORATE DOMICILE
[FNd1]
Rodman Ward, Jr., Erin Kelly [FNa1]

Copyright 1991 by the Delaware Bar Foundation; Rodman Ward, Jr. and Erin Kelly

**The following article will also appear in the Japanese publication, Mergers &**
**Acquisitions Report.**

A Japanese company that wants to acquire a United States company or operate a United States subsidiary typically forms a corporation in the United States to act as its vehicle. Under the United States federal system of government, corporation law, that is, the body of law that governs the creation and internal governance of corporations, is, for the most part, established by the individual states. Each of the fifty states has its own corporation code to regulate its corporate citizens. Thus, in setting up an acquisition or operating company, a business person will have to decide where to incorporate among the 50 United States. While a small operating company or wholly intrastate operation tends to incorporate in the state of its principal place of business, Delaware has long been viewed as the most popular jurisdiction of incorporation for holding companies and multi-state corporations.

Over 200,000 companies are now incorporated in Delaware, including more than half of the 500 largest United States industrial corporations. In fact, more large companies have incorporated in Delaware than in all other states combined. Delaware is the chartering state for over 40% of the companies listed on the New York Stock Exchange and for 37% of the companies listed on the American Stock Exchange. Since 1965, over 80% of the companies changing their states of incorporation have moved to Delaware.

Moreover, many acquirors, both domestic and international, form Delaware subsidiaries to accomplish acquisition transactions. Two prominent examples involving Japanese acquirors are Sony/Columbia Acquisition Corp., a Delaware subsidiary of Sony USA, which was incorporated in September 1989 to effectuate the acquisition of Columbia Pictures, and Yamanouchi Acquisition Corp., which was incorporated in Delaware in March 1989 as a vehicle to acquire Shaklee Corporation.

WHY DELAWARE?

Historical Development

The question many people, including many Americans, ask is: why do so many companies choose Delaware as their domicile? In part, the answer is a matter of historical accident. In 1896, Delaware's neighboring state of New Jersey adopted the first modern corporation law. A great number of major interstate corporate enterprises, such as Standard Oil (now Exxon), Du Pont and U.S. Steel (now USX), were incorporated in New Jersey. In 1899, a group of New York lawyers wanted to create an alternative to New Jersey incorporation should problems arise in that state. These lawyers persuaded Delaware to enact the Delaware General Corporation Law or, in short, "DGCL". The DGCL closely paralleled the then existing New Jersey statute.



In 1913, New Jersey's governor, Woodrow Wilson, in a populist and reforming *16 mood, encouraged changes in New Jersey's corporate code to increase internal regulation and increase taxes. The large companies reacted quickly: within a few years, nearly all the major New Jersey corporations had migrated to Delaware. History knows Wilson as the 28th President of the United States, and a great supporter of the League of Nations. Delawareans have good reason to appreciate his achievements for one additional reason.

Delaware Strives to Maintain Its Prominence

Delaware did not repeat Wilson's mistaken foray into corporate reform. Instead, Delaware retained its law in the spirit in which it was enacted, and refined it. As a result Delaware has continued to this day as the major corporate domicile for larger American corporations. Delaware's continued success may be attributed to three essential factors: its flexible and current corporate statute; its expert judiciary whose many considered and consistent interpretations of the DGCL over the years have imbued the statute with certain and predictable meaning; and the commitment on the part of the State to promote Delaware incorporations and service to its corporate citizens.

The Statute

Delaware has maintained the DGCL as a practical and up-to-date statute. The most comprehensive revision of the law occurred in 1967, at which time the statute was given a very careful review and modernization. Most of the changes further simplified procedural requirements for filing and record keeping. Certain substantive changes made the law the most advanced in the nation. Examples of such changes were the elimination of stockholders' preemptive rights except when explicitly adopted by the stockholders, the validation of interested director transactions that do not injure the corporation, the broadening of the power of corporations to indemnify wrongfully accused directors, and the facilitation of various forms of merger transactions. Since 1967, with the exception of anti-takeover legislation and permitted exoneration by stockholders of directors for gross negligence, amendments to the DGCL have been restricted to fine tuning.

A group of skilled Delaware corporate lawyers, representing the State's major law firms, constitute a Corporation Counsel which is vigilant in keeping the DGCL current. The Council monitors existing statutes, determines evolving needs and, when required, drafts amendments to the DGCL to recommend to the State legislature. Proposed amendments are reviewed and approved by the Bar Association's Executive Committee and introduced into the Delaware legislature by a bipartisan group of State legislators. Although debate takes place and the legislature questions the Committee, the credibility of the Delaware State Bar Association is very high and the amendments are usually adopted in the form in which they are proposed.

The Expertise of the Court of Chancery

Efforts have been made in other states to copy the DGCL and, in fact, many of the DGCL's statutory provisions are available in other states. Indeed, Nevada has adopted the DGCL outright, changing only its name. What other states have not successfully duplicated, however, and what remains perhaps the most significant factor distinguishing the Delaware corporate law is its expert judiciary, which has been called upon to interpret virtually every provision of the DGCL and has done so in a careful and consistent fashion. In a common law system, the existence of consistent reliable precedent is of great importance, and most litigants in corporate cases want sound, impartial, and predictable results.

Unlike most states, Delaware retains the bifurcated court system extant in England at the time of the American Revolution. Delaware has both a law court, with jurisdiction to decide claims for money damages, and an equity court, the Court of Chancery, empowered to decide claims for equitable remedies, such as injunctions and accountings, and to decide disputes related to relationships of special trust, such as fiduciary relationships. Because directors and officers historically were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

considered fiduciaries for the stockholders and because many corporate cases seek the equitable remedies of injunctions or accountings, over the years a number of corporate law cases gravitated to the Court of Chancery. In addition, an increasing number of provisions of the DGCL explicitly granted enforcement jurisdiction to the Court of Chancery. From the early 1900's until today, the Court has written literally thousands of opinions interpreting the DGCL and defining the duties and obligations of directors. These are far more corporate cases than have been decided in any other state.

The Delaware Chancery Court now consists of a Chancellor and four Vice Chancellors. The judges are appointed by the Governor of the State of Delaware for twelve year terms and are confirmed by the State Senate. There is a long tradition of reappointing judges who have achieved a reputation of competence, upon the completion of their first, or second terms. Upon taking office, each judge, if not already steeped in the tradition of the Court, the DGCL, and case law interpreting it, rapidly becomes so. Delaware's court of last resort is its Supreme Court. Members of that court, too, are appointed by the Governor for twelve year terms. Of its five justices, three may be considered expert in corporation law and the remaining two are quite knowledgeable in the field. Both the Court of Chancery and the Supreme Court are experienced in deciding corporate matters and understand the national impact of their decisions.

In contrast, in other states, corporate questions go in the first instance to judges who, because of the unity of their court systems, must deal with contract, tort, and criminal law claims as well. The diversity of their dockets precludes the bench as a whole from developing the special expertise in corporate matters that is found in Delaware. These other states have a paucity of court opinions interpreting their corporate statutes, and, often, the judicial interpretations that do exist do not afford the same level of certainty and predictability to practitioners using their corporate codes. Other states also frequently have elected judges who are highly political in their outlook.

Moreover, unlike the judiciaries of larger or more populous states with more crowded dockets, Delaware courts routinely provide prompt judicial resolution of corporate disputes. The courts permit expedited treatment of many corporate cases and have developed a facility for dealing with complex corporate matters in a very short time. A great many of the hostile takeover battles during the 1980's were decided by the Delaware courts in an expedited fashion. For example, in 1988, the British publisher, Robert Maxwell, bid in an auction for the sale of Macmillan Publishing Company. When Maxwell, a victim of a corrupted auction, initially lost the bidding to Kohlberg, Kravis & Roberts ("KKR"), he filed suit in the Court of Chancery. Through its expedited procedures the Delaware court system heard and resolved the dispute in just over one *17 month. The court condemned the auction process and awarded Macmillan to Maxwell just before the KKR transaction was to close. Other major expedited cases resolved in this period include disputes related to RJR Nabisco, Revlon, Paramount/Time Inc., Unocal/Mesa Petroleum, Polaroid, and many others. Outside the takeover process, however, most Delaware corporations do not find themselves in litigation. The process of decision in the litigated cases has so refined the law that business planners may usually order their affairs to avoid law suits.

Delaware's Commitment to Serving Its Corporate Citizens

As the DGCL and the Delaware judiciary gained recognition among corporate practitioners nationwide, the State itself recognized almost from the beginning that the revenues derived from incorporation could become a vital part of Delaware's economy. The State undertook to support and promote the efficiency of incorporation. Delaware's Secretary of State developed an expert Division of Corporations to serve Delaware's corporate citizens. Delaware has also sought to promote Delaware incorporations among international businesses. To this end, the State employs representatives in Tokyo, London, and the Hague who serve as contacts for business people interested in establishing Delaware companies.

The State has profited from the efforts. Since 1967, the Division's annual corporate franchise revenues have increased from

Westlaw.

9-FALL DELAW 15
9-FALL Del. Law. 15
(Cite as: 9-FALL Del. Law. 15)

about $18 million to in excess of $183 million, which represents about 16% of the state's total budget.

Delaware's Division of Corporations strives to accommodate fast-paced corporate transactions and is often the first to offer innovations in corporate services. The Division is the only state corporate department that puts all corporate filings on line immediately after they are filed via a computer scanner. This allows for more efficient access to and prioritizing of corporate documents. So that filings may be handled promptly, the Division is staffed from 8:00 a.m. until midnight. Corporate documents may be cleared in advance to insure that they are acceptable for filing and may be filed by facsimile. The Division also offers a "Special Service Department" that guarantees same-day or next-day service.

The Division insures that the simple incorporation process set out in the DGCL may be accomplished quickly. **18** Corporations are incorporated by "incorporators", who, under the DGCL, may be natural persons, partnerships, associations, or corporations. Incorporation is accomplished by filing a certificate of incorporation, signed by the incorporator(s), with the Division of Corporations. The certificate must include, among other things, the name and address of the corporation's "registered agent". A registered agent acts as the corporation's agent in Delaware and is the only Delaware presence that a corporation is required to have. The agent is authorized by the DGCL to accept service of legal papers for the corporation. Most Delaware corporations that operate outside the State engage one of the many professional registered agents who operate in Delaware. The Corporation begins its existence on the day the certificate is filed. The incorporators may then meet to adopt bylaws, elect directors and do any other further acts to perfect the organization of the corporation.

[FNd1]. The reasons for Delaware's preeminence in corporation law are largely institutional. In an area in which results frequently confuse and concern business people, Delaware is an island of efficiency, competence, and predictability. Of course, any institution is subject to criticism and Delaware's legislature and judiciary have received their share, some of it valid. Because the corporation law is so important to the state and its economy, Delaware heeds its critics and makes appropriate reforms. Time is the best test of an institution and, over time, Delaware's law has earned respect and emulation. Such success is not dramatic but the result of careful, conservative, long time attention.

[FNa1]. Mr. Ward is a partner and Ms. Kelly an associate in the Wilmington, Delaware office of the international law firm of Skadden, Arps, Slate, Meagher & Flom.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.