# C
# Part 1

Westlaw.

Not Reported in A.2d    Page 1
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
CANTOR FITZGERALD, L.P. Plaintiff,
v.
Iris CANTOR, et al., Defendants.
Iris CANTOR and Cantor Fitzgerald Incorporated, Third-Party Plaintiffs,
v.
CANTOR FITZGERALD GROUP MANAGEMENT, INC., Third-Party Defendant.
No. 16297.

March 13, 2000.

Rodman Ward, Jr., Thomas J. Allingham II, Karen L. Valihura, Martina Bernstein, Rosemary S. Goodier and Leonard P. Stark of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Of Counsel: Thomas J. Schwarz, Joseph M. Asher and Joseph De Simone of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York. Attorneys for Plaintiff.
Stephen E. Jenkins and Richard I.G. Jones, Jr. of Ashby & Geddes, Wilmington, Delaware. Attorneys for Defendants. Of Counsel: Barry I. Slotnick, Michael Shapiro and Joshua T. Rabinowitz of Slotnick, Shapiro & Crocker, LLP, New York, NY. Attorneys for Defendants Iris Cantor and Cantor Fitzgerald Incorporated. Jack C. Auspitz, Howard E. Heiss, Jamie A. Levitt of Morrison & Foerster, LLP, New York, NY. Attorneys for Defendant Market Data Corporation. Saul B. Shapiro, Marc S. Reiner and Susanne E. Rosenberg of Patterson, Belknap, Webb & Tyler LLP, New York, NY. Attorneys for Rodney Fisher.

MEMORANDUM OPINION

STEELE, V.C.
*1 A Delaware corporation enters into a licensing agreement to provide software for the brokerage of U.S. Treasury securities. Its Chief Executive Officer and controlling shareholder are members of its Board of Directors as well as limited partners in a Delaware partnership whose core business is the brokerage of U.S. Treasury securities. In addition to other less salient claims, the partnership alleges that the limited partners have breached a contractually created fiduciary duty of loyalty. May the partners of a Delaware limited partnership agree in their partnership contract that all partners, including those limited partners who do neither manage, operate nor govern the partnership, should be subject to a fiduciary duty of loyalty? For the reasons below I conclude that they may. The limited partners have breached those fiduciary duties imposed upon them by contract and the corporate vehicle they used for this purpose aided and abetted those breaches and tortiously interfered with the Partnership Agreement. While I conclude that the partnership fails to carry its burden of persuasion that injunctive relief, other equitable relief, and ancillary monetary damages are appropriate to remedy its complaints of wrongdoing, the partnership *is* entitled to declaratory relief and an award of attorney's fees for an egregious breach of the partnership agreement.

I. Background

A. The Parties

Plaintiff Cantor Fitzgerald, L.P. ("CFLP" or the "Partnership") is a Delaware limited partnership that owns 99.5 % of Cantor Fitzgerald Securities, a New York general partnership. Through this affiliate, CFLP is a leading inter-dealer and institutional broker of U.S. Treasury securities ("Treasuries") and other government securities. Counterclaim defendant CF Group Management, Inc. ("CFGM"), a New York corporation, serves as CFLP's managing general partner. Howard Lutnick ("Lutnick"), CFLP's President and Chief Executive Officer owns and operates CFGM.

Defendant Cantor Fitzgerald, Incorporated ("CFI"), a Nevada corporation, served as CFLP's managing general partner until January 2, 1996. CFI is a CFLP limited partner. Defendant Iris Cantor ("Cantor") is CFI's Chief Executive Officer and is the trustee of the Iris Cantor Trust, CFI's controlling shareholder. Under CFLP's partnership agreement dated August 28, 1996, (the "1996 Partnership Agreement"), Cantor is also a CFLP limited partner.

In 1987, CFLP's predecessor spun-off its Workstation Research Department to create Defendant Market

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00586-SLR   Document 445-3   Filed 11/23/2005   Page 3 of 15

Not Reported in A.2d                                                                                                      Page 2
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

Data Corporation ("MDC"), a Delaware corporation. Cantor is a member of MDC's Board of Directors and, as trustee of the Iris Cantor Trust, votes MDC's controlling shares. Defendant Rodney Fisher ("Fisher") is a shareholder of MDC and serves as its Chairman and Chief Executive Officer. He is also a CFLP limited partner. MDC is not a CFLP partner. Lutnick, also a shareholder of MDC, served on MDC's Board of Directors until June 1996.

### B. Cantor Fitzgerald's Formative Years & the Development of its Data Business

*2 Iris Cantor's late spouse B. Gerald ("Bernie") Cantor founded Cantor Fitzgerald FN1 in 1945. In 1972, Cantor Fitzgerald acquired Telerate Systems, Inc. ("Telerate"). Through Telerate, Bernie Cantor created the practice of putting live bids and offers for government securities over a network, a practice referred to as "screen brokerage." Screen brokerage enabled market participants to see, in real time, the prices at which trades occurred. The advent of screen brokerage dramatically altered the Treasuries industry and positioned Cantor Fitzgerald as the world's leading broker of Treasuries.

> FN1. "Cantor Fitzgerald" refers to the family of companies, other than MDC, owned or controlled by Bernie Cantor prior to the formation of CFLP in September 1992.

In the mid-1980s Cantor Fitzgerald hired Fisher, formerly an employee of Telerate. With Andrew Seidel, another Cantor Fitzgerald employee, Fisher identified a business opportunity for Cantor Fitzgerald: to perform simple calculations on bids and offers displayed over the Telerate system and to sell the resulting information to the financial community. Bernie Cantor, intrigued by the business' prospects, housed the business in Cantor Fitzgerald's Workstation Research Department.

### C. Cantor Fitzgerald Spins-Off its Workstation Research Department to Form MDC

In 1987, Cantor Fitzgerald spun-off its Workstation Research Department to form MDC. At the time Cantor Fitzgerald established MDC as an independent company, MDC engaged in a data enhancement business, selling information provided to it by Cantor Fitzgerald. MDC obtained information automatically provided by Cantor Fitzgerald's customers as they made trades through Cantor Fitzgerald and repackaged it into a useable form then sold to third parties.

The parties dispute the reason why Cantor Fitzgerald decided to spin-off its Workstation Research Department. CFLP maintains that Cantor Fitzgerald spun-off the Department to enhance its profitability and to avoid customer backlash. According to this theory, some of the customers who purchased data from the Department were the very same customers who provided the data, in raw form, for free by executing their trades through Cantor Fitzgerald. The continuation of this data enhancement business as part of Cantor Fitzgerald allegedly concerned dealers who feared that the dissemination of trading data would create pressure to narrow the "spread" between bids and offers and thereby reduce their profits. According to CFLP, transforming the Department into an independent MDC would preserve Cantor Fitzgerald's ability to profit from its data while making it easier to sell the data to its customers and reducing the risk of customer and dealer backlash.

Defendants, however, maintain that Cantor Fitzgerald spun-off the Workstation Research Department to enable the Department to conduct business with the entire financial community including Cantor Fitzgerald's competitors, many of whom would not conduct business with the Department while it was controlled by Cantor Fitzgerald. I do not consider the reasons for the spin-off proffered by CFLP and the Defendants to be inconsistent. Both proffers, taken together, are consistent with the goal of maximizing the Department's profits. Accepting Defendants' proffer does not, however, lead to the conclusion that CFLP spun-off the data enhancement business so that the new entity, MDC, could compete directly with Cantor Fitzgerald in its core line of business, brokering Treasuries. It does lead to the inescapable conclusion that, at that time, Cantor Fitzgerald did not object to data enhancement transactions with its competitors when the transactions were profitable and did not threaten harm to its core business.

### D. Formation of CFLP

*3 Until 1992, CFI operated as the holding company for Cantor Fitzgerald's businesses. On September 25, 1992, CFI, whose sole shareholders were Bernie and Iris Cantor, transferred essentially all of its assets to a new entity, the limited partnership CFLP, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00586-SLR    Document 445-3    Filed 11/23/2005    Page 4 of 15

Not Reported in A.2d                                                                                              Page 3
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

exchange for a significant ownership interest in CFLP. FN2 CFI became CFLP's initial Managing General Partner. CFI and CFGM were CFLP's only general partners. Bernie Cantor, other members of the Cantor Family, senior executives and employees of Cantor Fitzgerald and trusts set up by Bernie or Iris Cantor for family members held CFLP's limited partnership interests. FN3 The partners amended CFLP's partnership agreement several times between 1992 and 1996.

> FN2. Agreement of Limited Partnership of Cantor Fitzgerald, L.P., dated as of September 25, 1992, Section 6.01(b).
>
> FN3. Tr. Trans. Vol. II at 322; Pretrial Order at 10.

E. The 1996 Litigation, Settlement Agreement and Amendments to the Partnership Agreement

In January 1996, following procedures set forth in Section 3.01(g) of the Agreement of Limited Partnership of Cantor Fitzgerald, L.P. dated May 23, 1995 ("1995 Partnership Agreement"), a committee of five persons selected by CFI determined that Bernie Cantor was "Incapacitated." Section 3.01(f) of the 1995 Partnership Agreement provided that, upon such a determination, CFGM would replace CFI as Managing General Partner with day-to-day control of CFLP and CFI would become a Co-Managing General Partner. Iris Cantor disputed the committee's determination.

The parties litigated the dispute in this Court and, on May 7, 1996, resolved their legal differences by entering into a settlement agreement after one day of trial (the "1996 Settlement Agreement"). The 1996 Settlement Agreement released their claims against each other and provided, *inter alia*, that CFI would withdraw as Managing General Partner and as a General Partner and would become "a Limited Partner for all purposes under the Partnership Agreement; *provided however* that CFI shall not thereby be deemed to have "withdrawn" for purposes of Section 9.02(d) of the Partnership Agreement." FN4 CFGM became CFLP's sole Managing General Partner.

> FN4. 1996 Settlement Agreement ¶ 1 (emphasis in original). Section 9.02(d) of the 1995 Partnership Agreement states that a General Partner who has withdrawn from the Partnership may elect to have its General Partner Units converted into Limited Partner Units or to have its interest redeemed. It also states the consequences and conditions attached to either election.

The parties to the 1996 Settlement Agreement agreed to amend the existing Partnership Agreement to reflect the terms of the 1996 Settlement Agreement. FN5 CFGM authored the amendments and the resulting Agreement became the 1996 Partnership Agreement, which remains in effect at this time.

> FN5. Section 2(d) of the 1996 Settlement Agreement provides that "the parties agree to take all steps necessary or appropriate to implement and effectuate the provisions of this Section 2, including executing such amendments to the Partnership Agreement not inconsistent with the terms of this Agreement as the Managing General Partner shall reasonably request.... To the extent applicable, this Agreement shall itself be deemed an amendment to the Partnership Agreement."

F. MDC's Dealings with Chicago Board Brokerage

On June 4, 1996, MDC held a board meeting to discuss the possible provision of broker system software to third parties. According to the draft minutes of the meeting, Lutnick stated that "MDC's pursuit of these opportunities would be harmful to Cantor Fitzgerald ." FN6 The final minutes reflect that he stated that "MDC's pursuit of these opportunities would be a negative for Cantor Fitzgerald." FN7 By fax and regular mail dated June 11, 1996, Lutnick sent a one sentence letter to Iris Cantor which stated: "I hereby resign from the Board of Directors of Market Data Corporation effective immediately." FN8

> FN6. PX56 at MDC030546.
>
> FN7. PX57 at MDC031209.
>
> FN8. DX899.

*4 Defendant Fisher testified that MDC did not pursue the proposed business deals in the forms discussed at the June 4, 1996, meeting. FN9 But CFLP soon heard rumors that some of the parties identified as possible business partners at the June 4,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

Page 4

1996, meeting were discussing development of an interactive trading system . FN10 Between October 1997 and March 1998, CFLP executives visited trade shows where MDC promoted a product it touted as its Market Trader Broker System. FN11

FN9. Tr. Trans. Vol. XXXII at 6082-83.

FN10. Pretrial Order at 11; DX86 No. 13; DX93 No. 52.

FN11. Pretrial Order at 11.

In October 1997, CFLP's general counsel, Stephen M. Merkel, sent a letter to Cantor informing her that CFLP understood MDC was "designing an electronic trading system for U.S. Government Securities in cooperation with the Chicago Board of Trade" and that the activity constituted a breach of the Partnership Agreement. FN12 Fisher, his legal counsel and legal counsel for MDC received copies of the letter. On February 9, 1998, MDC entered into a contract to license software for the MarketPower Broker System to Chicago Board Brokerage, L.L.C ("CBB"). FN13 MDC publicly announced the deal on March 19, 1998.

FN12. PX16.

FN13. CBB is a Delaware limited liability company and a joint venture of Ceres Trading Limited Partnership, a limited partnership controlled by the Chicago Board of Trade, and Prebon Yamane (USA) Inc.; Pretrial Order at 12; PX23 (Licenses Between Chicago Board Brokerage, L.L.C. and Market Data Corporation dated Feb. 9, 1998).

G. Commencement of This Litigation, Procedural History and Remaining Claims

On April 6, 1998, CFLP filed this action against Iris Cantor, CFI, Fisher, MDC and CBB. Shortly thereafter CFLP moved to enjoin preliminarily the launch of MarketPower. After a hearing on May 29 and July 6-10, 1998, I concluded that CFLP had "a reasonable likelihood of establishing at a trial on the merits that defendant limited partners breached their fiduciary duty of loyalty to the general partner and the partnership" but also found that "CFLP will not suffer imminent harm so damaging to its core business resulting from the breach of that duty of loyalty that it exceeds the harm to the defendants if they are enjoined from further development and use of MarketPower pending a final hearing." FN14

FN14. *Cantor Fitzgerald L.P. v. Cantor,* Del. Ch., 724 A.2d 571, 574 (1998).

In the seventeen months following the preliminary injunction hearing, this Court decided dozens of motions, issued over thirty opinions, granted dozens of requests for telephone conferences to address evidentiary issues, and conducted a two-month trial. Several claims have been settled or dismissed. FN15 Defendant CBB and Counterclaim Defendant Lutnick are no longer parties to this action. CFLP, Fisher, MDC and Cantor/CFI have submitted 12 post-trial briefs on three separate subjects: evidentiary issues, merits and harm/remedies. The Court held post-trial oral argument on December 6 and 7, 1999, and all outstanding, relevant, evidentiary issues were resolved in opinions dated January 10 and 13, 2000.

FN15. On November 5, 1998, this Court dismissed CFLP's sixth cause of action against MDC for breach of a confidentiality agreement and CFLP's eight cause of action against CFI, Cantor and Fisher for tortious interference with a confidentiality agreement. *See Fitzgerald v. Cantor,* Del. Ch., C.A. No. 16297, Steele, V.C. (Nov. 5, 1998) and *Fitzgerald v. Cantor,* Del. Ch., C.A. No. 16297, Steele, V.C. (Dec. 30, 1998). On January 14, 1999, this Court dismissed portions of CFLP's Counts II, IV and V alleging claims against CBB and further confidential information claims against the non-CBB Defendants. *See Fitzgerald v. Cantor,* Del. Ch., C.A. No. 16297, Steele, V.C. (Jan. 14, 1999). As a result, the part of CFI's and Cantor's First Counterclaim based on CFLP's allegation of misuse of confidential information is no longer ripe. On March 23, 1999, this Court granted CFI and Cantor's motion to dismiss CFLP's ninth cause of action alleging improper transfer of shares of CFI. *See Fitzgerald v. Cantor,* C.A. No. 16297, Steele, V.C. (Mar. 23, 1999). Six days later, this Court granted CFLP's cross motion for summary judgment on CFI's and Fisher's books and records counterclaim. *See Fitzgerald v. Cantor,* Del. Ch., C.A. No. 16297, Steele, V.C. (Mar. 29, 1999).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00586-SLR    Document 445-3    Filed 11/23/2005    Page 6 of 15

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

The remaining claims of the Third Amended Complaint allege (1) that Cantor, CFI and Fisher breached their contractual and fiduciary duties in Sections 3.03(a)-(b) of the 1996 Partnership Agreement, and (2) that Defendant MDC aided and abetted these breaches of fiduciary duties and tortiously interfered with the contract between CFLP, CFI, Cantor and Fisher. CFLP seeks in relief a permanent injunction, imposition of a constructive trust on MDC's revenues, damages, various forms of declaratory relief, and attorney's fees.

*5 Counterclaimants, Defendants Fisher, Cantor and CFI (the "Limited Partner Defendants"), seek reformation of Section 3.03(b) of the 1996 Partnership Agreement. Defendants Cantor and CFI also seek various forms of declaratory relief, reformation of the 1996 Settlement Agreement and reformation of Section 3.03(a) of the 1996 Partnership Agreement. A counterclaim against CFLP and a third-party claim against CFLP's general partner CFGM assert breach of the implied covenant of good faith and fair dealing in connection with the 1996 Settlement Agreement.

This is the Court's Opinion on these remaining claims. As discussed below, I find that the 1996 Partnership Agreement is clear and unambiguous on its face, that it imposes both contractual and fiduciary duties on the Limited Partner Defendants, that the Limited Partner Defendants' actions breached these duties, that MDC aided and abetted the Limited Partner Defendants' breach of fiduciary duty, that MDC tortiously interfered with the 1996 Partnership Agreement and that Plaintiff CFLP is entitled to declaratory relief and an award of attorney's fees. Because resolution of the Limited Partner Defendants' claims of reformation do not affect the final disposition of the case, these claims are addressed first below.

II. Limited Partner Defendants' Reformation Counterclaims

CFLP contends that Section 3.03 of the 1996 Partnership Agreement prohibits CFI and its Affiliates from engaging in "Competitive Activities." FN16 Iris Cantor and CFI seek, in the event this Court concludes that CFLP's interpretation of the 1996 Partnership Agreement is correct, to have the Court reform Sections 3.03(a)-(b) of the 1996 Partnership Agreement to provide that CFI and its Affiliates may engage in Competitive Activities subject only to the economic consequences set forth in Article XI and to other provisions of the 1996 Partnership Agreement. They also seek reformation of the 1996 Settlement Agreement to provide: (1) that CFI is not subject to any obligations imposed by Section 3.03(a) that do not also apply to other limited partners; (2) that, to the extent that Section 3.03(b) subjects CFI to any duty to refrain from engaging in Competitive Activities, Article XI provides the Partnership's sole remedies; and, (3) that MDC is entitled to all the protections provided to "Affiliated Entities." FN17 Defendant Fisher seeks to reform Section 3.03(b) in a fashion similar to that sought by Cantor and CFI except that, rather than have Section 3.03(b) reformed to provide that he may engage in Competitive Activities, he seeks reformation to be able to act "as Chairman and CEO of MDC in connection with MDC's business with CFLP's competitors, including CBB" without violating Section 3.03(b). FN18

> FN16. The definition of "Competitive Activities," a defined term in the 1996 Partnership Agreement, is discussed below at Section III A.
>
> FN17. "Affiliated Entities," a defined term in the 1996 Partnership Agreement, refers to the group of entities owned, controlled or under common control with CFLP. See 1996 Partnership Agreement, Section 1.01.
>
> FN18. Rodney Fisher's Answer to Plaintiff's Third Amended Complaint, Affirmative Defenses and Counterclaims ¶ 53 (hereinafter Fisher's Answer).

A Court of Equity will not grant reformation "unless it can be demonstrated that the party seeking such form of relief acted under the influence of fraud or under a misapprehension resulting from mutual mistake." FN19 "A unilateral mistake cannot be a basis for reforming a contract." FN20 When a unilateral mistake, however, "is accompanied not only by the other party's knowledge thereof, but, also, by his silence, it is said to be equivalent to a mutual mistake; at any rate, while strictly not a mutual mistake, equity will reform the instrument." FN21 To prevail, the claim for reformation must be supported by clear and convincing evidence. FN22

> FN19. *Gracelawn Memorial Park, Inc. v. Eastern Memorial Consultants, Inc.,* Del.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00586-SLR    Document 445-3    Filed 11/23/2005    Page 7 of 15

Not Reported in A.2d                                                                                   Page 6
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

Ch., 280 A.2d 745, 748 (1971), aff'd, Del.Supr., 291 A.2d 276 (1972).

FN20. *Matter of Enstar Corp.*, Del.Supr., 604 A.2d 404, 413 (1992).

FN21. *Colvocoresses v. W.S. Wasserman Co.*, Del. Ch., 28 A.2d 588, 589-90 (1942) (citations omitted).

FN22. *Id.* at 590.

*6 Defendants' counterclaims for reformation assert: (1) that at the time the relevant Agreements were drafted, Defendants believed the Agreements provided the protections they now seek to obtain through reformation; and, (2) that, at the time of drafting, CFLP knew Defendants' beliefs and withheld from Defendants the fact that the Agreements did not match Defendants' expectations. During discovery, however, before they added their reformation claims, Defendants repeatedly stated that they did *not* have an understanding of the terms of the Agreements when they were drafted. Despite some rather elegant courtroom sophistries emanating from the mouths of well-prepared witnesses for Defendants, those entirely believable admissions during discovery failed to transmute into clear and convincing contrary evidence at trial.

A. CFI's and Cantor's Alleged Understanding of the Agreements

On October 28, 1998, the same day on which this Court granted Defendants' motions to add claims for reformation, FN23 in response to CFLP's interrogatory that asked when Cantor concluded that the Partnership Agreement limited CFI's right to compete and subjected CFI to the provisions of Article XI, Cantor responded that: "Mrs. Cantor does not have an independent understanding of the Partnership Agreement or its amendments." FN24

FN23. *Fitzgerald v. Cantor*, Del. Ch., C.A. No. 16297, Steele, V.C. (Oct. 28, 1998).

FN24. PX 179 at No. 11.

Prior to adding their claims for reformation, Cantor and CFI asserted that they, as of May 1, 1998, had a "current lay understanding" that the change in MDC's Affiliated Entity status adversely affected their economic interests, that Section 3.03(a) does not impose a duty on CFI and its Affiliates to refrain from engaging in Competitive Activities, and that Section 3.03(b) does not impose liability on Cantor for using MDC to engage in Competitive Activities. FN25 In her affidavit dated January 9, 1999, however, Cantor noted that during her deposition she testified that her "lay understanding of [her] rights and obligations under the CFLP Partnership Agreement was based solely on conversations with [her] attorneys" and testified that the "statements that [she] made about [her] lay understanding were all based on conversations with the Slotnick Firm after CFI entered into the [1996] Settlement Agreement." FN26 Cantor did not retain the Slotnick firm until after she signed the 1996 Settlement Agreement. The attorneys who interacted with Cantor did not have any communications regarding "the CFI Defendants' rights under the Partnership Agreement, the Settlement Agreement or otherwise, to cause or permit MDC or any of Defendants' other Affiliated Entities, to engage in Competitive Activities" or "MDC's continued classification as an Affiliated Entity after execution of the Settlement Agreement" before she signed the 1996 Partnership Agreement on August 28, 1996. FN27 Therefore, Cantor and CFI have expressly denied any contemporaneous knowledge about the effect of Sections 3.03(a) or (b), the right of CFI or its Affiliates to engage in Competitive Activities or the effect of MDC's classification as an Affiliated Entity.

FN25. PX178 at Nos. 28, 40 and 44.

FN26. Cantor Aff. 1/9/99 ¶¶ 2, 5.

FN27. Slotnick Aff. 2/3/99 ¶ 3; Crocker Aff. 2/3/99 ¶ 3.

*7 Despite these express denials, Cantor asserts that she had a general understanding that, as consideration for the 1996 Settlement Agreement's terms favorable to CFGM that she would achieve a "free, independent, strong company, and that [she] would be going home with something that [she] could make into a wonderful company." FN28 The basis for this understanding is a discussion between Cantor and Lutnick over lunch at the Hotel du Pont in Wilmington, Delaware. Cantor testified that Lutnick asked her to trust him and assured her that he would "never harm MDC." FN29 Cantor does not contend that Lutnick informed her that MDC either would or would not be allowed to compete. Cantor, in fact, repeatedly denied that Lutnick said anything about MDC's right to compete. FN30 She also confirmed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00586-SLR   Document 445-3   Filed 11/23/2005   Page 8 of 15

Not Reported in A.2d   Page 7
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

that her belief that MDC would be independent and free to compete was based on her previously existing understanding of the relationship between MDC and CFLP and not on any events that occurred during that time period. FN31 Nonetheless, she testified that at the time she signed the 1996 Settlement Agreement, she believed that MDC had the right to do business with CFLP's competitors. FN32

FN28. Tr. Trans. Vol. XXVI at 5043.

FN29. *Id.* at 5032.

FN30. Cantor was asked whether Lutnick told her "anything that would cause [her] to believe that MDC did not have the ability to enter into competitive activities." Cantor responded: "No." Tr. Trans. Vol. XXVI at 5032. Cantor was asked whether Lutnick "mention[ed] MDC and competitive activities in any manner, form or shape during the course of the meeting." Cantor responded: "No. Mr. Lutnick never mentioned that." *Id.* at 5033. Cantor also testified that "Mr. Lutnick never explained anything to me about MDC. I wasn't there to talk about MDC." *Id.* at 5043. *See also,* Pretrial Order at 12 (all parties stipulated that "[a]t no time during the negotiations leading to the May 7, 1996 Settlement Agreement among CFI, CFLP and CFGM ... did the parties ... discuss MDC's right or ability to compete with CFLP while CFI remained a Partner of CFLP").

FN31. *See* Tr. Trans. Vol. XXXV at 6566 (Cantor confirmed that "it wasn't anything that happened in that time frame, in May, that led [her] to believe [she was] getting a free MDC" and that that was "something that [she] thought [she] always had.").

FN32. Tr. Trans. Vol. XXVII at 5050.

B. Fisher's Alleged Understanding of the Agreements

On October 28, 1998, the same day on which I granted Fisher's motion to add a claim to reform Section 3.03(b) "so that Fisher's actions as Chairman and CEO of MDC in connection with MDC's business with CFLP's competitors, including CBB, are not violative of [Section 3.03(b) ] of the Partnership Agreement," FN33 Fisher answered CFLP's interrogatory that asked whether "doing business with competitors of Cantor Fitzgerald" constitutes "Competitive Activity" under the Partnership Agreement. Fisher objected on the bases of attorney-client privilege and work-product doctrine but also asserted under oath that "Mr. Fisher has no independent understanding of the Partnership Agreement." FN34 Between May and October 1998, Fisher provided the identical answer to at least ten additional requests seeking information on topics that included whether amendments to the Partnership Agreement (including the amendment to change MDC's status as an Affiliated Entity) adversely affected Partners and whether Fisher is bound by the Partnership Agreement. FN35 A short time later he confirmed that, even as of November 1998, he still had "no independent understanding of the specific provisions of the Partnership Agreement." FN36

FN33. Fisher's Answer ¶ 53.

FN34. PX26 at Response 1.

FN35. *See, e.g.,* PX 183 Nos. 3, 4, 6, 28-30, 41-42; PX 184 Nos. 17-18.

FN36. PX 186 at No. 19.

In marked contrast to his discovery responses, Fisher stated at trial that he had an understanding that "MDC, from the day we were founded on August 1, 1987, was free to do business with the entire financial community and that, of course, included Cantor Fitzgerald's competitors." FN37 Fisher's understanding is based on his contention that MDC had engaged in Competitive Activities in the past. Therefore, since CFLP had not objected to these activities, Fisher believed that MDC could freely engage in Competitive Activities and to do business with CFLP's competitors.

FN37. Tr. Trans. Vol. XXXI at 5937.

C. Analysis

*8 CFLP contends that Defendants thwarted discovery by invoking the attorney-client privilege and work-product doctrine and denied any contemporaneous understanding that CFI or its Affiliates would be allowed to compete with CFLP or to engage in a Competitive Activity. Accordingly, Plaintiff contends that Defendants should now be bound by their discovery admissions and should not be allowed to introduce contrary testimony at trial or

Case 1:97-cv-00586-SLR    Document 445-3    Filed 11/23/2005    Page 9 of 15

Not Reported in A.2d                                                                                           Page 8
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

to take contrary positions in their briefs. I took the testimony, in any event, to be sure that I understood the reformation claim.

Nonetheless, at trial I repeatedly informed Defendants that the focus on their reformation claims would be the understanding they possessed *at the time the Agreements were drafted.* Defendants either candidly admitted under oath that they had no relevant understandings, denied repeatedly that such understandings existed at the time the 1993 Partnership Agreement was drafted, at the time the 1996 Settlement Agreement was drafted, or at the time the 1996 Partnership Agreement was drafted or simply refused to reveal those understandings. To the extent, therefore, that Defendants' argue that Cantor believed, *at any time prior to the 1996 Partnership Agreement amendments,* that she would obtain a free, independent and strong MDC that could freely engage in Competitive Activities and to compete with CFLP's competitors, this argument is without merit. Cantor's contentions are not credible. Moreover, as discussed below in Section VI C, the course of dealing argument does not justify Fisher's belief that he would be able to serve as MDC's Chairman and CEO while MDC provided software to CBB to broker Treasuries.

Reformation, when granted, reforms an agreement to match the expectation and understanding of the party seeking reformation. Absent such an understanding, there cannot possibly be a basis for reformation. Moreover, even if one were able to conclude that Defendants had an understanding that the Agreements provided what they now seek to obtain through reformation, there is no evidence that Defendants acted under the influence of fraud.

As a member of MDC's Board of Directors, Lutnick was aware of MDC's proposed activities and Defendants concede that, contrary to remaining silent, Lutnick objected when he believed that MDC was attempting to engage in impermissible activities. There is also no support for the contention that CFLP knew, and remained silent, about the Defendants' different expectations when the parties signed the relevant Agreements. The fairest reading of the testimony about and the notes of the momentous Hotel du Pont luncheon and later conference room meeting of parties and attorneys, leads to the inescapable conclusion that both Cantor and Lutnick knew that the issue of a "free, strong and independent" MDC, as Defendants wish to categorize it today, loomed as the gut-wrenching deal-breaker issue that neither party wished to raise. Ending the 1996 litigation and the personal and financial heartache surrounding it drove the parties to settlement. The concept of a "free, strong, independent" MDC or MDC as an active, potential vigorous competitor of CFLP controlled by free-wheeling quislings, depending upon one's prospective at the time, could not be put on the table and discussed by either party because it served as the Gordian knot neither party wished to untie.

*9 At most, the evidence suggests that the Limited Partner Defendants and MDC object now to the terms for which the Defendants previously bargained or about which *they* remained silent at the critical point in the 1996 settlement negotiations. Contracts are not reformed to provide parties with bargains they failed to obtain through negotiations. On Defendants' counterclaims for reformation, I find for the Plaintiff.

III. Interpretation of the 1996 Partnership Agreement

CFLP's claims rest upon the allegation that the Limited Partner Defendants breached their contractual and/or fiduciary obligations set forth in Section 3.03 of the 1996 Partnership Agreement. Specifically, CFLP contends that Section 3.03(a) of the 1996 Partnership Agreement provides that CFI and its Affiliates shall not be allowed to engage in "Competitive Activities" while they are partners of the Partnership. CFLP also asserts that Section 3.03(b) imposes upon the Limited Partner Defendants a fiduciary duty of loyalty and a contractual obligation not to cause harm to the Partnership.

In response, the Limited Partner Defendants contend that Section 3.03(a) does not apply to CFI and its Affiliates and that, if it does, it is merely a proviso that does not prohibit them from engaging in a Competitive Activity but subjects CFI and its Affiliates who choose to engage in a Competitive Activity to other Sections of the 1996 Partnership Agreement that provide sanctions or impose other restrictions. The primary source of these sanctions and/or restrictions, according to the Limited Partner Defendants, is Article XI that imposes economic sanctions upon partners engaging in a Competitive Activity and which states, in Section 11.02(c), that "[n]othing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competitive Activity, or in other employment of any nature whatsoever." Accordingly, from the Limited Partner Defendants' point-of-view, engaging in a Competitive Activity is an activity that is permitted by Section 3.03(a) and

Not Reported in A.2d												Page 9
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

that, therefore, cannot be viewed as violating any duties contained in Section 3.03(b). In the alternative, if this Court does not find that the Limited Partner Defendants' interpretation is the only reasonable interpretation of the 1996 Partnership Agreement, Defendants' assert that the 1996 Partnership Agreement is ambiguous and that the Court should admit extrinsic evidence to interpret the Agreement.

"[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." FN38 As discussed below, I find that CFI and its Affiliates are not subject to Section 3.03(a) but that Section 3.03(b) imposes upon the Limited Partner Defendants a fiduciary duty of loyalty. Because the 1996 Partnership Agreement is clear on its face, Defendants' extrinsic evidence may not be considered. FN39

FN38. *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992).

FN39. *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, Del.Supr., 672 A.2d 41, 43 (1996).

A. The Relevant Provisions of the 1996 Partnership Agreement

*10 Section 3.03(a) states, in pertinent part:
Nothing contained in this Agreement shall be deemed to preclude the Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; *provided*, that such activities do not constitute Competitive Activities.... Neither the Managing General Partner, CFI nor any of their respective Affiliates shall be obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership.

Section 3.03(b) states, in its entirety:
Each Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity.

Section 1.01 of the 1996 Partnership Agreement states that " 'Competitive Activity' shall have the meaning given in Section 11.04(c)." Section 11.04(c) states, in pertinent part:
[A] Partner shall be considered to have engaged in a Competitive Activity if such Partner while a Partner or during the Restricted Period ...
(ii) solicits any of the customers of the Partnership or any Affiliated Entity (or any of their employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity ...
(iv) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business or assists others in engaging in any Competing Business in the manner described in the foregoing clause (iv). FN40

FN40. A Competing Business, as defined by Section 11.04(c) of the 1996 Partnership Agreement,:
(i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was first engaged in by the Partnership or an Affiliated Entity ...

B. Defendants' Interpretation of the 1996 Partnership Agreement

The Limited Partner Defendants put forth numerous arguments in support of their claims that Sections 3.03(a) and (b) do not prevent CFI and its Affiliates from engaging in a Competitive Activity.

1. Defendants' Counterclaim That CFI is Improperly Included Within Section 3.03(a)

In their Second Counterclaim, Defendants CFI and Cantor allege that CFI and its Affiliates are included,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

Page 10

improperly, within the scope of Section 3.03(a). If Defendants' allegations are correct, Cantor and CFI cannot be in violation of Section 3.03(a).

Cantor and CFI allege that Plaintiff CFLP and Third-Party Defendant CFGM breached the 1996 Settlement Agreement's covenant of good faith and fair dealing. FN41 The 1996 Settlement Agreement provides that CFI "will hereafter be a Limited Partner for all purposes under the Partnership Agreement..." FN42 According to Defendants, CFI was initially included in Section 3.03(a) because it was the Managing General Partner. Thus, Defendants contend that CFLP and CFGM were required to remove CFI and its Affiliates from Section 3.03(a) and that, by failing to amend the 1995 Partnership Agreement properly, CFLP and CFGM breached an implied covenant of good faith and fair dealing.

> FN41. The Second Counterclaim allegations against Lutnick were dismissed in an earlier opinion. See Fitzgerald v. Cantor, Del. Ch., C.A. No. 16297, Steele, V.C. (Nov. 10, 1998).
>
> FN42. 1996 Settlement Agreement at 2.

2. Defendants' Interpretation of Section 3.03(a)

*11 In the alternative, if this Court were to conclude that CFI is properly subject to Section 3.03(a), Defendants contend that Section 3.03(a) permits them to engage in Competitive Activities. Defendants' contention that Section 3.03(a) should be interpreted to provide that "CFI and its Affiliates *are permitted* to engage in any otherwise lawful Competitive Activity unless another provision of the Agreement that applies to a Competitive Activity precludes or limits them from engaging in that activity" FN43 is critical to understanding their interpretation of the 1996 Partnership Agreement. Defendants' arguments seek to show that no other section of the 1996 Partnership Agreement prohibits CFI or its Affiliates from engaging in a Competitive Activity. Because Defendants contend that no other section of the 1996 Partnership Agreement prohibits them from engaging in a Competitive Activity, they conclude, therefore, that CFI and its Affiliates are permitted to engage in a Competitive Activity.

> FN43. Iris Cantor and Cantor Fitzgerald Incorporated's Proposed Findings of Fact and Conclusions of Law at 32 (emphasis in original) (hereinafter Cantor/CFI Post-Trial OB).

Defendants' first argument relies on Section 1.02(b) of the 1996 Partnership Agreement which states:
The Partnership hereby grants to CFI a perpetual, worldwide non-exclusive license ... to use the name 'Cantor Fitzgerald' in connection with its business and activities; *provided, however,* that CFI shall not have the right to utilize such license to conduct any Competing Business. (emphasis in original).

Defendants contend that this Section merely prohibits CFI from using the "Cantor Fitzgerald" name when competing with the Partnership and that it does not prohibit CFI or its Affiliates from engaging in a Competitive Activity or in other competition with the Partnership. Defendants raised this argument in response to CFLP's motion for a preliminary injunction. I concluded then, as I do now, that Section 1.02(b) explains the conditions under which CFI may use the Cantor Fitzgerald name; it does not grant CFI, much less any other limited partner, the right to compete with CFLP. Because Section 1.02(b) states that CFI may not use the Cantor Fitzgerald name if CFI is engaged in a Competing Business, a reader could infer that there *are* circumstances under which CFI may engage in a Competitive Activity or engage in a Competing Business, however, the reader would only be able to determine the precise circumstances under which CFI may engage in such activities by reading the remainder of the 1996 Partnership Agreement.

In their post-trial briefs, Defendants Cantor and CFI next refer to Section 9.02(d) that allegedly "concerns what payments CFI is entitled to receive in the event that it withdraws or is removed as a General Partner ..." FN44 But the 1996 Partnership Agreement does not contain a Section 9.02(d). In support of this argument, Defendants apparently are referring to a previous version of the Partnership agreement. FN45 Because the terms of the 1996 Partnership Agreement control the issues at hand and because I conclude that there is but one clear and reasonable interpretation of those terms, Defendants' arguments based on terms of a previous partnership agreement will not be considered.

> FN44. *Id.* at 34.
>
> FN45. Throughout their post-trial opening brief, CFI and Cantor refer to DX483 when referring to the partnership agreement. DX

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00586-SLR   Document 445-3   Filed 11/23/2005   Page 12 of 15

Not Reported in A.2d                                                                                    Page 11
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

483 is the June 3, 1993, version of the partnership agreement. It is not the agreement in operation at the time Defendants engaged in the conduct that forms the basis for Plaintiff's claims.

**\*12** Finally, Defendants refer to Article XI that describes the conditions under which partners are entitled to receive payments from the Partnership. According to Defendants, although this section refers to a "Competitive Activity," and describes the economic consequences that will be imposed upon partners who choose to engage in a Competitive Activity, it does not prohibit any partner from engaging in a Competitive Activity. As Defendants note, Section 11.02(c) states that "[n]othing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competitive Activity, or in other employment of any nature whatsoever."

In sum, Defendants' interpretation begins with the conviction that the language of Section 3.03(a) allows CFI and its Affiliates to engage in a Competitive Activity unless such action is restricted or prohibited by another section of the 1996 Partnership Agreement. Finding no other section that clearly prohibits such action, Defendants conclude that CFI and its Affiliates are allowed to engage in a Competitive Activity subject only to the restrictions set forth in Section 1.02(b) on the use of the name "Cantor Fitzgerald" and in Article XI on receipt of payments from the Partnership.

3. Defendants' Interpretation of Section 3.03(b)

Cantor and CFI do not address the distinction in Section 3.03(b) between harm and loyalty. Other than with reliance on extrinsic evidence, which I shall not consider, they do not address the meaning of Section 3.03(b) except to state that what is allowed by Section 3.03(a) cannot be prohibited by Section 3.03(b) and that CFLP's interpretation of Section 3.03 is not reasonable because if engaging in a Competitive Activity is prohibited by Section 3.03(b) there would be no need for Section 3.03(a).

Defendant Fisher argues that, by using the term "acknowledge" rather than a binding term such as "agree," Section 3.03(b) does not impose any additional duty of loyalty on the partners but merely requires the partners to "acknowledge" the loyalty the partners had to the Partnership "by virtue of their relationship to the business." FN46 This loyalty, he argues, can not be a fiduciary duty of loyalty but can merely be the loyalty they owe to their employer and to the enterprise as a whole. Section 3.03(b) then continues, according to Fisher, by requiring the partners to "agree" that, pursuant to the duty already recognized, they will not harm the Partnership.

> FN46. Rodney Fisher's Proposed Findings of Fact and Conclusions of Law on the Merits at 80 (hereinafter Fisher's Post-Trial OB).

C. Plaintiff's Interpretation of the 1996 Partnership Agreement

1. Defendants' Counterclaim

Plaintiff CFLP responds to Defendants' Second Counterclaim by arguing that the continued inclusion of CFI and its Affiliates in Section 3.03(a) grants these Defendants a benefit because Section 3.03(a) provides that CFI and its Affiliates are not required to present business opportunities to the Partnership. CFLP does not address the Defendants' contention that, by failing to remove CFI and its Affiliates from Section 3.03(a), CFLP and CFGM breached the covenant of good faith and fair dealing inherent in the 1996 Settlement Agreement. CFLP evidently assumes too naively that CFI and its Affiliates would not want to lose their right to pursue business opportunities without first presenting them to the Partnership. Finally, CFLP correctly notes that the 1995 and 1996 Partnership Agreements and 1996 Settlement Agreement provide that the Managing General Partner may amend the Partnership Agreement without the consent of the Limited Partners. FN47

> FN47. With one exception, not relevant here, discussed below at Section VII.

2. Plaintiff's Interpretation of Section 3.03(a)

**\*13** CFLP contends that Section 3.03(a) only makes sense if it is interpreted as an express provision that prohibits CFI and its Affiliates from engaging in a Competitive Activity while they are partners of CFLP. According to CFLP, if partner wishes to engage in a Competitive Activity without violating the Partnership Agreement, the partner must first withdraw from the Partnership. Like the Limited Partner Defendants, CFLP turns to Section 11.02(c)

Case 1:97-cv-00586-SLR    Document 445-3    Filed 11/23/2005    Page 13 of 15

Not Reported in A.2d                                                                Page 12
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

to support its interpretation. Section 11.02(c) states:
Each Partner acknowledges that this Article XI is intended solely to reflect the economic agreement between the Partners with respect to amounts payable upon a Partner's Bankruptcy or Termination. Nothing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competing [sic] Activity, or in other employment of any nature whatsoever...

The Limited Partner Defendants acknowledge only the second sentence of Section 11.02(c). CFLP contends that the second sentence is limited by the first. Thus, according to CFLP, Article XI applies only to partners who have left the Partnership as a result of Bankruptcy or Termination and has no application to partners while they are partners.

3. Plaintiff's Interpretation of Section 3.03(b)

CFLP contends that Section 3.03(b) contains two separate duties: the fiduciary duty of loyalty and a duty not to harm the Partnership; the later of which is not itself a fiduciary duty. Although CFLP asserts that the Limited Partner Defendants' conduct breaches both duties, it contends that the question of whether a partnership may create a fiduciary duty of loyalty by contract (as opposed to restricting or expanding an existing fiduciary duty) is an issue of first impression and suggests that this Court need not reach the issue of whether Defendants have breached their fiduciary duty of loyalty as Defendants' violation of their contractual obligation not to harm alone supports a finding that Defendants breached Section 3.03(b). Nonetheless, CFLP contends that our law permits partners in a limited partnership to agree to be bound to a fiduciary duty of loyalty created by the partnership agreement. It would, of course, appear necessary for some finding and ruling in this regard as it constitutes the sole basis for CFLP's aiding and abetting a breach of fiduciary duty claim against MDC.

D. Analysis

CFI and its affiliates should not be included within Section 3.03(a). However, CFLP's interpretation of the 1996 Partnership Agreement is the only reasonable interpretation and CFLP's interpretation does not depend on whether CFI and its affiliates are or are not included within Section 3.03(a).

The Limited Partner Defendants' proposed interpretation contains two fatal flaws. First, Defendants' interpretation begins with the unfounded assumption that the language in Section 3.03(a), which provides that "[n]othing contained in this Agreement shall be deemed to preclude [CFI and its Affiliates] from engaging in ... business ventures ... *provided*, that such activities do not constitute Competitive Activities," means that CFI and its Affiliates are *permitted* to engage in a Competitive Activity unless the Partnership Agreement otherwise provides. I find that Section 3.03(a), viewed alone, out of the context of the entire 1996 Partnership Agreement, does not support such an assumption and that, when Section 3.03(a) is viewed in the proper context of the entire Agreement, as it must be, it does not permit the identified parties to engage in a Competitive Activity. Second, Defendants' argument depends upon a misinterpretation of Article XI which, contrary to Defendants' contentions, only applies to partners when they are no longer partners of CFLP. Defendants' interpretation that Article XI applies to partners while they are partners is incorrect.

*14 As discussed below, CFLP's interpretation of the 1996 Partnership Agreement does not rely on an unfounded assumption and is consistent with the clear language of Article XI. Because CFLP's interpretation fully explains all sections of the 1996 Partnership Agreement and does not create any internal contradictions in interpretation, I find that CFLP's interpretation is a reasonable interpretation. Because CFLP's interpretation is the only interpretation that is reasonable, I find that the language of the 1996 Partnership Agreement is clear on its face and that I need not resort to extrinsic evidence in order to understand its meaning. FN48

> FN48. *See, e.g., MHM/LLC, Inc. v. Horizon Mental Health Management, Inc.,* Del. Ch., C.A. No. 14465, at 5-6, Steele, V.C. (Oct. 3, 1996), *aff'd,* Del.Supr., 694 A.2d 844 (1997) (It is well settled that extrinsic evidence is not to be used if the language is clear on its face.). *See also Eagle Indus. Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

1. Defendants' Counterclaim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00586-SLR   Document 445-3   Filed 11/23/2005   Page 14 of 15

Not Reported in A.2d                                                                                                   Page 13
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

The 1996 Settlement Agreement provides that CFI "will hereafter be a Limited Partner for all purposes under the Partnership Agreement..." FN49 Although CFGM, as Managing General Partner, has the power to amend the Partnership Agreement, it may not use this general power in the 1996 Partnership Agreement or the 1996 Settlement Agreement to avoid express provisions of the 1996 Settlement Agreement, one of which provides that CFI shall be a Limited Partner for all purposes.

FN49. 1996 Settlement Agreement at 2.

Section 3.03(a) of the 1995 Partnership Agreement provided:
*CFI* shall be required to devote to the affairs of the Partnership such time and effort as may be reasonably necessary to conduct properly the Partnership's affairs. Nothing contained in this Agreement shall be deemed to preclude *CFI or any Affiliate of CFI* from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; provided, that such activities do not constitute Competitive Activities .... *Neither CFI nor any of its Affiliates* shall be obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership (emphasis added).

As amended in the 1996 Partnership Agreement, Section 3.03(a) provides:
*The Managing General Partner* shall be required to devote to the affairs of the Partnership such time and effort as may be reasonably necessary to conduct properly the Partnership's affairs. Nothing contained in this Agreement shall be deemed to preclude *the Managing General Partner, CFI or their respective Affiliates* from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; provided, that such activities do not constitute Competitive Activities .... *Neither the Managing General Partner, CFI nor any of their respective Affiliates* shall be obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership (emphasis added).

At the time of the 1996 Settlement Agreement, CFI and CFGM were both General Partners and CFI was the Managing General Partner. As a result of, and after, the 1996 Settlement Agreement, CFI withdrew as Managing General Partner and General Partner and CFGM became CFLP's only Managing General Partner or General Partner.

*15 The first sentence of Section 3.03(a) in the 1995 and 1996 Partnership Agreements clearly refers to the need to have the Managing General Partner devote sufficient time to the Partnership's affairs. Thus, the 1995 Partnership Agreement referred to "CFI" because it was the Managing General Partner. The second and final sentences of the 1995 Partnership Agreement continued the reference to "CFI" and there is no indication in the Agreement or from the evidence submitted by the parties to suggest any intention to refer to CFI other than in its role as the Managing General Partner. In other words, there is no indication that, even if CFI had not been the Managing General Partner, that CFI would either *be subject to,* or would *have the benefit of* Section 3.03(a). FN50

FN50. It is not clear whether Section 3.03(a) should be viewed as only providing a benefit. Because this Court does not need to and has not addressed whether *all* activities falling under the definition of Competitive Activities would be activities that breach Section 3.03(a), as well as Section 3.03(b), the later of which applies to all partners, it is not clear whether Section 3.03(a) imposes a greater restriction on the parties mentioned or provides a benefit by not requiring the parties to offer business opportunities to the Partnership.

Through the amendments, CFGM has, in the first sentence, replaced the former Managing General Partner with the current Managing General Partner by replacing the reference to "CFI" with a reference to "The Managing General Partner." In the second and last sentences, however, CFGM elected not to replace "CFI" with "The Managing General Partner." Instead, it added CFGM without removing CFI. By this action, CFGM obtained the unquestioned benefit of Section 3.03(a) while subjecting itself, CFI and their Affiliates to the prohibition on Competitive Activities.

The 1996 Settlement Agreement clearly provides that CFI shall be a Limited Partner for all purposes under

Case 1:97-cv-00586-SLR   Document 445-3   Filed 11/23/2005   Page 15 of 15

Not Reported in A.2d                                                                 Page 14
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

the Agreement. CFGM's power to amend the Partnership Agreement cannot be used to avoid its separate contractual commitment in the 1996 Settlement Agreement to provide that CFI shall "be a Limited Partner for all purposes." Therefore, I reform Section 3.03(a) of the 1996 Partnership Agreement to: (1) replace the phrase "the Managing General Partner, CFI or their respective Affiliates" with the phrase "the Managing General Partner or its Affiliates;" and, (2) replace the phrase "Neither the Managing General Partner, CFI nor any of their respective Affiliates" with the phrase "Neither the Managing General Partner nor its Affiliates ...". FN51 Neither CFI nor its Affiliate, Iris Cantor, have breached Section 3.03(a) of the 1996 Partnership Agreement.

> FN51. I note that this claim is for breach of an implied covenant of good faith and fair dealing. Although, to me, this does not seem to be the proper claim, I understand why Defendants choose to raise the issue in this form. This covenant is breached when a party engages in arbitrary or unreasonable conduct that has the effect of preventing the other party to that contract from receiving the fruits of the contract. See *Wilgus v. Salt Pond Investment Co.,* Del. Ch., 498 A.2d 151, 159 (1985). In this case, I do not see what fruits the Defendants have missed by Plaintiff's attempt to enforce Section 3.03(a). Moreover, a claim for breach of the implied covenant "must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation." *Continental Insurance Co. v.. Rutledge & Co.,* Del. Ch., C.A. No. 15539, at 32, Chandler, C. (Jan. 10, 2000). This Defendants do not demonstrate.
> The 1996 Settlement Agreement clearly states that it will serve as the amendments to the Partnership Agreement to the extent practicable. See 1996 Settlement Agreement Section 2(d). The 1996 Partnership Agreement merely contains a mistake and needs to be conformed to the 1996 Settlement Agreement. While I agree that the mistakes should be and will be rectified, there is no basis for liability despite that implication in Defendants' counterclaim.

2. Interpretation of Section 3.03(a) FN52

> FN52. If on appeal the Supreme Court were to conclude (1) that the reference to "CFI" (as opposed to the "Managing General Partner") indicates that CFI was included in Section 3.03(a) for reasons other than the fact it was the Managing General Partner, and thus (2) that "CFI" should remain in Section 3.03(a), it would be helpful to have the interpretation of the entire Agreement already completed as the parties have fully briefed this issue. Moreover, the Agreement, which is still in effect, guides the parties' current conduct, even though I ultimately conclude that only CFGM and its Affiliates are subject to the provisions of Section 3.03(a).

Section 3.03(a), which provides that "[n]othing contained in this Agreement shall be deemed to preclude [specified parties] from engaging in ... business ventures ... *provided,* that such activities do not constitute Competitive Activities," does not expressly state that the parties specified may engage in a Competitive Activity nor does it expressly state that they may not. Thus, the meaning of Section 3.03(a) is only revealed by examining the 1996 Partnership Agreement as a whole.

The consequences of engaging in a Competitive Activity are detailed in Article XI. Section 11.01 addresses the conditions under which a partner may transfer shares and its interpretation is not now at issue. FN53 Section 11.02 describes the conditions under which a partner will be entitled to receive payments (in the form of a "Base Amount" and "Partner's Additional Amount") from the Partnership. Section 11.03 describes the calculation of the "Base Amount" and Section 11.04 describes the conditions under which a partner may be entitled to payment of a "Partner's Additional Amounts." In sum, upon leaving the Partnership, a partner is entitled to receive the "Base Amount." Whether a partner is also entitled to receive the "Partner's Additional Amounts" depends on whether the partner has engaged in a Competitive Activity.

> FN53. A thorough discussion of Section 11.01 may be found in *Fitzgerald v. Cantor,* Del. Ch., C.A. 16297, Steele, V.C. (Mar. 23, 1999) in which this Court granted CFI's and Cantor's motion for summary judgment on Plaintiff's ninth cause of action.

*16 Section 11.02(a) states that, except as otherwise provided, upon Bankruptcy or Termination of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.