# C
# Part 2

Not Reported in A.2d                                                                                          Page 15
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

limited partner, the Partnership shall purchase the limited partner's Partnership units pursuant to the terms and conditions set forth in Article XI. It also provides that "[s]oley for purposes of this Article XI, all references to Partners shall include any Terminated or Bankrupt former Partner unless the context clearly indicates otherwise."

Section 11.02(b) states:
Each Partner acknowledges and recognizes that [Partners will have access to] information critical to the success of the business of the Partnership and the Affiliated Entities and will have an extraordinary opportunity to participate in the growth of the business of the Partnership. Each Partner also agrees that certain actions ... including ... engaging in a Competitive Activity ... while a Partner is a Partner or during the Restricted Period would harm the Partnership or the Affiliated Entities. Accordingly, in consideration of being afforded the opportunity to become a Partner, each Partner agrees to the economic terms set forth in this Article XI.

Section 11.02(c) states in relevant part:
Each Partner acknowledges that this Article XI is intended solely to reflect the economic agreement between the Partners with respect to amounts payable upon a Partner's Bankruptcy or Termination. Nothing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competing Activity, or in other employment of any nature whatsoever.

Finally, Section 11.02(d) states in relevant part:
Each Partner consents to the economic terms of this Article XI and agrees that a Partner who does not engage in a Competitive Activity during the Restricted Period shall be entitled to all amounts payable pursuant to Sections 11.03 and 11.04. A partner who chooses to engage in a Competitive Activity shall be entitled to receive all amounts payable pursuant to Section 11.03 and shall be entitled to receive additional amounts as are provided in Section 11 .04 to the extent that such amounts are payable prior to the date on which a Partner first participates in a Competitive Activity.

When read together, it is clear that Sections 11.02(c) and (d) provide that if a partner is Terminated or is Bankrupt, the partner may seek to earn income in any manner the partner wishes. The caveat, however, is that if the former partner chooses to earn income by

engaging in a Competitive Activity, the partner will not receive, in exchange for the partner's units, any of the additional amounts to which the partner would otherwise be entitled under section 11.04. FN54 Subsections 11.02(c) and (d) do not grant the Limited Partner Defendants the right to engage in a Competitive Activity or to compete with CFLP.

> FN54. The former partner may, however, receive the additional amounts up until the time when the partner begins to engage in a Competitive Activity. *See* 1996 Partnership Agreement Section 11.02(d).

Any remaining confusion as to whether the economic sanctions imposed by Article XI apply only to partners after they leave the Partnership or whether the parties to Partnership Agreement did not intend to allow an active partner to engage in a Competitive Activity is resolved by examination of Sections 12.02(a) and 11.04(h). Section 12.02(a) provides that "[e]xcept as otherwise agreed in writing by the Managing General Partner, the Partnership shall have the right to redeem any or all of the Units held by each Unitholder at any time and from time to time." Redemption pursuant to Section 12.02(a) is included within the 1996 Partnership Agreement's definition of Termination. FN55 Thus, the Partnership, upon concluding that a partner was engaging in a Competitive Activity, could redeem a partner's units and thus subject a partner to the provisions of Article XI, which apply to a Terminated partner.

> FN55. *See Id.* Section 1.01.

**\*17** Section 11.04(h) provides:
Notwithstanding anything to the contrary, the Personal Representative of a Partner who has become a Terminated Partner on account of death shall receive payment of his or her Additional Amounts at the same time such Personal Representative receives payments of the deceased Partner's Base Amount pursuant to Section 11.03; provided, however, that the Personal Representative of a deceased Partner shall not be entitled to receive payment of such Additional Amounts if the deceased Partner engaged in a Competitive Activity prior to his or her death.

Section 11.04 only makes sense if it refers to the situation where a partner, who is prohibited from engaging in a Competitive Activity, engages in a Competitive Activity but dies before leaving the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 16
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

Partnership. In such a case, either because the Partnership did not know of the Competitive Activity or knew but had not yet completed redemption of the partner's units pursuant to Section 12.02(a), it is necessary to provide that the partner would not be entitled to the Additional Amounts to place the partner in the same position as a partner who had engaged impermissibly in a Competitive Activity after leaving the Partnership or who had his or her units redeemed because he or she engaged in a Competitive Activity before leaving the Partnership. If the economic sanctions in Article XI applied to partners while they are partners, it would not be necessary to include Section 11.04(h). But Article XI sanctions only apply to partners who are prohibited from engaging in a Competitive Activity and who engage in a Competitive Activity during the "Restricted Period," which is defined as the "four year period immediately following the date on which a Partner ceases, for any reason, to be a Partner of the Partnership." FN56

FN56. *Id.*

Because, pursuant to Section 12.02(a), the Partnership may redeem a partner's units, thereby terminating a partner from the Partnership and subjecting the former partner to sanctions of Article XI, the only time that the provisions of the Partnership Agreement do not allow the Partnership to impose sanctions on a partner who has engaged, impermissibly, in a Competitive Activity is when the partner, for whatever reason, is not yet subject to the "Restricted Period."    FN57 The only circumstance when the terms of the 1996 Partnership Agreement do not allow for the Partnership to force a partner, who has engaged in a Competitive Activity, to enter the Restricted Period, is when the partner has died after engaging in a Competitive Activity but before leaving the Partnership. Therefore, Section 11.04(h) fits neatly into CFLP's interpretation of the Partnership Agreement by ensuring that no partner who is prohibited from engaging in a Competitive Activity is able to engage in a Competitive Activity and receive the full economic benefit obtained by partners who do not engage in a Competitive Activity.

FN57. Section 12.02(a) of the 1996 Partnership Agreement provides that the Partnership may be prevented from redeeming a partner's units (and thus subjecting a partner to termination and the

sanctions of Article XI) by agreements other than the Partnership Agreement. The existence of such other agreements, however, does not affect the interpretation of the 1996 Partnership Agreement.

Defendants agree that partners who engage in a Competitive Activity are subject to the provisions of Article XI, but because Defendants also assume that Section 3.03(a) *permits* certain parties to engage in a Competitive Activity while they are partners unless otherwise prohibited, they *must* argue that the sanctions of Article XI apply to the parties mentioned in Section 3.03(a) while they are partners. Because Article XI, in relevant part, clearly does not apply sanctions to partners while they are partners, Defendants' argument must be incorrect.

**\*18** Defendants' interpretation of the 1996 Partnership Agreement fails to persuade for a second reason. If, as argued by Defendants, Section 3.03(a) permits the specified parties to engage in a Competitive Activity and engaging in a Competitive Activity is prohibited only if a Section other than 3.03(a) prohibits that activity then, even under Defendants' interpretation, engaging in a Competitive Activity is prohibited by the 1996 Partnership Agreement because, as discussed immediately below, it is prohibited by Section 3.03(b).

3. Interpretation of Section 3.03(b)

Pursuant to Section 3.03(b), "[e]ach Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity." Contrary to Defendants' contentions, CFLP's interpretation of Section 3.03(b) does not conflict with CFLP's (and this Court's) interpretation of Section 3.03(a). The sections are neither redundant nor ambiguous. *Pursuant to Section 3.03(b)* all Partners acknowledge that they have assumed a duty of loyalty and agree not to engage in actions reasonably expected to harm the Partnership. *Pursuant to Section 3.03(a),* the Partnership acknowledges that certain parties are not "obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership." Thus, Section 3.03(a) *limits* the duties assumed by certain partners under Section 3.03(b).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 17
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

### 4. Conclusion

In sum, Defendants fail to provide a reasonable explanation of the 1996 Partnership Agreement. Their proposed explanation, which asserts that Section 3.03(a) permits Competitive Activities unless otherwise prohibited, depends upon an unfounded assumption and an obviously incorrect interpretation of Article XI. Therefore, Defendants' interpretation of the 1996 Partnership Agreement cannot be correct or even one of several possible reasonable interpretations.

CFLP's interpretation, on the other hand, is reasonable and creates no ambiguity in the terms of the 1996 Partnership Agreement. Defendants' arguments fail to establish that Plaintiff's interpretation is internally inconsistent or relies on the existence of redundant or unnecessary terms. Because the 1996 Partnership Agreement is not ambiguous and because Plaintiff's interpretation is the only reasonable interpretation, it is the correct interpretation.

I conclude that, as a matter of law, the 1996 Partnership Agreement, properly interpreted, provides that the parties specified in Section 3.03(a) are prohibited from engaging in Competitive Activities and that all partners have a duty of loyalty to not to take action that would harm the Partnership. FN58 This conclusion does not, however, address the issues of whether, as a matter of law, parties to a limited partnership agreement may establish, by the terms of the agreement, that limited partners who neither manage, operate, nor govern the partnership may bind themselves to a *fiduciary* duty of loyalty or whether, in this case, the parties properly created such a duty.

> FN58. As the proper interpretation reveals, contrary to Cantor's and CFI's contention, that Section 3.03(b) applies to Cantor and CFI (including while they are causing an Affiliated Entity to engage in a Competitive Activity), the portions of Cantor's and CFI's First and Second Counterclaims alleging that Section 3.03(b) provides immunity are incorrect. Accordingly, the Counterclaims which allege (1) that the amendments relating to the status of MDC are null and void and (2) that Plaintiff CFLP and Counterclaim Defendant CFGM have breached the *Partnership Agreement's* implied covenant of good faith and fair

dealing *relating to the status of MDC* are resolved in favor of the Plaintiff and Counterclaim Defendant.

### 5. May the Partners of a Delaware Limited Partnership Agree in Their Partnership Contract That Partners, Including Those Limited Partners who do not Participate in the Management or Operation of the Partnership, Should be Subject to a Fiduciary Duty of Loyalty?

**\*19** CFLP is a Delaware limited partnership governed by the Delaware Revised Uniform Limited Partnership Act ("DRULPA"). FN59 This "Act's basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement." FN60 Section 17-1101(c) of the Act provides that "[i]t is the policy of [the Act] to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." Section 17-1101(d) provides:

> FN59. 6 *Del.C.* § § 17-101 to 17-1111.

> FN60. *Elf Atochem N. Am., Inc. v. Jaffari,* Del.Supr., 727 A.2d 286, 291 (1999) (quoting MARTIN I. LUBAROFF & PAUL M. ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS, § 1.2 (1998)).

To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) and liabilities relating thereto to a limited partnership or to another partner ... (2) the partner's or other person's duties and liabilities may be expanded or restricted by provisions in a partnership agreement.

The Limited Partner Defendants contend that this language precludes a limited partnership from *creating* duties that do not exist separately at law or in equity.

Relying primarily on *Elf Atochem,* FN61 CFLP argues that the phrase "duties or liabilities may be expanded or restricted by provisions in a partnership agreement" in Section 117-1101(d) is not intended to limit the types of duties that may be addressed in a partnership agreement to those duties that exist separately at law or in equity. In other words, according to CFLP, Section 17-1101(d) allows a partnership to modify existing duties and to create

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

Page 18

additional new duties.

FN61. 727 A.2d 286.

In *Elf Atochem,* plaintiff argued that Section 18-109(d) of the Delaware Limited Liability Company Act (the "LLC Act") FN62, which provides that an LLC agreement "may" vest non-exclusive jurisdiction in a foreign jurisdiction or exclusive jurisdiction in Delaware courts or arbitrators, did not allow the LLC agreement to vest exclusive jurisdiction in a foreign jurisdiction. Even though Section 18-109 did not provide that the parties may agree to exclusive foreign jurisdiction, neither did the LLC Act provide that the parties' choices were limited to the delineated options. The Supreme Court stated that, "[i]n general, the legislature's use of 'may' connotes the voluntary, not mandatory or exclusive, set of options" FN63 and concluded that interpretation of "may" as a permissive, rather than as a restrictive, term "complements the overall policy of the [LLC] Act to give maximum effect to the parties' freedom of contract." FN64 Accordingly, the Supreme Court affirmed this Court's judgment that the parties were allowed to vest exclusive jurisdiction in a foreign jurisdiction.

FN62. 6 Del.C. § § 18-101 to 18-1109.

FN63. *Elf Atochem,* 727 A.2d at 296.

FN64. *Id.*

The Limited Partner Defendants acknowledge the reasoning and holding of *Elf Atochem* and recognize that both the LLC Act and the DRULPA are designed to give maximum effect to the parties' freedom of contract. Nonetheless, they contend that even if Section 17-1101(d) of the DRULPA is properly interpreted in a way that does not restrict the types of duties that may be addressed in a partnership agreement to those duties that pre-exist at law or in equity, the types of duties that may be addressed are, nonetheless, restricted by concerns of public policy. For example, Defendants contend that the parties to the Partnership Agreement may not contract to that which violates statutory law. But there is no argument in this case that the parties, by agreeing that the Limited Partner Defendants are subject to a duty of loyalty have violated statutory law. Nothing in DRULPA or our case law expressly prohibits a limited partnership agreement from providing that limited partners are subject to duties that the common

law or equity does not independently impose upon them.

*20 The Limited Partner Defendants attempt to distinguish *Elf Atochem* by asserting that, in this case, even if "may" is interpreted as allowing the creation of duties by contract, a *fiduciary* duty of loyalty may not be imposed upon the Limited Partner Defendants because they have no management authority, do not participate in Partnership governance, and "[e]quity does not impose fiduciary obligations on limited partners unless they have governing authority." FN65 In support of their position, the Limited Partner Defendants refer to cases where our Courts have held that because, or to the extent that, a limited partner has governing authority, the limited partner may be subject to fiduciary obligations. FN66

FN65. Fisher's Post-Trial OB at 62.

FN66. *See, e.g., KE Property Management Inc. v. 275 Madison Management Inc.,* Del. Ch., C.A. No. 12683, at 24, Hartnett, V.C. (July 27, 1993).

In post-trial briefing and at post-trial oral argument, the parties vigorously debated whether our law imposes default fiduciary duties on limited partners and whether a fiduciary duty of loyalty is an equitable and/or contractual concept. The parties contend that these issues have not been addressed by our Courts and/or that this Court has issued conflicting opinions. FN67 I disagree.

FN67. The parties kindly spared me the more cynical, but occasionally proferred argument that, because our Supreme Court has yet to speak to the issue that this Court should therefore not presume to address the subject definitively.

Defendants correctly assert that our Courts have not found limited partners subject to *default* fiduciary duties in the absence of a fiduciary relationship. In at least three cases this Court found that limited partners may be subject to fiduciary duties. In each case, the Court noted the existence of a fiduciary relationship. In *KE Property Management,* FN68 a limited partnership agreement empowered a limited partner to participate in control of the partnership by granting the ability, under specified circumstances, to remove the general partner. Then Vice Chancellor, now Justice, Hartnett held that "to the extent that a

Not Reported in A.2d                                                                                                                    Page 19
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

partnership agreement empowers a limited partner [with] discretion to take actions affecting governance of the limited partnership, the limited partner may be subject to the obligations of a f iduciary..." FN69 In *James River-Pennington Inc. v. CRSS Capital, Inc.,* FN70 the limited partner owed a fiduciary duty of loyalty to the partnership and to the other partners because it controlled the general partner through the votes of three of its six directors. In *RJ Associates, Inc. v. Health Payors' Organization Limited Partnership, HPA, Inc.,* FN71 the Court noted that even though the partnership agreement provided that the limited partners shall not participate in the operation, management or control of the partnership, the limited partner was involved in the governance and operation of the partnership and the limited partner was entitled to designate a majority of the general partner's board of directors.

FN68. *Id.*

FN69. *Id.* at 24.

FN70. Del. Ch., C.A. No. 13870, Steele, V.C. (Mar. 6, 1995).

FN71. Del. Ch., C.A. No. 16873, Jacobs, V.C. (July 16, 1999).

The defendants in *Kahn v. Icahn* FN72 and *Sonet v. Timber Co.,* FN73 although not limited partners, also stood in a fiduciary relationship to a limited partnership and to other partners. Citing to Section 17-1101, the Court in *Kahn* explained that "Delaware law permits partners to agree on their rights and obligations to each other and to the partnership. This is so even when Delaware law might impose different rights and obligations absent such agreement." FN74 Because the partnership agreements in *Kahn* and *Sonet* addressed and permitted the actions alleged to be breaches of fiduciary duty, the Court dismissed plaintiffs' claims.

FN72. Del. Ch., C.A. No. 15916, Chandler, C. (Nov. 12, 1998); *aff'd,* Del.Supr., No. 524, 1998, 2000 WL 140018 (Jan. 24, 2000).

FN73. Del. Ch., 722 A.2d 319 (1998).

FN74. *Kahn* at 5.

**\*21** Apparently interpreting the Chancellor's

decisions in *Kahn* and *Sonet* as applying only to the fiduciary obligations of a *general* partner in a limited partnership, Plaintiff argued post-trial that this Court has not clearly resolved whether *limited* partners are subject to default fiduciary duties. In support of this argument, CFLP relies on cases where this Court has referred to Section 17-1105 of the DRUPLA which provides that "[i]n any case not provided for in this chapter the Delaware Uniform Partnership Law [DUPL] FN75 ... and the rules of law and equity ... shall govern" and to DUPL Section 1521 which provides that all partners are accountable as fiduciaries.

FN75. 6 *Del.C.* § § 15-101 to 15-1210.

As discussed above, however, in these cases, the Court noted the existence of a fiduciary relationship that formed the basis for fiduciary duties. Furthermore, the Court's references to statute were consistent with the Chancellor's conclusion in *Sonet,* that *only* when the partnership agreement is "silent or ambiguous, or where principles of equity are implicated, will a Court begin to look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence." FN76

FN76. *Sonet,* 319 A.2d at 324.

Any lingering doubts as to whether this Court should turn to statute to impose fiduciary duties upon limited partners who do not participate in the management or control of the partnership or as to whether *Sonet* could be interpreted as applying only to *general* partners were put to rest in *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.,* FN77 where the parties directly raised the issue of whether a limited partner could be subject to default fiduciary duties in the absence of a fiduciary relationship. In *Bond Purchase,* the plaintiff limited partner FN78 did not stand in a fiduciary relationship with the partnership and other partners. None of the factors which this Court had previously recognized as establishing a fiduciary relationship, and thus giving rise to corresponding fiduciary duties, existed. Unlike the limited partners in *KE Property Management, James River-Pennington* and *RJ Associates,* there was no allegation that the limited partner controlled the general partner, that the limited partner was in common control with the general partner, or that the partnership agreement provided the limited partner with power to take action affecting the management or operation of the partnership. Moreover, I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 20
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

specifically noted that this Court in *KE Property Management* limited its reliance on statute to situations where the partnership agreement establishes a fiduciary relationship. Thus, in *KE Property Management,* the Court's reference to statute was supported by equitable principles springing from a fiduciary relationship as well as a partnership agreement that was silent on the scope of the corresponding fiduciary duties. Because I found no contractual language in *Bond Purchase* creating a fiduciary relationship nor an intent to impose fiduciary duties, I concluded that the plaintiff limited partner owed no fiduciary duties to the partnership or to other partners.

> FN77. Del. Ch., C.A. No. 16643, Steele, V.C. (July 23, 1999).

> FN78. The plaintiff in *Bond Purchase* was not, in all respects, a "limited partner." However, for the purpose of this discussion, the description is accurate.

**\*22** CFLP's claims in this case raise a question I had no need to address in *Bond Purchase:* whether parties to a limited partnership agreement may contractually impose fiduciary duties on limited partners who otherwise have no power to manage or to control the partnership. Defendants assert that "[t]here is no case law directly prohibiting the creation of fiduciary duties by contract precisely *because* it is unprecedented for a contract to purport to create traditionally equitable duties (*e.g.* fiduciary duties) ." FN79 Defendants seem to conclude that the relationship described by the term "fiduciary" is limited to management or control of another's resources independent of one's own. Even as basic a resource as Black's Law Dictionary recognizes that a fiduciary relationship can exist "when one merely places trust in the faithful integrity of another, who as a result gains superiority *or* influence over the first" and that a "fiduciary" is "one who owes to another the duties of good faith, trust, confidence and candor." FN80 The duty of loyalty that parties may impose upon one another by mutual assent in a contract, whether management, operational, or governance responsibilities follow or not, is a mutual exchange of a promise to treat one another with good faith, trust, confidence and candor. It is a promise articulated to define a mutually agreed relationship explicitly beyond that of any "implied" duty of good faith in an ordinary contract. This is hardly a shocking expectation to seek and to bargain for even in the harsh, competitive world of brokering

Treasuries.

> FN79. Fisher's Post-Trial OB at ¶ 110 (emphasis in original).

> FN80. BLACK'S LAW DICTIONARY, 256-57 (Pocket ed.1996).

Unprecedented or not, the Limited Partner Defendants cannot credibly argue that they have not knowingly and willingly accepted the obligation of a fiduciary duty of loyalty to the CFLP Partnership. And, in this situation, holding that the parties to the CFLP 1996 Partnership Agreement could bargain to impose a fiduciary duty of loyalty on the limited partners is not remotely offensive to any concerns of public policy. To the contrary, upholding the right of these partners to agree by a mutual exchange of dependent promises that they will not act in ways that threaten to destroy the common mission and purpose of the partnership upholds DRUPLA's policy of affording partners "the broadest possible discretion in drafting their partnership agreements." FN81 The duty of loyalty proclaimed in the 1996 Partnership Agreement requires no dependency upon a default concept to a narrow definition derived from corporate common law. The scope of the duties owed by the parties must be determined by reference to the nature of this particular business enterprise. FN82

> FN81. *Elf Atochem,* 727 A.2d 286, 291.

> FN82. As in *Cencom Cable Income Partners, L.P. Litig.,* Del. Ch., C.A. No. 14634, Steele, V.C. (Jan. 27, 2000), the issues in this case may not be resolved by blind reference to existing default rules or precedents established in other business settings. While these concepts may provide guidance, they do not reflect the unique nature of the partnership setting.

CFLP's existence and effectiveness depends upon its partners' loyalty to the Partnership. The record in this case clearly establishes that brokering Treasuries is a very competitive business and that CFLP jealously guards its dominant position in the market. Approximately eighty to ninety percent of CFLP's profit is derived from the brokerage of Treasuries and the sale of Treasury related data. FN83 CFLP provides a service by creating a marketplace for Treasuries and the success of that service depends upon the loyalty of its employees and its partners. As

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 21
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

Lutnick explained, CFLP is not a publicly traded partnership. Many partners are employees or family members of employees. The success of this still highly personalized business activity depends in large part on the stability of the Partnership and a sense of commitment to a common purpose. The capital needed to maintain or expand CFLP's position in the marketplace is contributed by its partners. A duty of loyalty is necessary to get partners to commit funds free of the fear that their fellow partners will compete in the very business that is central to CFLP's success: the brokerage of Treasuries. The CFLP Limited Partners, like partners in a general partnership, must be able to rely on a mutuality of commitment and purpose. CFLP's Limited Partners are not akin to shareholders investing in a corporation. CFLP's Limited Partners would not rationally warrant the ability to compete in a way that would harm the Partnership and their fellow partners-the Partnership's source of capital. Allowing such competition would undermine the Partnership's financial structure and destroy the morale of this people-oriented enterprise.

FN83. Lutnick 5/13/99 at 314-6; Simon 6/25/98 at 46-8.

IV. Application of the Partnership Agreement

A. Did CFI or Cantor Engage in "Competitive Activities" in Violation of Section 3.03(a) of the 1996 Partnership Agreement?

*23 Because I concluded in Section III D(1) that CFI and its Affiliates are improperly included within Section 3.03(a), Plaintiff's claims based on this Section are resolved in favor of Defendants. If, despite my confidence that they should not be, however, CFI and its Affiliates were included within this Section, the outcome would be as described below.

Plaintiff contends that, if CFI and its Affiliates are subject to Section 3.03(a), then Cantor and CFI have breached Section 3.03(a) of the 1996 Partnership Agreement. Section 3.03(a) prohibits the "Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing ... Competitive Activities." Cantor is an Affiliate of CFI. FN84

FN84. Section 1.01 of the 1996 Partnership Agreement defines "Affiliate" as "any

Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person." Cantor, through the Iris Cantor Trust, is CFI's controlling shareholder. Cantor, therefore, is an Affiliate of CFI.

By entering into the licensing agreement with CBB, MDC engaged in a "Competing Business" because the agreement "involve[d] the conduct of the wholesale or institutional brokerage business" FN85 and because the resulting business "compete[d] with ... other business conducted by the Partnership or any Affiliated Entity [and] such business was first engaged in by the Partnership or an Affiliated Entity." FN86

FN85. 1996 Partnership Agreement Section 11.04(c).

FN86. Id.

If Cantor were included within the prohibition in Section 3.03(a), Cantor, as a director and owner of MDC, would have engaged in a Competitive Activity as defined by Section 11.04(c) of the 1996 Partnership Agreement which provides that a partner engages in a Competitive Activity when the partner "directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business ." Because Cantor is a director and the controlling shareholder of MDC, a Competing Business, she would have engaged in a Competitive Activity. FN87 If Cantor, an Affiliate of CFI, had engaged in a Competitive Activity, CFI also would have breached Section 3.03(a) of the 1996 Partnership Agreement. FN88

FN87. Although the ability to do so is not a necessary element of liability, I note that Cantor, as controlling shareholder, could have prevented MDC from engaging in a competing Business. She did not. As a director, Cantor approved the License Agreement. (See Tr. Trans. Vol. XXVII at 5099-100; DX1011).

FN88. If Section 3.03(a) were not

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

interpreted as imposing responsibility upon CFI for the actions of its Affiliate, the Partnership would have no remedy against a non-Partner Affiliate who engages in a Competitive Activity.

B. Did the Limited Partner Defendants Breach Section 3.03(b) of the 1996 Partnership Agreement?

Plaintiff also contends that CFI, Cantor and Fisher have breached their contractual and fiduciary duties of loyalty under Section 3.03(b) of the 1996 Partnership Agreement. Section 3.03(b), by its terms applies to all "Partner [s]." CFI, Cantor and Fisher are "Partners" of CFLP. FN89 Thus, Section 3.03(b) applies to CFI, Cantor and Fisher.

> FN89. Section 1.01 of the 1996 Partnership Agreement defines "Partners" as "the General Partners and the Limited Partners."

CBB was formed to provide a means to trade Treasuries through an electronic screen-based trading system. FN90 Pursuant to the February 9, 1998, Licenses Between Chicago Board Brokerage, L.L.C. and Market Data Corporation (the "License Agreement"), MDC licensed proprietary software for MarketPower, CBB's "fully interactive electronic trading system in the U.S. Treasury Market." FN91 Cantor was a director and majority owner and Fisher a shareholder, director and chairman of MDC while MDC engaged in activity harmful to CFLP. Cantor and Fisher did not merely engage in business with competitors of the Partnership. They engaged in the Partnership's principal line of business with the Partnership's competitors. These actions harmed CFLP by affecting its ability to continue to function and its ability to raise capital. The Partnership Agreement imposed a duty of loyalty to prohibit those very actions in order to preserve CFLP's ability to function and to protect its continuing source of capital. Accordingly, both Cantor and Fisher have breached their contractual and fiduciary duties of loyalty in Section 3.03(b) of the 1996 Partnership Agreement.

> FN90. PX181 at No. 22; PX23 at 1.

> FN91. PX89 at CBB 0027973; PTO ¶ 27. (PX89 is the Equity Investor Notebook. At trial (Vol. XXVII at 5129-31) the notebook was admitted and I noted it would be useful to have as a reference to understand the facts

when writing the opinion. I also stated, however, that I would careful in using it to make findings of fact. I know of no reason why this reference would be objectionable as there is no genuine dispute about this material fact.)

V. Claims of Aiding and Abetting and Tortious Interference

*24 Counts II and IV raise accomplice liability theories against MDC. Count II is a claim for aiding and abetting the Limited Partner Defendants' breach of fiduciary duty, and Count IV is a claim for tortiously interfering with the 1996 Limited Partnership Agreement. The elements of tortious interference are: (1) a valid contract, (2) defendants' knowledge of the contract, (3) an intentional act by defendants that is a significant factor in causing the breach of the contract, (4) lack of justification for defendants' acts and (5) resulting injury. FN92 The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant, and (4) resulting damages to plaintiff. FN93 MDC contends that Plaintiff cannot succeed on the merits of its aiding and abetting and tortious interference claims because it cannot prove the elements of knowing participation or of intentional action without justification.

> FN92. *See Wallace v. Wood,* Del. Ch., C.A. No. 15731, at 13, Steele, V.C. (Oct. 12, 1999).

> FN93. *Id.* at 17.

It is undisputed that MDC and CBB agreed to work together to develop and sell a product that would compete directly with CFLP in CFLP's core business: brokering Treasuries. In October 1997 counsel for CFLP informed MDC that, in CFLP's opinion, "[Cantor] and Mr. Fisher are ... violating [their] duty of loyalty to the Partnership" by developing an electronic trading system for U.S. Government securities. FN94 The minutes of board meetings as well as correspondence acknowledged to have been received, lead me to conclude that MDC, whose controlling shareholder and Chief Executive Officer were members of MDC's Board of Directors and CFLP Limited Partners, had knowledge of the contractual and fiduciary obligations in the 1996 Partnership Agreement, and knowingly, intentionally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 23
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

and without justification engaged in actions in violation of these duties. MDC's actions caused "harm" to or "damaged" CFLP as explained in Section VIII. On Plaintiff's claims for aiding and abetting a breach of fiduciary duty and tortious interference with contract, I find for Plaintiff.

> FN94. *See* PX16 (Letter to Iris Cantor from Stephen M. Merkel, counsel for CFLP dated Oct. 6, 1997). Both Franz W. Paasche, counsel for MDC, and Fisher received copies of the letter. *See* PX18 (Letter to Stephen Merkel, Esq. from Franz W. Paasche dated Oct. 14, 1997, acknowledging receipt of Oct. 6 letter) and PX19 (Letter to Stephen Merkel, Esq. from John P. Schmitt acknowledging receipt of Oct. 14, 1997, letter on behalf of Fisher).

### VI. Defenses

The Limited Partner Defendants contend that, regardless of the terms of the 1996 Partnership Agreement, CFLP should be estopped from raising a claim for breach of that Agreement. Defendants contend that the parties' prior course of dealing establishes that CFLP routinely acquiesced in Defendants' competition with CFLP.

"Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." FN95 Defendants contend that since 1993, the year that CFLP first inserted the language currently found in sections 3.03(a), 3.03(b) and 11.04(c) of the 1996 Partnership Agreement, MDC engaged in many transactions with CFLP's competitors that fall within the definitions of Competitive Activities or Competing Business, or that might arguably be considered in violation of the Limited Partner Defendants' duty of loyalty and harmful to CFLP. Defendants contend that CFLP never objected to, or sought to enjoin, these transactions, notwithstanding that some of these transactions involved the development of electronic trading systems for companies that compete directly with CFLP. Thus, Defendants contend that CFLP led them to believe that MDC's transaction with CBB was also permissible under the 1996 Partnership Agreement.

> FN95. *NTC Group, Inc. v. West Point-Pepperell, Inc.,* Del. Ch., C . A. No. 10665, 1990 at 13, Hartnett, V.C. (Oct. 17, 1990) (citations omitted).

**\*25** In support of their argument, Defendants refer to several transactions between MDC and CFLP's competitors. These transactions fall into two general categories: data enhancement transactions and software distribution transactions.

### A. The Data Enhancement Transactions

Before its spin-off, when MDC was still a Department within Cantor Fitzgerald, the Department's business was limited to reselling information provided by Cantor Fitzgerald. Within one year of the spin-off, MDC entered into long-term contracts with MKI Securities Corp. ("MKI"), Tullet & Tokyo ("Tullet") and Fulton Prebon to distribute data they obtained from their customers' trades. These three companies were, to some degree, similar to Cantor Fitzgerald: they were all wholesale or institutional brokers. FN96 MDC agreed to display MKI's data for mortgaged backed securities, FN97 Tullet's data in foreign exchange and capital markets, FN98 and Fulton Prebon's data for money market information . FN99

> FN96. Tr. Trans. Vol. XXVIII at 5369-71, Tr. Trans. Vol. V at 809-10, 812-13, 816.

> FN97. Tr. Trans. Vol. XXVIII at 5371.

> FN98. Tr. Trans. Vol. XXXI at 5881.

> FN99. *Id.* at 5882-3.

Defendants contend that, by engaging in these transactions, MDC has engaged in business with CFLP's competitors and repeatedly has engaged in a "Competing Business," one definition of which in the 1996 Partnership Agreement is an activity that "involves the conduct of the wholesale or institutional brokerage business." FN100 Therefore, having acquiesced in MDC's participation in a Competing Business in the past, CFLP cannot now claim that similar actions are prohibited.

> FN100. 1996 Partnership Agreement Section 11.04(c).

Not Reported in A.2d                                                                              Page 24
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

CFLP concedes that Bernie Cantor did not object to the MKI, Tullet, and Fulton Prebon transactions. His acceptance of the transactions, according to CFLP, however, was based on the fact that the transactions provided a benefit to CFLP and did not harm CFLP. CFLP also stresses the fact that none of these data enhancement transactions ever threatened CFLP's core business of brokering Treasuries and that Bernie Cantor refused to allow MDC to enter into a data enhancement transaction involving the distribution of *Treasury* information obtained from a competitor of CFLP. FN101

FN101. *See* Tr. Trans. Vol. II at 288-291.

B. Software Distribution Transactions

In addition to the data enhancement transactions, MDC entered into two contracts to provide broker technology. First, in April 1991, MDC contracted with MKI's successor, Cowen & Co. ("Cowen") to develop a broker system. Cowen was not permitted to use the system to broker U.S Treasuries. FN102 Cowen was allowed to use it only in connection with its brokerage of mortgage-backed securities and zero coupon bonds. At the time MDC entered the contract with Cowen, Cantor Fitzgerald used its own internal mortgage-backed securities electronic trading system. In 1993, Patriot Securities, L .P. ("Patriot") took over Cowen's mortgage backed securities brokerage business and the MDC-Cowen agreement was assigned to Patriot. FN103 At that time, MDC and Patriot amended the agreement to allow Patriot to use the system to broker repurchase and reverse repurchase agreements of U.S. Government securities instead of zero coupon government bonds. FN104 A later amendment also permitted Patriot to use the system to broker emerging market debt and non-U.S. dollar repurchase and reverse repurchase agreements. FN105 Neither Cowen or Patriot were ever permitted to use the MDC system to broker Treasuries. FN106

FN102. Nadan 1/12/99 at 86-87, 92; Tr. Trans. Vol. XII at 2229.

FN103. PX 1079 (First Amendment to Computer Software Agreement dated March 23, 1993) at 2.

FN104. Tr. Trans. Vol. IV at 724; DX1079 at 2; Tr. Trans. Vol. XII at 2230.

FN105. PX50 (Second Amendment to Computer Software Agreement dated June 22, 1993) at 2; Tr. Trans. Vol. XII at 2231.

FN106. Tr. Trans. Vol. XXX at 5691-92.

*26 Second, in December 1993, MDC entered into an agreement with InterCapital Debt Trading, Ltd. ("ICAP") under which MDC agreed to develop an electronic trading system for ICAP for the trading of emerging market securities. Under the agreement, MDC gave a "limited license" to ICAP to use MDC software for trading corporate debt issued in Europe, sovereign debt issued by certain restricted entities, and certain other restricted instrument classes . FN107 Cantor Fitzgerald's business in these emerging markets was practically nonexistent. FN108 ICAP was not allowed to use the system to broker Treasuries. FN109

FN107. PX52 (Computer Software, Management and Technical Support Agreement dated Dec. 31, 1993).

FN108. Tr. Trans. Vol. II at 379-80.

FN109. Tr. Trans. Vol. XXX at 5694.

According to Defendants, the Cowen and ICAP deals were Competing Businesses and Competitive Activities under the Partnership Agreement. Therefore, by failing to object to these transactions, CFLP acquiesced in Defendants' competition with CFLP and created the impression that the CBB transaction also would not constitute a breach of the 1996 Partnership Agreement.

CFLP contends that it allowed the Cowen deal to go forward because that deal was completed before the present Section 3.03 was added to the Partnership Agreement and because Cowen competed with CFLP only in the mortgage-backed securities market, an area of very little or no profitability for CFLP. Plaintiff concedes that it permitted the InterCapital deal to go forward, even though that deal was consummated after Section 3.03 was added to the Partnership Agreement, but notes that ICAP was not allowed to use the system to broker Treasuries. Finally, CFLP points out that it repeatedly denied MDC permission to engage in transactions involving the brokerage of Treasuries. First, CFLP rejected Patriot's proposal to trade odd lots of Treasuries on a system designed by MDC. FN110 Second, CFLP rejected a request from Winstar that sought a

Not Reported in A.2d                                                                                    Page 25
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

proposal from MDC to provide a electronic trading system for the brokerage of odd-lot Treasuries. FN111 Third, CFLP rejected MDC's request to provide an electronic trading system for U.S. Government securities to Fundamental Brokers, Inc. FN112

FN110. Tr. Trans. Vol. XII at 2231-2236.

FN111. Tr. Trans. Vol. II at 317-19 (Lutnick testified that Winstar representatives met with him and the proposed deal was turned down); Tr. Trans. Vol. XXX at 5695 (Seidel testified that MDC independently rejected a transaction with Winstar because they could not agree on a price and because MDC was offered the opportunity to construct an odd-lot system for CFLP, which MDC eventually completed. (*See* Seidel 2/5/99 at 982-83)).

FN112. Tr. Trans. Vol. II at 308-11; Vol. XXXVIII at 7023-24.

CFLP also contends that this Court can find no acquiescence on its part as a matter of law because the 1996 Partnership Agreement contains an express non-waiver provision. FN113 Section 20.09 of the 1996 Partnership Agreement states:

FN113. "[A]cquiescence is a species of waiver." *Frank v. Wilson & Co.,* Del. Ch., 9 A.2d 82, 87 (1939), *aff'd,* Del.Supr., 32 A.2d 277 (1943). *See also Realty Growth Invs. v. Council of Unit Owners,* Del.Supr., 453 A.2d 450, 456 n. 6 (1982) ("As we see it, acquiescence and waiver both go to the extent of any inference which can be reasonably drawn from [plaintiffs'] conduct.").

No provision of this Agreement shall be deemed to have been waived unless such waiver is in writing signed by the waiving party. No such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Thus, Plaintiff contends that it could not have implicitly waived its rights by its failure to object to the Cowen or ICAP transactions or to any of MDC's other business dealings. FN114

FN114. *Marta v. Mutual Life Ins. Co.,* 887 F.Supp. 722, 727 (D.Del.1995).

C. Analysis

Waiver is a voluntary and intentional relinquishment of a known right. Defendants do not contend, and I find no evidence, that CFLP waived its right to object to the specific acts challenged in this action: the provision of software for the brokerage of Treasuries. Defendants' allegations may be read to assert that the Partnership Agreement was modified by the parties' conduct. Parties may modify a contract by conduct or words, FN115 but the alleged modification "must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." FN116

FN115. *See Durig v. Woodbridge,* Del.Super., No. 90C-NO-22, Ridgely, P.J., Dec. 8, 1992; *aff'd,* Del.Supr., 622 A.2d 1095 (1993).

FN116. *Reeder v. Sanford School, Inc.,* Del.Supr., 397 A.2d 139, 141 (1979). *See also, Continental Insurance Co. v. Rutledge & Co.,* Del. Ch., C.A. No. 15539, at 19, Chandler, C. (Jan. 10, 2000) (The high evidentiary burden of proving alterations with 'specificity and directness' assists the Court in ruling out "the possibility that the asserting party has alleged an oral modification in an attempt to unilaterally alter a pre-existing, but unfavorable, agreement.").

*27 The instant action concerns only MDC's provision of software for the brokerage of Treasuries. MDC has engaged, without objection from CFLP, and without a written waiver, in data enhancement transactions that arguably fall within the definition of Competing Business or Competitive Activity. But, as discussed above in Section III D(1), CFI and its Affiliates are not properly included within the coverage of Section 3.03(a) of the 1996 Partnership Agreement. Thus, they are not prohibited from engaging in a "Competing Business" or "Competitive Activity," unless the actions also violate Section 3.03(b).

CFLP can not prevent MDC from pursuing data enhancement transactions. The MKI, Tullet and Prebon data enhancement transactions, however, are not similar to the conduct at issue in this case and

Not Reported in A.2d                                                                 Page 26
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

CFLP's approval or failure to contest MDC's participation or insistence upon a signed writing in these transactions does not waive its right to object to MDC's conduct relating to CFLP's core business, the brokerage of Treasuries. I conclude that CFLP has neither acquiesced in MDC's provision of software for the brokerage of Treasuries nor intentionally relinquished its right to object.

## VII. Defendants' Remaining Counterclaim

The only remaining counterclaim is an allegation that CFLP, after the 1996 Settlement Agreement, improperly amended the Partnership Agreement to limit CFI's and Cantor's right to indemnification. Specifically, in their First Counterclaim, Defendants contend that CFLP amended Section 9.05 of the 1995 Partnership Agreement by eliminating a partner's right to receive indemnification for fees and expenses of counsel selected by the partner and by requiring that a partner's choice of counsel first be approved by CFLP's Managing General Partner. According to Defendants, "Section 14.01 of the 1995 Partnership Agreement provides that the 1995 Partnership Agreement 'may not be amended to':
(d) materially adversely affect the economic interest of a Partner in the Partnership ... without the consent of (x) two-thirds in interest of all Partners in the case of an amendment applying in a substantially similar manner to all classes of Units ... FN117

FN117. Answer of Iris Cantor and CFI to Third Amended Complaint, ¶ 105.

The indemnification amendment, according to Defendants, "materially and adversely affects the economic interests" of partners by limiting their right to indemnification. I disagree. Defendants' creative quotation replaced key language from Section 14 .01 with ellipses. The complete text of Section 14.01(d) provides "materially adversely affect the economic interest of a Partner *in the Partnership or the value of Partnership Units by altering the interest of any Partner in the amount or timing of distributions or the allocation of profits, losses or credits* other than any such alteration caused by the acquisition of additional Units by any Partner pursuant to this Agreement or as otherwise expressly provided herein, without the consent ..." (emphasis added). Attorney's fees do not fit within this definition or the definition cited by Defendants.

**\*28** Defendants also claim that the amendment deprived the partners of their "contractual rights to indemnification that, at the time the rights were granted, were described as rights that 'shall remain operative according to their terms and in full force and effect regardless of the termination of the Partnership or any Partner's interest in the Partnership." ' FN118 But Defendants do not assert that their rights have been altered as a result of the termination of the Partnership or their interest in the Partnership. Moreover, the 1996 Partnership Agreement and the 1996 Settlement Agreement provides CFLP with the right to amend the Partnership Agreement *without* the consent of any Limited Partner except as provided above in Section 14.01(d).

FN118. *Id.* at ¶ 150.

Finally, to the extent that the references in Defendants' First Counterclaim to an action filed in the Supreme Court of the State of New York and to an attempt by Defendants to comply with the terms of Section 14.01 the 1995 Partnership Agreement, may be read as an inartful expression of a claim that CFLP is attempting to deny a vested right, I note that Defendants have failed to provide any evidence to support this claim. Accordingly, on this Counterclaim, I find for Plaintiff.

## VIII. Harm and Remedies

To summarize the findings, Cantor and Fisher have breached the fiduciary duty of loyalty to which they were bound by contract in Section 3.03(b) of the 1996 Partnership Agreement. MDC has aided and abetted the breach of fiduciary duty and tortiously interfered with the 1996 Partnership Agreement. In what way, then, and based upon what proven facts, does equity shape an appropriate remedy?

### A. Allegations of Past Harm

CFLP contends that the threat and launch of MarketPower inflicted harm in several forms. First, CFLP contends that, the CBB/MDC threat forced it to abandon its plans to pursue electronic trading in Europe and to focus instead on the threat posed by MarketPower. FN119 This change in plan allegedly caused CFLP lost business opportunities. Second, CFLP contends that the threat of competition and actual competition from MarketPower forced it to

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

reduce commissions by offering fixed-fee deals. Third, CFLP contends that the threat of MarketPower delayed and reduced the funds raised by its intended July 1998 private placement of Partnership units to fund the expansion in Europe. Fourth, CFLP contends that the Defendants' actions have damaged the "integrity" of the Partnership Agreement, suggesting to other partners that they may breach the Agreement "assuming that they can successfully defend their actions in court while continuing to receive Partnership Distributions." FN120 Finally, CFLP contends that it has suffered harm by not being the first to offer inter-dealer electronic trading of Treasuries.

> FN119. While the record establishes that CFLP redirected resources of the firm to meet its perceived threat of harm from CBB and MDC's collaboration, little concrete evidence of specific monetary damages exists and much speculation about success in Europe pervades the record.

> FN120. Post-Trial Brief of Plaintiff Cantor Fitzgerald, L.P. on Issues of Harm and Remedy at 41.

Most of Plaintiff's claims are supported with expert testimony including descriptions of the advantages of being the first to enter a market, the harm that is likely to be caused by a failure to be the "first mover," rough estimates of commissions that CFLP might have been able to earn had it been able to be the first in Europe, and the number and price of fixed-fee commission deals.

*29 There is no doubt that the record supports the conclusion that CFLP vigorously reacted to the threat posed by MarketPower and that the reaction negatively affected the business prospects of CBB. There is doubt, however, about the extent to which CBB posed an actual threat to the success of CFLP and, most importantly, the extent to which there is any evidence that the harm CFLP alleges, including lower commissions, CFLP's failure to be the first in other markets, and CFLP's delayed and lower-priced private placement were caused primarily, or at all, by the actions of Defendants and CBB as opposed to other forces in this competitive market. As CFLP concedes, "in hindsight, CBB took little business from CFLP" FN121 and "CBB ultimately did not succeed." FN122

> FN121. Id. at n. 11.

> FN122. Id. at 42.

B. Allegations of Threatened Harm

MDC and CBB's launch of MarketPower proved ultimately unsuccessful and no party now claims that the venture currently operates or that MDC and CBB are presently offering electronic trading. CFLP contends, however, that MDC, through its proprietary software, has the ability to repeat its conduct and has proclaimed its intention to offer electronic trading in the future. CFLP refers to the "reasonable expectation that Cantor Fitzgerald would be harmed by CBB" as "a threat that has now, for reasons specific to CBB, abated." FN123 Nonetheless it asserts that the expectation of harm "is far from being in the past." FN124

> FN123. Answering Post-Trial Brief of Plaintiff Cantor Fitzgerald, L.P. on Issues of Harm and Remedy at 29.

> FN124. Id.

Support for CFLP's contention that MDC intends to engage in actions that will harm CFLP rests largely on evidence that MDC believes the best future for the company rests upon pursuit of deals driven by technology, as opposed to data enhancement. There is no support for the contention that MDC is currently acting or is planning to act in a way that violates the Partnership Agreement. As Seidel testified, MDC intends to proceed with development of broker systems "[o]nly if these proceedings are resolved and [MDC is] allowed to do so. [MDC is] not going to do anything that violates whatever the Court dictates." FN125

> FN125. Tr. Trans. Vol. XXX at 5757.

I find absolutely no evidence that MDC is currently engaged in or threatening to engage in conduct that violates the Partnership Agreement and that harms or threatens to harm CFLP. I am also unable to conclude that MDC directly caused any specific quantifiable harm to CFLP or that it currently unconscionably, fraudulently, or unfairly engages in revenue producing enterprises upon which a constructive trust should or even could be imposed. Accordingly there is no basis for any of the extreme forms of relief sought by Plaintiff. FN126

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 28
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

FN126. In its post-trial briefs, CFLP proposes several forms of remedies dependent upon the exercise of the Court's inherent equitable powers including a permanent injunction and several forms of relief aimed at removing the Limited Partners from the Partnership. As discussed below, I find that while the Defendants' breach of the Partnership Agreement was egregious, the harm caused to the Partnership and CFLP may be appropriately remedied by declaratory relief and an award of attorneys' fees.

It is clear, however, that the Limited Partner Defendants have engaged in an egregious breach of the Partnership Agreement, that MDC aided and abetted the breach and tortiously interfered with the Partnership Agreement, and that the conduct of the Limited Partner Defendants was "reasonably expected to harm" CFLP and violated their duty of loyalty in Section 3.03(b) of the 1996 Partnership Agreement. That I find insufficient quantifiable evidence that the Limited Partners caused harm that can be addressed by a specific monetary award of damages is irrelevant to the issue of whether they have breached their fiduciary duty of loyalty or have engaged in actions that "cause[d] harm." CFLP's demand that the Limited Partner Defendants who breached their duty of loyalty be subject to a permanent injunction whose terms would mandatorily remove them from the partnership and result in a forfeiture of their interests simply asks too much of equity. No rational balancing of the equities in this case, after measuring the wrongful conduct of the offending parties against the harm suffered by CFLP would result in the extreme, punitive sanction of a forfeiture of the Limited Partners' interest in CFLP. Admittedly, this longstanding, seething dispute has neither been a profitable diversion of economic resources nor a healing process toward an improved working relationship. Nonethless, however inartfully, equity must try to right the wrongs with adequate remedies that destroy no party in the process.

*30 Both parties have devoted an enormous amount of time and effort to present this Court with a thorough analysis of their respective claims and a detailed explanation of their past course of action. Here, like in many originally complex cases brought quickly under alleged exigent circumstances calling for immediate relief, fluid market conditions

controlled by business judgment, the positions of the parties and the nature of relief appropriate for equity to impose has changed. CFLP does not face the threat of imminent, irreparable injury. All remaining parties, however, face the need to close the open issues arising from their legal relationship and to encourage predictable and acceptable conduct in the future. The appropriate focus on remedy should be a declaratory judgment, explained by this Opinion, allowing the parties to move forward after assessing the costs of past misjudgment about the relative rights of the parties to the offending actors. Equity arose, after all, from a

[D]istinct interest not only in redressing injury but in preventing and mitigating inequity where possible. It [is] far more focused upon the specific nature of the dispute at hand and the promotion of reasonableness in the specific and particularized relationship[s] ...."
FN127

FN127. Wolfe and Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 2-2(a), pg. 21 (1998).

The resolution that follows outlines the appropriate redress for past grievances, acts as a sign post for future conduct and removes any room for prospective disagreement about the relative rights of the parties under current Agreements. Therefore, I conclude that:

(1) CFLP's Managing General Partner mistakenly amended the Partnership Agreement without the consent of CFLP's Limited Partners in a manner inconsistent with the 1996 Settlement Agreement. The 1996 Settlement Agreement assures CFI and its affiliates that they will be Limited Partners for all purposes. Therefore, on part of Defendants' Second Counterclaim, I find for Defendants concluding that CFI and its Affiliates are not included within Section 3.03(a) of the 1996 Partnership Agreement. The Partnership Agreement shall be reformed to comply with this ruling.

(2) While there is insufficient evidence to support CFLP's claim that the actions of the Limited Partner Defendants caused monetary harm to CFLP quantifiable in a specific award of damages, the Limited Partner Defendants have breached their contractually imposed fiduciary duty in Section 3.03(b) by disloyally engaging in conduct that could be reasonably expected to and did harm the Partnership.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 29
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
**(Cite as: Not Reported in A.2d)**

(3) MDC aided and abetted the Limited Partners' breach of fiduciary duty and tortiously interfered with the 1996 Partnership Agreement among CFLP and the Limited Partners. The nature of the harm can not be quantified, however, in an award of specific monetary damage.

(4) CFLP's past consent to certain of MDC's business transactions did not constitute a waiver of its right to object to the Limited Partner Defendants engaging in an activity that threatened to harm the Partnership's market position and its ability to raise capital by facilitating a competitor's attempt to broker Treasuries.

*31 (5) CFLP has waived its right to assert that CFI, Cantor and Fisher's participation in data enhancement transactions constitutes a *per se* breach of the duty of loyalty they owe to CFLP and to other CFLP partners. Where transactions proposed by those Limited Partners through MDC or otherwise involve the provision of Treasury data provided by a competitor of CFLP or the transaction involves the provision of other data also generated by CFLP, the Limited Partners must first obtain the written consent of CFLP's Managing General Partner. The Managing General Partner can not unreasonably withhold its consent. A basis to deny consent to the Limited Partner's participation would be a reason to believe that the provision of such data harms an existing business of CFLP.

(6) There is no evidence to support CFLP's claims that the Limited Partner Defendants are currently engaging in or threatening to engage in conduct in violation of the Partnership Agreement. The evidence does not support a view that MDC will engage in such conduct in the future or that it will act contrary to the judgment of this Court declaring the relative rights of the parties in this action. Accordingly, there is no justification for any form of extraordinary injunctive relief.

(7) If there is any "link" between the cost that CFLP incurred to address what it perceived as the threat posed by MDC and CBB, CFLP has waived its right to seek this form of compensatory damage. FN128

> FN128. *See Fitzgerald v. Cantor*, Del. Ch., C.A. No. 16297, Steele, V.C. (Nov. 11, 1998)

(8) There is no basis for imposition of a constructive trust on MDC's revenues or on MDC's current enterprises. MDC receives no revenues from any source directly resulting from its aiding and abetting the Limited Partners' breach of fiduciary duty nor from its tortious interference with the CFLP Partnership Agreement. Further, there is no evidence that CFI, Cantor or Fisher currently fraudulently, unconscionably, or unfairly or will in the future so derive any monetary benefit from their current breach of the Partnership Agreement. Therefore, no constructive trust can be imposed.

(9) Finally, the Limited Partner Defendants' egregious breach of the 1996 Limited Partnership Agreement, MDC's aiding and abetting the breach of fiduciary duty and tortious interference with contract represents the type of conduct justifying an award of attorney and expert witness fees. FN129 In general, this Court follows the American rule and parties are required to bear their own litigation expenses. However, this Court may award fees where equity so provides. FN130 In general, " fees can be awarded only when the party against whom the fees are assessed acted in bad faith, fraudulently, negligently, vexatiously, wantonly or oppressively." FN131 "[T]o constitute bad faith, the defendants' action must rise to a high level of egregiousness." FN132

> FN129. *See generally* Arbitrium (Cayman Islands) Handles Ag v. Johnston, 705 A.2d 225 (Del.Ch.1997); *aff'd*, Del.Supr., 720 A.2d 542 (1998).

> FN130. 10 *Del. C.* § 5106.

> FN131. *See Judge v. City of Rehoboth Beach*, Del. Ch., C.A. No. 1613, at 3, Chandler, V.C. (Apr. 29, 1994) and cases cited therein. *See also, Huntington Homeowners Assoc., Inc. v. 706 Investments*, Del. Ch., C.A. No. 16633, Lamb, V.C. (May 28, 1999).

> FN132. *Judge* at 4.

Defendants' actions in this case were egregious. As in *Judge*, "[t]his is not a case where defendants' position was defensible, and reasonable men or woman could differ on the outcome." FN133 MDC's controlling shareholder and Chief Executive Officer were CFLP Limited Partners with knowledge of the Partnership Agreement. They clearly knew that MDC had entered into a contract to license software that would directly, unambiguously, and intentionally assist a CFLP

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 30
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236
(Cite as: Not Reported in A.2d)

competitor in CFLP's core business: the brokerage of Treasuries. That was their goal. They knew that goal to be blatantly incompatible with and harmful to the business objective of CFLP and their partners in that venture.

FN133. *Id.*

**\*32** As early as June 1996, whether one accepts the draft or final minutes of MDC's Board meeting, there was no doubt that Lutnick, on behalf of CFLP, understood MDC's intention, and made it clear that CFLP objected to MDC's proposed provision of software for the purpose of brokering Treasuries to CFLP competitors. Nonetheless, MDC continued to pursue this business opportunity. In October 1997, Cantor, CFI, Fisher and their legal counsel were warned formally in writing that their continued course of conduct violated the Partnership Agreement. At this juncture, Defendants could have attempted a peaceful resolution of the conflict. After this time, there could be no question that their continued efforts to develop and license software for CBB willfully, recklessly, and intentionally violated the Partnership Agreement.

Perhaps some may wonder why this case does not represent a classic example of a disagreement where each side honestly, in good faith, believes that its interpretation of the Partnership Agreement is the correct interpretation. But the testimony of MDC principals on this issue is not credible and does not persuade me that this is an example of a good faith disagreement. To the contrary, I am convinced that Defendants, perhaps for sound business reasons, (mis)assessed the risks of going forward and decided to proceed against the odds.

While Defendants were, of course, free to engage in this risk/benefit analysis, they had no legal justification for their actions. Defendants have failed to demonstrate by a preponderance of the evidence that their actions were justified by the parties' prior course of dealing. No person in the position of Defendants could reasonably conclude that the parties' course of dealing, whether described as CFLP "approving" or CFLP "failing to object" to data enhancement transactions, justified the license of software to CBB for the purpose of developing a platform for dealing in the brokerage of Treasuries. Defendants placed their own economic interests ahead of those of CFLP. They forced CFLP into a position where it had no choice but to defend its business position by attack litigation in its most

expensive form: a request for expedited injunctive relief. This is clear evidence of bad faith. FN134 Equity cannot condone such action.

> FN134. *Abex Inc. v. Koll Real Estate Group, Inc.,* Del. Ch., C.A. No. 13462, at 37, Jacobs, V.C. (Dec. 22, 1994) ("Actions by a defendant which necessitate judicial intervention to secure a clearly defined and established right, are evidence of bad faith.").

Every wrong demands a remedy. The only proven harm in this case that may not be remedied by declaratory relief is the unnecessary expense forced upon CFLP to defend against the Defendants' deliberate and egregious breach of the Partnership Agreement. CFLP is entitled to judgment on the merits and to be reimbursed for the fees and costs associated with this litigation.

Plaintiff shall submit an order for declaratory relief consistent with this Memorandum Opinion. An application for fees and expenses will be considered upon presentation. All parties will have an appropriate period of time to respond and be heard.

Counsel has expressed concern that this Opinion might implicate release of confidential material when it becomes available to persons other than counsel and the litigants in this action. Counsel should promptly address these concerns, if any, to the Court immediately after review of this Opinion.

**\*33** IT IS SO ORDERED.

Del.Ch.,2000.
Cantor Fitzgerald, L.P. v. Cantor
Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.