# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------x
RONALD CANTOR, et al.,                          :
                                                :
                 Plaintiffs,                    :
                                                :     No. 97-CIV-586-KAJ
        v.                                      :
                                                :
RONALD O. PERELMAN, et al.,                     :
                                                :
                 Defendants.                    :
------------------------------------------------x
```

## COMPENDIUM OF UNREPORTED OPINIONS TO DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Attorneys for Defendants

DATED: December 6, 2005

# **INDEX**

CASES                                                                TAB NO.

Demetree v. Commonwealth Trust Co.,
 C.A. No. 14354, 1996 WL 494910 (Del. Ch. Aug. 27, 1996) ........................................... 1

Ince & Co. v. Silgan Corp.,
 C.A. Nos. 10941, 11159, 1994 WL 728799 (Del. Ch. Dec. 8, 1994) ............................... 2

Lee v. Engle,
 C.A. Nos. 13323, 13284, 1995 WL 761222 (Del. Ch. Dec. 15, 1995) ............................. 3

New Castle County v. Crescenzo,
 C.A. No. 7082, 1985 WL 21130 (Del. Ch.  Feb. 11, 1985) ............................................... 4

Tenneco Auto. Inc. v. El Paso Corp.,
 C.A. No. 18810-NC, 2001 WL 1456487 (Del. Ch. Nov. 7, 2001) .................................... 5

# **TAB 1**

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)
**(Cite as: 1996 WL 494910 (Del.Ch.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
William C. DEMETREE and Jack C. Demetree, Plaintiffs,
v.
COMMONWEALTH TRUST CO., Trustee of Trust 896
U/A dated November 29, 1962,
Defendant.
**Civil Action No. 14354.**

Submitted: Aug. 13, 1996.
Decided: Aug. 27, 1996.

Richard A. Levine, Richard H. Morse, and Janet Z.
Charlton, of Young, Conaway, Stargatt & Taylor,
Wilmington, for Plaintiffs.

Richard P. Beck, and Barbara MacDonald, of Morris,
James, Hitchens & Williams, Wilmington, for Defendant.

MEMORANDUM OPINION

ALLEN, Chancellor.

*1 Pending are cross-motions for summary judgment in this
action for specific performance of a contract. The
determination of these motions requires an interpretation of
two contracts executed contemporaneously on July 22,
1966. Summary judgment has been requested on the basis of
those contracts and other documents executed by and
between the parties, as well as affidavits and deposition
testimony.

The first contract ("Sublease"), entered into between
plaintiffs, William C. Demetree and Jack C. Demetree
("Demetrees"), and Horne's Enterprises, Inc. ("Horne's"),
granted the Demetrees a Sublease for a portion of a parcel of
land leased by Horne's from defendant, Commonwealth
Trust Co. ("Commonwealth"), in a prior contract ("Prime
Lease"). The Prime Lease provided for an initial term of
fifteen years and granted Horne's an option to renew for four
additional successive ten year periods. As contemplated
under the Prime Lease, the subsequent Sublease required the
Demetrees to construct a motel on the premises and granted

a conditional option to renew the Sublease in the event that
the Prime Lease had been renewed as well.

The second contract ("Triparty Agreement"), executed
contemporaneously by the Demetrees, Horne's, and
Commonwealth, both extended the initial termination date
of the Prime Lease from 1981 to 1985, and granted the
Demetrees a conditional right to enter into a direct lease
with Commonwealth if the Prime Lease were terminated by
Horne's "prior to the expiration of the four renewal periods"
provided for in the Prime Lease. An interpretation of this
right to enter into a new direct lease "on the same terms,
provisions, and conditions" *as the Sublease* is the subject of
this dispute.

In 1985 the original term of the Prime Lease expired and the
Prime Lease was extended until 1995. In 1990 Horne's
sought protection of the bankruptcy court and in that
connection entered into a release with Commonwealth in
which it waived its right to extend the Prime Lease. The
Demetrees did not learn of this at the time; they continued
to occupy the premises pursuant to their Sublease. On May
18, 1995, the Demetrees received notice that both the Prime
Lease and Sublease would terminate on December 31, 1995.
Commonwealth informed the Demetrees that, in its view,
the Demetrees had no right to renew the Sublease or require
Commonwealth to enter into a new direct contract.

The Demetrees disagree and here seek specific performance
compelling Commonwealth to enter into a new lease term
which the Demetrees contend is required by the Triparty
Agreement. According to the Demetrees' interpretation of
the Triparty Agreement, Commonwealth is contractually
obligated to enter into a direct lease for a term ending
December 31, 2005, with an option to renew for two
additional ten year terms.

For the following reasons, I conclude that the Triparty
Agreement did not create a legal obligation for
Commonwealth to enter into the demanded new direct lease.
The Triparty Agreement, however, obligates
Commonwealth to enter into a direct lease with the
Demetrees for a single seventeen year term, without an
option to renew, as provided by the terms of the Sublease.
[FN1] The Demetrees' motion for summary judgment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 2
Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)
**(Cite as: 1996 WL 494910 (Del.Ch.))**

should be granted as a matter of law pursuant to Court of Chancery Rule 56 since there is no dispute as to the material facts set forth below. *See Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979). Commonwealth's motion for summary judgment is denied because the Demetrees are entitled to the above stated specific performance.

> FN1. Although neither of the parties argued that the contracts entitle the Demetrees to a direct lease with a seventeen year non-renewal term, as will be discussed below, this is the most objectively reasonable construction of the literal meaning of the contractual language used by the parties.

*I. FACTS*

*1. THE PRIME LEASE*

**\*2** On September 3, 1963, Commonwealth, a Delaware corporation and trustee of Trust 896, leased then undeveloped trust property along Route 896, in Newark, Delaware, to Horne's to be used as the site of a motel and restaurant. The Prime Lease provided for an initial term of fifteen years, commencing January 1, 1964, and an option to renew for four successive ten year terms under the same terms and conditions.

*2. THE SUBLEASE*

On July 22, 1966, with Commonwealth's consent, Horne's subleased a portion of the property to the Demetrees for an initial seventeen year term, ending December 31, 1985, on the condition that Demetree construct and operate a Horne's Franchise Motor Lodge on the subleased premises. [FN2] The Sublease granted the Demetrees a right to renew the Sublease upon the same terms and conditions only if the Prime Lease was renewed for such period. Under the Sublease, Horne's was under no legal obligation to renew the Prime Lease. Section 18 of the Sublease stated that:

> FN2. Construction of the motel was to be completed within eighteen months. At the time of this contract, the Demetrees planned to sub-sublease the property to Scott-Douglas Corporation to operate the motel once it was constructed.

in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term ... [the] Sublease shall terminate at the end of the then existing term, notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option.

The Sublease specified rents payable for the initial period and four renewal periods.

*3. THE TRIPARTY AGREEMENT*

Contemporaneously, on July 22, 1966, Commonwealth, Horne's, and the Demetrees entered into the Triparty Agreement. [FN3] The Triparty Agreement extended the initial term of the Prime Lease to twenty-two years so that it would end on the same day as the Sublease, December 31, 1985, unless renewed. In addition, paragraphs 4 and 5 of the Triparty Agreement granted the Demetrees a right to enter into a direct lease with Commonwealth if the Prime Lease were terminated under specified circumstances.

> FN3. Benjamin Vinton, Jr., Commonwealth's president at the time of the Triparty Agreement, signed the contract on behalf of Commonwealth, but it appears from his January 3, 1996 deposition testimony that he was not involved in the negotiations or drafting of the clause at issue.

Paragraph 4 of the Triparty Agreement provided that Commonwealth would notify the Demetrees of "any default or breach" by Horne's. In the event of such a default or breach, the Demetrees would be entitled either to cure such default or breach to avoid termination of the Prime Lease by Commonwealth or enter into a new direct lease with Commonwealth on specified terms. Paragraph 4 stated that "in event said Prime Lease is terminated for any reason" the Demetrees have the right to:

execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable, and except that the terms of paragraph 3(a) of [the Triparty Agreement] shall be incorporated in any new lease. (italics added)

Paragraph 5 provided that "in the event Lessee [Horne's]



Not Reported in A.2d
Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)
**(Cite as: 1996 WL 494910 (Del.Ch.))**

shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees have a right to:

> *3 execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. [FN4] (italics added)

> > FN4. According to Jack Demetree's Affidavit, when he signed the Triparty Agreement he understood this paragraph to gave the Demetrees a "right to lease the property through 2025, whether or not Horne's continued to lease the property from Commonwealth."

Paragraph 3(a) of the Triparty Agreement, referred to above, stipulated conditions concerning the execution of a mortgage on the subleased premises. Among other things, the Demetrees agreed that any mortgage on the premises would have a final maturity date not exceeding December 31, 1985, the termination date for the initial term of the Sublease. On October 11, 1966, Chase Manhattan Bank extended a $500,000 loan to the Demetrees to construct the motel on the premises. [FN5] In addition to the $500,000 loan, the Demetrees invested approximately $275,000 for the construction of the motel.

> > FN5. The loan had an "interest only" clause applicable to the eighteen month motel construction period, to be followed by a fifteen year term to pay down the principal and interest together. The Triparty Agreement extended the initial term of the Prime Lease, preventing it from expiring during the term of the Demetrees' construction loan. After such extension, the loan would be paid off approximately three years before the end of the initial term of the Prime Lease and Sublease.
> > An assignment of the sub-sublease agreement with Scott-Douglas Corporation, dated July 29, 1966, was accepted as collateral to secure such loan. After Scott-Douglas defaulted in 1969, the Demetrees entered into a new sub-sublease agreement with Albright and Chason Motels of Delaware, Inc., with an initial term of five years

and options for renewal terms expiring December 31, 1985.

### 4. SUBSEQUENT EVENTS

On March 25, 1977, Horne's assigned its interest in the Prime Lease and Sublease to Wayanne, Inc., ("Wayanne"), a Delaware corporation. Wayanne subsequently exercised its option to renew the Prime Lease for an additional ten year term, and the Demetrees did the same, extending the termination date of both the Prime Lease and Sublease to December 31, 1995.

On March 10, 1990, Wayanne and Commonwealth entered into an agreement of "Release, Accord and Satisfaction" to resolve issues in connection with Wayanne's alleged default under the Prime Lease. The agreement released both parties from potential claims arising out of the Prime Lease and included a statement by Wayanne that it would not exercise the renewal option for a second ten year term, which would cause the Prime Lease to expire on December 31, 1995. The Demetrees were not informed about this agreement until May 18, 1995. [FN6] During this time period, there were other communications between the parties concerning the property. [FN7]

> > FN6. Commonwealth's attorney asked Wayanne's attorney to "maintain confidentiality" concerning the agreement, despite Demetree's right to receive notice of termination of the Prime Lease. According to Commonwealth, confidentiality concerning the agreement was required due to ongoing litigation to quiet title on the property. Title was cleared March 2, 1994. *Commonwealth Trust Co. v. Ferry,* C.A. No. 12714 (Del.Ch. Mar. 2, 1994) (Judgment Order).

> > FN7. In 1991, the Demetrees discussed the property with Vinton during a telephone conversation. According to them, Vinton suggested joint redevelopment of the property since they would be "in it for a long time." Vinton denies ever having made that statement. As will become clear, however, neither this factual dispute nor the notice issue is relevant to the determination of this

contract construction action.

In June 1992, the Demetrees executed an Agreement of Non-Disturbance and Entitlement with a subtenant Marinor Corp., Marinor's subtenant, MSL Motel Corporation, and Commonwealth. The agreement provided that if the Demetrees' Sublease were terminated by Commonwealth or the Demetrees or should "expire prior to December 31, 2025," for reasons other than MSL's default, then Commonwealth and the Demetrees agreed MSL's possession, use and enjoyment would not be disturbed.

On May 18, 1995, Commonwealth gave the Demetrees notice for the first time that the Prime Lease and Sublease would expire on December 31, 1995. Subsequent to receiving this notice, the Demetrees initiated this action requesting specific performance of paragraph 5 of the Triparty Agreement, construed by the Demetrees to provide a right to enter into a new lease directly with Commonwealth.

## II. RULES OF CONTRACT CONSTRUCTION

The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. See CORBIN ON CONTRACTS § 1 (1960); Bell Atlantic Meridian Systems v. Octel Communications Corp., C.A. No. 14348 (Del.Ch. Nov. 28, 1995), Mem.Op. at 12. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time. See WILLISTON ON CONTRACTS § 601 (1961); RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. c (1981); Burge v. Fidelity Bond & Mortgage Co., 648 A.2d 414, 420 (Del.1994); Klair v. Reese, 531 A.2d 219, 223 (Del.1987).

*4 Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words. See Myers v. Myers, 408 A.2d 279, 281 (Del.1979). Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. See City Investing Co. v. Continental Cas. Co., 624 A.2d 1191, 1198 (Del.1993); US West, Inc. v. Time Warner Inc., C.A. No.

14555 (Del.Ch. May 6, 1996), Mem.Op. at 21. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning. See Bell Atlantic, Mem.Op. at 13, n. 4.

In cases where the language of a contract is clear and unambiguous, this Court may not consider parol evidence to interpret the intent of the parties. [FN8] Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del.1992); Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del.1991). Deviation from this rule is only required where a literal reading of a contractual provision would be "clearly unreasonable and yield an arbitrary result." Citadel Holding, 603 A.2d at 822. The parol evidence rule is based on the principle that the clear meaning of the language of a written agreement most accurately reflects the understanding of the parties at the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered. See Mesa Partners v. Phillips Petroleum Co., 488 A.2d 107, 113 (Del.Ch.1984). The theoretical underpinnings of the parol evidence rule are particularly applicable in cases such as this one where a very long period has passed since the execution of the contract, making oral testimony concerning expectations of the parties at the time potentially less reliable. See 32A C.J.S., EVIDENCE § 851, p. 216 (1964) (the parol evidence rule is founded on the maxim that "written evidence is so much more certain and accurate than that which rests in fleeting memory only, that it would be unsafe, when parties have expressed the terms of their contract in writing, to permit weaker evidence to control").

> FN8. A preliminary assessment of extrinsic evidence may be necessary in certain cases in order to determine whether any ambiguities exist. See US West at n. 10; Bell Atlantic at n. 5; WILLISTON ON CONTRACTS § 601 (1961).

Of course, if there is uncertainty concerning the meaning of contractual language, the Court should consider the context and circumstances in which the words were used in order to determine the intended meaning. Klair, 531 A.2d at 223. [FN9] When faced with contract language reasonably susceptible to two possible constructions, this Court has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)
(Cite as: 1996 WL 494910 (Del.Ch.))

Page 5

long followed the principle that the:

> FN9. Relevant extrinsic evidence could include statements made during negotiations of the contract, prior dealing evidence, or relevant trade or industry practices. In this action, the depositions and affidavits presented to this Court did not contain any statements made at the time of negotiations. Instead, the submitted evidence merely contained recent testimony concerning memories of what the subjective expectations of the parties were at the time the contract was executed in 1966. Even if extrinsic evidence were considered in this action, these statements would not aid the Court in construing a reasonable objective meaning of the contract.

one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*5 *Holland v. National Automotive Fibres,* 194 A. 123, 127 (Del.Ch.1937). As will be discussed below, however, this is not such a case because the Triparty Agreement is capable of a literal and sensible interpretation, even if there remains doubt that it is an interpretation that the parties subjectively shared. That interpretation, which is well within the bounds of a commercially reasonable agreement, should be enforced.

*III. PLAIN MEANING ANALYSIS*

The Triparty Agreement can be read in conjunction with the Sublease to have one clear, unambiguous meaning. Consequently, none of the extrinsic evidence offered by the parties need be analyzed to interpret the contracts. Since Wayanne terminated the Prime Lease as of December 31, 1995, instead of extending the Prime Lease by exercising its option to renew, paragraph 5 is the principal relevant provision of the Triparty Agreement. As stated above, paragraph 5 of the Triparty Agreement provided that "in the event Lessee [Horne's] shall terminate said prime lease prior

to the expiration of the four renewal periods," the Demetrees would have a right to:

> execute a new lease with Lessor on the *same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. (italics added)

As the prime lessee did, by its waiver, terminate its rights under the prime lease "prior to the expiration of the four renewal periods," the literal command of Section 5 is that by reason of that fact, the Demetrees have a right "to execute a new lease with lessor." What are the terms of the new lease to which they are entitled? They are, again literally, "the same terms, provisions and conditions as set forth in said Sublease." As to term, the Sublease referred to *seventeen* "remaining years" of rental payments under the Sublease. In light of that fact and the fact that the Sublease did not contain any other provisions that could be construed as providing the Demetrees an independent right to renew the lease, it is not possible to conclude that the Demetrees have a right to a new lease with renewal rights. The plain meaning of the Sublease was that it would terminate at the end of the seventeen year term unless the Prime Lease had been renewed. Thus, paragraph 5 provided the Demetrees in the event that Horne's lease terminated at any time prior to expiration of the four renewal period with a right to enter into a direct lease with Commonwealth for a non-renewable seventeen year lease term. [FN10] If the parties had wanted the Demetrees to have the alleged renewal option, it could have been easily written into the contract. [FN11]

> FN10. Paragraph 4 granted the Demetrees a similar right to enter into a direct lease with Commonwealth in the event that Commonwealth, not Wayanne, terminated the Prime Lease prematurely due to default, breach, or any other reason. This construction of the two paragraphs does not cause them to be redundant, as argued by the Demetrees, because they are applicable under different circumstances.

> FN11. Paragraph 5 only refers to the four renewal periods in the context of when the Prime Lease might be terminated by the prime lessee. This

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 6
Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)
**(Cite as: 1996 WL 494910 (Del.Ch.))**

provision recognizes that the Prime Lease had an option to renew. Paragraph 5, however, does not create a right to enter into a direct lease with a right to renew. The Demetrees have a right to a direct lease on the same terms as the Sublease, not the Prime Lease.

In resisting any claimed right to a further lease under paragraph 5, Commonwealth asserts that paragraph 18 of the Sublease specifically precludes such a right. Section 18 provided that:

> in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term ... *[the] Sublease shall terminate at the end of the then existing term,* notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option. (italics added)

*6 This argument is not sound however. The right created by paragraph 5 of the Triparty Agreement is a right to a new lease on terms of the Sublease. That new lease itself will contain a provision in the form of Section 18. (That such a provision will be surplusage at this stage creates no legal difficulty). But as the right to the new lease does not arise out of the Sublease, the provision of the Sublease that terminates it is not fatal to the right to get a new lease on the terms reflected in paragraph 5.

An option to renew for forty years is a material term that reasonable parties would spell out clearly in such an agreement if it were an intended, agreed upon term. [FN12] It would be inappropriate for this Court to read in such a term to this contract which can be interpreted in accord with its plain meaning. If the parties had intended to create such an option to renew, it would have been objectively unreasonable for paragraph 5 to state that the lease would be on the same terms as the Sublease which contains no such right. Since paragraph 5 does not grant the Demetrees a right to enter into a direct lease with an option to renew for future terms, this Court will not create such a right.

> FN12. Demetree cites *Wilgus v. Salt Pond Inv. Co.* for the proposition that a requirement that a contract be on the "same terms and conditions" requires only that it be upon "the same material

terms and conditions." 498 A.2d 151, 159 (1985). While this may be true, it does not help Demetree in this matter because the renewal option would appear to be a highly material term in this context.

Similarly, it would be incorrect for this Court to ignore the plain language of paragraph 5 affording the Demetrees a right to a direct lease on substantially the same terms as the Sublease in the event that the Prime Lease was terminated prior to the four renewal periods. The material sections of the Sublease set out a seventeen year term lease with no option to renew. This is exactly what the Demetrees are entitled to demand from Commonwealth at this time and Commonwealth is obligated to grant. The public policy interest in commercial certainty will be best served by adhering to the plain meaning of the agreement entered into between the parties, even if the parties' differing subjective expectations at the time were different, as may have been true in this action.

*IV. CONCLUSION*

The Demetrees are not entitled to their requested specific performance because there is no legal obligation for Commonwealth to enter into a ten year direct lease with a right to renew for two successive ten year periods according to the plain meaning of the Triparty Agreement. Nonetheless, the Triparty Agreement, read in conjunction with the Sublease, entitles the Demetrees to specific performance requiring Commonwealth to enter into a direct lease for a seventeen year term, with no renewal option. Specific performance is appropriate in this type of action where a clear and definite agreement can be enforced without requiring the Court to supply essential additional or inconsistent contractual terms. *MF v. F,* 172 A.2d 274, 176 (Del.Ch.1961). Since there are no disputes as to material facts controlling the resolution of this action, the Demetrees are entitled to summary judgment as a matter of law and an order granting the above stated appropriate specific performance.

Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 728799 (Del.Ch.)
**(Cite as: 1994 WL 728799 (Del.Ch.))**

Page 1

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
INCE & CO., a New York partnership, and Fidelity Bankers Life Insurance
Company, a Virginia corporation, Plaintiffs,
v.
SILGAN CORPORATION, et al., Defendants.
INCE & CO., a New York partnership, and Fidelity Bankers Life Insurance
Company, a Virginia corporation, Petitioners,
v.
SILGAN CORPORATION, Respondent.
**Civ. A. Nos. 10941, 11159.**

Submitted: Nov. 18, 1994.
Decided: Dec. 8, 1994.
Edward B. Maxwell, 2nd, Bruce L. Silverstein, and James P. Hughes of Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiffs.

Allen M. Terrell, Jr. of Richards, Layton & Finger, Wilmington, of counsel: Kenneth M. Kramer, and James R. Warnot, Jr. of Shearman & Sterling, New York City, for defendants.

*MEMORANDUM OPINION*
CHANDLER, Vice Chancellor.

**\*1** The parties to this lawsuit reached a settlement in January, 1994, but they have returned to this Court to resolve their differences over the terms of their settlement agreement. This case is one of several lawsuits involving Silgan Corporation, all of which resulted from a merger transaction that cashed out minority stockholders. Ince & Co. and Fidelity Bankers Life Insurance ("Petitioners") brought an appraisal action against Silgan Corporation and a breach of fiduciary duty action against Silgan and its directors (collectively as "Silgan"). This Court approved the settlement of those actions on January 18, 1994, but that settlement agreement (the "Settlement Agreement") requires

an adjustment of the agreed figure--$1,525,000--based on any subsequent judgment or settlement in a related action, *EQJ Partnership v. Silgan Corp.,* Del.Ch., C.A. No. 11107 ("C.A. No. 11107"). Silgan has settled with several of the parties in C.A. No. 11107, so Silgan must adjust its payment to Petitioners according to the terms of the Settlement Agreement. The parties agree that the Settlement Agreement requires Silgan to pay Petitioners the difference between the per share value of the settlement in C.A. No. 11107 and $10.17--the per share value of the settlement of this action; but they cannot agree on how the Settlement Agreement calculates the value of the settlement in C.A. No. 11107.

I. THE PARTIES' CONTENTIONS

Silgan informed Petitioners of its settlement in C.A. No. 11107 and offered to pay Petitioners an additional $9000 to comply with the Settlement Agreement. Petitioners reviewed the settlement in C.A. No. 11107 and concluded that Silgan's offer did not conform to the terms of the Settlement Agreement. Petitioners contend that the Settlement Agreement directs Silgan to calculate the lump payment made to the settling parties in C.A. No. 11107 and divide it by the number of shares held by those parties. Silgan should then pay the difference between that figure and $10.17. This method of calculating the consideration paid by Silgan in C.A. No. 11107 results in a per share value that exceeds $10.50 per share.

Silgan states that Petitioners' interpretation of the Settlement Agreement violates both the letter and spirit of the agreement. Silgan characterizes the disputed clause in the Settlement Agreement as a "Most Favored Nation" clause, which is designed to provide Petitioners equal treatment with all subsequently settling parties. Silgan settled with several parties in C.A. No. 11107 for $6.50 per share plus: i) 10.416% interest through April 30, 1994, compounded annually; and ii) 10% simple interest from May 1 to the date of the payment. Silgan applied the settlement formula in C.A. No. 11107 to the date of the payment to Petitioners, and derived a settlement value of $10.23 per share. Silgan argues that this method of calculating the value of the settlement in C.A. No. 11107 serves the purpose of the Most Favored Nation clause: it results in equal payments to all of the settling parties. Petitioners' lump sum calculation, argues

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                  Page 2
Not Reported in A.2d, 1994 WL 728799 (Del.Ch.)
**(Cite as: 1994 WL 728799 (Del.Ch.))**

Silgan, provides Petitioners with a windfall because they receive interest payments for a period in which they had use of their money.

## II. THE SETTLEMENT AGREEMENT

**\*2** The parties agree that the objective meaning of the language of the Settlement Agreement should decide this dispute. *See Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992). I will not consider any extrinsic evidence of the intent of the parties unless the language of the contract does not provide a clear meaning. *Id.* The relevant portion of the Settlement Agreement reads:

> ... the "Settlement Amount" shall be defined as the greatest amount of consideration that Silgan agrees to provide by way of settlement to any petitioner in [C.A. No. 11107] (a "Settling Petitioner") when divided by the number of shares of Silgan common stock with respect to which the Settling Petitioner has demanded appraisal rights, less [\$10.17] for each share of common stock with respect to which the Settling Petitioner has demanded appraisal rights.

The plain meaning of this agreement supports the interpretation put forth by Petitioners. The Settlement Agreement instructs Silgan to divide the consideration paid to settling parties of C.A. No. 11107 by the number of shares held by those settling parties. The language of the agreement does not distinguish between the fair value paid to the settling parties and the interest paid to the settling parties. Silgan argues that the provision provides a windfall to the Petitioners because they will receive interest payments for a period in which they had use of their money. Silgan provides a plausible reason for drafting a "Most Favored Nation" clause that accounts for the effect that different payment dates will have on the consideration paid to settling parties, but it has not reconciled that purpose with the plain language of the agreement. The Settlement Agreement does not distinguish between interest payments and fair value payments in the settlement of C.A. No. 11107. It applies a simple solution that lumps all payments to the settling parties of C.A. No. 11107 together and divides by the number of shares held by those parties.

The Settlement Agreement's formula for adjusting the settlement in the case of a court judgment in C.A. No. 11107 provides further support for Petitioners' interpretation of the clause. The Settlement Agreement distinguishes between fair value and interest payments if C.A. No. 11107 is determined by a judgment of a court. Silgan does not explain why the Settlement Agreement clearly separates the fair value and interest payments if C.A. No. 11107 is settled by a judgment, but refers only to "consideration" in the case of a settlement. I conclude that the parties would not have drafted very different provisions for judgments and settlements had they intended both provisions to provide the same outcome.

Silgan does not address why the Settlement Agreement explicitly accounts for interest set by a judgment, but refers only to "consideration" for settlements. Instead, Silgan directs the Court to consider the "purpose" of Most Favored Nation clauses--providing equal settlements to all parties. Nevertheless, the contract provides a clear and unambiguous meaning, so the "purpose" must come from the language itself. *Rhone-Poulenc Basic Chemicals Co.,* 616 A.2d at 1195. Furthermore, the result reached by looking to the plain language is not unreasonable. If the fair value and interest rate is determined by a judgment, then the court sets the fair value and the interest rate. The Settlement Agreement makes a distinction between fair value and interest under these circumstances. If C.A. No. 11107 is settled, the settling petitioners may not care whether the payments are characterized as fair value or interest, but Silgan would have an incentive to characterize the bulk of the payments as interest if it affects Silgan's liability in this action. The Settlement Agreement does not attempt to establish a complex system to monitor Silgan's incentives to manipulate fair value and interest in a settlement. Rather, it avoids the problem by looking at the total consideration paid in a settlement. The Settlement Agreement clearly directs Silgan to divide the total consideration paid to the settling parties in C.A. No. 11107 by the number of shares held by those parties. Silgan cannot alter the clear meaning of the contract language by referring to the supposed purpose of a Most Favored Nation clause.

**\*3** Counsel should confer and agree upon a form of order that will implement this decision.

Westlaw.

Not Reported in A.2d                                                          Page 3
Not Reported in A.2d, 1994 WL 728799 (Del.Ch.)
**(Cite as: 1994 WL 728799 (Del.Ch.))**


Not Reported in A.2d, 1994 WL 728799 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 3**

Westlaw.

Not Reported in A.2d                                                                      Page 1
Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709
**(Cite as: 1995 WL 761222 (Del.Ch.))**

# H

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Robert A. LEE, as owner of account Guarantee Trustee and
Trust F/B/O Robert
Alton Lee Jeremiah O'Connor and Harry Lewis, Plaintiffs,
v.
Clyde Wm. ENGLE, et al., Defendants.
Richard N. FRANK, Plaintiff,
v.
Clyde Wm. ENGLE, et al., Defendants.
**Nos. Civ. A. 13323, Civ. A. 13284.**

Submitted: Aug. 21, 1995.
Decided: Dec. 15, 1995.

Kevin Gross of Rosenthal, Monhait, Gross & Goddess,
P.A., Wilmington, Robert D. Goldberg of Biggs &
Battaglia, Wilmington, for Plaintiffs.

OF COUNSEL: Stephen Lowey, Sherrie Brown of Lowey,
Dannenberg, Bemporad & Selinger, P.C., New York, City;
Lawrence B. Sucharow, Linda P. Nussbaum, Barbara Hart
of Goodkind Labaton Rudoff & Sucharow, New York, City,
for Robert A. Lee, as owner of account Guarantee Trustee
and Trust FBO Robert Alton Lee.

OF COUNSEL: Michael Fuchs, Roy Jacobs of Wolf Popper
Ross Wolf & Jones, New York, City, for John C. Boland.

Clark W. Furlow, Joanne Marie H. Shalk of Smith
Katzenstein & Furlow, Wilmington, Delaware. OF
COUNSEL: Zwerling, Schachter & Zwerling, New York
City for Defendant Sunstates Corporation.

Jesse A. Finkelstein, Matthew J. Ferretti, Lisa A. Schmidt of
Richards, Layton & Finger, Wilmington, for Individual
Defendants.

Michael D. Goldman, Stephen C. Norman, Kevin R.
Shannon of Potter Anderson & Corroon, Wilmington, for
Defendants Hickory Furniture Co., Telco Capital Corp., and
RDIS Corp.

MEMORANDUM OPINION

STEELE, Vice Chancellor.

## CONTENTIONS OF PARTIES

*1 On March 10, 1995, Plaintiffs brought a Motion to
Compel Production of Documents they requested in the
course of a shareholder derivative suit and class action.
Defendants refused to produce the requested documents.
Defendants assert the attorney-client privilege, work product
doctrine, and accountant-client privilege protect these
documents. This is the opinion deciding that motion to
compel.

## FINDINGS OF FACT

Plaintiff, Richard N. Frank, filed a shareholders' derivative
suit and class action ("the Frank Action") on December 8,
1993 against Clyde Wm. Engle ("Engle"), William D.
Schubert, Robert J. Spiller, Jr., Howard Friedman, Lee N.
Mortenson, Harold Sampson (collectively "the Individual
Defendants"), Hickory Furniture Company ("Hickory"),
Telco Capital Corporation ("Telco"), and Acton (now
Sunstates) Corporation ("Sunstates" or "the Company"). The
Frank Action alleges breaches of fiduciary duty, waste of
corporate assets, failure to pay dividends on $3.75
cumulative Preferred Stock, and violation of the duty of
disclosure with regard to the December 3, 1993 proxy
statement. The Frank Action seeks injunctive, declaratory,
and monetary relief.

Plaintiffs, Robert A. Lee, John C. Boland, Jeremiah
O'Connor, and Harry Lewis filed a shareholders' derivative
action ("the Lee Action") against the Individual Defendants,
Hickory, Telco, and RDIS Corporation ("RDIS"), naming
Sunstates as a nominal defendant. Engle is Chairman of the
Board and Chief Executive Officer of Sunstates. The Lee
Action alleges waste and breach of fiduciary duty. It also
seeks declaratory and monetary relief. Plaintiffs in the Lee
Action served a request for production of documents on
February 2, 1994.

Sometime thereafter, the parties entered into a
confidentiality stipulation and agreed to arrange discovery
in both the Frank and Lee actions. Defendants have
produced nearly 30,000 pages of documents to Plaintiffs.
On August 19, 1994, Defendants provided Plaintiffs with a
detailed privilege list. This list identified all documents

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                                                                                                                       Page 2
Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709
**(Cite as: 1995 WL 761222 (Del.Ch.))**

which Defendants withheld or produced in redacted form on the basis of privilege. The list provided the date, author, recipient, copy, summary description, and privilege Defendants asserted. Defendants have refused to produce 731 documents based on attorney-client, accountant-client, and work product privilege.

On October 12, 1994, Plaintiffs responded with a letter voicing objections to the privilege list. The Individual Defendants responded to these objections in a letter dated December 2, 1994. Plaintiffs filed a motion to compel production of documents on March 10, 1995. The motion seeks production of every document Defendants withheld on the basis of privilege.

CONCLUSIONS OF LAW

1. Attorney-Client and Work Product Privilege

The attorney-client privilege is "to foster the confidence of the client and enable [him] to communicate without fear in order to seek legal advice." *Valente v. Pepsico, Inc., 68 F.R.D. 361, 367-68 (D. Del. 1975)*. The attorney-client privilege protects legal advice, as opposed to business or personal advice. *Securities and Exch. Comm. v. Gulf & Western Indus., Inc., 518 F. Supp. 675, 681 (D.D.C. 1981)*. This privilege only protects advice which a person gives within "a professional legal capacity." *In re Sealed Case, 737 F.2d 94, 99 (D.C. Cir. 1984)*.

*2 Plaintiffs urge this Court to apply the *Valente* standard for attorney-client privilege protection. Absent some special cause, the attorney-client privilege does not protect a corporation's attorney's communications to the client corporation which relate to the subject of a later suit. *Valente, 68 F.R.D. at 367; see also Deutsch v. Cogan, Del. Ch., 580 A.2d 100, 104-05 (1990)*. This Court has been reluctant to apply *Valente* broadly. *See Gioia v. Texas Air Corp., Del. Ch., C.A. No. 9500, Allen, C. (Mar. 3, 1988)* Mem. op. at 6; *In the Matter of Heizer Corp., Del. Ch., C.A. No. 7949, Berger, V.C. (Nov. 9, 1987); Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc., Del. Ch., C.A. No. 8853, Jacobs, V.C. (Jun. 19, 1987)* Mem. op. at 7; *Tabas v. Bowden, Del. Ch., C.A. No. 6619, Hartnett, V.C. (Feb. 16, 1982)* Mem. op. at 6. In *Deutsch*, this Court announced parties could not discover attorney-client confidential communications

automatically in shareholder derivative suits. 580 A.2d at 106.

Although not a binding case, this Court adopted and consistently has followed *Garner v. Wolfinbarger* as opposed to *Valente*. [FN1] *Garner v. Wolfinbarger, 430 F.2d 1093 (5th. Cir. 1970), cert denied, 401 U.S. 974 (1971); see Deutsch, 580 A.2d at 106; Matter of Heizer Corp., C.A. No. 7949; Sealy Mattress Co. of N.J, C.A. No. 8853 at 7; Tabas, C.A. No. 6619 at 6*. Under *Garner*, a suing shareholder may overcome corporate claims of attorney-client privilege only if he or she shows "good cause" motivates the discovery. 430 F.2d at 1103. According to the *Garner* court,

> FN1. Even though *Valente* and *Garner* are facially at odds, Vice-Chancellor Hartnett harmonized the two in *Deutsch v. Cogan, Del. Ch., 580 A.2d 100, 106 (1990)*. The Vice-Chancellor explained,
> In *Garner* the court was not faced with a clear conflict of interest on the part of the attorneys as existed in *Valente*. The *Valente* court therefore may have just been applying the *Garner* balancing test to a clear conflict of interest and thereby arrived at the conclusion that the plaintiff had shown good cause.

The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders *to show cause* why it should not be invoked in the particular instance. (emphasis added).

*Garner, 430 F.2d at 1103-04*. This Court will not diverge from this established line of reasoning. The *Garner* analysis is appropriate. [FN2]

> FN2. Although I cannot embrace Plaintiffs' *Valente* argument which would automatically make the attorney-client privilege unavailable to directors, I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709
**(Cite as: 1995 WL 761222 (Del.Ch.))**

agree directors owe a strict fiduciary duty to shareholders. They are responsible to minority shareholders. *Valente v. PepsiCo., Inc.,* 68 F.D.R. 361 (1975). This responsibility does not apply *per se,* thereby superseding the burden *Garner* attaches to discovery. *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir. 1970).

In *Sealy Mattress Co.,* Vice-Chancellor Jacobs noted three factors of paramount importance to consider when determining whether the requisite good cause is present precluding invocation of the privilege:

(i) 'the nature of the shareholders' claim and whether it is obviously colorable;' (2) 'the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources;' (3) 'the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing.' C.A. No. 8853, at 7 (citing *Garner,* 430 F.2d at 1104).

*3 Defendants attempt to use the attorney-client privilege to insulate specific documents - the ones which Secretary and Vice President Leonard authorized or received ("the Leonard documents"). True, Leonard is an attorney. True, Leonard could use both confidentiality protections *if* he were acting as legal counsel to Sunstates. However, Leonard did *not* act in the capacity of Sunstates' in-house counsel. The record does not indicate Leonard prepared or reviewed meeting minutes or documents as an *attorney.* There was no attorney-client relationship between Leonard and Sunstates. Therefore, Leonard cannot avail himself of the protection associated with the attorney-client privilege or the work product doctrine. Accordingly, the attorney-client privilege cannot shield production of the Leonard documents.

Assuming *arguendo,* Leonard acted in the attorney-client capacity, applying the *Garner* criteria to the facts here, I find Plaintiffs have shown good cause necessitating production of certain withheld documents. First, Plaintiffs are minority shareholders of Sunstates seeking information related to transactions they challenge as breaches of fiduciary responsibility. They clearly have the right to bring a shareholder derivative action under Delaware law. *See Kramer v. Western Pac. Indus., Inc.,* Del. Supr., 546 A.2d 348, 351 (1988). A minority shareholder brings a

shareholder derivative action "to enforce a *corporate* cause of action against officers, directors, and third parties." Dennis J. Block, Nancy E. Barton, and Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors,* (Fourth ed. 1993), p. 709 (citing *Kamen v. Kemper Fin. Servs., Inc.,* 111 S. Ct. 1711, 1716 (1991) (emphasis in original, and quoting *Ross v. Bernhard,* 396 U.S. 531, 534 (1970))). The fact the Frank action and the Lee Action have progressed this far indicates viability. Otherwise, they may not have survived a motion to dismiss had one been presented. Plaintiffs' suit is, therefore, a "colorable claim."

Second, after careful scrutiny of the record, I find Plaintiffs have genuine cause for seeking production of the documents in question. It is both necessary and desirable for the plaintiff-shareholders to have the information. The withheld documents may lead to the discovery of information relevant to the transactions Plaintiffs contest as breaches of fiduciary duty. Furthermore, these documents may be the best evidence of the facts they contain which otherwise would be unavailable from any other practical source. The only *possible* alternative to this information may be an avoidable, unnecessarily cumbersome and expensive route of deposing in detail the individual directors.

Third, the record does not leave me with the impression Plaintiffs' request for document production constitutes a blind "fishing expedition." The record indicates Plaintiffs' desired documents are related to pursuit of their claims, even if they ultimately prove unsuccessful.

*4 Furthermore, a fiduciary owes an obligation of complete candor and openness to its beneficiary. *See, e.g., Riggs Nat'l Bank of Washington, D.C. v. Zimmer,* Del. Ch., 355 A.2d 709 (1976). A corporation and its directors are fiduciaries. *Valente,* 68 F.R.D. at 367-68. The Board of Directors, as fiduciaries, owe Frank, a stockholder, complete candor and openness.

Alternatively, Defendants attempt to shield documents which Leonard prepared or reviewed behind the work product doctrine. The work product doctrine only applies to materials an attorney assembled and brought into being in anticipation of litigation. *United States v. El Paso Co.,* 682

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                     Page 4
Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709
(Cite as: 1995 WL 761222 (Del.Ch.))

F.2d 530, 542 (5th Cir. 1982), *cert. denied,* 466 U.S. 944 (1984). The work product doctrine protects "'the privacy of lawyers in their work and encourages ... freedom ... from interference in the task of preparing their clients' cases for trial.'" *E.I. DuPont de Nemours & Co. v. Admiral Ins. Co.,* Del. Super., C.A. No. 89C-AU-99, Steele, J. (Dec. 23, 1992) Mem. op. at 6 (citing *Riggs Nat'l Bank of Washington, D.C. v. Zimmer,* Del. Ch., 355 A.2d 709, 715 (1976)), *interlocutory appeal denied,* Del. Super., 622 A.2d 1095 (1993). "It protects factual material gathered in preparation of a case and specifically shelters 'opinion' work product which includes attorneys' mental impressions, conclusions, opinion, and legal theories." *Id.* (citing *Hickman v. Taylor,* 329 U.S. 495, 510-11 (1947).

The work product doctrine is broader than the attorney-client privilege which protects only communications between the attorney and client. *Id.* at 7 (citing *In re Grand Jury Proceedings,* 604 F.2d 798, 801 (3d. Cir. 1979)). The work product doctrine consists of "factual" information and "opinion" information. *Id.*

Factual or "ordinary" work product includes "written witness statements and all other trial preparation material not involving an attorney's thought processes...." 4 James W. Moore, et al., *Moore's Federal Practice* ¶ 26.15[3.- 2], at 26-316 (2d ed. 1994). The party seeking discovery must show substantial need and inability to obtain the substantial equivalent without undue hardship. *E.I. DuPont de Nemours & Co.,* C.A. No. 89C-AU-99 at 7-8. Even if a party sufficiently demonstrates his or her need to obtain the draft work product, the work product doctrine protects "opinion" work product. *Id.* at 7. Opinion work includes "attorneys' mental impressions, conclusions, opinions, and legal theories." *Id.* (citing *Hickman,* 329 U.S. at 510-11). The policy behind this theory encourages lawyers to maintain their freedom to express and to record mental impressions and opinions for the benefit of their clients without fear of their impressions and opinions being used against their clients. *Id.* at 8.

The work product doctrine cannot shield the Leonard documents from production. The record shows no evidence Leonard interacted with Sunstates as an attorney until after this litigation began. By Defendants' own admission, the word "Counsel" does not appear in Leonard's title. Therefore, Leonard could not have been an attorney assembling and bringing into being materials in anticipation of litigation. Although he had his legal degree, his relationship with Sunstates did not relate to delivery of legal services.

**\*5** Plaintiffs urge the above privilege protections do not apply to documents intended for public disclosure. *See In re Micropro Sec. Litig.,* 1988 WL 109973 [[[1988-89 Transfer Binder] *Fed. Sec. L. Rep.* (CCH) ¶ 93,986 (N.D. Cal. 1988). According to Plaintiffs, "handwritten notations on preliminary drafts are generally for the purpose of conveying factual data, not seeking legal advice." Their insistence seems consistent with the *Micropro Sec.* court who wrote,

> [T]hese communications, consisting as they do of factual information, do not call for a legal opinion or analysis. Such a communication does not constitute legal advice or a request for legal advice. Rather, the purpose of the communication is to furnish the information necessary to compile the offering materials required by the federal securities laws. Thus, the principle purpose for making the communication is not to secure legal advice but to secure what is essentially a business service (that, is to compile business data for disclosure in order to comply with the requirements of the federal securities laws). In receiving this information, the attorney herein were essentially serving as a conduit for factual data, and were not acting primarily as lawyers. *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 147 (D.Del. 1977); *Hewlett Packard Co. v. Bausch & Lomb, Inc.,* 116 F.R.D. 533, 542 (N.D. Cal. 1987).

*MicroPro,* at 90,593. The *MicroPro* court also emphasized, the information given the [attorney] was to assist in preparing such prospectus which was to be published to others and was not intended to be kept in confidence. That is the critical circumstance, to wit, the absence of any intent that the information was to be kept in confidence. (citation omitted).

*Id.*

Although *MicroPro* is compelling, it is not binding on this Court. Chancellor Allen articulated this Court's position on

Not Reported in A.2d                                                        Page 5
Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709
**(Cite as: 1995 WL 761222 (Del.Ch.))**

the issue of producing draft documents in _Jedwab v. MGM Grand Hotels, Inc._, 1986 WL 3426, Del. Ch., C.A. No. 8077, Allen, C. (Mar. 20,1986) Mem. op. at 6-7. Defendants, following the Chancellor's reasoning, argue the attorney-client privilege and work product doctrine protect the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld. I agree.

In _Jedwab_, this Court held preliminary drafts of documents a company later files with the Securities and Exchange Commission "are the proper subject of a claim of privilege and thus need not be produced." _Id._ at 6. Chancellor Allen based his decision on the fact that a plaintiff has available to it the publicly-filed documents. _Id._ Chancellor Allen wrote,

[T]he only information available from prior drafts relates to matters appearing in prior drafts that were deleted, augmented or otherwise modified in the final product. ... [S]uch modifications are made as a result of communications between a client or its representatives and lawyers. Thus, new information disclosed from comparing drafts of SEC filings with the filed documents themselves necessarily relates to and may inferentially disclose communications between a client and its lawyers charged with preparing the final documents. Communications of this kind are clearly made "for the purpose of facilitating the rendition of professional legal services" and lie at the heart of the confidential communications that the lawyer-client privilege seeks to protect.

*6 ... [W]here... the document itself is prepared by a lawyer in a setting in which it is intended to remain confidential until a final version is deemed appropriate for public disclosure and where the only pertinence of the document to the discovery process is the inferential disclosure of the communication from a client to its lawyer, it strikes me that the underlying policies of the lawyer-client privilege are properly implicated and that discovery of such a document would inappropriately permit access by third parties to privileged communications.

_Id._ at 6-7.

Similarly, the work product doctrine protects the draft documents from production. Chancery Court Rule 26(b)(3)

specifies,

[A] party may obtain discovery of [relevant] documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Ch. Ct. R. 26(b)(3).

Here, the draft documents consist of both factual and opinion work product. As for the factual ones, Plaintiffs have not sufficiently shown why they would be unable to discover the same information without undue hardship. Our Courts have held a party may only compel production of opinion work product when a party puts that privileged information directly "at issue." _E.I. DuPont de Nemours & Co.,_ C.A. No. 89C-AU-99 at 7-8. At this time, the record does not indicate whether the party seeking the protection of the work product doctrine put opinion work, in fact, "in issue." A more careful analysis is unnecessary in any event. The attorney-client privilege shields the draft documents which Defendants intended for public disclosure. Defendants properly withheld the draft documents from Plaintiffs' scrutiny.

2. Accountant-Client Privilege

Finally, I turn to Plaintiffs request for the 110 documents which Defendants claim the Illinois Accountant-Client privilege protects. Delaware does not recognize the accountant-client privilege; nor do the Federal Courts. _State of Del. v. Wright,_ Del. Super., C.A. No. K94-02-0196I-0201I, Goldstein, J. (Jul. 20, 1994) (citing _U.S. v. Arthur Young & Co.,_ 464 U.S. 805, 817 (1984), _Couch v. United States,_ 409 U.S. 322, 335 (1973)).

Nevertheless, Defendants argue this Court should apply Illinois law which does recognize the accountant-client

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709
(Cite as: 1995 WL 761222 (Del.Ch.))

privilege, because "[Illinois] is the state with the most significant relationship to the communications in issue." I disagree.

*7 According to the Restatement of Conflicts, [FN3] a court should weigh four factors when determining whether it should apply law other than that of the forum state: (1) the number and nature of the contacts that the forum state has with the parties and the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties. *Restatement (Second) of Conflicts, § 139(2)*, Comment. Applying these factors to the factual record, I find Delaware law applies.

> FN3. Delaware follows the Restatement's choice of law principles and the Restatement's "most significant relationship" test. *Certain Underwriters at Lloyd's, London and London Market Insurance Cos.*, Del. Supr., 1994 LEXIS 355, Veasey, C.J. (Nov. 10, 1994) Slip op. (citing *Oliver B. Cannon & Son v. Dorr-Oliver, Inc.*, Del. Supr., 394 A.2d 1160, 1166 (1978).

First, Sunstates is a Delaware corporation. Incorporation in Delaware constitutes a knowing and voluntary request for the widely recognized benefits and advantages flowing from the application of Delaware general corporate law to the governance of the incorporator's business entity. Sunstates' principal place of business is in North Carolina, not in Illinois. Apparently, Illinois's only connection with Sunstates is that Illinois accountants originally generated or received the documents Defendants attempt to protect behind the accountant-client privilege. However, as Plaintiffs highlight in their Reply Memorandum in Support of Plaintiffs' Motion to Compel the Production of Documents, Sunstates' 1990 and 1991 Annual Reports state Ernst & Young, Raleigh, North Carolina are actually Sunstates' accountants. The Company's 1993 and 1994 SEC filings list Greensboro, North Carolina accountants as Sunstates accountants. [FN4] It seems, second only to Delaware, North Carolina, not Illinois, has the most significant relationship to the communications which Defendants claim the accountant-client privilege protects. [FN5] That circumstance is irrelevant, however. Delaware

has the most significant contacts with the Sunstates documents in question. Second, Defendants have not refuted Plaintiffs' argument these documents are material to Plaintiffs' case. I see no reason why they are not material. Third, while I can readily understand why some find the accountant-client privilege an important one, it is not the determining factor. Fourth, I see no reason why it is unfair to apply the law of the forum state - Delaware - here. If Sunstates did not intend to abide by Delaware law and anticipate Delaware law governing the conduct of its affairs, the Company would have incorporated elsewhere.

> FN4. Not surprisingly, an entity called "Sunstates" would necessarily be hard pressed to identify with Illinois.

> FN5. North Carolina does not recognize the accountant-client privilege. *State v. Agnew*, 241 S.E.2d 684, 692 (N.C. 1978), cert. denied, *Agnew v. N.C.*, 439 U.S. 830 (1978).

After weighing the evidence and applying it to the Restatement's four criteria, Delaware, not Illinois, is the state with the most significant relationship to the communications for which Defendants assert the accountant-client privilege. Since Delaware law recognizes no such privilege, there is no need to decide whether the privilege inures solely to the accountant or otherwise.

Accordingly, I grant in part and deny in part Plaintiffs' Motion to Compel Production of Documents. Plaintiffs are entitled to production of all documents they have specified in their Motion to Compel Production of Documents *excluding* the drafts of documents the Company intended for public disclosure. A separate order will follow reflecting this opinion.

### ORDER
*8 For the reasons set forth in the Court's Memorandum Opinion dated December 15, 1995:

This Court grants in part and denies in part Plaintiffs' Motion to Compel the Production of Documents -

Defendants are to produce, at their own expense, those documents Plaintiffs demanded as part of its request for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 7
Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709
**(Cite as: 1995 WL 761222 (Del.Ch.))**

documents *excluding* the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld.

Defendants are to produce these documents within seven working days of receipt of this order.

IT IS SO ORDERED.

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

END OF DOCUMENT

**TAB 4**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1985 WL 21130 (Del.Ch.)

**(Cite as: 1985 WL 21130 (Del.Ch.))**

Page 1

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
NEW CASTLE COUNTY, a political subdivision of the State of Delaware, Plaintiff,
v.
Edward CRESCENZO, a resident of New Castle County Defendant.
**CIVIL ACTION No. 7082.**

Submitted: Nov. 28, 1984.
Decided: Feb. 11, 1985.

On Plaintiff's Motion for Summary Judgment: denied; On Defendant's Motion for Summary Judgment: granted.

Brian A. Sullivan, New Castle County Department of Law, Wilmington, for plaintiff.

David Roeberg, Roeberg & Associates, P.A., Wilmington, for defendant.

MEMORANDUM (Unreported) OPINION
HARTNETT, Vice Chancellor.

*1 This is a suit by the plaintiff, New Castle County ("The County"), to enforce an easement granting a sewer right-of-way to it. On February 14, 1983 I granted The County a preliminary injunction which allowed it to proceed with installation of a sewer system across defendant's land. The County then moved, and defendant cross moved, for summary judgment. On the uncontroverted facts, The County's motion must be denied and defendant's motion must be granted.

The issue is whether the easement granted by the defendant limits The County to the installation of a sewer which can be utilized by the defendant or whether The County can use the easement to install a force main collector sewer which cannot be utilized by the defendant. I find that the easement, by its terms, clearly restricts its use to a sewer which can be utilized by the defendant.

I

In June of 1973 defendant met with two of The County's agents--one of whom was Harold O. Morris. Mr. Morris died in 1977--several years before the inception of this suit. Consequently, all the sworn testimony concerning this meeting comes from the defendant. The County's showing has been limited to evidence of Mr. Morris' habitual procedure and the internal workings of New Castle County.

The 1973 meeting between the defendant and the representative of The County lasted approximately five minutes according to defendant's deposition testimony. He read over a one page deed of easement submitted by The County, glanced at the attached diagram, spoke a few moments with Mr. Morris, and then signed it. In his deposition defendant states that he was told by Mr. Morris that his neighbors were all signing such agreements and that they were all going to get sewers. The defendant and his neighbors were, and still are, connected to septic tanks because there are no public sewers in their area with which they can connect their houses.

The deed of easement which defendant signed states in part:

"WHEREAS, the County is preparing or having prepared plans for a sanitary sewer system which will carry sewage *from and across the lands of the Grantor(s) [defendant]* and other lands adjacent thereto: and

WHEREAS, *in order to service the hereinbefore mentioned lands of the Grantor(s)* and/or others, it is necessary that the sewer line shall cross the lands of the Grantor(s).

NOW, THEREFORE, IT IS AGREED, for and in consideration of the sum of One Dollar ($1.00) in hand paid to the Grantor(s) as well as the mutual covenants herein contained, that:

1. The Grantor(s) hereby grant(s) to the County the right and privilege to lay, maintain, operate, relay and remove at any time, its pipes and appurtenances, including manholes, lampholes and cleanouts, for the sanitary system *hereinbefore mentioned, ...*" (emphasis added)

The deed of easement further sets forth the exact dimension of the easement and certain other rights and responsibilities

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

of the parties. It is signed under seal by the defendant and Mr. Albert W. Madora, the Director of Public Works of New Castle County, and was witnessed by Mr. Morris. Attached is a notary's certificate--although defendant has sworn that he never appeared before a notary. Also attached to the deed of easement is a plot of defendant's property showing where the easement is located. There is a notation on the plot that the easement is for the "Christina Force Main and Interceptor, Part D-1, Capital Project # 925". The deed of easement was recorded.

*2 The County obtained nine other such easements for the project at the same stated consideration of one dollar. Two other grantors were paid $10,000 and $12,000 but permanent above-ground structures were placed on their property. One other grantor was paid $2,000 because he was the last person along the proposed sewer line to grant an easement and was in a hold-out position for larger compensation.

In 1978 defendant expressed to The County his dissatisfaction with the agreement and the delay in the project. The County responded that it had a valid easement, and the construction contract for the project was awarded in 1982.

In January of 1983 defendant informed The County that without additional compensation he would not permit installation of the sewer or entry onto his property. In response to this threat, in February of 1983, The County obtained a preliminary injunction allowing it to complete the project by entering defendant's land.

II

In its motion for summary judgment The County asserts that the deed of easement is clear and unambiguous on its face and is enforceable as a matter of law and grants The County the right to install any type of sewer line in the easement. Defendant, on the other hand, contends that the type of sewer line installed is not that which is contemplated by the easement; the rescission of the agreement is warranted because of The County's fraud or innocent misrepresentations; and that there was a lack of consideration to support the grant of the easement. It is only necessary, however, to consider what type of sewer line the

easement permits to be installed.

III

The proponent of a motion for summary judgment has the burden of proving the absence of any issue of fact, and any doubt should be resolved against him. _Brown v. Ocean Drilling & Exploration Co., Del.Supr., 403 A.2d 1114 (1979)._ Where, however, the movant has set forth facts under oath which remain uncontroverted by the opposing party, such facts will be accepted as true. _Tanzer v. International Gen. Indus., Inc., Del.Ch., 402 A.2d 382 (1979)._

IV

The County asserts, in support of its motion for summary judgment, that the deed granting the easement is clear and unambiguous on its face, that it permits The County to construct any type of sewer line in the easement, is signed under seal, and is fully enforceable. Defendant also maintains that the agreement is clear and unambiguous, but that it supports his assertion that the agreement did not contemplate the type of sewer line which was installed.

A Court must construe contracts as they are made and give to language which is clear such force and effect as the language clearly demands. _Hajoca Corporation v. Security Trust Co., Del.Super., 25 A.2d 378 (1942)._ A Court may not, in the guise of construing a contract, rewrite it. _Conner v. Phoenix Steel Corp., Del.Supr., 249 A.2d 866 (1969)._ If the words are unambiguous, there is no room for interpretation or a search for the intent of the parties on the part of the Court. _Myers v. Myers, Del.Supr., 408 A.2d 279 (1979)._ Contracts, however, are to be construed liberally so as to carry out the intentions of the parties. _DuPont v. Wilmington Trust Co., Del.Ch., 45 A.2d 510 (1946)._

V

*3 Defendant relies on his testimony as parol evidence that Mr. Morris told him the easement was for "sewers". He claims he naturally assumed he could hook his house into these sewers. The parol evidence rule, however, generally bars the use of oral testimony to vary the terms of a formal written understanding. _Turek v. Tull, Del.Ch., 139 A.2d 368 (1958)._ There are exceptions to the rule which allow the admission of parol evidence to prove the making of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 1985 WL 21130 (Del.Ch.)
**(Cite as: 1985 WL 21130 (Del.Ch.))**

contract, to prove fraud, illegality, accident, or mistake, and to aid in the interpretation of ambiguous terms. _Scott-Douglas Corp. v. Greyhound Corp., Del.Super., 304 A.2d 309 (1973)._

Since the defendant is alleging mistake, fraud and misrepresentation, he could introduce parol evidence to sustain his position. Furthermore, if the terms of the contract are ambiguous, parol evidence could be considered to allow interpretation by the Court. It is not necessary, however, to look to parol evidence to resolve this lawsuit.

VI

Defendant also relies on the recitals (or preamble clauses) in the deed of easement in asserting that the contract by its express terms is limited to a sewer system into which defendant could hook his house, that, therefore, the system installed by The County went beyond the easement granted, and therefore The County had no right to install the type of sewer constructed.

Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument. _Stabler v. Ramsay, Del.Ch., 62 A.2d 464 (1948)._ If the recitals are inconsistent with the operative or granting part, the latter controls. _Id._

In the deed of easement before the Court, as quoted above, the first clause of the operative or granting part specifically refers to "the sanitary sewer system _hereinbefore mentioned_" (emphasis added). The only prior mention of a sanitary sewer system in the easement is in the recital. Without recourse to the recitals the reference to "the sanitary sewer system hereinbefore mentioned" is ambiguous. Once the language in the recital is considered, however, the meaning of the operative or granting language becomes clear and the contract, as a whole, becomes unambiguous.

The first whereas or recital clause refers to a sanitary sewer system to "carry sewage _from and_ across the lands of the Grantor ..." (emphasis added). This language quite clearly indicates that the easement granted by the deed is for the construction and maintenance of a sewer system which would carry sewage from the lands of the defendant. It is

conceded that the system contemplated and ultimately installed by The County is not the type into which a house could be connected. The sewer constructed is a collector line which is used for the rapid conveyance to treatment plants of large quantities of sewage under pressure. From an engineering standpoint it is virtually impossible for defendant to look up to this system.

*4 The fact that diagrams attached to the agreement called the project "The Christina Force Main and Interceptor" does not alter the clear meaning of the language in the easement. The caption of the project was merely included on an attachment to the easement and even if defendant noticed it, it strains credibility to believe that he would have understood that the language meant that he would not be able to connect his house to the sewer. "Force Main" is an engineering term of art and, the use of those words alone would not have given notice to an unsophisticated landowner of the specifics of the project-- particularly in light of the specific language of the easement which speaks of carrying sewage from the lands of the grantor.

In addition, Paragraph 5 of the easement requires that "The Grantor(s) agree(s) to abide by all rules and regulations that are in effect relative to the use of the sanitary sewers in New Castle County". This language reinforces the view that the deed of easement was intended to convey an easement to permit The County to construct and maintain sewers onto which a house could be connected so that defendant could have the use of the sewer.

The deposition of The County's agent states that no change was generally made in The County's form contract when the easement sought was for a sewer which was a Force Main System rather than a sewer system into which a homeowner could connect, unless the landowner specifically asked for a different form. This fact does not favor plaintiff, as it argues. It--coupled with The County's bargaining superiority and the fact that it wrote the form which defendant signed--reinforces that The County is bound by the clear unambiguous language of the agreement which states that the easement granted is for the construction and maintenance of a sewer system which will service defendant's lands. The type of system installed will not service defendant's lands and is therefore outside of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                        Page 4
Not Reported in A.2d, 1985 WL 21130 (Del.Ch.)
**(Cite as: 1985 WL 21130 (Del.Ch.))**

terms of the easement. The County therefore has no right to
the relief requested in its complaint and its motion for
summary judgment must be denied.

                          VI
Defendant has alleged both a failure and an inadequacy of
consideration, coupled with material misrepresentations on
the part of The County's agent, and counterclaims to have
the contract rescinded on those grounds. None of these
contentions need to be considered, however.

If the plain language of the agreement granted an easement
for the type of sewer system installed, the defendant's
arguments for rescission would have to be considered. The
alleged misrepresentation by Mr. Morris that defendant
would be getting sewers when considered with the very
slight consideration of one dollar would raise a factual issue
as to whether there could be a rescission of the easement for
the construction and maintenance of a system which
defendant could not use. I need not consider whether the
easement should be rescinded, however, because its plain
language does not grant the right to install sewers which do
not service the lands of the grantor--the defendant.
Defendant has not therefore been misled, and his remedy is
not rescission but must be for the legal remedy of trespass
resulting from misuse of the easement. See 28 C.J.S.,
*Easements* § 103(b).

                          VII
*5 To summarize, The County's motion for summary
judgment is denied and defendant's motion for summary
judgment is granted because the easement does not cover
the type of system which has been installed. There is no
need to consider rescission because the plain language of the
agreement corresponds to the alleged representation of The
County's agent that the sewer would service defendant's
house.

IT IS SO ORDERED.

Not Reported in A.2d, 1985 WL 21130 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw.

Not Reported in A.2d                                                                                                              Page 1

Not Reported in A.2d, 2001 WL 1456487 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
TENNECO AUTOMOTIVE INC., et al.
v.
EL PASO CORPORATION, et al.
**No. CIV.A. 18810-NC.**

Submitted: Oct. 22, 2001.
Nov. 7, 2001.

Allen M. Terrell, Jr., Esquire, Richards, Layton &
Finger, Wilmington.
Robert K. Payson, Esquire, Potter, Anderson &
Corroon, Wilmington.
William M. Lafferty, Esquire, Morris, Nichols,
Arsht & Tunnell, Wilmington.
Francis J. Murphy, Jr., Esquire, Murphy, Spadaro &
Landon, Wilmington.

NOBLE, Vice Chancellor.
**\*1** Dear Counsel:

This letter constitutes my decision on the El Paso
Defendants' Motion to Compel Testimony and
Production of Documents, filed on October 4, 2001
(the "Motion"). The Motion challenges the
assertion of attorney-client privilege by Plaintiff
Tenneco Automotive Inc. and Plaintiff Pactiv
Corporation (a) to certain deposition testimony of
David Zerhusen and (b) to certain documents sent
by or to David Zerhusen who has provided legal
services to Old Tenneco, New Tenneco, and El
Paso during the last several years. Defendants,
Certain Underwriters at Lloyd's, London and
London Market Insurance Companies, (the "
London Insurers") have also joined in the Motion.

A brief, but incomplete, corporate history is
necessary to an understanding of the context in
which the Motion arises. Prior to 1996, Tenneco

Inc. ("Old Tenneco") was a diversified industrial
company. Old Tenneco spun off the businesses now
known as Plaintiff Tenneco Automotive Inc. and
Plaintiff Pactiv Corporation (collectively "New
Tenneco") and Plaintiff Newport News
Shipbuilding Inc. ("Shipbuilding"). The residue of
Old Tenneco merged with a subsidiary of
Defendant El Paso Corporation (which, together
with its affiliates, is referred to as "El Paso"). The
London Insurers provided certain historical
insurance coverage to Old Tenneco, and at issue in
this litigation are the rights of Plaintiffs to coverage
by the London Insurers in the face of a settlement
agreement between El Paso and the London
Insurers which purports to release the London
Insurers from further responsibility under the Old
Tenneco policies.

Rights to insurance coverage as among El Paso,
New Tenneco, and Shipbuilding are governed by an
insurance agreement (the "Insurance Agreement").
Plaintiffs allege that El Paso breached the Insurance
Agreement by failing to notify them (i) when it
became aware of claims that might exhaust any or
all limits of liability under the London Insurers'
policies and (ii) whenever it took any action with
respect to administration of Old Tenneco's claims
under the London policies. FN1 El Paso, in
response, contends that the actual knowledge (what
did it know and when did it find out) of New
Tenneco is at issue in this litigation because, so El
Paso argues, New Tenneco should not be allowed to
complain about the absence of notice from El Paso
when it already had the knowledge which would
have been acquired if the notice had, in fact, been
given.

FN1. *See* Compl. ¶ 65.

The parties have focused on four documents which
present representative attorney-client privilege
issues:
1.    A    memorandum,    entitled    "Tenneco

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Discontinuation Operations-Proposal for Pursing Environmental Insurance Coverage Settlement" and dated August 23, 1996, sent to Mr. Zerhusen by Mr. Mathias (the "Mathias Memorandum"), a lawyer then advising New Tenneco. This memorandum was forwarded to counsel for El Paso.

2. A January 2, 1997 memorandum from Mr. Zerhusen entitled "Insurance Recovery, Discontinued Operations." This document is identified as Document 39 in Mr. Zerhusen's privilege log and also was forwarded to El Paso.

*2 3. A January 15, 1997 memorandum described as "Activities Report for Dave Zerhusen." This is identified as Document 40.

4. A January 19, 1999 "request for legal advice" from Mr. Zerhusen to Mr. Mathias. This is identified as Document 41.

All of these documents are presumptively subject to the attorney-client privilege. The Mathias Memorandum and Document 39 have been submitted to the Court for *in camera* inspection.

In order to appreciate the contexts from which the various assertions of attorney-client privilege have arisen, it is necessary to review Mr. Zerhusen's multiple employment relationships, which can be classified into four distinct periods:

1. Prior to June 1996, Mr. Zerhusen was an employee of Old Tenneco's legal department. There is no pending privilege issue from this period.

2. From June 1996 to February 1997, Mr. Zerhusen was employed by Old Tenneco and New Tenneco but worked with and for the benefit of El Paso on transition issues arising out of the corporate reorganization. The attorney-client privilege has been asserted in an effort to protect the Mathias Memorandum and Document 39 from this period. Copies of these documents are in the possession of El Paso because they were provided by Mr. Zerhusen as part of a common transition effort.

3. Mr. Zerhusen worked exclusively as in-house counsel for New Tenneco from May 1997 to June 2000. New Tenneco asserts the privilege to two representative documents (Documents 40 and 41) and certain deposition examination from this period.

4. Since December 2000, Mr. Zerhusen has worked in-house for El Paso. No claim of privilege arises out of this period.

Two aspects of the attorney-client privilege, the common interest privilege and the "at issue" exception, must be considered.

### *Common Interest.*

I must first determine if the Mathias Memorandum and Document 39, generated while Mr. Zerhusen was involved with corporate transition issues and which are in the possession of El Paso, are subject to any attorney-client privilege that could be asserted by New Tenneco. The initial question is whether Mr. Zerhusen's transmittal of these documents to El Paso on behalf of New Tenneco waived the privilege. I am satisfied that they were transmitted to El Paso while there was a community of interest between New Tenneco and El Paso and that Mr. Zerhusen reasonably believed that he owed a duty of confidentiality to both parties arising out of not only a confidentiality agreement between them, but also the attorney-client privilege. Thus, New Tenneco did not waive the attorney-client privilege when these documents were forwarded to El Paso. Furthermore, by virtue of DRE 502(b)(3), " [a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client ... by him or or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest." FN2 Accordingly, because El Paso received the documents as privileged communications addressing a common interest shared by El Paso and New Tenneco, El Paso cannot waive the attorney-client privilege on its own. FN3

> FN2. *See, e.g., Jedwab v. MGM Grand Hotels, Inc.,* Del. Ch., C.A. No. 8077, mem. op. at 4, Allen, C. (Mar. 20, 1986) (" clients have interests that are so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 1456487 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

> FN3. *See, e.g., Interfaith Housing Del.,
> Inc. v. Town of Georgetown,* 841 F.Supp.
> 1393, 1400-02 (D.Del.1994).

**\*3** Under DRE 503(d)(5), New Tenneco may not assert the privilege against El Paso, as the party with whom it had the common interest. However, while there may not be a privilege as between El Paso and New Tenneco that can be validly asserted, the privilege still attaches as to discovery sought by the London Insurers. Thus, as long as there are claims against the London Insurers and the London Insurers join in the Motion, DRE 503(d)(5) does not preclude assertion of the attorney-client privilege.

> *"At Issue."*

El Paso seeks to avoid New Tenneco's assertion of the attorney-client privilege under the "at issue" exception. The "at issue" exception provides that a party may be deemed to have waived the privilege if "(1) the party injects the communications themselves into the litigation, or (2) the party injects an issue into the litigation, the truthful resolution of which requires an examination of the confidential communications." FN4 All parties here agree that the "communications themselves" are not part of this litigation. They do differ, however, on whether the privileged communications are necessary to a truthful resolution of any issue "injected" by New Tenneco into these proceedings. The Complaint alleges, *inter alia,* that El Paso failed to provide appropriate notice regarding settlements with the London Insurers as required by the Insurance Agreement. The confidential communications do not help with the question of whether El Paso gave to New Tenneco the notice that may have been specifically and affirmatively required by the Insurance Agreement. Instead, they may form the factual basis for an argument by El Paso to the effect that New Tenneco had become aware of El Paso's actions at a time when it could have (or should have) acted to protect whatever interests may have been implicated by the notice provisions of the Insurance Agreement. Characterized somewhat simplistically, El Paso's argument is that notice cannot be required (or there is no remedy for

a failure to provide such notice) when the party entitled to notice already has timely knowledge of the necessary facts. Whether El Paso's argument will prevail is an issue that I should not, and will not, consider at this stage. It is, however, an argument for which El Paso should be allowed the opportunity to develop the factual basis. Moreover, New Tenneco should have foreseen (and perhaps it did) that El Paso would seek to assert its knowledge as a defense. Thus, when New Tenneco filed this action, it knew, or should have known, that its argument with respect to notice would be met with El Paso's contention that New Tenneco already knew those facts which should have been transmitted to New Tenneco pursuant to the notice provision of the Insurance Agreement. Accordingly, because questions regarding New Tenneco's knowledge were foreseeable when New Tenneco filed its Complaint, I conclude that New Tenneco " injected" the issue of its knowledge into this litigation. FN5

> FN4. *Hoechst Celanese Corp. v. Nat'l
> Union Fire Ins. Co.,* Del. Super, 623 A.2d
> 1118, 1125 (1992).

> FN5. I acknowledge that the relief sought
> by Plaintiffs with respect to notice claims
> is prospective only. Tr. of Oral Arg. at
> 17-18.

**\*4** That New Tenneco's notice claim is the cause for the questions about New Tenneco's knowledge does not end the inquiry. El Paso and the London Insurers will gain access to the privileged communications only if El Paso and the London Insurers would otherwise be "placed at a disadvantage due to the inability to review the concealed information." FN6 This "at issue" exception is premised upon the "rationale of fairness." FN7 Thus, the confidential source may be tapped for the benefit of El Paso and the London Insurers only when the needed information cannot be reliably obtained from another source. On the present record, the question of whether Defendants have adequate alternative sources for the needed information is a difficult one. Defendants concede that "[d]iscovery undertaken so far has revealed that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs were on notice of Old Tenneco's and El Paso's plans to bring an insurance coverage action relating to Old Tenneco's discontinued operations; obtained actual knowledge of the Kern County Litigation and the Settlement long before it was consummated; and knew any such Settlement would require policy buy-backs." FN8

> FN6. *Fitzgerald v. Cantor,* Del. Ch., C.A. No. 16297, mem. op. at 5, Steele, V.C. (Jan. 28, 1999).

> FN7. *Tacket v. State Farm Fire & Cas. Ins. Co.,* Del.Supr., 653 A.2d 254, 259 (1995) (" 'It would be unfair to deny the other party an opportunity to discover other relevant facts with respect to that subject matter." ') (quoting *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp 136, 156 (D.Del.1997)).

> FN8. Motion ¶ 1.

Thus, while it appears that the Defendants have had access to sufficient information to generalize what knowledge New Tenneco may have had, I conclude that they have an ongoing need for the specific details for which there is no acceptable substitute for intrusion into otherwise confidential communications.

Because the "at issue" exception exists to protect a party from the unfair application of the attorney-client privilege, the limitations on the exercise of the privilege must be no greater than that which is essential to achieve the exception's purposes. In this instance, one issue, framed generally, is what did Plaintiffs know about the actions that El Paso was going to take with respect to the coverage provided by the London Insurers, and when did they acquire that knowledge. For example, that a lawyer working for the Plaintiffs had privileged communications to the effect that, from among other options, El Paso was considering pursuing litigation with the London Insurers with buy-backs does not reach the level of need sufficient to justify limitation on the attorney-client privilege. However, evidence that lawyers working

for the Plaintiffs had privileged communications reflecting knowledge that El Paso was about to engage in such efforts does fall within the scope of the information to which El Paso is entitled.

*Discovery in Dispute.*

Four documents have been identified as representative of those raising attorney-client privilege issues. FN9 Those portions of the documents which reflect positions taken by, or statements made on behalf of, the London Insurers with respect to El Paso's coverage claims, are to be disclosed. Those portions of the documents relating to steps taken by El Paso or which indicate that El Paso had determined in substance how it would proceed or how it would likely proceed are likewise to be disclosed. Those portions that merely list options or potential strategies are not closely related to El Paso's need for access and, thus, remain subject to the privilege. Finally, those portions that do not address El Paso's London Insurers' coverage issues that form the basis of this litigation are not subject to disclosure either. FN10

> FN9. *See supra* p. 4.

> FN10. The work product doctrine was initially asserted as an additional reason to protect the confidentiality of the four documents. That claim has been withdrawn as to the Mathias Memorandum and Document 39. The claim has also been withdrawn as to Documents 40 and 41, subject to certain redactions. I read El Paso's Reply in Support of its Motion to Compel Testimony and Production of Documents (at n. 2) as reflecting El Paso's agreement with this approach. Thus, I do not understand that any specific assertion of the work product doctrine remains for judicial review. Moreover, I view the proposed redactions as generally consistent with my understanding of what information is not subject to disclosure under the "at issue" exception.

Not Reported in A.2d                                                                                     Page 5

Not Reported in A.2d, 2001 WL 1456487 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*5** An example of deposition examination that resulted in the assertion of the attorney-client privilege occurred when Mr. Zerhusen was asked whether Mr. Donovan, who was representing New Tenneco through his law firm, knew, prior to a certain event, that El Paso had initiated insurance coverage litigation against the London Insurers. FN11 In the absence of the "at issue" exception, this communication would clearly be protected by the attorney-client privilege. However, because it directly shows what New Tenneco, through its counsel, knew at a particular time, the question must be answered.

> FN11. *See* Plaintiffs' Response to El Paso's Motion to Compel Testimony and Production of Documents at Ex. C.

In general, Plaintiffs may not invoke the attorney-client privilege to preclude El Paso from learning about their knowledge of Old Tenneco's and El Paso's plans to pursue insurance coverage actions against the London Insurers under the policies at issue in this action or to settle any such litigation. On the other hand, El Paso has not demonstrated sufficient need to support a denial of the privilege to the extent that it seeks discovery regarding the "steps considered or taken by plaintiffs in light of such knowledge ." FN12

> FN12. El Paso's Reply in Support of its Motion to Compel Testimony and Production of Documents at 5. I note that the "at issue" exception applied here does not result in loss of the privilege's protection for otherwise privileged communications regarding Plaintiffs' plans, strategies, or conduct as to their rights under the Insurance Agreement or otherwise. No need has been shown to support such intrusion, if, indeed, that is part of the relief sought by El Paso.

I recognize that redaction of documents will be necessary, but that burden is the unfortunate product of an effort to balance competing, but important, interests.

Accordingly, for the reasons set forth above, the Motion is granted in part and denied in part. I ask that counsel confer and submit a form of order to reflect this ruling. I also anticipate that the order will address the resumption of Mr. Zerhusen's deposition and possibly other administrative or scheduling matters.

Del.Ch.,2001.
Tenneco Automotive Inc. v. El Paso Corp.
Not Reported in A.2d, 2001 WL 1456487 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.