# EXHIBIT 1

SUPPLEMENT TO THE REPORTS OF WILLIAM H. PURCELL

TRUSTEES OF THE MAFCO LITIGATION TRUST V. RONALD PERELMAN, ET AL
CIVIL ACTION NO. 97-586 (RRM) (SLR)
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

April 9, 2002

C 00001

I, William H. Purcell, hereby submit this supplement to my expert reports dated March 15 and March 29, 2002.

## INTRODUCTION

1.    I submitted an expert report dated March 15, 2002 in the above-referenced case (the "Purcell Expert Report"). In the Purcell Expert Report, I discussed certain restrictions relating to Marvel Entertainment Group, Inc. ("Marvel") in the Indentures for three Marvel Holding Company note issues: an issue by Marvel Holdings Inc. sold in April 1993 (the "Holdings Issue"); an issue by Marvel (Parent) Holdings Inc. sold in October 1993 (the "Parent Issue"); and an issue by Marvel III Holdings Inc. sold in February 1994 (the "Marvel III Issue"). I explained that in my opinion these restrictions were a substantial reason why the issuers could sell such notes to investors. I also stated that the existence of the Holding Company debt with restrictions relating to Marvel significantly limited Marvel's financing flexibility and options.

2.    I submitted a rebuttal expert report in the above-referenced case on March 29, 2002 (the "Purcell Rebuttal Report"). The Purcell Rebuttal Report stated my disagreement with the opinion of plaintiffs' expert, Professor Robert W. Holthausen.

3.    Subsequent to the preparation of my Reports, I was provided with a copy of the transcript of the deposition of Howard Gittis, the Vice Chairman and Chief Administrative Officer of MacAndrews & Forbes Holdings, which took place on March 25, 2002, and the exhibits marked and discussed at that deposition. I am

submitting this supplement to take into account information from the testimony and exhibits at the deposition of Mr. Gittis.

4.     My qualifications as an investment banker and as an expert in corporate debt financing are set forth in the Purcell Expert Report, pages 1-2 and Exhibit 1 thereof.

### SUPPLEMENTAL OPINIONS

5.     It is my opinion, based on my business experience and knowledge, and the testimony of Mr. Gittis, that the restrictions relating to Marvel in the Holding Company Indentures caused actual financial injury and damage to Marvel in the fourth quarter of 1996 in the amount of not less than $470,825,000.

6.     The basis for my opinion is set forth below.

7.     It is my understanding based on, for example, the deposition of Mr. Gittis, that Marvel desperately needed liquidity and financial flexibility as of November 1996, and that a major capital infusion was necessary for Marvel's financial restructuring and ability to survive and to have the opportunity to thrive over time.

8.     One of the restrictions on Marvel in the Holding Company indentures was section 4.09. That section is entitled "Majority Ownership; Limitation on Liens." It provides, *inter alia,* that each Holding Company "shall at all times from and after the Final Collateral Date be the legal and beneficial owner of a majority of the Voting Stock of Marvel."

9.     Mr. Gittis testified with reference to section 4.09 of the Holding Company Indentures, "no one would put the kind of money necessary to restructure Marvel

2

up without owning a majority of the shares free of these bond offerings; so you had to amend that provision." (Gittis Tr. at 13).

10. The deposition of Mr. Gittis shows that even Andrews Group Incorporated (which I understand was 100% owned by one of Mr. Perelman's holding companies) was unwilling to make a significant equity investment in Marvel in November 1996 unless the restrictions in the Holding Company Indentures could be amended.

11. Prior to Marvel's bankruptcy petition in late December 1996, Marvel had 101.8 million common shares outstanding. On the day prior to the November 12, 1996 Andrews Group proposal, Marvel's common shares, which publicly traded on the New York Stock Exchange, closed at a price of $4.625 per share.

12. Based on my review of Mr. Gittis's testimony and the exhibits referenced therein, it is my opinion that the restrictions relating to Marvel in the Holding Company Indentures caused actual financial harm and damage to Marvel in the amount of at least $470,825,000.

_William H. Purcell_

WILLIAM H. PURCELL

3

C 00004

# EXHIBIT 2

45

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                          )
                                                )
HECHINGER INVESTMENT COMPANY                    )       Chapter 11
OF DELAWARE, INC., et al.,                      )       Case Nos. 99-2261 (PJW)
                                                )       through 99-2283
                    Debtors.                    )       (Jointly Administered)
------------------------------------------------)
THE OFFICIAL COMMITTEE OF                       )
UNSECURED CREDITORS OF                          )
HECHINGER INVESTMENT COMPANY                    )
OF DELAWARE, INC., et al. on behalf             )
of HECHINGER INVESTMENT                         )
COMPANY OF DELAWARE, INC., et al.,              )
                                                )
                                                )       Civil Action No. 00-840-RRM
                    Plaintiff,                  )
                                                )
          v.                                    )
                                                )
FLEET RETAIL FINANCE GROUP, THE                 )       **JURY TRIAL DEMANDED**
CHASE MANHATTAN BANK, BACK BAY                  )
CAPITAL FUNDING, LLC, each individually         )
and as agents for various banks party to credit )
agreements described herein, LEONARD            )
GREEN & PARTNERS, L.P., GREEN                   )
EQUITY INVESTORS II, L.P.,                      )
JOHN W. HECHINGER, JR., JOHN                    )
W. HECHINGER, S. ROSS HECHINGER,                )
ANN D. JORDAN, ROBERT S. PARKER,                )
MELVIN A. WILMORE, ALAN J. ZAKON,               )
KENNETH J. CORT, W. CLARK                       )
McCLELLAND, JUNE R. HECHINGER,                  )
NANCY HECHINGER LOWE, SALLY                     )
HECHINGER RUDOY, CATHERINE S.                   )
ENGLAND, RICHARD ENGLAND, JR., JUNE )
L.P., LOIS ASSOCIATES L.P. and JARSAN           )
ASSOCIATES L.P.,                                )
                                                )
                    Defendants.                 )

**AMENDED COMPLAINT**

The Official Committee of Unsecured Creditors of Hechinger Investment Company of

Delaware, Inc. and its affiliated debtors (the "Committee") as and for its amended complaint

brought on behalf of the estates of Hechinger Company, Hechinger Investment Company of

Delaware, Inc., Hechinger Stores Company, Hechinger East Coast Stores Company, Centers

Holdings, Inc., BSQ Acquisition, Inc., BSQ Transferee, Inc., BucksProp Holding Company,

HProp, Inc., HQ Southwest, Inc., HQ Partners, HQ Mid-Atlantic, LLC, Hechinger Finance, Inc.,

Hechinger Financial Holdings Company, Hechinger International, Inc., Hechinger Property

Company, Hechinger Royalty Company, Hechinger Towers Company, HIDS, Inc., ManProp

Holding Company, Pennsy, Inc., PhilProp Holding Company, and RemProp, Inc. (collectively,

the "Debtors"), alleges as follows:

## SUMMARY OF ACTION

1.    This is an action to recover fraudulent conveyances, to redress breaches of

fiduciary and other duties and to equitably subordinate certain of Defendants' claims to those of

all other creditors in the Debtors' bankruptcy proceedings.

2.    These causes of action arise out of an integrated financial transaction, consummated

on September 27, 1997, that sealed the Debtors' financial doom.  Defendants John W. Hechinger,

Jr., John W. Hechinger, S. Ross Hechinger, Ann D. Jordan, Robert S. Parker, Melvin A.

Wilmore, Alan J. Zakon, Kenneth J. Cort and W. Clark McClelland (the "Directors") formerly

were directors (and in some cases officers) of the Debtors.  Defendants John W. Hechinger, Jr.,

John W. Hechinger, S. Ross Hechinger, June R. Hechinger, Nancy Hechinger Lowe, Sally

Hechinger Rudoy, Catherine S. England, Richard England, Jr., June L.P., Lois Associates L.P.

2

and Jarsan Associates L.P. each were members of -- or were entities owned or controlled by -- the Hechinger and England families (collectively, the "Hechinger Family Defendants"), who controlled the voting stock of certain of the Debtors prior to September 27, 1997. The Directors and the Hechinger Family Defendants breached their respective fiduciary duties for their own selfish gain by engineering, facilitating, recommending and approving a misconceived leveraged buy-out (the "Hechinger LBO") of the long-ailing Hechinger's chain of home improvement stores owned by Hechinger Company and its affiliates ("Hechinger"); as a direct result of the Hechinger LBO, each of the Directors, the Hechinger Family Defendants and other shareholders received substantial payments for their own Hechinger stock, all to the detriment of the Debtors and their unsecured creditors who received no consideration for this transfer, which occurred when Hechinger was insolvent.

3.      Defendants Fleet Retail Finance Group, The Chase Manhattan Bank, and Back Bay Capital Funding, LLC (the "Bank Defendants"), were part of, or successors in interest to, a group of lenders who financed the Hechinger LBO with callous disregard of its devastating consequences on unsecured creditors. As an integral part of this transaction, Hechinger acquired Builders Square (the "Builders Square Acquisition" and, together with the Hechinger LBO, the "Transaction") -- a competing chain of home improvement stores also in dire financial straits -- and financed the transaction by incurring hundreds of millions of dollars of secured debt that the Debtors could not service under any foreseeable scenario.

4.      Hechinger had been controlled for decades by the Hechinger family, which was eager to cash out its rapidly deteriorating investment to Defendant Leonard Green & Partners, L.P. (together with its affiliate, Green Equity Investors II, L.P., "Leonard Green"), the only party seriously interested in the acquisition. Hechinger (by and through the actions of the Directors),

3

the Hechinger Family Defendants, Leonard Green, and the Bank Defendants (or their predecessors) considered, negotiated, and ultimately consummated the Hechinger LBO and the Builders Square Acquisition in one integrated Transaction, even though Hechinger's financial advisor, Donaldson, Lufkin & Jenrette ("DLJ"), had already advised Hechinger's Board that Hechinger was insolvent.  DLJ's opinion -- including its findings with respect to Hechinger's insolvency -- was published in a proxy statement filed with the Securities and Exchange Commission in the weeks before the Transaction closed.  Knowingly or recklessly disregarding this opinion and the fact that Hechinger's was insolvent, Hechinger, the Directors, the Hechinger Family Defendants, Leonard Green, and the Bank Defendants proceeded with the Transaction notwithstanding its inevitable consequences: Chapter 11 bankruptcy, business failure, and, ultimately, liquidation.

5.    Through the Transaction, Defendants transferred or facilitated the transfer of enormous value from the Debtors to themselves for no consideration in return to the Debtors.  These transfers included payments to Debtors' former shareholders and Leonard Green, and fraudulent transfers and transaction fees to the Bank Defendants and other third parties.  By financing the transaction with borrowings secured by the Debtors' own assets, the Transaction shifted all of the risk of the Debtors' troubled operations to their unsecured creditors.  Accordingly, to redress the harm caused to the Debtors and their unsecured creditors by the Transaction, the Committee seeks to: (i) recover for the benefit of the estates the damages caused by the Directors' and Hechinger Family Defendants' breaches of their fiduciary and other duties in engineering, facilitating and approving the Transaction, (ii) recover for the benefit of the estates damages caused by the aiding and abetting by Leonard Green and its affiliates of the Directors' and the Hechinger Family Defendants' breaches of their fiduciary duties with respect to the

4

Transaction, (iii) avoid and recover for the benefit of the estates the amounts paid to the Hechinger Family Defendants and the Directors in connection with the Hechinger LBO, (iv) avoid and recover for the benefit of the estates the amounts paid to Leonard Green and its affiliates in connection with the Transaction and thereafter, and (iv) avoid, recover and/or subordinate for the benefit of the estates the obligations incurred and collateral granted to the Bank Defendants in connection with the Transaction.

## JURISDICTION AND VENUE

6.      Jurisdiction of this Court is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this constitutes a civil proceeding arising under title 11 of the United States Code (the "Bankruptcy Code"), or arising in or related to the above-captioned jointly administered chapter 11 cases under the Bankruptcy Code, which are pending in the United States Bankruptcy Court for the District of Delaware.

7.      This civil proceeding is a core proceeding under section 157(b)(2) (A), (H), (K) and (O) of title 28, United States Code.

8.      Venue in this Court is appropriate under section 1409(a) of title 28, United States Code.

9.      The Committee brings this action pursuant to the authority granted to it in (i) the Court's Final Order Authorizing Post-Petition Secured Superpriority Financing Pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, dated July 20, 1999 and (ii) the Stipulation and Order (Agreement) Authorizing Committee to Investigate, Commence and Prosecute Claims, so ordered on March 21, 2001 and entered on March 30, 2001.

## THE PARTIES AND OTHER KEY PARTICIPANTS

10.    Plaintiff, the Committee, is the statutory committee of unsecured creditors duly appointed on June 24, 1999 in each of the Debtors' chapter 11 cases by the Office of the United States Trustee for the District of Delaware.

11.    Upon information and belief, Defendant John W. Hechinger, Jr., who was the Chief Executive Officer and Chairman of the Board of Directors of certain of the Debtors at the time of the Transaction, approved the Transaction. John W. Hechinger, Jr. was a member of the Hechinger family and directly and/or indirectly owned or controlled a substantial amount of Hechinger stock prior to the Transaction.

12.    Upon information and belief, Defendant S. Ross Hechinger, who was Senior Vice President of Administration and a Director of certain of the Debtors at the time of the Transaction, approved the Transaction. S. Ross Hechinger was a member of the Hechinger family and directly and/or indirectly owned and controlled a substantial amount of Hechinger stock prior to the Transaction.

13.    Upon information and belief, Defendant John W. Hechinger, who was a Director of certain of the Debtors at the time of the Transaction, approved the Transaction. John W. Hechinger was a member of the Hechinger family and directly and/or indirectly owned a substantial amount of Hechinger stock prior to the Transaction.

14.    Upon information and belief, Defendant Kenneth J. Cort, who was President, Chief Operating Officer and Director of certain of the Debtors at the time of the Transaction, approved the Transaction and was a shareholder of Hechinger prior to the Transaction.

15.    Upon information and belief, Defendant W. Clarke McClelland, who was Executive Vice President, Chief Financial Officer and Director of certain of the Debtors at the

6

time of the Transaction, approved the Transaction and was a shareholder of Hechinger prior to the Transaction.

16.    Upon information and belief, Defendant Ann D. Jordan, who was a Director of certain of the Debtors at the time of the Transaction, approved the Transaction and was a shareholder of Hechinger prior to the Transaction.

17.    Upon information and belief, Defendant Robert S. Parker, who was a Director of certain of the Debtors at the time of the Transaction, approved the Transaction and was a shareholder of Hechinger prior to the Transaction.

18.    Upon information and belief, Defendant Melvin A. Wilmore, who was a Director of certain of the Debtors at the time of the Transaction, approved the Transaction and was a shareholder of Hechinger prior to the Transaction.

19.    Upon information and belief, Defendant Alan J. Zakon, who was a Director of certain of the Debtors at the time of the Transaction, approved the Transaction and was a shareholder of Hechinger prior to the Transaction.

20.    Upon information and belief, Defendant June R. Hechinger is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction.

21.    Upon information and belief, Defendant Nancy Hechinger Lowe is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction.

22.    Upon information and belief, Defendant Sally Hechinger Rudoy is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction.

23.    Upon information and belief, Defendant Catherine S. England is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction.

24.     Upon information and belief, Defendant Richard England, Jr. is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction.

25.     Upon information and belief, Defendant June L.P. is a limited partnership organized and existing under the laws of the State of Maryland and having its principal place of business at 11150 Main Street, Suite 503, Fairfax, Virginia 22030. Upon information and belief, June, L.P. is a partnership consisting of members of the family of John W. Hechinger. John W. Hechinger, Jr., S. Ross Hechinger, Sally Hechinger Rudoy and Nancy Hechinger Lowe are the general partners of June L.P., and John W. Hechinger and June R. Hechinger are its limited partners. June, L.P. was a substantial shareholder of Hechinger prior to the Transaction.

26.     Upon information and belief, Defendant Lois Associates L.P. ("Lois"), is a limited partnership organized and existing under the laws of the State of Maryland and having its principal place of business at 11150 Main Street, Suite 503, Fairfax, Virginia 22030. Upon information and belief, Lois is partnership consisting of members of the family of Richard England. Catherine England, Richard England, Jr. and Joan England Akman are the general partners of Lois. Lois was a substantial shareholder of Hechinger prior to the Transaction.

27.     Upon information and belief, Defendant Jarsan Associates L.P. ("Jarsan") is a limited partnership organized and existing under the laws of the State of Maryland and having its principal place of business at 11150 Main Street, Suite 503, Fairfax, Virginia 22030. Upon information and belief, Jarsan is a partnership consisting of members of the family of John W. Hechinger. John W. Hechinger, S. Ross Hechinger, Sally Hechinger Rudoy, Nancy Hechinger Lowe were general partners of Jarsan. Jarsan was a substantial shareholder of Hechinger prior to the Transaction.

8

28.    Upon information and belief, Defendant The Chase Manhattan Bank, National Association ("Chase") is a national banking association with an office located at 270 Park Avenue, New York, New York. Chase was among the lenders that financed the Transaction and served as Administrative Agent, Collateral Agent, Issuing Bank, and Swingline Lender under the Credit Agreement (as defined *infra*).

29.    Upon information and belief, Defendant Fleet Retail Finance, Inc. ("Fleet") is incorporated in Delaware with an office located at 1013 Centre Road, Wilmington, Delaware. Fleet was among the lenders that succeeded to the rights of the lenders who financed the Transaction and served as Administrative Agent and Collateral Agent under the Amended Credit Agreement (as defined *infra*). Fleet was formerly known as BankBoston Retail Finance, Inc.

30.    Upon information and belief, Defendant Back Bay Capital Funding, LLC is a limited liability company organized and existing under the laws of the State of Delaware with an office located at 440 South LaSalle Street, Chicago, Illinois. Back Bay Capital Funding LLC was among the lenders that succeeded to the rights of the lenders who financed the Transaction and served as Administrative Agent under the Amended Credit Agreement (as defined *infra*).

31.    Upon information and belief, Defendant Leonard Green & Partners, L.P. ("LGP") is a limited partnership organized and existing under the laws of the State of California and having its principal place of business at 333 South Grand Avenue, Suite 5400, Los Angeles, California.

32.    Upon information and belief, Defendant Green Equity Investors II, L.P. ("GEI II") is a limited partnership organized and existing under the laws of the State of California and having its principal place of business at 333 South Grand Avenue, Suite 5400, Los Angeles, California. Upon information and belief, GEI II is under common ownership and control with LGP.

9

33:    Hechinger Company is the debtor in In re Hechinger Company, Case No. 99-02266 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on June 11, 1999 (the "Petition Date"). Upon information and belief, Hechinger Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

34.    Hechinger Stores Company ("Hechinger Stores") is the debtor in In re Hechinger Stores Company, Case No. 99-02272 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, Hechinger Stores is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

35.    Hechinger East Coast Stores Company is the debtor in In re Hechinger East Coast Stores Company, Case No. 99-02273 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, Hechinger East Coast Stores Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

36.    Hechinger Investment Company of Delaware, Inc. is the debtor in In re Hechinger Investment Company of Delaware, Case No. 99-02261 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, Hechinger Investment Company of Delaware, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

10

37.    Centers Holdings, Inc. is the debtor in In re Centers Holdings, Inc., Case No. 99-02265 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, Centers Holdings, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

38.    BSQ Acquisition, Inc. is the debtor in In re BSQ Acquisition, Inc., Case No. 99-02262 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, BSQ Acquisition, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

39.    BSQ Transferee, Inc. is the debtor in In re BSQ Transferee, Inc., Case No. 99-02263 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, BSQ Transferee, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

40.    BucksProp Holding Company. is the debtor in In re BucksProp Holding Company, Case No. 99-02264 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, BucksProp Holding Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

41.    HProp, Inc. is the debtor in In re HProp, Inc., Case No. 99-02276 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date. Upon information and belief, HProp, Inc. is, and at all relevant times was, a

11

corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

42.     HQ Southwest, Inc. is the debtor in In re HQ Southwest LLC., Case No. 99-02279 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, HQ Southwest, Inc. is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

43.     HQ Partners is the debtor in In re HQ Partners, Case No.99-02278 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, HQ Partners is, and at all relevant times was, a partnership organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

44.     HQ Mid-Atlantic, LLC is the debtor in In re HQ Mid-Atlantic, LLC, Case No. 99-02277 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, HQ Mid-Atlantic, LLC is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

45.     Hechinger Finance, Inc. is the debtor in In re Hechinger Finance, Inc., Case No. 99-02267 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, Hechinger Finance, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

46.    Hechinger Financial Holdings Company is the debtor in <u>In re Hechinger Financial Holdings Company</u>, Case No. 99-02268 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, Hechinger Financial Holdings Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

47.    Hechinger International, Inc. is the debtor in <u>In re Hechinger International, Inc.</u>, Case No. 99-02269 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, Hechinger International, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

48.    Hechinger Property Company is the debtor in <u>In re Hechinger Property Company</u>, Case No. 99-02270 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, Hechinger Property Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

49.    Hechinger Royalty Company is the debtor in <u>In re Hechinger Royalty Company</u>, Case No. 99-02271 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, Hechinger Royalty Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

50.    Hechinger Towers Company is the debtor in <u>In re Hechinger Towers Company</u>, Case No. 99-02274 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, Hechinger Towers Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

51.    HIDS, Inc. is the debtor in <u>In re HIDS, Inc.</u>, Case No. 99-02275 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, HIDS, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

52.    ManProp Holding Company. is the debtor in <u>In re ManProp Holding Company</u>, Case No. 99-02280 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, ManProp Holding Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

53.    Pennsy, Inc. is the debtor in <u>In re Pennsy, Inc.</u>, Case No. 99-02281 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, Penny, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

54.    PhilProp Holding Company is the debtor in <u>In re PhilProp Holding Company</u>, Case No. 99-02282 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, PhilProp Holding Company

14

is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

55.    RemProp, Inc. is the debtor in In re RemProp, Inc., Case No. 99-02283 (PJW), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  Upon information and belief, RemProp, Inc. is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Maryland.

## FACTS IN SUPPORT OF CLAIMS FOR RELIEF

### I.

## HECHINGER'S RAPIDLY DETERIORATING FINANCIAL CONDITION LEADS THE HECHINGER FAMILY TO CASH OUT.

**A.    Hechinger: Background And Corporate Structure.**

56.    Prior to September of 1997, Hechinger, which owned and operated stores under the Hechinger's and Home Quarters trademarks, was a major retailer of products and services for home improvement, remodeling, and maintenance.  Prior to September of 1997, Hechinger was the ultimate parent company of several corporations running these retail chains.

57.    Sidney Hechinger founded Hechinger in 1911.  Hechinger became a public company in 1972, but members of the Hechinger family -- including John W. Hechinger, Jr., John W. Hechinger, S. Ross Hechinger and other Hechinger Family Defendants -- retained control over the company until the Hechinger LBO.  As of 1997, Hechinger had two classes of stock, class A (31 million shares outstanding) and class B (11.2 million shares outstanding).  Because the Hechinger Family Defendants owned most of the class B shares -- which allowed them to cast ten votes for each share -- the Hechinger Family Defendants controlled over 70% of

15

the voting power of Hechinger in 1997 even though the Hechinger Family Defendants did not own

a majority of Hechinger's stock. No significant decision could be made without the Hechinger

Family Defendants' approval.

**B.    The Beginning Of The Demise.**

58.    From 1983 to 1996, Hechinger embarked on a major expansion program in which

it added eighty-four stores to its thirty-four store base. By 1995, however, intense competition

-- led by industry behemoths Home Depot and Lowe's -- forced Hechinger to close sixteen of its

Home Quarters stores and nine Hechinger's stores. Beginning in 1994, Hechinger's operating

performance and financial condition went into a precipitous and sustained decline as summarized

in the following table:

| Year Ended | Sales | Net Income (Loss) |
|---|---|---|
| Jan. 28, 1995 | $2,449,554,000 | ($   9,911,000) |
| Feb. 3, 1996 | $2,252,780,000 | ($ 77,636,000) |
| Feb. 1, 1997 | $2,199,067,000 | ($ 25,076,000) |
| Transition Period | $1,560,000,000 | ($206,011,000) |

The "Transition Period" represents the period of February 4, 1997 through September 27, 1997, the

date of the Transaction. Not coincidentally, the decline in Hechinger's performance resulted

primarily from Home Depot's initiative to expand into Hechinger's core markets beginning in 1993.

59.    Even more ominous was the fact that Hechinger's same store sales had decreased

by 8% in fiscal year 1996 and 10.3% for the quarter ending on August 2, 1997. One analyst

covering Hechinger noted in July of 1997 that, "[t]here's definitely a pattern of consistently

negative same-store sales. This is the time of year when these types of retailers are supposed to

be more robust than ever. . . [b]ut Hechinger continues to have expectedly low numbers month

after month."

16

60.    Hechinger already was a highly leveraged company prior to September of 1997. At that time, it had approximately $321 million outstanding on three public bond issues along with a revolving credit facility with CIT Group/Business Credit, Inc. ("CIT") of approximately $110 million (the "CIT Loan"). Hechinger's debt service coverage -- earnings before interest, taxes, depreciation and amortization ("EBITDA") minus capital expenditures divided by interest -- for the twelve months ended August 2, 1997 was only .9, which meant that its cash flow was insufficient to meet interest obligations. In fact, for the same period, Hechinger's debt was 11.5 times EBITDA, which was significantly higher than its competitors.

## C.    Hechinger Goes Up For Sale.

61.    In the face of heavy losses over the period from 1994 through 1997, mounting competition and other business problems, the Hechinger Family Defendants -- with the participation and approval of each of the Directors -- decided to cash out, and Hechinger retained DLJ in mid-1996 to find a buyer for its languishing business. DLJ prepared an Information Memorandum for potential bidders, but the offering did not attract any significant interest until early 1997.

## II.

## KMART ATTEMPTS TO UNLOAD ITS MONEY-LOSING BUILDERS SQUARE BUSINESS.

## A.    Builders Square's Performance Also Deteriorates In The Face Of Stiff Competition.

62.    Prior to September of 1997, Builders Square, Inc. ("Builders Square"), the third largest retailer of home improvement and home decor products and services in the United States, was wholly owned by Kmart Corporation ("Kmart"). The deteriorating operating performance and financial condition of Builders Square were similar to that experienced by Hechinger: Builders

17

Square also began to experience serious financial trouble at least as early as 1994 when it lost

$10.7 million. Significant losses followed every year thereafter leading up to the merger with

Hechinger: $27.5 million in 1995, $317.1 million in 1996, and $61.9 million in 1997.

63.    Builders Square's performance suffered because of the same intense industry

competition confronting Hechinger. In 1994 and 1995, Builders Square's competitors opened 129

competitive stores. For the year-to-date period ending on August 23, 1997, major competitors

(primarily Home Depot and Lowe's) opened stores to compete directly with forty-six Builders

Square locations. Consequently, for these locations, Builders Square experienced a 16.9%

reduction in same store sales over 1996 and a 54% reduction in same store profit before overhead.

64.    Builders Square's operations also were highly-leveraged and capital intensive.

Prior to the Hechinger acquisition, the operations had been financed by an inter-company loan

from Kmart. As Builders Square's losses mounted, the loan swelled from $850 million in January

of 1995 to over $1 billion in January of 1997.

65.    Having already taken over $700 million in special charges related to Builders

Square operations and having spent almost $400 million on the business from 1994 through 1996,

Kmart decided to cut its losses. In early 1996, Kmart also hired DLJ as its financial advisor to

market Builders Square, and Kmart reclassified Builders Square as a discontinued operation.

Upon information and belief, Kmart had been attempting to sell Builders Square at a price

approximating its book value since 1995, but when it hired DLJ, Kmart recognized that the best

it could hope for was "nominal consideration" and the assumption of Builders Square's significant

lease liabilities.

66.    In 1997, Leonard Green emerged as the only bidder with serious interest in

Hechinger and Builders Square. Although Leonard Green originally had considered Hechinger

and Builders Square as alternative transactions, eventually it decided to acquire Builders Square under the framework of a leveraged buy-out of Hechinger.

## III.

## HECHINGER AND BUILDERS SQUARE MERGE
## IN A MISCONCEIVED LEVERAGED BUY-OUT.

**A.    Leonard Green Reduces Its Offer As Hechinger Continues To Deteriorate.**

67.    In the summer of 1997, Leonard Green entered into agreements to acquire Builders Square and Hechinger.  With respect to Hechinger, the deal originally provided that Leonard Green would pay $4 per share for all of the class B shares to obtain a majority of voting shares. Leonard Green also agreed to acquire 8% of the class A shares at $2.25 per share; of these, it would acquire 1,136,000 from the Hechinger Family Defendants and 1,555,000 from other shareholders.  The Hechinger Family Defendants, which owned 88% of the class B shares, would receive the average price of approximately $3.83 per share, while other shareholders -- to the extent they could even participate -- would receive the average price of only $3.39 per share.

68.    Hechinger's poor financial performance continued through the summer of 1997, and Hechinger had no choice but to renegotiate a significantly lower purchase price than that originally contemplated.  Hechinger's July 17, 1997 press release announcing the transaction indicated that Leonard Green had offered $3 per share to purchase all of the Hechinger's shares. Yet the purchase price was reduced even further because Hechinger's financial results continued to deteriorate, and Leonard Green threatened to abandon the deal.  Ultimately, Leonard Green agreed to pay all of the Hechinger shareholders only $2.375 per share.

**B.    DLJ's Analysis Shows That Hechinger Is Insolvent.**

69.    Hechinger requested that DLJ render an opinion to the Board of Directors that the Hechinger LBO was fair to shareholders from a financial point of view.  DLJ gave the Board the fairness opinion it sought, but DLJ's analysis demonstrated that Hechinger was insolvent using recognized valuation methodologies for determining solvency:

| Methodology | Insolvency Per Share |
|---|---|
| Comparable Acquisition Analysis | $1.81 - $14.87 |
| Discounted Cash Flow Analysis | $4.38 - $5.01 |

Upon information and belief, DLJ's comparable company analysis also showed that Hechinger was insolvent.  Therefore, although "fair" -- or more accurately, a windfall -- to shareholders, the Transaction was decidedly unfair to unsecured creditors.  Upon information and belief, the Directors and the Hechinger Family Defendants made no meaningful inquiry into the effects of the Hechinger LBO on Hechinger's unsecured creditors.  To the contrary, the Directors and the Hechinger Family Defendants knowingly or recklessly disregarded such effects so that they could selfishly receive substantial payments for their own holdings of Hechinger stock.

70.    Hechinger management also had produced a liquidation analysis of its own in June of 1997.  Although this analysis appeared to conclude that a liquidation would yield $74.6 million of equity, or $1.76 per share, in a best case scenario, Hechinger management recognized that the assumptions underlying it were fundamentally flawed.  The author of the liquidation analysis assumed that, to achieve this equity, Hechinger's long-term debt would be "settled" at $200 million less than face value when, of course, it could not outside of a bankruptcy or other similar proceeding.  Without this discount, Hechinger's was insolvent by at least $2.92 per share, or approximately $123 million.  Hechinger's Chief Financial Officer, W. Clark McClelland,

20

recognized this flaw when he told DLJ that the market value discount "would not be likely in a liquidation scenario" and pointed to other flaws that undermined the results of the liquidation analysis. In a worst case scenario, a liquidation would render Hechinger insolvent by a margin of $8.36 per share, or approximately $353 million, according to McClelland. Since Hechinger's financial condition continued to deteriorate from June of 1997 until the Transaction closed on September 27, 1997, the results of this liquidation analysis materially understated Hechinger's insolvency.

71.    Upon information and belief, the Directors and certain of the Hechinger Family Defendants were notified of the flaws in the liquidation analysis. Notes from an August 27, 1997 Board meeting reflect a discussion indicating that Hechinger's "liquidation value is approx[imately] $0" and that in a chapter 11 scenario "equity in retail [businesses] typically gets little or nothing." Yet McClelland also noted a more serious impediment to the Hechinger LBO. He added in a memo to DLJ that "I have not assumed a dividend to shareholders out of the proceeds of asset sales since . . . [i]t also may be a 'fraudulent conveyance' if this were to be done prior to a liquidation." Upon information and belief, these notes were taken after Hechinger announced a substantial loss for the third quarter and Leonard Green's triggering of the "material adverse event" clause in its agreement with Hechinger. Thus, senior management, the Board of Directors (including the Directors) and the Hechinger Family Defendants were concerned that Hechinger would not survive as a going concern or that it would have to file for bankruptcy protection.

72.    Undeterred by DLJ's and its own troubling conclusions, Hechinger proceeded with the Transaction after it was approved by the Directors, and pursuant to a certain Stockholders

Agreement, dated as of July 17, 1997 (as amended), the Hechinger Family Defendants voted in favor of the transaction.

73.    The Hechinger LBO and the Builders Square Acquisition were effected in an integrated transaction consisting of a series of complex steps -- including the formation of new corporations and several intercompany transfers.  The various steps, which are summarized below, occurred over several days culminating on September 27, 1997.  During this period, Hechinger acquired Builders Square, and Hechinger received a series of temporary loans that were repaid through a permanent $600 million secured credit facility, the proceeds of which were used to cash out the Directors, the Hechinger Family Defendants and Hechinger's other former shareholders and, to pay, among other things, tens of millions of dollars of Transaction fees.

**C.    The Builders Square Acquisition.**

74.    The Builders Square Acquisition step was effected pursuant to the terms of a Purchase and Sale Agreement, dated as of July 17, 1997 (the "Purchase Agreement") among BSQ Acquisition, Inc. ("BSQ Acquisition"), Kmart, and Builders Square.  Pursuant to the Purchase Agreement, Builders Square formed BSQ Transferee Corp. ("BSQT"), which acquired most of the operating assets and certain liabilities of Builders Square from Kmart in exchange for the stock of BSQT and a promissory note in the amount of $10.7 million.

75.    Defendant GEI II then formed Centers Holdings, Inc. ("Centers Holdings") with a capital contribution of $25 million.  Centers Holdings transferred the $25 million capital contribution (less certain costs and expenses) to BSQ Acquisition, a newly formed subsidiary of Centers Holdings.  LGP and/or GEI II received $10.5 million for certain fees relating to the Transaction.

22

76.    On September 25, 1997, BSQ Acquisition purchased the stock of BSQT from Builders Square for $10 million in cash plus a warrant to purchase 30% of the stock of Centers Holdings.  Coopers & Lybrand estimated that the fair market value of the warrant on a non-marketable, minority interest basis was $3,064,950, as of September 25, 1997.  After the Builders Square Acquisition, Centers Holdings operated the Builders Square chain.

## D.    The Lenders' Funds Cash Out Hechinger's Shareholders Via A Leveraged Buy-Out.

77.    A bank group assembled by Chase Securities Inc. and led by Chase (the "Chase Bank Group") financed the Hechinger LBO and the Builders Square Acquisition.  The Chase Bank Group originally included: BankAmerica Business Credit, Inc., as Documentation Agent and Borrowing Base Agent, Citicorp USA, Inc., as syndication agent, AT&T Commercial Finance Corporation, BankBoston, N.A., BNY Financial Corporation, BTM Capital Corp., CIT, Congress Financial Corporation (Western), Deutsche Financial Services, Dresdner Bank (New York and Grand Cayman Branches), Fleet Capital, Heller Financial Corp., IBJ Schroder Business Credit Corporation, LaSalle Business Credit, Inc., Mellon Bank, N.A., National Bank of Canada, National City Commercial Finance, PNC Business Credit, Sanwa Business Credit Corp., Signet Bank, Transamerica Business Credit Corp., Van Kampen American Capital Prime Rate Income Trust, and Wells Fargo Bank, N.A.  Upon information and belief, Dime Commercial Corporation, Fleet Business Credit, Foothill Capital Corp., and Jackson National Life Insurance Co. subsequently joined the Chase Bank Group.

78.    On September 25, 1997, BSQ Acquisition acquired Hechinger (hereinafter the term "Hechinger" includes any companies that were affiliated with Hechinger after the Transaction) through a triangular merger.  The Chase Bank Group loaned the face amount of $171 million to

BSQT (the "BSQT Loan"), which amounted to $160,818,433 after the deduction of fees and expenses. The BSQT Loan was secured by all of BSQT's inventory, accounts receivable and equipment. BSQ Acquisition formed Hechinger Acquisition Inc. ("Hechinger Acquisition"), contributed a portion of the BSQT Loan to Hechinger Acquisition, and paid the remaining $100,652,827 to the Hechinger shareholders, including the Hechinger Family Defendants and the Directors, in exchange for their stock. Hechinger Company merged into Hechinger Acquisition and became a wholly-owned subsidiary of BSQ Acquisition, a wholly-owned subsidiary of Centers Holdings.

79.    On September 25, 1997 the Chase Bank Group also loaned Hechinger Stores $112 million (the "CIT Repayment Loan") which was used in part to pay off CIT, Hechinger's former working capital lenders.

80.    The inventory owned by the Hechinger Company and BSQT was then transferred in a series of steps to the Hechinger Investment Company of Delaware ("HICD"). HICD became the "Permanent Borrower" under a $600 million secured loan (the "Chase Loan") made by the Chase Bank Group pursuant to a Credit Agreement, dated as of September 26, 1997 (the "Credit Agreement"). Centers Holdings, Inc., BSQ Acquisition, BSQT, Hechinger, Hechinger Stores, and Hechinger Stores East Coast Company also were parties to the Credit Agreement. Through a series of steps, $243 million of the Chase Loan was used to pay off the BSQT Loan ($127 million of which had been used to pay fees and to cash out the Hechinger shareholders) and the CIT Repayment Loan. Pursuant to a Security Agreement, dated as of September 26, 1997 (the "Security Agreement"), Hechinger pledged all of its inventory, accounts receivable and equipment, among other things, as security for the Chase Loan, and the Chase Bank Group obtained guarantees from all of HICD's affiliates. The parties also executed a Pledge Agreement,

dated as of September 26, 1997 (the "Pledge Agreement"), pursuant to which all Hechinger affiliates pledged, among other things, their equity interests in any subsidiary corporations or other entities.

**E.    The Transaction Causes Unsecured Creditors Substantial Harm.**

81.    Prior to the Transaction, the Debtors had less than $110 million in secured debt. Even with Hechinger's insolvency, unsecured creditors had significant assets from which they could satisfy much of their claims.

82.    The Transaction immediately caused substantial harm to unsecured creditors because Hechinger effectively gave away over $127 million of value in Transaction fees and payments to the Hechinger Family Defendants, the Directors and Hechinger's other former shareholders and replaced this value with additional secured debt that was structurally senior to the Debtors' unsecured creditors. In fact, the Transaction caused secured debt -- substantially all of which was held by the Chase Bank Group -- to increase by approximately $200 million when the Transaction closed, and all signs indicated that such debt would continue to increase because of the rapidly deteriorating state of the businesses. The Directors knew or recklessly disregarded the deleterious effect of the Transaction on unsecured creditors. Indeed, the Proxy Statement relating to the Transaction stated that the Directors "considered that the additional leverage which would be incurred in connection with the Merger could affect the creditworthiness of Hechinger after the consummation of the Merger and, accordingly, cause the Company's outstanding indebtedness to trade at a greater discount than prior to the announcement of the Original Merger Agreement."

83.    The Transaction also had disastrous long-term effects on unsecured creditors. Upon information and belief, from the Transaction to the Petition Date, secured debt increased

by approximately $485 million. Unfortunately, as Hechinger's secured debt increased, the assets available to satisfy the claims of unsecured creditors not only decreased by the amount of the secured debt, but also by the amount that Hechinger's asset base deteriorated: nearly $400 million. Thus, the total assets potentially available for distribution to unsecured creditors (at book value) decreased by as much as $885 million from the date of the Transaction to the Petition Date.

**F.    The Chase Bank Group's Knowledge That**
**The Transaction Was A Fraudulent Conveyance.**

84.    The Chase Bank Group was well aware that the Hechinger LBO could be avoided as a fraudulent conveyance. They knew the Chase Loan played a pivotal part in an integrated financial transaction. Indeed, the closing of the Hechinger LBO and obtaining the Chase Loan were conditions precedent to Kmart and Hechinger's obligations under the Purchase Agreement, and Leonard Green could not have consummated the Hechinger LBO and the Builders Square Acquisition without the Chase Loan. The Directors, the Hechinger Family Defendants, Leonard Green, the Chase Bank Group and the Debtors intended, were fully aware of, and agreed to, all aspects of this integrated transaction. In fact, the conditions precedent in the Credit Agreement contemplated that the Hechinger LBO and the Builders Square Acquisition would be consummated in conjunction with the closing of the Credit Agreement. Thus, the Proxy Statement related to the Transaction provided in pertinent part:

> As a condition to the obligations of Acquisition and BSQ Acquisition to consummate the Merger, financing must be obtained in amounts sufficient to enable BSQ Acquisition (i) to pay the aggregate consideration . . . payable in the Merger and the cash portion of the consideration under the BSQ Acquisition Agreement and (ii) to continue the operation of the businesses of New Builders Square and Hechinger. . . . GEI has obtained, through one of its affiliates, a commitment letter . . . from The Chase Manhattan Bank, Bank America Business Credit, Inc. and Citicorp USA, Inc. . . . with respect to the borrowing by BSQ Acquisition and/or its subsidiaries

of up to $600 million under certain senior *secured* credit facilities (the
"Senior Facilities").

Hechinger August Proxy Statement, dated September 25, 1997, at 18 (emphasis added).

85.    The Chase Bank Group knew or should have known about DLJ's fairness opinion
demonstrating Hechinger's insolvency.  A summary of the results of DLJ's analyses were
published in the Hechinger Proxy Statement, dated September 5, 1997.  Yet the Chase Bank
Group knowingly or recklessly disregarded it.

**G.    The Transaction Spells Certain Failure For
Hechinger And Certain Losses For Its Unsecured Creditors.**

86.    Hechinger and Builders Square were deteriorating rapidly before the Hechinger
LBO and the Builders Square Acquisition.  After the merger, they became even weaker.  The
Debtors paid various fees and financing charges totaling $27,943,823, $2 million more than the
equity capital contributed to the Transaction by Leonard Green through GEI II.  Secured debt
increased by at least the $127 million debt, which the Directors used to pay fees and to dividend
to themselves, the Hechinger Family Defendants and Hechinger's other former shareholders.  The
Transaction saddled the Debtors with a debt to capital ratio (at the book value of assets) of 95.6%
in the case of Centers Holdings (nearly three times the industry average) and 71.9% in the case
of Hechinger.  Upon information and belief, the Chase Bank Group bore none of the risk of the
Transaction because they underwrote the loan on a liquidation basis.  Instead, the Chase Loan
transferred the risk to the Debtors' unsecured creditors who were structurally subordinate to the
Chase Bank Group in terms of claims on most of the Debtors' property and who would receive
little, if any, recovery in a liquidation.

87.    Upon information and belief, the Chase Bank Group's reckless indifference to
Hechinger's deteriorating financial condition was driven by its hope to consummate a very

27

profitable transaction no matter what the ramifications. With a chance to make millions in upfront fees and interest -- and with a lien that covered its exposure -- the downside risk was virtually zero. Indeed, it proved to be zero because the Fleet Bank Group -- which acquired the Chase Loan -- was paid in full with interest after the Petition Date.

## IV.

## HECHINGER COLLAPSES FROM ITS MASSIVE DEBT BURDEN.

### A.    The Combined Company Is Worth Less Than The Sum Of Its Parts.

88.    Moody's Investor Service recognized the significant risks posed by the Hechinger LBO and the Builders Square Acquisition. Shortly after the Transaction, Moody's lowered its ratings on Hechinger's senior notes and debentures to Caa3 from B3, which meant that they were "of poor standing. Such [bonds] may be in default or there may be present elements of danger with respect to principal or interest." The modifier "3" to the rating indicates Hechinger was ranked "in the lower end of that generic rating category." According to a spokesperson for Moody's, the downgrade "reflect[ed] the challenges" Hechinger would face in "boosting sales, earnings and cash flow" after the combination with Builders Square in their highly competitive market.

89.    Although Leonard Green may have envisioned that the Builders Square-Hechinger combination would perform better than the sum of its parts, the opposite was actually foreseeable and came to pass. The combined company continued the deteriorating trend that began well before the merger. In the eighteen months thereafter, the combined operations of Builders Square and Hechinger continued to lose money at a staggering rate. Losses at the Hechinger level for the fifty-three weeks ended October 3, 1998 totaled approximately $93 million while EBITDA

totaled only $60 million. For the same period, losses at Centers Holdings totaled approximately $111 million. On a cash flow basis, things were even worse. For fifty-three weeks ended October 3, 1998, Hechinger suffered negative cash flow from operations of about $257 million. In the next twenty-six period ending April 3, 1999, Hechinger had negative cash flow from operations of approximately $226 million. Hechinger was bleeding cash despite management's efforts to implement a variety of initiatives to boost revenues and reduce expenses.

90.     By December of 1998, Hechinger was in a severe liquidity crisis. Upon information and belief, Hechinger's vendors had grown weary of its deteriorating financial condition, and Hechinger's credit terms with vendors tightened to the extent that it was rapidly exhausting availability on its $600 million secured credit line with the Chase Bank Group. This situation was only temporarily mitigated when the Chase Bank Group agreed to extend an additional $50 million loan on December 31, 1998. Kmart and GEI II guaranteed this loan, for which they received substantial fees. The losses, however, continued. For the thirty-six weeks ending on June 11, 1999, the losses for Hechinger and Builders Square were approximately $305 million and $350 million, respectively.

**B.     The Fleet Group Succeeds The Chase Bank
Group; Hechinger's Liquidity Continues To Erode.**

91.     On March 19, 1999, Hechinger executed an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), which effectively increased Hechinger's credit line by $50 million. Pursuant to an Amended and Restated Security Agreement, dated as of March 18, 1999, the line continued to be secured, not only by property previously encumbered, but also by certain of Hechinger's real estate. The Chase Bank Group was replaced by a bank group led by Fleet (the "Fleet Bank Group"). Three members of the Fleet Bank Group, including

Fleet, Citicorp USA, Inc. and Heller Financial, Inc. also were members of the original Chase

Bank Group and were well aware of the facts underlying the Transaction. Other members of the

Fleet Bank Group included Congress Financial Corporation, Jackson National Life Insurance

Company, Foothill Capital Corporation, General Electric Capital Corporation ("GECC"), Back

Bay Capital Funding, LLC ("Back Bay"), and Foothill Partners III, L.P. ("Foothill Partners").

Upon information and belief, all of these lenders except GECC, Back Bay, and Foothill Partners

joined the Chase Bank Group after the Hechinger LBO and the Builders Square Acquisition.

Pursuant to an Assignment and Release Agreement, dated March 18, 1999 (the "Assignment

Agreement"), the Chase Bank Group assigned all of its rights under the Chase Loan, including

the liens previously granted to the Chase Bank Group, to the Fleet Bank Group. These liens

secured the Fleet Bank Group's claims, which Hechinger ultimately paid during its bankruptcy

without prejudice to disgorgement if the Fleet Banks Group's liens were avoided.


## V.

## THE NATURAL AND INEVITABLE CONSEQUENCES
## OF THE TRANSACTIONS: BANKRUPTCY,
## BUSINESS FAILURE, AND LIQUIDATION

### A.    The Chapter 11 Filings.

92.     On June 11, 1999, after recently closing thirty-four Builders Square stores,

Hechinger and its affiliated companies filed for chapter 11 protection under the Bankruptcy Code

in the District of Delaware. Upon information and belief, as of the Petition Date, Hechinger was

in the process of closing eighty-nine additional stores. Hechinger initially argued that it could

restructure its operations and emerge from bankruptcy as a reorganized company. However, with

Hechinger's weak management team, high leverage, and deteriorating sales, there was little

question that it would soon liquidate. On or about September 9, 1999, Hechinger ceased its operations and publicly announced the liquidation of all of its remaining assets.

93. Bankruptcy and liquidation were the natural consequences of the Transaction. This fact was made abundantly clear by information available to Hechinger, the Directors, the Hechinger Family Defendants, Leonard Green, and the Chase Bank Group prior to the Transaction. Among other things:

A. Hechinger and Builders Square incurred massive losses in the three years leading up to the merger;

B. Same store sales were plummeting for both Hechinger and Builders Square;

C. Competition was becoming more intense;

D. All relevant financial statistics on Hechinger and Builders Square demonstrated a reduction in liquidity, increasing debt leverage, elimination of the equity base and decreasing cash interest coverage during the months prior to the merger;

E. The projections prepared by Leonard Green required a dramatic and improbable turnaround in the Debtors' financial performance;

F. DLJ's analyses indicated that Hechinger was insolvent; and

G. The Hechinger LBO removed over $127 million in assets by paying fees and cashing out the Hechinger Family Defendants, the Directors and Hechinger's other former shareholders for no consideration to the Debtors, at the same time it liened up most of the remaining assets.

94. The Directors -- led by the Hechinger Family Defendants -- approved the Hechinger LBO and the Builders Square Acquisition knowing that Hechinger was insolvent and that the Transaction would delay, hinder and defraud its unsecured creditors. Hechinger, the

31

Directors, the Hechinger Family Defendants and Leonard Green intended the natural consequences of their actions.    These actions hindered, delayed or defrauded Hechinger's unsecured creditors through the Hechinger LBO. Hechinger's officers, directors and controlling shareholders reviewed the Transaction to determine whether it was "fair" to shareholders, yet they totally ignored its devastating implications for unsecured creditors even though they knew or recklessly disregarded the fact that shareholders were being preferred.  The Chase Bank Group participated in and facilitated this result with full knowledge of the facts indicating that the Hechinger LBO and Builders Square Acquisition would be disastrous to the Debtors.  The Chase Bank Group was consciously and callously indifferent to the impact on unsecured creditors.  The acquisition by the Fleet Bank Group of the Chase Loan was subject to all legal infirmities of that Loan.

### FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duties against the Directors)

95.    The Committee repeats and realleges the allegations in paragraphs 1-94 as if fully set forth herein.

96.    Hechinger was insolvent at the time of the Transaction or was rendered insolvent as a result of the Transaction.  The Directors knew or should have known of Hechinger's insolvency.  Upon information and belief, prior to approving the Transaction, the Directors received copies, summaries or presentations of DLJ's opinion indicating that Hechinger was insolvent.

97.    By virtue of Hechinger's insolvency, the Directors owed fiduciary duties to Hechinger and its unsecured creditors to, among other things, preserve and maximize the value

32

of Hechinger's assets for the benefit of such creditors. Under these circumstances, the Directors also owed Hechinger and its unsecured creditors a duty of undivided loyalty in managing and supervising the business affairs of Hechinger.

98.    The Directors callously breached these fiduciary duties.

99.    The Directors approved the Transaction, thereby (i) ensuring the removal of at least $127 million of value from Hechinger by cashing out themselves, the Hechinger Family Defendants and Hechinger's other former shareholders and paying substantial fees related to the Transaction and (ii) causing Hechinger to grant liens, pledges and security interests to the Bank Defendants to secure the amounts paid to Hechinger shareholders and transaction-related fees. The Directors knew or should have known that Hechinger received no value, and certainly not reasonably equivalent value, for the amounts that were paid to cash them and the other Hechinger shareholders out and to pay fees in connection with the Transaction. The Transaction caused substantial harm to Hechinger and its unsecured creditors by depriving Hechinger of assets with a value of at least $127 million that otherwise would have been available to satisfy (in whole or in part) the claims of unsecured creditors.

100.    For the Directors, the primary purpose of the Transaction was to benefit themselves, the Hechinger Family Defendants and Hechinger's other shareholders, who received substantial payments for their Hechinger stock, which, because of Hechinger's insolvency, was worthless.

101.    As a result of the Directors' breaches of their fiduciary duties, Hechinger and its unsecured creditors have been deprived of at least the value of the amounts paid to Hechinger's shareholders and in respect of fees related to the Transaction, which the Committee believes to be in excess of $127 million.

102.    By virtue of the foregoing, the Directors are liable to reimburse the Debtors' estates damage caused by the Directors' breaches of their fiduciary duties, which the Committee believes to be at least $127 million.

### SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duties against the Hechinger Family Defendants)

103.    The Committee repeats and realleges the allegations in paragraphs 1-102 as if fully set forth herein.

104.    Hechinger was insolvent at the time of the Transaction or was rendered insolvent as a result of the Transaction. The Hechinger Family Defendants knew or should have known of Hechinger's insolvency. Upon information and belief, prior to approving the Transaction, the Hechinger Family Defendants received copies, summaries or presentations of DLJ's opinion indicating that Hechinger was insolvent.

105.    By virtue of Hechinger's insolvency and their status as controlling shareholders, the Hechinger Family Defendants had fiduciary duties to Hechinger and its unsecured creditors to, among other things (i) preserve and maximize the value of Hechinger's assets for the benefit of such creditors and (ii) act in a manner that would not injure the Debtors and such creditors.

106.    The Hechinger Family Defendants callously breached these fiduciary duties.

107.    The Hechinger Family Defendants, by and through a Stockholders Agreement, controlled the voting on all matters to which Hechinger's shareholders voted prior to the Transaction. Upon information and belief, each of the Hechinger Family Defendants agreed to vote their shares in one block in all significant matters, including, without limitation, the vote with respect to the Transaction.

34

108.    The Hechinger Family Defendants voted to approve the Transaction, thereby (i) ensuring the removal of at least $127 million of value from Hechinger by cashing out themselves and Hechinger's other former shareholders and paying substantial fees related to the Transaction and (ii) causing Hechinger to grant liens, pledges and security interests to the Bank Defendants to secure the amounts paid to Hechinger shareholders and transaction related fees. The Hechinger Family Defendants knew or should have known that Hechinger received no value, and certainly not reasonably equivalent value, for the amounts that were paid to cash them and the other Hechinger shareholders out and to pay fees in connection with the Transaction. The Transaction caused substantial harm to Hechinger and its unsecured creditors by depriving Hechinger of assets with a value of at least $127 million that otherwise would have been available to satisfy (in whole or in part) the claims of unsecured creditors.

109.    For the Hechinger Family Defendants, the primary purpose of the Transaction was to benefit themselves. By and through the Transaction, the Hechinger Family Defendants received substantial payments for their Hechinger stock, which, because of Hechinger's insolvency, was worthless. By approving the Transaction, the Hechinger Family Defendants put their own self interests ahead of the interests of the Debtors and their unsecured creditors to whom they owed fiduciary duties.

110.    As a result of the Hechinger Family Defendants' breaches of their fiduciary duties, Hechinger and its unsecured creditors have been deprived of at least the value of the amounts paid to Hechinger's shareholders and in respect of fees related to the Transaction, which the Committee believes to be in excess of $127 million.

111.   By virtue of the foregoing, the Hechinger Family Defendants are liable to reimburse the Debtors' estates for the damage caused by the Hechinger Family Defendants' breaches of their fiduciary duties, which the Committee believes to be at least $127 million.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment against the Hechinger Family Defendants)

112.   The Committee repeats and realleges the allegations in paragraphs 1-111 as if fully set forth herein.

113.   Through the wrongful receipt of the proceeds of the Hechinger LBO, the Hechinger Family Defendants have unjustly retained a benefit that belongs to the Debtors and their unsecured creditors, and the Hechinger Family Defendants' retention of that benefit violates fundamental principles of justice, equity and good conscience.

114.   The Hechinger Family Defendants, therefore, are liable to the Debtors and their estates for unjust enrichment.

115.   By virtue of the foregoing, the Hechinger Family Defendants are liable to reimburse the Debtors' estates the amount of the payments they received in connection with the Hechinger LBO.

### FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of
### Fiduciary Duty against LGP and GEI II)

116.   The Committee repeats and realleges the allegations in paragraphs 1-115 as if fully set forth herein.

117.   Hechinger was insolvent at the time of the Transaction or was rendered insolvent as a result of the Transaction.  Leonard Green knew or should have known of Hechinger's insolvency.  Upon information and belief, prior to entering into the Transaction, Leonard Green

36

received copies, summaries or presentations of DLJ's opinion indicating that Hechinger was insolvent.

118.    By virtue of Hechinger's insolvency, the Directors had fiduciary duties to Hechinger and its unsecured creditors to, among other things, preserve and maximize the value of Hechinger's assets for the benefit of such creditors. The Directors also owed Hechinger and its unsecured creditors a duty of undivided loyalty in managing and supervising the business affairs of Hechinger.

119.    Leonard Green knew or should have known that the Directors had the fiduciary duties alleged herein.

120.    The Directors callously breached these fiduciary duties.

121.    The Directors approved the Transaction, thereby (i) ensuring the removal of at least $127 million of value from Hechinger by cashing out themselves and Hechinger's other former shareholders and paying substantial fees related to the Transaction and (ii) causing Hechinger to grant liens, pledges and security interests to the Bank Defendants to secure the amounts paid to Hechinger shareholders and transaction related fees. The Individual Directors knew or should have known that Hechinger received no value, and certainly not reasonably equivalent value, for the amounts that were paid to cash them and the other Hechinger shareholders out and to pay fees in connection with the Transaction. The Transaction caused substantial harm to Hechinger and its unsecured creditors by depriving Hechinger of assets with a value of at least $127 million that otherwise would have been available to satisfy (in whole or in part) the claims of unsecured creditors.

122.   For the Directors, the primary purpose of the Transaction was to benefit themselves and Hechinger's other shareholders, who received substantial payments for their Hechinger stock, which, because of Hechinger's insolvency, was worthless.

123.   As a result of the Directors' breaches of their fiduciary duties, Hechinger and its unsecured creditors have been deprived of at least the value of the amounts paid to Hechinger's shareholders and in respect of fees related to the Transaction, which the Committee believes to be in excess of $127 million.

124.   Prior to entering into the Transaction, Leonard Green knew or should have known that approving the Transaction would be a violation of the Directors' fiduciary duties to the Debtors and unsecured creditors. Notwithstanding this knowledge, Leonard Green proceeded with the Transaction, thereby facilitating, assisting and aiding and abetting the Directors' breaches of their fiduciary duties.

125.   By virtue of the foregoing, LGP and/or GEI II are liable to reimburse the Debtors' estates for the damages caused by their aiding and abetting breaches of fiduciary duties, which the Committee believes to be at least $127 million.

### FIFTH CLAIM FOR RELIEF
**(Aiding and Abetting Breach of
Fiduciary Duty against LGP and GEI II)**

126.   The Committee repeats and realleges the allegations in paragraphs 1-125 as if fully set forth herein.

127.   Hechinger was insolvent at the time of the Transaction or was rendered insolvent as a result of the Transaction. The Hechinger Family Defendants knew or should have known of Hechinger's insolvency. Upon information and belief, prior to approving the Transaction, the

38

Hechinger Family Defendants received copies, summaries or presentations of DLJ's opinion indicating that Hechinger was insolvent.

128.    By virtue of Hechinger's insolvency and their status as controlling shareholders, the Hechinger Family Defendants had fiduciary duties to Hechinger and its unsecured creditors to, among other things, (i) preserve and maximize the value of Hechinger's assets for the benefit of such creditors (ii) act in a manner that would not injure the Debtors and its creditors.

129.    Leonard Green knew or should have known that the Hechinger Family Defendants had the fiduciary duties alleged herein.

130.    The Hechinger Family Defendants callously breached these fiduciary duties.

131.    The Hechinger Family Defendants, by and through a Stockholders Agreement, controlled the voting on all matters to which Hechinger's shareholders voted prior to the Transaction. Upon information and belief, each of the Hechinger Family Defendants agreed to vote their shares in one block in all significant matters, including, without limitation, the vote with respect to the Transaction.

132.    The Hechinger Family Defendants voted to approve the Transaction, thereby (i) ensuring the removal of at least $127 million of value from Hechinger by cashing out themselves and Hechinger's other former shareholders and paying substantial fees related to the Transaction and (ii) causing Hechinger to grant liens, pledges and security interests to the Bank Defendants to secure the amounts paid to Hechinger shareholders and transaction related fees. The Hechinger Family Defendants knew or should have known that Hechinger received no value, and certainly not reasonably equivalent value, for the amounts that were paid to cash them and the other Hechinger shareholders out and to pay fees in connection with the Transaction. The Transaction caused substantial harm to Hechinger and its unsecured creditors by depriving it of assets with a

39

value of at least $127 million that otherwise would have been available to satisfy (in whole or in part) the claims of unsecured creditors.

133.    For the Hechinger Family Defendants, the primary purpose of the Transaction was to benefit themselves. By and through the Transaction, the Hechinger Family Defendants received substantial payments for their Hechinger stock, which, because of Hechinger's insolvency, was worthless. By approving the Transaction, the Hechinger Family Defendants put their own self interests ahead of the interests of the Debtors and their unsecured creditors to whom they owed fiduciary duties.

134.    Prior to entering into the Transaction, Leonard Green knew that approving the Transaction would be a violation of the Hechinger Family Defendants' fiduciary duties to the Debtors and unsecured creditors. Notwithstanding this knowledge, Leonard Green proceeded with the Transaction, thereby facilitating, assisting and aiding and abetting the Hechinger Family Defendants' breaches of their fiduciary duties.

135.    By virtue of the foregoing, LGP and/or GEI II are liable to reimburse the Debtors' estates for the damages caused by their aiding and abetting breaches of fiduciary duties, which the Committee believes to be at least $127 million.

## SIXTH CLAIM FOR RELIEF
### (Avoidance and Recovery of Fraudulent
### Transfer against the Hechinger Family Defendants and the Directors)

136.    The Committee repeats and realleges the allegations in paragraphs 1-135 as if fully set forth herein.

137.   The payments to the Hechinger Family Defendants and the Directors pursuant to the Hechinger LBO were transfers of interests of the Debtors in property (the "Shareholder Payments").

138.   Hechinger made the Shareholder Payments with actual intent to hinder, delay or defraud any entity to which the Debtors were or became indebted, on or after the date that the Shareholder Payments were made.

139.   At all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors include, without limitation, KS Capital, L.P. and Teachers Insurance and Annuity Association of America, both of which have been holders of Hechinger's 9.45% Senior Debentures due 2012 and 5.95% Senior Notes since prior to the Transaction.  These creditors, among others, have the right to void the Transaction under applicable law, including the laws of the States of California, Delaware, Maryland, Michigan and Texas.

140.   By reason of the foregoing, pursuant to Sections 544(b), 550 and 551 of the Bankruptcy Code, the Committee is entitled to avoid and recover for the benefit of the estates the Shareholder Payments from the Hechinger Family Defendants and the Directors.

### SEVENTH CLAIM FOR RELIEF
**(Avoidance, Recovery and Preservation of Fraudulent
Transfer against the Hechinger Family Defendants and the Directors)**

141.   The Committee repeats and realleges the allegations in paragraphs 1-140 as if fully set forth herein.

142.    The Debtors received less than fair consideration -- indeed, no consideration -- for the Shareholder Payments.

143.    The Debtors (i) were insolvent on the date that the Shareholder Payments were made or became insolvent as a result of the Shareholder Payments, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

144.    At all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors include, without limitation, KS Capital, L.P. and Teachers Insurance and Annuity Association of America, both of which have been holders of Hechinger's 9.45% Senior Debentures due 2012 and 5.95% Senior Notes since prior to the Transaction. These creditors, among others, have the right to void the Transaction under applicable law, including the laws of the States of California, Delaware, Maryland, Michigan and Texas.

145.    By reason of the foregoing, pursuant to Sections 544(b), 550 and 551 of the Bankruptcy Code, the Committee is entitled to avoid and recover for the benefit of the estates the Shareholder Payments from the Hechinger Family Defendants and the Directors.

### EIGHTH CLAIM FOR RELIEF
(Avoidance and Recovery of Fraudulent Transfer against LGP and GEI II)

146.    The Committee repeats and realleges the allegations in paragraphs 1-145 as if fully set forth herein.

147.    To effectuate the Hechinger LBO and the Builders Square Acquisition, the Debtors borrowed from, and incurred the obligation to pay to, the Chase Bank Group a loan in the maximum amount of $600 million (the "Acquisition Obligation") pursuant to the Credit Agreement. To secure the Acquisition Obligation, the Debtors conveyed security interests in, among other things, substantially all of their inventory, equipment, accounts receivable and certain equity interests to the Chase Bank Group (the "Acquisition Security Interests") pursuant to the Security Agreement and the Pledge Agreement.  LGP and/or GEI II received a payment of $10.5 million dollars for certain fees in connection with the Hechinger LBO (the "LBO Payment")

148.    The payments to Hechinger's shareholders in the Hechinger LBO, the payments of Transaction fees, the payments to Builders Square for the Builders Square Acquisition, the transfer of the Acquisition Security Interests to the Chase Bank Group and the LBO Payment were transfers of interests of the Debtors in property (collectively, the "Transfers").

149.    Hechinger made the Transfers and incurred the Acquisition Obligation with actual intent to hinder, delay or defraud any entity to which the Debtors were or became indebted, on or after the date that such Transfers were made or the Acquisition Obligation was incurred.

150.    Leonard Green's conduct in the Hechinger LBO and the Builders Square Acquisition was recklessly indifferent and in bad faith.  In and through the Transaction, Leonard Green caused the Debtors to incur massive amounts of secured debt that the Debtors could not service under any foreseeable scenario, which shifted the risk of the Transaction to the Debtors' unsecured creditors.  At the same time, Leonard Green assumed little, if any risk; for Leonard Green, it amounted to a very inexpensive option on Hechinger's future.  If Hechinger failed, Leonard Green would only lose its $15 million investment.  If Hechinger succeeded, however,

they would garner all of the profit for themselves. Thus, the Transaction was to, or for the benefit of, LGP and GEI II.

151. At all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors include, without limitation, KS Capital, L.P. and Teachers Insurance and Annuity Association of America, both of which have been holders of Hechinger's 9.45% Senior Debentures due 2012 and 5.95% Senior Notes since prior to the Transaction. These creditors, among others, have the right to void the Transaction under applicable law, including the laws of the States of California, Delaware, Maryland, Michigan and Texas.

152. By reason of the foregoing, pursuant to Sections 544(b), 550 and 551 of the Bankruptcy Code, the Committee is entitled to a judgment against LGP and/or GEI II enabling the Committee to recover the value of the Transfers and any amounts paid on account of the Transfers.

### NINTH CLAIM FOR RELIEF
#### (Avoidance, Recovery and Preservation of Fraudulent Transfer against LGP and GEI II)

153. The Committee repeats and realleges the allegations in paragraphs 1-152 as if fully set forth herein.

154. The Debtors received less than fair consideration or reasonably equivalent value in exchange for the Transfers and the Acquisition Obligation insofar as the Debtors received no consideration for the amounts paid in Transaction fees and to Hechinger's former shareholders in the Hechinger LBO and less than fair consideration or reasonably equivalent value for the Builders Square Acquisition.

44

155.    The Debtors (i) were insolvent on the date that such Transfers were made and the Acquisition Obligation was incurred, or became insolvent as a result of such Transfers or the Acquisition Obligation; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

156.    LGP's conduct in the Hechinger LBO and the Builders Square Acquisition was recklessly indifferent and in bad faith. In and through the Transaction, Leonard Green caused the Debtors to incur massive amounts of secured debt that the Debtors could not service under any foreseeable scenario, which shifted the risk of the Transaction to the Debtors' unsecured creditors. At the same time, Leonard Green assumed little, if any risk; for Leonard Green, it amounted to a very inexpensive option on Hechinger's future. If Hechinger failed, Leonard Green would only lose its $15 million investment. If Hechinger succeeded, however, they would garner all of the profit for themselves. Thus, the Transaction was to, or for the benefit of, LGP and GEI II.

157.    With the knowledge and consent of Leonard Green, the borrowing underlying the Acquisition Obligation was earmarked by Hechinger for the purpose of consummating the Hechinger LBO and paying fees relating to the Transaction. Hechinger would not have been able to consummate the Hechinger LBO and the Builder Square Acquisition without incurring the Acquisition Obligation and without conveying the Acquisition Security Interests.

158.    The Builders Square Acquisition, the Hechinger LBO, the Acquisition Obligation and the Acquisition Security Interests were part and parcel of one integrated transaction. In fact, the closing of the Builders Square Acquisition was conditioned upon the closing of the Hechinger LBO. Thus, the Debtors could not have acquired the Builders Square assets unless they

consummated the Hechinger LBO.  At least $127 million of the borrowing underlying the Acquisition Obligation was earmarked for the purpose of paying Hechinger's former shareholders with no consideration to the Debtors.

159.    Leonard Green knew of, or recklessly disregarded, both the Debtors' insolvency and inadequate capitalization at the time of the Transaction and the effect of the Transaction on the Debtors' other creditors.

160.    At all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors include, without limitation, KS Capital, L.P. and Teachers Insurance and Annuity Association of America, both of which have been holders of Hechinger's 9.45% Senior Debentures due 2012 and 5.95% Senior Notes since prior to the Transaction.  These creditors, among others, have the right to void the Transaction under applicable law, including the laws of the States of California, Delaware, Maryland, Michigan and Texas.

161.    By reason of the foregoing, pursuant to Sections 544(b), 550 and 551 of the Bankruptcy Code, the Committee is entitled to a judgment against LGP and/or GEI II enabling the Committee to  recover the value of the Transfers and any amounts paid on account of the Transfers.

### TENTH CLAIM FOR RELIEF
### (Avoidance and Recovery of Fraudulent
### Transfer against LGP and GEI II)

162.    The Committee repeats and realleges the allegations in paragraphs 1-161 as if fully set forth herein.

163.    LGP and/or GEI II received monthly management fees and credit facility fees (the "Management Fees") from Hechinger totaling at least $1.75 million.

164.    The payment by the Debtors of the Management Fees were transfers of the Debtors of an interest in property.

165.    The Debtors received less than fair consideration or reasonably equivalent value in exchange for the Management Fees.

166.    The Debtors (i) were insolvent on each of the dates that the payment of the Management Fees occurred; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

167.    Upon information belief, LGP and/or GEI II were the initial transferees of the Management Fees.

168.    At all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors include, without limitation, KS Capital, L.P. and Teachers Insurance and Annuity Association of America, both of which have been holders of Hechinger's 9.45% Senior Debentures due 2012 and 5.95% Senior Notes since prior to the Transaction. These creditors, among others, have the right to void the Management Fees under applicable law, including the laws of the States of California, Delaware, Maryland, Michigan and Texas.

169.    By reason of the foregoing, pursuant to Sections 544(b), 550 and 551 of the Bankruptcy Code, the Committee is entitled to a judgment against LGP and/or GEI II enabling the Committee to avoid and recover the Management Fees.

### ELEVENTH CLAIM FOR RELIEF
**(Avoidance of Obligation; Avoidance, Recovery and Preservation of Fraudulent Transfer against the Bank Defendants)**

170.    The Committee repeats and realleges the allegations in paragraphs 1-169 as if fully set forth herein.

171.    To effectuate the Hechinger LBO and the Builders Square Acquisition, the Debtors borrowed from, and incurred the obligation to pay to, the Chase Bank Group the Acquisition Obligation pursuant to the Credit Agreement. To secure the Acquisition Obligation, the Debtors conveyed the Acquisition Security Interests pursuant to the Security Agreement and the Pledge Agreement.

172.    The Transfers were transfers of interests of the Debtors in property.

173.    Hechinger made the Transfers and incurred the Acquisition Obligation with actual intent to hinder, delay or defraud any entity to which the Debtors were or became indebted, on or after the date that such Transfers were made or the Acquisition Obligation was incurred.

174.    The Chase Bank Group's conduct in the Hechinger LBO and the Builders Square Acquisition was recklessly indifferent and in bad faith. Members of the Chase Bank Group were initial transferees of the Transfers and the Acquisition Obligation by virtue of their participation in the Chase Loan.

175.    Fleet and the members of the Fleet Bank Group were immediate or mediate transferees of the Transfers and the Acquisition Obligation by virtue of the Assignment

Agreement. Fleet and members of the Fleet Bank Group received their interest from the Chase Bank Group with full knowledge of the facts with respect to the Transaction. At least three of the banks in the Fleet Bank Group -- including Fleet -- were members of the Chase Bank Group.

176.    At all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors include, without limitation, KS Capital, L.P. and Teachers Insurance and Annuity Association of America, both of which have been holders of Hechinger's 9.45% Senior Debentures due 2012 and 5.95% Senior Notes since prior to the Transaction. These creditors, among others, have the right to void the Transaction under applicable law, including the laws of the States of California, Delaware, Maryland, Michigan and Texas.

177.    By reason of the foregoing, pursuant to Sections 544(b), 549, 550 and 551 of the Bankruptcy Code, the Committee is entitled to a judgment against Bank Defendants enabling the Committee to: (a) avoid and recover the Transfers and any amounts paid to Bank Defendants on account of the Transfers and (b) (1) avoid the Acquisition Obligation and recover any amounts paid to Bank Defendants on account of the Acquisition Obligation, or (2) recover the value of the Transaction fees and the amounts paid to Hechinger's shareholders in the Hechinger LBO.

### TWELFTH CLAIM FOR RELIEF
#### (Avoidance of Obligation; Avoidance, Recovery and Preservation of Fraudulent Transfer against the Bank Defendants)

178.    The Committee repeats and realleges the allegations in paragraphs 1-177 as if fully set forth herein.

49

179. The Debtors received less than fair consideration or reasonably equivalent value in exchange for the Transfers and the Acquisition Obligation insofar as the Debtors received no consideration for the amounts paid in Transaction fees and to Hechinger's former shareholders in the Hechinger LBO and less than fair consideration or reasonably equivalent value for the Builders Square Acquisition.

180. The Debtors (i) were insolvent on the date that such Transfers were made and the Acquisition Obligation was incurred, or became insolvent as a result of such Transfers or the Acquisition Obligation; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

181. The Chase Bank Group's conduct in the Hechinger LBO and the Builders Square Acquisition was recklessly indifferent and in bad faith. Members of the Chase Bank Group were initial transferees of the Transfers and the Acquisition Obligation by virtue of their participation in the Chase Loan.

182. With the knowledge and consent of the Chase Bank Group, the borrowing underlying the Acquisition Obligation was earmarked by Hechinger for the purpose of consummating the Hechinger LBO. Hechinger would not have been able to consummate the Hechinger LBO and the Builder Square Acquisition without incurring the Acquisition Obligation and without conveying the Acquisition Security Interests.

183. The Builders Square Acquisition, the Hechinger LBO, the Acquisition Obligation and the Acquisition Security Interests were part and parcel of one integrated transaction. In fact, the closing of the Builders Square Acquisition was conditioned upon the closing of the Hechinger

50

LBO.. Thus, the Debtors could not have acquired the Builders Square assets unless they consummated the Hechinger LBO. At least $127 million of the borrowing underlying the Acquisition Obligation was earmarked for the purpose of paying Hechinger's former shareholders with no consideration to the Debtors.

184.    The Chase Bank Group knew of, or recklessly disregarded, both the Debtors' insolvency and inadequate capitalization at the time of the Transaction and the effect of the Transaction on the Debtors' other creditors.

185.    Fleet and the members of the Fleet Bank Group were immediate or mediate transferees of the Transfers and the Acquisition Obligation by virtue of the Assignment Agreement. Fleet and members of the Fleet Bank Group received their interest from the Chase Bank Group with full knowledge of the facts with respect to the Transaction. At least three of the banks in the Fleet Bank Group -- including Fleet -- were members of the Chase Bank Group.

186.    At all times relevant hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors include, without limitation, KS Capital, L.P. and Teachers Insurance and Annuity Association of America, both of which have been holders of Hechinger's 9.45% Senior Debentures due 2012 and 5.95% Senior Notes since prior to the Transaction. These creditors, among others, have the right to void the Transaction under applicable law, including the laws of the States of California, Delaware, Maryland, Michigan and Texas.

187.    By reason of the foregoing, pursuant to Sections 544(b), 549, 550 and 551 of the Bankruptcy Code, the Committee is entitled to a judgment against the Bank Defendants enabling the Committee to: (a) avoid and recover the Transfers and any amounts paid to the Bank

Defendants on account of the Transfers and (b) (1) avoid the Acquisition Obligation and recover any amounts paid to the Bank Defendants on account of the Acquisition Obligation, or (2) recover the value of the Transaction fees and the amounts paid to Hechinger's shareholders in the Hechinger LBO.

## THIRTEENTH CLAIM FOR RELIEF
### (For Equitable Subordination of the Bank Defendants' Claims)

188.    The Committee repeats and realleges the allegations in paragraphs 1-187 as if fully set forth herein.

189.    The Chase Bank Group acted inequitably by, among other things:

- Knowingly facilitating the removal of over $127 million in value from Hechinger at a time when it was insolvent;

- Knowingly or recklessly disregarding Hechinger's insolvency;

- Knowingly or recklessly disregarding that Hechinger intended to hinder, delay or defraud its creditors;

- Knowingly or recklessly disregarding the fact that the Transaction would lead the Debtors to business failure, bankruptcy, and liquidation; and

- Knowingly or recklessly disregarding the impact of the liens on the Debtors' unsecured creditors.

190.    The inequitable conduct of the Chase Bank Group resulted in injury to other creditors of the Debtors.

191.    Members of the Fleet Bank Group were either part of the Chase Bank Group or were assigned the Acquisition Obligation and the Acquisition Security Interests from the Chase Bank Group with full knowledge with respect to underlying facts of the Transaction.

192.    Equitable subordination of the Bank Defendants' liens and claims is consistent with the provisions of the Bankruptcy Code.

193.    By reason of the foregoing, pursuant to Section 510(c) of the Bankruptcy Code, the Committee is entitled to a judgment against the Bank Defendants subordinating Bank Defendants' liens and claims to the prior payment in full of the Debtors' other creditors.

## RESERVATION OF RIGHTS

194.    The Committee reserves the right, to the extent permitted under the Bankruptcy Code or by agreement, to assert any claims relating to the subject matter of this Action or otherwise relating to the Debtors and their estates against any third party.

**WHEREFORE,** the Committee respectfully requests that this Court enter judgment:

1.    On its First Claim for Relief, recovery of the damages incurred by the estate against the Directors, which the Committee believes is at least $127 million;

2.    On its Second Claim For Relief, recovery of the damages incurred by the estate against the Hechinger Family Defendants, which the Committee believes is at least $127 million;

3.    On its Third Claim for Relief, recovery of the amounts by which the Hechinger Family Defendants were unjustly enriched because of the Hechinger LBO;

4.    On its Fourth Claim for Relief, recovery of the damages incurred by the estate against LGP and/or GEI II, which the Committee believes is at least $127 million;

5.    On its Fifth Claim for Relief, recovery of the damages incurred by the estate against LGP and/or GEI II, which the Committee believes is at least $127 million;

6.    On its Sixth Claim for Relief, pursuant to Sections 544(b), 550 and 551 of the Bankruptcy Code, avoiding and recovering the Shareholder Payments from the Hechinger Family Defendants and the Directors for the benefit of the estates;

7.    On its Seventh Claim for Relief, pursuant to Sections 544(b), 550 and 551 of the Bankruptcy Code, avoiding and recovering the Shareholder Payments from the Hechinger Family Defendants and the Directors for the benefit of the estates;

8.    On its Eighth Claim for Relief, pursuant to Sections 544(b), 549, 550 and 551 of the Bankruptcy Code, recovering from LGP and/or GEI II the value of the Transfers and any amounts paid on account of the Transfers;

9.    On its Ninth Claim for Relief, pursuant to Sections 544(b), 549, 550 and 551 of the Bankruptcy Code, recovering from LGP and/or GEI II the value of the Transfers and any amounts paid on account of the Transfers;

10.    On its Tenth Claim for Relief, pursuant to Bankruptcy Code Sections 544(b), 550 and 551, avoiding and recovering the Management Fees from LGP and/or GEI II for the benefit of the estates;

11.    On its Eleventh Claim for Relief, pursuant to Sections 544, 549, 550, and 551 of the Bankruptcy Code and applicable nonbankruptcy law, (a) avoiding and recovering the Acquisition Security Interests and any amounts paid to the Bank Defendants on account of the Acquisition Security Interests and (b) (1) avoiding the Acquisition Obligation and recovering any amounts paid to the Bank Defendants on account of the Acquisition Obligation, or (2) recovering the value of the Transaction fees and the amounts paid to Hechinger's shareholders in the Hechinger LBO;

12.    On its Twelfth Claim for Relief, pursuant to Sections 544, 549, 550, and 551 of the Bankruptcy Code and applicable nonbankruptcy law, (a) avoiding and recovering the Acquisition Security Interests and any amounts paid to the Bank Defendants on account of the Acquisition Security Interests and (b) (1) avoiding the Acquisition Obligation and recovering any amounts paid

54

to the Bank Defendants on account of the Acquisition Obligation, or (2) recovering the value of the

Transaction fees and the amounts paid to Hechinger's shareholders in the Hechinger LBO;

13.    On its Thirteenth Claim for Relief, pursuant to Section 510(c) of the Bankruptcy

Code and applicable nonbankruptcy law, subordinating the Bank Defendants' claims to the prior

payment in full of the Debtors' other creditors;

14.    Granting interest, costs, and expenses as permitted by law; and

15.    Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

**SAUL EWING LLP**

Mark Minuti (No. 2659)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6840

-and-

**KASOWITZ, BENSON, TORRES**
**& FRIEDMAN LLP**
David M. Friedman
David E. Ross
Andrew K. Glenn
Lisa G. Laukitis
1633 Broadway
New York, NY  10019
(212) 506-1700

CO-COUNSEL TO THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

Dated:  April 3, 2001