# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

RONALD CANTOR, et al.,

                Plaintiffs,

        v.

RONALD O. PERELMAN, et al.,

                Defendants.

-----------------------------------------------------------x

    :    No. 97-CIV-586-KAJ

## COMPENDIUM OF UNREPORTED OPINIONS
## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
## MOTION TO STRIKE PLAINTIFFS' JURY DEMAND

Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Attorneys for Defendants

DATED: December 7, 2005

INDEX

<u>CASE</u>                                                    <u>TAB NO</u>

<u>Cantor Fitzgerald. L.P. v. Cantor,</u>
        C.A. No. 16297, 2000 WL 307370 (Del. Ch. Mar. 13, 2000) . . . . . . . . . . . 1

<u>Cantor Fitzgerald. L.P. v. Cantor,</u>
        C.A. No. 16297, 2001 WL 536911 (Del. Ch. May 11, 2001) . . . . . . . . . . . 2

<u>Schwartz v. Prudential Ins. Co. of Am. (In re Kridlow),</u>
        C.A. Nos. 97-35168DAS, 98-0833,
        1999 WL 97939 (Bankr. E.D. Pa. Feb. 19, 1999) . . . . . . . . . . . . . . . . . . . . 3

<u>Smith v. Shell Petroleum, Inc.,</u>
        C.A. No. 8395, 1990 WL 186446 (Del. Ch. Nov. 26, 1990) . . . . . . . . . . . . 4

TAB 1

Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
CANTOR FITZGERALD, L.P. Plaintiff,
v.
Iris CANTOR, et al., Defendants.
Iris CANTOR and Cantor Fitzgerald Incorporated, Third-Party Plaintiffs,
v.
CANTOR FITZGERALD GROUP MANAGEMENT, INC., Third-Party Defendant.
No. 16297.
March 13, 2000.

Rodman Ward, Jr., Thomas J. Allingham II, Karen L. Valihura, Martina Bernstein, Rosemary S. Goodier and Leonard P. Stark of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Of Counsel: Thomas J. Schwarz, Joseph M. Asher and Joseph De Simone of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York. Attorneys for Plaintiff.
Stephen E. Jenkins and Richard I.G. Jones, Jr. of Ashby & Geddes, Wilmington, Delaware. Attorneys for Defendants. Of Counsel: Barry I. Slotnick, Michael Shapiro and Joshua T. Rabinowitz of Slotnick, Shapiro & Crocker, LLP, New York, NY. Attorneys for Defendants Iris Cantor and Cantor Fitzgerald Incorporated. Jack C. Auspitz, Howard E. Heiss, Jamie A. Levitt of Morrison & Foerster, LLP, New York, NY. Attorneys for Defendant Market Data Corporation. Saul B. Shapiro, Marc S. Reiner and Susanne E. Rosenberg of Patterson, Belknap, Webb & Tyler LLP, New York, NY. Attorneys for Rodney Fisher.

MEMORANDUM OPINION

STEELE, V.C.

*1 A Delaware corporation enters into a licensing agreement to provide software for the brokerage of U.S. Treasury securities. Its Chief Executive Officer and controlling shareholder are members of its Board of Directors as well as limited partners in a Delaware partnership whose core business is the brokerage of U.S. Treasury securities. In addition to other less salient claims, the partnership alleges that the limited partners have breached a contractually created fiduciary duty of loyalty. May the partners of a Delaware limited partnership agree in their partnership contract that all partners, including those limited partners who do neither manage, operate nor govern the partnership, should be subject to a fiduciary duty of loyalty? For the reasons below I conclude that they may. The limited partners have breached those fiduciary duties imposed upon them by contract and the corporate vehicle they used for this purpose aided and abetted those breaches and tortiously interfered with the Partnership Agreement. While I conclude that the partnership fails to carry its burden of persuasion that injunctive relief, other equitable relief, and ancillary monetary damages are appropriate to remedy its complaints of wrongdoing, the partnership *is* entitled to declaratory relief and an award of attorney's fees for an egregious breach of the partnership agreement.

I. Background


A. The Parties

Plaintiff Cantor Fitzgerald, L.P. ("CFLP" or the "Partnership") is a Delaware limited partnership that owns 99.5 % of Cantor Fitzgerald Securities, a New York general partnership. Through this affiliate, CFLP is a leading inter-dealer and institutional broker of U.S. Treasury securities ("Treasuries") and other government securities. Counterclaim defendant CF Group Management, Inc. ("CFGM"), a New York corporation, serves as CFLP's managing general partner. Howard Lutnick ("Lutnick"), CFLP's President and Chief Executive Officer owns and operates CFGM.
Defendant Cantor Fitzgerald, Incorporated ("CFI"), a Nevada corporation, served as CFLP's managing

general partner until January 2, 1996. CFI is a CFLP limited partner. Defendant Iris Cantor ("Cantor") is CFI's Chief Executive Officer and is the trustee of the Iris Cantor Trust, CFI's controlling shareholder. Under CFLP's partnership agreement dated August 28, 1996, (the "1996 Partnership Agreement"), Cantor is also a CFLP limited partner.

In 1987, CFLP's predecessor spun-off its Workstation Research Department to create Defendant Market Data Corporation ("MDC"), a Delaware corporation. Cantor is a member of MDC's Board of Directors and, as trustee of the Iris Cantor Trust, votes MDC's controlling shares. Defendant Rodney Fisher ("Fisher") is a shareholder of MDC and serves as its Chairman and Chief Executive Officer. He is also a CFLP limited partner. MDC is not a CFLP partner. Lutnick, also a shareholder of MDC, served on MDC's Board of Directors until June 1996.

B. Cantor Fitzgerald's Formative Years & the Development of its Data Business

**\*2** Iris Cantor's late spouse B. Gerald ("Bernie") Cantor founded Cantor Fitzgerald [FN1] in 1945. In 1972, Cantor Fitzgerald acquired Telerate Systems, Inc. ("Telerate"). Through Telerate, Bernie Cantor created the practice of putting live bids and offers for government securities over a network, a practice referred to as "screen brokerage." Screen brokerage enabled market participants to see, in real time, the prices at which trades occurred. The advent of screen brokerage dramatically altered the Treasuries industry and positioned Cantor Fitzgerald as the world's leading broker of Treasuries.

FN1. "Cantor Fitzgerald" refers to the family of companies, other than MDC, owned or controlled by Bernie Cantor prior to the formation of CFLP in September 1992.

In the mid-1980s Cantor Fitzgerald hired Fisher, formerly an employee of Telerate. With Andrew Seidel, another Cantor Fitzgerald employee, Fisher identified a business opportunity for Cantor Fitzgerald: to perform simple calculations on bids and offers displayed over the Telerate system and to sell the resulting information to the financial community. Bernie Cantor, intrigued by the business' prospects, housed the business in Cantor Fitzgerald's Workstation Research Department.

C. Cantor Fitzgerald Spins-Off its Workstation Research Department to Form MDC

In 1987, Cantor Fitzgerald spun-off its Workstation Research Department to form MDC. At the time Cantor Fitzgerald established MDC as an independent company, MDC engaged in a data enhancement business, selling information provided to it by Cantor Fitzgerald. MDC obtained information automatically provided by Cantor Fitzgerald's customers as they made trades through Cantor Fitzgerald and repackaged it into a useable form then sold to third parties.

The parties dispute the reason why Cantor Fitzgerald decided to spin-off its Workstation Research Department. CFLP maintains that Cantor Fitzgerald spun-off the Department to enhance its profitability and to avoid customer backlash. According to this theory, some of the customers who purchased data from the Department were the very same customers who provided the data, in raw form, for free by executing their trades through Cantor Fitzgerald. The continuation of this data enhancement business as part of Cantor Fitzgerald allegedly concerned dealers who feared that the dissemination of trading data would create pressure to narrow the "spread" between bids and offers and thereby reduce their profits. According to CFLP, transforming the Department into an independent MDC would preserve Cantor Fitzgerald's ability to profit from its data while making it easier to sell the data to its customers and reducing the risk of customer and dealer backlash. Defendants, however, maintain that Cantor Fitzgerald spun-off the Workstation Research Department to enable the Department to conduct business with the entire financial community including Cantor Fitzgerald's competitors, many of whom would not conduct business with the Department while it was controlled by Cantor Fitzgerald. I do not consider the reasons for the spin-off proffered by CFLP and the Defendants to be inconsistent. Both proffers, taken together, are consistent with the goal of maximizing the Department's profits. Accepting Defendants' proffer does not, however, lead to the conclusion that CFLP spun-off the data enhancement business so that the new entity, MDC, could compete directly with Cantor Fitzgerald in its core line of business, brokering Treasuries. It does lead to the inescapable conclusion that, at that time, Cantor Fitzgerald did not object to data enhancement transactions with its competitors when the transactions were profitable and did not threaten harm to its core business.

### D. Formation of CFLP

**\*3** Until 1992, CFI operated as the holding company for Cantor Fitzgerald's businesses. On September 25, 1992, CFI, whose sole shareholders were Bernie and Iris Cantor, transferred essentially all of its assets to a new entity, the limited partnership CFLP, in exchange for a significant ownership interest in CFLP.[FN2] CFI became CFLP's initial Managing General Partner. CFI and CFGM were CFLP's only general partners. Bernie Cantor, other members of the Cantor Family, senior executives and employees of Cantor Fitzgerald and trusts set up by Bernie or Iris Cantor for family members held CFLP's limited partnership interests.[FN3] The partners amended CFLP's partnership agreement several times between 1992 and 1996.

> FN2. Agreement of Limited Partnership of Cantor Fitzgerald, L.P., dated as of September 25, 1992, Section 6.01(b).

> FN3. Tr. Trans. Vol. II at 322; Pretrial Order at 10.

### E. The 1996 Litigation, Settlement Agreement and Amendments to the Partnership Agreement

In January 1996, following procedures set forth in Section 3.01(g) of the Agreement of Limited Partnership of Cantor Fitzgerald, L.P. dated May 23, 1995 ("1995 Partnership Agreement"), a committee of five persons selected by CFI determined that Bernie Cantor was "Incapacitated." Section 3.01(f) of the 1995 Partnership Agreement provided that, upon such a determination, CFGM would replace CFI as Managing General Partner with day-to-day control of CFLP and CFI would become a Co-Managing General Partner. Iris Cantor disputed the committee's determination.
The parties litigated the dispute in this Court and, on May 7, 1996, resolved their legal differences by entering into a settlement agreement after one day of trial (the "1996 Settlement Agreement"). The 1996 Settlement Agreement released their claims against each other and provided, *inter alia,* that CFI would withdraw as Managing General Partner and as a General Partner and would become "a Limited Partner for all purposes under the Partnership Agreement; *provided however* that CFI shall not thereby be deemed to have "withdrawn" for purposes of Section 9.02(d) of the Partnership Agreement."[FN4] CFGM became CFLP's sole Managing General Partner.

> FN4. 1996 Settlement Agreement ¶ 1 (emphasis in original). Section 9.02(d) of the 1995 Partnership Agreement states that a General Partner who has withdrawn from the Partnership may elect to have its General Partner Units converted into Limited Partner Units or to have its interest redeemed. It also states the consequences and conditions attached to either election.

The parties to the 1996 Settlement Agreement agreed to amend the existing Partnership Agreement to reflect the terms of the 1996 Settlement Agreement. [FN5] CFGM authored the amendments and the resulting Agreement became the 1996 Partnership Agreement, which remains in effect at this time.

> FN5. Section 2(d) of the 1996 Settlement Agreement provides that "the parties agree to take all steps necessary or appropriate to implement and effectuate the provisions of this Section 2, including executing such amendments to the Partnership Agreement not inconsistent with the terms of this Agreement as the Managing General Partner shall reasonably request···· To the extent applicable, this Agreement shall itself be deemed an amendment to the Partnership Agreement."

### F. MDC's Dealings with Chicago Board Brokerage

On June 4, 1996, MDC held a board meeting to discuss the possible provision of broker system

software to third parties. According to the draft minutes of the meeting, Lutnick stated that "MDC's pursuit of these opportunities would be harmful to Cantor Fitzgerald ."[FN6] The final minutes reflect that he stated that "MDC's pursuit of these opportunities would be a negative for Cantor Fitzgerald."[FN7] By fax and regular mail dated June 11, 1996, Lutnick sent a one sentence letter to Iris Cantor which stated: "I hereby resign from the Board of Directors of Market Data Corporation effective immediately."[FN8]

FN6. PX56 at MDC030546.

FN7. PX57 at MDC031209.

FN8. DX899.

**\*4** Defendant Fisher testified that MDC did not pursue the proposed business deals in the forms discussed at the June 4, 1996, meeting.[FN9] But CFLP soon heard rumors that some of the parties identified as possible business partners at the June 4, 1996, meeting were discussing development of an interactive trading system .[FN10] Between October 1997 and March 1998, CFLP executives visited trade shows where MDC promoted a product it touted as its Market Trader Broker System.[FN11]

FN9. Tr. Trans. Vol. XXXII at 6082-83.

FN10. Pretrial Order at 11; DX86 No. 13; DX93 No. 52.

FN11. Pretrial Order at 11.

In October 1997, CFLP's general counsel, Stephen M. Merkel, sent a letter to Cantor informing her that CFLP understood MDC was "designing an electronic trading system for U.S. Government Securities in cooperation with the Chicago Board of Trade" and that the activity constituted a breach of the Partnership Agreement.[FN12] Fisher, his legal counsel and legal counsel for MDC received copies of the letter. On February 9, 1998, MDC entered into a contract to license software for the MarketPower Broker System to Chicago Board Brokerage, L.L.C ("CBB").[FN13] MDC publicly announced the deal on March 19, 1998.

FN12. PX16.

FN13. CBB is a Delaware limited liability company and a joint venture of Ceres Trading Limited Partnership, a limited partnership controlled by the Chicago Board of Trade, and Prebon Yamane (USA) Inc.; Pretrial Order at 12; PX23 (Licenses Between Chicago Board Brokerage, L.L.C. and Market Data Corporation dated Feb. 9, 1998).

### G. Commencement of This Litigation, Procedural History and Remaining Claims

On April 6, 1998, CFLP filed this action against Iris Cantor, CFI, Fisher, MDC and CBB. Shortly thereafter CFLP moved to enjoin preliminarily the launch of MarketPower. After a hearing on May 29 and July 6-10, 1998, I concluded that CFLP had "a reasonable likelihood of establishing at a trial on the merits that defendant limited partners breached their fiduciary duty of loyalty to the general partner and the partnership" but also found that "CFLP will not suffer imminent harm so damaging to its core business resulting from the breach of that duty of loyalty that it exceeds the harm to the defendants if they are enjoined from further development and use of MarketPower pending a final hearing."[FN14]

FN14. *Cantor Fitzgerald L.P. v. Cantor,* Del. Ch., 724 A.2d 571, 574 (1998).

In the seventeen months following the preliminary injunction hearing, this Court decided dozens of motions, issued over thirty opinions, granted dozens of requests for telephone conferences to address evidentiary issues, and conducted a two-month trial. Several claims have been settled or dismissed.[FN15] Defendant CBB and Counterclaim Defendant Lutnick are no longer parties to this action. CFLP, Fisher, MDC and Cantor/CFI have submitted 12 post-trial briefs on three separate subjects: evidentiary issues, merits and harm/remedies. The Court held post-trial oral argument on December 6 and 7, 1999, and all outstanding, relevant, evidentiary issues were resolved in opinions dated January 10 and 13, 2000.

> FN15. On November 5, 1998, this Court dismissed CFLP's sixth cause of action against MDC for breach of a confidentiality agreement and CFLP's eight cause of action against CFI, Cantor and Fisher for tortious interference with a confidentiality agreement. See Fitzgerald v. Cantor, Del. Ch., C.A. No. 16297, Steele, V.C. (Nov. 5, 1998) and Fitzgerald v. Cantor, Del. Ch., C.A. No. 16297, Steele, V.C. (Dec. 30, 1998). On January 14, 1999, this Court dismissed portions of CFLP's Counts II, IV and V alleging claims against CBB and further confidential information claims against the non-CBB Defendants. See Fitzgerald v. Cantor, Del. Ch., C.A. No. 16297, Steele, V.C. (Jan. 14, 1999). As a result, the part of CFI's and Cantor's First Counterclaim based on CFLP's allegation of misuse of confidential information is no longer ripe. On March 23, 1999, this Court granted CFI and Cantor's motion to dismiss CFLP's ninth cause of action alleging improper transfer of shares of CFI. See Fitzgerald v. Cantor, C.A. No. 16297, Steele, V.C. (Mar. 23, 1999). Six days later, this Court granted CFLP's cross motion for summary judgment on CFI's and Fisher's books and records counterclaim. See Fitzgerald v. Cantor, Del. Ch., C.A. No. 16297, Steele, V.C. (Mar. 29, 1999).

The remaining claims of the Third Amended Complaint allege (1) that Cantor, CFI and Fisher breached their contractual and fiduciary duties in Sections 3.03(a)-(b) of the 1996 Partnership Agreement, and (2) that Defendant MDC aided and abetted these breaches of fiduciary duties and tortiously interfered with the contract between CFLP, CFI, Cantor and Fisher. CFLP seeks in relief a permanent injunction, imposition of a constructive trust on MDC's revenues, damages, various forms of declaratory relief, and attorney's fees.

**\*5** Counterclaimants, Defendants Fisher, Cantor and CFI (the "Limited Partner Defendants"), seek reformation of Section 3.03(b) of the 1996 Partnership Agreement. Defendants Cantor and CFI also seek various forms of declaratory relief, reformation of the 1996 Settlement Agreement and reformation of Section 3.03(a) of the 1996 Partnership Agreement. A counterclaim against CFLP and a third-party claim against CFLP's general partner CFGM assert breach of the implied covenant of good faith and fair dealing in connection with the 1996 Settlement Agreement.

This is the Court's Opinion on these remaining claims. As discussed below, I find that the 1996 Partnership Agreement is clear and unambiguous on its face, that it imposes both contractual and fiduciary duties on the Limited Partner Defendants, that the Limited Partner Defendants' actions breached these duties, that MDC aided and abetted the Limited Partner Defendants' breach of fiduciary duty, that MDC tortiously interfered with the 1996 Partnership Agreement and that Plaintiff CFLP is entitled to declaratory relief and an award of attorney's fees. Because resolution of the Limited Partner Defendants' claims of reformation do not affect the final disposition of the case, these claims are addressed first below.

## II. Limited Partner Defendants' Reformation Counterclaims

CFLP contends that Section 3.03 of the 1996 Partnership Agreement prohibits CFI and its Affiliates from engaging in "Competitive Activities." [FN16] Iris Cantor and CFI seek, in the event this Court concludes that CFLP's interpretation of the 1996 Partnership Agreement is correct, to have the Court reform Sections 3.03(a)-(b) of the 1996 Partnership Agreement to provide that CFI and its Affiliates may engage in Competitive Activities subject only to the economic consequences set forth in Article XI and to other provisions of the 1996 Partnership Agreement. They also seek reformation of the 1996 Settlement Agreement to provide: (1) that CFI is not subject to any obligations imposed by Section 3.03(a) that do not also apply to other limited partners; (2) that, to the extent that Section

3.03(b) subjects CFI to any duty to refrain from engaging in Competitive Activities, Article XI provides the Partnership's sole remedies; and, (3) that MDC is entitled to all the protections provided to "Affiliated Entities." [FN17] Defendant Fisher seeks to reform Section 3.03(b) in a fashion similar to that sought by Cantor and CFI except that, rather than have Section 3.03(b) reformed to provide that he may engage in Competitive Activities, he seeks reformation to be able to act "as Chairman and CEO of MDC in connection with MDC's business with CFLP's competitors, including CBB" without violating Section 3.03(b).[FN18]

> FN16. The definition of "Competitive Activities," a defined term in the 1996 Partnership Agreement, is discussed below at Section III A.

> FN17. "Affiliated Entities," a defined term in the 1996 Partnership Agreement, refers to the group of entities owned, controlled or under common control with CFLP. *See* 1996 Partnership Agreement, Section 1.01.

> FN18. Rodney Fisher's Answer to Plaintiff's Third Amended Complaint, Affirmative Defenses and Counterclaims ¶ 53 (hereinafter Fisher's Answer).

A Court of Equity will not grant reformation "unless it can be demonstrated that the party seeking such form of relief acted under the influence of fraud or under a misapprehension resulting from mutual mistake."[FN19] "A unilateral mistake cannot be a basis for reforming a contract."[FN20] When a unilateral mistake, however, "is accompanied not only by the other party's knowledge thereof, but, also, by his silence, it is said to be equivalent to a mutual mistake; at any rate, while strictly not a mutual mistake, equity will reform the instrument."[FN21] To prevail, the claim for reformation must be supported by clear and convincing evidence.[FN22]

> FN19. *Gracelawn Memorial Park, Inc. v. Eastern Memorial Consultants, Inc.,* Del. Ch., 280 A.2d 745, 748 (1971), aff'd, Del.Supr., 291 A.2d 276 (1972).

> FN20. *Matter of Enstar Corp.,* Del.Supr., 604 A.2d 404, 413 (1992).

> FN21. *Colvocoresses v. W.S. Wasserman Co.,* Del. Ch., 28 A.2d 588, 589-90 (1942) (citations omitted).

> FN22. *Id.* at 590.

**\*6** Defendants' counterclaims for reformation assert: (1) that at the time the relevant Agreements were drafted, Defendants believed the Agreements provided the protections they now seek to obtain through reformation; and, (2) that, at the time of drafting, CFLP knew Defendants' beliefs and withheld from Defendants the fact that the Agreements did not match Defendants' expectations. During discovery, however, before they added their reformation claims, Defendants repeatedly stated that they did *not* have an understanding of the terms of the Agreements when they were drafted. Despite some rather elegant courtroom sophistries emanating from the mouths of well-prepared witnesses for Defendants, those entirely believable admissions during discovery failed to transmute into clear and convincing contrary evidence at trial.

### A. CFI's and Cantor's Alleged Understanding of the Agreements

On October 28, 1998, the same day on which this Court granted Defendants' motions to add claims for reformation,[FN23] in response to CFLP's interrogatory that asked when Cantor concluded that the Partnership Agreement limited CFI's right to compete and subjected CFI to the provisions of Article XI, Cantor responded that: "Mrs. Cantor does not have an independent understanding of the Partnership Agreement or its amendments."[FN24]

FN23. *Fitzgerald v. Cantor,* Del. Ch., C.A. No. 16297, Steele, V.C. (Oct. 28, 1998).

FN24. PX 179 at No. 11.

Prior to adding their claims for reformation, Cantor and CFI asserted that they, as of May 1, 1998, had a "current lay understanding" that the change in MDC's Affiliated Entity status adversely affected their economic interests, that Section 3.03(a) does not impose a duty on CFI and its Affiliates to refrain from engaging in Competitive Activities, and that Section 3.03(b) does not impose liability on Cantor for using MDC to engage in Competitive Activities.[FN25] In her affidavit dated January 9, 1999, however, Cantor noted that during her deposition she testified that her "lay understanding of [her] rights and obligations under the CFLP Partnership Agreement was based solely on conversations with [her] attorneys" and testified that the "statements that [she] made about [her] lay understanding were all based on conversations with the Slotnick Firm after CFI entered into the [1996] Settlement Agreement."[FN26] Cantor did not retain the Slotnick firm until after she signed the 1996 Settlement Agreement. The attorneys who interacted with Cantor did not have any communications regarding "the CFI Defendants' rights under the Partnership Agreement, the Settlement Agreement or otherwise, to cause or permit MDC or any of Defendants' other Affiliated Entities, to engage in Competitive Activities" or "MDC's continued classification as an Affiliated Entity after execution of the Settlement Agreement" before she signed the 1996 Partnership Agreement on August 28, 1996.[FN27] Therefore, Cantor and CFI have expressly denied any contemporaneous knowledge about the effect of Sections 3.03(a) or (b), the right of CFI or its Affiliates to engage in Competitive Activities or the effect of MDC's classification as an Affiliated Entity.

FN25. PX178 at Nos. 28, 40 and 44.

FN26. Cantor Aff. 1/9/99 ¶¶ 2, 5.

FN27. Slotnick Aff. 2/3/99 ¶ 3; Crocker Aff. 2/3/99 ¶ 3.

**\*7** Despite these express denials, Cantor asserts that she had a general understanding that, as consideration for the 1996 Settlement Agreement's terms favorable to CFGM that she would achieve a "free, independent, strong company, and that [she] would be going home with something that [she] could make into a wonderful company."[FN28] The basis for this understanding is a discussion between Cantor and Lutnick over lunch at the Hotel du Pont in Wilmington, Delaware. Cantor testified that Lutnick asked her to trust him and assured her that he would "never harm MDC." [FN29] Cantor does not contend that Lutnick informed her that MDC either would or would not be allowed to compete. Cantor, in fact, repeatedly denied that Lutnick said anything about MDC's right to compete.[FN30] She also confirmed that her belief that MDC would be independent and free to compete was based on her previously existing understanding of the relationship between MDC and CFLP and not on any events that occurred during that time period.[FN31] Nonetheless, she testified that at the time she signed the 1996 Settlement Agreement, she believed that MDC had the right to do business with CFLP's competitors.[FN32]

FN28. Tr. Trans. Vol. XXVI at 5043.

FN29. *Id.* at 5032.

FN30. Cantor was asked whether Lutnick told her "anything that would cause [her] to believe that MDC did not have the ability to enter into competitive activities." Cantor responded: "No." Tr. Trans. Vol. XXVI at 5032. Cantor was asked whether Lutnick "mention[ed] MDC and competitive activities in any manner, form or shape during the course of the meeting." Cantor responded: "No. Mr. Lutnick never mentioned that." *Id.* at 5033. Cantor also testified that "Mr. Lutnick never explained anything to me about MDC. I wasn't there to talk about MDC." *Id.* at 5043. *See also,* Pretrial Order at 12 (all parties

stipulated that "[a]t no time during the negotiations leading to the May 7, 1996 Settlement Agreement among CFI, CFLP and CFGM ··· did the parties ··· discuss MDC's right or ability to compete with CFLP while CFI remained a Partner of CFLP").

FN31. *See* Tr. Trans. Vol. XXXV at 6566 (Cantor confirmed that "it wasn't anything that happened in that time frame, in May, that led [her] to believe [she was] getting a free MDC" and that that was "something that [she] thought [she] always had.").

FN32. Tr. Trans. Vol. XXVII at 5050.

## B. Fisher's Alleged Understanding of the Agreements

On October 28, 1998, the same day on which I granted Fisher's motion to add a claim to reform Section 3.03(b) "so that Fisher's actions as Chairman and CEO of MDC in connection with MDC's business with CFLP's competitors, including CBB, are not violative of [Section 3.03(b) ] of the Partnership Agreement,"[FN33] Fisher answered CFLP's interrogatory that asked whether "doing business with competitors of Cantor Fitzgerald" constitutes "Competitive Activity" under the Partnership Agreement. Fisher objected on the bases of attorney-client privilege and work-product doctrine but also asserted under oath that "Mr. Fisher has no independent understanding of the Partnership Agreement."[FN34] Between May and October 1998, Fisher provided the identical answer to at least ten additional requests seeking information on topics that included whether amendments to the Partnership Agreement (including the amendment to change MDC's status as an Affiliated Entity) adversely affected Partners and whether Fisher is bound by the Partnership Agreement. [FN35] A short time later he confirmed that, even as of November 1998, he still had "no independent understanding of the specific provisions of the Partnership Agreement."[FN36]

FN33. Fisher's Answer ¶ 53.

FN34. PX26 at Response 1.

FN35. *See, e.g.,* PX 183 Nos. 3, 4, 6, 28-30, 41-42; PX 184 Nos. 17-18.

FN36. PX 186 at No. 19.

In marked contrast to his discovery responses, Fisher stated at trial that he had an understanding that "MDC, from the day we were founded on August 1, 1987, was free to do business with the entire financial community and that, of course, included Cantor Fitzgerald's competitors."[FN37] Fisher's understanding is based on his contention that MDC had engaged in Competitive Activities in the past. Therefore, since CFLP had not objected to these activities, Fisher believed that MDC could freely engage in Competitive Activities and to do business with CFLP's competitors.

FN37. Tr. Trans. Vol. XXXI at 5937.

## C. Analysis

**\*8** CFLP contends that Defendants thwarted discovery by invoking the attorney-client privilege and work-product doctrine and denied any contemporaneous understanding that CFI or its Affiliates would be allowed to compete with CFLP or to engage in a Competitive Activity. Accordingly, Plaintiff contends that Defendants should now be bound by their discovery admissions and should not be allowed to introduce contrary testimony at trial or to take contrary positions in their briefs. I took the testimony, in any event, to be sure that I understood the reformation claim. Nonetheless, at trial I repeatedly informed Defendants that the focus on their reformation claims

would be the understanding they possessed *at the time the Agreements were drafted*. Defendants either candidly admitted under oath that they had no relevant understandings, denied repeatedly that such understandings existed at the time the 1993 Partnership Agreement was drafted, at the time the 1996 Settlement Agreement was drafted, or at the time the 1996 Partnership Agreement was drafted or simply refused to reveal those understandings. To the extent, therefore, that Defendants' argue that Cantor believed, *at any time prior to the 1996 Partnership Agreement amendments,* that she would obtain a free, independent and strong MDC that could freely engage in Competitive Activities and to compete with CFLP's competitors, this argument is without merit. Cantor's contentions are not credible. Moreover, as discussed below in Section VI C, the course of dealing argument does not justify Fisher's belief that he would be able to serve as MDC's Chairman and CEO while MDC provided software to CBB to broker Treasuries.

Reformation, when granted, reforms an agreement to match the expectation and understanding of the party seeking reformation. Absent such an understanding, there cannot possibly be a basis for reformation. Moreover, even if one were able to conclude that Defendants had an understanding that the Agreements provided what they now seek to obtain through reformation, there is no evidence that Defendants acted under the influence of fraud.

As a member of MDC's Board of Directors, Lutnick was aware of MDC's proposed activities and Defendants concede that, contrary to remaining silent, Lutnick objected when he believed that MDC was attempting to engage in impermissible activities. There is also no support for the contention that CFLP knew, and remained silent, about the Defendants' different expectations when the parties signed the relevant Agreements. The fairest reading of the testimony about and the notes of the momentous Hotel du Pont luncheon and later conference room meeting of parties and attorneys, leads to the inescapable conclusion that both Cantor and Lutnick knew that the issue of a "free, strong and independent" MDC, as Defendants wish to categorize it today, loomed as the gut-wrenching deal-breaker issue that neither party wished to raise. Ending the 1996 litigation and the personal and financial heartache surrounding it drove the parties to settlement. The concept of a "free, strong, independent" MDC or MDC as an active, potential vigorous competitor of CFLP controlled by free-wheeling quislings, depending upon one's prospective at the time, could not be put on the table and discussed by either party because it served as the Gordian knot neither party wished to untie.
**\*9** At most, the evidence suggests that the Limited Partner Defendants and MDC object now to the terms for which the Defendants previously bargained or about which *they* remained silent at the critical point in the 1996 settlement negotiations. Contracts are not reformed to provide parties with bargains they failed to obtain through negotiations. On Defendants' counterclaims for reformation, I find for the Plaintiff.

### III. Interpretation of the 1996 Partnership Agreement

CFLP's claims rest upon the allegation that the Limited Partner Defendants breached their contractual and/or fiduciary obligations set forth in Section 3.03 of the 1996 Partnership Agreement. Specifically, CFLP contends that Section 3.03(a) of the 1996 Partnership Agreement provides that CFI and its Affiliates shall not be allowed to engage in "Competitive Activities" while they are partners of the Partnership. CFLP also asserts that Section 3.03(b) imposes upon the Limited Partner Defendants a fiduciary duty of loyalty and a contractual obligation not to cause harm to the Partnership.

In response, the Limited Partner Defendants contend that Section 3.03(a) does not apply to CFI and its Affiliates and that, if it does, it is merely a proviso that does not prohibit them from engaging in a Competitive Activity but subjects CFI and its Affiliates who choose to engage in a Competitive Activity to other Sections of the 1996 Partnership Agreement that provide sanctions or impose other restrictions. The primary source of these sanctions and/or restrictions, according to the Limited Partner Defendants, is Article XI that imposes economic sanctions upon partners engaging in a Competitive Activity and which states, in Section 11.02(c), that "[n]othing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competitive Activity, or in other employment of any nature whatsoever." Accordingly, from the Limited Partner Defendants' point-of-view, engaging in a Competitive Activity is an activity that is permitted by Section 3.03(a) and that, therefore, cannot be viewed as violating any duties contained in Section 3.03(b). In the alternative, if this Court does not find that the Limited Partner Defendants' interpretation is the only reasonable interpretation of the 1996 Partnership Agreement, Defendants' assert that the 1996 Partnership Agreement is ambiguous and that the Court should admit extrinsic evidence to interpret the Agreement.

"[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[FN38] As discussed below, I find that CFI and its Affiliates are not subject to Section 3.03(a) but that Section 3.03(b) imposes upon the Limited Partner Defendants a fiduciary duty of loyalty. Because the 1996 Partnership Agreement is clear on its face, Defendants' extrinsic evidence may not be considered.[FN39]

FN38. *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co .,* Del.Supr., 616 A.2d 1192, 1196 (1992).

FN39. *Northwestern Nat'l Ins. Co. v. Esmark, Inc.,* Del.Supr., 672 A.2d 41, 43 (1996).

### A. The Relevant Provisions of the 1996 Partnership Agreement

**\*10** Section 3.03(a) states, in pertinent part:
Nothing contained in this Agreement shall be deemed to preclude the Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; *provided,* that such activities do not constitute Competitive Activities···· Neither the Managing General Partner, CFI nor any of their respective Affiliates shall be obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership.
Section 3.03(b) states, in its entirety:
Each Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity.
Section 1.01 of the 1996 Partnership Agreement states that " 'Competitive Activity' shall have the meaning given in Section 11.04(c)." Section 11.04(c) states, in pertinent part:
[A] Partner shall be considered to have engaged in a Competitive Activity if such Partner while a Partner or during the Restricted Period ···
(ii) solicits any of the customers of the Partnership or any Affiliated Entity (or any of their employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity ···
(iv) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business or assists others in engaging in any Competing Business in the manner described in the foregoing clause (iv).[FN40]

FN40. A Competing Business, as defined by Section 11.04(c) of the 1996 Partnership Agreement,:

(i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was first engaged in by the Partnership or an Affiliated Entity ···

### B. Defendants' Interpretation of the 1996 Partnership Agreement

The Limited Partner Defendants put forth numerous arguments in support of their claims that Sections 3.03(a) and (b) do not prevent CFI and its Affiliates from engaging in a Competitive Activity.

#### 1. Defendants' Counterclaim That CFI is Improperly Included Within Section 3.03(a)

In their Second Counterclaim, Defendants CFI and Cantor allege that CFI and its Affiliates are included, improperly, within the scope of Section 3.03(a). If Defendants' allegations are correct, Cantor and CFI cannot be in violation of Section 3.03(a).

Cantor and CFI allege that Plaintiff CFLP and Third-Party Defendant CFGM breached the 1996 Settlement Agreement's covenant of good faith and fair dealing.[FN41] The 1996 Settlement Agreement provides that CFI "will hereafter be a Limited Partner for all purposes under the Partnership Agreement…"[FN42] According to Defendants, CFI was initially included in Section 3.03(a) because it was the Managing General Partner. Thus, Defendants contend that CFLP and CFGM were required to remove CFI and its Affiliates from Section 3.03(a) and that, by failing to amend the 1995 Partnership Agreement properly, CFLP and CFGM breached an implied covenant of good faith and fair dealing.

> FN41. The Second Counterclaim allegations against Lutnick were dismissed in an earlier opinion. See Fitzgerald v. Cantor, Del. Ch., C.A. No. 16297, Steele, V.C. (Nov. 10, 1998).

> FN42. 1996 Settlement Agreement at 2.

### 2. Defendants' Interpretation of Section 3.03(a)

**\*11** In the alternative, if this Court were to conclude that CFI is properly subject to Section 3.03(a), Defendants contend that Section 3.03(a) permits them to engage in Competitive Activities. Defendants' contention that Section 3.03(a) should be interpreted to provide that "CFI and its Affiliates *are permitted* to engage in any otherwise lawful Competitive Activity unless another provision of the Agreement that applies to a Competitive Activity precludes or limits them from engaging in that activity"[FN43] is critical to understanding their interpretation of the 1996 Partnership Agreement. Defendants' arguments seek to show that no other section of the 1996 Partnership Agreement prohibits CFI or its Affiliates from engaging in a Competitive Activity. Because Defendants contend that no other section of the 1996 Partnership Agreement prohibits them from engaging in a Competitive Activity, they conclude, therefore, that CFI and its Affiliates are permitted to engage in a Competitive Activity.

> FN43. Iris Cantor and Cantor Fitzgerald Incorporated's Proposed Findings of Fact and Conclusions of Law at 32 (emphasis in original) (hereinafter Cantor/CFI Post-Trial OB).

Defendants' first argument relies on Section 1.02(b) of the 1996 Partnership Agreement which states: The Partnership hereby grants to CFI a perpetual, worldwide non-exclusive license … to use the name 'Cantor Fitzgerald' in connection with its business and activities; *provided, however,* that CFI shall not have the right to utilize such license to conduct any Competing Business. (emphasis in original). Defendants contend that this Section merely prohibits CFI from using the "Cantor Fitzgerald" name when competing with the Partnership and that it does not prohibit CFI or its Affiliates from engaging in a Competitive Activity or in other competition with the Partnership. Defendants raised this argument in response to CFLP's motion for a preliminary injunction. I concluded then, as I do now, that Section 1.02(b) explains the conditions under which CFI may use the Cantor Fitzgerald name; it does not grant CFI, much less any other limited partner, the right to compete with CFLP. Because Section 1.02(b) states that CFI may not use the Cantor Fitzgerald name if CFI is engaged in a Competing Business, a reader could infer that there *are* circumstances under which CFI may engage in a Competitive Activity or engage in a Competing Business, however, the reader would only be able to determine the precise circumstances under which CFI may engage in such activities by reading the remainder of the 1996 Partnership Agreement.

In their post-trial briefs, Defendants Cantor and CFI next refer to Section 9.02(d) that allegedly "concerns what payments CFI is entitled to receive in the event that it withdraws or is removed as a General Partner …"[FN44] But the 1996 Partnership Agreement does not contain a Section 9.02(d). In support of this argument, Defendants apparently are referring to a previous version of the Partnership agreement.[FN45] Because the terms of the 1996 Partnership Agreement control the issues at hand and because I conclude that there is but one clear and reasonable interpretation of those terms,

Defendants' arguments based on terms of a previous partnership agreement will not be considered.

> FN44. *Id.* at 34.

> FN45. Throughout their post-trial opening brief, CFI and Cantor refer to DX483 when referring to the partnership agreement. DX 483 is the June 3, 1993, version of the partnership agreement. It is not the agreement in operation at the time Defendants engaged in the conduct that forms the basis for Plaintiff's claims.

**\*12** Finally, Defendants refer to Article XI that describes the conditions under which partners are entitled to receive payments from the Partnership. According to Defendants, although this section refers to a "Competitive Activity," and describes the economic consequences that will be imposed upon partners who choose to engage in a Competitive Activity, it does not prohibit any partner from engaging in a Competitive Activity. As Defendants note, Section 11.02(c) states that "[n]othing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competitive Activity, or in other employment of any nature whatsoever."
In sum, Defendants' interpretation begins with the conviction that the language of Section 3.03(a) allows CFI and its Affiliates to engage in a Competitive Activity unless such action is restricted or prohibited by another section of the 1996 Partnership Agreement. Finding no other section that clearly prohibits such action, Defendants conclude that CFI and its Affiliates are allowed to engage in a Competitive Activity subject only to the restrictions set forth in Section 1.02(b) on the use of the name "Cantor Fitzgerald" and in Article XI on receipt of payments from the Partnership.

### 3. Defendants' Interpretation of Section 3.03(b)

Cantor and CFI do not address the distinction in Section 3.03(b) between harm and loyalty. Other than with reliance on extrinsic evidence, which I shall not consider, they do not address the meaning of Section 3.03(b) except to state that what is allowed by Section 3.03(a) cannot be prohibited by Section 3.03(b) and that CFLP's interpretation of Section 3.03 is not reasonable because if engaging in a Competitive Activity is prohibited by Section 3.03(b) there would be no need for Section 3.03(a). Defendant Fisher argues that, by using the term "acknowledge" rather than a binding term such as "agree," Section 3.03(b) does not impose any additional duty of loyalty on the partners but merely requires the partners to "acknowledge" the loyalty the partners had to the Partnership "by virtue of their relationship to the business."[FN46] This loyalty, he argues, can not be a fiduciary duty of loyalty but can merely be the loyalty they owe to their employer and to the enterprise as a whole. Section 3.03(b) then continues, according to Fisher, by requiring the partners to "agree" that, pursuant to the duty already recognized, they will not harm the Partnership.

> FN46. Rodney Fisher's Proposed Findings of Fact and Conclusions of Law on the Merits at 80 (hereinafter Fisher's Post-Trial OB).

### C. Plaintiff's Interpretation of the 1996 Partnership Agreement

### 1. Defendants' Counterclaim

Plaintiff CFLP responds to Defendants' Second Counterclaim by arguing that the continued inclusion of CFI and its Affiliates in Section 3.03(a) grants these Defendants a benefit because Section 3.03(a) provides that CFI and its Affiliates are not required to present business opportunities to the Partnership. CFLP does not address the Defendants' contention that, by failing to remove CFI and its Affiliates from Section 3.03(a), CFLP and CFGM breached the covenant of good faith and fair dealing inherent in the 1996 Settlement Agreement. CFLP evidently assumes too naively that CFI and its Affiliates would not want to lose their right to pursue business opportunities without first presenting them to the Partnership. Finally, CFLP correctly notes that the 1995 and 1996 Partnership Agreements and 1996 Settlement Agreement provide that the Managing General Partner may amend

the Partnership Agreement without the consent of the Limited Partners.<u>FN47</u>

> <u>FN47.</u> With one exception, not relevant here, discussed below at Section VII.

### 2. Plaintiff's Interpretation of Section 3.03(a)

**\*13** CFLP contends that Section 3.03(a) only makes sense if it is interpreted as an express provision that prohibits CFI and its Affiliates from engaging in a Competitive Activity while they are partners of CFLP. According to CFLP, if partner wishes to engage in a Competitive Activity without violating the Partnership Agreement, the partner must first withdraw from the Partnership. Like the Limited Partner Defendants, CFLP turns to Section 11.02(c) to support its interpretation. Section 11.02(c) states: Each Partner acknowledges that this Article XI is intended solely to reflect the economic agreement between the Partners with respect to amounts payable upon a Partner's Bankruptcy or Termination. Nothing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competing [sic] Activity, or in other employment of any nature whatsoever···
The Limited Partner Defendants acknowledge only the second sentence of Section 11.02(c). CFLP contends that the second sentence is limited by the first. Thus, according to CFLP, Article XI applies only to partners who have left the Partnership as a result of Bankruptcy or Termination and has no application to partners while they are partners.

### 3. Plaintiff's Interpretation of Section 3.03(b)

CFLP contends that Section 3.03(b) contains two separate duties: the fiduciary duty of loyalty and a duty not to harm the Partnership; the later of which is not itself a fiduciary duty. Although CFLP asserts that the Limited Partner Defendants' conduct breaches both duties, it contends that the question of whether a partnership may create a fiduciary duty of loyalty by contract (as opposed to restricting or expanding an existing fiduciary duty) is an issue of first impression and suggests that this Court need not reach the issue of whether Defendants have breached their fiduciary duty of loyalty as Defendants' violation of their contractual obligation not to harm alone supports a finding that Defendants breached Section 3.03(b). Nonetheless, CFLP contends that our law permits partners in a limited partnership to agree to be bound to a fiduciary duty of loyalty created by the partnership agreement. It would, of course, appear necessary for some finding and ruling in this regard as it constitutes the sole basis for CFLP's aiding and abetting a breach of fiduciary duty claim against MDC.

### D. Analysis

CFI and its affiliates should not be included within Section 3.03(a). However, CFLP's interpretation of the 1996 Partnership Agreement is the only reasonable interpretation and CFLP's interpretation does not depend on whether CFI and its affiliates are or are not included within Section 3.03(a).
The Limited Partner Defendants' proposed interpretation contains two fatal flaws. First, Defendants' interpretation begins with the unfounded assumption that the language in Section 3.03(a), which provides that "[n]othing contained in this Agreement shall be deemed to preclude [CFI and its Affiliates] from engaging in ··· business ventures ··· *provided,* that such activities do not constitute Competitive Activities," means that CFI and its Affiliates are *permitted* to engage in a Competitive Activity unless the Partnership Agreement otherwise provides. I find that Section 3.03(a), viewed alone, out of the context of the entire 1996 Partnership Agreement, does not support such an assumption and that, when Section 3.03(a) is viewed in the proper context of the entire Agreement, as it must be, it does not permit the identified parties to engage in a Competitive Activity. Second, Defendants' argument depends upon a misinterpretation of Article XI which, contrary to Defendants' contentions, only applies to partners when they are no longer partners of CFLP. Defendants' interpretation that Article XI applies to partners while they are partners is incorrect.
**\*14** As discussed below, CFLP's interpretation of the 1996 Partnership Agreement does not rely on an unfounded assumption and is consistent with the clear language of Article XI. Because CFLP's interpretation fully explains all sections of the 1996 Partnership Agreement and does not create any internal contradictions in interpretation, I find that CFLP's interpretation is a reasonable

interpretation. Because CFLP's interpretation is the only interpretation that is reasonable, I find that the language of the 1996 Partnership Agreement is clear on its face and that I need not resort to extrinsic evidence in order to understand its meaning.[FN48]

> [FN48.](#) *See, e.g., MHM/LLC, Inc. v. Horizon Mental Health Management, Inc.,* Del. Ch., C.A. No. 14465, at 5-6, Steele, V.C. (Oct. 3, 1996), *aff'd,*Del.Supr., 694 A.2d 844 (1997) (It is well settled that extrinsic evidence is not to be used if the language is clear on its face.). *See also Eagle Indus. Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

### 1. Defendants' Counterclaim

The 1996 Settlement Agreement provides that CFI "will hereafter be a Limited Partner for all purposes under the Partnership Agreement···."[FN49] Although CFGM, as Managing General Partner, has the power to amend the Partnership Agreement, it may not use this general power in the 1996 Partnership Agreement or the 1996 Settlement Agreement to avoid express provisions of the 1996 Settlement Agreement, one of which provides that CFI shall be a Limited Partner for all purposes.

> [FN49.](#) 1996 Settlement Agreement at 2.

Section 3.03(a) of the 1995 Partnership Agreement provided:
*CFI shall be required to devote to the affairs of the Partnership such time and effort as may be reasonably necessary to conduct properly the Partnership's affairs. Nothing contained in this Agreement shall be deemed to preclude CFI or any Affiliate of CFI from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; provided, that such activities do not constitute Competitive Activities ···· Neither CFI nor any of its Affiliates* shall be obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership (emphasis added).
As amended in the 1996 Partnership Agreement, Section 3.03(a) provides:
*The Managing General Partner shall be required to devote to the affairs of the Partnership such time and effort as may be reasonably necessary to conduct properly the Partnership's affairs. Nothing contained in this Agreement shall be deemed to preclude the Managing General Partner, CFI or their respective Affiliates from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; provided, that such activities do not constitute Competitive Activities ···· Neither the Managing General Partner, CFI nor any of their respective Affiliates* shall be obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership (emphasis added).
At the time of the 1996 Settlement Agreement, CFI and CFGM were both General Partners and CFI was the Managing General Partner. As a result of, and after, the 1996 Settlement Agreement, CFI withdrew as Managing General Partner and General Partner and CFGM became CFLP's only Managing General Partner or General Partner.
**\*15** The first sentence of Section 3.03(a) in the 1995 and 1996 Partnership Agreements clearly refers to the need to have the Managing General Partner devote sufficient time to the Partnership's affairs. Thus, the 1995 Partnership Agreement referred to "CFI" because it was the Managing General Partner. The second and final sentences of the 1995 Partnership Agreement continued the reference to "CFI" and there is no indication in the Agreement or from the evidence submitted by the parties to suggest any intention to refer to CFI other than in its role as the Managing General Partner. In other words, there is no indication that, even if CFI had not been the Managing General Partner, that CFI would either *be subject to,* or would *have the benefit of* Section 3.03(a).[FN50]

> [FN50.](#) It is not clear whether Section 3.03(a) should be viewed as only providing a

benefit. Because this Court does not need to and has not addressed whether *all* activities falling under the definition of Competitive Activities would be activities that breach Section 3.03(a), as well as Section 3.03(b), the later of which applies to all partners, it is not clear whether Section 3.03(a) imposes a greater restriction on the parties mentioned or provides a benefit by not requiring the parties to offer business opportunities to the Partnership.

Through the amendments, CFGM has, in the first sentence, replaced the former Managing General Partner with the current Managing General Partner by replacing the reference to "CFI" with a reference to "The Managing General Partner." In the second and last sentences, however, CFGM elected not to replace "CFI" with "The Managing General Partner." Instead, it added CFGM without removing CFI. By this action, CFGM obtained the unquestioned benefit of Section 3.03(a) while subjecting itself, CFI and their Affiliates to the prohibition on Competitive Activities.
The 1996 Settlement Agreement clearly provides that CFI shall be a Limited Partner for all purposes under the Agreement. CFGM's power to amend the Partnership Agreement cannot be used to avoid its separate contractual commitment in the 1996 Settlement Agreement to provide that CFI shall "be a Limited Partner for all purposes." Therefore, I reform Section 3.03(a) of the 1996 Partnership Agreement to: (1) replace the phrase "the Managing General Partner, CFI or their respective Affiliates" with the phrase "the Managing General Partner or its Affiliates;" and, (2) replace the phrase "Neither the Managing General Partner, CFI nor any of their respective Affiliates" with the phrase "Neither the Managing General Partner nor its Affiliates ⋯".[FN51] Neither CFI nor its Affiliate, Iris Cantor, have breached Section 3.03(a) of the 1996 Partnership Agreement.

> FN51. I note that this claim is for breach of an implied covenant of good faith and fair dealing. Although, to me, this does not seem to be the proper claim, I understand why Defendants choose to raise the issue in this form. This covenant is breached when a party engages in arbitrary or unreasonable conduct that has the effect of preventing the other party to that contract from receiving the fruits of the contract. *See Wilgus v. Salt Pond Investment Co., Del. Ch., 498 A.2d 151, 159 (1985)*. In this case, I do not see what fruits the Defendants have missed by Plaintiff's attempt to enforce Section 3.03(a). Moreover, a claim for breach of the implied covenant "must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation." *Continental Insurance Co. v.. Rutledge & Co.,* Del. Ch., C.A. No. 15539, at 32, Chandler, C. (Jan. 10, 2000). This Defendants do not demonstrate.

> The 1996 Settlement Agreement clearly states that it will serve as the amendments to the Partnership Agreement to the extent practicable. *See* 1996 Settlement Agreement Section 2(d). The 1996 Partnership Agreement merely contains a mistake and needs to be conformed to the 1996 Settlement Agreement. While I agree that the mistakes should be and will be rectified, there is no basis for liability despite that implication in Defendants' counterclaim.

### 2. Interpretation of Section 3.03(a) [FN52]

> FN52. If on appeal the Supreme Court were to conclude (1) that the reference to "CFI" (as opposed to the "Managing General Partner") indicates that CFI was included in Section 3.03(a) for reasons other than the fact it was the Managing General Partner, and thus (2) that "CFI" should remain in Section 3.03(a), it would be helpful to have the interpretation of the entire Agreement already completed as the parties have fully briefed this issue. Moreover, the Agreement, which is still in effect, guides the parties' current conduct, even though I ultimately conclude that only CFGM and its Affiliates are subject to the provisions of Section 3.03(a).

Section 3.03(a), which provides that "[n]othing contained in this Agreement shall be deemed to preclude [specified parties] from engaging in ⋯ business ventures ⋯ *provided,* that such activities do

not constitute Competitive Activities," does not expressly state that the parties specified may engage in a Competitive Activity nor does it expressly state that they may not. Thus, the meaning of Section 3.03(a) is only revealed by examining the 1996 Partnership Agreement as a whole.

The consequences of engaging in a Competitive Activity are detailed in Article XI. Section 11.01 addresses the conditions under which a partner may transfer shares and its interpretation is not now at issue.[FN53] Section 11.02 describes the conditions under which a partner will be entitled to receive payments (in the form of a "Base Amount" and "Partner's Additional Amount") from the Partnership. Section 11.03 describes the calculation of the "Base Amount" and Section 11.04 describes the conditions under which a partner may be entitled to payment of a "Partner's Additional Amounts." In sum, upon leaving the Partnership, a partner is entitled to receive the "Base Amount." Whether a partner is also entitled to receive the "Partner's Additional Amounts" depends on whether the partner has engaged in a Competitive Activity.

> FN53. A thorough discussion of Section 11.01 may be found in *Fitzgerald v. Cantor,* Del. Ch., C.A. 16297, Steele, V.C. (Mar. 23, 1999) in which this Court granted CFI's and Cantor's motion for summary judgment on Plaintiff's ninth cause of action.

**\*16** Section 11.02(a) states that, except as otherwise provided, upon Bankruptcy or Termination of a limited partner, the Partnership shall purchase the limited partner's Partnership units pursuant to the terms and conditions set forth in Article XI. It also provides that "[s]oley for purposes of this Article XI, all references to Partners shall include any Terminated or Bankrupt former Partner unless the context clearly indicates otherwise."

Section 11.02(b) states:

Each Partner acknowledges and recognizes that [Partners will have access to] information critical to the success of the business of the Partnership and the Affiliated Entities and will have an extraordinary opportunity to participate in the growth of the business of the Partnership. Each Partner also agrees that certain actions ··· including ··· engaging in a Competitive Activity ··· while a Partner is a Partner or during the Restricted Period would harm the Partnership or the Affiliated Entities. Accordingly, in consideration of being afforded the opportunity to become a Partner, each Partner agrees to the economic terms set forth in this Article XI.

Section 11.02(c) states in relevant part:

Each Partner acknowledges that this Article XI is intended solely to reflect the economic agreement between the Partners with respect to amounts payable upon a Partner's Bankruptcy or Termination. Nothing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competing Activity, or in other employment of any nature whatsoever.

Finally, Section 11.02(d) states in relevant part:

Each Partner consents to the economic terms of this Article XI and agrees that a Partner who does not engage in a Competitive Activity during the Restricted Period shall be entitled to all amounts payable pursuant to Sections 11.03 and 11.04. A partner who chooses to engage in a Competitive Activity shall be entitled to receive all amounts payable pursuant to Section 11.03 and shall be entitled to receive additional amounts as are provided in Section 11 .04 to the extent that such amounts are payable prior to the date on which a Partner first participates in a Competitive Activity.

When read together, it is clear that Sections 11.02(c) and (d) provide that if a partner is Terminated or is Bankrupt, the partner may seek to earn income in any manner the partner wishes. The caveat, however, is that if the former partner chooses to earn income by engaging in a Competitive Activity, the partner will not receive, in exchange for the partner's units, any of the additional amounts to which the partner would otherwise be entitled under section 11.04.[FN54] Subsections 11.02(c) and (d) do not grant the Limited Partner Defendants the right to engage in a Competitive Activity or to compete with CFLP.

> FN54. The former partner may, however, receive the additional amounts up until the time when the partner begins to engage in a Competitive Activity. *See* 1996 Partnership Agreement Section 11.02(d).

Any remaining confusion as to whether the economic sanctions imposed by Article XI apply only to partners after they leave the Partnership or whether the parties to Partnership Agreement did not

intend to allow an active partner to engage in a Competitive Activity is resolved by examination of Sections 12.02(a) and 11.04(h). Section 12.02(a) provides that "[e]xcept as otherwise agreed in writing by the Managing General Partner, the Partnership shall have the right to redeem any or all of the Units held by each Unitholder at any time and from time to time." Redemption pursuant to Section 12.02(a) is included within the 1996 Partnership Agreement's definition of Termination.[FN55] Thus, the Partnership, upon concluding that a partner was engaging in a Competitive Activity, could redeem a partner's units and thus subject a partner to the provisions of Article XI, which apply to a Terminated partner.

> FN55. *See Id.* Section 1.01.

**\*17** Section 11.04(h) provides:
Notwithstanding anything to the contrary, the Personal Representative of a Partner who has become a Terminated Partner on account of death shall receive payment of his or her Additional Amounts at the same time such Personal Representative receives payments of the deceased Partner's Base Amount pursuant to Section 11.03; provided, however, that the Personal Representative of a deceased Partner shall not be entitled to receive payment of such Additional Amounts if the deceased Partner engaged in a Competitive Activity prior to his or her death.
Section 11.04 only makes sense if it refers to the situation where a partner, who is prohibited from engaging in a Competitive Activity, engages in a Competitive Activity but dies before leaving the Partnership. In such a case, either because the Partnership did not know of the Competitive Activity or knew but had not yet completed redemption of the partner's units pursuant to Section 12.02(a), it is necessary to provide that the partner would not be entitled to the Additional Amounts to place the partner in the same position as a partner who had engaged impermissibly in a Competitive Activity after leaving the Partnership or who had his or her units redeemed because he or she engaged in a Competitive Activity before leaving the Partnership. If the economic sanctions in Article XI applied to partners while they are partners, it would not be necessary to include Section 11.04(h). But Article XI sanctions only apply to partners who are prohibited from engaging in a Competitive Activity and who engage in a Competitive Activity during the "Restricted Period," which is defined as the "four year period immediately following the date on which a Partner ceases, for any reason, to be a Partner of the Partnership."[FN56]

> FN56. *Id.*

Because, pursuant to Section 12.02(a), the Partnership may redeem a partner's units, thereby terminating a partner from the Partnership and subjecting the former partner to sanctions of Article XI, the only time that the provisions of the Partnership Agreement do not allow the Partnership to impose sanctions on a partner who has engaged, impermissibly, in a Competitive Activity is when the partner, for whatever reason, is not yet subject to the "Restricted Period." [FN57] The only circumstance when the terms of the 1996 Partnership Agreement do not allow for the Partnership to force a partner, who has engaged in a Competitive Activity, to enter the Restricted Period, is when the partner has died after engaging in a Competitive Activity but before leaving the Partnership. Therefore, Section 11.04(h) fits neatly into CFLP's interpretation of the Partnership Agreement by ensuring that no partner who is prohibited from engaging in a Competitive Activity is able to engage in a Competitive Activity and receive the full economic benefit obtained by partners who do not engage in a Competitive Activity.

> FN57. Section 12.02(a) of the 1996 Partnership Agreement provides that the Partnership may be prevented from redeeming a partner's units (and thus subjecting a partner to termination and the sanctions of Article XI) by agreements other than the Partnership Agreement. The existence of such other agreements, however, does not affect the interpretation of the 1996 Partnership Agreement.

Defendants agree that partners who engage in a Competitive Activity are subject to the provisions of Article XI, but because Defendants also assume that Section 3.03(a) *permits* certain parties to engage in a Competitive Activity while they are partners unless otherwise prohibited, they *must* argue

that the sanctions of Article XI apply to the parties mentioned in Section 3.03(a) while they are partners. Because Article XI, in relevant part, clearly does not apply sanctions to partners while they are partners, Defendants' argument must be incorrect.

**\*18** Defendants' interpretation of the 1996 Partnership Agreement fails to persuade for a second reason. If, as argued by Defendants, Section 3.03(a) permits the specified parties to engage in a Competitive Activity and engaging in a Competitive Activity is prohibited only if a Section other than 3.03(a) prohibits that activity then, even under Defendants' interpretation, engaging in a Competitive Activity is prohibited by the 1996 Partnership Agreement because, as discussed immediately below, it is prohibited by Section 3.03(b).

### 3. Interpretation of Section 3.03(b)

Pursuant to Section 3.03(b), "[e]ach Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity." Contrary to Defendants' contentions, CFLP's interpretation of Section 3.03(b) does not conflict with CFLP's (and this Court's) interpretation of Section 3.03(a). The sections are neither redundant nor ambiguous. *Pursuant to Section 3.03(b)* all Partners acknowledge that they have assumed a duty of loyalty and agree not to engage in actions reasonably expected to harm the Partnership. *Pursuant to Section 3.03(a),* the Partnership acknowledges that certain parties are not "obligated to present any particular business opportunity to the Partnership, even if such opportunity is of a character which, if presented to the Partnership, could be taken by the Partnership." Thus, Section 3.03(a) *limits* the duties assumed by certain partners under Section 3.03(b).

### 4. Conclusion

In sum, Defendants fail to provide a reasonable explanation of the 1996 Partnership Agreement. Their proposed explanation, which asserts that Section 3.03(a) permits Competitive Activities unless otherwise prohibited, depends upon an unfounded assumption and an obviously incorrect interpretation of Article XI. Therefore, Defendants' interpretation of the 1996 Partnership Agreement cannot be correct or even one of several possible reasonable interpretations.

CFLP's interpretation, on the other hand, is reasonable and creates no ambiguity in the terms of the 1996 Partnership Agreement. Defendants' arguments fail to establish that Plaintiff's interpretation is internally inconsistent or relies on the existence of redundant or unnecessary terms. Because the 1996 Partnership Agreement is not ambiguous and because Plaintiff's interpretation is the only reasonable interpretation, it is the correct interpretation.

I conclude that, as a matter of law, the 1996 Partnership Agreement, properly interpreted, provides that the parties specified in Section 3.03(a) are prohibited from engaging in Competitive Activities and that all partners have a duty of loyalty to not to take action that would harm the Partnership.

[FN58] This conclusion does not, however, address the issues of whether, as a matter of law, parties to a limited partnership agreement may establish, by the terms of the agreement, that limited partners who neither manage, operate, nor govern the partnership may bind themselves to a *fiduciary* duty of loyalty or whether, in this case, the parties properly created such a duty.

> FN58. As the proper interpretation reveals, contrary to Cantor's and CFI's contention, that Section 3.03(b) applies to Cantor and CFI (including while they are causing an Affiliated Entity to engage in a Competitive Activity), the portions of Cantor's and CFI's First and Second Counterclaims alleging that Section 3.03(b) provides immunity are incorrect. Accordingly, the Counterclaims which allege (1) that the amendments relating to the status of MDC are null and void and (2) that Plaintiff CFLP and Counterclaim Defendant CFGM have breached the *Partnership Agreement's* implied covenant of good faith and fair dealing *relating to the status of MDC* are resolved in favor of the Plaintiff and Counterclaim Defendant.

5. May the Partners of a Delaware Limited Partnership Agree in Their Partnership Contract That Partners, Including Those Limited Partners who do not Participate in the Management or Operation of the Partnership, Should be Subject to a Fiduciary Duty of Loyalty?

**\*19** CFLP is a Delaware limited partnership governed by the Delaware Revised Uniform Limited Partnership Act ("DRULPA").[FN59] This "Act's basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement."[FN60] Section 17-1101(c) of the Act provides that "[i]t is the policy of [the Act] to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." Section 17-1101 (d) provides:

FN59. 6 Del.C. §§ 17-101 to 17-1111.

FN60. Elf Atochem N. Am., Inc. v. Jaffari, Del.Supr., 727 A.2d 286, 291 (1999) (quoting MARTIN I. LUBAROFF & PAUL M. ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS, § 1.2 (1998)).

To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) and liabilities relating thereto to a limited partnership or to another partner ⋯ (2) the partner's or other person's duties and liabilities may be expanded or restricted by provisions in a partnership agreement.

The Limited Partner Defendants contend that this language precludes a limited partnership from creating duties that do not exist separately at law or in equity.

Relying primarily on Elf Atochem,[FN61] CFLP argues that the phrase "duties or liabilities may be expanded or restricted by provisions in a partnership agreement" in Section 117-1101(d) is not intended to limit the types of duties that may be addressed in a partnership agreement to those duties that exist separately at law or in equity. In other words, according to CFLP, Section 17-1101(d) allows a partnership to modify existing duties and to create additional new duties.

FN61. 727 A.2d 286.

In Elf Atochem, plaintiff argued that Section 18-109(d) of the Delaware Limited Liability Company Act (the "LLC Act")[FN62], which provides that an LLC agreement "may" vest non-exclusive jurisdiction in a foreign jurisdiction or exclusive jurisdiction in Delaware courts or arbitrators, did not allow the LLC agreement to vest exclusive jurisdiction in a foreign jurisdiction. Even though Section 18-109 did not provide that the parties may agree to exclusive foreign jurisdiction, neither did the LLC Act provide that the parties' choices were limited to the delineated options. The Supreme Court stated that, "[i]n general, the legislature's use of 'may' connotes the voluntary, not mandatory or exclusive, set of options"[FN63] and concluded that interpretation of "may" as a permissive, rather than as a restrictive, term "complements the overall policy of the [LLC] Act to give maximum effect to the parties' freedom of contract."[FN64] Accordingly, the Supreme Court affirmed this Court's judgment that the parties were allowed to vest exclusive jurisdiction in a foreign jurisdiction.

FN62. 6 Del.C. §§ 18-101 to 18-1109.

FN63. Elf Atochem, 727 A.2d at 296.

FN64. Id.

The Limited Partner Defendants acknowledge the reasoning and holding of Elf Atochem and recognize that both the LLC Act and the DRULPA are designed to give maximum effect to the parties' freedom of contract. Nonetheless, they contend that even if Section 17-1101(d) of the DRULPA is properly interpreted in a way that does not restrict the types of duties that may be addressed in a partnership agreement to those duties that pre-exist at law or in equity, the types of duties that may be addressed are, nonetheless, restricted by concerns of public policy. For example, Defendants contend that the parties to the Partnership Agreement may not contract to that which violates statutory law.

But there is no argument in this case that the parties, by agreeing that the Limited Partner Defendants are subject to a duty of loyalty have violated statutory law. Nothing in DRULPA or our case law expressly prohibits a limited partnership agreement from providing that limited partners are subject to duties that the common law or equity does not independently impose upon them.
**\*20** The Limited Partner Defendants attempt to distinguish *Elf Atochem* by asserting that, in this case, even if "may" is interpreted as allowing the creation of duties by contract, a *fiduciary* duty of loyalty may not be imposed upon the Limited Partner Defendants because they have no management authority, do not participate in Partnership governance, and "[e]quity does not impose fiduciary obligations on limited partners unless they have governing authority."[FN65] In support of their position, the Limited Partner Defendants refer to cases where our Courts have held that because, or to the extent that, a limited partner has governing authority, the limited partner may be subject to fiduciary obligations.[FN66]

FN65. Fisher's Post-Trial OB at 62.

FN66. *See, e.g., KE Property Management Inc. v. 275 Madison Management Inc.,* Del. Ch., C.A. No. 12683, at 24, Hartnett, V.C. (July 27, 1993).

In post-trial briefing and at post-trial oral argument, the parties vigorously debated whether our law imposes default fiduciary duties on limited partners and whether a fiduciary duty of loyalty is an equitable and/or contractual concept. The parties contend that these issues have not been addressed by our Courts and/or that this Court has issued conflicting opinions.[FN67] I disagree.

FN67. The parties kindly spared me the more cynical, but occasionally preferred argument that, because our Supreme Court has yet to speak to the issue that this Court should therefore not presume to address the subject definitively.

Defendants correctly assert that our Courts have not found limited partners subject to *default* fiduciary duties in the absence of a fiduciary relationship. In at least three cases this Court found that limited partners may be subject to fiduciary duties. In each case, the Court noted the existence of a fiduciary relationship. In *KE Property Management,*[FN68] a limited partnership agreement empowered a limited partner to participate in control of the partnership by granting the ability, under specified circumstances, to remove the general partner. Then Vice Chancellor, now Justice, Hartnett held that "to the extent that a partnership agreement empowers a limited partner [with] discretion to take actions affecting governance of the limited partnership, the limited partner may be subject to the obligations of a f iduciary…"[FN69] In *James River-Pennington Inc. v. CRSS Capital, Inc.,*[FN70] the limited partner owed a fiduciary duty of loyalty to the partnership and to the other partners because it controlled the general partner through the votes of three of its six directors. In *RJ Associates, Inc. v. Health Payors' Organization Limited Partnership, HPA, Inc.,*[FN71] the Court noted that even though the partnership agreement provided that the limited partners shall not participate in the operation, management or control of the partnership, the limited partner was involved in the governance and operation of the partnership and the limited partner was entitled to designate a majority of the general partner's board of directors.

FN68. *Id.*

FN69. *Id.* at 24.

FN70. Del. Ch., C.A. No. 13870, Steele, V.C. (Mar. 6, 1995).

FN71. Del. Ch., C.A. No. 16873, Jacobs, V.C. (July 16, 1999).

The defendants in *Kahn v. Icahn*[FN72] and *Sonet v. Timber Co.,*[FN73] although not limited partners, also stood in a fiduciary relationship to a limited partnership and to other partners. Citing to Section 17-

1101, the Court in *Kahn* explained that "Delaware law permits partners to agree on their rights and obligations to each other and to the partnership. This is so even when Delaware law might impose different rights and obligations absent such agreement."[FN74] Because the partnership agreements in *Kahn* and *Sonet* addressed and permitted the actions alleged to be breaches of fiduciary duty, the Court dismissed plaintiffs' claims.

> [FN72.](#) Del. Ch., C.A. No. 15916, Chandler, C. (Nov. 12, 1998); *aff'd,*Del.Supr., No. 524, 1998, 2000 WL 140018 (Jan. 24, 2000).

> [FN73.](#) Del. Ch., 722 A.2d 319 (1998).

> [FN74.](#) *Kahn* at 5.

**\*21** Apparently interpreting the Chancellor's decisions in *Kahn* and *Sonet* as applying only to the fiduciary obligations of a *general* partner in a limited partnership, Plaintiff argued post-trial that this Court has not clearly resolved whether *limited* partners are subject to default fiduciary duties. In support of this argument, CFLP relies on cases where this Court has referred to Section 17-1105 of the DRUPLA which provides that "[i]n any case not provided for in this chapter the Delaware Uniform Partnership Law [DUPL] [FN75.]... and the rules of law and equity ··· shall govern" and to DUPL Section 1521 which provides that all partners are accountable as fiduciaries.

> [FN75.](#) 6 *Del.C.* §§ [15-101](#) to [15-1210](#).

As discussed above, however, in these cases, the Court noted the existence of a fiduciary relationship that formed the basis for fiduciary duties. Furthermore, the Court's references to statute were consistent with the Chancellor's conclusion in *Sonet,* that *only* when the partnership agreement is "silent or ambiguous, or where principles of equity are implicated, will a Court begin to look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence."[FN76]

> [FN76.](#) *Sonet,* 319 A.2d at 324.

Any lingering doubts as to whether this Court should turn to statute to impose fiduciary duties upon limited partners who do not participate in the management or control of the partnership or as to whether *Sonet* could be interpreted as applying only to *general* partners were put to rest in *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.,*[FN77] where the parties directly raised the issue of whether a limited partner could be subject to default fiduciary duties in the absence of a fiduciary relationship. In *Bond Purchase,* the plaintiff limited partner [FN78] did not stand in a fiduciary relationship with the partnership and other partners. None of the factors which this Court had previously recognized as establishing a fiduciary relationship, and thus giving rise to corresponding fiduciary duties, existed. Unlike the limited partners in *KE Property Management, James River-Pennington* and *RJ Associates,* there was no allegation that the limited partner controlled the general partner, that the limited partner was in common control with the general partner, or that the partnership agreement provided the limited partner with power to take action affecting the management or operation of the partnership. Moreover, I specifically noted that this Court in *KE Property Management* limited its reliance on statute to situations where the partnership agreement establishes a fiduciary relationship. Thus, in *KE Property Management,* the Court's reference to statute was supported by equitable principles springing from a fiduciary relationship as well as a partnership agreement that was silent on the scope of the corresponding fiduciary duties. Because I found no contractual language in *Bond Purchase* creating a fiduciary relationship nor an intent to impose fiduciary duties, I concluded that the plaintiff limited partner owed no fiduciary duties to the partnership or to other partners.

> [FN77.](#) Del. Ch., C.A. No. 16643, Steele, V.C. (July 23, 1999).

FN78. The plaintiff in *Bond Purchase* was not, in all respects, a "limited partner." However, for the purpose of this discussion, the description is accurate.

**\*22** CFLP's claims in this case raise a question I had no need to address in *Bond Purchase:* whether parties to a limited partnership agreement may contractually impose fiduciary duties on limited partners who otherwise have no power to manage or to control the partnership. Defendants assert that "[t]here is no case law directly prohibiting the creation of fiduciary duties by contract precisely *because* it is unprecedented for a contract to purport to create traditionally equitable duties ( *e.g.* fiduciary duties) ."[FN79] Defendants seem to conclude that the relationship described by the term "fiduciary" is limited to management or control of another's resources independent of one's own. Even as basic a resource as Black's Law Dictionary recognizes that a fiduciary relationship can exist "when one merely places trust in the faithful integrity of another, who as a result gains superiority *or* influence over the first" and that a "fiduciary" is "one who owes to another the duties of good faith, trust, confidence and candor."[FN80] The duty of loyalty that parties may impose upon one another by mutual assent in a contract, whether management, operational, or governance responsibilities follow or not, is a mutual exchange of a promise to treat one another with good faith, trust, confidence and candor. It is a promise articulated to define a mutually agreed relationship explicitly beyond that of any "implied" duty of good faith in an ordinary contract. This is hardly a shocking expectation to seek and to bargain for even in the harsh, competitive world of brokering Treasuries.

FN79. Fisher's Post-Trial OB at ¶ 110 (emphasis in original).

FN80. BLACK'S LAW DICTIONARY, 256-57 (Pocket ed.1996).

Unprecedented or not, the Limited Partner Defendants cannot credibly argue that they have not knowingly and willingly accepted the obligation of a fiduciary duty of loyalty to the CFLP Partnership. And, in this situation, holding that the parties to the CFLP 1996 Partnership Agreement could bargain to impose a fiduciary duty of loyalty on the limited partners is not remotely offensive to any concerns of public policy. To the contrary, upholding the right of these partners to agree by a mutual exchange of dependent promises that they will not act in ways that threaten to destroy the common mission and purpose of the partnership upholds DRUPLA's policy of affording partners "the broadest possible discretion in drafting their partnership agreements."[FN81] The duty of loyalty proclaimed in the 1996 Partnership Agreement requires no dependency upon a default concept to a narrow definition derived from corporate common law. The scope of the duties owed by the parties must be determined by reference to the nature of this particular business enterprise. [FN82]

FN81. *Elf Atochem,* 727 A.2d 286, 291.

FN82. As in *Cencom Cable Income Partners, L.P. Litig.,* Del. Ch., C.A. No. 14634, Steele, V.C. (Jan. 27, 2000), the issues in this case may not be resolved by blind reference to existing default rules or precedents established in other business settings. While these concepts may provide guidance, they do not reflect the unique nature of the partnership setting.

CFLP's existence and effectiveness depends upon its partners' loyalty to the Partnership. The record in this case clearly establishes that brokering Treasuries is a very competitive business and that CFLP jealously guards its dominant position in the market. Approximately eighty to ninety percent of CFLP's profit is derived from the brokerage of Treasuries and the sale of Treasury related data.[FN83] CFLP provides a service by creating a marketplace for Treasuries and the success of that service depends upon the loyalty of its employees and its partners. As Lutnick explained, CFLP is not a publicly traded partnership. Many partners are employees or family members of employees. The success of this still highly personalized business activity depends in large part on the stability of the Partnership and a sense of commitment to a common purpose. The capital needed to maintain or expand CFLP's position in the marketplace is contributed by its partners. A duty of loyalty is necessary to get partners to commit funds free of the fear that their fellow partners will compete in the very business

that is central to CFLP's success: the brokerage of Treasuries. The CFLP Limited Partners, like partners in a general partnership, must be able to rely on a mutuality of commitment and purpose. CFLP's Limited Partners are not akin to shareholders investing in a corporation. CFLP's Limited Partners would not rationally warrant the ability to compete in a way that would harm the Partnership and their fellow partners-the Partnership's source of capital. Allowing such competition would undermine the Partnership's financial structure and destroy the morale of this people-oriented enterprise.

> FN83. Lutnick 5/13/99 at 314-6; Simon 6/25/98 at 46-8.

### IV. Application of the Partnership Agreement

#### A. Did CFI or Cantor Engage in "Competitive Activities" in Violation of Section 3.03(a) of the 1996 Partnership Agreement?

**\*23** Because I concluded in Section III D(1) that CFI and its Affiliates are improperly included within Section 3.03(a), Plaintiff's claims based on this Section are resolved in favor of Defendants. If, despite my confidence that they should not be, however, CFI and its Affiliates were included within this Section, the outcome would be as described below.
Plaintiff contends that, if CFI and its Affiliates are subject to Section 3.03(a), then Cantor and CFI have breached Section 3.03(a) of the 1996 Partnership Agreement. Section 3.03(a) prohibits the "Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing ⋯ Competitive Activities." Cantor is an Affiliate of CFI.[FN84]

> FN84. Section 1.01 of the 1996 Partnership Agreement defines "Affiliate" as "any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person." Cantor, through the Iris Cantor Trust, is CFI's controlling shareholder. Cantor, therefore, is an Affiliate of CFI.

By entering into the licensing agreement with CBB, MDC engaged in a "Competing Business" because the agreement "involve[d] the conduct of the wholesale or institutional brokerage business"[FN85] and because the resulting business "compete[d] with ⋯ other business conducted by the Partnership or any Affiliated Entity [and] such business was first engaged in by the Partnership or an Affiliated Entity."[FN86]

> FN85. 1996 Partnership Agreement Section 11.04(c).

> FN86. *Id.*

If Cantor were included within the prohibition in Section 3.03(a), Cantor, as a director and owner of MDC, would have engaged in a Competitive Activity as defined by Section 11.04(c) of the 1996 Partnership Agreement which provides that a partner engages in a Competitive Activity when the partner "directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business ." Because Cantor is a director and the controlling shareholder of MDC, a Competing Business, she would have engaged in a Competitive Activity.[FN87] If Cantor, an Affiliate of CFI, had engaged in a Competitive Activity, CFI also would have breached Section 3.03(a) of the 1996 Partnership Agreement.[FN88]

> FN87. Although the ability to do so is not a necessary element of liability, I note that Cantor, as controlling shareholder, could have prevented MDC from engaging in a competing Business. She did not. As a director, Cantor approved the License Agreement.

( *See* Tr. Trans. Vol. XXVII at 5099-100; DX1011).

FN88. If Section 3.03(a) were not interpreted as imposing responsibility upon CFI for the actions of its Affiliate, the Partnership would have no remedy against a non-Partner Affiliate who engages in a Competitive Activity.

B. Did the Limited Partner Defendants Breach Section 3.03(b) of the 1996 Partnership Agreement?

Plaintiff also contends that CFI, Cantor and Fisher have breached their contractual and fiduciary duties of loyalty under Section 3.03(b) of the 1996 Partnership Agreement. Section 3.03(b), by its terms applies to all "Partner [s]." CFI, Cantor and Fisher are "Partners" of CFLP.[FN89] Thus, Section 3.03(b) applies to CFI, Cantor and Fisher.

FN89. Section 1.01 of the 1996 Partnership Agreement defines "Partners" as "the General Partners and the Limited Partners."

CBB was formed to provide a means to trade Treasuries through an electronic screen-based trading system.[FN90] Pursuant to the February 9, 1998, Licenses Between Chicago Board Brokerage, L.L.C. and Market Data Corporation (the "License Agreement"), MDC licensed proprietary software for MarketPower, CBB's "fully interactive electronic trading system in the U.S. Treasury Market."[FN91] Cantor was a director and majority owner and Fisher a shareholder, director and chairman of MDC while MDC engaged in activity harmful to CFLP. Cantor and Fisher did not merely engage in business with competitors of the Partnership. They engaged in the Partnership's principal line of business with the Partnership's competitors. These actions harmed CFLP by affecting its ability to continue to function and its ability to raise capital. The Partnership Agreement imposed a duty of loyalty to prohibit those very actions in order to preserve CFLP's ability to function and to protect its continuing source of capital. Accordingly, both Cantor and Fisher have breached their contractual and fiduciary duties of loyalty in Section 3.03(b) of the 1996 Partnership Agreement.

FN90. PX181 at No. 22; PX23 at 1.

FN91. PX89 at CBB 0027973; PTO ¶ 27. (PX89 is the Equity Investor Notebook. At trial (Vol. XXVII at 5129-31) the notebook was admitted and I noted it would be useful to have as a reference to understand the facts when writing the opinion. I also stated, however, that I would careful in using it to make findings of fact. I know of no reason why this reference would be objectionable as there is no genuine dispute about this material fact.)

V. Claims of Aiding and Abetting and Tortious Interference

**\*24** Counts II and IV raise accomplice liability theories against MDC. Count II is a claim for aiding and abetting the Limited Partner Defendants' breach of fiduciary duty, and Count IV is a claim for tortiously interfering with the 1996 Limited Partnership Agreement. The elements of tortious interference are: (1) a valid contract, (2) defendants' knowledge of the contract, (3) an intentional act by defendants that is a significant factor in causing the breach of the contract, (4) lack of justification for defendants' acts and (5) resulting injury.[FN92] The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant, and (4) resulting damages to plaintiff.[FN93] MDC contends that Plaintiff cannot succeed on the merits of its aiding and abetting and tortious interference claims because it cannot prove the elements of knowing participation or of intentional action without justification.

FN92. *See Wallace v. Wood,* Del. Ch., C.A. No. 15731, at 13, Steele, V.C. (Oct. 12,

1999).

FN93. *Id.* at 17.

It is undisputed that MDC and CBB agreed to work together to develop and sell a product that would compete directly with CFLP in CFLP's core business: brokering Treasuries. In October 1997 counsel for CFLP informed MDC that, in CFLP's opinion, "[Cantor] and Mr. Fisher are ⋯ violating [their] duty of loyalty to the Partnership" by developing an electronic trading system for U.S. Government securities.[FN94] The minutes of board meetings as well as correspondence acknowledged to have been received, lead me to conclude that MDC, whose controlling shareholder and Chief Executive Officer were members of MDC's Board of Directors and CFLP Limited Partners, had knowledge of the contractual and fiduciary obligations in the 1996 Partnership Agreement, and knowingly, intentionally and without justification engaged in actions in violation of these duties. MDC's actions caused "harm" to or "damaged" CFLP as explained in Section VIII. On Plaintiff's claims for aiding and abetting a breach of fiduciary duty and tortious interference with contract, I find for Plaintiff.

FN94. *See* PX16 (Letter to Iris Cantor from Stephen M. Merkel, counsel for CFLP dated Oct. 6, 1997). Both Franz W. Paasche, counsel for MDC, and Fisher received copies of the letter. *See* PX18 (Letter to Stephen Merkel, Esq. from Franz W. Paasche dated Oct. 14, 1997, acknowledging receipt of Oct. 6 letter) and PX19 (Letter to Stephen Merkel, Esq. from John P. Schmitt acknowledging receipt of Oct. 14, 1997, letter on behalf of Fisher).

## VI. Defenses

The Limited Partner Defendants contend that, regardless of the terms of the 1996 Partnership Agreement, CFLP should be estopped from raising a claim for breach of that Agreement. Defendants contend that the parties' prior course of dealing establishes that CFLP routinely acquiesced in Defendants' competition with CFLP.
"Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[FN95] Defendants contend that since 1993, the year that CFLP first inserted the language currently found in sections 3.03(a), 3.03(b) and 11.04(c) of the 1996 Partnership Agreement, MDC engaged in many transactions with CFLP's competitors that fall within the definitions of Competitive Activities or Competing Business, or that might arguably be considered in violation of the Limited Partner Defendants' duty of loyalty and harmful to CFLP. Defendants contend that CFLP never objected to, or sought to enjoin, these transactions, notwithstanding that some of these transactions involved the development of electronic trading systems for companies that compete directly with CFLP. Thus, Defendants contend that CFLP led them to believe that MDC's transaction with CBB was also permissible under the 1996 Partnership Agreement.

FN95. *NTC Group, Inc. v. West Point-Pepperell, Inc.,* Del. Ch., C. A. No. 10665, 1990 at 13, Hartnett, V.C. (Oct. 17, 1990) (citations omitted).

**\*25** In support of their argument, Defendants refer to several transactions between MDC and CFLP's competitors. These transactions fall into two general categories: data enhancement transactions and software distribution transactions.

### A. The Data Enhancement Transactions

Before its spin-off, when MDC was still a Department within Cantor Fitzgerald, the Department's business was limited to reselling information provided by Cantor Fitzgerald. Within one year of the spin-off, MDC entered into long-term contracts with MKI Securities Corp. ("MKI"), Tullet & Tokyo ("Tullet") and Fulton Prebon to distribute data they obtained from their customers' trades. These

three companies were, to some degree, similar to Cantor Fitzgerald: they were all wholesale or institutional brokers.[FN96] MDC agreed to display MKI's data for mortgaged backed securities,[FN97] Tullet's data in foreign exchange and capital markets,[FN98] and Fulton Prebon's data for money market information .[FN99]

FN96. Tr. Trans. Vol. XXVIII at 5369-71, Tr. Trans. Vol. V at 809-10, 812-13, 816.

FN97. Tr. Trans. Vol. XXVIII at 5371.

FN98. Tr. Trans. Vol. XXXI at 5881.

FN99. *Id.* at 5882-3.

Defendants contend that, by engaging in these transactions, MDC has engaged in business with CFLP's competitors and repeatedly has engaged in a "Competing Business," one definition of which in the 1996 Partnership Agreement is an activity that "involves the conduct of the wholesale or institutional brokerage business."[FN100] Therefore, having acquiesced in MDC's participation in a Competing Business in the past, CFLP cannot now claim that similar actions are prohibited.

FN100. 1996 Partnership Agreement Section 11.04(c).

CFLP concedes that Bernie Cantor did not object to the MKI, Tullet, and Fulton Prebon transactions. His acceptance of the transactions, according to CFLP, however, was based on the fact that the transactions provided a benefit to CFLP and did not harm CFLP. CFLP also stresses the fact that none of these data enhancement transactions ever threatened CFLP's core business of brokering Treasuries and that Bernie Cantor refused to allow MDC to enter into a data enhancement transaction involving the distribution of *Treasury* information obtained from a competitor of CFLP.[FN101]

FN101. *See* Tr. Trans. Vol. II at 288-291.

## B. Software Distribution Transactions

In addition to the data enhancement transactions, MDC entered into two contracts to provide broker technology. First, in April 1991, MDC contracted with MKI's successor, Cowen & Co. ("Cowen") to develop a broker system. Cowen was not permitted to use the system to broker U.S Treasuries.[FN102] Cowen was allowed to use it only in connection with its brokerage of mortgage-backed securities and zero coupon bonds. At the time MDC entered the contract with Cowen, Cantor Fitzgerald used its own internal mortgage-backed securities electronic trading system. In 1993, Patriot Securities, L .P. ("Patriot") took over Cowen's mortgage backed securities brokerage business and the MDC-Cowen agreement was assigned to Patriot.[FN103] At that time, MDC and Patriot amended the agreement to allow Patriot to use the system to broker repurchase and reverse repurchase agreements of U.S. Government securities instead of zero coupon bonds.[FN104] A later amendment also permitted Patriot to use the system to broker emerging market debt and non-U.S. dollar repurchase and reverse repurchase agreements.[FN105] Neither Cowen or Patriot were ever permitted to use the MDC system to broker Treasuries.[FN106]

FN102. Nadan 1/12/99 at 86-87, 92; Tr. Trans. Vol. XII at 2229.

FN103. PX 1079 (First Amendment to Computer Software Agreement dated March 23, 1993) at 2.

FN104. Tr. Trans. Vol. IV at 724; DX1079 at 2; Tr. Trans. Vol. XII at 2230.

FN105. PX50 (Second Amendment to Computer Software Agreement dated June 22, 1993) at 2; Tr. Trans. Vol. XII at 2231.

FN106. Tr. Trans. Vol. XXX at 5691-92.

**\*26** Second, in December 1993, MDC entered into an agreement with InterCapital Debt Trading, Ltd. ("ICAP") under which MDC agreed to develop an electronic trading system for ICAP for the trading of emerging market securities. Under the agreement, MDC gave a "limited license" to ICAP to use MDC software for trading corporate debt issued in Europe, sovereign debt issued by certain restricted entities, and certain other restricted instrument classes .FN107 Cantor Fitzgerald's business in these emerging markets was practically nonexistent.FN108 ICAP was not allowed to use the system to broker Treasuries.FN109

FN107. PX52 (Computer Software, Management and Technical Support Agreement dated Dec. 31, 1993).

FN108. Tr. Trans. Vol. II at 379-80.

FN109. Tr. Trans. Vol. XXX at 5694.

According to Defendants, the Cowen and ICAP deals were Competing Businesses and Competitive Activities under the Partnership Agreement. Therefore, by failing to object to these transactions, CFLP acquiesced in Defendants' competition with CFLP and created the impression that the CBB transaction also would not constitute a breach of the 1996 Partnership Agreement.
CFLP contends that it allowed the Cowen deal to go forward because that deal was completed before the present Section 3.03 was added to the Partnership Agreement and because Cowen competed with CFLP only in the mortgage-backed securities market, an area of very little or no profitability for CFLP. Plaintiff concedes that it permitted the InterCapital deal to go forward, even though that deal was consummated after Section 3.03 was added to the Partnership Agreement, but notes that ICAP was not allowed to use the system to broker Treasuries. Finally, CFLP points out that it repeatedly denied MDC permission to engage in transactions involving the brokerage of Treasuries. First, CFLP rejected Patriot's proposal to trade odd lots of Treasuries on a system designed by MDC.FN110 Second, CFLP rejected a request from Winstar that sought a proposal from MDC to provide a electronic trading system for the brokerage of odd-lot Treasuries.FN111 Third, CFLP rejected MDC's request to provide an electronic trading system for U.S. Government securities to Fundamental Brokers, Inc.FN112

FN110. Tr. Trans. Vol. XII at 2231-2236.

FN111. Tr. Trans. Vol. II at 317-19 (Lutnick testified that Winstar representatives met with him and the proposed deal was turned down); Tr. Trans. Vol. XXX at 5695 (Seidel testified that MDC independently rejected a transaction with Winstar because they could not agree on a price and because MDC was offered the opportunity to construct an odd-lot system for CFLP, which MDC eventually completed. ( See Seidel 2/5/99 at 982-83)).

FN112. Tr. Trans. Vol. II at 308-11; Vol. XXXVIII at 7023-24.

CFLP also contends that this Court can find no acquiescence on its part as a matter of law because the 1996 Partnership Agreement contains an express non-waiver provision.FN113 Section 20.09 of the 1996 Partnership Agreement states:

FN113. "[A]cquiescence is a species of waiver." *Frank v. Wilson & Co.,* Del. Ch., 9 A.2d 82, 87 (1939), *aff'd,* Del.Supr., 32 A.2d 277 (1943). *See also Realty Growth Invs. v. Council of Unit Owners,* Del.Supr., 453 A.2d 450, 456 n. 6 (1982) ("As we see it,

acquiescence and waiver both go to the extent of any inference which can be reasonably drawn from [plaintiffs'] conduct.").

No provision of this Agreement shall be deemed to have been waived unless such waiver is in writing signed by the waiving party. No such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

Thus, Plaintiff contends that it could not have implicitly waived its rights by its failure to object to the Cowen or ICAP transactions or to any of MDC's other business dealings.[FN114]

FN114. *Marta v. Mutual Life Ins. Co.,* 887 F.Supp. 722, 727 (D.Del.1995).

## C. Analysis

Waiver is a voluntary and intentional relinquishment of a known right. Defendants do not contend, and I find no evidence, that CFLP waived its right to object to the specific acts challenged in this action: the provision of software for the brokerage of Treasuries. Defendants' allegations may be read to assert that the Partnership Agreement was modified by the parties' conduct. Parties may modify a contract by conduct or words,[FN115] but the alleged modification "must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document."[FN116]

FN115. *See Durig v. Woodbridge,* Del.Super., No. 90C-NO-22, Ridgely, P.J., Dec. 8, 1992; *aff'd,* Del.Supr., 622 A.2d 1095 (1993).

FN116. *Reeder v. Sanford School, Inc.,* Del.Supr., 397 A.2d 139, 141 (1979). *See also, Continental Insurance Co. v. Rutledge & Co.,* Del. Ch., C.A. No. 15539, at 19, Chandler, C. (Jan. 10, 2000) (The high evidentiary burden of proving alterations with 'specificity and directness' assists the Court in ruling out "the possibility that the asserting party has alleged an oral modification in an attempt to unilaterally alter a pre-existing, but unfavorable, agreement.").

**\*27** The instant action concerns only MDC's provision of software for the brokerage of Treasuries. MDC has engaged, without objection from CFLP, and without a written waiver, in data enhancement transactions that arguably fall within the definition of Competing Business or Competitive Activity. But, as discussed above in Section III D(1), CFI and its Affiliates are not properly included within the coverage of Section 3.03(a) of the 1996 Partnership Agreement. Thus, they are not prohibited from engaging in a "Competing Business" or "Competitive Activity," unless the actions also violate Section 3.03(b).

CFLP can not prevent MDC from pursuing data enhancement transactions. The MKI, Tullet and Prebon data enhancement transactions, however, are not similar to the conduct at issue in this case and CFLP's approval or failure to contest MDC's participation or insistence upon a signed writing in these transactions does not waive its right to object to MDC's conduct relating to CFLP's core business, the brokerage of Treasuries. I conclude that CFLP has neither acquiesced in MDC's provision of software for the brokerage of Treasuries nor intentionally relinquished its right to object.

## VII. Defendants' Remaining Counterclaim

The only remaining counterclaim is an allegation that CFLP, after the 1996 Settlement Agreement, improperly amended the Partnership Agreement to limit CFI's and Cantor's right to indemnification. Specifically, in their First Counterclaim, Defendants contend that CFLP amended Section 9.05 of the 1995 Partnership Agreement by eliminating a partner's right to receive indemnification for fees and expenses of counsel selected by the partner and by requiring that a partner's choice of counsel first be approved by CFLP's Managing General Partner. According to Defendants, "Section 14.01 of the 1995 Partnership Agreement provides that the 1995 Partnership Agreement 'may not be amended to':

(d) materially adversely affect the economic interest of a Partner in the Partnership ⋯ without the consent of (x) two-thirds in interest of all Partners in the case of an amendment applying in a substantially similar manner to all classes of Units ⋯.[FN117]

> FN117. Answer of Iris Cantor and CFI to Third Amended Complaint, ¶ 105.

The indemnification amendment, according to Defendants, "materially and adversely affects the economic interests" of partners by limiting their right to indemnification. I disagree. Defendants' creative quotation replaced key language from Section 14 .01 with ellipses. The complete text of Section 14.01(d) provides "materially adversely affect the economic interest of a Partner *in the Partnership or the value of Partnership Units by altering the interest of any Partner in the amount or timing of distributions or the allocation of profits, losses or credits* other than any such alteration caused by the acquisition of additional Units by any Partner pursuant to this Agreement or as otherwise expressly provided herein, without the consent ⋯" (emphasis added). Attorney's fees do not fit within this definition or the definition cited by Defendants.

***28** Defendants also claim that the amendment deprived the partners of their "contractual rights to indemnification that, at the time the rights were granted, were described as rights that 'shall remain operative according to their terms and in full force and effect regardless of the termination of the Partnership or any Partner's interest in the Partnership."'[FN118] But Defendants do not assert that their rights have been altered as a result of the termination of the Partnership or their interest in the Partnership. Moreover, the 1996 Partnership Agreement and the 1996 Settlement Agreement provides CFLP with the right to amend the Partnership Agreement *without* the consent of any Limited Partner except as provided above in Section 14.01(d).

> FN118. *Id.* at ¶ 150.

Finally, to the extent that the references in Defendants' First Counterclaim to an action filed in the Supreme Court of the State of New York and to an attempt by Defendants to comply with the terms of Section 14.01 the 1995 Partnership Agreement, may be read as an inartful expression of a claim that CFLP is attempting to deny a vested right, I note that Defendants have failed to provide any evidence to support this claim. Accordingly, on this Counterclaim, I find for Plaintiff.

## VIII. Harm and Remedies

To summarize the findings, Cantor and Fisher have breached the fiduciary duty of loyalty to which they were bound by contract in Section 3.03(b) of the 1996 Partnership Agreement. MDC has aided and abetted the breach of fiduciary duty and tortiously interfered with the 1996 Partnership Agreement. In what way, then, and based upon what proven facts, does equity shape an appropriate remedy?

### A. Allegations of Past Harm

CFLP contends that the threat and launch of MarketPower inflicted harm in several forms. First, CFLP contends that, the CBB/MDC threat forced it to abandon its plans to pursue electronic trading in Europe and to focus instead on the threat posed by MarketPower.[FN119] This change in plan allegedly caused CFLP lost business opportunities. Second, CFLP contends that the threat of competition and actual competition from MarketPower forced it to reduce commissions by offering fixed-fee deals. Third, CFLP contends that the threat of MarketPower delayed and reduced the funds raised by its intended July 1998 private placement of Partnership units to fund the expansion in Europe. Fourth, CFLP contends that the Defendants' actions have damaged the "integrity" of the Partnership Agreement, suggesting to other partners that they may breach the Agreement "assuming that they can successfully defend their actions in court while continuing to receive Partnership Distributions."[FN120] Finally, CFLP contends that it has suffered harm by not being the first to offer inter-dealer electronic trading of Treasuries.

> FN119. While the record establishes that CFLP redirected resources of the firm to meet its

perceived threat of harm from CBB and MDC's collaboration, little concrete evidence of specific monetary damages exists and much speculation about success in Europe pervades the record.

FN120. Post-Trial Brief of Plaintiff Cantor Fitzgerald, L.P. on Issues of Harm and Remedy at 41.

Most of Plaintiff's claims are supported with expert testimony including descriptions of the advantages of being the first to enter a market, the harm that is likely to be caused by a failure to be the "first mover," rough estimates of commissions that CFLP might have been able to earn had it been able to be the first in Europe, and the number and price of fixed-fee commission deals.
**\*29** There is no doubt that the record supports the conclusion that CFLP vigorously reacted to the threat posed by MarketPower and that the reaction negatively affected the business prospects of CBB. There is doubt, however, about the extent to which CBB posed an actual threat to the success of CFLP and, most importantly, the extent to which there is any evidence that the harm CFLP alleges, including lower commissions, CFLP's failure to be the first in other markets, and CFLP's delayed and lower-priced private placement were caused primarily, or at all, by the actions of Defendants and CBB as opposed to other forces in this competitive market. As CFLP concedes, "in hindsight, CBB took little business from CFLP"[FN121] and "CBB ultimately did not succeed." [FN122]

FN121. *Id.* at n. 11.

FN122. *Id.* at 42.

### B. Allegations of Threatened Harm

MDC and CBB's launch of MarketPower proved ultimately unsuccessful and no party now claims that the venture currently operates or that MDC and CBB are presently offering electronic trading. CFLP contends, however, that MDC, through its proprietary software, has the ability to repeat its conduct and has proclaimed its intention to offer electronic trading in the future. CFLP refers to the "reasonable expectation that Cantor Fitzgerald would be harmed by CBB" as "a threat that has now, for reasons specific to CBB, abated."[FN123] Nonetheless it asserts that the expectation of harm "is far from being in the past."[FN124]

FN123. Answering Post-Trial Brief of Plaintiff Cantor Fitzgerald, L.P. on Issues of Harm and Remedy at 29.

FN124. *Id.*

Support for CFLP's contention that MDC intends to engage in actions that will harm CFLP rests largely on evidence that MDC believes the best future for the company rests upon pursuit of deals driven by technology, as opposed to data enhancement. There is no support for the contention that MDC is currently acting or is planning to act in a way that violates the Partnership Agreement. As Seidel testified, MDC intends to proceed with development of broker systems "[o]nly if these proceedings are resolved and [MDC is] allowed to do so. [MDC is] not going to do anything that violates whatever the Court dictates."[FN125]

FN125. Tr. Trans. Vol. XXX at 5757.

I find absolutely no evidence that MDC is currently engaged in or threatening to engage in conduct that violates the Partnership Agreement and that harms or threatens to harm CFLP. I am also unable to conclude that MDC directly caused any specific quantifiable harm to CFLP or that it currently unconscionably, fraudulently, or unfairly engages in revenue producing enterprises upon which a constructive trust should or even could be imposed. Accordingly there is no basis for any of the

extreme forms of relief sought by Plaintiff.<sup>FN126</sup>

> FN126. In its post-trial briefs, CFLP proposes several forms of remedies dependent upon the exercise of the Court's inherent equitable powers including a permanent injunction and several forms of relief aimed at removing the Limited Partners from the Partnership. As discussed below, I find that while the Defendants' breach of the Partnership Agreement was egregious, the harm caused to the Partnership and CFLP may be appropriately remedied by declaratory relief and an award of attorneys' fees.

It is clear, however, that the Limited Partner Defendants have engaged in an egregious breach of the Partnership Agreement, that MDC aided and abetted the breach and tortiously interfered with the Partnership Agreement, and that the conduct of the Limited Partner Defendants was "reasonably expected to harm" CFLP and violated their duty of loyalty in Section 3.03(b) of the 1996 Partnership Agreement. That I find insufficient quantifiable evidence that the Limited Partners caused harm that can be addressed by a specific monetary award of damages is irrelevant to the issue of whether they have breached their fiduciary duty of loyalty or have engaged in actions that "cause[d] harm." CFLP's demand that the Limited Partner Defendants who breached their duty of loyalty be subject to a permanent injunction whose terms would mandatorily remove them from the partnership and result in a forfeiture of their interests simply asks too much of equity. No rational balancing of the equities in this case, after measuring the wrongful conduct of the offending parties against the harm suffered by CFLP would result in the extreme, punitive sanction of a forfeiture of the Limited Partners' interest in CFLP. Admittedly, this longstanding, seething dispute has neither been a profitable diversion of economic resources nor a healing process toward an improved working relationship. Nonethless, however inartfully, equity must try to right the wrongs with adequate remedies that destroy no party in the process.

**\*30** Both parties have devoted an enormous amount of time and effort to present this Court with a thorough analysis of their respective claims and a detailed explanation of their past course of action. Here, like in many originally complex cases brought quickly under alleged exigent circumstances calling for immediate relief, fluid market conditions controlled by business judgment, the positions of the parties and the nature of relief appropriate for equity to impose has changed. CFLP does not face the threat of imminent, irreparable injury. All remaining parties, however, face the need to close the open issues arising from their legal relationship and to encourage predictable and acceptable conduct in the future. The appropriate focus on remedy should be a declaratory judgment, explained by this Opinion, allowing the parties to move forward after assessing the costs of past misjudgment about the relative rights of the parties to the offending actors. Equity arose, after all, from a [D]istinct interest not only in redressing injury but in preventing and mitigating inequity where possible. It [is] far more focused upon the specific nature of the dispute at hand and the promotion of reasonableness in the specific and particularized relationship[s] ...." <sup>FN127</sup>

> FN127. Wolfe and Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 2-2(a), pg. 21 (1998).

The resolution that follows outlines the appropriate redress for past grievances, acts as a sign post for future conduct and removes any room for prospective disagreement about the relative rights of the parties under current Agreements. Therefore, I conclude that:

(1) CFLP's Managing General Partner mistakenly amended the Partnership Agreement without the consent of CFLP's Limited Partners in a manner inconsistent with the 1996 Settlement Agreement. The 1996 Settlement Agreement assures CFI and its affiliates that they will be Limited Partners for all purposes. Therefore, on part of Defendants' Second Counterclaim, I find for Defendants concluding that CFI and its Affiliates are not included within Section 3.03(a) of the 1996 Partnership Agreement. The Partnership Agreement shall be reformed to comply with this ruling.

(2) While there is insufficient evidence to support CFLP's claim that the actions of the Limited Partner Defendants caused monetary harm to CFLP quantifiable in a specific award of damages, the Limited Partner Defendants have breached their contractually imposed fiduciary duty in Section 3.03(b) by disloyally engaging in conduct that could be reasonably expected to and did harm the Partnership.

(3) MDC aided and abetted the Limited Partners' breach of fiduciary duty and tortiously interfered

with the 1996 Partnership Agreement among CFLP and the Limited Partners. The nature of the harm can not be quantified, however, in an award of specific monetary damage.

(4) CFLP's past consent to certain of MDC's business transactions did not constitute a waiver of its right to object to the Limited Partner Defendants engaging in an activity that threatened to harm the Partnership's market position and its ability to raise capital by facilitating a competitor's attempt to broker Treasuries.

***31** (5) CFLP has waived its right to assert that CFI, Cantor and Fisher's participation in data enhancement transactions constitutes a *per se* breach of the duty of loyalty they owe to CFLP and to other CFLP partners. Where transactions proposed by those Limited Partners through MDC or otherwise involve the provision of Treasury data provided by a competitor of CFLP or the transaction involves the provision of other data also generated by CFLP, the Limited Partners must first obtain the written consent of CFLP's Managing General Partner. The Managing General Partner can not unreasonably withhold its consent. A basis to deny consent to the Limited Partner's participation would be a reason to believe that the provision of such data harms an existing business of CFLP.

(6) There is no evidence to support CFLP's claims that the Limited Partner Defendants are currently engaging in or threatening to engage in conduct in violation of the Partnership Agreement. The evidence does not support a view that MDC will engage in such conduct in the future or that it will act contrary to the judgment of this Court declaring the relative rights of the parties in this action. Accordingly, there is no justification for any form of extraordinary injunctive relief.

(7) If there is any "link" between the cost that CFLP incurred to address what it perceived as the threat posed by MDC and CBB, CFLP has waived its right to seek this form of compensatory damage.[FN128]

FN128. *See Fitzgerald v. Cantor,* Del. Ch., C.A. No. 16297, Steele, V.C. (Nov. 11, 1998)

(8) There is no basis for imposition of a constructive trust on MDC's revenues or on MDC's current enterprises. MDC receives no revenues from any source directly resulting from its aiding and abetting the Limited Partners' breach of fiduciary duty nor from its tortious interference with the CFLP Partnership Agreement. Further, there is no evidence that CFI, Cantor or Fisher currently fraudulently, unconscionably, or unfairly or will in the future so derive any monetary benefit from their current breach of the Partnership Agreement. Therefore, no constructive trust can be imposed.

(9) Finally, the Limited Partner Defendants' egregious breach of the 1996 Limited Partnership Agreement, MDC's aiding and abetting the breach of fiduciary duty and tortious interference with contract represents the type of conduct justifying an award of attorney and expert witness fees.[FN129] In general, this Court follows the American rule and parties are required to bear their own litigation expenses. However, this Court may award fees where equity so provides.[FN130] In general, " fees can be awarded only when the party against whom the fees are assessed acted in bad faith, fraudulently, negligently, vexatiously, wantonly or oppressively."[FN131] "[T]o constitute bad faith, the defendants' action must rise to a high level of egregiousness."[FN132]

FN129. *See generally Arbitrium (Cayman Islands) Handles Ag v. Johnston,* 705 A.2d 225 (Del.Ch.1997); *aff'd,* Del.Supr., 720 A.2d 542 (1998).

FN130. 10 *Del. C.* § 5106.

FN131. *See Judge v. City of Rehoboth Beach,* Del. Ch., C.A. No. 1613, at 3, Chandler, V.C. (Apr. 29, 1994) and cases cited therein. *See also, Huntington Homeowners Assoc., Inc. v. 706 Investments,* Del. Ch., C.A. No. 16633, Lamb, V.C. (May 28, 1999).

FN132. *Judge* at 4.

Defendants' actions in this case were egregious. As in *Judge,* "[t]his is not a case where defendants' position was defensible, and reasonable men or woman could differ on the outcome."[FN133] MDC's controlling shareholder and Chief Executive Officer were CFLP Limited Partners with knowledge of the Partnership Agreement. They clearly knew that MDC had entered into a contract to license software

that would directly, unambiguously, and intentionally assist a CFLP competitor in CFLP's core business: the brokerage of Treasuries. That was their goal. They knew that goal to be blatantly incompatible with and harmful to the business objective of CFLP and their partners in that venture.

FN133. *Id.*

*\*32* As early as June 1996, whether one accepts the draft or final minutes of MDC's Board meeting, there was no doubt that Lutnick, on behalf of CFLP, understood MDC's intention, and made it clear that CFLP objected to MDC's proposed provision of software for the purpose of brokering Treasuries to CFLP competitors. Nonetheless, MDC continued to pursue this business opportunity. In October 1997, Cantor, CFI, Fisher and their legal counsel were warned formally in writing that their continued course of conduct violated the Partnership Agreement. At this juncture, Defendants could have attempted a peaceful resolution of the conflict. After this time, there could be no question that their continued efforts to develop and license software for CBB willfully, recklessly, and intentionally violated the Partnership Agreement.

Perhaps some may wonder why this case does not represent a classic example of a disagreement where each side honestly, in good faith, believes that its interpretation of the Partnership Agreement is the correct interpretation. But the testimony of MDC principals on this issue is not credible and does not persuade me that this is an example of a good faith disagreement. To the contrary, I am convinced that Defendants, perhaps for sound business reasons, (mis)assessed the risks of going forward and decided to proceed against the odds.

While Defendants were, of course, free to engage in this risk/benefit analysis, they had no legal justification for their actions. Defendants have failed to demonstrate by a preponderance of the evidence that their actions were justified by the parties' prior course of dealing. No person in the position of Defendants could reasonably conclude that the parties' course of dealing, whether described as CFLP "approving" or CFLP "failing to object" to data enhancement transactions, justified the license of software to CBB for the purpose of developing a platform for dealing in the brokerage of Treasuries. Defendants placed their own economic interests ahead of those of CFLP. They forced CFLP into a position where it had no choice but to defend its business position by attack litigation in its most expensive form: a request for expedited injunctive relief. This is clear evidence of bad faith.[FN134] Equity cannot condone such action.

FN134. *Abex Inc. v. Koll Real Estate Group, Inc.,* Del. Ch., C.A. No. 13462, at 37, Jacobs, V.C. (Dec. 22, 1994) ("Actions by a defendant which necessitate judicial intervention to secure a clearly defined and established right, are evidence of bad faith.").

Every wrong demands a remedy. The only proven harm in this case that may not be remedied by declaratory relief is the unnecessary expense forced upon CFLP to defend against the Defendants' deliberate and egregious breach of the Partnership Agreement. CFLP is entitled to judgment on the merits and to be reimbursed for the fees and costs associated with this litigation.

Plaintiff shall submit an order for declaratory relief consistent with this Memorandum Opinion. An application for fees and expenses will be considered upon presentation. All parties will have an appropriate period of time to respond and be heard.

Counsel has expressed concern that this Opinion might implicate release of confidential material when it becomes available to persons other than counsel and the litigants in this action. Counsel should promptly address these concerns, if any, to the Court immediately after review of this Opinion.

*\*33* IT IS SO ORDERED.

Del.Ch.,2000.

Cantor Fitzgerald, L.P. v. Cantor

Not Reported in A.2d, 2000 WL 307370 (Del.Ch.), 26 Del. J. Corp. L. 236

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.