IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, et al.,                    :
                                          :
                Plaintiffs,               :        No. 97-586-KAJ
                                          :
        v.                                :
                                          :
RONALD O. PERELMAN, et al.,               :
                                          :
                Defendants.               :

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF BEVIS LONGSTRETH,
WILLIAM H. PURCELL, ANDREW S. CARRON, JEFFERY L. BALIBAN,
AND PORTIONS OF THE TESTIMONY OF  JUSTICE JOSEPH T. WALSH,
RET.**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Defendants

DATED:  June 1, 2006

TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.      THE COURT MUST SCREEN IRRELEVANT OR UNRELIABLE
        EXPERT TESTIMONY BEFORE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.     WALSH'S AND LONGSTRETH'S LEGAL CONCLUSIONS
        ARE INADMISSIBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      Walsh's Improper Legal Opinions Should Be Excluded . . . . . . . . . . . . 10

        B.      The Court Should Exclude Longstreth's Legal Opinions . . . . . . . . . . . . 15

III.    THE EXPERT TESTIMONY OF LONGSTRETH AND PURCELL
        FAIL TO MEET DAUBERT'S REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . 20

        A.      Longstreth's Testimony Is Inadmissible Because It Is Wholly
                Unsupported By Any Methodology Or Objective Analysis . . . . . . . . . . 21

        B.      Purcell's Speculative And Subjective Opinions Should Be
                Excluded As Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.     THE COURT SHOULD EXCLUDE THE EXPERT REPORTS OF
        BALIBAN AND CARRON AS UNTIMELY . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

Askanase v. Fatjo,
    130 F.3d 657 (5th Cir. 1997) ................................................................ 10, 11, 12

Brooks v. Price,
    121 Fed. Appx. 961 (3d Cir. 2005) ............................................................ 36

Burkhart v. Washington Metropolitan Area Transit Auth.,
    112 F.3d 1207 (D.C. Cir. 1997) ................................................................ 9

Calhoun v. Yamaha Motor Corp.,
    350 F.3d 316 (3d Cir. 2003) ........................................................... 26, 28, 31

Cantor v. Perelman,
    414 F.3d 430 (3d Cir. 2005) ................................................................ 5, 20

Cede & Co v. Technicolor, Inc.,
    634 A.2d 345 (Del. 1994) ................................................................... 16

Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l., Inc.,
    350 F. Supp.2d 582, 594 (D. Del. 2004) ....................................................... 33

Coregis Ins. Co. v. City of Harrisburg,
    No. Civ. A. 1:03-CV-920, 2005 WL 2990694 (M.D. Pa. Nov. 8, 2005) ............. 9, 10, 19

Crowley v. Chait,
    322 F. Supp. 2d 530 (D.N.J. 2004) ........................................................... 11

Cryovac Inc. v. Pechiney Plastic Packaging, Inc.,
    No. Civ. A. 04-1278-KAJ, 2006 WL 1216220 (D. Del. Apr. 17, 2006) ................. 19, 21

Daubert v. Merrell Dow Pharm., Inc.,
    509 U.S. 579 (1993) ...................................................... 3, 8, 21, 29, 30, 32

Elcock v. K-mart Corp.,
    233 F.3d 734 (3d Cir. 2000) ......................................... 8, 21, 26, 27, 28

Fedor v. Freightliner, Inc.,
    193 F. Supp. 2d 820 (E.D. Pa. 2002) ......................................................... 25

Fedorczyk v. Caribbean Cruise Lines, Ltd.,
    82 F.3d 69 (3d Cir. 1996) ................................................................... 25

i

General Elec. Co. v. Joiner,
    522 U.S. 136 (1997) ........................................................................... 21, 33

Heller v. Shaw Indus.,
    167 F.3d 146 (3d Cir. 1999) ................................................................ 21

Hill v. Equitable Bank, N.A.,
    C.A. No. 82-220 CMW, 1987 WL 8953 (D. Del. Mar. 3, 1987) ................................... 18

Initial Public Offering Sec. Litig.,
    174 F. Supp. 2d 61 (S.D.N.Y. 2001) ..................................................... 9, 19

Kaplan v. Wyatt,
    499 A.2d 1184 (Del. 1985) ................................................................. 17

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999) ............................................................... 3, 8, 21, 29

Lithuanian Commerce Corp. Ltd. v. Sara Lee Hosiery,
    179 F.R.D. 450 (D.N.J. 1998) ............................................................. 33

Magistrini v. One Hour Martinizing Dry Cleaning,
    C.A. No. 02-2331, 2003 WL 21467223 (3d Cir. June 25, 2003) ................................ 21

Oddi v. Ford Motor Co.,
    234 F.3d 136 (3d. Cir. 2000) ................................................... 24, 25, 27, 31

In re Paoli R.R. Yard PCB Litig.,
    35 F.3d 717 (3d Cir. 1994) ..................................................... 8, 26, 27, 31

Stegemeier v. Magness,
    728 A.2d 557 (Del. 1999) .................................................................. 17

In re TMI Litig.,
    193 F.3d 613 (3d Cir. 1999) ............................................................... 33

United States v. Leo,
    941 F.2d 181 (3d Cir. 1991) .............................................................. 3, 9

In re Walt Disney Co.,
    C.A. No. 15452, 2004 WL 550750 (Del. Ch. Mar. 9, 2004) ................................ 10, 11

In re Western Nat'l Corp. S'holders Litig.,
    C.A. No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000) ................................... 18

Williams v. UMG Recordings, Inc.,
     C.A. Nos. 04-56314, 04-56398, 04-56399,
     2006 WL 1307922 (9th Cir. May 12, 2006) ................................................................. 32

## STATUTES

Fed. R. Civ. P. 26(a)(2)(C) ....................................................................................................... 36

Fed. R. Evid. 702 ................................................................................................................... 3, 8

Black's Law Dictionary Eighth Editon (2004) ......................................................................... 20

## NATURE AND STAGE OF THE PROCEEDINGS

In this action, Plaintiffs, the Trustees of the Mafco Litigation Trust, as assignees of certain claims of Marvel Entertainment Group, Inc. ("Marvel"), contend that defendants, who were either directors or indirect shareholders of Marvel ("Defendants") breached their fiduciary duties in connection with three offerings of notes that occurred in 1993 and early 1994 (the "Notes"). The Notes were issued by Marvel's immediate parent corporations, Marvel Holdings Inc., Marvel (Parent) Holdings Inc. and Marvel III Holdings Inc. (collectively, the "Marvel Holdings Companies "), and secured by pledges of the roughly $2 billion worth of Marvel stock owned by the Marvel Holdings Companies.

Under the terms of the notes, the Marvel Holdings Companies agreed that a default would occur if Marvel's business deteriorated and Marvel thereafter incurred additional debt, or if Marvel entered into certain self-dealing transactions, or if the Marvel Holdings Companies no longer owned a majority of Marvel's voting stock. Marvel itself was not a party to these promises and there was no consequence to it if these tests were not met or a default occurred. Plaintiffs contend that the inclusion of these restrictive covenants in the Notes constituted a breach of fiduciary duty.

On December 9, 2002, the Magistrate Judge issued a report recommending that the Court enter an order granting summary judgment in favor of Defendants, and denying Plaintiffs' cross-motion for summary judgment. (D.I. 384). On February 18, 2004, this Court adopted the Magistrate Judge's report in all respects. (D.I. 404). On July

12, 2005, the Court of Appeals for the Third Circuit reversed the grant of summary

judgment in favor of Defendants, affirmed the denial of Plaintiffs' motion for summary

judgment, and remanded the case for further proceedings.

Following the remand, this Court issued a scheduling order dated October

18, 2005 that, among other things, requires the parties to file objections to expert

testimony "by motion no later than June 1, 2006." (D.I. 430 at ¶ 2). Pursuant to that

order, Defendants submit this memorandum of law in support of their motion to exclude

the purported expert testimony of, Bevis Longstreth, Esquire, Messrs. William H. Purcell,

Andrew S. Carron, Jeffrey L. Baliban, and portions of Justice Joseph T. Walsh, Ret.'s

testimony.

## SUMMARY OF ARGUMENT

1.      Defendants move to preclude portions of the testimony of Plaintiffs'

experts Justice Joseph T. Walsh, Retired and Bevis Longstreth, Esquire, on the grounds

that their opinions assert legal conclusions that will not "assist the trier of fact to under-

stand the evidence or to determine a fact in issue." Fed. R. Evid. Rule 702 (emphasis

added).  "[I]t is not permissible for a witness to testify as to the governing law. . . ."

United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991).

2.      Defendants move to preclude the non-legal expert testimony of Longstreth,

and all of the expert testimony of William H. Purcell, on the grounds that their opinions

fail to meet requirements of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93,

597 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  Under

Daubert and its progeny, scientific or technical expert testimony must be based on

identifiable methods and procedures and not "subjective belief or unsupported specula-

tion."  Daubert, 509 U.S. at 590.  The Court should exclude the opinions of Longstreth

and Purcell as unreliable because they are based on their subjective "experience" and

divorced of any methodology providing a testable hypothesis or discernable standards.

3.      Defendants move to preclude the testimony of Jeffrey Baliban and Andrew

Carron on the grounds that their testimony was not timely identified pursuant to the

Court's scheduling orders.

3

## STATEMENT OF FACTS

Plaintiffs have identified five expert witnesses that they intend to introduce at trial in this action. During the first phase of the case, before the Third Circuit's remand, Plaintiffs identified a single expert, William H. Purcell, an investment banker who worked at Dillon Read until 1990 and has since been associated with smaller firms. (Purcell 3/15/02 Rpt. at ¶ 2 A214-15).

Purcell presented his opinions in three separate reports. In his initial report, Purcell explained that he was retained by Plaintiffs to render an opinion as to whether the restrictive covenants in the Indentures of the debt issues for the three Marvel Holdings Companies "were a substantial reason why the issuers could sell such issues to investors." (Id. at ¶ 6 A215). He opined that "the issues could not have been successfully sold without the existence of the restrictive covenants of Sections 4.04, 4.05 and 4.09." (Id. at ¶ 35 A228).

Purcell's second report is styled as a rebuttal to Defendants' expert, Robert W. Holthausen, who opined that Marvel was not harmed by the restrictive covenants in the notes. (Purcell 3/29/02 Rpt. at ¶ 4 A252) Purcell claims that Professor Holthausen's opinion that Marvel was not harmed by the restrictive covenants is based on the false premise that Marvel's capital structure would have been the same even in the absence of the restrictions in the Indentures. (Id. at ¶¶ 5, 6 A252-53). Based on his personal view as to how the board of directors should have arranged Marvel's capital structure, Purcell

4

opines that those restrictions "cause[d] economic harm to Marvel" by limiting its "financing flexibility." (Id. at ¶ 21 A260).

On April 9, 2002, Purcell submitted a supplemental report that for the first time attempted to quantify damages suffered by Marvel. In a cursory, three-page opinion, he asserts that "the restrictions relating to Marvel in the Holding Company Indentures caused actual financial injury and damage to Marvel in the fourth quarter of 1996 in the amount of not less than $470,825,000." (Id. at ¶¶ 5, 12 A252, A255-56).

On July 12, 2005, the Court of Appeals for the Third Circuit issued an opinion reversing this Court's grant of summary judgment for Defendants. Cantor v. Perelman, 414 F.3d 430 (3d Cir. 2005). The Third Circuit's opinion injected a new issue for experts into the case. The Court of Appeals noted "that plaintiffs should at least have the opportunity to establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." Cantor, 414 F.3d at 437. On remand, Plaintiffs' counsel asked for additional expert testimony based on the Third Circuit's decision. Specifically, in a conference held on September 9, 2005, Plaintiffs' counsel stated:

> We will need additional expert testimony, in light of the rulings by the Third Circuit, and the Third Circuit explained in its decision what would be proper and what would not be proper with respect to proving the amount of the unjust enrichment and one of the things the Third Circuit said in its decision: And this is on page 13.
>
> "We note only that plaintiffs should at least have the opportunity to establish through expert testimony what the defendants would have

> had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation."
>
> That's the end of the quote. So as part of the scheduling, we would like an opportunity to present this additional expert testimony. We understand that would mean we would submit a report. The defendants would have an opportunity for a rebuttal report . . . .

(Sept. 9, 2005 Trans. at 5-6 A5-6). The Court orally granted Plaintiffs' request at the hearing, which was subsequently confirmed in a stipulated order dated October 18, 2005.

In the supplemental expert discovery conducted in 2006, Plaintiffs identified three more experts: 1) Jeffrey L. Baliban, who addresses the damages issue previously addressed by Purcell (Baliban Rpt. at ¶ 6 A18; 2) Andrew S. Carron, who analyzed the alleged difference in proceeds that would have been obtained by the Marvel Holdings Companies had they issued the Notes without the disputed covenants (Carron Rpt. at ¶ 2 A72); and 3) Bevis Longstreth, who purported to analyze the nature of the arm's length bargaining that would have resulted between Marvel and the Marvel Holdings Companies had the Marvel Holdings Companies sought Marvel's agreement to the Note offerings. (Jan. Longstreth Rpt. at 2 A181).

Defendants served a report of Professor Lawrence Hamermesh opining as to the Marvel board's ability to dilute the Marvel Holdings Companies' position as majority shareholder and the Marvel Holdings Companies' converse rights to protect themselves from dilution as the law existed in 1993 to 1996.

The parties exchanged rebuttal reports on March 3, 2006. Defendants' rebuttal reports included a report from an investment banker named Peter A. Fowler, who

6

opined on the amount that the Marvel Holdings Companies would have had to pay, after arm's length bargaining, for Marvel to have agreed to the restrictive covenants in the Notes. Plaintiffs served the "rebuttal" report of Justice Walsh, who responds to (and mostly agrees with) Hamermesh's opinion, but also goes on to opine that Defendants breached their fiduciary duties. (Walsh Rpt. at ¶ 12 A281).

The parties engaged in depositions of the experts in April, concluding on April 21, 2006.

Although no further expert reports were called for by the Court's scheduling order, on April 21, 2006, Plaintiffs' counsel sent Defendants' counsel an email stating that Plaintiffs intended to submit a sur-rebuttal report from Longstreth responding to Fowler's analysis of the hypothetical arm's length bargaining. Over Defendants' objection, Plaintiffs served Longstreth's rebuttal report on May 15, 2006. Defendants took another deposition of Longstreth on May 24, 2006.

7

**ARGUMENT**

**I.     THE COURT MUST SCREEN IRRELEVANT OR UNRELIABLE EX-
PERT TESTIMONY BEFORE TRIAL.**

The Supreme Court has directed the District Courts to screen proffered

expert testimony to ensure it meets the requirements of Federal Rule of Evidence 702

before its admission into evidence.  Kumho Tire Co., 526 U.S. at 141; Daubert, 509 U.S.

at 592-93, 597.  Proper exercise of this "gatekeeping" role requires the Court to consider:

(1) qualifications – whether the expert is qualified to speak with authority on a particular

subject or issue; (2) reliability – whether the methodology underlying the testimony is

scientifically valid and based on more than a subjective belief or speculation opinion; and

(3) "fit"– whether there is a relevant "connection between the scientific research or test

result to be presented and particular disputed factual issues in the case."  In re Paoli R.R.

Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994) (citations omitted); see also Elcock

v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) ("Rule 702 embodies three distinct

substantive restrictions on the admission of expert testimony:  qualifications, reliability

and fit.")  In considering "fit", or relevance, the Court should focus on Rule 702's

requirement that the specialized knowledge that will "assist the trier of fact to understand

the evidence or to determine a fact in issue . . . ."  Fed. R. Evid. Rule 702 (emphasis

added).  Defendants move to exclude the testimony of three of Plaintiffs' proffered

experts – Walsh, Longstreth and Purcell – because their testimony addresses purely legal

8

issues, not facts in issue, or because the testimony is insufficiently reliable to be admitted at trial.

## II.     WALSH'S AND LONGSTRETH'S LEGAL CONCLUSIONS ARE INAD-MISSIBLE.

Plaintiffs do not proffer the testimony of Walsh and Longstreth to "assist the trier of fact to understand the evidence or to determine a fact in issue," as Rule 702 requires, but to tell the Court what result to reach as its conclusions of law. "The rule prohibiting experts from providing their legal opinions or conclusions is so well established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle." Coregis Ins. Co. v. City of Harrisburg, No. Civ. A. 1:03-CV-920, 2005 WL 2990694, at *2 (M.D. Pa. Nov. 8, 2005) (quoting In re Initial Pub. Offering Sec. Litig., 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001)). "In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." Id.[1]

The rule excluding legal testimony by experts applies even if the court is sitting as the trier of fact:

> The need to restrict experts from offering legal conclusions is
> obviously most important where the expert is offering testimony to
> a jury as the fact-finder.  In this case, the Court is acting as the

---

[1]     See, e.g., United States v. Leo, 941 F.2d at 196  ("[I]t is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury. . . ."); Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997) (finding reversible error where expert provided legal conclusions, observing that "[e]ach courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards").

9

finder of fact. Nevertheless, the Court finds no reason to apply a
more relaxed standard in this case.

Coregis, 2005 WL 2990694, at *2 n.3.

Here, Plaintiffs intend to proffer two legal experts: Walsh, a retired

Justice of the Delaware Supreme Court, and Longstreth, a retired New York corporate

lawyer. As described below, the testimony of these experts mostly consists of inadmissi-

ble legal opinion.

### A.    Walsh's Improper Legal Opinions Should Be Excluded.

There is no doubt that Walsh intends to testify as to legal conclusions, not

facts. His report reads like a magistrate judge's recommendation. It provides three

paragraphs of legal analysis of the fiduciary duties imposed by Delaware law, then

concludes that the defendants breached their fiduciary duty of loyalty to Marvel in

connection with the issuance of the notes. (Walsh Rpt. ¶¶ 9-12 A279-81). Courts do not

permit an expert to testify that defendants breached their fiduciary duties because such

opinions constitute impermissible legal conclusions. See Askanase v. Fatjo, 130 F.3d

657, 673 (5th Cir. 1997) (holding expert's testimony regarding whether officers and

directors fulfilled their fiduciary duties "is a legal opinion and inadmissible"); In re Walt

Disney Co., C.A. No. 15452, 2004 WL 550750, at *1 (Del. Ch. Mar. 9, 2004) (excluding

law professor's testimony that directors breached their fiduciary duties as an impermissi-

ble legal opinion).

Walsh's view as to how this Court should ultimately rule will not aid this Court as a trier of fact. See Askanase, 130 F.3d at 673; Disney, 2004 WL 550750, at *1. In Disney, Chancellor Chandler excluded a law professor's expert report opining that defendants "breached their fiduciary duties " because the court was "capable – without the assistance of Professor DeMott's testimony – of answering whether the individual defendants breached their fiduciary duties." Id. Indeed, Walsh conceded at his deposition that he does not have an ability to analyze the legal issues in dispute in this case that is superior to the abilities of this Court. (Walsh Dep. at 84 A322).  Furthermore, while this Court will hear all of the evidence at trial before deciding the breach of fiduciary duty question, Walsh reached his conclusion based solely on the summary of facts presented in the Third Circuit's decision reversing summary judgment, which portrayed the evidence in the light most favorable to Plaintiffs, and a small set of documents selected by Plaintiffs' counsel. (Walsh Rpt. at 4 A279; Walsh Dep. at 9 A320).  His failure to consider the full record that this Court will hear at trial renders his opinion unreliable. See Crowley v. Chait, 322 F. Supp. 2d 530, 542 (D.N.J. 2004) ("The information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for Daubert purposes.")

Plaintiffs will undoubtedly point out that Walsh is purportedly a rebuttal expert to Professor Lawrence Hamermesh, an expert identified by Defendants.  Thus, they will argue, Defendants opened this door.  Not so.  There is an important distinction

11

between Hamermesh's opinion, which focuses solely on whether the Marvel board could have diluted the Marvel Holdings Companies' majority position (see Hamermesh Report at 2 A170), and Walsh's opinion that advises the Court to decide the case in favor of Plaintiffs. (See Walsh Rpt. at ¶ 12 A281). Professor Hamermesh's report addresses a historic issue of law that serves as a "fact " in this case. See Askanase, 130 F.3d at 672-73 ("Lawyers may testify as to legal matters when those matters involve questions of fact.") Specifically, Hamermesh's legal opinion is needed in order to construct the hypothetical bargaining that the Third Circuit directed the parties to address through supplemental expert testimony. Defendants' expert on the hypothetical bargaining, Fowler, relies on Hamermesh's legal opinion in assessing how Marvel would have analyzed the potential costs of the alleged restriction on issuing voting stock that dilutes the Marvel Holdings Companies' majority position. (Fowler Rpt. at ¶ 24 A120-21). Based on Hamermesh's opinion, Fowler notes that the Marvel board would not have expected to have the ability to dilute the voting control of a majority shareholder regard-less of the existence of any restrictions in the Notes, and therefore would not have seen the restrictions as a significant cost. Plaintiffs' purported bargaining expert, Longstreth, agreed that Marvel's board of directors, in the course of arm's length bargaining over the terms of the Notes, would "certainly want to consult counsel" as to the board's ability to dilute the majority shareholder. (Longstreth II at 116 A311) Thus, Hamermesh's opinion concerns an issue of law that is a fact in this case. The parties would have needed to consult counsel regarding this legal issue in the course of their hypothetical bargaining, so

12

the fact-finder has to assess what the parties would have reasonably understood the law to be at that time.

Defendants ask the Court to exclude Walsh's improper legal testimony and to limit his opinions to a rebuttal of the narrow "law as fact" issue addressed by Hamermesh: During the relevant time period, did the board of directors have the ability to dilute a majority shareholder, and, conversely, did the majority shareholder have the right to protect itself from dilution? There are portions of Walsh's proffered opinions that fall within this permitted scope. Indeed, in the relevant portions of his testimony, he mostly agrees with Hamermesh. Examples of the permitted scope of Walsh's testimony include:

> Q: All right. And then you also agree with Mr. Professor Hamermesh that a majority shareholder is entitled to protect his majority interest from efforts to eliminate or reduce it?
>
> A: Yes.
>
>       \*     \*     \*
>
> Q: Would you agree with me though that a majority shareholder's right in his capacity as a shareholder is absolute, he can do whatever he wants to as a shareholder to protect his interest, his majority interest?
>
> A: Yes.
>
>       \*     \*     \*
>
> Q: Well, you understood Professor Hamermesh to be acknowledging that although no court had ever found circumstances, the courts had held out the possibility that in extreme circumstances dilution might be possible?
>
> A: Yes.
>
>       \*     \*     \*

13

Q: And he simply opined that it would require a compelling justification that the board would have to show in order to justify that sort of dilution, correct?

A: That's correct.

Q: All right. And that statement, that is, that it would require a compelling justification, is an accurate statement of the law. Is that correct?

A: Yes.

\*        \*        \*

Q: We have earlier agreed that the cases lay down a compelling justification standard, which doesn't seem to my lay ears to be consistent with as long as the board can say that it was advancing the financial viability of the company it can issue equity that dilutes a majority shareholder?

A: I think that's implicit. The board doesn't just go out willy-nilly and engage in financing which has any dilutive effect unless it's required. I think that's a given in all of this. All of the cases talk about that and I accepted those cases and I said at the end of the day it's a contextual test.

Q: With the standard being is this issuance of equity required for the financial viability of the company?

A: Yes. Do we need this? Not simply should we do it? But bearing in mind that this may have a dilutive effect on the interest of the majority shareholder, does the financial situation of the corporation require that we engage in this? If the answer is yes, then I think your board is justified in doing it.

Q: And the reason that that compelling justification is required is because the competing property interest in majority control has been deemed very significant by our courts. Is that correct?

A: That's exactly what I said in the first part of my opinion, it's a valuable property right.

(Walsh Dep. at 89-90, 93-94, 110-12 A321-26).

Defendants submit that Walsh's testimony excerpted above, and any

testimony of a similar subject matter, is appropriate rebuttal to Hamermesh's opinion.

The remainder of Walsh's report and proffered testimony goes beyond the scope of

14

Hamermesh's opinion, and improperly addresses the legal issues before this Court, not the legal issues that would have been considered by the parties in their hypothetical bargaining. As such, on the basis of the uniform and extensive case law cited above, Defendants request that Walsh's legal testimony be excluded as improper expert testimony except for testimony concerning the board's power to dilute a majority shareholder and the majority shareholder's corresponding right to protect itself from dilution, as the law was understood in the 1993 to 1996 time period.

**B.    The Court Should Exclude Longstreth's Legal Opinions.**

Plaintiff's second legal expert, Longstreth, does not openly concede that he is offering legal opinions, as Walsh does, but a review of his report and his testimony demonstrates that at least 5 of the 8 issues he addresses in his original report are legal issues. Longstreth's initial report answered a series of written questions submitted to him by Plaintiffs' counsel in a letter dated December 23, 2005. The letter begins by describing a question drawn from the Third Circuit's opinion:

> We wish to obtain your expert opinion with respect to the nature of the arms'-length bargaining that would have been conducted by Marvel with Perelman, if Perelman had presented to the independent directors of Marvel a request that Marvel assist and acquiesce in the Note transactions as it did. In this regard, Plaintiffs are seeking your views as to the considerations that a director of Marvel would have taken into account as part of this process, and the compensation and other benefits, if any, that a Marvel director would have sought to obtain on Marvel's behalf if Marvel were asked to agree to Perelman's request.
>
> To the extent that you consider it to be relevant, we would appreciate your consideration of the following queries as part of your analysis: [The letter lists eight questions].

15

(Jan. Longstreth Rpt., Ex. C at 4-4 A204-05).

The overall question presented to Longstreth was an appropriate subject for expert testimony – indeed, the Third Circuit directed Plaintiffs to obtain supplemental expert testimony as to this issue. Longstreth explained at his second deposition, however, that in his original report, he did not address the arm's length bargaining issue, but instead focused on the eight specific questions listed in the letter from Plaintiffs' counsel. (Longstreth II at 19-20, 22 A304-05). As the chart below illustrates, five of the eight questions that Longstreth was asked to answer concern legal issues:

| Questions Posed To Longstreth | Legal Answers |
|---|---|
| 1. If you were serving as an "independent director" of Marvel or another public company, could you describe in general terms your role and how you would carry out your obligations? (Emphasis added). | Longstreth cites to the "twin duties of loyalty and care generally expected of corporate directors throughout the country." (Jan. Longstreth Rpt. at 2 A181).<br><br>Actually, there are no federal duties of loyalty and care, but Delaware law imposes on directors the "triad" fiduciary duties of due care, loyalty and good faith. Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 367 (Del. 1994). |

| | |
|---|---|
| 2. In a situation where 80% of Marvel was owned by a large shareholder (companies owned directly or indirectly 100% by Perelman) and the remaining 20% of the shares were held by other (public) shareholders, would that affect the way in which you would perform your obligations as a Marvel director? (Emphasis added). | Longstreth opines: "I would be acutely aware of the fact that only the independent directors could be expected to assert, with undivided loyalty, the best interests of Marvel and all the shareholders, and that to do so could be a particularly difficult responsibility." (Jan. Longstreth Rpt. at 3 A182). |
| | Under Delaware law, a director is independent when he bases his decisions on "the merits of the issue rather than being governed by extraneous considerations or influences." Kaplan v. Wyatt, 499 A.2d 1184, 1189 (Del. 1985). |
| | Furthermore, "[t]he absolute prohibition under common law against self-dealing by a trustee has been modified in the corporate setting. . . ." Stegemeier v. Magness, 728 A.2d 557, 562 (Del. 1999). "Transactions approved by the directors are therefore not voidable because there are interested directors, if a committee of disinterested directors approves the transaction." Id. |

| | |
|---|---|
| 3. If you were a Marvel director and had learned that Perelman was planning to cause his wholly-owned holding companies to issue Notes on the terms that have been described, would you believe that you had <u>an obligation</u> to take any action on behalf of Marvel? (Emphasis added).<br><br>and | "I would demand that Perelman, in his capacity as a Marvel director, after completing his presentation and answering questions from the independent Marvel directors, step aside to allow the independent directors to consider, alone, the impact of the proposed restrictions on Marvel's business." (Jan. Longstreth Rpt. at 5 A184). |
| 4. Since some of the Marvel directors (including Messrs. Perelman, Bevins and Drapkin) were also directors of the holding companies, would discussions between Marvel and the issuers be conducted by those individuals acting simultaneously on behalf of those entities?<br><br>(Longstreth combines his answer to these questions) | "Delaware law generally respects the committee process as a legitimate method to produce disinterested and independent decisions, where some directors on the board, but not on the committee, arguably have conflicting interests." <u>In re Western Nat'l Corp. S'holders Litig.</u>, C.A. No. 15927, 2000 WL 710192, at *26 (Del. Ch. May 22, 2000). |
| 8. Marvel described the Indenture restrictions in various SEC filings of which we provided you copies. As a director of Marvel, would you expect any such descriptions to be accurate and not misleading? | "Of course, the SEC filings by Marvel . . . would have to be accurate and not misleading. . . . The descriptions of the restrictions being imposed on Marvel, as actually contained in the SEC filings, would have been materially misleading if it had been the plan of Perelman and the Note issuers only to honor the covenants imposing restrictions on Marvel if such restrictions did not infringe the best interests of Marvel." (Jan. Longstreth Rpt. at 8 A187).<br><br>"[I]t is for the jury to evaluate the facts of omission and misrepresentation and apply them to the applicable securities law as explained by the judge. In that decision making process, there is no room for an expert law professor." <u>Hill v. Equitable Bank, N.A.</u>, C.A. No. 82-220 CMW, 1987 WL 8953, at *1 (D. Del. Mar. 3, 1987). |

Courts readily see through a party's efforts, such as here, to dress up legal conclusions as facts. See Cryovac Inc. v. Pechiney Plastic Packaging, Inc., No. Civ. A. 04-1278-KAJ, 2006 WL 1216220, at *15 (D. Del. Apr. 17, 2006) (excluding expert's testimony as legal advocacy where he opined, based on his corporate management experience, that alleged contracts were merely price sheets, not contracts, because they did not have sufficient terms); In re Initial Public Offering Sec. Litig., 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (excluding affidavits from "experts on ethics" opining that judge should recuse herself because the affidavits were legal opinions). For example, in Coregis, 2005 WL 2990694, at *1, 3, the defendant submitted an expert report purporting to explain the scope of coverage under disputed insurance policies and their application to a particular claim. The court found that it was

> inappropriate for [the defendant] to pass off this expert report as the objective analysis of purely factual issues concerning commercial liability policies when the heart of the report is awash in legal conclusions regarding the proper method of interpreting insurance contracts – and is filled with legal argument regarding the state of the law in Pennsylvania that bears a striking resemblance to the very arguments made by [the defendant] in its briefs filed in this case.

2005 WL 2990694, at *5.

Moreover, the five legal issues described above, which Longstreth analyzes at length in his initial report, will not assist the Court as trier-of-fact for two reasons. First, as noted above, the Court has sufficient expertise to identify the directors' duties and obligations under Delaware corporate law. Second, the legal issues discussed by Longstreth are not even pertinent to the central issue raised by the Third Circuit in its

opinion and restated by Plaintiff's counsel in his letter to Longstreth: "What [is the amount that] the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation[?]" Cantor, 414 F.3d at 437. The five legal issues addressed by Longstreth concern his view that the directors' obligations (i.e., fiduciary duties) required them to act independently, but the Third Circuit's question presupposes that any bargaining would be "arm's length," i.e., "[o]f or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power . . . ." Black's Law Dictionary, Eighth Edition (2004). The issue raised by the Third Circuit that requires expertise is not whether the bargaining should have been arm's length, but what would have been the result of such hypothetical arm's length bargaining.

Only three of eight issues addressed by Longstreth in his initial report – issues 5, 6 and 7 – and his rebuttal report address the factual issue of how such hypothetical bargaining would have proceeded. This portion of his proffered testimony does not run afoul of the prohibition on legal testimony, but these opinions are nevertheless inadmissible because, as explained below, they fail to meet Daubert's reliability requirements.

III.    THE EXPERT TESTIMONY OF LONGSTRETH AND PURCELL FAIL TO MEET DAUBERT'S REQUIREMENTS.

In determining whether scientific or technical testimony is admissible, the Court must examine the methodology underlying the testimony to determine whether the

expert's conclusions are based on "good grounds." <u>Daubert</u>, 509 U.S. at 590.  In other

words, the Court "must examine the expert's conclusions in order to determine whether

they could reliably follow from the facts known to the expert and the methodology used."

<u>Heller v. Shaw Indus.</u>, 167 F.3d 146, 153 (3d Cir. 1999).  "The expert must explain how

and why he or she has reached the conclusion being proffered and must have as a basis

more than a subjective belief or speculation." <u>Cryovac</u>, 2006 WL 1216220, at *12 (citing

<u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 144 (1997)).

　　　　As explained below, the proffered expert testimony of Longstreth and

Purcell cannot survive the rigorous requirements of <u>Daubert</u> and its progeny for the

admission of scientific or technical testimony.

### A.　Longstreth's Testimony Is Inadmissible Because It Is Wholly Unsupported By Any Methodology Or Objective Analysis.

　　　　It is a fundamental rule of evidence that an expert's opinion must be "based

on the 'methods and procedures of science' rather than on 'subjective belief or unsup-

ported speculation.'" <u>Daubert</u>, 509 U.S. at 590.  "Nothing in either <u>Daubert</u> or the Federal

Rules of Evidence requires a district court to admit opinion evidence that is connected to

existing data only by the <u>ipse dixit</u> of the expert." <u>Kumho</u>, 526 U.S. at 137, 157 (quoting

<u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997)).  <u>See also</u> <u>Magistrini v. One Hour</u>

<u>Martinizing Dry Cleaning</u>, C.A. No. 02-2331, 2003 WL 21467223, at *1 (3d Cir. June 25,

2003) (same); <u>Elcock</u>, 233 F.3d at 749 (same).

Longstreth's opinions, to the extent that they are not legal opinions, are based entirely on his say-so, and not on any objective, analytical process or methodology. In his initial report, he identifies concerns he would have as a director negotiating the terms of the Notes, but offers no explanation of the bases for these concerns, or possible ways to ameliorate these concerns. For example, he states he would be concerned about "the 'bet the ranch' nature of accepting restrictions, that, depending on future events that I could not reasonably anticipate, might so restrict Marvel as to cause its demise." (Jan. Longstreth Rpt. at 7 A186). But his report offers no explanation as to why the restrictions would create this "bet the ranch" situation.

Longstreth's four page rebuttal report purports to respond to Fowler's analysis of the hypothetical negotiations between Marvel and the Marvel Holdings Companies. Fowler, in analyzing the arguments that each side would have brought to the negotiations, extensively examined the costs to Marvel from the alleged restrictions, such as cash costs or reduced financial flexibility, and the benefits received by the Marvel Holdings Companies from the alleged restrictions. (See Fowler Rpt. at ¶¶ 6-58 A112-35) Longstreth did not perform any similar analysis, but merely rejects Fowler's work with ipse dixit assertions. (See Longstreth Rebuttal Rpt. p. 2-4 A210-12).

Thus, in response to Mr. Fowler's extensive analysis of the benefits to Mr. Perelman from the Notes, which analyzes the Marvel Holdings Companies' financial goals, the need to include the alleged restrictions to achieve such goals, and alternative financing strategies available to the Marvel Holdings Companies, Longstreth provides the

22

following conclusory assertion:  "As to benefits, the wealth extraction from Marvel

accrued solely to the benefit of Ronald O. Perelman.  Nothing of benefit accrued to

Marvel or its minority shareholders."  (May Longstreth Rpt. at 2 A210).  At his deposi-

tion, Longstreth was unable to provide further support for his views.  (See Longstreth II at

63-64  A309 (Q:  "Do you have anything more specific in response to Mr. Fowler's

several page analysis of the benefits to Mr. Perelman beyond the two sentences that I see

here on page 2 of your rebuttal report?" * * * A:  "I have nothing to add.")).

When pressed further as to his views of Mr. Fowler's analysis of the

alternatives that the Marvel Holdings Companies had to pursue their financing objectives

with the alleged restrictions, Longstreth testified as follows:

> Q:  What analysis did you perform, if any, with respect to the question of
> whether MacAndrews & Forbes had alternatives to the restricted covenants in its
> pursuit of a financing?
>
> [objection omitted]
>
> A:  I considered all of this.  I have nothing to add.
>
> Q:  . . . So what other than you considered it, can you tell me anything more?
>
> A:  It's in my report.
>
> Q:  Can you show me where in your report?
>
> A:  It's throughout my report.
>
> Q:  Can you show m[e] any specific point of your report where I can find it?
>
> [objection omitted]
>
> Q:  If you can show me where in your report I can find this answer, I would
> appreciate that.

23

A: It's on every page. I can't pinpoint it. . . .

(Longstreth II at 58-60 A308).

Although Longstreth criticizes Fowler's methodology, he offers no

objective criteria to support his views other than common sense:

Q: Have you done any analysis of the documents that Mr. Fowler looked at or any other documents relating to the negotiation or structuring of the notes?

A: I have done -- I have spent a whole career doing secured borrowings. And I think I know what's in the minds of people in general when they take a pledge of stock and impose covenants on a company that is the issuer of the stock. And it isn't simply the value, the public market value of the stock, if it has a public market. It is a bundle of things. There is an upside and a downside. And I think it is very difficult to say that these noteholders had no interest in operational controls that they bargained for and which we find in the agreement.

Q: What is your basis for that?

A: Common sense.

Q: Other than common sense, did you do any analysis of the underwriter's memos or similar transactions or anything like that to support your view?

A: No, I'm basing my view on my experience of doing a large number of secured note agreements.

(Longstreth II at 68-69 A310).

Defendants submit that "common sense" cannot be the basis for an expert's

opinion. We have no doubt that the Court is imbued with common sense and does not

need Mr. Longstreth's help in that regard. In addition, courts routinely exclude experts

from testifying where their opinions have no analytical or objective support beyond their

24

own purported experience and judgment. See, e.g., Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d. Cir. 2000) (affirming District Court's exclusion of expert testimony because it was "based on nothing more than his training and years of experience. . . . ."); Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 75 (3d Cir. 1996) (stating that "if an expert opinion is based on speculation or conjecture, it may be stricken") (citing 1 McCormick on Evidence § 13, at 56 n.15).

The unreliability of Longstreth's testimony is best demonstrated by the fact that he simply made up "the order of magnitude of $150 million" figure that Plaintiffs intend to introduce as the basis for a monetary award by this Court. (May Longstreth Rpt. at 4 A212). Longstreth admitted that he did not employ any discernable methodology in computing the $150 million figure. See, e.g., Longstreth II at 150 A312 (Q: . . . "Can you explain to me the methodology that you used to reach that 150 million dollar figure?"; A: "Well, it wasn't rocket science or science of any kind."); Longstreth II at 90 ("I have no formulaic approach to this."). Longstreth offers no explanation for how he came up with the number other than to label it a "ballpark judgment." (Longstreth II at 150 A312). The Court should not allow Longstreth to introduce his $150 million "ball-park" figure because the complete lack of an identifiable methodology to support it leaves Defendants with no ability to meaningfully break it down or reduce it on cross-examination. See Fedor v. Freightliner, Inc., 193 F. Supp. 2d 820, 829-30 (E.D. Pa. 2002) (excluding expert opinion consisting of speculation informed by training and experience because it "lack[ed] any identifiable methodology which defendants could challenge").

25

Longstreth's opinion flunks every factor of the Third Circuit's multi-factor test for evaluating whether a particular scientific or technical methodology is reliable:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Paoli, 35 F.3d at 742 n.8. Accord Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003). In particular, Longstreth's opinion lacks a "testable hypothesis" and "standards controlling the technique's operations . . . ." The Third Circuit has imposed "the gist" of these requirements to non-scientific expert testimony. Elcock, 233 F.3d at 747. See also Oddi, 234 F.3d at 151. In Elcock, the Third Circuit remanded a case for a Daubert hearing to consider whether a vocational rehabilitation expert's opinion that the plaintiff suffered a 50 to 60 percent disability was reliable. Id. The court explained:

> Just as a scientist would want to duplicate the outcome when evaluating a technique for cold fusion, a vocational rehabilitationalist assessing [the expert's] disability determination would want to test the underlying hypotheses and review the standards controlling the technique's operation in an attempt to reproduce the results originally generated. If such testing did not generate consistent results, [the expert's] method would be exposed as unreliable because it is subjective and unreproducible. Moreover, without an inkling as to the standards controlling [the expert's] method-i.e., how he excludes for other variables, such as [the plaintiff's] pre-existing injuries or job limitations–an expert trying to reproduce [the testifying expert's] methods would be lost.

26

Id. at 747-48.

Here, <u>Longstreth himself</u> does not know what standards control the methodology he employed and <u>he cannot reproduce his own results</u>. He was asked at his deposition to use his methodology to apportion his $150 million overall figure to the three separate Note offerings, which took place sequentially between April 1993 and February 1994. Longstreth could only offer that the amount obtained in bargaining would be "smaller" and that "the percentage of the proceeds I would ask for would probably go up as the amount raised went down," but he admitted he was "stumped" and couldn't "answer that question with any precision." (Longstreth II at 155 A313). As even Longstreth cannot replicate his results or identify with precision the standards he employed to reach his conclusion, his testimony clearly fails the Third Circuit's criteria for expert testimony set forth in <u>Paoli</u>, <u>Elcock</u> and <u>Oddi</u>.

Finally, in addition to the unreliability of Longstreth's methodology, Longstreth also cannot satisfy the qualifications leg of the three legged standard for expert testimony in this Circuit because he personally lacks sufficient financial expertise and did not rely upon any qualified financial expert. Longstreth's initial report states that the directors would have engaged expert counsel and investment bankers and would have "direct[ed] their advisers to negotiate with Perelman and the investment banks with a view to completing the transaction necessary to give Marvel its benefits as a condition to the issuance of the Notes." (Jan. Longstreth Rpt. at 7-8 A186-87). Before issuing his rebuttal report, Longstreth did not consult with any legal or financial advisors, nor did he

27

rely on any of the reports or opinions expressed by any other expert (financial or other-

wise).  (Longstreth II at 11-12, 30-31 A305-06).

While Longstreth's experience as a longtime corporate attorney likely

obviated the need for legal counsel, he admitted that he would not be a suitable candidate

for the financial advisor who would have handled the negotiations.  (Id. at 31-32 A306)

Thus, by his own admission, he lacked the financial expertise to conduct these financially

complex negotiations and he did not rely upon any other expert to make up for that lack

of expertise.  For this reason, the Court should not qualify him as an expert to testify

about the hypothetical bargaining between Marvel and the Marvel Holdings Companies.

See Calhoun, 350 F.3d at 324 (restricting expert testimony because of the expert's

"paucity of knowledge" regarding the specifics about which he sought to testify).  In the

event that the Court determines that Longstreth's lack of financial expertise does not

alone bar his testimony, Defendants note that "the marginal nature of [an expert's]

qualifications does enter into the Daubert calculus . . . ."  Elcock, 233 F.3d at 744.

Accordingly, Defendants request that the Court exclude the non-legal

portion of Mr. Longstreth's expert testimony as unreliable.

> **B.    Purcell's Speculative And Subjective Opinions Should Be Excluded As Unreliable.**

Plaintiffs' original expert, Purcell, employs the same flawed technique as

Longstreth – he offers "expert" conclusions based entirely on his experience and without

any reference to any methodologies or objective criteria.  For this reason, Purcell's

28

testimony also falls well short of the admissibility standards set forth by the Supreme

Court in Daubert. 509 U.S. at 579. See also Kumho, 526 U.S. at 157.

Purcell offers three opinions spaced out over three reports. In his first

report, Purcell asserts that the Notes "could not have been successfully sold without the

existence of the restrictive covenants of Sections 4.04, 4.05 and 4.09." (Purcell 3/15/02

Rpt. at ¶ 35 A228). In his second report, which purports to rebut Holthausen's opinion

that Marvel was not harmed by the restrictive covenants in the Notes, he asserts that

Marvel was injured because it purportedly would have had a different capital structure in

the absence of the Notes. (Purcell 3/29/02 Rpt. at ¶¶ 5, 6, 21 A252-53, A260). In his

third report, he purports to quantify the damages suffered by Marvel, which he lists as

$470,825,000. (Purcell 4/9/02 Rpt. at ¶¶ 5, 12 A274-75). These assertions are typically

presented as Purcell's ipse dixit "opinion" and supported, if at all, by reference to Purcell's

experience as an investment banker:

- *Based upon my experience as an investment banker*, in the absence of the Holding Company debt made possible by Section 4.04 and other restrictions relating to Marvel, it would have been extremely unlikely that Marvel would have financed its aggressive acquisition program almost entirely with commercial bank debt. Rather, Marvel *probably would have* financed its acquisition program with a combination of long-term debt and equity, which would have afforded significant advantages over bank debt. (Purcell 3/29/02 Rpt. at ¶ 7 A253) (emphasis added).

- *In my opinion, and based on my experience as an investment banker*, the target capital structure for a company such as Marvel would have been no more than 30% debt and at least 70% equity. . . . Such a capital structure would have afforded Marvel greater flexibility and would likely have enabled Marvel to avoid the liquidity crisis and bankruptcy filing in late 1996. (Id. at ¶ 19 A259) (emphasis added).

29

- *It is my opinion* . . . that the restrictions relating to Marvel in the Holding Company Indentures caused actual financial injury and damage to Marvel in the fourth quarter of 1996 in the amount of not less than $470,825.00. (Purcell 4/9/02 Rpt. at ¶ 5 A274) (emphasis added).

A critical aspect of Purcell's theory that Marvel was harmed is his assertion that the restrictive covenants in the Notes precluded Marvel from using equity, rather than debt, to finance its acquisitions in the early to mid-nineties. (Purcell 3/15/02 Rpt. at ¶ 35 A228; Purcell 4/29/02 Rpt. at ¶¶ 6, 7, 9, 12 A274-75). He opines that the "target capital structure for a company such as Marvel [would] have been no more than 30% debt and at least 70% equity" and that such a capital structure "likely [would] have enabled Marvel to avoid the liquidity crisis and bankruptcy filing in late 1996." (Purcell 3/29/02 Rpt. at ¶ 19 A259). However, instead of basing that assertion on "good grounds," Daubert, 509 U.S. at 590, Purcell made up the 30/70 ratio he espouses:

> Q: You express the opinion on Paragraph 19 the target capital structure for a company such as Marvel would have been no more than 30 percent debt and at least seventy percent equity. Do you see that?
>
> A: I do.
>
> Q: Is that a ballpark figure, estimate, mathematically precise? What is that?
>
> A: No, it's an order of magnitude number. . . . *Based on my experience* a company like Marvel which is a non-asset related company, but a brand people type of company that [sic] type of company *generally investment bankers* and academics would say everything else being equal should have a lower amount of debt in its capitalization than something like a Gillette that sells razor blades that's very predictable and has a number of plants and tangible assets and what have you.
> So *this is an order of magnitude judgment that in my view most investment bankers would say in advising a company* Marvel [sic] independent, if you will, that the sound capital structure for you going forward in terms of when you're selling equity and how you're financing acquisitions would be a debt position of

30

> less than fifty percent *and in my judgment* they'd probably say at a maximum no
> more than thirty-five to forty percent.

(Purcell Dep. at 125-27 A315-16) (emphasis added).  Purcell purports to base his

personal, subjective views on the work of "prominent academicians" and the "majority of

people" but he does not identify these supposed academics or any surveys of business

people.

> Q: But it wasn't thought to be that much hooey [to be highly leveraged]
> back in '93, '94 and '95 as you say it is thought to be so now, right? . . .
>
> A: I would disagree.  I would say that the more prominent academicians
> as well as businessmen did not believe that to be true.  The majority of
> people never believed that to be true.  The people who were supporting
> LBOs and we believed it to possibly be true, *but I believe in my view and
> having lived through this era that that was the minority of people.*

(Purcell Dep. at 136-40 A317-18) (emphasis added).

Purcell's speculation, informed only by his "experience," is no more

reliable than Longstreth's unsupported assertions.  His unsupported speculation does not

satisfy Daubert.  See, e.g., Oddi, 234 F.3d at 158.  His opinion is inadmissible because it

lacks a "testable hypothesis" and "standards controlling the technique's operations . . . ."

Paoli, 35 F.3d at 742 n.8.  Accord Calhoun, 350 F.3d at 321.[2]

Purcell's damages calculation in his supplemental report is as unsubstanti-

ated as his assertions about Marvel's capital structure.  The financial analysis portion

---

[2]  Plaintiffs must have recognized the inadmissible nature of Purcell's speculative,
unsupported opinion because they have transparently sought to take advantage of
the supplemental expert testimony period to replace Purcell with Baliban.  At his
deposition, Baliban acknowledged that his opinion regarding the alleged effect that
the restrictive covenants would have had on Marvel's capital structure was "very
similar" to the opinion offered by Purcell in his report.  (Baliban Dep. at 62 A298).

31

supporting his contention that Marvel suffered damages in the amount of at least $470,825,000 consists of just three sentences. (<u>See</u> Purcell 4/9/02 Rpt. at ¶¶ 11-12 A280-81). Purcell reaches this figure by first noting that defendant the Andrews Group Incorporated ("Andrews"), which made a proposal to invest additional funds into Marvel at 87¢ per share (the "Andrews Proposal"), did not want to invest its funds without the consent of the holders of the Notes. (<u>See id.</u> at ¶¶ 6-12 A278-81) Based on what he perceives to be the thwarting of the Andrews Proposal by the terms of the Notes, he calculates damages by multiplying the number of outstanding common shares "[p]rior to Marvel's bankruptcy petition in late December 1996" (101.9 million) by the price that Marvel closed at on November 11, 1996 ($4.625), the day before the Andrews Proposal. (<u>Id.</u> at ¶ 12 A275). Purcell's conclusory damages analysis assumes that the drop in Marvel's stock price from its trading value on November 11, 1996, to its eventual cancellation years later, is entirely attributable to the terms of the Notes. (<u>See</u> Purcell Dep. at 160 A318a). His report has no discernable methodology that controls for other factors or effects, such as the fact that Andrews' offering price of 87¢ per share may have caused Marvel's stock price to drop from $4.625.

      Purcell's conclusory and simplistic measurement of damages is devoid of the methodological rigor demanded by <u>Daubert</u>. <u>See id.</u>, 509 U.S. at 593-94; <u>Williams v. UMG Recordings, Inc.</u>, C.A. Nos. 04-56314, 04-56398, 04-56399, 2006 WL 1307922, at *3 (9th Cir. May 12, 2006) (affirming District Court's exclusion of expert testimony for failure to provide "rigorous methodology" in damages calculations). Indeed, as with

Purcell's capital structure opinion, Plaintiffs apparently recognized that Purcell's unsup-

ported and speculative assertion would be excluded under <u>Daubert</u>, so they have sought to

replace him with Baliban. Baliban agreed that his "event study" that purports to calculate

damages covers the same issue as Purcell, but Baliban noted that his study was "some-

thing very much more proximate in the specific time of the announcements being

made . . . ." (Baliban Dep. at 66-67 A299). Baliban testified that, unlike Purcell's flawed

and simplistic analysis, it is both Baliban's practice and the usual practice for an expert

performing an event study "to attempt to narrow the event window as much as possible to

increase the likelihood that your – that the results are statistically significant and are

appropriately being assigned to the specific circumstances." (<u>Id.</u> at 68 A299)  Thus,

Plaintiff's replacement expert, Baliban, essentially declared Purcell's analysis to be

unsound.

In sum, Purcell's damages opinion does not provide an even remotely

adequate explanation to bridge the "analytical gap between the data and the opinion

proffered." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).  <u>See also In re TMI Litig.</u>,

193 F.3d 613, 716 (3d Cir. 1999) (stating that expert's methodology was "flawed under

<u>Daubert</u> as it was not calculated to produce reliable results"); <u>Chemipal Ltd. v. Slim-Fast

Nutritional Foods Int'l, Inc.</u>, 350 F. Supp. 2d 582, 594 (D. Del. 2004) (excluding expert's

opinions as unverifiable because he failed to "develop[] enough of an objective basis in

the record for such opinions"); <u>Lithuanian Commerce Corp. v. Sara Lee Hosiery</u>, 179

F.R.D. 450 (D.N.J. 1998) (excluding expert's damage calculations because they relied on

speculative and unsupported assumptions). Accordingly, his testimony should be
excluded.

## IV.     THE COURT SHOULD EXCLUDE THE EXPERT REPORTS OF BALIBAN AND CARRON AS UNTIMELY.

Finally, the expert reports of Baliban and Carron should be excluded
because those experts do not even purport to address the new issue raised by the Third
Circuit, which means their reports should have been submitted in April 2002. This
Court's February 6, 2002 amended scheduling order required <u>all</u> expert opinions to be
disclosed on or before April 10, 2002. (D.I. 201 at ¶ 4(d)). The only expert Plaintiffs
identified by that deadline was Purcell.

Plaintiffs received a limited right to provide additional (not replacement)
expert testimony at a teleconference held on September 9, 2005. Plaintiffs' counsel asked
permission to provide additional expert testimony "in light of the rulings by the Third
Circuit" and quoted the Third Circuit's statement that Plaintiffs "should at least have the
opportunity to establish through expert testimony what the defendants would have had to
pay Marvel, after arm's length bargaining, for the restrictions defendants secured without
compensation." (Sept. 5, 2005 Tr. at 5 A5). Based on Plaintiffs' representation that they
required additional expert testimony to address the issue raised by the Third Circuit, the
Court granted Plaintiffs' request. (Sept. 5, 2005 Tr. at 9 A9; D.I. 430, Oct. 18, 2005
Order).

When Plaintiffs submitted additional expert testimony on January 13,

2006, on the face of the reports only one of Plaintiffs' three new experts, Longstreth, even

purported to address the new issue injected into the case by the Third Circuit.[3] Baliban's

report addresses the exact same subject matter that Purcell covered in 2002. When shown

Purcell's reports at his deposition, Baliban conceded that a comparison of Purcell's reports

to his own reveals that Purcell comes to a "very similar conclusion with regard to the

impact that the restrictive covenants had on Marvel 's ability to access capital markets or

obtain financing on terms in Marvel's best interest . . . ." (Baliban Dep. at 62-63 A298).

Baliban also admits that Purcell's damages analysis had findings that are "sufficiently or

significantly similar to [his]." (Baliban Dep. at 65 A298). Nothing in the Third Circuit's

opinion caused Plaintiffs to obtain expert testimony from Baliban – he is a replacement

expert, not a supplemental expert. Baliban's opinions should have been disclosed in April

2002, not January 2006, and they should now be stricken as four years too late.

Similarly, Carron does not address the issue raised by the Third Circuit

that Plaintiffs used to justify their request for additional expert testimony. Instead, Carron

analyzed alternatives to issuing the Notes without the covenants – a subject that was

explicitly addressed in Purcell's original report. (Compare Purcell 3/15/02 Rpt. ¶¶ 23-35

---

[3]      Longstreth asserts that although he was asked prior to the filing of his January 13
Report to address the question of what compensation Marvel would have received,
after arm's length bargaining, for agreeing to accept the terms of the Notes, he did
not actually address this question until he wrote his "rebuttal" report, which was not
served until May 15, 2006. (Longstreth II at 19-20, 22 A304-05)

35

A224-28 with Carron Rpt. ¶¶ 19-21 A76-77)[4] Thus, Carron's report also should have

been disclosed in April 2002; four years later, it should be stricken.

   This Court permitted additional expert testimony based on Plaintiffs'

express representation that such testimony was needed in light of the Third Circuit's

opinion. Plaintiffs did not advise Defendants or the Court that they sought additional

experts in order to replace Purcell's testimony on the very issues he analyzed four years

ago. Plaintiffs should have identified Carron and Baliban in April 2002 pursuant to the

February 6, 2002 order. As they did not comply with that order, the Court should

exercise its discretion to preclude Plaintiffs from offering the opinions of Baliban and

Carron at trial. See Fed. R. Civ. P. 26(a)(2)(C); Brooks v. Price, 121 Fed. Appx. 961, 965

(3d Cir. 2005) (affirming the District of Delaware's decision to exclude an expert report

filed after the discovery cut-off date).

---

[4] Plaintiffs' counsel admitted Carron's report does not respond to the Third Circuit's
question in an email dated April 21, 2006, in which he insisted that Fowler's
"opinion as to the question raised in the Third Circuit decision concerning how
much the defendants would have had to pay Marvel if there had been arms-length
bargaining" was not a rebuttal of anything in Carron's report. Id. In other words,
even Plaintiffs acknowledge that the Third Circuit's question was not addressed by
Carron.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the expert testimony of Bevis Longstreth, Esquire, William H. Purcell, Jeffrey L. Baliban, Andrew S. Carron and portions of the testimony of Joseph T. Walsh should be granted.

Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000

Attorneys for Defendants

DATED:  June 1, 2006