IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, et al.,                    :
                                          :
                 Plaintiffs,              :        No. 97-586-KAJ
                                          :
        v.                                :
                                          :
RONALD O. PERELMAN, et al.,               :
                                          :
                 Defendants.              :


**COMPENDIUM OF UNREPORTED OPINIONS TO
DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF BEVIS LONGSTRETH,
WILLIAM H. PURCELL,  ANDREW S. CARRON,  JEFFREY L. BALIBAN,
AND PORTIONS OF THE
TESTIMONY OF JUSTICE JOSEPH T. WALSH, RET.**


SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Defendants.


DATED: June 1, 2006

# TAB 1

# INDEX

CASES                                                                                          TAB

Coregis Ins. Co. v. City of Harrisburg,
    No. Civ. A. 1:03-CV-920, 2005 WL 2990694 (M.D. Pa. Nov. 8, 2005) ........................ 1

Cryovac Inc. v. Pechiney Plastic Packaging, Inc.,
    No. Civ. A. 04-1278-KAJ, 2006 WL 1216220 (D. Del. Apr. 17, 2006) ........................ 2

Hill v. Equitable Bank, N.A.,
    C.A. No. 82-220 CMW, 1987 WL 8953 (D. Del. Mar. 3, 1987) .................................... 3

Magistrini v. One Hour Martinizing Dry Cleaning,
    C.A. No. 02-2331, 2003 WL 21467223 (3d Cir. June 25, 2003) .................................... 4

In re Walt Disney Co.,
    C.A. No. 15452, 2004 WL 550750 (Del. Ch. Mar. 9, 2004) ........................................... 5

In re Western Nat'l Corp. S'holders Litig.,
    C.A. No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000) ......................................... 6

Westlaw.

Slip Copy

Slip Copy, 2005 WL 2990694 (M.D.Pa.)
(Cite as: Slip Copy)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
  United States District Court,M.D. Pennsylvania.
  COREGIS INSURANCE COMPANY, Plaintiff
v.
CITY OF HARRISBURG, et al., Defendants and
Third-Party Plaintiff
v.
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, et al., Third-Party Defendants
**No. Civ.A. 1:03-CV-920.**

Nov. 8, 2005.

Clay H. Phillips, Darcy L. Ibach, Richard M. Kuntz,
Bollinger, Ruberry & Garvey, Chicago, IL, Jeffrey
R. Boswell, Boswell, Tintner, Piccola &
Wickersham, Harrisburg, PA, for Plaintiff.
Timothy T. Myers, Elliott, Greenleaf &
Siedzikowski, Blue Bell, PA, William R. Balaban,
Elliott Greenleaf Siedzikowski & Balaban, Ronald
L. Finck, Andrew Hilton Dowling, Mette, Evans &
Woodside, Harrisburg, PA, for Defendants and
Third-Party Plaintiff.
Henri Marcel, Deasey, Mahoney & Bender, Ltd.,
John C. Grugan, Ballard Spahr Andrews &
Ingersoll, LLP, Philadelphia, PA, Brett M.
Woodburn, James L. Goldsmith, Ray J.
Michalowski, Caldwell & Kearns, Harrisburg, PA,
for Third-Party Defendants.

*MEMORANDUM AND ORDER*
KANE, J.
*1 Pending before the Court are motions by
Third-Party Defendants CNA Financial Corporation
and St. Paul Fire & Marine Insurance Company to
strike the expert report of Douglas Talley, which
Harrisburg offered in support of the city's motions
for summary judgment against both parties. (Doc.
Nos.232, 236.) Harrisburg filed a consolidated
response to both motions. (Doc. No. 239.) For the
reasons that briefly follow, the motions will be
granted and the expert report will be stricken.

I. Introduction

On June 2, 2003, Coregis Insurance Company
commenced the instant action by filing a complaint
seeking a declaratory judgment that certain
insurance policies issued to Harrisburg and Dauphin
County do not provide coverage for the underlying
litigation of *Steven D. Crawford v. Commonwealth
of Pennsylvania, et al.,* Civil Action No.
1:CV-03-693 (*"Crawford"* ).[FN1] Harrisburg and
Dauphin County each answered Coregis's complaint
on August 4, 2003. Thereafter, on August 14, 2003,
Harrisburg filed a third-party complaint against a
number of insurance companies that allegedly
issued policies to the city between 1972 and 2003,
including CNA and St. Paul. All of the insurance
companies denied that Harrisburg was entitled to
coverage under the respective policies. By the
third-party complaint, Harrisburg seeks, *inter alia,*
entry of an order declaring that the third-party
defendants are under a duty to defend Harrisburg
and its additional insureds under each of the subject
insurance policies.

> FN1. Steven D. Crawford commenced the
> underlying civil rights action following his
> 2003 release from prison after having been
> incarcerated for 28 years for the murder of
> John Eddie Mitchell. Crawford was
> released after his attorney discovered
> certain potentially exculpatory evidence
> that allegedly had been suppressed by law
> enforcement officers involved in
> Crawford's prosecution and trial. Crawford
> also alleges that these officers altered
> evidence and testified falsely during each
> of Crawford's three trials held in 1974,
> 1977, and 1978.

Harrisburg has alleged that CNA is obligated to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provide the city with coverage for the *Crawford* litigation pursuant to general commercial liability policies CNA issued Harrisburg between 1972 and 1976. Harrisburg has been unable to produce copies of the CNA polices issued relating to these years, and has endeavored to prove that CNA is obligated to provide coverage under these missing policies by the introduction of extrinsic evidence. Presently, Harrisburg's claims to coverage under these policies are subject to cross-motions for summary judgment that are pending before the Court. Harrisburg has also claimed coverage under certain insurance policies that USF & G issued to the city between 1976 and 1982.[FN2] Although Harrisburg was unable to locate any of these policies, St. Paul recently discovered copies of the policies and provided them to Harrisburg. Harrisburg's claims to coverage under these policies is also subject to pending cross-motions for summary judgment.

> FN2. St. Paul merged with USF & G in 1998 and, as a result, USF & G became a wholly-owned subsidiary of St. Paul.

Harrisburg commissioned Douglas Talley's expert report ("Talley Report") ostensibly in an effort to assist with "reconstruction" of the lost CNA policies, and to provide the Court with information regarding the "types" of coverage provided in both the CNA and USF & G policies. (Doc. No. 239, at 1-2.) Additionally, Harrisburg claims that the Talley Report "analyzes the proper scope that any coverage analysis should entail." (*Id.*, at 3.) CNA and St. Paul each argue that the Talley Report should be stricken because the purported expert impermissibly offers legal conclusions as to the proper interpretation of insurance policies and because the opinions rendered in the report will not assist the Court to understand the evidence that has been offered to prove the terms and conditions of various insurance policies under which Harrisburg has claimed coverage. Harrisburg defends submission of the Talley Report by asserting that the report meets the requirements of Federal Rule of Evidence 702, asserting that the expert report "is helpful in understanding issues and practices in the insurance industry," and by arguing that the city has a legal right to submit expert opinions where

another party has offered lay opinion testimony.

## II. Discussion

**\*2** Federal Rule of Evidence 702 provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Whether to permit expert testimony on a particular issue is left to the discretion of the trial court. *First Nat'l State Bank of New Jersey v. Reliance Elec. Co.,* 668 F.2d 725, 731 (3d Cir.1981). In considering whether to allow expert testimony, a district court must limit expert testimony so as to not allow the expert to offer opinion on "what the law required" or "testify as to the governing law." *United States v. Leo,* 941 F.2d 181, 196-97 (3d Cir.1991).[FN3] As one court has explained:

> FN3. The need to restrict experts from offering legal conclusions is obviously most important where the expert is offering testimony to a jury as fact-finder. In this case, the Court is acting as the finder of fact. Nevertheless, the Court finds no reason to apply a more relaxed standard in this case. As discussed in this opinion, the Court finds that Harrisburg's proffered expert's opinion impermissibly purports to render legal conclusions, and is in any event unnecessary and unhelpful to the Court in construing the terms and conditions of the insurance policies under which Harrisburg has asserted a right to coverage. Additionally, the Court finds it would be inappropriate to require that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 2990694 (M.D.Pa.)
(Cite as: Slip Copy)

Page 3

CNA or St. Paul be put to the expense of commissioning their own expert reports to rebut the Talley Report.

The rule prohibiting experts from providing their legal opinions or conclusions is so well established that it is often deemed a basic premise or assumption of evidence law-a kind of axiomatic principle. In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law.
*In re Initial Public Offering Lit.,* 174 F.Supp.2d 61, 64 (S.D.N.Y.2001) (internal quotations omitted) (collecting cases, including *Leo* ).[FN4]

> FN4. *See also* Weinstein's Federal Evidence § 702.03[3] ("Expert testimony is not admissible to inform the finder of fact as to the law that will be [applied] to the facts in deciding the case.... Expert witnesses are also prohibited from drawing legal conclusions.... This proscription precludes an expert from testifying in the language of statutes, regulations or other legal standards that are at the heart of the case").

Upon consideration of this standard, the Court turns to the Talley Report. Mr. Talley represents that he was retained in order "to provide expert witness services in reconstructing the comprehensive general liability sections of certain business multi-peril insurance policies that CNA and USF & G sold to the City and analyzing those policies as they might relate to the civil rights lawsuit of Steven D. Crawford v. Commonwealth of Pennsylvania...." (Talley Rept. ¶ 13.) [FN5] After making several representations as to his professional background and credentials, Mr. Talley attests that the insurance policies at issue contain standard language that has been used in the insurance industry for 50 years. (*Id.* ¶ 14.) Talley makes additional representations concerning the elements and general structure of comprehensive general liability insurance policies, and offers his conclusions about the types of insurance policies CNA and St. Paul issued to the city. (*Id.* ¶¶ 17-28.)

> FN5. With respect to the USF & G policies, it is not clear why the Court requires any assistance in "reconstructing" the policies, as they have been located and provided to Harrisburg.

Subsequently, however, Talley proceeds to address the fundamental legal question before the Court: whether CNA or St. Paul are obligated to provide Harrisburg with a defense and indemnity for the Crawford action:
I have also been asked to offer an opinion on whether the comprehensive general liability coverage of the Continental Policies and the USF & G Policies potentially afford coverage to the City for its legal defense of, and any resulting indemnity obligation for, the Crawford lawsuit. A fair reading of the Crawford complaint against the City is not confined to damages for false arrest and false imprisonment, but alleges damages also for " extreme emotional distress, embarrassment, humiliation and fear" due to the City's alleged violation of certain federal civil rights statutes, 42 U.S.C. §§ 1983, 1985 and 1986, arising from negligent training and supervision of the police force and from racial discrimination. (Crawford Complaint §§ 90 and 99). The Crawford complaint specifically alleges that the City "lacked sufficient safeguards to prevent their agents from concealing exculpatory evidence and from testifying falsely" and had "failed to adequately train their employees so as to prevent them from altering evidence, concealing evidence and/or testifying falsely". (Crawford Complaint §§ 67 and 68).

*3 This alleged misconduct by the City, if proven, would essentially be a finding of negligence or other tortuous [sic] conduct that would have occurred during the period of the Continental Policies and the USF & G Policies. It is universally accepted a principle of insurance analysis that comprehensive general liability policies cover acts of negligence and other tortuous [sic] conduct unless expressly excluded.

(*Id.* ¶¶ 29-30.) The Court finds that Talley's ultimate opinions represent inappropriate legal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2990694 (M.D.Pa.)
**(Cite as: Slip Copy)**

conclusions about the scope of the *Crawford* complaint, and the proper means of interpreting the CNA and USF & G policies in light of his assessment of the complaint. In offering this legal analysis, Talley strays from offering expert opinion of factual issues into an impermissible effort to advise this Court about pure legal questions regarding the application of Pennsylvania law to the polices in issue. Moreover, Talley goes even further when he proceeds to offer his opinion about the proper interpretation of whether a claim for " extreme emotional distress" constitutes "bodily injury" under the policies in question and relevant Pennsylvania insurance law:The question should also be addressed whether the allegations of " extreme emotional distress, embarrassment, humiliation and fear" fall within the definition of " bodily injury" in the Continental Policies and USF & G Policies, thereby triggering defense and indemnity coverage for the City in the Crawford lawsuit.... My own review of the issue leads me to conclude that a claim for "extreme emotional distress" would be deemed a claim for "bodily injury " under Pennsylvania state law.... Currently, the ruling statement of law on this issue is an appellate decision in the case *Anthem Casualty Insurance Company v. Miller,* 729 A.2d 1227 (Pa.Sup.Ct.1999), where the court found that a claim for negligent infliction of emotion[al] distress without any physical injury did constitute a claim for "bodily injury" under an automobile liability insurance policy. The ruling of the *Anthem* case would, therefore, favor a finding of coverage for the City under the Continental Policies and the USF & G Policies in the *Crawford* case.

(*Id.* ¶ 31.) The Court is especially troubled by this particular paragraph of Talley's report. Talley's legal analysis reads as though it were stripped directly from Harrisburg's legal papers filed in this case in order to bolster the city's argument that *Anthem* somehow represents binding law on the proper scope of "bodily injury" coverage. Even if Talley's legal analysis were an appropriate subject of an expert report, the Court would find it unpersuasive. Talley is not a lawyer, and *Anthem* is not a controlling statement of the law on this narrow issue, despite Harrisburg's repeated assertions to the contrary. Given Talley's unwarranted

representations regarding the *Anthem* holding and its application to this action, the Court finds it appropriate to comment briefly upon Talley's legal analysis.

**\*4** In *Anthem,* the Pennsylvania Superior Court reviewed an order granting summary judgment in favor of a plaintiff who had asserted a claim for negligent infliction of emotional distress against an insurer after witnessing her husband being fatally struck by an automobile. According to the Superior Court, the appellant-insurer raised only one question on appeal: "Is the wife's claim for negligent infliction of emotional distress arising out of the same motor vehicle accident in which her husband was killed subject to the same 'per person' liability as the claim which she presented to the other driver's liability insurer as administratrix of her husband's estate?" 729 A.2d at 1228. The court rejected the insurer's specific contention that the insured could "recover for her claim of emotional distress only if her emotional distress constitutes bodily injury that is separate and distinct from the bodily injuries sustained by her husband." *Id.* To support its argument, *Anthem* attempted to analogize plaintiff's claims of emotional injury to a claim of loss of consortium, which Pennsylvania law treats as a derivative claim. *Id.* The Superior Court rejected this argument, basing its conclusion on Pennsylvania case law that allows a plaintiff to recover on a claim for emotional distress if the infliction of emotional distress was reasonably foreseeable. *Id.* Thus, in rejecting Anthem's argument, the Superior Court was merely amplifying the rule that "a claim for negligent infliction of emotional distress does not arise from the injuries sustained by the victim, but rather it arises from the witnessing of the accident." *Id.* (citing *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672, 678-79 (Pa.1979)). In resolving the appeal, the Superior Court did not even reach Anthem's argument that the plaintiff's claim for emotional distress was not a separate bodily injury covered by the insured's policy: "Because we have determined that Fay's claim is a separate claim, not derived from her husband's underlying bodily injury, we need not reach the merits of this issue." *Id.* at 1229. Nothing in the brief *Anthem* opinion specifically provides that claims for emotional injury are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2990694 (M.D.Pa.)
**(Cite as: Slip Copy)**

automatically subject to "bodily injury" insurance coverage, and in fact the Superior Court did not discuss in any way the specific provisions of the *Anthem* policy in issue.

In contrast, in *Kline v. The Kemper Group,* 826 F.Supp. 123 (M.D.Pa.1993), Judge McClure of this Court concluded that Pennsylvania courts "have soundly rejected the contention that policy definitions of injury or bodily injury encompass mental or emotional harm." *Id.* at 129 (citing *Jackson v. Travelers Ins. Co.,* 414 Pa.Super. 336, 606 A.2d 1384 (Pa.Super.Ct.1992)). In its defense of Talley's analysis, Harrisburg attempts to discredit *Kline* by claiming that "*Kline* and *Jackson* obviously *pre-date Anthem.*" (Doc. No. 239, at 12) (original emphasis). Harrisburg also argues that Judge McClure relied upon faulty reasoning in reaching his conclusion regarding Pennsylvania law.

**\*5** Notwithstanding Harrisburg's arguments, in a decision rendered more than three years after *Anthem,* the Pennsylvania Superior Court approved of Judge McClure's reasoning, stating that "[t]he federal district court for the middle district of Pennsylvania accurately interpreted Pennsylvania law when it ruled that 'the emotional distress or humiliation of having [one's] employment terminated [does not] constitute 'bodily injury.' ' *The Philadelphia Contributionship Ins. Co. v. Shapiro,* 798 A.2d 781, 787 (Pa.Super.Ct.2002). In *Shapiro,* the relevant insurance policy defined " bodily injury" as "bodily harm, sickness, or disease, including required care, loss of services and death that results." *Id.* The Superior Court noted that the plaintiff had claimed he suffered "compensatory and punitive damages ... including but not limited to damages for mental anguish and humiliation." *Id.* The Court held that plaintiff's claims were not covered under the "bodily injury" provisions of the insurance policy: "[Plaintiff] made no allegation that he suffered any 'bodily harm' as a result of being fired. *Instead the damages he claimed were all emotional damages and are not covered by the policy.*" *Id.* (emphasis added). In contrast to *Anthem, Shapiro* clearly provides that claims for emotional injury alone are not subject to "bodily injury" coverage under Pennsylvania law. For all of these reasons, the Court not only finds that the Talley

Report impermissibly offers legal conclusions, but also finds that the ultimate conclusion Talley reaches regarding *Anthem* is inaccurate.

In sum, the Court finds it inappropriate for Harrisburg to pass off this expert report as the objective analysis of purely factual issues concerning commercial liability policies when the heart of the report is awash in legal conclusions regarding the proper method of interpreting insurance contracts-and is filled with legal argument regarding the state of the law in Pennsylvania that bears a striking resemblance to the very arguments made by Harrisburg in its briefs filed in this case.

Even were the Court to find Talley's report to be legally appropriate, the Court would not find it helpful in resolving the insurance dispute presented in this action. The issues before the Court regarding the CNA and USF & G policies can be reduced to a straightforward question: do the allegations set forth within the four corners of the *Crawford* complaint come within the scope of coverages provided under the commercial liability policies at issue? This question is not unlike that presented in numerous insurance disputes that come before the Court in the ordinary course of the Court's business. The parties have filed extensive briefs on the issue before the Court, and have provided the Court with numerous citations to case law germane to the policy provisions in dispute. The Court does not require the assistance of Mr. Talley or any other expert report to resolve the issue presented in this action.

**\*6** Finally, the Court disagrees with Harrisburg's argument that it is automatically entitled to offer the expert testimony of Douglas Talley as a response to the declaration of Paul Ruane, CNA's claims adjuster. Harrisburg asserts that "[w]here a party offers expert opinion testimony on a particular issue, that party cannot then object to the opposing party using an expert for substantially the same purposes.... Here *it was CNA* that proffered the Declaration of Paul Ruane as lay and/or expert opinion that only 'personal injury' coverage purchased by additional endorsement for 'false arrest, detention or imprisonment, or malicious prosecution' covered the Crawford lawsuit." (Doc. No. 239, at 12) (original emphasis.) Harrisburg thus

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6

Slip Copy, 2005 WL 2990694 (M.D.Pa.)
**(Cite as: Slip Copy)**

appears to consider Talley's report to be an appropriate rejoinder to Mr. Ruane's coverage analysis. The city argues that: "CNA cannot have it both ways. It cannot offer evidence on its own opinion, albeit a lay opinion, and then seek to strike the portion of Mr. Talley's expert report that rebuts this discrete analysis." (*Id.*, at 13.)

Harrisburg's argument that Paul Ruane's declaration should operate to estop CNA from complaining about Harrisburg's submission of expert testimony ignores the fact that the declaration of Paul Ruane is not an expert report. Mr. Ruane's declaration was issued in his capacity as CNA's claims director, which requires him to make decisions as to whether various claims filed against the insurer are entitled to coverage under the terms and conditions of the relevant policies. The mere fact that a claims director issues a declaration explaining the basis for denying an insured's claim to coverage does not automatically entitle the insured to submit an expert report in response. Harrisburg does not offer any legal support for this argument, and the Court finds it to be without merit.

### III. Conclusion

For the foregoing reasons, the expert report of Douglas Talley offered by Harrisburg will be stricken. The report is replete with impermissible legal conclusions that are inappropriate in an expert report. Moreover, the Court does not find the proffered report to be helpful in resolving the questions before the Court regarding coverage. For the foregoing reasons, CNA's and St. Paul's motions to strike the Talley Report will be granted.

### IV. Order

And now, this 8th day of November 2005, for the reasons set forth in the within memorandum, IT IS HEREBY ORDERED THAT:
1. St. Paul Fire & Marine Insurance Company's Motion to Strike the Expert Report of Douglas Talley (Doc. No. 232) is GRANTED; and
2. CNA Financial Corporation, t/a CNA Insurance's Motion to Strike the Expert Report of Douglas

Talley (Doc. No. 236) is GRANTED.
3. St. Paul's Motion for Enlargement of Time to File an Expert Report (Doc. No. 233) is DENIED as MOOT.
4. CNA's Motion for Enlargement of Time to File an Expert Report (Doc. No. 235) is DENIED as MOOT.

M.D.Pa.,2005.
Coregis Ins. Co. v. City of Harrisburg
Slip Copy, 2005 WL 2990694 (M.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3136449 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendant, County of Dauphin in Support of its Motion for Summary Judgment on the Pol Policy (Oct. 12, 2005)
• 2004 WL 1967972 (Trial Motion, Memorandum and Affidavit) Reply of American Justice Insurance Reciprocal and the Star Pool to City of Harrisburg's Opposition to Motion for Oral Argument (May 10, 2004)
• 2004 WL 1967970 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Sentry's Motion for Declaratory Judgment (Apr. 26, 2004)
• 2004 WL 1967965 (Trial Motion, Memorandum and Affidavit) Reply Memorandum In Further Support of National Casualty Company's Motion for Summary Judgment (Apr. 23, 2004)
• 2004 WL 1967967 (Trial Motion, Memorandum and Affidavit) Reply Brief Filed on Behalf of Defendant American Justice Insurance Reciprocal and Defendant the Star Pool Against Third Party Plaintiff Harrisburg's Motion Opposing Dismissal of Its Third Party Complaint (Apr. 23, 2004)
• 2004 WL 1967960 (Trial Motion, Memorandum and Affidavit) Defendant County of Dauphin's Response To Plaintiff's ""Supplemental Brief In Support of Coregis's Motion for Judgment on the Pleadings" (Apr. 19, 2004)
• 2004 WL 1967958 (Trial Motion, Memorandum and Affidavit) the City of Harrisburg's Revised Consolidated Response to the Insurance Companies Motions on Triggering Coverage (Apr. 15, 2004)
• 2004 WL 1967956 (Trial Motion, Memorandum and Affidavit) the city of Harrisburg's Response to the Motions for Oral Argument on the ""Trigger"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2990694 (M.D.Pa.)
**(Cite as: Slip Copy)**

Issue by st Paul Ajir/Star Pool, Nationwide and Sentry (Apr. 5, 2004)

• 2004 WL 1967955 (Trial Motion, Memorandum and Affidavit) St. Paul Fire & Marine Insurance Company's Brief Regarding Trigger of Coverage (Mar. 23, 2004)

• 2004 WL 1967952 (Trial Motion, Memorandum and Affidavit) Brief in Support of Motion to Dismiss Third Party Complaint Filed on Behalf of defendants American Justice Insurance Reciprocal and the Star Pool (Mar. 19, 2004)

• 2004 WL 1967951 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Summary Judgment of National Casualty Company (Mar. 16, 2004)

• 2004 WL 1967950 (Trial Motion, Memorandum and Affidavit) Brief in Support of Sentry's Motion for Declaratory Judgment (Feb. 6, 2004)

• 2004 WL 1967949 (Trial Motion, Memorandum and Affidavit) Reply Brief of Folksamerica Reinsurance Company, as Successor in Interest to Third-Party Defendant Imperial Casualty and Indemnity Company, in Response to the City of Harrisburg's Opposition to Folksamerica's Motion for Summary Judgment (Jan. 26, 2004)

• 2004 WL 1967947 (Trial Motion, Memorandum and Affidavit) Reply Brief of Folksamerica Reinsurance Company, as Successor in Interest to Third-Party Defendant Imperial Casualty and Indemnity Company, to the City of Harrisburg's Response to Imperial Casualty's Motion for Oral Argument on Its Motion for Summary Judgment (Jan. 16, 2004)

• 2004 WL 1967948 (Trial Motion, Memorandum and Affidavit) The City of Harrisburg's Response to Imperial Casualty's Motion for Summary Judgment (Jan. 16, 2004)

• 2004 WL 1967946 (Trial Motion, Memorandum and Affidavit) The City of Harrisburg's Response to Imperial Casualty's Motion for Oral Argument on Its Motion for Summary Judgment (Jan. 14, 2004)

• 2004 WL 1967945 (Trial Motion, Memorandum and Affidavit) Brief in Support of Motion for Summary Judgment of Folksamerica Reinsurance Company, As Successor in Interest to Third-Party Defendant Imperial Casualty and Indemnity Company (Jan. 7, 2004)

• 2003 WL 23748325 (Trial Pleading) Answer and Affirmative Defenses of American Justice Insurance

Reciprocal and the Star Pool (Dec. 29, 2003)

• 2003 WL 23748319 (Trial Motion, Memorandum and Affidavit) Coregis' Judgment on the Pleadings Reply Brief (Dec. 15, 2003)

• 2003 WL 23748306 (Trial Motion, Memorandum and Affidavit) Coregis' Motion to Strike the County of Dauphin's Affirmative Defenses (Dec. 12, 2003)

• 2003 WL 23748314 (Trial Motion, Memorandum and Affidavit) Coregis' Reply Brief to Strike the County of Dauphin's Affirmative Defenses (Dec. 12, 2003)

• 2003 WL 23748284 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Coregis' Motion to Strike the County of Dauphin's Affirmative Defenses (Nov. 24, 2003)

• 2003 WL 23748291 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Plaintiff Coregis' Motion for Judgment on the Pleadings (Nov. 24, 2003)

• 2003 WL 23748300 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Coregis' Motion to Strike the County of Dauphin's Affirmative Defenses (Nov. 24, 2003)

• 2003 WL 23748280 (Trial Pleading) Answer of National Casualty Company to the City of Harrisburg's Third-Party Complaint (Nov. 21, 2003)

• 2003 WL 23748276 (Trial Pleading) Answer and Affirmative Defenses of Defendant CNA Financial Corporation t/a CNA Insurance to Third Party Complaint (Nov. 17, 2003)

• 2003 WL 23748270 (Trial Motion, Memorandum and Affidavit) The City of Harrisburg's Response to Coregis's Motion for Judgment on the Pleading (Nov. 7, 2003)

• 2003 WL 23748256 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiff Coregis' Motion for Judgment on the Pleadings (Oct. 20, 2003)

• 2003 WL 23748244 (Trial Pleading) Coregis Insurance Company's Answer to County of Dauphin's Counterclaim (Oct. 16, 2003)

• 2003 WL 23748251 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Coregis' Motion to Strike the County of Dauphin's Affirmative Defenses (Oct. 16, 2003)

• 2003 WL 23748233 (Trial Pleading) Answer of Third-Party Defendant, Sentry Insurance t/a Great Southwest Fire Insurance Company, with Affirmative Defenses to the City of Harrisburg's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2990694 (M.D.Pa.)
**(Cite as: Slip Copy)**

Third-Party Complaint (Oct. 10, 2003)
• 2003 WL 23748229 (Trial Pleading) Answer of
Folksamerica Reinsurance Company, as Successor
in Interest to Third-Party Defendant Imperial
Casualty and Imdemnity Company, to the City of
Harrisburg's Third-Party Complaint (Oct. 6, 2003)
• 2003 WL 23748224 (Trial Pleading) Amended
Answer, Affirmative Defenses, and Counterclaims
of Defendant, County of Dauphin, to Plaintiff's
Complaint for Declaratory Judgment (Sep. 29, 2003)
• 2003 WL 23748216 (Trial Pleading) Defendant,
St. Paul Fire and Marine Insurance Company's
Answer to the City of Harrisburg's Third Party
Complaint (Sep. 18, 2003)
• 2003 WL 23748210 (Trial Pleading) The City of
Harrisburg's Answer to Coregis's Affirmative
Defenses to Its Counterclaims (Sep. 15, 2003)
• 2003 WL 23748206 (Trial Motion, Memorandum
and Affidavit) The City of Harrisburg's Response to
Coregis's Motion to Strike its Affirmative Defenses
(Sep. 12, 2003)
• 2003 WL 23748200 (Trial Pleading) Coregis
Insurance Company's Answer and Affirmative
Defense to Harrisburg's First Counterclaims (Aug.
26, 2003)
• 2003 WL 23748196 (Trial Motion, Memorandum
and Affidavit) Memorandum in Support of Coregis'
Motion to Strike the City of Harrisburg's
Affirmative Defenses (Aug. 20, 2003)
• 2003 WL 23748177 (Trial Pleading) Third-Party
Complaint (Aug. 14, 2003)
• 2003 WL 23748165 (Trial Pleading) Answer of
Defendant, County of Dauphin, to Plaintiff's
Complaint for Declaratory Judgment (Aug. 4, 2003)
• 2003 WL 23748170 (Trial Pleading) The City of
Harrisburg's Answer, Affirmative Defenses and
Counterclaims (Aug. 4, 2003)
• 2003 WL 23748156 (Trial Pleading) Plaintiff
Coregis Insurance Company's Complaint for
Declaratory Judgment (Jun. 2, 2003)
• 2003 WL 23748220 (Trial Motion, Memorandum
and Affidavit) Coregis' Reply to the City of
Harrisburg's Response to Coregis' Motion to Strike
Its Affirmative Defenses (2003)
• 2003 WL 23748395 (Trial Motion, Memorandum
and Affidavit) St. Paul Fire & Marine Insurance
Company's Reply to the City of Harrisburg's
Consolidated Response to St. Paul's Motion
Regarding Trigger of Coverage (2003)

• 2003 WL 23748410 (Trial Motion, Memorandum
and Affidavit) Plaintiff Coregis Insurance
Company's Brief in Support of its Motion for
Summary Judgment Against Defendants County of
Dauphin and Estate of Simpson on Pol Policy
(2003)

END OF DOCUMENT

# TAB 2



--- F.Supp.2d ----                                                    Page 1

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
CRYOVAC INC., Plaintiff/Counter-Defendant,
v.
PECHINEY PLASTIC PACKAGING, INC.,
Defendant/Counter-Plaintiff.
**No. CIV.A. 04-1278-KAJ.**

April 17, 2006.

**Background:** Patentee brought action against
competitor for patent infringement and tortious
interference with contract and prospective business
relations. Parties moved for summary judgment.

**Holdings:** The District Court, Jordan, J., held that:

5(1) competitor's multilayer plastic films literally
infringed patent;

6(2) genuine issue of material fact precluded
summary judgment on issue of whether patent was
invalid as anticipated;

16(3) tortious interference claim was not
preempted; and

17(4) genuine issues of material fact precluded
summary judgment on tortious interference claim.

Ordered accordingly.

**[1] Patents 291 ☞323.2(2)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k323 Final Judgment or Decree
                291k323.2 Summary Judgment

291k323.2(2)    k.    Presence    or
Absence of Fact Issues. Most Cited Cases
Summary judgment is appropriate in patent
infringement suits when it is apparent that only one
conclusion regarding infringement could be reached
by a reasonable jury.

**[2] Patents 291 ☞112.5**

291 Patents
    291IV Applications and Proceedings Thereon
        291k112 Conclusiveness and Effect of
Decisions of Patent Office
            291k112.5 k. Sufficiency of Evidence to
Offset Effect of Decision in General. Most Cited
Cases
Invalidity of a patent must be shown by clear and
convincing evidence. 35 U.S.C.A. § 282.

**[3] Patents 291 ☞112.1**

291 Patents
    291IV Applications and Proceedings Thereon
        291k112 Conclusiveness and Effect of
Decisions of Patent Office
            291k112.1 k. In General. Most Cited Cases
Presumption of a patent's validity is never
weakened, and the burden of proving invalidity
does not shift from the party asserting invalidity.

**[4] Federal Civil Procedure 170A ☞2011**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(C) Reception of Evidence
            170Ak2011 k. In General. Most Cited
Cases
Motions to exclude evidence are committed to the
court's discretion.

**[5] Patents 291 ☞236.1**

291 Patents
    291XII Infringement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

291XII(A) What Constitutes Infringement
291k233 Patents for Machines or
Manufactures
291k236.1 k. Identity of Arrangement.
Most Cited Cases
Manufacturer's multilayer plastic films that shared
same composition with respect to the outer surface
and outer sealant layers literally infringed patent for
a multilayer film with at least seven layers "
arranged symmetrically"; although manufacturer's
film did not have same layer thickness as patentee's
film, its layers had the same symmetrical
arrangement.

**[6] Patents 291 ☞323.2(3)**

291 Patents
291XII Infringement
291XII(C) Suits in Equity
291k323 Final Judgment or Decree
291k323.2 Summary Judgment
291k323.2(3) k. Particular Cases.
Most Cited Cases
Genuine issue of material fact as to whether patent
for a multilayer plastic film, as construed by court,
was anticipated by prior art films precluded
summary judgment on claim that patent was invalid
as anticipated.

**[7] Patents 291 ☞323.2(3)**

291 Patents
291XII Infringement
291XII(C) Suits in Equity
291k323 Final Judgment or Decree
291k323.2 Summary Judgment
291k323.2(3) k. Particular Cases.
Most Cited Cases
Genuine issues of material fact with respect to
scope and content of the prior art and the
motivation to combine prior art references to
produce the invention claimed in patent for a
multilayer plastic film precluded summary judgment
on issue of obviousness in infringement case.

**[8] Patents 291 ☞16.13**

291 Patents
291II Patentability

291II(A) Invention; Obviousness
291k16.13 k. Fact Questions. Most Cited
Cases

**Patents 291 ☞323.2(2)**

291 Patents
291XII Infringement
291XII(C) Suits in Equity
291k323 Final Judgment or Decree
291k323.2 Summary Judgment
291k323.2(2) k. Presence or
Absence of Fact Issues. Most Cited Cases
Legal question of obviousness is based on factual
issues, and when material facts are disputed, and
testimonial, documentary, and expert evidence are
needed for their resolution, summary adjudication is
not indicated.

**[9] Patents 291 ☞99**

291 Patents
291IV Applications and Proceedings Thereon
291k99 k. Description of Invention in
Specification. Most Cited Cases
To be enabling, the specification of a patent must
teach those skilled in the art how to make and use
the full scope of the claimed invention without
undue experimentation.

**[10] Patents 291 ☞99**

291 Patents
291IV Applications and Proceedings Thereon
291k99 k. Description of Invention in
Specification. Most Cited Cases
To prove that a patent claim is not enabled, accused
infringer must prove that one of ordinary skill in the
art would be unable to make the claimed invention
without undue experimentation.

**[11] Patents 291 ☞323.2(3)**

291 Patents
291XII Infringement
291XII(C) Suits in Equity
291k323 Final Judgment or Decree
291k323.2 Summary Judgment
291k323.2(3) k. Particular Cases.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 3

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Most Cited Cases
Genuine issue of material fact as to whether one of ordinary skill in the art could have made the invention claimed in patent for a multilayer plastic film without undue experimentation precluded summary judgment on claim that patent was invalid for lack of enablement.

**[12] Torts 379 ☞212**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)1 In General
            379k212 k. Contracts. Most Cited Cases
Plaintiff alleging a claim for tortious interference with contract must prove: (1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury.

**[13] Torts 379 ☞213**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)1 In General
            379k213 k. Prospective Advantage, Contract or Relations; Expectancy. Most Cited Cases
To establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted.

**[14] States 360 ☞18.3**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.3 k. Preemption in General. Most Cited Cases
A law can be preempted in one of three ways: by explicit Congressional statement, by field preemption, or by an actual conflict between the state and federal laws. U.S.C.A. Const. Art. 6, cl. 2.

**[15] Patents 291 ☞280**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k280 k. Nature of Remedy. Most Cited Cases

**States 360 ☞18.87**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.83 Trade Regulation; Monopolies
            360k18.87 k. Copyrights and Patents. Most Cited Cases
A state law claim is preempted by federal patent law only when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

A state law claim is preempted by federal patent law only when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[16] States 360 ☞18.15**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases

**Torts 379 ☞203**

379 Torts
   379III Tortious Interference
      379III(A) In General
         379k203 k. Preemption. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                    Page 4

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Federal patent law did not preempt patentee's state tortious interference with contract claim against competitor, based on allegation that competitor tortiously interfered with patentee's relationship with a customer through willful infringement with patent rights; tort claims were being used in conjunction with and not in opposition to patent rights. U.S.C.A. Const. Art. 6, cl. 2.

Federal patent law did not preempt patentee's state tortious interference with contract claim against competitor, based on allegation that competitor tortiously interfered with patentee's relationship with a customer through willful infringement with patent rights; tort claims were being used in conjunction with and not in opposition to patent rights. U.S.C.A. Const. Art. 6, cl. 2.

**[17] Federal Civil Procedure 170A ⬪2515**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2515 k. Tort Cases in General.
Most Cited Cases
Genuine issues of material fact as to whether patentee had a binding requirements contract with a customer, whether patentee's competitor knew about the alleged contract, and whether competitor acted wrongfully in marketing infringing product to the customer precluded summary judgment on patentee's claim for tortious interference with a contract.

**[18] Patents 291 ⬪323.2(3)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k323 Final Judgment or Decree
            291k323.2 Summary Judgment
               291k323.2(3) k. Particular Cases.
Most Cited Cases
Genuine issue of material fact as to whether there was a non-infringing alternative to patentee's product precluded summary judgment on patentee's claim for lost profit damages in infringement case.

**[19] Patents 291 ⬪318(4.1)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k318 Profits
            291k318(4) Entire Profits or Those
Attributable to Infringement of Patent
               291k318(4.1) k. In General. Most
Cited Cases
Damages for lost profits may be awarded in patent infringement case, even where there are non-infringing alternatives, based on a patentee's previous share of the market.

**[20] Evidence 157 ⬪555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and
Sufficiency. Most Cited Cases

**Evidence 157 ⬪555.4(2)**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.4 Sources of Data
               157k555.4(2) k. Speculation, Guess,
or Conjecture. Most Cited Cases
Expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[21] Evidence 157 ⬪555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and
Sufficiency. Most Cited Cases
In determining whether expert testimony is admissible, court must examine the expert's conclusions in order to determine whether they

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 5

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

could reliably follow from the facts known to the expert and the methodology used.

**[22] Evidence 157 ☜555.4(3)**

157 Evidence
 157XII Opinion Evidence
  157XII(D) Examination of Experts
   157k555 Basis of Opinion
    157k555.4 Sources of Data
     157k555.4(3) k. Hearsay or
Evidence Otherwise Incompetent. Most Cited Cases
Expert's reliance on another witness's recollection of an experiment performed several years earlier in reaching opinion that patent was invalid went to weight of expert's opinion, rather than its admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[23] Evidence 157 ☜506**

157 Evidence
 157XII Opinion Evidence
  157XII(B) Subjects of Expert Testimony
   157k506 k. Matters Directly in Issue.
Most Cited Cases
Expert testimony on substantive areas of patent or contract law is impermissible. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**Patents 291 ☜328(2)**

291 Patents
 291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
  291k328 Patents Enumerated
   291k328(2) k. Original Utility. Most Cited Cases
4,755,419. Infringed.

John W. Shaw, Esq., Karen E. Keller, Esq., Michele Sherretta, Esq ., Young Conaway Stargatt & Taylor, LLP, Wilmington, Of Counsel: Ford F. Farabow, Jr., Esq., Joann M. Neth, Esq., Courtney B. Meeker, Esq., Mark J. Feldstein, Esq., Rebecca D. Hess, Esq. , Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, D.C., Counsel for Plaintiff.
N. Richard Powers, Esq., Connolly Bove Lodge & Hutz, Wilmington, Of Counsel: Donald P. Cassling,

Esq., Steven R. Trybus, Esq., Shelley Smith, Esq., Brian P. O'Donnell, Esq., Jenner & Block LLP, Chicago, IL, Counsel for Defendant.

MEMORANDUM OPINION
JORDAN, District J.

I. INTRODUCTION

**\*1** This patent infringement case is set to be tried to a jury beginning on June 12, 2006. Plaintiff Cryovac, Inc. ("Cryovac") has accused defendant Pechiney Plastic Packaging, Inc. ("Pechiney") of willfully infringing claim 11 of U.S. Patent No. 4,755,419 (issued July 5, 1988) (the " '419 patent"), and of tortious interference with contract and prospective business relations. (Docket Item ["D.I." ] 185, the "Second Amended Complaint.") Pechiney has denied infringement and tortious interference, and has counter-claimed that the patent is invalid and unenforceable. (D.I. 260, Amended Answer to the Second Amended Complaint at 11-15.)

Presently before me are six motions filed by Cryovac and Pechiney. Pechiney has filed a Motion for Summary Judgment on Patent Issues (D.I.195), a Motion for Summary Judgment on Lost Profits (D.I.193), a Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), and a Motion to Strike an affidavit submitted by Cryovac (D.I.281). Cryovac has filed a Motion for Summary Judgment that Pechiney Infringes Claim 11 of the '419 Patent (D.I.201), and a Motion to Exclude Expert Testimony (D.I.199). Jurisdiction is appropriate under 35 U.S.C. §§ 1331 and 1338. For the reasons that follow, Cryovac's Motion for Summary Judgment (D.I.201) will be granted as to literal infringement. Pechiney's Motion for Summary Judgment on Patent Issues (D.I.195) will be granted as to infringement under the doctrine of equivalents, and denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I.199) will be granted to the extent that Pechiney's experts will not be permitted to provide legal opinion or argument, and denied in all other respects. All of the other motions will be denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

## II. BACKGROUND

### A. The '419 Patent

The '419 patent discloses "[a] multilayer film with a combination of oxygen barrier properties, toughness, shrinkability, and good optical properties " ('419 patent, Abstract), used "to package various articles, including perishable food products" (*id* . at col. 1, lns. 10-11). Claim 11, the only claim asserted, is for:

An oriented coextruded film having at least seven layers arranged symmetrically comprising:

(a) a core layer comprising an ethylene vinyl alcohol copolymer;

(b) two intermediate layers each comprising a polyamide;

(c) two outer layers each comprising a polymeric material or blend of polymeric materials; and

(d) two layers, each comprising an adhesive polymeric material, which adhere each of said intermediate layers to a respective outer layer.

('419 patent, at col. 9, ln. 67-col. 10, ln. 9).

The specification of the '419 patent defines various terms, including "oriented." U.S. Patent No. 4,755,419 at col. 3, lns. 45-49. Additionally, the specification describes suitable components for each of the layers, and gives a preferred total thickness for each of the layers. (*See* '419 patent, at col. 5-6.) For example, the specification indicates that intermediate layers 12 and 14 "comprise polyamide, and more preferably, a copolymer of nylon 6 and nylon 12 ... each layer can form between 5% and 25% of the total thickness of the multilayer film." (*Id.* at col. 5, lns. 7-22.) Similar examples are given for each of the other layers of the film. (*See id.* at col. 5, ln. 23-col. 6 ln. 34 (discussing components of outer layers 16 and 18); *id.* at col. 6 lns. 39-68 (discussing adhesive layers 20 and 22).)

### B. Pechiney's ClearShield ™ Product

*2 Cryovac and Pechiney compete in the market for packaging materials for meat. Pechiney markets a product known as "ClearShield," which competes with Cryovac specifically in the bone-in, fresh, red meat packaging market. Cryovac alleges that Pechiney's ClearShield film infringes claim 11 of the '419 patent.

ClearShield is a coextruded seven layer film containing an ethylene vinyl alcohol copolymer core layer, two intermediate layers, each comprising a polyamide, two adhesive layers made of polymeric material, and two outer layers made of polymeric material. (Deposition of Dr. Eldridge Mount, III,[FN1] D.I. 202, Ex. 5 at 14:1-2; *id.* at 18:8-20:17.) The two outer layers of ClearShield, called the outer surface layer and outer sealant layer by Pechiney, have different thicknesses and chemical compositions. (Declaration of Michael Douglas,[FN2] D.I. 213 at ¶¶ 19, 21-29.) For all twenty-six different product specifications for ClearShield, the outer surface layer of ClearShield has a thickness * * * of the total thickness of the film, while the outer sealant layer has a total thickness * * * (*Id.* at ¶ 19.) Additionally, for each of the twenty-six product specifications, the outer surface layer and the outer sealant layer contain different amounts of * * *, a slip and antiblock agent.[FN3] (*Id.* at ¶¶ 21-24.) For all of the product specifications, the outer surface layer contains between * * *, and the outer sealant layer contains between * * *. (*Id.* at ¶¶ 21-24.)

### C. Prior Art Films

In making its invalidity argument, Pechiney focuses on two prior art films that it alleges are "oriented" within the meaning of claim 11 of the '419 patent.

### 1. *Allied Film*

Commencing around 1983, Dr. Seymour G. Gilbert [FN4] conducted a study for Allied Chemicals (" Allied") on a seven layer film having the structure HDPE/tie/nylon/EVOH/nylon/tie/HDPE (the " Allied Film"). (Declaration of Dr. Seymour G. Gilbert, D.I. 213, Ex. 4 at ¶ 9.) This study was described in at least one article that was publicly available in December of 1984, and one news

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                              Page 7

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

release from Allied. (*Id.*) Dr. Gilbert stated in his declaration that, based on his recollection of experiments performed on the Allied Film on the Instron Tester, which "provides stress data relating to orientation," and "Cross Polarization to visualize orientation," it was oriented. (*Id.* at ¶ 16.) Dr. Gilbert's recollection provides the only evidence that this film was oriented, and there are no test results or other laboratory data regarding the orientation of this film.

### 2. ANR Film C

Allied disclosed in a news release a nine-layer film with the structure HDPE/tie/nylon/tie/EVOH/tie/nylon/tie/HDPE(" ANR Film C"). (D.I. 216, Ex. 17 at A0226.) The results contained in that news release were presented to a regional conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985. (*Id.,* Ex. 16.) The news release disclosed that ANR Film C was 1.4 mils [FN5] thick, and had certain barrier protection properties. (*Id.,* Ex. 17 at A0227-29.) Pechiney asserts that this shows that the news release "inherently disclosed that ANR Film C was oriented." (D.I. 196 at 13.) There is no statement in the news release, however, that expressly indicates that ANR Film C was oriented. Additionally, the news release stated that " [c]ombinations of nylon and EVOH do not, Dr. Gilbert's tests showed, produce a significant synergistic effect in terms of barrier properties compared to a nylon-only coextrusion or an EVOH-only coextrusion." (D.I. 216, Ex. 17 at A0224.)

### D. Cryovac's Relationship with National Beef

**\*3** Cryovac and National Beef Packing, LLC (" National Beef") had a business relationship that began sometime in the late 1990s. (D.I. 251, Deposition of Terry L. Wilkerson [FN6] at 110:25-111:10.) During that period, National Beef purchased * * * of its packaging requirements for particular products from Cryovac. (*Id.* at 110:25-111:10, 130:1-17, 131:12-133:12.) In March of 2003 and January of 2004, Cryovac

negotiated agreements with National Beef that covered the periods from January 1, 2003 to December 31, 2005, and January 1, 2004 to December 31, 2007, respectively. (D.I. 250 at March 2003 Agreement, January 2004 Agreement.) Both Agreements stated that they would "serve as documentation of our current packaging agreement." (*Id.* at B001, B003.) Additionally, both agreements provided discounts to National Beef on various products sold by Cryovac, which discounts were " contingent upon combined minimum annual purchases of Barrier Bags, TBG Bags, HS film and Case-Ready lidding exceeding * * *." (*Id.*) Both agreements also provided for cash rebates based on the value of goods purchased by National Beef from Cryovac, starting at * * *. (*Id.* at B001, B004.) The January 2004 agreement further provided that, "[i]n the event that National Beef's packaging purchases fall short of 2003 minimum volume targets due to market conditions other than the use of competitive supply, Cryovac will consider the minimum volume target to have been met." (*Id.* at B003).

### III. STANDARD OF REVIEW

#### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to Interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: --- F.Supp.2d ----)

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. *Patent Infringement*

*4 [1] A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. *Markman,* 52 F.3d at 976. The first step, claim construction, has been held to be purely a matter of law. *Cybor,* 138 F.3d at 1454-56. The second step, application of the claim to the accused product, is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.,* 264 F.3d 1326, 1332 (Fed.Cir.2001) (Patent infringement, " whether literal or under the doctrine of equivalents, is a question of fact."). The patent owner has the burden of proving infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir.1984) (citing *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983)). Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. *See Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.2001).

### 2. *Patent Invalidity*

[2][3] When a party challenges a patent's validity, the starting point for analyzing that challenge is the statutory presumption of validity. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid."). Accordingly, "[t]he burden of establishing

invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* Invalidity must be shown by clear and convincing evidence. *Robotic Vision Sys. v. View Eng'g, Inc.,* 189 F.3d 1370, 1377 (Fed.Cir.1999). This presumption of validity is never weakened, and the burden of proving invalidity does not shift from the party asserting invalidity. *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.,* 745 F.Supp. 998, 1004 (D.Del.1990) (citing *ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1574-75 (Fed.Cir.1984) (other citations omitted)).

### B. Motion to Exclude Expert Testimony

[4] Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or to exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

### IV. DISCUSSION

### A. Infringement

### 1. *Literal Infringement*

[5] Cryovac and Pechiney have cross-moved for summary judgment on literal infringement. (D.I. 195; 201.) Both parties focus their arguments on their claim construction positions for the term " arranged symmetrically." (*See* D.I. 196 at 20-24; D.I. 202 at 13-17.) Essentially, both sides argue that they should win on claim construction, and thus on summary judgment as well. (*Id.*) I have construed the term "arranged symmetrically," largely as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cryovac advocated, to mean "putting the layers in a desired symmetrical order when the film is viewed in cross-section, so that the layers are in the same order on each side of the core of the film, for example c/d/b/a/b/d/c. This claim phrase limits only the arrangement of the layers, but does not require precise identity in the thickness of the layers or the amounts of recited components or additives that may be included in the layers." (*See* D.I. 304 at 13-15.) Thus, although I did not adopt Cryovac's construction in its entirety, I did not construe " arranged symmetrically" to mean that the film must have geometric symmetry with respect to the thickness and chemical composition of the layers, as Pechiney had urged.

*5 Pechiney essentially conceded at oral argument that, if I accepted Cryovac's proposed construction of the claim term "arranged symmetrically," then the ClearShield product met that limitation. (D.I. 298, Oral Argument Transcript, at 57:11-18.) [FN7] Indeed, the vast majority of Pechiney's arguments, both in its opposition to Cryovac's motion and in its support of its own motion, rely on my adopting Pechiney's position on claim construction. (D.I. 196 at 20-24; D.I. 239 at 8-15; D.I. 280 at 2-4.) As I have construed the term "arranged symmetrically," there is effectively no dispute between the parties as to whether Pechiney meets the terms of the claim, [FN8] and thus summary judgment of literal infringement will be granted to Cryovac.

Pechiney further argues, however, that Cryovac is, at most, entitled to summary judgment that one of Pechiney's twenty-six product specifications, Z-9001 F, infringes claim 11 of the '419 patent, because it is the only specification cited in Cryovac's briefing. (D.I. 239 at 18-19.) Cryovac responds by stating that it cited testimony about ClearShield film generally, that Z-9001 F is the product specification used to make the vast majority of ClearShield film on the market, that, at the very least, all of the films made by the same product specification as Z-9001 F infringe the '419 patent, and that Pechiney's expert witness testified that Z-9001 F was "representative of the class." (D.I. 278 at 16-19.)

Pechiney's argument has little merit. Although there are twenty-six different product specifications for ClearShield, those twenty-six specifications have been grouped by Pechiney into four "Composition Combinations." (*See* Declaration of Michael Douglas, D.I. 213, Ex. 3 at ¶¶ 21-24.) It therefore appears that different product specifications in the same Composition Combination have the same composition, at least with respect to the outer surface and outer sealant layers. (*Id.*)

Combination One applies to product specification Z-9001 F, as well as six other product specifications. (*Id.* at ¶ 21.) Because at least the outer surface and outer sealant layers of these seven films share the same composition, films made under all of the product specifications identified under Combination One literally infringe claim 11 of the '419 patent. Additionally, Combinations Two and Three, which apply to two and sixteen product specifications, respectively, have only small differences from Combination One. The outer surface and outer sealant layers in films made under both Combinations Two and Three contain identical amounts of * * *, which is identified as an antioxidant, in addition to the components of Combination One. (*Id.* at ¶¶ 22-23.) Combination Three also contains a higher percentage of * * *, the slip/antiblock agent, than Combinations One and Two in the outer surface layer. (*Id.* at ¶¶ 22-23.) Other than these minor differences, the outer surface and outer sealant layers of films made under Combinations Two and Three are identical to those made under Combination One. Thus, films made under the product specifications identified under Combinations Two and Three literally infringe claim 11 of the '419 patent under my construction of the term of that claim. Finally, Combination Four has only one product specification, DZ-9004-1, which Cryovac has agreed does not infringe claim 11 of the '419 patent. (D.I. 278 at 20.) Thus, summary judgment of literal infringement will be granted to Cryovac as to all ClearShield product specifications except DZ-9004-1.[FN9]

### 2. Doctrine of Equivalents

*6 Pechiney has moved for summary judgment that there is no infringement under the doctrine of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

equivalents. (D.I. 196 at 24-28.) Cryovac responds only by saying that the doctrine of equivalents does not apply to this case. (D.I. 241 at 16.) Because Cryovac is not asserting a case of infringement under the doctrine of equivalents, summary judgment on this issue will be denied as moot.

### B. Invalidity

Pechiney has moved for summary judgment that the patent is invalid because it is anticipated, obvious, and not enabled. Because there are genuine issues of material fact with respect to each of these issues, summary judgment of invalidity will be denied.

#### 1. *Anticipation*

[6] Pechiney argues that, under its construction of the term "oriented," both the Allied Film and ANR Film C anticipate the invention disclosed in claim 11 of the '419 patent. (D.I. 196 at 30-31; D.I. 280 at 6-7, 11.) Pechiney makes no argument as to whether claim 11 is anticipated by the Allied Film or ANR Film C when the term "oriented" is construed to include the limitation "this stretching accomplished by a racking or blown bubble process," as I have construed it.[FN10] (*See* D.I. 304 at 9, 14.) Therefore, given the construction I have arrived at, Pechiney's motion for summary judgment of anticipation must be denied.

#### 2. *Obviousness*

[7] Pechiney argues that, even if the Allied Film and ANR Film C are not oriented, and thus do not anticipate the invention of claim 11 of the '419 patent, it would have been obvious to a person of ordinary skill in the art to orient those films. (D.I. 196 at 33-37.) Pechiney asserts that oriented films, and the particular processes used to orient films, were well known in the art, and that the advantages of oriented films were also well known, such that a person of ordinary skill in the art would have been motivated to orient a multilayer film such as the Allied Film or ANR Film C. (*Id.* at 35-37.) Cryovac, however, counters by arguing that there

would not have been motivation to orient those films, and that a person of ordinary skill in the art would not have had an expectation of success in doing so. (D.I. 241 at 31-32.) Indeed, Cryovac claims that the prior art taught away from orienting those films. (*Id.* at 32.)

[8] "While the ultimate question of patent validity is one of law, ... [obviousness] lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved .... Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co.,* 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The legal question of obviousness is based on factual issues, and "when material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution, summary adjudication is not indicated." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.,* 946 F.2d 870, 872 (Fed.Cir.1991).

\*7 There are genuine issues of material fact with respect to at least the scope and content of the prior art and the motivation to combine prior art references to produce the invention in claim 11 of the '419 patent. Pechiney argues, and cites prior art to support its argument, that the prior art taught the elements of claim 11 of the '419 patent and that a person of skill in the art would have been motivated to orient films such as the Allied Film or ANR Film C. (D.I. 196 at 33-37.) However, Cryovac cites the declaration of its expert, Dr. Garth L. Wilkes, who in turn cites prior art that would have taught away from orienting EVOH-containing multilayer films. (Affidavit of Garth Wilkes, D.I. 242 at ¶¶ 30-37.) More specifically, Dr. Wilkes cites to prior art showing the difficulty of orienting multilayer films ( *Id.* at ¶ 30 (citing U.S. Patent No 4,501,797)) and the difficulty of orienting layers or films containing EVOH (*Id.* at ¶ 31 (citing U.S. Patent No. 4,610,914). This disagreement between the experts as to whether the prior art would have motivated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

one of ordinary skill in the art to make the invention of the '419 patent creates a genuine issue of material fact, and thus, summary judgment on obviousness must be denied.

### 3. Enablement

[9][10][11] Finally, Pechiney asserts that claim 11 of the '419 patent is invalid for lack of enablement. (D.I. 196 at 37-38.) Pechiney argues that the '419 patent teaches nothing new about how to orient a multi-layer film, and that if a person of ordinary skill in the art would not have been motivated to orient the films in the manner already known in the prior art, then the patent calls for a new but untaught type of orienting and is therefore not enabled. (Id. at 38.) Cryovac responds that, based on the information in the patent specification and the prior art, one of ordinary skill in the art could have made and used the invention. (D.I. 241 at 35-37.) "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.' " Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1365 (Fed.Cir.1997). To prove that a patent claim is not enabled, the accused infringer must prove that "one of ordinary skill in the art would be unable to make the claimed invention without undue experimentation." Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1360 (Fed.Cir.1998).

Pechiney's argument essentially boils down to an assertion that if claim 11 is not invalid for obviousness, then it must be invalid for lack of enablement. Pechiney, however, has not presented evidence sufficient to show that there is no genuine issue of material fact as to whether one of ordinary skill in the art could have made the invention of claim 11 of the '419 patent without undue experimentation. Pechiney's assertions that the patent teaches nothing new about orientation are met by Cryovac's contention that the '419 specification provided "detailed formation methods" on how to orient the film in the patent. Because Pechiney has failed to meet its burden of showing that there is no genuine issue of material fact regarding enablement, summary judgment on this

point must also be denied.

### C. Tortious Interference

*8 [12][13] Pechiney has moved for partial summary judgment on Cryovac's tortious interference claims.[FN11] A plaintiff alleging a claim for tortious interference with contract must prove: "(1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury." Gill v. Delaware Park, LLC, 294 F.Supp.2d 638, 645 (D.Del.2003). "[T]o establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 5 F.Supp.2d 238, 243 (D.Del.1998).

Pechiney first claims that it should be granted summary judgment on Cryovac's tortious interference claims because the state law causes of action for tortious interference with contract and tortious interference with a prospective contractual relationship are precluded by federal patent law. (D.I. 198 at 14-19.) Pechiney further argues that, even if the claims are not precluded, Cryovac cannot establish that there was a valid contract between Cryovac and National Beef (id. at 20-28), nor can it establish that Pechiney knew about such a contract, if it existed (id. at 28-31), or that Pechiney's actions in dealing with National Beef were wrongful (id. at 31-33). Cryovac responds by arguing that the claims are not precluded (D.I. 250 at 9-13), that it did have a contract with National Beef (id. at 14-34), that there are genuine issues of material fact as to whether Pechiney knew or should have known about that contract (id. at 35-37), and that Pechiney's actions were wrongful because they involved willful infringement of the '419 patent (id.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                          Page 12

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

at 37-39). I address each of these arguments in turn.

### 1. Preemption

[14][15] Under the Supremacy Clause of the United States Constitution, art. IV, cl. 2, "state law that conflicts with federal law is 'without effect.'" *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1331 (Fed.Cir.1998) (quoting *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).[FN12] A law can be preempted in one of three ways: by explicit Congressional statement, by field preemption, or by an actual conflict between the state and federal laws. *Hunter Douglas,* 153 F.3d at 1332. There is no explicit preemption of state law tortious interference claims in the patent statute, *see* 35 U.S.C. §§ 1-376, and the Federal Circuit Court of Appeals has ruled that "there is no field preemption of state unfair competition claims that rely on a substantial question of federal patent law." *Hunter Douglas,* 153 F.3d at 1333. Thus, a state law claim is preempted by federal patent law only in the third instance, i.e., when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (analyzing question of preemption of a state statute requiring aliens to register with the state); *see also Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) (finding that state unfair competition law cannot "give protection of a kind that clashes with the objectives of the federal patent laws").

*9 The Federal Circuit appears to have addressed the issue of whether a state law tortious interference with contract claim conflicts with federal patent law on two separate occasions. *See Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998); *Hunter Douglas,* 153 F.3d 1318. In *Dow Chemical,* the Court found that a state law claim for tortious interference with actual and prospective contractual relations was not preempted by federal patent law, even where it requires the adjudication of a question of federal patent law. *Dow Chem.,* 139 F.3d at 1473 . In *Dow Chemical,* the plaintiff sued the defendant-patentee for a declaratory judgment that the patent was not infringed, was invalid for inequitable conduct before the Patent & Trademark Office, and for state law claims of unfair competition based on the defendant-patentee's threats to sue the plaintiff and the plaintiff's customers for patent infringement. *Id.* at 1471-72. Similarly, in *Hunter Douglas,* the plaintiff sought a declaratory judgment that the defendant-patentee's patent was not infringed, was invalid, and was unenforceable due to inequitable conduct. *Hunter Douglas,* 153 F.3d at 1321-22. The plaintiff further sought various state law remedies based on the defendant-patentee's actions in telling the plaintiff's customers that the plaintiff did not have the right to sell its products because they were covered by the defendant's patent. *Id.* at 1322. However, the Court in *Hunter Douglas* found that the state law claims were preempted by federal patent law using an "as-applied" approach, finding that the plaintiff's tort action was based on conduct that was protected by federal patent law. *Id.* at 1335-36 (citing *Sears,* 376 U.S. at 231.).

[16] Naturally, Cryovac relies on *Dow Chemical,* while Pechiney relies on *Hunter Douglas.* It is unnecessary for me to harmonize those cases or to decide which case to apply, since this case presents a totally dissimilar factual scenario. In both of those cases, the accused infringer attempted to use state law unfair competition claims, based on the patentee's allegedly inequitable conduct in front of the Patent & Trademark Office, to limit the right to assert the patent. *See Dow Chem.,* 139 F.3d at 1471-72; *Hunter Douglas,* 153 F.3d at 1321-22. Thus, in both *Dow Chemical* and *Hunter Douglas,* the state law unfair competition claim presented at least some conflict with a patent owner's right under the patent statute to exclude others from making, using, or selling a patented product. Here, however, there is no such conflict. Cryovac, the patent owner, is asserting that Pechiney willfully infringed the '419 patent, and that Pechiney, partially through that infringement, tortiously interfered with Cryovac's relationship with National Beef. The unfair competition claims here are being used in conjunction with and not in opposition to the patent rights.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Furthermore, the tortious interference claims, even though they are based in part on Cryovac's assertion that Pechiney willfully infringed claim 11 of the '419 patent, require Cryovac to prove a number of things in addition to willful infringement, including the existence of a contract or a valid business relationship or expectancy and the knowledge Pechiney allegedly had of the contract or the relationship (*see supra* at 16). *See Dow Chem.,* 139 F.3d at 1477 ("a tort claim for intentional interference with contractual relations requires elements entirely different to those required for inequitable conduct"). Therefore, Cryovac's tortious interference claim is not preempted by patent law. *See Rodime PLC v. Seagate Tech., Inc.,* 174 F.3d 1294, 1306 (Fed.Cir.1999) (holding that a patentee could sue for tortious interference along with its claims of infringement).

### 2. *Existence of a Contract*

**\*10** [17] Pechiney asserts that it should be granted summary judgment on Cryovac's tortious interference claims because Cryovac cannot show that it had a contract with National Beef. (D.I. 198 at 20-28.) In particular, Pechiney argues that the document Cryovac alleges was a contract contains no quantity term, and additionally cannot be viewed as a requirements contract. (*Id.*) Pechiney further argues that National Beef did not intend to be bound by any agreement with Cryovac. (*Id.* at 27-28.) Cryovac responds that it did have a requirements contract with National Beef (D.I. 250 at 17-32), and that National Beef intended to be bound by that contract (*id.* at 16-17; 32-34). Each party cites a number of cases which it claims supports its position on whether there was a contract, and each argues that the facts of this dispute are similar to the cases it puts forward. All of these arguments, however, essentially amount to factual disputes over the meaning of the contract language and the intent of the parties. In short, there are genuine issues of material fact with respect to whether Cryovac and National Beef had a binding requirements contract.

The documents that Cryovac alleges are contracts with National Beef each contain a minimum purchase requirement of * * * for National Beef to receive the agreed on product discounts and cash rebates. (D .I. 250, March 2003 Agreement at B001-02; *id.* at January 2004 Agreement at B003-04.) Additionally, the January 2004 Agreement contains a provision that states "[i]n the event National Beef's packaging purchases fall short of 2003 minimum volume targets due to market conditions other than the use of competitive supply, Cryovac will consider the minimum volume target to have been met." (*Id.,* January 2004 Agreement at B003.) There are several courts that have found, in situations similar to the instant dispute, that a requirements contract either did exist or that there were issues of fact as to whether a requirements contract existed. *See, e.g. Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.,* 186 F.3d 815, 817-18 (7th Cir.1999) (holding that, although the language of the contract was permissive when it said the buyer could purchase "such quantities of the items listed herein as [it] might order or schedule" and that the "Buyer shall have the right at any time and from time to time to cancel, in whole or in part, the deliveries specified and the authorizations contained in any shipping schedule given to the Seller", "we must conclude that the contract, taken as a whole, is ambiguous and that further investigation as to whether the parties intended a requirements contract is required"); *Kansas Power & Light Co. v. Burlington N. Ry. Co.,* 740 F.2d 780, 788-89 (10th Cir.1984) (finding that a requirements contract existed where the contract "provide[d] for an incentive pricing system based on tonnage shipped" and had a term that stated that in years where the buyer's requirements feil below a certain level, "carriers [would] seek to amend the tariff to reduce the annual minimum tonnage requirement" for the buyer); *O.N. Jonas Co., Inc. v. Badische Corp.,* 706 F.2d 1161, 1164-65 (11th Cir.1983) (finding that the statement "[a] potential program utilizing our yarn was discussed in 1977 and we indicated that we would supply the yarn if we were provided a Heller guaranty on our form" was sufficient to show a requirements contract "in light of the business dealings" between the parties.) Thus, there are genuine issues of material fact as to whether Cryovac and National Beef had a binding requirements contract based on the March 2003 and January 2004 agreements and based on the course

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

of dealing and performance between those parties.

### 3. *Pechiney's Knowledge of the Alleged Contract*

*\*11* Pechiney next claims that even if Cryovac and National Beef did have a contract, the undisputed facts show that Pechiney had no knowledge of the contract, and thus, that Cryovac's claim of tortious interference with contract must fail. (D.I. 198 at 28-31.) Pechiney claims that National Beef did not believe that it had a binding contract with Cryovac, and thus did not tell Pechiney about any contract. ( *Id.* at 29-31.) Pechiney also points to statements by its employees that they had no knowledge of any contract between National Beef and Cryovac. (*Id.* at 30-31.) Cryovac contends, however, and Pechiney does not dispute, that Pechiney knew that Cryovac supplied 100% of National Beef's packaging products (*see* D.I. 251, Deposition of Thomas Grabowski FN13 at 212:1-8), that Cryovac's pricing was contingent on Cryovac continuing to be National Beef's 100% supplier (*id.*), and that National Beef was intending to award a contract in early 2004 for 100% of its packaging needs (D.I. 251, Ex. CC at B190). This evidence creates a genuine issue of material fact as to whether Pechiney knew about the alleged contract between Cryovac and National Beef.

### 4. *Pechiney's Wrongful Means*

Finally, Pechiney asserts that it is entitled to summary judgment on Cryovac's tortious interference with prospective contractual relations claim because Cryovac cannot establish that Pechiney acted wrongfully. (D.I. 198 at 31-33.) Pechiney essentially argues that, because it conducted research and got a non-infringement opinion, it acted in good faith and cannot be held liable for tortious interference. (*Id.*) However, " [s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles." *Haft v. Dart Group Corp.,* 841 F.Supp. 549, 577 (D.Del.1993) (quoting *DeLong Corp. v. Raymond Int'l, Inc.,* 622 F.2d 1135, 1146 (3d Cir.1980)). Additionally, Cryovac asserts that

Pechiney's initial opinion, the only opinion it had before marketing ClearShield, was insufficient because, among other things, it failed to analyze claim 11 of the '419 patent, the only claim in suit. (D.I. 250 at 39 (citing D.I. 251, Ex. G at B113).) Thus, there are genuine issues of material fact with respect to whether Pechiney acted wrongfully.

Accordingly, because Cryovac's tortious interference claims are not preempted, and because there are genuine issues of material fact as to whether there was a contract between Cryovac and National Beef, as to whether Pechiney knew about any such contract, and as to whether Pechiney acted wrongfully, summary judgment on Cryovac's tortious interference claims will be denied.

### D. Lost Profits

[18] Pechiney has moved for partial summary judgment that Cryovac is not entitled to lost profits damages because of the existence of non-infringing alternatives, namely products produced by Curwood, Inc. ("Curwood").FN14 (D.I.193.) Cryovac counters by arguing that there are genuine issues of material fact as to whether the products produced by Curwood were available non-infringing alternatives (D.I. 244 at 12-17), and that, under *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573 (Fed.Cir.1989), Cryovac is entitled to lost profits based on the sales it would have made but for Pechiney's sales of the ClearShield product.

*\*12* In support of its argument that Curwood's products were not acceptable non-infringing alternatives, Cryovac asserts that its products outperformed Curwood's products. (*See* D.I. 244 at 13-14 (citing, *e.g.,* D.I. 246, Ex. A at CR014-000581 ("The Curwood package did not perform well at destination, defect rate of 19% vs. the Cryovac package of less than 5%").) Cryovac also argues that Curwood did not compete with Cryovac because it did not offer a complete line of packaging products. (D.I. 244 at 14.) Additionally, the evidence from an internal Pechiney document shows that, prior to Pechiney's entry into the market, Cryovac held \* \* \* of the market, while Curwood held only \* \* \*. (D.I. 243, Ex. R at PPPI

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 15

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

0008241.) Thus, Cryovac has shown that there are genuine issues of material fact as to whether Curwood offered a non-infringing alternative.

[19] Furthermore, damages for lost profits may be awarded, even where there are non-infringing alternatives, based on a patentee's previous share of the market. *See State Indus., Inc.,* 883 F.2d at 1580 ( "[T]he district court acted well within its discretion when it awarded damages for [Defendant]'s infringing activity based on [Patentee]'s share of the market."). Thus, even if Curwood did produce a product that was a non-infringing alternative, it is possible for Cryovac to be awarded lost profits damages based on the market share it held prior to Pechiney's entrance into the market. The motion for partial summary judgment on lost profits must therefore be denied.

E. Cryovac's Motion to Exclude Expert Testimony

Cryovac has moved under Federal Rules of Evidence, 702, 703, and 403 to exclude the testimony of two of Pechiney's experts, Dr. Eldridge Mount and Mr. Larry Evans. (D.I.199.) Pechiney responds by arguing that Cryovac's assertions go to the weight the expert testimony should be given, not its admissibility (D.I. 252 at 2).

[20] Federal Rule of Evidence 702 obligates judges to ensure that any scientific or technical testimony admitted is relevant and reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. *See Daubert,* 509 U.S. at 592 n. 10 (citation omitted). The expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. *See*

*Joiner v. General Elec. Co.,* 522 U.S. 136, 144, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting failure of plaintiffs to explain "how and why [they] ... could have extrapolated their opinions"); *Kumho Tire,* 526 U.S. at 152 (an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert,* 509 U.S. at 590 (expert's testimony "must be supported by appropriate validation").

**\*13** [21] Further, Rule 702 requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. *Daubert,* 509 U.S. at 591-92. The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

Federal Rule of Evidence 703 provides, in relevant part, that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Federal Rule of Evidence 403 provides that relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

1. *Dr. Mount*

Cryovac claims that the portions of Dr. Mount's opinion that deal with invalidity based on the Allied Film should be excluded under Federal Rules of Evidence 702, 703, and 403, and that Dr. Mount's opinion on non-infringing alternatives should be excluded because it lacks support. (D.I. 200 at 16-22.) Specifically, Cryovac asserts that Dr. Mount's opinion is inadmissible because it was not derived by a scientific method (*id.* at 16), it is not objectively verifiable (*id.* at 17), it will not assist the trier of fact (*id.* at 17-18), it does not rely on the type of data reasonably relied on by experts in the field (*id.* at 18-19), it is unfairly prejudicial (*id.* at 20-21), and it will confuse the jury (*id.* at 21). Each

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

of these arguments, however, is simply an attack on Dr. Mount's reliance in his report on the statements of Dr. Gilbert regarding the Allied Film. (*Id.* at 16-22.) In forming his opinion on invalidity, Dr. Mount relied on, among other things, Dr. Gilbert's statement in his declaration that, based on his recollection of experiments performed on the Allied Film on the Instron Tester and Cross Polarization testing, the Allied Film was oriented (Declaration of Dr. Seymour G. Gilbert, D.I. 213, Ex. 4 at ¶ 16). (Second Supplemental Report of Eldridge Mount, D.I. 213, Ex. 5 at Ex. D at 4-6.) Cryovac claims that Dr. Gilbert's statement in his declaration is uncorroborated and that Dr. Mount's reliance on it makes Dr. Mount's opinion inadmissible under Rule 702, 703, and 403. (D.I. 200 at 16-21.)

[22] However, Cryovac does not contend that the tests performed by Dr. Gilbert are unreliable, but rather that it is improper to rely on Dr. Gilbert's uncorroborated memory. (*Id.*) Pechiney asserts that Dr. Gilbert's recollection is corroborated by an article entitled "Nylon Film Effective Packaging" published on December 14, 1984 in the Journal of Commerce (*See* D.I. 216, Ex. 18 at A0231-33), a news release presented at a regional conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985 (D.I.216, Ex. 16, 17), and an article published in a 1997 issue of the Journal of Food Science (D.I.216, Ex. 19). (*See* D.I. 252 at 7-11.) It appears, therefore, that there is arguably some corroboration of Dr. Gilbert's recollection, and thus Dr. Mount's reliance on Dr. Gilbert's statements is an issue that can fairly be dealt with on cross-examination, as it goes to the weight, not the admissibility of Dr. Mount's testimony.

*\*14* Having said that, though, I emphasize that I have defined the term "oriented" to include a process limitation, such that a film is "oriented" under my construction only if it is "accomplished by a racking or blown bubble process." (*See* D.I. 304 at 9, 14.) There is nothing in the declaration of Dr. Gilbert that indicates the process by which the Allied Film was oriented, if it was oriented. (D.I.213, Ex. 4.) Accordingly, Dr. Mount's testimony cannot include assertions about anticipation, since there is no evidence in the record that the Allied Film was oriented in the manner

stated in the patent.

Cryovac also claims that Dr. Mount's opinion on non-infringing alternatives lacks support, and that it should thus be excluded. (*Id.* at 21-22.) Cryovac asserts that the documents that Dr. Mount attempted to rely on do not support his opinion, and that his opinion should thus be excluded. (*Id.* at 22.) Again, however, this argument goes to the weight that should be given to his expert testimony, not its admissibility. Cryovac's motion to exclude the testimony of Dr. Mount will therefore be denied.

*2. Mr. Evans*

Cryovac also asserts that the damages opinion of Mr. Evans should be excluded in its entirety. With respect to Mr. Evans' opinion regarding non-infringing alternatives, Cryovac claims that Mr. Evans is unqualified to testify on the existence of non-infringing alternatives (D.I. 200 at 23), that his opinion on non-infringing alternatives is based on evidence that does not meet the requirements of Rule 703 (*id.* at 23-24), and that the evidence he relies on would be unfairly prejudicial to Cryovac ( *id.* at 24-25.) Further, Cryovac asserts that Mr. Evans' patent damages opinion should be excluded because there is no evidence to show the existence of acceptable non-infringing alternatives. (*Id.* at 25-26.) Pechiney responds by saying that Mr. Evans is not opining on non-infringing alternatives but is relying on the opinion of Dr. Mount in this matter in forming his opinion on damages in the form of lost profits. (D.I. 252 at 27-30.) While Cryovac is correct that Mr. Evans may not himself opine on whether there are acceptable non-infringing alternatives, Mr. Evans may rely on the testimony of Dr. Mount in forming his opinion on lost profits.

[23] Cryovac has also moved to exclude Mr. Evans' opinions on the basis that they contain improper opinions on patent and contract law. (D.I. 200 at 26-32.) Cryovac is correct that Mr. Evans's opinions go beyond opining on what the appropriate measure of damages should be, and make what amounts to legal argument on patent and contract law. As just one example among many, Mr. Evans states:
The alleged contracts with National Beef, i.e.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                              Page 17

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Cryovac's and [Pechiney's], were not contracts at all. As I indicated in my Initial Report, they were no more than 'price sheets'. No quantities were stated. National Beef could switch suppliers at any time. If National Beef did so, it would only lose its price protection and the possibility of volume discounts. In my nearly 30 years of corporate management experience, I have negotiated more than 30 to 40 supply agreements. These agreements specified, inter alia, quantities to be purchased or ' requirements', price and allowable escalation and dispute resolution. The alleged 'agreements' cited by Mr. Nawrocki are not supply or requirements contracts nor are they fixed quantity contracts, and they do not obligate National Beef to purchase bags nor do they obligated Cryovac to supply bags.

*15 (D.I. 207, Ex. 5 at ¶ 17; *see also* D.I. 207, Ex. 3 at ¶¶ 33-34, 41, 43; *id.,* Ex. 5 at ¶¶ 10, 12.) Such testimony on substantive areas of patent or contract law is impermissible. *Revion Consumer Prods. Corp. v. L'Oreal S.A.,* C.A. No. 96-192-MMS, 1997 WL 158281, at *3 (D.Del. Mar.26, 1997) (stating that expert "may not testify as to substantive issues of patent law"); *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.,* C.A. No. 88C-JA-155, 1995 WL 628447, at *3 (Del.Super.Apr. 22, 1995) ("the proper scope of expert testimony intersects with the law of contract interpretation, which firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract. Such testimony is reversible error and is not repaired by cross-examination") (citing *Marx & Co., Inc. v. Diners' Club Inc.,* 550 F.2d 505, 508 (2d Cir.1977) ( "the District Court erred in permitting Friedman, an expert witness called by plaintiffs, to give his opinion as to the legal obligations of the parties under the contract")). Thus, Cryovac's Motion to Exclude will be granted to the extent that Mr. Evans will be confined at trial to opining on what the damages award in this case should be if Pechiney's legal positions are accepted. He will not be permitted to advocate legal positions for Pechiney by opining on the substance of case law, or on the validity of any contract between Cryovac and National Beef. The Motion to Exclude will be denied in all other respects.

F. Pechiney's Motion to Strike Deily Declaration

In support of its opposition to Pechiney's Motion for Partial Summary Judgment on Lost Profits, Cryovac filed the Affidavit of Karl Deily. (D.I.245.) Pechiney has moved to strike that affidavit, contending that it is not made on personal knowledge, lacks foundation, and is speculative and conclusory. (D.I.281.) Because I did not rely on that affidavit in deciding Pechiney's Motion for Partial Summary Judgment on Lost Profits, the Motion to Strike will be denied as moot.

V. CONCLUSION [FN15]

Accordingly, Cryovac's Motion for Summary Judgment that Pechiney Infringes Claim 11 of the '419 Patent (D.I.201) will be granted as to all ClearShield product specifications except DZ-9004-1. Pechiney's Motion for Summary Judgment on Patent Issues (D.I.195) will be denied as moot to the extent that it seeks a judgment that there is no infringement under the doctrine of equivalents, and it will be denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I.199) will be granted to the extent that Mr. Evans is precluded from opining on the substance of case law or on the validity of any contract between Cryovac and National Beef, and to the extent that Dr. Mount will not be permitted to opine that prior art films are "oriented" as that term is used in the patent; that Motion will be denied in all other respects. Pechiney's Motion for Summary Judgment on Lost Profits (D.I.193) and Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), will be denied, and Pechiney's Motion to Strike (D.I.281) will be denied as moot. An appropriate order will follow.

ORDER

*16 For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for Summary Judgment that Pechiney Infringes Claim 11 of U.S. Patent No. 4,755,419 (D.I.201), filed by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Cryovac, Inc. ("Cryovac), is GRANTED as to all ClearShield product specifications except DZ-9004-1. IT IS FURTHER ORDERED that the Motion for Summary Judgment on Patent Issues (D.I.195), filed by Pechiney Plastic Packaging, Inc. ( "Pechiney"), is DENIED as moot to the extent that it seeks a judgment that there is no infringement under the doctrine of equivalents, and is DENIED in all other respects. IT IS FURTHER ORDERED that Cryovac's Motion to Exclude Expert Testimony (D.I.199) is GRANTED to the extent that Mr. Evans is precluded from opining on the substance of case law, or on the validity of any contract between Cryovac and National Beef, and to the extent that Dr. Mount will not be permitted to opine that prior art films are "oriented" as that term is used in the patent; that Motion is DENIED in all other respects. IT IS FURTHER ORDERED that Pechiney's Motion for Summary Judgment on Lost Profits (D.I.193) and Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), are DENIED, and its Motion to Strike (D.I.281) is DENIED as moot.

IT IS FURTHER ORDERED that the parties should meet and confer upon redactions to the accompanying opinion, and submit those proposed redactions within two weeks.

FN1. Dr. Eldridge Mount is an expert witness for Pechiney. (D.I. 213, Ex. 5 at ¶ 2.)

FN2. Michael Douglas is an employee of Pechiney's successor, Alcan Packaging, Inc., who helped in the research and development of ClearShield. (D.I. 213, Ex. 3 at ¶¶ 1, 4.)

FN3. The more * * * that is added to a layer, the more slippery that layer becomes. (*See* D.I. 298 at 59:3-15.)

FN4. Dr. Gilbert served as Professor of the Food Science Department at Rutgers University from 1965-1988. (D.I. 213, Ex. 4 at ¶ 4.)

FN5. A mil is defined as "a unit of length equal to 1/1000 inch used esp. In measuring thickness (as of plastic films)". Merriam-Webster's Collegiate Dictionary 736 (10th ed.2002).

FN6. Terry L. Wilkerson is the National Beef Executive Vice President of Strategic Business Growth, and the person at National Beef with whom Cryovac negotiated its contracts. (D.I. 250 at March 2003 Agreement, January 2004 Agreement.)

FN7. As a good advocate must, Pechiney's attorney agreed when agreement was essential, though he hedged where he could. The exchange, in relevant part, was as follows:
The Court: ... Assume for purposes of argument I were to accept Cryovac's version of 'symmetrically arranged.' Do you agree that there is infringement?
[Counsel]: Your Honor, I would agree if you accept [Cryovac's] definition of ' symmetrically arranged[,]' we meet symmetrically arranged.' Depending on what 'simultaneously' means and ' coextruded,' we put forth affirmative proof that we don't do 'simultaneously,' if that is meant to indicate some simultaneous event taking place in the coextrusion die. So that issue would still be out there.
The Court: So really, the difference in the percentages there that were at least alluded to here in the courtroom today along with differences in thickness. It comes down to and I view that as not a distinction in kind that would make it asymmetrically arranged.
[Counsel]: Well, Your Honor, let me clarify what I meant. If Your Honor adopts what they propose, and all that needs to happen is the c/d/b/a/b/d/c order, it's true layer one and layer seven meet C. I think they are significantly different with the antiblock. There are three times as much antiblock in layer seven as there is in layer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 20 of 21

one. That is done for a particular intentional reason and there is a dramatic difference between the way those two layers react.

So, if Your Honor include (sic) in the definition something more than I can just label this as something that has some at least polymeric material in it, which is all that C requires. If all you have to do is label it as C, then I would agree that it can be labeled as C.

If 'arranged symmetrically' has some more meaning than that, then there is a difference in kind between layer one and layer seven. (D.I. 298 at 57:8-58:15.)

FN8. Pechiney's counsel also stated that there could still be an issue as to infringement with respect to the construction of the term "coextruded." (D.I. 298 at 57:13-18.) However, as I stated in my claim construction ruling (see D.I. 304 at note 1), the parties appear to agree on a key aspect of the meaning of this term, and Pechiney effectively conceded that the ClearShield product met the claim limitation "coextruded" under that agreed-to meaning. (D .I. 240 at 26-27; D.I. 239 at 15-16.)

FN9. Indeed, Pechiney's argument may be, for practical purposes, moot, as Pechiney's 30(b)(6) witness, Michael Douglas, testified that the "vast majority of [Pechiney's] production" was under product specification Z-9001 F, and that " there may be a small amount being run Z-9002 F [also made under Combination One], but I'm not sure about that." (D.I. 243, Ex. Z at 20:11-21:2.) Douglas further stated that, to his knowledge, none of the other product specifications currently accounted for films being sold in the market. (Id. at 21:3-5.)

FN10. There would be genuine issues of material fact as to Pechiney's evidence that the Allied Film and ANR Film C are

oriented under any definition of that term. With respect to the Allied Film, Pechiney bases its assertion that the Allied Film was oriented on the statement of Dr. Gilbert that "[i]t was [his] recollection that results of the instron Tester and the Cross Polarization tester showed that the [Allied Film] ... was oriented." (D.I. 213, Ex. 4 at ¶ 16.) Cryovac disputes this conclusion, and notes that Dr. Gilbert failed to cite "a single piece of data, laboratory notebook entry, notes, drawings, or other evidence" that would corroborate Dr. Gilbert's recollection as to whether the Allied Film was oriented. (D.I. 241 at 18.) Thus, even if Pechiney's definition of "oriented" were still in play, there would be an issue of fact as to whether that film was oriented.

FN11. The parties appear to dispute whether the law of Delaware, where both Cryovac and Pechiney are incorporated, or the law of Kansas, the location of National Beef's plants, or the law of Missouri, the location of National Beef's offices, or the law of South Carolina, Cryovac's place of business, applies. However, the parties apparently agree (see D.I. 198 at 13-14; D.I. 250 at 9-10) that the law of tortious interference with contract and tortious interference with prospective contractual relations is essentially the same in all four states. See Dickens v. Snodgrass, Dunlap & Co., 255 Kan. 164, 872 P.2d 252, 257 (Kan.1994) (stating elements of tortious interference with contract claim); Tumer v. Halliburton Co., 240 Kan. 1, 722 P.2d 1106, 1115 (Kan.1986) (stating elements of tortious interference with prospective contractual relations claim); Tri-Continental Leasing Co. v. Neldhardt, 540 S.W.2d 210, 212 (Mo.Ct.App.1976) (stating elements of toritous interference with contract claim); Carter v. St. John's Regional Medical Center, 88 S.W.3d 1, 13 (Mo.Ct.App.2002) (stating elements of tortious interference with prospective contractual relations claim); DeBerry v. McCain, 275 S.C. 569, 274 S.E.2d 293,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                Page 20

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

296 (S.C.1981) (stating elements of tortious interference with contract claim); *Crandall Corp. v. Navistar Int'l Transp. Corp.,* 302 S.C. 265, 395 S.E.2d 179, 180 (S.C.1990) (stating elements of tortious interference with prospective contractual relations claim). Therefore, the resolution of Pechiney's Motion for Partial Summary Judgment on the tortious interference claims does not depend on a choice of law determination, and, for convenience, I cite to precedent based on Delaware law.

FN12. Hunter-Douglas was later overruled on a point not pertinent here. *See Midwest Industries, Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1358-59 (Fed.Cir.1999) (holding that Federal Circuit would henceforth apply its own law rather than regional circuit law to "questions involving the relationship between patent law and other federal and state law rights.").

FN13. Thomas Grabowski is an employee of Pechiney who participated in negotiations with National Beef. (D.I. 251, Ex. CC at B189-93.)

FN14. The opinion in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir.1978) sets forth a widely accepted test, although not an exclusive test, for lost profits. The court there stated that, to get lost profits, "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Id.*

FN15. This Opinion is filed under seal because much of the parties' briefing was filed under seal. The parties are in the best position to suggest, in the first instance, what redactions, if any, should be made in this opinion to preserve confidential information. The parties should confer and agree upon redactions, and submit them

within two weeks of the date of this Opinion.
D.Del.,2006.
Cryovac Inc. v. Pechiney Plastic Packaging, Inc.
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3666863 (Trial Pleading) Answer to Second Amended Complaint (Oct. 24, 2005)
• 2005 WL 3666861 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Summary Judgment on Patent Issues (Oct. 19, 2005)
• 2005 WL 3666862 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Partial Summary Judgment on Tortious Interference Claims (Oct. 19, 2005)
• 2005 WL 3666860 (Trial Pleading) Second Amended Complaint for Patent Infringement (Oct. 12, 2005)
• 1:04cv01278 (Docket) (Sep. 20, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.