IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, et al.,                        :
                                              :
                    Plaintiffs,               :        No. 97-586-KAJ
                                              :
          v.                                  :
                                              :
RONALD O. PERELMAN, et al.,                   :
                                              :
                    Defendants.               :

**APPENDIX TO
DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF BEVIS LONGSTRETH,
WILLIAM H. PURCELL,  ANDREW S. CARRON,  JEFFREY L. BALIBAN,
AND PORTIONS OF THE
TESTIMONY OF JUSTICE JOSEPH T. WALSH, RET.**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Defendants

DATED: June 1, 2006

INDEX

DESCRIPTION                                                                    TAB

Telephone Conference Transcript dated 09/09/05 . . . . . . . . . . . . . . . . . . . . . . . A 01

Expert Report of Jeffrey L. Baliban dated 01/13/06 . . . . . . . . . . . . . . . . . . . . . A 14

Expert Report of Andrew S. Carron dated 01/13/06 . . . . . . . . . . . . . . . . . . . . A 68

Rebuttal Expert Report of Peter A. Fowler dated 03/03/06 . . . . . . . . . . . . . . A 108

Expert Report of Lawrence A. Hamermesh dated 01/13/06 . . . . . . . . . . . . . A 169

Expert Report of Bevis Longstreth dated 01/12/06 . . . . . . . . . . . . . . . . . . . . A 179

Rebuttal Expert Report of Bevis Longstreth dated 05/15/06 . . . . . . . . . . . . . A 208

Expert Report of William H. Purcell dated 03/15/02 . . . . . . . . . . . . . . . . . . . A 213

Rebuttal Expert Report of William H. Purcell dated 03/29/02 . . . . . . . . . . . . A 251

Supplement to the Reports of William H. Purcell dated 04/09/02 . . . . . . . . . . A 272

Rebuttal Report of Justice Joseph T. Walsh dated 03/01/06 . . . . . . . . . . . . . . A 276

Excerpts of Jeffrey L. Baliban Deposition dated 04/11/06 . . . . . . . . . . . . . . . A 297

Excerpts of Bevis Longstreth Deposition dated 04/13/06 . . . . . . . . . . . . . . . . A 300

Excerpts of Bevis Longstreth Deposition dated 05/24/06 . . . . . . . . . . . . . . . . A 302

Excerpts of William H. Purcell Deposition dated 10/29/02 . . . . . . . . . . . . . . . A 314

Excerpts of Justice Joseph T. Walsh Deposition dated 05/08/06 . . . . . . . . . . . A 319

1

1        IN THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE DISTRICT OF DELAWARE

3   RONALD CANTOR, IVAN SNYDER and
    JAMES A. SCARPONE, as TRUSTEES OF    :    CIVIL ACTION
4   THE MAFCO LITIGATION TRUST, and as   :
    SUCCESSOR IN INTEREST TO MARVEL      :
5   ENTERTAINMENT GROUP INC., et al.,    :
                                         :
6               Plaintiffs,              :
                                         :
7           v.                           :
                                         :
8   RONALD O. PERELMAN, MAFCO HOLDINGS   :
    INC., MacANDREWS & FORBES HOLDINGS   :
9   INC., ANDREWS GROUP INC., WILLIAM C. :
    BEVINS, and DONALD G. DRAPKIN,       :
10                                       :    NO. 97-586 (KAJ)
               Defendants.
11                    - - -

12              Wilmington, Delaware
            Friday, September 9, 2005 at 9:30 a.m.
13              TELEPHONE CONFERENCE

14                    - - -

15   BEFORE:    HONORABLE KENT. A. JORDAN, U.S.D.C.J.

16                    - - -

     APPEARANCES:
17

18        ASHBY & GEDDES
          BY:  LEE TRAINER, ESQ.
19
               -and-
20
          FRIEDMAN KAPLAN SEILER & ADELMAN, LLP
21        BY:  EDWARD A. FRIEDMAN, ESQ.,
               DANIEL B. RAPPORT, ESQ., and
22             EMILY A. STUBBS, ESQ.
               (New York, New York)
23
               Counsel for Plaintiffs
24

25
                         Brian P. Gaffigan
                         Registered Merit Reporter

1

APPEARANCES (CONTINUED):

2

3       SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
       BY:  THOMAS J. ALLINGHAM, II, ESQ., and

4             PAUL J. LOCKWOOD, ESQ.

5            Counsel for Defendants

6

7

8                   - oOo -

9            P R O C E E D I N G S

10       (REPORTER'S NOTE:  The following telephone

11 conference was held in chambers, beginning at 9:30 a.m.)

12       THE COURT:  Hi, this is Judge Jordan.  Who do I

13 have on the line?

14       MR. LOCKWOOD:  For Mr. Perelman, it's Paul

15 Lockwood and Tom Allingham from Skadden Arps.

16       MR. TRAINER:  And Your Honor, for plaintiff,

17 this is Lee Trainer for Ashby & Geddes.  Also on the line

18 are Ed Friedman, Dan Rapport and Emily Stubbs from Friedman

19 Kaplan.

20       THE COURT:  All right.  Thanks for being on this

21 morning.  This ought to be real quick.  I just really want

22 to, now that I have the mandate from the Third Circuit, to

23 proceed consistent with their opinion from earlier in the

24 summer.  We need to figure out how to get this thing going

25 and get it off the dime.  So this is your opportunity to

1    tell me what you think about how we get this thing on a
2    schedule toward final disposition, and I'll hear from the
3    plaintiffs first.  Who is speaking for the plaintiffs?

4            MR. FRIEDMAN:  Good morning, Your Honor.  This
5    is Ed Friedman.  I will be speaking for the plaintiffs this
6    morning.  I have just a few things in connection with
7    getting this case moving, as Your Honor says.

8            One is that the plaintiffs need to file, and we
9    expect to do this within the next week, a motion for
10   extension of the trust.  That is because under the terms of
11   the trust and the initial extension that Your Honor entered
12   a little over a year ago, the term of the trust, unless
13   further amended, expires on October 1, 2005.  Obviously, the
14   proceedings will not be completed by then so we will file
15   that motion, I anticipate, within a week.

16           And at the same time, the trust is in the
17   process of arranging financing because the initial financing
18   that was provided to the trust has been virtually exhausted
19   and that process of arranging financing is also nearing
20   completion and I expect that within the next couple of
21   weeks, the trust will have the resources that it needs to
22   proceed.  But I just wanted to mention those two trust
23   administrative matters.

24           Then, I believe, Your Honor, as we review the
25   record and the status before the proceedings ended in the

4

1    District Court, I believe there are two matters that were

2    under consideration by Magistrate Judge Thynge that were

3    never resolved because they did not need to be resolved

4    when the case was dismissed on summary judgment but I think

5    obviously they will need to be addressed now:

6         One is the issue of the jury trial. I don't

7    know whether defendants are still taking this position but

8    we did have a dispute that had been briefed in front of

9    Judge Thynge concerning the plaintiffs' entitlement to a

10   jury trial. We believe it's now clear, we thought it was

11   clear before, that in light of the Third Circuit decision

12   with respect to plaintiffs' claims for damages, we would

13   be entitled to a trial by jury. And with respect to

14   plaintiffs' claims for unjust enrichment, those would be

15   determined, we believe, by the Court. And one issue to be

16   considered is whether Your Honor would want the jury to act

17   as an advisory jury with respect to the unjust enrichment

18   claims.

19        And the other pretrial issue that we believe

20   is still outstanding is that there was a dispute as to

21   documents not produced by defendants on their claim of

22   attorney-client privilege. And Magistrate Judge Thynge

23   had decided upon a procedure whereby 10 of the disputed

24   documents were submitted to her in camera. She was going

25   to review the parties briefs and those papers and those 10

5

1    documents and then make a ruling.  And that was, that is

2    where that matter stood when she issued her report recom-

3    mending dismissal of all the claims.

4                So those are two matters that we think need to

5    be addressed.  Oh.  And I guess one other matter which is of

6    great importance to the plaintiffs, Your Honor.

7                We will need additional expert testimony in

8    light of the rulings by the Third Circuit, and the Third

9    Circuit explained in its decision what would be proper and

10   what would not be proper with respect to proving the amount

11   of the unjust enrichment and one of the things the Third

12   Circuit said in its decision:  And this is on page 13.

13               "We note only that plaintiffs should at least

14   have the opportunity to establish through expert testimony

15   what     the defendants would have had to pay Marvel, after

16   arm's length bargaining, for the restrictions defendants

17   secured without compensation."

18               That's the end of the quote.

19               So as part of the scheduling, we would like an

20   opportunity to present this additional expert testimony.

21   We understand that would mean we would submit a report.

22   The defendants would have an opportunity for a rebuttal

23   report and we would assume that the defendants would want

24   a deposition or depositions and I don't know whether the

25   Third Circuit decision will result in the defendants

6

1  desiring to present additional expert testimony or whether

2  defendants will simply take the position that they will have

3  a rebuttal expert.

4         That's everything I have to say, Your Honor.

5  Thank you.

6         THE COURT:  All right.  Who is speaking on

7  behalf of the defendants?

8         MR. ALLINGHAM:  Tom Allingham, Judge Jordan.

9         THE COURT:  All right.

10        MR. ALLINGHAM:  From our perspective, it seems

11 much more efficient to resolve the threshold issue, that

12 is, the jury trial issue.  I frankly had not known about

13 the document issue but I agree with Mr. Friedman that

14 that should be resolved but that the jury issue should be

15 resolved before we set out a schedule for the reason that

16 the resolution of the jury issue will affect I think

17 obviously the scheduling.  And in any event, until Your

18 Honor has had the opportunity to see the motion and the

19 briefing, Your Honor would be flying blind as to how long

20 it would take to decide that motion.

21        THE COURT:  Well, explain to me, Mr. Allingham,

22 why the question of jury or not jury affects or should

23 affect when the case is tried.

24        MR. ALLINGHAM:  Well, I'm only guessing, Your

25 Honor, but I'm guessing that the slots available to try a

1    jury trial and a bench trial might be different.

2                THE COURT:  No, that premise is inaccurate.  So

3    we can and are going to schedule this thing for trial and

4    work back.

5                MR. ALLINGHAM:  Fine.

6                The second point I would make is that the

7    briefing on the jury trial motion is now two years old and

8    is very stale for a number of specific as well as more

9    generic of a two-year-old argument.  Judge Robinson has

10   recently issued an opinion striking a jury demand in a

11   breach of fiduciary duty case and I think that was in August

12   of this year.  That has not been addressed by any of the

13   parties from our perspective and that is obviously a

14   case that would be helpful from our perspective, from

15   Mr. Friedman's perspective.  We relied heavily on a case

16   in the District Court of New York that has, subsequent to

17   the briefing, been reversed by the Second Circuit.  Those

18   authorities specifically quite obviously need to be

19   addressed by the parties but the arguments as I reviewed

20   them appear to me to be stale in other respects as well and

21   I think that it would be inefficient in the extreme for Your

22   Honor to decide that motion on the basis of briefs that are

23   not up-to-date with respect to the most recent authority.

24               The two options obviously are to supplement

25   the briefing or to engage in new briefing on the motion.  I

1    suggest to the Court that new briefing is more sensible.  If

2    we were to supplement the briefing, I can easily see that it

3    would be you'd have to read the original brief anyway and

4    then you would have to read why the reversal by the Second

5    Circuit does not affect the result argued for in our

6    original briefs and Mr. Friedman would have to argue why

7    Judge Robinson's opinion doesn't change the analysis in his

8    briefs.  The more efficient thing would be to rebrief the

9    motion.

10            THE COURT:  Yes, let me interrupt for a moment

11   to poll Mr. Friedman on this specific point.

12            Do you disagree, sir, that the most efficient

13   pray way to proceed on the jury issue is to go ahead and

14   have the parties submit new briefs?

15            MR. FRIEDMAN:  I would agree with that, Your

16   Honor.

17            THE COURT:  Okay.  Done.  Part of the things

18   we're going to come up with is a briefing schedule for

19   rebriefing the jury issue in light of changes in the law.

20   I'll give the parties an opportunity to put their arguments

21   to the Court fresh.

22            Okay.  I interrupted you, Mr. Allingham.  What

23   next?

24            MR. ALLINGHAM:  Thanks, Your Honor.  With

25   respect to the additional expert testimony issue, in the

1  quote that Mr. Friedman read, I note that the Third Circuit

2  said that the plaintiffs should have the opportunity to

3  present evidence like that.  There was an opportunity in

4  the old schedule for presentation of expert evidence and we

5  believe that the plaintiffs have the opportunity, if they

6  wanted to, to present such expert testimony.

7          THE COURT:  Well, you can take it as a given

8  that even if I were to agree that maybe they should have

9  done it before, that I'm reading the language of this

10  opinion in the same way Mr. Friedman is.

11          MR. ALLINGHAM:  As Your Honor said an a minute

12  ago, done.

13          THE COURT:  Yes.

14          MR. ALLINGHAM:  So from our perspective, I guess

15  given that premise, I agreed with Mr. Friedman that we will

16  need to exchange reports and rebuttal reports and conduct

17  depositions of the experts at least on the reports, or if

18  they are new, the new experts.

19          THE COURT:  Okay.  And the document dispute, I

20  don't hear -- well, on the document dispute, here is what

21  I'm going to ask you folks to do.  I don't know but what the

22  parties positions may have changed in two years in light of

23  all that has gone past that would cast the attorney-client

24  dispute in a new light that either narrows or eliminates the

25  dispute.  So the way we're going to address that is to throw

1    it back into you folks' court to take a fresh look at it.

2    And if it needs to be addressed by the Court, to put a point

3    on the dispute again so that it's freshly proposed and can

4    be addressed in accordance with my discovery dispute

5    resolution procedures.

6            So is there anything else, Mr. Allingham, from

7    the defendants' perspective before I give you my thoughts on

8    this?

9            MR. ALLINGHAM:  No, Your Honor.

10           THE COURT:  Okay.  Here is what I would like

11   the parties to do.  I'm figuring if I give you folks a few

12   months to address your briefing and your expert reports and

13   myself some sensible period of time to address the issues,

14   we ought to be able to bring this matter to a trial some

15   time within a year at the outside.  Does that seem either

16   unreasonably long or unreasonably short to you,

17   Mr. Friedman?

18           MR. FRIEDMAN:  It seems fine, Your Honor.

19           THE COURT:  Mr. Allingham?

20           MR. ALLINGHAM:  I agree with that, Your Honor.

21           THE COURT:  I'm going to propose to you here

22   some dates, but first let me ask you, if this case were to

23   go to trial on all the issues that are left in the case,

24   how long do you think it would take to try the case?  And

25   at this point, I understand that the difference between a

1  jury and a nonjury case starts to have some impact, but

2  assume for the sake of argument that it's going to be a

3  jury trial so we are conservative in estimating our time.

4  And, Mr. Friedman, how long do you think it would take?

5              MR. FRIEDMAN:  My estimate, Your Honor, is four

6  weeks.

7              THE COURT:  Four weeks?

8              MR. FRIEDMAN:  Yes.

9              THE COURT:  Okay.  Mr. Allingham?

10             MR. ALLINGHAM:  Your Honor, I have been working

11 on this case now for about three weeks.  I've been working

12 hard on it, but I would like to defer to Paul Lockwood who

13 is also on the phone who has been on this case for as many

14 years as I have been weeks.

15             THE COURT:  Mr. Lockwood.

16             MR. LOCKWOOD:  Your Honor, four weeks sounds

17 like a good guess.  It's very hard to ballpark it, but like

18 I said, it sounds like a decent estimate.

19             THE COURT:  Well, I'll tell you what.  It sounds

20 to me like it's excessive because the longest I have ever

21 let somebody bring a matter before me was a three-week

22 trial; and for purposes of scheduling, I'll give you three

23 weeks, but anything past that, you are going to have to

24 make one heck of a persuasive argument to me for giving

25 additional hours.

12

1          MR. FRIEDMAN:  Your Honor, this is Ed Friedman.

2    I'm not going to make that argument.  I'm going to focus on

3    making the trial as efficient as possible.  I don't think we

4    should have a problem with a three-week trial.

5          THE COURT:  All right.  Well, give me just a

6    moment here because what I'm going to propose then is a date

7    that we set this trial and then have you folks talk with

8    each other about the intermediate dates and send me your

9    joint proposals so that we can put those intermediate dates

10   and the trial date into a scheduling order that we'll all be

11   working off of.  Give me a moment here while I take a look

12   at the calendar.

13          (Pause.)

14          THE COURT:  All right.  Here is what we'll do.

15   Actually, I regret to say you don't get quite three weeks.

16   Instead of 15 trial days, you get 14 trial days.

17          MR. FRIEDMAN:  Then we're going to make a

18   motion, Your Honor.  I'm kidding.

19          THE COURT:  Okay.  Good.

20          All right.  And we'll start the day after

21   Columbus Day next year, the 10th of October, and we'll run

22   it through the 27th of October, 2006.  The 10th to the 27th.

23          And I will look forward to hearing from you

24   folks with what you think the schedule needs to be for the

25   exchange of additional expert reports and rebuttal reports

A 12

1    and any deposition discovery that you need in connection

2    with that as well as briefing on the jury trial -- excuse

3    me -- yes, on the jury trial issue.  And, finally, with

4    your position about whether we still have a dispute on

5    attorney-client privilege.  All right?

6               MR. ALLINGHAM:  Thank you, Your Honor.

7               MR. FRIEDMAN:  Yes.  Thank you, Your Honor.

8               THE COURT:  When do you think I might be able to

9    hear back from you folks?

10              MR. ALLINGHAM:  We can certainly talk today and

11   if we can reach agreement, then we can be back to Your Honor

12   today or Monday, I think.

13              MR. FRIEDMAN:  Well, certainly at some point

14   next week we ought to be able to figure out a schedule.

15              THE COURT:  Yes.  If I hear from you at any

16   point next week, that would be fine.  And I'll get the order

17   in place right after I hear from you folks and we'll all be

18   working off the same sheet of music.  Thanks for your time.

19              (The attorneys respond, "Thank you, Your

20   Honor.")

21              (Telephone conference ends at 9:52 a.m.)

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, IVAN SNYDER and
JAMES A. SCARPONE, as TRUSTEES OF
THE MAFCO LITIGATION TRUST,

     Plaintiffs,

v.

RONALD O. PERELMAN, MAFCO
HOLDINGS INC., MacANDREWS &
FORBES HOLDINGS INC., WILLIAM C.
BEVINS and DONALD G. DRAPKIN,

     Defendants

Civil Action No. 97-586 (KAJ)


# REPORT OF JEFFREY L. BALIBAN


January 13, 2006

*This report has been prepared in connection with the above- referenced matter. The report is to be used solely for the purposes of the subject litigation and is not to be used, or relied upon, for any other purpose without the express written consent of NERA Economic Consulting.*

# Table of Contents

I.    Introduction.................................................................................................1
      A.  Transaction Background ........................................................................1
      B.  Assignment ...........................................................................................1
      C.  Qualifications........................................................................................3
                                                                                       3

II.   Background....................................................................................................4
      A.  Marvel Entertainment Group, Inc. .......................................................4
      B.  The Notes...............................................................................................4
                                                                                       5

III.  Marvel's Financing Activities Following the Note Issuances ..........................8

IV.   Direct Consequence of Restrictions on Marvel in the Fourth Quarter of 1996.................13
      A.  Marvel's Stock Price Reacts to Announcements..................................13
      B.  The Indenture Covenants Inhibit Marvel's Ability to Obtain Funds................19
      C.  Measurement of Damages.....................................................................21

# I.    INTRODUCTION

## A. Transaction Background

1.    Mr. Ronald O. Perelman ("Mr. Perelman") acquired Marvel Entertainment Group Inc. ("Marvel") in January 1989 through a chain of wholly owned corporations. In July 1991, Mr. Perelman completed Marvel's initial public offering and received net proceeds of $63.7 million.[1] In 1992, net publishing revenues represented 56 percent of Marvel's consolidated net revenues.[2] Through a series of acquisitions made between 1992 and 1996, Marvel pursued a strategy to become a diversified youth entertainment company.[3] By 1996, Marvel's operations consisted of, among other things, "(i) the publication and sale of comic books and other children's publications, (ii) consumer products, media advertising, promotions and licensing of Marvel characters, (iii) the marketing and distribution of sports and entertainment trading cards and activity sticker collections, (iv) the design, marketing and distribution of toys, and (v) the manufacture and distribution of adhesives and confectionery products."[4]

2.    Mr. Perelman established and wholly owned each of the following holding companies: Marvel Holdings, Inc. ("Marvel Holdings"), Marvel Parent Holdings, Inc. ("Marvel Parent") and Marvel III Holdings, Inc. ("Marvel III"), and collectively for all three entities "Marvel Holding Companies"). During 1993 and 1994, Marvel was 80 percent owned either directly or indirectly by these three holding companies (see *Figure 1—Ownership Flowchart* on page 5 below). Also in 1993 and 1994, the Marvel Holding Companies each issued and sold a series of notes representing debt obligations with a combined face value of $894.1 million (the "Notes").[5] The Marvel Holding Companies received aggregate net proceeds of approximately

---

[1]   Marvel SEC Form 10-K for the fiscal year ended 12/31/92, p. 1.

[2]   Marvel SEC Form 10-K for the fiscal year ended 12/31/92, p. 2.

[3]   Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 14.

[4]   Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1.

[5]   $517.5 million from Marvel Holdings Indenture, 4/15/93 (SKA 04771); $251.7 million from Marvel Parent Indenture, 10/1/93 (SKA 04060); $125 from Marvel III Indenture, 2/15/94 (SKA 02832).

$553.5 million from the Notes.[6] The Marvel Holding Companies were obligated to repay the Notes, but had no assets other than Marvel stock to repay the Notes at maturity. Marvel received none of the proceeds from the Notes.

3.     In the indentures for each of the Marvel Parent and Marvel III Note issuances, those holding companies agreed to cause Marvel to act in accordance with certain restrictions ("Indenture Covenants").[7] The indentures for each Note offering provided, among other things, that (a) with the exception of certain categories of debt, the issuer would not permit Marvel or any of its subsidiaries to issue any debt unless certain financial ratios were met,[8] (b) the issuer would not permit Marvel to issue any preferred stock except under specified circumstances,[9] (c) the issuer would not permit Marvel to make certain restricted payments,[10] and (d) the Marvel Holding Companies would collectively continue to hold a majority of Marvel common stock.[11] Plaintiffs' counsel has advised me that plaintiffs intend to present evidence at trial that the Notes could not have been marketed and sold by the issuers without the inclusion of the Indenture Covenants in each Indenture.

4.     The Marvel Holdings and Marvel Parent Notes were zero coupon Notes and so did not require the payment of interest or principal until maturity. The Marvel III Notes were not zero coupon notes and required semi-annual interest payments at an annual rate of 9 1/8 percent. The Offering Memorandum for the Marvel III Notes explained that "[Marvel III would] be a party to an amended and restated tax sharing agreement with Marvel ... which is expected to

---

[6]  $288.0 million from Marvel Holdings (Offering Memorandum, 4/16/93 (SKA 09027)); $144.9 million from Marvel Parent (Prospectus, 10/13/93 (SKA 05888)); $120.6 million from Marvel III (Offering Memorandum, 2/8/194 (SKA 05077)).

[7]  While the Marvel Holdings Indenture contains similar restrictions, plaintiffs' counsel has advised me that the claim for compensatory damages with respect to the Marvel Holdings Notes has been barred by the statute of limitations.

[8]  Section 4.04 of each: Marvel Holdings Indenture, 4/15/93 (SKA 04779), Marvel Parent Indenture, 10/1/93 (SKA 04069), Marvel III Indenture, 2/15/94  (SKA 02842-02843).

[9]  Section 4.04(c) of each: Marvel Holdings Indenture, 4/15/93 (SKA 04781) ,Marvel Parent Indenture, 10/1/93 (SKA 04071), Marvel III Indenture, 2/15/94  (SKA 02845).

[10]  Section 4.05 of each: Marvel Holdings Indenture, 4/15/93 (SKA 04782), Marvel Parent Indenture, 10/1/93 (SKA 04072), Marvel III Indenture, 2/15/94  (SKA 02845-02846).

[11]  Section 4.09(a) of each: Marvel Holdings Indenture, 4/15/93 (SKA 0478804789), Marvel Parent Indenture, 10/1/93 (SKA 04078-04079), Marvel III Indenture, 2/15/94  (SKA 02854-02855).

provide the principal source of cash for [Marvel III] to pay interest on the Notes."[12]  The Marvel III Indenture also imposed a Tax Deconsolidation Event covenant, amounting to a repurchase obligation on Marvel III if its ownership of Marvel's outstanding equity fell below 80 percent, causing Marvel to cease being a member of an affiliated group of companies for purposes of filing a consolidated federal income tax return.[13]

5.    On December 27, 1996, Marvel voluntarily petitioned for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

**B. Assignment**

6.    Counsel for the Plaintiffs has asked me to conduct economic analyses and provide my opinion with respect to whether, and to what extent, Marvel was harmed by the issuance of the Marvel Parent and Marvel III Notes on the terms described above.

7.    It is my opinion that the Indenture Covenants in the Marvel Parent and Marvel III Note issuances limited Marvel's access to capital markets, interfered with Marvel's ability to issue equity, and generally impeded Marvel's ability to obtain financing on terms in Marvel's best interest.  The Indenture Covenants also resulted in Marvel being unable to address a liquidity crisis in the fourth quarter of 1996 that led directly to Marvel's bankruptcy filing.  In my opinion, the magnitude of this particular harm at a time when Marvel's stock price had already declined to $4.63 a share can be measured by the further decline in market value and stock price of Marvel on November 12, 1996, and is at least $190 million.  It is also my opinion that the financial harm to Marvel caused by the issuance of the Marvel Parent and Marvel III Notes on the terms described above is in the range of $308 to $617 million, and that the Marvel III Note issuance alone would have been sufficient to cause all of the harm described herein.

**C. Qualifications**

8.    I am a Senior Vice President in the Securities and Finance practice of National Economic Research Associates ("NERA").  My practice at NERA focuses on resolving complex commercial disputes through independent analysis of the economic, finance, accounting, and

---

[12]  Marvel III Offering Memorandum (SKA 05079).

[13]  Section 4.14 of the Marvel III Indenture, 2/15/94 (SKA 02863); Marvel III Offering Memorandum (SKA 05079).

valuation issues at hand. Prior to joining NERA, I was a senior partner in the Dispute Advisory Services practice of KPMG LLP. My curriculum vitae, attached as Exhibit 1, provides the details of my education, background and experience.

9.     NERA is being compensated for its time at standard billing rates. My current hourly billing rate is $500. The hourly rates charged for other NERA personnel who helped me with this analysis range from $95 to $410.

10.     Documents I have considered in forming my opinions are listed in Exhibit 2.

## II.   BACKGROUND

### A. Marvel Entertainment Group, Inc.

11.     Ronald Perelman, through a series of wholly owned affiliates, controlled approximately 60 percent of Marvel's outstanding common stock at the time of the Marvel Holdings Note issuance in April of 1993. On May 7, 1993, MacAndrews & Forbes announced that it had completed a tender offer for 10 million shares of common stock of Marvel.[14] Mr. Perelman's affiliates increased their ownership of Marvel stock from approximately 60 percent (28,800,000 out of 48,340,528) to approximately 80.3 percent (38,800,000 out of 48,340,528) at that time.[15] Mr. Perelman's ownership of at least 80 percent of Marvel's equity allowed for Marvel's consolidation for tax purposes with other Perelman holdings. See Figure 1 below.

---

[14] "MacAndrews & Forbes Completes Tender Offer for Marvel Shares." PR Newswire, May 7, 1993. Obtained from Factiva.

[15] "MacAndrews & Forbes Completes Tender Offer for Marvel Shares." PR Newswire, May 7, 1993. Obtained from Factiva. Marvel SEC Form 10-K for the fiscal year ended 12/31/92, p. 1.



*Figure 1—Ownership Flowchart*[16]

## B. The Notes

12.    During 1993 and 1994, each of the Marvel Holding Companies issued a series of notes ("Notes") and received aggregate net proceeds of $553.5 million, as follows:

---

[16]  Marvel III Offering Memorandum, 2/8/94 (SKA 05079, 05083) and Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1.

a.  In April 1993 Marvel Holdings issued senior secured discount notes with a face value of $517.4 million, due in April 1998.[17] These were zero coupon notes (no interest payments prior to maturity) that accrued interest at an annual rate of 11.25 percent.[18] Marvel Holdings provided 48 million shares of Marvel common stock as collateral for its borrowings.[19] Marvel Holdings had no other assets from which it could repay the Notes.[20] Marvel Holdings issued the Notes and received net cash proceeds of $288 million, which were distributed to Marvel Parent. None of the proceeds were made available to Marvel.[21]

b.  In October 1993 Marvel Parent issued senior secured discount notes with a face value of $251.7 million, due in April 1998.[22] These were zero coupon notes (no interest payments prior to maturity) that accrued interest at an annual rate of 12.25 percent.[23] Marvel Parent provided 20 million shares of Marvel common stock as collateral for its borrowings.[24] Marvel Parent had no assets from which to repay the Notes other than Marvel common stock.[25] Marvel Parent issued the notes and received net cash proceeds of $144.9 million, which were distributed to Marvel III.[26] None of the proceeds were made available to Marvel.[27]

---

[17]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 2.

[18]  Marvel Holdings Offering Memorandum, 4/16/93, p. 1 (SKA 09027).

[19]  Marvel Holdings Offering Memorandum, 4/16/93, p. 7 (SKA 09033). The shares are adjusted for the 2-for-1 stock split payable 11/1/93 for shareholders of record 10/15/93. "Marvel Entertainment sets two-for-one split." Reuters News, 9/24/1993.

[20]  Marvel Holdings was formed to hold a majority of Marvel's outstanding shares and all of Marvel U.K.'s outstanding shares. Marvel Holdings Offering Memorandum, 4/16/93, pp. 1, 12 (SKA 09027, 09038)

[21]  Marvel Holdings Offering Memorandum, 4/16/93, p. 9 (09035).

[22]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 3

[23]  Marvel Parent Prospectus, 10/13/93, p. 7 (SKA 05878). Issue price data for Marvel Parent debt taken from Bloomberg LP.

[24]  Marvel Parent Prospectus, 10/13/93, p. 1 (SKA 05872) This is adjusted for the 2-for-1 stock split payable on 11/1/93. See footnote 19.

[25]  Marvel Parent Prospectus, 10/13/93, pp. 1, 3 (SKA 05872, 05874)

[26]  Marvel Parent Prospectus, 10/13/93, pp. 1, 9, 17 (SKA 05872, 05880, 05888).

[27]  Marvel Parent Prospectus, 10/13/93, pp. 9, 17 (SKA 05880, 05888).

c.  In February 1994 Marvel III issued senior secured notes with a face value of $125.0 million. These Notes were also due for repayment by April 1998 but, unlike the first two issuances, the Marvel III Notes were not zero coupon bonds and required semi-annual interest payments at an annual rate of 9¼ percent.[28] Marvel III provided 9.3 million shares of Marvel common stock as collateral for its borrowings. Marvel III stated in the Offering Memorandum that it anticipated funding interest on the notes from payments received through a tax sharing agreement with Marvel.[29] Other than such anticipated payments and Marvel common stock, Marvel III had no other assets from which to pay interest or repay the notes.[30] Marvel III issued the notes and received net cash proceeds of $120.6 million, which were distributed to Andrews Group, a wholly owned Perelman company and the parent of Marvel III.[31] None of the proceeds were made available to Marvel.[32]

13.    The Marvel III Offering Memorandum states that "[a]s a member of the Mafco Holdings Affiliated Group, Marvel is includable in Mafco Holdings' consolidated federal income tax return. Marvel has entered into a tax sharing agreement with Mafco Holdings pursuant to which it makes tax sharing payments to Mafco Holdings in amounts equal to the taxes it would have paid if it were to file separate consolidated tax returns for itself and its subsidiaries. [ ] Under the Indenture, the Issuer is required to retain…out of the tax sharing payment immediately preceding each interest payment date on the Notes, all amounts so received up to the aggregate amount of interest due on such interest payment date."[33] The Offering Memorandum further states that Marvel will be required to enter into the "Marvel Tax Sharing Agreement which will

---

[28] Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 2; Marvel III Offering Memorandum, 2/8/94, p. 1 (SKA 05077).

[29] Marvel III Offering Memorandum, 2/8/94, pp. 1, 3 (SKA 05077, 05079).

[30] Marvel III Offering Memorandum, 2/8/94, p. 1. (SKA 05077).

[31] Marvel III Offering Memorandum, 2/8/94, pp. 1, 7, 11 (SKA 05077, 05083, 05087); Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1.

[32] Marvel III Offering Memorandum, 2/8/94, p. 11 (SKA 05087).

[33] Marvel III Offering Memorandum, 2/8/94, p. 52 (SKA 05128).

amend and restate the existing tax sharing agreement to provide that Marvel will make payments thereunder to [Marvel III] instead of Mafco Holdings for 1994 and subsequent years."[34]

14.    Section 4.14 of the Marvel III Indenture, entitled *Tax Deconsolidation Event*, describes the consequences and penalties if "Marvel ceases to be a member of an affiliated group of corporations, which group also contains [Marvel III] as a member, for purposes of filing a consolidated Federal income tax return."[35] Upon a tax deconsolidation event, note holders would "have the right to require [Marvel III] to repurchase all or any part of such Holder's Securities at a repurchase price equal to 101 percent of the principal amount thereof plus accrued and unpaid interest (if any) to the date of repurchase."[36]

15.    As a practical consequence of the Marvel III note issuance, in order for Marvel to issue any new common equity and, in so doing, not trigger a tax deconsolidation event and other consequences under section 4.14, Marvel's controlling shareholders would have had to buy a sufficient amount of any new equity issued in order to maintain an 80 percent ownership stake.

## III.    MARVEL'S FINANCING ACTIVITIES FOLLOWING THE NOTE ISSUANCES

16.    From 1992 through 1995, Marvel developed and implemented a growth-by-acquisition strategy, acquiring interests in such companies as Fleer Corporation, SkyBox International, Inc., Toy Biz, Inc., and Panini S.p.A. Marvel also engaged in a consolidation of the comics business by acquiring other publishers, including Harvey Comics and Malibu Comics. The Toy Biz, Inc. acquisition was consummated on March 19, 1993, for 46 percent of Toy Biz in exchange for an exclusive, perpetual, royalty-free license to use all of Marvel's characters.[37] The acquisition for all the equity of Panini was consummated on August 4, 1994, at a cost of £ 251.5 billion (approximately $158.4 million based on the exchange rates in effect on the date of acquisition).[38] The acquisition for all of the issued and outstanding shares of SkyBox

---

[34] Marvel III Offering Memorandum, 2/8/94, p. 52 (SKA 05128).

[35] Marvel III Indenture, 2/15/94, p. 57 (SKA 02863).

[36] Marvel III Indenture, 2/15/94, p. 57 (SKA 02863).

[37] Marvel SEC Form 10-K for the fiscal year ended 12/31/93, Note F-9.

[38] Marvel SEC Form 10-K for the fiscal year ended 12/31/94, p. 1.

common stock was consummated on March 8, 1995, for $16 a share or approximately $165 million including fees, expenses and other acquisition costs.[39]

17.     In a board meeting in March 1993, just prior to the Marvel Holdings Note issuance, Marvel's board amended the Marvel corporate charter to increase its authorized capital stock (both common and preferred) in order to, among other things, effect stock splits and have stock available for "acquisitions of other companies and other general corporate purposes."[40] However, following the Note issuances, Marvel financed its acquisitions principally through bank debt, which increased substantially, from $245 million at the time of the issuance of the Marvel III notes in the first quarter of 1994, to more than $654 million just prior to the December 1996 bankruptcy filing.[41]  The history and terms of Marvel's bank debt financing are as follows:

a.  By year-end 1993, Marvel reported total debt of $250 million[42] consisting primarily of a Credit and Guarantee Agreement ("Guarantee Agreement") dated September 17, 1992, with an interest rate of 4.67 percent (at December 31, 1993) payable semi-annually.[43]  The Guarantee Agreement, initially consisting of a $260 million term loan and a $40 million revolver, required 12 consecutive semi-annual principal repayments of $17.5 million for April and October of 1993 and $22.5 million beginning in April 1994, with a revolver maturing on October 19, 1998.[44]

b.  By year-end 1994, Marvel had a total debt balance of $384.3 million consisting primarily of $141.5 million from a new term loan ("Term Loan") and $242 million from the existing Guarantee Agreement as amended and restated (the "Amended and Restated Credit Agreement").[45]  The interest rate on the Term Loan was composed of a Eurodollar Rate plus an applicable margin.  As of March

---

[39]  Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 1.

[40]  Marvel Entertainment Group, Inc., Meeting of the Board Notes, 3/18/93, pp. 3-4.  (ME 00487-00488)

[41]  Marvel SEC Form 10-K for the fiscal years ended 12/31/92 – 12/31/95, Marvel SEC Form 10-Q for the fiscal periods ended 3/31/94 and 9/30/96.

[42]  Marvel SEC Form 10-K for the fiscal year ended 12/31/93, Note F-3 (A00094).

[43]  Marvel SEC Form 10-K for the fiscal year ended 12/31/93, Note F-12 (A00103)

[44]  Marvel SEC Form 10-K for the fiscal year ended 12/31/92, Note F-10; Guarantee Agreement, 9/17/92, p. 28 (M-SP2 1799).

[45]  Marvel SEC Form 10-K for the fiscal year ended 12/31/94, Note F-11.  (A00152)

2, 1995, the Eurodollar rate was approximately 9¼ percent and the applicable margin rate was approximately ¾ percent to 1¼ percent to be determined based on the Company's financial performance.[46]  The principal payments under the new term loan were to be paid every six months from 2/28/1995 to 8/31/01.[47]  The first payment was a prepayment on September 30, 1994, in the amount of $9.4 million, and the first installment of $2.5 million was paid on February 28, 1995.[48]

c.  By year end 1995, Marvel had a total debt balance of $586.5 million[49] consisting primarily of the Amended and Restated Credit Agreement, the Term Loan, and $350 million from a new term loan ("U.S. Term Loan Agreement").  The interest rate in the U.S. Term Loan Agreement was based on the Eurodollar Rate plus an applicable margin.  As of March 4, 1996, the Eurodollar rate was approximately 7-13/16 percent to 8⅓ percent, depending upon the length of the relevant interest period and the applicable margin rate was approximately 2 to 2.5 percent.[50]  The principal payments under the new term loan were to be paid every six months from 8/31/99 to 2/28/02.  The first four payments were for $37,500,000 while the last two payments were for $100,000,000.[51]

d.  Marvel continued drawing from its Amended and Restated Credit Agreement and other private debt sources until its debt level reached $640.6 million just prior to its December 1996 bankruptcy filing.[52]

18.    There are a variety of factors that drive the amount of debt a firm should have in its capital structure, including tax issues, types of assets and uncertainty of operating income. Due to the high costs of financial distress, less debt is optimal in industries that tend to have a high ratio of intangible to tangible assets and a high degree of uncertainty related to future

---

[46]  Marvel SEC Form 10-K for the fiscal year ended 12/31/94, pp. 17, 18.

[47]  Term Loan, 8/30/94, p. 9.

[48]  Marvel SEC Form 10-K for the fiscal year ended 12/31/94, p. 17.

[49]  Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 42.

[50]  Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 18.

[51]  U.S. Term Loan Agreement, 4/24/95, p. 22.

[52]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. F-13.

operating income. The more uncertain a firm's operating income and the higher proportion of intangible assets it holds, the greater the likelihood of the firm going into financial distress, and increasing debt only increases the likelihood of distress. Thus, firms such as this typically finance mostly with equity.[53] Given the uncertainty of Marvel's operating income and intangible nature of its assets, as well as the long-term nature of cash flows from the acquisitions being financed, it would have been in Marvel's best interest to avail itself of equity financing instead of having to rely solely on bank debt from 1993 to 1996.

19.   Exhibits 3A and 3B show Marvel's debt-to-equity and interest coverage ratios relative to a group of comparable companies between 1993 and 1996 just prior to the Marvel bankruptcy.[54] The exhibits show that Marvel incurred debt levels far beyond the average of these industry peers. The debt-to-equity ratio for Marvel was 9, 27, 44 and 271 percent from 1993 to 1996 respectively while the debt-to-equity ratio for an index of comparable companies was 5, 5, 9 and 12 percent over the same time period. Similarly, Marvel's interest coverage ratio (EBIT[55]/interest expense) was 7.05, 6.37, 1.06 and (1.62) from 1993 to 1996, significantly lower than ratios for the comparable companies, which averaged 12.42, 10.88, 10.11 and 8.00 from 1993 to 1996, respectively.

20.   At December 31, 1993, Marvel's total debt was about $245 million, and it had a debt-to-equity ratio of 9 percent. At this ratio level, Marvel's objective should have been to reduce its debt-to-equity ratio toward the industry average of 5 percent. However, following the Marvel III Note issuance, Marvel relied solely on bank debt for financing. In my opinion, the complete failure to use equity financing was in the best interest of Mr. Perelman and his wholly owned holding companies as a result of the terms of the Notes, although not necessarily in the best interest of Marvel.

21.   By 1996, Marvel's bank debt increased to about $650 million.[56] Instead of controlling leverage risk by reducing its debt-to-equity ratio, Marvel increased the ratio to 271

---

[53] See Ross, Westerfield, and Jaffe, *Corporate Finance*, 6th Edition, McGraw Hill, 2002, p. 451.

[54] Comparable companies were chosen based on Marvel disclosures and analyst reports that describe Marvel's competitors. See Exhibit 4 for a description of the comparable companies.

[55] Earnings before interest and tax.

[56] Marvel SEC Form 10-Q for the fiscal period 9/30/96, p. 3.

percent. This increase in bank debt also resulted in an annual interest expense of $19.1 million in 1994, $47.1 million in 1995 and $60.8 million in 1996. Had Marvel obtained equity financing, its debt level could have been reduced to support an industry average debt-to-equity ratio. This would have reduced the amount of cash used for interest payments during the 1994-1996 period and would have resulted in available bank debt capacity to respond to its liquidity crisis in the fourth quarter of 1996. Even though Marvel experienced poor performance in both 1995 and 1996, it would have had access to cash to meet its obligations through year-end 1996, and could have avoided the liquidity crisis that caused its financial demise.

22.     The use of bank debt to finance acquisitions between 1993 and 1995 benefited Mr. Perelman because it allowed him to maintain (through his holding companies) his 80 percent equity stake in Marvel and not suffer the consequences of a tax deconsolidation event, or spend additional capital to buy Marvel stock. The extensive use of bank debt also enabled the Marvel Holding Companies to comply with Indenture Covenants that required them to cause Marvel to continue to have a majority of outstanding stock owned by the Marvel Holding Companies. The bank debt clearly resulted in Marvel's having debt-to-equity ratios significantly above those of comparable companies and was a cause of Marvel's financial distress. In the absence of the Indenture Covenants, which made the Marvel III Note issuance possible, it would have been in Marvel's interest to issue equity such that its capital structure would have been much more in line with comparable companies. Thus, it is my opinion that the Indenture Covenants was a cause of Marvel's financial distress.

23.     Research by professors Gregor Andrade and Steven Kaplan can be used to measure the value lost by companies that suffer financial distress. Andrade and Kaplan find that on average pre-distress enterprise value (the value of the company as a whole) declines by between 10 and 20 percent and that this decline is directly attributable to the overuse of debt financing.[57] The use of bank debt financing rather than, for example, zero coupon debt financing, only exacerbates the financial distress and liquidity problems for a company such as Marvel. Exhibit 5 shows that Marvel's enterprise value was $3,085 million as of January 31, 1994, prior to the Marvel III issuance in February of 1994, and before the subsequent increase in

---

[57] Gregor Andrade and Steven Kaplan, "How Costly is Financial (Not Economic) Distress? Evidence from Highly Leveraged Transactions that Became Distressed," *Journal of Finance*, Vol. LIII, No. 5 (October 1998), p. 1445.

Marvel debt. Taking into account the findings of the Andrade and Kaplan study, I estimate 10 to 20 percent of Marvel's enterprise value, between $308.5 million and $617.0 million, was lost due to financial distress caused by the Indenture Covenants and the financing decisions made in light of those covenants and other terms of the Notes, which I am informed were necessary to the marketing and issuance of the Notes. In fact, even though Marvel's enterprise value was $3,085 million as of January 31 1994, by December 31, 1998, subsequent to the Fourth Amended plan of Reorganization, it is reported that Marvel was purchased for "approximately $446.9 million which included approximately $257.9 million in cash and the remainder in securities …"[58]

24.    I believe it is appropriate to consider interest in order to compensate plaintiffs for the losses caused by defendants. Counsel has informed me that the legal rate of interest under Delaware law at the relevant time was the Federal Reserve Discount Rate, plus 5 percent. This would have been 8 percent on February 15, 1994. I also believe it is reasonable to use the mid-point between the range of potential losses for the purpose of estimating damages. My computation of damages, including interest, from February 15, 1994, to December 31, 2005, using the simple fixed-rate simple interest, fixed rate monthly compounding, variable rate monthly compounding approaches, is $902.4 million, $1,192.8 million and $1,334.2 million respectively (shown at the bottom of Exhibit 5). Because I understand the Court has discretion to use simple interest or compound and fixed or variable rates, I have set forth computations using all three approaches. In my opinion, the use of compound interest provides a more reasonable indication of the time value of money.

## IV.    DIRECT CONSEQUENCE OF RESTRICTIONS ON MARVEL IN THE FOURTH QUARTER OF 1996

### A. Marvel's Stock Price Reacts to Announcements

25.    In order to measure the effect of the Indenture Covenants on Marvel in the fourth quarter of 1996, I have looked at the market's reaction to various announcements, including

---

[58] Marvel Enterprises, Inc. SEC Form 10-K for the fiscal year ended 12/31/98, Note F-8.

those concerning the Indenture Covenants.[59]  It is an accepted principle of corporate finance that, in an efficient market, a company's stock market capitalization is a reasonable measure of the equity value of the company.[60]  Under the semi-strong form of the efficient market hypothesis, "[i]f markets are efficient…then prices will adjust immediately to public information."[61]  I obtained daily closing prices for Marvel Enterprise Group from FactSet.[62]  These daily prices are reflected in Figure 2 below for October and November 1996.



*Figure 2—Marvel Daily Closing Prices for October Through November 1996*

---

[59]  I do not believe that the harm caused to Marvel by the Indenture Covenants would be any different or greater if I were to consider the harm caused by the indenture covenants in all three note offerings, as opposed to just the Marvel Parent and/or Marvel III offerings, as described herein.

[60]  Ross, Westerfield, and Jaffe, *Corporate Finance*, 6th Edition, McGraw Hill, 2002,  p. 342.

[61]  Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill Irwin, New York, 2006, p. 337.

[62]  ©FactSet Research Systems, Inc.

26.     We reviewed news stories and announcements relating to Marvel during the fourth quarter of 1996 from various sources, including Business Wire, Dow Jones News Service, PR Newswire, Reuters and The Wall Street Journal. Public announcements signified by letter notations in Figure 2 above are described below:

a.  **October 8, 1996** – Marvel stock opens and closes at $7.875 a share. After the close, Marvel warns the market that it expects earnings to be between -7¢ to -12¢ a share for the third quarter of 1996.[63] Analysts had expected earnings of 8¢ a share for the third quarter and 12¢ a share for the fourth quarter of 1996.[64] Marvel also informs the market of its financial distress by stating "that it has violated bank credit lines as a result of its wider-than-expected operating losses ... Marvel said it has begun discussions regarding covenant waivers and credit restructuring, and added that it expects it will need an infusion of equity capital to complete a revamping."[65]

b.  **October 9, 1996** – Marvel "expects to report a third-quarter loss of between -7¢ and -12¢ a share. Because of the loss, the company said, it has failed to meet certain financial covenants and is negotiating 'with its agent bank seeking waivers to these covenants.'"[66] Marvel stock closes at $5.625 a share.

c.  **October 17, 1996** –

   i.  Andrews Group "expects to make a proposal to Marvel Entertainment Group Inc. under which Andrews Group ... would purchase new equity capital at Marvel."[67]

---

[63] "Marvel Entertainment Estimate -2-: Wider Oper Losses," Dow Jones News Service, 10/8/96. Obtained from Factiva.

[64] "Marvel Entertainment Estimate -3-: Street Saw 3Q Net 8c/Shr," Dow Jones News Service, 10/8/96. Obtained from Factiva.

[65] "Marvel Entertainment Estimate -2-: Wider Oper Losses," Dow Jones News Service, 10/8/96. Obtained from Factiva.

[66] "Marvel Entertainment Expects to Report Loss for 3rd Quarter," The Wall Street Journal, 10/9/96. Obtained from Factiva.

[67] "Andrews Grp –Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

ii. "This proposal will be subject to a number of conditions, including the waiver by Marvel's banks of certain financial covenants contained in its bank credit facilities and the restructuring of those facilities to provide for Marvel's cash requirements."[68]

iii. "The proposal will also be subject to an agreement among Marvel, its banks, the holders of certain Marvel holding company bonds and Andrews Group on the terms of the Andrews Group purchase."[69]

iv. "Andrews Group said any such purchase would result in "substantial" dilution to the existing Marvel shares, including the Marvel shares which serve as collateral for Marvel holding company bonds."[70]

d. **October 23, 1996** – "Scott M. Sassa, who was named to the newly created positions of president and chief operating officer of Ronald O. Perelman's Andrews Group Inc. yesterday, has been charged with the daunting task of bolstering [Marvel's] disparate entertainment, publishing, and toy assets. Mr. Sassa ... was also named chairman and chief executive of Marvel Entertainment Group Inc., which is owned 81% by Andrews Group."[71]

e. **November 12, 1996** –

i. "For the third quarter of 1993 Marvel reported a net loss of 12¢ a share compared to gain of 19¢ a share one year ago."[72]

ii. "As previously announced, as a result of Marvel's third quarter loss, the Company failed to satisfy certain financial covenants contained in its credit agreements and had commenced discussions with its agent bank

---

[68] "Andrews Grp –Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

[69] "Andrews Grp – Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

[70] "Andrews Grp – Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

[71] "Former Turner Broadcasting Executive Named Chairman and CEO of Marvel," The Wall Street Journal, 10/24/96. Obtained from Factiva.

[72] "Marvel 3Q96 Results and Performance Update." PR Newswire, 11/12/96. Obtained from Factiva.

seeking waivers of these covenants and a restructuring of the credit agreements to provide for its cash requirements. Such a restructuring will ultimately require an infusion of new equity capital. Until Marvel receives these waivers, it will not be able to borrow additional amounts under its domestic credit facilities.[73]

iii. "Andrews Group now owns about 81 million diluted shares of Marvel's 101.8 million outstanding diluted shares."[74]

iv. Marvel "has received a proposal from Andrews Group Incorporated for an equity investment in Marvel...it is expected that any purchase by Andrews of equity in Marvel will result in substantial dilution to the existing Marvel shares, including the Marvel shares that serve as collateral for the Marvel holding company bonds. The proposed equity infusion by Andrews is expected to be subject to a number of significant conditions, including Toy Biz...becoming a wholly owned subsidiary of Marvel."[75]

v. "The purchase price for the shares would be $350 million in cash or, at the option of Andrews, an equal value of shares of Class A common stock...of Toy Biz."[76]

vi. Andrews Group "is offering to buy 410 million newly issued Marvel shares for $350 million...That would price the new shares at about 85¢ each."[77]

vii. "The Andrews investment would provide Marvel with desperately needed liquidity and financial flexibility. *As such, it is a fundamental predicate*

---

[73] "Marvel 3Q96 Results and Performance Update." PR Newswire, 11/12/96. Obtained from Factiva.

[74] "Andrews Grp-Marvel-3-: Andrews Now Has 81M Marvel Shrs." Dow Jones News Service, 11/12/96. Obtained from Factiva.

[75] "Marvel Receives Andrews Proposal." PR Newswire, 11/12/96. Obtained from Factiva.

[76] "Marvel Receives Andrews Proposal." PR Newswire, 11/12/96. Obtained from Factiva.

[77] "Perelman's Andrews Grp Plans To Buy Marvel Stk On The Cheap," Dow Jones News Service, 11/12/96. Obtained from Factiva.

> *to a financial restructuring essential if Marvel is to resolve its current difficulties and have the opportunity over time to prosper.*"[78]

    viii.  "Moreover, the Andrews Investment is *subject to the satisfactory resolution of a number of issues under the Marvel parent holding company indentures, including that any Marvel Common Stock purchased by Andrews not be subject to the liens thereunder.*"[79]

    27.  To summarize, by October 9, 1996, the market knew that Marvel was in financial distress and needed a significant capital infusion. By October 17, 1996, the market knew that Mr. Perelman would be proposing a restructuring plan for Marvel involving an infusion of equity capital. As of October 17, 1996, Marvel's stock price was at $4.625 a share and fluctuated little from that level through November 11, 1996.[80] On November 12, 1996, Marvel announced for the first time that the Andrews investment would be a fundamental predicate to a financial restructuring essential if Marvel is to resolve its current difficulties and have the opportunity, over time, to prosper. At the same time Marvel stated that the Andrews investment was subject to the satisfactory resolution of a number of issues under the Marvel parent holding company indentures, including that any Marvel Common Stock purchased by Andrews not be subject to the liens thereunder. Immediately following this announcement, Marvel's stock price fell from a pre-announcement level of $4.63 to $2.75 per share, a decline of more than 40 percent. Marvel's announcement also included the fact that the Andrews Group was proposing $350 million of new equity at $0.85 per share, and I would expect such proposed price per share to affect Marvel's stock price, but as I explain below, the proposed transaction and pricing at $0.85 per share, was structured to address issues related to the Indenture Covenants.

---

[78] "Andrews Group Proposes To Acquire Newly Issued Marvel Entertainment Group Stock," Business Wire, 11/12/96. Obtained from Factiva. Emphasis added.

[79] "Marvel Receives Andrews Proposal," PR Newswire, 11/12/96. Obtained from Factiva. Emphasis added.

[80] The mean of daily closing prices from 10/17/96 through 11/11/96 is $4.85 a share.

## B. The Indenture Covenants Inhibit Marvel's Ability to Obtain Funds

28.     According to the Andrews proposal, Marvel needed approximately $350 million in funding in order to implement a restructuring plan.[81]  However, Andrews Group would not provide that funding if the newly issued equity was subject to the existing Indenture Covenants.

### 1. It Is Unlikely that Marvel Could Have Raised Debt Funding Subsequent to October 9, 1996.

29.     After the October earnings announcement and warning of bank covenant violations, the market knew that Marvel was in financial distress.  Given that the current bank debt was in or near default, additional debt financing would have been unlikely outside of a bankruptcy.  Further, restrictions in Section 4.04 of the Marvel Holdings Companies Indenture Covenants limited debt and preferred stock issuance due to the required EBITDA-to-interest ratio.

### 2. Due to the terms on which the Marvel Holding Companies Notes were issued as described above, Marvel Could Not Avail Itself of Equity Financing Without Significant Perelman Participation.

30.     On November 12, 1996, Andrews made a proposal to provide the equity funding that Marvel needed in the amount of $350 million.  At the pre-announcement price of $4.625 a share, Marvel would have needed to find a buyer for 75.68 million shares to raise the $350 million.  Section 4.09(a) of the Marvel Holding Companies Indentures required that the Marvel Holding Companies be the legal and beneficial owner in the aggregate of at least a majority of the voting stock of Marvel.  According to Marvel's September 30 1996 10-Q, Mr. Perelman owned or controlled approximately 82.6 million of the total issued and outstanding 101.8 million shares.  Issuing another 75.68 million shares would dilute the 82.6 million share stake to about 46 percent.  Therefore, to obtain the needed $350 million of new equity at market value either Mr. Perelman would have needed to participate in the equity infusion or the Marvel Holding Companies' equity would fall below 50.1 percent as required by Section 4.09(a).

31.     The Marvel III Offering Memorandum also describes various consequences "[i]n the event that, prior to the Marvel Collateral Release Date (as defined), [Marvel III] and Marvel

---

[81]  Karen Fessler, Daniel Fisher and Beth Williams, "Marvel Gets Perelman Bid for $350 Mln of New Stock," Bloomberg LP, 11/12/96.

(excluding its subsidiaries) cease to be members of the same consolidated federal tax group."[82] To maintain tax consolidation, Marvel III and its affiliates would have to own at least 80 percent of Marvel's common stock.[83] As of September 30, 1996, the Marvel Holding Companies and their affiliates held beneficial ownership of about 81 percent of Marvel (82.6 million of 101.8 million shares). Thus, any new equity infusion could not include any meaningful investment from an outside (*i.e.*, non-Perelman) source without diluting the Marvel Holding Companies and their affiliates below 80 percent. In fact, Mr. Perelman or his affiliates would have needed to provide funding of $274.5 million to acquire 59.4 million shares of a new 75.68 million share issuance at market prices necessary to raise $350 million. This level of new investment would have allowed maintenance of an 80 percent ownership stake (see Exhibit 6). However, as indicated by the Andrews proposal on November 12, 1996, Mr. Perelman was unwilling to make any equity investment in Marvel unless the note holders of each Marvel Holding Companies Note issuance agreed that such new equity would not be subject to the Indenture Covenants.

**3. Marvel's stock price declined by more than 40 percent when Marvel disclosed that the Indenture Covenants were a substantial impediment to Marvel's obtaining desperately needed financing.**

32.    Given Marvel's liquidity crisis, obtaining additional debt financing was unlikely or impossible, and Marvel's ability to obtain equity financing was ultimately prevented by the terms on which the Marvel III notes were issued as described above. Mr. Perelman could have personally financed the acquisition of 75.68 million shares of new equity at the current market price (about $4.625) to raise $350 million. However, his current stake of 82.6 million shares was pledged on the Marvel Holdings Companies Notes, and unless a sufficient amount of the new equity was owned by the Marvel Holding Companies, and subject to the Indenture Covenants, there would have been a default and Mr. Perelman was vulnerable to becoming a minority shareholder in the event the bondholders were able to execute on their security interest. Further, he would have lost significant tax benefits should his ownership interest in Marvel fall below 80 percent.

---

[82]  Tax Deconsolidation Event – Marvel III Offering Memorandum, 2/8/94, p. 10 (SKA 05086).

[83]  *See* U.S. Code, Title 26, Subtitle A, Chapter 6, Subchapter A, Section 1501 and 1504, available at http://www.law.cornell.edu/uscode/html/uscode26/usc_sec_26_00001501----000-notes.html;.

33.    Mr. Perelman made a proposal that was structured to protect his 80 percent position even if the holders of the Marvel Holding Companies Notes were to foreclose on their collateral. Since Marvel already had 101.8 million issued and outstanding shares, Mr. Perelman proposed to make an equity investment such that the preexisting equity would be no more than 20 percent of total outstanding shares *after* a new equity issuance. As such, he offered to fund the issuance of 410 million new shares. This would have brought total issued and outstanding shares up to 511.8 million (101.8 million plus 410 million), with the 410 million new shares being 80 percent of the new total. Since Mr. Perelman believed Marvel needed an investment of $350 million, he proposed to acquire new equity at a price of 85.36¢ a share (410 million shares × 85.36¢ a share = $350 million). Mr. Perelman's proposed new equity price of 85.36¢ per share is a product of this structure; it is not indicative of any further decline in the value of Marvel since October 17, 1996, and whose stock was trading at $4.63 immediately prior to the November 12, 1996 announcement.

## C. Measurement of Damages

34.    At a minimum, Marvel's damages can be measured as the loss in value from the drop in Marvel stock price as a result of the November 12th announcement. This is when the market is first told that Marvel's liquidity crisis, which threatens Marvel's financial survival, cannot be solved unless the holding company note holders are willing to modify the Indenture Covenants. On November 11, 1996, the closing price of Marvel stock was $4.63. However, as measured by the market's reaction to the November 12, 1996 announcement (Marvel's stock dropped from $4.63 to $2.75 indicating a loss in market value of $1.88 per share), the harm resulting from the Indenture Covenants was at least $190 million.

35.    To isolate the impact of the market's realization that the Indenture Covenants were a substantial impediment to Marvel's desperately needed financing, I control for Marvel's price change due to market and industry price movements, and the earnings announcement that also occurred on November 12th. Of the $1.88, I conclude that $1.87 is due to the Indenture Covenants (see exhibit 7A).

36.    I find that the drop of $1.87 led to a fall in equity value of $190 million ($1.87 per share multiplied by 101.8 shares outstanding – see exhibit 7B). This drop is a measure of the minimum damage to Marvel as a result of the Indenture Covenants because it considers only the

impact of these Indenture Covenants at a time when Marvel desperately needed capital. This analysis of the harm caused by the Indenture Covenants as of the fourth quarter of 1996 does not include or rely on any evidence as to how these restrictions were a cause of Marvel's financial distress up to that point.

37.    It is my opinion that this loss of $190 million was directly attributable to the Indenture Covenants because: (a) on November 12, 1996, the market learned for the first time that the Indenture Covenants were an obstacle preventing Marvel from obtaining the necessary equity infusion needed for restructuring given that Mr. Perelman, the only investor that could provide such funding without breaching the Indenture Covenants, was unwilling to do so absent relief from the Indenture Covenants, and (b) the dilutive price per share described in the proposal by the Andrews Group was not reflective of Marvel's value but allowed Mr. Perelman to try to further his personal interest in light of the Indenture Covenants.[84] Indeed, the Andrews proposal was not structured to benefit Marvel. From the perspective of Marvel, it would have been better off had it received $350 million through the issuance of equity at the prevailing market price.

38.    My opinion concerning the harm caused by the Indenture Covenants is confirmed by statements made by the defendants subsequent to the November 12, 1996 announcement. For example, Howard Gittis, the Vice-Chairman of MacAndrews and Forbes, acknowledged that no one would provide the kind of financing that Marvel required unless the note holders would agree to modify the Indenture Covenants.[85] Mr. Perelman advised the Marvel board of directors on December 12, 1996 that, in order for the Andrews proposal to be approved, it would be necessary to negotiate with the Marvel Holding Companies' note holders and that such negotiations were not possible because of the absence of an organized note holders group.[86] On December 26, 1996, Mr. Perelman advised the Marvel board of directors that because of "...the inability to expeditiously effect a restructuring of financial obligations of certain parent

---

[84] "Andrews Group has proposed to invest $350 million to acquire 409.8 million newly issued shares of Marvel Entertainment Group, representing 80.1% of the outstanding common shares after the investment. [...]Bondholders exchange bonds for Marvel common shares currently collateralizing bonds." Marvel SEC Form 8-K for the period ended 11/20/96, pp. 8, 9.

[85] In his deposition, Mr. Gittis states, "...[N]o one would put the kind of money necessary to restructure Marvel up without owning a majority of the shares free of these bond offerings; so you had to amend that provision." Deposition of Howard Gittis taken 3/25/02, pp. 4, 13.

[86] Marvel Entertainment Group, Inc., Special Meeting of the Board of Directors, 12/12/96, p. 2 (ME 01062)

companies of the Corporation that would enable the recapitalization of the Corporation, it was appropriate to consider the commencement of a [Chapter 11 case]."[87]

39.     At a minimum, the Indenture Covenants limited Marvel's ability to resolve its liquidity crisis in the fourth quarter of 1996. Mr. Perelman's November 12, 1996, offer to provide funds in response to the liquidity crisis was done so in a way so as to circumvent any impact of the Indenture Covenants. However, the revelation that even Mr. Perelman would not invest in Marvel without modification of the Indenture Covenants confirmed that those covenants caused harm to Marvel in the amount of at least the approximately $190 million reduction in Marvel's equity value.

40.     For the reasons stated above, it is appropriate to add interest in computing plaintiffs' damages, which in this case would be measured from November 12, 1996, a date on which the harm to Marvel caused by the Indenture Covenants was measurable and substantial. Exhibit 7B shows damage calculations of $363.9 million using the simple fixed interest rate method, $473.2 million using the compounding fixed interest rate method, and $422.0 using the compounding variable interest rate method to calculate damages as of December 31, 2005.

---

[87] Marvel Entertainment Group, Inc., Special Meeting of the Board of Directors, 12/26/96, p. 2 (ME 01065).

41.    My opinions are based on the documents considered and analyses performed to-date. They are subject to modification based on new information (including new reports or testimony by defendants' experts) which may subsequently come to my attention.


Respectfully,


Jeffrey L. Baliban