# EXHIBIT 1

# NERA
Economic Consulting

Exhibit 1

## JEFFREY L. BALIBAN

NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.
1166 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036

(212) 345-0249
(212) 345-4650 (fax)
jeffrey.baliban@nera.com

Mr. Baliban is a Senior Vice President in the Securities and Financial Economics practice. His 27-year practice has concentrated in resolving complex commercial disputes, economic issues, accounting issues and business valuation. Mr. Baliban began his career in audit in 1977. He became a Certified Public Accountant in 1981 and is admitted in the states of New York, Pennsylvania and Texas. In the mid-1980s, his practice moved from audit to forensic accounting and financial impact analysis. He earned his M.A. in Economics at the University of Texas in 1995, concentrating in econometrics, business and economic forecasting, statistical analysis and finance modeling. He also holds professional accreditations in business valuation and fraud examination.

Mr. Baliban has significant national and international experience in business valuation matters, forensic accounting investigations, measurement of economic value and/or damages in commercial disputes and business litigation matters, including business interruption and lost profits, contract and tort damage claims, fraudulent conveyance, long-term construction contract issues, lender liability issues, intellectual property matters, arson, fraud and embezzlement and environmental claims. His clients include corporations, law firms and commercial property and casualty insurance companies. Industries include, among others, petrochemical and energy, extraction and mining, healthcare, trucking and delivery, telecommunications, aerospace, manufacturing, retail, banking and financial institutions, real estate, technology, restaurants and food distribution, automobile dealerships, hotel and hospitality, insurance brokerage, professional practices, clothing and fashion. Mr. Baliban has significant experience in the litigation, discovery and testimony process. He has also written and spoken widely on accounting, economics and damages measurement issues.

**NERA**
Economic Consulting

## EDUCATION

UNIVERSITY OF TEXAS
M.A., Economics, 1995

CPA, ABV

FAIRLEIGH DICKINSON UNIVERSITY
B.S., Accounting, 1977

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2003- | NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.<br>*Senior Vice President*. Securities and Finance. |
| 1999-2003 | KPMG LLP<br>*Partner*. Dispute Advisory Services Leader.  Regional Partner-in-charge, southwest and western regions.  Insurance Services Group Leader. |
| 1980-1999 | CAMPOS & STRATIS LLP<br>*Co-Vice Chair*.  Concentrating on forensic accounting and economic damages analysis. |
| 1977-1980 | ERNST & ERNST (now Ernst & Young)<br>*Auditor*.  Member of audit staff, concentrating in manufacturing, financial services and not-for-profit clients. |

## CERTIFICATIONS AND AFFILIATIONS

Certified Public Accountant in Pennsylvania, Texas, and New York
Member of the American Institute of Certified Public Accountants
Member of the Pennsylvania Institute of Certified Public Accountants
Member of the Texas Society of Certified Public Accountants (served on the Litigation Services and Management Services Committees)
Accredited by the American Institute of Certified Public Accountants in Business Valuation
Member of the American Society of Appraisers
Certified Fraud Examiner
Who's Who in the World; Who's Who in America in Finance and Industry
Adjunct Professor of Economics at the University of Texas (formerly)

—2—

**NERA**
Economic Consulting

## TYPICAL ENGAGEMENT INVOLVEMENT

- Mr. Baliban's focus has been on resolving complex commercial and business disputes by analyzing, measuring and clarifying the often equally complex economic, accounting and valuation issues they engender.

- Analysis of financial condition, forensic accounting investigations, solvency analysis and valuation studies in matters relating to fraudulent conveyance, misrepresentation in reporting and deepening insolvency. Bankruptcy preference defense issues, typically related to statistical analysis of transactions in determining subjective and objective tests related to ordinary course of business and other preference defenses.

- Consultant and analyst in various P&C insurance related issues including risk analysis in underwriting, administration of claims run-off, insurer/reinsurer disputes, insurance agency valuation and other damages issues. Heavy commercial and industrial property damage insurance claims measurement, including property damage and cost accounting analyses, business interruption, contingent business interruption and extra expense claims, third-party liability matters, fidelity bond claims audits and subrogation actions.

- Designated economic and financial damages expert in a broad range of contract and tort damage claims, representing both plaintiffs and defendants in a variety of industries. Typically provides economic analysis, economic valuation, forensic accounting and/or statistical studies in order to provide an independent analysis of the financial impact related to the issues at hand.

- Economic analysis in intellectual property matters including measurement of lost profits damages/unjust enrichment, reasonable royalty and hypothetical negotiation estimation, market definition and elasticity of demand analysis. Application of audit and other investigative techniques to royalty reviews, including accuracy and completeness of licensee reporting, investigation of underreporting (intentional or unintentional), and objective analysis of systems and supporting information.

- Accredited business valuation analyst, providing independent measurement of ongoing business value in both dispute and non-dispute circumstances.

- Independent arbitrator in a variety of accounting matters including post-acquisition and purchase price disputes.

A 43

**NERA**
Economic Consulting

## REPRESENTATIVE CONSULTING PROJECTS

Analysis relating to allegations of deepening insolvency in the offshore drilling rig construction industry. Analyses pertain to cash flow models and identification of zone of insolvency.

Rebuttal testimony on the value of the Gas Fractionation Plant presented by owner in the form of a discounted future earnings model. Discussed model methodologies and appropriate techniques for reasonably estimating risk-adjusted discount rates.

Solvency analysis pertaining to claims of breach of fiduciary duty, misrepresentation and fraudulent conveyance relating to pre-bankruptcy leverage buyout.

Affidavit regarding business valuation methodologies and Uniform Standards of Professional Appraisal Practice, 2003.

Provided damages analysis in a matter arising between a managing general agent and two insurance carriers with whom it had previous agreements. Issues dealt with alleged wrongful termination of agreements. Provided valuation of lost profits, diminution of business value, and an overall economic analysis of relevant market forces driving the workers compensation line of business along with associated pricing forecasts.

Provided analysis of financial condition where the claim was that, due to accounting firm's alleged malpractice, the true financial condition of the plaintiff was not known by the directors. Analyzed Board of Directors reports, minutes and information provided.

Provided analysis of ability to pay in punitive damages matter involving a large Korean commercial contractor. Performed overall analysis of financial condition, availability and quality of net worth, liquidity and solvency issues.

Provided damages analysis in a dispute between a major gasoline refiner and a corporation regarding co-branding of quick service restaurants and retail gasoline outlets. Performed economic analysis of long-term co-branding opportunities and valuation of existing locations.

Provided damages and valuation analysis in a dispute arising between two surety bond agencies. Allegations included breach of contract and tortious interference. Economic analysis of relevant market and forecast of commercial construction.

— 4 —

A 44

**NERA**
Economic Consulting

Provided damages analysis in a claim brought by a mid-western refiner arising from partial refinery destruction allegedly due to a negligent contractor. Performed economic analysis related to production, costing, demand and product pricing. Forecasted earnings based on historic and index trends and reconciled results to plant linear model governing production.

Provided damages analysis in dispute between two scaffolding manufacturers. Issues arose regarding patent infringement and alleged wrongful seizure of inventory. Performed economic analysis defining relevant market and forecast of retail and commercial construction.

Provided damages and valuation analysis in large construction defect matter related to a major Las Vegas resort. Economic analysis performed relating to gaming issues, hospitality issues, impact of 9/11 on the market, competition and resort life-cycle and other salient matters.

Provided damages in alleged patent infringement and false advertising claims arising between two competing manufacturers of gas refinery plant filtration systems for in-line live carbon feeds.

Performed accounting analysis of working capital issues and potential loss of earnings arising from a post-acquisition dispute between competitors in medical services and supplies. Performed economic analysis of relevant market and damages quantification.

Provided economic analysis between two states Utilities Commissions with regard to an agreement to swap power seasonally. This matter arose from lack of available supply connected with various impacts from energy deregulation. Economic analysis performed to outline and describe such economic impact.

## PUBLICATIONS

"Valuation of Out-of-Sight Inventory Losses," *Texas Insurance Law Reporter*, June 1984.

"Accounting for Economic Loss," *Texas Insurance Law Reporter* and *Texas Bar Journal*, July 1991.

"Loss Measurement—The Investigative Accountant's Initial Concerns," *Claims Magazine*, May 1992.

A 45

**NERA**
Economic Consulting

"NAFTA: New Concept or Inevitable Theory," *Dallas Business Journal*, April 1993.

"Economic Damages—The Time Element," *Dallas Business Journal*, September 1993.

"Mexico—Lessons for Us All," *Professional Review*, Spring 1995.

"Business Damages in Commercial Cases," *CPA Litigation Services Counselor*, August and September 1996.

"Economic Analysis of Environmental Damages," *The National Law Journal*, October 1996.

"FAQs About Y2K," *Texas Lawyer*, February 1999.

"Calculating Fines for Environmental Infractions," *Environmental Protection*, March 1999.

## APPROVED CONTINUING EDUCATION COURSES AUTHORED

- Financial Statements—What They Are and How to Read Them.
- Analyzing Financial Condition.
- Basics of Business Damages.
- Basics of Business Valuation.
- Damages in Commercial Litigation.
- An Economic Approach to Punitive Damages.
- First and Third Party Property Claims Financial Services.
- Accounting for Insurance Claims.
- Business and Economic Forecasting Basics—Statistical and Regression Models.

**NERA**
Economic Consulting

## TESTIMONY (PREVIOUS FOUR YEARS)

*John Crane, Inc. v. Admiral Insurance Company, et al.*, 04 CH 08266, In the Circuit Court of Cook County, Illinois County Department, Chancery Division. (Deposition)

*Celebrity Cruises, Inc., et al. v. Essef Corporation, et al.*, 96 Civ 3135 (JCF), In the United States District Court for the Southern District of New York. (Deposition)

*James P. Stephenson, as Trustee for the estate of MJK Clearing, Inc., v. Deutsche Bank AG, et al.*, Civil No. 02-4845 RHK/AJB, and *Stockwalk Group, Inc., v. Deutsche Bank AG, et al.*, Civil No. 04-4164 RHK/AJB, United States District Court, District of Minnesota. (Deposition)

*Michael Vogt, Paul Beaumont, and Fred Breu on their own behalf and as representative plaintiffs on behalf of all similarly situated employees of Outboard Marine Corporation v. Greenmarine Holdings, LLC; Quantum Industrial Partners; and Quantum Industrial Holdings, LTD.*, Case No. 1:02-CV-02059-GEL., In The United States District Court for The Southern District of New York. (Deposition)

*Forrest W. Garvin and E-Netec, Corp. v. McGuire Woods, LLP, et al.*, County, File No. 02-CVS-19813, In the General Court of Justice, Superior Court Division for the State of North Carolina, Mecklenburg. (Deposition)

*Paceholder High Yield Fund, Inc., et al. v. Ranko Cucuz*, Civil Action No. 02-71778, In the United States District Court for the Eastern District of Michigan. (Deposition)

*Nassau County PBA v. Nassau County*, Interest Arbitration, 2002. (Hearing)

*Interline Energy Services, Inc., and Interline Resources Corporation v. Basin Western*, Eighth Judicial District, State of Wyoming, County of Converse, Civil Action No. 13629. (Deposition & Trial)

*Grinnell Fire Protection v. Road Sprinkler Fitters Union No. 669, U.A., United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the U.S. and Canada, AFL-CIO*, Case No. 5-CA-24521, Before the National Labor Relations Board. (Trial)

A 47

**NERA**
Economic Consulting

TESTIMONY (CONT.)

Teachers' Retirement System of Louisiana v. M. Bernard Aidinoff, et al., and American International Group, Inc., C.A. No. 20106-NC, In the Court of Chancery of the State of Delaware In and for New Castle County. (Deposition)

CISI v. MemberWorks, Case CV99-0362655 S, State of Connecticut, Judicial District of Fairfield at Bridgeport. (Deposition)

Deep South Surplus of Texas, Arkansas, Tennessee and Georgia, Inc. v. Great American Insurance Company and The Ohio Casualty Insurance Company, Case 00-03955, 134th Judicial District, Dallas County, Texas. (Deposition)

Koch Petroleum Group LP, et al. v. Truck Crane Service Co, et al., C7-00-7606, District Court, State of Minnesota. (Deposition)

State of Washington, Ex Rel., Public Disclosure Commission v. Washington Education Association, 00-2-01837, In the Superior Court of the State of Washington, In and for the County of Thurston. (Deposition & Trial)

Jordan B. Fishman, Ph.D. v. BioSource International, Inc., et al., CV 00-06426 ER (RNBx), United States District Court, Central District of California, Western Division. (Deposition)

Willis of New York, Inc., et al v. Lockton Companies, Inc., et al., 00 Civ. 6476 (JSR), New York South District Court.

Landmark Organization, Inc., et al. v. Monex Credit Company, et al., 00CC10279, Superior Court of the State of California. For the County of Orange. (Deposition)

Michael Leonard and Michael Sawyer v. Farmers' Insurance Exchange, et al., GN-001634, In the District Court, Travis County, Texas, 98th Judicial District. (Deposition & Class Certification Hearing)

Waco v. KHK, H-98-1309, United States District Court for Southern District of Texas Houston Division. (Deposition & Trial)

MCI Telecommunication v. Gilbert Texas Construction Corp., 3:97-CV-1180-G, District Court of the Northern District of Texas, Dallas Division. (Deposition & Trial)

A 48

**NERA**
Economic Consulting

### TESTIMONY (CONT.)

*Main Street v. Shell Oil*, 97-10741-L, District Court, 193rd Judicial District, Dallas County, Texas. (Deposition)

*Trinity Industries v. American Energy*, 97-06498, District Court, 191st Judicial District, Dallas County, Texas. (Deposition & Trial)

*Antonia M. Igelsias v. Kawasho International (Guam) Inc., et al*, CV-1497-93, In the Superior Court of Guam. (Deposition & Trial)

A 49

# EXHIBIT 2

**Exhibit 2**

## Marvel Entertainment Group, Inc.
### Documents Considered

#### Bates Stamped Materials

| Start | End |
|-------|-----|
| A 00070 | A 00409 |
| A 01792 | A 01812 |
| A 01817 | A 01846 |
| A 01888 | A 01888 |
| B 00086 | B 00096 |
| B 00261 | B 00319 |
| C 00001 | C 00004 |
| DEF 005442 | DEF 005443 |
| DEF 013137 | DEF 013138 |
| EY 003514 | EY 003542 |
| LNB 0010598 | LNB 0010608 |
| ME 00485 | ME 00494 |
| ME 01061 | ME 01073 |
| M-JB9 0166 | M-JB9 00289 |
| M-JB9 0290 | M-JB9 0480 |
| M-SP10 0572 | M-SP10 0573 |
| M-SP10 0630 | M-SP10 0630 |
| M-SP2 1767 | M-SP2 1875 |
| SKA 02801 | SKA 02938 |
| SKA 04031 | SKA 04135 |
| SKA 04743 | SKA 04850 |
| SKA 05077 | SKA 05212 |
| SKA 05872 | SKA 05991 |
| SKA 09027 | SKA 09122 |

#### Marvel Documents

- Marvel and Fleer Third Amendment 3/1/96
- Marvel and Fleer Fourth Amendment 6/30/96
- Marvel Term Loan 8/30/94
- Marvel U.S. Term Loan Agreement 4/24/95

#### Legal Documents

- Expert Rebuttal Report of Robert W. Holthausen 3/29/02
- Ronald Cantor, et. al. against Ronald O. Perelman, et. al. Opinion on the Appeal Filed 7/12/05
- Ronald Cantor, et. al. against Ronald O. Perelman, et. al. Second Complaint, 9/13/01

#### SEC Filings

- 4 Kids Entertainment Inc SEC Form 10-K for the fiscal years 12/31/95 - 12/31/96
- Hasbro Inc SEC Form 10-K for the years ended 12/31/94 - 12/31/98
- Marvel Enterprises, Inc. SEC Form 10-K for the fiscal year ended 12/31/98
- Marvel SEC Form 10-K for the fiscal years ended 12/31/92 - 12/31/97
- Marvel SEC Form 10-Q for the fiscal quarters ended 1Q1993 - 3Q1996
- Marvel SEC Form 8-K for the date 11/20/96

A 51

Exhibit 2

### Marvel Entertainment Group, Inc.
### Documents Considered

#### SEC Filings (cont.)

- Marvel SEC Form Schedule 13D (Amendment No. 4) for the date 3/7/97
- Mattel Inc SEC Form 10-K for the fiscal years ended 12/31/94 - 12/31/98
- Scholastic Corp SEC Form 10-K for the fiscal year ended 5/31/96
- The Topps Company Inc SEC Form 10-K for the fiscal year ended 3/2/96

#### News Articles

- Factiva Comprehensive Chronology Search: News stories obtained from
  Factiva using the search terms Marvel or Perelman* or "Andrews Group".
  Sources used were Business Wire, Dow Jones News Service,
  PR Newswire, Reuters, and the Wall Street Journal.
- "Andrews Group Names Sassa President -2-: Will be Marvel CEO." Dow
  Jones News Service, 10/23/96. Obtained from Factiva Research Systems.
- "Andrews Group Proposes to Acquire Newly Issued Marvel Entertainment
  Group Stock," Business Wire, 11/12/96. Obtained from Factiva.
- "Andrews Grp ~Toy Biz -3-: Andrews Might Buy Equity at Marvel." Dow
  Jones News Service, 10/17/96. Obtained from Factiva Research Systems.
- "Andrews Grp-Marvel-3-: Andrews Now Has 81M Marvel Shrs." Dow
  Jones News Service, 11/12/96. Obtained from Factiva Research Systems.
- "Andrews offers to combine Toy Biz and Marvel." Reuters News, 11/12/96.
  Obtained from Factiva Research Systems.
- "Former Turner Broadcasting Executive Named Chairman and CEO
  of Marvel." The Wall Street Journal, 10/24/96. Obtained from Factiva.
- "Marvel 3Q96 Results and Performance Update." PR Newswire, 11/12/96.
  Obtained from Factiva Research Systems.
- "MacAndrews & Forbes Completes Tender Offer for Marvel Shares."
  PR Newswire, 5/7/93. Obtained from Factiva.
- "Marvel Entertainment sets two-for-one split." Reuters News, 9/24/93.
  Obtained from Factiva.
- "Marvel Entertainment Estimate -2-: Wider Oper Losses." Dow Jones
  News Service, October 8, 1996. Obtained from Factiva.
- "Marvel Entertainment Estimate -3-: Street Saw 3Q Net 8c/Shr." Dow Jones
  News Service, October 8, 1996. Obtained from Factiva Research Systems.
- "Marvel Entertainment Expects to Report Loss for 3rd Quarter." The Wall
  Street Journal, October 9, 1996. Obtained from Factiva Research Systems.
- "Marvel Receives Andrews Proposal." PR Newswire, November 12, 1996.
  Obtained from Factiva Research Systems.
- "Marvel Shares Plunge 41% on News of Perelman's Plan to Buy
  New Stock." The Wall Street Journal, 11/13/96. Obtained from Factiva
  Research Systems.
- "Perelman's Andrews Grp Plans To Buy Marvel Stk On The Cheap." Dow
  Jones News Service, 11/12/96. Obtained from Factiva Research Systems.

A 52

**Exhibit 2**

### Marvel Entertainment Group, Inc.
### Documents Considered

---
#### News Articles (cont.)
---

- "Perelman's Andrews Grp-2: T. Biz Cash Flow Could Aid Marvel." Dow Jones News Service, 11/12/96. Obtained from Factiva Research Systems.
- Fessler, Karen, Daniel Fisher, and Beth Williams, "Marvel Gets Perelman Bid for $350 Mln of New Stock," Bloomberg, 11/12/96.
- Marich, Robert. "Perelman drops plan for Marvel Bondholders set $365 mil recapitalization plan in agreement with Ronald Perelman." Hollywood Reporter, 3/10/97.

---
#### Academic Literature
---

- Andrade, Gregor and Kaplan, Steven, "How Costly is Financial (Not Economic) Distress? Evidence from Highly Leveraged Transactions that Became Distressed" Journal of Finance, Vol LIII No. 5 (October 1998)
- Brealey, Richard A., Stewart C. Myers, Franklin Allen, Principle of Corporate Finance, McGraw-Hill Irwin, New York, 2006.
- Ibbotson Associates Cost of Capital Quarterly 1995 Yearbook
- Ross, Westerfield, and Jaffe, Corporate Finance, 6th Edition, McGraw Hill, 2002 p.451.

---
#### Other Sources
---

- Data from FactSet Research Systems, Inc.
- The Federal Reserve Discount Rate data was obtained from www.federalreserve.gov/releases/h15/data/Daily/discontinued_DWB_NA.txt for the date prior to 1/8/03 and www.federalreserve.gov/releases/h15/data/Daily/H15_DWPC_NA.txt for the date after 1/9/03.
- See U.S. Code, Title 26, Subtitle A, Chapter 6, Subchapter A, Section 1501 and 1504 www.law.cornell.edu/uscode/html/uscode26/usc_sec_26_00001501----000-notes.html
- Whitman Investment Research, Marvel Entertainment Group 11/11/96

A 53

# EXHIBIT 3



**Exhibit 3A**

**Marvel Entertainment Group, Inc.**
**Debt-to-Equity**
**Calendar Year End 1993 through 1996**

**Notes and Sources:** Debt to Equity ratio is computed based on book value debt to market value equity. Data obtained from FactSet Research Systems, Inc. and Marvel SEC Form 10-Q for the fiscal quarter ended 9/30/96. Marvel 1996 debt level is as of 9/30/96. The Index includes Hasbro, Inc. (HAS), Mattel, Inc. (MAT), 4Kids Entertainment, Inc. (KDE), Scholastic Corporation (SCHL), The Topps Company, Inc. (TOPP).

Exhibit 3B



Marvel Entertainment Group, Inc.
Interest Coverage Ratios (EBIT)
Calendar Year End 1993 through 1996

**Notes and Sources:** Interest Coverage Ratio is computed as earnings before interest and tax divided by interest expense. Data obtained from FactSet Research Systems, Inc. The Index includes Hasbro, Inc. (HAS), Mattel, Inc. (MAT), 4Kids Entertainment, Inc. (KDE), Scholastic Corporation (SCHL), The Topps Company, Inc. (TOPP). TOPP and SCHL are excluded from this index in years where they incurred no interest expense. TOPP and SCHL fiscal year end was

# EXHIBIT 4

Exhibit 4

Marvel Entertainment Group, Inc.
Comparable Analysis as of 1996

| Name | Company Description | Publishing - Comic Books and Other Children's Publications | Sports and Entertainment Trading Cards | Adhesives and Stickers | Toys | Consumer Products, Media and Advertising - Promotion Licensing | Other (Confectionary) |
|---|---|---|---|---|---|---|---|
| Marvel Entertainment Group (MRVQQ) | "A leading creator, publisher and distributor of youth entertainment products for domestic and international markets based on fictional action adventure characters owned by the Company, licenses from professional athletes, sports teams and popular entertainment characters and other properties owned by third parties." (Marvel 1996 10K, p. 1) | "The Company is the largest creator and publisher of comic books in North America." (Marvel 1996 10K, p. 3) | "Fleer/SkyBox is a leading marketer of sports and entertainment trading cards. In addition, Fleer/SkyBox manufactures and distributes entertainment trading cards using the Company's classic SUPER HEROES characters as well as characters based on other licensed properties." (Marvel 1996 10K, p. 4) | "Panini (subsidiary of Marvel) is the largest manufacturer and distributor of sports and entertainment sticker collections in the world... Panini produces and distributes stickers, which are pictures or self-adhesive more designed primarily to be collected and placed in albums. (Marvel 1996 10K, p. 7) | "Toy Biz (Marvel owns 26.6% equity interest) is an entertainment company that designs, markets and distributes a diverse product line. In the United States and internationally, based on popular entertainment properties, consumer brand names and proprietary designs. (Marvel 1996 10K, p. 8) | "The licensing of its joint venture involving the Marvel Characters for use with (i) merchandise and distributors; (ii) promotions; (iii) publishing; (iv) television and film; (v) on-line and interactive software; and (vi) restaurant, theme parks and site-based entertainment." (Marvel 1996 10K, p. 3) | "Fleer manufactures and markets an array of confectionery products. Fleer's confectionery operation is best known for its DUBBLE BUBBLE and RAZZLES gum products." (Marvel 1996 10K, p. 10) |
| The Topps Company, Inc. (TOPP) | "Topps is a leading marketer of collectible picture products featuring sports figures as well as popular television, movie and/or comic book characters. The Company also produces and distributes BAZOOKA brand bubble gum as well as unique lollipops such as RING POP and PUSH POP, other novelty candy products, comic books and sticker albums." (Topps 1996 10K, p. 2) | "Magazine and Book Publishing. The Company is currently publishing two monthly magazines." "Comic Books. Through its subsidiary, Topps Comics, Inc. the Company creates and markets high-quality color comic books for distribution in specialty shops and newsstands." (Topps 1996 10K, p.6) | "Sports Picture Products. The Company is a leading marketer of collectible picture products featuring major league baseball players and professional basketball, football and hockey players. Such products feature photographs of the athletes and include statistics and biographical material." "Entertainment and Other Picture Products... the Company markets many of the most successful entertainment and properties of the time." (Topps 1996 10K, p.3) | "Stickers and Albums. The Company designs and markets sticker and album collections in Europe through its subsidiary, Panini. Sticker products best includes a combination of sports and entertainment properties." (Topps 1996 10K, p.5) | | | "BAZOOKA Brand Bubble Gum...The Company has been marketing BAZOOKA brand bubble gum since 1947." "Lollipops. The Company markets several lollipop products throughout the United States and many foreign countries." "Other Novelty Candy Products. The Company markets a line of candy and candy-type novelty items which consist of a variety of novelty products in unusual sizes and packages." "Other Collectibles...the Company obtained the rights to produce a range of small plastic collectible products." (Topps 1996 10K, p.4) |

141

A 58

Exhibit 4

## Marvel Entertainment Group, Inc.
### Comparable Analysis as of 1996

| Name | Company Description | Publishing - Comic Books and Other Children Publications | Sports and Entertainment Trading Cards | Activities and Stickers | Toys | Consumer Products, Media and Advertising / Promotion Licensing | Other (Confirmatory) |
|---|---|---|---|---|---|---|---|
| Hasbro Inc. (HAS) | "The Company designs, manufactures and markets a diverse line of toy products and related items developed throughout the world. The Company also licenses various trademarks, characters and other property rights for use in connection with the sale by others of non-competing toys and non-toy products." (Hasbro 1996 10C, p.1) | | | | "The Hasbro Toy Group develops and markets infant, preschool, activity, boys and girls products in the United States." / "The Hasbro Games Group develops and markets games and puzzles." (Hasbro 1996 10C, p.3) | | |
| Mattel Inc. (MAT) | "Mattel, Inc. designs, manufactures, markets and distributes a broad variety of toy products on a worldwide basis." (Mattel 1996 10C, p.3) | | | | "The Company's principal core brands are 1) BARBIE fashion dolls and doll clothing and accessories; 2) FISHER-PRICE toys and juvenile products, including the POWER WHEELS line; 3) the Company's Disney-licensed toys; and 4) HOT WHEELS vehicles and playsets, each of which has broad worldwide appeal." (Mattel 1996 10C, p.3) | | |
| 4Kids Entertainment, Inc. (KIDS) | "a vertically integrated entertainment based company. The Company provides a comprehensive range of services including toy design and development, domestic and international merchandise licensing, media buying and planning, international and domestic television distribution and television production. The Company operates through four wholly-owned subsidiaries, Leisure Concepts, Inc., Leisure Concepts International, Inc., The Summit Media Group, Inc. and 4Kids Productions, Inc." (4Kids 1996 10C, p.2) | | | | | "4Kids Concepts, Inc. is engaged primarily in the business of domestic and international licensing of the commercial rights to corporate, personalities, and product concepts. The Summit Media Group, Inc. provides media planning, buying and marketing services primarily for toy and video game companies. 4Kids Productions, Inc. is a television and home video production company specializing in youth-oriented entertainment programming." (4Kids 1996 10C, p.2) | |

1 of 3

Exhibit 4

**Marvel Entertainment Group, Inc.**
**Comparable Analysis as of 1996**

| Name | Company Description | Publishing - Comic Books and Other Children Publications | Sports and Entertainment Trading Cards | Adhesives and Stickers | Toys | Consumer Products, Media and Advertising - Promotion Licensing | Other (Confectionary) |
|---|---|---|---|---|---|---|---|
| Scholastic Corporation (SCHL)[7] | "Among the leading publishers and distributors of children's books, classroom and professional magazines, and other educational materials. Scholastic distributes most of its products directly to children and teachers in elementary and secondary schools. Scholastic has developed strong name recognition and brand quality and distinction in learning and has attained a leading market position in the school-based distribution of children's books and magazines." (Scholastic 1996 10K, p.1) | "Children's Book Publishing ... one of the largest English language publishers of children's books... The Company offers a broad range of quality children's literature." (Scholastic 1996 10K, p.1) "Instructional Publishing, develops and distributes instructional materials, directly to schools." (Scholastic 1996 10K, p.5) "Magazine Publishing, complements its school-based book publishing business with the publication of classroom magazines...The Company also publishes two consumer magazines for retail business and home office professionals and a magazine for parents of children." (Scholastic 1996 10K, p.6) | | | | "Filmed Entertainment and Marketing and Consumer Products...license and develop products originated by third parties...is also a consumer products marketing enterprise and manages the licensing of consumer products and promotions for each franchise." (Scholastic 1996 10K, p.7) | |

**Notes and Sources:**
[1] Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1-10
[2] The Topps Company SEC Form 10-K for the fiscal year ended 12/31/96, p. 2-6
[3] Hasbro SEC Form 10-K for the fiscal year ended 12/31/96, p. 1-2
[4] Mattel SEC Form 10-K for the fiscal year ended 12/31/96, p. 2
[5] Kidz Entertainment SEC Form 10-K for the fiscal year ended 12/31/96, p. 2
[6] Scholastic SEC Form 10-K for the fiscal year ended 5/31/96

3 of 3

A 60

# EXHIBIT 5

Exhibit 5

**Marvel Entertainment Group, Inc.**
**Analysis of Decline in Enterprise Value**
**as a Result of Financial Distress**
*(Amounts in millions except share price)*

| | | |
|---|---|---:|
| Debt Value[1] | $ | 250.20 |
| Share Price[2] | | 29.13 |
| Shares Outstanding[3] | | 97.33 |
| Equity Value | $ | 2,834.82 |
| Total Enterprise Value (Debt + Equity) | $ | 3,085.02 |
| Loss of 10% | $ | 308.50 |
| Loss of 20% | $ | 617.00 |
| **Average of Losses** | $ | 462.75 |
| **Total Losses w/ Fixed Rate Simple Interest[4,5]** | $ | 902.37 |
| **Total Losses w/ Fixed Rate Monthly Compounding[4,6]** | $ | 1,192.78 |
| **Total Losses w/ Variable Rate Monthly Compounding[7]** | $ | 1,334.17 |

Notes and Sources:

Andrade, Gregor and Kaplan, Steven, "How Costly is Financial (Not Economic)
Distress? Evidence from Highly Leveraged Transactions that Became Distressed"
*Journal of Finance*, Vol LIII No. 5 (October 1998) p. 1445.
The Federal Reserve Discount Rate data was obtained from
www.federalreserve.gov/releases/h15/data/Daily/discontinued_DWB_NA.txt
for the date prior to 1/8/03 and
www.federalreserve.gov/releases/h15/data/Daily/H15_DWPC_NA.txt
for the date after 1/9/03.

[1] Debt value is as of 12/31/93. Taken from Marvel SEC Form 10-K for the fiscal year ended
12/31/93, p. F-3 (A 00094).

[2] Price per share is as of 1/31/94. Obtained from FactSet Research Systems, Inc.

[3] Shares outstanding is as of 11/10/93 taken from Marvel SEC Form 10-Q for the fiscal period
ended 9/30/93, p. 1 (A 00243).

[4] The Prejudgment Interest Rate is assumed to be five percentage points over the Federal
Reserve Discount Rate of 3.0 percent as of 2/15/94.

[5] Average of Losses * (1 + Prejudgment Interest Rate * Years between 2/15/94 and 12/31/05,
11.9 years)

[6] Average of Losses * (1 + (Prejudgment Interest Rate/12))^(Months between 2/15/94 and
12/31/05, 142.5 months)

[7] Average of Losses * Π (1+(Monthly Average Federal Reserve Discount Rate + 5%)/12)
for the time period 2/15/94 to 12/31/05.

# EXHIBIT 6

**Exhibit 6**

### Marvel Entertainment Group, Inc.
### Analysis of Equity Cost to Maintain 50 and 80 Percent Ownership
### November 11, 1996

|  | *Amounts in millions (except percentage and price data)* | | |
|---|---|---|---|
|  | **Total** | **Perelman** | **Market** |
| November 11, 1996 - Shares Outstanding | 101.81 | 82.63 | 19.18 |
| November 11, 1996 - Ownership Percent | *100.00%* | *81.16%* | *18.84%* |
| Required Capital Infusion[1] | $   350.00 | | |
| November 11, 1996 - Share Price | $     4.63 | | |
| Additional Shares Needed for Capital Infusion | 75.68 | | |
| Additional Shares Allocation for Perelman to Maintain Ownership Stake at: | | | |
| (a) 80% | 75.68 | 59.36 | 16.32 |
| (b) 51% | 75.68 | 7.89 | 67.79 |
| Total Shares and Share Allocation for Perelman to Maintain Ownership Stake at: | | | |
| (a) 80% | 177.49 | 141.99 | 35.50 |
| (b) 51% | 177.49 | 90.52 | 86.97 |
| Cost to Perelman to Maintain Stake at: | | | |
| (a) 80% | | $   274.53 | |
| (b) 51% | | $     36.48 | |

**Notes and Sources:**

Marvel share data obtained from Marvel SEC Form 10-Q for the fiscal quarter
ended 9/30/1996.  Share price obtained from Factset Research Systems, Inc.
"Andrews Grp-ToyBiz -3-: Andrews Might Buy Equity At Marvel." Dow Jones News Service.
10/17/96. Obtained from Factiva.

A 64

# EXHIBIT 7

Exhibit 7A

**Marvel Entertainment Group, Inc.**
**Calculation of Stock Price Reaction**
**Following November 12, 1996 Announcement**

| Date | Stock Price [1] | Actual Stock Price Return | Predicted Stock Price Return [2] | Abnormal Stock Price Return | t-statistic for Abnormal Stock Price Return [3] | Cumulative Abnormal Stock Price Change |
|------|------|------|------|------|------|------|
| 11/11/96 | $4.63 | | | | | |
| 11/12/96 | $2.75 | -40.54% | -0.13% | -40.46% | (12.37) ** | ($1.87) |

**Notes and Sources:**

[1] Data are from FactSet Research Systems, Inc.

[2] Returns are predicted using a regression of the returns of Marvel's stock price on the returns of the S&P 500, a Peer Index, and Earnings Surprise isolating the proposal plan run over the period from 7/17/91 to 12/31/96.

[3] Abnormal return t-statistics are calculated as the daily abnormal return divided by the standard error of the regression over the estimation period. Two stars (**) represent significance at the 5% level, and one star (*) represents significance at the 10% level.

A 66

Exhibit 7B

**Marvel Entertainment Group, Inc.**
**Calculation of Damages**
*(Amounts in millions except share price)*

|  |  |  |
|---|---|---|
| Shares Outstanding[1] |  | 101.8 |
| Price Drop Due to Indenture Covenants[2] | $ | 1.87 |
| **Change in Equity[3]** | $ | 190.53 |
| **Damage w/ Fixed Rate Simple Interest[4,5]** | $ | 363.9 |
| **Damage w/ Fixed Rate Monthly Compounding[4,6]** | $ | 473.2 |
| **Damage w/ Variable Rate Monthly Compounding[7]** | $ | 422.0 |

**Notes and Sources:**

The Federal Reserve Discount Rate data was obtained from
www.federalreserve.gov/releases/h15/data/Daily/discontinued_DWB_NA.txt
for the date prior to 1/8/03 and
www.federalreserve.gov/releases/h15/data/Daily/H15_DWPC_NA.txt
for the date after 1/9/03.

[1] Shares Outstanding was obtained from Marvel SEC Form 10-Q for the fiscal period ended 9/30/96.

[2] See Exhibit 7A for calculation of the price drop due to proposal.

[3] Change in Equity is shares outstanding multiplied by the price drop.

[4] The Prejudgment Interest Rate is assumed to be five percentage points over the Federal Reserve Discount Rate of 5.0 percent as of 11/12/96.

[5] Change in Equity * (1 + Prejudgment Interest Rate * Years between 11/12/96 and 12/31/05, 9.1 years)

[6] Change in Equity * (1 + (Prejudgment Interest Rate/12))^(Months between 11/12/96 and 12/31/05, 109.6 months)

[7] Change in Equity * $\Pi$ (1+(Monthly Average Federal Reserve Discount Rate + 5%)/12) for the time period 11/12/96 to 12/31/05.

A 67

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR; IVAN SNYDER;
JAMES A. SCARPONE, as Trustees of the
MAFCO Litigation Trust,

               Plaintiffs,

v.

                                      Civil Action No. 97-586 (KAJ)

RONALD O. PERELMAN; MAFCO
HOLDINGS, INC; MACANDREWS &
FORBES HOLDINGS, INC.; ANDREWS
GROUP INCORPORATED; WILLIAM C.
BEVINS; DONALD G. DRAPKIN,

               Defendants.

# EXPERT REPORT OF

# ANDREW S. CARRON

## NERA Economic Consulting

January 13, 2006

## Contents

I.    Introduction.................................................................................................1
      A. Transaction Background ...................................................................1
      B. Assignment ......................................................................................2
      C. Qualifications...................................................................................2
      D. Remuneration...................................................................................3
      E. Materials considered .......................................................................4

II.   The Marvel Holding Companies Notes ..............................................4

III.  Alternative Market Transaction ...........................................................5
      A. Description of the Coleman LYONs..................................................6
      B. Construction of Hypothetical Marvel LYONs....................................7
         1. Debt Component of Hypothetical Marvel LYONs.........................7
            a.  Decomposition of Coleman LYONs: Values of Put and Conversion (Call)
                Options.........................................................................8
            b.  Decomposition of Coleman LYONs: Proceeds of Debt Component and
                Spread to Swap Curve....................................................10
            c.  Estimation of Debt Component of Hypothetical Marvel LYONs ........10
         2. Estimation of Put and Conversion (Call) Options Components of Hypothetical
            Marvel LYONs .................................................................11
         3. Hypothetical Alternative Proceeds: Proceeds of Hypothetical LYONs without
            Conversion (Call) Option..................................................12

IV.   Current Values of Actual Dividends Paid by Issuers to Their Parent Corporations and
      Hypothetical Alternative Proceeds .................................................12

## List of Exhibits

Exhibit 1.     Curriculum Vitae of Andrew S. Carron.................................................................... 3

Exhibit 2.     Materials Considered ........................................................................................ 4

Exhibit 3.     Three Series of Marvel Notes ............................................................................ 4

Exhibit 4.     Coleman LYONs ............................................................................................ 6

Exhibit 5.     The Coleman Company: 12-Month Historical Volatility ........................................ 9

Exhibit 6.     Hypothetical Marvel LYONs............................................................................ 11

Exhibit 7.     Historical Volatility and Implied Volatility ........................................................ 11

Exhibit 8.     Comparison of Actual Notes Proceeds with Hypothetical Alternative
               Proceeds ....................................................................................................... 12

Exhibit 9.     Current Value of Actual Notes Proceeds and Hypothetical Alternative
               Proceeds ....................................................................................................... 13

A 70

# I. INTRODUCTION

## A. Transaction Background

1.      In the early 1990s, Ronald O. Perelman ("Perelman") was the majority beneficial shareholder of Marvel Entertainment Group, Inc. ("Marvel"). He held his shares in a series of indirectly wholly-owned holding companies: Marvel III Holdings Inc. ("Marvel III"), which owned 100 percent of Marvel (Parent) Holdings Inc. ("Marvel Parent"), which, in turn, owned 100 percent of Marvel Holdings Inc. ("Marvel Holdings," with Marvel III and Marvel Parent, the "Marvel Holding Companies"). During 1993 and 1994, defendants caused the Marvel Holding Companies to issue three series of Notes. Each series was secured by shares of the common stock of Marvel and was non-recourse beyond the Marvel Holding Companies. According to the Offering Documents for the Notes, the three series together raised a total of $553.5 million after payment of issuance expenses.[1] In each of the Note Indentures, the issuing company committed that it would prevent Marvel from taking certain actions. In particular, the Note Indentures contained covenants ("Indenture Covenants") providing that (1) with the exception of certain categories of debt, the issuing company would not permit Marvel or any subsidiary of Marvel to issue any debt unless certain financial conditions were met; (2) the issuing company would not permit Marvel to issue preferred stock except under specified circumstances; (3) the issuing company would continue to hold a majority of Marvel's voting shares; and (4) the issuing company would not permit any of its subsidiaries to make restricted payments.[2]

---

[1]   The "Offering Documents" consist of (1) Marvel Holdings Inc., Senior Secured Discount Notes due 1998, Offering Memorandum dated April 16, 1993 (SKA 09027-09122); (2) Marvel (Parent) Holdings Inc., Senior Secured Discount Notes due 1998, Prospectus dated October 13, 1993 (SKA 05872-05991); and (3) Marvel III Holdings Inc., 9$^1/_8$% Senior Secured Discount Notes due 1998, Offering Memorandum dated February 8, 1994 (SKA 05077-05212).

[2]   Marvel Holdings Inc., Senior Secured Discount Notes due 1998 and Series B Senior Secured Discount Notes due 1998, Indenture, Dated as of April 15, 1993 (SKA 04743-04850); Marvel (Parent) Holdings Inc., Senior Secured Discount Notes due 1998, Indenture, Dated as of October 1, 1993 (SKA 04031-04135); and Marvel III Holdings Inc., 9$^1/_8$% Senior Secured Discount Notes due 1998 and 9$^1/_8$% Series B Senior Secured Discount Notes due 1998, Indenture, Dated as of February 15, 1994 (SKA 02801-02938). The Indenture Covenants are listed in Sections 4.04, 4.04(c), 4.09(a) and 4.05, respectively, of the Note Indentures.

1

## B. Assignment

2.     I have been asked by counsel for plaintiffs to review the Offering Documents and to perform economic and financial analyses to answer the following questions:

- As of the time of each Note issuance, if the Marvel Holding Companies had raised funds using a different market transaction that was secured by the same Marvel shares but did not require the Indenture Covenants and that, like the Marvel Notes, had no recourse to assets of any other entities, would the proceeds have been materially different from the actual proceeds of that Note issuance?

- What was the value as of December 31, 2005 of the actual dividend paid from the Notes proceeds by each of the Marvel Holding Companies to its parent corporation at the time of the respective Note issuance? What would have been the value as of December 31, 2005 of such dividend if the available proceeds were those of the alternative market transaction?

3.     Briefly, my conclusions are as follows:

- In the aggregate, alternative market transactions without the Indenture Covenants but all other material terms equal would have raised $396.8 million, substantially less than the $553.5 million actually raised.

- Depending on the rate of interest, the $553.5 million in actual Notes proceeds paid as dividend would have had a current value between $1,101.8 million and $1,662.1 million as of December 31, 2005, and the $396.8 million proceeds from alternative market transactions would have had a current value between $788.0 million and $1,186.0 million. Thus, the current value difference in benefits to the dividend recipients as between the actual and alternative transactions would be in the range of $313.8 million to $476.1 million.

## C. Qualifications

4.     I am President of NERA Economic Consulting. Until January 1, 2006, I was Senior Vice President of NERA and head of the practice that performs research in securities and financial markets. NERA was established in 1961 and now employs more than 550 people in 20 offices worldwide. The securities practice dates from the early 1970s and employs a research staff of over 125 professionals with economics, finance and mathematics degrees. The practice counts as its clients major securities exchanges, risk managers, principals needing valuation services and parties in litigation.

2

5.     I have been qualified at trial and in arbitrations as an expert in financial economics, securities and derivatives, and portfolio analysis and risk management, among other topics.

6.     Prior to joining NERA in 1996, I spent over twelve years in the research, fixed income (i.e., bond), and risk management departments at the firms now known as Credit Suisse and Lehman Brothers. My responsibilities included analyzing security structures, creating valuation models, researching new products, advising institutional investors and high net worth individuals on asset-liability management and investment alternatives, supporting fixed income trading and sales departments, providing customers educational seminars on the firms' products, preparing monthly reports on securities, products and markets, and writing product guides.

7.     Prior to my work in the securities industry, I was a Senior Fellow in the Economic Studies Program of the Brookings Institution, a non-profit, independent, nonpartisan organization devoted to research, analysis, and public education. At Brookings, I conducted research on financial institutions and markets.

8.     I received a bachelor's degree in economics from Harvard University and a Ph.D. in economics from Yale University.

9.     My curriculum vitae is attached as Exhibit 1. It contains additional material regarding my qualifications, a list of all publications authored by me within the preceding ten years, and a listing of all cases in which I have testified as an expert at trial or by deposition within the preceding four years.

Exhibit 1.     *Curriculum Vitae of Andrew S. Carron*

## D. Remuneration

10.     NERA is being compensated for its time at standard billing rates. My current hourly rate is $575. The rates charged for other NERA personnel range from $95 to $410 per hour.

### E. Materials considered

11.     The materials considered in the preparation of this report are listed in Exhibit 2.

        *Exhibit 2.*    *Materials Considered*

## II.     THE MARVEL HOLDING COMPANIES NOTES

12.     The Marvel Holding Companies issued securities in April 1993, October 1993 and February 1994. Each issue matured in 1998. The first two securities had no stated coupon rate of interest although they accrued interest that was payable at maturity, while the third had a 9.125% coupon payable semiannually. Exhibit 3 describes the three series of Marvel Notes. For the two series issued in 1993, I have adjusted the number of shares put up by the issuer as collateral and the stock price of such shares to reflect the 2-for-1 Marvel stock split that took place on November 2, 1993.

        *Exhibit 3.*    *Three Series of Marvel Notes*

13.     Because the Marvel Holding Companies had no significant assets other than the shares of Marvel stock pledged as security for the Notes, the ultimate return to investors in the Notes depended on the value of Marvel stock. Marvel Parent had a residual claim on the assets of Marvel Holdings and the Marvel III Notes were guaranteed by Marvel Parent. The Marvel shares, however, constituted virtually the sole basis for repayment of the Notes. If the aggregate value of the shares backing a given Note were equal to or in excess of the face amount of the Note at maturity, investors were assured of payment in full. If the value of the relevant shares were less than the maturity amount of the Note, investors would anticipate receiving less than full payment. Hence, investors in the Notes were exposed to declines in the aggregate value of Marvel stock below the maturity value of the Notes. Conversely, the Marvel Holding Companies (and, by extension, defendants) would benefit from any increase in the Marvel share price above the maturity value of the Notes, but would forfeit those shares to Note investors if the share price were below the maturity value of the Notes.

4

14.    For example, consider the Marvel Holdings Notes. At maturity, if the Marvel stock price were above $10.78 ($517,440,000/48,000,000 shares), the aggregate value of the collateral shares (48,000,000) would exceed the accreted maturity value of the Notes ($517,440,000). In that case, the investors would be assured of payment in full and the issuer would retain the benefit of the stock value in excess of $10.78 per share. If the stock price were below $10.78, the aggregate value of the collateral shares would be less than the accreted maturity value of the Notes and the investors would likely receive less than the full payment since the issuer had no obligation to provide additional assets to pay off the Notes.

15.    In summary, the Note investors would incur losses if the price of Marvel shares declined significantly, while the Marvel Holding Companies (and, by extension, defendants) would receive the gains if the price of Marvel shares increased significantly. It is my understanding that prior to the maturity dates of the Notes, the Marvel shares backing the Notes declined significantly in value, the Marvel Holding Companies defaulted on their obligations, and the Note holders foreclosed on their collaterals and became the owners of those Marvel shares.

## III.  ALTERNATIVE MARKET TRANSACTION

16.    The most precise comparison of proceeds from the Note issuances with and without the Indenture Covenants would involve issuances with the same issuer, issue date, maturity, and collateral, differing only in the terms of the trust indenture. I searched for similar securities issuances but there were no securities issuances secured by Marvel stock other than the three Notes, all of which were subject to the Indenture Covenants. In general, it was rare at that time for public market debt instruments to be secured solely by shares of publicly traded stock. At around the same time of the Marvel Notes issuance, however, another indirectly wholly-owned Perelman holding company, Coleman Worldwide Corporation ("Coleman Worldwide") issued Liquid Yield Option Notes ("LYONs") that did not contain the Indenture Covenants. I consider the LYONs, with an adjustment to make them similar in structure to the Marvel Notes, to be a market transaction alternative to the Notes.

5

## A. Description of the Coleman LYONs

17.    On May 27, 1993, Coleman Worldwide issued LYONs that were secured by shares of stock in The Coleman Company, Inc. ("Coleman").[3]  As I describe below, these LYONs had an effective maturity (5 years) similar to the actual maturities (4 to 4.98 years) of the Marvel Notes. The Coleman LYONs were not subject to covenants comparable to the Indenture Covenants contained in the indentures of the Marvel Notes.[4]

18.    LYONs are a type of zero-coupon convertible bond first engineered by Merrill Lynch & Co. The first LYON was issued by Waste Management, Inc. on April 12, 1985.[5] The first panel of Exhibit 4 describes the Coleman LYONs issuance data obtained from the prospectus. According to the prospectus, Coleman Worldwide was to issue 500,000 LYONs and deposit 7,220,000 shares of Coleman common stock as collateral. The issue price of each LYON was $240.67, representing a yield to maturity of 7.25 percent per annum. Each LYON was exchangeable at the investor's direction at any time on or prior to maturity for 7.853 shares of Coleman common stock owned by Coleman Worldwide. If the investors converted all LYONs into shares, they would have received 3,926,500 shares. The investors could also require that Coleman Worldwide repurchase the LYONs after five, ten and fifteen years in exchange for the accreted value of the LYONs. The accreted value for a particular date is the issue price plus the applicable accrued interest as of that date. The issuer could redeem the LYONs for the accreted value at any time after five years. Note that the amount at the assumed maturity of five years is $171,805,000, equal to the accreted value of the LYONs computed on a semiannual bond-equivalent basis.

*Exhibit 4.*    *Coleman LYONs*

19.    The Coleman LYONs structure differed from that of the Marvel Notes in two material aspects. First, unlike the Marvel Notes, the LYONs did not contain the Indenture

---

[3]  Coleman Worldwide Corporation, Liquid Yield Option™ Notes due 2013 (Zero Coupon – Senior Secured), Exchangeable for Shares of Common Stock of The Coleman Company, Inc., Prospectus dated May 20, 1993.

[4]  Indenture between Coleman Worldwide Corporation and Continental Bank, National Association, as Trustees, Dated as of May 27, 1993, Liquid Yield Option™ Notes Due 2013.

[5]  McConnell, John J. and Eduardo S. Schwartz, "LYON Taming," *The Journal of Finance*, Vol. XLI, No. 3, July 1986., and Bloomberg L.P.

6

Covenants that the Marvel Notes contained. Additionally, investors in the Coleman LYONs could profit from increases in the price of the Coleman stock above a certain level while the investors in the Marvel Notes would not profit from any increases in the price of the Marvel stock. For example, if the Coleman stock price were above $43.76 ($171,805,000 / 3,926,500 shares), the aggregate value of the shares would be greater than the accreted value of the LYONs at effective maturity ($171,805,000). In that case, the investors could convert the LYONs into shares and retain the benefits.

20.    From the investors' perspective, the Coleman LYONs can be described as having three components: (1) a debt instrument in the form of an options-free zero-coupon collateralized note; (2) an implied put option that the investors sold to the issuer, representing the investors' potential exposure to declines in the value of the collateral shares below the LYONs maturity value; and (3) a conversion (call) option that the investors bought from the issuer to obtain the investors' potential upside in the event that the value of the 3,926,500 shares was greater than the LYONs maturity value.

## B. Construction of Hypothetical Marvel LYONs

21.    It is possible to construct hypothetical Marvel LYONs as an alternative to the Marvel Notes using the same Marvel shares that were pledged to secure the Notes. In order to do so, I estimated the values of the three components of the LYONs – debt, put option and conversion (call) option.

### 1. Debt Component of Hypothetical Marvel LYONs

22.    One input necessary to calculate the debt component of the hypothetical Marvel LYONs – the spread to the swap curve – can be obtained from the debt component of the Coleman LYONs. To determine the debt component of the Coleman LYONs, I first valued the put and conversion (call) options embedded in the LYONs using the security specific information and other data available from public sources. With these estimated values, I was able to determine the proceeds of the debt component from which I estimated the spread to the swap curve. I used this spread to the swap curve to estimate the debt component of the hypothetical Marvel LYONs.

### a. Decomposition of Coleman LYONs: Values of Put and Conversion (Call) Options

23.    I estimated the values of the put and conversion (call) options embedded in the Coleman LYONs using the Black-Scholes option pricing model. The Black-Scholes option pricing model is commonly used to value financial options. The inputs to the option pricing formula are stock price, strike price, risk-free interest rate, maturity (time to option expiration) and volatility of the stock. (If the underlying stock were expected to pay dividends, the anticipated dividend rate would be a sixth input. Coleman did not pay dividends and was not expected to do so at the time of the LYONs issuance.) The first three inputs are directly obtainable from the Offering Documents and other public sources.

24.    In calculating the values of the options, I assumed that each option had a maturity of five years. The reason is as follows. The standard option pricing literature suggests that for a security like the Coleman LYONs, investors would follow strategies that maximize the value of the security whereas the issuer would follow strategies that minimize the security's value. Investors would not exercise the conversion (call) option before five years because such a strategy would forgo the time value of the option. Recall that at 7.853 shares per LYON, the investors could convert the 500,000 LYONs into 3,926,500 Coleman shares. At five years, if the Coleman stock price is above $43.76 (the "Call Strike Price"), the conversion (call) option is in the money. That is, the value of the 3,926,500 shares is worth more than the accreted value of the LYONs ($171,805,000). In that case, the investors would exercise the conversion (call) option just before five years and exchange each LYON for 7.853 of Coleman shares. Otherwise, the issuer would redeem the LYONs at the accreted value at five years (which would be more than the value of the 3,926,500 shares). If the stock price is below $23.80 (the "Put Strike Price" = $171,805,000 / 7,220,000 shares), the put option is in the money and the value of the 7,220,000 shares is worth less than the accreted value of the LYONs ($171,805,000). In that case, the issuer would "exercise" the implied put option and put the shares to the investors, i.e., the issuer would give up the shares rather than pay the accreted value of the LYONs. If the stock price is between $23.80 and $43.76, investors likely would require the issuer to redeem the shares for cash because, absent the conversion (call) option (which would effectively expire after five years), the interest rate would no longer be sufficient to compensate investors for the risk inherent in the

8

A 78

transaction. A circumstance where investors might choose to hold the LYONs would be a combination of a relatively high stock price (but less than $43.76) and market rates of interest for similar transactions substantially below that which investors were accruing on the LYONs. However, under those circumstances, the issuer likely would take advantage of the high stock price and low interest rates to refinance the transaction. Therefore, it seems likely that the effective maturity of the LYONs is five years.

25.    The other key input for the valuation of the conversion (call) and put options of the Coleman LYONs is volatility. Volatility is a measure of the degree of change in a stock's market value, generally measured on an annualized basis and stated as a percentage. Although both historical and implied volatilities are used in option valuation, many market participants prefer to use implied volatility because of its forward-looking nature. Implied volatility for a particular company is obtained from the actual options that are traded in the market. Even though Coleman options were traded in the market, the data from 1993 are not available to us at this time. As a result, it is not possible to estimate directly the Coleman implied volatility at the time of the LYONs issuance. I am continuing to search for Coleman implied volatility data. In the meantime, I have made a conservative assumption about Coleman volatility. If I obtain data for Coleman implied volatility, the results of my analysis can be revised to reflect that information.

26.    The data for Coleman historical volatility, however, are available. As shown in Exhibit 5, the 12-month historical volatility as of May 27, 1993, the day of the Coleman LYONs issuance, was about 31 percent. The volatility at the end of February 1993 was about 36 percent and at the end of that year was about 19 percent.

Exhibit 5.    The Coleman Company: 12-Month Historical Volatility

27.    Since Coleman historical volatility was relatively low and stable, and since markets adjust to information, Coleman implied volatility could have been somewhat higher or lower than its historical volatility, but was unlikely to be substantially different from the historical volatility. A variation of more than 50 percent of the historical volatility would be extreme. I, therefore, assume a volatility of 45 percent, which is conservative for the purposes of my assignment.

9

A 79

28.    The third and fourth panels of Exhibit 4 report my estimates of the cost for all put options sold by the investors to the issuer and proceeds from all conversion (call) options bought by the investors from the issuer.

### b. Decomposition of Coleman LYONs: Proceeds of Debt Component and Spread to Swap Curve

29.    With the values of the put and conversion (call) options components, I could then estimate the value of the debt component of the Coleman LYONs. Note that the total proceeds of the LYONs and the values of the options are related to the value of the debt component by the following equation:

*LYONs Proceeds =*
*Value of Debt Component – Value of Put Options + Value of Call Options*

An estimate of the value of the debt component can, therefore, be obtained by adding the value of the put options to and subtracting the value of the conversion (call) options from the proceeds of the Coleman LYONs. With the value of the debt component, I calculated the debt yield as 7.68 percent. The difference between this yield and the 5-year swap interest rate (5.55 percent) as of the LYONs issuance date is an estimate of the yield spread relative to the swap curve (2.13 percentage points).[6] It is reasonable to believe that other potential issuers, such as Marvel, could have attained approximately the same spread to the swap curve for a similar collateralized debt instrument.

### c. Estimation of Debt Component of Hypothetical Marvel LYONs

30.    I then used this spread to the swap curve of 2.13 percentage points to estimate the value of the debt component of the hypothetical Marvel LYONs. The first panel of Exhibit 6 displays the terms of the hypothetical Marvel LYONs. The maturity of the hypothetical Marvel LYONs is assumed to be the maturity of the corresponding Marvel Notes. As shown in the second panel of the exhibit, I added the spread to the swap curve to the swap interest rate on the issuance date of each of the Marvel Notes to get the implicit discount rate of the debt component.

---

[6]  Yields for interest rate swap transactions are commonly used benchmarks for pricing debt securities issued by nongovernmental entities.

10

A 80

I then used this discount rate to get an estimate of the debt component of the hypothetical Marvel LYONs.

<em>Exhibit 6.    Hypothetical Marvel LYONs</em>

**2.  Estimation of Put and Conversion (Call) Options Components of Hypothetical Marvel LYONs**

31.    The next three panels of Exhibit 6 demonstrate how I estimated the values of the put and conversion (call) options components of the hypothetical Marvel LYONs. As before, the option values are estimated using the Black-Scholes option pricing model. I estimated volatility by looking at the historical and implied volatilities. I calculated the 12-month historical volatility of Marvel common stock over the relevant period and estimated the implied volatility based on the Marvel options that were actually traded. For each Marvel Note issuance date, data are available for options of 1-, 3- and 6-month durations on Marvel stock. I gave more weight to the 3- and 6-month implied volatilities and to the historical volatility. The 1-month implied volatility is less reliable for this purpose and was not used. I assumed the same volatility for the put and conversion (call) options for each issuance. Exhibit 7 shows both the historical and implied volatilities. For comparison purposes, I have included the historical volatility of Coleman in the exhibit.

<em>Exhibit 7.    Historical Volatility and Implied Volatility</em>

32.    The estimates of the values of the put and conversion (call) options components of the hypothetical Marvel LYONs are set forth in the fourth and fifth panels of Exhibit 6. I estimated the put strike price by dividing the accreted value at effective maturity of the hypothetical Marvel LYONs by the number of shares securing the respective Notes. I assumed that the Marvel call strike price would bear the same relationship to the initial Marvel stock price that the Coleman call strike price bore to the initial Coleman stock price. The number of conversion (call) options is obtained by dividing the accreted value at effective maturity of the hypothetical Marvel LYONs by the call strike price. Regardless of how one determines the value of the conversion (call) options, it does not affect the ultimate results of my analysis because, as explained below, the value of the conversion (call) options is netted out.

11

### 3. Hypothetical Alternative Proceeds: Proceeds of Hypothetical LYONs without Conversion (Call) Option

33.    As stated above, two material differences exist between the hypothetical Marvel LYONs and the Marvel Notes: (1) the LYONs do not have the Indenture Covenants and (2) the LYONs offered the investors the opportunity to participate in the appreciation of the underlying stock. To compare directly the proceeds of the Marvel Notes and the hypothetical Marvel LYONs, it is necessary to subtract the value of the conversion (call) option from the hypothetical Marvel LYONs proceeds ("Hypothetical Alternative Proceeds"). By subtracting the value of the conversion (call) option from the hypothetical Marvel LYONs proceeds, I remove the upside opportunity from the LYONs; the difference in Indenture Covenants, however, remains between the Notes and this alternative market transaction.

34.    Exhibit 8 shows my calculation of the proceeds of the hypothetical Marvel LYONs with the value of the conversion (call) option removed. I calculated the Hypothetical Alternative Proceeds to be $396.8 million, as compared to the $553.5 million in proceeds from the actual Marvel Notes. I, therefore, concluded that this alternative market transaction for the Marvel Holding Companies would have resulted in significantly lower proceeds. The difference between the actual Note proceeds and the Hypothetical Alternative Proceeds is $156.7 million.

Exhibit 8.    *Comparison of Actual Notes Proceeds with Hypothetical Alternative Proceeds*

## IV. CURRENT VALUES OF ACTUAL DIVIDENDS PAID BY ISSUERS TO THEIR PARENT CORPORATIONS AND HYPOTHETICAL ALTERNATIVE PROCEEDS

35.    I understand that in the case of each Marvel Holding Companies' Note issuance, the entire net proceeds were paid by the issuer to its parent corporation. In order to estimate the current values of the actual dividends paid from the Marvel Holding Companies' Note proceeds and what could have been paid from the Hypothetical Alternative Proceeds, I used the legal interest rate under Delaware law. It is my understanding that legal interest rate in Delaware is five percentage points over the Federal Reserve annual discount rate as of the settlement dates of the Marvel Notes.

36.    I obtained the Federal Reserve discount rate from the Federal Reserve's website.[7] I calculated the current values of the actual Notes proceeds and the Hypothetical Alternative Proceeds in three ways: (1) the Federal Reserve discount rate for each day, compounded monthly; (2) the Federal Reserve discount rate of the settlement date, compounded monthly; and (3) the Federal Reserve discount rate of the settlement date, without compounding.

37.    The current values of those proceeds under alternative scenarios are reported in Exhibit 9. These estimates are through December 31, 2005, but can be extended to the date of judgment at the request of the Court.

> Exhibit 9.    *Current Value of Actual Notes Proceeds and Hypothetical Alternative Proceeds*

38.    The actual proceeds of the first series of Notes – Marvel Holdings – were $288 million. The current values of these proceeds under the three alternatives are $886.1 million (variable rate, monthly compounding), $792.3 million (constant rate, monthly compounding) and $580.4 million (constant rate, no compounding), respectively. The proceeds of the corresponding hypothetical LYONs without the conversion (call) option were $164.2 million and the current values are $505.1 million, $451.6 million and $330.9 million, respectively.

39.    The actual proceeds of the second series of Notes – Marvel Parent – were $144.9 million. The current values of these proceeds under the three alternatives are $428.5 million, $383.1 million and $286.2 million, respectively. The proceeds of the corresponding hypothetical LYONs were $138.9 million and the current values are $410.9 million, $367.4 million and $274.4 million, respectively.

40.    The actual proceeds of the third series of Notes – Marvel III – were $120.6 million. The current values of these proceeds under the three alternatives are $347.6 million, $310.9 million and $235.2 million, respectively. The proceeds of the corresponding hypothetical LYONs were $93.7 million and the current values are $270.1 million, $241.6 million and $182.7 million, respectively.

---

[7] www.federalreserve.gov

## V.   MISCELLANEOUS

41.    My work is ongoing and my opinions are subject to revision based on new information (including new reports or testimony by defendants' experts), which subsequently may be provided to, or obtained by me.


Respectfully submitted,


_Andrew S. Carron_
Andrew S. Carron

# EXHIBIT 1

**Exhibit 1**
**Curriculum Vitae of Andrew S. Carron**

President
National Economic Research Associates, Inc.
1166 Avenue of the Americas, 34th Floor
New York, New York 10036
212 345 5407 Fax 212 345 4650
andrew.carron@nera.com

## Education

Yale University
Ph.D., Economics, 1980
M.Phil., Economics, 1978
M.A., Economics, 1977

Harvard University
B.A., Economics, 1973

## Professional Experience

**National Economic Research Associates, Inc.**

| | |
|---|---|
| 2006- | President |
| 2004- | Board of Directors |
| 2003-2005 | Chair, Securities and Financial Economics Practice |
| 2000-2005 | Senior Vice President |
| 1998-2000 | Vice President |
| 1996-1998 | Senior Consultant |

**Credit Suisse First Boston**

| | |
|---|---|
| 1996 | Director – Global Risk Management, CS First Boston Corporation (New York) |
| 1994-1996 | Director – Fixed Income Research and Manager, European Fixed Income Research Department, CS First Boston Limited (London) |
| 1989-1994 | Director – Fixed Income Research and Manager of Mortgage Research, The First Boston Corporation (New York) |
| 1986-1988 | Vice President and Manager of Mortgage Research, The First Boston Corporation (New York) |

**Lehman Brothers**

| | |
|---|---|
| 1985-1986 | Senior Vice President and Manager of Mortgage Research |
| 1984 | Vice President, Mortgage Finance Department |

Exhibit 1
Curriculum Vitae of Andrew S. Carron
Page 2


|  | **The Brookings Institution** |
|---|---|
| 1983-1984 | Senior Fellow |
| 1980-1982 | Research Associate |
| 1979-1980 | Research Fellow |
| 1973-1974 | Research Assistant |

|  | **Yale School of Organization and Management** |
|---|---|
| 1977-1978 | Teaching Assistant/Research Assistant |

|  | **U.S. Senate** |
|---|---|
| 1974-1976 | Legislative Assistant |

## Professional Activities

Securities and Exchange Commission Historical Society, Advisory Council, 2005-.

Public Securities Association, Board of Directors, 1990-92; Chairman of Mortgage Securities Division, 1991.

Brookings Institution Panel on Economic Activity, Member, 1987/1989.

Federal Home Loan Bank Board, Deposit Insurance Project, 1983.

Federal Savings and Loan Advisory Council, Public Interest Appointee, 1982-83.

President's Commission on Housing, Senior Staff, 1981-82.

American Economic Association, 1981-93.

National Science Foundation, Research Grant Review Panel, 1980-81.

## Testimony (FOUR YEARS)

Testimony before the National Association of Securities Dealers – Regulation Division, In the Matter of Arbitration Between *Calvin G. Kinchen, Jr., et al. v. UBS/PaineWebber, Inc.*, 2005.

Testimony before NASD Dispute Resolution, Inc. in *Isaac Raitport and Shirley Raitport v. Salomon Smith Barney, Inc., and CIBC World Markets Corp. a/k/a CIBC Oppenheimer & Co., Inc.*, 2005.

Deposition Testimony, In the United States District Court for the District of New Jersey in *G-I Holdings, Inc., et al. v. United States of America*, 2005.

A 87

Exhibit 1
Curriculum Vitae of Andrew S. Carron
Page 3

Testimony and Deposition Testimony in the United States Court of Federal Claims in *Anchor Savings Bank, FSB v. United States of America*, 2000, 2003, 2005.

Deposition Testimony before the United States Court of Federal Claims in *Homer J. Holland and Howard R. Ross v. United States of America*, 2002, 2005.

Deposition Testimony, In the United States District Court for the District of New Jersey – Newark in *Patricia Fox and Maria Cardeno v. Herzog, Heine, Geduld, Inc., et al.*, 2005.

Deposition Testimony before the United States Court of Federal Claims in *Astoria Federal Savings & Loan Association v. United States of America*, 2002, 2005.

Testimony before the American Arbitration Association on hedging strategies for concentrated stock positions, 2005.

Testimony before the American Arbitration Association on suitability of investment in commercial paper and damages related to investment, 2005.

Deposition Testimony, In the District Court of Tulsa County, State of Oklahoma, *Commercial Financial Services, Inc. v. Mayer Brown Rowe & Maw, P.A., et al. / Bank of America, N.A., et al.. v. Bartmann, et al.*, 2005.

Testimony and Deposition Testimony, In the United States Court of Federal Claims in *The Long Island Savings Bank, FSB, and The Long Island Savings Bank of Centereach, FSB v. United States of America*, 2000, 2003-2005.

Deposition Testimony, In the United States District Court for the Northern District of Illinois – Eastern Division, *Jerry R. Summers, et al. v. UAL Corporation ESOP Committee, et al.*, 2005.

Deposition Testimony, In the United States District Court for the Southern District of New York in *R2 Investments LDC v. Salomon Smith Barney, Inc., et al.*, 2005.

Deposition Testimony, In the United States District Court for the Northern District of Illinois – Eastern Division in *American National Bank and Trust Company of Chicago, et al. v. Allmerica Financial Life Insurance and Annuity Company*, 2004.

Deposition Testimony, In the United States District Court for the Southern District of New York, *In re WorldCom, Inc. ERISA Litigation*, 2004.

Deposition Testimony, In the United States District Court for the District of Massachusetts, *In re: Eaton Vance Corporation Securities Litigation*, 2004.

Exhibit 1
Curriculum Vitae of Andrew S. Carron
Page 4

Deposition Testimony, In the United States District Court for the Southern District of New York in *United States Securities and Exchange Commission v. David A. Zwick, et al.*, 2004.

Testimony before the National Association of Securities Dealers in *Cartel Pacific Limited v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.*, 2004.

Testimony and Deposition Testimony before the United States Court of Federal Claims in *First Federal Savings and Loan Association of Rochester v. United States of America*, 2002, 2004.

Testimony before the National Association of Securities Dealers in *Gustavo Lange, et al. v. Lehman Brothers, Inc.*, 2003.

Testimony before the National Association of Securities Dealers in *Kennilworth Partners LP and Kennilworth Partners II LP v. Bear, Stearns Securities Corporation and Bear, Stearns & Co., Inc.*, 2003.

Testimony, In the United States District Court for the Central District of California in *Board of Trustees for the Carpenters Pension Trust for Southern California v. TCW Asset Management Company*, 2003.

Testimony, In the Court of Common Pleas for Philadelphia County in *Aaron Wesley Wyatt v. Richard G. Phillips*, 2003.

Testimony and Deposition Testimony, In the United States District Court for the Central District of California – Southern Division, *In re First Alliance Mortgage Company, et al.*, 2002-2003.

Testimony and Deposition Testimony before the United States District Court for the Northern District of New York in *Ulico Casualty Company v. Clover Capital Management, Inc.*, 2001, 2003.

Deposition Testimony, In the Circuit Court of Cook County, Illinois – County Department Law Division, *Walton Street Capital, L.L.C. v. Ocwen Asset Investment Corp., et al.*, 2003.

Testimony and Deposition Testimony, In the United States District Court for the Southern District of New York in *Stanford Square, LLC v. Nomura Asset Capital Corporation*, 2002.

Deposition Testimony before the United States Court of Federal Claims in *Home Federal Bank of Tennessee, FSB v. United States of America*, 2002.

Exhibit 1
Curriculum Vitae of Andrew S. Carron
Page 5

Testimony before the New York Stock Exchange, Inc. Department of Arbitration in
*William J. Higgins and Mary Elizabeth O'Leary v. Neuberger Berman LLC and Howard
P. Ganek*, 2002.

## Publications (10 YEARS)

### Books/Monographs

with Phoebus J. Dhrymes and Tsvetan N. Beloreshki, *Credit Ratings for Structured
Products: A Review of Analytical Methodologies, Credit Assessment Accuracy, and
Issuer Selectivity Among the Credit Rating Agencies*, National Economic Research
Associates (2003).

### Newspaper and Magazine Articles

with Gregory J. Wallance, "Suitability Disputes And the Institutional Investor," *New
York Law Journal* (October 9, 1997).

## Securities Industry Accreditation

US:    New York Stock Exchange, Series 7, 63, 3, 16 (supervisory analyst).

UK:    Securities and Futures Authority (general representative/manager).

January 2006

A 90

# EXHIBIT 2

**Exhibit 2**
**Materials Considered**

Second Amended Complaint dated September 13, 2001.

Opinion of the Court, *Cantor, et al. v. Perelman, et al.*, Opinion Filed July 12, 2005.

Marvel Holdings Inc., Senior Secured Discount Notes due 1998, Offering Memorandum, dated April 16, 1993.

Marvel Holdings Inc., Senior Secured Discount Notes due 1998 and Series B Senior Secured Discount Notes due 1998, Indenture, Dated as of April 15, 1993.

Marvel (Parent) Holdings Inc., Senior Secured Discount Notes due 1998, Prospectus dated October 13, 1993.

Marvel (Parent) Holdings Inc., Senior Secured Discount Notes due 1998, Indenture, Dated as of October 1, 1993.

Marvel III Holdings Inc., $9^1/_8$% Senior Secured Discount Notes due 1998, Offering Memorandum dated February 8, 1994.

Marvel III Holdings Inc., $9^1/_8$% Senior Secured Discount Notes due 1998 and $9^1/_8$% Series B Senior Secured Discount Notes due 1998, Indenture, Dated as of February 15, 1994.

Coleman Worldwide Corporation, Liquid Yield Option™ Notes due 2013 (Zero Coupon – Senior Secured), Exchangeable for Shares of Common Stock of The Coleman Company, Inc., Prospectus dated May 20, 1993.

Indenture between Coleman Worldwide Corporation and Continental Bank, National Association, as Trustees, Dated as of May 27, 1993, Liquid Yield Option™ Notes Due 2013.

Bloomberg L.P.

Chicago Board of Options Exchange

www.federalreserve.gov

McConnell, John J. and Eduardo S. Schwartz, "LYON Taming," *The Journal of Finance*, Vol. XLI, No. 3, July 1986.

# EXHIBIT 3

Exhibit 3
Marvel Entertainment Group
Three Series of Marvel Notes[1]

| Notes Issuance Data | Marvel Holdings | Marvel Parent[2] | Marvel III | Total | |
|---|---|---|---|---|---|
| Prospectus Date | 4/16/1993 | 10/13/1993 | 2/8/1994 | | |
| Settlement Date | 4/22/1993 | 10/20/1993 | 2/15/1994 | | |
| Maturity Date | 4/15/1998 | 4/15/1998 | 2/15/1998 | | |
| Maturity (Years) | 4.98 | 4.49 | 4.00 | | |
| Accreted Value at Maturity | $517,447,000 | $251,678,000 | $125,000,000 | $894,125,000 | [A] |
| Equiv. Zero Coupon Value at Maturity | $517,447,000 | $251,678,000 | $178,614,898 | $947,739,898 | |
| Coupon | 0.000% | 0.000% | 9.125% | | |
| Per Note Price | 57.977% | 58.662% | 100.000% | | [B] |
| Total Price | $300,000,247 | $147,639,348 | $125,000,000 | | [C] = [A] * [B] |
| Transaction Cost | $10,875,000 | $2,139,263[3] | $3,750,000 | $16,764,263 | [D] |
| Expenses Payable by Issuer | $1,125,000 | $630,000 | $650,000 | $2,405,000 | [E] |
| Total Cost | $12,000,000 | $2,769,263[4] | $4,400,000 | | [F] = [D] + [E] |
| Net Proceeds to Issuer | $288,000,247 | $144,870,085[5] | $120,600,000 | $553,470,333 | [G] = [C] - [F] |
| Yield | 11.250% | 12.250% | 9.125% | | |
| Shares as Collateral[6] | 48,000,000 | 20,000,000 | 9,302,326 | 77,302,326 | |
| Share Price on Prospectus Date[6] | $12.313 | $23.313 | $26.875 | | |

Notes and Sources:

[1] Notes data obtained from the Offering Documents (SKA 09027-09122, SKA 05872-05991, SKA 05877-05212) and share prices from Bloomberg L.P.

[2] The prospectus for this offering does not give Transaction Cost. It, however, gives the price (57.812% of Accreted Value at Maturity) that the underwriter agreed to pay to the issuer. It also gives Expenses Payable by Issuer ($630,000) and Net Proceeds to Issuer ($144.9 million). Additionally, Per Note Price (58.662%) is obtained from Bloomberg L.P. Total Cost is, thus, derived as the difference between Total Price and Net Proceeds to Issuer, and Transaction Cost is derived as the difference between Total Cost and Expenses Payable by Issuer.

[3] Total Cost - Expenses Payable by Issuer

[4] Total Price - Net Proceeds to Issuer

[5] Accreted Value at Maturity * 57.812% - Expenses Payable by Issuer

[6] Shares as Collateral and Share Price at Issue are adjusted for the 2-for-1 Marvel stock split on November 2, 1993.

# EXHIBIT 4

**Exhibit 4**
**Coleman Worldwide Corporation**
**Coleman LYONs**

### *LYONs Issuance Data*

| | | |
|---|---|---|
| Prospectus Date | 5/20/1993 | |
| Settlement Date | 5/27/1993 | |
| Effective Maturity Date | 5/27/1998 | |
| Issue Price | $ 240.67 | |
| Accreted Value at Effective Maturity Date | $ 171,805,000 | |
| Coupon | 0.00% | |
| Time to Effective Maturity Date (Years) | 5.00 | |
| Yield | 7.25% | |
| Transaction Cost | $ 3,610,000 | |
| Expenses Payable by Issuer | $ 1,025,000 | |
| Net Proceeds to Issuer | $ 115,700,000 | [A] |
| Shares as Collateral | 7,220,000 | |
| Share Price on Prospectus Date | $ 27.000 | |
| LYON Exchange Rate (Number of Shares Per LYON) | 7.853 | |
| Number of LYONs | 500,000 | |
| Price Per LYON at Effective Maturity | $ 343.61 | |

### *Option Valuation Inputs*

| | |
|---|---|
| Volatility | 45.00% |
| Maturity in Years | 5.00 |
| Risk-Free Rate (Annual) | 5.35% |
| Dividend Yield | 0.00% |

### *Put Option*

| | | |
|---|---|---|
| Put Strike Price | $ 23.80 | |
| Price Per Put | $ 4.97 | |
| Number of Puts | 7,220,000 | |
| Value of All Put Options Sold by Investors | $ 35,906,031 | [B] |

### *Call Option*

| | | |
|---|---|---|
| Call Strike Price | $ 43.76 | |
| Price Per Call | $ 8.59 | |
| Number of Calls | 3,926,500 | |
| Value of All Call Options Bought by Investors | $ 33,743,360 | [C] |
| Value of Debt Component | $ 117,862,671 | [A]+[B]-[C] |
| Debt Yield | 7.68% | |
| Swap Rate (5 Years) | 5.55% | |
| **Spread to Swap Curve** | **2.13%** | |

**Notes and Sources:**
   Issuance data obtained from LYONs Prospectus for Coleman Worldwide Corporation and Bloomberg L.P.
   Calculation of effective maturity as described in the text.

# EXHIBIT 5



Exhibit 5
The Coleman Company
12-Month Historical Volatility

Source:
Bloomberg L.P.

# EXHIBIT 6

Exhibit 6

**Marvel Entertainment Group**

**Hypothetical Marvel LYONs** [1]

|  | Marvel Holdings | Marvel Parent | Marvel III | Total |
|---|---|---|---|---|
| **_LYONs Issuance Data_** | | | | |
| Prospectus Date | 4/16/1993 | 10/13/1993 | 2/8/1994 | |
| Settlement Date | 4/22/1993 | 10/20/1993 | 2/15/1994 | |
| Effective Maturity Date | 4/15/1998 | 4/15/1998 | 2/15/1998 | |
| Accreted Value at Effective Maturity Date | $ 517,447,000 | $ 251,678,000 | $ 178,614,898 | $ 947,739,898 |
| Coupon | 0.000% | 0.000% | 0.000% | |
| Time to Effective Maturity Date (Years) | 4.98 | 4.49 | 4.00 | |
| Shares as Collateral [2] | 48,000,000 | 20,000,000 | 9,302,326 | |
| Share Price on Prospectus Date [2] | $ 12.313 | $ 23.313 | $ 26.875 | |
| Number of LYONs | 517,447 | 251,678 | 178,615 | |
| Price Per LYON at Redemption | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | |
| **_Collateralized Debt Calculations_** | | | | |
| Spread to Swap Curve [3] | 2.13% | 2.13% | 2.13% | |
| Swap Rate [4] | 5.30% | 4.72% | 5.34% | |
| Assumed Discount Rate [5] | 7.43% | 6.85% | 7.47% | |
| Value of Debt Component | $ 359,748,567 | $ 186,028,247 | $ 133,225,921 | $ 679,002,735  [A] |
| **_Option Valuation Inputs_** | | | | |
| Volatility | 70% | 55% | 55% | |
| Maturity in Years | 4.98 | 4.49 | 4.00 | |
| Risk-Free Rate (Annual) [6] | 5.00% | 4.49% | 5.06% | |
| Dividend Yield | 0.00% | 0.00% | 0.00% | |
| **_Put Option_** | | | | |
| Put Strike Price | $ 10.78 | $ 12.58 | $ 19.20 | |
| Price Per Put | $ 4.07 | $ 2.36 | $ 4.25 | |
| Number of Puts | 48,000,000 | 20,000,000 | 9,302,326 | |
| Value of All Put Options Sold by Investors | $ 195,579,899 | $ 47,123,805 | $ 39,527,160 | $ 282,230,864  [B] |
| **_Call Option_** | | | | |
| Call Strike Price | $ 19.95 | $ 37.78 | $ 43.55 | |
| Price Per Call | $ 6.31 | $ 8.41 | $ 9.03 | |
| Number of Calls | 25,933,026 | 6,661,775 | 4,101,123 | |
| Value of All Call Options Bought by Investors | $ 163,641,060 | $ 56,007,588 | $ 37,044,031 | $ 256,692,679  [C] |
| **Net Proceeds to Issuer** | $ 327,809,728 | $ 194,912,030 | $ 130,742,792 | $ 653,464,550  [A]-[B]+[C] |

**Notes and Sources:**

[1] Data obtained from Exhibits 3 and 4, and Bloomberg L.P.

[2] For Marvel Holdings and Marvel Parent, Shares as Collateral and Share Price at Issue are adjusted for the 2-for-1 Marvel stock split on November 2, 1993.

[3] Spread to Swap Curve obtained from Coleman LYONs analysis (Exhibit 4).

[4] Interpolated using 4-year and 5-year swap interest rates obtained from Bloomberg L.P.

[5] Spread to Swap Curve + Swap Rate.

[6] Interpolated using 3-year and 5-year Treasury rates obtained from Bloomberg L.P.

A 101

# EXHIBIT 7



Exhibit 7
Marvel Entertainment Group ("M") and The Coleman Company ("C")
Historical Volatility and Implied Volatility[1]

Note:
[1] Implied volatility is based on put option offer price.
Sources:
Bloomberg L.P. and Chicago Board of Options Exchange.

A 103

# EXHIBIT 8

Exhibit 8
Marvel Entertainment Group
Comparison of Actual Notes Proceeds with Hypothetical Alternative Proceeds

| | Marvel Holdings | Marvel Parent | Marvel III | Total | |
|---|---|---|---|---|---|
| **Marvel Notes Issued** | | | | | |
| Actual Notes Proceeds | $ 288,000,247 | $ 144,870,085 | $ 120,600,000 | $ 553,470,333 | [A] |
| **Alternative Market Transaction** | | | | | |
| LYONs Proceeds | $ 327,809,728 | $ 194,912,030 | $ 130,742,792 | $ 653,464,550 | [B] |
| - Hypothetical Call Proceeds | $ 163,641,060 | $ 56,007,588 | $ 37,044,031 | $ 256,692,679 | [C] |
| = Hypothetical Alternative Proceeds | $ 164,168,668 | $ 138,904,442 | $ 93,698,761 | $ 396,771,871 | [D] = [B] - [C] |
| **Difference** | $ 123,831,579 | $ 5,965,643 | $ 26,901,239 | $ 156,698,461 | [E] = [A] - [D] |

A 105

# EXHIBIT 9

Exhibit 9

Marvel Entertainment Group

Current Value of Actual Notes Proceeds and Hypothetical Alternative Proceeds [1]

| | Marvel Holdings | Marvel Parent | Marvel III | Total |
|---|---|---|---|---|
| Settlement Date | 4/22/1993 | 10/20/1993 | 2/15/1994 | |
| Actual Marvel Notes Proceeds | $ 288,000,247 | $ 144,870,085 | $ 120,600,000 | $ 553,470,333 |
| Hypothetical Alternative Proceeds | $ 164,168,668 | $ 138,904,442 | $ 93,698,761 | $ 396,771,871 |
| Current Value Date | 12/31/2005 | 12/31/2005 | 12/31/2005 | |
| **Variable Rate, Monthly Compounding [2]** | | | | |
| Actual Marvel Notes Proceeds | $ 886,007,130 | $ 428,512,701 | $ 347,620,642 | $ 1,662,140,473 |
| Hypothetical Alternative Proceeds | $ 505,050,297 | $ 410,866,865 | $ 270,079,797 | $ 1,185,996,958 |
| Difference | $ 380,956,833 | $ 17,645,836 | $ 77,540,845 | $ 476,143,514 |
| **Fixed Rate, Monthly Compounding [3]** | | | | |
| Actual Marvel Notes Proceeds | $ 792,288,184 | $ 383,130,992 | $ 310,923,875 | $ 1,486,343,051 |
| Hypothetical Alternative Proceeds | $ 451,627,723 | $ 367,353,941 | $ 241,568,672 | $ 1,060,550,336 |
| Difference | $ 340,660,461 | $ 15,777,051 | $ 69,355,202 | $ 425,792,715 |
| **Fixed Rate, Simple Interest [4]** | | | | |
| Actual Marvel Notes Proceeds | $ 580,416,498 | $ 286,231,095 | $ 235,196,800 | $ 1,101,844,393 |
| Hypothetical Alternative Proceeds | $ 330,854,589 | $ 274,444,310 | $ 182,733,406 | $ 788,032,305 |
| Difference | $ 249,561,909 | $ 11,786,785 | $ 52,463,394 | $ 313,812,088 |

Notes and Sources:

[1] Federal Reserve discount rate data obtained from http://www.frbdiscountwindow.org/currentdiscountrates.cfm?hdrID=20&dtlID=51 and http://www.frbdiscountwindow.org/historicalrates.cfm?hdrID=20&dtlID=52.

[2] Proceeds * Π (1 + (Monthly Average Federal Reserve Discount Rate + 5%) / 12)

[3] Proceeds * (1 + (Federal Reserve Discount Rate on Settlement Date + 5%) / 12) ^ (12 * Years between Settlement Date and Present Value Date)

[4] Proceeds * (1 + (Federal Reserve Discount Rate on Settlement Date + 5%) * Years between Settlement Date and Present Value Date)