IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD CANTOR, IVAN SNYDER, JAMES A. SCARPONE, as Trustees of the MAFCO LITIGATION TRUST,     : : : : Plaintiffs, : : v. : : RONALD O. PERELMAN, MAFCO HOLDINGS, INC., MACANDREWS & FORBES HOLDINGS INC., ANDREWS GROUP INCORPORATED, WILLIAM C. BEVINS and DONALD G. DRAPKIN, : : : : : : : Defendants. : : | C.A. No. 97-586 (KAJ) |

REBUTTAL EXPERT REPORT OF PETER A. FOWLER

MARCH 3, 2006

**Table of Contents**

I.      Introduction ............................................................................................................. 1

    a.    Background................................................................................................... 1
    b.    Assignment.................................................................................................. 2
    c.    Qualifications ............................................................................................. 3
    d.    Remuneration.............................................................................................. 4
    e.    Materials Considered ................................................................................ 4

II.     Comments on Mr. Carron's Report.................................................................... 4

III.    Costs to Marvel from the Restrictions............................................................. 6

    a.    Effects on Marvel of the Restrictions – Cash Costs & Financial Flexibility. 6
    b.    Marvel Credit Rating and Credit Rating Agency Issues ............................... 8
    c.    Restricted Payment and Ownership Covenants ........................................... 11

IV.     Benefits to the Marvel Holding Companies of the Restrictions................. 12

    a.    Investors' view of risk in the Holding Company Notes............................. 12
    b.    Role of the Restrictions in marketing the Holding Company Notes ......... 13
    c.    M&F Holdings Financing Strategies............................................................. 17
    d.    Holding Company structures in the high-yield market ............................. 18
    e.    Alternative Structures for the Holding Company Notes............................ 19
    f.    Analysis of Mr. Carron's report and LYONs as alternative structure ...... 20

V.      Outcome of the Arms-length Negotiation....................................................... 27

**List of Exhibits**

1.    Marvel Holdings Companies & Affiliates Organization Chart
2.    Resume of Peter A. Fowler
3.    Materials Considered
4.    Debt Capacity Analysis for Marvel Entertainment Group
5.    Comparable Company Credit Analysis
6.    Holding vs. Operating Company Debt Issuance Comparison
7.    Collateralization of Marvel and Coleman Debt Issuances
8.    Overview of MacAndrews & Forbes Debt Issues: 1992-1994
9.    Comparison of Coleman Worldwide and Coleman Holdings Debt Issuances
10.   Estimate of the Error in Mr. Carron's Yields for Coleman LYONs and Marvel Holding Company Hypothetical LYONs
11.   Coleman Worldwide LYONs Analysis
12.   Marvel Holding Company  LYONs Analysis
13.   Potential Payment from Negotiation between M&F Holdings and Marvel

## I.    Introduction

1.    I, Peter A. Fowler, hereby submit this expert report in the above referenced case.  I reserve the right to amend and/or supplement this report based on any additional information that may become available.

### a.    *Background*

2.    MacAndrews & Forbes Holdings Inc. ("M&F Holdings") acquired Marvel Entertainment Group Inc. ("Marvel") in January 1989 through a series of holding companies.  In July 1991, Marvel completed its initial public offering. M&F Holdings established and owned each of the following holding companies (collectively, "Marvel Holding Companies"): Marvel Holdings Inc. ("Marvel Holdings"), Marvel (Parent) Holdings Inc. ("Marvel Parent"), and Marvel III Holdings Inc. ("Marvel III").  During 1993 and 1994, Marvel was 80 percent owned either directly or indirectly by these three holding companies (see **Exhibit 1**).[1]  In 1993 and 1994, the Marvel Holding Companies each issued and sold a series of notes with a combined face value of $894.1 million (the "Holding Company Notes").[2]  Gross proceeds to the Marvel Holding Companies were $572.6 million.[3]

3.    In the indentures for each of the Holding Company Notes, the holding companies agreed to cause Marvel to act in accordance with certain restrictions (the "Restrictions"). The indentures for each note offering provided, among other things, that (a) with the exception of certain categories of debt, the

---

[1] The Marvel Holding Companies achieved the 80 percent ownership threshold following the Marvel Holdings issuance, the proceeds of which were used to fund a tender offer for Marvel shares in May 1993. (Marvel Holdings Inc. Prospectus, July 9, 1993)

[2] The face value for each note was as follows: Marvel Holdings ($517.4 million), Marvel Parent ($251.7 million) and Marvel III ($125.0 million). (Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994)

[3] Proceeds from the notes were as follows: Marvel Holdings ($300 million), Marvel Parent ($147.6 million) and Marvel III ($125.0 million). (Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994)

1

issuer would not permit Marvel or any of its subsidiaries to issue any debt unless certain financial ratios were met (§4.04), (b) the issuer would not permit Marvel to issue any preferred stock except under specified circumstances (§4.04), (c) the issuer would not permit Marvel to make certain restrictive payments (§4.05) and (d) the Marvel Holding Companies would collectively continue to hold a majority of the Marvel voting stock (§4.09).[4]

4.     The notes issued by the Marvel Holding Companies were secured by shares of Marvel common stock. The notes issued by Marvel Holdings, Marvel Parent, and Marvel III were secured by 24.0 million, 10.0 million and 9.3 million shares of Marvel common stock, respectively.[5]  For all three issues, the number of Marvel shares pledged as collateral was fixed and not subject to adjustment based on changes in the market price of the Marvel common stock.[6]

### b.  *Assignment*

5.     I have been asked by counsel for the defendants to provide a rebuttal to the expert report of Andrew S. Carron.  In providing that rebuttal, I have been asked to assume that the indenture restrictions bound Marvel and to determine how much the Marvel Holding Companies would have had to pay Marvel, after arm's length bargaining at the time of issuance of the Holding Company Notes, to compensate Marvel for the Restrictions.[7]  My analysis assumes that the Marvel Holding Companies would have evaluated other

---

[4] Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994.

[5] Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994.  Following the 2-for-1 stock split by Marvel on November 2, 1993 the shares secured in the Marvel Holdings and Marvel (Parent) issuances were 48 million and 20 million, respectively.

[6] Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994.

[7] Third Circuit Court's Opinion in Cantor et al. v. Perelman et al. (Nos. 04-1790, 04-2896), July 12, 2005, p. 438.  In the Opinion, the Court notes "...what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation."

financing alternatives and used these alternatives as points in the negotiation, but ultimately the Marvel Holding Companies would have agreed to issue the Holding Company Notes as they were actually issued.

### c. *Qualifications*

6.      I have over 24 years experience as an investment banker. I began my career in the municipal bond department of Merrill Lynch Capital Markets from 1980-1982 where I structured, traded and underwrote municipal bonds. I worked as a Managing Director in the Investment Banking department of Credit Suisse First Boston ("CSFB") and its predecessors from 1984-2001. My career at CSFB spanned two areas in the investment banking group – both the corporate finance department, which advised corporations on financings and financial strategy, and the capital markets department, which acted as the intermediary between the investors and the corporations issuing the securities. I have experience in all areas of corporate finance. I was involved in numerous debt offerings, both public and private, both investment grade and high yield. I was also involved in all types of equity and equity-linked security offerings, including many convertible security offerings. I have dealt extensively with both of the principal credit rating agencies, Moody's Investor Services ("Moody's") and Standard & Poor's ("S&P"), and have advised many companies, including many first-time issuers, on the credit ratings process. In addition, I worked with many corporations on mergers and acquisitions, valuations, equity recapitalizations (utilizing voting and non-voting stock), leveraged buyouts and corporate reorganizations and restructurings. Since 2001, I have been President of Headlands Capital, Inc. and have been providing consulting advice to corporations on corporate finance and corporate strategy issues.

7.      I have a B.A. from Dartmouth College and an MBA from the Wharton School at the University of Pennsylvania.

8.    See **Exhibit 2** for my resume and my list of completed transactions. I have not testified as an expert at trial or by deposition in the last four years.

### d.    _Remuneration_

9.    I am being compensated for my work in this matter at my standard hourly rate of $1,000. I have utilized the support services of Chicago Partners LLC ("Chicago Partners") in preparing this report. All work performed by Chicago Partners has been under my direct supervision.

### e.    _Materials Considered_

10.    **Exhibit 3** lists the materials I have considered in preparation of this report.

## II.    Comments on Mr. Carron's Report

11.    Mr. Carron states in his expert report that he was asked to answer the following question:  "As of the time of each Note issuance, if the Marvel Holding Companies had raised funds using a different market transaction that was secured by the same Marvel shares but did not require the Indenture Covenants and that, like the Marvel Notes, had no recourse to assets of any other entities, would the proceeds have been materially different from the actual proceeds of that Note issuance?"[8] Mr. Carron concludes that the Marvel Holding Companies could have entered into a zero coupon, secured convertible note issuance similar to the LYONs notes entered into by Coleman Worldwide Corporation ("Coleman Worldwide"), but would have raised $156.7 million less than was raised from the Marvel Holding Company note issuances.[9] Mr. Carron calculates what the terms of the theoretical issues of LYONs by the Marvel

---

[8] Expert Report of Andrew S. Carron, January 13, 2006, ¶2.
[9] Expert Report of Andrew S. Carron, January 13, 2006, ¶3 and 34.

Holding Company would be and adjusts for the call options to reach his conclusion.

12.     I have reviewed Mr. Carron's expert report and disagree with his conclusions for the following reasons, which are discussed in detail in the remainder of this report:

- Mr. Carron's analysis is unreliable and does not match how the market structures, values and prices these securities.

- Mr. Carron ignores the fact that Coleman Holdings actually issued a relevant security in the same time period. Both the Coleman Holdings and the Coleman Worldwide LYONs issues were essentially the same structures (5-year zero coupon notes secured solely by Coleman common stock), with the primary difference being that the Coleman Worldwide LYONs issue gave the investors upside participation in the growth of Coleman's stock price. In effect, the Coleman Worldwide LYONs offered the same structural protection for investors that Mr. Carron assumes were provided in the Restrictions, only through a put structure, rather than covenants;

- Investors will pay for call options (a feature of LYONs that was absent from the Holding Company Notes) and thus, Coleman Worldwide (or the Marvel Holding Companies) could raise more proceeds through a LYONs issue than from a straight debt issue, assuming the same number of shares of underlying common stock collateral and the same debt structure;

- Mr. Carron's methodology is unreliable because it fails under testing of real world examples. Mr. Carron utilizes a methodology to impute the pricing that Marvel Holding Companies would achieve in his hypothetical LYONs offerings (and thus the proceeds the Marvel

Holding Companies would receive though a different market transaction absent the Restrictions). That methodology is fundamentally unreliable as it does not match the actual market pricing observable in this case. Mr. Carron imputes a secured, zero-coupon holding company straight debt pricing for the Coleman Worldwide LYONs and the hypothetical Marvel Holding Companies' LYONs issues that is materially inconsistent with the actual transactions that Coleman Holdings and the three Marvel Holding Companies did almost simultaneously;

- These problems render his analysis unreliable.

13.    The remainder of this report sets out the reasons for my disagreements with Mr. Carron's methodology and conclusions, as well as the support for my opinion regarding the outcome of a hypothetical negotiation between the Marvel Holding Companies and Marvel regarding the compensation for including the Restrictions in the Holding Company Notes.


## III.    Costs to Marvel from the Restrictions

14.    As part of this negotiation, Marvel would have determined its estimate of the costs, both actual cash costs and theoretical incremental costs, of the Restrictions being in place. I have evaluated Marvel and its financial condition and have determined what I think Marvel's estimated costs and negotiating position would have been.

### a.    *Effects on Marvel of the Restrictions – Cash Costs & Financial Flexibility*

15.    Marvel had its own financial restrictions from its outstanding debt. According to the expert report of Professor Robert W. Holthausen, these

6

covenants were more restrictive than the financial covenants in the notes issued by the Marvel Holding Companies.[10]  Specifically, the bank covenant for the Marvel Fleer loan required Marvel to maintain an interest coverage ratio (the ratio of operating cash flow to interest expense) of at least 4.0, while the Holding Company Notes contained a less restrictive EBITDA coverage ratio (the ratio of earnings before interest, taxes, depreciation and amortization, or EBITDA, to interest expense) of 2.0 - 2.25 which applied only to the Marvel's ability to issue additional indebtedness.[11]  It is important to note that the Marvel covenant was a more restrictive "maintenance" covenant (which means the Marvel needed to be in compliance every calendar quarter) while the Marvel Holding Companies used a less restrictive "incurrence" covenant (which means that Marvel needed to be in compliance only when Marvel was issuing debt).  The lower the required interest coverage ratio, the higher the amount of debt a company can incur or maintain while being in compliance with this ratio.

16.    Based on my review of Marvel's agreements for the bank financings completed during the time period the Holding Company Notes were issued, there were no additional cash costs incurred by Marvel when the Marvel Holding Companies issued the Holding Company Notes (1992-1994).[12]  In addition, none of these bank financing agreements referenced the notes issued by the Marvel Holding Companies or restricted Marvel because of the issuance of the Holding Company Notes.  Based on a telephone interview that I had with Mr. Irwin Engelman, the former CFO of M&F Holdings, the ultimate parent of the Marvel Holding Companies, I understand that Marvel's bank lenders were

---

[10] Expert Report of Robert W. Holthausen, March 15, 2002, ¶5-6.
[11] Marvel Entertainment Group - Fleer Credit and Guarantee Agreement, September 17, 1992, §8.1(b) and Marvel Holding Company Indentures, §4.04.
[12] Marvel Entertainment Group - Fleer Credit and Guarantee Agreement, September 17, 1992; Marvel Entertainment Group - Fleer Amended and Restated Credit and Guarantee Agreement, August 30, 1994;  Marvel Comics Italia and Marvel Entertainment Group Term Loan and Guarantee Agreement, August 30, 1994.

not in any way concerned with the issuance of the notes by the Marvel Holding Companies. I also understand that Mr. Engelman worked with these banks with respect to Marvel and the other companies that M&F Holdings invested in.

17.    The covenants contained in the Holding Company Notes, in particular the interest coverage covenant, did not constrain Marvel in a significant way. As I mentioned, Marvel's bank covenants were more restrictive. I examined the debt capacity of Marvel under the covenants of the Holding Company Notes and found that, based on Marvel's financial performance in 1993, Marvel could issue an additional $800 to $2,600 million in debt,[13] based on a range of acquisition multiples and debt costs, to fund acquisitions without being constrained by the Holding Company Notes' interest coverage covenant. This left Marvel with very significant financial flexibility at the time. See **Exhibit 4** for this debt capacity analysis.

### b.    *Marvel Credit Rating and Credit Rating Agency Issues*

18.    Based on my analysis, I believe that Marvel's credit quality at the time of the issuance of the Holding Company Notes was non-investment grade (see **Exhibit 5**). I believe that if Marvel had been rated by the major rating agencies (Moody's and S&P) as a separate entity during 1993-1994, and assuming that the Holding Company Notes had not been issued, its rating would be in the double-B category for its senior debt.[14] I understand that S&P assigned an implied senior debt rating of BB- in August 1993, when they rated the Marvel

---

[13] The debt capacity analysis is performed at one point in time, as of year-end 1993, but I also examined Marvel's debt capacity on a quarterly basis between December 31, 1992 and December 31, 1994.

[14] Standard & Poor's defines a double-B rated issuance as follows: "An obligation rated 'BB' is less vulnerable to nonpayment than other speculative issues. However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions that could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation." (Standard & Poor's Corporate Ratings Criteria 2006, p. 12) Based on my experience as an investment banker, the rating agencies used similar criteria in generating their credit ratings during the 1992-1994 time period.

Holdings and Marvel Parent issues.[15]   Marvel's first formal credit rating was received in July 1995 when Moody's and S&P rated Marvel's shelf registration statement for senior debt as B1/B+, respectively[16]

19.    The rating agencies would have looked at a number of factors in rating Marvel, including the underlying business risks of the comics and trading card businesses, the historical credit statistics of Marvel in comparison to its industry counterparts, its size and diversification of revenues, its financial strategy and its use of debt in its financing strategy, its acquisition strategy, its owner and the owner's history of using financial leverage in other investments.[17] Because Marvel was relatively small in revenues and earnings, concentrated relative to its industry counterparts, aggressive in its acquisition strategy, had a history of using debt to finance its acquisitions, and was owned by an investor who aggressively used leverage and acquisitions to grow his investments, I believe that the rating agencies would have concluded that Marvel was in the mid double-B quality credit range.[18]

20.    The rating agencies noted in their reports issued in 1993 and 1994 that they looked at the credit of Marvel and the holding companies on a consolidated basis.[19]   In addition, according to the testimony of William C. Bevins, the CEO of Marvel, Marvel's rating was affected by the rating agencies'

---

[15] S&P CreditWeek reports for Marvel Holding Companies, August 9, 1993 and June 13, 1994. This implied senior rating is what S&P now refers to as its issuer rating or corporate credit rating. (Standard & Poor's Corporate Ratings Criteria 2006, p. 45)

[16] S&P rated the Marvel shelf rating as B+ and B- ratings for the senior and subordinated debt, respectively (DEF 008125-26), while Moody's provided ratings of B1 and B2 for the senior and subordinated debt, respectively (DEF 8132-8133).

[17] Standard & Poor's Corporate Ratings Criteria 2006, pp. 9-11.

[18] Although Marvel was not formally rated by Moody's or S&P, it apparently was viewed as a double-B credit during this time period. ("Marvel Sweeping into High Yield Market with $200 Mil 144A," Private Placement Reporter Vol. 4; No. 28; Pg. 1, July 18, 1994)

[19] S&P noted in rating the Marvel III offering that "[r]atings on the holding company, Marvel III Holdings Inc., and its two subsidiaries are strongly affected by the underlying creditworthiness of Marvel Entertainment Group Inc. (operating company) and the ultimate parent of all the Marvel units, Mafco Holding Inc." (S&P CreditWire Ratings Rationale - Marvel III Holdings, September 29, 1994 (DEF 006378))

view that Marvel could not be rated higher than its parent, Mafco Holdings.[20] As such, the issuance of the Holding Company Notes indirectly increased the leverage of Marvel in the eyes of the rating agencies, which could have arguably increased Marvel's cost of debt. It is important to note that the credit rating agencies would evaluate the effect upon Marvel of any debt issued by the Marvel Holding Companies in a similar manner, whether the debt had the Restrictions, other structures or were structured as LYONs. Thus, it is not the Restrictions that affect the credit rating, but the existence of any parent company debt.

21.    I examined the relative pricing of "BB" and "B" debt offerings during 1993 and 1994 to estimate what the incremental cost of this theoretical incremental leverage might be. Based on the material Merrill Lynch prepared on the high-yield market conditions in 1994 in a presentation to Marvel management,[21] I observe that "BB" rated issues traded approximately 150 basis points lower in yield than "B" rated issues. As such, I estimate that this incremental theoretical cost would have been approximately 50 basis points for Marvel. It is important to note that Marvel could have faced this cost with or without the Restrictions.

22.    As a double-B credit, Marvel would likely have needed to have financial covenants restricting their issuance of debt whether it continued to finance in the bank market or in the high-yield market. I believe that such financial covenants would have been at least as restrictive as those in the Holding Company Notes.

---

[20] Deposition of William Bevins, March 7, 2002, p. 67. This view is confirmed by S&P's formal ratings criteria. (Standard & Poor's Corporate Ratings Criteria 2006, p. 85)
[21] Merrill Lynch Presentation to Marvel Entertainment Group, Inc. Regarding Financing Alternative, February 28, 1995 (M-JB10 1179)

10

A 119

c.    *Restricted Payment and Ownership Covenants*

23.    I have evaluated the restrictions on payments covenant in the Holding Company Notes.[22] This covenant restricts the holding company from making distributions to its shareholders, but does not affect dividends or distributions made by Marvel (either to the Holding Companies or its outside shareholders) as long as those distributions are made on a pro rata basis.[23] Thus, I did not find this covenant to be restrictive on Marvel.

24.    I have also evaluated the majority ownership requirement covenant in the Holding Company Notes.[24] In my experience, that this covenant was very common in the high-yield market. I examined a sample of high-yield debt issuances by holding companies during the period 1992-1994. Most of these holding company issuances were secured by the stock held by the holding company in an operating subsidiary. In addition, each issuance required the holding company to maintain at least a majority ownership of the operating subsidiary's capital stock. (See **Exhibit 6**) I understand from the expert report of Professor Lawrence A. Hamermesh that a company's directors would not expect to be able to eliminate a majority shareholder's control through the issuance of shares.[25] In addition, according to the expert report of Professor Robert Holthausen, Marvel would have been able to issue non-voting or limited voting

---

[22] Section 4.05 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).

[23] Marvel's existing bank debt also contained a covenant limiting restricted payments unless Marvel maintained certain financial ratios. (Marvel Entertainment Group - Fleer Credit and Guarantee Agreement, September 17, 1992, §8.7)

[24] Section 4.09 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).

[25] Expert Report of Lawrence A. Hamermesh, January 13, 2006, ¶9.

common stock if it desired to raise equity capital, without violating this covenant.[26] Thus, I did not find this covenant to be restrictive on Marvel.

## IV.    Benefits to the Marvel Holding Companies of the Restrictions

25.    I have examined the benefits of the restrictions in the Marvel Holding Company Notes to M&F Holdings.  As part of this analysis, I have examined, among other things, the importance of these restrictions in marketing and selling the Notes, the alternative ways to structure the debt securities, the other financing options available to M&F Holdings and the market conditions at the time of issuance.

### a.    *Investors' view of risk in the Holding Company Notes*

26.    The Holding Company Notes were secured by Marvel common stock, and the Marvel Holding Companies had no assets other than this common stock.[27]  As stated in the prospectuses, cash flow from Marvel was not available to service the notes and the notes would be repaid by "borrowing funds, selling its equity securities or equity securities of Marvel, or seeking capital contributions or loans from MacAndrews & Forbes or other affiliates."[28]  I believe investors viewed these securities as a form of intermediate term margin loans, as the notes were secured by marketable securities (i.e., Marvel stock) and had no other sources of repayment from the issuer.  From an investor's perspective, I believe that the Restrictions acted as monitoring triggers that could provide a method by which the note-holders would receive incremental rights if the financial position of Marvel, their only collateral, changed significantly.  If these

---

[26] Expert Rebuttal Report of Robert W. Holthausen, March 29, 2002, ¶14.

[27] Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994.

[28] Marvel Holdings Prospectus, July 9, 1993, pp. 12-13. See, also, Marvel (Parent) Holdings Prospectus, October 13, 1993, p. 13 and Marvel III Prospectus, May 11, 1994, p.17.

12

A 121

notes had been structured as a margin loan, the monitoring triggers would have been based on the market value of the Marvel stock. This was not the case with the Holding Company Notes.

### b. _Role of the Restrictions in marketing the Holding Company Notes_

27.     I believe that key attributes of the securities in marketing and selling the Holding Company Notes included the over-collateralization ratio (the market value of the underlying Marvel common stock in relation to the principal amount of the notes), monitoring devices concerning M&F Holdings' continued control of the operating companies, and the financial position of Marvel. The Restrictions themselves would not have been necessary to market the notes provided that investors received alternative monitoring devices that accomplished the same purpose. Investors looked to the collateral to provide the value to be repaid (or incentivize the Marvel Holding Companies to find some other source of repayment), and they wanted the block of Marvel stock pledged as collateral to be a control position so it would be more valuable than a minority position. Moreover, based on my discussion with Mr. Engelman, I understand that the investors were relying on Ronald Perelman's reputation (Mr. Perelman was the ultimate owner of the Marvel Holding Companies), and they wanted to be sure that their investment would continue to be controlled by him. For each of the issues, investors looked at the collateral value of the Marvel stock at the time of issuance and at its value relative to both the outstanding amount of the debt at issuance and the principal amount of the notes due at maturity. I believe that the pricing of the Holding Company Notes and the proceeds raised were principally tied to the price of Marvel's stock at the time and its prospects in the eyes of investors.

28.     I will now examine how the Holding Company Notes were priced by the market. **Exhibit 7** summarizes the level of collateralization for each of the

13

A 122

Holding Company Notes. At the time of the Marvel Holdings deal, the value of the Marvel stock was 2.0x the note proceeds and 1.1x the principal amount of the notes at maturity. With a yield of 11.25%, the notes were priced at 624 basis points over the 5-year Treasury (5.01%).[29] Between April 1993 (the Marvel Holdings issuance date) and October 1993 (the Marvel Parent issuance date), the value of Marvel's stock increased 88%. At the time of the issuance of the Marvel Parent deal, the value of the Marvel stock collateral was 3.1x the notes proceeds at issuance and 1.8x the principal amount of the notes at maturity. With a yield of 12.25%, the Marvel Parent notes were priced at 762 basis points over the 5-year Treasury (4.63%).[30] With a cash-pay yield of 9.125%, the Marvel III offering had collateral valued at 2.0x the note principal amount at both issuance and maturity, and were priced at 380 basis points over the 5-year Treasury (5.33%).[31] Clearly, the terms of the securities varied widely as interest rates changed and the credit quality of the issuer began to change.[32] Similarly, the amount of collateral required varied depending on Marvel's stock price and its perceived future performance.

29.     Investors used a break-even pricing model to help price these securities. A break-even price is that future stock price which Marvel's stock must be equal to or above so that the value of the collateral is equal to the principal amount of the notes at maturity. **Exhibit 7** illustrates that the note investors required only a slightly higher break-even stock price for each successive Holding Company Note issuance even though Marvel's stock price

---

[29] 5-year U.S. Treasury yield as of April 22, 1993 (Bloomberg, LP). The high-yield market typically prices new issues off the Treasury market.

[30] 5-year U.S. Treasury yield as of October 20, 1993 (Bloomberg, LP). The spread would increase to 776 basis points if one were to interpolate between the 3 and 5-year Treasury yields (4.49%) in order to match the 4.5 year duration of the Marvel Parent notes.

[31] 5-year U.S. Treasury yield as of February 15, 1994 (Bloomberg, LP). The spread would increase to 407 basis points if one were to interpolate between the 3 and 5-year Treasury yields (5.06%) in order to match the 4.0 year duration of the Marvel Parent notes.

[32] S&P downgraded its outlook for the Marvel Holding Companies from "Stable" in August 1993 to "Negative" in June 1994, when Marvel III's debt financing was registered with the SEC. (S&P CreditWeek reports for Marvel Holding Companies, August 9, 1993 and June 13, 1994)

14

appreciated significantly during that time period. Investors were betting that Marvel's stock price needed to be above $10.78, $12.58 and $13.44, respectively, for the Marvel Holdings, Marvel (Parent) and Marvel III notes, respectively, to be repaid. I have not included any transaction or liquidity discount costs in this analysis. These break-even prices were lower than the stock price at issuance and gave investors some margin for Marvel's stock to fall, while still having enough collateral to be repaid.

30.    A review of the research reports published by high-yield fixed income research analysts reveals that they evaluated the Holding Company Notes similarly based on collateral value and break-even analyses.[33] In addition, the investment banking memos prepared by Merrill Lynch and Bear Stearns used this framework to analyze the notes.[34] This confirms that investors evaluated the Holding Company Notes as similar to a margin loan and that they were primarily interested in the value of the collateral, not in their ability to control the operations of Marvel. None of these reports mentioned the Restrictions as an element of their analysis.

31.    It is useful to examine how a margin loan works in comparison to the Holding Company Notes. Banks make cash-pay margin loans, in their normal course of business, to holders of liquid, marketable common stock in the amount of approximately 50% against the value of the common stock, which equates to a 2.0x collateral ratio. The high-yield investors made an intermediate-term loan and in the cases of Marvel Holdings and Marvel Parent, they made a zero-coupon loan. In a margin loan, the collateral is marked-to-market and the borrower would be required to maintain the over-collateralization ratio, typically

---

[33] See, for example, Bear Stearns High Yield Research Report for Marvel Entertainment Group, November 15, 1994 (BS039508-19) and Nationsbank High Yield Research Entertainment for Marvel, April 27, 1994 (BS039990-40017).

[34] See, for example, Merrill Lynch memo re: Marvel Holdings Notes Collateral Coverage Analysis, November 8, 1996 (ML 3814-3818); Bear Sterns memo re: $150 Million (Gross Proceeds) Offering of Senior Secured Discount Notes Due 2003 for Marvel (Parent) Holdings, Inc., July 23, 1993 (BS 035949-035960)

2.0x, if the value of the common stock goes down, by posting additional collateral or repaying the loan. The Holding Company Notes had a similar 2.0x collateral coverage at the date of issuance but did not have marked-to-market protections. Instead, the Restrictions in the notes were the provision that allowed the investors to "monitor" the value of the collateral. The Restrictions, therefore, replaced the concept of the marked–to–market protection in the margin loans. However, the Restrictions were not the only way to provide this protection. A put option, like that in the Coleman Worldwide LYONs offering, provided protection to the investor similar to the protection in the margin loan, as investors could require the issuer to repurchase the Coleman Worldwide LYONS, if a financial ratio at the operating company was not met, just as lenders could require an issuer to repay the margin loan, if the value of the collateral fell.

32.     Based on my experience, I believe that some form of monitoring provisions would have been required to be imbedded in the securities in order to market and sell the notes, but it was not necessary that they be in the form of restrictive covenants. In fact, the put feature may have been preferable to an investor, since each single investor could exercise their put right, but if a covenant was breached, then either the trustee or 25% of the holders had to declare a default.[35] In addition, under the covenant structure, even if a default was declared, a majority of holders could waive a default caused by breach of the covenants.[36] Investors typically prefer more individual control over their investment decisions.

---

[35] Section 6.01 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).

[36] Section 6.04 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).

A 125

c.    *M&F Holdings Financing Strategies*

33.    Based on my discussion with Mr. Engelman, I understand that the objectives of M&F Holdings were to raise capital from their equity investments (in Marvel, Coleman, Revlon, etc.) and to maintain tax consolidation in order to take advantage of the operating earnings of the investments and tax losses at the holding companies.  The Holding Companies would have had other potential ways to achieve their objectives – margin loans from banks and issuing convertible securities.  Based on my discussion with Mr. Greg Woodland, a Senior Vice President of M&F Holdings concentrating in corporate finance, I understand that M&F Holdings evaluated a number of different financing alternatives for each of their investments (Revlon, Marvel, Coleman, etc.), and chose a different financing strategy for monetizing these investments in each case.  M&F Holdings issued over $5 billion of debt securities in the various investments and holding companies over 1992-1994.  They were very active, very innovative and used a variety of structures in executing these financings.  (See **Exhibit 8**)  In particular, I understand that M&F Holdings evaluated a LYONs financing for their investment in Marvel, but chose not to execute this financing because they had a strong opinion that Marvel's stock price would increase substantially in the medium term and they did not want to sell a security that gave investors the right to participate in this appreciation.  M&F Holdings did take advantage of the issuance of convertibles at Coleman Worldwide when they issued LYONs in May 1993.

34.    Based on my discussion with Mr. Engelman, I understand that M&F Holdings did not view the issuance of debt to the banks, structured as a margin loan, as an attractive alternative, as M&F Holdings' concentrated ownership position in Marvel's stock made these borrowings less efficient than other alternatives.  This means that M&F Holdings could have raised less proceeds for a given amount of collateral using a margin loan.

17

A 126

### d.   *Holding Company structures in the high-yield market*

35.    The holding company / common stock collateralization structure
of the Holding Company Notes was used for the first time in 1993. Prior to the
Marvel issuances, Mr. Perelman used the structure in an offering for Revlon
through Revlon Worldwide in March 1993.[37] In addition, M&F Holdings used a
similar structure with Coleman Holdings in October 1993.[38]    Each of these
issuances used a similar structure.  The notes were secured by stock in the
operating company and the stock over-collateralized the Notes.

36.    I also examined a sample of holding company debt issuances
during the time period 1992 - 1994.[39]    In most circumstances, the holding
company securities were secured by holdings in the operating company and
included restrictions on the operating company's ability to issue debt and make
certain payments (see **Exhibit 6**).

37.    Given that the structure of the Marvel Holding Company Notes
was new to the high-yield market, I believe that M&F Holdings would have
evaluated the benefits of creating a structure that was more similar to the existing
high-yield holding company issues, which utilized covenants to protect the
investors versus utilizing a structure that did not make representations about
how Marvel would conduct its operations, such as the put structure to protect
the investors.  A key discussion point would have been whether the investors
would charge the issuer a different interest rate for the two structures.  As I

---

[37] The Revlon offering was secured by Revlon Inc. shares, which were 100% owned by Revlon
Worldwide.  The provisions of the Revlon offering required that the holding company could not
make a public offering for any of the shares unless the remaining collateral (less the price of any
notes redeemed) exceeded $2 billion.  (Revlon Worldwide Corporation Senior Secured Discount
Notes Prospectus, April 2, 1993, p. 9)
[38] Coleman Holdings, Inc. Senior Secured Discount Notes Prospectus, October 7, 1993.
[39] I selected these transactions from all high yield debt offerings made during 1992-1994
according to the Thompson Financial SDC database, and for which there was a debt offering by
both the holding company and one of its operating subsidiaries within the same year and for
which I could obtain the prospectuses.

18

mentioned before in ¶33, there are some reasons to believe that investors would
have preferred a put right to covenants.

### e.    *Alternative Structures for the Holding Company Notes*

38.    As discussed above, I believe the investors looked at the Holding
Company Notes as a form of margin loan and the covenants provided
monitoring protection.   I believe that there was another way to structure the
notes while giving the investors the monitoring mechanisms they desired
without having a specific restriction on Marvel's financial position or its
ownership structure.

39.    I examined the zero-coupon convertible notes, trade-named LYONs
by Merrill Lynch, issue completed by Coleman Worldwide Corporation
("Coleman Worldwide") in May 1993.[40]  Coleman Worldwide, a wholly-owned
subsidiary of M & F Holdings, owned 82% of the operating company, The
Coleman Company, Inc. ("Coleman"), at the time.[41]  The Coleman Worldwide
LYONs issue contained a provision that allowed the investors to put the
securities back to the issuer under certain conditions.   Two of the conditions
which triggered the LYONs put provision were quite similar to the indentures in
the Marvel Holding Company Notes – a requirement for M&F Holdings to hold
a majority of the voting stock and a maximum consolidated debt to capitalization
ratio required for Coleman of 75%.[42,43]  By including these restrictions as a put
provision, Coleman Worldwide provided the investor with a monitoring
mechanism without committing that  the operating company (Coleman) would

---

[40] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993.
[41] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, p. 4.
[42] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, "Additional Purchase Right
Event," pp. 63-64 (Indenture §3.13) and p. 69 (definition of "permitted holders").
[43] The indentures of the Coleman Worldwide LYONs offering also contained additional
restrictions on the ability of Coleman Worldwide (but not its operating unit Coleman) to issue
debt and make certain payments. (Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993,
"Additional Purchase Right Event," pp. 65-66 (Indentures §4.06 and 4.08))

maintain the debt to capitalization ratio. Thus the operating company could make its own decisions without being constrained in any way by a particular financial or ownership covenant in the holding company security.

40.    I believe that Marvel could have included the ownership requirement and the debt issuance restrictions in the form of a put provision to accomplish what the investors desired without placing these restrictions on the operating company. As a result, M&F Holdings had an alternative to the Restrictions.

41.    Since the Holding Company Notes utilized novel structures, there are no precedents for addressing these restrictions through a put option in the high-yield market as they were addressed in the convertible market with the Coleman Worldwide issuance. As part of this negotiation, the parties would have debated the incremental cost, if any, of a put structure versus the covenant structure that was used.

### f.    *Analysis of Mr. Carron's report and LYONs as alternative structure*

42.    The Holding Companies had another financing alternative at the time – issuing convertible securities. As I previously mentioned, another M&F Holdings subsidiary, Coleman Worldwide, issued LYONs in May 1993. Another Coleman holding company, Coleman Holdings, Inc. ("Coleman Holdings") issued notes very similar to the Marvel Holding Company Notes in July 1993.

43.    It is useful to examine the two Coleman holding company issues, as they demonstrate the structures and terms available in the market and provide a roadmap for what Marvel could have issued.

44.    See **Exhibit 9** for a comparison of the Coleman Worldwide and Coleman Holdings debt issues. Key elements include:

- Both issues were done by holding companies above Coleman, the operating company.

- Both effectively had 5-year maturities - the Coleman Holdings issue was a 5-year note and the Coleman Worldwide issue allowed the investor to put the securities back to the issuer after 5-years.

- Both issuers' sole asset was common stock of Coleman, and the stock was the sole security for the notes.

- In both cases, the investors took on the risk that a decline in Coleman's common stock could impair the value of the notes.

- Neither issuer had access to the cash flow of Coleman and relied on the value of the Coleman stock securing the notes or other actions by M&F Holdings to be repaid.

- Both issues had provisions which allowed the investors to effectively monitor the credit of Coleman and the value of their collateral. Both Coleman Holdings and Coleman Worldwide limited the debt issued by Coleman such that it maintained a debt to capitalization ratio less than 75% and required the issuer to maintain a majority ownership of Coleman's voting stock.[44]    Coleman Holdings included these provisions as covenants and Coleman Worldwide included the provisions in the investor put right.[45]

- The principal difference between the issues was that Coleman Worldwide allowed investors to participate in the upside of Coleman's

---

[44] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, "Additional Purchase Right Event," pp. 63-64 (Indenture §3.13) and p. 69 (definition of "permitted holders"); Coleman Holdings, Inc. Senior Secured Discount Notes Indentures, July 15, 1993, §4.04 and 4.10.

[45] In addition, both offerings contained covenants restricting certain payments and limiting the issuance of debt by the issuer. Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, "Additional Purchase Right Event," pp. 65-66 (Indentures §4.06 and 4.08); Coleman Holdings, Inc. Senior Secured Discount Notes Indentures, July 15, 1993, §4.03 and 4.05.

stock through a call option while Coleman Holdings allowed no upside participation in Coleman's stock.

45.    At this point it is useful to review Mr. Carron's analysis in more detail and to point out what I believe the flaws are in his report. His methodology:

- Uses the Coleman Worldwide LYONs offering as a proxy for a financing that had a similar structure without the Restrictions;

- Adjusts for the embedded call options in the LYONs to create a straight debt pricing for Coleman Worldwide;

- Uses this debt pricing for Coleman Worldwide as a proxy for pricing a hypothetical Marvel Holdings LYONS offering;

- Adjusts the hypothetical Marvel Holdings LYONs for the imbedded call options to create the straight debt issue for Marvel  Holdings without the Restrictions.

46.    I believe that his analysis is fundamentally unreliable since the Coleman Worldwide LYONs structure offered the same protection as the Restrictions, only through a put structure, not as covenants. Both the Coleman Holdings and the Coleman Worldwide LYONs issues were essentially the same structures (5-year zero coupon notes secured by Coleman common stock), with the primary difference being that the Coleman Worldwide LYONs issue gave the investors upside participation in the growth of Coleman's stock price.

47.    Mr. Carron utilizes an unreliable methodology to impute the pricing that Marvel Holding Companies would achieve in their LYONs offerings (and thus the proceeds the Marvel Holding Companies would receive though this hypothetical market transaction without the Restrictions). I will show that it does not work here.

48.     Mr. Carron reconstructs the component values of a LYON security in a way that is unreliable and does not follow market practice or match market examples. He breaks the LYONs into three pieces – an unsecured straight note, an imputed put option where the issuer can put shares of collateral back to the noteholder, and a call option for the noteholder to share in the upside appreciation of the stock. In my analysis, which follows market convention, I separate the LYONs components into two pieces, a straight debt note collateralized by the underlying common shares, and a call option. Essentially I combine his first two pieces into one piece. The difference may seem to be subtle, but in fact it is quite material if any portion of Mr. Carron's analysis is incorrect. In my experience as an investment banker at CSFB in working with the convertible security specialists on pricing prospective LYONs type issues, we used two pieces in the analysis – we started with the 5-year debt costs and considered equity volatility data to value the call options in the convertible securities.

49.     Here, I examined whether Mr. Carron's methods match the real world results found in the pricing of debt issued at the same time. I took Mr. Carron's theoretical secured debt elements in the Coleman Worldwide LYONs analysis and compared it to the actual Coleman Holdings secured debt offering (see **Exhibit 10**). His imputed pricing for the Coleman notes was 982 basis points ("BPs") above the swap curve, while the actual pricing of the Coleman Holdings issue was 533 BPs above the swap curve. For the theoretical Marvel Holdings, Marvel Parent and Marvel III offerings, Mr. Carron calculated yields that were 1,913 BPs, 898 BPs and 1,146 BPs above the swap curve while the actual offering priced at 595 BPs, 753 BPs, and 379 BPs above the swap curve. This means Mr. Carron's cost estimates were inaccurate by 449 BPs for the Coleman LYONs analysis and by 1,318 BPs, 145 BPs and 767 BPs for the three respective Marvel Holding Company Notes offerings.

50.    Mr. Carron then uses this unreliable method to determine what pricing the Marvel Holding Companies would have enjoyed for a LYONs issue, and then, adjusting for the call options, imputes his version of standalone debt proceeds without the Restrictions. His mistake flows through his analysis and renders it unreliable. He should have been alerted to his mistake by understanding my earlier simple observation – investors will pay for call options and thus, Coleman (or the Marvel Holding Companies) could raise more proceeds through a LYONs issue than from a straight debt issue, assuming the same number of shares of underlying common stock collateral.

51.    I will show below how the elements of the Coleman LYONs should be analyzed and how the market data of the Coleman options and the Coleman Holdings debt offering confirm the validity of the Coleman Worldwide LYONs pricing.

52.    In **Exhibit 11**, I reconstruct the Coleman holding company offerings. I used two methods. In both I started with the premise that the LYONs should be priced as a combination of a 5-year zero-coupon collateralized bond plus call options.

- In the first instance, I used the actual debt pricing from the Coleman Holdings debt offering and solved for the implied volatility of the call options, to match the actual proceeds that the Coleman Worldwide LYONs generated. This implied volatility was 29.8% which compared to the actual Coleman 12 month (250 day) historic volatility of 31.4%. This result suggests that the market used these values, which were closely tied to actual market values, to price the Coleman Worldwide LYONs.

- In the second instance, I started with the actual Coleman equity volatility and then solved for the implied debt pricing. Again, the implied debt pricing imbedded in the Coleman Worldwide LYONs

24

offering calculated out at 598 basis points over the risk free rate, versus the actual market pricing of 566 basis points for the Coleman Holdings offering. This is just another way of confirming that this method reasonably reflects the market pricing.

- It is important to note that my two methods come to almost precisely the same conclusion so I believe that this test confirms that my method is much more accurate than Mr. Carron's. In this case, the conventional market model is much more accurate than the theoretical, academic model.

- In practice, the convertible market prices a package of debt and equity components in one security, so it is impossible to precisely extract how each component piece is valued.

53.    It is very important to note the difference in over-collateralization for the two Coleman holding company issues (see **Exhibit 7**). The convertible market for  Coleman Worldwide required less Coleman common stock as security (only 1.6x at issuance and 1.1x at the 5-year maturity), while the debt market required Coleman Holdings to over-collateralize the issue 2.0x at issuance and 1.2x at maturity. This makes logical sense since the convertible investors also got the upside potential in Coleman's stock so they were willing to give up some downside protection. Thus, a LYONs offering allowed Coleman Worldwide to raise more proceeds for the same amount of collateral of Coleman common shares.

54.    Given that these issues were effectively done simultaneously with the Marvel Holding Company Notes issuances in 1993, and the fact that, based on my discussion with Mr. Woodland, M&F Holdings actually discussed a LYONs offering with Merrill Lynch as a potential financing alternative for the Marvel Holding Companies, I believe that the Marvel Holding Companies could have completed a LYONs offering as a viable alternative.

55.    Using the same framework that I used in the Coleman LYONs analysis, I will illustrate what I believe the terms of the various LYONs transactions would have been for the Marvel Holding Companies. See **Exhibit 12**. This shows that the Marvel Holding Companies could have used the same structure as Coleman Worldwide and could have raised more proceeds from the LYONs market relative to the debt market issues than it actually did, if M&F Holdings was willing to give up the equity upside in the Marvel stock.

56.    As the chart shows, the debt components are priced as the independent debt issues actually behaved in the market. I then added the call option values to create the LYONs securities. I calculate that the Marvel Holding Companies could have raised an additional $204 million if they had used the LYONs structure.

57.    Now, look at the over-collateralization from our Marvel Holding Company LYONs pricing. It shows that Marvel Holdings, Marvel Parent and Marvel III had over-collateralization at issuance of 1.4x, 2.4x and 1.6x, less than the straight debt over-collateralization of 2.0x, 3.1x, and 2.0x at issuance. At maturity Marvel Holdings, Marvel Parent and Marvel III had over-collateralization of 1.1x, 1.9x and 1.4x, versus the straight debt over-collateralization of 1.1x, 1.8x, and 2.0x. Again this is consistent with the Coleman holding company example.

58.    This analysis conclusively shows that Mr. Carron's analysis and conclusions are inaccurate. I believe that the restrictions did not materially create value in the debt structures and his analysis methodology is fundamentally unreliable.

## V.    Outcome of the Arms-length Negotiation

59.    My judgment is that Marvel and M&F Holdings would have covered all of these points discussed above in their negotiation. The negotiation would likely occur through a series of back and forth exchanges between the parties in which each side asserted its arguments regarding the benefits of the Restrictions to the Marvel Holding Companies and the costs incurred by Marvel. The following illustrative series of exchanges summarize my view as to the key issues each side would assert in the negotiation:

### *Exchange 1*

Marvel:

    a.    The Restrictions hinder our ability to operate Marvel.

M & F Holdings:

    a.    Marvel has over $1 billion of debt capacity without being effected by the debt incurrence test (see ¶17).

    b.    Marvel's bank covenants are more restrictive (see ¶15).

    c.    The Restrictions are incurrence tests while Marvel's bank covenants are maintenance tests (see ¶15).

### *Exchange 2*

Marvel:

    a.    The Restrictions are critical to marketing the Holding Company Notes (see ¶22).

M & F Holdings:

    a.    The collateral value, ownership of Mr. Perelman and some monitoring provisions are critical to the marketing (see ¶27).

b.  Investors know they do not have access to the cash flow or assets of Marvel (see ¶26).

c.  Read the research reports – investors focus on the collateral value and Marvel's prospects (see ¶30).

d.  The Marvel stock price is much more important -- see how the Marvel Parent deal priced when the stock price went up 88% in a few months -- investors wanted more collateral to give them downside protection. The Restrictions were not even discussed. (see ¶28).

e.  Investors really care where Marvel's stock will be in five years – look at the breakeven analysis they perform (see ¶29-30).

### Exchange 3

Marvel:

a.  The Restrictions and this new holding company debt hurt Marvel's credit rating and increase its cost of debt (see ¶20).

M & F Holdings:

a.  Marvel is a "BB" credit already (see ¶18).

b.  There is no cash cost to the restrictions, now or in any new bank agreement (see ¶16).

c.  The theoretical cost is very small – only up to 50 basis points if you ever borrow and the lenders actually charge for it (see ¶21).

d.  Marvel knows that being part of M&F Holdings has a cost anyway since the rating agencies look at the operating company and its parents as a consolidated credit (see ¶20).

### Exchange 4 :

28

A 137

Marvel:

a.    The Restrictions make it hard for me to make distributions to my shareholders.

M & F Holdings:

a.    Marvel has restrictions already in its bank agreement and allowed amounts must be paid pro-rata (see ¶23).

### Exchange 5:

Marvel:

a.    M&F must pay Marvel for the Restrictions in the notes.

M&F Holdings:

a.    M&F has other options – we could issue LYONs or use puts instead of a covenant package format (see ¶39-40).

b.    With the LYONs we could raise even more money – if we want to share the upside, but we like the upside in Marvel now (see ¶33).

c.    Any issuance by M&F at the holding company level will hurt Marvel's credit – you will only get a payment if we do it as a deal with the Restrictions, and we don't have to do that format (see ¶20, 30).

### Exchange 6:

Marvel:

a.    The ownership covenant restricts Marvel

M&F Holdings:

a.    Marvel's Board does not expect to be able to dilute the majority shareholder, and besides, Marvel can always issue

29

A 138

non-voting or limited voting stock if the Board decides to (see ¶24).

### Exchange 7:

Marvel:

    a.    M&F Holdings should pay us a fee based on the amount of proceeds raised by M&F Holdings.

M&F Holdings:

    a.    We should pay you, if we pay any fee, based on the amount of Marvel debt outstanding today.

60.    I assume that M&F Holdings would have chosen to issue the notes in the structure as they were issued, and I believe that, as a result of a negotiation process similar to those described above, Marvel would have been successful in having the holding companies pay 25-50 basis points per year for the right to include the restrictions. I equate this in some ways to a waiver that an issuer pays to a bank when the issuer breaches a covenant. Even in circumstances when an issuer makes a minor infraction, the issuer's lenders usually extract a fee for waiving a breach of a covenant. I believe that the two parties would have debated the debt amount on which to calculate this payment. If they had based the payments on the amount of debt issued by the holding companies and if these payments were made upfront at the time of the issuance, then the payments to Marvel would have been $3.8 - $7.6 million for the Marvel Holding notes, $1.7 - $3.4 million for the Marvel Parent notes and $0.9 - $1.7 million for the Marvel III notes, for a total of $6.3 - $12.6 million. If the payments were based on the amount of outstanding debt for Marvel at the time, the payment would have been $2.4 - $4.8 million (see **Exhibit 13**).

30

Peter A. Fowler

March 3, 2006

**Exhibit 1**
Marvel Holding Companies & Affiliates
Organization Chart [1]



Principal
Indebtedness

9 1/8% $125 million Senior Secured Notes due February 15, 1998. Issue date February 15, 1994.

10 7/8% $251.7 Senior Secured Discount Notes due April 15, 1998. Issue date October 20, 1993.

11 ¼% $517.4 million Senior Secured Discount Notes due April 15, 1998. Issue date April 22, 1993.

Term Loan and Revolver Guaranty of Toy Biz line of credit Capital leases and other obligations

[1]   Source:  Marvel III Holdings Offering Memorandum, dated February 8, 1994 for 9 1/8% $125 million Senior Secured Notes due 1998.

[2]   Marvel Entertainment Group, Inc. will be required to make certain tax sharing payments to Marvel III which are expected to provide the principal source of cash for Marvel III to pay interest on the 9 ¼% Senior Secured Notes due 1998 (the "Notes").

Expert Report of Peter A. Fowler

**Exhibit 2**
Resume - Peter A. Fowler

2961 Clay Street
San Francisco, CA  94115
peter.fowler@gmail.com

Office: (415) 440-6551
Office Fax: (415) 440-6336
Cell: (917) 535-6114

**2001-2005  Headlands Capital, Inc.**                                        New York/San Francisco
*President and Managing Director*

- Provide independent strategic and corporate finance advice. Financial Advisor since 2001 to CEO of **Intermagnetics General Corporation**, a leading medical device and energy technology company. Advising on a wide range of strategic and financial issues, including divestitures, shareholder relations, financing for the energy technology business and strategic partnering. Developed and implementing acquisition strategy – advised on the successful unsolicited $150MM acquisition of Invivo Corporation, $100MM acquisition of MRI Devices Corporation and sale of Polycold Systems to Helix Technology for $53MM.
- Financial Advisor to the CEO and principal shareholder during 2001-2002 on a global financial restructuring of London-based **LNM Holdings and its subsidiary Ispat International N.V.**  Ispat is the world's fourth-largest steel company, operates in the U.S., Mexico, Canada, Trinidad, Netherlands, France and Germany, and has revenue of $4.5B and debt of $2.5B. Acting as Chief Restructuring Officer responsible for developing, negotiating and executing the global restructuring plan and overseeing the Ispat internal team, investment bankers and lawyers.  Completed the Mexican unit's restructuring. Devised strategy to maximize equity value, isolated potential problem to Mexican unit, and achieved debt rescheduling on attractive terms.

**1984-2001  CREDIT SUISSE FIRST BOSTON**                                        New York

*Managing Director, Investment Banking - Global Industrial & Services Group*          1999 - 2001
- Senior account officer for industrial  companies. Exceeded target revenue goals in 1999 and 2000.
- Industry Expertise - Extensive understanding of food and beverage, environmental services, aerospace/defense, office equipment, airline/airfreight and information services industries.
- Head of Environmental Services industry group; Led eight person team.    Identified business opportunity and organized this industry group from development of business plan and commitment of firm's capital to hiring of research analyst and banking team. Ranked as #3 team in deal volume 1997-1999.

*Managing Director, Investment Banking - Global Corporate Finance Group*          1994 – 1999
- Founding senior officer of group with mandate to "export" U.S. investment banking skills. Primary focus on Europe and Latin America. Partnered with international account officers to identify, solicit and execute complex cross-border financial advisory and capital raising transactions for industrial companies. Initiative resulted in $40MM of incremental revenues in 1995, growing to $100MM in 1999. Maintained primary account coverage for a select group of large U.S. industrial companies.

- Firm-wide product manager for tracking stock, tax deconsolidation and ESOPs.

*Director, Investment Banking - East Coast Industrial Group*          1992 – 1994
- Responsible for solicitation of large industrial clients with no CSFB relationship. Completed first time transactions with six new Fortune 500 companies resulting in $16MM incremental fee revenue.  Managed firm wide analyst (college graduates) recruiting program in 1991-1993.

*Director, Fixed Income Capital Markets*          1990 - 1992
*Vice President, Investment Banking - Corporate Finance Generalist Group*          1984 – 1990

**Summer 1983  LEHMAN BROTHERS KUHN LOEB INCORPORATED**          New York
*Associate, Corporate Finance Department*

**1980-1982  MERRILL LYNCH & CO.**          San Francisco/New York
*Junior Trader, Municipal Bond Department*

## Exhibit 2
### Resume - Peter A. Fowler

**EDUCATION:**

| 1984 | **THE WHARTON SCHOOL, UNIVERSITY OF PENNSYLVANIA** | Philadelphia, PA |

*Masters of Business Administration Degree.*  Concentration in finance.

| 1980 | **DARTMOUTH COLLEGE** | Hanover, NH |

*Bachelor of Arts Degree in Mathematics and History.*

**SELECTED TRANSACTIONS:**

A.  MANAGEMENT EXPERIENCE

> Head of UCLA MBA Recruiting, 1986
> Organized Investment Banking Department Associate Training Program 1986 & 1987
> Analyst Recruiting Committee, 1987 & 1988
> Regional Co-ordinator for Analyst Recruiting, 1987 & 1988
> Operating Officer, Corporate Finance Generalist Group, 1990
> Worked with Head of Investment Banking Department to restructure semi-annual professional review/evaluation system, 1990
> Operating Officer, Fixed Income Capital Markets, 1991-1993
> Operating Officer, East Coast Industrial Group, 1993-1994
> Wharton MBA Recruiting, 1985-2001 (Head 1999-2001)

B.  FINANCIAL ADVISORIES

1.  DIVESTITURES/ACQUISITIONS/GENERAL ADVISORIES

> Advised Lockheed on acquisition of Sanders Electronics for $1.2B, 1986
> Represented NL Industries against hostile bid for Coniston Partners, 1986
> Advised General Cinema in acquisition/spin-off of Neiman Marcus. Group from Carter Hawley Hale, 1987
> Advised Chart House on acquisition of Paradise Bakery, 1988
> Advised General Cinema on sale of General Cinema's Bottling Division to PepsiCo for $1.75B, 1989
> Advised Home Shopping Network in proposed merger with QVC Network, 1990
> Advised General Cinema on acquisition of Harcourt Brace Jovanovich, 1990
> Advised Hershey Foods on sale of OZF Jamin to Cobana BV in a management buyout, 1995
> Advised Rhône-Poulenc Rorer on purchase of majority interest in Applied Immune Services, Inc. for $84.4MM, 1995
> Advised Rhône-Poulenc Rorer on two-step increase in equity interest in Applied Immune Services, Inc. for $42.0MM, 1995
> Advised Welsh Carson Anderson & Stowe on purchase of 60% of credit card operations of The Limited Inc. for $165MM, 1996
> Advised Stonington Partners in $600MM acquisition of Graphic Systems division from Rockwell International, 1996
> Advised Ciba-Geigy AG on the divestiture of Mettler-Toldeo AG subsidiary for $766MM to AEA Investors, 1996
> Advised Hershey Foods on acquisition of North American operations of Leaf from Huhtamäki Oy for $515MM, 1996
> Advised Hershey Foods on divestiture of European confectionery operations, Gubor and Sperlari, to Huhtamäki Oy for $120MM, 1996
> Advised Doncasters plc in Acquisition of Triplex Lloyd plc for $400MM, 1998
> Advised Olayan Group in its Minority Investment in Coca-Cola Beverages plc, 1998
> Advised Allied Waste Industries in its Merger with American Disposal Services for $1.1 billion, 1998
> Advised Astrolink on its formation (Astrolink is a satellite services joint venture of Lockheed Martin, TRW and Telespazio), $900MM, 1999
> Advised KTI Inc. on its sale to Casella Waste for $600MM, 1999
> Advised Astrolink on the minority investment by Liberty Media, $425MM, 2000
> Advised UAL Corporation on the structure of its e-commerce assets, 2000

## Exhibit 2
### Resume - Peter A. Fowler

Advised Continental Airlines on recapitalization of NWA's equity investment, 2000
Advising American Airlines on the purchase of TWA and selected USAir assets, 2001
Advising Union Pacific on the spin-off of its telecom and technology assets, 2001
Advising Pitney Bowes on its strategic and defense issues, 1995-2001

2. RECAPITALIZATIONS

General Cinema - Dual class voting structure, 1984
Big V Supermarkets - Dual class voting structures, 1986
Cargill - Preferred stock structures, 1993
Bell Atlantic New Zealand Holdings - Tax deconsolidation, 1994
Ameritech New Zealand Holdings - Tax deconsolidation, 1994
Illinois Tool Works Leasing & Investments - Corporate restructuring/asset exchange, 1995
Pitney Bowes International Holdings - Advice on restructuring international operations, 1995
The Pittston Company - $1,550MM Tracking Stock Recapitalization of Pittston Services Group into Pittston Brinks and Pittston Burlington, 1996
Fletcher Challenge Ltd. - $3,100MM Tracking Stock Recapitalization of Ordinary Shares into Fletcher Challenge Paper, Fletcher Challenge Energy and Fletcher Challenge Building, 1996
Golden State BancCorp - Tracking Stock Warrants, 1998
Telephone & Data Systems - Tracking Stock Recapitalization, 1998

3. STRATEGIC ADVISORY/RESTRUCTURINGS

Advised Ingersoll-Rand on a strategic review of its business portfolio, 1986
Advised PACE Industries on strategic alternatives for restructuring its business portfolio, 1986
Advised Ford Motor on a strategic review of its financial service businesses, includes separation alternatives, 1986
Advised Beatrice on a review of its business portfolio, 1988
Advised Tenneco on a strategic audit, which led to a sale of its oil and gas business, 1988
Advised J.C. Penney on a strategic audit and review of the business portfolio, 1988
Advised United Waste Systems on capital structure issues, 1995
Advised American Disposal Services on capital structure issues, 1997

4. LEVERAGED ESOP/FLEXITRUST

Ashland Oil - $125MM Leveraged ESOP, sole advisor, 1985
Phillips Petroleum - $1.5B Leveraged ESOP, lead advisor (not closed), 1985
J.C. Penney - $706MM Leveraged ESOP, sole advisor, 1988
Rhône-Poulenc Rorer - $225MM Flexitrust, sole advisor, 1993
Air Products and Chemicals - $457MM Flexitrust, sole advisor, 1993

5. VALUATION OPINIONS

Lykes Brothers - Common Stock, 1985-1986
Neiman Marcus. - Convertible Preferred Stock, 1987
Hallmark - Preferred Stock, 1991
Wabash Railroad - Preferred Stock, 1991
Cargill - Preferred Stock, 1991
Bell Atlantic - Tax deconsolidation, 1994
Ameritech - Tax deconsolidation, 1994
Pitney Bowes - Tax deconsolidation, 1994
Perrier American Springwater Holdings NV - Common Stock, 1995

6. RATING AGENCY ADVISORIES

Airborne Freight, 1986
J.C. Penney, 1986-1990
Hasbro, 1990-1991
Virginia Electric, 1992
Bell Atlantic, 1994
Ameritech, 1994
Pitney Bowes, 1994-2001
PPG Industries, 2000

**Exhibit 2**
Resume - Peter A. Fowler

C. <u>CAPITAL MARKETS TRANSACTIONS</u>

    1. PUBLIC EQUITY

        Big V Supermarkets - $25MM Common Stock, sole manager, 1986
        Airborne Freight - $25MM Convertible Debt, sole manager, 1986
        General Cinema - £110MM Exchangeable Debentures into Cadbury Schweppes, co-lead manager, 1987
        E-II Holdings - $1.0B Common Stock, co-manager (IPO), 1987
        Chart House Enterprises - $57MM Common Stock, lead manager (IPO), 1989
        Hasbro - $125MM Convertible Debt, lead manager, 1991
        United Waste Systems - $23MM Common Stock, co-manager, 1993
        Mistic Beverage - $90MM Common Stock, co-manager (IPO), 1994 (Not completed)
        Canandaigua Wine - $135MM Common Stock, lead-manager, 1994
        Scania AB - $2.8B Common Stock, co-manager (IPO), 1996
        American Disposal Services - $25MM Common Stock, co-manager (IPO), 1996
        United Waste Systems - $150MM Convertible Debt, co-manager, 1996
        Pharmacia & Upjohn - $2,000MM Common Stock Sale by Volvo, co-manager, 1996
        Doncasters plc - $120MM Common Stock Sale by Inco Ltd, lead manager (IPO), 1997
        American Disposal - $78MM Common Stock, co-manager, 1997
        Allied Waste Industries - $290MM Common Stock, co-lead manager, 1997
        American Disposal - $211MM Common Stock, co-manager, 1997
        L-3 Communications - $100MM Common Stock (IPO), co-manager, 1998
        Owens-Illinois - $500MM Common Stock, co-manager, 1998
        United Road Services - $100MM Common Stock (IPO), co-manager, 1998
        Capital Environmental - $35MM Common Stock (IPO), lead-manager, 1999
        L-3 Communications - $450MM Common Stock, co-manager, 1999
        Pepsi Bottling Group - $2.3B Common Stock (IPO), co-manager, 1999
        Republic Services Group - $1.7B Common Stock, co-manager, 1999
        Continental Airlines - $350MM Convertible Preferred Stock, lead-manager, 2000
        United Parcel Service - $180MM Common Stock, blocktrade, 2000
        United Parcel Service - $50MM monetization of investment in Tumbleweed, 2000

    2. PUBLIC DEBT

        Citicorp - $250MM Senior Notes, co-manager, 1985
        Citicorp - $250MM Senior Notes, co-manager, 1985
        General Cinema - $100MM Subordinated Notes, lead manager, 1985
        General Cinema - $125MM Subordinated Notes, lead manager, 1987
        General Cinema - $125MM Subordinated Notes, lead manager, 1988
        IBM - $750MM Debentures, co-manager, 1989
        IBM Credit - $300MM Tax-Exempt Asset Backed Notes, sole manager, 1990
        Lockheed- $150MM Senior Euronotes, lead manager, 1986
        Lockheed - $300MM Senior Notes, co-manager, 1986
        J.C. Penney - $150MM Debentures, sole manager, 1986
        J.C. Penney - $250MM Notes, sole manager, 1986
        J.C. Penney - $200MM Debentures, sole manager, 1986
        J.C. Penney - $250MM Asset Backed Notes, sole manager, 1988
        J.C. Penney - $250MM Notes, sole manager, 1988
        J.C. Penney - $200MM Notes, sole manager, 1990
        J.C. Penney - $375MM Asset Backed Notes, sole manager, 1990
        J.C. Penney - $425MM Asset Backed Notes, sole manager, 1990
        Martin Marietta - $600MM Notes, co-manager, 1993
        Boston Gas - $50MM Medium Term Notes; 1994
        Midland Enterprises - $50MM Medium Term Notes, 1994
        PHH - $2B Medium Term Notes, agent, 1994
        Dayton Hudson - $400MM Asset Backed Notes, lead manager, 1995
        World Financial Network National Bank - $805MM Asset Backed Notes, lead manager, 1996
        Lockheed Martin - $5.0B Notes, co-manager, 1996
        Lockheed Martin - $1.5B Notes, lead-manager, 1996

**Exhibit 2**

Resume - Peter A. Fowler

Canandaigua Wine - $65MM Senior Subordinated Notes, co-manager, 1996
Allied Waste Industries - $1.75B Senior Notes, co-manager, 1998
Owens-Illinois - $1.01B Senior Notes, co-manager, 1998
Pitney Bowes Credit - $200MM Senior Notes, co-manager, 1998
Pitney Bowes - $300MM Senior Notes, lead-manager, 1998
Pepsi Bottling - $3.3B Senior Notes, joint-book manager, 1999
Lockheed Martin - $2.0B Senior Notes, co-manager, 1999
USA Waste - $600MM Senior Notes, co-manager, 1999
PPG Industries - $300MM Senior Notes, co-manager, 1999
Allied Waste Industries - $2.0B Senior Sub Notes, co-manager, 1999
Lockheed Martin - $1.95B debt Tender, sole-agent, 2000
Continental Airlines - $840MM EETC, lead-manager, 2000
United Airlines - $1.5B EETC, senior co-manager, 2000
Continental Airlines - $740MM EETC, lead manager, 2000
United Airlines - $800MM EETC, co-manager, 2000
NWA - $520MM EETC, lead-manager, 2000
USAirways - $362MM EETC, lead-manager, 2000
USAirways - $280MM EETC, co-manager, 2000
Union Pacific - $400MM Senior Notes, lead manager, 2001
Allied Waste Industries - $600MM Senior Notes, joint book- running manager, 2001
Waste Management Inc. - $600MM Senior Notes, joint book-running manager, 2001
United Parcel Service - £300MM Senior Notes, co-manager, 2001

3.  PRIVATE DEBT
    Airborne Freight - $25MM Senior Subordinated Notes, sole agent, 1986
    New York Times - $50MM Senior Notes, sole agent, 1987
    J.C. Penney - $706MM ESOP Notes, sole agent, 1988
    Neiman Marcus. Group - $52MM Senior Notes, sole agent, 1989
    Allied Waste Industries - $300MM lease advisory, 2001
    Federal Express - $125MM EETC private placement, 2000

4.  LEVERAGED BANK DEALS
    Allied Waste Industries - $1.1B, lead agent, 1998
    Allied Waste Industries - $7.0B, documentation agent, 1999
    Canandaigua Wine - $1.0B, syndication agent, 1999
    Canandaigua Wine - $200MM "B" Loan, lead agent, 1999

5.  PREFERRED STOCK
    Investment Banking:
    Hartford Fire Insurance - $65MM Sinking Fund Preferred, sole manager, 1985
    Hartford Fire Insurance - $85MM LIBOR Preferred, sole manager, 1985
    Hartford Fire Insurance - $75MM Sinking Fund Preferred, sole manager, 1985
    Hartford Fire Insurance - $50MM Sinking Fund Preferred, sole manager, 1985
    Rhône-Poulenc Rorer - $175MM Auction Rate Preferred, co-manager, 1991
    Bell Atlantic New Zealand Holdings - $85MM Sinking Fund Preferred, sole manager, 1994
    Ameritech New Zealand Holdings - $85MM Sinking Fund Preferred, sole manager, 1994
    Pitney Bowes International Holdings - $200MM Variable Term Preferred, lead manager, 1995
    Bell Atlantic New Zealand Holdings - $60MM Sinking Fund Preferred, sole manager, 1995
    Ameritech New Zealand Holdings - $50MM Variable Term Preferred, sole manager, 1995
    Pitney Bowes International Holdings - $100MM Variable Term Preferred, lead manager, 1997

    Capital Markets:
    Arizona Public Service - $50MM Sinking Fund Preferred, co-manager, 1991
    Alcoa International Holdings - $80MM Auction Rate Preferred, lead manager, 1991
    Ratners Group - $100MM Auction Rate Preferred, lead manager, 1991
    Rochester G&E - $30MM Sinking Fund Preferred, co-manager, 1991
    Georgia P&L - $50MM Sinking Fund Preferred, co-manager, 1991
    Rhône-Poulenc Rorer - $300MM Auction Rate Preferred, co-manager, 1991

**Exhibit 2**

Resume - Peter A. Fowler

Southern California Edison - $100MM Fixed Rate Perpetual Preferred, co-manager, 1992
Houston L&P - $100MM Auction Rate Preferred, lead manager, 1992
Exxon Corporation - $750MM SABRES Preferred, lead manager, 1992
Hackensack Water - $15MM Sinking Fund Preferred, sole agent, 1992
Citicorp - $175MM Fixed Rate Perpetual Preferred, co-manager, 1992
Southern California Edison - $100MM Sinking Fund Preferred, co-manager, 1992
Southern California Edison - $100MM Sinking Fund Preferred, lead manager, 1992
Boston Gas - $30MM Auction Rate Preferred, sole manager, 1992
U.S. Bancorp - $150MM Fixed Rate Perpetual Preferred, co-manager, 1992
Lincoln National Income Fund - $40MM Auction Rate Preferred, sole manager, 1992
First Colony Insurance - $80MM Auction Rate Preferred, lead manager, 1993

**Exhibit 3**
Materials Considered

Third Circuit Court's Opinion in Cantor et al. v. Perelman et al. (Nos. 04-1790, 04-2896), July 12, 2005
Expert Report of Jeffrey L. Baliban, January 13, 2006
Expert Report of Andrew S. Carron, January 13, 2006
Expert Report of Lawrence Hamermesh, January 13, 2006
Expert Report of Robert W. Holthausen, March 15, 2002
Expert Rebuttal Report of Robert W. Holthausen, March 29, 2002
Expert Report of Bevis Longstreth, January 12, 2006
Expert Report of William H. Purcell, March 15, 2002
Expert Rebuttal Report of William H. Purcell, March 29, 2002
Supplement to the Expert Reports of William H. Purcell, April 9, 2002
Deposition of William Bevins and Exhibits, March 7, 2002
Deposition of Robert J. Bicknese and Exhibits, March 20, 2002
Deposition of Donald G. Drapkin and Exhibits, March 8, 2002
Deposition of Marc Kramer and Exhibits, March 19, 2002
Deposition of Ronald O. Perelman, March 22, 2002
Telephonic Interview of Irwin Engelman, February 16, 2006
Telephonic Interview of Gregory Woodland, February 24, 2006
Marvel Holdings Inc. Offering Memorandum, April 16, 1993
Marvel Holdings Inc. Prospectus, July 9, 1993
Marvel (Parent) Holdings Inc. Prospectus, October 13, 1993
Marvel III Holdings Inc. Offering Memorandum, February 8, 1994
Marvel III Holdings Inc. Prospectus, May 11, 1994
Marvel Holdings Inc. Senior Secured Discount Notes due 1998 and Series B Senior Secured Discount
    Notes due 1998 Indenture, April 15, 1993
Marvel (Parent) Holdings Inc. Senior Secured Discount Notes due 1998 Indenture, October 1, 1993
Marvel III Holdings Inc. 9 1/8% Senior Secured Notes due 1998 and 9 1/8% Series B Senior Secured
    Notes due 1998 Indenture, February 15, 1994
Marvel Entertainment Group - Fleer Credit and Guarantee Agreement, September 17, 1992
Marvel Entertainment Group - Fleer Amended and Restated Credit and Guarantee Agreement, August
    30, 1994
Marvel Comics Italia and Marvel Entertainment Group Term Loan and Guarantee Agreement, August 30,
    1994
Clark Oil & Refining Corporation Senior Notes Prospectus, September 16, 1992
Clark R&M Holdings, Inc. Senior Secured Zero Coupon Notes Prospectus, April 28, 1993
Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993
Coleman Holdings, Inc. Senior Secured Discount Notes Prospectus, October 7, 1993
Coleman Holdings, Inc. Senior Secured Discount Notes Indentures, July 15, 1993
Comcast Discount Convertible Subordinated Debentures Prospectus Supplement, October 14, 1993
Comcast Step-up Convertible Subordinated Debentures Prospectus Supplement, September 3, 1993
Comcast Senior Subordinated Debentures Prospectus Supplement, January 8, 1993
EPIC Healthcare Group, Inc. Senior Subordinated Notes Prospectus, June 10, 1993
EPIC Holdings, Inc. Senior Deferred Coupon Notes Prospectus, March 18, 1992
Finlay Enterprises, Inc. Senior Discount Debentures Prospectus, May 20, 1993
Finlay Fine Jewelry Corporation Senior Notes Prospectus, May 19, 1993
Levitz Furniture Corporation Senior Notes Prospectus, December 4, 1992
LFC Holdings Corporation Senior Notes, December 3, 1992
Revlon Worldwide Corporation Series B Senior Secured Discount Notes Prospectus, April 2, 1993
Specialty Foods Corporation Series B Senior Notes and Senior Subordinated Notes Prospectus, September
    16, 1993
Specialty Foods Corporation Senior Secured Discount Debentures Prospectus, September 16, 1993

Expert Report of Peter A. Fowler

## Exhibit 3
## Materials Considered

Talley Manufacturing and Technology, Inc. Senior Notes and Senior Discount Debentures, October 15, 1993

Time Warner Inc. Liquid Yield Option Notes Prospectus Supplement, December 10, 1992

Time Warner Inc. Debentures Prospectus Supplement, January 7, 1993

Time Warner Inc. Notes Prospectus Supplement, January 20, 1993

USF&G Zero Coupon Convertible Subordinated Notes Prospectus Supplement to Prospectus dated February 4, 1994, February 25, 1994

USF&G Senior Notes Prospectus Supplement, June 23, 1994

Form 10-Q and 10-K filings for December 31, 1991 – November 30, 1995: Enquirer/Star Group, Inc., Hasbro, Inc., Marvel Entertainment Group, Inc., Mattel, Inc., Scholastic Corporation, The Topps Company, Inc., Tyco Toys, Inc.

U.S. Treasury data from Bloomberg, LP

Stock Price data from the University of Chicago's Center for Research in Stock Prices (CRSP)

High Yield, Convertible & Rule 144A debt offering data from Thomson Financial Securities Data (SDC)

Moody's and Standard & Poor's (S&P) debt ratings from Bloomberg, LP

Moody's Bond Survey ratings activity

Standard & Poor's Corporate Ratings Criteria 2006

Standard & Poor's CreditWeek ratings reports

S&P CreditWire Ratings Rationale - Marvel III Holdings, September 29, 1994 (DEF 006378)

"Funding Unaffected by Marvel Tender Amendment," Private Placement Reporter Vol. 3; No. 17; Pg. 4, May 3, 1993

"Marvel Sweeping into High Yield Market with $200 Mil 144A," Private Placement Reporter Vol. 4; No. 28; Pg. 1, July 18, 1994

Marvel Entertainment Group, Inc. and Marvel Holdings, Inc. Confidential Ratings Agency Presentation, May 1993 (DEF 009545-009595)

Bear Sterns memo re: $150 Million (Gross Proceeds) Offering of Senior Secured Discount Notes Due 2003 for Marvel (Parent) Holdings, Inc., July 23, 1993 (BS 035949-035960)

Bear Sterns memo re: Marvel (Parent) Holdings Inc. $150 Million Public Offering of Senior Secured Discount Notes, September 14, 1993 (BS 036117-036131)

Bear Sterns memo re: $125 Million Offering of Senior Secured Notes for Marvel III Holdings, Inc., January 21, 1994 (BS 035917-035935)

Bear Sterns memo re: Marvel III Holdings, Inc. $125 Million 144A Offering of Senior Secured Notes, January 28, 1994 (BS 036103-036116)

Bear Sterns memo re: Marvel III Holdings, Inc. - $125 Million Offering of Senior Secured Notes, February 14, 1994 (BS 035962-035992)

Bear Sterns memo re: $200 Million Offering of Senior Notes due 2004 for Marvel Entertainment Group, Inc., July 8, 1994 (BS 035936-035948)

Bear Sterns memo re: Marvel Proposed Term Sheet, July 11, 1994 (BS 035853-035870)

Merrill Lynch memo to Leveraged Transactions Committee re: Marvel III Holdings Notes, January 23, 1994 (ML 007-0010)

Merrill Lynch memo to Leveraged Transactions Committee re: Marvel Holdings Rule 144A Private Placement, March 19, 1993 and attachments (ML 1439-1630)

Merrill Lynch analysis of Marvel Entertainment Group Interest Coverage, March 31, 1993 (2782-2785)

Merrill Lynch memo to Marvel Zeros Deal Team re: Wall Street Journal article, March 29, 1993 (ML 2836)

Merrill Lynch Presentation to Marvel Entertainment Group, Inc. Regarding Financing Alternative, February 28, 1995 (M-JB10 1175 - 1205)

Merrill Lynch memo re: Marvel Holdings Notes Collateral Coverage Analysis, November 8, 1996 (ML 3814-3818)

Marvel Entertainment Group, Inc. Presentation re: Marvel Holdings, Inc. Senior Secured Notes Offering, April 4, 1993 (ML 1139-1180)

Marvel Entertainment Group Presentation to Chemical Bank, Project Biz, March 1, 1993 (ML 2799-2809)

Marvel Entertainment Group Presentation to Bank Group, July 1994 (M-MEG7 0002-0056)

Expert Report of Peter A. Fowler

**Exhibit 3**
Materials Considered

Marvel III Holdings Tentative Roadshow Schedule, January 31, 1994 (ML 3522-3526)
Analyst Reports for Marvel Entertainment Group (BS039508-39519, BS039990-40017, DEF004975-4980,
    DEF006370-6375, DEF006381-6385, DEF009111-9121, DEF009128-9133, ML 1748-1751, ML 1867-1870,
    ML 2136-2138, ML 2145, ML 2631-2642, M-MEG5 2092-2097)
McConnell, John J. and Eduardo S. Schwartz, *LYON Taming*, Journal of Finance Vol. XLI, No. 3, July 1986.

Expert Report of Peter A. Fowler

# Exhibit 4

## Debt Capacity Analysis for Marvel Entertainment
### For the Year-end 1993
($ in millions)

**Weighted Average Cost of Debt**

|  |  | 8% | 9% | 10% |
|---|---|---|---|---|
| EBITDA Multiple | 8x | $2,628.9 | $1,674.7 | $1,227.9 |
| | 10x | $1,535.0 | $1,151.7 | $920.7 |
| | 12x | $1,201.5 | $952.8 | $789.4 |

Note:
These values represent the amount of debt Marvel could issue for an acquisition at various interest rates and EBITDA acquisition multiples without violating its interest coverage ratio of 2.0x.

Expert Report of Peter A. Fowler

Exhibit 4
Marvel Entertainment Group
Debt Capacity Analysis as of December 31, 1993
($ in millions)

| Debt Capacity (EBITDA coverage) | Based on Year-end 1993 Financial Data | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] |
| [A] Additional amount of debt | $2,628.9 | $1,674.7 | $1,227.9 | $1,535.0 | $1,151.7 | $920.7 | $1,201.5 | $952.8 | $789.4 |
| Actual LTM EBITDA | 121.3 | 121.3 | 121.3 | 121.3 | 121.3 | 121.3 | 121.3 | 121.3 | 121.3 |
| Actual LTM Interest | 14.6 | 14.6 | 14.6 | 14.6 | 14.6 | 14.6 | 14.6 | 14.6 | 14.6 |
| Total Debt | 250.2 | 250.2 | 250.2 | 250.2 | 250.2 | 250.2 | 250.2 | 250.2 | 250.2 |
| Total Debt/EBITDA | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 |
| | | | | | | | | | |
| Additional EBITDA | 328.6 | 209.3 | 153.5 | 153.5 | 115.2 | 92.1 | 100.1 | 79.4 | 65.8 |
| Additional interest | 210.3 | 150.7 | 122.8 | 122.8 | 103.7 | 92.1 | 96.1 | 85.8 | 78.9 |
| Additional Debt | 2,628.9 | 1,674.7 | 1,227.9 | 1,535.0 | 1,151.7 | 920.7 | 1,201.5 | 952.8 | 789.4 |
| | | | | | | | | | |
| Pro Forma | | | | | | | | | |
| Debt/EBITDA | 6.4 | 5.8 | 5.4 | 6.5 | 5.9 | 5.5 | 6.6 | 6.0 | 5.6 |
| Pro Forma EBITDA/Interest | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |

| Assumptions | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] |
|---|---|---|---|---|---|---|---|---|---|
| EBITDA acquisition multiple | 8.0 | 8.0 | 8.0 | 10.0 | 10.0 | 10.0 | 12.0 | 12.0 | 12.0 |
| Weighted average cost of debt | 8% | 9% | 10% | 8% | 9% | 10% | 8% | 9% | 10% |

Notes:
[A] Marvel could issue debt for an acquisition at interest rates of 8%, 9%, and 10% at EBITDA multiples of 8x, 10x, and 12x without violating its interest coverage r

Expert Report of Peter A. Fowler

A 152

Exhibit 4

## Marvel Entertainment Group
### Debt Capacity Analysis (4Q'1992 - 4Q'1994)
($ in millions)

| | 1992 | | | | 1993 | | | | 1994 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | 1Q | 2Q | 3Q | 4Q | 1Q | 2Q | 3Q | 4Q |
| **[A] LTM EBITDA Coverage** | | | | | | | | | | | | |
| Senior Secured Note Covenant | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x |
| Actual ratio | | | | 10.6x | 7.9x | 7.2x | 7.1x | 8.3x | 9.5x | 9.8x | 9.9x | 8.2x |
| **[B] Debt Capacity (EBITDA coverage)** | | | | | | | | | | | | |
| Additional amount of debt | | | | $700.0 | $794.7 | $927.7 | $1,019.8 | $1,151.8 | $1,193.2 | $1,152.0 | $1,270.8 | $1,284.3 |
| Actual LTM EBITDA | | | | 69.0 | 84.9 | 102.8 | 113.6 | 121.3 | 121.0 | 115.7 | 127.4 | 135.7 |
| Actual LTM Interest | | | | 6.5 | 10.7 | 14.3 | 16.0 | 14.6 | 12.8 | 11.8 | 12.9 | 16.5 |
| Total Debt | | | | 236.2 | 215.2 | 223.7 | 250.7 | 250.2 | 245.2 | 240.2 | 398.9 | 384.3 |
| Total Debt/EBITDA | | | | 3.4 | 2.5 | 2.2 | 2.2 | 2.1 | 2.0 | 2.1 | 3.1 | 2.8 |
| Additional EBITDA | | | | 70.0 | 79.5 | 92.8 | 102.0 | 115.2 | 119.3 | 115.2 | 127.1 | 128.4 |
| Additional interest | | | | 63.0 | 71.5 | 83.5 | 91.8 | 103.7 | 107.4 | 103.7 | 114.4 | 115.6 |
| Additional Debt | | | | 700.0 | 794.7 | 927.7 | 1,019.8 | 1,151.8 | 1,193.2 | 1,152.0 | 1,270.8 | 1,284.3 |
| Pro Forma Debt/EBITDA | | | | 6.7 | 6.1 | 5.9 | 5.9 | 5.9 | 6.0 | 6.0 | 6.6 | 6.3 |
| Pro Forma EBITDA/Interest | | | | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **[C] Amount of Debt that could be raised at the end of the quarter with the income distributed to shareholders and not violate the EBITDA coverage covenant.** | | | | $311.1 | $353.1 | $412.4 | $453.1 | $511.7 | $530.0 | $511.7 | $564.4 | $570.6 |

Notes:
[A] LTM EBITDA coverage senior secured note covenant on a quarterly basis compared to Marvel's actual interest coverage ratio on a quarterly basis.
[B] Marvel could issue debt at its existing interest rate to fund an acquisition of this size without violating its interest coverage ratio.
[C] The additional amount of debt Marvel could raise in a given quarter with the additional income distributed to shareholders and not violate its LTM EBITDA coverage ratio.

Assumptions
EBITDA acquisition multiple    10
Weighted average cost of debt    9%

Expert Report of Peter A. Fowler

A 153

Exhibit 5

Comparable Company Credit Analysis - Financial Summary

1992-1994

($ in millions)

| | Marvel Entertainment Group | | | Hasbro | | | Mattel | | | Tyco Toys | | | Topps | | | Enquirer | | | Scholastic | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1992 | 1993 | 1994 | 1992 | 1993 | 1994 | 1992 | 1993 | 1994 | 1992 | 1993 | 1994 | 1992 | 1993 | 1994 | 1992 | 1993 | 1994 |
| **Income Statement** | | | | | | | | | | | | | | | | | | | | | |
| Revenue | $223.8 | $415.2 | $514.8 | $2,541.1 | $2,742.2 | $2,670.3 | $2,263.5 | $2,704.4 | $3,205.0 | $768.6 | $790.2 | $753.1 | $283.2 | $268.0 | $265.4 | $275.4 | $300.0 | $315.3 | $533.3 | $631.6 | $749.9 |
| EBITDA | 69.0 | 121.3 | 136.3 | 423.9 | 453.7 | 444.6 | 184.8 | 391.2 | 573.4 | 62.2 | (26.5) | 32.3 | 37.5 | 31.3 | 33.1 | 107.2 | 116.7 | 117.8 | 54.9 | 63.2 | 67.7 |
| EBIT | 63.2 | 109.0 | 121.4 | 328.3 | 353.0 | 322.4 | 97.0 | 293.5 | 449.1 | 44.3 | (38.7) | 0.1 | 32.8 | 14.2 | 27.8 | 72.1 | 82.6 | 82.8 | 49.1 | 55.6 | 61.7 |
| Net Income | 32.6 | 56.0 | 61.8 | 179.2 | 200.0 | 175.0 | 184.8 | 117.2 | 255.8 | 18.0 | (69.9) | (33.0) | 19.0 | 14.2 | 15.7 | 19.4 | 27.8 | 11.8 | 28.1 | 24.8 | 38.6 |
| Cash | 10.6 | 17.0 | 18.1 | 126.0 | 186.5 | 157.0 | 292.3 | 225.7 | 259.7 | 51.2 | 32.0 | 30.5 | 13.8 | 27.7 | 17.8 | 5.9 | 7.6 | 6.3 | 4.1 | 4.1 | 3.7 |
| Total Debt | 225.8 | 250.5 | 391.6 | 498.9 | 467.9 | 433.8 | 534.3 | 514.0 | 548.5 | 198.3 | 265.1 | 258.0 | 6.0 | 0.0 | 0.0 | 377.8 | 334.0 | 446.3 | 13.7 | 45.9 | 96.6 |
| Total Equity | 84.7 | 147.3 | 243.0 | 1,206.6 | 1,276.7 | 1,395.4 | 748.4 | 817.8 | 1,083.7 | 335.2 | 277.4 | 296.2 | 54.4 | 67.0 | 73.9 | 301.8 | 321.3 | 37.0 | 153.5 | 203.8 | 259.2 |
| Total Capitalization | 1,213.7 | 2,664.5 | 1,423.8 | 2,833.1 | 3,178.0 | 2,551.9 | 2,430.5 | 3,703.8 | 4,484.5 | 410.9 | 294.4 | 195.2 | 647.0 | 329.3 | 241.1 | 382.8 | 371.4 | 333.6 | 476.4 | 637.6 | 749.5 |
| **Ratings** [1,2] | | | | | | | | | | | | | | | | | | | | | |
| Moody's | NR | NR | NR | Baa1 | A2 | A2 | Baa3 | Baa2 | Baa1 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| S&P Senior Debt | NR | NR | NR | A- | A | A | BBB- | BBB+ | BBB+ | N/A | B+ | B | N/A | N/A | N/A | N/A | N/A | B | NR | NR | NR |
| **Coverage Ratios** | | | | | | | | | | | | | | | | | | | | | |
| Debt/EBITDA | 3.4 | 2.1 | 2.8 | 0.6 | 0.6 | 0.5 | 2.2 | 1.1 | 0.6 | 3.7 | (10.0) | 7.6 | 0.3 | 0.0 | 0.0 | 3.4 | 2.8 | 4.9 | 0.2 | 0.7 | 1.5 |
| EBITDA Coverage | 10.6 | 8.3 | 8.0 | 11.8 | 15.3 | 14.4 | 2.7 | 6.2 | 10.3 | 4.4 | (1.1) | 1.0 | 288.9 | 326.5 | 71.7 | 3.3 | 4.1 | 3.3 | 24.3 | 22.1 | 14.4 |
| EBIT Coverage | 9.7 | 7.5 | 7.1 | 9.1 | 11.9 | 10.5 | 1.4 | 4.8 | 8.1 | 3.1 | (2.4) | 0.0 | 252.1 | 294.5 | 60.4 | 2.2 | 2.9 | 2.3 | 21.7 | 19.5 | 12.5 |

Source: All Income and Balance Sheet items are from the companies' 10-Q and 10-K filings. Total Capitalization is from the Center for Research in Securities Prices (CRSP) at the University of Chicago's Business School. Ratings from Bloomberg and Moody's/S&P Credit Reports.

Note:
[1] Ratings for Moody's are based on their Senior Unsecured Debt rating for each company and ratings for S&P are based on S&P's LT Local Issuer Credit rating. NR = not rated; N/A = rating not available.
[2] No ratings were issued for Marvel Entertainment Group. However, the Marvel Holding Notes were rated by Moody's/S&P as follows: Marvel Holding Inc. and Marvel III Holdings (B3/B, August 1993) and Marvel (Parent) Holdings (B3/B, August 1993) and Marvel III Holdings (Caa/B, June 1994).

Expert Report of Peter A. Fowler

A 154

**Exhibit 6**
Holding vs. Operating Co. Debt Issuance Comparison - Talley

| | Talley Industries (Holdings) Sr. Discount Debentures | Talley Mftg. & Tech. Senior Notes |
|---|---|---|
| **Issuance Data:** | | |
| Prospectus Date | 10/15/1993 | 10/15/1993 |
| Issuance Date | 10/15/1993 | 10/15/1993 |
| Maturity Date | 10/15/2005 | 10/15/2003 |
| Time to Maturity Date (Years) | 12.0 | 10.0 |
| Issue Price | $553.12 | $1,000.00 |
| Accreted Value at Maturity Date | $126,555,000 | $115,000,000 |
| Issuance Price | $70,000,000 | $115,000,000 |
| Coupon | -No interest accrues until 10/15/1998 | 10.75% |
| Yield | 12.25% | 10.75% |
| S&P Rating | B- | B |
| Moody's Rating | B2 | B2 |
| **Other Information:** | | |
| Common Shares pledged (#) | -All stock and intercompany debt of operating co. (Tally Mftg) | -All stock and intercompany debt of subsidiary (Talley Technolodgy) . |
| Ownership of Operating Co. stock | -100% | -100% |
| Share Price on Prospectus Date | -Not publicly traded | -Not publicly traded |
| Use of Proceeds | -Repay outstanding debt and purchase preferred stock of Talley Mftg. | -Repay debt of Talley Mftg and its subsidiaries. |
| Optional Redemption? | -After 5 years, at set rates; before 3 years up to 35% at set rates. | -After 5 years, at set rates; before 3 years up to $15M at set rates. |
| Tax sharing agreement between Holding and Operating Co.? | -Yes | |
| Holding Co.'s covenants place restrictions on Operating Co.? | -Yes | |
| Holding Co.'s covenants require it to maintain certain ownership % in Operating Co.? | -Yes. Covenants require that Holdings must continue to own all of the capital stock of Oper. | |
| Key Terms/Covenants | - No mandatory sinking fund payments. | - Mandatory sinking fund payments to pay down 30% of principal by 2002. |
| | -Limits ability of Holdings and its subsidiaries to engage in certain material business operatings or activities, to pay dividends or make certain restricted payments, to incur additional indebtedness, to encumber, transfer, lease or dispose of assets, to enter into certain transactions with affiliates or to merge or consolidate. | -Limits ability to pay dividends to Holdings or make certain other restricted payments, to incur additional indebtedness, to encumber assets, to enter into certain transactions with afiliates, to merge or consolidate or to transfer, lease or dispose of its assets. |

Sources: Data obtained from debt offering prospectus and/or SDC database.

Expert Report of Peter A. Fowler

**Exhibit 6**
Holding vs. Operating Co. Debt Issuance Comparison - Finlay

| | Finlay Enterprises, Inc. (Holding Co.) Sr. Discount Debentures | Finlay Fine Jewelry Corp. Senior Notes |
|---|---|---|
| **Issuance Data:** | | |
| Prospectus Date | 5/19/1993 | 5/19/1993 |
| Issuance Date | 5/1/1993 | 5/1/1993 |
| Maturity Date | 5/1/2005 | 5/1/2003 |
| Time to Maturity Date (Years) | 12.0 | 10.0 |
| Issue Price | $562.93 | $1,000.00 |
| Accreted Value at Maturity Date | $98,000,000 | $135,000,000 |
| Issuance Price | $55,167,140 | $135,000,000 |
| Coupon | -No interest accrues until 5/1/1998 | 10.625% |
| Yield | 12.00% | 10.625% |
| S&P Rating | B- | B |
| Moody's Rating | B2 | B1 |
| | | |
| **Other Information:** | | |
| Common Shares pledged (#) | -All of stock and intercompany debt of operating co. (Finlay Fine Jewelry) | -Unsecured |
| Ownership of Operating Co. stock | -Finlay Enterprises to hold substantially all of Oper. Co. common stock following transaction. | |
| Share Price on Prospectus Date | -Not publicly traded | |
| Use of Proceeds | -Repurchase preferred stock and warrants and repay outstanding debt. | -Repurchase preferred stock and warrants and repay outstanding debt. |
| Optional Redemption? | -After 5 years, at set rates. | -After 5 years, at set rates. |
| Tax sharing agreement between Holding and Operating Co.? | -Yes | |
| Holding Co.'s covenants place restrictions on Operating Co.? | -Yes | |
| Holding Co.'s covenants require it to maintain certain ownership % in Operating Co.? | -Yes. Change of Control triggered if Holding Co. owns less than 100% of Oper. Co., which allows note holders to put their notes back to Holding Co. | |
| Key Terms/Covenants | -Limits ability of Holdings and its subsidiaries to engage in certain material business operatings or activities, to pay dividends or make certain restricted payments, to incur additional indebtedness, to encumber, transfer, lease or dispose of assets, to enter into certain transactions with affiliates or to merge or consolidate | - Limits ability of Oper. Co. and its subsidiares to pay dividends, repurchase stock or make certain other restricted payments, to incur additional indebtedness, to create certain liens, to enter into certain transactions with affiliates, to merge or consolidate. |

Sources: Data obtained from debt offering prospectus and/or SDC database.

Expert Report of Peter A. Fowler

A 156

**Exhibit 6**

Holding vs. Operating Co. Debt Issuance Comparison - Specialty Foods

| | Specialty Foods Acquisition Corp. (Holding Co.) Sr. Secured Discount Debentures | Specialty Foods Corp. Senior Subordinated Notes |
|---|---|---|
| **Issuance Data:** | | |
| Prospectus Date | 9/16/1993 | 9/16/1993 |
| Issuance Date | 8/2/1993 | 8/2/1993 |
| Maturity Date | 8/15/2005 | 8/15/2003 |
| Time to Maturity Date (Years) | 12.0 | 10.0 |
| Issue Price | $475.14 | $1,000.00 |
| Accreted Value at Maturity Date | $319,250,000 | $200,000,000 |
| Issuance Price | $151,688,000 | $200,000,000 |
| Coupon | -No interest accrues until 8/15/1999 | 11.25% |
| Yield | 13.0% | 11.25% |
| S&P Rating | NR | NR |
| Moody's Rating | NR | NR |
| | | |
| **Other Information:** | | |
| Type of collateral | -All stock and intercompany debt of operating co. (Specialty Foods Corp., or SFC) | -Unsecured |
| Ownership of Operating Co. stock | -Holdings owns 100% of SFC common stock. | |
| Share Price on Prospectus Date | -N/A | |
| Use of Proceeds | -Acquisition of eight independent businesses that form new company, Specialty Foods Corp. | -Repurchase preferred stock and warrants and repay outstanding debt. |
| Optional Redemption? | -After 8/15/99, at set rates. | -After 8/15/99, at set rates. |
| Tax sharing agreement between Holding and Operating Co.? | -Yes | |
| Holding Co.'s covenants place restrictions on Operating Co.? | -Yes | |
| Holding Co.'s covenants require it to maintain certain ownership % in Operating Co.? | -Yes. Change of Control triggered if Holding Co. owns less than 100% of Oper. Co., which allows note holders to put their notes back to Holding Co. | |
| Key Terms/Covenants | -Limits ability of Holdings and its subsidiaries to pay dividends or make certain restricted payments, to incur additional indebtedness or issue preferred stock, to create liens, make asset sales, to enter into certain transactions with affiliates or to merge, consolidate or sell all or substantially all of their assets. | - Limits ability of Oper. Co. and its subsidiares to pay dividends, repurchase stock or make certain other restricted payments, to incur additional indebtedness, to create certain liens, to enter into certain transactions with afiliates, to merge or consolidate. |

Sources: Data obtained from debt offering prospectus and/or SDC database.

Expert Report of Peter A. Fowler

**Exhibit 6**
Holding vs. Operating Co. Debt Issuance Comparison - Clark

| | Clark R&M Holdings, Inc. (Holding Co.) Sr. Secured Zero Coupon Notes | Clark Oil & Refining Corp. Senior Notes |
|---|---|---|
| **Issuance Data:** | | |
| Prospectus Date | 4/28/1993 | 9/15/1992 |
| Issuance Date | 4/23/1993 | 9/15/1992 |
| Maturity Date | 2/15/2000 | 9/14/2004 |
| Time to Maturity Date (Years) | 6.8 | 12.0 |
| Issue Price | $472.85 | $1,000.00 |
| Accreted Value at Maturity Date | $264,000,000 | $175,000,000 |
| Issuance Price | $124,832,400 | $175,000,000 |
| Coupon | 0.00% | 9.50% |
| Yield | 11.00% | 9.50% |
| S&P Rating | BB | BB+ |
| Moody's Rating | Ba3 | Ba2 |
| | | |
| **Other Information:** | | |
| Common Shares pledged (#) | -Pledge of all outstanding shares of capital stock owned by company in each of its subsidiaries. | -Unsecured |
| Ownership of Operating Co. stock | -100% | |
| Share Price on Prospectus Date | -N/A | |
| Use of Proceeds | -Not provided. | -General corporate purposes |
| Optional Redemption? | -Not unless change of control or issuance of capital stock. | -After 9/15/97, at set rates. |
| Tax sharing agreement between Holding and Operating Co.? | -Yes | |
| Holding Co.'s covenants place restrictions on Operating Co.? | -Yes | |
| Holding Co.'s covenants require it to maintain certain ownership % in Operating Co.? | -Yes. Restricts mergers unless full ownership of Oper. Co. transferred to successor. | |
| Key Terms/Covenants | - No mandatory sinking fund payments. | - Mandatory sinking fund payment of $87.5 million on 9/15/03. |
| | -Limits ability of Holdings and its subsidiaries to make restricted payments, enter into certain transactions with affiliates, engage in speculative futures and options trading, incur indebtedness, consolidate or merge or transfer or lease all or substantially all of its assets, or sell capital stock and certain assets. Also contains a minimum Net Worth covenant, which if violated triggers obligation to make offer to repurchase specified amounts this debt offering. | - Limits ability of Oper. Co. and its subsidiaries to incur indebtedness, pay dividends or to make distributions in respect to its capital stock or to make certain other restricted payments, to create liens, to consolidate or merge or transfer or lease all or substantially all of its assets, to enter into certain transactions with affiliates, to enter into sale and leaseback transactions, to sell capital stock of its subsidiaries and certain assets or to engage in speculative futures and options trading. Also contains a minimum Net Worth covenant, which if violated triggers obligation to make offer to repurchase specified amounts this debt |

Sources: Data obtained from debt offering prospectus and/or SDC database.

Expert Report of Peter A. Fowler

A 158

**Exhibit 6**
Holding vs. Operating Co. Debt Issuance Comparison - Levitz

| | LFC Holding Corp. (Holding Co.) Sr. Deferred Coupon Debentures and Warrants | Levitz Furniture Corp. Senior Notes |
|---|---|---|
| **Issuance Data:** | | |
| Prospectus Date | 12/4/1992 | 12/4/1992 |
| Issuance Date | 12/4/1992 | 12/4/1992 |
| Maturity Date | 6/15/2002 | 4/15/1997 |
| Time to Maturity Date (Years) | 9.5 | 4.4 |
| Issue Price | $520.54 | $1,000.00 |
| Accreted Value at Maturity Date | $115,005,000 | $115,000,000 |
| Issuance Price | $59,864,325 | $115,000,000 |
| Coupon | -No interest accrues until 6/15/1997 | 12.375% |
| Yield | 15% without exercise of Warrants; 18.14% with exercise of Warrants | 12.375% |
| S&P Rating | CCC+ | B- |
| Moody's Rating | B3 | B1 |
| **Other Information:** | | |
| Common Shares pledged (#) | -Unsecured | -Unsecured |
| Ownership of Operating Co. stock | -Holdings owns substantially all of Levitz common stock. | |
| Share Price on Prospectus Date | -Not publicly traded | |
| Use of Proceeds | -Proceeds to be contributed to Oper. Co. and used to repay its existing indebtedness. | -Repurchase preferred stock and warrants and repay outstanding debt. |
| Optional Redemption? | -After 8/15/99, at set rates. | -After 8/15/99, at set rates. |
| Tax sharing agreement between Holding and Operating Co.? | -Not mentioned in prospectus. | |
| Holding Co.'s covenants place restrictions on Operating Co.? | -Yes | |
| Holding Co.'s covenants require it to maintain certain ownership % in Operating Co.? | -Yes. Change of Control triggered if Holding Co. owns less than a majority of voting shares of Oper. Co., which allows note holders to put their notes back to Holding | |
| Key Terms/Covenants | -Limits ability of Holdings and its subsidiaries to pay dividends or make certain restricted payments, to incur additional indebtedness, to encumber assets, to enter into certain transactions with affiliates or to merge, consolidate or to transfer or lease its assets. | - Limits ability of Oper. Co. to pay dividends or make certain restricted payments, to incur additional indebtedness, to encumber assets, to enter into certain transactions with affiliates or to merge, consolidate or to transfer or lease its assets. |

Sources: Data obtained from debt offering prospectus and/or SDC database.

Expert Report of Peter A. Fowler

**Exhibit 6**
Holding vs. Operating Co. Debt Issuance Comparison - EPIC

| | EPIC Holdings, Inc. (Holding Co.) Sr. Deferred Coupon Notes | EPIC Healthcare Group, Inc. Sr. Subordinated Notes |
|---|---|---|
| **Issuance Data:** | | |
| Prospectus Date | 3/18/1992 | 6/10/1993 |
| Issuance Date | 3/18/1992 | 6/10/1993 |
| Maturity Date | 3/15/2002 | 6/1/2003 |
| Time to Maturity Date (Years) | 10.0 | 10.0 |
| Issue Price | $560.21 | $1,000.00 |
| Accreted Value at Maturity Date | $250,000,000 | $160,000,000 |
| Issuance Price | $140,052,500 | $160,000,000 |
| Coupon | -No interest accrues until 3/16/1997 | 10.875% |
| Yield | 12.0% | 10.875% |
| S&P Rating | CCC+ | CCC+ |
| Moody's Rating | B3 | B3 |
| **Other Information:** | | |
| Common Shares pledged (#) | -Unsecured | -Unsecured |
| Ownership of Operating Co. stock | -Following sale of these notes, Holdings owns 100% of EPIC Healthcare common stock. | |
| Share Price on Prospectus Date | -Not publicly traded. | |
| Use of Proceeds | -Repurchase Holdings preferred stock and for general corporate purposes. | -Repurchase existing debt. |
| Optional Redemption? | -At any time at 100% of principal plus accrued interest. | -After 6/1/98, at set rates. |
| Tax sharing agreement between Holding and Operating Co.? | -Not mentioned in prospectus. Oper. Co. prospectus states that Holding Co. interest and principal repayment to be funding by dividends from Oper. | |
| Holding Co.'s covenants place restrictions on Operating Co.? | -Yes | |
| Holding Co.'s covenants require it to maintain certain ownership % in Operating Co.? | -Yes. Change of Control triggered if Holding Co. owns less than 100% of Oper. Co., which allows note holders to put their notes back to Holding Co. | |
| Key Terms/Covenants | -Limits ability of Holdings and its subsidiaries to pay dividends or make certain restricted payments, to incur additional indebtedness, to enter into certain transactions with affiliates or to merge, consolidate or to transfer all or substantially all of its assets. | - Limits ability of Oper. Co. and its subsidiaries to pay dividends or to repurchase capital stock, to incur additional indebtedness or liens, to redeem subordinated debt prior to maturity, to enter into certain transactions with affiliates or to merge, consolidate or to transfer or lease its assets. |

Sources: Data obtained from debt offering prospectus and/or SDC database.

Expert Report of Peter A. Fowler

A 160

Exhibit 7

Collateralization of Marvel and Coleman Debt Issuances

| | | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Company | Deal | Prospectus Date | Value at Issuance | Value at Maturity | Share Price on Prospectus Date | Common Shares pledged as Security (#) | Value of Collateral at issuance | Ratio of collateral to debt value at issuance | Ratio of Value of Collateral at issuance to Value at Maturity | Value of collateral needed to provide ratio of 1:1 at maturity | Stock price needed to provide 1:1 ratio at maturity |
| Marvel | Marvel Holdings' Sr. Secured Discount Notes | 4/16/1993 | $300,000,247 | $517,447,000 | $12.31 | 48,000,000 | $591,000,000 | 2.0 | 1.1 | $517,447,000 | $10.78 |
| Marvel | Marvel Parent Holdings' Sr. Secured Discount Notes | 10/13/1993 | 147,639,348 | 251,678,000 | $23.19 | 20,000,000 | 463,750,000 | 3.1 | 1.8 | 251,678,000 | $12.58 |
| Marvel | Marvel III Holdings' Senior Secured Notes | 2/8/1994 | 125,000,000 | 125,000,000 | $26.88 | 9,302,326 | 250,000,011 | 2.0 | 2.0 | 125,000,000 | $13.44 |
| Coleman | LYONs (assuming effective maturity of 5 years) | 5/20/1993 | 120,335,000 | 171,805,000 | $27.00 | 7,220,000 | 194,940,000 | 1.6 | 1.1 | 171,805,000 | $23.80 |
| Coleman | Senior Secured Discount Notes | 7/15/1993 | 168,349,491 | 281,281,000 | $26.13 | 13,000,000 | 339,625,000 | 2.0 | 1.2 | 281,281,000 | $21.64 |

Notes:
[A] Debt offering prospectus.
[B] Debt offering prospectus.
[C] Debt offering prospectus.
[D] Debt offering, prospectus and/or CRSP.
[E] Debt offering prospectus.
[F] [D] x [E]
[G] [F]/[B]
[H] [F]/[C]
[I] [C]
[J] [I]/[E]

Expert Report of Peter A. Fowler

Exhibit 8

Overview of MacAndrew & Forbes Debt Issues: 1992-1994

(Dollars in Millions)

| Issue Date | Entity | Issue | Coupon | Offer Yield at Issuance | Amount Issued | Face Amount Outstanding | Maturity | Next Call | Ratings (Moody's/ S&P) | Original Sinking Fund Requirement | Current Optional Redemption Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Indebtedness at Coleman Holdings Inc. and Coleman Worldwide** | | | | | | | | | | | |
| 7/22/1992 | Coleman Holdings | Sr. Sec. Disc. Notes | 0.000% | 10.875% | $168.3 | $281.3 | 5/27/1998 | 7/15/1996 | NR/B | No | Non-Redeemable |
| 5/20/1993 | Coleman Worldwide | LYONs | 0.000% | 7.250% | 138.4 | 575.0 | 5/27/2013 | 5/27/1998 | B2/B | No | Non-Redeemable |
| | | | | | | $856.3 | | | | | |
| **Indebtedness at Marvel III Holdings, Marvel (Parent) Holdings and Marvel Holdings** | | | | | | | | | | | |
| 8/3/1993 | Marvel (Parent) Holdings | Sr. Sec. Disc. Notes | 0.000% | 12.250% | $147.6 | $251.7 | 4/15/1998 | 2/13/1995 | B3/B | No | 100.0% |
| 4/16/1993 | Marvel Holdings | Sr. Sec. Disc. Notes | 0.000% | 11.250% | 300.0 | 517.4 | 4/15/1998 | 2/13/1995 | B3/B | No | 100.0% |
| 6/6/1994 | Marvel III Holdings | Sr. Sec. Notes | 9.125% | 9.125% | 125.0 | 125.0 | 2/15/1998 | 10/15/1996 | Caa/B | No | Non-Redeemable |
| | | | | | | $894.1 | | | | | |
| **Indebtedness at Revlon** | | | | | | | | | | | |
| 5/13/1993 | Revlon Consumer Products | Sr. Sub Notes | 10.500% | 10.500% | $555.0 | $555.0 | 2/15/2003 | 2/15/1998 | B3/B- | No | Non-Redeemable |
| 5/27/1993 | Revlon Consumer Products | Sr. Notes | 9.500% | 10.001% | 195.6 | 200.0 | 6/1/1999 | NCL | B2/B | No | Non-Redeemable |
| 5/13/1993 | Revlon Consumer Products | Sr. Notes | 9.375% | NA | 254.7 | 260.0 | 4/1/2001 | 4/1/1998 | B2/B | No | Non-Redeemable |
| 7/9/1980 | Revlon Inc (a) | Debs | 10.875% | 11.004% | 197.8 | 85.0 | 7/15/2010 | 2/13/1995 | B2/B+ | 7/91-07/09: $9.0 | 102.9% |
| 3/18/1993 | Revlon Worldwide | Sr. Sec. Disc. Notes | 0.000% | 12.002% | 625.0 | 1,115.8 | 3/15/1998 | 2/13/1995 | B3/B- | No | 100.0% |
| | | | | | | $2,215.8 | | | | | |
| **Indebtedness at New World Communications** | | | | | | | | | | | |
| 12/1/1994 | New World Communications Group | Sr. Disc. Notes | 0.000% | 13.500% | $220.0 | $420.5 | 6/15/1999 | 2/13/1995 | Caa/B | No | 100.0% |
| 5/25/1993 | SCI Television | Step-Up Notes | 7.500% (b) | NA | 250.0 | 250.0 | 6/30/1998 | 2/13/1995 | NR | 12/94-12/97: $10.0; 12/97-6/98: $15.0 | 100.0% |
| 5/25/1993 | SCI Television | Sr. Notes | 11.000% | NA | 374.0 | 374.0 | 6/30/2005 | 6/30/1996 | B3/BB- | 6/04-06/05: $187.0 | Non-Redeemable |
| | | | | | | $1,044.5 | | | | | |
| **Indebtedness at Consolidated Cigar Corp** | | | | | | | | | | | |
| 2/24/1995 | Consolidated Cigar | Sr. Sub Notes | 10.500% | 10.500% | $90.0 | $90.0 | 3/1/2003 | 3/1/2008 | B3/B | No | Non-Redeemable |
| | | | | Total | | $5,100.7 | | | | | |

Source: Merrill Lynch Presentation to Marvel Entertainment Group, Inc. Regarding Financing Alternatives, February 28, 1995 (M-JB10 1187).
(a) Mandatory sinking fund requirements satisfied until 2005.
(b) Security has multiple coupons: 7.5% until 5/25/96, 8.5% until 5/25/97 and 9.5% until 6/30/98.

Expert Report of Peter A. Fowler

A 162

**Exhibit 9**

Comparison of Coleman Worldwide and Coleman Holdings Debt Issuances

Summary of Terms

| | LYONs | Senior Secured Discount Notes |
|---|---|---|
| **Issuance Data:** | | |
| Original Prospectus Date | 5/20/1993 | 7/15/1993 |
| Settlement Date | 5/27/1993 | 7/22/1993 |
| Maturity Date | 5/27/2013 | 5/27/1998 |
| Effective Maturity Date | 5/27/1998 | 5/27/1998 |
| Time to Maturity Date (Years) | 20.0 | 4.8 |
| Time to Effective Maturity Date (Years) | 5.0 | 4.8 |
| Issue Price | $240.67 | $598.51 |
| Price per Note at Effective Maturity | $343.61 | $1,000.00 |
| Number of notes issued | 500,000 | 281,281 |
| Accreted Value at Maturity Date | $500,000,000 | $281,281,000 |
| Accreted Value at Effective Maturity Date | $171,805,000 | $281,281,000 |
| Issuance Price | $120,335,000 | $168,349,491 |
| Transaction Cost | $3,610,000 | NA |
| Expenses Payable by Issuer | $1,025,000 | NA |
| Net Proceeds to Issuer | $115,700,000 | NA |
| Coupon | 0.00% | 0.00% |
| Yield | 7.25% | 10.875% |
| S&P Rating | B | B |
| Moody's Rating | B2 | NR |
| 5 Year Treasury | 6.09% | 5.22% |
| Spread to Treasury | 1.16% | 5.66% |
| | | |
| **Collateral Data:** | | |
| Common Shares (Entity) | Coleman Co. | Coleman Worldwide |
| Share Price on Prospectus Date | $27.00 | $26.13 |
| Common Shares pledged as Security (#) | 7,220,000 | 13,000,000 |
| Exchange Rate (# shares per note) | 7.853 | NA |

Sources: Data obtained from debt offering prospectus, CRSP, Bloomberg and/or SDC database.

Expert Report of Peter A. Fowler

A 163

**Exhibit 10**

# Estimate of the Error in Mr. Carron's Yields for Coleman LYONs and Marvel Holding Company Hypothetical LYONs

| LYONs Issuance Data | Coleman | Holdings | Parent | III |
|---|---|---|---|---|
| Prospectus Date | 5/20/1993 | 4/16/1993 | 10/13/1993 | 2/8/1994 |
| Settlement Date | 5/27/1993 | 4/22/1993 | 10/20/1993 | 2/15/1994 |
| Effective Maturity Date | 5/27/1998 | 4/15/1998 | 4/15/1998 | 2/15/1998 |
| Net Proceeds to Issuer | $120,335,000 | $327,809,728 | $194,912,030 | $130,742,792 |
| Accredited Value at Effective Maturity Date | $171,805,000 | $517,447,000 | $251,678,000 | $178,614,898 |
| Coupon | 0.00% | 0.00% | 0.00% | 0.00% |
| Time to Effective Maturity (Years) | 5.00 | 4.98 | 4.49 | 4.00 |
| Shares as Collateral | 7,220,000 | 48,000,000 | 20,000,000 | 9,302,326 |
| Share Price on Prospectus Date | $27.000 | $12.313 | $23.313 | $26.875 |
| Number of LYONS | 500,000 | 517,447 | 251,678 | 178,615 |
| Price per LYON at Issuance | $240.7 | $633.5 | $774.5 | $732.0 |
| Price per LYON at Redemption | $343.61 | $1,000 | $1,000 | $1,000 |
| **Collateralized Debt Calculation** | | | | |
| Spread to Swap Curve | 2.13% | 2.13% | 2.13% | 2.13% |
| Swap Rate | 5.55% | 5.30% | 4.72% | 5.34% |
| Assumed Discount Rate | 7.68% | 7.43% | 6.85% | 7.47% |
| Value of Debt Component | $117,862,671 | $359,748,567 | $186,028,247 | $133,225,921 |
| **Put Option** | | | | |
| Strike Price | $23.80 | $10.78 | $12.58 | $19.20 |
| Price per Put | $4.97 | $4.07 | $2.36 | $4.25 |
| Number of Puts | 7,220,000 | 48,000,000 | 20,000,000 | 9,302,326 |
| Value of All Put Options | $35,906,031 | $195,579,899 | $47,123,805 | $39,527,160 |
| Theoretical Debt Proceeds [1] | $81,956,640 | $164,168,668 | $138,904,442 | $93,698,761 |
| Theoretical Issue Price [2] | $163.91 | $317.27 | $551.91 | $524.59 |
| Theoretical Yield [3] | 15.37% | 24.43% | 13.70% | 16.80% |
| Swap Rate | 5.55% | 5.30% | 4.72% | 5.34% |
| Theoretical Spread to Swap Rate [4] | 9.82% | 19.13% | 8.98% | 11.46% |
| Actual Yield | 10.875% | 11.25% | 12.25% | 9.125% |
| Swap Rate | 5.55% | 5.30% | 4.72% | 5.34% |
| Actual Spread to Swap Rate [5] | 5.33% | 5.95% | 7.53% | 3.79% |
| Theoretical Debt Proceeds/ Net Proceeds to Issuer | 68.11% | 50.08% | 71.27% | 71.67% |
| Total Error in Debt Yield: | | | | |
| Theoretical Spread - Actual Spread | 4.49% | 13.18% | 1.45% | 7.67% |

Source:  All data is taken directly from Exhibit 6 of the Expert Report of Andrew S. Carron unless otherwise indicated.

[1] Theoretical Proceeds = Value of Debt Component - Value of All Put Options.
[2] Theoretical Issue Price = Theoretical Proceeds / Number of LYONs.
[3] Calculated yield base on Theoretical Issue Price above.
[4] Theoretical Spread to Swap Rate = Theoretical Yield - Swap Rate.
[5] Actual Spread to Swap Rate = Theoretical Yield - Swap Rate.

Expert Report of Peter A. Fowler

DRAFT

**Exhibit 11**
Coleman Worldwide LYONs Analysis

| Coleman Senior Secured Notes [1] | |
|---|---|
| Settlement Date | 7/22/1993 |
| Effective Maturity Date | 5/27/1998 |
| Issue Price | $598.51 |
| # of Bonds | 281,281 |
| Accredited Value at Effective Maturity Date | $281,281,000 |
| Coupon | 0.00% |
| Time to Effective Maturity (Years) | 4.85 |
| Price at Effective Maturity | $1,000 |
| Proceeds | $168,349,491 |
| Yield | 10.875% |
| 5 Year US Treasury [2] | 5.22% |
| Spread to Treasury | 5.66% |
| Shares as Collateral | 7,220,000 |
| Value of Collateral | $194,940,000 |
| Collateralization @ Issuance | 1.16x |
| Collateralization @ Maturity | 0.69x |

| Debt Value (assuming same spread) | |
|---|---|
| Settlement Date | 5/27/1993 |
| Effective Maturity Date | 5/27/1998 |
| Issue Price | $240.67 |
| # of Bonds | 500,000 |
| Accredited Value at Effective Maturity Date | $171,805,000 |
| Coupon | 0.00% |
| Time to Effective Maturity (Years) | 5.00 |
| Price at Effective Maturity | $344 |
| Proceeds | $120,335,000 |
| 5 Year Treasury [2] | 5.35% |
| Spread to Treasury | 5.66% |
| Debt Component Yield | 11.01% |
| Debt Component Price | $201.02 |
| Debt Component Proceeds | $100,512,266 |

| Implied Option Value | |
|---|---|
| Option Proceeds | $19,822,734 |
| # of Options | 3,926,500 |
| Option Price | $5.0484 |
| Stock Price | $27.00 |
| Strike Price | $43.76 |
| Conversion Factor | 7.853 |
| Risk Free Rate | 5.35% |
| Volatility | 29.81% |
| | |
| Debt Component | 83.53% |
| Equity Component | 16.47% |

[1] Coleman Holdings, Inc. Senior Secured Discount Notes Prospectus, October 7, 1993
[2] 5 Year US Treasury yield from Bloomberg.

Expert Report of Peter A. Fowler

**Exhibit 11**
Coleman Worldwide LYONs Analysis

**Coleman LYONS** [1]

| | |
|---|---|
| Settlement Date | 5/27/1993 |
| Effective Maturity Date | 5/27/1998 |
| Issue Price | $240.67 |
| # of Bonds | 500,000 |
| Accredited Value at Effective Maturity Date | $171,805,000 |
| Coupon | 0.00% |
| Time to Effective Maturity (Years) | 5.00 |
| Price at Effective Maturity | $344 |
| Proceeds | $120,335,000 |
| Yield | 7.25% |

**Option Value**

| | |
|---|---|
| Stock Price | $27.00 |
| Strike Price | $43.76 |
| Conversion Factor | 7.853 |
| Risk Free Rate[1] | 5.35% |
| Volatility[2] | 31.39% |
| Option Price | $5.4300 |
| # of Options | 3,926,500 |
| Option Proceeds | $21,320,764 |

**Implied Debt Value**

| | |
|---|---|
| Debt Proceeds | $99,014,236 |
| # of Bonds | 500,000 |
| Price per Bond | $198.03 |
| Yield | 11.33% |

| | |
|---|---|
| Debt Component | 82.28% |
| Equity Component | 17.72% |

[1] Coleman Woldwide Corp. LYONs Prospectus, May 20, 1993

[2] 5 Year US Treasury yield from Bloomberg

[3] 12 month (250 day) historical volatility from Bloomberg.

Expert Report of Peter A. Fowler

**Exhibit 12**
**Marvel Holding Company LYONs Analysis**

| | Holdings[1] | Parent[2] | III[3] | Total |
|---|---|---|---|---|
| **Hypothetical Marvel LYONS** | | | | |
| Settlement Date | 4/22/1993 | 10/20/1993 | 2/15/1994 | |
| Effective Maturity Date | 4/15/1998 | 4/15/1998 | 2/15/1998 | |
| # of Bonds | 517,447 | 251,678 | 125,000 | |
| Accredited Value at Effective Maturity Date | $517,447,000 | $251,678,000 | $178,658,568 | $947,783,568 |
| Coupon | 0.00% | 0.00% | 0.00% | |
| Time to Effective Maturity (Years) | 4.98 | 4.49 | 4.00 | |
| Price at Effective Maturity | $1,000 | $1,000 | $1,000 | |
| Shares as Collateral | 48,000,000 | 20,000,000 | 9,302,326 | 77,302,326 |
| Value of Collateral | $591,024,000 | $466,260,000 | $250,000,011 | |
| Collateralization @ Issuance | 1.40x | 2.36x | 1.60x | |
| Collateralization @ Maturity | 1.14x | 1.85x | 1.40x | |
| **Debt Component** | | | | |
| 5 Year US Treasury[4] | 5.01% | 4.63% | 5.33% | |
| Spread to Treasury | 6.24% | 7.62% | 3.80% | |
| Debt Component Yield | 11.250% | 12.25% | 9.125% | |
| Debt Component Price | $579.77 | $586.62 | $1,000.00 | |
| Debt Component Proceeds | $300,001,147 | $147,639,676 | $125,000,000 | $572,640,823 |
| **Option Component** | | | | |
| Stock Price | $12.31 | $23.31 | $26.88 | |
| Strike Price[5] | $19.95 | $37.78 | $43.55 | |
| # of Options | 25,931,973 | 6,661,632 | 4,102,126 | |
| Risk Free Rate[6] | 5.01% | 4.63% | 5.33% | |
| Volatility[7] | 53.21% | 50.04% | 47.64% | |
| Call Price | $4.72 | $7.55 | $7.63 | |
| Option Component Proceeds | $122,461,647 | $50,275,185 | $31,281,548 | $204,018,380 |
| **Total LYON Proceeds** | $422,462,794 | $197,914,861 | $156,281,548 | $776,659,203 |

[1] Marvel Holdings Prospectus, July 9, 1993.
[2] Marvel (Parent) Prospectus, October 13, 1993.
[3] Marvel III Prospectus, May 11, 1994.
[4] 5 Year US Treasury yield from Bloomberg.
[5] Assumes strike price bears same relationship to underlying price as in Coleman LYON.
[6] 5 Year US Treasury yield from Bloomberg.
[7] 12 month (250 day) historical volatility from Bloomberg.

Expert Report of Peter A. Fowler

## Exhibit 13
## Potential Payment from Negotiation between M&F Holdings and Marvel

| Benefit to Holding Companies | Total Debt Outstanding[1] | Discount Rate (r)[2] | 25 Basis Points | | | 50 Basis Points | | |
|---|---|---|---|---|---|---|---|---|
| | | | Present Value of Incremental Cost @ | | | Present Value of Incremental Cost @ | | |
| | | | r - 50 bp | r | r + 50 bp | r - 50 bp | r | r + 50 bp |
| Marvel Holdings | $300,000,247 | 11.250% | $3,873,414 | $3,787,430 | $3,703,728 | $7,746,828 | $7,574,861 | $7,407,457 |
| Marvel Parent | $147,639,348 | 12.250% | $1,714,495 | $1,680,488 | $1,647,302 | $3,428,990 | $3,360,976 | $3,294,605 |
| Marvel III | $125,000,000 | 9.125% | $877,425 | $861,220 | $845,477 | $1,754,849 | $1,722,439 | $1,690,953 |
| Total | $572,639,595 | | $6,465,334 | $6,329,138 | $6,196,507 | $12,930,668 | $12,658,276 | $12,393,015 |

| Cost to Marvel Entertainment | Total Debt Outstanding 12/31/1993[3] | Discount Rate (r)[4] | 25 Basis Points | | | 50 Basis Points | | |
|---|---|---|---|---|---|---|---|---|
| | | | Present Value of Incremental Cost @ | | | Present Value of Incremental Cost @ | | |
| | | | r - 50 bp | r | r + 50 bp | r - 50 bp | r | r + 50 bp |
| Current Portion | $45,100,000 | 4.67% | $451,937 | $440,977 | $430,412 | $903,874 | $881,953 | $860,824 |
| Long-term Debt | $205,100,000 | | $2,055,261 | $2,005,417 | $1,957,372 | $4,110,522 | $4,010,834 | $3,914,744 |
| Due to Fleer | $100,000 | | $1,002 | $978 | $954 | $2,004 | $1,956 | $1,909 |
| Sub-total | $250,300,000 | | $2,508,200 | $2,447,372 | $2,388,738 | $5,016,401 | $4,894,743 | $4,777,476 |

[1] Gross proceeds from Marvel Holding Company notes issuances.

[2] Discount rates reflect actual yield on the Marvel Holding Company Notes.

[3] Marvel Entertainment Group 10-K filing, December 31, 1993.

[4] Discount rate reflects Marvel Entertainment Group, Inc.'s cost of borrowing as of 12/31/1993 as reported in their form 10-K. The company's debt bears interest at the company's option of two different base rates plus applicable margins. I have selected the lower of the two rates resulting in a higher estimate of incremental cost.

Expert Report of Peter A. Fowler