IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                             :

| | |
|---|---|
| RONALD CANTOR, IVAN SNYDER and<br>JAMES A. SCARPONE, as TRUSTEES OF<br>THE MAFCO LITIGATION TRUST, | : <br>: <br>:   No. 97-CIV-586-KAJ |
| | : |
|              Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| RONALD O. PERELMAN,<br>MAFCO HOLDINGS INC.,<br>MacANDREWS & FORBES HOLDINGS INC.,<br>ANDREWS GROUP INCORPORATED<br>WILLIAM C. BEVINS and<br>DONALD G. DRAPKIN, | : <br>: <br>: <br>: <br>: <br>: |
| | : |
|           Defendants. | : |
| | : |

------------------------------------------------------------x

## REBUTTAL EXPERT REPORT OF
## BEVIS LONGSTRETH

May 15, 2006

May 15, 2006

I, Bevis Longstreth, submit this report in the above-referenced action.

<u>Qualifications</u>

Reference is made to the Expert Report of Bevis Longstreth, dated January 12, 2006 (the "Longstreth Report"),  previously filed with the Court. The Longstreth Report contains my qualifications.

<u>Rate of Compensation</u>

The Longstreth Report contains my rate of compensation.

<u>Materials Considered</u>

The Longstreth Report contains a listing of materials considered in preparing this rebuttal expert report.  In addition to such materials, I considered the Rebuttal Expert Report of Peter A. Fowler, dated March 3, 2006 (hereinafter referred to as the "Fowler Report").

<u>Opinion</u>

Paragraphs 59 and 60 of the Fowler Report contain Mr. Fowler's opinion regarding the outcome of an arm's length negotiation between Marvel and M&F Holdings, had one occurred, and include, in Paragraph 59, a series of exchanges between these parties "in which each side asserted arguments regarding the benefits of the Restrictions to the Marvel Holding Companies and the costs incurred by Marvel." Mr. Fowler describes the series of exchanges as summarizing "my view as to the key issues each side would assert in the negotiation."

My opinion is based on extensive experience with negotiations, spanning my entire career as a lawyer, fiduciary and senior government official.

In my opinion, the negotiation depicted by Mr. Fowler bears little resemblance to what one might reasonably expect to occur in a truly arm's length negotiation.  Exchange 1 unrealistically starts with Marvel saying "the Restrictions hinder our ability to operate Marvel." The negotiation would necessarily commence with a request by Ronald O. Perelman, directly or through his agents, for Marvel to participate in the proposed borrowings by the Marvel Holding Companies.  This request would spell out the various ways in which Marvel would be expected to participate, and would naturally include all of the ways in which Marvel, in fact, did participate.  This request would trigger consideration by the independent directors of Marvel of whether or not Marvel was willing to participate at all, and if it were willing, on what terms it would do so.

1

Allowing the Restrictions to be imposed on its business activities was just one of many steps required of Marvel to facilitate the borrowings, and negotiating over them would not have occurred until the more fundamental issues of whether, and on what terms, Marvel would be willing to help in the proposed borrowings, which were of absolutely no benefit to it.

Some specifics follow.

1. The scope of Mr. Fowler's negotiation is limited to argument over "the benefits of the Restrictions to the Marvel Holding Companies and the costs incurred by Marvel." Para. 59, at page 27. In serving the best interests of all the shareholders of Marvel, the negotiation would be over the benefits of the Note issuances by the Marvel Holding Companies to those companies and to Ronald O. Perelman, their sole shareholder, and the costs both actual and potential that could be incurred by Marvel as a result of the Note issuances.

As to benefits, the wealth extraction from Marvel accrued solely to the benefit of Ronald O. Perelman. Nothing of benefit accrued to Marvel or its minority shareholders.

As to costs, the risks of the Note issuances were borne by Marvel, whose assets were, in practical effect, the sole source of repayment. It is important to note that in Paragraph 20 of the Fowler Report, Mr. Fowler states with implied concurrence that the rating agencies treated the Note issuances by the Marvel Holding Companies as essentially debt of Marvel, increasing its leverage and its cost of future borrowings.

If bad things happened to Marvel, the wealth extraction by Mr. Perelman would be unaffected. However, if bad things happened to Marvel, the Note issuances and the Restrictions imposed on Marvel to secure the Noteholders would impair its ability to overcome those bad things. This scenario in fact occurred. Marvel's huge debt load impaired its liquidity and the Restrictions prevented Marvel from solving its liquidity problem except through bank borrowings.

In essence, the Note issuances were for Mr. Perelman a classic example of the "head's I win, tails you lose" transaction. The "you" in this case were Marvel and its minority shareholders. Such a transaction is the "promised land" for a deal-maker, but it would have been unobtainable had the transactions been presented to Marvel's Board of Directors and had Marvel's interests been represented by independent directors aided by banking and legal professionals of standing and independence.

2. In Exchange 1, Mr. Fowler has Marvel argue that "the Restrictions hinder our ability to operate Marvel."

In fact, the Restrictions worked a transfer of Marvel's corporate power from its Board of Directors to the Noteholders for so long as the Notes remained outstanding. It was an asymmetrical sharing of risk and reward, with the risks inherent in the Restrictions being borne 100% by Marvel and the rewards being received 100% by Mr.

2

Perelman. Marvel would have argued that unless the rewards were shared with Marvel, Marvel would be unwilling to participate in the Note issuances.

3. In Exchange 2, Mr. Fowler has Marvel argue that "the Restrictions are critical to marketing the Holding Company Notes."

This argument is far too narrowly based. It leaves out the extensive participation by Marvel, including its top executives, its counsel and its auditors, in making the Note issuances possible. From my experience as a financing lawyer, I can say that the elements of participation by Marvel were substantially equivalent to what Marvel would have done had it been the issuer of the Notes and the recipient of the Note proceeds. Its officers participated in roadshows to market the Notes. Its lawyer gave opinions to the Noteholders. Its auditors gave a "comfort" opinion. And Marvel acknowledged in filings that it considered itself bound by the Restrictions.

If none of these participatory steps by Marvel were necessary, they would be dropped through negotiation. The truth of the matter is, however, that the Note issuances could not have been effected without them. Mr. Fowler seems to be arguing that the transactions were akin to margin loans. But they were not akin to margin loans at all. In a margin loan, the issuer of the stock being pledged to secure the loan does not participate in any way, and certainly does not concur in any restriction of its business activities.

In trying to evaluate the importance of the Restrictions, it is important to remember that Marvel's assets were, in practical effect, the sole source of repayment for the Notes. This central aspect of the borrowings explains the importance of the Restrictions to the Noteholders, who used the Restrictions to place limits on the ways in which Marvel could deploy those assets and change its capital structure in its own best interests.

4. In Exchange 3, Mr. Fowler has Marvel argue that the Note issuances "hurt Marvel's credit rating and increase its cost of debt." Mr. Fowler is correct here. These were very serious consequences of the Note issuances. However, the Restrictions did much more. By transferring corporate power over Marvel's flexibility to raise capital to the Noteholders, Marvel was forced to "bet the ranch" on nothing happening that would cause that transfer of power to hurt Marvel. This calculated risk to Marvel was imposed on Marvel by Mr. Perelman, its controlling shareholder, in order to extract wealth from Marvel exclusively for his benefit.

In fact, as things turned out, the risk to Marvel was realized, since the Restrictions impaired Marvel's ability to raise capital. The risks contributed to Marvel's liquidity crisis and its ultimate bankruptcy, wiping out the value of the minority shareholdings without in any way impairing the massive wealth extraction by Mr. Perelman that was achieved through the Note issuances.

5. In Exchanges 5 and 7, Mr. Fowler has Marvel ask for payment for accepting the Restrictions based on the amount of proceeds raised by M&F Holdings. These

3

exchanges are not very well developed, but Mr. Fowler suggests that M&F Holdings could argue that it had options other than the Note issuances, including LYONs, and these options could have avoided imposing the Restrictions on Marvel.

As the foregoing comments suggest, the potential for harm to Marvel from the Note issuances was of a magnitude far greater than the Exchanges seem to contemplate. The asymmetrical apportionment of risk and reward would have been flatly unacceptable to Marvel. Whether any payment would justify assuming these risks, as it did, is unclear to me. With perfect hindsight, of course, no payment could have sufficed, given what befell Marvel. However, if Marvel were to consider payment in exchange for shouldering the risks of the Note issuances, there would have had to be a sharing of the benefits between Mr. Perelman and Marvel that adequately reflected the basic fact that, without such sharing, the Note issuances were the functional equivalent of a borrowing by Marvel, exposing it to risk without benefit.

In my judgment, the fee suggested by Mr. Fowler would have been flatly unacceptable to Marvel, in light of what was at stake in having Marvel -- a company with a multi-billion dollar market capitalization -- agree to incur the risks it was asked to incur to facilitate Mr. Perelman's wealth transfer. Taking these considerations into account, I believe the consideration that Marvel would have required would likely have been in the order of magnitude of $150 million.

Bevis Longstreth
May 15, 2006

4

# EXPERT REPORT OF WILLIAM H. PURCELL

TRUSTEES OF THE MAFCO LITIGATION TRUST V. RONALD PERELMAN, ET AL
CIVIL ACTION NO. 97-586 (RRM)
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

**March 15, 2002**

I, William H. Purcell, hereby submit this expert report in the above-referenced case. I reserve the right to amend and/or supplement this report based on any additional information that may become available.

## INTRODUCTION

### I. QUALIFICATIONS

1. I have been an investment banker for over 35 years, starting my career in 1966 at Dillon, Read & Co. Inc. ("Dillon Read") after graduation from business school. I was elected Managing Director at Dillon Read in 1982. During my 24 years at Dillon Read, I worked in all areas of Corporate Finance. In the area of corporate debt financings, I was involved in dozens of public and private offerings, including issues for holding companies. I am familiar with most types of debt instruments, including senior issues, subordinated issues and convertible issues. I have been involved with debt securities rated investment-grade and also below investment-grade. I have dealt extensively with both of the primary rating agencies, Moody's and Standard & Poor's. For a period of time, I served as co-head of the private placement department at Dillon Read. In addition, I worked in the areas of mergers and acquisitions and valuations, including leveraged buyouts, reorganizations, divestitures, and the issuance of fairness opinions.

2. I left Dillon Read in November 1990 to help install a new management team into AmBase Corporation. I became a senior consultant to AmBase and other corporate clients and have advised the corporate finance departments of other investment banking firms. I am currently a Senior Director of Seale & Associates

1

and a Managing Director of Taylor Strategic Divestitures, both investment banking firms in Washington D.C. I am involved with both financings and mergers and acquisitions.

3.   I have testified before courts and regulatory agencies in excess of 30 times about a wide range of investment banking matters. I have served on Boards of Directors; I have served in the capacity of chief executive officer; I have advised special committees of Boards of Directors; and I have advised various trustees and foundations.

4.   I have a BA in economics from Princeton University, and an MBA from New York University. My curriculum vitae is set forth in Exhibit 1.

5.   I am being compensated for my work in this matter at my standard hourly rate of $375.00.

## II. SUMMARY OF OPINION

6.   I have been asked to render an opinion whether the restrictive covenants relative to Marvel Entertainment Group, Inc. ("Marvel") in the Indentures for three Marvel Holding Company debt issues (an issue by Marvel Holdings Inc. sold in April 1993 (the "Holdings Issue"); an issue by Marvel (Parent) Holdings Inc. sold in October 1993 (the "Parent Issue"); and an issue by Marvel III Holdings Inc. sold in February 1994 (the "Marvel III Issue")) were a substantial reason why the issuers could sell such issues to investors.

7.   Based on my knowledge and experience as an investment banker, and my review and analysis of documents listed in Exhibit 2 and discussed herein, I have reached

2

the conclusion that the restrictive covenants relating to Marvel were a substantial reason why the Issuers could sell the above debt securities to investors. In fact, it is my opinion that the above debt securities could not have been successfully sold by the investment banking firms involved without the existence of the restrictive covenants, especially those described in Sections 4.04, 4.05 and 4.09 of the Indentures. Given the extremely subordinated position of the Holdings Issue, the Parent Issue, and the Marvel III Issue, with the corresponding risks to investors purchasing such debt, it is my opinion that such debt would not be salable to investors without the set of protections contained in the above restrictions. Indeed, it has been my experience that sophisticated investors (the primary purchasers of below investment-grade debt) cannot be satisfied by merely raising the interest rate/yield level of an issue, but that they must also be satisfied by having adequate credit protection such as the restrictive covenants referred to above. Without appropriate and adequate credit protection, sophisticated investors will generally avoid an issue totally. There usually is no middle ground with such issues, i.e., the investor is either a willing buyer, or totally declines to participate in the financing.

## OVERVIEW OF THE HOLDING COMPANY ISSUES

In this section, I discuss the ownership structure regarding Ronald O. Perelman's ("Perelman") stake in Marvel, and then I outline the terms of the Holdings Issue, Parent Issue, and Marvel III Issue with particular description of the restrictive covenants relating to Marvel.

A 216

## III. STRUCTURE OF THE HOLDING COMPANIES

8.  Prior to October 1993, Perelman's stake in Marvel was owned through a series of holding companies. Approximately 50% of Marvel was directly owned by Marvel Holdings, Inc. ("Holdings"). Another 30% of Marvel was directly owned by Marvel (Parent) Holdings, Inc. ("Parent"). In addition, Parent owned 100% of Marvel Holdings, Inc. (and hence the 50% of Marvel that Holdings owned), giving Parent control of 80% of the common stock in Marvel. Furthermore, Parent was 100% owned by MacAndrew & Forbes Holdings Inc. ("MacAndrews"), which was 100% owned by Mafco Holdings, Inc. ("Mafco".) Mr. Perelman maintained 100% ownership in Mafco. These relationships are depicted in Exhibit 3A.

9.  This structure changed between October 1993 and February 1994, as Marvel III Holdings, Inc. ("Marvel III") was added to the ownership structure. Marvel III, an intermediate holding company, took 100% ownership of Parent, and itself was 100% owned by MacAndrews. In addition, Marvel III had arrangements for a tax sharing agreement with Marvel. Exhibit 3B illustrates the ownership structure in February 1994.

## IV. TERMS OF THE HOLDINGS ISSUE, THE PARENT ISSUE AND THE MARVEL III ISSUE

### A. The Holdings Issue

10. The Holdings Issue was $517,447,000 face amount of Secured Notes, sold through an Offering Memorandum dated April 16, 1993. The Notes were priced at 57.977% of par (i.e., investors paid $300,000,000 for the total issue) and the net proceeds received were about $288,000,000 after the payment of offering fees and

4

other expenses. The Notes were sold as "discount" securities, providing no cash interest payments to investors, but only a yield to maturity of 11.25% through the increasing accretion price of the Notes to par at maturity in five years (i.e., as of April 15, 1998). The Notes were secured by 24 million common shares of Marvel, then priced at $25 per share on the New York Stock Exchange, or about $600 million in total aggregate value (i.e., having a value as of the offering date of twice the purchase price paid by investors). However, despite this initial collateral coverage, the investors had no protection against a price decline in Marvel's stock because the terms of the financing called for no additional Marvel shares to be pledged, or released. Thus, in the future, the collateral for the Notes might be more or less than the face value of the Notes. The lack of cash interest and the lack of protection relative to a price decline in the Marvel stock, in my opinion, are two examples of the subordinated nature and risk associated with the Notes. The Notes were in effect underwritten by Merrill Lynch & Co. ("Merrill"), which agreed to be the Initial Purchaser of Notes subject to a satisfactory Purchase Agreement being signed with Holdings. Merrill received a fee of about $10.9 million in connection with the transaction.

11. The net proceeds received by Holdings from the financing were distributed to Parent Holdings, and were to be used by Parent Holdings primarily to purchase about 11 million common shares of Marvel common stock in the market pursuant to a tender offer. No proceeds were received by Marvel, either directly or indirectly, from the financing. The tender offer would increase Parent Holdings' direct ownership of Marvel from about 10% to 32% of total shares outstanding,

A 218

and would increase the total shares of Marvel owned by Holdings and Parent Holdings to above 80% of Marvel's outstanding common shares.[1] This level of ownership enabled a tax sharing agreement with Marvel to go into effect.

B. The Parent Issue

12. The Parent Issue was $251,678,000 face amount of Secured Notes, sold through a Prospectus dated October 13, 1993. The Notes were purchased by the underwriter, Bear Stearns & Co. Inc ("Bear Stearns"), at 57.812% of par (i.e., net proceeds received were about $145 million). As with the Holdings Issue, the Parent Issue was sold as "discount" securities, having no current cash interest payments but only a yield to maturity of about 11.25% through the increasing accretion price of the Notes to par at maturity in about 4.5 years (i.e., as of April 15, 1998, the same maturity date as for the Holdings Issue). The Notes were secured by 10 million common shares of Marvel, resulting in an initial value coverage ratio of no less than 2 to 1. As with the Holdings Issue, no additional Marvel shares would be pledged as collateral, or released, regardless of the market price of the Marvel shares. The Notes were underwritten by Bear Stearns, but the fee was not disclosed in the Prospectus. The net proceeds that Parent Holdings received from the financing were expected to be distributed to its parent, MacAndrews.[2] No proceeds were received by Marvel, either directly or indirectly, from the financing.

---

[1] Parent Holdings commenced a tender offer for up to 11 million shares of Marvel common stock on March 26, 1993 at a price of $25 per share in cash. On April 23, 1993, the tender offer was amended to increase the price to $30 per share and to decrease the number of shares that would be purchased to 10 million. On May 7, 1993, Parent Holdings purchased 10 million shares, increasing the total Perelman ownership from approximately 60% to approximately 80%. (Holdings Prospectus dated July 9, 1993, p.5)
[2] Prospectus of Parent Holdings dated October 13, 1993, p.6, 9, 17.

6

A 219

## C. The Marvel III Issue

13. The Marvel III Issue was $125,000,000 face amount of Secured Notes, sold through an Offering Memorandum dated February 8, 1994. The Notes were purchased by Merrill and Bear Stearns at 100% of par (i.e., net proceeds received were about $121 million). The fee paid to Merrill and Bear Stearns was $3,750,000. Unlike the Holdings Issue and the Parent Issue, this Issue of Notes was not sold as discount securities, and semi-annual cash interest would be paid to the investors at the rate of 9.125%. The Issue had a maturity life of only four years, and the actual maturity date was two months prior to the maturity date for the Holdings Issue and the Parent Issue, i.e., February 15, 1998. The Notes were secured by 9.3 million common shares of Marvel, resulting in an initial value coverage of about 2 to 1. The net proceeds of this issue were to be distributed to Marvel III Holdings' parent, i.e., MacAndrews.[3] No proceeds were received by Marvel, either directly or indirectly, from the financing.

## D. Description of Restrictive Covenants Relating to Marvel

14. The Holdings Issue, the Parent Issue, and the Marvel III Issue all had a restrictive covenant provision entitled "Limitation on Debt of Marvel and its Subsidiaries and Limitation on Preferred Stock of Marvel" (Section 4.04 of Indenture), a restrictive covenant provision entitled "Limitation on Restricted Payments" (Section 4.05 of Indenture) and a restrictive covenant provision entitled "Majority Ownership; Limitation on Liens" (Section 4.09 of Indenture).

15. Although all of the covenants in the Indentures were important to investors, the extremely material covenants, in my opinion, were Sections 4.04, 4.05, and 4.09.

---

[3] Offering Memorandum of Marvel III Holdings dated February 8, 1994, p.7, 11, 23.

7

A 220

Section 4.04 stated that the company [i.e., Holdings, Parent Holdings, or Marvel III Holdings] "shall not permit Marvel or any subsidiary of Marvel to issue, directly or indirectly, any Debt unless at the time of such issuance, the Consolidated EBITDA Coverage Ratio of Marvel for the period of the most recently completed four consecutive quarters ending at least 45 days prior to the date such debt is issued exceeds the ratio"...of 2.0 to 1.0 through March 31, 1995 and 2.25 to 1.0 from April 1, 1995 and thereafter. (Emphasis added) Notwithstanding the above, Section 4.04 did allow Marvel to issue debt pursuant to its existing term loan and revolving credit provisions, including amendments thereto, and certain other debt as defined in the Indentures (such as non-recourse debt and a general 'basket' amount not to exceed $25 million). The primary purpose of this covenant was to assure Holding Company bond investors protection against the operating company issuing more than a certain amount of new debt. This provision burdened Marvel by limiting its flexibility to issue new debt or preferred stock under certain circumstances.

16. Section 4.05 of the Indenture stated that each Holding Company "shall not permit Marvel or any subsidiary of Marvel" to make certain Restricted Payments as defined. (Emphasis added)  The primary purpose of this covenant was to protect the Holding Company bond investors by maximizing Marvels' internal cash, which would be the means by which funds would be eventually dividended up-streamed to the Holding Companies to meet debt payments.  On the other hand, this limited Marvel's flexibility by preventing management from making certain fundamental corporate decisions for the desirable use of cash, such as investments

8

in affiliates, the early retirement of subordinated debt, purchases of its common stock, and certain dividend payments.

17. Section 4.09 of the Indenture stated that each Holding Company "shall at all times from and after the Final Collateral Date be the legal and beneficial owner of a majority of the Voting Stock of Marvel..." This covenant protected the investors in the Holding Company Issues because it ensured that Perelman would retain effective control of the operating company, and therefore have the ability to ensure compliance with the covenants in Sections 4.04 and 4.05. This restricted Marvel's ability to issue new equity either for cash proceeds or to complete acquisitions.

## WERE THE RESTRICTIVE COVENANTS RELATING TO MARVEL A SUBSTANTIAL REASON WHY THE ISSUERS COULD SELL THE ISSUES?

In this section, I discuss the debt rankings of the Marvel Holding Company Issues. I then explain the necessity of restrictive covenants from both the investor and investment banker perspectives, and illustrate through a review of comparable holding company debt offerings that restrictive covenants are generally required to sell the securities. I conclude that the restrictive covenants relating to Marvel were a substantial reason why the Issuers could sell their debt securities to investors.

## V. RATING AGENCY CREDIT DEFINITIONS AND DEBT RANKINGS

18. The Marvel Holding Company Issues were all considered to be low quality, risky issues, as evidenced by the fact all received ratings that were well below investment-grade from the two major credit rating organizations, Moody's and Standard & Poor's.

9

19. Only debt securities rated triple B (or Baa) or higher are defined as "investment-grade". Because many institutions, such as pension funds, are allowed to purchase <u>only</u> investment-grade debt securities, many corporations believe that it is important from a capital raising point of view to obtain or maintain an investment-grade rating on their debt, if possible.

20. Both the Holdings Issue and the Parent Issue received a B3 rating from Moody's and a B rating from Standard & Poor's. The Marvel III Issue received a Caa rating from Moody's and a B rating from Standard & Poor's. Moody's rated the Marvel III Issue lower than the other Issues because Marvel III Holdings was viewed as a third-tier holding company more distant from the cash flow of Marvel than the other two holding companies.

21. A single B rating is several levels below investment grade. It is generally defined by the rating agencies to be lacking the characteristics of a desirable investment, i.e., the assurance of receiving interest and principal payments over any long period of time is considered to be small.[4] A Caa rating is generally defined as being of poor standing, with the possibility of even heading towards default.

22. Based on my experience, the rating agencies, like many institutional purchasers of debt, have a basic dislike and/or nervousness about leveraged holding companies whose debt is rated below investment-grade.[5] Holding companies are often formed in order to maximize borrowings and leverage. A holding company

---

[4] Reference is made to Exhibit 4 herein for Moody's brochure regarding long-term ratings/definitions of ratings (as published on their corporate web site). The determination of a rating involves both a financial analysis and a business risk analysis. Standard & Poor's states in its <u>Corporate Ratings Criteria</u> booklet that: "Ratings represent an art as much as a science...at times, a rating decision may be influenced strongly by financial measures. At other times, business risk factors may dominate." (p.17)

[5] For example, Standard & Poor's characterizes it as a "disadvantage" in its rating analysis where "a company conducts its operations through one or more legally separate subsidiaries, but issues debt at the parent (i.e., holding company) level." <u>Corporate Ratings Criteria</u>, 63.

10

generally has no operating assets, but only shares of stock of either operating

subsidiaries or other investment situations. Therefore, holding companies

generally have no independent source of cash flow; their only source of cash,

without selling any of their share positions, is generally dividends or other

payments received from subsidiaries or investments.

## VI. THE IMPORTANCE OF THE RESTRICTIVE COVENANTS RELATING TO MARVEL

23. Both investors and investment bankers insist on appropriate and adequate credit

protection, such as the restrictive covenants of Sections 4.04, 4.05 and 4.09, before

purchasing or underwriting below investment-grade holding company debt.

24. Covenants typically vary according to the level of credit quality. Covenants

generally increase in number and grow more stringent as the quality of the credit

declines. In addition, covenants are often transaction-specific, especially as one

moves to speculative-grade offerings and holding company offerings.

### A. Investors

25. Sophisticated prospective investors would definitely understand that the only

value and cash flow available to the Holding Companies was in Marvel, the

operating company.[6] Therefore, they would realize that their credit protection lay

in restricting Marvel as much as possible. The prospective investors would also

understand that Mr. Perelman controlled Marvel through the Holding Companies,

that Mr. Perelman selected and controlled the Board of Directors of Marvel, and

---

[6] When Standard & Poor's assigned its rating to the Holdings Issue and the Parent Issue, it stated: "The creditworthiness of Marvel Holdings Inc. and Marvel (Parent) Holdings Inc. is strongly affected by the underlying creditworthiness of both Marvel Entertainment Group Inc. ("operating company") and Marvel's ultimate parent corporation, Mafco Holdings Inc."

that Mr. Perelman could thus <u>ensure</u> (i.e., therefore the 4.04 and 4.05 language of "shall not permit Marvel") what Marvel would and would not do in the future.

26. Restrictive covenants are important to investors in almost all debt issues, but are of critical importance in regard to below investment-grade holding company debt, which generally has limited, if any, operating asset protection. This is because even an operating company with restrictive covenants in its own debt instruments might refinance or pay-off its existing debt and thereby eliminate, or significantly modify, its existing covenants. Holding Company investors cannot rely on covenants in operating company debt instruments; such investors must have their own covenants with obligations flowing directly to them.

### B. Investment Bankers

27. The competition among investment banking firms for large clients is generally fierce. Financing fees and advisory fees for large transactions are generally quite lucrative.

28. An investment bank, in rendering financial advice to a client, must often balance the competing interests of the client's "wish list" versus what it is able to do, given real-world market conditions, without losing money.

29. When a debt issue is underwritten, as in the case of the three Holding Company issues, the investment bank actually buys the securities from the corporate client and then resells the securities to institutional investors. If the terms of the offering are not satisfactory to investors, they will not buy the securities and the investment bank will be required to keep ownership of them. The investment bank cannot return the securities to the corporate client after it has signed a Purchase or

12

Underwriting Agreement with the client. Investment banks are not in the business of using their capital to permanently own securities, and they will do everything possible to avoid such a situation. Investment banks are in the business of selling and distributing securities, thereby earning commissions and fees.

30. It has been my experience as an investment banker that corporations almost always want no covenants, or minimal covenants, in their debt indentures.[7] The primary reasons that investment bankers recommend, or insist, to clients that certain covenants <u>must</u> be included in a financing is that the investment banking firm knows that it cannot sell an issue to investors without proper, and expected, credit protections in place. An investment banking firm cannot afford to underwrite (i.e., buy and own) an issue that will not be accepted in the marketplace. Naturally, if an investment bank believed that a debt security could be sold successfully without any restrictive covenants, because of a company's high quality rating or otherwise, it would not recommend or insist to the corporate client that unnecessary restrictive covenants be part of the financing terms.

31. Here, where the Marvel Holding Companies were trying to sell large amounts of below investment-grade debt, both investors and investment bankers would have insisted on appropriate and adequate credit protection, such as the restrictive covenants of Sections 4.04, 4.05 and 4.09, before purchasing or underwriting below investment-grade holding company debt. As previously discussed, these covenants afforded protection to the Holding Company bond investors by restricting the ability of the operating company to issue more than a certain amount

---

[7] Standard & Poor's supports this viewpoint in stating: "Borrowers typically seek the least restrictive covenant package they can negotiate, since they want maximum flexibility to conduct their business in the way they see fit." (Ibid, 48)

13

of new debt, by restricting the operating company's ability to expend its internal cash (which would be the means by which funds would be eventually up-streamed to the Holding Companies to meet debt payments), and by restricting the operating company's ability to issue new equity unless it ensured that Perelman would retain effective control of the operating company, and would therefore be able to enforce the provisions in Section 4.04 and 4.05.

## VII. OTHER COMPARABLE HOLDING COMPANY DEBT ISSUES

32. In an effort to examine comparable debt issuances, I conducted a search for issuances that met the following three parameters: 1) the issue was greater than $100 million, 2) the issue received a below investment-grade rating, and 3) the debt was issued during the 1993-1995 period. From this universe, I selected comparable holding company issues and reviewed their prospectuses.

33. Without exception, I found that the holding company issues included restrictions regarding the conduct of their operating subsidiaries. Specifically, the holding company issues included limitations on the operating subsidiary's ability to incur debt, issue preferred stock, make 'restricted payments' such as dividends, sell assets, or make certain other distributions. In addition, other than Perelman related issues (such as the 1993 debt offering by Coleman Holdings Inc.), I was unable to find any holding company debt offerings in which none of the proceeds were made available to the operating company subsidiary.

34. This finding is consistent with my opinion that holding companies such as Holdings, Parent Holdings, and Marvel III Holdings could not sell debt securities

14

A 227

without restrictions on the primary operating company, similar to the restrictive covenants of Sections 4.04, 4.05 and 4.09.

## VIII. CONCLUSION

35. In my opinion, the restrictive covenants relating to Marvel were a substantial reason why the Issuers could sell their debt securities to investors. Given the low credit quality of the Issues, and the corresponding risks to investors purchasing such debt and investment bankers underwriting such debt, it is my opinion that the Issues could not have been successfully sold without the existence of the restrictive covenants of Sections 4.04, 4.05 and 4.09. The existence of the above debt with the restrictive covenants related to Marvel significantly limited Marvel's prospective financing flexibility and options. For example in the September 1992 through April 1995 period, Marvel engaged in an aggressive acquisition campaign, financing a number of purchases through bank debt. The restrictive covenants limited Marvel's ability to use equity, rather than debt, for the same acquisitions—a practice that may have prevented Marvel's eventual liquidity crisis. Furthermore, Marvel never received any proceeds from the Holding Company financings in exchange for these restrictive covenants that limited operational flexibility.

William H. Purcell

15

A 228

Exhibit 1

January 15, 2002

# William H. Purcell: Business Background Resume and Summary of Certain Transactions and Expert Testimony Work

Office: 225 Cedar Ridge Road
       Bedminster, NJ 07921

908-781-1803 (fax: 908-781-1024)
(cell phone: 908-581-1203) (home: 908-781-5065)

## Index:

| | | Page |
|---|---|---|
| (I) | Personal Resume | 1 |
| (II) | Selected M&A and Financing Transactions | |
| | 1) Dillon Read 1966-1990 | 2-5 |
| | 2) Since Dillon Read | 5-6 |
| (III) | Expert Testimony Work | |
| | 1) Dillon Read clients | 7 |
| | 2) Other: 1992-2002 | 7-10 |
| (IV) | Corporate Executive Positions | 10 |
| (V) | Exhibit: Lawyers/Law Firms that William H. Purcell has worked closely with | 11-13 |

FROM FRIEDMAN KAPLAN SEILER & ADELMAN Document 489-53, 15 Filed 06/05/2006 29/Page 23 of 64   P. 19

**WILLIAM H. PURCELL**
225 Cedar Ridge Road
Bedminster, New Jersey 07921
(office: 908-781-1803) (fax: 908-781-1024) (cell phone: 908-581-1203) (home: 908-781-5065)

**BORN:**       July 18, 1942, Kingston, Rhode Island

**EDUCATION:**
Boston Latin School - 1960
Princeton University - 1964 B.A. Degree, graduated with honors in Economics
New York University Graduate School of Business - 1966 MBA (graduated number one in class)
Pace University Law School (Night Program, 1996, one year)

**BUSINESS CAREER:**

**Present**

Seale & Associates, Senior Director: 2001-
Vice Chairman of the Board, Director, Business Talk Radio Inc.: 2001-
Taylor Strategic Divestitures, Managing Director: 1997-
Expert witness work and testimony for law firms in various litigation cases
Board of Directors of AMDG, Inc. (a diabetes biochem company) and Business News Network
Financial Advisor to miscellaneous clients
AmBase Corporation, Senior Consultant: 1991- 2001
Gruntal Capital Markets, Senior Advisor to Corporate Finance Department on project basis: 1991-1999
Senior Advisor on project basis to corporate finance departments of smaller-medium sized investment banks
Occasional guest lecturer on investment banking and finance (George Washington University Graduate
School of Business and Monmouth University)
President of Stanford Court Group Inc. and Brokerage Management Services, Inc. (NASD member
firms), from January 1996 through August 1996)
Gulf USA Corporation (OTC), President and Chief Executive Officer, Director and Director of Gulf
Resources Pacific (New Zealand) from October 1993 through February 1995
Member (1991-1992) of Governor Florio's N.J. Economic Development Task Force
Vice Chairman of Whitehill Capital (NASD member firm) from November 1990 through May 1991

**November 1990**

Resigned from Dillon, Read & Co. Inc. in November 1990 to initiate and to organize a 13D group to put a new
management team into AmBase Corporation and Carteret Savings Bank,, a subsidiary of AmBase. The 13D
group included an ex Senior Managing Director of Dillon Read, the Chairman of NAC Re Insurance Company,
Augustine Asset Management, Inc. and Lindner Management Corp.

**1966 - November 1990**

Investment Banker at Dillon, Read & Co. Inc., NY, NY
- Joined as an Associate in June 1966; elected Vice President in January 1973; elected Senior Vice
President in January 1979; elected Managing Director in January 1982

Worked in all areas of Corporate Finance during the 24 year period, including mergers & acquisitions, various
Court testimony regarding fairness opinions, public offerings in the taxable and tax-exempt areas, private
placements, lease financings, real estate financings, securitization financings and general financial advisory. In
addition, since January 1988, performed a number of firm administrative and coordinating functions, primarily the
review and work allocation of Dillon, Read's 50 plus Corporate Finance Associates and Analysts.

Client coverage of such companies as Anheuser-Busch, Hoechst Celanese, Volkswagen and Metropolitan Life.
Projects of last two years at Dillon, Read and other interesting assignments are as follows: Dow-Marion merger
representing Mr. Kauffman, Healthcare International Special Committee of Board representation, Ausimont-
Montedison Special Committee of Board, Quantum ReCap and Bridge Loan, workout of Federated Bridge Notes,
Horsehead Industries Purchase of Minority Interest, Dillon Read Purchase of Viking Office Products and
subsequent IPO, MacMillan situation representing the ESOT, Foodmaker Special Committee of Board, Owens
Corning Fiberglass Board representation, Dreyfus Tax Exempt Fund Organization, Gates Learjet Special
Committee of Board, Hilton Foundation, Tampa Bay - Steinbrenner race track sale, Sprint-United
Telecommunications merger, Guilford-Southern Pacific negotiations, AT&T-Pacific Telephone Special
Committee of Board, Twentieth Century Fox Special Committee of Board.

**CLUB AFFILIATIONS:**
Baltusrol Golf Club, Springfield, New Jersey
The Bond Club of New York
Ocean Reef Club, Key Largo, Florida

Princeton Club of New York
Tiger Inn, Princeton, New Jersey

- 1 -

## WHP:  Certain Transactions and Testimony

### (II) M&A Transactions (Various Financing Transactions also for these and other Companies)

1)  Dillon Read 1966-1990 / Managing Director (Fairness Opinion usually also involved)

   - Anheuser Busch acquisition of Campbell Taggert.

   - Anheuser Busch acquisition of Busch Stadium Inc. and Civic Center Redevelopment Corp.

   - Anheuser Busch acquisition of Sea World.

   - Anheuser Busch divestiture of its industrials products division.

   - Hoechst divestiture of its Calbiochem subsidiary.

   - Hoechst acquisition of polyester film business of Celanese.

   - Hoechst acquisition of Celanese Corp.

   - Hoechst acquisition of Foster Grant.

   - Hoechst valuation study of Marion Labs and Upjohn.

   - Roussel Uclaf purchase of Foster Grant Sunglass Corp.

   - Volkswagen divestiture of Triumph-Adler subsidiary.

   - Volkswagen acquisition of major car manufacturing facility in Pennsylvania (first investment in U.S.A.).

   - Metropolitan Life acquisition of Century 21 Real Estate.

   - Dow Chemical acquisition of Marion Labs (representing largest independent shareholder).

   - International General Industries acquisition of Kliklok Corp.

   - International Bank acquisition of International General Industries.

   - International Bank acquisition of outstanding minority interest of Globe Industries.

   - Mergers of Hawkeye Insurance and Northeastern Insurance of Hartford into Financial Security Group, with International Bank as control shareholder.

A 231

- Merger of Bankers Security Life with United Services Life, with International Bank as control shareholder.

- Healthcare International reorganization, representation of Special Committee of the Board.

- Montedison acquisition of Ausimont, representation of Special Committee of the Board.

- Quantum Recapitalization and bridge loan, representation of Special Committee of the Board.

- Horsehead Industries, purchase by management group, representation of Special Committee of the Board.

- Dillon Read LBO Fund purchase of Viking Office Products.

- MacMillan Publishing, purchase by ESOT and management group, representation of Special Committee of the Board.

- Foodmaker, purchase by management group, representation of Special Committee of the Board.

- Owens Corning Fiberglass, purchase by ESOT and management group, representation of Special Committee of the Board.

- Owens Illinois recapitalization, representation of Special Committee of the Board.

- Gates Learjet recapitalization, representation of Special Committee of the Board.

- Hilton Hotels and Hilton Foundation recapitalization and valuation of assets, representation of Special Committee of the Foundation.

- Issued back-up fairness opinion to that of Lehman Brothers to the Board of Directors of UOP in regard to the merger with Signal Corp.

- Sale of Tampa Bay racetrack for Steinbrenner family and Thayer family.

- Purchase of Pacific Telephone minority interest by AT&T, representation of Special Committee of the Board.

- Twentieth Century Fox, purchase by Marvin Davis and relative valuations, representation of Special Committee of the Board.

A 232

- The Hillman Co. acquisition of outstanding minority interest of Edgewater Corp.

- MASCO Corp. acquisition of Evans-Aristocrat Industries.

- Purex Industries, purchase by management group.

- United Telecommunications acquisition of Aero-Flow Dynamics, with simultaneous purchase of an Aero-Flow subsidiary by management, representation of Special Committee of the Board of Aero-Flow Dynamics.

- United Telecommunications acquisition of the 50% of Sprint not owned, from GTE Corp.

- Superior Oil acquisition of outstanding minority interest of Canadian Superior Oil Ltd.

- Marcona Corp.'s purchase of Ocean Industries, a subsidiary of Dillingham Corp.

- Foremost McKesson's purchase of Provident Securities, the Crocker family holding company.

- The reorganization of Interpublic Advertising Co.

- The Henry B. Gilpin Co. acquisition of Mooney-Mueller-Ward Co. and Kiefer Stewart Co.

- SKW Trostberg AG purchase of Airco's silicon and manganese divisions.

- Cellu Craft Inc., purchase by management group, representation of Special Committee of the Board.

- Workout of Federated Department Stores bridge financing notes.

- General Mills divestiture of Izod Corp.

- Inmont Corp. merger into Carrier Corp.

- Issued back-up fairness opinion to that of Morgan Stanley to the Board of Directors of Texaco in regard to Bass takeover attempt of Texaco.

- Acquisition of Laura Scudder Snack Foods by Dillon Read LBO Group.

- Acquisition of Charleson Publishing Co. by Dillon Read LBO Group.

- 4 -

A 233

- Acquisition of Viking Office Products by Dillon Read LBO Group. (This acquisition, for $65 million, was initiated by Purcell and became Dillon Read's most profitable investment by a wide margin, going public and growing to a market capitalization of over $2 billion before being acquired.)

2) <u>Since Dillon Read (1991 to present)</u>

- Represented AmBase Corp. in 1992 in the purchase of Augustine Asset Management, and also in 1996 in the sale of Augustine Asset Management to management. Rendered fairness opinion to the AmBase Board of Directors in both cases.

- Rendered a fairness opinion to the AmBase Board of Directors regarding the proposed purchase of Imperial Premium Finance Corp. from Carteret Savings Bank.

- Rendered a fairness opinion to the AmBase Board of Directors regarding a proposed recapitalization of Carteret Savings Bank through an investment by AmBase and American Stock Transfer Corp.

- Participated in capital raising activities for Carteret Savings Bank/AmBase Corp. in 1991-1992, including decisions relating to real estate assets.

- Rendered a fairness opinion to the AmBase Board of Directors regarding the proposed acquisition of Marcus Schloss & Co., Inc.

- Represented AmBase Corp. in its investments in two biotech companies, AMDG (diabetes) and SDG (asthma and hepatitis).

- Represented AmBase Corp. in negotiations with the following companies: Freeman Securities (brokerage), Discount Corp. of New York (government bond trading), Eurobrokers (money brokerage), Fidelity Insurance (life insurance), U.S. Quotes, Specialty Meats Inc. and others.

- Rendered a valuation opinion to the Management Committee of Behringwerke AG (100% owned by Hoechst AG) in connection with PB Diagnostic Systems, Inc., a company owned 50% by Behringwerke AG and 50% by Polaroid Corp.

- Rendered a fairness opinion to the Board of Directors of Community First Bank (Jacksonville, Florida) in connection with the sale of American Surety & Casualty Holding Co.

- Together with Shareholder Communications Corp., advised AmBase Corp. regarding a complex escheat program involving past acquisitions closed as far back as the late 1970's.

A 234

- Rendered a solvency opinion to the Board of Directors of C&W Acquisition Corp. and Meriwether Capital Corp. (a Rockefeller affiliated investment company) in connection with the leveraged acquisition of C&W Fabricators, Inc.

- As Managing Director of Taylor Strategic Divestitures, represented Moore Corporation in its sale of its business forms European subsidiaries.

- Rendered a valuation opinion to the Board of Directors of AMDG, Inc. in connection with a stock valuation.

- Represented AmBase from a financial point of view in U.S. Bankruptcy Court in connection with a reorganization of Home Holdings by Zurich Insurance.

- As Managing Director of Taylor Strategic Divestitures, represented Atlantic Richfield (ARCO) in the sale of its subsidiary, Union Texas Petrochemicals (ethylene), to the Williams Company.

- As Managing Director of Taylor Strategic Divestitures, represented Shell Chemicals (Shell Oil) in the restructuring and sale of its Polyketone/Carilon Polymers business.

- Advised 10% shareholder of NextHealth, Inc. about possible dissenting or appraisal positions and other alternatives regarding proposed management led going-private transaction.

- Advised an investment group about the possible purchase and financing of Belcher Foundry Company, a portfolio company and divestiture of Citicorp Venture Group.

- Advised certain outside Directors of Fisher Communications Inc. about the advantages and disadvantages of certain strategic alternatives proposed by the management of the Company.

- Advised Seale & Associates and clients about certain divestitures; closed divestitures for Engelhard, Honeywell, and American Standard.

- Advised Board of Directors of Kliklok Corporation about a combination transaction between its English subsidiary and another related English company.

- As Senior Director of Seale & Associates, advised a subsidiary of Potomac Electric Power Co. (Pepco Energy Services) regarding a possible acquisition.

A 235

## III) **Expert Testimony Work**

1) Dillon Read clients

   - Adolph Coors Co.: estate valuation, testimony to the IRS.

   - Montana Power Co.: testimony before the Montana Public Utility Commission.

   - Expert witness for Signal Corp. in Weinberger v. UOP, litigation in Delaware Chancery Court regarding Signal purchasing the minority interest in UOP and which important case established the basic guidelines for "fairness" in going-private transactions, i.e. the concept of entire fairness, encompassing both fair price and fair dealing. (1980 and 1984)

   - Witness for International General Industries in Tanzer v. International General Industries, litigation in Delaware Chancery Court regarding IGI purchasing the minority interest in Kliklok Corp. and which important case established the basic guidelines for "business purpose". (1976)

   - Testimony before the Department of Insurance in Conn. and Iowa in connection with the mergers of Hawkeye Insurance and Northeastern Insurance Co. into Financial Security Group.

   - Expert witness for Metropolitan Life Ins. Co. in Arkansas State Court in connection with whether Met Life or Sun Life Guaranty Corp. should be allowed to buy the reorganized Baldwin United business in that state. (1986)

   - Expert witness for Marathon Oil / U.S. Steel in Ohio Federal Court (Cincinnati) and in Ohio State Court (Findlay) in connection with shareholder litigation. (1983)

   - Expert witness for Pepsico (Friedman, Wang & Bleiberg) in Delaware State Court in connection with Pizza Hut franchise litigation. (1987)

   - Testimony before the California Public Utility Commission in connection with the purchase of the Pacific Telephone minority interest by AT&T.

   - Other various fact witness testimony in connection with certain merger transaction litigation for which Dillon, Read & Co. Inc. served as investment banker. (1970-1990)

2) Other

   - Witness for AmBase Corp. (Friedman, Wang & Bleiberg) in Bowne of New York City, Inc. v. AmBase Corp., in New York Federal Court (1992), in connection with missed mailing date for proxy statement litigation.

- 7 -

A 236

- Witness for AmBase Corp. (Wilentz, Goldman & Spitzer) in Richard L. Braun v. AmBase, in N.J. State Court (1993), in connection with employment litigation.

- Investment banking expert in rendering a solvency opinion to the Boards of Directors of C&W Acquisition Corp. and Meriwether Capital (counsel being Satterlee Stephens Burke & Burke) in connection with the leveraged acquisition of C&W Fabricators, Inc. (1996)

- Expert witness for Shared Technologies, Inc. (Gadsby & Hannah) in United States District Court, Southern District of New York in connection with merger fee litigation with the investment banking firm of Gerard Klauer Mattison & Co. LLC. (1997)

- Expert witness for NL Industries, Inc. and Harold C. Simmons (Bartlit Beck Herman Palenchar & Scott) in Superior Court of New Jersey, Chancery Division, in connection with litigation about NL's 1991 stock repurchase and tender program (Plaintiff being Frank David Seinfeld). (1997 and 1998)

- Fact witness and expert witness in five subject areas for AmBase Corporation (Pryor, Cashman, Sherman & Flynn) in United States Bankruptcy Court, Southern District of New York, as creditor in connection with the Chapter 11 reorganization of Home Holdings Inc. (owner of Home Insurance Company). (1998)

- Expert witness for the United States Securities and Exchange Commission (enforcement division) regarding the matter of David Barr, Administrative Law Judge Hearing in Miami, Florida. (1998)

- Expert witness for counsel of beneficiaries (Rucci, Burnham, Carta & Edelberg, LLP), Guardian ad litem for Trusts Under the Will of E. Cotton Rawls, Greenwich Probate Court, District of Greenwich, CT., in connection with trustee fiduciary responsibilities. (1998)

- Expert witness for Quickturn Design Systems, Inc. (Wilson Sonsini Goodrich & Rosati, and Morris, Nichols, Arsht, & Tunnell) in reviewing adequacy opinion rendered by Hambrecht & Quist to the Board of Directors of Quickturn in connection with a hostile tender offer made by Mentor Graphics Corporation; also rendered an independent adequacy opinion; Delaware State Chancery Court. (1998)

- Fact and expert witness for AmBase Corp. (Pryor, Cashman, Sherman & Flynn) in AmBase v. Zurich SF Holdings, Inc. in Supreme Court of New York in connection with a breach of contract. (1999-2000)

- Expert witness for Ernst & Young (Wiggin & Dana) in Share America, Inc. and Share America LP v. Ernst & Young in connection with a failed initial public offering; State of Connecticut, Superior Court. (1998 - 2001)

- 8 -

- Expert witness for Octavian, Inc. (Levin & Associates) in Octavian, Inc. et al. vs. McDonald & Company Investments, Inc. et al. in connection with a failed financing transaction and breach of "best efforts" undertaking; Cuyahoga County Court of Common Pleas, Ohio. (1999-2000)

- Expert witness for the United States Securities and Exchange Commission (enforcement division) regarding the matter SEC v. Erdman; Southern District, Florida. (1999)

- Expert witness for defendants, Berlin et al. (Morris, James, Hitchens & Williams) in Emerald Partners v. Berlin, et al; Delaware State Chancery Court, in connection with a merger fairness opinion of Bear Stearns and the updating thereof. (1999- 2000)

- Expert witness for defendants, Arbor Drugs, Inc. et al. (Davis Polk & Wardwell) in Richard Nodel et al. v. Arbor Drugs, Inc. et al. in connection with reviewing a merger fairness opinion of Goldman Sachs; Circuit Court, Oakland County, Michigan. (1999 – 2000)

- Expert witness for defendants, Bally Entertainment, Hilton Hotels, Arthur Goldberg et al. (Cadwalader, Wickersham & Taft; and Latham & Watkins) in Linda Parnes v. Bally Entertainment Corp. et al in connection with reviewing aspects of the merger transaction and the fairness opinions of Goldman Sachs and Merrill Lynch; Delaware State Chancery Court. (2000)

- Expert witness for defendants Hambros PLC et al (Schulte Roth & Zabel) in Kevin D. Shea et al v. Hambros PLC et al in connection with reviewing valuation of the investment banking business and other matters; Supreme Court of the State of New York. (2001)

- Expert witness for defendants Del Monte Foods Company and Morgan Stanley & Co. Inc. (Cleary Gottlieb, and Shearman & Sterling) in PPI Enterprises (U.S.), Inc. versus the above in connection with the valuation of a preferred stock and proper disclosure during a corporate restructuring to a seller of that preferred stock security; United States District Court Southern District of New York. (2001)

- Expert witness for defendant Bruce Winston (Curtis, Mallet-Prevost) in Chanin Capital Partners versus Bruce Winston in connection with valuation issues and fee issues relating to the sale of Harry Winston, Inc.; American Arbitration Association, State of New York. (2001)

- Expert witness for plaintiff Prison Acquisition Company L.L.C. (The Blackstone Group, L.P.; Fortress Investment Group, LLC; and Bank of America Corporation) (Skadden Arps) in Prison Acquisition Company L.L.C. versus Prison Realty Trust, Inc., Corrections Corporation of America et al in connection with a fee dispute and breach of contract; United States District Court Southern District of New York. (2001)

- 9 -

- Expert witness for plaintiff The Statutory Creditors' Committee on behalf of the Estates of Sabratek Corporation et al. (The Bayard Firm and Weil, Gotshal & Manges) versus Ralin Medical, Inc. and versus LaSalle Bank N.A. in connection with valuation and solvency issues; United States Bankruptcy Court for the District of Delaware. (2001)

- Expert witness for defendants IKON Office Solutions, Inc. et al. (Harkins Cunningham) in Whetman versus the above in connection with the valuation and investment attractiveness of IKON; United States District Court for the Eastern District of Pennsylvania. (2001)

- Expert witness for defendant Mead Johnson & Co. (Skadden Arps) in PBM Products, Inc. versus Mead Johnson & Co. in connection with valuation, projections, and damages issues; United States District Court of Virginia, Richmond Division. (2001)

- Expert witness for certain defendants in a criminal securities fraud matter (Lankler Siffert & Wohl, Manatt, Phelps & Phillips) in United States v. Black, Gardell et al; United States District Court Southern District of New York. (2001 - 2002)

- Expert witness for individual plaintiff in severance agreement litigation (Skadden Arps) in Rizzo v. The MacManus Group, Inc., et al in connection with valuation and disclosure issues; United States District Court Southern District of New York. (2001 - 2002)

- Expert witness for defendants, Best Lock Corp., Best Universal Lock Co. and Frank E. Best, Inc. (Morris Nichols) in IN RE Best Lock Corporation Consolidated Shareholder Litigation in connection with valuation and fairness issues: Delaware State Chancery Court. (2002)

## IV) Corporate Executive Positions

- From October 1993 through February 1995, served as President and CEO of Gulf USA Corporation, as it went through a reorganization process, and as a Director of Gulf Resources Pacific in New Zealand, a 90% owned subsidiary and one of the largest commercial real estate companies in New Zealand.

- Vice Chairman of the Board and Director for Business Talk Radio Inc. (2001 - )

- 10 -

## Lawyers/Law Firms That William H. Purcell Has Worked Closely With

1)  Prof. Laurence H. Tribe, Harvard Law School

2)  Cadwalader, Wickersham & Taft, NYC (Dennis Block, Jonathan Polkes)

3)  Cleary, Gottlieb, Steen & Hamilton, NYC (Howard Zelbo)

4)  Curtis, Mallet-Prevost, NYC (Jacques Semmelman)

5)  Davis Polk & Wardwell, NYC and DC (M. Carr Ferguson, John Corry, Laura Barzilai, tax NYC, and Dennis Glazer, NYC, & Tom Haroldson, DC)

6)  Friedman, Wang & Bleiberg, NYC (Peter Wang)

7)  Lankler Siffert & Wohl, NYC (Frank Wohl, Laura Stasior)

8)  Paul Weiss, Rifkind, Wharton & Garrison, NYC (Marty Flumenbaum)

9)  Pryor, Cashman, Sherman & Flynn, NYC (Peter Wolfson, Art Ruegger, Steve Rubinowitz)

10)  Satterlee Stephens Burke & Burke, NYC (Bob Hubbard)

11)  Schulte Roth & Zabel, NYC (Alan Glickman, Marc Elovitz, Steven Perlstein)

12)  Shearman & Sterling, NYC (Ken Kramer, Simon Malko)

13)  Skadden, Arps, Slate, Meagher & Flom, NYC (Edward Yodowitz, Jerome Hirsch and Steven Kolleeny; Kayalyn Marafioti; Connie Huttner and Ken Plevan; Christopher Malloy, Thomas Schwarz and Kelly Park)

14)  Weil, Gotshal & Manges, NYC (Miranda Schiller, Johnson NG)

15)  Arnold & Porter, DC (Mel Garbow, Ed Sisson)

16)  Cooper, Carvin & Rosenthal; Cooper & Kirk, DC (Chuck Cooper, Mike Kirk, Hamish Hume)

17)  Gibson, Dunn & Crutcher, DC (John Millian, Paul Blankenstein)

18)   Latham & Watkins, DC (Curtis Lu, Mary Britton)

19)   Manatt, Phelps & Phillips, DC (Abbe Lowell, Steve Reich, Julie Campbell)

20)   Scribner, Hall & Thompson, DC (Peter Winslow, Greg Oyler)

21)   Division of Enforcement, United States Securities and Exchange Commission, Boston Office (David Marder)

22)   Gadsby & Hannah, Boston (Bill Zucker)

23)   Silverglate & Good, Boston (Harvey Silverglate)

24)   Bader & Bader, White Plains, NY (I. Walton Bader)

25)   Collier, Halpern, Newberg, Nolletti & Bock, White Plains, NY (Phil Halpern, Scott Salant)

26)   The Bayard Firm, Wilmington, DE (Kurt Heyman, Ted Johnson, Vernon Proctor, Patricia Enerio)

27)   Morris, James, Hitchens & Williams, Wilmington, DE (Clark Collins, Lewis Lazarus, Joe Schoell)

28)   Morris, Nichols, Arsht & Tunnell, Wilmington, DC (Gil Sparks, Alan Stone)

29)   Harkins Cunningham, Philadelphia, PA (Steven Reed, Eleanor Morris Illoway, Barbara Denys)

30)   Sills Cummis Zuckerman Radin Tischman Epstein & Gross) NJ (Clive Cummis, Steve Gross, Jack Wenik)

31)   Wilentz, Goldman & Spitzer, Woodbridge, NJ (Fred Becker)

32)   Rucci, Burnham, Carta & Edelberg, Darien, CT (Mark Carta, Paul Burnham)

33)   Wiggin & Dana, New Haven, CT (Shaun Sullivan, Phyllis Pari, Kevin Dean)

34)   Edwards & Angell, Providence, RI (Bernie Buonanno)

35)   Levin & Associates, Cleveland, Ohio (Joel Levin)

36)   Bartlit Beck Herman Palenchar & Scott, Denver, CO (Don Scott, Les Houtz)

A 241

37) Wilson Sonsoni Goodrich & Rosati, Palo Alto, CA (Jamie DiBoise)

A 242

Exhibit 2
Materials Reviewed

Legal Documents
        Second Amended Complaint.

Filings
        Credit and Guarantee Agreement dated September 17, 1992 for Marvel Entertainment Group, Inc. Fleer Corp.
        Indenture dated as of October 1, 1993 for Marvel (Parent) Holdings Inc.
        Prospectus dated October 13, 1993 for Marvel (Parent) Holdings.
        Indenture dated as of April 15, 1993 for Marvel Holdings.
        Offering Memorandum dated April 16, 1993 for Marvel Holdings.
        Prospectus dated July 9, 1993 for Marvel Holdings.
        Offering Memorandum dated February 8, 1994 for Marvel III Holdings.
        Indenture dated as of February 15, 1994 for Marvel III Holdings.
        Prospectus dated May 11, 1994 for Marvel III Holdings.
        First Amendment and Consent Number 1 to the Credit Agreement dated as of August 29, 1995 for Toy Biz, Inc.
        Term Loan and Guarantee Agreement dated August 30, 1994 for Marvel Comics Italia, S.R.L. Marvel Entertainment
        Group, Inc.
        Amended and Restated Credit and Guarantee Agreement dated August 30, 1994 for Marvel Entertainment Group, Inc.
        Fleer Corp.
        First Amendment to the Amended and Restated Credit and Guarantee Agreement dated November 22, 1994 for Marvel
        Entertainment Group, Inc. Fleer Corp.
        Credit Agreement dated February 22, 1995 for Toy Biz, Inc.
        Form S-3 dated March 14, 1995 for Marvel Entertainment Group, Inc.
        Credit and Guarantee Agreement dated April 24, 1995 for Marvel Entertainment Group, Inc. Fleer Corp.
        Form S-3 dated September 27, 1995 for Marvel Entertainment Group, Inc.
        Amendment No. 1 to Form S-3 dated September 27, 1995 for Marvel Entertainment Group, Inc.
        Consent Number 1 to each the Amended and Restated Credit and Guarantee Agreement, the Credit and Guarantee
        Agreement and the Term Loan and Guarantee Agreement dated as of February 9, 1996 for Marvel Entertainment Group,
        Inc. Fleer Corp.
        Third Amendment to the Amended and Restated Credit and Guarantee Agreement dated as of March 1, 1996 for Marvel
        Entertainment Group, Inc. Fleer Corp.
        Consent Number 2 and First Amendment to the Credit and Guarantee Agreement dated as of March 1, 1996 for Marvel
        Entertainment Group, Inc. Fleer Corp.
        Consent Number 3 to the Credit and Guarantee Agreement dated as of June 30, 1996 for Marvel Entertainment Group, Inc.
        Fleer Corp.
        Consent Number 4 and Second Ammendment to the Amended and Restated Credit and Guarantee Agreement dated as of
        June 30, 1996 for Marvel Entertainment Group, Inc. Fleer Corp.
        Consent to the Participation Agreement dated as of September 24, 1996 for Marvel Comics Italia, S.R.L. Marvel
        Entertainment Group, Inc.
        Waiver Number 1 and Fifth Amendment to the Amended and Restated Credit and Guarantee Agreement dated as of
        November 25, 1996 for Marvel Entertainment Group, Inc. Fleer Corp.
        Consent Number 4 and Second Ammendment to the Credit and Guarantee Agreement dated as of November 25, 1996 for
        Marvel Entertainment Group, Inc. Fleer Corp.
        Marvel Entertainment Inc. $200 Million Senior Note Offering Presentation to Rating Agencies
        MEG, Inc. Summary of Indicitave Terms Regarding LYONs, with fax page dated 3/95
        Prospectus dated November 24, 1993 for Fruit of the Loom, Inc.
        Prospectus dated November 22, 1994 for Huntsman Polymers Corp.
        Prospectus dated December 8, 1995 for Ikon Office Solutions, Inc.
        Prospectus Supplement to Prospectus dated November 21, 1995 for ITT Industries, Inc.
        Prospectus dated October 14, 1993 for NL Industries, Inc.

Case 1:97-cv-00586-SLR Document 469-5 15 Filed 06/01/2006 Page 37 of 64

### Exhibit 2
### Materials Reviewed

Prospectus dated July 29, 1991 for Consolidated Cigar Corp.
Prospectus dated October 8, 1993 for Coleman Holdings, Inc.
Form 10-K for Fiscal Year ended 12/31/95 for Marvel Entertainment Group, Inc.
Form 10-K for Fiscal Year ended 12/31/94 for Marvel Entertainment Group, Inc.
Form 10-K for Fiscal Year ended 12/31/93 for Marvel Entertainment Group, Inc.
Form 10-K for Fiscal Year ended 12/31/92 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ended March 31, 1992 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended June 30, 1992 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended September 30, 1992 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ended March 31, 1993 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended June 30, 1993 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended September 30, 1993 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ended March 31, 1994 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended June 30, 1994 for Marvel Entertainment Group, Inc.
From 10-Q/A1 for the Quarterly Period Ended June 30, 1994 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended September 30, 1994 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ended March 31, 1995 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended June 30, 1995 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended September 30, 1995 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ended March 31, 1996 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended June 30, 1996 for Marvel Entertainment Group, Inc.
From 10-Q for the Quarterly Period Ended September 30, 1996 for Marvel Entertainment Group, Inc.
1992 Annual Report for Marvel Entertainment Group, Inc.
1994 Annual Report for Marvel Entertainment Group, Inc.
1995 Annual Report for Marvel Entertainment Group, Inc.

### Analyst Reports

Falco, P.A., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 10/15/92.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 5/27/93.
Fine, L.R., et al. Marvel Entertainment-Company Report. Merrill Lynch Capital Markets, 2/3/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 2/14/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 4/22/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 6/21/94.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 12/21/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 2/14/95.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 4/18/95.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 5/9/95.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 8/15/95.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 11/15/95.
Fine, L.R., et al. Marvel Entertainment-Company Report. Merrill Lynch Capital Markets, 3/14/96.
Fine, L.R., et al. Marvel Entertainment-Company Report. Merrill Lynch Capital Markets, 5/9/96.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 5/13/96.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 5/30/96.
Fine, L.R., et al. Marvel Entertainment-Company Report. Merrill Lynch Capital Markets, 8/15/96.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 8/15/96.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 8/30/96.
Kastenbaum, A. Marvel Entertainment Group, Inc. MJ Whitman, Inc. 11/11/96.
Moody's Investor Service. Marvel Entertainment Group - Company Report. Mergent, Inc. 5/1/97.

## Exhibit 2
## Materials Reviewed

Bloomberg Reports

Credit Rating Revisions-Marvel Entertainment
Credit Rating Revisions-Marvel Holdings
Credit Rating Revisions-Marvel III Holdings
Credit Rating Revisions-Marvel Parent Holdings
Corporate Debt Report - Issuances in the Industrial, Utility and Gas Transmission Industries Rated BBB or Lower From 1993 to 1995.
S&P CreditWire 7/27/93 - "Hldgs Sr. & Marvel Hldgs Sr. Rated 'B' By S&P."
Moody's Investor Service 8/3/93 - "Marvel Holdings Inc. Senior Secured Notes Rated 'B3' By Moody's."
Moody's Investor Service 6/7/94 - "Marvel III Holdings Assigned Caa To GTD Senior SEC Note."
S&P CreditWire 7/10/95 - "Marvel III Holdings & Subs Sr. Secd Deby to B- By S&P."
Moody's Investor Service 10/10/96 - "Marvel Entertainment Cut By Moody's; Sr. Shelf To ' (P)B3."
S&P CreditWire 10/15/96 - "Marvel Entertainment Shelf Rtg Cut To B/CCC+ By S&P."
S&P CreditWire 11/20/96 - "S&P Cuts Marvel Rtgs; Revln, Colmn, Con Cig Outlk Rev."
S&P CreditWire 11/20/96 - "S&P Cuts Marvel Rtgs; Revln, Colmn, Con Cig Outlk Rev -2-."
Moody's Investor Service 11/25/96 - "Marvel Holdings Ratings Cut By Moody's; Sr. SEC To 'C'."
Bloomberg 3/13/96 - "Marvel Entertainments Debt Ratings May Face Downgrade by S&P."
S&P CreditWire 12/27/96 - "Marvel Hldg Cos' Issue Rtgs Cut To 'D'; Off S&P Watch."
Bloomberg 2/17/99 - "Junk Bonds: Formica, Marvel, World Color Sell; Calendar Builds."
Bloomberg 2/18/99 - "Junk Bonds: Host Marriott, Triarc Sell, Familiar Names Sought."
Weekly Closing Equity Prices, MRVGQ, Bloomberg.

Other

10 Year U.S. T-Bill Weekly Interest Rate, Federal Reserve H-15.
http://www.federalreserve.gov/releases/H15/data/wf/tcm10y.txt.
Jaffe, Thomas. "Ron Perelman's Nonlinear Math." Forbes, 2/14/94. (retrieved from www.findarticles.com 2/22/02).
"Marvel Experiences Phenomenal Growth; Marvel Entertainment Group Inc." Chain Drug Review, 6/20/94. (retrieved from www.findarticles.com 2/22/02).
"Marvel Sweeping Into High Yield Market With $200 Mil 144A." Private Placement Reporter, 7/18/94. (retrieved from www.findarticles.com 2/22/02).
Spiro, Leah Nathans and Ronald Grover. "Ron Perelman, The Man Who Collects Companies." Business Week, 9/11/95. (retrieved from www.findarticles.com 2/22/02).
Levin, Gary and Martin Peers. "Perelman Takes Marvel To Bankruptcy Court. Marvel Files For Bankruptcy." Daily Variety, 12/30/96. (retrieved from www.findarticles.com 2/22/02).

Online Resources

2002 S&P Corporate Ratings Criteria Book,
http://www.standardandpoors.com/ResourceCenter/RatingsCriteria/CorporateFinance/2002CorporateRatingsCriteria.html.

"The Evolving Meaning of Moody's Bond Ratings."
http://www.moodys.com/moodys/cust/staticcontent/Evolving%20Meaning%20of%20Bond%20Ratings.pdf?section=rdef.
Moody's Credit Rating Definitions.
http://www.moodys.com/moodys/cust/staticcontent/2000200000265736.asp?section=rdef.
"Moody's Approach Toward the Analysis of Indenture Covenants."
http://www.moodys.com/moodys/cust/research/venus/Publication/Rating%20Methodology/noncategorized_number/49130
.pdf.

A 245

Exhibit 3A

### Ownership of the Issuer

The following chart illustrates a simplified ownership structure of the Issuer and its subsidiaries.



Exhibit 3B



Ownership of the Issuer

The following chart sets forth in simplified form the ownership structure of the Issuer and its subsidiaries.

7

A 247

search by **Issuer Name**   user name
for                          password

Select a Business Line

Advanced SEARCH

home    about moody's    products & services    find an analyst    rate it moody    contact    site map    help

## ABOUT MOODY'S

**Rating Definitions**

An Introduction
Global Locator
Understanding Risk
Rating Approach
Rating Methodologies
Rating Definitions
Risk Management
Moody's History
Partnerships/Alliances
Press Releases
Careers
Copyright Information
Shareholder Relations

### Debt Ratings

**Aaa**

Bonds and preferred stock which are rated Aaa are judged to be of the best quality. They carry the smallest degree of investment risk and are generally referred to as "gilt edged." Interest payments are protected by a large or by an exceptionally stable margin and principal is secure. While the various protective elements are likely to change, such changes as can be visualized are most unlikely to impair the fundamentally strong position of such issues.

**Aa**

Bonds and preferred stock which are rated Aa are judged to be of high quality by all standards. Together with the Aaa group they comprise what are generally known as high-grade bonds. They are rated lower than the best bonds because margins of protection may not be as large as in Aaa securities or fluctuation of protective elements may be of greater amplitude or there may be other elements present which make the long-term risk appear somewhat larger than the Aaa securities.

**A**

Bonds and preferred stock which are rated A possess many favorable investment attributes and are to be considered as upper-medium-grade obligations. Factors giving security to principal and interest are considered adequate, but elements may be present which suggest a susceptibility to impairment some time in the future.

**Baa**

**Exhibit 4**

Bonds and preferred stock which are rated Baa are considered as medium-grade obligations (i.e., they are neither highly protected nor poorly secured). Interest payments and principal security appear adequate for the present but certain protective elements may be lacking or may be characteristically unreliable over any great length of time. Such bonds lack outstanding investment characteristics and in fact have speculative characteristics as well.

**Ba**

Bonds and preferred stock which are rated Ba are judged to have speculative elements; their future cannot be considered as well-assured. Often the protection of interest and principal payments may be very moderate, and thereby not well safeguarded during both good and bad times over the future. Uncertainty of position characterizes bonds in this class.

**B**

Bonds and preferred stock which are rated B generally lack characteristics of the desirable investment. Assurance of interest and principal payments or of maintenance of other terms of the contract over any long period of time may be small.

**Caa**

Bonds and preferred stock which are rated Caa are of poor standing. Such issues may be in default or there may be present elements of danger with respect to principal or interest.

**Ca**

Bonds and preferred stock which are rated Ca represent obligations which are speculative in a high degree. Such issues are often in default or have other marked shortcomings.

**C**

Bonds and preferred stock which are rated C are the lowest rated class of bonds, and issues so rated can be regarded as having extremely poor

prospects of ever attaining any real investment standing.

Moody's assigns ratings to individual debt securities issued from medium-term note (MTN) programs, in addition to indicating ratings to MTN programs themselves. Notes issued under MTN programs with such indicated ratings are rated at issuance at the rating applicable to all pari passu notes issued under the same program, at the program's relevant indicated rating, provided such notes do not exhibit any of the characteristics listed below. For notes with any of the following characteristics, the rating of the individual note may differ from the indicated rating of the program:

1) Notes containing features which link the cash flow and/or market value to the credit performance of any third party or parties.

2) Notes allowing for negative coupons, or negative principal.

3) Notes containing any provision which could obligate the investor to make any additional payments.

Market participants must determine whether any particular note is rated, and if so, at what rating level. Moody's encourages market participants to contact Moody's Ratings Desks directly if they have questions regarding ratings for specific notes issued under a medium-term note program.

Note: Moody's applies numerical modifiers 1, 2, and 3 in each generic rating classification from Aa through Caa. The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the lower end of that generic rating category.

Back to Top



**Moody's Investors Service**

The leading provider of independent credit ratings, research and financial information to the capital markets.

©Copyright 2002 Moody's Investors Service   Privacy & Security   Proprietary Rights

1 MAR 2002, 12:11 Eastern Time

REBUTTAL REPORT OF WILLIAM H. PURCELL

TRUSTEES OF THE MAFCO LITIGATION TRUST V. RONALD PERELMAN, ET AL
CIVIL ACTION NO. 97-586 (RRM)
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

March 29, 2002

I, William H. Purcell, hereby submit this rebuttal expert report in the above-referenced case. I reserve the right to amend and/or supplement this report based on any additional information that may become available.

## INTRODUCTION

1. I submitted an expert report dated March 15, 2002 in the above-referenced case (the "Purcell Expert Report").

2. My qualifications as an investment banker and as an expert in corporate debt financing are set forth in the Purcell Expert Report, pages 1-2 and Exhibit 1 thereof.

3. Additional materials reviewed for this Report, as well as the materials reviewed for the Purcell Expert Report, are set forth in Exhibit 1 herein.

## SUMMARY OF OPINIONS

4. I have been asked to review the report of Robert W. Holthausen dated as of March 15, 2002 (the "Holthausen Report") and to set forth my observations, comments and opinions regarding such report.

5. Professor Holthausen expresses the opinion that Marvel Entertainment Group, Inc. ("Marvel") was not harmed economically by the limitations in Section 4.04 of the Holding Company Indentures with respect to Marvel's ability to incur additional indebtedness. Professor Holthausen reaches his conclusion by comparing the coverage ratios set forth in the Holding Company Notes to those set forth in Marvel's bank Credit Agreements. He concludes that the Marvel Credit Agreements required interest coverage ratios that were stricter than the corresponding ratios in the Holding Company Notes, at least until sometime in 1996.[1]

---

[1] Holthausen Report, pages 9-10.

A 252

6.  In my opinion, Professor Holthausen's opinion is based on a flawed premise. Professor Holthausen implicitly assumes that Marvel's capital structure would have been the same even in the absence of Section 4.04 (and other restrictions in the Indentures relating to Marvel). However, it is my opinion that the economic harm to Marvel caused by the restrictions in the Indentures cannot be assessed without considering the effect of those restrictive covenants on Marvel's capital structure, and Marvel's likely capital structure in the absence of those restrictions.

7.  Based upon my experience as an investment banker, in the absence of the Holding Company debt made possible by Section 4.04 and other restrictions relating to Marvel, it would have been extremely unlikely that Marvel would have financed its aggressive acquisition program almost entirely with commercial bank debt. Rather, Marvel probably would have financed its acquisition program with a combination of long-term debt and equity, which would have afforded significant advantages over bank debt. Thus, there is no valid basis for Professor Holthausen's attempt to measure whether Marvel was injured by Section 4.04 by comparing its terms to coverage ratios in Credit Agreements which are not indicative or representative of Marvel's likely financing options or flexibility in the absence of Section 4.04. Correspondingly, I believe that Professor Holthausen's analysis and conclusion rest on a highly improbable assumption, and are therefore unsound.

A 253

**PROFESSOR HOLTHAUSEN'S REPORT DOES NOT TAKE INTO ACCOUNT MARVEL'S LIKELY CAPITAL STRUCTURE IN THE ABSENCE OF THE RESTRICTIONS IN THE HOLDING COMPANY INDENTURES**

8.  In purporting to assess the effect of Section 4.04, Professor Holthausen does not undertake any analysis of whether Section 4.04 (and any other restrictions relating to Marvel) affected Marvel's capital structure, or what Marvel's capital structure would have been in the absence of such restrictive covenants. Instead, he simply compares the coverage ratios in Section 4.04 of the Holding Company Indentures to the coverage ratios in Marvel's bank credit agreements. The coverage ratios in Marvel's bank credit agreements might be relevant only if one assumed that Marvel's capital structure would have been the same -- and, therefore, the very same Credit Agreements would have been indicative of Marvel's financing flexibility -- even in the absence of the restrictive covenants in the Holding Company Indentures.

9.  In my opinion, in the absence of Section 4.04 and other restrictions relating to Marvel, Marvel's financing program and resulting capital structure would have been very different. As set forth in the Purcell Expert Report, I concluded that the three Holding Company Note Issues could not have been sold to investors without the restrictions relating to Marvel. In the absence of the Holding Company debt, it would have been extremely unlikely that Marvel would have financed its aggressive acquisition program almost entirely with commercial bank debt.

10. In considering Marvel's likely capital structure in the absence of the restrictions in the Holding Company indentures, several basic principles of corporate finance and financial planning are relevant. First, it is best to finance long-term assets with long-term debt or equity. Second, it is best to stretch out one's debt maturity schedule over as long a period of time as possible so cash flow can be managed with minimum refinancing risks. Finally, one should avoid over-reliance on short-term commercial paper or commercial

3

A 254

bank debt, primarily because: *i)* a certain amount of bank financing availability should always be kept open as a safety valve to cover situations for which cash is needed very quickly (e.g., for an unexpected acquisition opportunity, an unexpected operating problem, etc.) and *ii)* banks can become fading friends very quickly when and if something goes wrong at the company. Accordingly, the most widely recommended corporate finance advice is to pay off bank debt after it has reached a certain level by funding capital needs with long-term financing when capital markets are favorable.[2] All of the above corporate finance principles apply even more so to companies which are rapidly growing or have lower quality debt ratings.

<u>Marvel's Financing Options During 1992 – 1994</u>

11. Between September 1992 and May 1995, Marvel completed numerous significant acquisitions with an aggregate cash cost of approximately $600 million.[3] These acquisitions were financed entirely with commercial bank debt. By year-end 1994, Marvel's total debt was about $384 million and, by year-end 1995, was about $586 million.

12. In my opinion, without the Holding Company debt, which was only made possible by the restrictive covenants relating to Marvel, Marvel would have financed these acquisitions with a combination of long-term debt and equity. Such financing would have been much more favorable for Marvel than the maintenance of a large amount of bank debt. Indeed,

---

[2] Reference is made to the following texts: <u>The Essays of Warren Buffet:  Lessons for Corporate America</u> (First Revised Edition, 2001, Lawrence A. Cunningham, Cardozo Law Review); <u>Investment Valuation</u>, by Aswath Damodaran (2002, John Wiley & Sons, Inc.); <u>Applied Corporate Finance</u> by Aswath Damodaran (1999, John Wiley & Sons, Inc.); and <u>Corporate Finance, a Valuation Approach</u> by Simon Benninga and Oded Sarig (1997, McGraw Hill).

[3] The largest of these were Fleer in September 1992 for about $256 million, Panini in September 1994 for about $158 million, and SkyBox in April 1995 for about $150 million.

4                                                      A 255

it appears that Marvel's own management considered alternatives to bank financing throughout this period.[4]

13. Notwithstanding the consideration that was given to financing alternatives, Marvel relied exclusively on bank debt. Marvel did not issue any long-term debt or equity after 1992. The only Marvel-related public securities issued during this period were the Holding Company Notes, in April 1993, October 1993, and February 1994.[5]

Long-Term Debt Financing for Marvel

14. During the last quarter of 1992, 1993 and the first half of 1994, Marvel's financial ratios, from the perspective of the rating agencies, were all very strong.[6] These financial ratios, when calculated for Marvel, all fell within the averages of A-rated debt issues and BBB-rated debt issues. (See Exhibits 2 and 3.) It is my opinion that Marvel could have received an investment-grade (i.e., BBB or Baa) rating for a long-term debt financing in 1993 and the first half of 1994, and that such a financing would have been well received in the market.

---

[4] In the Marvel 1992 Annual Report, management talked about repaying bank debt from the sale of securities; in July 1994, management made a formal presentation to the rating agencies about a possible issue of $200 million of 10-year notes; at the end of July 1994, management sent a letter to Marvel's bank lending group stating that up to $200 million of unsecured Notes would be sold publicly within 6 months to pay down existing bank debt; and in March 1995, Marvel filed a shelf registration with the Securities and Exchange Commission to issue up to $400 million in public debt.

[5] These three issues resulted in aggregate net proceeds for the Holding Companies of approximately $550 million. No proceeds were received by Marvel, either directly or indirectly, from any of the financings.

[6] The important financial ratios from a ratings point of view are: *i)* earnings before interest and taxes ("EBIT") divided by interest expense; *ii)* earnings before interest, taxes, depreciation and amortization ("EBITDA") divided by interest expense; *iii)* net income plus depreciation and amortization ("Funds from Operations") divided by total debt; and *iv)* net income plus depreciation and amortization, less working capital requirements and capital expenditures ("Free Operating Cash Flow") divided by total debt. (Corporate Ratings Criteria booklet issued by Standard & Poor's.)

A 256

15. Moreover, the terms available in the public market for investment-grade debt during 1993 and 1994 were very favorable,[7] and such an issue would have benefited Marvel greatly from both a liquidity and a restrictive covenant point of view. In my opinion, Marvel would likely have sold at least $200 million of public debt with interest payable semi-annually and with a maturity of at least 10 years, that would have required no mandatory sinking fund payments, that would have had no restrictions on the total amount of debt that could be issued in the future, and that would have had no EBITDA or other financial ratio maintenance terms. Generally, the terms of such public debt financing would have afforded Marvel substantially more flexibility than the terms in Marvel's bank Credit Agreements.

16. Despite the otherwise favorable environment, Marvel did not issue any long-term public debt. In my opinion, the Holding Company Notes were a significant impediment to Marvel's ability to issue its own long-term public debt in at least two ways. First, the priority given to the three Holding Company Note issues -- which took place between April 1993 and February 1994 (with an Exchange Note Issue for the last Notes not completed until June 1994) -- would have diminished the market's appetite for an issue by Marvel itself. Second, the rating agencies have a negative view of holding companies that leverage themselves by issuing their own debt, and that view has negative implications for the underlying operating companies. For example, Standard & Poor's has the view that a strong operating subsidiary owned by a weak (i.e., leveraged) holding company parent generally could not receive a rating classification higher than that of the

---

[7] Interest rates were declining, e.g. the yield on 10-year Treasury Notes declined from 6.9% at the beginning of November 1992 to about 6.7% by year-end 1992, and continued to decline to under 6.0% by March 1993. By October 1993, the yield on Treasury Notes had declined to about 5.25% and by year-end 1993 was about 5.75%. In addition, BBB/Baa rated debt securities were being sold in the public market with maturities from 10 to 30 years, with no covenants relating to total debt allowable or to the maintenance of certain financial ratios.

A 257

parent.[8] Thus, the existence of a large amount of Holding Company debt, rated well below investment-grade at single-B and with covenants relating to Marvel, significantly impeded Marvel's ability to enter the long-term debt capital market at all, or at the least undermined its ability to make a debt offering with the favorable terms that likely would have been available in the absence of such Holding Company debt.

Equity Offering by Marvel

17. It is my opinion that, in the absence of the restrictive covenants and the Holding Company debt made possible thereby, the issuance of common stock would have been another attractive financing alternative for Marvel during the 1993 - 1994 period that would have been well-received by the markets. The cost of money to Marvel would have been very low, there would have been little or no dilution in reported earnings per share, Marvel could have retired bank debt which would thus be available for future acquisitions and contingencies, and its stated stockholders' equity per share would have increased.

18. However, the restrictions in the Holding Company indentures relating to Marvel again impeded Marvel's ability to rely upon equity financing. For example, instead of accumulating total bank debt of almost $600 million by the end of 1996, Marvel could have sold, in one or more tranches, about 22 million shares in order to raise approximately $585 million.[9] However, the ownership dilution to Mr. Perelman (and other shareholders) would have reached 30.5%, resulting in the Holding Companies

---

[8] Corporate Ratings Criteria, p.98.
[9] In 1993, market conditions for an equity offering were favorable. As of May 27, 1993, Marvel's common stock traded at $28 per share of the New York Stock Exchange, which price represented a price earnings ratio of 42 times actual 1992 earnings per share and 26 times estimated 1993 earnings per share (Merrill Lynch research report dated May 27, 1993). Most analysts were issuing "buy" recommendations for Marvel during 1993 and the first half of 1994, and Marvel's stock price continued to increase during most of this period.

7

A 258

owning less than 50% of Marvel's voting stock, as required by Section 4.09 (i.e., 80%

minus 30.5% being 49.5 %).

19. In my opinion, and based on my experience as an investment banker, the target capital

structure for a company such as Marvel would have been no more than 30% debt and at

least 70% equity. Instead, with the existence of the Holding Company debt, Marvel's

capitalization structure as of the last half of 1996 was almost the exact opposite, i.e., 77%

debt and 23% equity.[10]  In my opinion, Marvel could have achieved the above targeted

capital structure by selling $400 million of new common equity and about $230 million

of long-term debt. Thus, as of June 1996, Marvel's $820 million in total capitalization

would have been comprised of about $590 million of shareholders' equity ($190 million

of existing equity plus $400 million of new equity financing) and about $230 million of

long-term debt. Such a capital structure would have afforded Marvel greater flexibility

and would likely have enabled Marvel to avoid the liquidity crisis and bankruptcy filing

in late 1996. Indeed, any capital structure with substantial equity and long-term debt,

rather than Marvel's actual exclusive reliance on bank debt, would likely have provided

these benefits to Marvel.

## CONCLUSION

20. Professor Holthausen's comparison of coverage ratios in the Holding Company

Indentures to the coverage ratios in the Marvel Credit Agreements is not, in my view, a

valid measure of whether Section 4.04 caused economic harm to Marvel. In order to

assess the effect of Section 4.04 on Marvel, one would have to consider Marvel's likely

financing flexibility and capital structure without Section 4.04, and compare that to

Marvel's actual situation. Professor Holthausen fails to account for the possibility that,

---

[10] In fact, Marvel's debt as a percentage of total capitalization was 74% at the end of 1992 and never fell below 61% throughout the 1992-1996 period.

A 259

but for Section 4.04 and the other restrictions in the Holding Company Indentures,

Marvel's financing flexibility and capital structure would have been different.

21. In my view, it is highly unlikely that, in the absence of Section 4.04, Marvel would have

had the same capital structure and financing flexibility.  For the reasons explained in the

Purcell Expert Report, the three Holding Company Note Issues could not have been sold

to investors without the restrictions relating to Marvel such as Sections 4.04 and 4.09.  In

the absence of the Holding Company debt, it is my opinion that Marvel would have

financed its acquisitions differently and more soundly.  Because Marvel clearly would

have been in a better position without Section 4.04, I disagree with Professor

Holthausen's conclusion that Section 4.04 did not cause economic harm to Marvel.  I

believe that the restrictions in the Indentures, including Sections 4.04 and 4.09, did cause

economic harm to Marvel.


/s/ William H. Purcell
WILLIAM H. PURCELL

A 260

**Exhibit 1**
**Materials Reviewed**

Expert Report of Robert W. Holthausen, March 15, 2002.
A000724-755
DEF 004588-4593
DEF 17558-17562
KZ 001337-1338

<u>Filings</u>

Credit and Guarantee Agreement dated September 17, 1992 for Marvel Entertainment Group, Inc., Fleer Corp.

Indenture dated as of October 1, 1993 for Marvel (Parent) Holdings Inc.

Prospectus dated October 13, 1993 for Marvel (Parent) Holdings.

Indenture dated as of April 15, 1993 for Marvel Holdings.

Offering Memorandum dated April 16, 1993 for Marvel Holdings.

Prospectus dated July 9, 1993 for Marvel Holdings.

Offering Memorandum dated February 8, 1994 for Marvel III Holdings.

Indenture dated as of February 15, 1994 for Marvel III Holdings.

Prospectus dated May 11, 1994 for Marvel III Holdings.

First Amendment and Consent Number 1 to the Credit Agreement dated as of August 29, 1995 for Toy Biz, Inc.

Term Loan and Guarantee Agreement dated August 30, 1994 for Marvel Comics Italia, S.R.L. Marvel Entertainment Group, Inc.

Amended and Restated Credit and Guarantee Agreement dated August 30, 1994 for Marvel Entertainment Group, Inc., Fleer Corp.

First Amendment to the Amended and Restated Credit and Guarantee Agreement dated November 22, 1994 for Marvel Entertainment Group, Inc., Fleer Corp.

Credit Agreement dated February 22, 1995 for Toy Biz, Inc.

Form S-3 dated March 14, 1995 for Marvel Entertainment Group, Inc.

Credit and Guarantee Agreement dated April 24, 1995 for Marvel Entertainment Group, Inc., Fleer Corp.

Form S-3 dated September 27, 1995 for Marvel Entertainment Group, Inc.

Amendment No. 1 to Form S-3 dated September 27, 1995 for Marvel Entertainment Group, Inc.

Consent Number 1 to each the Amended and Restated Credit and Guarantee Agreement, the Credit and Guarantee Agreement and the Term Loan and Guarantee Agreement dated as of February 9, 1996 for Marvel Entertainment Group, Inc., Fleer Corp.

Third Amendment to the Amended and Restated Credit and Guarantee Agreement dated as of March 1, 1996 for Marvel Entertainment Group, Inc., Fleer Corp.

Consent Number 2 and First Amendment to the Credit and Guarantee Agreement dated as of March 1, 1996 for Marvel Entertainment Group, Inc., Fleer Corp.

Consent Number 3 to the Credit and Guarantee Agreement dated as of June 30, 1996 for Marvel Entertainment Group, Inc., Fleer Corp.

Consent Number 4 and Second Amendment to the Amended and Restated Credit and Guarantee Agreement dated as of June 30, 1996 for Marvel Entertainment Group, Inc., Fleer Corp.

Consent to the Participation Agreement dated as of September 24, 1996 for Marvel Comics Italia, I.E.. Marvel Entertainment Group, Inc.

Waiver Number 1 and Fifth Amendment to the Amended and Restated Credit and Guarantee Agreement dated as of November 25, 1996 for Marvel Entertainment Group, Inc., Fleer Corp.

Consent Number 4 and Second Amendment to the Credit and Guarantee Agreement dated as of November 25, 1996 for Marvel Entertainment Group, Inc., Fleer Corp.

Marvel Entertainment Inc. $200 Million Senior Note Offering Presentation to Rating Agencies.

MEG, Inc. Summary of Indicative Terms Regarding LYONs, with fax page dated 3/95.

**Exhibit 1**
**Materials Reviewed**

Prospectus dated November 24, 1993 for Fruit of the Loom, Inc.
Prospectus dated November 22, 1994 for Huntsman Polymers Corp.
Prospectus dated December 8, 1995 for Ikon Office Solutions, Inc.
Prospectus Supplement to Prospectus dated November 21, 1995 for ITT Industries, Inc.
Prospectus dated October 14, 1993 for NL Industries, Inc.
Prospectus dated July 29, 1991 for Consolidated Cigar Corp.
Prospectus dated October 8, 1993 for Coleman Holdings, Inc.
Form 10-K for Fiscal Year ending 12/31/95 for Marvel Entertainment Group, Inc.
Form 10-K for Fiscal Year ending 12/31/94 for Marvel Entertainment Group, Inc.
Form 10-K for Fiscal Year ending 12/31/93 for Marvel Entertainment Group, Inc.
Form 10-K for Fiscal Year ending 12/31/92 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending March 31, 1992 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending June 30, 1992 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending September 30, 1992 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending March 31, 1993 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending June 30, 1993 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending September 30, 1993 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending March 31, 1994 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending June 30, 1994 for Marvel Entertainment Group, Inc.
Form 10-Q/A1 for the Quarterly Period Ending June 30, 1994 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending September 30, 1994 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending March 31, 1995 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending June 30, 1995 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending September 30, 1995 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending March 31, 1996 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending June 30, 1996 for Marvel Entertainment Group, Inc.
Form 10-Q for the Quarterly Period Ending September 30, 1996 for Marvel Entertainment Group, Inc.
1992 Annual Report for Marvel Entertainment Group, Inc.
1994 Annual Report for Marvel Entertainment Group, Inc.
1995 Annual Report for Marvel Entertainment Group, Inc.

Analyst Reports

Falco, P.A., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 10/15/92.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 5/27/93.
Fine, L.R., et al. Marvel Entertainment-Company Report. Merrill Lynch Capital Markets, 2/3/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 2/14/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 4/22/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 6/21/94.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 12/21/94.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 2/14/95.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 4/18/95.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 5/9/95.
Fine, L.R., et al. Marvel Entertainment Group-Company Report. Merrill Lynch Capital Markets, 8/15/95.
Krutick, J.S. Marvel Entertainment Group-Company Report. Salomon Smith Barney, 11/15/95.
Fine, L.R., et al. Marvel Entertainment-Company Report. Merrill Lynch Capital Markets, 3/14/96.

## Exhibit 1
## Materials Reviewed

Fine, L.R., et al. Marvel Entertainment-Company Report.  Merrill Lynch Capital Markets, 5/9/96.
Krutick, J.S. Marvel Entertainment Group-Company Report.  Salomon Smith Barney, 5/13/96.
Krutick, J.S. Marvel Entertainment Group-Company Report.  Salomon Smith Barney, 5/30/96.
Fine, L.R., et al. Marvel Entertainment-Company Report.  Merrill Lynch Capital Markets, 8/15/96.
Krutick, J.S. Marvel Entertainment Group-Company Report.  Salomon Smith Barney, 8/15/96.
Krutick, J.S. Marvel Entertainment Group-Company Report.  Salomon Smith Barney, 8/30/96.
Kastenbaum, A. Marvel Entertainment Group, Inc.  MJ Whitman, Inc. 11/11/96.
Moody's Investor Service.  Marvel Entertainment Group - Company Report. Mergent, Inc. 5/1/97.

Bloomberg Reports
Credit Rating Revisions-Marvel Entertainment
Credit Rating Revisions-Marvel Holdings
Credit Rating Revisions-Marvel III Holdings
Credit Rating Revisions-Marvel Parent Holdings
Corporate Debt Report - Issuances in the Industrial, Utility and Gas Transmission Industries Rated BBB or Lower From
    1993 to 1995.
S&P CreditWire 7/27/93 - "Hldgs Sr. & Marvel Hldgs Sr. Rated 'B' By S&P."
Moody's Investor Service 8/3/93 - "Marvel Holdings Inc. Senior Secured Notes Rated 'B3' By Moody's."
Moody's Investor Service 6/7/94 - "Marvel III Holdings Assigned Caa To GTD Senior SEC Note."
S&P CreditWire 7/10/95 - "Marvel III Holdings & Subs Sr. Secd Deby to B- By S&P."
Moody's Investor Service 10/10/96 - "Marvel Entertainment Cut By Moody's; Sr. Shelf To ' (P)B3."
S&P CreditWire 10/15/96 - "Marvel Entertainment Shelf Rtg Cut To B/CCC+ By S&P."
S&P CreditWire 11/20/96 - "S&P Cuts Marvel Rtgs; Revln, Colmn, Con Cig Outlk Rev."
S&P CreditWire 11/20/96 - "S&P Cuts Marvel Rtgs; Revln, Colmn, Con Cig Outlk Rev -2-."
Moody's Investor Service 11/25/96 - "Marvel Holdings Ratings Cut By Moody's; Sr. SEC To 'C'."
Bloomberg 3/13/96 - "Marvel Entertainments Debt Ratings May Face Downgrade by S&P."
S&P CreditWire 12/27/96 - "Marvel Hldg Cos' Issue Rtgs Cut To 'D'; Off S&P Watch."
Bloomberg 2/17/99 - "Junk Bonds: Formica, Marvel, World Color Sell; Calendar Builds."
Bloomberg 2/18/99 - "Junk Bonds: Host Marriott, Triarc Sell, Familiar Names Sought."
Weekly Closing Equity Prices, MRVGQ, Bloomberg.

Other
10 Year U.S. T-Bill Weekly Interest Rate, Federal Reserve H-15.
    http://www.federalreserve.gov/releases/H15/data/wf/tcm10y.txt.
Jaffe, Thomas. "Ron Perelman's Nonlinear Math." Forbes, 2/14/94. (retrieved from www.findarticles.com 2/22/02).
    "Marvel Experiences Phenomenal Growth; Marvel Entertainment Group Inc." Chain Drug Review, 6/20/94.
    (retrieved from www.findarticles.com 2/22/02).
"Marvel Sweeping Into High Yield Market With $200 Mil 144A." Private Placement Reporter, 7/18/94. (retrieved from
    www.findarticles.com 2/22/02).
Spiro, Leah Nathans and Ronald Grover. "Ron Perelman, The Man Who Collects Companies." Business Week, 9/11/95.
    (retrieved from www.findarticles.com 2/22/02).
Levin, Gary and Martin Peers. "Perelman Takes Marvel To Bankruptcy Court. Marvel Files For Bankruptcy." Daily
    Variety, 12/30/96. (retrieved from www.findarticles.com 2/22/02).
Various 1996 Marvel News Articles.

**Exhibit 1**
**Materials Reviewed**

<u>Online Resources</u>

2002 S&P Corporate Ratings Criteria Book,
    http://www.standardandpoors.com/ResourceCenter/RatingsCriteria/CorporateFinance/2002CorporateRatingsCriteria
    .html.

"The Evolving Meaning of Moody's Bond Ratings."
    http://www.moodys.com/moodys/cust/staticcontent/Evolving%20Meaning%20of%20Bond%20Ratings.pdf?section
    =rdef.

Moody's Credit Rating Definitions,
    http://www.moodys.com/moodys/cust/staticcontent/2000200000265736.asp?section=rdef.

"Moody's Approach Toward the Analysis of Indenture Covenants."
    http://www.moodys.com/moodys/cust/research/venus/Publication/Rating%20Methodology/noncategorized_number/
    49130.pdf.


<u>Various 1993 & 1994 Debt Offering Prospectuses</u>

Prospectus dated January 25, 1994 for Mitchell Energy & Development Corp.
Prospectus dated October 21,1993 for Noble Affiliates Inc.
Prospectus dated April 1,1993 for Diamond Shamrock Inc.
Prospectus dated March 3, 1993 for York International Corp.
Prospectus dated September 1, 1993 for Brunswick Corp.
Prospectus dated January 25, 1994 for Black & Decker Corp.
Prospectus for Eastman Chemical Corp.
Prospectus for Hertz Corp.
Prospectus for Mead Corp.
Prospectus for Westvaco Corp.

Exhibit 2

## Rating Criteria Applied to Marvel Entertainment Group Financial Ratios

| | 1992 Q4 | 1993 Q1 | 1993 Q2 | 1993 Q3 | 1993 Q4 | 1994 Q1 | 1994 Q2 | 1994 Q3 | 1994 Q4 | 1995 Q1 | 1995 Q2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EBIT INTEREST COVERAGE | 10.5 / AA→A | 7.1 / AA→A | 6.5 | (dark) | 7.1 | 8.2 / AA→A | (dark) | (dark) | 7.3 / AA→A | -5 | 3.3 / A→BBB |
| EBITDA INTEREST COVERAGE | 10.6 / AA→A | 7.6 | 7.2 | 7.1 | 8.6 | 9.1 / AA→A | 9.4 / AA→A | 9.3 / AA→A | 12 / AA→A | 6.6 / A→BBB | 4.1 / BBB→BB |
| FUNDS FROM OPERATIONS/TOTAL DEBT (%) | 17.9 / BBB→BB | 24.6 / BBB→BB | 27.8 / A→BBB | 30.5 / A→BBB | 32.3 / A→BBB | 32.7 / A→BBB | 29.5 / A→BBB | 20.0 / BBB→BB | 21.5 / BBB→BB | 20.7 / BBB→BB | 15.1 / BB→B |
| FREE OPERATING CASH FLOW/TOTAL DEBT (%) | 21.8 | (dark) | (dark) | 18.6 / AA→A | 13.2 / AA→A | 19.1 / AA→A | 12.4 / A→BBB | (dark) | 2.7 / BB→B | (13.3) | (4.0) |

Note:
Ratios calculated according to S&P Corporate Ratings Criteria Book.

Legend:
AA→A
A→BBB
BBB→BB
BB→B

### Standard & Poor's Financial Ratio Median for Industrial Debt Offerings *

| | AAA | AA | A | BBB | BB | B |
|---|---|---|---|---|---|---|
| EBIT Interest Coverage | 16.4 | 8.3 | 4.3 | 2.7 | 1.6 | 1.0 |
| EBITDA Interest Coverage | 20.3 | 11.4 | 6.8 | 4.4 | 2.9 | 1.8 |
| Funds From Operations/Total Debt | 109.8 | 68.8 | 40.5 | 26.6 | 15.8 | 9.9 |
| Free Operating Cash Flow/Total Debt | 46.1 | 31.3 | 16.7 | 7.1 | 3.4 | 0.3 |

*Source: Standard & Poor's Creditweek, October 10, 1994

A 265

Exhibit 3A
Marvel Entertainment Group -- Quarterly Income Statement 1992-1995 (Dollars in Millions)
EBIT Interest Coverage

| | (Loss) income before (benefit) provision for income taxes, minority interest and extraordinary item [A] | Interest expense, net [B] | EBIT [C] | ANNUALIZED EBIT [D] | Interest expense, net [E] | ANNUALIZED INTEREST EXPENSE [F] | EBIT INTEREST COVERAGE [G] |
|---|---|---|---|---|---|---|---|
| **1992** | | | | | | | |
| Q1 | 8.8 | 0.2 | 9.0 | | 0.2 | | |
| Q2 | 12.6 | 0.2 | 12.8 | | 0.2 | | |
| Q3 | 17.6 | 1.8 | 19.4 | | 1.8 | | |
| Q4 | 17.7 | 4.3 | 22.0 | 63.3 | 4.3 | 6.5 | 9.7 |
| **1993** | | | | | | | |
| Q1 | 18.3 | 4.5 | 22.7 | 77.0 | 4.5 | 10.8 | 7.1 |
| Q2 | 24.7 | 3.8 | 28.4 | 92.6 | 3.8 | 14.4 | 6.5 |
| Q3 | 24.9 | 3.5 | 28.4 | 101.6 | 3.5 | 16.0 | 6.3 |
| Q4 | 22.0 | 2.9 | 24.9 | 104.5 | 2.9 | 14.6 | 7.2 |
| **1994** | | | | | | | |
| Q1 | 19.5 | 2.6 | 22.1 | 103.9 | 2.6 | 12.7 | 8.2 |
| Q2 | 20.3 | 2.8 | 23.1 | 98.5 | 2.8 | 11.8 | 8.4 |
| Q3 | 34.6 | 4.6 | 39.2 | 109.3 | 4.6 | 12.9 | 8.5 |
| Q4 | 29.9 | 6.5 | 36.4 | 120.8 | 6.5 | 16.5 | 7.3 |
| **1995** | | | | | | | |
| Q1 | 19.7 | 7.9 | 27.6 | 126.3 | 7.9 | 21.8 | 5.8 |
| Q2 | (17.2) | 10.4 | (6.8) | 96.4 | 10.4 | 29.4 | 3.3 |

Notes:
1. [C] = [A] + [B].
2. [D] = Rolling four quarters of [C].
3. [F] = Rolling four quarters of [E].
4. [G] = [D]/[F].

Exhibit 3B
Marvel Entertainment Group – Quarterly Income Statement 1992-1995 (Dollars in Millions)
EBITDA Interest Coverage

| | (Loss) income before (benefit) provision for income taxes, minority interest and extraordinary item [A] | Depreciation and Amortization * [B] | Interest expense, net [C] | EBITDA [D] | ANNUALIZED EBITDA [E] | Interest expense, net [F] | ANNUALIZED INTEREST EXPENSE [G] | EBITDA INTEREST COVERAGE [H] |
|---|---|---|---|---|---|---|---|---|
| **1992** | | | | | | | | |
| Q1 | 8.8 | 0.8 | 0.2 | 9.8 | | 0.2 | | |
| Q2 | 12.6 | 0.8 | 0.2 | 13.6 | | 0.2 | | |
| Q3 | 17.6 | 1.3 | 1.8 | 20.7 | | 1.8 | | |
| Q4 | 17.7 | 2.9 | 4.3 | 25.0 | 69.1 | 4.3 | 6.5 | 10.6 |
| **1993** | | | | | | | | |
| Q1 | 18.3 | 3.0 | 4.5 | 25.8 | 85.0 | 4.5 | 10.8 | 7.9 |
| Q2 | 24.7 | 3.0 | 3.8 | 31.5 | 102.9 | 3.8 | 14.4 | 7.2 |
| Q3 | 24.9 | 3.0 | 3.5 | 31.4 | 113.6 | 3.5 | 16.0 | 7.1 |
| Q4 | 22.0 | 3.2 | 2.9 | 28.1 | 116.8 | 2.9 | 14.6 | 8.0 |
| **1994** | | | | | | | | |
| Q1 | 19.5 | 3.3 | 2.6 | 25.4 | 116.4 | 2.6 | 12.7 | 9.1 |
| Q2 | 20.3 | 3.1 | 2.8 | 26.2 | 111.2 | 2.8 | 11.8 | 9.4 |
| Q3 | 34.6 | 3.9 | 4.6 | 43.1 | 122.8 | 4.6 | 12.9 | 9.5 |
| Q4 | 29.9 | 4.6 | 6.5 | 41.0 | 135.7 | 6.5 | 16.5 | 8.2 |
| **1995** | | | | | | | | |
| Q1 | 19.7 | 5.8 | 7.9 | 33.4 | 143.7 | 7.9 | 21.8 | 6.6 |
| Q2 | (17.2) | 8.9 | 10.4 | 2.1 | 119.6 | 10.4 | 29.4 | 4.1 |

Notes:
1. [D] = [A]+[B]+[C]
2. [E] = Rolling four quarters of [D].
3. [G] = Rolling four quarters of [F].
4. [H] = [E]/[G]

Exhibit 3C
Marvel Entertainment Group – Quarterly Income Statement 1992-1995 (Dollars in Millions)
Funds From Operations/Total Debt (%)

| | Net Income [A] | Depreciation and Amortization [B] | Interest expense, net [C] | Provision for Deferred Income Tax [D] | Minority Interest in Earnings of Toy Biz [E] | Gain from Sale of Toy Biz Common Stock [F] | Undistributed Earnings of Unconsolidated Subsidiaries [G] | Distributions from Unconsolidated Subsidiaries [H] | Extraordinary Items [I] | Other Income [J] | Funds From Operations [K] | ANNUALIZED FUNDS FROM OPERATIONS [L] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1992** | | | | | | | | | | | | |
| Q1 | 5.0 | 0.8 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.0 | |
| Q2 | 7.2 | 0.8 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.2 | |
| Q3 | 10.0 | 1.3 | 1.8 | (0.7) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.5 | |
| Q4 | 10.4 | 2.9 | 4.3 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 17.8 | 44.5 |
| **1993** | | | | | | | | | | | | |
| Q1 | 9.8 | 3.0 | 4.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 17.3 | 55.8 |
| Q2 | 14.7 | 3.0 | 3.8 | 3.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 25.0 | 72.7 |
| Q3 | 16.5 | 3.0 | 3.5 | (0.2) | 0.0 | 0.0 | (3.4) | 0.0 | 0.0 | 0.0 | 19.4 | 79.6 |
| Q4 | 14.9 | 3.2 | 2.9 | 2.3 | 0.0 | 0.0 | (1.1) | 0.0 | 0.0 | 0.0 | 22.2 | 84.0 |
| **1994** | | | | | | | | | | | | |
| Q1 | 12.2 | 3.3 | 2.6 | 0.0 | 0.0 | 0.0 | (1.2) | 0.0 | 0.0 | 0.0 | 16.9 | 83.6 |
| Q2 | 12.5 | 3.1 | 2.8 | 0.0 | 0.0 | 0.0 | (1.5) | 0.0 | 0.0 | (1.7) | 15.2 | 73.7 |
| Q3 | 22.6 | 3.9 | 4.6 | 0.0 | 0.0 | 0.0 | (2.6) | 0.0 | 0.0 | 0.0 | 28.5 | 82.8 |
| Q4 | 14.5 | 4.6 | 6.5 | 6.0 | 0.0 | 0.0 | (4.9) | 0.0 | 0.0 | 0.0 | 26.7 | 87.3 |
| **1995** | | | | | | | | | | | | |
| Q1 | 8.2 | 5.8 | 7.9 | 6.2 | 1.4 | 0.0 | (0.2) | 0.0 | 0.0 | (14.0) | 15.3 | 85.7 |
| Q2 | (17.7) | 8.9 | 10.4 | 9.3 | 2.7 | 0.0 | (0.6) | 3.0 | 3.3 | (0.3) | 19.0 | 89.5 |

Notes:
1. [K] = [A]+[B]+[C]+[D]+[E]+[F]+[G]+[H]+[I]+[J].
2. [L] = Rolling four quarters of [K].
3. [Q] = [M]+[N]+[O]+[P].
4. [R] = [L]/[Q]*100.

A 268

Exhibit 3C cont'd
Marvel Entertainment Group – Quarterly Income Statement 1992-1995 (Dollars in Millions)
Funds From Operations/Total Debt (%)

| | Current Portion of Long Term Debt [M] | Long-Term Debt [N] | Other Long Term Liabilities [O] | Short Term Borrowings [P] | TOTAL DEBT [Q] | FUNDS FROM OPERATIONS/TOTAL DEBT (%) [R] |
|---|---|---|---|---|---|---|
| **1992** | | | | | | |
| Q1 | 0.0 | 13.0 | 0.0 | 0.0 | 13.0 | |
| Q2 | 0.0 | 13.0 | 0.0 | 0.0 | 13.0 | |
| Q3 | 17.7 | 197.7 | 0.0 | 0.0 | 215.4 | |
| Q4 | 35.1 | 201.2 | 12.1 | 0.0 | 248.4 | 17.9 |
| **1993** | | | | | | |
| Q1 | 35.1 | 180.1 | 12.1 | 0.0 | 227.3 | 24.6 |
| Q2 | 40.1 | 183.6 | 38.2 | 0.0 | 261.9 | 27.8 |
| Q3 | 40.1 | 210.6 | 10.6 | 0.0 | 261.3 | 30.5 |
| Q4 | 45.1 | 205.1 | 10.0 | 0.0 | 260.2 | 32.3 |
| **1994** | | | | | | |
| Q1 | 45.1 | 200.1 | 10.0 | 0.0 | 255.2 | 33.7 |
| Q2 | 45.1 | 195.1 | 10.0 | 0.0 | 250.2 | 29.5 |
| Q3 | 20.4 | 378.5 | 14.4 | 0.0 | 413.3 | 20.0 |
| Q4 | 20.2 | 364.1 | 21.0 | 0.0 | 405.3 | 21.5 |
| **1995** | | | | | | |
| Q1 | 4.9 | 377.7 | 31.1 | 0.0 | 413.7 | 20.7 |
| Q2 | 5.1 | 553.8 | 35.7 | 0.0 | 594.6 | 15.1 |

Notes:
1. [K] = [A]+[B]+[C]+[D]+[E]+[F]+[G]+[H]+[I]+[J].
2. [L] = Rolling four quarters of [K].
3. [Q] = [M]+[N]+[O]+[P].
4. [R] = [L]/[Q]*100.

Exhibit 3D
Marvel Entertainment Group – Quarterly Income Statement 1992-1995 (Dollars in Millions)
Free Operating Cash Flow/Total Debt (%)

| | Net Income [A] | Depreciation and Amortization [B] | Interest expense, net [C] | Provision for Deferred Income Tax [D] | Minority Interest in Earnings of Toy Biz [E] | Gain from Sale of Toy Biz Common Stock [F] | Undistributed Earnings of Unconsolidated Subsidiaries [G] | Distributions from Unconsolidated Subsidiaries [H] | Extraordinary Items [I] | Other Income [J] | Funds From Operations [K] | ANNUALIZED FUNDS FROM OPERATIONS [L] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1991** Q4 | 5.4 | 0.6 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (0.0) | 0.0 | 6.3 | |
| **1992** Q1 | 5.0 | 0.8 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.0 | |
| Q2 | 7.2 | 0.8 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.2 | |
| Q3 | 10.0 | 1.3 | 1.8 | (0.7) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.5 | 33.0 |
| Q4 | 10.4 | 2.9 | 4.3 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 17.8 | 44.5 |
| **1993** Q1 | 9.8 | 3.0 | 4.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 17.3 | 55.8 |
| Q2 | 14.7 | 3.0 | 3.8 | 3.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 25.0 | 72.7 |
| Q3 | 16.5 | 3.0 | 3.5 | (0.2) | 0.0 | 0.0 | (3.4) | 0.0 | 0.0 | 0.0 | 19.4 | 79.6 |
| Q4 | 14.9 | 3.2 | 2.9 | 2.3 | 0.0 | 0.0 | (1.1) | 0.0 | 0.0 | 0.0 | 22.2 | 84.0 |
| **1994** Q1 | 12.2 | 3.3 | 2.6 | 0.0 | 0.0 | 0.0 | (1.2) | 0.0 | 0.0 | 0.0 | 16.9 | 83.6 |
| Q2 | 12.5 | 3.1 | 2.8 | 0.0 | 0.0 | 0.0 | (1.5) | 0.0 | 0.0 | (1.7) | 15.2 | 73.7 |
| Q3 | 22.6 | 3.9 | 4.6 | 0.0 | 0.0 | 0.0 | (2.6) | 0.0 | 0.0 | 0.0 | 28.5 | 82.8 |
| Q4 | 14.5 | 4.6 | 6.5 | 6.0 | 0.0 | 0.0 | (4.9) | 0.0 | 0.0 | 0.0 | 26.7 | 87.3 |
| **1995** Q1 | 8.2 | 5.8 | 7.9 | 6.2 | 1.4 | 0.0 | (0.2) | 0.0 | 0.0 | (14.0) | 15.3 | 85.7 |
| Q2 | (17.7) | 8.9 | 10.4 | 9.3 | 2.7 | 0.0 | (0.6) | 3.0 | 3.3 | (0.3) | 19.0 | 89.5 |

Notes:
1. [K] = [A]+[B]+[C]+[D]+[E]+[F]+[G]+[H]+[I]+[J].
2. [L] = Rolling four quarters of [K].
3. [N] = Rolling four quarters of [M].
4. [R] = [O]+[P]+[Q].
5. [S] = Working Capital - Previous Year's Working Capital.
6. [T] = [L]-[N]-[S].
7. [Y] = [U]+[V]+[W]+[X].
7. [Z] = [T]/[Y]*100.

A 270

Exhibit 3D cont'd
Marvel Entertainment Group -- Quarterly Income Statement 1991-1995  (Dollars in Millions)
Free Operating Cash Flow/Total Debt (%)

| | Capital Expenditure [M] | ANNUALIZED CAPITAL EXPENDITURE [N] | Total Current Assets [O] | Total Current Liabilities [P] | Cash [Q] | Working Capital [R] | CHANGE IN WORKING CAPITAL [S] | FREE OPERATING CASH FLOW [T] | Current Portion of Long Term Debt [U] | Long-Term Debt [V] | Other Long Term Liabilities [W] | Short Term Borrowings [X] | TOTAL DEBT [Y] | FREE OPERATING CASH FLOW/TOTAL DEBT (%) [Z] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1991 Q4** | 0.2 | | 18.3 | 22.7 | 0.7 | (5.0) | | | 0.0 | 19.0 | 0.8 | 0.0 | 19.8 | |
| **1992** | | | | | | | | | | | | | | |
| Q1 | 0.3 | | 16.2 | 21.2 | 1.6 | (6.6) | | | 0.0 | 13.0 | 0.0 | 0.0 | 13.0 | |
| Q2 | 0.3 | | 19.8 | 17.0 | 3.2 | (0.3) | | | 0.0 | 13.0 | 0.0 | 0.0 | 13.0 | |
| Q3 | 0.2 | 1.1 | 104.3 | 80.0 | 22.8 | 1.5 | | | 17.7 | 197.7 | 0.0 | 0.0 | 215.4 | |
| Q4 | 0.8 | 1.7 | 110.4 | 114.3 | 10.6 | (14.4) | (9.4) | 52.2 | 35.1 | 201.2 | 12.1 | 0.0 | 248.4 | 21.0 |
| **1993** | | | | | | | | | | | | | | |
| Q1 | 0.4 | 1.8 | 96.4 | 111.0 | 10.7 | (25.4) | (18.8) | 72.9 | 35.1 | 180.1 | 12.1 | 0.0 | 227.3 | 32.1 |
| Q2 | 0.8 | 2.2 | 88.7 | 91.8 | 13.6 | (16.7) | (16.4) | 86.8 | 40.1 | 183.6 | 38.2 | 0.0 | 261.9 | 33.2 |
| Q3 | 1.3 | 3.3 | 105.1 | 101.0 | 6.3 | (2.2) | (3.7) | 80.0 | 40.1 | 210.6 | 10.6 | 0.0 | 261.3 | 30.6 |
| Q4 | 0.8 | 3.3 | 132.5 | 109.5 | 17.0 | 6.0 | 20.4 | 60.3 | 45.1 | 205.1 | 10.0 | 0.0 | 260.2 | 23.2 |
| **1994** | | | | | | | | | | | | | | |
| Q1 | (1.0) | 1.9 | 145.7 | 115.8 | 22.3 | 7.6 | 33.0 | 48.7 | 45.1 | 200.1 | 10.0 | 0.0 | 255.2 | 19.1 |
| Q2 | 2.5 | 3.6 | 151.7 | 114.3 | 14.9 | 22.5 | 39.2 | 30.9 | 45.1 | 195.1 | 10.0 | 0.0 | 250.2 | 12.4 |
| Q3 | 0.6 | 2.9 | 275.3 | 157.4 | 90.9 | 90.9 | 93.1 | (13.2) | 20.4 | 378.5 | 14.4 | 0.0 | 413.3 | (3.2) |
| Q4 | 2.1 | 4.2 | 296.9 | 200.6 | 18.1 | 78.2 | 72.2 | 10.9 | 20.2 | 364.1 | 21.0 | 0.0 | 405.3 | 2.7 |
| **1995** | | | | | | | | | | | | | | |
| Q1 | 6.1 | 11.3 | 379.0 | 190.3 | 43.6 | 145.1 | 137.5 | (63.1) | 4.9 | 377.7 | 31.1 | 0.0 | 413.7 | (15.3) |
| Q2 | 8.9 | 17.7 | 433.7 | 249.7 | 66.2 | 117.8 | 95.3 | (23.5) | 5.1 | 553.8 | 35.7 | 0.0 | 594.6 | (4.0) |

Notes:
1. [K] = [A]+[B]+[C]+[D]+[E]+[F]+[G]+[H]+[I]+[J]
2. [L] = Rolling four quarters of Funds From Operations
3. [N] = Rolling four quarters of Capital Expenditure
4. [R] = [O]-[P]-[Q]
5. [S] = Working Capital - Previous Year's Working Capital
6. [T] = [L]-[N]-[S]
7. [Y] = [U]+[V]+[W]+[X]
8. [Z] = [T]/[Y]*100

A 271