

RECEIVED
APR 15 2002

# SUPPLEMENT TO THE REPORTS OF WILLIAM H. PURCELL

## TRUSTEES OF THE MAFCO LITIGATION TRUST V. RONALD PERELMAN, ET AL
### CIVIL ACTION NO. 97-586 (RRM) (SLR)
### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### April 9, 2002

I, William H. Purcell, hereby submit this supplement to my expert reports dated March 15 and March 29, 2002.

## INTRODUCTION

1.    I submitted an expert report dated March 15, 2002 in the above-referenced case (the "Purcell Expert Report"). In the Purcell Expert Report, I discussed certain restrictions relating to Marvel Entertainment Group, Inc. ("Marvel") in the Indentures for three Marvel Holding Company note issues: an issue by Marvel Holdings Inc. sold in April 1993 (the "Holdings Issue"); an issue by Marvel (Parent) Holdings Inc. sold in October 1993 (the "Parent Issue"); and an issue by Marvel III Holdings Inc. sold in February 1994 (the "Marvel III Issue"). I explained that in my opinion these restrictions were a substantial reason why the issuers could sell such notes to investors. I also stated that the existence of the Holding Company debt with restrictions relating to Marvel significantly limited Marvel's financing flexibility and options.

2.    I submitted a rebuttal expert report in the above-referenced case on March 29, 2002 (the "Purcell Rebuttal Report"). The Purcell Rebuttal Report stated my disagreement with the opinion of plaintiffs' expert, Professor Robert W. Holthausen.

3.    Subsequent to the preparation of my Reports, I was provided with a copy of the transcript of the deposition of Howard Gittis, the Vice Chairman and Chief Administrative Officer of MacAndrews & Forbes Holdings, which took place on March 25, 2002, and the exhibits marked and discussed at that deposition. I am

submitting this supplement to take into account information from the testimony and exhibits at the deposition of Mr. Gittis.

4.    My qualifications as an investment banker and as an expert in corporate debt financing are set forth in the Purcell Expert Report, pages 1-2 and Exhibit 1 thereof.

### SUPPLEMENTAL OPINIONS

5.    It is my opinion, based on my business experience and knowledge, and the testimony of Mr. Gittis, that the restrictions relating to Marvel in the Holding Company Indentures caused actual financial injury and damage to Marvel in the fourth quarter of 1996 in the amount of not less than $470,825,000.

6.    The basis for my opinion is set forth below.

7.    It is my understanding based on, for example, the deposition of Mr. Gittis, that Marvel desperately needed liquidity and financial flexibility as of November 1996, and that a major capital infusion was necessary for Marvel's financial restructuring and ability to survive and to have the opportunity to thrive over time.

8.    One of the restrictions on Marvel in the Holding Company indentures was section 4.09. That section is entitled "Majority Ownership; Limitation on Liens." It provides, *inter alia,* that each Holding Company "shall at all times from and after the Final Collateral Date be the legal and beneficial owner of a majority of the Voting Stock of Marvel."

9.    Mr. Gittis testified with reference to section 4.09 of the Holding Company Indentures, "no one would put the kind of money necessary to restructure Marvel

2

A 274

up without owning a majority of the shares free of these bond offerings; so you had to amend that provision." (Gittis Tr. at 13).

10.   The deposition of Mr. Gittis shows that even Andrews Group Incorporated (which I understand was 100% owned by one of Mr. Perelman's holding companies) was unwilling to make a significant equity investment in Marvel in November 1996 unless the restrictions in the Holding Company Indentures could be amended.

11.   Prior to Marvel's bankruptcy petition in late December 1996, Marvel had 101.8 million common shares outstanding.  On the day prior to the November 12, 1996 Andrews Group proposal, Marvel's common shares, which publicly traded on the New York Stock Exchange, closed at a price of $4.625 per share.

12.   Based on my review of Mr. Gittis's testimony and the exhibits referenced therein, it is my opinion that the restrictions relating to Marvel in the Holding Company Indentures caused actual financial harm and damage to Marvel in the amount of at least $470,825,000.

*William H. Purcell*

WILLIAM H. PURCELL

3

A 275

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, IVAN SNYDER and  
JAMES A. SCARPONE, AS TRUSTEES OF  
THE MAFCO LITIGATION TRUST,  

                    Plaintiffs,  

      -against-  

RONALD O. PERELMAN,  
MAFCO HOLDINGS, INC.,  
MacANDREWS & FORBES HOLDINGS INC.,  
ANDREWS GROUP INCORPORATED,  
WILLIAM C. BEVINS and  
DONALD G. DRAPKIN,  

                    Defendants.  

§ § § § § § § § § § § § § § § § §

No. 97-CIV-586-KAJ

## REBUTTAL REPORT OF JUSTICE JOSEPH T. WALSH, RETIRED
**Expert Witness for Plaintiffs Ronald Cantor, Ivan Snyder and James A. Scarpone, as Trustees of The MAFCO Litigation Trust**

**Date: March 1, 2006**

## QUALIFICATIONS OF EXPERT WITNESS

1.  I am currently Of Counsel to the law firm of McCarter & English, LLP of Wilmington, Delaware.  Prior to my present employment, I was a member of the Delaware Judiciary for more than thirty years.  I was appointed as a judge of the Delaware Superior Court in 1972.  In 1984, I was appointed as a Vice Chancellor of the Delaware Court of Chancery.  I was appointed as a Justice of the Delaware Supreme Court in 1985.  I was then reappointed as a justice for a second twelve-year term in 1997.  I retired from the Delaware Supreme Court effective May 1, 2003 and on June 1, 2003 joined McCarter & English.  My curriculum vitae, including a list of certain publications and opinions I have authored while serving on the Delaware Court of Chancery and the Delaware Supreme Court is attached hereto as Exhibit 1.

2.  Since joining McCarter & English, I have served as an arbitrator and mediator and have provided counsel and served as an expert witness in corporate litigation.

3.  I have been retained by the firm of Friedman Kaplan Seiler & Adelman LLP to provide consulting services and advice in connection with that firm's representation of the plaintiffs in the above captioned matter.  My compensation is on a fixed hourly rate of $510 and is not dependent on the outcome of these proceedings.  In this report I have been requested to comment on the Expert Report submitted by Professor Lawrence A. Hamermesh on behalf of the Defendants.  In so doing, I opine, as did Professor Hamermesh, on the nature and extent of the fiduciary principles underlying the rights and duties of the defendants as controlling shareholder and directors of Marvel Entertainment Group, Inc. ("Marvel"), under Delaware law, in connection with the issuance of certain Notes issued by the so-called "Marvel Holding Companies" *i.e,* Marvel III Holdings, Inc. ("Marvel III"), Marvel (Parent) Holdings, Inc. ("Marvel Parent") and Marvel Holdings, Inc. ("Marvel Holdings").

2

4. The facts assumed by me for the purpose of this report are drawn primarily from the decision of the Third Circuit Court of Appeals, dated July 12, 2005, reversing in part, and affirming in part, the District Court's grant of summary judgment in favor of the defendants and remanding the matter for further proceedings in the trial court. I attach as Exhibit 2 a list of the materials considered by me.

5. Defendant, Ronald O. Perelman ("Perelman"), was at all relevant times a director of Marvel and Chairman of its board. Through a chain of wholly-owned companies, Perelman exercised controlling interest of 60% to 80% of Marvel's stock. Defendants William C. Bevins ("Bevins") and Donald G. Drapkin ("Drapkin") were common directors and officers of Marvel and Perelman's controlling holding companies. Perelman, Bevins and Drapkin constituted three of the four members of the Executive Committee of the Marvel board.

6. In 1993 and 1994, the defendants arranged for the issuance by the Marvel Holding Companies of a series of Notes. The three tranches of Notes yielded $553.5 million. None of the proceeds of these Notes benefited Marvel, although the Notes contained certain restrictions applicable to Marvel. Specifically the Note Indentures provide that the issuers will not permit Marvel to issue debt, preferred stock, pay dividends or engage in stock buybacks, except under certain circumstances. The restrictions also provide that the issuers will prohibit Marvel's issuance of common stock that would dilute Marvel's control by Perelman. Marvel's senior management participated in "road shows" to support the marketing of the Notes.

7. The offering memoranda for each Note recited that "MacAndrews & Forbes will be able to direct and control the policies of the Issuer and its subsidiaries [*i.e.*, Marvel], including mergers, sales of assets and similar transactions." The memoranda further stated that "no vote

3

[would] be cast, and no consent, waiver or ratification given or action taken [by the Issuer], which would be inconsistent with or violate any provision of the Indenture or the Notes."

8. Subsequent to the issuance of the Notes, Marvel experienced liquidity problems and on December 27, 1996 filed a voluntary petition for bankruptcy. Plaintiffs allege that Marvel suffered financial harm as a result of being subject to the Note restrictions imposed solely for Perelman's benefit. The Third Circuit has ruled that, if the evidence showed at trial that defendants breached their duty of loyalty under Delaware law through exploitation of their fiduciary position for personal gain, plaintiffs should be afforded the opportunity to establish *inter alia*, "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." *Cantor v. Perelman* 414 F.3d 430 at 437.

9. Professor Hamermesh states that a controlling shareholder is "entitled to take extraordinary steps to protect that [controlling] interest against efforts by the board of directors to issue sufficient shares to eliminate that majority voting power." A controlling shareholder, however, especially a controlling shareholder who is also a director still owes fiduciary duties to the corporation and cannot breach those duties in order to maintain his controlling position. Any assessment of the defendants' responsibility to Marvel (and other constituencies affected by their conduct) must begin with the defendants' duties as directors of a corporation chartered under Delaware law. Directors of a Delaware corporation "have a triad of primary fiduciary duties: due care, loyalty, and good faith." *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). The duty of loyalty, implicated here, has been described in the seminal decision of the Delaware Court of Chancery, *Guth v. Loft*, 5 A.2d 503, 510 (Del. Ch. 1939) as one "not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing

anything that would work injury to the corporation…." Where directors stand on both sides of a transaction the specter of self-dealing is omnipresent and this danger is heightened where one of the parties to the transaction is a controlling shareholder of both entities. *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

10. In *Weinberger* the court emphasized that dual directors, who were appointed by the parent to the subsidiary's board, "still owed … an uncompromising duty of loyalty" to the subsidiary and its shareholders. *Weinberger*, 457 A.2d at 710.

> Given the absence of any attempt to structure this transaction on an arm's length basis, [the parent] cannot escape the effects of the conflicts it faced, particularly when its designees on [the subsidiary's] board did not totally abstain from participation in the matter. There is no 'safe harbor' for such divided loyalties in Delaware. …
>
> There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context. [Citation omitted.] Thus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations….

*Id.* at 710 . The court also held that "where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Id.* at 710.

11. Where a transaction carries the potential for self-dealing by a controlling shareholder, Delaware law recognizes that a "safe harbor" may be established through the formation of a special committee of independent directors. *Kahn v. Lynch Communication Sys.*, 638 A.2d 1110, 1117 (Del. 1994). The special committee mechanism has served to relieve the proponents of the transaction of the burden of proving the fairness of a business transaction provided the special committee "was truly independent, fully informed, and had the freedom to negotiate at arm's length." *Lynch* at 1020-21. When the special committee had real bargaining

5

power so that it could negotiate with the controlling shareholders the burden may be shifted to a shareholder attacking the fairness of the transaction.

12. In subjecting Marvel to the restrictions set forth in the Notes, Perelman and his aligned directors failed to discharge their fiduciary duty of loyalty owed to Marvel and Marvel's minority shareholders. At a minimum, the defendants should have provided for the use of a special committee of independent directors to engage in arm's length bargaining with Perelman over the terms of any commitment made by Perelman as Marvel's controlling shareholder to restrict Marvel's ability to raise capital. In proceeding to impose such restrictions unilaterally, the defendants breached the duty of loyalty which requires that the "best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

13. The principles underlying the obligation to demonstrate fairness in the context of parent-subsidiary mergers provide analogous support for the view that whenever a controlling shareholder crafts a transaction which impacts both controlled entities, he must ensure that the interests of one are not made subservient to the interests of another. "Delaware law is unyielding in its demand that directors owing duties to two constituencies uphold those duties, without compromise, to both groups; or if they cannot, they must relinquish that duty to another." *Gans v. MDR Liquidating Corp.*, 1998 WL 294006 (Del. Ch. 1998) at *3. As noted, the defendants made no effort to relinquish their duty in favor of a special committee and thus were clearly conflicted to the extent that the terms of the Notes carried the risk of financial detriment to Marvel. Indeed, not only did the defendants abjure the use of a special committee mechanism,

A 281

they required Marvel's employees directly to engage in activities in road shows to promote the marketing of the Notes.

14. Professor Hamermesh has concluded that a shareholder having majority or controlling voting power (presumably Perelman) possesses a valuable control premium which the shareholder is entitled to protect from efforts to reduce such control; including preventing corporate board of directors from adopting any measure to dilute or reduce such control. Professor Hamermesh has also concluded that under Delaware law as "generally recognized in the 1993-1996 time period ... directors cannot, consistent with their obligations as directors, seek to eliminate a majority stockholder's control through the issuance of shares, in the absence of some circumstance in which such an issuance would be necessary to protect the corporation and its stockholders from exploitation or breach of fiduciary duty by the majority stockholder." Professor Hamermesh opines that the restrictive provisions of the Indentures simply reflect limitations already permitted by Delaware law and did not "in any significant way, if at all" prevent Marvel and its board of directors from issuing other equity securities, short of deleting Perelman's control.

15. I do not disagree that the majority stock ownership is a valuable property right and enjoys recognition as a control premium. I also agree that a majority shareholder – in his capacity as a shareholder but not as a director – is entitled to protect that interest from efforts to eliminate or reduce it. But that right is not absolute. For example, the Court of Chancery noted in *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994), "a situation might arise in which a board could, consistently with its fiduciary duties, issue a dilutive option in order to protect the corporation or its minority shareholders from exploitation by a controlling shareholder who was in the process or threatening to violate his fiduciary duties to the corporation...."

A 282

16. I disagree, moreover, with Professor Hamermesh's implication that it is only in the face of the need to protect the corporation and its shareholders from exploitation or breach of fiduciary duty by a majority shareholder that directors can effect a dilution of majority control. As Chancellor Seitz noted in *Canada Southern Oils, Ltd. v. Manabi Exploration Co.*, 96 A.2d 810 (Del. Ch. 1953), cited by Professor Hamermesh, the test is a contextual one. If the corporation's "long range financial prospects" are not in jeopardy and the "primary purpose" of the issuance of additional shares was to deprive the controlling share of voting control, the dilution effort would not be permissible. Where, however, directors are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control. It is an abuse of power for a board of directors to issue stock "for the sole or primary purpose of diluting the voting power of an existing block of stock" but not for the principal purpose of raising necessary or desirable capital. *Freedman v. Restaurant Associates Indus., Inc.*, 1987 WL 14323 *9 (Del. Ch. Oct. 16, 1987).

17. Of course, one cannot opine with any assurance what options the independent directors of Marvel might have pursued to protect the interests of Marvel and its minority shareholders from the Indenture Restrictions. Not only was the use of a special committee of independent directors not explored as a protective measure to insure arm's-length bargaining, the implications of the Indenture restrictions on Marvel's interests apparently were never presented to the Marvel Board. Even though Perelman and his aligned directors were fully cognizant of the undertakings they had made applicable to Marvel through the Indenture Restrictions, they did not present the matter to the Marvel Board.

A 283

18. Finally, it should be noted that any action by the Marvel board to issue additional shares of common stock would have been an act permitted under the Delaware General Corporation Law. While that action might serve to reduce or dilute the controlling shareholder's interests, the action of the Board, if adopted for a proper corporate purpose, would be analyzed under the well-settled Delaware Corporate Law principle of independent legal significance. Under this doctrine, if an action can be accomplished under one section of the DGCL it need not satisfy the requirements of another section which permits the same result. *Orzeck v. Englehart*, 195 A.2d 375, 378 (1963); *Rothschild Intern. Corp. v. Liggett Group Inc.*, 474 A.2d 133, 136 (Del. 1984); *Moran v. Household International, Inc.*, 490 A.2d 1059, 1077 (Del. Ch. 1985), *aff'd.* 500 A.2d 1346 (1985). In my opinion, if the issuance of additional equity were for the purpose of advancing or protecting the financial viability of the company, and that result was the primary motivation for the Board's action, that action would be independently defensible, notwithstanding its dilutive effect on Perelman's interest.

_____
Joseph T. Walsh

A 284

Exhibit 1

## Exhibit 1

### Justice Joseph T. Walsh

Justice Joseph T. Walsh is a native Delawarean who served as a member of the Delaware Judiciary from 1972 to his retirement in 2003. He is an honors graduate of LaSalle University and Georgetown University Law Center where he was a member of the law review. He was admitted to the District of Columbia Bar in 1954 and to the Delaware Bar in 1955 and served as law clerk to Chief Judge Paul Leahy of the United States District Court for Delaware. He served three years on active duty as a member of the Judge Advocate General Corps of the United States Army. He engaged in the private practice of law for fourteen years, primarily as a litigator including service as Chief Counsel for the Delaware Public Service Commission. He also served as attorney for the Delaware House of Representatives and counsel for the Wilmington Parking Authority.

Justice Walsh was appointed as a judge of the Superior Court in 1972, a Vice Chancellor of the Court of Chancery in 1984 and as a Justice of the Delaware Supreme Court in 1985. He was reappointed as a justice to a twelve year term in 1997. Justice Walsh retired from the Delaware Supreme Court in April, 2003. He joined McCarter & English as Of Counsel June 1, 2003. As a former director of Einstein Institute for Science, Health and the Courts, Justice Walsh authored articles and lectured on the legal implications of genetic science. He is an adjunct professor at the Widener University School of Law from which he received an honorary Doctor of Laws degree in 1997.

While a member of the Delaware Judiciary, Justice Walsh chaired various committees including the Criminal Code Commentary Committee, the Long Range Court's Planning Committee, the Administrative Office of the Courts Restructuring Committee, and was a member of the New Castle County Courthouse Construction Committee. In 1989, Justice Walsh received the Herbert Harley Award from the American Judicature Society for promoting the effective administration of justice. In 2002, Justice Walsh received the First State Distinguished Service Award the highest award conferred by the Delaware State Bar Association and the 2002 Chief Justice's Annual Award for Outstanding Judicial Service.  On July 3, 2003, Delaware Governor Ruth Ann Minner awarded Justice Walsh the Order of the First State, the highest state government honor.  During his service on the Supreme Court, he authored more than 300 opinions in areas of civil, criminal and corporate law.

While a member of the Superior Court and the Court of Chancery, Justice Walsh participated in settlement negotiations in a variety of cases involving personal injury claims and business disputes.  He has completed the forty hour course in Mediation for Judges conducted by the American Bar Association Dispute Resolution Section Judicial Division and The National Judicial College.

Justice Walsh's publications include the following:

"Courts and Science: The Challenge and Burden of Technology."  *Courts Health Science & The Law*, October, 1990, Vol. 1, No. 2.

"The First Amendment and the Promise of Religious Freedom." *Delaware Lawyer*, Winter, 1991, Vol. 9, No. 4.

"Some Observations on a Changing Profession."  *Delaware Lawyer*, Winter, 1994, Vol. 12, No. 4.

"Courts and the Challenges of Adjudicating Genetic Testing's Secrets" (with Franklin M. Zweig and Daniel M. Freeman).  *Genetic Secrets*, edited by Professor Mark A. Rothstein, University of Houston Law School, 1996.

A 287

"Judiciary Article IV." *The Delaware Constitution of 1897, The First One Hundred Years*, edited by Harvey Bernard Rubenstein, Delaware State Bar Association, 1997.

"The Evolving Standards of Admissibility of Scientific Evidence." *Judges' Journal*, Summer 1997, Vol. 36, No. 3 and *Best of ABA Sections*, Spring 1998, Vol. 2, No. 1.

"Judicial Independence: A Delaware Perspective." *Delaware Law Review*, 1999, Vol. 2, No. 1.

"Keeping the Gate: The Evolving Role of the Judiciary in Admitting Scientific Evidence." *Judicature*, November-December 1999, Vol. 83, No. 3.

"The Fiduciary Foundation of Corporate Law." *The Journal of Corporation Law*, The University of Iowa College of Law, Spring, 2002, Vol. 27, No. 3.

"The New Castle County Courthouse." *Delaware Lawyer*, Winter 2002-2003, Vol. 20, No. 4.

"The Evolving Role of State Constitutional Law in Death Penalty Adjudication." *NYU Annual Survey of American Law, Judges' Forum No. 3*, 2003, Vol. 59, Issue 2.

"The Limits of Proportionality Review in Death Penalty Cases." *Delaware Lawyer*, Winter 2003-2004, Vol. 21, No. 4

A 288

## Corporate Opinions Authored by Justice Joseph T. Walsh

### Court of Chancery

Gilbert v. El Paso Company
490 A.2d 1050 (1984)

Mesa Partners v. Phillips Petroleum Company
488 A.2d 107 (1984)

Moran v. Household International, Inc.
490 A.2d 1059 (1985)
Affirmed 500 A.2d 1346 (1985)

MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.
501 A.2d 1239 (1985)
Affirmed 505 A.2d 454 (1985) (w/opinion to issue)
Opinion 506 A.2d 173 (1986)

### Supreme Court

1.  Georges Marciano, et al v. Joe Nakash, et al.
    535 A.2d 400 (1987)

2.  Bernard Kaplan, et al v. Peat, Marwick, Mitchell & Co., et al.
    540 A.2d 726 (1988)

3.  Anadarko Petroleum Corporation, et al. v. Panhandle Eastern Corp., et al.
    545 A.2d 1171 (1988)

4.  Louise Simons v. Marshall S. Cogan, et al.
    549 A.2d 300 (1988)

5.  Blinder, Robinson & Co., Inc. v. Donald L. Bruton Securities
    Commissioner of the State of Delaware
    552 A.2d 466 (1989)

6.  Tandycrafts, Inc., et al. v. Initio Partners
    562 A.2d 1162 (1989)

7.  Cavalier Oil Corporation v. William J. Harnett
    564 A.2d 1137 (1989)

4

8.   Leonard Barkan v. Amsted Industries, et al. and
     Enid Mindich, et al.
     567 A.2d 1279 (1989)

9.   Centaur Partners, IV v. National Intergroup, Inc., et al.
     582 A.2d 923 (1990)

10.  Ruth Kahn v. Household Acquisition Corporation and
     Household Finance Corporation
     591 A.2d 166 (1991)

11.  Charles M. Oberly, III, Attorney General of the State of Delaware,
     Allan P. Kirby, Jr., et al. v. Fred M. Kirby, et al.
     592 A.2d 445 (1991)

12.  In the Matter of the Appraisal of Shell Oil Company
     607 A.2d 1213 (1992)

13.  Stanley Heineman v. Datapoint Corporation, et al.
     611 A.2d 950 (1992)

14.  Marilyn Zirn v. VLI Corporation, et al.
     621 A.2d 773 (1993)

15.  City Investing Company Liquidating Trust v. Continental Casualty Co.
     624 A.2d 1191 (1993)

16.  ATA A. Farahpour v. DCX, Inc.
     635 A.2d 894 (1994)

17.  Jeffrey Prezant, et al. v. Joseph DeAngelis, et al.
     636 A.2d 915 (1994)

18.  Alabama By-Products Corporation and Drummond Company, Inc. v.
     CEDE & Co. acting on behalf of Shearson Lehman Brothers, Inc., et al.
     657 A.2d 254 (1995)

19.  Karen Shaw and Forrest Foster v. Agri-Mark, Inc.
     663 A.2d 464 (1995)

20.  Howard S. Klotz v. Warner Communications, Inc. and Time Warner
     674 A.2d 878 (1995)

A 290

21.    Alan R. Kahn v. Lynch Communication Systems, Inc., et al.
       669 A.2d 79 (1995)

22.    Merle Thorpe, Jr. by the Executor of his estate, Peter M. Castleman, and Foundation for
       Middle East Peace v. CERBCO, Inc., et al.
       676 A.2d 436 (1996)

23.    United States Cellular Investment Company of Allentown v.
       Bell Atlantic Mobile Systems, Inc., et al.
       677 A.2d 497 (1996)

24.    Alan Kahn, derivately on behalf of DEKALB Genetics Corp.
       v. Charles C. Roberts, et al.
       679 A.2d 460 (1996)

25.    Alan Russell Kahn v. Tremont Corporation, et al.
       694 A.2d 422 (1997)

26.    Laurel Gonsalves v. Straight Arrow Publishers, Inc.
       701 A.2d 357 (1997)

27.    SBC Interactive, Inc. v. Corporate Media Partners, et al.
       714 A.2d 758 (1998)

28.    Emerald Partners v. Ronald P. Berlin, et al.
       726 A.2d 1215 (1999)

29.    Waterside Partners v. C. Brewer and Company, Ltd., et al.
       739 A.2d 768 (1999)

30.    Leonard Loventhal Account v. Hilton Hotels Corp.
       780 A.2d 245 (2001)

31.    John A. Gentile v. Singlepoint Financial, Inc.
       PER CURIAM
       788 A.2d 111 (2001)

32.    Cameron McNeil and Justin McNeil v. Henry Slack McNeil, Jr., et al
       798 A.2d 503 (2002)

33.    Telxon Corporation v. Robert Meyerson, et al.
       802 A.2d 257 (2002)

34.    Stifel Financial Corporation v. Robert M. Cochran
       809 A.2d 555 (2002)

A 291

35.   Tyson Foods, Inc. and Lasso Acquisition Corp. v. Altos Corp., et al. and
      Baric Mappa, et al. and IAP, Inc.
      809 A.2d 575 (2002)

36.   Tyson Foods, Inc. and Lasso Acquisition Corp. v. Altos Corp.,
      Pelican Limited Partnership, et al. and Baruch Mappa, Michael Taragin, et al.
      and IBP, Inc.
      818 A.2d 145 (2003)

A 292

Exhibit 2

## Exhibit 2
## Materials Considered

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1993

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1994

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1993

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1993

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1993

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1994

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1994

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1994

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1996

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1996

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1996

- Marvel Entertainment Group, Inc. Form S-3 Registration Statement Debt Securities Prospectus Marvel Entertainment Group, Inc., March 14, 1995

- Tender Offer Statement, Amendment No. 1, April 16, 1993

- Form S-1 Registration Statement for the public offering of Notes on July 2, 1993

- Marvel III Holdings Inc. Form S-1, March 31, 1994

A 294

- Marvel Entertainment Group, Inc. Form 8-K, November 20, 1996
- Marvel Holdings Inc. Indenture, April 15, 1993
- Marvel (Parent) Holdings Inc. Indenture, October 1, 1993
- Marvel III Holdings Inc. Indenture, February 15, 1994
- Marvel Holdings Inc. Offering Memorandum, April 16, 1993
- Marvel (Parent) Holdings Inc. Prospectus, October 13, 1993
- Marvel III Holdings Inc. Offering Memorandum, February 8, 1994
- Marvel Board minutes, March 18, 1993, March 9, 1994, December 12, 1996 and December 26, 1996
- Outline for Howard Gittis Presentation to Marvel's Banks, November 19, 1996
- Transcript of Deposition of William C. Bevins, March 7, 2002
- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Brief of Plaintiffs-Appellants and Volume 1 of Joint Appendix
- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Brief for Appellees
- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Reply Brief of Plaintiffs-Appellants
- *Cantor, et al. v. Perelman, et al.*, 414 F.3d 430 (3d Cir. 2005)
- Expert Report of Bevis Longstreth, January 12, 2006
- Expert Report of Andrew S. Carron, January 13, 2006
- Report of Jeffrey L. Balaban, January 13, 2006
- Expert Report of Lawrence A. Hamermesh, January 13, 2006

MEI\5500050.1

2

A 295

## FRIEDMAN KAPLAN SEILER & ADELMAN LLP

BRUCE S. KAPLAN
EDWARD A. FRIEDMAN
GARY D. FRIEDMAN
BARRY A. ADELMAN
ERIC SEILER
ROBERT D. KAPLAN
ANDREW W. GOLDWATER
ROBERT J. LACK
GREGG S. LERNER
HAL NEIER
PHILIPPE ADLER
MATTHEW S. HAIKEN
PAUL J. FISHMAN
RICHARD M. HOFFMAN
SCOTT M. BERMAN
LANCE J. GOTKO
ELLEN A. HARNICK
ROBERT S. LOIGMAN
KATHERINE L. PRINGLE
MERYL S. ROSENBLATT
DANIEL B. RAPPORT
DAVID I. TANENBAUM
HALLIE B. LEVIN
ANNE E. BEAUMONT
MARY E. MULLIGAN

1633 BROADWAY

NEW YORK, NY 10019-6708

TELEPHONE (212) 833-1100

FACSIMILE (212) 833-1250

WWW.FKLAW.COM

WRITER'S DIRECT DIAL
(212) 833-1193

WRITER'S DIRECT FAX
(212) 373-7993

E-MAIL
ESTUBBS@FKLAW.COM

NORMAN ALPERT
MARC N. EPSTEIN
JOHN R. CAHILL
STUART R. GOLDFARB
      COUNSEL

SNEHA DEVADASON
CRAIG J. CODLIN
MELISSA E. LONDON
EMILY A. STUBBS
KENT K. ANKER
AMY C. BROWN
MALA AHUJA HARKER
HEATHER WINDT
LISA S. GETSON
GAURAV I. SHAH
SHEILA V. BARRETT
ASAF REINDEL
JOHN N. ORSINI
JEFFREY R. WANG
LAURENCE D. BORTEN
VANESSA RICHARDS
CHAD B. PIMENTEL
JENNY F. KAUFMAN
LEE D. VARTAN
JOSHUA D. JACOBSON
JONATHAN GOTTFRIED
BARBARA J. GRAVES

March 15, 2006

**BY EMAIL AND REGULAR MAIL**

Paul J. Lockwood, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899

Re:    *Cantor, et al. v. Perelman, et al.*

Dear Paul:

As you know, this firm represents the plaintiffs in the above-referenced matter. I write to advise you of the following with respect to the Rebuttal Report of Justice Joseph T. Walsh, Retired, dated March 1, 2006. First, Justice Walsh's curriculum vitae lists all publications he authored within the last ten years. Second, we have been advised by Justice Walsh that he has provided testimony as an expert by deposition within the last four years in the following cases: *Genesis Insurance Co. v. FTD.COM, Inc.*, Civil Action No. 03 C 4444 (N.D. Ill.); *John W. Enger v. John E. Richards, et al.*, No. 02-2-14778-O SEA (Wa. Super. Ct., King County); and *William Robertson, et al. v. Princeton University, et al.*, Docket No. C-99-02 (N.J. Super. Ct. Ch. Div., Mercer County). Please give me a call if you have any questions.

Sincerely,

Emily A. Stubbs

402201.1

A 296

Page 1

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3                 FOR THE DISTRICT OF DELAWARE
 4
 5    RONALD CANTOR, IVAN          ) No. 97-586-KAJ
      SNYDER and JAMES A.          )
 6    SCARPONE, as TRUSTEES OF     )
      THE MAFCO LITIGATION, and    )
 7    as Successors in Interest    )
      to the Marvel               )
 8    Entertainment Group,         )
      Inc., et al.,               )
 9                                 )
                Plaintiffs,        )
10                                 )
                vs.                )
11                                 )
      RONALD O. PERELMAN, et       )
12    al.,                         )
                                   )
13              Defendants.        )
      ----------------------------)
14
15
16
17        VIDEOTAPED DEPOSITION OF JEFFREY L. BALIBAN
18                 New York, New York
19               Tuesday, April 11, 2006
20
21
22
23
24    Reported by:
      PENNY SHERMAN
25    JOB NO. 183397
```

Page 62

Baliban

1
2      MR. GOLDWATER: Objection to form.
3      A.   Well, I think that the sentence that he
4   says, The existence of the above debt with the
5   restrictive covenants related to Marvel
6   significantly limited Marvel's prospective
7   financing flexibility and options.
8           I think there is significant agreement
9   with my statement that the indenture covenants in
10  the Marvel Parent and Marvel III note issuances
11  limited Marvel's access to capital markets,
12  interfered with Marvel's ability to issue equity
13  and generally impeded Marvel's ability to obtain
14  financing on terms in Marvel's best interest.
15     Q.   So these two reports, in that respect,
16  covered the same subject matter; is that fair?
17     MR. GOLDWATER: Objection to form.
18     A.   I don't know all of the subject matter
19  that the Purcell report covers. I think I did read
20  it once, maybe six months ago. I'm far more
21  familiar with my report.
22          But looking at those two sentences, it
23  certainly seems as though we drew a very similar
24  conclusion with regard to the impact that the
25  restrictive covenants had on Marvel's ability to

Page 63

Baliban

1
2   access capital markets or obtain financing on terms
3   in Marvel's best interest, or what he calls limited
4   Marvel's prospective financing flexibility and
5   options.
6      Q.   Can you take a look at Exhibit 3, which
7   is the March 29 report of Mr. Purcell. Take a look
8   in particular at page 7.
9      A.   Okay.
10     Q.   And just take a moment, if you would,
11  and read paragraphs 17, 18 and 19.
12     A.   17, 18, and 19?
13     Q.   Yes.
14          In paragraph 17, 18 and 19, I'm just
15  going to summarize the general subject matter. It
16  concerns the alleged effect that the restrictions
17  had on Marvel's ability to issue equity; is that,
18  as a general proposition, fair?
19     A.   He discusses alternatives that he
20  believes would have been more likely to have seen,
21  absent the restrictive covenants.
22     Q.   And those are equity financing
23  alternatives, right?
24     A.   They include -- they are some equity.
25  They do include, I believe, long-term debt, yeah.

Page 64

Baliban

1
2   In the middle of paragraph 19, it says, As of June
3   1996, Marvel's 820 million in total capitalization
4   would have been comprised of about 590 million of
5   shareholders' equity; 190 million of existing
6   equity, plus 400 million of new equity financing,
7   plus about 230 million of long-term debt. And he
8   discusses how a capital structure of that nature,
9   would have afforded Marvel greater flexibility.
10     Q.   And as a general matter, that covers the
11  same subject matter as your opinion that the note
12  issuances limit Marvel's access to capital markets,
13  interfered with Marvel's ability to issue equity
14  and generally impeded Marvel's ability to obtain
15  financing on terms in Marvel's best interest; is
16  that fair?
17     A.   I think as a general matter, probably
18  seems to include similar comments.
19     Q.   Can you look at Exhibit 4. It's
20  Mr. Purcell's April 9, 2002 report.
21     A.   Okay.
22     Q.   This was the one you said you don't
23  recall seeing before, correct?
24     A.   That's correct.
25     Q.   It's a very short report. It's just

Page 65

Baliban

1
2   three pages and it has an introduction. So if you
3   start from paragraph 3 and you read through
4   paragraph 12, that should cover the substance of
5   the report.
6          Can you do that, please?
7      A.   Sure. Okay.
8      Q.   Would you agree that this report, in
9   analyzing alleged damages that Marvel incurred
10  based on the stock price of November 12, 1996, has
11  a significant overlap with the subject matter of
12  your opinion regarding the harm that Marvel
13  suffered as a result of its liquidity crisis in the
14  fourth quarter of 1996?
15     MR. GOLDWATER: Objection to form.
16     A.   Well, when you say it has significant
17  overlap, I'm not certain what you mean, but it
18  seems to me that his findings are sufficiently or
19  significantly similar to mine on the same issue.
20     Q.   Now, he makes an analysis of damages
21  based on taking the stock price on November 12th,
22  multiply it -- multiplying it by the number of
23  shares outstanding and coming up with $470 million
24  in damages. Is that how you read this analysis?
25     A.   I suppose so.

17 (Pages 62 to 65)

Page 66

Baliban

1
2    Q.    Did you give consideration to that
3    approach?
4    A.    It is not too different from the
5    approach that we actually did use, in that it takes
6    a value of the stock and says the loss is -- the
7    loss of that value, subsequent to information and
8    certain announcements coming out. And that's not
9    too different from the event study that we did. I
10    don't know the details of Mr. Purcell's actual
11    calculations.
12        I am familiar with the event study that
13    we performed, the regressions that we performed,
14    the analysis of the statistical significance of the
15    variables that we identified in order to support
16    the conclusion that we reached. So, I mean, in
17    essence, he's saying we had a value of $4.62 or 63
18    cents a share and then we didn't. So, he
19    attributes that -- the loss of that value to these
20    issues. And in a large way, I do the same.
21    Q.    Well, you come to a significantly lower
22    number that's attributed to the harm; isn't that
23    right?
24    A.    I don't think so. I come to a number
25    that ranges from 300- to 600 million. He comes to

Page 67

Baliban

1
2    a number that's 400 million or so.
3    Q.    I'm focusing on your event study
4    analysis of the November 12, 1996 harm. Setting
5    aside Mr. Purcell's report, did you give
6    consideration to an analysis that was based on
7    taking a $4.63 price and comparing it to the
8    eventual cancellation of the shares years later at
9    zero and measuring that delta as the damages
10    figure?
11    A.    I was trying to do something very much
12    more proximate in the specific time of the
13    announcements being made, and that was the basis of
14    the regressions that we did. I did not expand my
15    event study to include other eventualities that may
16    have occurred in '97 or '98 or whenever those --
17    these were zeroed out, as you said. I don't even
18    know exactly when that occurred.
19    Q.    And why was it that you chose to do
20    something that was much more specific in time
21    related to the announcement?
22    A.    It is my process to apply appropriate
23    methodologies to a specifically identified
24    occurrence and measure the impact of that within
25    the constraints of an event window. And that's --

Page 68

Baliban

1
2    that is the process that I followed in performing
3    my event study. I defined my event window as
4    information becoming known in November and really
5    very narrowly thereafter.
6        And it is not unusual for a person
7    performing an event study to attempt to narrow the
8    event window as much as possible to increase the
9    likelihood that your -- that the results are
10    statistically significant and are appropriately
11    being assigned to the specific circumstances. And
12    so that's my process.
13        I don't know Mr. Purcell's process, and
14    all I can read here are his results, but I haven't
15    studied his process or his thinking. His results
16    are generally similar to mine.
17    Q.    Let's take a look at your report again.
18    In general terms, your report focuses on covenants
19    in the terms of three note offerings from 1993 and
20    1994; is that right?
21    A.    I think that that's correct. In
22    general, though, it really deals with the second
23    and third note offerings.
24    Q.    The subject in your report is the
25    October 1993 Marvel Parent offering and the

Page 69

Baliban

1
2    February 1994 Marvel III offering; is that correct?
3    A.    Yes.
4    Q.    And why is it that you did not consider
5    the Marvel Holdings offering, which was the first
6    one?
7    A.    I think I state in paragraph 3 --
8    Q.    Footnote 7?
9    A.    -- footnote 7, why that is.
10    Q.    And is that because plaintiffs' counsel
11    advised you, the claim for compensatory damages
12    with respect to the Holdings notes had been barred
13    by the statute of limitations?
14    A.    Yes.
15    Q.    So that was just an assumption that you
16    applied as an expert in this case?
17        You didn't look at that offering in
18    terms of damages; is that correct?
19        MR. GOLDWATER:  Could you repeat the
20    question again?
21        (The question was read.)
22        MR. GOLDWATER:  That's two questions.
23    I'm not sure which one you want him to deal
24    with.
25        MR. LOCKWOOD:  I think it's the same

18 (Pages 66 to 69)

Page 1

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3                 FOR THE DISTRICT OF DELAWARE
 4
 5    RONALD CANTOR, IVAN          ) No. 97-586-KAJ
      SNYDER and JAMES A.          )
 6    SCARPONE, as TRUSTEES OF     )
      THE MAFCO LITIGATION, and    )
 7    as Successors in Interest    )
      to the Marvel               )
 8    Entertainment Group,         )
      Inc., et al.,                )
 9                                 )
                Plaintiffs,        )
10                                 )
                vs.                )
11                                 )
      RONALD O. PERELMAN, et       )
12    al.,                         )
                                   )
13              Defendants.        )
      ---------------------------- )
14
15
16
17        VIDEOTAPED DEPOSITION OF BEVIS LONGSTRETH
18                   New York, New York
19                 Thursday, April 13, 2006
20
21
22
23
24    Reported by:
      PENNY SHERMAN
25    JOB NO. 183399
```

Page 158

1
2  indentures. And the person who accepted them is
3  with the board and management of Marvel.
4     Q.  Okay.
5     A.  And that acceptance was what you and I
6  have been sparring about.
7     Q.  Just chatting.
8     A.  Yeah, chatting.
9     Q.  Okay. But you know of no document,
10  piece of paper, video --
11     A.  No. Well, wait. I'm sorry, finish your
12  question.
13     Q.  Let me finish the question. You know of
14  no document, piece of paper, contract, video,
15  electronic recording, any other physical thing
16  which evidences the acceptance of these
17  restrictions by the Marvel board, correct?
18     A.  No.
19     Q.  Incorrect?
20     A.  Incorrect.
21     Q.  Okay. What's the piece of paper by
22  which Marvel accepted these --
23     A.  All the SEC filings I've been referring
24  to.
25     Q.  Oh, okay. Pull them out, let me see

Page 159

1
2  where it says Marvel accepted the restrictions,
3  those words.
4     A.  No, there are no words.
5     Q.  Okay.
6     A.  If you're talking about precise words,
7  those words are not there.
8     Q.  Mr. Longstreth, I'm talking about your
9  precise words. Did you see any piece of paper, any
10  audio, visual recording, anything else in the
11  record that said, in your words, that Marvel had
12  accepted any restrictions in the notes; you didn't
13  see that?
14     MR. FRIEDMAN: Objection. Asked and
15  answered.
16     A.  I'm saying that the behavior of the
17  management of Marvel and the board of Marvel,
18  together with various filings, fairly construed in
19  the totality, evidence, a corporate acceptance of
20  these covenants. And I've said that in many
21  different ways, but that's what I am saying.
22     And I believe that any fair reading of
23  the totality of the record would lead, you know, a
24  reasonably careful thinking person to conclude that
25  this company accepted the covenants that its

Page 160

1
2  controlling shareholder agreed to impose upon it.
3     Q.  But you didn't see anything that said
4  Marvel accepts the restrictions?
5     A.  Not those precise words. We're talking
6  about agreement by behavior, by a course of
7  conduct. That's what you litigators call it.
8     Q.  Now, the third paragraph to your answer
9  to these two questions, near the end --
10     A.  Third paragraph.
11     Q.  Yeah. Second to last sentence, it says,
12  These advisors. By that, you're referring to
13  independent counsel --
14     A.  Yeah.
15     Q.  -- and bankers who you would have
16  retained for your independent committee to
17  negotiate over the acceptance of these
18  restrictions, right?
19     A.  Right.
20     Q.  These advisors would serve Marvel
21  through its independent directors in determining
22  what kind of benefit, if any, in what size, would
23  constitute a reasonable, and to the independent
24  directors, acceptable quid pro quo for allowing the
25  restrictions to be imposed.

Page 161

1
2     My question -- I just want to make sure
3  you have no expert opinion on what the appropriate
4  quid pro quo for Marvel's acceptance of these
5  restrictions would have been, correct?
6     A.  Correct. No expert opinion you said?
7     Q.  Right. That's how you testified. You
8  don't know anything as a matter of fact. You
9  weren't aware of all of this as it was happening,
10  right?
11     A.  Well, it didn't happen.
12     Q.  No, no. I'm asking, you had no actual
13  knowledge of these events before you were retained
14  as an expert in this case?
15     A.  Oh, no.
16     MR. CLARK: Off the record.
17     THE VIDEOGRAPHER: The time is 2:12
18  p.m., April 13, 2006. This concludes Tape
19  Number 2 of the videotaped deposition of
20  Mr. Bevis Longstreth.
21     (A recess was taken.)
22     THE VIDEOGRAPHER: The time is 2:19 p.m.
23  April 13, 2006. This marks the beginning of
24  Tape Number 3 of the videotaped deposition of
25  Mr. Bevis Longstreth.

41 (Pages 158 to 161)

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---

RONALD CANTOR, IVAN SNYDER and JAMES

A. SCARPONE, as TRUSTEES OF THE MAFCO

LITIGATION and Successors in Interest

to the Marvel Entertainment Group,

Inc., et al.,

               Plaintiffs,

   vs.                     97-CIV-586-KAJ

RONALD O. PERELMAN, et al.,

               Defendant.

---

DEPOSITION OF BEVIS LONGSTRETH

New York, New York

Wednesday, May 24, 2006

Reported by:

Adrienne M. Mignano

JOB NO. 184644

Longstreth

1
2   and had access to my computer, wrenching it
3   away from my wife.
4       Q.   Did you use the notes that you had
5   prepared on the plane in drafting your
6   report?
7       A.   I did.
8       Q.   Did you look at any documents in
9   preparing your second report other than
10  Mr. Fowler's report?
11      A.   No.  Well, other than my own
12  report, my original report.
13      Q.   So you looked at your original
14  report?
15      A.   I did.
16      Q.   And you looked at Mr. Fowler's
17  report; is that right?
18      A.   Yes.
19      Q.   There is in your original report a
20  set of materials considered.  Are you
21  familiar with that portion of your report?
22      A.   Right.
23      Q.   Did you go back and look at any of
24  those materials that you had previously
25  looked at?

Page 10

Longstreth

1
2       A.   I did not.
3       Q.   And in your second report in which
4   you looked at your original report and
5   Mr. Fowler's report, I take it then that you
6   didn't rely on or incorporate any other
7   expert's opinion into this second report?
8       A.   No.
9       Q.   Have you read any of the other
10  expert reports?
11      A.   Yes.
12      Q.   Which ones have you read?
13      A.   Well, I read the one -- I think I
14  have read them all, but I don't remember all
15  of them at the moment.
16      Q.   Did you read any other expert
17  reports besides Mr. Fowler's and your own
18  before writing your second report?
19      A.   No, that's the third time you have
20  asked me that.  I guess I'm trying to give
21  you the same answer each time.
22      Q.   I appreciate that.
23           The plaintiffs have offered some
24  other experts.  I'll just give you their
25  names to try to help you in remembering the

Page 12

Longstreth

1
2       A.   No.
3       Q.   There is in Mr. Fowler's report an
4   exhibit entitled "Materials Considered" that
5   lists the documents that he looked at.
6           Are you familiar with that portion
7   of his report?
8       A.   I read his report from cover to
9   cover.
10      Q.   And he has an exhibit to his report
11  that has a set of the documents he
12  considered, correct?
13      A.   Right.
14      Q.   Did you go and look at the
15  documents that he considered?
16      A.   No.
17      Q.   The report that you provided first
18  time out, in preparing that report, you
19  didn't rely on any other expert's opinion; is
20  that correct?
21      A.   Rely on any other expert's opinion?
22      Q.   In reaching your own opinion.
23      A.   No, I don't think so.
24      Q.   And there is a double negative, so
25  that means you didn't?

Page 11

Longstreth

1
2   reports.
3           One of their experts is a
4   Mr. Baliban.  Are you familiar with
5   Mr. Baliban's report?
6       A.   I looked at it; I read it.
7       Q.   Did you read that carefully and
8   scrutinize that report?
9       A.   I gave it as much care as I thought
10  I needed to give it.
11      Q.   And since you didn't rely on it,
12  how much care did you need to give it?
13      A.   Well, what in my judgment seems
14  sufficient.
15      Q.   Did you give it a quick read or did
16  you read it slowly cover to cover; do you
17  remember?
18      A.   I don't remember.
19      Q.   What about Mr. Carron's report, he
20  is another expert that the plaintiffs have
21  engaged?
22      A.   I remember reading that too about
23  the same way.
24      Q.   So meaning that you don't remember
25  how you read it?

Page 13

Longstreth

1     Longstreth
2    A.  Yes.
3    Q.  And in the second sentence of
4  Mr. Fowler's report he says, "In providing
5  that rebuttal, I have been asked to assume
6  that the indenture restrictions bound Marvel
7  and to determine how much the Marvel holding
8  companies would have had to pay Marvel after
9  arm's length bargaining at the time of the
10  issuance of the holding company notes to
11  compensate Marvel for these restrictions."
12     Is that the issue that you were
13  responding to in your report?
14    A.  Yes.
15     Well, I'm responding to the -- I'm
16  not responding to that question so much as
17  I'm responding to the hypothetical arm's
18  length bargaining that Mr. Fowler inserted in
19  his report.
20     To answer this question, he didn't
21  need to do that, but he did choose to do it.
22  And having done it, it raises questions as to
23  the realism of what he was doing.  And it
24  reveals the basis on which he arrived
25  ultimately at an answer to this question.

Page 18

1      Longstreth
2  And I think that I was requested to address
3  the realism of what he depicted as an arm's
4  length negotiation.
5    Q.  If you go to the exhibits that were
6  previously marked at your deposition in
7  April.
8    A.  Up here?
9    Q.  Yes.
10     I'd like you to take a look at
11  Exhibit 1, which is your original expert
12  report.
13    A.  Okay.
14    Q.  And I would like to draw you to
15  page 2 of that report.
16    A.  Yes.
17    Q.  There is a block quote at the top
18  of the page under the heading "Opinion".
19     Do you see that?
20    A.  Yes.
21    Q.  It begins, "We wish to obtain your
22  expert opinion" --
23    A.  Right.
24    Q.  -- "with respect to the nature of
25  arm's length bargaining that would have been

Page 19

1     Longstreth
2  conducted by Marvel with Perelman if Perelman
3  had presented to the independent directors of
4  Marvel a request that Marvel assist and
5  acquiesced in the note transactions as it
6  did."
7     My question is:  How is your
8  rebuttal report different in the issue that
9  it analyzes from your initial report and the
10  question that you analyzed in that initial
11  report?
12    A.  Well, in the initial report, I
13  focused on the, really, almost exclusively on
14  the second sentence, and then very
15  specifically on the answers to the questions
16  that were put to me in a letter, I think.
17    Q.  There is a letter from Mr. Friedman
18  that's Exhibit C to your initial report.
19    A.  Yeah.
20    Q.  Is that what you're referring to?
21    A.  Yeah, I'm trying to find the
22  questions.  There were specific questions.
23  And you can see I -- my report starts with
24  the answer to question one.
25    Q.  There are seven questions listed on

Page 20

1     Longstreth
2  pages five and six of Exhibit C to your
3  initial report.
4     Is that what you're referring to?
5    A.  I'm fumbling around here because --
6    Q.  You're going beyond the -- it's
7  confusing because you have all the exhibits
8  there.  Stay within the first.
9    A.  Okay.
10     That's right.  Those are the
11  questions.
12    Q.  If you go to the previous page,
13  page 4 of Mr. Friedman's letter.
14    A.  Okay.
15    Q.  "Questions To Be Addressed".  Do
16  you see that heading?
17    A.  Yes.
18    Q.  And his overarching question to
19  you, at least as I read this letter, is set
20  forth in the topic sentence of that
21  paragraph.  "We wish to obtain your expert
22  opinion with respect to the nature of the
23  arm's length bargaining that would have been
24  conducted by Marvel with Perelman if Perelman
25  had presented to the independent directors of

Page 21

Longstreth

2 Marvel a request that Marvel assist and
3 acquiesce in the note transactions as it
4 did."
5     Did you address that?
6    A. **Well, that's the same paragraph as**
7 **I quoted in my answer.**
8    Q. And did your initial report, did it
9 address that question posed by the first
10 sentence of the paragraph quoted on page 2 of
11 your report?
12    A. **It really did not. It addressed**
13 **the second general question in that**
14 **paragraph, and then moved immediately to**
15 **answer the specific questions.**
16    Q. Does your rebuttal report, does it
17 respond to this first question that's posed
18 in the paragraph on page 2 of your report?
19     MR. FRIEDMAN: I object to the
20 form of the question.
21    A. **Well, it responds to what Ed**
22 **Friedman asked me to do, which was to**
23 **consider the Fowler hypothetical negotiation**
24 **and comment on the -- on how close to a real**
25 **negotiation it came.**

Page 22

1     **Longstreth**
2    Q. If you could, I'm going to ask you
3 to look at two things at once. Page two of
4 your initial report and that block quote.
5    A. **Right.**
6    Q. And that first sentence there and
7 Exhibit 7, Mr. Fowler's report.
8    A. **Page 7?**
9    Q. Page 2 of Fowler's report,
10 paragraph 5.
11    A. **I got it, yeah.**
12     **Oh, wait a minute.**
13    Q. The second sentence.
14    A. **Page 5 did you say?**
15    Q. Paragraph 5.
16    A. **I got it.**
17    Q. The second sentence of paragraph 5
18 where he discusses what he was asked to do.
19 And I want you to compare the issue
20 identified in the first sentence of the block
21 quote in your first report and that sentence
22 in the second sentence of paragraph 5 of
23 Mr. Fowler's report, and just tell me if, to
24 your understanding, there is a meaningful
25 difference between the issues described in

Page 23

1     Longstreth
2 those two sentences?
3     MR. FRIEDMAN: I object to the
4 form of the question.
5    A. **If there is a meaningful**
6 **difference?**
7    Q. Well, I'll be up front with you.
8 As I read the first sentence in the block
9 quote in your paragraph that begins "we wish
10 to obtain your expert opinion" --
11    A. **Yes.**
12    Q. -- I look at that, and I look at
13 Mr. Fowler's report paragraph 5, the sentence
14 that begins "In providing that rebuttal, I
15 have been asked to assume" -- and it goes on
16 from there.
17     I read those two sentences as
18 essentially addressing the same subject
19 matter.
20     Do you read them that way as well?
21    A. **No.**
22    Q. Why not?
23    A. **Well, Mr. Fowler's -- in the**
24 **assignment given to Mr. Fowler, there is a**
25 **simple question being asked, which is how**

Page 24

1     Longstreth
2 **much Marvel holding would have to pay Marvel.**
3 **In an arm's length negotiation, what would**
4 **they pay? And that's the question. That is**
5 **not the question here.**
6     **In this paragraph, which is much,**
7 **much broader, I'm being asked to give an**
8 **opinion on the nature of the arm's length**
9 **bargaining that would have occurred.**
10     **I took that paragraph frankly to**
11 **not be asking me to package a negotiation,**
12 **but rather to ask me to consider the --**
13 **really relying on the second sentence, "What**
14 **are the considerations that an independent**
15 **director would take into account in**
16 **considering this note issuance?"**
17     **In other words, in its broadest**
18 **context, I never answered the first**
19 **question directly. I answered the questions**
20 **that were put to me. That's how I went about**
21 **this. And I set out a bunch of**
22 **considerations that I thought a director who**
23 **was truly independent would have to think**
24 **about, including, of course, whether there is**
25 **going to be any negotiation at all. That**

Page 25

Longstreth

1 you would want financial advice as to how to
2
3 approach that negotiation; is that correct?
4 **A.   Yes, I would want professional**
5 **help.**
6    Q.   And in your initial report, you go
7 on to say, "These advisors would serve Marvel
8 through its independent directors in
9 determining what kind of benefit, if any, and
10 what size could constitute a reasonable and
11 to the independent directors acceptable quid
12 pro quo for allowing the restrictions to be
13 imposed. I would ask the advisors to develop
14 as many alternative ways of benefitting
15 Marvel adequately as possible."
16    That was your view in your initial
17 report as to how the directors should
18 approach the bargaining; is that correct?
19    MR. FRIEDMAN:  That's part of
20    what the report says.  What's the
21    question?
22    Q.   I'm confirming that was your view
23 in your initial report, correct?
24 **A.   Yes.**
25    Q.   And in your rebuttal report, before

Page 30

Longstreth

1 you gave your rebuttal report, did you
2
3 consult with any financial or legal experts
4 in order to analyze or flesh out how the
5 bargaining with Mr. Perelman would have
6 proceeded?
7 **A.   No.**
8    Q.   You are a lawyer; is that correct?
9 **A.   I don't practice any more.**
10    Q.   At one time you were a lawyer?
11 **A.   I was at one time. Technically, I**
12 **still am a member of the bar.**
13    Q.   You have never been an investment
14 banker; is that correct?
15 **A.   Never been an investment banker.**
16    Q.   And you never held yourself out as
17 an expert financial advisor?
18 **A.   That's not correct.**
19    Q.   You have held yourself out as a
20 professional financial advisor?
21 **A.   I do right now.**
22    Q.   In connection with providing
23 financial advice for companies --
24 **A.   No, in connection with the**
25 **management of money.**

Page 31

Longstreth

1    Q.   In terms of the work an investment
2 banker would do in analyzing potential or
3 financial structures of a financing
4 transaction, is that something that you would
5 consider yourself expert in?
6 **A.   Yes.  I mean, my experience has**
7 **been over a long period of time doing**
8 **financial transactions and giving advice with**
9 **them. And as you know, legal advice and**
10 **business advice and financial advice tend to**
11 **blur and overlap each other.  So I think the**
12 **answer to your question is yes.**
13    Q.   Well, when you were saying that the
14 board should go out and get expert financial
15 advisors --
16 **A.   Right.**
17    Q.   -- do you think that you would be a
18 suitable candidate for the board to hire?
19 **A.   No.  I mean, I didn't have myself**
20 **in mind.  I was thinking of someone that is**
21 **a -- is not providing the legal input, but is**
22 **providing the financial analysis and input.**
23    Q.   You have read --
24 **A.   In other words, it could be a**

Page 32

Longstreth

1 **commercial banker, investment banker.**
2    Q.   You have read Mr. Fowler's CV
3 that's attached to his report; is that right?
4 **A.   I have.**
5    Q.   And is Mr. Fowler someone who has
6 the expertise and background that you think
7 would meet minimum qualifications for a board
8 to engage as a financial advisor in a
9 negotiation such as this?
10 **A.   I don't remember his**
11 **qualifications.**
12    Q.   Well, why don't you take a look at
13 them. It's an exhibit to his report.
14 Exhibit 2.
15 **A.   Exhibit 2?**
16    Q.   To his report, which is Exhibit 7.
17 **A.   I'm looking at -- when he did all**
18 **this advising, where was it?**
19    Q.   Credit Suisse, First Boston.
20 **A.   Yes, well, he has got the kind of**
21 **experience I'm talking about.**
22 **But he would have to be -- to**
23 **qualify, he would have to be completely**
24 **independent and undividedly loyal to the**

Page 33

Longstreth

1 shall if you do this or if this happens. If
2 the event tax deconsolidation event happens,
3 then we, the holders, are entitled to a put.
4     Now, the practical effect of the
5 two is the same because if -- I mean, if the
6 noteholders choose to put the notes, the
7 holding companies don't have the wherewithal
8 to pay it except -- because they don't have
9 any assets except the stock in Marvel. So it
10 would rapidly, unless somebody came to the
11 rescue, it would rapidly -- the put would
12 rapidly lead to an event of default.
13     Q.   Why don't you take a look at
14 Mr. Fowler's report, which is Exhibit 6. And
15 I want to draw your attention to paragraph
16 32.
17     A.   32?
18     Q.   Yes.
19          MR. FRIEDMAN:  Fowler report, I
20     think is Exhibit 7.
21          MR. LOCKWOOD:  You're right.
22          MR. FRIEDMAN:  Paragraph 32.
23     Q.   I'll give you a moment just to read
24 paragraph 32 instead of reading it aloud.

Page 54

Longstreth

1     Just let me know when you're done.
2          In fact, while I'm having you do
3 some reading, why don't you start by reading
4 the last two sentences of the previous
5 paragraph as well.
6     A.   Right.  You mean 31?
7     Q.   Yes.
8     A.   The last how many?
9     Q.   You can start --
10     A.   A put option.
11     Q.   Both, however the restrictions --
12     A.   Yes.
13          MR. FRIEDMAN:  Let me interject
14     before you ask a question, that I
15     believe you have been asking questions
16     that go beyond the opinions expressed
17     by the witness in his rebuttal report,
18     and I believe questions you're asking
19     go beyond the opinions the witness
20     expressed in his initial report, and
21     to the extent that you open the door
22     and the witness expresses further
23     opinions, then we reserve and will
24     assert all of our rights with respect

Page 55

Longstreth

1 to such opinions at trial.
2     And I want the record to be clear
3 that my view is you are going way
4 beyond the opinions previously
5 expressed.
6          MR. LOCKWOOD:  I won't argue with
7     you here.  I completely disagree, but
8     I won't argue with you here.
9     Q.   The analysis that's in paragraph 31
10 and 32 that I just drew to your attention,
11 did you make any assessment of Mr. Fowler's
12 views that a protection similar to the
13 restrictions could be obtained by formatting
14 them as puts?
15     A.   I didn't credit it with -- I didn't
16 give it much weight, let's put it that way.
17 I was looking at what actually happened, not
18 other things that -- other ways of
19 restructuring the transaction to possibly
20 accomplish the same kinds of processions that
21 the noteholders were seeking through what
22 they actually got.  I didn't address -- I
23 didn't spend much time thinking about that.
24 I did think that the -- any analogy to a

Page 56

Longstreth

1 margin loan was completely wrong.
2     Q.   Well, in Mr. Fowler's construction
3 of the hypothetical negotiations between
4 Marvel --
5          MR. FRIEDMAN:  What page are you
6     referring to, if I may ask?
7          MR. LOCKWOOD:  I'm referring to
8     page 29, exchange 5.
9     A.   Okay.
10     Q.   His exchange is M -- and (a) from
11 Marvel says, "MacAndrews & Forbes must pay
12 Marvel for the restrictions in the notes",
13 and one of Mr. Fowler's responses is that
14 "MacAndrews & Forbes has other options, we
15 could issue LYONS or use puts instead of a
16 covenant package format."
17     Do you see that?
18     A.   Yes.
19     Q.   Did you, sir, do an analysis of
20 whether MacAndrews & Forbes had such other
21 options, such as using puts instead of
22 covenants?
23     A.   I thought about it.  It wasn't very
24 persuasive to me as a line of argument.  I

Page 57

Longstreth

1 think that if I were a director, or if I were
2 in charge of the argument, I would say well,
3 if that's the case, do what you can do
4 without tampering with our business, but if
5 you're going to tamper with our business, if
6 that's the way you want to do this, then
7 we're going to sit down and talk about what
8 it is going to cost you.
9    Q.   Well, can you explain to me, you
10 said you didn't.  You said you thought about
11 it and "it wasn't very persuasive to me".
12    Can you describe for me the
13 analysis you performed in making a judgment
14 as to whether Mr. Fowler had correctly
15 analyzed the put option, the option of using
16 puts?
17    MR. FRIEDMAN:  I object to the
18    form of the question because you
19    gave -- the witness gave you a
20    complete answer and you read back a
21    phrase from his prior answer.  Why
22    don't you read back the entire answer?
23    You have his explanation and opinion
24    at his prior answer.

Page 58

Longstreth

1    A.   It's in my report.
2    Q.   Can you show me where in your
3 report?
4    A.   It's throughout my report.
5    Q.   Can you show my any specific point
6 of your report where I can find it?
7    MR. FRIEDMAN:  I want the record
8    to be clear that the witness has
9    answered your questions on this
10    subject matter as well.
11    MR. LOCKWOOD:  I'm just trying to
12    avoid surprises.
13    Q.   If you can show me where in your
14 report I can find this answer, I would
15 appreciate that.
16    A.   It's on every page.  I can't
17 pinpoint it.  As I've said repeatedly, the
18 covenants were to transfer of the rights and
19 responsibilities of the board to run the
20 business at Marvel from that board to the
21 indenture trustee and the noteholders,
22 neither one of which had any fiduciary duty
23 whatsoever to the stockholders, particularly
24 the minority stockholders or Marvel itself.

Page 60

Longstreth

1    Q.   If you have no further analysis?
2    A.   I have nothing to add to that.
3    Q.   So there is nothing supporting your
4 judgment beyond what you said in the previous
5 answer; is that correct?
6    MR. FRIEDMAN:  I object to the
7    form of the question.
8    A.   My expert opinion and my rebuttal
9 opinion support my judgment.
10    Q.   What analysis did you perform, if
11 any, with respect to the question of whether
12 MacAndrews & Forbes had alternatives to the
13 restricted covenants in its pursuit of a
14 financing?
15    MR. FRIEDMAN:  I object to the
16    form of the question.
17    A.   I considered all of this.  I have
18 nothing to add.
19    Q.   I'm trying to understand your
20 thinking, so that we can hear about it at
21 trial and get an understanding of where
22 you're coming from.
23    So what other than you considered
24 it, can you tell me anything more?

Page 59

Longstreth

1    That's the essence of the problem
2 with these negative covenants.  And that
3 analysis could not be applied to either a put
4 or a margin loan.
5    Q.   Why don't you take a look at your
6 rebuttal report, again.
7    Page 2.  You have a sentence that
8 provides "some specifics follow".  And then
9 below that there is some numbered paragraphs.
10    A.   Uh-huh.
11    Q.   Are there any specifics omitted
12 from your report?
13    A.   I don't know.
14    Q.   Sitting here today, do you know of
15 any specifics that are missing from the
16 report?
17    A.   Well, each of these points could be
18 elaborated at greater length, but there is
19 nothing, I don't think there is anything that
20 is coming out of left field, it has nothing
21 to do with the points I'm making here.
22    Q.   So there is no --
23    A.   I would have to reserve the right
24 to elaborate the paragraphs I have set out

Page 61

Longstreth

here, particularly if I'm asked questions about it.

Q.   That invites me to go through all the paragraphs, so why don't we do that.

As to the second paragraph of number one, the brief two sentence paragraph, it says, "As to benefits, the wealth extraction from Marvel accrued solely to the benefit of Ronald O. Perelman, nothing of benefit accrued to Marvel or its minority shareholders."

In your analysis, what was the amount of the benefit that Mr. Perelman obtained as a result of the restrictions?

A.   The dollar amount?

Q.   Yes.

A.   I think it was something like 535.

Q.   So in your view, the full amount of the proceeds of the note offerings is the amount of the benefit that Mr. Perelman obtained as a result of having these restrictions in place; is that correct?

A.   Yes.

Q.   And you are aware that Mr. Fowler's

Page 62

Longstreth

report, and I can show you where in his report he does an analysis of the amount of the benefit obtained by Mr. Perelman as a result of the restrictions.

Can you look at that portion of his report?

A.   I looked at it.

Q.   It's section 4 that begins on page 12, and it goes on for several pages and has many subparts.

MR. FRIEDMAN:  Is there something that you want the witness to read?

MR. LOCKWOOD:  Well, I'm going to ask him a question right now.

Q.   Do you have anything more specific in response to Mr. Fowler's several page analysis of the benefits to Mr. Perelman beyond the two sentences that I see here on page 2 of your rebuttal report?

MR. FRIEDMAN:  When you refer to Mr. Fowler's analysis, which portion are you now referring to so the record is clear?

MR. LOCKWOOD:  On page 12, there

Page 63

Longstreth

is a Section 4, "Benefits to the Marvel Holding Companies of the Restrictions".

MR. FRIEDMAN:  And that continues until page what, until page 27?

MR. LOCKWOOD:  Yes.  Pages 12 to 26 are the benefits of his analysis.

A.   12 to 26?

Q.   Yes, 14 pages of analysis on that point.

MR. FRIEDMAN:  You want the witness to tell you if he agrees or disagrees with those 14, or rather 15 pages?

MR. LOCKWOOD:  Yes, I have two sentences in his expert report.  I'm looking for anything beyond those two sentences that responds to those pages.

A.   I have nothing to add.

Q.   In the next section, I mean next paragraph, as to the costs, do you see that?

A.   Yes.

Q.   "The risk of the note issuance were

Page 64

Longstreth

borne by Marvel, whose assets were in practical effect the sole resource of repayment."

A.   Source.

Q.   "Source of repayment."

What do you mean by that?

A.   The -- what I mean by that is that the proceeds of the notes flowed to Ronald Perelman, 100 percent.  The obligations on the notes were incurred by holding, which had no assets other than the stock of Marvel.  So the source of payment of both interest and principal on the notes was understood by the noteholders to be and expected to be solely the assets and business of Marvel.  And if the payments were not forthcoming, or other agreements by the holding companies to the noteholders were violated, the sole recourse of the noteholders was to foreclose on the stock and take over control of Marvel, and find a way either through running the business successfully or liquidating it to obtain payment.

Q.   Was it your understanding that the

Page 65

Longstreth

1 investors in the notes were looking to the
2 cash proceeds that Marvel would generate in
3 its business as a source of repaying the
4 notes?
5     A.   Yes.  Yes, that the profit making
6 potential of Marvel, or the value of its
7 assets, one or the other or both.  They held
8 80 percent of the residual value of Marvel as
9 security for payment on the notes.  That was
10 all they had.  So upon a default, they could
11 take the stock only representing 80 percent,
12 but that's a controlling block, and they
13 could do what they wanted to do with it in
14 order to try to obtain repayment of their
15 notes.
16     Q.   Paragraph 30 of Mr. Fowler's
17 report, can you take a look at that for a
18 moment?
19     A.   30?
20     Q.   Yes.
21          It may help to look at paragraph 29
22 to put it in context.
23     A.   Yeah.
24     Q.   In his, in Mr. Fowler's --

Page 66

Longstreth

1     MR. FRIEDMAN:  Do you want the
2 witness to read 30 as well as 29?
3     Q.   Yes, 30 as well as 29.  Let me know
4 when you have read those two.
5     A.   Yes, okay.
6     Q.   I'll attempt to paraphrase what 29
7 and 30 say, but the essence of them is that
8 Mr. Fowler is analyzing whether the investors
9 were looking to their ability to control the
10 operations of Marvel, or that they were
11 looking to the value of the collateral,
12 meaning the stock price of the shares that
13 were pledged as their source of repayment,
14 and concludes that it was what he calls a
15 break even analysis based on stock price that
16 they were looking to make this investment.
17          Do you have a reaction to that
18 analysis?
19     A.   Well, my reaction is that that's
20 a -- that's not an accurate statement.
21 Unless it's based possibly upon a very clear
22 internal memo that the noteholders wrote
23 indicating what's in their heads when they
24 negotiated the deal.  I haven't seen such a

Page 67

Longstreth

1 thing.  I think it is a great over
2 simplification.
3     Q.   Have you done any analysis of the
4 documents that Mr. Fowler looked at or any
5 other documents relating to the negotiation
6 or structuring of the notes?
7     A.   I have done -- I have spent a whole
8 career doing secured borrowings.  And I think
9 I know what's in the minds of people in
10 general when they take a pledge of stock and
11 impose covenants on a company that is the
12 issuer of the stock.  And it isn't simply the
13 value, the public market value of the stock,
14 if it has a public market.  It is a bundle of
15 things.  There is an upside and a downside.
16 And I think it is very difficult to say that
17 these noteholders had no interest in
18 operational controls that they bargained for
19 and which we find in the agreement.
20     Q.   What is your basis for that?
21     A.   Common sense.
22     Q.   Other than common sense, did you do
23 any analysis of the underwriter's memos or
24 similar transactions or anything like that to

Page 68

Longstreth

1 support your view?
2     A.   No, I'm basing my view on my
3 experience of doing a large number of secured
4 note agreements.
5     Q.   In those secured note agreements,
6 were those situations where the issuer of the
7 notes had no expectations of obtaining any of
8 the cash flows of the underlying business?
9     A.   I don't remember.  I probably could
10 find some that were and some that weren't; I
11 don't know.  What I'm getting at is the sole
12 source of payment in this case was from
13 Marvel's business and profits.  And a secured
14 lender in that situation is looking both at
15 the prospect of selling the stock, but also
16 looking at the prospect that the stock has
17 declined in value to the point where you
18 can't recover by selling the stock.  Selling
19 the stock would require registration in this
20 case.  It's a controlling block of a public
21 company.  It's very complicated.
22          And the decline in the stock price
23 could occur, in fact, I don't know that it
24 didn't occur in this case, with such rapidity

Page 69

Longstreth

Do you disagree with that viewpoint?

A. I don't think that this is an accurate statement of what Mr. Hammermesh says.

Q. What is it that you believe is the accurate statement that Mr. Hammermesh said?

A. He found some case support for the proposition and only the proposition that you cannot -- a minority cannot issue stock solely for the purpose -- expressly for the purpose of taking away control.

But putting that aside, there are a million business reasons why you would justify that, and one of them might be to save a company from bankruptcy.

Q. Have you ever been on the board of directors of a company that had a controlling shareholder?

A. Have I ever been on the board?

Q. Yes.

A. No.

Q. Have you ever -- I don't want to get into attorney-client privilege, so I'll

Page 114

Longstreth

ask a broad question.

A. That's all right.

Q. Have you ever been an advisor to a company that had a controlling shareholder?

A. Yes, a number of times.

Q. And was it your view that the directors had some duty to respect the property right that the majority shareholder had in its control position?

A. I don't think the issue came up in my experience. I mean, one such case was the MA Hannah Company controlled Consolidation Coal. We represented Consolidation Coal in a public offering of Consolidation Coal stock. We were very mindful of MA Hannah's control, but I just don't recall the issue coming up.

Q. Well, in your experience, did you ever experience a situation where the board of directors of a company decided to dilute the control position of the controlling shareholder without that controlling shareholder's consent?

A. I don't recall an instance of that.

Q. It would be exceptional if that

Page 115

Longstreth

happened, wouldn't it?

A. I don't know if it would be exceptional or not. I mean, you would have to give me all the circumstances and then depending on how urgent the need was, it might be exceptional, it might not be.

Q. If you were just putting yourself back in the role you were playing as a hypothetical negotiation as an independent director on this point as to whether the board had a power or a duty -- let me rephrase it.

On this point as to whether the board could reasonably expect to dilute a controlling shareholder, is that some issue that you would expect the board to go and seek an opinion of legal counsel about?

A. With reference to this situation perhaps.

Q. With reference to this situation and the issues being asserted by one side?

A. I think you would certainly want to consult counsel.

There is an unreality about your

Page 116

Longstreth

questioning here. If I were an independent director and the company's survival depended upon raising capital through stock, I think I would say to Mr. Perelman, you want to buy some more stock to maintain your control, because this company is going down the tubes. And if you don't want to get out of the way so we can save the company by selling to someone else. I mean, isn't that a rational approach?

Q. And if you did that, would in your view the terms of Section 4.09 prohibit you, as written, would it prohibit you from doing that?

A. Yes.

Q. Could you point me to the language in Section 4.09?

A. No, you're getting me back into the question that I said I answered fully. I assume I mean what 4.09 says is that the holding companies will maintain majority, does it not?

Q. That's what it says. It says the holding company shall at all times be or

Page 117

Longstreth

```
 1          Longstreth
 2   report.
 3       A.  Yes.
 4       Q.  I asked you some questions that
 5   caused this to come up earlier, but I don't
 6   think I have explored it fully.
 7          Is that your final conclusion is
 8   that you take into consideration all of these
 9   issues that you discussed and believe that
10   the consideration that Marvel would have
11   required would likely have been in the order
12   of magnitude of 150 million dollars.
13          Can you explain to me the
14   methodology that you used to reach that 150
15   million dollar figure?
16       A.  Well, it wasn't rocket science or
17   science of any kind. It's just a ballpark
18   judgment. I mean, ballpark being another way
19   of saying order of magnitude. And it is a
20   large number. This was a large transaction
21   in the sense of 553 million dollars being
22   extracted from the company indirectly and
23   going to one stockholder rather than all the
24   stockholders. So at a cost of potential harm
25   to the -- so you look at that, and you look
                                    Page 150
```

```
 1          Longstreth
 2   at the market cap of the company, Marvel at
 3   that time, and say something in this order of
 4   magnitude would be enough. If, and I keep
 5   coming back to the if, because it is very
 6   important in my mind. If I were prepared to
 7   do this at all.
 8       Q.  The first offering, I don't have
 9   the offering memoranda in front of me. Maybe
10   Mr. Friedman can correct me if I'm wrong, but
11   I think the numbers of the first offering are
12   in the range of 380, 390 million dollars?
13          MR. FRIEDMAN: The proceeds of
14       the first offerings I think were in
15       the range of 288.
16          MR. LOCKWOOD: You're right.
17       Okay.
18       Q.  So 288 million dollars, off by 100
19   million. Did you do an analysis of -- let's
20   say that was the only offering, can you tell
21   me under your methodology what the bargaining
22   threshold would have been for that -- because
23   I take it the bargaining would have happened
24   serially, there would have been first
25   offering bargaining, second offering
                                    Page 151
```

```
 1          Longstreth
 2   bargaining, third offering bargaining, so at
 3   the second session?
 4       A.  Do we know, you asked the question,
 5   wouldn't you, how many times are you going to
 6   do this? I mean, how much money are you
 7   going to extract?
 8       Q.  Let's see if we can break it down.
 9   The first offering happens in 1993, it's 288
10   million dollars of the proceeds of the
11   offering, and you're on the board, and I'm
12   just trying to understand based on you have
13   150 million dollars listed here. Can you
14   describe for me under the methodology you
15   employed how much money you would have sought
16   in that first offering?
17       A.  Well, what I'm trying to ask you is
18   do I know that the ultimate issuance will be
19   553 or is it something less?
20       Q.  No, at the first offering, all you
21   know is it is 288. You don't have a crystal
22   ball, you don't know what's going to happen
23   in the future. There is one offering and the
24   facts is as they were at the time in 1993.
25          MR. FRIEDMAN: I want to object
                                    Page 152
```

```
 1          Longstreth
 2   to the line of questioning because the
 3   Fowler report, unless I'm mistaken,
 4   does not break down the negotiations
 5   offering by offering. And I don't
 6   think there is any basis for the
 7   questions along those lines. But if
 8   you want to correct me, I'll stand
 9   corrected.
10       A.  The Fowler negotiation implies it's
11   one negotiation.
12       Q.  Well, let me see if I can help you.
13   I don't want to interrupt you, but I want to
14   respond to your statement.
15          If you look at page 30, the
16   concluding statement of Mr. Fowler's report,
17   it says, paragraph 60, he says that the
18   payments to Marvel would have been 3.8 to 7.6
19   for the Marvel holdings notes, 1.7 to 3.4 for
20   the Marvel parent notes, and 0.9 to 1.1
21   million for the Marvel III notes for a total
22   of 6.3 to 12.6 million.
23          What I'm trying to get at, does
24   your analysis provide for a similar breakdown
25   of an offering by offering amount?
                                    Page 153
```

Longstreth

1    **A.   I haven't done that kind of**
2  **analysis.**
3     Q.   And so you haven't done it to date.
4  Can you describe for me how I can do it using
5  the methodology you employ, how can I do that
6  breakdown?
7     **A.   Well, the market cap of the company**
8  **is still whatever it was, two billion. This**
9  **is a smaller amount of wealth extraction. So**
10 **it would imply a smaller absolute dollar**
11 **value of consideration.**
12    Q.   Okay.
13       So other than it would be smaller,
14 which makes sense to me, what factors would I
15 look at to determine how much it is?
16    **A.   Well, it would -- on the other side**
17 **of things, I would have to think about the**
18 **restrictions and the participation are all**
19 **the same. The restrictions could harm me,**
20 **but there is less money to be paid off and**
21 **get rid of the restrictions, but the**
22 **potential harm is still there. And I mean,**
23 **basically I think as Mr. Fowler says, I would**
24 **have to be thinking of this debt as Marvel**

Page 154

Longstreth

1    **Longstreth**
2  **debt. Because that's how the rating agencies**
3  **look at it. That's how the world looks at**
4  **it. So you look at it as Marvel debt for**
5  **which it is getting no benefit.**
6       **I think the percentage of the**
7  **proceeds that I would ask for would probably**
8  **go up as the amount being raised went down.**
9  **But I don't know how to tell you right here**
10 **what percentage of 288 I would be asking for.**
11 **I would have to -- the potential harm does**
12 **not decline in proportion to the decline in**
13 **the 553 to 288 in my opinion. It declines,**
14 **but not at the same rate.**
15       **So I think you have stumped me and**
16 **I can't answer that question with any**
17 **precision.**
18    Q.   If you go back to the beginning of
19 your report, page 1.
20    A.   Okay.
21    Q.   In the paragraph at the bottom of
22 the page, it starts "in my opinion".
23    A.   Yes.
24    Q.   You stated that "the negotiation
25 depicted by Mr. Fowler bears little

Page 155

Longstreth

1    Longstreth
2  resemblance to one might reasonably expect to
3  occur in a truly arm's length negotiation.
4  Exchange one unrealistically starts with
5  Marvel saying the restrictions hinder our
6  ability to operate Marvel."
7       Is it your understanding that the
8  exchanges listed by Mr. Fowler represent a
9  script or a dialogue of how these discussions
10 would have taken place?
11    **A.   I think that's what he said it was.**
12    Q.   Well, if you read paragraph 59 of
13 Mr. Fowler's report.
14    **A.   59, okay.**
15    Q.   Paragraph 59 on page 27.
16    **A.   Okay.**
17    Q.   Under the heading "Outcome of the
18 Arm's Length Negotiation".
19    **A.   Yes.**
20    Q.   He says, "My judgment is that
21 Marvel and M&F Holdings would have covered
22 all of these points discussed above in their
23 negotiation."
24       So you understand that he is
25 referring to the previous?

Page 156

Longstreth

1    Longstreth
2    **A.   The whole thing, yes.**
3    Q.   Yeah, report. And then he says,
4  "The negotiation would likely occur through a
5  series of back and forth exchanges between
6  the parties where each side asserted their
7  benefits and redistributions to the Marvel
8  holding companies and the costs incurred by
9  Marvel."
10       Without getting to the exact
11 exchanges that Mr. Fowler proposes, do you
12 agree with that approach to laying out how a
13 hypothetical negotiation would take place to
14 try to identify what the back and forth
15 exchanges on arguments or leverage points
16 would be?
17    **A.   Well, except the tense on the word**
18 **incurred is not -- I mean, it's not costs**
19 **incurred. It's the potential harm to the**
20 **company that results from accepting these**
21 **restrictions. That's all.**
22    Q.   And you understood whether or not
23 you were agreeing with this analysis that he
24 did look to what the potential costs to
25 Marvel would be from the restrictions; is

Page 157

1

2  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF DELAWARE
3  ------------------------------------------------x
   RONALD CANTOR, IVAN SNYDER and
4  JAMES A. SCARPONE, as TRUSTEES
   OF:  THE MAFCO LITIGATION TRUST,
5
                Plaintiffs,        Civil Action No.
6                                  97-586
         -against-
7
   RONALD O. PERELMAN; MAFCO
8  HOLDINGS, INC., MacANDREWS &
   FORBES HOLDINGS INC.; ANDREWS
9  GROUP INCORPORATED; WILLIAM C.
   BEVINS; DONALD G. DRAPKIN,
10
                Defendants.
11 ------------------------------------------------x

12       Videotaped Deposition of WILLIAM H. PURCELL,

13 taken in the above-entitled matter before RICHARD

14 GERMOSEN, a Certified Shorthand Reporter, Registered

15 Professional Reporter, Certified Realtime Reporter

16 and a Notary Public within and for the States of New

17 York and New Jersey, taken at the offices of SKADDEN,

18 ARPS, SLATE, MEAGHER & FLOM, LLP, 4 Times Square,

19 New York, New York  10036, on October 29, 2002,

20 commencing at 10:05 a.m.

21

          DAVID FELDMAN & ASSOCIATES (USA)

23          575 Madison Avenue, 10th Floor

24            New York, New York  10022

25        (212) 921-0771    Fax: (212) 921-0718

REVISED TRANSCRIPT



122

WILLIAM H. PURCELL

1  hand.
2      Q.    No, but did you discuss that at
3  anyplace in any of your reports about the
4  ability to issue equity?
5      A.    I did not. I think I did
6  indirectly just to add to that question when
7  Professor Holthausen in his rebuttal -- well, I
8  remember he said I didn't consider the -- but I
9  guess those were issued at the same time so I
10  never responded to the fact that he said I
11  didn't consider various flexibility options.
12  Obviously I read his report so I guess I never
13  did respond to that because both reports were as
14  of the same date.
15      Q.    In your rebuttal report I'm
16  directing your attention to Paragraph 18.
17          MR. GOLDWATER: Rebuttal report?
18          MR. ZIMET: Yes.
19          MR. GOLDWATER: Okay.
20          MR. ZIMET: Exhibit 2.
21      Q.    Is the point that you're making
22  there is that if -- that Marvel had the
23  flexibility to issue twenty-two million
24  shares -- well, what is your point? Is your
25

124

WILLIAM H. PURCELL

1      Q.    Who did that calculation?
2      A.    Who did that calculation?
3      Q.    Yes.
4      A.    I did.
5      Q.    Do you recall how you did it?
6      A.    I'm not being facetious. I don't
7  know if you mean if I did it with a calculator
8  or --
9      Q.    No.
10      A.    I took various assumptions which
11  I think are explained in the footnote at what
12  share a price you issued the shares.
13      Q.    Well, the share price, the share
14  price only tells you how much money you're going
15  to raise, right?
16      A.    No. The share price tells you
17  the number of shares that you issued in raising
18  that money also.
19      Q.    Okay, but in order to calculate
20  the dilution what do you need to know?
21      A.    Well, dilution is a simple
22  calculation. If you take the total number of
23  shares that are outstanding at a given point in
24  time and you take what Mr. Perelman's ownership
25

123

WILLIAM H. PURCELL

1  point that had they issued twenty-two million
2  shares they would have gone below -- they would
3  have caused the holding companies to bust the
4  covenant?
5      A.    No. I think my point here was
6  almost the same as Professor Holthausen that
7  said they clearly could have issued -- finance
8  themselves more soundly with a lot of equity
9  without breaching that particular covenant, but
10  not referring to the eighty percent provision
11  which is a different subject.
12      Q.    Right.
13          I don't understand the however.
14  However, the ownership dilution to Mr. Perelman
15  that starts at the bottom of 18, are you saying
16  that had they issued twenty-two million shares
17  the dilution would have taken him below --
18      A.    If they had issued that much,
19  right. There was an order of magnitude. In
20  other words, if they would have issued a little
21  bit less would have been higher. Just
22  tying it to the six hundred million. That's
23  all.
24      Q.    I see.
25

125

WILLIAM H. PURCELL

1  is in those shares at that point in time and you
2  add in this example twenty-two million shares to
3  the denominator then you calculate what
4  percentage the eight point two percent before
5  you issue the twenty-two million shares fell to
6  after you issued the twenty-two million shares
7  and the difference is the amount of dilution.
8      Q.    This ain't high finance?
9      A.    No.
10      Q.    Now, you express the opinion in
11  Paragraph 19 --
12          MR. ZIMET: It was high finance,
13  not tie finance.
14      Q.    You express the opinion on
15  Paragraph 19 the target capital structure for a
16  company such as Marvel would have been no more
17  than thirty percent debt and at least seventy
18  percent equity.
19          Do you see that?
20      A.    I do.
21      Q.    Is that a ballpark figure,
22  estimate, mathematically precise? What is that?
23      A.    No, it's an order of magnitude
24  number. In general in corporate finance
25



**126**

WILLIAM H. PURCELL

1
2 assuming you're a non-regulated company like a
3 utility anything considered above fifty percent
4 debt in your capital structure meaning less than
5 fifty percent equity is considered as a general
6 statement reasonably leveraged. Certain
7 companies people feel are better able to handle
8 a higher level of debt in their capital
9 structure than certain other companies.
10        Based on my experience a company
11 like Marvel which is a non-asset related
12 company, but a brand people type of company that
13 type of company generally investment bankers and
14 academics would say everything else being equal
15 should have a lower amount of debt in its
16 capitalization than something like a Gillette
17 that sells razor blades that's very predictable
18 and has a number of plants and tangible assets
19 and what have you.
20        So this is an order of magnitude
21 judgment that in my view most investment bankers
22 would say in advising a company Marvel
23 independent, if you will, that the sound capital
24 structure for you going forward in terms of when
25 you're selling equity and how you're financing

**127**

WILLIAM H. PURCELL

1
2 acquisitions would be a debt position of less
3 than fifty percent and in my judgment they'd
4 probably say at a maximum no more than
5 thirty-five to forty percent. So this is an
6 order of magnitude type of statement.
7    Q.   All right.
8        Do you know why as a matter of
9 fact the managers of Marvel chose to finance the
10 acquisitions of Fleer, Skybox and Panini in the
11 manner they did?
12    A.   Well, in the manner they did
13 which were cash acquisitions.
14    Q.   And financed with out of bank
15 debt?
16    A.   Right, and your question is?
17    Q.   Do you know --
18    A.   I do know that.
19    Q.   Yes, and the question is why did
20 the managers of -- do you know why the managers
21 of Marvel elected to finance those acquisitions
22 in that manner?
23    A.   I don't have specific knowledge.
24 If you want my views fine, but I do not have
25 specific knowledge as to their thinking at the

**128**

WILLIAM H. PURCELL

1
2 time, no.
3    Q.   All right.
4        I think in your report you
5 describe those acquisitions. Let me find the
6 reference. Footnote 3 in the rebuttal report,
7 you say -- are you with me?
8    A.   I do.
9    Q.   Where did you get those figures,
10 that is where did you get the notion that the
11 Fleer acquisition was two hundred and fifty-six
12 million?
13    A.   I believe from their annual
14 report or 10K.
15    Q.   Where did you get the notion that
16 the Skybox acquisition was a hundred and fifty
17 million dollars?
18    A.   Again, either from annual
19 reports, 10Ks or analyst reports of which I read
20 many covering Marvel at the time.
21    Q.   Did you make any effort to verify
22 those figures?
23    A.   As to whether they were correct?
24    Q.   Yes, or whether you just -- as to
25 whether they're correct or whether you correctly

**129**

WILLIAM H. PURCELL

1
2 reported them?
3    A.   Well, I don't think I made an
4 error in transcription or a typo, that would
5 have been caught and anything that's in a
6 company document or an analyst company that's
7 been following the company for a period of time
8 most of which were Merrill Lynch analyst reports
9 was also one of the investment bankers for
10 Merrill I would assume to be correct. So didn't
11 double verify.
12    Q.   You commented about the
13 desirability or the normative practice perhaps
14 of financing long-term assets with long-term
15 borrowings or long-term debt.
16    A.   Long-term capital. Either.
17    Q.   Fair enough.
18        Is there such a thing as
19 short-term equity?
20    A.   No.
21    Q.   Okay.
22    A.   But when you talk about long-term
23 capital I'm just saying you can't talk about
24 just debt.
25    Q.   Okay.

A 316

134

WILLIAM H. PURCELL
1
2  it's your Drealy book or any of the corporate
3  finance book people talk about risk profiles.
4  When they're talking about capitalization
5  structure you won't find an academic text that
6  says a company should have a specific capital
7  structure. They talk about the risk and
8  flexibilities that one should consider in
9  soundly financing companies. So with that
10 overview I'm not sure exactly what you're
11 looking to find in a textbook.
12     Q.    Do the names Modigliani and
13 Miller mean anything to you with respect to
14 finance?
15     A.    Sure.
16     Q.    What do you know about them?
17 What does it mean to you? What do those names
18 mean to you?
19     A.    They came up with a number of
20 different corporate financing theories some of
21 which are controversial still to this day.
22     Q.    Do you know whether they've
23 published any views about the composition of
24 corporate balance sheets with respect to
25 allocations as between debt and equity and the

135

WILLIAM H. PURCELL
1
2  preference for each?
3     A.    As a matter of fact the basic
4  theorem was that the total enterprise value of
5  the firm does not change significantly regarding
6  the mix of debt and equity over capitals in the
7  capital structure.
8         I believe they did not comment on
9  the risk profiles that resulted from those same
10 capital structures. They were commenting
11 primarily regarding whether the total value,
12 whether the total enterprise value of a firm
13 changed significantly depending upon the nature
14 of its capital structure.
15        I probably surprised you that I
16 knew about Modigliani. Did I?
17     Q.    No, it would have embarrassed you
18 if you didn't know them.
19        In Paragraph 16 of your rebuttal
20 report you used the word, you say the priority,
21 first the priority given to the three holding
22 company note issues.
23        Do you see that reference?
24     A.    I'm sorry, I have not found that
25 yet. In Paragraph 16?

136

WILLIAM H. PURCELL
1
2     Q.    Yes, in your rebuttal report.
3     A.    Okay. I see the sentence, first,
4  okay.
5     Q.    Yes. You're referring to -- am I
6  correct that when you use the word priority
7  you're not meaning it in any sort of sense of
8  prioritization of liens, but as much as in terms
9  of marketing priority and market attention, is
10 that right?
11     A.    Correct.
12     Q.    When you make the statement that
13 you did that the target capital structure for a
14 company such as Marvel would have been no more
15 than thirty percent debt and at least seventy
16 percent equity I understood your answer, your
17 justification for that conclusion to have been
18 your assessment of what investment banker advice
19 would be for companies configured like Marvel.
20        In addition to that are you aware
21 of any academic literature that would warrant
22 that conclusion that you can cite to me?
23     A.    Again, the academic literature,
24 as I said, goes to risk profiles of companies
25 with the conclusion that the higher the risk

137

WILLIAM H. PURCELL
1
2  profile or the more volatile the business or the
3  less tangible assets as a general statement they
4  recommend less debt in that capital structure.
5  They don't then pinpoint numbers.
6     Q.    I understand that.
7        My question is a little more
8  specific. Can you give me with respect to any
9  academic literature or empirical studies or any
10 business literature the names of the authors and
11 the titles of the references that say what
12 you --
13     A.    I believe some of them are
14 footnoted in either the first report or the
15 second report. As I testified earlier I took
16 some of the length out, but one of my favorite
17 quotes is Warren Buffett who most people know
18 who he is and those that don't know Modigliani
19 and his famous quote is that people who feel
20 that a lot of debt helps them focus on running
21 the business better because they are more
22 focused on their risk are not very smart people
23 because the roads of business are filled with
24 potholes and you cannot possibly miss them all.
25     Q.    Yes, but there is --

A 317

138

WILLIAM H. PURCELL
1
2    A.    And that is the risk of having
3    too much debt.
4    Q.    That is Warren Buffett's view,
5    but there is certainly an academic view and a
6    published view that having a higher level of
7    debt disciplines the managers to be very
8    efficient and very careful in their management
9    of the business?
10    MR. GOLDWATER: Excuse me.
11    Objection to the form.
12    Go ahead.
13    THE WITNESS: I'm sorry.
14    A.    People have said that mainly in
15    more recent history in defense of LBO type of
16    finances. Most well-regarded academics and
17    businessmen such as Warren Buffett say that is a
18    lot of hooey and as you pointed out in today's
19    current climate where business is not as booming
20    it has been shown to be a lot of hooey because
21    most highly leveraged companies have gone into
22    bankruptcy.
23    Q.    But it wasn't thought to be hooey
24    in '92, '93, '94 and '95 as universally as you
25    thought as it to be --

140

WILLIAM H. PURCELL
1
2    company and we can get into that if you want.
3    Q.    Well, I'm trying to understand
4    your report. Your report is -- are you second
5    guessing a business decision that was made with
6    which you disagree which is what it sounds like
7    to me here as opposed to saying that they would
8    have done it differently?
9    MR. GOLDWATER: Objection.
10    Q.    Isn't it a fact that what you --
11    Withdrawn.
12    I think the record will speak for
13    itself with respect to our last comments.
14    In the course of the expert
15    testimony that you've provided was there ever a
16    point in time where a court criticized your
17    testimony or evidence that you know of?
18    A.    Never.
19    Q.    Did you win every case that you
20    were -- did your side prevail in every case in
21    which you provided expert testimony?
22    MR. GOLDWATER: Let's hope so.
23    A.    The vast majority but not every
24    case.
25    Q.    All right.

139

WILLIAM H. PURCELL
1
2    MR. GOLDWATER: Objection to the
3    form.
4    Go ahead.
5    Q.    But it wasn't thought to be that
6    much hooey back in '93, '94 and '95 as you say
7    it is thought to be so now, right?
8    MR. GOLDWATER: Objection.
9    Go ahead.
10    A.    I would disagree. I would say
11    that the more prominent academicians as well as
12    businessmen did not believe that to be true.
13    The majority of people never believed that to be
14    true. The people who were supporting LBOs and
15    we believed it to possibly be true, but I
16    believe in my view and having lived through this
17    era that that was the minority of people.
18    Q.    Yes, and but the LBO phenomenon
19    was certainly one that was extant in the time
20    period '93, '94 and '95. People were doing LBOs
21    and they were doing it to make money, right?
22    MR. GOLDWATER: Objection to the
23    form.
24    A.    Absolutely which has nothing to
25    do with sound corporate finance of running a

141

WILLIAM H. PURCELL
1
2    In fact, when we talked about
3    Weinberger before and then we were interrupted
4    by my efforts to get a hold of the judge I think
5    I had asked you and I don't think you had
6    answered the question.
7    As I recall Weinberger you
8    testified in the Chancery Court on behalf of the
9    Signal Corporation, right?
10    A.    Correct.
11    Q.    And the Delaware Supreme Court
12    reversed that case against the interests of
13    Signal, right?
14    A.    Only in part and I'll give you
15    the exact answer because I'm maybe one of the
16    world experts on Weinberger versus UOP.
17    The judge made no changes in the
18    valuation as to what was fair or not fair which
19    was the subject of my testimony. The judge
20    after coming back from the Supreme Court and
21    this is what has begun the entire fairness
22    versus just valuation the judge said fairness
23    involves not just fair price which was the
24    initial testimony on valuation, but fair process
25    and the case was reversed and the judge threw

A 318

158

WILLIAM H. PURCELL
1 seven months ago, but that's to my recollection
2 how we -- how this came about the document
3 itself and what was in it.
4     Q.    What is the logic or the
5 rationale that underpins that number in your
6 mind?
7     A.    Well, you had had Mr. Gittis in
8 effect admit in his deposition that neither the
9 Andrews Group nor anybody else in his view would
10 put meaningful new equity into Marvel with the
11 existence of that provision in place without
12 waivers from the holding company bondholders
13 and, in fact, they couldn't get their waiver and
14 Andrews withdrew from the offer and that was
15 rather concrete evidence, if you will, if that's
16 the proper term to conclude that, which I had
17 already believed anyway that the existence of
18 these covenants in the holding company issues
19 was detrimental in many ways as I talked about
20 before to Marvel, but in the last stages of his
21 life also prevented it from getting the infusion
22 that could have been possible to keep it alive.
23 So it was the coup de grace if you will.
24     Q.    And the infusion to keep it alive

*(lines 1–24 shown; line numbering)*

159

WILLIAM H. PURCELL
1 from whom?
2     A.    To keep it alive as a going
3 concern for the then existing equity holders.
4     Q.    And the infusion that Mr. Gittis
5 was talking about was an infusion of additional
6 capital from Mr. Perelman, right?  That was the
7 essence of the Andrews Group proposal?
8     A.    Oh, the Andrews Group, but it
9 reflected on all the, you know, whether it was
10 Ikon and/or banks and everybody being unable to
11 reach either a consensual agreement or Ikon's
12 involvement.  I mean if you could not get the
13 bondholders to waive this provision the company,
14 the equity that it needed you would end up
15 replacing the existing control holder with
16 somebody else which couldn't be done without
17 changes in that instance.
18     Q.    Well, Mr. Ikon made a proposal,
19 did he not?
20     A.    Mr. Ikon made some proposals,
21 correct.
22     Q.    Yes, and did he follow through
23 on -- did he consummate any of his proposals to
24 acquire Marvel and stand in the shoes of

160

WILLIAM H. PURCELL
1 Mr. Perelman with respect to following the
2 pattern of the Andrews Group proposal?
3         MR. GOLDWATER:  Objection.
4     A.    He made a number of suggestions,
5 but none of them came to consummation including
6 the rights offering where everybody would
7 participate including bondholders, et cetera.
8     Q.    Do you know why they weren't
9 consummated?
10     A.    Well, you could --
11     Q.    Do you know?  Do you know why --
12     A.    Do I know for a fact?
13     Q.    Yes.
14     A.    Not other than what I've read.
15     Q.    All right.
16         Now, I still don't understand
17 where the four hundred and seventy million
18 dollar figure comes from.  What was the
19 calculation that that represents?
20     A.    Well, it's a difference between
21 four and five-eighths which was the price of the
22 stock the day prior to the announcement zero on
23 a hundred and one million shares.
24     Q.    So do you know whether, in fact,

161

WILLIAM H. PURCELL
1 Marvel was worth four and five-eighths times a
2 hundred and one million shares the day, the day
3 the Andrews Group proposal was made or the day
4 before?
5     A.    Well, there is no -- without
6 having projections and other ways to perform a
7 valuation of Marvel certainly it was a widely
8 traded stock.  Information was widely
9 disseminated in the marketplace.  Analysts were
10 still following and commenting on the company.
11 There was no reason to believe that the
12 efficient market wasn't working reasonably well
13 because of lack of liquidity or what have you,
14 but put it the other way there is no reason to
15 believe that the market based on all the
16 information it had didn't have a reasonable view
17 as to the value of Marvel at that time.
18     Q.    When Marvel went into bankruptcy
19 do you know whether or not it hired investment
20 bankers and others to review just the things you
21 were talking about, its prospects, its plans,
22 its assets and express a view as to the value of
23 the enterprise at that point in time?
24     A.    Well, actually one of the things

A 318a

Cantor, et al.
Joseph T. Walsh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, IVAN SNYDER and        )
JAMES A. SCARPONE, as TRUSTEES OF     )
THE MAFCO LITIGATION, and as          )
SUCCESSORS IN INTEREST TO MARVEL      )
ENTERTAINMENT GROUP, INC., et al.,    )
                                      )
              Plaintiffs,             )
                                      ) Civil Action
    v.                                ) No. 97-586-KAJ
                                      )
RONALD O. PERELMAN, MAFCO            )
HOLDINGS INC., MacANDREWS &          )
FORBES HOLDINGS INC., ANDREWS        )
GROUP INC., WILLIAM C. Bevins and    )
DONALD G. DRAPKIN,                   )
                                      )
              Defendants.             )

              Deposition of JOSEPH T. WALSH, ESQUIRE
taken pursuant to notice at the law offices of
Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney
Square, 7th Floor, Wilmington, Delaware, beginning at
11:53 a.m., on Monday, May 8, 2006, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:
        EDWARD A. FRIEDMAN, ESQ.
        FRIEDMAN KAPLAN SEILER & ADELMAN LLP
          1633 Broadway
          New York, New York  10019-6708
          For the Plaintiffs


                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com                    A 319

Cantor, et al.
Joseph T. Walsh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 6

1  connection with your work on this case?
2  **A. Yes.**
3  Q. And do you know the date of that engagement
4  letter?
5  **A. Again, my estimate would be the end of the**
6  **summer or the fall.**
7     MR. ALLINGHAM: And I don't think that, I
8  don't think the engagement letter would fall out --
9  I'll call for production of the engagement letter. I
10  don't think we have had any practice about those.
11     MR. FRIEDMAN: I will take that under
12  advisement. My recollection is this is the first
13  expert witness as to whom there has been a request for
14  the engagement letter.
15     Is that your understanding as well?
16     MR. ALLINGHAM: I don't know.
17  BY MR. ALLINGHAM:
18  Q. Tell me everything you recall that you and
19  Mr. Friedman discussed at any time up to the point at
20  which you were engaged.
21  **A. Well, it was a general conversation about**
22  **getting involved either as an expert or consulting**
23  **with his office and it was rather general.**
24     **And then he sent me a copy of the Third**

Page 7

1  **Circuit decision. I think he also supplied me with**
2  **the briefs that had been filed in the Third Circuit,**
3  **just to give me the background on it.**
4     **And that was basically it. And I said**
5  **yes, I would be happy to do what I could in the way of**
6  **giving them an opinion on matters involved in the**
7  **case.**
8  Q. Now, as you sit here today, are you aware of
9  anything in Walsh Exhibit 1 that you now view to be
10  inaccurate, incomplete or incorrect?
11  **A. You're talking about my report?**
12  Q. Yes, sir.
13  **A. No.**
14  Q. Okay. Do you have any opinions that you have
15  been asked -- sorry. Let me start again.
16     Apart from the opinions expressed in Walsh
17  Exhibit 1, your report, have you been asked to provide
18  any other opinions to the plaintiffs in connection
19  with this case?
20  **A. No.**
21  Q. Am I then correct that the extent of your work
22  in connection with this case is reflected in Walsh
23  Exhibit 1, your report?
24  **A. That is correct.**

Page 8

1  Q. Okay. If you will look at Exhibit 2 to Walsh
2  Exhibit 1, this is the last two pages of your report
3  and it's called Materials Considered.
4  **A. Yes.**
5  Q. Are these all the materials which you
6  considered in connection with the preparation of your
7  report?
8  **A. I think there was one other matter which**
9  **Mr. Friedman brought to my attention and I think it**
10  **was the rebuttal expert, and I don't remember his**
11  **name. It was the financial expert retained by you to**
12  **offer a rebuttal with respect to the ability of Marvel**
13  **to engage in certain financing and I think he showed**
14  **me a page in that that dealt with the ability of**
15  **Marvel to engage in debt financing and the fact that**
16  **the parent's holding companies' financial situation**
17  **would be reflected in any debt issued by the**
18  **subsidiary, Marvel. And I think that was the only**
19  **thing I saw.**
20  Q. The only thing you saw in addition to what's on
21  Exhibit 2?
22  **A. No. That was not on Exhibit 2 because --**
23  Q. That's the only thing, in addition to the
24  materials listed on Exhibit 2, the only other thing

Page 9

1  you recall having looked at in connection with the
2  preparation of your report is this excerpt from one of
3  the defendants' rebuttal expert reports?
4  **A. That's correct.**
5  Q. If I gave you the name, would you know it?
6  **A. Yeah.**
7  Q. Holthausen?
8  **A. I think so.**
9  Q. Okay. The alternatives are Fowler or Parsons.
10  **A. I think it was Fowler.**
11     MR. FRIEDMAN: I'm happy to help.
12     MR. ALLINGHAM: Sure. Go ahead.
13     MR. FRIEDMAN: And the witness can correct
14  me if his recollection is different. I believe I
15  showed the witness the Fowler rebuttal report which
16  was subsequent to the witness's preparation of his
17  report.
18     THE WITNESS: Yeah. It was Fowler.
19     MR. ALLINGHAM: Okay. Good.
20  BY MR. ALLINGHAM:
21  Q. Who identified the materials on Exhibit 2 for
22  you to look at?
23  **A. These were all sent to me by Mr. Friedman.**
24  Q. And when did you begin reviewing the materials

3 (Pages 6 to 9)

A 320

Cantor, et al.
Joseph T. Walsh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 78

1  working on this report?
2  **A. Fifteen, twenty.**
3  Q. Did you have anybody working with you on this
4  project?
5  **A. No.**
6  Q. So to --
7  **A. I had an associate getting me cases, but nobody**
8  **did any research for me.**
9  Q. That is to say you would do the research but
10  ask an associate to go chase down the actual copy?
11  **A. Yeah.**
12  Q. I have some sympathy with this. I do this too.
13      Is that because you don't like to read
14  cases on the screen?
15  **A. Yeah. I'm the old-fashioned type. I want the**
16  **paper in my hand.**
17  Q. So that associates chased down the paper
18  opinion but nobody did research for you on this
19  project?
20  **A. No.**
21  Q. Fifteen to twenty hours at $510 an hour is
22  somewhere between...
23      Just a minute.
24  **A. 7500 to 10,000.**

Page 79

1  Q. 7500 to $10,000, correct?
2  **A. Yeah.**
3  Q. Is that a good ballpark figure?
4  **A. That's a good ballpark.**
5  Q. And have you been paid for that work?
6  **A. Yes.**
7  Q. On Exhibit 2 there are several expert reports
8  listed, including the report of Bevis Longstreth,
9  Andrew Carron and Jeffrey Balaban.
10  **A. Yes.**
11  Q. Did you read those reports?
12  **A. I read Bevis Longstreth completely. The other**
13  **two I just glanced at.**
14  Q. Did you read the report of Mr. Longstreth
15  before it was issued on January 12, 2006?
16  **A. No. I didn't read it before it was issued, no.**
17  **I mean, I was given a copy of it I think before I**
18  **finished my report.**
19  Q. But you weren't involved in the drafting of
20  that report?
21  **A. Oh, no. I never have met Mr. Longstreth and so**
22  **I had no part in that.**
23  Q. Did the expert reports of -- we have two
24  minutes left. We got to change the tape.

Page 80

1      THE VIDEOTAPE OPERATOR: Going off the
2  record at approximately 1:56 p.m.
3      (A brief recess was taken.)
4      THE VIDEOTAPE OPERATOR: We're going back
5  on the record at approximately 2:03 p.m.
6  BY MR. ALLINGHAM:
7  Q. Justice Walsh, your report is titled Rebuttal
8  Report Of Justice Joseph T. Walsh, Retired.
9      Am I correct that what you were rebutting
10  in this report is the expert report submitted by
11  Professor Hamermesh?
12  **A. That's correct.**
13  Q. I'm assuming then that you reviewed Professor
14  Hamermesh's report?
15  **A. I did.**
16  Q. Did Professor Hamermesh opine on whether it was
17  a breach of fiduciary duty for Mr. Perelman to include
18  the restrictions in the indenture covenants without
19  submitting those covenants to the Marvel Entertainment
20  board?
21  **A. I think, as I gathered from his report, he said**
22  **in effect that Mr. Perelman had a right as a majority**
23  **owner, majority owner to maintain that control and**
24  **that the restrictions did no more than replicate his**

Page 81

1  **duty, his right under Delaware law to maintain that by**
2  **preventing the Marvel Entertainment board from issuing**
3  **shares which would have a dilutive effect.**
4  Q. That may have been an answer to my question,
5  but I'm not sure.
6      Did you view Professor Hamermesh's report
7  to have been offering an opinion as to whether
8  Mr. Perelman violated his fiduciary duty of loyalty by
9  imposing these restrictions without presenting it to
10  the Marvel Entertainment board?
11  **A. No. That wasn't the thrust. I think what he**
12  **was saying was that there wasn't anything wrong with**
13  **what he did because the end result of what he did was**
14  **protected by Delaware law anyway.**
15  Q. Yes, sir. That's what I understood his report
16  to be saying.
17  **A. Yeah. I didn't, I didn't say that -- I didn't**
18  **read his report as saying that he had a duty to**
19  **present this or present that to any board. I thought**
20  **he was talking about the rights that he had to**
21  **maintain majority control and to protect that right**
22  **against the action of the Marvel board to dilute it.**
23  Q. In the section, in paragraph 12 of your report
24  where you offer the opinion that "In subjecting Marvel

21 (Pages 78 to 81)

Cantor, et al.
Joseph T. Walsh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 82

1  to the restrictions set forth in the Notes, Perelman
2  and his aligned directors failed to discharge their
3  fiduciary duty of loyalty owed to Marvel and Marvel's
4  minority shareholders," is that a rebuttal of anything
5  in Professor Hamermesh's report or is that a separate
6  issue?
7     A.  Well, I was trying to, I really was trying to
8  set the background for what I thought Perelman's
9  general duty of loyalty was and that as part of that
10  he had the obligation to present to the board the
11  thrust of the restrictions, one of which would be
12  requiring that they not attempt to dilute his control.
13        So I thought that was the background for
14  his right to insist that he maintain that control.
15     Q.  You were a trial judge for twelve years.  Is
16  that right?
17     A.  Well, I was actually a trial judge if you count
18  Chancery about fourteen years.
19     Q.  Fourteen years.  I apologize.  I forgot about
20  that.
21        Does it strike you that the first sentence
22  of paragraph 12 represents a, and I don't mean this in
23  a pejorative way, but a usurpation of the trial
24  judge's ultimate decision-making power on dispositive

Page 83

1  issues in the case?
2     A.  Well, I suppose -- I have testified as an
3  expert on several occasions and there's always that
4  fine line between are you trying to usurp the judge's
5  right to determine what the law is, but I think that
6  as a practical matter this is a duty which a director
7  has ab initio.  It's not a question of anybody passing
8  upon it.  It's just looking at a situation and saying,
9  you know, a majority shareholder/director has this
10  obligation.
11     Q.  Well, there's two points in this sentence.  One
12  is what duty exists and the second is did the holder
13  of that duty breach it?
14        Doesn't it strike you that whether the
15  holder of the duty breached that duty is uniquely
16  within the province of the trial judge in this case?
17     A.  I think it might be.  I think that's going to
18  be his ultimate conclusion, but one can certainly
19  point out what the approach should have been of a
20  director in this situation, what the practice of being
21  a director required him to do or not do.
22     Q.  The requirement for expert testimony is that
23  one have some special expertise that would assist the
24  judge in deciding the case.

Page 84

1        Are you suggesting that you have some
2  expertise special and different from that of Judge
3  Jordan in this case in the ability to determine
4  whether Mr. Perelman and his aligned directors failed
5  to discharge their fiduciary duty?
6     A.  Well, I don't claim to have an expertise
7  superior to anybody.  I can only draw upon my
8  experience in being involved in many, many cases where
9  directors acted in such a way and the question arose
10  whether that was in conformity with their legal
11  obligation.  That's all I'm opining on.
12        I'm not saying that's superior to anybody
13  else.  I'm drawing upon my experience.
14     Q.  Isn't that precisely the issue that's presented
15  to Judge Jordan in this case?
16     A.  At the end of the day, it might be.  I don't
17  know what, I don't know what's going to be presented
18  to Judge Jordan.
19     Q.  In all events, we can agree that to the extent
20  that that's the issue to be presented to Judge Jordan,
21  you're not testifying that you have expertise superior
22  to Judge Jordan's on that issue?
23     A.  Absolutely not.  I would assume that if I have
24  any experience that would be of a benefit to anybody

Page 85

1  I'm presenting it.
2     Q.  The cases that you have cited regarding the
3  ability of a board of directors to dilute a majority
4  shareholder --
5     A.  Yes.
6     Q.  -- are Mendel vs. Carroll, a 1994 case, Canada
7  Southern vs. Manabi.  I never know how to pronounce
8  that.  I think it's Manabi, a 1953 case, and Freedman
9  vs. Restaurant Associates, a 1987 case.
10        Do you cite those cases and not more
11  recent ones because you accept Professor Hamermesh's
12  view that the relevant case law is that which was
13  known as of the date of the first issuance of notes up
14  to the date in 1996 when we sort of have all agreed
15  that the restrictions were no longer applying as a
16  practical matter?
17     A.  Well, I cite them because he cited them, with
18  the exception of the one case.
19     Q.  All right.  Are the conclusions set forth in
20  your report with respect to dilution of a majority
21  control position, is the authority for those positions
22  limited to the cases that you have cited?
23     A.  No.  There's been a more recent case that I
24  came across after this was, after my report.

22 (Pages 82 to 85)

Cantor, et al.                                                                    Perelman, et al.
Joseph T. Walsh, Esquire          v.          May 8, 2006
                              C.A. # 97-586-KAJ

Page 86

1  Q.  What was that case?
2  A.  That's the Benihana case.
3  Q.  When did you come across that?
4  A.  Just last week.
5  Q.  How did you come across it?
6  A.  I saw it in the advance sheets.
7  Q.  So you didn't see that case when you did the
8  research for this report?
9  A.  No.  No, I did not.
10 Q.  You're aware that the case was issued in
11 January of 2006?
12 A.  I know it was.  And I catch up to my advance
13 sheets about every three months.  I was reading four
14 of them at one time.  And I always read the Delaware
15 cases and when I glanced at that, I thought that
16 sounds familiar.  And then I saw that Vice Chancellor
17 Parsons had actually cited a couple of cases that I
18 had in my report, so that piqued my curiosity.
19 Q.  Did you shepardize the cases that you had in
20 your report before you issued the report?
21 A.  Yes.
22 Q.  Do you have an explanation for why the Benihana
23 case didn't turn up?
24 A.  Well, I really don't.  I can only tell you that

Page 87

1  I thought the only case that, the only cases I was
2  dealing with really were the cases cited by Professor
3  Hamermesh.
4  Q.  Are you aware of any other cases subsequent to
5  the cases cited in your report that touch on the issue
6  of a majority control and the possible dilution of
7  majority control?
8  A.  No.  Benihana is the only case other than this
9  that I -- as I said, I ran across that by
10 happenstance.  I was just going through the advance
11 sheets last week.
12 Q.  Did coming across the Benihana case cause you
13 to go back and check your research again?
14 A.  No.
15 Q.  Are you familiar with a case called Adlerstein?
16 A.  I don't recall that by name, no.
17 Q.  Do you have a view or are you expressing an
18 opinion as to whether it is the state of the law as of
19 the time of the issuance of the notes that would be
20 relevant to the issues expressed in Professor
21 Hamermesh's report?
22 A.  By that do you mean the law in effect at that
23 time and the cases cited by him?
24 Q.  That's what the directors would have known

Page 88

1  about.  That should be the relevant case law.
2  A.  That's what lawyers would have advised them
3  about, yes.
4  Q.  Fair enough.
5      So you would not, even if you had known
6  about the Benihana case you would not have included it
7  in your report because it would have been after the
8  time when the directors could have considered it?
9  A.  I might have included it because I don't think
10 the law has changed that much in that area.  I think
11 these principles as first announced by Chancellor
12 Seitz back in 1953 is still good law today.
13 Q.  Have you read the Benihana case?
14 A.  Yes.
15 Q.  What did you think of it?
16 A.  What do you mean what did I think of it?
17 Q.  It's on appeal.  You're aware of that?
18 A.  Yes.
19 Q.  Do you think it's rightly decided?
20 A.  I thought that portion that I read -- I was
21 concerned primarily about the board's issuance of
22 shares to dilute control.  I thought it was a correct
23 application.
24 Q.  I gather from your earlier answer that you

Page 89

1  didn't read the whole opinion?
2  A.  Oh, it's a long opinion.  I read it.  When I
3  got to that portion I focused on that.
4  Q.  So my impression was incorrect.  You did read
5  the whole opinion?
6  A.  Oh, yes.  I read it, yeah.  The other portions
7  of the opinion to my view had no application to
8  anything that I was doing.
9  Q.  Let me focus your attention on the opinion
10 expressed in your report in paragraph 16.  Actually,
11 let's start at paragraph 15 and get the agreements as
12 well as the disagreements.
13     In paragraph 15, is it fair to say that
14 you agree with Professor Hamermesh that majority stock
15 ownership is a valuable property right and enjoys
16 recognition as a control premium?
17 A.  Yes.
18 Q.  All right.  And then you also agree with
19 Mr. Professor Hamermesh that a majority shareholder in
20 his capacity as a shareholder is entitled to protect
21 his majority interest from efforts to eliminate or
22 reduce it?
23 A.  Yes.
24 Q.  All right.  You then say, "But that right is

23 (Pages 86 to 89)

Cantor, et al.
Joseph T. Walsh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 90

1 not absolute" and you then cite Mendel vs. Carroll, a
2 case which at least in the qoute that you have here
3 talks about whether a board can do something to dilute
4 a majority shareholder.
5     Do you see that?
6 **A. Yes.**
7 Q. Would you agree with me though that a majority
8 shareholder's right in his capacity as a shareholder
9 is absolute, he can do whatever he wants to as a
10 shareholder to protect his interest, his majority
11 interest?
12 **A. Yes.**
13 Q. Okay. So when you say, "But that right is not
14 absolute," you're really talking about whether there
15 might be rights that a board could exercise that might
16 prevent a majority shareholder from maintaining his
17 majority ownership position?
18 **A. Yeah. The perspective, I'm looking at it from**
19 **the board's perspective.**
20 Q. So by way of example, you would agree with me
21 that if Mr. Perelman had wanted to replace the board
22 of directors, if the board of directors had proposed
23 to dilute his ownership interest below 50 percent
24 Mr. Perelman as majority shareholder would be entitled

Page 91

1 to replace the board of directors if he wants to?
2 **A. I suppose he could.**
3 Q. It's only if he uses his position as a board
4 member that his fiduciary duties would be implicated?
5 **A. Yes. But the focus here is not on his**
6 **fiduciary duties. It's on the right of the board to**
7 **act.**
8 Q. Now, in Mendel vs. Carroll you quote some
9 language which says, quote, "a situation might arise
10 in which a board could, consistently with its
11 fiduciary duties, issue a dilutive option in order to
12 protect the corporation or its minority shareholders
13 from exploitation by a controlling shareholder who was
14 in the process or threatening to violate his fiduciary
15 duties to the corporation."
16 **A. Yes.**
17 Q. The facts in Mendel, was there a finding by the
18 Court that the board was justified in diluting a
19 majority shareholder below a majority position?
20 **A. No. Just the opposite. That's what the quote**
21 **is addressed to, that situation, not in that case,**
22 **that there would be in an egregious situation the**
23 **right of the board to do that.**
24     **This was not the case in Mendel.**

Page 92

1 Q. Mendel was not the case?
2 **A. No.**
3 Q. And you cite Freedman Associates. Was Freedman
4 such a case?
5 **A. No.**
6 Q. And you cite Canada Southern Oils vs. Manabi.
7 Was that such a case?
8 **A. No.**
9 Q. You don't cite Condec, but that's another case
10 that has these principles.
11 **A. Yes.**
12 Q. Was that such a case?
13 **A. Yes.**
14 Q. Apart from the Benihana case issued a few
15 months ago, are you aware of any case in which the
16 Delaware courts have found situations sufficiently
17 egregious, to use your word, to justify a board in
18 diluting a majority shareholder below 50 percent?
19 **A. Other than Benihana, no.**
20 Q. So when you wrote your opinion unaware of
21 Benihana, there had never been a Delaware opinion in
22 which a board's effort to dilute a majority
23 shareholder below 50 percent had been upheld?
24 **A. No. The purpose of the opinion was to**

Page 93

1 **demonstrate that this was not a rule which was**
2 **absolute in its effect; that as I read Professor**
3 **Hamermesh's rule he said, in effect, the case law**
4 **uniformly says that a board can't do this. And in my**
5 **view, a board can do it.**
6 Q. I'm sorry, sir. You understood Professor
7 Hamermesh's opinion to be that a board as an absolute
8 rule cannot dilute a majority shareholder below a
9 majority?
10 **A. No. His opinion was to the effect that the law**
11 **in effect at that time gave Mr. Perelman the same**
12 **protections that the restrictions did so that really**
13 **the restrictions created no problem for the board.**
14 Q. Well, you understood Professor Hamermesh to be
15 acknowledging that although no court had ever found
16 circumstances, the courts had held out the possibility
17 that in extreme circumstances dilution might be
18 possible?
19 **A. Yes.**
20 Q. And he simply opined that it would require a
21 compelling justification that the board would have to
22 show in order to justify that sort of dilution,
23 correct?
24 **A. That's correct.**

24 (Pages 90 to 93)

Cantor, et al.
Joseph T. Walsh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 94

1   Q. All right. And that statement, that is, that
2   it would require a compelling justification, is an
3   accurate statement of the law. Is that correct?
4   A. Yes.
5   Q. All right. And what was the compelling
6   justification presented by the Benihana board? Do you
7   recall?
8   A. Again, it was the need for the infusion of
9   capital; that other efforts to recapitalize had not
10  been effective; that there was a need to expand and
11  support franchises, and the Vice Chancellor thought
12  that was a sufficient basis.
13  Q. Are you aware of any other cases in which our
14  courts have looked at the need for financing as a
15  proposed justification for dilution of a majority
16  shareholder?
17  A. Well, Vice Chancellor or Chancellor Seitz in
18  the Canada Southern case dealt with that situation in
19  which the board attempted to defend its actions there
20  by saying that it needed capital and he said, in
21  effect, that there were other ways that you could
22  raise capital other than the issue of dilutive equity.
23  And I thought he did a good job of indicating all of
24  the factors which made this suspect, that it was

Page 95

1   really not a bona fide effort by a board to do
2   anything other than dilute control.
3       And I thought that was a good way to
4   approach it, that each of these cases has to be
5   analyzed on its own merits.
6   Q. So that when Professor Hamermesh wrote "In my
7   view, the concept of compelling justification" -- you
8   know, this is not fair. I would like for you to be
9   able to read this as I go along with it.
10      Do you have a copy?
11      It's at the last page, Justice Walsh, of
12  the report.
13      I'm in the carryover paragraph and just to
14  set the stage, this is where Professor Hamermesh is
15  talking about the heavy burden and the compelling
16  justification standard that comes in his view from
17  Blasius. And he says right after the Blasius cite "To
18  my knowledge, no judicial opinion has yet found the
19  existence of such a justification for the issuance of
20  shares for the purpose of eliminating the majority
21  control position of an existing stockholder. In my
22  view, moreover, the concept of 'compelling
23  justification' precludes such an issuance of shares
24  unless the directors can demonstrate that there is no

Page 96

1   other, less drastic measure to accomplish the same
2   compelling corporate goal."
3       I gather from your last answer that you
4   view that last sentence as, in effect, picking up on
5   the Canada Southern standard that Chancellor Seitz
6   articulated?
7   A. Yeah.
8       MR. FRIEDMAN: I object to the form of the
9   question.
10  Q. Is that correct?
11  A. Yes.
12  Q. So you agree with that last sentence?
13  A. (The witness nodded.)
14  Q. You have to answer verbally.
15  A. Yes.
16  Q. Yes.
17  A. And I think his previous sentence is correct
18  too where he says, "To my knowledge, no judicial
19  opinion has yet found the existence," et cetera to
20  the purpose of eliminating as opposed to the primary
21  purpose.
22  Q. Sure. But we can also agree that until January
23  of 2006 no judicial opinion had found the existence of
24  such a justification for the issuance of shares that

Page 97

1   eliminated the majority control position of an
2   existing stockholder no matter what its purpose.
3   Isn't that right?
4   A. No decision, you're correct. But I stand by my
5   statement of the law that the prohibition is against
6   the dilution being the primary purpose, that is, the
7   Court's emphasis, emphasized primary, which suggests
8   to me that there can be more than one reason.
9   Q. All right. Let's look at paragraph 16, and
10  this is the first point of disagreement with Professor
11  Hamermesh according to your report: "I disagree
12  with" -- I think that's true. Let me make sure.
13  A. Yes.
14  Q. Yes. Okay. "I disagree with Professor
15  Hamermesh's implication that it is only in the face of
16  the need to protect the corporation and its
17  shareholders from exploitation or breach of fiduciary
18  duty by a majority shareholder that directors can
19  effect a dilution of majority control."
20      Would you state affirmatively what your
21  view is of the situation or situations in which a
22  board of directors can effect a dilution of majority
23  control?
24  A. Well, I would say that if the recapitalization

25 (Pages 94 to 97)

Cantor, et al.
Joseph T. Walsh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 110

1  And by using "desirable" I don't mean that if it's a
2  whim of the board that let's do this that that would
3  be sufficient, not at all. I mean, the cases are
4  pretty clear on that. I'm not trying to add anything
5  to the requirements of the case law.
6      Q. All right. In the last sentence of paragraph
7  18 you wrote as follows: "In my opinion, if the
8  issuance of additional equity were for the purpose of
9  advancing or protecting the financial viability of the
10  company, and that result was the primary motivation
11  for the Board's action, that action would be
12  independently defensible, notwithstanding its dilutive
13  effect on Perelman's interest."
14      And is that in your view an accurate
15  statement?
16      A. Yes.
17      Q. So that as long as the primary motivation for
18  the board's issuance of equity is to advance or
19  protect the financial viability of the company, that
20  action would be sanctioned by our courts?
21      A. Yes. Again, in the context of the parameters
22  laid down by the cases that we have discussed.
23      Q. Well, that's precisely my problem. We have
24  earlier agreed that the cases lay down a compelling

Page 111

1  justification standard, which doesn't seem to my lay
2  ears to be consistent with as long as the board can
3  say that it was advancing the financial viability of
4  the company it can issue equity that dilutes a
5  majority shareholder.
6      A. I think that's implicit. The board just
7  doesn't go out willy-nilly and engage in financing
8  which has any dilutive effect unless it's required. I
9  think that's a given in all of this. All of the cases
10  talk about that and I accepted those cases and I said
11  at the end of the day it's a contextual test.
12      Q. With the standard being is this issuance of
13  equity required for the financial viability of the
14  company?
15      A. Yes. Do we need this? Not simply should we do
16  it? But bearing in mind that this may have a dilutive
17  effect on the interest of the majority shareholder,
18  does the financial situation of the corporation
19  require that we engage in this?
20      If the answer is yes, then I think your
21  board is justified in doing it.
22      Q. And the reason that that compelling
23  justification is required is because the competing
24  property interest in majority control has always been

Page 112

1  deemed very significant by our courts. Is that
2  correct?
3      A. That's exactly what I said in the first part of
4  my opinion, it's a valuable property right.
5      MR. ALLINGHAM: If you will give us five
6  minutes, I think we can finish up quickly.
7      THE VIDEOTAPE OPERATOR: We're going off
8  the record at approximately 2:50 p.m.
9      (A brief recess was taken.)
10      THE VIDEOTAPE OPERATOR: We're going back
11  on the record at approximately 2:54 p.m.
12  BY MR. ALLINGHAM:
13      Q. I understood, Justice Walsh, from your
14  testimony that you uncovered the Benihana case on your
15  own and not in response to information from someone
16  else?
17      A. That's correct. Yes.
18      Q. Okay. Would any of the opinions in your report
19  change if the Benihana opinion were reversed?
20      A. Reversed on?
21      Q. Appeal.
22      A. Well, I continue to believe the test is a
23  contextual one and I will have to await the reasoning
24  of the reversal before I would commit myself to that.

Page 113

1  I think the principle is still sound. And I think the
2  Supreme Court will find it sound.
3      Q. The principle that the decision on dilution is
4  a contextual one?
5      A. Yes.
6      Q. And so even if the Supreme Court were to reach
7  a different conclusion, it wouldn't alter your faith
8  in the basic principle that the decision is a
9  contextual one?
10      A. That's correct. Because the decision in
11  Benihana was a decision after trial and I assume that
12  it was based on fact findings by Vice Chancellor
13  Parsons. The Court I suppose will defer to the facts
14  under the clearly erroneous standard, but it may
15  conclude that those facts do not justify the
16  application of the legal principle involved.
17      We will have to wait and see.
18      Q. If the Supreme Court were to find that the
19  facts as found by Vice Chancellor Parsons did not
20  constitute the compelling justification required for
21  dilution of a majority shareholder, would that change
22  your view about whether the Marvel board here would
23  have been justified in diluting Perelman?
24      A. No.

29 (Pages 110 to 113)