IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
　　　　　　　　　　　　　　　　　　　　　　　　　:
RONALD CANTOR, IVAN SNYDER and　　　　　:
JAMES A. SCARPONE, as TRUSTEES OF　　　:
THE MAFCO LITIGATION TRUST,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiffs,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:　　C.A. No. 97-586-KAJ
　　　　　　- against -　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
RONALD O. PERELMAN,　　　　　　　　　　　　:
MAFCO HOLDINGS INC.,　　　　　　　　　　　　:
MacANDREWS & FORBES HOLDINGS INC.,　　:
ANDREWS GROUP INCORPORATED,　　　　　:
WILLIAM C. BEVINS and　　　　　　　　　　　　:
DONALD G. DRAPKIN,　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
-------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE TESTIMONY OF
LAWRENCE A. HAMERMESH
AND CERTAIN OPINIONS OF
ROBERT W. HOLTHAUSEN**

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
ASHBY & GEDDES
222 Delaware Avenue
Wilmington, Delaware 19899
(302) 654-1888

Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
FRIEDMAN KAPLAN SEILER
　& ADELMAN LLP
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

Dated:　June 1, 2006

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

SUMMARY OF ARGUMENT ......................................................................................4

    Hamermesh .........................................................................................................4

    Holthausen .........................................................................................................5

STATEMENT OF RELEVANT FACTS .......................................................................7

    Background .........................................................................................................7

    The Hamermesh Report ....................................................................................8

    The Holthausen Rebuttal Report .....................................................................10

ARGUMENT .............................................................................................................15

I.    HAMERMESH'S PROPOSED TESTIMONY CONCERNING
    DELAWARE LAW IS INADMISSIBLE .........................................................15

        A.    Hamermesh's Proposed Testimony Would Impermissibly Invade
            the Court's Province as Sole Arbiter of the Law .......................................15

        B.    Hamermesh's Proposed Testimony Incorrectly States the Law of
            Delaware ....................................................................................................17

II.    HOLTHAUSEN'S OPINIONS REGARDING "EXPECTATIONS" OF
    FINANCIAL DISTRESS ARE NOT PROBATIVE OF MARVEL'S
    ACTUAL DAMAGES ......................................................................................19

        A.    The Measure of Damages under Delaware Law Is Based on Actual
            Harm Proximately Caused by Defendants' Breaches ..............................20

        B.    Holthausen's Opinions Are Not Relevant to the Measure of
            Marvel's Actual Damages. .......................................................................21

        C.    Holthausen Mistakenly Assumes that Marvel May Be Equated
            with Its Stockholders and Creditors .........................................................25

CONCLUSION ...........................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986)............................................16

*Beattie v. Beattie*, 786 A.2d 549 (Del. Super. 2001) ........................................................24

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150 (Del. Ch. 2005) .....................18

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) ....................................................16

*Blasius Indus. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988).......................................9, 17

*Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161 (Del. Ch. 1999) .........................20

*Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.)*,
    208 B.R. 288 (Bankr. D. Mass. 1997) ...............................................................21, 22

*Canada S. Oils, Ltd., v. Manabi Exploration Co.*, 96 A.2d 810 (Del. Ch. 1953)...... *passim*

*Cantor v. Perelman*, 414 F.3d 430 (3d Cir. 2005)..........................................................1, 13

*Cede & Co. v. Technicolor, Inc.*, 634 A. 2d 345 (Del. 1993) ..........................................19

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001)......................................25

*Coleman v. Garrison*, 281 A.2d 616 (Del. 1971) ...........................................................20

*Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del. Ch. 1967)............................9, 17

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, No. Civ. A. 04-1278-KAJ,
    2006 WL 1216220 (D. Del. Apr. 17, 2006)..........................................................15

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...................................1, 16, 19

*Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401 (Del. 1985) ...............................................9

*Freedman v. Rest. Assocs. Indus., Inc.*, No. Civ. A. 9212, 1987 WL 14323
    (Del. Ch. Oct. 6, 1987)..................................................................................9, 17

*Hahn v. Atl. Richfield Co.*, 625 F.2d 1095, 1104 (3d Cir. 1980) ......................................20

*IGames Entm't, Inc. v. Chex Servs., Inc.*, No. Civ. A. 04-180-KAJ, 2005 WL
    3657156 (D. Del. June 9, 2005)..............................................................................19

*In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61 (S.D.N.Y. 2001)............4, 15

*In re Walt Disney Co. Derivative Litig.*, No. Civ. A. 15452-NC, 2004 WL 550750
(Del. Ch. Mar. 9, 2004)................................................................4, 15, 16

*Itek Corp. v. Chicago Aerial Indus., Inc.*, 274 A.2d 141 (Del. 1971)................................15

*Klinger v. Baltimore & Ohio R.R. Co.*, 432 F.2d 506 (2d Cir. 1970)................................24

*Mendel v. Carroll*, 651 A.2d 297 (Del. Ch. 1994)........................................................9, 17

*Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537 (2d Cir. 1994) ......................21

*Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92 (1st Cir. 1997)........................................15

*Norwest Bank Minnesota N.A. v. Federal Deposit Ins. Corp.*, 312 F.3d 447
(D.C. Cir. 2002) ............................................................................................22

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340
(3d Cir. 2001)........................................................................................20, 26

*Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994)......................9

*Rea v. Ford Motor Co.*, 560 F.2d 554 (3d Cir. 1977)........................................................22

*Sea-Land Serv., Inc. v. General Elec. Co.*, 134 F.3d 149 (3d Cir. 1998) ........................24

*Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988) ..............................................................16

*Texaco Ref. & Mktg., Inc. v. Delaware River Basin Comm'n*, 824 F. Supp. 500
(D. Del. 1993) ................................................................................................25

*Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (1996) ..............................................................21

*United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)................................................20

*United States v. Leo*, 941 F.2d 181 (3d Cir. 1991) ......................................................4, 15

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
529 U.S. 765 (2000)......................................................................................25

*Wilcox v. Plummers Ex'rs*, 29 U.S. (4 Pet.) 172 (1830) ..................................................22

## RULES & OTHER AUTHORITIES

Fed. R. Evid. 702 ...................................................................................3, 19

Dan B. Dobbs, *The Law of Torts* (2000)...................................................20, 24

J. Weinstein & M. Berger, *Weinstein's Evidence* (1988) ................................19

*Restatement (Second) of Torts* (1979)........................................................ *passim*

*Reference Manual on Scientific Evidence* (Second Edition)
       (Federal Judicial Center 2000) ...........................................................22

## NATURE AND STAGE OF THE PROCEEDINGS

In July 2005, the United States Court of Appeals for the Third Circuit rendered a decision in this case reversing summary judgment for defendants and remanding the action for further proceedings consistent with that opinion. *Cantor v. Perelman*, 414 F.3d 430 (3d Cir. 2005). On October 18, 2005, this Court entered an Order providing, among other things, that "[e]ither party may identify additional expert testimony on or before January 13, 2006 by filing additional reports in accordance with Federal Rule 26(a)(2). The parties shall file rebuttal expert reports on or before March 3, 2006." In that same Order, the Court required that objections to expert testimony on the basis of the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), shall be made by motion no later than June 1, 2006.

On January 13, 2006, plaintiffs served two expert reports prepared by economists -- Andrew Carron, President of National Economic Research Associates ("NERA") and Jeffrey Baliban, a Senior Vice President in NERA's Securities and Finance Practice -- and one expert report prepared by former SEC Commissioner and Debevoise & Plimpton partner Bevis Longstreth. Dr. Carron's report concerns plaintiffs' claim for unjust enrichment and sets forth his opinion as to the benefit obtained by Ronald O. Perelman as a result of the Indenture restrictions applicable to Marvel -- estimated to be $156.7 million before interest. Mr. Baliban's report concerns the actual damages suffered by Marvel and sets forth his opinion that the harm to Marvel as a result of the issuance of the Marvel Parent and Marvel III Notes was in the range of $308 to $617 million before interest. The report of Mr. Longstreth, who has served on numerous boards of directors throughout his career, provides Mr. Longstreth's opinion as to the

nature of the arm's length bargaining that would have been conducted by Marvel with Mr. Perelman if Mr. Perelman had presented to the independent directors of Marvel a request that Marvel assist and acquiesce in the Note transactions as it did.

Also on January 13, 2006, defendants served one expert report -- prepared by Professor Lawrence A. Hamermesh -- setting forth Professor Hamermesh's opinion that "the practice and effect of Delaware corporate law as of the period from 1993 to 1996 largely duplicated the indirect effect of Section 4.09(a) of the indentures limiting Marvel's ability to issue shares to reduce the Marvel Holding Companies' ownership of Marvel voting stock to less than a majority, assuming for purposes of argument that such restriction could or would have bound Marvel."

On March 3, 2006, without waiving their right to challenge Professor Hamermesh's opinion as inadmissible testimony on matters of domestic law, plaintiffs served a Rebuttal Report of former Delaware Supreme Court Justice Joseph T. Walsh. Justice Walsh disagrees with Professor Hamermesh and points out that Professor Hamermesh is relying on Delaware case law involving Board action that has as its primary purpose the dilution of a majority shareholder's control. Where, however, Justice Walsh explains, "directors are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control."

Also on March 3, 2006, defendants served three rebuttal reports -- two with respect to Dr. Carron's report, prepared by John Parsons and Peter Fowler, and one with respect to Mr. Baliban's report, prepared by Robert Holthausen. Defendants did not

serve a rebuttal report with respect to plaintiffs' Bevis Longstreth Report. Although defendants' Fowler Rebuttal Report touches on areas addressed by Mr. Longstreth, Mr. Fowler explicitly stated at his deposition that he was not rebutting Mr. Longstreth. Mr. Fowler testified that one part of his report was a rebuttal to Dr. Carron, and the other part was his opinion in respect of an issue set forth in the decision of the Third Circuit in this case. In the part of his report that was not a rebuttal, Mr. Fowler, who has never been a director of a corporation, set forth his opinion as to the exchanges that would occur in a hypothetical negotiation between Marvel and Mr. Perelman and the dollar amount that would ultimately have been acceptable to Marvel.

After Mr. Fowler acknowledged at his deposition that part of his so-called rebuttal report was not rebuttal at all, plaintiffs served a brief rebuttal report from Mr. Longstreth responding to that part of Mr. Fowler's report. Mr. Longstreth explained that in his opinion, based on his involvement in negotiations spanning his entire career as a lawyer, fiduciary and senior government official, the hypothetical negotiations depicted by Mr. Fowler bear little resemblance to what one might reasonably expect in a truly arm's length negotiation between Mr. Perelman and Marvel.

All of the experts were deposed after their reports were served, and Mr. Longstreth was deposed a second time by defendants' counsel after service of his rebuttal to Mr. Fowler.

In accordance with the Court's Order of October 18, 2005, plaintiffs are today filing their motion pursuant to Fed. R. Evid. 702 and the principles announced in *Daubert* to exclude: (a) the proposed testimony of defendants' expert Professor Lawrence A. Hamermesh on the ground that Professor Hamermesh is offering an opinion as to

matters of Delaware law, which is not a proper subject for expert testimony, and (b) the opinions in paragraphs 7 through 9 and 15 through 23 of the Expert Rebuttal Report of defendants' expert Professor Robert W. Holthausen on the ground that Professor Holthausen's proposed testimony as to damages is based on an incorrect legal theory concerning the measure of damages.

## SUMMARY OF ARGUMENT

### Hamermesh

        1.      Professor Hamermesh's proposed expert testimony is in reality an argument by counsel concerning interpretation of Delaware case law. Nothing in his report and nothing in his deposition testimony suggests that he is offering anything other than his interpretation of the Delaware cases he cites and discusses in his report.

        2.      In this Court, and in all federal courts, proposed expert testimony concerning matters of domestic law is not admissible. *See United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991) ("it is not permissible for a witness to testify as to the governing law" or "what the law required"); *see also In re Walt Disney Co. Derivative Litig.*, No. Civ. A. 15452-NC, 2004 WL 550750, at *1 (Del. Ch. Mar. 9, 2004) ("In this Court, witnesses do not opine on Delaware corporate law.") (attached hereto as Exhibit A); *In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64-65 (S.D.N.Y. 2001) ("This Court has repeatedly held that the testimony of an expert on matters of domestic law is inadmissible for *any* purpose.") (citation omitted, emphasis added)).

        3.      Hamermesh's opinion concerning Delaware law is incorrect. In fact, as long as a board of directors is causing the issuance of stock for a valid business reason, and not for the primary purpose of diluting a majority shareholder's control, the

board's conduct is proper even if it has the incidental effect of diluting the majority shareholder's control.

**Holthausen**

      4.     Plaintiffs' expert Jeffrey Baliban provides his opinion concerning actual damages, i.e., "whether, and to what extent, Marvel was harmed by the issuance of the Marvel Parent and Marvel III Notes on the terms described above." (Baliban Report ¶ 6.)[1] Baliban opines that the Indenture Covenants impacted Marvel's financing decisions and that Marvel's excessive bank debt was a cause of financial distress and actual harm. Applying an empirical study of the costs of financial distress, Baliban opines that Marvel sustained an overall loss of value in the range of approximately $308 to $617 million as a result of the Note issuances.

      5.     In the portion of his rebuttal report that is the subject of this motion, Professor Holthausen addresses questions that are legally improper and irrelevant. Rather than considering the *actual* damages suffered by *Marvel*, which is the subject of the Baliban Report, Professor Holthausen expresses his opinion as to expected financial harm for Marvel's creditors and stockholders at the time of the Note issuances. Professor Holthausen disregards, and does not express an opinion concerning, the actual harm Marvel suffered as a result of the financial distress caused by the Notes. Instead he offers his opinion as to whether there were "incremental expected costs of financial

---

[1] The Baliban Report is Ex. 6 to the Declaration of Jonathan Gottfried ("Gottfried Dec.")

distress associated with the Indenture Covenants at the time that the Notes were issued."
(Holthausen Rebuttal Report ¶7.)[2]

6.      As a matter of law, compensatory damages for breach of fiduciary
duty are measured by the harm to Marvel proximately caused by the defendants' breaches
of duty. Actual damage includes all injuries proximately caused by the breach of duty --
whether those damages are incurred at the time of the breach or thereafter. Holthausen's
opinion that he need not consider the actual financial distress and actual harm sustained
by Marvel is directly contrary to the settled rule of law that all injury sustained by the
plaintiffs as a proximate result of a breach of duty is included in the calculation of
damages.

7.      Simply put, Holthausen is offering an opinion on a measure of
damages that is legally incorrect. He offers an opinion as to how to measure
"expectations" that Marvel might experience financial distress in the future, rather than
measuring the actual injury Marvel suffered. He admits that he is not considering what
actually happened to Marvel as a result of the Note issuances. ("I think it's inappropriate
[to look at whether harm was actually sustained] . . . ." (Holthausen Dep. 91:23-25.))

8.      Moreover, Holthausen's "expectations" theory is premised upon
the fundamentally erroneous assumption that Marvel can be equated with its stockholders
and creditors. Holthausen assumes that Marvel's stockholders and creditors could have
chosen to liquidate their stakes in Marvel rather than incur the risk of financial distress
attributable to the Indenture Covenants. However, the injury to Marvel as a corporate
entity is distinct from any injury to its stockholders or creditors. Once the Notes were

---

[2] The Holthausen Rebuttal Report is Ex. 7 to the Gottfried Dec.

issued, Marvel did not have a "choice" as to whether to assume the risk of financial distress attributable to the Indenture Covenants. To the contrary, Marvel was saddled with the consequences of the Indenture Covenants regardless of choices available to Marvel's stockholders or creditors. Because Holthausen's "expectations" theory incorrectly assumes that damages can be assessed from the perspective of Marvel's "claimholders," his opinions are irrelevant to the damages at issue in this case -- *i.e.*, the damages sustained by Marvel itself.

## STATEMENT OF RELEVANT FACTS

### Background

Plaintiffs are the trustees of The MAFCO Litigation Trust (the "Trust"). The Trust was created pursuant to the order of this Court and the plan of reorganization in the bankruptcy cases of Marvel and its affiliates. (Ex. 1 §7.1(b); Ex. 2.)[3] Under that order and plan, the Trust is the assignee of Marvel's claims against the defendants. *Id.*

This is an action for breach of fiduciary duty against Ronald O. Perelman, the former controlling shareholder and Chairman of the Board of Marvel Entertainment Group, Inc. ("Marvel"). The other individual defendants are Donald G. Drapkin and William C. Bevins who were employees and directors of various Perelman-owned entities (including the holding companies that held his Marvel stock) as well as directors of Marvel. Bevins was also the CEO of Marvel. The defendant corporations – Mafco Holdings Inc., MacAndrews & Forbes Holdings Inc. and Andrews Group Inc. – are wholly owned by Perelman and are alleged to have aided and abetted the breaches of fiduciary duties by the individual defendants.

---

[3] References to "Ex. _" are to the exhibits to the Gottfried Dec.

In 1993 and 1994, Perelman and the other defendants caused the companies that held his Marvel stock (the "Holding Companies"[4]) to sell three tranches of notes (the "Notes"), raising $553.5 million for Perelman's personal use and providing no benefit to Marvel. Plaintiffs contend that Perelman and the other individual defendants breached their fiduciary duties when they used Marvel's corporate resources to sell the Notes and promised (through the Holding Companies) to restrict Marvel's ability to engage in a variety of fundamental corporate financing activities. As the Third Circuit stated:

> The record before us would support a finding that
> Perelman's companies received $553.5 million in financing
> they would not otherwise have been able to secure by
> committing to prevent Marvel from taking certain actions
> and by utilizing Marvel's corporate resources to market that
> financing. And, given the nature of the restrictions
> imposed, the commitment was one that could be
> effectuated only by exercising the defendants' control of
> Marvel's board of directors.

(*Cantor,* 414 F.3d at 435.)

## The Hamermesh Report

In his report, Professor Hamermesh sets forth his assignment as follows:

> At the request of counsel for the defendants in this
> proceeding, I have reviewed the question of the scope of
> the authority of the board of directors of Marvel
> Entertainment Group, Inc. to issue stock of Marvel, or
> options to acquire such stock, sufficient to reduce the
> ownership of such stock by the Marvel Holding Companies
> to less than a majority of Marvel's outstanding voting
> stock.

---

[4] The Holding Companies were Marvel Holdings Inc., Marvel (Parent) Holdings Inc., and Marvel III Holdings Inc.

(Hamermesh Report ¶1.)[5]

      Hamermesh proceeds to discuss decisions by Delaware courts, including: *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994); *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401 (Del. 1985); *Mendel v. Carroll*, 651 A.2d 297 (Del. Ch. 1994); *Blasius Indus. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988); *Freedman v. Rest. Assocs. Indus., Inc.*, No. Civ. A. 9212, 1987 WL 14323 (Del. Ch. Oct. 6, 1987); *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del. Ch. 1967); *Canada S. Oils, Ltd., v. Manabi Exploration Co.*, 96 A.2d 810 (Del. Ch. 1953). (*See* Hamermesh Report ¶¶ 6-9.) His report sets forth his interpretation of Delaware case law, and his conclusions are based on such interpretation.

      At his deposition, Professor Hamermesh is repeatedly asked the basis for his opinions, and he repeatedly explains that the basis is Delaware case law and statutes. For example, with respect to paragraph 7 of his report, Professor Hamermesh gives the following testimony:

> Q.    Other than the *Frantz vs. EAC* case that you already referred to, what is the basis for your opinion as expressed in paragraph 7?
>
> A.    Okay. As expressed in paragraph 7, just knowledge of the state of the Delaware General Corporation Law as it existed at that time.
>
> Q.    Anything else?
>
> A.    I can't think of any.

(Hamermesh Dep. 24:12-19.)[6]

     His testimony is to the same effect with respect to paragraphs 8 and 9:

---

[5] The Hamermesh Report is Ex. 3 to the Gottfried Dec.

[6] "Hamermesh Dep." refers to the transcript of the deposition of Professor Hamermesh which is Ex. 4 to the Gottfried Dec.

Q . . . . What is basis for your opinion in this paragraph 8?

A.  The state of the case law in Delaware through 1996 and particularly Chancellor Allen's treatment of the subject in the Mendel and Freedman cases.

(Hamermesh Dep. 26:14-18.)

\*       \*       \*

Q. . . . What is the basis for this statement in paragraph 9 of your opinion?

A.  The Delaware case law culminating and reviewed in Mendell vs. Carroll.

Q.  Anything besides Mendell vs. Carroll?

MR. ALLINGHAM: I object to the form of the question.

A.  And the case law reviewed in it.

(Hamermesh Dep. 36:6-13.)

## The Holthausen Rebuttal Report

Professor Holthausen acknowledges that Marvel was not in financial distress at the time that the Notes were issued.[7]  And, he does not dispute Baliban's opinions that Marvel became financially distressed because of excessive leverage, and that the Indenture covenants were a cause of Marvel's financial distress.[8]  (Holthausen Dep. 42:5-43:25)[9].

---

[7]  *See* Holthausen Rebuttal Report ¶8 ("Marvel was not a highly leveraged company at the time that the Holding Company Notes were issued . . . .")

[8]  In an earlier report in this case, Holthausen himself had opined that "Marvel was a very distressed organization as of the end of the third quarter of 1996." (Ex. 8 ¶18.)

[9]  "Holthausen Dep." refers to the transcript of the deposition of Professor Holthausen which is Ex. 9 to the Gottfried Dec.

Holthausen disagrees with plaintiffs as to the proper measure of damages under Delaware law. According to Professor Holthausen, "[t]he conceptually correct measure to estimate [damages] is the incremental *expected* costs of financial distress associated with the Indenture Covenants *at the time that the notes were issued*." (Holthausen Rebuttal Report ¶7) (emphasis added). Holthausen opines that such "expected" costs of financial distress should be calculated by determining the "incremental probability" of distress with and without the Indenture Covenants as of the issuance of the Marvel III Notes:

> To determine the expected financial distress costs associated with the Indenture Covenants, I compute the incremental probability of financial distress associated with the Indenture Covenants by estimating the difference in Marvel's probability of financial distress with and without the issuance of the Marvel III Notes at the time of their issuance, February 15, 1994.

(*Id.* ¶15). Holthausen's calculation of such "incremental probability" is based upon an options model that incorporates his assumptions as to what Marvel's "expected" future debt level would have been, measured as of the date of the Marvel III Note issuance. (*Id.* ¶¶16-18). Holthausen uses "the expectation of analysts" as of that date as an indicia of "expected" debt level, and notes that "analysts were forecasting a reduction in the amount of debt that Marvel would have going forward." (*Id.* ¶19). Holthausen does not factor into his calculation the hundreds of millions of dollars of additional debt that Marvel actually incurred following the Note issuances.

Holthausen acknowledges that, under his theory of damages, it is irrelevant whether or not Marvel actually sustained financial distress (Holthausen Dep. 83:19-84:5), and that he does not attempt to calculate the extent of the financial distress

11

injury Marvel actually sustained as a result of the Indenture Covenants while those covenants were outstanding. (*Id.* 91:15-92:2; 150:25-151:7).

At his deposition, Holthausen testifies that his theory of damages is based upon the premise that, on the dates that the Notes were issued, "claimholders" -- by which he means Marvel's stockholders and creditors -- had a choice whether to assume the risk associated with the Indenture Covenants or "exit" their stake:

> Q.    Since the indenture covenants could have an impact on Marvel at other times beyond the date when the notes are issued, why do you not think it proper to measure the impact on Marvel at those other times when it does have an impact?
>
> A.    Because essentially what you would then be doing is, you would be -- you know, when shareholders make a decision to hold or not to hold a company stock, they're bearing some risk associated with holding a company stock. And that information was out and it was in the marketplace that these indentures were there, and so a shareholder who chooses to continue to hold on to those shares knows that that information is out there. The price at that time is going to reflect whatever impact that had at the time when those things were issued.

(*Id.* 50:10-51:2).

> Q.    Okay. When I asked you about what was your benchmark, you mentioned up front that it was economic theory. What is the economic theory that you are alluding to?
>
> A.    Well, I think it's just a damages theory. Right? So you have -- some event takes place. Okay? There is an effect on value associated with that act. The claim holders are free to exit as soon as that has taken place unless, for some reason, their claim isn't marketable or they can't exit. If they can exit at that point in time, the damage they're going to suffer is from, you know: What was the value before the act? What was the value after the act? And then if they choose to exit or not exit, that's their business, but they had the right to exit immediately after that.
>
> Q.    When you're talking about the claim holders, you're talking about Marvel stockholders?
>
> A.    It could have been stockholders. It could have been debt holders. It could have been vendors. Right? I mean, they all have a choice of

continually making decisions as to whether or not they want to be a claim holder in Marvel.

(*Id.* at 69:14-70:13).

Holthausen explains that it is his impression that plaintiffs could be equated with Marvel's claimholders for purposes of the damages claim in this lawsuit, and that, in coming to his opinions concerning the measure of damages, he could not draw a distinction between Marvel and its stockholders or creditors:

> Q.    Okay. But Marvel is not a claim holder, is it? It's just an entity?
>
> A.    It's just an entity.
>
> Q.    It's there the whole time whether -- it doesn't have choices here. It's just there.
>
> A.    But the claim holders have choices.
>
> Q.    I agree with you. Claim holders may or may not have choices, depending on what information is available to them. I take it Marvel doesn't have any choices akin to the choices that are available to claim holders. Isn't that right?
>
> A.    I'm under the impression that it's the claim holders that are here in this matter.
>
> Q.    Okay. And if it turned out that, in fact, the plaintiffs in this case stand in the shoes of Marvel, would that affect your analysis of the damages in this case?
>
> A.    I don't know what that means, "stands in the shoes of Marvel." It sounds like a legal term to me.
>
> Q.    All it means is that we are Marvel for purposes of this lawsuit. We're not shareholders of Marvel. We're not creditors of Marvel. We're the corporate entity.
>
> A.    Well, Marvel is just made up of claim holders.
>
> Q.    So you -- you -- can you conceive of a damages analysis where Marvel as an entity is trying to recover damages as distinguished from the claim holders of Marvel? Is that something you've thought about?
>
> A.    No.

13

Q.    Okay.  And that's not something you did when -- that you thought about when you were putting your damages report together in this case?

A.    No.  I'm thinking about it from the claim holder's perspective.

(*Id.* 75:18-77:7).  Indeed, Holthausen views Marvel as "a bunch of claim holders," and has only thought about damages "from the perspective of the claimholders."  (*Id.* 85:7-85:13).  He acknowledges that his equation of Marvel with claimholders "is the predicate for [his] analysis."  (*Id.* at 85:16-86:24).

Plaintiffs move to exclude the opinions in the Holthausen Rebuttal Report which express or are based upon his opinion that damages should be measured by "expectations" of financial distress as of the dates of the Note issuances rather than the impact of financial distress actually sustained by Marvel while the Indenture restrictions were in effect.

14

# ARGUMENT

## I.

## HAMERMESH'S PROPOSED TESTIMONY CONCERNING DELAWARE LAW IS INADMISSIBLE

### A.     Hamermesh's Proposed Testimony Would Impermissibly Invade the Court's Province as Sole Arbiter of the Law

"[I]t is not permissible for a witness to testify as to the governing law" or "what the law required." *Leo*, 941 F.2d at 196 (3d Cir. 1991); *see also Itek Corp. v. Chicago Aerial Indus., Inc.*, 274 A.2d 141, 143 (Del. 1971) ("Testimony from an expert is inadmissible if it expresses the expert's opinion concerning applicable domestic law."); *In re Walt Disney Co. Derivative Litig.*, 2004 WL 550750, at *1 ("In this Court, witnesses do not opine on Delaware corporate law."); *In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d at 64 ("This Court has repeatedly held that the testimony of an expert on matters of domestic law is inadmissible for *any* purpose.") (citation omitted, emphasis added)); *cf. Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, No. Civ. A. 04-1278-KAJ, 2006 WL 1216220, at *15 (D. Del. Apr. 17, 2006) ("testimony on substantive areas of patent or contract law is impermissible.") (attached hereto as Exhibit B). "The rule prohibiting experts from providing their legal opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle." *In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d at 64 (quotation omitted).

Expert testimony on such matters is inadmissible because it is "exclusively within the province of the trial judge to determine issues of domestic law." *Itek Corp.*, 274 A.2d at 143.  As every circuit has held, experts may not invade the court's province by testifying on issues of law. *See e.g., Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92,

100 (1st Cir.1997) (excluding expert legal opinion "because the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial"); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) ("It is the responsibility of the court, not testifying witnesses, to define legal terms. The expert's testimony in this regard invaded the province of the court."); *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (en banc) ("There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge. . . .To allow anyone other than the judge to state the law would violate the basic concept.") (quotation marks and citation omitted); *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 368 (4th Cir.1986) (proffer of expert witness to testify to the meaning and applicability of law "flies squarely in the face of the precedent - and the logic of that precedent. . . .").

Professor Hamermesh's Report, and his deposition testimony, make clear that his trial testimony would consist of his opinions concerning Delaware law. Such testimony would invade the Court's province as the sole arbiter of the law in this case. Thus, his proposed testimony would not "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592; *see also In re Walt Disney Co. Derivative Litig.*, 2004 WL 550750, at *1 (rejecting expert testimony on legal issues and stating, "After fifteen years of service on the Court of Chancery, I certainly hope that I am capable without the assistance of Professor DeMott's testimony of answering whether the individual defendants breached their fiduciary duties."). Accordingly, Hamermesh's testimony should be excluded in its entirety.

**B.     Hamermesh's Proposed Testimony**
**Incorrectly States the Law of Delaware**

Hamermesh asserts that, under Delaware law, any action by the Marvel board to dilute Perelman's ownership to less than a majority would not have enjoyed a presumption of deference under the business judgment rule, and the board would have had to demonstrate a "compelling justification," and show that "there is no other, less drastic measure to accomplish the same compelling corporate goal."  (Hamermesh Report ¶9.)

The cases relied upon by Hamermesh do not support his conclusion. Rather, they stand for the limited proposition that a board that issues additional shares *for the primary or sole purpose of eliminating a majority stockholder's control* may only do so in order to protect the corporation and its stockholders from exploitation or breach of the majority stockholder's fiduciary duty.  For example, in *Mendel*, the Chancery Court rejected a proposed issuance of stock "for the *primary purpose* of diluting the voting power of an existing control block of stock," 651 A.2d at 298 (emphasis added); *see also Blasius Indus., Inc.,* 564 A.2d at 659 ("business judgment rule does not apply to board acts taken for the *primary purpose* of interfering with a stockholder's vote. . . .") (emphasis added); *Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *7 (Del. Ch. Oct. 16, 1987) (court rejects transaction "in order to promote a change in control") (attached hereto as Exhibit C); *Condec Corp.*, 230 A.2d at 777 (challenged transaction was "obviously designed for the *primary purpose* of reducing [plaintiff's] stock holdings in [defendant] below a majority.") (emphasis added); *Canada S. Oils, Ltd.*, 96 A.2d at 813 ("*primary purpose*" behind sale of shares was to deprive plaintiff of majority voting control) (emphasis added).  In fact, none of the cases relied upon by Hamermesh

addressed a situation where a board issued stock for a primary purpose other than diluting a majority shareholder.

However, "[w]here . . . directors are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control." (Rebuttal Report of Justice Joseph T. Walsh, Retired, Mar. 1, 2006 ("Walsh Rebuttal Report"), ¶ 16.) [10]  For example, in *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150 (Del. Ch. 2005), the Chancery Court approved the issuance of stock that diluted the majority shareholder, finding that the board "had valid reasons to use equity as opposed to debt financing." *Id.* at 189. Thus, the Court applied the business judgment rule to the decision of the Benihana board. [11]

The fundamental error of Hamermesh's analysis is that he posits an exception, for the benefit of controlling shareholders, to the bedrock principle of Delaware law that directors have a duty to act in the best interest of the corporation and all of its shareholders -- and there is no absolutely no case law or other legal authority supporting such an exception. On the contrary, as Justice Walsh points out in paragraph 12 of his rebuttal report, the Supreme Court of Delaware has made clear that the duty of loyalty requires that the "best interest of the corporation and its shareholders takes

---

[10] Plaintiffs have submitted the Walsh Rebuttal Report (Ex. 5 to the Gottfried Dec.) in the event that the Court decides not to exclude Hamermesh's testimony.

[11] Hamermesh's only response to *Benihana* is to suggest that the case may have been wrongly decided. (*See* Hamermesh Dep. 33:9-16 ("Well, to put it bluntly, the question is: Is that case correctly decided?")

precedence over *any* interest possessed by a director, officer or controlling shareholder and not shared by stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A. 2d 345, 361 (Del. 1993) (emphasis added). There is no case law in Delaware remotely suggesting that the Supreme Court's use of the word "any" is qualified or limited by the desire of a controlling shareholder to maintain control. Moreover, a "controlling shareholder, . . . especially a controlling shareholder who is also a director, still owes fiduciary duties to the corporation and cannot breach those duties in order to maintain his controlling position." (Walsh Rebuttal Report ¶ 9.) Under Hamermesh's logic, directors could not take action to accomplish a corporation's pressing and legitimate financing needs, if dilution of a controlling shareholder would be incidental to such action. That is simply not the law of Delaware. There is no basis for Hamermesh to testify to such an incorrect conclusion.

II.

### HOLTHAUSEN'S OPINIONS REGARDING "EXPECTATIONS" OF FINANCIAL DISTRESS ARE NOT PROBATIVE OF MARVEL'S ACTUAL DAMAGES

Under Federal Rule of Evidence 702, a witness qualified as an expert may only offer opinion testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue." "Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶702[02], p. 702-18 (1988)). In addition, "one aspect of relevance that must be examined is 'fit,' i.e., whether the opinion is 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *IGames Entm't, Inc. v. Chex Servs., Inc.*, No. Civ. A. 04-180-KAJ, 2005 WL

3657156, at *2 (D. Del. June 9, 2005) (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)) (attached hereto as Exhibit D).

Defendants cannot show the relevancy or "fit" of Holthausen's opinions that Marvel's damages should be measured by reference to expectations at the time of the Note issuances as to future financial distress. Such a theory has no relevance to the rule of law concerning the measure of damages, and no "fit" with the facts concerning the financial distress injury sustained by Marvel during the time the Indenture restrictions were in effect.

## A.    The Measure of Damages under Delaware Law is Based on Actual Harm Proximately Caused by Defendants' Breaches

"Breach of a fiduciary duty is a tort for which damages may be awarded." Dan B. Dobbs, *The Law of Torts* § 487, at 1392 (2000) (citing *Restatement (Second) of Torts* §874). In a tort case, damages are measured by the difference between the economic effect of the injury caused by defendants' breach of duty and the hypothetical economic outcome that would have occurred "but for" such breach of duty. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 351 (3d Cir. 2001) ("tort law attempts to place the injured party in the same position he occupied before the injury") (quoting *Hahn v. Atl. Richfield Co.*, 625 F.2d 1095, 1104 (3d Cir. 1980)); *Coleman v. Garrison*, 281 A.2d 616, 619 (Del. 1971) ("The general rule in tort damages is that the tortfeasor must place the injured party in the same financial position he would have been in had there been no tort.").

In this case, where "issues of loyalty are involved, potentially harsher rules come into play" because of the strong public policy interest in discouraging disloyalty. *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch.

1999).[12]  However, to the extent that actual damages are an element of recovery in a case involving breach of a duty of loyalty, the measure of damages is the difference between actual and "but for" economic outcomes as in other tort cases.  *See e.g., id.* at 1184.  In this case, where plaintiffs contend that Marvel's financial distress was a proximate result of defendants' disloyal conduct, the measure of damages is whether such distress caused Marvel to be worth less than the value it would have had absent such breaches of duty. *See e.g., Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 310 (Bankr. D. Mass. 1997) ("[t]he measure of damages governing the [bankruptcy] Trustee's claims for breach of fiduciary duties and aiding and abetting that breach is the amount of decrease in the fair market value of Healthco that resulted from the defendants' actions.")

## B.   Holthausen's Opinions Are Not Relevant to the Measure of Marvel's Actual Damages

Holthausen's opinions that damages should be measured by "expected" costs of financial distress at the time of the Note issuances are inconsistent with settled principles of law.  To start, although Holthausen does not dispute that the Indenture Covenants were a cause of financial distress sustained by Marvel, he does not consider the impact of such actual distress.  There is no support in the law for the notion that injuries occurring subsequent to, rather than simultaneously with, a tortfeasor's breach of duty are not compensable injuries.  The law is just the opposite.  It is long settled that " 'the proof of actual damage may extend to facts that occur and grow out of the injury,

---

[12]  *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (1996) ("Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. . . '[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages.'") (quoting *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)).

even up to the date of verdict.' " *Norwest Bank Minnesota N.A. v. Federal Deposit Ins. Corp.*, 312 F.3d 447, 452 (D.C. Cir. 2002) (quoting *Wilcox v. Plummers Ex'rs*, 29 U.S. (4 Pet.) 172, 182 (1830)); *see also Rea v. Ford Motor Co.*, 560 F.2d 554, 557 (3d Cir. 1977) ("in general, a court has the power to award damages occurring up to the date of the ultimate judgment in the case."); *Restatement (Second) of Torts* §910 (1979) ("[o]ne injured by the tort of another is entitled to recover damages from the other for all harm, past, present and prospective, legally caused by the tort.")  Because Holthausen turns a blind eye to financial distress actually sustained by Marvel in the years following the Note issuances, his opinions regarding damages are not relevant to a comparison of Marvel's value when it actually sustained financial distress with the value that it would have had "but for" the defendants' breaches of duty. *See Reference Manual on Scientific Evidence* (Second Edition) (Federal Judicial Center 2000) p. 307 ("the but-for analysis differs from the actual environment only by hypothesizing the absence of the harmful act committed by the defendant.")

In *Brandt* (applying Delaware law), the court rejected a damages theory that is squarely analogous to Holthausen's opinion that he may disregard financial distress injuries sustained by Marvel in the years following the Note issuances.  There, a Chapter 7 trustee alleged that directors of Healthco breached their fiduciary duties by approving a leveraged buyout which benefited them and the shareholder who appointed them, while saddling Healthco with an unsustainable debt load that led to the company's liquidation in a bankruptcy case commenced over two years after the LBO.  On motions for summary judgment, the trustee submitted expert testimony showing that, as a result of the defendants' tortious conduct, the fair market value of Healthco had decreased from a

22

value of $300 million prior to the LBO to $60 million upon the liquidation of its assets in

the bankruptcy. The defendant directors contended that the measure of damages was

limited to any decrease in the company's value "immediately after the LBO, not two

years later." *Id.* at 310. In reasoning equally applicable to Holthausen's opinions at issue

in this motion, the Court rejected defendants' argument, noting that "[t]his is like saying

of an accident which caused gradual health deterioration in the plaintiff that damages are

limited to the plaintiff's state of health immediately after the accident." *Id.*

        Holthausen's opinions regarding "expectations" as of the dates of the Note

issuances are also irreconcilable with the law that events occurring subsequent to a

tortfeasor's breach of duty -- whether they increase or decrease the actual damages -- are

taken into account in measuring damages, but prior "expectations" as to whether such

events would occur are irrelevant:

> Any event occurring prior to the trial that increases the
> harmful consequences of the defendant's tortious conduct,
> if it is an event for the consequences of which the
> defendant is responsible, increases the damages recoverable
> to the same extent, whether the event has occurred before
> suit is brought or after suit. Likewise an event that
> indicates that the conduct is less harmful *than had been
> supposed* prevents or diminishes damages for the
> consequences. . . .Thus when a person or his horse has been
> tortiously hurt, if the trial were held at once, the amount of
> damages would depend upon the length of time during
> which he or his animal would probably be disabled and
> other similar factors. If, however, the trial takes place two
> years later, *some of the events forecast previously may not
> have occurred, while others, perhaps less likely, may have
> taken plac*e. Thus if, because of the negligence of a
> physician or other unfavorable factors not known at the
> time of the harm, *an injured plaintiff has fared less well
> than was originally expected* and is still disabled, the
> damages include not only an amount for the loss of time
> and suffering for the years past but also an amount for the
> estimated loss in succeeding years . . . On the other hand, if

> in the meantime *the plaintiff has become completely well in*
> *a shorter time than might have been anticipated at the time*
> *of the injury*, the damages will include only the elements of
> loss during the time prior to his recovery.

*Restatement (Second) of Torts* §910, comment b (emphasis added)[13]. Thus, as long as the

harm that Marvel sustained was proximately caused by the Indenture Covenants, its

recovery is not limited by the extent to which such injury was "expected" at the time that

the defendants breached their duties. Holthausen's opinions as to such before-the-fact

"expectations" are, correspondingly, irrelevant to the measure of Marvel's actual

damages. *See Sea-Land Serv., Inc. v. General Elec. Co.*, 134 F.3d 149, 155 (3d Cir.

1998) ("Tort law is intended to compensate individuals where the harm goes beyond

failed expectations into personal and other property injury."); Dan B. Dobbs, *The Law of*

*Torts* § 188, at 464 (2000) ("Courts assume a radical distinction between the *nature* of a

harm and its *extent*. The foreseeability or risk rule holds the defendant subject to liability

if he could reasonably foresee the nature of the harm done, even if the total amount of

harm turned out to be quite unforeseeably large.").

> Holthausen's calculations of "expectations" are not a measure of actual

damages, but a forecast as to the probability of future damages. Such an opinion has no

bearing on the extent of the financial distress that Marvel actually sustained following the

Note issuances. *See Klinger v. Baltimore & Ohio R.R. Co.*, 432 F.2d 506, 514 (2d Cir.

1970) ("It is elementary that in computing damages the court must look to the actual

extent of the injury, and not to how much hurt the plaintiff might have suffered.")

---

[13]   Delaware has a "jurisprudential tradition of seeking guidance from the most
recent pronouncement of the Restatement of Torts." *Beattie v. Beattie*, 786 A.2d 549,
556 (Del. Super. 2001).

**C.    Holthausen Mistakenly Assumes that Marvel**
**     May be Equated with Its Stockholders and Creditors**

Holthausen's opinions regarding expectations of future financial distress at the time of the Note issuances do not "fit" the facts of this case because such opinions are based on the assumption that Marvel can be equated with its stockholders and creditors. That is a fundamentally flawed premise. The damages incurred by Marvel as a corporate entity are separate and distinct from any damages that might be suffered by its stockholders or creditors. Because Holthausen's opinions disregard that distinction, they do not fit the facts of this case and are irrelevant as a matter of law.

As the assignee of Marvel's claims, the Trust stands in its shoes for purposes of this lawsuit. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) (an "assignee of a claim has standing to assert the injury in fact suffered by the assignor.") It is a bedrock principle of law that the claims of a corporate entity exist separate and apart from any claims of its stockholders and/or creditors. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.") Indeed, the claims of a corporation are unaffected by, and indifferent to, any change in the composition of its stockholders. *See Texaco Ref. & Mktg, Inc. v. Delaware River Basin Comm'n*, 824 F. Supp. 500, 508 (D. Del. 1993) ("[i]f all of the corporation's stock changes hands over night, the corporation would maintain all of the rights, privileges, and liabilities it had prior to the change in the composition of the stockholders.")

Marvel's filing of a bankruptcy petition did not alter these basic precepts of corporate law. A corporation in bankruptcy has the same right to pursue claims for injury regardless of any claims of creditors or shareholders:

> *a corporation can suffer an injury unto itself, and any claim it asserts to recover for that injury is independent and separate from the claims of shareholders, creditors, and others.* We think it is irrelevant that, in bankruptcy, a successfully prosecuted cause of action leads to an inflow of money to the estate that will immediately flow out again to repay creditors.

*R.F. Lafferty & Co., Inc.*, 267 F.3d at 348-49 (italics added). Thus, the damages recoverable by a corporation in bankruptcy are still measured by the injury to the corporation -- not by any injury to its shareholders or creditors.

Holthausen's opinion that damages must be measured by reference to the "expectations" and options of shareholders or creditors at the time of the Note issuances cannot be squared with the fundamental distinction between a corporate entity and its stockholders or creditors. The financial distress injury to Marvel remained the same regardless of who owned its stock or who were its creditors. Simply put, Marvel's claim for damages "is independent and separate from the claims of shareholders, creditors, and others." *R.F. Lafferty & Co., Inc.*, 267 F.3d at 348-49. Because Holthausen's theory as to the measure of damages is based on the legally incorrect assumption that Marvel can be equated with its stockholders or creditors, his opinions on that subject are not relevant to the measure of damages in this case.

## CONCLUSION

For the reasons set forth above, plaintiffs respectfully request that the Court grant their motion to exclude: (a) in its entirety, the proposed testimony of Lawrence A. Hamermesh as reflected in the Hamermesh Report; and (b) those portions of

the opinions of Robert W. Holthausen set forth in paragraphs 7 through 9 and 15 through 23, inclusive, of the Holthausen Rebuttal Report.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888
lashby@ashby-geddes.com
ptrainer@ashby-geddes.com
tlydon@ashby-geddes.com

-and-

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP
Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

Dated: June 1, 2006
170095.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June 2006, I hand delivered and electronically filed

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO**

**EXCLUDE THE TESTIMONY OF LAWRENCE A. HAMERMESH AND CERTAIN**

**OPINIONS OF ROBERT W. HOLTHAUSEN** with the Clerk of Court using CM/ECF which

will send notification of such filing to the following:

> Anthony W. Clark, Esquire
> Skadden Arps Slate Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE 19899

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

164594.1