**EXHIBITS A – D TO
PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE TESTIMONY OF
LAWRENCE A. HAMERMESH
AND CERTAIN OPINIONS OF
ROBERT W. HOLTHAUSEN**

# EXHIBIT A

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 550750 (Del.Ch.)
(Cite as: 2004 WL 550750 (Del.Ch.))
н

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**In re THE WALT DISNEY COMPANY**
**Derivative Litig.**
No. Civ.A.15452-NC.

March 9, 2004.

Dear Counsel:

CHANDLER, J.

**\*1** This letter concerns the individual defendants'
motion to preclude the proposed expert testimony of
Professor Deborah A. DeMott. In her expert report,
Professor DeMott states that "the defendants ...
breached their fiduciary duties...." [FN1] As the
parties are well aware, that is the legal issue
presented in this case. [FN2] After considering the
parties' briefs and upon thorough review of
Professor DeMott's report, I find that her proposed
testimony is inadmissible for three reasons.

> FN1. Individual Defendants' Motion to Preclude the
> Proposed Expert Testimony of Deborah A. DeMott,
> Ex. A (Expert Report of Professor DeMott), at ¶ 5.
> Plaintiffs state that there are other opinions in the
> report, but after reviewing its contents, I find that the
> "other" opinions are merely reformulations of the
> same basic conclusion.

> FN2. *In re The Walt Disney Co. Derivative Litig.*,
> 825 A.2d 275, 277-78 (Del. Ch.2003).

First, "it is exclusively within the province of the
trial judge to determine issues of domestic law."
[FN3] In this Court, witnesses do not opine on
Delaware corporate law.

> FN3. *Itek Corp. v. Chicago Aerial Indus., Inc.*, 274
> A.2d 141, 143 (Del.1971). *See also North American*
> *Philips Corp. v. Aetna Cas. and Sur. Co.*, 1995 WL
> 628447, at *3 (Del.Super.Apr. 22, 1995) (Delaware
> law requires "exclusion of expert testimony that
> expresses a legal opinion"); *State v. Hodges*, 1996
> Del.Super. LEXIS 391, at *4 (Del.Super.Sept. 10,

1996) (same). Plaintiffs bear the burden of
demonstrating that Professor DeMott's proposed
testimony is admissible. *Bourjaily v. United States*,
483 U.S. 171, 175 (1987); *Minner v. American*
*Mortgage & Guar. Co.*, 791 A.2d 826, 843
(Del.Super.2000).

Second, Professor DeMott's proposed expert
testimony does not satisfy D.R.E. 702. Rule 702
requires that expert testimony "assist the trier of fact
to understand the evidence or to determine a fact in
issue." The Supreme Court has stated that "if [the
trier of fact], without the assistance of the expert,
[is] as capable of answering a question as an expert,
then the expert's opinion would not be helpful and is
not admissible under D.R.E. 702." [FN4] After
fifteen years of service on the Court of Chancery, I
certainly hope that I am capable-without the
assistance of Professor DeMott's testimony-of
answering whether the individual defendants
breached their fiduciary duties.

> FN4. *Jolly v. State*, 670 A.2d 1338 (TABLE), 1995
> WL 715868, at *1 (Del. Nov. 22, 1995).

Third, D.R.E. 704 does not compel the admission
of Professor DeMott's proposed expert testimony.
Rule 704 states that opinion testimony is not
objectionable "merely because it embraces an
ultimate issue." [FN5] In this case, I find Professor
DeMott's proposed testimony inadmissible not
*merely* because it embraces an ultimate issue, but
also because it embraces applicable domestic law.
Consistent with Rule 704, *Itek* prohibits such
testimony. [FN6]

> FN5. D.R.E. 704 (emphasis added).

> FN6. D.R.E. 704 cmt.

Plaintiffs argue that the individual defendants'
motion is premature, but I fail to see how Professor
DeMott's testimony will become any more
admissible three months from now. Moreover,
following the close of discovery on May 14, I see
no reason why this case should not proceed
promptly to a trial on the merits. Early
determination of this dispute over Professor
DeMott's report promotes judicial efficiency.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
**(Cite as: 2004 WL 550750, \*1 (Del.Ch.))**

As the parties have sought guidelines on certain scheduling matters, I also ask counsel to arrange a prompt teleconference with the Court to discuss such issues.

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 550750 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

# EXHIBIT B

2006 WL 1216220
--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)
(Cite as: 2006 WL 1216220 (D.Del.))
**H**

**Page 1**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
CRYOVAC INC., Plaintiff/Counter-Defendant,
v.
PECHINEY PLASTIC PACKAGING, INC.,
Defendant/Counter-Plaintiff.
No. CIV.A. 04-1278-KAJ.

April 17, 2006.

**Background:** Patentee brought action against competitor for patent infringement and tortious interference with contract and prospective business relations. Parties moved for summary judgment.

**Holdings:** The District Court, Jordan, J., held that:
  (1) competitor's multilayer plastic films literally infringed patent;
  (2) genuine issue of material fact precluded summary judgment on issue of whether patent was invalid as anticipated;
  (3) tortious interference claim was not preempted; and
  (4) genuine issues of material fact precluded summary judgment on tortious interference claim.
  Ordered accordingly.

**[1] Patents ☞ 323.2(2)**

291k323.2(2) Most Cited Cases
Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury.

**[2] Patents ☞ 112.5**
291k112.5 Most Cited Cases
Invalidity of a patent must be shown by clear and convincing evidence. 35 U.S.C.A. § 282.

**[3] Patents ☞ 112.1**
291k112.1 Most Cited Cases
Presumption of a patent's validity is never weakened, and the burden of proving invalidity does not shift from the party asserting invalidity.

**[4] Federal Civil Procedure ☞ 2011**
170Ak2011 Most Cited Cases
Motions to exclude evidence are committed to the court's discretion.

**[5] Patents ☞ 236.1**
291k236.1 Most Cited Cases
Manufacturer's multilayer plastic films that shared same composition with respect to the outer surface and outer sealant layers literally infringed patent for a multilayer film with at least seven layers "arranged symmetrically"; although manufacturer's film did not have same layer thickness as patentee's film, its layers had the same symmetrical arrangement.

**[6] Patents ☞ 323.2(3)**
291k323.2(3) Most Cited Cases
Genuine issue of material fact as to whether patent for a multilayer plastic film, as construed by court, was anticipated by prior art films precluded summary judgment on claim that patent was invalid as anticipated.

**[7] Patents ☞ 323.2(3)**
291k323.2(3) Most Cited Cases
Genuine issues of material fact with respect to scope and content of the prior art and the motivation to combine prior art references to produce the invention claimed in patent for a multilayer plastic film precluded summary judgment on issue of obviousness in infringement case.

**[8] Patents ☞ 16.13**
291k16.13 Most Cited Cases

**[8] Patents ☞ 323.2(2)**
291k323.2(2) Most Cited Cases
Legal question of obviousness is based on factual issues, and when material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution, summary adjudication is not indicated.

**[9] Patents ☞ 99**
291k99 Most Cited Cases
To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1216220
(Cite as: 2006 WL 1216220 (D.Del.))

**[10] Patents** ☞ **99**
291k99 Most Cited Cases
To prove that a patent claim is not enabled, accused infringer must prove that one of ordinary skill in the art would be unable to make the claimed invention without undue experimentation.

**[11] Patents** ☞ **323.2(3)**
291k323.2(3) Most Cited Cases
Genuine issue of material fact as to whether one of ordinary skill in the art could have made the invention claimed in patent for a multilayer plastic film without undue experimentation precluded summary judgment on claim that patent was invalid for lack of enablement.

**[12] Torts** ☞ **212**
379k212 Most Cited Cases
Plaintiff alleging a claim for tortious interference with contract must prove: (1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury.

**[13] Torts** ☞ **213**
379k213 Most Cited Cases
To establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted.

**[14] States** ☞ **18.3**
360k18.3 Most Cited Cases
A law can be preempted in one of three ways: by explicit Congressional statement, by field preemption, or by an actual conflict between the state and federal laws. U.S.C.A. Const. Art. 6, cl. 2.

**[15] Patents** ☞ **280**
291k280 Most Cited Cases
A state law claim is preempted by federal patent law only when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art.

6, cl. 2.

**[15] States** ☞ **18.87**
360k18.87 Most Cited Cases
A state law claim is preempted by federal patent law only when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[16] States** ☞ **18.15**
360k18.15 Most Cited Cases
Federal patent law did not preempt patentee's state tortious interference with contract claim against competitor, based on allegation that competitor tortiously interfered with patentee's relationship with a customer through willful infringement with patent rights; tort claims were being used in conjunction with and not in opposition to patent rights. U.S.C.A. Const. Art. 6, cl. 2.

**[16] Torts** ☞ **203**
379k203 Most Cited Cases
Federal patent law did not preempt patentee's state tortious interference with contract claim against competitor, based on allegation that competitor tortiously interfered with patentee's relationship with a customer through willful infringement with patent rights; tort claims were being used in conjunction with and not in opposition to patent rights. U.S.C.A. Const. Art. 6, cl. 2.

**[17] Federal Civil Procedure** ☞ **2515**
170Ak2515 Most Cited Cases
Genuine issues of material fact as to whether patentee had a binding requirements contract with a customer, whether patentee's competitor knew about the alleged contract, and whether competitor acted wrongfully in marketing infringing product to the customer precluded summary judgment on patentee's claim for tortious interference with a contract.

**[18] Patents** ☞ **323.2(3)**
291k323.2(3) Most Cited Cases
Genuine issue of material fact as to whether there was a non-infringing alternative to patentee's product precluded summary judgment on patentee's claim for lost profit damages in infringement case.

**[19] Patents** ☞ **318(4.1)**
291k318(4.1) Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Damages for lost profits may be awarded in patent infringement case, even where there are non-infringing alternatives, based on a patentee's previous share of the market.

**[20] Evidence ☞ 555.2**
157k555.2 Most Cited Cases

**[20] Evidence ☞ 555.4(2)**
157k555.4(2) Most Cited Cases
Expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[21] Evidence ☞ 555.2**
157k555.2 Most Cited Cases
In determining whether expert testimony is admissible, court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.

**[22] Evidence ☞ 555.4(3)**
157k555.4(3) Most Cited Cases
Expert's reliance on another witness's recollection of an experiment performed several years earlier in reaching opinion that patent was invalid went to weight of expert's opinion, rather than its admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[23] Evidence ☞ 506**
157k506 Most Cited Cases
Expert testimony on substantive areas of patent or contract law is impermissible. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**Patents ☞ 328(2)**
291k328(2) Most Cited Cases
4,755,419. Infringed.
 John W. Shaw, Esq., Karen E. Keller, Esq., Michele Sherretta, Esq ., Young Conaway Stargatt & Taylor, LLP, Wilmington, Of Counsel: Ford F. Farabow, Jr., Esq., Joann M. Neth, Esq., Courtney B. Meeker, Esq., Mark J. Feldstein, Esq., Rebecca D. Hess, Esq., Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, D.C., Counsel for Plaintiff.

 N. Richard Powers, Esq., Connolly Bove Lodge & Hutz, Wilmington, Of Counsel: Donald P. Cassling,

Esq., Steven R. Trybus, Esq., Shelley Smith, Esq., Brian P. O'Donnell, Esq., Jenner & Block LLP, Chicago, IL, Counsel for Defendant.

MEMORANDUM OPINION

JORDAN, District J.

I. INTRODUCTION

 *1 This patent infringement case is set to be tried to a jury beginning on June 12, 2006. Plaintiff Cryovac, Inc. ("Cryovac") has accused defendant Pechiney Plastic Packaging, Inc. ("Pechiney") of willfully infringing claim 11 of U.S. Patent No. 4,755,419 (issued July 5, 1988) (the " '419 patent") , and of tortious interference with contract and prospective business relations. (Docket Item ["D.I."] 185, the "Second Amended Complaint.") Pechiney has denied infringement and tortious interference, and has counter-claimed that the patent is invalid and unenforceable. (D.I. 260, Amended Answer to the Second Amended Complaint at 11-15.)

 Presently before me are six motions filed by Cryovac and Pechiney. Pechiney has filed a Motion for Summary Judgment on Patent Issues (D.I.195), a Motion for Summary Judgment on Lost Profits (D.I.193), a Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), and a Motion to Strike an affidavit submitted by Cryovac (D.I.281). Cryovac has filed a Motion for Summary Judgment that Pechiney Infringes Claim 11 of the '419 Patent (D.I.201), and a Motion to Exclude Expert Testimony (D.I.199). Jurisdiction is appropriate under 35 U.S.C. §§ 1331 and 1338. For the reasons that follow, Cryovac's Motion for Summary Judgment (D.I.201) will be granted as to literal infringement. Pechiney's Motion for Summary Judgment on Patent Issues (D.I.195) will be granted as to infringement under the doctrine of equivalents, and denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I.199) will be granted to the extent that Pechiney's experts will not be permitted to provide legal opinion or argument, and denied in all other respects. All of the other motions will be denied.

II. BACKGROUND

 A. The '419 Patent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 1216220
(Cite as: 2006 WL 1216220, *1 (D.Del.))

The '419 patent discloses "[a] multilayer film with a combination of oxygen barrier properties, toughness, shrinkability, and good optical properties" ('419 patent, Abstract), used "to package various articles, including perishable food products" (*id* . at col. 1, lns. 10-11). Claim 11, the only claim asserted, is for:

An oriented coextruded film having at least seven layers arranged symmetrically comprising:
(a) a core layer comprising an ethylene vinyl alcohol copolymer;
(b) two intermediate layers each comprising a polyamide;
(c) two outer layers each comprising a polymeric material or blend of polymeric materials; and
(d) two layers, each comprising an adhesive polymeric material, which adhere each of said intermediate layers to a respective outer layer.
('419 patent, at col. 9, ln. 67--col. 10, ln. 9).

The specification of the '419 patent defines various terms, including "oriented." U.S. Patent No. 4,755,419 at col. 3, lns. 45-49. Additionally, the specification describes suitable components for each of the layers, and gives a preferred total thickness for each of the layers. (*See* '419 patent, at col. 5-6.) For example, the specification indicates that intermediate layers 12 and 14 "comprise polyamide, and more preferably, a copolymer of nylon 6 and nylon 12 ... each layer can form between 5% and 25% of the total thickness of the multilayer film." ( *Id.* at col. 5, lns. 7-22.) Similar examples are given for each of the other layers of the film. (*See id.* at col. 5, ln. 23--col. 6 ln. 34 (discussing components of outer layers 16 and 18); *id.* at col. 6 lns. 39-68 (discussing adhesive layers 20 and 22).)

**B. Pechiney's ClearShield TM Product**

**\*2** Cryovac and Pechiney compete in the market for packaging materials for meat. Pechiney markets a product known as "ClearShield," which competes with Cryovac specifically in the bone-in, fresh, red meat packaging market. Cryovac alleges that Pechiney's ClearShield film infringes claim 11 of the '419 patent.

ClearShield is a coextruded seven layer film containing an ethylene vinyl alcohol copolymer core layer, two intermediate layers, each comprising a polyamide, two adhesive layers made of polymeric material, and two outer layers made of polymeric

material. (Deposition of Dr. Eldridge Mount, III, [FN1] D.I. 202, Ex. 5 at 14:1-2; *id*. at 18:8-20:17.) The two outer layers of ClearShield, called the outer surface layer and outer sealant layer by Pechiney, have different thicknesses and chemical compositions. (Declaration of Michael Douglas, [FN2] D.I. 213 at ¶¶ 19, 21-29.) For all twenty-six different product specifications for ClearShield, the outer surface layer of ClearShield has a thickness * * * of the total thickness of the film, while the outer sealant layer has a total thickness * * * (*Id.* at ¶ 19.) Additionally, for each of the twenty-six product specifications, the outer surface layer and the outer sealant layer contain different amounts of * * *, a slip and antiblock agent. [FN3] (*Id.* at ¶¶ 21-24.) For all of the product specifications, the outer surface layer contains between * * *, and the outer sealant layer contains between * * *. (*Id.* at ¶¶ 21-24.)

**C. Prior Art Films**

In making its invalidity argument, Pechiney focuses on two prior art films that it alleges are "oriented" within the meaning of claim 11 of the '419 patent.

*1. Allied Film*

Commencing around 1983, Dr. Seymour G. Gilbert [FN4] conducted a study for Allied Chemicals ("Allied") on a seven layer film having the structure HDPE/tie/nylon/EVOH/nylon/tie/HDPE (the "Allied Film"). (Declaration of Dr. Seymour G. Gilbert, D.I. 213, Ex. 4 at ¶ 9.) This study was described in at least one article that was publicly available in December of 1984, and one news release from Allied. (*Id.*) Dr. Gilbert stated in his declaration that, based on his recollection of experiments performed on the Allied Film on the Instron Tester, which "provides stress data relating to orientation," and "Cross Polarization to visualize orientation," it was oriented. (*Id.* at ¶ 16.) Dr. Gilbert's recollection provides the only evidence that this film was oriented, and there are no test results or other laboratory data regarding the orientation of this film.

*2. ANR Film C*

Allied disclosed in a news release a nine-layer film with the structure HDPE/tie/nylon/tie/EVOH/tie/ nylon/tie/HDPE("ANR Film C"). (D.I. 216, Ex. 17

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at A0226.) The results contained in that news release were presented to a regional conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985. (*Id.*, Ex. 16.) The news release disclosed that ANR Film C was 1.4 mils [FN5] thick, and had certain barrier protection properties. (*Id.*, Ex. 17 at A0227-29.) Pechiney asserts that this shows that the news release "inherently disclosed that ANR Film C was oriented." (D.I. 196 at 13.) There is no statement in the news release, however, that expressly indicates that ANR Film C was oriented. Additionally, the news release stated that "[c]ombinations of nylon and EVOH do not, Dr. Gilbert's tests showed, produce a significant synergistic effect in terms of barrier properties compared to a nylon-only coextrusion or an EVOH-only coextrusion." (D.I. 216, Ex. 17 at A0224.)

**D. Cryovac's Relationship with National Beef**

**\*3** Cryovac and National Beef Packing, LLC ("National Beef") had a business relationship that began sometime in the late 1990s. (D.I. 251, Deposition of Terry L. Wilkerson [FN6] at 110:25-111:10.) During that period, National Beef purchased \* \* \* of its packaging requirements for particular products from Cryovac. (*Id.* at 110:25-111:10, 130:1-17, 131:12-133:12.) In March of 2003 and January of 2004, Cryovac negotiated agreements with National Beef that covered the periods from January 1, 2003 to December 31, 2005, and January 1, 2004 to December 31, 2007, respectively. (D.I. 250 at March 2003 Agreement, January 2004 Agreement.) Both Agreements stated that they would "serve as documentation of our current packaging agreement." (*Id.* at B001, B003.) Additionally, both agreements provided discounts to National Beef on various products sold by Cryovac, which discounts were "contingent upon combined minimum annual purchases of Barrier Bags, TBG Bags, HS film and Case-Ready lidding exceeding \* \* \*." (*Id.*) Both agreements also provided for cash rebates based on the value of goods purchased by National Beef from Cryovac, starting at \* \* \*. (*Id.* at B001, B004.) The January 2004 agreement further provided that, "[i]n the event that National Beef's packaging purchases fall short of 2003 minimum volume targets due to market conditions other than the use of competitive supply, Cryovac will consider the minimum volume target to have been met." (*Id.* at B003.)

**III. STANDARD OF REVIEW**

**A. Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to Interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**1. *Patent Infringement***

**\*4** [1] A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. *Markman*, 52 F.3d at 976. The first step, claim construction, has been held to be purely a matter of law. *Cybor*, 138 F.3d at 1454-56. The second step, application of the claim to the accused product, is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed.Cir.2001) (Patent infringement, "whether literal or under the doctrine of equivalents,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



is a question of fact."). The patent owner has the burden of proving infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984) (citing *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983)). Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001).

## 2. *Patent Invalidity*

[2][3] When a party challenges a patent's validity, the starting point for analyzing that challenge is the statutory presumption of validity. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid."). Accordingly, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* Invalidity must be shown by clear and convincing evidence. *Robotic Vision Sys. v. View Eng'g, Inc.*, 189 F.3d 1370, 1377 (Fed.Cir.1999). This presumption of validity is never weakened, and the burden of proving invalidity does not shift from the party asserting invalidity. *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 745 F.Supp. 998, 1004 (D.Del.1990) (citing *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1574-75 (Fed.Cir.1984) (other citations omitted)).

## B. Motion to Exclude Expert Testimony

[4] Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or to exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

## IV. DISCUSSION

## A. Infringement

### 1. *Literal Infringement*

[5] Cryovac and Pechiney have cross-moved for summary judgment on literal infringement. (D.I. 195; 201.) Both parties focus their arguments on their claim construction positions for the term "arranged symmetrically." (*See* D.I. 196 at 20-24; D.I. 202 at 13-17.) Essentially, both sides argue that they should win on claim construction, and thus on summary judgment as well. (*Id.*) I have construed the term "arranged symmetrically," largely as Cryovac advocated, to mean "putting the layers in a desired symmetrical order when the film is viewed in cross-section, so that the layers are in the same order on each side of the core of the film, for example c/d/b/a/b/d/c. This claim phrase limits only the arrangement of the layers, but does not require precise identity in the thickness of the layers or the amounts of recited components or additives that may be included in the layers." (*See* D.I. 304 at 13-15.) Thus, although I did not adopt Cryovac's construction in its entirety, I did not construe "arranged symmetrically" to mean that the film must have geometric symmetry with respect to the thickness and chemical composition of the layers, as Pechiney had urged.

*5 Pechiney essentially conceded at oral argument that, if I accepted Cryovac's proposed construction of the claim term "arranged symmetrically," then the ClearShield product met that limitation. (D.I. 298, Oral Argument Transcript, at 57:11-18.) [FN7] Indeed, the vast majority of Pechiney's arguments, both in its opposition to Cryovac's motion and in its support of its own motion, rely on my adopting Pechiney's position on claim construction. (D.I. 196 at 20-24; D.I. 239 at 8-15; D.I. 280 at 2-4.) As I have construed the term "arranged symmetrically," there is effectively no dispute between the parties as to whether Pechiney meets the terms of the claim, [FN8] and thus summary judgment of literal infringement will be granted to Cryovac.

Pechiney further argues, however, that Cryovac is, at most, entitled to summary judgment that one of Pechiney's twenty-six product specifications, Z-9001 F, infringes claim 11 of the '419 patent, because it is the only specification cited in Cryovac's briefing. (D.I. 239 at 18-19.) Cryovac responds by stating that it cited testimony about ClearShield film generally, that Z-9001 F is the product specification used to make the vast majority

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of ClearShield film on the market, that, at the very least, all of the films made by the same product specification as Z-9001 F infringe the '419 patent, and that Pechiney's expert witness testified that Z-9001 F was "representative of the class." (D.I. 278 at 16-19.)

Pechiney's argument has little merit. Although there are twenty-six different product specifications for ClearShield, those twenty-six specifications have been grouped by Pechiney into four "Composition Combinations." (*See* Declaration of Michael Douglas, D.I. 213, Ex. 3 at ¶¶ 21-24.) It therefore appears that different product specifications in the same Composition Combination have the same composition, at least with respect to the outer surface and outer sealant layers. (*Id.*)

Combination One applies to product specification Z-9001 F, as well as six other product specifications. (*Id.* at ¶ 21.) Because at least the outer surface and outer sealant layers of these seven films share the same composition, films made under all of the product specifications identified under Combination One literally infringe claim 11 of the '419 patent. Additionally, Combinations Two and Three, which apply to two and sixteen product specifications, respectively, have only small differences from Combination One. The outer surface and outer sealant layers in films made under both Combinations Two and Three contain identical amounts of * * *, which is identified as an antioxidant, in addition to the components of Combination One. (*Id.* at ¶¶ 22-23.) Combination Three also contains a higher percentage of * * *, the slip/antiblock agent, than Combinations One and Two in the outer surface layer. (*Id.* at ¶¶ 22-23.) Other than these minor differences, the outer surface and outer sealant layers of films made under Combinations Two and Three are identical to those made under Combination One. Thus, films made under the product specifications identified under Combinations Two and Three literally infringe claim 11 of the '419 patent under my construction of the term of that claim. Finally, Combination Four has only one product specification, DZ-9004-1, which Cryovac has agreed does not infringe claim 11 of the '419 patent. (D.I. 278 at 20.) Thus, summary judgment of literal infringement will be granted to Cryovac as to all ClearShield product specifications except DZ-9004-1. [FN9]

*2. Doctrine of Equivalents*

*6 Pechiney has moved for summary judgment that there is no infringement under the doctrine of equivalents. (D.I. 196 at 24-28.) Cryovac responds only by saying that the doctrine of equivalents does not apply to this case. (D.I. 241 at 16.) Because Cryovac is not asserting a case of infringement under the doctrine of equivalents, summary judgment on this issue will be denied as moot.

B. Invalidity

Pechiney has moved for summary judgment that the patent is invalid because it is anticipated, obvious, and not enabled. Because there are genuine issues of material fact with respect to each of these issues, summary judgment of invalidity will be denied.

*1. Anticipation*

[6] Pechiney argues that, under its construction of the term "oriented," both the Allied Film and ANR Film C anticipate the invention disclosed in claim 11 of the '419 patent. (D.I. 196 at 30-31; D.I. 280 at 6-7, 11.) Pechiney makes no argument as to whether claim 11 is anticipated by the Allied Film or ANR Film C when the term "oriented" is construed to include the limitation "this stretching accomplished by a racking or blown bubble process," as I have construed it. [FN10] (*See* D.I. 304 at 9, 14.) Therefore, given the construction I have arrived at, Pechiney's motion for summary judgment of anticipation must be denied.

*2. Obviousness*

[7] Pechiney argues that, even if the Allied Film and ANR Film C are not oriented, and thus do not anticipate the invention of claim 11 of the '419 patent, it would have been obvious to a person of ordinary skill in the art to orient those films. (D.I. 196 at 33-37.) Pechiney asserts that oriented films, and the particular processes used to orient films, were well known in the art, and that the advantages of oriented films were also well known, such that a person of ordinary skill in the art would have been motivated to orient a multilayer film such as the Allied Film or ANR Film C. (*Id.* at 35-37.) Cryovac, however, counters by arguing that there would not have been motivation to orient those films, and that a person of ordinary skill in the art

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



would not have had an expectation of success in doing so. (D.I. 241 at 31-32.) Indeed, Cryovac claims that the prior art taught away from orienting those films. (*Id.* at 32.)

[8] "While the ultimate question of patent validity is one of law, ... [obviousness] lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved .... Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The legal question of obviousness is based on factual issues, and "when material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution, summary adjudication is not indicated." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed.Cir.1991).

*7 There are genuine issues of material fact with respect to at least the scope and content of the prior art and the motivation to combine prior art references to produce the invention in claim 11 of the '419 patent. Pechiney argues, and cites prior art to support its argument, that the prior art taught the elements of claim 11 of the '419 patent and that a person of skill in the art would have been motivated to orient films such as the Allied Film or ANR Film C. (D.I. 196 at 33-37.) However, Cryovac cites the declaration of its expert, Dr. Garth L. Wilkes, who in turn cites prior art that would have taught away from orienting EVOH-containing multilayer films. (Affidavit of Garth Wilkes, D.I. 242 at ¶¶ 30-37.) More specifically, Dr. Wilkes cites to prior art showing the difficulty of orienting multilayer films ( *Id.* at ¶ 30 (citing U.S. Patent No 4,501,797)) and the difficulty of orienting layers or films containing EVOH (*Id.* at ¶ 31 (citing U.S. Patent No. 4,610,914). This disagreement between the experts as to whether the prior art would have motivated one of ordinary skill in the art to make the invention of the '419 patent creates a genuine issue of material fact, and thus, summary judgment on obviousness must be denied.

### 3. *Enablement*

[9][10][11] Finally, Pechiney asserts that claim 11 of the '419 patent is invalid for lack of enablement. (D.I. 196 at 37-38.) Pechiney argues that the '419 patent teaches nothing new about how to orient a multi-layer film, and that if a person of ordinary skill in the art would not have been motivated to orient the films in the manner already known in the prior art, then the patent calls for a new but untaught type of orienting and is therefore not enabled. (*Id.* at 38.) Cryovac responds that, based on the information in the patent specification and the prior art, one of ordinary skill in the art could have made and used the invention. (D.I. 241 at 35-37.) "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.' " *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed.Cir.1997). To prove that a patent claim is not enabled, the accused infringer must prove that "one of ordinary skill in the art would be unable to make the claimed invention without undue experimentation." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360 (Fed.Cir.1998).

Pechiney's argument essentially boils down to an assertion that if claim 11 is not invalid for obviousness, then it must be invalid for lack of enablement. Pechiney, however, has not presented evidence sufficient to show that there is no genuine issue of material fact as to whether one of ordinary skill in the art could have made the invention of claim 11 of the '419 patent without undue experimentation. Pechiney's assertions that the patent teaches nothing new about orientation are met by Cryovac's contention that the '419 specification provided "detailed formation methods" on how to orient the film in the patent. Because Pechiney has failed to meet its burden of showing that there is no genuine issue of material fact regarding enablement, summary judgment on this point must also be denied.

### C. *Tortious Interference*

*8 [12][13] Pechiney has moved for partial summary judgment on Cryovac's tortious interference claims. [FN11] A plaintiff alleging a claim for tortious interference with contract must prove: "(1) a valid contract; (2) about which the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 1216220
(Cite as: 2006 WL 1216220, *8 (D.Del.))

defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury." *Gill v. Delaware Park, LLC,* 294 F.Supp.2d 638, 645 (D.Del.2003). "[T]o establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.,* 5 F.Supp.2d 238, 243 (D.Del.1998).

Pechiney first claims that it should be granted summary judgment on Cryovac's tortious interference claims because the state law causes of action for tortious interference with contract and tortious interference with a prospective contractual relationship are precluded by federal patent law. (D.I. 198 at 14-19.) Pechiney further argues that, even if the claims are not precluded, Cryovac cannot establish that there was a valid contract between Cryovac and National Beef (*id.* at 20-28.), nor can it establish that Pechiney knew about such a contract, if it existed (*id.* at 28-31), or that Pechiney's actions in dealing with National Beef were wrongful (*id.* at 31-33). Cryovac responds by arguing that the claims are not precluded (D.I. 250 at 9-13), that it did have a contract with National Beef (*id.* at 14-34), that there are genuine issues of material fact as to whether Pechiney knew or should have known about that contract (*id.* at 35-37), and that Pechiney's actions were wrongful because they involved willful infringement of the '419 patent (*id.* at 37-39). I address each of these arguments in turn.

1. *Preemption*

[14][15] Under the Supremacy Clause of the United States Constitution, art. IV, cl. 2, "state law that conflicts with federal law is 'without effect." " *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1331 (Fed.Cir.1998) (quoting *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). [FN12] A law can be preempted in one of three ways: by explicit Congressional statement, by field

preemption, or by an actual conflict between the state and federal laws. *Hunter Douglas,* 153 F.3d at 1332. There is no explicit preemption of state law tortious interference claims in the patent statute, *see* 35 U.S.C. §§ 1-376, and the Federal Circuit Court of Appeals has ruled that "there is no field preemption of state unfair competition claims that rely on a substantial question of federal patent law." *Hunter Douglas,* 153 F.3d at 1333. Thus, a state law claim is preempted by federal patent law only in the third instance, i.e., when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (analyzing question of preemption of a state statute requiring aliens to register with the state); *see also Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) (finding that state unfair competition law cannot "give protection of a kind that clashes with the objectives of the federal patent laws").

*9 The Federal Circuit appears to have addressed the issue of whether a state law tortious interference with contract claim conflicts with federal patent law on two separate occasions. *See Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998); *Hunter Douglas,* 153 F.3d 1318. In *Dow Chemical,* the Court found that a state law claim for tortious interference with actual and prospective contractual relations was not preempted by federal patent law, even where it requires the adjudication of a question of federal patent law. *Dow Chem.,* 139 F.3d at 1473. In *Dow Chemical,* the plaintiff sued the defendant-patentee for a declaratory judgment that the patent was not infringed, was invalid for inequitable conduct before the Patent & Trademark Office, and for state law claims of unfair competition based on the defendant-patentee's threats to sue the plaintiff and the plaintiff's customers for patent infringement. *Id.* at 1471-72. Similarly, in *Hunter Douglas,* the plaintiff sought a declaratory judgment that the defendant-patentee's patent was not infringed, was invalid, and was unenforceable due to inequitable conduct. *Hunter Douglas,* 153 F.3d at 1321-22. The plaintiff further sought various state law remedies based on the defendant-patentee's actions in telling the plaintiff's customers that the plaintiff did not have the right to sell its products because they were covered by the defendant's patent. *Id.* at 1322. However, the Court in *Hunter Douglas* found that the state law claims were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

preempted by federal patent law using an "as-applied" approach, finding that the plaintiff's tort action was based on conduct that was protected by federal patent law. *Id.* at 1335-36 (citing *Sears,* 376 U.S. at 231.).

[16] Naturally, Cryovac relies on *Dow Chemical,* while Pechiney relies on *Hunter Douglas.* It is unnecessary for me to harmonize those cases or to decide which case to apply, since this case presents a totally dissimilar factual scenario. In both of those cases, the accused infringer attempted to use state law unfair competition claims, based on the patentee's allegedly inequitable conduct in front of the Patent & Trademark Office, to limit the right to assert the patent. *See Dow Chem.,* 139 F.3d at 1471-72; *Hunter Douglas,* 153 F.3d at 1321-22. Thus, in both *Dow Chemical* and *Hunter Douglas,* the state law unfair competition claim presented at least some conflict with a patent owner's right under the patent statute to exclude others from making, using, or selling a patented product. Here, however, there is no such conflict. Cryovac, the patent owner, is asserting that Pechiney willfully infringed the '419 patent, and that Pechiney, partially through that infringement, tortiously interfered with Cryovac's relationship with National Beef. The unfair competition claims here are being used in conjunction with and not in opposition to the patent rights.

Furthermore, the tortious interference claims, even though they are based in part on Cryovac's assertion that Pechiney willfully infringed claim 11 of the '419 patent, require Cryovac to prove a number of things in addition to willful infringement, including the existence of a contract or a valid business relationship or expectancy and the knowledge Pechiney allegedly had of the contract or the relationship (*see supra* at 16). *See Dow Chem.,* 139 F.3d at 1477 ("a tort claim for intentional interference with contractual relations requires elements entirely different to those required for inequitable conduct"). Therefore, Cryovac's tortious interference claim is not preempted by patent law. *See Rodime PLC v. Seagate Tech., Inc.,* 174 F.3d 1294, 1306 (Fed.Cir.1999) (holding that a patentee could sue for tortious interference along with its claims of infringement).

2. *Existence of a Contract*

*10 [17] Pechiney asserts that it should be granted summary judgment on Cryovac's tortious interference claims because Cryovac cannot show that it had a contract with National Beef. (D.I. 198 at 20-28.) In particular, Pechiney argues that the document Cryovac alleges was a contract contains no quantity term, and additionally cannot be viewed as a requirements contract. (*Id.*) Pechiney further argues that National Beef did not intend to be bound by any agreement with Cryovac. (*Id.* at 27-28.) Cryovac responds that it did have a requirements contract with National Beef (D.I. 250 at 17-32), and that National Beef intended to be bound by that contract (*id.* at 16-17; 32-34). Each party cites a number of cases which it claims supports its position on whether there was a contract, and each argues that the facts of this dispute are similar to the cases it puts forward. All of these arguments, however, essentially amount to factual disputes over the meaning of the contract language and the intent of the parties. In short, there are genuine issues of material fact with respect to whether Cryovac and National Beef had a binding requirements contract.

The documents that Cryovac alleges are contracts with National Beef each contain a minimum purchase requirement of * * * for National Beef to receive the agreed on product discounts and cash rebates. (D .I. 250, March 2003 Agreement at B001-02; *id.* at January 2004 Agreement at B003-04.) Additionally, the January 2004 Agreement contains a provision that states "[i]n the event National Beef's packaging purchases fall short of 2003 minimum volume targets due to market conditions other than the use of competitive supply, Cryovac will consider the minimum volume target to have been met." (*Id.,* January 2004 Agreement at B003.) There are several courts that have found, in situations similar to the instant dispute, that a requirements contract either did exist or that there were issues of fact as to whether a requirements contract existed. *See, e.g. Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.,* 186 F.3d 815, 817-18 (7th Cir.1999) (holding that, although the language of the contract was permissive when it said the buyer could purchase "such quantities of the items listed herein as [it] might order or schedule" and that the "Buyer shall have the right at any time and from time to time to cancel, in whole or in part, the deliveries specified and the authorizations contained in any shipping schedule given to the Seller", "we must conclude that the contract, taken as a whole, is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



ambiguous and that further investigation as to whether the parties intended a requirements contract is required"); *Kansas Power & Light Co. v. Burlington N. Ry. Co.,* 740 F.2d 780, 788-89 (10th Cir.1984) (finding that a requirements contract existed where the contract "provide[d] for an incentive pricing system based on tonnage shipped" and had a term that stated that in years where the buyer's requirements feil below a certain level, "carriers [would] seek to amend the tariff to reduce the annual minimum tonnage requirement" for the buyer); *O.N. Jonas Co., Inc. v. Badische Corp.,* 706 F.2d 1161, 1164-65 (11th Cir.1983) (finding that the statement "[a] potential program utilizing our yarn was discussed in 1977 and we indicated that we would supply the yarn if we were provided a Heller guaranty on our form" was sufficient to show a requirements contract "in light of the business dealings" between the parties.) Thus, there are genuine issues of material fact as to whether Cryovac and National Beef had a binding requirements contract based on the March 2003 and January 2004 agreements and based on the course of dealing and performance between those parties.

### 3. *Pechiney's Knowledge of the Alleged Contract*

**\*11** Pechiney next claims that even if Cryovac and National Beef did have a contract, the undisputed facts show that Pechiney had no knowledge of the contract, and thus, that Cryovac's claim of tortious interference with contract must fail. (D.I. 198 at 28-31.) Pechiney claims that National Beef did not believe that it had a binding contract with Cryovac, and thus did not tell Pechiney about any contract. (*Id.* at 29-30.) Pechiney also points to statements by its employees that they had no knowledge of any contract between National Beef and Cryovac. (*Id.* at 30-31.) Cryovac contends, however, and Pechiney does not dispute, that Pechiney knew that Cryovac supplied 100% of National Beef's packaging products (*see* D.I. 251, Deposition of Thomas Grabowski [FN13] at 212:1-8), that Cryovac's pricing was contingent on Cryovac continuing to be National Beef's 100% supplier (*id.*), and that National Beef was intending to award a contract in early 2004 for 100% of its packaging needs (D.I. 251, Ex. CC at B190). This evidence creates a genuine issue of material fact as to whether Pechiney knew about the alleged contract between Cryovac and National Beef.

### 4. *Pechiney's Wrongful Means*

Finally, Pechiney asserts that it is entitled to summary judgment on Cryovac's tortious interference with prospective contractual relations claim because Cryovac cannot establish that Pechiney acted wrongfully. (D.I. 198 at 31-33.) Pechiney essentially argues that, because it conducted research and got a non-infringement opinion, it acted in good faith and cannot be held liable for tortious interference. (*Id.*) However, "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles." *Haft v. Dart Group Corp.,* 841 F.Supp. 549, 577 (D.Del.1993) (quoting *DeLong Corp. v. Raymond Int'l, Inc.,* 622 F.2d 1135, 1146 (3d Cir.1980)). Additionally, Cryovac asserts that Pechiney's initial opinion, the only opinion it had before marketing ClearShield, was insufficient because, among other things, it failed to analyze claim 11 of the '419 patent, the only claim in suit. (D.I. 250 at 39 (citing D.I. 251, Ex. G at B113).) Thus, there are genuine issues of material fact with respect to whether Pechiney acted wrongfully.

Accordingly, because Cryovac's tortious interference claims are not preempted, and because there are genuine issues of material fact as to whether there was a contract between Cryovac and National Beef, as to whether Pechiney knew about any such contract, and as to whether Pechiney acted wrongfully, summary judgment on Cryovac's tortious interference claims will be denied.

### D. Lost Profits

[18] Pechiney has moved for partial summary judgment that Cryovac is not entitled to lost profits damages because of the existence of non-infringing alternatives, namely products produced by Curwood, Inc. ("Curwood"). [FN14] (D.I.193.) Cryovac counters by arguing that there are genuine issues of material fact as to whether the products produced by Curwood were available non-infringing alternatives (D.I. 244 at 12-17), and that, under *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573 (Fed.Cir.1989), Cryovac is entitled to lost profits based on the sales it would have made but for Pechiney's sales of the ClearShield product.

**\*12** In support of its argument that Curwood's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



products were not acceptable non-infringing alternatives, Cryovac asserts that its products outperformed Curwood's products. (See D.I. 244 at 13-14 (citing, e.g., D.I. 246, Ex. A at CR014-000581 ("The Curwood package did not perform well at destination, defect rate of 19% vs. the Cryovac package of less than 5%").) Cryovac also argues that Curwood did not compete with Cryovac because it did not offer a complete line of packaging products. (D.I. 244 at 14.) Additionally, the evidence from an internal Pechiney document shows that, prior to Pechiney's entry into the market, Cryovac held * * * of the market, while Curwood held only * * *. (D.I. 243, Ex. R at PPPI 0008241.) Thus, Cryovac has shown that there are genuine issues of material fact as to whether Curwood offered a non-infringing alternative.

[19] Furthermore, damages for lost profits may be awarded, even where there are non-infringing alternatives, based on a patentee's previous share of the market. See State Indus., Inc., 883 F.2d at 1580 ("[T]he district court acted well within its discretion when it awarded damages for [Defendant]'s infringing activity based on [Patentee]'s share of the market."). Thus, even if Curwood did produce a product that was a non-infringing alternative, it is possible for Cryovac to be awarded lost profits damages based on the market share it held prior to Pechiney's entrance into the market. The motion for partial summary judgment on lost profits must therefore be denied.

E. Cryovac's Motion to Exclude Expert Testimony

Cryovac has moved under Federal Rules of Evidence, 702, 703, and 403 to exclude the testimony of two of Pechiney's experts, Dr. Eldridge Mount and Mr. Larry Evans. (D.I.199.) Pechiney responds by arguing that Cryovac's assertions go to the weight the expert testimony should be given, not its admissibility (D.I. 252 at 2).

[20] Federal Rule of Evidence 702 obligates judges to ensure that any scientific or technical testimony admitted is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge

will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. See Daubert, 509 U.S. at 592 n. 10 (citation omitted). The expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. See Joiner v. General Elec. Co., 522 U.S. 136, 144, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting failure of plaintiffs to explain "how and why [they] ... could have extrapolated their opinions"); Kumho Tire, 526 U.S. at 152 (an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); Daubert, 509 U.S. at 590 (expert's testimony "must be supported by appropriate validation").

*13 [21] Further, Rule 702 requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. Daubert, 509 U.S. at 591-92. The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir.1999) .

Federal Rule of Evidence 703 provides, in relevant part, that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Federal Rule of Evidence 403 provides that relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

1. Dr. Mount

Cryovac claims that the portions of Dr. Mount's opinion that deal with invalidity based on the Allied Film should be excluded under Federal Rules of Evidence 702, 703, and 403, and that Dr. Mount's opinion on non-infringing alternatives should be excluded because it lacks support. (D.I. 200 at 16-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 1216220
(Cite as: 2006 WL 1216220, *13 (D.Del.))

22.) Specifically, Cryovac asserts that Dr. Mount's opinion is inadmissible because it was not derived by a scientific method (*id.* at 16), it is not objectively verifiable (*id.* at 17), it will not assist the trier of fact (*id.* at 17-18), it does not rely on the type of data reasonably relied on by experts in the field (*id.* at 18-19), it is unfairly prejudicial (*id.* at 20-21), and it will confuse the jury (*id.* at 21). Each of these arguments, however, is simply an attack on Dr. Mount's reliance in his report on the statements of Dr. Gilbert regarding the Allied Film. (*Id.* at 16-22.) In forming his opinion on invalidity, Dr. Mount relied on, among other things, Dr. Gilbert's statement in his declaration that, based on his recollection of experiments performed on the Allied Film on the Instron Tester and Cross Polarization testing, the Allied Film was oriented (Declaration of Dr. Seymour G. Gilbert, D.I. 213, Ex. 4 at ¶ 16). (Second Supplemental Report of Eldridge Mount, D.I. 213, Ex. 5 at Ex. D at 4-6.) Cryovac claims that Dr. Gilbert's statement in his declaration is uncorroborated and that Dr. Mount's reliance on it makes Dr. Mount's opinion inadmissible under Rule 702, 703, and 403. (D.I. 200 at 16-21.)

[22] However, Cryovac does not contend that the tests performed by Dr. Gilbert are unreliable, but rather that it is improper to rely on Dr. Gilbert's uncorroborated memory. (*Id.*) Pechiney asserts that Dr. Gilbert's recollection is corroborated by an article entitled "Nylon Film Effective Packaging" published on December 14, 1984 in the Journal of Commerce (*See* D.I. 216, Ex. 18 at A0231-33), a news release presented at a regional conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985 (D.I.216, Ex. 16, 17), and an article published in a 1997 issue of the Journal of Food Science (D.I.216, Ex. 19). (*See* D.I. 252 at 7-11.) It appears, therefore, that there is arguably some corroboration of Dr. Gilbert's recollection, and thus Dr. Mount's reliance on Dr. Gilbert's statements is an issue that can fairly be dealt with on cross-examination, as it goes to the weight, not the admissibility of Dr. Mount's testimony.

*14 Having said that, though, I emphasize that I have defined the term "oriented" to include a process limitation, such that a film is "oriented" under my construction only if it is "accomplished by a racking or blown bubble process." (*See* D.I. 304 at 9, 14.) There is nothing in the declaration of Dr. Gilbert that indicates the process by which the

Allied Film was oriented, if it was oriented. (D.I.213, Ex. 4.) Accordingly, Dr. Mount's testimony cannot include assertions about anticipation, since there is no evidence in the record that the Allied Film was oriented in the manner stated in the patent.

Cryovac also claims that Dr. Mount's opinion on non-infringing alternatives lacks support, and that it should thus be excluded. (*Id.* at 21-22.) Cryovac asserts that the documents that Dr. Mount attempted to rely on do not support his opinion, and that his opinion should thus be excluded. (*Id.* at 22.) Again, however, this argument goes to the weight that should be given to his expert testimony, not its admissibility. Cryovac's motion to exclude the testimony of Dr. Mount will therefore be denied.

### 2. *Mr. Evans*

Cryovac also asserts that the damages opinion of Mr. Evans should be excluded in its entirety. With respect to Mr. Evans' opinion regarding non-infringing alternatives, Cryovac claims that Mr. Evans is unqualified to testify on the existence of non-infringing alternatives (D.I. 200 at 23), that his opinion on non-infringing alternatives is based on evidence that does not meet the requirements of Rule 703 (*id.* at 23-24), and that the evidence he relies on would be unfairly prejudicial to Cryovac (*id.* at 24-25.) Further, Cryovac asserts that Mr. Evans' patent damages opinion should be excluded because there is no evidence to show the existence of acceptable non-infringing alternatives. (*Id.* at 25-26.) Pechiney responds by saying that Mr. Evans is not opining on non-infringing alternatives but is relying on the opinion of Dr. Mount in this matter in forming his opinion on damages in the form of lost profits. (D.I. 252 at 27-30.) While Cryovac is correct that Mr. Evans may not himself opine on whether there are acceptable non-infringing alternatives, Mr. Evans may rely on the testimony of Dr. Mount in forming his opinion on lost profits.

[23] Cryovac has also moved to exclude Mr. Evans' opinions on the basis that they contain improper opinions on patent and contract law. (D.I. 200 at 26-32.) Cryovac is correct that Mr. Evans's opinions go beyond opining on what the appropriate measure of damages should be, and make what amounts to legal argument on patent and contract law. As just one example among many, Mr. Evans

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



states:

The alleged contracts with National Beef, i.e. Cryovac's and [Pechiney's], were not contracts at all. As I indicated in my Initial Report, they were no more than 'price sheets'. No quantities were stated. National Beef could switch suppliers at any time. If National Beef did so, it would only lose its price protection and the possibility of volume discounts. In my nearly 30 years of corporate management experience, I have negotiated more than 30 to 40 supply agreements. These agreements specified, inter alia, quantities to be purchased or 'requirements', price and allowable escalation and dispute resolution. The alleged 'agreements' cited by Mr. Nawrocki are not supply or requirements contracts nor are they fixed quantity contracts, and they do not obligate National Beef to purchase bags nor do they obligated Cryovac to supply bags.

*15 (D.I. 207, Ex. 5 at ¶ 17; *see also* D.I. 207, Ex. 3 at ¶¶ 33-34, 41, 43; *id.*, Ex. 5 at ¶¶ 10, 12.) Such testimony on substantive areas of patent or contract law is impermissible. *Revlon Consumer Prods. Corp. v. L'Oreal S.A.*, C.A. No. 96-192-MMS, 1997 WL 158281, at *3 (D.Del. Mar.26, 1997) (stating that expert "may not testify as to substantive issues of patent law"); *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, C.A. No. 88C-JA-155, 1995 WL 628447, at *3 (Del.Super.Apr. 22, 1995) ("the proper scope of expert testimony intersects with the law of contract interpretation, which firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract. Such testimony is reversible error and is not repaired by cross-examination") (citing *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 508 (2d Cir.1977) ("the District Court erred in permitting Friedman, an expert witness called by plaintiffs, to give his opinion as to the legal obligations of the parties under the contract")). Thus, Cryovac's Motion to Exclude will be granted to the extent that Mr. Evans will be confined at trial to opining on what the damages award in this case should be if Pechiney's legal positions are accepted. He will not be permitted to advocate legal positions for Pechiney by opining on the substance of case law, or on the validity of any contract between Cryovac and National Beef. The Motion to Exclude will be denied in all other respects.

F. Pechiney's Motion to Strike Deily Declaration

In support of its opposition to Pechiney's Motion

for Partial Summary Judgment on Lost Profits, Cryovac filed the Affidavit of Karl Deily. (D.I.245.) Pechiney has moved to strike that affidavit, contending that it is not made on personal knowledge, lacks foundation, and is speculative and conclusory. (D.I.281.) Because I did not rely on that affidavit in deciding Pechiney's Motion for Partial Summary Judgment on Lost Profits, the Motion to Strike will be denied as moot.

V. CONCLUSION [FN15]

Accordingly, Cryovac's Motion for Summary Judgment that Pechiney Infringes Claim 11 of the '419 Patent (D.I.201) will be granted as to all ClearShield product specifications except DZ-9004-1. Pechiney's Motion for Summary Judgment on Patent Issues (D.I.195) will be denied as moot to the extent that it seeks a judgment that there is no infringement under the doctrine of equivalents, and it will be denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I.199) will be granted to the extent that Mr. Evans is precluded from opining on the substance of case law or on the validity of any contract between Cryovac and National Beef, and to the extent that Dr. Mount will not be permitted to opine that prior art films are "oriented" as that term is used in the patent; that Motion will be denied in all other respects. Pechiney's Motion for Summary Judgment on Lost Profits (D.I.193) and Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), will be denied, and Pechiney's Motion to Strike (D.I.281) will be denied as moot. An appropriate order will follow.

ORDER

*16 For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for Summary Judgment that Pechiney Infringes Claim 11 of U.S. Patent No. 4,755,419 (D.I.201), filed by Cryovac, Inc. ("Cryovac"), is GRANTED as to all ClearShield product specifications except DZ-9004-1. IT IS FURTHER ORDERED that the Motion for Summary Judgment on Patent Issues (D.I.195), filed by Pechiney Plastic Packaging, Inc. ("Pechiney"), is DENIED as moot to the extent that it seeks a judgment that there is no infringement under the doctrine of equivalents, and is DENIED in all other respects. IT IS FURTHER ORDERED that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 1216220
(Cite as: 2006 WL 1216220, *16 (D.Del.))

Cryovac's Motion to Exclude Expert Testimony (D.I.199) is GRANTED to the extent that Mr. Evans is precluded from opining on the substance of case law, or on the validity of any contract between Cryovac and National Beef, and to the extent that Dr. Mount will not be permitted to opine that prior art films are "oriented" as that term is used in the patent; that Motion is DENIED in all other respects. IT IS FURTHER ORDERED that Pechiney's Motion for Summary Judgment on Lost Profits (D.I.193) and Motion for Partial Summary Judgment on Tortious Interference Claims (D.I.197), are DENIED, and its Motion to Strike (D.I.281) is DENIED as moot.

IT IS FURTHER ORDERED that the parties should meet and confer upon redactions to the accompanying opinion, and submit those proposed redactions within two weeks.

FN1. Dr. Eldridge Mount is an expert witness for Pechiney. (D.I. 213, Ex. 5 at ¶ 2.)

FN2. Michael Douglas is an employee of Pechiney's successor, Alcan Packaging, Inc., who helped in the research and development of ClearShield. (D.I. 213, Ex. 3 at ¶¶ 1, 4.)

FN3. The more * * * that is added to a layer, the more slippery that layer becomes. (See D.I. 298 at 59:3-15.)

FN4. Dr. Gilbert served as Professor of the Food Science Department at Rutgers University from 1965-1988. (D.I. 213, Ex. 4 at ¶ 4.)

FN5. A mil is defined as "a unit of length equal to 1/ 1000 inch used esp. In measuring thickness (as of plastic films)". Merriam-Webster's Collegiate Dictionary 736 (10th ed.2002).

FN6. Terry L. Wilkerson is the National Beef Executive Vice President of Strategic Business Growth, and the person at National Beef with whom Cryovac negotiated its contracts. (D.I. 250 at March 2003 Agreement, January 2004 Agreement.)

FN7. As a good advocate must, Pechiney's attorney agreed when agreement was essential, though he hedged where he could. The exchange, in relevant part, was as follows: The Court: ... Assume for purposes of argument I were to accept Cryovac's

version of 'symmetrically arranged.' Do you agree that there is infringement?
[Counsel]: Your Honor, I would agree if you accept [Cryovac's] definition of 'symmetrically arranged[,]' we meet symmetrically arranged. Depending on what 'simultaneously' means and 'coextruded,' we put forth affirmative proof that we don't do 'simultaneously,' if that is meant to indicate some simultaneous event taking place in the coextrusion die. So that issue would still be out there.
The Court: So really, the difference in the percentages there that were at least alluded to here in the courtroom today along with differences in thickness. It comes down to and I view that as not a distinction in kind that would make it asymmetrically arranged.
[Counsel]: Well, Your Honor, let me clarify what I meant. If Your Honor adopts what they propose, and all that needs to happen is the c/d/b/a/b/d/c order, it's true layer one and layer seven meet C. I think they are significantly different with the antiblock. There are three times as much antiblock in layer seven as there is in layer one. That is done for a particular intentional reason and there is a dramatic difference between the way those two layers react.
So, if Your Honor include (sic) in the definition something more than I can just label this as something that has some at least polymeric material in it, which is all that C requires. If all you have to do is label it as C, then I would agree that it can be labeled as C.
If 'arranged symmetrically' has some more meaning than that, then there is a difference in kind between layer one and layer seven.
(D.I. 298 at 57:8-58:15.)

FN8. Pechiney's counsel also stated that there could still be an issue as to infringement with respect to the construction of the term "coextruded." (D.I. 298 at 57:13-18.) However, as I stated in my claim construction ruling (see D.I. 304 at note 1), the parties appear to agree on a key aspect of the meaning of this term, and Pechiney effectively conceded that the ClearShield product met the claim limitation "coextruded" under that agreed-to meaning. (D .I. 240 at 26-27; D.I. 239 at 15-16.)

FN9. Indeed, Pechiney's argument may be, for practical purposes, moot, as Pechiney's 30(b)(6) witness, Michael Douglas, testified that the "vast majority of [Pechiney's] production" was under product specification Z-9001 F, and that "there may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 1216220
(Cite as: 2006 WL 1216220, *16 (D.Del.))

Page  16

be a small amount being run Z-9002 F [also made under Combination One], but I'm not sure about that." (D.I. 243, Ex. Z at 20:11-21:2.) Douglas further stated that, to his knowledge, none of the other product specifications currently accounted for films being sold in the market. (Id. at 21:3-5.)

FN10. There would be genuine issues of material fact as to Pechiney's evidence that the Allied Film and ANR Film C are oriented under any definition of that term. With respect to the Allied Film, Pechiney bases its assertion that the Allied Film was oriented on the statement of Dr. Gilbert that "[i]t was [his] recollection that results of the instron Tester and the Cross Polarization tester showed that the [Allied Film] ... was oriented." (D.I. 213, Ex. 4 at ¶ 16.) Cryovac disputes this conclusion, and notes that Dr. Gilbert failed to cite "a single piece of data, laboratory notebook entry, notes, drawings, or other evidence" that would corroborate Dr. Gilbert's recollection as to whether the Allied Film was oriented. (D.I. 241 at 18.) Thus, even if Pechiney's definition of "oriented" were still in play, there would be an issue of fact as to whether that film was oriented.

FN11. The parties appear to dispute whether the law of Delaware, where both Cryovac and Pechiney are incorporated, or the law of Kansas, the location of National Beef's plants, or the law of Missouri, the location of National Beef's offices, or the law of South Carolina, Cryovac's place of business, applies. However, the parties apparently agree (see D.I. 198 at 13-14; D.I. 250 at 9-10) that the law of tortious interference with contract and tortious interference with prospective contractual relations is essentially the same in all four states. See Dickens v. Snodgrass, Dunlap & Co., 255 Kan. 164, 872 P.2d 252, 257 (Kan.1994) (stating elements of tortious interference with contract claim); Turner v. Halliburton Co., 240 Kan. 1, 722 P.2d 1106, 1115 (Kan.1986) (stating elements of tortious interference with prospective contractual relations claim); Tri-Continental Leasing Co. v. Neidhardt, 540 S.W.2d 210, 212 (Mo.Ct.App.1976) (stating elements of tortious interference with contract claim); Carter v. St. John's Regional Medical Center, 88 S.W.3d 1, 13 (Mo.Ct.App.2002) (stating elements of tortious interference with prospective contractual relations claim); DeBerry v. McCain, 275 S.C. 569, 274 S.E.2d 293, 296 (S.C.1981) (stating elements of tortious interference with contract claim); Crandall

Corp. v. Navistar Int'l Transp. Corp., 302 S.C. 265, 395 S.E.2d 179, 180 (S.C.1990) (stating elements of tortious interference with prospective contractual relations claim). Therefore, the resolution of Pechiney's Motion for Partial Summary Judgment on the tortious interference claims does not depend on a choice of law determination, and, for convenience, I cite to precedent based on Delaware law.

FN12. Hunter-Douglas was later overruled on a point not pertinent here. See Midwest Industries, Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1358-59 (Fed.Cir.1999) (holding that Federal Circuit would henceforth apply its own law rather than regional circuit law to "questions involving the relationship between patent law and other federal and state law rights.").

FN13. Thomas Grabowski is an employee of Pechiney who participated in negotiations with National Beef. (D.I. 251, Ex. CC at B189-93.)

FN14. The opinion in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir.1978) sets forth a widely accepted test, although not an exclusive test, for lost profits. The court there stated that, to get lost profits, "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." Id.

FN15. This Opinion is filed under seal because much of the parties' briefing was filed under seal. The parties are in the best position to suggest, in the first instance, what redactions, if any, should be made in this opinion to preserve confidential information. The parties should confer and agree upon redactions, and submit them within two weeks of the date of this Opinion.

--- F.Supp.2d ----, 2006 WL 1216220 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

. **2005 WL 3666863 (Trial Pleading) Answer to Second Amended Complaint (Oct. 24, 2005)**

. **2005 WL 3666861 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Summary Judgment on Patent Issues (Oct. 19, 2005)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

. 2005 WL 3666862 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Partial Summary Judgment on Tortious Interfrence Claims (Oct. 19, 2005)

. 2005 WL 3666860 (Trial Pleading) Second Amended Complaint for Patent Infringement (Oct. 12, 2005)

. 1:04cv01278 (Docket) (Sep. 20, 2004)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

# EXHIBIT C

Westlaw.

Not Reported in A.2d                                                                                      Page 1
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
(Cite as: Not Reported in A.2d)

H

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
Glenn FREEDMAN, Harry Lewis, William Steiner,
Arthur L. Monheit and Dorothy Monheit as
Administrators of: the Estate of Charles Monheit,
deceased and David Scheinfeld, Plaintiffs,
v.
RESTAURANT ASSOCIATES INDUSTRIES,
INC., Martin Brody, Max Pine, Sidney Lester
Klepper, Renee Brody Levow, Darwin C. Dornbush,
Allan Goldring, Leonard Schecter, Morton A.
Siegler, Alan Silverman, Robert Wechsler and
Stephen A. Greyser, Defendants.
Submitted: October 15, 1987.
Decided: October 16, 1987.

**652 Joseph A. Rosenthal, and Kevin Gross, of
Morris, Rosenthal, Monhait & Gross, P.A.,
Wilmington, and Ralph L. Ellis, Jan Orange, and
Karen Kelly, of Abbey & Ellis, New York, and
David C. Harrison, of Lowey, Dannenberg & Knapp,
New York, of counsel, for plaintiffs.
David C. McBride, Bruce L. Silverstein, and Melanie
K. Sharp, of Young, Conaway, Stargatt & Taylor,
Wilmington, and Karl Savryn, of Dornbush, **653
Mensch, Mandelstam & Silverman, New York, of
counsel, for defendants Restaurant Associates, Brody
and Pine.
Edward P. Welch, and John G. Day, Henry P.
Wasserstein, and Jeremy A. Berman, of Skadden,
Arps, Slate, Meagher & Flom, Wilmington and New
York, for defendants Schecter, Siegler, Silverman,
Wechsler and Greyser.

MEMORANDUM OPINION
ALLEN, Chancellor.
*1 This action, brought as a class action on behalf of
the public shareholders of Restaurant Associates
Industries, Inc., a Delaware corporation, seeks a
preliminary and permanent injunction against the
effectuation of a proposed management-sponsored
leveraged buy-out of the Company planned to be
effectuated in two steps. The first step of the
proposed transaction is a currently pending cash
tender offer for any and all shares of the Company's
stock at $18 per share. That tender offer may, under
its terms, close no sooner than midnight tonight. The

second step in the transaction is to be a merger in
which the remaining public shareholders would have
their shares converted to a right to receive $18 in
cash.

The matter is now before the court on plaintiffs'
motion for a preliminary injunction. The relief
sought is unusual. In addition to seeking to enjoin
the closing of the pending offer, plaintiffs seek an
order, in effect, requiring the corporation to grant to a
third party with an apparent interest in acquiring the
Company, an option to acquire shares of the
Company's stock at $20 per share. The grant of such
relief, which has, in the circumstances, correctly been
characterized as a 'lock-up option,' would be
extraordinary; plaintiffs admit as much but contend
that the holding of our Supreme court in Revlon, Inc.
v. MacAndrews & Forbes Holdings, Inc., Del.Supr.,
506 A.2d 173 (1986) supports such relief in this
instance.

The gist of the claim as presented on the pending
motion is that certain directors of the Company have
acted in that capacity to advance their own interests
as buyers of the Company's stock and have
foreclosed the development of a competing bid for
the Company that would, if realized, be at a
materially high price. In presenting arguments in
support of the preliminary relief now requested,[FN1]
plaintiffs do not challenge the quality of disclosure
made **654 in the tender offer document, do not
challenge the bona fides or competence of the
committee of independent directors charged to
review the management proposal, nor do they
seriously charge that the price offered is unfairly low
except, insofar as it might be inferred from their
argument that a higher price might be achieved. A
further explication of the theory of recovery offered,
however, should be deferred while the background
facts of the dispute as they appear at this stage are set
forth. It is to that task that I then turn first.

I.

A. The Company, its business and capital structure.

The Company owns and operates some 250
restaurants and about 130 newsstands. Its
headquarters is located in New York City.

Not Reported in A.2d                                                                   Page 2
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
(Cite as: Not Reported in A.2d)

Restaurant's capital structure includes a dual classification of common stock. As of September, 1987, there were 2,188,508 shares of Class A common stock outstanding and 2,925,506 shares of Class B common stock. The principal difference between the A stock and the B stock is in its voting power. Each share of Class A stock carries 1/10th of the vote of one Class B share.

**\*2** Voting control of the Company is effectively held in the hands of a group controlling the management of the Company. That group-comprised of Restaurant's Chairman of the Board and CEO, Martin Brody ('Brody'); Restaurant's president, Max Pine ('Pine'); Renee Brody Levow ('Levow') (Brody's daughter); Restaurant's General Counsel, Sidney Lester Klepper ('Klepper'); Alan A. Goldring ('Goldring') and Darwin C. Dornbush ('Dornbush')-finds itself in the happy position of holding about 37% of the voting power of Restaurant's stock even though its aggregate holdings of Restaurant stock amount to only 1.4 million shares, i.e., 23% of Restaurant's outstanding shares. To this group may realistically be added Morris Goldman, Pine's father-in-law, who owns about 4.7% of the A shares and about 10.5% of the B shares. Together this group controls about 48% of the vote.

Restaurant's board is composed of 11 directors. In addition to Brody, Pine, Levow, Klepper, Goldring and Dornbush, defendants **\*\*655** Morton A. Siegler ('Siegler'), Leonard Schecter ('Schecter'), Alan Silverman ('Silverman'), Robert Wechsler ('Wechsler') and Stephen A. Greyser ('Greyser') are directors. [FN2]

#### B. Management's proposal to take the Company private and the appointment of a special board committee to evaluate it.

The Company's annual meeting was scheduled to be held in Los Angeles on June 4, 1987. Shortly before the date of the meeting, Brody told Greyser, Silverman and James Beltrame (Restaurant's Chief Financial Officer) that he, Brody, was thinking about, but had not decided on, a management-sponsored leveraged buy-out of Restaurant because 'it would be very good for management of the Company and for him.' (Silverman Dep. 18). Allegedly, Brody also informed Restaurant's board on June 4, 1987 that he was considering a leveraged buy-out. The minutes of that meeting, however, do not note any board discussion of that subject. On July 23, 1987, as reflected by the minutes of the board meeting of that

date, Brody again revealed to the board his plans for buying out the interests of all of the public shareholders. Some members of the board expressed reservations.

At the July 23, 1987 board meeting, Brody suggested that a special committee comprised of independent directors who had no financial interest in the proposed leveraged buy-out be formed to evaluate the management group's proposals. The board acted on that suggestion and appointed Siegler, Silverman and Schecter as members of a special committee for such a purpose. Outside directors Wechsler and Greyser often attended meetings of this special committee and appear to have participated in its deliberations. Brody, Pine and Goldring abstained from voting on the composition of the special committee.

The special committee promptly hired the law firm of Skadden, Arps, Slate, Meagher & Flom ('Skadden') and retained Prudential-**\*\*656** Bache Capital Funding ('Prudential Bache') to provide it with expert financial advice.

On August 26, the management group publicly announced its intention to make a cash offer for all of Restaurant's outstanding shares at $14 per share.

#### C. The Announcement of other interest in the Company.

**\*3** The management group was not without competition. On September 2, 1987, AWR Acquisitions Corp. ('AWR') sent Siegler a written proposal for a merger at $16.50 cash per share. AWR's 'offer' was subject to several conditions including performing a due diligence review and arranging financing for AWR's acquisition. Anwar Soliman is the chief executive officer and controlling shareholder of American Restaurant Group, Inc. That firm owns 260 restaurants and has annual sales of over $500 million.

#### D. The special committee and the bidding process.

On September 3, 1987, the special committee met with its advisors. It deliberated for over seven hours regarding Soliman's proposal and the management group's offer. Prudential-Bache reported that it had tentatively concluded that the fair value of Restaurant fell somewhere in the range of $15 to $18 per share. Thus, Prudential-Bache regarded the Management Group's $14 per share offer as unfair. Agreeing with

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
(Cite as: Not Reported in A.2d)

Prudential-Bache's assessment, the special committee informed the Restaurant Board that day of its conclusion that the Management Group's offer was not acceptable.

On the very next day, September 4, the special committee, Skadden, Prudential-Bache, and outside directors Wechsler and Greyser met with Mr. Soliman. Soliman was informed that the management group, owning 48% of the voting power of Restaurant's shares, was opposed to his proposal and that the management group had taken the position that their stock was not for sale. Soliman, on the other hand, insisted that 'he was only interested in a friendly takeover.' The special committee told Soliman that he would be considered as a qualified bidder once he had delivered a proposal letter from General Electric Credit Corporation, Soliman's contemplated source of financing. Delivery of the letter was accomplished that day.

On that same day, Restaurant's full board also met. Siegler recounted the special committee's meeting with Soliman earlier that day. The special committee advised the board to make information **657 available to Soliman, provided that he signed a confidentiality agreement. Additionally, Siegler informed the full board that he had recommended that Soliman speak to the management group. Brody indicated his own and Pine's willingness to do so during the Labor Day weekend.

Also during that board meeting, the management group announced a new offer at $14.75 cash per share, which the special committee rejected on the grounds that $15-$18 per share was the fair price range. Subsequently, the management group revealed that it might raise its offer as high as $16 per share, subject to certain conditions. Siegler's reply was that, while that price would be within the range of fairness, the special committee would neither approve nor disapprove of it at that stage. It intended to conduct further discussions with Soliman.

Soliman received confidential information from Restaurant about its financial condition during the course of the Labor Day weekend. Soliman contacted Siegler by telephone on September 7, informing him that the AWR offer would be increased to $19 per share, provided that financing was obtained and that the due diligence investigation went well.

E. The special committee proposes to dilute

management's voting power.

*4 On September 8, Soliman confirmed his $19 per share offer in writing. The management group informed the special committee that its members would refuse to sell their stock to Soliman and would vote against his proposed merger. The management group also told the Board that, unless the management group's $16 per share offer were accepted on that same day, the offer would be withdrawn.

Meeting with Wechsler and its legal and financial advisors, the special committee considered the management group's $16 per share proposal and Soliman's $19 per share proposal. Given the management group's strategic position in the Company's capital structure and its unwavering hostility to Soliman's proposal, the special committee suggested that Soliman make a proposal under which Soliman would be able to buy one million authorized, but as yet unissued, Class B treasury shares at $19 per share. The special committee advised Soliman that it would be prepared to endorse Soliman's offer and to recommend that Restaurant's board approve it if he paid the entire $19 million sum within two days. Effectuation of this proposal would dilute the management group's voting power to approximately 40%, at which level a hostile tender offer was thought more feasible. **658 Soliman had not, however, conducted his due diligence investigation. He would not consent to the special committee's suggestion.

The special committee conferred with its advisors again. It desired a proposal from Soliman evidencing his seriousness of purpose. Siegler and Wechsler contracted Soliman and reached an agreement in principle; the special committee would recommend that Restaurant's board grant a ten day option to Soliman to purchase at least one million authorized but unissued Class B shares at $19 per share. In exchange, Soliman would make a non-refundable payment of $2 million. The ten day option would allow Soliman to conduct a due diligence investigation before buying the stock.

F. The full board's reaction on September 8.

The full board met on September 8 at 9:30 in the evening. It adjourned 2:00 the following morning. During the meeting, the special committee recommended that Restaurant's Board approve in principle the option agreement with Soliman.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
(Cite as: Not Reported in A.2d)

Several board members, however, expressed doubts regarding the special committee's authority to negotiate such an arrangement, regarding the propriety of issuing shares for the purpose of dilution, and regarding the conditions upon which the arrangement with Soliman have placed.

When the special committee's recommendation was put to a vote, five directors-the members of the special committee, plus Greyser and Wechsler-voted in favor, six opposed. At the same meeting, the special committee declared that the management group's $16 per share offer was unacceptable. It was withdrawn.

The special committee held a meeting once more on September 12 which lasted over two hours. After consulting with Prudential-Bache about the range of fair values, Wechsler, Greyser and the special committee resolved not to approve any management group proposal that would pay public shareholders less than $18 per share. Restaurant's Board also met on September 12. At this meeting, the management group made a new offer whereby the public shareholders would receive $17.50 per share while management would receive $15.50 per share. The special committee demurred. Then, the management group revised the terms of its offer by increasing the price to be paid to the public shareholders to $18 per share while decreasing the price to be paid to the management shareholders to $15 per share. To this, both the special committee and Restaurant's full board unanimously agreed. The special committee insisted on a proviso under which non-public information would become available **659 to Soliman, subject to a confidentiality agreement, but not subject to a standstill agreement (which the Board had previously insisted upon). An agreement of merger between the Company and M Squared Corp., the corporation formed to make the tender offer, was then negotiated and executed.

*5 As the $18 per share proposal contained a provision permitting the board to withdraw if the circumstances indicated that fiduciary duties might be violated by going forward (sometimes called a 'fiduciary out'), counsel for the special committee sent Soliman a letter stating that further proposals were not precluded by the board's action in approving the management group's proposal. Soliman raised his offer to $20 on September 16. This offer was conditioned on the support of Restaurant's Board, the signing of a definitive merger agreement, the completion of a due diligence examination and on obtaining financing. Soliman also conditioned his

September 16 proposal upon the granting of two options. The first was similar to the option negotiated with the special committee. It contemplated the granting of a right to buy one million Class B shares at $20 per share, in exchange for a nonrefundable $2 million payment. The second option requested was designed to assure that any tender offer he made would result in his ability to effectuate a second-step merger.

G. The lock-up option.

Soliman's September 16 letter sought an option to purchase enough B shares to guarantee that AWR would, after the close of its contemplated tender offer, own 51% of the total voting power of Restaurant's shares. Such an option would also have had the effect of placing absolute voting control within Soliman's grasp even if few public shareholders agreed to tender shares to AWR.

Assertedly because of doubts that Soliman would follow through on his $20 per share offer, the special committee decided not to consider Soliman's bid until he had completed his due diligence investigation. The reasoning was that as Soliman climbed above a price that the committee's investment banking had advised was the upper range of fair value, it seemed to grow more likely that when Mr. Soliman did inspect the Company's books, he would conclude that Prudential-Bache was correct and would withdraw his proposal. Accordingly, the special committee's lawyer sent Soliman a letter on September 18 that until he completed his due diligence, the committee would not act. Soliman's response by a letter of the same date declared that he would not start his due diligence investigation unless **660 Restaurant's Board would agree to his September 16 proposal. Soliman indicated that, unless the Board met his terms, his offer would expire on September 21, 1987. The special committee's counsel replied on September 21 that Soliman should do his due diligence, since hypothetical proposals would not be considered. Finally, Soliman made a public statement on September 22, 1987 that he had sold much of his interest in Restaurant's stock and that he did not contemplate renewing his offer.

On September 17, 1987, the management group commenced its tender offer. As is typical in cases of this kind, at the first public mention of a possible change in control transaction, a class action was filed (on August 27, 1987) seeking to enjoin the closing of the then still unstructured management-proposed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transaction.

## II.

*6 The issuance of any form of equitable relief requires the exercise of judicial discretion informed by the particular facts and circumstances presented. A structure for the exercise of that judgment has long existed. It requires, first, that plaintiff persuade the court that he has a reasonable likelihood of prevailing on the merits of his complaint at trial. If that demonstration is made, the court is to inquire whether plaintiff is threatened with irreparable injury before a final hearing may be had and, finally, to balance against that threat, the harm that may befall the defendant (or others with a legitimate interest in the matter) should the remedy be granted improvidently. Shields v. Shields, Del.Ch., 498 A.2d 161 (1985); Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., Del.Supr., 506 A.2d 173 (1986).

I conclude for the reasons that follow that plaintiff has not demonstrated a reasonable likelihood of success at this time on the claim that it urges on this motion. Moreover, I am persuaded that enjoining completion of the management-sponsored tender offer risks irreparable injury to tendering shareholders. That view would have compelled denial of the pending motion even had I evaluated the probabilities of ultimate success differently.

## III.

Turning first to an assessment of the probability of ultimate success, it can be broken down into two parts. The first treats the main relief sought-an order requiring the Company to grant to **661 Soliman the options sought in his September 16 proposal. The second treats a fall-back position of plaintiffs-a requested order requiring the Company to grant the option recommended by the special committee but denied by the full board by a 6-5 vote on September 8. Both forms of requested relief are unusual and the argument in favor of each turns importantly upon the meaning and reach of the Revlon case.

The Revlon case recognizes an obligation on the part of a board of directors, once it is clear to the board that the corporation is to be subject to a change in control, to attempt to maximize the amount to be received by shareholders. As a consequence, steps taken to defeat a potential suitor, in such a setting, must be designed to maximize shareholder returns.

That is, in such a setting, defensive steps such as lock-up options or asset sales are valid when designed or intended to promote higher bidding and invalid if designed to favor one bidder and stop the bidding.[FN3] Plaintiffs' argument runs as follows. The bedrock principle that a board owes a duty to shareholders to act only in pursuit of their interests is the principle that explains Revlon. Where the company is to be sold, it cannot be in conformity with that obligation to defeat a higher offer in favor of a lower one regardless of other considerations. So understood, Revlon is consistent with a very long line of cases. See, e.g., Robinson v. Pittsburgh Oil Refining Corp., Del.Ch., 126 A. 46 (1924).

Plaintiffs admit that Revlon is directed towards defensive steps, but they say such a limitation is merely circumstantial-that case dealt with defensive steps. The principle that supports the decision, however, they say, cannot be limited to merely striking down impermissible steps; it extends to compelling a board to take affirmative steps that are necessary (where the condition that the company is for sale is satisfied) to maximize the return to stockholders in the sale. Approval of the first Soliman option at the September 8, 1987 board meeting and approval of the September 16 Soliman option proposal were such steps. It is contended that on September 6, the Board should have acted as the independent committee recommended and would have done so had the buyer-directors, and those aligned with them, not placed their interest as buyers over the interests of **662 other shareholders as sellers. Similarly (without the comfort derived from the recommendation of the independent committee), plaintiffs assert that the September 16th proposal of a look-up option could only have been approved by a board that was actually motivated to maximize stockholder returns.

*7 Defendants' response to this central contention are tiring in their number. Most importantly, they respond that (1) the Revlon principle may not be extended to require a board to take affirmative steps to promote bidding; (2) even if it could be, it could not be extended to require the affirmative steps here sought not only because there was no affirmative duty on September 8th to adopt the recommendation of the independent committee to grant an option to Mr. Soliman that would dilute management voting power, but also because such a step would have been a wrong to those stockholders who did not wish to sell,[FN4] and (3) failure to comply with the demands in Mr. Soliman's September 16 letter could not conceivably be found preliminarily to constitute a

Not Reported in A.2d                                                                 Page 6
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
(Cite as: Not Reported in A.2d)

wrong since the independent committee-against whom no charge of dereliction of any kind has been made-itself has not recommended that action. Therefore, it is contended that there is no basis for this court to require through the device of a mandatory injunction that the corporate defendant grant the option that Mr. Soliman requests and that all elements of the Board denied to him.

### A.

The primary remedy here sought-an order requiring the corporation to accept the terms of the Soliman September 16 proposal-is extraordinary both in the sense that it seeks mandatory relief on a preliminary injunction motion [FN5] and also in the more important **663 sense that it would be unprecedented. Plaintiff has cited no case in which a court required a corporation to enter into a contractual arrangement with a third party in order to promote a change in control. That such a holding would be novel does not preclude it, of course, but the lack of authority is a salient feature of the argument. I need not now, however, express an opinion as to whether such relief would ever be authorized as an extension of the Revlon teaching. I am of the view that the deliberations and actions of the independent board committee are likely to be found to preclude any such remedy in this case, even if the remedy might be assumed to be available in other circumstances.

Heavy reliance is placed upon the acts of specially constituted committees of disinterested directors when Delaware courts are asked to review the propriety of corporate transactions that involve elements or claims of self-dealing. See, e.g., Weinberger v. UOP, Del.Supr., 457 A.2d 701, 709 n. 7 (1983). While that reliance may, given the informal relations that may exist between board members, be seen as providing a possible escape-hatch for the unprincipled, cases such as this demonstrate that this technique of negotiation, when pursued in good faith, is a close surrogate for the structure that ordinarily provides protection to shareholders. Here there is no structural reason to doubt the effectiveness of the independent committee-it was appropriately constituted, well advised and active. Moreover, the results it achieved bespeak an aggressive and effective attempt to maximize public shareholder values.

*8 This committee exercised a judgment not to recommend to the full board the granting of the option sought on September 16. Minutes of its

meeting at which this action was considered put forth plausible and, indeed, persuasive reasons for that action. What basis would exist-were it free to do so at all-for this court to make that call differently?

This is not a case where a fiduciary is choosing the lower of two cash offers. Compare, Thomas v. Kempner, Del.Ch., C.A. No. 4138, Marvel, C. (March 7, 1973). A fiduciary is entitled to, indeed required to, consider all of the factors surrounding alternative possible transactions. Thus, for example, the likelihood that one of the alternatives may be less likely to close supplies a rational basis for preferring another proposal, even though it may be at a lower price. See Smith v. Good Music Station, Del.Ch., 129 A.2d 242 (1957); Wilmington Trust Company v. Coulter, el.Supr., 200 A.2d 441 (1964).

Here Mr. Soliman has been very careful to keep open the possibility of withdrawing if, upon an examination of the Company's **664 books and records, he finds them unacceptable. Moreover, he has been urged by the special committee to complete his 'due diligence' inspection but has refused to do so until his $20 offer is accepted stating that he did not want to waste the cost of the examination if the management shares were going simply to block his efforts again. This position, however, seems a little curious when one appreciates that Mr. Soliman purports to be prepared to put up $2 million immediately, on a non-refundable basis, to show his good faith. In any case, Mr. Soliman has been unwilling or unable to put his adversaries in the most difficult situation he could place them in: an unconditional cash offer at a higher price. In these circumstances, I do not find in the fact that the Soliman proposal uses the figure $20 as a basis to impugn the bona fides or competence of the special committee's decision to not recommend acceptance of Mr. Soliman's September 16 proposal.

This court has no special expertise in making the judgment concerning whether it would be wise or foolish to incur the risks that further pursuit of Mr. Soliman's proposal inevitably entails; to the contrary, one of the important reasons for the existence of the business judgment rule is the institutional incompetence of courts to pass upon the wisdom of business decisions. Plaintiffs have failed utterly to offer any legal justification for the court's second-guessing the decision of the special committee. Therefore, even were I persuaded that the full board was under the domination and control of the management directors-which has not been shown-I would apprehend no basis to address the merits of the

Not Reported in A.2d                                                                                          Page 7
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
**(Cite as: Not Reported in A.2d)**

decision to fail to agree to the September 16 proposed option transaction.

## B.

As a fall-back position, plaintiffs seek an alternative form of preliminary injunction: an injunction against the closing of the tender offer and, instead of requiring the Company to enter into the lock-up option, requiring it to enter into the option agreement voted upon at the September 8 board meeting. This relief would be less radical, although defendants suggest still breath-taking in its novelty; in order to justify it, the court need not make a business judgment of its own, but, it is urged, simply needs to recognize the reality that at least three of the six votes that were cast against granting the option were cast by management directors who were motivated to thwart any competing offer. If those votes are recognized as subject to a disabling conflict of interest and not deemed valid, **665** the board would be deemed to have approved the September 8 option proposal by a vote of 5-3.

*9 Defendants respond on several levels. First, they say that such relief would be unauthorized as there is not authority for the court to disregard the votes of directors where the proposal being voted upon is not one in which they have a personal interest. Second, they say, on the merits, that the option was an impermissible attempt to dilute the voting power of a 48% voting block and, admittedly, for no other purpose. It would, therefore, have constituted an abuse of the corporate machinery to have granted the option. Far from being a step required in the circumstances by Revlon, such an option, it is urged, would have been an abuse. Third, Defendants contend that granting such relief would be futile since Mr. Soliman has, in his September 16 proposal indicated what he requires to move forward and it is not simply the option treated at the September 8 board meeting. Equity ought not to attempt futile acts.

I take it to be established in our law that it would ordinarily be found to constitute an abuse of power for a board of directors to issue stock, not for the principal purpose of raising necessary or desirable capital, but for the sole or primary purpose of diluting the voting power of an existing block of stock. See Canada Southern Oils, Ltd. v. Manabi Exploration Co., Del.Ch., 96 A.2d 810 (1953); Condec Corporation v. Lunkenheimer Company, Del.Ch., 230 A.2d 769 (1967). Surely this would be the result

if the intention in diluting the existing shareholders' voting power was to preserve the existing board in office. See Phillips v. Insituform of North America, Inc., Del.Ch., C.A. No. 9173, Allen, C. (August 27, 1987). Insituform, however, suggested that issuing stock for the sole or primary purpose of diluting the power of an existing voting block may, in extraordinary circumstances, be valid if the purpose of the issuance is to further an independent corporate purpose rather than to entrench an existing board (even though it may collaterally have such an effect).

If, as I assume for present purposes, that proposition is correct, the question arises whether a board, in order to attempt to achieve the highest available price for the shareholders (in a setting where it appears that the public shareholders are to be eliminated by one technique or another), might be justified in issuing an option that would have the effect of diluting the voting power of an existing block. I believe the Supreme Court's opinion in Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946 (1985) suggests that the answer to that question is in the affirmative.

**666** But to say that a board might properly so conclude does not, of course, mean it must so conclude. Here, this board did not grant the option recommended by the special committee and plaintiffs are thus required to contend that to refuse to do so was an abuse of power. What is the basis to contend that the merit of this decision is a subject that this court should take up? Plaintiffs urge the classic basis for such review: they urge that a majority of the board labored under a conflict of interest. The conflict they posit arises because some of the directors had interests as stockholders (i.e., not to have their voting power diluted) that were in conflict with the interests of other stockholders (i.e., to have the blocking position of the management group's stock lifted so a higher offer might ensue).

*10 In the ordinary case, it is, of course, evident that interest as a stockholder will not conflict with a director's duty of office. See Aronson v. Lewis, Del.Supr., 473 A.2d 805 (1984). But there may, of course, be conflicts among stockholders themselves with respect to internal corporate affairs. Such conflicts may be expected to arise most readily where a control block of stock exists. It is easy to say that a director's duty runs to the corporation and all of its shareholders, but such a statement gives faint guidance to a director when conflicts among shareholder constituencies arise, as they do. For example, when merger considerations must be apportioned between Class A and Class B stock

Not Reported in A.2d                                                                                          Page 8
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
(Cite as: Not Reported in A.2d)

directors are inevitably faced with a conflict among classes of stock and, in most such instances, such directors will themselves own more of one class than another. Does such fact alone deprive such directors of the presumptions ordinarily accorded to their good faith decisions and require them to establish the intrinsic fairness of the apportionment? And, if so, do different directors have different burdens depending upon which class of stock they happen to own more of. It is not my impression that that is the law. See MacFarlane v. North American Cement Corp., Del.Ch., 157 A. 396 (1928). A different rule obtains, of course, when a controlling person exercises control over the corporation to set the terms of a transaction and compel its effectuation, a principle that has no application in this instance. See, e.g., Weinberger v. UOP, supra. With respect to the narrow question of conflicting interests among shareholders arising from consideration of the question whether stock should be issued for the sole purpose of diluting a control position, I am unable to apprehend any basis to deprive any director of the presumptions reflected in the business judgment rule simply on the basis of with which internal corporate stockholder constituency such director identifies himself. Accordingly, I conclude for present purposes**667 that plaintiff has shown no basis to attempt to disturb, through the use of equity's flexible remedies, the results of the September 8 board meeting and, thus, no reasonable probability of success with respect to the theory supporting their requested fall-back relief.

Some of the matters touched-upon in this memorandum are weighty and I express my views reluctantly, not having had time to consider them very deeply. However, the obligation to render a timely decision and to state as faithfully as I can the basis for that decision requires me in this instance to address matters that, when they are next presented, may warrant further reflection.

IV.

I pass over the question of threatened injury, but do note an independent basis for the denial of relief at this stage. It relates to the balancing of possible harms. To grant the remedy now would surely deprive tendering shareholders of a currently available option to sell their stock at a price more than 50% higher than the price of Restaurant's stock prior to the announcement of the proposed management buy-out. Plaintiffs would justify this step by reference to the expectation that Mr. Soliman,

if given the chance, will be able and willing to make a higher offer. If given the opportunity to do so, Mr. Soliman may be able and willing to pay more than $18 per share after an inspection of Restaurant's books and, even if he is not, management may still be willing to pay $18 a share. And, thus, the risks of exploring the Soliman interest further may be worth running. But the future is unknowable and the risks of a different outcome are not remote. The independent committee addressed these questions in its deliberations. Even were I persuaded that plaintiffs had established a probability of success on their claims, I would be rather reluctant to enjoin the closing of the tender offer where no misrepresentation is claimed and the financial benefit sought to be achieved is speculative.

*11 For the foregoing reasons, the motion for a preliminary injunction will be denied. IT IS SO ORDERED.

> FN1  Plaintiffs' complaint may be read as attempting to state theories of recovery-such as the inadequacy of the price proposed or a related theory concerning timing of the proposal-not pressed in the short time available for presentation and consideration of this preliminary injunction motion.

> FN2  Siegler, who owns 20,500 Restaurant shares, is a principal in Morton A. Siegler Associates, a New Jersey construction and real estate firm. Schecter, who owns 2,000 Restaurant shares, is president of a Chicago management consulting firm, Claridge Marketing Associates, Inc. Silverman, who owns more than 15,000 Restaurant shares, is the Chairman of Joseph Silverman & Co., a Boston wholesale floor covering enterprise. Wechsler, who owns more than 28,000 of Restaurant's shares of stock, is the Chairman of the Board of Yuno Concepts, Inc., a New Jersey firm in the restaurant business. Greyser is a Harvard Business School professor. He is also the Harvard Business Review's Editorial Board Chairman. He owns 500 shares of Restaurant's stock.

> FN3  Of course, even when designed to promote another bid, a good (i.e., effective) lock-up agreement may well end the bidding after that one last bid it induces is on the table. Thus, the implications of the distinction that Revlon draws have yet to be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651
(Cite as: Not Reported in A.2d)

fully worked out.

FN4  In this connection, defendants rely upon the recent opinion in Phillips v. Insituform of North America, Inc., Del.Ch., C.A. No. 9173, Allen, C. (August 27, 1987) as well as Canada Southern Oils, Ltd. v. Manabi Exploration Co., Del.Ch., 96 A.2d 810 (1953) and Condec Corp. v. Lunkenheimer Co., Del.Ch., 230 A.2d 769 (1967).

FN5  See Hunter v. Diocese of Wilmington, Del.Ch., C.A. No. 961-K, Allen, C. (August 4, 1987); Orantes-Hernandez v. Smith, 541 F.Supp. 351, 372 (C.D.Cal. 1982) (when one seeks a mandatory preliminary injunction, one must 'clearly establish that a change in the status quo is warranted'); Township of South Fayette v. Commonwealth, Pa.Supr., 385 A.2d 344, 347 ('[A] preliminary injunction containing mandatory provisions which will require a a change in the positions of the parties, should be granted even more sparingly than one which is merely prohibitory.'); Giacomini v. Bevilacqua, R.I.Supr., 372 A.2d 66 (1977) (application for preliminary mandatory injunction may be granted only when there is great urgency and the legal right asserted is clear).

Del.Ch., 1987.
Freedman v. Restaurant Associates Industries, Inc.
Not Reported in A.2d, 1987 WL 14323 (Del.Ch.), Fed. Sec. L. Rep. P 93,502, 13 Del. J. Corp. L. 651

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Slip Copy                                                                                    **Page  1**
Slip Copy, 2005 WL 3657156 (D.Del.)
**(Cite as: 2005 WL 3657156 (D.Del.))**
c

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
**IGAMES ENTERTAINMENT, INC., Plaintiff,**
v.
**CHEX SERVICES, INC., and Equitex, Inc.,
Defendants.**
**No. Civ.A. 04-180-KAJ.**

June 9, 2005.
Thomas P. Mcgonigle, Duane Morris LLP,
Wilmington, DE, for Plaintiff.

James W. Semple, Morris, James, Hitchens &
Williams, Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*

JORDAN, J.

*Introduction*

*1 This is a commercial dispute involving, among
other things, allegations of breach of contract.
Presently before me is a *Daubert* motion [FN1]
(Docket Item ["D.I."] 99) filed by the plaintiff,
iGames Entertainment, Inc. ("iGames"), seeking to
preclude a portion of the proposed testimony of
defendants' accounting expert, John Thomas Shopa.
For the reasons that follow, iGames' motion is
granted.

> FN1. Motions to preclude testimony or evidence
> being offered by a party pursuant to Federal Rule of
> Evidence 702, through a witness who claims
> specialized knowledge or expertise, are commonly
> called *Daubert* motions, the reference being to the
> Supreme Court's decision in *Daubert v. Merrell Dow
> Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct.
> 2786, 125 L.Ed.2d 469 (1993).

*Background* [FN2]

> FN2. The following background information is cast
> in the light most favorable to the non-moving parties
> and does not constitute findings of fact.

Plaintiff iGames is a holding company that, through
its subsidiaries Money Centers of America and
Available Money, provides "cash access and
financial management systems for the gaming
industry[.]" (D.I. 100 at Ex. C, pg 2.) [FN3]
Defendant Equitex, Inc. ("Equitex") is a holding
company that, during the events at issue, owned
defendant Chex Services, Inc. ("Chex"), which was
in the business of providing "comprehensive cash
access services to casinos and gaming
establishments." (*Id.*) In short, the parties are in the
business of seeing that gamblers who want access to
their own cash can get at it quickly, for a fee.

> FN3. The referenced Docket Item is the January 26,
> 2005 Expert Report of Thomas John Shopa, CPA,
> CFP.

On November 3, 2003, iGames and the defendants
entered into a stock purchase agreement (the
"SPA"), pursuant to which iGames was to acquire
all of the issued and outstanding stock of Chex. (*Id.*
at Ex. C, pg 4.) As part of the planned acquisition,
Chex and iGames entered into a Term Loan Note
dated January 6, 2004 (the "Note"), which
provided, *inter alia,* that Chex would lend money to
iGames and that, "[f]or the period ending February
1, 2004, the Borrower [iGames] shall pay to the
Lender [Chex] interest on the outstanding Term
Loans at the rate of fifteen percent (15%) per
annum, calculated on the basis of a 360-day year
and counting the actual number of days elapsed." (
*See id.* at Ex. C., pgs 4, 5.) For reasons not
pertinent to the present motion, the planned
transaction collapsed into the acrimony that has
produced this litigation, with a primary point of
contention being whether iGames breached its
obligations under the Note. (*See, e.g.,* D.I. 100 at
2-5; D.I. 108 at 2-6.)

Chex and Equitex have retained the services of Mr.
Shopa, a certified public accountant, and have
disclosed a report that he prepared in which, based
upon the language from the Note quoted above, he
opines that iGames' "obligations to pay interest to
Chex Services on the Term Loan Note were clearly
outlined in the agreement...." (D.I. 100 at Ex. C,
pg 5.) Quoting another portion of the Note, [FN4]
Mr. Shopa asserts that the Note was "similar in
nature to a lease, which calls for a fixed monthly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                              Page   2
(Cite as: 2005 WL 3657156, *1 (D.Del.))

rent payment and the payment of additional 'percentage rent' typically based upon sales revenue." (*Id.*) He concludes that, "[i]n such instances, the monthly rent is payable on the first day of the month with payment of the additional 'percentage rent' due as soon as the information to calculate the percentage rent becomes available." ( *Id.*) Mr. Shopa then opines, in essence, that iGames defaulted on its obligations, as he has described them (*id.* at 6), and that iGames' legal positions with respect to its obligations under the Note are "not reasonable" (*id.* at 8-9).

> FN4. The quoted language is, "[i]n addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence." (D.I. 100 at Ex. C, pg 5.)

**\*2** iGames' Motion asks that I "preclude Mr. Shopa from testifying as to his interpretation of the legal effect of the terms of a Term Loan Note between the parties" and that I bar him "from offering an opinion that iGames was in default of its alleged obligation under the parties' Term Loan Note...." (D.I.99.)

*Standard*

Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). [FN5]

> FN5. However, " 'when the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment,' the Court of Appeals will give those rulings 'a hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." ' *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l., Inc.*, 350 F.Supp.2d 582, 587 (D.Del.2004) (quoting *Paoli R.R. Yard*, 35 F.3d at 750).

*Discussion*

Federal Rule of Evidence 702 states that,
[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In applying this rule, trial judges are required to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. That responsibility has come to be known as "gatekeeping." *See id.* at 589 n. 7. In screening a proffered expert opinion, one aspect of relevance that must be examined is "fit," i.e., whether the opinion is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985).

In this case, iGames rightly denies that Mr. Shopa's opinion sufficiently fits the facts. Mr. Shopa's report declares that the payment arrangements called for by the Note are "similar in nature to a lease." (D.I. 100 at Ex. C, pg 5.) That assertion is made without any supporting analysis. [FN6] Mr. Shopa does observe that in leases, "the monthly rent is payable on the first day of the month with payment of the additional 'percentage rent' due as soon as the information to calculate the percentage rent becomes available." (*Id.*) But there is no effort by Mr. Shopa to explain how a note involving a loan incident to the acquisition of a fee-for-cash business is sufficiently like a commercial real estate lease to warrant his importing concepts from such leases into this case. Whatever similarity Mr. Shopa perceives is not self-evident. Thus, the defendants have failed to demonstrate that Mr. Shopa's opinion on this point fits the facts of this case.

> FN6. Also given without explanation or analytical support is the remarkable assertion that the payment obligations are "clearly outlined in the agreement[.]" (D.I. 100 at Ex. C, pg 5.) On the contrary, the only reason Mr. Shopa's opinion on the repayment terms is being offered at all is because those obligations are anything but clear. If the parties had bothered to mention when interest payments were due, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: 2005 WL 3657156, *2 (D.Del.))

Page    3

common term in loan documents, we would not be
having this discussion.

That conclusion is more plain when one considers
that, despite there being an extensive discovery
record in this matter (see 4/21/05 Transcript of Oral
Argument at 5--11 (defendants' counsel describing
evidence developed in discovery)), the defendants
point to nothing in the record to support the "this is
like a lease" opinion that Mr. Shopa proposes to
offer.

*3 More fundamentally, the defendants have failed
to lay a critical predicate for putting forward an
expert to opine on the meaning of terms in the Note:
evidence that the terms were given a specialized
meaning requiring expert aid to understand. The
relevant inquiry in a contract dispute is what the
parties meant by the language they chose. An expert
giving his view of what contract language means,
without linking it to what the parties understood, is
not giving relevant evidence. See Holiday Homes of
St. John, Inc. v. Lockhart, 678 F.2d 1176, 1185 (3d
Cir.1982) (testimony of expert witnesses was not
relevant to the question of what the parties intended
to agree to by signing contract); United States v.
Gregory Park Section II, Inc., 373 F.Supp. 317,
333 (D.N.J.1974) (expert testimony proffered to
explain meaning of words in a contract was barred
because, "defendant did not establish that these
words, as used by the parties, were given a
specialized usage requiring expert aid to determine
their meaning ...."); cf. Buford v. Wilmington Trust
Co., 841 F.2d 51, 55 (3d Cir.1988) (citing expert
testimony permitted at trial regarding "commonly ...
understood" meaning of words in a contract, when
the opinion was "consistent with the apparent ...
undertaking" set forth in a specific term of the
contract). Mr. Shopa's opinion about the meaning of
the payment terms, and his associated conclusion
that iGames was in default under those terms, is
therefore impermissible in this case.

*Conclusion*

Accordingly, it is hereby ORDERED that iGames'
*Daubert* motion (D.I.99) seeking to prevent the
defendants' expert, Thomas John Shopa, from
testifying to his interpretation of the payment terms
in the Note and further testifying that iGames is or
was in default under those terms is GRANTED.

Slip Copy, 2005 WL 3657156 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

. 1:04cv00180 (Docket) (Mar. 24, 2004)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.