"Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended.

"Secured Claim" means a Claim secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

"Secured Lenders" means those holders of Senior Secured Claims set forth on Exhibit 16 hereof.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Secured Claim" means any Contingent Senior Secured Claim and any Fixed Senior Secured Claim.

"Settlement Amount" means three million five hundred thousand dollars ($3,500,000) in Cash.

"Shareholder Agreement" means a shareholders' agreement by and between Isaac Perlmutter, Isaac Perlmutter, T.A., Zib Inc., Avi Arad, the New Investors and the Secured Lenders in form and substance reasonably acceptable to each of the foregoing and Toy Biz.

"Standstill Agreements" means the Agreements to be executed and delivered by High River, Westgate and certain of their Affiliates on the Consummation Date in the form of Exhibit 17 hereto, subject to non-substantive changes.

"Stipulation and Agreement" means the Stipulation and Agreement Effecting Consensual Amendment to the Third Amended Joint Plan of Reorganization Proposed by the Secured Lenders and Toy Biz, Inc. dated as of July 30, 1998 by and among Toy Biz, Isaac Perlmutter, Isaac Perlmutter T.A., Zib Inc., Avi Arad, Joseph M. Ahearn, James S. Carluccio, Alan Fine, James F. Halpin, Morton E. Handel, Alfred A. Piergallini, Donald E. Rosenblum, Paul R. Verkuil, Mark Dickstein, Dickstein & Co. L.P., Dickstein Focus Fund, L.P., Dickstein International Limited, Dickstein Partners L.P., DPI, the Trustee, Chase individually and on behalf of those holders of Senior Secured Claims which authorize Chase to sign the Stipulation and Agreement on their behalf pursuant to the Master Agreement Amendment, Chase as a holder of a DIP Claim, CIBC, Inc. as a holder of a DIP Claim, Goldman Sachs Credit Partners L.P. as a holder of a DIP Claim, Lehman Commercial Paper Inc. as a holder of a DIP Claim, The Long Term Credit Bank of Japan, Ltd., Los Angeles Agency as a holder of a DIP Claim, The Sumitomo Bank, Limited as a holder of a DIP Claim, High River,

21

Carl Icahn, Westgate, Vincent Intrieri, LaSalle, the Creditors Committee and the Equity Committee.

"Stockholder Series A Warrants" means warrants exercisable on or before the third (3rd) anniversary of the Consummation Date entitling the holder thereof to acquire one share of Newco Common Stock, subject to customary anti-dilution protections, based upon an initial exercise price of twelve dollars ($12.00) per share and otherwise upon the terms and conditions contained in the Stockholder Series A Warrant Agreement.

"Stockholder Series B Warrants" means warrants entitling the holder thereof to acquire one share of Convertible Preferred Stock at an initial exercise price of ten dollars and sixty-five cents($10.65) per share, subject to increase as provided in the Stockholder Series B Warrant Agreement and subject to customary anti-dilution protections, which warrants will be issued in one or more series, with all such warrants having the same Warrant Distribution Date constituting the same series and with the warrants in each such series being exercisable until the first (1st) Business Day occurring more than six months after the Warrant Distribution Date of such series, and otherwise having the terms and conditions contained in the Stockholder Series B Warrant Agreement.

"Stockholder Series C Warrants" means warrants exercisable on or before the fourth (4th) anniversary of the Consummation Date entitling the holder thereof to acquire one share of Newco Common Stock, subject to customary anti-dilution protections, based upon an initial exercise price of eighteen dollars and fifty cents ($18.50) per share and otherwise upon the terms and conditions contained in the Stockholder Series C Warrant Agreement.

"Stockholder Series A Warrant Agreement" means that certain Warrant Agreement in the form of Exhibit 18 hereto, subject to non-substantive changes.

"Stockholder Series B Warrant Agreement" means that certain Warrant Agreement in the form of Exhibit 19 hereto, subject to non-substantive changes.

"Stockholder Series C Warrant Agreement" means that certain Warrant Agreement in the form of Exhibit 20 hereto, subject to non-substantive changes.

"Subsidiary Equity Interests" means the Equity Interests in any of the Debtors held by any of the other Debtors.

22

"Substantial Contribution Application" means any application for compensation or reimbursement of expenses pursuant to sections 503(b)(3) or (4) of the Bankruptcy Code.

"Term Loan Facility" means a term loan facility or other financing arrangement for Newco and its subsidiaries in the amount of at least two hundred million dollars ($200,000,000) less any amount by which the Working Capital Facility exceeds fifty million dollars ($50,000,000) that may be secured by all or substantially all of the assets of Newco upon market rate terms and conditions and otherwise in form and substance reasonably acceptable to the Proponents.

"Toy Biz" means Toy Biz, Inc., a Delaware corporation.

"Toy Biz Cash Distribution" means an amount of Cash equal to the aggregate of (a) two hundred and eighty million dollars ($280,000,000), (b) any commitment or facility fees actually paid in connection with obtaining financing commitments required by this Plan of Reorganization, (c) the fees, expenses and costs of Toy Biz's attorneys, investment bankers, and other professionals incurred in connection with the Reorganization Cases and the transactions contemplated hereby, including, without limitation, in connection with or related to the preparation of any proxy statement, the making of any securities registration and the solicitation of any proxies for Toy Biz in an amount not to exceed in the aggregate (i) three million five hundred thousand dollars ($3,500,000) for the period through and including November 30, 1997, (ii) one million dollars ($1,000,000) for a fairness opinion, (iii) one million, five hundred thousand dollars ($1,500,000) as a success fee, and (iv) an average of six hundred and twenty-five thousand dollars ($625,000) per month thereafter through and including the Consummation Date, and (d) the Breakup Fee.

"Transaction" means the transactions contemplated by the Merger Agreement, and/or, to the extent applicable, the documents governing any Qualifying Transaction.

"Transmittal Material" shall mean the materials in the form of Exhibit 21 hereto, subject to non-substantive changes, which shall be distributed in connection with all Warrants distributed pursuant to this Plan of Reorganization.

"Trustee" means John J. Gibbons solely in his capacity as chapter 11 trustee for the Debtors.

"Unsecured Claim" means any Claim against a Debtor that is not an Administration Expense Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a DIP Claim, a Secured Claim, a Class Securities Litigation Claim, the LaSalle Claim or any deficiency Claim in respect of any Senior Secured Claim.

23

"Unsecured Creditor Payment" means Cash in an amount equal to fifteen percent (15%) of the aggregate amount of Allowed Unsecured Claims plus two million dollars ($2,000,000), but in no event more than eight million dollars ($8,000,000) in the aggregate.

"U.S. Trustee" means the United States Trustee appointed under section 581, title 28, United States Code to serve in the District of Delaware.

"Warrant Liquidation Agent" means a financial institution to be selected by Toy Biz no later than the Consummation Date subject to the approval of the Trustee not to be unreasonably withheld or delayed and retained by Newco pursuant to the Warrant Liquidation Agency Agreement.

"Warrant Liquidation Agency Agreement" means an agreement in form and substance reasonably satisfactory to the Proponents and the Trustee.

"Warrant Distribution Date" means the first to occur of (i) the date on which Newco substantially completes the distribution of a series of Stockholder Series B Warrants to the record holders of the applicable Claims or Equity Interest in accordance with this Plan of Reorganization, or (ii) the date on which such Stockholder Series B Warrants are distributed to the Warrant Liquidation Agent.

"Warrants" means the Plan Warrants, the Stockholder Series A Warrants, the Stockholder Series B Warrants and the Stockholder Series C Warrants.

"Westgate" means Westgate International L.P.

"Working Capital Facility" means a revolving credit loan facility for Newco and its subsidiaries in an amount of at least fifty million dollars ($50,000,000) less the amount by which the Term Loan Facility exceeds two hundred million ($200,000,000) upon market rate terms and conditions and otherwise in form and substance reasonably acceptable to the Proponents.

B.    Interpretation; Application of
      <u>Definitions and Rules of Construction</u>

Unless otherwise specified, all Section, schedule or exhibit references in this Plan of Reorganization are to the respective Section in, article of, or schedule or exhibit to, this Plan of Reorganization, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan of Reorganization as a whole and not to any particular

Section, subsection or clause contained in this Plan of Reorganization. Except as otherwise expressly provided herein, a term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan of Reorganization. The headings in this Plan of Reorganization are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

C.    <u>Exhibits and Schedules</u>

All Exhibits and Schedules to this Plan of Reorganization are contained in a supplemental Exhibit filed with the Clerk of the Bankruptcy Court contemporaneously herewith.

SECTION 2.    PROVISIONS FOR PAYMENT OF ADMINISTRATION EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.1  <u>Administration Expense Claims</u>.

On the Consummation Date, each holder of an Allowed Administration Expense Claim (including all DIP Claims) shall be paid by Newco on account of such Allowed Administration Expense Claim an amount in Cash equal to the amount of such Allowed Administration Expense Claim, except to the extent that any entity entitled to payment of any Allowed Administration Expense Claim agrees to a different treatment of such Administration Expense Claim; provided, that Allowed Administration Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be assumed and paid by Newco in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

This Plan of Reorganization constitutes a motion by the Proponents to fix a bar date for the filing of Administrative Expense Claims other than the Administration Expense Claims treated under Section 2.2 hereof, which shall be a date fixed by order of the Bankruptcy Court.

2.2  <u>Compensation and Reimbursement Claims</u>.

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Consummation Date under section 330 or 503(b)(2) of the Bankruptcy Code (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Consummation Date and, if granted such an award by the Bankruptcy Court, (b) shall be paid in full by Newco in such amounts as are

25

allowed by the Bankruptcy Court (i) upon the later of (A) the
Consummation Date, and (B) the date upon which the order relating
to any such Administration Expense Claim becomes a Final Order or
(ii) upon such other terms as may be mutually agreed upon between
such holder of an Administration Expense Claim and the Proponents
or, on and after the Consummation Date, Newco.

    2.3  <u>Priority Tax Claims</u>.

    On the Consummation Date, each holder of an Allowed
Priority Tax Claim shall be distributed on account of such
Allowed Priority Tax Claim a payment in Cash equal to the amount
of such Allowed Priority Tax Claim.

    SECTION 3.    <u>CLASSIFICATION OF CLAIMS
AND EQUITY INTERESTS</u>

    Claims against and Equity Interests in the Debtors are
divided into the following classes:

Class 1  —  Priority Non-Tax Claims

Class 2  —  Senior Secured Claims

    Subclass 2A  —  Fixed Senior Secured Claims
    Subclass 2B  —  Contingent Senior Secured Claims

Class 3  —  Other Secured Claims

    Subclass 3A  —  Entertainment
    Subclass 3B  —  The Asher Candy Company
    Subclass 3C  —  Fleer Corp.
    Subclass 3D  —  Frank H. Fleer Corp.
    Subclass 3E  —  Heroes World Distribution, Inc.
    Subclass 3F  —  Malibu Comics Entertainment, Inc.
    Subclass 3G  —  Marvel Characters, Inc.
    Subclass 3H  —  Marvel Direct Marketing Inc.
    Subclass 3I  —  SkyBox International Inc.

Class 4  —  Unsecured Claims

    Subclass 4A  —  Entertainment
    Subclass 4B  —  The Asher Candy Company
    Subclass 4C  —  Fleer Corp.
    Subclass 4D  —  Frank H. Fleer Corp.
    Subclass 4E  —  Heroes World Distribution, Inc.
    Subclass 4F  —  Malibu Comics Entertainment, Inc.
    Subclass 4G  —  Marvel Characters, Inc.
    Subclass 4H  —  Marvel Direct Marketing Inc.
    Subclass 4I  —  SkyBox International Inc.
    Subclass 4J  —  Intercompany Claims
    Subclass 4K  —  LaSalle Claim

26

Class 5     —     Class Securities Litigation Claims

Class 6     —     Equity Interests

    Subclass 6A     —     Entertainment
    Subclass 6B     —     Subsidiary Equity Interests

Class 7     —     Existing Warrants

     SECTION 4.     PROVISIONS FOR TREATMENT OF CLAIMS
               AND EQUITY INTERESTS UNDER THE PLAN

     4.1  Priority Non-Tax Claims (Class 1).

       On the Consummation Date, each holder of an Allowed
Priority Non-Tax Claim shall be distributed on account of such
Allowed Priority Non-Tax Claim a payment in Cash equal to the
amount of its Allowed Priority Non-Tax Claim.

     4.2  Senior Secured Claims (Class 2).

       (a)  Allowance of Senior Secured Claims.  On the
Consummation Date, the Claims of each holder of a Senior Secured
Claim under each of the Existing Credit Agreements shall be
allowed in an amount equal to the amount owing to such holder
under the applicable Existing Credit Agreement as of the date
hereof, together with interest, fees, charges and other amounts
owing under the Existing Credit Agreement through the
Consummation Date, but in no event more than an amount equal to
the sum of (i) the value of the Collateral as of the Consummation
Date securing such Senior Secured Claim, and (ii) any Claim for
adequate protection relating to the Collateral, arising out of
that certain Revolving Credit Guaranty Agreement by and among
Entertainment, the other Debtors and Chase dated December 27,
1996, the order entered by the Bankruptcy Court on January 24,
1997, or any amendments entered into or further orders entered by
the Bankruptcy Court with respect to either of the foregoing.

       (b)  Treatment of Allowed Fixed Senior Secured
Claims (Subclass 2A).

         (i)  No Qualifying Transaction.

       (A)  Distributions.  In the event that no Qualifying
Transaction closes, each holder of an Allowed Fixed Senior
Secured Claim shall be distributed, subject to increase or
decrease pursuant to Section 9.5 hereof, on the Consummation
Date, in full and complete satisfaction and discharge of its
Fixed Senior Secured Claims, its Ratable Proportion of:

(1) two hundred thirty one million, seven hundred and fifty thousand dollars ($231,750,000) in Cash less the sum of (a) the actual amount distributed to the holders of DIP Claims for permanent application against principal from the proceeds of the sale of the Confection Business, and (b) all other amounts paid to satisfy the outstanding principal amount of the DIP Claims (exclusive of any increase in the amount of the DIP Claims from and after October 7, 1997 including, without limitation, any interest or charges which may accrue and all amounts advanced under the DIP Credit Agreements);

(2) thirteen million, one hundred thousand (13,100,000) shares of Newco Common Stock;

(3) seven million nine hundred thousand (7,900,000) shares of Convertible Preferred Stock;

(4) [intentionally deleted];

(5) one thousand (1,000) shares of new common stock of each of the Debtors other than Entertainment representing one hundred percent (100%) of the issued and outstanding stock of such Debtors, which stock shall be transferred to Newco in accordance with section 6.15 hereof;

(6) the right to purchase up to forty million dollars ($40,000,000) of Convertible Preferred Stock of Newco as New Investors that would otherwise be issued to the New Investors set forth on Exhibit 12; and

(7) four and nine tenths percent(4.9%) of the Net Avoidance Litigation Proceeds to be distributed pursuant to Section 7.4(a) hereof.

Subject to the preceding sentence and without duplication, Chase and the holders of Senior Secured Claims shall be reimbursed for all of the professional fees, costs and expenses of professionals engaged by Chase in its capacity as agent or to act on behalf of all holders of Senior Secured Claims, including, without limitation, all fees and expenses of counsel and financial advisors incurred in connection with the Reorganization Cases, provided, however, that in no event shall the aggregate value (as of the Consummation Date) of the property distributed to holders of Fixed Senior Secured Claims exceed the amount of such Fixed Senior Secured Claims or the sum of (i) the value (as of the Consummation Date), of the collateral securing such Fixed Senior Secured Claims, and (ii) any Claim for adequate protection relating to the collateral, arising out of that certain Revolving Credit Guaranty Agreement by and among Entertainment, the other Debtors and Chase dated December 27, 1996, the order entered by the Bankruptcy Court on January 24, 1997, or any amendments

28

entered into or further orders entered by the Bankruptcy Court with respect to either of the foregoing.

(B) Intentionally Deleted.

(ii) Qualifying Transaction. In the event of a Qualifying Transaction, each holder of an Allowed Fixed Senior Secured Claim shall be distributed on the Consummation Date, in full and complete satisfaction and discharge of its Fixed Senior Secured Claims, its Ratable Proportion of all consideration received in connection with such transaction other than (i) the Toy Biz Cash Distribution, and (ii) any property to be distributed pursuant to Sections 2, 4.1, 4.2(c), 4.3, 4.4, 4.5 and 4.6 hereof; provided, however, that in no event shall the holders of Allowed Fixed Senior Secured Claims receive more than payment in full in accordance with the Existing Fleer Credit Agreements.

(c) Treatment of Allowed Contingent Senior Secured Claims (Subclass 2B).

(i) No Panini Liquidation Event. If no Panini Liquidation Event occurs on or prior to Consummation Date, the holders of Allowed Contingent Senior Secured Claims shall receive, on the Consummation Date, in full and complete satisfaction and discharge of their Contingent Senior Secured Claims, the Newco Guaranty of the Restructured Panini Obligations.

(ii) Panini Liquidation Event. If a Panini Liquidation Event occurs on or prior to Consummation Date, the holders of Allowed Contingent Senior Secured Claims shall receive, on the Consummation Date, in full and complete satisfaction and discharge of their Contingent Senior Secured Claims, their Ratable Proportion of the New Panini Securities and thirteen million dollars ($13,000,000) of Cash.

4.3  Other Secured Claims (Class 3).

On the Consummation Date, each holder of an Allowed Other Secured Claim in each subclass of Class 3 (Other Secured Claims) shall in full and complete satisfaction and discharge of its Other Secured Claim (a) be distributed on account of such Allowed Other Secured Claim Cash equal to such Allowed Other Secured Claim, (b) be distributed on account of such Allowed Other Secured Claim the Collateral securing such Allowed Other Secured Claim or (c) have such Allowed Other Secured Claim reinstated as against the applicable Reorganized Debtor and made unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand and receive payment of such Claim prior

29

to the stated maturity of such Claim from and after the
occurrence of a default.  Such treatment shall be determined by
the Proponents.

   4.4  <u>Unsecured Claims (Class 4)</u>.

      (a)  <u>Distributions</u>.

         (i)  <u>No Qualifying Transaction</u>.

            In the event that no Qualifying Transaction
occurs and except as set forth in Sections 4.4(b) and 4.4(c)
hereof, in full and complete satisfaction and discharge of its
Allowed Unsecured Claim, each holder of an Allowed Unsecured
Claim in each of Subclass 4A (Entertainment), Subclass 4B (The
Asher Candy Company), Subclass 4C (Fleer Corp.), Subclass 4D
(Frank H. Fleer Corp.), Subclass 4E (Heroes World Distribution,
Inc.), Subclass 4F (Malibu Comics Entertainment, Inc.),
Subclass 4G (Marvel Characters, Inc.), Subclass 4H (Marvel Direct
Marketing Inc.) and Subclass 4I (Skybox International Inc.) of
Class 4 (Unsecured Claims) shall, to the extent not paid prior to
the Consummation Date, be distributed, subject to increase or
decrease pursuant to Section 9.5 hereof:

      (1)  its Ratable Proportion of the Unsecured Creditor
Payment;

      (2)  its Ratable Proportion of one million (1,000,000) Plan
Warrants plus three (3) Plan Warrants for each eighty dollars
($80) of Allowed Unsecured Claims in excess of twenty million
dollars ($20,000,000) but in no event more than one million seven
hundred and fifty thousand (1,750,000) Plan Warrants in the
aggregate;

      (3)  its Ratable Proportion of the thirty percent (30%)
interest in the Net Avoidance Litigation Proceeds to be
distributed pursuant to Section 7.4(b) hereof;

      (4)  its Ratable Proportion of the first four million five
hundred thousand dollars ($4,500,000) of Net MAFCO Litigation
Proceeds plus a thirty percent (30%) interest in any Net MAFCO
Litigation Proceeds in excess of four million five hundred
thousand dollars ($4,500,000) to be distributed pursuant to
Section 7.4(b) hereof; and

      (5)  its Ratable Proportion of eight hundred thirty two
thousand five hundred (832,500) Stockholder Series A Warrants,
nine hundred thirty six thousand five hundred sixty three
(936,563) Stockholder Series B Warrants, and one million six
hundred eighteen thousand seven hundred fifty (1,618,750)
Stockholder Series C Warrants.

The number of Warrants to be distributed hereunder is subject to increase or decrease pursuant to Section 9.5 hereof.

(ii) <u>Qualifying Transaction</u>.

In the event that a Qualifying Transaction occurs and except as set forth in Sections 4.4(b) and 4.4(c) hereof, in full and complete satisfaction and discharge of its Allowed Unsecured Claim, each holder of an Allowed Unsecured Claim in each of Subclass 4A (Entertainment), Subclass 4B (The Asher Candy Company), Subclass 4C (Fleer Corp.), Subclass 4D (Frank H. Fleer Corp.), Subclass 4E (Heroes World Distribution, Inc.), Subclass 4F (Malibu Comics Entertainment, Inc.), Subclass 4G (Marvel Characters, Inc.), Subclass 4H (Marvel Direct Marketing Inc.) and Subclass 4I (Skybox International Inc.) of Class 4 (Unsecured Claims) shall, to the extent not paid prior to the Consummation Date, be distributed the same property as set forth in Section 4.4(a)(i) above except that each holder of an Allowed Unsecured Claim shall receive in lieu of the Plan Warrants to be distributed pursuant to Section 4.4(a)(i)(2) above one dollar and thirty cents ($1.30) for each Plan Warrant which would have otherwise been distributed to such holder. In addition, holders of Allowed Unsecured Claims shall receive all Excess Proceeds until all holders of Allowed Unsecured Claims have received payment in full.

(b) <u>Intercompany Claims</u>. Each holder of an Allowed Intercompany Claim shall receive, in full and complete satisfaction and discharge of its Intercompany Claim, its Ratable Proportion of one dollar ($1). In lieu thereof, at the election of the Proponents, any Intercompany Claims shall be treated as contributions to the capital of the obligor on such Intercompany Claims.

(c) <u>LaSalle Claim</u>. LaSalle shall receive the LaSalle Settlement Amount in full and complete satisfaction and discharge of the LaSalle Claim; <u>provided</u>, <u>however</u>, that nothing contained herein shall be construed as a discharge of obligations (other than those of the Debtors and their subsidiaries) under the Indentures.

4.5 <u>Class Securities Litigation Claims (Class 5)</u>.

(a) <u>Distributions</u>. Subject to allocation between holders of Allowed Class Securities Litigation Claims and holders of Allowed Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests) in accordance with Section 4.5(b) hereof, each holder of an Allowed Class Securities Litigation Claim shall be distributed, in full and complete satisfaction and discharge of its Allowed Class Securities Litigation on account of such Allowed Class Securities Litigation Claim its Ratable Proportion of (i) two million eight hundred sixty seven thousand

31

five hundred (2,867,500) Stockholder Series A Warrants, (ii) one million eight hundred thirty eight thousand four hundred thirty eight (1,838,438) Stockholder Series B Warrants, (iii) four million eight hundred fifty six thousand two hundred fifty (4,856,250) Stockholder Series C Warrants, and (iv) Net MAFCO Litigation Proceeds in the amounts set forth in Section 7.4 below, and, in the event a Qualifying Transaction closes pursuant to which holders of Fixed Senior Secured Claims and holders of Unsecured Claims are paid in full, all Excess Proceeds not distributed to holders of Unsecured Claims.  The number of Warrants distributed hereunder is subject to increase or decrease pursuant to Section 9.5 hereof.

(b)  Calculation of Distribution.  For purposes of effecting distributions hereunder on account of Allowed Class Securities Litigation Claims and Allowed Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests), any judgment evidencing any Allowed Class Securities Litigation Claim shall be converted into an implied number of shares of common stock of Entertainment calculated as the quotient of (i) the aggregate amount of any such judgment, divided by (ii) the average of intraday high and low average sales prices of a share of common stock of Entertainment on the New York Stock Exchange, as reported in The Wall Street Journal (National Edition) for the ten consecutive trading days ending on the trading day immediately preceding the date of the commencement of any action underlying any Allowed Class Securities Litigation Claim.

(c)  Parity of and Limitation on Distributions. The distributions to be made under this Section 4.5 on account of Allowed Class Securities Litigation Claims shall be made on the basis of parity with the Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests) and subject to the limitation that holders of Allowed Class Securities Litigation Claims and Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests) shall only be entitled to a single recovery on account of such Claims and Equity Interests.

4.6  Equity Interests (Class 6).

(a)  Entertainment (Subclass 6A).

(i)  Distributions.  Subject to allocation between holders of Allowed Class Securities Litigation Claims and holders of Allowed Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests) in accordance with Section 4.5(b) and 4.5(c) hereof, each holder of record of an Allowed Equity Interest in Subclass 6A (Entertainment) of Class 6 (Equity Interests) as of the Consummation Date shall be distributed, in full and complete satisfaction and discharge of such Allowed Equity Interest, on account of such Allowed Equity

32

Interest its Ratable Proportion of (i) two million eight hundred sixty seven thousand five hundred (2,867,500) Stockholder Series A Warrants, (ii) one million eight hundred thirty eight thousand four hundred thirty eight (1,838,438) Stockholder Series B Warrants, (iii) four million eight hundred fifty six thousand two hundred fifty (4,856,250) Stockholder Series C Warrants, and (iv) Net MAFCO Litigation Proceeds in the amounts set forth in Section 7.4 below, and in the event a Qualifying Transaction closes pursuant to which holders of Fixed Senior Secured Claims and holders of Unsecured Claims are paid in full, all Excess Proceeds not distributed to holders of Unsecured Claims. The number of Warrants distributed hereunder is subject to increase or decrease pursuant to Section 9.5 hereof.

(ii) <u>Parity of and Limitation on Distributions</u>. The distributions to be made under this Section 4.6 on account of Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests) shall be made on the basis of parity with the Allowed Class Securities Litigation Claims and subject to the limitation that holders of Allowed Class Securities Litigation Claims and Equity Interests in Subclass 6A (Entertainment) of Class 6 (Equity Interests) shall only be entitled to a single recovery on account of such Claims and Equity Interests.

(b) <u>Subsidiary Equity Interest (Subclass 6B)</u>. On the Consummation Date, all Subsidiary Equity Interests shall be canceled, and the holders of Subsidiary Equity Interests shall not be entitled to, and shall not, receive or retain any property or interest in property on account of such Subsidiary Equity Interest.

4.7 <u>Existing Warrants (Class 7)</u>.

On the Consummation Date, the Existing Warrants shall be canceled, and the holders of Existing Warrants shall not be entitled to, and shall not, receive or retain any property or interest in property on account of such Equity Interests in Class 7 (Existing Warrants).

SECTION 5.    IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND NOT IMPAIRED UNDER THE PLAN: ACCEPTANCE OR REJECTION OF THE PLAN

5.1 <u>Holders of Claims and Equity Interests Entitled to Vote</u>.

Each of Class 1 (Priority Non-Tax Claims), Class 2 (Senior Secured Claims), Class 3 (Other Secured Claims), Class 4 (Unsecured Claims), Class 5 (Class Securities Litigation Claims), Subclass 6A (Marvel Entertainment Group) of Class 6 (Equity

33

Interests), Subclass 6B (Subsidiary Equity Interests) of Class 6 (Equity Interests) and Class 7 (Existing Warrants) and, as applicable, each subclass thereof, are impaired hereunder.

### 5.2 Nonconsensual Confirmation.

The Proponents hereby move to have the Bankruptcy Court confirm this Plan of Reorganization under section 1129(b) of the Bankruptcy Code.

### 5.3 Severability of Plan of Reorganization.

This Plan of Reorganization is, severally, a plan of reorganization for each of the Debtors. In the event that this Plan of Reorganization is not confirmed for all Debtors, then this Plan of Reorganization may not be confirmed for any Debtor without the consent of each of the Proponents, provided, however, that this Plan of Reorganization may be confirmed if it can be confirmed for all Debtors other than Immaterial Debtors.

### SECTION 6.    MEANS OF IMPLEMENTATION

### 6.1 Closing of Transaction.

On the Consummation Date, the closing of the Transaction shall occur in accordance with the Merger Agreement and, in the event of a Qualifying Transaction, any other applicable document on the terms and subject to the conditions contained in such Merger Agreement and/or other applicable document, free and clear of all Liens, claims, encumbrances and interests. In connection therewith, all outstanding letters of credit or other similar obligations as set forth on Schedule 6.1 hereto issued for the account of any of the Debtors or the Debtors in Possession under the Existing Credit Agreements or the DIP Credit Agreement, as applicable, shall be (a) canceled and terminated with Chase receiving releases reasonably acceptable to Chase from the beneficiaries thereof, or (b) Newco shall issue a back to back letter of credit in form and substance reasonably acceptable to Chase. In the event that any of the letters of credit set forth on Schedule 6.1 hereto are drawn prior to the Consummation Date, Newco shall reimburse Chase for all amounts (including interest at the non-default rate provided for in the Existing Credit Agreements, fees and other charges) incurred solely in respect of any such letters of credit.

### 6.2 Derivative Securities Litigation Claims.

Any derivative securities litigation claims are property of the estate of Entertainment under section 541 of the Bankruptcy Code and shall become the property of Newco.

6.3  <u>Board of Directors of the Reorganized Debtors</u>.

The Board of Directors of Newco immediately following the Consummation Date shall consist of six (6) individuals designated by Toy Biz and the New Investors and five (5) individuals designated by the Secured Lenders.  The members of the Board of Directors of Newco, assuming its formation, are or shall be stated in a filing to made with the Bankruptcy Court prior to the Consummation Date.  Thereafter, and subject to the Shareholder Agreement, the Board of Directors of Newco shall be elected in accordance with the Charter and Bylaws.

6.4  <u>Officers of the Reorganized Debtors</u>.

The initial officers of Newco shall be determined by the Proponents.  The selection of officers of the Reorganized Debtors after the Consummation Date shall be as provided in the Charter and Bylaws.

6.5  <u>Distribution to New Investors</u>.

In the event that no Qualifying Transaction closes, the New Investors shall receive nine million (9,000,000) shares of Convertible Preferred Stock on the Consummation Date in exchange for ninety million dollars ($90,000,000) in Cash.

6.6  <u>Toy Biz Distribution</u>.

(a)  <u>No Qualifying Transaction</u>.

In the event that no Qualifying Transaction closes, holders of Toy Biz common stock (other than the Debtors) shall continue to hold the twenty million, three hundred and fifty-two thousand, one hundred twenty-seven (20,352,127) shares of Toy Biz common stock held by them on the Consummation Date and Characters shall continue to hold the seven million three hundred ninety four thousand (7,394,000) shares of Toy Biz common stock held by it.

(b)  <u>Qualifying Transaction</u>.

In the event that a Qualifying Transaction closes, holders of Toy Biz common stock (other than the Debtors) shall receive on the Consummation Date an amount of Cash equal to the Toy Biz Cash Distribution less the Breakup Fee and certain professional fees which net amount shall be payable in immediately available funds in accordance with instructions to be provided to the Debtors by Toy Biz on or before the Consummation Date.

35

6.7 <u>Fees to New Investors</u>.

(a)    <u>Professional Fees</u>.  On the Consummation Date, DPI as a New Investor committing to purchase Convertible Preferred Stock under the Convertible Preferred Stock Purchase Agreement shall be reimbursed by Newco in an amount not to exceed two hundred thousand dollars ($200,000) for all of the professional fees, costs and expenses incurred solely in connection with the preparation and negotiation of the Convertible Preferred Stock Purchase Agreement and related agreements and documentation, it being understood that DPI shall not be reimbursed for any other professional fees, costs or expenses relating to these Reorganization Cases paid to its personal counsel including, without limitation, any litigation relating to the Reorganization Cases, this Plan of Reorganization, the Convertible Preferred Stock Purchase Agreement or Toy Biz.

(b)    <u>Breakup Fee</u>.  In the event that a Qualifying Transaction closes, the Breakup Fee shall be payable in Cash in immediately available funds to DPI or its assignees.

6.8    <u>Dissolution of Committees</u>.

On the Consummation Date, all statutory committees (other than the Creditors Committee to the extent provided in Section 6.16 hereof) appointed by the U.S. Trustee in the Reorganization Cases shall automatically dissolve and such committees shall cease to exercise any functions and be divested of all rights, powers and duties.

6.9    <u>Intentionally deleted</u>.

6.10    <u>Newco Financing</u>.

In the event that no Qualifying Transaction closes, Toy Biz shall arrange for Newco to obtain the Term Loan Facility, the Working Capital Facility and investors to purchase ninety million dollars ($90,000,000) of Convertible Preferred Stock for ninety million dollars ($90,000,000) in Cash.

6.11    <u>Vote of Characters' Toy Biz Stock</u>.

As of the Consummation Date, Characters shall be deemed to have voted all of its Toy Biz common stock in favor of the Merger Agreement, any Qualifying Transaction and the transactions contemplated hereby.

36

6.12   <u>Forgiveness of Panini Obligations</u>.

On the Consummation Date, each of the Debtors shall forgive all monetary obligations of Panini to such Debtor due and payable as of December 31, 1997.

6.13   <u>Panini Indemnity</u>.

On the Consummation Date, Newco shall execute and deliver the Panini Indemnity.

6.14   <u>Outstanding Toy Biz Stock Interests</u>.  Any outstanding Toy Biz preferred stock or stock options shall be eliminated prior to the Consummation Date or will only dilute the Newco Common Stock to be distributed pursuant to Section 6.6 hereof.

6.15   <u>Distribution of Subsidiary Equity Interests</u>.

In connection with and in consideration for the distributions to be made under section 4.2(b)(i) hereof by Entertainment on account of the Allowed Fixed Senior Secured Claims, each holder of a Fixed Senior Secured Claim shall transfer to Entertainment, and Entertainment shall acquire by subrogation, all Fixed Senior Secured Claims against any Debtor other than Entertainment.  The distributions of shares of new common stock of Debtors other than Entertainment provided for under section 4.2(b)(i)(A)(5) hereof shall be made directly to Newco.

6.16   <u>Continuation of Creditors Committee</u>.

From and after the Consummation Date, the Creditors Committee may continue to exist solely for the purposes of monitoring the Claims objection process and performing the functions set forth in Section 7.9 hereof and in the Avoidance Litigation Trust Agreement, it being understood that the reasonable professional fees and expenses of the Creditors Committee and the expenses of its members shall be paid by the Avoidance Litigation Trust in an amount not to exceed one hundred thousand dollars ($100,000) and that neither Newco nor any of its subsidiaries or affiliates shall have any liability therefor.

6.17   <u>Right to Object to Fees</u>.

Nothing contained herein shall be construed as in any way limiting the right of any party in interest to object to any of the fees and expenses of any professionals retained pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

37

6.18  <u>Certain Securities Law Matters</u>.

In the event that the Confirmation Order does not determine that the issuance of the beneficial interests in the Litigation Trusts, Newco Common Stock, the Warrants (including the redistribution of the Warrants by LaSalle to the holders of the Holdings Notes or the sale thereof by LaSalle), the Newco Common Stock issuable on exercise of the Plan Warrants, Stockholder Series A Warrants and the Stockholder Series C Warrants, the Convertible Preferred Stock issuable on exercise of the Stockholder Series B Warrants and the Newco Common Stock issuable on exercise of that Convertible Preferred Stock are exempt from the registration requirements of the Securities Act pursuant to the exemption afforded by Section 1145 of the Bankruptcy Code, Newco will either obtain a no action letter from the Securities and Exchange Commission to the effect that the staff of the Securities and Exchange Commission will not recommend any enforcement action if those issuances are made without registration under the Securities Act pursuant to the exemption afforded by Section 1145 of the Bankruptcy Code or it will register the necessary issuances under the Securities Act reasonably promptly after the Consummation Date.  Newco shall use its reasonable efforts to cause Newco Common Stock, the New Panini Securities (if applicable), the Convertible Preferred Stock, Plan Warrants, Stockholder Series A Warrants and Stockholder Series C Warrants to be listed on the New York Stock Exchange or the American Stock Exchange at the time of, or as promptly as reasonably practicable after, the Consummation Date. Newco shall remain subject to the reporting requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended, and shall file all reports required to be filed thereunder with the Securities and Exchange Commission until Rule 144(k) under the Securities Act becomes applicable to resales of the Plan Warrants, Stockholder Series A Warrants, Stockholder Series C Warrants, shares of Common Stock and Convertible Preferred Stock issued on exercise of Warrants and shares of Common Stock issuable on exercise of those shares of Convertible Preferred Stock, other than resales for the account of persons who are at the time of such resale, or have been within the three months preceding such resale, affiliates of Newco.  Newco shall use its reasonable efforts to have the Securities and Exchange Commission declare effective, as promptly as reasonably practicable after the Consummation Date, one or more registration statements under the Securities Act registering (x) the resale by the New Investors of the shares of Convertible Preferred Stock acquired by the New Investors, including, without limitation, shares acquired by holders of Fixed Senior Secured Claims pursuant to Section 4.2(b)(i)(A)(6) hereof and (y) the resale by affiliates (as that term is defined in Rule 405 under the Securities Act) of Newco of (i) shares of Newco Common Stock, (ii) shares of Convertible Preferred Stock, (iii) Stockholder Series A Warrants,

38

(iv) Stockholder Series B Warrants, (v) Stockholder Series C
Warrants, (vi) Newco Common Stock issuable on exercise of the Plan
Warrants, Stockholder Series A Warrants and Stockholder Series C
Warrants, (vii) Convertible Preferred Stock issuable on exercise
of the Stockholder Series B Warrants, (viii) Newco Common Stock,
and (ix) Newco Common Stock issuable on conversion of Convertible
Preferred Stock, to the extent that the shares and warrants
referred to in (i) through (v), the warrants referred to in (vi) and
(vii) and the Convertible Preferred Stock referred to in (viii)
have been issued to those affiliates under the Plan.

6.19 <u>Settlement Amount</u>. Immediately prior to the
Consummation Date, Toy Biz shall pay the Settlement Amount to
Berlack, Israels & Liberman LLP for the benefit of High River and
Westgate.

6.20 <u>Excess Administration Claims Amount Loan</u>. On the
Consummation Date, the New Investors set forth on Exhibit 12 to
this Plan of Reorganization in the proportions there identified
shall lend Cash to Newco in an amount equal to the Excess
Administration Claims Amount and Newco shall execute and deliver
the Excess Administration Claims Note to the New Investors.

6.21 <u>Perlmutter Capital Contribution</u>. Isaac
Perlmutter or one of his Affiliates other than Toy Biz or one of
its subsidiaries shall contribute an amount of Cash as equity to
Newco equal to the Perlmutter Capital Contribution.

SECTION 7.     <u>LITIGATION TRUST</u>

7.1 <u>Assignment of Rights</u>.

(a) <u>Avoidance Litigation Trust</u>. On the Consummation
Date, (i) each of the Debtors and the Avoidance Litigation
Trustee shall execute and deliver the Avoidance Litigation Trust
Agreement pursuant to which the Debtors shall grant, assign,
transfer, convey and deliver to the Avoidance Litigation Trust,
without representation, warranty or recourse, for the benefit of
the Avoidance Beneficiaries all of the Debtors' right, title and
interest in and to any and all Litigation Claims arising pursuant
to sections 510, 544, 545, 547, 548, 549, 550, 551 and 553 of the
Bankruptcy Code including the right to prosecute the motion
pursuant to Fed. R. Civ. P. 60(b) filed by the Creditors
Committee in December, 1997, <u>provided</u>, <u>however</u>, that such
Litigation Claims shall not include any Litigation Claim that
seeks the recovery of any right, title or interest of any of the
Debtors or their subsidiaries in or to any right, title or
interest in intellectual property, including without limitation,
any right, title or interest in or to Spiderman, X-man or Ironman

39

and (ii) pursuant to the Avoidance Litigation Trust Agreement, the Avoidance Litigation Trustee shall accept the rights and properties assigned and transferred to it and the trust imposed upon it, agree to retain and enforce such Litigation Claims for the benefit of the Avoidance Beneficiaries, further agree to be appointed for such purpose under section 1123(b)(3)(B) of the Bankruptcy Code and hold the Net Avoidance Litigation Proceeds in trust for the Avoidance Beneficiaries.

(b) **MAFCO Litigation Trust**. On the Consummation Date, (i) each of the Debtors and the MAFCO Litigation Trustees shall execute and deliver the MAFCO Litigation Trust Agreement pursuant to which the Debtors shall grant, assign, transfer, convey and deliver to the MAFCO Litigation Trust, without representation, warranty or recourse, for the benefit of the MAFCO Beneficiaries (A) all of the Debtors' right, title and interest in and to any and all MAFCO Causes of Action, and (B) an interest in the Debtors' right to the benefits of the attorney client privilege, work-product immunity and other similar privileges to the extent and only to the extent provided in the MAFCO Litigation Trust Agreement, and (ii) pursuant to the MAFCO Litigation Trust Agreement, the MAFCO Litigation Trustees shall accept the rights and properties assigned and transferred to, or otherwise enjoyed by, them and the trust imposed upon them, agree to retain and enforce such Litigation Claims for the benefit of the MAFCO Beneficiaries, further agree to be appointed for such purpose under section 1123(b)(3)(B) of the Bankruptcy Code and hold the Net MAFCO Litigation Proceeds in trust for the MAFCO Beneficiaries.

7.2 <u>Control of Litigation</u>.

Except as set forth in this Section 7.2, the Litigation Trustees shall have the full power and discretion to select and to hire professionals, and to initiate, to prosecute, to supervise, to direct, to compromise and to settle all Litigation Claims. Notwithstanding the foregoing, Newco may, in its sole and absolute discretion, direct the Avoidance Litigation Trustee to dismiss with prejudice, to compromise or to settle any Cause of Action against any person or entity which is a provider of goods or services to Newco or party to any licensing arrangement with Newco, or, in each case, any of its direct or indirect subsidiaries, at any time from and after the Consummation Date which Newco reasonably believes could have an adverse effect on its business.

7.3 <u>Liability of Trustee</u>.

No Litigation Trustee shall have any liability for any of its acts or omissions in connection with the selection and hiring of professionals, or the initiation, prosecution,

supervision, direction, compromising or settling of any
Litigation Claims, except in the case of its gross negligence or
its own intentional and willful misconduct, and in no event shall
be liable for any action taken in reliance upon the advice of
professionals selected with due care in respect of the subject
matter in question. Notwithstanding the foregoing, a Litigation
Trustee may, without liability therefor, retain the services of
any professional services firm with which the Litigation Trustee
is affiliated.

7.4  <u>Distribution of Net Avoidance Litigation Proceeds
and Net MAFCO Litigation Proceeds</u>. Net Avoidance Litigation
Proceeds and Net MAFCO Litigation Proceeds shall be distributed
as follows:

(a) four and nine tenths percent (4.9%) of the Net
Avoidance Litigation Proceeds shall be distributed to the holders
of Allowed Fixed Senior Secured Claims pursuant to Section
4.2(b)(i)(7) hereof.

(b) the first four million five hundred thousand
dollars ($4,500,000) of Net MAFCO Litigation Proceeds, thirty
percent (30%) of any remaining Net MAFCO Litigation Proceeds and
thirty percent (30%) of Net Avoidance Litigation Proceeds shall
be distributed to the holders of Allowed Unsecured Claims
pursuant to Section 4.4 hereof.

(c) seventy percent (70%) of Net MAFCO Litigation
Proceeds after payment of the first four million five hundred
thousand dollars ($4,500,000) of Net MAFCO Litigation Proceeds to
holders of Allowed Unsecured Claims in classes 4A through 4I
shall be distributed to the holders of Allowed Class Securities
Litigation Claims and Allowed Equity Interests in Entertainment
pursuant to Sections 4.5 and 4.6(a) hereof.

(d) sixty five and one tenth percent (65.1%) of Net
Avoidance Litigation Proceeds shall be distributed to Newco.

7.5  <u>Professional Fees and Expenses</u>.

(a) <u>Avoidance Litigation Trust</u>. On the Consummation
Date, Newco shall execute and deliver to the Avoidance Litigation
Trustee the Avoidance Litigation Trust Loan Agreement pursuant to
which it shall agree for a period of five (5) years from and
after the Consummation Date to make loans to the Avoidance
Litigation Trust for the payment of all professional fees and
expenses of the Avoidance Litigation Trustee in an amount not to
exceed one million one hundred thousand dollars ($1,100,000) in
the aggregate, it being understood that one hundred thousand
dollars of such amount shall be for the exclusive purpose of
paying fees and expenses of the Creditors Committee which may

41

become due and payable pursuant to Section 6.16 hereof.  On the
Consummation Date, the Avoidance Litigation Trustee shall execute
and deliver to Newco the Avoidance Professional Fee Reimbursement
Note pursuant to which the Avoidance Litigation Trust shall be
obligated to reimburse Newco for any and all sums advanced
pursuant to the Avoidance Litigation Trust Loan Agreement
together with simple interest at the rate of ten percent (10%)
per annum which obligation shall be secured by a valid, binding,
enforceable, perfected, first priority security interest in and
lien against all assets of the Avoidance Litigation Trust.  On
the Consummation Date and thereafter whenever reasonably
requested to do so by Newco, the Avoidance Litigation Trustee
shall execute and deliver UCC-1 financing statements and any
other documents or interests requested by Newco to evidence a
perfected first priority security interest in and lien against
all assets of the Avoidance Litigation Trust to secure repayment
of the Avoidance Professional Fee Reimbursement Note.  After
payment in full of the Avoidance Professional Fee Reimbursement
Note, the Avoidance Litigation Trustee shall have the right, but
not the obligation, to reserve all or a portion of any recoveries
realized by the Avoidance Litigation Trustee to pay for future
professional fees and expenses.

         (b) MAFCO Litigation Trust.  On the Consummation Date,
Newco shall execute and deliver to the MAFCO Litigation Trustees
the MAFCO Litigation Trust Loan Agreement pursuant to which it
shall agree for a period of five (5) years from and after the
Consummation Date to make loans to the MAFCO Litigation Trust for
the payment of all professional fees and expenses of the MAFCO
Litigation Trustees in an amount not to exceed one million
dollars  ($1,000,000) in the aggregate.  On the Consummation
Date, the MAFCO Litigation Trustee shall execute and deliver to
Newco the MAFCO Professional Fee Reimbursement Note pursuant to
which the MAFCO Litigation Trust shall be obligated to reimburse
Newco for any and all sums advanced pursuant to the MAFCO
Litigation Trust Loan Agreement together with simple interest at
the rate of ten percent (10%) per annum which obligation shall be
secured by a valid, binding, enforceable, perfected, first
priority security interest in and lien against all assets of the
MAFCO Litigation Trust.  On the Consummation Date and thereafter
whenever reasonably requested to do so by Newco, the MAFCO
Litigation Trustees shall execute and deliver UCC-1 financing
statements and any other documents or interests requested by
Newco to evidence a perfected first priority security interest in
and lien against all assets of the MAFCO Litigation Trust to
secure repayment of the MAFCO Professional Fee Reimbursement
Note.  After payment in full of the MAFCO Professional Fee
Reimbursement Note, the MAFCO Litigation Trustees shall have the
right, but not the obligation, to reserve all or a portion of any
recoveries realized by the MAFCO Litigation Trustees to pay for
future professional fees and expenses.

                              42