# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re

MARVEL ENTERTAINMENT GROUP, INC.,
THE ASHER CANDY COMPANY, FLEER          Case No. 97-638-RRM
CORP., FRANK H. FLEER CORP.,
HEROES WORLD DISTRIBUTION, INC.,
MALIBU COMICS ENTERTAINMENT, INC.,
MARVEL CHARACTERS, INC., MARVEL
DIRECT MARKETING INC., and
SKYBOX INTERNATIONAL, INC.,

Debtors.

CONSENT ORDER (1) APPROVING STIPULATION AND
AGREEMENT EFFECTING CONSENSUAL AMENDMENT TO
THIRD AMENDED JOINT PLAN OF REORGANIZATION PROPOSED
BY THE SECURED LENDERS AND TOY BIZ, INC., (2) CONFIRMING
FOURTH AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY
THE SECURED LENDERS AND TOY BIZ, INC., AND (3) ESTABLISHING BAR
FOR FEE APPLICATIONS AND ADMINISTRATION EXPENSE CLAIMS

The Secured Lenders[*] and Toy Biz, Inc. (together, the "Proponents") having

proposed that certain Third Amended Joint Plan of Reorganization dated June 25, 1998

(the "Third Amended Plan") under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") in the jointly administered chapter 11 cases of the above-captioned

debtors (together, the "Debtors"); and the Creditors Committee, the Equity Committee, High

---

[*] All capitalized terms used and not defined herein shall have the same meaning as in
the Fourth Amended Plan (as hereinafter defined).

*1*

River, Westgate and LaSalle having each objected to confirmation of the Third Amended Plan;

and the Court having held a hearing on June 30 and July 1, 1998 to consider confirmation of

the Third Amended Plan; and the Court having issued a Memorandum Decision and entered an

order each dated July 13, 1998 confirming the Third Amended Plan (collectively, the "Third

Amended Plan Confirmation Order"); and the Creditors Committee, the Equity Committee,

High River, Westgate and LaSalle having each filed a notice of appeal from the Third

Amended Plan Confirmation Order or indicated their intention to file notices of appeal from

the Third Amended Plan Confirmation Order; and Toy Biz, Isaac Perlmutter, Isaac Perlmutter

T.A., Zib Inc., Avi Arad, Joseph M. Ahearn, James S. Carluccio, Alan Fine, James F.

Halpin, Morton E. Handel, Alfred A. Piergallini, Donald E. Rosenblum, Paul R. Verkuil,

Mark Dickstein, Dickstein & Co. L.P., Dickstein Focus Fund, L.P., Dickstein International

Limited, Dickstein Partners L.P. and Dickstein Partners Inc., John J. Gibbons (the "Trustee")

solely in his capacity as chapter 11 trustee for the above-captioned debtors (collectively, the

Debtors") on behalf of himself and the Debtors, Chase individually and on behalf of those

holders of Senior Secured Claims which authorize Chase to sign the Stipulation and Agreement

(as hereinafter defined) on their behalf pursuant to the Fifth Master Agreement Amendment (as

defined in the Stipulation and Agreement), Chase as a DIP Lender, CIBC, Inc. as a DIP

Lender, Goldman Sachs Credit Partners L.P. as a DIP Lender, Lehman Commercial Paper

Inc. as a DIP Lender, The Long Term Credit Bank of Japan, Ltd., Los Angeles Agency as a

DIP Lender, The Sumitomo Bank, Limited as a DIP Lender, High River, Carl Icahn,

Westgate, Vincent Intrieri, LaSalle, the Official Committee of Unsecured Creditors for the

Debtors and the Official Committee of Equity Security Holders for Entertainment having each

-2-

executed and delivered a Stipulation and Agreement Effecting Consensual Amendment to Third

Amended Joint Plan of Reorganization Proposed by the Secured Lenders and Toy Biz, Inc.

(the "Stipulation and Agreement") which provides, *inter alia*, for the Proponents to resolve the

objections of the Creditors Committee, the Equity Committee, High River, Westgate and

LaSalle by modifying the Third Amended Plan by proposing a Fourth Amended Joint Plan of

Reorganization Proposed by the Secured Lenders and Toy Biz, Inc. (the "Fourth Amended

Plan")which is an Exhibit to the Stipulation and Agreement; the Court hereby finds that:

        A.    This order is entered pursuant to 11 U.S.C. §1127 and Fed. R. Bankr. P.

3019. The Court has jurisdiction to enter this order pursuant to 28 U.S.C. §§ 157 and 1334.

Venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

        B.    The notice given with respect to the Stipulation and Agreement and Fourth

Amended Plan was adequate and appropriate and satisfies the requirements of applicable law,

including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure including any

notice required by Fed. R. Bankr. P. 3019.

        C.    The Stipulation and Agreement, including without limitation, the releases

contained therein, (1) is in the best interests of the Debtors, the Debtors' estates and holders of

Claims against and Equity Interests in the Debtors, (2) is fair, reasonable, adequate and

appropriate in light of the costs, expenses and delays in connection with the contemplated

appeals from Third Amended Plan Confirmation Order including, without limitation, those

provisions of the Third Amended Plan Confirmation Order relating to the Claims of LaSalle, (3)

is a reasonable exercise of the business judgment of all of the parties to the Stipulation and

Agreement, (4) is the result of arms length, good faith bargaining, and (5) is a reasonable exercise of the duties of LaSalle under the Indentures.

D.    The Fourth Amended Plan does not materially and adversely modify the distributions, rights or treatment of holders of Unsecured Claims from that which was provided to the holders of Unsecured Claims by the Third Amended Plan and adequate notice of the Stipulation and Agreement and the Fourth Amended Plan was provided pursuant to Fed. R. Bankr. P. 3019.

IT IS, THEREFORE, HEREBY ORDERED, ADJUDGED and DECREED THAT:

1.    The findings set forth above and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

Provisions Relating to Stipulation and Agreement

2.    The Stipulation and Agreement be, and it hereby is, approved in all respects.

3.    The Stipulation and Agreement be, and it hereby is, determined to be a valid and binding agreement enforceable against all parties to the Stipulation and Agreement, the Debtors and all parties in interest and all of their successors and assigns.

-4-

4.    The releases contained in Section 13 of the Stipulation and Agreement be, and they hereby are, determined to be valid, binding and enforceable in accordance with their terms.

5.    Neither this order, the Stipulation and Agreement, nor any proceedings taken pursuant hereto or thereto shall be offered or received as evidence of a presumption, concession or admission of any liability, fault, wrongdoing or other dereliction of duty on the part of any party to the Stipulation and Agreement; provided, however, that reference may be made to this order and the Stipulation and Agreement in such proceedings as may be necessary to effectuate the provisions thereof.

6.    In the event of the termination of the Stipulation and Agreement pursuant to Section 8 thereof, neither this order, the Stipulation and Agreement, nor any proceedings taken pursuant hereto or thereto shall constitute any waiver, estoppel or admission by any party thereto with respect to any rights or remedies it may possess, nor shall any complaint, action or claim by any party be barred or precluded. In the event of such termination, the entry into the Stipulation and Agreement by the parties thereto shall be deemed to have been without prejudice and a settlement negotiation within the scope of Fed. R. Ev. 408.

7.    This Court shall retain jurisdiction over all persons or entities whose claims or interests are affected by the Stipulation and Agreement and this order and all matters relating to the enforcement, administration and consummation of the transactions contemplated by the Stipulation and Agreement and this order.

<u>Provisions Relating to Fourth Amended Plan</u>

8.    Pursuant to Fed. R. Bankr. P. 3019 the holders of Unsecured Claims in classes 4A through 4I that have voted to accept the Second Amended Joint Plan of Reorganization Proposed By the Secured Lenders and Toy Biz, Inc. be, and they hereby are, deemed to have accepted the Fourth Amended Plan.

9.    The Third Amended Plan Confirmation Order, be, and it hereby is, modified and superceded to reflect the provisions of this order; provided, however, that the ten (10) day period referred to in the definition of Qualifying Transaction contained in the Fourth Amended Plan shall commence as of the date of entry of the Third Amended Plan Confirmation Order.

10.    The Fourth Amended Plan (including all Exhibits and Schedules thereto) is confirmed in accordance with section 1129 of the Bankruptcy Code and supercedes the Third Amended Plan and each of the provisions of the Fourth Amended Plan, including without limitation the provisions of Sections 7.7 and 12.2, be, and they hereby are, approved in all respects and all references herein to the "Fourth Amended Plan" shall be construed to mean a "Modification of the Third Amended Plan" pursuant to section 1127(b) of the Bankruptcy Code.

11.    From and after the date hereof, the Debtors, the Trustee, the Proponents and all parties in interest are authorized and directed to implement the Fourth Amended Plan in accordance with its terms and to take such actions as may be reasonably necessary to effectuate the Fourth Amended Plan.

12.   From and after the Confirmation Date, the Debtors, the Trustee, the Proponents and all parties in interest are authorized and directed to execute and deliver such documents and instruments as are necessary or desirable to implement the Fourth Amended Plan in accordance with its terms and within the time periods provided therein.

13.   The Convertible Preferred Stock Purchase Agreement shall be entered into as of the Confirmation Date, and shall constitute a legal, valid and binding agreement enforceable against the parties thereto in accordance with its terms on such date.  As of the Consummation Date, the Fourth Amended Plan and each of the exhibits thereto and each of the documents or instruments prepared by the Proponents in order to effectuate the terms of the Fourth Amended Plan, including but not limited to the Fourth Amended Plan exhibits (collectively, the "Plan Documents") shall constitute legal, valid and binding agreements, documents or instruments, enforceable against the parties thereto in accordance with their terms.  Insofar as any of the Plan Documents require the participation of one or more of the Debtors or the Trustee, such Plan Documents shall be deemed to have been duly authorized, executed and delivered by the Debtors and the Trustee, as applicable.

14.   By operation of section 1145(a) of the Bankruptcy Code, none of Section 5 of the Securities Act, or any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of or broker or dealer in a security shall apply to the issuance, offer, transfer or sale under the Fourth Amended Plan of Newco Common Stock,  New Panini Securities (if applicable), Convertible Preferred Stock (other than Convertible Preferred Stock sold pursuant to Section 4.2(b)(I)(A)(6) or Section 6.5 of the Fourth Amended Plan) or subordinated notes issued in exchange therefor under Article

-7-

VII of the Newco Certificate of Incorporation, Warrants, beneficial interests in the Avoidance Litigation Trust, beneficial interests in the MAFCO Litigation Trust, Newco Common Stock issuable on the exercise of Plan Warrants, Stockholder Series A Warrants, and Stockholder Series C Warrants, Convertible Preferred Stock issuable on the exercise of the Stockholder Series B Warrants and subordinated notes issued in exchange for such shares of Convertible Preferred Stock under Article VII of the Newco Certificate of Incorporation, or Newco Common Stock issuable on conversion of any of the foregoing shares of Convertible Preferred Stock. All securities referred to in this paragraph 14 (other than Convertible Preferred Stock sold pursuant to Section 4.2(b)(i)(A)(6) or Section 6.5 of the Fourth Amended Plan) will be deemed to have been sold in a public offering within the meaning of section 1145(c) of the Bankruptcy Code and shall be freely transferable, subject to any restriction on transfer contained in the terms of such stock, debt securities and warrants themselves or in the Plan Documents.

15.  Pursuant to Section 4(2) of the Securities Act, none of Section 5 of the Securities Act or any State or local law requiring registration for offer or sale of a security shall apply to the offer and sale of Convertible Preferred Stock by Newco to New Investors or to the offer and issuance of the Excess Administration Claims Note by Newco to Zib Inc. The Excess Administration Claims Note is exempt from the requirements of the Trust Indenture Act of 1939 pursuant to Section 304(b) of the Trust Indenture Act.

16.  The reversal, modification, vacatur or stay of any provision of this Confirmation Order shall not affect the consummation of the transactions contemplated by the Fourth Amended Plan or the distributions of Cash and distributions or issuance of any security,

including but not limited to, Newco Common Stock (including Newco Common Stock issuable upon exercise of Warrants or upon conversion of Convertible Preferred Stock), Convertible Preferred Stock (including Convertible Preferred Stock issuable upon the exercise of Warrants), Warrants, and interests as a Beneficiary of the Avoidance Litigation Trust or the MAFCO Litigation Trust thereunder (if effected prior to the receipt of written notice by counsel to Toy Biz and the Secured Lenders of such reversal, modification, vacatur or stay) or the right of persons and entities to or on behalf of whom such Cash and other distributions, including stock, debt securities and warrants were made, to retain the same. Distributees shall be entitled to all the rights, remedies, privileges and benefits granted herein or in the Fourth Amended Plan or Plan Documents without regard to any such reversal, modification, vacatur or stay if the merger is consummated or the distributions made prior to the receipt of such written notice of the effective date thereof. The cash deposited in the cash reserve trust account pursuant to Sections 8.6 and 9.3 of the Fourth Amended Plan and the reserves created on account of Disputed Claims in Class 4 are deemed distributed within the meaning of this paragraph upon such deposits in the trust accounts

17.  On the Consummation Date, pursuant to section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtors shall be assumed, except for any executory contract or unexpired lease that (a) has been assumed or rejected pursuant to Final Order, or (b) is specifically rejected on Schedule 10.1 to the Third Amended Plan, which schedule was filed with the Court on June 25, 1998 as amended on June 29, 1998 or as further amended.

-9-

18.   All executory contracts and unexpired leases of the Debtors listed on Schedule 10.1 (as amended) shall be deemed rejected as of the Consummation Date, and any claim for rejection damages arising therefrom must be filed with the Court and served upon counsel to the Proponents by or before thirty days from and after the date of this order. Any such claim that is not timely and properly served and filed shall be and hereby is forever barred, as set forth in Section 10.3 of the Fourth Amended Plan.

19.   Any executory contract or unexpired lease of the Debtors that is not listed on Schedule 10.1 (as amended) and has not been rejected prior to the date of this order and is not the subject of a pending motion to reject shall be assumed, as set forth in Section 10 of the Third Amended Plan.  Notice of the deadline for the filing of a claim asserting a "cure" amount pursuant to section 365 (b) of the Bankruptcy Code will be provided as part of the notice of deadline for the filing of Administration Expense Claims set forth in paragraphs 32 and 33 below.  Any such claim that is not timely and properly served and filed shall be, and hereby is, forever barred, as set forth in those paragraphs.

20.   The treatment of all Claims against or Equity Interests in each of the Debtors under the Fourth Amended Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against and any Equity Interest in such Debtor of any nature whatsoever, known or unknown, including without limitation, any interest accrued or expenses incurred thereon from and after the Petition Date, or against its estate or properties or interests in property.  All entities shall be enjoined and precluded from asserting against the Trustee, any Debtor, Reorganized Debtor or Newco or their respective properties or interests,

-10-

any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Consummation Date.

21.   From and after the Consummation Date, no Exculpated Person shall have or incur any liability to any other Exculpated Person or any entity accepting any distribution under the Fourth Amended Plan (i) for any act taken or omission made in connection with or in any manner related to negotiating, formulating, implementing, confirming or consummating (x) the Fourth Amended Plan (or prior iterations of the Fourth Amended Plan) or the transactions contemplated thereby, or (y) any agreement, instrument or other documents created in connection with the Fourth Amended Plan (or prior iterations of the Fourth Amended Plan), (ii) for the actions or other participation of such Exculpated Person in respect of any of the Reorganization Cases (including, without limitation, the negotiation of any other plan of reorganization, settlement or arrangement), (iii) that relates, directly or indirectly, by implication or otherwise, to the Existing Credit Documents, the DIP Claims, or the Senior Secured Claims, (iv) for any matters that relate, directly or indirectly, to or were asserted in or could have been asserted in the District Court Complaint, or (v) for any matters that relate, directly or indirectly, to or were asserted in or could have been asserted in the LaSalle Action; provided, however, that such exculpation shall not affect the rights and obligations of parties to agreements entered into in connection with or under the Fourth Amended Plan.  All Exculpated Persons as well as all entities receiving any distribution under the Fourth Amended Plan shall be enjoined and precluded from asserting against the Exculpated Persons or their respective properties or interests in property, any other Claims based upon liability exculpated

-11-

pursuant to the preceding sentence; provided, however, that nothing contained in this

paragraph 21 shall be construed as enjoining the prosecution of Independent Causes of Action.

22.    Subject to section 7.7 of the Plan, From and after the Consummation Date, all persons and entities, including

but not limited to defendants or potential defendants in controversies in connection with,

arising out of, or which are in any way related to any Litigation Claim or Covered Claim,

either directly, representatively, or in any other capacity, are enjoined from instituting or

prosecuting or continuing to prosecute, any action, claim, or claim-over against any

Exculpated Person on whatsoever theory (whether by way of third or subsequent-party

complaint, cross-claim, separate action or otherwise, and whether under federal, state or local

law) to recover in whole or in part any liability, direct or indirect, of such person or entity in

connection with, arising out of, or which is in any way related to any Litigation Claim or

Covered Claim; provided, however, that nothing contained in this paragraph 22 shall be

construed as enjoining the prosecution of Independent Causes of Action.

23.    The delivery of the Transmittal Materials to all persons and entities

receiving Warrants under the Fourth Amended Plan is hereby approved.

24.    On the Consummation Date, in accordance with section 1141 of the

Bankruptcy Code, the transfers of rights, interests and properties by and on behalf of the

Debtors as contemplated by the Fourth Amended Plan (including the transfer contemplated by

the merger) shall be and hereby are legal, valid, binding and effective transfers of such rights,

interests and properties, (b) shall vest good title in the transferees thereof, and (c) shall be free

and clear of all Claims, Liens and encumbrances, except as expressly provided in the Plan

Documents (including the liens securing the Newco Guaranty); provided, however, that neither

-12-

the succession by the MAFCO Litigation Trustee to an interest in certain evidentiary privileges and immunities pursuant to Section 7.1(b) of the Fourth Amended Plan nor the operation of Section 2.04 of the MAFCO Litigation Trust Agreement shall constitute a waiver of any such privilege or immunity.

25. Newco is appointed as Disbursing Agent under the Fourth Amended Plan, and the Disbursing Agent is authorized and directed to effect any and all actions contemplated to be taken by it under the Fourth Amended Plan. The Disbursing Agent be, and it hereby is, authorized and directed to comply with Section 8 of the Fourth Amended Plan.

26. The securities issued upon the exercise of any Warrant shall be deemed to have been sold in a public offering and shall be freely transferable.

27. The Excess Administration Claims Note is exempt from the requirements of the Trust Indenture Act of 1939 pursuant to Section 4(2) of the Securities Act (per Regulation D) and pursuant to Section 304(b) of the Trust Indenture Act.

28. Until the Consummation Date, this Court shall retain exclusive jurisdiction over the Debtors, their properties and operations. On the Consummation Date, in accordance with the Fourth Amended Plan and sections 105(a) and 1142 of the Bankruptcy Code, the Debtors, their properties and their operations shall be released from the custody and jurisdiction of the Court, except that the Court shall retain jurisdiction of those matters set forth in Section 14.1 of the Fourth Amended Plan.

29. Any person or entity seeking reimbursement of expenses or an allowance of final compensation or reimbursement of expenses for professional services rendered to the Debtors, the chapter 11 trustee, the official committees appointed in these cases or in relation

-13-

to the Reorganization Cases under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, shall file and serve an application for allowance of final compensation for services rendered and reimbursement of expenses incurred on or before the Consummation Date in or in connection with the Reorganization Cases (each, an "Application"), on each of the persons entitled to notice pursuant to this Court's Case Management Order, on or before forty-five days after the Consummation Date.

30.    Each Application shall comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, United States Trustee Guidelines and the orders of this Court in these cases, and shall set forth, among other things, in reasonable detail, (a) the name and address of the applicant; (b) the nature of the professional or other services rendered and expenses for which reimbursement is requested for all periods from the date the particular applicant was retained through the Consummation Date; (c) the amount of compensation and reimbursement of expenses requested;  (d) whether any payments have been received on account and, if so, the amount or amounts thereof; (e) the amount of any success fee or premium requested and the basis therefor; and (f) the amounts of compensation and reimbursement of expenses previously allowed by this Court, or the Bankruptcy Court, if any.

31.    Counsel for Toy Biz are directed to serve, no more than twenty (20) days after the deadline for the filing of fee applications, upon all persons entitled to notice pursuant to the Case Management Order, a notice setting forth the amount of fees and disbursements requested by each applicant who filed an Application, a deadline for filing objections thereto and the date, time and place of the hearing to consider the Applications and objections.

-14-

Objections, if any, to any Application shall be in writing, shall set forth with specificity the basis of the objection, shall state whether the objector is a holder of a Claim against or Equity Interest in the Debtors, and shall be served on the applicant whose Application is the subject of the objection and on the parties entitled to notice pursuant to paragraph 34 hereof by first class mail, personal service or express overnight delivery, and be filed with the Court so as to be received at least five Business Days prior to any hearing scheduled by this Court with respect thereto.

32.   Within ten (10) Business Days after the Consummation Date, or within such further time as this Court may allow, Newco (or its authorized representative) is directed to mail to all known holders of Claims and Equity Interests and all persons and entities that have filed notices of appearance in these cases as of the date of this order notice of the entry of this order, notice of the name and address of the Litigation Trustees so that any Beneficiary may communicate with the Litigation Trustees about changes of address or other matters, and notice of the deadlines for filing Administration Expense Claims and claims for "cure" amounts.  Notice of the entry of this order and of such deadlines shall also be published once in The Wall Street Journal (national edition), within ten (10)  Business Days after the Consummation Date.

33.   The deadline for filing Administration Expense Claims  and claims for "cure" amounts against the Debtors, their estates or properties, exclusive of fee claims pursuant to paragraph 29 hereof and Administration Expense Claims incurred in the ordinary course of business, shall be sixty (60) days after the Consummation Date, at 5:00 p.m. Delaware time.  The proofs of claim for Administration Expense Claims and "cure" amounts

-15-

must be filed with this Court and received by counsel to Toy Biz by or before that date and time, or the Debtors, the Reorganized Debtors, Newco and the property of same shall have no liability with respect to such Claims.

34. Unless otherwise provided in this Confirmation Order or the Plan Documents, any notice provided in these cases after the Consummation Date shall be limited to (a) entities directly affected by the relief requested, (b) counsel to Toy Biz, (c) counsel to the Secured Lenders, and (d) counsel to the Trustee; provided, however, that notice of objections to claims and responses thereto shall also be provided to counsel to the Creditors Committee.

35. Notwithstanding anything else contained herein to the contrary, any person or entity entitled to receive distributions pursuant to the Fourth Amended Plan may, at any time during the thirty (30) days following the Consummation Date, notify the Disbursing Agent and Newco c/o Battle Fowler LLP, 75 East 55th Street, New York, New York 10021, attention: Douglas L. Furth in writing that it will not accept such distributions and such person or entity will no longer be bound by the provisions of Section 12.2(b) of the Fourth Amended Plan.

36. The provisions of this Confirmation Order are integrated with each other and are non-severable and mutually dependent.

37. On the Consummation Date, all committees appointed in the Reorganization Cases pursuant to section 1102 of the Bankruptcy Code are dissolved except to the extent otherwise provided in Section 6.16 of the Fourth Amended Plan.

-16-

38.   On the Consummation Date, John J. Gibbons shall be, and he hereby is,
terminated and discharged as Trustee for the Debtors pursuant to section 1105 of the
Bankruptcy Code.  Notwithstanding the foregoing, the Trustee shall complete all required
reports concerning his activities as Trustee and may continue to retain any professional
previously retained by him in order to assist him in completing such reports.  Newco may, in
its sole and absolute discretion, retain any professionals retained by the Trustee in order to
perform services for Newco and such retention shall in no way prejudice the right of such
professional to be compensated for services rendered to the Trustee

Dated:        Wilmington, Delaware
              July 31, 1998


                                        _____
                                        UNITED STATES DISTRICT JUDGE


Consented and Agreed:

THE SECURED LENDERS

WACHTELL, LIPTON, ROSEN, KATZ
  Attorneys for the Secured Lenders
51 West 52nd Street
New York, NY 10019
(212) 403-1000

      -and-

RICHARDS, LAYTON & FINGER, P.A.
  Attorneys for the Secured Lenders
One Rodney Square
Wilmington, Delaware 19899
(302) 658-6541

                           -17-

By:_____

TOY BIZ, INC.

BATTLE FOWLER LLP
  Attorneys for Toy Biz, Inc.
75 East 55th Street
New York, NY 10022
(212) 856-7000

        -and-

PEPPER HAMILTON LLP
1201 Market Street
Wilmington, Delaware 19899
(302) 777-6500

By:_____

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

WILLKIE FARR & GALLAGHER
  Attorneys for the Official Committee of Unsecured Creditors
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

        -and-

FERRY & JOSEPH, P.A.
  Attorneys for the Official Committee of Unsecured Creditors
824 Market Street
Suite 904
P.O. Box 1351
Wilmington, DE 19899
(302) 575-1555

  By:_____

-18-

JOHN J. GIBBONS, chapter 11 trustee for the Debtors

GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE
  Attorneys for John J. Gibbons, the Chapter 11 Trustee
One Riverfront Plaza
Newark, NJ 07012
(973) 596-4500

        -and-

CONNOLLY, BOVE, LODGE & HUTZ
 Attorneys for John J. Gibbons, the Chapter 11 Trustee
1220 Market Street
P.O. Box 2207
Wilmington, DE 19899-2207
(302) 658-9141

By:_____


THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

ADELMAN LAVINE GOLD AND LEVIN,
 a Professional Corporation
 Attorneys for the Official Committee of Equity Security Holders
1900 Two Penn Center Plaza
Philadelphia, PA 19102-1799
(215) 568-7515

        -and-

DUANE, MORRIS & HECKSCHER
 Attorneys for the Official Committee of Equity Security Holders
1201 Market Street, Suite 1500
Wilmington, DE 19801
(302) 571-5560


By:_____


LASALLE NATIONAL BANK, AS SUCCESSOR INDENTURE TRUSTEE

CHAPMAN AND CUTLER
 Attorneys for LaSalle National Bank, as Successor Indenture Trustee
111 West Monroe Street
Chicago, IL 60603
(312) 845-3000

        -and-

-20-

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
  Attorneys for LaSalle National Bank, as Successor Indenture Trustee
919 Market Street, 10th Floor
Wilmington, DE 19801
(302) 426-1189

By:_____


HIGH RIVER LIMITED PARTNERSHIP AND
WESTGATE INTERNATIONAL L.P.

BERLACK, ISRAELS & LIBERMAN LLP
  Attorneys for High River Limited Partnership and Westgate
  International L.P.
120 West 45th Street
New York, NY 10036
(212) 704-0100

        -and-

PHILLIPS GOLDMAN & SPENCE, P.A.
  Attorneys for High River Limited Partnership and Westgate
  International L.P.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200

By:_____


-21-

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, IVAN SNYDER and　　　:
JAMES A. SCARPONE, as TRUSTEES OF　　:
THE MAFCO LITIGATION, and as　　　　　:
SUCCESSORS IN INTEREST TO MARVEL　　:
ENTERTAINMENT GROUP, INC. et al.,　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiffs,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　v.　　　　　　　　　　　　　:　　C. A. No. 97-586-KAJ
RONALD O. PERELMAN, MAFCO　　　　　　:
HOLDINGS INC., MacANDREWS &　　　　　:
FORBES HOLDINGS INC., ANDREWS　　　　:
GROUP INC., WILLIAM C. BEVINS and　　　:
DONALD G. DRAPKIN,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　Defendants.　　　　　　　　:

### Expert Report of Lawrence A. Hamermesh

1.   I am the Ruby R. Vale Professor of Corporate and Business Law at Widener University School of Law in Wilmington, Delaware, and currently serve as Visiting Professor at the University of Pennsylvania Law School. At the request of counsel for the defendants in this proceeding, I have reviewed the question of the scope of the authority of the board of directors of Marvel Entertainment Group, Inc. ("Marvel") to issue stock of Marvel, or options to acquire such stock, sufficient to reduce the ownership of such stock by the Marvel Holding Companies[1] to less than a majority of Marvel's outstanding voting stock.  This question implicates important policies governing the ownership and control of corporations, which policies (as expressed and understood at the time relevant to the events at issue in this proceeding) I review below.  That review proceeds from the perspective of law and policy prevailing as of the period from 1993 to 1996.

2.   My qualifications to engage in that review are summarized below and set out in more detail in my resume attached as Exhibit A.  I have been a professor at Widener since 1994 and I have taught classes in business organizations, corporate finance, securities regulation, mergers and acquisitions and equity/equitable remedies.  I serve as Director of the Widener Law School Institute of Delaware Corporate Law and serve as an advisor for the Delaware Journal of Corporate Law.  In Spring 2004, I was a Visiting

---

[1] The Marvel Holding Companies are Marvel Holdings Inc., Marvel (Parent) Holdings Inc., and Marvel III Holdings Inc.

1

Professor at the University of Pennsylvania Law School and in Winter 2002, I was a Visiting Professor at the University of Michigan Law School.

3.    I received my J.D. from Yale Law School in 1976.  Following law school, I was a practicing attorney at Morris, Nichols, Arsht & Tunnell in Wilmington, Delaware, where I was an associate from 1976 to 1984, and a partner from 1985 to 1994.  At Morris Nichols, my practice focused on counseling companies, and their officers and directors on areas of corporate governance.  I also litigated cases raising corporate governance issues, including class actions and derivative actions concerning the role of directors of companies and the fiduciary duties of those directors.  I was Delaware counsel in a number of noteworthy cases concerning corporate governance, including *Revlon*, *Viacom*, *Phillips Petroleum* and *Time, Inc.*

4.    I have also participated in task forces and written and spoken extensively on the role of directors and what and on whom a director can reasonably rely on in the course of meeting his or her fiduciary obligations to a company and its shareholders.  For example, in 2002 and 2003 I served as the Reporter for the ABA's Task Force on Corporate Responsibility.  I was the principal drafter of the Task Force's preliminary and final reports.  More recently, I was appointed as a commissioner on the National Association of Corporate Directors Blue Ribbon Commission on Implementing the Authority of the Empowered Board – Going Beyond Compliance, a group of about 25 individuals consisting primarily of inside and outside counsel and corporate directors.  I have also written a number of law review articles concerning the role of board members.

5.    I have also participated in drafting legislation relating to corporate governance.  In 2001, I was appointed by the ABA Section of Business Law to its Committee on Corporate Laws.  In the last few years I have chaired the Committee's Task Force on Articulation of Director Duties, whose work has led to the recent promulgation of an extensive set of amendments to the provisions of the Model Business Corporation Act addressing director oversight and other director responsibilities.  I have served since 1995 as a member of the Council of the Corporation Law Section of the Delaware State Bar Association, on which I served as Chair from 2002 until 2004.  The Council has primary responsibility for reviewing, drafting and proposing amendments to the Delaware General Corporation Law.

6.    In addressing the policies pertinent to the question of board authority to issue equity (stock or stock options) sufficient to eliminate a majority stockholder's status as such, I begin by observing that majority stock ownership is widely regarded – and certainly regarded by the policies of Delaware corporate law – as uniquely valuable.  *See, e.g., Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42-43 (Del. 1994).  The value of that control, moreover, for good reasons of policy aimed at promoting the free flow of capital and the market for corporate control, is considered to belong to the holder of a majority voting stock interest in a corporation.  *See Mendel v. Carroll*, 651 A.2d 297, 305 (Del. Ch. 1994) ("The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders

2

of a control premium," but noting limitations, such as negligence doctrine, on the majority stockholder's ability to sell control).

7.  Consistent with the unique value attaching to ownership of a majority voting stock interest in a corporation, the holder of such an interest is acknowledged to be entitled to take extraordinary steps to protect that interest against efforts by the board of directors to issue insufficient shares to eliminate that majority voting power.  Thus, for example, the owner of a majority voting block has been found entitled to adopt a by-law requiring unanimity as a requirement for action by the board of directors – an extraordinary requirement by normal standards of corporate practice, but a requirement that was found justified because of the possibility that, absent the requirement, a board of directors might use its formal power to issue shares so as to eliminate the owner's existing majority voting control.  *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401 (Del. 1985) ("the EAC bylaw amendments were a permissible part of EAC's attempt to avoid its disenfranchisement as a majority shareholder … .").

8.  Also consistent with the unique value attaching to ownership of a majority voting stock interest in a corporation, and consistent as well with the validation of strong measures by the holder of such an interest to protect its majority position, it is also widely acknowledged that a board of directors may not, except in extreme circumstances not yet encountered in judicial opinions, issue shares sufficient to deprive a stockholder of its majority control position, absent the majority stockholder's own consent to such an action.  This policy has been applied in a variety of contexts:

   a.    It is settled policy of Delaware corporate practice and law that directors may not issue shares to deprive a majority stockholder of control for the purpose of protecting their own positions as directors. *E.g., Mendel v. Carroll*, 651 A.2d at 304, *citing Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del. Ch. 1967), and *Canada Southern Oils, Ltd. v. Manabi Exploration Co.*, 96 A.2d 810 (Del. Ch. 1953) ("Surely if the principal motivation for such dilution is simply to maintain corporate control ("entrenchment") it would violate the norm of loyalty.").

   b.    It is similarly settled policy of Delaware corporate practice and law that directors have no obligation to issue shares to deprive a majority stockholder of control for the purpose of promoting a sale of control to a third party on terms which they believe, even in good faith, to constitute a valuable transaction for the corporation and its other stockholders, where the majority stockholder opposes the transaction. *E.g., Mendel v. Carroll*, 651 A.2d at 306; *Freedman v. Restaurant Associates Indus., Inc.*, 1987 WL 14323 (Del. Ch. Oct. 16, 1987).

9.  Accordingly, it is generally recognized in the 1993-1996 time period that directors cannot, consistent with their obligations as directors, seek to eliminate a majority stockholder's control through the issuance of shares, in the absence of some circumstance in which such an issuance would be necessary to protect the corporation

3

and its stockholders from exploitation or breach of fiduciary duty by the majority stockholder. *Mendel v. Carroll*, 651 A.2d at 306. Indeed, it has been suggested that directors defending such an issuance would have a "heavy burden" of demonstrating the existence of such a justifying circumstance. *Id.* at 306 n. 20. And the indication that the directors would bear a "heavy burden" is drawn from an opinion describing that burden as one of demonstrating that a "compelling justification" exists warranting the board's action. *Blasius Indus. v. Atlas Corp.*, 564 A.2d 651, 661 (Del. Ch. 1988). To my knowledge, no judicial opinion has yet found the existence of such a justification for the issuance of shares for the purpose of eliminating the majority control position of an existing stockholder. In my view, moreover, the concept of "compelling justification" precludes such an issuance of shares unless the directors can demonstrate that there is no other, less drastic measure to accomplish the same compelling corporate goal.

10. In light of these policies, the practice and effect of Delaware corporate law as of the period from 1993 to 1996 largely duplicated the indirect effect of Section 4.09(a) of the indentures limiting Marvel's ability to issue shares to reduce the Marvel Holding Companies' ownership of Marvel voting stock to less than a majority, assuming for purposes of argument that such restriction could or would have bound Marvel. That provision, therefore, did not in any significant way, if at all, prevent Marvel and its board of directors from engaging in an issuance of equity securities that they otherwise would have been permitted to accomplish under governing Delaware corporate law and policy.

                                                    _____
                                                    Lawrence A. Hamermesh

DATED:        January 13, 2006

**4**

Exhibit A

**LAWRENCE A. HAMERMESH**
**Widener University School of Law**
**4601 Concord Pike, P.O. Box 7474**
**Wilmington, Delaware 19803-0474**
Phone: (302) 477-2132
Fax: (302) 477-2257
E-mail: Lawrence.A.Hamermesh@law.widener.edu

**PERSONAL DATA:**
Home address:
   126 Hitching Post Drive
   Wilmington, Delaware 19803
Date of birth: June 14, 1952
Married: August 7, 1983, to Marion Yager Hamermesh
Children: Simon E., born 1984; Naomi Kate, born 1987

**EDUCATION AND CAREER HISTORY:**

**Admitted to the Delaware Bar, 1976; United States Supreme Court, 1999**

**Ruby R. Vale Professor of Corporate and Business Law, Widener University School of Law**
- 1994–present, teaching business organizations, corporate finance, securities regulation, mergers and acquisitions, professional responsibility, equity/equitable remedies
- Director, Widener Law School Institute of Delaware Corporate Law
- Adviser, Delaware Journal of Corporate Law

**Visiting Professor, University of Michigan Law School, Winter 2002**
**Visiting Professor, University of Pennsylvania Law School, Spring 2004, Spring 2006**

**Morris, Nichols, Arsht & Tunnell**, Wilmington, Delaware
- Associate, 1976-1984
- Partner, 1985-1994

**Yale Law School**
- J.D., 1976
- Barristers' Union (trial practice) participant
- Yale Legislative Services

**Haverford College**
- B.A., 1973
- National Merit Scholar
- Magna cum laude, political science
- Phi Beta Kappa
- 1971-1972, study at the University of Edinburgh, Edinburgh, Scotland

**Other Professional Qualifications and Background Information:**

Member, American Law Institute (elected 1999)

Member, Council of the Corporation Law Section of the Delaware State Bar Association,
     1995 to present; Vice Chair, 2000-2002; Chair, 2002-2004

Member, Corporate Laws Committee, American Bar Association Business Law
     Section, 2001-

Reporter, ABA Task Force on Professional Responsibility (2002-2003)

2004 Daniel L. Herrmann Professional Conduct Award, Delaware State Bar Association

Secretary, Delaware Board of Bar Examiners, 1983-1987

Member, National Association of Corporate Directors Blue Ribbon Commission on Implementing the Authority of the Empowered Board, 2005

Editorial Advisory Board, The Business Lawyer (2005- )

Treasurer, Delaware Volunteer Legal Services, Inc., 1991-2000
Chairman, Lawyer Referral Service Committee of the Delaware State Bar Association, 1993-1998, 2001-

Lecturer, University of Pennsylvania Law School, mergers and acquisitions, 1991-1993

## Areas of Private Legal Practice

Corporate counseling:   interpretation of and opinions concerning the Delaware General Corporation Law relating to mergers, dividends, meetings of stockholders, stock issuances, rights of preferred stockholders, corporate powers and authority, dissenters' rights, amendments to the certificate of incorporation and other corporate issues

Corporate litigation: primarily in the Delaware Supreme Court and Chancery Court
     (i)    defense of stockholder derivative and class actions based on alleged breaches of director and controlling stockholder fiduciary duties
     (ii)   prosecution and defense of corporate stock valuation (dissenters' rights) litigation (for Salomon Brothers Inc, Bear Stearns & Co., Getty Oil Co., among others)

(iii)   takeover-related litigation (preliminary injunction and other challenges to defensive actions allegedly in violation of fiduciary duties; stockholder election review proceedings; actions claiming violation of disclosure obligations under the federal securities laws)

Participated in such litigation as Delaware counsel to:
- Viacom, Inc. (in connection with merger with Paramount Communications, Inc.)
- Time, Incorporated (in connection with tender offer by Paramount Communications, Inc.)
- Stanley Stahl (in connection with the acquisition of Apple Bancorp, Inc.)
- Revlon, Inc. (in connection with the acquisition by Pantry Pride, Inc.)
- Phillips Petroleum Co. (in connection with the tender offer by Mesa Petroleum Co.)
- Consolidated Gold Fields (in connection with the tender offer by Ivanhoe Partners for Newmont Mining Corp.)

**PUBLISHED WRITINGS** (partial list)

*The Fair Value of Cornfields in Delaware Appraisal Law*, Journal of Corporation Law (forthcoming 2006) (with Michael Wachter)

*Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Business Lawyer 865 (2005) (with A. Gilchrist Sparks III)

*Premiums in Stock for Stock Mergers and Some Consequences in the Law of Director Fiduciary Duties*, 152 University of Pennsylvania Law Review 881 (2003)

*The ABA Task Force on Professional Responsibility and the 2003 Changes to the Model Rules of Professional Conduct*, 17 Georgetown Journal of Legal Ethics 35 (2003)

*Corporate Responsibility in Real Time: The Work (So Far) of the ABA Task Force on Corporate Responsibility*, 21 Delaware Lawyer 18 (Spring 2003)

*A Kinder, Gentler Critique of* Van Gorkom *and its Less Celebrated Legacies*, 96 Northwestern Law Review 595 (2002)

*Why I Do Not Teach* Van Gorkom, 34 Georgia Law Review 477 (2000)

*Corporate Democracy and Stockholder-Adopted By-Laws: Taking Back the Street?*, 73 Tulane Law Review 409 (December 1998)

Recipient of Volume 73 John Minor Wisdom Award for Academic Excellence in Legal Scholarship; selected as one of the ten best corporate and securities articles of 1999, 41 Corporate Practice Commentator 1453-1454

*Calling Off the* Lynch Mob: *The Corporate Director's Fiduciary Disclosure Duty*, 49 Vanderbilt Law Review 1087 (October 1996)

*Common Law Duties of Non-Director Corporate Officers* (with A. Gilchrist Sparks, III), 48 BUS. LAWYER 215 (1992)

"Appraisal Rights," chapter 36 of Drexler, Black and Sparks, DELAWARE CORPORATION LAW AND PRACTICE (Matthew Bender 1986)

"Defensive Techniques in Proxy Contests," Review of Securities & Commodities Regulation, May 23, 1990

"The Director as Auctioneer - A Role of Choice, Not a Rule of Law," Directors and Boards (Winter 1987)

"The Reliance on Counsel Defense," Review of Securities and Commodities Regulation, December 18, 1985

"Going Private Mergers After UOP," Review of Securities and Commodities Regulation, March 23, 1983

*Recent Continuing Legal Education Programs* (accompanying written materials in parentheses):

Third Circuit Judicial Conference, Nov. 2003 (Philadelphia), The Current Crisis in Corporate Governance

Federalist Society, 7th Annual Corporate Governance Conference, Sep. 24, 2003 (New York), Director Independence

ABA Section of Business Law, May 2003 (Washington, D.C.), Sarbanes-Oxley Revolution in Disclosure and Corporate Governance, New Corporate Governance Regime

Glasser LegalWorks 21st Annual Institute on Federal Securities, Feb. 2003 (Miami)

Practising Law Institute, The New Disclosure & Corporate Governance Regime (Oct. 2002) (Lawyer Responsibilities in the New Disclosure & Corporate Governance Regime)

Valuation Practice in Delaware, Seminar on Current Delaware Corporate Litigation and Transactional Problems, 2002, New York, New York ("Stand Clear of the Closing Doors: Obstacles to Judicial Valuation Under Delaware Law")

13th Annual Tulane Corporate Law Institute, Corporate Law Developments, 2001 ("Recent Delaware Corporate Law Cases," with David C. McBride and Christian Douglas Wright)

Stockholder-Adopted By-Laws After *Fleming*, Committee Forum of the Committee on Business and Corporate Litigation, Business Law Section, American Bar Association, Atlanta, Georgia (moderator and program chair)

The Next Century of Corporate Law: A Symposium on the Centennial of the Delaware General Corporation Law, Wilmington, Delaware 1999

## EXPERT WITNESS AND *AMICUS CURIAE*

*In re Request of the Governor*, 722 A.2d 307 (Del. 1998) (appointed by the Court *pro bono publico* to advocate on appointments clause of the State Constitution)

*Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039 (Del. 1996) (appointed by the Court to advocate on class action attorneys' fee award)

*California Public Employees Retirement System v. Felzen, et al.*, 119 S.Ct. 720, 142 L.Ed.2d 766 (1999) (*amicus curiae* in support of petitioner on issue of appellate standing in stockholder derivative actions)

*Worldspan, L.P. v. Abacus Distribution Systems Pte Ltd, et al.*, International Chamber of Commerce, International Court of Arbitration Case No. 9833/FMS (expert witness on fiduciary responsibilities of partners in a Delaware limited partnership)

*AMP Inc. v. Allied Signal, Inc.*, C.A. Nos. 98-4405, 98-4053, 98-4109 (E.D.Pa. 1998) (expert witness on fiduciary responsibilities under Delaware law of bidder officers and directors as directors of target corporation)

*Onti, Inc. v. Integra Bank*, 751 A.2d 904, 931-32 (Del. Ch. 1999) (expert witness on valuation of contingent claims including shareholder derivative claims)

*In the Matter of Banc of America Capital Management, LLC, et al.* and *In the Matter of Columbia Management Advisors, Inc.* (Securities and Exchange Commission, 2005) (appointment as independent distribution consultant in connection with mutual fund settlements)

## OTHER AFFILIATIONS

ACLU Delaware, Inc., director (President, 1996-2003); representative to the National Board of Directors 2004 —

Wilmington Community Orchestra, violin

# EXHIBIT 4

Cantor, et al.
Lawrence Hamermesh, Esquire

v.
C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, IVAN SNYDER and          )
JAMES A. SCARPONE, as TRUSTEES OF       )
THE MAFCO LITIGATION, and as            )
SUCCESSORS IN INTEREST TO MARVEL        )
ENTERTAINMENT GROUP, INC., et al.,      )
                                        )
         Plaintiffs,                    )
                                        ) Civil Action
    v.                                  ) No. 97-586-KAJ
                                        )
RONALD O. PERELMAN, MAFCO               )
HOLDINGS INC., MacANDREWS &             )
FORBES HOLDINGS INC., ANDREWS           )
GROUP INC., WILLIAM C. Bevins and       )
DONALD G. DRAPKIN,                      )
                                        )
         Defendants.                    )

          Deposition of LAWRENCE A. HAMERMESH, ESQUIRE
taken pursuant to notice at the law offices of
Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney
Square, 7th Floor, Wilmington, Delaware, beginning at
8:36 a.m., on Monday, May 8, 2006, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:

          EDWARD A. FRIEDMAN, ESQ.
          EMILY A. STUBBS, ESQ.
          FRIEDMAN KAPLAN SEILER & ADELMAN LLP
            1633 Broadway
            New York, New York  10019-6708
            For the Plaintiffs

                WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Cantor, et al.                                    v.                              Perelman, et al.
Lawrence Hamermesh, Esquire              C.A. # 97-586-KAJ                        May 8, 2006

Page 2

1   APPEARANCES: (Cont'd)
2        THOMAS J. ALLINGHAM, II, ESQ.
         BRIAN G. LENHARD, ESQ.
3        SKADDEN ARPS SLATE MEAGHER & FLOM LLP
         One Rodney Square - 7th Floor
4        Wilmington, Delaware  19801
         For the Defendants
5
    ALSO PRESENT:
6        LINDSAY DuPHILY - VIDEOTAPE OPERATOR
         DISCOVERY VIDEO SERVICES
7
8             - - - - -
9        THE VIDEOTAPE OPERATOR:  This is the
10  videotape deposition of Mr. Lawrence A. Hamermesh
11  taken by the plaintiff in the matter of Ronald Cantor,
12  Plaintiffs, versus Ronald O. Perelman, Civil Action
13  No. 97-586.
14        This deposition is being held in the
15  offices of Skadden, Arps, Slate, Meagher & Flom,
16  Wilmington, Delaware.  We are going on the record at
17  approximately 8:36 a.m. on May 8, 2006.
18        The court reporter is Kurt Fetzer from the
19  firm of Wilcox & Fetzer, Wilmington, Delaware.
20        My name is Lindsay DuPhily and I'm the
21  videotape specialist of Discovery Video Services in
22  association with Wilcox & Fetzer.
23        Counsel will now introduce themselves and
24  then the court reporter will swear in the witness.

Page 3

1        MS. STUBBS:  Emily Stubbs of Friedman,
2   Kaplan, Seiler & Adelman for plaintiffs.
3        MR. FRIEDMAN:  Ed Friedman with Ms. Stubbs
4   for plaintiffs.
5        MR. ALLINGHAM:  Tom Allingham of Skadden,
6   Arps, Slate, Meagher & Flom for the defendants.
7        MR. LENHARD:  Brian Lenhard with Skadden,
8   Arps for the defendants.
9             - - - - -
10       LAWRENCE A. HAMERMESH, ESQUIRE
11       the deponent herein, having first been
12       duly sworn on oath, was examined and
13       testified as follows:
14            EXAMINATION
15  BY MS. STUBBS:
16       Q.  Good morning.  My name is Emily Stubbs, as you
17  know.  I represent the plaintiffs in this action,
18  which are the trustees of the MAFCO Litigation Trust.
19       You understand that you are being offered
20  as an expert witness by the defendants in this matter?
21       A.  I do.
22       Q.  Is there any reason why you will not be able to
23  answer my questions fully, accurately and truthfully
24  today?

Page 4

1        A.  It depends on the question.  Generally, no.
2        Q.  Okay.  Do you prefer to be called Mister or
3   Professor?
4        A.  Mister is fine.
5        Q.  Okay.
6             MS. STUBBS:  I would like to ask the court
7   reporter to mark as Exhibit No. 1 the expert report of
8   Lawrence A. Hamermesh.
9             (Hamermesh Deposition Exhibit No. 1 was
10  marked for identification.)
11  BY MS. STUBBS:
12       Q.  Mr. Hamermesh, is this a copy of the expert
13  report that you submitted in this matter?
14       A.  It looks like it, yes.
15       Q.  If you could, could you turn to Exhibit A to
16  your expert report, Exhibit 1?  And just tell me, is
17  the education set forth on Exhibit A correct?
18       A.  Yes.  I think so.
19       Q.  How about the employment history, is the
20  employment history set forth on Exhibit A to your
21  report correct?
22       A.  I believe so.
23       Q.  If you would, would you please turn to the last
24  page of Exhibit A where it says Expert Witness And

Page 5

1   Amicus Curiae?  It looks like there are three cases
2   here that you have testified as an expert witness, the
3   Worldspan, AMP and Onti cases.  Is that correct?
4        A.  Let's see.  That's right.  Those listed here,
5   those are the three in which I testified as an expert,
6   right.
7        Q.  And other than as set forth on Exhibit A to
8   your report, are there cases where you gave testimony
9   by deposition or at trial as an expert witness within
10  the last four years?
11       A.  If you extend that to include testimony at
12  arbitration, the answer is yes.  I testified in an
13  arbitration in Switzerland in the summer of 2004.
14       Q.  Can you tell me the name of that case?
15       A.  It involved an Enron affiliate and the opposing
16  party was named Sarlux, I believe, S-a-r-l-u-x.
17       Q.  Okay.  And did you testify at the arbitration?
18       A.  I did.
19       Q.  And you gave a deposition as well?
20       A.  No.
21       Q.  And what was the subject matter of your
22  opinion?
23       A.  It was -- it had to do with the question of
24  interpreting the term ownership in a joint venture

2 (Pages 2 to 5)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 6

1   agreement because the question was ownership through a
2   chain of Delaware entities and it was important to the
3   arbitrators to understand the character of these
4   Delaware entities and the ownership rights and so
5   forth attaching to various interests in those
6   entities. And that's what I testified about.
7   Q.   And what was your opinion in that matter?
8   A.   It was pretty wide ranging. I'm not sure I can
9   reduce it to a nutshell, but the essence of it was
10  that, the thrust of it was that ownership was not
11  established where, among other things, a certificate
12  of ownership or something styled that way in a
13  Delaware statutory trust was equivalent to debt and
14  that the existence of that certificate of beneficial
15  interest did not defeat Enron's 100 percent ownership
16  of the shares of the company that was the joint
17  venture or that was in the joint venture rather.
18  Q.   And concentrating on the cases, the Worldspan
19  case, the AMP case and the Onti case, did you provide
20  testimony by deposition or at trial in those cases?
21  A.   Onti, both. Worldspan, neither. AMP, neither.
22       The Worldspan and AMP were by affidavit.
23  Q.   What was the opinion you expressed in each of
24  the three cases, Worldspan, AMP and Onti?

Page 7

1   A.   I can't do Worldspan justice at this point.
2   The broad subject matter was a question of fiduciary
3   duties owing to the limited partners of a Delaware
4   limited partnership, but the context I just can't
5   really bring up fully today.
6        AMP versus Allied-Signal was a case in
7   which the issue was the fiduciary duty of directors or
8   those nominees of the bidder were they to be elected
9   to the board of a target company. It says it there,
10  now that I look at it.
11       And Onti was a question of the appropriate
12  way to value, place a value on claims that could have
13  been brought derivatively on behalf of the corporation
14  where the valuation issue arose in the context of a
15  going-private merger.
16  Q.   Okay. But what was the opinion? That sounds
17  like you gave me the context.
18       But what was the opinion that you
19  expressed?
20  A.   Well, let me edge up to it this way. There
21  were two aspects of valuation of claims in that case.
22  One -- actually, it was claims potentially against the
23  corporation I believe on a debt instrument and placing
24  some sort of contingent or settlement value on that

Page 8

1   claim and placing contingent or settlement value on
2   claims of breach of fiduciary duty against a
3   controlling person of the company.
4        The opinion or testimony I gave was sort
5   of long and drawn-out and fairly detailed about the
6   various issues arising with respect to this claim of
7   breach of fiduciary duty and in the vernacular sort of
8   my handicapping of those claims and trying to assess
9   their settlement value. I don't remember the precise
10  number I put on it, but that was the gist of it.
11  Q.   And for AMP?
12  A.   That's what I explained before. What my
13  opinion was?
14  Q.   Yes, what your opinion was.
15  A.   Sorry. What my opinion was was the nominees
16  submitted by a bidder corporation for election as
17  directors of the target would if elected have
18  continuing obligations to the bidder insofar as they
19  were directors and officers of the bidder and could
20  not shed or ignore those duties simply by entering the
21  boardroom of the target company's board once elected.
22  Q.   If you turn back two pages in Exhibit A to your
23  report, there's a list that says Published Writings
24  (partial list)?

Page 9

1   A.   Right.
2   Q.   And what I would like to know is does this list
3   include all publications that you authored within the
4   ten years preceding the date of your opinion in this
5   case?
6   A.   The date of what? I'm sorry.
7   Q.   Ten years preceding the date of your opinion in
8   this matter.
9   A.   No.
10  Q.   How did you decide which of the publications
11  you authored in the last ten years would be listed?
12  A.   I tried to put everything that I considered
13  substantial in there. One area in which it's
14  incomplete is with respect to a couple of articles
15  that were in various stages of completion. I do have
16  "The Fair Value of Cornfields" as forthcoming because
17  that had been accepted for publication by a law
18  review.
19       And there is at least one other which I
20  think has now just been published in the Washburn Law
21  Review on generally the subject of Smith vs. Van
22  Gorkom again. And I had a short article in the
23  Delaware Journal of Corporate Law which was just
24  published. It was really an acceptance speech for my

Cantor, et al.                                          v.                              Perelman, et al.
Lawrence Hamermesh, Esquire        C.A. # 97-586-KAJ                        May 8, 2006

Page 10

1  professorship that I gave last year.
2        But generally I try not to put in short
3  articles or op-ed kind of things that I have done, not
4  that there have been that many.
5    Q.  But there are some short articles that you have
6  authored within the past ten years that are not
7  included on this list.  Is that correct?
8    A.  I believe so.
9    Q.  When was the last time you reviewed your
10  report?
11    A.  This morning.
12    Q.  And the opinions that you express in the report
13  are the opinions that you will testify to at trial.
14  Is that correct?
15    A.  If called, yes.
16    Q.  Are there any other opinions you're planning to
17  testify to at trial?
18    A.  Not that I know of.
19    Q.  Is there anything you think is incorrect in
20  your report?
21    A.  Incorrect?  No.
22    Q.  Do you plan to do any additional work in
23  connection with this litigation before trial?
24    A.  I don't plan to.  It's possible, but I don't

Page 11

1  plan to.
2    Q.  How much are you being paid?
3    A.  I'm paid at the rate of $400 per hour.
4    Q.  And what's the total number of hours you have
5  spent on this assignment so far?
6    A.  Not a lot.  I didn't look that up and I don't
7  remember.  It's a fairly small number.
8    Q.  So your total compensation is what you're
9  referring to now?
10    A.  Or hours, whichever way.  It's the same thing.
11    Q.  Who has paid you so far?
12    A.  I'm not sure anybody has paid me yet.
13    Q.  Please tell me what documents or other
14  materials you considered in preparation of your
15  report.
16    A.  Well, let's see.  In preparing my report I
17  looked at some case law, including the cases that are
18  cited in the report.
19        I looked at an excerpt from the notes
20  prospectuses, one of the notes prospectuses, and
21  reviewed the opinion of the Third Circuit in this
22  matter and a brief in the Third Circuit prepared by
23  the defendants.
24    Q.  Is that a complete list of the documents you

Page 12

1  reviewed in connection with this matter?
2    A.  It's what I can come up with right now.  There
3  may have been one or two others, but that's all I can
4  remember.
5        MS. STUBBS:  Tom, we request that a
6  complete list of materials considered be provided.
7        MR. ALLINGHAM:  Okay.
8  BY MS. STUBBS:
9    Q.  Were there any communications with Skadden
10  lawyers in which information was provided to you that
11  you considered in the preparation of the report?
12    A.  The documents I just mentioned.
13    Q.  Any other oral communications in which
14  information was provided to you?
15    A.  Yes.  I'm sorry.  After I prepared my report —
16  are you talking about in preparation of the report or
17  after?
18    Q.  Anything you considered in the preparation of
19  your report.
20    A.  Okay.  I don't believe there was any — I don't
21  remember any information being supplied in connection
22  with the preparation of my report beyond what we have
23  already discussed.
24    Q.  When you said just a moment ago after you

Page 13

1  received some materials, what are you referring to?
2    A.  I'm referring to Justice Walsh's report.
3    Q.  I see.  But in preparation of your report here
4  which was obviously prepared before Justice Walsh's
5  report, you didn't consider that, correct?
6    A.  Right.  Right.  I'm not that good.
7    Q.  Right.  Of course.
8        Okay.  Did anyone help you in the drafting
9  of your report?
10    A.  No.
11        I should qualify that.  I mean, I
12  submitted a draft to counsel, to Mr. Allingham and
13  possibly also Mr. Whitney, if I remember right, and we
14  did discuss it.
15        So to the extent that's help, that's a
16  response, that's a responsive fact, but I did draft it
17  myself.
18    Q.  You didn't have any research associates help
19  you with the research?
20    A.  No.
21    Q.  If you would look at paragraph 1 of your
22  report.  In paragraph 1 you state that your review of
23  important policies governing the ownership and control
24  of corporations.  That's about three lines from the

4 (Pages 10 to 13)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 14

1    bottom.
2    **A. "This question implicates"?**
3    Q. Yes. It starts, the sentence starts with that.
4    And it says, "This question implicates important
5    policies governing the ownership and control of
6    corporations, which policies (as expressed and
7    understood at the time relevant to the events at issue
8    in this proceeding) I review below."
9        And then you say, "That review proceeds
10   from the perspective of law and policy prevailing as
11   of the period from 1993 to 1996."
12       In your opinion, is the law and policy
13   governing the ownership and control of corporations
14   prevailing in the period of 1993 to '96 different from
15   that prevailing in the period before 1993 or after
16   1996?
17       MR. ALLINGHAM: If the witness hasn't
18   offered an opinion on anything other than the
19   perspective of law and policy prevailing as of the
20   period from '93 to '96, why is that question
21   appropriate?
22       MS. STUBBS: I'm curious to know if he has
23   an opinion about it.
24       MR. ALLINGHAM: Curiosity is not an

Page 15

1    adequate reason for asking a question.
2        MS. STUBBS: Are you instructing the
3    witness not to answer?
4        MR. ALLINGHAM: Well, I haven't yet
5    instructed the witness not to answer, but I don't
6    understand why if there's no opinion expressed on that
7    matter it's an appropriate topic for deposition.
8        MS. STUBBS: He's an expert and he's
9    saying he's limited his review of the law to a certain
10   period of time and I would like to know if he has an
11   opinion as to whether or not the law is different
12   before and after.
13       MR. ALLINGHAM: Sure. But he's an expert
14   on lots of things on which he hasn't offered an
15   opinion today. And I don't think you have a right to
16   ask him a question unless you want to pay him.
17       MS. STUBBS: I think the question is
18   proper because the witness cites cases which are not
19   all in the period of 1993 to '96 and I think it's a
20   proper question for that reason.
21       I would like to know if you're going to
22   allow your witness to answer.
23       MR. ALLINGHAM: Sure.
24       THE WITNESS: I'm sorry. It's been a

Page 16

1    while.
2        MS. STUBBS: That's all right.
3        Could you read back the question, please,
4    reporter?
5        (The reporter read back the last
6    question.)
7        THE WITNESS: Let me break my answer down
8    into two parts like the question asks.
9        As far as the period after 1996 is
10   concerned, I have not formed an opinion about whether
11   the law and policy parallel to what I described for
12   the '93-96 period has changed or evolved at all.
13       As for the period before that, before
14   1993, I find it hard to respond to the question
15   because the law as it existed and the policy as I
16   think was inherent in the law during that three-to-
17   four-year period necessarily proceeded from the
18   development of the law before 1993.
19       If the question is did something happen in
20   1993 or the several years after that that represented
21   a break in the law before, not that I believe.
22   BY MS. STUBBS:
23   Q. So I think what you're saying is there was a
24   continuous development of the law before 1993. Is

Page 17

1    that correct?
2    **A. That's a fair statement.**
3    Q. Okay. Looking at paragraph 1, you state "At
4    the request of counsel for the defendants in this
5    proceeding, I have reviewed the question of the scope
6    of the authority of the board of directors of Marvel
7    Entertainment Group, Inc. ('Marvel') to issue stock of
8    Marvel, or options to acquire such sock, sufficient to
9    reduce the ownership of such stock by the Marvel
10   Holding Companies," which you define as Marvel
11   Holdings, Inc., Marvel (Parent) Holdings, Inc. and
12   Marvel III Holdings, Inc., "to less than a majority of
13   Marvel's outstanding voting stock."
14       Could you please tell me what is the scope
15   of the authority of the board of Marvel to issue stock
16   of Marvel?
17   **A. In the abstract as a matter of general law? Is**
18   **that the question?**
19   Q. You can start in the abstract and then with
20   respect to the conditions that existed in the time
21   period that you were considering.
22       MR. ALLINGHAM: I'm sorry. Would you read
23   the clarification back, please?
24       (The reporter read back as requested.)

Cantor, et al.                                    v.                    Perelman, et al.
Lawrence Hamermesh, Esquire          C.A. # 97-586-KAJ                May 8, 2006

Page 18

1     MR. ALLINGHAM: I object to the form of
2  the question.
3        THE WITNESS: In the abstract, boards of
4  directors of Delaware corporations have power to issue
5  shares or options to acquire shares of capital stock
6  at least to the extent of the number and kind of
7  shares authorized in the certificate of incorporation
8  subject to any number of potential limitations in the
9  form of preemptive rights or contractual limitations
10 or limitations of fiduciary duty.
11       And I'm not sure how to answer beyond
12 that.
13 BY MS. STUBBS:
14    Q.  I guess in terms of how to answer beyond that,
15 my question is: The question that you were reviewing
16 and answering for your report, is it different from
17 the answer that you just gave? That is, the answer to
18 the question that you are answering, how is that
19 different from the answer you gave in terms of the
20 general authority of the board?
21    A.  Well, the focus of the question I was asked to
22 review is really much more on the question of
23 fiduciary duty limitations on the ability of the
24 Marvel Entertainment board of directors to issue stock

Page 19

1  sufficient to reduce the holding companies' share
2  ownership below 50 percent. Whether there were other
3  limitations in the charter or in contracts I don't
4  know about, I have no opinion about or no knowledge
5  about.
6        The focus was simply the question is
7  fiduciary duty of the directors of Marvel
8  Entertainment in relation to the control position held
9  by the holding companies and the extent to which that
10 control position would limit the Marvel Entertainment
11 board of directors' ability to issue shares.
12    Q.  Other than the limitation that you just
13 mentioned vis-a-vis the control position of the
14 controlling shareholder, are you aware of other limits
15 on the authority of the Marvel board to issue shares?
16    A.  I'm not.
17    Q.  How about any case law, statutes, articles of
18 incorporation of Marvel or bylaws that would limit the
19 board of Marvel's authority to issue stock of Marvel?
20    A.  If there are limitations in that category, I'm
21 not aware of them.
22    Q.  In your opinion, how does the control position
23 of Marvel, of the Marvel Holding Companies limit the
24 Marvel board's ability to issue shares?

Page 20

1     A.  Basically and from the perspective articulated
2  in the report as of '93 to '96, the limitation is that
3  boards of directors of Marvel or the board of
4  directors of Marvel Entertainment in my view could not
5  have issued stock sufficient to reduce or eliminate
6  that control position without something equivalent to
7  what has been described in the case law as a
8  compelling justification and that the ordinary
9  presumption of deference to the business judgment of
10 the directors with respect to issuing shares would not
11 apply to an issuance of shares with that effect of
12 eliminating the control position.
13    Q.  I guess since we're here maybe you could tell
14 me what's the basis for that opinion?
15    A.  Well, just highlighting some of the things in
16 my report, there are several. First of all, the
17 attribute of corporate control has been, again at
18 least through 1996, a highly valued attribute of
19 ownership valued by those who acquire it and pay for
20 it and by the courts in protecting it, by the Delaware
21 courts in protecting it.
22       So that, for example, as we saw in the
23 Delaware Supreme Court's opinion in Frantz vs. EAC
24 Industries, the owner of control is entitled to take

Page 21

1  what otherwise would be extraordinary steps to protect
2  that control from actions by directors that might
3  impair it or eliminate it.
4        That same deference or acknowledgment of
5  the value and importance of corporate control appeared
6  to me to be the underpinning of the important opinion
7  of the Court of Chancery in Condec vs. Lunkenheimer in
8  which the Court struck down an attempt to dilute
9  ownership, the controlling position of a bidder for
10 control.
11       And perhaps what struck me as the most
12 potent expression of the idea that I have been trying
13 to express was by Chancellor Allen both in the
14 Freedman-Restaurant Associates case and in the, more
15 directly I think in the Mendel vs. Carroll case in
16 which he found no requirement that directors of a
17 corporation with a controlling stockholder take steps
18 to assure that the corporation could be sold to a
19 third-party bidder for a price higher than what the
20 controlling stockholder was prepared to pay for the
21 minority shares, all of which as I saw it and see it
22 reflected a strong desire to protect control once
23 acquired from elimination or impairment by the board
24 of directors and to the point that in discussing the

6 (Pages 18 to 21)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.
C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 22

1 possibility of such an impairment Chancellor Allen,
2 who in my experience is not prone to using words
3 causally, described that action as a radical step.
4 Q. Any other basis for that opinion?
5 A. That's the overview of it.
6 Q. If you would look at paragraph 7 of your report
7 which is on page 3.
8 A. Okay.
9 Q. The first sentence of paragraph 7 says,
10 "Consistent with the unique value attaching to
11 ownership of a majority voting stock interest in a
12 corporation, the holder of such an interest is
13 acknowledged to be entitled to take extraordinary
14 steps to protect that interest against efforts by the
15 board of directors to issue sufficient shares to
16 eliminate that majority voting power."
17          What do you mean by "extraordinary steps"?
18 A. Well, the specific example was, again, the EAC
19 case in which the extraordinary step was the adoption
20 by the controlling stockholder of a bylaw requiring
21 unanimity for board action, which to my mind is
22 extraordinary.
23 Q. Are there any other examples of extraordinary
24 steps other than the one that you refer to in

Page 23

1 paragraph 7?
2 A. I'm sure there are. I can't remember any in
3 the case law, but I'm sure there are other steps that
4 could be taken in appropriate circumstances. I can't
5 right now think of what they are, but I'm sure they
6 exist.
7 Q. Okay. Then other than the example that you
8 have given, you can't think of any other kinds of
9 steps that the majority shareholder could take?
10 A. Well, in appropriate circumstances I would
11 think that removal of directors would be an
12 appropriate step, although extraordinary.
13 Q. Removal of the directors by the controlling
14 shareholder?
15 A. Right.
16 Q. Anything else?
17     MR. ALLINGHAM: Just so I understand the
18 question, you're asking the witness to identify any
19 action by a majority shareholder that the witness
20 would consider extraordinary?
21     MS. STUBBS: Correct. When he says
22 extraordinary steps when he's talked about what the
23 shareholder could do, the majority shareholder, the
24 controlling shareholder, I'm asking what he's

Page 24

1 referring to when he says extraordinary steps.
2 A. There are other possibilities. I mean, apart
3 from the unanimity bylaw, I imagine there are other
4 bylaws that a controlling stockholder could adopt that
5 would also limit the power of a board of directors,
6 for example, by requiring that certain business be
7 conducted by a particular committee. I mean, whatever
8 the bylaws could do a controlling stockholder could at
9 least ordinarily accomplish unilaterally in ways that
10 would to some extent limit or circumscribe the ability
11 of a board to act.
12 Q. Other than the Frantz vs. EAC case that you
13 already referred to, what is the basis for your
14 opinion as expressed in paragraph 7?
15 A. Okay. As expressed in paragraph 7, just
16 knowledge of the state of the Delaware General
17 Corporation Law as it existed at that time.
18 Q. Anything else?
19 A. I can't think of any.
20 Q. And when you say the state of Delaware General
21 Corporation Law, you mean the statutes, the case law.
22 Is that correct?
23 A. Right. And the statutes in particular in terms
24 of the authority they grant to stockholders.

Page 25

1 Q. Is there any particular statute that you have
2 in mind that you're referring to?
3 A. Section 109.
4 Q. And how does that form the basis of your
5 opinion?
6 A. That's the statute that confers general
7 authority, unremovable authority on stockholders to
8 adopt, amend and repeal bylaws and defines, at least
9 generally, the scope of those bylaws.
10     There are also lots of other provisions in
11 the Delaware General Corporation Law that define
12 particular areas in which bylaws can act to some
13 extent in ways that limit the powers of directors.
14     MS. STUBBS: I'm sorry. Could you read
15 that answer back for me?
16     (The reporter read back the last answer.)
17 BY MS. STUBBS:
18 Q. Other than the Delaware General Corporate Law,
19 the statutes that you referred to and I guess
20 generally statutes that relate to bylaw provisions
21 that can limit the authority of a board, is there any
22 other basis for your opinion in paragraph 7?
23 A. Not that I can think of.
24 Q. If you would look at paragraph 8 for me,

Cantor, et al.                              v.                    Perelman, et al.
Lawrence Hamermesh, Esquire        C.A. # 97-586-KAJ                  May 8, 2006

Page 26

1   please?
2          In this paragraph you state "Also
3   consistent with the unique value attaching to
4   ownership of a majority voting stock interest in a
5   corporation, and consistent as well with the
6   validation of strong measures by the holder of such an
7   interest to protect its majority position, it is also
8   widely acknowledged that a board of directors may not,
9   except in extreme circumstances not yet encountered in
10  judicial opinions, issue shares sufficient to deprive
11  a stockholder of its majority control position, absent
12  the majority stockholder's own consent to such an
13  action."
14         What is the basis for your opinion in this
15  paragraph 8?
16  **A.  The state of the case law in Delaware through**
17  **1996 and particularly Chancellor Allen's treatment of**
18  **the subject in the Mendel and Freedman cases.**
19  Q.  Is there any other basis for your opinion?
20  **A.  The case law that preexisted all that that**
21  **Chancellor Allen drew on.**
22         **And I should also state the reference to**
23  **unique value attaching to ownership of the majority**
24  **voting stock interest is also something that is widely**

Page 27

1   **acknowledged in academic literature I have**
2   **encountered, so I will add that.**
3   Q.  What academic literature are you talking about?
4   **A.  Academic literature, literature discussing the**
5   **significance of control. It's something that**
6   **academics like to write about a lot.**
7   Q.  Are you relying on any of this academic
8   literature in the opinion that you express in
9   paragraph 8?
10  **A.  Nothing in particular. Just the general**
11  **recognition of the importance of control.**
12  Q.  Do any examples come to mind?
13  **A.  Easterbrook and Fischel, the proper role of the**
14  **target company board of directors.**
15  Q.  What do you mean when you say extreme
16  circumstances not yet encountered by judicial
17  opinions?
18  **A.  That I think what I'm really doing here is**
19  **referring to Chancellor Allen's discussion of the**
20  **subject particularly in Mendel. In both Freedman and**
21  **Mendel and to some extent in Blasius he mused, for**
22  **lack of a better word, about the possibility that in**
23  **some instance a board of directors might be justified**
24  **in issuing shares sufficient to dilute a controlling**

Page 28

1   **stockholder's interest and thereby eliminate that**
2   **control. But as far as his opinions recite and as far**
3   **as my own knowledge of the state of the law at that**
4   **point goes, I'm not aware that there have been any**
5   **such cases.**
6          **The concept or the situation was one in**
7   **which Chancellor Allen speculated but had not yet**
8   **occurred in any case.**
9   Q.  And when you say, "extreme circumstances not
10  yet encountered in judicial opinions," are you
11  referring to through 1996 or through the present?
12  **A.  1996.**
13  Q.  Has it been encountered after 1996?
14         MR. ALLINGHAM:  What's the relevance of
15  that?
16  BY MS. STUBBS:
17  Q.  Do you have an opinion as to whether it's been
18  encountered after 1996, extreme circumstances?
19         MR. ALLINGHAM:  It's the same question.
20  You're now making the witness your expert in corporate
21  law on an opinion in which he's not, on an area on
22  which he's not offered an opinion.
23         MS. STUBBS:  Are you instructing him not
24  to answer?

Page 29

1          MR. ALLINGHAM:  Yeah.
2          MS. STUBBS:  Okay.
3          I'm going to take a break, if we can go
4   off the record.
5          THE VIDEOTAPE OPERATOR:  Going off the
6   record at approximately 9:18 a.m.
7          (A brief recess was taken.)
8          THE VIDEOTAPE OPERATOR:  Back on the
9   record at approximately 9:27 a.m.
10         MR. ALLINGHAM:  It might be, it might be
11  because of the early start that I'm crankier than
12  usual, but having another sip of coffee and another
13  bite of a danish, I have reconsidered my inappropriate
14  instruction. And I will, if you will have the
15  question read back, I will not -- I will withdraw the
16  instruction.
17         MS. STUBBS:  Reporter, could you read the
18  question that was objected to back, please?
19         (Discussion off the record.)
20         (The reporter read back the last
21  question).
22         MR. ALLINGHAM:  I don't know if that's
23  clear enough. Maybe either if you want to repose the
24  question or go back another question in order to make

8 (Pages 26 to 29)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 30

1  It clear.
2      MS. STUBBS:  Sure.  I will ask a better
3  question.
4  BY MS. STUBBS:
5   Q.  When you say extreme circumstances not yet
6  encountered by judicial opinions, do you mean that
7  statement to include the time period after 1996?
8   A.  I did not mean it to include the period after
9  1996.
10  Q.  Do you have an opinion whether such extreme
11  circumstances have yet been encountered in judicial
12  opinions?
13  A.  I don't.  But I don't think just leaving it at
14  "I don't" would be completely candid.
15      I am aware that in the Benihana case Vice
16  Chancellor Parsons has apparently validated an equity
17  issuance that had the effect of the sort that I
18  address in my report.  I said I do not have an opinion
19  because I'm not familiar enough with the record in
20  that case or even the details of the opinion to
21  conclude that the Vice Chancellor was correct in
22  identifying such extreme circumstances.
23      So literally I don't know whether those
24  circumstances have been encountered in an opinion, but

Page 31

1  there was at least one opinion recently in which the
2  Court of Chancery validated an equity issuance by a
3  board that had the effect of eliminating a control
4  position.
5   Q.  Any other opinions in the period after 1996
6  that you know of in which extreme circumstances were
7  discussed in this context?
8      MR. ALLINGHAM:  I object as irrelevant.
9  And in order not to keep interrupting you, Emily, if I
10  could have sort of a standing objection that matters
11  after 1996 on which Professor Hamermesh is not
12  offering an opinion are irrelevant, I will shut my
13  mouth and let you proceed.
14      MS. STUBBS:  That's fine.
15  A.  Yes.  I think it was a yes-no question, if I
16  remember right.
17  Q.  Yes.  I think I said are there other opinions?
18  I'm sorry.
19      MS. STUBBS:  Could you read back the
20  question and answer?
21      (The reporter read back as requested.)
22  BY MS. STUBBS:
23  Q.  And do you have an opinion as to whether or not
24  those opinions are relevant to what you are discussing

Page 32

1  in paragraph 8?
2      MR. ALLINGHAM:  I object to the form of
3  the question.
4   A.  Given the focus on the period '93 to '96, I
5  don't think the opinion I have in mind would be
6  relevant because it was an opinion that simply wasn't
7  obviously known at that point.  I think it is relevant
8  to the kind of issue I was discussing and the kind of
9  question about extreme circumstances.
10  Q.  Are you referring to the Benihana case now --
11  A.  No.
12  Q.  -- or a different case?
13  A.  A different case.
14  Q.  And what's that case?
15  A.  Adlerstein vs. Wertheimer.
16  Q.  Just a moment ago you were discussing the
17  Benihana case and you said it validated an equity
18  issuance.
19      What do you mean by the extreme
20  circumstances that may have arisen in the context of
21  the Benihana case?
22  A.  That's what I really don't know.  I don't know
23  the record and I'm not even familiar enough with the
24  factual recitation in the opinion to conclude whether

Page 33

1  or not the kind of circumstances that existed there
2  were extreme enough to validate the issuance, at least
3  given my view of the law other than this particular
4  opinion.
5      I'm not sure that's a clear enough answer
6  for you.
7   Q.  I'm not sure what you mean by "other than this
8  particular opinion."
9   A.  Well, to put it bluntly, the question is:  Is
10  that case correctly decided?  And I don't know the
11  answer because I'm not familiar enough with the record
12  to talk about whether or not the circumstances were
13  extreme enough to justify what the board did there.
14      All I know is that the Court of Chancery
15  did validate it, the case is on appeal and that's
16  about all I can tell you.
17  Q.  Okay.  So in the context of your opinion when
18  you say extreme circumstances are required in order to
19  validate this issuance, in the Benihana case what
20  you're saying is the Court found there were such
21  extreme circumstances but you're not sure if that case
22  was correctly decided?  Is that correct?
23  A.  Almost.  I was troubled by the extent to which
24  or by the fact as I read the opinion that the Court

Wilcox & Fetzer, Ltd.

Professional Court Reporters

9 (Pages 30 to 33)

(302)655-0477

Cantor, et al.                              v.                          Perelman, et al.
Lawrence Hamermesh, Esquire        C.A. # 97-586-KAJ                    May 8, 2006

Page 34

1  did not seem to pay attention to the importance of
2  control and the effect on control of the stock
3  issuance in question. Honestly, I would have expected
4  more attention to the kind of case law that I discuss
5  in my report and the importance of control rather than
6  a deference to director business judgment.
7        But that may be a doctrinal dispute
8  without a difference, depending upon how extreme the
9  facts were that might have justified what the board
10  did in that case, and that's what I don't know about.
11  Q.  What were you referring to when you referred to
12  the Adlerstein vs. Wertheimer case?
13  A.  The context or the circumstance or the
14  existence of extreme circumstance in that case came up
15  in the context of whether or not two out of the three
16  directors were permitted to take action to issue
17  significant stock to a third party without giving
18  notice that the matter would be considered at a board
19  meeting, give notice to the third party who was the
20  preexisting controlling stockholder. And quite apart
21  from whether or not such an issuance would ever have
22  been permissible, the Court of Chancery in the person
23  of Vice Chancellor Lamb concluded that it was a breach
24  of fiduciary duty on the part of the two directors

Page 35

1  even in fairly compelling circumstances of corporate
2  need to try to proceed as they did without giving
3  notice to the other director, the controlling
4  stockholder, of the proposal to issue new equity.
5  Q.  Okay. So in the Wertheimer case the issue was
6  that the two directors had to give notice to the third
7  director in order to issue the proposed additional
8  equity?
9  A.  That the issuance was effectively set aside for
10  failure to have done that.
11  Q.  Okay. And the notice obligation arose from
12  their fiduciary duties to the other controlling, to
13  the controlling shareholder, the third director?
14  A.  Both.
15  Q.  Both?
16  A.  The Court did emphasize that it wasn't simply a
17  matter of just the fact that he was a director but
18  also that he was at the same time the controlling
19  stockholder.
20  Q.  I see. Okay. Turning to paragraph 9 at the
21  bottom of page 3, you state "Accordingly, it is
22  generally recognized in the 1993 to 1996 time period
23  that directors cannot, consistent with their
24  obligations as directors, seek to eliminate a majority

Page 36

1  stockholder's control through the issuance of shares,
2  in the absence of some circumstance in which such an
3  issuance would be necessary to protect the corporation
4  and its stockholders from exploitation or breach of
5  fiduciary duty by the majority stockholder."
6        What is the basis for this statement in
7  paragraph 9 of your opinion?
8  A.  The Delaware case law culminating and reviewed
9  in Mendel vs. Carroll.
10  Q.  Anything besides Mendel vs. Carroll?
11        MR. ALLINGHAM:  I object to the form of
12  the question.
13  A.  And the case law reviewed in it.
14  Q.  And the case law reviewed in it. I'll ask a
15  better question.
16        Anything other than the case law referred
17  to in Mendel vs. Carroll and the case Mendel vs.
18  Carroll?
19        MR. ALLINGHAM:  You should probably do it
20  again. I object to the form of the question.
21  Q.  Other than your previous answer that you relied
22  on Mendel vs. Carroll and the case law therein, is
23  there anything else that you relied on in forming the
24  opinion in the first statement, sentence in paragraph

Page 37

1  9?
2  A.  Just what we talked about before back in
3  paragraph 7 -- in paragraph 8, the reference to the
4  unique value attaching to control. That's all I can
5  think of.
6  Q.  Any other law or policy?
7  A.  Not that I can think of right now.
8  Q.  Focusing on the first sentence again of
9  paragraph 9, what do you mean when you state "seek to
10  eliminate a majority stockholder's control"?
11  A.  The rest of the clause which has the
12  phrase "through the issuance of shares" was intended
13  to refer to action by a board of directors to issue
14  equity sufficient to eliminate a preexisting holder's
15  voting control of the corporation.
16  Q.  Do you have an opinion as to whether the first
17  sentence of paragraph 9 would still apply where the
18  directors of the company have a different purpose,
19  that is, not to eliminate a majority shareholder's
20  control, but where the effect is to eliminate a
21  majority shareholder's control?
22  A.  I didn't intend to limit this first sentence to
23  actions by boards of directors where the underlying
24  purpose was solely to eliminate majority stockholder

Cantor, et al.
Lawrence Hamermesh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 38

1 control or a majority stockholder's control.
2     The phrase "seek to eliminate" was not
3 intended to suggest that that would be the only
4 purpose or to situations where that was the only
5 purpose for doing so. To the contrary, I think the
6 characterization of an issuance of equity that has
7 that effect of eliminating majority control as a
8 radical step would be applied even if the purpose was
9 not nakedly to eliminate control and do nothing else.
10   Q. So I think your answer is yes, you do have an
11 opinion in that where the effect is to limit the
12 majority stockholder's control there would be
13 limitations on the ability of the board to issue
14 shares. Is that correct?
15     MR. ALLINGHAM: I object to the form of
16 the question.
17   A. I'm not sure how to answer it. Maybe we should
18 double back over it.
19   Q. Sure.
20   A. I mean, I have an opinion about lots of things.
21 Maybe we can just refine it.
22   Q. Sure. I guess I'm just trying to understand.
23     I think what you said, and please correct
24 me if I'm wrong, is that, what you were just trying to

Page 39

1 say is that you didn't intend to say that seek to
2 eliminate a majority stockholder's control would
3 necessarily be required to be the sole purpose of the
4 board in issuing the shares for the action, for the
5 directors to be unable to issue the shares?
6     MR. ALLINGHAM: I object to the form of
7 the question.
8   A. Not quite.
9   Q. Okay. Maybe you could explain to me a little
10 better what you meant.
11   A. If I hear your question right, your focus on
12 the words "seek to eliminate" is trying to determine
13 whether or not by the use of those words I meant to
14 address my opinion only to circumstances where the
15 board of directors' sole purpose was to eliminate
16 majority stockholder control. That's not the way in
17 which I intended to use the words "seek to eliminate."
18   Q. Okay. But where the board intends to issue
19 shares not for the purpose of eliminating the majority
20 stockholder's control but where the effect of that
21 issuance is to eliminate the majority stockholder's
22 control, do you have an opinion as to whether or not
23 the board can do so?
24   A. In all circumstances? No, I don't have that

Page 40

1 opinion.
2   Q. Okay. Where you use the term "seek to" in the
3 first sentence of paragraph 9, does that encompass
4 where that is the sole purpose, that is, to eliminate
5 a majority stockholder's control through the issuance
6 of shares?
7   A. Encompass in the sense of including, yes.
8   Q. And does it also apply where that is a purpose
9 but not the sole purpose?
10   A. Yes. Yes.
11   Q. And does it also apply where regardless of the
12 purpose the issuance of shares would have the effect
13 of eliminating the majority stockholder's control?
14   A. Yes, with the qualifiers that are in the rest
15 of the sentence.
16   Q. And what's the basis for that opinion?
17   A. I thought that was the basis.
18     MR. ALLINGHAM: Yes. You mean other than
19 what's in paragraph 9?
20   Q. Other than what's in paragraph 9, what's the
21 basis for your opinion there?
22   A. I think it's the same interchange we had
23 before. It's the case law culminating in Mendel vs.
24 Carroll and the general recognition of the importance

Page 41

1 of control.
2   Q. Anything else?
3   A. Again, not that I can think of right now.
4   Q. Okay. Focusing on the sentence that begins "To
5 my knowledge, you state "To my knowledge, no judicial
6 opinion has yet found the existence of such a
7 justification for the issuance of shares for the
8 purpose of eliminating the majority control position
9 of an existing stockholder."
10     When you say, "no judicial opinion has yet
11 found," are you limiting that statement to opinions
12 issued up to 1996?
13   A. I should be. It's not written very well. I
14 think it's still true, but in terms of the opinion
15 that I'm intending to give it's in reference to the
16 period through 1996.
17   Q. On what do you base the opinion in this
18 statement?
19   A. Well, again, Mendel vs. Carroll and the case
20 law leading up to it.
21   Q. Anything else?
22   A. I guess put another way, the fact that I'm not
23 aware of any opinion of that sort.
24   Q. When you researched the case law for this

11 (Pages 38 to 41)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.
C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 42

1　opinion, was your research limited by date? That is,
2　did you limit your research for the period up to 1996?
3　　A. (Pause) I'm sorry to take so long with what
4　should be a fairly simple question, but the question
5　suggests a more encyclopedic approach than I took.
6　　　Apart from being generally familiar with
7　the case law in any event, what I did was look at
8　cases knowing, for example, that Freedman and Mendel
9　addressed this kind of question, so those were really
10　my starting point. To the extent that -- and I looked
11　at other cases that are referred to in this report.
12　　　To the extent that there might be
13　something else out there that would contradict this
14　statement, I surely didn't find it and I surely would
15　have expected to see it discussed in Freedman or
16　Mendel or both.
17　　　I don't remember making a conscious
18　determination to close my eyes to any cases that
19　occurred after 1996, but given the focus on the period
20　'93 through '96 I didn't spend time in any methodical
21　way looking to see if there was any case after then
22　that might have borne on this issue.
23　　Q. So, for example, you didn't run a Westlaw
24　search that was limited to the period up to 1996?

Page 43

1　　A. Right. I did not do that kind of research or
2　did not research in that kind of way.
3　　Q. Did you run any Westlaw searches?
4　　A. I think I did. I think I did run Mendel. I
5　might have shepardized it. I'm not sure.
6　　Q. And when I say Westlaw, I don't mean to limit
7　it to Westlaw.
8　　A. No. I understand.
9　　Q. But I mean electronic search of case law
10　research or something similar to that.
11　　A. Right.
12　　Q. In your report do you give an opinion as to
13　whether a board of directors may issue shares for
14　purposes other than seeking to eliminate a majority
15　shareholder's control?
16　　　MR. ALLINGHAM: Would you read the
17　question back, please?
18　　　(The reporter read back the last
19　question.)
20　　　THE WITNESS: Where the effect of that
21　issuance is to eliminate a preexisting controlling
22　stockholder's control, yes.
23　BY MS. STUBBS:
24　　Q. And what is that opinion?

Page 44

1　　A. It's the view generally expressed in paragraph
2　9 that even if the directors' sole or primary purpose
3　is not to eliminate the majority stockholder's control
4　where the effect of an equity issuance is that, the
5　directors would having taken that radical step be
6　required to come forward with some significant
7　justification for it.
8　　Q. And what's the basis for that opinion?
9　　A. Again, case law culminating in Mendel vs.
10　Carroll.
11　　Q. And does Mendel vs. Carroll address whether a
12　board of directors may issue shares for purposes other
13　than seeking to eliminate a majority shareholder's
14　control?
15　　A. I believe so.
16　　Q. Looking at the last sentence of paragraph 9,
17　you say, "In my view, moreover, the concept of
18　'compelling justification' precludes such an issuance
19　of shares unless the directors can demonstrate that
20　there is no other, less drastic measure to accomplish
21　the same compelling corporate goal."
22　　　What do you mean by "other, less drastic
23　measure"?
24　　A. It's a concept that would be heavily contextual

Page 45

1　but, for example, if a board of directors were to
2　conclude that the corporation required, for its
3　survival required an infusion of equity through the
4　issuance of shares and the board approved such an
5　issuance, I would expect a court given the value
6　attaching to control to demand some kind of showing by
7　the directors that there was no practicable way to
8　address the problem without eliminating the
9　controlling stockholder's position of control.
10　　　And that's just an example of how that
11　might work in one particular context.
12　　Q. Let me make sure I understand what you're
13　saying.
14　　　The directors would have to demonstrate to
15　the board that there was no other practicable way to
16　effect the infusion of equity?
17　　　MR. ALLINGHAM: The directors are the
18　board.
19　　　MS. STUBBS: Right.
20　　A. To a court.
21　　Q. Oh, to a court?
22　　A. Yes.
23　　Q. I misheard you. I thought you said to the
24　board.

12 (Pages 42 to 45)

Cantor, et al.                                    v.                           Perelman, et al.
Lawrence Hamermesh, Esquire              C.A. # 97-586-KAJ                    May 8, 2006

Page 46

1   A.  I'm sorry if I misspoke.  To a court.
2   Q.  That's all right.  I must have misheard.
3       Okay.  On what do you base that opinion in
4  this statement, the last sentence of paragraph 9?
5   A.  Again, I base it on Mendel and the case law
6  leading up to it.
7   Q.  Anything else?
8   A.  Again, the importance of control.
9   Q.  I see that you cite in paragraph 9 also to
10  Blasius Industries.  Does Blasius Industries vs. Atlas
11  Corp. address whether a board of directors may issue
12  shares for purposes other than seeking to eliminate a
13  majority shareholder's control?
14   A.  Not directly, but I think indirectly, yes.
15   Q.  In what way?
16   A.  Well, Blasius is perhaps the case to which the
17  Court of Chancery most starkly addresses the
18  allocation of authority between the directors and the
19  stockholders and stands generally for the proposition
20  that where a board of directors takes steps even in
21  good faith and for good business reasons to determine
22  unilaterally how the electoral process will be
23  conducted that when they do that and the effect is to
24  blunt control or a threat to their control or

Page 47

1  eliminate it that they have to demonstrate some
2  compelling justification for doing what they do; that
3  the Court was almost prepared to acknowledge a per se
4  rule against director authority to engage in that kind
5  of behavior, but as he did in Mendel and Freedman
6  Chancellor Allen in Blasius acknowledged the
7  possibility that at some point in some circumstances
8  extreme enough the directors might have that power,
9  but when they do that they would have to come forward
10  with some compelling justification to demonstrate
11  their entitlement to do it.
12       And the inference — I take that back.
13  Not the inference.  But the pertinence of Blasius is
14  something that I think Chancellor Allen recognized
15  himself in Mendel that when a board takes upon itself
16  or attempts to exercise formal power to eliminate the
17  control by a majority stockholder, it's really
18  implicating the same policies governing allocation of
19  authority between directors and stockholders that were
20  at issue in Blasius.
21   Q.  Does any other source upon which you rely
22  address whether a board of directors may issue shares
23  for purposes other than seeking to eliminate a
24  majority shareholder's control?

Page 48

1       MR. ALLINGHAM:  I apologize.  Would you
2  read the question back?
3       THE WITNESS:  Yes.  For my benefit too,
4  please.
5       (The reporter read back the last
6  question.)
7       MR. ALLINGHAM:  I object to the form of
8  the question.
9       THE WITNESS:  My question is when you say,
10  "any other source," I'm not sure which source
11  you're --
12  BY MS. STUBBS:
13   Q.  I'm sorry.  Other than Blasius and Mendel vs.
14  Carroll which we just discussed, do you rely on any
15  other source that discusses or addresses whether a
16  board of directors may issue shares for purposes other
17  than seeking to eliminate a majority shareholder's
18  control?
19   A.  In a way a lot of the other cases that are
20  referred to do address it.  I mean, the problem is
21  with the word "address."  As I said just a moment ago,
22  I draw inferences in support from the Court's
23  treatment of the issues in Blasius.
24       I also draw support from the Court's

Page 49

1  treatment of the issuance of shares in Condec even
2  though the Court in that case did talk about it as an
3  entrenchment-oriented action by the board.
4       I draw support from, pertinent inferences
5  from EAC-Frantz Industries.
6       So all of these other cases are things
7  that I think inform the opinion I've expressed.
8   Q.  Any other cases other than the ones that you
9  just mentioned now?
10       MR. ALLINGHAM:  Any other cases what?
11  That address the issue of the issuance of shares for
12  something other than —
13       MS. STUBBS:  Correct.  The same question.
14       MR. ALLINGHAM:  I don't want to phrase
15  your question for you.
16       MS. STUBBS:  That's okay.
17  BY MS. STUBBS:
18   Q.  The same question:  Are there any other cases
19  that you rely on in forming your opinion other than
20  the cases that we have just discussed right now?
21   A.  Yes.  I mean, you can stretch this out to
22  fairly attenuated lengths, but I don't think it's too
23  attenuated to say that Paramount vs. QVC and Revlon
24  and that whole line of cases contribute to my sense of

13 (Pages 46 to 49)

Cantor, et al.                          v.                    Perelman, et al.
Lawrence Hamermesh, Esquire        C.A. # 97-586-KAJ                May 8, 2006

Page 50

1  the importance of control, although they don't deal
2  directly with the issuance of shares by boards to
3  eliminate majority, preexisting majority control.
4    Q.  Okay.  Your report does not set forth an
5  opinion concerning whether any of the defendants in
6  this action, Cantor versus Perelman, breached their
7  fiduciary duties to Marvel, correct?
8    A.  Correct.
9    Q.  And specifically your opinion does not address
10  whether Perelman breached his fiduciary duties to
11  Marvel?
12    A.  Also correct.
13    Q.  Okay.  Focusing on paragraph 10 of your report,
14  you state "In light of these policies, the practice
15  and effect of Delaware corporate law as of the period
16  from 1993 to 1996 largely duplicated the indirect
17  effect of Section 4.09(a) of the indentures limiting
18  Marvel's ability to issue shares to reduce the Marvel
19  Holding Companies' ownership of Marvel voting stock to
20  less than a majority, assuming for purposes of
21  argument that such restriction could or would have
22  bound Marvel."
23         What do you mean by "practice and effect"?
24    A.  Essentially, the way in which the expressions

Page 51

1  the Delaware courts up to and including that time
2  period affected the way practitioners and advisors of
3  boards would have and did conduct themselves in
4  relation to approaching this question of the power of
5  a board to dilute down a majority stockholder, in
6  essence; what did people at the time take out of the
7  case law in terms of how they viewed the powers and
8  rights of the board in relation to a controlling
9  stockholder.
10    Q.  What's your basis for that opinion?
11    A.  Practice from 1976 through 1994 and a couple of
12  years in academia after that.
13    Q.  I'm sorry.  1974?
14    A.  1994.  1976 to 1994 in practice.
15       MS. STUBBS:  I'm sorry.  Could you read
16  that answer back again?
17       (The reporter read back as follows:
18  "Answer: Essentially, the way in which the
19  expressions the Delaware courts up to and
20  including that time period affected the way
21  practitioners and advisors of boards would have
22  and did conduct themselves in relation to
23  approaching this question of the power of a
24  board to dilute down a majority stockholder, in

Page 52

1       essence; what did people at the time take out
2       of the case law in terms of how they viewed the
3       powers and rights of the board in relation to a
4       controlling stockholder.")
5  BY MS. STUBBS:
6    Q.  What do you mean by "practitioners and
7  advisors" in that answer?
8    A.  The lawyers who counseled with boards in
9  discussing questions of this sort, primarily the
10  people in Delaware whose views about Delaware law
11  would have informed lawyers and directors elsewhere on
12  approaching the question.
13    Q.  And what's the basis for that opinion again?
14    A.  Again, having practiced in that area of the law
15  and among people who did from 1976 to 1994 and I think
16  continued to study it after that from 1994 to 1996.
17    Q.  Any other basis for that opinion?
18    A.  No.  I think that's the general basis for it.
19    Q.  Looking again at the first sentence of
20  paragraph 10, can you tell me what you mean by
21  "largely duplicated"?
22    A.  Yes.  Let me start with the word "largely"
23  because it's obviously a qualifier.
24         The qualification corresponds to the

Page 53

1  continued reference in the opinions to the possibility
2  of some set of circumstances that might come up in
3  which a board could be justified in eliminating the
4  majority stockholder's control position.
5         The word "duplicated" is intended to
6  convey the idea that, to put it maybe more directly,
7  if there was some limitation on Marvel's power to
8  issue shares sufficient to reduce the holding
9  company's ownership below 50 percent, whatever
10  contractual or other limitation that might have been
11  would have essentially been superfluous in light of
12  the case law that we have been discussing.
13    Q.  Are the policies that you refer to in the very
14  first clause of the first sentence of paragraph 10,
15  are those the statements in paragraph 9?
16    A.  The intent is to bring back all of the policies
17  and considerations referred to in the previous
18  paragraphs.
19    Q.  All the previous paragraphs of your report?
20    A.  Maybe not 1 and 2 and 3, but where I discuss
21  policies and corporate law, yes.
22    Q.  And where are the policies that you refer to in
23  the first sentence of paragraph 10 set forth?
24    A.  Well, for one, they begin in paragraph 6 with a

14 (Pages 50 to 53)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 54

1 reference to the unique value of majority stock
2 ownership. They continue in paragraph 6 with
3 reference to policies of promoting free flow of
4 capital and the market for corporate control. I think
5 that's the primary place where you see any kind of
6 exposition of the policies, the underlying policies.
7      After that in paragraph 7, 8 and 9 what I
8 have tried to do is develop the doctrinal
9 ramifications of those policies as expressed in the
10 Delaware cases.
11      Q.   Getting back to the previous discussion we had
12 about the term practice and effect, you referred to
13 practitioners and advisors and the lawyers who counsel
14 boards.
15      Have you ever counseled a board of
16 directors?
17      A.   Yes.
18      Q.   When was that?
19      A.   Gosh, in the eighties and early nineties.
20      Q.   And what sorts of issues were you counseling
21 them on, the board of directors on?
22      A.   Matters of fiduciary duty in relationship to
23 takeovers. I think that's a broad category and that's
24 certainly the bulk of what I have in mind. There may

Page 55

1 have been other issues.
2      Q.   How many boards of directors did you advise?
3      A.   Directly only a few. In terms of being in the
4 room, directly only a few. Indirectly, more than I
5 can count.
6      Q.   When you say, "a few," what do you mean?
7      A.   Maybe three or four.
8      Q.   And that was over what time period?
9      A.   I'd say late eighties after I became a partner
10 to 1994.
11      Q.   And did you ever counsel any board of directors
12 with respect to an issuance of stock that would have
13 the effect of eliminating a majority shareholder's
14 control?
15      A.   Not directly. Not in terms of being in the
16 room, no.
17      Q.   How about indirectly?
18      A.   I can't remember.
19      Q.   What do you understand the effect of Section
20 4.09(a) of the indentures in the Marvel Holding
21 Companies' issuances to be on Marvel?
22      A.   I'm not sure it had any effect.
23      Q.   What do you base that statement on?
24      A.   The uncertainties about, arises from the fact

Page 56

1 that as written it did not operate on Marvel itself or
2 Marvel's board of directors.
3      Q.   Can you explain what you mean by that?
4      A.   Yeah. If I understood it right, the provision
5 of the indentures in question was one that was
6 essentially a promise by the borrower, borrowers that
7 their control or their stock control of Marvel would
8 not fall below 50 percent but, as I said, at least in
9 form it did not bind Marvel as I understood it, nor
10 did it bind Marvel's directors to behave in any
11 particular way, nor did it bind, if I understood it
12 right, the controlling stockholders to take
13 affirmative action as Marvel's stockholders to address
14 a potential issuance of shares that might have
15 resulted in a violation of that covenant.
16      Q.   What's the basis for that understanding that
17 you just told me about?
18      A.   Review of the text of 4.09(a) and discussion of
19 some of the language that accompanied the issuances in
20 the prospectus.
21      Q.   Did you also review the indentures?
22      A.   Not beyond looking at 4.09(a) really.
23      Q.   And is your understanding also based on the
24 brief that you were given by defendants' counsel in

Page 57

1 the Third Circuit appeal?
2      A.   To some extent, yes, and also by Justice
3 Walsh's report.
4      Q.   Justice Walsh's report that was issued after
5 your report?
6      A.   Right.
7      Q.   Any other basis for your understanding of the
8 effect of Section 4.09(a) of the indentures on Marvel?
9      A.   Just also informed by the Third Circuit
10 opinion, by the documents that I looked at that we
11 talked about before.
12      Q.   You don't express an opinion in your report as
13 to whether Section 4.09(a) bound Marvel. Is that
14 correct?
15      A.   Correct.
16      Q.   Focusing on the last sentence of paragraph 10,
17 you state "That provision, therefore, did not in any
18 significant way, if at all, prevent Marvel and its
19 board of directors from engaging in an issuance of
20 equity securities that they otherwise would have been
21 permitted to accomplish under governing Delaware
22 corporate law and policy."
23      Does your report express an opinion as to
24 whether from 1993 to 1996 Marvel or its board of

15 (Pages 54 to 57)

Cantor, et al.                                        v.                              Perelman, et al.
Lawrence Hamermesh, Esquire              C.A. # 97-586-KAJ                          May 8, 2006

Page 58

1  directors could issue equity securities that would
2  dilute the Marvel Holding Companies' Marvel stock
3  ownership below a majority if the equity was issued
4  for a proper corporate purpose?
5     A.  I think the answer is no, because I don't
6  purport to or have the knowledge sufficient to address
7  any particular circumstance in which such an equity
8  offering might have occurred and whether there was or
9  could have been such a case in particular
10  circumstances is beyond the scope of what I tried to
11  do.
12     Q.  Have you reviewed Marvel's certificate of
13  incorporation?
14     A.  I have not.
15     Q.  Are you aware that the board of Marvel had
16  passed a resolution in March of 1993 to amend Marvel's
17  certificate of incorporation to increase the
18  authorized capital stock of the company?
19     A.  I'm not.
20     Q.  Do you have an opinion as to whether -- I'll
21  represent to you that Marvel had amended its
22  certificate of incorporation in 1993 to authorize the
23  issuance of additional shares of preferred stock and
24  common stock but that those shares were not issued.

Page 59

1          Do you have an opinion as to whether after
2  Marvel amended its certificate of incorporation any
3  further shareholder action was necessary for the
4  Marvel board to issue those shares?
5     A.  Well, when you say, "those shares" I don't know
6  what shares you mean.
7     Q.  The shares authorized but not yet issued under
8  the articles of incorporation of Marvel.
9     A.  Just to be clear, we're talking about shares
10  that are authorized but not issued in the certificate
11  of incorporation.  Barring some other limitation
12  that's not addressed in your question, at that point
13  the board of directors has the formal power at least
14  to issue shares without stockholder action, unless --
15  and I don't know that this is the case, I don't think
16  it is the case -- where you have a situation where
17  there are stock exchange requirements that require a
18  common stockholder vote.
19     Q.  Assume there are no such requirements that
20  require a common stockholder vote.  Would your opinion
21  then be as you just stated it, that there would be,
22  that the board has the formal power then to issue the
23  shares?
24     A.  I think that's the case.  I can't think of any

Page 60

1  other constraint.  If there's no contractual or other
2  voting constraint that the charter itself imposes,
3  once the shares are authorized it's ordinarily the
4  power of the board to issue them.
5     Q.  And what's the basis for your opinion?
6     A.  Section 151 of the Delaware General Corporation
7  Law.
8     Q.  Anything else?
9     A.  Section 141.
10     Q.  Anything else?
11     A.  Case law.
12     Q.  Any particular case law?
13     A.  I mean, I could start to list cases in which
14  boards issued shares and courts have validated it or
15  at least acknowledged the power, but I don't think you
16  really want a list like that.
17     Q.  Do you have an opinion whether in view of the
18  law and policy of Delaware and considering Marvel's
19  certificate of incorporation as amended in May of 1993
20  there is any limitation on Marvel's board's power or
21  ability to issue equity if for a purpose other than
22  diluting a majority shareholder in the period of 1993
23  to 1996?
24     A.  Yes.  As I've said, the fiduciary duty

Page 61

1  limitations in terms of dealing with a controlling
2  stockholder extend beyond situations where the sole
3  purpose of the board is to eliminate that control.  I
4  believe the doctrine is much more robust than that.
5     Q.  And although it may be repetitive, maybe you
6  could tell me again the basis for your opinion.
7     A.  It would be.  But, again, it's the case law
8  culminating in Mendel.  It's the underlying policies
9  that I have referred to in my report.  It's the case
10  law we have discussed already.
11          MS. STUBBS:  Can we go off the record?
12  We're going to take a short break.
13          THE WITNESS:  Sure.
14          THE VIDEOTAPE OPERATOR:  Going off the
15  record at approximately 10:20 a.m.
16          (A brief recess was taken.)
17          THE VIDEOTAPE OPERATOR:  We're back on the
18  record at approximately 10:33 a.m.
19  BY MS. STUBBS:
20     Q.  Mr. Hamermesh, with respect to the Benihana and
21  Adlerstein cases that you mentioned earlier, do you
22  believe those cases changed the law with respect to
23  the opinion you expressed as it existed in 1996?
24     A.  I don't know.  I didn't see anything in

16 (Pages 58 to 61)

Cantor, et al.                                        v.                            Perelman, et al.
Lawrence Hamermesh, Esquire          C.A. # 97-586-KAJ                        May 8, 2006

Page 62

1  Adlerstein that was inconsistent with the view I
2  expressed, although to be honest I really haven't
3  studied Adlerstein with that question in mind, and the
4  same for Benihana. I mean, depending on what happens
5  to Benihana on appeal, that might lead me if I studied
6  it some more to conclude that there's been some
7  development or change in the law, but I'm really not
8  sure.
9      Q. Looking back at paragraph 8 of your report, in
10 the fourth line down you use the term "extreme
11 circumstances not yet encountered in judicial
12 opinions."
13         We talked about this briefly before, but I
14 would like to know what do you mean by the term
15 "extreme circumstances" as you use it in paragraph 8?
16         MR. ALLINGHAM: Didn't you already ask
17 that question?
18         MS. STUBBS: I asked it, but I think he
19 answered what he felt the cases said about it. I
20 would like to know what he means by the term "extreme
21 circumstances."
22     A. That may be the same thing. I think if I had
23 something more specific in mind, and I'm not sure I
24 could, I might have elaborated on it. But the

Page 63

1  reference is to the thread in the case law,
2  particularly in Chancellor Allen's opinions, that hold
3  out a possibility of such circumstances without
4  defining them very clearly. And so by "extreme
5  circumstances" I'm really relating that to what I
6  discuss in paragraph 9, for example, when I talk about
7  some circumstance in the third and fourth line and I'm
8  talking about what I refer elsewhere in that paragraph
9  to as compelling justification. Those are at least in
10 my mind all of a piece.
11     Q. Is the term "extreme circumstances" used in any
12 of the cases that you rely on?
13     A. I don't know.
14     Q. What about in paragraph 9 where you use the
15 term compelling justification in quotes in the last
16 sentence?
17     A. What about it?
18     Q. Is that a quote from a particular case?
19     A. Yes.
20     Q. Which case is that?
21     A. I believe that's Blasius or certainly
22 Blasius — it may be a quote from a case that Blasius
23 relied on pretty heavily, the Aprahamian vs. HBO case.
24 I'm not sure whether Blasius picked up that same

Page 64

1  language again.
2      Q. In your experience, have you seen a transaction
3  where a majority shareholder, other than Ronald
4  Perelman, of a public corporation promises to restrict
5  the financing activities of the corporation in order
6  to obtain a benefit for himself personally?
7          MR. ALLINGHAM: Does that have anything to
8  do with the opinions expressed by Professor Hamermesh
9  in this case?
10         MS. STUBBS: Well, it goes to his
11 experience.
12         MR. ALLINGHAM: So any question having to
13 do with any possible transaction under Delaware
14 corporate law would be an appropriate question because
15 it goes to his experience?
16         MS. STUBBS: His qualifications as an
17 expert witness.
18         MR. ALLINGHAM: Is that really a rule you
19 want to establish with respect to Justice Walsh's
20 deposition?
21         MS. STUBBS: Are you instructing the
22 witness not to answer?
23         MR. ALLINGHAM: You know, I'm really
24 looking for a little guidance here. I mean,

Page 65

1  seriously, you could ask — we could be here for three
2  days if that's an appropriate, if that's a basis for
3  an appropriate question.
4          MR. FRIEDMAN: Tom, since I'm going to be
5  defending Justice Walsh today, I'll answer your
6  question.
7          We're not trying to establish any rule. I
8  think in light of the opinion this witness expressed
9  that one question is appropriate. There may be
10 similar questions that you think will be appropriate
11 with respect to Justice Walsh when he is deposed.
12         So I think either you should direct him
13 not to answer or you should let him answer and that's
14 where we are.
15         MR. ALLINGHAM: I don't think it's
16 appropriate to direct an expert witness not to answer,
17 so I won't. Your question, however, is inappropriate.
18         MS. STUBBS: Could you read back the
19 question so he has it?
20         (The reporter read back the last
21 question.)
22         THE WITNESS: Without wanting to get into
23 an argument, the problem I have with the question is
24 the characterization of what happened in this case as

17 (Pages 62 to 65)

Cantor, et al.                              v.                        Perelman, et al.
Lawrence Hamermesh, Esquire        C.A. # 97-586-KAJ                       May 8, 2006

Page 66

1  a promise to restrict the activities of financing
2  activities of the subsidiary. As we discussed before,
3  it's not clear to me, and as I said I don't want to
4  argue about it because this is not a matter on which I
5  formed an opinion, but it's not clear to me that
6  that's what's going on in this case.
7      I believe I have encountered circumstances
8  in which a controlling stockholder has borrowed funds
9  through pledging shares of the subsidiary and making
10 promises about the way in which those shares would be
11 voted. I can't think of examples offhand, but that
12 seems fairly familiar, is a fairly familiar sort of a
13 transaction.
14     Beyond that, I don't think I can answer
15 your question.
16 BY MS. STUBBS:
17 Q.  Do you have an opinion as to whether a majority
18 shareholder who is also a director of the corporation
19 has any duties to the corporation in connection with
20 such a transaction?
21     MR. ALLINGHAM: What is the "such a
22 transaction"?
23     MS. STUBBS: A transaction in which the
24 majority shareholder promises to restrict the

Page 67

1  financing activities of the corporation in order to
2  obtain a benefit for himself personally.
3  A.  Without knowing a few more particulars, I'm not
4  sure how to answer that except to say that directors
5  always have a duty of loyalty and a duty of care and
6  maybe an independent duty of good faith that will bear
7  upon their ability to take corporate action as a
8  director that enriches themselves, that might enrich
9  himself or herself.
10 Q.  And in the cases that you said you had
11 encountered in which a controlling shareholder had
12 promised to vote his shares in a particular way in
13 connection with a transaction, was the controlling
14 shareholder in those circumstances also a director?
15 A.  I don't remember whether the controlling
16 shareholder was an entity -- you're really asking
17 about an affiliate, whether there's an affiliate
18 relationship between some person who is also sitting
19 on the board?
20     I guess I'm not sure precisely what
21 question you're asking. Nor, to spare you the
22 difficulty, am I certain I can give you very precise
23 answers about the kind of transactions that I have
24 seen over the years.

Page 68

1  Q.  But in the cases that you were referring to
2  previously where you said you had encountered cases in
3  which a controlling shareholder promised to vote in
4  the case of an entity or in the case of a person's
5  shares in a particular way, could you recall any such
6  cases in which there was an individual who controlled
7  that entity who was also a director?
8      MR. ALLINGHAM: I object to the form of
9  the question.
10 A.  I don't have the specific cases in mind, no.
11 Q.  I would like you to assume that the board of
12 Marvel has decided that it's in Marvel's best interest
13 to issue $350 million of equity but Ronald Perelman,
14 Marvel's controlling shareholder, objects and says he
15 does not consent to that financing or any financing
16 that would dilute his holding companies' majority
17 ownership of Marvel shares.
18     Do you have an opinion as to whether or
19 not the Marvel board could go forward with the
20 issuance of equity?
21 A.  Not across the board, no, I don't. I don't
22 know that one could form an opinion on that barren of
23 a set of facts.
24 Q.  Are there facts that you would need to know in

Page 69

1  order to give an opinion?
2  A.  Absolutely.
3  Q.  What sort of facts would those be?
4  A.  Alternative sources of financing, quality of
5  the need for financing, the quality of the types of
6  financing available, efforts that have been made to
7  find such financing, the use to which the proceeds of
8  the financing would be put, all sorts of things I
9  would need to look at before you could form an opinion
10 about whether there would be a breach of fiduciary
11 duty associated with the position you have described.
12 Q.  Sir, what did you do to prepare for your
13 deposition today?
14 A.  Sorry. I woke up, but that's being flip.
15     This morning I looked over my report a
16 little bit and Justice Walsh's report a little bit. I
17 looked at the indenture provision.
18 Q.  Did you meet with your counsel?
19 A.  No.
20     You mean today?
21 Q.  At any time.
22 A.  At any time? I'm sorry.
23 Q.  Before today's deposition, what did you do to
24 prepare for today's deposition?

18 (Pages 66 to 69)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.
C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 70

1   A.  Okay.  Reviewed the documents we have talked
2   about already.  I met with Mr. Allingham for a couple
3   of hours the week before last, I think.  I think
4   that's it.
5   Q.  And the documents that you referred to as
6   reviewing, are those the documents that you told me
7   you considered in connection with issuing your report?
8   A.  Those and Justice Walsh's report.
9   Q.  Did you discuss your deposition testimony today
10  with anyone else other than your counsel?
11  A.  Mr. Allingham.  I mentioned to my wife where I
12  was going.  That's about it.
13  Q.  Other than serving as an expert witness in this
14  case, do you have or have you had any relationship
15  with any of the defendants in this case?
16  A.  As an adversary, yes.
17  Q.  When were you retained in this matter?
18  A.  The best I can do is most likely in early
19  January, and I really don't have an independent
20  recollection of that.  It's just judging by the date
21  of the report.
22  Q.  Sometime around the holiday period?
23  A.  Sometime around then.
24  Q.  Who contacted you?

Page 71

1   A.  I believe it was Mr. Allingham.
2   Q.  And other than serving as an expert in this
3   case, do you have or have you had any relationship
4   with any of the attorneys representing the defendants
5   in this case?
6   A.  I'm sorry.  Other than what?
7   Q.  Other than serving as an expert here.
8   A.  Relationship with any of the attorneys in this
9   case?
10  Q.  Representing the defendants.
11  A.  Representing the defendants?  Well, I've worked
12  with and against a lot of people from Skadden, Arps
13  over the years and I know them to various degrees.
14  Those are the only attorneys I know of.
15  Q.  How about Mr. Allingham, did you work together
16  at Morris, Nichols?
17  A.  Our time there overlapped.  If we worked on the
18  same case at the same time, I don't remember.  It was
19  a long time ago.  But we were there at the same time
20  for a number of years.
21  Q.  Do you maintain a social relationship with
22  Mr. Allingham?
23  A.  Yeah.  I think that's a fair statement.
24  Q.  Do you go to sports games together or something

Page 72

1   like that?
2   A.  No.
3   Q.  Not really?
4   A.  I'm trying to think if there's anything that
5   meets that definition.
6       Possibly boogie boarding at the beach, but
7   that's about as close as it gets.
8   Q.  Have you ever previously been retained by any
9   of the defendants in this case?
10  A.  I don't think so.  Not that I remember.
11  Q.  When you say you were adversaries, what were
12  you referring to before?
13  A.  Revlon.
14  Q.  Have you previously been retained by Skadden,
15  Arps or any of the lawyers at Skadden as an expert
16  witness?
17  A.  In any context?  Yes.
18  Q.  What was that?
19  A.  There were a couple I can remember.  I think
20  Skadden was the firm that engaged me in that AMP case
21  we talked about and undoubtedly through the
22  recommendation of people here in Delaware it was
23  Skadden's London office that engaged me in that
24  arbitration we discussed earlier.

Page 73

1   Q.  That was the Enron-Sarlux arbitration?
2   A.  Yes.  Right.
3   Q.  I think if we take a very brief pause, we're
4   almost done.
5       MS. STUBBS:  If we could go off the
6   record.
7       THE VIDEOTAPE OPERATOR:  Going off the
8   record at approximately 10:48 a.m.
9       (A brief recess was taken.)
10      THE VIDEOTAPE OPERATOR:  Back on the
11  record at approximately 10:50 a.m.
12      MS. STUBBS:  We have no further questions.
13  Thank you for your time.
14      THE WITNESS:  You're welcome.
15      THE VIDEOTAPE OPERATOR:  This deposition
16  is ending at approximately 10:50 a.m.
17      (Deposition concluded at 10:50 a.m.)
18
19
20
21
22
23
24

19 (Pages 70 to 73)

Cantor, et al.
Lawrence Hamermesh, Esquire

v.

C.A. # 97-586-KAJ

Perelman, et al.
May 8, 2006

Page 74

```
 1            I N D E X
 2   DEPONENT:  LAWRENCE A. HAMERMESH, ESQ.   PAGE
 3     Examination by Ms. Stubbs          3
 4          E X H I B I T S
 5   HAMERMESH DEPOSITION EXHIBIT          MARKED
 6   1 Multi-page document captioned "Expert
       Report of Lawrence A. Hamermesh"
 7                                    4
 8   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 75
 9   CERTIFICATE OF REPORTER             PAGE 76
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 76

```
 1   State of Delaware  )
                        )
 2   New Castle County  )
 3
 4        CERTIFICATE OF REPORTER
 5
 6       I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
 7   there came before me on Monday, May 8, 2006, the
     deponent herein, LAWRENCE A. HAMERMESH, ESQUIRE, who
 8   was duly sworn by me and thereafter examined by
     counsel for the respective parties; that the questions
 9   asked of said deponent and the answers given were
     taken down by me in Stenotype notes and thereafter
10   transcribed by use of computer-aided transcription and
     computer printer under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17       Kurt A. Fetzer, RDR, CRR
         Certification No. 100-RPR
18       (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24
```

Page 75

```
 1
 2
 3        REPLACE THIS PAGE
 4        WITH THE ERRATA SHEET
 5        AFTER IT HAS BEEN
 6        COMPLETED AND SIGNED
 7        BY THE DEPONENT.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```