# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

RONALD CANTOR, IVAN SNYDER and
JAMES A. SCARPONE, as TRUSTEES OF
THE MAFCO LITIGATION TRUST,

                    Plaintiffs,

         - against -                 Civil Action No. 97-586 (RRM)

RONALD O. PERELMAN,
MAFCO HOLDINGS INC,
MacANDREWS & FORBES HOLDINGS INC.
ANDREWS GROUP INCORPORATED,
WILLIAM C. BEVINS and
DONALD G. DRAPKIN,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## EXPERT REPORT OF ROBERT W. HOLTHAUSEN

### I.    Qualifications

1.     My name is Robert W. Holthausen and I am the Nomura Securities Co. Professor of Accounting and Finance at the Wharton School of the University of Pennsylvania. I received the B.A. degree from St. Lawrence University in 1969, the M.B.A. and Ph.D. degrees from the University of Rochester Graduate School of Management in 1971 and 1980, respectively. From 1979 to 1983, I was an Assistant Professor of Accounting and Finance at the Graduate School of Business of the University of Chicago. From 1983 to 1989 I was an Associate Professor of Accounting and Finance at the Graduate School of Business of the University of Chicago. From 1989 to the present I have been a Professor of Accounting and Finance at the Wharton School of the University of Pennsylvania. In

1

1992 I was appointed to the Nomura chair which I still hold. I have served on the editorial boards of a number of professional journals as described on my curriculum vitae, which is attached as Exhibit 1. I am currently an Associate Editor of the Journal of Accounting and Economics and a member of the Editorial Board of the Journal of Accounting Research. I have published a number of articles on accounting and finance. These are also listed on my curriculum vitae.

## II.    Retention

2.      I have been asked by counsel for the defendants to review the Second Amended Complaint, the issuance of the Marvel Holdings Inc. Notes, of the Marvel (Parent) Holdings, Inc. Notes and the Marvel III Holding Inc. Notes, (collectively referred to as the "Holding Company Notes") and the history of Marvel Entertainment Group (referred to as "Marvel") from 1991 through the bankruptcy filing in 1996. Based upon my review, counsel has asked me to respond to what I understand is plaintiffs' contention that Marvel was harmed economically by the covenant in the Holding Company Notes requiring the Holding Companies to limit Marvel's ability to incur additional indebtedness unless a certain financial ratio (the Consolidated EBITDA Coverage Ratio) was satisfied.

3.      In conjunction with the matters addressed in this report, I have considered the materials listed on Attachment 1. I reserve the right to consider any additional materials I may deem appropriate in conjunction with any supplemental or rebuttal reports or otherwise. I also reserve the right to consider and/or rely upon other expert reports that may be filed in this matter and any further testimony of any fact or expert witnesses at a deposition or at trial.

2

## III.    Limitation on Additional Indebtedness in Holding Companies' Indenture

4.       The restriction relating to Marvel's ability to incur additional indebtedness first appeared in the Notes issued in April 1993 and appeared as well in the Notes issued in October 1993 and February 1994. This Consolidated EBITDA Coverage Ratio is described in Section 4.04 of the 1992 Marvel Holdings Note Indenture which reads as follows:

> Limitation on Debt of Marvel and Its Subsidiaries and Limitation on Preferred Stock of Marvel.  (a)  The Company shall not permit Marvel or any Subsidiary of Marvel to Issue, directly or indirectly, any Debt unless at the time of such Issuance, the Consolidated EBITDA Coverage Ratio of Marvel for the most recently completed four consecutive fiscal quarters ending at least 45 days prior to the date such debt is Issued exceeds the ratio indicated below for Debt Issued in each period indicated:

| Period | Ratio |
|---|---|
| Through March 31, 1995 | 2.00 to 1.0 |
| From April 1, 1995 and thereafter | 2.25 to 1.0 |

The restrictions make exceptions for certain defined items.[1]

5.       Marvel itself was a party to several Credit Agreements dated September 17, 1992, August 30, 1994, April 24, 1995, March 1, 1996 and June 30, 1996. Each of these agreements also had a restriction on additional indebtedness.[2] For example, I understand that Section 8.2 of the September 1992 Agreement specifically restricted Marvel from issuing any additional debt beyond relatively small, incremental amounts for identified purposes, unless they obtained prior consent of the lenders. With regard to the ability to

---

[1] Marvel Holdings Inc., Indenture, April 15, 1993, pp. 32-33; Marvel (Parent) Holdings Inc., Indenture, October 1, 1993, pp. 34-37; Marvel III Holdings Inc., Indenture, February 15, 1994, pp. 36-39.

[2] Marvel Entertainment Group, Inc., Fleer Corp., Credit And Guarantee Agreement, September 17, 1992, pp. 69-71; Marvel Entertainment Group, Inc., Fleer Corp., Amended and Restated Credit and Guarantee Agreement, August 30, 1994, pp. 55-57; Second Amendment To The Amended and Restated Credit and Guarantee Agreement (dated as of August 30, 1994), April 24, 1995, pp. 9-10; Third Amendment To The Credit and Guarantee Agreement (dated as of August 30, 1994), March 1, 1996, pp. 11-12; Consent Number 2 and Fourth Amendment To The Amended and Restated Credit and Guarantee Agreement (dated as of August 30, 1994), June 30, 1996, p. 3.

incur additional indebtedness, therefore, the Marvel Credit Agreements were more restrictive than the Holding Company Notes, aside from any variation among the limited exceptions listed in the respective Agreements and Notes.

6.    The Marvel Credit Agreements also had a negative covenant requiring a minimum Interest Coverage Ratio. The formula for the Consolidated EBITDA Coverage Ratio in the Marvel Holding Notes is substantially similar to the formula for the minimum Interest Coverage Ratio in the Marvel Credit Agreements.[3] However, the ratio limits set out in the Marvel Holding Notes are substantially lower in all years than the ratio limits set out in the Marvel Credit Agreement for 1992. This can be seen in Exhibit 2 which shows the two ratio limits across various years. A lower ratio limit corresponds to a 'looser' constraint or trigger. It can be seen from the plot that, for both agreements, the interest coverage restriction was written to become "tighter" as time passed. The ratio limits set out in the Marvel Holding Notes are also lower than the limits set out in the Marvel Credit Agreements for 1994 and 1995.

7.    Notwithstanding the prohibition on additional indebtedness and the more stringent Interest Coverage Ratio in the Marvel Credit Agreements, Marvel obtained the banks' consent to add significant amounts of debt between 1994 and 1996. Exhibit 3 shows Marvel's outstanding long-term debt at year-end for the years 1992 through 1996. Long term debt (including current portion) increased by $134 million in 1994, $202 million in

---

[3] Both formulas define a ratio of a cash flow like variable to interest. In one case the formula labels this cash flow variable Annualized Consolidated EBITDA, while in the other case the formula labels it Annualized Consolidated Operating Cash Flow. Notwithstanding the difference in labels, the two formulas utilize the major line items from financial statements in the same way. In order to construct the cash flow variable, each formula defines a number of items that are to be added back to or deducted from a net income figure. There are some differences in the descriptions of a few of these items that may or may not produce minor discrepancies, depending upon the interpretation. The only notable discrepancy is the fact that the Holding Company Notes allow certain non-cash charges to be added back that the 1992 Marvel Credit Agreement does not allow. This is addressed in more detail in paragraphs 8 and 9.

1995, and $54 million in 1996. These additional bank borrowings were used to fund several major acquisitions, among other things. In Exhibit 4, I show the amount spent on acquisitions, other investments, the net debt raised (new borrowings less retirements), and internally generated funds (operating cash flow). As can be seen, Marvel continued to acquire new businesses throughout 1994 and 1995 subsequent to the issuance of Holding Company Notes. In 1994, Marvel invested in Toy Biz and acquired Panini, Malibu Comics Entertainment, Welsh Publishing Group and Superhero Enterprises. In 1995, they acquired SkyBox, Panini's equity interest held by its joint venture and Toy Biz acquired Spectra Star. Thus, for several years, Marvel successfully issued additional debt to fund its acquisition strategy.

8.     In connection with Marvel's increased debt, the Marvel Credit Agreement was revised several times. In particular, the Interest Coverage Ratio was adjusted downward —i.e., was made less restrictive—during the period when Marvel borrowed additional funds. Exhibit 5 is a plot of the Interest Coverage Ratio of the three different Marvel Credit Agreements negotiated through 1995 and the coverage ratio in the Holding Company Notes. It can be seen from the plot that the Interest Coverage Ratio in each of the Marvel Credit Agreements was written to become "tighter" as time passed from the date of issuance. Of course, since Marvel continued to replace its existing credit agreements with new credit agreements, many of these staged increases in the tightness of the constraints never took affect as they were superseded by new Credit Agreements. Most importantly, the plot shows that the Holding Company Notes always specified an Interest Coverage Ratio that was less restrictive than the ratio defined by the Marvel Credit Agreement in force at the time (assuming the definition of the variables was

identical, which is discussed in paragraphs 8 and 9 below). Thus, through 1995, the debt
covenant in the Holding Company Notes was not the limiting constraint on Marvel's
ability to incur additional debt.

9.    In early 1996, based on its year-end 1995 results, Marvel discovered that it would
be in violation of the Interest Coverage Ratio covenant in the April 25, 1995 Marvel
Credit Agreement unless it were able to renegotiate the Agreement with its lenders. The
coverage ratio specified in the debt covenant in the Holding Company Notes, however,
was still satisfied. This was true in part because the coverage ratio in the Holding
Company Notes was lower than the coverage ratio in the Marvel Credit Agreement. The
other contributing factor was that minor differences in the formulas for the respective
coverage ratios in the Holding Company Notes and the April 1995 Marvel Credit
Agreement became meaningful. Marvel's 1995 financial results included certain charges
that were added back under the formula applied by the Holding Company Notes but were
not added back under the slightly different formula specified in the April 1995 Marvel
Credit Agreement.

10.    In the March 1, 1996 Marvel Credit Agreement, which was the outcome of the
renegotiation, the Interest Coverage Ratio for the period through September 30, 1996 was
lowered to a value equal to the coverage ratio specified in the Holding Company Notes.[4]
In addition, the Agreement changed the definition of the operating cash flow number to
allow Marvel to add back certain charges from the second and fourth quarter of 1995.
With respect to the specific charges that were to be added back, the formula under the

---

[4] Third Amendment To The Credit and Guarantee Agreement (dated as of August 30, 1994), March 1,
1996, pp. 12; Marvel Holdings Inc., Indenture, April 15, 1993, p. 32; Marvel (Parent) Holdings Inc.,
Indenture, October 1, 1993, p. 34; Marvel III Holdings Inc., Indenture, February 15, 1994, p. 37.

Marvel Credit Agreement for March 1996 allows slightly more to be added back than the formula under the Holding Company Notes. These two changes kept Marvel from being in technical default of its Credit Agreement based on its first quarter 1996 results.

11.    In connection with these changes, Marvel obtained an additional $25 million revolving credit facility. I understand at this time that Marvel's banks obtained additional liens on Marvel's assets.[5]

12.    The March 1996 Marvel Credit Agreement was revised again in the face of Marvel's disappointing June 1996 quarterly results. The June 1996 Marvel Credit Agreement included a new, looser, Interest Coverage Ratio which kept Marvel from being in technical default of its Credit Agreement. However, the June 1996 renegotiation did not produce any new credit for Marvel.

13.    Even this looser Interest Coverage Ratio, however, was not enough to maintain Marvel's compliance under the Credit Agreement. The September 1996 quarterly results were yet more disappointing, and Marvel's Interest Coverage Ratio again declined. On October 8, 1996, Marvel announced that it was in violation of the covenants in the Marvel Credit Agreement (although there was no disclosure of which covenant they violated).[6] By my calculations, it was not until October 15, 1996 approximately one week after announcement of Marvel's violation of the covenants in its Credit Agreement, that Marvel's coverage ratio fell below the limit specified in the Holding Company Notes. In other words, it was only after Marvel violated the Interest Coverage Ratio in the Credit Agreement, triggering an event of default, that the debt covenant in the Holding

---

[5] Marvel Entertainment Group Inc., Form 10-Q, For The Period Ending, March 31, 1996, p. 7.

[6] "Marvel 1996 Third Quarter Preliminary Results", PR Newswire, October 8, 1996.

Company Notes could have had any possible impact on Marvel's ability to incur additional debt.

14.    Before Marvel could issue any additional debt after this default, it would first have had to renegotiate the terms of its Credit Agreement with its lenders. The lenders could have reduced or waived interest rates, lengthened the term of the required payments and adjusted the covenants to remove the technical default. This renegotiation of Marvel's existing debt could have been done without any permission from the Holding Company Noteholders. Thus, the Holding Company Notes were not the cause of the default, nor did they preclude a restructuring of the debt.

15.    While Marvel's lenders were not precluded from restructuring Marvel's debt, it is doubtful that they had much to gain from doing so. Ultimately, as of October 15, 1996, the question became whether Marvel could have issued additional debt, but for the restrictions on indebtedness in the Holding Company Notes. Based on my analysis of Marvel's financial situation at the time, it is hard to imagine that Marvel could have attracted new unsecured creditors which would have been junior to Marvel's bank debt, even if there were no debt covenant in the Holding Company Notes.

16.    Exhibit 6 provides information on Marvel's liquidity at the end of the third quarter of 1996. The exhibit shows Marvel's most recent four quarters of operating cash flow, which is declining markedly. These four quarters are summed to produce an annualized operating cash flow of negative $45 million. The exhibit also shows Marvel's debt coming due within the next year. The operating cash flow less the debt coming due yields a large shortfall of $61 million. The exhibit shows the cash and unused lines of credit that Marvel has outstanding that it might use to cover this shortfall. However, even

8

exhausting these resources, Marvel is left with a deficit of $14 million. This calculation leaves out the cash Marvel would have needed for capital expenditures. During the four quarters ending September 1996, Marvel had spent $53 million on capital and other investments.

17.     Marvel's growing financial difficulty also shows up in an analysis of other financial data. One widely used statistic for measuring the creditworthiness of a company is the Z-score developed by Edward Altman.[7] The Z-score is an average of five ratios:

> i) working capital/total assets is a measure of liquidity, relative to total capitalization;
> ii) retained earnings/total assets is a measure of both leverage, cumulative historical profitability and age;
> iii) EBIT/total assets is a measure of the earnings before interest and taxes generated by the assets;
> iv) market value of equity/book value of liabilities is a measure of how much a firm's assets can decline in value before the liabilities exceed the assets
> v) sales/total assets is a measure of the amount of revenue generated by a dollar of assets.

Altman defined two cutoff values for the Z-score—2.675 and 1.81—and he suggests using the lower cutoff of 1.81 to determine financial distress.

18.     The results indicate that Marvel was a very distressed organization as of the end of the third quarter of 1996. In the first and second quarter of 1996, Marvel's Z-Score is hovering right around Altman's preferred cutoff of 1.81—the first quarter Z-score is 1.779 and the second quarter Z-score is 1.722. By the third quarter of 1996, the model gives a clear indication of distress as the Z-Score has fallen to 1.326.

19.     Therefore I disagree with plaintiffs' contention that Marvel was harmed economically by the covenants in the Holding Company Notes requiring the Holding Companies to limit Marvel's ability to incur additional indebtedness. Marvel was at all

---

[7] Edward I. Altman, July 2000, Predicting Financial Distress of Companies: Revisiting the Z-Score and Zeta Models.

9

pertinent times contractually prohibited from incurring additional indebtedness by its
Credit Agreements with its lenders, aside from the exceptions noted.  These Credit
Agreements also required interest coverage ratios that were stricter than the
corresponding ratios in the Holding Company Notes until Marvel's financial condition
had so deteriorated that additional borrowing was unlikely under any circumstances.


                                        /s Robert W. Holthausen

                                        Robert W. Holthausen

                                        March 15, 2002

## Attachment 1:  Documents Relied Upon

Second Amended Complaint

Marvel Holdings Inc., Indenture, April 15, 1993.

Marvel (Parent) Holdings Inc., Indenture, October 1, 1993.

Marvel III Holdings Inc., Indenture, February 15, 1994.

Marvel Entertainment Group, Inc., Fleer Corp., Credit And Guarantee Agreement, September 17, 1992.

Marvel Entertainment Group, Inc., Fleer Corp., Amended and Restated Credit and Guarantee Agreement, August 30, 1994.

Second Amendment to the Amended and Restated Credit and Guarantee Agreement (dated as of August 30, 1994), April 24, 1995.

Third Amendment to the Credit and Guarantee Agreement (dated as of August 30, 1994), March 1, 1996.

Consent Number 2 and Fourth Amendment to the Amended and Restated Credit and Guarantee Agreement (dated as of August 30, 1994), June 30, 1996.

Marvel Entertainment Group, Form 10-Q for the Quarterly Period Ended March 31, 1996.

Marvel Entertainment Group, Form 10-Q for the Quarterly Period Ended June 30, 1996.

Marvel Entertainment Group, Form 10-Q for the Quarterly Period Ended September 30, 1996.

Marvel Entertainment Group, Form 10-K, for the Fiscal Year Ended December 31, 1991.

Marvel Entertainment Group, Form 10-K, for the Fiscal Year Ended December 31, 1992.

Marvel Entertainment Group, Form 10-K, for the Fiscal Year Ended December 31, 1994.

Marvel Entertainment Group, Form 10-K, for the Fiscal Year Ended December 31, 1995.

Marvel Entertainment Group, Form 10-K, for the Fiscal Year Ended December 31, 1996.

"Marvel 1996 Third Quarter Preliminary Results," PR Newswire, October 8, 1996.

Edward I. Altman, July 2000, Predicting Financial Distress of Companies: Revisiting the Z-Score and Zeta Models.

Compustat.

**Exhibit 1**

# ROBERT W. HOLTHAUSEN

*Nomura Securities Company Professor of Accounting and Finance,*
*Wharton School, University of Pennsylvania*

## EDUCATION

Ph.D.  Business Administration, University of Rochester, Graduate School of Management, May, 1980

M.B.A.  University of Rochester, Graduate School of Management, June, 1971

B.A.  St. Lawrence University, June, 1969

## EXPERIENCE

1992–Present  *Nomura Securities Company Professor of Accounting and Finance*
The Wharton School, University of Pennsylvania,
Philadelphia, Pennsylvania

1989–Present  *Professor of Accounting and Finance*
The Wharton School, University of Pennsylvania,
Philadelphia, Pennsylvania

1983–1989  *Associate Professor of Accounting and Finance*
Graduate School of Business, University of Chicago,
Chicago, Illinois

1979–1983  *Assistant Professor of Accounting and Finance*
Graduate School of Business, University of Chicago,
Chicago, Illinois

1977–1978  *Instructor*
Graduate School of Management, University of Rochester,
Rochester, New York

1973–1975  *Assistant Professor of Accounting and Finance*
State University College of Arts and Sciences,
Plattsburgh, New York

Exhibit 1 — Page 2

| 1971–1973 | *Staff and Senior Audit Accountant*<br>Price Waterhouse & Co.,<br>Rochester, New York |
|---|---|
| 1969–1971 | *Financial Analyst*<br>Mobil Chemical Corporation, Plastics Division,<br>Macedon, New York |

## HONORS AND AWARDS

- Welling Professorship, George Washington University, 1998–2000

- David J. Hauck Undergraduate Teaching Award, 1992–1993

- Wharton Graduate Association Excellence in Teaching Award, 1990–91

- Wharton Undergraduate Teaching Award, 1989–1990, 1990–1991, 1992–1993, 1995–1996

- Peat, Marwick, Mitchell and Co. Grant, 1982–1983

- Managerial Economics Research Center Grant, University of Rochester, 1979

- Richard D. Irwin Foundation Fellow, 1978–1979

- Arthur Andersen & Co. Doctoral Dissertation Grant, 1978–1979

- Dean's Honor List, University of Rochester, 1976–1977

- University Fellowship at the University of Rochester, 1969–1971, 1975–1978

- Beta Gamma Sigma, University of Rochester, June 1971

## PROFESSIONAL STATURE AND MEMBERSHIPS

- Certified Public Accountant (awarded New York State Certificate, March 1973)

- American Institute of Certified Public Accountants

- American Accounting Association

- American Finance Association

2

**Exhibit 1** — Page 3

## PUBLICATIONS

"The Relevance of the Value Relevance Literature for Financial Accounting Standard Setting." *Journal of Accounting and Economics* Vol. 31. No. 1-3 (September, 2001), pp. 3-76 (with Ross Watts).

"Corporate Governance, Chief Executive Officer Compensation, and Firm Performance." *Journal of Financial Economics* Vol. 51. No.3 (March, 1999), pp. 371–406 (with John E. Core and David F. Larcker).

"The Financial Performance of Reverse Leveraged Buyouts," *Journal of Financial Economics* Vol 42. No. 3 (November, 1996), pp. 293–332 (with David F. Larcker).

"Business Unit Innovation and the Structure of Executive Compensation," *Journal of Accounting and Economics* Vol 19. Nos. 2&3 (March–May, 1995), pp. 279–314 (with David F. Larcker and Richard Sloan).

"Annual Bonus Schemes and the Manipulation of Earnings," *Journal of Accounting and Economics* Vol. 19, No. 1 (February, 1995), pp. 29–74 (with David F. Larcker and Richard Sloan).

"The Prediction of Stock Returns Using Financial Statement Information," *Journal of Accounting and Economics* Vol. 15. No. 2/3 (June–September, 1992), pp. 373–412 (with D. Larcker).

"The Effect of Bond Rating Agency Announcements on Bond and Stock Prices." *Journal of Finance* Vol. XLVII, No. 2 (June, 1992), pp. 733–752 (with J. Hand and R. Leftwich).

"Large Block Transactions, The Speed of Response, and Temporary and Permanent Stock Price Effects," *Journal of Financial Economics* Vol. 26. No. 1 (July, 1990), pp. 71–95 (with R. Leftwich and Dave Mayers).

"Accounting Method Choice: Opportunistic Behavior, Efficient Contracting and Information Perspectives," *Journal of Accounting and Economics*, Vol. 12, No. 1-3 (January, 1990), pp. 207–218.

"The Effect of Informedness and Consensus on Price and Volume Behavior," *The Accounting Review*, Vol. 65, No. 1 (January, 1990), pp. 191–208 (with R. Verrecchia).

"The Effect of Sequential Information Releases on the Variance of Price Changes in an Intertemporal Multi-Asset Market," *Journal of Accounting Research*, Vol. 26, No. 1 (Spring, 1988) pp. 82–106 (with R. Verrecchia).

"The Effect of Large Block Transactions on Security Prices: A Cross-Sectional Analysis," *Journal of Financial Economics*, Vol. 19, No. 2 (December, 1987), pp. 237–267 (with R. Leftwich and D. Mayers).

"Predicting Audit Qualifications with Financial and Market Variables," *Accounting Review*, Vol. 62, No. 3 (July, 1987), pp. 431–454 (with N. Dopuch and R. Leftwich).

"The Effects of Bond Rating Changes on Common Stock Prices," *Journal of Financial Economics*, Vol. 17, No. 1 (September, 1986), pp. 57–90 (with R. Leftwich).

**Exhibit 1 — Page 4**

"Abnormal Stock Returns Associated with Media Disclosures of 'Subject to' Qualified Audit Opinions," *Journal of Accounting and Economics*, Vol. 8, No. 2 (June, 1986), pp. 93–118 (with N. Dopuch and R. Leftwich).

"Qualified Audit Opinions and Stock Prices: Information Content, Announcement Dates and Concurrent Disclosures," *Journal of Accounting and Economics*, Vol. 6, No. 1 (April, 1984), pp. 3–38 (with P. Dodd, N. Dopuch and R. Leftwich).

"The Economic Consequences of Accounting Choice: Implications of Costly Contracting and Monitoring," *Journal of Accounting and Economics*, Vol. 5, No. 2 (August, 1983), pp. 77–119 (with R. Leftwich).

"Anomalous Abnormal Returns Following Quarterly Earnings Announcements," *Proceedings: The Seminar on the Analysis of Security Prices*, Volume 28, No. 1 (May, 1983), pp.37–60.

"Evidence on the Effect of Bond Covenants and Management Compensation Contracts on the Choice of Accounting Techniques: The Case of the Depreciation Switch-Back," *Journal of Accounting and Economics*, Vol. 3, No. 1 (March, 1981), pp. 73–109.

## Working Papers/Research in Progress

"Organizational Structure and Financial Performance," (with David F. Larcker).

"Research Investigating the Economic Consequences of Accounting Standards," (with Krishna Palepu).

## Miscellaneous

"Performance, Leverage and Ownership Structure in Reverse LBOs," *Journal of Applied Corporate Finance*, Vol 10. No.1 (Spring, 1997) (with Dave Larcker), pp. 8–20.

"Discussion of 'Estimation and Market Valuation of Environmental Liabilities Relating to Superfund Sites', Supplement to *Journal of Accounting Research, Studies on Accounting, Financial Disclosures and the Law*, Vol. 32 (1994), pp. 211–219.

"Research on Accounting and Capital Markets," in *Accounting Dissertations: Research Design and Implementation*, (1982), (Proceedings of the Big Ten Accounting Doctoral Consortium), pp. 65–79.

"A Critique of Price-Level Adjusted Accounting," *Hospital Progress*, August, 1976, pp. 52–55 (with J. Talbott).

"Fact Not Fiction —PL(E)AS(E)," *The Michigan CPA*, July-August, 1974, pp. 35-39 (with J. Talbott).

## PROFESSIONAL ACTIVITIES

## Editorial Boards

• Consulting Editor of the *Journal of Accounting and Economics*, 1997–2000

4

Exhibit 1 — Page 5

- Associate Editor of the *Accounting Review*, 1994–1996

- Associate Editor of the *Accounting Review*, 1986–1987

- Consulting Editor of the *Accounting Review*, 1987–1989

- Associate Editor of the *Journal of Accounting and Economics*, 1985–1997, 2000-present

- Member of the Editorial Board of the *Journal of Accounting Research*, since 1982

- Member of the Editorial Board of the *Accounting Review*, 1982-1985, 1989-1993

- Editorial Collaborator for the *Journal of Financial Economics* since 1984

- Editorial Collaborator for the *Journal of Finance* since 1987

**Other Professional Contributions**

- Deloitte and Touche Foundation Doctoral Fellowship Selection Committee, 1996, 1997, 1998, 1999

- Program Committee for the 1996 AAA Annual Meetings in Charge of Special Research Sessions

- Member of Planning Committee for 1995 AAA/FASB Financial Research Conference.

- Distinguished Visiting Faculty, 1994 and 1998 AAA Doctoral Consortium

- Member of the 1993 New Faculty Consortium Planning Committee

- Group Leader, 1993 New Faculty Consortium

- Member of the 1993, 1996 & 1997 AAA Research Advisory Committee

- Member of the 1993 and 1988 AAA Competitive Manuscript Award Committees

- Member of the 1992 Western Finance Association Program Committee

- Member of the 1986 AAA Program Advisory Committee

- Resident Faculty for the 1983 AAA Doctoral Consortium

- Member of the 1982 AAA Notable Contributions to Accounting Literature Committee

- Member of the 1985, 1996 AAA Research Advisory Committee

**Exhibit 1** — Page 6

- Member of the 1984 AAA Notable Contributions to Accounting Literature Committee

**PRIOR TESTIMONY – LAST 4 YEARS**

Richard C. Goodwin, Plaintiff v. LIVE Entertainment, Inc., et al., Defendants
Expert Report, July 15, 1998 / December 17, 1998
Deposition Testimony

# Exhibit 2
## Comparison of Coverage Ratios in the Marvel Credit Agreement in 1992 and Holding Company Notes



Note:  The Holding Company Notes specify an EBITDA Coverage Ratio.  The Marvel Credit Agreement specifies an Interest Coverage Ratio.

Source:  Marvel Entertainment Group, Inc., Fleer Corp., Credit And Guarantee Agreement, September 17, 1992; Marvel Holdings Inc., Indenture, April 15, 1993; Marvel (Parent) Holdings Inc., Indenture, October 1, 1993; Marvel III Holdings Inc., Indenture, February 15, 1994

Exhibit 3

Marvel Entertainment Group - Long Term Debt

$ Millions

| | | 1992 [A] | 1993 [B] | 1994 [C] | 1995 [D] | 1996 [E] |
|---|---|---|---|---|---|---|
| | | | | *Year Ending December 31,* | | |
| [1] | Merger Facility, as Amended | 236.3 | | | | |
| [2] | Term Loan Facility | | 212.0 | | | |
| [3] | Revolving Credit Facility | | 38.0 | | | |
| | Amended and Restated Credit Agreement | | | | | |
| [4] | Term Loan Facility | | | 160.0 | | |
| [5] | Revolving Credit Facility | | | 82.5 | 87.5 | 120.0 |
| [6] | Term Loan Agreement | | | 141.5 | 139.3 | 139.3 |
| [7] | U.S. Term Loan Agreement | | | | 350.0 | 350.0 |
| [8] | Additional Revolving Credit Facility | | | | | 15.0 |
| [9] | Capital Lease Obligations and Other Long Term Debt | | 0.2 | 0.3 | 9.5 | 16.3 |
| [10] | Long Term Debt (Including Current Maturities) | 236.3 | 250.2 | 384.3 | 586.5 | 640.6 |
| [11] | Less Amount Reclassified | | | | | (485.0) |
| [12] | Less Current Maturities | (35.1) | (45.1) | (20.2) | (5.2) | (10.6) |
| [13] | Long Term Debt (excluding Current Maturities) | 201.2 | 205.1 | 364.1 | 581.3 | 145.0 |

Notes continued on next page

**Notes**

**Columns**

[A]         Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1992, p. F-13.
[B], [C]    Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1994, p. F-11.
[D]         Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1995, p. F-12.
[E]         Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1996, p. F-14.

**Rows**

[1]         = Long Term Debt + Current Maturities, or 201.2 + 35.1 = 236.3.
[2] - [9]   From Note 5, Long Term Debt Table.
[10]        = sum [1] - [9].
[11] - [12] From Note 5, Long Term Debt Table.
[13]        = sum [10] - [12]

## Exhibit 4
## Marvel - Sources and Use of Funds

$ Millions

| | | 1991 [A] | 1992 [B] | Year Ending December 31 — 1993 [C] | 1994 [D] | 1995 [E] | 1996 [F] |
|---|---|---|---|---|---|---|---|
| [1] | **Acquisitions Descriptions** | | Acquisition of Fleer (1) | Acquisition of Fleer (remaining balance)(1); Investment in and advances to Toy Biz (2); Acquisition of Marvel Comics Limited (Marvel U.K.) (3) | Investment in and advances to Toy Biz (1); Acquisition of Panini (2); Acquisitions of Malibu Comics Entertainment, Welsh Publishing Group, and Superhero Enterprises (3) | Acquisition of SkyBox (1); Other Acquisitions (including Panini's buyout of the equity interest held by its joint venture in Brazil, Editora Abril Panini and Toy Biz's acquisition of Spectra Star) (2) | |
| [2] | Value (1) | | | (32.1) | (0.4) | (162.5) | |
| [3] | Value (2) | | (254.0) | (9.4) | (133.2) | (27.5) | |
| [4] | Value (3) | | (1.7) | (1.9) | (15.6) | | |
| | **Investments** | | | | | | |
| [5] | Capital Expenditures | (0.4) | | (3.3) | (4.2) | (42.5) | (43.2) |
| [6] | Other Investments | | (1.7) | - | (4.7) | (0.7) | (3.3) |
| [7] | Total Investments | (0.4) | (1.7) | (3.3) | (8.9) | (43.2) | (46.5) |
| | **Net Debt Raised** | | | | | | |
| [8] | Net Borrowing under Credit Agreement | | 236.0 | 14.0 | | | |
| [9] | Net Borrowings under Term Portion of Credit Agreement | | | | | | |
| [10] | Net Borrowings under Revolving Portion of Credit Agreements | | | | 92.3 | 184.8 | (5.3) |
| [11] | Net Borrowings under Debtor-in-Possession Loan | | | | 44.5 | 5.0 | 47.5 |
| [12] | Payment of Promissory Note to Primary Stockholder | 2.5 | | | | | |
| [13] | Principal Repayments (Borrowings) under Former Credit Agreement | 40.5 | (19.2) | | (9.5) | (3.6) | 10.0 |
| [14] | Net Debt Raised | 43.0 | 216.8 | 14.0 | 127.3 | 162.2 | 27.0 |
| | | | | | | | 79.2 |
| [15] | **Internal Funds Generated** | 17.8 | 40.1 | 36.2 | 12.7 | 3.5 | (102.9) |

Notes continued on next page

## Exhibit 4
## Marvel – Sources and Use of Funds

**Notes**

**Columns**

[A]   Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1991.
[B]   Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1992.
[C]   Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1993.
[D]   Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1994.
[E]   Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1995.
[F]   Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1996.

**Rows**

[1]   Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1992, p. F8-F9.  Marvel Entertainment Group, Form 10-K, For the Period
       Ending December 31, 1993, p. F8-F10.  Marvel Entertainment Group, Form 10-K, For the Period Ending December 31, 1994, p. F8-F11.  Marvel
       Entertainment Group, Form 10-K, For the Period Ending December 31, 1995, p. F9-F11.

[2]   From the "Acquisition" line in Consolidated Cash Flows Statement.
[3] 1993-1994   From the "Acquisition" line in Consolidated Cash Flows Statement.
[3] 1995   From the "Other Acquisitions" line in Consolidated Cash Flows Statement.
[4] 1993   From the "Acquisition" line in Consolidated Cash Flows Statement.
[4] 1994   From the "Other Acquisitions" line in Consolidated Cash Flows Statement.
[5]   From the "Capital Expenditures" line in Consolidated Cash Flows Statement.
[6]   From the "Other Investments" line in Consolidated Cash Flows Statement.
[7]   =[5]+[6]
[8]   From "Net borrowings under credit agreement" line in Consolidated Cash Flows Statement.
[9]   From "Net borrowings (repayments) under term portion of credit agreements" line in Consolidated Cash Flows Statement.
[10]  From "Net borrowings under revolving portion of credit agreements" line in Consolidated Cash Flows Statement.
[11]  From "Net borrowings under DIP Loan" in Consolidated Cash Flows Statement.  Marvel Entertainment Group, Form 10-K, For the Period Ending December,
       1996, p. F6
[12]  From "Payment of promissory note to primary stockholder" in Consolidated Cash Flows Statement   Marvel Entertainment Group, Form 10-K, For the Period
       Ending December 31, 1991, p. F6
[13]  From "Principal payments under former credit agreement and other debt" in Consolidated Cash Flows Statement.
[14]  =[8]+[9]+[10]+[11]+[12]+[13]
[15]  From "Net cash provided by operating activities" in Consolidated Cash Flows Statement.

# Exhibit 5
# Comparison of Coverage Ratios in 92, 94 & 95 Marvel Credit Agreements and Holding Company Notes



Note: The Holding Company Notes specify an EBITDA Coverage Ratio. The Marvel Credit Agreements specify an Interest Coverage Ratio.

Source: Marvel Entertainment Group, Inc., Fleer Corp., Credit And Guarantee Agreement, September 17, 1992; Marvel Entertainment Group, Inc., Fleer Corp., Amended and Restated Credit and Guarantee Agreement, August 30, 1994; Second Amendment To The Amended and Restated Credit and Guarantee Agreement (dated as of August 30, 1994), April 24, 1995; Marvel Holdings Inc., Indenture, April 15, 1993; Marvel (Parent) Holdings Inc., Indenture, October 1, 1993; Marvel III Holdings Inc., Indenture, February 15, 1994.

**Exhibit 6**

**Marvel's Liquidity**

|  | | Quarterly | | | | Annualized |
|---|---|---|---|---|---|---|
|  |  | 1995 Q4 | 1996 Q1 | 1996 Q2 | 1996 Q3 | 1996 Q3 |
|  |  | [A] | [B] | [C] | [D] | [E] |
| [1] | Operating Cash Flow | $25.1 | -$15.2 | -$19.9 | -$34.9 | -$44.9 |
| [2] | Debt Due in 1 Year |  |  |  |  | $16.4 (a) |
| [3] | Cash Flow Less Debt |  |  |  |  | -$61.3 |
| [4] | Unused Credit Line |  |  |  |  | $0.0 |
| [5] | Unused Credit From Foreign Credit Facilities |  |  |  |  | $11.0 |
| [6] | Cash Balances |  |  |  |  | $35.9 |
| [7] | Total Other Sources |  |  |  |  | $46.9 |
| [8] | Surplus (Deficit) |  |  |  |  | -$14.4 |

**Notes continued on next page**

(a)   Due to Marvel Entertainment Group's technical default, its bank debt was reclassified as current debt. For the purposes of this analysis, I would like to undo this reclassification. Lacking the detailed breakdown of debt, I have substituted last quarter's current debt.

**Notes**

**Columns**

[E], [1]    Sum of Operating Cash Flows 1995 Q4, 1996 Q1, 1996 Q2, and 1996 Q3.

**Rows**

[1]    Compustat Data. Quarterly Operating Cash Flows are calculated as the difference of sequential quarterly year-to-date Operating Cash Flows except Annualized 1996 Q3, see Note [E], [1].

[2]    Compustat Data for 1996 Q2. See Note (a).

[3]    = [1] - [2].

[4]    As of November 8, 1996, Marvel Entertainment Group, Form-10Q, for the period ending September 30, 1996, p. 16; Note, according to the Marvel Entertainment Group, Form-10Q, for the period ending June 30, 1996, the unused credit line as of August 13, 1996 was $35 million.

[5]    As of November 8, 1996, Marvel Entertainment Group, Form 10-Q, for the period ending September 30, 1996, p. 16.
Note: "Until the Company receives waivers of the failure to satisfy financial covenants contained in the Credit Agreements, it will not be able to borrow additional amounts under its domestic credit facilities."

[6]    Compustat Data.

[7]    = [4] + [5] + [6].

[8]    = [3] + [7].

## CERTIFICATE OF SERVICE

I, Paul J. Lockwood, certify that I caused to be served two copies of defen-

dants' Notice of Expert Report on the following counsel in the manner specified:

## VIA HAND DELIVERY

Lawrence C. Ashby
Ashby & Geddes
222 Delaware Avenue, 17th floor
P.O. Box 1150
Wilmington, Delaware 19899


## VIA FED EX

Edward Friedman
Friedman, Kaplan Seiler
 & Adelman LLP
875 Third Avenue
New York, New York 10022

Paul J. Lockwood (ID#3369)