# EXHIBIT 9

1

2         IN THE UNITED STATES DISTRICT COURT

3           FOR THE DISTRICT OF DELAWARE

4

5 ------------------------------------x

6 RONALD CANTOR, IVAN SNYDER,

   JAMES A. SCARPONE, as Trustee of

7 the MAFCO LITIGATION TRUST,

8            Plaintiffs,

                            C.A. No.

9                           97-586 (KAJ)

10      vs.

11 RONALD O. PERELMAN, MAFCO

   HOLDINGS, INC., MACANDREWS &

12 FORBES HOLDINGS, INC., ANDREWS

   GROUP INCORPORATED, WILLIAM C.

13 BEVINS AND DONALD G. DRAPKIN,

14           Defendants.

15 ------------------------------------x

16

17    VIDEOTAPED DEPOSITION OF ROBERT W. HOLTHAUSEN

18          THURSDAY, APRIL 20, 2006

19

20

21

22

23

   HUDSON REPORTING & VIDEO, INC.

24 124 West 30th Street, 2nd Fl.

   New York, New York 10001

25 Tel: 212-273-9911  Fax: 212-273-9915

Page 2

1
2     Videotaped deposition of ROBERT W.
3  HOLTHAUSEN taken in the above-entitled matter
4  before Mark Iuzzolino, a Certified Shorthand
5  Reporter (License No. X101103) and Notary Public
6  of the State of New Jersey, taken at the offices
7  of FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP, 1633
8  Broadway, New York, New York 10019, on THURSDAY,
9  APRIL 20, 2006, commencing at 10:05 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S :
3
4  FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP
5  1633 Broadway
6  New York, New York 10019
7  BY:  ANDREW W. GOLDWATER, ESQ.
8         AND
9     JONATHAN GOTTFRIED, ESQ.
10  Attorneys for the Plaintiffs
11
12  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13  One Rodney Square
14  Wilmington, Delaware 19899-0636
15  302-651-3000
16  BY:  THOMAS J. ALLINGHAM, II, ESQ.
17         AND
18     BRIAN G. LENHARD, ESQ.
19  Attorneys for the Defendants
20
21  ALSO PRESENT:
22
23  MACANDREWS & FORBES HOLDINGS, INC.
24  STEVEN L. FASMAN
25  BILL POZNANSKI, VIDEOGRAPHER - HUDSON REPORTING

Page 4

1
2         THE VIDEOGRAPHER:  This is the beginning
3  of tape No. 1 in the videotape deposition of
4  Robert Holthausen being taken by counsel for
5  plaintiff pursuant to agreement in the case of
6  Cantor et al., plaintiffs, versus Perelman et al.,
7  defendants, in the US District Court for the
8  District of Delaware, case number 97-586.  This
9  deposition is being held at the law offices of
10  Friedman Kaplan, located at 1633 Broadway, New
11  York City, New York, on Thursday, April 20, 2006,
12  at the time indicated on the video screen, which
13  is approximately 10:05 a.m.  At this point we're
14  on the video record.  My name is Bill Poznanski,
15  and I'm the videographer working here today for
16  Hudson Reporting Services.  The court reporter is
17  Mark Iuzzolino, also in association with Hudson.
18  At this point I would ask counsel present to
19  please audibly introduce themselves with the name
20  of their firm and who they represent, starting
21  with the attorney taking the deposition.
22         MR. GOLDWATER:  Andrew Goldwater,
23  Friedman Kaplan Seiler & Adelman.  I'm counsel for
24  the plaintiffs.
25         MR. GOTTFRIED:  Jonathan Gottfried, also

Page 5

1
2  with Friedman Kaplan.
3         MR. ALLINGHAM:  Tom Allingham, Skadden
4  Arps, Slate, Meagher & Flom, LLP representing the
5  defendants.
6         MR. LENHARD:  Brian Lenhard with Skadden
7  Arps also.
8         THE VIDEOGRAPHER:  At this point I would
9  ask the court reporter to please swear in the
10  witness.
11         ROBERT W. HOLTHAUSEN
12  having been first duly sworn, was examined and
13  testified as follows:
14
15         DIRECT EXAMINATION
16  BY MR. GOLDWATER:
17     Q.  Good morning, Mr. Holthausen.  I'm
18  Andrew Goldwater.  I'm an attorney for the
19  plaintiffs.  I'll be asking you questions today.
20  If I ask you a question that is unclear to you,
21  please let me know, and I'll try to clarify or
22  rephrase the question.  Otherwise, I'll assume
23  that you -- that we're on the same wave length.
24     A.  That's fine.
25     Q.  Are you still a professor at the Wharton

2 (Pages 2 to 5)

Page 6

1      Robert W. Holthausen
2  School?
3      A.  Yes, I am.
4      Q.  And what are your primary areas of
5  professional expertise?
6      A.  My primary areas of professional
7  expertise?  I've done a lot of work on corporate
8  valuation.  I've done a lot of work on corporate
9  governance.  I've done a lot of work on bond
10  ratings and bond rating agencies.  In working in
11  corporate valuation, you get into lots of issues
12  about capital structure, default, issues of that
13  ilk.  I've written about compensation of
14  executives.  I've written about block trades.  I
15  don't know how long you want me to go on, but, I
16  mean, I've done a lot of work in a lot of
17  different areas over the last 25 years.
18      Q.  Okay.  Are there -- I leave it up to
19  you.  I can't judge for you.  But are there any
20  other areas where you have professional expertise?
21      A.  Well, I've done some -- when you say
22  "professional," do you mean academic, or do you
23  mean -- do you want to know about consulting
24  things, or what?
25      Q.  It encompasses the entirety of your

Page 7

1      Robert W. Holthausen
2  career.
3      A.  Okay, okay.  So I've done work on --
4  I've done consulting work on compensation.  I've
5  done consulting work where I've helped hedge funds
6  create trading rules.  I've helped a small
7  start-up company raise capital.  I helped a
8  publicly traded company that was in a distressed
9  debt situation try to figure out how to resolve
10  that distressed debt situation.  I helped a
11  publicly traded company understand what happened
12  to them when they had engaged in -- they had put
13  in a particular incentive scheme, and how
14  management responded to that and why investment
15  changed dramatically within the firm.  Those are
16  the things that come to the -- to my head right
17  now.
18      Q.  Are you an expert in the area of damages
19  analysis?
20      A.  Yes.  I've done work on damages analysis
21  before.
22      Q.  What work have you done in that area?
23      A.  I've been involved in a number of cases
24  where I either had to talk about -- compute
25  damages or talk about the theory of damages.  This

Page 8

1  is a case, obviously, where I'm working on that.
2  The prior case that I worked on was a case,
3  Equimed versus Ernst & Young, which is on my
4  exhibit, which is also a damages case.  I've
5  worked on cases involving insurance companies that
6  was a damage case.  I worked on a trucking company
7  that involved a damage case.  I'm working
8  currently on another matter that's a damages case.
9  There's probably some others in there, too.  I've
10  been involved in a number of damages cases at this
11  point.
12      Q.  Okay.  Obviously I did see the Equimed
13  case on your CV.  When did you work on the
14  insurance company case?
15      A.  That's probably 20 years ago, 15 to 20
16  years ago.
17      Q.  And were you retained as an expert
18  witness in that case?
19      A.  Yes, I was.
20      Q.  Who was the law firm you worked with,
21  lawyer?
22      A.  I don't remember that.
23      Q.  Do you remember the name of the party?
24      A.  Monarch Insurance, and Ernst & Young was

Page 9

1      Robert W. Holthausen
2  involved in that.
3      Q.  As an adversary of Monarch Insurance?
4      A.  Ernst & Young was being sued because of
5  a matter related to Monarch Insurance.
6      Q.  I see.  So who was the entity that
7  retained you?  Was it Ernst & Young?
8      A.  Ernst & Young, yes.
9      Q.  And what was the subject of your expert
10  report or testimony in that case?
11      A.  We're dredging up ancient history that I
12  haven't thought about for a long time.  If I
13  remember correctly, there were -- you know, I
14  don't remember the details enough to really feel
15  comfortable.  I know it had something to do with
16  some announcement and trying to figure out what
17  the price effects were associated with the
18  announcement.  I just don't remember.  It's so
19  long ago, I just don't remember the details that
20  well.
21      Q.  Okay.  In the trucking company case,
22  when did you do your work on the trucking company
23  case?
24      A.  That was more recently, but it was
25  probably, you know, 15 years ago instead of 20

3 (Pages 6 to 9)

Page 10

Robert W. Holthausen

1     Robert W. Holthausen
2  years ago.
3     Q.  Who was the lawyer or law firm that
4  retained you?
5     A.  Sidley Austin.
6     Q.  And do you remember the name of the
7  party on whose behalf you were working?
8     A.  I think it was called "Circle Express."
9     Q.  Were you retained as an --
10    A.  Well, actually, I was retained by a
11 public accounting firm.  May have been Ernst &
12 Young again, but I'm not sure about that.  But the
13 entity, it involved Circle Express, I think.
14    Q.  I see.  And the party in the dispute
15 that you were working on behalf of may have been
16 Ernst & Young?
17    A.  It may have been, but I'm not sure.
18    Q.  And do you remember what the subject of
19 your testimony was in that matter?
20    A.  The subject was -- had to do with a
21 restatement of financial statements that took
22 place.  And if I remember correctly -- and, again,
23 this is pretty hazy.  If I remember correctly, the
24 bondholders were suing, stating that if the
25 earnings had not been -- if the earnings had been

Page 11

Robert W. Holthausen

1     Robert W. Holthausen
2  reported appropriately to begin with, then the
3  bond rating that the bonds would have gotten would
4  have been lower and, therefore, the interest rate
5  would have been higher.  And so the issue was:
6  What was the magnitude or what was the impact of
7  that earnings restatement on the likelihood that
8  the rating agencies would have taken a different
9  view?
10    Q.  Do you have any recollection of what
11 court that matter was pending in or tribunal?  I
12 don't know if it was an arbitration or a lawsuit.
13    A.  No.  It was a lawsuit, but it never -- I
14 was never deposed in that case.
15    Q.  Do you happen to remember which court it
16 was in?
17    A.  (The witness shakes head in the
18 negative.)
19    Q.  Okay.  Do you happen to remember which
20 court the Monarch Insurance matter was in?
21    A.  No, I do not.  Sorry.  I'm shaking my
22 head.  I have to speak.
23    Q.  And you mention the Equimed matter that
24 I do see on your CV.  Who retained you in that
25 case?

Page 12

Robert W. Holthausen

1     Robert W. Holthausen
2     A.  Ernst & Young.
3     Q.  And who's the lawyer or law firm that
4  you were --
5     A.  Drinker Biddle.
6     Q.  And do I understand correctly that
7  that's an arbitration?
8     A.  That's correct.
9     Q.  Okay.  And what was -- were you retained
10 as an expert witness?
11    A.  Yes, I was.
12    Q.  Is that by Ernst & Young?
13    A.  Yes.
14    Q.  And what was the subject matter of your
15 opinions that you offered in that case?
16    A.  The subject matter had to do with
17 whether or not -- well, Ernst & Young in that
18 particular case withdrew from an engagement after
19 a protracted period of time.  And the issue was:
20 Was there any damage to Equimed because Ernst &
21 Young had withdrawn from the case?  And they were
22 alleging things like, there was a potential
23 purchase of Equimed that was going to take place
24 or a portion of Equimed that was going to take
25 place, and plaintiffs complained -- contended that

Page 13

Robert W. Holthausen

1     Robert W. Holthausen
2  when Ernst & Young withdrew, that that transaction
3  fell apart.
4     Q.  And what was your particular opinion
5  offered on what subject?
6     A.  In addition, there was contentions that
7  they were denied access to capital markets because
8  of the withdrawal of Ernst & Young from the audit.
9  And so basically, I did an analysis of whether or
10 not they were -- whether Ernst & Young's
11 withdrawal from the case had any impact on their
12 ability to raise capital or not, either equity or
13 debt.  They were delisted by the NASDAQ.  There
14 was a contention that the reason they were
15 delisted was because of Ernst & Young.  That was
16 not true.  They would have been delisted anyway.
17 So those were the kinds of things that I did.  So
18 I did basically both -- address liability issues
19 as well as damage issues in that case.
20    Q.  Have you ever testified at trial as an
21 expert witness?
22    A.  By "trial," you don't mean arbitration,
23 but you mean actual trial?
24    Q.  Okay, we'll start there.  That's -- yes,
25 have you ever testified in a court?

4 (Pages 10 to 13)

Robert W. Holthausen

1
2     A.   Well, I've testified in an arbitration.
3  I never testified in a court of law.
4     Q.   I see.  So no judge has had occasion to
5  pass on your testimony in any way --
6     A.   Correct.
7     Q.   -- because you haven't had the occasion.
8  Okay.
9         MR. ALLINGHAM:  Excuse me.
10  Mr. Goldwater has at tendency to finish up his
11  questions slowly.  You've got to let him finish
12  before you --
13     A.   I'm sorry.  Thanks.
14     Q.   Okay.  Over the last ten years, what
15  percentage of your professional time have you
16  spent on -- in the area of damages analysis?
17     A.   I have no idea what percentage of my
18  time.  I don't work on cases that often, so it's
19  not a huge percentage of the time.  I mean, I
20  think about valuation issues all the time, and
21  damages are basically valuation issues.  So to
22  that extent, I teach valuation courses.  I'm
23  always talking about valuation.  And so to the
24  extent that damages are, in large part, a
25  valuation exercise or often a valuation --

Robert W. Holthausen

1
2  valuation exercise, you know, I think about those
3  issues all the time.
4     Q.   Okay.  Just in the area of dispute work
5  that you've done, putting aside -- I take your
6  point about how valuation may have relevance to
7  the dispute-related work you've done.  What
8  percentage of your time in the last ten years have
9  you spent on dispute work on average?  Is it less
10  than 10 percent of your time?
11     A.   It's probably 10 percent or less, I
12  would say, yes.
13     Q.   Have you ever published an article on
14  damage analysis?
15     A.   No, I've never published an article
16  directly on damages analysis.
17     Q.   Have you ever spoken at a professional
18  event, you know, whether it be a conference or
19  seminar, on damages analysis?
20     A.   No.
21     Q.   Have you ever attended a professional
22  event on damages analysis?
23     A.   Not to my recollection, no.
24     Q.   Have you ever taught a class on damages
25  analysis?

Robert W. Holthausen

1
2     A.   Well, again, I teach a class on
3  valuation all the time, and we talk about
4  valuation issues, and we talk about issues that
5  are certainly related to damages, but I've never
6  talked specifically, for example, in a law school
7  about damages analysis.
8     Q.   Okay.  Or any other kind of school, I
9  take it?
10     A.   Correct.  It's not in the curriculum of
11  the business school.
12     Q.   Okay.  Have you ever taken a class on
13  damages analysis?
14     A.   No, I've never taken a class on damages
15  analysis, but I've read work on damages analysis.
16     Q.   I'm sorry.  You've read work on --
17     A.   I've read work on damages analysis.
18     Q.   What work have you read?
19     A.   Well, there's an article by Fisher that
20  I've read and somebody else, but I don't remember
21  who the other author is.  It has Janice Joplin in
22  the title.  I don't remember the other work that
23  I've read on damages analysis off the top of my
24  head.
25     Q.   Okay.  Is it your practice to make an

Robert W. Holthausen

1
2  effort to keep informed on literature or articles
3  on the subject of damages analysis?
4     A.   I subscribe to journals like the Journal
5  of Law and Economics, and so there are articles
6  that are written in there periodically about
7  damages analysis.
8     Q.   Anything else?
9     A.   Not off the top of my head.
10     Q.   Okay, okay.  Do you believe that you're
11  qualified to serve as an expert on the subject of
12  damages in this particular lawsuit?
13     A.   Yes.
14     Q.   Okay.  And why is that?
15     A.   I believe I understand the theory of
16  damages, and I believe I have expertise in the
17  matters that are being contended here.
18     Q.   How did you come to be retained as an
19  expert on damages issues, specifically in rebuttal
20  to Mr. Baliban's report?
21     A.   I was sent an e-mail, I believe, by
22  Miguel Herce -- last name is spelled H-e-r-c-e --
23  saying that the Marvel case was back in play and
24  that he wondered if I would be available to have a
25  conversation with Mr. Allingham.

5 (Pages 14 to 17)

Hudson Reporting & Video, Inc.
www.hudsonreporting.com

Page 22

Robert W. Holthausen

1
2     A.  No.  I hadn't seen any reports, so there
3  was nothing for me to express an opinion about.
4     Q.  And was there any discussion of your
5  suitability to serve as a rebuttal expert on
6  damages?
7     A.  No, there was not.
8     Q.  Okay.  If I'm understanding correctly,
9  there was just an initial e-mail from Mr. Herce,
10  and then in the next call with Mr. Allingham you
11  were retained?  It was the only pre-retention
12  communications?
13     A.  To my recollection, that's it.
14     Q.  Okay.  How were you compensated for your
15  work as a rebuttal expert?
16     A.  On an hourly basis.
17     Q.  Okay.  Is that 800 an hour?
18     A.  Yes, it is.
19     Q.  How much are your charges so far on your
20  work as a rebuttal expert?
21     A.  I think ballpark, it was around $70,000.
22     Q.  And have you been paid?
23     A.  No, I have not.
24     Q.  Okay.  And is any part of your payment
25  contingent in any way?

Page 23

Robert W. Holthausen

1
2     A.  No.
3        MR. GOLDWATER:  May I have this marked
4  as Holthausen Exhibit 1?
5        (Expert report of Robert W. Holthausen
6  is marked as Holthausen Exhibit 1 for
7  Identification.)
8     Q.  Mr. Holthausen, I show you what we've
9  marked as Holthausen Exhibit 1 and ask you to
10  please take a look at that and tell me if that is
11  your rebuttal report in response to Mr. Baliban's
12  report.
13     A.  Yes, it is.
14     Q.  Okay.  And are the opinions in your
15  report the opinions you intend to offer at trial?
16     A.  These are the opinions that I have at
17  this point in time.  There's a lot of depositions
18  being taken right now.  I have not read those
19  depositions, so I do not know what's in those
20  depositions.  Reading those depositions could
21  presumably cause me to want to do additional work
22  or amend my opinions in some way or augment my
23  opinions in some way.
24     Q.  Well, being as this is my last
25  opportunity to speak to you between now and the

Page 24

Robert W. Holthausen

1
2  trial, as you sit here today, are there any other
3  opinions other than the ones in your report that
4  you intend to offer at trial?
5        MR. ALLINGHAM:  Objection.  Asked and
6  answered.
7     Q.  As you sit here today, are you aware of
8  any other opinions that you plan to offer at trial
9  beyond what is reflected in your report?
10        MR. ALLINGHAM:  Same objection.
11     A.  I think I've said that I might augment
12  my opinions based upon what other people have
13  said.
14     Q.  I have heard you say that.
15     A.  Okay.
16     Q.  Today do you know of any other opinions
17  you plan to offer at trial other than what is in
18  your report?
19     A.  The one matter I've thought about since
20  then that probably -- and I haven't thought about
21  how to do it yet.  One of the things in computing
22  a -- the expected cost of financial distress is
23  that those financial distress costs are going to
24  occur in the future.  And it would be appropriate
25  to think about present-valuing those financial

Page 25

Robert W. Holthausen

1
2  distress costs.  And I haven't thought a lot about
3  how you would do that.  It's not clear when the
4  financial distress costs would occur, but it seems
5  to me that calculating the present value of those
6  financial distress costs would be something that
7  would be appropriate to do.  My report doesn't
8  reflect doing that present-value calculation, and
9  I haven't figured out yet exactly how you would do
10  that present-value calculation.
11     Q.  What is the basis for your statement
12  that "financial distress costs are going to occur
13  in the future"?
14     A.  Well, there's a period where the actual
15  financial distress is going to be incurred
16  potentially, and it may not occur at the time
17  that -- you know, when you're standing at some
18  particular point in time, say February 15, 1994,
19  the financial distress hasn't occurred yet.  And
20  the issue would be:  How you think about present
21  valuing something which may occur in the future
22  back to the current time period?
23     Q.  When we sit at trial and we are thinking
24  about financial distress costs incurred by Marvel,
25  are we talking about costs that have already been

7 (Pages 22 to 25)

**Hudson Reporting & Video, Inc.**
www.hudsonreporting.com

Robert W. Holthausen

1
2  incurred or costs that will be incurred in the
3  future?
4      MR. ALLINGHAM: Would you just read the
5  question back for me?
6      (Counsel requests the reading of the
7  following testimony:
8      "QUESTION: When we sit at trial and we
9  are thinking about financial distress costs
10 incurred by Marvel, are we talking about costs
11 that have already been incurred or costs that will
12 be incurred in the future?")
13     MR. ALLINGHAM: I object to the form of
14 the question.
15     THE WITNESS: Could you read it again?
16     (Counsel requests the reading of the
17 following testimony:
18     "QUESTION: When we sit at trial and we
19 are thinking about financial distress costs
20 incurred by Marvel, are we talking about costs
21 that have already been incurred or costs that will
22 be incurred in the future?")
23     A. I guess your question isn't clear to me.
24 I wonder if you could rephrase it.
25     Q. I'll try to. Is it -- do you have a

Robert W. Holthausen

1
2  view as to whether the financial distress costs
3  that Mr. Baliban opines were suffered by Marvel
4  are costs that Marvel has already suffered or that
5  it has yet to suffer?
6      MR. ALLINGHAM: I object to the form of
7  the question. I object to the form of the
8  question. I'll --
9      Q. I'll rephrase it. When did Marvel
10 sustain financial distress costs?
11     A. Well, it's not clear that Marvel did
12 sustain substantial financial distress costs, but
13 my calculation of the financial distress cost is
14 based upon calculating the expected financial
15 distress cost that might have occurred associated
16 with the issuance of the holding company notes.
17 Those financial distress costs haven't been
18 incurred at the time the notes are issued.
19     Q. So --
20     A. There is some probabilistic expectation
21 that they might occur based upon certain
22 assumptions, which I'm sure we'll get into later
23 on. If those occur in the future and you're
24 calculating sort of what the expected value of
25 those financial distress costs are at the time of

Robert W. Holthausen

1
2  the note issuance, you would want to calculate the
3  present value of those costs to figure out what
4  the costs were at the time of the note issuance.
5  So, for example, if we were to talk about the
6  Marvel III notes, which were issued on
7  February 15, '94, what was the expected value of
8  those, that would be a present-value calculation.
9  I have an expected-value calculation in there, but
10 I haven't calculated the present value of the
11 financial distress costs.
12     Q. Is there anything else that is not
13 already in your report that you expect to offer as
14 an opinion at trial other than what you just told
15 me?
16     A. There's a couple of things that I have
17 done since the report that have not altered my
18 opinions in any --
19     THE REPORTER: Have not? I couldn't
20 hear because of the squeak. That have not?
21     A. -- altered my report that I have done
22 since then.
23     Q. What are those things?
24     A. And --
25     Q. Oh, I'm sorry.

Robert W. Holthausen

1
2      A. That's okay. One thing I did was, I
3  looked at whether or not there were any
4  significant announcement effects on any of the
5  days that I had talked about in my report. And
6  basically, there were no significant announcement
7  effects on any of the days in my report until we
8  get to October 8 of 1996.
9      MR. ALLINGHAM: Could I interrupt for a
10 minute, Andrew? Would you be willing to swap
11 chairs? because it's squeaking a lot, and I can
12 tell it's tough on the court reporter.
13     MR. GOLDWATER: Sure.
14     THE VIDEOGRAPHER: Should we go off the
15 record?
16     MR. ALLINGHAM: No, no. It's fine.
17     A. And all that did was buttress my
18 opinions or fortify my opinions. Another thing I
19 did was, I did some sensitivity analysis to my
20 bankruptcy probability model to see whether or not
21 the financial distress costs were sensitive to
22 varying inputs. I concluded that, based upon
23 reasonable variation in those assumptions, the
24 expected financial distress costs are not very
25 sensitive to alternative estimates.

8 (Pages 26 to 29)

**Hudson Reporting & Video, Inc.**
www.hudsonreporting.com

Robert W. Holthausen

1
2  Q.  Anything else?
3  A.  The only other thing that I did was, I
4  looked to see whether there were any analyst
5  reports that came out between -- if I get these
6  dates right -- October 17 of '96 and November 12
7  of '96 to see whether they discussed the
8  announcement that the Andrews Group had made on
9  October 17 regarding the potential equity
10  infusion. And I found a series of analyst reports
11  that also buttress my contention that the market
12  was aware of the potential issues associated with
13  the holding company notes prior to the November 12
14  announcement.
15  Q.  Is that all?
16  A.  Yes.
17  MR. ALLINGHAM: Andrew, in talking to
18  Professor Holthausen, I heard the same thing that
19  you heard just now yesterday. And if you're
20  interested, I asked him for copies of the analyst
21  reports that he talked about, and I have them for
22  you if you want them since they're not identified
23  on whatever the exhibit is that talks about
24  materials relied upon.
25  MR. GOLDWATER: Yes, that would be fine.

Robert W. Holthausen

1
2  We would like to see --
3  MR. ALLINGHAM: You want them now? You
4  want them on a break?
5  MR. GOLDWATER: I don't want them this
6  moment.
7  Q.  Professor Holthausen, going back a few
8  questions and answers ago, when you were telling
9  me about financial distress costs that you were
10  saying were going to occur in the future, and
11  maybe there should be a present valuing of certain
12  costs, somewhere in that answer you mentioned that
13  it wasn't clear whether Marvel experienced
14  financial distress. Do you remember that?
15  A.  Uh-huh.
16  Q.  Okay. Are you --
17  A.  No, no, no. I didn't say whether they
18  experienced financial distress.
19  Q.  Then maybe I misunderstood.
20  A.  Right.
21  Q.  What did you say on that?
22  A.  I believe I said the issue was whether
23  they had experienced financial distress costs and
24  how much they had experienced in the way of
25  financial distress costs.

Robert W. Holthausen

1
2  Q.  You're distinguishing between whether
3  Marvel experienced financial distress and whether
4  they experienced costs as a result of the
5  financial distress?
6  A.  Uh-huh.
7  Q.  I see.
8  MR. ALLINGHAM: You have to say yes or
9  no.
10  A.  Oh. Yes. Sorry.
11  Q.  Are you offering an opinion on whether
12  Marvel experienced financial distress?
13  A.  No. I only offer an opinion on what the
14  damages are associated with the holding company --
15  issuance of the holding company notes.
16  Q.  Professor Holthausen, is there anything
17  in your report, which is the only thing I have
18  right now from you, which is incorrect?
19  A.  Not to my knowledge, other than the
20  things that we just talked about is that it may be
21  appropriate to do a present-value calculation on
22  these costs.
23  Q.  And you've already told me some things
24  that -- relating to things you've thought about
25  since you've issued your report. Putting those to

Robert W. Holthausen

1
2  one side, because I've heard you on that, is there
3  any opinions you would change or would be
4  different if you're issuing your report today?
5  A.  No.
6  Q.  Okay. Would you please look at
7  Exhibit 3 to your report?
8  Okay. You see that's entitled "Documents
9  Considered"?
10  A.  Yes.
11  Q.  And what do you mean by "considered" in
12  this context?
13  A.  These are documents that I looked at in
14  the course of coming up with my opinions in this
15  matter.
16  Q.  Okay. So is any document that you
17  looked at in the course of coming up with your
18  opinions in this matter listed on Exhibit 3?
19  MR. ALLINGHAM: Would you read that
20  question back, please? I may have misunderstood.
21  Q.  I'll just say it. It's easier.
22  Are any documents that you looked at in the
23  course of coming to your opinions in this matter
24  listed on Exhibit 3?
25  A.  Yes.

9 (Pages 30 to 33)

Robert W. Holthausen

1
2    Q.  And did you look at any materials that
3    are not listed on Exhibit 3?
4    A.  The only thing that I think that I have
5    looked at -- it was subsequent to the report --
6    that's not on this exhibit was, I looked at a
7    letter from High River dated maybe December 17 or
8    19 to the Andrews Group, and I looked at a
9    March 5, '96, proposal -- I don't know if I have
10   that date right -- a March 1996 proposal.
11   Q.  Proposal to who from whom?
12   A.  It was a proposal -- it was the Icahn --
13   I'll call it the "Icahn proposal" to do the rights
14   offering.
15   Q.  Would that have been a 1997 document?
16   A.  Ah, thank you.  March '97, yes.
17   Q.  Okay.  Anything else?
18   A.  And then I've also seen those analyst
19   reports which we talked about a few minutes ago.
20   Q.  If you look at item 28H on Exhibit 3,
21   you see it refers to a "comprehensive factiva,"
22   f-a-c-t-i-v-a, search for the period January 1,
23   1991 through December 31, 1997?
24   A.  Uh-huh.
25   Q.  What were the parameters of the search?

Robert W. Holthausen

1
2    A.  Basically for articles involving Marvel,
3    Marvel holding company notes.  And it was not
4    limited to certain sources.  It was to any source
5    at all.
6    Q.  Okay.  And did you review all of the
7    search output?
8    A.  Well, I reviewed a lot of it.  As far as
9    I know, I reviewed all of it, but -- I mean, I got
10   a whole stack of factiva stuff, so as far as I
11   know, I reviewed all of it.
12   Q.  The next item, 28I, refers to various
13   Bloomberg articles for the same time period.  Do
14   you see that?
15   A.  Uh-huh.
16   Q.  Which articles did you look at?
17   A.  I don't remember off the top of my head.
18   Q.  Okay.  Do you know how you selected
19   them?
20   A.  Again, it was a search based on Marvel,
21   Marvel Holdings, things of that nature.
22   Q.  And do you retain, I guess, the output
23   of that search or those articles that you looked
24   at?
25   A.  Those are retained by Charles River.  I

Robert W. Holthausen

1
2    don't have them personally.
3    Q.  Did you review them?
4    A.  Yes.
5    Q.  And then you sent them back to Charles
6    River?  I'm just not clear how they get back to
7    Charles River.
8    A.  Well, sometimes I work up in the offices
9    in Charles River.
10   Q.  And is that what you did for this
11   report?
12   A.  I was up there several times.
13   Q.  Okay.  This would be a good time to ask
14   you whether there was anyone besides yourself
15   involved in the preparation of your rebuttal
16   report.
17   A.  Could you define what you mean by
18   "preparation"?  Doing analysis?
19   Q.  Doing analysis, drafting, or any other
20   work on the report.
21   A.  There were people from Charles River
22   that I directed to do various work, which involved
23   collecting data, doing various forms analysis that
24   I directed.  The people that I worked with
25   primarily were Stephen O'Neil and Miguel Herce.

Robert W. Holthausen

1
2    There were other people who worked on that that I
3    did not have direct contact with.
4    MR. ALLINGHAM:  Professor Holthausen,
5    you have a habit -- and because it's your right
6    hand and the court reporter is sitting to your
7    right -- you put your hand up to your face.  So it
8    would help, I might suspect, if you kept your
9    hands down.
10   A.  Okay.
11   Q.  What was the role of Mr. O'Neil?
12   A.  Mr. O'Neil is the primary person that I
13   talked with during the engagement, and Miguel was
14   the secondary person that I talked with.  I forget
15   Mr. O'Neil's title, to tell you the truth.  He's
16   more senior to Mr. Herce.
17   Q.  Did you do anything to -- I'm sorry.
18   What work did -- what were the roles of the
19   people that you worked with?  Did you give them --
20   what were the roles of the people you worked with?
21   A.  Well, I told them what kind of analysis
22   I wanted done.  I would tell them to search for
23   articles.  I would tell them to, you know, "We
24   need stock prices from this time period.  We need
25   to run this probability distress model in this

10 (Pages 34 to 37)

Page 38

Robert W. Holthausen

1  particular way." So I would give them assignments
2  that they would have to do.
3
4      Q.  Okay.  And did they perform economic
5  analyses and calculations?
6      A.  That's what I think I just described to
7  you.
8      Q.  Okay.  Shows you what I know.
9      And did you do anything to determine whether
10 the work performed by these other people was
11 accurate?
12     A.  Yeah.  I check a lot of the work that's
13 performed, so I go through and I go through a lot
14 of the stuff that is done and check it for
15 accuracy.
16     Q.  Do you check all the work that's done?
17     A.  Well, I check a lot of it.  You know, I
18 go back, and I look back to -- we pull numbers
19 from 10Ks and things like that.  I go back and I
20 look at the 10Ks to see that the numbers are the
21 numbers that I would have pulled out of the 10Ks
22 and things like that.
23     Q.  And who drafted your rebuttal report?
24     A.  I drafted my rebuttal report.
25     Q.  Was there anyone else who was involved

Page 39

Robert W. Holthausen

1  in the drafting?
2      A.  Nobody else drafted the report.  I got
3  comments on it, but I drafted it.  It was on my
4  computer the whole time except for maybe an hour.
5      Q.  What was the hour about?
6      A.  I asked them to put in a bunch of
7  footnotes that I didn't want to type in.
8      Q.  How much time did you spend on your
9  rebuttal report, any way you can quantify it?
10     A.  Oh, well, let's see.  It must have
11 been -- we're talking about all the analysis and
12 everything?
13     Q.  Well, how much time you spent, I guess
14 I'm asking you, as opposed --
15     A.  It must be somewhere between 80 and 90
16 hours based upon what I said I billed.
17     Q.  Do you know what that is as a percentage
18 of the total amount of time spent by everybody on
19 the work?
20     A.  No idea.
21     Q.  And prior to finalizing your report, did
22 you produce any drafts?
23     A.  Yes.
24     Q.  How many?

Page 40

Robert W. Holthausen

1      A.  I don't think I know the answer to that.
2      Q.  Was it more than one?
3      A.  Oh, sure.  I mean, I was revising it
4  continually.  I mean, I would write it, and then
5  I'd read it, and I'd make corrections to it and,
6  you know, reword it and things like that, so I was
7  constantly revising it, so -- you know.
8      Q.  How many iterations did you send out to
9  other people for review and comment?
10     A.  I would say two or three.
11     Q.  Okay.  And who did you send it to for
12 review or comment?
13     A.  Stephen O'Neil at Charles River read it,
14 and attorneys at Skadden read it.
15     Q.  And who did you receive comments from?
16     A.  I received comments from Stephen O'Neil
17 and from the attorneys at Skadden.
18     Q.  Okay.  And did you incorporate comments
19 or suggestions from Mr. O'Neil into the final?
20     A.  They would give me some ideas about how
21 to say something clearer, or they'd say that "This
22 is isn't said very clearly.  Can you rephrase it?"
23 And so to the extent that I agreed with those
24 kinds of comments, I would figure out how to

Page 41

Robert W. Holthausen

1  redraft.
2      Q.  Did you receive any comments on
3  substance as opposed to style?
4      A.  No.
5      Q.  Okay.  What was your assignment as a
6  rebuttal expert in this case?
7      A.  My assignment was to review the damages
8  calculation of Mr. Baliban and comment on my
9  opinion as to whether those were reasonable
10 calculations or not.
11     Q.  Mr. Holthausen, would you please take a
12 look at paragraph 2 of your report, which we've
13 marked as Holthausen Exhibit 1?
14     A.  Uh-huh.
15     Q.  In your very first sentence of paragraph
16 2, you note that Mr. Baliban's report discusses
17 whether and to what extent Marvel Entertainment
18 Group was harmed by the issuance of the -- and
19 this is my own shorthand -- Marvel parent and
20 Marvel III holding company notes?
21     A.  Right.
22     Q.  Okay.  Now, your report addresses
23 Mr. Baliban's opinions concerning the extent to
24 which Marvel Entertainment was harmed by the

11 (Pages 38 to 41)

Robert W. Holthausen

1
2  issuance of Marvel parent and Marvel III notes.
3  Isn't that true?
4      A.  That is correct.
5      Q.  Okay.  My question is:  Was it also part
6  of your assignment to address the "whether"
7  question, whether Marvel Entertainment was harmed
8  by the issuance of the Marvel parent and
9  Marvel III notes?
10     A.  Not in this -- not in this report.
11     Q.  Okay.  Let me also understand if I can
12  figure out what is or is not within the scope of
13  your -- your work in your rebuttal report.
14     Are you expressing an opinion on whether the
15  note issuances by Marvel parent and Marvel III
16  were a reason why Marvel financed acquisitions
17  with bank debt rather than equity?
18     A.  Are we talking about -- can we clarify
19  something?  Are we talking about this report --
20     Q.  Yes.
21     A.  -- and only this report?
22     Q.  That is what I'm asking you.
23     A.  Okay.  So can I infer for the rest of
24  this deposition, unless you say otherwise, that
25  when you ask me a question like that, it is just

Robert W. Holthausen

1
2  about this report?
3      Q.  That is very fair.
4      A.  Okay.  I just wanted to clarify that.
5  So now, would you ask the question again or repeat
6  the question?
7      Q.  I'll try.  Are you expressing an opinion
8  in this report on whether the note issuances by
9  Marvel parent and Marvel III were a reason why
10  Marvel financed acquisitions with bank debt rather
11  than equity?
12     A.  No, I'm not.
13     Q.  Okay.  And in this report are you
14  expressing an opinion on whether the
15  debt-to-equity ratio in Marvel's capital structure
16  was a cause of financial distress?
17     A.  No, I'm not.
18     Q.  And I think -- this may be implicit in
19  what you told me earlier, but I just want to make
20  sure I understand.
21     Are you expressing an opinion in this report
22  on whether Marvel became financially distressed
23  after the issuance of the Marvel parent and
24  Marvel III notes?
25     A.  No.

Robert W. Holthausen

1
2      Q.  Your report addresses the extent to
3  which there was injury, if any, flowing from that?
4      A.  Correct.  Flowing from the issuance of
5  the indenture holding notes.
6      Q.  Correct.  Mr. Holthausen, on page 3 of
7  your report, just above paragraph 6, do you see
8  there's a caption entitled "Application of the
9  Andrade" -- that's A-n-d-r-a-d-e -- "and Kaplan
10  Study to Marvel"?
11     A.  Yes.
12     Q.  Okay.  Could you just tell me which
13  paragraphs of your report are addressing the
14  application of the Andrade and Kaplan study to
15  Marvel?  Is that everything up through the next
16  heading after paragraph 23?
17     A.  Well, there are -- yes, basically, but
18  not every paragraph is going to talk about Andrade
19  and Kaplan.  And there are other calculations that
20  are done, and then Andrade and Kaplan is again
21  implied based upon those calculations, but
22  basically that whole section 3 has to do with how
23  I would think about applying Andrade and Kaplan to
24  the Marvel situation.
25     Q.  Is it correct to say that paragraph 6

Robert W. Holthausen

1
2  through 14 of your report address the application
3  of the Andrade and Kaplan study to Marvel?
4      A.  Are you excluding the paragraphs
5  subsequent to 14?
6      Q.  No.  I'm just saying at a minimum 6
7  through 14.  I don't mean to draw any negative
8  inference on that.  Just at least 6 through 14?
9  Is that all about the application of the Andrade
10  and Kaplan study to Marvel?
11     MR. ALLINGHAM:  Andrade.
12     Q.  Mr. Allingham informs me that it's
13  mispronouncing Andrade.  Since I don't know that
14  that will show up on the transcript, I'll live
15  with the consequences.
16     A.  Well, Andrade and Kaplan do not talk
17  about theory of damages.  And I get into that in
18  those paragraphs.  So certainly 6 to 14 has to do
19  with Andrade and Kaplan, but it goes beyond
20  Andrade and Kaplan.
21     Q.  Okay.
22     A.  I'm not really sure what your question
23  is, so I'm trying to be responsive, but if that's
24  not it, let me know.
25     Q.  Well, you are actually understanding

12 (Pages 42 to 45)

Robert W. Holthausen

1
2  what I'm asking you because I take it when you
3  say, for example, in paragraph 7 what you believe
4  is a conceptually correct measure, you are
5  offering your own opinion as to how best to
6  measure the impact of the indenture covenants as
7  distinguished from saying something about how the
8  Andrade and Kaplan study is being applied?
9    A. Correct. Here I am talking about the
10 right way to think about damages in this
11 perspective with regard to the Marvel matter.
12   Q. Okay. Let me just make sure I
13 understand what — at least what we're talking
14 about in paragraph 7. When you say in paragraph
15 7, "The conceptually correct measure to
16 estimate" — and then the sentence goes on from
17 there, what is it that you're saying should be
18 measured in the way you describe in paragraph 7?
19   A. What I'm getting at here is the issue of
20 an ex-ante, if you want, measure of damages versus
21 an ex-post measure of damages. And so what I'm
22 really arguing here is that when we think about:
23 What are the potential costs associated with the
24 indenture covenants — and let me just say
25 something to get it on the record, and I'll just

Robert W. Holthausen

1
2  say it once. Okay? I've been asked in this
3  particular report to assume that Marvel was
4  constrained by the holding company notes. Okay?
5  So everything in this report makes that assumption
6  that Marvel, in fact, was going to act in
7  accordance with those holding company notes. I
8  understand that that's a legal issue and that it's
9  being asserted otherwise by the defendants, but
10 I'm not making any opinion about that in this
11 report. I've been asked to assume that they are
12 constrained in that sense.
13   Q. Okay. I'm actually asking you something
14 really —
15   A. Okay.
16   Q. — straightforward —
17   A. Okay.
18   Q. — which is: What is it that you are
19 saying should be estimated in the way you are
20 describing? Is it the — when you say "the
21 conceptually correct measure to estimate," to
22 estimate what? The injury —
23   A. To estimate the injury, right. Or to
24 estimate the injury associated with the issuance
25 of the indenture covenants, you would want to

Robert W. Holthausen

1
2  measure what the expected value of those holding
3  company — the issuance of those holding company
4  notes would have on Marvel.
5    Q. And what is the basis for your opinion
6  that the conceptually correct measure is "the
7  incremental expected costs of financial distress
8  associated with the indenture covenants at the
9  time the notes were issued"?
10   A. Okay. Well, I guess there's several
11 parts to that. First, the way I think about it is
12 the following. There is — let's suppose
13 there's — the holding company notes are issued,
14 and let's suppose that that, in some sense,
15 affects Marvel's value. Okay? The impact of that
16 is going to be based upon — the impact on value
17 is going to be based upon what the expected cost
18 of those are to Marvel. And potentially let's
19 assume — let's take it, for sake of argument,
20 that the holding company notes would, in fact,
21 constrain Marvel in terms of their financing. If
22 that were true and that increased the likelihood
23 that Marvel would experience financial distress
24 somewhere down the road, then the securities
25 prices would respond to that news that, in fact,

Robert W. Holthausen

1
2  this could happen in the future. And so there
3  would potentially be — let's suppose there was.
4  There could potentially be a decline in value.
5  That decline in value is what you want to measure
6  because it measures what the expected cost was
7  associated with the holding company notes. If a
8  stockholder — once that information is made
9  public and the price responds, if a stockholder
10 wanted to not take the gamble that that financial
11 distress cost would occur sometime in the future,
12 then that stockholder could sell their stock at
13 that point in time. So if the stock is liquidly
14 traded and this event occurs which could have some
15 impact on Marvel in the future, the expected cost
16 of that would be recognized in the price now, and
17 that is the damage suffered by those shareholders.
18 If they choose to stay on after that, that's their
19 choice as to whether they do that or not.
20   Q. Is it your view that the indenture
21 covenants could only have an impact on Marvel at
22 the time that they are issued?
23   A. No. The indenture impacts potentially
24 could have an impact on Marvel at other times.
25 Okay? Remember, I've been asked to assume that

13 (Pages 46 to 49)

Page 50

Robert W. Holthausen

1  they can have an impact on Marvel. But the issue
2  is in terms of a damage. How would you think
3  about doing a damage calculation? The damage
4  calculation should be based upon what the expected
5  cost to the shareholder is at the time that this
6  event takes place -- okay? -- because the
7  shareholder can then, if they want to, decide that
8  they no longer want to hold Marvel shares.
9  Q. Since the indenture covenants could have
10  an impact on Marvel at other times beyond the date
11  when the notes are issued, why do you not think it
12  proper to measure the impact on Marvel at those
13  other times when it does have an impact?
14  A. Because essentially what you would then
15  be doing is, you would be -- you know, when
16  shareholders make a decision to hold or not to
17  hold a company stock, they're bearing some risk
18  associated with holding a company stock. And that
19  information was out and it was in the marketplace
20  that these indentures were there, and so a
21  shareholder who chooses to continue to hold on to
22  those shares knows that that information is out
23  there. The price at the time is going to reflect
24  whatever impact that had at the time when those

Page 51

Robert W. Holthausen

1  things were issued.
2  THE VIDEOGRAPHER: One second.
3  MR. GOLDWATER: Are you changing tapes?
4  THE VIDEOGRAPHER: Just one second.
5  Okay.
6  Q. Professor Holthausen, are you trying to
7  measure the impact of the indenture covenants on
8  the shareholders of Marvel as distinguished from
9  Marvel as an enterprise?
10  A. No. I measure it on Marvel as an
11  enterprise. I was using shareholders as an
12  example of that, but it is measured on Marvel as
13  an enterprise.
14  Q. Did the indenture covenants have an
15  impact on Marvel on the date that the holding
16  company notes were issued?
17  A. Was there a price response?
18  Q. Was there an injury to Marvel on the
19  date that the Marvel parent and Marvel III holding
20  company notes were issued?
21  A. There was no -- to my knowledge, there
22  was no statistically significant price stock
23  effect on those dates.
24  Q. I don't know if we're saying the same

Page 52

Robert W. Holthausen

1  thing. I was asking you: Is there was an injury
2  to Marvel on the date that the parent and
3  Marvel III notes were issued? Are we saying the
4  same thing, that there is no injury on that date?
5  A. I mean, there are price movements on
6  various days, and then there are issues of whether
7  or not those price movements are statistically
8  significant or not.
9  Q. Okay. I'm not talking about price
10  movements at all.
11  A. Okay.
12  Q. I'm just asking you a question, which
13  is: On the date that the Marvel parent and
14  Marvel III notes were issued, did the issuance of
15  those notes cause -- injure Marvel, have an impact
16  on Marvel?
17  A. I assess several different -- I have
18  several different damage estimates. Okay? And
19  depending upon relying on the Andrade Kaplan --
20  and Kaplan study, just as Baliban did. However, I
21  looked at the Andrade and Kaplan study and looked
22  at a lot of the evidence in Andrade and Kaplan.
23  And based upon that, my analysis suggests you get
24  damages anywhere between zero and $12 million.

Page 53

Robert W. Holthausen

1  Q. Okay. I can read Andrade and Kaplan,
2  too. My question is to you as an expert: Is it
3  your opinion that on the date that the Marvel
4  parent and Marvel III notes are issued, Marvel
5  sustains an injury?
6  A. Again, conditioned on what my assignment
7  was here -- my assignment here was to assume that
8  Marvel was going to be constrained by the holding
9  company notes. Based upon that, I estimate
10  damages that go between zero and $12 million at
11  the time of the issuance of the holding company
12  notes. And, you know, where in that range it
13  is -- you know, there are arguments it could be
14  zero, there are arguments it could be $12 million,
15  depending upon which of the numbers you want to
16  pull from the Andrade and Kaplan study.
17  Q. So all you can say as to whether there's
18  injury on the day they're issued is, there may be
19  there may not be?
20  A. Well, I'm giving a range of estimates of
21  between zero and $12 million on the date of the
22  issuance.
23  Q. If it's zero, then there's no injury?
24  A. If it's zero, there's no injury.

14 (Pages 50 to 53)

Page 54

Robert W. Holthausen

1  Q. If it's $12 million, it's $12 million of
2  injury?
3
4  A. Correct.
5  Q. Okay. And in November of 1996 when
6  Marvel is in a liquidity crisis, do the indenture
7  impact -- I'm sorry -- do the indenture covenants
8  have an impact on Marvel's ability to obtain
9  financing?
10  A. Are you asking me about my opinions in
11  this report?
12  Q. Well, if -- certainly if you don't have
13  an opinion on that question, then, by all means,
14  you should tell me you don't have an opinion. But
15  I don't know whether you do or you don't, so all I
16  can do is ask you this question.
17  In November of 1996 did the indenture
18  covenants have an impact on Marvel when it was in
19  the throws of its liquidity crisis?
20  A. In -- now we're going to have to go back
21  to my first report, not this report, because I
22  wasn't asked to discuss that issue in this
23  particular report. Right? In the first report,
24  what I do is, I go through and I talk a lot about
25  sections 404, 405, 409. I talk about all those

Page 55

Robert W. Holthausen

1
2  sections, and I talk about the different things
3  that Marvel could have done, not just in November,
4  but they could have done throughout the time
5  period that the holding company notes were issued.
6  So there are -- there were lots of alternatives
7  that Marvel had under section 404, 405, and 409
8  that would have allowed them to issue debt, issue
9  preferred stock, issue common equity, things of
10  that nature. So those were things that were
11  discussed in my first report and my second report.
12  Q. Okay. There's no hypotheticals at all
13  built into my question. I'm not asking you for
14  any hypothetical "what if" scenarios. I'm just
15  asking you a question based on your observation of
16  historical fact.
17  My question is: In November of 1996, did the
18  indenture covenants have an impact on Marvel?
19  MR. ALLINGHAM: That question is the
20  same question you just asked that you got an
21  answer to.
22  MR. GOLDWATER: Yes, it is.
23  MR. ALLINGHAM: I object. Asked and
24  answered.
25  MR. GOLDWATER: Well, certainly asked.

Page 56

Robert W. Holthausen

1
2  I agree with you on that.
3  Q. There's no hypotheticals here. I'm not
4  asking what Marvel could have done differently to
5  avoid the situation that, in fact, it was in. I'm
6  just asking you as a matter of historical fact:
7  Did Marvel sustain injury from the indenture
8  covenants in November of 1996?
9  MR. ALLINGHAM: Well, that's a different
10  question than the one you asked earlier.
11  MR. GOLDWATER: Well, all right. That's
12  the one that's on the table.
13  MR. ALLINGHAM: Okay.
14  A. Okay. So say the question again.
15  MR. GOLDWATER: Please read
16  Mr. Holthausen the question.
17  (Counsel requests the reading of the
18  following testimony:
19  "QUESTION: There's no hypotheticals
20  here. I'm not asking what Marvel could have done
21  differently to avoid the situation that, in fact,
22  it was in. I'm just asking you as a matter of
23  historical fact: Did Marvel sustain injury from
24  the indenture covenants in November of 1996?")
25  A. I mean, there were things that Marvel

Page 57

Robert W. Holthausen

1
2  still could have done in November of '96 had it
3  wanted to. I mean, it could have issued equity
4  had it wanted to. Whether or not there would have
5  been an appetite in the marketplace for an equity
6  issuance is -- you know, that's a different
7  question having to do with what people thought
8  about Marvel and whether they wanted to invest in
9  Marvel at the time. But had Marvel wanted to,
10  Marvel could have issued equity, assuming that
11  there was an appetite in the marketplace. And I
12  don't think the holding company notes would have
13  affected its ability to issue equity.
14  Q. So your answer to whether Marvel
15  sustained an injury from the indenture covenants
16  in November of 1996 is what? Yes, no, or you're
17  not sure, you don't know?
18  A. Well, I think that they had alternatives
19  that were available to them that -- you know,
20  there were no -- there were things that they could
21  have done even with the indenture notes there.
22  Let me rephrase that. There were actions that
23  Marvel could have taken that were not constrained
24  by the existence of the indenture holding notes --
25  by the holding company notes. And whether or not

15 (Pages 54 to 57)

**Hudson Reporting & Video, Inc.**
**www.hudsonreporting.com**

Robert W. Holthausen

1  Robert W. Holthausen
2  there was an appetite in the marketplace for them
3  to issue equity, for example, that's a different
4  question than saying that -- did the holding
5  company notes themselves harm them, harm Marvel?
6      Q.  So does that lead you to believe that
7  Marvel did not sustain injury from the indenture
8  covenants in November of 1996?
9      A.  It leads me to believe they had options
10  open to them potentially that the holding company
11  notes didn't constrain them from taking.  Now,
12  that doesn't mean that they were able to issue the
13  equity or that they did issue equity or whatever.
14      Q.  Okay.  I clearly understand that you're
15  telling me that you think, in your opinion, Marvel
16  had options open to them.  What I'm not
17  understanding is whether you have a view and, if
18  you do, what is your view as to whether Marvel was
19  injured by the indenture covenants of November of
20  1996.
21      A.  I do not -- again, I believe they had
22  options open to them and that they -- that there
23  were actions that Marvel could have taken --
24  okay? -- that would -- whether or not -- again,
25  whether there was an appetite out there or not,

1  Robert W. Holthausen
2  that would have allowed them to do those things
3  even with the existence of the holding company
4  notes.
5      Q.  Are you just unable to answer my
6  question?
7      A.  I don't know.  I think I am.
8          MR. ALLINGHAM:  Objection to the form of
9  the question.
10      A.  I think I am answering it.
11      Q.  Okay.  And I have certainly heard you
12  say that you believe Marvel had options open to
13  them.  Does that mean -- and where does that lead
14  you in your thinking?  Does that lead to you
15  believe that Marvel did or did not sustain injury
16  as a result of the indenture covenants in November
17  of 1996, or does it not lead you anywhere?  I have
18  no idea, but I really would like to know your view
19  on this.
20      A.  Well, the -- my view of this is that the
21  market knew about the holding company notes prior
22  to November of 1996 and that there was information
23  out there in the marketplace about the existence
24  of those holding company notes and what impact
25  they might have on Marvel.  And that was all known

1  Robert W. Holthausen
2  prior to November of 1996.  So I don't believe
3  that, for example, the price decline that is
4  observed on November 12, 1996, has to do with the
5  holding company notes.  That price response is
6  not, in my opinion, a price response because of
7  the holding company notes.
8      Q.  Professor Holthausen, did the indenture
9  covenant limit Marvel's financing options in
10  November of 1996?
11          MR. ALLINGHAM:  This is, again, based on
12  the assumption that you were asked to make?
13          MR. GOLDWATER:  It's just a question.
14  It's not edited in any way, and he can answer any
15  way he wants.
16      A.  Well, again, under the assumption that
17  Marvel was constrained by these holding company
18  notes.  Right?  I mean, that's what the basis of
19  my report was written on.
20      Q.  Yes, that's what I understood all your
21  things that you said in your report to be premised
22  on.
23      A.  Right.
24      Q.  Okay.  So on that premise, did the
25  indenture covenants limit Marvel's financing

1  Robert W. Holthausen
2  flexibility in November of 1996?
3      A.  I still think they -- as I said, I think
4  they had options and they had flexibility at that
5  point in time if there was an appetite in the
6  marketplace.
7      Q.  Okay.
8      A.  I don't understand what I'm not
9  answering.
10      Q.  Whether -- I'm not asking you, although
11  you keep telling me that, whether Marvel had
12  financing options open to them in November of
13  1996.  What I'm asking you is whether the
14  indenture covenants were -- imposed any limitation
15  on Marvel's ability to obtain financing in
16  November of 1996.  Assume a world in which there
17  are no indenture covenants and Marvel has a
18  universe of financing options.  Next, assume a
19  universe that actually existed, which is the
20  universe where there are indenture covenants.  And
21  please tell me, as compared between those two
22  universes:  Are Marvel's financing options limited
23  in the universe where there are indenture
24  covenants?
25      A.  I don't think they had any impact on

16 (Pages 58 to 61)

Page 62

Robert W. Holthausen

1   Robert W. Holthausen
2   Marvel's ability to go out and get financing
3   between those two worlds.
4       Q.   Okay. So your opinion is that Marvel
5   sustained no injury from the indenture covenants
6   in November of 1996?
7       A.   No. I'm saying that -- I'm saying that
8   they had the ability to go out and obtain
9   financing and -- during that time period, and they
10  still had those options open to them even though
11  the indenture covenants were in existence.
12      Q.   And did they have all the options that
13  they would have had, had there been no indenture
14  covenants?
15      A.   Well, there were limitations, for
16  example, on, you know -- if Perelman was going to
17  act in accordance with the indenture covenants,
18  there were limitations on the fact that Perelman
19  had owned a majority of the shares.
20      Q.   So --
21      A.   But that still would have left many
22  options open.
23      Q.   So to some extent, there were -- they
24  had less options than they would have had without
25  the indenture covenants. Isn't that right?

Page 63

Robert W. Holthausen

1   Robert W. Holthausen
2       A.   There may have been less options, but
3   they still had plenty of options available to
4   them.
5       Q.   Okay. But I think we're saying the same
6   thing, then, which is --
7           MR. ALLINGHAM: Andrew, you've been at
8   this for 20 minutes. Don't you think that the
9   record is pretty clear?
10          MR. GOLDWATER: No. I think I'm not
11  getting answers to my questions. That's what I
12  think.
13          MR. ALLINGHAM: Well, you're entitled to
14  keep asking as long as you like. I thought that
15  the record was pretty clear.
16          MR. GOLDWATER: Okay. Great.
17      Q.   I think we're now saying the same thing,
18  or hopefully we're saying the same thing. We
19  agree now that Marvel did not have all of the
20  financing flexibility or options that it would
21  have had, had the indenture covenants not been in
22  existence. Isn't that what we're both saying now?
23      A.   Well --
24          MR. ALLINGHAM: I object. I'm sorry to
25  object to the form of the question, but that's not

Page 64

Robert W. Holthausen

1   Robert W. Holthausen
2   a proper question.
3       Q.   Am I misunderstanding?
4       A.   What I'm saying is that there was plenty
5   of flexibility still there. They could have
6   issued -- they could have issued equity, and they
7   still would have owned a majority of the shares.
8       Q.   Okay. Let me ask you -- since you keep
9   saying it, let me just ask you about it.
10      You're saying Marvel could have issued equity
11  in November of 1996?
12      A.   I said -- but, again, I said: Whether
13  there was any appetite in the marketplace for
14  that, I don't know the answer to that. You know,
15  forget the indenture company notes. Right? Just
16  Marvel alone in its -- as it was in November of
17  1996, could they have issued equity? Would there
18  have been an appetite for issuance of equity,
19  absent the holding company notes? I haven't done
20  an analysis of that.
21      Q.   Okay. My question actually is not a
22  hypothetical question. It doesn't assume away the
23  indenture covenants. It's a question based on the
24  facts as they were in November of 1996.
25      In November of 1996, is it your view that

Page 65

Robert W. Holthausen

1   Robert W. Holthausen
2   Marvel could have issued equity?
3       A.   With the holding company notes?
4       Q.   Correct.
5       A.   I've not done an analysis of whether
6   they could have issued equity at that point in
7   time.
8       Q.   Okay. And so what were the other
9   financing options that you believe were open to
10  Marvel in November of 1996? You think they could
11  have issued more debt at that time?
12      A.   No, no. I've already said that I don't
13  think they could have issued any more debt in
14  November of 1996.
15      Q.   So I guess that raises the question:
16  What financing options were open to them in
17  November of 1996?
18      A.   Well, I mean, primarily it would have
19  been for an equity infusion.
20      Q.   Okay. And unless my short-term memory
21  is going, I thought you had told me that you
22  hadn't looked at whether Marvel could have issued
23  equity in November of 1996.
24      A.   I didn't do an analysis of whether there
25  would be an appetite for an equity issuance of

17 (Pages 62 to 65)

Robert W. Holthausen

1  Marvel in November of 1996.
2  Q.  Okay.  And have you looked at or do you
3  have a view on how much equity Marvel could have
4  raised in November of 1996?
5  A.  No, I haven't looked at that.
6  Q.  Okay.  Do you remember reading in the
7  material that you considered that Mr. Perelman was
8  suggesting that Marvel needed $350 million in an
9  equity infusion in order to carry on as a viable
10 business?
11 A.  Correct.
12 Q.  Okay.  Do you know whether Marvel could
13 have raised $350 million in any sort of financing
14 in November of 1996?
15 A.  Well, I mean, there was the Perelman
16 off -- the Andrews Group proposal for
17 $350 million, and then there was a proposal from
18 Icahn where Icahn said that they would -- I think
19 he originally that they would put in $350 million,
20 and then I think subsequently he said that they
21 would put in $365 million.
22 Q.  Okay.  The --
23 A.  Those would both be equity infusions.
24 Q.  The Perelman offer was conditioned on a

Robert W. Holthausen

1  waiver of the indenture covenants, was it not?
2  A.  Correct.
3  Q.  Okay.  And was the Icahn offer also
4  conditioned on a waiver of the indenture
5  covenants?
6  A.  I don't remember the answer to that.
7  Q.  Okay.  And I guess my question is --
8  A.  Because Icahn represented the
9  noteholders, as far as I know, in that
10 transaction.  It was going to be a rights offer.
11 Anyway ...
12 Q.  Yeah.  I guess my question is, you know:
13 Putting aside offers which require the indenture
14 covenants to go away, do you have a view on
15 whether Marvel could have raised $350 million in
16 November of 1996?
17 A.  Just in a public offering?
18 Q.  Any way, public, private, any way.
19 A.  Again, I have not done analysis if they
20 could have gone out and done a public offering for
21 $350 million.
22 Q.  Thank you.  When you say in paragraph 7
23 of your report that "The conceptually correct
24 measure is the incremental expected cost of

Robert W. Holthausen

1  financial distress associated with the indenture
2  covenants at the time the notes were issued," what
3  is the benchmark you're using for determining what
4  is correct?
5  A.  I'm just using economic theory here in
6  terms of how you would think about the damage, if
7  you want, sustained by the claim holders if, in
8  fact, the indenture covenants increased the
9  likelihood that Marvel would experience financial
10 distress.  So the issue is -- you know, there is
11 some possibility, absent any indenture company
12 notes, that Marvel would experience financial
13 distress, so that can occur even without the --
14 without the holding company notes.  And so then
15 the issue would be:  Well, if you have holding
16 company notes, does that change the probability of
17 financial distress?  And so, you want to estimate
18 sort of the incremental expected cost of those
19 financial distress, which is basically the harm
20 that would have been suffered at the time that
21 those notes were issued.
22 Q.  Okay.
23 A.  The way to think about that is -- I
24 think actually in the Third Circuit Court of

Robert W. Holthausen

1  Appeals opinion, there was actually a statement in
2  there that said, you know, another way -- a way to
3  think about what might have happened here would
4  have been -- if there had been an arm's-length
5  transaction between Andrews and Marvel, you know,
6  what would be, you know, for the issuance of the
7  holding company notes, what kind of compensation
8  might Marvel have demanded in an arm's-length
9  transaction?  One way to think about that is:
10 Okay.  Well, what are the expected costs
11 associated with issuing those holding company
12 notes?
13 Q.  Okay.  When I asked you about what was
14 your benchmark, you mentioned up front that it was
15 economic theory.  What is the economic theory that
16 you are alluding to?
17 A.  Well, I think it's just a damages
18 theory.  Right?  So you have -- some event takes
19 place.  Okay?  There is an effect on value
20 associated with that act.  The claim holders are
21 free to exit as soon as that has taken place
22 unless, for some reason, their claim isn't
23 marketable or they can't exit.  If they can exit
24 at that point in time, the damage they're going to

18 (Pages 66 to 69)

Robert W. Holthausen

2 suffer is from, you know: What was the value
3 before the act? What was the value after the act?
4 And then if they choose to exit or not exit,
5 that's their business, but they had the right to
6 exit immediately after that.
7    Q. When you're talking about the claim
8 holders, you're talking about Marvel stockholders?
9    A. It could have been stockholders. It
10 could have been debt holders. It could have been
11 vendors. Right? I mean, they all have a choice
12 of continually making decisions as to whether or
13 not they want to be a claim holder in Marvel.
14    Q. And what is it that would alert them —
15 what's the event that's supposedly alerting them
16 to — that there's going to be an effect on value?
17    A. Well, it's in the public record that
18 these holding company notes have been issued, and
19 it's discussed in — not only in the prospectuses
20 for the holding company notes, but in lots of
21 Marvel documents as well.
22    Q. And is it your view that if the claim
23 holders don't react immediately upon the issuance
24 of the holding company notes, that all the events
25 that happened past that date are not — any

Robert W. Holthausen

2 effects on the value of Marvel are not effects for
3 which Marvel is entitled to recompense?
4    A. Right. I think that they had the option
5 of whether or not — you know, I'm not saying the
6 day. Okay? You know, you may not be able to exit
7 in a day. Right? But over some reasonable amount
8 of time, if you didn't like the way that — what
9 might happen at Marvel, you would have the ability
10 to exit from that. And so what I'm trying to do
11 here is, I'm trying to estimate this expected
12 value or this ex-ante cost of these indenture
13 company notes.
14    Q. Have you ever estimated damages in a
15 tort case before?
16    A. Not in a tort case.
17    Q. Is it your view that the damage in a
18 tort case must be coincident with the breach of
19 duty?
20    A. You're using terms that sound like legal
21 terms to me that I don't understand.
22    Q. I am, and I apologize.
23    A. Okay. I don't understand what you're
24 asking.
25    Q. I'll try to do better.

Robert W. Holthausen

2    Am I understanding you correctly,
3 Professor Holthausen, that, in your view, if
4 Marvel sustains injury beyond some reasonable
5 period after the issuance of the holding company
6 notes, that is not injury for which Marvel claim
7 holders are entitled to recover damages?
8    A. I think we have to be a little more
9 careful in our wording, so let me try to rephrase
10 your question, or maybe you want to rephrase it.
11 I don't care. Could you read that back, and then
12 I'll try to rephrase it?
13    (Counsel requests the reading of the
14 following testimony:
15    "QUESTION: Am I understanding you
16 correctly, Professor Holthausen, that, in your
17 view, if Marvel sustains injury beyond some
18 reasonable period after the issuance of the
19 holding company notes, that is not injury for
20 which Marvel claim holders are entitled to recover
21 damages?")
22    A. Okay. And the thing is that the only
23 thing that — the thing that happened was that I
24 want to get on — I guess get clarified is, in
25 your question, what you're assuming is that the

Robert W. Holthausen

2 holding company notes were issued, and that was
3 the — that was the only thing that happened. And
4 then everything else that happened was a result of
5 the issuance of those holding company notes. Is
6 that your question?
7    Q. Yes, that is my question.
8    A. Yeah. Okay. But I just wanted —
9 because you said some — you know, certain
10 things — you didn't say that other events didn't
11 transpire. Right?
12    Q. It's almost my question. Not everything
13 else that happened as a result of the indenture
14 covenants, but that if the indenture — and I'll
15 try to help — I'll try to rephrase.
16    MR. ALLINGHAM: Good, because I think if
17 we're going to do it serially, it's not going to
18 work.
19    MR. GOLDWATER: Of course we are.
20    Q. If the indenture covenants are issued on
21 day one, and three years after day one Marvel
22 sustains economic injury from the existence of the
23 holding company notes, is it your view — do you
24 have a view on whether Marvel is entitled to
25 recover damages for the injury it sustains in year

19 (Pages 70 to 73)

Page 74

Robert W. Holthausen

1
2  three, even assuming a breach of duty three years
3  earlier?
4      A.  The claim holders of Marvel?
5      Q.  Correct.
6      A.  Okay.  First of all, I'm not a lawyer.
7  Right?  So the law may have something to say about
8  what is the right --
9          THE REPORTER:  One at a time.
10     Q.  Yes, as an economic matter, absolutely.
11     A.  -- what is the right way and what is the
12  wrong way to do it from a matter of law.  I'm not
13  a lawyer.  That's up to you guys and a judge to
14  figure out whether there's some case law here that
15  speaks to that issue.  But with regard to the
16  issue of the holding company notes, yeah, my view
17  is that when the holding company notes are issued,
18  if there's some harm associated with the issuance
19  of those, the claim holder should be compensated
20  based upon what that harm was at the time because
21  they are --
22     Q.  At what time?  I'm sorry to interrupt.
23     A.  At the time the holding company notes
24  are issued.  Okay?  Because they're free to exit
25  from holding Marvel securities subsequent to that.

Page 75

Robert W. Holthausen

1
2      Q.  And what information is available to the
3  claim holders at the time the notes are issued?
4      A.  Well, they know about -- they know that
5  the holding company notes have been issued.  They
6  know that -- I mean, all this stuff is a matter of
7  public record.  They would know what the indenture
8  covenants are.  There are analyst reports about
9  the holding company notes.  There are Marvel
10  documents per se, not the holding company
11  documents, but the Marvel documents per se about
12  the holding company notes, so there's a lot of
13  stuff that gets into the public record.  So once
14  that information is in the public domain or in the
15  public record, then people could choose to remain
16  there or not in terms of continuing to hold Marvel
17  securities or not.
18     Q.  Okay.  But Marvel is not a claim holder,
19  is it?  It's just an entity?
20     A.  It's just an entity.
21     Q.  It's there the whole time whether -- it
22  doesn't have choices here.  It's just there.
23     A.  But the claim holders have choices.
24     Q.  I agree with you.  Claim holders may or
25  may not have choices, depending on what

Page 76

Robert W. Holthausen

1
2  information is available to them.  I take it
3  Marvel doesn't have any choices akin to the
4  choices that are available to claim holders.
5  Isn't that right?
6      A.  I'm under the impression that it's the
7  claim holders that are here in this matter.
8      Q.  Okay.  And if it turned out that, in
9  fact, the plaintiffs in this case stand in the
10  shoes of Marvel, would that affect your analysis
11  of the damages in this case?
12     A.  I don't know what that means, "stands in
13  the shoes of Marvel."  It sounds like a legal term
14  to me.
15     Q.  All it means is that we are Marvel for
16  purposes of this lawsuit.  We're not shareholders
17  of Marvel.  We're not creditors of Marvel.  We're
18  the corporate entity.
19     A.  Well, Marvel is just made up of claim
20  holders.
21     Q.  So you -- you -- can you conceive of a
22  damages analysis where Marvel as an entity is
23  trying to recover damages as distinguished from
24  the claim holders of Marvel?  Is that something
25  you've thought about?

Page 77

Robert W. Holthausen

1
2      A.  No.
3      Q.  Okay.  And that's not something you did
4  when -- that you thought about when you were
5  putting your damages report together in this case?
6      A.  No.  I'm thinking about it from the
7  claim holder's perspective.
8          MR. GOLDWATER:  Okay.  Do you guys want
9  to take a break, take a short break?
10         THE VIDEOGRAPHER:  Standby.  The time
11  now is 11:35 a.m., and we're going off the record.
12         (There is a recess taken.)
13         THE VIDEOGRAPHER:  The time now is 11:42
14  a.m., and we're back on the record.
15  BY MR. GOLDWATER:
16     Q.  Professor Holthausen, I think I now
17  understand how you went about doing your analysis,
18  so let me ask you these questions.
19         Am I correct that in forming your opinion you
20  did not consider whether the indenture covenants
21  had an impact on Marvel in 1995 and 1996?
22     A.  I did an analysis of what the impact was
23  in the October announcement of 1996, October 17,
24  to see what the impact was at that point in time
25  when there was information about the Perelman --

20 (Pages 74 to 77)

Page 78

Robert W. Holthausen

1    the Andrews Group offer, so I did an analysis
2    then. I did not -- and I did an analysis of what
3    Mr. Baliban did in November of 1996 to examine
4    whether I believed that his damage calculation was
5    appropriate or not.
6        Q. Okay. And you did. I apologize for
7    overlooking that. Am I correct that aside from
8    the analysis you did of the impact of
9    announcements in October and November of 1996 when
10    you were looking at the question of financial
11    distress costs in general without reference to
12    those specific announcements, you did not look at
13    the impact of the indenture covenants on Marvel in
14    1995 and 1996?
15        A. Absent the announcement effects?
16        Q. Correct.
17        A. Well, I mean, in my first report I
18    talked a lot about -- my first and second
19    report -- excuse me -- I talked -- again, I don't
20    know if we're talking about the third report or
21    the first and second report. If we're talking
22    about the first and second report, there was a lot
23    of analysis in there about what Marvel could have
24    done through 1995 and 1996.

Page 79

Robert W. Holthausen

1        Q. Okay.
2        A. In this third report, the only specific
3    things about Marvel in, say, October and November
4    of 1996 have to do with the announcement effects.
5        Q. Okay. And I am talking about this third
6    report now.
7        A. Okay.
8        Q. So aside from the announcement effects,
9    you did not look at the impact of the indenture
10    covenants in 1995 and 1996?
11        A. In this report?
12        Q. In this report.
13        A. Correct.
14        Q. Okay. And in paragraph 7 of this
15    report, this Holthausen Exhibit 1 where you're
16    talking about "the conceptually correct measure,"
17    is it your -- do you mean that what you describe
18    in paragraph 7 is the only correct measure of
19    actual damages caused by indenture covenants, or
20    does it mean that it's comparatively more correct
21    than the measure in Mr. Baliban's report?
22        A. I think it's the correct -- I think it's
23    the correct measure. It's the measure at the time
24    of the indenture covenant agreements, and so that

Page 80

Robert W. Holthausen

1    is how I would determine damages in this
2    particular case.
3        Q. Okay. Is it the one and only correct
4    measure of damages, in your view?
5        A. Yes.
6        Q. Okay. Assuming the Andrade and Kaplan
7    study is correctly applied, is that study a
8    reasonable way to determine the damages caused by
9    financial distress?
10        A. Well, the Andrade and Kaplan study -- I
11    guess I'm not going to be able to answer your
12    question because there's so much entailed in the
13    statement "correctly applied." So I believe I've
14    correctly applied Andrade and Kaplan. I don't
15    believe that Mr. Baliban did. So there's so many
16    steps in the words "correctly applied" that you
17    used, I don't know how to answer that question.
18        Q. Yeah. I'm not asking a question that
19    has any relation to anything you did or
20    Mr. Baliban did. I'm just asking you an abstract
21    question, which is: Assuming it's correct
22    application by an economist, is the study a
23    reasonable methodology to determine damages caused
24    by financial distress?

Page 81

Robert W. Holthausen

1        A. It's a reasonable methodology, assuming
2    that you use all of the evidence in there to try
3    to learn something about financial distress costs.
4    It is not an article about how to compute damages
5    in a particular situation.
6        (Mr. Fasman enters the room.)
7        Q. In forming your opinions,
8    Professor Holthausen, did you consider whether or
9    not Marvel, in fact, suffered financial distress
10    after the issuance of the Marvel parent and
11    Marvel III notes?
12        A. No. I just estimated -- I used the
13    Andrade and Kaplan study to estimate what those
14    financial distress costs would have been, given
15    the Andrade and Kaplan study.
16        Q. Okay. And did you consider in forming
17    your opinions whether the impact of financial
18    distress on Marvel is something that would be
19    sustained over a period of time extending beyond
20    the issuance of the Marvel parent and Marvel III
21    notes?
22        A. Well, the Andrade and Kaplan -- well, my
23    damage analysis is based upon the expected costs
24    of those financial distress at the time the

21 (Pages 78 to 81)

Page 82

Robert W. Holthausen

1
2  indenture company notes are issued, which takes
3  into consideration that the financial distress
4  costs may occur at some point in the future.
5      Q.  So you took it into account to the
6  extent that you are predicting probabilities of
7  financial distress in the future?
8      A.  Right, and then what those future
9  financial distress costs would be, and then
10 calculating their expected value.
11     Q.  Okay.  The present valuing is something
12 that's not in your report, but that you're
13 thinking about?
14     A.  Correct.  But I didn't talk about that
15 just then.  I talked just about the expected
16 value, yes.
17     Q.  Do you believe that your focus on a
18 single point in time, predicting probabilities
19 from a single point in time is consistent with the
20 Andrade and Kaplan studies' methodologies for
21 measuring the impact of financial distress?
22     MR. ALLINGHAM:  I'm sorry, Andrew, but
23 would you read that back?
24     MR. GOLDWATER:  Sure.
25     MR. ALLINGHAM:  Or can you read it

Page 83

Robert W. Holthausen

1
2  again?
3      MR. GOLDWATER:  I can just say it.
4      Q.  Do you believe that your focus on a
5  single point in time is consistent with Andrade
6  and Kaplan's methodologies for estimating the
7  impact of financial distress?
8      MR. ALLINGHAM:  I object to the form of
9  the question.
10     A.  I'm trying to do something here that's
11 different than what Andrade and Kaplan are doing.
12 I'm trying to measure the ex-ante costs of
13 financial distress.  Their measure is primarily an
14 ex-post measure.  They talk about the expected
15 costs of financial distress in that study, but
16 they're primarily measuring the ex-post cost of
17 financial distress because they only look at
18 companies that experience financial distress.
19     Q.  Is it relevant to your opinions,
20 Professor Holthausen, that Marvel actually did
21 suffer financial distress?
22     A.  My opinion is based upon the expected
23 value of financial distress, which is -- has to do
24 with the probability that they will suffer
25 financial distress.

Page 84

Robert W. Holthausen

1
2      Q.  So does that mean that it's not relevant
3  to your methodology whether or not they actually
4  did sustain financial distress?
5      A.  That's correct.
6      Q.  And in an analysis of actual damages in
7  a tort case, why is it not relevant to look at
8  whether the plaintiff actually sustained financial
9  harm?
10     MR. ALLINGHAM:  Objection.  Calls for a
11 legal conclusion.
12     A.  I think you're asking me a legal
13 question.
14     Q.  I'll -- fair enough.  Let me try to
15 restate it.
16     In a damages analysis, do you think that it's
17 inappropriate to look at whether -- to look at
18 whether the plaintiff actually sustained harm?
19     A.  I don't think you've given me nearly
20 enough facts to answer that question.
21     Q.  Do you think it's inappropriate to look
22 at whether Marvel Entertainment actually sustained
23 injury from financial distress in 1995 or 1996?
24     A.  I think the issue here is:  What are the
25 expected costs of financial distress at the time

Page 85

Robert W. Holthausen

1
2  those indenture company notes are issued? for the
3  reasons that I've articulated before.
4      Q.  Those are the reasons based on the
5  choices available to claim holders of Marvel?
6      A.  Yes, right.
7      Q.  And -- okay.  And if Marvel itself as an
8  enterprise is the plaintiff in the case, does that
9  change your view at all?
10     A.  I think you're getting into legal issues
11 that -- I mean, for me, Marvel is a bunch of claim
12 holders, and so I'm thinking about this from the
13 perspective of the claim holders.
14     Q.  Okay.
15     A.  I think I've said that before.
16     Q.  Okay.  So when I say things like:  If
17 Marvel -- is the entity is the plaintiff, is it
18 that you -- you're unable to think about it that
19 way, or you just haven't thought about it that
20 way?  I'm not --
21     A.  Well, to me, the entity is the claim
22 holders of Marvel.
23     Q.  Yes.  You've said that.
24     A.  Right.
25     Q.  That's the predicate for all of your

22 (Pages 82 to 85)

Page 86

1       Robert W. Holthausen
2  analysis.
3       A.  Right, that is the predicate for my
4  analysis, right.
5       Q.  So when I now tell you to assume that
6  the plaintiff in the case is Marvel Entertainment,
7  I guess my question -- my question is:  Does that
8  alter your analysis?  And I know that you looked
9  at it a different way.  I'm now saying:  If you
10 assume that Marvel Entertainment is the plaintiff,
11 does that alter your analysis?
12      A.  Well, I don't -- I mean, I can't
13 distinguish in my own mind, as I think about
14 corporations and stuff -- I mean, you must be
15 doing something legal.  Okay?  But from an
16 economist' perspective, it's the claim holders of
17 the organization.  So I don't understand.  I mean,
18 you must be going down some legal path that --
19 some nuance that doesn't mean anything to me as an
20 economist.
21      Q.  So there's no effect on your thinking if
22 Marvel Entertainment is the plaintiff in the case?
23      A.  Correct, because I think about it as the
24 claim holders.
25      Q.  Okay.  And all the choices that were

Page 87

1       Robert W. Holthausen
2  available to all those claim holders, would they
3  be available to Marvel Entertainment?
4       A.  I've just said that I think about Marvel
5  Entertainment as the claim holders.
6       Q.  Okay.  When you were explaining the
7  economic underpinning of how you thought about it,
8  you were explaining to me that claim holders of
9  Marvel had choices to make.
10      A.  Correct.
11      Q.  And I'm now saying:  If Marvel the
12 entity, which is indifferent as to who its claim
13 holders are -- it doesn't care whether Joe Smith
14 or Jack Jones or Jane Doe is the shareholder or
15 debt holder, it's indifferent, so the movement
16 among its claim holders who have choices to make
17 is a matter of economic indifference to Marvel.
18 It's just there.  Does that difference in the
19 economic underpinning make a difference to you in
20 forming your opinions?
21      MR. ALLINGHAM:  Object to the form of
22 the question.
23      A.  Well, for me, I always think about it
24 from the claim holders' perspective.  I have not
25 done -- I have not thought about this from this

Page 88

1       Robert W. Holthausen
2  perspective.
3       Q.  Okay.  Professor Holthausen, would you
4  please take a look at paragraph 8 of your report,
5  marked as Holthausen Exhibit 1?
6       A.  Uh-huh.
7       Q.  Do you see in the very first sentence
8  you mention that -- or you say that "Mr. Baliban's
9  measure is incorrect because he assumes that it
10 was certain that Marvel would experience financial
11 distress"?
12      A.  Correct.
13      Q.  Okay.  You see that?
14      A.  Uh-huh.
15      Q.  Do you dispute whether, after the
16 issuance of the Marvel parent and Marvel III
17 notes, Marvel, in fact, experienced financial
18 distress?
19      A.  I'm just -- all I'm saying in this
20 sentence is that he assumes that it was certain
21 that they would experience financial distress, and
22 I don't believe that to be correct.
23      Q.  I understand that.  I'm just -- we may
24 have actually covered this before, and I'm just
25 not remembering correctly.  But are you disputing

Page 89

1       Robert W. Holthausen
2  whether, as a matter of historical fact, Marvel
3  experienced financial distress?
4       A.  No.
5       Q.  And is it your opinion that it would be
6  incorrect for Mr. Baliban to observe, as a matter
7  of historical fact, whether Marvel experienced
8  financial distress?
9       A.  Is it -- that question doesn't mean
10 anything to me.  You asked me if it was incorrect
11 to observe it.  I don't know what you're getting
12 at.
13      Q.  Oh, okay.  In doing a damages analysis
14 of the harm to Marvel from the indenture
15 covenants, is it inappropriate or incorrect or
16 whatever term you want -- whatever pejorative you
17 want to apply for Mr. Baliban to take into account
18 in forming his opinion as to the actual damages
19 suffered by Marvel whether Marvel sustained
20 financial distress as a result of the indenture
21 covenants?
22      MR. ALLINGHAM:  With respect, I object
23 to the form of the question, which, I think, is
24 asking the witness to design his own question.
25      MR. GOLDWATER:  I'm not sure what that

23 (Pages 86 to 89)

Robert W. Holthausen

1
2 means.
3         MR. ALLINGHAM: You asked him to use
4 whatever pejorative he wanted to use.
5         MR. GOLDWATER: I don't need an
6 explanation. I'll live with the objection. I'll
7 just restate it.
8         Q. Why do you say Mr. Baliban's measure is
9 incorrect in your paragraph 8?
10         A. Because he assumes that the financial
11 distress is certain. I've already argued in
12 paragraph 7 that it's -- we want to measure the
13 incremental expected costs of financial distress,
14 and he's just assuming that it's certain it's
15 going to happen.
16         Q. Okay. Do you -- is it your belief that
17 Mr. Baliban had to make an assumption about
18 whether Marvel would experience financial
19 distress?
20         A. I don't know what Mr. Baliban had to do.
21         Q. If you are able to observe what happened
22 as a matter of historical fact, why would you not
23 take that data into account in an analysis of
24 actual damages?
25         A. Because, as I've said, what we want to

Robert W. Holthausen

1
2 measure is, we want to measure what the expected
3 impact of these indenture covenants was at the
4 time that they were issued. And to assume with
5 certainty that -- to observe that Marvel goes --
6 has -- experiences financial distress and to
7 estimate what those financial distress costs were,
8 assumes, A, at the time the indenture company
9 notes were issued that it was certain that they
10 were going to do it and, B, that the financial
11 distress was solely caused by the indenture
12 covenant agreements, and neither of those is true.
13 It was neither certain, and you can't say that it
14 was solely caused.
15         Q. Is it your opinion that an economist
16 should limit an analysis of damages to changes in
17 probabilities of harm rather than looking at
18 whether actual harm was actually sustained?
19         A. In this particular case, I think it's
20 appropriate to think about: What is the expected
21 cost of financial distress at the time the
22 indenture company notes were issued?
23         Q. And is it inappropriate to look at
24 whether harm actually was sustained?
25         A. I think it's inappropriate because I

Robert W. Holthausen

1
2 believe that the claim holders had choices.
3         Q. Is there any other economic principle or
4 economic evidence that supports your view that
5 damages should be limited to changes in
6 probabilities beyond what you've told me about the
7 choices available to claim holders of Marvel?
8         MR. ALLINGHAM: I object to the form of
9 the question.
10         A. I didn't understand the question.
11         Q. Is there any economic principle that
12 supports -- that supports your view that damages
13 should be limited to changes in probabilities of
14 harm as distinguished from actual harm --
15         MR. ALLINGHAM: Objection.
16         Q. -- beyond what you've already told me?
17         MR. ALLINGHAM: I object to the form of
18 the question, which I think is the same question.
19         MR. GOLDWATER: Well, at least I got
20 that right.
21         A. Beyond what I've already told you?
22         Q. Yes.
23         A. I don't know. It's an awfully broad
24 question. Off the top of my head, I think what I
25 have told you is why I think it's the right way to

Robert W. Holthausen

1
2 do it. Whether there are other rationales for
3 doing it, I'm not sure I thought about all the
4 possibilities.
5         Q. Okay. You mention a little further down
6 in paragraph 8 of your report, marked as
7 Holthausen Exhibit 1 --
8         A. Uh-huh.
9         Q. -- that "Marvel was not a highly
10 leveraged company at the time that the holding
11 company notes were issued."
12         Do you see that?
13         A. Correct.
14         Q. And what is your criteria for
15 determining whether Marvel was or wasn't highly
16 leveraged?
17         A. Oh, I was just comparing it to the HLTs
18 that were in the Andrade and Kaplan study. I
19 don't believe Marvel was nearly as highly levered
20 back then as the firms that were in the Andrade
21 and Kaplan study.
22         Q. On an absolute basis?
23         A. Yeah.
24         Q. Okay. And would you agree that
25 companies with characteristics comparable to

24 (Pages 90 to 93)

Robert W. Holthausen

1  Robert W. Holthausen
2  Marvel would be an appropriate basis of comparison
3  in determining whether or not Marvel was highly
4  leveraged?
5      A.  Say that again.
6      Q.  Sure.  Would you agree that companies
7  with characteristics comparable to Marvel would be
8  an appropriate basis of comparison in determining
9  whether Marvel was highly leveraged?
10     A.  I mean, you can look at comparable
11 companies, and you can see what the relative
12 magnitudes of the leverage are.
13     Q.  Yes.  And would that be an appropriate
14 basis of comparison for a determination about
15 whether Marvel was highly leveraged or not?
16     A.  It would be a statement about highly
17 leverage relative to the comparable companies.
18 Whether it's highly leverage relative to what its
19 debt capacity is, that may or may not answer the
20 question.
21     Q.  Did you do any analysis of Marvel's
22 leverage compared to companies with
23 characteristics comparable to Marvel?
24     A.  No.
25     Q.  And are you offering an opinion as to

Robert W. Holthausen

1  Robert W. Holthausen
2  whether Marvel's capital structure reflected a
3  debt-to-equity ratio that was higher than
4  comparable companies?
5      A.  No, I'm not.
6      Q.  Okay.  Would you please take a look at
7  paragraph 9 of Holthausen Exhibit 1?
8      A.  Uh-huh.
9      Q.  Do you see that in the first sentence
10 there you say that "Mr. Baliban's measure is
11 incorrect because it assumes that Marvel's
12 financial distress was caused solely by the
13 indenture covenants"?
14     A.  Correct.
15     Q.  What leads you to believe that
16 Mr. Baliban was making such an assumption?
17     A.  Well, it's the form of his calculation
18 for determining damages associated with the
19 indenture covenants because he just takes the 10
20 to 20 percent estimate from Andrade and Kaplan and
21 multiplies it by the value of the firm when he's
22 applying the Andrade and Kaplan study.  And so
23 basically he's presuming in assessing damages
24 associated with the issuance of the indenture
25 covenants that you can take the financial distress

Robert W. Holthausen

1  Robert W. Holthausen
2  number, multiply it by the value of the firm, and
3  that's the damages associated with the indenture
4  covenants.
5      Q.  And is that incorrect?
6      A.  Yes.
7      Q.  Why is that incorrect?
8      A.  It's incorrect because it assumes that
9  the financial distress was solely caused by the
10 indenture covenants.
11     Q.  How is it relevant that the
12 determination of the extent of damages whether the
13 indenture covenants were the sole cause of
14 financial distress or one out of two or three
15 causes of financial distress?
16     A.  Well, I would -- you know, from an
17 economic perspective, you would want to think
18 about:  How did the issuance of the indenture
19 covenants affect the likelihood that financial
20 distress would occur? because Marvel may have --
21 let's suppose the indenture covenants never, ever
22 were issued.  It's still possible that Marvel
23 would have experienced financial distress.  So if
24 you want to figure out what the effect or the
25 impact or the damage of the indenture covenants

Robert W. Holthausen

1  Robert W. Holthausen
2  are, you have to try to extract from the
3  likelihood that Marvel might have experienced
4  financial distress, absent those indenture
5  covenants.
6      Q.  So this goes back to your view that the
7  correct measure of damages should be based on the
8  probability of financial distress rather than
9  whether Marvel actually sustained financial
10 distress?
11     A.  Yes, absolutely, right.
12     Q.  Okay.  And whether or not there were
13 other causes of Marvel's financial distress
14 besides the indenture covenants, are you
15 expressing an opinion on whether the indenture
16 covenants were at least a cause of financial
17 distress?
18     MR. ALLINGHAM:  I object.  This is asked
19 and answered.  We've been through this five times,
20 I think.  Haven't you asked that question half a
21 dozen times?
22     MR. GOLDWATER:  I don't know.  I'm
23 honestly trying to do my best here.  And I
24 apologize if I covered it before.  I don't
25 recollect one way or another.

25 (Pages 94 to 97)

Robert W. Holthausen

1  Robert W. Holthausen
2  Q. But are you expressing -- if you know
3  the answer, please tell me because I don't know
4  it. Are you expressing an opinion on whether the
5  indenture covenants were a cause of financial
6  distress whether or not it was the sole cause?
7  A. In this report --
8  Q. Correct.
9  A. -- I've been asked to calculate or to
10 comment on the analysis that Mr. Baliban did and
11 to assume that Marvel was constrained by the
12 indenture covenants, and then to calculate what
13 the increase in the probability of -- the
14 increase in the probability of financial distress
15 was associated with the indenture covenants.
16 THE REPORTER: With the indenture?
17 THE WITNESS: With the indenture
18 covenants. Sorry.
19 Q. So it did not encompass whether the
20 indenture covenants were a cause of financial
21 distress?, if I'm understanding you.
22 A. My damage calculation makes an
23 assumption that, in fact, the indenture covenants
24 cause Marvel to take on more notes. I was asked
25 to make that assumption. Okay? And so when I

1  Robert W. Holthausen
2  actually do the damage calculation, the damage
3  calculation assumes that Marvel became more highly
4  levered because of the indenture covenants.
5  Q. Okay. I hear you. In the last sentence
6  of paragraph 9 of your report, which is marked as
7  Holthausen Exhibit 1, you have a sentence which
8  says, in part, that "Mr. Baliban does not attempt
9  to apportion the economic harm between the effect
10 of the holding company notes and the effect of
11 Marvel's capital structure decisions, absent the
12 holding company notes."
13 Do you see that?
14 A. Uh-huh.
15 Q. Okay. What economic harm are you
16 referring to? Is that the economic harm from
17 financial distress?
18 A. Financial distress, yes, right.
19 Q. And what do you mean by "Marvel's
20 capital structure decisions, absent the holding
21 company notes"?
22 A. So in other words, Marvel was already a
23 levered company prior to the issuance of the
24 holding company notes. Because it had leverage in
25 its capital structure, it's possible that it would

1  Robert W. Holthausen
2  have experienced financial distress even if the
3  holding company notes hadn't been issued.
4  Q. Okay. Is it your view that Mr. Baliban
5  should have tried to determine what Marvel's
6  capital structure would have been, absent the
7  holding company notes?
8  A. It's my view that an assessment of
9  damages would have to consider the fact that
10 Marvel could have experienced financial distress
11 without the holding company notes, and then -- and
12 you would have to take that into consideration in
13 figuring out what the damages were associated with
14 the issuance of the holding company notes.
15 THE VIDEOGRAPHER: Okay. I have to
16 change the tapes. This concludes tape No. 1 in
17 the videotape deposition of Robert Holthausen.
18 The time now is 12:12 p.m. We're going off the
19 record.
20 (There is a recess taken.)
21 THE VIDEOGRAPHER: This is the beginning
22 of tape No. 2 in the videotape deposition of
23 Robert Holthausen. The time now is 12:24 p.m.,
24 and we're back on the record.
25 BY MR. GOLDWATER:

1  Robert W. Holthausen
2  Q. Professor Holthausen, just to reorient
3  you, we're talking about that sentence, the last
4  sentence of paragraph 9 of Holthausen Exhibit 1.
5  A. Yes.
6  Q. In the absence of the holding company
7  notes, would you expect Marvel's capital structure
8  to be a cause of financial distress?
9  A. Well, it would depend upon the capital
10 structure that Marvel chose to take on. And
11 depending upon how much debt was in that capital
12 structure, it could affect the likelihood of
13 financial distress.
14 Q. Okay. And have you done any analysis of
15 what Marvel's capital structure would have been,
16 absent the holding company notes?
17 A. The analysis that I did assumed that
18 Marvel's capital structure was what it was prior
19 to the issuance of the holding company notes.
20 Q. And -- okay. So that wasn't a
21 hypothetical -- that wasn't you trying to imagine
22 a world in which there were no holding company
23 notes? That was you carrying forward the status
24 quo right before the holding company notes?
25 A. Correct.

26 (Pages 98 to 101)