Robert W. Holthausen

1
2  Q.  Okay.  And how would an economist go
3  about apportioning harm between the effect of the
4  holding company notes and the effect of a
5  hypothetical capital structure decision, absent
6  the holding company notes?
7     A.  Well, I think what you do is, you take
8  into consideration the difference in the
9  probabilities of Marvel experiencing financial
10 distress.
11    Q.  Okay.  This goes back to your damages
12 methodology of forecasting the probability of
13 financial distress with and without the holding
14 company notes?
15    A.  Correct.
16    Q.  Okay.  Would you please take a look at
17 paragraph 10 of Holthausen Exhibit 1?
18    A.  Okay.
19    Q.  All right.  Do you see that paragraph
20 10, you say that Mr. Baliban incorrectly applied
21 the Andrade and Kaplan estimate of financial
22 distress costs of 10 to 20 percent because such an
23 estimate should be applied to the distressed
24 company one year prior to the onset of financial
25 distress?

Robert W. Holthausen

1
2     MR. ALLINGHAM:  I apologize.  Were you
3  reading, or is that a summary?
4     MR. GOLDWATER:  It's a summary.
5     MR. ALLINGHAM:  Sorry.
6     A.  Yes, I see that.
7     Q.  And do you see that you support that
8  opinion with a reference in footnote 3 of your
9  report to page 1463 of the Andrade and Kaplan
10 study?
11    A.  Correct.
12    Q.  Okay.  Let me hand you the Andrade and
13 Kaplan study.  Can I have this marked as
14 Holthausen Exhibit 2?
15       (Andrade and Kaplan study is marked as
16 Holthausen Exhibit 2 for Identification.)
17    Q.  Okay.  I show you what's been marked as
18 Holthausen Exhibit 2.  Does that look like a copy
19 of the Andrade and Kaplan study that we've been
20 talking about?
21    A.  Yes.
22    Q.  Okay.  And would you please take a look
23 at the page that you reference in footnote 3 of
24 your report, page 1463?
25    A.  Okay.

Robert W. Holthausen

1
2     Q.  Okay.  Now, the text on that page is
3  discussing an estimate of financial distress costs
4  based upon changes and operating performance
5  that's reflected in a chart on page 1464.  Do you
6  see that?
7     A.  Correct.
8     Q.  My question is:  Why do you identify the
9  particular estimate on page 1463 as the applicable
10 measurement of financial distress costs?
11    A.  Well, what I'm referring to here is the
12 10 to 20 percent estimate that came out of
13 Mr. Baliban's report.  And I believe this is where
14 that 10 to 20 percent estimate comes from out of
15 his report.
16    Q.  Did you see a citation to this
17 particular measure or -- I'm sorry -- this
18 particular estimate in Mr. Baliban's report?
19    A.  I don't remember that off the top of my
20 head, whether there was a particular reference to
21 this.
22    Q.  Okay.  Within the Andrade and Kaplan
23 study there are a number of estimates of financial
24 distress costs.  Isn't that true?
25    A.  Yes.

Robert W. Holthausen

1
2     Q.  Okay.  And have you done anything to
3  determine whether the estimates on page 1463 are
4  more applicable to the facts of this lawsuit than
5  any of the other estimates of financial distress
6  costs within the Andrade and Kaplan study?
7     MR. ALLINGHAM:  Would you read that
8  back, please?
9       (Counsel requests the reading of the
10 following testimony:
11    "QUESTION:  And have you done anything
12 to determine whether the estimates on page 1463
13 are more applicable to the facts of this lawsuit
14 than any of the other estimates of financial
15 distress costs within the Andrade and Kaplan
16 study?")
17    A.  Could you repeat that one more time?
18    Q.  I'll just say it.
19    A.  Okay.
20    Q.  Have you done anything to determine
21 whether the particular estimate based on changes
22 in operating performance referenced on page 1463
23 is more applicable to the facts of this lawsuit
24 than any of the other estimates which are also
25 contained within the Andrade and Kaplan study?

27 (Pages 102 to 105)

Robert W. Holthausen

2  A.  What I've done is, I've looked at a
3  series of estimates of financial distress costs
4  that come out of their paper.  I haven't just
5  looked at one.  I've looked at alternatives as
6  well.
7  Q.  And as you say, I think, somewhere in
8  your report, that you have to consider all of the
9  evidence in that study.  Isn't that right?
10  A.  That's correct.
11  Q.  Okay.  It's not appropriate to single
12  out one measure.  Isn't that right?
13  A.  I think that's right.
14  Q.  Okay.  Towards the bottom of page 5 of
15  Holthausen Exhibit 1, you note that "Marvel
16  announced an attempt to restructure its debt on
17  October 8, 19 -- October 8, 1996," and you say
18  that that is the "appropriate date of distress
19  consistent with Andrade and Kaplan."
20  Do you see that?
21  A.  Yes.
22  Q.  Okay.  And what do you mean by the "date
23  of distress"?
24  A.  Well, Andrade and Kaplan measure
25  financial distress costs by looking from the

Robert W. Holthausen

1
2  fiscal year prior to the onset of financial
3  distress.  And they define in their study the
4  onset of financial distress as either of those
5  three things that I mention: defaulting on a debt
6  payment, trying to restructure the debt, or EBITDA
7  falls below interest expense.
8  Q.  So they define the onset as the fiscal
9  year prior to the financial distress event or
10  signal?
11  A.  No.  They define the onset as those
12  three things, and then they measure it from the
13  fiscal year prior to the onset through
14  post-resolution, for example.
15  Q.  Okay.  And according to the measurement
16  in the Andrade and Kaplan study, is the impact of
17  financial distress felt on a particular date or
18  over a period of time?
19  A.  They don't measure that because they
20  look over long windows, so they don't say it
21  occurred on this date or that date.  They look
22  over a period of time, and they look at various
23  windows.
24  Q.  Yes.  They measure the impact over
25  various intervals of time, depending on which

Robert W. Holthausen

1
2  particular methodology they're applying?
3  A.  Correct.
4  Q.  Okay, okay.  If you look at paragraph 10
5  on page 6 of your report -- it's the first
6  complete sentence on page 6.  It starts, "Under
7  the methodology of the study," and then the
8  sentence goes on.  Do you see that?
9  A.  Uh-huh.
10  Q.  What are you referring to when you say
11  "the methodology of the study"?
12  A.  Well, when Andrade and Kaplan talked
13  primarily about their 10 to 20 percent estimate,
14  it comes from this table 6 measuring from -- I
15  guess it's in panel B -- from year minus one to
16  post-resolution.  And so these numbers of
17  financial distress that you see here in that panel
18  B are measured from the fiscal year prior to the
19  onset of financial distress.  So these percentage
20  estimates that they're getting are based upon what
21  the value of the firms were at that point in time.
22  So if you want to use these 10 to 20 percent
23  estimates which come from this table, then I think
24  you have to apply it -- or you have to apply it to
25  the like period for Marvel.

Robert W. Holthausen

1
2  Q.  So you're assuming that Mr. Baliban is
3  also using table 6?
4  A.  Yes --
5  Q.  Okay.
6  A.  -- because I think that's where the 10
7  to 20 percent in Andrade and Kaplan primarily
8  comes from.
9  Q.  And I think we've already discussed:
10  The relevant time interval for the measurement of
11  financial distress cost depends on the particular
12  methodology that's being applied?
13  A.  Say that again.
14  Q.  Within the study, the relevant time
15  interval for the measurement of financial distress
16  costs, it depends on the particular methodology
17  within Andrade and Kaplan that they're using?
18  A.  Well, they measure it over different
19  time windows.
20  Q.  Okay.  So we would have to know what
21  Mr. Baliban was looking to for his estimate?
22  A.  Correct.  But I think when he talks
23  about 10 to 20 percent, this is primarily where it
24  comes from.
25  Q.  And what do you base that on?

28 (Pages 106 to 109)

Page 110

Robert W. Holthausen

1
2      A.   The Andrade and Kaplan study.
3      Q.   No.  What do you base your statement
4  that Mr. Baliban is primarily using --
5      A.   Well, this is where I think Andrade and
6  Kaplan basically get their 10 to 20 percent from,
7  and he gets it from Andrade and Kaplan.
8      Q.   Okay.  Let me just finish the question.
9      A.   I'm sorry.  Right.
10      Q.   Where do you base your statement that
11  that's where Mr. Baliban gets the 10 to 20 percent
12  from?
13      A.   Perhaps he got it from someplace else,
14  but I believe Andrade and Kaplan got the 10 to
15  20 percent from this table.
16      Q.   Okay.  Would you please take a look at
17  paragraph 12 of Holthausen Exhibit 1?
18      A.   Yes.
19      Q.   In the second sentence of paragraph 12,
20  you say that "The Andrade and Kaplan study
21  provides another potential measure of the expected
22  cost to Marvel associated with the indenture
23  covenants," and the sentence goes on.
24      A.   Uh-huh.
25      Q.   What do you mean by a "potential

Page 111

Robert W. Holthausen

1
2  measure"?
3      A.   I could have just used another measure.
4      Q.   Are all the methodologies used to
5  estimate the cost of financial distress in the
6  Andrade and Kaplan study potential measures?
7      A.   Well, they're potential measures
8  measured at various points of time.  Whether
9  they're all appropriate or not depends on what
10  you're trying to do.
11      Q.   Okay.  And did you do anything to
12  determine, out of the universe of measures within
13  the Andrade and Kaplan study, which was the most
14  appropriate measure for use in this lawsuit?
15      A.   Again, what I -- since I want to measure
16  the expected cost, I want to measure the cost from
17  prior to the onset of financial distress to
18  post-resolution, and that's based upon wanting to
19  know sort of what the ex-ante effects were going
20  to be.
21      Q.   So did you do an analysis of the
22  difference in enterprise value of Marvel prior to
23  the onset of financial distress and
24  post-resolution?
25      A.   You'll have to say that again.

Page 112

Robert W. Holthausen

1
2      Q.   My question to you is whether you had
3  done any analysis to determine which, out of the
4  several measures or several estimates of financial
5  distress in Andrade and Kaplan, which was the most
6  applicable to the facts of this case.  And you
7  said, well, I was looking at a measure that looked
8  at the difference before a financial distress and
9  up until post-resolution of distress.
10      A.   That has to do with my theory of
11  economic damage -- right? -- because that's the
12  period where we want to look at it from sort of
13  this ex-ante view, which goes from before to
14  after.
15      Q.   So what did you do specifically?  I'm
16  not clear on what you did.
17      A.   Well, I'm looking at situations where --
18  so, for example, in panel B I want to measure the
19  financial distress from the year prior to the
20  onset of financial distress to post-resolution.
21      Q.   Panel B of what?
22      A.   Excuse me?  I didn't understand.
23      Q.   You mentioned a panel B.  I'm not
24  sure --
25      A.   I'm sorry.  Panel B of table 6.

Page 113

Robert W. Holthausen

1
2      Q.   So you actually did an analysis
3  according to the time interval in table 6 of the
4  Andrade and Kaplan study?
5      A.   Right, and some of the other tables,
6  too.  With my damage analysis --
7      Q.   I'm sorry to interrupt you.  And you
8  said some of the others, too.  Which of the others
9  did you do that for?
10      A.   Well, the other ones that I refer to in
11  my report.
12      Q.   Okay, just those.  I guess I'm not --
13  can you show me which and where in your report you
14  refer to some others?
15      A.   Well, for example, I talk in page 7
16  about table 5, and in paragraph 13 I talk about
17  panel B of table 9, so I try to be pretty explicit
18  about where I'm pulling the data from.
19      Q.   So you did do analyses for a few of the
20  methodologies within the Andrade and Kaplan study.
21  Did you do anything to determine which was the
22  most appropriate or most applicable of the Andrade
23  and Kaplan estimates?
24      A.   Well, I selected from -- there were some
25  that I selected based upon my damage theory.

29 (Pages 110 to 113)

Robert W. Holthausen

1
2  Right? And those are the ones that I talk about
3  in my report that I think are most appropriate.
4      Q.  Okay.
5      A.  And then I talk about, for example, you
6  know, the 10 to 20 percent estimate, and I also
7  talk about the 0 percent estimates that Andrade
8  and Kaplan get in their study.
9      Q.  Okay. So to the extent you did any
10  selecting, it was of methodologies that you viewed
11  as able to be harmonized with your theory of
12  damages?
13      A.  Correct.
14      Q.  Can I just ask you in that same sentence
15  that we started off on, that second sentence of
16  paragraph 12 where you're saying that the Andrade
17  and Kaplan study "provides another potential
18  measure of the expected cost to Marvel"? Why do
19  you say that the Andrade and Kaplan study
20  "provides a potential measure of expected costs"?
21  I'm focusing now on "expected."
22      A.  I can see that the word "expected" there
23  could be misconstrued because this application of
24  Andrade and Kaplan still would assume that --
25  would be based upon the certainty assumption and

Robert W. Holthausen

1
2  the sole causation assumption. So I'm using it in
3  a different -- different term -- different way
4  than I had used the word "expected" before, and I
5  could see it could be misconstrued.
6      Q.  Is it your belief that the Andrade and
7  Kaplan study is trying to measure expectations as
8  to cost of distress rather than the actual cost of
9  distress?
10      A.  No. They're trying to measure actual
11  cost of distress.
12      Q.  Okay. The next sentence in paragraph
13  12, you refer to a different time interval. You
14  note that in another estimate within the Andrade
15  and Kaplan study, they measure from two months
16  prior to a highly leveraged transaction to a point
17  in time immediately after the resolution of
18  distress. Do you see that?
19      A.  Right.
20      Q.  Just the next sentence?
21      A.  Yes.
22      Q.  Did you make any effort to apply that
23  measurement to Marvel?
24      A.  Yes. I talk about what the financial
25  distress costs would be if you apply that measure

Robert W. Holthausen

1
2  to Marvel.
3      Q.  Where is the --
4      A.  Well, I apply what the effect of the
5  holding company notes would be to Marvel under the
6  assumption that the holding company notes force
7  Marvel to become a highly levered firm.
8      Q.  Where is that?
9      A.  Where is what?
10      Q.  What you just said. You say that you
11  apply it. Where is it that you apply it?
12      A.  Well, all I do is, I talk about. I
13  apply it in the sense of when they look at this,
14  they report from the time prior to the highly
15  levered transaction to post-resolution of distress
16  that the capital earns positive returns. Point
17  estimates and none of the returns are
18  significantly different from zero. So applying
19  that would indicate that, if you take the view
20  that Mr. Baliban does, that the indenture
21  covenants caused Marvel to become a highly levered
22  firm, this would suggest -- this estimate here
23  suggests that the cost would be zero.
24      Q.  Did you look at the actual difference in
25  enterprise value if you applied that to the

Robert W. Holthausen

1
2  historical facts?
3      A.  I don't understand the question.
4      Q.  Did you try to determine the difference
5  in enterprise value from Marvel two months prior
6  to a note issuance, a parent company note issuance
7  to post-bankruptcy?
8      A.  For what purpose? The point here is
9  that -- what they're saying is that the returns
10  are zero to the capital earned. Okay? Their
11  point estimates are positive, and they're
12  insignificantly different from zero in a
13  statistical test.
14      Q.  Yeah. And I'm just asking you if you
15  did that -- if you used that time interval and
16  applied the time interval to Marvel in a way -- I
17  understand what you're talking about with the
18  study. I'm just asking you whether you used that
19  time interval and applied it to Marvel.
20      A.  Well, what I conclude from this is,
21  here's another measure out of Andrade and Kaplan,
22  and this measure out of Andrade and Kaplan would
23  give you zero economic harm.
24      Q.  I understand.
25      A.  Okay.

30 (Pages 114 to 117)

Robert W. Holthausen

1   Robert W. Holthausen
2   Kaplan, their 10 to 20 percent cost of financial
3   distress, they talk about it over and over again
4   as it being an upper bound because it's mixing --
5   even in that sample, which they tried not to get
6   any economic distress in, it already has economic
7   distress. We don't want to measure economic
8   distress. We want to measure financial distress.
9   We want to measure something that was caused by
10  the capital structure under the assumption that
11  the indenture covenant notes caused the capital
12  structure to be highly levered.
13      Q. What do Andrade and Kaplan find for
14  companies that suffer from both economic and
15  financial distress?
16      A. You mean the shock sample?
17      Q. Correct.
18      A. Well, we can look it up, but it's not
19  relevant because what they're saying is that that
20  mixes in the economic distress, and we're trying
21  to measure the financial distress.
22      Q. If Marvel, in fact, suffered from
23  economic distress, how is that not a relevant
24  sample?
25      A. Because the economic distress that

Robert W. Holthausen

1   Robert W. Holthausen
2   Marvel suffered had nothing to do with the
3   indenture company notes. The reason that it
4   suffered economic distress was because the comic
5   book business turned down, the sticker business
6   turned down, they all turned down. And we're
7   trying to measure financial distress costs here,
8   not economic distress.
9       Q. Okay.
10      MR. GOLDWATER: Do you want to break for
11  lunch now?
12      MR. ALLINGHAM: Sure.
13      THE VIDEOGRAPHER: Standby. The time
14  now is 12:54 p.m., and we're going off the record.
15      (There is a luncheon recess taken.)
16
17
18
19
20
21
22
23
24
25

Robert W. Holthausen

1   Robert W. Holthausen
2       AFTERNOON SESSION
3       THE VIDEOGRAPHER: The time now is 1:37
4   p.m., and we're back on the record.
5   BY MR. GOLDWATER:
6       Q. Mr. Holthausen, would you please take a
7   look at paragraph 16 of Holthausen Exhibit 1? Do
8   you see in the very first sentence of paragraph
9   16, you state that "The probability of financial
10  distress for any scenario is derived from an
11  option model"?
12      A. Correct.
13      Q. Okay. What definition of "financial
14  distress" are you now using in paragraph 16?
15      A. The definition that the model uses is
16  whether the value of the assets will fall below
17  the value of the debt.
18      Q. When you refer to "the model," what is
19  it you're talking about?
20      A. This option model that's in the
21  Hillegeist, Keating, Cram, and Lundsted paper.
22      Q. That's the paper referenced in footnote
23  9 of your report, Holthausen-1?
24      A. Correct.
25      Q. And in that report they refer to what

Robert W. Holthausen

1   Robert W. Holthausen
2   you just described as the value of the assets
3   falling below the value of the debt as bankruptcy.
4   Is that correct?
5       A. They use that to estimate the
6   probability of financial distress, right. So, in
7   other words, if the assets are -- the value of the
8   assets is way above the value of the debt, then
9   there will be no financial distress at the time
10  that the debt has to be repaid.
11      Q. I'm just asking you a question. When --
12  within that study that you reference in footnote 9
13  of your report, how do they define "bankruptcy"?
14  Is it the same -- is it what you just said, the
15  value of the assets falling below the value of the
16  debt at a given point in time?
17      A. Correct.
18      Q. And are you using their definition of
19  "bankruptcy" as a proxy for financial distress in
20  your report?
21      A. Well, what comes out of the model is
22  actually a probability of financial distress, so
23  I'm using the probability that comes out of the
24  model. And the probability is estimating: What
25  is the likelihood that the value of the assets

32 (Pages 122 to 125)

Robert W. Holthausen

1 will fall below the value of the debt?
2 Q. Will I see the words "financial
3 distress" in the article assessing the probability
4 of bankruptcy?
5 A. No. I think they talk about it as
6 bankruptcy.
7 Q. Okay.
8 A. They may talk about financial distress,
9 but I don't remember.
10 Q. Okay. And when you talk about financial
11 distress in paragraph 16 and, I assume, the
12 following analyses, you are talking about
13 bankruptcy as defined in the
14 assessing-the-probability-of-bankruptcy study?
15 MR. ALLINGHAM: Object to the form of
16 the question.
17 Q. I can rephrase to meet the objection.
18 When you refer to "financial distress" in
19 paragraph 16 and thereafter, what are you
20 referring to?
21 MR. ALLINGHAM: I still object to the
22 form of the question. Sorry.
23 Q. Are you referring to the -- when you
24 refer to "financial distress," are you referring

Robert W. Holthausen

1 to how the authors of the
2 assessing-the-probability-of-bankruptcy article
3 define "bankruptcy"?
4 A. I'm referring to the probability that
5 the value of the assets will fall below the value
6 of the debt.
7 Q. Okay. So that's a different definition
8 of "financial distress" than, for example, the
9 authors of the Andrade and Kaplan study use?
10 A. They're somewhat different, yes.
11 Q. And why are you relying on an article
12 that addresses probabilities of bankruptcy?
13 A. Because the likelihood of financial
14 distress is going to be a function of what those
15 values of the assets are relative to the value of
16 the debt. And so what we're doing here is, we're
17 using this as an estimate of that probability.
18 Q. When you say that "The likelihood of
19 distress is a function of assets versus debt," in
20 what -- in what way -- what is the function?
21 A. What is the functional form?
22 Q. I'm not -- how is the likelihood of
23 distress a function of the value of assets versus
24 the value of debts?

Robert W. Holthausen

1 A. Well, if the value of the assets far
2 exceeds the value of the debt, then it's unlikely
3 that the firm is experiencing any financial
4 distress. When the value of those assets falls
5 well below the value of the debt, then it's highly
6 likely the firm is in a distressed situation, and
7 at that point the equity holders may just choose
8 to let the debt holders have the firm.
9 Q. So this is a model, this
10 assessing-the-probability-of-bankruptcy model,
11 where all assets are equivalent regardless of
12 their liquidity?
13 A. The model makes -- yeah, the model makes
14 that assumption, yes.
15 Q. And all the liabilities are equivalent
16 regardless of the maturity or time when they're
17 due in reality?
18 A. Well, not the way we estimate the model.
19 Q. Is there actually a calculation you
20 could perform that could translate the
21 financial -- the likelihood of financial distress
22 as used by Andrade and Kaplan into the probability
23 of bankruptcy as used in the
24 assessing-the-probability-of-bankruptcy study?

Robert W. Holthausen

1 A. Say again.
2 Q. Is there actually a calculation one
3 could do to translate the probability of financial
4 distress that you extract from Andrade and Kaplan
5 and conform it to assessing the probability of
6 bankruptcy as used in that study?
7 A. No. I think they're very related to one
8 another. And all we're doing here is, we're
9 assessing the difference between two
10 probabilities.
11 Q. Okay. A company can be in financial
12 distress without being in bankruptcy. Isn't that
13 right?
14 A. It's conceivable that a company could be
15 in financial -- in some kind of financial distress
16 without actually having gone into bankruptcy.
17 Q. And a company can be in bankruptcy
18 without being in financial distress. Isn't that
19 right?
20 A. Both of those things can happen. That's
21 correct.
22 Q. Are you assuming that the injury that
23 Marvel would sustain from the probability of a
24 bankruptcy is the injuries that would flow from

33 (Pages 126 to 129)

Robert W. Holthausen

1
2  filing a bankruptcy petition? Let me just ask you
3  in general.
4      What injuries is it that you think Marvel
5  would sustain from filing a bankruptcy petition?
6      A.  I'm looking at what the injury is
7  associated with the financial distress cost as
8  estimated by Andrade and Kaplan. And I'm using as
9  an approximation for the probability of financial
10 distress the bankruptcy probability. And more
11 particularly, what I'm doing is, I'm using the
12 change in that probability of bankruptcy as a
13 proxy for the change in the probability of
14 financial distress.
15     Q.  I have a very much smaller question,
16 which is:  What injuries would Marvel sustain from
17 filing a bankruptcy petition?
18     A.  I did not analyze that.
19     Q.  What injuries would Marvel sustain from
20 incurring a period of financial distress?
21     A.  The estimates of the injuries from
22 financial distress come from the Andrade and
23 Kaplan paper.
24     Q.  Right.  And qualitatively, do you happen
25 to know what those injuries are?

Robert W. Holthausen

1
2      A.  Well, they can be a lot of different
3  things.  They can be customers deciding, you know,
4  that they no longer want to enter into contracts
5  with them.  It may be that they might not be able
6  to license products because people don't know if
7  they're going to be around.
8      Q.  And do you know the period of time in
9  which Marvel would sustain injuries from financial
10 distress?
11     A.  The period of time?  I don't understand
12 your question.
13     Q.  Over what period of time Marvel would
14 sustain injury from financial distress?
15     A.  It would depend upon how long they were
16 in financial distress, I presume.
17     Q.  So you don't know how long they would
18 sustain injury pre-bankruptcy petition if they
19 were in financial distress versus post-bankruptcy
20 petition, I take it?
21     A.  No.
22     Q.  Okay.  Do you believe that an increase
23 in the probability of bankruptcy is the only
24 injury that Marvel could sustain from financial
25 distress?

Robert W. Holthausen

1
2      A.  I don't really understand the question.
3  What I'm doing to estimate the cost of financial
4  distress is the estimates from Andrade and Kaplan
5  in conjunction with the change in the probability
6  that they're going to experience financial
7  distress.
8      Q.  Have you tried to measure the extent of
9  an injury from financial distress other than the
10 incremental probability of bankruptcy as of
11 February 15, 1994?
12     A.  Well, it's the incremental probability
13 of bankruptcy in conjunction with the estimates
14 from Andrade and Kaplan.
15     Q.  What is in conjunction with the
16 estimates from Andrade and Kaplan adding?  I'm
17 missing that.  Have you tried to measure the
18 extent of any -- obviously you tried to measure
19 the extent of injury from an incremental
20 probability of bankruptcy as of February 15, 1994.
21 Do we agree on that?
22     A.  Well, the injury isn't just the change
23 in the probability.  You have to multiply the
24 change in the probability times the cost.
25     Q.  Okay.

Robert W. Holthausen

1
2      A.  And that's where the Andrade and Kaplan
3  study comes in.  That's where the cost comes in.
4      Q.  And have you tried to measure the extent
5  of any injury from financial distress other than
6  that incremental change in probabilities?
7          MR. ALLINGHAM:  I object to the form of
8  the question.
9      A.  Again, it's in conjunction with the
10 Andrade and Kaplan study.  It's not just the
11 change in the probability.
12     Q.  Okay.  Multiplied by whatever figure you
13 derived from Andrade and Kaplan?
14     A.  Correct.
15     Q.  And have you tried to do -- measure the
16 extent of an injury other than that multiplication
17 calculation which is, you know, the one you just
18 told me?
19     A.  Well, the only other estimate I have of
20 injury in the paper has to do with the price
21 response to the October 17 announcement.  But,
22 again, that's an ex-post measure of damage, not an
23 ex-ante measure of damage.
24     Q.  Okay.  And other than what you've just
25 told me, is there anything else you've tried to

34 (Pages 130 to 133)

**Hudson Reporting & Video, Inc.**
www.hudsonreporting.com

1      Robert W. Holthausen
2  measure?
3      A.  No.
4      Q.  By the way, does the -- when assessing
5  the probability of bankruptcy, I assume that's a
6  probability of bankruptcy on a given date as
7  opposed to a period of time?
8      A.  It's the -- way it's measured in
9  this paper, it's:  What's the probability that the
10  firm would have experienced bankruptcy by the due
11  date of, in my case, the Marvel III notes?
12      Q.  Okay.  And how do you go about
13  calculating the probability of bankruptcy?
14      A.  Well, you use this option model.  And if
15  we turn to one of the exhibits, we can walk
16  through it, if you want.  Well, I guess we can
17  start with Exhibit 4.
18      Q.  Okay.  What are the inputs to your
19  methodology for assessing the probability of
20  bankruptcy?
21      A.  The inputs vary a little bit, so we have
22  to talk about a particular scenario, so can we
23  talk about without the Marvel III notes?
24      Q.  Okay.
25      A.  Well, the inputs then are the face value

1      Robert W. Holthausen
2  of the zero-coupon-equivalent liabilities, which
3  basically is saying, "Let's take the liabilities
4  prior to the time of the Marvel III notes," and
5  let's assume that they were all zero coupon
6  liabilities, so the interest just accrued on them.
7  We then take the years to maturity on the
8  Marvel III notes, which is four years.  We
9  estimate the equity volatility of Marvel, which is
10  around 48.5 percent.  We estimate the risk-free
11  rate over the four years of the Marvel III notes.
12  And we calculate the market value of the equity of
13  Marvel as of February 15, '94, when the Marvel III
14  notes were issued.
15      Q.  Okay.  I see in your note to equity
16  volatility, you state that you derive your equity
17  figure "from the standard deviation of daily
18  Marvel stock returns over the year prior to
19  February 15, 1994"?
20      A.  Correct.
21      Q.  And the sentence goes on?
22      A.  Right.
23      Q.  Is that what's commonly known as a
24  "historical volatility"?
25      A.  Yes, it is.

1      Robert W. Holthausen
2      Q.  And why do you choose to use historical
3  volatility?
4      A.  It's the basis on which the Hillegeist
5  paper assessed the probability of bankruptcy and
6  showed it was better than the other models.
7      Q.  Showed it was better than what other
8  models?
9      A.  Well, they make a comparison of this
10  option model against something called a "Z-score
11  model," another one called the "Olson model."
12      Q.  Aren't those accounting-based
13  methodologies?
14      A.  Those are primarily accounting-based
15  methodologies, yes.
16      Q.  So those are not options-based
17  methodologies, if I'm understanding?
18      A.  They are not, right.
19      Q.  So there wouldn't be a volatility figure
20  in the accounting-based model?
21      A.  That is correct.
22      Q.  So does the study actually tell you to
23  apply historical volatility as distinguished from
24  implied volatility?
25      A.  They base their measures on the

1      Robert W. Holthausen
2  historical volatilities and show that it gives you
3  much more accurate predictions than either the
4  accounting-based models.
5      Q.  Is there actually a discussion within
6  the Hillegeist article as to whether to use
7  historical or implied volatility?
8      A.  I don't remember that there was any
9  discussion about implied volatilities.  There may
10  have been.  I just don't remember.
11      Q.  Okay.  And are you saying that you
12  actually saw them applying historical volatility?
13      A.  They say they used historical
14  volatilities.
15      Q.  And I take it you don't know why they
16  used historical volatilities?
17      A.  Well, it's a fairly common thing to do.
18      Q.  Right.  Now, you're trying to assess a
19  future probability of bankruptcy.  Isn't that
20  right?
21      A.  Correct.
22      Q.  Okay.  Don't you think it's more
23  appropriate to use a forward-looking volatility
24  measure?
25      A.  Sometimes those forward-looking

35 (Pages 134 to 137)

Robert W. Holthausen

1
2  volatility measures give you all different kinds
3  of point estimates so that -- we're trying to
4  measure what the volatility over a four-year
5  period. Those implied measures are likely to give
6  me a volatility estimate over three months or six
7  months, something like that.
8      Q.  So was it an ease-of-computation
9  consideration that led you to use historical
10  volatility?
11     A.  I was trying to be consistent with the
12  paper because the paper shows that this method
13  dominates the other methods conditional on this
14  procedure.
15     Q.  Okay.  You mentioned a -- I'm sorry.
16     You were telling me the inputs that you used
17  and, I don't think you had gotten up to outputs
18  because I interrupted you.  Please go head.
19     A.  I know I got as far -- I got as far as
20  the inputs.  I think that's all you asked me.
21     Q.  Okay.  What were the outputs?
22     A.  Well, the outputs -- from that, you can
23  derive what the asset value and the asset
24  volatility are as well as what the probability of
25  bankruptcy is.

Robert W. Holthausen

1
2      Q.  And that is the probability that assets
3  will be less than debt on four years from whatever
4  date you pick as your starting point?
5      A.  Correct.
6      Q.  Can you tell me -- in your note to --
7  note No. 8 under "Notes and Sources" on Exhibit 4
8  of your report, there's a sentence in note 8 that
9  says, "Instead of the estimated asset return, I
10  used the risk-free rate in four."
11     A.  Right.
12     Q.  The risk-free rate is one of the inputs?
13     A.  Yes.
14     Q.  And why do you use the estimated asset
15  return instead of -- I'm sorry.
16     Why do you use the risk-free rate instead of
17  the estimated asset return?
18     A.  Well, what they do in the paper is, they
19  use the historical -- the historical realized
20  return on the assets.  And sometimes that winds up
21  being negative.  And if it's negative, then they
22  use the risk-free rate because you wouldn't expect
23  assets to be priced to yield a negative return.
24  The problem that you can get into when you use the
25  estimated asset return is that if the historical

Robert W. Holthausen

1
2  estimated asset return has been high, then the
3  probability of bankruptcy will be zero because
4  using the historical number basically presumes
5  that you'll continue to get that high estimated
6  asset return.  In Marvel's case, if you use the
7  historical estimated asset return, you get a
8  measure of zero financial distress cost no matter
9  what you do.  And so using the risk-free rate will
10  provide some estimate of financial distress costs.
11     Q.  So it wasn't that the typical reason
12  that would drive you to use the risk-free rate,
13  that asset returns are negative.  It was the
14  opposite end of the spectrum?
15     A.  In this particular --
16     MR. ALLINGHAM:  Object to the form of
17  the question.
18     A.  In this particular case, yes, it was not
19  that asset returns were negative.  It was asset
20  returns were so high, there would be no likelihood
21  of distress from the model.
22     Q.  And did that give you any pause or
23  concern as to whether that was a valid model to be
24  using?
25     A.  No.  In fact, what this would do is, it

Robert W. Holthausen

1
2  would increase the probability of financial
3  distress, so, if anything, it would increase the
4  cost of financial distress.
5      Q.  No.  I understand what you did.  I'm
6  saying:  Did you have any concern about whether
7  the model was an appropriate model?
8      A.  No, no.  The model is used a lot by a
9  lot of people.
10     Q.  Had you applied this methodology before?
11     A.  I talk about it in class.
12     Q.  Which class is that?
13     A.  My corporate valuation class.
14     Q.  Okay.  I think you said other people use
15  this methodology?
16     A.  Yeah, use a similar methodology, yes.
17     Q.  Oh.  Who is it who uses a similar
18  methodology?
19     A.  KMV, for example.  KMV was bought by
20  Moody's.
21     Q.  Do you actually know the methodology
22  that KMV uses?
23     A.  You can't know all of it because some of
24  it is proprietary.  So we know parts of it, and
25  parts of it are consistent with this, but then

Page 142

Robert W. Holthausen

1    Robert W. Holthausen
2  they don't tell you everything that you do.
3    Q.  So you know that KMV uses a model in
4  which -- parts of which are similar to the
5  Hillegeist model?
6    A.  Correct.
7    Q.  Do you know anyone else who uses it, or
8  parts of it, I guess?
9    A.  There's a corporation called "LLC" that
10  uses it.  KMV sold their products to lots of banks
11  who examine long portfolios and things like that
12  using it, so it's a commercial product that's
13  sold.
14    Q.  KMV sold its proprietary product?
15    A.  Correct.
16    Q.  Okay.  I'm talking about just this
17  Hillegeist model.  Is there anyone who uses that?
18    A.  I know that Hillegeist has been
19  approached by hedge funds and banks.  I don't know
20  whether any of them were ultimately implemented or
21  not, but a lot of them were playing around with
22  it.
23    Q.  So as you sit here, do you know if
24  anyone is using the Hillegeist model?
25    A.  The Hillegeist version?

Page 143

1    Robert W. Holthausen
2    Q.  The Hillegeist version.
3    A.  I mean, it's derived from the same
4  theory as what KMV uses and LLC and all the
5  others, but the exact form of the Hillegeist
6  model, I can't tell you.
7    Q.  Okay.  And had you calculated
8  probabilities of bankruptcy for a professional or
9  academic purposes before this case?
10    A.  Probabilities?  No.
11    Q.  This was your first occasion to apply --
12    A.  Well, for academic purposes, yeah.  In
13  my class I have, yes.  I'm sorry.  I was thinking
14  professional.
15    Q.  So you had applied the Hillegeist
16  version in class?
17    A.  We talk about it in class, yes.  We talk
18  about the other models, too.  We talk about the
19  Olson model.  We talk about the Altman model.
20    Q.  Okay.  I don't know if I'm getting hung
21  up on semantics or what.  When you say you talk
22  about it, do you -- have you applied the model to
23  any real world situation as opposed to talking
24  about models?
25    A.  Well, we come up with examples, and we

Page 144

1    Robert W. Holthausen
2  teach the students what the inputs are and how the
3  model works.
4    Q.  Okay.  Going back to your Exhibit 4, how
5  did you pick four as the years to maturity?
6    A.  That was the years on the Marvel III
7  notes.
8    Q.  And why did you pick February 15, 1994,
9  as the date on which to assess probabilities of
10  bankruptcy?
11    A.  That was the date that the Marvel III
12  notes were issued.
13    Q.  I think you mentioned that you also have
14  a panel that discusses the application of your
15  model with the Marvel III notes.  Can you tell me
16  about that, in particular, whether it's different
17  in some way?
18    A.  Well, in those -- I run two scenarios
19  where you make an assumption about -- that Marvel
20  was going to have to issue -- I make the
21  assumption that the indenture company -- the
22  holding notes caused Marvel to have to increase
23  its leverage.  And so then the issue is:  What
24  would have been the expectation about the amount
25  of leverage that Marvel might have had -- might

Page 145

1    Robert W. Holthausen
2  have had to issue, given the Marvel III notes
3  under the assumption that it was going to cause
4  them to have to issue debt?  So I look at three
5  scenarios.  The first scenario is just to see what
6  analysts were saying about how much debt Marvel
7  was going to issue, and that's not in this table.
8  That's in the text.  And the analysts were saying
9  after the issuance of the Marvel III notes that
10  they actually were going to retire debt, that they
11  were going to pay down debt.  If they paid down
12  debt, then there's no increase in the financial
13  distress costs in the probability of distress, so
14  there's no economic harm.
15    Q.  Okay.  And if I look at your calculation
16  with the Marvel III notes, I see one -- the equity
17  volatility, there was an input without the notes,
18  there was an output with the notes.
19    A.  Correct.
20    Q.  And why is that?
21    A.  Well, one of the things that the equity
22  volatility allows -- if you look over where you
23  have the without the Marvel II notes, one of the
24  things that you can figure out from applying the
25  model is what the asset volatility is.  So now I'm

37 (Pages 142 to 145)

**Hudson Reporting & Video, Inc.**
www.hudsonreporting.com

Robert W. Holthausen

1        Robert W. Holthausen
2  in February of 1994 in order to see what the
3  result would be?
4    A.  I think I alluded to this before. I
5  said I did some sensitivity analysis. So, for
6  example, in this particular case we hold the rate
7  of interest constant at 6 percent even though
8  we're increasing the amount of debt. One might
9  argue that the cost of debt would go up a little
10  bit if you increase the amount of leverage in the
11  firm, so we ran scenarios at 7 and 8 percent,
12  things like that.
13    Q.  Before you came to this -- before you
14  decided that you should use expected costs of
15  financial distress as distinguished from actual
16  costs of financial distress, did you consider any
17  other methods for measuring harm?
18    A.  The only other measure that you might be
19  able to use for measuring harm would be to look at
20  price responses on the days in which, for example,
21  the Marvel III notes were issued or something like
22  that. So, in other words, on the date on which
23  something occurred -- right? -- you can see what
24  the price response is on those days.
25    Q.  But you didn't do any calculation of

1        Robert W. Holthausen
2  what actual injuries were sustained in 1995 or
3  1996?
4    A.  Again, I estimated the October 17 date
5  that we talked about.
6    Q.  Other than that material.
7    A.  Yes.
8    Q.  Okay. Could you take a look at
9  Exhibit 5 to Holthausen Exhibit 1, please? And
10  what does that show?
11    A.  Here I'm estimating what the costs of
12  financial distress are, the expected cost of
13  financial distress, the expected incremental cost
14  of financial distress, to be more precise, which
15  is a function of what the incremental probability
16  of financial distress is in conjunction with, in
17  panel A, the average of the 10 and 20 percent that
18  comes out of Andrade and Kaplan, and in panel B
19  the estimated cost of financial distress
20  associated with the no-shock sample.
21    Q.  Why --
22    A.  I'm sorry.
23    Q.  I'm sorry. Go ahead, please.
24    A.  And I show that for scenario 2 and
25  scenario 3.

1        Robert W. Holthausen
2    Q.  What are you referring to here by the
3  "no-shock sample"? Is that the same as the
4  Andrade and Kaplan --
5    A.  Yeah, that is the Andrade and Kaplan
6  no-shock sample.
7    Q.  And why are you showing a no-shock
8  sample?
9    A.  For the same reasons we talked about
10  before, that Andrade and Kaplan are worried about
11  in their paper that the 10 to 20 percent estimates
12  that they get are an upper bound because they
13  believe that that mixes economic -- those
14  estimates mix the effect of economic distress and
15  financial distress.
16    Q.  And did you do any calculation --
17  perform any calculation using the Andrade Kaplan
18  results for shock companies?
19    A.  No.
20    Q.  Had you considered doing that?
21    A.  No.
22    Q.  Can you explain to me what note 5 under
23  "Notes and Sources" in Exhibit 5 means? Your
24  table says, "The average cost of financial
25  distress in percentage is zero," but then you have

1        Robert W. Holthausen
2  some positive numbers in note 5, and I'm not
3  understanding how the positive numbers yield an
4  average of zero.
5    A.  Oh. Well, that's -- those are the
6  results that come out of their study, which
7  indicates that there would be no cost associated
8  with financial distress.
9    Q.  Oh. You're saying these are showing
10  positive --
11    A.  They're showing positive --
12    Q.  -- financial distress costs?
13    A.  Well, that's what comes out of their
14  study, and so they infer from that that the
15  financial distress is zero.
16    Q.  So that's not your calculation; that's
17  theirs?
18    A.  The 5.6 and the 31.2?
19    Q.  Correct.
20    A.  Yes.
21    Q.  Professor Holthausen, was Marvel's
22  strategy to grow by acquisition relevant to its
23  likelihood of financial distress?
24    A.  Well, growing by acquisition doesn't
25  lead you to financial distress.

39 (Pages 150 to 153)

Page 154

Robert W. Holthausen

1
2    Q.  Is it relevant to its likelihood of
3  financial distress?
4    A.  It would depend upon how you finance
5  yourself.
6    Q.  So is Marvel's acquisition strategy
7  taken into account at all in your methodology that
8  you take from the Hillegeist study?
9    A.  Is it's which strategy?  Its acquisition
10  strategy?
11    Q.  Yes.
12    A.  No.
13    Q.  So under the Hillegeist model as applied
14  by you, all other factors equal, a company which
15  has plans to make acquisitions is just as likely
16  to suffer financial distress as a company without
17  acquisition plans?
18    A.  Well, except that it might affect the
19  inputs into the model, such as equity volatility
20  or something like that, or the asset volatility.
21    Q.  If the plans are known on the date that
22  you pick as your start date?
23    A.  Yes.
24    Q.  And is Marvel's financing strategy
25  relevant to its likelihood of financial distress?

Page 155

Robert W. Holthausen

1
2    A.  Sure.  How it chooses to finance itself
3  will affect the probability of financial distress.
4    Q.  So is Marvel's financing strategy going
5  forward from February 15, 1994, factored into your
6  model in some way?
7    A.  Well, what I presume here in scenarios 2
8  and 3 is that they're actually going to increase
9  the amount of debt that they have.  And I look an
10  ex-ante calculation about what's sort of the
11  maximum amount debt that you might infer that they
12  would be able to issue at that point in time.
13    Q.  Why is it you're not using their actual
14  debt levels?
15    A.  Because this is an ex-ante calculation,
16  nobody knew how many acquisitions they were going
17  to do, nobody knew how much debt they would take
18  on ultimately.  This has to be a calculation based
19  upon some expectation at the time that the holding
20  company notes are issued.
21    Q.  And that all goes back to the
22  fundamental point that you mentioned this morning
23  about your view that you measured the expectations
24  as of February 15, 1994?
25    A.  Correct.

Page 156

Robert W. Holthausen

1
2    Q.  Is the impact of the indenture covenants
3  on Marvel after February 15, 1994, relevant to its
4  likelihood of financial distress?
5    A.  Well, what this calculation presumes is
6  that the indenture covenants force Marvel to take
7  on additional debt, and so this calculation is
8  based on that presumption, and then looks at the
9  increase in debt which would have been feasible at
10  the time, given the Marvel credit agreements and
11  some projection about its EBITDA.
12    Q.  Okay.  And is any actual impact of the
13  indenture covenants factored into the model?
14    A.  Well, actual -- I was asked to assume
15  that the indenture covenants caused Marvel to
16  increase the amount of debt, so that's the extent
17  to which the indenture covenants affect
18  calculation here because it's an assumption that
19  the debt levels will go up because of the
20  indenture covenants.
21    Q.  Did you assess the probability of
22  bankruptcy for any date other than February 15,
23  1994?
24    A.  It's the probability that by the due
25  date of the March -- you're standing at

Page 157

Robert W. Holthausen

1
2  February 15, 1994.  You have a certain amount of
3  liabilities.  What is the likelihood that you'll
4  be bankrupt in the period between then and when
5  the Marvel notes are due?
6    Q.  I can see you did that.  My question is
7  simply whether you made that assessment or
8  calculation for any date other than February 15.
9    A.  Right.  My point is, it goes to the end
10  of the due date of the Marvel III notes.
11    Q.  I'm not being clear.  It's probably my
12  fault.
13    Did you pick a start date other than
14  February 15, 1994?
15    A.  No.
16    Q.  So the one and only scenario -- or all
17  the scenarios you ran assumed February 15, 1994,
18  as the start date?
19    A.  Correct, because that was the date of
20  the Marvel III notes.  And Mr. Baliban said that
21  as far as he was concerned, that was where all the
22  harm came from, the Marvel III notes.
23    Q.  Okay.  Can you look at paragraph 18 of
24  Holthausen Exhibit 1, please?  And this is talking
25  about the various scenarios that you described to

40 (Pages 154 to 157)

Page 158

```
 1           Robert W. Holthausen
 2   me?
 3       A.  Uh-huh.
 4       Q.  Your scenario 1 is the expectation of
 5   analysts about the amount of debt that Marvel
 6   would have subsequent to the issuance of the
 7   Marvel III notes?
 8       A.  Uh-huh.
 9       Q.  And why did you hypothesize that
10   scenario?
11       A.  Because, again, it's an expectation of
12   the future debt level, so these are analysts who
13   were following the firm.  They've read the 10Ks.
14   They've talked to management.  And so the issue
15   is:  What were they forecasting about the amount
16   of debt that Marvel was going to take on?
17       Q.  Were you assuming that the expectations
18   of an analyst about the amount of debt that Marvel
19   would take on were consistent with Marvel's own
20   plans?
21       A.  Again, I'm trying to calculate what an
22   expected value is.  And one of the ways to do that
23   is to use information about expectations.  So this
24   is one of the scenarios I looked at because it
25   reflects analysts' expectations of what is going
```

Page 159

```
 1           Robert W. Holthausen
 2   to occur.
 3       Q.  I guess that's really my question, is:
 4   Why do you take analysts' expectation rather than
 5   for example MacAndrews & Forbes' expectations?
 6       A.  I don't have any data about MacAndrews &
 7   Forbes' expectations.  If I did, I could rerun the
 8   model.
 9       Q.  Sure.  Why do you not use the
10   expectations of the management of Marvel?
11       A.  I don't have any data from the
12   management of Marvel about how much debt they were
13   going to issue.
14       Q.  So it's the availability of data that is
15   a factor in constructing these scenarios?
16       A.  Correct.
17           MR. ALLINGHAM:  Object to the form of
18   the question.
19       Q.  Okay.  You mention in, I think, the next
20   paragraph, 19, and I think you told me this
21   before, that after issuance of the Marvel III
22   notes, analysts expected Marvel to reduce its debt
23   level?
24       A.  Yes.
25       Q.  And are the analyst reports that you
```

Page 160

```
 1           Robert W. Holthausen
 2   looked at just the once you list in paragraph 19,
 3   or are there others?
 4       A.  No.  Those are the ones I looked at.
 5       Q.  Okay.  And what was the time frame of
 6   the analyst reports you looked at?
 7       A.  I was trying to find something
 8   reasonably close to when the Marvel III notes were
 9   issued.
10       Q.  I'm sorry.  Go ahead.
11       A.  That's it.
12       Q.  The last one you cite was on July 21,
13   1994?
14       A.  Correct.
15       Q.  Okay.  And was there any particular
16   reason you stopped at that date?
17       A.  No.  I was just trying to — again, I
18   was just trying to find things that were, you
19   know, consistent with the time period when the
20   Marvel III notes were issued.
21       Q.  Is there a reason you didn't look at
22   reports from August of 1994 in particular?
23       A.  No.
24       Q.  So if Marvel made a huge acquisition,
25   that would just be coincidence?
```

Page 161

```
 1           Robert W. Holthausen
 2       A.  Yes.  Well, I'm trying to figure out
 3   what were the expectations at the time these notes
 4   were issued.
 5       Q.  Do you think that Marvel's board didn't
 6   know that it was going to make an acquisition in
 7   August — in July 21 of 1994?
 8       A.  I don't know what the board knew.  I
 9   have no personal knowledge of what the board knew.
10       Q.  Did you consider why analysts believed
11   Marvel would reduce its debt after the Marvel III
12   note issuance?
13       A.  No.
14       Q.  And did you consider why Marvel acted
15   contrary to analyst expectations as of that time?
16       A.  No, I do not.
17       Q.  And did you consider whether it was in
18   Marvel's best interest to finance acquisitions
19   with bank debt rather than equity?
20       A.  No, I did not do an analysis of that.
21       Q.  Could you take a look at paragraph 20 of
22   Holthausen Exhibit 1, please?
23       A.  Uh-huh.
24       Q.  Can you help me out here with
25   understanding what you're doing in paragraph 20?
```

41 (Pages 158 to 161)

Robert W. Holthausen

1
2    Are you considering whether it was in Marvel's
3    best interest -- I'm sorry.
4        Are you assuming that Marvel's own credit
5    agreements would still have been in place had the
6    holding company notes never been issued?
7        A.  No.  I'm assuming that the Marvel -- I'm
8    just assuming that the Marvel credit agreements
9    are in place.
10       Q.  With or without the holding company
11   notes?
12       A.  With or without the holding company
13   notes.
14       Q.  And do you think that it is a reasonable
15   assumption to assume that the credit agreements
16   would have been in place, absent the holding
17   company notes?
18       A.  Yes.
19       Q.  And why is that?
20       A.  Because they had credit agreements
21   before the holding company notes.
22       Q.  Could you please take a look at
23   paragraph 24 of Holthausen Exhibit 1?
24       A.  Uh-huh.
25       Q.  Okay.  You say that Mr. Baliban has to

Robert W. Holthausen

1
2    make a number of assumptions in order to use the
3    decline in Marvel's stock price on November 12,
4    1996, as a measure of the minimum harm to Marvel.
5    Do you see that?
6        A.  Uh-huh.
7        Q.  Okay.  Are all the assumptions you're
8    saying he must be making listed in paragraph 24,
9    or are there others that are not listed here?
10       A.  I believe that's all the assumptions.
11   The second assumption incorporates two things.
12   One is that there are many announcements that take
13   place on that day, and the second is that I
14   believe that the Andrews offer provides the market
15   with information.  So both of those are
16   incorporated in that second assumption that no
17   other value-relevant news comes out about Marvel.
18   And it goes on to talk about the two assumptions,
19   about the financial distress certainty and the
20   sole causation assumption as well, right.  So all
21   those assumptions are there.
22       Q.  Is it your view that the expected cost
23   of the indenture covenants at the time the notes
24   were issue is relevant to Mr. Baliban's analysis
25   of the damages to Marvel in November of 1996?

Robert W. Holthausen

1
2        A.  I'm sorry.  You're going to have to
3    repeat that again.
4        Q.  Sure.  One of the assumptions you list
5    in your paragraph 24 is, you say that
6    "Mr. Baliban's estimate is not based on the
7    expected cost of the indenture covenants at the
8    time that those notes were issued."
9        Do you see that?  It's like the last
10   sentence --
11       A.  Right.
12       Q.  -- paragraph 24.  I assume it's your
13   view that the expected cost of the indenture
14   covenants at the time the notes were issued is
15   somehow relevant to Mr. Baliban's analysis of the
16   damages to Marvel in November of 1996?
17       A.  Well, it depends on whether you want to
18   do an ex-ante calculation or an ex-post
19   calculation.  If he wants to do an ex-post
20   calculation, then he's got to obviously ignore the
21   expectation piece.  I don't even think doing an
22   ex-post analysis, you can ignore the sole
23   causation piece.
24       Q.  How is the expected cost of the
25   indenture covenants -- of the indenture covenants

Robert W. Holthausen

1
2    at the time they were issued relevant to
3    Mr. Baliban's analysis of a minimum damage level
4    in November of 1996?
5        A.  I think I just answered that, but my
6    point is that he believes that doing an ex-post
7    analysis is an appropriate way to measure damages.
8    I've said I think it has to be an ex-ante measure.
9        Q.  I'm with you so far.
10       A.  Okay.  So if you use an ex-ante measure,
11   then you have to take into consideration the
12   expectation that it would occur at the time the
13   notes are issued.  He is doing an ex-post measure,
14   so he doesn't take into consideration the
15   expectation.  My whole point is just back to the
16   same thing, and that is that I think we should be
17   doing an ex-ante measure, not an ex-post measure.
18       Q.  I see.  So it's that fundamental point
19   of departure between you and Mr. Baliban?
20       A.  It's the fundamental point of departure,
21   correct.
22       Q.  Are you able to take his analysis of
23   market impact in 1996 on its own terms and tell me
24   whether the expected cost of the indenture
25   covenants at the time they were issued has

42 (Pages 162 to 165)

Robert W. Holthausen

1
2  anything to do with that?
3      A.  I'm not sure what you mean, "on its own
4  terms."  Are you asking me if I wanted to do an
5  ex-post analysis like his, do I have to take into
6  consideration the expectation?
7      Q.  Yes.
8      A.  No, because he's assuming that it's
9  certain that they will fail.  So if you want to
10  make the certainty assumption, then you don't have
11  to take into consideration the expectation.
12      Q.  Okay.  You mention in paragraph 24 and a
13  little higher up in paragraph 24 that -- you say
14  that "Mr. Baliban has to assume that November 12,
15  1996, was the first time that the market knew that
16  Mr. Perelman," P-e-r-e-l-m-a-n, "or
17  Perelman-controlled entities would not provide
18  Marvel with an equity infusion without a waiver of
19  the indenture covenants from the holding company
20  noteholders."
21      Do you see that in paragraph 24?
22      A.  I'm sorry.  I just found it.
23      Q.  Okay.  Let me know when you're with me.
24  You're with me?
25      A.  Uh-huh.

Robert W. Holthausen

1
2      Q.  Oh, okay.  Is it your belief that that
3  was not the case?
4      A.  It's my belief that is not the case.
5      Q.  And why is that?
6      A.  Because I believe the market found out
7  prior to November 12 through the October 17
8  announcement, and I believe that that's buttressed
9  by the fact that the analysts were talking about
10  it subsequent to October 17, but before
11  November 12.
12      Q.  You believe that the market learned
13  before November 12 that Mr. Perelman would not
14  make an equity investment in Marvel unless the
15  holding company noteholders waived the indenture
16  covenants?
17      A.  Yes.
18      Q.  Okay.  Let's take a look at the
19  October 17 announcement.
20      MR. GOLDWATER:  Can I have this marked
21  as Holthausen Exhibit 3, please?
22      (Announcement dated October 17, 1996, is
23  marked as Holthausen Exhibit 3 for
24  Identification.)
25      Q.  Okay.  I show you what's been marked as

Robert W. Holthausen

1
2  Holthausen Exhibit 3 and ask you to please take a
3  look at that.
4      A.  Okay.
5      Q.  Okay.  Is that the October 17
6  announcement that you were just referring to?
7      A.  Correct.
8      Q.  And what in that announcement would
9  alert the market that Mr. Perelman would not make
10  an equity investment in Marvel unless the holding
11  company noteholders waived the indenture
12  covenants?
13      A.  Well, I think there's two things in here
14  that are talked about.  One is the fact that
15  there's going to have to be an agreement with the
16  Marvel holding company noteholders and the Andrews
17  Group on the terms of that purchase and the fact
18  that the collateral that is in those is going to
19  be substantially diluted, which is in the next
20  paragraph.  I think any reasonable inference from
21  those things is that there's going to be
22  substantial negotiations that are going to have to
23  take place with the Marvel company bondholders,
24  the holding company bondholders.
25      Q.  Okay.  So you think the inference that

Robert W. Holthausen

1
2  the market would take from this is that there's
3  going to be a negotiation.  A negotiation between
4  who about what?
5      A.  I think there's going to be -- I think
6  there's going to be a lot of negotiations.  I
7  think there's going to be negotiations with
8  Marvel, the banks, with Andrews, and with the
9  Marvel holding company bondholders.  So -- and
10  those were going to revolve around different
11  things, in all likelihood, so that negotiation
12  with the banks is going to be one thing, and
13  negotiation with the noteholders is going to be
14  something else.
15      Q.  And what's the "something else" that you
16  see in the October 17 announcement?
17      A.  With the noteholders?
18      Q.  Yes.
19      A.  Well, I mean, the collateral is going to
20  be substantially diluted.  And so what that means
21  is, the value of the collateral is going to fall
22  substantially if this transaction goes through.
23      Q.  Anything else?
24      A.  And if it goes -- if the delusion is
25  substantial enough, it's going to violate the

43 (Pages 166 to 169)

Page 170

Robert W. Holthausen

1 Robert W. Holthausen
2 50 percent majority ownership rule. So it's going
3 to depend on how substantial the delusion is, but
4 I think it certainly puts the market on notice of
5 that issue.
6    Q. Does the October 17 announcement say
7 anything about the indenture covenants?
8    A. It does not say anything directly about
9 the indenture covenants.
10    Q. Now, in paragraph 29 of your report,
11 Holthausen Exhibit 1, the sentence that carries
12 over from page 17 to 18, you say, "It's not true
13 that the market was unaware of the potential role
14 of the holders of the holding company notes
15 regarding an equity infusion from entities
16 controlled by Mr. Perelman."
17    Do you see that?
18    A. Uh-huh.
19    Q. What do you mean by "the potential role
20 of the holders of the holding company notes"?
21    A. Well, that they were going to have to be
22 in agreement -- they were going to have to
23 negotiate with the Andrews Group, and they were
24 going to have to agree to the terms with the
25 Andrews Group about the delusion that's going to

Page 171

Robert W. Holthausen

1 Robert W. Holthausen
2 take place.
3    Q. Okay. The potential role was undefined,
4 I take it?
5    A. Well, I think I just defined it, but,
6 yes. I mean, there could have been other things
7 that they could be negotiating as well.
8    Q. Okay. And the outcome of this
9 negotiation could be good, bad, or indifferent.
10 We just don't know?
11    A. Yeah. I mean, anything could happen
12 associated with that. That's correct.
13    Q. Okay. And do you believe,
14 Professor Holthausen -- I think you've done some
15 work in this area -- that the specificity of the
16 information in the announcement has a bearing on
17 its market impact?
18    A. What do you mean by "specificity" in
19 this particular case?
20    Q. The amount of information provided on
21 the subject that you are opining about.
22    A. Well, I think there -- you know, the
23 more information that's given, the better, but I
24 think there's a lot of information here about the
25 role that the holding company notes are going to

Page 172

Robert W. Holthausen

1 Robert W. Holthausen
2 play in this negotiation.
3    Q. Anything beyond what you've already told
4 me?
5    A. No. I think I've already articulated
6 what I think it says.
7    Q. Okay. And do you know if the market
8 views that favorably, unfavorably, or otherwise?
9    A. Views what favorably or unfavorably?
10    Q. Whatever it is you're saying they
11 learned about the role of the noteholders.
12    A. Well, there's a price response on that
13 day that's negative. It's not statistically
14 significant in terms of how people normally
15 characterize statistical significance, but there
16 is a price response on that day, and I think the
17 value of the equity falls $25 million roughly.
18    Q. When you say, "It's not statistically
19 significant," can you tell me what it means? Not
20 meeting a particular confidence level?
21    A. Not meeting a particular confidence
22 level.
23    Q. Is that the 95 percent confidence level?
24    A. I forget exactly what it was. I'm not
25 sure it even met the 90, but -- I just don't

Page 173

Robert W. Holthausen

1 Robert W. Holthausen
2 remember what it was.
3    Q. Okay. Professor Holthausen, did
4 investors learn anything about the indenture
5 covenants in particular in the Marvel parent or
6 Marvel III notes from the October 17 announcement?
7    A. There was nothing stated in particular
8 about the indenture covenants in this
9 announcement, but I think it's a reasonable
10 inference to draw that they would understand what
11 those were, that there was some role for those.
12 And, in fact, the analyst reports that come out
13 between October 17 and November 12 talk about the
14 indenture covenants.
15    Q. These are the reports I haven't seen
16 yet?
17    A. Yes, they are.
18    Q. Did investors learn from the October 17
19 announcement that Mr. Perelman would not make an
20 equity investment in Marvel unless the noteholders
21 agreed that the stock he bought would not be
22 subject to the indenture covenants?
23    A. They did not learn that directly.
24    Q. Okay. You said you did some analysis to
25 determine whether the information in the

44 (Pages 170 to 173)

Page 182

Robert W. Holthausen

1
2   Q.   Yes.
3   A.   Yes, that's my understanding.
4   Q.   Okay. And if, indeed, he did control
5   for the third quarter earnings information, do you
6   have any other criticism of his report based on
7   the announcement of that third quarter earnings
8   information?
9   A.   Just the third quarter earnings
10  information or all the other information?
11  Q.   Just the third quarter.
12  A.   Well, to be honest, I'd have to go back
13  and look more carefully at what he did to know
14  whether I thought he did it correctly or not.
15  Assuming he did it correctly, then I wouldn't have
16  any qualms with it.
17  Q.   As you sit here, I take it you can't
18  remember --
19  A.   I cannot remember how he did it.
20  Q.   Okay. Could we take a five-minute
21  break?
22  A.   Sure.
23       THE VIDEOGRAPHER:  If we can also --
24  when we go off the record, I have a question. The
25  time now is 2:57 p.m., and we're going off the

Page 183

Robert W. Holthausen

1
2   record.
3       (There is an off-the-record discussion.)
4       THE VIDEOGRAPHER:  This concludes the
5   tape No. 2 of the videotape deposition of Robert
6   Holthausen. The time now is 2:58 p.m., and we're
7   going off the record.
8       (There is a recess taken.)
9       THE VIDEOGRAPHER:  This the beginning of
10  tape No. 3 in the videotape deposition of Robert
11  Holthausen. The time now is 3:09 p.m., and we're
12  back on the record.
13  BY MR. GOLDWATER:
14  Q.   Professor Holthausen, would you just
15  take a look at paragraph 33 of Holthausen
16  Exhibit 1?
17  A.   Okay.
18  Q.   Okay. You mention in that paragraph
19  that "Marvel announced earnings guidance for the
20  upcoming fourth quarter of 1996."
21       Do you see that?
22  A.   Correct.
23  Q.   In your view, is this announcement of
24  fourth quarter guidance significant to
25  Mr. Baliban's report in some way?

Page 184

Robert W. Holthausen

1
2   A.   Well, I think they're disclosing bad
3   news here. Expectations had been roughly 40 cents
4   a share. They're saying here that the loss is
5   going to be 52 to 57 cents a share. I think that
6   would be viewed as negative news by the market.
7   Q.   Was there something that Mr. Baliban
8   should have done about this announcement of
9   company guidance that he didn't do?
10  A.   Well, the issue is whether, you know,
11  you can apportion all these things out or not
12  amongst all these different announcements, which
13  is difficult to do. There's a long literature on
14  management forecasts which basically says that if
15  managers forecast bad news, there are negative
16  price responses to them.
17  Q.   You've seen studies specifically
18  addressing company guidance?
19  A.   Management forecasts. They're the same
20  thing. There are studies on point estimates.
21  There are studies on range estimates, all kinds of
22  studies.
23  Q.   Are you able to tell me the name or
24  author of any of those studies?
25  A.   There's a study by Steve Penman, there's

Page 185

Robert W. Holthausen

1
2   a study by Greg Waymire.
3   Q.   How do you spell that?
4   A.   Waymire?
5   Q.   Yes.
6   A.   W-a-y-m-i-r-e. There's probably -- I
7   don't remember them all off the top of my head.
8   There's probably 10 or 15 studies on management
9   forecasts that look at different elements of the
10  forecasts. Some look at price responses. Some
11  look at analyst reactions to them.
12  Q.   And these are -- to make sure we're
13  talking about the same thing, these are
14  forward-looking company guidance as distinguished
15  from announcements of earnings for periods of time
16  that have already come and passed?
17  A.   Forward-looking company guidance in your
18  terminology, yes.
19  Q.   Do you have a view, Mr. Holthausen, as
20  to whether the announcement of this guidance
21  affected Marvel's stock price on November 12,
22  1996?
23  A.   I believe it would have affected it
24  negatively, but I have not attempted to measure
25  that.

47 (Pages 182 to 185)

Robert W. Holthausen

1
2  Q.  What's the basis for your opinion if you
3  haven't attempted to measure it?
4  A.  All the prior studies that indicate when
5  managers release negative forecasts, there are
6  negative stock price reactions to them.
7  Q.  Do you believe it's relevant whether
8  announcements of company guidance have in the past
9  impacted stock price?
10  A.  Maybe you could rephrase that for me.
11  Are you saying if Marvel had issued guidance in
12  the past?
13  Q.  Yes.
14  A.  It's certainly possible the issue would
15  be whether you have enough observations, whether
16  you could control for all the other things that
17  were taking place there. It's not necessarily a
18  simple thing to do for an individual company
19  because of the number of times that companies
20  often give guidance.
21  Q.  And in your review of the analyst
22  reports that you looked at, did you see any where
23  they were talking about the -- in the wake of all
24  of the news that came out on November 12, did you
25  see any where they were discussing the

Robert W. Holthausen

1
2  implications of the fourth quarter company
3  guidance as distinguished from the other news
4  items that came out that day?
5  A.  I believe there were analysts who
6  basically lowered their expectations of earnings
7  based upon this.
8  Q.  Which analysts are those?
9  A.  I don't remember off the top of my head.
10  Q.  Do you know if those reports came out on
11  November 12 as distinguished from some period of
12  time after November 12?
13  A.  I believe they were after November 12.
14  Q.  Okay. Okay. Would you please take a
15  look at paragraph 34 of Holthausen Exhibit 1?
16  A.  Uh-huh.
17  Q.  You say there that Marvel announced that
18  it was "evaluating whether there had been
19  impairment to goodwill and other intangible
20  assets, and is considering restructuring and other
21  actions, all of which could result in substantial
22  1996 year-end charges."
23  Do you see that?
24  A.  Uh-huh.
25  Q.  In your view, was there something

Robert W. Holthausen

1
2  Mr. Baliban should have done with this information
3  that he didn't do?
4  A.  Well, the issue, again, is that this --
5  there's potentially negative
6  news to the market. Market rate may have
7  responded negatively to the news that it was
8  evaluating this impairment and evaluating
9  alternative restructuring plans. And if you want
10  to infer something about the price response to
11  other news that came out that day, you would have
12  to try to figure out how to control for this.
13  Q.  When you say you would have to control
14  for it, you're assuming it has a market impact?
15  A.  Correct. If it doesn't have any market
16  impact, then you wouldn't have to control for it.
17  But if it does have a market impact, you'd have to
18  try to figure out how you could control for it.
19  Q.  Understood. And is it your view that
20  this news had a market impact?
21  A.  Certainly news like this in other
22  studies. There have been studies on impairment
23  and studies on restructuring in the past, and a
24  lot of those indicate negative price responses.
25  Now, most of those actually look at -- I think

Robert W. Holthausen

1
2  they actually look at restructuring announcements.
3  I don't know whether there's been a study that has
4  tried to look at -- were evaluating whether to
5  restructure or evaluating whether to impair. I'm
6  not sure there's enough sample size that will
7  allow you to do that study.
8  Q.  So you're not aware of a study that
9  evaluates the market impact, if any, of
10  announcements that a company is evaluating whether
11  to take an impairment or restructuring?
12  A.  Not off the top of my head, right.
13  Q.  And what are the articles that you were
14  referring to when you said there are articles that
15  talk about announcements of actual impairments and
16  restructuring charges?
17  A.  There's an article by Jennifer Francis.
18  Q.  F-r-a-n-c-i-s?
19  A.  Uh-huh. Oh, what's his name? There's
20  an article by a guy who was at Cornell when he
21  wrote it. I can't remember his name. I'm sorry.
22  It escapes me off the top of my head.
23  Q.  Okay. You're aware, aren't you, that
24  there are a lot of articles that show that
25  announcements of restructuring or impairment

48 (Pages 186 to 189)

Robert W. Holthausen

1
2  charges have positive market impacts?
3      A.  There's mixed evidence in the literature
4  about that.
5      Q.  Okay.  And are you able to say, as you
6  sit here, whether this particular announcement had
7  a market impact on Marvel?
8      A.  No, I'm not.
9      Q.  I think you may have told me this
10  already, and I apologize if you did.  But did you
11  do any analysis of whether or to what extent
12  Marvel's announcement that it was evaluating
13  whether to take an impairment to goodwill and was
14  considering restructuring actions affected
15  Marvel's stock price?
16      A.  This particular announcement?
17      Q.  Yes.
18      A.  No.  There's no way to examine this
19  particular announcement because it's not in
20  isolation.
21      Q.  Okay.  Would you please take a look at
22  paragraph 35 of Holthausen Exhibit 1?  You mention
23  in that paragraph that Marvel announced on
24  November 12, 1996, that "as a result of the
25  defaults under its credit agreements, which had

Robert W. Holthausen

1
2  been announced the prior month, Marvel was
3  reclassifying the balance of its long-term debt to
4  current liabilities"?
5      A.  Correct.
6      Q.  Okay.  And what's the significance of
7  that announcement, if any, to Mr. Baliban's
8  report?
9      A.  Well, the issue, again, is whether or
10  not this has negative implications for Marvel's
11  stock price.  One of the things that you learn
12  from this is that they haven't been successful in
13  obtaining a waiver, and they must not be on the
14  cusp of getting that waiver either because,
15  otherwise, they would postpone the
16  reclassification of this until their 10Q was due.
17  So if they thought they were going to get one in
18  the next day or two, they would be holding off on
19  this announcement and not going forward with it.
20  But what's obviously happening here is, they know
21  they're not going to get it in the short term.
22  Generally accepted accounting principles will
23  require this reclassification in the absence of a
24  waiver or in the absence of fairly definitive
25  information that the waiver is forthcoming.

Robert W. Holthausen

1
2      Q.  Was there something that Mr. Baliban
3  should have done with this information that you
4  think he didn't do?
5      A.  Well, again, this is something that has
6  potentially negative news on the stock price, and
7  he's not adjusting or controlling for that to the
8  extent that it does have a negative impact.
9      Q.  And in your -- do you have an opinion as
10  to whether this announcement did have an impact on
11  Marvel's stock price on November 12?
12      A.  Well, it certainly wouldn't be
13  considered good news.  Whether it actually
14  affected market expectations is hard to know
15  because you don't know what the market's
16  expectation was on that date, but you certainly
17  couldn't classify it as good news, and it may have
18  had a negative impact on stock price.
19      Q.  I understand your view that it may have.
20  My question is:  Are you offering an opinion as to
21  whether it did have a market impact on Marvel?
22      A.  There's no way to definitively separate
23  all these out from a single announcement.
24      Q.  Okay.  So if I'm understanding you,
25  you're not offering an opinion as to whether this

Robert W. Holthausen

1
2  particular item of news impacted Marvel's stock
3  price on November 12?
4      A.  I'm saying that it could have, and it
5  hasn't been controlled for.
6      Q.  Maybe I missed something.  I thought we
7  established earlier that you can't control for
8  something unless you assume it has a market
9  impact.  Is that correct?  There's nothing to
10  control for unless a news item has a market
11  impact?
12      A.  Sure, right, right.
13      Q.  Okay.  So the first question is whether
14  it has a market impact, and that's what I'm asking
15  you.  Did this news item have a market impact on
16  November 12?
17      A.  It potentially has a market impact, but
18  there's no way to know that from one announcement
19  that takes place in the context of eight other
20  announcements.
21      Q.  Professor Holthausen, have you done any
22  analysis to determine whether or to what extent
23  Marvel's announcement that it was reclassifying
24  long-term debt affected Marvel's stock price on
25  November 12?

49 (Pages 190 to 193)

Page 194

Robert W. Holthausen

1
2    A.  As I said, there's no way to do that
3    analysis, given that all these occurred at the
4    same time.
5    Q.  So if I'm understanding you, you did not
6    do any such analysis?
7    A.  Correct.
8    Q.  By the way, if that had a market impact,
9    if we assume that it had a market impact, would
10   you expect a corresponding impact on the market
11   price if and when Marvel announced that it had
12   been able to obtain a waiver from its banks?
13   A.  At the same time period?
14   Q.  No, no.  If we assume that this news
15   about reclassifying long-term debt was significant
16   to the market to the extent that it had a market
17   impact, wouldn't we also expect that if and when
18   Marvel did obtain bank waivers, there would be a
19   market impact in the other direction?
20        MR. ALLINGHAM:  I object to the form of
21   the question.
22   A.  I don't think you necessarily could
23   infer that because it all depends upon what the
24   market's expectations are.  There are lots of
25   times when companies need to obtain waivers, and

Page 195

Robert W. Holthausen

1
2    everybody thinks they're going to be able to
3    obtain a waiver.  And when they obtain the waiver,
4    there's no significant price response because
5    everybody thought it was going to be pretty easy
6    for them to obtain a waiver.
7    Q.  Okay.  And does the same hold true for
8    November 12, that it depends on what the market's
9    expectations were?
10        MR. ALLINGHAM:  Objection to the form of
11   the question.
12   A.  All --
13   A.  Go ahead.
14   A.  Whether or not anything responds depends
15   upon what the market's expectation are about the
16   news.
17   Q.  Okay.  Would you please take a look at
18   paragraph 37 of Holthausen Exhibit 1?
19   A.  Okay.
20   Q.  You see the third sentence of that
21   paragraph?  You say that the Andrews Group
22   proposal "likely provided the market with
23   information about the value of the company"?
24   A.  Uh-huh.
25   Q.  What information are you talking about?

Page 196

Robert W. Holthausen

1
2    A.  Well, the offer of 85 cents a share,
3    which is significantly below the price prior to
4    November 12, is an offer from somebody who would
5    be considered an insider at the company and would
6    presumably have fairly detailed knowledge about
7    the company.
8    Q.  And did the announcement of the
9    85-cents-a-share offer affect Marvel's stock
10   price?
11   A.  Well, we know that Marvel's stock price
12   responded on November 12, and we know that a lot
13   of things occurred on November 12.  I mean, it
14   went from whatever it was, 4 5/8 to 275 or
15   whatever.  So there are a lot of things that are
16   occurring on that day, including this particular
17   announcement.
18   Q.  Did this particular announcement affect
19   Marvel's stock price?
20   A.  I believe this announcement would affect
21   Marvel's stock price.
22   Q.  And how do you know that?
23   A.  I don't know it with certainty.  I think
24   that when you have an insider who is offering 85
25   cents a share where the current price is 4 5/8,

Page 197

Robert W. Holthausen

1
2    this is a smart investor who's done a lot of
3    deals.  I'm pretty sure this offer would be
4    subject to going through a whole fairness opinion.
5    And I presume they weren't just making an offer,
6    you know, that they knew was going to get
7    rejected.  And so if this is what he believes is a
8    value that he would be willing to pay for this
9    company, then I think that's going to give the
10   market some information about what the value of
11   Marvel's stock price is.
12   Q.  Have you done any analysis of whether or
13   to what extent the announcement of the terms of
14   the Andrews Group proposal, in other words, the 85
15   cents a share, affected Marvel's stock price?
16   A.  Again, there's no way to disentangle all
17   of these announcements which are occurring
18   simultaneously.
19   Q.  Okay.  In Mr. Baliban's report he
20   expressed the opinion that the 85-cent price per
21   share offered by Andrews Group was structured in
22   order to protect Mr. Perelman's 80 percent
23   position in Marvel's stock.  Does your report
24   address Mr. Baliban's opinion on that subject?
25   A.  I don't talk about that particular issue

50 (Pages 194 to 197)

Robert W. Holthausen

1      Robert W. Holthausen
2  in my report.
3     Q.  Okay.  And in Mr. Baliban's report he
4  expresses the opinion that the 85 cents per share
5  offered by Andrews Group was not reflective of
6  Marvel's value.  Does your report address
7  Mr. Baliban's opinion on that subject?
8     A.  Again, what I said here was, I think
9  that the market responded to this information.
10  It's clear that the market didn't think that
11  Marvel was worth 85 cents a share because the
12  stock price doesn't drop all the way to 85 cents a
13  share.  But I think the market learned from this
14  and revised its expectations about Marvel based
15  upon this offer.
16     Q.  Did you do any analysis to determine
17  what the value of Marvel was on November 12, 1996?
18     A.  A fundamental value based upon
19  discounted cash flows or something like that?
20     Q.  Or anything else.
21     A.  No, I did not.
22     Q.  And you may have told me this.  Do you
23  have an opinion as to how -- are you offering an
24  opinion as to how the 85 percent share offer price
25  was derived, or is that outside the scope of what

Robert W. Holthausen

1      Robert W. Holthausen
2  $350 million in.  Mr. Baliban takes this given
3  that $350 million is the right amount of money to
4  put in.
5     Q.  I don't understand what you just told
6  me.  You're saying that Andrews Group could have
7  chosen to put more money in?
8     A.  If they thought -- if they wanted to
9  have the 80 percent -- okay? -- and they wanted
10  to, you know, have a transaction that was more
11  likely to be approved because if 85 cents was too
12  low a share price, too low a value, they could
13  have put more money in.
14     Q.  Oh, I see.  They could have increased
15  the share price?
16     A.  Sure --
17     Q.  I see.
18     A.  -- which would have meant that they
19  would have had to have put more money in if they
20  wanted to retain an 80 percent ownership.
21     Q.  And if they wanted to have the
22  transaction approved, wouldn't it increase the
23  likelihood of that happening if the offer -- if
24  the share price was closer to the market price?
25     A.  Sure.  If they had offered more,

Robert W. Holthausen

1      Robert W. Holthausen
2  you're doing?
3      MR. ALLINGHAM:  Objection to the form.
4  You said "the 85 percent" --
5      MR. GOLDWATER:  Oh, I'm sorry.  My
6  mistake.  I'll restate it.
7     Q.  Are you offering an opinion as to how
8  the 85-cent-per-share price was derived?
9     A.  The 85-cent price per share was derived
10  by the Andrews Group based upon presumably what it
11  thought the valuation was.
12     Q.  Okay.  Do you have an opinion whether
13  the 85-cents-per-share offer price in the Andrews
14  Group proposal was itself a product of the
15  indenture covenants?
16     A.  I don't think it had to be a product of
17  the indenture covenants because Mr. Baliban's
18  calculation presumes that you're going to put in
19  $350 million.  There would be nothing that -- I
20  mean, they could have put in more money if they
21  had wanted to for the same number of shares.  So
22  if they wanted to get this transaction done and
23  they thought that 85 cents a share wasn't a
24  reasonable valuation, but they wanted to get the
25  transaction done, they could have put more than

Robert W. Holthausen

1      Robert W. Holthausen
2  potentially it might have gotten approved, but --
3  and my point is that they knew this was going to
4  have to go through a whole process in order to get
5  approved.  And I presume they just weren't wasting
6  their time by putting out an offer that was so far
7  below what they perceived to be the market value
8  of this company.
9     Q.  Why do you presume that?
10     A.  Well, why would I waste my time putting
11  forward an offer that I knew would never go
12  through?  These are, you know, rational people.
13  They know a lot about the processes at which this
14  is going to take place.  Buying 80 percent of the
15  company, it's hard to believe you're not going to
16  get a fairness opinion associated with this.
17     Q.  Have you done anything, looked at
18  documents, talked to people, done any economic
19  analyses to try to determine how the
20  85-cent-per-share offer price was derived?
21     A.  I've not seen any documents.
22      MR. GOLDWATER:  Could I have this marked
23  as Holthausen-4?  You know what?  We don't need to
24  do that.  I'm going to give you another piece of
25  paper to mark.  May I have this piece of paper

Robert W. Holthausen

1
2  marked as Holthausen-4?
3        (Press release dated November 12, 1996,
4  is marked as Holthausen Exhibit 4 for
5  Identification.)
6      Q.  I show you what's been marked as
7  Holthausen-4 and ask you to please take a look at
8  that.
9      A.  Okay.
10     Q.  If you look at the second page of
11  Exhibit 4 -- by the way, this is the announcement
12  on November 12, 1996, of Marvel's receipt of the
13  Andrews proposal.  Is that right?
14     A.  That's what it says.
15     Q.  Okay.
16     A.  It's not the Andrews proposal.  It's not
17  the Andrews proposal announcement.
18     Q.  What is it?
19     A.  It looks like a report that somebody has
20  made about the Andrews proposal.
21     Q.  Oh, I see what you're saying.  It's not
22  a document prepared by Andrews.  It's Marvel's
23  announcement that --
24     A.  It's not the press release from the
25  Andrews Group.

Robert W. Holthausen

1
2  restructuring, essential if Marvel is to resolve
3  its current difficulties and have the opportunity
4  over time to prosper."
5      Okay.  Those two parts of the November 12
6  announcement are not mentioned in your reports.  I
7  just wanted to go over them with you.  Did the
8  information in those two paragraphs, in your
9  opinion -- do you have an opinion as to whether or
10  not the announcement of that information affected
11  Marvel's stock price?
12     A.  Well, the first paragraph talks about --
13  it's going to require consents, etc., from the
14  Marvel credit agreements.  I believe that was
15  already said in the October 17 announcement.
16     Q.  Yeah, I agree with that, so I didn't
17  talk about that.
18     A.  -- that that would be necessary.
19     Q.  I didn't even read that sentence.
20     A.  Okay.  I'm sorry.  I'm looking at
21  paragraphs.  Okay.
22     Q.  Okay.  It's the sentence beginning
23  "moreover."
24     A.  Okay.  So then, the issue here is
25  whether or not -- "a number of issues under Marvel

Robert W. Holthausen

1
2      Q.  It's the press release from Marvel?
3      A.  Okay.
4      Q.  Okay.  And if you look at the second
5  page of Exhibit 4, you see the first full
6  paragraph.  The last sentence says, "The Andrews
7  investment is subject to the satisfactory
8  resolution of a number of issues under the Marvel
9  parent holding company indentures, including that
10  any Marvel common stock purchased by Andrews not
11  be subject to the liens thereunder."
12     A.  Uh-huh.
13     Q.  Okay.  You don't mention that in your
14  reports.  I just wanted to ask you:  Did the
15  announcement -- you know what?  I'll do this
16  together with another piece of this.  The third
17  paragraph of that, on that second page of
18  Exhibit 4, "In our view, the Andrews investments
19  represents a significant opportunity for Marvel
20  and its stockholders," do you see that paragraph?
21     A.  Uh-huh.
22     Q.  It goes on, "The Andrews investment
23  would provide Marvel with desperately needed
24  liquidity and financial flexibility.  As such, it
25  is a fundamental predicate to a financial

Robert W. Holthausen

1
2  parent holding company indentures, including any
3  Marvel common stock purchased by Andrews, not be
4  subject to the liens thereunder."  The --
5      Q.  Your question is just whether you have a
6  view as to whether that affected Marvel's stock
7  price.
8      A.  Well, there was already -- you know, the
9  analysts were already talking about the issues of
10  dilution and the potential that Perelman might
11  have to put up some other kind of collateral
12  because of the dilution that was going to take
13  place.  I think it's fair to say that the market
14  knew in advance of that that there were going to
15  be negotiations with the noteholders about the
16  indenture covenant agreements and the -- and the
17  effect of the dilution on the collateral.  Whether
18  or not this particular piece of it was known or
19  not, certainly the dilution was going to be an
20  important component that was going to have to be
21  negotiated with the noteholders.  And the analysts
22  were talking about how this was going to be a, you
23  know, a significant sticking point in what was
24  going to go on.
25     Q.  Yeah.  My question is whether you have a

52 (Pages 202 to 205)

Robert W. Holthausen

2 view -- and maybe you don't -- as to whether this
3 particular item of information affected Marvel's
4 stock price.
5     A.   I think this was largely known by
6 October 17, but, again, it's impossible to
7 disentangle all these announcements from one
8 another.
9     Q.   So you can't say, as you sit here,
10 whether it did or it didn't?
11     A.   Whether it had some incremental impact
12 relative to the October 17 announcement?
13     Q.   That's not my question. As you sit here
14 today, can you tell me: Do you have a view as to
15 whether that particular item affected Marvel's
16 stock price?
17     A.   I think that most of this information
18 was out on October 17.
19     Q.   Does that mean your answer is you don't
20 think it did?
21     A.   I don't think this was going to have a
22 very significant impact because of all these
23 issues had been talked about previously.
24     Q.   And have you done any analysis of
25 whether or to what extent the announcement of that

Robert W. Holthausen

2 information affected Marvel's stock price?
3     A.   No.
4     Q.   You mentioned -- by the way, did the
5 November 12 announcement that we're looking at,
6 this Holthausen Exhibit 4, did that change the mix
7 of information in the market as to who would be
8 negotiating and about what?
9     A.   No. I think the players are pretty much
10 the same because it's Andrews, Marvel, the banks,
11 and the holding company noteholders, so I don't
12 think the players have changed relative to what
13 the October 17 announcement said. It does talk
14 about the boards of directors of both Marvel and
15 Andrews, but I don't think that would be a
16 surprise to the market, given the announcement on
17 the 17th. Maybe I'm missing something, but I
18 don't think it changes the players.
19     Q.   What in this November 12 announcement
20 would be signaling to investors that Mr. Perelman
21 was inviting a negotiation with the noteholders?
22     A.   Was inviting a negotiation?
23     Q.   I'm trying to understand. You've told
24 me that you think that the market understood this
25 to be inviting a negotiation of some sort that

Robert W. Holthausen

2 somehow the noteholders would have a part in.
3 What is it in this announcement that leads you to
4 that?
5     A.   Well, there's the sentence that we were
6 just talking about that says that the Andrews
7 investment is subject to a satisfactory resolution
8 of a number of issues under the Marvel parent
9 holding company indentures, which I believe is
10 this same kind of stuff that you learned in the
11 October 17 announcement.
12     Q.   What kind of stuff -- the "same kind of
13 stuff," what do you mean by that?
14     A.   I mean, we already talked about in the
15 October 17 announcement how there were going to
16 have to be negotiations with the noteholders in
17 order for that to go through.
18     Q.   Okay. My recollection of what you said
19 about October 17 is somehow we would have to infer
20 what the negotiation would be about because I
21 didn't talk about indenture covenants or things
22 like that. Is that consistent with your
23 understanding or your recollection?
24     A.   Well -- but it did talk about
25 negotiations taking place with the noteholders of

Robert W. Holthausen

2 the holding company notes.
3     Q.   Well, it didn't actually mention a
4 negotiation. You introduced that term. What I'm
5 trying to figure out is, since you introduced the
6 "negotiation" term, what it is that you thought
7 was -- whether you thought something was changing
8 as a result of this November 12 announcement?
9     A.   Maybe I'm not understanding your
10 question. Okay? When I go back and I look at
11 Exhibit 3, the sentence says, "Proposal would be
12 subject to an agreement among Marvel, its banks,
13 the holders of certain Marvel holding company
14 bonds, and Andrews Group on the terms of the
15 Andrews Group purchase."
16     Q.   Right.
17     A.   So all I'm saying is that all of those
18 players that were named in October 17 are named
19 here.
20     Q.   Right.
21     A.   And any players that are mentioned here
22 that are not part of October 17th are the boards
23 of directors of Andrews and Marvel, which I think
24 everybody would have inferred would have been
25 involved anyway, so --

53 (Pages 206 to 209)

Robert W. Holthausen

1
2    Q.    And is there anything about -- when
3    Exhibit 4 says that "The Andrews investment is
4    subject to resolution of some issues under the
5    holding company indentures, including that any
6    Marvel common stock purchased by Andrews not be
7    subject to the liens thereunder," is that
8    signaling to you that Perelman is inviting a
9    negotiation on that subject?
10    A.    Maybe we're speaking at cross purposes
11    because of the word "negotiation," but there's
12    going to have to be some satisfactory resolution
13    of that.  The holding -- the holding company
14    noteholders can say yes, they will or no, they
15    won't.  I mean, I don't know what you mean by --
16    what you're getting at with the word
17    "negotiation."  Obviously they have to resolve
18    this issue.
19    Q.    In October 17 the Andrews Group
20    announces that it has a rescue plan that it
21    intends to propose, without giving any details.
22    Is that fair?
23    A.    Without giving details, for example, of
24    the price per share --
25    Q.    Exactly.

Robert W. Holthausen

1
2    A.    Okay, yes.
3    Q.    Okay.  And on November 12 the Andrews
4    Group tells Marvel that if there's going to be any
5    rescue plan, it's contingent on the noteholders
6    waiving the liens of the indenture covenants.  Is
7    that also fair?
8    A.    It does say that on November 12, but, as
9    I said before, I think it's pretty obvious from
10    the October 17 announcement that the negotiations
11    with the noteholders are going to have to be about
12    those indenture covenants.  And the analysts went
13    on to talk, for example, about the majority
14    provisions in the indenture covenants.
15    Q.    On November -- these are the analyst
16    reports that you mentioned earlier?
17    A.    Uh-huh.
18    Q.    Okay.  And I think you told me these
19    were after November 12?
20    A.    No.  They were after October 17 and
21    before November 12.
22    Q.    And before November 12.  Okay.  Did you
23    believe, Professor Holthausen, that the market
24    would have understood the November 12
25    announcement -- this Holthausen Exhibit 4, that

Robert W. Holthausen

1
2    it's proposal was such -- that the Andrews
3    proposal was subject to a waiver of liens under
4    the holding company indentures -- to be inviting a
5    negotiation on that subject?  In other words,
6    Perelman's open to it not being subject to the
7    liens?  I'm sorry.  That Perelman's open to it
8    being subject to the liens?  It's really an open
9    item for discussion?
10    MR. ALLINGHAM:  Objection to the form of
11    the question.
12    A.    I have no idea whether Perelman wanted
13    to negotiate that point or not.
14    Q.    No.  Of course you don't.  I'm asking
15    you whether, you know, as a reasonable market
16    person who is looking -- looks at things like
17    market impact, do you think that investors in the
18    market would have understood Perelman to be
19    saying, "You know, I'm really open to a negotiated
20    resolution of this.  And maybe they'll be subject
21    to the liens and maybe they won't.  It's really
22    something I'm happy to discuss with noteholders"?
23    A.    Well, again, I have no personal
24    knowledge of what Perelman was thinking.  You can
25    imagine, however, that Perelman would be

Robert W. Holthausen

1
2    interested in trying to do something to save this
3    company.  And whether he thought that this was --
4    you know, he was going to make this one offer and
5    that was it and not change?  I can't speak to
6    that.
7    Q.    Yeah.  You're personalizing it in a way
8    that I'm not, that I'm not.  I'm not talking about
9    Mr. Perelman in his heart of hearts contends.
10    What I'm asking you is whether an investor who
11    sees this announcement would understand.  It's
12    irrelevant what Mr. Perelman in his heart of
13    hearts wants to do.  Would an investor who's
14    deciding whether to buy, sell, or hold Marvel
15    stock read this announcement and think, "Gee, it
16    sounds like Mr. Perelman is really open to
17    negotiation on the subject of whether an equity
18    investment would or wouldn't be subject to the
19    lien of the holding company indentures"?
20    MR. ALLINGHAM:  Objection to the form of
21    the question.
22    A.    I mean, if I read the sentence, it just
23    says "subject to the satisfactory resolution of a
24    number of issues," but it doesn't say that it has
25    to get resolved, how it's going to get resolved.

54 (Pages 210 to 213)

Page 214

Robert W. Holthausen

1  Robert W. Holthausen
2  I mean, it is an issue on the table.
3      Q.  Do you see any analysts say that
4  Mr. Perelman -- predict that Mr. Perelman would be
5  willing to make an investment that wasn't
6  subject -- I'm sorry -- that was subject to the
7  lien of the holding company notes?
8      A.  I don't remember any analyst saying
9  that.
10     Q.  Let's move on.  Could you take a look at
11  paragraph 40 of your report, Holthausen Exhibit 1,
12  please?
13     A.  Uh-huh.
14     Q.  You talk about a computation of a
15  "prudent investor rate for various time periods
16  using simple interest" there.  Do you see that?
17     A.  Yes.
18     Q.  Okay.  And are you expressing an opinion
19  as to whether this is the appropriate interest
20  rate to be applied to any measure of damages in
21  this case?
22     A.  No.
23     Q.  Just acting --
24     A.  I was asked to be a calculator, and
25  that's what I was.

Page 215

Robert W. Holthausen

1  Robert W. Holthausen
2      Q.  Thank you.  You mentioned, I guess, in
3  the penultimate sentence of paragraph 40 that
4  "Certain judgments are required to perform an
5  actual calculation of a prudent investor rate."
6      A.  Correct.
7      Q.  Could you direct me on Exhibit 6 to
8  which of the -- what parts of the calculation are
9  the products of judgment as opposed to something
10  else?
11     A.  Okay.  So if you look at one, the
12  one-year certificate of deposit --
13     Q.  Uh-huh.
14     A.  -- you can see that the data that we
15  found had six-month CD yields for a while, and
16  then 12-month CD yields.
17     Q.  Where would I see that?
18     A.  1B, footnote 1B.  We could not find
19  12-month CD yields going all the way back through
20  this time period.
21     Q.  Oh, I see what you're saying.
22     A.  So what did we do?  We measured -- over
23  the time period where both series existed, we
24  measured what the yield difference was between the
25  12 month and the six month, the average, and we

Page 216

Robert W. Holthausen

1  Robert W. Holthausen
2  added that to the six month in the period where
3  the 12 month didn't take place.
4      Q.  Are there any other instances where you
5  used your judgment?
6      A.  Another place where -- this is all going
7  to sound pretty silly -- but 3CG, the way that
8  these commercial paper rates were quoted was based
9  upon 360 days for a while.  I guess it's because
10  people didn't have computers, and they figured
11  dividing by 360 was easier than 365.  And then
12  they changed the series to computing it on a
13  365-day basis.  So instead of using the 360-day
14  basis, we went back and readjusted those to a
15  365-day basis.  We didn't find a good ten-year
16  treasury bond series.
17     Q.  This is in 4B?
18     A.  This is from 4B.  Sorry.  And so what we
19  did was, we took the five-year and the 20-year
20  series from Ibbotson and apportioned them to come
21  up with a ten, which would say essentially that
22  there's a -- to the extent that the 20 year earns
23  more than the five year, we're assuming a linear
24  approximation to the ten year.  You understand
25  what I'm saying?

Page 217

Robert W. Holthausen

1  Robert W. Holthausen
2      Q.  I do.
3      A.  Okay.  The triple A bond we actually
4  used.  You know, maybe you could get a series of
5  triple A bonds.  We couldn't find one, very
6  simply, so we actually used a Salomon Brothers
7  high-grade corporate bond index, which I believe
8  is double A and triple A bonds.
9      Q.  Is this for note 5B?
10     A.  I'm sorry.  Yes, it's 5B.  And the
11  opinion just says "the average-risk mutual fund."
12     Q.  This is in 6B?
13     A.  This is in 6B.  They don't really talk
14  about whether they mean a mutual fund that invests
15  in stocks because there's bonds and there's
16  everything else.  But if you look at all the other
17  types of investments that are there, it kind of
18  seems like they must really be talking about a
19  stock fund and not a bond fund.  And then once you
20  decide you're going to do a stock fund, which is
21  the first judgment, which stock fund do you want
22  to choose?  You could use an international index.
23  What are you going to use?  We just used the S&P
24  500 because it seemed like something a US investor
25  would pretty much -- but doesn't mean that you

55 (Pages 214 to 217)

Page 222

```
 1
 2                  I N D E X
 3
 4   WITNESS      EXAMINED BY              PAGE
 5   ROBERT W. HOLTHAUSEN
 6          Mr. Goldwater           5
 7
 8
 9
10                E X H I B I T S
11
12   NUMBER         DESCRIPTION          PAGE
13   Holthausen-1  Expert report of Robert   23
14          W. Holthausen
15   Holthausen-2  Andrade and Kaplan        103
16          study
17   Holthausen-3  Announcement dated        167
18          October 17, 1996
19   Holthausen-4  Press release dated       202
20          November 12, 1996
21
22
23
24
25
```

**Hudson Reporting & Video, Inc.**
**www.hudsonreporting.com**

1-800-310-1769　　　　　　　　　　　　　　　　　　　　**New York**