IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD CANTOR, et al., | : | |
| | : | |
| Plaintiffs, | : | No. 97-586-KAJ |
| | : | |
| v. | : | |
| | : | |
| RONALD O. PERELMAN, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE THE TESTIMONY OF LAWRENCE A. HAMERMESH AND
CERTAIN OPINIONS OF ROBERT W. HOLTHAUSEN**

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Attorneys for Defendants

DATED: June 22, 2006

Case 1:97-cv-00586-SLR    Document 475    Filed 06/22/2006    Page 2 of 26

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ...........................1

SUMMARY OF ARGUMENT .............................................2

STATEMENT OF FACTS ...............................................4

ARGUMENT ........................................................9

I. PROFESSOR HOLTHAUSEN'S DAMAGES ANALYSIS IS CONSISTENT
   WITH DELAWARE CASE LAW APPLYING DAMAGES FOR BREACHES
   OF FIDUCIARY DUTY ...............................................9

    A.    Delaware Law Calculates Damages Based On The Conditions That
         Existed At The Time Of The Breach Of Fiduciary Duty .................9

    B.    Plaintiffs' Motion Is Premature Given The Court's Wide Discretion
         To Fashion A Remedy ...........................................13

    C.    Professor Holthausen's Consideration Of The Marvel's Claimholders'
         Post- Transaction Knowledge In Assessing Damages Is Consistent
         With Delaware Law .............................................13

    D.    Several Portions Of Professor Holthausen's Rebuttal Testimony That
         Plaintiffs Seek To Exclude Are Independent Of The Timing Issue ........17

II. PROFESSOR HAMERMESH'S OPINION REGARDING DELAWARE
    CORPORATION LAW, AS THE DIRECTORS WOULD HAVE
    UNDERSTOOD IT AT THE TIME OF THE CHALLENGED
    TRANSACTIONS, CONCERNS AN ISSUE OF FACT, NOT AN
    ISSUE OF LAW .................................................18

CONCLUSION .....................................................22

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

Adlerstein v. Wertheimer,
    C.A. No. 19101, 2002 WL 205684 (Del. Ch. Jan. 25, 2002) ........................................ 21

Albert v. Alex Brown Mgmt. Servs., Inc.,
    C.A. No. 762, 2005 WL 1594085 (Del. Ch. June 29, 2005) ........................................ 16

Askanase v. Fatjo,
    130 F.3d 657 (5th Cir. 1997) ........................................................................................ 18

Benihana of Tokyo, Inc. v. Benihana, Inc.,
    891 A.2d 150 (Del. Ch. 2005) ...................................................................................... 21

Bokat v. Getty Oil Co.,
    262 A.2d 246 (Del. 1970) ............................................................................................. 15

Bomarko Inc. v. International Telecharge, Inc.,
    794 A.2d 1161 (Del. Ch. 1999), aff'd, 766 A.2d 437 (Del. 2000) ............................ 9, 10

Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),
    208 B.R. 288 (Bankr. D. Mass. 1997) ......................................................................... 12

Cantor v. Perelman,
    414 F.3d 430 (3d Cir. 2005) .................................................................................... 18, 19

Cede & Co. v. Technicolor, Inc.,
    634 A.2d 345 (Del. 1993) ............................................................................................... 9

Cole v. Kershaw,
    C.A. No. 13904, 2000 WL 1206672 (Del. Ch. Aug. 15, 2000) ................................ 10, 11

Gentile v. Rossette,
    C.A. No. 20213-NC, 2005 WL 2810683 (Del. Ch. Oct. 20, 2005) .......................... 10, 11

Gesoff v. IIC Indus.,
    C.A. Nos. 19473, 19600, 2006 WL 1458218 (Del. Ch. May, 18, 2006) ..................... 13

Kramer v. Western Pac. Indus.,
    546 A.2d 348 (Del. 1988) ............................................................................................. 15

Onti, Inc. v. Integra Bank,
    751 A.2d 904 (Del. Ch. 1999) ...................................................................................... 19

i

Straussburger v. Earley,
    752 A.2d 557 (Del. Ch. 2000) ........................................................................... 10

Union Illinois v. Korte,
    C.A. No. 17392, 2001 WL 1526303 (Del. Ch. Nov. 28, 2001),
    aff'd, C.A.No. 17392 (Del. Ch. Dec. 21, 2001) ORDER .................................................. 12

AUTHORITIES                                                                                    PAGE(S)

Dan B. Dobbs, 1 Dobbs Law of Remedies § 3.2 (2 ed. 1993) ................................................ 11, 12

Dan B. Dobbs, 1 Dobbs Law of Remedies § 3.3 (2 ed. 1993) ...................................................... 12

Dan B. Dobbs, The Law of Torts (2000) ...................................................................... 11

## NATURE AND STAGE OF THE PROCEEDINGS

On June 1, 2006, plaintiffs, the Trustees of the Mafco Litigation Trust, filed a motion to exclude the testimony of Professor Lawrence A. Hamermesh and certain opinions of Professor Robert W. Holthausen.  This is defendants' brief in opposition to that motion.

Defendants incorporate by reference the Nature and Stage of Proceedings included in Defendants' Brief in Support of Their Motion to Exclude the Purported Expert Testimony of Bevis Longstreth, Esquire, Messrs. William H. Purcell, Andrew S. Carron, Jeffrey L. Baliban, and Portions of the testimony of Justice Joseph T. Walsh, Ret., which was filed on June 1, 2006 ("Defendants' Opening Brief").  Undefined capitalized terms in this brief are defined in Defendants' Opening Brief.

## SUMMARY OF ARGUMENT

1.    Plaintiffs argue that certain portions of the rebuttal testimony of Professor Robert W. Holthausen are legally irrelevant because he analyzed the damages suffered by Marvel (if any) by looking to the effect that the terms of the Notes had on the value of Marvel at the time of the disputed transactions. According to Plaintiffs, under Delaware corporate law, damages should be calculated based on events up to the time of the verdict. In support of this assertion, Plaintiffs cite inapposite tort law treatises and other secondary tort authorities, but tellingly ignore the well-established Delaware case law directly on point. Contrary to Plaintiffs' assertions, Delaware courts typically assess damages calculated as of the date of the disputed transaction. It bears emphasis, however, that the Court is not bound to adopt any particular framework in crafting a remedy for a breach of fiduciary duty. Upon hearing all of the evidence at trial, if the Court were to find a breach of fiduciary duty, its powers would be complete to fashion any form of equitable and monetary relief as may be appropriate. Defendants submit that the testimony of Professor Holthausen will aid the Court in that effort, and, therefore, should not be excluded prior to trial.

2.    Plaintiffs also seek to exclude the testimony of Professor Lawrence A. Hamermesh on the grounds that he intends to offer an improper legal opinion. Defendants agree that legal testimony is generally improper, but Professor Hamermesh's testimony fits into the limited "law as fact" exception to that general rule. Professor Hamermesh will testify as to the state of Delaware law, during the 1993 to 1996 time

2

frame, regarding a board's ability to dilute a stockholder's majority position without the

stockholder's consent, and the rights of the majority stockholder to oppose such an effort

by the directors. His opinion is necessary to construct the hypothetical arm's length

bargaining that would have taken place between Marvel and the Marvel Holdings

Companies over the terms of the Notes, assuming the Marvel Holdings Companies

sought to bind Marvel to the Notes. In such bargaining, the Marvel Holdings Companies

would have asserted that the terms of the Notes that require the Marvel Holdings

Companies to remain in majority voting control would simply mimic those companies'

existing rights under Delaware law. The persons bargaining on Marvel's behalf therefore

would have sought to understand this legal issue. Professor Hamermesh's opinion

provides guidance to the Court as to the answers they would have received from counsel

at the time. Accordingly, although Professor Hamermesh's opinion is legal, it bears upon

a factual issue in this case and therefore falls outside the general ban on legal testimony.

3

## STATEMENT OF FACTS

### Professor Holthausen's Rebuttal Testimony

Plaintiffs challenge certain portions of the testimony of Professor Holthausen offered to rebut the damages opinion offered by Plaintiffs' latest damages expert, Mr. Baliban.  According to Plaintiffs, Professor Holthausen improperly calculated  "expected" damages but, in truth, his methodology assesses <u>actual</u> damages.  Consistent with standard damages theory, Professor Holthausen assumes for purposes of his rebuttal opinion that Plaintiffs could prove liability and causation, then measures Marvel's actual damages by assessing the drop in Marvel's value -- if any -- at the time of the challenged transaction -- <u>i.e.</u>, the Note offerings.  (<u>See, e.g.</u>, Holthausen dep. at 69 ("What is the economic theory that you are alluding to?  A: . . . [I]t's just a damages theory.  Right?  So you have -- some event takes place.  Okay?  There is an effect on value associated with that act.") (D.I. 472 Ex. 9)

More specifically, Professor Holthausen rebuts Mr. Baliban's opinion that Marvel suffered economic harm because the covenants in the Notes purportedly caused Marvel to favor bank debt over equity as a source of financing its acquisitions, which purportedly made Marvel overly leveraged and thereby increased its risk of financial distress.  (Baliban Rpt. at ¶¶ 21-23 D.I. 469 at A26-27)  Professor Holthausen accepted all of Mr. Baliban's assumptions regarding the purported effects that the Notes had on Marvel's capital structure, then sought to estimate Marvel's "incremental expected cost of . . . financial distress, which is basically the harm that would have been suffered . . . ."

4

(Holthausen dep. at 68)  As Professor Holthausen explained at his deposition: "[M]y damage analysis is based upon the expected costs of [that] financial distress at the time the indenture company notes are issued, which takes into consideration that the financial distress costs may occur at some point in the future." (Id. at 81-82 D.I. 472 Ex. 9)

Mr. Baliban's own testimony confirms that Professor Holthausen's approach of analyzing the alleged harm at the time of the transaction is a better assessment of any actual harm to Marvel than Mr. Baliban's approach, which looks at events years after the alleged breach without attempting to isolate the injury purportedly caused by the Notes (on the one hand) from the losses resulting from the stark collapse of Marvel's business (on the other).  As an initial matter, Mr. Baliban's analysis completely ignores the unquestionable upside to the decision to increase Marvel's leverage that existed at the time of the transaction.  He conceded at his deposition that a business decision to increase leverage, and thereby increase risk, may result in future gains, not future losses, because with increased risk comes increased reward:

> Q.    . . . Do you agree with the statement from this finance textbook that levered stockholders have better returns in good times than do unlevered stockholders, [and] that [they] have worse returns in bad times, implying greater risk with leverage; do you agree with that principle?
>
> A.    In general, yes.

(Baliban dep. at 200-01, Decl. of Brian G. Lenhard)  Mr. Baliban further conceded that the increase in the risk of financial distress would be the harm suffered by Marvel:

5

Q.      . . . Did you do a study or analysis at the time that the financing decisions
        were made in 1994 and 1995, about how likely future bad times were for
        Marvel versus future good times?

        MR. GOLDWATER: Objection to form.

A.      I did not do a study of expectations of good times versus bad times. What I --
        what opinion I ultimately reach is, the riskiness of returns was increased at the
        time that the decisions were made to sign the indenture covenants and to limit
        Marvel's ability to access capital markets or have typical flexibility in its
        financing. And because the risk was increased, the value, the expected value
        of those earnings would be lower.

(Baliban dep. at 201-02 Id.)

        Thus Mr. Baliban's testimony actually supports Professor Holthausen's

approach to damages, which seeks to estimate the effect on Marvel's value of the

increase in risk of financial distress created by the Notes. (See Holthausen Rebuttal Rpt.

at 7 D.I. 472 Ex. 7) Indeed, as Professor Holthausen explains in his report, the study that

is Mr. Baliban's sole source for his damages theory – Gregor Andrade and Steven N.

Kaplan, "How Costly is Financial (Not Economic) Distress? Evidence From Highly

Leveraged Transactions that Became Distressed, Journal of Finance, Vol. LIII, No. 5

(October, 1998) ("Andrade and Kaplan") – supports the conclusion that Marvel suffered

no damages at all because, at the time Marvel's financing decisions were made, the upside

potential of Marvel's highly leveraged capital structure outweighed the downside risks of

future financial distress. (See Holthausen Rebuttal Rpt. at ¶ 12 (quoting Andrade and

Kaplan at 1458) ("These results, therefore, indicate that the combination of benefits from

6

the [highly leveraged transactions] and costs of distress did not decrease the value of capital and, in all likelihood, increased it.")

**Professor Hamermesh's Testimony**

Plaintiffs also seek to exclude the expert testimony of Professor Lawrence A. Hamermesh, a well-known expert in Delaware corporation law, who will opine at trial as to the legal restrictions on the Marvel board's ability to dilute the Marvel Holdings Companies' position as majority shareholder and the Marvel Holdings Companies' converse rights to protect themselves from dilution, as the law existed during the period from 1993 to 1996. Professor Hamermesh's opinion is relied upon by Mr. Peter A. Fowler, Defendants' rebuttal expert on the hypothetical arm's length bargaining that would have taken place between Marvel and the Marvel Holdings Companies had the Marvel Holdings Companies sought to bind Marvel to the terms of the notes.

Professor Hamermesh's report provides: "I begin by observing that majority stock ownership is widely regarded – and certainly regarded by the policies of Delaware corporate law – as uniquely valuable." (Hamermesh Rpt. at ¶ 6 D.I. 469 A170) "Consistent with the unique value attaching to ownership of a majority voting stock interest in a corporation, the holder of such an interest is acknowledged to be entitled to take extraordinary steps to protect that interest against efforts by the board of directors to issue sufficient shares to eliminate that majority voting power." (Id. at ¶ 7 A171) "Also consistent with the unique value attaching to ownership of a majority voting stock interest in a corporation, and consistent as well with the validation of strong measures by the

7

holder of such an interest to protect its majority position, it is also widely acknowledged that a board of directors may not, except in extreme circumstances not yet encountered in judicial opinions, issue shares sufficient to deprive a stockholder of its majority control position, absent the majority shareholder's own consent to such an action." (Id. at ¶ 8 A171)

"Accordingly, it is generally recognized that in the 1993-1996 time period that directors cannot, consistent with their obligations as directors, seek to eliminate a majority stockholder's control through the issuance of shares, in the absence of some circumstance in which such an issuance would be necessary to protect the corporation and its stockholders from exploitation or breach of fiduciary duty by the majority stock-holder." (Id. at ¶ 9 A171-72) "In light of these policies, the practice and effect of Delaware corporate law as of the period from 1993 to 1996 largely duplicated the indirect effect of Section 4.09(a) of the indentures limiting Marvel's ability to issue shares to reduce the Marvel Holding Companies' ownership of Marvel voting stock to less than a majority, assuming for purposes of argument that such restriction could or would have bound Marvel." (Id. at ¶ 10 A172)

8

## ARGUMENT

I.    **PROFESSOR HOLTHAUSEN'S DAMAGES ANALYSIS IS CONSISTENT WITH DELAWARE CASE LAW APPLYING DAMAGES FOR BREACHES OF FIDUCIARY DUTY.**

Plaintiffs argue that portions of Professor Holthausen's testimony should be excluded from trial because he estimates damages at the time of the alleged breach of fiduciary duty instead of calculating damages based on events taking place years later. As explained below, Professor Holthausen's framework for analyzing damages is entirely consistent with the damages analysis used in corporate cases in the Delaware courts.

A.    **Delaware Law Calculates Damages Based On The Conditions That Existed At The Time Of The Breach Of Fiduciary Duty.**

Relying almost entirely on tort law authorities (such as a tort law hornbook, the Restatement (Second) of Torts, and cases applying tort law), Plaintiffs argue that this Court should measure damages by looking to changes in the value of Marvel occurring up to the time of the verdict. (See Pl. Br. at 20-21 D.I. 471)  Plaintiffs' reliance on secondary (purportedly analogous) tort law authorities ignores the Delaware Supreme Court's direct admonition that "a tort action[] does not control a claim for breach of fiduciary duty." Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 370 (Del. 1993).  Moreover, reliance on purportedly analogous tort authority is unnecessary, as there is no lack of Delaware case law on how to calculate damages for a breach of fiduciary duty.  The only Delaware corporate law case cited by Plaintiffs – Bomarko, Inc. v. International Telecharge, Inc., 794 A.2d 1161 (Del. Ch. 1999), aff'd, 766 A.2d 437 (Del. 2000), applies the damages

9

framework used by Professor Holthausen that looks to the expectations at the time of the transaction and not the actual results that occurred later. In <u>Bomarko</u>, the plaintiffs alleged that defendant directors had breached fiduciary duties in connection with a merger. <u>See id.</u> at 1176. After finding a breach of fiduciary duty, the Court based damages on "what [plaintiffs'] shares would have been worth <u>at the time of the Merger</u> if [the defendant] had not breached his fiduciary duties." <u>Id.</u> at 1184 (emphasis added). In making that assessment, the Court of Chancery looked to "the contemporaneous expectations of management" and rejected an analysis based on the company's "actual experience in the years following the Merger . . . ." <u>Id.</u> at 1185. The damages analysis used by Vice Chancellor Lamb in <u>Bomarko</u> directly refutes the position taken by the plaintiffs on this motion.

The damages framework applied in <u>Bomarko</u> is hardly unique. Delaware courts ordinarily measure damages for a breach of fiduciary duty in Delaware based on the alleged loss in value at the time of the transaction. <u>See, e.g.</u>, <u>Gentile v. Rossette</u>, C.A. No. 20213-NC, 2005 WL 2810683, at *9 (Del. Ch. Oct. 20, 2005) ("The Court's calculation of any damages must be based on conditions as of the merger date, <u>i.e.</u>, what the shares would have been worth at the time of the Merger if [the directors] had not breached [their] fiduciary duties.") (citation omitted); <u>Straussburger v. Earley</u>, 752 A.2d 557, 579 (Del. Ch. 2000) ("[S]hareholders are normally entitled to out-of-pocket (i.e., compensatory) money damages equal to the 'fair' or 'intrinsic' value of their stock at the time of the merger, less the price per share that they actually received."); <u>Cole v.</u>

10

Kershaw, C.A. No. 13904, 2000 WL 1206672, at *9 (Del. Ch. Aug. 15, 2000) (measuring

damages for partners' breach of duty of loyalty by plaintiff's proportionate share of the fair

value of the partnership calculated as of the date of transaction). In direct contrast to

Section 910 of the Restatement (Second) of Torts cited by Plaintiffs (see Pl. Br. at 23-24),

Delaware courts typically do not take into account events leading up to the date of the

verdict, but assess damages at the time of the breach. See Gentile, 2005 WL 2810683, at

*9 (disregarding the fact that the company later went bankrupt and assessing damages

based on conditions as of the breach).

       Even if the Court were to look at secondary authorities instead of the control-

ling Delaware case law, the Court's conclusion would not change because the treatises on

remedies also support Professor Holthausen's approach. According to a leading treatise:

"Outside the personal injury field, the term "general damages" usually refers to market-

measured damages." Dan B. Dobbs, 1 Dobbs Law of Remedies § 3.2 at p. 288 (2d ed.

1993).[1] "All loss is represented by the difference in market value before and after the tort

or the contract market differential at the relevant date and place." Id. at § 3.3 p. 301

(emphasis in original). The market-measure of damages is based on the market's

judgment of potential future value, based on the information available at the time of the

---

[1]    Plaintiffs' brief inexplicably cites the legal malpractice section of Professor Dobbs'
hornbook on torts (Dan B. Dobbs, The Law of Torts (2000)) instead of citing his more
pertinent treatise on remedies. Dobbs on Remedies is not only directly on point, but it is
the far more influential text, having been cited 27 times by the Delaware courts, whereas
Dobbs on Torts has never been cited by the Delaware courts (based on a 6/19/2006
Westlaw search).

transaction. See id. at p. 300-01. Delaware law similarly looks to future predicted results to create a present market value. See Union Illinois v. Korte, C.A. No. 17392, 2001 WL 1526303, at *8 (Del. Ch. Nov. 28, 2001) (Report of S. Glasscock, Master) (assessing fairness of transaction by setting "fair market value" based on projected cash flows at time of transaction), aff'd, C.A. No. 17392 (Del. Ch. Dec. 21, 2001) ORDER. In other words, Plaintiffs' damages, if any, would be based on the change in market value of Marvel at the time of the disputed transaction.[2] This is entirely consistent with Professor Holthausen's approach. (See Holthausen dep. at 69-70 ("[T]he damage they're going to suffer is . . . What was the value before the act? What was the value after the act?") (D.I. 472 Ex. 9)[3]

In sum, Plaintiffs cannot sustain their contention that Professor Holthausen's rebuttal opinion is inconsistent with Delaware law regarding the measurement of damages

---

[2]  Professor Holthausen testified that "there was no statistically significant price stock effect" on the dates the terms of the notes were publicly announced. (Holthausen dep. at 51 D.I. 472 Ex. 9)

[3]  Plaintiffs rely heavily on Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.), 208 B.R. 288, 310 (Bankr. D. Mass. 1997), a Massachusetts bankruptcy decision that properly holds that damages for a corporate injury should be measured by the change to fair market value of the corporation resulting from the disputed transaction, but then demonstrates a lack of understanding of the concept by looking to the value of the corporation years after the transaction. The Massachusetts bankruptcy court cites no case law on fair market value damages, but instead analogizes to a personal injury case in which an accident causes the plaintiff's health to gradually deteriorate over time. Id. That analogy is wrong because damages are not measured by the fair market value standard in personal injury cases. See 1 Dobbs Law of Remedies § 3.3 n.1 ("[T]here is no room in personal injury cases (or breach of employment contract cases) for using a market measure."). Defendants submit that the Court should follow the extensive Delaware law cited above and disregard the cursory, poorly reasoned damages discussion in Brandt.

12

in corporate cases. Accordingly, Plaintiffs' motion to exclude portions of the testimony of Professor Holthausen should be denied.

**B.    Plaintiffs' Motion Is Premature Given The Court's Wide Discretion To Fashion A Remedy.**

While Delaware courts typically assess damages based on the conditions at the time of the transaction, Defendants readily acknowledge that "the court's 'powers are complete to fashion any form of equitable and monetary relief as may be appropriate.'" Gesoff v. IIC Indus., C.A. Nos. 19473, 19600, 2006 WL 1458218, at *17 (Del. Ch. May, 18, 2006) (citation omitted). In other words, after hearing the evidence at trial, the Court can apply any methodology the Court believes equitable under the circumstances. Given this Court's wide discretion in fashioning a remedy, Defendants submit that the Court should wait until after trial before broaching the issue of the appropriate framework for any monetary remedy. Accordingly, Plaintiffs' motion to exclude certain portions of the testimony of Professor Holthausen should be denied.

**C.    Professor Holthausen's Consideration Of The Marvel's Claimholders' Post-Transaction Knowledge In Assessing Damages Is Consistent With Delaware Law.**

Plaintiffs also vigorously attack Professor Holthausen's deposition testimony in which he defended his decision to calculate Marvel's actual damages at the time of the transaction by noting that, as an economic matter, any Marvel shareholder or creditor who disliked the increased risk in their Marvel investment could have exited that investment. (See Holthausen dep. at 50-51, 69-71 D.I. 472 Ex. 9) Contrary to Plaintiffs' assertions,

13

there is no split between the law of damages and the economic theory of damages

identified by Professor Holthausen at his deposition.  His discussion of the economic

choices of Marvel's shareholders is just another way of explaining the market value

approach to damages favored by the law:

> The damage calculation should be based upon what the expected cost to
> the shareholder is at the time this event takes place – okay? – because the
> shareholder can then, if they want to, decide that they no longer want to
> hold Marvel shares. . . .
> [W]hen shareholders make a decision to hold or not to hold a company
> stock, they're bearing some risk associated with holding a company stock.
> And that information was out and it was in the marketplace that these
> indentures were there, and so a shareholder who chooses to continue to
> hold on to those shares knows that information is out there.  The price at
> the time is going to reflect whatever impact that had at the time when
> those things were issued.

(Holthausen dep. at 50-51)  Compare pp. 9-13 supra (describing the market value

approach to damages favored by the law).

Despite Plaintiffs' suggestion that Professor Holthausen was analyzing the

damages to shareholders instead of Marvel, Professor Holthausen testified that he was

calculating damages for Marvel as an entity:

> Q.   Professor Holthausen, are you trying to measure the impact of the indenture
> covenants on the shareholders of Marvel as distinguished from Marvel as an
> enterprise?
>
> A:   No.  I measure it on Marvel as an enterprise.  I was using sharehold-
> ers as an example of that, but it is measured on Marvel as an enter-
> prise.

(Id. at 51)  Once again, Professor Holthausen's economic analysis lines up perfectly with

Delaware law.  It is well-settled that an alleged injury that affects all shareholders

14

generally by reducing the corporation's market capitalization is an injury to the corporation, not to the individual shareholders. See Bokat v. Getty Oil Co., 262 A.2d 246, 249 (Del. 1970) ("When an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation."); Kramer v. Western Pac. Indus., 546 A.2d 348, 352 (Del. 1988).

Defendants further submit that the Court would find Professor Holthausen's economic analysis of the risk assumed by Marvel's shareholders and creditors to be useful if the Court were required after trial to exercise its discretion regarding the form of a remedy. Defendants submit that the equities favor Professor Holthausen's *ex ante* approach over Mr. Baliban's *ex post* approach. Mr. Baliban opines that the covenants in the Notes purportedly caused Marvel to favor bank debt over equity as a source of financing its acquisitions, which purportedly reduced Marvel's enterprise value. (Baliban Rpt. at ¶¶ 21-23 D.I. 469 A26-27) He admitted at his deposition, however, that increasing Marvel's leverage would have benefitted Marvel's shareholders had Marvel continued to enjoy financial success. (Baliban dep. at 201 Ex. A) As terms of the Notes and the amount of leverage at Marvel were all publicly disclosed, the shareholders who did not like the risk/reward offered by Marvel's leverage could have filed suit on Marvel's behalf to rescind those transactions, or they could have sold their shares. Instead, Marvel's shareholders knowingly accepted the risk posed by Marvel's leverage, and for several years enjoyed the benefits of that leverage through a high stock price. It was not until

15

years later, when Marvel experienced bad times and leverage was no longer beneficial,

that this lawsuit was brought (and it was more than a decade later before Mr. Baliban

came up with his belated theory of damages).[4]  Allowing Plaintiffs to now base their

damages claim on a risk/reward profile that was knowingly accepted by Marvel's

claimholders would be inequitable.

The Court of Chancery's analysis in <u>Albert v. Alex Brown Mgmt. Servs.,</u>

<u>Inc.</u>, C.A. No. 762, 2005 WL 1594085 (Del. Ch. June 29, 2005), is instructive.  In <u>Albert</u>,

the plaintiffs argued that the defendant fund managers had breached their fiduciary duties

by not employing diversification and hedging strategies, thereby exposing the investors to

too much risk.  <u>Id.</u> at *13-14.  In dismissing the plaintiffs' claim as untimely, the court

explained the stark unfairness of the plaintiffs' argument that they were not harmed by the

risk they faced, but by the results:

> The flaw in the plaintiffs' argument is best exemplified by their claims for
> hedging. The wrongful act the plaintiffs allege is the unhedging of the
> Funds. However, after the defendants unhedged the Funds, their value
> skyrocketed. This was due, of course, to the fact that the Funds were
> exposed to much more risk. Assuming (without deciding) that unhedging
> the Funds was a wrongful act, it was wrongful because it exposed the
> Funds to this extra risk. However, under the plaintiffs' theory, they are
> given the equivalent of a call option. If the unhedging of the Funds works
> out, and the value of the Funds goes up, the plaintiffs will have no com-
> plaint. But if the hedging (or lack thereof) strategy does not work out, and
> the value of the Funds falls, the plaintiffs can sue. This clearly is not, and
> should not be, the law. The plaintiffs made the decision to ride the bubble
> to the top. They cannot now complain that the bubble burst.

---

[4]    For a discussion of the untimeliness of Mr. Baliban's report, <u>see</u> Defendants' Opening
Brief at pp. 34-35.

Id. at *18.

Plaintiffs' new damages theory, offered through Mr. Baliban, suffers from the same flaw. Defendants submit that it would be inequitable to calculate damages in a manner that allows all claimholders of Marvel collectively to have accepted the benefits of the risk posed by Marvel's leverage, but to now recast the downside of that risk as "damages." At the very least, the Court, in the exercise of its equitable discretion as to a remedy, should look to Professor Holthausen's approach to damages, which eliminates this concern by focusing on the cost of the incremental risk at the time of the challenged transaction. In any case, the Court should not rule out this possibility before hearing all the evidence at trial.

**D.      Several Portions Of Professor Holthausen's Rebuttal Testimony That Plaintiffs Seek To Exclude Are Independent Of The Timing Issue.**

Plaintiffs challenge Professor Holthausen's testimony based solely on their assertion that he should not have calculated damages based on any effect the Notes had on the value of Marvel at the time of the transaction, yet they ask the Court to exclude testimony relating to paragraphs 9 and 23 of Professor Holthausen's rebuttal report, which have nothing to do with that timing issue. Professor Holthausen should still be permitted to make the following points in rebuttal to Mr. Baliban even if the Court were to require Professor Holthausen to adopt Mr. Baliban's timing framework:

- In paragraph 9, Professor Holthausen criticizes Mr. Baliban for failing "to apportion the economic harm between the effect of the Holding Company Notes and the effect of Marvel's capital structure decisions absent the Holding Company Notes. . . ." (Holthausen Rebuttal Rpt. at ¶ 9 D.I. 472 Ex. 7)

17

- In paragraphs 13, 14 and 23, Professor Holthausen explains another misapplication of the Andrade and Kaplan study by Mr. Baliban. Mr. Baliban mistakenly bases his opinion on a sample of firms that fails to isolate the cost of economic distress, i.e., a business downturn, from financial distress, i.e., distress caused by a company's capital structure. Andrade and Kaplan's "no shock" sample of companies that solely experienced financial distress suffered no decline in enterprise value, which sets the damages from purely financial distress at zero, even accepting Mr. Baliban's framework. (See Holthausen Rebuttal Rpt. at ¶¶ 13, 14 and 23)

Plaintiffs have offered no reason why these valid points of criticism of Mr. Baliban's flawed damages opinion should not be heard by the Court at trial. Accordingly, even if the Court were to accept Plaintiffs' arguments on its motion – and the Court should not – then the Court should still permit Professor Holthausen to testify concerning the topics in paragraphs 9 and 23 of his report.

## II.    PROFESSOR HAMERMESH'S OPINION REGARDING DELAWARE CORPORATION LAW, AS THE DIRECTORS WOULD HAVE UNDERSTOOD IT AT THE TIME OF THE CHALLENGED TRANSACTIONS, CONCERNS AN ISSUE OF FACT, NOT AN ISSUE OF LAW.

Defendants agree with Plaintiffs that, as a general matter, an expert cannot testify as to the law. Professor Holthausen's opinion fits into an exception to that general rule because it concerns a historic issue of law that serves as a "fact" in this case. See Askanase v. Fatjo, 130 F.3d 657, 673 (5th Cir. 1997) ("Lawyers may testify as to legal matters when those matters involve questions of fact.").

Defendants intend to submit Professor Hamermesh's legal opinion into evidence in order to construct the hypothetical bargaining that the Third Circuit directed the parties to address through supplemental expert testimony. See Cantor v. Perelman,

18

414 F.3d 430, 437 (3d Cir. 2005). Defendants' expert on the hypothetical bargaining, Mr.

Fowler, relies on Professor Hamermesh's legal opinion in assessing how the Marvel board

and its advisors would have analyzed the potential costs of the alleged restriction on

issuing voting stock that dilutes the Marvel Holdings Companies' majority position.

(Fowler Rpt. at ¶ 24 D.I. 469 A120) Based on Professor Hamermesh's opinion, Mr.

Fowler concludes that the Marvel board would not have expected to have the ability to

dilute the voting control of a majority shareholder regardless of the existence of any

restrictions in the Notes, and therefore would not have seen the restrictions as a signifi-

cant cost. (Id.) Plaintiffs' purported bargaining expert, Mr. Bevis Longstreth, agreed that

Marvel's board of directors, in the course of arm's length bargaining over the terms of the

Notes, would "certainly want to consult counsel" as to the board's ability to dilute the

majority shareholder. (Longstreth dep. at 116 D.I. 469 A311) As the directors would

have consulted counsel regarding this legal issue in the course of their hypothetical

bargaining, the fact-finder should consider what the parties would have reasonably

understood the law to be at that time. Professor Hamermesh's report addresses that

factual issue.

      The "law as fact" exception to legal testimony is well-illustrated by Chancel-

lor Chandler's consideration of the legal expert testimony of former Chancellor Grover C.

Brown and Professor Hamermesh in Onti, Inc. v. Integra Bank, 751 A.2d 904, 931-32

(Del. Ch. 1999). In Onti, the court assessed whether a cash-out merger transaction was

fair to the minority shareholders. Id. at 906. In assessing whether the directors had fairly

valued the corporation for purposes of the merger, the court needed to consider whether three derivative claims pending at the time of the merger had any value. See id. at 931. The court heard expert testimony from Professor Hamermesh and from former Chancellor Brown about the likely outcome of that litigation and its net value. See id.

Professor Hamermesh's role in this case is analytically similar to his role in Onti, as his testimony about historical law will aid the fact-finder in constructing the hypothetical bargaining that the Third Circuit directed the Court to consider. Accordingly, Plaintiffs' motion to exclude the testimony of Professor Hamermesh should be denied.

*          *          *

Much of Plaintiffs' brief concerns their attempt to rebut the substance of Professor Hamermesh's opinion, which is irrelevant to the pending motion. Defendants will not burden the Court with a lengthy response to Plaintiffs' untimely arguments, but Defendants note that Plaintiffs sidestep the central point of Professor Hamermesh's opinion – that a majority voting position has value associated with it and Delaware law respects and guards that value. (Hamermesh Rpt. at ¶ 2 D.I. 469 A169-70)  Indeed, Plaintiffs' expert, Justice Walsh, agrees with Professor Hamermesh that voting control is an important property right. (Walsh dep. at 89, 112 D.I. 469 A323, A326)  He also agrees that a majority shareholder can take action to protect its valuable property right. (Id. at 89)  As Section 4.09 of the respective indenture covenants merely requires the Marvel Holdings Companies (not Marvel) to protect their property interest in voting

20

control, that provision is essentially identical to the pre-existing rights and obligations imposed by Delaware law.[5] Defendants submit, however, that the Court's consideration of this issue can await the trial.

---

[5]     Plaintiffs' brief also ignores the time period governing Professor Hamermesh's opinion (the same period during which the hypothetical arm's length bargaining would have taken place), by citing a 2005 decision, Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150 (Del. Ch. 2005). If recent case law were relevant, (which it is not) then the Court would need to consider the Court of Chancery's decision in Adlerstein v. Wertheimer, C.A. No. 19101, 2002 WL 205684 (Del. Ch. Jan. 25, 2002). In Adlerstein, the directors of an insolvent corporation sought to save the company from a dire financial crisis by issuing new shares that diluted the majority shareholders' control. See id. at *11. The court rescinded the issuance of shares because the directors violated their fiduciary duty of loyalty to the majority shareholder in depriving him of control. Id. at *11-12.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to exclude the expert testimony

of Lawrence Hamermesh and certain opinions of Robert Holthausen should be denied.


Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000

Attorneys for Defendants


DATED:  June 22, 2006