# EXHIBIT A

```
                                                              Page 1
 1
 2           IN THE UNITED STATES DISTRICT COURT
 3               FOR THE DISTRICT OF DELAWARE
 4
 5   RONALD CANTOR, IVAN          )  No. 97-586-KAJ
     SNYDER and JAMES A.          )
 6   SCARPONE, as TRUSTEES OF     )
     THE MAFCO LITIGATION, and    )
 7   as Successors in Interest    )
     to the Marvel                )
 8   Entertainment Group,         )
     Inc., et al.,                )
 9                                )
              Plaintiffs,         )
10                                )
              vs.                 )
11                                )
     RONALD O. PERELMAN, et       )
12   al.,                         )
                                  )
13            Defendants.         )
     -----------------------------)
14
15
16
17      VIDEOTAPED DEPOSITION OF JEFFREY L. BALIBAN
18                  New York, New York
19                Tuesday, April 11, 2006
20
21
22
23
24   Reported by:
     PENNY SHERMAN
25   JOB NO. 183397
```

Page 198

1 Baliban
2 decisions were made, there was also potential
3 benefits to using debt over equity?
4     MR. GOLDWATER: Objection to form.
5   A.   I'm not aware, certainly in November of
6 1996, of the breach of fiduciary duty. And I
7 guess, for my -- for the purposes of my answer, I'm
8 assuming that there was a breach of fiduciary duty.
9     Ultimately, I understand that's up to
10 the court. And if the court decides there was no
11 breach of fiduciary duty, I suppose that changes
12 the nature of this case. But for the purposes of
13 my report, I'm assuming that there was a breach of
14 fiduciary duty.
15     I'm not aware of any benefit at November
16 of 1996 that that breach of fiduciary duty caused
17 or engendered to Marvel. And I'm not even
18 certain -- I'd have to think about this -- even if
19 there was benefit at some earlier time, whether or
20 not that means a breach of fiduciary duty or the
21 damages that flow from a breach of fiduciary duty
22 are somehow impacted. But it's something, I guess,
23 I'd have to think about, and it probably requires a
24 legal analysis that I would rely on counsel to
25 provide.

Page 199

1 Baliban
2     MR. LOCKWOOD: Well, let's mark Exhibit
3 11, a document that is an excerpt from a
4 finance textbook that you cite in your report.
5     (Baliban Exhibit 11, Excerpt from a
6 finance textbook, marked for identification,
7 as of this date.)
8     MR. GOLDWATER: Do you have a copy of
9 that?
10     MR. LOCKWOOD: Yeah, I do.
11   Q.   You cite in your report a textbook
12 written by Ross, Westerfield, and Jaffe, R-O-S-S,
13 W-E-S-T-E-R-F-I-E-L-D and J-A-F-F-E, titled
14 Corporate Finance.
15   A.   Yes.
16   Q.   And that's a sound book in terms of
17 setting forth basic principles of corporate
18 finance; is that fair?
19   A.   Yes.
20   Q.   And I just want to draw your
21 attention -- I gave you an excerpt from it and I
22 want to draw your attention to page 398. The
23 bottom paragraph on that page under the heading,
24 Risk to Equity Holders Rises With Leverage.
25   A.   Okay.

Page 200

1 Baliban
2   Q.   It says, in the third to last sentence
3 on that page, In other words, leveraged
4 stockholders have better returns in good times than
5 do unleveraged stockholders, but have worse returns
6 in bad times.
7     And over on the next page, I'll just
8 draw your attention to another statement. It's
9 very similar, page 399. The second sentence says,
10 This means that the levered stockholders have
11 better returns in good times than do unlevered
12 stockholders, but have worse returns in bad times
13 implying greater risk with leverage.
14     So, in terms of a financing decision, at
15 the time the decision is made, if you don't know
16 for certain that bad times are ahead, it doesn't
17 mean that you're going to damage shareholders by
18 financing the debt versus equity; is that fair?
19     MR. GOLDWATER: Objection.
20   A.   Well, I'm sorry. Could you give me your
21 question one more time?
22   Q.   Let me ask it in a different way.
23     Do you agree with the statement from
24 this finance textbook that levered stockholders
25 have better returns in good times than do unlevered

Page 201

1 Baliban
2 stockholders that have worse returns in bad times,
3 implying greater risk with leverage; do you agree
4 with that principle?
5   A.   In general, yes.
6   Q.   In 1994 and 1995, when the Marvel board
7 was making its financing decisions, do you have a
8 view, at that time -- did you do an analysis as to
9 how certain its ultimate bad times in 1996 were?
10     Let me rephrase that question. It's not
11 a good question.
12     Did you do a study or analysis at the
13 time that the financing decisions were made in 1994
14 and 1995, about how likely future bad times were
15 for Marvel versus future good times?
16     MR. GOLDWATER: Objection to form.
17   A.   I did not do a study of expectations of
18 good times versus bad times. What I -- what
19 opinion I ultimately reach is, the riskiness of
20 returns was increased at the time that the
21 decisions were made to sign the indenture covenants
22 and to limit Marvel's ability to access capital
23 markets or have typical flexibility in its
24 financing. And because the risk was increased, the
25 value, the expected value of those earnings would

Page 202

Baliban

2  be lower.
3  Q. We have to take a break now because of
4  the tape. Are you done with your answer?
5  A. I am.
6      THE VIDEOGRAPHER: The time is 5:29 p.m.
7  and this marks the end of Tape Number 3.
8      (A recess was taken.)
9      THE VIDEOGRAPHER: The time is 5:34 p.m.
10  and this marks the beginning of Tape Number 4.
11  Q. If you go back to the rebuttal report of
12  Professor Holthausen, Exhibit 10.
13  A. Okay.
14  Q. There's another criticism that he has of
15  your analysis, which he labels the sole causation
16  assumption. Are you familiar with that criticism?
17  A. I recall it. I don't know the exact
18  paragraph.
19  Q. It's in paragraph 9.
20  A. Okay.
21  Q. Why don't you take a moment to read
22  paragraph 9.
23  A. Okay.
24  Q. Do you have a response to his criticism
25  based on your sole causation assumption?

Page 203

Baliban

2  A. Well, I'm not -- I'm not sure what he's
3  saying where he says, I don't apportion economic
4  harm between the effect of the holding company
5  notes and the effect of Marvel's capital structure
6  decisions, absent holding company notes. The --
7  I'm not saying that Marvel was a financially
8  distressed organization before the signing of the
9  holding company notes.
10  Q. And you are --
11  A. I'm also not saying that -- I'm also not
12  saying that Marvel did not suffer economic
13  distress.
14  Q. And what -- that last statement, what do
15  you mean by that?
16  A. It is a recognized concept that
17  companies can suffer economic distress, which means
18  that business is poor or there's some exogenous
19  shock that causes expected earnings to be far less
20  than -- to be far less, and there to be general
21  business downturns. And that is what I would call
22  economic distress.
23      It is a recognized concept that,
24  separate and apart from economic distress,
25  companies can suffer from financial distress, that

Page 204

Baliban

2  is, the distress that they suffer when they are too
3  highly leveraged. There are circumstances when
4  companies can suffer economic distress and not
5  necessarily suffer financial distress because
6  they're not too highly levered. There are
7  circumstances where companies can be suffering from
8  financial distress even though their business is
9  good and there's no economic distress.
10     In Marvel's case, you had both. You had
11  economic distress. There were exogenous shocks
12  that caused business to just take a downturn.
13  Business did not turn out to be as good as they
14  expected and they were suffering from financial
15  distress.
16     Now, Marvel's stock price went from
17  30-something, 35 down to 4. And I'm not saying
18  anywhere that that entire drop from $30 -- $35 a
19  share down to $4 a share is due to the indenture
20  covenants. I'm saying, when it was 4, at the time
21  that it was at a liquidity crisis and needed cash
22  and could not get cash at all and had nowhere to go
23  and nowhere to turn, the drop from $4.62 and a half
24  to a $1.88 is a measure of the financial distress
25  or the damage that the limitations that those

Page 205

Baliban

2  indenture covenants caused. That's when the teeth
3  of those covenants and those restrictions really,
4  really sank in.
5     So, I'm not sure I understand what he
6  means by solely caused. I do believe that the
7  financial distress was solely caused by the
8  indenture covenants and the financing choices that
9  Marvel's board made, in -- because those indenture
10  covenants existed.
11  Q. Take a look at paragraph 30 of your
12  report.
13  A. 30?
14  Q. Yes, 30. Three, zero.
15  A. And this is of my report?
16  Q. Of your report, yes.
17  A. Okay.
18  Q. In paragraph 30 you state in the second
19  sentence that, at the preannouncement price of
20  $4.63 a share, Marvel would have needed to buy --
21  find a buyer for 75.68 million shares to raise the
22  $350 million.
23     Sir, are you offering your opinion that
24  in November of 1996 Marvel could have done a public
25  offering and raised $350 million at a price of