IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD CANTOR, et al., | : |
| | : |
| Plaintiffs, | : No. 97-586-KAJ |
| | : |
| v. | : |
| | : |
| RONALD O. PERELMAN, et al., | : |
| | : |
| Defendants. | : |

**COMPENDIUM OF UNREPORTED OPINIONS TO DEFENDANTS' BRIEF
IN OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE THE TESTIMONY OF LAWRENCE A. HAMERMESH AND
CERTAIN OPINIONS OF ROBERT W. HOLTHAUSEN**

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Defendants

DATED:  June 22, 2006

INDEX

Adlerstein v. Wertheimer,
    C.A. No. 19101, 2002 WL 205684 (Del. Ch. Jan. 25, 2002) . . . . . . . . . . . 1

Albert v. Alex Brown Mgmt. Servs.,
    C.A. No. 762, 2005 WL 159085 (Del. Ch. June 29, 2005) . . . . . . . . . . . . 2

Cole v. Kershaw,
    C.A. No. 13904, 2000 WL 1206672 (Del. Ch. Aug. 15, 2000) . . . . . . . . . . 3

Gentile v. Rossette,
    C.A. No. 20213, 2005 WL 2810683 (Del. Ch. Oct. 20, 2005) . . . . . . . . . . 4

Gesoff v. IIC Indus.,
    C.A. Nos. 19473, 19600, 2006 WL 1458218 (Del. Ch. May 18, 2006) . . . . 5

Union Illinois v. Korte,
    C.A. No. 17392, 2001 WL 1526303 (Del. Ch. Nov. 28, 2001),
    aff'd, C.A. No. 17392 (Del. Ch. Dec. 21, 2001) ORDER . . . . . . . . . . . . . 6

# EXHIBIT 1



Not Reported in A.2d                                                                                                                  Page 1
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**C**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
Joseph ADLERSTEIN, an individual, Plaintiff,
v.
Stephen N. WERTHEIMER, an individual; Judy K. Mencher, an individual; Ilan Reich, an individual; and Spectrumedix Corporation, a Delaware corporation, Defendants.
No. CIV.A. 19101.

Submitted: Nov. 27, 2001.
Decided: Jan. 25, 2002.

Former chairman and chief executive officer (CEO) of corporation, who had been director and controlling stockholder, sued corporation and three individuals who claim to be current directors seeks a determination that board meeting that resulted in his removal and issuance of new class of supervoting preferred stock was not properly convened and that all actions taken at or in conjunction with meeting were null and void. The Court of Chancery, Lamb, Vice Chancellor, held that: (1) telephone conversation between director and chairman was sufficient to provide chairman with notice of board meeting, but (2) directors' decision to keep chairman uninformed about their plan to present proposal to destroy his voting control over corporation for consideration at board meeting invalidated board's approval of proposal at meeting.

So ordered.

West Headnotes

**[1] Corporations 101 ⚖298(3)**

101 Corporations
   101X Officers and Agents
      101X(B) Authority and Functions
         101k298 Meetings of Directors
            101k298(3) k. Calling and Notice. Most Cited Cases
Telephone conversation between director and corporation's chairman and chief executive officer (CEO) was sufficient to provide chairman with notice of board meeting, as was required by corporate bylaws, even though chairman was not provided with written notice or meeting agenda.

**[2] Corporations 101 ⚖298(3)**

101 Corporations
   101X Officers and Agents
      101X(B) Authority and Functions
         101k298 Meetings of Directors
            101k298(3) k. Calling and Notice. Most Cited Cases
Directors' decision to keep insolvent corporation's chairman, director, and controlling stockholder uninformed about their plan to present proposal to terminate chairman and approve acquisition of corporation by outside investor for consideration at board meeting invalidated board's approval of proposal at meeting; chairman was entitled to know ahead of time of plan to issue new class of supervoting preferred stock to investor with purposeful effect of destroying chairman's voting control over corporation, given his contractual power to prevent issuance of stock by executing written consent removing other directors from board.

John L. Reed, Esquire, Thomas P. McGonigle, Esquire, Timothy R. Dudderar, Esquire, Duane Morris & Heckscher, LLP, Wilmington, Delaware, Attorneys for Plaintiff.
Edward M. McNally, Esquire, Michael J. Maimone, Esquire, Linda Martin, Esquire, Morris James Hitchens & Williams, LLP, Wilmington, Delaware, Attorneys for Defendants.

MEMORANDUM OPINION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LAMB, Vice Chancellor.

I.

*1 This is an action pursuant to Section 225 of the Delaware General Corporation Law ("DGCL") brought by Joseph Adlerstein, the former Chairman and CEO of SpectruMedix Corporation (" SpectruMedix" or "the Company"), a Delaware corporation. SpectruMedix is in the business of manufacturing and selling instruments to the genetics and pharmaceutical industries and is headquartered in State College, Pennsylvania. Adlerstein's complaint is against the Company and three individuals who claim to be the current directors of the Company: Steven N. Wertheimer, Judy K. Mencher, and Ilan Reich.

At issue in the Complaint are a series of actions taken on July 9, 2001, at or in conjunction with a purported meeting of the SpectruMedix board of directors held at the New York City offices of McDermott, Will & Emery ("MW & E"). [FN1] First, a board majority (consisting of Wertheimer and Mencher) voted to issue to the I. Reich Family Limited Partnership ("Reich Partnership"), an entity affiliated with Reich, a sufficient number of shares of a new class of supervoting preferred stock to convey to the Reich Partnership a majority of the voting power of the Company's stock. Second, the same majority voted to remove Adlerstein for cause as Chief Executive Officer of the Company, to strip him of his title as Chairman of the Board, and to appoint Reich to serve as Chief Executive Officer and as Chairman of the Board. Third, immediately after the board meeting, the Reich Partnership executed and delivered to SpectruMedix a written consent in lieu of stockholders meeting purporting to remove Adlerstein as a director. When the dust settled, the board consisted of Wertheimer, Mencher, and Reich; the Reich Partnership had replaced Adlerstein as holder of majority voting control; and Reich had replaced Adlerstein as Chairman and CEO.

FN1. Over the years Adlerstein was represented in various personal capacities by Stephen Selbst, a partner in MW & E's New York City office. Eventually Selbst also began to serve as counsel to SpectruMedix. Selbst was present at the July 9 meeting and, as counsel to SpectruMedix, schemed with Wertheimer, Mencher, and Reich to engineer Adlerstein's ouster.

Adlerstein seeks a determination that the July 9 meeting was not properly convened and, therefore, all actions taken at or in conjunction with that meeting are null and void. Adlerstein also contends that, even if the meeting was duly noticed and convened, the actions taken at the meeting by Wertheimer and Mencher were the product of a breach of the fiduciary duties they owed to him in his capacity as a director and the controlling stockholder.

II.

Adlerstein is a scientist and entrepreneur. He has a Ph.D. in physics and was involved with the funding and management of a number of start-up technology companies before founding SpectruMedix (originally named Premier American Technologies Company) in 1992.

Wertheimer, an investment banker, was introduced to Adlerstein by Selbst [FN2] and was elected to the board by Adlerstein on January 1, 2000. Mencher is a money manager with an expertise in high yield and distressed investments. On Wertheimer's recommendation, Adlerstein elected Mencher to the board on March 22, 2000.

FN2. *See supra* note 1.

In 1997, SpectruMedix completed an initial public offering of its common stock, raising net proceeds of $4.67 million, more than half of which was used to repay existing indebtedness. SpectruMedix experienced substantial net losses over the next several years, "burning" through all of the cash raised in the IPO.

*2 In July 1999, SpectruMedix entered into a series

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

of agreements with Applied Biosystems, Inc. and certain of its affiliates. As a result of these agreements SpectruMedix received $5 million in cash in exchange for a sublicense to certain technology licensed by SpectruMedix, shares of SpectruMedix Series A Preferred Stock, and a consulting agreement. Following this transaction, apart from a small amount of revenue from the sale of instruments and related disposable products, SpectruMedix received no other funds between July 31, 1999 and July 9, 2001.

In 1999, to avoid a liquidity crisis, Adlerstein loaned SpectruMedix $500,000. In exchange, SpectruMedix gave Adlerstein a note that was convertible (at Adlerstein's option) into shares of a new Series B Preferred Stock of SpectruMedix that voted with the common and carried 80,000 votes per share. In January 2000, Adlerstein converted approximately $103,000 outstanding under this loan agreement into shares of Series B Preferred Stock. As a result, although Adlerstein owned only 21.41% of the equity of SpectruMedix, he controlled 73.27% of the voting power of the Company.

Late in 1999, before joining the board, Wertheimer convinced Adlerstein to hire Manus O'Donnell, an independent management consultant, to study and report on the status of the Company's management and finances. O'Donnell conducted his study and delivered a report dated January 2, 2000, in which he concluded that, unless the Company began making sales of instruments, it had sufficient cash and cash equivalents to continue operations only until September 2001.

During September 2000, as a result of increasing concern over SpectruMedix's deteriorating financial condition, Wertheimer and Mencher convinced Adlerstein to re-hire O'Donnell. On September 15, 2000, O'Donnell updated his report, shortening the period during which sufficient cash reserves were forecasted. He stated:
[S]ince my last forecast in December, the company burn rate has increased substantially ... mainly due to increased headcount expense. As a result cash would last until May 2001 if grant money is received as predicted (at 115K per month from October onward). If grants are not received, then cash would be exhausted in January 2001.

As O'Donnell noted, the change in forecast was due in large part to Adlerstein's decision to increase staffing levels from 23 to 51. This headcount increase resulted in an escalation of the annual payroll by just over 100%. O'Donnell concluded by telling the board of directors that, at the then-current level of fixed expenses, SpectruMedix needed to sell and get paid for one machine per month in order to maintain an adequate cash position.

On March 28, 2001, a sexual harassment complaint was made against Adlerstein asserting that he threatened an employee's job because she objected to his inappropriate behavior toward her. An independent consultant was hired who, after an investigation, concluded that Adlerstein had been guilty of sexual harassment as defined in the Company's policy and had been less than candid in connection with the investigation. The consultant made an oral report of this conclusion to Wertheimer and Mencher on May 14, 2001. Because Adlerstein failed to pay the consultant's bill, a written report detailing the investigation was not delivered to the Company until September 2001.

*3 On April 11, 2001, a meeting of the SpectruMedix board was held. At that meeting Adlerstein represented to the board, and the minutes of the meeting state, that three instruments had been purchased and shipped during the quarter ending March 31, 2001 and the Company was projecting sales of six to nine instruments for the quarter ending June 30, 2001. In fact, according to uncontroverted testimony, the Company sold only one instrument during the quarter ending March 31, 2001 and that sale was made on the condition that SpectruMedix would further develop the instrument to a commercially viable level of functionality.

During April 2001, Wertheimer and Mencher convinced Adlerstein to again hire O'Donnell to generate an updated report on the financial condition of the Company. The resulting report, which projected a cash balance of $66,000 for the Company as of May 31, 2001, was discussed at an April 30, 2001 meeting of the board. As reflected in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 4

Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the board's minutes for that meeting Adlerstein on the one hand and Wertheimer and Mencher on the other had very different reactions to the Company's financial state:

[Adlerstein] did not regard the situation as quite as desperate as the other directors. He said that the Company had previously faced similar cash crises and had weathered them. He said that he had found money to keep the Company alive in the past, and if required to do so again, he would find the resources. Mr. Wertheimer and Ms. Mencher lauded him for his past efforts to save the Company, but said that the[y] were seeking to bring the Company to a cash neutral or profitable position as promptly as possible. The point, Ms. Mencher said, was to put the Company in a position where Dr. Adlerstein wouldn't be required to keep the Company afloat personally in the future.[FN3]

FN3. Def. Ex. ("DX") 18 at 1.

This divergence in perspective continued through the July 9 meeting.

The board met again on May 25, 2001. Adlerstein reported that the Company was "low on cash" but delivered an upbeat report on the status of discussions he was having with several potential strategic partners. Wertheimer and Mencher remained concerned about the Company's deteriorating financial condition and began to question seriously the information Adlerstein was providing to them. As Mencher testified:

[I]t became clear that we were not getting the entire picture of what was going on with the company and that the company was quickly heading ... toward a major liquidity crisis-if it wasn't already in one-and that the company needed a crisis manager, just for somebody to get in and tell the board what was really going on and how long the company had to survive.[FN4]

FN4. Transcript of Trial Testimony ("Tr.") at 172-73.

Thus, Wertheimer and Mencher suggested that the Company should again hire O'Donnell's firm to help the Company in reducing expenses and improving the instrument manufacturing process. Adlerstein agreed, and the entire board unanimously resolved to do so. O'Donnell and his colleague, Gordon Mason, agreed to take on such an assignment provided SpectruMedix execute a written consulting agreement.

*4 During the month of June 2001, O'Donnell and members of his firm began to play a hands-on role at the Company's headquarters, reducing the number of employees while improving the instrument manufacturing process. Among other things, they drew up an organizational chart that defined lines of authority and responsibility in the Company, something Adlerstein had refused to do. These changes were met enthusiastically by the Company's senior employees.

Adlerstein conducted a rearguard action against O'Donnell's restructuring efforts. Most notably, he refused to sign a written contract with O'Donnell, notwithstanding the direction of the board that he do so. He also was frequently away from headquarters in State College during June but, when he did appear, acted to undo changes that had been implemented. Eventually, O'Donnell and Mason stopped working. Wertheimer and Mencher concluded that Adlerstein was intentionally impeding the progress of the consultants and resolved to investigate the situation at SpectruMedix for themselves.

Wertheimer contacted three of the four department heads at the Company and learned that these individuals were planning to quit their jobs with SpectruMedix if organizational and other changes implemented by the consultants were not kept in place. On July 2, 2001, O'Donnell forwarded a report to Wertheimer and Mencher which concluded that Adlerstein was "the central problem" at the Company, because "he is totally lacking in managerial and business competence and has demonstrated an unwillingness to accept these shortcomings." [FN5] O'Donnell further opined: "For SpectruMedix to have any chance, [Adlerstein] must be removed from any operating influence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

within the company." [FN6]

FN5. DX 28 at 2.

FN6. *Id.*

In June 2001, Wertheimer contacted Reich to discuss involving him as both an investor and manager of SpectruMedix. Wertheimer knew that Reich had the personal wealth and managerial experience to take on a restructuring of SpectruMedix.[FN7] As he testified at trial: "Ilan was the only guy I knew that had money and had the skills to go in and ... pull this out of the fire.... No institutional investor would go anywhere near a company like this. It had to be somebody that liked to get his hands dirty, who liked to go into a company and basically try and make something out of something that was in a lot of trouble." [FN8]

FN7. Wertheimer was aware that in the mid-1980s Reich had pleaded guilty to federal charges of trading on inside information while he was a partner in a prominent New York City law firm and served a one-year prison sentence. Nevertheless, he also knew that, from 1998 to 2000, Reich was employed as the President and CEO of Inamed Corporation, a publicly traded company, and had accomplished a significant turnaround of that company. Wertheimer knew that Reich had left Inamed in 2001 and might be interested in a new challenge.

FN8. Tr. at 312.

On June 27, 2001, Reich met with Selbst and O'Donnell to discuss the business of SpectruMedix. Adlerstein was unaware of this meeting. The next day, Reich and Adlerstein met in New York. Reich testified that he then determined that he would only be willing to invest in SpectruMedix if he, and not Adlerstein, were in charge of the Company. Reich thereafter executed a confidentiality agreement and received non-public information in due diligence.

On June 30, Reich sent an e-mail to Selbst that referred to an upcoming meeting between Selbst and Wertheimer for the purpose of discussing Adlerstein's Series B Preferred shares. Adlerstein was not copied on this e-mail and was not aware of this meeting. Also on June 30, Wertheimer had a discussion with Reich about firing Adlerstein.

*5 On July 2, 2001, Reich participated in a conference call with Wertheimer and Mencher and later that day met with Wertheimer to discuss his potential investment. At that meeting, the option of firing Adlerstein for cause from his position as CEO due to his sexual harassment of a Company employee was discussed, as was Adlerstein's voting control over the Company. Adlerstein had no idea this meeting was taking place. But by this time Reich knew he would have an opportunity to take over SpectruMedix.

On July 3, 2001, Reich met with various department heads of the Company during a due diligence visit to the SpectruMedix headquarters. Aware of this visit, Adlerstein acted to discourage senior officials at State College from cooperating fully with Reich. As he e-mailed one of the Company's principal scientists:
I am not willing to have you spend an inordinate amount of time satisfying [Reich's] ... requests at the risk of exposing our innards (i.e.technologies, analysis) to someone ... who, in the final analysis, is by no means a sure thing to invest in [SpectruMedix].[FN9]

FN9. DX 29.

A. SpectruMedix's Insolvency

By the beginning of July 2001, if not earlier, SpectruMedix was either insolvent or operating on the brink of insolvency.[FN10] The Company had very little cash (or cash equivalents) and no material accounts receivable due. At the same time, the Company had substantial and increasing accounts payable, Adlerstein was not communicating with creditors, and key parts vendors were refusing to make deliveries unless paid in cash. Indisputably,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 6
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

SpectruMedix did not have sufficient cash on hand to meet its next employee payroll on July 13, 2001, and had no realistic expectation of receiving sufficient funds to do so from its operations. Moreover, the Company's auditors were unwilling to issue the opinion letter necessary for it to file an annual report with the SEC, which was due to be filed on July 10th.

> FN10. According to DX 34, an unaudited balance sheet as of June 30, 2001, SpectruMedix had $89,293 in cash and certificates of deposit and $2,404,135 in accounts payable.

B. The July 9, 2001 Board Meeting

*1. Notice*

Wertheimer testified that, on or about July 5, 2001, he and Adlerstein spoke on the telephone about the deteriorating financial condition of the Company and matters relating to a significant arbitration involving SpectruMedix.[FN11] In that proceeding, MW & E had moved to withdraw as counsel to SpectruMedix, as a result, among other things, of disputes over non-payment of fees and expenses. Wertheimer and Adlerstein may have discussed the fact that the arbitrator planned to hold a conference on the motion to withdraw on Monday, July 9, and wished to be able to speak to Adlerstein by telephone. Wertheimer testified that, during this conversation, Adlerstein agreed to convene a meeting of the board of directors at 11 a.m. on July 9, 2001, at MW & E's New York City offices. Wertheimer further testified that Adlerstein was aware that the topics to be discussed at the meeting would be (i) SpectruMedix's dire financial condition and immediate need for cash, (ii) the arbitration, including the need to retain new counsel, (iii) the formal execution of an agreement to retain O'Donnell, and (iv) the Company's certified public accountants' refusal to issue an audit opinion. Adlerstein maintains that, while he agreed to meet with Wertheimer on July 9 in MW & E's offices, the only purpose of that meeting was to be available to speak to the arbitrator about the motion to withdraw. He denies that he ever agreed to call a board meeting for that time or knew that one was to be held.

> FN11. The other party to the arbitration was Iowa State University Research Foundation, the licensor of core technologies used in SpectruMedix's instrumentation. The arbitration posed a substantial risk to the future viability of SpectruMedix.

*6 The trial record contains plainly divergent testimony on the subject of whether Adlerstein called the July 9 meeting or was given notice of it. Mencher, Reich, and Selbst all support Wertheimer's testimony, although they all learned about the meeting from Wertheimer. Thus, while their testimony is corroborative of his, it provides no independent evidence of Adlerstein's state of knowledge. Adlerstein's trial testimony was undermined by Karl Fazler, the Company's business manager, who spoke with Adlerstein on the morning of July 9, and remembered Adlerstein telling him that he was on his way to MW & E's offices in order to meet with the board of directors.[FN12] At the same time, Adlerstein's testimony is buttressed, to some degree, by the fact that none of the directors received written notice of a meeting although, the evidence suggests, SpectruMedix usually circulated notice and a proposed agenda by e-mail.[FN13]

> FN12. On cross-examination, Fazler re-affirmed his recollection that Adlerstein had said he was going to meet with the board, conceding only that it was "possible" Adlerstein had said he was going to meet with a board member, rather than to a board meeting. Adlerstein did not take the stand to rebut Fazler's testimony.

> FN13. There appear in evidence notices or agendas for board meetings of SpectruMedix dated May 9, June 20, and December 7, 2000 and April 10, April 27, and May 25, 2001. These were usually drafted by Selbst and e-mailed by him to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the board members. The fact that he and Adlerstein were not on "talking terms" by this point due to his firm's unpaid legal bills may account for the lack of either a written notice or agenda for the July 9, 2001 meeting. There was no agenda and no minutes, however, for a board meeting that occurred in January 2001 in Boston, which supports Defendants' assertion that not all board meetings were formally noticed.

*2. Adlerstein was kept in the dark about the Reich proposal*

Mencher's notes show that Reich first proposed terms for an acquisition of SpectruMedix no later than July 5. On that date, she had a teleconference with Wertheimer and Reich in which they discussed the outline of the transaction and the need to terminate Adlerstein. Her notes contain the entry " fire Joe + negotiate a settlement," followed by a summary of terms for his separation.

The documents necessary for a transaction with Reich were in draft form by July 6, 2001. Selbst sent these documents by e-mail to Wertheimer, Mencher, and Reich. He did not send them to Adlerstein, who was deliberately kept unaware that Reich had made a proposal until the July 9 meeting. At trial, Wertheimer was asked whether "[b]etween the time you got the proposal from Mr. Reich-until the time you walked in to the board meeting on July 9th, did you tell Doctor Adlerstein that you were negotiating a proposal with Ilan Reich ...." He responded that he had not:
A. Because I wanted to save the company at that point.... So, no, I didn't tell him that this was going on, because I had no faith that he would-that he would, first of all, you know, go along with the deal; but secondly, I was also worried that he would do something to scare off the investor.[FN14]

FN14. Tr. at 326-27.

Although Adlerstein argues that the Reich proposal was finalized on Friday, July 6, the record supports the conclusion that Reich and Wertheimer were still negotiating some terms of the deal on the morning of July 9 and that final documents were not ready until that time. The deal finally negotiated provided, subject to board approval, that the Reich Partnership would invest $1 million in SpectruMedix, Reich would assume the active management of SpectruMedix, and SpectruMedix would issue shares of its Series C Preferred Stock to the Reich Partnership carrying with them voting control of the Company.

*3. The meeting occurs*

Adlerstein arrived late at MW & E's New York City offices to find Selbst and Wertheimer waiting for him. He inquired about the conference with the arbitrator and was told that the matter had been postponed. Mencher was hooked in by phone and, according to Wertheimer, Adlerstein called the meeting to order and "wanted to talk about lawyers and the arbitration."[FN15] Wertheimer then interrupted and said that they needed to talk about finances. He then told Adlerstein that there was a proposal from Reich and handed him a term sheet showing the material elements of the deal.[FN16]

FN15. Id. at 333.

FN16. Id.

*7 After reviewing it, Adlerstein told Wertheimer and Mencher that he was not interested in the Reich proposal because it would dilute his shares in the Company and result in him losing voting control. He has since testified that his lack of interest was also because he believed the price of $1 million to be insufficient for control of SpectruMedix. He did not, however, voice this concern at the time.

In response to the objection that he did voice, Wertheimer and Mencher explained that in their judgment the Company was in immediate need of funds and the investment by Reich was needed to avoid liquidation. Wertheimer asked Adlerstein directly if he was personally in a position to provide the needed funds. Adlerstein responded that he was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 8
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

not.

Wertheimer and Mencher tried to engage Adlerstein in further discussion about the Reich proposal, but Adlerstein sat silent. He testified that the reason for his silence was advice given to him by Selbst in the past: "when in doubt about what to do in a situation like this, keep your mouth shut." [FN17] Because he and Mencher could not get Adlerstein to engage in any dialogue regarding the proposed transaction, Wertheimer moved the transaction for a vote. Wertheimer testified:

    FN17. Tr. at 71.

There was no use in talking about it, because [Adlerstein] wouldn't talk.... So the fact that the discussion didn't go any longer, the finger should not be pointed at us, it should be pointed at the person that cut off the discussion. That is Doctor Adlerstein.[FN18]

    FN18. Tr. at 372-73.

Adlerstein has testified that when the vote on the transaction was called he did not participate. The minutes of the meeting reflect that he voted "no." Each of the others present at the meeting-Wertheimer, Mencher, and Selbst-confirms the statement in the minutes.[FN19]

    FN19. Adlerstein also testified that, when he realized Wertheimer and Mencher were prepared to act against his interests, he asked Selbst about using his voting power to prevent this from happening. According to Adlerstein, Selbst told him that he could not, due to a 10-day notice requirement for convening a meeting of shareholders. The others deny that this exchange took place. According to the minutes of the July 9 meeting, the second item of business was an amendment to the Company's bylaws, approved by a vote of 2 to 1, with Adlerstein opposed. Prior to its amendment, the bylaw purported to proscribe shareholder action by written consent. Of course, this bylaw was very likely unenforceable as a matter of Delaware law. *Datapoint Corp. v. Plaza Sec. Co.,* 496 A.2d 1031, 1035 (Del.1985). The importance of this bylaw and its effect on Adlerstein's right to remove Wertheimer and Mencher was not explored by the parties at trial.

The board then took up the question of removing Adlerstein "for cause" from his office as CEO and Chairman of SpectruMedix. The elements of "cause" assigned were mismanagement of the Company, misrepresentations to his fellow board members as to its financial situation, and sexual harassment in contravention of his employment contract. After the meeting, the Reich Partnership executed and delivered a stockholder's written consent removing Adlerstein as a director of SpectruMedix. Reich was chosen to replace him.

Some months after July 9, Adlerstein executed a written consent purporting to vote his Series B Preferred shares to remove Wertheimer and Mencher from the board. Adlerstein initiated this Section 225 action on September 11, 2001.

III.

The general purpose of Section 225 is to provide "a quick method of review of the corporate election process in order to prevent a corporation from being immobilized by controversies as to who are its proper officers and directors." [FN20] Because it is summary in nature, a Section 225 proceeding is limited to those issues that must necessarily be considered in order to resolve a disputed corporate election process.[FN21] A Section 225 action focuses narrowly on the corporate election at issue and is not an appropriate occasion to resolve matters ancillary or secondary to that election.[FN22]

    FN20. *Bossier v. Connell,* 1986 Del. Ch. LEXIS 471, at *5 (Del. Ch. Oct. 7, 1986).

    FN21. *Box v. Box,* 697 A.2d 395, 398

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                 Page 9
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

(Del.1997).

FN22. *Arbitrium Handels AG v. Johnston,* 1997 Del. Ch. LEXIS 132, at *11 (Del. Ch. Sept. 17, 1997).

*8 Here, the question is whether the meeting held on July 9 was a meeting of the board of directors or not. If it was not, Adlerstein continues to exercise a majority of the voting power and is now the sole lawful director. If it was, I must then address a welter of arguments advanced by Adlerstein to prove that the actions taken at the July 9 meeting ought to be invalidated because Wertheimer and Mencher (and Selbst) all operated in secret to negotiate terms with Reich while keeping Adlerstein deliberately uninformed about their plan to present the Reich proposal at the July 9 meeting. The more persuasive of these arguments are predicated largely on the decisions of the Court of Chancery in *VGS, Inc. v. Castiel* [FN23] and *Koch v. Stearn.* [FN24]

FN23. 2000 Del. Ch. LEXIS 122 (Del. Ch. Aug. 31, 2000).

FN24. 1992 Del. Ch. LEXIS 163 (Del. Ch. July 28, 1992).

Finally, if all else fails, Adlerstein argues that Wertheimer and Mencher violated their fiduciary duties of care and loyalty to SpectruMedix in approving the Reich transaction with inadequate information and on terms that were unfair to the Company and its stockholders. He asks for an order canceling the shares and disregarding any effort by Reich to vote them.

For the reasons next discussed, I conclude that, although the meeting of July 9 was called as a board meeting, the actions taken at it must be invalidated. Thus, it is unnecessary to reach the last issue presented by Adlerstein.

A. The Call Of The Meeting

[1] On balance, the evidence at trial indicates that Adlerstein called the July 9 meeting. The procedure for giving notice of a board meeting is typically set forth in a Company's certificate or bylaws. The bylaws of SpectruMedix provide that special meetings of the board "may be called by the president on two (2) days' notice to each director by mail or forty-eight (48) hours notice to each director either personally or by telegram...." [FN25] I credit Wertheimer's account of his July 5 telephone call with Adlerstein. There is no reason to believe that Adlerstein would not have agreed to convene a board meeting on July 9, in view of the many urgent problems confronting SpectruMedix at that time. Fazler's testimony that Adlerstein called him on the morning of the meeting and said that he was on his way to a board meeting provides additional support for Wertheimer on this point. [FN26]

FN25. Bylaws at Article III, Section 7.

FN26. This conclusion makes it unnecessary to decide if Adlerstein's decision to remain at the meeting for its duration amounted to a waiver of notice and objection. Section 229 of the DGCL provides, as follows:
Whenever notice is required to be given under any provision of this chapter or the certificate of incorporation or bylaws ... [a]ttendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.
DEL. CODE ANN. tit. 8, § 229 (2001). This section of the law has been applied to waive any defect with respect to notice when a director attends and participates in a meeting despite imperfect notice. *Koch v. Stearn,* 1992 Del. Ch. LEXIS 163, at *12.

In reaching this conclusion, I have considered and reject Adlerstein's argument that the lack of any written notice or agenda for the July 9 meeting proves that it was not a board meeting. Concededly, the record supports Adlerstein's contention that, on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                         Page 10
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

many other occasions, someone, usually Selbst, distributed notices and agendas for board meetings of SpectruMedix. Nevertheless, the SpectruMedix bylaws do not require either written notice or the advanced distribution of a proposed agenda. Moreover, the record shows that, on other occasions, meetings of the board of directors were held without written notice or an agenda.[FN27]

> FN27. One such meeting was held in Boston in January 2001.

### B. The Validity Of The Actions Taken At The July 9 Meeting

*9 [2] A more difficult issue is whether the decision of Wertheimer, Mencher, and Selbst (no doubt with the knowledge of Reich) to keep Adlerstein uninformed about their plan to present the Reich proposal for consideration at the July 9 meeting invalidates the board's approval of that proposal at the meeting.

There are several factors that weigh against a finding of invalidity. The first is the absence from SpectruMedix's bylaws of any requirement of prior notice of agenda items for meetings of the board of directors, coupled with the absence of any hard and fast legal rule that directors be given advance notice of all matters to be considered at a meeting. Second, is the good faith belief of Wertheimer and Mencher that Adlerstein should be removed from management and that, if they had told him about the Reich proposal ahead of time, he would have done something to kill the deal. Third, is the fact of SpectruMedix's insolvency and the argument that the exigencies created by that insolvency gave Wertheimer and Mencher legal warrant to "spring" the Reich proposal on Adlerstein without warning.

Ultimately, I am unable to agree that these factors, either singly or in the aggregate, provide legal justification for the conduct of the July 9 meeting. Instead, I conclude that in the context of the set of legal rights that existed within SpectruMedix at the time of the July 9 meeting, Adlerstein was entitled to know ahead of time of the plan to issue new Series C Preferred Stock with the purposeful effect of destroying his voting control over the Company. This right to advance notice derives from a basic requirement of our corporation law that boards of directors conduct their affairs in a manner that satisfies minimum standards of fairness.

Here, the decision to keep Adlerstein in the dark about the plan to introduce the Reich proposal was significant because Adlerstein possessed the contractual power to prevent the issuance of the Series C Preferred Stock by executing a written consent removing one or both of Wertheimer and Mencher from the board. He may or may not have exercised this power had he been told about the plan in advance. But he was fully entitled to the opportunity to do so and the machinations of those individuals who deprived him of this opportunity were unfair and cannot be countenanced by this court.[FN28]

> FN28. The outcome in this case flows from the fact the Adlerstein was both a director and a controlling stockholder, not from either status individually. In the absence of some special contractual right, there is no authority to support the argument that Adlerstein's stockholder status entitled him to advance notice of actions proposed to be taken at a meeting of the board of directors. The actions may be voidable if improperly motivated. *Condec v. Lunkenheimer,* 230 A.2d 769 A.2d 769 (Del. Ch.1967). But the absence (or presence) of notice is not a critical factor. Similarly, in the absence of a bylaw or other custom or regulation requiring that directors be given advance notice of items proposed for action at board meetings, there is no reason to believe that the failure to give such notice alone would ordinarily give rise to a claim of invalidity. *Dillon v. Berg,* 326 F.Supp. 1214, 1221 (D.Del.), *aff'd,* 453 F.2d 876 (3d Cir.1971). Nevertheless, when a director either is the controlling stockholder or represents the controlling stockholder, our law takes a different view of the matter where the decision to withhold advance notice is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 11
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

done for the purpose of preventing the controlling stockholder/director from exercising his or her contractual right to put a halt to the other directors' schemes.

This result is consistent with the results reached in similar cases. For example, in *VGS, Inc. v. Castiel,* [FN29] the court struck down a merger approved by the written consent of two out of three managers of a Delaware LLC for the purpose of transferring voting control over the enterprise from one member to another. Because the disadvantaged member (who was the third manager) possessed the power to remove one of the other two managers and, thus, could have prevented the merger from happening, the court concluded that it was a breach of the duty of loyalty for the others to have acted in secret to effect the transaction. As then Vice Chancellor (now Justice) Steele wrote:

FN29. 2000 Del. Ch. LEXIS 122 (Del. Ch. Aug. 31, 2000).

*10 While a majority of the board acted by written consent, as all involved surely knew, had the original member's manager received notice beforehand that his appointed manager contemplated action against his interests he would have promptly attempted to remove him. Because the two managers acted without notice to the third manager under circumstances where they knew that with notice ... he could have acted to protect his majority interest, they breached their duty of loyalty to the original member and their fellow manager by failing to act in good faith.[FN30]

FN30. *Id.* at *2-3.

Adlerstein argues that the rationale of *VGS* operates *a fortiori* in this case because the documents that governed the LLC in *VGS* allowed the LLC's managers to act by non-unanimous written consent. Thus, there was no legal necessity for them to meet with the third manager at all. Despite this unusual governance provision, the court ruled that the two managers owed a fiduciary duty to the other, in both his managerial and membership capacities, to disclose their plan to authorize the dilutive merger in order to allow him to exercise his voting control to protect his controlling position. Here, Wertheimer and Mencher could not act outside of a meeting and could not convene a meeting without notice to Adlerstein. Thus, Adlerstein argues, their obligation to give him advance notice of the Reich proposal is even clearer.

It is difficult to accept this argument fully because the absence of a meeting was itself a fundamental problem in *VGS*. If there had been a meeting, it is likely that Castiel, the controlling member, would have had some opportunity to protect himself at that time by immediately removing the third manager from office. Here, by contrast, there was a meeting, and Adlerstein had *some* notice of the Reich proposal before it was approved by the SpectruMedix board of directors. The question is whether he had an adequate opportunity to protect his interests.

The same question has been addressed in other cases, most notably, in *Koch v. Stearn.*[FN31] In that case, there was a four-person board of directors and two stockholders, Stearn and Koch, each of whom had the right to appoint (and remove) two directors. Due to substantial financial pressures on the Company, three of the directors decided that Stearn should be removed from his positions as Chairman and Chief Executive Officer. They invited Stearn and his counsel to attend a meeting but did not send to either of them the draft resolutions that they had circulated among themselves calling for Stearn's removal. The board met and, over Stearn's vigorous objection, adopted the resolutions. Either then, or later in the meeting, Stearn called for his designee to quit the board but did not execute the written consent of stockholders necessary under Section 228 of the DGCL to effect the removal and replacement of that director.

FN31. 1992 Del. Ch. LEXIS 163 (Del. Ch. July 28, 1992).

The court concluded that Stearn's presence at the meeting was obtained by trickery or deceit because his fellow directors hid from him their plans for his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 12
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

ouster. Alternatively, the court found that, even if Stearn had waived his objection to the meeting by remaining and participating, the actions taken were, nonetheless, void, for the following reasons:

*11 I find that Stearn was disadvantaged by the other directors' failure to communicate their plans to him. If Stearn had seen the draft resolutions before the meeting, he could have exercised his right to remove [his designee] as a director and he could have replaced [him] with another nominee who would vote with Stearn to block Stearn's removal. Without doubt, Stearn's inability to thus protect himself constituted a disadvantage.[FN32]

   FN32. *Id.* at *15.

It is equally the case here that Adlerstein was disadvantaged "by the other directors' failure to communicate their plans to him." Had he known beforehand that Wertheimer and Mencher intended to approve the Reich proposal and to remove him from office at the July 9 meeting, he could have exercised his legal right to remove one or both of them and, thus, prevented the completion of those plans. The authority of both *Koch* and *VGS* strongly support the conclusion that Adlerstein had a right to such advance notice in order that he might have taken steps to protect his interests.

Wertheimer and Mencher argue that SpectruMedix's dire financial circumstances and actual or impending insolvency justify their actions because, they believe, it was necessary to keep Adlerstein uninformed in order for them to "save the Company. " From the record at trial, it is fair to conclude that SpectruMedix was insolvent as of July 9, 2001, in the sense that it was unable to meet its obligations as they came due. This was already true of ordinary supply contracts and fees for its attorneys and consultants. It was also about to be true for a payroll due a few days after the July 9 meeting. Nevertheless, I conclude that these facts do not alter the outcome of the case. Quite the opposite, it is in such times of dire consequence that the well established rules of good board conduct are most imporant.

While it is true that a board of directors of an insolvent corporation or one operating in the vicinity of insolvency has fiduciary duties to creditors and others as well as to its stockholders,[FN33] it is not true that our law countenances, permits, or requires directors to conduct the affairs of an insolvent corporation in a manner that is inconsistent with principles of fairness or in breach of duties owed to the stockholders. Indeed, in both *VGS* and *Koch* the directors taking the challenged action argued unsuccessfully that the corporation's dire financial condition and other compelling business circumstances either justified their acts or, at least, served to put the complaining director on notice that they might act against him or his interests.

   FN33. *McDonald v. Williams,* 174 U.S. 397, 404-05, 19 S.Ct. 743, 43 L.Ed. 1022 (1899); *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* 1991 Del. Ch. LEXIS 215, at *108 (Del. Ch. Dec. 30, 1991).

There is authority in this court suggesting the possibility that a board of directors could, " consistent with its fiduciary duties, issue a dilutive option in order to protect the corporation or its minority shareholders from exploitation by a controlling shareholder who was in the process of threatening to violate his fiduciary duties to the corporation."[FN34] Nevertheless, neither this nor any other authority suggests that directors could accomplish such action through trickery or deceit, and I am not prepared to hold otherwise.[FN35]

   FN34. *Mendel v. Carroll,* 651 A.2d 297, 306 (Del.Ch.1994).

   FN35. Of course, as Chancellor Allen noted in *Mandel,* "if the principal motivation for such dilution is simply to maintain corporate control ... it would violate the norm of loyalty." 651 A.2d at 304. This principle was firmly established

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 13
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

in *Condec,* 230 A.2d 769. The corollary proposition would appear to be equally true: i.e., an action taken primarily to divest a stockholder of control and transfer that control to another would also seem afoul of "the norm of loyalty."

### IV.

**\*12** For all the foregoing reasons, I have concluded that the actions taken at the July 9, 2001 meeting must be undone. Nevertheless, I recognize that the financial and business condition of SpectruMedix has changed materially since July 9, 2001. I also note plaintiff's proposal, during the trial, that I should appoint a custodian for SpectruMedix rather than reinstate Adlerstein's control. Under these circumstances, before entering a final order, the court will solicit the parties' views as to the appropriate form of relief. To this end, I direct that the parties confer, through counsel or otherwise, in an effort to agree upon the form of an order implementing this decision. Such agreement, of course, will be without prejudice to any party's rights in relation to this decision. If the parties are unable to agree on a form of order, they are directed to submit letter memoranda by 5 p.m. on February 7, 2002, addressed to the appropriate form of relief.

Del.Ch.,2002.
Adlerstein v. Wertheimer
Not Reported in A.2d, 2002 WL 205684 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.