EXHIBIT 3

Page 2 of 15



Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Stephen A. COLE, Plaintiff,
v.
Kenneth A. KERSHAW, Allen C. Liddicoat,
Elizabeth E. Robbins, R. Bruce White and Richard
C. Woodin, Churchtown Partners and B.A.R.K.E .,
L.L.C., Defendants.
**No. Civ.A. 13904.**

Submitted Feb. 3, 2000.
Decided Aug. 15, 2000.

Melvyn I. Monzack and Joseph J. Bodnar, Walsh,
Monzack    and    Monaco,    P.A.,    Wilmington,
Delaware, for Plaintiff.
Stephen E. Jenkins and Steven T. Margolin, of
Ashby & Geddes, Wilmington, Delaware, for
Defendants.

*MEMORANDUM OPINION*
JACOBS, Vice Chancellor.
*1 The plaintiff, Stephen Cole, who was a former
partner of Churchtown Partners, a Delaware general
partnership ("Churchtown" or "the Partnership"),
challenges the October 1, 1993 merger of
Churchtown into BARKE, LLC, a Delaware limited
liability company formed and owned by the
defendants, who were Churchtown's remaining
partners ("BARKE"). In the merger, which
eliminated Cole's interest in the Partnership, Cole
received a cash payment of $2,000. Cole attacks the
merger on two grounds: (i) the merger was not
legally authorized under either the Delaware
Partnership Act or the Partnership Agreement, and
(ii) even if the merger was legally valid, it was
equitably invalid because both the decision-making
process leading up to the merger and the $2,000
merger price were unfair. By virtue of these claimed
breaches of fiduciary duty by the defendants, Cole

seeks an award against them of damages plus his
attorneys' fees and expenses.

This is the Opinion of the Court, after trial and
post-trial briefing, on the merits of these claims. For
the reasons next discussed, I conclude that although
the merger was statutorily valid, its terms were
unfair to Cole. Consequently, the plaintiff has
established his entitlement to relief, which will be
an award of damages measured by the value of
Cole's partnership interest as of the date of the
merger, subject to adjustments to reflect the
disproportionate risk and expense that Cole's
pre-merger conduct inflicted upon the defendants.

I. THE FACTS [FN1]

FN1. Many of the underlying facts are
undisputed, but where there are disputes,
the facts are as found herein.

The plaintiff, Cole, and the individual defendants
(Elizabeth Robbins, R. Bruce White, Allen C.
Liddicoat, Kenneth Kershaw, and Richard Woodin)
were all partners of Churchtown. The corporate
defendant, BARKE, was the vehicle created to
effectuate the merger and to operate Churchtown's
business under a different entity form owned by
Churchtown's former partners other than Cole.

A. The Formation of Churchtown

In November 1989, Cole and the individual
defendants formed Churchtown as a Delaware
general partnership, to purchase and develop a 400+
acre parcel of raw farmland located south of the
Chesapeake & Delaware Canal in New Castle
County, Delaware (the "Property"). The partners'
plan was to develop the Property into a golf-course
residential community by building a golf course,
installing the subdivision's infrastructure, and then

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 2

selling the individual lots to third-party residential builders (the "Project").

As envisioned, the Project would have been the largest residential subdivision south of the C & D Canal at that time.[FN2] In the real estate world, that kind of project was considered a very high-risk type of real estate development.[FN3] The Project's "normal" risks were compounded by the fact that the Property was highly leveraged: $1.8 million of the $1.925 million purchase price had been financed by a loan from Wilmington Trust Company (the "Loan") that would fall due in three years.[FN4]

> FN2. Tr. at 450.
>
> FN3. Tr. at 274.
>
> FN4. DX 2, 3.

In forming Churchtown, the partners executed a "standard form" general partnership agreement to formalize their legal arrangement. The Partnership Agreement called for an initial capitalization of $400, allocated as follows: Robbins and White-$100 each, and Liddicoat, Kershaw, Cole and Woodin-$50 each. The Partnership Agreement did not explicitly address how the Partnership would be funded thereafter on an ongoing basis, but the partners all understood and agreed that that would be done through a combination of periodic "cash calls" and a bank loan promissory note personally signed by each partner. [FN5] The "cash calls" would be made as needed to fund the Project through its various stages to completion. Importantly for present purposes, the Partnership Agreement did not prescribe what the consequences would be if a partner failed to meet a cash call for additional capital contributions-the precise contingency that occurred in this case.

> FN5. Tr. at 66-67, 85; 446; DX 3, 5, 9, 12, 15, 19, 22, 24, 29, 34, 37, 40, 44.

B. The Partnership's Initial Financing

*2 On November 1, 1989, the Partnership borrowed

$1,800,000 from Wilmington Trust Company to finance the purchase of the Property (the "Loan"). Each partner and his or her spouse became personally liable on the Loan promissory note, which would fall due on November 1, 1992. From November 1989 until September 1991, Cole was fully involved in and knowledgeable of the Partnership activities, and up to September 1991, he paid his share of all cash calls on a current basis. For that 22-month period, Cole's cash contributions to Churchtown totaled $84,496.[FN6]

> FN6. Tr. at 9, 65-67, 69-70; DX 122.

Beginning with the September 1991 cash call, however, Cole stopped meeting his financial obligations to the Partnership. Cole also stopped communicating with his partners, and never responded to any of their efforts to communicate with him. Cole did not inform his partners that he no longer intended to meet cash calls, nor did he tell them the reasons why. Cole's explanation at trial was that he needed to devote his financial resources to prosecuting and defending other lawsuits that concerned other business ventures, some of which involved one or more of the defendants.[FN7] Cole further explained that he expected his partners in Churchtown to give him "some latitude" in meeting cash calls, as he claimed to have done in similar circumstances involving certain of the defendants. [FN8]

> FN7. Tr. 84; DX 44.
>
> FN8. Cole Dep. at 93; Cole admitted, however, that at no time did he ever "carry" Liddicoat, Robbins, or White-who collectively owned 62.5% of the Partnership.

C. Refinancing of the Loan

From its inception, the Project experienced constant setbacks in obtaining regulatory approval for the Record Plan for the proposed subdivision. The Project also faced burdensome challenges from the Delaware Department of Transportation ("DelDOT"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 3

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

) and the Water Resources Agency.[FN9] Those setbacks created the need for additional financing in order for the Project to continue. Those increased financial demands, coupled with the fact that the Loan would soon fall due,[FN10] imposed significant economic pressure on the Partnership. Indeed, it quickly became clear that the Partnership could avoid foreclosure only by refinancing the Loan. Accordingly, Mr. Liddicoat contacted Mr. Charles Brown, the Partnership's loan officer at Wilmington Trust, in an effort to obtain refinancing. Wilmington Trust agreed to refinance the Loan, on the condition that all of the partners personally become obligors on the promissory note. In December 1992, Mr. Brown sent to Mr. Liddicoat the necessary refinance loan documents, to be executed by all the partners. [FN11]

> FN9. New legislation that had been enacted in the summer of 1990 tightened the regulatory requirements related to " spray irrigation"-the type of wastewater management on which the Project was based. Those requirements restricted the number of available lots on the subdivision. Related problems stemmed from the fact that the Property was located within a Water Resource Protection Area, which raised various environmental and water quality issues. DelDOT also expressed concern that the rural roadways surrounding the Property would not be able to handle the increased traffic flow that would result from development. These concerns required special studies to be performed, which created additional expense for the Partnership and further delayed the completion of the Project.

> FN10. DX 84; Tr. at 511.

> FN11. Tr. at 515.

It was at this point that the partners first learned that they had a problem with Mr. Cole. The parties, each of whom had executed the original Loan documents, received telephone messages from Mr. Liddicoat's secretary, requesting them to come to

Liddicoat's office to execute the loan refinance documents.[FN12] All of them did that except Cole, [FN13] who claims that he did not receive that telephone call, that he was never asked to sign these documents, and that the defendants never told him that the Partnership was in serious jeopardy. The heavy weight of the credible evidence, however, proves the contrary. In fact, telephone calls were made (without success) to Cole, and a message was left with his secretary.[FN14] Although Cole did not appear or execute the refinance loan papers, Mr. Liddicoat continued his efforts to contact Cole and to inform him that the refinancing papers needed to be signed. Cole, however, remained unresponsive. Liddicoat then informed his partners of Cole's refusal to respond to his efforts to contact him. The defendants became quite concerned that something needed to be done to enable the Project to be refinanced and to move forward.[FN15] Ultimately, the defendants prevailed on Wilmington Trust to refinance the Loan on this one occasion without Cole's participation. Wilmington Trust informed the defendants, however, that any future loans would have to be signed by all the partners.[FN16]

> FN12. Tr. at 515.

> FN13. DX 82.

> FN14. *Id.*

> FN15. Tr. at 522-23.

> FN16. Tr. at 555-56.

C. The Defendants Merge Churchtown into BARKE

**\*3** Ultimately the defendants concluded that Cole's abdication of his responsibility to them, coupled with Wilmington Trust's stated refusal to extend further credit without Cole's participation, left only one workable solution: eliminate Cole as a partner. The defendants sought legal advice about how to accomplish that.[FN17] The result was the August 1993 Plan and Agreement of Merger between Churchtown Partners and BARKE, which (to repeat) was a limited liability company ("LLC") that the defendants created as the vehicle to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

eliminate Cole's Partnership interest.[FN18] Under that Agreement, Churchtown was merged into BARKE, whose members (owners) were all of the Churchtown partners except Cole–*i.e.,* the individual defendants. The consideration paid to Cole in the merger was a cash payment of $2,000, which was the amount the individual defendants had unilaterally determined as the value of Cole's partnership interest. The defendants made that determination without the benefit of any independent or expert financial advice concerning the value of the Partnership. The merger became effective on October 1, 1993, when a Certificate of Merger was filed with the Delaware Secretary of State.[FN19]

FN17. Tr. at 338, 523, 559.

FN18. PX 27-28.

FN19. PX 76.

At the time of the merger, an agreement to develop the subdivision (the "Corrozzi agreement")[FN20] was in place, and record plan approval for the subdivision had been obtained.[FN21] Formal approval for the golf course had not yet been obtained, although the necessary zoning variance had been secured.[FN22]

FN20. Corrozzi Properties was the only builder who at that time had showed interest in the Project. The resulting contract obligated Corrozzi to purchase five lots. Tr. at 524, 597.

FN21. PX 40, PX 81-82.

FN22. Woodin Dep. at 362 & 364.

Cole was never told that his partnership interest either would be–or had been–eliminated by the merger. Nor did Cole learn that until nine months later when he received a copy of Churchtown's IRS Form K-1 on June 28, 1994.[FN23] That was the first notice that Cole received of the merger and of the resulting elimination of his 12.5% Partnership

interest.[FN24] At that time Cole also received the $2,000 payment for his 12.5% interest. Importantly, the value of Cole's Partnership interest had not been determined as of October 1993, the merger effective date. Rather, it had been valued as of September 1991-two years earlier, when Cole stopped making his cash call payments.

FN23. Cole Dep. at 18; PX 88E at 604.

FN24. Cole Dep. at 17-18.

## II. THE CONTENTIONS

Cole asserts two claims for relief. The first is that the merger was legally invalid because neither the then-applicable partnership statute nor the Partnership Agreement authorized a merger of a general partnership into an LLC. As a consequence, Cole urges, the Partnership still exists, he remains a partner, and his damages, measured as the fair value of his Partnership interest, must be determined as of the date of trial.

Second, and in the alternative, Cole contends that even if the merger was valid legally, it was invalid equitably because the merger was not entirely fair and was therefore the product of a breach of fiduciary duty owed by the defendants to Cole. All parties agree that the defendants stood on both sides of the merger transaction and that the entire fairness standard of review is applicable. The plaintiff argues that under that standard the defendants cannot satisfy their burden to prove that the merger was entirely fair to Cole, because neither the decision-making process nor the transaction price was fair.

*4 The defendants assert several defenses against these claims. First, they argue that Cole comes to this Court with unclean hands and is therefore barred from seeking relief. Second, they contend that at the time of the merger Cole was no longer a partner of Churchtown, and therefore was not entitled to be paid the fair value of his interest at the time of the merger. Third, the defendants urge that even if the unclean hands defense does not apply and Cole was a partner at the time of the merger, (1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the merger was valid legally because the then-applicable LLC statute authorized a merger of an LLC and a general partnership, and (2) the merger was valid equitably because it was entirely fair in terms of both process and price. Therefore, defendants conclude, the merger lawfully terminated the Partnership under the terms of the Partnership Agreement, and Cole was paid all that he was entitled to receive.

These contentions raise five issues. (1) Does the unclean hands doctrine bar the plaintiff's claims? (2) Was Cole a partner of Churchtown at the time of the merger? (3) Was the merger of Churchtown into BARKE valid as a matter of Delaware statutory law? (4) Have the defendants carried their burden of showing that the merger was entirely fair? Because I conclude that the plaintiff prevails on these four issues, a fifth issue arises, which is: how should damages be determined? These issues are now addressed.

### III. LEGAL ANALYSIS

#### A. The Affirmative Defenses

I first consider the affirmative defenses because, if accepted, they would obviate the need to determine the "merger validity" issues.

#### 1. The Unclean Hands Defense

The defendants argue that Cole is guilty of unclean hands because he violated his duties to the Partnership, and thereby created the need for the very merger he now attacks, which was necessary to assure that the Project could survive. The defendants claim that because Cole's failure to meet cash calls and to execute the loan refinance agreements jeopardized the Partnership's ability to survive, "the doors to the Court of Equity should be shut against [Cole]," who comes to this Court with unclean hands.[FN25]

> FN25. *Citing Bodley v. Jones,* Del.Supr.,

59 A.2d 463, 465 (1947); *see also Nakahara v. NS 1991 American Trust,* Del. Ch ., 718 A.2d 518, 522 (1998).

I cannot agree. Although Cole did violate his obligation to meet the cash calls and sign the loan refinance documents, that is not sufficient to bar him from seeking relief in equity. Nowhere did the Partnership Agreement specify that the consequence of a partner's failure to make cash calls would be the outright forfeiture of his or her Partnership interest. To validate that defense would give Cole's other partners license to treat him however unfairly they chose, without Cole having any legal recourse. That inequitable result would be a perverse application of the defense of unclean hands, which itself is a doctrine intended to accomplish equity. Where (as here) the Partnership Agreement does not address this nonpayment issue, to utilize that doctrine to fill that gap would be unduly harsh. To be sure, Cole should have to pay a price for his irresponsible abdications. But in these circumstances the forfeiture of his Partnership Interest would be too high a price.

*5 Accordingly, the unclean hands defense must be rejected.[FN26]

> FN26. As discussed elsewhere in this Opinion, Cole's abdication of responsibility will be accounted for as a downward adjustment to the damages to be awarded.

#### 2. The Argument That Cole Ceased Being a Partner in 1991-92

The defendants next contend that Cole was not a partner at the time of the merger, because during the 1991-1992 period, his conduct either (i) constituted an abandonment of the Partnership, or (ii) operated legally as a dissolution of the Partnership.

The abandonment argument is said to rest upon *Pan American Trade and Investment Corporation,*[FN27] where this Court found that no abandonment had occurred. Defendants urge, despite that result, that the analysis employed in *Pan American* would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

compel an opposite finding in this case. The defendants point to the *Pan American* Court's pronouncement that "[t]he relationship between ... partners, is fiduciary in character and imposes on all participants the utmost good faith, fairness, and honesty in dealing with each other" in connection with their venture; [FN28] and its finding that there had been no abandonment because the record " clearly sustain[ed] a finding that [plaintiff] performed his part of the bargain" and clearly established that "[plaintiff] did not at any time discontinue his efforts" in connection with the venture.[FN29] Here by way of contrast (the defendants argue), Cole's failure to meet cash calls, to communicate with his partners, and to sign the loan refinance documents, establish that he did not " perform[ ] his part of the bargain," and that he had " discontinue[d] his efforts" in connection with the venture.

> FN27. Del. Ch., 154 A.2d 151 (1959).

> FN28. *Id.* at 154 (citations omitted).

> FN29. *Id.* at 155.

Alternatively, the defendants argue that even if Cole's conduct did not constitute an abandonment, it did operate as a dissolution of the Partnership. The argument runs as follows: the partnership statute defines dissolution as a "change in relation of the partners caused by any partner ceasing to be associated in the carrying on ... of the business." [FN30] Dissolution results from the express will of any partner at any time, whether stated directly or implied from conduct indicating that partner's abandonment of the partnership.[FN31] The defendants contend that Cole's failure to make cash calls, to communicate with his partners, and to sign the refinance loan documents epitomized the " change in relation" that either automatically worked a dissolution of the Partnership under 6 *Del. C.* § 1531, or at the very least, justifies a decree that the Partnership was dissolved at the time this conduct occurred .[FN32]

> FN30. 6 *Del.C.* § 1529.

> FN31. 6 *Del.C.* § 1531(2); *See also* 1 *Rowley on Partnership* § 31.2 (2d ed.).

> FN32. The Delaware partnership statute, 6 *Del.C.* §§ 1532(a)(3)(4)(6), pertinently provides that the Court "shall decree a dissolution" whenever one partner:
> "(a) has been guilty of such conduct as tends to prejudicially affect the carrying on of the partnership's business;
> (b) willfully or persistently commits a breach of the parties' agreement or conducts himself in matters relating to the partnership so that it is not reasonably practicable to carry on the business in partnership with him; or
> (c) otherwise acts in such a way that renders dissolution equitable under the circumstances."

Neither argument, in my opinion, has merit. Both positions are flatly inconsistent with the defendants' professed rationale for eliminating Cole from the venture, which is that Cole *was* a partner, and that the remaining partners had no choice but to eliminate Cole as a partner if the Partnership was to obtain the financing needed for its survival. The record, moreover, is devoid of any evidence that at any time before the merger or before this litigation was commenced, the defendants ever took the position that Cole had abandoned the Partnership or that his conduct had caused its dissolution. Accordingly, these counterfactual arguments have the earmarks of a litigation-driven contrivance.

**\*6** Moreover, those contentions, in these circumstances, are inequitable. There is no evidence that the defendants ever informed Cole of their legal position or that they intended to eliminate his interest in the Partnership. I do not doubt that the defendants reasonably believed that Cole had abandoned the Partnership or that the defendants were acting in good faith. But the defendants' benign mental state cannot justify their eliminating Cole as a partner without affording him prior notice and an opportunity to protect his interests.

The Court's rejection of these threshold defenses brings to the forefront the substantive merger

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 7

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

validity issues, which are next evaluated.

### B. The Statutory Validity of the Merger

The plaintiff first attacks the statutory validity of the merger, on the basis that neither the Partnership Agreement nor the general partnership statute authorized a merger between an LLC and a general partnership. Cole acknowledges that § 209 of the Delaware Limited Liability Company Act, which was then in force, did permit an LLC to merge with a partnership. He argues, however, that the fact that LLCs could legally merge with partnerships does not establish the converse, *i.e.,* that partnerships were legally authorized to merge with LLCs.

Alternatively, Cole argues that even if § 209 is read to authorize the Partnership to merge with BARKE, that provision should not be applied here because the Partnership was formed before the LLC statute was enacted, and therefore the application of § 209 to this merger would be impermissibly retroactive. Finally, Cole contends that in any event, the merger did not dissolve the Partnership, because it did not effect a dissolution under either the Delaware Uniform Partnership Law ("DUPL") or the Partnership Agreement.

I cannot accept these arguments. Although neither the Partnership Agreement nor the DUPL contained a provision expressly authorizing mergers of general partnerships with other entities, that does not end the analysis. The DUPL directed that "[i]n any case not provided for in this chapter the rules of law and equity ... shall govern." [FN33] One of those "rules of law" was Section 209 of Delaware's then-applicable LLC statute, which expressly authorized a merger of a Delaware LLC into a partnership:

FN33. 6 *Del.C.* § 1505.

Pursuant to an agreement of merger or consolidation, a domestic limited liability company may merge or consolidate with or into 1 or more domestic limited liability companies or other business entities formed or organized under the law as of the State of Delaware or any other state of the United States or any foreign country or other foreign jurisdiction, with such domestic limited liability company or other business entity as the agreements shall provide being the surviving or resulting domestic limited liability company or other business entity.

As used in this section, "other business entity" means a corporation, or a business trust or association, a real estate investment trust, a common law trust, or any other unincorporated business, including a partnership (whether general or limited), and a foreign limited liability company, but excluding a domestic limited liability company. [FN34]

FN34. 6 *Del.C.* §§ 18-209(a)-(b).

*7 If this provision, explicitly authorizing LLCs to merge with general partnerships, is to have meaning, the General Assembly must be presumed to have intended that such a merger could go in either direction, *i.e.,* that LLCs would be allowed to merge with general partnerships, or the reverse. Therefore, the fact that the general partnership statute was silent on the subject is of no moment. The LLC statute was not silent, and, accordingly, authorized the merger.

Cole next contends that because Churchtown was formed before the LLC statute became effective in 1992, applying that statute to this merger would constitute an impermissible retroactive application. This argument is unfounded, because nothing in the LLC statute limits its applicability to merging entities that were formed after the statute was enacted.[FN35] Accordingly, the relevant time for applying the statute is the date of the merger, not the earlier date on which the Partnership was formed.[FN36] The merger here occurred on October 1, 1993, *after* the statute had become effective, for which reason the application of the LLC statute is prospective, not retroactive.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                Page 8

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN35. *See* 6 *Del.C.* §§ 18-209; *compare with* 6 *Del.C.* § 2301(a) (expressly restricting application to certain dates of occurrence.)

FN36. *See id.*

I further conclude (contrary to Cole's position) that the effect of the merger was to dissolve Churchtown. To dissolve a general partnership, the DUPL required either the "express will of all the partners" or that a dissolution by expulsion of a partner be "in accordance with such powers conferred by agreement." [FN37] In this case, the relevant "powers conferred by agreement" are found in Section 17(a)(iii) of the Partnership Agreement, which provided that:

FN37. 6 *Del.C.* § 1531.

The Partnership is dissolved *by operation of law,* other than by reason of the bankruptcy, incompetency, death, dissolution, termination or withdrawal of any Partner where the business of the Partnership is carried on without termination or winding up as provided ... (emphasis added)
Here, the merger operated as a dissolution by "operation of law," because as a result, the Partnership ceased to exist and its assets and liabilities passed to BARKE as the surviving entity. [FN38] Therefore, the dissolution of Churchtown was "in accordance with such powers conferred by agreement" within the meaning of 6 *Del. C.* § 1531.

FN38. Churchtown Partnership Agreement, Section 17(a)(iii).

The statutory validity and the legal effect of the merger having been determined, I now turn to the plaintiff's equitable validity claim, *i.e.,* that the merger was not entirely fair to Cole.

C. The Equitable Validity of the Merger

All parties agree that entire fairness is the applicable standard of review, [FN39] and that under that standard the defendants have "the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." [FN40] Entire fairness has two components: fair dealing and fair price.[FN41] Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." [FN42] Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." [FN43]

FN39. Def. Ans. Br. at 29.

FN40. *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983).

FN41. *See id.* at 711.

FN42. *Id.*

FN43. *Id.*

1. Fair Dealing

*8 The defendants contend that even though their merger decision making process was imperfect, it should not be found unfair. The reason (defendants say) is that Cole's conduct was so egregious that he should not be entitled to the same level of fair treatment that would be required in different circumstances.[FN44] More specifically, defendants insist, Churchtown was a privately-held nearly insolvent partnership, and the types of procedural safeguards normally required in mergers of large publicly held corporations should not be mandated in this quite different setting. Based on this premise, the defendants freely concede that while Cole did not receive advance notice of the merger, that process failure should be regarded as "immaterial" and as "a detail that simply did not get done." [FN45]

FN44. As defendants argue in their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Answering Brief (at page 29): "What is " fair depends entirely on the circumstances and what is "entirely fair" is-if possible-even more bound to the "entire" factual context.... For two years, Mr. Cole refused to live up to his obligations, refused to communicate, and left his partners in the lurch. He had, in fact, betrayed their trust and breached his duties to them. The defendants were therefore clearly entitled to deal with the problems Mr. Cole's conduct was causing and was likely to cause in the future." The defendants' arguments beg the issue, however, which is not *whether* they were entitled to deal with those problems, but *how.*

FN45. *Id.* at 30.

The argument does not withstand scrutiny. Procedures designed to ensure fair process in the context of small enterprises may indeed differ (within limits) from those required in the context of larger corporations. But certain "fair process" procedures are fundamental and cannot be dispensed with. One of them is advance notice of a transaction that may be adverse to a partner's interests .FN46 Here, Cole did not receive notice of the merger and its elimination of his partnership interest until almost nine months after the merger became effective.FN47 That failure to provide adequate and timely notice deprived Cole of any opportunity to seek injunctive relief or otherwise to protect his interest, such as (for example) by negotiating (either directly or through counsel) better merger terms. The second-and in this case, fatal-process failure was that the valuation of Cole's partnership interest was accomplished unilaterally by self-interested parties (the individual defendants), unaided by any independent or disinterested valuation advice.

FN46. *See Kumar v. Racing Corp. of America, Inc.,* Del. Ch., C.A. No. 12039, Mem. Op. at 12, Berger, V.C. (Apr. 26, 1991) ("Although the procedures followed in the merger of a small corporation may

not normally be as elaborate as those followed by larger companies, fair dealing is still required. Here, there seems to have been no effort to negotiate with anyone on behalf of the public minority stockholders or plaintiffs. Beyond the absence of negotiations, it appears that there was a deliberate effort to keep plaintiffs in the dark and thereby prevent them from protecting their rights. How else can one explain the failure to give Kumar, a large stockholder and a director, any notice of the proposed merger ...")

FN47. Cole Dep. at 17-18.

Accordingly, the defendants have failed to establish that the merger was the product of fair dealing.

### 2. Fair Price

The defendants paid Cole $2,000 based on their unilateral valuation of his 12.5% partnership interest as of 1991, the year Cole ceased making cash call payments. The defendants argue that $2,000 represented the "fair price" for Cole's partnership interest. They are wrong.

The basis for $2,000 payment was a 1991 valuation of the Partnership's land, not a valuation made as of the October 1993 merger date. It is undisputed that the value of the Partnership's assets as of the merger date was considerably greater than its value two years earlier. The 1991 value was based on an appraisal of the raw land at historical cost,FN48 with no worth ascribed to its future earning capacity. But by 1993, Churchtown had become a viable enterprise that had substantial going concern value, the source of which was not limited to raw land. That value also derived from Churchtown's contractual arrangements with Corrozzi and from the development value of the subdivision that had recently received approval.FN49 Under no circumstances could the $2,000 payment have represented the "fair price" to which Cole was entitled as compensation for the surreptitious appropriation of his Partnership interest.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 10

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN48. PX 43.

FN49. PX 40, 81-82.

**\*9** Because I conclude that the defendants have not
met their burden to demonstrate that the merger was
entirely fair either as to process or price, Cole is
entitled to a remedy. I find the appropriate remedy
to be an award of damages measured by Cole's
proportionate share of the fair value of the
Partnership, calculated as of the October 1, 1993
merger date. How that award is to be determined is
the issue next discussed.

### D. The Appropriate Damage Award

The final issue is the amount of damages to which
Cole is entitled. The Court has determined that the
merger effected a dissolution of the Partnership on
October 1, 1993 and that Cole remained a
Churchtown partner until that time. It therefore
follows that Cole is entitled to his proportionate
share (12.5%) of the Partnership's net worth as of
October 1, 1993,[FN50] adjusted downwards to
account for the incremental risk Cole inflicted upon
the remaining partners by his refusal to pay the cash
calls and to execute the loan refinancing documents.
The contested evidence of these values is now
analyzed.

> FN50. The Partnership's net worth is the
> fair market value of the Partnership's assets
> at that time, less the Partnership's
> liabilities. *See* Churchtown Partnership
> Agreement Section 16(b) which provides
> that: "... [the] Partnership interest under
> this Section 16 shall be an amount
> determined as of the end of the latest fiscal
> quarter of the Partnership immediately
> preceding the Event of Withdrawal equal
> to the percentage of the fair market value
> of the net assets of the Partnership which is
> the same as the percentage of the
> Withdrawing Partner's interest in the
> profits and losses of the Partnership."

1. The Value of the Partnership's Assets as of

October 1993

As of October 1, 1993, the Partnership's assets
consisted of 201 residential lots, plus approximately
240 acres that were set aside to build the golf course
("the Project"). The question is: what was the fair
market value of the 201 lots and the golf course as
of that date? In an effort to address that issue, each
side engaged an expert to value the Project as of
October 1, 1993 and earlier dates, and to testify at
trial on those subjects.

#### a. The Value of the 201 Lots

Respecting the value of the 201 lots, the parties
dispute which valuation method-the discounted cash
flow method ("DCF") or the Sales Comparison
Approach ("SCA")-is the more appropriate. The
plaintiff's expert, Mr. David Wilk, relied primarily
on the DCF method to value the lots, although he
did use the SCA as well. Mr. Wilk concluded that
the value of each lot was $13,500, yielding a total
value of $2,713,500 (201 $13,500). The
defendants' expert, Mr. Thomas Mummaw, relied
solely upon the SCA to arrive at his valuation of
$8,000 per lot, for a total of $1,608,000.

The defendants challenge Mr. Wilk's reliance on the
DCF approach, arguing that it is inappropriate in
this case because as of October 1993, little progress
had been made on the Project and reliable
information that was critical to any DCF analysis
was not available at that time. I agree.

The underlying conceptual premise of the DCF
valuation method is that the value of the property
being appraised is the worth of its future benefits,
measured by the present value of its future cash
flow.[FN51] To value the lots under the DCF
method, the following information was required:
comparable rental data, market vacancy rates,
operating expenses, holding costs, and the
anticipated yield requirements of investors for the
class and type of property being valued.[FN52]
Because as of October 1993 all that existed was raw
unimproved land, that information was not
available, and as a result Mr. Wilk's use of the DCF
method required him to make assumptions that were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

speculative and unreliable.[FN53] I conclude, for those reasons, and in these specific circumstances, that the DCF method was not the most appropriate or reliable of the available valuation approaches.

> FN51. PX 126 at 8.

> FN52. DX 133 at 38; Tr. at 658.

> FN53. For example, in selecting the site development costs, Mr. Wilk relied entirely upon Mr. Cole's estimation of those costs (Tr. at 261-62), which was only one third of the actual expenses (DX 123) and only one half of the estimate for costs made by the partners at the outset of construction (PX 45 at 5). These costs were not increased for inflation, although Mr. Wilk used an inflation factor to account for increases in the lot prices (Tr. at 262). Moreover, he spread the costs evenly over a 10-year period, even though at trial he admitted that a large portion of the site costs for a real-estate project are incurred up front (Tr. at 262-63).

**\*10** Of the two valuation methods utilized, the SCA is the more reliable. That approach requires ascertaining what it would cost to acquire, without undue delay, a parcel of property comparable to the property being valued. [FN54] The SCA approach requires that comparable properties be identified and that the sale price of those properties then be adjusted for significant differences between the subject property and the comparables.

> FN54. *Id.*

Both experts valued the 201 lots using the SCA. As earlier noted, the plaintiff's expert, Mr. Wilk, valued the 201 lots at $13,500 per lot, for a total of $2,713,500, while the defendants' expert, Mr. Mummaw, valued the lots at $8,000 per lot, for a total of $1,608,000. After considering the experts' reports, the testimony, and the arguments relating thereto, I conclude that Mr. Mummaw's valuation more reliably represents the fair value of the 201

lots at the time of the merger. Mr. Wilk's valuation analysis is less reliable and persuasive, both because of the comparable properties he selected and the price adjustments he made to those properties.

Mr. Wilk selected as comparables five properties that had been sold between February 1992 and July 1994. All five properties had been approved for subdivision development, and like the subject Property, had not yet been improved with any new construction. In performing his valuation, however, Mr. Wilk made errors. First, he assumed the 201 lots comprised, all told, 70 acres, whereas in fact they occupied almost 211 acres.[FN55] Mr. Wilk conceded that larger parcels are worth less per lot, but made no adjustment to account for that fact. [FN56]

> FN55. Tr. at 235. Because of that incorrect assumption, the 201 lots being valued had far greater acreage than did the comparable properties. Tr. at 235 (the comparables were between 41 and 83 acres in size).

> FN56. Tr. at 253.

Mr. Wilk also erred in adjusting his comparables. Of his five comparables, only two-Sale Number 2 and Sale Number 3-had per lot prices (before adjustments) above Wilk's $13,500 per lot price. At trial Mr. Wilk admitted that Sale Number 2 was not a good comparable, and also conceded that Sale number 3 was not a good comparable either.[FN57] Thus, by his own admission, the two sales used to establish the upper end of the value range of Mr. Wilk's comparables were flawed. Accordingly, I conclude that Mr. Wilk's $13,500 per lot valuation is artificially high.

> FN57. Tr. at 238. ("Unfortunately, as I discovered in deposition, sale number 3 was not a good comparable ...")

The defendants' expert, Mr. Mummaw, used three comparables to arrive at his valuation of the lots. The plaintiff attacks only Mr. Mummaw's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 12

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
(Cite as: Not Reported in A.2d)

experience, stressing that he had never appraised a major residential subdivision in Delaware.[FN58] Plaintiff does not, however, challenge the substance of Mr. Mummaw's valuation, including the selection of comparable properties or his price adjustments to those comparables. I find that inexperience alone is not sufficient to discredit an expert absent evidence that the inexperience affected his valuation. Because no such evidence was presented, I accept Mr. Mummaw's $1,608,000 valuation of the 201 lots.

FN58. Pl. Reply Br. at 26.

b. The Value of the Golf Course

With respect to the golf course parcel, the basic dispute concerns whether that parcel should be valued as if it were approved or unapproved. The undisputed facts are that official approval had not been obtained as of October 1993; however, the land had received a zoning variance, and all that remained was for the Partnership to actually submit a golf course record plan to the County.

*11 The defendants take the position that because the golf course had not been approved as of the October 1993 merger date, and because it was oddly shaped, that parcel had a low value because it would be extremely difficult to develop. The defendants argue that the golf course land was, "a winding tract between the lots at Back Creek, with a shape that somewhat resembles a flattened squid."[FN59] Because of its shape and the legal restrictions on the Property, defendants say, the practical difficulties facing anyone who wanted to build on that parcel would have been far greater than for the parcels Mr. Wilk used as his comparables.

FN59. Def. Post-trial Br. at 40.

The plaintiff, on the other hand, portrays the golf course land as having been virtually approved. He emphasizes the substantial evidence that the land would not be used for anything other than a golf course and that it had already been granted a variance for that use.

Neither analysis portrays the complete reality of what eventually would become the golf course property. The plaintiff's position-which assumes that the parcel had already received approval-is too generous, while the defendants' view-that the property was too difficult to develop as a golf course-is overly conservative. In reality, as of October 1993, what was to become the eventual golf course property had been all but formally approved. For that reason, I conclude that a fair valuation (like "the truth") lies somewhere in between the parties' valuation positions. Mr. Wilk valued the approximately 237 acres that were earmarked for development as an 18-hole golf course, at $6,000 per acre. Mr. Mummaw valued the land at $4,000 per acre. In my view, the more likely fair value of the golf course property as of October 1993 is "in between"-$5,000 per acre. I therefore determine $5,000 per acre as the value of the golf course parcel, for a total value of $1,200,000.[FN60]

FN60. This total assumes that the golf course occupied 240 acres.

2. Adjustments

My findings that as of October 1, 1993 the 201 lots were worth $8,000 per lot, and that the (eventual) golf course property was worth $5,000 per acre, do not conclude the damages analysis. Two further deductions are needed before Cole's damages can be determined: (1) the Partnership's debts and expenses as of October 1993, and (2) an amount attributable to Cole's failure to meet cash calls and to sign the loan refinancing documents. Because the record is not sufficiently developed or clear as to what the Partnership's debts and expenses were of October 1993, I request that the parties submit to the Court supplemental memoranda addressing this point. The memoranda shall also address the appropriate rate of interest that should be added to the amount of Cole's unpaid cash calls.

Moreover, a further, separate adjustment must be made to the damages award to account for Cole's failure to meet the cash calls between 1991 and October 1993, and for the risks and expenses of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 13

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Partnership being borne entirely by the other partners. Without an adjustment to reflect that fact, Cole would receive a larger *pro rata* share of the value of Churchtown's assets than what (in my view) would be fair.

*\*12* Not surprisingly, the parties cannot agree on how to determine that adjustment. Mr. Cole urges that he should be permitted to pay all of the $62,370 unpaid post-1991 cash call payments now, and that that amount should be deducted from his damage award. Cole does not propose adding any interest to that deducted amount, even though most of it has gone unpaid for over seven years.

The defendants urge that the most appropriate way to make the adjustment is to decrease Cole's percentage interest in the Partnership, to reflect the lesser degree of risk that he assumed from and after 1991 until the merger. At trial the defendants established that as of October 1993, Cole had made only 59% of his required contributions. Accordingly, the defendants propose that Cole's 12.5% interest in the Partnership be adjusted downwards by 59%, thereby reducing his interest to 7.38%.

I cannot accept either approach in its entirety. Cole's proposal is flawed insofar as he fails to add interest to the principal amount of the unpaid cash calls. Interest is necessary in order to capture the time value of the money Cole failed to contribute. [FN61] Nor does Cole's approach account for the more speculative nature of the venture in October 1993, at which point the risk to the partners was far greater than it is today. Allowing Cole to pay his cash calls years after the fact, now that hindsight has established that the Project has succeeded, and without paying any interest, would unduly benefit Cole at his partners' expense.

> FN61. Recognizing that the Court might so hold, the plaintiff states that if an interest rate applies, the "rate [should be] equal to not more than 1% over the prime rate prevailing at WTC." Pl. Post-trial Rep. Br. at 27, fn. 16.

The defendants' proposal is even more problematic. While the defendants' approach may account theoretically for the difference in relative risk, I am extremely reluctant to diminish Cole's Partnership interest percentage as a remedial matter, where neither the Partnership Agreement nor any Delaware statutory or case law cited to me validates that approach. For this Court to rewrite the Partnership Agreement to alter a partner's ownership interest without any legal basis, would clearly overreach.

I conclude that the most appropriate way to adjust for the risk and expense Cole should have (but did not) assume between 1991 and October 1993 is to require him to pay the principal amount he owes-approximately $62,370-plus interest at a rate that would reflect the rate of return an investor willing to buy into Cole's highly speculative position in the Partnership in 1991 would likely have demanded. That approach has the virtue of requiring Cole to account for both his fair share of the Partnership expenses, and for the risks he shirked. The parties' supplemental submissions should include argument as to what interest rate is most appropriate to accomplish this purpose.

### 3. Attorneys' Fees

Finally, the plaintiff argues that he is entitled to recover costs and attorneys' fees. He claims entitlement on the basis that the defendants acted in bad faith by effecting a merger that they knew would terminate Cole's interest in the venture, yet provide no notice to Cole.

This claim lacks merit. Although I agree that the defendants would have been well advised to seek a pre-merger judicial declaration of the rights of the parties and of the value of Cole's interest, and although the defendants were in any event obligated to give Cole advance notice of the merger, their failure to take these steps does not establish that they acted in bad faith. Indeed, I have found that the defendants, reasonably and in good faith, proceeded with the merger as the only way to ensure that the venture would be able to continue. To be sure, the manner that the defendants chose to effectuate the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

merger violated their fiduciary duty, but that the
conduct did not rise to the level of egregiousness
required to justify fee shifting. The defendants'
request for attorneys' fees is therefore denied.

### IV. CONCLUSION

Counsel for the parties shall confer and submit a
form of order that implements the rulings made
herein.

Del.Ch.,2000.
Cole v. Kershaw
Not Reported in A.2d, 2000 WL 1206672 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 4



Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
John A. GENTILE, Victoria S. Cashman, Bradley
T. Martin, John Knight, and Dyad Partners, LLC,
Plaintiffs,
v.
Pasquale David ROSSETTE, Douglas W. Bachelor,
and Leasenet Group, Inc., an Ohio corporation, as
successor by merger to LeaseNet Group, Inc., a
Delaware corporation, Defendants.
**No. Civ.A. 20213-NC.**

Submitted June 2, 2005.
Decided Oct. 20, 2005.

David A. Jenkins, and Joelle E. Polesky, of Smith
Katzenstein & Furlow LLP, Wilmington, Delaware,
and John L. Reed, of Edwards & Angell,
Wilmington, Delaware, for Plaintiffs.
Jesse A. Finkelstein, of Richards, Layton & Finger,
P.A., Wilmington, Delaware, J. Travis Laster, of
Abrams & Laster, LLP, Wilmington, Delaware, and
Shawn T. Carnathan, and Alan J. Langton, of
Quigley, O'Connor & Carnathan LLC, Burlington,
Massachusetts, for Defendants.

MEMORANDUM OPINION
NOBLE, Vice Chancellor.
*1 SinglePoint Financial, Inc. ("SinglePoint" or the
"Company") was a software development company
that never produced a commercially viable product
and never generated a sustained revenue stream.[FN1]
It survived only because Defendant Pasquale David
Rossette ("Rossette"), its majority shareholder,
regularly provided desperately needed infusions of
cash to meet operating obligations.[FN2] The
Plaintiffs, former shareholders of SinglePoint,[FN3]
which merged into a subsidiary of Cofiniti, Inc. in
2000, [FN4] bring this action for breach of fiduciary
duty against its two directors, Rossette and

Defendant Douglas W. Bachelor ("Bachelor").
They challenge, as an unwarranted dilution of their
equity interests and voting power in SinglePoint, the
conversion of some of the debt held by Rossette
into SinglePoint common stock at an unfairly and
unreasonably low conversion rate. They also
challenge special benefits that Rossette received as
part of the merger-additional consideration upon
which he conditioned his approval of the merger.

> FN1. Affidavit of Douglas Bachelor ("
> Bachelor Aff.") ¶¶ 3, 8.

> FN2. *Id.* ¶ 3.

> FN3. The Plaintiffs are John A. Gentile,
> Victoria S. Cashman, Bradley T. Martin,
> John Knight, and Dyad Partners, LLC
> (collectively, the "Plaintiffs").

> FN4. Affidavit of James B. Radebaugh ("
> Radebaugh Aff.") Ex. 23 (Agreement and
> Plan of Reorganization by and among
> MarketKnowledge, Inc. Cosmo Merger
> Corp., and SinglePoint Financial, Inc.,
> Sept. 15, 2000 (the "Merger Agreement")).
> MarketKnowledge adopted the Cofiniti
> name shortly before consummation of the
> merger.

Rossette and Bachelor now seek summary
judgment. First, they claim that the Plaintiffs' claims
are all derivative in nature and, thus, the Plaintiffs
lost standing to pursue their claims upon completion
of the merger. Second, they assert that they are
entitled to judgment as a matter of law on the merits
of the Plaintiffs' substantive claims as well. For the
reasons set forth below, the Plaintiffs' claims of
dilution are derivative in nature and must be
dismissed. Whether the claims premised upon the
separate consideration received by Rossette as part
of the merger are direct claims cannot be resolved
on the current record, and the Defendants have not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                   Page 2

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
(Cite as: Not Reported in A.2d)

demonstrated that, on the undisputed facts, they are entitled to judgment as a matter of law.

## I. BACKGROUND

### A. *The Company*

In 1995, Plaintiff Gentile and Defendant Bachelor, who were acquaintances and co-workers, discussed forming a new software company together.[FN5] Later that year, Gentile and Bachelor presented their idea to Rossette, a childhood friend of Gentile, who agreed to provide an initial investment.[FN6] As a result of their agreement, on March 19, 1996, Gentile, Rossette, and Bachelor formed the company that would come to be known as SinglePoint,[FN7] a "high technology financial services company" that "support[ed] financial advisors and their clients with the ability to manage assets online." [FN8] The Company failed to develop a commercially viable product and to produce significant revenues.[FN9] Faced with tremendous financial difficulties throughout its existence (1996-2000), the Company turned to Rossette-who was SinglePoint's sole source of additional funds-several times for financial assistance. [FN10]

FN5. Bachelor Aff. ¶ 4.

FN6. *Id.* ¶ 5; Deposition of David Pasquale Rossette ("Rossette Dep.") at 17.

FN7. Bachelor Aff. ¶ 6. The Company, a Delaware corporation originally called New Horizons Technology, changed its name to OpTeamaSoft in June 1997, and finally in 1999, to SinglePoint Financial, Inc. *Id.;* Bachelor Dep. at 7-8; Radebaugh Aff., Ex. 14 (Board Minutes, July 26, 1999).

FN8. Affidavit of Joelle E. Polesky (" Polesky Aff."), Ex. 16 (SinglePoint Financial, Inc. Information Statement, Oct. 13, 2000 (the "Information Statement")) at 2.

FN9. Bachelor Aff. ¶ 3.

FN10. *Id.*

Gentile, Rossette, and Bachelor served as the initial directors of the Company.[FN11] Gentile was the first President and Chief Executive Officer ("CEO") and Bachelor was the Chief Technology Officer. [FN12] When the Company encountered difficulties, it relied, as was its practice, upon Rossette for more funding.[FN13] After having to make several additional cash infusions in 1998, Rossette insisted that Gentile be replaced as President before Rossette would make any more funds available. [FN14] Gentile's replacement, Christopher McGrath, resigned less than one year later, and Bachelor became the new CEO.[FN15] The Company continued to struggle though, and in April 1999, Rossette decided to take over as CEO, a position that he held throughout the balance of SinglePoint's existence.[FN16]

FN11. *Id.* ¶ 7; Rossette Dep. at 19-20.

FN12. Bachelor Aff. ¶ 7. Bachelor initially served in a part-time capacity. *Id.* He was named Chief Technology Officer in June 1997. *Id.* ¶ 2.

FN13. *Id.* ¶ 3.

FN14. Bachelor Aff. ¶¶ 11-13. During the months of June and July 1999, Gentile was terminated as an officer and removed from the Board of Directors. *Id.* ¶ 25. With Gentile gone, Rossette and Bachelor comprised the Board in its entirety. *See* Radebaugh Aff., Ex. 14 (Board Minutes, July 26, 1999).

FN15. Affidavit of Christopher McGrath (" McGrath Aff.") ¶ 1; Bachelor Aff. ¶ 19.

FN16. Bachelor Aff. ¶ 21; Rossette Dep. at 23.

### B. *The Debt Conversion*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*2** As of March 2000, Rossette had advanced more than $3 million to the Company.[FN17] In consideration of this financing, Rossette had received promissory notes that were convertible into shares of SinglePoint common stock. [FN18] The initial conversion rate was $1.33 per share. [FN19] On November 1, 1997, the rate was dropped to $0.75 per share,[FN20] and, on October 23, 1999, the rate was lowered once more to $0.50 per share. [FN21]

> FN17. Radebaugh Aff., Ex. 18 (Board Minutes, Mar. 27, 2000).
>
> FN18. Poleksy Aff. Ex. 1 (Stock Purchase Agreement, June 7, 1997).
>
> FN19. *Id.*
>
> FN20. Poleksy Aff., Ex. 2 (Stock Purchase Agreement, Nov. 1, 1997). In 1999, SinglePoint converted $460,620 of the debt owed to Rossette at a rate of $0.75 per share. Radebaugh Aff., Ex. 11 (Debt Conversion Agreement, Jan. 13, 1999) at A 0843-46.
>
> FN21. Polesky Aff., Ex. 4 (Amended Loan Agreement, Oct. 23, 1999).

SinglePoint's capital structure, before March 27, 2000, principally consisted of almost 6,000,000 outstanding shares of common stock and debt payable to Rossette. Rossette believed that the large amount of debt owed SinglePoint deterred investment by third parties.[FN22] To ameliorate this problem, Rossette decided to exercise his option under the promissory notes to convert a substantial portion of his debt holdings into equity holdings in the Company. [FN23] Instead of employing the contractually agreed upon conversion rate of $0.50 per share, Rossette and Bachelor agreed to a substantially lower rate of $0.05 per share.[FN24]

> FN22. Bachelor Aff. ¶ 40.
>
> FN23. *Id.;* Rossette Dep. at 128-29.

> FN24. Rossette Dep. at 128-33; Bachelor Aff. ¶ 42. Rossette personally retained The Harman Group Corporate Finance, Inc. (the "Harman Group") to render a fairness opinion regarding whether the new debt conversion ratio was fair to SinglePoint. Rossette Dep. at 157. The Harman Group concluded that the fair value of SinglePoint common stock was $0.04 per share. Polesky Aff., Ex. 10 (The Harman Group Fairness Opinion, Mar. 27, 2000) at 3. Plaintiffs challenge the independence of the experts chosen by Rossette and put forth facts that call into question the accuracy of such a conclusion. For example, Rossette and Bachelor voted to increase the exercise price of employee stock options from $0.50 per share to $0.75 per share just 17 days before approving the $0.05 per share rate for Rossette's debt conversion. Rossette Dep. at 110-11 and Ex. 11 (Board Minutes, Mar 10, 2000). The employee stock option plan required that the exercise price for certain options be priced at fair market value. Polesky Aff., Ex. 5 (1997 Stock Option Plan § VII, ¶ 6.1). Thus, the inference is that Rossette and Bachelor believed that the fair market value per share of SinglePoint common stock was $0.75.

Rossette and Bachelor, the sole directors at that time,[FN25] convened a meeting of the Board at which it was agreed that more than $2.2 million of Rossette's debt would be converted into SinglePoint equity at a conversion rate of $0.05 per share.[FN26] As a result, the debt would be exchanged for 44,419,020 shares of SinglePoint common stock, instead of the approximately 4.4 million shares that Rossette would have received at the $0.50 per share conversion rate.[FN27]

> FN25. Radebaugh Aff., Ex. 14.
>
> FN26. Polesky Aff., Ex. 8 (Board Minutes, Mar. 27, 2000).
>
> FN27. *Id.* Later, there would be a 1-for-10

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

reverse stock split.

Rossette's debt holdings, however, would convert into more shares of common stock than were then authorized; thus, an amendment to the SinglePoint certificate of incorporation was needed.[FN28] Accordingly, at a Special Shareholders Meeting on March 27, 2000, the number of authorized shares was increased from 10,000,000 to 60,000,000.[FN29] Thereafter, under a new Debt Conversion Agreement, all but $1 million in principal of Rossette's debt holdings were converted into shares of common stock at a rate of one common share for every $0.05 of debt.[FN30] Before the conversion, Rossette held approximately 61.19% of SinglePoint's equity; after the conversion, he held 93.49% of SinglePoint's then issued and outstanding stock.[FN31]

FN28. Rossette Dep., Ex. 9 (Board Minutes, Mar. 10, 2000).

FN29. *Id.* Plaintiffs challenge the validity of this meeting and subsequent vote. Plaintiffs contend that the shareholders " received no notice of the dilution" because, although the shareholders were asked to vote on the authorization of additional shares, the underlying purpose of the authorization-the debt conversion-was not disclosed. Pls.' Answering Br. at 16.

FN30. Radebaugh Aff., Ex. 18. As a result of the Debt Conversion Agreement, SinglePoint further restructured its remaining obligations to Rossette and negotiated an additional $500,000 in credit with him. *Id.* The Board also executed a contract to provide Rossette $327,450 in compensation, should the Company experience a change in control. *Id.*

FN31. Radebaugh Aff., Ex. 19 (Board of Directors' Stock Analysis, Mar. 10, 2000 and Mar. 27, 2000).

C. *The Merger*

After the conversion, SinglePoint began looking for a possible acquiror. [FN32] As the result of negotiations with Rossette,[FN33] Cofiniti, SinglePoint's only direct competitor,[FN34] offered approximately $14 million of its stock for the Company's stock.[FN35] On September 15, 2000, SinglePoint entered into an Agreement and Plan of Reorganization pursuant to which Cosmo Merger Corp., a Delaware corporation wholly-owned by Cofiniti, was to merge into SinglePoint, with SinglePoint, the surviving entity, thus becoming a wholly-owned subsidiary of Cofiniti.[FN36] As consideration, SinglePoint shareholders would receive approximately 0.49 shares of Cofiniti common stock for each share of SinglePoint common stock.[FN37]

FN32. Rossette Aff. ¶ 3.

FN33. Bachelor Aff. ¶ 49.

FN34. Affidavit of Thomas Loch ("Loch Aff.") ¶ 10.

FN35. Bachelor played a minimal role in the negation process between Cofiniti and SinglePoint; Rossette stated that he handled all of the "material" negotiations himself. Rossette Dep. at 177-78.

FN36. Merger Agreement at A1312.

FN37. *Id.* This had an approximate value of $2.46 per share, based on Cofiniti's apparent market value of $5 per share. Information Statement at C-02364.

**\*3** In order to secure Rossette's approval of the Merger, Cofiniti offered Rossette benefits that were not shared with the other shareholders. These benefits included a "put," whereby Cofiniti, *inter alia,* was required to repurchase, in no later than one year, 360,000 shares of the Cofiniti stock Rossette received in the merger at a price of $5 per share, for a total of $1.8 million.[FN38] Because Cofiniti shares were not publicly traded,[FN39] thereby making it difficult for the minority shareholders to liquidate their shares, the put was a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 5

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

substantial benefit to Rossette.

> FN38. Rossette Dep., Ex. 30 (Agreement for the Sale and Purchase of Stock, Sept. 15, 2000, the "Repurchase Agreement").

> FN39. Information Statement at C-02364.

On October 13, 2000, SinglePoint issued an Information Statement regarding the Merger to its shareholders. The shareholders were told that, " approval of the merger is assumed because several of [the] large stockholders, representing in the aggregate approximately 96.8% of [the] outstanding common stock, have agreed to vote their shares in favor of the merger." [FN40] The Information Statement explained that Rossette had obtained certain benefits not shared with the other stockholders as a result of the Merger. The Information Statement, however, failed to disclose specifically that Rossette had conditioned his approval of the Merger on his receipt of the put agreement with Cofiniti, which entitled Rossette to receive $1.8 million in one year. It also failed to disclose that Rossette had obtained the put agreement. The Merger was approved by a majority of the minority shareholders.[FN41] The Plaintiffs neither consented to, nor voted their shares in favor of, the Merger.

> FN40. *Id.*

> FN41. Bachelor Aff. ¶ 53.

### D. *Post-Merger Events*

After the Merger, Cofiniti encountered many of the same problems that had thwarted SinglePoint's efforts. Within 18 months, Cofiniti had filed for bankruptcy and was later liquidated.[FN42] Rossette's put agreement, upon which the Plaintiffs have focused, was canceled. As a result of his efforts to support SinglePoint and Cofiniti, Rossette may have lost as much as $6 million. [FN43]

> FN42. On March 11, 2002, Cofiniti filed a

Chapter 7 bankruptcy petition. Rossette Aff. ¶ 8.

> FN43. *Id.* ¶ 6.

## II. CONTENTIONS

The Defendants' motion for summary judgment attacks Plaintiffs' claims for breach of fiduciary duties in connection with the Debt Conversion (Count I) and the Merger (Count II). Defendants assert that these claims are derivative in nature and, because of the Cofiniti merger, Plaintiffs lost standing to pursue them on behalf of SinglePoint. If either Count I or Count II is properly viewed as derivative in nature, it must be dismissed as a matter of law.

Defendants also assert that, regardless of whether the claims are derivative or direct, they are nonetheless entitled to summary judgment because the Plaintiffs have not advanced any viable claim for breach of fiduciary duty. Additionally, Defendants argue that an exculpation provision in SinglePoint's charter bars recovery for any breach of the duty of care. Finally, Defendants contend that they are entitled to summary judgment because the Plaintiffs have suffered no cognizable damages.

## III. APPLICABLE STANDARD

*\*4* Under Court of Chancery Rule 56, summary judgment may be granted only when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.[FN44] The Court must view the facts in the "light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that no material question of fact exists." [FN45] A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of [his] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial. If [he] does not so respond, summary judgment, if appropriate, shall be entered against [him]." [FN46] The Court "also maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                           Page 6

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
(Cite as: Not Reported in A.2d)

the law or its application." [FN47]

> FN44. Del. Ch. Ct. R. 56(c); *Motorola, Inc. v. Amkor Tech., Inc.,* 849 A.2d 931, 935 (Del.2004).

> FN45. *Cochran v. Stifel Fin. Corp.,* 2000 WL 1847676, at *4 (Del. Ch. Dec. 13, 2000), *aff'd in part, rev'd in part on other grounds,* 809 A.2d 555 (Del.2002).

> FN46. Del. Ch. Ct. R. 56(e).

> FN47. *Cooke v. Oolie,* 2000 WL 710199, at *11 (Del. Ch. May 24, 2000).

## IV. ANALYSIS

### A. *Distinguishing Between Direct and Derivative Claims*

The direct/derivative distinction is critical because, by reason of the Merger with Cofiniti, the Plaintiffs are no longer SinglePoint shareholders. Thus, they lack standing to bring a derivative claim on behalf of the Company. [FN48] On the other hand,

> FN48. *See, e.g., In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 998 (Del. Ch.2004) ("[A] merger which eliminates a shareholder's ownership of stock in a corporation also eliminates his or her status to bring a derivative suit on behalf of the corporation, on the theory that upon the merger the derivative rights pass to the surviving corporation which then has the sole right or standing to prosecute the action.") (citing *Lewis v. Anderson,* 477 A.2d 1040, 1045-46 (Del.1984)).

[a] direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder [of stock in the company at the time of the transaction]. An action in which the holder can prevail without showing an injury or breach of duty to the

corporation ... may be maintained by the holder in an individual capacity.[FN49]

> FN49. *Syncor,* 857 A.2d at 997 (quoting 2 A.L.I., Principles of Corporate Governance, Analysis & Recommendations § 7.02(b) at 17).

Whether a claim is derivative or direct depends " *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" [FN50] In answering these questions, the Court is to look beyond the words of complaint, into the " nature of the wrong alleged," [FN51] and after considering all of the facts, "determine for itself whether a direct claim exists." [FN52]

> FN50. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del.2004) (emphasis in original).

> FN51. *In re J.P. Morgan Chase & Co. S'holders Litig.,* 2005 WL 1076069, at *5 (Del. Ch. Apr. 29, 2005) (quoting *Syncor,* 857 A.2d at 997).

> FN52. *In re J.P. Morgan Chase,* 2005 WL 1076069, at *5 (quoting *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del. Ch.2004)).

### 1. *The Debt Conversion and Share Dilution*

Plaintiffs allege that the Debt Conversion, by which the SinglePoint board authorized the issuance of additional shares of the Company's common stock in order to convert into equity part of the debt owed to Rossette, "result[ed] in a massive dilution of the minority stockholders' interests." [FN53] Plaintiffs argue that the conversion rate ($0.05 per share) was inadequate and caused SinglePoint to issue "vastly more stock than it should have." [FN54]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN53. Pls.' Opening Br. at 12.

FN54. *Id.* at 33.

The Plaintiffs' contention that they were directly harmed by the alleged dilution fails as a matter of law. When a "board of directors authorizes the issuance of stock for no or grossly inadequate consideration, the corporation is directly injured and shareholders are injured derivatively ... [and] mere claims of dilution, *without more*, cannot convert a claim traditionally understood as derivative, into a direct one." [FN55] A dilution claim may be direct, however, if voting rights are harmed.[FN56] Stock dilution may produce a direct claim:

> FN55. *J.P. Morgan Chase,* 2005 WL 1076069, at *6 (internal quotations and citations omitted) (emphasis added). *See also Gatz v. Ponsoldt,* 2004 WL 3029868 (Del. Ch. Nov. 5, 2004).

> FN56. *See, e.g., Oliver v. Boston Univ.,* 2000 WL 1091480 (Del. Ch. July 18, 2000)
> .

**\*5** where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value *and* voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder. [FN57]

> FN57. *In re Paxson Comnc'n. Corp. S'holders Litig.,* 2001 WL 812028, at *5 (Del. Ch. July 12, 2001) (emphasis added).

Here, however, the minority shareholders' voting power was not materially decreased.[FN58] Rossette owned a controlling interest both before (61%), and after (93%), the challenged Debt Conversion.[FN59] As minority shareholders to begin with, Plaintiffs' voting power was not materially changed.[FN60]

> FN58. In contrast, dilution claims emphasizing the diminishment of voting power have been categorized as direct claims. *See, e.g., Oliver,* 2000 WL 1091480, at *6.

> FN59. The Plaintiffs have not argued that the Debt Conversion impacted voting rights because a corporate parent (of course, not the circumstances here at the time) controlling at least 90% of shares can use a short-form merger to divest the minority shareholders of their equity interest without any shareholder vote. *See* 8 *Del.C.* § 253.

> FN60. *See, e.g., Agostino v. Hicks,* 845 A.2d 1110, 1124 (Del. Ch.2004) (finding no cognizable loss of voting power where the plaintiffs held only a minority interest before the challenged transaction).

The issuance of additional stock necessarily reduces the proportional voting power of those shareholders who do not maintain their same percentage of the total number of outstanding shares. Thus, dilution typically is a consequence of any effort to raise funds through the issuance of new shares. It may be done for good purposes or for bad purposes. Here, by selling its shares too cheaply-the core of Plaintiffs' attack-SinglePoint lost-perhaps only theoretically in light of its unhappy fiscal condition-the ability to sell those shares for a better price. That loss, while hurting the shareholders in the sense that any corporate loss hurts shareholders, was the Company's loss; the remedy would be either to cancel the shares (thereby affording the Company the opportunity to sell the shares for fair value) or to require the acquirer to pay fair value (thereby conferring a financial benefit on the Company). Thus, this is an instance where the Company suffered the harm and any remedy would be for the benefit of the Company. As such, under *Tooley,* the claim is derivative.[FN61]

> FN61. The Plaintiffs view the exchange of debt for stock as a recapitalization. After all, they argue, stock was issued, but no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

cash was received. Pls.' Answering Br. at 33. There are, of course, instances where a recapitalization can give rise to direct claims. *See, e.g., Acker v. Transurgical, Inc.,* 2004 WL 1230945 (Del. Ch. Apr. 22, 2004), because it will reallocate rights among shareholders without causing any consequences to the corporation. The debt conversion in this instance, if one accepts Plaintiffs' allegations, did cause harm to the Company and, if the Company sold those share too cheaply, whether payment was through debt cancellation or the receipt of cash makes no difference for these purposes.

Because the Plaintiffs' challenge to the Debt Conversion may only be brought derivatively by the Company's shareholders, the Plaintiffs lost standing to pursue that claim upon completion of the Merger. Accordingly, the Defendants are entitled to summary judgment dismissing Count I of the Complaint.

### 2. *The Merger*

The Plaintiffs also challenge the stock-for-stock merger of SinglePoint and Cofiniti. They contend that Rossette conditioned his approval of the Merger on receipt of special benefits, not available to the other shareholders, and that, because of his conduct, the Merger process was unfair and the consideration which they received from the Merger was also unfair. The focus is on the put provided by the Repurchase Agreement.[FN62] The Plaintiffs point out that a reallocation of the Merger proceeds would benefit them directly. The parties' debate revolves around *Parnes* [FN63] and *Kramer.*[FN64] In both *Kramer* and *Parnes,* the shareholders alleged that they suffered a direct injury as a result of unfair transactions that occurred in connection with a merger.[FN65] The cases had strikingly different outcomes.

FN62. The Plaintiffs also complain about the handling of SinglePoint's indebtedness to Rossette. For example, Rossette, with

consummation of the Merger, was repaid some $355,000 for sums which he advanced to SinglePoint after the Merger Agreement had been executed. Merger Agreement at A1362, A1371; Rossette Dep. at 198. Without these funds, SinglePoint could not have continued in business through closing. SinglePoint's other debt to Rossette was assumed by Cofiniti. The Plaintiffs do not dispute that Rossette's loans to SinglePoint were critical to its survival and they offer no viable reason for why Rossette, simply because of his status as a director and majority shareholder of SinglePoint, should have been expected to forego a commitment for repayment of duly incurred indebtedness.

FN63. *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243 (Del.1999) (applying motion to dismiss standard).

FN64. *Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348 (Del.1988). *Tooley* confirms that the conclusions in both *Parnes* and *Kramer* resulted from the proper analysis. 845 A.2d at 1039. The Defendants, perhaps recognizing the similarities between this case and *Parnes,* contend that the *Tooley* Court, although it approved the test applied in *Parnes,* did not necessarily approve the result in *Parnes.* Defs.' Reply Br. at 8 n. 4.

FN65. *See Kramer,* 546 A.2d at 349; *Parnes,* 722 A.2d at 1244.

In *Kramer,* the stockholders challenged the decision by the board of directors to grant stock options and golden parachutes to management six months before a merger. The stockholders argued that the claim was direct because their share of the merger proceeds was reduced by the cost of the options and golden parachutes. The Court concluded that the claim was essentially for "waste of corporate assets" [FN66] and, therefore, derivative in nature because it did not "allege something other than an injury resulting from a wrong to the corporation." [FN67]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN66. *Kramer,* 546 A.2d at 355.

FN67. *Tooley,* 845 A.2d at 1038 (discussing *Kramer* ).

**\*6** As did the shareholders in *Kramer,* the shareholders in *Parnes* alleged that their share of merger proceeds had been unfairly reduced. Unlike the *Kramer* case, however, the gravamen of the plaintiffs' complaint in *Parnes* was not based on benefits granted before the merger. Instead, the reduction in their share of the proceeds, the *Parnes* shareholders contended, was caused by the board chairman's insistence that he receive special payments before he would consent to the merger. Unlike in *Kramer,* this claim was held to be direct. The critical distinction was that because of the board chairman's alleged conduct, the entire merger process had been tainted by unfair dealing with a resulting material, adverse impact on price. In contrast, *Kramer* did not involve an allegation that the merger price was unfair, or that the merger was obtained through unfair dealing. In *Kramer,* the plaintiffs complained that the value of the corporation itself had been reduced by the cost of the options and golden parachutes that had been granted prior to the merger-"a classic derivative claim" because the corporation alone directly suffered the harm.[FN68]

FN68. *See Parnes,* 722 A.2d at 1245 (discussing *Kramer* ).

Thus, the shareholder-plaintiff who seeks to bring a direct action must tie her claim to the price and process of the merger.
[A] direct attack on the fairness or validity of a merger can be maintained as an individual or direct action.... In order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price.[FN69]

FN69. *Dieterich,* 857 A.2d at 1029 (quoting *Parnes,* 722 A.2d at 1245).

Here, Plaintiffs allege that the directors breached their fiduciary duties by engaging in unfair dealing during the merger process. Specifically, Plaintiffs allege that in order to secure Rossette's approval of the Merger, the Board (or Rossette with the passive and poorly informed acquiescence of Bachelor) unfairly shifted merger consideration from the minority shareholders to Rossette. In the Plaintiffs' view, Cofiniti had a finite amount it was willing to pay for SinglePoint, and Rossette misused his directorship position to usurp a portion of the available bounty for his own personal benefit. The side benefits to Rosette included the right (and obligation) to sell, at some future time, the Cofiniti shares he received in the Merger back to Cofiniti at an agreed upon price-a benefit that no other shareholder was offered. In support of this allegation, Plaintiffs offer Rossette's own deposition testimony that he needed personal "inducements" in order to approve the Merger.[FN70] Taking the facts in a light most favorable to the Plaintiffs, Rossette's conduct may be viewed as similar to the conduct alleged in *Parnes.*

FN70. Rossette Dep. at 208-09.

Defendants argue that *Kramer* is dispositive of this case because the challenged side benefits to Rossette, comparable to the options and golden parachutes in *Kramer,* are essentially examples of alleged corporate waste. Defendants contend that the challenged benefits to Rossette were not part of the merger consideration, but were conferred upon Rossette as a SinglePoint creditor. But, as *Parnes* confirms, *Kramer* does not stand for the proposition that all side payments made in connection with a merger are derivative in nature. The Court stressed the timing of the side payments in *Kramer,* pointing out that the "conduct extend[ed] over a period of six months or more," and was "largely unrelated to the [merger]." [FN71] Because the benefits in *Kramer* were not cotemporaneous with the merger, the Court determined that the shareholders' claims did not "implicate the fairness of the merger terms," and therefore, "[did] not directly challenge the merger as resulting from a breach of fiduciary duty." [FN72] In contrast, here the challenged side benefits were (as Plaintiffs allege) entirely related to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                         Page 10

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
(Cite as: Not Reported in A.2d)

merger-consummation of the merger was actually conditioned upon Rossette's receipt of some " inducement." Rossette's insistence that he receive a personal benefit in order to approve the Merger distinguishes this case from *Kramer*. The Merger, and its allocation of proceeds, is alleged to have resulted from a breach of fiduciary duty and the shareholders' complaint directly attacks the merger process and its consequences for them.

> FN71. *Kramer*, 546 A.2d at 352.

> FN72. *Id.* at 354.

*7 In the post-merger fallout, according to *Dieterich*, "a shareholder makes a direct claim by alleging that director conduct in a transaction that eliminates shareholders is so egregious as to materially affect the price paid in that transaction." [FN73] This suggests that the question of whether a claim is direct or derivative requires consideration of whether the alleged conduct caused a material impact on the price received by the shareholders. Accordingly, the value of the put as the separate consideration flowing to Rossette as part of the Merger, must be assessed.

> FN73. 857 A.2d at 1027 (relying upon *Golaine v. Edwards*, 1999 WL 1271882 (Del. Ch. Dec. 21.1999)).

The value of the put as of the time of the Merger has not been established. The Plaintiffs prefer the simple approach of multiplying 360,000 shares by the put price of $5 per share to reach $1.8 million. The proper value would seem to be significantly less than that, whether because of the time value of money (depending upon the circumstances, the agreement may be viewed as one requiring a payment at the end of one year) or the difference between market price and the exercise price of the put (at the time of the Merger, one would have assumed that Cofiniti would have had some value a year later). The Defendants argue that the value of the put is inherently speculative and difficult to ascertain. They are correct that the valuation of contractual rights of this nature is difficult,[FN74] but

that does not lead to the conclusion, especially in the context of a motion for summary judgment where inferences are to be drawn in favor of the nonmoving party, that the put was of no or *de minimis* value. Rossette insisted upon the put and it was material to him. [FN75] Thus, he-or so one can reasonably infer-thought that it had material value. The Court in these circumstances should not attempt to calculate the value of the put because that is essentially a fact-finding exercise, one usually performed with the help or hindrance of expert witnesses. If the value of the put approaches the $1.8 million ascribed to it by Plaintiffs, then it would likely be viewed as material when measured against the $14 million Merger consideration allocated among all of SinglePoint's shareholders. Conversely, if the value of the put tends toward the *de minimis* valuation advanced by the Defendants, its materiality, or, more specifically, its impact on the fair price aspect of the Merger, is subject to substantial doubt .[FN76]

> FN74. *See, e.g., Lewis v. Vogelstein,* 699 A.2d 327, 331-33 (Del. Ch.1997).

> FN75. Rossette Dep. at 208-09.

> FN76. The proper classification of the put agreement is also in dispute. Rossette argues that it was provided to him because of his status as creditor; the Repurchase Agreement recites that it was an inducement to him as the controlling shareholder. The Plaintiffs view it as a benefit acquired, at least in substantial part, by virtue of his status of director. If the benefits of the put agreement are properly characterized as merger consideration in which, but for the directors' unfair dealing, the shareholders would have participated, the shareholders may have presented a direct claim. On the other hand, if the benefits were granted to Rossette-a SinglePoint creditor-for reasons independent of the Merger, the shareholders suffered no direct harm because they had no individual entitlement to proceeds that Cofiniti offered to a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

creditor outside the scope of the merger consideration.

In short, the Court's inquiry as to whether the Plaintiffs' claims regarding the Merger are direct must also focus on whether Rossette's diversion of the value of the put from the other shareholders resulted in an unfair price. [FN77] Because this question cannot be resolved on the existing summary judgment record, the Court cannot now conclude that the Plaintiffs' Merger claim is derivative.[FN78]

> FN77. This is not to exclude the unfair process aspect of the Plaintiffs' challenge. Fairness of price and process, in the final analysis, calls for an integrated review. *See, e.g., Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1163 (Del.1995) (" The test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined in whole since the question is one of entire fairness.").

> FN78. Alternatively, this is one of those instances where the Court may deny summary judgment in the expectation that the factual record will be enhanced and provide a more solid foundation for its analysis. *See, e.g., Cooke,* 2000 WL 710199, at *11.

### B. *Defendants' Fiduciary Duties and the Merger*

The Court in its review of the Defendants' summary judgment challenge to the Plaintiffs' claims under the Merger now turns to whether, assuming for these purposes that those claims are direct, they would nonetheless fail as a matter of law based on the undisputed material facts. The Defendants' arguments can be grouped as follows: (1) the Plaintiffs have not brought an action that requires evaluation of the Defendants' conduct under the entire fairness standard; (2) the Merger was approved by a disinterested and independent Bachelor, who constituted one-half of the Board, and ratified by a majority of the minority

shareholders; (3) even if Rossette is unsuccessful in his effort to earn summary judgment, Bachelor, because of his limited, independent and disinterested role, is entitled to summary judgment; (4) the exculpatory clause in SinglePoint's charter, adopted under 8 *Del.C.* § 102(b)(7), relieves the Defendants of any liability for the monetary damages now sought by the Plaintiffs; and (5) the Plaintiffs have not shown that the Defendants' actions caused them cognizable and calculable damages.

#### 1. *Entire Fairness Standard*

**\*8** Rossette received a personal benefit, the put agreement, that was not available to the other shareholders. Although there are substantial questions as to the value of the put, one cannot conclude as a matter of undisputed fact, that it was not material either to Rossette or to the other shareholders. Thus, for Rossette, the Merger was a self-interested transaction.[FN79] Unless otherwise relieved of the burden, it falls upon the Defendants to show that the transaction was "entirely fair." The Defendants, however, cannot "demonstrate that the record evidence, viewed in the light most favorable to the [P]laintiffs, including all reasonable inferences, compels a conclusion that the transaction was entirely fair." [FN80]

> FN79. *See Orman v. Cullman,* 794 A.2d 5, 29 (Del. Ch.2002). "[A] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.") (internal quotations and citations omitted); *Chaffin v. GNI Group, Inc.,* 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) ("To be considered disinterested, the director's decision must be based entirely on the corporate merits of the transaction and not be influenced by personal or extraneous considerations. Thus, a director who stands to receive a substantial benefit in a transaction that he votes to approve, cannot objectively be viewed as disinterested.") (internal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 12

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
(Cite as: Not Reported in A.2d)

citations and quotations omitted).

FN80. *Seagraves v. Urstadt Prop. Co., Inc.,* 1996 WL 159026, at *4 (Del. Ch. Apr. 1, 1996) (stating that when a "merger [is] a self-dealing transaction, the burden of proving entire fairness rests on the defendants.").

### 2. *Approval of the Merger by Bachelor and the Minority Shareholders*

Defendants insist that, because the Merger was approved by an independent director, Bachelor, and a majority of the minority shareholders, they need not demonstrate that the Merger was entirely fair. At the time of the Merger, SinglePoint's board consisted only of Rossette and Bachelor. Assuming, as is reasonable, that Bachelor was independent and disinterested, he was only one half of an evenly divided board-not a majority. His approval of the Merger is insufficient to validate Rossette's self-interested transaction.[FN81]

FN81. *See In re Oracle Corp., Deriv. Litig.,* 824 A.2d 917, 944 (Del. Ch.2003); *Chaffin,* 1999 WL 712569 at *4-6. In addition, Bachelor apparently had no independent sources of assistance (legal or financial) to assist him. Because of Rossette's status-controlling shareholder, director, creditor-the ability of Bachelor alone to preserve the interests of the minority shareholders was limited. Moreover, even if Rossette extracted unfair consideration from the Merger, Bachelor might have readily concluded that the Merger was nonetheless in the best interests of the minority shareholders. Without a combination with another entity or a substantial infusion of capital, SinglePoint could have failed and then the shareholders would have had nothing. Indeed, SinglePoint's ability to stay in business until consummation of the Merger appears to have been in doubt. That the merger with Cofiniti was in the best interests of the shareholders may have

explained Bachelor's support for the Merger even though the allocation of consideration from the Merger may have been both inequitable and actionable.

Nor does the shareholder vote ratify the interested transaction because the Information Statement failed to provide adequate disclosure to the shareholders. Rossette's approval of the Merger was conditioned upon his receipt of the certain "inducements," which included the put agreement with Cofiniti. Omission of the fact that Rossette was to receive this benefit in connection with the Merger "raise[s] a question as to the judgment and care of the defendant directors regarding their ... disclosure decisions connected with the merger."[FN82] Moreover, if the put agreement conferred a material benefit upon Rossette,[FN83] the failure to disclose it to the shareholders leads to the conclusion that they were not fully informed. Shareholder ratification of an interested transaction can only occur if the shareholders are fully informed.[FN84]

FN82. *Emerald Partners v. Berlin,* 726 A.2d 1215, 1221 (Del.1999) (internal quotations omitted).

FN83. As addressed above, whether it was material cannot be determined from the record for summary judgment purposes.

FN84. *See, e.g., In re Emerging Commc'ns, Inc. S'holders Litig.,* 2004 WL 1305745, at *36 (Del. Ch. May 3, 2004).

### 3. *Bachelor's Role*

Bachelor seeks to extricate himself from this litigation by pointing out that the Plaintiffs have made no significant effort to demonstrate that he was beholden to Rossette or that he was interested in the Merger.[FN85] Bachelor approved the Merger as one of two directors, but he did so without ever inquiring of either Rossette or Cofiniti whether Rossette was receiving any special consideration even though Rossette negotiated the terms of the Merger with Cofiniti.[FN86] In the context of a motion for summary judgment, it is a reasonable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 13

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

inference that the Court may draw, for these purposes, that Bachelor failed to discharge his duties with due care and loyalty (or in good faith). The shareholders had every right to expect him to ascertain (or at least attempt to ascertain) whether Rossette had negotiated any significant specific favorable terms for his exclusive benefit. Bachelor's abject failure to take any steps to meet this expectation precludes summary judgment.[FN87]

> FN85. Bachelor did secure employment with Cofiniti following the Merger, but the Plaintiffs have not suggested that his employment alone, in this context, would compromise the exercise of his business judgment.

> FN86. Bachelor Dep. at 58-59.

> FN87. *See, e.g., Emerald Partners,* 726 A.2d at 1222-24.

### 4. *Exculpation Provision in SinglePoint's Charter*

**\*9** SinglePoint's certificate of incorporation contained a typical exculpation provision adopted in accordance with 8 *Del. C.* § 102(b)(7). Under Section 102(b)(7), directors may be exculpated from personal liability for monetary damages arising out of their breach of their duty of care. If the loyalty or good faith of a director is in doubt, however, the protection of Section 102(b)(7) is not available.

Based upon the current record, Rossette's loyalty (because of his interest in the put agreement) and Bachelor's good faith are at issue, and, thus, the Court cannot conclude that only a duty of care claim remains.[FN88] Therefore, consideration of the effect of the exculpatory provision, at this point, is premature.[FN89]

> FN88. *See, e.g., Orman,* 794 A.2d at 41.

> FN89. *See Emerald Partners v. Berlin,* 787 A.2d 85, 95 (Del.2000) (stating that " [a] judicial determination on the issue of

entire fairness is a condition precedent to any consideration of damages" and, therefore, any consideration of an affirmative Section 102(b)(7) defense).

### 5. *Damages*

Finally, Defendants argue that the Plaintiffs' claims fail because they have no cognizable damages. In light of Cofiniti's financial demise after the Merger, Defendants assert that even if "Plaintiffs would have received more shares of Cofiniti stock in the merger but for the purported wrongdoing by Rossette, those shares would have been valueless."[FN90] The Court's calculation of any damages must be based on conditions as of the merger date, i.e., what the "shares would have been worth at the time of the Merger if [Rossette and Bachelor] had not breached [their] fiduciary duties."[FN91] That the shares and the put agreement may have *eventually* become worthless does not change this analysis. In addition, as set forth above, the questions of material fact concerning the value of the put agreement preclude summary judgment on this basis as well.

> FN90. Defs.' Opening Br. at 47.

> FN91. *Int'l Telecharge, Inc. v. Bomarko, Inc.,* 766 A.2d 437, 440-441 (Del.2000)

### V. CONCLUSION

For the foregoing reasons, summary judgment will be granted to the Defendants with respect to Count I (Debt Conversion and Share Dilution) of the Complaint. The Court concludes that Count I states a derivative, and not a direct, claim. Defendants' motion for summary judgment will be denied with respect to Count II (Merger) of the Complaint. Rossette undertook a self-interested transaction in which he received benefits not shared with those to whom he owed fiduciary duties. Based on the record, whether Plaintiffs' claim is direct or derivative cannot be resolved on summary judgment. Similarly, the record does allow for the conclusion, at this stage, that the Merger was entirely fair or that any of the Defendants' other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 14

Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**


contentions prevail.

An order will be entered to implement this
memorandum opinion.

Del.Ch.,2005.
Gentile v. Rossette
Not Reported in A.2d, 2005 WL 2810683 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.