EXHIBIT 5



Not Reported in A.2d                                                      Page 1

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Richard S. GESOFF, Plaintiff,
v.
IIC INDUSTRIES INC., CP Holdings Limited,
Kenyon Phillips Acquisition, LLC, Bernard
Schreier, John Smith, Robert M. Levy, Robert
Glatter, and Alfred L. Simon, Defendants.
CEDE & CO., Petitioner,
v.
IIC INDUSTRIES INC. and Kenyon Phillips
Acquisition, LLC, Respondents.
**No. Civ.A. 19473, Civ.A. 19600.**

Submitted Feb. 9, 2006.
Decided May 18, 2006.

Joseph A. Rosenthal, Jessica Zeldin, Rosenthal
Monthait & Goddess P.A., Wilmington, Delaware;
Harold B. Obstfeld, Harold B. Obstfeld P .C., New
York, New York, for the Plaintiff and Petitioner.
Daniel A. Dreisbach, Elizabeth C. Tucker,
Richards, Layton & Finger, P.A., Wilmington,
Delaware; David J. Cynamon, Matthew A. Anzaldi,
Pillsbury Winthrop Shaw Pittman LLP,
Washington, D.C., for Defendants IIC Industries
Inc., CP Holdings Limited, Kenyon Phillips
Acquisition, LLC, Bernard Shreier, John Smith,
Robert M. Levy, and Robert Glatter.
Stephen C. Norman, Melony R. Anderson, Potter
Anderson & Corroon, Wilmington, Delaware, for
Defendant Alfred L. Simon.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.
**\*1** This case arises out of a decision by a foreign
holding company which controlled a publicly traded
United States subsidiary to simplify its internal
structure by removing the minority stockholders of
that subsidiary in a going-private transaction. To
achieve that goal, the controlling stockholder first
initiated a voluntary tender offer at a price
supposedly determined through a negotiation with a
special committee. When the tender offer failed, the
controller successfully executed a statutory
long-form merger at the same price.

The present class action was filed by one of the
minority stockholders, claiming that the merger
evidenced unfair dealing and produced an unfair
price. Additionally, the minority stockholder has
brought a statutory appraisal claim, seeking a
determination of the fair value of the U.S.
subsidiary's shares at the time of the merger. The
defendants argue that the merger process was fair,
or at least harmlessly flawed, and that the price
determined by the merger process was fair in view
of the fact that the terrorist attacks of September 11,
2001 intervened between the determination of the
merger price and the transaction itself. They also
urge the court to decide that the fair appraisal value
of the shares is well below the consideration offered
in the merger. Additionally, one of the defendants
claims that his actions in approving the merger were
exculpated by the corporation's provision under 8
*Del. C.* § 102(b)(7), and therefore that he cannot be
personally liable for any damages.

The court held trial from May 25, 2005 to May 31,
2005. The parties submitted post-trial briefs and
argument was presented on February 9, 2006. In
this opinion, the court finds that the merger process
between the controlling stockholder and the
subsidiary was marked with grave examples of
unfairness, and led to a plainly unfair price for the
going-private transaction. Consequently, the court
awards damages to the class and to those
stockholders seeking appraisal based on the court's
determination of fair value at the time of the
merger, a figure that is significantly in excess of the
consideration offered in the going-private
transaction. Nonetheless, the court finds that the
subsidiary corporation's Section 102(b)(7) provision
does act to protect the one defendant who raised

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

that affirmative defense, and therefore assigns him none of the liability.

I.

A. *The Parties*

1. *The Plaintiff*

The plaintiff in this case, Richard Gesoff, was a stockholder of IIC Industries Inc. until the transaction at issue. He owned approximately 50,000 shares of IIC common stock. As a result of the transaction, Gesoff's shares have been cashed out at the disputed price, $10.50 per share. His class action claim has been brought on behalf of all persons who were owners of the common stock of IIC on the effective date of the merger, March 27, 2002, except for affiliates of IIC or CP, and those stockholders who properly opted out of the class. Gesoff's statutory appraisal proceeding is on behalf of 402,476 IIC shares, slightly less than half of the shares owned by class members.

2. *The Defendants* [FN1]

> FN1. The plaintiff has also sued Kenyon Phillips Acquisition LLC, a subsidiary formed specifically for purposes of the merger, and wholly owned by Kenyon Phillips Limited, itself a wholly owned subsidiary of CP Holdings. The individual named defendants, Bernard Schreier, John Smith, Robert M. Levy, Robert Glatter, and Alfred L. Simon, are discussed below, but, in summary, were the directors of IIC. Except for Simon, all were also directors of CP Holdings.

**\*2** CP Holdings is an English holding company with its principal place of business in Watford, England. This conglomerate owns approximately 80% of the defendant in this case, IIC Industries, Inc ., a Delaware corporation with its principal place of business in New York City. In essence, the only business of IIC is to act as an intermediate holding company for certain overseas assets.

As an investment company, IIC controls various companies engaged in businesses throughout the world. The most significant of these is Danubius Hotel & Spa Rt., a Hungarian corporation, listed on the Budapest Stock Exchange, that operates hotels and spas in Hungary and the Czech Republic.[FN2] Overall, the Danubius group owns and manages approximately 3,100 four-star rooms, and 2,300 three-star rooms. It claims to be the leading hotel chain in Hungary, and attracts many tourists from Western Europe and elsewhere.[FN3]

> FN2. Formally, IIC owns a 49% voting interest in Danubius, and CP owns another 5% of the company. JX 237.

> FN3. JX 32.

IIC also controls Investor Rt., a Hungarian holding company, whose principal subsidiaries are Agrimill Rt., in which Investor has a 65% interest, and Interag Rt., in which Investor has a 79% interest. [FN4] Agrimill is also listed on the Budapest Stock Exchange and is engaged in the processing of agricultural products. Agrimill's business strategy has been to produce flour, animal feeds, and maize products to be sold both on the domestic Hungarian and export markets.[FN5]

> FN4. Interag is a Hungarian company involved in the warehousing and warrant business, and automobile dealerships.

> FN5. *Id.*

Additionally, IIC controls ITE and Equipment Company Limited, an Israeli corporation that distributes tractors and other heavy equipment in Israel through its 70% owned subsidiary, Zoko Ltd. Zoko is listed on the Tel Aviv Stock Exchange, and manufactures and distributes products such as construction equipment, diesel engines and trucks, and spare parts for such equipment. Zoko is also the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 3

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

exclusive dealer in Israel for Caterpillar and Navistar trucks, and is a dealer for Ingersoll-Rand equipment. In addition to selling the aforementioned heavy machinery, Zoko offers service and maintenance of these machines.[FN6]

> FN6. *Id.*

Finally, IIC controls Balton CP Limited, which sells agricultural, communications, and electrical equipment in Nigeria, Zambia, Ghana, Kenya, Tanzania, Uganda, and the Ivory Coast. In summary, Balton uses its expertise in agriculture to provide modern flower, fruit, and vegetable growing facilities in greenhouses and fields, including greenhouse structures, full irrigation systems, cold storage, and packing lines. In addition, Balton acts as a distributor for Motorola, Inc. in Nigeria and Ghana in West Africa, distributing Motorola two-way radios, walkie-talkies, mobile phones, base stations, repeaters, and telephones.[FN7]

> FN7. *Id.*

**B.** *CP Decides To Take IIC Private*

The events that led to this trial began when Paul Filer was appointed as Finance Director of CP Holdings in 2000.[FN8] As part of his initial duties, he was assigned by the board of CP Holdings and its chairman, Sir Bernard Schreier, to undertake a review of the company's corporate structure. Filer decided, as a result of this review, that IIC was serving little purpose in its current form. Indeed, IIC was exposing CP to the U.S. regulatory environment and its associated costs, including possible tax liability, while CP was failing to take advantage of its presence in the U.S. to raise funds through the capital markets.[FN9] In December 2000, Filer prepared a report setting out his findings. This report first noted the potential benefits of removing IIC as an intermediate holding company:

> FN8. Tr. 700:19.

> FN9. JX 48.

*3 There have been extensive discussions internally on simplifying the group structure. The purpose for doing this is:
• Improve the ability to extract cash by CP At present it is expensive to remit cash from Hungary to CP. This is firstly because the funds have to be split with the relevant minorities....
• Reduce the costs within the current structure The cost of maintaining a quoted company in the U.S. seems an unnecessary expense. No use is being made of the quote; overall it is a burden, not a benefit.... [FN10]

> FN10. *Id.*

The report observed that CP owned only 78% of IIC, and therefore the minority would have to be removed either by a "rights issue to dilute the minority" or by a "tender offer to the minority to acquire their shares." [FN11] The report then noted that a "separate paper on the mechanics of buying out the minority" was attached.[FN12]

> FN11. *Id.*

> FN12. *Id.*

The information in that separate document was provided by IIC's and CP's U.S. lawyer for purposes of the going-private transaction, Samuel Ottensoser, [FN13] who would soon play an important role in the tender offer. In addition to setting out the two options described above for removing the minority, this report noted that the minority was likely to negotiate aggressively as to the price at which they would be cashed out. At this relatively early stage, indeed, CP and its counsel expected the minority to demand $16.20 per share:

> FN13. Tr. 707:8-10.

Any price that is below $16.20, the disclosed net assets, will yield a book gain to CP on the shares

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
(Cite as: Not Reported in A.2d)

tendered. Equally any price below $16.20 will be difficult to sell to the minority, as they will be sustaining a loss against the disclosed book value. The best argument is that they could never realize the $16.20, so that figure is not a realistic disposal value.[FN14]

> FN14. JX 49.

But the document also included information that indicated that CP had paid only $10 per share for IIC in the recent past.[FN15]

> FN15. *Id.*

On January 25, 2001, the CP board authorized Filer to continue investigating the removal of the IIC minority, but did not yet authorize any approach to those stockholders.[FN16] Following the board's authorization, Filer produced another report in March 2001 explaining his progress. This report reiterated much of the information available in the December 2000 report, but included new information as to Filer's progress in securing financial advice. As Filer noted, "we have received from our U.S. lawyers the name of a small investment bank that would be willing to do the company valuation necessary to support the tender offer...." [FN17] Filer testified at trial that this small investment bank, that had been recommended by Ottensoser, was Jesup & Lamont.[FN18] This was CP's first contact with that firm.[FN19]

> FN16. JX 50; Tr. 711:8-14.
>
> FN17. JX 9.
>
> FN18. Tr. 712:13-18. The court notes, in passing, that Ottensoser's son was employed at Jesup & Lamont during this time.
>
> FN19. Tr. 714:7-8.

In the following months, Filer continued preparing the groundwork for a possible transaction. On May 17, 2001, Filer presented a more comprehensive report describing his conclusions as to the going-private transaction to Schreier, John Smith, and Robert Levy,[FN20] who together comprise the CP Holdings executive team.[FN21] In that document, Filer described the work that had been done to date, including a quote received from Jesup & Lamont, an assessment of the possible fees involved in the transaction, and a discussion of possible consequences that might result.[FN22] This document included new information that showed that CP was now required to pay $13 for shares of IIC in the open market.[FN23] Filer testified at trial that, at this point, neither he nor the board had prepared a valuation of IIC to determine the value of the company.[FN24]

> FN20. Smith and Levy are the joint managing directors of CP Holdings. Tr. 715:1-2.
>
> FN21. Tr. 715:1-2.
>
> FN22. JX 2.
>
> FN23. Tr. 717:1-4.
>
> FN24. Tr. 717:10:13.

*4 At a subsequent board meeting of CP Holdings on May 24, 2001, the board adopted Filer's plans, and expressly authorized that a "bid approach" be made to the board of IIC at $13 per share for the minority stockholdings,[FN25] which was envisioned to be in the form of a tender offer followed by a short-form merger under 8 *Del. C.* § 253.[FN26] This price, although not based on a formal discounted cash flow analysis, was based on the price at which CP had been paying in the market at that time for shares of IIC.[FN27] The board also authorized that $100,000 be spent to obtain a fairness opinion, but decided that the process through which IIC board approval would be obtained was subject to later discussion because "those members of the board requesting [the fairness opinion] should be independent." [FN28]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN25. JX 54.

FN26. A short-form merger, of course, allows a parent company holding more than 90% of a subsidiary's shares to squeeze out the remaining minority without a stockholder vote.

FN27. Tr. 721:15-18.

FN28. JX 54.

*C. IIC Appoints A Special Committee*

Apparently on the basis of Ottensoser's advice, the IIC board of directors decided to appoint a special committee to help comply with Delaware law for fundamental transactions between parents and subsidiaries. The only IIC directors independent of CP Holdings were Alfred L. Simon and Wilfred Wyler. Wyler, however, was elderly, and unable to fulfill the responsibilities of the supplemental appointment.[FN29] On May 24, 2001, therefore, Filer called Simon, and asked him to become the sole member of the special committee. [FN30] Simon accepted the commission in principle, although he had not yet been officially empowered.[FN31]

FN29. Wyler passed away in January 2002. Tr. 723:18-22.

FN30. JX 55.

FN31. JX 55; Tr. 821:19-22.

Filer's next step was to visit New York and meet personally with the key players in the plan to privatize IIC. On June 18, 2001, Filer met with Jesup & Lamont, before speaking in person with Simon. This meeting, Filer testified, was a " courtesy visit," although Filer was never able to articulate what such a visit entailed,[FN32] or whether details of Jesup & Lamont's eventual representation were discussed. The next day, Filer met with both Simon and Michael Zarriello of Jesup & Lamont. At that meeting, Zarriello was given the opportunity to "pitch" his firm to Simon for the appointment as financial advisor to the special

committee.[FN33] Simon attended the presentation, and testified at trial that he reserved judgment on whether to formally hire Jesup & Lamont.[FN34]

FN32. Tr. 725:21-24; Tr. 726:1; Tr. 782:1-6 ("I went to see [Jesup & Lamont]. It was, I guess, out of courtesy, and just to see who they were.").

FN33. Tr. 726:11-16; Tr. 825:14-23.

FN34. Tr. 726:9-11.

In June 2001, Simon was appointed by undated consent as the sole director of the special committee tasked with examining CP's tender offer on behalf of IIC's minority stockholders.[FN35] Simon's authorization formally invested him with the power to present a recommendation to the IIC board as to the CP tender offer only, in the following form:

FN35. JX 6.

RESOLVED, that the Board hereby appoints Alfred L. Simon, the Company's only director not affiliated with CPH ... to examine the Tender Offer and to prepare and present a recommendation to the Board and the public stockholders on the Company's position on the Tender Offer.[FN36]

FN36. *Id.*

In connection with that recommendation, the consent gave Simon the authority to appoint outside auditors and/or counsel to assist him in preparing the recommendation.[FN37] The resolution further authorized Simon to spend $100,000, the same price as quoted by Jesup & Lamont, for a fairness opinion, and granted Simon a director's fee of $10,000 for the additional work the position would require.

FN37. *Id.*

**\*5** While this formal grant seems relatively broad,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 6

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the court notes that the evidence adduced at trial and the defendants' own testimony demonstrate convincingly that Simon's authority was closely circumscribed even from the beginning of his role as the sole member of the special committee. First, Simon had no real authority to choose either his own lawyer or his own financial advisor. Ottensoser was presented to Simon as the choice of the conflicted IIC board, and CP's choice, for counsel. [FN38] He had long been IIC's main outside counsel, and had already spent considerable time working on the proposed transaction on behalf of CP.[FN39] And as Simon testified at trial, when he pressed Ottensoser about the clear conflict of interest in representing IIC and CP on the one hand and the special committee on the other, Ottensoser answered that no conflict existed between the two roles.[FN40]

> FN38. Q: Why did you wait? [to decide whether to retain Jesup & Lamont for a week after the meeting in which the investment bank first pitched their services?]
> A: First, I wanted to digest this. I wanted to speak to Sam Ottensoser, who *had been appointed, and I had accepted him,* as my counsel. Tr. 828: 22-25 (emphasis added).

> FN39. Tr. 708: 17-22.

> FN40. Simon testified that Ottensoser responded to this question by saying " something to the effect that ... IIC and [Simon] were really on the same side of this, and looking to get the best price from CP Holdings, and there was no conflict." Tr. 831: 18-22.

Simon had no more latitude as to his choice of financial advisor. On June 12, 2001, Jesup & Lamont had already sent a draft engagement letter to Simon, then still working only in the role of director of IIC.[FN41] As early as June 15, 2001, four days before Simon was officially granted any power to hire financial or legal advisors, Filer emailed Zarriello promising that "we are very close to having you signed up for the project." [FN42] As

Filer confirmed at trial, this email was motivated by a desire to hurry the privatization process toward a conclusion.[FN43] Zarriello, as described above, was then allowed to make a pitch to Simon on June 19, even before Simon was officially empowered, and before he was able to do any independent research on investment banking firms.[FN44] Simon spoke to no other investment banking firms before appointing Jesup & Lamont to assist him in his duties, relying on Ottensoser's advice that "Jesup would do fine." [FN45] Nor did Simon discover the relationship that had arisen between Filer and Jesup & Lamont in the months prior to the creation of the special committee. Indeed, Simon failed to even ask whether Jesup & Lamont had any prior relationship with either CP or IIC, assuming that an "honest" investment banker would volunteer this information on his own.[FN46]

> FN41. JX 12.

> FN42. JX 56.

> FN43. Filer testified that this email " confirm[ed] his desire to get on with ... the privatization project." Tr. 787:14-18

> FN44. Tr. 825:14-20.

> FN45. Tr. 830:6-8.

> FN46. Tr. 830:12-24.

### D. *CP Negotiates With Simon And The Special Committee As To The Tender Offer*

The evidence adduced at trial creates a clear picture of what, as will be discussed below, was an entirely inadequate negotiation between Simon and CP. At the heart of this process was an email exchange between Filer and Ottensoser on May 17, 2001, which clearly outlines the manipulative way in which CP envisioned the negotiation process with the special committee, even at this very early stage. In Filer's words, in an email seeking to "confirm the process," CP would first make a "lowish bid" to the board of IIC, which would respond by hiring Jesup & Lamont, named specifically, to evaluate the bid.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Jesup & Lamont was then expected to recommend a bid that was a "bit higher." CP would meet that new price, Jesup & Lamont would approve it, and the door would then be open for CP to make its tender offer for the shares of IIC.[FN47] Ottensoser's response to this frank outline was clear. As he wrote, "I just spoke to Michael [Zarriello] again and he confirms that this is the process." [FN48] Asked at trial about this email, Filer equivocated by saying that the term "lowish" in the email meant, to him, a " realistic bid with room to maneuver," [FN49] in the context of the price that CP had paid previously for shares of IIC.[FN50]

> FN47. JX 36.
>
> FN48. *Id.*
>
> FN49. Tr. 719:14-15
>
> FN50. Tr. 719:18-19.

**\*6** The way the negotiation proceeded in the next several months confirms that CP adhered in spirit to the plan set forth in this email. In accordance with CP's obvious wishes, and the fact that Jesup & Lamont had been afforded advance access to Simon and had been recommended by the special committee's conflicted lawyer, Ottensoser, Jesup & Lamont was hired as the special committee's financial advisor on June 22, 2001. Filer confirmed this by sending a retainer check to Zariello on June 26, and by faxing the signature page of Jesup & Lamont's engagement letter to Zarriello on the same day.

Concurrently, CP made its "lowish" initial offer for IIC, dropping the previously authorized $13 price, about which Simon had full knowledge, [FN51] to a new price of $10 per share.[FN52] At trial, Filer explained this decision as a result of a conversation with Schreier.[FN53] In essence, the two had decided to lower the price because they felt that $10 was " the price that we would wish to start this process," [FN54] leaving room to negotiate later. This conversation was confirmed in a letter issued by Schreier on June 22, 2001 informally announcing the transaction, noting that CP intended to "

commence a tender offer shortly for any and all of the Common Shares, other than those beneficially owned by [CP], for $10 per share, net to seller in cash." [FN55]

> FN51. Tr. 819:15-24.
>
> FN52. Tr. 820:6-7.
>
> FN53. Tr. 728:5-8.
>
> FN54. Tr. 728:9-12.
>
> FN55. JX 4.

In the following several months, Jesup & Lamont conducted a valuation of IIC, purportedly for the special committee. This process involved considerable interaction between Simon and the professionals at Jesup & Lamont, with Simon suggesting various alternative ways of valuing IIC that Jesup ultimately rejected.[FN56] In order to gather information, Jesup & Lamont were also engaged in discussions with Filer. Filer testified that he acted as a conduit for financial information to be prepared for the investment bank.[FN57] Apparently unbeknownst to Simon, however, Filer was also receiving significant information from Jesup & Lamont .[FN58] Specifically, Filer testified under cross-examination that he received draft valuations from Jesup & Lamont of IIC's subsidiaries or investments.[FN59] Filer also testified that he received Jesup & Lamont's valuation ranges for IIC. [FN60] These were shared in a memorandum sent to certain members of CP's board of directors, including Schreier, on August 8, 2001.[FN61] Throughout the entire process, therefore, CP had almost full access to the special committee's valuation numbers and analysis.

> FN56. Tr. 841-843; JX 24.
>
> FN57. Tr. 732:17-21.
>
> FN58. Tr. 787.
>
> FN59. Tr. 787:20-24.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 8

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN60. Tr. 790:6-12.

FN61. JX 30; Tr. 791:3-8.

On August 7, 2001, Simon told Filer during a telephone conversation that he could not recommend an offer of $10 per share to the stockholders. Simon asked CP to increase its offer to something above $10.30, the midpoint of the preliminary valuation range determined by Jesup and Lamont.[FN62] The next day, Filer issued a report to certain members of the CP board, again including Schreier, which set out Simon's position at that point. As Filer explained,

FN62. Tr. 858; JX 29.

Al Simon recognizes that the $10 offer is fair, but would be more comfortable if he felt he had succeeded in raising it. A further $0.50 would be sufficient to satisfy him in this regard. However, a decision on the offer price can be delayed until the Board meeting.[FN63]

FN63. JX 30.

*7 Filer testified that he had no independent knowledge of how he knew that an extra $0.50 would satisfy Simon aside from a reference in his handwritten notes of the August 7 telephone call.[FN64] At first, Filer refused to raise CP's offer.[FN65] Indeed, Simon testified at trial that the period between August 2001 and September 10, 2001 was characterized by continued negotiations concerning any additional consideration over $10 per share that the IIC minority would receive in the tender offer. As Simon explained,

FN64. Tr. 741:12-14; Tr. 742:9-11.

FN65. Tr. 857:2-4.

I think it's just really a repeat of what I have said, that-my looking for reasons to get CP to make a higher bid and CP telling me that they have done their work, this is what the company is worth to

them, and that is all they are going to pay for it. [FN66]

FN66. Tr. 857:11-16.

What followed is not entirely clear. On August 21, 2001, Filer produced another memorandum to the CP board confirming that CP would move its offer up to $10.50, as Simon had requested.[FN67] This memo also noted that Simon would definitely recommend the offer to the stockholders at the new price, and that Simon had almost finalized the fairness opinion with the investment bank. [FN68] But Simon testified at trial that, in August, no such agreement had been reached. In Simon's view, the critical negotiation occurred on September 10, 2001, when Simon claims that he finally agreed to recommend the tender offer so long as it came in above the midpoint of the Jesup & Lamont valuation. [FN69]

FN67. JX 31.

FN68. *Id.*

FN69. JX 858:1-12.

What is clear, in any case, is that both Filer and Simon agreed on September 10, 2001 to the $10.50 per share tender offer price.[FN70] Based on this price, and supported by a fairness opinion by Jesup & Lamont,[FN71] the IIC board met later that day. Simon discussed the process leading up to the $10.50 offer, and then announced his decision to recommend the tender offer to the stockholders as fair from a financial point of view.[FN72] The full IIC board, however, decided not to make a recommendation with respect to the tender offer. [FN73]

FN70. Tr. 859:1-8.

FN71. JX 32.

FN72. Tr. 860.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 9

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN73. "However, because of the conflict of interest as a result of the fact that a majority of the Company's directors consist of principals and management of CP Holdings, the Board will not make a recommendation to the stockholders of the Company with respect to the Tender offer." JX 39.

### E. The CP Tender Offer Is Initiated And Comes Up Short

Although the CP board had approved an immediate tender offer approach, matters were understandably delayed by the tragic events of September 11. It took until October 15, 2001 for CP to formally commence the tender offer. According to the tender offer statement filed with the SEC, the offer was designed with the intention of effectuating a merger between IIC and CP after it terminated.

On May 24, 2001, the Board of Directors of CP Holdings met to discuss the possibility of launching a tender offer for all of the Common Shares that CP Holdings did not already own.... The Board was advised of the requirements under Delaware law of long-and short-form mergers, and since CP Holdings already owned nearly 80% of the Company's outstanding common stock, the Board authorized the commencement of a tender offer for all the outstanding shares of the Company, with the intention of receiving at least enough stock to bring CP Holdings' percentage of ownership up to 90% to thus enable CP Holdings to effectuate a short-form merger with the Company.[FN74]

FN74. JX 42.

**\*8** Although CP clearly hoped to reach the 90% threshold for short-form merger under 8 *Del. C.* § 253, the tender offer resulted in only 20% of the unaffiliated shares being tendered,[FN75] despite three extensions of the tender offer. This meant that CP's ownership of IIC increased from 78.8% to 84.1%. Unable to garner sufficient support in the tender offer to acquire the remaining shares of IIC by short-form merger, CP determined to proceed with the merger in some other way.[FN76]

FN75. JX 7.

FN76. JX 111; JX 113.

### F. The Merger

After the tender offer was closed, CP decided to move forward immediately with the second step of the merger, after a discussion between Schreier and Filer in which the two ruled out the possibility of lowering the offered consideration as a result of the altered international situation.[FN77] The CP board met on January 24, 2002, in part to confirm that the merger process was going forward. The minutes of that meeting specifically note that Filer hired the law firm Shaw Pittman to provide a "second opinion on the work being done by Sam Ottensoser."[FN78] There is no indication, however, that Shaw Pittman ever conducted work in an independent way for the special committee.

FN77. Tr. 755:17-24; Tr. 756:1-10.

FN78. JX 113.

Filer forwarded a document to Simon on January 25, 2005 summarizing the performance of the businesses within the IIC group since the preparation of the Jesup & Lamont report.[FN79] This document pointed out various challenges facing the IIC group companies in the coming year, including fallout from the terrorist attacks, and concerns about the strength of various currencies, especially the Hungarian forint (HUF), in IIC's portfolio.[FN80] In a conference call on that same day, having provided Simon with the aforementioned information, Filer discussed the merger with Simon. Specifically, he told Simon of the need to include the "independent Director's view on the fairness of the price offered per share" in the proxy materials sent to IIC stockholders in connection with the merger and explained the need for Simon "to be happy that the offer remained fair from a financial point of view."[FN81]

FN79. Tr. 748:3-6.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN80. JX 70.

FN81. *Id.*

In response to Filer, Simon conducted no new research as to the fairness of the transaction. Indeed, Simon's view seems to have been that the merger transaction he was asked to approve was substantively the same transaction as he had approved on September 10, 2001. Asked whether he was retained as a member of the special committee in connection with the merger, for example, Simon answered:
I'm sorry. I'm confusing the two ... [the merger] [w]ith the tender offer ... I believed that my responsibility continued-as long as there were independent shareholders and-this is sort of like a continuation of the same transaction. I was still applying due diligence to what was happening at the companies. I was keeping up with what was going on. I think I assumed at the time that I still was responsible ... to act in the interests of the independent shareholders, although maybe legally, I was not.[FN82]

FN82. Tr. 880:11-20.

**\*9** Apparently acting on the belief that he had already satisfied his duty to represent the minority, Simon relied "solely" on information given to him by Filer in the course of the aforementioned conversations.[FN83] Specifically, Simon concluded that he was prepared to recommend the merger without receiving any new fairness opinion, and without conducting any new formalities on behalf of the minority even in light of the failure of the tender offer to attract more than a scant number of tenders. When asked during trial why he felt no need for further information, given the events of September 11, 2001, Simon explained that he was concerned that new information would reflect a lower price for IIC than the merger price.[FN84] In any case, Simon testified that he concluded that the merger too was fair.[FN85] As a result, a meeting of the IIC board was held on February 1, 2002 to review and vote on the merger. Simon was not in attendance, and did not personally vote on the merger,[FN86] but did

give his proxy to Filer to vote in favor of the transaction.[FN87] The IIC board approved the combination on the same day.[FN88] The IIC stockholder meeting was held on March 27, 2002, and the merger was officially approved by CP's vote.

FN83. Tr. 882:22.

FN84. Tr. 873-883; Tr. 884:5-10.

FN85. Tr. 872.

FN86. Tr. 874-75.

FN87. JX 164.

FN88. JX 169.

II.

The plaintiff makes two primary arguments. First, in the entire fairness class claim, Gesoff argues that the merger between IIC and CP described above was a product of unfair dealing, and produced an unfair price. Therefore, he demands that the court award him damages for those failures of fiduciary duty on the part of the CP and IIC boards. Second, in the statutory appraisal action, the plaintiff presents the expert report of David N. Fuller of Value Incorporated in support of his position that the fair value of IIC's common stock should be determined by this court to be $20.17 per share. The appraisal action has been brought on behalf of dissenting IIC stockholders who held 402,476 shares, somewhat less than half of the shares owned by class members.[FN89]

FN89. The defendants contend that those stockholders who accepted the merger consideration or who voted in favor of the merger, acquiesced in the transaction, and are therefore barred from recovery. In this context, the court is well aware of the apparent inconsistency between *Bershad v. Curtiss-Wright Corp.,* 535 A.2d 840 (Del.1987), which held that well-informed stockholders who accept merger

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

consideration cannot seek an entire fairness remedy, and more recent cases in this court which hold otherwise. *See In re JCC Holding Co. Inc. S'holders Litig.,* 843 A.2d 713 (Del. Ch.2003); *In re Best Lock Corp. S'holders Litig.,* 845 A.2d 1057 (Del. Ch.2001); *but see Norberg v. Security Storage Co.,* 2000 Del. Ch. LEXIS 142 (Del. Ch. Sept. 19, 2000) (holding that the rule in *Bershad* precluded recovery in a minority squeeze out transaction). Whether it is because minority stockholders who are squeezed out in an unfair transaction cannot, by definition, be well informed, or because, as this court has held, *Kahn v. Lynch* implicitly overruled the holding in *Bershad,* it seems extremely unlikely to the court that Delaware law denies a remedy to minority stockholders battered into accepting unfair merger consideration.

The defendants argue in response that the merger was entirely fair because any irregularities in the merger dealings did not affect the fairness of the merger price. Most importantly, the defendants argue, the events of September 11, 2001, which they claim necessarily depressed the value of IIC, made the merger price, determined before that date, "more than fair." Second, the defendants rely on the expert report of Neil J. Beaton to assert that the fair appraisal value of IIC was somewhere between $6.22 and $12.98 on a per share basis as of March 27, 2002, with a midpoint of $9.60 per share. Third, Simon argues that the plaintiff's claims against him, even if supported by the evidence adduced at trial, constitute at most duty of care violations. Therefore, Simon argues, those claims are barred against him personally by IIC's Section 102(b)(7) provision, as provided for in Article Tenth of the IIC charter.

### III.

### A. *The Entire Fairness Standard*

**\*10** It is well established that a statutory long-form merger between a parent and a subsidiary invokes

the entire fairness standard of review. [FN90] The usual deference courts give to corporate boards of directors, as embodied in the business judgment rule, is inappropriate in these circumstances because the self-interested directors have an interest that diverges from that of the minority stockholders, [FN91] and, to the extent that the minority resists, the process is entirely suffused with the parent's coercive power. [FN92] Entire fairness review, in other words, serves to protect the minority stockholders where the law's normal range of protections are insufficient.

> FN90. *Kahn v. Lynch Commc'n Sys.,* 669 A.2d 79 (Del.1994) *(Kahn II).*

> FN91. *Citron v. E.I. Du Pont de Nemours & Co.,* 584 A.2d 490 (Del.1990); Rodman Ward, Edward P. Welch, & Andrew Turezyn, Folk on the Delaware General Corporation Law, § 251.6 (2005 ed.).

> FN92. *In re Cysive Inc. S'holders Litig.,* 836 A.2d 531, 547 (Del. Ch.2003).

The meaning of the phrase "entire fairness" was definitively set out by the Supreme Court in *Weinberger v. UOP, Inc.*[FN93] According to the now familiar words of that opinion, entire fairness has two aspects: fair dealing and fair price. This test, however, is not a "bifurcated one between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." [FN94] In the specific context of a merger between a parent and a subsidiary, this review requires the parties to be assiduous in fulfilling their fiduciary duties. Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.

> FN93. 457 A.2d 701 (Del.1983).

> FN94. *Id.* at 708 ("Although perfection is not possible, or expected, the result here could have been entirely different if UOP

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

had appointed an independent negotiating committee of its outside directors to deal with Signal at arm's length. Since fairness in this context can be equated to conduct by a theoretical, wholly independent, board of directors acting upon the matter before them, it is unfortunate that this course apparently was neither considered nor pursued. Particularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the standard of fairness.") (internal citations omitted).

### 1. *The Legal Standard Of Fair Dealing*

Most of the cases in which Delaware courts have closely examined the procedural safeguards surrounding parent-subsidiary mergers have focused on how a defendant can shift the burden of proving entire fairness from itself to the plaintiff.[FN95] Such differentiations are most important at preliminary stages of litigation. By the time a case comes to trial, however, the standards for shifting the burden of entire fairness, and those factors establishing fair dealing, are highly intertwined. What can shift the burden of entire fairness can also establish fair dealing.[FN96] The following summary of our courts' entire fairness cases, therefore, assumes that indicators of fairness are interchangeable between those two doctrinal divisions.[FN97]

> FN95. As this court has recently observed, the entanglement between the substantive doctrine of entire fairness and the burden-shifting force of a special committee or an informed majority of the minority vote means that defendants must act like they have the burden of persuasion throughout the entire trial court process. *In re Cysive,* 836 A.2d at 549.

> FN96. *Id.*

> FN97. To the extent that burden shifting

and the ultimate determination of fairness are separate inquiries at trial, the court finds that the burden of proving entire fairness lies with the defendants in this case.

The Supreme Court observed as early as *Weinberger* that the establishment of an independent special committee can serve as powerful evidence of fair dealing. Since that case was decided, parties have relied increasingly on such committees to prove entire fairness, seeking to assure themselves that important transactions will withstand scrutiny. This trend has necessarily occasioned attention from our courts. If the parties in a parent-subsidiary merger decide to proceed by establishing an independent bargaining structure through a special committee, the court takes that establishment seriously, and examines the special committee process closely for indicators of fairness. To summarize Delaware cases, the goal of the process established by the board of the subsidiary must be to come as close as possible to simulating arm's-length bargaining with the parent.[FN98] For obvious reasons, a transaction that is by its terms dependent on the special committee process will struggle to evidence fair dealing if that process withers under scrutiny.

> FN98. *Rabkin v. Olin Corp.,* 1990 Del. Ch. LEXIS 50, *18-19 (Del. Ch. Apr. 17, 1990) (in order to shift the burden of proving entire fairness, a "special committee must have real bargaining power that it can exercise with the majority shareholder on an arms' length basis").

**\*11** The court's investigation of a special committee process for fairness is highly fact intensive, and our courts commonly look to a range of well known factors to evaluate fair dealing. A comprehensive discussion of all the possible ways to prove fair dealing in a parent-subsidiary context in this opinion would not be practical. Several of these factors, however, are of importance in this case, or are especially central to any evaluation of a special committee. These factors are discussed briefly below.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

As a threshold matter, the composition of the special committee is of central importance. Members of a special committee negotiating a parent-subsidiary merger must, of course, be independent and willing to perform their job. [FN99] This independence is the *sina qua non* of the entire negotiation process. The court necessarily places more trust in a multiple-member committee than in a committee where a single member works free of the oversight provided by at least one colleague. [FN100] But, in those rare circumstances when a special committee is comprised of only one director, Delaware courts have required the sole member, "like Caesar's wife, to be above reproach." [FN101]

> FN99. This court has held, for example, that leaving negotiations in the hands of directors who are not independent is evidence of unfairness. *Sealy Mattress Co. v. Sealy, Inc.,* 532 A.2d 1324, 1337 (Del. Ch.1987) (noting, in the context of a case that set out a "textbook study of how one might violate as many fiduciary precepts as possible in the course of a single merger transaction," that the "directors were not independent and that they 'functioned in a ministerial capacity to carry out the parent [corporation's] bidding' ").

> FN100. Vice Chancellor Hartnett's common sense intuition that two heads are better than one in the context of special board committees has since been bolstered, in some sense, by economic and empirical research. *See, e.g.,* Stephen M. Bainbridge, *Why a Board? Group Decisionmaking in Corporate Governance,* 55 Vand. L.Rev.. 1, 12 (2002) ("In sum, groups appear to outperform their average member consistently, even at relatively complex tasks requiring exercise of evaluative judgment.... Corporate law's strong emphasis on collective decisionmaking by the board thus seems to have a compelling efficiency rationale.").

> FN101. The source of this formulation is,

perhaps, somewhat more obscure today than when it first entered our law. In short, when Julius Caesar was asked why he chose to divorce his wife after a false accusation of adultery, Caesar's laconic answer is said to have been that "Caesar's wife must be above suspicion," or as it is usually rendered, "Caesar's wife must be above reproach." Plutarch, Plutarch's Lives 206 (Arthur Hugh Clough ed., John Dryden trans., 2001). Since Vice Chancellor Hartnett first cited Caesar's famous aphorism in *Lewis v. Fuqua,* 502 A.2d 962, 967 (Del. Ch.1985), in the context of a special litigation committee, it has been used repeatedly to describe the responsibilities of directors charged with managing committees of the sort at issue here.

In addition to being independent and, preferably, having more than one member, a well constituted special committee should be given a clear mandate setting out its powers and responsibilities in negotiating the interested transaction. Evidently, this mandate should include the power to fully evaluate the transaction at issue, and, ideally, include what this court has called the "critical power " to say "no" to the transaction.[FN102] The controller's commitment to leave the essential fate of the transaction in the hands of the special committee is a significant one, because it ensures that the merger offer is not negotiated in the shadow of punitive action by the controller if the minority resists the merger. Our courts have also noted that, when questioned, members of a special committee should be able to articulate the extent of their authority.[FN103] The source of that requirement, simply enough, is the common sense principle that no mandate, however clear, is sufficient if the special committee does not understand its considerable powers.

> FN102. *In Re First Boston, Inc. S'holders Litig.,* 1990 Del. Ch. LEXIS 74, *20 (Del. Ch. June 7, 1990) ("It is that power [to say no] and the recognition of the responsibility it implies by committees of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

disinterested directors, that gives utility to the device of special board committees in charge of control transactions ."); *Kahn v. Lynch,* 638 A.2d 1110, 1119 (Del.1994) ( *Kahn I* ).

FN103. *In Re Tele-Commc'ns, Inc. S'holders Litig.,* 2005 Del. Ch. LEXIS 206, *37 (Del. Ch. Dec. 21, 2005) ("A special committee's clear understanding of its own mandate is an important factor facilitating the knowledgeable and careful fulfilment of its purpose ."); *Clements v. Rogers,* 790 A.2d 1222, 1241 (Del. Ch.2001) (holding that a special committee's misunderstanding of its purpose and mandate could be combined with other factors to show that a special committee's effectiveness was " compromised from the get-go").

As has been repeatedly held, special committee members should have access to knowledgeable and independent advisors, including legal and financial advisors. [FN104] Two recent cases clearly illustrate the adverse consequences of depriving the special committee of such support.

FN104. *In Re Tele-Communications,* 2005 Del. Ch. LEXIS at *41 ("The effectiveness of a Special Committee often lies in the quality of the advice its members receive from their legal and financial advisors.")

In *In Re Tele-Communications, Inc. Shareholders Litigation,*[FN105] this court denied summary judgment for the defendants in an entire fairness action. The transaction at issue raised entire fairness concerns because the company's equity structure was divided into three groups of paired stock series, each group tracking one of the company's three operating divisions. For each division's two series of stock, the A shares were entitled to one vote per share, and the B shares were entitled to ten votes per share. When the defendant company (TCI) entered into merger negotiations with AT & T, TCI's board decided to establish a special committee to ensure fairness, in view of the fact that

certain B series stockholders insisted on receiving a premium for their shares in any transaction. The special committee retained the same legal and financial advisors as TCI when evaluating the claim. Although the court's ultimate decision was based on a broad range of troubling facts about the negotiation process, the court noted that a special committee's decision to use the legal and financial advisors already advising the parent "alone rais[ed] questions regarding the quality and independence of the counsel and advice received." [FN106] This was particularly true where, as in that case, the financial advisor with the dual role was motivated by an incentive fee structure to close the deal on behalf of the full board, thus further splitting its loyalties.

FN105. *Id.*

FN106. *Id.* at *41.

**\*12** Similarly, in *In re Emerging Communications, Inc. Shareholders Litigation,*[FN107] this court found that a special committee had been prejudiced when its financial and legal advisors were co-opted by the parent. As the court observed in that case, the special committee was prejudiced by the fact that the advisors best placed to assist the special committee were made unavailable by the parent itself.[FN108] The point, critically, was not that other advisors were unqualified, but that the parent's action in robbing the subsidiary of these trusted advisors betrayed the unfairness of the transaction itself.[FN109]

FN107. 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004).

FN108. *Id.* at *119.

FN109. *Id.* ("[T]he board-or at the very least the Special Committee-should have insisted that Prudential and Cahill recuse themselves from the negotiations. By [failing to do so], ECM was deprived of the advantage of knowledgeable advisors. That advantage was conferred upon ECM's controlling stockholders and to-be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

adversary in the transaction-Prosser. There is no evidence that either the full board or the Special Committee ever considered that issue.").

Structural protections embedded in the merger offer are also of some importance in establishing the fair dealing aspect of entire fairness. As the Supreme Court held in *Kahn v. Lynch,* a majority of the minority voting provision, even without an independent special committee, can shift the burden of entire fairness to the plaintiff.[FN110] Similarly, this court has suggested repeatedly that the presence of a non-waivable "majority of the minority" provision is an indicator at trial of fairness [FN111] because it disables the power of the majority st ockholder to both initiate and approve the merger. [FN112]

FN110. *Kahn I,* 638 A.2d at 1117.

FN111. *Jedwab v. MGM Grand Hotels,* 509 A.2d 584, 599-600 (Del. Ch.1986) (a majority of the minority provision " typically constitute[s] indicia of fairness").

FN112. *In re Pure Resources S'holders Litig.,* 808 A.2d 421, 442 (Del. Ch.2002).

Finally, the discussions between the parent and the special committee should be conducted in a way that is consistent with arm's-length negotiations. These negotiations need not, of course, be a "death struggle." [FN113] But they should be vigorous and spirited, and provide evidence that the special committee and the parent are not colluding to injure the minority stockholders. At a minimum, the special committee should have control over its own sources of information and should have the loyalty of its advisors throughout the process. [FN114]

FN113. *In re Cysive,* 836 A.2d at 543.

FN114. *Id.* at 554. ("Once [the parent] became a buyer, [the investment bank's] reporting authority went straight to the special committee, and it acted as a

vigorous negotiator on the committee's behalf.").

While this list of factors is not exhaustive, the lesson it should collectively teach to transactional planners faced with conducting such a process is unmistakably clear. If a parent seeks to satisfy the high standard of entire fairness by establishing a special committee, its burden to show fair dealing cannot be satisfied by orchestrating a stylized mockery of arm's-length negotiation.[FN115] In order to satisfy entire fairness, the committee must act with informed diligence, and seek the best result available for its constituents, given the facts at hand.

FN115. *See, e.g, Rabkin,* 1990 Del. Ch. LEXIS 50.

### 2. Was The CP Merger With IIC The Product Of Fair Dealing?

CP's defense of fair dealing is necessarily based on the purportedly arm's-length negotiating process it instituted in order to establish the merger price. [FN116] Other factors that have shown fair dealing in the past are simply inapplicable here. Neither CP nor IIC claim to have sought alternative, third-party buyers for the company,[FN117] for example, or to have undertaken any other action that might make the CP/IIC merger process the product of fair dealing. In sum, therefore, the question of whether this merger evidenced fair dealing is entirely dependent on the quality of the negotiations between Simon, as the sole member of the special committee, and the team at CP.

FN116. The court does not reach the plaintiff's numerous disclosure claims. Simply put, while it is settled law that adequate disclosure is part of the duty of fair dealing, Folk *supra* note 91, at § 251.6.3.6, the alleged disclosure violations in this case are entirely overshadowed by the plaintiff's substantive allegations of unfair dealing. Even if the defendants had disclosed all material facts in their proxy materials, the court would not be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 16

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

persuaded that the entirely coercive CP/IIC merger, which never depended on the minority's vote, would have been any more fair. *See e.g., Kahn II,* 669 A.2d at 89 (holding that a finding of adequate disclosure in a parent-subsidiary merger was persuasive evidence of entire fairness, because "although the merger was not conditioned on a majority of the minority vote ... more than 94 percent of the shares were tendered in response to Alcatel's offer ").

FN117. *In re Cysive,* 836 A.2d at 553 (discussing factors that supported the conclusion that an interested transaction met the "exacting standard of entire fairness," the court observed, "first, the decision to enter into the Snowbird Agreement was preceded by an active and aggressive search for a third-party buyer").

**\*13** It is unfortunate, therefore, that the process designed by Schreier, Filer, and the rest of the CP board to effectuate the merger between CP and IIC in the case *sub judice* fails at the very threshold to establish fair dealing. Indeed, redolent as they are with cynicism and corruption, the facts in this case serve as a singular example of the pitfalls inherent in organizing any sort of self-dealing transaction. This court cannot allow so clear a breach of fiduciary duty to escape without remedy.

The flaws in the special committee process begin with the appointment of Simon as the sole member of the committee. Although the court acknowledges that no other independent director was available, and that Simon was independent of CP, this lone appointment necessarily causes the court to examine the entire process with a higher level of scrutiny, and equally causes the court to require more of Simon than it would had he been joined by other independent directors. Unfortunately, the facts of this case serve to illustrate exactly why a single-member special committee has been thought such a worrisome portent of unfair dealing. On numerous occasions during the course of negotiations, a second director might have ameliorated the process by counseling Simon to

think again, or by making it more difficult for CP to exert the control it exerted over the special committee. But that moderating influence was never available.

At the heart of the court's conclusion that the negotiation process was flawed is the fact that Simon's mandate as a special director, whether embodied by the June 2001 IIC board consent or otherwise, was fatally incomplete. The mandate entirely failed to set out a clear range of authority for Simon in terms of his power to approve or disapprove the merger. The plain language of the June 2001 board resolution allows Simon only to provide a vague recommendation as to the transaction, a power that Simon was unsure included any right to veto the merger.[FN118] This seemingly willful vagueness in Simon's mandate, and of CP's authority to proceed with or without minority approval, sits in contrast to those cases where special committee negotiations have been held to help establish entire fairness.[FN119]

FN118. Tr. 833:7-13.

FN119. *See, e.g., In re Cysive,* 836 A.2d at 554 (noting, in the course of finding that a transaction evidenced entire fairness, a fully empowered special committee was an important factor in that conclusion) (" Second, once the Snowbird offer was made, a special committee was set up that had *full authority* to negotiate with Carbonell on Cysive's behalf regarding that transaction.").

Additionally, and somewhat uniquely, the record in this case evidences the parties' deep confusion about the nature of the contemplated transaction. The evidence shows clearly that when this transaction was first negotiated during the summer and fall of 2001, the parties all envisioned a tender offer followed by a short-form merger. It is unclear whether they considered the consequences of the fact that the tender offer could fail to provide CP with 90% ownership of IIC. The tender offer materials, as described above, show the same intent when the offer was initiated in October 2001,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 17

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

although those documents evidence CP's intention to later consummate an unspecified merger regardless of the result of the tender offer. At this point, therefore, CP was in no sense contemplating the type of long-form merger transaction our courts usually are asked to assess, characterized by a full negotiation between the parent and the subsidiary's special committee, the signing of an agreement of merger, and a possible tender offer in connection with that finalized transaction. Rather, CP appears to have initiated a process that was in some ways like the unilateral tender offer process approved in *In re Siliconix Shareholders Litigation* [FN120] and in *In re Pure Resources, Inc. Shareholders Litigation,* but mimicked the traditional merger route by including the subsidiary intimately in the process even before the tender offer was officially made.[FN121]

> FN120. 2001 Del. Ch. LEXIS 83 (Del. Ch. June 19, 2001).

> FN121. The court need not reach the question of exactly what level of scrutiny would have attached to that transaction had the tender offer succeeded in driving CP's ownership of IIC over 90%. Certainly, the lack of a non-waivable majority of the minority provision in the October 15, 2001 tender offer would have raised serious questions about its lack of coercion.

**\*14** When the tender offer failed, however, the short-form merger became impossible. It was only then that CP decided to proceed definitively with a long-form merger. It chose to do so, however, without undertaking any further formalities to ensure that this somewhat new transaction would be fair to the minority stockholders, other than having Filer, apparently on behalf of CP, hire Shaw Pittman to review Ottensoser's work. The court cannot be sure whether CP proceeded in this way because it felt that the negotiations between Simon and the special committee with regard to the initial tender offer were sufficient to establish the fairness of the merger or because it simply failed to understand that the change in transactional form could, at least, have some consequences in terms of

judicial scrutiny. Simon's testimony, in any case, betrays a deep confusion as to the distinction between a tender offer and a merger. Whatever the truth of the matter, the validity of the merger approved on March 27, 2002 rests primarily on work done months earlier, formally to approve a tender offer approach. That disjunction, never addressed internally either by IIC or CP, casts serious doubt on whether Simon's inadequate mandate was even intended to apply to the later long-form merger, or whether his role as a special committee director was really designed exclusively to evaluate the tender offer.

The court does not mean to imply that a change from one transactional form to another requires a wholesale retreading of ground previously covered, and corporations can change their minds as to how they choose to structure fundamental transactions, even in mid-stream.[FN122] But neither Simon's testimony, nor any other part of the record, convince the court that the parties in this case acted from the beginning with a view toward a long-form merger.

> FN122. *See e.g., Paramount Commc'ns, Inc. v. Time, Inc.,* 571 A.2d 1140 (Del.1990).

Even if Simon had clearly been granted the power to say "no," his efforts were crippled by the special committee's complete lack of independent legal and financial advice. Doubtless, Simon's mandate formally gave him the authority to hire financial and legal advisors to evaluate the tender offer. But the reality of these appointments was that both the special committee's financial and legal advisors were handpicked by CP. Jesup & Lamont were effectively selected by CP and Filer, having been contacted months earlier, and having essentially been promised employment by Filer rather than the special committee. That conflict of interest robs Jesup & Lamont's fairness opinion of its value as an indicator of fairness, and is itself an indicator that the parties did not structure the process in a way that was entirely fair. The situation in this case, in sum, is of a more alarming kind than the dual representation in *In re Tele-Communications, Inc.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

where the skewed incentives of the special committee's financial advisor merely suggested possible disloyalty. Here, as shown indisputably at trial, Jesup & Lamont were actively and persistently disloyal to the special committee and to its aims of ensuring a fair transaction for IIC's minority stockholders.

**\*15** Simon's decision to retain Ottensoser as the special committee's legal counsel was, if anything, even more damaging to the special committee's duty to be well and independently informed. Ottensoser was IIC's outside counsel, was beholden for his job to a board entirely dominated by CP, and had indeed been advising CP on its approach to the tender offer from the beginning. No reasonable observer could have believed that Ottensoser was an appropriate independent counsel for the IIC special committee. It is most unfortunate, therefore, that Simon accepted Ottensoser's frankly incredible statement that his dual representation of IIC and the special committee presented no conflict of interest. Both Ottensoser's work as counsel for the IIC special committee, and Simon's blithe acceptance of his representation, are evidence of unfair dealing. Indeed, as the Supreme Court observed in a similar case, the fact that the parent's "General Counsel suggested the name of appropriate legal counsel to the Special Committee, and that individual was promptly retained," was a notable indicator that the special committee's process was not to be trusted.[FN123] Here, CP ensured its control over the special committee process by the simple expedient of inserting its own outside counsel directly into the opposition camp.[FN124]

> FN123. *Kahn v. Tremont,* 694 A.2d 422, 429 (Del.1997).

> FN124. *In re Cysive,* 836 A.2d at 531, presents an important limitation on the court's suspicion as to advisors shared between the parent or subsidiary and the special committee. In that case, the subsidiary in a proposed merger between a parent and a subsidiary formed a "pristine" special committee composed of two independent directors. The committee then

retained the same investment bank as its own advisor as the subsidiary had retained in its initial, failed, efforts to sell the company to a third party. The court found that this dual representation did not conflict the investment bank, because the bank's responsibilities now clearly ran to the special committee. As the court noted, " once [the parent] became a buyer, [the investment bank's] authority went straight to the special committee, and it acted as a vigorous negotiator on the committee's behalf." *Id.* at 554. The differences between that case, and the situation in this case, where the special committee's advisors fed information to the parent throughout the process, are substantial and determinative.

Even had Ottensoser been a fully independent advisor, the court is troubled by Simon's failure to investigate Ottensoser's qualifications to serve as transactional counsel. As Simon flatly testified, he considered no other lawyers, and in fact accepted CP's "appointment" of IIC's counsel as his own. But the ramshackle way in which the merger between IIC and CP was organized raises, to say the least, very serious doubts about Ottensoser's familiarity and competence to give a client advice about Delaware fiduciary duty law. This case, therefore, presents a situation in which the special committee's advisors are of little use in establishing the entire fairness of the merger transaction. As the Supreme Court observed in *Kahn v. Tremont,* "professional advisors have the ability to influence directors who are anxious to make the right decision but who are often *in terra [in]cognito.*"[FN125] No evidence in this case suggests that Simon was able to rely on his conflicted and inexperienced advisors for the help he so obviously needed.

> FN125. 694 A.2d at 429.

The court can take no comfort, therefore, in the prophylactics established by the IIC board to ensure that the CP/IIC merger was the product of fair dealing. Regrettably, moreover, the negotiation between CP and IIC was rife with substantive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

unfairness.

Considered alone, the most disturbing email sent on May 17, 2001 between Ottensoser, Filer, and Zarriello is enough to cast a dark shadow over the entire merger process. The plain text of the message shows that CP had no intention of negotiating at arm's length with the special committee, but rather planned from the beginning to orchestrate an unfair process with a predetermined result. Even more problematic, the defendants were successful in carrying out the plan described in that letter. CP managed to dupe Simon into hiring Jesup & Lamont as his financial advisor. It then proceeded to make precisely the "lowish" offer envisioned in the email message, which Simon approved exactly as the letter said he would after a nominal increase in consideration. This email was not, in other words, a merely descriptive piece of work recording the process that CP hoped would transpire. It prescribed, in advance, the process that Jesup & Lamont would convince Simon to follow in the future on behalf of the subsidiary. As such, it is clear and startling evidence that the facade of arm's-length negotiation constructed by CP was nothing more than a sham.

**\*16** Equally troubling, as was entirely obvious from trial, was the fact that information flowed freely from Jesup & Lamont to Filer at CP. The evidence shows that Filer knew Simon's private valuations of IIC at all relevant times. In fact, without Simon's knowledge, Filer was receiving a stream of draft valuation reports on which to base his negotiating strategy against the special committee. This sieve-like separation between Jesup & Lamont and CP was obviously inimical to the special committee's power to negotiate a fair transaction. Any transaction that relies on so transparently corrupt a process cannot possibly be found to satisfy the high standard of entire fairness.

To summarize the collected weight of the evidence, the court finds that the process established by the defendants unilaterally imposed on the minority a price of the parent's own choosing, established a deceptive negotiation between the parties, and left the minority's putative special committee almost entirely powerless against its parent. This muddled,

dishonest, process is emphatically not what the Supreme Court meant by fair dealing in *Weinberger,* and will not be tolerated here.

### 3. Fair Price

The defendants' arguments as to the procedural fairness of the underlying merger are halfhearted, and their papers walk the line of conceding that the negotiations between CP and IIC were, as this court has held, severely lacking in fairness.[FN126] But, the defendants argue, the price paid in the transaction was entirely fair. Not because $10.50 was a fair price at the time Simon approved the tender offer on September 10, 2001, but because September 11, 2001 intervened between Simon's approval and the merger.[FN127] The defendants argue that whatever the fairness of the price on September 10, the next day's cataclysm so depressed IIC's intrinsic value that $10.50 became a fair price. Indeed, the defendants' valuation expert testified at trial that IIC was worth only $9.60 on the date of the merger. Therefore, the defendants contend, the merger between IIC and CP was entirely fair.

> FN126. Def.'s Opening Post-Trial Br. at 36. ("[D]ue to poor legal advice from their American lawyer, IIC and CP Holdings were unaware of procedural safeguards ... that would have insulated the going-private process from challenge.... Despite any procedural missteps of IIC and CP Holdings ... the minority shareholders received more than fair value for their shares in the March 2002 merger.").

> FN127. Our courts have held that the correct test of fair price is that "upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before." *Rosenblatt v. Getty Oil,* 493 A.2d 929, 940 (Del.1985). This " involves all relevant economic factors of the proposed merger, such as asset value, market value, earnings, future prospects, and any other elements that affect the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 20

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

inherent or intrinsic value of a company's stock." *Id.* Therefore, in general, the techniques used to determine the fairness of price in a non-appraisal stockholder's suit are the same as those used in appraisal proceedings. Folk, *supra* note 91, at § 251.6.2.

As a logical matter, of course, the defendants are right to note that if $10.50 was even in the vicinity of a fair price on September 10, and if the defendants had shown that IIC was affected to the same extent as many American companies on September 11, then the fair price on September 12 would be somewhat below $10.50. Neither of these assumptions, coincide with the evidence presented in this case.

Initially, the defendants have frankly failed to show, as is their burden, that the September 11 terrorist attacks had a significant effect on IIC. The defendants' papers simply rely for this causal link on a combination of common sense and the fact that the CP board discussed lowering the offer price after the attacks but declined to do so. The evidence adduced at trial, however, does not support the conclusion that September 11 had a material affect on IIC's intrinsic value. The component of IIC most likely to be affected by September 11 was Danubius, a hotel company, and the largest part of IIC's valuation. Filer testified that September 11 certainly would have some effect on Danubius's business, because Americans would be less likely to visit Hungary and the Czech Republic.[FN128] But Filer also testified that Americans formed a smaller part of the business than other customers. And it is not at all obvious to the court that Germans, the key Danubius client, would stop vacationing in eastern Europe because of an attack on New York,[FN129] especially when, as Filer also testified, any decline in German tourism could just as easily be explained by the fact that the "German economy was starting to suffer from a recession" [FN130] which in fact much predated 2001. Danubius was also under pressure from increased competition in Hungary, due in part to government subsidies for spa hotels. [FN131] Further, as is clear, world currency trends leading to a strong Hungarian forint were hurting revenues.[FN132] The defendants have produced no

credible evidence that all of these developments were somehow localized to the time after the $10.50 price was approved by Simon. If Danubius was suffering, no evidence shows that September 11 was the cause.

> FN128. Tr. 751:4-10.
>
> FN129. Danubius Hotels' own Annual General Meeting report notes, in reference to the Czech hotels, that they "did not feel the September 11 events (as most of their guests are European, the majority is from Germany"). JX 156.
>
> FN130. Tr. 750:16-24.
>
> FN131. Tr. 751:12-24.
>
> FN132. Tr. 750: 20-24.

**\*17** Nor is it especially obvious to the court that IIC's other businesses were materially affected by September 11. It is hardly credible that Balton, a company operating in environments so risky that the defendants' own expert imposed a 12.5% specific country risk premium on its revenues,[FN133] was likely to become any more risk-prone due to terrorist attacks, or that its market for basic food products would decline substantially. And IIC's companies in Israel had surely already factored into their plans the extreme risk of terrorism on their front step, rather than thousands of miles away in New York. The second intifada, for example, began in September 2000, a full year before September 11 supposedly weakened ITE's and Zoko's prospects. None of this in any way is meant to minimize the effects of the attacks of September 11, which were felt so acutely and so intimately in this country. But the defendants have failed to show that they materially undercut the value of IIC, a company wholly based overseas.

> FN133. JX 311 at 39.

Nor have the defendants given any reason for this court to believe that the price was fair on either side

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 21

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

of September 11. Of course, the price of $10.50 per share was well below the $13 determined to be an acceptable price at the beginning of the process by CP, a fact known to Simon and Jesup & Lamont. It was below what the court determines an appraisal process would show. It was, as the evidence adduced at trial demonstrated, even below the illiquid market price of IIC shares. As this court has held in the past, reliance on a price determined in a thinly traded, illiquid, market is evidence of a price's unfairness.[FN134] Yet, in this case, the minority stockholders would actually have been better off had CP bought the shares in exactly that sort of market. The only indicator of fairness the price adhered to was Jesup & Lamont's valuations during the negotiation process. But as already discussed, Jesup & Lamont was deeply conflicted, ostensibly hired by the special committee, but plainly loyal to CP. In sum, the price of $10.50 per share for IIC was unfair, and is obviously so from the evidence adduced at trial. The defendants have failed to show that September 11 changed that basic truth.

> FN134. *Seagraves v. Urstadt Property Co.,* 1996 Del. Ch. LEXIS 36, *22 (Del. Ch. Apr. 1, 1996).

### C. Remedy

As this court has held in the past, and as affirmed by the Supreme Court, the calculation of damages in a consolidated entire fairness and appraisal action decided on the basis of entire fairness is a flexible process. As such, significant discretion is given to the court in fashioning an appropriate remedy. In determining damages, the court's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate...." [FN135] Or, as the Supreme Court has described this court's authority, "the Court of Chancery has greater discretion when fashioning an award of damages in an action for a breach of the duty of loyalty than it would when assessing fair value in an appraisal action." [FN136] Obviously, the court cannot award punitive damages. But the court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the

breach of the fiduciary relationship.[FN137]

> FN135. *Weinberger v. UOP,* 457 A.2d 701, 714 (Del.1983).

> FN136. *Int'l Telecharge v. Bomarko, Inc.,* 766 A.2d 437, 441 (Del.2000).

> FN137. *Id.*

**\*18** This case presents exactly such a situation. Plainly, IIC is extremely difficult to accurately value. It was difficult to value before September 11 due to its wide ranging holdings in highly divergent markets. It became, perhaps, even more difficult to value after September 11 because this court cannot know how to factor the effects of terrorism into a company already exposed to terrorism in Israel, unreliant on American visitors in Hungary, and otherwise exposed to sovereign risks in Africa that must far outstrip the effects of September 11. The court will, therefore, evaluate the reports of the experts produced by both sides, conduct its own DCF analysis based on the findings of those experts, [FN138] and test the results of that financial analysis against the facts of this case in order to ensure that the value produced by that analysis is consistent with what the court believes is the proper measure of damages.[FN139] Because the court is convinced this process yields a value at least as high as a formal appraisal, the court will not perform a separate statutory appraisal, but instead, uses the value ascertained as a basis on which to compensate all individual and class plaintiffs.

> FN138. As this court has recently noted, " [t]he DCF model of valuation is a standard one that gives life to the finance principle that firms should be valued on the expected value of their future cash flows, discounted to present value in a manner that accounts for risk. The DCF method is frequently used in this court, and [the court] ... prefer[s] to give it great, and sometimes even exclusive, weight when it may be used responsibly." *Andaloro v. PFPC Worldwide,* 2005 Del. Ch. LEXIS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 22

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

125, *35 (Del. Ch. Aug. 19, 2005).

FN139. Even in a case that is purely a matter of statutory appraisal, this court retains considerable discretion to arrive at a fair value. *Union Ill.1995 Inv. L.P. v. Union Fin. Group,* 847 A .2d 340, 356-57 (Del. Ch.2003) ("I am free to consider all non-speculative elements of value, provided that I honor the fair value definition articulated by the Delaware Supreme Court. This does not mean that I must perform every conceivable valuation technique in the universe and then give some arithmetic weight to each of them. Rather, I am empowered to come up with a valuation, drawing on what I reasonably conclude is the most reliable evidence of value on the record.").

### 1. *DCF Analysis*

The court concludes that the evidence adduced at trial does not support the conclusions of the plaintiff's expert, David Fuller. First, Fuller's opinion relies to a material extent on expert valuations, by Russell Kett for Danubius and Ofer Nir for the Zoko real estate. As proven at trial, however, both of these valuations are seriously suspect.

Kett is a managing director at HVS International, a firm based in London, Egland, specializing in the valuation and financial analysis of hotels. [FN140] He was hired by Fuller, on the plaintiff's behalf, to conduct a valuation of eight hotels owned by Danubius in Budapest, and the values that he derived for those hotels were incorporated into Fuller's valuation for that company, which is by far the largest component of IIC's overall value. Kett's testimony concerning his valuation report, however, led to serious suspicions regarding its reliability. Two of his most significant errors demonstrate particularly why the court can give no weight at all to his opinion.

FN140. Tr. 5:23-24.

The first of these errors concerns the franchise fee that the Budapest Hilton Hotel was required to pay to the international Hilton company for the privilege of using the well known brand name. As Kett forthrightly conceded in his initial report, that fee was necessarily part of any valuation of Danubius, and would reduce the company's value:

The Hotel is operated under a franchise agreement with Hilton Hotels. We have not had sight of any of the terms of this agreement, nor are we aware of the fees payable to Hilton Hotels. We note that the fees in 2001 were approximately 7.7% of total revenue and have allowed this amount to increase with inflation in our projections. [FN141]

FN141. JX 137 at 23.

When Kett actually did the calculations to derive the value of the Budapest Hilton in his initial report, he inexplicably omitted this substantial expense, [FN142] thus greatly overvaluing the hotel. When this clear mistake became evident, Kett issued a revision to his report purportedly fixing the error. [FN143] As Kett testified, this revision was meant to do nothing but correct the omission of the franchise fee.[FN144] At trial, however, it became clear that although Kett purported to have fixed the error in his calculations, he had somehow made yet another mistake. This time, although his calculations included a franchise fee, that fee was self-evidently too low. [FN145] Again, therefore, Kett's valuation was plainly wrong, and overstated the Budapest Hilton's value.[FN146] When Kett was questioned about his mistakes at trial, he could provide no explanation and no indication of what the value of Danubius would be if he had done the calculation correctly.[FN147]

FN142. *Id.* at 24.

FN143. JX 262.

FN144. Tr. 59:12-16.

FN145. Tr. 62:12-18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN146. Tr. 63:17-20.

FN147. Tr. 63:14-24.

**\*19** Kett's second serious error concerned the calculation of the sale value of the Budapest Hilton, which was incorporated into the tenth year net income of the hotel's DCF value.[FN148] In his original report, completely omitting the franchise fee, Kett had arrived at a sale value for the hotel of roughly 20.1 million HUF. His revised report, taking into account the (admittedly too low) franchise fee, replaced this figure with a new value of 19.5 million HUF,[FN149] a difference of approximately 600,000 HUF. When questioned at trial about how he arrived at this number, it became apparent that this revised calculation had no basis in fact. Rather, taking Kett's own calculations on their face, the correct sale value of the Budapest Hilton was about 16.4 million HUF,[FN150] a difference of about 3 million HUF from the number he incorporated into his calculations of Danubius's value. During cross-examination, Kett had no explanation whatsoever for this significant, and easy to conceal, mistake.[FN151] He conceded, however, that using the correct value would substantially lower his valuation.[FN152]

FN148. JX 137 at 25.

FN149. JX 262 at 25.

FN150. Tr. 65:6-12.

FN151. Tr. 66:13-16.

FN152. Tr. 67-1-14.

The court gave the plaintiff the evening after Kett's testimony to provide some further explanation of these two mistakes. What emerged the next morning were completely novel rationalizations of Kett's valuations, none of which Kett had so much as alluded to when he was questioned at trial.[FN153] Given that Kett repeatedly assured the court that he had been personally involved with the valuations at every stage,[FN154] the court finds it extremely unlikely that Kett could have simply forgotten these important aspects of his own valuation. Rather, as the court observed at trial, the more plausible explanation of Kett's failure to testify as to these explanations when he was first asked about them is that they were concocted only after his mistakes became apparent. Kett's after-the-fact revisions to the plain text of his report, therefore, do nothing to reassure the court as to the reliability of his work, and are fatal to Fuller's report as it relates to Danubius.

FN153. Tr. 269-279.

FN154. *See, e.g.,* Tr. 13.

Fuller also relied on Nir's valuation of certain pieces of real estate owned by ITE and used by Zoko in order to run its business. Specifically, these included a 23,199 square meter lot at Kiriyat Beyalik, and a smaller lot at Holon. The court believes that Nir's valuation, and its use by Fuller, was more reliable than Kett's flawed analysis. When incorporating Nir's valuation into ITE's balance sheet, for example, Fuller was careful to use only the lower of the valuations found by Nir, and to eliminate any value for a third, smaller, property, for which Nir was unable to provide either a book or market value. Moreover, Nir correctly anchored his valuation at the low end of the price per square meter for somewhat similar properties in the Israeli market.[FN155] However, Nir's valuation was heavily based on documents that either could not be found and presented as evidence, or were produced only shortly before trial and were available only in Hebrew. This fact prejudiced the defendants and reduces the court's confidence in Nir's opinion. Further, Nir conceded that he had only been hired to conduct a "short version" valuation, and had not even been inside the properties he was meant to value.[FN156] On the whole, therefore, the court believes that Fuller's complete reliance on Nir's opinion was unjustified.

FN155. Tr. 400:5-11.

FN156. Tr. 161; Tr. 162: 13-15.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 24

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*20** Additionally, the court finds that Fuller made certain other mistakes in his valuation analysis that render his testimony unreliable. In his initial report, Fuller relied on forecasts for the IIC constituent companies that differed considerably from the forecasts produced by management. Later, Fuller adopted Beaton's DCF analysis for Danubius, Agrimill, and Balton, apparently conceding that management analysis was a better basis for valuation than his own subjective valuations.[FN157] Further, he used country-specific risk premia that the court believes were too low for all the IIC constituent companies, incorrectly applied control premia to DCF analysis, and entirely discounted the existence of a small-stock risk premium in all circumstances. [FN158] These troubling weaknesses in Fuller's valuation mean that the court cannot adopt the plaintiff's fair value conclusion of \$20.17.

FN157. Tr. 354:2-15.

FN158. Tr. 243:21-24; Tr. 244:1-10.

In contrast, the court believes that the evidence adduced at trial substantially supports the report of the defendant's expert, Neil J. Beaton. Thus, the court will adopt it as the general framework for its own valuation. Specifically, the court believes that using a scenario analysis, averaging conservative and optimistic possibilities, is the most appropriate valuation technique for a company in the somewhat uncertain position of IIC at the time it was to be valued. The plaintiff has, however, raised significant questions about certain aspects of Beaton's methodology. The court is convinced, therefore, that a proper valuation of IIC would require several material adjustments to Beaton's report. These are discussed in turn below.

a. *Beaton's Application Of Specific-Company Risk Premia*

A so-called "specific-company risk premium" (SCRP) is added to a discount rate when valuing an asset "to the extent that the company has risk factors that have not already been reflected in the general equity risk premium as modified by beta

and the small company size premium." [FN159] In his value determination, Beaton applied a SCRP to all constituent parts of IIC. In valuing Danubius, for example, Beaton applied a SCRP of 3% under his optimistic scenario, and 2% under the conservative scenario. In his view, these premia were justified due to a variety of risks faced by the constituent companies of IIC not reflected in the industry beta. For Danubius, therefore, Beaton "identified the over-supply of hotels in the Budapest market, and in Hungary overall, [and a major cut-back in] capital expenditures." [FN160]

FN159. Shannon Pratt, The lawyer's Business valuation Handbook 125 (2000).

FN160. Tr. 533.

As a commonly used reference in Delaware case law explains, "estimating [the SCRP] necessarily requires some subjective judgment on the part of the appraiser." But, as the same source explains, " the more the judgment is based on rigorous financial analysis, the more reliable the result is likely to be." [FN161] As a result of the inherent subjectivity of the SCRP, our courts have been ambivalent in their approach to the use of that premium. In *Union Illinois 1995 Investment L.P. v. Union Financial Group, Ltd,*[FN162] for example, this court rejected the use of a company-specific risk premium, without purporting to decide in general whether such premia are appropriate to a financial analysis. Although, as the court noted, " investors do consider company-specific risks in calculating the cost they will use in investing capital, ... pure proponents of CAPM argue that only systemic risk as measured by beta is relevant to the cost of capital and that company-specific risks should be addressed by appropriate revisions in cash-flow estimates." [FN163] This court has also explained that we have been "understandably ... suspicious of expert valuations offered at trial that incorporate subjective measures of company-specific risk premia, as subjective measures may easily be employed as a means to smuggle improper risk assumptions into the discount rate so as to affect dramatically the expert's ultimate opinion on value." [FN164] As this court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 25

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

observed in *ONTI, Inc. v. Integra Bank,*[FN165] applying a company-specific premium in the *absence* of beta, "the concept of a company-specific risk premium is not so prevalent as [defendants] imply." [FN166] In accordance with that sentiment, our courts have not applied company-specific risk premia without fact based evidence produced at trial on which to base that discount.

FN161. Pratt, *supra* note 159 at 121.

FN162. 847 A.2d at 340.

FN163. *Id.* at n. 28.

FN164. *Solar Cells, Inc. v. True N. Partners,* 2002 Del. Ch. LEXIS 38, *21 (Del. Ch. Apr. 25, 2002).

FN165. 751 A.2d 904, 920 (Del. Ch.1999).

FN166. *Id.* at 920; *see also, Hintmann v. Weber,* 1998 Del. Ch. LEXIS 26 (Del. Ch. Feb. 17, 1998) ("a company specific risk premium 'remains largely a matter of the analyst's judgment, without a commonly accepted set of empirical support evidence.' Thus, the factors relied upon in assessing an investment specific premium should be carefully explained to the court. As with all aspects of a party's valuation for purposes of Section 262, the proponent of a company specific premium bears the burden of convincing the court of the premium's appropriateness.") (internal citations omitted).

*21 In this case, the court finds that the defendants did not carry their burden of proving the appropriateness of company-specific premia for IIC constituent companies. As Beaton conceded at trial, his application of the SCRP was based almost entirely on his subjective beliefs as to the correct discount rate for each IIC company. He was unable, crucially, to point to specific financial analyses on which the court could rely to derive such a discount. Indeed, when discussing the correct SCRP to be applied to Balton, Beaton flatly admitted that he

applied only 100 basis points of risk to that company because he felt that to add more would " be, actually, punitive at that point." [FN167] The court recognizes that some level of subjectivity is inherent in the calculation of SCRP. Beaton's analysis, however, is unmoored to any objective financial analysis the court can reasonably evaluate, and thus cannot be the basis of what are, in aggregate, substantial discounts to IIC's fair value. In view of that conclusion, the court has applied no SCRP for any IIC constituent company, whether in the conservative or optimistic DCF scenarios.

FN167. Tr. 563:22-23.

b. *Beaton's Application Of Small-Company Risk Premia*

In deriving the value for IIC, Beaton applied small-company risk premia to all IIC constituent companies, relying on the Ibbotson Associates chart, *Size Premium in Excess of CAPM,* for guidance on incorporating the size effect into the equity discount.[FN168] Specifically, relying on that source, Beaton adds a small-size premium of 5.33% to the Weighted Average Cost of Capital (WACC) of all the IIC companies, including Danubius, arguing that all of these companies' market capitalizations fall within the tenth decile of the companies observed by Ibbotson.

FN168. Pratt, *supra* note 159, at 125.

In short, a small-stock premium arises from empirical observations that the common stocks of small firms generally provide higher mean returns than do the stocks of large firms.[FN169] Studies have also shown, however, that smaller companies tend to experience higher risk than larger companies. [FN170] Financial analysts have, on that basis, applied a further discount to the valuation of small companies in order to reflect that increased risk.

FN169. Christopher B. Barry, et al., *Robustness of Size and Value Effects in*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 26

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
(Cite as: Not Reported in A.2d)

*Emerging Equity Markets 1985-2000* at 1 (Texas Christian Univ. Center for Fin. Studies, Working Paper, 2001).

FN170. Pratt, *supra* note 159, at 125.

The small-size premium, although somewhat controversial, is a generally accepted premise of both financial analyses and of this court's valuation opinions.[FN171] What differentiates the facts in the present case from other circumstances in which the small-size premium has been applied, however, is that the IIC constituent companies all operate entirely outside the U.S., while the Ibbotson charts rely solely on observations of the U.S. market. The general question that Beaton's decision to apply small-size premia raises, therefore, is whether size risk premia developed for the U.S. market are applicable in any sense to a foreign corporation. In other words, Beaton's valuation calls on the court to decide whether there is something inherently risky about the stock of companies that are small compared to their global competitors, or whether the small-stock premium arises only when a company is small in relation to the market on which it trades.

FN171. *ONTI,* 751 A.2d at 920 ("this court has traditionally recognized the existence of a small stock premium in appraisal matters"); *Hintmann,* 1998 Del. Ch. LEXIS at *14 ("a small stock premium is appropriate to reflect that 'on average, smaller companies have higher rates of return than larger companies.' This Court has accepted the addition of small stock premia."); *Emerging Communications,* 2004 Del. Ch. LEXIS at *71 ("although plaintiffs contend that there is no basis in the finance literature or theory for adding a 'small firm/small stock' premium to the cost of equity, that is not entirely accurate. There is finance literature supporting the position that stocks of smaller companies are riskier than securities of large ones, and therefore, command a higher expected rate of return in the market. Our case law also recognizes the propriety of a small

firm/small stock premium in appropriate circumstances.").

*22 Our courts have never squarely considered the question of the international application of U.S. small-size premia, especially in developing or newly developed markets. The finance literature, further, is deeply conflicted, and indeterminate, on the correct application of such premia in foreign valuations. As multiple important sources have noted, the small-size premium almost certainly does not apply in a uniform way in all markets. Rather, local factors and local conditions necessarily change whether a corporation can expect to experience the higher risk and higher returns that small corporations evidence in the U.S. One study states, for example:

Initially, we define size for each firm relative to each firm's local market average. Unlike BE/ME, which suffers from incomparability across markets due to differences in accounting, size is entirely comparable across markets: $100 million in Brazil is exactly the same value as $100 million in Zimbabwe. However, if size matters at the local level, then using absolute size in portfolios may mask the effect that size has in distinct markets and in fact could capture differences in performance across markets rather than the effect of size *per se.* For example, the *average* size of a stock in Brazil in our data is $1.7 billion. The *largest* stock from Zimbabwe in our data is $1.5 billion.... In Section VI of the paper, we also report results using absolute size, or size not adjusted by the average size in the local market. The choice of relative size versus absolute size is ultimately a question of the degree to which emerging capital markets are integrated globally. In a perfectly integrated global capital market in which investors freely select from among all securities in global markets, absolute size would be the preferred measure of size. If, alternatively, global capital markets were completely segmented, relative size would be the appropriate measure to employ in testing for the existence of a size effect.[FN172]

FN172. *See* Barry, *supra* note 169, at 6-7.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

There are various reasons that the global capital markets might be segmented, thus leading to results for small stocks that differ somewhat from those observed in the U.S. and in other leading developed economies:

Foreign investors may be first attracted to large (blue chip) shares, which would tend to increase their returns relative to smaller stocks. In addition, in some countries, larger firms may have had increasing access to cheaper capital over this period, either domestically through government-subsidized credit or, more likely, through lower-cost international financing, which would make their equity more attractive. Finally, it is possible that trade and other reforms that occurred in many of these countries could have benefitted large firms more than their smaller counterparts.[FN173]

> FN173. Stijn Claessens et al., *The Cross-Section of Stock Returns* 12 (The World Bank, Policy Research Department, Policy Research Working Paper No. 1505, 1995).

The end result of this uncertainty is reflected in recent empirical studies. Some scholars have discovered that small stocks enjoy premiums over large stocks in developing economies, just as in more developed economies.[FN174] But others believe that "in many cases, the signs of those coefficients are contrary to those found in many developed markets. This is especially true for size."[FN175] The general weight of the scholarship, in summary, seems to be that the small-size premium might well apply in the same way as in the U.S. in more highly developed foreign markets, and would not apply to the same extent, or at all, in newly developing markets.

> FN174. K. Geert Rouwenhorst, *Local Return Factors and Turnover in Emerging Stock Markets* (Yale University, School of Management, Working Paper Series, 1998) ("The paper shows that the factors that drive cross-sectional differences in

expected stock returns in emerging equity markets are qualitatively similar to those that have been found in developed equity markets. In a sample of more than 1700 firms from 20 countries, I find that emerging market stocks exhibit momentum, small stocks outperform large stocks, and value stocks outperform growth stocks.").

> FN175. Claessens, *supra* note 173, at 15.

**\*23** Based on the evidence presented at trial, the court does not believe that a small-stock premium can possibly be justified in connection with Balton, which operates in countries with very few of the ties to the global capital markets which point towards use of that premium. The specific risks that accompany investment in Balton, in any case, are well represented in the high country-specific risk premium applied to the company's valuation, which takes into account the risk of operating a company in the African markets where Balton does business.

Danubius, Agrimill, Investor, and Zoko/ITE, however, are based in countries that the evidence shows are relatively well connected to the global capital markets. They are traded on major stock markets, and have access to international capital. The court, therefore, believes that some small-stock premium should be applied to the value of these companies, and that the best data available to the court is that represented by the Ibbotson numbers.

Taking into account the Ibbotson chart, and the size of the IIC constituent companies in relation to their home markets, the court is convinced by the defendants' argument that Investor, Agrimill, and Zoko/ITE would probably evidence behavior characteristic of small companies in the U.S., and should thus be subject to a further discount for their small size in the court's determination of fair value. Therefore, the court will apply the Ibbotson Decile 10 small-size risk premium of 5.33% as a factor in deriving the WACC of those two companies.

Danubius is quite a different matter. Most important, Danubius forms part of the index for the Budapest Stock Exchange, a strong indication that it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 28

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

may not evidence the full 5.33% risk premium for a company of its size in the U.S. [FN176] Also, the Ibbotson numbers suggest, at least, that the hotel industry itself may be less subject to the size premium than other industries. [FN177] On those and other bases, the court believes that the 5.33% Decile 10 risk premium applied to both the conservative and optimistic scenarios of Danubius does not properly reflect Danubius's position within its own market. In order to balance the court's belief that some small-stock premium should apply to Danubius, the court will apply the Decile 9 small-stock risk premium of 2.41% to both of the Danubius valuation scenarios.[FN178]

> FN176. Tr. 506:5-20.

> FN177. JX 158 at 142.

> FN178. The court also notes that under Beaton's optimistic DCF value, Danubius would be a Decile 9 company even in the U.S. Tr. 683-684.

### c. The ITE Real Estate

ITE owns certain real estate at Kiriyat Beyalik and in Holon, both of which are leased by Zoko, an ITE subsidiary, for its operations. In Beaton's analysis, this real estate was valued at the book value of 18.8 million NIS, because Beaton felt that any value this land had above book would be consumed if the land were sold and Zoko made to move elsewhere. As the Beaton report explains, "[w]e did not make any adjustment for ITE's real estate assets since the transfer payment to ITE is significantly captured by ITE's majority ownership in Zoko. Because these properties are single purpose assets built to accommodate Zoko's particular operation, any value derived from the sale of these properties over their book value would most likely be consumed by tenant and leasehold improvements of new facilities needed to replace the sold properties." [FN179] When questioned further at trial about this conclusion, Beaton affirmed his written statement, refusing to put any specific number on Zoko's moving costs other than to say that these costs would be "equal to the value that they believed the

properties could be sold for over book value," [FN180] no matter what that number might eventually be. [FN181]

> FN179. JX 311, at 50.

> FN180. Tr. 622:19-22.

> FN181. Tr. 623:2-10.

**\*24** The court cannot accept Beaton's Panglossian approach to valuation. The ITE real estate, as Beaton seems to concede, had some value, apparently above book value. Beaton, for example, entirely discounts the very real possibility, raised by both Nir and Fuller, that ITE would be able to sell the real estate, and the new buyer would allow Zoko to remain on the property to the end of its lease in exchange for the rent previously paid to ITE.[FN182]

> FN182. Tr. 402:3-13.

On this basis, the court believes that some upward adjustment to book value for the ITE real estate is justified. The only available number to use to derive that value is provided by Nir's preliminary analysis. The number, 51.8 million NIS for the two main properties, is incorporated into Fuller's valuation report as a component of Net PPE, constituting a 33.012 million NIS adjustment to the land's book value.[FN183] As the court has already held, however, neither Nir's report nor Fuller's use of the report in his calculations are entirely reliable. To the extent the court is compelled to use Nir's report as a starting point, the court believes it should apply a significant discount to that calculation to take into account the fact that Nir failed to sufficiently consider the amount of time it would take to sell the very large Kiriyat Beyalik property, failed to consider the potential expense if Zoko was forced to move or forced to accommodate itself with a new landlord, and failed to consider whether selling the property (and thus forsaking the rent it received from Zoko) would have any effect on ITE's balance sheet. [FN184]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                Page 29

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN183. PX 5, at 17.

FN184. Tr. 403:3-6.

To reflect those failures, the court will apply a 67% discount to Fuller's and Nir's adjustment to the book value of the Zoko properties. This calculation, which reduces Fuller's and Nir's adjustment to 10.89 million NIS, produces a Net PPE value for ITE of 29.69 million NIS. Further, in order to reflect the inherent uncertainty of deriving a value for real estate in this way, the court will apply this adjustment only to the optimistic ITE balance sheet, and not to the conservative valuation.

#### d. The Zoko Forecasts

In his initial valuation report, Beaton used "the conservative and optimistic forecasts prepared by management for the years 2002 through 2005" in deriving his valuation for Zoko as part of ITE. [FN185] As Beaton admitted at trial, however, this statement was misleading.[FN186] Rather, Beaton personally prepared the forecasts used in his valuation for Zoko, purportedly based on management forecasts, but adjusted downward for various reasons having to do with Zoko's business situation as of the valuation date. The court is not persuaded that Beaton's revisions to the Zoko management projections are reliable, and their use would cut against this court's belief that management projections are generally preferable to projections by third parties, especially projections by third parties created after the fact.[FN187] In deriving both the conservative and optimistic value for Zoko, therefore, the court has used the management forecasts for that business from 2002 through 2005, and has reflected the resultant values for Zoko in the ITE balance sheet. [FN188]

FN185. JX 311 at 45.

FN186. Tr. 608:7-8.

FN187. *See e.g., Doft & Co. v. Travelocity.com,* 2004 Del. Ch. LEXIS 75, *22 (Del. Ch. May 20, 2004) ("Delaware

law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations.").

FN188. The new optimistic value for Zoko under this valuation method is in excess of the market capitalization of Zoko, which represented the optimistic value of Zoko under Beaton's valuation. JX 311 at 49. Following Beaton's method of using the highest indicated value for the optimistic value, the court has incorporated that new value into the ITE balance sheet.

#### e. Value Conclusion

*25 In summary, the court accepts the Beaton valuation with four substantive changes. First, the court rejects Beaton's use of SCRP, and therefore applies no SCRP for any of the IIC companies. Second, the court rejects Beaton's use of a small-size premium for Balton, adopts Beaton's use of that premium for Agrimill, Investor, and Zoko/ITE, and reduces that premium from 5.33% to 2.41% for Danubius. Third, the court rejects, in part, Beaton's belief that the ITE real estate leased to Zoko has no value above book value, and therefore applies an adjustment of 10.89 million NIS to ITE's optimistic balance sheet to reflect the court's view as to the potential value of that land. Finally, the court rejects Beaton's forecast for Zoko, and applies management's forecasts to both the conservative and optimistic valuation of Zoko.

Having made these changes to the Beaton valuation, the court derives a conservative DCF valuation for IIC of $9.55 per share and an optimistic valuation of $19.05 per share. The midpoint of these results is $14.30 per share of common stock. The table below shows the effect of each of the four described changes on the conservative, optimistic, and midpoint values of the IIC stock. The table includes a column describing the incremental effect of each change over the value under the immediately previous version of the court's DCF valuation. In other words, the fifth column of the table shows how much the described DCF adjustment adds to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 30

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the value per share of IIC without that change, but
with all changes previously made.

| Version of DCF Valuation | Conservative Value Per Share | Optimistic Value | Midpoint Value | Incremental Change |
|---|---|---|---|---|
| Beaton 5/26 Revised Report | $6.22 | $12.98 | $9.60 | - |
| SCRP removed from WACC for all IIC Companies | $7.29 | $15.36 | $11.33 | $1.73 |
| Small-size Premium for Balton removed from WACC | $7.50 | $15.71 | $11.61 | $0.28 |
| Danubius Small-size Premium Adjustment | $8.68 | $18.30 | $13.49 | $1.88 |
| Zoko Real Estate adjusted in Optimistic ITE BS | $8.68 | $18.71 | $13.69 | $0.20 |
| Zoko Forecasts adjusted to fit Management Forecasts | $9.55 | $19.05 | $14.30 | $0.61 |

The fact that CP's initial approach to Simon and to
the special committee was at $13 per share provides
validation for the court's value determination, as
does the fact that CP paid $13 per share at one point
in what was, admittedly, a thinly traded market. On
that basis, the court will give the DCF approach
described above 100% weight in its final value
determination, and will thus award $14.30 per
common share.

### E. The Question Of Simon's Liability

As explained above, the plaintiff has brought claims
not only against CP and IIC, but against the former
directors of IIC, namely Schreier, Smith, Levy,
Glatter, and Simon, as individual defendants. All
the individual defendants other than Simon
implicitly concede, by failing to raise any

affirmative defenses, that they cannot claim
exculpation under Article Tenth of IIC's certificate
of incorporation, the company's Section 102(b)(7)
provision. [FN189]

> FN189. All these defendants clearly have
> personal financial interests in the CP/IIC
> merger, and therefore cannot avail
> themselves of Section 102(b)(7)
> exculpation.

**\*26** Alone among the individual defendants, Simon
claims that his actions in negotiating and approving
the unfair CP/IIC merger are exculpated under
Article Tenth. Even if the IIC merger was unfair, as
this court has already concluded, and even if he
breached his duty of care in authorizing that unfair
merger, Simon argues that he neither violated his
fiduciary duty of loyalty nor failed to evidence good

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 31

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

faith in any way.[FN190] Therefore, Simon believes that he has access to Section 102(b)(7) as an affirmative defense, and cannot be liable for monetary damages.

FN190. Pl.'s Opening Post-Trial Br. 38.

Section 102(b)(7) was added to Delaware law in 1986 in the wake of the landmark case, *Smith v. Van Gorkom.*[FN191] It provides that corporations may limit the personal liability of directors for all breaches of fiduciary duty other than for "breach of the duty of loyalty, failure to act in good faith, intentional misconduct," and certain other violations. Crucially, Section 102(b)(7) is regarded as an affirmative defense or limited immunity. Therefore, in an entire fairness case where the court has found that a challenged transaction is not entirely fair, a director seeking to rely on the exculpatory provision must show that any liability of his is "exclusively attributable to a violation of the duty of care ."[FN192]

FN191. 488 A.2d 858 (Del.1985).

FN192. *Emerging Commc'ns,* 2004 Del. Ch. LEXIS at 70.

Our courts have issued numerous opinions describing the line between violations of the duty of care, which can be exculpated under Section 102(b)(7), and violations that preclude exculpation under that provision. [FN193] In the context of the instant case, the most pertinent of these decisions is this court's recent opinion in *Emerging Communications,* a case that similarly involved a parent-subsidiary merger, found to have failed the entire fairness test, where each of the directors raised the defense to liability of Section 102(b)(7). The court explained the standard for Section 102(b)(7) and then proceeded to examine each director's conduct in turn. The court found that one director, who was also the majority stockholder of the parent entity gaining from the entire fairness transaction, was "liable in his capacity as a director for breach of his duty of loyalty, conduct that is not exculpated under [Section 102(b)(7) ]."[FN194]

That director was not exculpated because he " derived an improper personal benefit"[FN195] from the transaction, another express carve-out in Section 102(b)(7). That is to say, the fact that the unfair transaction directly benefitted that director took him outside the realm of exculpation.

FN193. Folk, *supra* note 91, at § 102.15.

FN194. *Emerging Commc'ns,* 2004 Del. Ch. LEXIS at *140.

FN195. *Id.*

The court found that a second director was liable for the same reasons, because his economic interests were so intertwined with those of the controlling stockholder that he clearly violated either his fiduciary duty of loyalty or evidenced a lack of good faith.[FN196] A third director was also held culpable despite Section 102(b)(7) because he knew or should have known, on the basis of his extensive knowledge of the relevant industry and his financial expertise, that the price was unfair.[FN197] Although the court conceded that it could not divine the director's mental state when he made the decision to vote for the merger, it held that the director was liable for damages because of the burden of proof imposed by Section 102(b)(7) on a director seeking to avail himself of the statute's protections. The possibility [that the director was acting in good faith] is "not sufficient to carry the day, because to establish a director's exculpation from liability under 8 *Del. C.* § 102(b)(7), the burden falls upon the director to show that 'his failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty of care.' "[FN198]

FN196. *Id.* at *142.

FN197. *Id.* at *144.

FN198. *Id.* at *145-146.

**\*27** Finally, the court found certain other directors to have proved that they were entitled to Section 102(b)(7) protection. The court found that no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

evidence showed that those directors "affirmatively colluded with [the controller] to effectuate the [p]rivatization, or that they otherwise deliberately engaged in conduct disloyal to the minority stockholders' interests." [FN199] The court considered the plaintiffs' allegations that the directors had participated in a "scripted minuet" to approve an unfair price, but found that there was no evidence in that case that the directors "actually engaged in such improperly motivated conduct, or otherwise acted with disloyal intent." [FN200] The court also noted that if good faith meant adopting a " 'we don't care about the risks attitude' concerning a material corporate decision," [FN201] the plaintiffs had also failed to show that those particular defendants had acted with conscious disregard or made decisions with knowledge that they lacked material information. Therefore, those directors were exculpated from liability under Section 102(b)(7).

FN199. *Id.* at *148.

FN200. *Id.* at *152.

FN201. *Id.* at *153.

The facts in this case closely resemble those at issue in *Emerging Communications.* At the threshold, the challenged merger is clearly unfair. Further, just as in *Emerging Communications,* the director seeking exculpation violated his fiduciary duty of due care in approving the unfair merger. Therefore, this court is faced only with the question of whether the director violated his fiduciary duty of loyalty or acted with a lack of good faith. [FN202] After careful consideration, the court finds that, like the independent directors in *Emerging Communications,* Simon is entitled to the benefit of Section 102(b)(7) exculpation.

FN202. Simon also claims that "the fact that [he] did not vote in favor of the Merger [but rather was absent for scheduling reasons from the IIC board meeting that approved the transaction] is fatal to plaintiffs' claims against him."

Simon's Post-Trial Opening Br. 17. The case on which Simon relies for this proposition, however, does not support his position. In *In re Tri-Star Pictures, Inc. S'holders Litig.,* 1995 Del. Ch. LEXIS 27, *8 (Del. Ch. Mar. 9, 1995), this court noted that a director who plays "no role" in a challenged transaction cannot be held liable on a claim that the board's approval of that transaction was unlawful. But the court also recognized that "no per se rule unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction." *Id.* at *8. Ultimately, the court in that case concluded that certain directors who had no "role, open or surreptitious, in formulating, negotiating, or facilitating the transaction complained of," could not be held liable. Nor did those directors have some "fiduciary duty not to abstain" from voting on such a transaction. In this case, by contrast, Simon was closely involved with the challenged merger from the very beginning. Its completion was literally premised on his involvement, and this court's conclusion that the transaction was unfair is based, in large part, on Simon's failures to properly conduct the parent-subsidiary negotiation. Simon's contention, therefore, that he cannot be held liable for the unfair merger because he was away at a fraternity reunion on the day of the vote, is, frankly, badly mistaken, and is entirely outside the scope of the limited defense envisioned in *Tri-Star.*

The court finds no evidence that Simon was personally conflicted in the CP/IIC transaction, or derived a personal benefit from that transaction to the exclusion of the minority stockholders. Nor did any evidence adduced at trial show that Simon " affirmatively colluded" with Filer, Schreier, and IIC in their scheme to squeeze out the IIC minority at an unfair price. To the extent that such a plan existed, as demonstrated by the May 17 email, Simon was not included in the inner circle. Whatever Simon's liability, therefore, the case against him does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 33

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

rest on allegations of deliberate or self-interested misconduct.

The question remains whether Simon's conduct betrays that he knew or should have known that the merger process and price was unfair. But, unlike the director found culpable on that basis in *Emerging Communications,* the evidence adduced at trial here shows that Simon was unaware of the key facts that made the merger transaction so clearly unfair from a procedural point of view. Always laboring under CP's efforts to deprive him of information, Simon failed to discover that Jesup & Lamont had divided loyalties and had funneled crucial information to Filer and CP that belonged to the special committee. Similarly, although he knew that Ottensoser was retained by IIC, Simon apparently failed to discover until this litigation began that Ottensoser had also been engaged by CP in connection with the transaction. His ignorance of that key fact ensured that Simon could not appreciate the serious and evident conflicts of interest that burdened Ottensoser's representation of the special committee. And Ottensoser did nothing to remedy Simon's misconception.

**\*28** As to fair price, it is true that Simon knew about the $13 price authorized on May 24, 2001, and unaccountably failed to ask for it during the negotiations for the initial tender offer. Whether that failure would have evidenced a lack of good faith had the tender offer been successful in securing 90% ownership for CP, it seems likely that the same price was not available some months later in connection with the merger. In contrast, Simon was able to achieve a price above the midpoint of the flawed Jesup & Lamont valuation, which, though still unfair, evidences some good faith effort to negotiate with CP within the disabling strictures of CP's unfair merger process.

In short, the evidence adduced at trial shows that Simon attempted to fulfill his responsibilities as the sole member of the special committee, but failed to do so effectively in part as a result of carelessness and negligence, through which he failed to fulfill his duty of due care, and in part because of the manipulative efforts of the controlling stockholder and its agents to squeeze out the minority at an

unfair price. Like those directors found to be exculpated in *Emerging Communications,* in other words, Simon did nothing during the CP/IIC merger process to "[cover] himself in glory, or merit commendation." [FN203] But it is equally true that " negligent or even gross negligent conduct does not equate to disloyalty or bad faith," and nothing in the record in this case suggests that Simon " intentionally conspired ... to engage in a process that would create the illusion, but avoid the reality, of arm's length bargaining to obscure the true purpose of benefitting [CP] at the expense of the minority...." [FN204] In hindsight, the court believes that a more diligent independent director would have uncovered the controlling stockholder's nefarious plan to conclude an unfair merger. But to impose liability for a lack of good faith based on those facts would expand the holding of *Emerging Communications* beyond that required to protect the IIC stockholders' expectations, as evidenced by their decision to extend protection under Section 102(b)(7) to their directors. As such, holding Simon personally liable in this case would be fundamentally inconsistent with the purpose and language of Section 102(b)(7).

FN203. *Emerging Commc'ns,* 2004 Del. Ch. LEXIS at \*149.

FN204. *Id.* at \*153.

### IV.

For the reasons set forth herein, the court finds that the defendants have failed to prove that the IIC merger was a product of fair dealing, or that the merger consideration of $10.50 was a fair price, and therefore have failed to prove the entire fairness of the merger transaction. Consequently, the court exercises its equitable powers to award the appraisal claimants $14.30 per share, and all other claimants the difference between the merger price and $14.30 per share. This damages award will include pre-judgment interest at the legal rate, compounded quarterly. Finally, the court finds that Simon has proved his entitlement to exculpation under Section 102(b)(7), and is therefore not liable for the damages the court assigns in this case. IT IS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 34

Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**


SO ORDERED.

Del.Ch.,2006.
Gesoff v. IIC Industries Inc.
Not Reported in A.2d, 2006 WL 1458218 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.