EXHIBIT 6



Not Reported in A.2d    Page 1

Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

C
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
UNION ILLINOIS, et al. Plaintiffs,
v.
KORTE, et al. Individual Defendants,
andUNION FINANCIAL GROUP, LTD., Nominal Defendant.
**No. CIV.A. 17392.**

Date Submitted: Sept. 14, 2001.
Draft Report: Sept. 17, 2001.
Final Report: Nov. 28, 2001.

Peter J. Walsh, Jr., Kevin R. Shannon, and Rebecca L. Scalia of Potter Anderson & Corroon LLP, Wilmington, Delaware; Attorneys for Plaintiffs.
Vernon R. Proctor, Kurt M. Heyman, and Patricia L. Enerio of The Bayard Firm, Wilmington, Delaware; Attorneys for Defendants.
Lewis H. Lazarus, of Morris James Hitchens & Williams, LLP, Wilmington, Delaware; Attorney for Nominal Defendant.

MASTER'S REPORT
GLASSCOCK, Master.
*1 This action arises out of the sale of common stock of nominal defendant Union Financial Group ( "UFG" or the "Company") to particular directors of that company. The plaintiffs are shareholders of UFG, and are affiliated with the family of former UFG Chief Executive Officer, Denis O'Brien (O'Brien).[FN1] Collectively, the plaintiffs own approximately 38% of the outstanding shares of UFG. O'Brien himself owned no stock in UFG and is not a party to this action.

> FN1. The plaintiffs include Union Illinois 1995 investment limited partnership, James D. O'Brien, the Dennis O'Brien Irrevocable Family Trust, the O'Brien Family Trust, the James O'Brien Irrevocable Family Trust, and the Douglas O'Brien Irrevocable Family Trust.

The self-dealing stock sale (the "private stock sale") was accomplished soon after the board of directors (the "board") discharged O'Brien from his duties as President and CEO of UFG. The plaintiffs challenge the private stock sale as in violation of the defendant directors' fiduciary duties of care and loyalty. They filed this derivative [FN2] action on August 25, 1999, against individual defendants Ralph Korte, Steve Orthwein, Joe Micheletto, H .C. Milford, Timothy Crowley, Steve Jones, Theodore R.P. Martin, Greg Sullivan, and Robert Chapman,[FN3] as well as UFG, alleging, in part, that both the process by which the shares were sold and the price at which they were sold were unfair.[FN4] This matter was tried on July 30-August 1, 2001. This is my Report after trial.

> FN2. Although the Complaint was originally brought both derivatively and individually against the defendants, plaintiffs waived any individual claim at trial.

> FN3. Each of these individual defendants were directors of UFG during the time of the Private Stock Sale. All the individual defendants are also currently directors of UFG, except Chapman who has resigned.

> FN4. Plaintiffs also made claims related to the suspension of the dividend and conversion rights of the Company's Series C Preferred Stock. These claims were settled pursuant to a Stipulation and Agreement of Compromise, Settlement, and Release, which the Court approved on March 30, 2000.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 2
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

I. FACTS

UFG is a privately-held bank holding company with its principle offices in Swansea, Illinois. UFG is engaged, through its wholly-owned subsidiaries, primarily in the operation of community banks in Illinois. It has two principle subsidiaries: Union Bank of Illinois ("UBI") and State Bank of Jerseyville ("SBJ"), both of which are located in southern Illinois.

During 1998 and early 1999, UFG was engaged in a program of rapid growth pursuant to a new strategic plan formed around 1996 by the Company's then-President and CEO, Denis O'Brien. In accord with this plan, UFG sought to expand its presence in Southern Illinois and St. Louis, Missouri, and to open a new bank, chartered in Missouri (the "Missouri Bank").

UFG was also expanding its business through its subsidiary, B. Clydesdale & Company ("BCC"), which it had formed in 1997 to engage in the small (or "pay-day") loan business.[FN5] BCC owned approximately 80 loan offices in Missouri, Illinois, Indiana, California, Oregon, Utah, Nevada, New Mexico, and North Carolina. In addition to the payday loan business, UFG also became involved at this time in the subprime consumer finance business. The growth of BCC required significant expenditure of cash, and at the time of the challenged transaction, BCC was not generating any positive cash flow for UFG.

FN5. The payday loan business operated by making small loans and car title loans to individual borrowers at high interest rates, secured by their next paychecks or car titles, respectively.

In order to finance its growth, UFG undertook an offering of 100 shares of Series D Preferred Stock in November of 1998. This offering was necessary at the time because, as O'Brien explained at the January 1999 board meeting, "[BCC] needed to maintain a reasonable and viable debt to equity ratio and other ratios, which had decreased because of the underperformance in 1998 of [BCC]." [FN6] The offering was also necessary because UFG had exhausted its line of credit with its principle lender. In 1998, the principle outside lender of UFG was Firstar Bank, N.A. ("Firstar"). As of the end of 1998, the maximum amount of UFG's line of credit with Firstar was $13.75 million, and UFG had drawn down the entire amount.

FN6. Stipulated Fact in Pretrial Order, at 8 (¶ 21).

*2 Series D Preferred shares were offered at $100,000 per share, convertible at $40.00 per share into 2,500 shares of common stock of the Company, provided that the conversion price would decrease by the percentage that the Company did not achieve certain income or share price standards. By the end of June 1999, UFG had received $8,500,000 in Series D subscriptions. Despite this infusion of cash, the Company remained under-capitalized. In early 1999 O'Brien was attempting to extend the Company's line of credit with Firstar and obtain other credit facilities.

Up until this time, UFG had been operating without a CFO. O'Brien interviewed Thomas Barnett, a certified public accountant, for that job in the spring of 1999. After interviewing Barnett, O'Brien recommended to the Board that the Company hire him as CFO. The Board agreed with O'Brien's assessment of Barnett, and Barnett became the new CFO of UFG. He began work on approximately June 2, 1999. Within a few weeks of his employment, Barnett, along with O'Brien, learned that Firstar would not extend its line of credit. O'Brien remained optimistic about prospects for obtaining additional financing from sources other than Firstar; Barnett was not likewise optimistic.

By-mid June of 1999, there were strong signals that UFG was in need of cash. UFG had been, for some time, paying creditors late and deferring accounts payable.[FN7] In addition, the Company had received a notice from the Federal Reserve that its UBI subsidiary had fallen below the minimum "adequately capitalized" level in the first quarter of 1999.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

> FN7. Terry Feig, UFG's controller, responsible for accounts payable and payroll in this period, testified that he was only able to make payroll by paying creditors late, some as late as 120 days, and by deferring accounts payable. In addition to the costs of O'Brien's expansion plans, the Company at this time had significant legal expenses.

On June 11, 1999, members of UFG's Executive Management Committee, including, Barnett, O'Brien, in-house attorney Carolyn Ryseff, Missouri Bank president Jack Biggs, and the Illinois bank presidents, Dennis Bielke and John Hefner, met to discuss the Company's financial situation. Barnett and others voiced their concerns about the Company's financing and cash flow problems to O'Brien, but O'Brien did not agree with their assessment of the situation. According to Barnett, he contacted O'Brien after the meeting to suggest that O'Brien call a special meeting of the Board, but O'Brien refused because he was scheduled to attend business meetings on the West Coast.

The Executive Management Committee, absent O'Brien, reconvened the following Tuesday (June 15) to continue its discussion of the problems facing UFG. Over the next few days, Barnett, Biggs, and Bielke continued to discuss the need for a special Board meeting to apprise the entire Board of the Company's financial situation. It was decided, primarily due to the efforts of Biggs and Bielke, that the Board would meet in a special session from June 22-23, 1999. In anticipation of the meeting, Bielke prepared a memorandum outlining the Executive Management Committee's concerns. Barnett prepared a BCC financial performance summary as of May 31 and a set of cash flow projections for UFG.

The special meeting was convened in Swansea, Illinois, on Wednesday, June 22, 1999. After O'Brien's opening remarks, Barnett was appointed a member of the Board. Next, Bielke made a presentation regarding his memorandum outlining the Executive Management Committee's concerns. O'Brien's counter-presentation continued in the second day of the meeting, June 23. The outside directors (everyone except Barnett, Biggs, Hefner, and Bielke) had met alone early that morning. Following O'Brien's presentation, the outside directors met alone again. It was at this time that they made the decision to discharge O'Brien from his duties as CEO of UFG.

*3 When the meeting was reconvened in the early afternoon, O'Brien was no longer in attendance. The Board proceeded to approve certain resolutions and make further recommendations required by the over-extension of the Company, including possible store closings, possible sale of the subprime business, and efforts to obtain additional equity. After the meeting, director Orthwein notified O'Brien that he had been placed on leave.[FN8] The Board also decided that the inside directors-Barnett, Biggs, Hefner, and Bielke-should resign in favor of having a Board consisting solely of outsiders. The inside directors submitted their resignations the next day. Although he was no longer a director, Barnett was elected to be the Company's interim CEO and he also continued to be the Company's CFO.

> FN8. O'Brien's employment was terminated about one week later.

On June 27, 1999, Barnett sent Korte (the new Chairman of the Board) a memorandum concerning a proposed stock sale to certain officers and directors of UFG. No other director was given a copy. The proposed sale contemplated an offering which, if fully subscribed, would have resulted in the sale of 120,000 shares of common stock of UFG, or about 8% of the then-outstanding common stock of UFG. Barnett testified at trial that he planned the Private Stock Sale because he believed it was the only viable option available to the directors of UFG. The directors had to act before the end of June so that they would fulfill federally-required banking ratios and meet payroll. Additional financing was not available. They could not make a public offering of stock because there was inadequate time to make the proper disclosures. Thus, Barnett concluded that the Private Stock Sale was the appropriate option.[FN9]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 4
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

> FN9. One theory of the plaintiffs has been that Barnett and the Board were motivated by animus towards O'Brien and the O'Brien Family, rather than concern for the Company. The plaintiffs failed to substantiate this theory by the evidence submitted at trial.

During the last week of June, Barnett and Korte spoke to all of the outside directors of UFG (but not O'Brien) as well as several officers, and asked them to purchase UFG common stock at $15.00 per share. Barnett unilaterally set the $15.00 price. He stated at trial that he based the price on two previous sales of UFG common stock-the sale to potential directors of the proposed Missouri bank at $15 per share in the spring of 1999 and the most recent valuation to UFG's ESOP at the price of $13.00 in late 1998.[FN10]

> FN10. The sale to the Missouri bank directors was for $1,000 each, to satisfy a federal banking regulation requiring that level of ownership.

Almost $450,000 was raised by the Private Stock Sale, based on a sale of almost 30,000 shares of UFG common stock. O'Brien was not offered stock in the Private Stock Sale [FN11] and his exclusion was not discussed among the other directors. None of the directors participating in the sale questioned its fairness, either as to process or price. At the time of the Private Stock Sale, at least one director (Micheletto) participating in the Private Stock Sale held an option to purchase common stock of the Company at a price less than $15. [FN12] Instead of exercising that option, however, that director chose to participate in the Private Stock Sale. As a result, he received fewer shares for his investment than if he had purchased shares pursuant to his option.

> FN11. As of the time of the sale, O'Brien personally owned no shares of UFG stock in his own name. Defendants stress that O'Brien was in financial distress at this time and that the directors were aware of this fact when they excluded him from the Private Stock Sale. Nevertheless, the exclusion of O'Brien from the offering seems to have been motivated primarily by reluctance on the part of Korte and Barnett to solicit funds from a man whom the Board had so recently discharged.

> FN12. Micheletto testified at trial that he could have exercised this option, but participated in the Private Stock Sale in order to help his fellow directors recapitalize the Company.

*4 A special Board meeting was held on July 7, 1999. Present were O'Brien, those directors who had purchased shares in the Private Stock Sale, and three directors who had not purchased shares. At this meeting, Barnett distributed to the directors a short memorandum describing the sale of approximately 30,000 shares of UFG common stock at $15.00 per share (as well as the purchase of approximately 7,200 shares of UFG common stock by the UFG ESOP at about $13 per share). He represented to the Board that the $15.00 price he set for the offering was based on the two previous transfers of UFG common stock described above (the 1998 valuation for the ESOP and the 1999 sale to the Missouri directors); he did not mention, must less detail, any valuation method used to determine the price for either of these earlier offerings. The Board neither questioned the $15.00 price nor inquired further as to the basis of the price for the current offering or either of the two earlier stock transfers. The defendant directors simply voted to ratify the Private Stock Sale after listening to Barnett's brief presentation. Every director except O'Brien voted in favor of ratification.

At a July 21, 1999, Board meeting, the Board approved the creation of an Executive Committee consisting of Korte, Orthwein, Crowley, and Jones for the purpose of evaluating the Company's continuing financial problems. O'Brien dissented from the resolution creating the Executive Committee. At the August 18, 1999, Board meeting, the Executive Committee recommended the creation of a "Special Committee" for the purpose of raising additional capital by a private placement to fund the Missouri bank and to resolve certain potential

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

problems relating to the Series D Preferred.[FN13]

> FN13. The members of the Board were concerned that there may be demands for rescission of the Series D Preferred and, thus, that holders of that stock should be given the opportunity to exchange their Series D Preferred shares for UFG common stock at a fixed exchange ratio.

This lawsuit was filed on August 25, 1999. The Special Committee met for the first time on August 27, 1999 to consider issues related to the series D Preferred. The Special Committee retained independent legal counsel and financial advisors. At the October 20, 1999, Board meeting, the Special Committee's role was expanded to include the engagement of a financial advisor to render a fairness opinion on the Private Stock Sale. The Special Committee selected Mercer Capital for this task.

Mercer Capital rendered its signed fairness opinion to the Special Committee on December 14, 1999. In its opinion, Mercer Capital concluded that the $15 price paid for UFG common stock by the officers and directors of UFG on June 30, 1999, was fair to UFG and its shareholders from a financial point of view.

## II. ANALYSIS

### A. *Was the Transaction Entirely Fair?*

#### *1. Standard of Review*

It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have "the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983). Directors will be found to have acted with entire fairness where they "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain."

*Id.* This is clearly a case where the defendant directors bear the burden of proving entire fairness. The defendant directors of UFG stood on both sides of the transaction, and defendants concede that it was their burden at trial to prove that their conduct satisfied the entire fairness standard.

*\*5* The concept of entire fairness has two components: fair dealing and fair price. *See Weinberger,* 457 A.2d at 711. Fair dealing " embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors ... were obtained." *Id.* Fair price " relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* In making a determination as to the entire fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole. *Id.*

#### *2. Fair Dealing*

As an initial matter, I am convinced that the defendant directors acted in good faith. Based on his testimony at trial, it is clear to me that Barnett planned the Private Stock Sale and recommended it to the Board in the good faith belief that it was a necessity born of the Company's financial distress. I am persuaded by the testimony of Korte, Crowley and Micheletto that the defendant directors approved and participated in the Private Stock Sale because they shared Barnett's opinion that the Company was in financial distress and that the sale was necessary under the circumstances.

The stipulated facts of this case in conjunction with the testimony at trial demonstrate that the defendant directors had good reason for their belief that the Company was in a financial crisis. UFG had been paying creditors late and it appeared in June of 1999 that it could not even pay its own employees. Despite several efforts, UFG was not able to borrow any more money. UFG faced large legal costs. It was unlikely that UFG would be able to maintain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 6
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

adequate capital ratios required by the Federal Reserve; the applicable ratios needed to be met by the end of June because it was at this time that the Company was required to file its quarterly report.

In the last weeks of June, the defendant directors believed they were out of options. In order to meet the required ratios by the end of June, to meet payroll, to pay creditors, and also to continue to fund the Company's on-going operations, the directors decided personally to invest in what must have appeared to them at the time to be, if not a sinking ship, then one making heavy weather indeed. It is clear from the testimony at trial that the motive of the participating directors was to recapitalize the company. For example, at the time director Micheletto purchased stock in the Private Stock Sale at the price of $15.00 per share, he held an option to purchase common stock of UFG at the price of $13.78 per share. If he wanted simply to gain equity in the Company, he would have bought shares at the lowest price possible, as any reasonable investor would. Instead, he bought stock for $15.00 per share. Clearly, the reason for this action is that he (and the other participating Directors and Officers) were attempting to recapitalize the Company.

*6 When they approved and participated in the Private Stock Sale, the directors were acting with good intentions. In order to meet their burden of entire fairness, though, defendants must prove more than their good intentions. They must prove that they acted in a manner that was of the utmost fairness. Here, the defendant directors did not obtain disinterested director approval or shareholder approval of the issuance to themselves. What is more troubling to me is the fact that the defendant directors accepted and approved without challenge the $15.00 price set by Barnett. Barnett testified that he determined the $15.00 price based on two previous offerings of stock by UFG-the offering to the UFG ESOP in late 1998 at $13.00 per share and the offering to new directors of the proposed Missouri bank in the spring of 1999 at $15 per share. At no time, however, did Barnett explain to Board members the basis of the $15.00 price or the basis of the price in either of the two previous offerings; nor did he indicate to the directors that the prior stock sales were for market value. Thus, both when the directors purchased stock in late June and when they ratified the transaction at the July 7 Board meeting, they neither had nor sought any independent evidence of the market value of the corporate asset which they transferred to themselves.

This Court has recognized in the past that, "[w]here a corporation in financial distress issues stock as a means to raise needed capital, its directors are given considerable latitude in fixing the price for the issuance." *Savin Business Machs. Corp. v.. Rapifax Corp.,* Del.Ch., No. 5331, Brown, V.C., (Feb. 15, 1978) Mem. Op. at 5. This Court has also recognized, however, that directors must employ or establish some reliable method to set a sale price for the stock of a corporation. *See Linton v. Everett,* No. 15219, Jacobs, V.C., (July 31, 1997) Mem. Op. at 5 (finding that the Court can not determine whether the price paid by defendant directors for stock sold to themselves was fair when the defendant directors lacked any reliable method by which to value certain factors that impacted stock price). Here, the defendant directors plainly failed to establish the value of the stock which they sold to themselves. They made their decision based solely on the information given to them by Barnett. Barnett told them only that the price was determined based on two previous offerings, the ESOP valuation and the sale to the potential directors of the proposed Missouri bank. The directors had no basis to judge whether the method used by Barnett to value the stock was reliable. Thus, defendants can not meet their burden of proving that the process by which they arrived at the $15.00 per share price was entirely fair.

*3. Fair Price: Fair Value v. Fair Market Value*

The plaintiffs contend that fair price in this context, the sale of corporate assets by directors to themselves, requires that the stock be assigned at its "fair value." By this they mean the fair value methodology used to determine the value of stock under the statutory appraisal remedy. This Court applies standards constrained by the appraisal statute and related case law when determining the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

value of a company in an appraisal proceeding pursuant to 8 *Del.C.* § 262. Those standards require the Court to correct for any minority discount inherent in the value of a minority block of shares, and to avoid the application of any discount for lack of marketability. It is the plaintiffs' position that the Court should use this appraisal-unique "fair value" standard instead of applying "fair market value" principles which reflect the actual amount for which the stock could have been freely exchanged. I agree with the defendants, however, that the latter evaluation method is proper.

*7 Our Supreme Court created the appraisal-unique "fair value" standard because it recognized that appraisal was a unique remedy, created by statute, and with unique policy goals. In *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137 (1989), the Supreme Court affirmed this Court's decision not to apply marketability and minority discounts in appraising the stock held by a minority shareholder. The trial Court stated that "the object of a § 262 appraisal is 'to value the *corporation* itself, as distinguished from a specific fraction of its *shares* as they may exist in the hands of a particular shareholder ....' " *Cavalier,* at 1444. (emphasis in original). The Court went on to explain the policy justification for this approach as follows:
Discounting individual shareholdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Cavalier,* at 1445.

*Cavalier* makes clear that the valuation used in appraisal cases arose from particular policy considerations peculiar to the appraisal remedy. Those considerations are not present in this non-appraisal derivative action. The object here is merely to ensure that the directors transferred assets of the corporation to themselves in an amount which reflected the free-exchange value of the assets. The stock sold in the challenged private transaction represents only 2% of the common stock of UFG. This case does not involve an appraisal of the shares of an innocent, squeezed-out minority stockholder. Rather, it involved the transfer of assets to the directors and officers in exchange for desperately-needed cash, in a good faith attempt to save the company from what the directors perceived to be potential financial ruin. The purpose of an appraisal remedy is "to value what has been taken from the shareholder: *viz.* his proportionate interest in a going concern." *Cavalier,* at 1144 (quotation omitted.) What has been "taken" here is the difference between the assets transferred and the market value of these assets; it has been "taken" not from an individual shareholder but from the company itself. For these reasons, it is clear to me that, in order to determine the fair price here, the stock must be valued as the market would value it, which will ensure that the corporation will receive full value for the assets (the stock) which the directors caused to be sold to themselves.[FN14] The parties' experts agree that a fair market price evaluation must include the application of marketability and minority discount.

> FN14. In other words, it is "entirely fair" to the corporation that it receive from the directors the most it could have received from outsiders for this small issue of equity-the market value of the shares. In rejecting the remedy of recision, the plaintiffs here indicate that the issuance of equity itself, as opposed to the particular price and process, was reasonable. The amount which the company could have received from the sale of its stock, absent unfair dealing, is the fair market value.

*4. Fair Price: The Expert Opinions and the Fair Market Value of the Stock*

*8 The plaintiffs' expert, Donald A. Puglisi [FN15], testified that the fair market value of the common stock of UFG could be determined using a discounted cash flow approach, which takes management's projected cash flows and multiplies them by a discount factor. Puglisi accepted the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

projected cash flows calculated by UFG management in September, 1999, after the private sale (that is, he used the same figures relied on by the defendants' expert in his testimony at trial and in the production of the Mercer fairness opinion). He also accepted the discount factor applied in the Mercer fairness opinion, with one notable exception. He did not accept that the discount rate should reflect firm-specific risk. Mercer's discount rate reflected both industry risk and a separately calculated "firm-specific" risk. Puglisi eliminated the firm-specific risk, explaining that it conflicts with a basic application of the capital asset pricing model employed by both experts. He also noted that firm specific risk was already reflected in management's cash flow projections (meaning that including it separately would amount to applying a double discount). After applying the appropriate discounts, Puglisi concluded that the fair market value of the UFG stock was $17.99 per share.[FN16]

> FN15. Professor Puglisi is the MBNA Professor of Finance at the University of Delaware.
>
> FN16. At the request of the plaintiffs, Puglisi also computed the "fair (appraisal) value" of the stock: $29.87 per share.

The defendants' expert was Kenneth Wayne Patton. Mr. Patton is employed by Mercer Capital Management and delivered the fairness opinion to the special committee on December 14, 1999, after the consummation and ratification of the private stock sale. That fairness opinion formed the basis of his testimony at trial. Like Puglisi, Patton used a discounted cash flow analysis based on management's projected earnings.[FN17] He disagreed with Puglisi in two respects, however. First, as discussed above, he opined that the discount factor should reflect both industry-specific and firm-specific risk. He explained that the discount he applied included a separate discount for firm-specific risk because he did not believe that management had properly accounted for this risk in its cash flow projections. He conceded, however, that it would normally be assumed that management did account for company-specific risk in projected earnings. Secondly, he disagreed with Puglisi that the projected earnings should include earnings expected in the succeeding three years following the time of the stock sale. He argued that the estimated cash flows for those three years should not be part of the company's projected free cash flows since those earnings were already ear-marked to satisfy the company's debt or other outstanding claims. Patton concluded that the $15.00 price paid by the directors and officers in the Private Stock Sale was fair.

> FN17. Puglisi and Patton also used other methods to calculate value; however, I accept Puglisi's assertion that discounted cash flow method, used by both experts, is the "most appropriate" in the circumstance here.

Thus, the parties' experts only disagree with regard to two issues: 1) whether the discount factor should reflect firm-specific risk as well as industry-specific risk; and 2) whether the first three years' cash flows should be included in the analysis. I will address these issues in turn.

*9 It is not appropriate under these circumstances to take into account firm-specific risk. It is conceded by both parties' experts that firm-specific risk would normally be included as part of a standard projection of earnings. If that is the case here, an additional discount for firm-specific risk would lead to an under-valuation. The burden to show fair price is on the defendants, and the evidence in the record is insufficient to support a finding that management failed to take this risk into consideration when it calculated its projected earnings. More fundamentally, this case involves self-dealing by corporation fiduciaries. Therefore, these fiduciaries should be held to the projections of their own management team; the burden resulting from any insufficiency in financial projections in this instance must fall on the defendants, not the corporation.

Similarly, it is not appropriate to exclude earnings data for the first three years from the sum of projected earnings. First, it is conceded by both parties' experts that such data normally would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 9
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

included as part of a standard projection of earnings. The fact that the Company had particular claims or debt should be part of the projected earnings analysis itself. There is insufficient evidence in the record to support a finding that management failed to take these claims or other obligations into consideration when it calculated its projected earnings. Moreover, even if, in fact, management failed to account for outstanding claims or debt as part of its cash-flow projections, equity suggests that, in valuing assets they sold to themselves, the directors should be held to the projections of their own, self-installed, management.

I find that the fair market value of the common stock of UFG on June 30, 1999 was $17.99.

### *B. Relief*

Where a corporation has suffered injury due to a self-dealing transaction by a board of directors that is not entirely fair to the shareholders of that corporation, the corporation is entitled to relief. That relief, however, is equitable in nature, and the remedy should be tailored with equity in mind.

This is an unusual case in the sense that plaintiffs are not seeking a rescission of the sale of stock. Rather, they seek to have the directors pay more money to the corporation, commensurate with the true value of the shares they purchased. Although this remedy is one possible appropriate remedy when directors engage in a self-dealing transaction which does not satisfy the exacting standard of entire fairness, it is not the appropriate remedy in this case considering the context of the directors' actions.

In this case, I have found that the defendants acted in good faith. The evidence makes it clear that the directors were worried about the financial future of UFG in the long run and the short run. They discovered the financial problems facing their Company at what amounted to the last minute. In order to meet payroll, fulfill federally-required banking ratios, and allow the Company to continue financing its ongoing operations, the defendant directors decided that each participant in the Private Stock Sale would invest a lump sum of money, commensurate with his financial ability to do so, in order to shore up the Company. With respect to the shares which they sold to themselves, however, the directors are constrained to act in a manner which is entirely fair. Even given the circumstances which they faced in June, 1999, the price at which they issued stock to themselves was neither reasonably set nor adequate, and thus was not entirely fair.

*10 Had the transaction been entirely fair, the self-dealing stock sale was a reasonable approach to the company's straitened circumstances, and in fact it brought temporary relief for the immediate cash-flow problem. It is inappropriate, therefore, to require the defendants to place still more money into the company. I find the appropriate remedy here, instead, is to reduce the number of shares purchased by each defendant in the Private Stock Sale, to a number which ensures that the company receive a fair price for the assets transferred. Each director participating in the sale, for the benefit of the corporation, gave a finite amount of cash to the corporation in return for equity. Because the shares were undervalued, each defendant received too much equity. To determine how many shares each defendant must return to the corporation, he must determine the number of shares, at $17.99 per share, to which his investment entitled him, and subtract this amount from the shares actually received in the Private Stock Sale.

### III. EXCEPTIONS TO THE DRAFT REPORT

Both the plaintiffs and the individual defendants took exceptions to the draft version of this report.

### *Plaintiffs' Exceptions*

The plaintiffs argue that I am in error in finding that the directors' motivation for the private stock sale was to infuse cash into a company in difficult circumstances. The heart of their argument is that the directors were engaged in an attempt to "dilute" the holdings of the O'Brien family. They point to several factors which, they argue, support this conclusion. First, they cite the testimony by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

comptroller, Mr. Fieg, that Barnett stated to him that "we have to dilute O'Brien." Next, the plaintiffs point out that the directors failed to sell themselves Series D (nonvoting) shares rather than common shares. They also argue that a subsequent action of the board in August of 1999 to suspend the conversion rights of Series C shares (many of which were held by the O'Brien family) all point to the board's "true motive" of dilution.

I reject this contention for a number of reasons. First, it is not at all clear to me that the "dilution" statement which Mr. Fieg testified was made by Mr. Barnett (and which Barnett denies) was made in reference to the private stock sale. Second, there is no evidence that any of the *defendants* had any such intent. More fundamentally, if this small stock offering, limited in both number of shares offered and duration, was a vehicle to dilute the O'Brien family, was a peculiarly incompetent one. For the reasons stated fully in earlier portions of this report, it appears clear to me that the board acted with the motive of infusing cash into the company, and not for the dilution motive suggested by the plaintiffs.

The plaintiffs also point to another instance of what they describe as the board's bad faith in connection with the private stock sale. They point out that at the same meeting in which it ratified the private stock sale, the board also ratified sale of Series D shares to an investor, a sale which had been pending for some months. The plaintiffs argue (based on testimony by Mr. O'Brien) that the Series D conversion price of $40 per share put the board on notice that a fair valuation of the common stock was $30 per share. I remain unconvinced, however, that the board perceived such a relationship between the Series D conversion price and the value of the common stock. Accordingly, the plaintiffs' request that I amend the report to include a finding that the directors breached their fiduciary duties, beyond those previously stated in this report, is denied.

*Individual Defendants' Exceptions*

*The Directors' Breach of Fiduciary Duty*

\*11 The individual defendants argue that I erred in finding that the directors failed to demonstrate fair dealing in setting a price for the private stock sale. The individual defendants make the unremarkable assertions that the board has discretion in setting the price of stock and that a review of this discretion must take into account the exigent circumstances in the context of which the board made its decisions. *See* 12 *Del.C.* §§ 152, 153. The individual defendants argue that the exigent circumstances here (notably, the urgent need for cash before the end of June 1999) were sufficient to support the board's decision that $15 was a fair price, based upon the conclusory information given them by Mr. Barnett.

The individual defendants fundamentally misunderstand my conclusions in this report. There is no question that exigent circumstances were present and that the board reacted to those circumstances. Having (through its management) put the company in a position where a quick infusion of cash was needed, the board was justified in taking action in response. However, as fiduciaries, directors cannot use the self-created financial difficulties of the company to profit at the expense of the stockholders. Whether the directors would have been justified in issuing shares at $15 per share to third parties is not the issue here. As stated fully earlier in this report, if the directors use their power as fiduciaries to transfer to themselves assets of the company, they must compensate the company for the value of those assets, and may not profit at the expense of the shareholders. As a corollary, they must undertake a reasonable process to ensure a price for the assets that is fair to the shareholders.

The individual defendants also argue that § 141(e) of the Delaware General Corporation Law insulates board members from liability where they have relied upon the opinion of an officer: here, according to the individual defendants, the recommendation by Barnett that the stock sale be ratified at $15 per share. [FN18] This is not a case, however, where the board relied upon the accuracy of an adequate explanation by an officer of the $15 per share private stock offering. Rather, as stated fully earlier in this report, the board was provided

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

with no objective information about how the stock price of $15 was arrived at, other than the ESOP valuation and sale to the Missouri directors, neither of which were indicators of the actual value of the shares. Therefore, the individual directors cannot rely upon § 141(e) as a prophylaxis against liability.[FN19]

FN18. 8 *Del. C.*, § 141(e) provides that
A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of his duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

FN19. The individual defendants agreed before trial that the standard of review in this matter is entire fairness. They argue in their exceptions, for the first time, that the individual defendants who did not participate in the private stock sale were not "interested" directors, that the entire fairness standard should not apply to them and that they should dismissed. To the extent this assertion is timely, I need not consider it here because the remedy which I have recommended does not involve these defendants.

*Fair Market Value*

The individual defendants complain that I erred in accepting Professor Puglisi's conclusion as to fair market value, rather than that of their expert, Mr. Patton. The experts of both parties used a discounted cash flow method to determine the value of the shares. Put simply, this method takes the estimated cash flows provided by management, reduced to present value, and discounted by a risk factor which is arrived at based on management's description of the business to be undertaken by the company. While employing this basic approach, the experts differed in two respects.

**\*12** First, the individual defendants' expert applied a discount rate not only applicable to firms engaged in the same businesses as UFG, but also a second discount for "special risks" applicable *only* to UFG. According to individual defendants, this is risk which is not allowed for in the directors' estimate of cash flows, is not allowed for in the discount applicable to the industry at large, and is not a risk which investors could avoid through diversification. Rather, according to the individual defendants, this is a risk which is inherent in UFG itself. I am convinced by Professor Puglisi's testimony, however, that an additional discount for such a risk is incompatible with the basic discounted cash flow model. The individual defendants have failed to identify precisely from what this risk arises.[FN20] Since the objective risk factors should be accounted for by the industry discount and the estimates of cash flows, it is not clear what (other than, perhaps the amount of care and skill applied by the board and management) is unique to UFG that would cause its discount rate logically to be higher than other similarly placed companies. For the reasons stated more fully in earlier portions of this report, I accept Dr. Puglisi's calculation of fair market value.

FN20. The defendants point to expenditures rquired in connection with the Missouri Bank business, payroll expenses and "the need to maintain the required regulatory capital ratios," but fail to explain why these expenses and requirements are unique to UFG, why they result in exceptional risk or why they are not accounted for in managment's estimate of cash flows.

Similarly, the individual defendants argue that I erred in rejecting their expert's exclusion, from his analysis of value, of those cash flows predicted by management for the first three years after the date of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 12
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

valuation. The defendants' expert testified that these projected cash flows should not be treated as "free" cash flows because they would be diverted to company expenses. Once again, however, I accept Dr. Puglisi's testimony that such a manipulation of the projected cash flows is incompatible with the discounted cash flow method.[FN21] Mr. Patton, and the individual defendants in their post-trial briefing, have failed to explain to me why, if this income stream must be allocated to meet company expenses, it was included by management in its cash flow (earnings) analysis.[FN22] For the reasons stated fully earlier in this report, I accept the fair market value analysis of the plaintiff's expert.

> FN21. It is not clear to me why, if the defendants' expert feels that management has misstated cash flows by failing to take into account claims upon those cash flows, he has removed the first year's *negative* cash flows from his valuation methodology. Because the defendants' expert disregarded both positive and negative cash flows, the resulting difference in price caused by the different treatment of cash flows by the experts is minimal.
>
> FN22. The discounted cash flow analysis of both experts is based on data set out at Jnt. Ex. 49 (Patton dep. ex. 34), and includes "management forecasts" of "consolidated net income" for the years 1999-2002. Mr. Patton's report refers to these as "forecast earnings," and he bases his "value based upon forecast earnings" -his DCF valuation-upon the 2002 earnings forecast. Perhaps unfortunately, I have continued the confusing practice of using the terms "earnings" and "cash flows" interchangeably in the main body of this report, as indeed they have been used in the presentation of the evidence here.
> In their exceptions, the individual defendants seem to be making an argument that "earnings" or "consolidated net income," as set forth in the management forecast of earnings in the Patton report, represents not cash flows, but rather a mere forecast of "accounting profits." Ind. def. except., at 13-14. The testimony of both experts at trial, however, make clear to me that the "earnings" projected by management for 1999-2002 were projected cash flows, upon which both experts based their DCF analysis. If, as the individual defendants now appear to suggest, the 1999-2002 projected earnings (or "consolidated net income") figures are *not* projected cash flows, what then is the basis for Mr. Patton to use these figures in developing a DCF analysis? As the plaintiffs point out, if management forecasts do not represent forecasts of cash flows, then the Patton/Mercer Capitol DCF analysis itself is fatally flawed and cannot satisfy defendants' burden of proof to demonstrate fair price.

The individual defendants' exceptions are therefore denied.

### IV. CONCLUSION

The defendant directors acted in violation of their duty under these circumstances to be entirely fair to the UFG and to its stockholders. I also find, however, that the defendant directors acted in good faith. A return of excess equity will make the corporation whole without unduly penalizing the defendants.

Once the report is final, the parties should agree on the appropriate amount of plaintiffs' attorney fees which should be paid by the corporation. Absent agreement, I will recommend the fee award and I retain jurisdiction for that purpose.

Del.Ch.,2001.
Union Illinois v. Korte
Not Reported in A.2d, 2001 WL 1526303 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ORIGINAL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| UNION ILLINOIS 1995 INVESTMENT LIMITED PARTNERSHIP, JAMES D. O'BRIEN, THE DENIS O'BRIEN IRREVOCABLE FAMILY TRUST, THE O'BRIEN FAMILY TRUST, THE JAMES O'BRIEN FAMILY IRREVOCABLE TRUST, AND THE DOUGLAS O'BRIEN FAMILY IRREVOCABLE TRUST, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.: 17392-NC ) |
| RALPH KORTE, STEVE ORTHWEIN, JOE MICHELETTO, H.C. MILFORD, TIMOTHY CROWLEY, STEVE JONES, THEODORE R. P. MARTIN, GREG SULLIVAN, and ROBERT H. CHAPMAN, | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| UNION FINANCIAL GROUP, LTD., | ) ) |
| Nominal Defendant. | ) |

## ORDER AND FINAL JUDGMENT

Plaintiffs' derivative claims on behalf of Union Financial Group, Ltd. having been tried before Master Glasscock on July 30, 31, and August 1, 2001 and Master Glasscock having issued a Final Report on November 28, 2001 ("the Master's Report"), and this Court having reviewed exceptions to the Master's Report taken by the individual defendants and heard oral argument from the parties on all issues, including plaintiffs' petition for attorneys' fees and costs,

1

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED this 21st day of December 2001, that:

1. Final judgment is entered in favor of Union Financial Group, Ltd. and against Defendants Ralph Korte, Steve Orthwein, Joe Micheletto, H. C. Milford, and Timothy Crowley (collectively the "Individual Defendants") for the reasons stated in the Master's Report and in this Court's oral ruling of December 21, 2001 ("the Oral Ruling").

2. The Individual Defendants shall return to the Company the excess shares they received in accordance with the Master's Report.

3. Final judgment is entered in favor of defendants Steve Jones, Theodore R.P. Martin, Greg Sullivan and Robert H. Chapman for the reasons stated in the Oral Ruling.

4. Plaintiffs are awarded attorneys fees in the amount of $20,000.00, to be paid by Union Financial Group, Ltd. within thirty (30) days hereof, with the parties to bear their own costs.

5. The Court shall retain jurisdiction solely for the purpose of enforcing the relief ordered.

_____
Vice Chancellor