IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
                         :

RONALD CANTOR, IVAN SNYDER and    :
JAMES A. SCARPONE, as TRUSTEES OF  :
THE MAFCO LITIGATION TRUST,     :

                         :   No. 97-CIV-586-KAJ

              Plaintiffs,    :

                         :

      - against -        :

                         :

RONALD O. PERELMAN,        :
MAFCO HOLDINGS INC.,       :
MacANDREWS & FORBES HOLDINGS INC., :
ANDREWS GROUP INCORPORATED,  :
WILLIAM C. BEVINS and       :
DONALD G. DRAPKIN,        :

                         :

           Defendants.   :

                         :

---------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY BY PLAINTIFFS' EXPERT WITNESSES

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
ASHBY & GEDDES
222 Delaware Avenue
Wilmington, Delaware 19899
(302) 654-1888

Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

Dated:  June 22, 2006

410922.8

## **TABLE OF CONTENTS**

Page

SUMMARY OF ARGUMENT ................................................................................1

    William Purcell ................................................................................................2

    Bevis Longstreth ............................................................................................4

    Andrew Carron and Jeffrey Baliban ...........................................................5

    Joseph T. Walsh .............................................................................................5

ARGUMENT ......................................................................................................5

I.      THE TESTIMONY OF PURCELL AND LONGSTRETH, BASED
       UPON THEIR KNOWLEDGE AND EXPERIENCE, IS ADMISSIBLE
       UNDER FED. R. EVID. 702 .................................................................5

      A.    Purcell's Opinion Concerning the Importance of the Restrictions in
           Marketing and Selling the Notes Is Reliable ...............................7

      B.    Purcell's Opinion Concerning Marvel's Capital Structure Is
           Reliable ........................................................................................9

      C.    Purcell's Opinion Concerning  Marvel's Damages Is Reliable ................11

      D.    Longstreth's Opinion Concerning an Independent Director's
           Evaluation of the Restrictions is Reliable ...................................12

      E.    Longstreth's Critique of Fowler's Hypothetical Negotiation Is
           Reliable ......................................................................................17

      F.    Longstreth's Opinion Concerning the Importance of the
           Restrictions to the Noteholders Is Reliable ...............................19

      G.    Longstreth's Opinion Concerning the Financial Aspects of Arm's-
           Length Negotiations Is Reliable .................................................20

      H.    Longstreth Is Offering Opinions Based on Decades of Relevant
           Experience, Not Legal Opinions ...............................................21

II.    THE EXPERT REPORTS OF CARRON AND BALIBAN WERE
     TIMELY AND PROPER PURSUANT TO THIS COURT'S
     SCHEDULING ORDER .......................................................................21

      A.    The Carron and Baliban Reports Were Timely Served ............................22

Page

    B.     The Carron and Baliban Reports Are Responsive to Issues Framed
          by the Third Circuit.......................................................................................24

    C.     Defendants Were Not Prejudiced by Timing of the Baliban and
          Carron Expert Reports ..............................................................................24

III.    IF THE COURT ADMITS THE OPINION OF DEFENDANTS'
      EXPERT ON DELAWARE LAW -- PROFESSOR LAWRENCE A.
      HAMERMESH -- THE COURT SHOULD ALSO ADMIT THE
      OPINION OF PLAINTIFFS' REBUTTAL EXPERT ON DELAWARE
      LAW -- JUSTICE (RET.) JOSEPH T. WALSH ...................................................25

CONCLUSION.........................................................................................................28

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Askanase v. Fatjo,*
    130 F.3d 657 (5th Cir. 1997) ................................................................29

*Cantor v. Perelman,*
    414 F.3d 430 (3d Cir.  2005)........................................................ *passim*

*Cede & Co. v. Technicolor, Inc.,*
    634 A.2d 345 (Del. 1993) ................................................................27

*Chase Manhattan Mortgage Corp. v. Advanta Corp.,*
    01 Civ. 507, 2004 WL 422681 (D. Del. Mar. 4, 2004).....................7, 25

*Clark v. Richman,*
    339 F. Supp. 2d 631 (M.D. Pa. 2004) ....................................................7

*Fierro v. Gomez,*
    865 F. Supp. 1387 (N.D. Cal. 1994) ......................................................7

*First Nat'l State Bank v. Reliance Elec. Co.,*
    668 F.2d 725 (3d Cir. 1981)..................................................................6

*Hawkspere Shipping Co., Ltd. v. Coastal Cargo Co., Inc.,*
    00 Civ. 1748, 2001 WL 1586694 (E.D. La. Dec. 11, 2001) ..................7

*Huddleston v. Herman & MacLean,*
    640 F.2d 534 (5th Cir. 1981) ..............................................................29

*In re Dow Corning Corp.,*
    237 B.R. 364 (Bankr. E.D. Mich. 1999) ................................................7

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994).....................................................................6

*In re Sunrise Sec. Litig.,*
    916 F.2d 874 (3d Cir. 1990)................................................................12

*Indiana Area School Dist. v. H.H.,*
    04 Civ. 1696, 2006 WL 1134942 (W.D. Pa. Mar. 4, 2006).................7

*Kannankeril v. Terminix Int'l, Inc.,*
    128 F.3d 802 (3d Cir. 1997).............................................................6, 7

Page(s)

*Oddi v. Ford Motor Co.,*
    234 F.3d 136 (3d Cir. 2000).................................................................6

*Schneider v. Fried,*
    320 F.3d 396 (3d Cir. 2003)................................................................6

*Suter v. General Accident Ins. Co.,*
    424 F. Supp. 2d 781 (D.N.J. 2006) ...................................................22

*Triche v. Overnite Transp. Co.,*
    95 Civ. 0691, 1996 WL 276353 (E.D. La. May 21, 1996) .....................7

*United States v. 14.38 Acres of Land,*
    80 F.3d 1074 (5th Cir. 1996) .............................................................12

*United States v. Brown,*
    415 F.3d 1257 (11th Cir. 2005) ..........................................................7

*United States v. Demjanjuk,*
    367 F.3d 623 (6th Cir. 2004) ..............................................................7

*United States v. Leo,*
    941 F.2d 181 (3d Cir. 1991)................................................................6

*Windsor Shirt Co. v. New Jersey Nat'l Bank,*
    793 F. Supp. 589 (E.D. Pa. 1992) .....................................................13

## RULES

Fed. R. Evid. 702 ...................................................................... *passim*

Plaintiffs respectfully submit this Memorandum in opposition to defendants' motion to exclude the expert testimony of Bevis Longstreth, William H. Purcell, Andrew S. Carron, Jeffery L. Baliban, and portions of the testimony of Justice Joseph T. Walsh, Ret.

## SUMMARY OF ARGUMENT

1.    Defendants are moving to exclude the testimony of every one of plaintiffs' five experts.  This is extraordinary in light of the law -- *see e.g.* the Advisory Committee Note to Rule 702 ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule . . . this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert.") -- and in light of how distinguished each of plaintiffs' experts is:  Bevis Longstreth (a former commissioner of the SEC, a corporate lawyer for over 40 years at Debevoise & Plimpton, Advisor to the American Law Institute, member of numerous boards of directors), Joseph T. Walsh (former Justice of the Delaware Supreme Court), Andrew Carron (president of National Economic Research Associates), Jeffrey Baliban (senior vice-president at NERA), and William Purcell (whose opinions are quoted at length in the Third Circuit decision in this case).[1]

2.    Defendants argue that the Court should exclude the opinions of Longstreth and Purcell as unreliable because they are based on their "subjective 'experience.'"  (Def. Br. at 3.)  In fact, Rule 702 expressly permits a witness to be

---

[1] Plaintiffs are not suggesting that a witness with impressive credentials cannot be challenged under *Daubert*, but defendants seem to think that the Court's gate-keeping function means keeping the gate closed.

410922.8

qualified as an expert based on "experience." As explained in the Advisory Committee Note to Rule 702, "Nothing in this amendment is intended to suggest that experience alone -- or experience in conjunction with other knowledge, skill, training or education -- may not provide a sufficient basis for expert testimony." Indeed, the Advisory Committee Note goes on to say, "To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."

3.      The opinions of Longstreth and Purcell are based upon their knowledge, experience and training, and the reliability of their opinions is to be evaluated by reference to knowledge and experience in the relevant fields. They need not employ scientific or mathematical analyses, as long as they reliably apply their knowledge and experience to the facts of the case at hand. That is exactly what Purcell and Longstreth have done here.

**William Purcell**

4.      Purcell has expressed the opinion that Indenture Restrictions applicable to Marvel Entertainment Group, Inc. ("Marvel") were a substantial reason why the Marvel Holding Companies were able to issue and sell the Notes. Purcell's opinion is supported by his knowledge and experience concerning principles and practices in the debt capital markets. Purcell's opinion is also substantiated by the testimony and admissions of defendants themselves. Donald Drapkin, who was a director of the Marvel Holding Companies (and also a director of Marvel) at the time of the Note issuances has testified that the underwriters for the Marvel Holding Companies felt that the Indenture Restrictions limiting Marvel's issuance of debt and Marvel's issuance of preferred stock were "necessary" to market the Notes. (B3-5.)

2

5.    Purcell's opinion that Marvel would have had a different capital structure in the absence of the Notes is based upon basic principles of corporate finance that are widely accepted in the investment banking field.  Referring to Purcell's opinion, the Third Circuit stated:

> . . . there is evidence in the record from which a trier of fact could conclude that, but for the Indenture restrictions, a Marvel management acting in its best interest would have had a different and more favorable capital structure.

*Cantor v. Perelman*, 414 F.3d 430, 437 (3d Cir. 2005).

6.    Purcell's opinion that the Restrictions caused actual financial harm to Marvel in the approximate amount of $471 million is based on defendants' admissions that the Restrictions impeded Marvel's ability to obtain the financing it needed to survive, and the market capitalization of Marvel -- a NYSE-listed company.  Courts recognize that the market capitalization of a public company is an appropriate measure of the company's value.[2]

---

[2] As is their right, plaintiffs will present at trial alternative theories of damages and unjust enrichment, as well as evidence that could support monetary awards in varying amounts.  Thus, in addition to the Purcell opinion, which was provided to defendants prior to their filing of a summary judgment motion in 2002, plaintiffs will also offer at trial the expert opinions of Baliban (actual damages in the range of $308 million to $617 million before interest) and Carron (a partial measure of the enrichment to Perelman based on the additional proceeds he obtained by virtue of the restrictions -- $156 million before interest).  Defendants are challenging the Carron and Baliban opinions only on timing grounds discussed below, not on *Daubert* grounds.  In addition, plaintiffs believe that the evidence at trial will show that an unjust enrichment award in the entire amount of the note proceeds paid as a dividend by the Marvel Holding Companies to Ronald Perelman and/or his wholly-owned corporations -- $553.5 million -- plus interest, is warranted.

3

**Bevis Longstreth**

7.      Longstreth explains why an independent director of Marvel would have recognized that the Restrictions reflected a "bet the ranch" risk that could ultimately lead to the demise of Marvel.  Because the Restrictions limited Marvel's flexibility to engage in financing transactions for its corporate needs, an independent director would have been concerned that the Restrictions would interfere with Marvel's ability to obtain financing at a time when financing would be urgently needed -- the very situation Marvel confronted in the fall of 1996, when the Restrictions precluded Marvel from obtaining the financing it desperately needed to survive.

8.      Longstreth's rebuttal of Fowler's opinion concerning a hypothetical negotiation between defendants and independent directors of Marvel is based upon good grounds, including that Marvel received no benefit from the Note transactions, that Perelman obtained all the benefit and such benefit would be unaffected even if Marvel did not survive, and that independent directors of Marvel would have sought to avoid jeopardizing Marvel's financial viability.  Assuming, in Perelman's favor, that independent directors would have been willing to accede to the Restrictions in exchange for payment, Longstreth opines that such a negotiation would have resulted in a payment to Marvel in the magnitude of approximately $150 million (rather than the $2.4 to $12.6 million suggested by Fowler).  His opinion is based upon the serious risks to Marvel caused by the Restrictions, Marvel's value at the time of the Note issuances (more than $2 billion), and the huge amount of wealth ($553.5 million) that Perelman was extracting through the Note transactions.

9.    Longstreth is not offering legal opinions.  To the extent that his opinions are informed by an understanding of the law governing corporate fiduciaries, that is not a basis for excluding his testimony.

**Andrew Carron and Jeffrey Baliban**

10.    There is no basis for excluding the testimony of Andrew Carron or Jeffrey Baliban as untimely or otherwise because:  (i) neither the Third Circuit nor this Court limited the scope of additional testimony to be proffered following remand; (ii) the opinions of Carron and Baliban are probative on issues framed by the Third Circuit's decision; and (iii) defendants were not prejudiced by the timing of the Carron and Baliban reports because they have had, and have taken full advantage of, the opportunity to submit rebuttal reports and take the depositions of Carron and Baliban.

**Joseph T. Walsh**

11.    Defendants seek to exclude portions of the testimony of plaintiffs' rebuttal expert Joseph T. Walsh, former Justice of the Supreme Court of Delaware, while, at the same time, they argue that the opinion of their expert, Professor Lawrence A. Hamermesh, concerning Delaware law should be admitted in its entirety.  Plaintiffs' position is that if Hamermesh's opinion is permitted, then Walsh's should also be permitted (or both should be excluded).

## ARGUMENT

### I.

### THE TESTIMONY OF PURCELL AND LONGSTRETH, BASED UPON THEIR KNOWLEDGE AND EXPERIENCE, IS ADMISSIBLE UNDER FED. R. EVID. 702

Defendants contend that the opinions of Purcell and Longstreth are unreliable because they are based on their experience, supposedly without reference to

5

any methodologies. (*See* Def. Br. at 22, 28.) That contention reflects a fundamental misapprehension of the law. There is nothing unreliable about expert testimony grounded in experience. *See* Fed. R. Evid. 702 Advisory Committee Note ("[n]othing in [the 2000 amendments to Rule 702] is intended to suggest that experience alone -- or experience in conjunction with other knowledge, skill, training or education -- may not provide a sufficient foundation for expert testimony.") The issue with respect to such testimony is whether the expert is reliably applying his knowledge and experience to the facts of this case. This is consistent with longstanding Third Circuit precedent acknowledging the admissibility of such "custom and practice" testimony. *See United States v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991) (citing *First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (per curiam)).

  While the expert must have "good grounds" for his or her belief, *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003), the "standard for determining scientific reliability 'is not that high.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 155-56 (3d Cir. 2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744-45); *see also Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) ("Whether the . . . expert might have done a better job is not the test."). "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril*, 128 F.3d at 806.[3]

---

[3] This court and numerous other courts have observed that in a bench trial it may be preferable to evaluate an expert's testimony on the basis of a full record at trial. *Chase Manhattan Mortgage Corp. v. Advanta Corp.*, 01 Civ. 507, 2004 WL 422681, at \*10 (D. Del. March 4, 2004). (Ex. A to Plaintiffs' Compendium of Unreported Opinions.) *See also United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for

As the Advisory Committee explains, "[s]ome types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. . . . The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702 Advisory Committee Note. Here, because Purcell and Longstreth are testifying to opinions based on their knowledge, experience and training, the reliability of their opinions is to be evaluated by reference to the knowledge and experience in their fields.

## A.    Purcell's Opinion Concerning the Importance of the Restrictions in Marketing and Selling the Notes Is Reliable

Purcell has been an investment banker for over thirty-five years. (A214.) He has worked in all areas of corporate finance, including debt and equity financings, and has dealt extensively with the principal debt rating agencies. (*Id.*) Purcell has an undergraduate degree from Princeton University, an M.B.A. degree from New York University, and has testified as an expert witness over thirty times about a wide range of investment banking matters. (A215.)

---

himself."); *United States v. Demjanjuk*, 367 F.3d 623, 633-35 (6th Cir. 2004) (affirming district court's admission of expert testimony, where "the trial judge was very much aware of the applicable legal standards and considered the expert's methodology in determining the weight to be attributed to the testimony."); *Indiana Area School Dist. v. H.H.*, 04 Civ. 1696, 2006 WL 1134942, at *1 (W.D. Pa. Mar. 4, 2006) (Ex. C to Plaintiffs' Compendium of Unreported Opinions); *Clark v. Richman*, 339 F. Supp. 2d 631, 648 (M.D. Pa. 2004); *Hawkspere Shipping Co., Ltd. v. Coastal Cargo Co., Inc.*, 00 Civ. 1748, 2001 WL 1586694, at *1 (E.D. La. Dec. 11, 2001) (Ex. B to Plaintiffs' Compendium); *In re Dow Corning Corp.*, 237 B.R. 364, 371 n.23 (Bankr. E.D. Mich. 1999); *Triche v. Overnite Transp. Co.*, 95 Civ. 0691, 1996 WL 276353, at *2-*3 (E.D. La. May 21, 1996) (Ex. D to Plaintiffs' Compendium); *Fierro v. Gomez*, 865 F. Supp. 1387, 1395 n.7 (N.D. Cal. 1994).

Purcell opines that the restrictive covenants applicable to Marvel were a substantial reason why Marvel Holdings, Inc., Marvel (Parent) Holdings, Inc. and Marvel III Holdings, Inc. could sell the Notes in the issuances that took place in 1993 and 1994. (A215-16.) He cites, for example, Section 4.04 of the Indentures which provides that the holding companies shall not permit Marvel to issue debt and/or preferred stock except under certain circumstances.[4]  (A220-21.)  Because the Notes were secured only by Marvel common stock, and because any creditors and preferred stockholders of Marvel would have a claim on Marvel's assets ahead of the Noteholders, the Noteholders had an interest, different from Marvel's interest, in limiting Marvel's ability to issue preferred stock, as well as debt.  Purcell also discusses Section 4.05 and Section 4.09, which contain restrictions applicable to Marvel.  As a general matter, underwriters include such restrictive covenants in debt instruments because they cannot sell an issue without such credit protections in place.  (*Id.* ¶ 30, A226.)

Purcell has "good grounds" for his opinion as evidenced by his explanation of applicable principles based upon his knowledge and experience with corporate debt issuances:  He explains that holding company issues are viewed as risky, and that investors would understand that the real value for the ultimate repayment of holding company notes is in the operating subsidiaries.  Purcell also explains that

_____

[4] Marvel's own financing documents contained no restrictions on the issuance of preferred stock.  Ironically, just a couple of months before the issuance of the first tranche of Holding Company Notes, the Marvel Board had increased Marvel's authorized preferred shares to facilitate Marvel's capital raising activities.  But after the issuance of the Holding Company Notes, Marvel never issued preferred stock, notwithstanding its tremendous financing needs, and the trebling of its bank debt (from approximately $200 million to approximately $600 million) during the two-year period after the issuance of the Notes.

covenants grow more stringent as the quality of credit declines, and are of critical importance for below investment grade holding company debt such as the Holding Company issuances. He further explains that underwriters, who do not want to hold the underwritten securities, will negotiate for the terms necessary to resell the debt notwithstanding their clients' general desire for as few restrictions as possible.

Purcell's opinion is properly based on the application of these principles to the facts of this case. Purcell has also tested his opinion by reviewing other comparable holding company debt issuances, and he found that without exception that they included restrictions on the operating companies similar to the Restrictions at issue here. (What is unique about Ronald Perelman's holding companies is that they promised to restrict the financing activities of subsidiaries that were not 100% owned without any sharing of the benefits with such subsidiaries.) Moreover, Purcell's opinion is entirely consistent with the testimony of defendant Drapkin and defendants' own investment banker who handled the note issuances. (B3-5.)

**B.    Purcell's Opinion Concerning Marvel's Capital Structure Is Reliable**

In 2002, Purcell issued a report in rebuttal to defendants' expert Robert Holthausen concerning the harm to Marvel as a result of the Indenture covenants. Purcell explains that Professor Holthausen's opinion is based on the flawed premise that even in the absence of the indenture covenants, Marvel's own credit agreements would be the same and would be determinative of Marvel's limited financing flexibility. Purcell opines that if the indenture covenants applicable to Marvel did not exist, Marvel would have had a different and more favorable capital structure, rather than one that relied exclusively on bank debt. (A253.) Citing four well-respected business texts, Purcell explains that his opinion rests on certain fundamental principles of corporate finance:

9

(1) it is best to finance long-term assets (*i.e.*, the several businesses acquired by Marvel during the relevant time frame) with long-term debt or equity; (2) it is best to stretch out debt maturities over as long a time as possible so cash flow can be managed with minimum refinancing risks; (3) companies should avoid over-reliance on short-term commercial paper or bank debt primarily because some bank financing should always be kept available as a safety valve to cover situations where cash is needed quickly, and bank lenders can apply pressure very quickly if something goes wrong; and (4)  it is best to pay off bank debt after it has reached a certain level by funding capital needs with long-term financing when capital markets are favorable." (A254-55.)

Purcell also explains why a target capital structure for a company such as Marvel would have been of an order of magnitude of 30% debt and 70% equity.  Again he refers to numerous corporate finance texts, which recognize that a target capital structure is a matter of judgment based on the risk profile of a company, and not the product of a mathematical calculation.  (A 315-16, A254-55, A259.)  In Purcell's judgment, which he is well-qualified to provide, Marvel's risk profile during the relevant time period militated against high levels of debt because:  (i) Marvel was not a capital-intensive business with substantial tangible assets but a company looking to exploit a brand; (ii) Marvel did not have a predictable cash flow; (iii) Marvel was a rapidly growing company which had a strategy of diversifying through acquisitions, and; (iv) Marvel would have needed to build an appropriate margin of safety into its capital structure to account for unpredictable, but inevitable, downturns in its business cycle. (*Id.*)

Defendants are thus incorrect when they argue that Purcell's opinion concerning Marvel's capital structure is Purcell's *ipse dixit* (Def. Br. at 29), and that Purcell does not have "good grounds" for his opinion that a target capital structure for Marvel would have been no more than 30% debt and at least 70% equity. (*Id.* at 30.) As explained above, the principles of corporate finance Purcell is relying upon constitute an "accepted body of learning or experience" in the investment banking field. Indeed, the Third Circuit found that Purcell's opinions on Marvel's likely capital structure in the absence of the Holding Company Notes "would provide a basis for concluding that Marvel did suffer injury from those restrictions [in the indentures.]" *Cantor*, 414 F.3d at 437-38. In sum, Purcell's opinions are based on factors recognized by practitioners and academics in corporate finance. To the extent that defendants disagree with Purcell's judgment, cross-examination -- not exclusion from evidence -- is their remedy. *See* Fed. R. Evid. 702 advisory committee's note ("'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'") (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)).

## C.    Purcell's Opinion Concerning Marvel's Damages Is Reliable

In a supplemental report issued in 2002, taking into account the deposition of Howard Gittis, vice-chairman of defendant McAndrews & Forbes, Purcell opines that Marvel's damage from the restrictive covenants was approximately $471 million representing its market capitalization on November 11, 1996. (A275.) Gittis acknowledged that in the fall of 1996 Marvel desperately needed a major capital infusion in order to have the ability to restructure and survive, but testified that "no one" would put up the money necessary to fund Marvel without a modification of section 4.09 of the Holding Company covenants. (B8.) Because "no one" – not just defendants – would

11

provide capital necessary to a restructuring because of Section 4.09, Purcell reasoned that the indenture covenants were the "coup de grace" that necessitated Marvel's filing of a bankruptcy provision one month after defendants' own announcement that Perelman would not invest equity without modification of the indenture covenants. (B181.)

Purcell's calculation of damages is based on Marvel's market capitalization as of the day before Perelman's announcement that he would not provide additional capital absent modification of the Indenture covenants, as compared to the zero value of its equity following Marvel's bankruptcy. While defendants criticize such a methodology as "simplistic," market capitalization is routinely accepted by the courts in this Circuit as a measure of value. *See In re Sunrise Sec. Litig.*, 916 F.2d 874, 886 (3d Cir. 1990) ("Underlying the rule that diminution in share value is an injury to the corporation and shareholders generally is the principle that decreases in share value reflect decreases in the value of the company."); *Windsor Shirt Co. v. New Jersey Nat'l Bank*, 793 F. Supp. 589, 595 (E.D. Pa. 1992) ("It is beyond peradventure that the market capitalization of all the shares of a company's stock represents the approximate market value of the company.") Defendants present no reason why this Court should be the first to reject market capitalization as a value benchmark.[5]

### D.    Longstreth's Opinion Concerning an Independent Director's Evaluation of the Restrictions is Reliable

Longstreth's opinions are based on his experience over the last 45 years as (i) an independent director of various companies, including the NYSE-listed Capstead

---

[5] To the extent defendants believe that there was some superseding or intervening cause why Marvel's equity became worthless, they can present that evidence or cross-examine Purcell.

Mortgage Corporation (1993-2000) and, currently, the College Retirement Equities Find, which is the equity investment arm of TIAA-CREF (an organization widely hailed for its leadership in corporate governance practices); (ii) a lawyer at Debevoise & Plimpton for more than thirty years during which time he regularly advised corporate boards on governance matters and worked on financings of every conceivable kind; (iii) a commissioner of the United States Securities and Exchange Commission (1981-84); and (iv) an advisor on financial and legal matters in the for-profit and non-profit worlds, including as a Member of the Finance Committee of the Rockefeller Family Fund (1972-81, 1984-2004), and as a Member of the Board of Governors of the American Stock Exchange (1992-98). Mr. Longstreth has taught at Columbia Law School and served as Adviser to the American Law Institute Projects on Principles of Corporate Governance and the Restatement of the Law of Trusts. (A180; B41-42.)

In Longstreth's opinion, if Perelman had presented to the Marvel Board his plans for the Note issuances -- including his intention to cause his holding companies to promise to restrict Marvel's financing activities, and his need for Marvel's active assistance and participation to effectuate the Note issuances -- an independent director would have recognized that the Note transactions represented a conflict of interest between Perelman and the best interests of Marvel because: (i) Perelman was getting all of the benefit from the Note transactions, while Marvel was getting nothing; and (ii) the security for the Notes would not be limited to a pledge of Perelman's stock, but would also include negative covenants in which the issuers would agree to restrict Marvel in a variety of ways, and (iii) Marvel's resources were being used to effectuate the transactions. (A185-86.)

An independent director would also have understood that if Marvel had resisted the application of the Restrictions after the Notes were issued, it would have done so at peril of being sued for tortious interference with the contractual relationship between the Noteholders and the issuers. (A185.) As Longstreth explains, if Marvel did something at odds with the Restrictions, the Noteholders could argue that Marvel's conduct constitutes "a tortious interference with an advantageous contractual relationship which they [Marvel] know all about and are subject to. And if it weren't so, they [Marvel] would have made disclosure in their SEC filings that they were prepared not to comply with these obligations instead of suggesting, as they have, that they are subject to them." (B117.) Longstreth is not expressing a legal opinion about the merits of such a claim; he opined that the threat or possibility of such a claim would impact Marvel.

Defendants contend that Longstreth provides no support for his opinion that an independent director would be concerned about the "bet the ranch" nature of the restrictive covenants. (Def. Br. at 22.) To the contrary, Longstreth has "good grounds" for his opinion. An independent director would have understood that the restrictions had potentially dire consequences to Marvel because restrictions on how and when a corporation can engage in fundamental financing transactions can, by their nature, turn out to be life-threatening if they interfere with a corporation's ability to raise capital at a time when capital is urgently needed. The restrictions were especially threatening to Marvel because the only way Marvel could escape them would be to negotiate with Noteholders (which turned out to be impossible) or pay off all of the Holding Company debt (which would make no sense since Perelman received all of the proceeds, and Marvel, none). Although Marvel was always free to eliminate the restrictions and

14

covenants in its own debt instruments by issuing equity and paying off the debt, Marvel had no ability to eliminate the restrictions applicable to it in the Note indentures.

Defendants have never contended that Marvel could have eliminated the restrictions applicable to it in the Holding Company Indentures. Instead, defendants have argued that because Marvel was not a party to the Indentures, the Indenture restrictions were of no consequence to Marvel. In fact, the evidence that will be presented at trial establishes that the restrictions were of major consequence for Marvel, and that they prevented Marvel from obtaining desperately-needed financing when Marvel was facing a liquidity crisis in the fall of 1996. No matter how many times defendants say the restrictions constituted mere events of default for the Holding Companies, that were of no consequence for Marvel, the facts are otherwise.

For example, according to the minutes of the December 12, 1996 meeting of Marvel's Board of Directors, Perelman told the Marvel board that "a delay in implementing the restructuring [of Marvel] would have a negative impact on [Marvel's] liquidity needs," and that because the Holding Company bondholders have not organized, it has not been possible to negotiate with them for their consent to the restructuring of Marvel. (B182.) As a result, Perelman told the board, Marvel was considering filing for bankruptcy. (*Id.*) Then, at the December 26, 1996 board meeting, Perelman told the Marvel board that due to the deterioration of the company's financial condition, and the inability to restructure the Holding Companies' obligations under the Note indentures, Marvel had to file for bankruptcy. (B185.) Thus, Longstreth's "bet the ranch" concern is not only supported by his knowledge and years of experience with respect to corporate governance and financial matters, but was ultimately borne out by the facts in this case.

15

As Longstreth explains, the dire problems Marvel suffered as a result of the Restrictions would have been readily foreseeable to an independent director of Marvel in 1993-94, when the Note transactions were in process. However, a review of Marvel's Board minutes shows that defendants never presented to the Marvel Board a request that Marvel provide the assistance and participation Perelman needed to effectuate the Note transactions, together with disclosure of the consequences for Marvel. Instead, Perelman, Bevins and Drapkin simply commandeered Marvel's resources and participation for their own benefit, and, as required by defendants' underwriters, promised (through Perelman's holding companies) to use their control over Marvel to restrict Marvel's financing activities. As the Third Circuit stated:

> The record before us would support a finding that Perelman's companies received $553.5 million in financing they would not otherwise have been able to secure by committing to prevent Marvel from taking certain actions and by utilizing Marvel's corporate resources to market that financing. And, given the nature of the restrictions imposed, the commitment was one that could be effectuated only by exercising the defendants' control of Marvel's board of directors. This is thus not a case in which a fiduciary allegedly sold stockholder votes that it was entitled to cast in its own interest. This is a case involving an alleged sale of director votes.

*Cantor*, 414 F.3d at 435-36.

In light of his decades of experience as a corporate fiduciary and corporate lawyer (as well as his experience as an Advisor to ALI Projects on corporate governance and trusts and as an SEC commissioner), Longstreth is well-qualified to testify about how independent directors would have evaluated the Note transactions, and their actions and their concerns.

16

**E.    Longstreth's Critique of Fowler's Hypothetical Negotiation Is Reliable**

In his initial report, Longstreth did not express an opinion as to the dollar amount that he would expect to be the end-result of arm's length bargaining between Perelman and independent Marvel directors.  However, one of defendants' rebuttal experts, Peter Fowler, also presented his opinion (which he acknowledges was not in rebuttal to any of plaintiffs' experts) as to the hypothetical back-and-forth discussions that he believes would have occurred between Perelman and Marvel's independent directors, and the dollar amount that Perelman and Marvel would have ultimately agreed to.  In Fowler's opinion, independent Marvel directors would have accepted a relatively *de minimis* fee of somewhere between $2.4 million and $12.6 million – the equivalent of what a borrower pays to waive a "minor" default.  (A139.)

Plaintiffs asked Longstreth to review Fowler's opinion, and as Longstreth opined in his rebuttal report, Fowler's hypothetical negotiation is completely at odds with what would have happened in the real world under the circumstances of this case.  Based on Longstreth's extensive experience as an independent director, and his knowledge of their duties and practices – all of which Fowler lacks – Longstreth sets forth his opinion as to a more realistic negotiation that would have occurred.

Defendants suggest that Longstreth's analysis is limited to the conclusory assertion:  "As to benefits, the wealth extraction from Marvel accrued solely to the benefit of Ronald O. Perelman.  Nothing of benefit accrued to Marvel or its minority shareholders."  (Def. Br. at 23-24.)  In fact, a reading of Longstreth's reports, as well as his deposition testimony, shows that he is offering a thoughtful and multi-faceted critique of Fowler -- although it should also be noted that the so-called conclusory assertion is undeniably correct.  Defendants do not and cannot, dispute that Marvel obtained nothing

17

from the Note transactions, and Perelman obtained all the benefit; defendants' Fowler admitted as much at his deposition. (B201-02.)

Longstreth also criticizes Fowler for overlooking the fact that the $553.5 million that Perelman would obtain from the Note transactions would be unimpaired even if bad things happened to Marvel as a result:

> In essence, the Note issuances were for Mr. Perelman a classic example of the "head's I win, tails you lose" transaction. The "you" in this case were Marvel and its minority shareholders. Such a transaction is the "promised land" for a deal-maker, but it would have been unobtainable had the transactions been presented to Marvel's Board of Directors and had Marvel's best interests been represented by independent directors aided by banking and legal professional of standing and independence.

(A210.) An independent director would have understood that Perelman would be locking in his gain from the Note transactions, while Marvel's downside would have been unlimited and potentially calamitous.

In addition, Longstreth takes issue with Fowler's assumption that Marvel's only role in the issuance of the Notes would have been its acquiescence to the Restrictions. As Longstreth points out, however, independent directors would have taken into account all the other ways in which Marvel's participation and cooperation was requested and required by the Marvel Holding Companies -- for example, Marvel and Marvel executives played a central role in due diligence and road shows for the Notes, defendants' underwriters required and obtained opinion letters from Marvel's General Counsel and comfort letters from Marvel's auditors, and Marvel, through defendants and other officers and directors, acknowledged the Restrictions in its SEC filings. (A211.)

While defendants criticize Longstreth for not having done his own analysis of defendants' alternatives (Def. Br. at 23), Longstreth testified that he had considered the alternatives postulated by Fowler "throughout [his] report" (B262).  It was Fowler, in fact, who made clear that defendants themselves had rejected the two most obvious alternatives – a margin loan and a debt security convertible into stock (a Liquid Yield Option Note).  Fowler concedes that the margin loan would have been "less efficient" (i.e., raising less money for Perelman), and that they rejected the convertible security because Perelman did "not want to sell a security that gave investors the right to participate in the appreciation" of Perelman's Marvel stake.  (A126.)  Thus, Longstreth took into account the same alternatives as Fowler.

**F.    Longstreth's Opinion Concerning the Importance of the Restrictions to the Noteholders Is Reliable**

Defendants contend that Longstreth's opinion that the Noteholders considered the Restrictions to be important is unreliable and should be excluded because he does not employ "objective criteria."  (Def. Br. at 24.)  In fact, Longstreth evaluated investors' interest in the Restriction based upon the numerous similar transactions he has personally participated over his more than forty year career:

> I have done – I have spent a whole career doing secured borrowings.  And I think I know what's in the mind of people in general when they take a pledge of stock and impose covenants on a company that is the issuer of the stock.  And it isn't simply the value, the public value of the stock, if it has a public market.  It is a bundle of things.  There is an upside and a downside.  And I think it is very difficult to say that these noteholders had no interest in operational controls that they bargained for and which we find in the agreement.

(B270.)  As discussed above, such first-hand, real world experiences provide Longstreth with specialized knowledge as to industry custom and practice that is "good grounds" for

19

offering an opinion as to the significance of the restrictive covenants to prospective Note purchasers. If defendants want to challenge the basis for that opinion – Longstreth's experience – they will have the opportunity to cross-examine him at trial, but grounding his opinion on experience in debt transactions does not make his testimony unreliable, or provide a basis for excluding his testimony.[6]

### G.    Longstreth's Opinion Concerning the Financial Aspects of Arm's-Length Negotiations Is Reliable

Defendants contend that Longstreth's opinion that independent Marvel directors would have required a payment to Marvel in the magnitude of $150 million in order to obtain Marvel's acquiescence and cooperation in the Note issuances is unreliable because Longstreth does not arrive at that figure through any calculation or mathematical model. (Def. Br. at 25-28.) While defendants criticize Longstreth's analysis for allegedly lacking a "testable hypothesis," defendants simply ignore the analysis that Longstreth actually used to render his opinion.

Longstreth based his opinion upon several considerations that would have informed the negotiating posture of an independent director faced with the Note transactions: (1) the risks Marvel would face as a result of the issuance of the Notes, including the potentially devastating effects of the Restrictions; (2) Marvel's value at the time – over $2 billion; and (3) Perelman's wealth extraction ($553.5 million). Based

---

[6] Moreover, Fowler's report actually supports Longstreth's and Purcell's opinion that the Restrictions were necessary to sell the Notes, although Fowler argues that the market would have accepted "monitoring devices" -- a term he makes up -- as an alternative to the restrictions. In contrast to the opinions of Longstreth and Purcell, based on actual experience and practices in the debt capital markets, Fowler's argument is unsubstantiated speculation.

upon these factors and Longstreth's knowledge and experience, he opined that an independent director would not have accepted the modest amounts suggested by Fowler, but would have demanded an amount that more accurately reflected the risks to Marvel and the benefits to Perelman – a payment in the order of magnitude of $150 million. (A212.)

### H. Longstreth Is Offering Opinions Based on Decades of Relevant Experience, Not Legal Opinions

Defendants contend that Longstreth's opinions on how an independent director would carry out his obligations, is nothing more than a legal opinion as to "directors' duties and obligations under Delaware corporate law." (Def. Br. at 19.)  In fact, Longstreth is opining on the custom and practice that independent directors would follow when approaching a transaction with a conflicted fiduciary.  It is to be expected that the customs and practices followed by independent directors would be informed by an understanding of the relevant background law.  *See Suter v. General Accident Ins. Co.*, 424 F. Supp. 2d 781, 792-93 (D.N.J. 2006) ("Where an expert is opining as to the custom and practice of a particular business, and where someone who is an expert in a particular field would be expected to understand the ways in which the laws affect the business, such testimony should be admitted.").

### II.

### THE EXPERT REPORTS OF CARRON AND BALIBAN WERE TIMELY AND PROPER PURSUANT TO THIS COURT'S SCHEDULING ORDER

Defendants contend that the Court should exclude the expert reports of Andrew Carron and Jeffery Baliban because they should have been submitted in April 2002, over three years before the Third Circuit's ruling in this case.  Defendants' contention rests on the false premise that the Third Circuit and/or this Court limited the

21

scope of additional expert testimony. In fact, neither the Third Circuit nor this Court imposed any such limitation, and defendants' own conduct prior to this motion belies any such limitation. Defendants received the Carron and Baliban reports in January; in March they served two separate rebuttal reports with respect to Carron, and one rebuttal report to Baliban; in April, they deposed Carron and Baliban. And then, in June, for the first time, they took the position that the Carron and Baliban reports were not timely.

## A.    The Carron and Baliban Reports Were Timely Served

Defendants' argument proceeds from the erroneous premise that the Third Circuit intended to limit plaintiffs' presentation of expert testimony by stating that "plaintiffs should at least have the opportunity to establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." *Cantor*, 414 F.3d at 437. As the full context makes clear, the Third Circuit was not restricting plaintiffs' proof on remand but rather providing an illustrative example of what plaintiffs may "at least" want to establish through expert testimony:

> The defendants did not contend in support of their motions for summary judgment that the plaintiffs were not able to submit evidence of unjust enrichment and the issue of the extent of any unjust enrichment is, accordingly, not before us. For that reason, *it would not be appropriate for us to restrict plaintiffs' proof on remand*. We note only that plaintiffs should *at least* have the opportunity to establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendant secured without compensation.

*Id.* at 437 (emphasis added).

Defendants also imply that this Court somehow limited the additional expert proof that plaintiffs could adduce to the "bargaining" example stated by the Third

22

Circuit.  The Scheduling Order contains no such limitation.  It provides that "Either party may identify additional expert testimony on or before January 13, 2006 by filing additional reports in accordance with Federal Rule 26(a)(2)."[7]

Indeed, defendants' own conduct prior to this motion was inconsistent with the notion that expert discovery was limited to the single "bargaining" example in the Third Circuit's decision.  Both sides submitted expert reports and rebuttal reports, and depositions were conducted -- with no suggestion by defendants that plaintiffs' reports were improper under this Court's scheduling order.  Defendants knew by mid-January when plaintiffs submitted the Carron and Baliban expert reports that plaintiffs did not believe there was any limitation on the scope of expert discovery.  However, defendants did not raise at that time -- either with plaintiffs or the Court -- the argument that some unstated limitation on expert discovery should be read into the Scheduling Order.  Only after plaintiffs have relied on that Order through opening and expert rebuttal reports and depositions have defendants first articulated that position.  Given plaintiffs' reliance on the terms of that Order since October 2005 and defendants' corresponding silence until June 2006, plaintiffs submit that it is too late for defendants to launch what is essentially a collateral attack on the Order that has governed the parties' conduct for nine months.

---

[7] Defendants say that plaintiffs represented to the Court that additional expert discovery would be limited to the Third Circuit's bargaining example (Def. Br. at 34-35), but that is not so.  In the September 9, 2005 telephone conference, plaintiffs noted the Third Circuit's statement that the plaintiffs should "at least" be able to show what would have been obtainable through arms' length bargaining, but counsel did not say that expert discovery would be limited to that single illustrative example.  (Transcript of Conference Call with Court, Sept. 9, 2005, p. 5, A05.)

**B.  The Carron and Baliban Reports Are
    Responsive to Issues Framed by the Third Circuit**

Carron's testimony is probative on the issue of defendants' unjust

enrichment -- an issue identified by the Third Circuit for trial. *See Cantor*, 414 F.3d at

437 ("the issue of the extent of any unjust enrichment is . . . not before us.")  Carron

analyzes the amount of funds that Perelman would have been able to raise had Perelman

engaged in an alternative financing transaction comparable to the Note issuances but for

the exclusion of the Indenture Covenants, and compares that to the amount that Perelman

was able to raise through the Note issuances including the Indenture Covenants.  As

Carron testified at his deposition, the approximately $156 million difference in proceeds

represents, in effect, the value of Marvel's "consent" to the transaction that Perelman

actually engaged in.  (B375.)  The Third Circuit's decision also addresses the legal

framework with respect to plaintiffs' damages claim, and Baliban's testimony addresses

that issue as framed by the Third Circuit's decision.  Thus, the Carron and Baliban

opinions are responsive to issues that the Third Circuit has identified as appropriate for

trial on remand.

**C.  Defendants Were Not Prejudiced by Timing
    of the Baliban and Carron Expert Reports**

Finally, "[t]he touchstone for determining whether to exclude untimely

expert reports is whether the party opposing their admission is prejudiced." *Chase*

*Manhattan Mortgage Corp.*, 2004 WL 422681, at *10.  Here, defendants do not even

attempt to make out a claim that they have been prejudiced by the timing of the Carron

and Baliban reports.  Those reports were served six months prior to the date for

submission of the pre-trial order.  Defendants have already served reports from two

rebuttal experts with respect to Carron, and one rebuttal expert with respect to Baliban,

24

and have deposed Carron and Baliban -- all within the time frames for expert discovery set forth in the Scheduling Order. Thus, defendants have had ample opportunity and ability to prepare to cross-examine Baliban and Carron, and to present rebuttal evidence at trial. In the absence of any prejudice whatsoever, there is no basis for exclusion of reports by Carron and Baliban.

III.

### IF THE COURT ADMITS THE OPINION OF DEFENDANTS' EXPERT ON DELAWARE LAW -- PROFESSOR LAWRENCE A. HAMERMESH -- THE COURT SHOULD ALSO ADMIT THE OPINION OF PLAINTIFFS' REBUTTAL EXPERT ON DELAWARE LAW -- JUSTICE (RET.) JOSEPH T. WALSH

Defendants have moved to exclude certain testimony to be offered at trial on behalf of plaintiffs by former Delaware Supreme Court Justice Joseph T. Walsh. In defendants' view, the legal opinion of their expert, Professor Hamermesh, concerning limitations on a Board's ability to dilute a majority shareholder should be admitted in its entirety, but portions of Justice (Ret.) Walsh's rebuttal opinion should be excluded. Plaintiffs submit that, on the issue of admissibility, there is no basis for distinguishing between Hamermesh and Walsh. If the Court decides to hear Professor Hamermesh's testimony, then the rebuttal testimony of Justice (Ret.) Walsh should also be admitted.

Hamermesh and Walsh do have a significant disagreement concerning the proper interpretation of Delaware law -- but that is not a basis to admit Hamermesh's testimony and exclude Walsh's (although plaintiffs acknowledge it may be a basis for excluding both). Hamermesh argues that the provisions of section 4.09 of the Indentures, requiring the Marvel Holding Companies to maintain majority control of Marvel, largely duplicate, at least in Hamermesh's interpretation, the limits that Delaware law places on a Board's ability to dilute a majority shareholder. But the cases relied upon by Hamermesh

25

do not support his conclusion. Rather, they stand for the limited proposition that a board that issues additional shares *for the primary or sole purpose of eliminating a majority stockholder's control* may only do so in order to protect the corporation and its stockholders from exploitation or breach of the majority stockholder's fiduciary duty. None of the cases relied upon by Hamermesh addressed a situation where a board issued stock for a primary purpose other than diluting a majority shareholder.

However, "[w]here . . . directors are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control." (Rebuttal Report of Justice Joseph T. Walsh, Retired, Mar. 1, 2006 (¶ 16.) The fundamental error of Hamermesh's analysis is that he posits an exception, for the benefit of controlling shareholders, to the bedrock principle of Delaware law that directors have a duty to act in the best interest of the corporation and all of its shareholders -- and there is absolutely no case law or other legal authority supporting such an exception. On the contrary, as Justice Walsh points out in paragraph 12 of his rebuttal report, the Supreme Court of Delaware has made clear that the duty of loyalty requires that the "best interest of the corporation and its shareholders takes precedence over *any* interest possessed by a director, officer or controlling shareholder and not shared by stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A. 2d 345, 361 (Del. 1993) (emphasis added).

Defendants concede that Walsh's testimony is admissible to the extent that it addresses the question: "During the relevant time period, did the board of directors have the ability to dilute a majority shareholder, and, conversely, did the majority

shareholder have the right to protect itself from dilution?" (Def. Brief at 13.) The four paragraphs of Walsh's report defendants seek to exclude (Walsh Rebuttal Report ¶¶ 9-12, A279-81) squarely address the fiduciary obligations that limit a majority shareholder's power to act in his own self interest. Thus, the part of Walsh's opinion defendants seek to exclude is directly responsive to the question posed by defendants, and Hamermesh's opinion that a controlling shareholder is "entitled to take extraordinary steps to protect" his self interest. (Hamermesh Report ¶ 7, Ex. 3 to the Declaration of Jonathan Gottfried in Support of Plaintiffs' Motion.) By considering not only a controlling shareholder's rights but also his responsibilities, Walsh responds to and counters Hamermesh. (*See, e.g.,* Walsh Rebuttal Report at ¶ 15, A282, ("I do not disagree that the majority stock ownership is a valuable property right . . . . But that right is not absolute.").) There is no basis for excluding parts of Walsh's opinion because they present a more thorough and complete portrayal of a controlling shareholder's permissible actions under Delaware law during the relevant time period.

Defendants next attempt to distinguish Walsh's testimony on the ground that he "reached his conclusion based solely on the summary of facts presented in the Third Circuit's decision reversing summary judgment . . . and a small set of documents selected by Plaintiffs' counsel." (Def. Br. at 11.) In fact, Walsh considered the Note prospectuses and Indentures, numerous SEC filings by Marvel and the Holding Companies, Marvel board minutes, the Third Circuit's decision, the parties' briefs, and other expert reports offered in this matter. By contrast, Hamermesh reviewed only some selected cases from Delaware, an "excerpt" from one or more of the Note prospectuses, the Third Circuit's decision, and a brief submitted by defendants. (B378-79.) If the

27

materials considered by Hamermesh were enough for him to render an opinion, then the more extensive record considered by Walsh is sufficient.

The defendants also argue that Hamermesh's "legal opinion" is permissible because it deals with "a historic issue of law," whereas Walsh's report supposedly does not. (Def. Br. at 12.) Yet once the defendants concede that Hamermesh is offering a "legal opinion," the fact remains that his analysis of Delaware jurisprudence impermissibly treads on an area reserved for the Court. The law does not provide an exception for "historic" legal issues – what the law was during the relevant period from 1993 through 1996 is still a legal, not a factual, issue to be decided by the Court.

The lone case cited by defendants – *Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) – does not support their position. The court in *Askanase* excluded the lawyer's testimony because, like Hamermesh, he offered a legal opinion. *Id.* at 673 ("Such testimony is a legal opinion and inadmissible."). Had he been testifying as to the underlying facts in the case, the outcome might have been different. *See, e.g., Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981) (lawyer could testify as expert witness as to whether certain boilerplate language in a prospectus was customary in the securities industry.). But Hamermesh is not offering any such custom and practice testimony – he is only offering his opinion of the state of the law. Thus, there is no basis upon which to admit Hamermesh's testimony, while excluding the testimony of Walsh.

## CONCLUSION

For the reasons set forth above, plaintiffs respectfully submit that defendants' motion to exclude the expert testimony of Bevis Longstreth, William H.

28

Purcell, Andrew S. Carron, Jeffery L. Baliban, and portions of the testimony of Justice

Joseph T. Walsh, Ret. should be denied in all respects.

Dated:   June 22, 2006

Respectfully submitted,

ASHBY & GEDDES

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888

-and-

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP
Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

170722.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of June, 2006, **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY BY PLAINTIFFS' EXPERT WITNESSES** was hand delivered and electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

> Anthony W. Clark, Esquire
> Skadden Arps Slate Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE  19801

*/s/ Philip Trainer, Jr.*
_____
Philip Trainer, Jr.

170085.1