IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

RONALD CANTOR, IVAN SNYDER and
JAMES A. SCARPONE, as TRUSTEES OF
THE MAFCO LITIGATION TRUST,

                     Plaintiffs,

      - against -

RONALD O. PERELMAN,
MAFCO HOLDINGS INC.,
MacANDREWS & FORBES HOLDINGS INC.,
ANDREWS GROUP INCORPORATED,
WILLIAM C. BEVINS and
DONALD G. DRAPKIN,

                     Defendants.

No. 97-CIV-586-KAJ

-----------------------------------------------------------x

## APPENDIX TO PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY BY PLAINTIFFS' EXPERT WITNESSES

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
ASHBY & GEDDES
222 Delaware Avenue
Wilmington, Delaware 19899
(302) 654-1888

Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

Dated:  June 22, 2006

411280.1

## TABLE OF CONTENTS

| DESCRIPTION | PAGE |
|---|---|
| Excerpts from Deposition of Donald G. Drapkin (3/8/02) | B 001 |
| Excerpts from Deposition of Howard Gittis (3/25/02) | B 006 |
| Excerpts from Deposition of Bevis Longstreth (4/13/06) | B 009 |
| Excerpts from Deposition of William H. Purcell (10/29/02) | B 177 |
| Special Meeting of the Board of Directors of Marvel Entertainment Group, Inc. December 12, 1996 | B 182 |
| Special Meeting of the Board of Directors of Marvel Entertainment Group, Inc. December 26, 1996 | B 185 |
| Excerpts from Deposition of Peter Fowler (4/19/06) | B 196 |
| Excerpts from Deposition of Bevis Longstreth (5/24/06) | B 203 |
| E-mail from P. Lockwood to E. Stubbs re: Proposed Schedule, (9/15/05) | B 367 |
| Excerpts from Deposition of Andrew S. Carron (4/07/06) | B 373 |
| Excerpts from Deposition of Lawrence A. Hamermesh (5/08/06) | B 376 |

411349.1

**COPY**

1

1

2    IN THE UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - - -x

4    RONALD CANTOR, IVAN SNYDER and

     JAMES A. SCARPONE, as TRUSTEES OF

5    THE MAFCO LITIGATION TRUST,

6                         Plaintiffs,

7      -against-                          Civil Action No.

                                          97-586

8                                         (RRM)

9    RONALD O. PERELMAN,

     MAFCO HOLDINGS INC.,

10   MacANDREWS & FORBES HOLDINGS INC.,

     ANDREWS GROUP INCORPORATED,

11   WILLIAM C. BEVINS and

     DONALD G. DRAPKIN,

12

                         Defendants.

13   - - - - - - - - - - - - - - - - -x

14

15       VIDEOTAPE DEPOSITION of DONALD G. DRAPKIN, taken

16   by plaintiffs at the offices of Friedman Kaplan

17   Seiler & Adelman, LLP 875 Third Avenue, New York,

18   New York, pursuant to notice and agreement, on

19   March 8, 2002, commencing at 10:10 a.m., before

20   Jeffrey Benz, a Registered Professional Reporter

21   and Notary Public within and for the State of New

22   York.

23

24

25



*Hudson* *Reporting & Video Inc.*

*fax:* (212) 273 • 9915     *phone*   212 • 273 • 9911     **B 001**

                           *toll free* 1 • 800 • 310 • 1769

2

```
 1
 2   A P P E A R A N C E S:
 3
         FRIEDMAN KAPLAN SEILER & ADELMAN, LLP
 4               Attorneys for plaintiff
                 875 Third Avenue
 5               New York, New York    10022-6225
 6       BY:  EDWARD A. FRIEDMAN, ESQ.
              LEE D. SOSSEN, ESQ.
 7
 8
         SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
 9               Attorneys for Defendants
                 Four Times Square
10               New York, New York    10036
11       BY:  ROBERT E. ZIMET, ESQ.
12
13
14   ALSO PRESENT:
15   BARRY F. SCHWARTZ, Executive Vice President,
             General Counsel, MacAndrews & Forbes Holdings,
16           Inc.
17   MARK BRADY, Videographer
18
19
20
21
22
23
24
25
```

34

1

Drapkin

2   Exhibit 6, I would appreciate it if you would open

3   it up to page 35.  Sorry, page 36.

4        A     There is no page 36 in this one.  I'm

5   sorry, you mean 36?  Or -- make things easy, 37?

6        Q     Oh.

7              MR. ZIMET:  Page 37.

8        Q     You're in Exhibit 6, and you don't have

9   a page 36?

10             MR. ZIMET:  He does.

11       A     It's broken type, but the page that I

12   think you're asking for is page 37.

13             MR. FRIEDMAN:  Is your page 36 the same

14        as this one?

15             MR. ZIMET:  Go ahead.

16       Q     I beg your pardon.  I'm a little

17   confused.  May I take a look at the document you

18   have?  Thank you.

19             So in Exhibit 6, isn't there a page 36

20   to which I have opened up the document?

21       A     Yeah, I was having a problem, because

22   there's broken type.  It looked like 35 to me.

23       Q     I see.  Okay.  And just so we're clear,

24   in Exhibit 6, you see a section 4.04 that is

25   entitled, Limitation on Debt of Marvel and its

35

1

Drapkin

2    Subsidiaries, and Limitation on Preferred Stock of

3    Marvel?

4        A    Yes, sir.

5        Q    Do you see a provision with that same

6    title on page 34 of Exhibit 5 and on page 32 of

7    Exhibit 4?

8        A    Yes, sir.

9        Q    Are you familiar with the substance of

10   those provisions, that is section 4.04 in each of

11   the indentures?

12       A    Generally.

13       Q    And what's your understanding of what

14   those provisions say?

15           MR. ZIMET:   Objection.

16       A    That there was a limitation on the

17   amount of debt that the Marvel operating

18   company -- that the parent company would permit

19   the Marvel operating company to issue.

20       Q    Was there also a limitation on the

21   preferred stock that Marvel could issue?

22       A    Yes.

23       Q    Do you know why those provisions are in

24   these indentures?

25       A    It's my recollection that the -- the

1

Drapkin

2    underwriters felt it was necessary to market the

3    bonds.  Notes.

4        Q    Did somebody tell you that?

5        A    Probably.

6        Q    Do you recall who?

7        A    No, sir.

8        Q    What do you mean by market the notes?

9        A    You've previously asked me about road

10    show.  When you go on the road show, you're

11    marketing your securities to potential buyers.

12        Q    Do you recall having any discussions

13    about the provisions in section 4.04 of each

14    indenture, before the offering occurred?

15        A    Yes, sir.

16        Q    Who did you discuss these provisions

17    with, before the offerings occurred?

18        A    I can't recall specific discussions.

19        Q    Do you recall general discussions?

20        A    Yes, sir.

21        Q    Tell me what you recall, please.

22        A    That these ratios would not have any

23    impact on Marvel.

24        Q    Is that something that you said?

25        A    I --

1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF DELAWARE

4    ----------------------------------------x

5    RONALD CANTOR, IVAN SNYDER and JAMES A.

6    SCARPONE, as TRUSTEES OF THE MAFCO

7    LITIGATION TRUST,

8            Plaintiffs,

9        -against-

10    RONALD O. PERELMAN, MAFCO HOLDINGS INC.,

11    MacANDREWS & FORBES HOLDINGS INC.,

12    ANDREWS GROUP INCORPORATED, WILLIAM C.

13    BEVINS and DONALD G. DRAPKIN,

14            Defendants.

15    ----------------------------------------x

16                March 25, 2002

17                2:00 p.m.

18        Deposition of HOWARD GITTIS, held at

19    the offices of Friedman, Kaplan, Seiler &

20    Adelman, 875 Third Avenue, New York, New

21    York, before Renate Reid, RPR, a Notary

22    Public of the State of New York.

23

**Gittis, H.  3/25/02  pp. 1-42**            **Page 1**

2

```
 1

 2     A P P E A R A N C E S:

 3
       FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP
 4        Attorneys for Plaintiffs
            875 Third Avenue
 5          New York, New York 10022-6225

 6     BY:  EDWARD A. FRIEDMAN, Esq.

 7

 8     SKADDEN, ARPS, SLATE, MEAGHER
       & FLOM, LLP
 9        Attorneys for Defendants
            One Rodney Square
10           PO Box 636
            Wilmington, Delaware 19899
11
       BY:  ROBERT ZIMET, Esq.
12

13

14

15

16

17

18

19

20

21

22

23
```

**Gittis, H.  3/25/02  pp. 1-42**                    **Page 2**

13

1           Gittis

2    changes.  The provision you showed me

3    earlier and this provision were among

4    those things that had to be changed.

5        Q.  4.04 and 4.0 --

6        A.  Yes, because you couldn't do a

7    restructuring because no one would put

8    money up, including us, and let the

9    majority of the stock be in here, so

10   that's the context in which it arose.

11       Q.  When you say, no one would do a

12   restructuring and put this -- the stock

13   in here, what are you referring to?

14       A.  That's not what I said.  What I'm

15   saying is no one would put the kind of

16   money necessary to restructure Marvel up

17   without owning a majority of the shares

18   free of these bond offerings; so you had

19   to amend that provision.

20       Q.  And that provision is 4.09?

21       A.  Yes.

22       Q.  Did you make any efforts to find

23   a source of new money for Marvel

**Gittis, H.  3/25/02  pp. 1-42**          **Page 13**

Page 1

1
2                IN THE UNITED STATES DISTRICT COURT
3                  FOR THE DISTRICT OF DELAWARE
4
5    RONALD CANTOR, IVAN          ) No. 97-586-KAJ
     SNYDER and JAMES A.          )
6    SCARPONE, as TRUSTEES OF     )
     THE MAFCO LITIGATION, and    )
7    as Successors in Interest    )
     to the Marvel                )
8    Entertainment Group,         )
     Inc., et al.,                )
9                                 )
              Plaintiffs,         )
10                                )
                 vs.              )
11                                )
     RONALD O. PERELMAN, et       )
12   al.,                         )
                                  )
13            Defendants.         )
     -----------------------------)
14
15
16
17        VIDEOTAPED DEPOSITION OF BEVIS LONGSTRETH
18                 New York, New York
19               Thursday, April 13, 2006
20
21
22
23
24   Reported by:
     PENNY SHERMAN
25   JOB NO. 183399

Page 2

1

2                              April 13, 2006

3                              10:07 a.m.

4

5              Videotaped deposition of BEVIS

6        LONGSTRETH, held at the offices of Skadden,

7        Arps, Slate, Meagher & Flom, LLP, Four

8        Times Square, New York, New York, pursuant

9        to Agreement, before Penny Sherman, a

10       Notary Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2              A P P E A R A N C E S :

3

4        FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP

5        Attorneys for Plaintiffs and Witness

6                1633 Broadway

7                New York, New York  10019-6708

8        BY:   EDWARD A. FRIEDMAN, ESQ.

9

10       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

11       Attorneys for Defendants

12                One Rodney Square

13                P.O. Box 636

14                 Wilmington, Delaware  19899-0636

15       BY:   ANTHONY W. CLARK, ESQ.

16                     -and-

17                BRIAN G. LENHARD, ESQ.

18

19    ALSO PRESENT:

20       FERNANDO ALVAREZ, Legal Video Specialist

21       MUKARRAM ATTARI

22       STEVEN L. FASMAN, ESQ.

23

24

25

Page 4

1

2          THE VIDEOGRAPHER:  This is Tape Number 1

3      of the videotaped deposition of Mr. Bevis

4      Longstreth in the matter of Ronald Cantor,

5      Ivan Snyder, James Scarpone, as trustees of

6      the MAFCO Litigation Trust, plaintiffs versus

7      Ronald O. Perelman, et al. defendants, in the

8      United States District Court for the District

9      of Delaware.  This deposition is being held at

10     Skadden, Arps, Four Times Square, New York,

11     New York, on April 13, 2006, at approximately

12     10:07 a.m.

13          My name is Fernandez Alvarez from the

14     firm of Esquire Video Services.  I am the

15     legal video specialist.

16          The court reporter is Penny Sherman in

17     association with Esquire Deposition Services.

18          Would counsel please introduce

19     themselves.

20          MR. CLARK:  Tony Clark and Brian

21     Lenhard, Skadden, Arps for the defendants.

22          MR. FRIEDMAN:  Edward Friedman with

23     Friedman, Kaplan, Seiler & Adelman, attorneys

24     for the plaintiffs and for the witness.

25          THE VIDEOGRAPHER:  And would the court

Page 5

1                                    Longstreth

2           reporter please swear in the witness.

3    B E V I S    L O N G S T R E T H,    called as a

4           witness, having been duly sworn by a Notary

5           Public, was examined and testified as

6           follows:

7    EXAMINATION BY

8    MR. CLARK:

9           Q.     State your name for the record, please.

10          A.     Bevis Longstreth.

11          Q.     Mr. Longstreth, you're an attorney,

12   correct?

13          A.     I am, a retired attorney.

14          Q.     Did you ever practice in litigation?

15          A.     Not in a litigation department.

16          Q.     Okay.  Have you ever been deposed or

17   testified in court before today?

18          A.     Yes -- oh, I've been deposed.  I have

19   not testified in court.

20          Q.     So you're generally familiar with the

21   process.  I don't need to go through all of the

22   detailed rules?

23          A.     I am.

24          Q.     Any reason why your ability to answer

25   questions honestly, accurately and completely today

Page 6

1                    Longstreth

2    might be impaired?

3         A.    No.

4         Q.    And you're represented by Mr. Friedman,

5    I understand that.  We can take breaks whenever you

6    wish, just not when a question is pending.  And the

7    only other caution I'll give you is that under the

8    rules that apply in Delaware, you're not permitted

9    to consult with Mr. Friedman or, frankly, anyone

10   else about the substance of your testimony until

11   the deposition has been concluded, other than if

12   there's an issue about whether something involves

13   privilege.

14        A.    Okay.

15        Q.    Now, let's talk about how you got

16   involved in this case.

17              Who first contacted you about this

18   litigation?

19        A.    Gary Friedman.

20        Q.    And when did he contact you?

21        A.    I don't remember.

22        Q.    Who is Gary Friedman?

23        A.    He's Ed Friedman's brother and he's a

24   corporate lawyer at the Friedman firm.

25        Q.    Before being contacted by Gary Friedman,

Page 7

1                          Longstreth

2    did you have any knowledge of this litigation; had

3    you ever heard of it?

4         A.    No.

5         Q.    Other than Gary Friedman, before being

6    contacted about this litigation, did you know

7    anyone else at Messrs. Friedman's law firm?

8         A.    No.

9         Q.    And were you then or are you now

10   familiar with any of the plaintiffs in this case:

11   Ronald Cantor, Ivan Snyder, James Scarpone?

12        A.    No.

13        Q.    If you don't recall -- if not a precise

14   date, can you tell me --

15        A.    Well, within the past year.

16        Q.    Within the past year?

17        A.    Yes.

18        Q.    Within the past six months, would the

19   first contact have been; it would be, you know,

20   say, September of '05 going forward?

21        A.    I can't be precise about it.  Time

22   speeds up as you get older.

23        Q.    And when Mr. Friedman contacted you,

24   what did you do; did he call you on the phone?

25        A.    Yes.

1                          Longstreth

2        Q.    Do you recall what he told you, what he

3   said to you in that initial contact?

4        A.    Well, he said that they -- the firm was

5   looking for an expert witness experienced in

6   corporate governance matters and would I be at all

7   interested in considering it and being considered.

8        Q.    And was that the sum and substance of

9   what he told you in the first call?

10       A.    Yeah.

11       Q.    And did you respond to his inquiry at

12  that point?

13       A.    Yeah, I did.

14       Q.    And what did you tell him?

15       A.    I said I like that kind of case, if I --

16  if the merits are such that I can really support it

17  and support the side you're on and be useful.  So,

18  I said, I can't tell you if that's the case here or

19  not until I look at the case.

20       Q.    Did he tell you anything about the

21  substance of the case in that first contact?

22       A.    Certainly that they were representing

23  the plaintiffs' side in the case involving

24  fiduciary duty.  I don't think -- if he told me the

25  details, I didn't register them.

Page 9

1                          Longstreth

2        Q.    Did he disclose the parties to you so

3   you could, you know, check and see if you had any

4   conflicts, for example?

5        A.    No.

6        Q.    Did he talk to you about the specific

7   nature and scope of the expert opinion or opinions

8   that the plaintiffs would be seeking in the case?

9        A.    No.

10       Q.    Anything else that you can recall from

11  that initial telephone call?

12       A.    No.

13       Q.    When is the next time you had any

14  contact with anyone about this case after that

15  first call with Mr. Friedman?

16       A.    I think I got the copy of the opinion on

17  appeal at that time.

18       Q.    The third circuit opinion?

19       A.    Yeah.

20       Q.    At which time?

21       A.    Well, after our conversation.  And I

22  read that.  And it's possible that some of the

23  other stuff that is listed there in my report I

24  also got.  I don't remember the sequencing of

25  receiving all that material.

```
 1                      Longstreth

 2      Q.    Who did you get the third circuit

 3 opinion from?

 4      A.    Probably my counsel to my right here.  I

 5 don't recall if I had letters from Gary, but I know

 6 I had from Ed.  And so, that was the next step.

 7      Q.    To receive a copy of the court's opinion

 8 and perhaps other documents?

 9      A.    Yeah.

10      Q.    Did you -- after talking to Gary

11 Friedman on that initial call, did you -- when's

12 the first time -- I assume there was a first time

13 before today -- but when was the first time you

14 talked to Ed Friedman about the case?

15      A.    I don't remember.  I mean, I can't...

16      Q.    Shortly after the initial contact,

17 months later, just in the last couple of weeks?

18      A.    Oh, no.  It was, yeah, within a space of

19 a couple of weeks.

20      Q.    Of the initial contact?

21      A.    Yes.

22      Q.    And tell me about that contact, that

23 communication between you and Ed Friedman; what was

24 the substance of that?

25      A.    Well, I saw in the opinion, the
```

Page 11

1                              Longstreth

2      expertise that the judge had suggested was --

3      would, I think in the judge's opinion, the circuit

4      court's opinion would be useful, and I thought I

5      could respond to that.

6                    As I understood the facts, I felt that I

7      had something to say, based on my experience and

8      judgment, and so I was interested in being

9      considered.  And I think we had discussions as to

10     why, what my qualifications would serve.  And so

11     we -- I discussed some of my qualifications.  And

12     Gary Friedman was at Debevoise a long time ago, so

13     he knew me and that's probably why he called me.

14          Q.    In this initial contact with Ed

15     Friedman, did you discuss the nature of the

16     opinions that were being sought from you as a

17     corporate governance expert?

18          A.    Well, we discussed -- I -- we didn't

19     discuss specifics about -- I hadn't formed any

20     conclusions at that point, so we -- we discussed

21     the case and...

22          Q.    Well, maybe the way to probably -- tell

23     me as much as you can recall that was discussed in

24     your initial -- was it a phone call with

25     Mr. Friedman?

Page 12

1                              Longstreth

2        A.     Yeah, I think it was his phone call,

3    either with Ed and Gary or just Gary, talking about

4    my qualifications that would be -- that would make

5    me useful.

6        Q.     Uh-huh.

7        A.     I've had some experience with being an

8    expert witness and I've turned down a number of

9    cases after they were sent to me, because I just

10   didn't think the merits of the case were something

11   I could support.

12       Q.     Uh-huh.

13       A.     So, I've had that experience and I -- so

14   I wanted -- I wanted to be sure that this was a

15   case where I could render judgments that would be

16   useful on the side I was being retained to provide

17   expertise for.  But at the same token, I wanted to

18   be sure that the -- that they, the Friedman firm,

19   knew what they were getting.

20              And I think most of the conversation was

21   about their -- about my disclosing, you know, what

22   my experience and background was.

23       Q.     I appreciate that you disclosed your

24   experience.

25              Did you discuss in this, what I

Page 13

1                              Longstreth

2    understand to be the second phone call, though, the

3    type of opinion that was being sought by

4    plaintiffs?

5         A.    I think to the extent that -- I -- I

6    think what they were looking for was someone with

7    experience in advising boards and in serving on

8    boards of public companies who could bring that

9    experience to bear on how he or she would behave in

10    the situation that this case presented.

11         Q.    And was there a particular behavior that

12    you were asked about, with respect to the board in

13    this case, in this second phone call?

14              That is, were you asked specifically

15    about how the board conducted itself or what you

16    thought about how the board conducted itself or

17    perhaps what plaintiffs' counsel felt the board

18    should have done; anything like that?

19         A.    No.    What I was asked was, what would

20    I -- under the facts of the case, if I was sitting

21    there as an independent director, what they were

22    seeking was my best judgment as to how I would

23    behave.

24         Q.    And did you give them any indication of

25    the answer to that question in this second phone

1                          Longstreth

2    call?

3         A.    If I did, it was very tentative.

4         Q.    Do you recall if you did?

5         A.    No.

6         Q.    Anything else you recall about that

7    conversation?

8         A.    No.

9         Q.    When was the next time you spoke with

10   anyone about the case?

11        A.    Well, I don't remember that.  I know

12   we -- at some point we met.  I met with Gary and

13   with Ed.

14        Q.    Well, let me ask a general question.

15   Over the course of the past year or whatever the

16   time frame has been, or a magnitude, do you recall

17   how many times you have talked with people from

18   plaintiffs' counsel on the phone about the case?

19        A.    How many times?

20        Q.    Yeah, or a magnitude.  I know you can't

21   be precise.

22        A.    Okay.  Maybe four or five times.

23        Q.    And do you recall how many times you've

24   met with plaintiffs' counsel?

25        A.    Probably three times.

1                            Longstreth

2         Q.    And so you just don't recall when the

3    next communication was after the second phone call?

4         A.    No, I don't.

5         Q.    Do you recall the substance of the next

6    communication?

7         A.    No.

8         Q.    Do you recall the substance of any

9    further communications between you and plaintiffs'

10   counsel about this case?

11             MR. FRIEDMAN:  Let me caution the

12        witness before he answers that.  We will

13        assert an attorney-client privilege as to the

14        substance of communications that we had after

15        you were retained as an expert, unless we,

16        counsel, provided information to you that is

17        part of what you relied on in your report.

18             So, if you have any questions about

19        privilege, we can talk before you answer, but

20        just be sensitive to the attorney-client

21        privilege as you answer Mr. Clark's questions.

22             MR. CLARK:  Let me just ask one question

23        about the privilege.  Is this the privilege

24        between your firm and plaintiffs or between

25        you and the witness, who you've indicated you

1                        Longstreth

2       represent?

3            MR. FRIEDMAN:  It's fundamentally a work

4       product.

5            MR. CLARK:  Okay.  All right.  So with

6       that in mind, could you -- I don't remember

7       what I asked.

8            MR. FRIEDMAN:  Yeah, I don't think that

9       question was objectionable, I just wanted to

10      make clear.

11           (The question was read.)

12      A.    The substance?

13      Q.    Yes.

14      A.    Well, the -- essentially what was going

15   on is, they gave me documents.  I read the

16   documents and I would come and ask questions.  I'd

17   get answers, and finally, I went off and wrote a

18   report.  So the -- during the course of our

19   meetings, basically I was asking questions that

20   occurred to me as a result of the documents I read.

21      Q.    In any of these communications, written

22   or oral, on the phone or in person, did anyone

23   representing any of the plaintiffs ever express to

24   you, in words or substance, what the opinion was or

25   the opinions were that plaintiffs wanted from you

Page 17

1                              Longstreth

2    as an expert?

3         A.    No.

4         Q.    And in any of these communications prior

5    to the issuance of your report, which we'll get to

6    in a minute, did you ever tell them what your

7    opinions and conclusions were before you issued

8    your report?

9         A.    I think I would have expressed tentative

10   conclusions.

11        Q.    When you say would have, that suggests

12   to me that you don't really recall.  Did you

13   express --

14        A.    I don't recall, because it's a

15   continuum.  I mean, from the day I get the first

16   call to the day I submit the report -- and I'm just

17   trying to give you a picture of the kind of

18   conversations that we had.

19        Q.    Is it your best recollection that prior

20   to issuing your written report, you did inform

21   plaintiffs' counsel of the substance of your

22   conclusions and opinions?

23        A.    Certainly the tendency that I was going

24   to -- but I -- in writing the report -- and this is

25   the way I often work -- I evolved ideas that and

1                          Longstreth

2    conclusions that I had never expressed before,

3    because I hadn't concentrated on it the way one

4    concentrates on a brief, as I'm sure you're aware

5    when you write your briefs.

6         Q.    Okay.  So if I -- let me see if I

7    understand.  You believe that you did, prior to

8    issuing the report, express to plaintiffs' counsel

9    at least some of the conclusions and opinions you

10   were coming to, but your best recollection is that

11   you probably didn't express all of the conclusions

12   and opinions that eventually made their way into

13   the report as it was issued; is that fair?

14        A.    Yeah, definitely.  Yes, that's right.

15        Q.    And in any of these communications

16   before the report was issued, did anyone from

17   plaintiffs' counsel express back to you their views

18   about the opinions and conclusions you were

19   reaching?

20        A.    No.

21        Q.    Never once?

22        A.    No.

23        Q.    Never said --

24        A.    They seemed to be very careful about

25   that.

Page 19

                              Longstreth

1

2      Q.    So, no one indicated, in words or

3   substance, that the opinions and conclusions you

4   were coming to were beneficial to the plaintiffs'

5   case?

6      A.    Well, that's a different question you're

7   asking me.

8      Q.    I know.  That's why I asked it.

9      A.    Well, in the course of the whole

10  conversations we had, I gave some sense of the

11  process that was in the record and what I thought

12  about it, and they gave some sense to me that if I

13  expressed that sort of thing, it would be helpful

14  not hurtful to them.  That's why they retained me.

15  So, I mean, in other words -- well, that's it.

16     Q.    In these discussions or communications

17  before the issuance of the report, did anyone from

18  plaintiffs' counsel or anyone representing

19  plaintiffs express to you that any of the

20  conclusions or opinions you were coming to were not

21  helpful, undesirable, anything of that sort?

22     A.    Never once.

23     Q.    Let's go ahead and mark the report.

24         (Longstreth Exhibit 1, Bevis

25      Longstreth's report, marked for

Page 20

1                        Longstreth

2        identification, as of this date.)

3             MR. CLARK:  Let's mark this as

4        Longstreth 1.

5        Q.    Before we get to the document itself,

6   just let me make my record.

7             I'd like you to tell me now, in as much

8   detail as you can, the substance of all discussions

9   and communications prior to the issuance of the

10  report that you had with anyone representing

11  plaintiffs' counsel.

12            MR. FRIEDMAN:  I'll permit the witness

13       to answer that question subject to the

14       objection that I made, which is to say, if the

15       witness has a recollection of conversations in

16       which we provided information that he relied

17       on, he can testify to that.

18            Beyond that, I would object to the

19       question because I just think it's over-broad

20       and there may be specific questions that can

21       elicit, you know, information along the lines

22       of other questions Mr. Clark has asked.

23       Q.    Okay.  So you can answer in accordance

24  with his instruction, but do me one favor, tell me

25  after you're done answering as much as you think

1                          Longstreth

2    you can, given that instruction, whether or not

3    there's information that you're not telling me, not

4    what it is, but whether or not there's any

5    information you're not disclosing as a result of

6    the instruction from counsel.

7              MR. FRIEDMAN:  So just let me note my

8         objection to the form of the question.  And I

9         think there may be some need for reading back

10        the question or clarifying it.  So I'll make

11        my objection now and then I'll not interrupt,

12        so --

13             MR. CLARK:  Look, it's a fair -- it's a

14        fair objection, but I figure -- I think maybe

15        we've, if not plumbed the depths, I think

16        we've probably gone pretty far down the road

17        of specific recall with respect to these

18        conversations and communications for when the

19        report got issued.

20             MR. FRIEDMAN:  Right.

21    Q.    I just want to know if there was --

22    A.    Is this a redundant question to all the

23    other questions you've asked?

24    Q.    Yeah.  I'm saying, is there anything

25    else you can recall --

1                      Longstreth

2       A.     Anything else?

3  DI  Q.    -- about the substance of those

4  communications that you can tell me now, and with

5  counsel's instruction in mind?

6       A.    I've asked questions, for example, about

7  things, factual matters that I should -- that I

8  knew at one point when I reviewed the whole record,

9  all those documents, but I couldn't remember.  For

10 example, I would ask if the restriction on --

11            MR. FRIEDMAN:  I'm going to direct the

12        witness not to testify about specific

13        conversations we had relating to the substance

14        of these matters.

15            MR. CLARK:  Okay.

16            MR. FRIEDMAN:  Unless they were

17        conversations in which counsel provided

18        information that was relied on in formulating

19        the report.

20            THE WITNESS:  Yeah, well, there is no

21        information that counsels provided me with

22        except for the documents listed there, that

23        I've relied upon in the report.

24            MR. FRIEDMAN:  So, for example, your

25        question would call for the witness to testify

1                          Longstreth

2          about conversations that the witness and I had

3          after the report was issued.

4                  MR. CLARK:  Actually, right now, I was

5          just asking up to the time of the report.

6                  MR. FRIEDMAN:  Up to the -- all right.

7                  MR. CLARK:  And then the next question

8          was after the report was issued.

9          Q.    For now I'm limiting it up to -- it was

10   January 12th.

11         A.    There's nothing beyond what I've said,

12   up to the time of the report.

13                 MR. FRIEDMAN:  And just so the record is

14         clear, I think, when the witness was starting

15         to answer your question before I objected, he

16         was getting into conversations after the

17         report was issued.

18                 MR. CLARK:  The answer suggested that to

19         me, as well.

20         Q.    So, there's no information from

21   plaintiffs' counsel or any other source, for that

22   matter, that you relied upon in forming the

23   opinions and conclusions reflected in your report,

24   other than as expressly disclosed in the report

25   itself; is that fair?

Page 24

1                          Longstreth

2        A.    That's fair.  Except, let me add one

3    thing.  For some reason there was a deletion from

4    my resume.

5        Q.    We'll get to that.

6        A.    Okay.  Because I think it's relevant in

7    terms of my experience.

8        Q.    We're going to get to -- well, we're

9    going to get to that fairly shortly.

10              Could you take a look at Exhibit 1, if

11   you can identify that for us?

12       A.    Yeah.  This is my report.

13       Q.    Now, take a look at the back of the

14   report.  You've got a number of exhibits, the last

15   one being Exhibit C.  Can you tell me what that is?

16       A.    Yes.  Exhibit C is a letter to me dated

17   December 23, 2005 from Edward Friedman, and it

18   gives me -- it really sets forth the questions that

19   I was being asked to address.

20       Q.    Now, before you got this letter --

21       A.    And it also includes some facts that

22   I'm -- was entitled to rely upon.

23       Q.    I take it from your testimony that you

24   had been in discussions with plaintiffs' counsel

25   for at least some months before you received this

Page 25

1                              Longstreth

2    letter; is that fair?  It's dated two days before

3    Christmas.

4        A.    I'd say I don't recall.  I really don't

5    remember whether it was one month or three months

6    or four months.

7        Q.    And before you got this letter, did you

8    have any indication of the questions that counsel

9    wanted answered by you as an expert?

10       A.    I had a general idea, but I didn't have

11   specific ideas.

12       Q.    So this letter would have been the first

13   specific instruction, as far as you can recall,

14   from counsel on the questions that you were to

15   address as an expert, correct?

16       A.    Let me just make sure of something.

17             Yeah, that's right.

18       Q.    And prior to receiving this letter, the

19   December 23, 2005 letter, is it fair to say you had

20   formed no opinions or conclusions about the answers

21   to be provided to these questions?

22       A.    Well, I didn't know the questions.

23       Q.    So is the answer to my question yes?

24       A.    Yes.

25       Q.    Now, Exhibit B to your report --

1                          Longstreth

2        A.    Yes.

3        Q.    Is a list of documents.  Did you receive

4   all the documents on your list here?

5        A.    Yes.

6        Q.    Did you review all the documents on that

7   list?

8        A.    I looked at all the documents on the

9   list and I -- yes.

10        Q.    You didn't necessarily read every jot

11   and tiddle in some of the thicker documents, but

12   you fairly reviewed, to the extent you thought

13   appropriate and necessary, everything on the list?

14        A.    I did.

15        Q.    And where did you get the documents

16   from?

17        A.    From the Friedman Firm.

18        Q.    Did you receive any of these documents

19   from any place other than the Friedman Firm?

20        A.    No.

21        Q.    And who decided which documents you were

22   going to receive?

23        A.    The Friedman Firm.

24        Q.    Did you at any point ask for any

25   particular documents or information?

1                          Longstreth

2        A.    Yes.   I asked for the opinions that were

3   delivered by the counsel for Marvel.

4        Q.    Okay.   Anything else?

5        A.    That's all I can remember.

6        Q.    The opinions that you asked for, they're

7   down in the second bottom half of the page --

8        A.    Yeah.

9        Q.    -- dated April 22, 1993, October 20, '93

10  and February 18, '94.   Those are the opinions

11  you're referring to?

12       A.    That's right.

13       Q.    Was there -- were there any documents or

14  was there any information that you requested from

15  counsel or anyone else bearing on this matter that

16  you didn't receive?

17       A.    I don't recall anything, no.

18       Q.    Did plaintiffs' counsel or anyone else

19  explain to you how they came up with the list of

20  document -- how they decided what documents to show

21  you?

22       A.    No, we didn't talk about that.

23       Q.    And you don't have any information on

24  that subject in any other way?

25       A.    No.

Page 28

Longstreth

1

2      Q.    I think I asked you this, but if I'm

3   repeating, I'm sorry.  Have you reviewed any other

4   documents or received any other information beyond

5   what's listed in Exhibit B that pertain to this

6   matter?

7      A.    No.

8      Q.    Now, the report, who prepared this

9   report?

10     A.    I prepared it.

11     Q.    Did you have any help in preparing it?

12  I mean, for example, did you write it out longhand

13  and somebody type it for you or do you do your own

14  typing?

15     A.    I wrote it on my IBM ThinkPad or

16  whatever it's called.

17     Q.    And I take it, there was various

18  iterations of your report before it found its way

19  to final form, various drafts?

20     A.    There was a draft and then the final.

21     Q.    Just one draft?

22     A.    Just --

23     Q.    So this would be -- the final is the

24  second draft, if I can just --

25     A.    That's correct.

Page 29

1                              Longstreth

2         Q.    Okay.  Did you provide --

3         A.    Now, when you compose on a computer, you

4    don't say draft number one, draft number two.  You

5    go over it.  So, I think, in my experience, the

6    advent of the computer, you probably -- this is the

7    equivalent of more than one draft.

8         Q.    I understand what you're saying.  As you

9    were preparing what you've testified to as the

10   first draft, you would continually revise portions

11   of it until you said, Okay, here's the first draft?

12        A.    Right.

13        Q.    And thereafter, when you went to work on

14   the final, the same thing happened; you'd be

15   revising it as you went until you said, Okay, it's

16   done, that's fine?

17        A.    That's right.

18        Q.    Did you provide the first draft of your

19   report to anyone?

20        A.    Yes, I provided it to the Friedmans.

21        Q.    And after providing that draft report to

22   plaintiffs' counsel, did you have any discussions

23   or -- I don't want to know the substance at this

24   point -- well, I don't think I can given counsel's

25   instruction, but -- I'd love to know the substance

```
 1                          Longstreth
 2    but -- did you have discussions or communications
 3    with plaintiffs' counsel in which they provided
 4    comments on the draft?
 5         A.    Yes, they reacted to the draft and I
 6    listened to them and...
 7         Q.    And did you incorporate any of their
 8    comments or suggestions into what became the final
 9    report?
10         A.    There were corrections, factual
11    corrections, to be made.
12         Q.    Anything else?
13         A.    No.
14         Q.    Are there any errors in the final report
15    as issued, to your knowledge?
16         A.    There's a typo.
17         Q.    Ah, where's the typo?
18         A.    In page 1, in the second paragraph, in
19    the middle line beginning, Where I am.
20         Q.    Yes.
21         A.    Oh.  Well, in my copy, I think my copy,
22    am is -- maybe that was somehow revised.
23         Q.    It is?
24         A.    I mean, that looks like right, Where I
25    am chair.
```

Page 31

```
 1                         Longstreth

 2        Q.     You thought there was a typo --

 3        A.     I thought the word am wasn't on my

 4   draft, I mean the letter M.  I thought I was being

 5   so smart.  I get myself into trouble.

 6        Q.     Does your report, Exhibit 1, include all

 7   of your analyses and opinions related to the

 8   subject of this litigation?

 9        A.     Include?  Would you repeat that

10   question?

11        Q.     Sure, sure.  Does your report include

12   all of your analyses and your opinions and

13   conclusions related to the subject of this

14   litigation?

15        A.     Yes.

16        Q.     And are there any conclusions or

17   opinions that you formed with respect to this

18   litigation that are not reflected in the report?

19        A.     No.

20        Q.     Did you consider whether to provide any

21   other opinions on any issue related to the subject

22   of this litigation that's not reflected in the

23   report?

24        A.     No.

25        Q.     And did you read any other expert
```

Page 32

1                          Longstreth

2    reports prepared for this case?

3        A.    Not until after I had submitted this

4    report in final.

5        Q.    After submitting this report, you did

6    read other expert reports?

7        A.    I did.

8        Q.    And which ones were those?

9        A.    Baliban, Carron, Fowler, some professor,

10   Haber --

11            MR. CLARK:   H-A-M-M-E-R-M-E-S-H.   That's

12        close enough.

13       A.    Hammermesh.

14       Q.    Any others?

15       A.    That's all I can recall.

16       Q.    And have you read any other documents

17   pertaining to this matter subsequent your the

18   issuance of this report?

19       A.    Yes.   I -- omitted from my resume is the

20   first legal article I published as a lawyer in

21   1961, and oddly enough it has bearing on this case.

22   And I asked counsel to see if they could get it for

23   me, because it's so old and I don't have it

24   anymore.   It was published in the Business Lawyer.

25       Q.    Can you tell me what the cite or the

Page 33

1                          Longstreth

2    title --

3         A.    It's about the ability of a subsidiary

4    to provide its assets in support of a parent

5    borrowing.

6    RQ        MR. CLARK:  I would like to have that

7         document produced.

8              MR. FRIEDMAN:  I tracked down a copy a

9         few days ago and I will send it to you.

10        Q.    Okay.  So you read the expert -- after

11   issuing the opinion in exhibit -- the report in

12   Exhibit 1, you read the expert reports you've

13   identified, you read the article that you had

14   prepared in 1961; any other documents pertaining to

15   this matter that you read subsequent to issuing

16   your report?

17        A.    No.

18        Q.    And I think this is obvious from your

19   prior testimony, but I'll ask it directly anyhow.

20              In the opinions reflected in your

21   report, you're not relying on the views of any

22   other experts, are you?

23        A.    No, I'm not.

24        Q.    Now, your CV, Exhibit A to the report,

25   you've indicated a few minutes ago that there was

Page 34

1                           Longstreth

2    something missing.  Was it the article?  Is that --

3         A.    No.

4         Q.    Not something else?

5         A.    The article I responded because you

6    asked if I'd read anything.

7         Q.    Uh-huh.

8         A.    Yes.  I served for six or seven years,

9    from around 1993 to 2000, on the board of a New

10   York Stock Exchange listed corporation out of

11   Dallas called Capstead Mortgage Corporation,

12   C-A-P-S-T-E-A-D.  And that got dropped from my CV

13   inadvertently, I guess because I'm no longer on

14   that board.

15        Q.    Other than that correction or that

16   addition, is your curriculum vitae accurate?

17        A.    It was accurate.  It's now complete.

18        Q.    Accurate and complete.  Right.  Okay, so

19   with that addition, we can rely on Exhibit A to

20   your report for all of your professional

21   credentials and your publications, plus the 1961

22   article, right?

23        A.    Yes.

24        Q.    Capstead.

25        A.    Right.

Page 35

```
1                          Longstreth

2       Q.      What was the business?

3       A.      Capstead is a mortgage REIT, a real

4  estate investment trust.

5       Q.      And you were --

6       A.      The chairman of the -- I have to deviate

7  from your line of questioning to tell you that the

8  chairman of the audit committee of this company

9  throughout my tenure as a director, was Harriet

10 Myers.

11      Q.      Almost Supreme Court Justice Harriet

12 Myers.

13      A.      She was an outstanding board member, and

14 despite my efforts with the press, this was never

15 published anywhere, neither by the republicans or

16 the democrats.

17      Q.      I suspect that it fell into the category

18 of dog bites boy.  If you added some more color to

19 it you might have got it in the press.

20      A.      Yeah, I know.

21      Q.      Well, you just answered by correcting.

22              Is that only instance -- well, first of

23 all, you were what you would consider to be an

24 independent director of Capstead?

25      A.      Absolutely.
```

Page 36

1                        Longstreth

2        Q.    And is that the only instance in which

3    you have served as an independent director of a

4    public U.S. company?

5        A.    Yes.

6        Q.    Any other service as a director of a

7    public company, i.e. a non-U.S. public company?

8        A.    Well, I've been on the board of

9    Investcap for a long time, and I'm on the board of

10   the CREF, College Retired Equity Fund.  Of course,

11   that's not a public company, although we behave

12   like one.

13       Q.    Have you had any experience as a

14   director or manager or employee of any company

15   operating in the entertainment business?

16       A.    As a director or manager?

17       Q.    Director, manager or employee.

18       A.    No.

19       Q.    And have you ever had any experience as

20   a director, manager or employee of any company

21   operating in the comic book business?

22       A.    No.

23       Q.    Trading card business?

24       A.    No.

25       Q.    Sticker business?

Page 37

```
 1                          Longstreth
 2        A.    No.
 3        Q.    So would it fair to say that you don't
 4   have any basis and experience to assess the
 5   financing needs of those types of businesses?
 6        A.    That's fair.
 7        Q.    Or you don't have any basis and
 8   experience to assess the best alternatives for
 9   financing those kinds of businesses?
10        A.    I wouldn't say that.  I would say that
11   if adequately informed, the general judgments I
12   have about the world of corporations would give me
13   enough information to render a useful judgment.
14        Q.    Let me put it this way.
15              Do you consider yourself an expert in
16   the area of financing for entertainment, comic
17   book, trading card or sticker businesses; is that
18   part of your expertise?
19        A.    Not the way you've limited it, no.  But
20   my whole career has been based upon doing
21   finance -- doing legal work for financings of every
22   conceivable kind.
23        Q.    Right.  You are -- you do consider
24   yourself to be an expert in your areas of the law?
25        A.    Yes.  And the areas of business that the
```

Page 38

1                              Longstreth

2    areas of law, I'm an expert in, touch.

3         Q.    So as a lawyer, did you represent any

4    entertainment businesses?

5         A.    No.

6         Q.    Same question.  Did you ever represent

7    any comic book businesses, trading card businesses

8    or sticker businesses as a lawyer?

9         A.    No.

10        Q.    So you don't have any personal

11   experience assessing the best alternatives for

12   financing those sorts of businesses, correct?

13        A.    That's right.  No special expertise

14   about that.

15        Q.    Now, I think you alluded to this, but

16   have you ever testified -- you have testified at

17   deposition before, you told me that.  Have you ever

18   testified as an expert witness before?

19        A.    In court?

20        Q.    In deposition or at trial.

21        A.    In deposition, yes.

22        Q.    How many times?

23        A.    Twice.

24        Q.    Can you tell me each of those

25   situations, what was it about?

Page 39

Longstreth

1

2      A.      Roughly, yeah.  One was for an expert

3   witness representing PaineWebber in a securities

4   public offering where I was an expert on securities

5   laws, the 1933 Act, in particular.

6              And the other case was involving a trust

7   company in a case where imprudence in money

8   management was alleged.  And I was an expert on the

9   standards of fiduciary behavior that applied to

10  money management companies.

11     Q.      And in both of those cases, you did

12  provide deposition testimony; is that correct?

13     A.      Depositions.

14     Q.      Do you recall when these cases were?

15     A.      Well, one -- the trust one was probably

16  12 years ago and the --

17     Q.      Early '90s?

18     A.      And the securities case was probably 15

19  years ago.

20     Q.      Late '80s?

21     A.      Yeah.

22     Q.      Have you ever been retained as an expert

23  in litigation where you weren't called upon to

24  testify?

25     A.      Yes.

Page 40

1                          Longstreth

2        Q.    How many times?

3        A.    Oh, where I was actually retained?

4        Q.    Yes.

5        A.    Not where I was sought to be retained

6   and turned down?

7        Q.    Correct.

8        A.    Probably four times, four or five times.

9        Q.    By who, when -- give me the same level

10  of general detail as you gave the others.

11       A.    Okay.  I may -- I may not be able to.

12       Q.    Would this be as a consulting expert?

13       A.    Always as an expert witness with the

14  expectation that this would go to trial.

15       Q.    And it didn't?

16       A.    And it didn't.

17       Q.    And you didn't have to go?

18       A.    I didn't even get deposed.

19       Q.    Sure, okay.  Go ahead and give me --

20       A.    All right.  The most recent was

21  involving an Oklahoma company called CFS, a huge

22  fraud in Oklahoma.  And I represented -- I didn't

23  represent anybody.  I was an expert witness for the

24  plaintiffs in that case suing Chase Morgan and

25  Mayor Brown.  And I was called upon to give expert

1                         Longstreth

2    testimony as to the meaning of a 10(b)5 opinion in

3    a 144A transaction, in a series of 144A

4    transactions.

5         Q.    Okay.  Before you go on to the others,

6    can I just ask you, did any of these matters where

7    you served as an expert before, to your knowledge,

8    go to trial and judgment?

9         A.    This case was settled after a one day --

10   what do you call these things, mini-trials or...

11        Q.    Oh, oh, a mock trial?

12        A.    Mock trial.

13        Q.    Right, right.  And how about the

14   PaineWebber or the trust company case; did those go

15   to trial, do you know?

16        A.    I don't think either one went to trial.

17        Q.    Okay.  So you never testified in court

18   as an expert?

19        A.    Never.

20        Q.    So, the ones where you didn't testify at

21   all, CFS was one.  You said there were maybe three

22   or four.  Can you recall the others?

23        A.    Yes, there was a case -- I was retained

24   by a dissident part of the Hearst family to be an

25   expert witness in a case involving the dissident

Page 42

                                    Longstreth

1

2    against the trust that controlled the Hearst

3    empire.  And I was also retained as a consultant.

4    And I -- in that case --

5         Q.    Is this -- are we talking about the same

6    case?

7         A.    Yes.  I mean, what I am getting at is, I

8    never got to an expert report.

9         Q.    I see.

10        A.    But I did write -- I came up with ideas

11   for how to settle this family matter.

12        Q.    Okay.  And what was the -- if there was

13   one, what was the crux of the case; what was the

14   issue?

15        A.    Well, the crux of the case was that

16   the -- that the -- there were entrenched managers

17   who were mismanaging the empire and treating the

18   family like trash.

19        Q.    Okay.  So it was entrenchment and

20   mismanagement of the trust?

21        A.    Yes.

22        Q.    Those were the issues you were advising

23   on?

24        A.    Yes.

25        Q.    Any others?  Any other matters you can

Page 43

1                        Longstreth

2  recall where you were retained as an expert?

3       A.    I was retained by the Bank of America in

4  a lawsuit by Wirehauser (phonetic) against Bank of

5  America for mismanagement of their pension funds.

6  And in that case, I don't remember if I rendered an

7  expert report, but I know we had a mini-trial.

8       Q.    And you testified -- you talked to

9  the --

10      A.    I did.  I presented my thoughts at that

11  mini-trial, one-day trial.  It resulted in -- it

12  was before a lawyer who was chosen as sort of an

13  arbitrator -- mediation, I guess it's called.  And

14  the case was settled right there on the spot.

15      Q.    And any others that you recall where you

16  were retained as an expert?

17      A.    I was retained as an expert witness in a

18  case involving Behr, B-E-H-R, Paint Company, which

19  has a sole -- used to have a sole supply contract

20  to Home Depot.  If you go to Home Depot, that's the

21  paint you'll buy.

22      Q.    Is that what the case involved?

23      A.    I was retained as an expert in money

24  management and fiduciary behavior, and I don't

25  remember much about the case.

Page 44

1                          Longstreth

2        Q.     Any other cases where you were retained

3   as an expert?

4        A.     Not that I can recall.  Which is not to

5   say there wasn't any, but --

6        Q.     No, no, I appreciate that.

7        A.     I just -- they're fuzzy.

8        Q.     I just want to run back through these

9   four to get an idea of when these matters were.

10  CFS, when would that have been?

11       A.     CFS was settled last year.  That's the

12  most recent.

13       Q.     2005.  The Hearst matter?

14       A.     Oh, eight years ago.

15       Q.     Late '90s?

16       A.     Yeah, late '90s.

17       Q.     Bank of America?

18       A.     Fifteen years ago.

19       Q.     1990-ish.  Behr Paint?

20       A.     Around the time of the Bank of America

21  case.

22       Q.     Around '90, okay.

23              Before this engagement in this case, the

24  Cantor case, had you ever been retained as an

25  expert to evaluate or consider the actions of a

Page 45

1                    Longstreth

2    public company's board in connection with a

3    financing transaction?

4        A.    No, not that I can recall.

5        Q.    Now, when -- I think I've already asked

6    this.  You don't recall when you began to work on

7    this case, do you?

8        A.    No.  We -- not precisely.

9        Q.    Sometime in the past 12 months?

10       A.    Yeah, within the past 12 months.

11       Q.    Well, between whenever you began to --

12   you agreed to be retained, you were retained and

13   you started work.  Between then, whenever that was,

14   and January 12, when you issued your report, do you

15   know how many hours you spent working on the

16   assignment?

17       A.    I can't recall the number of hours.

18       Q.    Did you keep time records of your work?

19       A.    Yes.  Yes, I did.

20       Q.    Did anyone else assist you in your work,

21   other than, you know, you got information from

22   plaintiffs' counsel?

23       A.    No.  I have a secretary and an office at

24   Debevoise for life, but I have no associate help

25   anymore.  It would have been nice, but I didn't.