Page 46

1                            Longstreth

2        Q.    It is nice, believe me.  Where would I

3   be?

4        A.    I've almost forgotten the feeling.

5        Q.    Where would I be without them?

6        A.    It's hard to get those light bulbs

7   screwed in by myself.

8        Q.    Now, your report indicates that the

9   charge -- your expert fee in this case is $1,000

10  per hour; is that correct?

11       A.    Correct.

12       Q.    Have you ever charged that rate in any

13  other matters, like these matters that you've

14  testified to?

15       A.    I think I charged that rate in the CFS

16  matter, but not before.

17       Q.    Do you know what your total charges --

18  well, let me start it this way.

19             Have you submitted an invoice, a bill,

20  to anybody in connection with your work?

21       A.    Yes, I've submitted more or less monthly

22  bills.

23       Q.    And who did you submit those to?

24       A.    The Friedman Firm.

25       Q.    Do you know what the total of those

1                          Longstreth

2    invoices has been, in order of magnitude?

3        A.    I don't know what the total has been.  I

4    don't want to speculate on it because I would -- I

5    would get it wrong.

6        Q.    Well, let's try and --

7        A.    I mean, I could get it badly wrong.

8        Q.    Let's try and see if we can come up at

9    least with a ballpark.

10       A.    Okay.

11       Q.    Through -- when's the last time you

12   submitted an invoice, as far as you can recall?

13       A.    After I submitted the expert report.  I

14   don't think I've submitted anything since then,

15   even though some months has passed, because I

16   didn't do anything on the case.

17       Q.    Somewhere between January 12th and

18   today --

19       A.    Probably the end of January, for a

20   period through January 31st.

21       Q.    And through January 31, 2006, would your

22   total charges have exceeded $10,000?

23       A.    Yes.

24       Q.    Would your total charges have exceeded

25   $50,000?

1                          Longstreth

2        A.    Probably no.  Although, I mean, it would

3   be -- you know, it's somewhere in that area,

4   probably.

5        Q.    Your best estimate --

6        A.    Best estimate.

7        Q.    -- is somewhere between 10- and $50,000?

8        A.    No, I think it's closer to 50 than 10.

9   I mean, 10 is 10 hours.  I've spent more time than

10  that.

11       Q.    Closer to --

12             MR. CLARK:  Off the record for a second.

13             THE VIDEOGRAPHER:  The time is 11:03

14  a.m. and we are going off the record.

15             (Discussion off the record.)

16             THE VIDEOGRAPHER:  The time now is 11:12

17  a.m.  We are back on the record.

18       Q.    Subsequent to your last invoice, do you

19  know, again, not to the minute, but generally, do

20  you know how much time you have put into the case?

21       A.    Maybe six hours, something like that.

22       Q.    Which has not been billed?

23       A.    Not been billed.

24       Q.    Have you been paid for the invoices that

25  you've submitted?

1                      Longstreth

2        A.     Yes.

3        Q.     The full amount?

4        A.     Yes.

5        Q.     By whom?

6        A.     By the Friedman Firm.

7        Q.     And when were you paid?  Were you paid,

8    you know --

9        A.     Promptly after I submitted the bill.

10       Q.     So you're owed nothing; there's no

11   outstanding amounts?

12       A.     That's correct.

13       Q.     Is payment of any portion of your fees

14   or charges contingent on the outcome of this

15   litigation?

16       A.     No.

17       Q.     You've got to let me finish.

18       A.     Oh, I'm sorry.

19       Q.     Even though you knew where I was going

20   with that one.  I thought it was a subtle question.

21       A.     A very subtle question.

22       Q.     Prior to agreeing to this engagement,

23   did you inquire into the financial status of the

24   plaintiffs?

25       A.     No.

Page 50

1                          Longstreth

2          Q.    Was it your agreement from the outset

3    that the Friedman Firm would be responsible for

4    paying your fees and you would look only to the

5    Friedman firm for the payment of those fees and

6    expenses?

7          A.    I really didn't investigate it.  I --

8          Q.    No, I was asking, what was your

9    understanding for who was going to pay you and who

10   was responsible to pay you.

11         A.    Well, it's been my custom not to

12   investigate this very closely, and I didn't feel a

13   need to in the case of the Friedman Firm.

14         Q.    But it's a different question,

15   Mr. Longstreth.  I'm just asking, from the outset,

16   was it your agreement and understanding that you

17   would be paid by the Friedman Firm and the Friedman

18   Firm would be responsible for paying, as opposed to

19   the plaintiffs or anybody else?

20         A.    That's what I thought, although I also

21   thought they would be paid by the plaintiffs, their

22   clients.

23         Q.    They -- the Friedman Firm would?

24         A.    Yes.

25         Q.    Now, turning to your report.  As I

1                        Longstreth

2   understand it, and I'm looking at the second page,

3   page 2 of the report itself.

4        A.    Right.   Okay.

5        Q.    You were engaged to opine -- there are a

6   number of questions, but basically you were opining

7   on one issue, and that is the nature of the

8   arms-length bargaining that would have occurred

9   between Mr. Perelman or his affiliates and the

10  Marvel board had he asked the Marvel board to

11  assist or acquiesce in the Holding Company note

12  transactions in '93 and early '94; is that correct?

13       A.    Yes.

14       Q.    And then in connection with that

15  overarching issue, you were asked your expert

16  opinion on, I think, eight specific subquestions,

17  if you will; is that correct?

18       A.    That's correct.   Seven or eight, yeah.

19       Q.    So, is it fair to say that the scope of

20  your expert -- these Holding Company note

21  transactions as to which you were going to give an

22  opinion on the nature of arm's-length bargaining,

23  the last of those occurred in February of 1994; is

24  that your recollection?

25       A.    That's the Marvel III?

1                              Longstreth

2          Q.    Marvel III.

3          A.    Yes.

4          Q.    So the temporal scope of your expert

5    opinion would be limited to the time up to the

6    issuance of those Marvel III notes in February of

7    1994; is that correct?

8          A.    Yes, but -- yes.  That was the focus of

9    the opinion.

10         Q.    Well, you make a number of statements in

11   your report concerning events after February 1994

12   that would appear to be beyond the scope of your

13   precise assignment; is that correct?

14         A.    Well, they are observations.  Let's

15   take, for example, the shelf registration of Marvel

16   in which Marvel warns readers about the impact of

17   these negative covenants.  I mean, that -- that's

18   central to my opinion.

19         Q.    We'll get to that, but my point --

20         A.    I mean, that's outside the period --

21         Q.    The temporal scope of where you were

22   being asked to give an opinion.  Let me approach it

23   this way.

24               It would be fair, wouldn't it, to say

25   that none of the facts or circumstances that you

1          Longstreth

2    talk about in your report that occurred after

3    February of 1994 could have been considered in any

4    way, shape or form by the independent directors of

5    Marvel in connection with any of these note

6    transactions, had they been asked to consider those

7    transactions?

8          A.    What actually happened is unknown, if

9    that's what you're saying.

10         Q.    Right.

11         A.    I mean, what's going to happen in the

12   future is unknowable.  On the other hand, a

13   director has a duty to foresee possibilities.

14   That's their job.  So, there's a question of what

15   was recently foreseeable.

16         Q.    But in assessing --

17         A.    In contrast to what actually happened.

18         Q.    In assessing the reasonableness of what

19   a director did or didn't do at a particular point

20   in time, it would not be fair to charge him with

21   knowledge of facts that had not yet occurred; is

22   that correct?

23         A.    That's correct.

24               On the other hand, it's -- it's -- let

25   me point out, it's also, I observed that before the

Page 54

1                           Longstreth

2    first note issuance, the company, Marvel, amended

3    its charter to double its capacity in both the

4    preferred stock and common stock.  And that, too,

5    is central, even though it's not in the temporal

6    period you're talking about.

7          Q.    Now, going to page 1 of your report --

8    what I -- just so you understand, what I've done to

9    help myself out is put together the questions from

10   Mr. Friedman's letter, which is Exhibit C to your

11   report, and just my notes and then your answer.  So

12   to the extent you need to look at the questions as

13   I ask you my questions, and you've got to flip back

14   to Exhibit C, and then your answers would be in the

15   beginning.

16               MR. FRIEDMAN:  Tony, since I have an

17          extra copy, I will rip off, with your

18          permission, the letter so the witness doesn't

19          have to flip the pages.

20               THE WITNESS:  Okay, good.

21          Q.    Now, the first question asked was -- let

22   me read it into the record.  Question number 1: If

23   you were serving as an independent director of

24   Marvel, another public company, could you describe

25   in general terms your role and how you would carry

Page 55

1                           Longstreth

2     out your obligations?

3               That was the question you were asked.

4     And in your answer, at the end of the first

5     paragraph, you say that you would owe to Marvel --

6     you would owe Marvel the twin duties of loyalty and

7     care generally expected of corporate directors.

8               You'd owe those duties to the

9     shareholders as well, correct?

10         A.    Yes, through the company to the

11    shareholders.

12         Q.    And question 2 talks about the fact that

13    Marvel had an 80 percent stockholder, 20 percent of

14    the shares held by the public and whether that

15    would affect the way in which you would perform

16    your obligations as a Marvel director.

17              In the course of your answer to number

18    2, you refer, for example, midway through the

19    second paragraph, you talk about what the

20    independent directors could be expected to assert

21    with undivided loyalty, the best interest of Marvel

22    and all the stockholders -- all the shareholders.

23    Do you see that?

24         A.    Yes, I do.

25         Q.    The next two paragraphs down, again,

Page 56

Longstreth

1

2   you're talking about your duty of care to Marvel

3   and loyalty to the company and all its

4   shareholders.  Do you see that?

5       A.    Yes.

6       Q.    And the next paragraph down, once again,

7   you talk about assessing the best interest of

8   Marvel and all its shareholders?

9       A.    Yes.

10      Q.    All its shareholders, that would include

11  the majority shareholder as well as the minority

12  shareholders, correct?

13      A.    Correct.

14      Q.    Would it be, to your understanding,

15  consistent with your fiduciary duties owed to the

16  majority shareholder to place or attempt to place

17  restrictions or limitations on the majority

18  shareholders' ability to sell, lend or hypothecate

19  its stock, which restrictions didn't apply to any

20  of the minority shares?

21      A.    Would you repeat that question?

22      Q.    Sure.  To your understanding, would it

23  be consistent with the fiduciary duties to the

24  majority shareholder to place restrictions or

25  limitations on its ability to sell, lend or

1                           Longstreth

2    hypothecate its stock, which restrictions did not

3    apply to the shares held by the minority?

4         A.    I don't think I know the answer to that

5    question.  I don't understand how Marvel could

6    impose restrictions on stock that had been issued

7    to the majority shareholder.

8                I mean, are you suggesting there's some

9    power that would enable me to do that?

10        Q.    No, I'm asking whether -- if you tried

11   to do that, you believe as an expert in corporate

12   governance, that would be consistent with your

13   fiduciary duties to the majority shareholder.

14               Putting aside whether you could do it,

15   is it consistent with your fiduciary duties to the

16   majority shareholder to try and somehow limit his

17   rights to sell, lend or hypothecate his shares when

18   you are not applying those limitations to all the

19   shares?

20        A.    I'd have to know all the facts.

21        Q.    So it might be consistent with your

22   fiduciary duty to try and do that?

23        A.    There might be.  It might be.

24        Q.    Can you tell me what facts you'd like to

25   know to make that judgment, 'cause I'd like to

Page 59

Longstreth

1

2          Q.     Including the majority shareholder?

3          A.     Including the majority shareholder.

4          Q.     Whose rights you would be attempting to

5    limit?

6          A.     You would be attempting to limit.  And

7    so you would go to him and say, Here's the deal.

8    In my judgment, it might serve -- or I could say,

9    in my judgment, it does serve the best interest of

10   this company and its shareholders, all of them, for

11   you to restrict your shares.

12             I don't know what I -- I don't know the

13   case I'm talking about, but I'm not going to be

14   driven to exclude the possibility of such a case.

15         Q.     Sir, your answer, you said, it might

16   be -- I can say, in my judgment, it does serve the

17   best interest of this company and its shareholder,

18   all of them, for you, majority shareholder, to

19   restrict your shares.

20             I'm not asking about that.  I'm asking

21   about a situation which the majority shareholder

22   does not agree, does not desire to restrict his

23   shares in any way, shape or form, okay?

24         A.     Right.

25         Q.     Under those circumstances, do you

Page 60

1                          Longstreth

2    believe that it could be consistent with your

3    fiduciary duties to all the shareholders, including

4    the majority shareholder on a discriminatory basis,

5    to apply restrictions to just his shares that don't

6    apply to anybody else's shares?

7        A.    I can't rule out the possibility without

8    a lot of thought.

9        Q.    Okay.  Well, give it some thought and

10   when you've thought about it enough, you tell me if

11   you can come up with any instance in which you

12   think that would be consistent with your fiduciary

13   duties owed to all the shareholders, you let us

14   know.

15       A.    Okay.

16       Q.    You've never seen such a situation in

17   your many years of corporate practice, have you?

18       A.    Not that I can recall.

19       Q.    Going to your answer to question 2 --

20       A.    2?

21       Q.    Yes, at the end of --

22             MR. FRIEDMAN:  I'm sorry, I thought you

23        were talking about question 2.

24             MR. CLARK:  I was.

25             MR. FRIEDMAN:  So --

1                          Longstreth

2          MR. CLARK:  I'm going back to it.

3          MR. FRIEDMAN:  Okay.

4          MR. CLARK:  The hypothetical we were

5     discussing --

6          MR. FRIEDMAN:  Okay.  I just wanted to

7     make sure I was in the right place.

8          Q.    In the second paragraph -- well,

9     throughout this report, you acknowledge, do you

10    not, that Mr. Perelman, through his affiliates,

11    owned approximately 80 percent, slightly more than

12    80 percent of the common stock of Marvel, right?

13         A.    Yes.

14         Q.    Do you know how Mr. Perelman got that 80

15    percent?

16         A.    No.

17         Q.    Are you aware that he --

18         A.    If I knew, I don't recall.

19         Q.    So you're not aware that he purchased it

20    from other shareholders for a fair price; you don't

21    know that?

22         A.    I don't know that.

23         Q.    As an 80 percent stockholder, in your

24    view as an expert on corporate governance, was he

25    entitled to whatever benefits there are to owning a

Page 62

1                          Longstreth

2    controlling majority block of stock?

3        A.    As a stockholder?

4        Q.    Yes, as a stockholder.

5        A.    I would say generally, that's true.

6        Q.    He would.  And the board of Marvel --

7        A.    But he -- I mean, generally that's true,

8    but he, as a board member, he has a fiduciary duty

9    to the corporation and all of its stockholders

10   and --

11       Q.    Sure, as a majority stockholder and the

12   controlling stockholder he's got a fiduciary duty

13   to the corporation and the stockholders, right?

14       A.    It's probably a different duty.

15       Q.    Now, I want to focus on the board's

16   fiduciary duties for a moment.

17       A.    Yes.

18       Q.    The board, for example, would not have

19   been entitled under Delaware law, as you understand

20   it -- you understand Marvel was a Delaware

21   corporation?

22       A.    Yes, I do.

23       Q.    To your understanding, the board

24   wouldn't have been entitled under Delaware law, for

25   example, to attempt to dilute Mr. Perelman into a

Page 63

1                          Longstreth

2     noncontrolling minority position against his will,

3     would they?

4          A.    Well, that's what your expert witness

5     says.

6          Q.    I'm asking you for your opinion on that.

7          A.    Do you want to repeat that question?

8          Q.    Sure.  Under Delaware law, is it your

9     understanding that the board of directors would not

10    have been entitled to attempt to dilute

11    Mr. Perelman's ownership interest in Marvel into a

12    noncontrol or a nonmajority position without his

13    consent or against his will?

14         A.    Well, I believe, based on your expert

15    witness's report, that under Delaware law that

16    would not be permitted if that were the sole

17    purpose of the exercise.

18         Q.    If it were just one purpose of the

19    exercise, not the sole purpose, is it your

20    understanding that that would be permitted?  And if

21    you don't know, you don't have the expertise to

22    tell us, you can say that, too.

23         A.    I don't know for sure.  I mean, that --

24    you're asking me a very technical legal question --

25         Q.    Yes.

Page 64

1                    Longstreth

2        A.    -- and I'm not here to give you

3    expertise on technical legal questions.

4        Q.    So you're not aware, other than what

5    Professor Hammermesh may have had to said in his

6    report, you're not aware of whether or not under

7    controlling Delaware law, the board of directors,

8    consistent with their fiduciary duties to all

9    shareholders including the majority, would be

10   entitled to dilute the majority shareholder against

11   his will out of a controlling position; you just

12   don't know one way or the other?

13       A.    Well, no.  I don't know.  But I do know

14   that a fair reading of that expert report would

15   indicate that we are talking sole purpose.

16       Q.    Now, in the third paragraph of your

17   answer to question 2, towards the end, you talked

18   about standing up to the pressure.

19       A.    The third paragraph?

20       Q.    Yes.

21       A.    Okay.

22       Q.    Starts, Given the potential.

23       A.    Yeah, I got it.

24       Q.    Okay.  You end by talking about standing

25   up to the pressure that could be asserted by the

Page 65

1                              Longstreth

2    controlling shareholder, that's Mr. Perelman,

3    right?

4         A.    Yes.

5         Q.    What is that pressure that you're

6    referring to there?

7         A.    Well, this -- Marvel had a -- has a

8    controlling stockholder with 80 percent and public

9    stockholders with 20 percent and the pressure for

10   an independent director to step into that job is, I

11   think it's fairly obvious.  The tendency of most 80

12   percent owners of a corporation would be to treat

13   the corporation as his or hers.  I mean, in other

14   words, a corporation that would -- would tend to

15   see the corporation's interest and his interest as

16   identical.

17             And that's just human nature that I'm

18   expressing a view about.  But the case -- you know,

19   the courts are filled with cases that illustrate

20   that human trait.  And so a director being asked to

21   serve as an independent director on this board

22   would have to be acutely aware of the potential for

23   conflict arising between the interests of the

24   controlling shareholder on the one hand and the

25   interests of all the shareholders on the other

Page 66

1                                    Longstreth

2    hand.

3        Q.    So the pressure that you're referring to

4    in that phrase is the potential for a conflict

5    between the majority and the minority shareholders?

6        A.    Yes, or conflict between the best

7    interests of the controlling shareholder on the one

8    hand and the best interests of all the shareholders

9    and particularly the minority on the other hand.

10       Q.    Now, going down two paragraphs below

11   that, In considering corporate issues --

12       A.    Yes.

13       Q.    -- saying, Considering corporate issues,

14   I would be especially watchful for matters in which

15   the controlling shareholder was directly or

16   indirectly interested, other than through his stake

17   in Marvel.

18            What did you mean by that, what I take

19   to be an exclusion to your general statement, that

20   last piece there, other than through his stake in

21   Marvel?

22       A.    Well, I mean, I'm talking about the

23   possibility for self-dealing transactions between

24   the controlling shareholder and the corporation

25   that benefit the controlling shareholder in ways

Page 67

Longstreth

1

2    disproportionate to the benefits to Marvel or

3    through Marvel, the other shareholders or to the

4    other shareholders directly.

5        Q.    By the way, going back to up to the

6    pressure point --

7        A.    Yes.

8        Q.    -- one quick thing.  You say, I would

9    only accept the director position if I had thought

10   I could succeed in standing up to the pressure that

11   could be exerted by the controlling shareholder.

12            As a matter of fact, are you aware of

13   any instance in which Mr. Perelman attempted to

14   exert this pressure that you mentioned here on the

15   board of directors of Marvel?

16       A.    No.  I would say, what I do know is that

17   he ignored the board of directors.  I mean, these

18   note transactions and the covenants that were

19   impinging on the ability of Marvel to do business

20   weren't even brought to the board.

21       Q.    But you're not --

22       A.    So the --

23       Q.    -- aware of a situation in which

24   Mr. Perelman went to the board and exerted pressure

25   on the board --

Page 68

1                          Longstreth

2        A.    I don't know.   I don't think --

3        Q.    -- contrary to whatever it is they

4    thought they should be doing?

5        A.    I don't know of anything like that.  I'm

6    saying that the record shows he didn't even get to

7    that point.

8        Q.    Going back down, okay, to -- is it fair

9    to say that, if I can sort of reverse your sentence

10   here about other than through the stake in Marvel,

11   is it fair to say that you would not be especially

12   watchful for matters in which the controlling

13   shareholder was directly or indirectly interested

14   through his stake in Marvel?

15       A.    I didn't say that.

16       Q.    No, I know you didn't.  I'm trying to

17   understand what you did say.  You seem to be

18   indicating that you would be especially watchful

19   about something, and that you carve out from what

20   you'd be especially watchful of something else.

21   And that is, matters where a strong shareholder has

22   his interest through his stake in Marvel.  And I'm

23   just really trying to understand exactly what the

24   distinction is that you appear to be drawing here.

25       A.    I'm saying it's a situation that I would

Longstreth

be walking into in assuming duties that was fraught with danger because of the powerful controlling position of the controlling shareholder. And that's what makes it important to be especially watchful of all the transactions that might be going on which involve or could involve interests of the controlling shareholder outside of the interests of Marvel.

And I mean, to just take an example, I mean, Andrews, the deal that Andrews put on the table. I guess Andrews -- I believe Andrews is controlled entirely by Mr. Perelman. So, the Andrews deal is something that one would have to be watchful for, particularly what's happening to the stock -- I think the Andrews deal involved picking up the remaining outstanding stock of Toy Biz or something -- some company that Marvel held a majority interest in, but not all the shares. And so Andrews is talking about getting hold of the minority for itself.

I mean, it's that kind of a thing. That's all I'm saying, but you cannot reverse the sentence and say, I can be asleep for the rest -- if there were not a controlling shareholder sitting

Page 70

```
 1                      Longstreth

 2    there.

 3        Q.    That answers it for me.

 4             You talk about the Andrews proposal.  As

 5    a matter of sort of process, if I take what you

 6    said correctly, you're indicating that there was a

 7    conflict of interest between -- potential conflict

 8    of interest between Mr. Perelman because of his

 9    ownership of Andrews on the one hand and Marvel and

10    its other shareholders on the other with respect to

11    that proposal; is that fair?

12        A.    Well, I don't know a great deal about

13    that proposal and all the ins and outs of it, but

14    on its face, it seemed to me that -- in fact, maybe

15    I get this idea from reading the Carl Icahn letter.

16    I mean, he seemed disturbed that the minority

17    interest that was sought to be acquired by Andrews

18    would go to Andrews rather than to Marvel.  That's

19    all.

20        Q.    Well, whatever Carl Icahn thought, he

21    thought.  I'm trying to get to your understanding.

22             Did you have some understanding, based

23    on the work you've done in this case, that the

24    Andrews proposal raised at least a potential for a

25    conflict of interest between Mr. Perelman and his
```

Page 71

1                          Longstreth

2    interest on the one hand and Marvel and the

3    minority shareholders on the other?

4         A.     Well, it had the potential of there

5    being conflicts because on the one hand, it's a

6    wholly-owned company.

7         Q.     I don't disagree.  I'm just making sure

8    we understand each other.

9         A.     That's all.

10        Q.     As a matter of corporate governance and

11   good corporate process, under those circumstances,

12   what would you think that the independent directors

13   of Marvel should have done?

14            How should they have -- not what

15   decisions should they come to, but how should they

16   have conducted themselves in considering the matter

17   and coming to a decision?

18        A.     Which matter?

19        Q.     The Andrews proposal that you raised in

20   your answers a few minutes ago.

21        A.     Well, I think they proposed in that case

22   to have a special committee of independent

23   directors.

24        Q.     And that's what they should have done,

25   isn't it?

Page 72

1                                Longstreth

2         A.      Sounds right.

3         Q.      Now, your answer to number 2, down six

4    paragraphs, one starts, The issuance of the notes

5    by the wholly-owned holding companies.  Do you see

6    that paragraph?

7         A.      Yes.

8         Q.      I'm not entirely positive that this is

9    so, but at least this is the first place, about

10   halfway through that paragraph, where I see your

11   reference to the negative covenants in the notes.

12   Do you see that?

13        A.      Yes, I do.

14        Q.      You say that, As discussed at some

15   length below -- we'll get to below -- the security

16   for the notes included a range of negative

17   covenants restricting Marvel's freedom of action

18   and correspondingly the free play of business

19   judgment by its board, et cetera.

20               I just want to be absolutely clear.

21   Where are these covenants?

22               Well, to your understanding, were there

23   any covenants to which Marvel or the board of

24   directors agreed, related to these notes that

25   restricted the board's exercise of business

1                        Longstreth

2    judgment?

3        A.    You mean were they a party to the

4    covenants that affected them?

5        Q.    A party or agreed in some other way, in

6    any way, shape or form.

7        A.    I don't think there was any contractual

8    undertaking by Marvel to comply with those

9    covenants.

10       Q.    Right.  Marvel was not, to your

11   understanding, a party to the indentures governing

12   the notes, right?

13       A.    That's my understanding.

14       Q.    And none of the independent directors of

15   Marvel was a party to that contract, correct?

16       A.    That's correct.

17       Q.    And neither one --

18       A.    I don't even think they knew about it.

19       Q.    You did understand that there were

20   public SEC filings in connection with all of these

21   notes?

22       A.    Yes.

23       Q.    And putting aside the indentures, to

24   your knowledge, there were no other agreements

25   between Marvel or its independent directors on the

Page 74

                                Longstreth

1

2    one hand and anybody else on the other hand, by

3    which either Marvel or the independent directors

4    agreed to be bound by any restrictions in the

5    indentures for the notes?

6         A.    I don't know of any agreement by the

7    independent directors to be bound by the notes.

8         Q.    Or Marvel?

9         A.    Or Marvel.  However, I mean, that's not

10   the whole story.  The record is abundant in

11   establishing that Marvel considered itself bound by

12   those covenants.

13        Q.    You didn't, I mean, you, as a lawyer

14   looking at this, you came to the conclusion that

15   Marvel was not contractually bound, right?

16        A.    I said that there was no contract

17   binding them, but I also said that the record

18   indicates that de facto they considered themselves

19   bound.

20        Q.    I understand that's your view of the

21   record.

22        A.    Right.

23        Q.    A trier of fact will determine what the

24   record actually shows.  But what I was trying to

25   get to was, you're an expert and you're a corporate

Page 75

1                          Longstreth

2    lawyer with many decades of very substantial

3    experience.  You understood, based on the -- you

4    know, I'm not saying an insubstantial amount of

5    time, but 40 or 50 hours of time that you've spent

6    on this matter, that Marvel, as a legal matter, as

7    a contractual matter, was not bound in any way,

8    shape or form, by any restrictions in the holding

9    company indentures; is that correct?

10        A.   As a matter of contract law, that's

11   correct.  But there are many other ways to be

12   bound.  And I think that this record shows that

13   they considered themselves bound, behaved that way

14   and indeed may have been subject to a claim of

15   tortuous interference if they had not complied or

16   tried not to comply with the covenants.

17        Q.   In your opinion as a lawyer, was Marvel

18   bound by the covenants in the note indentures?

19        A.   Well, I'm not here to function as a

20   lawyer.

21        Q.   You're here to function as an expert.

22   If you want to tell us that you're not an expert as

23   a lawyer, you can tell us that and the judge will

24   take that into account.

25             So I'd like an answer to my question.

Page 76

Longstreth

1

2      A.    Okay.  Do you want to repeat the
3  question?

4           MR. CLARK:  Sure.  Just go ahead and
5      read that back, will you, Penny?

6           (The question was read.)

7      A.    If I were counsel to Marvel, given this
8  record, given the SEC filings, I would advise
9  Marvel that they were bound.

10     Q.    Okay.  That's your advice as counsel to
11  Marvel.  Now I would like your opinion as a lawyer,
12  sitting here under oath today, was Marvel bound by
13  the covenants in the indentures for the notes?

14     A.    As a -- as a strict legal matter, they
15  were not bound.

16           MR. CLARK:  Okay.  Let's mark as
17      Longstreth Exhibit 2 a three-page document
18      which I will represent is an excerpt, a cover
19      page and an excerpt from the form S-3 filed by
20      Marvel Entertainment Group, Inc. with the SEC
21      on March 14, 1995.

22           (Longstreth Exhibit 2, Cover page and
23      excerpt from the form S-3 filed with the SEC
24      by Marvel Entertainment Group, Inc. on March
25      14, 1995, marked for identification, as of

Page 77

1                              Longstreth

2          this date.)

3          Q.    You have seen this document before,

4     haven't you, Mr. Longstreth?

5          A.    Yes, I think so.

6          Q.    This was one of the documents you

7     reviewed.  I think it's the fourth one on your

8     Exhibit B list?

9          A.    This is the shelf registration.

10         Q.    Yeah, I think -- I think that's correct.

11         A.    1995?

12         Q.    Yeah, March 14, 1995.  You can confirm

13    from looking at Exhibit B to Longstreth Exhibit

14    1 --

15         A.    Okay.

16         Q.    -- which is the list of the documents

17    you considered to see whether this is, in fact, an

18    excerpt, as you understand it --

19         A.    Yeah.

20         Q.    -- of one of the documents you reviewed?

21         A.    Okay.

22         Q.    It is?

23         A.    Yes.

24         Q.    Did you consider in your work in this

25    matter, did you consider whether the terms of the

Page 78

1                        Longstreth

2    negative covenants that you're talking about in

3    your answer to number 2 -- those are the negative

4    covenants in the holding company indentures --

5         A.    Right.

6         Q.    -- whether those negative covenants were

7    more, less or as restrictive as the terms of

8    Marvel's own debt facilities?

9         A.    I did.

10        Q.    And what determination did you make on

11   that?

12        A.    I determined that they were roughly the

13   same.  There are differences and I can't recall

14   exactly what the differences were.

15        Q.    So if the negative covenants in the

16   holding company indentures were, as you say,

17   roughly the same as those in Marvel's own debt

18   facilities, do you have any reason to conclude that

19   even if the note indentures hadn't existed or

20   didn't contain these negative covenants, the free

21   play of business judgment by Marvel's board would

22   have been materially less restricted?

23        A.    Yes.

24        Q.    And go ahead.  Explain.

25        A.    I have a strong reason to believe that.

Page 79

1                           Longstreth

2        Q.     You think that -- okay.  Go ahead.

3   Explain it.

4        A.     Well, the difference is that in the case

5   of the term bank debt.

6        Q.     Marvel's term bank debt?

7        A.     Marvel's term bank debt -- and let's

8   give this discussion -- assume they're exactly the

9   same covenants, to make it simple.  In that case,

10  the directors of Marvel are free to refinance the

11  bank term.  In that case, the directors are free to

12  refinance the bank term debt.

13       Q.     And I assume you mean refinance with new

14  debt that doesn't have those sort of covenants,

15  right?

16       A.     That's what I mean, yes.  With new debt,

17  with stock, preferred stock or common stock and

18  therefore the -- the control of the business

19  remains in the hands of the directors of Marvel.

20  And it can -- that board can decide how to

21  handle the term debt and how to handle, therefore,

22  the covenants.

23       Q.     Okay.

24       A.     In the other case, let me finish this

25  answer -- in the other case, the covenants are in

Page 80

Longstreth

1
2    the indentures, three indentures, that were
3    supporting the notes issued by Perelman's holding
4    companies.  And the affect of those covenants under
5    those circumstances, was to lift out of the hands
6    of the board of Marvel a range of business
7    judgments that could have been freely exercised by
8    that board and hand that power over to the
9    indenture trustee, the noteholders and Perelman as
10   an individual, not as a fiduciary, in some
11   combination or separately.
12         And neither the indenture holder nor the
13   noteholders had any fiduciary duty whatsoever to
14   Marvel or its stockholders.  And yet they held this
15   extraordinary power to limit the business judgment
16   of that board, and -- and that's a crucial
17   difference.  I tried to say that in my report, and
18   that's it.
19         Q.    And they held this power pursuant to the
20   terms then set forth in the --
21         A.    Indentures.
22         Q.    -- note indentures?
23         A.    Right.
24         Q.    These are the note indentures that
25   you've testified were not as technical legal matter

Page 81

1                          Longstreth

2    binding on Marvel and the Marvel board of

3    directors, correct?

4         A.    I said, as a technical legal matter of

5    contract law, Marvel wasn't legally bound.  I also

6    tried to say that by Marvel's own behavior, it

7    became de facto bound.

8         Q.    Now, going back to your hypothetical.

9    Instead of assuming that the board of directors of

10   Marvel go out and refinance its debt, okay, let's

11   just assume they don't do that.  That Marvel's

12   debt, with the same or roughly the same covenants

13   as were found in the holding company note

14   indentures, that that debt facility continued to

15   exist, okay?

16             As long as that debt facility was in

17   place, Marvel's board of directors free play of

18   business judgment would have been limited to the

19   same extent, as you're saying, as a practical

20   matter, it was under the note indentures; isn't

21   that fair?

22        A.    No, it isn't fair.

23        Q.    How is it different?

24        A.    Because at any moment in time that board

25   could wipe away those covenants.

Page 82

1                              Longstreth

2        Q.    I'm sorry, I thought I asked you to

3    assume that that didn't happen.  So if I didn't, I

4    will.  Assume that that debt is not refinanced,

5    it's not wiped away, as you say --

6        A.    No, but it's the potential to wipe it

7    away at any moment.  Today, I don't want to wipe it

8    away.  Tomorrow, I do.

9        Q.    I don't want to argue with you.  Assume

10   that they don't have that potential, that they

11   can't refinance.

12       A.    Oh, that they can't do it?

13       Q.    Sure.  Assume that.  Okay.  Now, under

14   that set of facts, the board's free play of

15   business judgment would be just as limited as you

16   believe it was as a practical matter under these,

17   the terms of the holding company note indentures?

18       A.    You'd have to tell me a lot more.  I

19   mean, why can't -- why aren't they free?

20       Q.    It doesn't matter.

21       A.    It does matter.

22       Q.    No, it's my assumption.  It's my

23   hypothetical.  If you don't know the answer, you

24   just say, I can't answer that question, Mr. Clark,

25   and I'll go on.  I'll move on.

1                          Longstreth

2          A.     I can't -- I can't answer it.

3          Q.     Because I'm going to ask it again at

4     trial and you won't be able to answer it there

5     either.

6                 So you don't think --

7          A.     Maybe the judge will allow me to

8     question you enough so that I can understand the

9     question thoroughly.

10         Q.     You tell me what you need to know.

11         A.     I just did.

12         Q.     What?

13         A.     I need to know why I can't repay the

14    debt.

15         Q.     Because the debt says you can't without

16    an extraordinary penalty, okay?

17         A.     But it doesn't.  You're making up a debt

18    that doesn't exist.

19         Q.     I'm making a hypothetical, which is what

20    you do with experts.  You ask them hypothetical

21    questions that get you answers.

22         A.     But let's deal with the debt we're

23    talking about, not the debt you're inventing.

24         Q.     Okay.  Let's deal with the debt that

25    we're talking about.  It was in place, right?

Page 84

1                          Longstreth

2        A.     Yeah.

3        Q.     Same time as these notes were in place,

4    right?

5        A.     Right.

6        Q.     Had the same or roughly the same

7    limitations on Marvel's freedom of action, correct?

8        A.     Roughly.

9        Q.     So, Marvel's own debt instruments

10   limited its board's freedom of action?

11       A.     Until the board decided not to be

12   limited.

13       Q.     Well, let's deal with the facts.  Did

14   the board decide not to be so limited?

15       A.     It could have at any minute.

16       Q.     Did it, to your understanding?  The

17   answer is no, isn't it?  You understand the

18   debt that I'm talking about --

19            MR. FRIEDMAN:  Please don't interrupt

20       the witness.

21            MR. CLARK:  I'm not.

22            MR. FRIEDMAN:  He was starting to give

23       an answer -- he was -- you asked a question,

24       he started to give an answer and you jumped

25       in.

Page 85

1          Longstreth

2          MR. CLARK:  Okay.  Now that you've had

3     your say, Mr. Friedman.

4     Q.    I'm going to ask you the question.

5     A.    Right.

6     Q.    You understand as a matter of fact that

7  during the entire period of time, from 1993 through

8  the end of 1996 that we're dealing with here, that

9  Marvel had in place debt facilities that had

10 covenants that restricted the freedom of the

11 board's action every bit as much as you say they

12 were restricted as a practical matter by the

13 covenants found in these note indentures; isn't

14 that the fact?

15    A.    Yes.  I mean, in fact, the debt rose

16 from 250 million to 600 and something million --

17 650 million, but it's important to get at the

18 reason for that.  The reason is, they couldn't

19 finance any other way.

20    Q.    Then going on in your answer to question

21 2.  Do you see the paragraph -- it's the next

22 paragraph.  It starts, As Marvel began to acquire

23 liquidity problems.  Do you see that?

24    A.    Yes.  Where am I?

25    Q.    It's --

Page 86

1                    Longstreth

2        A.    Oh, As Marvel began to encounter?

3        Q.    Yes.

4        A.    Okay.

5        Q.    You say, these negative covenants,

6   referring to the covenants in the holding company

7   indentures, not in Marvel's own --

8        A.    Right.

9        Q.    -- debt facilities, correct?

10       A.    Right.

11       Q.    These negative covenants impaired its

12  ability to raise much needed capital, leading in

13  the end to a bankruptcy file, right?

14       A.    Yes.

15       Q.    Did Marvel's own covenants impair its

16  ability to raise much needed capital?

17       A.    No.

18       Q.    Why not?

19       A.    Because they could have issued preferred

20  or debt or common stock and paid off the bank

21  loans.

22       Q.    And they were legally entitled to do

23  that, to your understanding?

24       A.    Not under the indenture to the third --

25       Q.    We're getting back to that indenture.

Page 87

1                          Longstreth

2    Okay.

3              You agree that as a technical legal

4    matter, Marvel wasn't bound by those indentures,

5    right?  You have already said that.

6         A.    Well, let's not repeat that.

7         Q.    Okay.

8         A.    Whatever I said, I said.

9         Q.    Given that you said that --

10        A.    I also said, de facto, the company

11   accepted those restrictions as their own and

12   behaved that way and made filings with the SEC that

13   would support that conclusion.

14             And so, indeed, the minutes that I'm

15   referring to here make it perfectly clear that

16   Mr. Perelman thinks that's the case because he's

17   talking about the inability to get the negative

18   covenants in the indenture that supports his note

19   issuance waived.

20        Q.    Okay.  Now --

21        A.    And he can't get them waived because he

22   can't find the noteholders.  That's what he says.

23        Q.    Let's go back to my question.  It's your

24   testimony that the negative covenants in Marvel's

25   own debt facilities did not impair its ability to

Page 88

Longstreth

1
2  raise much needed capital; is that correct?

3       A.    The negative covenants in the Marvel's
4  term bank debt.  That's what I'm saying.

5       Q.    Did not impair its ability to raise
6  capital?

7       A.    Yes.

8       Q.    And by contrast, you are also saying
9  that the negative covenants in an indenture, which
10 as a technical legal matter, did not bind Marvel,
11 did impair its ability to raise much needed
12 capital; is that correct?

13      A.    That's correct.

14      Q.    And that this state of affairs led in
15 the end to a bankruptcy filing, correct?

16      A.    Yes.

17      Q.    Explain how that happened.  Explain how
18 what you just said led to this bankruptcy filing.

19      A.    Well, as the minutes -- as the minutes
20 of this -- there are minutes of two meetings.
21 Maybe I ought to examine those minutes so I can
22 show you exactly what I'm trying to say.

23      Q.    Well, you've got your report here.  Just
24 explain to me what you say in here, because I don't
25 see the cause and effect on the face of your report

1                        Longstreth

2   between these negative covenants and the

3   indentures -- I don't see the cause and effect

4   between the negative covenants in the holding

5   company note indentures and the end result of a

6   bankruptcy filing.  So I would like you to connect

7   the dots.

8            MR. FRIEDMAN:  Do you want to show the

9        witness the board minutes he requested?

10           MR. CLARK:  I don't.  I don't at this

11       point, no.

12       A.    Well, there -- let's see.  I think the

13   minutes that I examined of the Marvel board

14   meetings of December 12th and December 26th lead

15   me, and I think any reasonable reader, to the

16   conclusion, one, that the indenture negative

17   covenants were an obstacle to Marvel's ability to

18   find a solution to its liquidity problem.  There is

19   no mention, on the other hand, of the bank term

20   loan covenants being an obstacle.

21           Second, a fair reading of those minutes

22   makes it clear that although a waiver of the note

23   indentures covenants is necessary, it can't be

24   obtained short of bankruptcy because I think, as

25   Mr. Perelman says, that the notes had been

```
 1                        Longstreth
 2   purchased by some distress event hedge funds, and
 3   they simply were not in the form of a group that
 4   could be met and negotiated with.
 5            And third, there is discussion in both
 6   sets of minutes about the need to file in Chapter
 7   11 so that you can bypass these precise negative
 8   covenants that are the problem.
 9            So when I say it led to -- when I say
10   the covenants led to a bankruptcy filing, I think
11   I'm simply following the logic which is impeccable
12   of Mr. Perelman as written up in his own minutes.
13       Q.    So the waiver of the note covenants that
14   you mentioned in your last answer, that was a
15   condition of what, of financing, new financing for
16   Marvel?  Is that what it was?
17       A.    Unless you got the waiver, you couldn't
18   solve the liquidity problem by finding more
19   capital, either through additional borrowing or a
20   refinancing or an equity placement.  Yeah.
21            Any -- the negative covenants stood in
22   the way of, as I understand it, a range of possible
23   ways to solve a problem that threatened the
24   viability of Marvel.
25       Q.    But what was the source of the
```

Page 91

1                              Longstreth

2    financing?

3         A.    Well, among other things, there was the

4    Andrews offer and then there's also something from

5    Icahn, which I didn't fully understand.  But there

6    may have been other approaches.  I don't know.  The

7    minutes don't make that clear.  But what they do

8    make clear is that the negative covenants were a

9    complete obstacle to doing anything, and that's why

10   the minutes suggest that the only solution to this

11   is to file for a chapter.

12        Q.    Were you aware of whether this Icahn

13   proposal that you referred to had as a condition

14   anything to do with a waiver of the covenants of

15   the notes?

16        A.    I'm not aware of that.  I don't know.

17             MR. CLARK:  Let's go off the record for

18        a minute while we change the tape.

19             THE VIDEOGRAPHER:  The time is 12:09

20        p.m., April 13, 2006.  This completes Tape

21        Number 1 of the videotaped deposition of

22        Mr. Bevis Longstreth.

23             (Longstreth Exhibit 3, Document on High

24        River Limited Partnership letterhead, dated

25        December 10, 1996, marked for identification,

Page 92

                              Longstreth

1

2          as of this date.)

3                (Longstreth Exhibit 4, Document on High

4          River Limited Partnership letterhead, dated

5          December 19, 1996, marked for identification,

6          as of this date.)

7                (Discussion off the record.)

8                THE VIDEOGRAPHER:  The time now is 12:12

9          p.m., April 13, 2006.  This marks the

10         beginning of Tape Number 2 of the videotaped

11         deposition of Mr. Bevis Longstreth.

12               MR. CLARK:  Now, while we were off the

13         record, I asked the court reporter to mark as

14         Longstreth Exhibit 3 a document that appears

15         to be dated December 10, 1996, on the

16         letterhead of High River Limited Partnership

17         and I asked to have marked as Longstreth

18         Exhibit 4, a December 19, 1996 letter on the

19         same type of letterhead.

20         Q.    Have you seen those documents before?

21         A.    Yes, I have.

22         Q.    You reviewed those in connection with

23    your report?

24         A.    I did.

25         Q.    Take as much or as little time as you

Page 93

1                              Longstreth

2    need to read these.  My question to you is whether

3    anywhere in these documents there's an indication

4    that whatever proposal Mr. Icahn and High River

5    Limited Partnership was making to Marvel to provide

6    the financing it talks about, whether there was any

7    condition that you can find related to a waiver of

8    the covenants in the holding company notes.

9         A.    Well, what these letters say is that

10   they want permission to conduct due diligence,

11   through which they would discover these covenants,

12   I trust, and realize that they have to do something

13   about it.

14        Q.    Well, let's take that.

15        A.    So, I see -- there's not a statement in

16   here about the negative covenants.  That's true,

17   but --

18        Q.    On its face --

19              MR. FRIEDMAN:  Please, the witness

20        was --

21        A.    I don't see why there would need to be

22   any reference to it at all at this preliminary

23   stage.

24        Q.    There is no stated condition to the

25   proposal as articulated in these two letters that

Page 94

1                          Longstreth

2    involves any waiver of any covenants in any of the

3    indenture notes?

4         A.    No, but you're an experienced lawyer, as

5    am I, and you know that in this kind of a letter,

6    you wouldn't dream of putting in such a thing.

7    What you say is, I'm going to do due diligence.

8    Due diligence is designed to turn up all the

9    problems.  You don't put the problems in an

10   offering letter.  You put the opportunities in the

11   offering letter and say, I'm subject to due

12   diligence, we're prepared to move forward.

13        Q.    So you think that Mr. Icahn was going to

14   perform due diligence, and in that diligence, you

15   think he was going to discover the existence of the

16   note indentures and the negative covenants?

17             MR. FRIEDMAN:  I object to the form of

18        the question.

19             MR. CLARK:  It's just a question.

20        Q.    Is that your testimony?

21        A.    I think due diligence and the way these

22   things are done, the subject to confirmatory due

23   diligence, that is a phrase that embraces any and

24   all possibilities that we discover that could put a

25   crimp in our deal, and we'll have to address those

Page 95

```
 1                        Longstreth

 2   after we discover them.  It's a hold, that's all.

 3        Q.     Let me approach it differently.

 4               Is it your belief, based on everything

 5   that you've read and all the work you've done in

 6   connection with this matter, that as of December

 7   10th and December 19, 1996, Mr. Icahn and High

 8   River Limited Partnership were or likely were

 9   unaware of the existence of the negative covenants

10   in the note indentures?

11        A.     I have no idea.

12        Q.     Were they holders of the notes that were

13   covered by those indentures at that time?

14        A.     I think they were.

15        Q.     And as a matter of prudent management of

16   one's own financial affairs, would you expect that

17   Mr. Icahn would have familiarized himself, or his

18   advisors would have, with the terms that govern the

19   notes that he had purchased?

20        A.     Not necessarily.  The --

21        Q.     Okay.

22        A.     Not necessarily.

23        Q.     But in reading these two documents,

24   Exhibit 4 -- Exhibits 3 and 4, no indication that

25   there's any condition on the Icahn proposal related
```

Page 96

1                          Longstreth

2     to a waiver of the note covenants, correct?

3          A.    I didn't say that.  I said it's subject

4     to confirmatory due diligence which covers the

5     water front.

6          Q.    Yeah, now answer my question.

7               MR. CLARK:  Would you read it back,

8          please?

9               MR. FRIEDMAN:  Objection.  Objection to

10         your question, it's been asked and answered.

11              MR. CLARK:  I'm going to ask it as many

12         times as it takes to get the straight answer,

13         which is no.

14         Q.    Is there anything in either of these two

15    letters, Exhibits 3 and 4, that on the face of

16    these letters indicates that there is a condition

17    to Mr. Icahn's proposal based on a waiver of the

18    note covenants?

19         A.    No.

20         Q.    It didn't take that many tries.

21              Going back to your answer to Exhibit 2,

22    the next paragraph, that's the one we were just

23    looking at.

24         A.    Yeah.

25         Q.    It starts, These minutes capture with

Page 97

1                          Longstreth

2    dramatic affect?

3         A.    Yes.

4         Q.    At the end of this paragraph, you say,

5    It is highly likely that there were many other

6    instances of impairment of the more than three-year

7    period between the issuance of the first tranche of

8    notes in the Chapter 11 filing.  Do you see that?

9         A.    Yes.

10        Q.    Please identify for us each and every

11   such instance of impairment that you're referring

12   to here.

13        A.    I don't have any specific impairments.

14   I'm -- I'm simply estimating or judging that it is

15   likely they occurred.  This is an -- Marvel was an

16   acquisitor, a company, as I understand it, that

17   liked to acquire other companies, and you have a

18   choice of acquiring them for debt or equity or some

19   combination.

20             And so, in that respect alone, it is --

21   I'm saying, it's likely there were other occasions

22   where the range of possible ways to finance an

23   acquisition was constrained.

24        Q.    You know of no single instance in which

25   that was the case, correct?

1                           Longstreth

2        A.    Not definitively.  That's right.

3        Q.    Other than definitively, do you know of

4   any other -- any instance in which there was this

5   impairment?

6        A.    There was a company that was acquired

7   for debt, for term bank debt.  What's the name of

8   that?

9        Q.    Skybox?

10       A.    Skybox.

11       Q.    Okay.

12       A.    And that's an example.  I mean, it is --

13   it is -- it is strange for a $3 billion company to

14   use bank debt, which grew from 250 to 650 over this

15   period.  It seems to me it's strange anyway to use

16   that kind of bank debt, term bank debt, which is

17   pretty short-term compared to long-term notes or

18   compared to equity to acquire a company.

19       Q.    You --

20            MR. FRIEDMAN:  He's still answering.

21       Q.    I'm sorry, he's still answering.  Go

22   right ahead.

23       A.    No, I'm through.

24       Q.    I thought so.  You're no expert on

25   financing of acquisitions by entertainment --

Page 99

                              Longstreth

1

2          A.     No.

3          Q.     Comic book, sticker and --

4          A.     I said I was not.  I'm informed in part

5    by the expert opinion of Mr. Carron is it?  I

6    think.

7          Q.     Your report, you said earlier, your

8    opinions and conclusions are not based on any other

9    expert's opinion, right?

10         A.     Before, that's right.

11         Q.     Now, the next couple of paragraphs --

12         A.     So, in -- in that respect, I was

13   conflating two things, but all I say in this

14   expert's report is that, in my judgment, it was

15   likely that there were other instances, many other

16   instances.  And I have no proof of that, I'm just

17   rendering a judgment.

18         Q.     And you have no professional expertise

19   in that area as well?

20                MR. FRIEDMAN:  I object to the form of

21         the question, what --

22         Q.     I'm asking you that question; is that

23   true?

24                MR. FRIEDMAN:  What is the area?

25         Q.     Of financing, of acquisitions by

Page 100

1                          Longstreth

2    entertainment, comic book, sticker or trading card

3    businesses, you have no expertise in that area,

4    right?

5        A.    In that limited area.

6        Q.    Now, the next several paragraphs, you

7    talk about the Skybox acquisition.

8        A.    Right.

9        Q.    And if I get the gist of this right,

10   you're saying that -- well, let's take it in

11   pieces.

12              Under the Marvel III notes -- do you

13   recall what the face amount of the Marvel III notes

14   was?

15       A.    No.

16       Q.    125 million, does that sound about

17   right?

18       A.    I don't remember.

19       Q.    It was.  The Marvel III notes, as you

20   indicate here, were cash.  They had to pay interest

21   semi-annually, right?

22       A.    That's right.

23       Q.    And the offering memorandum indicated

24   that a principal source of cash to make those

25   payments would be payments being made by Marvel

Page 101

1                          Longstreth

2   presumably to, directly or indirectly to Marvel III

3   under a tax-sharing arrangement, correct?

4        A.    Yes.

5        Q.    And you point out that were Mr. Perelman

6   and his affiliates' ownership of Marvel common

7   stock to drop below 80 percent, then if I

8   understand what you are saying here, that

9   tax-sharing arrangement would no longer be viable

10  or available --

11       A.    Yes.

12       Q.    -- as a source of cash to make those

13  interest payments, correct?

14       A.    Yes.

15       Q.    So, what you're indicating or suggesting

16  is that for these reasons, Mr. Perelman would not

17  want that tax-sharing arrangement, that tax-sharing

18  arrangement to be terminated, to be threatened by a

19  dilution?

20       A.    Yes.  Well, the holding companies, if I

21  understand it correctly, had -- their sole asset

22  was the stock of Marvel, so they would have no

23  means of meeting the interest payments.

24       Q.    Now, did you -- I didn't see it on your

25  list, but did you ever -- did you know there was a

Page 102

1                              Longstreth

2      tax-sharing agreement that governed this

3      arrangement?

4           A.    I think I assumed there was.  I don't

5      think I saw it.

6           Q.    Right, you've never reviewed it.  Do you

7      know, under that arrangement, how long Marvel made

8      these tax-sharing payments up to Marvel III?

9           A.    How long it had done so?

10          Q.    Yeah, how long did it make payments?

11          A.    I don't know.  I didn't look at that.

12          Q.    Are you aware that starting in 1995,

13     Marvel actually received payments under the

14     tax-sharing arrangement and didn't make them.  It

15     got money, it didn't pay money; were you aware of

16     that?

17          A.    No.  How do you mean?  Would you explain

18     that a little further?

19          Q.    Sure.  It's the fact that with respect

20     to 1995, Marvel was paid approximately $15 million

21     cash under this tax-sharing arrangement.  And with

22     respect to 1996, Marvel was actually paid somewhere

23     in the range of 10-and-a-half-million dollars under

24     this tax-sharing arrangement.

25                To the extent that Marvel was receiving

1                        Longstreth

2    those payments for 1995 and 1996, you'd agree with

3    me, would you not, that that was a benefit to

4    Marvel?

5         A.    Yeah, on its face.  On the basis of just

6    what you've told me, it would appear to be a

7    benefit.

8         Q.    Now, the other thing, sir, you point to

9    the loss of this source of income under the

10   tax-sharing arrangement as one reason that

11   Mr. Perelman would have an interest in preventing

12   Marvel from issuing stock that would dilute his

13   holdings to less than 80 percent, right?

14        A.    Yes.

15        Q.    And then you offer a second reason why

16   he would be so incentivized, and that was the fact

17   that -- a deconsolidation of that, going below 80

18   percent would trigger a right on the part of the

19   holders of the Marvel III notes to require that

20   their bonds be repurchased at 101 percent of face

21   value, correct?

22        A.    Yes.

23        Q.    Now, Marvel III was obligated under the

24   terms of the notes at some time to pay off the

25   purchase -- face amount, the $125 million, right?

Page 104

1                           Longstreth

2        A.    Yes.

3        Q.    So this provision involved a, what I

4    call a one percent penalty, in effect, on Marvel

5    III or for an early repurchase, correct?

6        A.    Well, it's more than that.  It's one

7    percent cost plus the loss of the term of the

8    notes.

9        Q.    Right.  The face -- one percent in

10   addition to the obligation to pay back the $125

11   million face amount of the notes?

12       A.    Over time?

13       Q.    Right.

14       A.    Yeah.  I mean, it's essentially a put

15   or --

16       Q.    Right.

17       A.    And I'd call it essentially equivalent

18   to a default.

19       Q.    Now, if the face amount --

20       A.    Acceleration.

21       Q.    You through?

22             If the face amount of the notes was $125

23   million, then the one percent penalty is

24   $1,250,000, right?

25             Correct?  You've got to articulate it.

Page 105

1

2          A.      Yes.

3          Q.      Do you have any -- based on all the work

4    you've done, do you have any understanding or

5    knowledge of whether $1,250,000 was a material sum

6    to Mr. Perelman in 1996?

7          A.      I don't know, but I think it's important

8    to understand that an acceleration is what's

9    painful here.

10         Q.      Going on to the next -- actually, let's

11   go off the record.

12                 MR. CLARK:  The time is 12:30 p.m. and

13            we are going off the record.

14                 (Discussion off the record.)

15                 (Lunch recess.)

16                 (Time noted:  12:30 p.m.)

17

18

19

20

21

22

23

24

25

Page 106

1

2                    A F T E R N O O N    S E S S I O N

3                    (Time noted:  1:02 p.m.)

4      B E V I S    L O N G S T R E T H, resumed and

5          testified as follows:

6      EXAMINATION (Cont'd.)

7      BY MR. CLARK

8               THE VIDEOGRAPHER:  The time is 1:02 p.m.

9          and we're back on the record.

10              (Discussion off the record.)

11              THE VIDEOGRAPHER:  1:02, we're going off

12         the record.

13              (Longstreth Exhibit 5, Answer to

14         Question 2 of Mr. Longstreth's report, marked

15         for identification, as of this date.)

16              THE VIDEOGRAPHER:  The time is 1:05 p.m.

17         and we're back on the record.

18         Q.    Mr. Longstreth, before we broke for

19    lunch, we were talking about Skybox acquisition in

20    1995.  Do you recall?

21         A.    Yes.

22         Q.    Going to the second last paragraph of

23    your answer to question 2 in your report, you talk

24    about, in the latter part of that paragraph, you

25    say, Although the issuance of Marvel common stock

Page 107

1

2    would certainly have been one way of raising $150

3    million -- that's the price of Skybox, right;

4    that's what you're talking about there?

5        A.    Yes.

6        Q.    It is obvious that given the dire

7    consequences to Marvel III and so doing, Perelman

8    and his colleagues would have had a strong interest

9    in avoiding any exploration of a stock offering,

10   even if it was clearly the best alternative for

11   Marvel and all of its shareholders.

12           That last phrase, all of it's

13   shareholders, you include Mr. Perelman in there,

14   right?

15       A.    I do.

16       Q.    The dire consequences that you refer to

17   in this sentence, those are the same things we were

18   talking about just before lunch, right?  Number 1:

19   The loss of Marvel's theoretical obligation to make

20   tax-sharing payments to the holding companies,

21   right?

22       A.    Yes.

23       Q.    And then, The acceleration of one

24   percent premium payment to the Marvel III

25   noteholders, right?