1

2      A.    Did you say the acceleration and?

3      Q.    And, yes.

4      A.    Thank you.

5      Q.    Yes, I did.  Yes.  Those are the --

6  there aren't any other dire consequences that

7  you're aware of?

8      A.    Not that I know of.  And loss of

9  consolidation, but that's part of the loss of the

10  tax-paying arrangement.

11      Q.    And so far as you're aware, Marvel was

12  restricted in its ability to make and finance this

13  acquisition by the terms of its own outstanding

14  debt facilities; is that correct?

15      A.    Was restricted in using it to -- in the

16  way it could do it?

17      Q.    In it's ability to make a financial

18  transaction by its own --

19          MR. FRIEDMAN:  Can I have the whole

20      question read back, please?

21          MR. CLARK:  I will just repeat it.

22      Q.    So far as you're aware, Marvel was

23  restricted in its ability to make and finance that

24  Skybox acquisition by the terms of its own

25  outstanding debt facilities; is that your

Page 109

1

2    understanding?

3        A.    It was -- my understanding is that there

4    were restrictions.  I don't think there were

5    exactly the same restrictions as applied to the --

6    to Marvel because of the indenture, because of the

7    note indenture.

8        Q.    Right.  When you say that applied to

9    Marvel, you're not retracing your testimony from

10   this morning, are you?  You agree that Marvel --

11       A.    I'm saying --

12       Q.    -- as a technical legal matter was not

13   bound by --

14       A.    I did.  But I also say, de facto, they

15   were bound.  They submitted themselves to the

16   covenants and treated them as binding on them.

17   I've said that before.

18       Q.    Sure.

19       A.    Each time you say one thing, I say the

20   other.

21       Q.    And let's flesh that out a little bit.

22   Let's say that Marvel, for whatever reason, went

23   out and issued stock, tried to issue stock in

24   connection with this transaction, you know, $150

25   million worth of stock.  And noteholders rushed

1

2      into the court of chancery, at the court of equity

3      and said, I want a preliminary injunction against

4      Marvel from issuing that stock because that is a

5      violation of the covenants in my notes.

6                  What would the court say, do you think?

7      As a practical matter, what would the court say in

8      that circumstance?

9          A.      They'd go in and say it's a tortuous

10     interference with an advantageous contractual

11     relationship which they know all about and are

12     subject to.  And if it weren't so, they would have

13     made disclosure in their SEC filings that they were

14     prepared not to comply with these obligations

15     instead of suggesting, as they have, that they are

16     subject to them.

17         Q.      So Marvel would be enjoined --

18         A.      It would be a complicated decision.

19         Q.      And they'd be enjoined because of a

20     theory of tortuous interference?

21         A.      That's one theory, yeah.

22         Q.      But they wouldn't be enjoined because of

23     a theory that they were contractually bound by

24     those covenants, correct?  That's your

25     understanding?

Page 111

1

2      A.      I think that's probably right.

3      Q.      Now, you said here, you mentioned here

4   about Perelman's strong interest in avoiding a

5   stock offering.  And then you used the phrase, Even

6   if it was clearly the best alternative for Marvel

7   and all of its shareholders.

8              You're not contending, as an expert, are

9   you, that issuing stock in this acquisition was, in

10  fact, the best alternative for Marvel to finance a

11  deal, are you?

12     A.      I don't know.

13     Q.      You don't have the expertise to form a

14  conclusion about that, do you, about whether that

15  was the best alternative?

16     A.      Based on what I now know, I don't have

17  the expertise.

18     Q.      Presumably, would you agree that the

19  financial advisors to Marvel in connection with the

20  Skybox deal would have been in a better position

21  with better expertise than you to make that

22  judgment?

23     A.      Who?

24     Q.      The financial advisors who were advising

25  Marvel in connection with that transaction.

1

2            MR. FRIEDMAN:  In the actual

3       transaction?

4            MR. CLARK:  Yes.

5       A.    I don't know who the financial advisors

6    were.

7       Q.    So, perhaps they wouldn't have been in a

8    better position than you are today to make that

9    judgment?

10      A.    If they were -- if they had been

11   retained by Mr. Perelman and had relationships with

12   Mr. Perelman other than solely as a director of

13   Marvel, I don't care how good they are, they would

14   be conflicted and therefore their judgments would

15   be suspect.

16      Q.    Do you know -- you have no factual basis

17   to believe that Mr. Perelman hired Marvel's

18   financial advisors on that transaction?

19      A.    I don't know if there were financial

20   advisors on the transaction.

21      Q.    If Marvel management made the

22   judgment -- well, if Marvel management and the

23   Marvel board of directors made the judgment in 1995

24   that bank debt financing was the best alternative

25   for Marvel and its shareholder in making the Skybox

1

2    acquisition, you have no factual basis or financial

3    expertise to dispute that conclusion; is that

4    correct?

5        A.    That's correct.  All I was saying was

6    that the negative covenants reduced the options

7    available to be considered by any financial

8    advisors that might have been retained.

9        Q.    Now, you refer in the last paragraph to

10   the answer to question 2, to the possibility of

11   creating a committee that consisted solely of

12   independent Marvel directors.  That's what in the

13   trade we call a special committee.  Do you

14   understand that phrase, special committee?

15       A.    Yes, I understand the phrase.  I don't

16   think it's necessarily a term that applies to --

17   exclusively to what I'm talking about.

18       Q.    Well, are you aware, based on your

19   review of all the things you looked at, the work

20   you did in this case, are you aware of any

21   instances in which the Marvel board of directors

22   did designate such a committee of independent

23   directors to deal with proposals or issues

24   involving Mr. Perelman and potential conflicts of

25   interest?  Are you aware that that happened?

1

2      A.    Well, we touched on that earlier, didn't

3  we?

4      Q.    We did.

5      A.    And I think I read in some -- in a press

6  conference or a press release or some kind of

7  release relating to the consideration of the

8  Andrews offer that there was an intention -- an

9  intention to create -- I don't know if it was

10  created -- a committee of independent directors to

11  consider that offer.

12      Q.    Which I think you said earlier would

13  be -- would have been the appropriate thing to do

14  under the circumstances?

15      A.    I do think so.

16      Q.    Were you aware that there was a tender

17  offer by Mr. Perelman for Marvel stock in 1993?

18  Are you aware of that transaction?

19      A.    That's where he got to his 80 percent.

20      Q.    That's correct.

21      A.    I'm vaguely aware of it.

22      Q.    Are you aware that there was a special

23  committee of independent directors designated by

24  the board?

25      A.    I'm not.

1

2      Q.    If there was, that would have been the

3  appropriate thing to do under the circumstances?

4      A.    Yes.

5      Q.    Are you aware --

6      A.    Was there?

7      Q.    Yes, there was.

8            Based on your work and your review in

9  this case, are you aware of any transaction to

10  which Marvel was a party or proposed to be a party,

11  where Mr. Perelman was on the other side and the

12  Marvel board didn't establish a special committee

13  of independent directors to deal with the

14  situation?

15      A.    The issuance of these notes, these three

16  tranches of notes.

17      Q.    Well, but you told me that Marvel wasn't

18  a party to those contracts, right?

19      A.    Well, yes.  We don't need to reiterate

20  what we've been saying.

21      Q.    Right.  So, are you aware of any

22  transaction in which Marvel was a party or proposed

23  to be a party and Mr. Perelman was on the other

24  side of the transaction in which the Marvel board

25  of directors didn't establish a special committee

Page 116

1

2    of independent directors to deal with the

3    conflict -- the theoretical potential conflict

4    situation?

5         Are you aware of any instance where that

6    occurred?

7         A.    I'm not.

8         Q.    Now, in your report, you bring together

9    questions 3 and 4 -- or you answer questions 3 and

10   4 together.  I'd like to explore those a little

11   bit.

12        The first question talks about you being

13   a director and learning that the holding companies

14   were going to issue the notes on the terms --

15        A.    Yes.

16        Q.    -- that they eventually were and you

17   were asked if you thought you had -- would have had

18   an obligation to take any action and try and

19   determine whether the issuance of the notes could

20   have any affect on Marvel.

21        And then the second question talks about

22   whether it would have been appropriate for

23   Perelman, Bevins and Drapkin to be involved in

24   discussions between Marvel and the holding

25   companies since they were on both boards, right?

1

2      A.    Yes.

3      Q.    If I understand the first part of your

4  answer, what you'd have done in those circumstances

5  is to ask Mr. Perelman to disclose all material

6  facts on his conflict in the transactions to the

7  Marvel directors, right?

8      A.    Right.

9      Q.    Do you know whether those facts were

10  indeed disclosed to or known by the Marvel

11  directors at the time of these transactions?

12      A.    I don't know.  I know that there is no

13  record of this.  In the minutes, there seems to be

14  no record of the note issuance plan being presented

15  to the board for consideration.

16      Q.    But if the directors who actually served

17  at this time said they were aware of those facts,

18  they knew that Mr. Perelman was planning these

19  transactions, they knew Mr. Perelman obviously

20  owned 80 percent of the company or 60 percent in

21  the first instance, you'd have no basis to dispute

22  that?

23      A.    If they knew, you're saying --

24      Q.    Yeah, if the directors knew --

25      A.    -- would I have a basis for saying they

Page 118

1

2    didn't know?

3        Q.    Right.

4        A.    No, I'd have no basis for disputing it.

5    What I am saying is that if they were performing

6    their duties as independent directors correctly,

7    they wouldn't have allowed this transaction to go

8    forward the way it did.

9        Q.    Now, in the third paragraph to that

10   answer, you talk about the security for the notes,

11   including these negative covenants, wherein those

12   issuers -- these are the holding companies, right?

13       A.    Yes.

14       Q.    -- would agree to exercise their power

15   to restrict Marvel in a variety of ways.

16            What power did the note issuers have to

17   restrict Marvel; what are you talking about there?

18       A.    Well, Perelman owned the issuers 100

19   percent.  He controlled them.  So they were simply

20   instrumentalities of Mr. Perelman.

21       Q.    Right.

22       A.    And they had agreed to cause Marvel,

23   their subsidiary, to comply with these covenants.

24   So, I'm talking about the power that they have as

25   controlling shareholders to cause compliance.

Page 119

1

2      Q.    And what is that power?  What does a

3  shareholder have in terms of power to cause a

4  corporation to do what it wants if the corporation

5  and its board otherwise doesn't want to do it?

6  What is that power?

7      A.    Well, they can remove the directors and

8  put in a new team of directors.

9      Q.    That's all they can do, isn't it?  Isn't

10  that the power you're referring to, the power to

11  remove and replace the board?

12      A.    Well, that's the ultimate power.  The

13  intermediate power is if -- if the board doesn't

14  want to lose their jobs, they go along with what

15  they're being told to do.

16      Q.    Isn't that the same thing you just said?

17          Isn't that removing and replacing the

18  board; that's the power that a majority shareholder

19  has to cause the board of directors of a

20  corporation to do what he wants them to do?

21      A.    Ultimately, yes.

22      Q.    And there isn't any other power that you

23  were referring to here?

24          MR. FRIEDMAN:  Where's the here in that

25      question?

Page 120

1

2          MR. CLARK:  Power to restrict Marvel in

3     a variety of ways.

4      Q.    That's the power, right?

5      A.    Yes.  I think that's --

6      Q.    Yeah.  I just want to make sure I've

7   covered the water front.  To your knowledge, was

8   this power, that is, the power to remove and

9   replace members of the board of directors of

10  Marvel, ever threatened or exercised to obtain

11  Marvel's approval or acquiescence of the notes?

12     A.    I don't know.

13     Q.    You don't know if it was?

14     A.    No. I mean, what -- what is clear, I

15  think, is one, the Marvel board did not consider

16  these transactions and approve or disapprove them

17  or negotiate over them.

18          What is clear beyond that is that

19  despite the absence of that, the Marvel executives

20  and legal counsel and auditor participated fully in

21  achieving the offering of these three tranches of

22  notes, including giving, in the case of the legal

23  counsel, giving an opinion which was -- is in my

24  experience, substantially equivalent to an opinion

25  that you would give and be asked to give if you

Page 121

1

2    were issuing the notes yourselves.

3             I mean, in other words, they

4    participated fully in a financing that had all the

5    earmarks of a financing that they were engaged in

6    themselves.

7             So, somehow that happened; is their

8    cooperation, and its very full cooperation was

9    achieved without the board taking any formal action

10   or getting involved.  I don't know what went on to

11   make that happen, but it happened.

12       Q.    Right.  Just, my question is, do you

13   have any basis in fact to assert that Mr. Perelman

14   and the holding companies exercised their power to

15   threaten or actually remove or replace directors in

16   order to obtain all that cooperation you just

17   talked about?

18       A.    I have no evidence, except the -- I have

19   no evidence except the facts that I just recited,

20   which indicate the power was being exercised.  And

21   the reason for that is that this transaction had

22   zero benefit for Marvel and total benefit for one

23   individual, Mr. Perelman.  And yet this company,

24   which got nothing out of it, cooperated as fully as

25   they would have been involved in a note offering

Page 122

1

2    where they got the proceeds themselves.

3            So that has to be explained.  And so

4    it's all circumstantial evidence to lead me to

5    conclude that the control I'm describing was

6    exercised in some way.  I'm just looking at the

7    results, not the process.

8        Q.    Now, if the directors, the independent

9    directors of Marvel were to testify that, in fact,

10   they were never -- knew all the facts, they were

11   never threatened, hondled, cajoled or approached in

12   any way, shape or form to cause Marvel to do or not

13   do anything with respect to these notes, you

14   wouldn't have any basis to dispute that, would you?

15       A.    I'd only have the result.

16       Q.    Other than the result, you have no facts

17   to suggest that anybody was threatened with this

18   power that you say the majority shareholder had?

19       A.    It's a res ipse loquitor, if I remember

20   that from my practice.

21       Q.    Is the answer to my question, yes, you

22   have no evidence to support any assertion that that

23   power -- I withdraw it.

24            MR. FRIEDMAN:  Obviously the transcript

25       should reflect everything that was said to the

Page 123

1

2          extent you transcribed it.

3                    MR. CLARK:  Sure, sure, of course.

4                    THE WITNESS:  To the extent you got it.

5          Q.    Okay.  Now, going over to the fourth

6      paragraph -- going over to the fourth paragraph of

7      your answer to questions 3 and 4, start again with

8      the reference to the power, the share power.

9          A.    Share power.

10          Q.    That's the same thing, just the power to

11      elect and remove directors?

12          A.    That's right.

13          Q.    And you know as a fact that that power

14      was not actually exercised, right?  You saw nothing

15      in the record to indicate that a director was

16      removed or replaced by Mr. Perelman in connection

17      with the issuance of the notes; is that correct?

18          A.    No, it isn't correct.

19          Q.    Okay.  I'd like to know where in the

20      record you saw evidence that Mr. Perelman removed a

21      director of the Marvel board during this period?

22          A.    Have you ever seen -- well, I'm going to

23      answer your question.  Have you ever seen a

24      sheepdog corral sheep?  You know what happens?

25      They don't -- the dog doesn't go bite the sheep.

Page 124

1

2    The dog looks at the sheep and the sheep goes where

3    it's supposed to go.  That's a perfect analog to

4    what the results in this case suggest happened.

5        Q.    Okay.  But you understand --

6        A.    There's no thumbscrew involved, there's

7    a look.

8        Q.    You understand that Mr. Perelman did not

9    remove and replace a single director of the Marvel

10   board in connection with the issuance of these

11   notes?

12       A.    And I have --

13       Q.    Is that correct?

14       A.    That's correct.

15       Q.    Okay.

16       A.    And I assert that's because he exercised

17   the power he had.

18       Q.    Now, there's nothing wrong -- there was

19   nothing wrong, was there, in your view, in

20   Mr. Perelman borrowing money and using his Marvel

21   stock as collateral for that loan?

22       A.    That's correct.  If that were all he

23   did, we wouldn't be here.

24       Q.    And Mr. Perelman, he didn't have any

25   duty to share the proceeds of such a borrowing with

Page 125

1

2   Marvel, did he?

3       A.    No.

4       Q.    In fact, he could have, instead of

5   borrowing money and using the stock as collateral,

6   he could have just gone out and sold the stock to

7   anybody he wanted to get the money and Marvel

8   would've have nothing to say about that; is that

9   true?

10      A.    True.

11      Q.    Now, you go on a little further down in

12  this paragraph to say that, As an independent

13  director, it would be obvious to me that Perelman

14  could not be expected to discharge his fiduciary

15  duty to Marvel as both its controlling shareholder

16  and a director, while at the same time seeking to

17  restrict Marvel's ability to conduct its affairs in

18  order to sell the notes and secure the net proceeds

19  therefrom for himself personally, without any

20  benefit to Marvel.

21          What you're saying there is, if I

22  understand it, it would have been obvious to you

23  that Mr. Perelman --

24      A.    Was conflicted.

25      Q.    Right.  That's what you're saying,

Page 126

1

2    right?

3         A.    Was conflicted.

4         Q.    If it would've been obvious to you that

5    he was conflicted, is it fair to say that it

6    probably would've been obvious to the people who

7    were the actual independent directors at that time?

8         A.    I'd say it should have been obvious to

9    them.

10        Q.    By the way, do you know who the

11   directors of Marvel were during this period of

12   time?

13        A.    I remember a list of them.  Frank

14   Gifford was one of them.

15        Q.    Do you know Mr. Gifford?

16        A.    No.

17        Q.    Other than seeing him on Monday night

18   football for a number of years and kicking for the

19   Giants or whatever he did for the Giants?

20        A.    No.

21        Q.    Do you personally know any of the other

22   gentlemen on the board?

23        A.    No, I don't.

24        Q.    Do you know Michael Fuchs?

25        A.    I think I do.

Page 127

1

2      Q.    Did you know Michael Fuchs was the CEO

3  of Home Box Office for a period of time, that

4  Michael Fuchs?

5      A.    I wonder if I've got the right guy.  Do

6  you know Michael Fuchs?

7      Q.    I do know Michael Fuchs and my question

8  to you is, don't you and he sit on the board of

9  trustees of The New School together?

10      A.    That's what I was going to ask you.

11      Q.    Right.  That's your belief?

12      A.    That's my belief.

13      Q.    And based on your dealings with

14  Mr. Fuchs, do you have any reason to question his

15  honesty and his integrity?

16      A.    No, not his honesty or his integrity.

17      Q.    Do you have any basis to question the

18  honesty or integrity of any of the members of the

19  Marvel board of directors?

20      A.    Was Mr. Fuchs on this board when the --

21  when the --

22      Q.    Yes, he was.

23      A.    I see.  I didn't remember his name on

24  the minutes.

25      Q.    I don't know if he's on the minutes or

1

2    not, but he was on the board.

3        A.    I see.

4        Q.    Do you have any basis to question the

5    integrity or honesty of any of the independent

6    directors of Marvel --

7        A.    No, I do not have any basis to question

8    the honesty or integrity of any of the board

9    members.

10        Q.    Now, a little further on, next

11    paragraph, you say, In my experience, it is

12    commonplace for conflicted directors to disclose

13    the nature of their conflict to those on the board

14    not so conflicted.

15            Do you have any reason to believe that

16    Mr. Perelman didn't disclose any potential

17    conflicts that he might have had to the Marvel

18    board?

19        A.    I have no reason to form an opinion

20    about that.

21        Q.    Do you have any reason to believe that

22    when the Marvel board was required or requested to

23    take action on any matter where a potential

24    conflict with Mr. Perelman existed, that

25    Mr. Perelman and Mr. Drapkin and Mr. Bevins didn't

Page 129

1

2    recuse themselves from the deliberations as you

3    indicate should be done?

4        A.    Well, I have a reason to believe it

5    didn't happen because I asked to see the minutes of

6    all the meetings during this relevant period, and

7    there's nothing in the minutes to suggest that this

8    transaction was handled in the way I think it

9    should have been handled.

10       Q.    Well, it's different.  You're answering

11   a question I didn't ask.  Now, let's go back.

12            You say in your answer that in these

13   conflict situations, there's two duties that the

14   conflicted director has.  One is to tell the other

15   directors that he's got a conflict, right?

16   Correct?

17       A.    Right.

18       Q.    And the second is, you talk about a duty

19   to recuse, right?

20       A.    Yes.

21       Q.    By the way, where does that duty, this

22   duty to recuse come from?  Is there a statute that

23   says that?  Is there a common law case that says

24   that?

25       A.    Well, you know, they -- as well as I do,

Page 130

1

2      that if you participate in a conflicted transaction

3      under Delaware law, there's an absolute fairness

4      test.  The business judgment rule is removed from

5      the case, so...

6           Q.    That's what you're referring to?

7           A.    That's what I'm referring to.

8           Q.    Okay.  And my question to you was, do

9      you have any facts to suggest that in any situation

10     where the Marvel board was required or requested to

11     take action and the potential conflict between

12     Mr. Perelman and Marvel existed, then Mr. Perelman,

13     Mr. Drapkin and Mr. Bevins didn't recuse themselves

14     from the board's deliberations?

15          A.    Yes, these three transactions.

16          Q.    Which three?

17          A.    The board, in my judgment, was required

18     to be presented with the facts and take action, and

19     they didn't do it.  At least they didn't do it

20     insofar as the minutes of the meetings that were

21     held during this period disclosed to me.

22          Q.    And what was the action that the board

23     was required to take with respect to the issuance

24     of the holding company notes?

25          A.    Was to require to evaluate the conflict

Page 131

1

2    of interest and the impact of these covenants, and

3    indeed, the whole transaction on this company

4    before it participated in the offering.

5        Q.    And that participation consisted of

6    what?  Just so we are clear on that.

7        A.    Well, we've been over that.  It

8    consisted of leading the road show.  Bevins'

9    testimony suggests he led the road show.

10        Q.    Uh-huh.

11        A.    The general counsel gave a very complete

12    financing opinion, including a 10b-5 that couldn't

13    have been given, by the way, by any responsible

14    lawyer if these covenants -- if Marvel's board felt

15    free to ignore the covenants.  And so, that's in

16    the report.

17            But so, I think that -- that you're -- I

18    mean, this gets to the crux, the central core of

19    this case, which is the fact, there's no evidence

20    that the board considered the impact on Marvel of

21    this transaction or series of transactions.

22        Q.    Let me ask you -- let's put aside the

23    notes, okay, the note transactions, for just a

24    minute.

25        A.    Okay.

Page 132

1

2        Q.    Are you aware of any other instance

3    where the board of Marvel was required or requested

4    to take any action and a potential conflict existed

5    with Mr. Perelman where Perelman and Drapkin and

6    Bevins didn't recuse themselves, putting aside the

7    note transactions?

8        A.    I'm not aware of anything.

9        Q.    Now, going to the note transactions.

10   Your belief is that as a practical matter, Marvel

11   and its management and its directors agreed that

12   Marvel would be restricted as provided in the note

13   covenants; is that right?

14       A.    Yes.  De facto, it was -- these

15   restrictions were accepted.

16       Q.    Is there any reason you can think of,

17   based on everything you've read in this case and

18   your many years of experience in the law and in

19   business, why were that so, Marvel wouldn't simply

20   be a party to the contract?

21       A.    Which contract?

22       Q.    The indentures.

23       A.    Well, they weren't issuing the notes.

24   And the noteholders were satisfied that 80 percent

25   control gave the power necessary to cause the sub

Page 133

1

2    to comply.

3        Q.    But if the sub was agreeing to be bound

4    by the notes, why didn't they just sign the

5    contract?

6        A.    I don't know, maybe no one asked them.

7        Q.    Would've made more sense, though,

8    wouldn't it, just as a structural matter, if Marvel

9    was to be bound by these provisions, for it to sign

10    on the dotted line and say, I'm a party to the

11    contract and I'm bound?

12        A.    I don't think so.

13        Q.    As a lawyer advising Marvel under these

14    circumstances, Marvel management coming to you,

15    saying, We're going to be bound by these

16    provisions, shouldn't we be a party to the

17    contract?  You'd say what?

18        A.    I would say, I think my general instinct

19    is to, don't sign anything you're not required to

20    sign, especially if it's --

21        Q.    Why is that?

22        A.    Huh?

23        Q.    Why would you tell them not to sign if

24    they weren't required to?

25        A.    Well, no one's asked them to sign.

Page 134

1

2          Q.     But why would you tell them that?

3          A.     I would tell them it's not generally

4     wise to volunteer things.

5          Q.     Why is that?

6          A.     You might get killed.

7          Q.     It might give you the opportunity to

8     say, I'm not bound if I'm not a party to the

9     contract; that's one possibility, isn't it?

10         A.     If that was the possibility, they had to

11    say it to the noteholders, they had to say it to

12    the indenture trustee, they had to say it to the

13    SEC and to all the other investors in this company.

14    Without any question, that's the most material --

15         Q.     What is it that they had to say?

16         A.     They had to say, We, Marvel, although

17    our parent has agreed to cause us to comply with

18    these restricted covenants, which can hurt our

19    business, we want you to know that we have informed

20    the noteholders, we are not bound by them and we

21    are not necessarily going to allow them to be

22    imposed on us, and we'd have to say that to the --

23    in our filings to the SEC.  Otherwise, we're

24    materially misleading shareholders.

25         Q.     Let's say the holding companies were the

Page 135

1

2    most direct parents to Marvel, right, in the whole

3    corporate chain, because they held the stock --

4        A.    I think so.

5        Q.    -- directly.  And then at the top of

6    that chain is Mr. Perelman, who indirectly, through

7    various entities, indirectly held the stock of the

8    holding companies, which held the stock of Marvel,

9    right?

10        A.    I don't know how he held that stock.

11        Q.    But you understood that there were many

12    upstream companies besides the Marvel holding

13    companies, right?

14        A.    Yes.

15        Q.    Like --

16        A.    I didn't figure it all out.

17        Q.    No, of course not.

18        A.    MacAndrews & Forbes is one of them.

19        Q.    So these -- is it the case that if any

20    of the upstream parent companies to Marvel would

21    enter into a contract that might have some impact

22    on Marvel, that Marvel was obligated to tell the

23    world that it wasn't contractually bound; is that

24    your view?

25        A.    I can't answer your hypothetical.  All I

Page 136

1

2    can answer is, this was a -- Marvel had a tight

3    nexus to the issuance of this debt.  It --

4    everything it did to facilitate the issuance of

5    this debt, in totality, adds up to behavior

6    substantially equivalent to issuing the debt

7    itself.

8         Q.    Is everything --

9         A.    But it didn't get any benefit from the

10   debt it issued; it all went to Mr. Perelman.  And

11   what I'm saying, in this circumstance, being a

12   public company and having to enter into filings, it

13   had to make complete material disclosure, accurate

14   disclosure about material facts.

15              And I'm just saying that a material fact

16   would be whether or not they're going to consider

17   themselves bound by these covenants.  And I think

18   the record indicates what they thought about that,

19   and the lawyering that wrote these disclosure

20   documents, in my judgment, evinces an understanding

21   that Marvel's going to comply.

22        Q.    You didn't see any disclosure that said

23   that Marvel was bound by the holding company

24   indentures, did you?

25        A.    Well...