Page 137

1

2      Q.    Those words, Mr. Longstreth, Marvel is

3    bound by the holding company indentures, did you

4    see that?

5            MR. FRIEDMAN:  The witness was looking

6        at a document.

7            MR. CLARK:  Yes.

8      Q.    Yes, and I invite you to find those

9    words in there for me.  Not some other words that

10   you construe, but those words.

11     A.    Those precise words --

12     Q.    Yes.

13     A.    -- are not in this shelf registration.

14     Q.    Or in anything else that you've read?

15     A.    Nothing else that I have read.

16     Q.    Is there some SEC rule that we ought to

17   look to that requires disclosure of a registrant --

18   in a registrant's filing, that the registrant is

19   not bound by a particular contract?

20     A.    Yes.

21     Q.    What rule is that?

22     A.    It's the rule that you can't tell half

23   truths.

24     Q.    10b-5?

25     A.    10b-5.

Page 138

1

2      Q.    That's it?

3      A.    Yes.

4      Q.    Let me ask you, in your experience, have

5   you ever seen an SEC filing by a public company in

6   which the public company listed, for the world to

7   see, all of the contracts that it was not a party

8   to; have you ever seen that kind of a disclosure?

9      A.    I don't think so.

10     Q.    I don't think so.

11           Now, question 5 -- see, we're getting

12   there.

13           In the beginning of your answer to

14   question 5, you say, and you said it earlier, that

15   there was no benefit to Marvel from having these

16   restrictions imposed on it.  Marvel never agreed to

17   have those restrictions -- those restrictions

18   imposed on it, right?

19     A.    Are you asking me if it was bound in the

20   technical contractual way?

21     Q.    Marvel did not agree to be bound by

22   those restrictions; I'm asking you that, without

23   any technical legal anything.  I'm asking, in those

24   words, is that true?

25     A.    You can agree to something by behavior.

Page 139

```
 1
 2        Q.      Is that true?
 3        A.      Yes.
 4        Q.      That Marvel did not agree to be bound by
 5   the restrictions?
 6        A.      I'm saying that the behavior of Marvel
 7   indicated, it did agree to be bound by these
 8   restrictions.
 9        Q.      Well, let's look in your answer to
10   paragraph -- to question 5.
11        A.      And that's good contract law, by the
12   way.
13        Q.      Look at the second paragraph of your
14   answer to question 5.  You say at the beginning, In
15   its presentation, Perelman might have argued that
16   the restrictions -- talking about the restrictions
17   in the holding company indentures, right?
18        A.      Yes.
19        Q.      So Perelman might have argued that the
20   restrictions needn't bother Marvel because Marvel
21   was not agreeing to be bound by them; is that a
22   true statement?
23        A.      This -- what I'm trying to say here is
24   what Mr. Perelman might have argued.
25        Q.      So, if he had said to the board in his
```

Page 140

1

2    argument that Marvel was not agreeing to be bound

3    by the restrictions in the indentures, would that

4    have been a true statement, to your understanding?

5          A.     It depends when the presentation would

6    be made.

7          Q.     Before the issuance of the notes.

8          A.     Oh, before any issuance of the notes.

9    Yes, he could have said that.

10         Q.     And it would have been true?

11         A.     It would have been true.

12         Q.     Now, after the issuance of the notes, he

13   could have said that and it still would have been

14   true, right, that Marvel had not agreed to be

15   bound --

16         A.     Well, I mean, we're arguing over the

17   question of how one agrees.

18         Q.     Using the language of your report.

19         A.     Yeah.  Well, I'm saying that the

20   behavior of Marvel constituted a de facto

21   acceptance of these obligations.  That's what I've

22   been saying, I think, consistently, and -- and --

23   and...

24         Q.     If Marvel during this period of time,

25   '93 and '94, '95, '96, if Marvel had been complying

1

2  with the restrictions in its own debt facilities,

3  would that have constituted a de facto agreement to

4  be bound by restrictions in indentures to which it

5  was not a party?

6        A.    No.

7        Q.    Now, near the end of this first

8  paragraph, you say, Even if the noteholders and the

9  indenture trustee claimed that the best interest of

10  the noteholders were the same as the best interest

11  of Marvel, the fact would remain that this

12  judgment, which is a matter of corporate law, was

13  placed in the hands of Marvel's board of directors,

14  would have been taken away from that board.

15              How so?

16        A.    Because the -- the restrictions are on

17  Marvel, which were critical to the issuance of the

18  notes.  Otherwise, there wouldn't be any covenants

19  in the indenture, restrict the business that the

20  board of Marvel can engage in and place the control

21  of those restrictions in the hands of people who

22  have no fiduciary duty to Marvel.

23              So it's a huge change from the board

24  being able to pay off the bank term covenants by

25  paying off that debt or refinancing it in one way

Page 142

1

2     or the other, because they control the situation as

3     directors representing the shareholders of Marvel.

4              In this case, those restrictions are

5     under the control of the noteholders and the

6     indenture.  And those people have no fiduciary duty

7     to the shareholders of Marvel or to Marvel itself.

8     And so it's a huge shift in the power structure and

9     in the control over the business of Marvel, and

10    that's what I mean to be saying there.

11        Q.    You're not saying that the board of

12    Marvel had unilateral control over the restrictions

13    contained in its debt facilities, are you?

14        A.    I'm saying, they could get rid of them

15    by refinancing.  They can't get rid of the

16    indenture covenants.  In the note indenture

17    covenants, they don't have any way of doing that.

18        Q.    Right, because they're not a party to

19    that contract.

20        A.    No, I suppose they could pay off the

21    notes.

22        Q.    Didn't have any obligation to do so, did

23    they?

24        A.    No, and it would be an insane thing to

25    do because they are paying off someone else's debt.

Page 143

 1

 2          Q.    And its someone else's debt because

 3    someone else was the one who agreed to be bound by

 4    the indenture?

 5          A.    Yes, well, someone else, yeah, monetized

 6    his asset.

 7          Q.    Now, but coming back to Marvel's board's

 8    control of the restrictions in Marvel's debt.

 9                My point is that there would be someone

10    else that would have a say in whether Marvel could

11    refinance that debt, wouldn't there be?

12          A.    No.

13          Q.    The lender?

14          A.    The lender -- the bank term -- the term

15    bank loans could be repaid.

16          Q.    With what?

17          A.    With cash.

18          Q.    From where?

19          A.    Well, that's up to Marvel's board.

20          Q.    Well, let's say they don't have the

21    cash.  You say refinance.  I took that to mean they

22    go out and borrow the money somewhere else and pay

23    off the existing bank loan and get rid of the

24    restrictions that way.

25          A.    No, they could issue stock or they could

Page 144

1
2    issue debt.

3        Q.    Not if their debt said they couldn't do

4    it without the board's consent, right?

5        A.    Which debt?

6        Q.    Without the bank's consent.  If there

7    were covenants in the bank debt that said Marvel

8    couldn't go out and issue stock or incur other debt

9    without the bank's consent, they couldn't do it

10   without paying off the bank, right?

11       A.    Oh, no, but why would they do it?  I'm

12   talking about a refinancing.

13       Q.    Right.

14       A.    I'm saying that they have -- the board

15   has the power to find, to source some money and pay

16   off the banks which held the power over these

17   covenants.

18       Q.    And it's entirely possible that the new

19   source of financing would insist on the same or

20   even more restrictive covenants as a condition of

21   making the new loan.  That's entirely possible,

22   right?

23       A.    It's not totally impossible.

24       Q.    Okay.  I'll take that formulation of it.

25             So the board --

Page 145

1

2      A.    It would be totally impossible if they

3  were issuing stock to derive the proceeds necessary

4  to pay off the debt.

5      Q.    What's that?

6      A.    If they sold stock and -- the

7  stockholder is not going to impose those covenants.

8  That would be very strange.

9      Q.    But if the bank had imposed a limitation

10 on Marvel's ability to issue stock, the bank could

11 tell them they can't do that, right?

12     A.    No, no.

13     Q.    Why not?

14     A.    Because their bank's being taken out.

15     Q.    Not if the bank says you can't issue

16 stock and they have the right to say that.

17     A.    No.  If they -- the company has the

18 right to prepay the debt, the bank debt.

19     Q.    Maybe they do and maybe they don't.

20     A.    I think they did.

21     Q.    My only point, Mr. Longstreth, is that

22 when you take the position that the board had

23 unilateral control over the restrictions that

24 applied to Marvel on account of its own debt,

25 that's not entirely so because they do have to

Page 146

1

2    comply with whatever their obligations are to the

3    lender of the debt, whatever the bank -- the

4    contract says, right?

5        A.    They created the relationship and they

6    can terminate it.

7        Q.    Under the terms of the contract?

8        A.    Yes.

9        Q.    And they couldn't do that with respect

10   to the indentures, right?

11       A.    Right.  That's the difference.

12       Q.    Because they weren't a party to the

13   contract.  They had no control over what that

14   contract said and whether that contract could be

15   changed in any way, shape or form; isn't that true?

16            MR. FRIEDMAN:  That's a compound

17       question.

18            MR. CLARK:  It certainly is.

19            MR. FRIEDMAN:  So, let's ask one

20       question at a time.

21            MR. CLARK:  I'll keep that question and

22       you can move to strike.

23            MR. FRIEDMAN:  I object to the form of

24       the question.

25       Q.    So, isn't that true --

Page 147

1

2          MR. FRIEDMAN:  Just read back the

3     question and we will get one at a time,

4     please.

5          MR. CLARK:  Read back the whole

6     question.

7          THE WITNESS:  I think I know the answer

8     to the question.

9          MR. CLARK:  I think you do, too.

10          (The question was read.)

11     A.    No, it is not true.

12     Q.    Now, in all of this work that you did,

13     you didn't see a single contract, a document that

14     you as a lawyer would give an opinion that it was a

15     legally binding piece of paper whereby the Marvel

16     or the Marvel directors agreed to restrict the

17     board's exercise of business judgment on any matter

18     in any way, did you?

19     A.    The Marvel board?

20     Q.    Yeah.

21     A.    No.

22     Q.    Now, in the second paragraph of the

23     answer to question 5, after the second line there

24     where you say, Marvel was agreeing -- was not

25     agreeing to be bound, right, you go on to say, If

Page 148

1

2    at some future time they proved disadvantageous to

3    Marvel, they could simply refuse to comply.

4                The, they, being the negative covenants,

5    right?

6        A.    Yes.   Where is that?   Oh, I got you,

7    yes.  Yes.

8        Q.    Did that time ever come where these

9    things proved disadvantageous to Marvel, these

10   covenants and the indentures that they weren't a

11   party to?

12       A.    Yes, yes.

13       Q.    When was that?

14       A.    Well, I don't know the earliest point,

15   but on the record that I looked at, it occurred

16   leading up to the December 12 board meeting.

17       Q.    Was there ever a situation that you saw

18   in the record, where Marvel sought to obtain

19   financing from any source other than Mr. Perelman

20   or his affiliates, okay?  So put them to one side.

21                Marvel went out to some unaffiliated

22   third party, sought to obtain financing and was

23   unable to do so because of the covenants in these

24   notes.

25       A.    I don't know.   What I do know is what

Page 149

1

2   the -- what the minutes of that meeting and the one

3   after it say.

4        Q.    I appreciate that, but I would like --

5   you don't know, based on your review of the record

6   that was provided to you by Mr. Friedman, whether

7   or not Marvel ever sought financing from an

8   unrelated unaffiliated third party and was unable

9   to obtain financing because of these notes?

10       A.    I don't know.  But I mean, I can answer

11  that question by telling you that the very powerful

12  implication of the minutes is that they searched

13  high and low for financing and couldn't find any.

14  And why do I say that?  I say that because people

15  don't just venture into Chapter 11 for the fun of

16  it.

17       Q.    Well, you don't --

18       A.    And that December 12 minutes says, Look,

19  the only way we can get rid of these covenants is

20  to go into Chapter 11.  So, I mean if you're --

21  Mr. Perelman is much too smart a man to have

22  ignored obvious financing opportunities that were

23  kicking around somewhere.

24       Q.    And are you aware that in all of these

25  financing alternatives that may have been looked

1

2    at -- well, you don't know whether they were or

3    not?

4         A.    I don't.

5         Q.    Let's assume that they were.  Are you

6    aware of any evidence to indicate that Marvel was

7    unable to pursue any of those alternatives with

8    unrelated third parties, not affiliates of

9    Mr. Perelman, on account of anything in the note

10   indentures?

11        A.    No.  But, look, if Andrews who's

12   controlled by Perelman, says, I can't provide

13   financing unless we can deal with these covenants,

14   it's a fortiori case -- it's a stronger case as

15   applied to any third party lender who he might have

16   found.

17        Q.    The majority looked at Mr. Icahn's --

18   however you want to caveat it -- proposal in the

19   two letters in December and you saw no condition in

20   there --

21        A.    Due diligence.

22        Q.    Let me finish.

23        A.    I won't interrupt you again.

24        Q.    You saw no condition in there that said

25   that his offer was conditioned on any waiver of any

Page 151

1

2   provisions of any note indentures; isn't that true?

3       A.    Not in so many words, but there's the

4   blanket condition of due diligence.

5       Q.    Right.  He is a holder of the notes that

6   were directly subject to the indentures with

7   reserving the right to conduct due diligence.  And

8   you think that might possibly cover looking for

9   information about what restrictions arose from the

10  indentures for the notes that he held, and maybe

11  that would then lead to some condition in his

12  proposal; is that what we are to gather?

13      A.    I would tell you, as a lapsed lawyer,

14  that those words cover anything and everything that

15  he discovers through due diligence, whether he knew

16  something about it ahead of time or not.

17           And, for example, if he found out that a

18  waiver was impossible because the noteholder --

19  nobody knew who they were or where they were or how

20  to solicit, that may be a new fact perhaps he

21  didn't know, even though he might have known about

22  the covenants in the note indenture.

23      Q.    Now, on this topic of due diligence with

24  Mr. Icahn, would you agree with me that if he were

25  a member of the board of directors of Marvel, he'd

Page 152

1

2    have an absolute legal right to take as much due

3    diligence as he wanted to with respect to Marvel;

4    he could get access to any information he wanted as

5    a director, right?

6         A.    Do you mean in connection with --

7         Q.    As a director of a Delaware corporation.

8         A.    But, if he were a director of a Delaware

9    corporation, you're asking me, could he exercise

10   due diligence?

11        Q.    No, I'm asking a different question.

12              You're not a Delaware lawyer, right?

13   You've not been admitted to the Bar in Delaware,

14   correct?

15        A.    All my career, I have given opinions on

16   Delaware law.

17        Q.    But you're not a member of the Delaware

18   Bar?

19        A.    No.

20        Q.    But you have been giving opinions on

21   Delaware law and you're very familiar with it,

22   correct?

23        A.    I used to be pretty familiar with it.

24        Q.    Are you familiar with Section 220-D of

25   the Delaware General Corporation Law?

Page 153

1

2      A.      Remind me what it says.

3      Q.      It says that a director of a Delaware

4   corporation has an absolute right to get any

5   information he wants from the corporation about the

6   corporation, its business and affairs.  You

7   understand --

8      A.      Yes.

9      Q.      -- and you've long understood that to be

10   the law, right?

11      A.      Yes.

12      Q.      So, back to my question about Carl

13   Icahn.

14           Were Mr. Icahn a director, he would be

15   able to do all the due diligence he wanted with

16   respect to any facts pertaining to Marvel, right?

17      A.      Right.

18      Q.      So, if Mr. Perelman, if Mr. -- my

19   apologies to Mr. Perelman -- if Mr. Icahn, in fact,

20   did become a director of Marvel, did have access to

21   all that information, and yet never made a proposal

22   to finance Marvel based on a waiver of any

23   conditions or terms in the indentures for the

24   holding company notes, would you agree with me that

25   that indicates that those notes, those indentures

Page 154

1

2    were not an impediment to a financing proposal, at

3    least for Mr. Icahn; would you agree with that?

4        A.    No.

5        Q.    Okay.  Why not?  Why not?

6        A.    Because when -- can we -- can we assume

7    that he is a director?

8        Q.    He was.  He became a director of Marvel.

9    He was on the board of directors for a period of

10   several months in 1997.  He had access to all the

11   information he wanted.  That's a fact.  You can

12   assume that to be true.

13       A.    At the time he made the offer.

14       Q.    He made other proposals while he was a

15   director of Marvel.  You can assume that to be

16   true.

17       A.    Well, '97 he went on the board?

18       Q.    Yes, he did.

19       A.    Well, aren't we talking about this '96?

20       Q.    Well, now we're talking about '97.

21       A.    Well, I was talking about this.  I don't

22   know anything about '97.  I'm talking about the

23   language subject to confirmatory due diligence.

24       Q.    Are you aware that Mr. Icahn never made

25   a proposal to Marvel to provide it with any

1

2    financing that on its face contained a condition

3    related to a waiver of any terms of the indentures

4    for the notes?  Are you aware of that?

5        A.    I don't know, but I don't think it's

6    relevant to what you and I are trying to talk

7    about.

8        Q.    Now, in the last paragraph of your

9    answer to question number 5, the first sentence you

10   say --

11       A.    The last paragraph?

12       Q.    Last paragraph, first sentence.  I would

13   reflect on the fact that shortly before the first

14   issue of notes occurred at a board meeting of

15   Marvel on March 18, 1993, we amended Marvel's

16   charter to increase its authorized capital stock,

17   et cetera.

18            Who's we?

19       A.    Well, I'm putting myself in the shoes of

20   a director.  So, we, the board.

21       Q.    We means the people who were actually

22   the board at that time?

23       A.    That's correct.  I'm not too sure why I

24   worded it that way.

25       Q.    I wasn't either.

Page 156

1

2          A.      I was trying to get into the role.

3          Q.      Into the head.  That's okay.

4                  Your answers to question 6 and 7, first

5     paragraph.  First of all, I would be concerned

6     about the bet-the-ranch nature of accepting

7     restrictions.

8                  When you talk about accepting

9     restrictions, who accepted what restrictions?

10         A.      The board.

11         Q.      Of?

12         A.      Marvel accepting restrictions on its

13    business.

14         Q.      And --

15         A.      You understand, this is a negotiation

16    we're now having.  I mean, we've moved -- we've

17    moved to the hypothetical situation of Perelman

18    telling us what he wants to do.

19         Q.      Fair enough.  Let's go on.

20                 Accepting restrictions depending on

21    future events, I could not reasonably anticipate,

22    might so restrict Marvel as to cause its demise.

23                 That's the hypothetical, right?

24         A.      That's what I mean by bet the ranch.

25         Q.      Right.  But that's the hypothetical.

Page 157

1

2      That whole sentence is your hypothetical --

3          A.    That's right.

4          Q.    But the next sentence isn't

5      hypothetical, right?  The next sentence says, With

6      hindsight, of course, this is precisely what

7      happened.

8              You're stating as a matter of fact that

9      Marvel's demise was caused by some restrictions

10     that have been accepted by somebody.  Is that a

11     fair reading of that paragraph?

12         A.    Yes.

13         Q.    Okay.  So, let's go back to the

14     accepting restrictions.  Who accepted what

15     restrictions?

16         A.    Well, in this hypothetical --

17         Q.    Well, no, no, no.  I want to deal with

18     the facts as you understood them.  You say that

19     what happened to Marvel is that as a result of

20     accepting restrictions, Marvel's demise was brought

21     about.

22             I want to know who accepted them and

23     what the restrictions were.

24         A.    Yeah.  Well, the restrictions are the

25     negative covenants that are contained in the note

Page 158

```
 1
 2    indentures.   And the person who accepted them is
 3    with the board and management of Marvel.
 4         Q.    Okay.
 5         A.    And that acceptance was what you and I
 6    have been sparring about.
 7         Q.    Just chatting.
 8         A.    Yeah, chatting.
 9         Q.    Okay.  But you know of no document,
10    piece of paper, video --
11         A.    No.  Well, wait.  I'm sorry, finish your
12    question.
13         Q.    Let me finish the question.  You know of
14    no document, piece of paper, contract, video,
15    electronic recording, any other physical thing
16    which evidences the acceptance of these
17    restrictions by the Marvel board, correct?
18         A.    No.
19         Q.    Incorrect?
20         A.    Incorrect.
21         Q.    Okay.  What's the piece of paper by
22    which Marvel accepted these --
23         A.    All the SEC filings I've been referring
24    to.
25         Q.    Oh, okay.  Pull them out, let me see
```

Page 159

1

2    where it says Marvel accepted the restrictions,

3    those words.

4         A.    No, there are no words.

5         Q.    Okay.

6         A.    If you're talking about precise words,

7    those words are not there.

8         Q.    Mr. Longstreth, I'm talking about your

9    precise words.  Did you see any piece of paper, any

10   audio, visual recording, anything else in the

11   record that said, in your words, that Marvel had

12   accepted any restrictions in the notes; you didn't

13   see that?

14              MR. FRIEDMAN:  Objection.  Asked and

15        answered.

16        A.    I'm saying that the behavior of the

17   management of Marvel and the board of Marvel,

18   together with various filings, fairly construed in

19   the totality, evidence, a corporate acceptance of

20   these covenants.  And I've said that in many

21   different ways, but that's what I am saying.

22              And I believe that any fair reading of

23   the totality of the record would lead, you know, a

24   reasonably careful thinking person to conclude that

25   this company accepted the covenants that its

Page 160

1

2    controlling shareholder agreed to impose upon it.

3        Q.    But you didn't see anything that said

4    Marvel accepts the restrictions?

5        A.    Not those precise words.  We're talking

6    about agreement by behavior, by a course of

7    conduct.  That's what you litigators call it.

8        Q.    Now, the third paragraph to your answer

9    to these two questions, near the end --

10       A.    Third paragraph.

11       Q.    Yeah.  Second to last sentence, it says,

12   These advisors.  By that, you're referring to

13   independent counsel --

14       A.    Yeah.

15       Q.    -- and bankers who you would have

16   retained for your independent committee to

17   negotiate over the acceptance of these

18   restrictions, right?

19       A.    Right.

20       Q.    These advisors would serve Marvel

21   through its independent directors in determining

22   what kind of benefit, if any, in what size, would

23   constitute a reasonable, and to the independent

24   directors, acceptable quid pro quo for allowing the

25   restrictions to be imposed.

Page 161

 1

 2          My question -- I just want to make sure

 3   you have no expert opinion on what the appropriate

 4   quid pro quo for Marvel's acceptance of these

 5   restrictions would have been, correct?

 6       A.    Correct.  No expert opinion you said?

 7       Q.    Right.  That's how you testified.  You

 8   don't know anything as a matter of fact.  You

 9   weren't aware of all of this as it was happening,

10   right?

11       A.    Well, it didn't happen.

12       Q.    No, no.  I'm asking, you had no actual

13   knowledge of these events before you were retained

14   as an expert in this case?

15       A.    Oh, no.

16          MR. CLARK:  Off the record.

17          THE VIDEOGRAPHER:  The time is 2:12

18       p.m., April 13, 2006.  This concludes Tape

19       Number 2 of the videotaped deposition of

20       Mr. Bevis Longstreth.

21          (A recess was taken.)

22          THE VIDEOGRAPHER:  The time is 2:19 p.m.

23       April 13, 2006.  This marks the beginning of

24       Tape Number 3 of the videotaped deposition of

25       Mr. Bevis Longstreth.

Page 162

1

2          Q.    Mr. Longstreth, in one of your recent

3     answers in the last half hour, 45 minutes, you

4     referred to yourself as a lapsed lawyer.  What did

5     you mean by that?

6          A.    Well, I haven't practiced law since

7     19 -- since 1994.

8          Q.    Are you still a member of the Bar?

9          A.    Yes.

10         Q.    In what jurisdictions?

11         A.    New York.

12         Q.    Just New York?

13         A.    Yeah.  I taught at Columbia for five

14    years.  I've taught law and I've been an expert

15    witness, I guess, as we have gone over.  But I

16    haven't actually practiced law.

17         Q.    And you talked a lot about Marvel's

18    acceptance of the restrictions in the note

19    indentures by, I think you said by conduct, by

20    conduct of the management of Marvel, conduct of the

21    board of Marvel?

22         A.    Right.

23         Q.    So is it your view that through this

24    conduct, Marvel became legally bound as a party to

25    the indentures and the restrictions in the

Page 163

1

2    indentures?

3         A.    Well, we talked about that before.

4         Q.    And what was the answer?

5         A.    In a technical sense, I don't think they

6    were legally bound.

7         Q.    In a nontechnical sense, were they

8    legally bound?

9         A.    The course of conduct that they engaged

10   in constituted acceptance, and the consequences of

11   trying to unaccept what they had accepted could

12   have been, in my judgment, severe, because among

13   the ways in which they accepted these covenants

14   were filings with the SEC.

15              And in other ways they accepted them was

16   in the implication to the noteholders that they

17   would -- they would agree to them, they would

18   comply with them.  They weren't going to resist

19   them.  They didn't consider themselves free to

20   ignore them.

21              So all that course of conduct would lay

22   a basis for their running into legal difficulty if

23   they ignored them.

24         Q.    Let me --

25         A.    That's my conclusion.

Page 164

1

2      Q.      Let me ask it this way.  Based on this

3   acceptance by conduct that you·testified to, is it

4   your opinion that if the indenture trustee and the

5   noteholders had brought an action against Marvel

6   for breach of contract, not tortuous interference

7   or anything else, breach of contract because it

8   didn't adhere to these negative covenants in some

9   way, shape or form, that they would have been

10   entitled to a judgment, assuming that Marvel hadn't

11   adhered?

12      A.      Yes.  If that's all they did, perhaps.

13   I just -- I would have to really study that.

14      Q.      So, it's, at least as you sit here right

15   now, it is not your unequivocal view that Marvel

16   had become legally bound by the terms of the

17   holding company indentures as a result of this

18   conduct; is that fair?

19      A.      It's -- if you mean legally bound in the

20   sense that in that case we just hypothesized, a

21   contract case, is it clear to me that Marvel would

22   be liable, I can't say that without --

23      Q.      Let me try it another way.

24      A.      Okay.

25      Q.      If Marvel had, hypothetically -- you're

Page 165

1

2    an expert, so I can ask these things -- if Marvel

3    had gone out in 1996 and issued a whole bunch of

4    stock, common stock, diluted Mr. Perelman down to,

5    pick a number, 10 percent, okay, clearly contrary

6    to the terms of the indentures, right, if that had

7    occurred, and the indenture trustee and the

8    noteholders sued the holding companies on the

9    contract to enforce their rights, they would be

10   entitled to a judgment for whatever the contract

11   said their relief was, right?  Breach of

12   contract --

13        A.    Breach of the contract, yeah.

14        Q.    They'd be entitled to a judgment, right?

15   Okay.  Same set of facts, except that they go

16   through Marvel.  Are they entitled to a breach of

17   contract judgement and remedy against Marvel?

18        A.    I don't know.  I -- I -- I do know that

19   there's a case there.  Whether it's a highly

20   probable successful case, I don't know.  I -- I --

21   I -- I think there's a case there based upon

22   acceptance of the conditions and an acting in

23   reliance upon that acceptance.

24        Q.    And what's the case?  What's the cause

25   of action and the basis for relief of this case

Page 166

1

2    that you are talking about; tort, contract --

3        A.    That the course of conduct by Marvel

4    induced reliance on the noteholders, because it's

5    my view that the noteholders would not have lent

6    the money to Mr. Perelman without the covenants.

7        Q.    You're no expert on finance; we've

8    established that, right?

9            So that's not an expert opinion you're

10   offering, right?

11       A.    It's an expert opinion based upon many,

12   many, many negotiations and that people do not

13   agree to covenants they don't have to agree to.

14       Q.    Well, it's not an expert opinion that

15   you bothered to put into your expert report, is it?

16   There's no --

17       A.    No, we didn't talk about -- I wasn't

18   asked to consider it.

19       Q.    I want to go back to --

20       A.    But you're asking me to consider it.

21       Q.    I want to go back to what the legal

22   result, you, as an expert on these matters, what

23   the legal result of this acceptance by conduct was.

24           Is there a contract between Marvel and

25   the noteholders as a result of this acceptance by

Page 167

1

2    conduct?

3        A.    I'm saying there could be.

4        Q.    You are?

5        A.    Yes.  I mean, there could be.

6        Q.    Great.  You've answered my question.

7              MR. CLARK:  I have no further questions.

8    Thank you very much.

9              MR. FRIEDMAN:  No questions.

10             MR. CLARK:  We're done.  Thank you, Mr.

11   Longstreth.

12             THE VIDEOGRAPHER:  The time is 2:27

13   p.m., April 13, 2006.  This concludes the

14   videotaped deposition of Mr. Bevis Longstreth.

15             (Time noted: 2:27 p.m.)

16

17             _____

18             BEVIS LONGSTRETH

19

20   Subscribed and sworn to before me

21   this _____ day of _____, 2006.

22

23   _____

24

25

Page 168

```
 1
 2                    C E R T I F I C A T E
 3    STATE OF NEW YORK      )
 4                           : ss.
 5    COUNTY OF KINGS        )
 6
 7            I, PENNY SHERMAN, a Shorthand Reporter
 8    and Notary Public within and for the State of New
 9    York, do hereby certify:
10            That BEVIS LONGSTRETH, the witness whose
11    deposition is hereinbefore set forth, was duly
12    sworn by me and that such deposition is a true
13    record of the testimony given by the witness.
14            I further certify that I am not related
15    to any of the parties to this action
16    by blood or marriage, and that I am in no way
17    interested in the outcome of this
18    matter.
19            IN WITNESS WHEREOF, I have hereunto set
20    my hand this 26th day of April, 2006.
21
22
23    PENNY SHERMAN
24
25
```

Page 169

```
 1                              INDEX
 2   WITNESS:                                              PAGE:
 3
              B E V I S   L O N G S T R E T H              5
 4
                             * * * * *
 5
                         EXAMINATION BY:
 6
     MR. CLARK.........................................5-
 7
                             * * * * *
 8
                      INFORMATION REQUESTS:
 9
     REQUESTS: 33/6
10
     DIRECTIONS:  22/3
11                           * * * * *
12                          EXHIBITS
13
     Longstreth Exhibit 1, Bevis Longstreth's report,       19
14   marked for identification
                                                            76
15   Longstreth Exhibit 2, Cover page and excerpt from
     the form S-3 filed with the SEC by Marvel
16   Entertainment Group, Inc. on March 14, 1995, marked
     for identification
17                                                          91
     Longstreth Exhibit 3, Document on High River Limited
18   Partnership letterhead, dated December 10, 1996,
     marked for identification
19                                                          92
     Longstreth Exhibit 4, Document on High River Limited
20   Partnership letterhead, dated December 19, 1996,
     marked for identification
21                                                         106
     Longstreth Exhibit 5, Answer to Question 2 of Mr.
22   Longstreth's report, marked for identification
23                           * * * * *
24
25
```

ORIGINAL

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    ------------------------------------------------x
     RONALD CANTOR, IVAN SNYDER and
4    JAMES A. SCARPONE, as TRUSTEES
     OF:  THE MAFCO LITIGATION TRUST,
5
                 Plaintiffs,        Civil Action No.
6                                   97-586
           -against-
7
     RONALD O. PERELMAN; MAFCO
8    HOLDINGS, INC., MacANDREWS &
     FORBES HOLDINGS INC.; ANDREWS
9    GROUP INCORPORATED; WILLIAM C.
     BEVINS; DONALD G. DRAPKIN,
10
                 Defendants.
11   ------------------------------------------------x

12         Videotaped Deposition of WILLIAM H. PURCELL,

13   taken in the above-entitled matter before RICHARD

14   GERMOSEN, a Certified Shorthand Reporter, Registered

15   Professional Reporter, Certified Realtime Reporter

16   and a Notary Public within and for the States of New

17   York and New Jersey, taken at the offices of SKADDEN,

18   ARPS, SLATE, MEAGHER & FLOM, LLP, 4 Times Square,

19   New York, New York  10036, on October 29, 2002,

20   commencing at 10:05 a.m.

21

22             DAVID FELDMAN & ASSOCIATES (USA)

23             575 Madison Avenue, 10th Floor

24               New York, New York  10022

25         (212) 921-0771    Fax: (212) 921-0718

2

```
 1
 2   A P P E A R A N C E S:
 3
 4
 5   FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP
 6   BY:  ANDREW W. GOLDWATER, ESQ.
 7   875 Third Avenue
 8   New York, New York  10022
 9   Attorneys for the Plaintiffs
10
11
12   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13   BY:  ROBERT E. ZIMET, ESQ.
14        -and-
15   BY:  WHITNEY WALTERS, ESQ.
16   4 Times Square
17   New York, New York  10036
18   Attorneys for the Defendants
19
20
21   ALSO PRESENT:
22   DANIELLE CAPAWANNA, Videographer
23
24
25
```

B 178

DAVID FELDMAN & ASSOCIATES (USA)    (212) 921-0771

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
     RONALD CANTOR, IVAN SNYDER and
4    JAMES A. SCARPONE, as TRUSTEES
     OF: THE MAFCO LITIGATION TRUST,
5
                    Plaintiffs,        Civil Action No.
6                                      97-586
          -against-
7
     RONALD O. PERELMAN; MAFCO
8    HOLDINGS, INC., MacANDREWS &
     FORBES HOLDINGS INC.; ANDREWS
9    GROUP INCORPORATED; WILLIAM C.
     BEVINS; DONALD G. DRAPKIN,
10
                    Defendants.
11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

12          Videotaped Deposition of WILLIAM H. PURCELL,

13   taken in the above-entitled matter before RICHARD

14   GERMOSEN, a Certified Shorthand Reporter, Registered

15   Professional Reporter, Certified Realtime Reporter

16   and a Notary Public within and for the States of New

17   York and New Jersey, taken at the offices of SKADDEN,

18   ARPS, SLATE, MEAGHER & FLOM, LLP, 4 Times Square,

19   New York, New York  10036, on October 29, 2002,

20   commencing at 10:05 a.m.

21

22          DAVID FELDMAN & ASSOCIATES (USA)

23          575 Madison Avenue, 10th Floor

24              New York, New York  10022

25      (212) 921-0771    Fax: (212) 921-0718

REVISED TRANSCRIPT

```
1              WILLIAM H. PURCELL
2    profile or the more volatile the business or the
3    less tangible assets as a general statement they
4    recommend less debt in that capital structure.
5    They don't then pinpoint numbers.
6         Q.        I understand that.
7              My question is a little more
8    specific.  Can you give me with respect to any
9    academic literature or empirical studies or any
10   business literature the names of the authors and
11   the titles of the references that say what
12   you --
13        A.        I believe some of them are
14   footnoted in either the first report or the
15   second report.  As I testified earlier I took
16   some of the length out, but one of my favorite
17   quotes is Warren Buffett who most people know
18   who he is and those that don't know Modigliani
19   and his famous quote is that people who feel
20   that a lot of debt helps them focus on running
21   the business better because they are more
22   focused on their risk are not very smart people
23   because the roads of business are filled with
24   potholes and you cannot possibly miss them all.
25        Q.        Yes, but there is --
```

B 180

DAVID FELDMAN & ASSOCIATES (USA)    (212) 921-0771

```
 1                    WILLIAM H. PURCELL
 2    seven months ago, but that's to my recollection
 3    how we -- how this came about the document
 4    itself and what was in it.
 5            Q.      What is the logic or the
 6    rationale that underpins that number in your
 7    mind?
 8            A.      Well, you had had Mr. Gittis in
 9    effect admit in his deposition that neither the
10    Andrews Group nor anybody else in his view would
11    put meaningful new equity into Marvel with the
12    existence of that provision in place without
13    waivers from the holding company bondholders
14    and, in fact, they couldn't get their waiver and
15    Andrews withdrew from the offer and that was
16    rather concrete evidence, if you will, if that's
17    the proper term to conclude that, which I had
18    already believed anyway that the existence of
19    these covenants in the holding company issues
20    was detrimental in many ways as I talked about
21    before to Marvel, but in the last stages of his
22    life also prevented it from getting the infusion
23    that could have been possible to keep it alive.
24    So it was the coup de grace if you will.
25            Q.      And the infusion to keep it alive
```

B 181

Special Meeting of the Board of Directors
of Marvel Entertainment Group, Inc.
held at 35 East 62nd Street,
New York, New York
on December 12, 1996, at 10:00 A.M. New York time


Present in person:

      Ronald O. Perelman
      Donald G. Drapkin
      Michael J. Fuchs
      Morton L. Janklow
      Scott C. Marden
      Scott M. Sassa
      David J. Schreff

Present by telephone:

      William C. Bevins
      Frank Gifford
      E. Gregory Hookstratten
      Stan Lee
      Terry C. Stewart
      Kenneth Ziffren

Absent:
      Quincy Jones

Present by invitation:

      Thomas Balliett of Kramer, Levin Naftalis & Frankel
      Thomas Constance of Kramer, Levin, Naftalis & Frankel
      Daniel Celentano of Bear Stearns & Co. Inc.
      Irwin Engelman, Executive Vice President and Chief
        Financial Officer of MacAndrews & Forbes Holdings Inc.
      Marcia Goldstein of Weil Gotshal & Manges LLP
      Steven R. Isko, Vice President, Legal Affairs and
        Secretary of the Corporation
      Bobby G. Jenkins, Executive Vice President and Chief
        Financial Officer of the Corporation
      Barry F. Schwartz, Executive Vice President and
        General Counsel of MacAndrews & Forbes Holdings Inc.
      Paul E. Shapiro, Executive Vice President and
        General Counsel of the Corporation

LGL-RP\BROADARD\SPECBD MTG

B 182

December 12, 1996
Page 2

        Mr. Perelman presided and Mr. Isko recorded the minutes
of the meeting.

        Notice of the Meeting has been duly given in accordance
with the By-Laws of the Corporation.  The members of the Board who
participated by means of conference telephone communications
equipment and video conference communications equipment could hear
all of the other meeting participants and could be heard by them.

Update on Restructuring

        Mr.  Perelman  outlined  the  status  of  the  proposed
financial restructuring of the Corporation, including the proposal
by Andrews Group Incorporated ("Andrews Group") to invest $350
million in exchange for 80.1% of the outstanding shares of the
Corporation on a fully diluted basis, the proposed acquisition of
the Class A common stock of Toy Biz, Inc. ("Toy Biz") not owned by
the Corporation and the additional credit facilities being sought
to provide the Corporation with the liquidity it requires.  Mr.
Perelman stated that the bonds issued by parent companies of the
Corporation have generally traded out of the hands of the tradi-
tional institutional holders and into the hands of "distress" funds
and other holders.  As of today, the present bondholders have not
organized and, therefore, Andrews Group has not been able to
negotiate with the bondholders for their consent to the proposed
investment by Andrews Group in the Corporation.  Mr. Perelman
stated that a delay in implementing the restructuring would have a
negative impact on the Corporation's liquidity needs.  Mr. Perelman
stated that, as a result, one option being considered in order to
consummate the financial restructuring of the Corporation is the
commencement of a case under Chapter 11 of the bankruptcy code.

        Following Mr. Perelman's comments, Mr. Bevins reviewed
the status of the proposed equity investment by Andrews Group in
the Corporation, the proposed acquisition of the Class A common
stock of Toy Biz not currently owned by the Corporation and the
additional credit facilities being sought from the Corporation's
lending group, all to take effect upon consummation of such
transactions.  Mr. Bevins discussed a proposal that had been
received from a High River Limited Partners, a purported bondholder
controlled by Carl Icahn, and reviewed the discussions between
Andrews Group and Carl Icahn, a representative of such bondholder
and the viability of such bondholder's proposal.  Mr. Bevins then
discussed the impact on the Corporation's business of a delay in
implementing the restructuring in light of the Corporation's
liquidity needs.  Mr. Bevins reviewed with the Board the Corp-
oration's ability to obtain financing during a reorganization case
and the status of discussions between the Corporation and its agent

LGL-SPMELOBOARDSPECBD.MTG

B 183

M E    01062

December 12, 1996
Page 3

bank concerning such financing. Mr. Bevins stated that a reorganization case with a "debtor in possession" financing facility would allow the Corporation to obtain necessary liquidity for its working capital and investment spending requirements pending the completion of its financial restructuring. Mr. Schwartz provided an update on the litigation filed in connection with the propsed restructuring.

Messrs. Perelman, Bevins and Schwartz responded to questions regarding the Corporation's restructuring and possible courses of actions.

The Board was informed that no resolution was being presented at this time and no vote was needed yet. However, the Board was alerted to the fact that prompt Board action might be needed in the near future.

Adjournment

There being no further business to come before the Meeting, a motion to adjourn the Meeting was made, seconded and passed, and the Meeting was thereupon adjourned.

_____
                                Secretary

LGL-ENIX ONBOARDINFBOR0.MTG

**B 184**

ME      01063

Special Meeting of the Board of Directors
of Marvel Entertainment Group, Inc.
held at 35 East 62nd Street,
New York, New York
on December 26, 1996, at 4:00 P.M. New York time

Present in person:

       Donald G. Drapkin
       Scott C. Marden
       Scott M. Sassa
       Terry C. Stewart

Present by telephone:

       Ronald O. Perelman
       William C. Bevins
       Frank Gifford
       Morton L. Janklow *
       E. Gregory Hookstratten *
       Stan Lee
       David J. Schreff
       Kenneth Ziffren *

Absent:

       Michael Fuchs
       Quincy Jones

Present by invitation:

       Thomas Balliett of Kramer, Levin, Naftalis & Frankel
       Thomas Constance of Kramer, Levin, Naftalis & Frankel
       Daniel Celentano of Bear Stearns & Co. Inc.
       Irwin Engelman, Executive Vice President and Chief
         Financial Officer of MacAndrews & Forbes Holdings Inc.
       Edmund J. Feeley, President and Chief Operating Officer
         of Fleer Corp.
       Marcia Goldstein of Weil Gotshal & Manges LLP
       Steven R. Isko, Vice President, Legal Affairs and
         Secretary of the Corporation
       Bobby G. Jenkins, Executive Vice President and Chief
         Financial Officer of the Corporation
       Harvey Miller of Weil Gotshal & Manges LLP
       Gordon Rich of CS First Boston Corporation
       Andrew Sammett of Bear Stearns & Co. Inc.
       Paul E. Shapiro, Executive Vice President and
         General Counsel of the Corporation
       Andrew Stuhlberger of CS First Boston Corporation
       Robert Wiesenthal of CS First Boston Corporation

---

\*  Indicates member of the Special Committee

LGL-SP\SKONBOARD\DEC26AD.MTG

B 185

ME    01064

December 26, 1996
Page 2

Mr. Perelman presided and Mr. Isko recorded the minutes of the meeting.

Notice of the Meeting was duly given in accordance with the By-Laws of the Corporation. The members of the Board who participated by means of conference telephone communications equipment could hear all of the other meeting participants and could be heard by them.

Approval of the Minutes of Meeting of the Board of Directors.

The first order of business to be considered by the Board was the approval of the minutes of the meetings of the Board of Directors held on December 4, 1996 and December 12, 1996. Draft minutes for these meetings had been provided to each Director for review and comment prior to the Meeting.

Upon motion duly made and seconded, the minutes, as submitted, were unanimously approved.

Consideration of Commencement of a Reorganization Case under Chapter 11 of the United States Bankruptcy Code.

Mr. Perelman stated that the first order of business was the consideration of the commencement of a chapter 11 reorganization on behalf of the Corporation under the United States Bankruptcy Code. Mr. Perelman stated that the financial situation of the Corporation and its subsidiaries had deteriorated significantly to the point that it was currently projected that the Corporation would run out of cash during the early part of January, 1997. In that perspective and the inability to expeditiously effect a restructuring of the financial obligations of certain parent companies of the Corporation that would enable the recapitalization of the Corporation, it was appropriate to consider the commencement of a case under chapter 11 of the United States Bankruptcy Code on behalf of the Corporation. Mr. Perelman stated that a chapter 11 reorganization case would provide the means pursuant to which the proposed investment in the Corporation by Andrews Group, Incorporated ("Andrews Group") of $365 million could be effectuated.

Mr. Perelman introduced Mr. Bevins, who described the principal terms of a proposed investment in the Corporation by Andrews Group of $365 million in exchange for shares of common stock of the Corporation ("Company Common Stock") representing 80.8% of the outstanding shares of the Corporation after giving effect to such investment, representing a per share purchase price of approximately $0.86 per share (the "Purchase Price"). Mr.

LGL-SP\ISK\ONBOARD\DEC96BD.MTG

B 186

ME     01065

December 26, 1996
Page 3

Bevins stated that such equity investment would be used to acquire the equity of Toy Biz, Inc. ("Toy Biz") not owned by the Corporation pursuant to a Stock Purchase Agreement with each of Isaac Perlmutter and Avi Arad and a Merger Agreement between Andrews Group and Toy Biz (the "Merger Agreement") which are to be assigned to the Corporation as part of the consummation of the proposed Plan of Reorganization.  Mr. Bevins reviewed with the Board the terms of the Stock Purchase Agreements for the acquisition of Messrs. Perlmutter and Arad's shares of Class A Common Stock of Toy Biz (the "Class A Common Stock") at a purchase price of $14 per share in cash and a $40 million promissory note bearing interest at the five year Treasury rate representing approximately $3 per share and the proposed performance bonus plan to be implemented for Messrs. Perlmutter, Arad and Ahearn, and the terms of the Merger Agreement whereby the Class A Common Stock of Toy Biz held by the public would be acquired for $22.50 per share.  Mr. Bevins stated that if approved by the Corporation's Board, the Stock Purchase Agreements and the Merger Agreements would be assigned by Andrews Group to the Corporation as part of the proposed Plan of Reorganization in exchange for approximately 427.3 million shares of common stock of the Corporation to be issued to Andrews Group or its designee.  Mr. Bevins then reviewed with the Board the $160 million new Toy Biz credit facility with the Corporation's lenders which will fund working capital and strategic investment needs of the Corporation and its subsidiaries.  Mr. Bevins also reviewed with the Board the difficulties the Corporation has encountered in its operations in the current environment, the resulting cash liquidity problems and stated that in his opinion the commencement of a chapter 11 case by the Corporation should enable the reorganization of the Corporation's financial structure and consummation of the proposed recapitalization on a timely basis.

Mr. Perelman then introduced Gordon Rich of CS First Boston Corporation ("First Boston"), financial advisor to the Special Committee.  Mr. Rich reviewed the analysis conducted by First Boston on the fairness of the Purchase Price.  Mr. Rich reviewed with the Board a brief history of the Corporation and a historical financial performance, noting that the Corporation does not presently generate, nor will it in the 1997 fiscal year generate, sufficient cash to cover its interest expense.  Mr. Rich reviewed with the Board the various fundamental analyses performed by First Boston and the breakup analysis of the Corporation conducted by First Boston, and the assumptions underlying First Boston's value analyses, noting that the value ascribed to Fleer Corp. in the breakup analysis might be too high.  Mr. Rich then delivered his oral opinion that the Purchase Price to be paid by Andrews Group was fair from a financial point of view to the Corporation.  Mr. Rich then responded to questions.

LCL-SMIXONBOARDADEC96D.NTC

B 187

ME      01066

December 26, 1996
Page 4

Mr. Perelman thanked Mr. Rich for his presentation and then introduced Mr. Harvey R. Miller of Weil, Gotshal & Manges LLP, Special Counsel to the Corporation. Mr. Miller described the process for the commencement of a chapter 11 case by the Corporation and proposed schedule of hearings and events that would occur subsequent to the commencement date. Mr. Miller stated that concurrently with the commencement of the chapter 11 case, the Corporation and its subsidiaries would file with the Bankruptcy Court the proposed plan of reorganization incorporating the Andrews Group proposal, as well as a proposed disclosure statement to be approved by the Bankruptcy Court and thereafter used to solicit acceptance of the proposed plan of reorganization. He reviewed with the Board the list of the entities, including the Corporation, that would commence cases under chapter 11 and, generally, the documents that would be filed in relation to each chapter 11 case. Mr. Miller then reviewed with the Board the fiduciary duties of directors and officers in connection with the commencement and administration of a chapter 11 case for the Corporation. Mr. Miller then responded to questions.

Mr. Perelman then introduced Mr. Daniel Celentano of Bear Stearns & Co. Inc., financial advisor to the Corporation ("Bear Stearns"). Mr. Celentano reviewed with the Board the analyses conducted by Bear Stearns in connection with the filing of the chapter 11 case by the Corporation. Mr. Celentano reviewed with the Board the reorganization value analysis, the liquidation value analysis and the analysis of feasibility of the proposed Plan of Reorganization conducted by Bear Stearns, the assumptions underlying Bear Stearns' analyses and Bear Stearns conclusions, including that the reorganization value of the Corporation absent the proposed acquisition of Toy Biz or payment of debt is zero, that the reorganization value of the Corporation assuming the consummation of the investment by Andrews Group and the acquisition of Toy Biz on the terms proposed is between $0.36 and $0.63 per share, that under the liquidation analysis there would be no proceeds available for the common stock holders of the Corporation and that under the feasibility analysis the Corporation would be not able to pay its obligations as they become due. Mr. Celentano then responded to questions.

Mr. Perelman stated that copies of the Board presentations prepared by First Boston and Bear Stearns would be available to any Director and may be obtained by request to the Secretary of the Corporation.

Following the presentation by Mr. Bevins, First Boston and Bear Stearns, there was a discussion among the directors.

After motion duly made and seconded, the following resolutions were unanimously adopted:

LGL-SP\EX-D\BOARD\DEC\\96D MTG

B 188

ME    01067

December 26, 1996
Page 5

WHEREAS, the Board of Directors acknowledges the liquidity needs of the Corporation and that based on current expectations, within approximately ten days the Corporation would not have sufficient liquidity to operate; and

WHEREAS, there is no feasible alternative to the transactions contemplated by the proposed investment by Andrews Group in the Corporation pursuant to the Acquisition Agreement, the proposed acquisition of Toy Biz, pursuant to the Arad Stock Purchase Agreement and Perlmutter Stock Purchase Agreement (each as defined below) and the Merger Agreement and the proposed $160 million Toy Biz credit facility for the Corporation to restructure its capital structure in order for the Corporation to operate; and

WHEREAS, the Board has considered the desirability and feasibility of a restructuring of the indebtedness and other obligations, organizational structure and ownership of the Corporation, such that, among other things, the business of the Corporation would be combined with that of Toy Biz and, in connection therewith, the Corporation would issue to Andrews Group a number of shares of Company Common Stock (or its equivalent) that will constitute 80.8% of the issued and outstanding shares of Company Common Stock after giving effect to such issuance; and

WHEREAS, Andrews Group has entered into the Stock Purchase Agreements, each dated as of November 20, 1996, with Isaac Perlmutter, Isaac Perlmutter, T.A. and Zib, Inc. and Avi Arad (collectively, the "Toy Biz Selling Stockholders") with respect to the purchase of their respective shares of the Class A Common Stock of Toy Biz (the "Perlmutter Stock Purchase Agreement" and the "Arad Stock Purchase Agreement," respectively); and

WHEREAS, Andrews Group has reached agreement with Toy Biz's Special Committee to buy the Series A Preferred Stock and the publicly held shares of Class A Common Stock and of Toy Biz for the price and on substantially the terms set forth in the Merger Agreement; and

WHEREAS, the Corporation has negotiated with Andrews Group the terms and conditions upon which the Corporation will issue and sell Company Common Stock to Andrews Group, and it is anticipated that the consideration for any such sale may be paid by Andrews Group in the form of (i) cash, (ii) shares of the issued and outstanding Class A Common Stock of Toy Biz not already owned by the Corporation or (iii) a combination of the foregoing; and

WHEREAS, in the event that Company Common Stock is issued to Andrews Group in exchange for cash consideration, the Corporation will accept an assignment of the rights and assume the

B 189

ME    01068

December 26, 1996
Page 6

obligations of Andrews Group pursuant to its agreements with Toy Biz and the Toy Biz Selling Stockholders; and

WHEREAS, the Corporation is negotiating with Andrews Group and other parties in interest the principal terms for restructuring the indebtedness and ownership of the Corporation and acquiring Toy Biz, and management has reviewed such transactions with the Board in reasonable detail; and

WHEREAS, the Board has requested, and management and the Corporation's financial advisor have made presentations to the Board with respect to the proposed issuance of Company Common Stock to Andrews Group and the proposed acquisition of Toy Biz; and

WHEREAS, the Board has considered such presentations and the circumstances confronting the Corporation; and

WHEREAS, management has recommended to the Board (i) the commencement of a voluntary case by the Corporation for reorganization under the provisions of chapter 11 of title 11, United States Code, as hereinafter set forth and, in connection therewith, (ii) the approval of the issuance of shares of the Company Common Stock to Andrews Group, as hereinafter set forth, and (iii) the acquisition of Toy Biz, as hereinafter set forth;

NOW, THEREFORE, BE IT:

RESOLVED, that, in the judgment of the Board, it is desirable and in the best interests of the Corporation that the Corporation and certain of its subsidiaries each commence a Chapter 11 case by filing a voluntary petition seeking reorganization (the "Reorganization") under the provisions of chapter 11 of title 11, United States Code (the "Bankruptcy Code"); and

RESOLVED, that the appropriate officers of the Corporation be and each hereby is, authorized and empowered on behalf of, and in the name of, the Corporation to execute and verify or certify a petition under chapter 11 of the Bankruptcy Code and to cause the same to be filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") at such time as said authorized officer executing the same shall determine; and

RESOLVED, that the appropriate officers of the Corporation be, and they hereby are, authorized and empowered on behalf of, and in the name of, the Corporation to execute and file all petitions, schedules, lists, and other papers and to take any and all action that any of the authorized officers may deem necessary, proper or desirable in connection with the chapter 11 case, with a view to the successful prosecution of the case; and

LGL-IINSIDE\BOARD\DEC3\BD.MTG

B 190

ME    01069