December 26, 1996
Page 7

RESOLVED, that the appropriate officers of the Corporation be, and they hereby are, authorized and empowered on behalf of, and in the name of, the Corporation to execute a plan of reorganization under chapter 11 of the Bankruptcy Code, including any and all modifications, supplements, and amendments thereto, and to cause the same to be filed in the United States Bankruptcy Court for the District of Delaware at such time as said authorized officer executing the same shall determine; and

RESOLVED, that the law firm of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 be, and it hereby is, employed as attorneys for the Corporation under a general retainer; and

RESOLVED, that the appropriate officers be, and they hereby are, authorized and empowered on behalf of, and in the name of, the Corporation to retain and employ other attorneys, investment bankers, accountants, restructuring professionals, financial advisors and other professionals to assist in the Corporation's chapter 11 case on such terms as are deemed necessary, proper or desirable; and

RESOLVED, that in connection with the commencement of the chapter 11 cases by the Corporation, the appropriate officers of the Corporation be and hereby are, authorized and empowered on behalf of, and in the name of, the Corporation, to negotiate, execute and deliver a debtor-in-possession loan facility (including, in connection therewith, such notes, security agreements and other agreements or instruments as such officers consider appropriate) on such terms and conditions as such officer or officers executing the same may consider necessary, proper or desirable, such determination to be conclusively evidenced by such execution or the taking of such action, and to consummate the transactions contemplated by such agreements or instruments on behalf of the Corporation and any pertinent affiliates; and

RESOLVED, that the appropriate officers of the Corporation and any employees or agents (including counsel) designated by or directed by any such officers, be, and each hereby is, authorized and empowered on behalf of, and in the name of, the Corporation to cause the Corporation and such of its affiliates as management deems appropriate to file such definitive plans of reorganization or joint plans of reorganization as may be authorized by the Boards, and any and all authorized modifications, supplements or amendments thereto, and such other agreements, instruments and documents as may be necessary, appropriate or desirable in connection with such plans and to make such motions and other filings with the Bankruptcy Court, and do all other things, as may be or become necessary, appropriate or desirable for the successful confirmation of such plans; and

LGL-INDEX:OBOARD:DEC96:08.WTC

B 191

ME    01070

December 26, 1996
Page 8

RESOLVED, that, in the judgment of the Board, it is desirable and in the best interests of the Corporation that, in connection with the Reorganization, the Corporation issue and sell to Andrews Group a number of shares of Company Common Stock, constituting approximately 80.8% of the issued and outstanding Company Common Stock after giving effect to such issuance and sale, in exchange for approximately $365 million in cash or, in the alternative, in exchange for shares of the Class A Common Stock of Toy Biz having an equivalent value, or a combination of cash and Class A Common Stock; and

RESOLVED, that the form, terms and provisions of the Acquisition Agreement, in substantially the form attached hereto as Exhibit A, be, and the same hereby is, authorized and approved; and

RESOLVED, that in the event that Andrews Group purchases Company Common Stock in exchange for cash pursuant to and in accordance with the terms of the Acquisition Agreement, it is desirable and in the best interests of the Corporation to use such cash to acquire the shares of Class A Common Stock and Series A Preferred Stock of Toy Biz that the Corporation does not already own and which are not being delivered by Andrews Group to the Corporation pursuant to the Acquisition Agreement, and assume the obligations of Andrews Group (or an affiliate or subsidiary thereof) under (i) the Merger Agreement providing for the purchase of Series A Preferred Stock and publicly held Class A Common Stock of Toy Biz in substantially the form attached hereto as Exhibit B, (ii) the Arad Stock Purchase Agreement and (iii) the Perlmutter Stock Purchase Agreement, with such changes to any of the foregoing documents as such officer or officers executing the same may approve, such approval to be conclusively evidenced by such execution or the taking of such action, and to consummate the respective transactions contemplated hereby; and

RESOLVED, that in the event Andrews Group purchases Company Common Stock in exchange for cash and assigns to the Company, in accordance with the terms of the Acquisition Agreement, the rights and obligations of Andrews Group under the Merger Agreement and under the Arad Stock Purchase Agreement and the Perlmutter Stock Purchase Agreement attached hereto as Exhibit C and Exhibit D, respectively, such rights and obligations of Andrews Group shall be accepted and assumed by the Corporation, and, the acceptance and assumption by the Corporation of the same be, and the same hereby is, authorized and approved; and

RESOLVED, that the appropriate officers of the Corporation be, and each hereby is, authorized and empowered on behalf of, and in the name of, the Corporation to negotiate, execute and deliver the Acquisition Agreement, and appropriate

LGL-SPUSKOUBOABRDEC3NND.WTG

B 192

ME    01071

December 26, 1996
Page 9

instruments of assignment and assumption with respect to each of the Arad Stock Purchase Agreement, the Perlmutter Stock Purchase Agreement and the Merger Agreement, with such changes to any of the foregoing documents as such officer or officers executing the same may approve, such approval to be conclusively evidenced by such execution or the taking of such action, provided that any material change on behalf of the Corporation to any such document that would be less favorable to the Corporation shall require the approval of the Board, and to consummate the respective transactions contemplated hereby; and

RESOLVED, that the appropriate officers of the Corporation be, and each hereby is, authorized and empowered on behalf of, and in the name of, the Corporation (i) to negotiate, execute and deliver, upon or following the assumption by the Corporation of the Arad Stock Purchase Agreement and the Perlmutter Stock Purchase Agreement, the Promissory Notes contemplated thereby with such changes thereto as such officer or officers executing the same may approve, such approval to be conclusively evidenced by such execution, or (ii) to execute, negotiate and deliver one or more Promissory Notes to Andrews Group on substantially the same terms and conditions as any Promissory Notes to be issued by Andrews Group to Arad and Perlmutter in connection with the consummation of the transactions contemplated by the Arad Stock Purchase Agreement or the Perlmutter Stock Purchase Agreement (the "Arad/Perlmutter Notes") with such changes thereto as such officer or officers executing the same may approve, such approval to be conclusively evidenced by such execution; and

RESOLVED, that the appropriate officers of the Corporation, and any employees or agents (including counsel) designated by or directed by any such officers, be, and each hereby is, authorized and empowered to cause the Corporation and such of its affiliates as management deems appropriate to enter into, execute, deliver, certify, file and/or record, and perform, such agreements, instruments, motions, affidavits, applications for approvals or ruling of governmental or regulatory authorities, certificates and other documents, and to take such other actions, as in the judgment of such officer shall be or become necessary, proper and desirable to prosecute to a successful completion the chapter 11 cases, to effectuate the restructuring of the debt, other obligations, organizational form and structure and ownership of the Corporation and its subsidiaries consistent with the foregoing resolutions and to carry out and put into effect the purposes of the foregoing resolutions and the transactions contemplated by these resolutions, their authority thereunto to be evidenced by the taking of such actions; and

LGL-SINXXLOUBOARD\DEC96\D.WTC

—

B 193

M E    01072

December 26, 1996
Page 10

RESOLVED, that any and all past actions heretofore taken
by officers or directors of the Corporation in the name of and on
behalf of the Corporation in furtherance of any or all of the
preceding resolutions be, and the same hereby are ratified,
approved and adopted.

Adjournment

There being no further business to come before the
Meeting, a motion to adjourn the Meeting was made, seconded and
passed, and the Meeting was thereupon adjourned.

_____
Secretary

LGL-SPLSKO\BOARD\DEC96RD.MTG

B 194

M E      01073

**Exhibit A**
Form of the Stock Purchase Agreement between
Andrews Group Incorporated and the Corporation

B 195

ME    01074

00001

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF DELAWARE

3    ----------------------------------x

4    RONALD CANTOR, IVAN SNYDER,

5    JAMES A. SCARPONE, as Trustee of

6    the MAFCO LITIGATION TRUST,

7          Plaintiffs,

8                        C.A. No.

9                        97-586 (KAJ)

10        vs.

11    RONALD O. PERELMAN, MAFCO

12    HOLDINGS, INC., MACANDREWS &

13    FORBES HOLDINGS, INC., ANDREWS

14    GROUP INCORPORATED, WILLIAM C.

15    BEVINS AND DONALD G. DRAPKIN,

16          Defendants.

17    ----------------------------------x

18        VIDEOTAPED DEPOSITION OF PETER A. FOWLER

19            WEDNESDAY, APRIL 19, 2006

20    HUDSON REPORTING & VIDEO, INC.

21    124 West 30th Street, 2nd Fl.

22    New York, New York 10001

23    Tel: (212) 273-9911 Fax: (212) 273-9915

24

25

Fowler, Peter A.   04/19/06   pp. 1-221          Page 1

00002
1

2      Videotaped deposition of PETER A. FOWLER

3   taken in the above-entitled matter before Mark

4   Iuzzolino, a Certified Shorthand Reporter (License

5   No. X101103) and Notary Public of the State of New

6   Jersey, taken at the offices of FRIEDMAN, KAPLAN,

7   SEILER & ADELMAN, LLP, 1633 Broadway, New York,

8   New York 10019, on WEDNESDAY, APRIL 19, 2006,

9   commencing at 10:03 a.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00068

1

2    A.   Right.

3    Q.   -- as banker --

4        MR. LOCKWOOD:  This is not about what

5    Mr. Engelman told him, but based on his

6    experience?

7        MR. FRIEDMAN:  Correct, correct.

8    Q.   Well, it's actually based on both.  I'm

9    asking a question about what Mr. Engelman told

10   you.

11       MR. LOCKWOOD:  I think you should either

12   ask him about --

13   Q.   Let me make it clear.  I think it's a

14   proper question, but I'll break it down.

15   Mr. Engelman told you that the restrictions

16   were included in the indenture as part of the

17   negotiation between the issuer and the

18   underwriter.  Correct?

19   A.   That's correct.

20   Q.   Did Mr. Engelman tell you whether it was

21   the issuer or the underwriter in this case who had

22   proposed including the restrictions in the

23   indenture?

24   A.   I believe that he told me that they

25   called prospective underwriters, investment banks

00069

1

2 they dealt with, and said, "We have a need" -- as

3 they had with a variety of their companies, to

4 think about monetizing their investments, and

5 asked the underwriters for ideas. So in that

6 case, I guess -- I don't know precisely, but I

7 believe the underwriter might have put it in a

8 term sheet that he sent to the company.

9     Q. And now I'm asking a question based on

10 your experience as a banker.

11     Based on your experience, would you think

12 that, in this particular case, the underwriter

13 would have proposed including the restrictions, or

14 the issuer would have proposed including the

15 restrictions?

16     A. The normal process is, an underwriter

17 says, "Here's what we think you can do," delivers

18 a draft term sheet, and then the issuer goes

19 through ever provision and pushes and pulls,

20 depending on what he -- to get the best possible

21 deal he can as an issuer.

22     Q. My precise question is: Based on your

23 experience, would you have expected in this

24 negotiation between MacAndrews & Forbes on the one

25 hand and the underwriters on the other that the

00070

1

2 underwriters would have proposed including the

3 restrictions, or would you have expected that the

4 issuer would have proposed including the

5 restrictions?

6    A.  I would have expected the underwriters

7 would have included it in a term sheet describing

8 the issue that they thought they could execute.

9    Q.  And would you have expected that when

10 the issuers reviewed that term sheet, they would

11 have pushed back with respect to terms that they

12 did not like?

13    A.  I would have expected them to negotiate

14 on every possible term.

15    Q.  Including the restrictions?

16    A.  Uh-huh.

17    Q.  You have to say yes.

18    A.  Yes.  Sorry.

19    Q.  Now, you asked Mr. Engelman whether --

20    MR. LOCKWOOD:  Can we just note for the

21 record that Mr. Fasman has entered the room?

22    MR. FRIEDMAN:  It would be an honor.

23 How are you doing, Steve?

24    Q.  You said you asked Mr. Engelman whether

25 they considered puts rather than the restrictions.

**Fowler, Peter A.  04/19/06  pp. 1-221**        **Page 70**

**B 200**

00197

1

2 which a controlling shareholder engaged in

3 financing for its own benefit. Let's just stop

4 there for a moment. You understand that the

5 Marvel holding company note issuances were

6 financing transactions for the benefit of the

7 Marvel holding companies and their parents.

8 Correct?

9     MR. LOCKWOOD: Objection to the form.

10    A.  What do you mean by "benefit"?

11    Q.  Was Marvel the operating company

12 receiving any of the proceeds of the holding

13 company note issues?

14    A.  Not that I'm aware of, not that I'm

15 aware of.

16    Q.  And you've already testified that, as

17 far as you know, the Marvel operating company was

18 not receiving any benefits from the holding

19 company --

20    A.  That's correct, uh-huh.

21    Q.  -- note issuances.  Correct?

22    A.  That's correct.

23    Q.  Is it your understanding that the

24 holding companies themselves and their parent

25 corporations would benefit from the proceeds

00198

1

2  <u>obtained upon the holding company note issuances?</u>

3      <u>A.   Yes.</u>

4      <u>Q.   And you are aware that at the time of</u>

5  <u>the holding company note issuances, the holding</u>

6  <u>companies were the majority shareholders in</u>

7  <u>Marvel, the operating company?</u>

8      <u>A.   Yes.</u>

9      Q.   My question is:  Other than these Marvel

10  holding company transactions, are you aware of any

11  transaction in which a controlling shareholder

12  engaged in financing for its own benefit with

13  promises that it would cause its public company

14  subsidiary to comply with certain covenants?

15      A.   I'm not entirely sure.  What I'd have to

16  do is review all the holding company issues to be

17  evaluated because I believe some of the proceeds

18  from those holding company issues did not come

19  down to the operating company.  And I'd have to

20  review the other component of your question, which

21  asked:  Were there financial covenants, you know,

22  restricting the operating company?

23      Q.   Now, you have your report open.  Is that

24  because you're looking at Exhibit 6?

25      A.   Exhibit 6 might have some of that

**Fowler, Peter A.   04/19/06   pp. 1-221**          **Page 198**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---

RONALD CANTOR, IVAN SNYDER and JAMES

A. SCARPONE, as TRUSTEES OF THE MAFCO

LITIGATION and Successors in Interest

to the Marvel Entertainment Group,

Inc., et al.,

             Plaintiffs,

   vs.                        97-CIV-586-KAJ

RONALD O. PERELMAN, et al.,

             Defendant.

---

DEPOSITION OF BEVIS LONGSTRETH

New York, New York

Wednesday, May 24, 2006

Reported by:

Adrienne M. Mignano

JOB NO. 184644

Page 2

1

2

3

4               May 24, 2006

5               10:00 a.m.

6

7          Deposition of BEVIS LONGSTRETH,

8     held at the offices of Skadden Arps,

9     Four Times Square, New York, New York,

10    pursuant to Notice, before Adrienne M.

11    Mignano, a Notary Public of the State

12    of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2      A P P E A R A N C E S:

3

4      FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP
       Attorneys for Plaintiffs
5           1633 Broadway
            New York, New York 10019-6708
6

       BY:  EDWARD A. FRIEDMAN, ESQ.
7

8

       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
9      Attorneys for Defendants
            One Rodney Square
10          Wilmington, Delaware 19801
11     BY:  PAUL J. LOCKWOOD, ESQ.
            BRIAN G. LENHARD, ESQ.
12

13

14     ALSO PRESENT:

15      KAREEM CUNNINGHAM, Videographer

16

17

18

19

20

21

22

23

24

25

Page 4

1

2          IT IS HEREBY STIPULATED AND AGREED,

3     by and between counsel for the respective

4     parties hereto, that the filing, sealing and

5     certification of the within deposition shall

6     be and the same are hereby waived;

7          IT IS FURTHER STIPULATED AND AGREED

8     that all objections, except as to the form

9     of the question, shall be reserved to the

10    time of the trial;

11         IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be signed

13    before any Notary Public with the same force

14    and effect as if signed and sworn to before

15    the Court.

16

17

18

19

20

21

22

23

24

25

Page 5

1

2          THE VIDEOGRAPHER:  This is tape

3     number one of the videotaped

4     deposition of Mr. Bevis Longstreth in

5     the matter of Ronald Cantor, et al.

6     versus Ronald L. Perelman, et al., in

7     the United States District Court,

8     District of Delaware, number

9     97-CIV-586-KAJ.

10          This deposition is being held at

11     Skadden Arps, Four Times Square, New

12     York, New York on May 24, 2006 at

13     approximately 10:02 a.m.

14          My name is Kareem Cunningham from

15     the firm of Esquire Deposition

16     Services.  I'm the legal video

17     specialist.  The court reporter is Ms.

18     Adrienne Mignano in association with

19     Esquire.

20          Would counsel please introduce

21     themselves.

22          MR. LOCKWOOD:  Paul Lockwood of

23     Skadden Arps on behalf of defendants,

24     and with me is Brian Lenhard.

25          MR. FRIEDMAN:  Ed Friedman

Page 6

1          Longstreth

2          representing the plaintiffs and the

3          witness.  I am with Friedman, Kaplan,

4          Seiler and Adelman.

5              THE VIDEOGRAPHER:  Will the court

6          reporter please swear in the witness.

7   B E V I S   L O N G S T R E T H,  called as

8          a witness, having been duly sworn by a

9          Notary Public, was examined and

10         testified as follows:

11  EXAMINATION BY

12  MR. LOCKWOOD:

13      Q.   Mr. Longstreth, you were previously

14  deposed in this case, and in the course of

15  this deposition, there were certain exhibits

16  that were marked.  I'm going to put these in

17  front of you and I'll give your counsel a set

18  as well.  I may make reference to those

19  previous exhibits.

20      **A.    Okay.**

21      Q.   When I do, we'll refer to them.

22  This copy, I'll let you know because I don't

23  expect I'm going to get to Exhibit 5, but

24  Exhibit 5 is a little messed up in this set

25  that I noticed this morning.  But we'll deal

1                    Longstreth

2    with that when we have to deal with it, and

3    if we have to deal with it.

4              MR. FRIEDMAN:  I don't have a tab

5         5.

6              MR. LOCKWOOD:  Exactly.

7              MR. FRIEDMAN:  What is Exhibit 5?

8              MR. LOCKWOOD:  It's your letter

9         to Mr. Longstreth, and it follows

10        after the Icahn letter that's Exhibit

11        4.

12             MR. FRIEDMAN:  Very good.

13   BY MR. LOCKWOOD:

14       Q.    Let me introduce myself for the

15   record even though I did so for the

16   videographer.

17             My name is Paul Lockwood, and I'm

18   from Skadden Arps representing the defendants

19   in this action.

20             I'm going to be asking you

21   questions today and in doing so, I'll

22   endeavor to be as clear as I can, but I might

23   fail in that attempt.  And if I do so and you

24   do not understand my question, just please

25   speak up, let me know, and I'll try to

Page 8

Longstreth

2  rephrase.

3      **A.    Okay.**

4      Q.    If that's okay?

5      **A.    Uh-huh.**

6      Q.    Did you do anything to prepare for

7  today's deposition?

8      **A.    Yeah, I did.**

9      Q.    What was that?

10     **A.    I reviewed my expert report and my**

11 **rebuttal report and Peter Fowler's report.**

12     Q.    Did you review any other documents

13 besides those three documents?

14     **A.    No.**

15     Q.    When were you first asked to

16 provide an opinion rebutting Mr. Fowler's

17 report?

18     **A.    Well, sometime after the last**

19 **deposition, but I can't pinpoint the date.**

20     Q.    So sometime in late April; does

21 that sound right?

22     **A.    Probably.  If that's important, I**

23 **can find a date.**

24     Q.    Let me see if I can help pinpoint

25 it for you.

Page 9

1            Longstreth

2                    Did you travel out of the country

3      in late April or early May?

4          A.    I did.

5          Q.    Do you know when that was?

6          A.    Yes, I was gone in London for the

7      last week of April.

8          Q.    And had you started on this project

9      of responding to Mr. Fowler's report before

10     that trip?

11         A.    Yes.

12         Q.    Yes?

13         A.    You're helping me recall, because

14     I -- as I recall, I think I told Ed that I

15     would try to write a response on the plane

16     coming back from London.

17         Q.    And is that what you did?

18         A.    I did.

19         Q.    So you were on the airplane with a

20     notepad or a computer drafting a response?

21         A.    I didn't take my computer.  And I

22     wrote the report on my computer, therefore,

23     what I think I did was to study Mr. Fowler's

24     report on the plane and make notes, and then

25     at some point after I got back to New York

1              **Longstreth**

2    **and had access to my computer, wrenching it**

3    **away from my wife.**

4         Q.    Did you use the notes that you had

5    prepared on the plane in drafting your

6    report?

7         **A.    I did.**

8         Q.    Did you look at any documents in

9    preparing your second report other than

10   Mr. Fowler's report?

11        **A.    No.  Well, other than my own**

12   **report, my original report.**

13        Q.    So you looked at your original

14   report?

15        **A.    I did.**

16        Q.    And you looked at Mr. Fowler's

17   report; is that right?

18        **A.    Yes.**

19        Q.    There is in your original report a

20   set of materials considered.  Are you

21   familiar with that portion of your report?

22        **A.    Right.**

23        Q.    Did you go back and look at any of

24   those materials that you had previously

25   looked at?

1                          Longstreth

2        **A.**    **No.**

3        Q.    There is in Mr. Fowler's report an

4    exhibit entitled "Materials Considered" that

5    lists the documents that he looked at.

6              Are you familiar with that portion

7    of his report?

8        **A.**    **I read his report from cover to**

9    **cover.**

10        Q.    And he has an exhibit to his report

11    that has a set of the documents he

12    considered, correct?

13        **A.**    **Right.**

14        Q.    Did you go and look at the

15    documents that he considered?

16        **A.**    **No.**

17        Q.    The report that you provided first

18    time out, in preparing that report, you

19    didn't rely on any other expert's opinion; is

20    that correct?

21        **A.**    **Rely on any other expert's opinion?**

22        Q.    In reaching your own opinion.

23        **A.**    **No, I don't think so.**

24        Q.    And there is a double negative, so

25    that means you didn't?

Page 12

Longstreth

1

2    A.    I did not.

3    Q.    And in your second report in which

4  you looked at your original report and

5  Mr. Fowler's report, I take it then that you

6  didn't rely on or incorporate any other

7  expert's opinion into this second report?

8    A.    No.

9    Q.    Have you read any of the other

10  expert reports?

11    A.    Yes.

12    Q.    Which ones have you read?

13    A.    Well, I read the one -- I think I

14  have read them all, but I don't remember all

15  of them at the moment.

16    Q.    Did you read any other expert

17  reports besides Mr. Fowler's and your own

18  before writing your second report?

19    A.    No, that's the third time you have

20  asked me that.  I guess I'm trying to give

21  you the same answer each time.

22    Q.    I appreciate that.

23        The plaintiffs have offered some

24  other experts.  I'll just give you their

25  names to try to help you in remembering the

Page 13

1                    Longstreth

2    reports.

3              One of their experts is a

4    Mr. Baliban.   Are you familiar with

5    Mr. Baliban's report?

6         A.    I looked at it; I read it.

7         Q.    Did you read that carefully and

8    scrutinize that report?

9         A.    I gave it as much care as I thought

10   I needed to give it.

11        Q.    And since you didn't rely on it,

12   how much care did you need to give it?

13        A.    Well, what in my judgment seems

14   sufficient.

15        Q.    Did you give it a quick read or did

16   you read it slowly cover to cover; do you

17   remember?

18        A.    I don't remember.

19        Q.    What about Mr. Carron's report, he

20   is another expert that the plaintiffs have

21   engaged?

22        A.    I remember reading that too about

23   the same way.

24        Q.    So meaning that you don't remember

25   how you read it?

Page 14

Longstreth

1

2      A.     I don't remember precisely how long

3  it took me to read it.

4      Q.     There is another expert that

5  plaintiffs engaged by the name of Purcell.

6  He has three reports.  Have you seen his

7  reports?

8      A.     I think so.

9      Q.     And do you know whether you spent a

10  significant amount of time reading and

11  analyzing those reports?

12      A.     I just gave it the attention that I

13  thought it deserved.

14      Q.     And can you remember specifically

15  whether it was something that you read more

16  than once?

17      A.     I can't remember.

18      Q.     What about Mr. Carron's report, do

19  you know whether you read that more than

20  once?

21      A.     I can't remember that either.

22      Q.     What about Mr. Baliban?

23      A.     Or that.

24      Q.     There is also an opinion that the

25  plaintiffs have stating in a report by

Page 15

Longstreth

1

2      Justice Walsh, former justice of the Delaware

3      Supreme Court.

4              Have you seen that report?

5      A.      I think so.

6      Q.      Do you know whether you read it?

7      A.      I think I read it.

8      Q.      Do you know whether you read it

9      more than once?

10     A.      I don't remember.

11             MR. LOCKWOOD:  We're going to

12         mark as Longstreth Exhibit 6, a copy

13         of the rebuttal expert report of Bevis

14         Longstreth.

15             (Longstreth Exhibit 6, Rebuttal

16     Expert Report of Bevis Longstreth,

17     marked for identification, as of this

18     date.)

19     Q.     Mr. Longstreth, is this document

20     that I put in front of you marked as Exhibit

21     6, this is your rebuttal report; is that

22     correct?

23     A.     Yes.

24     Q.     And were you the sole author of

25     this report?

1          Longstreth

2     A.     I am.

3     Q.     Did you have any input from anybody

4  else?

5     A.     I took comments on a draft from Ed

6  Friedman and Gary Friedman.

7     Q.     Did you take any notes when you

8  were receiving comments from Mr. Friedman and

9  Mr. Friedman?

10    A.     No.

11    Q.     In general terms, what is the

12  question or issue that you seek to address in

13  this rebuttal report?

14    A.     Well, the Fowler report contained a

15  hypothetical negotiation between Marvel, and

16  I assume it meant the independent directors

17  of Marvel, and the holding companies, and my

18  report addressed the nature and scope and

19  substance of that hypothetical negotiation,

20  and was my effort to reflect a different

21  point of view about how such a negotiation

22  might have progressed.  And beyond

23  progressing, how it might have initiated.  So

24  that's it.

25          MR. LOCKWOOD:  Let's mark as

1          Longstreth

2          Exhibit 7 the rebuttal expert report

3      of Peter Fowler.

4              (Longstreth Exhibit 7, Rebuttal

5      Expert Report of Peter Fowler, marked

6      for identification, as of this date.)

7          MR. FRIEDMAN:  Paul, on my

8      Exhibit 6, there is a last page that

9      doesn't seem to be part of the

10     document.  It says SSA Global

11     Technologies, Inc.

12     Q.    Is that on yours as well?

13     **A.    I have got the same thing, yeah.**

14         MR. LOCKWOOD:  Can we agree to

15     pull that off?

16         MR. FRIEDMAN:  Done.

17     Q.    Mr. Longstreth, Exhibit 7 is the

18 Fowler report that you were rebutting; is

19 that correct?

20     **A.    Yes.**

21     Q.    Let me take you to page 2 of

22 Mr. Fowler's report.

23     **A.    Okay.**

24     Q.    Under the heading "Assignment", do

25 you see that portion of the report?

Page 18

Longstreth

1

2      A.      Yes.

3      Q.      And in the second sentence of

4   Mr. Fowler's report he says, "In providing

5   that rebuttal, I have been asked to assume

6   that the indenture restrictions bound Marvel

7   and to determine how much the Marvel holding

8   companies would have had to pay Marvel after

9   arm's length bargaining at the time of the

10   issuance of the holding company notes to

11   compensate Marvel for these restrictions."

12          Is that the issue that you were

13   responding to in your report?

14      A.      Yes.

15          Well, I'm responding to the -- I'm

16   not responding to that question so much as

17   I'm responding to the hypothetical arm's

18   length bargaining that Mr. Fowler inserted in

19   his report.

20          To answer this question, he didn't

21   need to do that, but he did choose to do it.

22   And having done it, it raises questions as to

23   the realism of what he was doing.  And it

24   reveals the basis on which he arrived

25   ultimately at an answer to this question.

Page 19

1                           Longstreth

2    **And I think that I was requested to address**

3    **the realism of what he depicted as an arm's**

4    **length negotiation.**

5         Q.    If you go to the exhibits that were

6    previously marked at your deposition in

7    April.

8         **A.    Up here?**

9         Q.    Yes.

10             I'd like you to take a look at

11   Exhibit 1, which is your original expert

12   report.

13        **A.    Okay.**

14        Q.    And I would like to draw you to

15   page 2 of that report.

16        **A.    Yes.**

17        Q.    There is a block quote at the top

18   of the page under the heading "Opinion".

19             Do you see that?

20        **A.    Yes.**

21        Q.    It begins, "We wish to obtain your

22   expert opinion" --

23        **A.    Right.**

24        Q.    -- "with respect to the nature of

25   arm's length bargaining that would have been

Page 20

1                           Longstreth

2    conducted by Marvel with Perelman if Perelman

3    had presented to the independent directors of

4    Marvel a request that Marvel assist and

5    acquiesced in the note transactions as it

6    did."

7                My question is:  How is your

8    rebuttal report different in the issue that

9    it analyzes from your initial report and the

10   question that you analyzed in that initial

11   report?

12        A.     Well, in the initial report, I

13   focused on the, really, almost exclusively on

14   the second sentence, and then very

15   specifically on the answers to the questions

16   that were put to me in a letter, I think.

17        Q.     There is a letter from Mr. Friedman

18   that's Exhibit C to your initial report.

19        A.     Yeah.

20        Q.     Is that what you're referring to?

21        A.     Yeah, I'm trying to find the

22   questions.  There were specific questions.

23   And you can see I -- my report starts with

24   the answer to question one.

25        Q.     There are seven questions listed on

1          Longstreth

2    pages five and six of Exhibit C to your

3    initial report.

4              Is that what you're referring to?

5    **A.      I'm fumbling around here because --**

6    Q.     You're going beyond the -- it's

7    confusing because you have all the exhibits

8    there.  Stay within the first.

9    **A.      Okay.**

10             **That's right.  Those are the**

11   **questions.**

12   Q.     If you go to the previous page,

13   page 4 of Mr. Friedman's letter.

14   **A.      Okay.**

15   Q.      "Questions To Be Addressed".  Do

16   you see that heading?

17   **A.      Yes.**

18   Q.     And his overarching question to

19   you, at least as I read this letter, is set

20   forth in the topic sentence of that

21   paragraph.  "We wish to obtain your expert

22   opinion with respect to the nature of the

23   arm's length bargaining that would have been

24   conducted by Marvel with Perelman if Perelman

25   had presented to the independent directors of

Page 22

Longstreth

2    Marvel a request that Marvel assist and

3    acquiesce in the note transactions as it

4    did."

5            Did you address that?

6        A.    Well, that's the same paragraph as

7    I quoted in my answer.

8        Q.    And did your initial report, did it

9    address that question posed by the first

10   sentence of the paragraph quoted on page 2 of

11   your report?

12       A.    It really did not.  It addressed

13   the second general question in that

14   paragraph, and then moved immediately to

15   answer the specific questions.

16       Q.    Does your rebuttal report, does it

17   respond to this first question that's posed

18   in the paragraph on page 2 of your report?

19           MR. FRIEDMAN:  I object to the

20       form of the question.

21       A.    Well, it responds to what Ed

22   Friedman asked me to do, which was to

23   consider the Fowler hypothetical negotiation

24   and comment on the -- on how close to a real

25   negotiation it came.

1                    **Longstreth**

2       Q.    If you could, I'm going to ask you

3   to look at two things at once.  Page two of

4   your initial report and that block quote.

5       **A.    Right.**

6       Q.    And that first sentence there and

7   Exhibit 7, Mr. Fowler's report.

8       **A.    Page 7?**

9       Q.    Page 2 of Fowler's report,

10  paragraph 5.

11      **A.    I got it, yeah.**

12          **Oh, wait a minute.**

13      Q.    The second sentence.

14      **A.    Page 5 did you say?**

15      Q.    Paragraph 5.

16      **A.    I got it.**

17      Q.    The second sentence of paragraph 5

18  where he discusses what he was asked to do.

19  And I want you to compare the issue

20  identified in the first sentence of the block

21  quote in your first report and that sentence

22  in the second sentence of paragraph 5 of

23  Mr. Fowler's report, and just tell me if, to

24  your understanding, there is a meaningful

25  difference between the issues described in

1                    Longstreth

2    those two sentences?

3            MR. FRIEDMAN:  I object to the

4        form of the question.

5    **A.    If there is a meaningful**

6    **difference?**

7    Q.    Well, I'll be up front with you.

8    As I read the first sentence in the block

9    quote in your paragraph that begins "we wish

10    to obtain your expert opinion" --

11    **A.    Yes.**

12    Q.    -- I look at that, and I look at

13    Mr. Fowler's report paragraph 5, the sentence

14    that begins "In providing that rebuttal, I

15    have been asked to assume" -- and it goes on

16    from there.

17            I read those two sentences as

18    essentially addressing the same subject

19    matter.

20            Do you read them that way as well?

21    **A.    No.**

22    Q.    Why not?

23    **A.    Well, Mr. Fowler's -- in the**

24    **assignment given to Mr. Fowler, there is a**

25    **simple question being asked, which is how**

1          Longstreth

2     much Marvel holding would have to pay Marvel.

3     In an arm's length negotiation, what would

4     they pay?  And that's the question.  That is

5     not the question here.

6              In this paragraph, which is much,

7     much broader, I'm being asked to give an

8     opinion on the nature of the arm's length

9     bargaining that would have occurred.

10             I took that paragraph frankly to

11    not be asking me to package a negotiation,

12    but rather to ask me to consider the --

13    really relying on the second sentence, "What

14    are the considerations that an independent

15    director would take into account in

16    considering this note issuance?"

17             In other words, in its broadest

18    context, and I never answered the first

19    question directly.  I answered the questions

20    that were put to me.  That's how I went about

21    this.  And I set out a bunch of

22    considerations that I thought a director who

23    was truly independent would have to think

24    about, including, of course, whether there is

25    going to be any negotiation at all.  That

Page 26

1                          **Longstreth**

2     **would be the fundamental question.**

3          Q.    If you look at Mr. Fowler's report.

4          **A.    Yes.**

5          Q.    On page 2 in the footnotes, I'd

6     like to draw your attention to footnote 7,

7     which quotes from the Third Circuit's opinion

8     in this case, and first off, have you read

9     the Third Circuit's opinion in this case?

10         **A.    I have.**

11         Q.    And Mr. Fowler quotes from a

12    portion of that opinion in Footnote 7, which

13    he quotes in the opinion, the Court notes and

14    he quotes, "What the defendants would have

15    had to pay Marvel, after arm's length

16    bargaining, for the restrictions defendants

17    secured without compensation."

18              Do either of your reports address

19    that issue?

20              MR. FRIEDMAN:  I object to the

21         form of the question.

22         **A.    Yes, I think they do.  I mean, they**

23    **don't -- they do not develop a mathematical**

24    **or other kind of formula for arriving at a**

25    **dollar amount.  But they do provide insight**

1        Longstreth

2   into what someone with an eye solely to the

3   interests of Marvel and with a fiduciary duty

4   to Marvel and its shareholders would have

5   taken into account, would have considered

6   before even getting to a table to negotiate,

7   and then if they did decide to get to the

8   table, what would have been considered

9   important.

10          All of that is essential

11  information to arrive at an amount if there

12  is going to be an amount to be paid.

13          So I think the answer to your

14  question is yes.

15      Q.   If you look at Exhibit 1 to your

16  initial report, which is -- I mean your

17  initial report, which is Exhibit 1.

18      A.   My report?

19      Q.   Yes, your first report.  Page 7 of

20  Exhibit 1 is what I want to draw your

21  attention to.

22      A.   Where is Exhibit 1?

23          Oh, my report?  Okay, I thought you

24  meant the exhibit.

25          Okay.

Page 28

1                              **Longstreth**

2        Q.    This contains the answers to six

3    and seven in this section?

4        **A.    Yes.**

5        Q.    There is a description at

6    paragraph -- the last paragraph on this page.

7        **A.    Uh-huh.**

8        Q.    As I read this, of discussions

9    that -- or the process that you would employ

10   if you were a director asked to negotiate

11   with Mr. Perelman as to the terms of this

12   transaction; is that correct?

13       **A.    Yes.**

14       Q.    And in it, you reference that the

15   independent directors would retain A,

16   counsel, and B, bankers.

17             Do you see that that was what you

18   indicated it would be responsible for the

19   directors to do before the negotiations; is

20   that right?

21       **A.    Yeah, this is if they had decided**

22   **that they were going to become involved in**

23   **the issuance of the notes to the extent that**

24   **they were being asked to be involved.  And in**

25   **fact, they were involved as it turned out.**

Page 29

1                         **Longstreth**

2              **If they decided to that for a**

3    **price, they would do that.   Then and only**

4    **then would they sit down with independent**

5    **counsel and bankers to talk about what that**

6    **price might be.**

7         Q.    So it's your view that the

8    directors would reject an approach by Mr.

9    Perelman without first meeting with

10   financial and legal advisors to inform

11   themselves of whether that was the right

12   decision to make or not?

13        **A.    I don't know whether they would**

14   **bring in investor bankers before they made**

15   **that decision.   I think they could have made**

16   **the decision on their own because they are**

17   **competent directors.   They know their**

18   **business.  Presumably they know it a lot**

19   **better than any banker would know it.   What**

20   **they could use, in my judgment, where I would**

21   **feel I needed help was when I got down to a**

22   **negotiation.**

23        Q.    So in negotiations, if you made a

24   decision to engage in arm's length

25   negotiations, you would want legal advice and

1                         Longstreth

2      you would want financial advice as to how to

3      approach that negotiation; is that correct?

4          **A.      Yes, I would want professional**

5      **help.**

6          Q.      And in your initial report, you go

7      on to say, "These advisors would serve Marvel

8      through its independent directors in

9      determining what kind of benefit, if any, and

10     what size could constitute a reasonable and

11     to the independent directors acceptable quid

12     pro quo for allowing the restrictions to be

13     imposed.  I would ask the advisors to develop

14     as many alternative ways of benefitting

15     Marvel adequately as possible."

16              That was your view in your initial

17     report as to how the directors should

18     approach the bargaining; is that correct?

19              MR. FRIEDMAN:  That's part of

20          what the report says.  What's the

21          question?

22          Q.      I'm confirming that was your view

23     in your initial report, correct?

24     **A.      Yes.**

25          Q.      And in your rebuttal report, before

1                        Longstreth

2    you gave your rebuttal report, did you

3    consult with any financial or legal experts

4    in order to analyze or flesh out how the

5    bargaining with Mr. Perelman would have

6    proceeded?

7        A.    No.

8        Q.    You are a lawyer; is that correct?

9        A.    I don't practice any more.

10       Q.    At one time you were a lawyer?

11       A.    I was at one time.  Technically, I

12   still am a member of the bar.

13       Q.    You have never been an investment

14   banker; is that correct?

15       A.    Never been an investment banker.

16       Q.    And you never held yourself out as

17   an expert financial advisor?

18       A.    That's not correct.

19       Q.    You have held yourself out as a

20   professional financial advisor?

21       A.    I do right now.

22       Q.    In connection with providing

23   financial advice for companies --

24       A.    No, in connection with the

25   management of money.

Page 32

**Longstreth**

1

2    Q.    In terms of the work an investment

3    banker would do in analyzing potential or

4    financial structures of a financing

5    transaction, is that something that you would

6    consider yourself expert in?

7    **A.    Yes.  I mean, my experience has**

8    **been over a long period of time doing**

9    **financial transactions and giving advice with**

10   **them.  And as you know, legal advice and**

11   **business advice and financial advice tend to**

12   **blur and overlap each other.  So I think the**

13   **answer to your question is yes.**

14   Q.    Well, when you were saying that the

15   board should go out and get expert financial

16   advisors --

17   **A.    Right.**

18   Q.    -- do you think that you would be a

19   suitable candidate for the board to hire?

20   **A.    No.  I mean, I didn't have myself**

21   **in mind.  I was thinking of someone that is**

22   **a -- is not providing the legal input, but is**

23   **providing the financial analysis and input.**

24   Q.    You have read --

25   **A.    In other words, it could be a**

Page 33

1                        **Longstreth**

2    **commercial banker, investment banker.**

3         Q.    You have read Mr. Fowler's CV

4    that's attached to his report; is that right?

5         **A.    I have.**

6         Q.    And is Mr. Fowler someone who has

7    the expertise and background that you think

8    would meet minimum qualifications for a board

9    to engage as a financial advisor in a

10   negotiation such as this?

11        **A.    I don't remember his**

12   **qualifications.**

13        Q.    Well, why don't you take a look at

14   them.  It's an exhibit to his report.

15   Exhibit 2.

16        **A.    Exhibit 2?**

17        Q.    To his report, which is Exhibit 7.

18        **A.    I'm looking at -- when he did all**

19   **this advising, where was it?**

20        Q.    Credit Suisse, First Boston.

21        **A.    Yes, well, he has got the kind of**

22   **experience I'm talking about.**

23             **But he would have to be -- to**

24   **qualify, he would have to be completely**

25   **independent and undividedly loyal to the**