1                           **Longstreth**

2     **independent directors of Marvel.**

3          Q.      Is it your understanding that the

4     arm's length negotiations that would occur

5     here would have to be tantamount to

6     negotiations that would occur between two

7     completely independent companies, companies

8     that had no cross ownership so they each had

9     their own advisors, they had their own

10    interest, and they were looking out for

11    themselves on each side of the table?

12         A.      Can you repeat the question?

13         Q.      Sure.

14                 I'll try to phrase it in a better

15    way.

16                 Is it your understanding that the

17    arm's length bargaining, this hypothetical

18    arm's length bargaining, should be bargaining

19    in which each side is acting as if they were

20    completely independent, separate companies

21    bargaining with solely their own interests at

22    stake?

23         A.      That's a compound question and

24    there is part of it that makes it hard to

25    answer.

1                    **Longstreth**

2        Q.    Okay.   Why don't you explain what

3   the difficulty is?

4        **A.    Well, when you say as if they were**

5   **completely independent, that isn't the fact.**

6   **The fact is that 80 percent of Marvel is**

7   **owned by --**

8        Q.    I understand.

9              What I'm trying to say is the goal

10  in setting up a structure.

11       **A.    It's an arm's length bargaining, so**

12  **arm's length implies that you are free to**

13  **negotiate in your own interest without**

14  **conflict.   So -- I mean, the people that I'm**

15  **talking about doing the negotiating would be**

16  **representing the Marvel and its shareholders,**

17  **all of its shareholders.**

18       Q.    And is it your understanding in the

19  hypothetical bargaining that you are

20  considering for purposes of your second

21  report that Mr. Perelman would be in this

22  transaction free to negotiate on his behalf

23  across the table from this independent

24  committee or whatever the structure was set

25  up to create independence?

Page 36

Longstreth

1

2    A.    I think if the independent

3    directors were truly independent and they

4    were acting as I described just a minute ago

5    for the benefit of Marvel and all of its

6    shareholders, Mr. Perelman could negotiate on

7    his side.  That's right.

8    Q.    And would you expect --

9    A.    I mean, he wouldn't be precluded

10   from participating on his side to reflect his

11   interests.

12   Q.    Would you expect each side to

13   engage their own financial advisors to

14   analyze a transaction from each of their

15   perspectives?

16   A.    Well, I don't know what to say

17   about him, but I did say that I would expect

18   the independent directors to seek financial

19   expertise and negotiating skill.  The reason

20   you do that is not just because you need some

21   expertise.  You may not need it, but the

22   presence of someone to negotiate for you has

23   tactical advantages.

24   Q.    And the financial advisor that

25   Marvel would retain, as I take it from your

Longstreth

1
2  first report, would come up with as many
3  alternative ways to negotiate on behalf of
4  Marvel as reasonably possible; is that
5  correct?
6      A.    I don't know what they would come
7  up with.
8      Q.    Have you made any attempt to
9  construct for purposes of the hypothetical
10 bargaining you're talking about, the
11 positioning that Marvel's financial advisors
12 would take?
13         MR. FRIEDMAN:  I object to the
14     form of the question.
15     Q.    It's a bad question.  Let me
16 rephrase it.
17         Have you attempted to construct the
18 points of negotiation that would have been
19 developed by Marvel's financial advisors
20 going into the negotiations?
21     A.    I think my two reports taken
22 collectively indicate a whole host of
23 considerations that independent directors
24 acting independently would take into account.
25     Q.    And would those -- does your report

1              Longstreth

2    identify the term, the financial terms that

3    the Marvel bankers would be armed with going

4    into the negotiations with Mr. Perelman?

5        A.    The financial terms?

6        Q.    Well, the financial analysis that

7    they would present to Mr. Perelman's side.

8        A.    Well, my report is what it is.  I

9    don't know whether it fits that definition or

10   not.

11       Q.    Have you made any attempt in

12   putting together your analysis to look at the

13   negotiations from Mr. Perelman's perspective

14   and to understand what his best points to

15   present to Marvel would be in the

16   negotiations?

17       A.    Well, I haven't tried to outdo

18   Mr. Fowler in his representation of

19   Mr. Perelman and -- so the answer is I took

20   what Mr. Fowler said to be the Perelman

21   position is as good as it gets.

22       Q.    So you made no independent attempt

23   to analyze Mr. Perelman's position and what

24   his bargaining position would be?

25       A.    Well, I didn't say that.  What I

1                         Longstreth

2    said was in the rebuttal we have, Mr. Fowler

3    advanced a hypothetical negotiation and I

4    took it that he was representing

5    Mr. Perelman's point of view as well as it

6    could be represented.  I didn't try to do it

7    over again.

8        Q.    And before Mr. Fowler put in his

9    report, had you given any consideration to

10   the positions that Mr. Perelman would take in

11   the negotiations?

12       A.    Yes, and whatever consideration I

13   gave is reflected in my original report.

14       Q.    If you take a look at your second

15   report, which is Exhibit 6, in the last

16   paragraph of the first page.

17       A.    Uh-huh.

18       Q.    That begins "In my opinion".

19             Do you see that?

20       A.    Yes.

21       Q.    The second sentence quotes from

22   Mr. Fowler's report?

23       A.    That's right.

24       Q.    And it says "Exchange 1

25   unrealistically starts with Marvel saying the

Page 40

1              Longstreth

2    restrictions" -- and that's capitalized --

3    "hinder our ability to operate Marvel."

4              What is, for purposes of your

5    report, your understanding of the term

6    "restrictions" as used there?

7        **A.    As that term, I think, is defined**

8    **in Mr. Fowler's report, it refers to the**

9    **negative covenants that were put in the note**

10   **agreements.  Or the notes.**

11       Q.    Let's take a look at Mr. Fowler's

12   report and where he defines the term

13   restrictions.

14       **A.    Can you show me where that is?**

15       Q.    It's in paragraph 3, which is on

16   page 1 to 2.

17              MR. FRIEDMAN:  Is there a

18         question?

19              MR. LOCKWOOD:  I thought there

20         was, maybe there wasn't.

21       Q.    Have you read paragraph 3?

22       **A.    I have.**

23       Q.    Are those four covenant provisions

24   that he cites in paragraph 3, are those the.

25   restrictions that you were focused on in your

1                    Longstreth

2    rebuttal report?

3        **A.    Yes.**

4        Q.    Let me show you --

5        **A.    They are the ones that I quote -- I**

6    **quote from his report.**

7        Q.    Let me show you a document that --

8    it's been previously marked.  I'm going to

9    mark it again.  To keep the record clean,

10   we'll mark it as Fowler 8.

11             MR. FRIEDMAN:  Longstreth 8 you

12        mean?

13             MR. LOCKWOOD:  Longstreth 8.

14        Thank you.

15             (Longstreth Exhibit 8, Excerpt

16        from Marvel III Holdings Indenture,

17        marked for identification, as of this

18        date.)

19        Q.    It is an excerpt from the Marvel,

20   Marvel Roman numeral III holdings indenture.

21             MR. FRIEDMAN:  Do you want the

22        witness to look at any part of Exhibit

23        8?

24             MR. LOCKWOOD:  Yes, I do, since

25        he has it in front of him, which he

Page 42

1                    Longstreth

2       does now.

3       Q.    Mr. Longstreth, I'm not trying to

4  hide anything from you here.  I just want to

5  show you paragraph 3 includes four covenant

6  provisions, two of which are part of Section

7  4.04 of the indentures, one that is part of

8  Section 4.05 of the indentures, and one that

9  is part of Section 4.09 of the indentures.

10            From reading your deposition in

11  April, I understood that your analysis in

12  your original report also addressed or

13  concerned Section 4.14 of the Marvel III

14  indenture, which is on page 57, if you use

15  the numbers on the bottom of the page of this

16  document.

17       A.    4.14?

18       Q.    Yes.

19       A.    That's the consolidation.

20       Q.    "Tax deconsolidation event terms."

21            Do you see that?

22       A.    Yes.

23       Q.    In your rebuttal report, does your

24  analysis of the restrictions and the

25  negotiations relating to the restrictions,

Page 43

1                    Longstreth

2    does it include or exclude this Section 4.14

3    provision?

4                    MR. FRIEDMAN:  I object to the

5          form of the question.

6    **A.    Well, Mr. Fowler defined the**

7    **restrictions to simply include these**

8    **covenants, these negative covenants.  My --**

9    **the thrust of my rebuttal report is that**

10   **that's too narrow a basis to be -- it's too**

11   **narrow a basis on which to arrive at a**

12   **conclusion about the nature of the arm's**

13   **length bargaining.  And I have tried to say**

14   **that if they got down to negotiating, it**

15   **would be over all of the aspects of the note**

16   **issuances that involved Marvel in a**

17   **participatory way; in other words, in a**

18   **facilitating way.**

19   Q.    Would that include then Section

20   4.14, this tax deconsolidation event of the

21   Marvel III indenture?

22   **A.    Yes, it would.**

23   Q.    Have you read Mr. Fowler's

24   deposition?

25   **A.    No, I haven't.**

Page 44

Longstreth

1

2     Q.    Have you had it summarized?

3     A.    Not that I can recall.

4     Q.    If you look at Exhibit 1, which is

5     your original report.

6     A.    Okay.

7     Q.    And the section that I'm interested

8     in is Exhibit B, the materials considered.

9           I understood from your testimony --

10    A.    Exhibit B?  Okay.

11    Q.    Earlier today, you didn't go back

12    and rereview these documents in preparing

13    your second report; is that correct?

14    A.    That's correct.

15    Q.    But do these documents still inform

16    your judgment with respect to your second

17    report?

18    A.    I can't tell you.

19    Q.    Well, your understanding of the

20    overall facts in the case, where did that

21    come from?

22    A.    It came from Exhibit B and

23    discussions with counsel.

24    Q.    Is there information that you

25    relied on in your report that came from

1                         Longstreth

2      discussions with counsel?

3          A.    No.

4          Q.    Well, one of the things that you

5      reference in each of your reports is you make

6      reference to certain of the minutes of Marvel

7      board meetings; is that correct?

8          A.    Yes.

9          Q.    And did you look at all of the

10     minutes or just those minutes that are listed

11     on Exhibit B?

12         A.    I didn't look at all the minutes.

13         Q.    Did you look at -- I take it

14     because it is listed here that you looked at

15     the minutes for the March 18, '93, March 9,

16     '94, December 12, '96 and December 26, '96

17     board meetings; is that correct?

18         A.    I did.

19         Q.    Do you know whether you looked at

20     any other minutes beyond those particular

21     minutes?

22         A.    I believe these were -- to the best

23     I can recall, these were the only minutes I

24     looked at.

25         Q.    Who selected those minutes for your

Page 46

1                    Longstreth

2    review?

3        A.      My counsel.

4        Q.      There is also listed here just

5    above, above that there are three opinion

6    letters?

7        A.      Yes.

8        Q.      One from each of the three

9    offerings.

10               Do you see that?

11       A.      Yes, I do.

12       Q.      And are those opinion letters, they

13    are documents that you would expect would be

14    found in the closing binders for each of

15    those three transactions, is that true, based

16    on your experience as a lawyer?

17       A.      Whatever opinions would be given

18    would be in the closing.

19       Q.      And I take it from the list of

20    materials considered here, you never saw the

21    closing binders; is that right?

22       A.      That's correct.

23       Q.      So it was counsel that selected the

24    three documents from the closing binders for

25    you to review; is that correct?

Longstreth

1

2      A.    No, it isn't correct.  I requested

3  the opinions.  I said I -- if there were

4  opinions, I would like to see them.  I was

5  interested in knowing who gave opinions.

6      Q.    Is there anything else that you

7  recall requesting from counsel relating to

8  the closing documents for the note offerings?

9      A.    The purchase agreements, the

10  underlying -- are they listed here?  Well,

11  the offering memo I asked for.

12          You see the offerings memo there?

13      Q.    Yes, I see an offering memo and an

14  indenture.

15      A.    And the indenture.  I think I was

16  provided with the indenture.

17          You're trying to distinguish

18  between things I was given and things I asked

19  for?

20      Q.    At this point, I'm asking what

21  specific documents did you ask for that you

22  weren't given by counsel but you sought and,

23  therefore, obtained.

24      A.    I think it is limited to the

25  opinions and the -- and maybe not all of the

1               **Longstreth**

2      opinions, I don't remember.

3          Q.      In your second report, I can show

4      you exactly where if you would like me to,

5      you make reference to a comfort letter being

6      received from the auditors of Marvel.

7               Do you recall that's in your

8      report?

9          A.      I know, yes.

10         Q.      And I don't see that listed here on

11     your materials considered.  Can you explain

12     that for me?

13         A.      No, I can't explain it.

14               I believe that there was a comfort

15     letter.

16         Q.      Was that something that the

17     attorneys brought to your attention or

18     something you asked about?

19         A.      Something I asked about.

20         Q.      I also note that other expert

21     reports that you told me you read are not

22     listed on the materials considered.  Is there

23     a reason for that?

24               MR. FRIEDMAN:  The other expert

25     reports, if I'm correct, were prepared

Page 49

Longstreth

after Exhibit B was prepared.

        MR. LOCKWOOD:  That's true.

   A.    I never saw them before I wrote my initial report.

   Q.    Your second report incorporates Exhibit B by reference; is that right?

   A.    Sounds like an omission.

   Q.    Yeah, so those should have been listed on a supplemental Exhibit B; is that fair?

   A.    If I was -- let me see what this says.

      Yeah, I think it should have been. I did add the Peter Fowler, but I didn't say I looked at the other things.

      Now, I mean, you know I think I could explain this perhaps.  First of all, I can explain it as an oversight, but second, I can explain it by the fact that those other expert opinions were not central to what I was doing, although I had seen them.

   Q.    Is there anything else that you know that you saw that you don't see in Exhibit B that you may have seen since

Page 50

Longstreth

Exhibit B was prepared?

A.    No.

Q.    Let's go back to Exhibit 8, page 57, Section 4.14.

A.    Exhibit 8, okay.

Q.    Is it your understanding that this is a put provision?

A.    Oh, 4 --

Q.    4.14.

A.    Yes, something like a put provision, yes.

Q.    And in general terms, how does a put provision work?

A.    Well, a put provision relates to the financial instrument held by someone who has the right to put that provision -- put that financial instrument to somebody else. In other words, deliver it. And demand payment for it. So the typical case would be a promissory note. The holder of the note by contract has a right upon the occurrence of specific events to take the note and deliver it to somebody, in the classic case it would be the issuer of the note, and demand payment

Page 51

1                          **Longstreth**

2    **immediately.  That's what a put means in sort**

3    **of general language.**

4         Q.    Let's talk specifically about 4.14,

5    this provision.

6         **A.    Okay.**

7         Q.    In this provision, there is a

8    defined term a "tax deconsolidation event".

9              Do you see that?

10        **A.    Yes.**

11        Q.    And we can get into the specifics

12   later, but the essence of this provision is

13   that if that defined term event occurs, then

14   the holders of the Marvel III notes have a

15   right to put their shares to Marvel III?

16        **A.    Put their notes?**

17        Q.    Put their notes.  Is that correct?

18        **A.    To Marvel III for payment, right.**

19        Q.    And the payment that they are to

20   receive under the terms of 4.14 is 101

21   percent of the principal amount, correct?

22        **A.    Right.**

23        Q.    And do they get future interest to

24   put those notes, or do they get only interest

25   to date under the terms of 4.14?

1          Longstreth

2    A.    I have to read it.

3          Did you say do they get future

4    interest?

5    Q.    Yes.  Do they get to accelerate

6    their interest for the remaining period of

7    the note or do they get only interest accrued

8    to the date of the put?

9          MR. FRIEDMAN:  I have -- while

10         the witness is looking at that, I have

11         an objection and question, which is

12         whether your position is that this

13         line of questioning relates to Mr.

14         Longstreth's rebuttal report.

15         MR. LOCKWOOD:  Yes, I do believe

16         it relates directly to Mr. Fowler's

17         report, so these are foundational

18         questions that I'm asking to get

19         there.

20   A.    Well, the repurchase price is 101

21   percent of the principal amount plus accrued

22   and unpaid interest to the date of

23   repurchase.

24         I might have to read the whole

25   thing, but that paragraph says that you get,

Page 53

1                    **Longstreth**

2    **and that's quite typical, you get a premium**

3    **on the principal amount at one percent and**

4    **you get paid your interest up to the date of**

5    **repurchase.  That is what it seems to say.**

6              **But there is a subject to the right**

7    **of holders on the relevant record date to**

8    **receive interest due on the relevant interest**

9    **payment date.  So, I would have to figure out**

10   **what that means.**

11       Q.    Did you in the hypothetical

12   bargaining that you were analyzing for

13   purposes of your rebuttal report?

14       **A.    Yes.**

15       Q.    Did you make any distinctions

16   between a put right, such as in Section 4.14,

17   and a restricted covenant that operates more

18   like the debt restriction in Section 4.04,

19   which reads "The company shall not permit

20   Marvel or any subsidiary of Marvel"?

21       **A.    Yeah, there is a distinction, one**

22   **is a negative covenant that if it is violated**

23   **triggers an event of default.  This is an**

24   **event, which is worded in such a way that it**

25   **is not a thou shalt not, as much as a thou**

Page 54

1                          **Longstreth**

2      **shall if you do this or if this happens.  If**

3      **the event tax deconsolidation event happens,**

4      **then we, the holders, are entitled to a put.**

5              **Now, the practical effect of the**

6      **two is the same because if -- I mean, if the**

7      **noteholders choose to put the notes, the**

8      **holding companies don't have the wherewithal**

9      **to pay it except -- because they don't have**

10     **any assets except the stock in Marvel.  So it**

11     **would rapidly, unless somebody came to the**

12     **rescue, it would rapidly -- the put would**

13     **rapidly lead to an event of default.**

14          Q.    Why don't you take a look at

15     Mr. Fowler's report, which is Exhibit 6.  And

16     I want to draw your attention to paragraph

17     32.

18          **A.    32?**

19          Q.    Yes.

20          MR. FRIEDMAN:  Fowler report, I

21       think is Exhibit 7.

22          MR. LOCKWOOD:  You're right.

23          MR. FRIEDMAN:  Paragraph 32.

24          Q.    I'll give you a moment just to read

25     paragraph 32 instead of reading it aloud.

Longstreth

2  Just let me know when you're done.

3          In fact, while I'm having you do

4  some reading, why don't you start by reading

5  the last two sentences of the previous

6  paragraph as well.

7      **A.      Right.   You mean 31?**

8      Q.     Yes.

9      **A.      The last how many?**

10     Q.     You can start --

11     **A.     A put option.**

12     Q.      Both, however the restrictions --

13     **A.     Yes.**

14          MR. FRIEDMAN:   Let me interject

15      before you ask a question, that I

16      believe you have been asking questions

17      that go beyond the opinions expressed

18      by the witness in his rebuttal report,

19      and I believe questions you're asking

20      go beyond the opinions the witness

21      expressed in his initial report, and

22      to the extent that you open the door

23      and the witness expresses further

24      opinions, then we reserve and will

25      **assert** all of our rights with respect

Page 56

Longstreth

to such opinions at trial.

And I want the record to be clear
that my view is you are going way
beyond the opinions previously
expressed.

MR. LOCKWOOD:  I won't argue with
you here.  I completely disagree, but
I won't argue with you here.

Q.    The analysis that's in paragraph 31
and 32 that I just drew to your attention,
did you make any assessment of Mr. Fowler's
views that a protection similar to the
restrictions could be obtained by formatting
them as puts?

A.    I didn't credit it with -- I didn't
give it much weight, let's put it that way.
I was looking at what actually happened, not
other things that -- other ways of
restructuring the transaction to possibly
accomplish the same kinds of processions that
the noteholders were seeking through what
they actually got.  I didn't address -- I
didn't spend much time thinking about that.
I did think that the -- any analogy to a

Page 57

1                        **Longstreth**

2    **margin loan was completely wrong.**

3         Q.    Well, in Mr. Fowler's construction

4    of the hypothetical negotiations between

5    Marvel --

6              MR. FRIEDMAN:  What page are you

7         referring to, if I may ask?

8              MR. LOCKWOOD:  I'm referring to

9         page 29, exchange 5.

10        **A.    Okay.**

11        Q.    His exchange is M -- and (a) from

12   Marvel says, "MacAndrews & Forbes must pay

13   Marvel for the restrictions in the notes",

14   and one of Mr. Fowler's responses is that

15   "MacAndrews & Forbes has other options, we

16   could issue LYONS or use puts instead of a

17   covenant package format."

18             Do you see that?

19        **A.    Yes.**

20        Q.    Did you, sir, do an analysis of

21   whether MacAndrews & Forbes had such other

22   options, such as using puts instead of

23   covenants?

24        **A.    I thought about it.  It wasn't very**

25   **persuasive to me as a line of argument.  I**

Page 58

1                   **Longstreth**

2    **think that if I were a director, or if I were**

3    **in charge of the argument, I would say well,**

4    **if that's the case, do what you can do**

5    **without tampering with our business, but if**

6    **you're going to tamper with our business, if**

7    **that's the way you want to do this, then**

8    **we're going to sit down and talk about what**

9    **it is going to cost you.**

10       Q.    Well, can you explain to me, you

11   said you didn't.  You said you thought about

12   it and "it wasn't very persuasive to me".

13           Can you describe for me the

14   analysis you performed in making a judgment

15   as to whether Mr. Fowler had correctly

16   analyzed the put option, the option of using

17   puts?

18           MR. FRIEDMAN:  I object to the

19       form of the question because you

20       gave -- the witness gave you a

21       complete answer and you read back a

22       phrase from his prior answer.  Why

23       don't you read back the entire answer?

24       You have his explanation and opinion

25       at his prior answer.

Page 59

Longstreth

1

2      Q.    If you have no further analysis?

3      **A.    I have nothing to add to that.**

4      Q.    So there is nothing supporting your

5  judgment beyond what you said in the previous

6  answer; is that correct?

7           MR. FRIEDMAN:  I object to the

8       form of the question.

9      **A.    My expert opinion and my rebuttal**

10 **opinion support my judgment.**

11     Q.    What analysis did you perform, if

12 any, with respect to the question of whether

13 MacAndrews & Forbes had alternatives to the

14 restricted covenants in its pursuit of a

15 financing?

16          MR. FRIEDMAN:  I object to the

17      form of the question.

18     **A.    I considered all of this.  I have**

19 **nothing to add.**

20     Q.    I'm trying to understand your

21 thinking, so that we can hear about it at

22 trial and get an understanding of where

23 you're coming from.

24          So what other than you considered

25 it, can you tell me anything more?

Page 60

1                    Longstreth

2      **A.**     **It's in my report.**

3      Q.    Can you show me where in your

4   report?

5      **A.**     **It's throughout my report.**

6      Q.    Can you show my any specific point

7   of your report where I can find it?

8            MR. FRIEDMAN:  I want the record

9         to be clear that the witness has

10        answered your questions on this

11        subject matter as well.

12            MR. LOCKWOOD:  I'm just trying to

13        avoid surprises.

14     Q.    If you can show me where in your

15   report I can find this answer, I would

16   appreciate that.

17     **A.**     **It's on every page.  I can't**

18   **pinpoint it.  As I've said repeatedly, the**

19   **covenants were to transfer of the rights and**

20   **responsibilities of the board to run the**

21   **business at Marvel from that board to the**

22   **indenture trustee and the noteholders,**

23   **neither one of which had any fiduciary duty**

24   **whatsoever to the stockholders, particularly**

25   **the minority stockholders or Marvel itself.**

1                         Longstreth

2             That's the essence of the problem

3    with these negative covenants.  And that

4    analysis could not be applied to either a put

5    or a margin loan.

6        Q.    Why don't you take a look at your

7    rebuttal report, again.

8             Page 2.  You have a sentence that

9    provides "some specifics follow".  And then

10   below that there is some numbered paragraphs.

11       A.    Uh-huh.

12       Q.    Are there any specifics omitted

13   from your report?

14       A.    I don't know.

15       Q.    Sitting here today, do you know of

16   any specifics that are missing from the

17   report?

18       A.    Well, each of these points could be

19   elaborated at greater length, but there is

20   nothing, I don't think there is anything that

21   is coming out of left field, it has nothing

22   to do with the points I'm making here.

23       Q.    So there is no --

24       A.    I would have to reserve the right

25   to elaborate the paragraphs I have set out

Page 62

1                           Longstreth

2    here, particularly if I'm asked questions

3    about it.

4         Q.     That invites me to go through all

5    the paragraphs, so why don't we do that.

6              As to the second paragraph of

7    number one, the brief two sentence paragraph,

8    it says, "As to benefits, the wealth

9    extraction from Marvel accrued solely to the

10   benefit of Ronald O. Perelman, nothing of

11   benefit accrued to Marvel or its minority

12   shareholders."

13             In your analysis, what was the

14   amount of the benefit that Mr. Perelman

15   obtained as a result of the restrictions?

16        A.     The dollar amount?

17        Q.     Yes.

18        A.     I think it was something like 535.

19        Q.     So in your view, the full amount of

20   the proceeds of the note offerings is the

21   amount of the benefit that Mr. Perelman

22   obtained as a result of having these

23   restrictions in place; is that correct?

24        A.     Yes.

25        Q.     And you are aware that Mr. Fowler's

Page 63

1              Longstreth

2    report, and I can show you where in his

3    report he does an analysis of the amount of

4    the benefit obtained by Mr. Perelman as a

5    result of the restrictions.

6              Can you look at that portion of his

7    report?

8         A.    I looked at it.

9         Q.    It's section 4 that begins on page

10   12, and it goes on for several pages and has

11   many subparts.

12             MR. FRIEDMAN:  Is there something

13        that you want the witness to read?

14             MR. LOCKWOOD:  Well, I'm going to

15        ask him a question right now.

16        Q.    Do you have anything more specific

17   in response to Mr. Fowler's several page

18   analysis of the benefits to Mr. Perelman

19   beyond the two sentences that I see here on

20   page 2 of your rebuttal report?

21             MR. FRIEDMAN:  When you refer to

22        Mr. Fowler's analysis, which portion

23        are you now referring to so the record

24        is clear?

25             MR. LOCKWOOD:  On page 12, there

Page 64

1          Longstreth

2      is a Section 4, "Benefits to the

3      Marvel Holding Companies of the

4      Restrictions".

5          MR. FRIEDMAN:  And that continues

6      until page what, until page 27?

7          MR. LOCKWOOD:  Yes.  Pages 12 to

8      26 are the benefits of his analysis.

9   **A.    12 to 26?**

10     Q.    Yes, 14 pages of analysis on that

11  point.

12          MR. FRIEDMAN:  You want the

13     witness to tell you if he agrees or

14     disagrees with those 14, or rather 15

15     pages?

16          MR. LOCKWOOD:  Yes, I have two

17     sentences in his expert report.  I'm

18     looking for anything beyond those two

19     sentences that responds to those

20     pages.

21  **A.    I have nothing to add.**

22     Q.    In the next section, I mean next

23  paragraph, as to the costs, do you see that?

24  **A.    Yes.**

25     Q.    "The risk of the note issuance were

1                          Longstreth

2    borne by Marvel, whose assets were in

3    practical effect the sole resource of

4    repayment."

5        A.    Source.

6        Q.    "Source of repayment."

7              What do you mean by that?

8        A.    The -- what I mean by that is that

9    the proceeds of the notes flowed to Ronald

10   Perelman, 100 percent.  The obligations on

11   the notes were incurred by holding, which had

12   no assets other than the stock of Marvel.  So

13   the source of payment of both interest and

14   principal on the notes was understood by the

15   noteholders to be and expected to be solely

16   the assets and business of Marvel.  And if

17   the payments were not forthcoming, or other

18   agreements by the holding companies to the

19   noteholders were violated, the sole recourse

20   of the noteholders was to foreclose on the

21   stock and take over control of Marvel, and

22   find a way either through running the

23   business successfully or liquidating it to

24   obtain payment.

25       Q.    Was it your understanding that the

1               Longstreth

2   investors in the notes were looking to the

3   cash proceeds that Marvel would generate in

4   its business as a source of repaying the

5   notes?

6        **A.    Yes.  Yes, that the profit making**

7   **potential of Marvel, or the value of its**

8   **assets, one or the other or both.  They held**

9   **80 percent of the residual value of Marvel as**

10  **security for payment on the notes.  That was**

11  **all they had.  So upon a default, they could**

12  **take the stock only representing 80 percent,**

13  **but that's a controlling block, and they**

14  **could do what they wanted to do with it in**

15  **order to try to obtain repayment of their**

16  **notes.**

17       Q.    Paragraph 30 of Mr. Fowler's

18  report, can you take a look at that for a

19  moment?

20       **A.    30?**

21       Q.    Yes.

22            It may help to look at paragraph 29

23  to put it in context.

24       **A.    Yeah.**

25       Q.    In his, in Mr. Fowler's --

Page 67

Longstreth

1

2        MR. FRIEDMAN:  Do you want the

3    witness to read 30 as well as 29?

4        Q.    Yes, 30 as well as 29.  Let me know

5    when you have read those two.

6        **A.    Yes, okay.**

7        Q.    I'll attempt to paraphrase what 29

8    and 30 say, but the essence of them is that

9    Mr. Fowler is analyzing whether the investors

10   were looking to their ability to control the

11   operations of Marvel, or that they were

12   looking to the value of the collateral,

13   meaning the stock price of the shares that

14   were pledged as their source of repayment,

15   and concludes that it was what he calls a

16   break even analysis based on stock price that

17   they were looking to make this investment.

18        Do you have a reaction to that

19   analysis?

20        **A.    Well, my reaction is that that's**

21   **a -- that's not an accurate statement.**

22   **Unless it's based possibly upon a very clear**

23   **internal memo that the noteholders wrote**

24   **indicating what's in their heads when they**

25   **negotiated the deal.  I haven't seen such a**

Page 68

1                        **Longstreth**

2      **thing.  I think it is a great over**

3      **simplification.**

4          Q.    Have you done any analysis of the

5      documents that Mr. Fowler looked at or any

6      other documents relating to the negotiation

7      or structuring of the notes?

8          **A.    I have done -- I have spent a whole**

9      **career doing secured borrowings.  And I think**

10     **I know what's in the minds of people in**

11     **general when they take a pledge of stock and**

12     **impose covenants on a company that is the**

13     **issuer of the stock.  And it isn't simply the**

14     **value, the public market value of the stock,**

15     **if it has a public market.  It is a bundle of**

16     **things.  There is an upside and a downside.**

17     **And I think it is very difficult to say that**

18     **these noteholders had no interest in**

19     **operational controls that they bargained for**

20     **and which we find in the agreement.**

21         Q.    What is your basis for that?

22         **A.    Common sense.**

23         Q.    Other than common sense, did you do

24     any analysis of the underwriter's memos or

25     similar transactions or anything like that to

1                         Longstreth

2      support your view?

3           A.      No, I'm basing my view on my

4      experience of doing a large number of secured

5      note agreements.

6           Q.      In those secured note agreements,

7      were those situations where the issuer of the

8      notes had no expectations of obtaining any of

9      the cash flows of the underlying business?

10          A.      I don't remember.  I probably could

11     find some that were and some that weren't; I

12     don't know.  What I'm getting at is the sole

13     source of payment in this case was from

14     Marvel's business and profits.  And a secured

15     lender in that situation is looking both at

16     the prospect of selling the stock, but also

17     looking at the prospect that the stock has

18     declined in value to the point where you

19     can't recover by selling the stock.  Selling

20     the stock would require registration in this

21     case.  It's a controlling block of a public

22     company.  It's very complicated.

23               And the decline in the stock price

24     could occur, in fact, I don't know that it

25     didn't occur in this case, with such rapidity

1                    **Longstreth**

2  **that it is too late.  There is nothing that**

3  **you can do except foreclose on the stock and**

4  **then use the powers of majority stockholder**

5  **to try to recover.**

6          **And if Mr. Fowler is telling us**

7  **that the prospect of a decline in the value**

8  **of the stock such that they couldn't get**

9  **repayment except through ownership of the**

10  **company, and access to its assets, I have**

11  **trouble believing that.**

12      Q.    So the ownership of the company and

13  the access to the assets would occur upon a

14  default would take control of the stock?

15  **A.    Yes.**

16      MR. FRIEDMAN:  Are we planning to

17  go straight through to noon without a

18  break?

19      MR. LOCKWOOD:  If you would like

20  to take a break now, I'm happy to take

21  a break.

22      MR. FRIEDMAN:  Let's go off the

23  record for a few seconds to stretch.

24  We don't even have to leave the room.

25      THE VIDEOGRAPHER:  It's 11:41 and

Page 71

1                        Longstreth

2          we're going off the record.

3                (Thereupon, a recess was taken,

4          and then the proceedings continued at

5          as follows:)

6                THE VIDEOGRAPHER:  It's 11:44 and

7          we're back on the record.

8    BY MR. LOCKWOOD:

9        Q.    Mr. Longstreth, I'd like you to

10   draw your attention to the third paragraph

11   under number 1.

12       **A.    Okay.**

13       Q.    And the second sentence you say,

14   "It is important to note that in paragraph 20

15   of the Fowler report, Mr. Fowler states with

16   implied concurrence that the rating agencies

17   treated the note issuances by the Marvel

18   holding companies as essentially debt of

19   Marvel increasing its leverage and its cost

20   of future borrowings."  And you cite to

21   paragraph 20 of the Fowler report.

22       **A.    Yes.**

23       Q.    In Mr. Fowler's report, and more

24   than just paragraph 20, but several preceding

25   and subsequent paragraphs, he analyzes the

1                     Longstreth

2    effect that additional debt at the parent

3    company level would have on the debt rating

4    of the operating company; is that fair?

5         A.    Yes.

6         Q.    And did you do a similar analysis,

7    yourself, an independent analysis of the

8    effect on the credit rating?

9         A.    No.

10         Q.    Did you look at anyone's analysis

11    on the effect of the credit rating other than

12    Mr. Fowler's?

13         **A.    No, I relied on what he said in**

14    **that paragraph 20.**

15         Q.    And --

16         **A.    I think he is pointing to the**

17    **analysis that the credit rating agencies did,**

18    **and I take that to be a fact.**

19         Q.    In paragraph 20 on page 10 --

20         **A.    Yes.**

21         Q.    -- he says, "As such, the issuance

22    of the holding company notes indirectly

23    increase the leverage of Marvel in the eyes

24    of the rating agencies which could have

25    arguably increased Marvel's cost of debt."

1       Longstreth

2              He goes on to say, "It is important

3       to note that the credit rating agencies would

4       evaluate the effect upon Marvel of any debt

5       issued by the Marvel holding companies in a

6       similar manner, whether the debt had the

7       restrictions, other structures or

8       restructured as LYONS."

9              Do you see that?

10      **A.     I do.**

11      Q.     Do you have an opinion as to that

12      statement in Mr. Fowler's report?

13      **A.     Restate the question.  Do I have an**

14      **opinion?**

15      Q.     Yeah, what is your opinion, if you

16      have one, regarding Mr. Fowler's statement

17      that "It's important to note that the credit

18      rating agencies would evaluate the effect

19      upon Marvel of any debt issued by the Marvel

20      holding companies in a similar manner whether

21      the debt had the restrictions, other

22      structure or restructured as LYONS.  Thus it

23      is not the restrictions that affect the

24      credit rating, but the existence of any

25      **parent company debt."**

Page 74

Longstreth

1

2    **A.**    **I don't know whether he is right**

3    **about that or not.**

4    Q.    So you haven't done any analysis to

5    assess whether he is right about that or not;

6    is that fair?

7    **A.**    **That's right.**

8    Q.    Is it also true that you haven't

9    done any analysis as to whether the Marvel

10    holding companies could have issued debt

11    without the restrictions in some other form

12    or format; is that correct?

13    **A.**    **That's right.  I don't know if they**

14    **could have issued this debt without the**

15    **restrictions or not.  I take it that the**

16    **restrictions were very important, otherwise,**

17    **they wouldn't be there.**

18    Q.    And in responding to Mr. Fowler's

19    report --

20    **A.**    **Right.**

21    Q.    -- exchange 2?

22    **A.**    **My paragraph 2?**

23    Q.    His report.  There is a lot of

24    reports and a lot of exhibits, so I'll try to

25    be --

1                    .   Longstreth

2        **A.       His report?**

3        Q.       His report, page 27, exchange 2.

4        **A.       Okay.**

5        Q.       He has, "Marvel stating to

6    MacAndrews & Forbes that the restrictions are

7    critical to marketing the holding company

8    notes."  And he has, "MacAndrews & Forbes

9    having several responses to that assertion."

10            But my question to you is:  Did you

11   do any analysis as to whether there were

12   alternatives, feasible alternatives from

13   MacAndrews & Forbes to having these

14   restrictions in the notes as a means of

15   raising money?

16       **A.       Well, isn't that the same question**

17   **that you just asked me a minute ago?**

18       Q.       It may be.  The reason why I'm

19   asking it this way is so that it's tied into

20   what Mr. Fowler said.  I'm just trying to get

21   a sense of whether I ask it this way, it

22   triggers any memories that you might have.

23       **A.       Well, he doesn't explain what the**

24   **restrictions are doing there if they aren't**

25   **important.  And he keeps saying how important**

1                        Longstreth

2      the Marvel stock price is, but that's --

3      these aren't equity holders.  These are

4      noteholders and they want to get repaid.

5      They have -- in my experience, noteholders

6      look on the downside as well as the upside,

7      and wonder if things don't go well, how do I

8      get repaid.  And I think that's why the

9      restrictions are in there, and I think that's

10     why they were essential.  And as I've said

11     before, a margin loan or put is very

12     different.

13          Q.    In Mr. Fowler's report, and I'll

14     draw your attention to page 12, paragraph 26.

15          A.    26?

16          Q.    Yes.

17          A.    Within that paragraph, there is a

18     sentence, it's the last full sentence on the

19     page, starts "From an investor's

20     perspective."

21               Do you see that?

22               MR. FRIEDMAN:  What page of

23          Fowler are you on?

24               MR. LOCKWOOD:  Fowler, page 26.

25          A.    The last sentence on the page,

**Longstreth**

**"From an investor's perspective?"**

Q.    "I believe that the restrictions acted as monitoring triggers that could provide a method in which the noteholders would receive incremental rights in the financial position of Marvel, their only collateral changed significantly."

Do you disagree with Mr. Fowler's conclusion there?

**A.    I don't understand the sentence.**

Q.    Did you -- in drafting your report, did you read this portion of his opinion and formulate a rebuttal to it?

MR. FRIEDMAN:  When you say "this portion of his opinion", are you referring to that one sentence?

MR. LOCKWOOD:  That one sentence or the discussion he has overall of the investor's view of the purpose of the restrictions.

MR. FRIEDMAN:  Which is paragraph 26, all of paragraph 26?

MR. LOCKWOOD:  Yes, and there is a further discussion in paragraphs 27

1           Longstreth

2       to 32.

3       A.      I never heard a -- it's a very odd

4   way of describing negative covenants, which

5   the violation of which leads to an event of

6   default.  He calls them monitoring triggers

7   that would give the noteholders incremental

8   rights.

9           I mean, it's just an odd way to

10  describe what in plain English is an

11  obligation not to do certain things, an

12  obligation restricting the business of Marvel

13  in very important ways, the violation of

14  which leads to an event of default.  That's

15  the plain English of it.

16      Q.      And an event of default, it's not

17  an incremental right, it's a seizure of

18  control thing.  Is that -- I'm trying to

19  understand your dispute.

20      A.      I've never heard anyone call an

21  event of default an incremental right.  It's

22  simply -- that's why I don't understand what

23  he is trying to accomplish by the sentence.

24  And I'm not even sure I know what he means.

25  I don't know what an incremental right is.  I

1              Longstreth

2  do know what an event of default is and what

3  a violation of a negative covenant is.  So we

4  would have to talk that over.  Maybe we'll

5  get a chance to.

6      Q.    In the paragraph on page 2 that

7  starts of your report -- sorry, getting back

8  to your report.

9      A.     Page 2?

10     Q.     Page 2.

11            You make a reference in that

12  paragraph to bad things that could happen to

13  Marvel?

14     A.     Yeah.

15     Q.    What are the bad things that you

16  are describing there?

17     A.    Well, Marvel could become over

18  leveraged and could have its prospects

19  decline to the point where it was unable to

20  generate enough cash flow, free cash flow to

21  meet the debt service, so that it would have

22  a liquidity crisis.  And that can happen to

23  any company.  Of course, it wouldn't affect

24  the stock price dramatically.

25            And if that sort of thing happened,

Page 80

1                   Longstreth

2    the company would want to issue equity or

3    debt, subordinated debt, some combination.

4    It would want to be able to use the range of

5    possible capital raising approaches that

6    would enable it to get back on a more viable

7    road.  That's the kind of bad things that

8    could happen.

9              There are other bad things, but

10   anyway that's one kind of paradigm situation.

11   And, in fact, some of those things did

12   happen.  And, in fact, as I pointed out in

13   the original report, those covenants

14   restricted the freedom of action that Marvel

15   had, and, therefore, contributed to its

16   bankruptcy.

17        Q.    Let's stick with that one example

18   of a bad thing, and I think we'll get to the

19   others after the lunch break.  But as I

20   understood your statement, the problem that

21   you have identified as one possible outcome

22   is that Marvel would be over leveraged and,

23   therefore, would have a liquidity crisis?

24        A.    It could.

25        Q.    And one of the things you said was

1             Longstreth

2    that Marvel could respond to that by issuing

3    debt.  I'm trying to understand how debt is a

4    good response or an appropriate response to

5    the problem of over leverage?

6        A.    Well, it isn't normally a very good

7    response.  I also said equity.  I'm just

8    exploring a range of possibilities.  Maybe it

9    is some kind of convertible debt, which is

10   used to refinance senior debt.  It could be a

11   convertible subordinated debt.  It could be

12   convertible debt with warrants.

13           There are a whole range of things

14   you can do to try to get yourself out of the

15   fix you're in.  I do understand that fixed

16   senior debt, if you have a liquidity crisis,

17   it may not work.

18           On the other hand, the difference

19   between long-term senior notes and short-term

20   bank borrowings is most people recognize that

21   there is a difference there.  And by

22   incurring long-term debt, you maybe can

23   stretch things out.  Maybe you have a balloon

24   at the end.  There are lots of ways, in other

25   words, that you might be able to solve a

Page 82

1                        **Longstreth**

2    **liquidity crisis rather than just issuing**

3    **common stock, but equity helps.**

4         Q.    So the debt component that you're

5    talking about as a way to solve a liquidity

6    crisis arising from over leverage would be in

7    some measure a refinancing of the debt; is

8    that fair?

9              MR. FRIEDMAN:  I object to the

10             form of the question.

11        **A.    Yes.  I mean that's one way of**

12   **doing it.  I'm not saying that -- I don't**

13   **know all the different ways that one might**

14   **have solved a hypothetical problem we're now**

15   **inventing, but I am saying that those**

16   **covenants would restrict the freedom of**

17   **action.**

18             MR. LOCKWOOD:  It's noon, so why

19             don't we take the lunch break now and

20             we'll get back together at 2:30?

21             THE VIDEOGRAPHER:  The time is

22             11:59 and this ends videotape number

23             one.

24             (Thereupon, a recess was taken,

25             and then the proceedings continued as

1          Longstreth

2          follows:)

3               THE VIDEOGRAPHER:  The time is

4          2:31 and this begins videotape number

5          two.

6          A F T E R N O O N    S E S S I O N

7     B E V I S    L O N G S T R E T H,  resumed and

8          testified as follows:

9     EXAMINATION BY (Cont'd.)

10    MR. LOCKWOOD:

11         Q.    Mr. Longstreth, when we ended

12    before lunch, I had asked you about the bad

13    things that you have identified in your

14    report, and one of the --

15         **A.    Actually that I haven't identified.**

16         Q.    That's what we were going to get

17    to.

18               You discussed one scenario that you

19    do identify in your report, which is that

20    Marvel as a result of these restrictions, in

21    your view, could become over leveraged.

22               So are there others, other bad

23    things that you were contemplating that the

24    directors would take into account in

25    negotiations with Mr. Perelman as to whether

Page 84

1          Longstreth

2     they would accept these restrictions or not?

3          A.     Well, there are a million possible

4     things that could happen to a company that

5     would cause it to suffer.  That's all I was

6     referring to.

7               Look at AIG, look at Enron, any

8     kind of company that has Fannie Mae, has bad

9     things happen to it for whatever reasons, for

10    bad judgment or just the accident of business

11    developments.  Anything can happen that will

12    be bad for your bottom line.  And I was just

13    juxtaposing, assuming something bad happened,

14    the impact of those bad things on

15    Mr. Perelman versus Marvel.  That's all.

16         Q.     If any of these bad things happen,

17    I take your testimony to mean that the bad

18    things themselves are things that may affect

19    Marvel's business, cause it to do worse than

20    expected, and that as a result of the

21    restrictions, you believe that Marvel would

22    be unable to deal with those?

23         A.     Well, they might be unable to deal

24    with them.  The restrictions impair its

25    freedom of action.  And it's freedom of

1                    **Longstreth**

2    **action may prove important in remedying a bad**

3    **thing, and that's all I'm trying to say.**

4         Q.    In what way do those impairments,

5    freedom of action, in your view, create any

6    reasonable or rational likelihood of

7    impairing the company's ability to respond to

8    a future crisis?

9         MR. FRIEDMAN:  I want to note for

10        the record that there was -- a lot of

11        this subject was covered in the prior

12        deposition of Mr. Longstreth.

13        MR. LOCKWOOD:  I'm trying to

14        understand what he is referring to in

15        this portion of the report.  If he

16        wants to refer back to his old report,

17        he can refer me back to his old

18        report.

19        Q.    If you want to refer back to the

20    things you said previously and say you have

21    nothing to add to that, I'll take that

22    answer.

23        **A.    I think I will do that because I**

24    **have covered the point.**

25        Q.    If you go to the exchange --

Page 86

Longstreth

1

2  actually it's number 2 on page 2 of your

3  report.   It refers to exchange 1 in

4  Mr. Fowler's report.   And it says, Mr. Fowler

5  has Marvel argue that "the restrictions

6  hinder our ability to operate Marvel".

7          Do you see that?

8      A.    Yes.

9      Q.    And below that you say, "In fact,

10  the restrictions worked a transfer of

11  Marvel's corporate power from its board of

12  directors to the noteholders for so long as

13  the notes remained outstanding."

14          Do you see that?

15      A.    I do.

16      Q.    This transfer of corporate power,

17  to what extent did a transfer of corporate

18  power occur?

19      A.    Well, to the extent that the board

20  of directors was limited in the power it had

21  to borrow money or issue equity, by those

22  negative covenants, and in the case of the

23  third, what's it called Marvel III, in that

24  case, it was further limited by the need to

25  maintain the 80 percent ownership.   That made

1                    Longstreth

2    consolidation possible, and, therefore, made

3    the tax payments possible, upstream payments

4    that would be used for meeting the debt

5    service on the third traunch of notes, which

6    I believe were the only traunch that called

7    for current payments of interest.

8              That's the transfer of power that

9    I'm talking about.  It was -- it wasn't a

10   complete transfer of power.  It was a

11   transfer of power to the extent that those

12   restrictions interfered with something the

13   board of directors otherwise would have done

14   or wanted to do or even wanted to explore

15   doing.

16        Q.    Well, any contract that a company

17   enters into in some way limits the board's

18   future discretion as to that particular

19   subject matter; is that fair?

20        A.    That's fair.

21        Q.    So the concept of entering into

22   agreement, because this is a hypothetical

23   bargaining situation that results in

24   agreement where Marvel is going to be paid

25   something for agreeing to these restrictions,

1                    Longstreth

2     the concept in general of accepting some

3     limitations on future discretion is not

4     something that you think is out of bounds; is

5     that fair?

6          A.    Well, it's the asymmetrical aspect

7     of this particular set of negative covenants

8     that I have a problem with.  Because it --

9     the restrictions are on Marvel, yet the

10    purpose of the restrictions benefitted solely

11    the holding companies and Perelman.  So the

12    benefit burden is asymmetrical, which is not

13    the normal situation when a board decides to

14    restrict its freedom of action by entering

15    into a contract for its own benefit.

16         Q.    Well, you understood that

17    Mr. Fowler's report is analyzing a

18    circumstance where Marvel is approached and

19    asked how much would it require in terms of

20    payment to accept those restrictions; is that

21    right?  Is that your understanding of his

22    report?

23         A.    That's what he was asked to

24    consider?

25         Q.    Yes.