1          Longstreth

2     **A.     Yes.**

3     Q.     Is that what you considered as

4  well, how much Marvel would accept in order

5  to monetarily -- in order to make that

6  asymmetrical situation symmetrical?

7     **A.     I considered that, but the main**

8  **thing I was asked to consider, I think, is**

9  **the factors that would go into a business**

10 **judgment by the independent directors.**

11    Q.     But in your rebuttal report,

12 responding to Mr. Fowler's analysis, in that

13 report and this report that we're asking you

14 about today, was it your attempt to find out

15 how much money Marvel would need to obtain in

16 negotiations in order to make that

17 asymmetrical situation symmetrical?

18    **A.     I just expressed an order of**

19 **magnitude amount of money.**

20    Q.     And is that amount of money, in

21 your view, is that an adequate amount of

22 money?  150 million dollars is your

23 conclusion; is that correct?

24    **A.     In the order of magnitude of**

25 **something, that would.**

1                   **Longstreth**

2       Q.    What does that mean "in the order

3   of magnitude"?

4       **A.    I have no formulaic approach to**

5   **this.  I'm trying to look at a company with a**

6   **two billion dollar market cap at this time.**

7   **I'm trying to look at how much money is being**

8   **extracted by one shareholder, 553, and I'm**

9   **just saying in the order of magnitude, which**

10  **is, in other words, a very rough statement of**

11  **an amount of money that would suffice, if the**

12  **board decided, look, we're prepared to bet**

13  **the ranch on this thing, but we need to be**

14  **compensated.**

15      Q.    If you or a director is tasked with

16  approving a transaction in which you are

17  deciding what Marvel should receive as

18  payment for these restrictions, would you

19  deem it appropriate to seek advice from a

20  financial advisor or investment banker before

21  making your final judgment?

22      **A.    About the amount?**

23      Q.    About the amount.

24      **A.    Well, I said that in my first**

25  **report.  I said that you ought to -- if**

1          **Longstreth**

2     **you're going to sit down and negotiate, in**

3     **other words, if you say, I have overcome the**

4     **bet the ranch problem so let's talk about**

5     **what is enough to warrant our taking these**

6     **risks with the company, yeah, I think that's**

7     **what I said.**

8          Q.    And the risks that you say that

9     they would be taking, would you consult with

10    financial and legal advisors to try to

11    identify all of those potential risks that

12    Marvel would face?

13         **A.    As an independent director, I don't**

14    **think I would feel as compelled to do that**

15    **with respect to the business risk, because I**

16    **mean, I know the company better than they do,**

17    **and I know the business risk.  I mean, any**

18    **extra advice is always welcome.  I'm just**

19    **saying I don't feel quite the same way about**

20    **that question as I do about exploring ways of**

21    **compensating me.**

22         Q.    Let's talk about the risk.

23              You say in your exchange two that

24    there is one hundred percent of the risk is

25    being borne by Marvel?

1                           Longstreth

2        **A.      Yes.**

3        Q.     Other than the over leverage risk,

4   what other risks are imposed on Marvel as a

5   result of these provisions?

6        **A.      I can't imagine all the different**

7   **risks.  All I know as a director, I'm tying**

8   **my hands with respect to a set of things I**

9   **shouldn't do, I can't do, and in ways I**

10  **cannot now identify completely.  I know that**

11  **it's possible that those tying of hands could**

12  **come back to hurt me.  That's all.**

13       Q.     Well, did you look at Mr. Fowler's

14  report and his analysis of what the costs in

15  terms of reduced financial flexibility would

16  be to Marvel?

17       **A.      I did look at it.**

18       Q.     And in particular, Mr. Fowler does

19  an analysis of the debt restriction?

20            MR. FRIEDMAN:  What page are you

21       referring to?

22            MR. LOCKWOOD:  I'm referring to

23       pages seven and eight.  Actually it

24       starts the last two sentences of page

25       six and goes through page eight.

1                         Longstreth

2        **A.      I'm getting used to your approach,**

3    **and I now look at the page before the page**

4    **you refer me to.**

5        Q.    Well, I'm trying to give you a

6    fulsome analysis so you don't tell me later I

7    didn't give you enough so you can make a

8    judgment.

9        **A.      It's helpful.**

10       Q.    In fact, I'll give you a moment if

11   you like.

12       **A.      I have developed a rhythm about**

13   **this stuff.**

14       Q.    If you would like to read

15   paragraphs 15 through 17.

16             MR. FRIEDMAN:  From the bottom of

17         6 through the middle of page 8?

18             MR. LOCKWOOD:  Correct.

19       **A.      Do you want me to read 17 too?**

20       Q.    Yes.

21       **·A.      Well, isn't the key to all of that**

22   **the words "at the time" in the next to last**

23   **sentence of 17?  I mean, I don't quarrel with**

24   **what he is saying except I do find that**

25   **the -- I see no real significance to an**

1          **Longstreth**

2    **incurrence test versus a maintenance test,**

3    **but putting that aside for a minute.**

4          Q.    I think it would be helpful --

5                MR. FRIEDMAN:  Let the witness

6          finish what he was saying.

7                MR. LOCKWOOD:  There is no

8          question pending.

9                MR. FRIEDMAN:  Do you want to

10         strike everything he said or let him

11         finish?

12       **A.    You never asked me a question.**

13         Q.    I asked you to read this and then I

14   was going to ask you a question.

15                MR. FRIEDMAN:  You should finish

16         what you were saying.

17       **A.    I thought there was a question,**

18   **what do I think of this.**

19         Q.    That may have been my next

20   question, but I didn't get a chance to ask

21   it.  If you're answering that question, go

22   ahead and finish.

23       **A.    What I was saying, aside from**

24   **suggesting that maintenance and incurrence**

25   **tests are not a very big deal in this**

Page 95

1                       Longstreth

2    context, what I really was saying is that at

3    the time the notes were issued, the negative

4    covenants were not biting hard on Marvel, but

5    that really isn't the analysis that I would

6    engage in as a director.  I would say to

7    myself when they bite, if we get in a

8    condition where they start to bite, then

9    what?  What can they do to me on the

10   downside?

11              I think the analysis, with all due

12   respect to Mr. Fowler, his analysis is very

13   upbeat, looking at the stock coverage at the

14   time and depreciating rather severely the

15   value of the covenants on the downside.  I'm

16   looking at the downside and saying that they

17   were important.  And so it's just two

18   different points of view about the same

19   thing.

20   Q.     With respect to Mr. Fowler's

21   analysis, one of the things that you have

22   pointed out that he discusses is distinction

23   between maintenance covenants and incurrence

24   covenants.  In that context, he is

25   contrasting the covenants that are found in

1                       Longstreth

2    Marvel's own credit agreements to the

3    covenants that are found in the Marvel

4    holding company indenture; is that your

5    understanding?

6        A.    Yes.

7        Q.    I take it from the materials

8    reviewed that you didn't look at any of

9    Marvel's credit agreements; is that correct?

10       A.    **That's true; I think that's**

11   **correct.**

12       Q.    And you are, in the course of your

13   work as a lawyer, you're someone who is

14   familiar with bank credit agreements?

15       A.    **I am.**

16       Q.    And in terms of Mr. Fowler's

17   analysis where he is actually relying on

18   Professor Holthaussen's analysis, that the

19   Marvel credit agreement themselves had

20   greater restrictions than the holding company

21   covenants?

22       A.    **Yes.**

23       Q.    I know you were asked some

24   questions by Mr. Clark about this.

25       A.    **Yes.**

1          **Longstreth**

2          Q.    Has your view changed at all since

3     the last deposition?

4          **A.    No.**

5          Q.    You didn't do any further work to

6     analyze the Marvel covenants versus the

7     Marvel holding company covenants?

8          **A.    I did not.**

9          Q.    With respect to the debt capacity

10    of Marvel, if Marvel was to live under these

11    covenants that Mr. Fowler had performed and

12    that's noted in paragraph 17 and is set forth

13    in Exhibit 4 of his report, did you try to

14    construct any similar analysis of what

15    Marvel's debt capacity would be?

16         **A.    No.**

17         Q.    Do you have any reason to dispute

18    the numbers that were derived by Mr. Fowler

19    as a result of his analysis?  The hard data

20    is going to be found in Exhibit 4 to his

21    report.

22         **A.    I did not examine his analysis to**

23    **see if he was right or wrong.  I have no**

24    **reason to believe he is wrong about that.  It**

25    **all speaks at the time of the issuance of the**

Page 98

1                      **Longstreth**

2    **notes.  I'm not saying it is right either.  I**

3    **just accepted it as a statement.**

4        Q.    Now, I think you have several times

5    today said that one of the things that

6    concerned you is that what Marvel would do on

7    a needed financial flexibility on a downturn;

8    is that fair?

9        A.    Yes.

10       Q.    I also take it from your testimony

11   that one of the things that most concerned

12   you on a downturn was the company's ability

13   to access equity markets as a way?

14       A.    **Well, that was one of the things,**

15   **yes.**

16       Q.    And is it your understanding that

17   the terms of the notes restrict Marvel's

18   ability to access equity markets?

19       A.    **There were restrictions.  I would**

20   **have to go back and review the details.**

21   **There are restrictions --**

22       Q.    I'd invite you to if you want to

23   look at Exhibit 8.

24       A.    **Certainly the consolidation test**

25   **was a de facto restriction, although it's**

Page 99

1                        Longstreth

2    worded in the nature of a put, but it was a

3    de facto restriction on the ability of Marvel

4    to raise capital through the sale of equity

5    to others, if that sale would result in a

6    loss of the ability to consolidate.

7        Q.    Let's take a look --

8        A.    But I think there are some other

9    restrictions in maybe 404 that relate to

10   preferred stock maybe.

11       Q.    We'll go through those one at a

12   time then.

13       A.    Okay.

14       Q.    We'll start --

15       A.    I have to refresh my recollection.

16       Q.    I'll give you an opportunity to do

17   that.

18             If you look at Exhibit 8, which is

19   the note provisions.

20       A.    8?

21       Q.    Yes, it's in that pile somewhere.

22       A.    I got it.

23       Q.    And I'll draw your attention to --

24   if you use the numbers of the indenture, page

25   57, which is Section 4.14.

1              Longstreth

2      A.     57.

3      Q.     The top of the page, it's A-918.

4            MR. FRIEDMAN:  Please don't

5       interrupt the witness once he starts

6       his answer.  If you want to ask a

7       follow-up question that's one thing,

8       but let him finish his answer.  I

9       don't think there is a question

10       pending.

11            MR. LOCKWOOD:  There is not.

12     Q.     Section 4.14, this is the tax

13  deconsolidation event provision, correct?

14     A.     Yes.

15     Q.     We've already discussed this, but

16  this provision is in the nature of a put; is

17  that correct?

18     A.     Yes.

19     Q.     Do you read this provision as a ban

20  on Marvel's issuance of securities of any

21  type?

22     A.     Of any type?

23     Q.     Yes.  Does this ban Marvel from

24  issuing securities?

25     A.     Well, it's not worded as a ban,

**Longstreth**

1
2   number one, but in a -- it is tantamount to a

3   very serious restriction on the issuance of

4   any securities that would cause a

5   deconsolidation event.

6        Q.    And why is that?

7        A.    Because it triggers a put.  And the

8   company to which the notes are put doesn't

9   have the means of paying off the notes.  And,

10  therefore, the put would lead immediately to

11  a default in the payment on the notes, which

12  would result in a foreclosure.  I mean,

13  that's the likely scenario.

14       Q.    Let me see if I can understand

15  this.

16             How much -- what percentage of

17  Marvel stock, to your knowledge, is pledged

18  in connection with this Marvel III offer?

19       A.    I think it is 80 percent.

20       Q.    80 percent is pledged for the three

21  offerings.  Do you know what percent is

22  pledged just for this offering, the last one?

23       A.    I don't.

24       Q.    If I told you it was less than ten

25  percent, would you have any reason to doubt

Page 102

1                    Longstreth

2    that?

3              You don't have any reason one way

4    or the other, you don't know?

5         A.    No, I don't.

6         Q.    But do you have any basis to say

7    that Marvel III at any of the times that

8    Marvel actually went out into the debt market

9    and raised money by borrowing funds, that at

10   that time, Marvel III didn't have the ability

11   to sell some or all of its stock to deal with

12   any put?

13        A.    Is that question do I have any

14   reason to believe that Marvel, that Marvel

15   III couldn't have gone out and sold the stock

16   that it held to generate the income to pay

17   off the notes?

18        Q.    Correct.

19        A.    I don't know how the numbers would

20   have worked out.  I don't know if they could

21   have done that.  I just don't know.

22        Q.    So you didn't do any analysis to

23   determine whether they could or couldn't do

24   that?

25        A.    No.

Page 103

**Longstreth**

1

2      Q.    If Marvel III goes out and sells

3   shares that it owns, how does that restrict

4   or transfer power from the board of directors

5   of Marvel to the noteholders?

6      **A.    If Marvel III goes out and sells**

7   **the stock that it -- the stock in Marvel?**

8      Q.    The Marvel stock that it owns, if

9   it sells that stock, how does that transfer

10  power from Marvel's board to the noteholders?

11     **A.    I didn't say it did.**

12     Q.    So it doesn't?

13     **A.    I said that the transfer of power**

14  **came from the negative covenants.**

15     Q.    So it doesn't come through this put

16  provision?

17     **A.    No, that's another element of it.**

18     Q.    Is it --

19     **A.    That doesn't have anything to do**

20  **with selling the stock.  The way you put**

21  **that.**

22     Q.    The end result of this put

23  provision would be that Marvel III would be

24  forced to come up with the funds to pay the

25  put, correct?

Page 104

Longstreth

1

2      A.      Right.

3      Q.      And you have not done an analysis

4   as to how many noteholders would think it was

5   economically appropriate to exercise that put

6   right at any particular point in time; is

7   that correct?

8      A.      I think they would exercise the put

9   right if they felt insecure.  That's all.  I

10   haven't done an analysis of all the different

11   possible circumstances that would make them

12   feel insecure, but by definition, I think the

13   deconsolidation event, which is the trigger

14   for the put, defines maximum insecurity for

15   them.  That's why they have the put.

16      Q.      Well, the put is an individual

17   noteholder's option, correct?

18          MR. FRIEDMAN:  I object to the

19      form of the question.

20      Q.      Each noteholder gets to make their

21   own election?

22      A.      I think that's right.  Each holder,

23   right.

24      Q.      And it is possible based on

25   prevailing interest rates, the amount of

Page 105

Longstreth

1 security in a particular time whether

2 Mr. Perelman, because of the amount of

3 security, would be incentivized to step up

4 and make payments, which he did during these

5 time periods?

6          There could be a lot of factors

7 whether the put was an economically good or

8 bad idea for the noteholders; is that fair?

9     **A.     Yes, I think there are a lot of**

10 **factors, but given the unique structure here**

11 **where the note issuer has no assets, except**

12 **that stock, and where the interest is due**

13 **quarterly, I think, anyway it is due**

14 **annually, and where the source of that is**

15 **coming from the tax payments, this**

16 **deconsolidation event is not to be taken**

17 **lightly.**

18          **It defines a level of insecurity**

19 **that I think would encourage each noteholder,**

20 **if it occurred, to think very seriously about**

21 **the need to get out.**

22     Q.     But did you do any economic study

23 or analysis to determine whether at any

24 particular time that Marvel board was

Page 106

Longstreth

1

2  considering financing alternatives, whether

3  at that time it appeared rational for the

4  noteholders to put their notes if this put is

5  triggered by the Marvel board's conduct?

6      **A.    No, I didn't.**

7      Q.    And you would agree that the Marvel

8  board, if you were a board member and you

9  were considering taking certain action that

10  might trigger this put, and you sought legal

11  advice or you tried to determine what your

12  rights were as a company or as a board

13  member, that even assuming that Marvel signed

14  this contract, there is nothing in this

15  Section 4.14 that obligates Marvel directly

16  to do or not do anything; is that fair?

17      **A.    That's fair.**

18      Q.    Let's go to Section 4.09.

19      **A.    Which one?**

20      Q.    4.04.

21      4.09, which is on page 48, or if

22  you use the top, it's A-909. And this is the

23  one that's titled "Required Stock Ownership".

24      **A.    Yes.**

25      Q.    In general, in reaching your

Page 107

Longstreth

1

2    opinion, did you have an understanding of how

3    this particular covenant worked?

4         **A.      I think I did at one time.  I'm not**

5    **going to remember without reading it.**

6         Q.      If you need to take a moment, go

7    ahead.

8         **A.      Yeah.**

9              MR. FRIEDMAN:  Does the exhibit

10             include the page with defined terms?

11             MR. LOCKWOOD:  It may not.

12             MR. FRIEDMAN:  Do you want to

13             tell us if you have a document?

14             MR. LOCKWOOD:  I can tell you

15             that the company is -- the MPH is

16             Marvel Parent Holdings and MHI is

17             Marvel Holdings, Inc., which is the

18             first issuer.

19        **A.      The first?**

20        Q.      Yes.

21        **A.      So the company is Marvel III,**

22    **right?**

23        Q.      The company is Marvel III, and

24    Marvel, the public operating company, is

25    called Marvel?

Page 108

Longstreth

A.    Right.

Well, I mean the A, 409A is a covenant requiring the company together with its downstream subsidiaries to own a majority of the voting stock of Marvel.  That's how I see it.

Q.    As an experienced corporate lawyer, is it your view that control of a company has value?

A.    Yes.

Q.    And from the prospective of the Marvel holding companies, is that value that comes from the control of Marvel, the operating company, a property right that they would have an incentive to maintain?

A.    I would think so.

Q.    If you were a director of the Marvel holding companies, would you feel obligated to shareholders or even to creditors to take actions within obviously legal bounds to maintain that controlled position?

A.    To maintain the controlled position, yes, I would certainly be

1          **Longstreth**

2    interested in doing so, yes.  I mean, I

3    wouldn't be interested in throwing it away.

4    I think there is a fiduciary duty that the

5    majority owes to the minority, and that is

6    getting into law, which I'm not supposed to

7    talk about, I guess.

8              So you balance the property rights

9    of control against some constraints on how

10   you use that control so that you don't hurt

11   the minority.

12        Q.    Well, does this Section 4.09, does

13   it require Marvel or any member of its board

14   of directors to ensure that these holding

15   companies maintain 50 percent ownership?

16        **A.    That the holding companies what?**

17        Q.    Maintain 50 percent voting control.

18   Does it pose an obligation as it is written

19   at Marvel or the directors of Marvel?

20        **A.    No.**

21        Q.    It doesn't, right?

22        **A.    No.**

23        Q.    Can you explain to me then how does

24   Section 4.09 transfer the power of the board

25   of directors of Marvel to issue equity to the

Page 110

1                        Longstreth

2     noteholders, as I understand your opinion to

3     state?

4          A.    Well, I'm tempted just to say read

5     the deposition.  Tony Clark and I spent

6     probably the better part of an hour

7     discussing my statement to that effect in the

8     last report.  And I don't think I can add

9     much to what I said then, and I would rather

10    just in the interest of time refer you to

11    what we said.  We talked back and forth about

12    it.  I have said nothing different in this

13    report; it's the same concept.  And the

14    answer would be exactly the same.

15         Q.    Well, if you were on the board of

16    directors of Marvel and you're looking ahead

17    to these future crises that may arise and

18    making sure that you have flexibility to deal

19    with these future crises, such as you need to

20    issue equity for some distant crisis, do the

21    terms of Section 4.09, would they prohibit

22    you as a director from issuing stock if you

23    thought that was the right decision for

24    Marvel?

25              MR. FRIEDMAN:  Objection.  Asked

Page 111

1          Longstreth

2          and answered last time as well as at

3          this deposition.

4     A.    I think my answer is yes, and for

5     all the reasons we talked about at great

6     length.  I really have nothing to add on that

7     subject.

8     Q.    If you were a director of Marvel --

9     well, let me back it up.

10          If you look at Mr. Fowler's report.

11    A.    Okay.

12    Q.    He does an analysis of whether

13    Section 4.09, referring to the company's

14    flexibility --

15          MR. FRIEDMAN:  What page are you

16          referring to?

17          MR. LOCKWOOD:  Hold on a moment.

18          I'm looking at paragraph 24, it's

19          on pages 11 and 12.

20    A.    Okay, I got it.

21    Q.    Just let me know when you had a

22    chance to read paragraph 24.

23    A.    Okay.  Is there a question?

24    Q.    Yes.  I want to draw your

25    attention, if you go back to 29, just to tie

1          Longstreth

2     this into the exchanges, there is an exchange

3     6.

4              MR. FRIEDMAN:  Go back to page

5         29.

6              MR. LOCKWOOD:  Yes, page 29,

7         exchange 6.

8          Q.    Where Mr. Fowler recounts an

9     exchange in which Marvel would say the

10    ownership covenant restricts Marvel and

11    MacAndrews & Forbes response would be

12    twofold, that the board does not expect to be

13    able to dilute the majority share and limited

14    stock even if the board decides to, which

15    both those issues are discussed in paragraph

16    24 of Mr. Fowler's report.

17             In your considering a hypothetical

18    negotiation between Marvel and Mr. Perelman,

19    did you take into account the fact that

20    Mr. Perelman's side would present those two

21    positions?

22         **A.    Yes, I did.**

23         Q.    And if you look at paragraph 24

24    with respect to the expectations of being

25    able to dilute the majority shareholder,

Page 113

1                    Longstreth

2       there is a reference by Mr. Fowler to the

3       expert report of Professor Hammermesh.

4                    Do you see that?

5       A.    Yes.

6       Q.    Did you read Professor Hammermesh's

7       report?

8       A.    I did.

9       Q.    There is also a reference to

10      limiting or non-voting limiting stock to the

11      report of Professor Holthaussen.

12                   Do you see that?

13      A.    Yes.

14      Q.    Did you read Professor

15      Holthaussen's report?

16      A.    Yes.

17      Q.    Did you read those in connection to

18      preparing your rebuttal to Mr. Fowler?

19      A.    I didn't go back and reread them.

20      Q.    So let's start with Mr. Fowler's

21      reliance on Professor Hammermesh for the

22      proposition that Marvel's directors wouldn't

23      have expected to be able to eliminate a

24      majority shareholder's control through the

25      issuance of shares.

Page 114

Longstreth

Do you disagree with that
viewpoint?

A.    I don't think that this is an
accurate statement of what Mr. Hammermesh
says.

Q.    What is it that you believe is the
accurate statement that Mr. Hammermesh said?

A.    He found some case support for the
proposition and only the proposition that you
cannot -- a minority cannot issue stock
solely for the purpose -- expressly for the
purpose of taking away control.

But putting that aside, there are a
million business reasons why you would
justify that, and one of them might be to
save a company from bankruptcy.

Q.    Have you ever been on the board of
directors of a company that had a controlling
shareholder?

A.    Have I ever been on the board?

Q.    Yes.

A.    No.

Q.    Have you ever -- I don't want to
get into attorney-client privilege, so I'll

Page 115

1                           Longstreth

2    ask a broad question.

3         A.    That's all right.

4         Q.    Have you ever been an advisor to a

5    company that had a controlling shareholder?

6         A.    Yes, a number of times.

7         Q.    And was it your view that the

8    directors had some duty to respect the

9    property right that the majority shareholder

10   had in its control position?

11        A.    I don't think the issue came up in

12   my experience.  I mean, one such case was the

13   MA Hannah Company controlled Consolidation

14   Coal.  We represented Consolidation Coal in a

15   public offering of Consolidation Coal stock.

16   We were very mindful of MA Hannah's control,

17   but I just don't recall the issue coming up.

18        Q.    Well, in your experience, did you

19   ever experience a situation where the board

20   of directors of a company decided to dilute

21   the control position of the controlling

22   shareholder without that controlling

23   shareholder's consent?

24        A.    I don't recall an instance of that.

25        Q.    It would be exceptional if that

Page 116

1                          Longstreth

2     happened, wouldn't it?

3          A.    I don't know if it would be

4     exceptional or not.  I mean, you would have

5     to give me all the circumstances and then

6     depending on how urgent the need was, it

7     might be exceptional, it might not be.

8          Q.    If you were just putting yourself

9     back in the role you were playing as a

10    hypothetical negotiation as an independent

11    director on this point as to whether the

12    board had a power or a duty -- let me

13    rephrase it.

14               On this point as to whether the

15    board could reasonably expect to dilute a

16    controlling shareholder, is that some issue

17    that you would expect the board to go and

18    seek an opinion of legal counsel about?

19          A.    With reference to this situation

20    perhaps.

21          Q.    With reference to this situation

22    and the issues being asserted by one side?

23          A.    I think you would certainly want to

24    consult counsel.

25               There is an unreality about your

1          Longstreth

2     questioning here.  If I were an independent

3     director and the company's survival depended

4     upon raising capital through stock, I think I

5     would say to Mr. Perelman, you want to buy

6     some more stock to maintain your control,

7     because this company is going down the tubes.

8     And if you don't want to get out of the way

9     so we can save the company by selling to

10     someone else.  I mean, isn't that a rational

11     approach?

12          Q.    And if you did that, would in your

13     view the terms of Section 4.09 prohibit you,

14     as written, would it prohibit you from doing

15     that?

16          A.    Yes.

17          Q.    Could you point me to the language

18     in Section 4.09?

19          A.    No, you're getting me back into the

20     question that I said I answered fully.  I

21     assume I mean what 4.09 says is that the

22     holding companies will maintain majority,

23     does it not?

24          Q.    That's what it says.  It says the

25     holding company shall at all times be or

Page 118

1                        Longstreth

2    cause --

3        **A.    Are you asking me how is it that**

4    **that would be binding on Marvel?**

5        Q.    No, I'm not asking if it is

6    binding.  I'm assuming this provision is

7    binding on Marvel, and I'm asking if you were

8    enforcing this provision as written, what in

9    it says Marvel will or will not do anything?

10           MR. FRIEDMAN:  With all due

11           respect, there is an hour back and

12           forth at the prior session of Mr.

13           Longstreth's deposition on this very

14           question.

15       **A.    I can't add to what I said.  And I**

16   **said a lot.**

17           MR. FRIEDMAN:  Are you saying

18           that you don't think this was covered

19           at great length?

20           MR. LOCKWOOD:  I think there is a

21           distinction, but if he doesn't want to

22           add to it, we'll leave it at that.

23       **A.    Since you raised -- if you raise**

24   **questions that I don't answer, I'm not sure**

25   **what the status of that is.  I mean, you**

1                    **Longstreth**

2   **asked me to look at 27, and in particular,**

3   **the answers to the argument.  Isn't it --**

4   **wait.**

5        Q.    Page 29.

6        **A.    I'm sorry, 29.**

7        Q.    Well, I hadn't gotten to the second

8   one.  The second one was that the company

9   could issue non-voting or limited stock that

10  the company decides to.  That's the second

11  one I was getting to.

12       **A.    Is there a question about that?**

13       Q.    There will be.  I get to ask the

14  questions.

15       **A.    Yes, I know.**

16       Q.    The report by Professor Holthaussen

17  does an analysis of the company's ability to

18  issue non-voting or limited voting stock at

19  essentially no discount to what voting stock

20  would have obtained in the equity market.  So

21  are you familiar with that analysis?

22            MR. FRIEDMAN:  I'm objecting to

23       the form of the question.

24       **A.    Yes.**

25       Q.    Regardless of my spin, Mr. Friedman

1          Longstreth

2    is objecting to that, you have read Mr.

3    Holthaussen's report on it?

4         A.    Yes.

5         Q.    And you attempt to analyze whether

6    Mr. Holthaussen is correct about the

7    company's ability to issue non-voting or

8    limited voting stock and what the market's

9    reaction to such an offering would be?

10        A.    Well, I think I did.  I might have

11   to refresh my recollection about his report

12   before I could comment fully on it.  But I

13   think I fundamentally disagree with what he

14   is saying that you can issue voting stock or

15   non-voting or limited voting stock and they

16   are all the same, treated the same by the

17   marketplace.

18              I represented the Ford Foundation

19   from 1961 when they held 98.6 percent of Ford

20   Motor Company stock, all non-voting, until

21   1980 when the last sale of Ford stock was

22   accomplished by the Ford Foundation.  And

23   from Sidney Weinberg on, no one ever dreamed

24   that the non-voting stock that Ford held,

25   Ford Foundation had the same value as the

Page 121

Longstreth

1

2    class B shares or the common.  So I don't

3    know what he is talking about, but I think if

4    he has got examples, I think I could find

5    examples that could disprove what his

6    examples are trying to prove.

7              In any case, it is simply an

8    oxymoron to say that Marvel says the

9    ownership covenant restricts Marvel and the

10   answer is Marvel can always issue non-voting

11   or limited.  He is making the point that the

12   restrictions limit Marvel, because he can't

13   issue voting.

14       Q.    The -- well, do you understand that

15   Mr. Fowler has assumed for purposes of this

16   report that it restricts Marvel?

17       A.    Do I understand that?

18       Q.    Yes, that's an assumption in the

19   beginning of his report.  If you look at --

20       A.    Well, it doesn't appear.  It is an

21   assumption in the give and take of his

22   hypothetical arm's length negotiation.  I

23   mean, I have to read his response in exchange

24   6 to mean that Marvel says the covenant

25   restricts us, and he is saying no, it

Page 122

1                         **Longstreth**

2     **doesn't.  Maybe he didn't mean that, but**

3     **that's what it looked like to me.**

4          Q.    Well, did you understand him to

5     mean it isn't restrictive in a real world

6     sense, it has no impact on Marvel?

7          **A.    Well, the two points he makes**

8     **simply doesn't make sense to me.  That's all.**

9          Q.    With respect to the second point,

10    and your example about the Ford Foundation,

11    why isn't that in your report?

12              MR. FRIEDMAN:  I object to the

13         form of the question.

14         **A.    Why isn't that --**

15              MR. FRIEDMAN:  You asked the

16         witness a question and he gave you an

17         answer.

18         Q.    I'm trying to understand, is that

19    one of the bases upon which you are -- that

20    part of the analysis that you performed in

21    deciding that Mr. Fowler's analysis was

22    inadequate or flawed was to rely on your

23    experience with the Ford Foundation?

24              MR. FRIEDMAN:  I object to the

25         form of the question.

Page 123

1                          Longstreth

2       **A.    Well, I said as a preliminary**

3  **matter that my opinion is based on extensive**

4  **experience with negotiations spanning my**

5  **entire career as a lawyer, fiduciary and**

6  **senior government official.  I didn't report**

7  **to state what I have been doing for the last**

8  **40 years.  It's just based on experience.**

9       Q.    Other than that example that you

10  gave me, have you done any other analysis

11  based on transactions you may have been

12  involved in or transactions that you have

13  looked to or any general market data to

14  determine whether low vote or non-voting

15  stock in a controlled company could be issued

16  at relatively minor discount or no discount

17  to voting stock?

18      **A.    I haven't done any specific**

19  **analysis for purposes of this exercise.**

20      Q.    Is that an opinion you're going to

21  offer at trial that in your judgment,

22  non-voting or limited voting stock would not

23  be an option for the board of directors to

24  deal with any future liquidity crisis?

25      **A.    I never said it wasn't an option.**

Page 124

**Longstreth**

I'm not saying it isn't an option.  Of course it's an option.  I'm simply saying it's not the same thing as issuing voting stock.

Q.    Can you quantify for me what the relative difference would be in terms of value to Marvel of non-voting or low voting stock versus voting common stock?

A.    I cannot quantify while I'm sitting here, no.

Q.    Did you make any attempt to quantify in preparing your rebuttal to Mr. Fowler's report?

A.    I mean, is the stock registered? Is it freely transferable?  I don't know the answers to any of these questions.  I'm simply speaking out of experience in regard to low vote and no-vote shares.  And I do have experience on that.

Maybe I better mention one other thing so that it isn't a surprise at the -- but I served on a study group for the American Stock Exchange.  Well, and for the New York Stock Exchange, for all the exchanges in recent years.  Let's see, what