**Longstreth**

1

2  was it, the SEC wrote Rule 19C3, I think.  I

3  may not get this precisely right.  The SEC

4  tried to write a rule that prohibited low

5  vote or non-voting stock after there was a

6  big outcry over this subject, which was the

7  second outcry.

8          The first outcry occurred before

9  the great crash, a professor came down to the

10 New York Stock Exchange and proclaimed that

11 it was unfair to shareholders to have

12 non-voting stock and the New York Stock

13 Exchange rewrote the rules to prohibit it.

14 But then we have the American and Nasdaq,

15 which didn't have those rules, and in the

16 80s, there was a hue and cry over that, I

17 mean -- and the committee was appointed by

18 the SEC to study this issue, or it may have

19 been appointed by the stock exchanges.

20         Anyway, I served on that committee

21 and we wrote a report which led to 19C3,

22 which was then, I think, ruled beyond the

23 powers of the SEC to enact, but anyway, I

24 have some basis of experience in this.

25         I would have to go back and study

Page 126

**Longstreth**

what came up, but it is hard to get away from
the impression that there is a serious
difference in value between the right to vote
and the absence of a right to vote or the
right to have only a limited vote.

Q.    Did you go back and study the work
you did for the American Stock Exchange?

A.    Not at all.

Q.    And --

A.    I'm just giving you -- I wanted to
mention that so that it is not a surprise if
I ever mention it again.  But I'm giving you
my best recollection, which isn't very good.

Q.    In a company with an 80 percent
shareholder, the votes are going to be -- the
outcome of any election is going to be
determined by that 80 percent shareholders'
vote; is that fair?

A.    Well, unless they have an unusual
set of articles or bylaws.

Q.    And, therefore, the minority
shareholders' stock whether voting or not in
a circumstance where one entity has a
controlling interest is generally equivalent

Page 127

1                         Longstreth

2     on those circumstances to non-voting stock,

3     isn't it?

4          A.    Not necessarily.

5          Q.    Why not?

6          A.    Because it's a different set of

7     rights and circumstances can change, and when

8     they do change, the vote may develop more

9     rather than less value.

10               I mean, precisely the situation

11    here where if stock were issued widely to

12    change the 80 percent to something below 50,

13    for example, then the value of the minority

14    share and its vote would presumably go up.

15         Q.    At the expense of the majority

16    share?

17         A.    Well, I don't know if it is at the

18    expense of the majority.

19         Q.    Well, to the extent that voting

20    control has a value, it would shift from the

21    controlling shareholder to all the

22    shareholders generally; is that fair?

23         A.    That's right.

24         Q.    The structure of having a low vote

25    or non-voting stock in your experience is a

Page 128

Longstreth

1

2      fairly common structure for media and

3      entertainment companies?

4          A.      Like the New York Times?

5          Q.      Right.

6          A.      It's not uncommon.

7          Q.      In exchange 2, paragraph 3 of your

8      report, on page 3.

9          A.      Okay.  Page 3.

10         Q.      You make a statement saying that

11     "Mr. Fowler's argument is far too narrowly

12     based", and we've discussed already some of

13     the things that you think Mr. Fowler said.

14             I want to focus on some of the

15     particular examples that are in this

16     paragraph, and one is the participation by

17     Marvel's top executives, its counsels, and

18     its auditors making the note issuances

19     possible.

20             Do you see that?

21         A.      Yes.

22         Q.      The participation by its counsel,

23     does that refer to the three opinion letters

24     that are cited as materials considered in

25     Exhibit B to your initial report?

1      Longstreth

2      **A.**    **That's one of the elements in**

3   **participation, yes.**

4      Q.    Are there any other elements in

5   participation by counsel for Marvel that

6   you're referring to?

7      **A.**    **Well, I think counsel for Marvel**

8   **would have either participated in the road**

9   **shows or prepared the executives to conduct**

10  **those road shows.  I mean, I think that the**

11  **counsel was involved in ways that a counsel**

12  **would be involved if it were issuing these**

13  **notes itself.  The exact scope of that, I'm**

14  **not sure of.**

15     Q.    Are you just speculating about

16  that?

17     **A.**    **No.**

18     Q.    What facts are you basing your

19  views on?

20     **A.**    **Because the counsel gave this**

21  **opinion and the opinion required that it have**

22  **a basis of knowledge to give that opinion.**

23  **That kind of opinion is not rendered with**

24  **blinders on.**

25     Q.    The opinion that was given, you

1                          Longstreth

2    described in the previous report as a

3    10(b)(5) opinion; is that right?

4         A.    I think so.

5         Q.    And 10(b)(5), does that refer to

6    Rule 10(b)(5)?

7         A.    Of the 34 Act, yes.

8         Q.    And that's a rule that prohibits

9    companies from issuing fraudulent financial

10   statements; is that fair?

11        A.    Fraud of any kind in connection

12   with the issuance of securities.

13        Q.    And this 10(b)(5) opinion that

14   you're referring to, is that in essence an

15   opinion stating that the financial statements

16   of the company are not in violation of Rule

17   10(b)(5)?

18        A.    Well, typically a 10(b)(5) opinion

19   has a carve out for financials.

20        Q.    So it's not certifying the

21   financial statements?

22        A.    By an accountant.

23        Q.    So it's only certified the

24   financials in that there is no material

25   misstatement or omission in those financial

1          Longstreth

2    statement; is that correct?

3         **A.    Yes.**

4         Q.    And in those circumstances, the

5    counsel for Marvel, he is not giving an

6    opinion to the holding company's public

7    filings.  He is just talking about his own

8    company?

9         **A.    Yes, as we have agreed, I don't**

10   **know if we've agreed, but that's the source**

11   **of the value here.**

12        Q.    So in these circumstances, what the

13   opinion that's being given by the counsel for

14   Marvel is that his company hasn't committed

15   fraud in the non-financial side of its

16   financial statements?

17             MR. FRIEDMAN:  I object to the

18        form of the question.

19        Q.    Is that fair?

20        **A.    No, I don't think the word fraud**

21   **appears in the typical 10(b)(5) opinion.  It**

22   **sticks pretty close to the statute.**

23        Q.    So there is no materially false

24   statement or omission in the company's public

25   filings?

1            Longstreth

2       **A.      The omission of a fact necessary to**

3   **make the facts stated therein not misleading.**

4       Q.     And when a company -- I take it you

5   were at the SEC at one time, correct?

6       **A.     I was.**

7       Q.     And you've also been a securities

8   lawyer for many years, right?

9       **A.     Yes.**

10      Q.     And is it your understanding that

11  investors in public companies are entitled

12  and expected to rely on publicly filed

13  documents from public companies as being in

14  compliance with that Rule 10(b)(5) and 34 Act

15  requirement?

16      **A.     Is it my understanding.**

17      Q.     It's a bad question, I'll try it

18  again.

19          If I'm an investor in any public

20  company, I can expect that if I look up the

21  company's public filings, that those public

22  filings are going to be free from material

23  misstatement or omission because the company

24  has endeavored to make sure that they are; is

25  that fair?

Page 133

Longstreth

1
2  **A.    That's the hope, yes.  And I think**
3  **that the SEC's job is to set up a set of**
4  **procedures that give the typical investor**
5  **some assurance that that's the case.  That**
6  **the information furnished to them is**
7  **reliable.**
8      Q.    So this expectation that you can
9  rely on the financial statements and the
10  public statements of the company as being
11  free from material misstatement is not
12  something that is special or unique to anyone
13  who gets a 10(b)(5) opinion, but there is a
14  reasonable expectation of any investor; is
15  that fair?
16     **A.    Yes.**
17     Q.    You also state that the auditors
18  for the company give a comfort opinion.  What
19  is your basis for that statement?
20     **A.    I think that counsel told me that.**
21     Q.    Have you seen the comfort opinion?
22     **A.    I don't think I have.**
23     Q.    And it is not really a comfort
24  opinion, it is a comfort letter, isn't it?
25     **A.    Well, that's quibbly.**

1    **Longstreth**

2      Q.    Don't auditors quibble about the

3    word opinion?

4      **A.    Everybody quibbles about the word**

5    **opinion nowadays, including lawyers, so a**

6    **10(b)(5) opinion isn't called an opinion,**

7    **it's called a letter.  It's separated from**

8    **the legal opinions.  All kinds of things are**

9    **done to try to make it appear to be something**

10   **that it isn't.  And I think the same is true**

11   **of accounting.  Did I call it?**

12     Q.    You called it a comfort opinion.  I

13   do a lot of work in this field and I have

14   never come across a comfort opinion.  I have

15   come across comfort letters though, that

16   seems to be a term of art.

17     **A.    Okay, I grant you that other**

18   **people, particularly accountants, might call**

19   **it a letter.**

20     Q.    And a comfort letter, what is it?

21     **A.    It's a statement by the auditors**

22   **that having participated in the offering of**

23   **securities that is the subject of its letter**

24   **or opinion, nothing has come to its attention**

25   **that would suggest to it that there are**

1      **Longstreth**

2      **misstatements of material fact or omissions**

3      **of fact that are necessary to make the**

4      **statements made not misleading.  It's that**

5      **kind of thing.  It's sometimes called a cold**

6      **comfort letter.**

7          Q.    Is that your understanding of what

8      the letter that Marvel's auditors issued in

9      connection with these offerings said?

10         **A.    It is.**

11         Q.    And would it be different to you if

12     instead of that, the comfort letter made

13     reference to its previous conducted audits

14     and identified that the company had been

15     audited as of X date and that that particular

16     auditing firm E&Y had issued audits as of

17     that date and opined as of those particular

18     dates that the financial statements were free

19     of material error?

20         **A.    I don't understand the question.**

21         Q.    Okay.  As I said in the beginning,

22     I'm happy to rephrase.

23             Would it be different if instead

24     of -- the distinction that I'm asking you

25     about, you said they participated in the

Page 136

Longstreth

1
2  offerings and nothing had come to their
3  attention in the course of ·the offerings as
4  opposed to referring back to their last dated
5  audit?

6      A.    Right.

7      Q.    And saying we audited this company
8  as of this date, and as of the date of that
9  audit --

10     **A.    Nothing had come to our attention**
11 **back then.**

12     Q.    They all say as of the date of the
13 audit, here is our opinion, that they
14 basically refer back to the last opinion that
15 they gave and advised the underwriters that
16 there is such an opinion stating that the
17 company has financial statements that have
18 been audited in accordance with GAAP as of
19 that date?

20     **A.    And that's all they said?**

21     Q.    Yes.  Would that be different to
22 you?

23     **A.    Well, that doesn't sound like the**
24 **kind of comfort letter that I'm familiar**
25 **with, if those are the facts.  You understand**

Page 137

Longstreth

1
2    my purpose in mentioning the things I have
3    mentioned was simply to show that in many
4    respects, the Marvel and its professionals
5    participated in this offering to an extent
6    that suggested that they were very involved
7    in it.  And to an extent suggesting that if
8    they hadn't been that involved in it, the
9    offering would have not taken place.
10       Q.    Let's ask about the third area
11   which you have mentioned here, which is that
12   Marvel's officers participated in road shows
13   to market the notes.
14            Do you see that?
15       A.    Yes.
16       Q.    And who, to your knowledge, was a
17   Marvel officer who participated in a road
18   show for the notes?
19       A.    I would have to refresh my
20   recollection on that.
21       Q.    Do you know what the source of your
22   knowledge for that statement was?
23       A.    I think -- I don't know if it is in
24   the opinion or not.  I think I know I was
25   told that by counsel, but I may have read it

1                        Longstreth

2    elsewhere as well.

3            I think I did read it.  I mean, I

4    read the brief.

5        Q.    You may have read it in a brief or

6    opinion, but you didn't look at any of the

7    underlying evidence on that issue; is that

8    correct?

9        A.    What is the underlying evidence?

10       Q.    I'm trying to understand the

11   underlying evidence that you're relying on.

12       A.    I think I would have had to have

13   been out there and see who was at the road

14   shows.  I didn't look at anything anyway.

15       Q.    Does it matter to you the extent to

16   which Marvel's officers participated in the

17   road shows?  How many officers or how many

18   road shows?

19       A.    For the purposes of what I'm trying

20   to say, I don't think it matters.

21       Q.    Do you know who Mr. Bevins is?

22       A.    Yes, he is one of the officers.

23       Q.    He was chief executive officer of

24   Marvel, correct?

25       A.    Yes.

1                          **Longstreth**

2        Q.    I'll tell you he testified and he

3   participated in the road shows.

4        **A.    Yes.**

5        Q.    He was also an officer of the

6   holding companies?

7        **A.    That's right.**

8        Q.    Do you know that his salary was

9   paid by the holding companies?

10       **A.    I don't know who paid his salary.**

11       Q.    Would it matter to your judgment

12  that you have reached here that Mr. Bevins

13  who participated in the road show was a dual

14  officer and his paycheck came from the

15  holding companies not from Marvel?

16            MR. FRIEDMAN:   I object to the

17       form of the question.

18       **A.    Well, regardless of who's paying**

19  **you, I guess he is there because he knows**

20  **something about Marvel, and the noteholders**

21  **of the placement agent want someone who knows**

22  **about Marvel to talk about its condition,**

23  **financial condition, and its prospects.   I**

24  **assume he didn't answer a lot of questions**

25  **about the holding companies because they**

Page 140

1                          **Longstreth**

2      **aren't doing anything.**

3          Q.    Now, if you were a director of

4      Marvel and/or any company, any company that

5      has a large shareholder and is going to do an

6      offering, either a secondary offering of the

7      shares it owns, or something like this where

8      they are issuing notes that are pledged, and

9      you know they are going to go out and tell

10     the Marvel story because Marvel is, as you

11     say, the story that people would be

12     interested in, do you think it would be

13     reasonable under those circumstances for

14     Marvel management to want to be directly

15     involved and be the ones actually out there

16     in front of these investment banks and market

17     makers telling the Marvel story versus having

18     someone else do it?

19         A.    **Well, if it were benefitting them,**

20     **their company, whatever they were appearing**

21     **before was for the benefit of their company,**

22     **they certainly would want to be there.  If it**

23     **is not benefitting them at all, I think a**

24     **different calculus applies.**

25         Q.    Well, let me ask you this:  If you

1          Longstreth

2      had an opportunity as management of the

3      company to go before large investment banks

4      and other market makers who were not only

5      looking at these notes but who also follow

6      Marvel's stock, issue opinions about

7      recommendations of Marvel's stock, it matters

8      to a company like Marvel what the investment

9      bank and other analysts following the stock

10     think about the company, doesn't it?

11         **A.      Yes.**

12         Q.     And you might be concerned, for

13     example, if someone else is going to go out

14     and tell the Marvel story without you

15     actually being present in the room while

16     these analysts who are hearing about Marvel

17     are -- they might get misinformation, for

18     example.  Is that a valid concern?

19         **A.      Well, if it -- yes, you're making a**

20     **fair point, that they would -- given the type**

21     **of -- of audience, if it is a bunch of**

22     **security analysts who follow Marvel stock,**

23     **they would have an interest in making sure**

24     **the story is correct.**

25         MR. FRIEDMAN:  When you reach a

1          Longstreth

2          convenient point, can we take a break

3          for a minute?

4              MR. LOCKWOOD:  Sure.  Why don't

5          we take a break now because my next

6          question will require, I think, a

7          lengthy answer.

8              THE VIDEOGRAPHER:  It's 3:54 and

9          we're going off the record.

10              (Thereupon, a recess was taken,

11          and then the proceedings continued as

12          follows:)

13              THE VIDEOGRAPHER:  It's 3:59 and

14          we're back on the record.

15     BY MR. LOCKWOOD:

16          **A.    Before you start with this long**

17     **question, can I elaborate one answer to a**

18     **question you asked me?**

19          Q.    If you need to.

20          **A.    I'd like to.**

21              **You asked me about the purpose of**

22     **all of the information that the SEC requires**

23     **to be delivered to the investors.**

24          Q.    Yes.

25          **A.    Whether it is supposed to be**

Page 143

Longstreth

1  correct material-wise and I said yes.  And

2  that was in the context of the 10(b)(5)

3  opinion.  I simply want to say that for a

4  lawyer to give a 10(b)(5) opinion is a

5  very -- is not a matter of simply writing it

6  out without having done extensive work, and

7  so in the case of this lawyer giving this

8  opinion, it would represent in the minds of

9  those receiving it, as well as in his mind as

10  a professional, which I assume he was, an

11  opinion based upon a large amount of

12  involvement in the note issuance.  The

13  practice, the common practice in giving such

14  opinions is to do today, because of 144A type

15  transactions, to do the equivalent of the

16  kind of due diligence you would do in a

17  public offering.  So I don't think -- I think

18  it is simply important to understand what I

19  believe the delivery of that opinion

20  represented in terms of the company's

21  engagement of this offering.

22  Q.    The opinion that he gave didn't

23  pertain to the company, the issuers or the

24  securities.  It pertained to the business of

1              Longstreth

2    Marvel and its prior statements, public

3    statements; is that right?

4        A.    Well, I think it pertained to the

5    reps and warranties that were given with

6    respect to Marvel by the holding companies.

7    I think it would pertain to -- it should

8    pertain to anything and everything that

9    the -- that the noteholders were looking at

10   in deciding whether to invest in these notes.

11              MR. LOCKWOOD:  Let's mark this as

12        9.

13              (Longstreth Exhibit 9, 10(b)(5)

14        Opinion, marked for identification, as

15        of this date.)

16       A.    I have Exhibit 9.

17       Q.    So is this the opinion that you're

18   referring to, 10(b)(5) opinion with respect

19   to the Marvel III offering?

20       A.    Yes, I think so.  Just let me --

21              February, 18, that's one of them.

22   Okay.

23       Q.    Let me ask you first, is it your

24   view that an opinion from Marvel's general

25   counsel was necessary, was irreplaceable to

1                    Longstreth

2    the underwriters in connection with this

3    transaction?

4         A.    Well, it was necessary because it

5    was a condition to closing under the purchase

6    agreement.

7         Q.    Is it in your experience that the

8    10(b)(5) opinion that you're referring to

9    typically comes from the issuer, the issuer's

10   counsel?

11        A.    Yes.

12        Q.    And in these circumstances, if the

13   issuer had gone to the underwriter and said

14   you're going to be getting an opinion from

15   the issuer's counsel instead of the operating

16   company's counsel, do you have any basis to

17   say that that wouldn't have been acceptable

18   to the underwriter?

19        A.    I think the opinion -- an opinion

20   from counsel to the holding company who

21   issued the notes would be less desirable.

22   How much less desirable to become

23   unacceptable, I don't know.

24        Q.    And as someone familiar with SEC

25   regulations and how companies act initially,

Page 146

1          Longstreth

2    financial statements that are subject to the

3    SEC rules, would a holding company that

4    incorporates its operating company's

5    financial statements into its consolidated

6    financial statements, would it be responsible

7    for the accuracy of all of the financial

8    statements including the subsidiaries'

9    financial statements?

10        **A.    The holding company?**

11        Q.    Yes, if it issued its own financial

12   statements that were consolidated and

13   including the sub's financial statements,

14   it's responsible for the whole thing; is that

15   correct?

16        **A.    Well, it is responsible for its**

17   **financial statements, but this transaction**

18   **involved a great deal more than just**

19   **financial statements and its level of**

20   **responsibility would vary a great deal**

21   **depending on whether that holding company was**

22   **a holding company or a private company.**

23        Q.    So if you have a holding company, a

24   company that's going to be issuing securities

25   that are subject to the Securities Act, it

1                    Longstreth

2    would have a responsibility to ensure that

3    there is no false or misleading statements in

4    its prospectus; is that correct?

5         **A.    In its prospectus, yes.**

6         Q.    And to the extent that its

7    prospectus incorporates information about its

8    operating subsidiary, it would still have a

9    responsibility to do due diligence and have a

10   basis to say that the operating company's

11   financial statements are correct?

12        **A.    That's true.**

13        Q.    And that's true of any public

14   holding company has got an obligation to do

15   that when it issues securities, correct?

16        **A.    Yes.**

17        Q.    So in your experience, is it

18   typical for public holding companies to have

19   access to the staff of its public operating

20   companies so that it can comply with the

21   securities laws in issuing its own

22   securities?

23             MR. FRIEDMAN:  Is your question

24        limited to public operating companies?

25        Q.    It's public operating companies and

Longstreth

1

2  public holding companies is the question.

3  Public on both levels.

4      A.      Yes.

5      Q.      You say in your opinion on page 3,

6  second sentence of the second paragraph,

7  under number 3, that "the truth of the matter

8  is, however, that the note issuances could

9  not have been affected without them", and I

10  believe based on the context that the them is

11  the other actions that Marvel staff and

12  advisors took in connection with this

13  transaction.

14          What is your basis for that

15  statement?

16      A.      Well, it's an opinion.  It's my

17  opinion.  It's based upon what actually did

18  happen and what I think a placement agent and

19  noteholders would likely demand in a

20  situation such as this.  I mean, this is an

21  unusual situation in that the holding company

22  is a shell.  But it's being asked to issue

23  notes for a large amount of money.  So it is

24  an unusual transaction.  The questions you

25  put to me about a public holding company

Longstreth

1

2    were, I think --

3        Q.    More general?

4        A.    Yes.  So that's the basis for --

5    this is my experience and an analysis of the

6    transaction, but it's only an opinion.

7        Q.    Is there a -- is there any effort

8    that you made to look at comparable

9    transactions or comparable companies,

10   comparable issuances before you reached this

11   opinion?

12       A.    No.

13       Q.    Did you look up any economic or

14   industry or market literature research before

15   you reached this opinion?

16       A.    No.

17             I think it is an opinion based on

18   my experience, familiarity with 10(b)(5)

19   opinions, and what would be expected by, as I

20   said, by the placement agents or the

21   noteholders, the investors.  And that's

22   informed by many years of advising investors

23   in private placements as well as public

24   offerings.  But it is just an opinion.

25       Q.    If you look at page 4 of your

Page 150

1                          Longstreth

2     report.

3          A.     Yes.

4          Q.     I asked you some questions that

5     caused this to come up earlier, but I don't

6     think I have explored it fully.

7                 Is that your final conclusion is

8     that you take into consideration all of these

9     issues that you discussed and believe that

10    the consideration that Marvel would have

11    required would likely have been in the order

12    of magnitude of 150 million dollars.

13                Can you explain to me the

14    methodology that you used to reach that 150

15    million dollar figure?

16         A.     Well, it wasn't rocket science or

17    science of any kind.  It's just a ballpark

18    judgment.  I mean, ballpark being another way

19    of saying order of magnitude.  And it is a

20    large number.  This was a large transaction

21    in the sense of 553 million dollars being

22    extracted from the company indirectly and

23    going to one stockholder rather than all the

24    stockholders.  So at a cost of potential harm

25    to the -- so you look at that, and you look

Page 151

**Longstreth**

1

2      **at the market cap of the company, Marvel at**

3      **that time, and say something in this order of**

4      **magnitude would be enough.  If, and I keep**

5      **coming back to the if, because it is very**

6      **important in my mind.  If I were prepared to**

7      **do this at all.**

8          Q.    The first offering, I don't have

9      the offering memoranda in front of me.  Maybe

10     Mr. Friedman can correct me if I'm wrong, but

11     I think the numbers of the first offering are

12     in the range of 380, 390 million dollars?

13              MR. FRIEDMAN:  The proceeds of

14          the first offerings I think were in

15          the range of 288.

16              MR. LOCKWOOD:  You're right.

17          Okay.

18          Q.    So 288 million dollars, off by 100

19     million.  Did you do an analysis of -- let's

20     say that was the only offering, can you tell

21     me under your methodology what the bargaining

22     threshold would have been for that -- because

23     I take it the bargaining would have happened

24     serially, there would have been first

25     offering bargaining, second offering

Page 152

1                          Longstreth

2    bargaining, third offering bargaining, so at

3    the second session?

4         A.    Do we know, you asked the question,

5    wouldn't you, how many times are you going to

6    do this?  I mean, how much money are you

7    going to extract?

8         Q.    Let's see if we can break it down.

9    The first offering happens in 1993, it's 288

10   million dollars of the proceeds of the

11   offering, and you're on the board, and I'm

12   just trying to understand based on you have

13   150 million dollars listed here.  Can you

14   describe for me under the methodology you

15   employed how much money you would have sought

16   in that first offering?

17        A.    Well, what I'm trying to ask you is

18   do I know that the ultimate issuance will be

19   553 or is it something less?

20        Q.    No, at the first offering, all you

21   know is it is 288.  You don't have a crystal

22   ball, you don't know what's going to happen

23   in the future.  There is one offering and the

24   facts is as they were at the time in 1993.

25             MR. FRIEDMAN:  I want to object

1          Longstreth

2          to the line of questioning because the

3          Fowler report, unless I'm mistaken,

4          does not break down the negotiations

5          offering by offering.  And I don't

6          think there is any basis for the

7          questions along those lines.  But if

8          you want to correct me, I'll stand

9          corrected.

10        **A.      The Fowler negotiation implies it's**

11  **one negotiation.**

12        Q.    Well, let me see if I can help you.

13  I don't want to interrupt you, but I want to

14  respond to your statement.

15        If you look at page 30, the

16  concluding statement of Mr. Fowler's report,

17  it says, paragraph 60, he says that the

18  payments to Marvel would have been 3.8 to 7.6

19  for the Marvel holdings notes, 1.7 to 3.4 for

20  the Marvel parent notes, and 0.9 to 1.1

21  million for the Marvel III notes for a total

22  of 6.3 to 12.6 million.

23        What I'm trying to get at, does

24  your analysis provide for a similar breakdown

25  of an offering by offering amount?

Page 154

1                          Longstreth

2    **A.      I haven't done that kind of**

3    **analysis.**

4          Q.    And so you haven't done it to date.

5    Can you describe for me how I can do it using

6    the methodology you employ, how can I do that

7    breakdown?

8    **A.      Well, the market cap of the company**

9    **is still whatever it was, two billion.  This**

10   **is a smaller amount of wealth extraction.  So**

11   **it would imply a smaller absolute dollar**

12   **value of consideration.**

13         Q.    Okay.

14               So other than it would be smaller,

15   which makes sense to me, what factors would I

16   look at to determine how much it is?

17   **A.      Well, it would -- on the other side**

18   **of things, I would have to think about the**

19   **restrictions and the participation are all**

20   **the same.  The restrictions could harm me,**

21   **but there is less money to be paid off and**

22   **get rid of the restrictions, but the**

23   **potential harm is still there.  And I mean,**

24   **basically I think as Mr. Fowler says, I would**

25   **have to be thinking of this debt as Marvel**

Page 155

1                      Longstreth

2    debt.  Because that's how the rating agencies

3    look at it.  That's how the world looks at

4    it.  So you look at it as Marvel debt for

5    which it is getting no benefit.

6              I think the percentage of the

7    proceeds that I would ask for would probably

8    go up as the amount being raised went down.

9    But I don't know how to tell you right here

10   what percentage of 288 I would be asking for.

11   I would have to -- the potential harm does

12   not decline in proportion to the decline in

13   the 553 to 288 in my opinion.  It declines,

14   but not at the same rate.

15             So I think you have stumped me and

16   I can't answer that question with any

17   precision.

18        Q.    If you go back to the beginning of

19   your report, page 1.

20        A.    Okay.

21        Q.    In the paragraph at the bottom of

22   the page, it starts "in my opinion".

23        A.    Yes.

24        Q.    You stated that "the negotiation

25   depicted by Mr. Fowler bears little

Page 156

1                        Longstreth

2     resemblance to one might reasonably expect to

3     occur in a truly arm's length negotiation.

4     Exchange one unrealistically starts with

5     Marvel saying the restrictions hinder our

6     ability to operate Marvel."

7              Is it your understanding that the

8     exchanges listed by Mr. Fowler represent a

9     script or a dialogue of how these discussions

10    would have taken place?

11    **A.     I think that's what he said it was.**

12    Q.     Well, if you read paragraph 59 of

13    Mr. Fowler's report.

14    **A.     59, okay.**

15    Q.     Paragraph 59 on page 27.

16    **A.     Okay.**

17    Q.     Under the heading "Outcome of the

18    Arm's Length Negotiation".

19    **A.     Yes.**

20    Q.     He says, "My judgment is that

21    Marvel and M&F Holdings would have covered

22    all of these points discussed above in their

23    negotiation."

24              So you understand that he is

25    referring to the previous?

Page 157

Longstreth

1

2    **A.    The whole thing, yes.**

3    Q.    Yeah, report.  And then he says,

4    "The negotiation would likely occur through a

5    series of back and forth exchanges between

6    the parties where each side asserted their

7    benefits and redistributions to the Marvel

8    holding companies and the costs incurred by

9    Marvel."

10        Without getting to the exact

11    exchanges that Mr. Fowler proposes, do you

12    agree with that approach to laying out how a

13    hypothetical negotiation would take place to

14    try to identify what the back and forth

15    exchanges on arguments or leverage points

16    would be?

17    **A.    Well, except the tense on the word**

18    **incurred is not -- I mean, it's not costs**

19    **incurred.  It's the potential harm to the**

20    **company that results from accepting these**

21    **restrictions.  That's all.**

22    Q.    And you understood whether or not

23    you were agreeing with this analysis that he

24    did look to what the potential costs to

25    Marvel would be from the restrictions; is

Longstreth

1

2    that right?

3       A.    No, I don't think he really took

4    adequately into consideration the bet your

5    ranch problem.  I think it's -- there is a

6    high level of technical analysis that as I

7    see, it looks solely to the status quo or

8    things getting better, but doesn't look to

9    the issue of what could happen, what could go

10   wrong that would impair Marvel.

11             That would be my overall criticism

12   of this analysis.  I mean, in other words,

13   dwelling on the idea of incurrence test

14   versus maintenance test is not the way I

15   would like at this.  I look at it more

16   broadly as what could go wrong that would

17   cause these restrictions to impair Marvel's

18   chances of prospering or surviving.  I mean,

19   we are faced in this case with the unusual

20   circumstance that bad things did happen.  So

21   it isn't -- I think from my perspective, it's

22   hard to ignore what actually happened in the

23   thinking through what might happen.  And

24   that's a reality.

25       Q.    And other than the fact that

1                    Longstreth

2    Mr. Perelman wasn't willing to put his own

3    money into Marvel, are you aware of any facts

4    as things actually happened supporting the

5    view that these restrictions somehow

6    precluded Marvel from restructuring or

7    reorganizing itself when it got into

8    financial distress?

9         **A.    Well, they couldn't -- I mean, no**

10   **one else could put money in.  It wasn't just**

11   **Perelman.**

12        Q.    What's your basis for that

13   statement?

14        **A.    Well, the minutes describe a**

15   **situation, Mr. Perelman describes a situation**

16   **that says that we can't -- the noteholders**

17   **are so disbursed that we can't get hold of**

18   **them to ask them to consider a waiver.**

19        Q.    With respect to his proposal,

20   correct?

21        **A.    Or any proposal.**

22        Q.    Does he say with respect to any

23   proposal or does he say with respect to his

24   proposal?

25        **A.    I think it was with respect to his**

1              **Longstreth**

2    **proposal, but I mean that's because that was**

3    **the proposal on the table, but there could**

4    **have been others.**

5         Q.    And I take it you haven't read

6    Mr. Icahn's deposition; is that correct?

7         **A.    I think that's correct.**

8         Q.    And you haven't read Mr. Intrieri's

9    deposition?

10        **A.    Right.**

11        Q.    Have you looked at any documents

12   from the bankruptcy court?

13        **A.    I looked at what I said I looked**

14   **at.**

15        Q.    I keep finding some things that you

16   have looked at that aren't on there.

17        **A.    Only one thing.**

18        Q.    I'm trying to confirm you didn't

19   look at any of the bankruptcy filings.

20        **A.    I don't think so.  Such as what?**

21   **Give me an example.**

22        Q.    Such as the motions or orders or

23   proposed plans of reorganizations or offers

24   to buy stock, those kind of things that came

25   out of the bankruptcy court?

Page 161

1          Longstreth

2    **A.    No.**

3        MR. LOCKWOOD:  Why don't we take

4    a break.

5        THE VIDEOGRAPHER:  The time is

6    4:28 and we're going off the record.

7        (Thereupon, a recess was taken,

8    and then the proceedings continued as

9    follows:)

10        THE VIDEOGRAPHER:  4:32 and we're

11    back on the record.

12        MR. LOCKWOOD:  I have no further

13    questions for the witness at this

14    time.  Obviously if he is going to

15    formulate any additional opinions, I

16    reserve my right to ask additional

17    questions.

18        One thing I would like to point

19    out, I noticed toward the end of the

20    deposition that Mr. Longstreth, there

21    was a couple of times where I think

22    you were writing on the record

23    exhibit, so to the extent that there

24    is handwriting on the official

25    exhibits that that's the handwriting

Page 162

1                        Longstreth

2          that the witness undertook during the

3          course of the deposition.  If copies

4          have that handwriting, that's where it

5          came from.

6              THE WITNESS:  I did write in one

7          of those things.

8              MR. LOCKWOOD:  That's it.

9              THE VIDEOGRAPHER:  It's 4:33 and

10         this concludes the deposition.

11                     _____

                        BEVIS LONGSTRETH

12

13         Subscribed and sworn to before me

14         this ___ day of _____, 2006.

15

16         _____

17

18

19

20

21

22

23

24

25

1

2     ------------------- I N D E X -------------------

3     WITNESS                    EXAMINATION BY                    PAGE

4     LONGSTRETH                 MR. LOCKWOOD                        6

5

6     ------------- INFORMATION REQUESTS -------------

7     NONE

8     ------------------- EXHIBITS -------------------

9     LONGSTRETH EXHIBITS                                        FOR ID.

10    6    Rebuttal Expert Report of Bevis

           Longstreth                                            15

11

      7    Rebuttal Expert Report of Peter

12         Fowler                                                17

13    8    Excerpt from Marvel III Holdings

           Indenture                                             41

14

      9    10(b)(5) Opinion                                      144

15

16

17

18

19

20

21

22

23

24

25

Page 164

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                             : ss

5    COUNTY OF NEW YORK      )

6

7          I, Adrienne M. Mignano, a Notary

8    Public within and for the State of New

9    York, do hereby certify:

10         That BEVIS LONGSTRETH, the

11   witness whose deposition is

12   hereinbefore set forth, was duly sworn

13   by me and that such deposition is a

14   true record of the testimony given by

15   the witness.

16         I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that I

19   am in no way interested in the outcome

20   of this matter.

21         IN WITNESS WHEREOF, I have

22   hereunto set my hand this 25th day of

23   May 2006.

24                        *Adrienne Mignano*

25
                         _____

                         ADRIENNE M. MIGNANO

-----Original Message-----
From: Paul Lockwood [mailto:PLOCKWOO@skadden.com]
Sent: Thursday, September 15, 2005 5:25 PM
To: Stubbs, Emily A.
Subject: RE: Cantor v. Perelman: Proposed Schedule


Emily

Per our telephone discussions and my voicemail of this afternoon,
attached is a proposed scheduling order.  With exceptions I've already
discussed, it tracks your initial proposal.  I added a few things that
come from the Judge's off-the-rack scheduling order.

I've got to run to a parent-teacher conference at my daughter's school
tonight, so I will call you first thing AM.

>>> "Stubbs, Emily A." <estubbs@fklaw.com> 09/15/05 10:13 AM >>>
Paul,
Please send us your response to our proposed schedule as soon as
possible.  We were hoping we would have time to try to resolve any
disagreements and still make a joint submission to the Court this week.
Emily

> -----Original Message-----
> From:    Stubbs, Emily A.
> Sent:    Friday, September 09, 2005 3:21 PM
> To: 'plockwoo@skadden.com'
> Cc: Friedman, Edward A.; Rapport, Daniel B.
> Subject: Cantor v. Perelman:  Proposed Schedule
>
> Paul:
> In accordance with Judge Jordan's directions during today's
telephone
> conference, we propose the following schedule for briefing of the
> outstanding issues, completion of expert discovery, and submission
of
> the pretrial order:
>
> Jury trial briefs (simultaneous briefing, 10 pages):        Oct.
21
> Submissions re: privilege issues (simultaneous letter briefs): Oct.
21
> Service of new expert reports:                  Jan. 13
> Service of rebuttal expert reports:                      March 3
> Completion of expert depositions:               April
21
> Plaintiffs serve draft of pretrial order:
> May 22
> Defendants serve response to plaintiffs' draft
>   with any proposed additions and revisions:          June 8
> Submit final joint pretrial order to Court:             June 28
> Parties file jury instructions, verdict forms, jury interrogatories:
> Aug. 7 Pretrial conference:
>                                     TBD by
> court, date proposed is on or about Sept. 11
>

Trial                                           Oct.
10-
> Oct. 27, 2006
>
> Please let me know if these dates are acceptable to you. Thanks,
Emily
>
> Emily A. Stubbs, Esq.
> Friedman Kaplan Seiler & Adelman LLP
> 1633 Broadway
> New York, New York 10019-6708
> 212-833-1100 (tel.)
> 212-833-1193 (direct tel.)
> 212-833-1250 (fax)
> 212-373-7993 (direct fax)
> estubbs@fklaw.com
> www.fklaw.com
>
> *********************************************
>
> This transmission may be a confidential attorney-client communication
> or may otherwise be privileged or confidential. If you are not the
> intended recipient, please do not read, copy, or re-transmit this
> communication.  If you have received this communication in error,
> please notify us by replying to the sender of this message, and
delete
> this message (and your reply) and any attachments.  Thank you in
> advance for your cooperation and assistance.
>
> *********************************************
>
>
>

---------------------------------------------------------------------
-------
To ensure compliance with Treasury Department regulations, we advise
you that, unless otherwise expressly indicated, any federal tax advice
contained in this message was not intended or written to be used, and
cannot be used, for the purpose of (i) avoiding tax-related penalties
under the Internal Revenue Code or applicable state or local tax law
provisions or (ii) promoting, marketing or recommending to another
party any tax-related matters addressed herein.

****************************************************
This e-mail and any attachments thereto, is intended only for use by
the addressee(s) named herein and may contain legally privileged and/or
confidential information. If you are not the intended recipient of this
e-mail, you are hereby notified any dissemination, distribution or
copying of this email, and any attachments thereto, is strictly
prohibited. If you receive this email in error please immediately
notify me at (212) 735-3000 and permanently delete the original copy
and any copy of any e-mail, and any printout thereof.

Further information about the firm, a list of the Partners and their
professional qualifications will be provided upon request.
****************************************************

IN THE DISTRICT COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| RONALD CANTOR, IVAN SNYDER and | : | |
| JAMES A. SCARPONE, as TRUSTEES OF | : | |
| THE MAFCO LITIGATION, and as | : | |
| SUCCESSORS IN INTEREST TO MARVEL | : | |
| ENTERTAINMENT GROUP, INC. et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C. A. No. 97-586 RRM (KAJ) |
| RONALD O. PERELMAN, MAFCO | : | |
| HOLDINGS INC., MacANDREWS & | : | |
| FORBES HOLDINGS INC., ANDREWS | : | |
| GROUP INC., WILLIAM C. BEVINS and | : | |
| DONALD G. DRAPKIN, | : | |
| | : | |
| Defendants. | : | |

## SCHEDULING ORDER

At Wilmington, Delaware, this ___ day of _____, 2005,

Following a scheduling conference held on September 9, 2005, IT IS ORDERED

that:

      1.   Discovery

      (a)   Fact Discovery.  Fact discovery is complete and neither party

can initiate additional fact discovery without leave of the Court.

      (b)   Disclosure of Expert Testimony.  Either party may identify

supplemental expert testimony on or before January 13, 2005 by filing a supplemental

report in accordance with Federal Rule 26(a)(2).  The parties shall file rebuttal expert

reports on or before March 3, 2006.  Depositions upon oral examinations of experts so

identified shall be initiated so that it will be completed on or before April 21, 2006.

**B 369**

(c)    <u>Daubert Motions.</u>  To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.,</u> 509 U.S. 579 (1993), it shall be made by motion no later than June 14, 2006, unless otherwise ordered by the Court.

(d)    <u>Discovery Disputes (In General).</u>  Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference.  Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter, not to exceed three pages, outlining the issues in dispute and its position on those issues.  (The Court does not seek extensive argument or authorities at this point; it seeks simply a statement of the issue to be addressed and or summary of the basis for the party's position on the issue.)  Not less than twenty-four hours prior to the conference, any party opposing the application for relief may file a letter, not to exceed three pages, outlining that party's reasons for its opposition.  Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court will order it.

(e)    <u>The Pending Motion to Compel</u>  The parties should meet and confer to resolve the outstanding dispute regarding defendants' assertion of the attorney-client privilege.  If the parties are not able to resolve that dispute, then on or before October 21, 2005, plaintiffs shall renew their application, in accordance with the procedure set forth in the prior paragraph, by making their request for a teleconference.

2.    <u>Motion to Strike Jury Demand</u>  Defendants shall file their motion to strike the jury demand and supporting papers on or before October 21, 2005.  The motion shall be briefed in accordance with the Court's Local Rules.

**B 370**

2

2.    <u>Pretrial Conference</u>  On September ___, 2006, the Court will hold a Rule

16(d) Final Pretrial Conference in Courtroom No. ___ with counsel beginning at ___ _.m.

On or before May 8, 2006, plaintiffs' counsel shall forward to defendants' counsel a draft

of the pretrial order with the information plaintiff proposes to include in that draft.  On or

before June 8, 2006, defendants' counsel shall, in turn, provide plaintiffs' counsel with

comments on the plaintiffs' draft and the information the defendants intend to include in

the proposed order.  Each party shall include in the draft pretrial order an identification of

each expert witness that party expects to call to testify at the trial and a brief statement of

the substance of each opinion the expert will testify to at the trial.  The final pretrial order

shall be filed with the Court on or before June 28, 2006.  Unless otherwise ordered by the

Court, the parties should assume that filing the pretrial order satisfies the pretrial

disclosure requirement in Federal Rule of Civil Procedure 26(a)(3).

2.    <u>Motions *in Limine*</u>.  Motions *in Limine* shall not be separately filed.

All *in limine* requests and responses thereto shall be set forth in the proposed pretrial

order.  Each party shall be limited to five *in limine* requests, unless otherwise permitted

by the Court.  The *in limine* request and any response shall contain the authorities relied

upon; each *in limine* request may be supported by a maximum of five pages of argument

and may be opposed by a maximum of five pages of argument.  If more than one party is

supporting or opposing an *in limine* request, such support or opposition shall be

combined in a single five (5) page submission, unless otherwise ordered by the Court.

No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted

by the Court.

**B 371**

3

3.    <u>Jury Instructions, Voir Dire, and Special Verdict Forms</u>.  If the case is to be tried to a jury, pursuant to Local Rules 47 and 51, the parties should simultaneously exchange draft proposed instructions to the jury, special verdict forms and jury interrogatories on August 7, 2006.  The parties shall file proposed voir dire, instructions to the jury, and special verdict forms and jury interrogatories three full business days before the final pretrial conference.  That submission shall be accompanied by a computer diskette (in WordPerfect format) which contains the instructions, proposed voir dire, special verdict forms and jury interrogatories.

4.    <u>Trial.</u>  This matter is scheduled for a trial beginning at 9:30 a.m. on October 10, 2006 and shall conclude on October 27, 2006.

———————————————————
UNITED STATES DISTRICT JUDGE

**B 372**

00001

1

2      IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

3

4  RONALD CANTOR, IVAN SNYDER,  )
   JAMES A. SCARPONE, as        )
5  Trustee of the MAFCO         )
   Litigation Trust,            )
6                               )
            Plaintiffs,  )
7                        )
     - against -         )      Index No.
8                        )
   RONALD O. PERELMAN;        )      97-586 (KAJ)
9  MAFCO HOLDINGS, INC.,      )
   MacANDREWS & FORBES        )
10 HOLDINGS, INC.; ANDREWS    )
   GROUP INCORPORATED;        )
11 WILLIAM C. BEVINS;         )
   DONALD G. DRAPKIN,         )
12                            )
            Defendants. )
13 _____)

14

15

16    VIDEOTAPED DEPOSITION OF ANDREW S. CARRON

17         New York, New York

18         Friday, April 7, 2006

19

20

21

22

23

24  Reported by:
    DIANE HARTY
25  JOB NO. 183258

Carron, A.S.   04/07/06   pp. 1-191          Page 1

00002
1

2

3

4

5

6

7                          April 7, 2006

8                          10:05 a.m.

9

10        Videotaped Deposition of ANDREW S.

11    CARRON, held at 4 Times Square, New York, New

12    York, pursuant to Notice, before DIANE HARTY,

13    a Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

**Carron, A.S.   04/07/06    pp. 1-191**                **Page 2**

00067

1

2  to try to reformulate this idea, but it's one I'm

3  having trouble grasping.

4      Suppose the indenture covenants could

5  be imposed on Marvel only with the consent of

6  Marvel. Is it your opinion that the value of that

7  consent is $156.7 million?

8      A.   I hadn't thought about it in that

9  framework, but I think that the value to the

10  issuer of obtaining that consent and thereby being

11  permitted to issue the note was worth

12  156.7 million.

13      Q.   Okay. Let me keep at it.

14      Am I correct that you are offering no

15  opinion as to the value to the buyers of the notes

16  of the indenture covenants?

17      A.   It's -- it's true I'm not offering that

18  opinion. It's possible that one could determine

19  that value from the work that I've done, but I'm

20  not offering that opinion.

21      Q.   And you have not been asked to give

22  such an opinion?

23      A.   That's correct.

24      Q.   Now, that $156.7 million value of the

25  consent that we just talked about, you are not

00001

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE

2 RONALD CANTOR, IVAN SNYDER and  )
  JAMES A. SCARPONE, as TRUSTEES OF )

3 THE MAFCO LITIGATION, and as    )
  SUCCESSORS IN INTEREST TO MARVEL  )

4 ENTERTAINMENT GROUP, INC., et al., )
                    )

5     Plaintiffs,     )
               ) Civil Action

6 v.            ) No. 97-586-KAJ
               )

7 RONALD O. PERELMAN, MAFCO   )
  HOLDINGS INC., MacANDREWS &    )

8 FORBES HOLDINGS INC., ANDREWS  )
  GROUP INC., WILLIAM C. Bevins and )

9 DONALD G. DRAPKIN,     )
               )

10    Defendants.   )
       Deposition of LAWRENCE A. HAMERMESH, ESQUIRE

11 taken pursuant to notice at the law offices of
  Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney

12 Square, 7th Floor, Wilmington, Delaware, beginning at
  8:36 a.m., on Monday, May 8, 2006, before Kurt A.

13 Fetzer, Registered Diplomate Reporter and Notary
  Public.

14 APPEARANCES:

15   EDWARD A. FRIEDMAN, ESQ.

16   EMILY A. STUBBS, ESQ.

17   FRIEDMAN KAPLAN SEILER & ADELMAN LLP

18    1633 Broadway

19    New York, New York  10019-6708

20    For the Plaintiffs

21      WILCOX & FETZER

22  1330 King Street - Wilmington, Delaware 19801

23     (302) 655-0477

24     www.wilfet.com

**Hamermesh, L.A.  05/08/06  pp. 1-76**     **Page 1**

00002

1  APPEARANCES: (Cont'd)

2      THOMAS J. ALLINGHAM, II, ESQ.
        BRIAN G. LENHARD, ESQ.
3      SKADDEN ARPS SLATE MEAGHER & FLOM LLP
        One Rodney Square - 7th Floor
4       Wilmington, Delaware  19801
        For the Defendants
5
  ALSO PRESENT:
6      LINDSAY DuPHILY - VIDEOTAPE OPERATOR
        DISCOVERY VIDEO SERVICES
7

8           - - - - -

9           THE VIDEOTAPE OPERATOR:  This is the

10  videotape deposition of Mr. Lawrence A. Hamermesh

11  taken by the plaintiff in the matter of Ronald Cantor,

12  Plaintiffs, versus Ronald O. Perelman, Civil Action

13  No. 97-586.

14         This deposition is being held in the

15  offices of Skadden, Arps, Slate, Meagher & Flom,

16  Wilmington, Delaware.  We are going on the record at

17  approximately 8:36 a.m. on May 8, 2006.

18         The court reporter is Kurt Fetzer from the

19  firm of Wilcox & Fetzer, Wilmington, Delaware.

20         My name is Lindsay DuPhily and I'm the

21  videotape specialist of Discovery Video Services in

22  association with Wilcox & Fetzer.

23         Counsel will now introduce themselves and

24  then the court reporter will swear in the witness.

**Hamermesh, L.A.   05/08/06   pp. 1-76**           **Page 2**

00011

1    plan to.

2    Q.  How much are you being paid?

3    A.  I'm paid at the rate of $400 per hour.

4    Q.  And what's the total number of hours you have

5    spent on this assignment so far?

6    A.  Not a lot.  I didn't look that up and I don't

7    remember.  It's a fairly small number.

8    Q.  So your total compensation is what you're

9    referring to now?

10   A.  Or hours, whichever way.  It's the same thing.

11   Q.  Who has paid you so far?

12   A.  I'm not sure anybody has paid me yet.

13   **Q.  Please tell me what documents or other**

14   **materials you considered in preparation of your**

15   **report.**

16   **A.  Well, let's see.  In preparing my report I**

17   **looked at some case law, including the cases that are**

18   **cited in the report.**

19          **I looked at an excerpt from the notes**

20   **prospectuses, one of the notes prospectuses, and**

21   **reviewed the opinion of the Third Circuit in this**

22   **matter and a brief in the Third Circuit prepared by**

23   **the defendants.**

24   **Q.  Is that a complete list of the documents you**

**Hamermesh, L.A.   05/08/06   pp. 1-76**          **Page 11**

**B 378**

00012

1  reviewed in connection with this matter?

2  A.  It's what I can come up with right now.  There

3  may have been one or two others, but that's all I can

4  remember.

5      MS. STUBBS:  Tom, we request that a

6  complete list of materials considered be provided.

7      MR. ALLINGHAM:  Okay.

8  BY MS. STUBBS:

9  Q.  Were there any communications with Skadden

10  lawyers in which information was provided to you that

11  you considered in the preparation of the report?

12  A.  The documents I just mentioned.

13  Q.  Any other oral communications in which

14  information was provided to you?

15  A.  Yes.  I'm sorry.  After I prepared my report --

16  are you talking about in preparation of the report or

17  after?

18  Q.  Anything you considered in the preparation of

19  your report.

20  A.  Okay.  I don't believe there was any -- I don't

21  remember any information being supplied in connection

22  with the preparation of my report beyond what we have

23  already discussed.

24  Q.  When you said just a moment ago after you

**Hamermesh, L.A.   05/08/06   pp. 1-76**                    **Page 12**