IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                            :

RONALD CANTOR, IVAN SNYDER and     :
JAMES A. SCARPONE, as TRUSTEES OF   :
THE MAFCO LITIGATION TRUST,      :
                            :   No. 97-CIV-586-KAJ

               Plaintiffs,    :
                            :

     - against -        :
                            :

RONALD O. PERELMAN,        :
MAFCO HOLDINGS INC.,       :
MacANDREWS & FORBES HOLDINGS INC.,  :
ANDREWS GROUP INCORPORATED,   :
WILLIAM C. BEVINS and      :
DONALD G. DRAPKIN,       :
                            :

             Defendants.   :
                            :
------------------------------------------------------------x

**COMPENDIUM OF UNREPORTED
OPINIONS FOR PLAINTIFFS'
MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY BY PLAINTIFFS' EXPERT
WITNESSES**

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
ASHBY & GEDDES
222 Delaware Avenue
Wilmington, Delaware 19899
(302) 654-1888

Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

Dated: June 22, 2006

411282.1

INDEX

DESCRIPTION                                                                    TAB

*Chase Manhattan Mortgage Corp. v. Advanta Corp.*, 01 Civ. 507,
    2004 WL 422681 (D. Del. March 4, 2004)……………………………………………..A

*Hawkspere Shipping Co., Ltd. v. Coastal Cargo Co., Inc.*, 00 Civ. 1748,
    2001 WL 1586694 (E.D. La. Dec. 11, 2001)………………………………………..B

*Indiana Area School Dist. v. H.H.*, 04 Civ. 1696,
    2006 WL 1134942 (W.D. Pa. Mar. 4, 2006)………………………………….....C

*Triche v. Overnite Transp. Co.*, 95 Civ. 0691,
    1996 WL 276353 (E.D. La. May 21, 1996)………………………………….…D

411282.1



**A**

Not Reported in F.Supp.2d                                                         Page  1
Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
(Cite as: 2004 WL 422681 (D.Del.))

H

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
CHASE MANHATTAN MORTGAGE CORP., et
al., Plaintiffs,
v.
ADVANTA CORP., et al., Defendants.
No. Civ.A. 01-507(KAJ).

March 4, 2004.
Michael D. Goldman, and Erica L. Niezgoda,
Potter Anderson & Corroon LLP, Wilmington,
Delaware, for plaintiffs.

Jami Wintz McKeon, John C. Goodchild, III, and
Gregory T. Parks, Morgan, Lewis, Bockius LLP,
Philadelphia, Pennsylvania, co-counsel.

Todd Schiltz, Wolf, Block, Schorr & Solis-Cohen
LLP, Wilmington, Delaware, for defendants.

Jay A. Dubow, Wolf, Block, Schorr and Solis-
Cohen LLP, Philadelphia, Pennsylvania, co-
counsel.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

**\*1** Presently before me are several motions filed by
plaintiffs Chase Manhattan Mortgage Corporation
and Chase Home Mortgage Company of the
Southeast (collectively, "Chase") and defendants
Advanta Corp., Advanta National Bank USA,
Advanta Bank Corp., Advanta Mortgage Holding
Co., Advanta Mortgage Corp. USA, Advanta
Residual Holding Corp., Advanta Mortgage Conduit
Services Inc., Advanta Mortgage Corp. Midatlantic,
Advanta Mortgage Corp. Northeast, Advanta
Mortgage Receivables Inc., Advanta Finance Corp.,
Advanta Conduit Receivables, Inc. and Advanta
Finance Residual Corporation (collectively,
"Advanta"). Chase filed this action on July 26,
2001, alleging that Advanta engaged in (1) federal
securities fraud, in violation of § 10(b) of the
Securities Exchange Act of 1934, 15 U .S.C. § 78j;
(2) Delaware securities fraud, in violation of 6 Del.

C. § 7323(a)(2); (3) common law fraud; (4)
negligent misrepresentation; and (5) breach of
contract, arising out of a transaction in which
Advanta sold certain mortgage assets to Chase.
(Docket Item ["D.I."] 1.) Jurisdiction is proper
under 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and
1367.

Both parties filed Motions for Summary Judgment
on September 22, 2003. (D.I.331, 336.)
Thereafter, on October 6, 2003, Chase filed a
Motion to Exclude the Expert Testimony of W.
Barefoot Bankhead (D.I.342) and Advanta filed a
Motion to Exclude the Expert Testimony of Bella
Borg, Melanie Smith, and Brian Olasov (D.I.345).
The parties appeared before me to argue all of these
Motions on December 12, 2003. (D.I.380.) For the
reasons that follow, the parties 'Motions for
Summary Judgment will be denied and the parties'
Motions to Exclude Expert Testimony will be
denied without prejudice.

II. BACKGROUND [FN1]

> FN1. The background information provided herein
> does not constitute findings of fact, and is culled
> largely from the allegations contained in Chase's
> complaint.

A. *The Advanta Mortgage Assets*

In May 2000, Advanta offered to sell certain
mortgage assets to Chase. (D.I. 1 at ¶ 18; D.I. 331
at 7.) The parties were familiar with one another
because, prior to the offer to sell, Advanta had
serviced billions of dollars worth of Chase's
mortgage loans. (*Id.*) Among the mortgage assets
that Advanta was offering for sale were mortgage-
backed securities consisting of residual interests
[FN2] in securitized mortgage pools. (*Id.* at ¶ 19.)
These mortgage pools consisted of subprime
residential mortgage loans, which were the same
type of loans Advanta had been servicing for Chase.
[FN3] (*Id.*)

> FN2. In some cases, the sponsor of a subprime
> securitization will retain a subordinated financial
> interest in the securitization, known as the residual
> interest. (D.I. 1 ¶ 3.) The residual interest holder is
> entitled to receive the overcollateralization in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 422681, *1 (D.Del.))

trust (the principal balance of the loans in the trust that exceeds the principal amount of the certificates issued by the trust) and the excess spread (the difference between the average interest rate of the loans in the trust and the average interest rate of the certificates offered by the trust) in the securitization, to the extent those amounts are not required to pay the expenses of the trust and the certificateholders the amounts they are due. (D.I. 331 at 5.)

FN3. Subprime mortgage loans are loans to borrowers with sub-standard credit. (D.I. 331 at 3.)

From 1988 through 1999, Advanta sponsored subprime mortgage securitizations approximately four times each year. [FN4] (D.I. 331 at 6.) Advanta was both the servicer and residual interest holder in the Trusts at issue and routinely assessed the value of its residual interests in those securitizations. [FN5] (*Id.*) The value of the residual interests is determined by projecting the future cash flow from the securitizations to the residual interest holder, discounted to present value. [FN6] (*Id.*)

FN4. A subprime mortgage securitization means that a number of loans are pooled together and sold into a trust, and interests in the trust are sold to investors, known as certificateholders. (D.I. 1 ¶ 1.)

FN5. Advanta maintained residual interest valuation materials, which consisted of valuation binders or books from each routine assessment. (D.I. 331 at 9.)

FN6. Certain assumptions are made in order to project the future cash flow, including the future losses that will be experienced by loans within the trusts, the voluntary prepayment rate for loans within the trusts, the time it will take for the securitizations to reach their overcollateralization targets and therefore allow cash to flow to the residual interest holder, and the discount rate to apply to the cash flow. (D.I. 331 at 6.)

Chase alleges that when a mortgage loan is liquidated, the proceeds from the sale of the mortgaged property are typically used first to reimburse the servicer for any interest payments advanced by the servicer ("servicer advances") in respect of delinquent mortgage payments, and then to pay the remaining principal balance due on the mortgage. (D.I. 1 ¶ 21.) According to Chase,

when Advanta liquidated mortgage loans [FN7] in mortgage pools it had securitized, it did not use the proceeds first to reimburse the servicer advances, as was common practice in the industry, but instead applied all the proceeds to the unpaid principal balance of the loan, leaving some or all of its interest advances unreimbursed. (*Id.* at ¶ 23.) Chase asserts that, by using this procedure, Advanta reported smaller overall losses than it would have reported had it followed the procedures required by the terms of the underlying Servicing Agreements. [FN8] (*Id.*) Chase also alleges that Advanta maintained aged advances on its books relating to loans that had been liquidated, and carried those advances on its books as if they were still recoverable, thus benefitting from the appearance of lower losses. (*Id.* at ¶ 23-25.) Chase claims that at the time Advanta proposed to sell its mortgage assets to Chase (the "Transaction" or the "Asset Purchase Transaction"), Chase wrongly believed that Advanta followed the common practice and the terms of the Servicing Agreements governing its trusts. (*Id.* at ¶ 27.)

FN7. Loans that have been liquidated are referred to as "zero-balance" loans because, after liquidation, their outstanding balance is zero. (D.I. 1 at ¶ 23.)

FN8. Chase asserts that the Servicing Agreements typically provide that if the borrower on an underlying mortgage fails to make a scheduled monthly payment, the servicer of the pool, subject to certain exceptions, must advance the interest portion of the delinquent monthly payment to the trust's certificateholders. (D.I. 1 ¶ 20.)

**B. *Chase's Due Diligence***

**\*2** Chase conducted due diligence for approximately seven months prior to the Transaction. (D.I. 331 at 1.) On June 19, 2000, the parties executed a Confidentiality Agreement wherein Chase "acknowledge[d] that any and all information contained in the Evaluation Material is being provided [by Advanta] without any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material...." (*Id.* at 35, D .I. 333, Ex. 46 at 4.) Chase claims that from August 7 through 9, 2000, a team from its company visited one of Advanta's facilities in San Diego, California to look at certain information, including a detailed listing of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 422681, *2 (D.Del.))

receivables and advances on zero-balance loans or loans paid in full. [FN9] (D.I. 1 at ¶ 33.)

FN9. Advanta notes that Chase also conducted on-site due diligence at one of Advanta's facilities in Fort Washington, Pennsylvania on July 26-27, 2000 and that, at each of Chase's on-site visits, Advanta provided Chase employees with access to documents, presentations regarding various aspects of Advanta's mortgage business, and the opportunity to interview and meet with Advanta employees. (D.I. 331 at 8.)

Michael Pocisk, Chase's Private Investor Reporting Manager, was responsible for Chase's due diligence review of Advanta's Investor Reporting Department. (D.I. 331 at 16.) In the course of that review, Mr. Pocisk met with various Advanta officials and took notes during each of those meetings. (Id.) Before one of the meetings, Mr. Pocisk reviewed a copy of a Monthly Summary Report and Certification ("MSR & C") for one of the trusts involved in this litigation, the so-called 1997-3 Trust. (Id. at 18.) Mr. Pocisk's notes on the 1997-3 Trust contain a chart entitled "Summary of loan losses." (Id., D.I. 333, Ex. 26.) The chart reflects that the total loss amount for the 1997-3 Trust was $19.4 million, which matches the total losses disclosed in Advanta's MSR & C for the 1997-3 Trust. (Id.) Mr. Pocisk drew a line to that total loss number and made the notation "wow" next to it. (Id.) Mr. Pocisk testified that he wrote "wow" next to the total loss amount because "it was a realized loss that was greater than [he] had ever seen sustained at Chase." (Id.; D.I. 334 (Pocisk Deposition at 112:6-10).)

C. *The Purchase and Sale Agreement*

After conducting due diligence, Chase submitted a bid for the assets of Advanta's mortgage business on September 19, 2000, which Advanta initially rejected. (D.I. 331 at 25.) Chase agreed to increase its bid by $25 million and submitted its final bid for Advanta's assets on October 13, 2000. (Id.) On January 8, 2001, Chase and Advanta entered into a Purchase and Sale Agreement (the "Agreement") whereby Advanta agreed to sell Chase certain assets of Advanta's mortgage business, and Chase agreed to assume certain liabilities relating to the acquired assets. (D.I. 1 at ¶ 41.)

The terms of the Agreement were heavily negotiated between the parties. Section 4.16 of the Agreement contains a provision stating that, "[e]xcept as otherwise set forth in this Agreement, ... the Company [Advanta] ... [does not] make any representation or warranty whatsoever, express or implied, as to the Assets or the Business...." (D.I. 333, Ex. 48 at 43.) Section 6.24 of the Agreement contains a covenant pursuant to which Advanta agreed to "take such actions as are necessary to insure that, as of the Closing Date, there are no investor cash shortages, no non-recoverable advances of principal and interest, no non-recoverable advances on zero balance loans, and no outstanding checks greater than 180 days." (D.I. 337 at 6; D.I. 333, Ex. 48 at 71.) Section 11.03 of the Agreement contains an integration clause, which states that the "Agreement (including the Disclosure Schedules and the Ancillary Agreements) ... constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior disclosures, agreements and understandings, both written and oral ... among the parties or any of them with respect to the subject matter hereof...." (D.I. 331 at 27; D.I. 333, Ex. 48 at 84.)

D. *The Fallout*

*3 The sale of Advanta's mortgage assets closed on February 28, 2001 for a cash price in excess of $1 billion (the "Closing"). (D.I. 1 at ¶ 43.) After the Closing, Chase asserts that it received Advanta's mortgage assets and discovered that Advanta provided misleading information regarding the existence of non-recoverable advances on zero-balance loans and the amount of historic losses suffered by the mortgage pools underlying the residual interest securities. (Id. at ¶ 49.) Chase further alleges that it learned that Advanta's method of reporting realized losses understated the amount of loss on each mortgage securitization pool. (Id. at ¶ 52.) Chase claims that Advanta was intentionally deceiving Chase because Advanta knew that it had nonrecoverable advances on zero-balance loans (id. at ¶ 55) and knew that it had engaged in practices that were inconsistent with industry custom (id. at ¶ 71). Chase also claims that Advanta knew Chase would use the inaccurate loss figures to value the residual securities (id. at ¶ 80) and that Chase had been deceived during the Transaction (id. at ¶ 92). Chase claims that it has suffered millions of dollars

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in damages as a result of the alleged misconduct by Advanta. (*Id.* at ¶ 95.)

## III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (2003). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to

> do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U .S. 574, 586-87 (1986). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## IV. DISCUSSION

### A. Chase's Motion for Summary Judgment

1. Chase's claim that Advanta breached § 6.24 of the Purchase and Sale Agreement

*4 Chase argues that it is entitled to summary judgment on its claim that Advanta breached § 6.24 of the Agreement. (D.I. 337 at 16.) Chase states that, pursuant to § 6.24, Advanta promised that at the time of the Closing there would be no non-

recoverable advances on zero balance loans. (*Id.*) Chase argues that Advanta had approximately $17.5 million in outstanding advances on zero balance loans at the time of the Closing, constituting a breach of § 6.24. (*Id.*)

In response, Advanta asserts that throughout the negotiations concerning § 6.24 of the Agreement, Chase repeatedly "sought a representation from Advanta that there would be *no advances* on zero balance loans as of the Closing." (D.I. 358 at 6 (emphasis in original).) Advanta states that it never made such a representation, and ultimately agreed that it would take "such actions as were necessary so as to insure that, as of the Closing, there would be 'no *non-recoverable* advances' on zero balance loans." (*Id.*) Advanta claims that its employees understood "non-recoverable advance" to mean "advances that are not capable of being recovered from any source at any time," and that this understanding was communicated to Chase. (*Id.* at 7.) Advanta asserts that the $17.5 million in advances at issue were capable of being recovered according to this definition (*id.* at 30), an assertion which Chase disputes (D.I. 369 at 6, 8).

I find that Chase is not entitled to summary judgment on its claim that Advanta breached § 6.24 of the Agreement. While there apparently is no dispute that there were approximately $17.5 million in advances on Advanta's zero-balance loans, there is a dispute as to whether those advances were non-recoverable at the time of the Closing. There are genuine issues of material fact as to whether Advanta's understanding of the term "non-recoverable advance" was communicated to Chase during the course of due diligence and negotiations. The parties' arguments require me to look at documentary evidence from the negotiations surrounding the Agreement and, ultimately, to make credibility determinations and speculate as to what the principals involved in negotiating the Agreement were thinking at the time, which is inappropriate at the summary judgment stage. The definition of "recoverable" as it is used in the Agreement is a matter of contract interpretation. However, the issues of fact pertaining to the parties' negotiations may impact the appropriate construction of "recoverable" as it is used in the Agreement, including whether the advances can properly be viewed as "recoverable" if the only source of recovery is money that Chase was entitled to receive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 422681, *4 (D.Del.))

anyway as the residual holder. For these reasons, Chase's Motion for Summary Judgment that Advanta breached § 6.24 of the Agreement will be denied.

### 2. Chase's request for an order pursuant to Federal Rule of Civil Procedure 56(d)

Chase argues that it is entitled to an order, pursuant to Federal Rule of Civil Procedure 56(d), [FN10] stating that "the undisputed facts establish that Advanta knowingly provided Chase with materially false and misleading information," thereby establishing, for purposes of trial, two of the elements (namely, misrepresentation and scienter) Chase must prove to sustain a cause of action for federal securities fraud and common law fraud. (D.I. 337 at 20.) Specifically, Chase asserts that Advanta's Statements to Certificateholders (the "Statements") under-reported Advanta's historical losses and that Advanta made a misrepresentation of material fact when it gave or directed Chase to them as a source for historical loss information. (Id. at 22.) Chase further asserts that Advanta made misrepresentations by omission when it "failed continuously throughout the due diligence and negotiation period to tell Chase that the information on the Statements was false." (Id .)

> FN10. Federal Rule of Civil Procedure 56(d) provides, in relevant part, that a court "shall if practicable ascertain what material facts exist without substantial controversy ... [and] make an order specifying the facts that appear without substantial controversy ... Upon trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly." Fed.R.Civ.P. 56(d) (2003).

**\*5** In response, Advanta asserts that, for all of the Trusts formed before 1997, "the Statements have a section entitled 'Realized Losses Tracking,' which contains complete loss information, including principal and interest losses, experienced by the loans in the Trusts." (D.I. 358 at 14.) Advanta states that the 1997 Trusts show principal losses in a section of the report called, "Mortgage Loan Principal Reduction Information," and show losses relating to interest and servicing advances in other sections of the Statements. (Id. at 17.) Advanta further asserts that most of the Statements for the 1998 Trusts report the current month's losses, and

the Statements for the 1999 and 2000 Trusts report principal losses in a section labeled "Total Realized Loss of Principal." (Id. at 19 .) Finally, Advanta argues that the Statements were produced together with information that was responsive to "literally hundreds of different requests for information," and not specifically in response to Chase's request for loss information, and that the Statements were not false or misleading. (Id. at 21, 26.)

Based upon this evidence, it is clear that the material facts pertaining to the allegations regarding Advanta's misrepresentation and scienter are in substantial controversy, see Fed.R.Civ.P. 56(d), and, therefore, Chase's request for an order pursuant to Federal Rule of Civil Procedure 56(d) will be denied.

### B. Advanta's Motion for Summary Judgment

In support of it Motion for Summary Judgment, Advanta argues that Chase's common law fraud and negligent misrepresentation claims are barred because, due to the non-reliance and integration clauses contained in the Agreement, Chase cannot establish that it reasonably relied on any allegedly false or misleading information. [FN11] (D.I. 331 at 35, 36.) Advanta further argues that, to the extent Chase claims that false or misleading information was incorporated into the Agreement, Chase's tort-based claims are barred by the "economic loss" and "gist of the action" doctrines recognized under Pennsylvania law. [FN12] (Id. at 37.) Advanta further argues that, if Chase's tort-based claims are not barred, Advanta is entitled to summary judgment in its favor on those claims because the information Advanta provided to Chase was not false or misleading, nor did Advanta intend to defraud Chase. (Id. at 38) Advanta also argues that it is entitled to summary judgment on Chase's claims that Advanta breached sections 4.11, 4.40, 6.24, 4.04, 4.08, 4.19, 4.22, 4.27, 4.28, 6.26, 4.29 and 6.01 of the Agreement. (Id. at 47-58.) Finally, Advanta argues that it is entitled to summary judgment on its counterclaim that Chase breached certain terms of the Agreement by failing to release over $900,000 from a document holdback that was due to Advanta within two weeks after the Closing. (Id. at 58.)

> FN11. Advanta also argues that it is entitled to judgment as a matter of law on Chase's Delaware

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 422681, *5 (D.Del.))

securities law claim because "Delaware securities law is not applicable where the primary nexus between Delaware and the transaction is the incorporation of one or more parties in the state." (D.I. 331 at 34 (citing 6 Del. C. § 7323 (notes); *Singer v. Magnavox Co.,* 380 A.2d 969, 981 (Del.1977), *overruled on other grounds by Weinberger v. UOP, Inc.,* 457 A.2d 701, 715 (Del.1983)).) The fact that Advanta is incorporated in Delaware is not the primary nexus between Delaware and the Transaction at issue. In this case, the parties explicitly agreed, by way of a choice of law provision in § 11.06 of the Agreement, that the "Agreement shall be governed and construed in accordance with the laws of the State of Delaware...." (D.I. 333, Ex. 48 at 86.) Therefore, Advanta is not entitled to summary judgment as a matter of law on Chase's Delaware securities law claim.

FN12. In its Motion for Summary Judgment, Advanta raised the issue that Chase's common law fraud and negligent misrepresentation claims are subject to a choice of law analysis, and that Pennsylvania substantive law should apply to these claims. (D.I. 331 at 34.) In its opposition, Chase argues that there is no true conflict between Pennsylvania and Delaware law with respect to the elements of a fraud claim, and that I need not address the choice of law issues raised by Advanta. (D.I. 348 at 10.) As Advanta itself recognizes (D.I. 331 at 38), the elements of federal securities fraud, Pennsylvania common law fraud, and Delaware common law fraud are virtually identical in this context. The plaintiff must show that the defendant (1) made a misstatement or omission of material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury. *See AES Corp. v. Dow Chemical Co.,* 325 F.3d 174, 178 (3d Cir.2003) (federal securities claim under Rule 10b-5); *David Pflumm Paving & Excavating, Inc. v. Foundation Services Co.,* 816 A.2d 1164, 1171 (Pa.Super.2003) (Pennsylvania common law fraud); *Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1074 (Del.1983) (Delaware common law fraud). Finding no meaningful distinction between Delaware law on fraud and Pennsylvania law on fraud, no conflict of law analysis is required on this point.

Nor is a conflict of law analysis implicated by Advanta's argument that Chase's "tort-based [fraud] claims are barred by the 'economic loss' and 'gist of the action' doctrines" recognized under Pennsylvania law "because Chase's claims sound in contract." (D.I. 331 at 37.) Any claims that sound in contract in this case are governed by Delaware law by the express terms of the Agreement, *see supra* n. 10.

Apart from repeating many of the arguments advanced in its own Motion for Summary Judgment, Chase responds by arguing that the non-reliance and integration clauses in the Purchase and Sale Agreement do not preclude Chase's fraud claims under the applicable Third Circuit law. (D.I. 348 at 28.) Chase also argues that Advanta is not entitled to summary judgment on Chase's breach of contract claims because they all raise disputed issues of fact. (*Id.* at 55.) Finally, Chase argues that Advanta is not entitled to summary judgment on its counterclaim because there is a genuine dispute of material fact over how many "starting exceptions" existed as of February 28, 2001 upon which to calculate the amount of money that Chase should have released from a document holdback. (*Id.* at 58.)

1. The effect of the non-reliance and integration clauses in the Agreement

**\*6** It is undisputed that § 4.16 of the Agreement contains a non-reliance clause and § 11.03 of the Agreement contains an integration clause. Advanta argues that, due to these clauses in the Agreement, Chase's alleged reliance on misrepresentations was unreasonable as a matter of law. Chase, on the other hand, argues that the presence of a non-reliance or integration clause in the Agreement does not establish, *per se,* that its reliance was unreasonable.

The "reasonable reliance" element of a Rule 10b-5 claim for federal securities fraud requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests. *AES Corp. v. Dow Chemical Co.,* 325 F.3d 174, 178 (3d Cir.2003) (citing *Semerenko v. Cendant Corp.,* 223 F.3d 165, 174 (3d Cir.2000)). Reliance is an essential element of a Rule 10b-5 claim. *Id.* at 180. The existence of a non-reliance clause is but one

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                        Page   7
(Cite as: 2004 WL 422681, *6 (D.Del.))

factor to consider in determining the reasonableness of a party's reliance. *Id.* at 180, 183.

A sophisticated investor will have to "show more to justify its reliance" in the face of a non-reliance clause. *Id.* at 180. Though "cases involving a non-reliance clause in a negotiated contract between sophisticated parties will often be appropriate candidates for resolution at the summary judgment stage," the Third Circuit has been "unwilling ... to hold that the extraction of a non-reliance clause, even from a sophisticated buyer, will always provide immunity from Rule 10b-5 liability." *Id.*

Both Chase and Advanta are undeniably sophisticated investors. Chase argues that it conducted a diligent and thorough investigation into Advanta's assets and reasonably relied on Advanta's representations, discovering no reason to suspect that Advanta was intentionally providing Chase with false or misleading information. *See AES*, 325 F.3d at 180 (quoting *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir.1976)) ("a sophisticated investor is not barred [from] reliance upon the honestly of those with whom he deals in the absence of knowledge that the trust is misplaced"). Chase's papers describe, in great detail, the due diligence that it conducted prior to entering into the Transaction and executing the Agreement with Advanta. While judgment for Advanta may be appropriate at some point, I decline to "give controlling significance to the existence of a non-reliance clause in a vacuum." *See id.* at 182. Advanta is not entitled to summary judgment on Chase's federal securities claim simply because Chase is a sophisticated investor and the Agreement contains a non-reliance clause. [FN13] *See id.* ("[T]o hold that a buyer is barred from relief under Rule 10b-5 solely by virtue of his contractual commitment not to rely would be fundamentally inconsistent with § 29(a) [of the Securities Exchange Act, which forecloses anticipatory waivers of compliance with the duties imposed by Rule 10b-5]."); *see also In re: Daimler Chrysler AG Sec. Litig.*, 294 F.Supp.2d 616, 622 (D.Del.2003) (denying summary judgment that plaintiff was precluded from establishing reasonable reliance where plaintiff was "clearly a sophisticated investor involved in a complex transaction" and many factors weighed in favor of finding that plaintiff's reliance was reasonable).

FN13. For the same reasons, I am not persuaded

that this case can be resolved in the context of a summary judgment motion with respect to the integration clause in the Agreement, particularly because the integration clause is not as explicit with respect to the issue of reliance as is the non-reliance clause in the Agreement. *See In re: DaimlerChrysler Sec. Litig.*, 294 F.Supp.2d 616, 623 (D.Del.2003).

2. Advanta's argument that it is entitled to summary judgment on Chase's fraud-based claims and breach of contract claims

*7 Advanta argues that there are no genuine issues of material fact with respect to Chase's fraud claims because Advanta did not knowingly provide Chase with false or misleading information prior to the parties executing the Agreement. However, as discussed *supra*, I have already determined that there is a substantial controversy between the parties as to the material facts pertaining to Advanta's alleged misrepresentation and scienter, and thus, Advanta is not entitled to summary judgment on Chase's fraud claims. As to the contract claims, Chase has answered each of Advanta's arguments pertaining to those claims by pointing out disputed issues of material fact. [FN14] (D.I. 348 at 55-58.) Thus, Advanta is not entitled to summary judgment on Chase's breach of contract claims.

FN14. For example, Advanta says that it fully disclosed all advances on zero balance loans in the disclosure schedule and, as such, did not breach § 4.40 of the Agreement. (D.I. 331 at 49.) In response, Chase says that one of its witnesses will testify that he was given a one-page schedule showing "a credit balance of $767,618 on advances on zero balance loans and was told that this was 'all advances' on zero balance loans," when in fact there were $17.5 million in advances outstanding on zero balance loans, thus creating a genuine issue of material fact as to whether Advanta fully disclosed all advances on zero balance loans. (D.I. 348 at 56.) Advanta also claims that it did not breach § 4.27 of the Agreement because "none of the documents [it] submitted to the SEC contain[ed] any material misstatement or omission." (D.I. 331 at 56 .) Chase says it has evidence sufficient to prove that Advanta submitted the allegedly false Statements to Certificateholders to the SEC, in violation of federal law, creating yet another genuine issue of material fact. (D.I. 348 at 57.) This colloquy repeats in much the same manner for each of the contractual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 422681, *7 (D.Del.))

provisions upon which Advanta has moved for summary judgment.

**3. Advanta's argument that it is entitled to summary judgment on its counterclaim**

Advanta argues that it is entitled to summary judgment on its counterclaim that Chase breached certain terms contained in a "Post-Closing Letter" executed on February 28, 2001. (D.I.333, Ex. 66.) Section 1.08(m) of the Agreement states that the parties would place certain funds in a Document Holdback Account to protect Chase from losses relating to missing or defective documents in various loan files. (D.I. 333, Ex. 48 at 12.) Since the parties had not completed the audit of those loan files by the Closing, they agreed to place an amount in the Document Holdback Account that would cover any of the losses. (D.I. 331 at 58.)

At Closing, $1,270,020 was placed in the Document Holdback Account. (D.I. 333, Ex. 67 at 2.) The Holdback Amount at Closing was $346,830, which was calculated using a Holdback Agreement per Document of $55.00. (*Id.*) Advanta argues that the terms of the Post-Closing Letter required that "[w]ithin two weeks after the date hereof, Buyer [Chase] shall release any funds in the Document Holdback Account in excess of the amount that would have been the amount of the Document Holdback at closing, computed in accordance with the provisions of the Agreement." (D.I.333, Ex. 66.) Advanta claims that Chase owes it the difference between the amount placed in the Document Holdback Account and the Holdback Amount at Closing (in excess of $900,000).

In response, Chase disputes the evidence provided by Advanta to support its calculations, claiming that it lists 6,305 document exceptions and that "[t]here is other evidence ... that there were 23,091 'starting exceptions' (i.e., the exceptions as of the Closing Date)." (D.I. 348 at 58-59.) Chase also questions the source and reliability of the evidence. Chase then argues that, using its evidence, "$55 per exception equals $1,270,005--$5 more than was placed in the holdback." However, Advanta's chart reflects that $1,270,020 was placed in the holdback. (D.I.333, Ex. 67.)

In response, Advanta states that documentary evidence was provided to it by Bankers Trust, the custodian of the loan files, "on the day of Closing for the specific purpose of determining the number of outstanding document exceptions at the time of closing." (D.I. 372 at 19.) Advanta argues that Chase does not explain the source of the documentary evidence it cites to rebut Advanta's calculations. (*Id.*) Advanta then states that, on the basis of Chase's evidence, Chase was required to release $1,179,800 to Advanta from the Document Holdback Account by March 2002 at the latest. (*Id.*)

**8 On this issue too, there are genuine issues of material fact. How much money, if any, Chase was required to release to Advanta from the Document Holdback Account cannot be answered on the present record, as the parties themselves appear to have changed their calculations numerous times in the course of briefing this issue and seem to be confused (or at least confusing) about the documentary evidence upon which they each rely. Summary judgment for Advanta on its counterclaim will therefore be denied.

**C. The Parties' Motions to Exclude Certain Expert Testimony**

On October 6, 2003, Chase filed a motion to exclude the expert testimony of W. Barefoot Bankhead. (D.I.342.) That same day, Advanta filed a motion to exclude the expert testimony of Bella Borg, Melanie Smith and Brian Olasov. (D.I.345.)

Advanta offered W. Barefoot Bankhead as an expert regarding the residual interests in Advanta's subprime mortgage securitizations and to rebut Chase's valuation of the residual interests at issue and to opine on the adequacy of Chase's due diligence. (D.I. 343 at 3, 4.) Chase argues that Mr. Bankhead is incapable, as a matter of law, to proffer opinions because he has "never before valued assets of this nature [subprime mortgage securitizations] and never performed due diligence for an acquisition like [the one involved in this litigation]." (*Id.* at 5.)

Chase retained Bella S. Borg to "formulate opinions concerning industry standards with respect to application of liquidation proceeds and reporting of losses due to loan foreclosures within a securitization." (D.I. 347 at A1.) Advanta argues that Ms. Borg's opinions are "unsupported and unreliable" and "precisely the type of testimony barred by Rule 702 and *Daubert.*" (D.I. 346 at 4.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Advanta further argues that Ms. Borg's experience has been limited to the prime mortgage industry and commercial loans, as opposed to the subprime residential loans at issue in this case. (*Id.* at 5.) Finally, Advanta argues for the exclusion of Ms. Borg's opinions that there is a standard definition within the industry for "realized loss" and that Advanta did not comply with the industry standards for reporting realized loss. (*Id.*) Advanta says those opinions should be excluded because Ms. Borg employed no methodology in reaching her conclusion. (*Id.* at 8.)

Chase offered Melanie Smith as an expert to opine on whether Schedule 4.40 of the Agreement in this case contained an adequate disclosure of advances on zero balance loans. (D.I. 347 at A108.) Advanta argues that Ms. Smith's testimony should be excluded at trial because it is "based on an incomplete and limited set of facts" and "offers no assistance to this Court." (D.I. 346 at 19.)

Finally, Chase offered Peter Olasov as an expert to "express opinions as to the reliance Chase placed on various materials in pricing and consummating its acquisition of various assets and operations related to Advanta's sub-prime business along with the impact to value associated with changes to various assumptions Chase made in acquiring these assets." (D.I. 347 at A201.) Advanta argues that Mr. Olasov's report and testimony contain "speculative and unsupported assumptions that cannot form the basis of an expert opinion." (D.I. 346 at 26.)

**\*9** Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993). The Rule provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Civ.P. 702 (2003). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id.* at 589-590. Further, Federal Rule of Civil Procedure 702 requires that expert

testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591-92.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id.* at 592-93. Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used. *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

A party cannot qualify a person as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *Redman v. John D. Brush and Co.,* 111 F.3d 1174, 1179 (4th Cir.1997); *Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 382 (5th Cir.1996). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir.1987); *STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 768 (D.Md.1999) (quotation omitted), *aff'd,* 211 F.3d 588 (Fed.Cir.2000); *Sec. and Exch. Comm'n v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998).

This case is currently scheduled for a one-week bench trial to begin on April 26, 2004. At oral argument, I asked counsel for both parties whether I was obligated to carry out the "gatekeeping" function of *Daubert* in a bench trial in the same manner as I am obligated to in a jury trial. (D.I. 380 at 13:19-25.) Counsel candidly and correctly pointed out that the leading cases in the Third Circuit do not carve out any exception for applying *Daubert* differently in a bench trial than in a jury trial, nor does the case law indicate whether I must decide to exclude expert testimony prior or subsequent to a bench trial. (*Id.* at 16:17-25 through 17:1-11.)

**\*10** The parties' main argument was that, if I ruled on their *Daubert* motions before trial, it would streamline their trial preparations and perhaps prevent them from spending the time allocated to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



them at trial to examine expert witnesses whose testimony may ultimately be excluded. However, given the parties' briefing, the qualifications of the experts at issue, and the experts' reports and deposition testimony, I will not say at this point and on this record that the experts' opinions are so poor a fit with the evidence and so inadequate in their foundation as to be irrelevant or unreliable, and I therefore decline to exclude the proposed expert testimony at this time. If this were a jury trial, I might view the balancing differently, however, in the present context I will allow Mr. Bankhead, Ms. Borg, Ms. Smith, and Mr. Olasov to testify at trial. Both Chase's and Advanta's motions to exclude expert testimony will be denied without prejudice to their arguing about what weight, if any, the expert testimony should be given. [FN15]

> FN15. While I am mindful of the costs associated with preparing expert witnesses for trial, I believe that my ultimate judgment on the weight to be given to expert testimony is best made on a more complete record than presently exists.

Advanta also argues that the opinions contained in Ms. Smith's and Mr. Olasov's supplemental reports should be excluded because they were submitted six weeks after the deadline for expert reports, and that Advanta was prejudiced as a result of their untimely submission. (D.I. 346 at 25, 33.) In response, Chase states that the supplemental reports of Ms. Smith and Mr. Olasov should not be excluded because Mr. Olasov's initial report stated that he would be submitting a supplemental report; both supplemental reports were submitted only a few weeks after the deadline; Advanta had ample opportunity to depose both Ms. Smith and Mr. Olasov about their supplemental reports; and the trial was not set to begin until over seven months after the supplemental reports were submitted. (D.I. 362 at 27.)

The touchstone for determining whether to exclude untimely expert reports is whether the party opposing their admission is prejudiced. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791 (3d Cir.1994) (citation omitted). Advanta has not pointed to any prejudice that it suffered as a result of the late supplemental reports proffered by Ms. Smith and Mr. Olasov. Ms. Smith's supplemental report was served upon Advanta eight days prior to her deposition, and Mr. Olasov's supplemental report was served upon Advanta two days prior to

his deposition. (D.I. 366 at 16.) Thus, Advanta had the opportunity to question both of these experts on the opinions expressed in their respective supplemental reports and could have rescheduled those depositions if it believed it needed additional time.

Advanta's only argument for excluding the supplemental reports is that they were late. While that is obviously a highly important factor, it is not alone determinative. If Advanta truly thought it was prejudiced by these supplemental reports, it should have raised the issue back in September of 2003. That Ms. Smith's and Mr. Olasov's supplemental reports were delivered prior to their depositions, albeit a few weeks late, coupled with the fact that Advanta has not articulated any prejudice that it has suffered as a result of their late submission, leads to the conclusion that they should not be excluded. *In re Paoli R.R.*, 35 F.3d at 792 (reversing district court's decision to exclude evidence as untimely where "prejudice to defendants was extremely minimal").

## V. CONCLUSION

**\*11** For the reasons set forth, Chase's Motion for Summary Judgment (D .I. 336) will be denied and its request for an order pursuant to Federal Rule of Civil Procedure 56(d) will be denied. Advanta's Motion for Summary Judgment (D.I.329) will be denied. Both Chase's and Advanta's Motions to Exclude Expert Testimony (D.I.342, 345) will be denied without prejudice to their arguing about what weight, if any, the expert testimony should be given.

An appropriate order will issue.

### ORDER

In accordance with the Memorandum Opinion issued today, it is hereby ORDERED that
1. Chase's Motion for Summary Judgment (D.I.336) is DENIED;
2. Chase's request for an order pursuant to Federal Rule of Civil Procedure 56(d) is DENIED;
3. Advanta's Motion for Summary Judgment (D.I.329) is DENIED;
4. Both Chase's and Advanta's Motions to Exclude Expert Testimony (D.I.342, 345) are DENIED WITHOUT PREJUDICE to their arguing about what weight, if any, the expert testimony should be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



given.

 Not Reported in F.Supp.2d, 2004 WL 422681
(D.Del.), Fed. Sec. L. Rep. P 92,712

   **Motions, Pleadings and Filings (Back to top)**

. 1:01cv00507 (Docket) (Jul. 26, 2001)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B**

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 1586694 (E.D.La.)
(Cite as: 2001 WL 1586694 (E.D.La.))
H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
**HAWKSPERE SHIPPING CO. LTD.**
v.
**COASTAL CARGO COMPANY, INC.**
**No. Civ.A. 00-1748.**

Dec. 11, 2001.

MCNAMARA, J.

**\*1** Before the court are the following motions:
(1) "Motion for Summary Judgment" filed by
Defendant, Coastal Cargo Company, Inc. against
Hawkspere Shipping Company, Ltd. and Certain
Underwriters at Lloyd's, London;
(2) "Motion *in Limine*" filed by Coastal Cargo; and

(3) "Motion *in Limine*" filed by Cross-Defendant,
Azov Shipping Company.

The motions, set for hearing on Wednesday,
December 12, 2001, are before the court on briefs,
without oral argument. Now, having reviewed the
memoranda of counsel and the applicable law, the
court rules.

Coastal Cargo's Motion for Summary Judgment
In this matter, the M/V MARIUPOL was allegedly
damaged during cargo discharge. Hawkspere
Shipping Company, Ltd. was a charterer of the
vessel, and Coastal Cargo was the stevedore whose
personnel were unloading the vessel at the time of
the incident.

Hawkspere secured payment (in the amount of
$106,406.82) for repairs to the M/V MARIUPOL.
Underwriters provided insurance coverage to
Hawkspere for the amount Hawkspere, as the
charterer of the M/V MARIUPOL, was obligated to
pay relating to the physical damage sustained by the
M/V MARIUPOL. Subject to a $10,000 deductible,
Underwriters paid Hawkspere $96,406.82.

Hawkspere initially filed this suit against Coastal
Cargo seeking to recover the cost of repairs for the
physical damages to the M/V MARIUPOL. The

court subsequently allowed counsel for Hawkspere
to withdraw because counsel was experiencing
communications problems with his client. [FN1]
The court also allowed Underwriters to intervene as
the subrogated insurers of Hawkspere. [FN2]

> FN1. *See* Order attached to Hawkspere's Motion to
> Withdraw as Counsel of Record. (Doc. No. 54,
> entered on October 22, 2001). Upon review of this
> Order, the court notes that the Order allows counsel
> "to withdraw as counsel of record for defendant,
> Serac & Co. (Shipping) Ltd." The court finds that
> counsel's inclusion of "Serac" instead of
> "Hawkspere" was inadvertent error, because the
> same counsel was withdrawing as counsel for Serac
> in another matter, and thus the court now modifies
> the October 22, 2001, order by replacing "Serac &
> Co. (Shipping) Ltd." with "Hawkspere Shipping
> Company, Ltd."

> FN2. Hawkspere's former counsel now represents
> Underwriters.

In its present Motion for Summary Judgment,
Coastal Cargo argues that the payments made by
Underwriters for the costs of repairs to the M/V
MARIUPOL amount to unrecoverable economic
losses. However, Underwriters' claims against
Coastal Cargo are for damages arising directly from
the physical damages to the M/V MARIUPOL, and
thus the rule of *Robins Dry Dock* [FN3] is
inapplicable.

> FN3. *Robins Dry Dock & Repair Co. v. Flint*, 275
> U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927).

Accordingly;

IT IS ORDERED that Coastal Cargo's Motion for
Summary Judgment against Hawkspere Shipping
Company, Ltd. and Certain Underwriters at
Lloyd's, London, be and is hereby DENIED.

Coastal Cargo's and Azov's Motions in Limine
In its Motion in *Limine*, Coastal Cargo seeks an
order prohibiting any party from soliciting and/or
offering any testimony from (marine surveyor) Brian
S. Jones in the form of opinion or inference as to the
fitness of the ship's gear (i.e., the hydraulic cranes)
on the M/V MARIUPOL to discharge cargo at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



time of the casualty. Similarly, in its Cross-Motion in *Limine,* Azov seeks an order striking the testimony of Coastal Cargo's expert (surveyor) Albert B. Westerman, as well as the testimony of (marine surveyor) Captain Ronald L. Campana and (marine engineer and naval architect) Geoff Webster.

Having reviewed the attachments attached to the memoranda in support of the respective Motions in *Limine,* the court declines (at this stage of the proceedings) to parse every line in the subject expert reports and deposition testimony to determine what is factual information and what is permissible expert opinion within the meaning of Federal Rule of Evidence 702, *Daubert* [FN4] and *Kumho.* [FN5] At the non-jury Trial of this matter, the court will separate the chaff from the wheat in determining whether or not any of the experts' purported testimony is based on "scientific, technical or other specialized knowledge" that will be of assistance to the court.

> FN4. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 505 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

> FN5. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

*2 Accordingly;

IT IS ORDERED that the Motions in *Limine* filed by Coastal Cargo and Azov be and are hereby DENIED at this stage of the proceedings.

Not Reported in F.Supp.2d, 2001 WL 1586694 (E.D.La.)

**Motions, Pleadings and Filings (Back to top)**

. 2:00CV01748 (Docket) (Jun. 14, 2000)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

C

Slip Copy
Slip Copy, 2006 WL 1134942 (W.D.Pa.)
(Cite as: 2006 WL 1134942 (W.D.Pa.))

**Page 1**

н

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
**INDIANA AREA SCHOOL DISTRICT,**
**Plaintiff,**
v.
**H.H. and his Parents, Defendants.**
**No. Civ.A. 04-1696.**

March 14, 2006.
Christina L. Lane, William Andrews, Andrews & Price, Pittsburgh, PA, for Plaintiff.

Charles W. Jelley, Tremba, Jelley & Whelton, LLC, Greensburg, PA, for Defendants.

*MEMORANDUM OPINION & ORDER*

AMBROSE, Chief J.

**\*1** This case is scheduled for a bench trial on March 27, 2006, on the issue of compensatory damages for violations of the ADA and § 504 of the Rehabilitation Act during the 2003-2004 school year. *See,* Docket No. 56. Pending before the Court is Defendants', H.H.'s and his parents', Motion *In Limine* To Preclude Testimony and Strike the Expert Report of William Penn Ed.D. (Docket No. 58). Plaintiff filed a response thereto. (Docket No. 62). Thus, the issue is ripe for review.

Defendants' Motion *In Limine* is based on *Daubert v. Merrell Dow Pharmaceutical, Inc., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court held that:
[f]aced with a proffer of expert scientific testimony, ... the trial court judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1992). In the Third Circuit, the trial court's role as a "gatekeeper" announced in *Daubert* requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 741-42 (3d Cir.1994). As this case will proceed to a bench trial, the Court's " 'role as a gatekeeper pursuant to *Daubert* is arguably less essential." ' *Clark v. Richman,* 339 F.Supp.2d 631, 648 (M.D.Pa.2004), *quoting Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 596 n. 10 (D.N.J.2002) (*citing Cibbs v. Cibbs,* 210 F.3d 491, 500 (5th Cir.2000); *Volk v. United States,* 57 F.Supp.2d 888, 896 n. 5 (N.D.Cal.1999) ).

First, Defendants seek to exclude the testimony of Dr. Penn that Plaintiff provided a FAPE because it is contrary to conclusions made by this Court. (Docket No. 58, ¶ 2). In response, Plaintiff indicates that it offered the report of Dr. Penn prior to this Court's rulings on the issue of a denial of a FAPE. (Docket No. 62, p. 5, n. 3). Based on the same, Plaintiff submits that it is now only offering Dr. Penn as an expert to address the issue of pain and suffering. *Id.* Thus, this issue is now moot.

Second, Defendants argue that Dr. Penn's report is not reliable or fit to assist this Court. (Docket No. 58, ¶ 4; Docket No. 59, pp. 6-8). Specifically, with regard to the only remaining issue of compensatory damages, Defendants suggest that Dr. Penn omits any reference to observing or assessing H.H.'s educational or behavioral levels or losses. (Docket No. 59, p. 7). This argument, however, goes to weight, not admissibility.

**\*2** Third, Defendants ague that Dr. Penn is not an expert. ( Docket No. 58, ¶ 5; Docket No. 59, pp. 8-9). Based on a review of Dr. Penn's curriculum vita, however, I disagree. *See,* Docket No. 59, Exhibit A. Dr. Penn is qualified as an expert to testify in this case as to the remaining issue of compensatory damages for violations of the ADA and § 504 of the Rehabilitation Act.

THEREFORE, this 14th day of March, 2006, after careful consideration of the pending Motion, it is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Ordered that the Motion *in Limine* (Docket No. 58), is denied.

 Slip Copy, 2006 WL 1134942 (W.D.Pa.)

  Motions, Pleadings and Filings (Back to top)

.   2006   WL   1182156   (Trial   Motion, Memorandum and Affidavit) Brief in Opposition to Defendants' Motion in Limine to Preclude the Report and Testimony of Dr. William Penn (Mar. 10, 2006)Original Image of this Document (PDF)

.   2006   WL   1182155   (Trial   Motion, Memorandum and Affidavit) Defendant's Brief in Support of Motion in Limine Strike the Expert Report and to Preclude the Testimony of William Penn Ed.E. (Mar. 1, 2006)Original Image of this Document (PDF)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

**D**

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 276353 (E.D.La.)
(Cite as: 1996 WL 276353 (E.D.La.))

Page    1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
**Dorrel TRICHE, et al.**
**v.**
**OVERNITE TRANSPORTATION CO., et al.**
**No. CIV. A. 95-0691.**

May 21, 1996.

DUVAL, District Judge.

**\*1** An objection to the deposition testimony of Dr. Christy A. Montegut has been lodged by Blue Grass. They object to any expert testimony given by Dr. Montegut for either Dorrel Triche or Russell Webre based on his failing to have provided an expert report with respect to these two individuals. He has provided a report for Wayne Vicknair on February 5, 1996. Dr. Montegut is a treating physician for these individuals.

Because of plaintiffs' failure to provide a curriculum vitae as ordered in the pre-trial conference minute entry and expert reports for Mssr. Triche and Webre as required by the standard pre-trial notice, the Court will not accept any "expert testimony" provided by Dr. Montegut in his deposition. It is impossible to evaluate Dr. Montegut's qualifications as an expert without the former, and the failure to produce the report as required is prejudicial to the defendants.

In reaching this decision the Court has considered the following four factors:
(1) the importance of witnesses' testimony;
(2) the prejudice to the opposing party of allowing the witnesses to testify;
(3) the possibility of curing such prejudice by granting a continuance; and
(4) the explanation, if any, for the party's failure to comply with the discovery order.
*Sierra Club, Lone Star Chap. v. Cedar Point Oil,* 73 F.3d 546, 572 (5th Cir. 1996), *citing Bradley v. United States,* 866 F.2d 120, 125 (5th Cir. 1989).

In this instance, plaintiffs have numerous other expert doctors to testify with respect to their alleged

damages. The prejudice to defendants is present, albeit not outrageous. Most importantly, the Court specifically offered plaintiffs' counsel the opportunity to cure all of his alleged "prejudice" by granting a continuance, and he rejected the opportunity. Finally, the Court does not know the reason for plaintiffs' failure to comply with the Court's order.

However, the Court will consider the testimony of this doctor with respect to Triche and Webre as a fact witness and a treating physician as contemplated under Fed. R. Evid. 701. The Court will rule on the individual objections lodged to specific testimony in a later ruling within that framework.

It must be noted that the result would be the same if plaintiffs attempted to call this doctor live. Accordingly,

IT IS ORDERED that Blue Grass's Objection to Deposition Testimony of Christy Montegut is GRANTED to the extent that Dr. Montegut will not be accepted as an "expert witness;" however, his testimony and the objections lodged thereto will be evaluated in light of Fed. R. Evid. 701.

A similar objection was lodged concerning the deposition testimony of Thomas F. Schrager, PhD. with respect to testimony concerning Wayne Vicknair and Russel Webre. Dr. Schrager has provided a report only for Dorrel Triche. Dr. Schrager has been presented to the Court as an expert toxicologist. In this motion, defendants contend that Dr. Schrager has not rendered any "treatment" to any of the plaintiffs as he is a toxicologist, not a physician. The Court has not received a written response to this motion.

**\*2** Examining the same four factors listed above, the Court reaches a similar conclusion concerning the expert testimony of Dr. Schrager with respect to Wayne Vicknair or Russel Webre. Counsel for plaintiffs was given the opportunity to continue this trial and rejected it. Accordingly, Blue Grass's Objection to Deposition Testimony of Thomas Schrager is GRANTED to the extent that Dr. Schrager will not be accepted as an "expert witness;" however, his testimony and the objections lodged thereto will be evaluated in light of Fed. R.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1996 WL 276353, *2 (E.D.La.))

Page  2

Evid. 701.

Overnite Transportation Company ("Overnite") has also filed Motion in Limine to Exclude Drs. Brautbar, Schrager and Callender's Testimony. They seek to exclude these expert witnesses based on Fed. R. of Evid. 401 (relevance), 403 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time), 702 (testimony by experts) and 703 (bases of opinion testimony by experts). In the alternative, they seek to exclude testimony which contains non-dose specific conclusions requiring a sequelae of exposure, including conclusions regarding increased risk of cancer and the quantification of that risk. The motion substantively relates only to Dr. Brautbar. In a later filing, Overnite outlined its specific objections based on a *Daubert* analysis with respect to Dr. Schrager.

At the outset, the Court notes that this is a non-jury trial, thus the possible prejudice caused by unreliable expert testimony going to a jury is not present. Furthermore, these *Daubert* motions were filed after the pre-trial conference making it, temporally, impossible to hold a full blown *Daubert* hearing. This ruling deals exclusively with defendants' attempt to exclude these experts from testifying based on *Daubert v. Merrell Dow Pharmaceutical, Inc.,* -- U.S. --- 113 S. Ct. 2786 (1993).

*Daubert* arose in the context of Bendectin, a drug which generated massive "toxic tort" litigation. The issue presented there was whether certain highly scientific evidence was admissible. The Supreme Court in that case assigned to the district court the role of "gate keeper." A district court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 2796. The key then is whether the expert's hypothesis can be and has been tested. *See Wheat v. Pfizer, Inc.,* 31 F.3d 340, 343 (5th Cir. 1994).

As this Court has previously stated:
However, that is not the only inquiry. *Daubert* recognizes that "another pertinent consideration is whether the theory or technique has been subjected to peer review and publication." *Daubert,* 113 S. Ct. at 2797. A district court should also consider

"the known or potential rate of error." *Id.* Finally, "general acceptance" is recognized as having a bearing on the inquiry. *Id.* In *Daubert,* the Supreme Court admonished district courts to realize that the inquiry envisioned by Rule 702 is a flexible one. Its overarching subject is the scientific validity--and thus the evidentiary relevance and reliability--of the principles that underlie a proposed submission." *Id.*
*3 The Supreme Court finally instructed that rather than preventing less than "generally accepted" evidence to be adduced,
[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Id.* at 2798 (emphasis added) ....

One thing is clear. The MSDS for sodium bichromate demonstrates clearly that the material at issue here is a highly toxic and potentially dangerous material. Drs. Brautbar, Callender and Schrager are being presented as toxicologists to demonstrate the injuries caused by the plaintiffs' exposure to sodium bichromate. Each, from their curriculum vitae, appear to be highly qualified in their field. Dr. Brautbar is a doctor who is a member of the American Chemical Society, Society of Toxicology, the American College of Occupational and Environmental Medicine and American College of Toxicology. He is a director for the Center for Internal Occupational and Toxicological Medicine and a member of the executive committee of the California Society of Industrial Medicine and Surgery. He is a consultant to the Editor of Advances of Modern Environmental Toxicology and is on the editorial board of Toxicology and Industrial Health.

Dr. Schrager obtained a PhD in Toxicology from the Massachusetts Institute of Technology in 1983. He has served on the editorial board of *International Journal of Occupational Medicine and Toxicology.* He works as a consultant to the EPA and the federal government. He taught from 1982-1986 general principle in toxicology and toxicologic pathology sponsored by Boston University School of Medicine, originally sponsored by the US EPA. Dr. Callender is Board eligible for the 1992 American Board of Medical Toxicology examination. He has participated in a number of conferences and continuing medical training with respect to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
(Cite as: 1996 WL 276353, *3 (E.D.La.))

Page    3

toxicology. He has given speeches on "Health Effects of Chemical Toxicity" in March of 1995. He has presented numerous papers concerning neurology in relation to exposure to toxic substances.

Overnite did not hire an expert to address the issue of damage allegedly caused by the sodium bichromate. Instead it has chosen to attempt to strike these witnesses based on *Daubert*. Considering the circumstances of this trial, the Court believes that rather than striking this experts, the objections raised will be used in the context of determining the weight the Court will give these.

Accordingly,

IT IS ORDERED that the motions to exclude experts Brautbar, Schrager and Callender based on *Daubert* are DENIED.

Not Reported in F.Supp., 1996 WL 276353 (E.D.La.)

**Motions, Pleadings and Filings (Back to top)**

. 2:95cv00691 (Docket) (Mar. 02, 1995)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2006, **COMPENDIUM OF UNREPORTED OPINIONS FOR PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY BY PLAINTIFFS' EXPERT WITNESSES** was hand delivered and electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

> Anthony W. Clark, Esquire
> Skadden Arps Slate Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE 19899

*/s/ Philip Trainer, Jr.*

Philip Trainer, Jr.

170085.1