IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD CANTOR, et al., | : | |
| | : | |
| Plaintiffs, | : | No. 97-586-KAJ |
| | : | |
| v. | : | |
| | : | |
| RONALD O. PERELMAN, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE EXPERT TESTIMONY**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Defendants

DATED:  June 30, 2006

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    THE DAUBERT STANDARD APPLIES TO BENCH TRIALS . . . . . . 3

II.   LONGSTRETH'S OPINION IS INADMISSIBLE . . . . . . . . . . . . . . . . 4

      A.    Longstreth's Opinions Lack A Methodology . . . . . . . . . . . . . . . 5

      B.    Longstreth's Opinions Regarding Director Duties Are
            Inadmissible Legal Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    Longstreth Is Not Qualified To Opine On Financial Terms . . . . . 9

III.  PURCELL'S OPINIONS ARE INADMISSIBLE . . . . . . . . . . . . . . . . . . 10

IV.   PLAINTIFFS' LATE DESIGNATION OF BALIBAN AND
      CARRON SHOULD PRECLUDE THEIR TESTIMONY . . . . . . . . . . . 13

      A.    The Court Granted Plaintiffs The Limited Right To Identify
            Supplement Experts As To Hypothetical Arms' Length
            Bargaining . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    Plaintiffs' Late Identification Has Prejudiced Defendants . . . . . . 15

V.    WALSH'S TESTIMONY REGARDING WHETHER THE
      DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES
      SHOULD BE EXCLUDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

CASES                                                          PAGE(S)

Albert v. Alex Brown Mgmt. Servs., Inc.,
    C.A. No. 762, 2005 WL 1594085 (Del. Ch. June 29, 2005) ............................... 16

Calhoun v. Yamaha Motors Corp.,
    350 F.3d 316 (3d Cir. 2003) ............................................................................ 1, 8

Cantor v. Perelman,
    414 F.3d 430 (3d Cir. 2005) ........................................... 6, 7, 9, 12, 14, 16

Carpe v. Aquila, Inc.,
    No. 02-0388-CV-W-FJG, 2005 WL 1138833 (W.D. Mo. Mar. 23, 2005) .......... 12

Chase Manhattan Mortgage Corp. v. Advanta Corp.,
    No. Civ. A. 01-507(KAJ), 2004 WL 422681 (D. Del. Mar. 4, 2004) ................... 3

DRR, L.L.C. v. Sears, Roebuck & Co.,
    171 F.R.D. 162 (D. Del. 1997) ........................................................................ 17

Daubert v. Merrell Dow Pharm., Inc.,
    509 U.S. 579 (1993) .......................................................................................... 1

In re Delmarva Sec. Litig.,
    794 F. Supp. 1293 (D. Del. 1992) .................................................................... 11

In re Dow Corning Corp.,
    237 B.R. 364 (Bankr. E.D. Mich. 1999) ............................................................ 3

Elcock v. K-Mart Corp.,
    233 F.3d 734 (3d Cir. 2000) ......................................................................... 1, 8

In re Executive Telecard Ltd. Sec. Litig.,
    979 F. Supp. 1021 (S.D.N.Y. 1997) ........................................................... 11, 12

Fedor v. Freightliner, Inc.,
    193 F. Supp. 2d 820 (E.D. Pa. 2002) ........................................................... 8, 13

Fierro v. Gomez,
    865 F. Supp. 1387 (N.D. Cal. 1994) .................................................................. 3

Harvey v. United States,
    No. CIVA04CV00188WYDCBS,
    2005 WL 3164236 (D. Colo. Nov. 28, 2005) ...................................... 17

Heremling v. Montgomery Ward & Co.,
    851 F. Supp. 1369 (D. Minn. 1994) ....................................................... 17

Indiana Area Sch. Dist. v. H.H.,
    No. Civ. A. 04-1696, 2006 WL 1134942 (W.D. Pa. Mar. 14, 2006) ..................... 3

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999) ......................................................................... 1

Oddi v. Ford Motor Co.,
    234 F.3d 136 (3d. Cir. 2000) ........................................................... 1, 8

In re Oracle Sec. Litig.,
    829 F. Supp. 1176 (N.D. Cal. 1993) ..................................................... 12

In re PHP Healthcare Corp.,
    128 Fed. Appx. 839, No. 03-3972, 2005 WL 488785 (3d Cir. Mar. 3, 2005) .... 11

In re Sunrise Sec. Litig.,
    916 F.2d 874 (3d Cir. 1990) ............................................................. 12

United States v. Demjanjuk,
    367 F.3d 623 (6th Cir. 2004) ............................................................. 3

In re Walt Disney Co.,
    C.A. No. 15452, 2004 WL 550750 (Del. Ch. Mar. 9, 2004) ................................ 9

In re Walt Disney Derivative Litig.,
    C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ......................... 9, 19

Windsor Shirt Co. v. New Jersey Nat'l Bank,
    793 F. Supp. 589 (E.D. Pa. 1992), aff'd, 989 F.2d 490 (3d Cir. 1993) ............... 12

## SUMMARY OF ARGUMENT

1.      Defendants move to preclude the expert testimony of Bevis Longstreth and

William H. Purcell on the grounds that their opinions fail to meet the requirements of

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93, 597 (1993), and Kumho Tire

Co. v. Carmichael, 526 U.S. 137, 141 (1999).  In violation of extensive Third Circuit case

law applying Daubert, Longstreth and Purcell offer opinions purporting to justify

hundreds of millions of dollars in monetary relief based almost entirely on their unspeci-

fied "experience."  As applied by the Third Circuit, Daubert requires an expert to ground

his opinion in a recognized methodology with a testable hypothesis.  See Calhoun v.

Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003); Oddi v. Ford Motor Co., 234

F.3d 136 (3d Cir. 2000); Elcock v. K-Mart Corp., 233 F.3d 734 (3d Cir. 2000).  Because

Longstreth and Purcell each suggest the Court should award an enormous monetary

remedy to Plaintiffs without using any recognized methodology or study to justify their

respective numbers, the Court should exclude both of these experts as unreliable.

2.      Defendants move to preclude the testimony of Jeffrey Baliban and Andrew

Carron on the grounds that their testimony was not timely identified pursuant to the

Court's scheduling orders.  In these late reports, Baliban and Carron came up with new

theories supporting Plaintiffs' proposed remedies even though the belated theories had not

been authorized by the Third Circuit.  Defendants were prejudiced by this delay because it

precluded Defendants from addressing these new theories in their summary judgment

arguments.

3.    Defendants also seek to exclude portions of the testimony of Longstreth and Justice Joseph T. Walsh, Ret. because these attorneys intend to offer impermissible legal opinions regarding Defendants' liability. Walsh's report expressly opines that the Defendants breached their fiduciary duties. Longstreth similarly opines that the directors breached their fiduciary duties, but he dresses up his legal opinion as a purported description of "customs and practices" for directors of Delaware corporations. Defendants submit that the Court can see through that ruse and properly exclude their testimony.

2

**ARGUMENT**

## I.   THE <u>DAUBERT</u> STANDARD APPLIES TO BENCH TRIALS.

Plaintiffs ask the Court to ignore its obligation to screen expert testimony because

this case will be tried without a jury. The cases cited by Plaintiffs, however, acknowledge

that the <u>Daubert</u> standard applies to bench trials in the same way that it applies to jury

trials. <u>See</u> <u>Chase Manhattan Mortgage Corp. v. Advanta Corp.</u>, Civ. A. No. 01-

507(KAJ), 2004 WL 422681, at *9 (D. Del. Mar. 4, 2004) ("Counsel candidly and

correctly pointed out that the leading cases in the Third Circuit do not carve out any

exception for applying <u>Daubert</u> differently in a bench trial than in a jury trial . . . ."); <u>In re</u>

<u>Dow Corning Corp.</u>, 237 B.R. 364, 370-71, 373-74 (Bankr. E.D. Mich. 1999) (excluding

expert testimony in bench trial because expert lacked a sound methodology).[1]

Plaintiffs' request to put off the <u>Daubert</u> rulings until after the trial would elimi-

nate the benefits of <u>Daubert</u>'s pretrial screening mechanism, which apply with particular

force in this case. For a trial scheduled for slightly longer than two weeks, Plaintiffs have

identified five expert witnesses who have served a total of eight reports. In addition,

Defendants will suffer prejudice in two ways. First, even if the Court ultimately bars

their testimony and does its best to ignore it, the Court will have heard it. Second,

---

[1]     Other cases cited by Plaintiffs further demonstrate that courts must apply <u>Daubert</u> in
bench trials as well as jury trials. <u>See</u> <u>United States v. Demjanjuk</u>, 367 F.3d 623, 634
(6th Cir. 2004) (allowing expert to testify only after extensive voir dire); <u>Indiana Area
Sch. Dist. v. H.H.</u>, No. Civ. A. 04-1696, 2006 WL 1134942, at *1 (W.D. Pa. Mar. 14,
2006) (completing <u>Daubert</u> analysis before admitting expert testimony); <u>Fierro v.
Gomez</u>, 865 F. Supp 1387, 1395 n.7 (N.D. Cal. 1994) (applying <u>Daubert</u> <u>sua</u> <u>sponte</u>
before admitting expert testimony in bench trial).

Defendants will have to expend unnecessary, but substantial resources preparing cross-examinations. Defendants submit that <u>Daubert</u> requires a ruling on the admissibility of this expert testimony before the trial.

## II.    LONGSTRETH'S OPINION IS INADMISSIBLE.

Plaintiffs' answering brief is notable more for what it does not argue in defense of Longstreth's opinion than for what it does argue. Plaintiffs (i) ignore Longstreth's concession that he would have needed a financial advisor to conduct arms' length negotiations concerning the Notes, and that he neither had such skills himself nor relied upon a qualified financial expert before offering his opinion (<u>compare</u> Pls'. Ans. Br. at 20 <u>with</u> Defs'. Op. Br. at 28); (ii) are unable to explain how he came up with his $150 million "ballpark" figure (<u>compare</u> Pls'. Ans. Br. at 20-21 <u>with</u> Defs'. Op. Br. at 25-27); (iii) are unable to identify a basis for Longstreth's conclusory statements regarding the benefits of the covenants to the noteholders or the Marvel Holding Companies beyond his general "experience" as a corporate lawyer and adjunct law professor (<u>compare</u> Pls'. Ans. Br. at 12-13, 19, 21 <u>with</u> Defs'. Op. Br. at 22-24); (iv) ignore the extensive Third Circuit case law excluding expert testimony based on nothing more than "experience" (<u>see</u> Defs'. Op. Br. at 20-21, 25-27); and (v) ignore the cases cited by Defendants rejecting testimony by corporate lawyers about corporate governance as nothing more than improper legal testimony. (<u>See</u> Defs'. Op. Br. at 10, 19)

4

A.    **Longstreth's Opinions Lack A Methodology.**

Perhaps unsurprisingly, most of Plaintiffs' defense of Longstreth's "ballpark"

judgment focuses on a snippet of his opinion that has at least some framework to it. (See

Pls'. Ans. Br. at 14-16)  Unfortunately for Plaintiffs, the remainder of his analysis, and his

conclusion, are either speculative and unreliable or legal opinions.

In his initial report, Longstreth opines that in independent, arms' length negotia-

tions over whether Marvel should accept the terms of the Notes, the Marvel Board

purportedly would have been concerned that "future events that I could not reasonably

anticipate, might so restrict Marvel as to cause its demise." (A186 D.I. 469)  In support

of this supposed risk, Longstreth points to Mr. Perelman's unsuccessful effort to rescue

Marvel by offering to put up another $365 million of his own money, which Mr.

Perelman conditioned on his receipt of a waiver of default from the holders of the Notes.

(A182) (See also Pls'. Ans. Br. at 14-15)

Were this the full extent of Longstreth's opinion, Defendants would not have

made this motion because, on this small point only, Longstreth has explained the basis for

his conclusion, and cross-examination is, therefore, readily available.  Defendants can

explore the factual premise behind Longstreth's opinion and show that it is false.  For

example, the Notes did not limit Marvel's ability to receive offers to restructure its debts –

Marvel was not a party to the Notes and was not bound by their terms.  Mr. Perelman

conditioned his willingness to invest $365 million of new money in Marvel on an

agreement with the noteholders because a default under the Notes would negatively affect

5

<u>him</u>, but it would have no effect on Marvel.[2] The covenants in the Notes, like all loan

covenants, were inserted to give the noteholders the ability to declare a default and seize

the collateral – namely, the stock owned by the Marvel Holding Companies – if Marvel

took actions inconsistent with the covenants. At his deposition, Longstreth, an experi-

enced corporate lawyer, understood and acknowledged that the noteholders' sole remedy

would be to take possession of the pledged shares:

> And if the payments were not forthcoming, or other agreements by the
> holding companies to the noteholders were violated, <u>the sole recourse of</u>
> <u>the noteholders</u> was to foreclose on the stock and take over control of
> Marvel, and find a way either through running the business successfully or
> liquidating it to obtain payment.

(Longstreth II at 65 A309) (emphasis added)[3]

---

[2]     At trial, Defendants will show that Marvel was free to accept restructuring proposals
from other bidders without regard to the terms of the Notes. Indeed, the trial record
will show that Carl Icahn made several proposals to invest $365 million in Marvel
without conditioning his offers on a waiver of restrictions in the Notes.

[3]     Longstreth's understanding of the significance of the covenants exactly matches the
interpretation that the Third Circuit held would result in a verdict in favor of defen-
dants:

The only significance of the covenants, Perelman insists, is that any violation
constituted an event of default which, if left uncured, would entitle the Notes
holders to take control of Marvel. The reality of the matter, Perelman con-
tends, is that potential Note purchasers would insist upon having the covenants
not because the covenants provided assurance that Marvel would refrain from
taking the stipulated actions, but rather because they provided assurance that
the Note holders could seize control if Marvel did. Under this view, there was
no expectation that the Marvel board would do anything other than function as
an independent body, and the sole potential effect of the covenants on Marvel
was the possibility that they might occasion a change in its stockholders.

Cantor v. Perelman, 414 F.3d 430, 441 (3d. Cir. 2005).

The vast bulk of Longstreth's opinion, however, especially his $150 million unjust enrichment figure, rests entirely on ipse dixit assertions that cannot be tested and scrutinized. In arguing that Longstreth has some basis for claiming that Defendants were unjustly enriched by $150 million, Plaintiffs simply run away from Longstreth's deposition testimony. Longstreth admitted that his "ballpark" figure was not based on discernable methodology, and he was "stumped" when asked to recreate his results by focusing on just one of the Note offerings. (See Longstreth II at 150 A312 (Q: . . . "Can you explain to me the methodology that you used to reach that 150 million dollar figure?"; A: "Well, it wasn't rocket science or science of any kind."); id. at 90 B292 D.I. 479 ("I have no formulaic approach to this."); id. at 150 A312; id. at 155 A313)

Longstreth's other views were equally as conclusory and unsupported. He opined, without explanation, that the value Mr. Perelman's benefit from the covenants was $553 million. (Longstreth II at 63 A309; A210) As the Third Circuit has already rejected the idea that Mr. Perelman's benefit from the covenants was $553 million, Longstreth's re-assertion of this discredited concept at least merits an explanation that attempts to reconcile that conclusion with the Third Circuit's decision. See Cantor, 414 F.3d at 437, 442. At his deposition, Longstreth could not justify his discredited conclusory assertion. (Longstreth II at 64 A309; see also A210)

Longstreth purports to rebut Mr. Fowler's detailed analysis of MacAndrews & Forbes' alternatives to using the covenants, such as using put rights, but Longstreth's analysis of these alternatives comes down to: "I thought about it. It wasn't very persua-

7

sive to me as a line of argument." (Longstreth II at 57-58, A307-08)  Other than rejecting

the idea out of hand, he does not explain whether put rights were a viable alternative to

the covenants.  (Id. at 58-60 A308)

Plaintiffs argue that Longstreth's opinion is informed by his experience and "the

numerous similar transactions he has personally participated [in] over his more than forty

year career[.]" (Pls'. Ans. Br. at 19, citing Longstreth II at 68, B270)  If Longstreth had

actually identified these "numerous similar transactions," explained why they were

similar, and then compared that data to the facts at issue in this case, Defendants would

then have some basis for scrutinizing his analysis and critiquing his judgment.  Instead,

he simply asserts that in his "experience," he has participated in unspecified similar

transactions, leaving Defendants and the Court with no objective method for testing his

contention.  This problem is precisely why courts reject expert testimony based on merely

the experience of the expert that lacks an identifiable methodology.  See Fedor v.

Freightliner, Inc., 193 F. Supp. 2d 820, 829-30 (E.D. Pa. 2002) (excluding opinion based

on expert's training and experience because it "lack[ed] any identifiable methodology

which defendants could challenge"); Oddi, 234 F.3d at 158.  See also Defs'. Op. Br. at 20-

21, 25-27 (citing Calhoun, 350 F.3d at 321; Elcock, 233 F.3d at 747).

### B.    Longstreth's Opinions Regarding Director Duties Are Inadmissible Legal Opinions.

Most of Longstreth's first report goes to the legal issues of whether supposed

"corporate governance principles" obligated the Marvel Board to vote on the Note

8

offerings, and how the Board should have conducted itself according to Longstreth's views of fiduciary duties. (See A181-86; see also Pls' Ans. Br. at 13, 21) Such testimony from a corporate lawyer like Longstreth does not aid the fact-finder; it should be excluded. See In re Walt Disney Co. Derivative. Litig., C.A. No. 15452, 2004 WL 550750, at *1 (Del. Ch. Mar. 9, 2004). (See also Defs'. Op. Br. at 10-11, 19-20) Plaintiffs' assertion that Longstreth's opinions merely concern the customs and practices of business ignores the fact that, for directors' of Delaware corporations, such "customs and practices" are defined by the directors' fiduciary duties under Delaware law. See In re Walt Disney Derivative Litig., C.A. No. 15452, 2005 WL 2056651, at *28 (Del. Ch. Aug. 9, 2005) (finding no value in law professor's testimony about the "custom and practice of Delaware corporations" because the testimony merely used different terms to describe fiduciary duties under Delaware law). (See also Defs'. Op. Br. at 16-18) In any event, Longstreth's extensive discussion about the fiduciary duties of the directors and the process they should have employed to replicate arms' length bargaining does not even address the hypothetical question posed by the Third Circuit, which presupposes the bargaining would be arms' length, and asks what would have resulted from such negotiations. See Cantor, 414 F.3d at 437. (See Defs'. Op. Br. at 20)

## C.     Longstreth Is Not Qualified To Opine On Financial Terms.

Tellingly, Plaintiffs do not address Longstreth's admission that he lacks the requisite skills to make the financial determinations that he made in his second report. In Longstreth's first report, he does not describe the results of the hypothetical arms' length

9

bargaining, but merely states that Marvel's independent directors would have needed to hire expert financial and legal advisors to "serve . . . in determining what kind of benefit, if any, in what size, could constitute a reasonable and, to the independent directors, acceptable, quid pro quo for allowing the restrictions to be imposed." (A186-87)  In his second report, he purports to make those determinations himself, without consulting a financial expert.  (A212)  At his deposition, he admitted that he lacks the skills to be a financial advisor for such negotiations.  (Longstreth II at 11-12 B213-14, 29-32, A305-06)  In other words, Longstreth's own testimony confirms that he is not qualified to make the financial determinations in his second report regarding the supposed outcome of the hypothetical arms' length negotiations between Marvel and the Marvel Holding Companies.  For this reason and the other reasons described above, Longstreth's opinion is unreliable and should be excluded.

**III.    PURCELL'S OPINIONS ARE INADMISSIBLE.**

Plaintiffs contend that Purcell, like Longstreth, should be permitted to submit sweeping opinions purporting to justify hundreds of millions of dollars in damages based on his "experience" and without any coherent, testable methodology.

Purcell opines that Plaintiffs are entitled to an astonishing $470 million in damages based on an analysis that merely takes Marvel's stock price on November 11, 1996, multiplies it by the number of Marvel shares outstanding, then points out that Marvel's shares were canceled without cash payment to the stockholders when Marvel emerged from bankruptcy nearly two years later.  (A274-75)  In support of this damages

10

theory, Plaintiffs argue that changes in market capitalization can be a measurement of damages. (Pls'. Ans. Br. at 12)

Defendants agree that a change in market capitalization can be a measurement of damages for an appropriate plaintiff (though not Marvel), but only when an expert establishes that the change was caused by the alleged event in dispute. Purcell skips this critical step. Without it, his opinion is worthless. The Court does not need an expert witness to establish Marvel's market capitalization on particular dates; Marvel's publicly traded stock price and number of shares outstanding are subject to judicial notice. <u>See, e.g.</u>, <u>In re PHP Healthcare Corp.</u>, No. 03-3972, 2005 WL 488785, at *3 (3d Cir. Mar. 3, 2005) ("We also may consider facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence, such as stock prices on the New York Stock Exchange."); <u>In re Delmarva Sec. Litig.</u>, 794 F. Supp. 1293, 1300 n.5 (D. Del. 1992) ("The Court may take judicial notice of closing stock prices pursuant to Federal Rule of Evidence 201(f)").

An expert opining that Plaintiffs' damages are equal to the change in Marvel's market capitalization between November 11, 1996 and July 31, 1998, must offer, among other things, some reliable financial methodology explaining <u>why</u> the change in Marvel's stock price was attributable to the covenants in the Notes. Courts have rejected damages analyses based on movements in a stock price where there is insufficient evidence that the sole basis for the movements are the acts giving rise to the claim. <u>See</u> <u>In re Executive. Telecard, Ltd. Sec. Litig.</u>, 979 F. Supp. 1021, 1025-26 (S.D.N.Y. 1997) (excluding, on

11

Daubert grounds, damages expert who failed to use an event study or similar analysis to

isolate the influences on changes to the stock price in securities fraud action); In re Oracle

Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (same); Carpe v. Aquila, Inc., No.

02-0388-CV-W-FJG, 2005 WL 1138833, at *3-4 (W.D. Mo. Mar. 23, 2005) (same).

The two cases cited by Plaintiffs do not support admitting damages based solely

on changes to market capitalization without an event study or similar basis for excluding

other factors.  In In re Sunrise Sec. Litig., 916 F.2d 874 (3d Cir. 1990), the court merely

noted that a loss of market capitalization is an injury that gives rise to a derivative suit.  In

Windsor Shirt Co. v. New Jersey Nat'l Bank, 793 F. Supp. 589, 595 (E.D. Pa. 1992),

aff'd, 989 F.2d 490 (3d Cir. 1993), the court held that a corporation can recover damages

for a loss in its market capitalization caused by a breach of contract.  As both of these

cases are pre-Daubert, they obviously do not discuss Daubert's reliability standards.  Even

Plaintiffs' replacement expert, Baliban, criticized Purcell's failure to perform a study that

focused on a particular event's effect on the stock price at a particular point in time.

(Baliban Dep. at 66-68 (A299))

Another key flaw in Purcell's testimony is his wholly subjective opinion, allegedly

based on his experience, that the "appropriate" capital structure for Marvel would have

been 30% debt and 70% equity.[4]  Plaintiffs' Answering Brief does not even comment

---

[4]      Plaintiffs argue that the Third Circuit endorsed Purcell's speculative theory about the
supposed appropriate capital structure for Marvel.  (See Pl. Ans. Br. at 3, citing Cantor,
414 F.3d at 437).  The Third Circuit's opinion does not address the Daubert admissibil-
ity of Purcell's testimony.  In fact, Defendants had not raised such issues on the appeal,
(continued...)

upon Purcell's deposition testimony conceding that this capital structure was "an order of magnitude" that he just made up. (A315-16) Thus, Purcell's contention that Marvel should have had a 30/70 capitalization ratio is not based on any real world data that Defendants can test and scrutinize. Indeed, throughout his report, Purcell invokes his subjective "experience" instead of citing actual data, leaving Defendants without a fair opportunity to cross-examine him. See Fedor, 193 F. Supp. 2d at 829-30. (See also Defs'. Op. Br. at 29-32) Accordingly, Daubert bars Purcell's purportedly "expert" testimony.

## IV.    PLAINTIFFS' LATE DESIGNATION OF BALIBAN AND CARRON SHOULD PRECLUDE THEIR TESTIMONY.

Plaintiffs seek to excuse their late identification of their replacement experts, Baliban and Carron, on two grounds. First, Plaintiffs argue that the Third Circuit's decision widely re-opened expert discovery on all issues and gave them the opportunity to hire replacement experts. Second, they argue that their belated identification of Baliban and Carron did not prejudice Defendants. Neither of these justifications for their late identification of their replacement experts withstands scrutiny.

---

[4]     (...continued)
as the time for Daubert motions had not yet arrived when this Court granted summary judgment.

13

A.    **The Court Granted Plaintiffs The Limited Right To Identify Supplement Experts As To Hypothetical Arms' Length Bargaining.**

Although the parties were required under this Court's February 6, 2002 order to submit all expert reports by April 10, 2002, Plaintiffs contend that the Third Circuit opened the gates to additional experts on all issues with the following language:

> The defendants did not contend in support of their motions for summary judgment that the plaintiffs were not able to submit evidence of unjust enrichment and the issue of the extent of any unjust enrichment is, accordingly, not before us. For that reason, it would not be appropriate for us to restrict plaintiffs' proof on remand. We note only that plaintiffs should at least have the opportunity to establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation.

Cantor, 414 F.3d at 437. Emphasizing the words "at least" in this paragraph, Plaintiffs argue that the Third Circuit meant to reopen discovery as to more than just the arms' length bargaining theory of unjust enrichment. But the words "at least" modify the phrase "have the opportunity" -- meaning they should at least be given a chance to prove this amount of unjust enrichment, which they might fail to do. In any event, even under Plaintiffs' interpretation of this language, the Third Circuit was only giving them another chance to establish the amount of unjust enrichment, and not directing this Court to reopen expert discovery as to all other issues.

At a teleconference held on September 9, 2005, this Court granted Plaintiffs' request for additional expert discovery based on Plaintiffs' express representation that they would be seeking additional expert testimony consistent with the Third Circuit's opinion. (A05) Plaintiffs' made clear that their request for additional expert discovery

14

concerned the issue of the amount of unjust enrichment. (Id.) Yet Plaintiffs' replacement

experts, Carron and Baliban, do not opine about the arms' length bargaining theory

identified by the Third Circuit, and Baliban's opinion does not address the issue of unjust

enrichment at all. (Baliban at 55) (Q: "Were you engaged to provide any opinions

regarding unjust enrichment? A: No.") (Appendix C2) Defendants submit that these two

experts should have been identified in 2002. At the very least, Plaintiffs should be barred

from using Baliban at trial, as they cannot point to any language in the Third Circuit's

opinion that would have required them to hire a replacement damages expert.

**B.      Plaintiffs' Late Identification Has Prejudiced Defendants.**

Plaintiffs seek to excuse their late identification of Baliban and Carron by arguing

that Defendants suffered no prejudice. On the contrary, Plaintiffs' new experts have come

up with entirely new theories regarding liability and remedy. Defendants would have

addressed these new theories in their summary judgment motions before this Court and

the Third Circuit. As the opportunity for summary judgment motions has now passed,

Defendants have been prejudiced.

For example, had Plaintiffs timely identified one of Baliban's damages theories,

Defendants would have argued on summary judgment that this theory strongly supports

the laches defense. In one of his two damages theories, Baliban asserts that a highly

leveraged capital structure reduces the value of a company by 10-20% if the company

suffers financial distress. (See A26-27) Baliban admits, however, that increasing

Marvel's leverage would have benefitted Marvel's stockholders had Marvel continued to

15

enjoy financial success.  (Baliban at 200-01 Appendix C3)  As a result, Marvel's stock-holders could unfairly invoke Baliban's theory to create a riskless, yet high-yield invest-ment. Marvel's stockholders could accept the risk posed by Marvel's leverage, and the high stock price created by that leverage, and if Marvel thereafter suffered a downturn, they could sue claiming that Defendants' business strategy was too risky.  The Court of Chancery applied laches to a similar theory of injury in <u>Albert v. Alex Brown Mgmt. Servs., Inc.</u>, C.A. No. 762, 2005 WL 1594085 (Del. Ch. June 29, 2005), because of the unfair prejudice to the defendants. (<u>See also</u> D.I. 475, Defs'. Brief In Opp. To Pls'. Mot. To Exclude at 15-17)  Defendants were denied the opportunity to present this argument by Plaintiffs' delay in identifying Baliban.  Indeed, it should be noted that the Third Circuit rejected Defendants' laches argument on the grounds that Defendants had not shown that they suffered prejudice from Plaintiffs' delay in filing suit.  <u>Cantor,</u> 414 F.3d at 436.  Defendants could have made a much stronger showing on this point had Baliban been in the case at the time.

As another example of prejudice, Baliban's expert opinion focuses on a new theory that Defendants' financing decisions for Marvel were motivated by a desire to avoid tax consolidation and thereby maintain payments from Marvel to Marvel III under a tax sharing agreement.  (<u>See</u> Baliban Rpt. at ¶¶ 13-15, 31 (A2-23, A34-35))  Had this issue been timely raised before the summary judgment briefing, Defendants would have moved for summary judgment on the grounds that Plaintiffs do not possess any claim for

relief "relating to any tax sharing or other similar agreement . . . ." (Mafco Litigation

Trust Agreement at 1 Appendix C10)

Plaintiffs' belated identification of Baliban's theories years after Defendants

moved for summary judgment has caused prejudice.[5]  Courts have frequently held that a

party has been prejudiced where, as here, an expert witness raises a new theory after the

submission of dispositive motions.  See, e.g., Heremling v. Montgomery Ward & Co.,

851 F. Supp. 1369, 1376 (D. Minn. 1994) (expert disclosure after summary judgment

briefing creates prejudice justifying expert's exclusion); Harvey v. United States,  Civ. A.

No. 04  CV 00188, 2005 WL 3164236, at *14 (D. Colo. Nov. 28, 2005).  Cf. DRR,

L.L.C. v. Sears, Roebuck & Co., 171 F.R.D. 162, 166 (D. Del. 1997) (denying leave to

amend complaint after summary judgment briefing because of prejudice to defendants).[6]

In sum, Plaintiffs did not timely identify their replacement experts, Baliban and

Carron, and that delay prejudiced Defendants.  Accordingly, Defendants request that

Baliban's and Carron's testimony be excluded from trial.

---

[5]     Defendants intend to raise both of these legal arguments at trial or through motions in
limine, but the loss of the opportunity to present summary judgment motions on these
grounds has prejudiced Defendants.

[6]     Plaintiffs assert that Defendants' motion to preclude Carron and Baliban is inconsistent
with Defendants' participation in expert discovery this spring. (Pl. Br. at p. 23)
Defendants participated in that discovery in order to determine whether Carron and
Baliban were experts whose testimony properly related to the issue raised by the Third
Circuit, or were improper replacement experts.  The discovery demonstrates that they
are improper replacement experts, and Defendants timely filed objections to that
testimony by the June 1, 2006 deadline set by the Court.

V.    **WALSH'S TESTIMONY REGARDING WHETHER THE DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES SHOULD BE EXCLUDED.**

Plaintiffs oppose Defendants' motion to exclude portions of the testimony of Walsh on the grounds that, if Defendants' legal expert, Professor Lawrence Hamermesh, is admitted, then Walsh's rebuttal testimony must also be admitted. This ignores the fact that Walsh's testimony goes well beyond rebuttal. Hamermesh's opinion properly focuses on a question of historical fact, namely the legal milieu as of 1996 that the Marvel Board would have faced if Marvel had chosen to be bound by the restrictions in the Notes. (Hamermesh Rpt. at 2-3 (A170-71); Defs'. Op. Br. at 11-12; see also Defs'. Br. Opp. to Pls'. Mot. to Exclude at 18-21) Walsh's opinion improperly goes to the ultimate question presented to the Court – did the Defendants breach their fiduciary duties? (Walsh Rpt. at ¶ 12 (A281), see Defs'. Op. Br. at 10-12) The testimony of the experts confirms this distinction. Hamermesh testified as follows:

> Q.    Your report does not set forth an opinion concerning whether any of the defendants in this action, Cantor versus Perelman, breached their fiduciary duties to Marvel, correct?
>
> A.    Correct.
>
> Q.    And specifically your opinion does not address whether Perelman breached his fiduciary duties to Marvel?
>
> A.    Also correct.

(Hamermesh at 50)

Walsh testified:

> Q.    Did you view Professor Hamermesh's report to have been offering an opinion as to whether Mr. Perelman violated his fiduciary duty of

18

> loyalty by imposing these restrictions without presenting it to the
> Marvel Entertainment board?

A. No. That wasn't the thrust. I think what he was saying was that there wasn't anything wrong w what he did was protected by Delaware law anyway.

Q. Yes, sir. That's what I understood his report to be saying.

A. Yeah. I didn't, I didn't say that -- I didn't read his report as saying that
he had a duty to present this or present that to any board. I thought he
was talking about the rights that he had to maintain majority control
and to protect that right against the action of the Marvel board to
dilute it.

(Walsh at 81 (A321))

Defendants submit that the Court can draw a clear line to separate Walsh's

improper legal testimony from Hamermesh's appropriate testimony. If Walsh's testimony

concerns the core legal issue the Court must resolve in this lawsuit, i.e. whether Defen-

dants breached their fiduciary duties, then the opinion is an improper legal opinion. If the

testimony concerns the legal milieu that the Marvel Board would have faced during

hypothetical negotiations over whether Marvel should agree to be bound by the Notes,

i.e., whether a majority shareholder had legal protections against dilution during 1993 to

1996, then it is appropriate "law as fact" testimony. This distinction has been made by

other courts in similar contexts. See, e.g., In re Walt Disney Derivative Litig., C.A. No.

15452, 2005 WL 2056651, at *28-30 (Del. Ch. Aug. 9, 2005) (rejecting law professor's

testimony concerning whether directors complied with fiduciary duties as improper legal

testimony, but considering and relying upon legal experts' opinions about the likely

outcome of litigation over a hypothetical decision to terminate an officer with cause).

19

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the expert testimony of Bevis Longstreth, Esquire, William H. Purcell, Jeffrey L. Baliban, Andrew S. Carron and portions of the testimony of Justice Joseph T. Walsh, Ret. should be granted.


Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Defendants


DATED:  June 30, 2006