IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, et al.,                    :
                                          :
                Plaintiffs,               :        No. 97-586-KAJ
                                          :
        v.                                :
                                          :
RONALD O. PERELMAN, et al.,               :
                                          :
                Defendants.               :

**COMPENDIUM OF UNREPORTED OPINIONS TO
DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE EXPERT TESTIMONY**

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Defendants

DATED:  June 30, 2006

# INDEX

CASES                                                                          TAB

Albert v. Alex Brown Mgmt. Servs., Inc.,
     C.A. No. 762, 2005 WL 1594085 (Del. Ch. June 29, 2005) ............................. 1

Carpe v. Aquila,
     No. 02-0388-CV-W-FJG, 2005 WL 1138833 (W.D. Mo. Mar. 23, 2005) .......... 2

Chase Manhattan Mortgage Corp. v. Advanta Corp.,
     No. Civ. A. 01-507(KAJ), 2004 WL 422681 (D. Del. Mar. 4, 2004) ................ 3

Harvey v. United States,
     No. CIVA04CV00188WYDCBS, 2005 WL 3164236 (D. Colo. Nov. 28, 2005)  4

Indiana Area Sch. Dist. v. H.H.,
     No. Civ. A. 04-1696, 2006 WL 1134942 (W.D. Pa. Mar. 14, 2006) .................. 5

In re PHP Healthcare Corp.,
     128 Fed. Appx. 839, No. 03-3972, 2005 WL 488785 (3d Cir. Mar. 3, 2005) .... 6

In re Walt Disney Co.,
     C.A. No. 15452, 2004 WL 550750 (Del. Ch. Mar. 9, 2004) .............................. 7

In re Walt Disney Derivative Litig.,
     C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ............................ 8

TAB 1



Not Reported in A.2d

Page 1

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Todd ALBERT, Joseph M. Bryan, Jr., Kevin
Calderwood, Katherine D. Crothall, Scott W.
Frazier, FU Family Revocable Trust, Robert B.
Goergen, Sr., Robert G. Goergen, Jr., Todd A.
Goergen, Hasan 1995 Living Trust, Wai Yan Ho,
Willis James Hindman, Johnson Family Living
Trust, Michael R. Kidder Revocable Trust, Mark
and Ann Kington, Jeffrey A. Koser, Marlenko Inc.,
Elaine McKay Family, LP, David Mixer, MRW
Trust, James Murray, Jim K. Omura 1996 Trust,
Jennifer Owen and Michael J. Ross, Nicholas Peay,
Douglas G. Smith, Frederick G. Smith, Jane
Vei-Chun Sun, Mark Wabschall, Karen L. Walsh,
Warmenhoven 1995 Children's Trust, Yan 1996
Revocable Trust, Barbara J. Zale, and Charles A.
Ziering, Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES,
INC.; Deutsche Bank Securities, Inc.; Deutsche
Bank, AG; Richard Hale; Gary Fearnow; Bruns
Grayson; E. Robert Kent, Jr.; Truman T. Semans;
DC Investment Partners, LLC; Doctor Robert
Cants, III; and Michael W. Devlin, Defendants.
Elizabeth J. BAKER, Bender 1996 Revocable
Trust, Dr. Steven J. Berlin, Estate of Robert B.
Blow, Luther C. Bolick, Stephen E. Coit, Sara
Crowder, Gerald K. and Teresa K. Fehr, FU Family
Revocable Trust, Ralph Glasgal, Robert G.
Goergen, Jr.1985 Trust, Todd A. Goergen 1985
Trust, Peter O. Hausmann, Willis James Hindman,
William F. Kaiser, Mark and Ann Kington, Timothy
K. Krauskopf, William T. McConnell, Philip R.
McKee, David Mixer, MRW Trust, James Murray,
Paul D. and Judith F. Newman, W.L. Norton,
Gregory Packer, Howard E. Rose, Ruben Family
Limited Partnership, 5 S Trust, Saladrigas Family
Ltd. Partnership, Ricardo A. Salas, Jose M.
Sanchez, Samuel Siegel, Silverman 1996

Irrevocable Trust, Douglas G. Smith, Frederick G.
Smith, Ronald B. Stakland, Strauch Kulhanjain
Family Trust, Bruce E. Toll, Alexander R. and
Marjorie L. Vaccaro, Yanover Family Ltd.
Partnership, Michael Yokell, and Justin A. Zivin,
Plaintiffs,
v.
ALEX. BROWN MANAGEMENT SERVICES;
Deutsche Bank Securities, Inc.; Deutsche Bank,
AG; Richard Hale; E. Robert Kent, Jr.; Truman T.
Semans; DC Investment Partners, LLC; Doctor
Robert Crants, III, and Michael W. Devlin,
Defendants.
**No. Civ.A. 762-N.**

Submitted March 21, 2005.
Decided June 29, 2005.

Jeffrey S. Goddess, Jessica Zeldin, Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington,
Delaware; Steven E. Fineman, Hector D. Geribon,
Daniel P. Chiplock, Lieff, Cabraser, Heimann &
Bernstein, LLP, New York, New York, for the
Plaintiffs.
Michael D. Goldman, Peter J. Walsh, Jr., Melony
R. Anderson, Potter Anderson & Corroon LLP,
Wilmington, Delaware; Christopher P. Hall, Kevin
Rover, Marilyn B. Ampolsk, Morgan Lewis &
Bockius, LLP, New York, New York, for the
Defendants.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.

I.

*1 The plaintiffs, investors in two exchange funds,
bring these complaints against the managers of the
funds for breach of fiduciary duty, breach of
contract, fraud, negligence, unjust enrichment, and
conspiracy to commit fraud and aiding and abetting
of the preceding. Each plaintiff contributed
appreciated securities (valued at a million dollars or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 2

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

more) to the funds in the hopes of receiving a diversified basket of securities, capital appreciation, and tax deferral. After the funds' value collapsed, the funds' managers suspended redemptions and communications with the investors.

The defendants seek to dismiss both complaints, arguing that the plaintiffs' claims are time-barred, that the plaintiffs fail to state a claim upon which relief can be granted, and that any claims that the plaintiffs have made are derivative, and they have not pleaded that demand was refused or futile. The court agrees the majority of claims are untimely. However, because it is unclear which of the plaintiffs' numerous claims are time-barred, the court orders the plaintiffs to file supplemental arguments on this issue.

II.[FN1]

FN1. This opinion deals with the disposition of motions in two separate suits, *Albert v. Alex. Brown Mgmt. Serv.*, C.A. No. 762-N, and *Baker v. Alex. Brown Mgmt. Serv.*, C.A. No. 763-N. Even though the named defendants, the attorneys for both parties, and the factual and legal allegations are essentially the same in both, the cases have not been consolidated. The main factual difference between the cases is that C.A. No. 762-N is brought by investors in Fund I and deals with alleged wrongdoing with respect to Fund I, while C.A. No. 763-N is brought by investors in Fund II and deals with allegations of wrongdoing with respect to Fund II. When factually distinguishing the allegations made in the two cases, the court refers to the complaint filed in C.A. No. 762-N as the "Fund I Complaint" and the complaint filed in C.A. No. 763-N as the "Fund II Complaint." Collectively, the court refers to them simply as the complaints. Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

Plaintiffs are limited partners in two investment vehicles known as exchange funds, the DB Alex. Brown Exchange Fund I, L.P. ("Fund I") and the DB Alex. Brown Exchange Fund II, L.P. ("Fund II") (collectively, the "Funds"), managed and operated by the defendants. The plaintiffs made investments in the Funds in 1997 by contributing certain concentrated equity positions, with a minimum value of $1 million, in exchange for interests, or units, in one of the Funds.

Initially, the Funds met with great success. From the initial net asset value ("NAV") of $119.47 per partnership unit for Fund I, and $71.61 for Fund II, the Funds peaked at NAVs of approximately $370 for Fund I and $135 for Fund II, in 2000. However, the Funds suffered from the vicissitudes of the markets, and by mid-2003, the NAVs had fallen to approximately $26 for Fund I and $33 for Fund II. The plaintiffs filed the complaints in this court on October 19, 2004.

The plaintiffs filed two richly detailed complaints, well over a hundred pages each, naming as defendants Alex. Brown Management Services (" Alex.Brown"), [FN2] the General Partner of Fund I and the Investment Advisor of Fund II; Alex. Brown's Management Committee; DC Investment Partners LLC ("DCIP"), the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II; [FN3] DCIP's managing members; [FN4] Deutsche Bank Securities Inc. ("DBSI"), the custodian and placement agent of the Funds; and Deutsche Bank, AG.[FN5]

FN2. Alex. Brown was a wholly owned subsidiary of Alex. Brown, Inc. from its creation until on or about September 1, 1997.

FN3. Collectively, Alex. Brown and DCIP are referred to as the "Managers."

FN4. Defendants Robert Crants, III and Michael W. Devlin were, at all relevant times, the managing members, and part owners, of DCIP.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

> FN5. In September of 1997, Alex. Brown, Inc. was acquired by Bankers Trust New York Corporation and was renamed BT Alex. Brown Incorporated. In June of 1999, Deutsche Bank acquired Bankers Trust, including BT Alex. Brown and its subsidiaries. Effective December 4, 1999, BT Alex. Brown changed its name to DB Alex. Brown, LLC. Effective January 1, 2001, DB Alex. Brown changed its name to Deutsche Banc Alex. Brown. Effective April 1, 2002, Deutsche Banc Alex. Brown changed its name to Deutsche Bank Securities.

### A. *Exchange Funds Generally*

Generally, an exchange fund is a vehicle that allows investors with substantial holdings of equity securities with large, unrealized capital appreciation to diversify and gain professional management. The investors contribute their appreciated securities and receive an interest in the partnership, thereby diversifying their holding without incurring immediate capital gains tax. A provision in the Internal Revenue Code (the "Tax Code") allows the exchange to be tax free, as long as the partnership (or fund) holds no more than 80% of its assets in " stocks and securities" at the fund's closing. Since the contributed securities in an exchange fund are generally stock and securities as defined by the Tax Code, the fund's sponsor must insure that, at each exchange fund closing, at least 20% of the fund's assets are held in "qualified investments." These investments consist of a limited range of less liquid investments that fall outside the definition of "stock and securities." To satisfy this requirement, exchange funds usually invest in private preferred stock units; e.g. those issued by real estate operating partnerships.

**\*2** To achieve the benefits of a tax-free exchange, partners must generally remain in the partnership (or fund) for a minimum number of years, as specified in the Tax Code (five years at the inception of Fund I, seven years at the inception of Fund II).[FN6] At the end of the requisite period, partners may generally redeem all or a portion of their share of the partnership without triggering capital gains tax liability. Redemption policies vary. For example, most exchange funds distribute a *pro rata* portion of the fund's total marketable securities; i.e. investors often receive a diversified basket of securities as a tax-free redemption.

> FN6. The five year anniversary of the inception of Fund I passed in May of 2002. The seven year anniversary of the inception of Fund II passed in October of 2004.

Exchange fund sponsors are generally large investment banks or independent investment management firms. The fiduciary oversight of investors' interests are usually performed by the sponsor or an independent group, such as a management committee or a board of directors. Exchange fund participants must satisfy financial suitability standards, and the minimum investment is usually $1 million.

Portfolio construction is important to exchange funds. In order to preserve the tax deferral for the investors, the fund's management tries to avoid selling any of the original contributed securities during the life of the fund. Most funds have a clearly-stated investment objective and use sophisticated portfolio construction techniques to determine an appropriate and diversified universe of stocks eligible for inclusion in the fund. Selection criteria generally includes such characteristics as market capitalization, industry sector, trading volume, volatility, and dividends.

When the fund sponsors assemble the proposed portfolio and prospective investors have submitted their stocks for inclusion in the fund, investors generally receive an "inspection report" listing the contributed securities that have tentatively been accepted. The investor typically has three to five business days to review that report and to withdraw from the fund if desired. Generally, once the deadline has passed, the investment manager reviews the remaining portfolio to ensure that it is still in keeping with the investment objective and makes any necessary adjustments, after which the fund closes and the partnership is officially formed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 4

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Concurrent with the portfolio construction process, the fund sponsor secures the required 20% qualified investments portion of the portfolio. Many funds use leverage, borrowing money from banks (lines of credit) or brokers (margin accounts) to purchase the qualified investments and other assets for the fund's portfolio.

### B. *The Marketing Of The Funds*

For both Funds, an Alex. Brown Internal Sales Memorandum (the "Sales Memos") was used by Alex. Brown brokers to market and promote the Funds to prospective investors. Both Sales Memos stated that the Funds' objective was to "[a]chieve long-term appreciation in the value of the Fund's assets equal to or better than the appreciation in the broader stock market." The strategy identified in the Sales Memos was to construct a "diversified portfolio," characterized by "flexibility and the ability to accept a broad range of contributed securities." The Sales Memos indicated that the Funds would contain the contributed securities, illiquid securities, and acquired securities.

**\*3** The Fund I Sales Memo stated that the securities contributed to the Fund would be "screened by the Sub-Advisor according to liquidity and fundamentals." The Fund I Sales Memo also stated that the Fund's management would use hedging strategies to "liquefy a portion of the contributed securities to provide the funds to purchase the illiquid securities and the acquired securities." According to the Fund I Sales Memo, the contemplated hedging strategies would also facilitate "the acceptance of a broad range of [contributed] securities." The Fund II Sales Memo stated that Fund II's management would hedge the contributed securities "almost immediately with collars. Typically, calls and puts will be purchased approximately 10% 'out of the money,' so there is roughly 10% upside and 10% downside exposure." According to the Fund II Sales Memo, the contemplated hedging would allow a "wider range of securities, as well as larger amounts of a single stock, to be accepted."

The Fund I Sales Memo stated that the illiquid

securities would be selected by the sub-advisor and general partner, and would initially be precious metals but would ultimately be invested in "LBO funds, distressed real estate funds, merchant banking funds, and other private equity placements." The Fund II Sales Memo indicated that the Fund would have access to "top private equity funds." According to the Fund II Sales Memo, Fund II's illiquid assets would initially be commodities "used as a 'holding tank' until longer term investments draw down capital commitments" but that private real estate partnerships would become "the primary investment vehicle for the illiquid portfolio."

In addition, the Sales Memos stated that the balance of the Funds' assets would be in "acquired securities, " specifically the "Flag Funds" [FN7] managed by Alex. Brown Investment Management.

> FN7. The Flag Funds were at all relevant times offered and managed by Alex. Brown and its successors, including DBSI. Three members of the Funds' Management Committees also served leading roles with the Flag Funds. Defendants Richard Hale, the Chairman of the Management Committees of both Funds, and Truman T. Semans, a member of the Management Committees of both Funds, were at all relevant times directors of the Flag Funds (at inception of Fund II, Semans was the Chairman of the Flag Funds), and Gary Fearnow, also a member of the Management Committees of both Funds, was a Vice-President of the Flag Funds.

### C. *The Terms Of The Funds*

The terms and structure of Fund I were set forth in a Private Placement Memorandum dated April 14, 1997 ("Fund I PPM"), an Agreement of Limited Partnership ("Fund I Partnership Agreement") and subscription documents, including a subscription agreement ("Fund I Subscription Agreement"). Likewise, the terms and structure of Fund II were set forth in a Private Placement Memorandum dated October 3, 1997 ("Fund II PPM"), an Agreement of Limited Partnership ("Fund II Partnership

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Agreement") and subscription documents, including a subscription agreement ("Fund II Subscription Agreement").[FN8]

> FN8. Both Funds were established as Delaware limited partnerships and are governed by Delaware law.

The PPMs of both Fund I and Fund II state that the Funds were established to "offer diversification and professional investment management to persons who have substantial holdings of publicly traded or privately held equity securities with relatively large unrealized capital appreciation or that are restricted as to disposition under the Securities Act of 1933, as amended." The investment objective of the Funds was to "achieve long-term appreciation in the value of the Fund's assets, while minimizing the recognition of capital gains by the Fund and Investors with respect to the contributed securities." The PPMs stated that "persons who transfer appreciated securities to the Fund in exchange for Units ... will not incur federal income tax liability by reason of the exchange."

**\*4** The PPMs provided that an investment in the Funds could be made by "contributing equity securities acceptable to the Fund in exchange for limited partnership interests in the Fund." The PPMs also provided that in determining which securities would be accepted for contribution to the Funds and in what amounts, "the Sub-Advisor will undertake an extensive screening process to identify the securities eligible for contribution. This screening process will be based upon an analysis of historical levels of risk and returns for securities, liquidity characteristics and forecasts of future returns based on fundamental analysis and quantitative models." However, unlike many exchange funds, the Funds did not offer prospective limited partners the opportunity to inspect the accepted contributed securities prior to the closing of the Funds. Further, at no time prior to or after the closing of the Funds, were the plaintiffs provided with any analysis of the screening of those securities submitted for inclusion in the Funds.

The PPM represented that the Funds intended to

accomplish its objectives and goals through investing in three broad asset classes: (i) equity securities, primarily of publicly traded companies, including restricted securities, that were contributed by Investors; (ii) "illiquid assets," which the PPMs indicated would comprise at least 22% of the Funds' total assets, consisting of real estate and exchange-traded commodities other than precious metals, owned directly or through partnerships or similar entities; and (iii) "acquired assets," which were to "consist of shares of diversified equity and other mutual funds and unit investment trusts ... including the Flag Investors Equity Partners Fund...."

The PPMs stated that the Funds were to borrow under a credit facility with commercial banks or under margin arrangements with broker-dealers to purchase the illiquid assets and acquired assets, and to pay placement fees as well as offering, organizational, and borrowing expenses. The PPMs also stated that the Funds could borrow to make additional acquisitions of investments or to meet any short-term liquidity needs of the Funds.

### D. *Management Of The Funds*

The General Partner and Investment Advisor of Fund I is, and at all relevant times was, Alex. Brown. The PPM stated that the General Partner would be "responsible for managing the Fund's investment activities and for the oversight and management of the business and operations of the Fund." The Fund I PPM also stated that the General Partner would be "responsible for the establishment of investment policy [and] relationships with Investors." The Fund I PPM provided that responsibility for the "supervision of the Fund and monitoring of its investment strategy will reside in the Management Committee of the General Partner." ("Fund I Committee"). In April of 1997, and until about July 2, 2002, the Fund I Committee included Hale, Fearnow, Bruns Grayson, E. Robert Kent, Jr., and Semans.

**\*5** Likewise, the Investment Advisor of Fund II is, and at all relevant times was, Alex. Brown. The PPM stated that the Investment Advisor would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

responsible for establishment of investment policy, relationships with Investors, and for the oversight and overall management of the business and operations of Fund II. The Investment Advisor was also responsible for convening and conducting all meetings of the investors, distributing annual and other reports to investors and responding to inquiries received from the investors, prospective investors, the general public, and others. In addition, the Investment Advisor was responsible for establishing bank credit facilities and was responsible for Fund II's compliance with its reporting obligations to lending banks.

The Investment Advisor established a management committee (the "Fund II Committee") [FN9] to carry out these functions. From the inception of the Fund to the present, the Chairman of the Fund II Committee has been Hale. From October of 1997 until about July 2, 2002, the Fund II Committee included Fearnow, Grayson, Kent, and Semans.

> FN9. Collectively, the Fund I Committee and the Fund II Committee are referred to as the "Management Committees."

From the inception of Fund I through on/or about September 1, 1997, a subsidiary of Alex. Brown (and its successors) served as the placement agent for Fund I, solicited subscriptions for units in Fund I, and served as the custodian for Fund I's accounts. In addition, either Alex. Brown, Inc. or Alex. Brown & Sons provided Fund I with a margin account. Likewise, from October of 1997 through about June 4, 1999, BT Alex. Brown (and its successors) served as the private placement agent for Fund II, solicited subscriptions for Fund II, and served as the custodian for Fund II's accounts. During that same time period, BT Alex. Brown provided Fund II with a margin account.

DCIP is, and was at all relevant times, the Sub-Advisor for Fund I and the General Partner and Sub-Advisor of Fund II. The PPMs of both funds provide: "DCIP is responsible for the day-to-day management and administration of the Fund and for providing certain investment management advice to the Fund." DCIP acted principally through its

managing members, defendants Crants and Devlin.

As compensation for acting as the Investment Advisor and General Partner of Fund I, and the Investment Advisor of Fund II, and to cover expenses, Alex. Brown received a monthly fee equivalent to 1.35% annually of the total values of the gross assets of the Funds. A portion of the management fee, equivalent to .55% of gross assets annually, was paid to DCIP monthly for its management services. In addition, the placement agent and accounts custodian-BT Alex. Brown and its successors, including Deutsche Bank Securities-received placement and servicing fees.

### E. Redemptions

When first established, Fund I's PPM included a five year investment requirement and Fund II's PPM included a seven year investment requirement. [FN10] However, the PPMs and the Partnership Agreements of the Funds provided for limited redemption rights after the second anniversary of an investor's admission to the Fund.[FN11]

> FN10. This difference in the length of the investment requirement was due to a change in the Revenue Code that occurred between the formation of Fund I and Fund II.

> FN11. After the second anniversary and on or before the fifth anniversary of Fund I, or the seventh anniversary for Fund II, of an investor's admission to the Funds, an investor could redeem its units as of any quarter-end at their NAV, provided that the redemption would be limited to the investor contributed securities, and to those contributed securities fair market value, at the time of redemption. After the fifth anniversary of one's admission to Fund I, or the seventh anniversary of admission to Fund II, an investor could redeem its units as of any quarter-end at NAV, subject to the General Partner's (Fund I) or the Investment Manager's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                       Page 7

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

(Fund II) right to select securities to be distributed.

**\*6** Notwithstanding the specific redemption provisions, the Investment Advisor reserved the right, in its sole discretion, to delay or deny redemptions, if such redemption requests imposed significant liquidity costs on the Funds. More specifically, the PPMs provided that no redemption would be made "to the extent the Fund, as determined by the Investment Advisor in its sole discretion, does not have sufficient or appropriate assets to satisfy the redemption."

### F. *The Closings*

Fund I was officially formed and closed on or about May 5, 1997. At its inception, Fund I had 88 limited partners who contributed more than 90 securities valued at approximately $152.5 million. The 33 plaintiffs who have initiated this action are among those limited partners. At the inception of Fund I, the plaintiffs contributed securities worth approximately $59.9 million.

Fund II was officially formed and closed between October of 1997 and April 17, 1998 (the date of the last closing). At its inception, Fund II had 82 limited partners who contributed more than 80 securities valued at approximately $132.7 million. The 42 plaintiffs who have initiated this action are among those limited partners. At the inception of Fund II, the plaintiffs contributed securities worth approximately $59 million.

### G. *Removal Of The General Partner*

The Partnership Agreement of Fund II provides that, by consent of the limited partners in Fund II, those limited partners "shall be entitled to remove the General Partner" for breaches by the General Partner of any material obligations under the Fund II Partnership Agreement based upon a determination by the limited partners that the General Partner had acted negligently in any material respect, or had engaged in fraud or willful misconduct, or failed or refused to substantially

perform its duties as the General Partner. The action of removing the General Partner requires the consent or approval of limited partners whose units represent at least 51% of the aggregate units owned by the limited partners in Fund II. There is no similar provision in the Partnership Agreement of Fund I.

### H. *The Performance Of The Funds And Management's Reporting*

The PPMs and the Partnership Agreements promised the investors that they would "receive unaudited semi-annual and audited annual financial statements and semi-annual reports on the performance of the Fund." The Partnership Agreement also provided that the "names of the Limited Partners and their addresses are set forth on Schedule A, which shall be amended by the General Partner, from time to time to reflect the withdrawal and substitution of Limited Partners and the change in the number of Units owned by the Limited Partners."

The first Fund I Management Committee meeting took place on May 12, 1997. Present at this meeting were Committee members Hale, Fearnow, Grayson, and Semans. Crants of DCIP also participated in the meeting by telephone.[FN12] This first meeting was devoted primarily to a discussion of the illiquid investments for Fund I. Allegedly, the Management Committee did not meet again for more than one year.

> FN12. The plaintiffs allege not to have knowledge of what was discussed or determined during Management Committee meetings until those Committee minutes were obtained in June of 2003.

**\*7** The Management Committee of Alex. Brown Management and DCIP communicated with the plaintiffs through semi-annual reports. The first such report for Fund I was dated September 30, 1997, and for Fund II was dated January 20, 1998. These reports were sent to the limited partners sometime thereafter.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 8

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
(Cite as: Not Reported in A.2d)

According to the financial statement accompanying the September 30, 1997 report, Fund I was composed of "a broadly diversified portfolio of over 90 different securities, aggregating over $160mm and to date have hedged approximately 95% of those holdings using a combination of both short sales 'against the box' and equity collars ." The September 30, 1997 report also noted that in " terms of the illiquid assets, we have now committed approximately 27% of the Fund's total assets to private partnerships" and that Fund I had a NAV of $119.47 per partnership unit.

Likewise, the financial statement accompanying the January 20, 1998 report stated that Fund II was composed of "a diversified portfolio of over 55 different securities, aggregating over $80 million in value, and the Fund expects to enhance these numbers further with additional closings in 1998." The January 20, 1998 financial statement continued: "[I]n spite of the fact that we are still in the marketing period, we have hedged the majority of those holdings using equity collars, and expect to hedge the remainder in the coming quarter." Also according to these financial statements, Fund II had a NAV of $71.61 per unit as of December 31, 1997.

The January 20, 1998 report for Fund II went on to state:
We expect the illiquid assets that we acquire will represent one of the most important drivers to the long-term performance of the Fund. We are therefore extremely pleased to report that we have already been able to commit approximately 15% of the Fund's assets to two real estate partnerships, and have approximately 22% of the Fund invested in a managed commodity partnership while we look for new real estate investments and await the funding of our current commitments.

In October of 1997, Fund I committed, and eventually invested, $5 million in ABX Fund LP. Fund I was the only limited partner, and only investor, in the ABX Fund. The General Partner of the ABX Fund, Calvert Capital, managed the ABX Fund through defendant Grayson, a member of the Management Committee of Fund I. The ABX Fund was sponsored by BT Alex. Brown. Alex. Brown

and Grayson received management fees of approximately $140,000 annually in addition to the fees charged by Fund I's management on the Fund's assets for the management of the ABX Fund. The plaintiffs were never advised that Fund I was the sole investor in ABX.

The next report from the Management Committee and the Sub-Advisor for Fund I to the limited partners was dated December 31, 1997, and was sent to the limited partners sometime thereafter. The report stated that management's "strategy of hedging the contributed securities (heavily weighted in technology stocks) and acquiring illiquid assets and shares in the Flag Equity Partners Fund and the Flag Value Builders Fund helped mute the markets' volatility meaningfully." According to the report, technology and telecommunications contributed securities represented at least 69% of Fund I's NAV as of the end of 1997. The December 31, 1997 report further noted that management's "hedging approach will continue in 1998, though we may shift more of our short-against-the-box positions over to new equity collars." Approximately 95% of the contributed securities were hedged through collars and short sale transactions by the end of 1997. The December 31, 1997 report stated that, as of December 31, 1997, Fund I had a NAV of $118.12 per unit. The December 31, 1997 report also stated that, by the end of 1997, Fund I had a line of credit with PNC Bank of approximately $55.8 million.

*8 The first audited financial statement for Fund I is for the fiscal year ending December 31, 1997, is dated February 20, 1998, and was sent to the limited partners sometime thereafter. That audited financial statement included a description of the percentage of contributed securities attributable to industry sectors. More specifically, the December 31, 1997 audited financial statement for Fund I reported that at least 62.3% of the contributed securities were invested in technology and telecommunications stocks. Belying the well-pleaded factual allegations in the Fund I Complaint, the plaintiffs make the conclusory allegation that they were not informed by Fund I's management of this heavy weighting of Fund I in technology and telecommunications stocks.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 9

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

The December 31, 1997 audited financial statement, also explained that approximately 13% of Fund I's portfolio was invested in the Flag Funds. The Flag Funds held a number of positions in technology and telecommunications stocks, further increasing the Fund's overall investment in those sectors. The Fund's investment in investment partnerships and private partnerships (approximately 12% of the overall portfolio at the time) also included stakes in technology and telecommunications companies.

The first audited financial statement for Fund II was for the fiscal year ending December 31, 1997, is dated February 20, 1998, and was sent to the limited partners sometime thereafter. That audited financial statement, like the first audited financial statement for Fund I, included a description of the percentage of contributed securities by industry sectors. It stated that at least 41.3% of the contributed securities were invested in technology and telecommunications stocks. The financial statement identified all individual stocks that made up more than 5% of Fund II's value. In addition, the financial statement identified that, as of December 31, 1997, Fund II had a line of credit with PNC Bank of approximately $35 million. On January 14, 1998, the PNC Bank line of credit was increased to $50 million.

The next communication from Alex. Brown and DCIP regarding Fund I was dated June 30, 1998, and sent to the limited partners sometime thereafter. In that report, management described large declines in the markets in the first half of 1998, but stated it had "effectively utilized equity collars to limit our downsize exposure in these severe sell-offs." Collars and short sales were being used at the time to hedge over 90% of the contributed securities. The June 30, 1998 report stated that, as of June 25, 1998, Fund I had a NAV of $121.14 per unit and that on or about July 13, 1998 Fund I's line of credit was increased to approximately $86.5 million. In addition to PNC Bank, two other banks, Bank of America and First American National Bank, provided lines of credit.

Likewise, DCIP and Alex. Brown provided a management report regarding Fund II to the limited partners dated June 30, 1998, and sent this report to

Fund II's limited partners sometime thereafter. In that report, Fund II's management stated:
**\*9** Since the end of last year, we have had five additional closings adding 27 more stocks to the portfolio and slightly greater than $48 million in market value of contributed securities. The final closing for the fund was on April 17.... With these additional closings, the fund is now comprised of 82 different securities, aggregating over $120 million of contributed securities.

The June 30, 1998 report represented that management "instituted prudent portfolio hedging with equity collars protecting over 90% of the portfolio." The report went on:
The equity collars that are used as a hedging tool allow some upside participation while limiting our downside risk. The performance of the contributeds [sic] has been generally positive, though the portfolio, which has many small and mid-cap stocks, has lagged the Dow Jones and S & P 500 indices as large-cap stocks have generally outperformed small-cap stocks.

The June 1998 report also stated that Fund II had " already been able to commit approximately 20% of the fund's assets to real estate partnerships, and have approximately 22% of the fund invested in a managed commodity partnership while we look for new real estate investments and await the funding of our current commitments." As of June 25, 1998, Fund II had a NAV of $70.98 per unit.

Thereafter, semi-annual reports for both Funds were sent out to the limited partners by DCIP and Alex. Brown. These reports detailed the rise and fall of the Funds' net asset values.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

| Date | Fund I's NAV Per Unit |
|---|---|
| June 30, 1999 | $128.34 |
| December 31, 1999 | $293.04 |
| February 15, 2000 | $370 |
| June 30, 2000 | $292.89 |
| December 31, 2000 | $194.70 |
| June 30, 2001 | $102.11 |
| December 31, 2001 | $74.25 |

After 2001, Alex. Brown and DCIP stopped reporting to the limited partners and did not provide the limited partners with the 2001 audited financial statement, the June 30, 2002 report, or the December 31, 2002 report for Fund I until the spring of 2003.

The net asset values reported in the semi-annual reports for Fund II show that Fund II also suffered the slings and arrows of the financial markets.

| Date | Fund II's NAV Per Unit |
|---|---|
| December 31, 1998 | $74.72 |
| June 30, 1999 | $82.83 |
| December 31, 1999 | $133.82 |
| June 30, 2000 | $134.53 |
| December 31, 2000 | $97.54 |
| June 30, 2001 | $80.82 |
| December 31, 2001 | $66.59 |

After 2001, Alex. Brown and DCIP stopped reporting to the limited partners and did not provide the limited partners with an audited 2002 financial statement, a June 30, 2002 financial report, a December 31, 2002 financial report, or a June 30, 2003 financial report for Fund II.

The Management Committee of Fund I again met on September 6, 2001. Present at the meeting were Committee members Hale, Fearnow, and Kent. Also in attendance were Hooker, Crants, Phillips, and Potter. During the September 6, 2001 meeting, Chairman Hale stated "that the recent sharp market decline was creating liquidity issues for Fund I. Fund I's NAV had fallen to $80 at the August 25,

2001 monthly pricing and was about $64 today." According to Hale, the "decline was primarily a function [of] the drop in value of the contributed securities." Hale also stated that "Fund I was facing about $7mm in margin calls over the next week...." In addition, selling "contributed securities was discussed but it generates a taxable gain that must be paid by the Fund so it was not seen as a good solution."

### I. The Liquidity Crunch Cometh

*10 Predictability, in early 2001, the Funds ran into a liquidity crunch. The Managers of the Funds had attempted to reduce the risk of the Funds by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

simultaneously buying a put option and selling a call option on the same security; known in financial jargon as "collaring." This is essentially a wash transaction, since the value of the put option purchased is approximately the same as the value of the call option sold. However, as the value of some securities in the Funds appreciated, the Funds were required to honor the call options. Since the Funds did not want to transfer the securities subject to the calls (as this would have been a taxable event), the Managers were forced to pay the difference between the strike price and the securities' current price. As the price of certain securities in the Funds (such as Yahoo!) exploded, the Funds were forced to come up with large amounts of cash, quickly. They did so mostly through their lines of credit.

As a result of declining market prices, on three separate occasions between September 27, 2001 and February 1, 2002, Fund I violated a financial covenant in its $40 million bank line of credit agreement, which required Fund I to maintain a ratio of total assets to borrowings of 2.25:1.00. Each time, Bank of America provided two months of relief by reducing the test ratio to 2.0. In or about May of 2002, Fund I entered into a demand loan with Deutsche Bank for $10 million. On or about June 5, 2002, Fund I triggered an "Event of Default" under the credit agreement with Bank of America by failing to repay the loan at maturity (June 5, 2002), among other things. On or about June 21, 2002, Alex. Brown Management sent a letter to Fund I's limited partners, notifying them for the first time of the event of default, the demand loan with Deutsche Bank, and the violation of the bank covenant.

Fund II also ran into liquidity problems. From September of 2001 to April of 2002, on four separate occasions, Fund II violated similar financial covenant in its $30 million bank line of credit agreement, requiring Fund II to maintain a ratio of total assets to borrowings of 2.25:1.00. Each time, Bank of America provided two months of relief by reducing the test ratio to 2.0 for a short period of time. On or about June 28, 2002, Fund II triggered an "Event of Default" under the credit agreement with Bank of America by failing to repay the loan at maturity, among other things. The

limited partners were not immediately advised of the covenant violations, or of the bank default.

In a letter dated July 11, 2002, the Management Committee advised Fund II's limited partners that Fund II had defaulted on its credit agreement with Bank of America. The letter also advised Fund II's investors of a discontinuation of redemptions and that the Fund's management was discontinuing publishing a NAV for the Fund.

Pursuant to an August 27, 2002 Amendment and Waiver, Bank of America agreed to extend the letter of credit maturity to June 24, 2003, provided that Fund II provide a perfected second lien on Fund II's margin account, further protection of its collateral, and pay all accrued interest and fees. On or about September 24, 2002, Fund II's management wrote to the limited partners advising them of the renewal of the Bank of America loan through June 30, 2003, the changes in the Management Committee, and indicating that Fund II's NAV had fallen to $35.54 per unit.[FN13]

> FN13. The Fund I Complaint alleges both that Bank of America extended the maturity date of the letter of credit until June 24, 2003, and that the Managers informed the limited partners that the Bank of America loan had been renewed until June 30, 2003. Fund I Compl. ¶¶ 181-82. There is no explanation in the Fund I Complaint for the apparent discrepancy between theses two dates.

*J. Management Shakeup*

**\*11** On or about July 2, 2002, officials at Deutsche Bank fired the Management Committee of the Funds, except for Hale, and replaced those Committee members with Leo Grohowski (Managing Director and Chief Investment Officer for Deutsche Asset Management in the Americas), Ann Doyle (head of Alternative Products for DB Alex. Brown Private Client Division), and Michael Colon (Chief Operating Officer for DB Alex. Brown Private Client Division and Chief Operating Officer for Americas Equities for Deutsche Bank).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

In or about May of 2003, the Managers resumed formal communication with the limited partners of Fund I by issuing a report dated April 30, 2003. According to the report, as of April 30, 2003, the Fund had a NAV of $26.01 per unit. In or about July of 2003, the limited partners of Fund I received audited financial statements for Fund I for 2001 and 2002, dated March 14, 2003 and May 9, 2003. These statements, and the accompanying notes, described to the limited partners Fund I's ongoing financial difficulties and a new letter of credit arrangement with Deutsche Bank.

Likewise, in July of 2003, the Managers issued a report, dated April 30, 2003, to the limited partners of Fund II regarding that Fund. According to the report, as of April 30, 2003, the Fund had a NAV of $29.57 per unit. In July of 2003, the plaintiffs received audited financial statements for Fund II for 2001 and 2002, dated March 14, 2003 and June 26, 2003. In October of 2003, Alex. Brown and DCIP sent another report, dated June 30, 2003, in which the management advised the limited partners that Fund II would not honor any redemption requests and that, as of June 30, 2003, the Fund had a NAV of $33.19 per unit.

During the life of the Funds, Alex. Brown and DCIP allowed several redemptions of capital contributions to be made.

### K. *Procedural Posture*

The allegations set out in the two complaints are nearly identical and they are both set out in eleven counts. The first count is for breach of fiduciary duty. The second count is for aiding and abetting a breach of fiduciary duty. The third count is for common law fraud. The fourth claim is for aiding and abetting common law fraud. The fifth count is for breach of contract against Alex. Brown Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II). The sixth count is for breach of the covenant of good faith and fair dealing against Alex. Brown (with respect to Fund I) and breach of the covenant of good faith and fair dealing against DCIP (with respect to Fund II). The seventh count is for gross

negligence. The eight count is for unjust enrichment against all defendants. The ninth count is for conspiracy liability. The tenth count is for an accounting. The eleventh count is for agency liability against Deutsche Bank and Deutsche Bank Securities.

On January 24, 2005, the defendants moved to dismiss the amended complaints on the grounds that: (i) the claims are untimely, (ii) the majority of claims are derivative, and the plaintiffs have not pled demand nor that demand was excused, (iii) the plaintiffs' claims for aiding and abetting, conspiracy, and agency liability are improperly pled, (iv) the complaint fails to state a claim for unjust enrichment, and (v) the plaintiffs' request for an accounting is improper. On March 21, 2005, the court heard oral arguments on the motions to dismiss. This is the court's disposition of those motions.[FN14]

> FN14. For the sake of clarity, the two separate motions will be referred to hereafter collectively as one.

### III.

**\*12** The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading. [FN15] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[FN16] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true.[FN17] However, neither inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true. [FN18] That is, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences.[FN19]

FN15. *Kohls v. Kenetech Corp.,* 791 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 13

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

763, 767 (Del. Ch.2000).

FN16. *Grobow v. Perot,* 539 A.2d 180, 187 n. 6 (Del.1988).

FN17. *Id.*

FN18. *Id.*

FN19. *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del. Ch.1999).

IV.

*A. Statute Of Limitations*

The defendants argue that all claims are time-barred. The applicable statute of limitations contained in 10 *Del. C.* § 8106 imposes a three-year period of limitations on tort, contract, and fiduciary duty claims, and that three-year period applies by analogy to proceedings in equity.[FN20] A statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches. However, the statutory period may create a presumptive time period for application of laches to bar a claim.[FN21] In the absence of unusual or mitigating circumstances, where the analogous statute of limitations at law period has run, a plaintiff is barred from bringing suit without the necessity of the court engaging in a traditional laches analysis.[FN22]

FN20. *Wal-Mart Stores v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004) (per curiam). Likewise, 10 *Del. C.* § 8106 applies to actions based on gross negligence, *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv.,* 1996 Del. Ch. LEXIS 116, at *44 (Del. Ch. Sept. 3, 1996); an accounting, *Artesian Water Co. v. Lynch,* 283 A.2d 690, 692 (Del. Ch.1971); and conspiracy, aiding and abetting, and agency liability, *see Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1064 (Del. Ch.1989) (applying 10

*Del. C .* § 8106 and holding that a claim for conspiracy was time-barred).

FN21. *United States Cellular Inv. Co. v. Bell Atl. Mobile Sys.,* 677 A.2d 497, 502 (Del.1996); *see also Atlantis Plastics,* 558 A .2d at 1064 ("An analogous statute of limitations period applicable at law, however, is to be given great weight in determining whether a suit is to be time-barred in equity by laches and will be applied in the absence of unusual or mitigating circumstances.").

FN22. *See United States Cellular,* 677 A.2d at 502; *Atlantis Plastics,* 558 A.2d at 1064.

In connection with efforts to informally resolve their dispute, the parties entered into a tolling agreement, effective November 11, 2003, which tolled the statutes of limitations applicable to the plaintiffs' claims. Therefore, absent tolling (discussed more fully *infra* ), if the claims accrued before November 11, 2000, they are time-barred.

*B. Documents Relied Upon In The Motion To Dismiss*

In their motion to dismiss, the defendants rely heavily upon documents purportedly demonstrating that the plaintiffs had timely access to the facts underlying their claims such that they should be deemed to have been given "inquiry notice" and be barred from pursuing their claims on that basis. The court's ability to consider these documents is therefore critical to resolving this motion. Our Supreme Court has cautioned trial courts to be sparing in our resort to documents outside the pleadings.[FN23] However, as in other cases,[FN24] it is clear that the documents relied upon by the defendants on this motion (e.g. the audited financial reports and the semi-annual investor reports) were consulted, relied upon, and quoted from extensively by the plaintiffs in drafting the complaints. "By expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference...."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN25 Therefore, these documents are properly before the court on the motion to dismiss.

> FN23. *See, e.g., Wal-Mart,* 860 A.2d at 320; *In re Santa Fe Pacific Corp. S'holder Litig.,* 669 A.2d 59, 68-70 (Del.1995).

> FN24. *See, e.g., In re Dean Witter P'ship Litig.,* 1998 Del. Ch. LEXIS 133, at *27 n. 46 (Del. Ch. July 17, 1998), *aff'd,* 725 A.2d 441 (Del.1999).

> FN25. *Id.; see also Santa Fe,* 669 A.2d at 69 (holding that, on a 12(b)(6) motion, this court has properly considered documents referred to in complaints when the documents were integral to a plaintiff's claim and incorporated in the complaint).

### C. Accrual Of Claims

*13 A cause of action accrues under 10 *Del. C.* § 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action. [FN26] The complaints allege seven different types of wrongdoing by the defendants. First, the plaintiffs allege that DCIP failed to properly screen the securities accepted into the Funds and, instead, accepted essentially all of the securities offered for inclusion in the Funds.[FN27] Second, the plaintiffs allege that the Managers failed to properly hedge the funds against risk, especially since the Funds were overweighted in technology and telecommunications stocks.[FN28] Third, the plaintiffs allege that the decisions, or lack thereof, made by the Managers caused a liquidity crisis that caused a virtual collapse of the fund.[FN29] Fourth, the plaintiffs allege that the Managers failed to provide financial reports and/or annual audited financial statements in violation of Delaware law and the Partnership Agreements.[FN30] Fifth, the plaintiffs allege that the Managers did not, and were incapable of, providing proper day-to-day management of the funds because the actual managers of the Funds were not sufficiently experienced or capable.[FN31] In addition, the plaintiffs allege that the Managers failed to properly screen the securities for inclusion in the Funds,

failed to implement a proper hedging strategy, and failed to manage the funds so to meet their investment goals.[FN32] Sixth, the plaintiffs allege that the Managers engaged in self-dealing by receiving millions of dollars in fees and by investing the Funds' money in companies managed and controlled by Alex. Brown Management.[FN33] Seventh, the plaintiffs allege that Deutsche Bank aided and abetted the wrongful conduct alleged above, engaged in the illegal activity, and participated in a conspiracy to violate the law.[FN34] Finally, in addition to these seven alleged wrongful acts, the court infers from the complaints a claim that the redemptions allowed by the Funds' Managers were wrongful. The court addresses each of the factual bases, and the accrual, of these claims in turn.

> FN26. *Wal-Mart,* 860 A.2d at 319; *Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999) ( "A cause of action accrues at the moment of the wrongful act, even if the plaintiff is ignorant of the wrong.") (citing *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *15)).

> FN27. Fund I Compl. ¶¶ 170-72, Fund II Compl. ¶¶ 188-190.

> FN28. Fund I Compl. ¶¶ 185-190, Fund II Compl. ¶¶ 204-208.

> FN29. Fund I Compl. ¶ 194, Fund II Compl. ¶ 212.

> FN30. Fund I Compl. ¶ 221, Fund II Compl. ¶ 235.

> FN31. Fund I Compl. ¶ 229, Fund II Compl. ¶ 243.

> FN32. Fund I Compl. ¶ 229, Fund II Compl. ¶ 243.

> FN33. Fund I Compl. ¶¶ 234-37, Fund II Compl. ¶¶ 248-51.

> FN34. Fund I Compl. ¶ 238, Fund II Compl. ¶ 252.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 15

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

### 1. *Failure To Screen, Diversify, And Properly Design The Funds*

The plaintiffs allege that the Managers breached their fiduciary duties in initially screening the stocks allowed into the Funds, failing to properly diversify the Funds, and that, generally, "the entire structure of the Fund[s] was fatally flawed from the outset."[FN35] Accepting these allegations as true, the plaintiffs' injuries occurred when the Funds closed, at which time the Funds were not (allegedly) properly diversified nor properly screened. This was the time of the wrongful act. Fund I closed on May 5, 1997,[FN36] and Fund II closed on April 17, 1998.[FN37] Likewise, claims that the Funds were improperly structured accrued at the time the Funds closed. Therefore, all the claims based on these factual allegations accrued before November 11, 2000 and are presumptively time-barred.

> FN35. Fund I Compl. ¶ 270, Fund II Compl. ¶ 285.
>
> FN36. Fund I Compl. ¶ 84.
>
> FN37. Fund II Compl. ¶ 96.

### 2. *Failure To Implement Hedging Strategies*

**\*14** The plaintiffs allege that Alex. Brown and DCIP breached their fiduciary duties, their contractual duties, and committed fraud by failing to properly implement hedging strategies to protect the Funds from downside risk. According to the complaints, at the time the Funds were formed the Managers of the Funds hedged the majority of the contributed securities using collars and, to a lesser extent, short sales.[FN38] Beginning in the fall of 1998, the managers began discussing the effect that hedging was having on the Funds.[FN39] By the fall of 1999, all prior hedges on the Fund I had expired, and the Managers determined not to re-hedge.[FN40] Similarly, the Managers removed all of the hedges on Fund II in the fall of 1999.[FN41] The Funds were, therefore, unhedged during the fourth quarter of 1999 and early 2000 when the stock markets boomed.[FN42] This allowed the Funds to participate in the boom, but also left them exposed to the stock

market bust.[FN43] In the spring of 2001, after the Funds had suffered substantial losses, the Managers reinstated some hedging strategies.[FN44]

> FN38. Fund I Compl. ¶ 186, Fund II Compl. ¶ 205.
>
> FN39. Fund I Compl. ¶ 188, Fund II Compl. ¶ 206.
>
> FN40. Fund I Compl. ¶ 190.
>
> FN41. Fund II Compl. ¶ 206.
>
> FN42. Fund I Compl. ¶ 186, Fund II Compl. ¶ 205.
>
> FN43. Fund I Compl. ¶ 191, Fund II Compl. ¶ 209.
>
> FN44. Fund I Compl. ¶ 192, Fund II Compl. ¶ 210.

The alleged harm to the plaintiffs occurred when the Managers unhedged the Funds. This was the act that exposed the Funds to the risk of a falling market, and that led to their alleged injury. Thus, any claims arising from the fact that the Funds were not properly hedged accrued at the time the Funds became unhedged. The complaints allege that this occurred in the fall of 1999.[FN45] Therefore, all the claims based on these factual allegations accrued before November 11, 2000 and are presumptively time-barred.

> FN45. Fund I Compl. ¶ 190, Fund II Compl. ¶ 206.

### 3. *The Liquidity Crisis*

The complaints allege that the collars used by the Funds' management were specifically designed to settle in cash, rather than by the delivery of the underlying securities. When the strike prices of the calls were exceeded, the Funds repurchased the calls with cash generated from borrowing, instead of liquidating the underlying securities. Beginning

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 16

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

in the middle of 1998, as the stock market bubble inflated, the hedged securities blew through their collars. This created millions of dollars in cash liabilities for the Funds.[FN46]

> FN46. Fund I Compl. ¶ 187, Fund II Compl. ¶ 205.

The complaints allege that the Funds' "liquidity problem-and hence its inability to meet its investment objective-began when the [Managers] failed to evaluate and screen the securities selected for the Fund." [FN47] According to the plaintiffs, these initial "structural flaws" led to the lack of liquidity.[FN48] It was the lack of liquidity, plaintiffs contend, that eventually led to the Funds inability to hedge with equity collars, declining net asset values, bank defaults, and the suspension of redemption rights. [FN49]

> FN47. Fund I Compl. ¶ 198, Fund II Compl. ¶ 216.
>
> FN48. Fund I Compl. ¶ 194, Fund II Compl. ¶ 212.
>
> FN49. Fund I Compl. ¶¶ 194-219, Fund II Compl. ¶¶ 212-33.

However, the wrongful acts the plaintiffs allege are that the Managers failed to diversify and screen the securities admitted into the Funds. As discussed in Section IV.C.1, *supra,* these acts all occurred, and therefore the claims based on them accrued, before November 11, 2000. Thus, they are presumptively time-barred.

### 4. *Failure to Provide Financial Reports And List Of Limited Partners*

**\*15** The complaints allege that, under Section 11.2 of the Partnership Agreements, the Managers were required to deliver semi-annual unaudited financial statements and a report on the financial condition of the Funds' business and the results of its operations to each limited partner. Also, the Partnership

Agreements required the Managers to provide annual audits of the Funds, consisting of a balance sheet, a statement of operations, a statement of cash flows and related notes.[FN50] The complaints allege that the Managers failed to produce reports or audited statements during 2002, resumed reporting in the spring of 2003, and this failure to provide reports during that time period violated the Partnership Agreement as well as Delaware law. [FN51]

> FN50. Fund I Compl. ¶ 220, Fund II Compl. ¶ 234.
>
> FN51. Fund I Compl. ¶ 221, Fund II Compl. ¶ 235.

In addition, management was required to identify in Schedule A to the Partnership Agreements the names and addresses of the Funds' limited partners, and amend such list to reflect the withdrawal and substitution of limited partners and the change in the number of units owned by the limited partners. [FN52] The plaintiffs allege that, despite this obligation, the Partnership Agreements did not include the names and addresses of the limited partners and the number of units each held in the Funds, and management never provided to the plaintiffs that information.[FN53]

> FN52. Fund I Compl. ¶ 222, Fund II Compl. ¶ 236.
>
> FN53. Fund I Compl. ¶ 222, Fund II Compl. ¶ 236.

With respect to the claims for failing to provide audited financial statements and financial reports, the Managers first failed to provide these reports in 2002. Having occurred after November 11, 2000, these claims are timely.

With respect to the claims for failing to provide lists of the limited partners of the Funds, these claims accrued at the time of the wrongful act, i.e. the time at which the Mangers were allegedly obligated to provide the names of the limited partners but failed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

to do so. This was, according to the complaints, at the time the Managers sent out the Partnership Agreements. This occurred long before November 11, 2000. Therefore, the claims based on these alleged wrongful acts are presumptively untimely.

### 5. Failure Of Alex. Brown And DCIP To Provide Professional And Active Management And Supervision Of The Funds

The complaints allege that Alex. Brown was charged with managing the investment decisions of the Funds and that Alex. Brown delegated this responsibility to the Management Committees.[FN54] The complaints further allege that the Management Committees devoted such a negligible amount of time to their work that they violated their duties to exercise reasonable care, in good faith, to the manage the Funds.[FN55] The complaints also allege that DCIP failed in its duty to manage and administer the Funds on a day-to-day basis. Specifically, the complaints allege that defendants Crants and Devlin, who did the actual managing of the Funds for DCIP, were not sufficiently experienced or qualified to manage the Funds.[FN56] The complaints also allege that Crants and Devlin devoted insufficient time to managing the Funds and that, instead, they devoted their time to the creation and management of other investment companies, for which they were investigated for securities fraud.[FN57]

> FN54. Fund I Compl. ¶ 224, Fund II Compl. ¶ 238.
>
> FN55. Fund I Compl. ¶ 225, Fund II Compl. ¶ 239.
>
> FN56. Fund I Compl. ¶ 229, Fund II Compl. ¶ 242.
>
> FN57. Fund I Compl. ¶¶ 230-31, Fund II Compl. ¶¶ 244-45.

*16 As opposed to their other claims, the plaintiffs' allegations of failure to manage the Funds are not a discrete wrong, which occurred at a specific time.

Instead, they allege that DCIP and Alex. Brown owed (and owe) a continuing duty to actively manage and supervise the Funds. The wrongful act is the failure to meet that duty. The court cannot say that this wrongful act occurred before November 11, 2000. Therefore, the plaintiffs' claims based on the failure of Alex. Brown and DCIP to provide active management are *not* barred by the statute of limitations.

### 6. Self-Dealing And Related Party Transactions

The complaints allege that Alex. Brown and DCIP received millions of dollars in management fees from the Funds and that millions more were paid to Alex. Brown's affiliates and parents over the years in the form of accounts servicing fees, transaction commissions or fees, and interest on margin accounts.[FN58] The complaints further allege that the Funds' management invested the Funds' money in companies and partnerships managed and controlled by Alex. Brown's affiliates and parents (including Deutsche Bank Securities), and members of the Management Committee so that Alex. Brown could collect fees on both sides of the transaction.[FN59] The complaints also allege that the fees that Alex. Brown and DCIP generated through their operation of the Funds and their investment of the Funds' assets in related-party entities, as well as their desire to continue to receive those fees, motivated Alex. Brown and DCIP to engage in the wrongful conduct alleged in the complaints.[FN60]

> FN58. Fund I Compl. ¶ 233, Fund II Compl. ¶ 247.
>
> FN59. Fund I Compl. ¶ 234, Fund II Compl. ¶ 248.
>
> FN60. Fund I Compl. ¶ 232, Fund II Compl. ¶ 251.

The complaints allege four specific related-party transactions that were improper. First, the complaints allege that, in October of 1997, Fund I invested $5 million in a private venture capital partnership, known as the ABX Fund, that was run

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 18

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

by Grayson, a member of Fund I's Management Committee. Rather than invest the $5 million directly, Fund I's management allegedly directed the money to a separate entity controlled by a member of the Management Committee, thereby generating fees and commissions for Grayson and his company, to the detriment of the plaintiffs.[FN61]

> FN61. Fund I Compl. ¶ 236.

Second, the complaints allege that, in October of 1998, Fund II invested $7.5 million in a private partnership known as the Place Collegiate Properties Fund. Allegedly, Crants and Devlin had ownership interests in the Place Collegiate Properties Fund, and stood to benefit financially from Fund II's investment in that fund.[FN62]

> FN62. Fund II Compl. ¶ 250.

Third, the complaints allege that the Funds invested in the Flag Funds. The Flag Funds were offered and managed by Alex. Brown and its successors, including Deutsche Bank Securities, and members of the Management Committees also served leading roles in the Flag Funds.[FN63] The complaints further allege that as of December 31, 1997 approximately 13% of Fund I's portfolio was invested in the Flag Funds,[FN64] and that, by November of 1998, Fund II had invested approximately $7 million in the Flag Funds.[FN65]

> FN63. Fund I Compl. ¶ 75, Fund II Compl. ¶ 86.
>
> FN64. Fund I Compl. ¶ 94.
>
> FN65. Fund II Compl. ¶ 121.

**\*17** Fourth, the Fund I Complaint alleges that from the inception of Fund I, on September 1, 1997, a subsidiary of Alex. Brown (and its successors) served as the placement agent for Fund I, served as the custodian for Fund I's accounts, and provided Fund I with a margin account.[FN66] Likewise, from October of 1997 through about June 4, 1999, BT

Alex. Brown (and its successors) served as the private placement agent for Fund II, solicited subscriptions for Fund II, served as the custodian for Fund II's accounts, and provided Fund II with a margin account.[FN67] The self-dealing, apparently, is that an affiliate of the Funds' Managers provided the margin accounts.

> FN66. Fund I Compl. ¶ 78.
>
> FN67. Fund II Compl. ¶ 89.

On the face of the complaints, all of these alleged wrongful acts took place, and thus accrued, long before November 11, 2000. As such, the claims based on these allegedly wrongful acts are presumptively time-barred.

### 7. The Redemptions

The complaints allege that the Managers of the Funds wrongfully allowed several limited partners to withdraw part or all of their interests from the Funds, and failed to advise the plaintiffs of these withdrawals. With respect to Fund I, the plaintiffs allege that on July 7, 1999, seven limited partners withdrew approximately $13.3 million.[FN68] On July 18, 2000, five limited partners withdrew approximately $6.8 million.[FN69] By December 2001, the Managers had allowed the additional redemption of approximately $8.0 million. [FN70] On June 21, 2002, Alex. Brown Management sent a letter to Fund I's limited partners, including the plaintiffs, stating that they were suspending all redemptions.[FN71]

> FN68. Fund I Compl. ¶ 122.
>
> FN69. Id. ¶ 133.
>
> FN70. Id. ¶ 210.
>
> FN71. Id. ¶ 162.

With respect to Fund II, on April 30, 1999, one limited partner withdrew approximately $1.2

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                         Page 19

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
(Cite as: Not Reported in A.2d)

million.[FN72] On July 20, 1999, two limited partners withdrew approximately $1.97 million. [FN73] On November 8, 1999, one limited partner withdrew approximately $2.4 million.[FN74] On January 31, 2000, one limited partner withdrew approximately $1.6 million.[FN75] On April 12, 2000 and July 18, 2000, five limited partners withdrew a total of approximately $41.7 million. [FN76] On October 1, 2000, an investor withdrew approximately $3 million.[FN77] On January 17, 2001, three investors withdrew approximately $1.8 million.[FN78] On October 25, 2001, an investor withdrew approximately $150,000.[FN79] On December 31, 2001, two investors withdrew approximately $3.4 million.[FN80] In October of 2003, the Managers disseminated a report, dated June 30, 2003, to the plaintiffs, stating that the Fund would not honor any redemption requests. It further stated that "redemptions would increase the Fund leverage," and that the "release of stocks in the case of a redemption is a reduction in the collateral for the margin and bank loans." [FN81]

FN72. Fund II Compl. ¶ 130.

FN73. *Id.* ¶ 135.

FN74. *Id.* ¶ 136.

FN75. *Id.* ¶ 142.

FN76. *Id.* ¶ 147.

FN77. Fund II Compl. ¶ 152.

FN78. *Id.* ¶ 159.

FN79. *Id.* ¶ 169.

FN80. *Id.* ¶ 174.

FN81. *Id.* ¶ 186.

On the face of the complaints, claims based on the majority of these alleged wrongful acts are untimely. That is because they are alleged to have occurred before November 11, 2000. However, three withdrawals from Fund II are alleged to have

occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, approximately $8.0 million in withdrawals were alleged to have occurred in December of 2000 from Fund I (the " Fund I December 2000 Withdrawals"). Therefore, all claims for allowing withdrawals, except those based on the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals, are presumptively time-barred.[FN82]

FN82. All alleged wrongful withdrawals, other than the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals, are hereinafter referred to as the "Pre-2001 Withdrawals."

### 8. The Plaintiffs' Response

*18 The plaintiffs argue that their claims did not accrue until December 31, 2001, when the Funds' NAVs were reported to be lower than their first reported level. They argue that "[e]ach Plaintiff could not have suffered an injury or damages before he or she actually suffered a 'loss' relative to his or her initial investment...." [FN83] They complain that the NAVs of the Funds did not peak until sometime after the defendants committed most of the alleged wrongful acts. The plaintiffs also claim that the cause of action could not have accrued until December 31, 2001, because they could not have brought suit until then. In essence, the plaintiffs argue that they could not have brought suit until they had suffered a harm, and that they did not suffer a harm until the value of the Funds dropped below the initial NAV.

FN83. Fund I Pl.'s Answering Br. at 12.; Fund II Pl.'s Answering Br. at 13.

This is incorrect. The law in Delaware is crystal clear that a claim accrues as soon as the wrongful act occurs.[FN84] This is so because the plaintiffs were harmed as soon as the alleged wrongful acts occurred. Whether or not the plaintiffs could have sued for damages is not dispositive as to whether

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the claim accrued, since, as soon as the alleged wrongful act occurred, the plaintiffs could have sought injunctive relief. They did not. Instead, they waited until the value of the Funds climbed to dizzying heights, and then came crashing down.

> FN84. *See Wal-Mart,* 860 A.2d at 319 (" [A] cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."); *SmithKline Beecham Pharms. Co. v. Merck & Co.,* 766 A.2d 442, 450 (Del.2000) ("[The] statute [of] ... limitations period begins to run from the time the cause of action accrues. This is so 'even if the plaintiff is ignorant of the cause of action." ') (quoting *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *15); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* 330 A.2d 130, 132 (Del.1974) (" [T]he statute of limitations ... begins to run at the time of the wrongful act, and, ignorance of a cause of action, absent concealment or fraud, does not stop it.").

The flaw in the plaintiffs' argument is best exemplified by their claims for hedging. The wrongful act the plaintiffs allege is the unhedging of the Funds. However, after the defendants unhedged the Funds, their value skyrocketed. This was due, of course, to the fact that the Funds were exposed to much more risk. Assuming (without deciding) that unhedging the Funds was a wrongful act, it was wrongful because it exposed the Funds to this extra risk. However, under the plaintiffs' theory, they are given the equivalent of a call option. If the unhedging of the Funds works out, and the value of the Funds goes up, the plaintiffs will have no complaint. But if the hedging (or lack thereof) strategy does not work out, and the value of the Funds falls, the plaintiffs can sue. This clearly is not, and should not be, the law. The plaintiffs made the decision to ride the bubble to the top. They cannot now complain that the bubble burst.

The court reiterates that a claim accrues at the time of the alleged wrongdoing, and not when the plaintiff suffered a loss.

### D. *Tolling Of The Statute Of Limitations*

The plaintiffs allege that their claims are timely because the statute of limitations was tolled until approximately June of 2002. Even after a cause of action accrues, the running of the limitations period can be tolled in certain limited circumstances.[FN85] The plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them.[FN86]

> FN85. *Wal-Mart,* 860 A.2d at 319.

> FN86. *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *19.

#### 1. *Inherently Unknowable Tolling*

**\*19** Under the so-called "discovery rule," the statute of limitations is tolled where the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of. [FN87] In such a case, the statute will begin to run only upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts. The statute of limitations then begins to run upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person on inquiry notice of such facts.[FN88]

> FN87. *Wal-Mart,* 860 A.2d at 319 (quoting *Coleman v. PriceWaterhouseCoopers, LLC,* 854 A.2d 838, 842-43 (Del.2004)).

> FN88. *Wal-Mart,* 860 A.2d at 319 (quoting *Coleman,* 854 A.2d at 842-43).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 21

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

### 2. *Fraudulent Concealment Tolling*

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.[FN89] Fraudulent concealment requires an affirmative act of concealment or some misrepresentation by a defendant that prevents a plaintiff from gaining knowledge of the facts.[FN90] " Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." [FN91] Where there has been fraudulent concealment from a plaintiff, the statute of limitations is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence.[FN92]

> FN89. *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *20-*21.
>
> FN90. *Id.* at *21 (citing *Halpern v. Barran,* 313 A.2d 139, 143 (Del.Ch.1973)).
>
> FN91. *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *21 (quoting *Halpern,* 313 A.2d at 143).
>
> FN92. *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *21 (citing *Halpern,* 313 A.2d at 143).

### 3. *Equitable Tolling*

Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[FN93] Underlying this doctrine is the idea that even an attentive and diligent investor may rely, in complete propriety, upon the good faith of fiduciaries, and may be completely ignorant of transactions that constitute self-interested acts injurious to the partnership.[FN94] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong. [FN95]

> FN93. *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *21.
>
> FN94. *Id.* at *22 (quoting *Kahn v. Seaboard Corp.,* 625 A.2d 269, 275 (Del. Ch.1993)).
>
> FN95. *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *22 (citing *NL Indus. v. MAXXAM, Inc. (In re MAXXAM, Inc. /Federated Dev. S'holder Litig.),* 659 A.2d 760, 769 (Del. Ch.1995)).

It is a plaintiff's burden to plead facts to demonstrate that the statute of limitations was, in fact, tolled.[FN96] Furthermore, if the limitations period is tolled under any of these theories, it is only tolled until a plaintiff discovers, or by exercising reasonable diligence should have discovered, his injury.[FN97] Thus, the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, i.e. on inquiry notice.[FN98] Therefore, for the plaintiffs to establish that, due to any of these three doctrines, this action is not time-barred, they must show that they were *not* on inquiry notice of their claims before November 11, 2000.

> FN96. *Dean Witter,* 1998 Del. Ch. LEXIS 133, at *23.
>
> FN97. *Id.*
>
> FN98. *Id.*

### E. *Inquiry Notice*

#### 1. *Failure To Screen, Diversify, And Properly Design The Funds, And The Liquidity Crisis*

**\*20** The plaintiffs had actual or inquiry notice of the alleged failure to screen the securities and diversify the Funds by the time they received the investor reports and audited financial statements detailing the makeup of the Funds. With respect to Fund I, the plaintiffs specifically allege that the Fund Managers sent them the December 31, 1997

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 22

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

semi-annual investor report and the February 20, 1998 audited financial statement (for the year ending December 31, 1997) shortly after the date of those documents.[FN99] The plaintiffs expressly acknowledge that the December 31, 1997 investor report disclosed that the securities contributed to Fund I were "heavily weighted in technology stocks. " [FN100] Moreover, the December 31, 1997 investor report, like each subsequent semi-annual investor report, included a schedule listing all of Fund I's contributed securities and illiquid assets, and the February 20, 1998 audited financial statement disclosed the value of each category of Fund I's investments, including the percentage of Fund I's net equity and dollar value represented by the contributed securities within each industry sector. Therefore, by the time the plaintiffs received the December 31, 1997 investor report, they knew the securities that made up Fund I, and should have known that Fund I was overweighted in technology and telecommunications stocks, and that the Fund was not diversified.

> FN99. Fund I Compl. ¶ 92.

> FN100. *Id.* at ¶ 90.

With respect to Fund II, the plaintiffs specifically allege that "sometime in the late winter or early spring of 1998," they received the first audited financial statement for Fund II; dated February 20, 1998, and for the fiscal year ending December 31, 1997; and that this statement "first informed [the plaintiffs] of how heavily weighted the contributed securities and the overall Fund portfolio were in technology and telecommunications stocks...." [FN101] The plaintiffs also allege that that the audited financial statement identified the individual technology and telecommunications stocks that made up more than 5% of Fund II's portfolio.[FN102] Moreover, like that for Fund I, the February 20, 1998 audited financial statement for Fund II disclosed the value of each category of Fund II's investments, including the percentage of Fund II's net equity and dollar value represented by the contributed securities within each industry sector. Therefore, again like Fund I, by the time the plaintiffs received the February 20, 1998 audited

financial statement for Fund II, they knew the securities that made up Fund II, and should have known that Fund II was overweighted in technology and telecommunications stocks and that it was not diversified.

> FN101. Fund II Compl. ¶ 101.

> FN102. *Id.*

In addition, the failure to screen and properly diversify the Funds are the factual predicates of the so-called "liquidity crisis ." Thus, the above analysis applies equally to this alleged wrongdoing.

For the above reasons, the claims based on the failure to screen, diversify, and properly design the Funds, and the liquidity crisis, are time-barred and must be dismissed.

#### 2. *Failure To Implement Hedging Strategies*

**\*21** The plaintiffs had actual or inquiry notice of the alleged failure to implement hedging strategies before November 11, 2000. With respect to Fund I, the plaintiffs had actual or inquiry notice that Fund I was unhedged no later than July or August of 2000, when they received the June 30, 2000 semi-annual report that disclosed that Fund I was no longer hedged. That report stated:
In order to mute some of the volatility in the market, *we evaluated possible hedging strategies for the contributed portfolio, but it became clear that given our current level of diversification, it would be too expensive for the risk trade-off.* We will, however, continue to monitor and evaluate potential hedging strategies.[FN103]

> FN103. Anderson Aff. Ex. 14 at 2 (emphasis added).

Furthermore, each audited financial report contained lists of the value of each investment category, as a percentage of net assets of the Funds. These included a listing of the call options, put

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

options, and securities sold short. The December 31, 1998 audited financial report listed that 39.7% of the net assets of Fund I (valued at approximately $62 million) were in call options. It also listed that 18.8% of the net assets of Fund I (valued at approximately $30 million) were in securities sold short. The December 31, 1999 audited financial report shows that, a year later, these numbers had dramatically change. The December 31, 1999 audited financial report listed that only 0.8% of the net assets of Fund I (valued at approximately $6 million) were in call options, while 10.0% (valued at approximately $37 million *in losses* ) were in securities sold short.

Likewise, the investors of Fund II had actual or inquiry notice that that Fund was unhedged no later than January or February of 1999, when they received the December 31, 1998 semi-annual investor report. The Fund II Complaint quotes the December 31, 1998 semi-annual investor report and alleges that Fund II removed its hedges in the second half of 1998.[FN104] The specific passage from the 1998 semi-annual investor report quoted in the Fund II Complaint states:

> FN104. Fund II Compl. ¶ 120.

The use of equity collars throughout the first nine months of the year protected the Fund from losses totaling over $15 million or nine points of net asset value. As valuation fell to unsustainable levels, however, *we removed our hedges* to participate in the upside we believed could occur. This decision proved beneficial as the markets recovered and several of our holdings generated improved performance toward the end of the year. (Emphasis added.)

The audited financial reports for Fund II also provided the Fund II investors with a list of the value of each investment category, as a percentage of net assets of the Funds, including a listing of the options used to hedge Fund II. Therefore, for all of the above reasons, the plaintiffs had actual or inquiry notice that the Funds were unhedged.

### 3. *Failure To Provide The Names And Addresses Of The Funds' Limited Partners*

The plaintiffs had actual or inquiry notice of the failure to provide a list of the limited partners before November 11, 2000. The complaints allege that the Managers were required to provide the names and addresses of the Funds' limited partners in the Partnership Agreements, and that they failed to do so. [FN105] The Fund I Partnership Agreement did not contain a list of the limited partners of that Fund, while the Fund II Partnership Agreement contained a list, but did not contain the addresses and ownership interests of the limited partners. [FN106]

> FN105. Fund I Compl. ¶ 222, Fund II Compl. ¶ 236.

> FN106. *See* Fund I Partnership Agreement; Fund II Partnership Agreement, Schedule " A."

**\*22** However, the plaintiffs should have been aware that the Partnership Agreements did not contain a limited partner list (or that the list was incomplete) as soon as they received the document. Schedule A of the Fund II Partnership Agreement clearly lists the names of limited partners, without any additional information. Schedule A of the Fund I Partnership Agreement is blank. The plaintiffs received these documents long before November 11, 2000. Thus, these claims are untimely.

### 4. *Self-Dealing And Related Party Transactions*

The plaintiffs had actual or inquiry notice of the alleged self-dealing and related party transactions before November 11, 2000. The documents that the Managers provided to the plaintiffs disclosed that the Funds would engage in the types of fee arrangements and related party transactions that the plaintiffs now challenge. The Fund I and Fund II Partnership Agreements contain nearly identical provisions that provide:
3.7 Compensation; Reimbursement of Expenses. The Partnership may pay compensation and other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 24

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

fees to the [Managers] or any Affiliated Persons thereof, in such amounts and on such terms as the General Partner, in its sole discretion, shall, subject to the provisions of Section 3.8, determine. Each Limited Partner, by becoming such, acknowledges and agrees, without limiting the generality of the forgoing, that the General Partner and its Affiliated Persons shall be entitled to receive from the Partnership the fees and commissions described in the [Private Placement] Memorandum, all of which shall be deemed to satisfy the provisions of Section 3.8....

3.8 Transactions with Affiliated Persons. The Partnership may enter into transactions with the [Managers] and Affiliated Persons [thereof], but only on terms at least as favorable to the Partnership as may be reasonably expected to be obtained from unrelated third parties, it being agreed that the terms of the arrangements referred to in Section 3.7 satisfy such standard.

The PPMs also made extensive disclosures of the potential conflicts of interest and related party transactions. In the section titled "Conflicts of Interest," the PPMs unambiguously state: "There are inherent and potential conflicts of interest between the General Partner and the Fund and the Sub-Advisor and the Fund." [FN107] The PPMs also disclose that there were possible conflicts with respect to fees:

> FN107. Fund I PPM at 36, Fund II PPM at 40.

The Fund may invest in investment vehicles sponsored by Alex. Brown or affiliates of Alex. Brown which will increase the funds under management of such other investment vehicles and which may increase, in dollar terms, the amount of fees payable to the investment advisors of such other investment vehicles who may be affiliates of the General Partner or Alex. Brown. [FN108]

> FN108. Fund I PPM at 17, Fund II PPM at 18.

The plaintiffs were also aware (or should have

been) of the specific allegations of related-party transactions. First, with respect to Fund I's investment in the ABX Fund, this investment was disclosed to the plaintiffs in the Fund I September 30, 1997 investor report. Furthermore, while the plaintiffs complain that defendant Grayson ran the ABX Fund, they also admit that this fact was disclosed to them. [FN109]

> FN109. Fund I Compl. ¶ 236.

**\*23** Second, with respect to the Funds' investment in the Flag Funds, the PPMs specifically disclosed that the Funds would invest in the Flag Funds. The PPMs state:

The Fund will seek to accomplish its investment objective through investing in securities in three broad asset types.... The third class is expected to consist of shares of diversified equity mutual funds and unit investment trusts [ ]collectively, the " Mutual Funds" including the *Flag Investors Equity Partners Fund* .... [FN110]

> FN110. Fund I PPM at 1-2 (emphasis added); the Fund II PPM at 1-2 states essentially the same, except it uses a slightly different phraseology.

Thus, the plaintiffs should have been aware that the Funds would invest in the Flag Funds from the time they received the PPMs, long before November 11, 2000.

Third, with respect to Alex. Brown (and/or its successors) providing margin accounts to the Funds, these transactions were disclosed to the plaintiffs in the PPMs. The PPMs state: "The Fund also may ... invest Fund cash in short-term investments, such as . .. short-term bank obligations and interest-bearing deposit accounts, including, without limitation, instruments of, and accounts with, Alex. Brown or its affiliates." [FN111] Therefore, from the beginning of their investment, the plaintiffs were put on notice that the Funds would have investment accounts with Alex. Brown and/or its affiliates.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN111. Fund I PPM at 22; Fund II PPM at 23.

Fourth, while the investment of Fund II in the Place Collegiate Properties Fund was not specifically disclosed, it was a type of investment that was well-disclosed. The passages from the Fund II Partnership and Fund II PPM quoted, *supra,* clearly put the plaintiffs on notice that these type of investments would be made by that Fund.

Thus, for the above reasons, the claims based on the alleged self-dealing are time-barred.

*5. Pre-2001 Withdrawals*

The plaintiffs had actual or inquiry notice of the allegedly wrongful redemptions before November 11, 2000. Under the Fund I Partnership Agreement, redemptions of the fair market value of contributed stock were allowed after the second anniversary of the investor's admittance into Fund I.[FN112] This was also disclosed in the Fund I PPM.[FN113] The Fund II Partnership Agreement and the Fund II PPM provided the same.[FN114] Thus, from the very beginning of their investment, the plaintiffs were aware that, after two years, the Funds would allow withdrawals.

FN112. Fund I Compl. ¶ 81.

FN113. *Id.*

FN114. Fund II Compl. ¶ 93.

In addition, the plaintiffs were on notice (or should have been) of many of the specific redemptions about which they complain. With regard to the withdrawals from Fund I, the plaintiffs specifically admit that they were aware of withdrawal of $13.3 million (occurring on July 7, 1999) in April of 2000 due to the "issuance of the 1999 audited financial statements for Fund I in about April, 2000." [FN115] Likewise, with respect to Fund II, the plaintiffs complain that the Managers allowed redemptions of approximately $5.6 million in 1999. However, the plaintiffs specifically admit that they were made

aware of these redemptions by "the issuance of the 1999 audited financial statements for Fund II, date April 25, 2000." [FN116]

FN115. Fund II Compl. ¶ 208.

FN116. Fund II Compl. ¶ 219.

**\*24** Given that the Partnership Agreements and the PPMs specifically informed the plaintiffs that the Funds would allow redemptions, and given that the financial reports disclosed the initial redemptions, the plaintiffs should have been aware that the Funds would allow these redemptions. Therefore, the claims based on the Pre-2001 Withdrawals are time-barred.

V.

Three of the factual allegations made by the plaintiffs occurred after November 11, 2000. Therefore, and to that extent, claims based on these factual allegations are not time-barred. These factual allegations are: (i) the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law, (ii) the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals, thereby precipitating (or at least exacerbating) a liquidity crisis, and (iii) the Managers failed to provide active and competent management of the Funds.

Given the limited nature of these matters, the court is uncertain which of the eleven legal claims set forth in both complaints remain at issue. Before addressing the defendants' remaining challenges to those claims, the court concludes that it is advisable to request a further submission from the plaintiffs that addresses the continuing vitality of the claims asserted in the complaints. The court asks that this submission be made no later than July 15, 2005 and should not exceed 10 pages in length. The defendants' response, not to exceed 10 pages, should be filed by July 22, 2005. When those additional submissions are received, the court will address the remaining issues.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

### VI.

For the foregoing reasons, the motions to dismiss are granted in part, denied in part, and reserved in part. IT IS SO ORDERED.

Del.Ch.,2005.
Albert v. Alex. Brown Management Services, Inc.
Not Reported in A.2d, 2005 WL 1594085 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3108654 (Trial Pleading) Response of Dc Investment Partners, Llc, Doctor Robert Carnts, Iii and Michael W. Devlin to Plaintiffs' Brief in Response to the Court's Memorandum Opinion and Order of June 29, 2005 (Aug. 17, 2005)
• 2005 WL 3108588 (Trial Motion, Memorandum and Affidavit) Answering Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc., and Deutsche Bank A.G. In Response to the Court's June 29, 2005 Order (Jul. 22, 2005)
• 2005 WL 3108590 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Response to the Court's Memorandum Opinion and Order of June 29, 2005 (Jul. 15, 2005)
• 2005 WL 850324 (Trial Motion, Memorandum and Affidavit) DC Investment Partners, LLC's, D. Robert Crants, III's and Michael W. Devlin's Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Complaint (Mar. 18, 2005)
• 2005 WL 850325 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Motion to Dismiss of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc., and Deutsche Bank, AG (Mar. 18, 2005)
• 2005 WL 850386 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss (Mar. 7, 2005)
• 2005 WL 418240 (Trial Motion, Memorandum and Affidavit) Opening Brief of Defendants Alex. Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G. in Support of Their Motion to Dismiss (Jan. 25, 2005)
• 2005 WL 418241 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of DC Investment Partners, LLC, Doctor Robert Crants, III and Michael W. Devlin's Motion to Dismiss Plaintiffs' Complaint (Jan. 25, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.