TAB 4

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Colorado.
William HARVEY, Plaintiff,
v.
UNITED STATES OF AMERICA Defendant.
**No. CIVA04CV00188WYDCBS.**

Nov. 28, 2005.

William E. Harvey, Rancho Cordova, CA, pro se.
Amanda Adams Rocque, Elizabeth Ann Weishaupl,
U.S. Attorney's Office, Denver, CO, for Defendant.

MEMORANDUM ORDER REGARDING
DEFENDANT'S MOTION TO STRIKE EXPERT
REPORTS OF DR. KRISTIE BOBOLIS AND DR.
BRENT VanHOOZEN, OR IN THE
ALTERNATIVE, REQUEST TO REDEPOSE
THESE EXPERTS
SHAFFER, Magistrate J.
**\*1** THIS MATTER comes before the court on
Defendant United States of America's Motion to
Strike Expert Reports of Dr. Kristie Bobolis and Dr.
Brent VanHoozen, or in the alternative, Request to
Redepose These Experts (Document # 102), filed
on September 19, 2005. Plaintiff Harvey filed his
Opposition to the Defendant's Motion to Strike on
October 12, 2005. The United States filed a Reply
in Support of Defendant's Motion to Strike on
October 19, 2005. Pursuant to the February 12,
2004 Amended Order of Reference (Document # 2)
and the memorandum dated September 20, 2005
(Document # 105), this motion was referred to the
Magistrate Judge.

I held a hearing on the instant motion on October
20, 2005, which Plaintiff Harvey attended by
telephone. The court carefully considered the
arguments advanced in the parties' papers and
during the October 20th hearing, as well as the
entire court file and the applicable case law. At the

conclusion of the October 20th hearing, the court
granted in part and denied in part Defendant's
Motion to Strike, and stated on the record the bases
for that decision. This Memorandum Order will
further memorialize and explain that ruling.

BACKGROUND FACTS

Proceeding *pro se,* William Harvey commenced this
action on February 2, 2004, pursuant to the Federal
Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et
seq.,* alleging medical malpractice by Bureau of
Prisons ("BOP") health care providers. Mr. Harvey
was a federal prisoner incarcerated at the Federal
Correctional Institution in Englewood, Colorado
(hereinafter "FCI Englewood") from September
1991 to July 2002, and as such was under the direct
medical care and supervision of the medical staff at
that facility. Plaintiff's Amended Complaint,
accepted for filing on August 24, 2004, asserts that
the United States was negligent in failing to
diagnose and properly treat his lung cancer.
Specifically, Mr. Harvey alleges that the United
States breached the applicable standard of care by:
(1) failing to inform him that at least two doctors
suspected he had cancer; (2) failing to perform a
bronchoscopy in January 2000; (3) failing to
investigate other diagnoses; and (4) failing to
perform any chest x-rays or CT scans between
January 2001 and June 2002. Plaintiff contends that
the failure of two internal medicine physicians and
three physician's assistants employed at FCI
Englewood to correctly diagnose or treat his lung
cancer before July 2002 substantially reduced his
chances of cure and survival.

On April 16, 2004, Plaintiff filed a Certificate of
Review, pursuant to C.R.S. § 13-20-602, in which
Mr. Harvey certified that he had consulted with
oncologists, pulmonologists and other doctors
engaged in the diagnosis and treatment of cancer
who are licensed to practice medicine in North
Carolina and California. The Certificate of Review

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

further stated that "these doctors are substantially familiar with applicable standards of care and practice as they relate to the acts and omissions alleged in the Plaintiff's Complaint" and "have indicated to the Plaintiff that the delay in correctly diagnosing and/or properly treating the Plaintiff's cancer was the proximate cause of his developing a Stage III(B) cancer."

**\*2** This court held a Fed.R.Civ.P. 16(a) scheduling conference on May 24, 2004, at which time I established a discovery deadline of November 22, 2004 and a dispositive motion deadline of December 22, 2004. The parties also were directed to designate, pursuant to Fed.R.Civ.P. 26(a)(2), affirmative experts [FN1] on or before August 24, 2004, and rebuttal experts on or before October 8, 2004. Each of these deadlines had been proposed by the parties and were incorporated in the Scheduling Order executed by the court. In the Scheduling Order, Plaintiff stated that he anticipated expert testimony from, "but not limited to, pulmonologists and oncologists, as well as other experts in the medical profession."

> FN1. *See* Advisory Committee Notes to 1993 Amendments to Fed.R.Civ.P. 26(a)(2) ("in most cases the party with the burden of proof on an issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue").

During the May 24, 2004 scheduling conference, defense counsel expressed some concern regarding Plaintiff's initial disclosures under Fed.R.Civ.P. 26(a)(1), noting that Mr. Harvey had not identified any medical professionals as individuals likely to have information that Plaintiff might use to support his claims. Plaintiff was directed to supplement his Rule 26(a)(1) disclosures within ten days of the scheduling conference.

On August 20, 2004, Plaintiff Harvey filed a motion requesting a two-month extension of the deadline for designating expert witnesses. Plaintiff's motion explained that he needed "additional time to consult expert witnesses, supply them with the X-rays and

reports involved in this case, and have them prepare their reports on the matters at issue in this civil action." *See* Plaintiff's Motion for Extension of Time, at 1 (Document # 28). Mr. Harvey stated that once he obtained the requested copies of x-rays and related materials, they would be "supplied to the Plaintiff's experts who will prepare reports regarding their expert opinions." *Id.* at 2. The court granted Mr. Harvey's motion on August 24, 2004, and extended the deadlines for designating affirmative experts and rebuttal experts to October 25, 2004 and December 7, 2004, respectively. I also extended the discovery deadline to January 21, 2005 and the dispositive motion deadline to February 22, 2005.

Plaintiff Harvey designated Drs. Brent VanHoozen and Kristie Bobolis as experts in this case on October 22, 2005. While Plaintiff's disclosures identified these witnesses, and other medical practitioners, by name and medical speciality, and provided corresponding addresses and telephone numbers, there was no description of the witnesses' anticipated testimony. Defense counsel sent a letter to Mr. Harvey on October 29, 2004, in which she took the position that Plaintiff's treating physicians could "testify about matters such as your current condition and prognosis" without preparing written reports under Rule 26(a)(2)(B). Counsel argued, however, that a complete expert report would be required "to the extent that you wish for any of these doctors to testify about matters such as causation for your current medical condition or the standard of care provided by Defendant's employees while you were still incarcerated." *See* Exhibit A-2 attached to Defendant's Motion to Compel Plaintiff to Supplement Expert Designations. Mr. Harvey was asked to "clarify your intentions and/or remedy these deficiencies no latter than November 15, 2004. " *Id.* On November 19, 2004, Defendant United States filed a Motion to Compel Plaintiff to Supplement Expert Designations (Document # 38). Defendant argued that Mr. Harvey's disclosures were deficient under Fed.R.Civ.P. 26(a)(2)(B), which mandates a written report and the disclosure of specific information by any witness who is retained or specifically employed to provide expert testimony in the subject litigation.[FN2]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

FN2. Notably, Defendant's motion was devoid of any case citations. Although Defendant cites several pertinent cases in its Reply in Support of Defendant's Motion to Strike, none of those cases were referenced in defendant's Motion to Compel Plaintiff to Supplement Expert Designations. The court is left to wonder more thorough briefing from the outset might have avoided the present dispute.

*3 On December 11, 2004, Plaintiff Harvey sent a letter to defense counsel providing "synopses of conversations" with his treating physicians. *See* Exhibit B attached to Defendant's Motion to Strike. In that letter, Mr. Harvey represented that Dr. VanHoozen had been provided with copies of his medical records from FCI Englewood.
I made several inquiries of Dr. VanHoozen regarding the cancer in my right lung, the metastazied cancer in my left lung, and the treatments I had received as to the former.... When I informed Dr. VanHoozen that no x-rays had been taken for nearly eighteen months, despite persistent coughing and congestion, he believed that such did not comport with accepted practices of care. This was especially true where the symptoms continued in spite of the many medications prescribed.

As for his conversations with Dr. Bobolis, Plaintiff wrote thatOn April 29, 2004, I met with Dr. Bobolis regarding treatment of the cancer in my left lung. Prior reports from FCI Englewood and FMC Butner were provided to her. I discussing my prior treatments, I asked whether she believed it unusual for th medical staff and FCI Englewood to continue to diagnose and treat me for pneumonia and bronchitis without having any x-ray to confirm or eliminate such diagnoses.
Dr. Bobolis agreed that this was unusual because the accepted practice is to obtain a "baseline" through an x-ray. She also believed that if an x-ray had been taken between the one on January 24, 2001 and the next one on June 24, 2002, given the size of the tumor discovered by the latter x-ray, the tumor would have been discovered much earlier and at a earlier stage its progression.
On November 29, 2004, I again met with Dr. Bobolis regarding my treatment. At that time I told

her that a sputum test had been conduct in December of 1999 and a large quantity of squamous cells were detected. I asked her if this was normal. Dr. Bobolis thought that this was reason for concern. I asked her what she would have done had this been presented to her. Dr. Bobolis indicated that she would have ordered further tests to determine whether these cells were malignant.

Mr. Harvey concluded his December 11, 2004 letter by stating that "this is the extent of the relevant information I obtained from these Doctors ... I did have other discussions with these Doctors, but most of these discussions concerned by my treatments." *Id.*

In the wake of Mr. Harvey's letter, on December 21, 2004, Defendant moved to withdraw its motion to compel supplemental expert designations. Defendant stated that it "does not intend to object to Plaintiff's submission of summaries with his treating physicians as violating Fed.R.Civ.P. 26(a)(2)." *See* Motion to Withdraw Defendant's Motion to Compel (Document # 44).

This court held a telephonic status conference on December 30, 2004. At that time, I granted the parties' Joint Motion to Amend the Scheduling Order and set a deadline of February 14, 2005 to complete all expert disclosures, a discovery deadline of April 4, 2005, and a new dispositive motion deadline of May 2, 2005.

*4 Dr. VanHoozen, Mr. Harvey's pulmonologist, was deposed in this case on March 31, 2005. At that time, Dr. VanHoozen testified that he was Mr. Harvey's treating physician from March to October 2004. During that same period of time, Dr. VanHoozen did not review any medical records from the Federal Bureau of Prisons. *See* Deposition Testimony of Dr. Brent VanHoozen, at p. 29, attached as Exhibit 13 to Defendant's Response in Opposition to Plaintiff's Motion to Modify Scheduling Order. Dr. VanHoozen also testified that since October 2004, he had not reviewed any medical records from the Bureau of Prisons and that Mr. Harvey had not given him any medical records to review. *Id.* at pp. 29-30. Dr. VanHoozen testified that without reviewing Bureau of Prisons medical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

records, he did not have an opinion "to a reasonable degree of pulmonological probability regarding whether or not there was a breach of the standard of care in Mr. Harvey's treatment while he was at the Bureau of Prisons," and did not have any opinion " to a reasonable degree pf pulmonological probability that the medical care providers at the Bureau of Prisons failed to properly diagnose Mr. Harvey's lung cancer." *Id.* at pp. 49-52. Without reviewing the pertinent medical records, Dr. VanHoozen did not have any criticisms of the care that Plaintiff received from the Bureau of Prisons. *Id.* at p. 53. Dr. VanHoozen stated that he and Mr. Harvey "will have to meet to discuss if I'm going to be in an expert witness role, at which time I would have to review some of the records...." *Id.* at 74.

Plaintiff's oncologist, Dr. Bobolis, was deposed on March 29, 2005. At that time, Dr. Bobolis testified that she had not seen any Bureau of Prisons medical records concerning Mr. Harvey's care and treatment prior to January 31, 2001. *See* Deposition Testimony of Dr. Kristie Bobolis, at pp. 13 and 26, attached as Exhibit 12 to Defendant's Response in Opposition to Plaintiff's Motion to Modify Scheduling Order. Dr. Bobolis testified that as recently as March 7, 2005, Mr. Harvey had not asked her to provide an expert opinion regarding standard of care. *Id.* at pp. 26-27, and 79. She also testified that without reviewing films and medical records dating back to Plaintiff's incarceration at FCI Englewood, she could not form an opinion as to whether there was a failure to diagnose Mr. Harvey's lung cancer while he was at that facility. *Id.* at pp. 36 and 80.

On April 12, 2005, Plaintiff Harvey filed a Motion to Modify Scheduling Order and a supporting brief (Documents # 61 and 62). As grounds for the requested extension, Plaintiff stated that he "needs the additional time in order to obtain empirical evidence regarding the standard of care for situations similar to those that existed in this case at a time critical to the issues of the lawsuit. The Plaintiff has been unable to complete this aspect of discovery sooner because its need did not become apparent until recently." *See* Brief in Support of Motion to Modify Scheduling Order, at 2.

*5 On May 2, 2005, Defendant moved for summary judgment, arguing that without expert testimony, Mr. Harvey had no evidence to establish the appropriate standard of care or to prove a causal connection between an alleged breach of the standard of care and his medical injury. Defendant's motion correctly noted that Mr. Harvey has the burden to "establish the controlling standard of care, as well as the defendant's failure to adhere to that standard, by expert testimony." *See* Defendant United States of America's Motion for Summary Judgment, at 8, citing *Melville v. Southward,* 791 P.2d 383, 387 (Colo.1990). In light of the deposition testimony offered by Plaintiff's experts, the United States argued that "Harvey has no expert witness who will provide an opinion that the United States breached the applicable standard of care in failing to diagnose his lung cancer or failing to provide adequate medical treatment." *Id.* at 9.

On May 5 and 17, 2005, the court heard argument on Plaintiff's Motion to Modify Scheduling Order. Plaintiff explained that he wished to extend the discovery deadlines in order to obtain additional evidence to establish the requisite standard of care in Colorado. As he explained to the court, Mr. Harvey proposed to visit five walk-in clinics in Littleton, Colorado, selected at random. On each visit, Mr. Harvey intended to tell the clinic staff he had a cough, congestion and shortness of breath, which he says were the same symptoms he presented to the medical staff at FCI Englewood between 2000 and 2002. Mr. Harvey stated that he would also tell the clinic doctor that he had a prior history of pneumonia, but not intend to mention his current diagnosis of lung cancer. Mr. Harvey opined that the clinic doctors would immediately order a chest x-ray, thereby establishing a standard of care for Colorado and confirming the sub-standard care provided by Bureau of Prison medical personnel. Mr. Harvey suggested that each of these clinic doctors would qualify as a "treating" expert under Fed.R.Civ.P. 26(a)(2)(B), to the extent that they ordered an x-ray as "treatment" for a particular condition. However, Plaintiff also conceded during the hearing on May 17, 2005, that the clinic doctors would not be providing any ongoing treatment after this initial consultation and would likely be a " retained" expert for purposes of trial.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 5

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

While the court expressed some skepticism as to Plaintiff's proposed course of action, at the conclusion of the hearing on May 17, 2005, this court granted Plaintiff's Motion to Modify Scheduling Order and permitted Mr. Harvey to designate two additional experts on or before June 30, 2005. Without deciding whether these individuals would qualify as "retained experts" or " treating physicians," I directed Mr. Harvey to provide written reports that fully comply with the requirements of Rule 26(a)(2)(B). *See* Fed.R.Civ.P. 26(a)(2)(B) (vesting the court with discretion to modify the expert disclosure requirements).

*6 On June 29, 2005, Plaintiff designated two additional experts: Elizabeth Harvey, a registered nurse, and Steven Klompus, a physician's assistant. Both of the newly designated "experts" reside and practice medicine in California. Plaintiff's Motion to Modify Scheduling Order had requested an extension of time "to obtain empirical evidence regarding the standard of care for situations similar to those that existed in this case at a time critical to the issues of the lawsuit." Notably, it appears that neither Ms. Harvey nor Mr. Klompus have ever practiced medicine in Colorado. Apparently, Mr. Harvey chose to abandon his plan to elicit opinions or testimony from walk-in clinic physicians in Colorado.

On August 1, 2005, Plaintiff filed his Response in Opposition to Defendants' Motion for Summary Judgment, as well as an Amended Response on August 2, 2005. On August 9, 2005, Mr. Harvey filed his Exhibits in Support of His Opposition, which included an expert report from Dr. Bobolis, dated July 18, 2005, and an expert report from Dr. VanHoozen, dated July 26, 2005.

The report signed by Dr. Bobolis purports to rely upon her lengthy experience as a board-certified physician in internal medicine (1988), medical oncology (1991) and hematology (1992), as well as her review of records from FCI Englewood and films from 1999 through 2002. In her report, Dr. Bobolis opines that
had [Mr. Harvey] received appropriate work-up in January 2000 with bronchoscopy he would very likely had (sic.) been diagnosed with early stage

lung cancer, which carries a high cure rate with surgery, on the order of 70% to 80%. The failure to repeat a CT scan rather than a chest x-ray in February 2000 represents substandard follow-up of the abnormal CT findings in January, especially in light of the concern that Mr. Harvey could have a cancer with an endobronchial mass as the cause of his symptoms, and abnormal films in December 1999 through January 2000. The failure to work up his continued symptoms of cough appropriately also represents substandard care with repeated failure to obtain follow-up films from January 2001 until June 2002.... The failure to diagnose his malignancy in early stage has greatly diminished any chance for long-term survival.

*See* Attachment F to Plaintiff's Exhibits in Support of his Opposition to the Defendant's Motion for Summary Judgment.

Dr. VanHoozen's expert report, dated July 26, 2005, was based upon his review of Plaintiff's medical records from September 26, 1991 through March 4, 2003, eight chest radiographs from September 2, 1993 through June 25, 2002, and written opinions provided by Defendant's experts. Dr. VanHoozen apparently did not receive these records until July 5, 2005. Dr. VanHoozen's report concludes, in pertinent part, that
For the most part, I believe you received excellent care while remanded to the Federal Bureau of Prisons. I do however believe that the community standard of care was breached during the period of December 23, 1999 through February 28, 2000. During this time you were appropriately recognized as being at risk for an endobronchial obstruction (such as a malignancy) producing the right upper lobe pneumonia. It was appropriately recommended by Dr. Tsuda and Dr. Kraus that you receive a chest CT scan and a bronchoscopy. However, despite the presence of enlarged mediastinal lymph nodes, it was felt by the consulting pulmonologist, Dr. O'Leary that a follow-up chest radiograph was sufficient to exclude malignancy.... I believe that it is quite likely that an early malignancy was present at the time of your pneumonia in December 1999. The cancelled bronchoscopy was a missed opportunity to uncover this. Likewise, a follow-up CT should have been done instead of the follow-up

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

chest radiograph in order to evaluate for persistent mediastinal adenopathy.

**\*7** *See* Attachment G to Plaintiff's Exhibits in Support of his Opposition to the Defendant's Motion for Summary Judgment.

## ANALYSIS

Defendant has moved, presumably pursuant to Fed.R.Civ.P. 37(c), to strike the expert reports of Dr. Bobolis and Dr. VanHoozen proffered on August 9, 2005 in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. The United States first argues that the reports were untimely in light of the expert disclosure deadlines established by this court. Moreover, Defendant contends that the July 2005 reports cannot be considerable "supplemental expert reports" because the December 2004 Synopses did not comply with the requirements of Rule 26(a)(2)(B). Finally, the United States argues that it will be prejudiced if the District Court considers expert reports that substantially expand upon the limited information provided in the December 2004 Synopses and the doctors' deposition testimony in March 2005.

Mr. Harvey responds that the United States waived any Rule 26(a)(2) objections to the December 2004 Synopses by withdrawing its earlier Motion to Compel Plaintiff to Supplement Expert Designations. In light of that waiver, Plaintiff presumed that "if the need arose, the Plaintiff could submit his expert reports in support of his Opposition to the summary judgment motion." *See* Plaintiff's Opposition to the Defendant's Motion to Strike, a 4. Plaintiff also argues that sanctions are unwarranted since his failure to comply with Rule 26(a)(2) was justified and non-prejudicial.

Rule 37(c)(1) of the Federal Rules of Civil Procedure states that where a party fails to make a disclosure required by Rule 26(a) or Rule 26(e)(1), that party may not use at trial any witness or information not so disclosed, unless the court determines that the failure to disclose was substantially justified or harmless. *See* Fed.R.Civ.P. 37(c)(1). The non-moving party has the burden of

showing that they were substantially justified in failing to comply with Rule 26(a) or Rule 26(e). *Nguyen v. IBP, Inc.,* 162 F.R.D. 675, 680 (D.Kan.1995). While Rule 37(c)(1) is written in mandatory terms, it also vests the court with discretion to impose "other appropriate sanctions" in addition to or in lieu of an order striking witnesses or evidence not properly disclosed. *See Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Co.,* 170 F.3d 985, 993 (10th Cir.1999) (recognizing that Rule 37(c) vests broad discretion with the trial court). *See also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001) (noting that the district court's discretion should be given particularly wide latitude in imposing sanctions under Rule 37(c)(1)); *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico,* 248 F.3d 29, 34 (1st Cir.2001) (holding that district courts have broad discretion in meting out Rule 37(c) sanctions for Rule 26 violations).

As a threshold matter, the court must determine whether Plaintiff Harvey has complied with his disclosure obligations under Rule 26(a) and (e). Sanctions under Rule 37(c) are not warranted in the absence of a failure to disclose.

### I. Plaintiff's Compliance with Rule 26(a)(2)

**\*8** Rule 26(a)(2) of the Federal Rules of Civil Procedure explicitly states that "a party shall disclose to other parties the identity of *any person* who may be used at trial to present evidence under Rule 702, 703, or 705 of the Federal Rules of Evidence." [FN3] *See* Fed.R.Civ.P. 26(a)(2)(A) (emphasis added). *See also Sullivan v. Glock, Inc.,* 175 F.R.D. 497, 501 (D.Md.1997) (even in the case of a "hybrid" witness who will provide both factual testimony and expert opinions, a party must still disclose that witness' identity under Rule 26(a)(2)(A)). When the expert is "a witness who is retained or specifically employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony," this disclosure obligation must take the form of a signed written report. *See* Fed.R.Civ.P. 26(a)(2)(B). A retained expert must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

provide a written report which includes, *inter alia*, " a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions." The written report should explain "how" and "why" the expert reached the opinions they intend to offer at trial. *See Reed v. Binder,* 165 F.R.D. 424, 428 n. 6 (D.N.J.1996) (an expert report should indicate " 'what' the expert say, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions to be expressed").

> FN3. In particular, Rule 702 provides that " a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *See* Fed.R.Evid. 702.

The Advisory Committee Notes to Rule 26(a)(2)(B) state that "a treating physician ... can be deposed or called to testify at trial without any requirement for a written report." *See* Advisory Committee Notes to 1993 Amendments to Fed.R.Civ.P. 26(a)(2)(B). The treating physician is offering testimony " because he was an actor or viewer with respect to transactions or occurrences that are a part of the subject matter of lawsuit." *Bucher v. Gainey Transportation Service of Indiana, Inc.,* 167 F.R.D. 387, 390 (M.D.Pa.1996). The Advisory Committee presumably felt that a written report from a treating physician would not be necessary because the treating physician prepares contemporaneous notes documenting his observations, findings and treatment regime. *See Sprague v. Liberty Mutual Ins. Co.,* 177 F.R.D. 78, 81 (D.N.H.1998) (observing that "unretained experts, who formed opinions from pre-litigation observation, invariably have files from which any competent trial attorney can effectively cross-examine"). *Cf. Lamere v. New York State Office for the Aging,* 223 F.R.D. 85, 89 (N.D.N.Y.2004) (a treating physician's medical

records prepared in the course of treatment "are, in essence, an early disclosure of opinions before a deposition or testimony is conducted").

The disclosure requirements under Rule 26(a)(2)(B) , however, should not turn on the expert's label or classification. It is the substance of the expert's testimony, not the status of the expert, which will dictate whether a Rule 26(a)(2)(B) report will be required. *See Gomez v. Rivera Rodriguez,* 344 F.3d 103, 113 (1st Cir.2003), citing *Patel v. Gayes,* 984 F.2d 214, 218 (7th Cir.1993).[FN4] Thus, a written report is appropriate when a treating physician intends to offer testimony at trial with regard to the applicable standard of care. *Harville v. Vanderbilt University, Inc.,* 2003 WL 22025028 (6th Cir.2003).

> FN4. Although *Patel* was decided prior to the 1993 Amendment to Fed.R.Civ.P. 26, the reasoning underlying that decision remains persuasive. *Zurba v. United States,* 202 F.R.D. 590, 592 ((N.D.Ill.2001). *Cf. Davoll v. Webb,* 194 F.3d 1116, 1138 (10th Cir.1999).

**\*9** The determinative issue is the scope of the proposed testimony. For example, a treating physician requested to review medical records of another health care provider in order to render opinion testimony concerning the appropriateness of the care and treatment of that provider would be specifically retained notwithstanding that he also happens to be the treating physician.
*Wreath v. United States,* 161 F.R.D. 448, 450 (D.Kan.1995). "A treating physician who has formulated opinions going beyond what was necessary to provide appropriate care for the injured party steps into the shoes of a retained expert for purposes of Rule 26(a)(2)." *Thomas v. Consolidated Rail Corp.,* 169 F.R.D. 1, 2 (D.Mass.1996). Similarly, when a treating physician's information or opinions were developed for trial, or where their expert testimony will concern matters not based on observations during the course of treatment, the treating physician will be required to prepare a written report. *See Washington v. Arapahoe County Department of Social Services,* 197 F.R.D. 439, 441-42

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 8

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

(D.Colo.2000). *See also Zarecki v. National Railroad Passenger Corp.,* 914 F.Supp. 1566, 1573 (N.D.Ill.1996) (rejecting plaintiff's argument that a treating physician was exempt from reporting requirement where the physician's testimony concerned professional opinions developed for trial).

Defendant apparently concedes that Drs. Bobolis and Dr. VanHoozen are treating physicians. Nevertheless, the December 2004 Synopses indicated that Dr. VanHoozen held the opinion that a failure to take "x-rays ... for nearly eighteen months, despite persistent coughing and congestion, ... did not comport with accepted medical practices." The summary of Dr. Bobolis' anticipated testimony was more equivocal. According to the December 2004 Synopses, Dr. Bobolis was aware of Mr. Harvey's prior treatment at FCI Englewood, and viewed as "unusual" the decision by the FCI Englewood medical staff "to continue to diagnosis and treat [Plaintiff] for pneumonia and bronchitis without having any x-ray to confirm or eliminate such diagnosis." A reasonable interpretation of the December 2004 Synopses would lead to the conclusion that Mr. Harvey anticipated eliciting expert opinions from these doctors concerning the appropriateness of care and treatment provided by a previous medical practitioner. Such opinions would trigger an obligation to prepare Rule 26(a)(2)(B) reports.

However, on December 21, 2004, the United States moved to withdraw its Motion to Compel Plaintiff to Supplement Expert Designations. In abandoning its challenge to the sufficiency of Plaintiff's December 2004 Synopses, Defendant indicated that it "does not intend to object to Plaintiff's submission of summaries with his treating physicians as violating Fed.R.Civ.P. 26(a)(2)." The pending motion to strike argues that Mr. Harvey cannot tender "supplemental" reports from Drs. Bobolis and VanHoozen because he did not file proper Rule 26(a)(2)(B) reports in the first instance. I do not find that argument persuasive. This court will not permit Defendant to belatedly revive its Rule 26(a)(2)(B) challenge to the sufficiency of the December 2004 Synopses. *Cf. Continental Industries, Inc. v. Integrated Logistics Solutions, LLC,* 211 F.R.D. 442, 444 (N.D.Okl.2002) (holding

that a failure to pursue remedies in a timely manner may result in a waiver of discovery violations).

**\*10** However, the recent submissions by Drs. Bobolis and VanHoozen clearly proffer opinions " in anticipate of litigation" that mandate compliance with Rule 26(a)(2)(B). Although Mr. Harvey's Synopsis stated that Dr. VanHoozen had been provided with copies of Plaintiff's medical records from FCI Englewood, Dr. VanHoozen testified that he had not reviewed any medical records from the Federal Bureau of Prisons while he was Mr. Harvey's treating physician from March to October 2004. Dr. VanHoozen also testified that since October 2004, he had not reviewed any medical records from the Bureau of Prisons. More significantly, Dr. VanHoozen testified that without reviewing Bureau of Prisons medical records, he did not have an opinion "to a reasonable degree of pulmonological probability regarding whether or not there was a breach of the standard of care in Mr. Harvey's treatment while he was at the Bureau of Prisons," and did not have any opinion "to a reasonable degree pf pulmonological probability that the medical care providers at the Bureau of Prisons failed to properly diagnose Mr. Harvey's lung cancer."

Dr. VanHoozen's letter of July 26, 2005 states that he did not receive Mr. Harvey's Bureau of Prisons medical records until July 5, 2005. The court can only infer that Dr. VanHoozen did not require these records in his capacity as Plaintiff's "treating physician" and that Dr. VanHoozen reviewed these records solely in anticipation of litigation.

Similarly, Dr. Bobolis's indicates in her letter of July 18, 2005 that Mr. Harvey has been under her care since April 29, 2004. In the same letter, Dr. Bobolis expresses certain opinions concerning perceived deficiencies in the medical care provided by Bureau of Prisons personnel, and states that her " conclusions are based on review of records from FCI Englewood and films from 1999 through 2002." During her deposition in March 2005, Dr. Bobolis stated that she had not seen any Bureau of Prison medical records concerning Mr. Harvey's care and treatment prior to January 31, 2001. It seems reasonable to conclude that Dr. Bobolis received

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

pertinent Bureau of Prisons medical records after her deposition and approximately a year after commencing her treatment of Mr. Harvey. Without information to the contrary, it appears that Dr. Bobolis did not review the FCI Englewood medical records for purposes of treating Mr. Harvey's Stage IV lung cancer, but rather in anticipation of providing expert testimony on the appropriate standard of care.

While it is possible that Drs. Bobolis and VanHoozen formed their "standard of care" opinions in the course of treating Mr. Harvey, the timing of events and the entire record casts considerable doubt on that possibility. To the contrary, the chronology of events indicates that the doctors formulated these pivotal opinions after their depositions and in anticipation of their appearance as a witness at trial. Plaintiff should have fully disclosed the opinions of Drs. Bobolis and VanHoozen pursuant to Rule 26(a)(2)(B) prior to their depositions. Mr. Harvey will not be sanctioned for this specific omission only because the United States elected to waive the violation by withdrawing its Motion to Compel Plaintiff to Supplement Expert Designation

### II. The Timeliness of Plaintiff's "Supplemental" Expert Reports

**\*11** As an alternative basis for relief, Defendant argues that the July 2005 reports of Drs. Bobolis and VanHoozen should be struck as untimely based upon deadlines set by this court. Defendant notes that the expert reports were provided more than nine months after the October 25, 2004 deadline for designation of affirmative experts.

Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice, in part, by minimizing surprise at trial. *United States ex rel. Schwartz v. TRW, Inc.,* 211 F.R.D. 388, 2002 WL 31688812 (C.D.Cal.2002). In that regard, the rationale for *timely* expert designations under Rule 26(a)(2) does not distinguish between retained and non-retained experts.
Formal disclosure of experts is not pointless.

Knowing the identity of the opponent's expert witnesses allows a party to properly prepare for trial. ... The failure to disclose experts prejudiced [Defendant] because there are countermeasures that could have been taken that are not applicable to fact witnesses, such as attempting to disqualify the expert testimony ..., retaining rebuttal experts, and holding additional depositions to retrieve the information not available because of the absence of a report.

*Musser v. Gentiva Health Services,* 356 F.3d 751, 757-58 (7th Cir.2004) (internal citations omitted).

The court must also acknowledge the important role a scheduling order plays in the management of its docket. *Cf. Washington v. Arapahoe County Department of Social Services,* 197 F.R.D. at 441 (noting that a "scheduling order is an important tool necessary for the orderly preparation of a case for trial"). *See also Rent-a-Center, Inc. v. 47 Mamaroneck Ave. Corp.,* 215 F.R.D. 100, 101 (S.D.N.Y.2003) ("scheduling orders are designed to offer a degree of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed and the case will proceed"). However, it appears that on or about October 22, 2004, Plaintiff identified Dr. Bobolis and Dr. VanHoozen as "the experts he may rely upon." While Defendant initially challenged the adequacy of Plaintiff's disclosures, Mr. Harvey identified these experts within the prescribed deadline. Once again, Defendant must suffer the consequences of its decision to withdraw the earlier motion to compel supplemental disclosures. Accordingly, I will not strike these expert reports as violative of deadlines set pursuant to Rule 16.

While the most recent reports from Drs. Bobolis and VanHoozen may not violate scheduling deadlines, Plaintiff has an independent obligation to comply with the requirements of Rule 26(e)(1). Even if the parties agreed to treat the December 2004 Synopses as the functional equivalent of a expert report under Rule 26(a)(2)(B), Plaintiff was required to supplement his December 2004 Synopsis when he realized that the disclosed information was incomplete or inaccurate, unless the additional or corrective information had been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

made known to the opposing party. With respect to an expert from whom a Rule 26(a)(2)(B) report is required, the duty to supplement includes both information provided in a written report, as well as information disclosed during the expert's deposition. *See* Fed.R.Civ.P. 26(e)(1). In this case, I find that Plaintiff failed to supplement his expert disclosures on a timely basis. Again, a chronological review of salient events is illuminating.

**\*12** Mr. Harvey was aware, as early as April 16, 2004 when he filed his Certificate of Review, that the applicable standard of care would be a pivotal issue in this case. On August 20, 2004, Plaintiff requested a two-month extension of the deadline for designating expert witnesses, stating that he needed "additional time to consult expert witnesses, supply them with the X-rays and reports involved in this case, and have them prepare their reports on the matters at issue in this civil action." Plaintiff's August 20th motion explicitly stated that his experts "will prepare reports regarding their expert opinions. " On December 15, 2004, the parties filed a Stipulated Motion to Amend Scheduling Order, which specifically noted that Mr. Harvey had not identified any physicians who "will render testimony regarding causation or standard of care."

Dr. VanHoozen's deposition testimony on March 31, 2005 departed, in significant respects, from the earlier Synopses provided by Plaintiff. Although Mr. Harvey's Synopses stated that Dr. VanHoozen had been provided with copies of Plaintiff's medical records from FCI Englewood, Dr. VanHoozen testified that he had not reviewed any medical records from the Federal Bureau of Prisons while he was Mr. Harvey's treating physician from March to October 2004. Dr. VanHoozen also testified that since October 2004, he had not reviewed any medical records from the Bureau of Prisons. More significantly, Dr. VanHoozen testified that without reviewing Bureau of Prisons medical records, he did not have an opinion "to a reasonable degree of pulmonological probability regarding whether or not there was a breach of the standard of care in Mr. Harvey's treatment while he was at the Bureau of Prisons," and did not have any opinion "to a reasonable degree pf pulmonological probability

that the medical care providers at the Bureau of Prisons failed to properly diagnose Mr. Harvey's lung cancer."

Dr. Bobolis' deposition testimony on March 29, 2005 was equally revealing. The December 2004 Synopses stated that Dr. Bobolis had been provided with medical reports from FCI Englewood. The Synopses also proffered that Dr. Bobilis had characterized as "unusual" certain treatment decisions made Bureau of Prison medical personnel. However, during her March 29, 2005 deposition, Dr. Bobolis testified that she had not seen any Bureau of Prisons medical records concerning Mr. Harvey's care and treatment prior to January 31, 2001. She further testified that without reviewing films and medical records dating back to Plaintiff's incarceration at FCI Englewood, she could not form an opinion as to whether there was a failure to diagnose Mr. Harvey's lung cancer while he was at that facility.

Notwithstanding the discrepancies between the witnesses' deposition testimony and the December 2004 Synopses, Plaintiff did not provide any supplementation prior to the filing of Defendant's motion for summary judgment on May 2, 2005. Interestingly enough, Mr. Harvey moved on April 12, 2005, to modify the existing scheduling, citing, in part, the need for "additional time to obtain empirical evidence regarding the standard of care in this case." Plaintiff claimed that the need for this " empirical evidence" had not become apparent "until recently." This claim of surprise seems remarkable in light of prior filings with the court. On May 17, 2005, I granted Plaintiff's motion in part and permitted Mr. Harvey to designate "two additional experts." However, I required these new experts to furnish written reports that fully complied with the requirements of Rule 26(a)(2)(B)

**\*13** On August 9, 2005, Plaintiff filed the exhibits in support of his Opposition to the Defendant's Motion for Summary Judgment. Included among those exhibits were supplemental reports from Dr. Bobolis and Dr. VanHoozen, dated July 18, 2005 and July 26, 2005, respectively. Apparently, Defendant received these supplemental reports for the first time on August 9, 2005, more than four

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

months after the doctors' depositions and three months after Defendant's motion for summary judgment was filed.

Under the circumstances, I conclude that Plaintiff failed to comply in a timely manner with the requirements of Rule 26(e)(1). Again, Rule 26(e)(1) requires a party to supplement disclosures when they "learn that in some material respect the information is incomplete or incorrect." *Cf. Tenbarge v. Ames Taping Tool Systems, Inc.,* 190 F.3d 862, 865 (8th Cir.1999) (noting that " discovery of expert opinion must not be allowed to degenerate into a game of evasion"). I find it difficult to believe that Mr. Harvey did not immediately perceive the contradictions between his December 2004 Synopses and his experts' deposition testimony. Mr. Harvey has offered no justification for this delay or good reason why Dr. Bobolis or Dr. VanHoozen could not have provided supplemental reports more expeditiously. *See Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 596 (4th Cir.2003) (in a case where plaintiff failed to timely disclose a supplemental opinion by its expert, the court noted that Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules as a precondition for imposing sanctions).

A party who fails to provide the required expert disclosures may not use at trial any witness not so disclosed, unless the court determines that the failure to disclose was substantially justified or harmless. *See* Fed.R.Civ.P. 37(c)(1). Sanctions should not be imposed under Rule 37(c)(1) where the failure to disclose was substantially justified or harmless. For purposes of Rule 37(c)(1), a party's failure to disclose is substantially justified where the non-moving party has a reasonable basis in law and fact, and where there exists a genuine dispute concerning compliance. *Nguyen v. IBP, Inc.,* 162 F.R.D. at 680. "Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure." *Id.*
The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court. A district court need not make explicit findings concerning the existence

of a substantial justification or the harmlessness of a failure to disclose. Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

**\*14** *Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Co.,* 170 F.3d at 993. The court remains mindful that exclusion of evidence is an drastic sanction. *Summers v. Missouri Pacific Railroad System,* 132 F.3d 599, 604 (10th Cir.1997).

Applying the *Woodworker's* factors to the record before the court, I conclude that Harvey's failure to comply with its obligations under Rule 26(e)(1) was not substantially justified. The court also does not find that Plaintiff's non-compliance was harmless. *Cf. Lintz v. American General Finance, Inc.,* 1999 WL 619045, \* 6 (D.Kan.1999) (noting that non-compliance is harmless only when there is no prejudice to the opposing party). In this case, Defendant has expended time and resources in preparing a motion for summary judgment that might have been avoided by timely production of Plaintiff's expert reports. *See Jones v. Thompson,* 996 F.2d 261, 264 (10th Cir.1993) (recognizing that delay and mounting costs can equate to prejudice). *See also Indemnity Insurance Company of North America v. American Eurocopter, LLC,,* 227 F.R.D. 421, 425 (M.D.N.C.2005) ("merely identifying a witness as an expert without requiring the identification of the opinions may render the depositions more difficult"). Certainly, Defendant is prejudiced by the need to re-depose Plaintiff's experts. Had Mr. Harvey supplemented his December 2004 Synopses in a timely manner, the United States would have been in a position to factor that additional information into its discovery plan, would have had that information available when the experts were deposed in March 2005, and could have taken that information in account in deciding whether to file a motion for summary judgment. *Cf. Perkasie Industries Corp. v. Advance Transformer, Inc.,* 143 F.R.D. 73, 76-77 (E.D.Pa.1992) (holding that a party is not permitted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

to postpone identifying the substance if its witnesses' testimony until a critical point in the proceedings at which it will become extremely burdensome for his opponent to prepare effectively to meet them). In weighing the element of prejudice or surprise, the court also will take heed of the purposes underlying Rule 26. "The importance of ... witness disclosures and the harms resulting from a failure to disclose need little elaboration." *Licciardi v. TIG Ins. Group.,* 140 F.3d 357, 363 (1st Cir.1998) (noting that Rule 26 is designed in part to eliminate unfair surprise).

As for the second and third *Woodworker's* factors, the court recognizes that a trial date has not been set in this case. That fact affords a greater ability to cure any prejudice to Defendant and minimizes the possibility of trial disruption. To suggest, however, that sanctions are not appropriate simply because the trial court can provide a further extension of time or delay the trial would effectively absolve Plaintiff of any responsibility to comply with his discovery obligations. Rule 26(a) and (e) are designed to facilitate case management and the discovery process. Certainly, Plaintiff's untimely supplementation has disrupted those objectives.

\*15 Finally, with respect to the fourth factor, Defendant has not offered any evidence that would demonstrate that Mr. Harvey's failure to comply with Rule 26(e)(1) was the product of bad faith or willfulness. However, Plaintiff's lack of bad faith alone may not be enough to overcome the other three factors. *Cf. Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 955 (10th Cir.2002), *cert. denied,* 537 U.S. 1066, 123 S.Ct. 623, 154 L.Ed.2d 555 (2002). Plaintiff should not be permitted to ignore his disclosure obligations and then avoid sanctions simply by claiming his deficiencies were not willful.

Consistent with the primary goal of Rule 37 sanctions, which is to deter misconduct, "the sanction imposed should be the least severe of those available, which appears adequate to deter and punish the wrongdoer." *Hite v. The PQ Corp.,* 1998 WL 895893, \*2 (D.Kan.1998). Defendant's motion requests an order striking the July 2005 expert reports of Dr. Bobolis and Dr. VanHoozen from Plaintiff's Response in Opposition to Motion for

Summary Judgment. After carefully considering the *Woodworker's* factors and the objectives underlying Rule 37(c), I find that the sanction specifically requested by the United States is not warranted under the facts in this case. *See Scott v. IBM Corp.,* 196 F.R.D. 233, 247 n. 9 (D.N.J.2000) (noting that exclusion of evidence under Rule 37(c) is not appropriate unless the resulting prejudice cannot be cured); *Comuso v. National Railroad Passenger Corp.,* 1998 WL 800342 \*2 (E.D.Pa.1998) (holding that the importance of the excluded testimony is also an important final consideration in considering Rule 37(c) sanctions). I conclude that a lesser sanction is sufficient to vindicate the interests underlying Rule 26(a) and (e).

In holding that sanctions are appropriate, the court acknowledges Plaintiff's *pro se* status and his medical condition. *See, e.g., Gaines v. Stenseng,* 292 F.3d 1222, 1224 (10th Cir.2002) (holding that *pro se* pleadings should be construed liberally and held to a less stringent standard than formal proceedings drafted by lawyers). This court has consistently recognized that Mr. Harvey's cancer creates certain complications that may not be experienced by other litigants. For example, I have repeatedly allowed Mr. Harvey to appear at hearings and other court proceedings by telephone. Indeed, Mr. Harvey has yet to physically appear for any proceedings before this court. I have also granted motions to extend deadlines based upon conflicting demands imposed by Plaintiff's medical condition. *See, e.g.,* Plaintiff's Motion for Extension of Time, dated August 20, 2004, and Plaintiff's Brief in Support of Motion to Modify Scheduling Order, dated April 12, 2005. However, once a *pro se* litigant is in court, he or she must conform to the relevant law and rules of court, including the Federal Rules of Civil Procedure. *See, e.g., Ogden v. San Juan County,* 32 F.3d 452, 455 (10th Cir.1994); *Moon v. Newsome,* 863 F.2d 835, 937 (11th Cir.1989).

### CONCLUSION

\*16 Accordingly, for the foregoing reasons, I will deny in part and grant in part Defendant United States of America's Motion to Strike Expert Reports

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 13

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**

of Dr. Kristie Bobolis and Dr. Brent VanHoozen, or in the alternative, Request to Redepose These Experts (Document # 102). The court will not strike the expert reports of Dr. Bobolis and Dr. VanHoozen, because I believe that sanction is unwarranted under the totality of circumstances. However, I will grant Defendant's motion to the extent it seeks leave to re-depose these experts. Each of those depositions will be limited to two hours in length.

Recognizing the additional costs that inevitably result from inefficient discovery, I will also require, as an appropriate sanction for Plaintiff's failure to comply with disclosure obligations under Rules 26, that Mr. Harvey pay the amount of $750 to defray a portion of the additional expense that may be incurred by the United States as a result of these additional depositions. *See Wasko v. Moore,* 2005 WL 226241, *3 (10th Cir.2005) (noting that even if a party "shows a total inability to pay, 'the court may assess a moderate sanction to deter future abusive litigation" '). *See also Dodd Insurance Services, Inc. v. Royal Insurance Co.,* 935 F.2d 1152, 1160 (10th Cir.1991) (noting that a party's professed inability to pay a monetary sanction is not an absolute bar; the party being sanctions has the burden of coming forward with evidence of their financial status or their inability to pay any sanction). I will stay this portion of the Memorandum Order for a period of 14 days to allow Plaintiff Harvey an opportunity to present evidence of his inability to pay the sanction imposed. Plaintiff will also be responsible for any fees charged by Dr. Bobolis or Dr. VanHoozen to prepare for and attend their second deposition. *Cf. Burton v. R.J. Reynolds Tobacco Co.,* 203 F.R.D. 636, 642 (D.Kan.2001). The court concludes that no other sanction is appropriate or necessary to achieve the objectives underlying Rules 26 and 37.

Defendant's motion also requests leave to file a renewed motion for summary judgment after re-deposing Dr. Bobolis and Dr. VanHoozen. In view of the grounds asserted in Defendant's motion for summary judgment and this court's ruling on the instant motion to strike, it would seem that the pending motion for summary judgment may be moot. Accordingly, Defendant is directed to file,

within ten (10) days of receipt of this Memorandum Order, a status report indicating whether the United States will persist with its pending motion for summary judgment or whether the United States will withdraw that motion in anticipation of re-deposing Drs. Bobolis and VanHoozen on their opinions concerning causation and standard of care. This obligation to provide a status report will not be effected by any objection which Mr. Harvey may assert to the sanctions imposed herein.

D.Colo.,2005.
Harvey v. U.S.
Slip Copy, 2005 WL 3164236 (D.Colo.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2836008 (Trial Motion, Memorandum and Affidavit) Defendant's Motion to Strike Expert Reports of Dr. Kristie Bobolis and Dr. Brent Van Hoozen, OR IN the Alternative, Request to Redepose these Experts (Sep. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2836012 (Trial Motion, Memorandum and Affidavit) Defendant's Motion to Strike Expert Report and Expert Testimony of Elisabeth Harvey (Sep. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2836015 (Trial Motion, Memorandum and Affidavit) Defendant's Reply in Support of Motion for Summary Judgment (Sep. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2836003 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply to the Defendant's Response to Objection to the Magistrate Judge's Decision Denying Plaintiff's Motion to Exclude Partial Transcripts Submitted by Defendant Or, in the Alternative, to Submit Complete Copies (Aug. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2835998 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Objection to the Magistrate Judge's Decision Denying Plaintiff's Motion to Exclude Partial Transcripts Submitted by Defendant Or, in the Alternative, to Submit Complete Copies (Aug. 5, 2005) Original Image of this Document (PDF)
• 2005 WL 2835994 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Aug. 2, 2005)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 14

Slip Copy, 2005 WL 3164236 (D.Colo.)
**(Cite as: Slip Copy)**


Original Image of this Document (PDF)
• 2005 WL 2835991 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Opposition to Defendant's
Motion for Summary Judgment (Aug. 1, 2005)
Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5



Slip Copy                                                                     Page 1

Slip Copy, 2006 WL 1134942 (W.D.Pa.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
INDIANA AREA SCHOOL DISTRICT, Plaintiff,
v.
H.H. and his Parents, Defendants.
**No. Civ.A. 04-1696.**

March 14, 2006.

Christina L. Lane, William Andrews, Andrews &
Price, Pittsburgh, PA, for Plaintiff.
Charles W. Jelley, Tremba, Jelley & Whelton, LLC,
Greensburg, PA, for Defendants.

*MEMORANDUM OPINION & ORDER*
AMBROSE, Chief J.
**\*1** This case is scheduled for a bench trial on March
27, 2006, on the issue of compensatory damages for
violations of the ADA and § 504 of the
Rehabilitation Act during the 2003-2004 school
year. *See,* Docket No. 56. Pending before the Court
is Defendants', H.H.'s and his parents', Motion *In
Limine* To Preclude Testimony and Strike the
Expert Report of William Penn Ed.D. (Docket No.
58). Plaintiff filed a response thereto. (Docket No.
62). Thus, the issue is ripe for review.

Defendants' Motion *In Limine* is based on *Daubert
v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579,
113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In
Daubert,* the Supreme Court held that:
[f]aced with a proffer of expert scientific testimony,
... the trial court judge must determine at the outset ..
. whether the expert is proposing to testify to (1)
scientific knowledge that (2) will assist the trier of
fact to understand or determine a fact in issue. This
entails a preliminary assessment of whether the
reasoning or methodology underlying the testimony
is scientifically valid and of whether that reasoning
or methodology properly can be applied to the facts
in issue.

*Daubert v. Merrell Dow Pharm., Inc., 509 U.S.
579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469*
(1992). In the Third Circuit, the trial court's role as
a "gatekeeper" announced in *Daubert* requires
proof that: (1) the proffered witness is qualified as
an expert; (2) the expert must testify about matters
requiring scientific, technical, or specialized
knowledge; and (3) the expert's testimony must "fit"
the facts of the case. *In re Paoli R.R. Yard PCB
Litigation,* 35 F.3d 717, 741-42 (3d Cir.1994). As
this case will proceed to a bench trial, the Court's " '
role as a gatekeeper pursuant to *Daubert* is arguably
less essential." ' *Clark v. Richman,* 339 F.Supp.2d
631, 648 (M.D.Pa.2004), *quoting Magistrini v. One
Hour Martinizing Dry Cleaning,* 180 F.Supp.2d
584, 596 n. 10 (D.N.J.2002) *(citing Cibbs v. Cibbs,
210 F.3d 491, 500 (5th Cir.2000); Volk v. United
States,* 57 F.Supp.2d 888, 896 n. 5 (N.D.Cal.1999)).

First, Defendants seek to exclude the testimony of
Dr. Penn that Plaintiff provided a FAPE because it
is contrary to conclusions made by this Court.
(Docket No. 58, ¶ 2). In response, Plaintiff
indicates that it offered the report of Dr. Penn prior
to this Court's rulings on the issue of a denial of a
FAPE. (Docket No. 62, p. 5, n. 3). Based on the
same, Plaintiff submits that it is now only offering
Dr. Penn as an expert to address the issue of pain
and suffering. *Id.* Thus, this issue is now moot.

Second, Defendants argue that Dr. Penn's report is
not reliable or fit to assist this Court. (Docket No.
58, ¶ 4; Docket No. 59, pp. 6-8). Specifically, with
regard to the only remaining issue of compensatory
damages, Defendants suggest that Dr. Penn omits
any reference to observing or assessing H.H.'s
educational or behavioral levels or losses. (Docket
No. 59, p. 7). This argument, however, goes to
weight, not admissibility.

**\*2** Third, Defendants ague that Dr. Penn is not an
expert. (Docket No. 58, ¶ 5; Docket No. 59, pp.
8-9). Based on a review of Dr. Penn's curriculum
vita, however, I disagree. *See,* Docket No. 59,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1134942 (W.D.Pa.)
**(Cite as: Slip Copy)**

Exhibit A. Dr. Penn is qualified as an expert to testify in this case as to the remaining issue of compensatory damages for violations of the ADA and § 504 of the Rehabilitation Act.

THEREFORE, this 14th day of March, 2006, after careful consideration of the pending Motion, it is Ordered that the Motion *in Limine* (Docket No. 58), is denied.

W.D.Pa.,2006.
Indiana Area School Dist. v. H.H.
Slip Copy, 2006 WL 1134942 (W.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182156 (Trial Motion, Memorandum and Affidavit) Brief in Opposition to Defendants' Motion in Limine to Preclude the Report and Testimony of Dr. William Penn (Mar. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1182155 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in Support of Motion in Limine Strike the Expert Report and to Preclude the Testimony of William Penn Ed.E. (Mar. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 825395 (Trial Motion, Memorandum and Affidavit) Brief in Response to Defendants' Motion for Partial Summary Judgment (Feb. 8, 2006)
• 2006 WL 825396 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Motion for Partial Summary Judgment (Feb. 8, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6



128 Fed.Appx. 839

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
(Cite as: 128 Fed.Appx. 839)

Page 1

**H**
Briefs and Other Related Documents

This case was not selected for publication in the Federal ReporterNOT PRECEDENTIALThis case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
In re: PHP HEALTHCARE CORPORATION,
Debtor,
PHP Liquidating, LLC, Appellant,
v.
*Charles H. Robbins; RJB Partners Profutures Fund Management, Inc.; Strome Hedge Cap Ltd; Strome Partners LP; Strome Offshore Ltd; Strome Suskind Hedge Cap LP; Lakeshore International Ltd; Kenneth L. Staub; Lisa I. Grove-Samuelson Trust B; Rachael K. Collins Trust B; J.F. Grove III Trust A; Earle E. Gales, Jr.; Deere Park Capital Management, LLC; Elara Ltd; Canadian Imperial Holdings; Sil Nominees Ltd; Bear Stearns Securities Corp.; Watt Family Property; Fortune Fund Ltd; Robert Charles Ketner; Kirk Whillock; Judy Willock; Oh Sharma; Bhagyawati Sharma; Caldwell & Orkin Market Opportunity Fund # 1; Jill Brooks Milberg; Dennis Decret; Tom Teters; Mary K. Carpenter; Robert F. Carpenter; John P. Cole; Linda D. Cole; Ward T. Bell & Associates, Inc. Profit Sharing Plan; William L. Todd; Allen Mendler; Paul Cole; Paul Mandragona; Carmella G. Mandragona; Terry W. Hunt; Randall A. Konsker; Carol R. Bounds; Mary Jerkins; Berwin C. Jerkins; R2 Investments; Q Funding LP; Harry Metherian, Jr.; Jolana Metherian; Metherian Family Living Trust; Maria Calvert; Ohio State Systems Small 384; Big Capital Partners LP; Executive Nurse Home Care, Inc.; Walker Smith Capital LP; Jeanne Marcari; John Does 1-500; ABC Corps 1-500; Robert Konsker; Profutures

Special Equities Fund LP, *(Amended pursuant to Court's 07/28/04 Order).
No. 03-3972.

Argued Jan. 20, 2005.
Decided March 3, 2005.

**Background:** As assignee of claims of Chapter 11 debtor-in-possession and unsecured creditors, liquidator of debtor's assets sued debtor's shareholders and former shareholders, seeking to recover consideration paid in series of stock redemption transactions authorized by debtor's board of directors. The United States District Court for the District of Delaware, Joseph J. Farnan, Jr., J., 291 B.R. 592 and 291 B.R. 603, granted former shareholders' motions to dismiss. Liquidator appealed.

**Holdings:** The Court of Appeals held that:

1(1) Delaware law governed liquidator's claims;

2(2) liquidator lacked standing, as assignee of creditors' claims, to assert claim under state statute governing stock redemptions;

3(3) absence of allegation that shareholders knew that debtor's capital was impaired when they redeemed stock precluded claims by liquidator, as debtor's assignee, under state statute governing stock redemptions; and

4(4) liquidator failed to state fraudulent transfer claims.

Affirmed.

West Headnotes

**[1] Contracts 95 ⚬⚬129(1)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839                                                                                                    Page 2

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
**(Cite as: 128 Fed.Appx. 839)**

95 Contracts
   95I Requisites and Validity
     95I(F) Legality of Object and of Consideration
       95k129 Obstructing or Perverting Administration of Justice
         95k129(1) k. Agreements Relating to Actions and Other Proceedings in General. Most Cited Cases

**Corporations 101 ⚷640**

101 Corporations
   101XVI Foreign Corporations
     101k640 k. Subjection to Same Requirements as Imposed by Home State. Most Cited Cases
Transactions involving redemption of Chapter 11 debtor's stock qualified as internal affairs of debtor for purposes of internal affairs doctrine, which required that laws of state of incorporation govern matters peculiar to relationships among or between corporation and its officers, directors, and shareholders, given allegations that debtor, a Delaware corporation, violated Delaware law because it had no surplus when it redeemed stock or because redemptions impaired debtor's capital, and therefore Delaware law governed claims in which debtor's assignee sought to recover consideration paid in redemption transactions, despite choice-of-law provision in stock purchase agreement indicating that Virginia law applied. Restatement (Second) of Conflict of Laws § 302 comment.

**[2] Bankruptcy 51 ⚷2154.1**

51 Bankruptcy
   51II Courts; Proceedings in General
     51II(B) Actions and Proceedings in General
       51k2154 Rights of Action by or on Behalf of Trustee or Debtor
         51k2154.1 k. In General. Most Cited Cases
To the extent that Delaware statute governing redemption of corporate stock created private right of action on creditor's behalf, it created general right of action seeking to redress injury common to all creditors, and therefore liquidator of Chapter 11 debtor-corporation's assets did not have standing, as

assignee of creditors' claims, to assert claim under statute challenging debtor's stock redemption transactions; individual creditor could not assert general claim belonging to all creditors, and liquidator's standing as assignee extended only as far as creditor-assignor's standing. 8 Del.C. § 160(a)(1).

**[3] Bankruptcy 51 ⚷2154.1**

51 Bankruptcy
   51II Courts; Proceedings in General
     51II(B) Actions and Proceedings in General
       51k2154 Rights of Action by or on Behalf of Trustee or Debtor
         51k2154.1 k. In General. Most Cited Cases
Even if Delaware statute gave debtors-in-possession (DIPs) or their assignees implied right to sue stockholders who received payments for unlawful stock redemptions, it did so only as to those stockholders who received payments with knowledge of facts indicating that redemptions were unlawful, and therefore absence of allegation that shareholders of Chapter 11 debtor-corporation knew that debtor's capital was impaired when shareholders redeemed their stock precluded claims under statute in which debtor's assignee sought to recover from shareholders consideration paid in disputed redemption transactions. 8 Del.C. § 174(c)
.

**[4] Bankruptcy 51 ⚷2724**

51 Bankruptcy
   51V The Estate
     51V(H) Avoidance Rights
       51V(H)2 Proceedings
         51k2724 k. Pleading. Most Cited Cases
Liquidator of Chapter 11 debtor's assets failed to state claims for fraudulent transfer against debtor's founder and members of founder's family under Bankruptcy Code and Delaware law, given absence of allegation that debtor redeemed stock of founder and family members with actual intent to defraud creditors, or that debtor received less than reasonably equivalent value for redeemed stock. Bankr.Code, 11 U.S.C.A. § 548(a)(1)(A, B); 6 Del.C. § 1301 et seq.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839                                                                                            Page 3

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
**(Cite as: 128 Fed.Appx. 839)**

**[5] Bankruptcy 51 ☜2650(2)**

51 Bankruptcy
   51V The Estate
      51V(F) Fraudulent Transfers
         51k2650 Consideration
            51k2650(2) k. "Reasonably Equivalent
Value" in General. Most Cited Cases

**Corporations 101 ☜548(9)**

101 Corporations
   101XII Insolvency and Receivers
      101k548 Creditors' Suits
         101k548(9) k. Evidence. Most Cited Cases
Market price information for Chapter 11
debtor-corporation's stock at time of challenged
stock redemption established that debtor received
reasonably equivalent value for its stock, given that
contemporaneous market price for debtor's stock
exceeded consideration paid to debtor's
shareholders, and therefore transactions did not
support fraudulent transfer claims under Bankruptcy
Code or Delaware law. Bankr.Code, 11 U.S.C.A. §
548(a)(1)(B); 6 Del.C. § 1301 et seq.

**\*841** On Appeal from the United States District
Court for the District of Delaware. Dist. Court
Civil Action No. 01-236. District Judge: The
Honorable Joseph J. Farnan, Jr.

Gerald H. Gline (Argued), Cole, Schotz, Meisel,
Forman & Leonard, P.A., Hackensack, New Jersey,
Neal J. Levitsky, Fox Rothschild, Wilmington,
Delaware, for Appellants.
Thomas J. Allingham II (Argued), Darryl A. Parson
, Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware, Michael Wooley (Argued),
Potter Anderson & Corroon LLP, Wilmington,
Delaware, Thomas G. Macauley (Argued),
Zuckerman Spaeder LLP, Wilmington, Delaware,
Laurie S. Silverstein, William A. Hazeltine, Potter,
Anderson & Corroon, Wilmington, Delaware,
Michael Woolley, **\*842** Mark D. Kotwick, Seward
& Kissel, New York, New York, Andrew R. Lee,
Jones, Walker, Waechter, Poitevent, Carrere &
Denegre, New Orleans, Louisiana, William M.
Kelleher, Ballard, Spahr, Andrews & Ingersoll,

Wilmington, Delaware, Thomas C. Marconi,
Wilmington, Delaware, for Appellees.

Before ALITO, MCKEE, and SMITH, Circuit
Judges.

OPINION

PER CURIAM.
**\*\*1** The various Defendants in this action all moved
to dismiss the Amended Complaint dated April 4,
2002 ("the Amended Complaint") for failure to
state a claim upon which relief can be granted. The
District Court granted those Motions in several
Orders and dismissed the Amended Complaint with
prejudice. For the reasons set forth below, we
affirm those Orders.

I.

PHP Healthcare Corporation ("PHP" or "the Debtor
"), a Delaware corporation, filed a voluntary
petition for relief under Chapter 11 of the
Bankruptcy Code on November 19, 1998.
Plaintiff-Appellant PHP Liquidating LLC ("the
Liquidating Company") was established on October
12, 1999, pursuant to the Second Amended Plan of
Liquidation ("the Plan"), to liquidate the assets of
PHP for the benefit of the Liquidating Company's
members, the creditors of PHP. With exceptions not
relevant here, the Liquidating Company is the
assignee of all rights, titles, interests and causes of
action that PHP possesses as the
debtor-in-possession. As such, the Liquidating
Company has the express power to investigate,
pursue, compromise or dismiss any and all such
causes of action. Pursuant to the Plan, creditors
were also given the option to assign and transfer to
the Liquidating Company their claims and causes of
action. Many of PHP's creditors assigned their
claims to the Liquidating Company.

The Liquidating Company filed suit in federal
district court in Delaware against certain
stockholders and former stockholders of PHP,
seeking to recover the consideration paid in a series
of stock redemption transactions authorized by
PHP's Board of Directors. Soon after the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
(Cite as: 128 Fed.Appx. 839)

Liquidating Company filed its Amended Complaint, the Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The District Court granted their various motions in three separate Orders and explained those Orders in two separate Opinions. The District Court did not say in so many words that it dismissed the Amended Complaint "with prejudice," but the import of the Opinions and Orders seem clear. Moreover, in the absence of a clear statement to the contrary, a dismissal pursuant to Rule 12(b)(6) should be presumed to be made with prejudice. *See United States ex rel. Karvelas v. Melrose Wakefield Hospital,* 360 F.2d 220, 241 (1st Cir.2004) (stating First Circuit rule that "in the absence of a clear statement to the contrary, a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is presumed to be with prejudice.") This appeal followed.

II.

[1] Defendant Robbins argues that Virginia law, not Delaware law, governs claims arising from his stock redemption transactions because the Stock Purchase Agreement between Robbins and PHP contains a Virginia choice of law provision. The Liquidating Company argues that Delaware law controls because the Stock Purchase Agreement is trumped by the "internal affairs" doctrine, which requires that the laws of the state of incorporation govern " matters peculiar to the relationships *843 among or between the corporation and its current officers, directors, and shareholders." *See Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

**2 When two states have a connection to a case and an issue arises on which the states' respective laws differ, a choice of law must be made. Because there is no "significant conflict between some federal policy or interest and the use of state law," we will not recognize a federal rule of decision. *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87-88, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (internal quotation marks and citation omitted); *see also Resolution Trust Corp. v. Forest Grove, Inc.,* 33 F.3d 284 (3d Cir.1994) (discussing *O'Melveny* ). Instead, we will adopt the choice of law rule of

Delaware-the state in which the Bankruptcy Court resides. *See In re Merritt Dredging Co.,* 839 F.2d 203, 206 (4th Cir.) (applying choice of law rules of state in which federal bankruptcy court resided), *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988). Delaware recognizes the internal affairs doctrine. *McDermott Inc. v. Lewis,* 531 A.2d 206, 215 (Del.1987). Thus the question presented is whether the current dispute is an " internal affair."

The Restatement (Second) of Conflict of Laws explains the doctrine by offering examples of internal affairs "which involve primarily a corporation's relationship to its shareholders":
[S]teps taken in the course of the original incorporation, the election or appointment of directors and officers, the adoption of by-laws, the issuance of corporate shares, preemptive rights, the holding of directors' and shareholders' meetings, methods of voting including any requirement for cumulative voting, shareholders' rights to examine corporate records, charter and by-law amendments, mergers, consolidations and reorganizations and the reclassification of shares. Matters which may also affect the interests of the corporation's creditors include the issuance of bonds, the declaration and payment of dividends, loans by the corporation to directors, officers and shareholders, and the purchase and *redemption by the corporation of outstanding shares of its own stock.*

Restatement (Second) of Conflict of Laws § 302 cmt. a (1971) (emphasis added). *See also Cohn v. Mishkoff-Costello Co.,* 256 N.Y. 102, 175 N.E. 529 (1931) (court refused to hear case against Indiana corporation where plaintiffs claimed corporation was under a duty to redeem their stock because such an issue was an internal affair of the corporation and thus ought be decided by the state of incorporation); *Miesse v. Seiberling Rubber Co.,* 264 A.D. 373, 35 N.Y.S.2d 504 (1942) (court refused to require a Delaware corporation, which was being reorganized in Delaware, to redeem preferred stock in accordance with its certificate of incorporation since such action involved internal affairs of corporation); *In re Integra Realty Resources, Inc.,* 198 B.R. 352 (Bankr.D.Colo.1996) ("[T]he question of unlawful dividends relates

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
**(Cite as: 128 Fed.Appx. 839)**

directly to the administration of corporate affairs."). Some courts have held that a stock redemption is not an internal affair where the redemption is subject to a definitive contract between the corporation and one of its shareholders. *See Borst v. East Coast Shipyards,* 105 N.Y.S.2d 228 (Sup.Ct.1951) (in action by preferred stockholder against New Jersey corporation to recover redemption price of preferred stock together with accumulated dividends, court held such action did not involve matters pertaining to internal management of foreign corporation, and New York court would assume jurisdiction). Here, however, the contract at issue**844** and the result of this action may affect indirectly the rights of non-parties to the contract; it is alleged that PHP violated Delaware law either because PHP had no surplus when it redeemed its stock, or, in the alternative, because the redemption impaired PHP's capital. For this reason the redemptions at issue qualify as internal affairs of PHP. *See Lakeman Realty Corp. v. Sunny Isles Ocean Beach Co.,* 5 Misc.2d 471, 160 N.Y.S.2d 947 (Sup.Ct.1957) (suit for redemption of preferred stock and payment of accrued dividends to one stockholder might place Florida corporation under duty to all holders, which might impair capital or necessitate a change in the structure, which would involve the internal affairs of the corporation and thus should be regulated by the state of incorporation); *Prescott v. Plant Industries, Inc.,* 88 F.R.D. 257 (S.D.N.Y.1980) (citing *Lakeman* and discussing internal affairs doctrine in general).

**3 Because PHP is a Delaware corporation and the Liquidating Company's dispute with Robbins falls within the internal affairs doctrine, Delaware law controls.

### III.

In deciding a motion to dismiss under Rule 12(b)(6), we exercise plenary review. *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 183 (3d Cir.2000). Our role is to assess the legal feasibility of the Amended Complaint, not to weigh the evidence offered in its support. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80

(1957). Accordingly, we accept as true all facts alleged in the Amended Complaint and draw all reasonable inferences in the Liquidating Company's favor. *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). We also may consider facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence, such as stock prices on the New York Stock Exchange. *In re NAHC, Inc. Securities Litigation,* 306 F.3d 1314, 1331 (3d Cir.2002) (judicial notice of stock price data compiled by Dow Jones News service); *Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594, 600 n. 3 (3d Cir.2002) (judicial notice of stock prices reported by Quotron Chart Services). However, if it is clear that the Liquidating Company will not be able to prove facts sufficient to support a valid legal claim, and thus further amendment would be futile, then the Amended Complaint may be dismissed. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Lake v. Arnold,* 232 F.3d 360, 373-374 (3d Cir.2000).

### IV.

[2] Count I of the Amended Complaint alleges that PHP violated Section 160(a)(1) of the Delaware General Corporation Law ("DGCL") either because PHP had no surplus when it redeemed its stock from the Defendants, or, in the alternative, because the redemption impaired PHP's capital. The Liquidating Company seeks to recover from the Defendants, current and former shareholders of PHP, the proceeds of these allegedly illegal stock redemption transactions. Because we are reviewing a motion to dismiss, we assume that the Liquidating Company's factual allegations are correct: one way or the other, PHP violated Section 160 when it purchased Defendants' shares. Thus the issue presented is whether the Liquidating Company may sue Defendants for PHP's violation of Section 160. We conclude that the Liquidating Company cannot sue, regardless of whether it asserts its rights as the assignee of the creditors or as the assignee of the debtor-in-possession.

As a creditor's assignee, the Liquidating Company's standing only extends as far as its creditor's standing, and an individual *845 creditor of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
**(Cite as: 128 Fed.Appx. 839)**

debtor may not assert a general claim belonging to all creditors. *Board of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 169 (3d Cir.2002) ("[O]nce a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.' ") (citation omitted); *see also, e.g., St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 701 (2d Cir.1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action.").

**\*\*4** If Section 160 creates a private right of action, it is a general right of action that seeks to redress an injury common to all creditors. Section 160 in its entirety reads as follows:
(a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; provided, however, that no corporation shall:
(1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock, or, if no shares entitled to such a preference are outstanding, any of its own shares, if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title. Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of a corporation given by it as consideration for its acquisition by purchase, redemption or exchange of its shares of stock if at the time such note, debenture or obligation was delivered by the corporation its capital was not then impaired or did not thereby become impaired;
(2) Purchase, for more than the price at which they may then be redeemed, any of its shares which are

redeemable at the option of the corporation; or
(3) Redeem any of its shares unless their redemption is authorized by subsection (b) of § 151 of this title and then only in accordance with such section and the certificate of incorporation.
(b) Nothing in this section limits or affects a corporation's right to resell any of its shares theretofore purchased or redeemed out of surplus and which have not been retired, for such consideration as shall be fixed by the board of directors.
(c) Shares of its own capital stock belonging to the corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes. Nothing in this section shall be construed as limiting the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.
(d) Shares which have been called for redemption shall not be deemed to be outstanding shares for the purpose of **\*846** voting or determining the total number of shares entitled to vote on any matter on and after the date on which written notice of redemption has been sent to holders thereof and a sum sufficient to redeem such shares has been irrevocably deposited or set aside to pay the redemption price to the holders of the shares upon surrender of certificates therefor.

**\*\*5** Even if we assume for the sake of argument that the statute implicitly creates a private right of action for creditors, it certainly does not distinguish between creditors, or even mention reliance or specific damages. Moreover, the previous versions of Section 160 and the various amendments to it (in 1967, 1970, 1973, 1974, and 1996) do not reveal pertinent ambiguities or shades of meaning that contradict the initial reading. *See* 8 Del. C.1953, § 160; 56 Del. Laws, c. 50 (1967); 57 Del. Laws, c. 649, § 1 (1970); 59 Del. Laws, c. 106, § 3 (1973); 59 Del. Laws, c. 437, § 9 (1974); 70 Del. Laws, c. 349, § 3 (1996). And at all events, the Liquidating Company does not allege reliance or specific harm; its claim is a general one which, if it can be brought, would be equally available to any creditor of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
**(Cite as: 128 Fed.Appx. 839)**

debtor. Thus, the Liquidating Company does not, as a creditor's assignee, have standing to assert its claim.

[3] As the District Court observed, however, there is some indication that a debtor-in-possession or its assignee could sue certain stockholders under Section 174. Subsection (c) provides that a director "against whom a claim is successfully asserted under [subsection(a) ] is entitled" to bring suit against certain stockholders, and the way subsection (c) describes a director's right of action suggests that a corporation's assignee may bring suit against such stockholders too. Subsection (c) states:

Any director against whom a claim is successfully asserted under this section shall be entitled, to the extent of the amount paid by such director as a result of such claim, to be subrogated to *the rights of the corporation against stockholders* who received the dividend on, or assets for the sale or redemption of, their stock with knowledge of facts indicating that such dividend, stock purchase or redemption was unlawful under this chapter, in proportion to the amounts received by such stockholders respectively.

8 Del. C. § 174(c) (emphasis added). On its face, this text does not "provide that anyone, apart from the director, can assert the rights of the corporation." Barbara Black, *Corporate Dividends and Stock Repurchases* § 4.33 (2003). One court, however, has ruled that a corporate right of action exists under Delaware law against any shareholders who knowingly received an unlawful dividend. *See In re Integra Realty Resources, Inc.,* 198 B.R. 352, 365 (Bankr.D.Colo.1996). This interpretation of Section 174 makes sense; it would be strange if a third-party who profited from an injury was liable to the victim, but only the person who inflicted that injury could vindicate the victim's rights.

But if Section 174 creates or recognizes a right of debtors-in-possession to sue stockholders who receive payments for unlawful stock redemptions, it does so only against those stockholders "with knowledge of facts indicating that such [  ] redemption was unlawful."

The Amended Complaint does not allege Defendants knew PHP's capital was impaired when they redeemed their stock, and at oral argument counsel for the Liquidating Company admitted that his client probably *could not* allege Defendants knew. Thus Counsel was unable to represent that such an allegation would be **847** made if further pleading were allowed. Accordingly, even if Section 174 does imply a right of action by debtors-in-possession or their assignees against shareholders who knowingly receive unlawful stock redemptions, Section 174 does not give *this* Plaintiff a cause of action against *these* Defendants. The Liquidating Company has indicated that it cannot allege its claim differently, and an implied remedy applicable to the present case as alleged would subvert the statutory scheme.

V.

**6 The only Defendants charged with Count II were ProFutures Special Equities Fund, L.P., ProFutures Fund Management, Inc., Charles H. Robbins ("Robbins"), the founder and former Chairman of PHP, and members of Robbins's family. After filing briefs in this appeal, the ProFutures entities settled with the Liquidating Company. Thus the only Defendants still in the action charged with Count II are Robbins and his family. Count II of the Amended Complaint asserts that the redemption transactions between PHP and the Robbins Family were fraudulent transfers of property under 11 U.S.C. § 548 and 6 Del. C. § 1301, *et seq.* We need not discuss the provisions of the Delaware Fraudulent Transfer Act, 6 Del. C. § 1301 *et seq.* (2002) because they are substantially the same as the relevant parts of the Bankruptcy Code. *Compare* 11 U.S.C. § 548 (2002) *with* 6 Del. C. §§ 1302 -1306 (2002).

[4] To properly plead a fraudulent transfer claim against the Robbins Family, the Liquidating Company would have had to allege either, pursuant to Section 548(a)(1)(A), that the debtor redeemed the stock with actual intent to defraud creditors or, pursuant to Section 548(a)(1)(B), that (i) PHP received less than a reasonably equivalent value for the stock and (ii) that PHP was insolvent on the date

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
**(Cite as: 128 Fed.Appx. 839)**

Page 8

of the redemptions or was rendered insolvent by the redemptions. The Liquidating Company does not meet the requirements of Section 548(a)(1)(A) because it does not plead actual intent; the Liquidating Company does not meet the requirements of Section 548(a)(1)(B)(ii) because it does not plead that PHP received less than a reasonably equivalent value for the stock. Count II is therefore facially deficient with respect to the Robbins family.

[5] The Liquidating Company claimed for the first time that PHP received less than reasonably equivalent value from the Robbins Family only in its brief in response to the family's motion to dismiss. While counsel may "clarify" a pleading through subsequent briefing, a lawyer's statement in a response brief is no substitute for adequately pleaded facts in a complaint, and a memorandum cannot provide allegations that are wholly absent from the Amended Complaint. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 n. 9 (3d Cir.2002).

The Liquidating Company offered no allegation of fact in its Amended Complaint as to the value of the shares received by PHP except the market price information. This information only supports Robbins's position, for it is undisputed that the contemporaneous price of PHP's stock on the NYSE exceeded the consideration paid to the Robbins Family. In this context the District Court was right to conclude that the Liquidating Company had not properly pleaded its fraudulent transfer claim.

Admittedly, the District Court did not explain how its result complied with this Circuit's procedure for evaluating whether reasonably equivalent value is exchanged in a particular transaction. It would have been better if the District Court had done so. In *848Mellon Bank v. The Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139 (3d Cir.1996), we held that a court must "make an express factual determination as to whether the debtor received any value at all" from the challenged transaction, keeping in mind that "the price a debtor paid, in and of itself, reveals nothing about whether the debtor received

something of actual 'value.' " *Id.* at 149. In that determination, "[t]he touchstone is whether the transaction conferred realizable commercial value on the debtor...." *Id.* (emphasis omitted), quoting *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 647 (3d Cir.1991). Once that determination is made, if the court has concluded that the debtor did, in fact, receive something of actual value, then the court must then apply a " totality of the circumstances test" to evaluate whether the value received was reasonably equivalent to the value the debtor relinquished. *Id.* at 154. The "fair market value" of services rendered or goods purchased is part of the totality of the circumstances, but other things may be relevant as well, such as whether the debtor and the transferee had an arm's-length relationship at the time of the transaction and whether the transaction was conducted in good faith by the transferee. *See id.* at 149. The fair market value of services rendered or goods purchased is not, by itself, " conclusively determinative" of reasonably equivalent value. *See id.* at 150.

**7 However, although the District Court did not explain how its decision conformed to the two-part *RML* test, the record below supports a decision to dismiss with prejudice for at least two reasons. First, the Liquidating Company did not plead or even argue in its brief that the market was being manipulated at the time of the redemption, nor did it offer any other reason why the market price for PHP stock might have been inaccurate. Given that the Liquidating Company has already been granted leave to amend its complaint once, the Liquidating Company's failure suggests that it cannot prove facts sufficient to support a valid fraudulent conveyance claim. Second, counsel for the Liquidating Company admitted at oral argument that his client probably could not allege, in support of Count I of its complaint, that PHP's shareholders and former shareholders knew facts indicating their stock redemption was unlawful. Robbins and his family are charged with Count I, so this admission applies to them. An unlawful stock redemption is a redemption made while a company is insolvent, or a redemption that renders a company insolvent. If the Liquidating Company cannot allege that Robbins and his family knowingly received a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 839                                                                                      Page 9

128 Fed.Appx. 839, 2005 WL 488785 (C.A.3 (Del.))
**(Cite as: 128 Fed.Appx. 839)**

redemption while PHP was insolvent, or a
redemption that rendered PHP insolvent, it is hard
to see how the Liquidating Company could allege
that Robbins and his family entered into the
redemption transactions in bad faith.

In this context we conclude that the stock the debtor
redeemed from Robbins and his family for $16.75
per share had realizable commercial value, and that
the lowest market price on the day of the
transaction-$17.50 per share-was a fair measure of
that value. PHP stock traded on the New York
Stock Exchange, one of the most efficient capital
markets in the world. In the absence of any
evidence of manipulation or bad faith we are
comfortable presuming that stock the New York
Stock Exchange values at $17.50 per share is not
only of some actual value, however small, but also
of a value reasonably equivalent to $17.50 per
share, or, barring that, at least $16.75 per share.

C.A.3 (Del.),2005.
In re PHP Healthcare Corp.
128 Fed.Appx. 839, 2005 WL 488785 (C.A.3
(Del.))

Briefs and Other Related Documents (Back to top)

• 03-3972 (Docket) (Oct. 08, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7



Not Reported in A.2d

Not Reported in A.2d, 2004 WL 550750 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re THE WALT DISNEY COMPANY Derivative
Litig.
**No. Civ.A.15452-NC.**

March 9, 2004.

Dear Counsel:

CHANDLER, J.
*1 This letter concerns the individual defendants'
motion to preclude the proposed expert testimony
of Professor Deborah A. DeMott. In her expert
report, Professor DeMott states that "the defendants
... breached their fiduciary duties...." FN1 As the
parties are well aware, that is the legal issue
presented in this case.FN2 After considering the
parties' briefs and upon thorough review of
Professor DeMott's report, I find that her proposed
testimony is inadmissible for three reasons.

> FN1. Individual Defendants' Motion to
> Preclude the Proposed Expert Testimony
> of Deborah A. DeMott, Ex. A (Expert
> Report of Professor DeMott), at ¶ 5.
> Plaintiffs state that there are other opinions
> in the report, but after reviewing its
> contents, I find that the "other" opinions
> are merely reformulations of the same
> basic conclusion.

> FN2. *In re The Walt Disney Co. Derivative
> Litig.,* 825 A.2d 275, 277-78 (Del.
> Ch.2003).

First, "it is exclusively within the province of the
trial judge to determine issues of domestic law." FN3
In this Court, witnesses do not opine on
Delaware corporate law.

> FN3. *Itek Corp. v. Chicago Aerial Indus.,
> Inc.,* 274 A.2d 141, 143 (Del.1971). *See
> also North American Philips Corp. v.
> Aetna Cas. and Sur. Co.,* 1995 WL
> 628447, at *3 (Del.Super.Apr. 22, 1995)
> (Delaware law requires "exclusion of
> expert testimony that expresses a legal
> opinion"); *State v. Hodges,* 1996
> Del.Super. LEXIS 391, at *4
> (Del.Super.Sept. 10, 1996) (same).
> Plaintiffs bear the burden of demonstrating
> that Professor DeMott's proposed
> testimony is admissible. *Bourjaily v.
> United States,* 483 U.S. 171, 175 (1987);
> *Minner v. American Mortgage & Guar.
> Co.,* 791 A.2d 826, 843 (Del.Super.2000).

Second, Professor DeMott's proposed expert
testimony does not satisfy D.R.E. 702. Rule 702
requires that expert testimony "assist the trier of
fact to understand the evidence or to determine a
fact in issue." The Supreme Court has stated that "if
[the trier of fact], without the assistance of the
expert, [is] as capable of answering a question as an
expert, then the expert's opinion would not be
helpful and is not admissible under D.R.E. 702." FN4
After fifteen years of service on the Court of
Chancery, I certainly hope that I am
capable-without the assistance of Professor
DeMott's testimony-of answering whether the
individual defendants breached their fiduciary
duties.

> FN4. *Jolly v. State,* 670 A.2d 1338
> (TABLE), 1995 WL 715868, at *1 (Del.
> Nov. 22, 1995).

Third, D.R.E. 704 does not compel the admission of
Professor DeMott's proposed expert testimony. Rule
704 states that opinion testimony is not
objectionable "merely because it embraces an
ultimate issue." FN5 In this case, I find Professor
DeMott's proposed testimony inadmissible not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2

Not Reported in A.2d, 2004 WL 550750 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*merely* because it embraces an ultimate issue, but
also because it embraces applicable domestic law.
Consistent with Rule 704, *Itek* prohibits such
testimony. [FN6]

> FN5. D.R.E. 704 (emphasis added).

> FN6. D.R.E. 704 cmt.

Plaintiffs argue that the individual defendants'
motion is premature, but I fail to see how Professor
DeMott's testimony will become any more
admissible three months from now. Moreover,
following the close of discovery on May 14, I see
no reason why this case should not proceed
promptly to a trial on the merits. Early
determination of this dispute over Professor
DeMott's report promotes judicial efficiency.

As the parties have sought guidelines on certain
scheduling matters, I also ask counsel to arrange a
prompt teleconference with the Court to discuss
such issues.

IT IS SO ORDERED.

Del.Ch.,2004.
In re Walt Disney Co.
Not Reported in A.2d, 2004 WL 550750 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.