settled that dispute before the lawsuit was filed for roughly $90 million, and although the actual amount of the settlement remains confidential, Ovitz believes that it was in excess of $250 million.[FN158] Ovitz, however, was not given authority to settle that suit on behalf of the Company.[FN159] The litigation, therefore, was filed and continued until the confidential settlement in 1999.[FN160]

> FN156. Tr. 1153:18-24; 4053:8-16.

> FN157. Tr. 4690:1-6; *see also* Tr. 3824:1-3829:22.

> FN158. Tr. 1153:18-1160:12.

> FN159. Tr. 1159:18-1160:5.

> FN160. Litvack testified that "[n]o one could settle the Jeffrey Katzenberg case for $90 million." Tr. 6132:22-23. *See supra* note 157.

Ovitz was assigned to oversee Disney Interactive, which created interactive video games.[FN161] Eisner testified that Disney Interactive was "doing very badly, actually," but he hoped that Ovitz might be able to turn it around. [FN162] Ovitz was unable to do so.[FN163] In the face of Eisner's critical view of Ovitz's performance with respect to Disney Interactive, Ovitz testified that he had several ideas for Disney Interactive which could have potentially helped Disney Interactive,[FN164] including a joint venture with Sony,[FN165] and a purchase of part of Yahoo!®, [FN166] all of which Eisner rejected. Ovitz also pursued, together with Roth, a deal intended to benefit Disney's motion picture studio with Beacon Communications, a company run by Armyan Bernstein, a writer and director. Again Eisner instructed Ovitz not to close the deal.[FN167]

> FN161. Tr. 1164:7-1165:12; 5168:12-24.

> FN162. Tr. 5168:20-5169:6; *see* PTE 744 at WD09336-37.

> FN163. Tr. 5170:5-10.

> FN164. *See* Tr. 1180:14-1181:8.

> FN165. Tr. 1165:13-1171:18.

FN166. Tr. 1171:19-1179:17; *see also* Tr. 1179:18-1180:13.

FN167. Tr. 1210:23-1213:6; PTE 322; PTE 747; PTE 749.

**\*14** Ovitz wanted the Company to purchase Putnam Publishing in order to acquire the rights to author Tom Clancy. He also wanted to place other prominent authors (and former clients) such as Michael Crichton and Stephen King under contract with Disney's publishing division.[FN168] Eisner rejected these efforts as ill conceived.[FN169]

FN168. Tr. 1160:18-1163:19.

FN169. Tr. 1163:21-1164:9; *see also* Tr. 4286:8-12.

A similar story emerges of Ovitz's leadership over Hollywood Records. [FN170] Ovitz wanted to place Janet Jackson under contract with Hollywood Recrods,[FN171] acquire EMI (a Hollywood Records competitor) or enter into a joint venture with Sony.[FN172] Once again, however, Eisner rejected all of these suggestions.[FN173] Eisner and others were also critical of what they perceived to be a lack of attention paid by Ovitz to Hollywood Records, [FN174] though Ovitz's files belie the assertion that Ovitz ignored his oversight of Hollywood Records.[FN175]

FN170. *See* Tr. 1134:7-1137:24. Hollywood Records, according to Litvack, was from its creation to that time, "a spectacular failure." Tr. 6146:23-6147:5; *see also* DTE 207; PTE 638.

FN171. Tr. 1138:1-1139:10.

FN172. Tr. 1139:18-1147:2.

FN173. Tr. 1139:11-17; 1147:3-9.

FN174. *See* PTE 24 at DD002452-53; PTE 626; PTE 780 at WD13842.

FN175. *See* PTE 606; PTE 622; PTE 629; PTE 768; DTE 190. Donohues' predictable opinion that "Ovitz could have been in a coma and still collecting these empty documents" is of no benefit to the Court and, indeed, documents such as PTE 606 and PTE 622

contain marginalia with Ovitz's handwriting, which would refute Donohue's opinion that there is no indication that the files were ever read by Ovitz. *See* Tr. 9282:15-9284:16. Furthermore, plaintiff's attempt to use Ovitz's statement on the Larry King Live show-that after a year on the job he knew "about one percent of what I need to know"-to demonstrate that ovitz failed to apply himself on the job, is specious and wholly unpersuasive. PTE 323 at 7.

There are three competing theories as to why Ovitz was not successful. First, plaintiffs argue that Ovitz failed to follow Eisner's directives, especially in regard to acquisitions,[FN176] and that generally, Ovitz did very little. Second, Ovitz contends that Eisner's micromanaging prevented Ovitz from having the authority necessary to make the changes that Ovitz thought were appropriate.[FN177] In addition, Ovitz believes he was not given enough time for his efforts to bear fruit.[FN178] Third, the remaining defendants simply posit that Ovitz failed to transition from a private to public company, from the "sell side to the buy side," and otherwise did not adapt to the Company culture or fit in with other executives. In the end, however, it makes no difference why Ovitz was not as successful as his reputation would have led many to expect, so long as he was not grossly negligent or malfeasant.

FN176. Plaintiffs' authority for this argument comes from the letter Eisner wrote to Ovitz dated October 10, 1995. PTE 267. Plaintiffs often quote the letter in this way:

"Acquisitions are something we should ⋯ almost never do." *Id.* at DD002290. The sentence actually reads: "Acquisitions are something *we should look at* and almost never do." *Id.* (emphasis added). It is obvious that this letter, therefore, can provide no support for the proposition that Ovitz intentionally disobeyed an order or directive from Eisner to not pursue acquisitions under any circumstances. As discussed above, the record does not bear out the assertion that Ovitz continued pursuing specific acquisitions after being instructed by Eisner to no longer pursue them.

FN177. Ironically, Ovitz testified that Eisner advised him not to take the job at MCA because Eisner believed that Ovitz would not have enough autonomy to turn the company around. Tr. 1275:14-1276:14.

FN178. *See, e.g.,* Tr. 1171:14-18.

Many of Ovitz's efforts failed to produce results, often because his efforts reflected an opposite philosophy than that held by Eisner, Iger, and Roth. FN179 This does not mean that Ovitz intentionally failed to follow Eisner's directives or that he was insubordinate. To the contrary, it demonstrates that Ovitz was attempting to use his knowledge and experience, which (by virtue of his experience on the "sell side" as opposed to the "buy side" of the entertainment industry) was fundamentally different from Eisner's, Iger's, and Roth's, to benefit the Company.FN180 But different does not mean wrong. Total agreement within an organization is often a far greater threat than diversity of opinion.FN181 Unfortunately, the philosophical divide between Eisner and Ovitz was greater than both believed, and as two proud and stubborn individuals, neither of them was willing to consider the possibility that their point of view might be incorrect, leading to their inevitable falling out.FN182

FN179. *See* Roth 29:16-30:20.

FN180. *See* Tr. 4284:9-4285:10.

FN181. I note that Judge Posner eloquently emphasized this point in his critique of the 9/11 Commission Report by saying that:

Much more troublesome [than the public relations effort by the commission, especially the participation of victims' relatives] are the inclusion in the report of recommendations (rather than just investigative findings) *and the commissioners' misplaced, though successful, quest for unanimity···· And pressure for unanimity encourages just the kind of herd thinking now being blamed for that other recent intelligence failure-the belief that Saddam Hussein possessed weapons of mass destruction.*

At least the commission was consistent. It believes in centralizing intelligence, and people who prefer centralized, pyramidal governance structures to diversity and competition deprecate dissent. *But insistence on unanimity ··· deprives decision makers of a full range of alternatives. For all one knows, the price of unanimity was adopting recommendations that were the second choice of many of the commission's members or were consequences of horse trading.* The premium placed on unanimity undermines the commission's conclusion····

Richard A. Posner, *The 9/11 Report: A Dissent,* N.Y. TIMES, August 29, 2004 (emphasis added). Judge Posner's critique also warns against the dangers of judging past actions with the benefit of perfect hindsight, saying that, "The commission's statement that Clinton and Bush had been offered only a 'narrow and unimaginative menu of options for action' [in response to al Qaeda] is hindsight wisdom at its most fatuous," by outlining several of the available options. *Id.*

FN182. *See* Tr. 3811:3-3814:15.

### 5. *Veracity and "Agenting"*

At trial, plaintiffs, together with their expert on these issues, Donohue, spent a great deal of effort attempting to persuade the Court that Ovitz was a habitual liar, and that his lack of veracity would constitute good cause to terminate him without paying the NFT.[FN183] Defendants respond that the purported veracity problems attributable to Ovitz do not involve material falsehoods, but instead were caused by Ovitz's tendency to "handle" or "agent" others.

FN183. As with many of their other allegations, plaintiffs heavily rely on PTE 20, PTE 24, PTE 67, PTE 79, and the hearsay statements of Bass. In attempting to bolster their position, plaintiffs point to part of Ovitz's trial testimony to argue that his "self-serving" testimony was contradicted by other witnesses. *See, e.g.,* Tr. 1220:14-1228:1. In that passage, Ovitz recalls meetings in New York with Bollenbach, Litvack and Iger, followed by a meeting with Eisner in Los Angeles. *Id.* Eisner's testimony indicates a lack of specific recollection of that meeting, but basic familiarity with the issues purportedly discussed there. Tr. 5081:8-5084:5. Bollenbach could not specifically recall the meeting either, but does remember at least one meeting in New York with Ovitz. Tr. 5488:10-5493:11. Litvack's testimony was unclear on whether he remembered the meeting to which Ovitz was referring, at one point saying "I am sure that we met with Mr. Eisner after these meetings, yes," with the very next words out of his mouth being, "I don't recall." Tr. 6555:5-6556:16. Needless to say, the contradiction is, at most, minimal and a natural consequence of the many years that have passed since these events transpired rather than evidence of a lack of honesty on the part of Ovitz.

**\*15** Eisner testified that, with respect to Iger's statement that Iger did not trust Ovitz,[FN184] the lack of trust was related to Ovitz's failure to communicate with Iger, and that Ovitz "wasn't doing anything wrong." [FN185] Eisner also expressed that he personally did not trust Ovitz. [FN186] From both the tenor of the document (written shortly after the stress of his mother's death) and from Eisner's more emotionally detached trial testimony,[FN187] however, it is clear that Eisner was not referring to any material falsehoods, but instead to Ovitz's salesmanship [FN188] or, in other words, his "agenting." [FN189]

FN184. PTE 67 at DD002981; Tr. 4298:6-4302:7.

FN185. Tr. 4300:7-4301:22. This testimony demonstrates that there could be any number of reasons for which Iger would no longer trust Ovitz. Lack of veracity is but one.

FN186. Eisner wrote:

Michael [Ovitz] does not have the trust of anybody. I do not trust him. None of the people he works with feels comfortable with his directness and honesty. Like an athlete who has lost his way, Michael is pressing, is confused, [is] ineffective. His heart may be in the right place, but his ego never allows it to pump. His creative instincts may be in the right place, but his insecurity and existential drive never allows a real functioning process···· He would be a great salesman, but his corporate disingenuous nature undermines him. And his lack of interests in long-term outcomes affects his judgment on short-term deals. The biggest problem is that nobody trusts him, for he cannot tell the truth. He says whatever comes to mind, no matter what the reality. Because of all the above his executives, outside business associates, and the Press have turned against him.

PTE 79 at DD002624.

FN187. Tr. 4434:1-4439:22; *see also* Tr. 3763:11-23; 6386:24-6388:4.

FN188. Tr. 4438:10-4439:22.

FN189. Tr. 6373:18-6374:13. *But cf.* Bass 44:17-46:5; 102:24-103:5 (Bass' opinion that Ovitz was not honest was not based

upon first hand experience and personal knowledge, but was based instead on the hearsay statements of Eisner and other unnamed declarants). Eisner's credible trial testimony on this subject significantly undermines the probative value of Bass' testimony, which again, the Court was not able to observe personally. *See, e.g.,* Tr. 4434:1-4439:22.

Litvack felt the same way, saying that he did not trust Ovitz's judgment and that he did not trust Ovitz generally because Ovitz would "handle" Litvack and "put his spin on things." [FN190] Litvack also said that the "worst that I could remember in terms of lies was-and I use the word 'lies'-was 'I was on the phone with someone important and couldn't be on time for the meeting." ' [FN191] Other executives and directors made similar comments that they could recall no material falsehoods told to them by Ovitz.[FN192]

FN190. Tr. 6132:11-19; *see also* Tr. 6088:12-6092:23; 6374:18-6378:17.

FN191. Tr. 6135:1-4. Clearly, these statements, even if construed as lies, would not constitute gross negligence or malfeasance.

FN192. *See* Tr. 2621:15-2622:13 (Russell); 3755:8-3756:9 (Gold); 4012:14-4013:8 (Roy Disney); 5307:17-5308:9 (Bollenbach); 5809:3-7 (Nunis); 5940:20-23 (Bowers); 6724:7-15 (O'Donovan); 6847:10-16 (Wilson); 7148:8-12 (Poitier); 7552:23-7553:1 (T. Murphy); 7649:10-16 (Lozano); 7867:6-9 (Watson); 8161:6-7 (Stern); Roth 118:20-119:13.

In the absence of any concrete evidence that Ovitz told a material falsehood during his tenure at Disney, plaintiffs fall back on alleging that Ovitz's disclosures regarding his earn-out with, and past income from, CAA, were false or materially misleading.[FN193] As a neutral fact-finder, I find that the evidence simply does not support either of those assertions.[FN194] The allegedly false or misleading disclosure regarding Ovitz's earn-out rights is contained in the copy of the Company's "Statement of Policy Regarding Conflicts of Interest and Business Ethics and Questionnaire Regarding Compliance" that Ovitz signed on October 24, 1995.[FN195]

FN193. At trial, when asked to give specific instances of lies by Ovitz, Donohue could only provide two concrete examples of Ovitz's lying, one with respect to a deal Ovitz apparently made to sell an airplane to one of his prior business partners, *see* PTE 404

at 45 n.48, and the other relating to breaking the purported mutual non-disparagement agreement that Ovitz agreed to when he left the Company. Tr. 655:24-658:12. Donohue's report indicates that even he did not consider the alleged deception with respect to the airplane grounds for a for-cause termination because it did not occur in the course of Ovitz's duties for Disney. PTE 404 at 45 n.48. Any statements Ovitz may have made that violated a mutual non-disparagement agreement would similarly not constitute cause for termination because they occurred after his termination was publicly announced, and were not made in the course of his duties for the Company.

FN194. *See* PTE 200 (W-2 for 1995 representing Ovitz's income at CAA from January 1, 1995 to the end of September 1995 for almost $18 million). This W-2 is consistent with Ovitz's testimony. Tr. 1099:5-15.

FN195. PTE 314; PTE 127 (transmission of the signature page of the document by Adler to Santaniello). Ovitz's statement reads as follows:

I beneficially own a majority interest in my prior employer ("Prior Employer"), a franchised talent agency. My ownership interest is held by an independent trustee. The talent agency business of the Prior Employer is being continued by Creative Artists Agency LLC ("CAA"), in which I have no direct or indirect ownership interest. The Prior Employer will continue to receive commissions from contracts entered into by its former talent agency clients on or before September 30, 1995 and will also lease certain real and personal property to CAA.

Except for ownership interests of less than 5% in publicly traded companies, either I or my Prior Employer may be deemed to beneficially have ownership interests in the following entities that are engaged in the media, entertainment, communications or publishing businesses: Diamond Cable Communications PLC [ & ] Ziff-Davis Holdings Corp.

PTE 314 at DD000292.

Plaintiffs attack this disclosure on several grounds. First, they argue that Ovitz was entitled to a majority of some unknown list of booked commissions that allegedly changed over time. The disclosure by Ovitz

makes clear that he owned a majority interest in his prior employer, which would lead any reasonable person to believe that he would receive a majority of the income from that entity.[FN196] The disclosure also clearly spells out that Ovitz would be entitled to receive commissions from contracts entered into on or before September 30, 1995.[FN197] Ovitz's testimony that it is common practice in the industry for some of these contracts to be oral is not contradicted.[FN198] Plaintiffs' assertion that the commissions list evolved over time is consistent with the parties' agreement, but there is no support in the record for the assertion that the *definition* of those commissions changed during any time relevant to this suit.[FN199]

FN196. Oldco's (also known as CAA, Inc. or "Prior Employer") receipt of revenues from booked talent commissions were based upon Newco's (also known as CAA, LLC) financial success. *See* PTE 203 at MTO 1660; Tr. 1450:5-1452:5; 1533:2-1535:4. To alleviate any potential conflicts relating to this symbiotic relationship between Oldco and Newco, Disney created a process by which conflicts of interest between Ovitz and CAA were to be avoided through approval of transactions greater than $100,000 involving a CAA client by any two of (1) Eisner, (2) Litvack, or (3) Gerry Swider. PTE 148; PTE 374; Tr. 1298:11-1299:22; 1610:20-1613:2; 6457:15-6469:20; 6696:5-6697:1. Plaintiffs attempt to use PTE 581 to demonstrate that this process was not followed, but Litvack's memory of these deals is hazy, and with respect to many of the deals, Litvack testified that he believed the projects related to many of those deals were not completed. Tr. 6494:11-6508:7. Given the sparsity of this record, I cannot conclude first, that the conflict of interest avoidance procedure was not used, or second (and more importantly), that if the procedure was not used, such failure was attributable to Ovitz, or that Ovitz used his position as President to facilitate deals with CAA clients in order to advance his personal financial interests. *See* Tr. 8844:10-8851:19.

FN197. *See* PTE 202 at MTO 582, PTE 206 at MTO 611-12; PTE 208.

FN198. Ovitz 561:22-562:6; *see also* PTE 206 at MTO 610-11.

FN199. It appears that the definition of booked commissions may have been altered in 1999, long after Ovitz left Disney, making such change irrelevant to this case. PTE 209 at MTO 2161-63. This

alteration may have been necessitated by Newco's arrearages in paying Oldco, arrearages which were substantial as of October 1997. PTE 205. Eventually, Newco and Oldco reached a settlement in full accord and satisfaction of their respective obligations. PTE 209.

Second, plaintiffs contend that Ovitz held a security interest in Newco that contradicts his disclosure that he had no direct or indirect ownership interest in Newco.[FN200] The form used to perfect the security interest is clear on its face that it relates to a debt instrument, hence Oldco is referred to as the "Secured Party" and Newco is referred to as the "Debtor." [FN201] As plaintiffs' counsel no doubt understands, a security interest based upon a debt instrument is *not* an ownership interest. Upon considering the documentary evidence and testimony, I find that Ovitz's disclosures were neither false nor misleading.[FN202]

FN200. *See* PTE 203 (creation of interest); PTE 254 (perfection of interest).

FN201. PTE 254.

FN202. Plaintiffs' allegations that Ovitz *again* lied in relation to the Statement of Policy Regarding Conflicts of Interest and Business Ethics and Questionnaire Regarding Compliance when he left the Company, *see* PTE 70, must also fail in light of my findings below that Ovitz was in compliance with the Company's policies regarding gifts.

### 6. *Gifts and Expenses*

**\*16** In moving from the talent agency he founded to a public company, Ovitz was faced with an array of new policies and rules relating to gifts and expenses. Eisner had asked Russell to speak to Ovitz about his expenses, [FN203] and on January 17, 1996, Russell and Ovitz met for breakfast to discuss the topic.[FN204] To follow up on their meeting, Ovitz sent a memo to Russell in January 1996 asking for help in handling his expenses.[FN205] According to Ovitz, Russell was "fantastic" in helping Ovitz's assistant meet and confer with a knowledgeable Disney employee so that Ovitz's expenses could be properly handled.[FN206]

FN203. *See* PTE 378; Tr. 3046:6-3049:17; 4393:1-4394:4.

FN204. Tr. 2560:3-2563:18.

FN205. PTE 318; Tr. 1315:8-1318:12.

FN206. Tr. 1317:11-1318:12.

The only evidence in the record that is admissible to prove that Ovitz did not comply with Disney's policies regarding expenses is (1) the statements by Eisner that Ovitz may not have been in compliance with those policies, and (2) the undisputed fact that Disney withheld $1 million from the cash payment of Ovitz's NFT, but ultimately returned all but roughly $140,000 of that amount. FN207

> FN207. At trial and in the post-trial briefing, plaintiffs have relied extensively on PTE 147, a draft report by Price Waterhouse which purportedly uncovers numerous examples of Ovitz' expense reimbursement requests not complying with Company policy. I have previously ruled that the report is hearsay, and therefore inadmissible when offered to prove the truth of the matters asserted in the report. *See In re The Walt Disney Co. Derivative Litig.,* 2005 WL 407220, at *1 (Del.Ch. Feb.4, 2005). Plaintiffs also cite to DTE 59, a collection of expense reports submitted by Ovitz in an effort to show that Ovitz requested reimbursement for non-Disney expenses. The documents in DTE 59 on their face do not demonstrate that the expenses were not related to Disney, and there is no testimony in the record to lead me to believe otherwise. In fact, each and every expense report in DTE 59 has been countersigned in the box for "Audit Approval," with the overwhelming majority (but not all) of the forms also having been countersigned in the box for "Management Approval." In the absence of further evidence, this can lead me to no other conclusion than that all of the expenses detailed in DTE 59 were properly reimbursable under appropriate Company guidelines, including those incurred in late December 1996. DTE 59 at WD04935, WD05159.

The record contains several examples of statements by Eisner where he believed that Ovitz's compliance with Company expense policies was questionable. FN208 The trial testimony of Eisner, Russell, and especially Litvack (whom Eisner had assigned to oversee Ovitz's expenses), however, was credible and coherent in stating that Ovitz was in compliance with the Company's expense policies. FN209

FN208. *See* PTE 24 at DD002451; PTE 378; Tr. 3049:18-3051:20.

FN209. *See* Tr. 2632:21-2633:23; 2892:4-14; 4578:9-4580:20; 6145:20-6146:6; 6171:8-6178:11; 6362:5-23; 6533:4-20; 6604:5-16; 6692:12-6693:12; *cf.* Tr. 2883:24-2885:21; 3041:2-22.

With respect to the eventual holdback of $139,184 from Ovitz's severance, [FN210] only $70,212 was attributed to potential expense policy violations. [FN211] The remaining $68,972 related to the unamortized cost of capital improvements to Ovitz's home,[FN212] and Litvack clearly testified at trial that the Company had no contractual right to recoup those costs from Ovitz. [FN213]

FN210. *See* PTE 385; PTE 403.

FN211. DTE 178.

FN212. *Id.*

FN213. Tr. 6174:17-6176:16.

The record provides no support for, and indeed often contradicts, two key assertions made by plaintiffs regarding the holdback. First, plaintiffs' assertions that the holdback itself is evidence that the defendants were on notice at the time of Ovitz's termination that grounds to terminate him for cause may have existed cannot stand in light of the testimony that many executives at the Company were at least six months behind in billing their expenses.[FN214] The holdback, then, was simply a way to avoid having to collect that money back from Ovitz after termination if there was insufficient justification for the billings.[FN215] Second, the $70,212 ultimately withheld from Ovitz is not *prima facie* evidence that Ovitz "stole" from Disney. As to both of these points, Litvack testified that insufficient justification and documentation was the reason for the final holdback-not a determination that Ovitz had "stolen" from or otherwise intentionally defrauded the Company. [FN216]

FN214. Tr. 4579:4-4580:20; 4400:21-4402:4; 5044:16-5045:19; 6423:19-6424:19.

FN215. Tr. 4579:4-4580:20; 4400:21-4402:4; 5044:16-5045:19; 6423:19-6424:19.

FN216. Tr. 6174:8-6175:23; 6178:7-11; 6604:5-6605:23; *see also* Tr. 6273:9-6275:9; 6533:4-20; 6691:16-6692:24.

Plaintiffs have repeatedly criticized Ovitz's gift giving as self-serving and not in accordance with Company policies. Furthermore, they argue that he failed to properly report gifts that he received while serving as President of Disney. FN217 Once more, the record fails to support these assertions. As with Ovitz's expenses, Eisner asked Russell to assist Ovitz in complying with Disney's policies with respect to gifts. FN218 Litvack was also told of Eisner's concerns, and following an investigation, he found that Ovitz was in compliance with Disney's gift policies. FN219 At trial, plaintiffs' counsel asked Litvack whether he was aware of several questionable gifts, but Litvack unambiguously testified that either he had approved those gifts, or that, had he been asked, he would have approved those gifts because they related to the business of the Company. FN220 In sum, finding Litvack's and Eisner's trial testimony credible as cited above, I find that Ovitz was not in violation of The Walt Disney Company's policies relating to expenses or giving and receiving gifts.

FN217. *See* PTE 24 at DD002451-52; PTE 148; PTE 374. Plaintiffs attempt to use DTE 61 to impugn Ovitz's handling of gifts. The document on its face, however, supports the conclusion that Ovitz was complying with Company policies by demonstrating that three of those four gifts were retained by Ovitz in exchange for a charitable contribution, and that the fourth was used as a prize at a Company event. In my mind, the simple fact that two of the gifts were not received by Disney until January 7, 1997 is unremarkable and not probative in any way detrimental to Ovitz, especially in light of the holiday season during which Ovitz was terminated and that the gifts were submitted to Disney shortly after the new year began.

FN218. *See* PTE 17; PTE 378; DTE 151.

FN219. Tr. 6139:10-6141:8; 6146:7-9; *see* PTE 406 (all gifts reported by Ovitz were turned over to the appropriate department within the Company); DTE 61.

FN220. Tr. 6437:21-6445:22; 6518:11-6530:4; 6533:1-20; *see* Tr. 5023:4-5029:18; 5034:5-5038:13; 5039:9-5042:22; *see also* Tr. 2201:15-2210:21 (Ovitz) (describing the reasons for some of

his gifts); *cf.* Tr. 3049:18-3066:16 (Russell unable to give useful testimony expounding upon PTE 378 and PTE 17 due to lack of recall).

### C. Ovitz's Termination

### 1. *The Beginning of the End*

**\*17** Ovitz's relationship with Eisner, and with other Disney executives and directors, continued to deteriorate through September 1996. In mid-September, Litvack, with Eisner's approval, spoke with, or more accurately cornered Ovitz. Litvack told Ovitz that he thought it was clear that Ovitz was not working out at Disney and that he should start looking for both a graceful way out of Disney and a new job.[FN221] After Litvack reported this conversation to Eisner, Eisner, hoping to make Ovitz realize that there was no future for him at Disney, sent Litvack back to Ovitz and asked Litvack to make it clear that Eisner no longer wanted Ovitz at Disney and that Ovitz should seriously consider other employment opportunities, including the opportunity at Sony. [FN222] It seems that Ovitz brought up the possibility of moving to Sony with Eisner during a flight in June 1996 to New Orleans.[FN223] Eisner believed that Ovitz meant it as a threat, but Eisner welcomed the idea of Ovitz leaving the Company. Litvack conveyed Eisner's sentiments, and Ovitz responded by telling Litvack that he was "going to have to pull me out of here ⋯ I'm not leaving," and that if Eisner wanted him to leave Disney, Eisner could tell him so to his face.[FN224] At trial, Ovitz testified that he felt that "as far as [he] was concerned, [he] was chained to that desk and that company. [That he] wasn't going to leave there a loser," that the guy that hired him or the full board would have to fire him, and that he hoped he could still make it work and make all these problems just disappear.[FN225]

FN221. Tr. 6101:2-6102:18; 6562:7-13.

FN222. Tr. 4354:19-4355:6; 4731:13-4732:16; 6102:21-6103:14.

FN223. Tr. 4319:10-23. Eisner testified that when Ovitz first brought the Sony option up that Eisner believed that it would provide him a graceful way out of the Ovitz problem. *See id.*

FN224. Ovitz 537:24-25; Tr. 1350:5-13552:9; 6103:15-6103:24.

FN225. Tr. 1352:14-1353:20.

Following up on the discussions between Litvack and Ovitz, Eisner and Ovitz had several meetings on or around September 21, 1996, during which they discussed Ovitz's future (or lack thereof) at Disney, and the possibility that Ovitz would seek employment at Sony.[FN226] Eisner believed that Sony would be both willing and excited to take Ovitz in "trade" from Disney because Ovitz had a very positive longstanding relationship with many of Sony's top executives. Eisner favored the Sony "trade" because, not only would it remove Ovitz and his personality from the halls of Disney, but it would also relieve Disney of having to pay Ovitz under the OEA and would hopefully bring a valuable return to Disney in the form of licensing rights for *The Young and the Restless.*[FN227]

FN226. PTE 18.

FN227. Tr. 4351:23-4354:2. Eisner was hoping to obtain the licensing rights to *The Young and the Restless,* which would help Disney with its new Soap Opera Channel. Eisner also believed that if he did not ask for something in return for Ovitz, that Sony would think that Disney did not want Ovitz and then Sony may not have wanted him either.

The Sony discussions continued on October 8 when Ovitz wrote Eisner a note asking for formal permission to begin negotiations with Sony.[FN228] After stating that he was still shocked that Eisner wanted him out, Ovitz wrote that he had resolved to look at other employment possibilities, and he wanted to make sure that he did not leave himself or Sony open to a lawsuit because his departure from Disney would leave Ovitz in breach of the OEA.[FN229] On October 9 Eisner responded by letter, telling Ovitz that neither he nor anyone else at Disney had any objections to Ovitz working out a deal and eventually going to work for Sony. In fact, Eisner thought it was best that Ovitz and Disney work together to ensure a smooth departure.[FN230] Additionally, Eisner wrote a letter to Mr. Idei, Sony's Chairman, trumpeting Ovitz and notifying Mr. Idei that Disney had given permission for Ovitz to enter into negotiations for a possible move to Sony.[FN231] Apparently, however, only a limited number of directors knew that Ovitz was given permission to negotiate with Sony, including Litvack,[FN232] Watson,[FN233] Russell,[FN234] Gold,[FN235] and Roy Disney,[FN236] and that the board as a whole was never approached about the possible Sony "trade." Of these directors, only Litvack and Russell were ever asked

for their opinions on the matter.

FN228. PTE 18.

FN229. *Id.*

FN230. PTE 19 at WD00399-401.

FN231. *Id.* at WD00402. Eisner also forwarded this letter to Ovitz.

FN232. Tr. 6104:8-6107:6.

FN233. Tr. 7858:21-7859:22.

FN234. Tr. 2571:23-2572:14.

FN235. Tr. 3766:2-3767:6.

FN236. Tr. 4022:10-4023:8.

**\*18** On November 1, Ovitz wrote a letter to Eisner notifying Eisner that things had failed to work out with Sony and that Ovitz had instead decided to recommit himself to Disney with "an even greater commitment of [his] own energies" than he had before and an "increased appreciation" of the Disney organization.[FN237] There are varying accounts of why Ovitz did not end up employed at Sony, but the important fact is that Ovitz remained at Disney. [FN238]

FN237. PTE 19 at WD00404.

FN238. *See* Tr. 1363:17-1365:2 (Ovitz) (stating that he did not continue negotiations with Sony because there were, in his view, severe conflicts within Sony's upper management); 4362:1-9 (Eisner) (stating that he was told that Ovitz did not get an offer at Sony because Ovitz was being unreasonable in his demands and that he was asking for "the sun and the moon" from Sony).

### 2. *The September 30, 1996 Board Meeting*

During the course of the Sony discussions the Disney board convened a meeting on September 30, 1996, while attending a Disney anniversary at the Walt Disney World Resort in Orlando, Florida. Ovitz was in attendance at

the board meeting, and it is undisputed that neither Ovitz's future with Disney nor his conversations to date with Eisner and Litvack were discussed at the general board meeting.[FN239] Eisner, however, testified that he spoke with various directors either during an executive session held that same day at which Ovitz was not present, or in small groups during the weekend, to notify them that there were continuing problems with Ovitz's performance.[FN240] Additionally, other directors testified that Eisner apprised them of the developing situation with Ovitz either during or prior to September 1996. [FN241] Although Eisner never sat down at a full board meeting to discuss the persistent and growing Ovitz problem, it is clear that he made an effort to notify and talk with a large majority, if not all of the directors.

FN239. Tr. 6677:2-11; 7592:8-10.

FN240. Tr. 4349:13-4350:5; 4728:17-4729:12 :

FN241. Tr. 3087:7-3088:16 (Russell); 3818:9-21 (Gold); 4021:7-4022:9 (Roy Disney); 5593:2-5594:12, 5725:6-5726:2 (Mitchell); 5810:8-12 (Nunis); 6836:5-6837:19 (Wilson).

On the night of September 30, Eisner and Ovitz made their now-famous appearance on *The Larry King Live Show* in which Eisner refuted the then current Hollywood gossip that there was a growing rift between himself and Ovitz and emphatically stated that if given the chance, he would hire Ovitz again. [FN242] It is clear now that this entire interview was a shameless public relations move during which both Eisner and Ovitz did not candidly answer Larry King's questions with the goal of deflating the negative rumors surrounding their failed partnership.

FN242. PTE 323, PTE 505.

On October 1, the day after the Larry King interview, Eisner sent a letter that he had been working on since the summer, to Russell and Watson detailing Eisner's mounting difficulties with Ovitz, including Ovitz's failure to adapt to Disney's corporate culture in even the slightest fashion, Eisner's lack of trust for Ovitz, and Ovitz's complete failure to alleviate Eisner's workload. [FN243] Apparently, an incident at Eisner's mother's funeral, which involved Ovitz getting into an argument on a New York City street over a parking space, spurred Eisner to finally send this letter. The letter stated that:

FN243. PTE 79; *see also supra* text "Veracity and 'Agenting' " at 49. Although I have found that Ovitz was not a liar, Eisner's persistently-vocalized reservations about Ovitz's veracity are not inconsistent with that finding. I conclude that while Ovitz gave this Court no reason to believe that he lied, that is is entirely possible that his actions while at Disney and his general character led Eisner to believe that Ovitz was not completely honest. Eisner, however, was unable to point to specific instances where Ovitz was untruthful.

If I should be hit by a truck, the company simply cannot make [Ovitz] CEO or leave him as president with a figurehead CEO. It would be catastrophic. I hate saying it, but his strength of personality together with his erratic behavior and pathological problems, and I hate saying that, is a mixture leading to disaster for this company.[FN244]

FN244. *Id.* at DD002623.

**\*19** Eisner stated that his goal in writing the letter was to keep Ovitz from succeeding him at Disney should the opportunity arise. Because of that purpose, the letter contained a good deal of hyperbole to help Eisner better "unsell" Ovitz as his successor.[FN245] Neither Russell nor Watson divulged at any time the contents of the letter with other members of the board. [FN246]

FN245. Tr. 4436:14-4439:6.

FN246. Tr. 3078:17-3079:15; 7881:10-7887:3.

Eisner was informed on November 1 that Ovitz's negotiations with Sony had failed to result in Ovitz leaving Disney. Once Eisner discovered that the Sony negotiations had failed to produce the desired result, Eisner decided that Ovitz must be gone by the end of the year.[FN247] To facilitate Ovitz's departure, Eisner asked Wilson to take a Thanksgiving trip on the yacht that Ovitz and Wilson jointly owned, the Illusion.[FN248] It was Eisner's hope that Wilson, a confidant of Ovitz's, could help Ovitz finally understand not only that Ovitz had to leave Disney, but that everyone, including Ovitz, would be better off if he left.

FN247. Tr. 4368:9-4369:3.

FN248. Tr. 4369:4-4370:2; 6838:18-6839:11.

Still struggling to make Ovitz understand that he had to leave Disney, Eisner wrote a letter to Ovitz on November 11 (which was never sent), in which he again tried to put Ovitz on notice that he was no longer welcome at Disney. [FN249] Eisner characterized this letter as:

FN249. PTE 24.

[A] shot at trying to conjure up every argument, every issue exaggerated to the point of extreme nature so that [Ovitz] could see how deadly serious [Eisner] was···· However, [Eisner] realized it was ··· not accurate, way exaggerated, silly, hyperbole, insensitive, and it read like ··· a Vanity Fair article. [FN250]

FN250. Tr. 4372:5-19.

Eisner also stated that:
One of the reasons Litvack didn't want me to send the memo is there were so many things in the memo ··· which just weren't true, but I was trying to create a case that [Ovitz] could not argue with. [FN251]

FN251. Tr. 5028:13-19.

In this letter, Eisner told Ovitz that:
I think we should part ways professionally. I believe you should resign (this is not a legal suggestion but a cosmetic one), and we should put the best possible face on it. When we talked last Friday, I told you again that my biggest problem was that you played the angles too much. I told you 98% of the problem was that I did not know when you were telling the truth, about big things, about small things···· We are beyond the curing stage. We are now in salvation. I would like to remain friends, to end this so it looks like you decided it, and to be positive and supportive ··· I hope we can work together now to accomplish what has to be done. I am ready to work as hard as necessary and as long. [FN252]

FN252. PTE 24 at DD002454-002455.

Eisner sent this document to Bass and Russell for their review. [FN253] Eisner also believed that he may have shown the letter to Litvack, but Litvack did not recall having seen this letter before trial. [FN254] For my purposes, Russell was the only director to receive this document and he did not share it or the matters it concerned with anyone else on the board. [FN255] Instead of sending this letter to Ovitz, Eisner met with Ovitz personally on November

13 and they discussed much of what was contained in the letter, especially Ovitz's alleged management and ethics problems.[FN256] Notes taken by Eisner following this meeting stated that the meeting was "2 hours and 15 minutes of [Eisner] telling [Ovitz] that it was not going to work."[FN257] Eisner believed that Ovitz just would not listen to what he was trying to tell him and instead, Ovitz insisted that he would stay at Disney, going so far as to state that he would chain himself to his desk.[FN258]

FN253. Eisner 606:4-7.

FN254. Tr. 6143:3-20.

FN255. Tr. 3090:9-3091:8; 3095:20-3096:3.

FN256. Eisner 606:8-607:14; *see also* Tr. 5199:14-19; 2017:17-2018:15.

FN257. PTE 325 at DD002549.

FN258. Tr. 4370:3-19. The threat of chaining himself to his desk, although obviously metaphorical, demonstrates exactly how unwilling Ovitz was to even consider leaving Disney at that point.

### 3. *Options for Ovitz's Termination*

**\*20** Since the Sony option was discussed in early September, Eisner and Litvack had also been discussing whether Ovitz could be terminated, and more importantly, whether he could be terminated for cause.[FN259] Eisner hoped to obtain a termination for cause because he believed that although Ovitz "had not done the job that would warrant [the NFT] payment" Disney was obliged to honor the OEA.[FN260] Honoring the OEA meant that if Ovitz was terminated without cause, he would receive the NFT payment that the OEA called for, which consisted of the balance of Ovitz's salary, an imputed amount of bonuses, a $10 million termination fee and the immediate vesting of his three million stock options at the time. Litvack advised Eisner from the very beginning that he did not believe that there was cause to terminate Ovitz under the OEA.

FN259. Tr. 4379:23-4380:19; 6110:12-6111:3.

FN260. Tr. 4380:22-4381:15.

As the end of November approached, Eisner again asked Litvack if Disney had cause to fire Ovitz and avoid the costly NFT payment.[FN261] Litvack proceeded to examine more carefully the issue of whether cause existed under the OEA. Litvack reviewed the OEA, refreshed himself on the meaning of gross negligence and malfeasance and reviewed all of the facts concerning Ovitz's performance of which he was aware.[FN262] Litvack freely admits that he did not do any legal research in answering the cause question; [FN263] nor did he order an outside investigation to be undertaken or an outside opinion to be authored.[FN264] Litvack did state that in December he consulted with Morton Pierce, a senior partner at Dewey Ballantine, and that Pierce agreed that there was no cause.[FN265] Pierce, however, was not admitted to the California Bar (California law governed the OEA), was not an expert in employment law,[FN266] and could not recall speaking with Litvack regarding Ovitz.[FN267] Furthermore, Pierce's bills to Disney do not clearly reflect that any such conversation took place regarding whether Ovitz could be terminated for cause.[FN268] After taking these steps, Litvack, for the second time, concluded that there was no cause to terminate Ovitz. In fact, despite Ovitz's poor performance and concerns about his honesty, Litvack believed that the question of whether Ovitz could be terminated for cause was not a close question and, in fact, Litvack described it as "a no-brainer." [FN269] Litvack, however, produced no written work product or notes to show to the board that would explain or defend his conclusion, and because he did not ask for an outside opinion to be authored, there was no written work product at all. When Litvack notified Eisner that he did not believe cause existed, Eisner testified that he "checked with almost anybody that [he] could find that had a legal degree, and there was just no light in that possibility. It was a total dead end from day one."[FN270]

FN261. Tr. 6110:15-6111:3.

FN262. Tr. 6113:21-6114:19.

FN263. Tr. 6114:20-10 (Litvack) (stating that he did not do any case research because he "didn't believe that there were going to be any cases that were going to answer the question for [him]. [He] had been dealing with contracts and litigation all [his] life···· [He] felt he knew the facts as to what the man had done and not done.").

FN264. Tr. 6115:22-6116:14 (Litvack) (stating that he did not order an outside investigation because he believed he knew the facts and an outsider would have gone to him to get the facts, and also because he believed that the firing of Ovitz was a sensitive matter and he wanted to involve as few people as possible); 6130:5-24 (Litvack) (explaining that he did not order an outside written opinion because it would have been expensive, and he believed it was a "CYA tactic done by general counsels to cover themselves" and he didn't believe he needed that). Litvack consulted Val Cohen, co-head of the Disney litigation group, and possibly Santaniello, and to the extent he met with them, he stated that they both agreed with his conclusion that there was no cause, although there is no record of their having met or discussed the existence of cause. See Tr. 6119:22-6121:8. Litvack admits, however, that all the information Val Cohen knew about Ovitz, she would have learned from Litvack. See Tr. 6401:2-6405:4.

FN265. Tr. 6121:9-6126:8.

FN266. Tr. 6222:22-6225:13.

FN267. Tr. 6398:3-11.

FN268. PTE 391; PTE 392 (bill contains charge of $25,500 for consultation in the Ovitz matter which included advice regarding proxy disclosure and tax considerations relating to Ovitz's termination).

FN269. Tr. 6114:24-10. In light of the hostile relationship between Litvack and Ovitz, I believe if Litvack thought it were possible to avoid paying Ovitz the NFT payment, that out of pure ill-will, Litvack would have tried almost anything to avoid the payment. See Tr. 6115:9-21 ("[I]f there was a way not to pay him, I would have loved not to pay him···· I didn't like him, and he didn't like me. I didn't feel he had done the job.").

FN270. Tr. 4380:10-21.

In a perfect, more responsible world, both Litvack and Eisner would have had sufficient documentation not only to back up their conclusion that Ovitz could not be terminated for cause, but they would have also had sufficient evidence of the research and legwork they did to arrive at that conclusion. Despite the paucity of evidence, it is clear to the Court that both Eisner and

Litvack wanted to fire Ovitz for cause to avoid the costly NFT payment, and perhaps out of personal motivations. The Court is convinced, based upon these two factors, that Eisner and Litvack did in fact make a concerted effort to determine if Ovitz could be terminated for cause, and that despite these efforts, they were unable to manufacture the desired result.

**\*21** In addition to determining that there was no cause to fire Ovitz as defined in the OEA, Litvack also testified that it would be inappropriate and unethical for Disney to try to bluff Ovitz into accepting an amount less than agreed to in the OEA in case of an NFT.[FN271] Litvack believed that it would be a bad idea to attempt to coerce Ovitz (by threatening a for-cause termination) into negotiating for a smaller NFT package than was provided for in the OEA because Disney, when pressed by Ovitz's attorneys, would have to admit that there in fact was no cause and possibly subject Disney to a wrongful termination suit.[FN272] Litvack also believed that a failed attempt to bluff Ovitz out of the NFT could be quite harmful to Disney's reputation because it would appear as if Disney was trying to get out of contractual obligations (which it would have been), and that would make it difficult for Disney to do business and be viewed as an honest business partner.[FN273]

FN271. Tr. 6128:6-11.

FN272. Tr. 6118:16-6119:13; 6129:2-6130:3.

FN273. *Id.* Litvack also believed that attempting to relocate Ovitz within Disney would not improve the situation as Ovitz just was not a good match for Disney, although he conceded that that was up to Eisner. *See* Tr. 6128:12-6129:1.

### 4. *The November 25, 1996 Board Meeting*

The Disney board held its next meeting on November 25, and Ovitz was present. The minutes of this meeting contain no record that the board engaged in any discussion concerning Ovitz's termination, or that they were informed of the actions that Eisner and Litvack had taken to this point concerning Ovitz. [FN274] The only action recorded in the minutes concerning Ovitz is his unanimous renomination to a new three-year term to the board.[FN275] Gold testified, however, that by this time the board knew that Ovitz would be fired, but because Ovitz was present at the meeting it would have been akin to a "public hanging" to fail to re-nominate him.[FN276]

FN274. PTE 91.

FN275. *Id.* at WD01561A.

FN276. Tr. 3771:21-3772:16 (Because the proxy was not due for some time, Gold stated that the board chose to renominate Ovitz and then change the slate after he was fired instead of embarrassing Ovitz at the meeting.).

Although there was no mention of Ovitz's impending termination at the board meeting, it is apparent, despite the lack of a written record, that directly following the board meeting, there was some discussion concerning Ovitz at the executive session which was held at Disney Imagineering in a glass-walled room (according to those in attendance who remember this event).[FN277] One of the more striking images of this trial is that apparently Ovitz was directly outside the glass walls-looking in at this meeting-while his fate at Disney was being discussed. There are no minutes to show who attended the executive session, but I am reasonably certain that at least Eisner, Gold, Bowers, Watson and Stern were in attendance.[FN278] In the absence of further evidence, I must conclude that no other directors attended this session. It is also clear that Eisner notified the directors in attendance at the executive session that it was his intention to fire Ovitz by year's end and that he had asked Wilson to speak with Ovitz while they were onboard the Illusion during the upcoming Thanksgiving holiday.[FN279]

FN277. I recognize that certain portions of the deposition testimony concerning this executive session, whether it occurred, and what was said at it, are to some degree in conflict with the trial testimony. *See* Gold 357:20-361:24 (stating that he does not independently recall when the executive session occurred, but that there was an executive session during which Ovitz's termination was discussed); Litvack 573:7-574:9 (stating that he was unaware of an executive session, however if there was such a meeting, he would have been excluded); Russell 731:18-732:7 (stating that he does not recall an executive session after the November 1996 board meeting); Stern 163:14-164:2 (stating that he has no recollection of an executive session of the board after the November 1996 meeting). Although be later testified that after reviewing Gold's trial testimony that he vividly recalled the meeting, *see* Tr. 8155:13-8158:4, Eisner himself testified that this was not an *official* executive session, but instead he gathered the non-management directors in a room to discuss Ovitz. *See* Tr. 4425:7-4426:10. Despite these conflicts, I am convinced that such a meeting took place. What was discussed at that meeting,

however, is an entirely separate question that I will deal with shortly.

FN278. Mitchell was called after the meeting by Eisner and was told that there was some discussion of Ovitz's performance. Tr. 5758:21-5759:10. Mitchell, however, was not told anything concerning the NFT. *See* Tr. 5782:8-18.

FN279. Tr. 4551:17-4552:21 (Eisner); 3772:17-3773:18, 3785:3-9 ("You couldn't have left the November … executive session without knowing where Mr. Eisner was going [as concerned Ovitz].") (Gold); 5950:20-5952:13 (Bowers); 7859:23-7862:5 (Watson); 8155:13-8158:4 (Stern).

Beyond Ovitz's impending doom and Wilson's upcoming boat trip, there is some controversy as to whether any details of the NFT and the cause question were discussed at this meeting. Eisner testified that, in addition to the other items, he informed those in attendance of what the NFT would cost Disney. [FN280] Gold tells a somewhat more elaborate (and certainly more self-serving) version of the meeting in which Gold asks Eisner whether Ovitz's termination would be for cause, and Eisner assures Gold, in the presence of the other directors, that Litvack had advised Eisner that there were no grounds for a "for cause" termination.[FN281] After the executive session adjourned, Gold testified that Litvack came into the room and Eisner told Gold to ask Litvack about cause, and that Litvack then told Gold that there was no cause to terminate Ovitz.[FN282] Stern, noting at trial that he had failed to recall anything at all concerning this meeting during his deposition, echoed Gold's version, stating that after the meeting, Litvack said that there was "no other way to go" besides an NFT.[FN283]

FN280. Tr. 4425:7-4426:10.

FN281. Tr. 3773:15-3774:16.

FN282. Tr. 3774:17-3776:7; 3906:17-3908:4. Gold told a slightly different story at his deposition which had Litvack in the room during the entire executive session and did not have Gold asking Litvack questions about outside counsel. *See* Gold 348:12-351:15.

FN283. Tr. 8155:13-8158:4.

**\*22** Outside of Gold and Stern, nobody else present at the executive

session recalled Gold raising the issue of fault with Eisner or having witnessed Gold speak with Litvack. Litvack recalls speaking with Gold sometime before December 12, and he recalls in substance a similar conversation to what Gold and Stern recall, that is, Eisner telling Gold to ask Litvack about cause. Litvack, however, cannot place that conversation in time, believes it took place in the boardroom and believes that the only people present were Eisner, Gold and himself.[FN284] Because of these numerous discrepancies, I cannot conclude that Gold questioned Eisner during this meeting regarding cause, nor can I conclude that the conversation that took place between Gold and Litvack occurred after the executive session in the presence of those who were in attendance.

FN284. Tr. 6343:20-6346:5.


### 5. *The Illusion Dispelled*

Shortly after the November 25 board meeting and executive session, the Ovitz and Wilson families left on the Illusion for a Thanksgiving trip to the British Virgin Islands. Ovitz embarked on this trip with the hope that if he could figure out a way to make it to Christmas, he could fix everything with Disney and make his problems go away.[FN285] Wilson, however, had other plans. [FN286] Ovitz recalled the conversations between him and Wilson quite well. Ovitz recalled that Wilson told him that "it wasn't going to work and that [Eisner] wanted [Ovitz] out of the company."[FN287] Ovitz said that after speaking with Wilson he began to realize how serious the situation with Disney had become and that he needed to talk to his attorneys and get some perspective on the situation.[FN288] Wilson was unable to recall the details of what he and Ovitz spoke about,[FN289] but Wilson does recall that Ovitz was quite "emotionally concerned" with his situation at Disney.[FN290]

FN285. Tr.2050:1-10.

FN286. Wilson also testified that Eisner informed him that Ovitz would be entitled to a payment under the OEA if he was terminated without fault, and that Wilson knew what the approximate value of that payment was. *See* Tr. 7031:10-7032:4.

FN287. Tr.2051:7-11.

FN288. *Id.*

FN289. Tr. 7016:16-22.

FN290. Tr. 7017:24-7018:5.

At some point during the trip, Eisner contacted Wilson by phone and Wilson related the situation and the progress he had made with Ovitz.[FN291] Wilson was unable to remember the specifics of his conversation with Eisner, but his recollection was refreshed after viewing notes, dated December 1, taken by Eisner following the conversation.[FN292] Wilson recalled describing Ovitz as a "wounded animal ⋯ in a corner," and stated that by this he meant that Ovitz could become dangerous to the organization if the relationship with Disney continued.[FN293] Wilson also recalled stating that Ovitz was a "loyal friend and devastating enemy," [FN294] and advising that Eisner should be reasonable and magnanimous, both financially and publicly, so Ovitz could save face.[FN295]

FN291. Tr. 7016:23-7017:9.

FN292. PTE 25.

FN293. Tr. 7026:22-7027:23; see also PTE 25.

FN294. Tr. 7028:2-7029:1.

FN295. Tr. 7030:6-7031:9.

On December 3, having returned from his Thanksgiving trip, Ovitz, armed with his newfound understanding that his time at Disney was rapidly coming to an end, met with Eisner to discuss the terms of his departure. Eisner memorialized this meeting in a note to Russell which read "I met with Michael Ovitz today who wants to bring our discussions to a conclusion this week, wants you and Bob Goldman to settle out his contract immediately and sign it by weeks end."[FN296] Essentially, this note asked Russell to take charge of managing the Ovitz departure. Ovitz asked that he not have to deal personally with Litvack during the termination process, although he had no qualms about Litvack being involved.[FN297] Ovitz also asked for several concessions from Disney, including keeping his seat on the board, obtaining a consulting/advising arrangement with Disney, the continued use of an office and staff (but not on the Disney lot), continued health insurance and home security, continued use of the company car and the repurchase of his plane.[FN298]

FN296. PTE 326 DD002539.

FN297. *Id.* at DD002540; *see also* Tr.2060:19-2061:9.

FN298. PTE 326.

**\*23** Although Eisner and Ovitz did not see eye to eye on Ovitz's requests, Eisner initially objected only to Ovitz's continued use of the company car, telling Russell, "I don't want to nit pick here, but we are paying him a fortune."[FN299] The memo to Russell does not reflect Eisner's objections to Ovitz's other requests. Eisner, however, testified that "by the time I got from number one to number five [of listing Ovitz's requests] I had already realized it was a bad idea, and the next day I called him and told him that ⋯ it would be impossible."[FN300] Eisner also told Russell that:

FN299. *Id.* at DD002539.

FN300. Tr. 4397:20-24.

Any deal we make that is one cent more than the contract should include a non raid clause with teeth, a non compete in areas he advises us in, and a non disclose or bad mouth me or the company for five years at least. It would be great if you paid some of his money out over time which he would lose if he broke that deal.[FN301]

FN301. PTE 326 at DD002540; *see also* PTE 379.

Shortly after this meeting, Ovitz spoke with Russell on the phone, and Russell described the conversation as "a very, very troubling and unusual conversation."[FN302] Russell stated that during their conversation, Ovitz made clear that he understood that the door to Disney was closed, but he was still "pleading his heart out ⋯ [with] tears in his voice."[FN303] Over the next week, Disney, and more accurately, Eisner, rejected every request that Ovitz had made, informing him that all he would receive is what he had contracted for in the OEA and nothing more.[FN304] Other than the extra benefits which Ovitz requested and Disney summarily denied, there seems to have been no negotiation between anyone in Ovitz's camp and anyone at Disney concerning whether there would be a for cause termination or an NFT, and nobody seems to have even mentioned to Ovitz or his representatives the possibility of a for cause termination.[FN305]

FN302. Tr. 2577:3-2578:1.

FN303. *Id.*

FN304. Tr. 1379:21-1380:5, 3228:9-3229:19 (denial of continuing seat on board); 1379:1-20, 2098:5-13, 3227:8-18 (denial of consulting agreement); 3224:7-21 (denial of use of office and staff); 2063:21-2064:10, 3225:10-13 (denial of opportunity to repurchase plane); 6178:15-6179:23 (denial of repurchase or continued use of car).

FN305. Tr. 1378:6-14 (Ovitz) (stating that Eisner never mentioned to him the possibility that he would be fired for cause); 4455:3-19 (Eisner) (stating that at no time did he mention to Ovitz the possibility that he could be fired for cause, and denying that any negotiations took place between the two parties); 2640:17-2641:21 (Russell) (stating that he had never mentioned anything concerning a for cause termination to Ovitz or anyone working for Ovitz); 6186:15-6187:4 (Litvack) (stating that to the best of his knowledge, neither he nor anyone else at Disney ever mentioned to Ovitz or one of his representatives that he could be fired for cause).

## 6. *Ovitz's Bonus and His Termination*

On December 10, the Executive Performance Plan Committee ("EPPC") met to consider annual bonuses for Disney's most highly-compensated executive officers. The EPPC was chaired by Gold, its other members Lozano, Poitier and Russell, attended, although Poitier and Lozano attended by phone.[FN306] Also in attendance were Eisner, Watson, Litvack, Santaniello, and Marsha Reed. [FN307] Russell informed all those in attendance of his conversations with Ovitz's representatives and that Ovitz was going to be terminated, but that he was not going to be terminated for cause.[FN308] At this meeting, Russell recommended that Ovitz, despite his poor performance and imminent termination, should receive a $7.5 million bonus for his services during the 1996 fiscal year because Disney had done so well during the fiscal year and because Disney had a large bonus pool.[FN309] The EPPC approved this recommendation and it appears that Russell may have even advised the EPPC (despite the *clear* language in the OEA stating that the *bonus was discretionary* ) that Disney was contractually obligated to pay Ovitz his bonus.[FN310] Despite the fact that all of those in attendance should have known better, nobody spoke up to correct the mistaken perception

that Ovitz had to receive a bonus, let alone a $7.5 million bonus.

FN306. PTE 51.

FN307. *Id.* Watson attended by phone.

FN308. Tr. 2581:23-2582:17; 3785:3-3786:11; 4429:7-4430:4; *see also* DTE 163.

FN309. PTE 51 at WD01229; *see also* 2582:18-2583:12.

FN310. Tr. 3926:11-15 (Gold) (stating that Russell stated that the bonus was mandatory); 7752:1-7754:22 (Lozano) (stating that although he could not recall Russell advising the EPPC that the bonus was mandatory, that he believed that they were contractually obligated to grant Ovitz a $7.5 million bonus); 6154:15-6156:16 (Litvack) (stating that Russell told the EPPC that the bonus was mandatory, and that Litvack did not say anything because he was not sure what Russell was referring to and he did not want to embarrass Russell). Planning to correct Russell's mistake when he spoke with him later on, Litvack nonetheless ordered that Ovitz's bonus be paid. *See* PTE 175; Tr. 6156:16-6157:10.

**\*24** The following evening, Eisner met with Ovitz at Eisner's mother's apartment in New York City.[FN311] By the time this meeting occurred, it had already been decided that Ovitz was being terminated, without cause, and would be receiving his contractual NFT payment, and that he would not be receiving any of the additional items that he asked for.[FN312] The purpose of this meeting was to agree to a press release to announce the termination, let Ovitz know that he would not receive any additional items, and as Eisner described it, it served as "the final parting." [FN313] Eisner and Ovitz apparently came to some understanding that neither Ovitz nor Disney was to defame each other in the press, and that the separation was to be undertaken with dignity and respect for both sides.[FN314] Ovitz's termination was memorialized the following day in a letter signed by Litvack and dated December 12.[FN315] Litvack testified that Russell negotiated the terms in the letter, but Litvack signed this document on Eisner's instructions.[FN316] The board was not shown the December 12 letter,[FN317] nor did it meet to approve its terms.[FN318]

FN311. Tr. 4402:8-4403:8.

FN312. Eisner did give some testimony that by December 11 he still intended to give Ovitz some sort of consulting arrangement separate from and unrelated to the OEA. The overwhelming weight of the evidence, however, demonstrates that this was not in fact the case, and it certainly did not happen. *See* Tr. 4601:6-23.

FN313. Tr. 4592:18-4593:6.

FN314. Eisner 654:16-655:16; *see also* Tr. 4601:8-18.

FN315. PTE 13. The letter reads:

This will confirm the terms of our mutual agreement as follows:

1. The term of your employment under your existing Employment Agreement with Disney will end on January 31, 1997.

2. This letter will for all purposes of the Employment Agreement be given the same effect as though there had been a "Non-Fault Termination," and the Company will pay you, on or before February 5, 1997, all amounts due you under the Employment Agreement, including those under Section 11(c) thereof. In addition, the stock options granted pursuant to Option A, will vest as of January 31, 1997 and will expire in accordance with their terms on September 30, 2002.

FN316. Tr. 6157:11-6159:8.

FN317. Bowers 335:3-14; Gold 207:13-18; Roy Disney 189:20-190:10.

FN318. Tr. 3933:8-20 (Gold); 4102:23-4103:11 (Eisner); 5772:18-5773:4 (Mitchell); 5881:24-5882:23 (Nunis); 5990:21-5991:10 (Bowers); 7248:3-7249:6 (Poitier); 7615:19-7616:16 (Murphy); 7758:2-7759:22 (Lozano).

Also on December 12, Disney issued the press release announcing Ovitz's termination.[FN319] The press release stated that "Michael S. Ovitz, will leave the company by mutual agreement effective January 31, 1997. He will continue to serve as an advisor and consultant to the company and the Board of Directors."[FN320] Although I am puzzled by the use of the phrase

"mutual agreement," I am nonetheless convinced, based upon Ovitz's constant self-denial and difficult behavior during the months leading up to his termination, and Eisner's commitment that he would handle the termination gracefully for Ovitz's benefit (and likely to prevent Ovitz from defaming him and Disney in the press),[FN321] that the termination was anything but a mutual agreement. [FN322] Additionally, although I am troubled by the statement in the press release that Ovitz would continue to serve as an advisor and consultant to the board, because this was either a deliberate untruth or an incredibly irresponsible and sloppy error on Disney's part, it is ultimately immaterial to the issues to be resolved in this case. Therefore, I do not believe that the statement in the press release regarding Ovitz continuing as an advisor and consultant to the Disney board is reflective of any agreement or understanding that Disney and Ovitz had at the time.[FN323] The Court believes that both of these untrue statements were likely made as part of an effort by Disney to make Ovitz's departure seem as amicable as possible so that Ovitz's reputation would not be publicly tarnished any more than could be avoided. In any event, once Ovitz left Eisner's mother's apartment, he never again returned to Disney. [FN324]

FN319. PTE 390.

FN320. *Id.*

FN321. PTE 19 at WD4000. *See also* Tr.2088:1-5 (Ovitz) (stating "what we agreed on that they tried to handle this with some dignity for me and some grace and were very generous in their press release, which was very nice for them to do.").

FN322. *See also* Tr.2087:6-2088:5 (Ovitz) (stating that "I wouldn't leave by mutual agreement and I wasn't going to serve as an advisor and consultant. I wanted to [serve in those positions.]"); 2573:11-21 (Foster: "[Ovitz's] departure was not voluntary, is that correct?" Russell: "No way, no way."); 4525:12-16 (Schulman: "You were trying to work out getting Mr. Ovitz's consent; correct?" Eisner: "I was not trying to get his consent on being fired. I was trying to get his consent of leaving the company in a graceful way.").

FN323. Tr.2087:6-2088:5. What makes it even clearer that Disney was simply trying to mislead the public is that no such representation was made in Ovitz's termination letter. PTE 13.

FN324. Tr. 1382:22-1383:1.

That same day, Eisner at least attempted to contact each of the Board members by phone before the issuance of the press release in order to notify them that Ovitz had been officially terminated.FN325 None of the board members at that time, or at any other time before or during trial, ever objected to Ovitz's termination; in fact, most if not all thought it was the appropriate move for Eisner to make.FN326 Also on December 12, copies of the press release along with a letter from Eisner were sent to each of the directors. FN327 The letters contained no more information regarding the termination than was contained in the press release.

FN325. DTE 413 (Eisner's incoming and outgoing phone log from December 12 through December 14 listing calls placed to Nunis, Roy Disney, Russell, O'Donovan, Wilson, Murphy, Gold, Stern, Bowers, Poitier and Walker); *see also* Tr. 3802:6-2223 (Gold) (testifying that Eisner notified him by phone, and asked him to pass the news on to Roy Disney); 5810:19-5811:20 (Nunis) (testifying that Eisner notified him by phone); 5932:7-5833:3 (Bowers) (testifying that Eisner notified her by phone); 7556:1-7557:15 (T. Murphy) (testifying that Eisner notified him by phone); 7642:21-7643:9 (Lozano) (testifying that Eisner notified him by phone); 8159:19-8160:24 (Stern) (testifying that Eisner notified him by phone). Eisner also notified Bass and Warren Buffett. Tr. 4405:18-4406:14.

FN326. Tr. 3778:1-23 (Gold) (stating that as of the November 25 executive session, he concurred with Eisner's decision to terminate Ovitz despite what it would cost Disney); 4026:13-4028:5 (Roy Disney) (stating that he supported the decision to terminate Ovitz despite the cost involved because of the significant problems Ovitz was causing within Disney); 4405:18-4409:10 (Eisner) (stating that he received no objection from any board member after placing phone calls to notify them of Ovitz's termination or after they received copies of the press release and accompanying letter); 5810:19-5811:20 (Nunis) (stating that as of the press release he supported Eisner's decision to terminate Ovitz because "turmoil at the top of the company" was dangerous for everyone); 5933:22-5935:15 (Bowers) (stating that she supported Eisner's decision to terminate Ovitz as of the press release because it was clear that Ovitz was not a team player); 6720:11-6720:23 (O'Donovan) (stating that he supported Eisner's decision to terminate Ovitz because it is important to have harmony at the top of a large

organization); 7144:3-7146:13 (Poitier) (stating that he believed Ovitz had to be terminated according to the terms of the OEA because it was a "clear mismatch"); 7556:3-7557:7 (Murphy) (stating that he supported Eisner's decision to terminate Ovitz despite the cost because it was the best thing for Disney and its shareholders); 7642:21-7643:24 (Lozano) (stating that he supported Eisner's decision to terminate Ovitz despite the cost to Disney); 8158:5-8160:24 (Stern) (stating that he supported Eisner's decision to terminate Ovitz because it was a bad relationship, and the amount Disney would save would outweigh the cost of the termination).

FN327. PTE 13.

**\*25** Thus, as of December 12, Ovitz was officially terminated without cause. Up to this point, however, the Disney board had never met in order to vote on, or even discuss, the termination at a full session, and few if any directors did an independent investigation of whether Ovitz could be terminated for cause. As a result, the Disney directors had been taken for a wild ride, and most of it was in the dark. Additionally neither the EPPC nor the compensation committee had a vote on the matter, and it seems as though they had yet to have a substantive discussion of whether Ovitz could be terminated for cause. Many directors believed that Eisner had the power to fire Ovitz on his own and that he did not need to convene a board meeting to do so.[FN328] Other directors believed that if a meeting was required to terminate Ovitz, that Litvack, serving as corporate counsel, would have advised them that was the case and he would have made sure one was called.[FN329] Litvack believed that Eisner had the power to fire Ovitz on his own accord and, therefore, did not believe it was necessary to convene a meeting.[FN330] Litvack also stated that he did not call a meeting because not only did he believe that Eisner was empowered to fire Ovitz on his own, but Litvack believed that all the directors were up to speed and in agreement that Ovitz should be terminated.[FN331] Although there was no meeting called to vote on or even discuss Ovitz's termination, it is clear that most, if not all, directors trusted Eisner's and Litvack's conclusion that there was no cause and that Ovitz should still be terminated without cause even though this entailed making the costly NFT payment.[FN332]

FN328. Tr. 2587:1-7 (Russell); 5733:3-5734:17 (Mitchell); 6721:8-21 (O'Donovan); 7067:21-7069:8 (Wilson); 7561:9-13 (Murphy); 8233:5-16 (Stern).

FN329. Tr. 2889:10-2892:3 (Russell); 6720:21-6721:7, 6785:1118-6786:15 (O'Donovan); 7227:2-7 (Poitier); 7561:14-17 (Murphy); 7466:11-7467:2 (Lozano).

FN330. Tr. 6149:4-6151:11.

FN331. *Id.*

FN332. Tr. 2574:5-2576:21 (Russell) (stating that he believed that Eisner and Litvack had done sufficient research and trusted their judgment that there was no cause to terminate Ovitz, that he was unaware of anything that would constitute cause to fire Ovitz, and that he was aware that Ovitz would receive the NFT payment); 3775:12-3778:18 (Gold) (stating that he was aware of the size of the NFT payment, that after asking Litvack about his conclusions concerning cause he believed that Litvack had done and was continuing to do sufficient research and Gold trusted his and Eisner's conclusions, and that Gold also had no knowledge of any act that would have constituted cause to fire Ovitz); 5597:18-5598:13 (Mitchell) (stating that he relied on and trusted Litvack's determination that there was no cause and Mitchell knew of nothing that would have constituted cause); 5813:2-24 (Nunis) (stating that he believed that if Eisner and Litvack could have avoided paying the NFT that they would have done so); 5933:4-5934:24 (Bowers) (agreeing with Eisner's decision, that Disney would honor the terms of the OEA and make a large payment to Ovitz including a large cash payment and acceleration of the options); 6781:18-6782:9 (O'Donovan) (stating that he was not aware of the value of Ovitz's payment and relied on Litvack entirely to make the cause determination); 7557:2-15 (Murphy) (stating that he believed that if there was a way that Eisner could have avoided paying Ovitz he would have and he therefore trusted Eisner's judgment on the issue of cause); 7867:2-7868:2 (Watson) (stating that he did not believe that Ovitz was grossly negligent or malfeasant and that therefore he could not be fired for cause); 8160:2-8161:16 (Stern) (stating that he believed that Ovitz never lied to him, and that Stern trusted Eisner's judgment because he had a reputation for being "a tough buck," and if Eisner could have avoided paying Ovitz he would have).

During the week that Ovitz was terminated (December 11-16), articles began appearing in the press with quotes from Ovitz or his representatives describing why Ovitz left Disney and detailing to some extent the size of his

severance package.[FN333] For example, a December 14 article in the Baltimore Sun reported that "Resigning Disney President Michael Ovitz said yesterday through a representative that Disney is giving him a $90 million severance package."[FN334] Other articles describing Ovitz's frustrations at Disney stated that Ovitz "wasn't game to struggle against a bad situation,"[FN335] and that "Ovitz was frustrated by his poorly defined role, Eisner's reluctance to share power and repeated clashes with other senior Disney executives ⋯ notably [Litvack] and [Bollenbach],"[FN336] and that "the reality was that Eisner did not let go ⋯ [and that] Eisner thwarted [Ovitz] by not giving him detailed responsibilities or the power to manage the various Disney divisions."[FN337] The articles also stated that Ovitz's departure was mutual,[FN338] and some went so far as to state that Ovitz's departure was his own idea.[FN339] Additionally, it was reported that Ovitz had hired a public relations consultant named Steven Rivers to put a positive spin on the termination for Ovitz.[FN340] Ovitz, however, testified that he did not employ Rivers or any other PR firm at this time.[FN341] Eisner believed that he had been generous in his treatment of Ovitz, as well as his agreement to make the termination seem mutual, and felt that these articles were:

FN333. DTE 243.

FN334. DTE 243 at 13-14; *see also id.* at DD002077, DD002068.

FN335. *Id.* at DD002075.

FN336. *Id.* at DD002077.

FN337. *Id.* at DD002068.

FN338. *Id.* at DD002075.

FN339. *Id.* at DD002084.

FN340. Tr. 4432:20-4433:1 (Eisner) (testifying that, when he confronted Ovitz about these articles, Ovitz admitted to hiring Rivers); *see also* DTE 243 at DD002076, DD002084, DTE 243 at 12, 14.

FN341. Tr.2090:17-2091:6.

**\*26** an incredible betrayal not of a contract, not of any kind of written agreement, but that I had bent over backwards, and not because he was my friend. I would do it with anybody that was leaving under these circumstances, and he just, you know, threw it right in the company's face. And I was reading every single day about what idiots we were, the Disney Company, and how he had done this enormous feat.[FN342]

> FN342. Tr. 4433:2-4433:14.

On December 16, Eisner reacted to these stories by sending an e-mail to John Dreyer, Disney's communications chief, which among other things stated that Ovitz was a "psychopath" and "totally incompetent." [FN343] Eisner described the letter as his effort at "venting" and that "although [he] didn't know what the words meant, [he] was just so angry."[FN344]

> FN343. PTE 20.

> FN344. Tr. 4433:15-21.

Following the official termination, the EPPC met on December 20 with the sole purpose of rescinding Ovitz's $7.5 million bonus. Litvack stated that after the December 10 EPPC meeting, he had questioned Russell as to whether the bonus was mandatory, and that Russell had sent Litvack a memo (which had been drafted almost a year earlier as an introduction to the OEA) on December 18, and in that document it became apparent that the bonus was not in fact mandatory. [FN345] Russell also had a discussion with Gold on December 18 during which he told Gold that his recommendation that Ovitz be paid a bonus was stupid and that he was worried that members of the EPPC were under the mistaken belief that the bonus was contractual.[FN346] Gold testified that within a week of the December 10 meeting, Litvack and Russell came to him "sheepishly, and said 'we've made a mistake.' ' [FN347] On December 20 a special telephonic meeting of the EPPC was convened with the purpose of rescinding Ovitz's $7.5 million bonus, which the EPPC had voted in favor of just ten days earlier. [FN348] Gold, Lozano, Russell, Watson, Eisner and Litvack attended the meeting.[FN349]

> FN345. PTE 180; *see also* Tr. 6159:20-6161:5.

> FN346. Tr. 2589:12-2591:1; *see also* PTE 384 (Russell's notes of his meeting with Gold).

FN347. Tr. 3799:15-3800:7.

FN348. PTE 53.

FN349. *Id.*

Russell's self-prepared agenda for the meeting outlines what was discussed before revoking Ovitz's bonus, including that it would be "illogical and impossible to justify any bonus one day and fire him the next, [and that] Committee members [could not] be asked to try to justify it based on good performance."[FN350] The EPPC then revoked Ovitz's bonus. After the revocation, Gold questioned Litvack if he had not also made a mistake as to whether Ovitz could be terminated for cause and Litvack told Gold that he was sure that he had not. Gold also contends that Litvack said his view was supported by outside counsel.[FN351] Litvack denies ever having made this representation.

FN350. PTE 93; *see also* Tr. 2591:15-2592:2; 3797:14-3799:14.

FN351. Tr. 3796:1-18; 6167:20-6168:14.

After Ovitz's bonus was rescinded, Eisner, in a December 27 letter, accelerated Ovitz's departure date from January 31, 1997, to December 27, 1996, and Ovitz's tenure as both an executive and director of Disney ended on that date.[FN352] Similar to the December 12 letter, this letter states that Ovitz's termination "will for all purposes of the Employment Agreement be treated as a 'Non-Fault Termination.' " There was no mention in this letter of Ovitz serving as a consultant to the board, however.[FN353] The letter, unlike the December 12 letter, contained specific details of Ovitz's payout and stated Ovitz would immediately receive roughly $38 million in cash and that the first tranche of three million options would vest immediately.[FN354] Litvack is the signatory on this letter and Ovitz cosigned. Litvack, however, testified that he signed the letter agreement because no one else was available to do so during the holidays and that he had no role in drafting it.[FN355]

FN352. PTE 14.

FN353. *Id.*

FN354. *Id.*

FN355. Tr. 6170:14-19; 6586:18-6587:5.

**\*27** As previously mentioned, Disney also chose to withhold $1,000,000 of Ovitz's NFT payment "pending final settlement of [Ovitz's] accounts."[FN356] Ovitz has stated that his agreement to the holdback was a condition to "Disney honoring its contractual obligations." [FN357] Eisner, however, testified that it was common for executives at Disney to be behind on their expenses up to six months, so it made sense to holdback $1 million in case of lingering expenses.[FN358] Besides Eisner, Litvack, and perhaps Russell, no defendant even saw the December 27 letter before it was signed.[FN359] Additionally, neither the full board nor any committee thereof met to discuss the acceleration of Ovitz's departure or the $1 million holdback.[FN360] Shortly after Disney paid Ovitz what he was owed under the OEA for an NFT (minus the $1 million holdback), plaintiffs filed the current action.

FN356. *Id.* At the time that Eisner ordered the holdback, he did not know that Price Waterhouse would be called in to do a full audit of Ovitz's expenses. Tr. 5147:15-5150:11.

FN357. Ovitz Post Trial Br. at 13.

FN358. Tr. 4400:21-4402:4.

FN359. *See, e.g.,* Bowers 336:20-24; Lozano 213:19-214:2; Mitchell 40:13-23; T. Murphy 106:14-21; Nunis 80:3-5; O'Donovan 119:23-120:4; Poitier 176:24-177:18; Stern 192:9-23; Watson 442:16-19; Wilson 125:25-126:8; Roy Disney 190:11-24.

FN360. Tr. 3943:19-3944:22.

The full board next met on January 27, 1997. By this time, the board was aware of the negative publicity that the Ovitz termination and NFT payment had received. There was an extensive discussion of Ovitz's termination at this meeting and the pending lawsuit. Litvack, addressing the full board for the first time concerning the cause issue, notified the board that in his opinion there had been no gross negligence or malfeasance and, thus, Ovitz could not be terminated for cause.[FN361] Litvack stood by his decision at trial, stating he had learned nothing since 1996 that made him reconsider his original advice to the board that Disney could not fire Ovitz for cause.[FN362]

FN361. Tr. 2599:10-2600:9 (Russell) (stating that Litvack had

explained about the lawsuit and that he stated that "we had acted properly and that there would not have been a basis to claim that there was good cause under the employment agreement ⋯ with respect to the discharge of Michael Ovitz."); 4444:8-4446:12 (Eisner) (stating that the board was fully informed of all the details of Ovitz's termination and that Litvack explained the cause question "to the point that everybody was getting tired of me saying, "Okay, Sandy, say it once again. Who did you talk to? Are you sure? Did we do the right thing?"); 5936:13-5939:15 (Bowers) (stating that Litvack advised the board that there was no gross negligence or malfeasance to terminate Ovitz and that they had to pay him and that she also recalls Litvack stating that he had received outside counsel at this point); 6181:11-6183:11 (Litvack) (stating that he set out the whole Ovitz situation for the board and that he told the board that he did not believe there was gross negligence or malfeasance and hence no way to terminate Ovitz for cause) Litvack also stated that he did not recall saying that he had the advice of outside counsel, but that if he was asked he would have responded that he did. *Id.; see also* PTE 799.

FN362. Tr. 6693:1-12.

### D. Expert Witnesses

Six expert witnesses testified over the course of the trial.<u>FN363</u> In general, their reports and testimony, while meeting the minimum standards for admissibility, were not of as much help to the Court as they could have been because of the polarized nature of their opinions, especially their interpretations of the factual questions that are of central importance in this trial. I shall discuss each expert *seriatim.* To the extent that my conclusions about an expert are decidedly negative, that characterization is based upon an objective evaluation of the witness and the strength and relevance of the evidence presented both in the report and at trial.

FN363. A seventh expert, Alan Johnson, prepared a report on behalf of the defendants and was deposed, but he did not testify at trial. *See* Tr. 771:24-772:16. His amended report dated August 6, 2004, is part of the trial record. DTE 181. Professor Murphy spent a significant amount of time at trial disputing certain elements of Johnson's report. Tr. 833:21-857:19.

### 1. *Professor Deborah DeMott*

Plaintiffs offered Professor DeMott, the David F. Cavers Professor of Law at Duke Law School, as an expert on "the custom and practice with regard to corporate governance in Delaware public companies in the time period relevant to this case."[FN364] Professor DeMott was subject to an earlier motion *in limine,* whereby defendants sought to exclude her testimony. That motion was granted on the grounds that her report and proposed testimony did not comply with D.R.E. 702 and improperly opined on the application of Delaware law to the facts of this case.[FN365] Professor DeMott rewrote her report, [FN366] and her testimony was received at trial over defendants' objections.[FN367]

FN364. Tr. 23:20-24.

FN365. *See In re The Walt Disney Co. Derivative Litig.,* 2004 WL 550750 (Del.Ch. Mar.9, 2004).

FN366. PTE 462.

FN367. Tr. 24:1-38:6.

**\*28** Professor DeMott opined on the "custom and practice of corporate governance in publicly traded Delaware corporations as of the times relevant to the transactions in this case," and also on "whether the conduct of the board of directors of [the Company] complied with or departed from those customs and those practices."[FN368] Despite plaintiffs' and Professor DeMott's efforts to couch her opinion in terms of custom and practice of Delaware corporations, it was clear to all that her report and testimony were still directed to the core issues in this case-whether the defendants breached their fiduciary duties as they exist under Delaware law.[FN369]

FN368. Tr. 40:9-18.

FN369. For example, instead of using the term "custom and practice" in her report, Professor DeMott states that good corporate goverance "requires," "includes" and "envisions" certain actions. Tr. 98:24-101:10; *see also* Tr. 161:22-166:3 (plaintiffs' counsel objects to a question on cross-examination on the grounds that defense counsel was "just inserting the phrase 'custom and practice,' " and that these questions were "not going to what is the custom and practice in the particular time frame with respect to

public Delaware companies, but what are the legal requirements [imposed upon fiduciaries of Delaware corporations]").

In addition to opining on the core issues in this case,[FN370] another key area of Professor DeMott's report (and the corresponding testimony) that is of no value to the Court is her interpretation of the Company's certificate of incorporation, bylaws, and board committee charters.[FN371] Interpretation of the Company's internal governing documents is a matter exclusively for the Court.[FN372] Thus, there is very little, if any, of Professor DeMott's report that is of benefit to the Court, especially because the relevant question is not whether the defendants complied with the custom and practice of other Delaware corporations during the relevant time frame, but whether they complied with their fiduciary duties.[FN373]

FN370. See PTE 462 at ¶ 14 ("Neither Disney's Board nor its Compensation Committee gave careful consideration to the implications of the terms of Disney's employment agreement with Mr. [Ovitz]."); see also id. at ¶ 17 ("The record leaves no doubt that both the decision to terminate Mr. Ovitz's employment and the decision to characterize the termination as a non-fault termination were made by Mr. Eisner without consideration by Disney's Board.").

FN371. PTE 462 at ¶¶ 9, 12, 17; Tr. 172:6-175:5.

FN372. See Itek Corp. v. Chicago Aerial Indus., Inc., 274 A.2d 141, 143 (Del.1971).

FN373. Professor DeMott's testimony was useful, however, in the sense that it drew in stark relief the contrast between ideal corporate governance practices and the unwholesome boardroom culture at Disney-that is, her testimony clarified how ornamental, passive directors contribute to sycophantic tendencies among directors and how imperial CEOs can exploit this condition for their own benefit, especially in the executive compensation and severance area. See Tr. 43:4-46:15 (individualized one-on-one discussions between management and directors can lead to directors who are "unequally or unevenly informed with regard to significant matters" and "have the effect of vitiating, sapping the board's ability as an institution to function together collectively and collegially and deliberatively"); 83:12-84:6.

## 2. *Professor John Donohue*

Professor Donohue, the William H. Neukom Professor of Law at Stanford Law School, came to the witness stand on behalf of plaintiffs three different times during the course of the trial. His report and testimony were directed to the issue of whether Ovitz could (and should) have been terminated for cause as opposed to the NFT he received. The fatal flaw in Donohue's opinion is that it is based upon his factual determinations-determinations with which I, after weighing all of the evidence, do not agree.[FN374] For example, in the summary of his conclusions, Donohue states that Ovitz committed gross negligence or malfeasance because of his dishonesty, and because of eight other categories of bad acts.[FN375] As demonstrated above, in the lengthy and detailed recitation of the facts, I conclude that those determinations are simply not supported by a fair and neutral evaluation of the record.

FN374. *See* Tr. 636:16-637:6; 702:4-7.

FN375. PTE 404 at 4.

Donohue's opinion outlined an array of legal standards that might cover Ovitz's termination.[FN376] In his zeal to crucify Ovitz, Donohue concluded that Ovitz's conduct would meet any of the multiplicity of standards he discusses for gross negligence or malfeasance, and his report contains very little guidance in terms of which standard might be the most appropriate or most likely to be applied by a California court.[FN377] As a result, Donohue's report and testimony are of little value to the Court in evaluating defendants' conduct as it relates to Ovitz's termination.

FN376. *Id.* at 7-34.

FN377. *See id.* at 4.

Donohue was permitted to file a supplemental report based upon his review of certain documents, which were produced by defendants shortly before trial. [FN378] The supplemental report made no substantive changes to Donohue's opinions and conclusions.[FN379]

FN378. PTE 826.

FN379. *Id.*

### 3. Professor Kevin Murphy

**\*29** Professor Murphy (to whom I will refer as "Professor Murphy" in order to avoid any potential confusion with defendant Thomas Murphy), the E. Morgan Stanley Chair in Business Administration at the Marshall School of Business at the University of Southern California, presented expert testimony for plaintiffs on the issue of damages together with an economic and reasonableness evaluation of Ovitz's compensation package.[FN380] Professor Murphy concluded that Ovitz's compensation package was unreasonably excessive and orders of magnitude larger than the compensation awarded to executives with arguably equivalent responsibilities.[FN381] In determining the reasonableness of Ovitz's compensation, Professor Murphy chose not to consider Ovitz's past income at CAA and the effect that income would have on the remuneration he would expect from any future employment.[FN382] As would be expected, Professor Murphy concluded that the most reasonable and appropriate assumptions are those that would maximize the value of the OEA and corresponding cost of the NFT.[FN383] Perhaps Professor Murphy's most pointed criticism of the OEA is that the Company was unable to reduce its potential financial exposure because the OEA did not contain any provisions for mitigation or non-compete restrictions,[FN384] but that criticism is not supported by the language of the OEA.[FN385]

FN380. *See* PTE 426 (Professor Murphy report).

FN381. *See, e.g.,* Tr. 748:22-749:13.

FN382. Tr. 868:17-870:16; 1061:5-19; *see also* Tr. 1010:21-1020:18; 1036:12-1037:9; 1043:1-21.

FN383. *See* Tr. 901:6-919:14; 925:2-939:4; 980:4-989:7; 1072:11-1077:13; 1081:19-1085:17; PTE 426 at 24-31 (Professor Murphy's discussion of the cost to the Company of Ovitz's severance where he concludes that the Black-Scholes value (as opposed to intrinsic or realized cost) of Ovitz's options (by far the highest of the three) is the appropriate way to measure that cost).

FN384. Tr. 803:3-805:5.

FN385. *See* PTE 7 ¶ 9 at WD00209-10.

Professor Murphy's report did not include an event study, but at trial Professor Murphy gave a very brief and unpersuasive critique of Dunbar's event study, which as discussed below, concluded that the Company's market capitalization increased by more than $1 billion as a result of the announcement of Ovitz's hiring. The record does not reflect that Professor Murphy's qualifications as an expert extend to performing and interpreting event studies, and I therefore reject Professor Murphy's critique of Dunbar's conclusion with respect to the market's reaction to the announcement of Ovitz's hiring.[FN386] The remainder of his report, however, is of use to the Court in determining the economic consequences facing the defendants when the decisions at issue in this case were made.

> FN386. Notwithstanding the statements in the text above, Professor Murphy does make a very good point that the press release announcing Ovitz's hiring (PTE 3) does not disclose any economic terms of Ovitz's employment with the Company, and therefore, as a matter of common sense, the market cannot be said to have "approved" the economic terms of the OEA. *See* 859:7-860:3. One might intuit, however, that the $1 billion increase in the Company's market capitalization as a result of Ovitz's hiring would reflect the assumptions of the market as to the potential cost of Ovitz's employment contract, even if the market was unaware of the actual cost. Dunbar testified to this effect, outlining the public reports of Ovitz's compensation before the text of the OEA was filed publicly in December 1995 and concluding that the lack of statistically significant market reaction at that time was due to the market's correct assumptions of the size of the compensation package on August 14, 1995. Tr. 7296:8-7297:20; 7414:19-7416:3; DTE 428 at 3-9.

### 4. *Larry R. Feldman*

Ovitz's expert with respect to whether he could have been terminated for cause was Larry Feldman. Feldman is a renowned litigator in southern California and is currently employed at Kaye Scholer LLP.[FN387] Feldman opined that the Company had no grounds upon which to terminate Ovitz for cause, and that had the Company done so, that Ovitz would have been able to pursue meritorious claims for breach of contract, fraud and defamation, with damages far in excess of the value of the NFT.[FN388]

> FN387. *See* DTE 408 at 1-2.

FN388. DTE 408 at 47.

Upon comparing Feldman's report to the factual determinations I have made, I conclude that the evidence presented at trial is generally consistent with Feldman's view of the relevant facts. Feldman's legal analysis, however, is more troublesome. For example, I am not persuaded in the least that the legal standard used by Feldman in his report to define gross negligence or malfeasance-criminal misconduct or its equivalent-is the correct standard. FN389 Additionally, his opinion with respect to potential claims for defamation and fraud in the inducement is thinly supported and fails to adequately address potentially meritorious defenses that the Company could have asserted to such causes of action. FN390 In sum, therefore, Feldman's report and testimony are of some value to the Court, but not substantial value.

> FN389. DTE 408 at 10-16. *But see* PTE 404 at 17-18 (Donohue's opinion that gross negligence is not exclusively a criminal standard); DTE 430 at 8-11 (Fox concurring with Donohue); *cf.* Tr. 8333:24-8334:10 (Feldman) (stating at trial that gross negligence does not require actual criminal misconduct).

> FN390. *See* DTE 408 at 36-44; Tr. 8403:19-8411:3; 8455:21-8467:3; 8552:18-8577:21.

### 5. *John C. Fox*

**\*30** John Fox, a partner of Fenwick & West LLP, testified on behalf of all defendants but Ovitz as an expert with respect to whether Ovitz could have been terminated for cause. Fox's report and testimony were very thorough, well reasoned and informed by Fox's extensive practical experience as an employment law litigator and advisor. FN391

> FN391. *See* DTE 430 (Fox report); DTE 248 (Fox's supplemental report).

The overwhelming majority of Fox's factual determinations are consonant with the conclusions I have reached above based upon the evidence presented at trial. His legal conclusions based upon those facts, therefore, are of far greater weight and persuasive value than the conclusions reached by Donohue. Similar to Feldman, Fox gives short shrift in his report to analyzing Ovitz's potential claims for fraud in the inducement and

defamation.[FN392] Unlike Feldman, however, Fox was able to clearly articulate at trial the reasoning behind his conclusion with respect to the viability of these tort claims, bolstering the value of his report in those areas.[FN393] Fox also testified in great detail regarding the definition of gross negligence and malfeasance.[FN394] He also opined that, regardless of how gross negligence and malfeasance might be defined in a hypothetical *Ovitz v. The Walt Disney Company* suit had Ovitz been terminated for cause, after reviewing the evidence, Ovitz's conduct (or misconduct) did not even come close to that high standard. [FN395] In summary, Fox's report is of significant value to the Court, and I will weigh his conclusions accordingly in making my determinations regarding the ultimate issues in this case.

FN392. DTE 430 at 27-28; *see* DTE 430 at 28; DTE 408 at 36-43.

FN393. *See* Tr. 8838:1-19; 8866:3-17; 8905:20-8908:1; 8948:20-8951:13; 8956:6-8960:9; 9207:14-9213:23; 9222:23-9231:19; 9244:21-9246:8.

FN394. Tr. 8739:15-8748:4; 8999:20-9039:22; 9084:5-20.

FN395. Tr. 8758:1-8837:3; 8844:10-8860:6; 8922:3-8925:18; 8947:5-8951:13; 8955:10-8961:24; 9025:22-9026:15; 9039:23-9040:12; 9048:3-9195:7.

### 6. *Frederick C. Dunbar*

The remaining expert was Frederick Dunbar, Senior Vice President of National Economic Research Associates, Inc., who testified on behalf of the defendants as to the market reaction to the hiring of Ovitz and also critiqued Professor Murphy's report as it related to the valuation of Ovitz's options and the present value calculation of the cash portion of the NFT payment.[FN396] Dunbar's conclusion with respect to the market's overwhelmingly positive reaction to Ovitz's hiring is not unassailable, but is nonetheless well-supported by the evidence and based upon accepted methods of analysis. [FN397] With respect to his opinion that a reduced or discounted option expiration date is appropriate when performing a Black-Scholes valuation of the options, Dunbar's testimony at trial was thorough and convincing.[FN398] Accordingly, Dunbar's Black-Scholes calculations are more valuable and persuasive than those performed by Professor Murphy and will be useful in evaluating the defendants' actions.

FN396. *See* DTE 428 (Dunbar report). I have omitted any discussion regarding Professor Murphy's opinion regarding the appropriate discount rate (together with Dunbar's response thereto) because there is no evidence in the record that would indicate that any of the defendants in this action exercised any discretion whatsoever in determining the discount rate applied to the cash payment received by Ovitz as a result of the NFT. Without that evidence connecting a defendant to that decision, I fail to see the current relevance of why other discount rates might have been appropriate. Whichever Disney employees made the decision as to which discount rate to use, were they before the Court, would receive the protections of the business judgment rule. There is no evidence in the record that would impugn in any way the presumptions of care, loyalty, or good faith used by those employees in the business judgment of determining the appropriate discount rate. For that reason, an analysis of why a particular discount rate might have been more appropriate than the one selected is not germane to the issues to be decided herein. *See* Santaniello 149:16-154:14 (stating that he was unaware of how the discount rate was determined); PTE 130 (memo from the Company's Controller's office to Santaniello enclosing present value calculations at 6.5% and 6.75%); PTE 131 (demonstrating that the 6.5% discount rate was actually used in paying Ovitz).

FN397. DTE 428 at 3-9; Tr. 7287:6-7300:3; 7365:6-7448:16.

FN398. Tr. 7306:11-7333:16; 7448:17-7506:6. In contrast, Professor Murphy's explanation for using the latest possible termination date when valuing the options upon termination, based upon the fact that the exercisability of those options was extended, (in exchange for dropping the $50 million guarantee), and based upon an array of possible hedges, is not nearly as persuasive. *See* Tr. 823:18-830:20; 964:19-972:20.

## II. LEGAL STANDARDS

The outcome of this case is determined by whether the defendants complied with their fiduciary duties in connection with the hiring and termination of Michael Ovitz. At the outset, the Court emphasizes that the best practices of corporate governance include compliance with fiduciary duties.[FN399] Compliance with fiduciary duties, however, is not always enough to meet or to satisfy what is expected by the best practices of corporate governance.

FN399. All good corporate governance practices include compliance with statutory law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability. But they are not required by the corporation law and do not define standards of liability.

*Brehm v. Eisner,* 746 A.2d 244, 256 (Del.2000).

**\*31** The fiduciary duties owed by directors of a Delaware corporation are the duties of due care and loyalty.[FN400] Of late, much discussion among the bench, bar, and academics alike, has surrounded a so-called third fiduciary duty, that of good faith. Of primary importance in this case are the fiduciary duty of due care and the duty of a director to act in good faith. Other than to the extent that the duty of loyalty is implicated by a lack of good faith, the only remaining issues to be decided herein with respect to the duty of loyalty are those relating to Ovitz's actions in connection with his own termination. [FN401] These considerations will be addressed *seriatim,* although issues of good faith are (to a certain degree) inseparably and necessarily intertwined with the duties of care and loyalty, as well as a principal reason the distinctness of these duties make a difference-namely § 102(b)(7) of the Delaware General Corporation Law.[FN402]

FN400. The Delaware Supreme Court has been clear that outside the recognized fiduciary duties of care and loyalty (and perhaps good faith), there are not other fiduciary duties. In certain circumstances, however, specific applications of the duties of care and loyalty are called for, such as so-called " *Revlon* " duties and the duty of candor or disclosure. *See Malpiede v. Townson,* 780 A.2d 1075, 1083, 1086 (Del.2001); *Paramount Communications Inc. v. QVC Network, Inc.,* 637 A.2d 34, 43 (Del.1994). ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, 'the directors must act in accordance with their fundamental duties of care and loyalty.' ") (citation omitted)).

FN401. *See In re The Walt Disney Co. Derivative Litig. ("Disney III"),* 2004 WL 2050138, at \*7 (Del.Ch. Sept.10, 2004); *Brehm,*

746 A.2d at 257-58.

FN402. Perhaps these categories of care and loyalty, so rigidly defined and categorized in Delaware for many years, are really just different ways of analyzing the same issue. Professor Sean Griffith said it best when he recently wrote:

At first glance, the duties of care and loyalty appear quite distinctive····

A bit of digging beneath these surface differences, however, reveals the richly interconnected roots of the two doctrinal paradigms. Start with the duty of care: directors must conduct themselves as ordinarily prudent persons managing their own affairs. So far so good, but a moment's reflection reveals that an ordinarily prudent person becomes an ordinarily prudent director only once we assume an element of loyalty. How do ordinarily prudent directors conduct their affairs? A decision is taken with due care, when from an array of alternatives, the directors employ a procedure to pick the one that best advances *the interests of the corporation.* Now pause for a moment to consider what a funny way this is of conceiving what an ordinarily prudent person would do *in the conduct of her own affairs.* We might typically assume that an ordinarily prudent person, in evaluating a set of alternatives, picks the one that provides the most benefit and least cost to *herself.* A director's decision-making process, however, can be evaluated only by changing the referent from herself to the corporation. The question of prudence, in other words, is framed with a tacit element of loyalty.

····

··· [Shareholders and courts] are worried about the directors' loyalty because we are concerned that their disloyalty will result in a poor bargain for the corporation. We are concerned, in other words, that conflicted directors will strike bargains for the corporation that an ordinarily prudent person would not strike for herself. This can be seen most clearly if the non-arms-length transactions that raise duty of loyalty concerns are imagined as arms-length transactions with third parties. Would an ordinarily prudent person lease a corporate asset to a third party on exceedingly generous terms? Would an ordinarily prudent person lavish compensation on a third party and permit the third party to