TAB 2



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Missouri,
Western Division.
Robert CARPE, et al., Plaintiffs,
v.
AQUILA, INC., et al., Defendants.
No. 02-0388-CV-W-FJG.

March 23, 2005.

Andrew L. Zivitz, Karen E. Reilly, Bala Cynwyd, PA, Don R. Lolli, Kansas City, MO, for Plaintiffs.
Brian D. Martin, Michael Thompson, Lori J. Sellers, Kansas City, MO, for Defendants.

ORDER

GAITAN, J.
*1 Pending before the Court are (1) Defendants' Motion in Limine to Exclude Mr. Michael A. Marek's Testimony and Expert Report (Doc. No. 143); (2) Plaintiffs' Motion to Strike Defendants' Expert Testimony (Doc. No. 139); (3) Defendants' Motion for Leave to Depose Plaintiffs' Expert Michael A. Marek (Doc. No. 135); (4) Plaintiffs' Motion to Strike Various Materials Submitted by Defendants in Support of Defendants' Motion for Summary Judgment (Doc. No. 176); (5) Defendants' Motion to Exceed Page Limitation for Reply in Support of Motion for Summary Judgment (Doc. No. 190); (6) Defendants' Motion for Summary Judgment (Doc. No. 164); and (7) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 162). Each will be considered below.

I. Background

The present lawsuit is a class action alleging that defendants Aquila, Inc., Robert K. Green,[FN1] Richard C. Green, Jr.,[FN2] Keith G. Stamm, [FN3] and UtiliCorp United, Inc., engaged in securities violations. In particular, plaintiffs (a class of purchasers of Aquila Class A common stock) allege that defendant Aquila, Inc. (hereafter "Aquila"), formerly a wholly-owned subsidiary of defendant UtiliCorp United Inc. (hereafter "UtiliCorp"), had its initial public offering (IPO) on or about April 25, 2001.[FN4] In the IPO, Aquila sold 14,225,000 shares of Class A common stock, and UtiliCorp sold 5,250,000 shares of Aquila Class A common stock. UtiliCorp retained Aquila's Class B common stock, representing approximately 80% of the outstanding shares of Aquila's common stock, and approximately 98% of the combined voting power of Aquila's voting stock.

FN1. Robert Green was (among other things) Chairman of the Board of Directors of Aquila, and signed the Registration Statement.

FN2. Richard Green was a director of Aquila, and before UtiliCorp's re-acquisition of Aquila, served as the CEO and Chairman of the Board of UtiliCorp. Richard Green also signed the Registration Statement.

FN3. Mr. Stamm was a director of Aquila, and was CEO of Aquila at all relevant times until November 26, 2001. Mr. Stamm also signed the registration statement.

FN4. It is worth noting that plaintiffs have amended their class period, to include April 24, 2001 as the start date of the class period. *See* Doc. No. 233.

In Aquila's Form S-1/A Registration Statement filed on April 23, 2001, and the accompanying Form 424B4 Final Prospectus, defendants represented that the Board of Directors of Aquila would appoint three independent directors to an audit committee.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

New York Stock Exchange ("NYSE") rules require two independent members to be appointed to an audit committee within 90 days of a company's IPO, with a third to be added within one year after the IPO. Plaintiffs allege that, at the time of the IPO, defendants, notwithstanding their representations, never intended to appoint independent directors to an audit committee.

On November 7, 2001, UtiliCorp announced that it was commencing an exchange offer for all of Aquila's publicly-held Class A shares. On December 3, 2001, defendants disclosed in a Form S-4 that no independent audit committee members had been appointed. Plaintiffs allege that at the time UtiliCorp completed its tender offer, it reacquired Aquila for only $17.67 per share, approximately 25% less than the $24 per share IPO price.

Plaintiffs bring the following claims: (1) Violations of Section 11 of the Securities Act, 15 U.S.C. § 77k , brought against defendants other than UtiliCorp in connection with the IPO; (2) Violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, brought against defendants Aquila and UtiliCorp in connection with the IPO; (3) Violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, brought against UtiliCorp and the individual defendants; (4) Violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, brought against all defendants; and (5) Violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), brought against UtiliCorp and the individual defendants.

## II. Defendants' Motion in Limine to Exclude Mr. Michael A. Marek's Testimony and Expert Report (Doc. No. 143)

**\*2** Defendants argue that plaintiffs' expert, Michael A. Marek,[FN5] should be excluded from testifying in this case because (1) he failed to conduct an " event study," making his methodology and proposed opinions fatally flawed; (2) he ignores critical facts in arriving at his opinions, making his opinions unreliable; and (3) the subject matter of his opinions is irrelevant. The Court finds the first two grounds mentioned by defendants to be dispositive

and considers only those below.[FN6]

> FN5. Mr. Marek is a Chartered Financial Analyst. He has a bachelor's degree in Economics, and for the last twenty years has been in the business of providing litigation support and testimony.

> FN6. Defendants also point out other alleged deficiencies in Mr. Marek's report. These alleged deficiencies include: (1) failing to use the industry definition of abnormal stock price return; (2) relying on academic papers that are "not on-point, are not 'peer reviewed,' and are not supported by the research conducted by the discipline as a whole," ignoring numerous other published and peer-reviewed papers finding no causal link between the independence of boards and the value of shares; (3) using an "arbitrage spread" analysis when such analysis is not supported by any peer-reviewed articles, and even if it were, failing to take into account variables in the market including the events surrounding the demise of Enron. Because the Court is able to reach its decision on other grounds, the Court takes no position on these alleged deficiencies with Mr. Marek's expert report.

As a preliminary matter, "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir.2001). The Court is in possession of ample evidence contained in the written record and does not find it necessary to conduct a hearing regarding the contested expert testimony. *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 152-53, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Additionally,
Federal Rule of Evidence 702 governs admissibility of expert testimony. *See Fed.R.Evid. 702.* "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Weisgram v. Marley Co.,* 169 F.3d 514, 523 (8th Cir.1999), *aff'd,* 528 U.S. 440, 120 S.Ct. 1011, 145 L.Ed.2d 445 (2000); *see also Daubert [v. Merrell Dow Pharm.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

509 U.S. 579,] 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (citing *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)) (highlighting the " 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony' '). The rule clearly "is one of admissibility rather than exclusion." *Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir.1991). The proposed expert testimony must meet three prerequisites in order to be admitted under Rule 702 . 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[3] (2001). First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* This is the basic rule of relevance. Second, the proposed witness must be qualified to assist the finder of fact. *Id.* Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires... ." *Id.; see also Daubert,* 509 U.S. at 591, 113 S.Ct. 2786, 125 L.Ed.2d 469.

*Lauzon,* 270 F.3d at 686.

In the seminal case regarding expert opinion testimony, *Daubert v. Merrell Dow Pharmaceuticals,* the U.S. Supreme Court emphasized the district court's gatekeeper role when screening expert testimony for relevance and reliability.... *Daubert* provides a number of nonexclusive factors a court can apply in performing this role: 1) whether the theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory has been generally accepted.... *Daubert's* progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

**\*3** 270 F.3d at 686-87 (internal quotation marks

and citations omitted). Further, "[t]he trial court must determine whether this particular expert has sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case," and the court must determine the reasonableness of an expert's methodology "regarding *the particular matter to which the expert testimony was directly relevant." Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 154, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)) (internal quotation marks omitted) (emphasis in original).

Additionally, Federal Rule of Civil Procedure 26(a)(2), in reference to Federal Rule of Evidence 702, states that the proponent of expert testimony must disclose the identity of the proposed expert and said disclosure,

with respect to a witness who is retained or specially employed to provide expert testimony in the case, ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

*Fed.R.Civ.P. 26(a)(2).* Further, the Court's Scheduling and Trial Order in effect during the pertinent period (Doc. No. 130) mirrors the mandates of the Federal Rules in regard to proffered expert testimony. Consequently, the Court will review Mr. Marek's proposed testimony and proposed rebuttal testimony under Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702 in relationship to pertinent factors propounded by *Daubert* and its progeny.

Defendants argue that Mr. Marek failed to complete a proper event study, and that his opinions should be excluded for that reason. "Damages in a securities fraud case are measured by the difference

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 4

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

between the price at which the stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions." *Imperial Credit Indus., Inc. Sec. Litig.,* 252 F.Supp.2d 1005, 1014 (C.D.Cal.2003) (citing *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128, 154-55, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). In order to arrive at that calculation, damages must be calculated after eliminating "that portion of the price decline or price difference which is unrelated to the alleged wrong." *Imperial Credit,* 252 F.Supp.2d at 1014-15 (citation omitted). As discussed by defendants, the accepted means of distinguishing between fraud-related and non-fraud-related changes in a stock's behavior is an "event study." *In re Oracle Sec. Litig.,* 829 F.Supp. 1176, 1181 (N.D.Cal.1993). "An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *Imperial Credit,* 252 F.Supp.2d at 1014.

**\*4** Defendants state that Mr. Marek has not conducted an appropriate event study because he did not take into account in his analysis other factors that could have affected the price of Aquila's stock. In particular, defendants compare Mr. Marek's report in the present case with the excluded report Mr. Marek prepared in *Imperial Credit.* In *Imperial Credit,* the Court found that Mr. Marek failed to take into account significant market events, and that because the defendants could not be held accountable for those market events, the plaintiffs could not "eliminate that portion of the [stock] price decline ... which is unrelated to the alleged wrong." *Id.* at 1015. Failure to conduct an event study comparing the stock's price to the market as a whole or a selected index of similar businesses is enough to cause an expert's opinion to be excluded. *See Northern Telecom Sec. Litig.,* 116 F.Supp.2d 446, 457-60 (S.D.N.Y.2000); *Oracle Sec. Litig.,* 829 F.Supp. at 1181; *Executive Telecard Ltd. Sec. Litig.,* 979 F.Supp. 1021, 1025 (S.D.N.Y.1997).

In the present case, Mr. Marek's report does not compare Aquila to the rest of the energy-trading industry or the energy industry as a whole; instead, Mr. Marek compares Aquila's performance with that of UtiliCorp.[FN7] Plaintiffs claim that the

returns of UtiliCorp are a more reliable predictor than the industry index used by defendants' expert; however, plaintiffs provide no reasoned analysis as to why this is so. Instead, the Court agrees with defendants that this comparison makes no sense given that UtiliCorp owned 80 of Aquila's stock, and therefore it would be expected that UtiliCorp's price would react to changes in Aquila's price. The Court finds that here, as with *Imperial Credit,* the failure to take into account market trends of other energy trading firms renders Mr. Marek's report fatally flawed and not resting on a "reliable basis in the knowledge and experience of [Marek's] discipline." 252 F.Supp.2d at 1016 (citing *Daubert,* 509 U.S. at 592). On this basis, the Court finds that plaintiffs' expert did not perform a proper event study and failed to follow the accepted methodology of his field, making his opinions in this case inherently unreliable. Defendants' motion to exclude Mr. Marek's testimony and expert report (Doc. No. 143) is GRANTED.

> FN7. The Court takes judicial notice that in late 2001, the energy industry as a whole experienced a downturn in stock prices (including the very well-publicized demise of Enron).

III. Plaintiffs' Motion to Strike Defendants' Expert Testimony (Doc. No. 139)

Plaintiffs argue that defendants' expert, Dr. Kenneth Lehn,[FN8] based his opinion on fundamentally flawed assumptions, and therefore his testimony should be stricken. In particular, plaintiffs do not challenge the methodology used by Dr. Lehn in arriving at his conclusions; instead, plaintiffs argue that defendants' expert attached significance to the incorrect dates in reaching his conclusions. Plaintiffs claim that Dr. Lehn incorrectly attached significance to (1) December 3, 2001, and (2) July 24, 2001, in performing his event studies.

> FN8. Among his other qualifications, Dr. Lehn is the former chief economist for the United States Securities and Exchange Commission (1987-1991), where one of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

his duties was to examine whether certain information releases had a material effect on the stock prices of various companies. Dr. Lehn, who has a Ph.D. in Economics, currently serves as the Samuel A. McCullough Professor of Finance in the Joseph M. Katz School of Business at the University of Pittsburgh.

**\*5** However, defendants note that both of these dates were identified in plaintiffs' amended complaint. December 3, 2001, is the date on which plaintiffs assert that the market first learned that no independent directors had been or would be appointed to defendant Aquila's audit committee. July 24, 2001, is the date 90 days after the IPO, the date on which defendant Aquila allegedly was to have appointed independent directors to its audit committee.

This Court finds plaintiffs' challenges to defendants' expert to be meritless. First of all, December 3, 2001, is obviously a date of great importance, as plaintiffs have alleged that December 3 is the date upon which they and the market first knew that Aquila had not appointed an independent audit committee. The Court finds logical Dr. Lehn's conclusion that if the November 7, 2001 price of Aquila stock was inflated by the impression that Aquila had independent directors, the price should have dropped "on December 3, 2001 as the market revised its expectations about the likelihood that Aquila's board would negotiate a higher exchange ratio from UtiliCorp." *See* Doc. No. 153, Ex. B (Declaration of Kenneth Lehn) at 6.

With respect to Dr. Lehn's event study on July 24, 2001, the Court agrees with defendants that this date also holds some degree of importance in the present matter. In accordance with plaintiffs' "fraud on the market" theory, which must be premised on an efficient markets hypothesis (*see Basic Incorporated v. Levinson,* 485 U.S. 224, 246-47, n. 24, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)), if the market knew that defendant Aquila had promised to appoint independent directors within ninety days, the market also knew that defendant Aquila had failed to announce the appointment of directors within that time frame. Defendants further note that

event studies regarding the failure to make an announcement have been repeatedly documented in the literature.

Therefore, for the foregoing reasons, plaintiffs' motion to strike defendants' expert testimony (Doc. No. 139) is DENIED.

### IV. Defendants' Motion for Leave to Depose Plaintiffs' Expert (Doc. No. 135)

As the Court has found that plaintiffs' expert Michael A. Marek's opinions should be excluded from this case, defendant's Motion for Leave to Depose Plaintiffs' Expert Michael A. Marek (Doc. No. 135) is DENIED AS MOOT.

### V. Plaintiffs' Motion to Strike Various Materials Submitted by Defendants in Support of Defendants' Motion for Summary Judgment (Doc. No. 176)

The Court finds that defendants' expert materials submitted with defendants' motion for summary judgment should not be stricken for the same reasons that plaintiff's motion to strike defendants' expert (Doc. No. 139) was denied. Therefore, with respect to those materials, plaintiffs' motion to strike (Doc. No. 176) is DENIED.

With respect to the remainder of the materials mentioned in plaintiffs' motion, those materials were not used by the Court in reaching the result in its examination of defendants' motion for summary judgment. Therefore, with respect to those remaining materials, plaintiffs' motion to strike (Doc. No. 176) is DENIED AS MOOT.

### VI. Defendants' Motion to Exceed Page Limitation (Doc. No. 190)

**\*6** Defendants move for leave to file reply suggestions that exceed the page limits imposed by Local Rule 7.1(f). Plaintiffs do not object to the length of defendants' proposed reply suggestions; however, plaintiffs object to an exhibit attached to defendants' reply suggestions. Plaintiffs state that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

the declaration of Jeffrey P. Bennett, Esquire, should be stricken because (1) the defendants used attorney-client privilege to block certain discovery, so they should not now be able to affirmatively rely upon attorney communications; (2) defendants waived any right to use the Bennett declaration because they did not file it with their opening brief; and (3) the Bennett declaration contains inadmissible hearsay.

Defendants reply that plaintiffs' objections to the Bennett declaration are meritless. First, defendants note that deposition testimony demonstrates that plaintiffs were permitted to inquire into the matters contained in the Bennett declaration. Further, defendants assert that the Bennett declaration was not required to be presented in their opening brief because the Bennett declaration is attached to the reply brief as a *reply* to an argument made in plaintiffs' response brief. Finally, defendants note that the declaration does not contain hearsay; the testimony contained in the Bennett declaration is used by defendants not to prove the truth of the matter asserted, but simply that the statements were made to defendants.

The Court agrees with the points and authorities cited in defendants' reply. Therefore, defendants' motion for leave to exceed page limitation (Doc. No. 190) is GRANTED. To the extent that plaintiffs' response in opposition is a motion to strike the exhibits to defendants' reply brief, that motion (Doc. No. 191) is DENIED. In the interests of providing a speedy resolution to this matter, the Court will consider the reply brief attached to Doc. No. 190 as a timely-filed reply to defendants' motion for summary judgment.

## VII. Defendants' Motion for Summary Judgment (Doc. No. 164)

Defendants state several reasons as to why summary judgment should be granted. First, they indicate that the representation relied upon by plaintiffs cannot form the basis for a federal securities law claim. Second, they state that there is no evidence that the alleged representation was false at the time it was made. Third, defendants state that the alleged

misrepresentation was not material to investors because independent directors would not have resulted in any material added benefit to investors. Fourth, defendants argue that plaintiffs can show no damages caused by the alleged misrepresentation. Fifth, defendant state that the claims under Section 15 of the Securities Act and Section 20 of the Exchange Act are not viable because there are no underlying primary violations under Section 11, 12(a)(2), and 10(b). Because the Court finds defendants' fourth and fifth arguments to be determinative, it considers only those arguments below.

### A. Standard

*7 Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. *Fed.R.Civ.P.* 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-590, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. *Matsushita,* 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. *Fed.R.Civ.P.* 56(e); *Lower Brule Sioux Tribe v. South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. *Lower Brule,* 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. *Id.* Rather, "the disputes must be outcome determinative under prevailing law." *Id.* (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 7

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." *Matsushita,* 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex,* 477 U.S. at 327.

B. Lack of Damages

As discussed above, plaintiffs' damages expert's opinion does not meet the standards of *Daubert* and its progeny. In plaintiff's Section 10(b) and Rule 10b-5 claims, plaintiffs have pleaded a " fraud-on-the-market" theory. Under such a theory, it is presumed "that any material misrepresentation made by an issuer of securities will quickly and accurately be reflected in the market price of that issuer's securities." *Seagate Technology II Sec. Litig.,* 843 F.Supp. 1341, 1355 (C.D.Cal.1994) (citing *Basic,* 485 U.S. at 247). Therefore, the plaintiffs must show that the *market* was affected by such material misrepresentation. As part of their case in chief, the plaintiffs must prove that the false statement artificially inflated the market price, and that the false statement thereafter caused a decline in the stock's price when the statement was revealed to be false. *See id.* at 1348; *Harris v. Union Elec. Co.,* 787 F.2d 355, 362 (8th Cir.1986).

*8 As discussed in defendants' expert report, there was no decline in Aquila's market-adjusted share price on December 3, 2001, the date when the market learned that Aquila had not appointed independent directors. Additionally, there was a gain in Aquila's price on November 7, 2001, the date when the exchange offer was first announced and when UtiliCorp's Form 8-K filing disclosed that all of Aquila's board was affiliated with UtiliCorp. Finally, the expert's report demonstrates that there was no decline in Aquila's price on or about July 23, 2001, the date by which Aquila should have appointed independent directors but had not yet

made any announcements regarding same. Defendants' expert report indicates that Aquila's share price tracked the industry index of other energy-trading firms closely, and that Aquila out-performed many of these firms.

As discussed above, plaintiffs' expert does not take into account market forces related to the downfall of Enron and the difficulties experienced industry-wide by energy-trading firms. This failure makes plaintiffs' expert report unreliable. In a Section 10(b) and Rule 10b-5 case, expert testimony is required in order for plaintiffs to meet their burden of proof in establishing the fact of damages and the means of calculation of same. *See Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 301 (3d Cir.1991); *Warner Communications Sec. Litig.,* 618 F.Supp. 735, 744 (S.D.N.Y.1985); *Harris v. Union Elec. Co.,* 787 F.2d 355, 362 (8th Cir.1986). Therefore, summary judgment should be granted in defendants' favor as to plaintiffs' Section 10(b) and Rule 10b-5 claims.

With respect to plaintiffs' Section 11 claims, the statute explicitly provides that loss caused by something other than an untrue statement is not recoverable. "[I]f the defendant proves that any portion or all" of a decline of a stock price was caused by something other than that false statement, then "such portion of or all of such damages shall not be recoverable." 15 U.S.C. § 77k(e). Although plaintiffs are not obligated under Section 11 to proves damages as part of their case in chief, when a defendant affirmatively demonstrates that "a lower share value did not result from any non-disclosure or false statement," that defendant is entitled to dismissal of the Section 11 claim. *Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 277 (3d Cir.2004). [FN9]

FN9. This defense is called "negative causation" by several courts. *See, e.g., Adams Golf,* 381 F.3d at 277.

As discussed above, plaintiffs' expert's conclusions have been excluded. Defendants' expert opines that the decline in stock price entirely was due to market factors. The Court agrees with defendant that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

facts establish a "negative causation" affirmative defense, and plaintiffs are without a means of demonstrating that any portion of the decline (or difference) in stock price is due to any alleged fraud. Defendants are entitled to summary judgment on the Section 11 claims.

With respect to plaintiffs' Section 12(a)(2) claims, as with plaintiffs' Section 11. Section 12(b) provides:

**\*9** In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

15 U.S.C. § 77l(b). As discussed above, defendants' expert proffered that all of the decrease in Aquila's share value was attributable to market conditions affecting the energy-trading industry. Plaintiffs have no admissible contradictory evidence. Therefore, defendants have prove that the value of Aquila's price decreases "shall not be recoverable," pursuant to the terms of Section 12(b). The Court GRANTS defendants' motion for summary judgment as to this issue.

### C. Section 15 and Section 20 Claims

Claims made under Section 15 of the Securities Act and Section 20 of the Exchange Act are claims in which individual defendants are alleged to be liable as "control persons" for alleged violations of Sections 11, 12(a)(2) and 10(b). As discussed by defendants, for control person liability to exist, there first must be liability for the primary violations of Sections 11, 12(a)(2) and/or 10(b). See *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 550 n. 12 (8th Cir.1997); *Diviries v. Prudential-Bache Sec., Inc.,* 805 F.2d 326, 329 (8th Cir.1986). Because defendants are entitled to summary

judgment on the claims of primary violations (*see* above), the individual defendants are entitled to dismissal of the Section 15 and Section 20 claims. Therefore, defendants' motion for summary judgment is GRANTED as to this issue.

### VIII. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 161)

As plaintiffs are unable to demonstrate damages (as discussed above), plaintiffs' motion for partial summary judgment (Doc. No. 161) is DENIED.

Therefore, for the foregoing reasons:

(1) Defendants' Motion in Limine to Exclude Mr. Michael A. Marek's Testimony and Expert Report (Doc. No. 143) is GRANTED;

(2) Plaintiffs' Motion to Strike Defendants' Expert Testimony (Doc. No. 139) is DENIED;

(3) Defendants' Motion for Leave to Depose Plaintiffs' Expert Michael A. Marek (Doc. No. 135) is DENIED AS MOOT;

(4) Plaintiffs' Motion to Strike Various Materials Submitted by Defendants in Support of Defendants' Motion for Summary Judgment (Doc. No. 176) is DENIED in part, and DENIED AS MOOT in part;

(5) Defendants' Motion to Exceed Page Limitation for Reply in Support of Motion for Summary Judgment (Doc. No. 190) is GRANTED;

(6) Defendants' Motion for Summary Judgment (Doc. No. 164) is GRANTED;

(7) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 161) is DENIED; and

**\*10** (8) All other pending motions are DENIED AS MOOT.

IT IS SO ORDERED.

W.D.Mo.,2005.
Carpe v. Aquila, Inc.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

Not Reported in F.Supp.2d, 2005 WL 1138833 (W.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2005 WL 1138833
(W.D.Mo.)

Briefs and Other Related Documents (Back to top)

• 4:02cv00388 (Docket) (Apr. 26, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3



Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

▷
Briefs and Other Related Documents

United States District Court,D. Delaware.
CHASE MANHATTAN MORTGAGE CORP., et
al., Plaintiffs,
v.
ADVANTA CORP., et al., Defendants.
**No. Civ.A. 01-507(KAJ).**

March 4, 2004.

Michael D. Goldman, and Erica L. Niezgoda, Potter
Anderson & Corroon LLP, Wilmington, Delaware,
for plaintiffs.
Jami Wintz McKeon, John C. Goodchild, III, and
Gregory T. Parks, Morgan, Lewis, Bockius LLP,
Philadelphia, Pennsylvania, co-counsel.
Todd Schiltz, Wolf, Block, Schorr & Solis-Cohen
LLP, Wilmington, Delaware, for defendants.
Jay A. Dubow, Wolf, Block, Schorr and
Solis-Cohen LLP, Philadelphia, Pennsylvania,
co-counsel.

MEMORANDUM OPINION
JORDAN, J.

I. INTRODUCTION

*1 Presently before me are several motions filed by
plaintiffs Chase Manhattan Mortgage Corporation
and Chase Home Mortgage Company of the
Southeast (collectively, "Chase") and defendants
Advanta Corp., Advanta National Bank USA,
Advanta Bank Corp., Advanta Mortgage Holding
Co., Advanta Mortgage Corp. USA, Advanta
Residual Holding Corp., Advanta Mortgage
Conduit Services Inc., Advanta Mortgage Corp.
Midatlantic, Advanta Mortgage Corp. Northeast,
Advanta Mortgage Receivables Inc., Advanta
Finance Corp., Advanta Conduit Receivables, Inc.
and Advanta Finance Residual Corporation
(collectively, "Advanta"). Chase filed this action on

July 26, 2001, alleging that Advanta engaged in (1)
federal securities fraud, in violation of § 10(b) of
the Securities Exchange Act of 1934, 15 U .S.C. §
78j; (2) Delaware securities fraud, in violation of 6
Del. C. § 7323(a)(2); (3) common law fraud; (4)
negligent misrepresentation; and (5) breach of
contract, arising out of a transaction in which
Advanta sold certain mortgage assets to Chase.
(Docket Item ["D.I."] 1.) Jurisdiction is proper
under 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and
1367.

Both parties filed Motions for Summary Judgment
on September 22, 2003. (D.I.331, 336.) Thereafter,
on October 6, 2003, Chase filed a Motion to
Exclude the Expert Testimony of W. Barefoot
Bankhead (D.I.342) and Advanta filed a Motion to
Exclude the Expert Testimony of Bella Borg,
Melanie Smith, and Brian Olasov (D.I.345). The
parties appeared before me to argue all of these
Motions on December 12, 2003. (D.I.380.) For the
reasons that follow, the parties 'Motions for
Summary Judgment will be denied and the parties'
Motions to Exclude Expert Testimony will be
denied without prejudice.

II. BACKGROUND [FN1]

> FN1. The background information
> provided herein does not constitute
> findings of fact, and is culled largely from
> the allegations contained in Chase's
> complaint.

A. *The Advanta Mortgage Assets*

In May 2000, Advanta offered to sell certain
mortgage assets to Chase. (D.I. 1 at ¶ 18; D.I. 331
at 7.) The parties were familiar with one another
because, prior to the offer to sell, Advanta had
serviced billions of dollars worth of Chase's
mortgage loans. (*Id.*) Among the mortgage assets

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

that Advanta was offering for sale were mortgage-backed securities consisting of residual interests [FN2] in securitized mortgage pools. (*Id.* at ¶ 19.) These mortgage pools consisted of subprime residential mortgage loans, which were the same type of loans Advanta had been servicing for Chase. [FN3] (*Id.*)

> FN2. In some cases, the sponsor of a subprime securitization will retain a subordinated financial interest in the securitization, known as the residual interest. (D.I. 1 ¶ 3.) The residual interest holder is entitled to receive the overcollateralization in the trust (the principal balance of the loans in the trust that exceeds the principal amount of the certificates issued by the trust) and the excess spread (the difference between the average interest rate of the loans in the trust and the average interest rate of the certificates offered by the trust) in the securitization, to the extent those amounts are not required to pay the expenses of the trust and the certificateholders the amounts they are due. (D.I. 331 at 5.)

> FN3. Subprime mortgage loans are loans to borrowers with sub-standard credit. (D.I. 331 at 3.)

From 1988 through 1999, Advanta sponsored subprime mortgage securitizations approximately four times each year. [FN4] (D.I. 331 at 6.) Advanta was both the servicer and residual interest holder in the Trusts at issue and routinely assessed the value of its residual interests in those securitizations. [FN5] (*Id.*) The value of the residual interests is determined by projecting the future cash flow from the securitizations to the residual interest holder, discounted to present value. [FN6] (*Id.*)

> FN4. A subprime mortgage securitization means that a number of loans are pooled together and sold into a trust, and interests in the trust are sold to investors, known as certificateholders. (D.I. 1 ¶ 1.)

> FN5. Advanta maintained residual interest valuation materials, which consisted of valuation binders or books from each routine assessment. (D.I. 331 at 9.)

> FN6. Certain assumptions are made in order to project the future cash flow, including the future losses that will be experienced by loans within the trusts, the voluntary prepayment rate for loans within the trusts, the time it will take for the securitizations to reach their overcollateralization targets and therefore allow cash to flow to the residual interest holder, and the discount rate to apply to the cash flow. (D.I. 331 at 6.)

Chase alleges that when a mortgage loan is liquidated, the proceeds from the sale of the mortgaged property are typically used first to reimburse the servicer for any interest payments advanced by the servicer ("servicer advances") in respect of delinquent mortgage payments, and then to pay the remaining principal balance due on the mortgage. (D.I. 1 at ¶ 21.) According to Chase, when Advanta liquidated mortgage loans [FN7] in mortgage pools it had securitized, it did not use the proceeds first to reimburse the servicer advances, as was common practice in the industry, but instead applied all the proceeds to the unpaid principal balance of the loan, leaving some or all of its interest advances unreimbursed. (*Id.* at ¶ 23.) Chase asserts that, by using this procedure, Advanta reported smaller overall losses than it would have reported had it followed the procedures required by the terms of the underlying Servicing Agreements. [FN8] (*Id.*) Chase also alleges that Advanta maintained aged advances on its books relating to loans that had been liquidated, and carried those advances on its books as if they were still recoverable, thus benefitting from the appearance of lower losses. (*Id.* at ¶ 23-25.) Chase claims that at the time Advanta proposed to sell its mortgage assets to Chase (the "Transaction" or the "Asset Purchase Transaction"), Chase wrongly believed that Advanta followed the common practice and the terms of the Servicing Agreements governing its trusts. (*Id.* at ¶ 27.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

FN7. Loans that have been liquidated are referred to as "zero-balance" loans because, after liquidation, their outstanding balance is zero. (D.I. 1 at ¶ 23.)

FN8. Chase asserts that the Servicing Agreements typically provide that if the borrower on an underlying mortgage fails to make a scheduled monthly payment, the servicer of the pool, subject to certain exceptions, must advance the interest portion of the delinquent monthly payment to the trust's certificateholders. (D.I. 1 ¶ 20.)

### B. *Chase's Due Diligence*

**\*2** Chase conducted due diligence for approximately seven months prior to the Transaction. (D.I. 331 at 1.) On June 19, 2000, the parties executed a Confidentiality Agreement wherein Chase "acknowledge[d] that any and all information contained in the Evaluation Material is being provided [by Advanta] without any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material...." (*Id.* at 35, D .I. 333, Ex. 46 at 4.) Chase claims that from August 7 through 9, 2000, a team from its company visited one of Advanta's facilities in San Diego, California to look at certain information, including a detailed listing of receivables and advances on zero-balance loans or loans paid in full.[FN9] (D.I. 1 at ¶ 33.)

FN9. Advanta notes that Chase also conducted on-site due diligence at one of Advanta's facilities in Fort Washington, Pennsylvania on July 26-27, 2000 and that, at each of Chase's on-site visits, Advanta provided Chase employees with access to documents, presentations regarding various aspects of Advanta's mortgage business, and the opportunity to interview and meet with Advanta employees. (D.I. 331 at 8.)

Michael Pocisk, Chase's Private Investor Reporting Manager, was responsible for Chase's due diligence

review of Advanta's Investor Reporting Department. (D.I. 331 at 16.) In the course of that review, Mr. Pocisk met with various Advanta officials and took notes during each of those meetings. (*Id.*) Before one of the meetings, Mr. Pocisk reviewed a copy of a Monthly Summary Report and Certification (" MSR & C") for one of the trusts involved in this litigation, the so-called 1997-3 Trust. (*Id.* at 18.) Mr. Pocisk's notes on the 1997-3 Trust contain a chart entitled "Summary of loan losses." (*Id.,* D.I. 333, Ex. 26.) The chart reflects that the total loss amount for the 1997-3 Trust was $19.4 million, which matches the total losses disclosed in Advanta's MSR & C for the 1997-3 Trust. (*Id.*) Mr. Pocisk drew a line to that total loss number and made the notation "wow" next to it. (*Id.*) Mr. Pocisk testified that he wrote "wow" next to the total loss amount because "it was a realized loss that was greater than [he] had ever seen sustained at Chase." (*Id.;* D.I. 334 (Pocisk Deposition at 112:6-10).)

### C. *The Purchase and Sale Agreement*

After conducting due diligence, Chase submitted a bid for the assets of Advanta's mortgage business on September 19, 2000, which Advanta initially rejected. (D.I. 331 at 25.) Chase agreed to increase its bid by $25 million and submitted its final bid for Advanta's assets on October 13, 2000. (*Id.*) On January 8, 2001, Chase and Advanta entered into a Purchase and Sale Agreement (the "Agreement") whereby Advanta agreed to sell Chase certain assets of Advanta's mortgage business, and Chase agreed to assume certain liabilities relating to the acquired assets. (D.I. 1 at ¶ 41.)

The terms of the Agreement were heavily negotiated between the parties. Section 4.16 of the Agreement contains a provision stating that, " [e]xcept as otherwise set forth in this Agreement, ... the Company [Advanta] ... [does not] make any representation or warranty whatsoever, express or implied, as to the Assets or the Business...." (D.I. 333, Ex. 48 at 43.) Section 6.24 of the Agreement contains a covenant pursuant to which Advanta agreed to "take such actions as are necessary to insure that, as of the Closing Date, there are no investor cash shortages, no non-recoverable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

advances of principal and interest, no non-recoverable advances on zero balance loans, and no outstanding checks greater than 180 days." (D.I. 337 at 6; D.I. 333, Ex. 48 at 71.) Section 11.03 of the Agreement contains an integration clause, which states that the "Agreement (including the Disclosure Schedules and the Ancillary Agreements) ... constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior disclosures, agreements and understandings, both written and oral ... among the parties or any of them with respect to the subject matter hereof...." (D.I. 331 at 27; D.I. 333, Ex. 48 at 84.)

### D. *The Fallout*

**\*3** The sale of Advanta's mortgage assets closed on February 28, 2001 for a cash price in excess of $1 billion (the "Closing"). (D.I. 1 at ¶ 43.) After the Closing, Chase asserts that it received Advanta's mortgage assets and discovered that Advanta provided misleading information regarding the existence of non-recoverable advances on zero-balance loans and the amount of historic losses suffered by the mortgage pools underlying the residual interest securities. (*Id.* at ¶ 49.) Chase further alleges that it learned that Advanta's method of reporting realized losses understated the amount of loss on each mortgage securitization pool. (*Id.* at ¶ 52.) Chase claims that Advanta was intentionally deceiving Chase because Advanta knew that it had nonrecoverable advances on zero-balance loans (*id.* at ¶ 55) and knew that it had engaged in practices that were inconsistent with industry custom (*id.* at ¶ 71). Chase also claims that Advanta knew Chase would use the inaccurate loss figures to value the residual securities (*id.* at ¶ 80) and that Chase had been deceived during the Transaction (*id.* at ¶ 92). Chase claims that it has suffered millions of dollars in damages as a result of the alleged misconduct by Advanta. (*Id.* at ¶ 95.)

### III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court

determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (2003). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U .S. 574, 586-87 (1986). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

### IV. DISCUSSION

A. Chase's Motion for Summary Judgment

1. Chase's claim that Advanta breached § 6.24 of the Purchase and Sale Agreement

**\*4** Chase argues that it is entitled to summary judgment on its claim that Advanta breached § 6.24 of the Agreement. (D.I. 337 at 16.) Chase states that, pursuant to § 6.24, Advanta promised that at the time of the Closing there would be no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

non-recoverable advances on zero balance loans. ( *Id.*) Chase argues that Advanta had approximately $17.5 million in outstanding advances on zero balance loans at the time of the Closing, constituting a breach of § 6.24. (*Id.*)

In response, Advanta asserts that throughout the negotiations concerning § 6.24 of the Agreement, Chase repeatedly "sought a representation from Advanta that there would be *no advances* on zero balance loans as of the Closing." (D.I. 358 at 6 (emphasis in original).) Advanta states that it never made such a representation, and ultimately agreed that it would take "such actions as were necessary so as to insure that, as of the Closing, there would be 'no *non-recoverable* advances' on zero balance loans." (*Id.*) Advanta claims that its employees understood "non-recoverable advance" to mean " advances that are not capable of being recovered from any source at any time," and that this understanding was communicated to Chase. (*Id.* at 7.) Advanta asserts that the $17.5 million in advances at issue were capable of being recovered according to this definition (*id.* at 30), an assertion which Chase disputes (D.I. 369 at 6, 8).

I find that Chase is not entitled to summary judgment on its claim that Advanta breached § 6.24 of the Agreement. While there apparently is no dispute that there were approximately $17.5 million in advances on Advanta's zero-balance loans, there is a dispute as to whether those advances were non-recoverable at the time of the Closing. There are genuine issues of material fact as to whether Advanta's understanding of the term " non-recoverable advance" was communicated to Chase during the course of due diligence and negotiations. The parties' arguments require me to look at documentary evidence from the negotiations surrounding the Agreement and, ultimately, to make credibility determinations and speculate as to what the principals involved in negotiating the Agreement were thinking at the time, which is inappropriate at the summary judgment stage. The definition of "recoverable" as it is used in the Agreement is a matter of contract interpretation. However, the issues of fact pertaining to the parties' negotiations may impact the appropriate construction of "recoverable" as it is used in the

Agreement, including whether the advances can properly be viewed as "recoverable" if the only source of recovery is money that Chase was entitled to receive anyway as the residual holder. For these reasons, Chase's Motion for Summary Judgment that Advanta breached § 6.24 of the Agreement will be denied.

> 2. Chase's request for an order pursuant to Federal
> Rule of Civil Procedure 56(d)

Chase argues that it is entitled to an order, pursuant to Federal Rule of Civil Procedure 56(d),[FN10] stating that "the undisputed facts establish that Advanta knowingly provided Chase with materially false and misleading information," thereby establishing, for purposes of trial, two of the elements (namely, misrepresentation and scienter) Chase must prove to sustain a cause of action for federal securities fraud and common law fraud. (D.I. 337 at 20.) Specifically, Chase asserts that Advanta's Statements to Certificateholders (the " Statements") under-reported Advanta's historical losses and that Advanta made a misrepresentation of material fact when it gave or directed Chase to them as a source for historical loss information. (*Id.* at 22.) Chase further asserts that Advanta made misrepresentations by omission when it "failed continuously throughout the due diligence and negotiation period to tell Chase that the information on the Statements was false." (*Id.*)

> FN10. Federal Rule of Civil Procedure 56(d) provides, in relevant part, that a court "shall if practicable ascertain what material facts exist without substantial controversy ... [and] make an order specifying the facts that appear without substantial controversy ... Upon trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly." Fed.R.Civ.P. 56(d) (2003).

*5 In response, Advanta asserts that, for all of the Trusts formed before 1997, "the Statements have a section entitled 'Realized Losses Tracking,' which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

contains complete loss information, including principal and interest losses, experienced by the loans in the Trusts." (D.I. 358 at 14.) Advanta states that the 1997 Trusts show principal losses in a section of the report called, "Mortgage Loan Principal Reduction Information," and show losses relating to interest and servicing advances in other sections of the Statements. (*Id.* at 17.) Advanta further asserts that most of the Statements for the 1998 Trusts report the current month's losses, and the Statements for the 1999 and 2000 Trusts report principal losses in a section labeled "Total Realized Loss of Principal." (*Id.* at 19 .) Finally, Advanta argues that the Statements were produced together with information that was responsive to "literally hundreds of different requests for information," and not specifically in response to Chase's request for loss information, and that the Statements were not false or misleading. (*Id.* at 21, 26.)

Based upon this evidence, it is clear that the material facts pertaining to the allegations regarding Advanta's misrepresentation and scienter are in substantial controversy, *see* Fed.R.Civ.P. 56(d), and, therefore, Chase's request for an order pursuant to Federal Rule of Civil Procedure 56(d) will be denied.

### B. Advanta's Motion for Summary Judgment

In support of it Motion for Summary Judgment, Advanta argues that Chase's common law fraud and negligent misrepresentation claims are barred because, due to the non-reliance and integration clauses contained in the Agreement, Chase cannot establish that it reasonably relied on any allegedly false or misleading information.[FN11] (D.I. 331 at 35, 36.) Advanta further argues that, to the extent Chase claims that false or misleading information was incorporated into the Agreement, Chase's tort-based claims are barred by the "economic loss" and "gist of the action" doctrines recognized under Pennsylvania law. [FN12] (*Id.* at 37.) Advanta further argues that, if Chase's tort-based claims are not barred, Advanta is entitled to summary judgment in its favor on those claims because the information Advanta provided to Chase was not false or misleading, nor did Advanta intend to

defraud Chase. (*Id.* at 38) Advanta also argues that it is entitled to summary judgment on Chase's claims that Advanta breached sections 4.11, 4.40, 6.24, 4.04, 4.08, 4.19, 4.22, 4.27, 4.28, 6.26, 4.29 and 6.01 of the Agreement. (*Id.* at 47-58). Finally, Advanta argues that it is entitled to summary judgment on its counterclaim that Chase breached certain terms of the Agreement by failing to release over $900,000 from a document holdback that was due to Advanta within two weeks after the Closing. ( *Id.* at 58.)

> FN11. Advanta also argues that it is entitled to judgment as a matter of law on Chase's Delaware securities law claim because "Delaware securities law is not applicable where the primary nexus between Delaware and the transaction is the incorporation of one or more parties in the state." (D.I. 331 at 34 (citing 6 Del. C. § 7323 (notes); *Singer v. Magnavox Co.,* 380 A.2d 969, 981 (Del.1977), *overruled on other grounds by Weinberger v. UOP, Inc.,* 457 A.2d 701, 715 (Del.1983)).) The fact that Advanta is incorporated in Delaware is not the primary nexus between Delaware and the Transaction at issue. In this case, the parties explicitly agreed, by way of a choice of law provision in § 11.06 of the Agreement, that the " Agreement shall be governed by and construed in accordance with the laws of the State of Delaware...." (D.I. 333, Ex. 48 at 86.) Therefore, Advanta is not entitled to summary judgment as a matter of law on Chase's Delaware securities law claim.

> FN12. In its Motion for Summary Judgment, Advanta raised the issue that Chase's common law fraud and negligent misrepresentation claims are subject to a choice of law analysis, and that Pennsylvania substantive law should apply to these claims. (D.I. 331 at 34.) In its opposition, Chase argues that there is no true conflict between Pennsylvania and Delaware law with respect to the elements of a fraud claim, and that I need not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
(Cite as: Not Reported in F.Supp.2d)

address the choice of law issues raised by Advanta. (D.I. 348 at 10.)

As Advanta itself recognizes (D.I. 331 at 38), the elements of federal securities fraud, Pennsylvania common law fraud, and Delaware common law fraud are virtually identical in this context. The plaintiff must show that the defendant (1) made a misstatement or omission of material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury. *See AES Corp. v. Dow Chemical Co.,* 325 F.3d 174, 178 (3d Cir.2003) (federal securities claim under Rule 10b-5); *David Pflumm Paving & Excavating, Inc. v. Foundation Services Co.,* 816 A.2d 1164, 1171 (Pa.Super.2003) (Pennsylvania common law fraud); *Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1074 (Del.1983) (Delaware common law fraud). Finding no meaningful distinction between Delaware law on fraud and Pennsylvania law on fraud, no conflict of law analysis is required on this point.

Nor is a conflict of law analysis implicated by Advanta's argument that Chase's " tort-based [fraud] claims are barred by the 'economic loss' and 'gist of the action' doctrines" recognized under Pennsylvania law "because Chase's claims sound in contract." (D.I. 331 at 37.) Any claims that sound in contract in this case are governed by Delaware law by the express terms of the Agreement, *see supra* n. 10.

Apart from repeating many of the arguments advanced in its own Motion for Summary Judgment, Chase responds by arguing that the non-reliance and integration clauses in the Purchase and Sale Agreement do not preclude Chase's fraud claims under the applicable Third Circuit law. (D.I. 348 at 28.) Chase also argues that Advanta is not entitled to summary judgment on Chase's breach of contract claims because they all raise disputed issues of fact. (*Id.* at 55.) Finally, Chase argues that

Advanta is not entitled to summary judgment on its counterclaim because there is a genuine dispute of material fact over how many "starting exceptions" existed as of February 28, 2001 upon which to calculate the amount of money that Chase should have released from a document holdback. (*Id.* at 58.)

### 1. The effect of the non-reliance and integration clauses in the Agreement

*6 It is undisputed that § 4.16 of the Agreement contains a non-reliance clause and § 11.03 of the Agreement contains an integration clause. Advanta argues that, due to these clauses in the Agreement, Chase's alleged reliance on misrepresentations was unreasonable as a matter of law. Chase, on the other hand, argues that the presence of a non-reliance or integration clause in the Agreement does not establish, *per se,* that its reliance was unreasonable.

The "reasonable reliance" element of a Rule 10b-5 claim for federal securities fraud requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests. *AES Corp. v. Dow Chemical Co.,* 325 F.3d 174, 178 (3d Cir.2003) (citing *Semerenko v. Cendant Corp.,* 223 F.3d 165, 174 (3d Cir.2000)). Reliance is an essential element of a Rule 10b-5 claim. *Id.* at 180. The existence of a non-reliance clause is but one factor to consider in determining the reasonableness of a party's reliance. *Id.* at 180, 183.

A sophisticated investor will have to "show more to justify its reliance" in the face of a non-reliance clause. *Id.* at 180. Though "cases involving a non-reliance clause in a negotiated contract between sophisticated parties will often be appropriate candidates for resolution at the summary judgment stage," the Third Circuit has been "unwilling ... to hold that the extraction of a non-reliance clause, even from a sophisticated buyer, will always provide immunity from Rule 10b-5 liability." *Id.*

Both Chase and Advanta are undeniably sophisticated investors. Chase argues that it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

conducted a diligent and thorough investigation into Advanta's assets and reasonably relied on Advanta's representations, discovering no reason to suspect that Advanta was intentionally providing Chase with false or misleading information. *See AES,* 325 F.3d at 180 (quoting *Straub v. Vaisman & Co.,* 540 F.2d 591, 598 (3d Cir.1976)) ("a sophisticated investor is not barred [from] reliance upon the honestly of those with whom he deals in the absence of knowledge that the trust is misplaced"). Chase's papers describe, in great detail, the due diligence that it conducted prior to entering into the Transaction and executing the Agreement with Advanta. While judgment for Advanta may be appropriate at some point, I decline to "give controlling significance to the existence of a non-reliance clause in a vacuum." *See id.* at 182. Advanta is not entitled to summary judgment on Chase's federal securities claim simply because Chase is a sophisticated investor and the Agreement contains a non-reliance clause.[FN13] *See id.* ("[T]o hold that a buyer is barred from relief under Rule 10b-5 solely by virtue of his contractual commitment not to rely would be fundamentally inconsistent with § 29(a) [of the Securities Exchange Act, which forecloses anticipatory waivers of compliance with the duties imposed by Rule 10b-5]."); *see also In re: Daimler Chrysler AG Sec. Litig.,* 294 F.Supp.2d 616, 622 (D.Del.2003) (denying summary judgment that plaintiff was precluded from establishing reasonable reliance where plaintiff was "clearly a sophisticated investor involved in a complex transaction" and many factors weighed in favor of finding that plaintiff's reliance was reasonable).

> FN13. For the same reasons, I am not persuaded that this case can be resolved in the context of a summary judgment motion with respect to the integration clause in the Agreement, particularly because the integration clause is not as explicit with respect to the issue of reliance as is the non-reliance clause in the Agreement. *See In re: DaimlerChrysler Sec. Litig.,* 294 F.Supp.2d 616, 623 (D.Del.2003).

2. Advanta's argument that it is entitled to summary

judgment on Chase's fraud-based claims and breach of contract claims

*7 Advanta argues that there are no genuine issues of material fact with respect to Chase's fraud claims because Advanta did not knowingly provide Chase with false or misleading information. However, as discussed *supra,* I have already determined that there is a substantial controversy between the parties as to the material facts pertaining to Advanta's alleged misrepresentation and scienter, and thus, Advanta is not entitled to summary judgment on Chase's fraud claims. As to the contract claims, Chase has answered each of Advanta's arguments pertaining to those claims by pointing out disputed issues of material fact.[FN14] (D.I. 348 at 55-58.) Thus, Advanta is not entitled to summary judgment on Chase's breach of contract claims.

> FN14. For example, Advanta says that it fully disclosed all advances on zero balance loans in the disclosure schedule and, as such, did not breach § 4.40 of the Agreement. (D.I. 331 at 49.) In response, Chase says that one of its witnesses will testify that he was given a one-page schedule showing "a credit balance of $767,618 on advances on zero balance loans and was told that this was 'all advances' on zero balance loans," when in fact there were $17.5 million in advances outstanding on zero balance loans, thus creating a genuine issue of material fact as to whether Advanta fully disclosed all advances on zero balance loans. (D.I. 348 at 56.) Advanta also claims that it did not breach § 4.27 of the Agreement because " none of the documents [it] submitted to the SEC contain[ed] any material misstatement or omission." (D.I. 331 at 56 .) Chase says it has evidence sufficient to prove that Advanta submitted the allegedly false Statements to Certificateholders to the SEC, in violation of federal law, creating yet another genuine issue of material fact. (D.I. 348 at 57.) This colloquy repeats in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

much the same manner for each of the contractual provisions upon which Advanta has moved for summary judgment.

### 3. Advanta's argument that it is entitled to summary judgment on its counterclaim

Advanta argues that it is entitled to summary judgment on its counterclaim that Chase breached certain terms contained in a "Post-Closing Letter" executed on February 28, 2001. (D.I.333, Ex. 66.) Section 1.08(m) of the Agreement states that the parties would place certain funds in a Document Holdback Account to protect Chase from losses relating to missing or defective documents in various loan files. (D.I. 333, Ex. 48 at 12.) Since the parties had not completed the audit of those loan files by the Closing, they agreed to place an amount in the Document Holdback Account that would cover any of the losses. (D.I. 331 at 58.)

At Closing, $1,270,020 was placed in the Document Holdback Account. (D.I. 333, Ex. 67 at 2.) The Holdback Amount at Closing was $346,830, which was calculated using a Holdback Agreement per Document of $55.00. (*Id.*) Advanta argues that the terms of the Post-Closing Letter required that " [w]ithin two weeks after the date hereof, Buyer [Chase] shall release any funds in the Document Holdback Account in excess of the amount that would have been the amount of the Document Holdback at closing, computed in accordance with the provisions of the Agreement." (D.I.333, Ex. 66.) Advanta claims that Chase owes it the difference between the amount placed in the Document Holdback Account and the Holdback Amount at Closing (in excess of $900,000).

In response, Chase disputes the evidence provided by Advanta to support its calculations, claiming that it lists 6,305 document exceptions and that "[t]here is other evidence ... that there were 23,091 'starting exceptions' (i.e., the exceptions as of the Closing Date)." (D.I. 348 at 58-59.) Chase also questions the source and reliability of the evidence. Chase then argues that, using its evidence, "$55 per exception equals $1,270,005-$5 more than was placed in the holdback." However, Advanta's chart reflects that $1,270,020 was placed in the holdback.

(D.I.333, Ex. 67.)

In response, Advanta states that documentary evidence was provided to it by Bankers Trust, the custodian of the loan files, "on the day of Closing for the specific purpose of determining the number of outstanding document exceptions at the time of closing." (D.I. 372 at 19.) Advanta argues that Chase does not explain the source of the documentary evidence it cites to rebut Advanta's calculations. (*Id.*) Advanta then states that, on the basis of Chase's evidence, Chase was required to release $1,179,800 to Advanta from the Document Holdback Account by March 2002 at the latest. (*Id.*)

*8 On this issue too, there are genuine issues of material fact. How much money, if any, Chase was required to release to Advanta from the Document Holdback Account cannot be answered on the present record, as the parties themselves appear to have changed their calculations numerous times in the course of briefing this issue and seem to be confused (or at least confusing) about the documentary evidence upon which they each rely. Summary judgment for Advanta on its counterclaim will therefore be denied.

### C. The Parties' Motions to Exclude Certain Expert Testimony

On October 6, 2003, Chase filed a motion to exclude the expert testimony of W. Barefoot Bankhead. (D.I.342.) That same day, Advanta filed a motion to exclude the expert testimony of Bella Borg, Melanie Smith and Brian Olasov. (D.I.345.)

Advanta offered W. Barefoot Bankhead as an expert regarding the residual interests in Advanta's subprime mortgage securitizations and to rebut Chase's valuation of the residual interests at issue and to opine on the adequacy of Chase's due diligence. (D.I. 343 at 3, 4.) Chase argues that Mr. Bankhead is incapable, as a matter of law, to proffer opinions because he has "never before valued assets of this nature [subprime mortgage securitizations] and never performed due diligence for an acquisition like [the one involved in this litigation]." (*Id.* at 5.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 10

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

Chase retained Bella S. Borg to "formulate opinions concerning industry standards with respect to application of liquidation proceeds and reporting of losses due to loan foreclosures within a securitization." (D.I. 347 at A1.) Advanta argues that Ms. Borg's opinions are "unsupported and unreliable" and "precisely the type of testimony barred by Rule 702 and *Daubert.*" (D.I. 346 at 4.) Advanta further argues that Ms. Borg's experience has been limited to the prime mortgage industry and commercial loans, as opposed to the subprime residential loans at issue in this case. (*Id.* at 5.) Finally, Advanta argues for the exclusion of Ms. Borg's opinions that there is a standard definition within the industry for "realized loss" and that Advanta did not comply with the industry standards for reporting realized loss. (*Id.*) Advanta says those opinions should be excluded because Ms. Borg employed no methodology in reaching her conclusion. (*Id.* at 8.)

Chase offered Melanie Smith as an expert to opine on whether Schedule 4.40 of the Agreement in this case contained an adequate disclosure of advances on zero balance loans. (D.I. 347 at A108.) Advanta argues that Ms. Smith's testimony should be excluded at trial because it is "based on an incomplete and limited set of facts" and "offers no assistance to this Court." (D.I. 346 at 19.)

Finally, Chase offered Peter Olasov as an expert to " express opinions as to the reliance Chase placed on various materials in pricing and consummating its acquisition of various assets and operations related to Advanta's sub-prime business along with the impact to value associated with changes to various assumptions Chase made in acquiring these assets." (D.I. 347 at A201.) Advanta argues that Mr. Olasov's report and testimony contain "speculative and unsupported assumptions that cannot form the basis of an expert opinion." (D.I. 346 at 26.)

*9 Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993). The Rule provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Civ.P. 702 (2003). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id.* at 589-590. Further, Federal Rule of Civil Procedure 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591-92.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id.* at 592-93. Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used. *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

A party cannot qualify a person as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *Redman v. John D. Brush and Co.,* 111 F.3d 1174, 1179 (4th Cir.1997); *Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 382 (5th Cir.1996). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir.1987); *STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 768 (D.Md.1999) (quotation omitted), *aff'd,* 211 F.3d 588 (Fed.Cir.2000); *Sec. and Exch. Comm'n v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998).

This case is currently scheduled for a one-week bench trial to begin on April 26, 2004. At oral argument, I asked counsel for both parties whether I was obligated to carry out the "gatekeeping" function of *Daubert* in a bench trial in the same manner as I am obligated to in a jury trial. (D.I. 380

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 11

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
(Cite as: Not Reported in F.Supp.2d)

at 13:19-25.) Counsel candidly and correctly pointed out that the leading cases in the Third Circuit do not carve out any exception for applying *Daubert* differently in a bench trial than in a jury trial, nor does the case law indicate whether I must decide to exclude expert testimony prior or subsequent to a bench trial. (*Id.* at 16:17-25 through 17:1-11.)

*10 The parties' main argument was that, if I ruled on their *Daubert* motions before trial, it would streamline their trial preparations and perhaps prevent them from spending the time allocated to them at trial to examine expert witnesses whose testimony may ultimately be excluded. However, given the parties' briefing, the qualifications of the experts at issue, and the experts' reports and deposition testimony, I will not say at this point and on this record that the experts' opinions are so poor a fit with the evidence and so inadequate in their foundation as to be irrelevant or unreliable, and I therefore decline to exclude the proposed expert testimony at this time. If this were a jury trial, I might view the balancing differently, however, in the present context I will allow Mr. Bankhead, Ms. Borg, Ms. Smith, and Mr. Olasov to testify at trial. Both Chase's and Advanta's motions to exclude expert testimony will be denied without prejudice to their arguing about what weight, if any, the expert testimony should be given.[FN15]

> FN15. While I am mindful of the costs associated with preparing expert witnesses for trial, I believe that my ultimate judgment on the weight to be given to expert testimony is best made on a more complete record than presently exists.

Advanta also argues that the opinions contained in Ms. Smith's and Mr. Olasov's supplemental reports should be excluded because they were submitted six weeks after the deadline for expert reports, and that Advanta was prejudiced as a result of their untimely submission. (D.I. 346 at 25, 33.) In response, Chase states that the supplemental reports of Ms. Smith and Mr. Olasov should not be excluded because Mr. Olasov's initial report stated that he would be submitting a supplemental report; both

supplemental reports were submitted only a few weeks after the deadline; Advanta had ample opportunity to depose both Ms. Smith and Mr. Olasov about their supplemental reports; and the trial was not set to begin until over seven months after the supplemental reports were submitted. (D.I. 362 at 27.)

The touchstone for determining whether to exclude untimely expert reports is whether the party opposing their admission is prejudiced. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 791 (3d Cir.1994) (citation omitted). Advanta has not pointed to any prejudice that it suffered as a result of the late supplemental reports proffered by Ms. Smith and Mr. Olasov. Ms. Smith's supplemental report was served upon Advanta eight days prior to her deposition, and Mr. Olasov's supplemental report was served upon Advanta two days prior to his deposition. (D.I. 366 at 16.) Thus, Advanta had the opportunity to question both of these experts on the opinions expressed in their respective supplemental reports and could have rescheduled those depositions if it believed it needed additional time.

Advanta's only argument for excluding the supplemental reports is that they were late. While that is obviously a highly important factor, it is not alone determinative. If Advanta truly thought it was prejudiced by these supplemental reports, it should have raised the issue back in September of 2003. That Ms. Smith's and Mr. Olasov's supplemental reports were delivered prior to their depositions, albeit a few weeks late, coupled with the fact that Advanta has not articulated any prejudice that it has suffered as a result of their late submission, leads to the conclusion that they should not be excluded. *In re Paoli R.R.,* 35 F.3d at 792 (reversing district court's decision to exclude evidence as untimely where "prejudice to defendants was extremely minimal").

## V. CONCLUSION

*11 For the reasons set forth, Chase's Motion for Summary Judgment (D .I. 336) will be denied and its request for an order pursuant to Federal Rule of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 12

Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712
**(Cite as: Not Reported in F.Supp.2d)**

Civil Procedure 56(d) will be denied. Advanta's Motion for Summary Judgment (D.I.329) will be denied. Both Chase's and Advanta's Motions to Exclude Expert Testimony (D.I.342, 345) will be denied without prejudice to their arguing about what weight, if any, the expert testimony should be given.

An appropriate order will issue.

*ORDER*

In accordance with the Memorandum Opinion issued today, it is hereby ORDERED that
1. Chase's Motion for Summary Judgment (D.I.336) is DENIED;
2. Chase's request for an order pursuant to Federal Rule of Civil Procedure 56(d) is DENIED;
3. Advanta's Motion for Summary Judgment (D.I.329) is DENIED;
4. Both Chase's and Advanta's Motions to Exclude Expert Testimony (D.I.342, 345) are DENIED WITHOUT PREJUDICE to their arguing about what weight, if any, the expert testimony should be given.

D.Del.,2004.
Chase Manhattan Mortg. Corp. v. Advanta Corp.
Not Reported in F.Supp.2d, 2004 WL 422681 (D.Del.), Fed. Sec. L. Rep. P 92,712

Briefs and Other Related Documents (Back to top)

• 1:01cv00507 (Docket) (Jul. 26, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.