TAB 8



Not Reported in A.2d                                                                                          Page 1

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

**H**
Briefs and Other Related Documents

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re THE WALT DISNEY COMPANY
DERIVATIVE LITIGATION
**No. Civ.A. 15452.**

Submitted April 28, 2005.
Decided Aug. 9, 2005.

**Background:** Entertainment corporation's
stockholders brought action against corporate
directors and officers for breach of fiduciary duty
and waste in connection with hiring and termination
of corporate president, who received generous
termination benefits even though employment at
corporation lasted little more than a year.

**Holdings:** The Court of Chancery, New Castle
County, Chandler, Chancellor, held that:

1(1) president did not breach duty of loyalty to
corporation when president accepted non-fault
termination package upon termination by chief
executive officer (CEO);

2(2) termination of president and payment of
non-fault termination benefits did not constitute
waste;

3(3) CEO acted in good faith and was not grossly
negligent so as to breach his fiduciary duty of care
when he negotiated with and hired president;

4(4) chairman of corporation's compensation
committee was not grossly negligent and did not act
in bad faith when he negotiated with and hired
president;

5(5) compensation committee member who helped

design compensation package and employment
agreement did not breach fiduciary duty of care or
act in anything other than in good faith;

8(6) board of directors was not under a duty to act
with respect to termination of president;

9(7) general counsel acted in good faith when he
advised chief executive officer with respect to
termination; and

10(8) CEO acted in accordance with his fiduciary
duties and in good faith when he terminated
president.

Judgment for defendants.

West Headnotes

**[1] Corporations 101 ⇐312(1)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
      101k312 Corporate Property, Funds, and
Securities
        101k312(1) k. Liability for Property
and Funds in General. Most Cited Cases
Entertainment corporation's president did not
breach duty of loyalty to corporation when
president accepted non-fault termination package
upon termination by chief executive officer;
president played no part in termination decision or
in decision that termination would not be for cause
under president's employment agreement, which
would have prevented payment of the non-fault
termination package, and no reasonably prudent
person in president's position would have insisted
on board meeting to reconsider his termination or to
discuss and ratify his termination.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 2

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

**[2] Corporations 101 ⬅312(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
         101k312 Corporate Property, Funds, and
Securities
            101k312(1) k. Liability for Property
and Funds in General. Most Cited Cases
Termination of entertainment corporation's
president and payment of non-fault termination
benefits did not constitute waste; president could
not be terminated for cause due to any intentional
poor performance, gross negligence, or
malfeasance, chief executive officer did not intend
to hire president, whom he considered a friend, for
the purpose of firing him shortly thereafter with a
spectacular severance payoff, and many board
members testified that company would be better off
without president.

**[3] Corporations 101 ⬅310(2)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
         101k310 Management of Corporate
Affairs in General
            101k310(2) k. Degree of Care
Required and Negligence. Most Cited Cases
Entertainment corporation's chief executive officer
(CEO) acted in good faith and was not grossly
negligent so as to breach his fiduciary duty of care
when he negotiated with and hired president, who
was terminated shortly thereafter and given large
non-fault termination package; although CEO failed
to involve corporate board of directors when
making decision to hire president and when
agreeing on the terms of president's employment
agreement, CEO informed himself of all material
information reasonably available and acted in a
reasonable manner.

**[4] Corporations 101 ⬅310(2)**

101 Corporations
   101X Officers and Agents

      101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
         101k310 Management of Corporate
Affairs in General
            101k310(2) k. Degree of Care
Required and Negligence. Most Cited Cases
Chairman of entertainment corporation's
compensation committee was not grossly negligent
and did not act in bad faith when he negotiated with
and hired president, who was terminated shortly
thereafter and who received a large non-fault
termination severance package, although chairman
failed to independently verify president's
representations about past income and rigorously
investigate president's background.

**[5] Corporations 101 ⬅310(2)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
         101k310 Management of Corporate
Affairs in General
            101k310(2) k. Degree of Care
Required and Negligence. Most Cited Cases
Member of entertainment corporation's
compensation committee who helped design
president's compensation package and employment
agreement did not breach fiduciary duty of care or
act in anything other than in good faith in
connection with hiring of president and approval of
his employment agreement, which resulted in
president's receipt of large non-fault termination
benefits package upon president's termination;
member was a past chairman of the board and was
familiar with executive compensation at company,
and member informed himself of all material
information reasonably available before making
compensation decisions.

**[6] Corporations 101 ⬅310(2)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to
Corporation and Its Members
         101k310 Management of Corporate
Affairs in General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

101k310(2) k. Degree of Care Required and Negligence. Most Cited Cases
Low level of involvement in president's hiring by two members of entertainment corporation's compensation committee was not a breach of the fiduciary duty of care or an act bad faith, despite allegations that members approved president's employment agreement, which contained large non-fault termination benefits package, without receiving sufficient documentation and after short board meeting; members were aware that agreement would be discussed at meeting, discussion lasted at least 25 to 30 minutes, committee was provided with sheet of key terms and a presentation, and members reasonably relied on compensation consultant's representations and analysis.

**[7] Corporations 101 ☞310(1)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(1) k. In General. Most Cited Cases
Entertainment corporation's full board of directors properly exercised their business judgment and acted in accordance with their fiduciary duties when they elected president to corporation's presidency, although president was terminated little more than a year after hiring and received generous non-fault termination package; directors, before voting, were informed of who president was, the reporting structure that president had agreed to and the key terms of the president's employment agreement, and members acted in good faith and believed they were acting in the best interests of the corporation when they hired president.

**[8] Corporations 101 ☞294**

101 Corporations
    101X Officers and Agents
        101X(A) Election or Appointment, Qualification, and Tenure
            101k294 k. Removal. Most Cited Cases

**Corporations 101 ☞310(1)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(1) k. In General. Most Cited Cases
Entertainment corporation's board of directors was not under a duty to act with respect to termination of president, who received large non-fault termination benefits package, and thus board members did not violate fiduciary duties or act in bad faith with respect to termination and his receipt of benefits package; corporation's chairman and chief executive officer (CEO) had power to terminate president without board approval, and CEO exercised that power and terminated president, which resulted in corporation's obligation to pay the termination package.

**[9] Attorney and Client 45 ☞112.50**

45 Attorney and Client
    45III Duties and Liabilities of Attorney to Client
        45k112.50 k. Research and Knowledge of Law. Most Cited Cases

**Corporations 101 ☞310(2)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(2) k. Degree of Care Required and Negligence. Most Cited Cases
Entertainment corporation's general counsel acted in good faith when he advised chief executive officer (CEO) with respect to termination of corporation's president, who was entitled to large non-fault termination package, despite his conclusion regarding potential conflict between president's compensation agreement and corporation's stock benefits plan; counsel gave the proper advice and came to the proper conclusions when necessary,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 4

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

including that president could not be terminated for cause, counsel was familiar with the relevant factual information and legal standards, and counsel acted in good faith for what he believed were the best interests of the corporation.

**[10] Corporations 101 ⚖⇒294**

101 Corporations
    101X Officers and Agents
        101X(A)   Election   or   Appointment, Qualification, and Tenure
            101k294 k. Removal. Most Cited Cases

**Corporations 101 ⚖⇒310(2)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(2)   k.   Degree   of   Care Required and Negligence. Most Cited Cases
Entertainment corporation's chief executive officer (CEO) acted in accordance with his fiduciary duties and in good faith when he terminated president, who was entitled to large non-fault termination benefits package; CEO initially hired president as his future successor but president failed to perform to those expectations, CEO considered other options along with termination, including keeping president in position of president, moving him to another role within corporation, and even a "trade" of president to another company in exchange for the rights to a television program, but, after reviewing all material information reasonable available, decided to terminate president.

Joseph A. Rosenthal, Norman M. Monhait and Carmella P. Keener of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Seth D. Rigrodsky, of Milberg Weiss Bershad & Schulman LLP, Wilmington, Delaware; Steven G. Schulman, Joshua H. Vinik, Jennifer K. Hirsh and John B. Rediker, of Milberg Weiss Bershad & Schulman LLP, New York, New York, for Plaintiffs, of counsel.

David C. McBride and Christian Douglas Wright, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Mark H. Epstein and Jason L. Haas, of Munger, Tolles & Olson LLP, Los Angeles, California, for Defendant Michael S. Ovitz, of counsel.
Andre G. Bouchard and Joel Friedlander, of Bouchard,   Margules   &   Friedlander,   P.A., Wilmington, Delaware, for Nominal Defendant The Walt Disney Company.
Robert K. Payson, Stephen C. Norman and Kevin R. Shannon, of Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant Sanford M. Litvack.
Jesse A. Finkelstein, Gregory P. Williams, Anne C. Foster, Lisa A. Schmidt, Evan O. Williford and Michael R. Robinson, of Richards, Layton & Finger,   P.A.,   Wilmington,   Delaware,   for Defendants Stephen F. Bollenbach, Reveta F. Bowers, Ignacio E. Lozano, Jr., George J. Mitchell, Thomas S. Murphy, Richard A. Nunis, Leo J. O'Donovan, S.J., Sidney Poitier, Irwin E. Russell, Robert A.M. Stern, E. Cardon Walker, Raymond L. Watson and Gary L. Wilson.
A. Gilchrist Sparks, III and S. Mark Hurd, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Stephen D. Alexander and Fred L. Wilks , formerly of Fried, Frank, Harris, Shriver & Jacobson LLP, Los Angeles, California, for Defendants Roy Disney and Stanley P. Gold, of counsel.
Lawrence C. Ashby and Richard D. Heins, of Ashby & Geddes, Wilmington, Delaware; Gary P. Naftalis, Michael S. Oberman, Paul F. Schoeman and Shoshana Menu, of Kramer Levin Naftalis & Frankel LLP, New York, New York, for Defendant Michael Eisner, of counsel.

*OPINION AND ORDER*
CHANDLER, J.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

TABLE OF CONTENTS.

Introduction.                                                                                     1
I. FACTS.                                                                                          6
  A. Michael Ovitz Joins The Walt Disney Company.                                       6
    1. Background.                                                             6
    2. Ovitz First Contemplates Leaving CAA But His
Negotiations With MCA Fail.                                                                       10
    3. Ovitz Seriously Considers Joining The Walt
Disney Company.                                                                                  12
    4. Ovitz's Contract With Disney Begins to Take
Form.                                                                                            15
    5. Crystal is Retained to Assist Russell and
Watson in Evaluating the OEA.                                                                    17
    6. Ovitz Accepts Eisner's Offer.                                           22
    7. Disney's Board of Directors Hires Michael
Ovitz.                                                                                           26
    8. The October 16, 1995 Compensation
Committee Meeting.                                                                               30
  B. Ovitz's Performance as President of the Walt
Disney Company.                                                                                  32
    1. Ovitz's Early Performance.                                              32
    2. A Mismatch of Cultures and Styles.                                      36
    3. Approaching the Endgame.                                                38
    4. Specific Examples of Ovitz's Performance as
President of The Walt Disney Company.                                                            38
    5. Veracity and "Agenting".                                                49
    6. Gifts and Expenses.                                                     54
  C. Ovitz's Termination.                                                               59
    1. The Beginning of the End.                                               59
    2. The September 30, 1996 Board Meeting.                                   63
    3. Options for Ovitz's Termination.                                        68
    4. The November 25, 1996 Board Meeting.                                    72
    5. The Illusion Dispelled.                                                 76
    6. Ovitz's Bonus and His Termination.                                      80
  D. Expert Witnesses.                                                                  94
    1. Professor Deborah DeMott.                                               94
    2. Professor John Donohue.                                                 97
    3. Professor Kevin Murphy.                                                 98
    4. Larry R. Feldman.                                                       100
    5. John C. Fox.                                                            101
    6. Frederick C. Dunbar.                                                    103
II. LEGAL STANDARDS.                                                                             104
  A. The Business Judgment Rule.                                                         107
  B. Waste.                                                                              111
  C. The Fiduciary Duty of Due Care.                                                     112
  D. The Fiduciary Duty of Loyalty.                                                      115

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 6

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

| | |
|---|---|
| E. Section 102(b)(7). | 117 |
| F. Acting in Good Faith. | 119 |
| III. ANALYSIS. | 126 |
| A. Ovitz Did Not Breach His Duty of Loyalty. | 127 |
| B. Defendants Did Not Commit Waste. | 131 |
| C. The Old Board's Decision to Hire Ovitz and the Compensation Committee's Approval of the OEA Was Not Grossly Negligent and Not in Bad Faith. | 133 |
| 1. Eisner. | 134 |
| 2. Russell. | 141 |
| 3. Watson. | 145 |
| 4. Poitier and Lozano. | 147 |
| 5. The Remaining Members of the Old Board. | 159 |
| D. Eisner and Litvack Did Not Act in Bad Faith in Connection With Ovitz's Termination, and the Remainder of the New Board Had No Duties in Connection Therewith. | 161 |
| 1. The New Board Was Not Under a Duty to Act. | 162 |
| 2. Litvack. | 169 |
| 3. Eisner. | 171 |
| IV. CONCLUSION. | 174 |

### INTRODUCTION

*1 This is the Court's decision after trial in this long running dispute over an executive compensation and severance package. The stockholder plaintiffs have alleged that the director defendants breached their fiduciary duties in connection with the 1995 hiring and 1996 termination of Michael Ovitz as President of The Walt Disney Company. The trial consumed thirty-seven days (between October 20, 2004 and January 19, 2005) and generated 9,360 pages of transcript from twenty-four witnesses. The Court also reviewed thousands of pages of deposition transcripts and 1,033 trial exhibits that filled more than twenty-two 3 1/2 -inch binders. Extensive post-trial memoranda also were submitted and considered. After carefully considering all of the evidence and arguments, and for the reasons set forth in this Opinion, I conclude that the director defendants did not breach their fiduciary duties or commit waste. Therefore, I will enter judgment in favor of the defendants as to all claims in the amended complaint.

As I will explain in painful detail hereafter, there are many aspects of defendants' conduct that fell significantly short of the best practices of ideal corporate governance. Recognizing the protean nature of ideal corporate governance practices, particularly over an era that has included the Enron and WorldCom debacles, and the resulting legislative focus on corporate governance, it is perhaps worth pointing out that the actions (and the failures to act) of the Disney board that gave rise to this lawsuit took place ten years ago, and that applying 21st century notions of best practices in analyzing whether those decisions were actionable would be misplaced.

Unlike ideals of corporate governance, a fiduciary's duties do not change over time. How we understand those duties may evolve and become refined, but the duties themselves have not changed, except to the extent that fulfilling a fiduciary duty requires obedience to other positive law. This Court strongly encourages directors and officers to employ best practices, as those practices are understood at the time a corporate decision is taken. But Delaware law does not-indeed, the common law cannot-hold fiduciaries liable for a failure to comply with the aspirational ideal of best practices, any more than a common-law court deciding a medical malpractice dispute can impose a standard of liability based on ideal-rather than competent or standard-medical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

treatment practices, lest the average medical practitioner be found inevitably derelict.

Fiduciaries are held by the common law to a high standard in fulfilling their stewardship over the assets of others, a standard that (depending on the circumstances) may not be the same as that contemplated by ideal corporate governance. Yet therein lies perhaps the greatest strength of Delaware's corporation law. Fiduciaries who act faithfully and honestly on behalf of those whose interests they represent are indeed granted wide latitude in their efforts to maximize shareholders' investment. Times may change, but fiduciary duties do not. Indeed, other institutions may develop, pronounce and urge adherence to ideals of corporate best practices. But the development of aspirational ideals, however worthy as goals for human behavior, should not work to distort the legal requirements by which human behavior is actually measured. Nor should the common law of fiduciary duties become a prisoner of narrow definitions or formulaic expressions. It is thus both the province and special duty of this Court to measure, in light of all the facts and circumstances of a particular case, whether an individual who has accepted a position of responsibility over the assets of another has been unremittingly faithful to his or her charge.

**\*2** Because this matter, by its very nature, has become something of a public spectacle-commencing as it did with the spectacular hiring of one of the entertainment industry's best-known personalities to help run one of its iconic businesses, and ending with a spectacular failure of that union, with breathtaking amounts of severance pay the consequence-it is, I think, worth noting what the role of this Court must be in evaluating decision-makers' performance with respect to decisions gone awry, spectacularly or otherwise. It is easy, of course, to fault a decision that ends in a failure, once hindsight makes the result of that decision plain to see. But the essence of business is risk-the application of informed belief to contingencies whose outcomes can sometimes be predicted, but never known. The decision-makers entrusted by shareholders must act out of loyalty to those shareholders. They must in good faith act to make informed decisions on behalf of the

shareholders, untainted by self-interest. Where they fail to do so, this Court stands ready to remedy breaches of fiduciary duty.

Even where decision-makers act as faithful servants, however, their ability and the wisdom of their judgments will vary. The redress for failures that arise from faithful management must come from the markets, through the action of shareholders and the free flow of capital, and not from this Court. Should the Court apportion liability based on the ultimate outcome of decisions taken in good faith by faithful directors or officers, those decision-makers would necessarily take decisions that minimize risk, not maximize value. The entire advantage of the risk-taking, innovative, wealth-creating engine that is the Delaware corporation would cease to exist, with disastrous results for shareholders and society alike. That is why, under our corporate law, corporate decision-makers are held strictly to their fiduciary duties, but within the boundaries of those duties are free to act as their judgment and abilities dictate, free of *post hoc* penalties from a reviewing court using perfect hindsight. Corporate decisions are made, risks are taken, the results become apparent, capital flows accordingly, and shareholder value is increased.

Because of these considerations, I have tried to outline carefully the relevant facts and law, in a detailed manner and with abundant citations to the voluminous record. I do this, in part, because of the possibility that the Opinion may serve as guidance for future officers and directors-not only of The Walt Disney Company, but of other Delaware corporations. And, in part, it is an effort to ensure meaningful appellate review. Ultimately, however, it is for others to judge whether my effort here offers reasonable guidance to corporate directors, in general, on the subject of executive compensation and severance payments.[FN1] What follows is my judgment on whether each director of The Walt Disney Company fulfilled his or her obligation to act in good faith and with honesty of purpose under the unusual facts of this case.

> FN1. The subject of executive compensation itself has recently produced

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

much thoughtful analysis and comment. *See, e.g.,* Lucian Bebchuk and Jesse Fried, Pay Without Performance: The Unfulfilled Promise of Executive Compensation (2004) (describing how management influence distorts the compensation process); Stephen M. Bainbridge, *Executive Compensation: Who Decides,* 83 Tex. L.Rev. 1615 (2005) (reviewing and critiquing Bebchuk and Fried's *Pay Without Performance* ).

## I. FACTS [FN2]

FN2. To be consistent with the parties' submissions, the trial transcript will be cited as "Tr.," and at relevant times will indicate the particular witness by including that witness' name in parentheses. Deposition testimony will be cited as " [Deponent]." Plaintiffs' trial exhibits will be cited as "PTE" and Defendants' trial exhibits will be cited as "DTE." Finally, for the sake of clarity, the Court will refer to Roy Disney as such.

*A. Michael Ovitz Joins The Walt Disney Company*

### 1. Background

*3 The story of Michael Ovitz's rise and fall at The Walt Disney Company ("Disney" or the "Company" ) begins with the unfortunate and untimely demise of Frank Wells. Before his death, Wells served as Disney's President and Chief Operating Officer, and both he and Michael Eisner, Disney's Chairman and CEO, enjoyed ten years of remarkable success at the Company's helm. In April 1994, a fatal helicopter crash ended Wells' tenure at Disney and forced the company to consider a decision it was not properly prepared or ready to make.[FN3]

FN3. *See* Tr. 4148:11-4150:5.

Disney's short list of potential internal successors produced, for one reason or another, no viable

candidates.[FN4] Instead, Eisner assumed Disney's presidency, and for a brief moment, the Company was able to stave off the need to replace Wells. Within three months, however, misfortune again struck the Company when Eisner was unexpectedly diagnosed with heart disease and underwent quadruple bypass surgery. The unfortunate timing of Eisner's illness and operation set off an " enormous amount of speculation" concerning Eisner's health and convinced Eisner of the need to " protect[ ] the company and get [ ] help." [FN5] Over the next year, Eisner and Disney's board of directors discussed the need to identify Eisner's successor. These events were the springboard from which Eisner intensified his longstanding desire to bring Michael Ovitz within the Disney fold.[FN6]

FN4. Tr. 3997:24-3999:4; *see also* 6025:7-19.

FN5. *See* Tr. 4150:20-4152:8.

FN6. Eisner never called a board meeting for the specific purpose of discussing the possibility of hiring Ovitz, but at various times Eisner did contact board members on an individual basis. *See* Tr. 3665:1-3676:20 (Gold); 3997:6-3999:4 (Roy Disney); 4699:19-4700:24 (Eisner); 5913:23-5914:10 (Bowers); 7125:2-18 (Poitier); 7628:19-7629:2 (Lozano); 8142:2-8 (Stern); *see also* Bowers 183:13-185:6; 192:8-25; Lozano 54:13-56:14; Mitchell 17:23-19:14; Wilson 44:22-45:23; 48:14-49:2.

By the summer of 1995, Michael Ovitz and Michael Eisner had been friends for nearly twenty-five years. These men were very well acquainted, both socially and professionally. Over time, this relationship engendered numerous overtures, by which Eisner and Ovitz flirted with the idea of joining ranks and doing something together.[FN7] As Eisner put it: "I had been trying to hire him forever.... I couldn't do business with him ... he was too tough, so I thought he would be better ... on our side." [FN8] But until Eisner had offered Ovitz Disney's presidency, Ovitz had never seriously considered any of Eisner's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

offers and, according to Ovitz, there was good reason.

> FN7. Tr. 1105:12-1106:13 (Ovitz) (" [O]ver the years, he had asked me, and we had talked many times about doing something together from the time he [Eisner] was with ABC, then at Paramount and then when he went to Disney.").

> FN8. Eisner 111:3-112:2.

Michael Ovitz's interest in the entertainment industry was kindled during his high school years and, from that time through college, Ovitz held different posts at Universal Studios and Twentieth Century Fox. After graduating college, Ovitz left the studios and gained employment in the mailroom of the William Morris Agency. At that time, William Morris was well regarded as the oldest and largest theatrical talent agency in the world.[FN9] Ovitz worked for William Morris for six years, and had worked his way up to become a talent agent within the agency's television department. Here, Ovitz began to question the company's direction and its approach to representing its clients. Despite several colleagues' attempts to address their discontent with management, their efforts were not well received and, eventually, these philosophical disagreements led to an impasse. Ovitz and four other William Morris agents left, and Creative Artist Agency ("CAA") was born.

> FN9. Tr. 1091:6-10.

*4 CAA had a modest beginning and, from 1974 to 1979, the company's revenues were barely sufficient to meet its expenses.[FN10] During this period, most of CAA's business focused on the television industry, because CAA was self-financed and television revenues were more certain than revenues from feature films.[FN11] It was not until late 1979 that CAA branched off into the motion picture industry, and another four or five years later, the company moved into the music and consulting businesses. Ovitz attributes CAA's rise, in part, to a business model that he dubbed: "packaging."[FN12]

As Ovitz explained, before CAA, it was Hollywood studios, distributors or networks that controlled the talent "either contractually or by virtue of the fact that they had all of the distribution capability."[FN13] CAA revolutionized this system by grouping various talents, whether they were actors, directors or writers. These "packaged" talents could then coordinate their efforts to best exploit their leverage and maximize the economics of any given deal.[FN14] The effect of Ovitz's business model was clear. By 1995, CAA had reshaped an entire industry and had grown from five men sitting around a card table to the premier Hollywood talent agency. When Ovitz joined Disney, he left behind 550 employees and an impressive roster of about 1400 of Hollywood's top actors, directors, writers and musicians-a roster that earned CAA approximately $150 million in annual revenues. In turn, this success translated into an annual income of $20 million for Ovitz and, for his part, he was regarded as one of the most powerful figures in Hollywood.

> FN10. CAA's beginnings were so modest that the wives of the five founding partners were needed on a rotating basis to answer the company's phones. Tr. 1093:1-5.

> FN11. Tr. 1094:20-1095:16.

> FN12. *Id.*

> FN13. Tr. 1093:8-24.

> FN14. During trial, Ovitz best explained the concept of packaging by way of example. After Warner Brothers had rejected the screenplay for the motion picture *Rain Man,* the screen writer, using CAA as a conduit, was able to pass his work on to Dustin Hoffman, who teamed up with Tom Cruise, another CAA client, and Barry Levinson, to produce a picture that went on to win 1989's Academy Award for Best Picture. Tr. 1094:2-19.

*2. Ovitz First Contemplates Leaving CAA But His Negotiations With MCA Fail*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

In the spring of 1995, CAA was retained to facilitate negotiations between the Seagram Company and Matsushita where Seagram was to purchase eighty percent of Matsushita's holdings in Music Corporation of America ("MCA," now known as Universal Studios). During those negotiations, Edgar Bronfman Jr., Seagram's Chairman and CEO, who had known Michael Ovitz for a number of years, began to discuss with Ovitz the possibility of leaving CAA and joining MCA.

Bronfman's deal contemplated MCA purchasing CAA's consulting business from Ovitz, Ron Meyer and Bill Haber (the three remaining CAA founders and its only shareholders) in exchange for MCA stock. Ovitz, Meyer, and Haber would then sell their remaining CAA interest to a third party and use the proceeds to purchase more MCA stock.[FN15] If the deal were consummated, Ovitz would take MCA's reins as Chairman and CEO and would be paid handsomely for the job, including options for an additional 3.5 percent of MCA, $1.5 million in Seagram shares, and a seven-year contract (with a three-year renewal option) that paid a seven-figure salary with performance-based cash bonuses that could reach three to five times the base salary.[FN16]

> FN15. If the fair market value of CAA's non-consulting business was less than $50 million, Ovitz, Meyer and Haber would be required to invest their personal assets to bring their collective investment in MCA up to $50 million. In return, MCA would provide Ovitz, personally, with ninety percent of the quantity of MCA restricted stock needed to bring the three CAA shareholders' collective stake in MCA equity up to six and a half percent. PTE 793.

> FN16. *Id.*

By June 1995, it was apparent that Ovitz's deal with MCA would never materialize. Ovitz attributed this failure to his rising skepticism over his ability to improve "a company that had been flat for five [or more] years" in a culture unlikely "to support the effort of expansion, capital expenses, and changing

overhead" that Ovitz perceived was needed.[FN17] Fueling Ovitz's skepticism was his perception that sudden changes to the terms of the CAA/MCA deal were not coming from Bronfman, but, in fact, were instigated at the behest of Bronfman's father and uncle, who were controlling shareholders in the Seagram Company. In the end, Ovitz remained unconvinced that Bronfman could deliver the things that he was promising to deliver.[FN18]

> FN17. Tr. 1280:14-1281:22.

> FN18. *Id.*

**\*5** With the MCA deal falling apart, Ovitz returned to CAA and business continued as usual until Ovitz discovered that his close friend and number two at CAA, Ron Meyer, was leaving for MCA. This revelation devastated Ovitz, who had no idea Meyer was interested in leaving CAA, let alone leaving without Ovitz. Suddenly, the prospect of Ovitz remaining with the company he and Meyer built no longer seemed palatable, and Ovitz became receptive to the idea of joining Disney.

### 3. *Ovitz Seriously Considers Joining The Walt Disney Company*

Michael Eisner had been following Ovitz's talks with MCA closely and believed that now was the time to either talk to Ovitz seriously about joining Disney or face the possibility of having Ovitz at the helm of a major Disney competitor. [FN19] Thus, the informal overtures that had spanned the last two decades intensified and Eisner was "on a hunt" [FN20] to bring Ovitz to Disney.

> FN19. *See* Tr. 4173:24-4175:12 (Eisner) (" I saw a parade of horribles in front of me, which were resolved in a fairly, averagely managed company coming back to America. I saw a company that spent money pretty freely, wanting maybe to get Michael Ovitz to come manage it. And I was getting a little nervous about the prospect of ... having Michael Ovitz work

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

for us be usurped by MCA, and not only have him not work for us but be a competitor.").

FN20. *Id.*

Eisner's renewed efforts to recruit Ovitz received support from Sid Bass and Roy Disney (Roy Disney was also a director of the Company), two of the company's largest individual shareholders.[FN21] Hoping not to be outdone by MCA, Eisner and Irwin Russell (the chairman of Disney's compensation committee) reached out to Ovitz and attempted to convince him to join Disney. Both Eisner and Russell knew the basic terms and economics of MCA's offer and both knew that Disney would not match or exceed those terms. [FN22] For this reason, the initial talks with Ovitz were unproductive and ended in short order. Eisner could not compete with the rich terms MCA was offering and he settled on the notion that Disney would have "to live with [Ovitz going to] a competitor because [Disney] could not match [MCA's terms]." [FN23] Within a few weeks, however, the tides changed and Eisner learned that Meyer was leaving CAA to join MCA. For the first time, Eisner's desire to hire Ovitz was aligned with Ovitz's desire to leave CAA.

> FN21. From the beginning, Bass made clear that he would support Ovitz's hiring but that he would not support Ovitz sharing equal power with Eisner. *See* PTE 778 at MDE 000053.

> FN22. *See, e.g.,* Tr. 4175:13-4177:3.

> FN23. *Id.*

Eisner's efforts to hire Ovitz were in full swing by mid-July 1995. Russell, per Eisner's direction, assumed the lead role in negotiating the financial terms of the contract. These efforts took on significant import in the face of Disney's recent announcement of the acquisition of CapCities/ABC, a transaction that would double the size of Disney, place even greater demands on Eisner, and exacerbate the need for someone else to shoulder

some of the load. Russell, in his negotiations with Bob Goldman, Ovitz's attorney, learned that Ovitz was making approximately $20 to $25 million a year from CAA and owned fifty-five percent of the company.[FN24] From the start, Ovitz made it clear that he would not give up his fifty-five percent interest in CAA without downside protection.[FN25]

> FN24. Plaintiffs have contended that the compensation committee had no informed discussions concerning Ovitz's earnings while with CAA and attribute this failure to Russell. *See* Pls.' Post Trial Open. Br. at 20; Tr. 2755:1-22. Russell did, however, have a basic understanding of what MCA was willing to pay Ovitz. *See* Tr. 2630:8-2631:10; *see also* DTE 76 at DD001991. Russell also testified that Goldman had represented to him that Ovitz was earning approximately $20 to $25 million a year from CAA and that he had no reason to question Goldman's veracity. Tr. 2755:1-22.

> FN25. Ovitz repeated several times throughout his testimony that he had learned during his years of experience representing talent always to negotiate for upside participation and downside protection, and that when it came to negotiating for his own interests, he wanted no less. *See, e.g.,* Tr. 1277:9-1278:5; 2175:2-2177:7.

While Russell and Goldman were in the preliminary stages of negotiating the financial terms of Ovitz's contract, Eisner and Ovitz continued their talks as well. From these talks, Ovitz gathered that it was his skills and experience that would be brought to bear on Disney's current weaknesses, which he identified as poor talent relationships and stagnant foreign growth.[FN26] Remaining cautious, Ovitz wanted assurances from Eisner that Ovitz's vision was shared and that Eisner was sincere in his desire to reinvent Disney. Apparently, Eisner was able to assuage Ovitz's concerns, because at some point during these negotiations, Ovitz came to the understanding that he and Eisner would run Disney

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

as partners. Ovitz did recognize that Eisner was Chairman and would be his superior, but he believed that the two would work in unison in a relationship akin to the one that exists between senior and junior partners. [FN27] As it would turn out, Ovitz was mistaken, for Eisner had a radically different perception of their respective roles at Disney.

FN26. Tr. 1108:5-1113:5.

FN27. Tr. 1113:21-1115:4; 1116:7-1119:2.

*4. Ovitz's Contract With Disney Begins to Take Form*

**\*6** By the beginning of August 1995, the non-contentious terms of Ovitz's employment agreement (the "OEA") were $1 million in annual salary and a performance-based, discretionary bonus.[FN28] The remaining terms were not as easily agreed to and related primarily to stock options and Ovitz's insistence for downside protection.[FN29] Ovitz, using Eisner's contract as a yardstick, was asking for options on eight million shares of Disney's stock. Both Russell and Eisner, however, refused to offer eight million options and believed that no options should be offered within the first five years of Ovitz's contract.[FN30] This was a non-starter, since Ovitz would not leave CAA without downside protection and Disney had a policy against front-loading contracts with signing bonuses. Using both Eisner's and Wells' original employment contracts as a template, the parties reached a compromise.[FN31] Under the proposed OEA, Ovitz would receive a five-year contract with two tranches of options. The first tranche consisted of three million options vesting in equal parts in the third, fourth and fifth years, and if the value of those options at the end of the five years had not appreciated to $50 million, Disney would make up the difference. The second tranche consisted of two million options that would vest immediately if Disney and Ovitz opted to renew the contract.

FN28. *See* PTE 386 at DD001925; *see also* Tr. 2415:2-14.

FN29. After the MCA negotiations fell apart, and Ovitz decided to go to Disney, Ovitz, Meyer, and Haber transferred their interests in CAA to nine agents in exchange for seventy-five percent of revenues over the next four years on deals consummated before Ovitz left. *See* PTE 204. These payments were conditioned upon the new CAA first attaining certain financial benchmarks. *See id.* At the time this transfer occurred, no up-front cash was paid and it was uncertain whether new CAA would be profitable. *See, e.g.,* Tr. 1274:13-24. The record demonstrates that the compensation committee did not consider this arrangement when they determined Ovitz's level of compensation. *See* Tr. 2761:9-15 (Russell); 7206:22-7207:20 (Poitier); 7698:24-7699:2 (Lozano); 8096:1-10 (Watson).

FN30. *See* Tr. 2415:4-2421:13; 4203:22-4204:6.

FN31. *See* DTE 40 at DD001942; *see also* Tr. 2391:14-2392:18.

The proposed OEA sought to protect both parties in the event that Ovitz's employment ended prematurely and provided that absent defined causes, neither party could terminate the agreement without penalty. If Ovitz, for example, walked away, for any reason other than those permitted under the OEA, he would forfeit any benefits remaining under the OEA and could be enjoined from working for a competitor.[FN32] Likewise, if Disney fired Ovitz for any reason other than gross negligence or malfeasance, Ovitz would be entitled to a non-fault payment (Non-Fault Termination or " NFT"), which consisted of his remaining salary, $7.5 million a year for any unaccrued bonuses, the immediate vesting of his first tranche of options and a $10 million cash out payment for the second tranche of options.[FN33]

FN32. *See* PTE 7 ¶ 9 at WD00209. *But see* Tr. 804:18-805:5 (Murphy) (opining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

that the OEA did not contain a mitigation or non-compete clause and that Ovitz " would be perfectly free to go accept additional alternative employment").

FN33. *See* PTE 33 at DD001768-69.

### 5. Crystal is Retained to Assist Russell and Watson in Evaluating the OEA

As the basic terms of the OEA were coming together, Russell authored and provided Eisner and Ovitz with a "Case Study" outlining the OEA parameters and Russell's commentary on what he believed was an extraordinary level of executive compensation.[FN34] Specifically, Russell noted that it was appropriate to provide Ovitz with "downside protection and upside opportunity" and to assist Ovitz with "the adjustment in life style resulting from the lower level of cash compensation from a public company in contrast to the availability of cash distributions and perquisites from a privately held enterprise." [FN35] According to Russell, Ovitz was an "exceptional corporate executive" [FN36] who was a "highly successful and unique entrepreneur." [FN37] Nevertheless, Russell cautioned that Ovitz's salary under the OEA was at the top level for any corporate officer and significantly above that of the CEO and that the number of stock options granted under the OEA was far beyond the standards applied within Disney and corporate America "and will raise very strong criticism." [FN38] Russell rounded out his analysis by recommending an additional study so that he and Eisner could answer questions should they arise. Russell did not provide this Case Study to any other member of Disney's board of directors.[FN39]

FN34. PTE 64 at DD001935.

FN35. *Id.*

FN36. *Id.*

FN37. *Id.*

FN38. *Id.* at DD001936.

FN39. Tr. 2765:2-5.

*7 With the various financial terms of the OEA sufficiently concrete, Russell enlisted the aid of two people who could help with the final financial analysis: Raymond Watson, a current member of Disney's compensation committee and the past chairman of Disney's board of directors (and one of the men who designed the original pay structure behind Wells' and Eisner's compensation packages); [FN40] and Graef Crystal, an executive compensation consultant, who is particularly well known within the industry for lambasting the extravagant compensation paid to America's top executives. [FN41] The three men were set to meet on August 10. Before the meeting, Crystal prepared, on a laptop computer, a comprehensive executive compensation database that would accept various inputs and run Black-Scholes [FN42] analyses to output a range of values for the options.[FN43] At the meeting, the three men worked with various assumptions and manipulated inputs in order to generate a series of values that could be attributed to the OEA.[FN44] In addition to Crystal's work, Watson had prepared several spreadsheets presenting similar assessments, but these spreadsheets did not use the Black-Scholes valuation method. At the end of the day, the men made their conclusions, discussed them, and agreed that Crystal would memorialize his findings and fax the report to Russell.

FN40. This was the first instance where a board member other than Russell or Eisner was brought into the Ovitz negotiation process. *See, e.g.,* Tr. 7167:5-13 (Poitier) (testifying that before August 13, 1995 he did not discuss Ovitz's compensation package); 7658:4-21 (Lozano) (testifying that before the August 1995 press release, he did not speak to any board member, aside from Eisner, concerning Ovitz's employment); 2425:18-2427:15 (Russell) (testifying that it was his intention to inform Watson of the negotiations only after there was a good possibility of a deal).

FN41. Crystal, who had previously headed Towers Perrin's compensation practice, has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

consulted on behalf of Disney for many years and is actively engaged in both teaching and publishing in the field. *See* Tr. 2714:5-2715:5; 3243:2-3261:15.

FN42. The Black-Scholes' method is a formula for option valuation, widely used and accepted by industry figures and regulators, that determines option value based upon a complex calculation involving the exercise price and term of the options, the price of the underlying stock, its dividend history and volatility, and the risk-free interest rate. Tr. 764:20-765:13.

FN43. Tr. 3268:13-3269:11.

FN44. The various inputs accounted for different numbers of options, vesting periods, and potential proceeds of option exercises at various times and prices. *See, e.g., id.; see also* DTE 12; DTE 28; DTE 32; DTE 56.

Two days later, Crystal faxed his memorandum to Russell. In the memo, Crystal concluded that the OEA would provide Ovitz with approximately $23.6 million per year for the first five years of the deal.[FN45] Crystal estimated that the contract was worth $23.9 million a year, over a seven-year period, if Disney and Ovitz exercised the two-year renewal option.[FN46] Crystal opined that those figures would approximate Ovitz's present compensation with CAA. That evening, Russell, Watson and Crystal phoned each other and further discussed Crystal's conclusions and the assumptions underlying those conclusions. [FN47] During those discussions some questions surfaced, and Russell asked Crystal to revise his memo to resolve the ambiguities Russell believed existed in the current draft. Instead of addressing the points Russell highlighted, Crystal faxed a new letter to Russell expressing Crystal's concern over the portion of the OEA that created the $50 million option appreciation guarantee. [FN48] Crystal contended that the current language of the OEA, if he was reading it correctly, would allow Ovitz to hold the first tranche of options, wait until his five-year term

was up, collect the $50 million guarantee and then exercise in-the-money options for an additional windfall.[FN49] In light of this, Crystal was philosophically opposed to a pay package that would give Ovitz the best of both worlds-*i.e.,* low risk and high return.[FN50] Crystal's letter was never circulated to any board member other than Eisner. [FN51] Rather, Russell addressed Crystal's concerns and clarified that the guarantee would not function in the manner Crystal believed [FN52] and, on August 18, Crystal augmented his August 12 memo and faxed Russell the revised copy. Again, Crystal opined that the OEA, during the first five years, was, as he originally estimated, worth $23.6 million, but as to the value of the OEA's renewal option, Crystal revised his estimation and believed that the two additional years would increase the value of the entire OEA to $24.1 million per year.[FN53] Up until this point, only three members of Disney's board of directors were in the know concerning the status of the negotiations with Ovitz or the particulars of the OEA-Eisner, Russell and Watson.

FN45. PTE 365.

FN46. *Id.*

FN47. Plaintiffs have questioned whether this conversation actually occurred. *See* Pls.' Post Trial Opening Br. at 11. Based on the testimony adduced at trial the Court is satisfied that Crystal, Watson and Russell did indeed speak by phone to discuss their findings. *See* Tr. 2444:13-2445:4; 2452:10-16; *see also* DTE 120 at WD07502; PTE 215.

FN48. *See* PTE 59.

FN49. *Id.* at DD001391.

FN50. *Id.*

FN51. *See* Tr. 2790:11-21; 7707:8-7708:3.

FN52. *See* PTE 214 at DD001385; *see also* Tr. 2458:3-2460:11.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN53. *See* PTE 366.

### 6. *Ovitz Accepts Eisner's Offer*

**\*8** While Russell, Watson and Crystal were
finalizing their analysis of the OEA, Eisner and
Ovitz were coming to terms of their own. Eisner,
having recently conferred with Russell concerning
his ongoing research, gave Ovitz a
take-it-or-leave-it offer: If Ovitz joined Disney as
its new President, he would not assume the duties or
title of COO.[FN54] After short deliberation, Ovitz
accepted Eisner's terms, and that evening he, Eisner
and Sid Bass (and their families) celebrated Ovitz's
decision.

> FN54. While vacationing together, Eisner
> told Ovitz that Sid Bass was flying into
> Aspen for dinner and that "either we're
> going to have a deal by the time he lands ...
> or we're not, ... [and] the deal will be gone.
> " Ovitz was then given until 6:00 p.m. that
> night to concede on a number of issues; the
> two largest concessions were: 1) the
> reduction in the number of options from a
> single grant of five million to two separate
> grants,-the first grant being three million
> options for the first five years, and the
> second grant consisting of an additional
> two million options if the contract was
> renewed; and 2) Ovitz abandoning the idea
> of joining the Company as a Co-CEO. *See*
> Tr. 4196:10-4198:3.

As it would turn out, the celebratory mood was
short lived. The next day, August 13, Eisner called
a meeting at his home in Los Angeles to discuss his
decision and, in addition to Ovitz and Russell,
Sanford Litvack (Disney's General Counsel) [FN55]
and Stephen Bollenbach (Disney's Chief Financial
Officer) were invited to attend. At the meeting,
Litvack and Bollenbach, who had just found out the
day before that Eisner was negotiating with Ovitz,
[FN56] were not happy with the decision. Their
discontent "officially" stemmed from the perception
that Ovitz would disrupt the cohesion that existed
between Eisner, Litvack and Bollenbach,[FN57] and
both Litvack and Bollenbach made it clear that they

would not agree to report to Ovitz but would
continue to report to Eisner.[FN58] At trial, the Court
was left with the perception that Litvack harbored
resentment that he was not selected to be Disney's
President and that this fueled, to some extent,
Litvack's resistance to Ovitz assuming the post he
coveted.[FN59] Bollenbach's resistance was more
curious. Indeed, Bollenbach had been hired before
Ovitz and, at the time, his expectation was that he
would report only to Eisner. Still, his testimony
seemed disingenuous to the Court when he pinned
his resistance on the fact that he had been part of a
cohesive trio (*i.e.,* Bollenbach, Litvack, and Eisner).
After all, Bollenbach had been with the Company
for a total of three months before he was informed
of the negotiations with Ovitz.[FN60] Despite this
mutiny, Eisner was able to assuage Ovitz's concern
about his shrinking authority in the Company, and
Ovitz, with his back against the wall, acceded to
Litvack and Bollenbach's terms.

> FN55. Litvack was also Disney's Chief of
> Corporate Operations and Executive Vice
> President for Law and Human Resources.

> FN56. *See* Tr. 6040:20-23;
> 6045:15-6047:11.

> FN57. *See id.*

> FN58. Tr. 5274:4-5276:2; 6048:1-6049:13.

> FN59. *See, e.g.,* Tr. 6027:13-6028:22.

> FN60. *See* Tr. 5271:22-5272:11.

The next day, August 14, Ovitz and Eisner signed
the letter agreement ("OLA") that outlined the basic
terms of Ovitz's employment.[FN61] The OLA
specified that Ovitz's hiring was subject to approval
of Disney's compensation committee [FN62] and
board of directors.[FN63] That same day, Russell
contacted Sidney Poitier (for a second time) to
inform him that Eisner and Ovitz reached an
agreement.[FN64] At trial, Poitier failed to recount
with any specificity his conversation with Russell.
He made clear that he was never faxed Crystal's
analysis or the draft of the OLA (which Litvack had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 16

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
(Cite as: Not Reported in A.2d)

prepared for Russell on August 12).[FN65] Nevertheless, Poitier did testify that Russell had " mention[ed] the terms" of the OEA and that Russell promised to stay in touch with any developments. [FN66] Poitier believed that hiring Ovitz was a good idea because he knew Ovitz's reputation in the entertainment business and considered him an innovator who understood the movie business. [FN67] Poitier also expressed the opinion that Ovitz would adequately adapt to running a public company such as Disney.[FN68] Watson also contacted Ignacio "Nacho" Lozano by phone.[FN69] The record is unclear as to exactly when Lozano was called.[FN70] As with Poitier, relatively little of Lozano's phone conversation was recounted at trial, except to say that Lozano testified that he felt comfortable with Ovitz's ability to make the transition from a private company culture to that of a public company.[FN71] As for communications with the other board members, Eisner contacted each of them by phone to inform them of the impending deal. During these calls, Eisner described his friendship with Ovitz, and Ovitz's background and qualifications. [FN72]

FN61. *See* PTE 60.

FN62. The compensation committee was comprised of Russell, Watson, Ignacio Lozano and Sidney Poitier.

FN63. *See* PTE 60 at DD002932.

FN64. In his prior deposition, Poitier testified that the first contact concerning the Ovitz contract occurred at the compensation committee meeting on September 26, 1995. *See* Poitier 117:19-118:5. At trial, the witness revised his testimony to reflect that the first contact actually occurred via a phone call from Russell on Sunday August 13. Tr. 7125:19-7126:13; 7167:5-13. Russell testified that he had called Poitier twice. The first call occurred on August 13, and the second call was made the next day before the press release on August 14. *See* Tr. 2445:17-2446:20. I am satisfied that

both calls did in fact occur and that at the time of the calls, Poitier was on his yacht vacationing in Sardinia.

FN65. Tr. 7167:14-17.

FN66. Tr. 7126:10-13.

FN67. Tr. 7127:4-17.

FN68. Tr. 7129:13-18.

FN69. Tr. 7637:14-7638:3.

FN70. Lozano could not recall when the call occurred, but in an August 18, 1995 memo, Russell notes that "all the members of the Compensation Committee heartily endorse this pay package. Watson had a long discussion with Ignacio Lozano and I had two long conversations with Sidney Poitier in which all the details were reviewed and discussed before the deal was signed." PTE 215 at DD001636.

FN71. Tr. 7631:18-7632:1.

FN72. *See, e.g.,* Tr. 4215:12-4216:14 (Eisner); 3704:3-23 (Gold) (testifying that he received a call from Eisner and also spoke with Roy Disney); 5388:9-23 (Bollenbach); 5582:15-5583:8 (Mitchell); 5802:14-23 (Nunis); 7658:4-21 (Lozano); 8141:23-8143:3 (Stern); *see also* DTE 413 (Eisner's phone log).

**\*9** On the same day that Eisner and Ovitz signed the OLA, the news of Ovitz's hiring was made public via a press release. Public reaction was extremely positive. Disney was applauded for the decision, and Disney's stock price increased 4.4 percent in a single day-increasing Disney's market capitalization by more than $1 billion.[FN73]

FN73. *See* DTE 92; DTE 428 Ex. 4a.

7. *Disney's Board of Directors Hires Michael Ovitz*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 17

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

Once the OLA was signed, Joseph Santaniello, who was an in-house attorney within Disney's legal department, took charge of embodying the terms Russell and Goldman had agreed upon and which were memorialized in the OLA.[FN74] To that end, Santaniello concluded that the $50 million guarantee presented negative tax implications for the Company, as it might not have been deductible. [FN75] Concluding that the provision must be eliminated, Russell initiated discussions on how to compensate Ovitz for this change-from this, an amalgamation of amendments to certain terms of the OEA arose in order to replace the back-end guarantee.[FN76] Russell again worked with Watson and Crystal to consider the possible consequences of the proposed changes. [FN77] Russell and Crystal applied the Black-Scholes methodology to assess the value of the extended exercisability features of the options and Watson generated his own analysis to the same end.[FN78]

FN74. Tr. 6055:16-6056:14.

FN75. Santaniello 48:23-49:19.

FN76. *See id.* at 50:7-19; *see also* PTE 348 (Russell's letter to Eisner suggesting the elimination of the $50 million guarantee and replacing it with: (1) the reduction in the option strike price from 115% to 100% of the Company's stock price on the day of the grant for the two million options that would become exercisable in the sixth and seventh year after commencement of employment; (2) Payment of $10 million in severance if the Company chose not to renew Ovitz's contract; and (3) alteration of the renewal option to provide for a five year extension, $1.25 million per year in salary, the same bonus structure as the first five years of the contract, and the grant of three million additional options).

FN77. Tr. 2485:22-2486:16.

FN78. *See, e.g.,* Tr. 2489:7-21.

On September 26, 1995, the compensation committee met *for one hour* to consider (1) the proposed terms of the OEA, (2) the compensation packages for various Disney employees, (3) 121 stock option grants, (4) Iger's CapCities/ABC employment agreement and (5) Russell's compensation for negotiating the Ovitz deal.[FN79] The discussion concerning the OEA focused on a term sheet (the actual draft of the OEA was not distributed), from which Russell and Watson outlined the process they had followed back in August and described Crystal's analysis. Russell testified that the topics discussed were historical comparables such as Eisner's and Wells' option grants,[FN80] and the factors that he, Watson and Crystal had considered in setting the size of the option grants and the termination provisions of the contract.[FN81] Watson testified that he provided the committee with the spreadsheet analysis he had performed back in August and discussed his findings.[FN82] Crystal, however, did not attend the meeting and his work product was not distributed to the Committee. At trial, Crystal testified that he was available via telephone to respond to questions if needed, but no one from the committee in fact called.[FN83] After Russell's and Watson's presentations, Litvack responded to various questions but the substance of those questions was not recounted in any detail at trial.[FN84] Poitier and Lozano testified that they believed they had received sufficient information from Russell's and Watson's presentations [FN85] to enable them to exercise their judgment in the best interest of the Company.[FN86] When the discussions concluded, the Committee unanimously voted to approve the terms of the OEA subject to "reasonable further negotiations within the framework of the terms and conditions" [FN87] described in the OEA.[FN88]

FN79. PTE 39.

FN80. Tr. 2521:8-2522:19. Although Russell used Wells' and Eisner's contracts as benchmarks for Ovitz's pay package, neither Poitier nor Lozano were able to recall any discussion concerning Crystal's observation that there were no comparables of non-CEO presidents of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 18

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

public companies that could justify Ovitz's pay package. *See* Tr. 7181:21-7182:1; 7701:4-10.

FN81. *See, e.g.,* Tr. 2522:11-2523:4. Although the term sheet did highlight the term "wrongful termination," no one on the committee recalled any discussion concerning the meaning of gross negligence or malfeasance. *See* Tr. 2903:8-16; 7198:14-20; 7701:23-7702:2; 7716:22-7717:3. Despite this omission, the terms gross negligence or malfeasance were not foreign to the board of directors, as the language was standard, and could be found, for example, in Eisner's, Wells', Katzenberg's and Roth's employment contracts. *See* Tr. 6081:1-9.

FN82. Tr. 7848:16-21. Poitier could not recall whether Watson had actually distributed copies of his spreadsheets, but he did recall that "figures and numbers" were passed around and discussed. *See* Tr. 7222:20-7223:8. Lozano also had no recollection at trial that these spreadsheets were actually distributed. Tr. 7702:3-6. I attribute this lack of recollection to the nine years that have passed between that meeting and the trial and do not attribute any lack of veracity to Watson's testimony because of it.

FN83. Tr. 3602:2-21.

FN84. Plaintiffs contend that since Litvack had no responsibility in the actual negotiations of the Ovitz contract, the question session, which followed Russell's and Watson's presentations, and was memorialized in the committee minutes, could not have been of any substance. *See* Pls.' Post Trial Opening Br. at 21. The Court does not agree with this contention. Litvack testified that he knew what the deal was. *See* Litvack 384:18-385:4. He could therefore speak intelligently to questions from the committee. Whatever personal animosity Litvack harbored for

Ovitz, not actually negotiating the deal did not prevent him from answering the committee's questions with "substance."

FN85. Plaintiffs have demonstrated that at no point were the following matters discussed in the committee meeting: (1) the purchase of Ovitz's private jet for $187,000 over the appraised value; (2) the purchase of Ovitz's BMW at acquisition cost and not the depreciated market value; (3) the purchase of Ovitz's computers at replacement value instead of their lower book value; (4) any specific list of perquisites, despite Eisner already agreeing to provide Ovitz with numerous such benefits; and (5) that despite Ovitz's bonus being payable completely on a discretionary basis, Russell's memorandum to Ovitz indicating that the bonus would likely approximate $7.5 million annually. Although I have concluded that plaintiffs have established these facts, they are ultimately immaterial to my decision.

FN86. *See* Tr. 7136:23-7137:3; 7140:12-19; 7636:2-10; 7639:21-7640:3.

FN87. PTE 39 at WD01170.

FN88. At the behest of Watson, the committee discussed the time and energy Russell had placed into the negotiations and suggested that the committee recommend to the full board that Russell be compensated $250,000. The compensation committee voted to recommend this fee and the full board, while in executive session, approved it. See PTE 39 at WD01171; PTE 29 at WD01195-96. Russell abstained from voting on the issue.

*10 An executive meeting of Disney's board immediately followed the compensation committee's meeting.[FN89] In executive session, the board was informed of the reporting structure that Eisner and Ovitz agreed to, but no discussion of the discontent Litvack or Bollenbach expressed at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

Eisner's home was recounted.[FN90] Eisner led the discussion regarding Ovitz, and Watson then explained his analysis and both he and Russell responded to questions by the board.[FN91] Upon resuming the regular session, the board deliberated further, then voted unanimously to elect Ovitz as President.[FN92]

FN89. PTE 29 at WD01195-96.

FN90. Neither Litvack nor Bollenbach attended the executive session. *Id.*

FN91. Tr. 2537:11-2540:16 (Russell); 3733:1-3735:16 (Gold); 4014:7-4017:24 (Roy Disney); 4872:4-4879:4 (Eisner); 5585:12-5588:11 (Mitchell); 5919:7-5925:2 (Bowers); 7851-5-7853:9 (Watson); 8145:13-8146:8 (Stern).

FN92. PTE 29 at WD01196.

8. *The October 16, 1995 Compensation Committee Meeting*

In accordance with the compensation committee's resolution roughly three weeks before,[FN93] the compensation committee convened again on October 16, 1995, in a special meeting to discuss several issues relating to stock options. [FN94] After a presentation by Litvack, during which he responded to questions from the members of the committee, the compensation committee unanimously approved amendments to The Walt Disney Company 1990 Stock Incentive Plan, thereafter titled The Walt Disney Company Amended and Restated 1990 Stock Incentive Plan (the "1990 Plan"), and also approved a new plan, known as The Walt Disney Company 1995 Stock Incentive Plan (the "1995 Plan").[FN95] Both plans were subject to further approval by the full board of directors and by shareholders.[FN96]

FN93. PTE 39 at WD01170 (mentioning that Ovitz's stock option grant would be delayed until further details were worked out between Ovitz and the Company),

WD01186-88 (term sheet outlining vesting schedule, other special terms of Ovitz's options, and that Ovitz's options would be formally granted at a later date).

FN94. PTE 41 at WD00118; Tr. 2546:1-2547:24; 2971:3-2972:10; 7228:18-7229:1. Although not members of the compensation committee, Litvack, Schultz (Vice President-Corporate Compensation) and Santaniello attended this meeting. PTE 41 at WD00118; Tr. 6076:22-6077:2; Schultz 86:10-15; Santaniello 102:12-19. Poitier and Russell attended by telephone from the Company's New York office, but Lozano and Watson were present in person. PTE 41 at WD00118; *see also* PTE 372 (Russell's notes of the October 16, 1995 meeting).

FN95. PTE 41 at WD00119-21, WD00123-141; Tr. 6077:3-6078:17. *But see* Tr. 7732:12-17 (Lozano has no independent recollection of the October 16, 1995 meeting).

FN96. PTE 41 at WD00120; *see* PTE 30 (memo requesting the board's unanimous consent to the amendments to the 1990 Plan and adoption of the 1995 Plan and explaining the differences between the old 1990 Plan and the new Plans, including the potential for exercisability beyond twenty-four months following termination); PTE 265 (unanimous written consent of the Company's board of directors approving the amendments to the 1990 Plan and adoption of the 1995 Plan); DTE 142 (proxy statement dated November 13, 1995 requesting shareholder approval of the amendments to the 1990 Plan and adoption of the 1995 Plan); Tr. 2548:1-2549:9.

Following approval of these plans, Litvack reviewed the terms of the proposed OEA with the compensation committee,[FN97] after which the committee unanimously approved the terms of the OEA and the award of Ovitz's options pursuant to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 20

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
(Cite as: Not Reported in A.2d)

the 1990 Plan.[FN98] Ovitz's options were priced at market as of the date of the meeting.[FN99] As a final wrap-up before adjourning, the compensation committee passed a resolution "that all of the actions heretofore taken by the officers of the Corporation in connection with the foregoing resolutions [relating to the OEA] be, and they hereby are, confirmed and ratified." [FN100]

> FN97. Discussion of the *bona fides* of the OEA was minimal because that discussion had occurred at the compensation committee meeting on September 26, 1995. *See* Tr. 2976:17-2977:3; 6648:9-6649:1.

> FN98. PTE 41 at WD00121-22; Tr. 2979:7-10; 6078:21-6080:4; *see* PTE 43 (memo from Marsha Reed to Donna Scanlon confirming the grant of Ovitz's options and their key terms); PTE 44 (PTE 43 with marginalia); PTE 48 (Ovitz's Stock Option Agreement); PTE 339 (same). *But see* Tr. 7230:4-7231:10 (Poitier) (testifying that he does not independently recall Litvack's discussion of the OEA).

> FN99. PTE 41 at WD00122; Tr. 2979:11-16; 2980:18-2981:4; 6083:7-24; *see* PTE 43; PTE 44; PTE 48; PTE 339.

> FN100. PTE 41 at WD00122. A similar resolution was also part of the resolutions approving the amendments to the 1990 Plan and adoption of the 1995 Plan. *Id.* at WD00121.

The amendment to the 1990 Plan (consistent with the provisions of the new 1995 Plan), together with the terms of the Stock Option Agreement,[FN101] provided that, in the event of an NFT, Ovitz's options would be exercisable until the later of September 30, 2002, or twenty-four months after termination, but in no event later than October 16, 2005 (ten years from the date of grant). [FN102]

> FN101. PTE 48; PTE 339.

> FN102. PTE 48 at DD002785; *see* PTE 41 at WD00142-43.

### B. Ovitz's Performance as President of The Walt Disney Company

#### 1. Ovitz's Early Performance

Ovitz's tenure as President of The Walt Disney Company officially began on October 1, 1995. [FN103] Eisner authored three documents shortly after Ovitz began work that shed light on his early performance on the job. The first is a letter written to Ovitz dated October 10, 1995.[FN104] Eisner lauded Ovitz's initial performance,[FN105] and also provided Ovitz with some written guidance with respect to Eisner's management philosophies.[FN106] Ovitz testified that this letter was a continuation of conversations he had already had with Eisner, and that the letter was "incredibly helpful and very supportive," [FN107] especially in light of the fact that Ovitz was adjusting to working at a publicly-traded company.[FN108]

> FN103. *See* PTE 3 at DD002012.

> FN104. PTE 267 (Eisner faxed a copy of the letter to Watson on October 16, 1995); Tr. 4251:7-18.

> FN105. Some examples of Eisner's compliments to Ovitz: "I have noticed how quickly and brilliantly you have taken to the company and the company to you...." PTE 267 at DD002287. "Your instincts were right in coming to The Walt Disney Company and mine were right in suggesting it." *Id.* "Our partnership is born in corporate heaven...." *Id.* at DD002290. "This is basically your first week on the job and I can already see how well it is all going to work." *Id.* at DD002291.

> FN106. Eisner wrote that PTE 267 "is a practical letter." *Id.* at DD002288. Some examples of Eisner's teachings: "There is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

no need to tell you how unique this company is...." *Id.* at DD002287. "[W]e generally stay away from partnership and joint ventures.... We recognize that business control is creative control." *Id.* at DD002287-88. "We must concentrate on the operations. We must concentrate on continuing to lead creatively. We must throw out mediocrity." *Id.* at DD002288. Eisner told Ovitz that public company executives should "act like 'Caesar's wife'. " *Id.* "I feel about acquisitions exactly as I feel about everything else. We don't need them.... Most companies create the fiction that they can run anything better than the management of a target company. Often that is not true." *Id.* at DD002289. Eisner also provided a list of ten questions to ask before making an acquisition. *Id.* at DD002290.

FN107. Ovitz 211:21-22.

FN108. *Id.* at 212:2-9.

**\*11** The second document is a letter Eisner wrote to the board of directors, the Bass family, and his wife on October 20, 1995.[FN109] In it, Eisner called Ovitz's hiring "a great coup for us and a saving grace for me.... Everybody is excited being with him, doing business with him.... He has already run a private company, and being a quick study, has quickly adapted to the public institution." [FN110] Eisner testified that the October 20 letter accurately reflected his views of Ovitz at the time it was written.[FN111] Eisner also used the October 20 letter to reiterate his views regarding the appropriateness of acquisitions for the Company. [FN112]

FN109. PTE 313; Tr. 4263:5-18.

FN110. PTE 313 at MDE000041; *see also* Tr. 3746:13-3747:14 (Gold) (testifying that "very early on" in Ovitz's tenure, Eisner's communications to him about Ovitz "were relatively complimentary"); 3750:20-3751:10. *But see* Tr.

4018:9-4021:6 (Roy Disney) (testifying that Ovitz was known by October 1995 as being habitually late to meetings); 6088:12-6092:23 (Litvack) (testifying to an argument between himself and Ovitz in October 1995 regarding Disney characters appearing on the David Letterman Show and explaining how this was an example of how Litvack and Ovitz could not get along, but that the fault belonged to both of them).

FN111. Tr. 4265:7-4266:7.

FN112. PTE 313 at MDE000042-44.

The third document is dated November 10, 1995, and is a memo addressed to Tony Schwartz, Eisner's biographer.[FN113] In it, Eisner says that Ovitz has had a difficult time accepting Bollenbach and Litvack as his equals, but that Ovitz was adjusting, realizing that he need not "prove to himself, to the group, to the world, that he is in charge." [FN114] Eisner also reaffirmed that "Michael Ovitz is the right choice. He will, in short order, be up to speed in the areas we have discussed endlessly-brand management, corporate direction, moral compass and all those difficult areas, especially for Disney, to define." [FN115] Eisner described the already-existing tension between Ovitz and Litvack as attributable to Litvack by saying, "Sandy Litvack may never settle in because of his basic annoyance with the style of Michael Ovitz, but he may. Time may make it work, if he will let it." [FN116]

FN113. PTE 316. Eisner testified that his statements contained in PTE 316 were " honest and candid" when they were written. Tr. 4273:13-19; 4274:15-20.

FN114. PTE 316 at MDE000035.

FN115. *Id.* at MDE000036. If these areas were difficult for Disney to define, it is understandable that Ovitz would have a difficult time making the necessary adjustments.

FN116. *Id.* at MDE000037.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

As late as the end of 1995, Eisner's attitude with respect to Ovitz was positive.[FN117] Eisner wrote, " 1996 is going to be a great year-We are going to be a great team-We every day are working better together-Time will be on our side-We will be strong, smart, and unstoppable!!!"[FN118] Eisner opined that Ovitz performed well during 1995,[FN119] notwithstanding the difficulties Ovitz was experiencing assimilating to Disney's culture.[FN120]

FN117. PTE 331; Tr. 4277:8-4278:15.

FN118. PTE 331 at DD002275.

FN119. Tr. 4278:18-4279:2. Especially after seeing the project come to fruition, Eisner is thankful for Ovitz's advice during late 1995 to place the gate to Disney's California Adventure theme park directly across from the main gate to Disneyland. Tr. 4278:18-4279:23; *see* Tr. 5302:19-5304:10 (Bollenbach) (testifying that he believed that notwithstanding Ovitz's difficulties, Ovitz could still be " valuable" and "a contributor to the company").

FN120. Tr. 4279:24-4280:6. These positive, but still realistic, evaluations of Ovitz's performance stand in contrast to statements that Bass claims Eisner made at a dinner in early November 1995. *See* Bass 88:15-90:16. In my discretion as fact-finder, I do not find Bass' statements on this subject credible, and I conclude instead that the contemporaneous documents authored by Eisner, together with his trial testimony in regards to them, are credible and probative. At his deposition, Bass said that only after having his recollection refreshed was he able to recall that his meeting in Aspen with Ovitz occurred in August 1995, Bass 40:18-23, and when asked the "approximate date" of Ovitz's hiring, Bass could only reply "Fall 95." Bass 76:3-5. Because the time at which Eisner made the statements

attributed to him is of paramount importance, I do not credit Bass' deposition testimony for that reason, but not that reason alone. *See* Tr. 4274:21-4276:12 (Eisner) (testifying that Bass was mistaken with respect to when certain events occurred). Bass' testimony is also vague as to the problems attributed to Ovitz-that Eisner "was having no success in dealing with Ovitz," that Ovitz "didn't care about money," "never looked at economics," and had "continuous problems of veracity." Bass 88:25-89:8. Furthermore, Eisner may not have been completely truthful with Bass or may have exaggerated the extent of the problems with Ovitz due to the stresses of that day or any other reason. *See* Tr. 4372:13-16; 4373:11-17; 4431:6-4433:21. Had I had the opportunity to observe Bass at trial, I might have reached a different conclusion as to the weight of his testimony, but based upon the record presented to me and my personal determinations as to the credibility of the testimony presented at trial, I find Eisner's account of Ovitz's performance together with the contemporaneous documents credible, and Bass' deposition testimony not credible. As a totally separate matter, Bass' statements would be of little worth even if I were to credit them, because they are hearsay and, therefore, inadmissible against all defendants other than Eisner. D.R.E. 801.

### 2. *A Mismatch of Cultures and Styles*

In 1996, however, the tenor of the comments surrounding Ovitz's performance and his transition to The Walt Disney Company changed.[FN121] In January 1996, a corporate retreat was held at Walt Disney World in Orlando, Florida.[FN122] At that retreat, Ovitz failed to integrate himself in the group of executives by declining to participate in group activities, insisting on a limousine when the other executives, including Eisner, were taking a bus, and making inappropriate demands of the park employees.[FN123] In short, Ovitz "was a little elitist for the egalitarian Walt Disney World cast members

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 23

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
(Cite as: Not Reported in A.2d)

[employees]," [FN124] and a poor fit with his fellow executives.[FN125]

> FN121. *See* Tr. 6970:21-6971:11; 7141:2-22. *Compare* Tr. 2567:7-16, 3746:17-3747:14, 3750:20-3751:6, 4010:10-4011:1, 5591:20-5593:1, 5806:12-5808:7, 5925:3-5926:10, 6086:5-17 *and* 7640:9-12 *with* 2567:17-2568:2, 3751:11-3751:18, 4021:7-4022:9, 4280:7-13, 5291:24-5292:16, 5593:2-11, 5808:8-20, 5926:11-24, 7241:14-7243:20, 7552:2-16, 7640:13-22, 7854:24-7857:12 *and* 8146:9-8147:2 (comparing the directors' views of Ovitz in 1995 and 1996).

> FN122. Tr. 4280:14-4282:22.

> FN123. Tr. 4281:4-4282:1.

> FN124. Tr. 4281:23-24; *see also* Tr. 4282:2-22.

> FN125. Tr. 5291:24-5295:7; 5307:2-18; *see also* Tr. 3751:11-3754:16 (Gold) (testifying to a lunch meeting with Eisner on January 26, 1996, where Gold was " shocked" to hear of these problems with Ovitz); 3754:17-3755:7 (Gold) (testifying that he spoke to Roy Disney about this conversation, and Roy Disney was less surprised to hear of these difficulties than Gold because of his personal interactions with Ovitz).

As 1996 wore on, it became apparent that the difficulties Ovitz was having at the Company were less and less likely to be resolved. By the summer of 1996, Eisner had spoken with several directors about Ovitz's failure to adapt to the Company's culture.[FN126] In June 1996, Eisner, Ovitz, and Wilson were in France for a cycling trip during which "it became clear [to Wilson] that what [he] had been hearing was not just idle gossip," but that " there was a problem of Mr. Ovitz being accepted into the organization." [FN127]

> FN126. Tr. 2567:17-2571:18; 4021:7-4022:12; 4294:4-4295:20 (between January and May 1996, Eisner spoke with Gold, Bollenbach, Litvack, Watson, Wilson and Russell about the increasing difficulties with Ovitz); 4733:7-4734:2; 5593:2-11; 5810:8-12; 5851:10-5854:12; 6095:19-6099:17; 7855:20-7857:12; 8147:3-8148:24; PTE 67 (note from Eisner to Watson and Russell enclosing an email from Eisner to Bass on May 26, 1996, discussing a conversation they had a few weeks earlier); *see also* Tr. 4297:2-4304:5 (Eisner) (testifying that he was aware in May 1996 that Iger, Bollenbach and Litvack were having problems with Ovitz); 6099:18-6100:9 (Litvack) (testifying that he was also aware of the problems between Ovitz and Iger).

> FN127. Tr. 6836:15-6838:9; 4734:3-4735:12.

### 3. *Approaching the Endgame*

**\*12** By the fall of 1996, directors began discussing that the disconnect between Ovitz and the Company was likely irreparable, and that Ovitz would have to be terminated.[FN128] Additionally, the industry and popular press were beginning to publish an increasing number of articles describing dissension within The Walt Disney Company's executive suite. [FN129] One of the more prominent of these articles was an article published in Vanity Fair based on an interview given by Bollenbach,[FN130] which many of the directors discussed while present for the November 25, 1996 board meeting.[FN131]

> FN128. *See* Tr. 4345:17-4346:4; 4354:3-4355:6; 4368:1-18; 7555:22-7556:2; 8153:10-8154:5.

> FN129. PTE 8; PTE 21; PTE 22; PTE 166; PTE 171; PTE 300; PTE 304; PTE 321; PTE 507; PTE 508; PTE 509.

> FN130. PTE 8.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN131. Tr. 5930:2-13; *see* PTE 89 (fax
from Gold to Roy Disney on November 6,
1996, attaching the text of the article); *see
also* Tr. 5199:20-5200:23 (Eisner)
(recalling having read the article);
6580:13-15 (Litvack) (testifying he is "sure
" all the directors saw the article);
7574:10-14 (Tom Murphy read it). *But see
also* Tr. 6757:14-21 (O'Donovan) (failing
to recall reading the article);
7916:23-7917:3 (Watson) (recalling the
article's existence, but not reading it).

### 4. *Specific Examples of Ovitz's Performance as President of The Walt Disney Company*

Throughout this litigation, plaintiffs have argued
that Ovitz acted improperly while in office. The
specific examples discussed below demonstrate that
the record created at trial does not support those
allegations.

Plaintiffs have alleged that even before Ovitz was
formally elected as President and employed by
Disney, that he exercised Presidential authority in
connection with the construction or renovation of
his office.[FN132] The record does provide support
for the benign assertion that Ovitz performed some
work for the Company before his hiring was official.
[FN133] In addition to the fact that the documents
plaintiffs rely on evidence no effort by Ovitz to
direct the office work or authorize expenditures for
it,[FN134] the testimony of both Ovitz and Eisner
was that Ovitz's involvement in the project was
limited. Furthermore, Ovitz's authority over the
project both before and after October 1, 1995, was
minimal at best, yet at the same time consistent with
the input that would be expected from an executive
when a new office is built for him or her.[FN135]

FN132. Ovitz 183:21-187:5; PTE 476;
DTE 110; *see* Tr.1927:6-1940:24; PTE 24
at DD002451.

FN133. Ovitz 162:16-163:7; Tr.
5289:14-5291:23 (Bollenbach) (testifying
that he thought it was a "very good practice
" to provide information to an officer

coming to a senior position at the company
before that person officially begins work);
6074:22-6075:8 (Litvack testified that: "It
was not unusual at all," for someone to
begin work before their employment
agreement was executed). *See generally*
Tr. 2222:9-2223:8; PTE 545 (presentation
regarding the CapCities/ABC acquisition
that was forwarded to Ovitz before he
arrived at the Company, but there is
nothing in the record to suggest that Ovitz
received this document before mid-August
1995); PTE 622; PTE 742; DTE 190; DTE
192; DTE 193; DTE 224. Eisner also
applauds Ovitz's attendance on a trip to
Jackson Hole, Wyoming to meet the
Company's Consumer Products division
before his employment officially began.
PTE 316 at MDE000037. Because Ovitz
was performing work either on behalf of
the Company, or in preparation for his
tenure there, his request for reimbursement
of expenses related to The Walt Disney
Company during that period of time are
therefore appropriate and reasonable. *See*
DTE 59 at WD6601. The appropriate
persons in both management and auditing
approved those September 1995 expenses.
*Id.*

FN134. PTE 476; DTE 110; *cf.*
Tr.1934:11-1935:24; PTE 475 (memo
dated January 15, 1995 addressed to Ovitz
with respect to millwork expenditures in
Ovitz's office, though the context makes it
clear that if January 15 is the correct date,
that the memo must have intended to be
dated January 15, 1996, as DTE 144, DTE
152 and DTE 153 all indicate that there
were outstanding issues regarding the
millwork in Ovitz's office from December
1995 until at least February 1996).

FN135. Tr. 4389:10-4391:11;
6075:12-6076:16; 6141:9-24; *see also* Tr.
1318:13-1326:1; 1927:6-1940:24; DTE
144; PTE 654. Furthermore, the work that
may have occurred on Ovitz's office
between mid-August 1995 and the formal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 25

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

commencement of his employment on October 1 of that year is consistent with what would be anticipated when a company prepares for a new employee before their expected arrival.

In addition to allegations that Ovitz overstepped his authority with respect to his office, plaintiffs contend that Ovitz acted improperly in connection with discussions he had, either personally, or on behalf of the Company, with representatives from the National Football League ("NFL") with respect to bringing a team to the Los Angeles area.[FN136] First and foremost, contemporary documents indicate that Disney, under Eisner's direction, was considering bringing an NFL franchise to Los Angeles before Ovitz's hiring was even announced, much less completed.[FN137] Second, any work Ovitz may have done on behalf of the Company in regards to the NFL before his employment formally began is, in my mind, evidence of Ovitz's good faith efforts to benefit the Company and bring himself up to speed-not evidence of malfeasance or other ulterior motives.[FN138] Third, it is clear from the record that, as soon as Eisner instructed Ovitz to cease discussions with the NFL, Ovitz complied with Eisner's directive.[FN139] Again, the record fails to support allegations of misconduct by Ovitz in this regard either before or after October 1, 1995.

FN136. *See* Tr. 1128:5-1133:18.

FN137. DTE 188 (memo to Eisner dated August 14, 1995 summarizing the status of the Company's prior discussions with the NFL; Ovitz was copied on the memo).

FN138. *See* PTE 621; PTE 631; DTE 189; DTE 191 (duplicative of PTE 631); Tr. 5159:12-5166:18.    There    are    no allegations, nor any factual support in the record, for the proposition (which plaintiffs have not put forward) that Ovitz received a salary from the Company for work performed before October 1, 1995.

FN139.    Tr.    1133:19-1134:2;    5164:7-16. The    deposition    testimony    cited    by

plaintiffs    (Bass    76:9-77:25;    Eisner 330:3-331:6), which they argue supports the    contrary    proposition    that    Ovitz continued pursuing a deal with the NFL after Eisner instructed him to cease such discussions, is too vague to contradict the trial testimony previously cited. *See also* Tr. 4283:19-21 (Eisner) (testifying that Ovitz "walked away from" deals that made no economic sense).

Plaintiffs argue that Ovitz is responsible, at least in part, for Bollenbach's decision to leave the Company,[FN140] and the controversy surrounding the hiring of Jamie Tarses to ABC. Bollenbach's trial testimony, however, contradicts the assertion that he left because of Ovitz.[FN141] Instead, he left the Company to pursue a better opportunity with Hilton Hotels.[FN142]

FN140.    *See*    PTE    8    at    DD002123, DD002125.

FN141. Tr. 5308:10-5310:10. Bollenbach did, however, reaffirm at trial that certain portions of PTE 8 were accurate. *See* Tr. 5399:7-5401:4;        5412:18-5413:9; 5471:22-5472:6.

FN142. Tr. 5308:10-5310:10.

**\*13** In mid-1996, ABC hired Jamie Tarses.[FN143] It was reported in the press that Ovitz "orchestrated" Tarses' hiring even though she was under contract at NBC for roughly fifteen more months.[FN144] Eisner testified that Ovitz was not at fault for the perceived negative repercussions of Tarses' hiring, saying that he "was convinced that [Ovitz] was brought into something he did not instigate." [FN145] In fact, Tarses' hiring was championed by Iger and approved by Litvack.[FN146]

FN143. Ms. Tarses was a television executive and is sometimes referred to as Jamie McDermott. Tr. 1698:7-8; 1713:7-8.

FN144. PTE 85; PTE 303; *see* PTE 435.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 26

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN145. Tr. 4385:3-4386:16; DTE 194; *see* Tr. 1700:5-22. *But see* Ovitz 450:14-451:3.

FN146. Iger 97:21-99:8; *see* Tr. 6136:23-6138:1. *But see* Bass 123:7-125:5 (Bass' opinion on the Tarses situation is that it was Ovitz's fault based upon statements made by Eisner that are inadmissible hearsay against all defendants but Eisner).

Another "failure" plaintiffs have attempted to pin on Ovitz, but which is in reality more attributable to Iger, revolves around the film *Kundun,* directed by Martin Scorsese.[FN147] The film was not well received by the Chinese government and, at least initially, may have caused the Company some setbacks in that rapidly expanding market.[FN148] Once again, however, the testimony was clear that Ovitz did not have authority to approve the movie; instead, that authority (and the concomitant responsibility) rested wholly with Roth and Eisner.[FN149]

FN147. Tr. 1217:14-19; 4386:17-23.

FN148. Tr. 1218:19-1220:4; 6138:10-15.

FN149. Tr. 1217:20-1218:12; 4386:24-4389:3; 6138:2-15. Because Ovitz had no authority over the motion picture studio, Eisner's attempt to blame him for losses in that area was unwarranted. *See* PTE 755 at WD09868. Indeed, Eisner had recognized in his May 26, 1996, email to Bass that the cost overruns in the motion picture studio were due to Roth's decision to dramatically increase marketing costs on unsuccessful movies. PTE 67 at DD002980-81.

Although the general consensus on Ovitz's tenure is largely negative, Ovitz did make some valuable contributions while President of the Company. As previously mentioned,[FN150] Ovitz made a key recommendation with respect to the location of the gate to Disney's California Adventure theme park, built on part of the Disneyland parking lot.[FN151]

He was instrumental in recruiting Geraldine Laybourne, founder of the children's cable channel Nickelodeon, and overhauling ABC's Saturday morning lineup.[FN152] Ovitz was successful in bringing Tim Allen back to work after he walked off the set of Home Improvement due to a disagreement.[FN153] He also helped retain several animators that Katzenberg was trying to bring over to Dreamworks.[FN154] Ovitz also assisted Roth in handling relationships with "talent." [FN155] Ultimately, however, Ovitz's time as President was marked by more "woulda, coulda, shoulda" than actual success.

FN150. *See supra* note 119.

FN151. Tr. 1204:11-1208:2; 4278:18-4279:23.

FN152. Tr. 1233:8-1238:5.

FN153. Tr. 1249:7-1255:14; 5034:5-5038:13; *see also* Tr. 6539:6-6542:6.

FN154. Tr. 1229:16-1231:9.

FN155. Tr. 1208:3-1209:18; Roth 9:22-10:18. In the end, Ovitz and Roth had different and wholly incompatible perspectives on the use of talent. *See* Roth 34:9-38:15.

As an example, Jeffrey Katzenberg was formerly the head of Walt Disney Studios.[FN156] After his contract with Disney was not renewed, he founded Dreamworks and embroiled the Company in a very costly lawsuit.[FN157] Ovitz testified that after some discussions with Katzenberg, he could have settled that dispute before the lawsuit was filed for roughly $90 million, and although the actual amount of the settlement remains confidential, Ovitz believes that it was in excess of $250 million.[FN158] Ovitz, however, was not given authority to settle that suit on behalf of the Company.[FN159] The litigation, therefore, was filed and continued until the confidential settlement in 1999.[FN160]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN156. Tr. 1153:18-24; 4053:8-16.

FN157. Tr. 4690:1-6; *see also* Tr. 3824:1-3829:22.

FN158. Tr. 1153:18-1160:12.

FN159. Tr. 1159:18-1160:5.

FN160. Litvack testified that "[n]o one could settle the Jeffrey Katzenberg case for $90 million." Tr. 6132:22-23. *See supra* note 157.

Ovitz was assigned to oversee Disney Interactive, which created interactive video games.[FN161] Eisner testified that Disney Interactive was "doing very badly, actually," but he hoped that Ovitz might be able to turn it around. [FN162] Ovitz was unable to do so.[FN163] In the face of Eisner's critical view of Ovitz's performance with respect to Disney Interactive, Ovitz testified that he had several ideas for Disney Interactive which could have potentially helped Disney Interactive,[FN164] including a joint venture with Sony,[FN165] and a purchase of part of Yahoo!®, [FN166] all of which Eisner rejected. Ovitz also pursued, together with Roth, a deal intended to benefit Disney's motion picture studio with Beacon Communications, a company run by Armyan Bernstein, a writer and director. Again Eisner instructed Ovitz not to close the deal.[FN167]

FN161. Tr. 1164:7-1165:12; 5168:12-24.

FN162. Tr. 5168:20-5169:6; *see* PTE 744 at WD09336-37.

FN163. Tr. 5170:5-10.

FN164. *See* Tr. 1180:14-1181:8.

FN165. Tr. 1165:13-1171:18.

FN166. Tr. 1171:19-1179:17; *see also* Tr. 1179:18-1180:13.

FN167. Tr. 1210:23-1213:6; PTE 322; PTE 747; PTE 749.

*14 Ovitz wanted the Company to purchase Putnam Publishing in order to acquire the rights to author Tom Clancy. He also wanted to place other prominent authors (and former clients) such as Michael Crichton and Stephen King under contract with Disney's publishing division.[FN168] Eisner rejected these efforts as ill conceived.[FN169]

FN168. Tr. 1160:18-1163:19.

FN169. Tr. 1163:21-1164:9; *see also* Tr. 4286:8-12.

A similar story emerges of Ovitz's leadership over Hollywood Records. [FN170] Ovitz wanted to place Janet Jackson under contract with Hollywood Recrods,[FN171] acquire EMI (a Hollywood Records competitor) or enter into a joint venture with Sony. [FN172] Once again, however, Eisner rejected all of these suggestions.[FN173] Eisner and others were also critical of what they perceived to be a lack of attention paid by Ovitz to Hollywood Records, [FN174] though Ovitz's files belie the assertion that Ovitz ignored his oversight of Hollywood Records. [FN175]

FN170. *See* Tr. 1134:7-1137:24. Hollywood Records, according to Litvack, was from its creation to that time, "a spectacular failure." Tr. 6146:23-6147:5; *see also* DTE 207; PTE 638.

FN171. Tr. 1138:1-1139:10.

FN172. Tr. 1139:18-1147:2.

FN173. Tr. 1139:11-17; 1147:3-9.

FN174. *See* PTE 24 at DD002452-53; PTE 626; PTE 780 at WD13842.

FN175. *See* PTE 606; PTE 622; PTE 629; PTE 768; DTE 190. Donohues' predictable opinion that "Ovitz could have been in a coma and still collecting these empty documents" is of no benefit to the Court and, indeed, documents such as PTE 606

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

and PTE 622 contain marginalia with Ovitz's handwriting, which would refute Donohue's opinion that there is no indication that the files were ever read by Ovitz. *See* Tr. 9282:15-9284:16. Furthermore, plaintiff's attempt to use Ovitz's statement on the Larry King Live show-that after a year on the job he knew " about one percent of what I need to know" -to demonstrate that ovitz failed to apply himself on the job, is specious and wholly unpersuasive. PTE 323 at 7.

There are three competing theories as to why Ovitz was not successful. First, plaintiffs argue that Ovitz failed to follow Eisner's directives, especially in regard to acquisitions,[FN176] and that generally, Ovitz did very little. Second, Ovitz contends that Eisner's micromanaging prevented Ovitz from having the authority necessary to make the changes that Ovitz thought were appropriate.[FN177] In addition, Ovitz believes he was not given enough time for his efforts to bear fruit.[FN178] Third, the remaining defendants simply posit that Ovitz failed to transition from a private to public company, from the "sell side to the buy side," and otherwise did not adapt to the Company culture or fit in with other executives. In the end, however, it makes no difference why Ovitz was not as successful as his reputation would have led many to expect, so long as he was not grossly negligent or malfeasant.

FN176. Plaintiffs' authority for this argument comes from the letter Eisner wrote to Ovitz dated October 10, 1995. PTE 267. Plaintiffs often quote the letter in this way:
"Acquisitions are something we should ... almost never do." *Id.* at DD002290. The sentence actually reads: "Acquisitions are something *we should look at* and almost never do." *Id.* (emphasis added). It is obvious that this letter, therefore, can provide no support for the proposition that Ovitz intentionally disobeyed an order or directive from Eisner to not pursue acquisitions under any circumstances. As discussed above, the record does not bear

out the assertion that Ovitz continued pursuing specific acquisitions after being instructed by Eisner to no longer pursue them.

FN177. Ironically, Ovitz testified that Eisner advised him not to take the job at MCA because Eisner believed that Ovitz would not have enough autonomy to turn the company around. Tr. 1275:14-1276:14.

FN178. *See, e.g.,* Tr. 1171:14-18.

Many of Ovitz's efforts failed to produce results, often because his efforts reflected an opposite philosophy than that held by Eisner, Iger, and Roth.[FN179] This does not mean that Ovitz intentionally failed to follow Eisner's directives or that he was insubordinate. To the contrary, it demonstrates that Ovitz was attempting to use his knowledge and experience, which (by virtue of his experience on the "sell side" as opposed to the "buy side" of the entertainment industry) was fundamentally different from Eisner's, Iger's, and Roth's, to benefit the Company.[FN180] But different does not mean wrong. Total agreement within an organization is often a far greater threat than diversity of opinion.[FN181] Unfortunately, the philosophical divide between Eisner and Ovitz was greater than both believed, and as two proud and stubborn individuals, neither of them was willing to consider the possibility that their point of view might be incorrect, leading to their inevitable falling out.[FN182]

FN179. *See* Roth 29:16-30:20.

FN180. *See* Tr. 4284:9-4285:10.

FN181. I note that Judge Posner eloquently emphasized this point in his critique of the 9/11 Commission Report by saying that:
Much more troublesome [than the public relations effort by the commission, especially the participation of victims' relatives] are the inclusion in the report of recommendations (rather than just

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

investigative findings) *and the commissioners' misplaced, though successful, quest for unanimity.... And pressure for unanimity encourages just the kind of herd thinking now being blamed for that other recent intelligence failure-the belief that Saddam Hussein possessed weapons of mass destruction.* At least the commission was consistent. It believes in centralizing intelligence, and people who prefer centralized, pyramidal governance structures to diversity and competition deprecate dissent. *But insistence on unanimity ... deprives decision makers of a full range of alternatives. For all one knows, the price of unanimity was adopting recommendations that were the second choice of many of the commission's members or were consequences of horse trading.* The premium placed on unanimity undermines the commission's conclusion.... Richard A. Posner, *The 9/11 Report: A Dissent,* N.Y. Times, August 29, 2004 (emphasis added). Judge Posner's critique also warns against the dangers of judging past actions with the benefit of perfect hindsight, saying that, "The commission's statement that Clinton and Bush had been offered only a 'narrow and unimaginative menu of options for action' [in response to al Qaeda] is hindsight wisdom at its most fatuous," by outlining several of the available options. *Id.*

FN182. *See* Tr. 3811:3-3814:15.

### 5. *Veracity and "Agenting"*

At trial, plaintiffs, together with their expert on these issues, Donohue, spent a great deal of effort attempting to persuade the Court that Ovitz was a habitual liar, and that his lack of veracity would constitute good cause to terminate him without paying the NFT.[FN183] Defendants respond that the purported veracity problems attributable to Ovitz do not involve material falsehoods, but instead were caused by Ovitz's tendency to "handle" or "agent" others.

FN183. As with many of their other allegations, plaintiffs heavily rely on PTE 20, PTE 24, PTE 67, PTE 79, and the hearsay statements of Bass. In attempting to bolster their position, plaintiffs point to part of Ovitz's trial testimony to argue that his "self-serving" testimony was contradicted by other witnesses. *See, e.g.,* Tr. 1220:14-1228:1. In that passage, Ovitz recalls meetings in New York with Bollenbach, Litvack and Iger, followed by a meeting with Eisner in Los Angeles. *Id.* Eisner's testimony indicates a lack of specific recollection of that meeting, but basic familiarity with the issues purportedly discussed there. Tr. 5081:8-5084:5. Bollenbach could not specifically recall the meeting either, but does remember at least one meeting in New York with Ovitz. Tr. 5488:10-5493:11. Litvack's testimony was unclear on whether he remembered the meeting to which Ovitz was referring, at one point saying "I am sure that we met with Mr. Eisner after these meetings, yes," with the very next words out of his mouth being, "I don't recall." Tr. 6555:5-6556:16. Needless to say, the contradiction is, at most, minimal and a natural consequence of the many years that have passed since these events transpired rather than evidence of a lack of honesty on the part of Ovitz.

**\*15** Eisner testified that, with respect to Iger's statement that Iger did not trust Ovitz,[FN184] the lack of trust was related to Ovitz's failure to communicate with Iger, and that Ovitz "wasn't doing anything wrong." [FN185] Eisner also expressed that he personally did not trust Ovitz. [FN186] From both the tenor of the document (written shortly after the stress of his mother's death) and from Eisner's more emotionally detached trial testimony,[FN187] however, it is clear that Eisner was not referring to any material falsehoods, but instead to Ovitz's salesmanship [FN188] or, in other words, his "agenting." [FN189]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN184. PTE 67 at DD002981; Tr. 4298:6-4302:7.

FN185. Tr. 4300:7-4301:22. This testimony demonstrates that there could be any number of reasons for which Iger would no longer trust Ovitz. Lack of veracity is but one.

FN186. Eisner wrote:
Michael [Ovitz] does not have the trust of anybody. I do not trust him. None of the people he works with feels comfortable with his directness and honesty. Like an athlete who has lost his way, Michael is pressing, is confused, [is] ineffective. His heart may be in the right place, but his ego never allows it to pump. His creative instincts may be in the right place, but his insecurity and existential drive never allows a real functioning process.... He would be a great salesman, but his corporate disingenuous nature undermines him. And his lack of interests in long-term outcomes affects his judgment on short-term deals. The biggest problem is that nobody trusts him, for he cannot tell the truth. He says whatever comes to mind, no matter what the reality. Because of all the above his executives, outside business associates, and the Press have turned against him.
PTE 79 at DD002624.

FN187. Tr. 4434:1-4439:22; *see also* Tr. 3763:11-23; 6386:24-6388:4.

FN188. Tr. 4438:10-4439:22.

FN189. Tr. 6373:18-6374:13. *But cf.* Bass 44:17-46:5; 102:24-103:5 (Bass' opinion that Ovitz was not honest was not based upon first hand experience and personal knowledge, but was based instead on the hearsay statements of Eisner and other unnamed declarants). Eisner's credible trial testimony on this subject significantly undermines the probative value of Bass' testimony, which again, the Court was not

able to observe personally. *See, e.g.,* Tr. 4434:1-4439:22.

Litvack felt the same way, saying that he did not trust Ovitz's judgment and that he did not trust Ovitz generally because Ovitz would "handle" Litvack and "put his spin on things." [FN190] Litvack also said that the "worst that I could remember in terms of lies was-and I use the word ' lies'-was 'I was on the phone with someone important and couldn't be on time for the meeting.' ' [FN191] Other executives and directors made similar comments that they could recall no material falsehoods told to them by Ovitz.[FN192]

FN190. Tr. 6132:11-19; *see also* Tr. 6088:12-6092:23; 6374:18-6378:17.

FN191. Tr. 6135:1-4. Clearly, these statements, even if construed as lies, would not constitute gross negligence or malfeasance.

FN192. *See* Tr. 2621:15-2622:13 (Russell); 3755:8-3756:9 (Gold); 4012:14-4013:8 (Roy Disney); 5307:17-5308:9 (Bollenbach); 5809:3-7 (Nunis); 5940:20-23 (Bowers); 6724:7-15 (O'Donovan); 6847:10-16 (Wilson); 7148:8-12 (Poitier); 7552:23-7553:1 (T. Murphy); 7649:10-16 (Lozano); 7867:6-9 (Watson); 8161:6-7 (Stern); Roth 118:20-119:13.

In the absence of any concrete evidence that Ovitz told a material falsehood during his tenure at Disney, plaintiffs fall back on alleging that Ovitz's disclosures regarding his earn-out with, and past income from, CAA, were false or materially misleading.[FN193] As a neutral fact-finder, I find that the evidence simply does not support either of those assertions.[FN194] The allegedly false or misleading disclosure regarding Ovitz's earn-out rights is contained in the copy of the Company's " Statement of Policy Regarding Conflicts of Interest and Business Ethics and Questionnaire Regarding Compliance" that Ovitz signed on October 24, 1995. [FN195]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 31

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
(Cite as: Not Reported in A.2d)

FN193. At trial, when asked to give specific instances of lies by Ovitz, Donohue could only provide two concrete examples of Ovitz's lying, one with respect to a deal Ovitz apparently made to sell an airplane to one of his prior business partners, *see* PTE 404 at 45 n.48, and the other relating to breaking the purported mutual non-disparagement agreement that Ovitz agreed to when he left the Company. Tr. 655:24-658:12. Donohue's report indicates that even he did not consider the alleged deception with respect to the airplane grounds for a for-cause termination because it did not occur in the course of Ovitz's duties for Disney. PTE 404 at 45 n.48. Any statements Ovitz may have made that violated a mutual non-disparagement agreement would similarly not constitute cause for termination because they occurred after his termination was publicly announced, and were not made in the course of his duties for the Company.

FN194. *See* PTE 200 (W-2 for 1995 representing Ovitz's income at CAA from January 1, 1995 to the end of September 1995 for almost $18 million). This W-2 is consistent with Ovitz's testimony. Tr. 1099:5-15.

FN195. PTE 314; PTE 127 (transmission of the signature page of the document by Adler to Santaniello). Ovitz's statement reads as follows:
I beneficially own a majority interest in my prior employer ("Prior Employer"), a franchised talent agency. My ownership interest is held by an independent trustee. The talent agency business of the Prior Employer is being continued by Creative Artists Agency LLC ("CAA"), in which I have no direct or indirect ownership interest. The Prior Employer will continue to receive commissions from contracts entered into by its former talent agency clients on or before September 30, 1995 and will also lease certain real and

personal property to CAA.
Except for ownership interests of less than 5% in publicly traded companies, either I or my Prior Employer may be deemed to beneficially have ownership interests in the following entities that are engaged in the media, entertainment, communications or publishing businesses: Diamond Cable Communications PLC [ & ] Ziff-Davis Holdings Corp.
PTE 314 at DD000292.

Plaintiffs attack this disclosure on several grounds. First, they argue that Ovitz was entitled to a majority of some unknown list of booked commissions that allegedly changed over time. The disclosure by Ovitz makes clear that he owned a majority interest in his prior employer, which would lead any reasonable person to believe that he would receive a majority of the income from that entity. FN196 The disclosure also clearly spells out that Ovitz would be entitled to receive commissions from contracts entered into on or before September 30, 1995.FN197 Ovitz's testimony that it is common practice in the industry for some of these contracts to be oral is not contradicted.FN198 Plaintiffs' assertion that the commissions list evolved over time is consistent with the parties' agreement, but there is no support in the record for the assertion that the *definition* of those commissions changed during any time relevant to this suit.FN199

FN196. Oldco's (also known as CAA, Inc. or "Prior Employer") receipt of revenues from booked talent commissions were based upon Newco's (also known as CAA, LLC) financial success. *See* PTE 203 at MTO 1660; Tr. 1450:5-1452:5; 1533:2-1535:4. To alleviate any potential conflicts relating to this symbiotic relationship between Oldco and Newco, Disney created a process by which conflicts of interest between Ovitz and CAA were to be avoided through approval of transactions greater than $100,000 involving a CAA client by any two of (1) Eisner, (2) Litvack, or (3) Gerry Swider. PTE 148; PTE 374; Tr. 1298:11-1299:22;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 32

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
(Cite as: Not Reported in A.2d)

1610:20-1613:2;          6457:15-6469:20;
6696:5-6697:1. Plaintiffs attempt to use
PTE 581 to demonstrate that this process
was not followed, but Litvack's memory of
these deals is hazy, and with respect to
many of the deals, Litvack testified that he
believed the projects related to many of
those deals were not completed. Tr.
6494:11-6508:7. Given the sparsity of this
record, I cannot conclude first, that the
conflict of interest avoidance procedure
was not used, or second (and more
importantly), that if the procedure was not
used, such failure was attributable to
Ovitz, or that Ovitz used his position as
President to facilitate deals with CAA
clients in order to advance his personal
financial     interests.     *See*     Tr.
8844:10-8851:19.

FN197. *See* PTE 202 at MTO 582, PTE
206 at MTO 611-12; PTE 208.

FN198. Ovitz 561:22-562:6; *see also* PTE
206 at MTO 610-11.

FN199. It appears that the definition of
booked commissions may have been
altered in 1999, long after Ovitz left
Disney, making such change irrelevant to
this case. PTE 209 at MTO 2161-63. This
alteration may have been necessitated by
Newco's arrearages in paying Oldco,
arrearages which were substantial as of
October 1997. PTE 205. Eventually,
Newco and Oldco reached a settlement in
full accord and satisfaction of their
respective obligations. PTE 209.

Second, plaintiffs contend that Ovitz held a security
interest in Newco that contradicts his disclosure that
he had no direct or indirect ownership interest in
Newco.[FN200] The form used to perfect the security
interest is clear on its face that it relates to a debt
instrument, hence Oldco is referred to as the "
Secured Party" and Newco is referred to as the "
Debtor." [FN201] As plaintiffs' counsel no doubt
understands, a security interest based upon a debt
instrument is *not* an ownership interest. Upon

considering the documentary evidence and
testimony, I find that Ovitz's disclosures were
neither false nor misleading.[FN202]

FN200. *See* PTE 203 (creation of interest);
PTE 254 (perfection of interest).

FN201. PTE 254.

FN202. Plaintiffs' allegations that Ovitz
*again* lied in relation to the Statement of
Policy Regarding Conflicts of Interest and
Business       Ethics       and       Questionnaire
Regarding Compliance when he left the
Company, *see* PTE 70, must also fail in
light of my findings below that Ovitz was
in compliance with the Company's policies
regarding gifts.

### 6. Gifts and Expenses

*16 In moving from the talent agency he founded to
a public company, Ovitz was faced with an array of
new policies and rules relating to gifts and
expenses. Eisner had asked Russell to speak to
Ovitz about his expenses, [FN203] and on January
17, 1996, Russell and Ovitz met for breakfast to
discuss the topic.[FN204] To follow up on their
meeting, Ovitz sent a memo to Russell in January
1996 asking for help in handling his expenses. [FN205]
According to Ovitz, Russell was "fantastic"
in helping Ovitz's assistant meet and confer with a
knowledgeable Disney employee so that Ovitz's
expenses could be properly handled.[FN206]

FN203. *See* PTE 378; Tr. 3046:6-3049:17;
4393:1-4394:4.

FN204. Tr. 2560:3-2563:18.

FN205. PTE 318; Tr. 1315:8-1318:12.

FN206. Tr. 1317:11-1318:12.

The only evidence in the record that is admissible to
prove that Ovitz did not comply with Disney's
policies regarding expenses is (1) the statements by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

Eisner that Ovitz may not have been in compliance with those policies, and (2) the undisputed fact that Disney withheld $1 million from the cash payment of Ovitz's NFT, but ultimately returned all but roughly $140,000 of that amount. [FN207]

> FN207. At trial and in the post-trial briefing, plaintiffs have relied extensively on PTE 147, a draft report by Price Waterhouse which purportedly uncovers numerous examples of Ovitz' expense reimbursement requests not complying with Company policy. I have previously ruled that the report is hearsay, and therefore inadmissible when offered to prove the truth of the matters asserted in the report. *See In re The Walt Disney Co. Derivative Litig.,* 2005 WL 407220, at *1 (Del.Ch. Feb.4, 2005). Plaintiffs also cite to DTE 59, a collection of expense reports submitted by Ovitz in an effort to show that Ovitz requested reimbursement for non-Disney expenses. The documents in DTE 59 on their face do not demonstrate that the expenses were not related to Disney, and there is no testimony in the record to lead me to believe otherwise. In fact, each and every expense report in DTE 59 has been countersigned in the box for "Audit Approval," with the overwhelming majority (but not all) of the forms also having been countersigned in the box for "Management Approval." In the absence of further evidence, this can lead me to no other conclusion than that all of the expenses detailed in DTE 59 were properly reimbursable under appropriate Company guidelines, including those incurred in late December 1996. DTE 59 at WD04935, WD05159.

The record contains several examples of statements by Eisner where he believed that Ovitz's compliance with Company expense policies was questionable. [FN208] The trial testimony of Eisner, Russell, and especially Litvack (whom Eisner had assigned to oversee Ovitz's expenses), however, was credible and coherent in stating that Ovitz was in compliance

with the Company's expense policies.[FN209]

> FN208. *See* PTE 24 at DD002451; PTE 378; Tr. 3049:18-3051:20.

> FN209. *See* Tr. 2632:21-2633:23; 2892:4-14; 4578:9-4580:20; 6145:20-6146:6; 6171:8-6178:11; 6362:5-23; 6533:4-20; 6604:5-16; 6692:12-6693:12; *cf.* Tr. 2883:24-2885:21; 3041:2-22.

With respect to the eventual holdback of $139,184 from Ovitz's severance, [FN210] only $70,212 was attributed to potential expense policy violations. [FN211] The remaining $68,972 related to the unamortized cost of capital improvements to Ovitz's home,[FN212] and Litvack clearly testified at trial that the Company had no contractual right to recoup those costs from Ovitz. [FN213]

> FN210. *See* PTE 385; PTE 403.

> FN211. DTE 178.

> FN212. *Id.*

> FN213. Tr. 6174:17-6176:16.

The record provides no support for, and indeed often contradicts, two key assertions made by plaintiffs regarding the holdback. First, plaintiffs' assertions that the holdback itself is evidence that the defendants were on notice at the time of Ovitz's termination that grounds to terminate him for cause may have existed cannot stand in light of the testimony that many executives at the Company were at least six months behind in billing their expenses.[FN214] The holdback, then, was simply a way to avoid having to collect that money back from Ovitz after termination if there was insufficient justification for the billings.[FN215] Second, the $70,212 ultimately withheld from Ovitz is not *prima facie* evidence that Ovitz "stole" from Disney. As to both of these points, Litvack testified that insufficient justification and documentation was the reason for the final holdback-not a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

Page 34

determination that Ovitz had "stolen" from or otherwise intentionally defrauded the Company. [FN216]

FN214.    Tr.    4579:4-4580:20; 4400:21-4402:4;    5044:16-5045:19; 6423:19-6424:19.

FN215.    Tr.    4579:4-4580:20; 4400:21-4402:4;    5044:16-5045:19; 6423:19-6424:19.

FN216.  Tr.  6174:8-6175:23;  6178:7-11; 6604:5-6605:23;    *see    also*    Tr. 6273:9-6275:9;    6533:4-20; 6691:16-6692:24.

Plaintiffs have repeatedly criticized Ovitz's gift giving as self-serving and not in accordance with Company policies. Furthermore, they argue that he failed to properly report gifts that he received while serving as President of Disney. [FN217] Once more, the record fails to support these assertions. As with Ovitz's expenses, Eisner asked Russell to assist Ovitz in complying with Disney's policies with respect to gifts.[FN218] Litvack was also told of Eisner's concerns, and following an investigation, he found that Ovitz was in compliance with Disney's gift policies.[FN219] At trial, plaintiffs' counsel asked Litvack whether he was aware of several questionable gifts, but Litvack unambiguously testified that either he had approved those gifts, or that, had he been asked, he would have approved those gifts because they related to the business of the Company.[FN220] In sum, finding Litvack's and Eisner's trial testimony credible as cited above, I find that Ovitz was not in violation of The Walt Disney Company's policies relating to expenses or giving and receiving gifts.

FN217.  *See*  PTE 24 at DD002451-52; PTE 148; PTE 374. Plaintiffs attempt to use DTE 61 to impugn Ovitz's handling of gifts. The document on its face, however, supports the conclusion that Ovitz was complying with Company policies by demonstrating that three of those four gifts

were retained by Ovitz in exchange for a charitable contribution, and that the fourth was used as a prize at a Company event. In my mind, the simple fact that two of the gifts were not received by Disney until January 7, 1997 is unremarkable and not probative in any way detrimental to Ovitz, especially in light of the holiday season during which Ovitz was terminated and that the gifts were submitted to Disney shortly after the new year began.

FN218. *See* PTE 17; PTE 378; DTE 151.

FN219.  Tr.  6139:10-6141:8;  6146:7-9;  *see* PTE 406 (all gifts reported by Ovitz were turned over to the appropriate department within the Company); DTE 61.

FN220.    Tr.    6437:21-6445:22; 6518:11-6530:4;  6533:1-20;  *see*  Tr. 5023:4-5029:18;    5034:5-5038:13; 5039:9-5042:22;    *see    also*    Tr. 2201:15-2210:21  (Ovitz) (describing the reasons for some of his gifts); *cf.* Tr. 3049:18-3066:16 (Russell unable to give useful testimony expounding upon PTE 378 and PTE 17 due to lack of recall).

*C. Ovitz's Termination*

1. *The Beginning of the End*

**\*17** Ovitz's relationship with Eisner, and with other Disney executives and directors, continued to deteriorate through September 1996. In mid-September, Litvack, with Eisner's approval, spoke with, or more accurately cornered Ovitz. Litvack told Ovitz that he thought it was clear that Ovitz was not working out at Disney and that he should start looking for both a graceful way out of Disney and a new job.[FN221] After Litvack reported this conversation to Eisner, Eisner, hoping to make Ovitz realize that there was no future for him at Disney, sent Litvack back to Ovitz and asked Litvack to make it clear that Eisner no longer wanted Ovitz at Disney and that Ovitz should seriously consider other employment opportunities,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

including the opportunity at Sony. [FN222] It seems that Ovitz brought up the possibility of moving to Sony with Eisner during a flight in June 1996 to New Orleans.[FN223] Eisner believed that Ovitz meant it as a threat, but Eisner welcomed the idea of Ovitz leaving the Company. Litvack conveyed Eisner's sentiments, and Ovitz responded by telling Litvack that he was "going to have to pull me out of here ... I'm not leaving," and that if Eisner wanted him to leave Disney, Eisner could tell him so to his face.[FN224] At trial, Ovitz testified that he felt that " as far as [he] was concerned, [he] was chained to that desk and that company. [That he] wasn't going to leave there a loser," that the guy that hired him or the full board would have to fire him, and that he hoped he could still make it work and make all these problems just disappear.[FN225]

> FN221. Tr. 6101:2-6102:18; 6562:7-13.

> FN222. Tr. 4354:19-4355:6; 4731:13-4732:16; 6102:21-6103:14.

> FN223. Tr. 4319:10-23. Eisner testified that when Ovitz first brought the Sony option up that Eisner believed that it would provide him a graceful way out of the Ovitz problem. *See id.*

> FN224. Ovitz 537:24-25; Tr. 1350:5-13552:9; 6103:15-6103:24.

> FN225. Tr. 1352:14-1353:20.

Following up on the discussions between Litvack and Ovitz, Eisner and Ovitz had several meetings on or around September 21, 1996, during which they discussed Ovitz's future (or lack thereof) at Disney, and the possibility that Ovitz would seek employment at Sony.[FN226] Eisner believed that Sony would be both willing and excited to take Ovitz in "trade" from Disney because Ovitz had a very positive longstanding relationship with many of Sony's top executives. Eisner favored the Sony " trade" because, not only would it remove Ovitz and his personality from the halls of Disney, but it would also relieve Disney of having to pay Ovitz under the OEA and would hopefully bring a

valuable return to Disney in the form of licensing rights for *The Young and the Restless*.[FN227]

> FN226. PTE 18.

> FN227. Tr. 4351:23-4354:2. Eisner was hoping to obtain the licensing rights to *The Young and the Restless,* which would help Disney with its new Soap Opera Channel. Eisner also believed that if he did not ask for something in return for Ovitz, that Sony would think that Disney did not want Ovitz and then Sony may not have wanted him either.

The Sony discussions continued on October 8 when Ovitz wrote Eisner a note asking for formal permission to begin negotiations with Sony.[FN228] After stating that he was still shocked that Eisner wanted him out, Ovitz wrote that he had resolved to look at other employment possibilities, and he wanted to make sure that he did not leave himself or Sony open to a lawsuit because his departure from Disney would leave Ovitz in breach of the OEA. [FN229] On October 9 Eisner responded by letter, telling Ovitz that neither he nor anyone else at Disney had any objections to Ovitz working out a deal and eventually going to work for Sony. In fact, Eisner thought it was best that Ovitz and Disney work together to ensure a smooth departure.[FN230] Additionally, Eisner wrote a letter to Mr. Idei, Sony's Chairman, trumpeting Ovitz and notifying Mr. Idei that Disney had given permission for Ovitz to enter into negotiations for a possible move to Sony.[FN231] Apparently, however, only a limited number of directors knew that Ovitz was given permission to negotiate with Sony, including Litvack,[FN232] Watson,[FN233] Russell,[FN234] Gold, [FN235] and Roy Disney,[FN236] and that the board as a whole was never approached about the possible Sony "trade." Of these directors, only Litvack and Russell were ever asked for their opinions on the matter.

> FN228. PTE 18.

> FN229. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN230. PTE 19 at WD00399-401.

FN231. *Id.* at WD00402. Eisner also forwarded this letter to Ovitz.

FN232. Tr. 6104:8-6107:6.

FN233. Tr. 7858:21-7859:22.

FN234. Tr. 2571:23-2572:14.

FN235. Tr. 3766:2-3767:6.

FN236. Tr. 4022:10-4023:8.

*18 On November 1, Ovitz wrote a letter to Eisner notifying Eisner that things had failed to work out with Sony and that Ovitz had instead decided to recommit himself to Disney with "an even greater commitment of [his] own energies" than he had before and an "increased appreciation" of the Disney organization.[FN237] There are varying accounts of why Ovitz did not end up employed at Sony, but the important fact is that Ovitz remained at Disney. [FN238]

FN237. PTE 19 at WD00404.

FN238. *See* Tr. 1363:17-1365:2 (Ovitz) (stating that he did not continue negotiations with Sony because there were, in his view, severe conflicts within Sony's upper management); 4362:1-9 (Eisner) (stating that he was told that Ovitz did not get an offer at Sony because Ovitz was being unreasonable in his demands and that he was asking for "the sun and the moon" from Sony).

*2. The September 30, 1996 Board Meeting*

During the course of the Sony discussions the Disney board convened a meeting on September 30, 1996, while attending a Disney anniversary at the Walt Disney World Resort in Orlando, Florida. Ovitz was in attendance at the board meeting, and it is undisputed that neither Ovitz's future with Disney nor his conversations to date with Eisner and

Litvack were discussed at the general board meeting. [FN239] Eisner, however, testified that he spoke with various directors either during an executive session held that same day at which Ovitz was not present, or in small groups during the weekend, to notify them that there were continuing problems with Ovitz's performance.[FN240] Additionally, other directors testified that Eisner apprised them of the developing situation with Ovitz either during or prior to September 1996. [FN241] Although Eisner never sat down at a full board meeting to discuss the persistent and growing Ovitz problem, it is clear that he made an effort to notify and talk with a large majority, if not all of the directors.

FN239. Tr. 6677:2-11; 7592:8-10.

FN240.        Tr.        4349:13-4350:5; 4728:17-4729:12.

FN241. Tr. 3087:7-3088:16 (Russell); 3818:9-21 (Gold); 4021:7-4022:9 (Roy Disney); 5593:2-5594:12, 5725:6-5726:2 (Mitchell);        5810:8-12        (Nunis); 6836:5-6837:19 (Wilson).

On the night of September 30, Eisner and Ovitz made their now-famous appearance on *The Larry King Live Show* in which Eisner refuted the then current Hollywood gossip that there was a growing rift between himself and Ovitz and emphatically stated that if given the chance, he would hire Ovitz again. [FN242] It is clear now that this entire interview was a shameless public relations move during which both Eisner and Ovitz did not candidly answer Larry King's questions with the goal of deflating the negative rumors surrounding their failed partnership.

FN242. PTE 323, PTE 505.

On October 1, the day after the Larry King interview, Eisner sent a letter that he had been working on since the summer, to Russell and Watson detailing Eisner's mounting difficulties with Ovitz, including Ovitz's failure to adapt to Disney's corporate culture in even the slightest fashion,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

Eisner's lack of trust for Ovitz, and Ovitz's complete failure to alleviate Eisner's workload. [FN243] Apparently, an incident at Eisner's mother's funeral, which involved Ovitz getting into an argument on a New York City street over a parking space, spurred Eisner to finally send this letter. The letter stated that:

> FN243. PTE 79; *see also supra* text " Veracity and 'Agenting' " at 49. Although I have found that Ovitz was not a liar, Eisner's persistently-vocalized reservations about Ovitz's veracity are not inconsistent with that finding. I conclude that while Ovitz gave this Court no reason to believe that he lied, that is entirely possible that his actions while at Disney and his general character led Eisner to believe that Ovitz was not completely honest. Eisner, however, was unable to point to specific instances where Ovitz was untruthful.

If I should be hit by a truck, the company simply cannot make [Ovitz] CEO or leave him as president with a figurehead CEO. It would be catastrophic. I hate saying it, but his strength of personality together with his erratic behavior and pathological problems, and I hate saying that, is a mixture leading to disaster for this company.[FN244]

> FN244. *Id.* at DD002623.

**\*19** Eisner stated that his goal in writing the letter was to keep Ovitz from succeeding him at Disney should the opportunity arise. Because of that purpose, the letter contained a good deal of hyperbole to help Eisner better "unsell" Ovitz as his successor.[FN245] Neither Russell nor Watson divulged at any time the contents of the letter with other members of the board.[FN246]

> FN245. Tr. 4436:14-4439:6.

> FN246.        Tr.        3078:17-3079:15; 7881:10-7887:3.

Eisner was informed on November 1 that Ovitz's negotiations with Sony had failed to result in Ovitz leaving Disney. Once Eisner discovered that the Sony negotiations had failed to produce the desired result, Eisner decided that Ovitz must be gone by the end of the year.[FN247] To facilitate Ovitz's departure, Eisner asked Wilson to take a Thanksgiving trip on the yacht that Ovitz and Wilson jointly owned, the Illusion.[FN248] It was Eisner's hope that Wilson, a confidant of Ovitz's, could help Ovitz finally understand not only that Ovitz had to leave Disney, but that everyone, including Ovitz, would be better off if he left.

> FN247. Tr. 4368:9-4369:3.

> FN248.        Tr.        4369:4-4370:2; 6838:18-6839:11.

Still struggling to make Ovitz understand that he had to leave Disney, Eisner wrote a letter to Ovitz on November 11 (which was never sent), in which he again tried to put Ovitz on notice that he was no longer welcome at Disney. [FN249] Eisner characterized this letter as:

> FN249. PTE 24.

[A] shot at trying to conjure up every argument, every issue exaggerated to the point of extreme nature so that [Ovitz] could see how deadly serious [Eisner] was.... However, [Eisner] realized it was ... not accurate, way exaggerated, silly, hyperbole, insensitive, and it read like ... a Vanity Fair article. [FN250]

> FN250. Tr. 4372:5-19.

Eisner also stated that:
One of the reasons Litvack didn't want me to send the memo is there were so many things in the memo ... which just weren't true, but I was trying to create a case that [Ovitz] could not argue with.[FN251]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                         Page 38

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN251. Tr. 5028:13-19.

In this letter, Eisner told Ovitz that:
I think we should part ways professionally. I believe you should resign (this is not a legal suggestion but a cosmetic one), and we should put the best possible face on it. When we talked last Friday, I told you again that my biggest problem was that you played the angles too much. I told you 98% of the problem was that I did not know when you were telling the truth, about big things, about small things.... We are beyond the curing stage. We are now in salvation. I would like to remain friends, to end this so it looks like you decided it, and to be positive and supportive ... I hope we can work together now to accomplish what has to be done. I am ready to work as hard as necessary and as long.[FN252]

FN252. PTE 24 at DD002454-002455.

Eisner sent this document to Bass and Russell for their review.[FN253] Eisner also believed that he may have shown the letter to Litvack, but Litvack did not recall having seen this letter before trial.[FN254] For my purposes, Russell was the only director to receive this document and he did not share it or the matters it concerned with anyone else on the board.[FN255] Instead of sending this letter to Ovitz, Eisner met with Ovitz personally on November 13 and they discussed much of what was contained in the letter, especially Ovitz's alleged management and ethics problems.[FN256] Notes taken by Eisner following this meeting stated that the meeting was "2 hours and 15 minutes of [Eisner] telling [Ovitz] that it was not going to work." [FN257] Eisner believed that Ovitz just would not listen to what he was trying to tell him and instead, Ovitz insisted that he would stay at Disney, going so far as to state that he would chain himself to his desk.[FN258]

FN253. Eisner 606:4-7.

FN254. Tr. 6143:3-20.

FN255.      Tr.      3090:9-3091:8;

3095:20-3096:3.

FN256. Eisner 606:8-607:14; *see also* Tr. 5199:14-19; 2017:17-2018:15.

FN257. PTE 325 at DD002549.

FN258. Tr. 4370:3-19. The threat of chaining himself to his desk, although obviously metaphorical, demonstrates exactly how unwilling Ovitz was to even consider leaving Disney at that point.

*3. Options for Ovitz's Termination*

**\*20** Since the Sony option was discussed in early September, Eisner and Litvack had also been discussing whether Ovitz could be terminated, and more importantly, whether he could be terminated for cause.[FN259] Eisner hoped to obtain a termination for cause because he believed that although Ovitz "had not done the job that would warrant [the NFT] payment" Disney was obliged to honor the OEA.[FN260] Honoring the OEA meant that if Ovitz was terminated without cause, he would receive the NFT payment that the OEA called for, which consisted of the balance of Ovitz's salary, an imputed amount of bonuses, a $10 million termination fee and the immediate vesting of his three million stock options at the time. Litvack advised Eisner from the very beginning that he did not believe that there was cause to terminate Ovitz under the OEA.

FN259.      Tr.      4379:23-4380:19; 6110:12-6111:3.

FN260. Tr. 4380:22-4381:15.

As the end of November approached, Eisner again asked Litvack if Disney had cause to fire Ovitz and avoid the costly NFT payment.[FN261] Litvack proceeded to examine more carefully the issue of whether cause existed under the OEA. Litvack reviewed the OEA, refreshed himself on the meaning of gross negligence and malfeasance and reviewed all of the facts concerning Ovitz's performance of which he was aware.[FN262] Litvack

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
(Cite as: Not Reported in A.2d)

freely admits that he did not do any legal research in answering the cause question; [FN263] nor did he order an outside investigation to be undertaken or an outside opinion to be rendered.[FN264] Litvack did state that in December he consulted with Morton Pierce, a senior partner at Dewey Ballantine, and that Pierce agreed that there was no cause.[FN265] Pierce, however, was not admitted to the California Bar (California law governed the OEA), was not an expert in employment law,[FN266] and could not recall speaking with Litvack regarding Ovitz.[FN267] Furthermore, Pierce's bills to Disney do not clearly reflect that any such conversation took place regarding whether Ovitz could be terminated for cause.[FN268] After taking these steps, Litvack, for the second time, concluded that there was no cause to terminate Ovitz. In fact, despite Ovitz's poor performance and concerns about his honesty, Litvack believed that the question of whether Ovitz could be terminated for cause was not a close question and, in fact, Litvack described it as "a no-brainer." [FN269] Litvack, however, produced no written work product or notes to show to the board that would explain or defend his conclusion, and because he did not ask for an outside opinion to be authored, there was no written work product at all. When Litvack notified Eisner that he did not believe cause existed, Eisner testified that he "checked with almost anybody that [he] could find that had a legal degree, and there was just no light in that possibility. It was a total dead end from day one." [FN270]

FN261. Tr. 6110:15-6111:3.

FN262. Tr. 6113:21-6114:19.

FN263. Tr. 6114:20-10 (Litvack) (stating that he did not do any case research because he "didn't believe that there were going to be any cases that were going to answer the question for [him]. [He] had been dealing with contracts and litigation all [his] life.... [He] felt he knew the facts as to what the man had done and not done." ).

FN264. Tr. 6115:22-6116:14 (Litvack)

(stating that he did not order an outside investigation because he believed he knew the facts and an outsider would have gone to him to get the facts, and also because he believed that the firing of Ovitz was a sensitive matter and he wanted to involve as few people as possible); 6130:5-24 (Litvack) (explaining that he did not order an outside written opinion because it would have been expensive, and he believed it was a "CYA tactic done by general counsels to cover themselves" and he didn't believe he needed that). Litvack consulted Val Cohen, co-head of the Disney litigation group, and possibly Santaniello, and to the extent he met with them, he stated that they both agreed with his conclusion that there was no cause, although there is no record of their having met or discussed the existence of cause. See Tr. 6119:22-6121:8. Litvack admits, however, that all the information Val Cohen knew about Ovitz, she would have learned from Litvack. See Tr. 6401:2-6405:4.

FN265. Tr. 6121:9-6126:8.

FN266. Tr. 6222:22-6225:13.

FN267. Tr. 6398:3-11.

FN268. PTE 391; PTE 392 (bill contains charge of $25,500 for consultation in the Ovitz matter which included advice regarding proxy disclosure and tax considerations relating to Ovitz's termination).

FN269. Tr. 6114:24-10. In light of the hostile relationship between Litvack and Ovitz, I believe if Litvack thought it were possible to avoid paying Ovitz the NFT payment, that out of pure ill-will, Litvack would have tried almost anything to avoid the payment. See Tr. 6115:9-21 ("[I]f there was a way not to pay him, I would have loved not to pay him.... I didn't like him, and he didn't like me. I didn't feel he had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

done the job.").

FN270. Tr. 4380:10-21.

In a perfect, more responsible world, both Litvack and Eisner would have had sufficient documentation not only to back up their conclusion that Ovitz could not be terminated for cause, but they would have also had sufficient evidence of the research and legwork they did to arrive at that conclusion. Despite the paucity of evidence, it is clear to the Court that both Eisner and Litvack wanted to fire Ovitz for cause to avoid the costly NFT payment, and perhaps out of personal motivations. The Court is convinced, based upon these two factors, that Eisner and Litvack did in fact make a concerted effort to determine if Ovitz could be terminated for cause, and that despite these efforts, they were unable to manufacture the desired result.

**\*21** In addition to determining that there was no cause to fire Ovitz as defined in the OEA, Litvack also testified that it would be inappropriate and unethical for Disney to try to bluff Ovitz into accepting an amount less than agreed to in the OEA in case of an NFT.[FN271] Litvack believed that it would be a bad idea to attempt to coerce Ovitz (by threatening a for-cause termination) into negotiating for a smaller NFT package than was provided for in the OEA because Disney, when pressed by Ovitz's attorneys, would have to admit that there in fact was no cause and possibly subject Disney to a wrongful termination suit.[FN272] Litvack also believed that a failed attempt to bluff Ovitz out of the NFT could be quite harmful to Disney's reputation because it would appear as if Disney was trying to get out of contractual obligations (which it would have been), and that would make it difficult for Disney to do business and be viewed as an honest business partner.[FN273]

FN271. Tr. 6128:6-11.

FN272.      Tr.      6118:16-6119:13; 6129:2-6130:3.

FN273. *Id.* Litvack also believed that

attempting to relocate Ovitz within Disney would not improve the situation as Ovitz just was not a good match for Disney, although he conceded that that was up to Eisner. *See* Tr. 6128:12-6129:1.

4. *The November 25, 1996 Board Meeting*

The Disney board held its next meeting on November 25, and Ovitz was present. The minutes of this meeting contain no record that the board engaged in any discussion concerning Ovitz's termination, or that they were informed of the actions that Eisner and Litvack had taken to this point concerning Ovitz. [FN274] The only action recorded in the minutes concerning Ovitz is his unanimous renomination to a new three-year term to the board.[FN275] Gold testified, however, that by this time the board knew that Ovitz would be fired, but because Ovitz was present at the meeting it would have been akin to a "public hanging" to fail to re-nominate him.[FN276]

FN274. PTE 91.

FN275. *Id.* at WD01561A.

FN276. Tr. 3771:21-3772:16 (Because the proxy was not due for some time, Gold stated that the board chose to renominate Ovitz and then change the slate after he was fired instead of embarrassing Ovitz at the meeting.).

Although there was no mention of Ovitz's impending termination at the board meeting, it is apparent, despite the lack of a written record, that directly following the board meeting, there was some discussion concerning Ovitz at the executive session which was held at Disney Imagineering in a glass-walled room (according to those in attendance who remember this event).[FN277] One of the more striking images of this trial is that apparently Ovitz was directly outside the glass walls-looking in at this meeting-while his fate at Disney was being discussed. There are no minutes to show who attended the executive session, but I am reasonably certain that at least Eisner, Gold, Bowers, Watson

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.