and Stern were in attendance.[FN278] In the absence of further evidence, I must conclude that no other directors attended this session. It is also clear that Eisner notified the directors in attendance at the executive session that it was his intention to fire Ovitz by year's end and that he had asked Wilson to speak with Ovitz while they were onboard the Illusion during the upcoming Thanksgiving holiday.[FN279]

FN277. I recognize that certain portions of the deposition testimony concerning this executive session, whether it occurred, and what was said at it, are to some degree in conflict with the trial testimony. *See* Gold 357:20-361:24 (stating that he does not independently recall when the executive session occurred, but that there was an executive session during which Ovitz's termination was discussed); Litvack 573:7-574:9 (stating that he was unaware of an executive session, however if there was such a meeting, he would have been excluded); Russell 731:18-732:7 (stating that he does not recall an executive session after the November 1996 board meeting); Stern 163:14-164:2 (stating that he has no recollection of an executive session of the board after the November 1996 meeting). Although be later testified that after reviewing Gold's trial testimony that he vividly recalled the meeting, *see* Tr. 8155:13-8158:4, Eisner himself testified that this was not an *official* executive session, but instead he gathered the non-management directors in a room to discuss Ovitz. *See* Tr. 4425:7-4426:10. Despite these conflicts, I am convinced that such a meeting took place. What was discussed at that meeting, however, is an entirely separate question that I will deal with shortly.

FN278. Mitchell was called after the meeting by Eisner and was told that there was some discussion of Ovitz's performance. Tr. 5758:21-5759:10. Mitchell, however, was not told anything concerning the NFT. *See* Tr. 5782:8-18.

FN279. Tr. 4551:17-4552:21 (Eisner); 3772:17-3773:18, 3785:3-9 ("You couldn't have left the November ... executive session without knowing where Mr. Eisner was going [as concerned Ovitz].") (Gold); 5950:20-5952:13 (Bowers); 7859:23-7862:5 (Watson); 8155:13-8158:4 (Stern).

Beyond Ovitz's impending doom and Wilson's upcoming boat trip, there is some controversy as to whether any details of the NFT and the cause question were discussed at this meeting. Eisner testified that, in addition to the other items, he informed those in attendance of what the NFT would cost Disney.[FN280] Gold tells a somewhat more elaborate (and certainly more self-serving) version of the meeting in which Gold asks Eisner whether Ovitz's termination would be for cause, and Eisner assures Gold, in the presence of the other directors, that Litvack had advised Eisner that there were no grounds for a "for cause" termination.[FN281] After the executive session adjourned, Gold testified that Litvack came into the room and Eisner told Gold to ask Litvack about cause, and that Litvack then told Gold that there was no cause to terminate Ovitz.[FN282] Stern, noting at trial that he had failed to recall anything at all concerning this meeting during his deposition, echoed Gold's version, stating that after the meeting, Litvack said that there was "no other way to go" besides an NFT.[FN283]

FN280. Tr. 4425:7-4426:10.

FN281. Tr. 3773:15-3774:16.

FN282. Tr. 3774:17-3776:7; 3906:17-3908:4. Gold told a slightly different story at his deposition which had Litvack in the room during the entire executive session and did not have Gold asking Litvack questions about outside counsel. *See* Gold 348:12-351:15.

FN283. Tr. 8155:13-8158:4.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***22** Outside of Gold and Stern, nobody else present at the executive session recalled Gold raising the issue of fault with Eisner or having witnessed Gold speak with Litvack. Litvack recalls speaking with Gold sometime before December 12, and he recalls in substance a similar conversation to what Gold and Stern recall, that is, Eisner telling Gold to ask Litvack about cause. Litvack, however, cannot place that conversation in time, believes it took place in the boardroom and believes that the only people present were Eisner, Gold and himself. [FN284] Because of these numerous discrepancies, I cannot conclude that Gold questioned Eisner during this meeting regarding cause, nor can I conclude that the conversation that took place between Gold and Litvack occurred after the executive session in the presence of those who were in attendance.

FN284. Tr. 6343:20-6346:5.

5. *The Illusion Dispelled*

Shortly after the November 25 board meeting and executive session, the Ovitz and Wilson families left on the Illusion for a Thanksgiving trip to the British Virgin Islands. Ovitz embarked on this trip with the hope that if he could figure out a way to make it to Christmas, he could fix everything with Disney and make his problems go away.[FN285] Wilson, however, had other plans. [FN286] Ovitz recalled the conversations between him and Wilson quite well. Ovitz recalled that Wilson told him that " it wasn't going to work and that [Eisner] wanted [Ovitz] out of the company." [FN287] Ovitz said that after speaking with Wilson he began to realize how serious the situation with Disney had become and that he needed to talk to his attorneys and get some perspective on the situation.[FN288] Wilson was unable to recall the details of what he and Ovitz spoke about,[FN289] but Wilson does recall that Ovitz was quite "emotionally concerned" with his situation at Disney.[FN290]

FN285. Tr.2050:1-10.

FN286. Wilson also testified that Eisner informed him that Ovitz would be entitled to a payment under the OEA if he was terminated without fault, and that Wilson knew what the approximate value of that payment was. *See* Tr. 7031:10-7032:4.

FN287. Tr.2051:7-11.

FN288. *Id.*

FN289. Tr. 7016:16-22.

FN290. Tr. 7017:24-7018:5.

At some point during the trip, Eisner contacted Wilson by phone and Wilson related the situation and the progress he had made with Ovitz.[FN291] Wilson was unable to remember the specifics of his conversation with Eisner, but his recollection was refreshed after viewing notes, dated December 1, taken by Eisner following the conversation.[FN292] Wilson recalled describing Ovitz as a "wounded animal ... in a corner," and stated that by this he meant that Ovitz could become dangerous to the organization if the relationship with Disney continued.[FN293] Wilson also recalled stating that Ovitz was a "loyal friend and devastating enemy," [FN294] and advising that Eisner should be reasonable and magnanimous, both financially and publicly, so Ovitz could save face.[FN295]

FN291. Tr. 7016:23-7017:9.

FN292. PTE 25.

FN293. Tr. 7026:22-7027:23; *see also* PTE 25.

FN294. Tr. 7028:2-7029:1.

FN295. Tr. 7030:6-7031:9.

On December 3, having returned from his Thanksgiving trip, Ovitz, armed with his newfound understanding that his time at Disney was rapidly coming to an end, met with Eisner to discuss the terms of his departure. Eisner memorialized this meeting in a note to Russell which read "I met with Michael Ovitz today who wants to bring our

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Page 43

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

discussions to a conclusion this week, wants you and Bob Goldman to settle out his contract immediately and sign it by weeks end." [FN296] Essentially, this note asked Russell to take charge of managing the Ovitz departure. Ovitz asked that he not have to deal personally with Litvack during the termination process, although he had no qualms about Litvack being involved.[FN297] Ovitz also asked for several concessions from Disney, including keeping his seat on the board, obtaining a consulting/advising arrangement with Disney, the continued use of an office and staff (but not on the Disney lot), continued health insurance and home security, continued use of the company car and the repurchase of his plane.[FN298]

FN296. PTE 326 DD002539.

FN297. *Id.* at DD002540; *see also* Tr.2060:19-2061:9.

FN298. PTE 326.

***23** Although Eisner and Ovitz did not see eye to eye on Ovitz's requests, Eisner initially objected only to Ovitz's continued use of the company car, telling Russell, "I don't want to nit pick here, but we are paying him a fortune." [FN299] The memo to Russell does not reflect Eisner's objections to Ovitz's other requests. Eisner, however, testified that "by the time I got from number one to number five [of listing Ovitz's requests] I had already realized it was a bad idea, and the next day I called him and told him that ... it would be impossible." [FN300] Eisner also told Russell that:

FN299. *Id.* at DD002539.

FN300. Tr. 4397:20-24.

Any deal we make that is one cent more than the contract should include a non raid clause with teeth, a non compete in areas he advises us in, and a non disclose or bad mouth me or the company for five years at least. It would be great if you paid some of his money out over time which he would lose if he broke that deal.[FN301]

FN301. PTE 326 at DD002540; *see also* PTE 379.

Shortly after this meeting, Ovitz spoke with Russell on the phone, and Russell described the conversation as "a very, very troubling and unusual conversation." [FN302] Russell stated that during their conversation, Ovitz made clear that he understood that the door to Disney was closed, but he was still "pleading his heart out ... [with] tears in his voice." [FN303] Over the next week, Disney, and more accurately, Eisner, rejected every request that Ovitz had made, informing him that all he would receive is what he had contracted for in the OEA and nothing more.[FN304] Other than the extra benefits which Ovitz requested and Disney summarily denied, there seems to have been no negotiation between anyone in Ovitz's camp and anyone at Disney concerning whether there would be a for cause termination or an NFT, and nobody seems to have even mentioned to Ovitz or his representatives the possibility of a for cause termination.[FN305]

FN302. Tr. 2577:3-2578:1.

FN303. *Id.*

FN304. Tr. 1379:21-1380:5, 3228:9-3229:19 (denial of continuing seat on board); 1379:1-20, 2098:5-13, 3227:8-18 (denial of consulting agreement); 3224:7-21 (denial of use of office and staff); 2063:21-2064:10, 3225:10-13 (denial of opportunity to repurchase plane); 6178:15-6179:23 (denial of repurchase or continued use of car).

FN305. Tr. 1378:6-14 (Ovitz) (stating that Eisner never mentioned to him the possibility that he would be fired for cause); 4455:3-19 (Eisner) (stating that at no time did he mention to Ovitz the possibility that he could be fired for cause, and denying that any negotiations took place between the two parties); 2640:17-2641:21 (Russell) (stating that he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Page 45 of 92

Not Reported in A.2d
Page 44

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

had never mentioned anything concerning a for cause termination to Ovitz or anyone working for Ovitz); 6186:15-6187:4 (Litvack) (stating that to the best of his knowledge, neither he nor anyone else at Disney ever mentioned to Ovitz or one of his representatives that he could be fired for cause).

6. *Ovitz's Bonus and His Termination*

On December 10, the Executive Performance Plan Committee ("EPPC") met to consider annual bonuses for Disney's most highly-compensated executive officers. The EPPC was chaired by Gold, its other members Lozano, Poitier and Russell, attended, although Poitier and Lozano attended by phone.[FN306] Also in attendance were Eisner, Watson, Litvack, Santaniello, and Marsha Reed.[FN307] Russell informed all those in attendance of his conversations with Ovitz's representatives and that Ovitz was going to be terminated, but that he was not going to be terminated for cause.[FN308] At this meeting, Russell recommended that Ovitz, despite his poor performance and imminent termination, should receive a $7.5 million bonus for his services during the 1996 fiscal year because Disney had done so well during the fiscal year and because Disney had a large bonus pool.[FN309] The EPPC approved this recommendation and it appears that Russell may have even advised the EPPC (despite the *clear* language in the OEA stating that the *bonus was discretionary* ) that Disney was contractually obligated to pay Ovitz his bonus.[FN310] Despite the fact that all of those in attendance should have known better, nobody spoke up to correct the mistaken perception that Ovitz had to receive a bonus, let alone a $7.5 million bonus.

FN306. PTE 51.

FN307. *Id.* Watson attended by phone.

FN308. Tr. 2581:23-2582:17; 3785:3-3786:11; 4429:7-4430:4; *see also* DTE 163.

FN309. PTE 51 at WD01229; *see also* 2582:18-2583:12.

FN310. Tr. 3926:11-15 (Gold) (stating that Russell stated that the bonus was mandatory); 7752:1-7754:22 (Lozano) (stating that although he could not recall Russell advising the EPPC that the bonus was mandatory, that he believed that they were contractually obligated to grant Ovitz a $7.5 million bonus); 6154:15-6156:16 (Litvack) (stating that Russell told the EPPC that the bonus was mandatory, and that Litvack did not say anything because he was not sure what Russell was referring to and he did not want to embarrass Russell). Planning to correct Russell's mistake when he spoke with him later on, Litvack nonetheless ordered that Ovitz's bonus be paid. *See* PTE 175; Tr. 6156:16-6157:10.

***24** The following evening, Eisner met with Ovitz at Eisner's mother's apartment in New York City.[FN311] By the time this meeting occurred, it had already been decided that Ovitz was being terminated, without cause, and would be receiving his contractual NFT payment, and that he would not be receiving any of the additional items that he asked for.[FN312] The purpose of this meeting was to agree to a press release to announce the termination, let Ovitz know that he would not receive any additional items, and as Eisner described it, it served as "the final parting."[FN313] Eisner and Ovitz apparently came to some understanding that neither Ovitz nor Disney was to defame each other in the press, and that the separation was to be undertaken with dignity and respect for both sides.[FN314] Ovitz's termination was memorialized the following day in a letter signed by Litvack and dated December 12.[FN315] Litvack testified that Russell negotiated the terms in the letter, but Litvack signed this document on Eisner's instructions.[FN316] The board was not shown the December 12 letter,[FN317] nor did it meet to approve its terms.[FN318]

FN311. Tr. 4402:8-4403:8.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d Page 45

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN312. Eisner did give some testimony that by December 11 he still intended to give Ovitz some sort of consulting arrangement separate from and unrelated to the OEA. The overwhelming weight of the evidence, however, demonstrates that this was not in fact the case, and it certainly did not happen. *See* Tr. 4601:6-23.

FN313. Tr. 4592:18-4593:6.

FN314. Eisner 654:16-655:16; *see also* Tr. 4601:8-18.

FN315. PTE 13. The letter reads:
This will confirm the terms of our mutual agreement as follows:
1. The term of your employment under your existing Employment Agreement with Disney will end on January 31, 1997.
2. This letter will for all purposes of the Employment Agreement be given the same effect as though there had been a " Non-Fault Termination," and the Company will pay you, on or before February 5, 1997, all amounts due you under the Employment Agreement, including those under Section 11(c) thereof. In addition, the stock options granted pursuant to Option A, will vest as of January 31, 1997 and will expire in accordance with their terms on September 30, 2002.

FN316. Tr. 6157:11-6159:8.

FN317. Bowers 335:3-14; Gold 207:13-18; Roy Disney 189:20-190:10.

FN318. Tr. 3933:8-20 (Gold); 4102:23-4103:11 (Eisner); 5772:18-5773:4 (Mitchell); 5881:24-5882:23 (Nunis); 5990:21-5991:10 (Bowers); 7248:3-7249:6 (Poitier); 7615:19-7616:16 (Murphy); 7758:2-7759:22 (Lozano).

Also on December 12, Disney issued the press release announcing Ovitz's termination.[FN319] The press release stated that "Michael S. Ovitz, will leave the company by mutual agreement effective January 31, 1997. He will continue to serve as an advisor and consultant to the company and the Board of Directors." [FN320] Although I am puzzled by the use of the phrase "mutual agreement," I am nonetheless convinced, based upon Ovitz's constant self-denial and difficult behavior during the months leading up to his termination, and Eisner's commitment that he would handle the termination gracefully for Ovitz's benefit (and likely to prevent Ovitz from defaming him and Disney in the press), [FN321] that the termination was anything but a mutual agreement. [FN322] Additionally, although I am troubled by the statement in the press release that Ovitz would continue to serve as an advisor and consultant to the board, because this was either a deliberate untruth or an incredibly irresponsible and sloppy error on Disney's part, it is ultimately immaterial to the issues to be resolved in this case. Therefore, I do not believe that the statement in the press release regarding Ovitz continuing as an advisor and consultant to the Disney board is reflective of any agreement or understanding that Disney and Ovitz had at the time.[FN323] The Court believes that both of these untrue statements were likely made as part of an effort by Disney to make Ovitz's departure seem as amicable as possible so that Ovitz's reputation would not be publicly tarnished any more than could be avoided. In any event, once Ovitz left Eisner's mother's apartment, he never again returned to Disney. [FN324]

FN319. PTE 390.

FN320. *Id.*

FN321. PTE 19 at WD4000. *See also* Tr.2088:1-5 (Ovitz) (stating "what we agreed on that they tried to handle this with some dignity for me and some grace and were very generous in their press release, which was very nice for them to do.").

FN322. *See also* Tr.2087:6-2088:5 (Ovitz) (stating that "I wouldn't leave by mutual agreement and I wasn't going to serve as an advisor and consultant. I wanted to [serve

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d Page 46

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

in those positions.]"); 2573:11-21 (Foster: "[Ovitz's] departure was not voluntary, is that correct?" Russell: "No way, no way." ); 4525:12-16 (Schulman: "You were trying to work out getting Mr. Ovitz's consent; correct?" Eisner: "I was not trying to get his consent on being fired. I was trying to get his consent of leaving the company in a graceful way.").

FN323. Tr.2087:6-2088:5. What makes it even clearer that Disney was simply trying to mislead the public is that no such representation was made in Ovitz's termination letter. PTE 13.

FN324. Tr. 1382:22-1383:1.

That same day, Eisner at least attempted to contact each of the Board members by phone before the issuance of the press release in order to notify them that Ovitz had been officially terminated.[FN325] None of the board members at that time, or at any other time before or during trial, ever objected to Ovitz's termination; in fact, most if not all thought it was the appropriate move for Eisner to make.[FN326] Also on December 12, copies of the press release along with a letter from Eisner were sent to each of the directors. [FN327] The letters contained no more information regarding the termination than was contained in the press release.

FN325. DTE 413 (Eisner's incoming and outgoing phone log from December 12 through December 14 listing calls placed to Nunis, Roy Disney, Russell, O'Donovan, Wilson, Murphy, Gold, Stern, Bowers, Poitier and Walker); *see also* Tr. 3802:6-2223 (Gold) (testifying that Eisner notified him by phone, and asked him to pass the news on to Roy Disney); 5810:19-5811:20 (Nunis) (testifying that Eisner notified him by phone); 5932:7-5833:3 (Bowers) (testifying that Eisner notified her by phone); 7556:1-7557:15 (T. Murphy) (testifying that Eisner notified him by phone); 7642:21-7643:9 (Lozano) (testifying that Eisner notified him by phone); 8159:19-8160:24 (Stern) (testifying that Eisner notified him by phone). Eisner also notified Bass and Warren Buffett. Tr. 4405:18-4406:14.

FN326. Tr. 3778:1-23 (Gold) (stating that as of the November 25 executive session, he concurred with Eisner's decision to terminate Ovitz despite what it would cost Disney); 4026:13-4028:5 (Roy Disney) (stating that he supported the decision to terminate Ovitz despite the cost involved because of the significant problems Ovitz was causing within Disney); 4405:18-4409:10 (Eisner) (stating that he received no objection from any board member after placing phone calls to notify them of Ovitz's termination or after they received copies of the press release and accompanying letter); 5810:19-5811:20 (Nunis) (stating that as of the press release he supported Eisner's decision to terminate Ovitz because "turmoil at the top of the company" was dangerous for everyone); 5933:22-5935:15 (Bowers) (stating that she supported Eisner's decision to terminate Ovitz as of the press release because it was clear that Ovitz was not a team player); 6720:11-6720:23 (O'Donovan) (stating that he supported Eisner's decision to terminate Ovitz because it is important to have harmony at the top of a large organization); 7144:3-7146:13 (Poitier) (stating that he believed Ovitz had to be terminated according to the terms of the OEA because it was a "clear mismatch"); 7556:3-7557:7 (Murphy) (stating that he supported Eisner's decision to terminate Ovitz despite the cost because it was the best thing for Disney and its shareholders); 7642:21-7643:24 (Lozano) (stating that he supported Eisner's decision to terminate Ovitz despite the cost to Disney); 8158:5-8160:24 (Stern) (stating that he supported Eisner's decision to terminate Ovitz because it was a bad relationship, and the amount Disney would save would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Page 48 of 92

Not Reported in A.2d
Page 47

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

outweigh the cost of the termination).

FN327. PTE 13.

***25** Thus, as of December 12, Ovitz was officially terminated without cause. Up to this point, however, the Disney board had never met in order to vote on, or even discuss, the termination at a full session, and few if any directors did an independent investigation of whether Ovitz could be terminated for cause. As a result, the Disney directors had been taken for a wild ride, and most of it was in the dark. Additionally neither the EPPC nor the compensation committee had a vote on the matter, and it seems as though they had yet to have a substantive discussion of whether Ovitz could be terminated for cause. Many directors believed that Eisner had the power to fire Ovitz on his own and that he did not need to convene a board meeting to do so.[FN328] Other directors believed that if a meeting was required to terminate Ovitz, that Litvack, serving as corporate counsel, would have advised them that was the case and he would have made sure one was called.[FN329] Litvack believed that Eisner had the power to fire Ovitz on his own accord and, therefore, did not believe it was necessary to convene a meeting.[FN330] Litvack also stated that he did not call a meeting because not only did he believe that Eisner was empowered to fire Ovitz on his own, but Litvack believed that all the directors were up to speed and in agreement that Ovitz should be terminated.[FN331] Although there was no meeting called to vote on or even discuss Ovitz's termination, it is clear that most, if not all, directors trusted Eisner's and Litvack's conclusion that there was no cause and that Ovitz should still be terminated without cause even though this entailed making the costly NFT payment.[FN332]

FN328. Tr. 2587:1-7 (Russell); 5733:3-5734:17 (Mitchell); 6721:8-21 (O'Donovan); 7067:21-7069:8 (Wilson); 7561:9-13 (Murphy); 8233:5-16 (Stern).

FN329. Tr. 2889:10-2892:3 (Russell); 6720:21-6721:7, 6785:1118-6786:15 (O'Donovan); 7227:2-7 (Poitier); 7561:14-17 (Murphy); 7466:11-7467:2 (Lozano).

FN330. Tr. 6149:4-6151:11.

FN331. *Id.*

FN332. Tr. 2574:5-2576:21 (Russell) (stating that he believed that Eisner and Litvack had done sufficient research and trusted their judgment that there was no cause to terminate Ovitz, that he was unaware of anything that would constitute cause to fire Ovitz, and that he was aware that Ovitz would receive the NFT payment); 3775:12-3778:18 (Gold) (stating that he was aware of the size of the NFT payment, that after asking Litvack about his conclusions concerning cause he believed that Litvack had done and was continuing to do sufficient research and Gold trusted his and Eisner's conclusions, and that Gold also had no knowledge of any act that would have constituted cause to fire Ovitz); 5597:18-5598:13 (Mitchell) (stating that he relied on and trusted Litvack's determination that there was no cause and Mitchell knew of nothing that would have constituted cause); 5813:2-24 (Nunis) (stating that he believed that if Eisner and Litvack could have avoided paying the NFT that they would have done so); 5933:4-5934:24 (Bowers) (agreeing with Eisner's decision, that Disney would honor the terms of the OEA and make a large payment to Ovitz including a large cash payment and acceleration of the options); 6781:18-6782:9 (O'Donovan) (stating that he was not aware of the value of Ovitz's payment and relied on Litvack entirely to make the cause determination); 7557:2-15 (Murphy) (stating that he believed that if there was a way that Eisner could have avoided paying Ovitz he would have and he therefore trusted Eisner's judgment on the issue of cause); 7867:2-7868:2 (Watson) (stating that he did not believe that Ovitz was grossly negligent or malfeasant and that therefore he could not be fired for cause);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Page 49 of 92

Not Reported in A.2d

Page 48

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

8160:2-8161:16 (Stern) (stating that he believed that Ovitz never lied to him, and that Stern trusted Eisner's judgment because he had a reputation for being "a tough buck," and if Eisner could have avoided paying Ovitz he would have).

During the week that Ovitz was terminated (December 11-16), articles began appearing in the press with quotes from Ovitz or his representatives describing why Ovitz left Disney and detailing to some extent the size of his severance package. [FN333] For example, a December 14 article in the Baltimore Sun reported that "Resigning Disney President Michael Ovitz said yesterday through a representative that Disney is giving him a $90 million severance package." [FN334] Other articles describing Ovitz's frustrations at Disney stated that Ovitz "wasn't game to struggle against a bad situation," [FN335] and that "Ovitz was frustrated by his poorly defined role, Eisner's reluctance to share power and repeated clashes with other senior Disney executives ... notably [Litvack] and [Bollenbach]," [FN336] and that "the reality was that Eisner did not let go ... [and that] Eisner thwarted [Ovitz] by not giving him detailed responsibilities or the power to manage the various Disney divisions." [FN337] The articles also stated that Ovitz's departure was mutual,[FN338] and some went so far as to state that Ovitz's departure was his own idea.[FN339] Additionally, it was reported that Ovitz had hired a public relations consultant named Steven Rivers to put a positive spin on the termination for Ovitz.[FN340] Ovitz, however, testified that he did not employ Rivers or any other PR firm at this time.[FN341] Eisner believed that he had been generous in his treatment of Ovitz, as well as his agreement to make the termination seem mutual, and felt that these articles were:

FN333. DTE 243.

FN334. DTE 243 at 13-14; *see also id.* at DD002077, DD002068.

FN335. *Id.* at DD002075.

FN336. *Id.* at DD002077.

FN337. *Id.* at DD002068.

FN338. *Id.* at DD002075.

FN339. *Id.* at DD002084.

FN340. Tr. 4432:20-4433:1 (Eisner) (testifying that, when he confronted Ovitz about these articles, Ovitz admitted to hiring Rivers); *see also* DTE 243 at DD002076, DD002084, DTE 243 at 12, 14.

FN341. Tr.2090:17-2091:6.

***26** an incredible betrayal not of a contract, not of any kind of written agreement, but that I had bent over backwards, and not because he was my friend. I would do it with anybody that was leaving under these circumstances, and he just, you know, threw it right in the company's face. And I was reading every single day about what idiots we were, the Disney Company, and how he had done this enormous feat.[FN342]

FN342. Tr. 4433:2-4433:14.

On December 16, Eisner reacted to these stories by sending an e-mail to John Dreyer, Disney's communications chief, which among other things stated that Ovitz was a "psychopath" and "totally incompetent." [FN343] Eisner described the letter as his effort at "venting" and that "although [he] didn't know what the words meant, [he] was just so angry." [FN344]

FN343. PTE 20.

FN344. Tr. 4433:15-21.

Following the official termination, the EPPC met on December 20 with the sole purpose of rescinding Ovitz's $7.5 million bonus. Litvack stated that after the December 10 EPPC meeting, he had questioned Russell as to whether the bonus was mandatory, and that Russell had sent Litvack a memo (which had been drafted almost a year earlier as an introduction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d

Page 49

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

to the OEA) on December 18, and in that document it became apparent that the bonus was not in fact mandatory. [FN345] Russell also had a discussion with Gold on December 18 during which he told Gold that his recommendation that Ovitz be paid a bonus was stupid and that he was worried that members of the EPPC were under the mistaken belief that the bonus was contractual.[FN346] Gold testified that within a week of the December 10 meeting, Litvack and Russell came to him " sheepishly, and said 'we've made a mistake." ' [FN347] On December 20 a special telephonic meeting of the EPPC was convened with the purpose of rescinding Ovitz's $7.5 million bonus, which the EPPC had voted in favor of just ten days earlier. [FN348] Gold, Lozano, Russell, Watson, Eisner and Litvack attended the meeting.[FN349]

FN345. PTE 180; *see also* Tr. 6159:20-6161:5.

FN346. Tr. 2589:12-2591:1; *see also* PTE 384 (Russell's notes of his meeting with Gold).

FN347. Tr. 3799:15-3800:7.

FN348. PTE 53.

FN349. *Id.*

Russell's self-prepared agenda for the meeting outlines what was discussed before revoking Ovitz's bonus, including that it would be "illogical and impossible to justify any bonus one day and fire him the next, [and that] Committee members [could not] be asked to try to justify it based on good performance." [FN350] The EPPC then revoked Ovitz's bonus. After the revocation, Gold questioned Litvack if he had not also made a mistake as to whether Ovitz could be terminated for cause and Litvack told Gold that he was sure that he had not. Gold also contends that Litvack said his view was supported by outside counsel.[FN351] Litvack denies ever having made this representation.

FN350. PTE 93; *see also* Tr. 2591:15-2592:2; 3797:14-3799:14.

FN351. Tr. 3796:1-18; 6167:20-6168:14.

After Ovitz's bonus was rescinded, Eisner, in a December 27 letter, accelerated Ovitz's departure date from January 31, 1997, to December 27, 1996, and Ovitz's tenure as both an executive and director of Disney ended on that date.[FN352] Similar to the December 12 letter, this letter states that Ovitz's termination "will for all purposes of the Employment Agreement be treated as a 'Non-Fault Termination.' " There was no mention in this letter of Ovitz serving as a consultant to the board, however.[FN353] The letter, unlike the December 12 letter, contained specific details of Ovitz's payout and stated Ovitz would immediately receive roughly $38 million in cash and that the first tranche of three million options would vest immediately.[FN354] Litvack is the signatory on this letter and Ovitz cosigned. Litvack, however, testified that he signed the letter agreement because no one else was available to do so during the holidays and that he had no role in drafting it.[FN355]

FN352. PTE 14.

FN353. *Id.*

FN354. *Id.*

FN355. Tr. 6170:14-19; 6586:18-6587:5.

***27** As previously mentioned, Disney also chose to withhold $1,000,000 of Ovitz's NFT payment " pending final settlement of [Ovitz's] accounts." [FN356] Ovitz has stated that his agreement to the holdback was a condition to "Disney honoring its contractual obligations." [FN357] Eisner, however, testified that it was common for executives at Disney to be behind on their expenses up to six months, so it made sense to holdback $1 million in case of lingering expenses.[FN358] Besides Eisner, Litvack, and perhaps Russell, no defendant even saw the December 27 letter before it was signed. [FN359] Additionally, neither the full board nor any committee thereof met to discuss the acceleration of Ovitz's departure or the $1 million holdback.[FN360]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Page 51 of 92

Not Reported in A.2d

Page 50

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

Shortly after Disney paid Ovitz what he was owed under the OEA for an NFT (minus the $1 million holdback), plaintiffs filed the current action.

FN356. *Id.* At the time that Eisner ordered the holdback, he did not know that Price Waterhouse would be called in to do a full audit of Ovitz's expenses. Tr. 5147:15-5150:11.

FN357. Ovitz Post Trial Br. at 13.

FN358. Tr. 4400:21-4402:4.

FN359. *See, e.g.,* Bowers 336:20-24; Lozano 213:19-214:2; Mitchell 40:13-23; T. Murphy 106:14-21; Nunis 80:3-5; O'Donovan 119:23-120:4; Poitier 176:24-177:18; Stern 192:9-23; Watson 442:16-19; Wilson 125:25-126:8; Roy Disney 190:11-24.

FN360. Tr. 3943:19-3944:22.

The full board next met on January 27, 1997. By this time, the board was aware of the negative publicity that the Ovitz termination and NFT payment had received. There was an extensive discussion of Ovitz's termination at this meeting and the pending lawsuit. Litvack, addressing the full board for the first time concerning the cause issue, notified the board that in his opinion there had been no gross negligence or malfeasance and, thus, Ovitz could not be terminated for cause.[FN361] Litvack stood by his decision at trial, stating he had learned nothing since 1996 that made him reconsider his original advice to the board that Disney could not fire Ovitz for cause.[FN362]

FN361. Tr. 2599:10-2600:9 (Russell) (stating that Litvack had explained about the lawsuit and that he stated that "we had acted properly and that there would not have been a basis to claim that there was good cause under the employment agreement ... with respect to the discharge of Michael Ovitz."); 4444:8-4446:12 (Eisner) (stating that the board was fully informed of all the details of Ovitz's termination and that Litvack explained the cause question "to the point that everybody was getting tired of me saying, "Okay, Sandy, say it once again. Who did you talk to? Are you sure? Did we do the right thing?"); 5936:13-5939:15 (Bowers) (stating that Litvack advised the board that there was no gross negligence or malfeasance to terminate Ovitz and that they had to pay him and that she also recalls Litvack stating that he had received outside counsel at this point); 6181:11-6183:11 (Litvack) (stating that he set out the whole Ovitz situation for the board and that he told the board that he did not believe there was gross negligence or malfeasance and hence no way to terminate Ovitz for cause) Litvack also stated that he did not recall saying that he had the advice of outside counsel, but that if he was asked he would have responded that he did. *Id.; see also* PTE 799.

FN362. Tr. 6693:1-12.

*D. Expert Witnesses*

Six expert witnesses testified over the course of the trial.[FN363] In general, their reports and testimony, while meeting the minimum standards for admissibility, were not of as much help to the Court as they could have been because of the polarized nature of their opinions, especially their interpretations of the factual questions that are of central importance in this trial. I shall discuss each expert *seriatim.* To the extent that my conclusions about an expert are decidedly negative, that characterization is based upon an objective evaluation of the witness and the strength and relevance of the evidence presented both in the report and at trial.

FN363. A seventh expert, Alan Johnson, prepared a report on behalf of the defendants and was deposed, but he did not testify at trial. *See* Tr. 771:24-772:16.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Page 52 of 92

Not Reported in A.2d Page 51

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

His amended report dated August 6, 2004, is part of the trial record. DTE 181. Professor Murphy spent a significant amount of time at trial disputing certain elements of Johnson's report. Tr. 833:21-857:19.

1. *Professor Deborah DeMott*

Plaintiffs offered Professor DeMott, the David F. Cavers Professor of Law at Duke Law School, as an expert on "the custom and practice with regard to corporate governance in Delaware public companies in the time period relevant to this case." FN364 Professor DeMott was subject to an earlier motion *in limine,* whereby defendants sought to exclude her testimony. That motion was granted on the grounds that her report and proposed testimony did not comply with D.R.E. 702 and improperly opined on the application of Delaware law to the facts of this case.FN365 Professor DeMott rewrote her report, FN366 and her testimony was received at trial over defendants' objections.FN367

FN364. Tr. 23:20-24.

FN365. *See In re The Walt Disney Co. Derivative Litig.,* 2004 WL 550750 (Del.Ch. Mar.9, 2004).

FN366. PTE 462.

FN367. Tr. 24:1-38:6.

***28** Professor DeMott opined on the "custom and practice of corporate governance in publicly traded Delaware corporations as of the times relevant to the transactions in this case," and also on "whether the conduct of the board of directors of [the Company] complied with or departed from those customs and those practices." FN368 Despite plaintiffs' and Professor DeMott's efforts to couch her opinion in terms of custom and practice of Delaware corporations, it was clear to all that her report and testimony were still directed to the core issues in this case-whether the defendants breached their fiduciary duties as they exist under Delaware law.FN369

FN368. Tr. 40:9-18.

FN369. For example, instead of using the term "custom and practice" in her report, Professor DeMott states that good corporate goverance "requires," "includes" and "envisions" certain actions. Tr. 98:24-101:10; *see also* Tr. 161:22-166:3 (plaintiffs' counsel objects to a question on cross-examination on the grounds that defense counsel was "just inserting the phrase 'custom and practice,' " and that these questions were "not going to what is the custom and practice in the particular time frame with respect to public Delaware companies, but what are the legal requirements [imposed upon fiduciaries of Delaware corporations]").

In addition to opining on the core issues in this case, FN370 another key area of Professor DeMott's report (and the corresponding testimony) that is of no value to the Court is her interpretation of the Company's certificate of incorporation, bylaws, and board committee charters.FN371 Interpretation of the Company's internal governing documents is a matter exclusively for the Court.FN372 Thus, there is very little, if any, of Professor DeMott's report that is of benefit to the Court, especially because the relevant question is not whether the defendants complied with the custom and practice of other Delaware corporations during the relevant time frame, but whether they complied with their fiduciary duties.FN373

FN370. *See* PTE 462 at ¶ 14 ("Neither Disney's Board nor its Compensation Committee gave careful consideration to the implications of the terms of Disney's employment agreement with Mr. [Ovitz]." ); *see also id.* at ¶ 17 ("The record leaves no doubt that both the decision to terminate Mr. Ovitz's employment and the decision to characterize the termination as a non-fault termination were made by Mr. Eisner without consideration by Disney's Board.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d

Page 52

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

FN371. PTE 462 at ¶¶ 9, 12, 17; Tr. 172:6-175:5.

FN372. *See Itek Corp. v. Chicago Aerial Indus., Inc.,* 274 A.2d 141, 143 (Del.1971).

FN373. Professor DeMott's testimony was useful, however, in the sense that it drew in stark relief the contrast between ideal corporate governance practices and the unwholesome boardroom culture at Disney-that is, her testimony clarified how ornamental, passive directors contribute to sycophantic tendencies among directors and how imperial CEOs can exploit this condition for their own benefit, especially in the executive compensation and severance area. *See* Tr. 43:4-46:15 (individualized one-on-one discussions between management and directors can lead to directors who are "unequally or unevenly informed with regard to significant matters" and "have the effect of vitiating, sapping the board's ability as an institution to function together collectively and collegially and deliberatively"); 83:12-84:6.

2. *Professor John Donohue*

Professor Donohue, the William H. Neukom Professor of Law at Stanford Law School, came to the witness stand on behalf of plaintiffs three different times during the course of the trial. His report and testimony were directed to the issue of whether Ovitz could (and should) have been terminated for cause as opposed to the NFT he received. The fatal flaw in Donohue's opinion is that it is based upon his factual determinations-determinations with which I, after weighing all of the evidence, do not agree.[FN374] For example, in the summary of his conclusions, Donohue states that Ovitz committed gross negligence or malfeasance because of his dishonesty, and because of eight other categories of bad acts.[FN375] As demonstrated above, in the lengthy and detailed recitation of the facts, I conclude that those determinations are simply not supported by a fair and neutral evaluation of the record.

FN374. *See* Tr. 636:16-637:6; 702:4-7.

FN375. PTE 404 at 4.

Donohue's opinion outlined an array of legal standards that might cover Ovitz's termination.[FN376] In his zeal to crucify Ovitz, Donohue concluded that Ovitz's conduct would meet any of the multiplicity of standards he discusses for gross negligence or malfeasance, and his report contains very little guidance in terms of which standard might be the most appropriate or most likely to be applied by a California court.[FN377] As a result, Donohue's report and testimony are of little value to the Court in evaluating defendants' conduct as it relates to Ovitz's termination.

FN376. *Id.* at 7-34.

FN377. *See id.* at 4.

Donohue was permitted to file a supplemental report based upon his review of certain documents, which were produced by defendants shortly before trial.[FN378] The supplemental report made no substantive changes to Donohue's opinions and conclusions.[FN379]

FN378. PTE 826.

FN379. *Id.*

3. *Professor Kevin Murphy*

***29** Professor Murphy (to whom I will refer as "Professor Murphy" in order to avoid any potential confusion with defendant Thomas Murphy), the E. Morgan Stanley Chair in Business Administration at the Marshall School of Business at the University of Southern California, presented expert testimony for plaintiffs on the issue of damages together with an economic and reasonableness evaluation of Ovitz's compensation package.[FN380] Professor Murphy concluded that Ovitz's compensation package was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d Page 53

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

unreasonably excessive and orders of magnitude larger than the compensation awarded to executives with arguably equivalent responsibilities.[FN381] In determining the reasonableness of Ovitz's compensation, Professor Murphy chose not to consider Ovitz's past income at CAA and the effect that income would have on the remuneration he would expect from any future employment.[FN382] As would be expected, Professor Murphy concluded that the most reasonable and appropriate assumptions are those that would maximize the value of the OEA and corresponding cost of the NFT.[FN383] Perhaps Professor Murphy's most pointed criticism of the OEA is that the Company was unable to reduce its potential financial exposure because the OEA did not contain any provisions for mitigation or non-compete restrictions,[FN384] but that criticism is not supported by the language of the OEA.[FN385]

FN380. *See* PTE 426 (Professor Murphy report).

FN381. *See, e.g.,* Tr. 748:22-749:13.

FN382. Tr. 868:17-870:16; 1061:5-19; *see also* Tr. 1010:21-1020:18; 1036:12-1037:9; 1043:1-21.

FN383. *See* Tr. 901:6-919:14; 925:2-939:4; 980:4-989:7; 1072:11-1077:13; 1081:19-1085:17; PTE 426 at 24-31 (Professor Murphy's discussion of the cost to the Company of Ovitz's severance where he concludes that the Black-Scholes value (as opposed to intrinsic or realized cost) of Ovitz's options (by far the highest of the three) is the appropriate way to measure that cost).

FN384. Tr. 803:3-805:5.

FN385. *See* PTE 7 ¶ 9 at WD00209-10.

Professor Murphy's report did not include an event study, but at trial Professor Murphy gave a very brief and unpersuasive critique of Dunbar's event study, which as discussed below, concluded that the Company's market capitalization increased by more than $1 billion as a result of the announcement of Ovitz's hiring. The record does not reflect that Professor Murphy's qualifications as an expert extend to performing and interpreting event studies, and I therefore reject Professor Murphy's critique of Dunbar's conclusion with respect to the market's reaction to the announcement of Ovitz's hiring.[FN386] The remainder of his report, however, is of use to the Court in determining the economic consequences facing the defendants when the decisions at issue in this case were made.

FN386. Notwithstanding the statements in the text above, Professor Murphy does make a very good point that the press release announcing Ovitz's hiring (PTE 3) does not disclose any economic terms of Ovitz's employment with the Company, and therefore, as a matter of common sense, the market cannot be said to have "approved" the economic terms of the OEA. *See* 859:7-860:3. One might intuit, however, that the $1 billion increase in the Company's market capitalization as a result of Ovitz's hiring would reflect the assumptions of the market as to the potential cost of Ovitz's employment contract, even if the market was unaware of the actual cost. Dunbar testified to this effect, outlining the public reports of Ovitz's compensation before the text of the OEA was filed publicly in December 1995 and concluding that the lack of statistically significant market reaction at that time was due to the market's correct assumptions of the size of the compensation package on August 14, 1995. Tr. 7296:8-7297:20; 7414:19-7416:3; DTE 428 at 3-9.

4. *Larry R. Feldman*

Ovitz's expert with respect to whether he could have been terminated for cause was Larry Feldman. Feldman is a renowned litigator in southern California and is currently employed at Kaye Scholer LLP.[FN387] Feldman opined that the Company had no grounds upon which to terminate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d Page 54

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

Ovitz for cause, and that had the Company done so, that Ovitz would have been able to pursue meritorious claims for breach of contract, fraud and defamation, with damages far in excess of the value of the NFT.[FN388]

FN387. *See* DTE 408 at 1-2.

FN388. DTE 408 at 47.

Upon comparing Feldman's report to the factual determinations I have made, I conclude that the evidence presented at trial is generally consistent with Feldman's view of the relevant facts. Feldman's legal analysis, however, is more troublesome. For example, I am not persuaded in the least that the legal standard used by Feldman in his report to define gross negligence or malfeasance-criminal misconduct or its equivalent-is the correct standard.[FN389] Additionally, his opinion with respect to potential claims for defamation and fraud in the inducement is thinly supported and fails to adequately address potentially meritorious defenses that the Company could have asserted to such causes of action.[FN390] In sum, therefore, Feldman's report and testimony are of some value to the Court, but not substantial value.

FN389. DTE 408 at 10-16. *But see* PTE 404 at 17-18 (Donohue's opinion that gross negligence is not exclusively a criminal standard); DTE 430 at 8-11 (Fox concurring with Donohue); *cf.* Tr. 8333:24-8334:10 (Feldman) (stating at trial that gross negligence does not require actual criminal misconduct).

FN390. *See* DTE 408 at 36-44; Tr. 8403:19-8411:3; 8455:21-8467:3; 8552:18-8577:21.

5. *John C. Fox*

***30** John Fox, a partner of Fenwick & West LLP, testified on behalf of all defendants but Ovitz as an expert with respect to whether Ovitz could have been terminated for cause. Fox's report and testimony were very thorough, well reasoned and informed by Fox's extensive practical experience as an employment law litigator and advisor.[FN391]

FN391. *See* DTE 430 (Fox report); DTE 248 (Fox's supplemental report).

The overwhelming majority of Fox's factual determinations are consonant with the conclusions I have reached above based upon the evidence presented at trial. His legal conclusions based upon those facts, therefore, are of far greater weight and persuasive value than the conclusions reached by Donohue. Similar to Feldman, Fox gives short shrift in his report to analyzing Ovitz's potential claims for fraud in the inducement and defamation.[FN392] Unlike Feldman, however, Fox was able to clearly articulate at trial the reasoning behind his conclusion with respect to the viability of these tort claims, bolstering the value of his report in those areas.[FN393] Fox also testified in great detail regarding the definition of gross negligence and malfeasance.[FN394] He also opined that, regardless of how gross negligence and malfeasance might be defined in a hypothetical *Ovitz v. The Walt Disney Company* suit had Ovitz been terminated for cause, after reviewing the evidence, Ovitz's conduct (or misconduct) did not even come close to that high standard.[FN395] In summary, Fox's report is of significant value to the Court, and I will weigh his conclusions accordingly in making my determinations regarding the ultimate issues in this case.

FN392. DTE 430 at 27-28; *see* DTE 430 at 28; DTE 408 at 36-43.

FN393. *See* Tr. 8838:1-19; 8866:3-17; 8905:20-8908:1; 8948:20-8951:13; 8956:6-8960:9; 9207:14-9213:23; 9222:23-9231:19; 9244:21-9246:8.

FN394. Tr. 8739:15-8748:4; 8999:20-9039:22; 9084:5-20.

FN395. Tr. 8758:1-8837:3; 8844:10-8860:6; 8922:3-8925:18;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

8947:5-8951:13; 8955:10-8961:24; 9025:22-9026:15; 9039:23-9040:12; 9048:3-9195:7.

6. *Frederick C. Dunbar*

The remaining expert was Frederick Dunbar, Senior Vice President of National Economic Research Associates, Inc., who testified on behalf of the defendants as to the market reaction to the hiring of Ovitz and also critiqued Professor Murphy's report as it related to the valuation of Ovitz's options and the present value calculation of the cash portion of the NFT payment.[FN396] Dunbar's conclusion with respect to the market's overwhelmingly positive reaction to Ovitz's hiring is not unassailable, but is nonetheless well-supported by the evidence and based upon accepted methods of analysis. [FN397] With respect to his opinion that a reduced or discounted option expiration date is appropriate when performing a Black-Scholes valuation of the options, Dunbar's testimony at trial was thorough and convincing.[FN398] Accordingly, Dunbar's Black-Scholes calculations are more valuable and persuasive than those performed by Professor Murphy and will be useful in evaluating the defendants' actions.

FN396. *See* DTE 428 (Dunbar report). I have omitted any discussion regarding Professor Murphy's opinion regarding the appropriate discount rate (together with Dunbar's response thereto) because there is no evidence in the record that would indicate that any of the defendants in this action exercised any discretion whatsoever in determining the discount rate applied to the cash payment received by Ovitz as a result of the NFT. Without that evidence connecting a defendant to that decision, I fail to see the current relevance of why other discount rates might have been appropriate. Whichever Disney employees made the decision as to which discount rate to use, were they before the Court, would receive the protections of the business judgment rule. There is no evidence in the record that would impugn in any way the presumptions of care, loyalty, or good faith used by those employees in the business judgment of determining the appropriate discount rate. For that reason, an analysis of why a particular discount rate might have been more appropriate than the one selected is not germane to the issues to be decided herein. *See* Santaniello 149:16-154:14 (stating that he was unaware of how the discount rate was determined); PTE 130 (memo from the Company's Controller's office to Santaniello enclosing present value calculations at 6.5% and 6.75%); PTE 131 (demonstrating that the 6.5% discount rate was actually used in paying Ovitz).

FN397. DTE 428 at 3-9; Tr. 7287:6-7300:3; 7365:6-7448:16.

FN398. Tr. 7306:11-7333:16; 7448:17-7506:6. In contrast, Professor Murphy's explanation for using the latest possible termination date when valuing the options upon termination, based upon the fact that the exercisability of those options was extended, (in exchange for dropping the $50 million guarantee), and based upon an array of possible hedges, is not nearly as persuasive. *See* Tr. 823:18-830:20; 964:19-972:20.

II. LEGAL STANDARDS

The outcome of this case is determined by whether the defendants complied with their fiduciary duties in connection with the hiring and termination of Michael Ovitz. At the outset, the Court emphasizes that the best practices of corporate governance include compliance with fiduciary duties.[FN399] Compliance with fiduciary duties, however, is not always enough to meet or to satisfy what is expected by the best practices of corporate governance.

FN399. All good corporate governance practices include compliance with statutory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Page 56

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability. But they are not required by the corporation law and do not define standards of liability.
*Brehm v. Eisner,* 746 A.2d 244, 256 (Del.2000).

***31** The fiduciary duties owed by directors of a Delaware corporation are the duties of due care and loyalty.[FN400] Of late, much discussion among the bench, bar, and academics alike, has surrounded a so-called third fiduciary duty, that of good faith. Of primary importance in this case are the fiduciary duty of due care and the duty of a director to act in good faith. Other than to the extent that the duty of loyalty is implicated by a lack of good faith, the only remaining issues to be decided herein with respect to the duty of loyalty are those relating to Ovitz's actions in connection with his own termination. [FN401] These considerations will be addressed *seriatim,* although issues of good faith are (to a certain degree) inseparably and necessarily intertwined with the duties of care and loyalty, as well as a principal reason the distinctness of these duties make a difference-namely § 102(b)(7) of the Delaware General Corporation Law.[FN402]

FN400. The Delaware Supreme Court has been clear that outside the recognized fiduciary duties of care and loyalty (and perhaps good faith), there are not other fiduciary duties. In certain circumstances, however, specific applications of the duties of care and loyalty are called for, such as so-called "*Revlon* " duties and the duty of candor or disclosure. *See Malpiede v. Townson,* 780 A.2d 1075, 1083, 1086 (Del.2001); *Paramount Communications Inc. v. QVC Network, Inc.,* 637 A.2d 34, 43 (Del.1994). ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, 'the directors must act in accordance with their fundamental duties of care and loyalty.' ") (citation omitted)).

FN401. *See In re The Walt Disney Co. Derivative Litig. ("Disney III"),* 2004 WL 2050138, at *7 (Del.Ch. Sept.10, 2004); *Brehm,* 746 A.2d at 257-58.

FN402. Perhaps these categories of care and loyalty, so rigidly defined and categorized in Delaware for many years, are really just different ways of analyzing the same issue. Professor Sean Griffith said it best when he recently wrote:
At first glance, the duties of care and loyalty appear quite distinctive....
A bit of digging beneath these surface differences, however, reveals the richly interconnected roots of the two doctrinal paradigms. Start with the duty of care: directors must conduct themselves as ordinarily prudent persons managing their own affairs. So far so good, but a moment's reflection reveals that an ordinarily prudent person becomes an ordinarily prudent director only once we assume an element of loyalty. How do ordinarily prudent directors conduct their affairs? A decision is taken with due care, when from an array of alternatives, the directors employ a procedure to pick the one that best advances *the interests of the corporation.* Now pause for a moment to consider what a funny way this is of conceiving what an ordinarily prudent person would do *in the conduct of her own affairs.* We might typically assume that an ordinarily prudent person, in evaluating a set of alternatives, picks the one that provides the most benefit and least cost to *herself.* A director's decision-making process, however, can be evaluated only by changing the referent from herself to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

> corporation. The question of prudence, in other words, is framed with a tacit element of loyalty.
>
> ....
>
> ... [Shareholders and courts] are worried about the directors' loyalty because we are concerned that their disloyalty will result in a poor bargain for the corporation. We are concerned, in other words, that conflicted directors will strike bargains for the corporation that an ordinarily prudent person would not strike for herself. This can be seen most clearly if the non-arms-length transactions that raise duty of loyalty concerns are imagined as arms-length transactions with third parties. Would an ordinarily prudent person lease a corporate asset to a third party on exceedingly generous terms? Would an ordinarily prudent person lavish compensation on a third party and permit the third party to divert investment opportunities that would otherwise come her way? These are duty of loyalty concerns framed as duty of care questions. The phrasing is natural because, at its core, the duty of loyalty is just a bet that some situations are likely to lead to careless or imprudent transactions for the corporation, which is to say that the duty of care is a motivating concern for the duty of loyalty. Here again the duties overlap.
>
> Sean J. Griffith, *Good Faith Business Judgment: A Theory of Rhetoric in Corporate Law Jurisprudence,* 55 Duke L.J. (forthcoming 2005) (manuscript of May 25, 2005 at 39-42 available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=728431) (emphasis in original, citations omitted).

*A. The Business Judgment Rule*

A comprehensive review of the history of the business judgment rule is not necessary here, but a brief discussion of its boundaries and proper use is appropriate. Delaware law is clear that the business and affairs of a corporation are managed by or under the direction of its board of directors. FN403 The business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation.FN404 Because courts are ill equipped to engage in *post hoc* substantive review of business decisions, the business judgment rule "operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." FN405

FN403. 8 *Del. C.* § 141(a).

FN404. *See Zapata Corp. v. Maldonado,* 430 A.2d 779, 782 (Del.1981).

FN405. *Cede & Co. v. Technicolor, Inc.* (" *Cede III*" ), 634 A.2d 345, 360 (Del.1993) (citing *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del.1988)).

The business judgment rule is not actually a substantive rule of law, FN406 but instead it is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, ... and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." FN407 This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on the part of the directors.FN408 In the absence of this evidence, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose." FN409 When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste.FN410

FN406. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995) (citing *Cede III,* 634 A.2d at 360); *see Emerald Partners v. Berlin,* 787 A.2d 85, 90-91 (Del.2001); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1374 (Del.1995).

FN407. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). In *Smith v. Van Gorkom,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 59 of 92

Not Reported in A.2d Page 58

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

the Delaware Supreme Court clarified that "the presumption that the directors acted in good faith [is] irrelevant in determining the threshold issue of whether the directors as a Board exercised an informed business judgment." 488 A.2d 858, 889 (Del.1985). In *In re Holly Farms Corp. S'holders Litig.*, the Court of Chancery denied the protections of the business judgment rule to a board of directors' agreement to a lock up because it was "the product of a fundamentally flawed process and cannot be in the interests of the stockholders." 1988 WL 143010, at *6 (Del.Ch. Dec.30, 1988).

FN408. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988); *Cede III,* 634 A.2d at 360. In *Gagliardi,* Chancellor Allen described the policy rationale for the business judgment rule in the paragraph quoted below. Although this statement, made in 1996, may at first appear to be undercut by the increased incentive compensation of the dot-com era, the rationale still applies because of the relatively small percentages of stock held by officers and directors of public companies.

Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolisly risky! stupidly risky! egregiously risky--you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects. Given this disjunction, only a very small probability of director liability based on "negligence", "inattention ", "waste", etc. could induce a board to avoid authorizing risky investment projects to any extent! Obviously, it is in the shareholders' economic interest to offer sufficient protection to directors from liability for negligence, etc., to allow directors to conclude that, as a practical matter, there is no risk that, if they act in good faith and meet minimalist proceduralist standards of attention, they can face liability as a result of a business loss.

*Gagliardi v. TriFoods Int'l Inc.,* 683 A.2d 1049, 1052 (Del.Ch.1996).

FN409. *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971); *see also Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985).

FN410. *In re J.P. Stevens & Co., Inc. S'holders Litig.,* 542 A.2d 770, 780 (Del.Ch.1988).

This presumption can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction.[FN411] In that event, the burden shifts to the director defendants to demonstrate that the challenged transaction was "entirely fair" to the corporation and its shareholders.[FN412]

FN411. *Emerald Partners,* 787 A.2d at 91.

FN412. *Id.* In certain circumstances, the burden can shift back to the plaintiffs in the event of ratification by disinterested directors or shareholders. *See Solomon v. Armstrong,* 747 A.2d 1098, 1111, 1113-17 (Del.Ch.1999), *aff'd,* 746 A.2d 277 (Del.2000).

In *Van Gorkom,* the Delaware Supreme Court analyzed the Trans Union board of directors *as a whole* in determining whether the protections of the business judgment rule applied.[FN413] More recent cases understand that liability determinations must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Page 60 of 92

Not Reported in A.2d Page 59

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

be on a director-by-director basis. In *Emerging Communications,* Justice Jacobs wrote (while sitting as a Vice Chancellor) that the "liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." FN414 There is a not significant degree of tension between these two positions, notwithstanding the procedural differences between the two cases.

FN413. *Van Gorkom,* 488 A.2d at 889.

FN414. *In re Emerging Communications Inc. S'holders Litig.,* 2004 WL 1305745, at *38 (Del.Ch. Jun.4, 2004).

***32** Even if the directors have exercised their business judgment, the protections of the business judgment rule will not apply if the directors have made an "unintelligent or unadvised judgment." FN415 Furthermore, in instances where directors have not exercised business judgment, that is, in the event of director inaction, the protections of the business judgment rule do not apply.FN416 Under those circumstances, the appropriate standard for determining liability is widely believed to be gross negligence,FN417 but a single Delaware case has held that ordinary negligence would be the appropriate standard.FN418

FN415. *Mitchell v. Highland-Western Glass,* 167 A. 831, 833 (Del.Ch.1933); *Van Gorkom,* 488 A.2d at 872.

FN416. *Aronson,* 473 A.2d at 813. This is not to say that all director inaction is not subject to the business judgment rule. As the *Aronson* Court noted, *"a conscious decision to refrain from acting* may nonetheless be a valid exercise of business judgment." *Id.* (emphasis added).

FN417. *See Seminaris v. Landa,* 662 A.2d 1350 (Del.Ch.1995); *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268 (Del.Ch.1995).

FN418. *Rabkin v. Philip A. Hunt Chem. Corp.,* 1987 WL 28436, at *1-3 (Del.Ch. Dec.17, 1987). *See Graham v. Allis-Chalmers Mfg. Co.,* 188 A.2d 125, 130 (Del.1963). I confess to being mystified why plaintiffs did not cite *Rabkin* and its lower standard of liability when they did cite *Aronson* for the proposition that the business judgment rule does not apply to director inaction, as well as a bankruptcy decision that heavily relied upon *Rabkin. See Pereira v. Cogan,* 294 B.R. 449 (S.D.N.Y.2003), *vacated and remanded sub nom. Pereira v. Farace,* 413 F.3d 330, 2005 WL 1532318 (2d Cir. June 30, 2005). A similar mystery confronted then-Vice Chancellor Berger in *Rabkin,* where she wrote:

Both parties agree that liability must be predicated upon a finding of gross negligence. As a result, the Court did not have the benefit of what it assumed would be plaintiffs' arguments in support of the Court's original ruling [that ordinary negligence was the appropriate standard] and the Court is left in the unenviable position of deciding against both parties.

1987 WL 28436, at *2. It also bears noting that no Delaware decision (until this one) has cited *Rabkin,* decided roughly eighteen years ago, and it would appear that *Seminaris, In re Baxter Int'l,* and *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959 (Del.Ch.1996), have since eclipsed *Rabkin* by implicitly accepting that gross negligence is the appropriate standard even in cases of alleged director inaction and lack of oversight.

*B. Waste*

Corporate waste is very rarely found in Delaware courts because the applicable test imposes such an onerous burden upon a plaintiff-proving "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." FN419 In other words, waste is a rare, "unconscionable case[ ] where directors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Page 61 of 92

Not Reported in A.2d Page 60

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

irrationally squander or give away corporate assets." FN420

FN419. *Brehm,* 746 A.2d at 263; *In re The Walt Disney Co. Derivative Litig.* (*"Disney I"* ), 731 A.2d 342, 362 (Del.Ch.1998) (quoting *Glazer v. Zapata Corp.,* 658 A.2d 176, 183 (Del.Ch.1993)).

FN420. *Brehm,* 746 A.2d at 263.

The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith.FN421 It is not necessarily true, however, that every act of bad faith by a director constitutes waste. For example, if a director acts in bad faith (for whatever reason), but the transaction is one in which a businessperson of ordinary, sound judgment concludes that the corporation received adequate consideration, the transaction would not constitute waste. FN422

FN421. *See White v. Panic,* 783 A.2d 543, 553-55 (Del.2001) (citing *J.P. Stevens,* 542 A.2d at 780-81).

FN422. Nevertheless, if the director acted in bad faith, it would be extraordinarily difficult for the defendant directors to prove that the transaction was entirely fair to the corporation because it would be difficult to demonstrate fair process. *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983).

*C. The Fiduciary Duty of Due Care*

The fiduciary duty of due care requires that directors of a Delaware corporation "use that amount of care which ordinarily careful and prudent men would use in similar circumstances," FN423 and "consider all material information reasonably available" in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent. FN424 Chancellor Allen described the two contexts in which liability for a breach of the duty of care can arise:

FN423. *Graham,* 188 A.2d at 130.

FN424. *Brehm,* 746 A.2d at 259; *Official Comm. Of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins, et al.* (*"IHS"* ), 2004 WL 1949290, at *9 n. 37 (Del.Ch. Aug.24, 2004); *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at *12 (Del.Ch. Jan.10, 2003) . In *Cede III,* the Supreme Court affirmed and adopted Chancellor Allen's "presumed findings" that the directors of Technicolor " were grossly negligent in failing to reach an informed decision when they approved the agreement of merger, and ... thereby breached their duty of care." 634 A.2d at 366. By way of example, a board of directors need not read *"in haec verba* every contract or legal document that it approves, but if it is to successfully absolve itself from charges of [violations of the duty of care], there must be some credible evidence that the directors knew what they were doing, and ensured that their purported action was given effect." *Van Gorkom,* 488 A.2d 858, 883 n. 25 (Del.1985).

First, such liability may be said to follow *from a board decision* that results in a loss because that decision was ill advised or "negligent". Second, liability to the corporation for a loss may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss.FN425

FN425. *Caremark,* 698 A.2d at 967 (emphasis in original).

Chancellor Allen then explained with respect to board decisions:

... [These] cases will typically be subject to review under the director-protective business judgment rule, assuming the decision made was the product of *a process* that was *either* deliberately considered in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d Page 61

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

good faith or was otherwise rational. What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to " egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests. To employ a different rule-one that permitted an "objective" evaluation of the decision-would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions.

***33** Indeed, one wonders on what moral basis might shareholders attack a *good faith* business decision of a director as "unreasonable" or "irrational". Where a director *in fact exercises a good faith effort to be informed and to exercise appropriate judgment,* he or she should be deemed to satisfy fully the duty of attention.[FN426]

FN426. *Id.* at 967-68 (internal citations and footnotes omitted, emphasis in original).

With respect to liability for director inaction, Chancellor Allen wrote that in order for the inaction to be so great as to constitute a breach of the director's duty of care, a plaintiff must show a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight." [FN427] The Chancellor rationalized this extremely high standard of liability for violations of the duty of care through inaction by concluding that:

FN427. *Id.* at 971.

[A] demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors.[FN428]

FN428. *Id.* (emphasis in original).

In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a " 'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.' " [FN429] Because duty of care violations are actionable only if the directors acted with gross negligence,[FN430] and because in most instances money damages are unavailable to a plaintiff who could theoretically prove a duty of care violation,[FN431] duty of care violations are rarely found.

FN429. *Tomczak v. Morton Thiokol, Inc.,* 1990 WL 42607, at *12 (Del.Ch. Apr.5, 1990) (quoting *Allaun v. Consol. Oil Co.,* 147 A. 257, 261 (Del.Ch.1929), and citing *Gimbel v. Signal Cos., Inc.,* 316 A.2d 599, 615 (Del.Ch.), *aff'd,* 316 A.2d 619 (Del.1974)). For example, on a motion to dismiss, in order for a plaintiff to successfully plead that the directors acted with gross negligence (as opposed to regular negligence), the plaintiff should articulate "facts that suggest a *wide* disparity between the process the directors used ... and that which would have been rational." *Guttman v. Huang,* 823 A.2d 492, 507 n. 39 (Del.Ch.2003) (emphasis in original).

FN430. *Brehm,* 746 A.2d at 259.

FN431. *See* 8 *Del. C.* § 102(b)(7).

*D. The Fiduciary Duty of Loyalty*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d Page 62

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

The fiduciary duty of loyalty was described in the seminal case of *Guth v. Loft, Inc.*, in these strict and unyielding terms:

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.[FN432]

FN432. 5 A.2d 503, 510 (Del.1939).

More recently, the Delaware Supreme Court stated that there is no safe-harbor for divided loyalties in Delaware,[FN433] and that the duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take[ ] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." [FN434] The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders.[FN435]

FN433. *Weinberger,* 457 A.2d at 710.

FN434. *Cede III,* 634 A.2d at 361 (citing *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984)).

FN435. *Id.* at 362 (citing *Nixon v. Blackwell,* 626 A.2d 1366, 1375 (Del.1993)).

***34** In the specific context at issue here with respect to a classic duty of loyalty claim, Ovitz, as a fiduciary of Disney, was required to act in an " adversarial and arms-length manner" when negotiating his termination and not abuse or manipulate the corporate process by which that termination was granted.[FN436] He was obligated to act in good faith and "not advantage himself at the expense of the Disney shareholders." [FN437]

FN436. *In re The Walt Disney Co. Derivative Litig.* (*"Disney II"* ), 825 A.2d 275, 290 (Del.Ch.2003); *Disney III,* 2004 WL 2050138, at *7.

FN437. *Disney II,* 825 A.2d at 290; *see IHS,* 2004 WL 1949290, at *16.

*E. Section 102(b)(7)*

Following the Delaware Supreme Court's landmark decision in *Van Gorkom,* [FN438] the Delaware General Assembly acted swiftly to enact 8 *Del. C.* § 102(b)(7).[FN439] Section 102(b)(7) states that a corporation may include in its certificate of incorporation:

FN438. 488 A.2d 858.

FN439. 65 Del. Laws, c. 289 (1986).

(7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective. All references in this paragraph to a director shall also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006

Not Reported in A.2d Page 63

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705
**(Cite as: Not Reported in A.2d)**

be deemed to refer (x) to a member of the governing body of a corporation which is not authorized to issue capital stock, and (y) to such other person or persons, if any, who, pursuant to a provision of the certificate of incorporation in accordance with § 141(a) of this title, exercise or perform any of the powers or duties otherwise conferred or imposed upon the board of directors by this title.

The purpose of Section 102(b)(7) was explained by the Delaware Supreme Court in this manner:

The purpose of Section 102(b)(7) was to *permit shareholders*-who are entitled to rely upon directors to discharge their fiduciary duties at all times-to adopt a provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations and certain other conduct.[FN440]

FN440. *Emerald Partners,* 787 A.2d at 90 (emphasis in original); *see Malpiede,* 780 A.2d at 1095.

Recently, Vice Chancellor Strine wrote that, "[o]ne of the primary purposes of § 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith." [FN441] Or in other words, § 102(b)(7) is most useful "when, despite the directors' good intentions, [the challenged transaction] did not generate financial success and ... the possibility of hindsight bias about the directors' prior ability to foresee that their business plans would not pan out" could improperly influence a *post hoc* judicial evaluation of the directors' actions.[FN442]

FN441. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 777 (Del.Ch.2004).

FN442. *Id.*

***35** The vast majority of Delaware corporations have a provision in their certificate of incorporation that permits exculpation to the extent provided for by § 102(b)(7). This provision prohibits recovery of monetary damages from directors for a successful shareholder claim, either direct or derivative, that is exclusively based upon establishing a violation of the duty of due care.[FN443] The existence of an exculpation provision authorized by § 102(b)(7) does not, however, eliminate a director's fiduciary duty of care, because a court may still grant injunctive relief for violations of that duty. [FN444]

FN443. *Emerald Partners,* 787 A.2d at 91.

FN444. *Malpiede,* 780 A.2d at 1095; E. Norman Veasey, et al., *Delaware Supports Directors With a Three-Legged Stool of Limited Liability, Indemnification, and Insurance,* 42 Bus. Law. 399, 403 (1987) ( "[S]ection 102(b)(7) does not eliminate the duty of care that is properly imposed upon directors. Directors continue to be charged under Delaware law with a duty of care in the decisionmaking process and in their oversight responsibilities. The duty of care continues to have vitality in remedial contexts as opposed to actions for personal monetary damages against directors as individuals."). *Cf. Strassburger v. Earley,* 752 A.2d 557, 581 (Del.Ch.2000) (holding that rescissory damages, although an equitable remedy, is not appropriate for breaches solely of the duty of care).

An exculpation provision such as that authorized by § 102(b)(7) is in the nature of an affirmative defense.[FN445] As a result, it is the burden of the director defendants to demonstrate that they are entitled to the protections of the relevant charter provision.[FN446]

FN445. *Emerald Partners,* 787 A.2d at 91-92.

FN446. *See id.; Emerging Communications,* 2004 WL 1305745, at *42.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&destination=atp&prid=A005580... 6/30/2006