IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                               :
RONALD CANTOR, IVAN SNYDER and                 :
JAMES A. SCARPONE, as TRUSTEES OF              :
THE MAFCO LITIGATION TRUST,                    :
                                               :
                    Plaintiffs,                :
                                               :
         - against -                           :
                                               :   C.A. No. 97-586-KAJ
RONALD O. PERELMAN,                            :
MAFCO HOLDINGS INC.,                           :
MacANDREWS & FORBES HOLDINGS INC.,             :
ANDREWS GROUP INCORPORATED,                    :
WILLIAM C. BEVINS and                          :
DONALD G. DRAPKIN,                             :
                                               :
                    Defendants.                :
                                               :
------------------------------------------------------------x
```

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF LAWRENCE A. HAMERMESH AND CERTAIN OPINIONS OF ROBERT W. HOLTHAUSEN

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
ASHBY & GEDDES
222 Delaware Avenue
Wilmington, Delaware 19899
(302) 654-1888

Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

Dated:   June 30, 2006

## TABLE OF CONTENTS

Page

ARGUMENT .................................................................................................................1

I.    PROFESSOR HAMERMESH'S OPINION REGARDING DELAWARE
      CORPORATION LAW CONCERNS AN ISSUE OF LAW, NOT
      AN ISSUE OF FACT ............................................................................................1

II.   HOLTHAUSEN'S OPINION IS BASED ON AN INCORRECT VIEW OF
      DELAWARE LAW CONCERNING DAMAGES FOR BREACH OF
      FIDUCIARY DUTY...............................................................................................6

      A.    Marvel's Damages Should Be Measured As Of The Time Of The Actual
            Harm To Marvel, Even If That Harm Occurred After Defendants'
            Breach Of Fiduciary Duty...........................................................................7

      B.    That Marvel Shareholders And Creditors Allegedly Could Have
            Sold Their Investments After The Notes Were Issued Is
            Irrelevant To The Measure of Damages Suffered By Marvel ..................12

      C.    Plaintiffs Agree With Defendants That The Court Has Discretion To
            Defer Decision Until There Is A Fuller Record At Trial ...........................14

CONCLUSION...........................................................................................................15

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Adlerstein v. Wertheimer*,
    C.A. No. 19101, 2002 WL 205684 (Del. Ch. Jan. 25, 2002) ...................................5

*Albert v. Alex Brown Mgmt Servs., Inc.*,
    C.A. No. 762, 2005 WL 1594085 (Del. Ch. June 29, 2005) ..........................13, 14

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
    891 A.2d 150 (Del. Ch. 2005).................................................................................4, 5

*Blasius Indus. v. Atlas Corp.*,
    564 A.2d 651 (Del. Ch. 1988)....................................................................................3

*Bomarko, Inc. v. Int'l Telecharge, Inc.*,
    794 A.2d 1161 (Del. Ch. 1999)......................................................................8, 9, 10,

*Canada S. Oils, Ltd., v. Manabi Exploration Co.*,
    96 A.2d 810 (Del. Ch. 1953)..................................................................................3, 4

*Cantor v. Perelman*,
    414 F.3d 430 (3d Cir. 2005).......................................................................................3

*Cede & Co. v. Technicolor, Inc.*,
    634 A. 2d 345 (Del. 1993) ...............................................................................3, 6, 9

*Cole v. Kershaw*,
    C.A. No. 13904, 2000 WL 1206672 (Del. Ch. Aug. 15, 2000)..............................10

*Condec Corp. v. Lunkenheimer Co.*,
    230 A.2d 769 (Del. Ch. 1967)....................................................................................3

*Elder v. Holloway*,
    510 U.S. 510 (1994)....................................................................................................1

*Elder v. Holloway*,
    984 F.2d 991 (9th Cir. 1993) .....................................................................................1

*Freedman v. Rest. Assocs. Indus., Inc.*,
    C.A. No. 9212, 1987 WL 14323 (Del. Ch. Oct. 6, 1987).........................................3

*Gentile v. Rossette*,
    C.A. No. 20213-NC, 2005 WL 2810683 (Del. Ch. Oct. 20, 2005) .......................10

*Glazer v. Zapata Corp.,*
    658 A.2d 176 (Del. Ch. 1993)..................................................................5

*In re The Mony Group, Inc. Shareholder Litigation,*
    853 A.2d 661 (Del. Ch. 2004)................................................................13

*In re Walt Disney Co. Derivative Litig.,*
    C.A. No. 15452-NC, 2004 WL 550750 (Del. Ch. Mar. 9, 2004) ..........2

*Mendel v. Carroll,*
    651 A.2d 297 (Del. Ch. June 1994) .......................................................3

*Milbank, Tweed, Hadley & McCloy v. Boon,*
    13 F.3d 537, 543 (2d Cir. 1994) ............................................................9

*Onti, Inc. v. Integra Bank,*
    751 A.2d 904 (Del. Ch. 1999)................................................................2

*Strassburger v. Early,*
    752 A.2d 557 (Del. Ch. 2000)..............................................................10

*Thorpe v. CERBCO, Inc.,*
    676 A.2d 436 (Del. 1996) ......................................................................8

*United States v. Leo,*
    941 F.2d 181 (3d Cir. 1991)...................................................................2

## OTHER AUTHORITIES

Dan B. Dobbs, *Law of Remedies* (2d ed. 1993) .................................................11

Plaintiffs respectfully submit this Reply Memorandum in response to Defendants' Brief in Opposition to Plaintiffs' Motion to Exclude the Testimony of Lawrence A. Hamermesh and Certain Opinions of Robert W. Holthausen ("Def. Br.") and in further support of their motion.

## ARGUMENT

### I.

### PROFESSOR HAMERMESH'S OPINION REGARDING DELAWARE CORPORATION LAW CONCERNS AN ISSUE OF LAW, NOT AN ISSUE OF FACT

Defendants argue that Professor Hamermesh's opinion regarding Delaware corporation law in 1993-94, when the Note transactions occurred, is an issue of fact, not an issue of law. While conceding that "as a general matter, an expert cannot testify as to the law," defendants nonetheless insist that there is a "law as fact" exception to this rule – that is, legal opinion testimony is permissible when it concerns "a historic issue of law that serves as a 'fact.'" (Def. Br. at 18.) No such exception exists. Rather, defendants are "adding a new term to the argot of jurisprudence: 'legal facts.' The term is as self-contradictory and nonsensical as the doctrine it supports." *Elder v. Holloway*, 984 F.2d 991, 992 (9th Cir. 1993) (Kozinski, J., dissenting). As the Supreme Court noted (agreeing with Judge Kozinski and overruling the Ninth Circuit), whether a legal right "was clearly established at a particular time . . . presents a question of law, not one of 'legal facts. . . .'" *Elder v. Holloway*, 510 U.S. 510, 516 (1994).

Defendants suggest that because another one of their experts, Peter Fowler, relies upon Hamermesh's legal opinion, and because plaintiffs' expert Bevis Longstreth opines that independent Marvel directors would have consulted with counsel,

the Court "should consider what the parties would have reasonably understood the law to be at that time." (Def. Br. at 19.)  While the Court doubtless will consider the state of the law during the relevant period, that does not make it an issue of fact.  The Court is fully equipped to determine what the law was without the aid of expert testimony.  *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991) (expert testimony as to "what the law required" inadmissible).

The case of *Onti, Inc. v. Integra Bank*, 751 A.2d 904 (Del. Ch. 1999) – which defendants contend illustrates the "law as fact" exception – does not change the rule prohibiting expert legal opinions.  In *Onti*, an appraisal proceeding, Hamermesh and former Chancellor Brown opined on the value of certain derivative suits.  *Id.* at 931.  The expert opinions in *Onti*, however, were not legal opinions.  While they may have taken into account background legal principles (akin to what Longstreth does in his report), the expert opinions in *Onti* were not offered for the sole purpose of explicating the state of the law – which is all that Hamermesh purports to do here.  Had Hamermesh been offering nothing more than his opinion on Delaware law in *Onti*, his testimony would have been inadmissible.  *See, e.g., In re Walt Disney Co. Derivative Litig.*, C.A. No. 15452-NC, 2004 WL 550750, at *1 (Del. Ch. Mar. 9, 2004) ("In this Court, witnesses do not opine on Delaware corporate law.") (Ex. A to Plaintiffs' Compendium, D.I. 471).  By the same token, Hamermesh's bare legal opinions here should be excluded.

The exclusion of Hamermesh's proposed testimony is especially warranted because his legal opinion is at odds with the actual state of Delaware law. Hamermesh argues that Section 4.09 of each Indenture largely duplicates the effect of Delaware law in the absence of such Indenture provision.  Section 4.09 of each Indenture,

as explained by the Third Circuit, "provides that the Marvel Holding Companies shall continue to hold a majority of Marvel's voting shares *(i.e., restricting Marvel's ability to issue stock that might dilute Perelman's stake)*." *Cantor v. Perelman,* 414 F.3d 430, 434 (3d Cir. 2005) (emphasis added). The restriction in Section 4.09 is absolute, and without regard to the purpose for which Marvel might seek to issue equity.

In contrast to the restriction in Section 4.09, Delaware law is clear that a corporate board may issue stock, even if it has the effect of diluting a majority shareholder, if it is acting in the best interests of the corporation. In 1993, the year of the first Note transaction, the Supreme Court of Delaware explained the duties of corporate directors with the statement that the "best interest of the corporation and its shareholders takes precedence over *any* interest possessed by a director, officer or controlling shareholder and not shared by stockholders generally." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993) (emphasis added). The only limitation placed on a board's ability to issue stock is that it may not act to entrench itself – that is, it may not act with the *primary* or *sole* purpose of eliminating a majority stockholder's voting control. The cases relied upon by Hamermesh say nothing more.[1]

---

[1] *See Mendel v. Carroll,* 651 A.2d 297, 298 (Del. Ch. June 1994) (rejecting stock issuance where "primary purpose" was to dilute controlling shareholder); *Blasius Indus. v. Atlas Corp.,* 564 A.2d 651, 659 (Del. Ch. 1988) (business judgment rule does not apply when "primary purpose" is to interfere with stockholder's vote); *Freedman v. Rest. Assocs. Indus., Inc.,* C.A. No. 9212, 1987 WL 14323, at *7 (Del. Ch. Oct. 6, 1987) (Ex. C to Plaintiffs' Compendium, D.I. 471) (rejecting transaction designed to "promote a change in control"); *Condec Corp. v. Lunkenheimer Co.,* 230 A.2d 769, 777 (Del. Ch. 1967) (rejecting transaction where "primary purpose" was to dilute majority shareholder); *Canada S. Oils, Ltd., v. Manabi Exploration Co.,* 96 A.2d 810, 813 (Del. Ch. 1953) (rejecting stock sale where "primary purpose" was to dilute plaintiff's majority voting control).

None of the cases cited by Hamermesh remotely suggest that corporate directors who are acting to benefit or save their corporation must change their course to avoid dilution of the majority shareholder. Indeed, one of the cases cited by Hamermesh explicitly illustrates the fallacy in his conclusion. In *Canada S. Oils, Ltd.*, 96 A.2d 810, the board had caused shares to be issued to obtain financing for the corporation. As a result, the majority shareholder lost his majority voting control. The majority shareholder sued the corporation to enjoin the voting of the newly-issued shares. The court explained that the "crucial issue" to be decided was whether the board's action was for the "primary purpose" of depriving the controlling shareholder of his voting control (in which case it would be unlawful) or whether the shares were issued to raise money to meet the corporation's "dire financial plight" (in which case the plaintiff's loss of voting control would not be an actionable consequence). *Id.* at 812-813. On the evidence presented, the court found that the "primary purpose" was to deprive plaintiffs of majority voting control, and thus the injunction was issued. But the decision makes clear that where a board takes action for a legitimate purpose, such action is not unlawful because it has the effect of divesting the majority shareholder of control.

The recent decision of the Delaware Court of Chancery in *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150 (Del. Ch. 2005), also illustrates this point. There, the court approved the issuance of stock that diluted the majority shareholder, finding that the board "had valid reasons to use equity as opposed to debt financing." *Id.* at 189; *see also* Rebuttal Report of Justice Joseph T. Walsh, Retired, Mar. 1, 2006 ¶ 16 (D.I. 469, A283) (where directors "are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they

4

could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control"). At his deposition, Hamermesh suggested that the Court of Chancery had made a mistake (Hamermesh Dep. 33:9-16, D.I. 472, Ex. 4) and defendants now contend that *Benihana* is not relevant because it was decided in 2005, and therefore does not represent the state of the law during the 1993-1996 period. (Def. Br. at 21 n.5.)

To the contrary, *Benihana* is based upon the same longstanding principles set forth in *Cede*: save for those limited circumstances where a board acts for the sole or primary purpose of entrenching itself and diluting the voting power of a particular shareholder, the interests of the corporation are paramount to the interests of any shareholder. *See also Glazer v. Zapata Corp.*, 658 A.2d 176, 186 (Del. Ch. 1993) (directors may not engage in transactions "designed and pursued for the primary purpose of diluting the votes held by the insurgent stockholders" but there is no requirement that "management refrain from issuing voting securities, and thereby diluting the voting strength of insurgent stockholders, during the pendency of a proxy contest, when the issuance legitimately has a primary purpose directed to the management of the corporation and its business."). *Benihana* does not represent a change in the law, but rather a reaffirmation of what the law has always been.[2] Thus, Hamermesh's proposed

---

[2] Defendants contend that if the Court considers *Benihana*, it should also consider *Adlerstein v. Wertheimer*, C.A. No. 19101, 2002 WL 205684 (Del. Ch. Jan. 25, 2002) (Defendants' Compendium, D.I. 477). Like the cases cited by Hamermesh, *Adlerstein* stands for the unremarkable proposition that a board cannot act "with the purposeful effect of destroying [a shareholder's] voting control over the Company." *Id.* at *9. It does not mean that a board is prohibited from issuing shares when it is in the best interests of the corporation to do so, even if doing so might dilute a majority shareholder.

testimony is contrary to the basic precepts set forth in *Cede*, and there is no basis for Hamermesh to testify to such an incorrect legal conclusion.

## II.

### HOLTHAUSEN'S OPINION IS BASED ON AN INCORRECT VIEW OF DELAWARE LAW CONCERNING DAMAGES FOR BREACH OF FIDUCIARY DUTY

One of plaintiffs' experts, Jeffrey Baliban, submitted a report expressing his opinions concerning the actual damages suffered by Marvel as a result of the issuance of the Marvel Parent and Marvel III Notes with the Indenture restrictions applicable to Marvel. Baliban explains that the holding company note issuances limited Marvel's access to capital markets, interfered with Marvel's ability to issue equity and generally impeded Marvel's ability to obtain financing on terms in Marvel's best interest. Baliban opines that the Indenture covenants resulted in Marvel being unable to address a liquidity crisis in the fourth quarter of 1996 that led directly to Marvel's bankruptcy filing. Defendant Ronald O. Perelman himself acknowledged to the Marvel Board of Directors, in December 1996, that Marvel's bankruptcy filing was necessitated by constraints resulting from the holding company note issuances. Baliban estimates that the actual damages suffered by Marvel is in the range of $308 million to $617 million before interest.

In his rebuttal to Baliban, Holthausen argues that the "conceptually correct measure to estimate is the incremental expected costs of financial distress associated with the Indenture Covenants at the time the notes were issued." (Holthausen Rebuttal Report ¶ 7, D.I. 472, Ex. 7.) Holthausen disagrees with Baliban's opinion (and Delaware law)

6

that actual damages can be measured by considering the harm to Marvel actually caused by the Indenture covenants after the Notes were issued. Holthausen also argues that instead of looking at the harm to Marvel as a corporation, it is appropriate to evaluate the expectancy and options of Marvel's creditors and stockholders.

### A.    Marvel's Damages Should Be Measured As Of The Time Of The Actual Harm To Marvel, Even If That Harm Occurred After Defendants' Breach Of Fiduciary Duty

Holthausen's view, as plaintiffs explained in their opening brief, is based on an incorrect understanding of Delaware law. Under Delaware law, damages that are actually and proximately caused by tortious conduct, such as a breach of fiduciary duty, are measured by the actual harm incurred. In some cases the full extent of the harm caused by the breach of fiduciary occurs and can be measured at the time of the breach – for example, in the case of a corporate director who arranges a self-dealing merger at an unfair price, damages could be measured at the merger date as the difference between the consideration paid and the actual value.[3] In other cases, the harm occurs and would be measured after the date of the breach. For example, consider a situation where a director of XYZ Corp. accepts a $1,000 bribe from ABC in exchange for his promise to cause XYZ Corp. to buy ABC's above-market-price widgets. Such conduct would give rise to a claim by XYZ Corp. against the director for breach of his duty of loyalty. While the director's unjust enrichment would be measurable as of the date of the breach (*i.e.*, the $1,000 bribe), the company's actual damages would be measured based on how many

---

[3] It should be noted that in the hypothetical, as in the instant case, there would be a claim for unjust enrichment as well as, or as an alternative to, the damages claim. The wrongdoing director could be required to disgorge his gains from the improper conduct which could exceed the measure of actual damages.

7

widgets were purchased at above-market prices after the bribe was received. If such purchases occurred during a two-year period after the bribe, the measure of damages would necessarily require consideration of the economic harm suffered during that two-year period.

Thus, as plaintiffs noted in their opening brief, it is a settled tort law principle that "the proof of actual damage may extend to facts that occur and grow out of the injury, even up to the date of verdict." (Pl. Br. at 21-22.) Defendants do not and cannot present any authority that contradicts this basic principle of damages recoverable in tort cases. Rather, they contend that the principle does not apply to this case, and that damages for a breach of fiduciary duty are measured strictly by "the expectations at the time of the transactions and not the actual results that occurred later." (Def. Br. at 10.)

In defendants' view, the damages recoverable by plaintiffs in breach-of-fiduciary-duty cases would be more limited than the damages recoverable in other tort cases. Defendants, we submit, have it exactly backwards, as is made clear by *Bomarko* and other cases they rely on in their brief. The Delaware Court of Chancery explained in *Bomarko* that where, as here, "issues of loyalty are involved, potentially harsher rules [towards the disloyal fiduciary] come into play" because of the strong public policy interest in discouraging loyalty. *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000); *see also Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) ("Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly . . . 'Breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen

normally stringent requirements of causation and damages.'") (quoting *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)).

Defendants' attempts to steer the Court away from these fundamental principles are all unavailing. First, they suggest that the Court should disregard in the fiduciary context the principles regarding the measure of damages applicable to torts generally by taking a snippet out of context from *Cede*, 634 A.2d at 370: "a tort action[] does not control a claim for breach of fiduciary duty." The *Cede* court was not talking about damages, but rather was making the point that the burden of proof analysis for a breach of fiduciary duty is different than for other torts. *Cede* in no way suggested that the measure of damages for a breach of fiduciary duty would be different, let alone more restricted, than for other torts.

Next defendants argue that *Bomarko* supports Holthausen's view that it is appropriate to exclude consideration of the harm Marvel actually suffered after the Notes were issued. (Def. Br. at 9-10.) In fact, *Bomarko* is irreconcilable with Holthausen's opinion. In *Bomarko*, defendant Haan, the chairman and CEO of ITI, violated his duty of loyalty in May 1992 by, among other things, interfering with ITI's ability to restructure its debt. As a result, the company had to restructure its debt in November 1992, and eventually merged with a Haan-related entity in March 1993. Because Haan's breach of duty occurred in May 1992, under Holthausen's logic the *Bomarko* court would have restricted the measure of damages to the change in the value of the plaintiffs' shares as of that date. But that is not what happened. Instead, the Court of Chancery measured damages taking into account what the plaintiffs' shares were worth in November 1992

and March 1993. 794 A.2d at 1184.[4] Thus, *Bomarko* does not follow the Holthausen

approach, but rather calculated damages in accordance with the longstanding rule that

damages are based on actual injuries, whether such injuries occur simultaneously with, or

subsequent to, the tortfeasor's breach of duty.

          Defendants cite other cases involving mergers or share buybacks for the

proposition that damages are calculated as of the date of the "transaction." But in those

cases, the only harm the plaintiffs could have suffered occurred at the time of the

transaction. For example, in *Gentile v. Rossette*, C.A. No. 20213-NC, 2005 WL

2810683, at *9 (Del. Ch. Oct. 20, 2005) (Defendants' Compendium, D.I. 477), the

plaintiffs challenged a merger transaction where the director and controlling shareholder

breached his duty of loyalty by accepting a special benefit not made available to other

shareholders as an inducement to agree to a merger. The court calculated damages as of

the merger date because the only time the plaintiffs had suffered any harm was when they

did not receive adequate consideration for their shares. *See also Strassburger v. Early*,

752 A.2d 557, 579 (Del. Ch. 2000) (directors breached duties of loyalty by causing

corporation to repurchase holdings of two largest shareholders; damages calculated as of

repurchase date); *Cole v. Kershaw*, C.A. No. 13904, 2000 WL 1206672, at *9-*12 (Del.

Ch. Aug. 15, 2000) (Defendants' Compendium, D.I. 477) (partners breached fiduciary

---

    [4] Defendants also contend that *Bomarko* calculated damages without regard to
events occurring after Haan's breach of duty because it "looked to 'the contemporaneous
expectations of management' and rejected an analysis based on the company's 'actual
experience in the years following the Merger . . . .'" (Def. Br. at 10.) However, the
phrases that defendants extract out of *Bomarko* refer to the Court's assessment of a
discounted cash flow analysis proffered as evidence of ITI's value "at the time of the
Merger" -- *i.e.*, ten months after Haan's breach of duty. *Bomarko*, 794 A.2d at 1185.

obligations by entering into merger in 1993 and valuing plaintiff's interests as of 1991;
damages calculated based on value as of merger).  The fact that the injury in these
particular cases happened to be contemporaneous with the challenged transaction does
not mean that injury from a breach of fiduciary duty must always occur at the same time
as the transaction, or that actual harm suffered after the transaction should not be taken
into account when calculating damages.

Finally, defendants contend that Holthausen's opinion is consistent with "a
leading treatise" on remedies, citing Dan B. Dobbs, *Law of Remedies* § 3.3 at p. 301 (2d
ed. 1993), for the proposition that "[a]ll loss is represented by the difference in market
value before and after the tort . . . ."  Apparently, defendants would have the Court
believe that the treatise's reference to value as of the date of "the tort" is consistent with
Holthausen's opinion that Marvel's damages should be computed as of the date of the
breach of duty (*i.e.*, the Note issuances) and that the damage calculation should not take
into account Marvel's actual financial distress injuries during a time period post-dating
the Note issuances.  However, what the Dobbs treatise makes clear two sentences earlier
(and defendants overlook) is that "market or general damages close out the account
between the parties on . . . *the date of the harm in the case of a tort.*"  *Id.* (emphasis
added).  Holthausen's opinion does not consider injury occurring on "the date of the
harm" to Marvel.  To the contrary, Holthausen refuses to look past the dates of the Note
issuances to any injury occurring thereafter, and insists that Marvel's actual harm from
financial distress subsequent to the Note issuances should not even be taken into account.
Thus, Holthausen's theory is as much at war with the Dobbs treatise as it is with all other
sources of law on the principles governing the measure of damages in this case.

**B.    That Marvel Shareholders And Creditors Allegedly Could Have Sold Their Investments After The Notes Were Issued Is <u>Completely Irrelevant To The Measure Of Damages Suffered By Marvel</u>**

Holthausen decided to calculate Marvel's damages as of the time the Notes were issued because he assumed that "any Marvel shareholder or creditor who disliked the increased risk in their Marvel investment could have exited that investment." (Def. Br. at 13.)  This is a complete non sequitur.  Assuming Marvel's shareholders and creditors could have sold, that does not mean that the only harm Marvel suffered occurred at the time of the Note transactions.  Holthausen offers no explanation for why the ability of shareholders or creditors to sell their investments would have insulated Marvel from harm while the Notes were outstanding and the covenants restricting Marvel were still in place.

Defendants suggest that because there was a market for Marvel's shares, any diminution in the "market value" of the shares at the time the Notes were issued is the correct measure of damages to Marvel on the theory that "an alleged injury that affects all shareholders generally by reducing the corporation's market capitalization is an injury to the corporation."  (*Id.* at 14-15.)  But there is no reason why defendants' breaches of fiduciary duty would have caused a diminution in market value only as of the date the Notes were issued.  As explained in the expert report of Jeffrey Baliban, Marvel continued to suffer for years after the Notes were issued as a result of defendants' breaches of fiduciary duty.

In a totally new argument, defendants now contend that the Court will find Holthausen's analysis of the "risk assumed by Marvel's shareholders and creditors to be useful if the Court were required after trial to exercise its discretion regarding the form of

a remedy." (*Id.* at 15.) Specifically, they contend that it would be "inequitable" to award damages based on the harm Marvel suffered after the Notes were issued because Marvel's shareholders and creditors purportedly accepted the risks that arose from defendant's breaches of fiduciary duty by retaining their investments. (*Id.* at 16.)

This argument reinforces the inappropriateness of Holthausen's opinions based on his assumption of identity between Marvel and its "claimholders." First, Marvel as an entity, unlike its shareholders, had no choice as to whether to "accept" the risks of injury posed by the Indenture Covenants; rather, defendants unilaterally imposed those risks on Marvel without presenting any choices whatsoever to its Board of Directors. Second, it is irrelevant what risks a particular subset of Marvel's "claimholders" at the time of a particular Note issuance chose to accept because "[t]he board owes its fiduciary duties to the corporation and its stockholders, not merely to a set of stockholders as of a certain record date." *In re The Mony Group, Inc. Shareholder Litigation*, 853 A.2d 661, 676 (Del. Ch. 2004).

The only cased cited by defendants for the proposition that the Court should consider the risk allegedly assumed by Marvel's shareholders and creditors in measuring the damage to Marvel – *Albert v. Alex Brown Mgmt Servs., Inc.*, C.A. No. 762, 2005 WL 1594085 (Del. Ch. June 29, 2005) (Defendants' Compendium, D.I. 477) – is not at all on point. In that case, the plaintiffs were shareholders, not the corporation, and the issue was when does a claim accrue for statute of limitations purposes. Noting that the plaintiffs had decided "to ride the bubble" and not bring suit earlier while the value of their investments was rising, the Court of Chancery held that the claim was time barred because "a claim accrues at the time of the alleged wrongdoing, and not when the

plaintiff suffered a loss." *Id.* at *18. The court said nothing about the appropriate measure of damages if the claim had been timely, let alone how damages should be measured when the corporate entity has been harmed by the breach of duty.

In sum, whether Marvel's shareholders and creditors could have sold their investments in the wake of the Note transactions is completely irrelevant to the harm that Marvel ultimately suffered as a result of defendants' breaches of fiduciary duty. Holthausen's opinions based on that legally impermissible premise should be excluded in their entirety.

**C.     Plaintiffs Agree With Defendants That The Court Has Discretion To Defer Decision Until There Is A Fuller Record At Trial**

Defendants argue that Holthausen's testimony should not be excluded because "the Court should wait until after trial before broaching the issue of the appropriate framework for any monetary remedy." (Def. Br. 13.) Plaintiffs agree with defendants that the Court has discretion, especially in a bench trial, to defer decision as to the admissibility of an expert's testimony until there is a fuller record. If the Court accepts defendants' argument with respect to Holthausen, the same reasoning would apply to plaintiffs' experts, all of whom defendants are seeking to exclude.

## CONCLUSION

For the reasons set forth above and in their opening brief, plaintiffs respectfully request that the Court grant their motion to exclude: (a) in its entirety, the proposed testimony of Lawrence A. Hamermesh as reflected in the Hamermesh Report; and (b) those portions of the opinions of Robert W. Holthausen set forth in paragraphs 7 through 9 and 15 through 23, inclusive, of the Holthausen Rebuttal Report.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888

-and-

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP
Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

Dated: June 30, 2006
170961.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of June, 2006, **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF LAWRENCE A. HAMERMESH AND CERTAIN OPINIONS OF ROBERT W. HOLTHAUSEN** was hand delivered and electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

> Anthony W. Clark, Esquire
> Skadden Arps Slate Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE  19801

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

170085.1