IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                            :
RONALD CANTOR, IVAN SNYDER and              :
JAMES A. SCARPONE, as TRUSTEES OF           :
THE MAFCO LITIGATION TRUST,                 :
                                            :
                        Plaintiffs,         :     Civil Action No. 97-586 (KAJ)
                                            :
        - against -                         :
                                            :
RONALD O. PERELMAN,                         :
MAFCO HOLDINGS INC.,                        :
MacANDREWS & FORBES HOLDINGS INC.,          :
ANDREWS GROUP INCORPORATED,                 :
WILLIAM C. BEVINS and                       :
DONALD G. DRAPKIN,                          :
                                            :
                        Defendants.         :
                                            :
------------------------------------------------------------x
```

## JOINT PROPOSED PRETRIAL ORDER

Submitted by the Parties:   August 4, 2006

Pretrial Conference:        September 11, 2006 at 4:30 p.m.


This matter comes before the Court at a final pretrial conference held

pursuant to Rule 16, Federal Rules of Civil Procedure.

**Plaintiffs' Counsel:**

Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888

Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

**Defendants' Counsel**

Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

## TABLE OF CONTENTS

Page

I.     NATURE OF THE CASE ................................................................1

       A.     Plaintiffs' Statement.................................................1

       B.     Defendants' Statement ................................................5

II.    JURISDICTION ........................................................................8

III.   UNCONTROVERTED FACTS ........................................................9

IV.    ISSUES OF FACT THAT REMAIN TO BE LITIGATED ................................27

       A.     Issues of Fact Identified by Plaintiffs ................................27

       B.     Issues of Fact Identified by Defendants...............................29

V.     ISSUES OF LAW ......................................................................34

       A.     Issues of Law Identified by Plaintiffs ................................34

       B.     Issues of Law Identified by Defendants...............................37

VI.    WITNESSES ..........................................................................44

       A.     Plaintiffs' Witnesses ................................................44

       B.     Defendants' Witnesses ...............................................50

VII.   EXHIBITS ...........................................................................51

VIII.  DEPOSITION DESIGNATIONS.....................................................51

IX.    DAMAGES ...........................................................................51

       A.     Plaintiffs' Statement.................................................51

       B.     Defendants' Statement ...............................................52

X.     BIFURCATED TRIAL.................................................................52

XI.    TRIAL BRIEFS AND IN LIMINE REQUESTS .....................................52

XII.   LIMITATIONS, RESERVATIONS AND OTHER MATTERS ..........................52

XIII.  POST-TRIAL BRIEFING ............................................................52

TABLE OF CONTENTS -- CONTINUED

PLAINTIFFS' EXPERT REPORTS ......................................................... SCHEDULE A-1

DEFENDANTS' EXPERT REPORTS .................................................... SCHEDULE A-2

PLAINTIFFS' EXHIBITS IN EVIDENCE...............................................SCHEDULE B-1

DEFENDANTS' EXHIBITS IN EVIDENCE...........................................SCHEDULE B-2

PLAINTIFFS' DEPOSITION DESIGNATIONS ....................................SCHEDULE C-1

DEFENDANTS' DEPOSITION DESIGNATIONS ...............................SCHEDULE C-2

DEFENDANTS' MOTIONS IN LIMINE...............................................SCHEDULE D-1

PLAINTIFFS' RESPONSES TO
      DEFENDANTS' MOTIONS IN LIMINE...................................SCHEDULE D-2

I.    **Nature of the Case**

    A.    Plaintiffs' Statement

        This is an action for breach of fiduciary duty.  The action was commenced by Marvel Entertainment Group, Inc. ("Marvel"), as debtor-in-possession, in 1997. Plaintiffs are Ronald Cantor, Ivan Snyder and James Scarpone, as Trustees of The MAFCO Litigation Trust (the "Trust").  The Trust was created in or about July 1998 pursuant to the order of this Court and the plan of reorganization in the bankruptcy cases of Marvel and its affiliates.  Under that order and plan, the Trust is the assignee of Marvel's claims asserted herein against defendants.  The beneficiaries of the Trust are the former unsecured creditors and shareholders of Marvel as of the time the Trust was created.

        At all relevant times, Marvel was a public corporation with its shares traded on the New York Stock Exchange.  Defendant Ronald O. Perelman, through corporations he wholly owned directly or indirectly, owned at least a majority of Marvel's outstanding voting stock, and, as repeatedly stated in Marvel's SEC filings, Mr. Perelman was able to control Marvel and elect its entire Board of Directors.  Mr. Perelman himself was a director of Marvel and Chairman of the Board of Directors as well as the owner of, and a director of, the holding companies that issued the notes described herein.  At the time of the first note issuance, in April 1993, Mr. Perelman owned approximately 60% of Marvel's outstanding voting stock, and the public shareholders owned approximately 40%.  At the time of the second note issuance, in October 1993, and at all times thereafter through Marvel's bankruptcy filing in December 1996 and continuing until approximately June 1997, Mr. Perelman owned approximately

80.1% of Marvel's outstanding voting stock and the public shareholders owned approximately 20%.

In addition to Mr. Perelman, defendants are three corporations wholly owned, directly or indirectly, by Mr. Perelman – Mafco Holdings Inc. ("Mafco") (now known as MacAndrews & Forbes Holdings Inc.), MacAndrews & Forbes Holdings Inc. ("MacAndrews & Forbes") (now known as MacAndrews & Forbes Inc.) and Andrews Group Incorporated ("Andrews") – and two individuals – William C. Bevins and Donald G. Drapkin. Mr. Bevins and Mr. Drapkin were senior executives and directors of various companies in Mr. Perelman's corporate hierarchy (including the holding companies that issued the notes described herein) and also directors of Marvel during the time that Mr. Perelman controlled Marvel. Mr. Bevins was the CEO of Marvel.

In 1993 and 1994, Mr. Perelman and the other defendants caused the companies that held his Marvel stock (Marvel III Holdings Inc. ("Marvel III"), Marvel (Parent) Holdings Inc. ("Parent") and Marvel Holdings Inc. ("Holdings", and together with Marvel III and Parent, the "Marvel Holding Companies") to sell three tranches of notes (the "Notes")), raising $553.5 million for Perelman's personal use and providing no benefit to Marvel. Plaintiffs allege that defendants breached their fiduciary duties in multiple respects. *First*, by promising to restrict Marvel's financing activities in order to implement transactions that provided significant benefit to Mr. Perelman and no benefit whatsoever to Marvel. *Second*, by causing Marvel to participate in the road shows and due diligence and to take other action, such as providing its general counsel's 10b-5 opinion and its accountants' comfort letter – all of which was necessary to sell the Notes and raise half a billion dollars for Mr. Perelman's personal benefit. Simply put,

defendants (and Mr. Perelman, in particular) used their fiduciary positions for personal gain. *Third*, by failing to consider the actual, adverse consequences to Marvel of the Note transactions and Indenture restrictions, they failed to fulfill their most fundamental fiduciary duty, which is to act in the best interest of Marvel and protect Marvel and all of its shareholders.

Plaintiffs acknowledge that Mr. Perelman had a right to pledge his shares for a personal loan. But he did not have a right, in order to obtain a benefit for himself, to make promises through his corporate vehicles that he would not permit Marvel to engage in certain financing activities. Nor did Messrs. Perelman, Bevins and Drapkin have a right to use Marvel to provide assistance and support that was needed to effectuate the Note transactions. In making these promises and taking these actions, defendants breached their fiduciary duty because "*corporate officers and directors are not permitted to use their positions of trust and confidence to further their private interests.*" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (emphasis added) (*quoting Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)). Mr. Perelman's holding companies obtained $553.5 million dollars for Mr. Perelman personally on the strength of their promise that they would cause Marvel to comply with financial covenants – a promise that was meaningful precisely because Mr. Perelman was the Chairman of Marvel and (through the Holding Companies) Marvel's controlling shareholder.

Plaintiffs submit that Messrs. Perelman, Bevins and Drapkin failed to protect Marvel's interest when they used Marvel's resources to effectuate the Note transactions (and ignored the adverse consequences to Marvel of such transactions and restrictions). These transactions could not have been accomplished without Marvel's

assistance. Messrs. Perelman, Bevins and Drapkin were thus protecting Mr. Perelman, not Marvel. Mr. Perelman let his personal interest take precedence over Marvel's interest. Under settled Delaware law, this is a breach of fiduciary duty. As the Delaware Supreme Court has said, the "*duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.*" *Cede*, 634 A.2d at 361 (emphasis added; citations omitted).

When defendants repeatedly argue that Marvel was a bystander in the Note transactions and that there was no role for the Marvel Board, what they are really saying is that Mr. Perelman – not the Marvel Board – should decide whether Marvel should assist Mr. Perelman in completing the Note transactions, and Mr. Perelman – not the Marvel Board – should decide whether it is in Marvel's best interest to have Mr. Perelman's holding companies promise to restrict Marvel. Plaintiffs submit that defendants' view is completely inconsistent with Delaware law. And whether or not there was harm to the corporation resulting from defendants' breach of duty, the fiduciary must disgorge all gain flowing from the breach of duty.

Although defendants argue that the Notes and the Indenture restrictions had no impact on Marvel, the evidence – including Marvel's own SEC filings, Mr. Perelman's statements to the Marvel Board in December 1996, the statements and admissions by Howard Gittis who was the Vice Chairman of defendant MacAndrews & Forbes Holdings Inc., and the admissions of defendants' own expert Peter Fowler – shows otherwise.

The Trust seeks the equitable remedy of disgorgement of Mr. Perelman's unjust enrichment in the amount of $553.5 million plus pre-judgment interest under Delaware law for a total judgment in excess of $1 billion.  In the alternative (without conceding that a judgment for less than $1 billion would be appropriate), plaintiffs seek monetary relief based on either (i) the expected outcome of arms' length negotiations between Mr. Perelman and independent directors of Marvel if Mr. Perelman had sought to obtain from Marvel through negotiations the assistance, participation and acquiescence in the Note transactions that he simply commandeered for himself by virtue of his control, amounting to no less than $156.7 million plus pre-judgment interest (for a total judgment of approximately $300 million), or (ii) compensatory damages for the harm caused to Marvel by defendants' breaches of fiduciary duty amounting to no less than $313 million plus pre-judgment interest (for a total judgment of approximately $600 million).

The operative pleadings are plaintiffs' Second Amended Complaint, and defendants' Answer to the Second Amended Complaint.  There are no counterclaims.

B.    Defendants' Statement

In 1993 and 1994, the Marvel Holding Companies, entities indirectly owned by MacAndrews & Forbes, borrowed money in three separate note offerings, to which Marvel was not a party.  In the offerings, the offerors raised $288 million for the purchase of additional Marvel stock and $265.5 million for the use of MacAndrews & Forbes and its subsidiaries.  None of the proceeds was made available to Marvel.

As security for those borrowings, the Marvel Holding Companies pledged their majority equity ownership in Marvel.  The borrowing entities also agreed that a

default would occur if there was a deterioration in Marvel's business (and,
correspondingly, in the value of the lenders' security in interest in Marvel stock), as
measured by Marvel's leverage, or if Marvel entered into certain self-dealing
transactions, or if the borrowers no longer owned a majority of Marvel's shares.
Critically, Marvel itself was not a party to these promises and there was no consequence
to it of a default.

Indeed, the only significance of the covenants was that any violation
constituted an event of default which, if left uncured, would entitle the note holders to
take control of Marvel (by taking the Marvel Holding Companies' pledged Marvel
shares).  In light of this, the reality is that potential note purchasers would insist upon
having the covenants not because the covenants provided assurance that Marvel would
refrain from taking the stipulated actions, but because they provided assurance that the
note holders could seize control of Marvel if Marvel did.  There was no expectation that
the Marvel Board would do anything but function as an independent body if it was
confronted with a decision touching on the subjects of the covenants (in fact, the Marvel
Board did act independently with respect to competing proposals to restructure Marvel
when financial misfortune struck in 1996).

Plaintiffs also have no evidence that the Notes' restrictions actually
impinged on Marvel or limited the directors' duty to manage Marvel in any way.
Plaintiffs' beneficiaries lost money – as did Mr. Perelman – because Marvel's business
collapsed, not because of the terms of the Notes.

In the years following these Note offerings, Marvel's trading card and
comic book business unexpectedly and dramatically deteriorated.  Interest in comic books

waned in favor of video games, and the notorious 1994-95 baseball strike, which

canceled the World Series for the first time in 90 years, clobbered interest in trading

cards. In addition, during the 1994-1995 time period, pro hockey and pro basketball had

labor problems that further eroded interest in trading cards. As a result of these problems

in Marvel's core business, the Notes ultimately went into default and note holders lost

money. Mr. Perelman also lost billions of dollars when the value of his indirect

ownership interest in Marvel vanished.

   In this lawsuit, plaintiffs claim that defendants exploited their fiduciary

positions for Mr. Perelman's personal gain by causing the Marvel Holding Companies to

issue the Notes and purportedly restricting Marvel's ability to pursue financing. In their

Second Amended Complaint, plaintiffs allege (1) a state law cause of action for breach of

fiduciary duty against Messrs. Perelman, Bevins, and Drapkin, and (2) a state law cause

of action for aiding and abetting a breach of fiduciary duty against Mafco, MacAndrews

& Forbes, and Andrews.

   On March 22, 2002, defendants moved for summary judgment (D.I. 274,

275) on all of the claims asserted in the Second Amended Complaint, and plaintiffs

moved for partial summary judgment (D.I. 267, 268) on certain of those claims against

Mr. Perelman only.

   On December 9, 2002, Magistrate Judge Mary Pat Thynge denied

plaintiffs' motion for partial summary judgment, and granted in part and denied in part

defendant's motion for summary judgment. On February 18, 2004, this Court adopted

Magistrate Judge Thynge's report in all respects.

On appeal, the Third Circuit affirmed the denial of plaintiffs' motion for partial summary judgment, and reversed the order granting summary judgment for defendants in most respects. The Third Circuit affirmed summary judgment for defendants as to the statute of limitations issue for the first Note offering.

The parties are now preparing for trial on remand.

There are no counterclaims or crossclaims.

## II.    Jurisdiction

Plaintiffs submit that this Court has subject matter jurisdiction over this action for the following reasons:

On December 27, 1996, Marvel filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. As debtor-in-possession, Marvel commenced this action on October 30, 1997, asserting claims, *inter alia*, against defendants for breach of fiduciary duty, seeking both damages and equitable relief. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334(b) because it was related to the Marvel bankruptcy. *See Cantor v. Perelman*, 414 F.3d 430, 436 n.2 (3d Cir. 2005).

On July 31, 1998, this Court entered an order confirming the Fourth Amended Joint Plan of Reorganization for Marvel, approving the creation of the MAFCO Litigation Trust and the appointment of the Trustees to continue the prosecution of Marvel's claims against defendants, and retaining jurisdiction over this matter. By order dated June 29, 2004, the Court closed the Marvel bankruptcy case, but retained jurisdiction over this action. *See Smith v. Commercial Banking Corp.*, 866 F.2d 576, 580 (3d Cir. 1989).

## III.    Uncontroverted Facts

**The Parties**

1.    On December 27, 1996, Marvel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware.

2.    As debtors-in-possession, Marvel and certain of its subsidiaries commenced this action on October 30, 1997.

3.    On July 31, 1998, this Court confirmed the Fourth Amended Joint Plan of Reorganization for Marvel (the "Plan"), and approved the creation of the MAFCO Litigation Trust.  (PX 335, 336 and DX 918, 919 are copies of the Order and Plan.)

4.    Plaintiffs Ronald Cantor, James Scarpone and Ivan Snyder are the Trustees of the MAFCO Litigation Trust, created on October 1, 1998, pursuant to the MAFCO Litigation Trust Agreement.  (PX 337 and DX 921 are copies of the MAFCO Litigation Trust Agreement)

5.    Under the MAFCO Litigation Trust Agreement, the beneficiaries of the MAFCO Litigation Trust include holders of Allowed Unsecured Claims (other than Intercompany Claims and the LaSalle Claim), holders of Allowed Class Securities Litigation Claims, and holders of Allowed Equity Interests in Marvel (as these terms are defined in the Plan).

6.    Defendant Mafco is a corporation organized under the laws of the State of Delaware.

7.    Defendant MacAndrews & Forbes is a corporation organized under the laws of the State of Delaware.

8.    Defendant Andrews is a corporation organized under the laws of the State of Delaware.

9.    From 1993 to the present, Mr. Perelman has owned 100% of defendant Mafco, which, in turn, has owned 100% of defendant MacAndrews & Forbes, which, in turn, has owned 100% of defendant Andrews.

10.    Parent was incorporated in 1988, Holdings was incorporated in April 1993, and Marvel III was incorporated in 1994. From the formation of Parent until the formation of Holdings, defendant MacAndrews & Forbes indirectly owned 100% of Parent. From the formation of Holdings until the formation of Marvel III, defendant MacAndrews & Forbes indirectly owned 100% of Parent, which in turn, owned 100% of Holdings. From the formation of Marvel III until December 27, 1996, MacAndrews & Forbes indirectly owned 100% of Marvel III, which, in turn, owned 100% of Parent, which, in turn, owned 100% of Holdings.

11.    Defendant Mr. Perelman was a director of Marvel from 1991 through June 2, 1997, Chairman of the Board from 1991 to October 23, 1996, and Chairman of the Executive Committee from 1991 through June 2, 1997. Mr. Perelman was a director and Chairman of the Board of Mafco, MacAndrews & Forbes, and Andrews from 1991 to 1997. Mr. Perelman was a director and Chairman of the Board of Parent, Holdings and Marvel III from the time of their respective formations until April 24, 1997.

12.    From 1991 to 1997, defendant Mr. Drapkin was a director and the Vice Chairman of MacAndrews & Forbes, and a director of Andrews and Mafco. Mr. Drapkin was a director and the Vice Chairman of the Board of Parent, Holdings and

Marvel III from the time of their respective formations until April 24, 1997. From 1991 until June 2, 1997, Mr. Drapkin was a director of Marvel, and a member of Marvel's Executive Committee.

13.     Defendant Mr. Bevins served as President and Chief Executive Officer of Andrews from August 1988 until January 6, 1997. Mr. Bevins served as a director of Andrews from at least January 1, 1993 through at least December 31, 1996. Mr. Bevins served as Executive Vice President of MacAndrews & Forbes from May 1988 through at least December 31, 1996. Mr. Bevins served as a director of each of Parent, Holdings and Marvel III from the time of their respective formations through at least December 31, 1996. Mr. Bevins served as Chief Executive Officer of Marvel from 1991 until October 23, 1996 , and as President of Marvel from November 1994 to September 4, 1996. From 1989 through at least December 31, 1996, Mr. Bevins was a director of Marvel and a member of Marvel's Executive Committee.

14.     From March 12, 1992 through December 27, 1996, the Executive Committee of the Marvel Board never had more than four members, including at all times Perelman, Bevins and Drapkin.

15.     From at least January 1, 1993 through at least January 31, 1996, Bevins was a director of Andrews. From at least January 1, 1993 through at least January 31, 1996, Perelman and Drapkin were directors of Mafco, MacAndrews and Andrews.

16.     Perelman, Bevins and Drapkin constituted the entire board of directors for Holdings, Parent and Marvel III from the time of their respective formations until April 24, 1997.

**Background**

17. Marvel has been publishing comic books (and other forms of entertainment) since 1939.

18. Between 1939 and 1993, Marvel developed a roster of more than 3,500 proprietary characters, including the X-Men, Spider Man, the Fantastic Four, Captain America, Iron Man, the Incredible Hulk and the Silver Surfer.

19. In January 1989, Parent, then known as New Marvel Holdings Inc., bought Marvel from New World Entertainment Ltd. for $82.5 million.

20. On or about July 15, 1991, Marvel filed a prospectus with the SEC to offer shares in Marvel to the public. (PX 18 and DX 9 are copies of the prospectus.)

21. On July 22, 1991, Marvel completed an initial public offering that reduced Parent's ownership stake to 60%.

22. The IPO share price for Marvel stock was $16.50.

23. On January 21, 1992, Marvel's Board of Directors declared a two-for-one stock split.   On March 3, 1992, Marvel effected the stock split in the form of a dividend distributed to stockholders of record as of February 20, 1992.

24. On November 6, 1992, Marvel's Board of Directors declared a two-for-one stock split.   On December 21, 1992, Marvel effected the stock split in the form of a dividend distributed to stockholders of record as of December 7, 1992.

25. On September 17, 1993, Marvel's Board of Directors declared a two-for-one stock split.  On November 1, 1993, Marvel effected the stock split in the form of a dividend distributed to stockholders of record as of October 15, 1993.

26. On September 1, 1992, Marvel entered the sports trading card business by purchasing Fleer Corp. for $256 million, which Marvel financed in

accordance with and pursuant to the terms and financial covenants of the Credit and

Guarantee Agreement, dated as of September 17, 1992, by and among Marvel, Fleer,

Chemical Bank, as Administrative Agent, and the banks parties thereto (the "1992 Credit

and Guarantee Agreement").  (PX 192 and DX 29-30 are copies of the 1992 Credit and

Guarantee Agreement.)

27.    On March 18, 1993, there was a meeting of the Marvel Board of

Directors, at which the Board passed a resolution to amend the company's Restated

Certificate of Incorporation.  (PX 83 and DX 62 are copies of the minutes of the March

18, 1993 meeting.)   The Marvel shareholders approved the amendments at the next

shareholders meeting on May 25, 1993.

28.    On April 30, 1993, Marvel acquired a 46% interest in Toy Biz, Inc.

in exchange for a perpetual, royalty-free license to make toys using Marvel characters

and $9 million.

29.    During the 1993-1995 time period, Marvel also purchased several

other businesses, including a children's activity sticker business, another sports trading

card business, smaller comic book businesses and a comic book distributor.

30.    For the fiscal years 1989 through 1996, Marvel reported to the

SEC net revenues, net income, shareholders' equity and long term debt (in $ millions) as

follows:

| Year (as of December 31) | Net Revenues | Net Income | Shareholder Equity | Long Term Debt |
|---|---|---|---|---|
| 1989 | $ 68.6 | $ 2.4 | $ 12.0 | $63.0 |
| 1990 | $ 81.1 | $ 5.4 | $ 16.5 | $59.5 |
| 1991 | $115.1 | $ 16.1 | $ 48.7 | $19.0 |
| 1992 | $223.8 | $32.6 | $ 84.7 | $236.3 |
| 1993 | $415.2 | $56.0 | $147.3 | $250.2 |
| 1994 | $514.8 | $61.8 | $243.0 | $348.3 |
| 1995 | $828.9 | $(48.4) | $207.8 | $586.5 |
| 1996 | $745.5 | $(464.4) | $(256.3) | $155.6 |

31.     On May 13, 1992, Marvel issued the Notice and Proxy Statement for the Annual Meeting of Stockholders of Marvel to be held on June 25, 1992.  (PX 191 and DX 19 are copies of such notice and proxy statement.)

32.     On April 21, 1993, Marvel issued the Notice and Proxy Statement for the Annual Meeting of Stockholders of Marvel to be held on May 25, 1993.  (PX 208 and DX 122 are copies of such notice and proxy statement.)

33.     On April 18, 1994, Marvel issued the Notice and Proxy Statement for the Annual Meeting of Stockholders of Marvel to be held on May 26, 1994.  (PX 247 and DX 366 are copies of such notice and proxy statement.)

34.     On April 21, 1995, Marvel issued the Notice and Proxy Statement for the Annual Meeting of Stockholders of Marvel to be held on May 24, 1995.  (PX 264 and DX 548 are copies of such notice and proxy statement.)

35.     On April 18, 1996, Marvel issued the Notice and Proxy Statement for the Annual Meeting of Stockholders of Marvel to be held on May 21, 1996.  (PX 278 and DX 656 are copies of such notice and proxy statement.)

36.     On March 25, 1993, there was a meeting of the Marvel Board of Directors.  (PX 84 and DX 74 are copies of the minutes of such meeting.)

37.     On March 25, 1993, there was a meeting of the "Special Committee of Marvel Entertainment Group, Inc."  (PX 85 and DX 75 are copies of the minutes of such meeting.)

38.     On March 26, 1993, Mafco, MacAndrews & Forbes and Parent filed with the SEC a Schedule 14D-1.  (PX 42 and DX 81 are copies of such filing.)

39.     On March 31, 1993, there was a meeting of the "Special Committee of Marvel Entertainment Group, Inc."  (PX 87 and DX 86 are copies of the minutes of such meeting.)

40.     On April 1, 1993, there was a meeting of the Marvel Board of Directors.  (PX 88 and DX 89 are copies of the minutes of such meeting.)

41.     On April 16, 1993, Mafco, MacAndrews & Forbes and Parent filed with the SEC a Schedule 14D-1 (Amendment 1).  (PX 46 and DX 116 are copies of such filing.)

42.     On April 23, 1993, Mafco, MacAndrews & Forbes and Parent filed with the SEC a Schedule 14D-1 (Amendment 4).  (DX 131 is a copy of such filing.)

43.     On April 26, 1993, Wheat First Butcher & Singer issued an analyst report concerning Marvel.  (DX 133 is a copy of such document.)

44.     On April 27, 1993, there was a meeting of the "Special Committee of Marvel Entertainment Group, Inc." (PX 91 and DX 140 are copies of the minutes of such meeting.)

45.     On April 27, 1993, there was a meeting of the Marvel Board of Directors. (PX 92 and DX 139 are copies of the minutes of such meeting.)

46.     On or about April 15, 1993, Parent contributed 24.2 million shares of Marvel stock to Holdings.   Following this transfer, Holdings owned a majority of the voting stock of Marvel.

47.     On May 7, 1993, Parent accepted for payment 20,000,000 shares of Marvel stock (adjusted for subsequent splits) pursuant to the tender offer.

48.     As of March 31, 1994, Marvel had 97,808,892 shares outstanding, of which 78,712,500 (or 80.5% of all outstanding shares) were beneficially owned by Mr. Perelman, indirectly through indirect, wholly owned subsidiaries of Mafco.

49.     Marvel and Mafco entered into a Tax Sharing Agreement, dated May 18, 1993. (PX 214 is a copy of such document.)  Marvel, Mafco and Marvel III entered into an Amended and Restated Tax Sharing Agreement, dated January 1, 1994. (PX 233 is a copy of such document.).

50.     After the Tender Offer and through June 1996, Holdings, Parent and other Mafco affiliates acquired more than 5 million additional Marvel shares (after giving effect to a November 1993 stock split) at a cost of more than $84 million. From at least January 1, 1993 through at least April 15, 1994, Terry C. Stewart was the President, Chief Operating Officer and a director of Marvel.

51.    From at least January 1, 1993 through at least April 15, 1994,

Jeffrey L. Kaplan was an Executive Vice President of Marvel.

**The Holdings Notes**

52.    On April 15, 1993, Holdings issued $517,447,000 (face value) of

senior secured discount (zero coupon) notes due April 15, 1998.  The Holdings Notes had

an effective yield to maturity of 11 ¼ % per year.  The Initial Purchaser of the Holdings

Notes was Merrill Lynch & Co.

53.    Holdings received net proceeds from the Holdings Notes of

approximately $288,000,000, and Holdings declared and paid a dividend of that amount

to Parent.

54.    None of the proceeds from the Holdings Notes went to Marvel.

55.    Holdings pledged 24 million shares of Marvel stock as collateral

for the Holdings Notes.

56.    Holdings and NationsBank of Georgia, N.A. were the signatories

to the indenture for the Holdings Notes dated as of April 15, 1993 (the "Holdings

Indenture").  (PX 1 and DX 113 are copies of the Holdings Indenture.)

57.    Only Holdings had any obligation to repay the Holdings Notes.

58.    Holdings issued an offering memorandum for the Holdings Notes

dated April 16, 1993 (the "Holdings Offering Memorandum").  (PX 2 and DX 114 are

copies of the Holdings Offering Memorandum.)

59.    In connection with the issuance of the Holdings Notes, Ernst &

Young provided a letter to Merrill Lynch dated April 16, 1993.  (PX 205 is a copy of

such letter.)

60.     Ernst & Young was the independent auditor for Holdings.

61.     Ernst & Young was the independent auditor for Marvel.

62.     In connection with the issuance of the Holdings Notes, Robert L. Losey provided a letter to Merrill Lynch dated April 22, 1993.  (PX 210 is a copy of such letter.)

63.     Robert L. Losey was the Executive Vice President and General Counsel of Marvel as of April 22, 1993.

64.     In connection with the issuance of the Holdings Notes, Merrill Lynch provided a document entitled "Certificate of Fair Value" dated April 22, 1993. (DX 126 is a copy of such document.)

**The Parent Notes**

65.     On October 1, 1993, Parent issued $251,678,000 (face value) of senior secured discount (zero coupon) notes due April 15, 1998.  The Parent Notes had an effective yield to maturity of 12 ¼ % per year.  The Underwriter of the Parent Notes was Bear, Stearns & Co. Inc.

66.     Parent received net proceeds from the Parent Notes of approximately $144,870,000, and Parent declared and paid a dividend of that amount to Four Star Holdings Corp., a direct wholly owned subsidiary of Andrews.

67.     None of the proceeds from the Parent Notes went to Marvel.

68.     Parent pledged 10 million shares of Marvel common stock and 100% of the common stock of Holdings as collateral for the Parent Notes.

69.    Parent and NationsBank of Georgia, N.A. were the signatories to the indenture for the Parent Notes dated as of October 1, 1993 (the "Parent Indenture"). (PX 10 and DX 236 are copies of the Parent Indenture.)

70.    Only Parent had any obligation to repay the Parent Notes.

71.    Parent issued a prospectus for the Parent Notes dated October 13, 1993 (the "Parent Prospectus"). (PX 11 and DX 259 are copies of the Parent Prospectus.)

72.    In connection with the issuance of the Parent Notes, Ernst & Young provided letters to Bear Stearns dated October 12 and 20, 1993. (PX 224, 226 are copies of such letters.)

73.    Ernst & Young was the independent auditor for Parent.

74.    Ernst & Young was the independent auditor for Marvel.

75.    In connection with the issuance of the Parent Notes, Robert L. Losey provided a letter to Bear Stearns dated October 20, 1993. (PX 229 is a copy of such letter.)

76.    Robert L. Losey was the Executive Vice President and General Counsel of Marvel as of October 20, 1993.

77.    In connection with the issuance of the Parent Notes, Bear Stearns provided a document entitled "Certificate of Fair Value" dated October 20, 1993. (DX 277 is a copy of such document.)

78.    In connection with the issuance of the Parent Notes, Parent and Bear Stearns entered into an Underwriting Agreement, dated as of October 12, 1993 (the "Parent Underwriting Agreement"). (PX 225 is copy of the Parent Underwriting Agreement.)

79.    On July 2, 1993, Parent filed with the SEC a Form S-1.  (PX 7 and DX 177 are copies of such filing.)

**The Marvel III Notes**

80.    On February 15, 1994, Marvel III issued $125,000,000 (face value) of senior secured notes due February 15, 1998.  The annual yield on the Marvel III Notes was 9 1/8 %.  The Initial Purchasers of the Marvel III Notes were Merrill Lynch & Co. and Bear, Stearns & Co. Inc.

81.    Marvel received net proceeds from the Marvel III Notes of approximately $120,600,000, and Marvel III declared and paid a dividend of that amount to Four Star Holdings Corp.

82.    None of the proceeds from the Marvel III Notes went to Marvel.

83.    Marvel III pledged all of the stock of Parent as collateral for the Marvel III Notes.  In addition, Parent guaranteed the Marvel III notes on a non-recourse basis (the "Non-Recourse Guaranty"), and the Non-Recourse Guaranty was secured by Parent's pledge of 9.3 million shares of Marvel stock owned by Parent.

84.    Marvel III and NationsBank of Georgia, N.A. were the signatories to the indenture of the Marvel III Notes dated as of February 15, 1994 (the Marvel III Indenture").  (PX 15 and DX 324 are copies of the Marvel III Indenture.)

85.    Only Marvel III and Parent had any obligation to repay the Marvel III Notes.

86.    Marvel III issued an offering memorandum for the Marvel III Notes dated February 8, 1994 (the "Marvel III Offering Memorandum").  (PX 12 and DX 318 are copies of the Marvel III Offering Memorandum.)

87.  In connection with the issuance of the Marvel III Notes, Ernst & Young provided letters to Bear Stearns and Merrill Lynch dated February 8 and 18, 1994. (PX 243, 245 are copies of such letters.)

88.  Ernst & Young was the independent auditor for Marvel III.

89.  Ernst & Young was the independent auditor for Marvel.

90.  In connection with the issuance of the Marvel III Notes, Paul E. Shapiro provided a letter to Bear Stearns and Merrill Lynch dated February 18, 1994. (PX 246 is a copy of such letter.)

91.  Paul E. Shapiro was the Executive Vice President and General Counsel of Marvel as of February 18, 1994.

92.  In connection with the issuance of the Marvel III Notes, Merrill Lynch provided a document entitled "Certificate of Fair Value" dated February 18, 1994. (DX 326 is a copy of such document.)

**Events After the Issuance of the Notes**

93.  On May 6, 1993, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending March 31, 1993.  (PX 20 and DX 149 are copies of such filing.)

94.  On August 13, 1993, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending June 30, 1993.  (PX 21 and DX 211 are copies of such filing.)

95.  On November 12, 1993, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending September 30, 1993.  (PX 22 and DX 283 are copies of such filing.)

96.  On March 31, 1994, Marvel filed with the SEC a Form 10-K for the fiscal year ending December 31, 1993.  (PX 24 and DX 342 are copies of such filing.)

97.    On May 13, 1994, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending March 31, 1994.  (PX 25 and DX 386 are copies of such filing.)

98.    On August 12, 1994, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending June 30, 1994.  (PX 26 and DX 430 are copies of such filing.)

99.    On November 11, 1994, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending September 30, 1994.  (PX 27 and DX 469 are copies of such filing.)

100.    On March 28, 1995, Marvel filed with the SEC a Form 10-K for the fiscal year ending December 31, 1994.  (PX 29 and DX 530 are copies of such filing.)

101.    On May 12, 1995, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending March 31, 1995.  (PX 30 and DX 559 are copies of such filing.)

102.    On August 11, 1995, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending June 30, 1995.  (PX 31 is a copy of such filing.)

103.    On November 13, 1995, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending September 30, 1995.  (PX 33 and DX 593 are copies of such filing.)

104.    On March 28, 1996, Marvel filed with the SEC a Form 10-K for the fiscal year ending December 31, 1995.  (PX 34 and DX 645 are copies of such filing.)

105.    On May 13, 1996, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending March 31, 1996.  (PX 35 and DX 646 are copies of such filing.)

106.    On August 14, 1996, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending June 30, 1996.  (PX 36 and DX 92 are copies of such filing.)

107.   On November 14, 1996, Marvel filed with the SEC a Form 10-Q for the fiscal quarter ending September 30, 1996.  (PX 37 and DX 711 are copies of such filing.)

108.   On March 14, 1995, Marvel filed with the SEC a form S-3 Registration Statement.  (PX 28 and DX 520 are copies of such filing.)

109.   The parties agree that the publicly traded price of Marvel's common stock at any particular point in time is a readily identifiable fact as to which the Court may take judicial notice.

110.   On August 31, 1994, Marvel expanded its business into Europe by purchasing an Italian sticker company, Panini S.p.A. for $158 million, which Marvel financed in accordance with and pursuant to the terms and financial covenants of: (i) the Term Loan and Guarantee Agreement dated August 30, 1994 between the Marvel Comics Italia, S.R.L. and Marvel on the one hand, and Instituto Bancario San Paolo Di Torino (as lender) on the other hand (the "1994 Term Loan and Guarantee Agreement") (PX 255 and DX 435 are copies of the 1994 Term Loan and Guarantee Agreement"); and (ii) Amended and Restated Credit and Guarantee Agreement, dated as of August 30, 1994, by and among Marvel, Fleer, Chemical Bank, as Administrative Agent, and the banks parties thereto (the "1994 Amended and Restated Credit and Guarantee Agreement") (PX 256 and DX 436-37 are copies of the 1994 Amended and Restated Credit and Guarantee Agreement).

111.   On April 27, 1995, Marvel expanded again by purchasing SkyBox International Inc. for $165 million, which Marvel financed in accordance with and pursuant to the terms and financial covenants of the Credit and Guarantee Agreement,

dated as of April 24, 1995, by and among Marvel, Fleer, Chemical Bank, as Administrative Agent, and the banks parties thereto (the "1995 Credit and Guarantee Agreement").  (PX 265-67 and DX 550-51 are copies of the 1995 Credit and Guarantee Agreement.)

112.    Marvel's financial condition deteriorated throughout 1996.

113.    As of September 30, 1996, Marvel and its subsidiaries had borrowed approximately $654 million under its credit agreements and borrowing facilities.

114.    Marvel entered into a letter agreement with Bear , Stearns & Co. Inc., dated as of October 1, 1996.  (PX 285 and DX 715 are copies of such agreement.)

115.    On October 23, 1996, there was a meeting of the Marvel Board of Directors.  (PX 161 and DX 727 are copies of the minutes of such meeting.)

116.    On October 24, 1996, there was a meeting of the "Special Committee of the Board of Directors of Marvel Entertainment Group, Inc."   (PX 162 and DX 728 are copies of the minutes of such meeting.)

117.    On November 12, 1996, Marvel issued a press release.  (PX 311 and DX 742 are copies of such press release.)

118.    On November 6, 1996, Lehman Brothers issued a High Yield Research report concerning Marvel and the Holding Companies.  (PX 300 and DX 737 are copies of such document.)

119.    On November 19, 1996, Howard Gittis made a presentation to representatives of the banks that had loaned money to Marvel.

120.    High River Limited Partnership wrote a letter dated December 10, 1996 to Andrews.  (PX 319 and DX 788 are copies of such letter.)

121.    Andrews wrote a letter dated December 12, 1996 to High River Limited Partnership.  (DX 791 is a copy of such letter.)

122.    On December 12, 1996, there was a meeting of the Marvel Board of Directors.  (PX 168 and DX 793 are copies of the minutes of such meeting.)

123.    High River Limited Partnership wrote a letter dated December 19, 1996 to Marvel.  (PX 322 and DX 799 are copies of such letter.)

124.    Thomas E. Constance of Kramer Levin Naftalis & Frankel wrote a letter dated December 26, 1996 to High River Limited Partnership.  (DX 803 is a copy of such letter.)

125.    On December 26, 1996, there was a meeting of the Marvel Board of Directors.  (PX 169 and DX 804 are copies of the minutes of such meeting.)

126.    Credit Suisse First Boston Corporation sent a letter dated December 27, 1996 addressed to the Board of Directors of Marvel.  (PX 325 and DX 808 are copies of such letter.)

127.    On December 27, 1996, Marvel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware.

128.    On December 27, 1996, Marvel issued a press release.  (PX 39 is a copy of such press release.)

129.    On December 27, 1996, Holdings, Parent and Marvel III filed petitions for relief under Chapter 11 of the United States Bankruptcy Code.

130.    On December 27, 1996, Marvel filed a Disclosure Statement Relating to a Joint Plan of Reorganization for the company. (DX 810 is a copy of such document.)

131.    On December 27, 1996, Holdings, Parent and Marvel III filed petitions for relief under Chapter 11 of the United States Bankruptcy Code.

132.    On January 9, 1997, an Official Bondholders Committee (the "Bondholders Committee") was formed in the bankruptcy proceedings filed by Holdings, Parent and Marvel III..

133.    The Bondholders Committee wrote a letter dated January 13, 1997 to Marvel. (PX 450 and DX 824 are copies of such letter.)

134.    Paul Shapiro, Executive Vice President, General Counsel and Chief Administrative Officer of Marvel, wrote a letter dated February 14, 1997 to Carl Icahn. (DX 833 is a copy of such letter.)

135.    The Bondholders Committee, High River Limited Partnership, Westgate International, L.P. and United Equities Commodities Company wrote a letter dated March 5, 1997 to Marvel. (PX 329 and DX 835 are copies of such letter.)

136.    David M. Friedman wrote a letter dated March 19, 1997 to Harvey R. Miller. (DX 850 is a copy of such letter.)

137.    On April 29, 1997, Holdings and the Official Committee of Marvel Holdings Inc., Marvel (Parent) Holdings Inc. and Marvel III Holdings Inc. filed a Disclosure Statement Relating to a Joint Chapter 11 Plan of Reorganization and Rights Offering. (DX 867 is a copy of such document.)

138.    Holdings executed a written consent as 50.03% shareholder of Marvel dated June 2, 1997.  (DX 880 is a copy of such consent.)

139.    On December 22, 1997, this Court appointed a chapter 11 trustee to oversee the operations of Marvel.

## IV.    Issues of Fact that Remain to be Litigated

### A.    Issues of Fact Identified by Plaintiffs

Plaintiffs identify the following issues of facts that remain to be litigated. By listing these issues, plaintiffs do not intend to assume any burden of proof that properly rests with defendants.

1.    Whether (i) the restrictions applicable to Marvel in the Note Indentures and/or (ii) Marvel's assistance and participation in the process of marketing and selling the Notes, either separately or together, facilitated in a material way the ability of the Marvel Holding Companies to sell the Notes and obtain proceeds of $553.5 million?

2.    Whether defendants had interests that differed from and/or conflicted with the interests of Marvel with respect to the Note transactions?

3.    Whether the Note transactions were entirely fair to Marvel?

4.    Whether defendants exploited their fiduciary positions as both directors and/or the controlling shareholder of Marvel for personal gain?

5.    Whether defendants' contention is correct, that the Indenture restrictions were of no consequence to Marvel because Marvel was not a signatory to the Indentures?

6.    Whether, as a result of the Notes and the restrictions applicable to Marvel in the Note Indentures, defendants had interests that differed from and/or

conflicted with the interests of Marvel with respect to decisions concerning Marvel's financing and capital structure in the period following the Note issuances?

7.    Whether a special committee of independent Marvel directors was ever formed (or should have been formed) to consider Marvel's financing options and capital structure in light of the conflict between, on the one hand, Marvel's interest in obtaining financing and having a capital structure that was in Marvel's best interests and, on the other hand, defendants' interest in avoiding the burdens, costs and risks that defendants would face if Marvel issued additional equity?

8.    Whether defendants can prove by a preponderance of the evidence that, following the Note issuances, (i) Marvel's financing decisions and capital structure were entirely fair to Marvel, and (ii) the Notes and the restrictions did not interfere with or impede the ability of any independent Marvel directors to make financing decisions that were in Marvel's best interests?

9.    Whether the Notes and restrictions interfered with Marvel's ability to obtain desperately needed financing in late 1996 when Marvel was facing a liquidity crisis?

10.    To extent that defendants contend that Marvel was prevented from obtaining the financing it needed to overcome its liquidity crisis in the fall of 1996 for reasons other than the Notes and restrictions, whether defendants can show by a preponderance of the evidence that Marvel would not have been able to obtain necessary financing even in the absence of the Notes and restrictions?

11.    Whether the Notes and restrictions caused Marvel to be worth less than it would have been worth in the absence of the Notes and restrictions?

12.    Whether defendants can show by a preponderance of the evidence that any part of the $553.5 million defendants received from the Note transactions was obtained independently of the restrictions in the Note Indentures and Marvel's participation in the issuance of the Notes?

13.    Without conceding that the amount of defendants' unjust enrichment is less than the total amount of Note proceeds, what would have been the outcome of an arms' length negotiation between defendants and a hypothetical special committee of independent Marvel directors in which defendants bargained for Marvel's voluntary acceptance of the restrictions contained in the Note Indentures and Marvel's assistance and participation in the issuance of the Notes?

B.    <u>Issues of Fact Identified by Defendants</u>

Defendants identify the following issues of fact that remain to be litigated. By listing these issues, defendants do not intend to assume any burden of proof that properly rests with plaintiffs.

1.    Whether the Mafco Litigation Trust Agreement specifically carves out claims relating to the tax sharing agreement or any similar agreement, such as a claim based on allegations that defendants sought to avoid tax deconsolidation in order to maintain Marvel's payments to Marvel III under the tax sharing agreement, and thereby avoid a put right under Section 4.14 of the Marvel III Indenture.

2.    Whether Marvel was a party to the Note offerings.

3.    Whether Marvel was bound by any of the terms of the Notes.

4.    Whether the Note offerings were self-dealing transactions in which a director or majority stockholder stood across the table from Marvel.

5.      Whether the Marvel Holding Companies sold the votes of Marvel's directors in the Note offerings.

6.      Whether, under the terms of the Notes, the Marvel Holding Companies promised to repay the principal of the Notes with accelerated interest (or, if they could not make the payment, to turn their Marvel shares over to the indenture trustee), in the event that Marvel were to issue debt at a point in time in the future when its financial performance did not satisfy a specified financial ratio.

7.      Whether, under the terms of the Notes, the Marvel Holding Companies promised to repay the principal of the Notes with accelerated interest (or, if they could not make the payment, to turn their Marvel shares over to the indenture trustee), in the event that Marvel were to issue preferred stock at a point in time in the future when its financial performance did not satisfy a specified financial ratio.

8.      Whether, under the terms of the Notes, the Marvel Holding Companies promised to repay the principal of the Notes with accelerated interest (or, if they could not make the payment, to turn their Marvel shares over to the indenture trustee), in the event that Marvel were to make a restricted payment as defined in the Indentures.

9.      Whether, under the terms of the Notes, Holdings promised to repay the principal of the Notes with accelerated interest (or, if they could not make the payment, to turn their Marvel shares over to the indenture trustee) in the event that Holdings no longer held a majority of Marvel's voting stock.

10.     Whether, under the terms of the Notes, Parent and Marvel III promised to repay the principal of the Notes with accelerated interest (or, if they could

not make the payment, to turn their Marvel shares over to the indenture trustee) in the event that Holdings and Parent combined no longer held a majority of Marvel's voting stock.

11.     Whether the plain language of Section 4.09 of the Holdings, Parent or Marvel III Indentures contains any promise by the respective Marvel Holding Company to cause Marvel to refrain from issuing voting equity.

12.     Whether the plain language of Section 4.09 of the Holdings, Parent or Marvel III Indentures merely reflects a commitment on the part of respective issuer to use their lawful voting power as stockholders to protect their property right in their status as majority shareholders of Marvel.

13.     Whether the plain language of Section 4.14 of the Marvel III Indenture contains any promise by Marvel III to cause Marvel to refrain from issuing equity.

14.     Whether a triggering of the put right in Section 4.14 of the Marvel III Indenture would have any effect on Marvel.

15.     Whether a material number of holders of the Marvel III Notes would have put their Notes to Marvel III had Marvel issued a sufficient amount of equity to cause a tax deconsolidation event under the terms of Section 4.14 of the Marvel III Indenture when Marvel financed acquisitions with debt in August 1994 and April 1995.

16.     Whether a triggering of the put right in Section 4.14 of the Marvel III Indenture would have had a sufficiently large financial effect on Mr. Perelman that it would have influenced his decision making regarding the best interests of his multi-billion dollar investment in Marvel.

17.     Whether the Marvel Holding Companies could have raised the same amount of money under the Notes without Section 4.04, 4.05 or 4.09 of the Indentures by providing the purchasers of the Notes with similar protections in the form of put rights instead of restrictive covenants.

18.     Whether the Marvel Holding Companies could have raised as much or more money than the proceeds of the Notes by issuing alternative debt instruments, such as Liquid Yield Option Notes (LYONs), that did not contain restrictive covenants such as Section 4.04, 4.05 or 4.09 of the Indentures.

19.     Whether the stockholders of Marvel were on inquiry notice of the covenants in the Parent Notes before December 27, 1993.

20.     Whether the restrictions on the issuance of new debt in Marvel's own credit agreements were stricter than the restriction on the issuance of new Marvel debt in Section 4.04 of the Indentures.

21.     Whether Sections 4.04 of the Parent or Marvel III Indentures caused Marvel to refrain from issuing debt it otherwise would have issued.

22.     Whether Sections 4.04 of the Parent or Marvel III Indentures caused Marvel to refrain from issuing preferred stock it otherwise would have issued.

23.     Whether Marvel's deteriorating financial condition after March 1996 prevented it from issuing additional debt or preferred stock.

24.     Whether Marvel could have financed all of its acquisitions in the 1992 to 1995 time frame with voting equity without triggering a default under Sections 4.09 of the Parent and Marvel III Indentures.

25.    Whether Marvel could have financed all of its acquisitions in the 1992 to 1995 time frame with preferred stock without triggering a default under Sections 4.04 of the Parent and Marvel III Indentures.

26.    Whether the issuance of the Notes caused any legally cognizable harm to Marvel.

27.    Whether, at the time Marvel financed the acquisition of Panini with bank debt, the Marvel board had reason to believe that Marvel's shareholders would benefit from the use of debt over equity to fund the acquisition because it was then unlikely that Marvel would suffer future financial distress.

28.    Whether, at the time Marvel financed the acquisition of Skybox with bank debt, the Marvel board had reason to believe that Marvel's shareholders would benefit from the use of debt over equity to fund the acquisition because it was then unlikely that Marvel would suffer future financial distress.

29.    Whether the collapse of Marvel's core businesses of comic books and trading cards caused Marvel to declare bankruptcy.

30.    Whether the ability of third-party investors (other than Mr. Perelman) to make proposals to restructure Marvel was barred by the terms of the Notes.

31.    Whether the board of directors of Marvel could have accepted an offer to restructure Marvel's debt that did not require waiving or amending the covenants in the Indentures.

32.    Whether the proposal to infuse new equity into Marvel made by Carl Icahn (the "Icahn Proposal") was conditioned upon an amendment, alteration or waiver of any term of the Indentures.

33.    Whether Icahn's failure to consummate the Icahn Proposal had anything to do with the terms of the Notes.

34.    Assuming that the Marvel Holding Companies had instead chosen to make the terms of the Notes binding upon Marvel, how much would Marvel have received, in arms' length bargaining, for its agreement to be bound by the Notes?

35.    Whether Messrs. Bevins and Drapkin received a personal financial benefit from any of the Note offerings.

## V.    **Issues of Law**

### A.    Issues of Law Identified by Plaintiffs

Plaintiffs identify the following issues of law to be decided by the Court:

1.    Whether defendants Messrs. Perelman, Bevins and Drapkin owed fiduciary obligations to Marvel as directors of Marvel?  Whether any or all of the defendants owed fiduciary obligations to Marvel as its controlling shareholder?  *See Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991).

2.    Whether defendants Messrs. Perelman, Bevins and Drapkin fulfilled their fiduciary duties to Marvel as directors of Marvel in connection with the issuance of the Notes and Marvel's financial decisions after such issuance.  *See Emerald*

*Partners*, 787 A.2d at 90; *Cede & Co.*, 634 A.2d at 362; *Weinberger*, 457 A.2d at 710;

*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

        3.      Whether defendants fulfilled their fiduciary duties to Marvel as the

controlling shareholder of Marvel in connection with the issuance of the Notes and

Marvel's financial decisions after such issuance. *See Kahn*, 638 A.2d at 1113-14; *In re*

*USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991)

        4.      Whether defendants have the burden of proving the entire fairness

to Marvel of the Note transactions? *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445

(Del. 1996); *Cede*, 634 A.2d at 361; *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991);

*Guth*, 5 A.2d at 510; *Bomarko v. International Telecharge, Inc.*, 794 A.2d 1161, 1188

(Del. Ch. 1999); *Citron v. E.I. du Pont & Co.*, 584 A.2d 490, 500 n.13 (Del. Ch. 1990);

*Citron v. Steego Corp.*, C.A. No. 10171, 1988 WL 94738, at *8 (Del. Ch. Sept. 9, 1988);

*Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949).

        5.      Whether defendants have the burden of proving that, following the

Note issuances, decisions concerning Marvel's financing were entirely fair to Marvel?

*See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *Cede*, 634 A.2d at 361;

*Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991); *Guth.*, 5 A.2d at 510; *Bomarko*, 794

A.2d at 1188; *Citron v. E.I. du Pont & Co.*, 584 A.2d 490, 500 n.13 (Del. Ch. 1990);

*Citron v. Steego Corp.*, C.A. No. 10171, 1988 WL 94738, at *8 (Del. Ch. Sept. 9, 1988);

*Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949).

        6.      Whether the Marvel board's inaction and failure to consider the

best capital structure for Marvel, or their abdication to defendants in this regard, is

entitled to the protection of the business judgment rule? *See Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984).

7. Whether defendants have the burden of proving that Marvel would not have been able to obtain the financing necessary to overcome its liquidity crisis in the fourth quarter of 1996 even in the absence of the Notes and restrictions applicable to Marvel? *See Bomarko,* 794 A.2d at 1179 & 1185.

8. In a case involving a defendant fiduciary's breach of his duty of loyalty, what are the guiding legal principles in a court of equity for determining the relief to be awarded to plaintiffs? *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Bomarko,* 794 A.2d at 1179; *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881 (Del. Ch. 1999).

9. In measuring the extent of unjust enrichment, whether a disloyal fiduciary is allowed to offset the gain obtained from his disloyal conduct by the amount he could have obtained had he chosen a course of action that did not involve breaching his duty of loyalty? *See Guth*, 5 A.2d at 510; *Bomarko*, 794 A.2d at 1179 (Del. Ch. 1999); *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *Strougo v. Carroll*, C.A. No. 8040, 1991 Del. Ch. LEXIS 11, at *10 (Del. Ch. Jan. 29, 1991); *Citron v. Steego Corp.*, C.A. No. 10171, 1988 WL 94738, at *8 (Del. Ch. Sept. 9, 1988); *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949).

10. Assuming the $553.5 million in Note proceeds was obtained because of disloyal conduct by defendants, whether defendants have the burden of proving that they were unjustly enriched by an amount less than $553.5 million? *See*

*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161, 1179 & 1184 (Del. Ch. 1999).

11.     Whether defendants Mafco, MacAndrews & Forbes and Andrews aided and abetted breaches of fiduciary duty by Messrs. Perelman, Bevins and Drapkin? *See In re Emerging Commc'ns, Inc. Shareholders Litig.*, No. Civ. A. 16415, 2004 WL 1305745, at *38; *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172-73 (Del. 2002); *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

12.     Should pre-judgment interest be awarded in favor of plaintiffs on any judgment, and what should the interest rate(s) be, and from what date(s) should interest run?

B.     <u>Issues of Law Identified by Defendants</u>

1.     Whether the filing of the original complaint by attorneys unauthorized to represent Marvel was an *ultra vires* act which never invoked the jurisdiction of the Court. *See* 11 U.S.C. § 327; *In re Engel*, 124 F.3d 567, 574 (3d Cir. 1997); *In re Ladycliff College*, 35 B.R. 111, 113 (Bankr. S.D.N.Y. 1983); *Hunt v. Up North Plastics, Inc.*, 177 F.R.D. 449, 450-51, 452 n.2, 453-54 & n.3 (D. Minn. 1997).

2.     Whether plaintiffs' claims for damages relating to the Parent Note offerings are time-barred because Marvel's stockholders were put on inquiry notice of their claims more than three years before Marvel filed for bankruptcy. *See Cantor v. Perelman*, 414 F.3d 430, 438-40 (3d Cir. 2005); *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 72-73 (D. Del. 2002); *Dofflemyer v. W.F. Hall Printing Co.*, 558 F. Supp. 372, 378 (D. Del. 1983); *In re Dean Witter P'ship Litig.*, C.A. No. 14816, 1998 WL 442456,

at *4 (Del. Ch. July 17, 1998), *aff'd mem.*, 725 A.2d 441 (Del. 1999); *Kahn v. Seaboard Corp.*, 625 A.2d 269, 274 (Del. Ch. 1993).

3.      Whether plaintiffs have standing to pursue claims relating to the tax sharing agreement between Marvel and Mafco, including claims relating to purported incentives that defendants had to prefer Marvel to use debt to finance its acquisitions arising from the tax sharing agreement or the related put right in Section 4.14 of the Marvel III Indenture. *See In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 62 (D. Del. 2002); *Marvel Entm't Group, Inc.. v. Mafco Holdings Inc.*, No. 02-1702 (Settlement Agreement); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 368 (3d Cir. 2001); *Orloff v. Shulman*, C.A. No. 852-N, 2005 WL 3272355, at *7 (Del. Ch. Nov. 23, 2005); *In re Union Square Assocs. Sec. Litig.*, C.A. No. 11028, 1993 WL 513232, at *5 (Del. Ch. Nov. 29, 1993).

4.      Whether plaintiffs' claims are barred in whole or in part by <u>res judicata</u> or collateral estoppel. *See LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279 (D. Del. 2000); *Micron Tech., Inc. v. Rambus Inc.*, 189 F. Supp. 2d 201, 209 (D. Del. 2002); *In re Continental Airlines, Inc.*, 145 B.R. 404, 409 (D. Del. 1992); *Johnson & Johnson v. Coopervision, Inc.*, 720 F. Supp. 1116, 1123 (D. Del. 1989); *Rhode Island Hosp. Trust Nat'l Bank v. Bogosian (In re Belmont Realty Corp.)*, 11 F.3d 1092, 1097 (1st Cir. 1993); *Amalgamated Sugar Co. v. NL Indus.*, 825 F.2d 634, 640-41 (2d Cir. 1987); *Rymer Foods, Inc. v. Morey Fish Co.*, No. 96-4139, 1997 WL 358870, at *5 (7th Cir. June 23, 1997).

5.      Whether plaintiffs' claims are barred in whole or in part by the doctrine of acquiescence. *See In re Marriott Hotel Props. II Ltd. P'ship*, No. Civ. A.

14961, 2000 WL 128875, at *21 (Del. Ch. Jan. 24, 2000) (citing *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 848 (Del. 1987)); *Danvir Corp. v. Wahl*, C.A. No. 8386, 1987 WL 16507, at *5 (Del. Ch. Sept. 8, 1987); *Morente v. Morente*, C.A. No. 16763, 2000 WL 264329, at *2 n.9 (Del. Ch. Feb. 29, 2000).

6.      Whether plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.  *See Nakahara v. NS 1991 Am. Trust*, 739 A.2d 770, 792 (Del. Ch. 1998); *Morente*, 2000 WL 264329, at *2.

7.      Whether Mr. Perelman, Mafco, MacAndrews & Forbes or Andrews owed any fiduciary duties resulting from their indirect ownership of Holdings, the majority shareholder of Marvel.  *See J. Royal Parker Assocs., Inc. v. Parco Brown & Root, Inc.*, C.A. No. 7013, 1984 WL 8255, at *4 (Del. Ch. Nov. 30, 1984); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999).

8.      Whether plaintiffs can pierce the corporate veil to impose the obligations of a majority shareholder upon Mr. Perelman, Mafco, MacAndrews & Forbes or Andrews.  *See LaSalle*, 82 F. Supp. 2d at 295; *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989); *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996).

9.      Whether a majority stockholder can act in its own best interest when voting as a stockholder.  *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996); *In re BHC Commc'ns, Inc. S'holders Litig.*, 789 A.2d 1, 11 (Del. Ch. 2001); *Thorpe v. CERBCO, Inc.*, C.A. No. 11713, 1993 WL 443406, at *5 (Del. Ch. Oct. 29, 1993).

10.    Whether a majority ownership position is an important property right recognized by Delaware law. *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42-43 (Del. 1994); *Mendel v. Carroll*, 651 A.2d 297, 305 (Del. Ch. 1994).

11.    Whether directors of a Delaware corporation can dilute a majority stockholder's majority voting position without the consent of the majority stockholder absent a compelling justification. *See Mendell*, 651 A.2d at 304; *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del. Ch. 1967); *Canada Southern Oils, Ltd. v. Manabi Exploration Co.*, 96 A.2d 810 (Del. Ch. 1953).

12.    Whether a majority stockholder can take extraordinary measures as a stockholder to protect its majority voting status. *See Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401 (Del. 1985).

13.    Whether it is a breach of fiduciary duty for a majority stockholder to promise its own investors that it will seek to maintain its majority ownership status. *See In re BHC Commc'ns*, 789 A.2d at 11; *In re Paxson Commc'n Corp. S'holders Litig.*, C.A. No. 17568, 2001 WL 812028, at *7 (Del. Ch. July 12, 2001); *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1193-94 (Del. Ch. 2000).

14.    Whether it is a breach of fiduciary duty for a majority shareholder to promise to repay a loan with accelerated interest in the event that the corporation issues debt at a point in time in the future when its financial performance does not satisfy certain financial ratios. *Cantor*, 414 F.3d at 441-42.

15.    Whether a majority shareholder is required to engage in self sacrifice regarding (i) the terms upon which it will make a new investment in the corporation, or (ii) the manner in which it structures its own balance sheet because a

parent corporation's leverage ratio may have an incidental effect on the credit rating of its subsidiary. *See Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828, 853 n. 100 (Del. Ch. 2003); *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386 (Del. Ch. 1999); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986).

16.     Whether the defendant directors are shielded from liability by 8 *Del. C.* § 102(b)(7) and the terms of Marvel's certificate of incorporation. *See Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001); *Emerald Partners v. Berlin*, 787 A.2d 85, 92 (Del. 2001); *In re BHC Commc'ns*, 789 A.2d at 9-10; *McMillan v. Intercargo Corp.*, 768 A.2d 492 (Del. Ch. 2000).

17.     Whether the terms of the Notes bind Marvel. *See Shultz v. Delaware Trust Co.*, 360 A.2d 576, 578 (Del. Super. Ct. 1976); *Cochran v. Stifel Fin. Corp.*, C.A. No. 17350, 2000 WL 286722, at *13 (Del. Ch. Mar. 8, 2000), aff'd in part, rev'd in part on other grounds, 809 A.2d 555 (Del. 2002); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160, 172 (Del. 2002).

18.     Whether the board of directors of Marvel was required to take any action with respect to a transaction that did not bind Marvel, and as to which Marvel was not a party. 8 *Del. C.* § 141(a); *Gotham Partners*, 817 A.2d at 172; *Wallace*, 752 A.2d 1175 at 1183-84.

19.     Whether the directors of Marvel can be held liable, *qua* directors, for a promise made by a majority shareholder that is a separate and independent corporation. *See J. Royal Parker Assocs.*, 1984 WL 8255, at *4; *Wallace*, 752 A.2d at 1183-84; *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629 (Del. 1968); *In re*

*Tri-Star Pictures, Inc., Litig.*, C.A. No. 9477, 1995 WL 106520, at *2 (Del. Ch. Mar. 9, 1995); *Citron v. E.I. du Pont de Nemours & Co.*, 584 A.2d 490, 499 (Del. Ch. 1990).

20.     Whether entire fairness applies to a transaction in which the corporation and a director or controlling shareholder do not stand on opposite sides of the transaction. *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del. 1995); *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002).

21.     Whether the potential conflict of interest between Mr. Perelman's personal interest in avoiding a default under notes issued by corporations he indirectly owned, on the one hand, and Marvel's potential interests in taking actions inconsistent with the terms of the Notes, on the other hand, can form the basis of a breach of fiduciary duty where the conflict presented by the terms of those Notes never materialized. *See* 8 *Del. C.* § 144; *Oberly v. Kirby*, 592 A.2d 445, 467 (Del. 1991); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984).

22.     Whether plaintiffs have rebutted the business judgment rule's presumptions of good faith, loyalty and care with respect to the Marvel board of directors' decision to fund the acquisition of Panini with bank debt. *See In re Walt Disney Co. Derivative Litig.*, No. 411, 2005, 2006 WL 1562466, at *15 (Del. June 8, 2006); *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

23.     Whether plaintiffs have rebutted the business judgment rule's presumptions of good faith, loyalty and care with respect to the Marvel board of

directors' decision to fund the acquisition of Skybox with bank debt. *See In re Walt Disney Co. Derivative Litig.*, No. 411, 2005, 2006 WL 1562466, at *15 (Del. June 8, 2006); *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

24.     Whether the possibility that some number of holders of Marvel III notes might opt to invoke a put right pursuant to Section 4.14 of the Marvel III Indenture if Marvel diluted Mafco's indirect ownership below 80% (and the possible economic consequences of that put right) was material to Mr. Perelman's personal financial situation such that it rendered him "interested" in Marvel's decisions to use debt instead of equity to finance any acquisitions. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363-64 (Del. 1993); *Orman*, 794 A.2d at 23 n.44; *In re General Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999).

25.     Whether the terms of the Notes were the proximate cause of Marvel's financial losses. *Thorpe v. CERBCO Inc.*, 676 A.2d 436, 444 (Del. 1996).

26.     Whether, if defendants breached fiduciary obligations to Marvel in connection with the Notes, the appropriate relief would be to order defendants to pay Marvel what it would have received through arms' length bargaining for its consent to be bound by the restrictions in the Notes. *See Cantor*, 414 F.3d at 437; *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 907 (Del. Ch. 1999).

27.     Whether defendants Mafco, MacAndrews & Forbes and Andrews aided and abetted a breach of fiduciary duty. *See Goodwin v. Live Entm't, Inc.*, C.A. No. 15765, 1999 WL 64265, at *28 (Del. Ch. Jan. 25), *aff'd mem.*, 741 A.2d 16 (Del.

1999); *Klang v. Smith's Food & Drug Ctrs., Inc.*, C.A. No. 15012, 1997 WL 257463, at

*13 n.82 (Del. Ch. May 13), *aff'd,* 702 A.2d 150 (Del. 1997).

        28.     Whether plaintiffs are entitled to interest on any monetary award in

light of their (and Marvel's shareholders') extreme and unjustified delay in prosecuting

their claims. *See Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del.

1988); *Wacht v. Continental Hosts, Ltd.*, C.A. No. 7954, 1994 WL 728836, at *3 (Del.

Ch. Dec. 23, 1994); *Juliano v. D & S Builders, Inc.*, C.A. No. 85C-88, 1994 WL 713963,

at *1 (Del. Super. Ct. 1994).

## VI.    Witnesses

      A.    Plaintiffs' Witnesses

        1.     The following is a list of expert witnesses plaintiffs expect to call,

and a brief summary of the opinions to be offered:  In addition, copies of each expert's

report(s) are attached as Schedule A-1.

        (a)     Bevis Longstreth

        If Mr. Perelman had presented to the independent directors of Marvel a

request that Marvel assist and acquiesce in the Note transactions as it did, an independent

director would have learned that the security for the Notes included a range of negative

covenants wherein the issuers agreed to exercise their power to restrict Marvel in various

ways.  An independent director would have become aware that Mr. Perelman faced a

conflict between his personal interests and Marvel's corporate interests, and would

demand that Messrs. Perelman, Bevins and Drapkin step aside to allow the independent

directors alone to consider the impact of the proposed restrictions on Marvel.

        Independent directors would have retained counsel and bankers who had

no connection to either Mr. Perelman or the investment bankers involved in the Note

issuances to advise them.  In negotiating with Perelman, independent directors would

have considered the following:

> (1)    Without the restrictions on Marvel and the active participation of Marvel and its management, the Notes could not have been issued.

> (2)    Marvel received no benefit from the restrictions, while all of the benefits would accrue to Mr. Perelman.  By the same token, if Marvel faced financial crisis, Mr. Perelman's wealth extraction would be unaffected, but Marvel would still have to deal with the deleterious effects of the restrictions imposed on the company.  The restrictions would limit the power of the Marvel board to use in the best interests of Marvel the increase in authorized capital stock implemented shortly before the first issue of Notes occurred.  The restrictions might, depending upon future events, so restrict Marvel's flexibility with respect to financing as to cause its demise.

> (3)    If Mr. Perelman were to argue that Marvel need not be concerned about the restrictions because Marvel was not agreeing to be bound by them, his argument would not be persuasive.  In fact, the restrictions worked a transfer of corporate power from the Marvel board to the Noteholders for as long as the Notes remained outstanding.  The Noteholders and Indenture Trustee, who would have the legal right to enforce the covenants, had no fiduciary obligation to Marvel and would act solely in their own best interests.

> (4)    Had Mr. Perelman intended to cause Marvel not to comply with the negative covenants or had Marvel itself intended not to comply with those covenants when compliance was not in Marvel's best interests, Marvel's counsel could not have given the 10b-5 opinions that it gave in connection with each such Note issuance because there was no disclosure suggesting any such possibility.  Marvel would have had to disclose the restrictions in its SEC filings.  Had Marvel claimed in its SEC filings that Mr. Perelman would not allow his holding companies to comply with their covenants where it was not in Marvel's best interests to do so, the Note issuances could not have been completed.

> (5)    Were Marvel's independent directors to resist the application of the restrictive covenants, they and Marvel would be exposed to the risk of a claim for tortious interference with the contractual relationships between the Indenture Trustee and Mr. Perelman's holding companies.

It would not make sense for Marvel to participate in the issuance of the

Notes or allow accept the proposed restrictions unless there were benefits to Marvel

worth more than the costs of surrendering its freedom of action, having its officers conduct road shows and otherwise support the placement of the Notes, and having its lawyers participate actively in the issuance of the Notes and deliver opinions regarding Marvel. Taking all of the aforementioned factors into account, the consideration that Marvel would have required would have been in the order of magnitude of $150 million.

(b)     Andrew Carron

As of the time of each of the Note issuances by Holdings, Parent and Marvel III, if the Marvel Holding Companies had raised funds using a different market transaction that was secured by the same Marvel shares but did not require the Indenture Covenants and that, like the Marvel Notes, had no recourse to assets of any other entities, the proceeds would have been materially different from the actual proceeds of each Note issuance. An alternative market transaction would have been if the Marvel Holding Companies had issued Liquid Yield Option Notes such as those issued around the same time by another indirectly, wholly owned by Mr. Perelman, holding company, Coleman Worldwide Corporation. In the aggregate, alternative market transactions without the Indenture Covenants but all other material terms equal would have raised $396.8 million, *i.e.,* $156.7 million less than the $553.5 million actually raised by the Marvel Holding Companies.

Depending on the rate of interest, the $553.5 million in actual Notes proceeds paid as dividends would have had a value as of December 31, 2005 of between $1,101.8 million and $1,662.1 million, and the $396.8 million proceeds from alternative market transactions would have had a value of between $788 million and $1,186.0 million. Thus, the value difference in benefits to the dividend recipients as between the

actual and alternative transactions, as of December 31, 2005, would be in the range of $313.8 million to $476.1 million.

(c)    Jeffrey L. Baliban

The issuance of Notes by Parent and Marvel III on the basis of the restrictive covenants relating to Marvel and other terms in the Indentures caused harm to Marvel by limiting Marvel's access to capital markets, interfering with Marvel's ability to issue equity, and generally impeding Marvel's ability to obtain financing on terms in Marvel's best interests. The Indenture Covenants were a reason why Marvel financed acquisitions exclusively with bank debt rather than in a manner that would have been consistent with its best interests, and a reason why Marvel's debt to equity ratio following the Note issuances was much larger than the debt to equity ratio of comparable companies. Marvel's financing of its acquisitions with bank debt, which was in the best interests of Mr. Perelman but not Marvel, was a cause of Marvel's financial distress. The Indenture Covenants also resulted in Marvel being unable to raise financing it needed to overcome a liquidity crisis in the fourth quarter of 1996 which led directly to Marvel's bankruptcy filing.

The magnitude of the harm to Marvel by virtue of its inability to address a liquidity crisis at a time when Marvel's stock price had already declined to $4.63 a share can be measured by the further decline in market value and stock price of Marvel on November 12, 1996, and is at least $190.5 million. This is a minimum amount of damages to Marvel that is subsumed within the overall financial distress damages attributable to the Indenture Covenants. Depending on the rate of interest, the $190 million in damages would have had a value as of December 31, 2005 of between $363.9

million and $422.0 million. The overall financial harm to Marvel caused by the issuance

of the Parent and Marvel III Notes is in the range of $308 to $617 million – with an

average loss of $462.7 million – and the Marvel III Note issuance alone would have been

sufficient to cause all of that harm to Marvel. Depending upon the rate of interest, the

average overall loss of $462.7 million would have had a value as of December 31, 2005

of between $902.4 million and $1.334.2 million.

(d)      William Purcell

The restrictive covenants relating to Marvel were a substantial reason why

Holdings, Parent and Marvel III could sell debt securities to investors in the note

issuances that took place in April 1993, October 1993 and February 1994. Those debt

securities could not have been successfully sold by the investment banking firms

involved without the existence of the restrictive covenants, including those in Sections

4.04, 4.05 and 4.09 of the Indentures. The damage caused to Marvel by the issuance of

the Notes with these restrictions was approximately $475 million.

The opinion of defendants' expert, Professor Robert Holthausen, in his

Report dated March 15, 2002, that the restrictive covenants did not damage Marvel is

based on the erroneous assumption that Marvel's capital structure would have been the

same even in the absence of those covenants. The harm caused to Marvel by the

covenants cannot be assessed without considering the effect of the covenants on Marvel's

capital structure, and its likely structure in the absence of those restrictions. In the

absence of the holding company debt made possible by the covenants, Marvel would not

have financed its acquisition program exclusively with bank debt, but would have done

so with a combination of long-term debt and equity which would have afforded significant advantages over bank debt.

(e)    Justice Joseph T. Walsh, Retired (in rebuttal to Lawrence A. Hamermesh)

Professor Hammermesh opines that a controlling shareholder is entitled to take extraordinary steps to protect that controlling interest against efforts by the board of directors to issue sufficient shares to eliminate that majority voting power.  In rebuttal, Justice (Ret.) Walsh opines that the duty of loyalty require that the "best interests of the corporation and its shareholders takes precedence over *any* interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (emphasis added).

2.    Non-expert witnesses plaintiffs expect to call:

(a)    Ronald O. Perelman (in person and by deposition)

(b)    William C. Bevins (in person and by deposition)

(c)    Donald G. Drapkin (in person and by deposition)

(d)    Howard Gittis (in person and by deposition)

(e)    Bobby Jenkins (by deposition)

(f)    Robert Marc Kramer (by deposition)

(g)    Robert Bicknese (by deposition)

(h)    Daniel Celentano (by deposition)

(i)    Peter A. Fowler (by deposition)

B.    <u>Defendants' Witnesses</u>

    1.    The following is a list of expert witnesses that defendants expect to call at trial.  Defendants refer the Court to the expert reports attached as Schedule A-2 for a summary of their opinions.

        (a)    Robert W. Holthausen

        (b)    Peter A. Fowler

        (c)    John E. Parsons

        (d)    Lawrence A. Hamermesh

    2.    Non-expert witnesses defendants expect to call:

        (a)    William Bevins

        (b)    Robert Bicknese (by deposition)

        (c)    Ronald Cantor (by deposition)

        (d)    Daniel Celentano (by deposition)

        (e)    Donald Drapkin

        (f)    Irwin Engelman

        (g)    Howard Gittis

        (h)    Vincent Intrieri (by deposition)

        (i)    Carl Icahn (by deposition)

        (j)    Bobby Jenkins (in person and by deposition)

        (k)    Robert Kramer (by deposition)

        (l)    Ronald Perelman

        (m)    Terry Stewart

        (n)    James Scarpone (by deposition)

       (o)     Ivan Snyder (by deposition)

       (p)     Greg Woodland

       (q)     Kenneth Ziffren

    C.     Each of the parties may call rebuttal witnesses as may be necessary without prior notice thereof to the other party.

## VII.    Exhibits

Attached as Schedule B-1 is a list of pre-marked exhibits that plaintiffs may offer at trial. Attached as Schedule B-2 is a list of pre-marked exhibits that defendants may offer at trial. The parties agree that these exhibits are admissible into evidence at trial. Neither party concedes the relevance of the other party's exhibits, but both parties agree that relevance will not be a basis for objecting to admissibility. The exhibits on Schedules B-1 and B-2 are hereby admitted as "PX __" or "DX __" (as the case may be) in evidence. The foregoing is without prejudice to the Daubert motions and motions in limine that have been filed or are attached hereto. Each of the parties reserves the right to amend or supplement their respective list if circumstances warrant.

## VIII.    Deposition Designations

Attached as Schedule C-1 is a list of the deposition designations which plaintiffs will offer into evidence. Attached as Schedule C-2 is a list of the deposition designations which defendants will offer into evidence. Each of the parties reserves the right to amend or supplement their respective list if circumstances warrant.

## IX.    Damages

    A.    Plaintiffs' Statement

Plaintiffs seek disgorgement of $553.5 million plus pre-judgment interest for a total judgment in excess of $1 billion. In the alternative, plaintiffs seek damages

caused by the issuance of the Parent and Marvel III Notes in the range of $308 to $617

million, plus pre-judgment interest.  As another alternative, if monetary relief is to be

measured based on arms' length negotiations, plaintiffs seek no less than $150 million,

plus pre-judgment interest.

      B.    <u>Defendants' Statement</u>

      Defendants have not breached their fiduciary duties to plaintiffs and

therefore are not liable to plaintiffs.  In addition, Plaintiffs cannot establish damages.

**X.    <u>Bifurcated Trial</u>**

      The parties do not request a bifurcated trial.

**XI.    <u>Trial Briefs and In Limine Requests</u>**

      A.    Defendants' motions in limine are attached as Schedule D-1, and

Plaintiffs' responses thereto are attached as Schedule D-2.

      B.    The parties shall simultaneously file and serve their pretrial briefs on

September 22, 2006 at either 5:00 p.m. or a time agreed to by the parties.

**XII.    <u>Limitations, Reservations and Other Matters</u>**

      A.    Length of Trial:  The probable length of trial is 14 days.  The case is listed

on the trial calendar to begin on October 10, 2006, and conclude on October 27, 1996.

      B.    On February 10, 2006, the Court granted defendants' motion to strike

plaintiffs' jury demand.

**XIII.  <u>Post-Trial Briefing</u>**

      The parties propose the following schedule for post-trial briefing:

plaintiffs shall file and serve their opening brief and exhibits within sixty (60) days from

the date that the full trial transcript is available.  Defendants shall file and serve their brief

in response and exhibits within sixty (60) days thereafter. Plaintiffs shall file and serve their reply brief and exhibits within thirty (30) days thereafter.

IT IS ORDERED that this Final Pretrial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice or for good cause shown. Such modification may be made either on application of counsel for the parties or on motion of the Court.

Dated:

_____
UNITED STATES DISTRICT JUDGE

APPROVED AS TO FORM AND
SUBSTANCE:

ASHBY & GEDDES

/s/ Tiffany Geyer Lydon
_____

Lawrence C. Ashby (I.D. No. 468)
Philip Trainer, Jr. (I.D. No. 2788)
Tiffany Geyer Lydon (I.D. No. 3950)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware  19899
(302) 654-1888

-and-

Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Emily A. Stubbs
Jonathan Gottfried
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
1633 Broadway
New York, New York  10019
(212) 833-1100

Attorneys for Plaintiffs


SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

/s/ Paul J. Lockwood
_____

Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000

Attorneys for Defendants