# SCHEDULE A-1

# Part 1 of 5

# Longstreth

# Longstreth

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x
                                         :

RONALD CANTOR, IVAN SNYDER and     :
JAMES A. SCARPONE, as TRUSTEES OF  :
THE MAFCO LITIGATION TRUST,      :
                                         :   No. 97-CIV-586-KAJ
                 Plaintiffs,     :

                                         :
           - against -           :

RONALD O. PERELMAN,           :
MAFCO HOLDINGS INC.,          :
MacANDREWS & FORBES HOLDINGS INC.,  :
ANDREWS GROUP INCORPORATED,    :
WILLIAM C. BEVINS and          :
DONALD G. DRAPKIN,           :
                                       :
                 Defendants.    :
                                         :
-----------------------------------------------------------x

## EXPERT REPORT OF BEVIS LONGSTRETH

January 12, 2006

I, Bevis Longstreth, submit this report in the above-referenced action.

Qualifications

I received my B.A. from Princeton University in 1956 and my law degree from Harvard University in 1961. I practiced law at Debevoise & Plimpton for approximately 30 years, first as an associate and from 1970 as a partner. I was twice appointed a Commissioner of the Securities and Exchange Commission by President Reagan, serving from 1981 to 1984. I then returned to Debevoise & Plimpton, practicing corporate, finance, banking and securities law until my retirement in 1994. I was an Adjunct Professor at Columbia University School of Law from 1994 to 1999. I am the author of Modern Investment Management and the Prudent Man Rule (Oxford University Press, 1986) and have written and lectured extensively on corporate governance and other issues of corporate and securities law. I served as an advisor to the American Law Institute's Project on Principles of Corporate Governance.

Throughout my career as a lawyer I have served on boards of directors and of trustees in both the profit and not-for-profit world. Since 1996, I have been a member of the Board of Trustees of the College Retirement Equities Fund (CREF), and am Co-Chair of its Committee on Corporate Governance and Social Responsibility. Since 1993, I have served as a member of the Board of Directors of AMVESCAP PLC, one of the world's largest independent global investment managers. I have been Chair of the Audit Committee for 13 years. In 2005, I became a member of the Board of Directors of the privately owned investment management firm of Grantham, Mayo & Van Otterloo, LLC, where I am Chair of its Risk Committee. From 1972 until I was appointed to the SEC, and again after I left the SEC, I have been a member of the Finance Committee of the Rockefeller Family Fund (Chairman, 1987-2004), where I have been responsible for investment strategy, asset allocation, manager selection and monitoring. I have served since 2004 as a member of the Standing Advisory Group to the Public Company Audit Oversight Board, and from 1992 to 1998 I was a Member of the Board of Governors of the American Stock Exchange. Other qualifications may be found in my curriculum vitae, attached as Exhibit A. (It includes a listing of all publications I have authored within the last ten years.)

Rate of Compensation, Materials Considered and Basis for Opinion

My rate of compensation paid for the study and testimony I am providing in this action is $1,000 per hour. A list of the materials I have considered in forming the opinions set forth herein is attached as Exhibit B. The basis for my opinions, as set forth below, is my experience as a board member and trustee of numerous organizations, my experience as a practicing lawyer counseling boards of directors, my service as an SEC Commissioner, and my other professional and academic experience in addressing issues of corporate governance.

I have not testified as an expert at trial or by deposition within the preceding four years.

1

Opinion

        Reference is made to the letter of Edward A. Friedman to Bevis Longstreth, dated December 23, 2005 (the "Letter"), a copy of which is attached hereto as Exhibit C. I set forth below my answers to the numbered questions contained in the Letter. Those answers, taken in their totality, answer the general questions set forth at the bottom of page 4 and top of page 5 of the Letter, which are to the following effect:

> "We wish to obtain your expert opinion with respect to the nature of the arm's-length bargaining that would have been conducted by Marvel with Perelman, if Perelman had presented to the independent directors of Marvel a request that Marvel assist and acquiesce in the Note transactions as it did. In this regard, we are seeking your views as to the considerations that a director of Marvel would have taken into account as part of this process, and the compensation and other benefits, if any, that a Marvel director would have sought to obtain on Marvel's behalf if Marvel were asked to agree to Perelman's request."

Answer to 1.

        As an independent director of Marvel (or, for that matter, of any other company, public or private), I would have various responsibilities. The most significant responsibility involves the direction and oversight of the management of the business and affairs of Marvel. In discharging this responsibility, I would owe Marvel the twin duties of loyalty and care generally expected of corporate directors throughout the country.

        In my experience, loyalty requires that I must at all times serve Marvel and its stockholders with a loyalty uncompromised by any competing interest, personal or otherwise.

        Care requires that in the discharge of my responsibilities as a director, I must exercise reasonable business judgment informed by facts that a reasonable investigation would disclose. In other words, I would have to make such investigation of the facts surrounding a corporate issue to be decided as would, in my reasonable judgment, enable me to reach an informed decision regarding that issue.

Answer to 2.

        Given the distribution of Marvel's stock ownership, where 80% is owned directly or indirectly by one controlling shareholder, and the remaining 20% is owned by public shareholders, I would be aware of the conflicts that were likely to arise in decision-making by Marvel's board between what's in the best interests of the controlling shareholder, on the one hand, and what's in the best interests of the public shareholders, on the other hand.

2

Given the power implied by ownership of 80% of all outstanding stock, I would be aware of the pressure that from time to time could be exerted upon me, as an independent director of Marvel, by the controlling shareholder, who would naturally expect to be able to guide Marvel's board in doing what he wanted Marvel to do. I would be acutely aware of the fact that only the independent directors could be expected to assert, with undivided loyalty, the best interests of Marvel and all the shareholders, and that to do so could be a particularly difficult responsibility. The Chairman of Marvel's Board was Perelman. The CEO of Marvel was Bevins, who was also a member of Marvel's Board. And Drapkin was a member of Marvel's Board. These three individuals comprised the Boards of the various holding companies that were wholly-owned, directly or indirectly, by Perelman and through which he held ownership of 80% of all outstanding stock of Marvel.

Given the potential for difficulty under these circumstances in discharging the duty of an independent director of Marvel, I would only have accepted the director position if I thought I could succeed in standing up to the pressure that could be exerted by the controlling shareholder.

I would probably have had a discussion with the controlling shareholder about the obvious conflicts that could arise in order to make sure he knew of my determination to discharge my duty of care to Marvel with a loyalty to this company and all its shareholders, undiluted by regard for how I got appointed to the board or any friendship that existed between the controlling shareholder and me.

In considering corporate issues, I would be especially watchful for matters in which the controlling shareholder was directly or indirectly interested, other than through his stake in Marvel. Once identified, I would take particular care in assessing the best interests of Marvel and all its shareholders in regard to such matters.

The issuance of the Notes by the wholly-owned holding companies of Perelman was a clear case of conflict between the personal interests of Perelman and the corporate interests of Marvel. As discussed at some length below, the security for the Notes included a range of negative covenants restricting Marvel's freedom of action, and correspondingly, the free play of business judgment by its Board, in pursuit of business opportunities that were attractive for Marvel or in furtherance of measures necessary for the health, or even the survival, of Marvel.

As Marvel began to encounter liquidity problems, these negative covenants impaired its ability to raise much needed capital, leading in the end to a bankruptcy filing. Evidence of impairment is found in the Minutes of the Special Meeting of the Marvel Board held on December 12, 1996, where Perelman indicates that a "proposed financial restructuring" by Andrews Group Incorporated, involving an investment of $350 million for 80.1% of the outstanding common stock of Marvel, could not go forward because the holders of the Notes, whose consent to such a restructuring was required under the negative covenants, could not even be organized into a group capable of being approached for the purpose of negotiation leading, possibly, to consent. Perelman goes on to say that the delay in obtaining this restructuring was having a

3

negative impact on Marvel's liquidity needs and that, therefore, one option being considered was a bankruptcy filing under Chapter 11. Perelman stated that in Chapter 11, Marvel might be able to achieve the proposed financial restructuring without regard to the rights of the Noteholders under the negative covenants.

These Minutes capture with dramatic effect the actual impairment of Marvel's business and prospects created by the negative covenants. Of course, they are simply a snapshot of Marvel's business at one moment in time. Given the wide scope of the restrictions on Marvel that resulted from the negative covenants, it is highly likely that there were many other instances of impairment over the more than three year period between the issuance of the first tranche of Notes and the Chapter 11 filing.

In fact, the terms of the third tranche of Notes, issued in 1994 and referred to in the Letter as the Marvel III Notes, considered together with Marvel's exploration of financing possibilities for its acquisition of SkyBox International Inc. in 1995, present another concrete example of impairment. In brief, the Marvel III Notes, unlike those issued in 1993 in the previous two tranches, bore interest payable semi-annually. As indicated in the Private Offering Memorandum ("POM") for the Marvel III Notes, the principal source of cash to make interest payments would come from tax sharing payments to be made by Marvel under a consolidated group tax sharing agreement among Marvel and its controlling corporate shareholders, among which was Marvel III.

The POM pointed out that the obligation of Marvel to make tax sharing payments would terminate if less than 80% of Marvel's outstanding common stock were owned by the consolidated group, and that the consolidated group's ownership stood at approximately 80%. Accordingly, Marvel could not issue common stock to third parties (unless the consolidated group correspondingly increased its stake) without causing (a) a loss of the right to consolidate Marvel with Perelman's wholly-owned holding companies, and, importantly, (b) a loss of Marvel's duty to make the tax sharing payments that were being counted on to service interest due on the Marvel III Notes.

In addition, if Perelman's ownership of Marvel, through his wholly-owned holding companies, dropped below 80%, this "deconsolidation event" would trigger a right on the part of the holders of the Marvel III Notes to require Marvel III to repurchase the Marvel III Notes in full at a purchase price of 101% of their face value.

In Marvel's 10K for 1994, its intention to acquire SkyBox is discussed, and Marvel states that it is exploring various alternatives to raise the purchase price of $150 million for this acquisition. In fact, Marvel raised the purchase price through a bank term loan, which didn't violate any of the negative covenants to which it was subject under the terms of the Notes. Although the issuance of Marvel common stock would certainly have been one way of raising $150 million, it is obvious that, given the dire consequences to Marvel III of doing so, Perelman and his colleagues would have had a strong interest in avoiding any exploration of a stock offering, even if it was clearly the best alternative for Marvel and all of its shareholders. The issuance of preferred stock would have been another alternative that, depending on the negative covenants, could have been impossible without the consent of the Noteholders.

4

To explore financing alternatives with an eye solely to determining what was in the best interests of Marvel and all its shareholders, it would have been necessary to have a Committee designated, consisting solely of independent Marvel directors, who would be free to explore the alternatives, free of interference or influence from Perelman, Bevins and Drapkin. The Committee would be free to retain independent financial advisers to assist in the exploration. There is no evidence that these sound corporate practices were followed.

Answers to 3 and 4.

Upon learning of Perelman's intention to cause his wholly-owned holding companies to issue Notes pursuant to Indentures as described in the Letter, I would have asked Perelman to make a complete presentation to the Marvel Board of his planned Note offering. Such a presentation would have disclosed the following important matters, among others.

First, the security for the Notes would not be limited to a pledge of Perelman's controlling block of Marvel stock.

Security for the Notes would include negative covenants in the Indentures to which the issuers of the Notes (each a holding company wholly-owned directly or indirectly by Perelman) were parties, wherein those issuers would agree to exercise their power to restrict Marvel in a variety of ways apparently considered necessary by the investment bankers to market the Notes. These restrictions included, among other things, limitations on debt of Marvel and its subsidiaries, on the issuance of preferred stock, and on so-called Restricted Payments, which were defined to include dividends, repurchases of stock and non-scheduled repayments of debt.

Given the sheer power of Perelman, as owner of 80% of the stock of Marvel, to cause compliance with these restrictions, and the obvious interest of Perelman, personally, as sole recipient (through his wholly-owned holding companies) of the net proceeds of the Note issuances, in doing so, the requested presentation would make clear the deep and serious conflict of interest that Perelman faced. As an independent director, it would be obvious to me that Perelman could not be expected to discharge his fiduciary duty to Marvel as both its controlling shareholder and as a director, while at the same time seeking to restrict Marvel's ability to conduct its affairs in order to sell the Notes and secure the net proceeds therefrom for himself personally, without any benefit to Marvel. I would demand that Perelman, in his capacity as a Marvel director, after completing his presentation and answering questions from the independent Marvel directors, step aside to allow the independent directors to consider, alone, the impact of the proposed restrictions on Marvel's business. I would make the same demand of Messrs. Bevins and Drapkin, the other Marvel board members who held positions with Perelman's holding companies and therefore were not independent.

In my experience, it is commonplace for conflicted directors to disclose the nature of their conflict to those on the board not so conflicted and then leave the meeting so that the unconflicted directors can consider the matter free from the presence

of the conflicted directors and whatever influence their presence and continued participation in the meeting might create. For a conflicted director, there is both the duty to disclose and the duty to recuse oneself in order to leave the decision-making entirely to those not conflicted. In the case of a public company, like Marvel, where the conflicted director also controls the company through stock ownership, the duties to disclose and recuse become vested with even greater necessity.

<u>Answer to 5.</u>

In thinking about the impact of the restrictions on Marvel's business, I would start with the realization that there was no benefit to Marvel from having such restrictions imposed on it. All the benefits of the Note issuances would accrue to Perelman. This being the case, I would ask how it could conceivably be in Marvel's best interests to allow such restrictions to apply. I would know that the Noteholders and Indenture Trustee, who would possess the legal right to enforce the convenants by which such restrictions would be applied to Marvel, would have the sole power to waive or amend such restrictions and in considering such actions in the future would have solely the best interests of the Noteholders in mind. Those interests could easily differ from the best interests of Marvel. Even if the Noteholders and Indenture Trustee claimed that the best interests of the Noteholders were the same as the best interests of Marvel, the fact would remain that this judgment, which as a matter of corporate law was placed in the hands of Marvel's board of directors, would have been taken away from that board and placed squarely in the hands of the Noteholders and Indenture Trustee, neither of whom owed any fiduciary duty whatsoever to Marvel or its shareholders.

In his presentation, Perelman might have argued that the restrictions needn't bother Marvel because Marvel was not agreeing to be bound by them, and if at some future time they proved disadvantageous to Marvel, it could simply refuse to comply. This argument would not prove persuasive to me or to other independent directors. We would know that Marvel would have to disclose the restrictions in its SEC filings. We would know that, were we to claim in such filings that Perelman, as controlling shareholder, would not allow his wholly-owned holding companies to comply with their covenants to impose restrictions on Marvel in cases where it was not in the best interests of Marvel to do so, that the Note issuances could not be completed. We would also know that, were we, as the independent directors of Marvel, to resist the application of any restriction, we would do so at peril of being sued for tortious interference with the contractual relationships between the Indenture Trustee and Perelman's wholly-owned holding companies. Indeed, Marvel would also be exposed to this risk.

In fact, to meet specific closing conditions, Marvel's counsel delivered to the investment banks involved in each of the three tranches of the Notes, legal opinions that, in my experience, were essentially the same in form and scope, as would be delivered in a financing transaction involving Marvel as the issuer of its own indebtedness. These opinions included so-called 10b-5 opinions with respect to the accuracy and completeness of disclosure about Marvel made to the bankers responsible for placing the Notes and were based upon the participation by such counsel in conferences with the various parties involved in the offerings.

6

Had Perelman intended to use his power over Marvel to cause it not to comply with the negative covenants, or had Marvel itself intended to not comply with those covenants, when, in either case, compliance was not in Marvel's best interests, Marvel's counsel could not have given the 10b-5 opinions because there was no disclosure suggesting any such possibility.

I would reflect on the fact that, shortly before the first issue of Notes occurred, at a Board meeting of Marvel on March 18, 1993, we amended Marvel's charter to increase its authorized capital stock, both Common and Preferred, by more than 200% in order to, among other things, effect stock splits and have stock available for "acquisitions of other companies and other general corporate purposes." I would realize that the negative covenants would limit the power of the Marvel Board to use the increase in authorized capital stock in what it deemed the best interests of Marvel and its shareholders.

Answers to 6 and 7.

First of all, I would be concerned about the "bet the ranch" nature of accepting restrictions that, depending on future events that I could not reasonably anticipate, might so restrict Marvel as to cause its demise. With hindsight, of course, this is precisely what happened.

Even if I could get past the "bet the ranch" concern, and it is not clear to me, at this point, that I could have been able to do so, as an independent director, I would refuse to allow Marvel to accept the proposed restrictions unless I could conclude that there were benefits to Marvel worth more than the cost, however uncertain, of allowing it to (a) surrender its freedom of action for however long the Notes remained outstanding, (b) cause its officers to conduct road shows and otherwise provide support instrumental in achieving a successful placement of the Notes and (c) have its general counsel and other lawyers acting on its behalf participate actively throughout the process of offer, issuance and sale of the three tranches of the Notes, as indicated by the fact that such counsel delivered financing-type opinions regarding Marvel, which included so-called 10b-5 opinions in respect of disclosures made in the offering materials regarding Marvel and its subsidiaries.

As proposed by Perelman there were no benefits of any kind accruing to Marvel. Before deciding there were no benefits sufficient to convince me to expose Marvel to the uncertain risks of the negative covenants, I would be willing at least to explore what, if any, benefits might be possible. I would, therefore, invite Perelman back into the board room and acquaint him with this proposition. If he were willing to negotiate benefits for Marvel, then I would advise him that the independent directors would retain (a) counsel and (b) bankers, who in each case had no connections to either Perelman or the investment bankers involved in the Note issuances or any of the prospective Note purchasers. These advisers would serve Marvel through its independent directors in determining what kind of benefit, if any, in what size, could constitute a reasonable and, to the independent directors, acceptable quid pro quo for allowing the

7

restrictions to be imposed. I would ask the advisers to develop as many alternative ways of benefiting Marvel adequately as possible.

If the independent directors could overcome the "bet the ranch" concern, and if they could identify benefits representing an adequate quid pro quo for subjecting Marvel to the negative covenants, then the independent directors would direct their advisers to negotiate with Perelman and the investment bankers with a view to completing the transactions necessary to give Marvel its benefits as a condition to the issuance of the Notes.

Answer to 8.

Of course, the SEC filings by Marvel relating to the Note issuances would have to be accurate and not misleading. Ultimately, it is the Marvel Board's responsibility to assure this result. The descriptions of the restrictions being imposed on Marvel, as actually contained in the SEC filings, would certainly have been materially misleading if it had been the plan of Perelman and the Note issuers only to honor the covenants imposing restrictions on Marvel if such restrictions did not infringe the best interests of Marvel. No such qualification was inserted in the filings, and no reader of the statements filed could have been expected to imagine that such a qualification would apply.

In Marvel's S-3 Registration Statement filed with the SEC on March 14, 1995 to enable Marvel to offer debt securities "off the shelf," the section titled "Investment Considerations" makes abundantly clear that Marvel considered the negative covenants agreed to by the issuers of the Notes to restrict Marvel in regard to its business and to create risks for its business and prospects that investors should carefully evaluate, including the risk of a default under its own debt instruments.

_____
Bevis Longstreth

Dated: January 12, 2006

8

Exhibit A

Curriculum Vitae
of
BEVIS LONGSTRETH

Permanent Address:     322 Central Park West
New York, NY  10025

Telephone:     Office (212) 909-6651
Home   (212) 663-0576

E-mail:     blongstreth@debevoise.com
blongstreth@mindspring.com

Age:     71 Born January 29, 1934 in New York City

Marital Status:     Married to Clara Seymour St. John
Three children -  Katherine S.
Thomas D.
Benjamin H.

Education:     Harvard Law School (JD 1961)
Princeton University (1956)

Military:     Lieutenant, U.S. Marine Corps
(active duty 1956-58)

Admitted to Bar:     In the State of New York
March 26, 1962

Professional
Employment:     From 1994 to 1999
Adjunct Professor
Columbia University School of Law

Practiced law with the New York
firm of Debevoise & Plimpton from
1962 to 1981 (partner since 1970);
rejoined firm February 1984; retired 1994

Appointed Commissioner, Securities and Exchange
Commission, 1981; re-appointed, 1982; resigned
January 13, 1984

21975326v1

Professional and
Civic Activities

Current:

Since 2005, Member, Board of Directors of Grantham, Mayo &
Van Otterloo, LLC; Chairman, Risk Committee

Since 2004, Chairman, Fund for Independence in Journalism

Since 2004, Member, Standing Advisory Group to the Public
Company Audit Oversight Board

Since 2003, Member of the Board of Trustees, The Textile
Museum

Since 2002, Member of the Advisory Board of the Center for
Public Integrity.

Since 1996, Member of the Board of Trustees, College Retirement
Equities Fund (CREF), Co-Chair, Committee on Corporate
Governance and Social Responsibility

Since 1993, Member of the Board of Directors, AMVESCAP PLC;
Chair, Audit Committee

From 1991 to 1996, and from 1997 to 2005, Trustee of The Nathan
Cummings Foundation, and from 1996 to 2005, Chairman of its
Investment Committee

Since 1987, Trustee of New School University; member, Executive
Committee; Chair, Audit Committee

From 1972 to 1981 and since 1984, Member, Finance Committee,
Rockefeller Family Fund, responsible for investment strategy,
manager selection and monitoring; Chairman from 1987 to 2004

Previous:

From 1999-2001, Member, Panel on Audit Effectiveness,
appointed by Public Oversight Board

From 1980 to 2002, Director, Symphony Space, Inc.; from 1998
through 2001, Chairman.

During 1998, Member of National Adjudicatory Council of the
National Association of Securities Dealers, Inc.

From 1992 to 1998, Member of the Board of Governors of the
American Stock Exchange

2

21975326v1

From 1985 to 1997, Member, Consultant Panel to the Comptroller General of the United States

From 1984 to 2000, President, Board of Trustees of The Winston Foundation for World Peace

Served as Adviser, Project on Restatement of the Law Trusts — Prudent Investor Rule, American Law Institute

Served as Adviser, Project on Principles of Corporate Governance, American Law Institute

From 1984 to 1992, Member, Investment Committee, and from 1986 to 1992, Chairman of Investment Committee and Member of Board of Directors of Social Science Research Council

From 1981-1984 and from 1986 to 1993, Member, Administrative Conference of the United States

From 1991 to 1996, Member of the Advisory Board to Securities Regulation Institute University of California, San Diego

From 1987 to 1995, Member of the Pension Finance Committee of The World Bank

From 1980 to 1983, Director, Phipps Houses, Inc.

From 1977 to 1980, Member, Special Committee on the Lawyer's Pro Bono Obligations of the City Bar Association

From 1976 to 1979, Member, Committee on Professional Responsibility of the City Bar Association

From 1975 to 1981, Lecturer-at-Law, Columbia Law School, responsible with J. Harvey Goldschmid and William L. Cary for seminar on The Corporation in Modern Society

From 1973 to 1980, Trustee, Bennington College

From 1972 to 1977, Trustee, West Side Montessori School; President, 1974-1977

Consultant to The Ford Foundation in 1971 on the social aspects of investments and, with H. David Rosenbloom, author of a private report to The Ford Foundation on this subject

3

Assisted in establishing, and from 1968 through 1971 a member of the Board of Trustees of, Community Law Office, an experimental poverty law office located in East Harlem, representing individuals and groups from that neighborhood

Privacy Consultant to New York State Identification and Intelligence System in 1970

From 1963 to 1973, Member, Board of Directors of Union Settlement Association, a neighborhood service and action agency in East Harlem; Chairman, 1966-1968

Served as Secretary on the Special Committee on Science and Law of the Association of the Bar of the City of New York from 1962 until 1967, during which period that Committee completed a foundation-sponsored study into the impact of technology on privacy, one product of which was Alan F. Westin's book <u>Privacy and Freedom</u> (Atheneum New York 1967)

4

Publications by Bevis Longstreth

Books:

Spindle and Bow (Hali Publications Limited, 2005)

Modern Investment Management and the Prudent Man Rule (Oxford University Press, 1986)

With H. David Rosenbloom, Corporate Social Responsibility and the Institutional Investor (Praeger Publishers 1972)


Articles:

"The Corporate Bar as It Appears to a Retired Practitioner," The American Law Institute, Remarks and Addresses at the 82nd Annual Meeting, May 16-18, 2005, at p. 20

"The Riddle of the Pazyryk," 137 Hali (November-December 2004).

"It Rarely Pays to Criticise Executive Earnings," Financial Times, October 15, 2004.

"Financial Fiduciaries: A Call to Action," 26 Director's Monthly 9 (September 2002)

"The Profile: Designer Disclosure for Mutual Funds," 64 Brooklyn Law Review 1019 (1998)

With Ivan E. Mattei, "Organizational Freedom for Banks: The case in support," 97 Columbia Law Review 6 (October 1997) pp. 1895-1922

"Warren E. Buffett on Corporate Constituency Laws and Other Newfangled Ideas: An Imaginary Conversation," 19 Cardozo Law Review 1-2 (Sept.-Nov. 1997)

"Corporate Governance: There's Danger in New Orthodoxies," The Journal of Portfolio Management (Spring 1995)

"Executive Perspectives: Conference on International Capital Markets in a World of Accounting Differences," 5 Journal of International Financial Management & Accounting 1 (February 1994)

With Joel B. Prager, "'Gun Jumping' Revisited: A Proposal to Prevent False Starts in Private Offerings," Securities Regulation Law Journal, Fall 1993, page 235

With Ivan E. Mattei and David P. Mason, "U.S. Bank Reform:  Getting Beyond the Oxymoron," Annual Review of American Law, New York University School of Law, 1991 Volume, Issue 3 (also to be reprinted in the proceedings of the International Conference on the Japanese Financial Market and Corporate Managerial Behavior held in Tokyo to honor the Tenth Anniversary of the International University of Japan)

With Nancy Kane, "Shareholders' Growing Role In Executive Compensation," New York Law Journal (February 20 and 27, 1992)

"Reflections on the State of Corporate Governance," 57 Brooklyn Law Review 1 (Spring 1991)

"Takeovers, Corporate Governance, and Stock Ownership:  Some Disquieting Trends," The Journal of Portfolio Management (Spring 1990)

"Changes in Managerial Control and Stock Ownership," New York Law Journal, Thursday, October 19, 1989, p. 5.

"Global Securities Markets and the SEC," University of  Pennsylvania's Journal of International Business Law (Spring 1988)

"Villains, Victims and Volatility after Black Monday," Chicago Tribune (April 5, 1988)

"Putting Reins on Wall Street," The New York Times (July 9, 1987)

"Glass-Steagall:  The Case for Repeal," 31 New York Law School Law Review 2 (1986)

"Two-Class Common Could Be Harmful," The New York Times (April 7, 1985)

"Why SIPC Can't Support a Big Failure," The New York Times (August 26, 1984)

"Changes of Ownership and Control," New York Law Journal (June 4, 1984)

"Halting Insider Trading," The New York Times (April 12, 1984)

"The SEC's Role in Bankruptcy — A Change in Approach," International Financial Law Review (April 1984)

"Life at the SEC — Reflections of a Departing Commissioner," The New York Times (February 5, 1984)

"The SEC's Role in Financial Disclosure," Journal of Accounting, Auditing and Finance (Winter 1983)

"Do Public Shareholders Get a Fair Deal in Management Buyouts?," International Financial Law Review (November 1983)

2

"The SEC After Fifty Years:  An Assessment of Its Past and Future," (Book Review), 83 Col. L. Rev., 1593 (1983)

"Toward Neutral Principles of International Securities Regulation," Wirtschaft und Recht (1983) at 182

"Fairness of Management Buyouts Needs Evaluation,"Legal Times (October 10, 1983)

"In Search of a Safety Net for the Financial Services Industry," The Banker Magazine (July-August 1983)

"Averting a Chain Reaction Disaster in the Money World," Business and Society Review (Summer 1983) at 32

"SEC Disclosure Policy Regarding Management Integrity," 38 Business Lawyer 1413 (August 1983)

"A Little Shade, Please:  The Government-in-the Sunshine Act Isn't Working," The Washington Post (July 25, 1983)

"Open Letter to Bush Task Group on Regulation of Financial Services and Wirth Commission on Capital Markets," Sec. Reg. & L. Rep. (BNA) Vol. 15, No. 15 (April 15, 1983) at 772

"Why Free Markets and Banks Don't Mix — A Call for New Financial Regulation," The New York Times (May 29, 1983)

"Duty to Supervise is Critical to Effective Self-Regulation," The National Law Journal (May 16, 1983)

"Searching for a Financial Services Safety Net," American Banker (March 4, 1983)

"Consequences of the Rationale for Corporate Giving," Philanthropy Monthly (June 1982)

"El Legislador como Catalizador en los Procesos — de Formacion de Capital y de Mejoramiento de los Mercados de Valores," Segundo Encuentro Internacional de Derecho Bursatil (May 31, 1982)

"Regulation by the 'Pinch' Not the Handful," Enterprise (May 1982)

"SEC Battle Against Insider Trading is Worth the Effort," Legal Times (May 10, 1982)

"Reliance on Advice of Counsel as a Defense to Securities Law Violations," 37 <u>Business Lawyer</u> 1195 (April 1982); also published in [1981-82] Fed. Sec. L. Rep. (CCH) ¶83,063

With Howard R. Dressner, "150th Birthday Tribute to Prudent Man Rule," <u>New York Law Journal</u> (January 2, 1981)

With John G. Koeltl, "Market Information Revisited," 11 <u>The Review of Securities Regulations</u> 843 (October 1978)

"Shareholder Proposal Under '34 Act, Rule 14A-8," <u>PLI Eighth Annual Institute on Securities Regulation</u> (Mundheim editor 1977)

"The Impact of Section 4944 on Foundation Investments Policy, "PLI Fifth Biennial Conference on Tax Planning for Private Foundations, Tax Exempt Status and Charitable Contributions (1974)

"Social Aspects of Business Behavior — An Issue for Institutional Investors," 112 <u>Trusts & Estates</u> 322 (May 1973)

"Disclosure and the Social Aspects of Business Behavior," 28 <u>Business Lawyer</u> 215 (Special Issue, March 1973)

"Behavioral Research Using Students: A Privacy Issue for Schools," 76 <u>The School Review</u> 1 (March 1968)

4

Exhibit B

## Exhibit B
## Materials Considered

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1993

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1994

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1995

- Marvel Entertainment Group, Inc. Form S-3 Registration Statement Debt Securities Prospectus Marvel Entertainment Group, Inc., March 14, 1995

- Tender Offer Statement, Amendment No. 1, April 16, 1993

- Form S-1 Registration Statement for the public offering of Notes on July 2, 1993

- Marvel III Holdings Inc. Form S-1, March 31, 1994

- Marvel Entertainment Group, Inc. Form 8-K dated November 20, 1996

- Marvel Holdings Inc. Indenture dated April 15, 1993

- Marvel (Parent) Holdings Inc. Indenture dated October 1, 1993

- Marvel III Holdings Inc. Indenture dated February 15, 1994

- Marvel Holdings Inc. Offering Memorandum dated April 16, 1993

- Marvel (Parent) Holdings Inc. Prospectus dated October 13, 1993

- Marvel III Holdings Inc. Offering Memorandum dated February 8, 1994

- Opinion letter dated April 22, 1993 from Robert L. Losey, Marvel Entertainment Group, Inc., to Merrill Lynch & Co.

- Opinion letter dated October 20, 1993 from Robert L. Losey, Marvel Entertainment Group, Inc., to Bears, [sic] Stearns & Co. Inc.

- Opinion letter dated February 18, 1994 from Paul E. Shapiro, Marvel Entertainment Group, Inc., to Merrill Lynch & Co. and Bear, Stearns & Co. Inc.

- Marvel Board minutes, March 18, 1993, March 9, 1994, December 12, 1996, and December 26, 1996

- Outline for Howard Gittis Presentation to Marvel's Banks, November 19, 1996

- The Andrews Proposal, November 12, 1996

- The High River Proposal, December 10 and December 19, 1996

- Transcript of Deposition of William C. Bevins, March 7, 2002

- Transcript of Deposition of Howard Gittis, March 25, 2002

- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Brief of Plaintiffs-Appellants and Volume 1 of Joint Appendix

- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Brief for Appellees

- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Reply Brief of Plaintiffs-Appellants

Exhibit C

# FRIEDMAN KAPLAN SEILER & ADELMAN LLP

BRUCE S. KAPLAN
EDWARD A. FRIEDMAN
GARY D. FRIEDMAN
BARRY A. ADELMAN
ERIC SEILER
ROBERT D. KAPLAN
ANDREW W. GOLDWATER
ROBERT J. LACK
GREGG S. LERNER
HAL NEIER
PHILIPPE ADLER
MATTHEW S. HAIKEN
PAUL J. FISHMAN
RICHARD M. HOFFMAN
SCOTT M. BERMAN
LANCE J. GOTKO
ELLEN A. HARNICK
ROBERT S. LOIGMAN
KATHERINE L. PRINGLE
MERYL S. ROSENBLATT
DANIEL B. RAPPORT
DAVID I. TANENBAUM
HALLIE B. LEVIN

1633 BROADWAY

NEW YORK, NY 10019-6708

TELEPHONE (212) 833-1100

FACSIMILE (212) 833-1250

WWW.FKLAW.COM

NORMAN ALPERT
MARC N. EPSTEIN
JOHN R. CAHILL
—— COUNSEL ——

SNEHA DEVADASON
CRAIG J. CODLIN
ANNE E. BEAUMONT
MELISSA E. LONDON
EMILY A. STUBBS
KENT K. ANKER
AMY C. BROWN
MALA AHUJA HARKER
HEATHER WINDT
LISA S. GETSON
SHEILA V. FLYNN
ASAF REINDEL
JOHN N. ORSINI
JEFFREY R. WANG
LAURENCE D. BORTEN
VANESSA RICHARDS
CHAD B. PIMENTEL
JENNY F. KAUFMAN
LEE D. VARTAN
JOSHUA D. JACOBSON
JONATHAN GOTTFRIED

December 23, 2005

Mr. Bevis Longstreth
919 Third Avenue
New York, NY  10022

Re:  *Ronald Cantor, et al. v. Ronald O. Perelman, et al.*
Civil Action No. 97-586 (KAJ)

Dear Bevis:

We are requesting your expert opinion, on the basis of your expertise in corporate governance practices, on the matters and questions referred to below.

Background

As you know, this firm represents the plaintiffs, the Trustees of the MAFCO Litigation Trust, in the above-referenced action (the "Action").  The Trust was created pursuant to the MAFCO Litigation Trust Agreement, and, pursuant to that Agreement, the claims alleged in the Action were assigned by Marvel Entertainment Group, Inc. ("Marvel"), the original plaintiff in the Action, to the Trust.  In other words, the claims alleged in the Action are claims of Marvel against the defendants.  The

394184.6

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

Mr. Bevis Longstreth                    - 2 -                    December 23, 2005

defendants include Ronald O. Perelman ("Perelman"), William Bevins ("Bevins") and
Donald Drapkin ("Drapkin").

At all relevant times, Perelman was a director of Marvel, Chairman of
Marvel's Board, and, through a chain of corporations he wholly owned, the controlling
shareholder of Marvel.  At all relevant times, Perelman owned 100% of defendant Mafco
Holdings Inc., which in turn owned 100% of defendant MacAndrews & Forbes Holdings
Inc. ("MacAndrews & Forbes"), which in turn owned 100% of defendant Andrews Group
Incorporated ("Andrews Group").  At all relevant times, defendant MacAndrews &
Forbes also owned 100% of Marvel III Holdings Inc. ("Marvel III"), which in turn owned
100% of Marvel (Parent) Holdings Inc. ("Marvel Parent"), which in turn owned 100% of
Marvel Holdings Inc. ("Marvel Holdings").  Marvel III, Marvel Parent and Marvel
Holdings are together referred to as the "Marvel Holding Companies".  The first tranche
of Notes described below was issued by Marvel Holdings, the second tranche by Marvel
Parent and the third tranche by Marvel III.  At all relevant times, the Marvel Holding
Companies owned between approximately 60% and 80% of Marvel's total outstanding
stock and public shareholders owned between approximately 20% and 40%.

At all relevant times, Bevins was a director and Chief Executive Officer of
Marvel, a director of each of the Marvel Holding Companies, and also, at various times,
President, Chief Executive Officer and a director of Andrews Group, and Vice Chairman
and a director of MacAndrews & Forbes.  At all relevant times, Drapkin was a director of
Marvel, a director of each of the Marvel Holding Companies, and also, at various times,

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

Mr. Bevis Longstreth                    - 3 -                    December 23, 2005

Vice Chairman and a director of MacAndrews & Forbes, and a director of Andrews
Group.

Plaintiffs allege that in 1993 and 1994 while Perelman controlled both
Marvel and the Marvel Holding Companies, and while Perelman, Bevins and Drapkin
were directors of Marvel and the Marvel Holding Companies, Perelman caused the
Marvel Holding Companies to issue three tranches of notes, secured by the Marvel
common stock they owned. The Marvel Holding Companies had no assets other than
their shares of Marvel common stock. Neither Perelman nor the Marvel Holding
Companies ever presented to the Marvel Board the issue of whether Marvel should
acquiesce and assist the Marvel Holding Companies in the Note transactions.
Nevertheless, Marvel officers and employees assisted the Marvel Holding Companies in
the sale of the notes by, for example, traveling and participating in investor "road shows".

The first tranche of notes, with a face value of $517,447,000 (the "Marvel
Holdings Notes"), was issued in April 1993 by Marvel Holdings. The second tranche,
with a face value of $251,678,000 (the "Marvel Parent Notes"), was issued in October
1993 by Marvel Parent. The third tranche, with a face value of $125 million (the "Marvel
III Notes"), was issued in February 1994 by Marvel III. The Marvel Holdings Notes, the
Marvel Parent Notes and the Marvel III Notes are collectively referred to herein as the
"Notes."

The Marvel Holding Companies received $553.5 million from the three
Note issuances. Because the Marvel Holdings Notes and the Marvel Parent Notes were
zero-coupon notes, the net proceeds from the issuances of such Notes were substantially

394184.6

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

Mr. Bevis Longstreth                    - 4 -                    December 23, 2005

less than their face value.  The net proceeds from the Notes — $288 million from the

Marvel Holdings Notes, $144.9 million from the Marvel Parent Notes, and $120.6

million from the Marvel III Notes — were distributed upstream in Perelman's wholly-

owned corporate hierarchy.  Marvel received none of the Note proceeds.

      In the Indentures for each of the Note Issuances, the Marvel Holding

Companies promised to restrict Marvel's ability to raise capital and to engage in a variety

of basic corporate transactions.  The offering memorandum for each Note issuance stated

that "MacAndrews & Forbes will be able to direct and control the policies of the Issuer

and its subsidiaries [i.e., Marvel], including mergers, sales of assets and similar

transactions."  Each offering memorandum further stated that "no vote [would] be cast,

and no consent, waiver or ratification given or action taken [by the relevant holding

company], which would be inconsistent with or violate any provision of the Indenture or

the Notes."  Marvel also acknowledged the Indenture provisions in its own SEC filings.

(We have previously provided you copies of the Indentures, offering memoranda and

relevant SEC filings.)

Questions to be Addressed

      We wish to obtain your expert opinion with respect to the nature of the

arm's-length bargaining that would have been conducted by Marvel with Perelman, if

Perelman had presented to the independent directors of Marvel a request that Marvel

assist and acquiesce in the Note transactions as it did.  In this regard, we are seeking your

views as to the considerations that a director of Marvel would have taken into account as

part of this process, and the compensation and other benefits, if any, that a Marvel

394184.6

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

Mr. Bevis Longstreth                    - 5 -                    December 23, 2005

director would have sought to obtain on Marvel's behalf if Marvel were asked to agree to

Perelman's request.

        To the extent that you consider it to be relevant, we would appreciate your

consideration of the following queries as part of your analysis:

    1.    If you were serving as an "independent director" of Marvel or another

public company, could you describe in general terms your role and how you would carry

out your obligations?  (For this purpose, we would consider an "independent director" to

be a person who has no affiliation or association with Marvel, the Marvel Holding

Companies or Perelman, other than such person's service as a director of Marvel.)

    2.    In a situation where 80% of Marvel was owned by a large shareholder

(companies owned directly or indirectly 100% by Perelman) and the remaining 20% of

the shares were held by other (public) shareholders), would that affect the way in which

you would perform your obligations as a Marvel director?

    3.    If you were a Marvel director and had learned that Perelman was planning

to cause his wholly-owned holding companies to issue Notes on the terms that have been

described, would you believe that you had an obligation to take any action on behalf of

Marvel?  As a starting point, would you try to determine whether the issuance of such

Notes could have any effect on Marvel?  (If appropriate, you may wish to describe briefly

what an Indenture is, and what "covenants" are, in order to provide context for your

analysis.)

    4.    Since some of the Marvel directors (including Messrs. Perelman, Bevins

and Drapkin) were also directors of the holding companies, would discussions between

394184.6

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

Mr. Bevis Longstreth                        - 6 -                    December 23, 2005

Marvel and the issuers be conducted by those individuals acting simultaneously on behalf

of both of those entities?  In your experience, how would such a situation generally be

handled?  (If relevant to your analysis, you may wish to describe the concept of

"independent directors" and "special committees.")

     5.    In assessing the impact of these transactions on Marvel, what are the

possible effects that you as a director of Marvel would think about?  How would you, as a

director of Marvel, analyze Marvel's best interests in addressing any such effects?  Might

you seek protections for Marvel's interests that would be different from any contractual

protections that the holding companies might have negotiated for themselves?

     6.    If Mr. Perelman was benefiting from these transactions, and Marvel was

not, how would that affect any arm's-length bargaining between Marvel and Perelman?

(We understand that the extent of the benefit to Mr. Perelman may or may not be

comparable to any harm that Marvel might suffer as a result of the transactions, but we

nevertheless would want to know how a Marvel director would use, if at all, such

information as to Mr. Perelman's benefit.)

     7.    If Mr. Perelman requested assistance from Marvel in accomplishing the

Note issuances (such as, by having management of Marvel participate in "road shows"

for the sale of the Notes), would you as a Marvel director authorize such assistance?

What would you consider in making your decision?  Would there be bargaining between

Marvel and Mr. Perelman about this request, and if so, who would conduct the bargaining

on Marvel's behalf?

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

Mr. Bevis Longstreth                    - 7 -                    December 23, 2005

      8.    Marvel described the Indenture restrictions in various SEC filings that we have provided you copies of. As a director of Marvel, would you expect any such descriptions to be accurate and not misleading?

      In posing the above questions, we are not intending to limit the scope of your report. Rather, we understand that these questions may indicate the kinds of issues that you may wish to consider in preparing your report. Furthermore, to the extent that you wish to review any information in the record in addition to the documentation we have already provided you, please let us know and we will be happy to furnish any such additional information.

      Thank you for your consideration of these important matters.

                  Sincerely,

                  Edward A. Friedman

394184.6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------x
                                   :

RONALD CANTOR, IVAN SNYDER and      :
JAMES A. SCARPONE, as TRUSTEES OF  :
THE MAFCO LITIGATION TRUST,         :     No. 97-CIV-586-KAJ
                                    :

                   Plaintiff,      :

           - against -           :

RONALD O. PERELMAN,                 :
MAFCO HOLDINGS INC.,               :
MacANDREWS & FORBES HOLDINGS INC.,  :
ANDREWS GROUP INCORPORATED       :
WILLIAM C. BEVINS and               :
DONALD G. DRAPKIN,               :

                 Defendants.  :
                                    :
----------------------------------------------------------x

## REBUTTAL EXPERT REPORT OF
## BEVIS LONGSTRETH

May 15, 2006

May 15, 2006

I, Bevis Longstreth, submit this report in the above-referenced action.

## Qualifications

Reference is made to the Expert Report of Bevis Longstreth, dated January 12, 2006 (the "Longstreth Report"), previously filed with the Court. The Longstreth Report contains my qualifications.

## Rate of Compensation

The Longstreth Report contains my rate of compensation.

## Materials Considered

The Longstreth Report contains a listing of materials considered in preparing this rebuttal expert report. In addition to such materials, I considered the Rebuttal Expert Report of Peter A. Fowler, dated March 3, 2006 (hereinafter referred to as the "Fowler Report").

## Opinion

Paragraphs 59 and 60 of the Fowler Report contain Mr. Fowler's opinion regarding the outcome of an arm's length negotiation between Marvel and M&F Holdings, had one occurred, and include, in Paragraph 59, a series of exchanges between these parties "in which each side asserted arguments regarding the benefits of the Restrictions to the Marvel Holding Companies and the costs incurred by Marvel." Mr. Fowler describes the series of exchanges as summarizing "my view as to the key issues each side would assert in the negotiation."

My opinion is based on extensive experience with negotiations, spanning my entire career as a lawyer, fiduciary and senior government official.

In my opinion, the negotiation depicted by Mr. Fowler bears little resemblance to what one might reasonably expect to occur in a truly arm's length negotiation. Exchange 1 unrealistically starts with Marvel saying "the Restrictions hinder our ability to operate Marvel." The negotiation would necessarily commence with a request by Ronald O. Perelman, directly or through his agents, for Marvel to participate in the proposed borrowings by the Marvel Holding Companies. This request would spell out the various ways in which Marvel would be expected to participate, and would naturally include all of the ways in which Marvel, in fact, did participate. This request would trigger consideration by the independent directors of Marvel of whether or not Marvel was willing to participate at all, and if it were willing, on what terms it would do so.

1

Allowing the Restrictions to be imposed on its business activities was just one of many steps required of Marvel to facilitate the borrowings, and negotiating over them would not have occurred until the more fundamental issues of whether, and on what terms, Marvel would be willing to help in the proposed borrowings, which were of absolutely no benefit to it.

Some specifics follow.

1. The scope of Mr. Fowler's negotiation is limited to argument over "the benefits of the Restrictions to the Marvel Holding Companies and the costs incurred by Marvel." Para. 59, at page 27. In serving the best interests of all the shareholders of Marvel, the negotiation would be over the benefits of the Note issuances by the Marvel Holding Companies to those companies and to Ronald O. Perelman, their sole shareholder, and the costs both actual and potential that could be incurred by Marvel as a result of the Note issuances.

As to benefits, the wealth extraction from Marvel accrued solely to the benefit of Ronald O. Perelman. Nothing of benefit accrued to Marvel or its minority shareholders.

As to costs, the risks of the Note issuances were borne by Marvel, whose assets were, in practical effect, the sole source of repayment. It is important to note that in Paragraph 20 of the Fowler Report, Mr. Fowler states with implied concurrence that the rating agencies treated the Note issuances by the Marvel Holding Companies as essentially debt of Marvel, increasing its leverage and its cost of future borrowings.

If bad things happened to Marvel, the wealth extraction by Mr. Perelman would be unaffected. However, if bad things happened to Marvel, the Note issuances and the Restrictions imposed on Marvel to secure the Noteholders would impair its ability to overcome those bad things. This scenario in fact occurred. Marvel's huge debt load impaired its liquidity and the Restrictions prevented Marvel from solving its liquidity problem except through bank borrowings.

In essence, the Note issuances were for Mr. Perelman a classic example of the "head's I win, tails you lose" transaction. The "you" in this case were Marvel and its minority shareholders. Such a transaction is the "promised land" for a deal-maker, but it would have been unobtainable had the transactions been presented to Marvel's Board of Directors and had Marvel's interests been represented by independent directors aided by banking and legal professionals of standing and independence.

2. In Exchange 1, Mr. Fowler has Marvel argue that "the Restrictions hinder our ability to operate Marvel."

In fact, the Restrictions worked a transfer of Marvel's corporate power from its Board of Directors to the Noteholders for so long as the Notes remained outstanding. It was an asymmetrical sharing of risk and reward, with the risks inherent in the Restrictions being borne 100% by Marvel and the rewards being received 100% by Mr.

2

Perelman. Marvel would have argued that unless the rewards were shared with Marvel, Marvel would be unwilling to participate in the Note issuances.

3. In Exchange 2, Mr. Fowler has Marvel argue that "the Restrictions are critical to marketing the Holding Company Notes."

This argument is far too narrowly based. It leaves out the extensive participation by Marvel, including its top executives, its counsel and its auditors, in making the Note issuances possible. From my experience as a financing lawyer, I can say that the elements of participation by Marvel were substantially equivalent to what Marvel would have done had it been the issuer of the Notes and the recipient of the Note proceeds. Its officers participated in roadshows to market the Notes. Its lawyer gave opinions to the Noteholders. Its auditors gave a "comfort" opinion. And Marvel acknowledged in filings that it considered itself bound by the Restrictions.

If none of these participatory steps by Marvel were necessary, they would be dropped through negotiation. The truth of the matter is, however, that the Note issuances could not have been effected without them. Mr. Fowler seems to be arguing that the transactions were akin to margin loans. But they were not akin to margin loans at all. In a margin loan, the issuer of the stock being pledged to secure the loan does not participate in any way, and certainly does not concur in any restriction of its business activities.

In trying to evaluate the importance of the Restrictions, it is important to remember that Marvel's assets were, in practical effect, the sole source of repayment for the Notes. This central aspect of the borrowings explains the importance of the Restrictions to the Noteholders, who used the Restrictions to place limits on the ways in which Marvel could deploy those assets and change its capital structure in its own best interests.

4. In Exchange 3, Mr. Fowler has Marvel argue that the Note issuances "hurt Marvel's credit rating and increase its cost of debt." Mr. Fowler is correct here. These were very serious consequences of the Note issuances. However, the Restrictions did much more. By transferring corporate power over Marvel's flexibility to raise capital to the Noteholders, Marvel was forced to "bet the ranch" on nothing happening that would cause that transfer of power to hurt Marvel. This calculated risk to Marvel was imposed on Marvel by Mr. Perelman, its controlling shareholder, in order to extract wealth from Marvel exclusively for his benefit.

In fact, as things turned out, the risk to Marvel was realized, since the Restrictions impaired Marvel's ability to raise capital. The risks contributed to Marvel's liquidity crisis and its ultimate bankruptcy, wiping out the value of the minority shareholdings without in any way impairing the massive wealth extraction by Mr. Perelman that was achieved through the Note issuances.

5. In Exchanges 5 and 7, Mr. Fowler has Marvel ask for payment for accepting the Restrictions based on the amount of proceeds raised by M&F Holdings. These

3

exchanges are not very well developed, but Mr. Fowler suggests that M&F Holdings could argue that it had options other than the Note issuances, including LYONs, and these options could have avoided imposing the Restrictions on Marvel.

As the foregoing comments suggest, the potential for harm to Marvel from the Note issuances was of a magnitude far greater than the Exchanges seem to contemplate. The asymmetrical apportionment of risk and reward would have been flatly unacceptable to Marvel. Whether any payment would justify assuming these risks, as it did, is unclear to me. With perfect hindsight, of course, no payment could have sufficed, given what befell Marvel. However, if Marvel were to consider payment in exchange for shouldering the risks of the Note issuances, there would have had to be a sharing of the benefits between Mr. Perelman and Marvel that adequately reflected the basic fact that, without such sharing, the Note issuances were the functional equivalent of a borrowing by Marvel, exposing it to risk without benefit.

In my judgment, the fee suggested by Mr. Fowler would have been flatly unacceptable to Marvel, in light of what was at stake in having Marvel -- a company with a multi-billion dollar market capitalization -- agree to incur the risks it was asked to incur to facilitate Mr. Perelman's wealth transfer. Taking these considerations into account, I believe the consideration that Marvel would have required would likely have been in the order of magnitude of $150 million.

Bevis Longstreth
May 15, 2006

4