# SCHEDULE A-1

# Part 3 of 5

# Baliban

# Baliban

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| RONALD CANTOR, IVAN SNYDER and JAMES A. SCARPONE, as TRUSTEES OF THE MAFCO LITIGATION TRUST, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : : | |
| RONALD O. PERELMAN, MAFCO HOLDINGS INC., MacANDREWS & FORBES HOLDINGS INC., WILLIAM C. BEVINS and DONALD G. DRAPKIN, | : : : : : | Civil Action No. 97-586 (KAJ) |
| Defendants | : : | |

# REPORT OF JEFFREY L. BALIBAN

January 13, 2006

*This report has been prepared in connection with the above- referenced matter. The report is to be used solely for the purposes of the subject litigation and is not to be used, or relied upon, for any other purpose without the express written consent of NERA Economic Consulting.*

# Table of Contents

I.     Introduction .................................................................................................................1
       A. Transaction Background ....................................................................................1
       B. Assignment ........................................................................................................3
       C. Qualifications ....................................................................................................3

II.    Background ...................................................................................................................4
       A. Marvel Entertainment Group, Inc. ...................................................................4
       B. The Notes ..........................................................................................................5

III.   Marvel's Financing Activities Following the Note Issuances ....................................8

IV.    Direct Consequence of Restrictions on Marvel in the Fourth Quarter of 1996 ........13
       A. Marvel's Stock Price Reacts to Announcements ............................................13
       B. The Indenture Covenants Inhibit Marvel's Ability to Obtain Funds ..............19
       C. Measurement of Damages ...............................................................................21

# I.    INTRODUCTION

## A. Transaction Background

1.        Mr. Ronald O. Perelman ("Mr. Perelman") acquired Marvel Entertainment Group Inc. ("Marvel") in January 1989 through a chain of wholly owned corporations.  In July 1991, Mr. Perelman completed Marvel's initial public offering and received net proceeds of $63.7 million.[1]  In 1992, net publishing revenues represented 56 percent of Marvel's consolidated net revenues.[2]  Through a series of acquisitions made between 1992 and 1996, Marvel pursued a strategy to become a diversified youth entertainment company.[3]  By 1996, Marvel's operations consisted of, among other things, "(i) the publication and sale of comic books and other children's publications, (ii) consumer products, media advertising, promotions and licensing of Marvel characters, (iii) the marketing and distribution of sports and entertainment trading cards and activity sticker collections, (iv) the design, marketing and distribution of toys, and (v) the manufacture and distribution of adhesives and confectionery products."[4]

2.        Mr. Perelman established and wholly owned each of the following holding companies: Marvel Holdings, Inc. ("Marvel Holdings"), Marvel Parent Holdings, Inc. ("Marvel Parent") and Marvel III Holdings, Inc. ("Marvel III"), and collectively for all three entities "Marvel Holding Companies").  During 1993 and 1994, Marvel was 80 percent owned either directly or indirectly by these three holding companies (see *Figure 1—Ownership Flowchart* on page 5 below).  Also in 1993 and 1994, the Marvel Holding Companies each issued and sold a series of notes representing debt obligations with a combined face value of $894.1 million (the "Notes").[5]  The Marvel Holding Companies received aggregate net proceeds of approximately

---

[1]  Marvel SEC Form 10-K for the fiscal year ended 12/31/92, p. 1.

[2]  Marvel SEC Form 10-K for the fiscal year ended 12/31/92, p. 2.

[3]  Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 14.

[4]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1.

[5]  $517.5 million from Marvel Holdings Indenture, 4/15/93 (SKA 04771); $251.7 million from Marvel Parent Indenture, 10/1/93 (SKA 04060); $125 from Marvel III Indenture, 2/15/94 (SKA 02832).

$553.5 million from the Notes.[6] The Marvel Holding Companies were obligated to repay the Notes, but had no assets other than Marvel stock to repay the Notes at maturity. Marvel received none of the proceeds from the Notes.

   3.     In the indentures for each of the Marvel Parent and Marvel III Note issuances, those holding companies agreed to cause Marvel to act in accordance with certain restrictions ("Indenture Covenants").[7] The indentures for each Note offering provided, among other things, that (a) with the exception of certain categories of debt, the issuer would not permit Marvel or any of its subsidiaries to issue any debt unless certain financial ratios were met,[8] (b) the issuer would not permit Marvel to issue any preferred stock except under specified circumstances,[9] (c) the issuer would not permit Marvel to make certain restricted payments,[10] and (d) the Marvel Holding Companies would collectively continue to hold a majority of Marvel common stock.[11] Plaintiffs' counsel has advised me that plaintiffs intend to present evidence at trial that the Notes could not have been marketed and sold by the issuers without the inclusion of the Indenture Covenants in each Indenture.

   4.     The Marvel Holdings and Marvel Parent Notes were zero coupon Notes and so did not require the payment of interest or principal until maturity. The Marvel III Notes were not zero coupon notes and required semi-annual interest payments at an annual rate of $9\frac{1}{8}$ percent. The Offering Memorandum for the Marvel III Notes explained that "[Marvel III would] be a party to an amended and restated tax sharing agreement with Marvel ... which is expected to

---

[6]   $288.0 million from Marvel Holdings (Offering Memorandum, 4/16/93 (SKA 09027)); $144.9 million from Marvel Parent (Prospectus, 10/13/93 (SKA 05888)); $120.6 million from Marvel III (Offering Memorandum, 2/8/194 (SKA 05077)).

[7]   While the Marvel Holdings Indenture contains similar restrictions, plaintiffs' counsel has advised me that the claim for compensatory damages with respect to the Marvel Holdings Notes has been barred by the statute of limitations.

[8]   Section 4.04 of each: Marvel Holdings Indenture, 4/15/93 (SKA 04779), Marvel Parent Indenture, 10/1/93 (SKA 04069), Marvel III Indenture, 2/15/94 (SKA 02842-02843).

[9]   Section 4.04(c) of each: Marvel Holdings Indenture, 4/15/93 (SKA 04781) ,Marvel Parent Indenture, 10/1/93 (SKA 04071), Marvel III Indenture, 2/15/94 (SKA 02845).

[10]   Section 4.05 of each: Marvel Holdings Indenture, 4/15/93 (SKA 04782), Marvel Parent Indenture, 10/1/93 (SKA 04072), Marvel III Indenture, 2/15/94 (SKA 02845-02846).

[11]   Section 4.09(a) of each: Marvel Holdings Indenture, 4/15/93 (SKA 0478804789), Marvel Parent Indenture, 10/1/93 (SKA 04078-04079), Marvel III Indenture, 2/15/94 (SKA 02854-02855).

provide the principal source of cash for [Marvel III] to pay interest on the Notes."[12]  The Marvel III Indenture also imposed a Tax Deconsolidation Event covenant, amounting to a repurchase obligation on Marvel III if its ownership of Marvel's outstanding equity fell below 80 percent, causing Marvel to cease being a member of an affiliated group of companies for purposes of filing a consolidated federal income tax return.[13]

5.      On December 27, 1996, Marvel voluntarily petitioned for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

## B. Assignment

6.      Counsel for the Plaintiffs has asked me to conduct economic analyses and provide my opinion with respect to whether, and to what extent, Marvel was harmed by the issuance of the Marvel Parent and Marvel III Notes on the terms described above.

7.      It is my opinion that the Indenture Covenants in the Marvel Parent and Marvel III Note issuances limited Marvel's access to capital markets, interfered with Marvel's ability to issue equity, and generally impeded Marvel's ability to obtain financing on terms in Marvel's best interest.  The Indenture Covenants also resulted in Marvel being unable to address a liquidity crisis in the fourth quarter of 1996 that led directly to Marvel's bankruptcy filing.  In my opinion, the magnitude of this particular harm at a time when Marvel's stock price had already declined to $4.63 a share can be measured by the further decline in market value and stock price of Marvel on November 12, 1996, and is at least $190 million.  It is also my opinion that the financial harm to Marvel caused by the issuance of the Marvel Parent and Marvel III Notes on the terms described above is in the range of $308 to $617 million, and that the Marvel III Note issuance alone would have been sufficient to cause all of the harm described herein.

## C. Qualifications

8.      I am a Senior Vice President in the Securities and Finance practice of National Economic Research Associates ("NERA").  My practice at NERA focuses on resolving complex commercial disputes through independent analysis of the economic, finance, accounting, and

---

[12]  Marvel III Offering Memorandum (SKA 05079).

[13]  Section 4.14 of the Marvel III Indenture, 2/15/94 (SKA 02863); Marvel III Offering Memorandum (SKA 05079).

valuation issues at hand. Prior to joining NERA, I was a senior partner in the Dispute Advisory Services practice of KPMG LLP. My curriculum vitae, attached as Exhibit 1, provides the details of my education, background and experience.

9.      NERA is being compensated for its time at standard billing rates. My current hourly billing rate is $500. The hourly rates charged for other NERA personnel who helped me with this analysis range from $95 to $410.

10.     Documents I have considered in forming my opinions are listed in Exhibit 2.

## II.   BACKGROUND

### A. Marvel Entertainment Group, Inc.

11.     Ronald Perelman, through a series of wholly owned affiliates, controlled approximately 60 percent of Marvel's outstanding common stock at the time of the Marvel Holdings Note issuance in April of 1993. On May 7, 1993, MacAndrews & Forbes announced that it had completed a tender offer for 10 million shares of common stock of Marvel.[14] Mr. Perelman's affiliates increased their ownership of Marvel stock from approximately 60 percent (28,800,000 out of 48,340,528) to approximately 80.3 percent (38,800,000 out of 48,340,528) at that time.[15] Mr. Perelman's ownership of at least 80 percent of Marvel's equity allowed for Marvel's consolidation for tax purposes with other Perelman holdings. See Figure 1 below.

---

[14] "MacAndrews & Forbes Completes Tender Offer for Marvel Shares." PR Newswire, May 7, 1993. Obtained from Factiva.

[15] "MacAndrews & Forbes Completes Tender Offer for Marvel Shares." PR Newswire, May 7, 1993. Obtained from Factiva. Marvel SEC Form 10-K for the fiscal year ended 12/31/92, p. 1.

## Ownership of Marvel Entertainment Group, Inc.



*Figure 1—Ownership Flowchart*[16]

## B. The Notes

12.    During 1993 and 1994, each of the Marvel Holding Companies issued a series of notes ("Notes") and received aggregate net proceeds of $553.5 million, as follows:

---

[16]  Marvel III Offering Memorandum, 2/8/94 (SKA 05079, 05083) and Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1.

a.  In April 1993 Marvel Holdings issued senior secured discount notes with a face value of $517.4 million, due in April 1998.[17] These were zero coupon notes (no interest payments prior to maturity) that accrued interest at an annual rate of 11.25 percent.[18] Marvel Holdings provided 48 million shares of Marvel common stock as collateral for its borrowings.[19] Marvel Holdings had no other assets from which it could repay the Notes.[20] Marvel Holdings issued the Notes and received net cash proceeds of $288 million, which were distributed to Marvel Parent. None of the proceeds were made available to Marvel.[21]

b.  In October 1993 Marvel Parent issued senior secured discount notes with a face value of $251.7 million, due in April 1998.[22] These were zero coupon notes (no interest payments prior to maturity) that accrued interest at an annual rate of 12.25 percent.[23] Marvel Parent provided 20 million shares of Marvel common stock as collateral for its borrowings.[24] Marvel Parent had no assets from which to repay the Notes other than Marvel common stock.[25] Marvel Parent issued the notes and received net cash proceeds of $144.9 million, which were distributed to Marvel III.[26] None of the proceeds were made available to Marvel.[27]

---

[17]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 2.

[18]  Marvel Holdings Offering Memorandum, 4/16/93, p. 1 (SKA 09027).

[19]  Marvel Holdings Offering Memorandum, 4/16/93, p. 7 (SKA 09033). The shares are adjusted for the 2-for-1 stock split payable 11/1/93 for shareholders of record 10/15/93. "Marvel Entertainment sets two-for-one split." Reuters News, 9/24/1993.

[20]  Marvel Holdings was formed to hold a majority of Marvel's outstanding shares and all of Marvel U.K.'s outstanding shares. Marvel Holdings Offering Memorandum, 4/16/93, pp. 1, 12 (SKA 09027, 09038)

[21]  Marvel Holdings Offering Memorandum, 4/16/93, p. 9 (09035).

[22]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 3

[23]  Marvel Parent Prospectus, 10/13/93, p. 7 (SKA 05878). Issue price data for Marvel Parent debt taken from Bloomberg LP.

[24]  Marvel Parent Prospectus, 10/13/93, p. 1 (SKA 05872) This is adjusted for the 2-for-1 stock split payable on 11/1/93. See footnote 19.

[25]  Marvel Parent Prospectus, 10/13/93, pp. 1, 3 (SKA 05872, 05874)

[26]  Marvel Parent Prospectus, 10/13/93, pp. 1, 9, 17 (SKA 05872, 05880, 05888).

[27]  Marvel Parent Prospectus, 10/13/93, pp. 9, 17 (SKA 05880, 05888).

c. In February 1994 Marvel III issued senior secured notes with a face value of $125.0 million. These Notes were also due for repayment by April 1998 but, unlike the first two issuances, the Marvel III Notes were not zero coupon bonds and required semi-annual interest payments at an annual rate of 9¼ percent.[28] Marvel III provided 9.3 million shares of Marvel common stock as collateral for its borrowings. Marvel III stated in the Offering Memorandum that it anticipated funding interest on the notes from payments received through a tax sharing agreement with Marvel.[29] Other than such anticipated payments and Marvel common stock, Marvel III had no other assets from which to pay interest or repay the notes.[30] Marvel III issued the notes and received net cash proceeds of $120.6 million, which were distributed to Andrews Group, a wholly owned Perelman company and the parent of Marvel III.[31] None of the proceeds were made available to Marvel.[32]

13.     The Marvel III Offering Memorandum states that "[a]s a member of the Mafco Holdings Affiliated Group, Marvel is includable in Mafco Holdings' consolidated federal income tax return. Marvel has entered into a tax sharing agreement with Mafco Holdings pursuant to which it makes tax sharing payments to Mafco Holdings in amounts equal to the taxes it would have paid if it were to file separate consolidated tax returns for itself and its subsidiaries. [ ] Under the Indenture, the Issuer is required to retain…out of the tax sharing payment immediately preceding each interest payment date on the Notes, all amounts so received up to the aggregate amount of interest due on such interest payment date."[33] The Offering Memorandum further states that Marvel will be required to enter into the "Marvel Tax Sharing Agreement which will

---

[28]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 2; Marvel III Offering Memorandum, 2/8/94, p. 1 (SKA 05077).

[29]  Marvel III Offering Memorandum, 2/8/94, pp. 1, 3 (SKA 05077, 05079).

[30]  Marvel III Offering Memorandum, 2/8/94, p. 1. (SKA 05077).

[31]  Marvel III Offering Memorandum, 2/8/94, pp. 1, 7, 11 (SKA 05077, 05083, 05087); Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1.

[32]  Marvel III Offering Memorandum, 2/8/94, p. 11 (SKA 05087).

[33]  Marvel III Offering Memorandum, 2/8/94, p. 52 (SKA 05128).

amend and restate the existing tax sharing agreement to provide that Marvel will make payments thereunder to [Marvel III] instead of Mafco Holdings for 1994 and subsequent years."[34]

14.    Section 4.14 of the Marvel III Indenture, entitled *Tax Deconsolidation Event*, describes the consequences and penalties if "Marvel ceases to be a member of an affiliated group of corporations, which group also contains [Marvel III] as a member, for purposes of filing a consolidated Federal income tax return."[35]  Upon a tax deconsolidation event, note holders would "have the right to require [Marvel III] to repurchase all or any part of such Holder's Securities at a repurchase price equal to 101 percent of the principal amount thereof plus accrued and unpaid interest (if any) to the date of repurchase."[36]

15.    As a practical consequence of the Marvel III note issuance, in order for Marvel to issue any new common equity and, in so doing, not trigger a tax deconsolidation event and other consequences under section 4.14, Marvel's controlling shareholders would have had to buy a sufficient amount of any new equity issued in order to maintain an 80 percent ownership stake.

## III.    MARVEL'S FINANCING ACTIVITIES FOLLOWING THE NOTE ISSUANCES

16.    From 1992 through 1995, Marvel developed and implemented a growth-by-acquisition strategy, acquiring interests in such companies as Fleer Corporation, SkyBox International, Inc., Toy Biz, Inc., and Panini S.p.A.  Marvel also engaged in a consolidation of the comics business by acquiring other publishers, including Harvey Comics and Malibu Comics.  The Toy Biz, Inc. acquisition was consummated on March 19, 1993, for 46 percent of Toy Biz in exchange for an exclusive, perpetual, royalty-free license to use all of Marvel's characters.[37]  The acquisition for all the equity of Panini was consummated on August 4, 1994, at a cost of £ 251.5 billion (approximately $158.4 million based on the exchange rates in effect on the date of acquisition).[38]  The acquisition for all of the issued and outstanding shares of SkyBox

---

[34]  Marvel III Offering Memorandum, 2/8/94, p. 52 (SKA 05128).

[35]  Marvel III Indenture, 2/15/94, p. 57 (SKA 02863).

[36]  Marvel III Indenture, 2/15/94, p. 57 (SKA 02863).

[37]  Marvel SEC Form 10-K for the fiscal year ended 12/31/93, Note F-9.

[38]  Marvel SEC Form 10-K for the fiscal year ended 12/31/94, p. 1.

common stock was consummated on March 8, 1995, for $16 a share or approximately $165 million including fees, expenses and other acquisition costs.[39]

17.     In a board meeting in March 1993, just prior to the Marvel Holdings Note issuance, Marvel's board amended the Marvel corporate charter to increase its authorized capital stock (both common and preferred) in order to, among other things, effect stock splits and have stock available for "acquisitions of other companies and other general corporate purposes."[40] However, following the Note issuances, Marvel financed its acquisitions principally through bank debt, which increased substantially, from $245 million at the time of the issuance of the Marvel III notes in the first quarter of 1994, to more than $654 million just prior to the December 1996 bankruptcy filing.[41]  The history and terms of Marvel's bank debt financing are as follows:

a.     By year-end 1993, Marvel reported total debt of $250 million[42] consisting primarily of a Credit and Guarantee Agreement ("Guarantee Agreement") dated September 17, 1992, with an interest rate of 4.67 percent (at December 31, 1993) payable semi-annually.[43]  The Guarantee Agreement, initially consisting of a $260 million term loan and a $40 million revolver, required 12 consecutive semi-annual principal repayments of $17.5 million for April and October of 1993 and $22.5 million beginning in April 1994, with a revolver maturing on October 19, 1998.[44]

b.     By year-end 1994, Marvel had a total debt balance of $384.3 million consisting primarily of $141.5 million from a new term loan ("Term Loan") and $242 million from the existing Guarantee Agreement as amended and restated (the "Amended and Restated Credit Agreement").[45]  The interest rate on the Term Loan was composed of a Eurodollar Rate plus an applicable margin.  As of March

---

[39]  Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 1.

[40]  Marvel Entertainment Group, Inc., Meeting of the Board Notes, 3/18/93, pp. 3-4.  (ME 00487-00488)

[41]  Marvel SEC Form 10-K for the fiscal years ended 12/31/92 – 12/31/95, Marvel SEC Form 10-Q for the fiscal periods ended 3/31/94 and 9/30/96.

[42]  Marvel SEC Form 10-K for the fiscal year ended 12/31/93, Note F-3 (A00094).

[43]  Marvel SEC Form 10-K for the fiscal year ended 12/31/93, Note F-12 (A00103)

[44]  Marvel SEC Form 10-K for the fiscal year ended 12/31/92, Note F-10; Guarantee Agreement, 9/17/92, p. 28 (M-SP2 1799).

[45]  Marvel SEC Form 10-K for the fiscal year ended 12/31/94, Note F-11.  (A00152)

2, 1995, the Eurodollar rate was approximately 9¼ percent and the applicable margin rate was approximately ¾ percent to 1¼ percent to be determined based on the Company's financial performance.[46]  The principal payments under the new term loan were to be paid every six months from 2/28/1995 to 8/31/01.[47]  The first payment was a prepayment on September 30, 1994, in the amount of $9.4 million, and the first installment of $2.5 million was paid on February 28, 1995.[48]

c.  By year end 1995, Marvel had a total debt balance of $586.5 million[49] consisting primarily of the Amended and Restated Credit Agreement, the Term Loan, and $350 million from a new term loan ("U.S. Term Loan Agreement").  The interest rate in the U.S. Term Loan Agreement was based on the Eurodollar Rate plus an applicable margin.  As of March 4, 1996, the Eurodollar rate was approximately $7\text{-}^{13}/_{16}$ percent to 8⅛ percent, depending upon the length of the relevant interest period and the applicable margin rate was approximately 2 to 2.5 percent.[50]  The principal payments under the new term loan were to be paid every six months from 8/31/99 to 2/28/02.  The first four payments were for $37,500,000 while the last two payments were for $100,000,000.[51]

d.  Marvel continued drawing from its Amended and Restated Credit Agreement and other private debt sources until its debt level reached $640.6 million just prior to its December 1996 bankruptcy filing.[52]

18.     There are a variety of factors that drive the amount of debt a firm should have in its capital structure, including tax issues, types of assets and uncertainty of operating income. Due to the high costs of financial distress, less debt is optimal in industries that tend to have a high ratio of intangible to tangible assets and a high degree of uncertainty related to future

---

[46]  Marvel SEC Form 10-K for the fiscal year ended 12/31/94, pp. 17, 18.

[47]  Term Loan, 8/30/94, p. 9.

[48]  Marvel SEC Form 10-K for the fiscal year ended 12/31/94, p. 17.

[49]  Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 42.

[50]  Marvel SEC Form 10-K for the fiscal year ended 12/31/95, p. 18.

[51]  U.S. Term Loan Agreement, 4/24/95, p. 22.

[52]  Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. F-13.

operating income. The more uncertain a firm's operating income and the higher proportion of intangible assets it holds, the greater the likelihood of the firm going into financial distress, and increasing debt only increases the likelihood of distress. Thus, firms such as this typically finance mostly with equity.[53] Given the uncertainty of Marvel's operating income and intangible nature of its assets, as well as the long-term nature of cash flows from the acquisitions being financed, it would have been in Marvel's best interest to avail itself of equity financing instead of having to rely solely on bank debt from 1993 to 1996.

19.    Exhibits 3A and 3B show Marvel's debt-to-equity and interest coverage ratios relative to a group of comparable companies between 1993 and 1996 just prior to the Marvel bankruptcy.[54] The exhibits show that Marvel incurred debt levels far beyond the average of these industry peers. The debt-to-equity ratio for Marvel was 9, 27, 44 and 271 percent from 1993 to 1996 respectively while the debt-to-equity ratio for an index of comparable companies was 5, 5, 9 and 12 percent over the same time period. Similarly, Marvel's interest coverage ratio (EBIT[55]/interest expense) was 7.05, 6.37, 1.06 and (1.62) from 1993 to 1996, significantly lower than ratios for the comparable companies, which averaged 12.42, 10.88, 10.11 and 8.00 from 1993 to 1996, respectively.

20.    At December 31, 1993, Marvel's total debt was about $245 million, and it had a debt-to-equity ratio of 9 percent. At this ratio level, Marvel's objective should have been to reduce its debt-to-equity ratio toward the industry average of 5 percent. However, following the Marvel III Note issuance, Marvel relied solely on bank debt for financing. In my opinion, the complete failure to use equity financing was in the best interest of Mr. Perelman and his wholly owned holding companies as a result of the terms of the Notes, although not necessarily in the best interest of Marvel.

21.    By 1996, Marvel's bank debt increased to about $650 million.[56] Instead of controlling leverage risk by reducing its debt-to-equity ratio, Marvel increased the ratio to 271

---

[53]  See Ross, Westerfield, and Jaffe, *Corporate Finance*, 6th Edition, McGraw Hill, 2002, p. 451.

[54]  Comparable companies were chosen based on Marvel disclosures and analyst reports that describe Marvel's competitors. See Exhibit 4 for a description of the comparable companies.

[55]  Earnings before interest and tax.

[56]  Marvel SEC Form 10-Q for the fiscal period 9/30/96, p. 3.

percent. This increase in bank debt also resulted in an annual interest expense of $19.1 million in 1994, $47.1 million in 1995 and $60.8 million in 1996. Had Marvel obtained equity financing, its debt level could have been reduced to support an industry average debt-to-equity ratio. This would have reduced the amount of cash used for interest payments during the 1994–1996 period and would have resulted in available bank debt capacity to respond to its liquidity crisis in the fourth quarter of 1996. Even though Marvel experienced poor performance in both 1995 and 1996, it would have had access to cash to meet its obligations through year-end 1996, and could have avoided the liquidity crisis that caused its financial demise.

22.    The use of bank debt to finance acquisitions between 1993 and 1995 benefited Mr. Perelman because it allowed him to maintain (through his holding companies) his 80 percent equity stake in Marvel and not suffer the consequences of a tax deconsolidation event, or spend additional capital to buy Marvel stock. The extensive use of bank debt also enabled the Marvel Holding Companies to comply with Indenture Covenants that required them to cause Marvel to continue to have a majority of outstanding stock owned by the Marvel Holding Companies. The bank debt clearly resulted in Marvel's having debt-to-equity ratios significantly above those of comparable companies and was a cause of Marvel's financial distress. In the absence of the Indenture Covenants, which made the Marvel III Note issuance possible, it would have been in Marvel's interest to issue equity such that its capital structure would have been much more in line with comparable companies. Thus, it is my opinion that the Indenture Covenants was a cause of Marvel's financial distress.

23.    Research by professors Gregor Andrade and Steven Kaplan can be used to measure the value lost by companies that suffer financial distress. Andrade and Kaplan find that on average pre-distress enterprise value (the value of the company as a whole) declines by between 10 and 20 percent and that this decline is directly attributable to the overuse of debt financing.[57] The use of bank debt financing rather than, for example, zero coupon debt financing, only exacerbates the financial distress and liquidity problems for a company such as Marvel. Exhibit 5 shows that Marvel's enterprise value was $3,085 million as of January 31, 1994, prior to the Marvel III issuance in February of 1994, and before the subsequent increase in

---

[57] Gregor Andrade and Steven Kaplan, "How Costly is Financial (Not Economic) Distress? Evidence from Highly Leveraged Transactions that Became Distressed," *Journal of Finance*, Vol. LIII, No. 5 (October 1998), p. 1445.

Marvel debt.  Taking into account the findings of the Andrade and Kaplan study, I estimate 10 to 20 percent of Marvel's enterprise value, between $308.5 million and $617.0 million, was lost due to financial distress caused by the Indenture Covenants and the financing decisions made in light of those covenants and other terms of the Notes, which I am informed were necessary to the marketing and issuance of the Notes.  In fact, even though Marvel's enterprise value was $3,085 million as of January 31 1994, by December 31, 1998, subsequent to the Fourth Amended plan of Reorganization, it is reported that Marvel was purchased for "approximately $446.9 million which included approximately $257.9 million in cash and the remainder in securities ..."[58]

24.      I believe it is appropriate to consider interest in order to compensate plaintiffs for the losses caused by defendants.  Counsel has informed me that the legal rate of interest under Delaware law at the relevant time was the Federal Reserve Discount Rate, plus 5 percent.  This would have been 8 percent on February 15, 1994.  I also believe it is reasonable to use the mid-point between the range of potential losses for the purpose of estimating damages.  My computation of damages, including interest, from February 15, 1994, to December 31, 2005, using the simple fixed-rate simple interest, fixed rate monthly compounding, variable rate monthly compounding approaches, is $902.4 million, $1,192.8 million and $1,334.2 million respectively (shown at the bottom of Exhibit 5).  Because I understand the Court has discretion to use simple interest or compound and fixed or variable rates, I have set forth computations using all three approaches.  In my opinion, the use of compound interest provides a more reasonable indication of the time value of money.

## IV.   DIRECT CONSEQUENCE OF RESTRICTIONS ON MARVEL IN THE FOURTH QUARTER OF 1996

### A.  Marvel's Stock Price Reacts to Announcements

25.      In order to measure the effect of the Indenture Covenants on Marvel in the fourth quarter of 1996, I have looked at the market's reaction to various announcements, including

---

[58] Marvel Enterprises, Inc. SEC Form 10-K for the fiscal year ended 12/31/98, Note F-8.

those concerning the Indenture Covenants.[59]  It is an accepted principle of corporate finance that, in an efficient market, a company's stock market capitalization is a reasonable measure of the equity value of the company.[60]  Under the semi-strong form of the efficient market hypothesis, "[i]f markets are efficient…then prices will adjust immediately to public information."[61]  I obtained daily closing prices for Marvel Enterprise Group from FactSet.[62]  These daily prices are reflected in Figure 2 below for October and November 1996.



*Figure 2—Marvel Daily Closing Prices for October Through November 1996*

---

[59]  I do not believe that the harm caused to Marvel by the Indenture Covenants would be any different or greater if I were to consider the harm caused by the indenture covenants in all three note offerings, as opposed to just the Marvel Parent and/or Marvel III offerings, as described herein.

[60]  Ross, Westerfield, and Jaffe, *Corporate Finance*, 6th Edition, McGraw Hill, 2002, p. 342.

[61]  Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill Irwin, New York, 2006, p. 337.

[62]  ©FactSet Research Systems, Inc.

26.    We reviewed news stories and announcements relating to Marvel during the fourth quarter of 1996 from various sources, including Business Wire, Dow Jones News Service, PR Newswire, Reuters and The Wall Street Journal. Public announcements signified by letter notations in Figure 2 above are described below:

a. **October 8, 1996** – Marvel stock opens and closes at $7.875 a share. After the close, Marvel warns the market that it expects earnings to be between -7¢ to -12¢ a share for the third quarter of 1996.[63] Analysts had expected earnings of 8¢ a share for the third quarter and 12¢ a share for the fourth quarter of 1996.[64] Marvel also informs the market of its financial distress by stating "that it has violated bank credit lines as a result of its wider-than-expected operating losses … Marvel said it has begun discussions regarding covenant waivers and credit restructuring, and added that it expects it will need an infusion of equity capital to complete a revamping."[65]

b. **October 9, 1996** – Marvel "expects to report a third-quarter loss of between -7¢ and -12¢ a share. Because of the loss, the company said, it has failed to meet certain financial covenants and is negotiating 'with its agent bank seeking waivers to these covenants.'"[66] Marvel stock closes at $5.625 a share.

c. **October 17, 1996** –

i. Andrews Group "expects to make a proposal to Marvel Entertainment Group Inc. under which Andrews Group … would purchase new equity capital at Marvel."[67]

---

[63] "Marvel Entertainment Estimate -2-: Wider Oper Losses," Dow Jones News Service, 10/8/96. Obtained from Factiva.

[64] "Marvel Entertainment Estimate -3-: Street Saw 3Q Net 8c/Shr," Dow Jones News Service, 10/8/96. Obtained from Factiva.

[65] "Marvel Entertainment Estimate -2-: Wider Oper Losses," Dow Jones News Service, 10/8/96. Obtained from Factiva.

[66] "Marvel Entertainment Expects to Report Loss for 3rd Quarter," The Wall Street Journal, 10/9/96. Obtained from Factiva.

[67] "Andrews Grp –Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

      ii. "This proposal will be subject to a number of conditions, including the waiver by Marvel's banks of certain financial covenants contained in its bank credit facilities and the restructuring of those facilities to provide for Marvel's cash requirements."[68]

      iii. "The proposal will also be subject to an agreement among Marvel, its banks, the holders of certain Marvel holding company bonds and Andrews Group on the terms of the Andrews Group purchase."[69]

      iv. "Andrews Group said any such purchase would result in "substantial" dilution to the existing Marvel shares, including the Marvel shares which serve as collateral for Marvel holding company bonds."[70]

  d. **October 23, 1996** – "Scott M. Sassa, who was named to the newly created positions of president and chief operating officer of Ronald O. Perelman's Andrews Group Inc. yesterday, has been charged with the daunting task of bolstering [Marvel's] disparate entertainment, publishing, and toy assets. Mr. Sassa ... was also named chairman and chief executive of Marvel Entertainment Group Inc., which is owned 81% by Andrews Group."[71]

  e. **November 12, 1996** –

      i. "For the third quarter of 1993 Marvel reported a net loss of 12¢ a share compared to gain of 19¢ a share one year ago."[72]

      ii. "As previously announced, as a result of Marvel's third quarter loss, the Company failed to satisfy certain financial covenants contained in its credit agreements and had commenced discussions with its agent bank

---

[68] "Andrews Grp –Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

[69] "Andrews Grp – Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

[70] "Andrews Grp – Toy Biz -3-: Andrews Might Buy Equity at Marvel," Dow Jones News Service, 10/17/96. Obtained from Factiva.

[71] "Former Turner Broadcasting Executive Named Chairman and CEO of Marvel," The Wall Street Journal, 10/24/96. Obtained from Factiva.

[72] "Marvel 3Q96 Results and Performance Update." PR Newswire, 11/12/96. Obtained from Factiva.

seeking waivers of these covenants and a restructuring of the credit agreements to provide for its cash requirements. Such a restructuring will ultimately require an infusion of new equity capital. Until Marvel receives these waivers, it will not be able to borrow additional amounts under its domestic credit facilities.[73]

iii.   "Andrews Group now owns about 81 million diluted shares of Marvel's 101.8 million outstanding diluted shares."[74]

iv.   Marvel "has received a proposal from Andrews Group Incorporated for an equity investment in Marvel...it is expected that any purchase by Andrews of equity in Marvel will result in substantial dilution to the existing Marvel shares, including the Marvel shares that serve as collateral for the Marvel holding company bonds. The proposed equity infusion by Andrews is expected to be subject to a number of significant conditions, including Toy Biz...becoming a wholly owned subsidiary of Marvel."[75]

v.   "The purchase price for the shares would be $350 million in cash or, at the option of Andrews, an equal value of shares of Class A common stock...of Toy Biz."[76]

vi.   Andrews Group "is offering to buy 410 million newly issued Marvel shares for $350 million...That would price the new shares at about 85¢ each."[77]

vii.   "The Andrews investment would provide Marvel with desperately needed liquidity and financial flexibility. *As such, it is a fundamental predicate*

---

[73]   "Marvel 3Q96 Results and Performance Update." PR Newswire, 11/12/96. Obtained from Factiva.

[74]   "Andrews Grp-Marvel-3-: Andrews Now Has 81M Marvel Shrs." Dow Jones News Service, 11/12/96. Obtained from Factiva.

[75]   "Marvel Receives Andrews Proposal." PR Newswire, 11/12/96. Obtained from Factiva.

[76]   "Marvel Receives Andrews Proposal." PR Newswire, 11/12/96. Obtained from Factiva.

[77]   "Perelman's Andrews Grp Plans To Buy Marvel Stk On The Cheap," Dow Jones News Service, 11/12/96. Obtained from Factiva.

> *to a financial restructuring essential if Marvel is to resolve its current*
> *difficulties and have the opportunity over time to prosper."*[78]

viii. *"Moreover, the Andrews Investment is **subject to the satisfactory***
*resolution of a number of issues under the Marvel parent holding***
*company indentures, including that any Marvel Common Stock***
*purchased by Andrews not be subject to the liens thereunder."*[79]

27.     To summarize, by October 9, 1996, the market knew that Marvel was in financial
distress and needed a significant capital infusion. By October 17, 1996, the market knew that
Mr. Perelman would be proposing a restructuring plan for Marvel involving an infusion of equity
capital. As of October 17, 1996, Marvel's stock price was at $4.625 a share and fluctuated little
from that level through November 11, 1996.[80] On November 12, 1996, Marvel announced for
the first time that the Andrews investment would be a fundamental predicate to a financial
restructuring essential if Marvel is to resolve its current difficulties and have the opportunity,
over time, to prosper. At the same time Marvel stated that the Andrews investment was subject
to the satisfactory resolution of a number of issues under the Marvel parent holding company
indentures, including that any Marvel Common Stock purchased by Andrews not be subject to
the liens thereunder. Immediately following this announcement, Marvel's stock price fell from a
pre-announcement level of $4.63 to $2.75 per share, a decline of more than 40 percent. Marvel's
announcement also included the fact that the Andrews Group was proposing $350 million of new
equity at $0.85 per share, and I would expect such proposed price per share to affect Marvel's
stock price, but as I explain below, the proposed transaction and pricing at $0.85 per share, was
structured to address issues related to the Indenture Covenants.

---

[78] "Andrews Group Proposes To Acquire Newly Issued Marvel Entertainment Group Stock," Business Wire,
11/12/96. Obtained from Factiva. Emphasis added.

[79] "Marvel Receives Andrews Proposal," PR Newswire, 11/12/96. Obtained from Factiva. Emphasis added.

[80] The mean of daily closing prices from 10/17/96 through 11/11/96 is $4.85 a share.

**B. The Indenture Covenants Inhibit Marvel's Ability to Obtain Funds**

28.     According to the Andrews proposal, Marvel needed approximately $350 million in funding in order to implement a restructuring plan.[81]  However, Andrews Group would not provide that funding if the newly issued equity was subject to the existing Indenture Covenants.

**1. It Is Unlikely that Marvel Could Have Raised Debt Funding Subsequent to October 9, 1996.**

29.     After the October earnings announcement and warning of bank covenant violations, the market knew that Marvel was in financial distress.  Given that the current bank debt was in or near default, additional debt financing would have been unlikely outside of a bankruptcy.  Further, restrictions in Section 4.04 of the Marvel Holdings Companies Indenture Covenants limited debt and preferred stock issuance due to the required EBITDA-to-interest ratio.

**2. Due to the terms on which the Marvel Holding Companies Notes were issued as described above, Marvel Could Not Avail Itself of Equity Financing Without Significant Perelman Participation.**

30.     On November 12, 1996, Andrews made a proposal to provide the equity funding that Marvel needed in the amount of $350 million.  At the pre-announcement price of $4.625 a share, Marvel would have needed to find a buyer for 75.68 million shares to raise the $350 million.  Section 4.09(a) of the Marvel Holding Companies Indentures required that the Marvel Holding Companies be the legal and beneficial owner in the aggregate of at least a majority of the voting stock of Marvel.  According to Marvel's September 30 1996 10-Q, Mr. Perelman owned or controlled approximately 82.6 million of the total issued and outstanding 101.8 million shares.  Issuing another 75.68 million shares would dilute the 82.6 million share stake to about 46 percent.  Therefore, to obtain the needed $350 million of new equity at market value either Mr. Perelman would have needed to participate in the equity infusion or the Marvel Holding Companies' equity would fall below 50.1 percent as required by Section 4.09(a).

31.     The Marvel III Offering Memorandum also describes various consequences "[i]n the event that, prior to the Marvel Collateral Release Date (as defined), [Marvel III] and Marvel

---

[81]  Karen Fessler, Daniel Fisher and Beth Williams, "Marvel Gets Perelman Bid for $350 Mln of New Stock," Bloomberg LP, 11/12/96.

(excluding its subsidiaries) cease to be members of the same consolidated federal tax group."[82] To maintain tax consolidation, Marvel III and its affiliates would have to own at least 80 percent of Marvel's common stock.[83]  As of September 30, 1996, the Marvel Holding Companies and their affiliates held beneficial ownership of about 81 percent of Marvel (82.6 million of 101.8 million shares).  Thus, any new equity infusion could not include any meaningful investment from an outside (*i.e.*, non-Perelman) source without diluting the Marvel Holding Companies and their affiliates below 80 percent.  In fact, Mr. Perelman or his affiliates would have needed to provide funding of $274.5 million to acquire 59.4 million shares of a new 75.68 million share issuance at market prices necessary to raise $350 million.  This level of new investment would have allowed maintenance of an 80 percent ownership stake (see Exhibit 6).  However, as indicated by the Andrews proposal on November 12, 1996, Mr. Perelman was unwilling to make any equity investment in Marvel unless the note holders of each Marvel Holding Companies Note issuance agreed that such new equity would not be subject to the Indenture Covenants.

**3.  Marvel's stock price declined by more than 40 percent when Marvel disclosed that the Indenture Covenants were a substantial impediment to Marvel's obtaining desperately needed financing.**

32.    Given Marvel's liquidity crisis, obtaining additional debt financing was unlikely or impossible, and Marvel's ability to obtain equity financing was ultimately prevented by the terms on which the Marvel III notes were issued as described above.  Mr. Perelman could have personally financed the acquisition of 75.68 million shares of new equity at the current market price (about $4.625) to raise $350 million.  However, his current stake of 82.6 million shares was pledged on the Marvel Holdings Companies Notes, and unless a sufficient amount of the new equity was owned by the Marvel Holding Companies, and subject to the Indenture Covenants, there would have been a default and Mr. Perelman was vulnerable to becoming a minority shareholder in the event the bondholders were able to execute on their security interest.  Further, he would have lost significant tax benefits should his ownership interest in Marvel fall below 80 percent.

---

[82] Tax Deconsolidation Event – Marvel III Offering Memorandum, 2/8/94, p. 10 (SKA 05086).

[83] *See* U.S. Code, Title 26, Subtitle A, Chapter 6, Subchapter A, Section 1501 and 1504, available at http://www.law.cornell.edu/uscode/html/uscode26/usc_sec_26_00001501----000-notes.html;.

33.     Mr. Perelman made a proposal that was structured to protect his 80 percent position even if the holders of the Marvel Holding Companies Notes were to foreclose on their collateral. Since Marvel already had 101.8 million issued and outstanding shares, Mr. Perelman proposed to make an equity investment such that the preexisting equity would be no more than 20 percent of total outstanding shares *after* a new equity issuance. As such, he offered to fund the issuance of 410 million new shares. This would have brought total issued and outstanding shares up to 511.8 million (101.8 million plus 410 million), with the 410 million new shares being 80 percent of the new total. Since Mr. Perelman believed Marvel needed an investment of $350 million, he proposed to acquire new equity at a price of 85.36¢ a share (410 million shares × 85.36¢ a share = $350 million). Mr. Perelman's proposed new equity price of 85.36¢ per share is a product of this structure; it is not indicative of any further decline in the value of Marvel since October 17, 1996, and whose stock was trading at $4.63 immediately prior to the November 12, 1996 announcement.

## C. Measurement of Damages

34.     At a minimum, Marvel's damages can be measured as the loss in value from the drop in Marvel stock price as a result of the November 12th announcement. This is when the market is first told that Marvel's liquidity crisis, which threatens Marvel's financial survival, cannot be solved unless the holding company note holders are willing to modify the Indenture Covenants. On November 11, 1996, the closing price of Marvel stock was $4.63. However, as measured by the market's reaction to the November 12, 1996 announcement (Marvel's stock dropped from $4.63 to $2.75 indicating a loss in market value of $1.88 per share), the harm resulting from the Indenture Covenants was at least $190 million.

35.     To isolate the impact of the market's realization that the Indenture Covenants were a substantial impediment to Marvel's desperately needed financing, I control for Marvel's price change due to market and industry price movements, and the earnings announcement that also occurred on November 12th. Of the $1.88, I conclude that $1.87 is due to the Indenture Covenants (see exhibit 7A).

36.     I find that the drop of $1.87 led to a fall in equity value of $190 million ($1.87 per share multiplied by 101.8 shares outstanding – see exhibit 7B). This drop is a measure of the minimum damage to Marvel as a result of the Indenture Covenants because it considers only the

impact of these Indenture Covenants at a time when Marvel desperately needed capital. This analysis of the harm caused by the Indenture Covenants as of the fourth quarter of 1996 does not include or rely on any evidence as to how these restrictions were a cause of Marvel's financial distress up to that point.

37.    It is my opinion that this loss of $190 million was directly attributable to the Indenture Covenants because: (a) on November 12, 1996, the market learned for the first time that the Indenture Covenants were an obstacle preventing Marvel from obtaining the necessary equity infusion needed for restructuring given that Mr. Perelman, the only investor that could provide such funding without breaching the Indenture Covenants, was unwilling to do so absent relief from the Indenture Covenants, and (b) the dilutive price per share described in the proposal by the Andrews Group was not reflective of Marvel's value but allowed Mr. Perelman to try to further his personal interest in light of the Indenture Covenants.[84] Indeed, the Andrews proposal was not structured to benefit Marvel. From the perspective of Marvel, it would have been better off had it received $350 million through the issuance of equity at the prevailing market price.

38.    My opinion concerning the harm caused by the Indenture Covenants is confirmed by statements made by the defendants subsequent to the November 12, 1996 announcement. For example, Howard Gittis, the Vice-Chairman of MacAndrews and Forbes, acknowledged that no one would provide the kind of financing that Marvel required unless the note holders would agree to modify the Indenture Covenants.[85] Mr. Perelman advised the Marvel board of directors on December 12, 1996 that, in order for the Andrews proposal to be approved, it would be necessary to negotiate with the Marvel Holding Companies' note holders and that such negotiations were not possible because of the absence of an organized note holders group.[86] On December 26, 1996, Mr. Perelman advised the Marvel board of directors that because of "...the inability to expeditiously effect a restructuring of financial obligations of certain parent

---

[84] "Andrews Group has proposed to invest $350 million to acquire 409.8 million newly issued shares of Marvel Entertainment Group, representing 80.1% of the outstanding common shares after the investment. [...]Bondholders exchange bonds for Marvel common shares currently collateralizing bonds." Marvel SEC Form 8-K for the period ended 11/20/96, pp. 8, 9.

[85] In his deposition, Mr. Gittis states, "...[N]o one would put the kind of money necessary to restructure Marvel up without owning a majority of the shares free of these bond offerings; so you had to amend that provision." Deposition of Howard Gittis taken 3/25/02, pp. 4, 13.

[86] Marvel Entertainment Group, Inc., Special Meeting of the Board of Directors, 12/12/96, p. 2 (ME 01062)

companies of the Corporation that would enable the recapitalization of the Corporation, it was appropriate to consider the commencement of a [Chapter 11 case]."[87]

39.    At a minimum, the Indenture Covenants limited Marvel's ability to resolve its liquidity crisis in the fourth quarter of 1996.  Mr. Perelman's November 12, 1996, offer to provide funds in response to the liquidity crisis was done so in a way so as to circumvent any impact of the Indenture Covenants.  However, the revelation that even Mr. Perelman would not invest in Marvel without modification of the Indenture Covenants confirmed that those covenants caused harm to Marvel in the amount of at least the approximately $190 million reduction in Marvel's equity value.

40.    For the reasons stated above, it is appropriate to add interest in computing plaintiffs' damages, which in this case would be measured from November 12, 1996, a date on which the harm to Marvel caused by the Indenture Covenants was measurable and substantial. Exhibit 7B shows damage calculations of $363.9 million using the simple fixed interest rate method, $473.2 million using the compounding fixed interest rate method, and $422.0 using the compounding variable interest rate method to calculate damages as of December 31, 2005.

---

[87]  Marvel Entertainment Group, Inc., Special Meeting of the Board of Directors, 12/26/96, p. 2 (ME 01065).

41.     My opinions are based on the documents considered and analyses performed to-date.  They are subject to modification based on new information (including new reports or testimony by defendants' experts) which may subsequently come to my attention.


Respectfully,


Jeffrey L. Baliban

# Exhibit 1

Exhibit 1

# NERA
Economic Consulting

## JEFFREY L. BALIBAN

NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.
1166 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036

(212) 345-0249
(212) 345-4650 (fax)
jeffrey.baliban@nera.com

Mr. Baliban is a Senior Vice President in the Securities and Financial Economics practice. His 27-year practice has concentrated in resolving complex commercial disputes, economic issues, accounting issues and business valuation. Mr. Baliban began his career in audit in 1977. He became a Certified Public Accountant in 1981 and is admitted in the states of New York, Pennsylvania and Texas. In the mid-1980s, his practice moved from audit to forensic accounting and financial impact analysis. He earned his M.A. in Economics at the University of Texas in 1995, concentrating in econometrics, business and economic forecasting, statistical analysis and finance modeling. He also holds professional accreditations in business valuation and fraud examination.

Mr. Baliban has significant national and international experience in business valuation matters, forensic accounting investigations, measurement of economic value and/or damages in commercial disputes and business litigation matters, including business interruption and lost profits, contract and tort damage claims, fraudulent conveyance, long-term construction contract issues, lender liability issues, intellectual property matters, arson, fraud and embezzlement and environmental claims. His clients include corporations, law firms and commercial property and casualty insurance companies. Industries include, among others, petrochemical and energy, extraction and mining, healthcare, trucking and delivery, telecommunications, aerospace, manufacturing, retail, banking and financial institutions, real estate, technology, restaurants and food distribution, automobile dealerships, hotel and hospitality, insurance brokerage, professional practices, clothing and fashion. Mr. Baliban has significant experience in the litigation, discovery and testimony process. He has also written and spoken widely on accounting, economics and damages measurement issues.

**NERA**
Economic Consulting

## EDUCATION

UNIVERSITY OF TEXAS
M.A., Economics, 1995

CPA, ABV

FAIRLEIGH DICKINSON UNIVERSITY
B.S., Accounting, 1977

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2003- | NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.<br>*Senior Vice President*. Securities and Finance. |
| 1999-2003 | KPMG LLP<br>*Partner*. Dispute Advisory Services Leader.  Regional Partner-in-charge,<br>southwest and western regions.  Insurance Services Group Leader. |
| 1980-1999 | CAMPOS & STRATIS LLP<br>*Co-Vice Chair*.  Concentrating on forensic accounting and economic<br>damages analysis. |
| 1977-1980 | ERNST & ERNST (now Ernst & Young)<br>*Auditor*.  Member of audit staff, concentrating in manufacturing,<br>financial services and not-for-profit clients. |

## CERTIFICATIONS AND AFFILIATIONS

Certified Public Accountant in Pennsylvania, Texas, and New York
Member of the American Institute of Certified Public Accountants
Member of the Pennsylvania Institute of Certified Public Accountants
Member of the Texas Society of Certified Public Accountants (served on the
Litigation Services and Management Services Committees)
Accredited by the American Institute of Certified Public Accountants in
Business Valuation
Member of the American Society of Appraisers
Certified Fraud Examiner
Who's Who in the World; Who's Who in America in Finance and Industry
Adjunct Professor of Economics at the University of Texas (formerly)

**NERA**
Economic Consulting

## TYPICAL ENGAGEMENT INVOLVEMENT

- Mr. Baliban's focus has been on resolving complex commercial and business disputes by analyzing, measuring and clarifying the often equally complex economic, accounting and valuation issues they engender.

- Analysis of financial condition, forensic accounting investigations, solvency analysis and valuation studies in matters relating to fraudulent conveyance, misrepresentation in reporting and deepening insolvency. Bankruptcy preference defense issues, typically related to statistical analysis of transactions in determining subjective and objective tests related to ordinary course of business and other preference defenses.

- Consultant and analyst in various P&C insurance related issues including risk analysis in underwriting, administration of claims run-off, insurer/reinsurer disputes, insurance agency valuation and other damages issues. Heavy commercial and industrial property damage insurance claims measurement, including property damage and cost accounting analyses, business interruption, contingent business interruption and extra expense claims, third-party liability matters, fidelity bond claims audits and subrogation actions.

- Designated economic and financial damages expert in a broad range of contract and tort damage claims, representing both plaintiffs and defendants in a variety of industries. Typically provides economic analysis, economic valuation, forensic accounting and/or statistical studies in order to provide an independent analysis of the financial impact related to the issues at hand.

- Economic analysis in intellectual property matters including measurement of lost profits damages/unjust enrichment, reasonable royalty and hypothetical negotiation estimation, market definition and elasticity of demand analysis. Application of audit and other investigative techniques to royalty reviews, including accuracy and completeness of licensee reporting, investigation of underreporting (intentional or unintentional), and objective analysis of systems and supporting information.

- Accredited business valuation analyst, providing independent measurement of ongoing business value in both dispute and non-dispute circumstances.

- Independent arbitrator in a variety of accounting matters including post-acquisition and purchase price disputes.

**NERA**
Economic Consulting

## REPRESENTATIVE CONSULTING PROJECTS

Analysis relating to allegations of deepening insolvency in the offshore drilling rig construction industry. Analyses pertain to cash flow models and identification of zone of insolvency.

Rebuttal testimony on the value of the Gas Fractionation Plant presented by owner in the form of a discounted future earnings model. Discussed model methodologies and appropriate techniques for reasonably estimating risk-adjusted discount rates.

Solvency analysis pertaining to claims of breach of fiduciary duty, misrepresentation and fraudulent conveyance relating to pre-bankruptcy leverage buyout.

Affidavit regarding business valuation methodologies and Uniform Standards of Professional Appraisal Practice, 2003.

Provided damages analysis in a matter arising between a managing general agent and two insurance carriers with whom it had previous agreements. Issues dealt with alleged wrongful termination of agreements. Provided valuation of lost profits, diminution of business value, and an overall economic analysis of relevant market forces driving the workers compensation line of business along with associated pricing forecasts.

Provided analysis of financial condition where the claim was that, due to accounting firm's alleged malpractice, the true financial condition of the plaintiff was not known by the directors. Analyzed Board of Directors reports, minutes and information provided.

Provided analysis of ability to pay in punitive damages matter involving a large Korean commercial contractor. Performed overall analysis of financial condition, availability and quality of net worth, liquidity and solvency issues.

Provided damages analysis in a dispute between a major gasoline refiner and a corporation regarding co-branding of quick service restaurants and retail gasoline outlets. Performed economic analysis of long-term co-branding opportunities and valuation of existing locations.

Provided damages and valuation analysis in a dispute arising between two surety bond agencies. Allegations included breach of contract and tortious interference. Economic analysis of relevant market and forecast of commercial construction.

**NERA**
Economic Consulting

Provided damages analysis in a claim brought by a mid-western refiner arising from partial refinery destruction allegedly due to a negligent contractor. Performed economic analysis related to production, costing, demand and product pricing. Forecasted earnings based on historic and index trends and reconciled results to plant linear model governing production.

Provided damages analysis in dispute between two scaffolding manufacturers. Issues arose regarding patent infringement and alleged wrongful seizure of inventory. Performed economic analysis defining relevant market and forecast of retail and commercial construction.

Provided damages and valuation analysis in large construction defect matter related to a major Las Vegas resort. Economic analysis performed relating to gaming issues, hospitality issues, impact of 9/11 on the market, competition and resort life-cycle and other salient matters.

Provided damages in alleged patent infringement and false advertising claims arising between two competing manufacturers of gas refinery plant filtration systems for in-line live carbon feeds.

Performed accounting analysis of working capital issues and potential loss of earnings arising from a post-acquisition dispute between competitors in medical services and supplies. Performed economic analysis of relevant market and damages quantification.

Provided economic analysis between two states Utilities Commissions with regard to an agreement to swap power seasonally. This matter arose from lack of available supply connected with various impacts from energy deregulation. Economic analysis performed to outline and describe such economic impact.


PUBLICATIONS

"Valuation of Out-of-Sight Inventory Losses," *Texas Insurance Law Reporter*, June 1984.

"Accounting for Economic Loss," *Texas Insurance Law Reporter* and *Texas Bar Journal*, July 1991.

"Loss Measurement—The Investigative Accountant's Initial Concerns," *Claims Magazine*, May 1992.

**NERA**
Economic Consulting

"NAFTA: New Concept or Inevitable Theory," *Dallas Business Journal*, April 1993.

"Economic Damages—The Time Element," *Dallas Business Journal*, September 1993.

"Mexico—Lessons for Us All," *Professional Review*, Spring 1995.

"Business Damages in Commercial Cases," *CPA Litigation Services Counselor*, August and September 1996.

"Economic Analysis of Environmental Damages," *The National Law Journal*, October 1996.

"FAQs About Y2K," *Texas Lawyer*, February 1999.

"Calculating Fines for Environmental Infractions," *Environmental Protection*, March 1999.

## APPROVED CONTINUING EDUCATION COURSES AUTHORED

- Financial Statements—What They Are and How to Read Them.
- Analyzing Financial Condition.
- Basics of Business Damages.
- Basics of Business Valuation.
- Damages in Commercial Litigation.
- An Economic Approach to Punitive Damages.
- First and Third Party Property Claims Financial Services.
- Accounting for Insurance Claims.
- Business and Economic Forecasting Basics—Statistical and Regression Models.

**NERA**
Economic Consulting

## TESTIMONY (PREVIOUS FOUR YEARS)

*John Crane, Inc. v. Admiral Insurance Company, et al.,* 04 CH 08266, In the Circuit Court of Cook County, Illinois County Department, Chancery Division. (Deposition)

*Celebrity Cruises, Inc., et al. v. Essef Corporation, et al.,* 96 Civ 3135 (JCF), In the United States District Court for the Southern District of New York. (Deposition)

*James P. Stephenson, as Trustee for the estate of MJK Clearing, Inc., v. Deutsche Bank AG, et al.,* Civil No. 02-4845 RHK/AJB, and *Stockwalk Group, Inc., v. Deutsche Bank AG, et al.,* Civil No. 04-4164 RHK/AJB, United States District Court, District of Minnesota. (Deposition)

*Michael Vogt, Paul Beaumont, and Fred Breu on their own behalf and as representative plaintiffs on behalf of all similarly situated employees of Outboard Marine Corporation v. Greenmarine Holdings, LLC; Quantum Industrial Partners; and Quantum Industrial Holdings, LTD.,* Case No. 1:02-CV-02059-GEL., In The United States District Court for The Southern District of New York. (Deposition)

*Forrest W. Garvin and E-Netec, Corp. v. McGuire Woods, LLP, et al.,* County, File No. 02-CVS-19813, In the General Court of Justice, Superior Court Division for the State of North Carolina, Mecklenburg. (Deposition)

*Paceholder High Yield Fund, Inc., et al. v. Ranko Cucuz,* Civil Action No. 02-71778, In the United States District Court for the Eastern District of Michigan. (Deposition)

*Nassau County PBA v. Nassau County,* Interest Arbitration, 2002. (Hearing)

*Interline Energy Services, Inc., and Interline Resources Corporation v. Basin Western,* Eighth Judicial District, State of Wyoming, County of Converse, Civil Action No. 13629. (Deposition & Trial)

*Grinnell Fire Protection v. Road Sprinkler Fitters Union No. 669, U.A., United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the U.S. and Canada, AFL-CIO,* Case No. 5-CA-24521, Before the National Labor Relations Board. (Trial)

**NERA**
Economic Consulting

## TESTIMONY (CONT.)

*Teachers' Retirement System of Louisiana v. M. Bernard Aidinoff, et al., and
American International Group, Inc.*, C.A. No. 20106-NC, In the Court of
Chancery of the State of Delaware In and for New Castle County.
(Deposition)

*CISI v. MemberWorks*, Case CV99-0362655 S, State of Connecticut, Judicial
District of Fairfield at Bridgeport. (Deposition)

*Deep South Surplus of Texas, Arkansas, Tennessee and Georgia, Inc. v. Great
American Insurance Company and The Ohio Casualty Insurance Company*,
Case 00-03955, 134th Judicial District, Dallas County, Texas. (Deposition)

*Koch Petroleum Group LP, et al. v. Truck Crane Service Co, et al.*, C7-00-
7606, District Court, State of Minnesota. (Deposition)

*State of Washington, Ex Rel., Public Disclosure Commission v. Washington
Education Association*, 00-2-01837, In the Superior Court of the State of
Washington, In and for the County of Thurston. (Deposition & Trial)

*Jordan B. Fishman, Ph.D. v. BioSource International, Inc., et al.*, CV 00-
06426 ER (RNBx), United States District Court, Central District of California,
Western Division. (Deposition)

*Willis of New York, Inc., et al v. Lockton Companies, Inc., et al.*, 00 Civ. 6476
(JSR), New York South District Court.

*Landmark Organization, Inc., et al. v. Monex Credit Company, et al.*,
00CC10279, Superior Court of the State of California. For the County of
Orange. (Deposition)

*Michael Leonard and Michael Sawyer v. Farmers' Insurance Exchange, et al.*,
GN-001634, In the District Court, Travis County, Texas, 98th Judicial District.
(Deposition & Class Certification Hearing)

*Waco v. KHK*, H-98-1309, United States District Court for Southern District of
Texas Houston Division. (Deposition & Trial)

*MCI Telecommunication v. Gilbert Texas Construction Corp.*, 3:97-CV-1180-
G, District Court of the Northern District of Texas, Dallas Division.
(Deposition & Trial)

**NERA**
Economic Consulting

## TESTIMONY (CONT.)

*Main Street v. Shell Oil*, 97-10741-L, District Court, 193rd Judicial District, Dallas County, Texas. (Deposition)

*Trinity Industries v. American Energy*, 97-06498, District Court, 191st Judicial District, Dallas County, Texas. (Deposition & Trial)

*Antonia M. Igelsias v. Kawasho International (Guam) Inc., et al*, CV-1497-93, In the Superior Court of Guam. (Deposition & Trial)

# Exhibit 2

Exhibit 2

**Marvel Entertainment Group, Inc.**
**Documents Considered**

**Bates Stamped Materials**

| Start | End |
|---|---|
| A 00070 | A 00409 |
| A 01792 | A 01812 |
| A 01817 | A 01846 |
| A 01888 | A 01888 |
| B 00086 | B 00096 |
| B 00261 | B 00319 |
| C 00001 | C 00004 |
| DEF 005442 | DEF 005443 |
| DEF 013137 | DEF 013138 |
| EY 003514 | EY 003542 |
| LNB 0010598 | LNB 0010608 |
| ME 00485 | ME 00494 |
| ME 01061 | ME 01073 |
| M-JB9 0166 | M-JB9 00289 |
| M-JB9 0290 | M-JB9 0480 |
| M-SP10 0572 | M-SP10 0573 |
| M-SP10 0630 | M-SP10 0630 |
| M-SP2 1767 | M-SP2 1875 |
| SKA 02801 | SKA 02938 |
| SKA 04031 | SKA 04135 |
| SKA 04743 | SKA 04850 |
| SKA 05077 | SKA 05212 |
| SKA 05872 | SKA 05991 |
| SKA 09027 | SKA 09122 |

**Marvel Documents**

- Marvel and Fleer Third Amendment 3/1/96
- Marvel and Fleer Fourth Amendment 6/30/96
- Marvel Term Loan 8/30/94
- Marvel U.S. Term Loan Agreement 4/24/95

**Legal Documents**

- Expert Rebuttal Report of Robert W. Holthausen 3/29/02
- Ronald Cantor, et. al. against Ronald O. Perelman, et. al. Opinion
  on the Appeal Filed 7/12/05
- Ronald Cantor, et. al. against Ronald O. Perelman, et. al. Second
  Complaint, 9/13/01

**SEC Filings**

- 4 Kids Entertainment Inc SEC Form 10-K for the fiscal years
  12/31/95 - 12/31/96
- Hasbro Inc SEC Form 10-K for the years ended 12/31/94 - 12/31/98
- Marvel Enterprises, Inc. SEC Form 10-K for the fiscal year ended 12/31/98
- Marvel SEC Form 10-K for the fiscal years ended 12/31/92 - 12/31/97
- Marvel SEC Form 10-Q for the fiscal quarters ended 1Q1993 - 3Q1996
- Marvel SEC Form 8-K for the date 11/20/96

Exhibit 2

## Marvel Entertainment Group, Inc.
### Documents Considered

### SEC Filings (cont.)

- Marvel SEC Form Schedule 13D (Amendment No. 4) for the date 3/7/97
- Mattel Inc SEC Form 10-K for the fiscal years ended 12/31/94 - 12/31/98
- Scholastic Corp SEC Form 10-K for the fiscal year ended 5/31/96
- The Topps Company Inc SEC Form 10-K for the fiscal year ended 3/2/96

### News Articles

- Factiva Comprehensive Chronology Search: News stories obtained from
  Factiva using the search terms Marvel or Perelman* or "Andrews Group".
  Sources used were Business Wire, Dow Jones News Service,
  PR Newswire, Reuters, and the Wall Street Journal.
- "Andrews Group Names Sassa President -2-: Will be Marvel CEO." Dow
  Jones News Service, 10/23/96. Obtained from Factiva Research Systems.
- "Andrews Group Proposes to Acquire Newly Issued Marvel Entertainment
  Group Stock," Business Wire, 11/12/96. Obtained from Factiva.
- "Andrews Grp –Toy Biz -3-: Andrews Might Buy Equity at Marvel." Dow
  Jones News Service, 10/17/96. Obtained from Factiva Research Systems.
- "Andrews Grp-Marvel-3-: Andrews Now Has 81M Marvel Shrs." Dow
  Jones News Service, 11/12/96.  Obtained from Factiva Research Systems.
- "Andrews offers to combine Toy Biz and Marvel." Reuters News, 11/12/96.
  Obtained from Factiva Research Systems.
- "Former Turner Broadcasting Executive Named Chairman and CEO
  of Marvel." The Wall Street Journal, 10/24/96. Obtained from Factiva.
- "Marvel 3Q96 Results and Performance Update." PR Newswire, 11/12/96.
  Obtained from Factiva Research Systems.
- "MacAndrews & Forbes Completes Tender Offer for Marvel Shares."
  PR Newswire, 5/7/93. Obtained from Factiva.
- "Marvel Entertainment sets two-for-one split." Reuters News, 9/24/93.
  Obtained from Factiva.
- "Marvel Entertainment Estimate -2-: Wider Oper Losses." Dow Jones
  News Service, October 8, 1996. Obtained from Factiva.
- "Marvel Entertainment Estimate -3-: Street Saw 3Q Net 8c/Shr." Dow Jones
  News Service, October 8, 1996. Obtained from Factiva Research Systems.
- "Marvel Entertainment Expects to Report Loss for 3rd Quarter." The Wall
  Street Journal, October 9, 1996.  Obtained from Factiva Research Systems.
- "Marvel Receives Andrews Proposal." PR Newswire, November 12, 1996.
  Obtained from Factiva Research Systems.
- "Marvel Shares Plunge 41% on News of Perelman's Plan to Buy
  New Stock." The Wall Street Journal, 11/13/96. Obtained from Factiva
  Research Systems.
- "Perelman's Andrews Grp Plans To Buy Marvel Stk On The Cheap." Dow
  Jones News Service, 11/12/96. Obtained from Factiva Research Systems.

Exhibit 2

## Marvel Entertainment Group, Inc.
## Documents Considered

### News Articles (cont.)

- "Perelman's Andrews Grp-2: T. Biz Cash Flow Could Aid Marvel." Dow
  Jones News Service, 11/12/96. Obtained from Factiva Research Systems.
- Fessler, Karen, Daniel Fisher, and Beth Williams, "Marvel Gets Perelman
  Bid for $350 Mln of New Stock," Bloomberg, 11/12/96.
- Marich, Robert. "Perelman drops plan for Marvel Bondholders set $365 mil
  recapitalization plan in agreement with Ronald Perelman."
  Hollywood Reporter, 3/10/97.

### Academic Literature

- Andrade, Gregor and Kaplan, Steven, "How Costly is Financial (Not
  Economic) Distress? Evidence from Highly Leveraged Transactions that
  Became Distressed" Journal of Finance, Vol LIII No. 5 (October 1998)
- Brealey, Richard A., Stewart C. Myers, Franklin Allen, Principle of Corporate
  Finance, McGraw-Hill Irwin, New York, 2006.
- Ibbotson Associates Cost of Capital Quarterly 1995 Yearbook
- Ross, Westerfield, and Jaffe, Corporate Finance, 6th Edition, McGraw Hill,
  2002 p.451.

### Other Sources

- Data from FactSet Research Systems, Inc.
- The Federal Reserve Discount Rate data was obtained from
  www.federalreserve.gov/releases/h15/data/Daily/discontinued_DWB_NA.txt
  for the date prior to 1/8/03 and
  www.federalreserve.gov/releases/h15/data/Daily/H15_DWPC_NA.txt
  for the date after 1/9/03.
- See U.S. Code, Title 26, Subtitle A, Chapter 6, Subchapter A,
  Section 1501 and 1504
  www.law.cornell.edu/uscode/html/uscode26/usc_sec_26_00001501----000-notes.html
- Whitman Investment Research, Marvel Entertainment Group 11/11/96

# Exhibit 3



Exhibit 3A

**Marvel Entertainment Group, Inc.**
**Debt-to-Equity**
**Calendar Year End 1993 through 1996**

■ **Marvel Debt-to-equity**     □ **Peer Index Debt-to-equity**

**Notes and Sources:** Debt to Equity ratio is computed based on book value debt to market value equity. Data obtained from FactSet Research Systems, Inc. and Marvel SEC Form 10-Q for the fiscal quarter ended 9/30/96. Marvel 1996 debt level is as of 9/30/96. The Index includes Hastro, Inc. (HAS), Mattel, Inc. (MAT), 4Kids Entertainment, Inc. (KDE), Scholastic Corporation (SCHL), The Topps Company, Inc. (TOPP).



**Exhibit 3B**

**Marvel Entertainment Group, Inc.**
**Interest Coverage Ratios (EBIT)**
**Calendar Year End 1993 through 1996**

■ Marvel w/ EBIT    □ Index w/ EBIT

**Notes and Sources:** Interest Coverage Ratio is computed as earnings before interest and tax divided by interest expense. Data obtained from FactSet Research Systems, Inc. The Index includes Hasbro, Inc. (HAS), Mattel, Inc. (MAT), 4Kids Entertainment, Inc. (KDE), Scholastic Corporation (SCHL), The Topps Company, Inc. (TOPP). TOPP and SCHL are excluded from this index in years where they incurred no interest expense. TOPP and SCHL fiscal year end was

# Exhibit 4

Exhibit 4

Marvel Entertainment Group, Inc.
Comparable Analysis as of 1996

| Name | Company Description | Publishing - Comic Books and Other Children Publications | Sports and Entertainment Trading Cards | Adhesives and Stickers | Toys | Consumer Products, Media and Advertising - Promotion Licensing | Other (CastleBeary) |
|---|---|---|---|---|---|---|---|
| Marvel Entertainment Group (MRVGQ) | "A leading creator, publisher and distributor of youth entertainment products for domestic and international markets based on its fictional action adventure characters owned by the Company, licenses from professional athletes, sports teams and popular entertainment characters and other properties owned by third parties." (Marvel 1996 10K, p. 1) | "The Company is the largest publisher of comic books in North America." (Marvel 1996 10K, p. 5) | "Fleer/SkyBox is a leading marketer of sports and entertainment trading cards. In addition, Fleer/SkyBox manufactures and distributes entertainment trading cards using the Company's classic SUPER HEROES characters as well as characters based on other licensed properties." (Marvel 1996 10K, p. 6) | "Panini (subsidiary of Marvel) is the largest manufacturer and distributor of sports and entertainment sticker collections in the world...Panini produces and distributes stickers, which are pictures or self-adhesive paper designed primarily to be collected and placed in albums. (Marvel 1996 10K, p. 7) 10K, p. 6) | "Toy Biz (Marvel owns 26.6% equity interest) is a toy entertainment company that designs, markets and distributes a diverse product line. In the United States and internationally, based on popular entertainment properties, consumer brand names and proprietary designs. (Marvel 1996 10K, p. 8) | "the licensing of (i) joint ventures (involving the Marvel Characters for use with (i) merchandise, (ii) promotions, (iii) publishing, (iv) television and film, (v) on-line and interactive software and (vi) restaurants, theme parks and site-based entertainment." (Marvel 1996 10K, p. 9) | "Fleer manufactures and markets an array of confectionery products. Fleer's confectionery operation is best known for its DUBBLE BUBBLE and RAZZLES gum products." (Marvel 1996 10K, p. 10) |
| The Topps Company, Inc (TOPPS) | "Topps is a leading marketer of collectible picture products featuring sports figures as well as popular television, movie and/or comic book characters. The Company also produces and distributes BAZOOKA brand bubble gum as well as unique lollipops, such as RING POP and PUSH POP, other novelty candy products, comic books and sticker albums." (Topps 1996 10K, p. 2) | "Magazine and Book Publishing. The Company is currently publishing two quarterly magazines "Comic Books. Through its subsidiary, Topps Comics, Inc., the Company creates and markets high-quality color comic books for distribution in specialty shops and newsstands." (Topps 1996 10K, p.4) | "Sports Picture Products. The Company is a leading marketer of collectible picture products featuring major league baseball players and professional basketball, football and hockey players. Such products feature photographs of the athletes and include summary statistics and biographical material. "Entertainment and Other Picture Products...the Company has marketed many of the dominant entertainment card properties of the time" (Topps 1996 10K, p.3) | "Stickers and Albums. The Company designs and markets sticker and album collections in Europe through its subsidiary, Merlin...Merlin's product line includes a combination of sports and entertainment properties." (Topps 1996 10K, p.5) | | | "BAZOOKA Brand Bubble Gum....The Company has been marketing BAZOOKA brand bubble gum since 1947." "Lollipops...The Company markets several lollipop products throughout the United States and many foreign countries." "Other Novelty Candy Products...The Company markets a line of candy and candy-coated bubble gum which consists of a variety of specialty products in unusual motifs and packages. "Other Collectibles...the Company obtained the right to produce a range of small plastic collectible puppies." (Topps 1996 10K, p. 5-6) |

1 of 3

Exhibit 4

**Marvel Entertainment Group, Inc.**
**Comparable Analysis as of 1996**

| Name | Company Description | Publishing - Comic Books and Other Children Publications | Sports and Entertainment Trading Cards | Adhesive and Stickers | Toys | Consumer Products, Media and Advertising - Promotion Licensing | Other (Confectionary) |
|---|---|---|---|---|---|---|---|
| Hasbro Inc. (HAS) [1] | "The Company designs, manufactures and markets a diverse line of toy products and related items throughout the world. The Company also licenses various tradenames, characters and other property rights for use in connection with the sale by others of noncompeting toys and non-toy products." (Hasbro 1996 10K, p.1) | | | | "The Hasbro Toy Group develops and markets infant, preschool, activity, boys and girls products in the United States." (Hasbro 1996 10K, p. 1) "The Hasbro Games Group develops and markets games and puzzles." (Hasbro 1996 10K, p.1) | | |
| Mattel Inc. (MAT) [2] | "Mattel, Inc. designs, manufactures, markets and distributes a broad variety of toy products on a worldwide basis." (Mattel 1996 10K, p. 2) | | | | "The Company's principal core brands are: i) BARBIE fashion dolls and doll clothing and accessories, ii) FISHER-PRICE toys and accessories, including the POWER WHEELS line...iii) the Company's Disney-licensed toys, and iv) HOT WHEELS vehicles and playsets, each of which has broad worldwide appeal." (Mattel 1996 10K, p. 2) | | |
| 4Kids Entertainment, Inc (KDE) [3] | "a vertically integrated entertainment based company. The Company provides a comprehensive range of services including toy design and development, domestic and international merchandise licensing, media buying and planning, international and domestic television distribution and television production. The Company operates through four wholly owned subsidiaries, Leisure Concepts, Inc., The Summit Media Group, Inc. and 4Kids Productions, Inc." (4Kids 1996 10K, p. 2) | | | | | "Leisure Concepts, Inc. is engaged primarily in the business of domestic and international licensing of the commercial rights to properties, personalities, and product concepts. The Summit Media Group, Inc. provides media planning, buying and marketing services primarily for toy and video game companies. 4Kids Productions, Inc. is a television and home video production company specializing in youth-oriented entertainment programming." (4Kids 1996 10K, p. 2) | |

2 of 3

Exhibit 4

Marvel Entertainment Group, Inc.
Comparable Analysis as of 1996

| Name | Company Description | Publishing - Comic Books and Other Children Publications | Sports and Entertainment Trading Cards | Adhesives and Stickers | Toys | Consumer Products, Media and Advertising - Promotion Licensing | Other (Confectionary) |
|---|---|---|---|---|---|---|---|
| Scholastic Corporation (SCHL)[5] | "among the leading publishers and distributors of children's books, classroom and professional magazines, and other educational materials. Scholastic distributes most of its products directly to children and teachers in elementary and secondary schools. Scholastic has developed strong name recognition associated with quality and dedication to learning and has achieved a leading market position in the school-based distribution of children's books and magazines." (Scholastic 1996 10K, p. 1) | "Children's Book Publishing ... one of the largest English language publishers of children's books... The Company offers a broad range of quality children's literature." (Scholastic 1996 10K, p. 2) "Instructional Publishing ... develops and distributes instructional materials ... directly to schools." (Scholastic 1996 10K, p. 3) "Magazine Publishing ... complements its school based book publishing business with the publication of classroom magazines... The Company also publishes two consumer magazines for small business and home office professionals and a magazine for parents of children." (Scholastic 1996 10K, p. 4) | | | | "Filmed Entertainment and Marketing and Consumer Products... licenses and develops products originated by third parties ... orchestrates consumer marketing campaigns and manages the licensing of consumer products and promotion for each franchise." (Scholastic 1996 10K, p. 7) | |

Notes and Sources:

[1] Marvel SEC Form 10-K for the fiscal year ended 12/31/96, p. 1-10
[2] The Topps Company SEC Form 10-K for the fiscal year ended 12/31/96, p. 2-6
[3] Hasbro SEC Form 10-K for the fiscal year ended 12/31/96, p. 1-2
[4] Mattel SEC Form 10-K for the fiscal year ended 12/31/96, p. 2
[5] Kids Entertainment SEC Form 10-K for the fiscal year ended 12/31/96, p. 2
[6] Scholastic SEC Form 10-K for the fiscal year ended 5/31/96

# Exhibit 5

Exhibit 5

**Marvel Entertainment Group, Inc.**
**Analysis of Decline in Enterprise Value**
**as a Result of Financial Distress**
*(Amounts in millions except share price)*

| | | |
|---|---|---|
| Debt Value[1] | $ | 250.20 |
| Share Price[2] | | 29.13 |
| Shares Outstanding[3] | | 97.33 |
| Equity Value | $ | 2,834.82 |
| Total Enterprise Value (Debt + Equity) | $ | 3,085.02 |
| Loss of 10% | $ | 308.50 |
| Loss of 20% | $ | 617.00 |
| **Average of Losses** | $ | 462.75 |
| **Total Losses w/ Fixed Rate Simple Interest[4,5]** | $ | 902.37 |
| **Total Losses w/ Fixed Rate Monthly Compounding[4,6]** | $ | 1,192.78 |
| **Total Losses w/ Variable Rate Monthly Compounding[7]** | $ | 1,334.17 |

**Notes and Sources:**

Andrade, Gregor and Kaplan, Steven, "How Costly is Financial (Not Economic)
Distress? Evidence from Highly Leveraged Transactions that Became Distressed"
*Journal of Finance*, Vol LIII No. 5 (October 1998) p. 1445.
The Federal Reserve Discount Rate data was obtained from
www.federalreserve.gov/releases/h15/data/Daily/discontinued_DWB_NA.txt
for the date prior to 1/8/03 and
www.federalreserve.gov/releases/h15/data/Daily/H15_DWPC_NA.txt
for the date after 1/9/03.

[1] Debt value is as of 12/31/93. Taken from Marvel SEC Form 10-K for the fiscal year ended
12/31/93, p. F-3 (A 00094).

[2] Price per share is as of 1/31/94. Obtained from FactSet Research Systems, Inc.

[3] Shares outstanding is as of 11/10/93 taken from Marvel SEC Form 10-Q for the fiscal period
ended 9/30/93, p. 1 (A 00243).

[4] The Prejudgment Interest Rate is assumed to be five percentage points over the Federal
Reserve Discount Rate of 3.0 percent as of 2/15/94.

[5] Average of Losses * (1 + Prejudgment Interest Rate * Years between 2/15/94 and 12/31/05,
11.9 years)

[6] Average of Losses * (1 + (Prejudgment Interest Rate/12))^(Months between 2/15/94 and
12/31/05, 142.5 months)

[7] Average of Losses * Π (1+(Monthly Average Federal Reserve Discount Rate + 5%)/12)
for the time period 2/15/94 to 12/31/05.

# Exhibit 6

**Exhibit 6**

**Marvel Entertainment Group, Inc.**
**Analysis of Equity Cost to Maintain 50 and 80 Percent Ownership**
**November 11, 1996**

|  | | *Amounts in millions* | |
|  | | *(except percentage and price data)* | |
|  | **Total** | **Perelman** | **Market** |
| --- | --- | --- | --- |
| November 11, 1996 - Shares Outstanding | 101.81 | 82.63 | 19.18 |
| November 11, 1996 - Ownership Percent | *100.00%* | *81.16%* | *18.84%* |
|  |  |  |  |
| Required Capital Infusion[1] | $  350.00 |  |  |
| November 11, 1996 - Share Price | $  4.63 |  |  |
| Additional Shares Needed for Capital Infusion | 75.68 |  |  |
|  |  |  |  |
| Additional Shares Allocation for Perelman to Maintain Ownership Stake at: |  |  |  |
| (a) 80% | 75.68 | 59.36 | 16.32 |
| (b) 51% | 75.68 | 7.89 | 67.79 |
|  |  |  |  |
| Total Shares and Share Allocation for Perelman to Maintain Ownership Stake at: |  |  |  |
| (a) 80% | 177.49 | 141.99 | 35.50 |
| (b) 51% | 177.49 | 90.52 | 86.97 |
|  |  |  |  |
| Cost to Perelman to Maintain Stake at: |  |  |  |
| (a) 80% |  | $  274.53 |  |
| (b) 51% |  | $  36.48 |  |

**Notes and Sources:**

Marvel share data obtained from Marvel SEC Form 10-Q for the fiscal quarter
ended 9/30/1996.  Share price obtained from Factset Research Systems, Inc.

"Andrews Grp-ToyBiz -3-: Andrews Might Buy Equity At Marvel." Dow Jones News Service.
10/17/96. Obtained from Factiva.

# Exhibit 7

Exhibit 7A

## Marvel Entertainment Group, Inc.
### Calculation of Stock Price Reaction
### Following November 12, 1996 Announcement

| Date | Stock Price [1] | Actual Stock Price Return | Predicted Stock Price Return [2] | Abnormal Stock Price Return | t-statistic for Abnormal Stock Price Return [3] | Cumulative Abnormal Stock Price Change |
|---|---|---|---|---|---|---|
| 11/11/96 | $4.63 | | | | | |
| 11/12/96 | $2.75 | -40.54% | -0.13% | -40.46% | (12.37) ** | ($1.87) |

**Notes and Sources:**

[1] Data are from FactSet Research Systems, Inc.

[2] Returns are predicted using a regression of the returns of Marvel's stock price on the returns of the S&P 500, a Peer Index, and Earnings Surprise isolating the proposal plan run over the period from 7/17/91 to 12/31/96.

[3] Abnormal return t-statistics are calculated as the daily abnormal return divided by the standard error of the regression over the estimation period. Two stars (**) represent significance at the 5% level, and one star (*) represents significance at the 10% level.

### Marvel Entertainment Group, Inc.
### Calculation of Damages
#### *(Amounts in millions except share price)*

| | | |
|---|---|---:|
| Shares Outstanding[1] | | 101.8 |
| Price Drop Due to Indenture Covenants[2] | $ | 1.87 |
| | | |
| **Change in Equity[3]** | $ | 190.53 |
| | | |
| **Damage w/ Fixed Rate Simple Interest[4,5]** | $ | 363.9 |
| | | |
| **Damage w/ Fixed Rate Monthly Compounding[4,6]** | $ | 473.2 |
| | | |
| **Damage w/ Variable Rate Monthly Compounding[7]** | $ | 422.0 |

**Notes and Sources:**

The Federal Reserve Discount Rate data was obtained from
www.federalreserve.gov/releases/h15/data/Daily/discontinued_DWB_NA.txt
for the date prior to 1/8/03 and
www.federalreserve.gov/releases/h15/data/Daily/H15_DWPC_NA.txt
for the date after 1/9/03.

[1] Shares Outstanding was obtained from Marvel SEC Form 10-Q for the fiscal period ended 9/30/96.

[2] See Exhibit 7A for calculation of the price drop due to proposal.

[3] Change in Equity is shares outstanding multiplied by the price drop.

[4] The Prejudgment Interest Rate is assumed to be five percentage points over the Federal Reserve Discount Rate of 5.0 percent as of 11/12/96.

[5] Change in Equity * (1 + Prejudgment Interest Rate * Years between 11/12/96 and 12/31/05, 9.1 years)

[6] Change in Equity * (1 + (Prejudgment Interest Rate/12))^(Months between 11/12/96 and 12/31/05, 109.6 months)

[7] Change in Equity * $\Pi$ (1+(Monthly Average Federal Reserve Discount Rate + 5%)/12) for the time period 11/12/96 to 12/31/05.

Privileged and Confidential

**Marvel Entertainment Group, Inc**
**Regression Model Scenarios**
**Summary Sheet**

| | Original Model[6] | Adjusted Model[7] |
|---|---|---|
| **Regression Model[1]** | | |
| Intercept | 0.000 | 0.000 |
| | *0.24* | *0.23* |
| SP Return[2] | 0.881 | 0.882 |
| | *6.07* ** | *6.08* ** |
| Peer Return[3] | 0.133 | 0.132 |
| | *2.73* ** | *2.71* ** |
| Actual ES[4] | 0.632 | 1.285 |
| | *0.87* | *0.85* |
| Guidance Current ES[5] | | (1.211) |
| | | *(0.49)* |
| November 12th Indicator | (0.41) | (0.45) |
| | *(11.92)* ** | *(4.79)* ** |

**Notes and Sources:**

[1] Abnormal return t-statistics are italicized and are calculated as the daily abnormal return divided by the standard error of the regression over the estimation period. Two stars (**) represent significance at the 5% level, and one star (*) represents significance at the 10% level.

[2] S&P 500 % Return. Source: FactSet

[3] Peer Index includes 4 Kids Entertainment, Inc., Hasbro Inc., Mattel Inc., Scholastic Corporation, The Topps Company, Inc. Source: FactSet

[4] Actual Announcement subtracted by Expected EPS, where Expected EPS is the analyst consensus of expected EPS for the quarter or year end from IBES, and then divided by the Stock Price Prior to Announcement. Source: IBES, FactSet, Factiva

[5] Guidance Current, where Guidance Current is the Marvel announcement of expected EPS results for the current quarter or year end, subtracted by Expected EPS, where Expected EPS is the analyst consensus of expected EPS for the quarter or year end from IBES, and then divided by the Stock Price Prior to Announcement. Source: IBES, FactSet, Factiva

[6] Marvel Return = β0 + β1SP Return + β2Peer Return + β3Actual ES + November 12th Indicator + ε

[7] Marvel Return = β0 + β1SP Return + β2Peer Return + β3Actual ES + β4Guidance Current ES + November 12th Indicator + ε