# SCHEDULE A-1

# Part 5 of 5

# Walsh

# Walsh

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD CANTOR, IVAN SNYDER and | § | |
| JAMES A. SCARPONE, AS TRUSTEES OF | § | |
| THE MAFCO LITIGATION TRUST, | § | |
| | § | |
| Plaintiffs, | § | No. 97-CIV-586-KAJ |
| | § | |
| -against- | § | |
| | § | |
| RONALD O. PERELMAN, | § | |
| MAFCO HOLDINGS, INC., | § | |
| MacANDREWS & FORBES HOLDINGS INC., | § | |
| ANDREWS GROUP INCORPORATED, | § | |
| WILLIAM C. BEVINS and | § | |
| DONALD G. DRAPKIN, | § | |
| | § | |
| Defendants. | § | |

**REBUTTAL REPORT OF JUSTICE JOSEPH T. WALSH, RETIRED**
**Expert Witness for Plaintiffs Ronald Cantor, Ivan Snyder and James A. Scarpone, as**
**Trustees of The MAFCO Litigation Trust**

**Date:  March 1, 2006**

## QUALIFICATIONS OF EXPERT WITNESS

1. I am currently Of Counsel to the law firm of McCarter & English, LLP of Wilmington, Delaware. Prior to my present employment, I was a member of the Delaware Judiciary for more than thirty years. I was appointed as a judge of the Delaware Superior Court in 1972. In 1984, I was appointed as a Vice Chancellor of the Delaware Court of Chancery. I was appointed as a Justice of the Delaware Supreme Court in 1985. I was then reappointed as a justice for a second twelve-year term in 1997. I retired from the Delaware Supreme Court effective May 1, 2003 and on June 1, 2003 joined McCarter & English. My curriculum vitae, including a list of certain publications and opinions I have authored while serving on the Delaware Court of Chancery and the Delaware Supreme Court is attached hereto as Exhibit 1.

2. Since joining McCarter & English, I have served as an arbitrator and mediator and have provided counsel and served as an expert witness in corporate litigation.

3. I have been retained by the firm of Friedman Kaplan Seiler & Adelman LLP to provide consulting services and advice in connection with that firm's representation of the plaintiffs in the above captioned matter. My compensation is on a fixed hourly rate of $510 and is not dependent on the outcome of these proceedings. In this report I have been requested to comment on the Expert Report submitted by Professor Lawrence A. Hamermesh on behalf of the Defendants. In so doing, I opine, as did Professor Hamermesh, on the nature and extent of the fiduciary principles underlying the rights and duties of the defendants as controlling shareholder and directors of Marvel Entertainment Group, Inc. ("Marvel"), under Delaware law, in connection with the issuance of certain Notes issued by the so-called "Marvel Holding Companies" *i.e,* Marvel III Holdings, Inc. ("Marvel III"), Marvel (Parent) Holdings, Inc. ("Marvel Parent") and Marvel Holdings, Inc. ("Marvel Holdings").

2

4. The facts assumed by me for the purpose of this report are drawn primarily from the decision of the Third Circuit Court of Appeals, dated July 12, 2005, reversing in part, and affirming in part, the District Court's grant of summary judgment in favor of the defendants and remanding the matter for further proceedings in the trial court. I attach as Exhibit 2 a list of the materials considered by me.

5. Defendant, Ronald O. Perelman ("Perelman"), was at all relevant times a director of Marvel and Chairman of its board. Through a chain of wholly-owned companies, Perelman exercised controlling interest of 60% to 80% of Marvel's stock. Defendants William C. Bevins ("Bevins") and Donald G. Drapkin ("Drapkin") were common directors and officers of Marvel and Perelman's controlling holding companies. Perelman, Bevins and Drapkin constituted three of the four members of the Executive Committee of the Marvel board.

6. In 1993 and 1994, the defendants arranged for the issuance by the Marvel Holding Companies of a series of Notes. The three tranches of Notes yielded $553.5 million. None of the proceeds of these Notes benefited Marvel, although the Notes contained certain restrictions applicable to Marvel. Specifically the Note Indentures provide that the issuers will not permit Marvel to issue debt, preferred stock, pay dividends or engage in stock buybacks, except under certain circumstances. The restrictions also provide that the issuers will prohibit Marvel's issuance of common stock that would dilute Marvel's control by Perelman. Marvel's senior management participated in "road shows" to support the marketing of the Notes.

7. The offering memoranda for each Note recited that "MacAndrews & Forbes will be able to direct and control the policies of the Issuer and its subsidiaries [*i.e.,* Marvel], including mergers, sales of assets and similar transactions." The memoranda further stated that "no vote

3

[would] be cast, and no consent, waiver or ratification given or action taken [by the Issuer], which would be inconsistent with or violate any provision of the Indenture or the Notes."

8. Subsequent to the issuance of the Notes, Marvel experienced liquidity problems and on December 27, 1996 filed a voluntary petition for bankruptcy.  Plaintiffs allege that Marvel suffered financial harm as a result of being subject to the Note restrictions imposed solely for Perelman's benefit.  The Third Circuit has ruled that, if the evidence showed at trial that defendants breached their duty of loyalty under Delaware law through exploitation of their fiduciary position for personal gain, plaintiffs should be afforded the opportunity to establish *inter alia*, "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." *Cantor v. Perelman* 414 F.3d 430 at 437.

9. Professor Hamermesh states that a controlling shareholder is "entitled to take extraordinary steps to protect that [controlling] interest against efforts by the board of directors to issue sufficient shares to eliminate that majority voting power."  A controlling shareholder, however, especially a controlling shareholder who is also a director still owes fiduciary duties to the corporation and cannot breach those duties in order to maintain his controlling position.  Any assessment of the defendants' responsibility to Marvel (and other constituencies affected by their conduct) must begin with the defendants' duties as directors of a corporation chartered under Delaware law.  Directors of a Delaware corporation "have a triad of primary fiduciary duties: due care, loyalty, and good faith." *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). The duty of loyalty, implicated here, has been described in the seminal  decision of the Delaware Court of Chancery, *Guth v. Loft*, 5 A.2d 503, 510 (Del. Ch. 1939) as one "not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing

4

anything that would work injury to the corporation...." Where directors stand on both sides of a transaction the specter of self-dealing is omnipresent and this danger is heightened where one of the parties to the transaction is a controlling shareholder of both entities. *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

10.    In *Weinberger* the court emphasized that dual directors, who were appointed by the parent to the subsidiary's board, "still owed ... an uncompromising duty of loyalty" to the subsidiary and its shareholders. *Weinberger*, 457 A.2d at 710.

> Given the absence of any attempt to structure this transaction on an arm's length basis, [the parent] cannot escape the effects of the conflicts it faced, particularly when its designees on [the subsidiary's] board did not totally abstain from participation in the matter. There is no 'safe harbor' for such divided loyalties in Delaware. ...
>
> There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context. [Citation omitted.] Thus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations....

*Id.* at 710 . The court also held that "where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Id.* at 710.

11.    Where a transaction carries the potential for self-dealing by a controlling shareholder, Delaware law recognizes that a "safe harbor" may be established through the formation of a special committee of independent directors. *Kahn v. Lynch Communication Sys.*, 638 A.2d 1110, 1117 (Del. 1994). The special committee mechanism has served to relieve the proponents of the transaction of the burden of proving the fairness of a business transaction provided the special committee "was truly independent, fully informed, and had the freedom to negotiate at arm's length." *Lynch* at 1020-21. When the special committee had real bargaining

5

power so that it could negotiate with the controlling shareholders the burden may be shifted to a shareholder attacking the fairness of the transaction.

12. In subjecting Marvel to the restrictions set forth in the Notes, Perelman and his aligned directors failed to discharge their fiduciary duty of loyalty owed to Marvel and Marvel's minority shareholders. At a minimum, the defendants should have provided for the use of a special committee of independent directors to engage in arm's length bargaining with Perelman over the terms of any commitment made by Perelman as Marvel's controlling shareholder to restrict Marvel's ability to raise capital. In proceeding to impose such restrictions unilaterally, the defendants breached the duty of loyalty which requires that the "best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

13. The principles underlying the obligation to demonstrate fairness in the context of parent-subsidiary mergers provide analogous support for the view that whenever a controlling shareholder crafts a transaction which impacts both controlled entities, he must ensure that the interests of one are not made subservient to the interests of another. "Delaware law is unyielding in its demand that directors owing duties to two constituencies uphold those duties, without compromise, to both groups; or if they cannot, they must relinquish that duty to another." *Gans v. MDR Liquidating Corp.*, 1998 WL 294006 (Del. Ch. 1998) at *3. As noted, the defendants made no effort to relinquish their duty in favor of a special committee and thus were clearly conflicted to the extent that the terms of the Notes carried the risk of financial detriment to Marvel. Indeed, not only did the defendants abjure the use of a special committee mechanism,

6

they required Marvel's employees directly to engage in activities in road shows to promote the marketing of the Notes.

14.   Professor Hamermesh has concluded that a shareholder having majority or controlling voting power (presumably Perelman) possesses a valuable control premium which the shareholder is entitled to protect from efforts to reduce such control; including preventing corporate board of directors from adopting any measure to dilute or reduce such control. Professor Hamermesh has also concluded that under Delaware law as "generally recognized in the 1993-1996 time period ... directors cannot, consistent with their obligations as directors, seek to eliminate a majority stockholder's control through the issuance of shares, in the absence of some circumstance in which such an issuance would be necessary to protect the corporation and its stockholders from exploitation or breach of fiduciary duty by the majority stockholder." Professor Hamermesh opines that the restrictive provisions of the Indentures simply reflect limitations already permitted by Delaware law and did not "in any significant way, if at all" prevent Marvel and its board of directors from  issuing other equity securities, short of deleting Perelman's control.

15.   I do not disagree that the majority stock ownership is a valuable property right and enjoys recognition as a control premium.  I also agree that a majority shareholder – in his capacity as a shareholder but not as a director – is entitled to protect that interest from efforts to eliminate or reduce it.  But that right is not absolute.  For example,  the Court of Chancery noted in *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994), "a situation might arise in which a board could, consistently with its fiduciary duties, issue a dilutive option in order to protect the corporation or its minority shareholders from exploitation by a controlling shareholder who was in the process or threatening to violate his fiduciary duties to the corporation...."

7

16. I disagree, moreover, with Professor Hamermesh's implication that it is only in the face of the need to protect the corporation and its shareholders from exploitation or breach of fiduciary duty by a majority shareholder that directors can effect a dilution of majority control. As Chancellor Seitz noted in *Canada Southern Oils, Ltd. v. Manabi Exploration Co.*, 96 A.2d 810 (Del. Ch. 1953), cited by Professor Hamermesh, the test is a contextual one. If the corporation's "long range financial prospects" are not in jeopardy and the "primary purpose" of the issuance of additional shares was to deprive the controlling share of voting control, the dilution effort would not be permissible. Where, however, directors are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control. It is an abuse of power for a board of directors to issue stock "for the sole or primary purpose of diluting the voting power of an existing block of stock" but not for the principal purpose of raising necessary or desirable capital. *Freedman v. Restaurant Associates Indus., Inc.*, 1987 WL 14323 *9 (Del. Ch. Oct. 16, 1987).

17. Of course, one cannot opine with any assurance what options the independent directors of Marvel might have pursued to protect the interests of Marvel and its minority shareholders from the Indenture Restrictions. Not only was the use of a special committee of independent directors not explored as a protective measure to insure arm's-length bargaining, the implications of the Indenture restrictions on Marvel's interests apparently were never presented to the Marvel Board. Even though Perelman and his aligned directors were fully cognizant of the undertakings they had made applicable to Marvel through the Indenture Restrictions, they did not present the matter to the Marvel Board.

8

18. Finally, it should be noted that any action by the Marvel board to issue additional shares of common stock would have been an act permitted under the Delaware General Corporation Law. While that action might serve to reduce or dilute the controlling shareholder's interests, the action of the Board, if adopted for a proper corporate purpose, would be analyzed under the well-settled Delaware Corporate Law principle of independent legal significance. Under this doctrine, if an action can be accomplished under one section of the DGCL it need not satisfy the requirements of another section which permits the same result. *Orzeck v. Englehart*, 195 A.2d 375, 378 (1963); *Rothschild Intern. Corp. v. Liggett Group Inc.*, 474 A.2d 133, 136 (Del. 1984); *Moran v. Household International, Inc.*, 490 A.2d 1059, 1077 (Del. Ch. 1985), *aff'd.* 500 A.2d 1346 (1985). In my opinion, if the issuance of additional equity were for the purpose of advancing or protecting the financial viability of the company, and that result was the primary motivation for the Board's action, that action would be independently defensible, notwithstanding its dilutive effect on Perelman's interest.

Joseph T. Walsh

9

# Exhibit 1

## Exhibit 1

### Justice Joseph T. Walsh

Justice Joseph T. Walsh is a native Delawarean who served as a member of the Delaware Judiciary from 1972 to his retirement in 2003.  He is an honors graduate of LaSalle University and Georgetown University Law Center where he was a member of the law review.  He was admitted to the District of Columbia Bar in 1954 and to the Delaware Bar in 1955 and served as law clerk to Chief Judge Paul Leahy of the United States District Court for Delaware.  He served three years on active duty as a member of the Judge Advocate General Corps of the United States Army.  He engaged in the private practice of law for fourteen years, primarily as a litigator including service as Chief Counsel for the Delaware Public Service Commission.  He also served as attorney for the Delaware House of Representatives and counsel for the Wilmington Parking Authority.

Justice Walsh was appointed as a judge of the Superior Court in 1972, a Vice Chancellor of the Court of Chancery in 1984 and as a Justice of the Delaware Supreme Court in 1985.  He was reappointed as a justice to a twelve year term in 1997.  Justice Walsh retired from the Delaware Supreme Court in April, 2003.  He joined McCarter & English as Of Counsel June 1, 2003.  As a former director of Einstein Institute for Science, Health and the Courts, Justice Walsh authored articles and lectured on the legal implications of genetic science.  He is an adjunct professor at the Widener University School of Law from which he received an honorary Doctor of Laws degree in 1997.

While a member of the Delaware Judiciary, Justice Walsh chaired various committees including the Criminal Code Commentary Committee, the Long Range Court's Planning Committee, the Administrative Office of the Courts Restructuring Committee, and was a member of the New Castle County Courthouse Construction Committee. In 1989, Justice Walsh received the Herbert Harley Award from the American Judicature Society for promoting the effective administration of justice. In 2002, Justice Walsh received the First State Distinguished Service Award the highest award conferred by the Delaware State Bar Association and the 2002 Chief Justice's Annual Award for Outstanding Judicial Service.   On July 3, 2003, Delaware Governor Ruth Ann Minner awarded Justice Walsh the Order of the First State, the highest state government honor.   During his service on the Supreme Court, he authored more than 300 opinions in areas of civil, criminal and corporate law.

While a member of the Superior Court and the Court of Chancery, Justice Walsh participated in settlement negotiations in a variety of cases involving personal injury claims and business disputes.  He has completed the forty hour course in Mediation for Judges conducted by the American Bar Association Dispute Resolution Section Judicial Division and The National Judicial College.

Justice Walsh's publications include the following:

**"Courts and Science: The Challenge and Burden of Technology."** *Courts Health Science & The Law*, October, 1990, Vol. 1, No. 2.

**"The First Amendment and the Promise of Religious Freedom."** *Delaware Lawyer*, Winter, 1991, Vol. 9, No. 4.

**"Some Observations on a Changing Profession."** *Delaware Lawyer*, Winter, 1994, Vol. 12, No. 4.

**"Courts and the Challenges of Adjudicating Genetic Testing's Secrets"** (with Franklin M. Zweig and Daniel M. Freeman). *Genetic Secrets*, edited by Professor Mark A. Rothstein, University of Houston Law School, 1996.

2

"Judiciary Article IV." *The Delaware Constitution of 1897, The First One Hundred Years*, edited by Harvey Bernard Rubenstein, Delaware State Bar Association, 1997.

"The Evolving Standards of Admissibility of Scientific Evidence." *Judges' Journal*, Summer 1997, Vol. 36, No. 3 and *Best of ABA Sections*, Spring 1998, Vol. 2, No. 1.

"Judicial Independence: A Delaware Perspective." *Delaware Law Review*, 1999, Vol. 2, No. 1.

"Keeping the Gate: The Evolving Role of the Judiciary in Admitting Scientific Evidence." *Judicature*, November-December 1999, Vol. 83, No. 3.

"The Fiduciary Foundation of Corporate Law." *The Journal of Corporation Law*, The University of Iowa College of Law, Spring, 2002, Vol. 27, No. 3.

"The New Castle County Courthouse." *Delaware Lawyer*, Winter 2002-2003, Vol. 20, No. 4.

"The Evolving Role of State Constitutional Law in Death Penalty Adjudication." *NYU Annual Survey of American Law, Judges' Forum No. 3*, 2003, Vol. 59, Issue 2.

"The Limits of Proportionality Review in Death Penalty Cases." *Delaware Lawyer*, Winter 2003-2004, Vol. 21, No. 4

**Corporate Opinions Authored by Justice Joseph T. Walsh**

### Court of Chancery

Gilbert v. El Paso Company
490 A.2d 1050 (1984)

Mesa Partners v. Phillips Petroleum Company
488 A.2d 107 (1984)

Moran v. Household International, Inc.
490 A.2d 1059 (1985)
Affirmed 500 A.2d 1346 (1985)

MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.
501 A.2d 1239 (1985)
Affirmed 505 A.2d 454 (1985) (w/opinion to issue)
Opinion 506 A.2d 173 (1986)

### Supreme Court

1.  Georges Marciano, et al v. Joe Nakash, et al.
    535 A.2d 400 (1987)

2.  Bernard Kaplan, et al v. Peat, Marwick, Mitchell & Co., et al.
    540 A.2d 726 (1988)

3.  Anadarko Petroleum Corporation, et al. v. Panhandle Eastern Corp., et al.
    545 A.2d 1171 (1988)

4.  Louise Simons v. Marshall S. Cogan, et al.
    549 A.2d 300 (1988)

5.  Blinder, Robinson & Co., Inc. v. Donald L. Bruton Securities
    Commissioner of the State of Delaware
    552 A.2d 466 (1989)

6.  Tandycrafts, Inc., et al. v. Initio Partners
    562 A.2d 1162 (1989)

7.  Cavalier Oil Corporation v. William J. Harnett
    564 A.2d 1137 (1989)

8.  Leonard Barkan v. Amsted Industries, et al. and
    Enid Mindich, et al.
    567 A.2d 1279 (1989)

9.  Centaur Partners, IV v. National Intergroup, Inc., et al.
    582 A.2d 923 (1990)

10. Ruth Kahn v. Household Acquisition Corporation and
    Household Finance Corporation
    591 A.2d 166 (1991)

11. Charles M. Oberly, III, Attorney General of the State of Delaware,
    Allan P. Kirby, Jr., et al. v. Fred M. Kirby, et al.
    592 A.2d 445 (1991)

12. In the Matter of the Appraisal of Shell Oil Company
    607 A.2d 1213 (1992)

13. Stanley Heineman v. Datapoint Corporation, et al.
    611 A.2d 950 (1992)

14. Marilyn Zirn v. VLI Corporation, et al.
    621 A.2d 773 (1993)

15. City Investing Company Liquidating Trust v. Continental Casualty Co.
    624 A.2d 1191 (1993)

16. ATA A. Farahpour v. DCX, Inc.
    635 A.2d 894 (1994)

17. Jeffrey Prezant, et al. v. Joseph DeAngelis, et al.
    636 A.2d 915 (1994)

18. Alabama By-Products Corporation and Drummond Company, Inc. v.
    CEDE & Co. acting on behalf of Shearson Lehman Brothers, Inc., et al.
    657 A.2d 254 (1995)

19. Karen Shaw and Forrest Foster v. Agri-Mark, Inc.
    663 A.2d 464 (1995)

20. Howard S. Klotz v. Warner Communications, Inc. and Time Warner
    674 A.2d 878 (1995)

5

21.  Alan R. Kahn v. Lynch Communication Systems, Inc., et al.
     669 A.2d 79 (1995)

22.  Merle Thorpe, Jr. by the Executor of his estate, Peter M. Castleman, and Foundation for
     Middle East Peace v. CERBCO, Inc., et al.
     676 A.2d 436 (1996)

23.  United States Cellular Investment Company of Allentown v.
     Bell Atlantic Mobile Systems, Inc., et al.
     677 A.2d 497 (1996)

24.  Alan Kahn, derivately on behalf of DEKALB Genetics Corp.
     v. Charles C. Roberts, et al.
     679 A.2d 460 (1996)

25.  Alan Russell Kahn v. Tremont Corporation, et al.
     694 A.2d 422 (1997)

26.  Laurel Gonsalves v. Straight Arrow Publishers, Inc.
     701 A.2d 357 (1997)

27.  SBC Interactive, Inc. v. Corporate Media Partners, et al.
     714 A.2d 758 (1998)

28.  Emerald Partners v. Ronald P. Berlin, et al.
     726 A.2d 1215 (1999)

29.  Waterside Partners v. C. Brewer and Company, Ltd., et al.
     739 A.2d 768 (1999)

30.  Leonard Loventhal Account v. Hilton Hotels Corp.
     780 A.2d 245 (2001)

31.  John A. Gentile v. Singlepoint Financial, Inc.
     PER CURIAM
     788 A.2d 111 (2001)

32.  Cameron McNeil and Justin McNeil v. Henry Slack McNeil, Jr., et al
     798 A.2d 503 (2002)

33.  Telxon Corporation v. Robert Meyerson, et al.
     802 A.2d 257 (2002)

34.  Stifel Financial Corporation v. Robert M. Cochran
     809 A.2d 555 (2002)

35.    Tyson Foods, Inc. and Lasso Acquisition Corp. v. Altos Corp., et al. and
       Baric Mappa, et al. and IAP, Inc.
       809 A.2d 575 (2002)

36.    Tyson Foods, Inc. and Lasso Acquisition Corp. v. Altos Corp.,
       Pelican Limited Partnership, et al. and Baruch Mappa, Michael Taragin, et al.
       and IBP,  Inc.
       818 A.2d 145 (2003)

# Exhibit 2

**Exhibit 2**
**Materials Considered**

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1993

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1994

- Marvel Entertainment Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1993

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1993

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1993

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1994

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1994

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1994

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1995

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended March 31, 1996

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended June 30, 1996

- Marvel Entertainment Group, Inc. Form 10-Q for the Quarterly Period Ended September 30, 1996

- Marvel Entertainment Group, Inc. Form S-3 Registration Statement Debt Securities Prospectus Marvel Entertainment Group, Inc., March 14, 1995

- Tender Offer Statement, Amendment No. 1, April 16, 1993

- Form S-1 Registration Statement for the public offering of Notes on July 2, 1993

- Marvel III Holdings Inc. Form S-1, March 31, 1994

- Marvel Entertainment Group, Inc. Form 8-K, November 20, 1996

- Marvel Holdings Inc. Indenture, April 15, 1993

- Marvel (Parent) Holdings Inc. Indenture, October 1, 1993

- Marvel III Holdings Inc. Indenture, February 15, 1994

- Marvel Holdings Inc. Offering Memorandum, April 16, 1993

- Marvel (Parent) Holdings Inc. Prospectus, October 13, 1993

- Marvel III Holdings Inc. Offering Memorandum, February 8, 1994

- Marvel Board minutes, March 18, 1993, March 9, 1994, December 12, 1996 and December 26, 1996

- Outline for Howard Gittis Presentation to Marvel's Banks, November 19, 1996

- Transcript of Deposition of William C. Bevins, March 7, 2002

- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Brief of Plaintiffs-Appellants and Volume 1 of Joint Appendix

- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Brief for Appellees

- *Cantor, et al. v. Perelman, et al.*, Court of Appeals Docket Index Nos. 04-1790 & 04-2896, Reply Brief of Plaintiffs-Appellants

- *Cantor, et al. v. Perelman, et al.*, 414 F.3d 430 (3d Cir. 2005)

- Expert Report of Bevis Longstreth, January 12, 2006

- Expert Report of Andrew S. Carron, January 13, 2006

- Report of Jeffrey L. Balaban, January 13, 2006

- Expert Report of Lawrence A. Hamermesh, January 13, 2006

MEI\5500050.1

2