# SCHEDULE A-2

# Part 2 of 4

# Fowler

# Fowler
# Part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

RONALD CANTOR, IVAN SNYDER,         :
JAMES A. SCARPONE, as Trustees of the  :
MAFCO LITIGATION TRUST,             :
                                    :
                                    :
            Plaintiffs,             :
                                    :
v.                                  :        C.A. No. 97-586 (KAJ)
                                    :
RONALD O. PERELMAN, MAFCO           :
HOLDINGS, INC., MACANDREWS &        :
FORBES HOLDINGS INC., ANDREWS       :
GROUP INCORPORATED, WILLIAM C.      :
BEVINS and DONALD G. DRAPKIN,       :
                                    :
            Defendants.             :

---

REBUTTAL EXPERT REPORT OF PETER A. FOWLER

MARCH 3, 2006

**Table of Contents**

I.      Introduction ......................................................................................... 1

    a.   Background ......................................................................................... 1
    b.   Assignment ......................................................................................... 2
    c.   Qualifications ..................................................................................... 3
    d.   Remuneration ..................................................................................... 4
    e.   Materials Considered ......................................................................... 4

II.     Comments on Mr. Carron's Report .................................................... 4

III.    Costs to Marvel from the Restrictions ............................................... 6

    a.   Effects on Marvel of the Restrictions – Cash Costs & Financial Flexibility . 6
    b.   Marvel Credit Rating and Credit Rating Agency Issues ................... 8
    c.   Restricted Payment and Ownership Covenants ............................ 11

IV.     Benefits to the Marvel Holding Companies of the Restrictions ....... 12

    a.   Investors' view of risk in the Holding Company Notes ................. 12
    b.   Role of the Restrictions in marketing the Holding Company Notes ........ 13
    c.   M&F Holdings Financing Strategies ................................................ 17
    d.   Holding Company structures in the high-yield market ................. 18
    e.   Alternative Structures for the Holding Company Notes ................ 19
    f.   Analysis of Mr. Carron's report and LYONs as alternative structure ....... 20

V.      Outcome of the Arms-length Negotiation ........................................ 27

**List of Exhibits**

1.    Marvel Holdings Companies & Affiliates Organization Chart
2.    Resume of Peter A. Fowler
3.    Materials Considered
4.    Debt Capacity Analysis for Marvel Entertainment Group
5.    Comparable Company Credit Analysis
6.    Holding vs. Operating Company Debt Issuance Comparison
7.    Collateralization of Marvel and Coleman Debt Issuances
8.    Overview of MacAndrews & Forbes Debt Issues: 1992-1994
9.    Comparison of Coleman Worldwide and Coleman Holdings Debt
      Issuances
10.   Estimate of the Error in Mr. Carron's Yields for Coleman LYONs and
      Marvel Holding Company Hypothetical LYONs
11.   Coleman Worldwide LYONs Analysis
12.   Marvel Holding Company  LYONs Analysis
13.   Potential Payment from Negotiation between M&F Holdings and Marvel

## I.    Introduction

1.    I, Peter A. Fowler, hereby submit this expert report in the above referenced case.  I reserve the right to amend and/or supplement this report based on any additional information that may become available.

### a.    *Background*

2.    MacAndrews & Forbes Holdings Inc. ("M&F Holdings") acquired Marvel Entertainment Group Inc. ("Marvel") in January 1989 through a series of holding companies.  In July 1991, Marvel completed its initial public offering. M&F Holdings established and owned each of the following holding companies (collectively, "Marvel Holding Companies"): Marvel Holdings Inc. ("Marvel Holdings"), Marvel (Parent) Holdings Inc. ("Marvel Parent"), and Marvel III Holdings Inc. ("Marvel III").  During 1993 and 1994, Marvel was 80 percent owned either directly or indirectly by these three holding companies (see **Exhibit 1**).[1]  In 1993 and 1994, the Marvel Holding Companies each issued and sold a series of notes with a combined face value of $894.1 million (the "Holding Company Notes").[2]  Gross proceeds to the Marvel Holding Companies were $572.6 million.[3]

3.    In the indentures for each of the Holding Company Notes, the holding companies agreed to cause Marvel to act in accordance with certain restrictions (the "Restrictions").  The indentures for each note offering provided, among other things, that (a) with the exception of certain categories of debt, the

---

[1] The Marvel Holding Companies achieved the 80 percent ownership threshold following the Marvel Holdings issuance, the proceeds of which were used to fund a tender offer for Marvel shares in May 1993. (Marvel Holdings Inc. Prospectus, July 9, 1993)

[2] The face value for each note was as follows: Marvel Holdings ($517.4 million), Marvel Parent ($251.7 million) and Marvel III ($125.0 million). (Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994)

[3] Proceeds from the notes were as follows: Marvel Holdings ($300 million), Marvel Parent ($147.6 million) and Marvel III ($125.0 million). (Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994)

issuer would not permit Marvel or any of its subsidiaries to issue any debt unless certain financial ratios were met (§4.04), (b) the issuer would not permit Marvel to issue any preferred stock except under specified circumstances (§4.04), (c) the issuer would not permit Marvel to make certain restrictive payments (§4.05) and (d) the Marvel Holding Companies would collectively continue to hold a majority of the Marvel voting stock (§4.09).[4]

4.     The notes issued by the Marvel Holding Companies were secured by shares of Marvel common stock. The notes issued by Marvel Holdings, Marvel Parent, and Marvel III were secured by 24.0 million, 10.0 million and 9.3 million shares of Marvel common stock, respectively.[5]  For all three issues, the number of Marvel shares pledged as collateral was fixed and not subject to adjustment based on changes in the market price of the Marvel common stock.[6]

### b.   *Assignment*

5.     I have been asked by counsel for the defendants to provide a rebuttal to the expert report of Andrew S. Carron.  In providing that rebuttal, I have been asked to assume that the indenture restrictions bound Marvel and to determine how much the Marvel Holding Companies would have had to pay Marvel, after arm's length bargaining at the time of issuance of the Holding Company Notes, to compensate Marvel for the Restrictions.[7]  My analysis assumes that the Marvel Holding Companies would have evaluated other

---

[4] Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994.

[5] Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994.  Following the 2-for-1 stock split by Marvel on November 2, 1993 the shares secured in the Marvel Holdings and Marvel (Parent) issuances were 48 million and 20 million, respectively.

[6] Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994.

[7] Third Circuit Court's Opinion in Cantor et al. v. Perelman et al. (Nos. 04-1790, 04-2896), July 12, 2005, p. 438.  In the Opinion, the Court notes "...what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation."

2

financing alternatives and used these alternatives as points in the negotiation, but ultimately the Marvel Holding Companies would have agreed to issue the Holding Company Notes as they were actually issued.

   *c.* *Qualifications*

  6. I have over 24 years experience as an investment banker. I began my career in the municipal bond department of Merrill Lynch Capital Markets from 1980-1982 where I structured, traded and underwrote municipal bonds. I worked as a Managing Director in the Investment Banking department of Credit Suisse First Boston ("CSFB") and its predecessors from 1984-2001. My career at CSFB spanned two areas in the investment banking group – both the corporate finance department, which advised corporations on financings and financial strategy, and the capital markets department, which acted as the intermediary between the investors and the corporations issuing the securities. I have experience in all areas of corporate finance. I was involved in numerous debt offerings, both public and private, both investment grade and high yield. I was also involved in all types of equity and equity-linked security offerings, including many convertible security offerings. I have dealt extensively with both of the principal credit rating agencies, Moody's Investor Services ("Moody's") and Standard & Poor's ("S&P"), and have advised many companies, including many first-time issuers, on the credit ratings process. In addition, I worked with many corporations on mergers and acquisitions, valuations, equity recapitalizations (utilizing voting and non-voting stock), leveraged buyouts and corporate reorganizations and restructurings. Since 2001, I have been President of Headlands Capital, Inc. and have been providing consulting advice to corporations on corporate finance and corporate strategy issues.

  7. I have a B.A. from Dartmouth College and an MBA from the Wharton School at the University of Pennsylvania.

8.    See **Exhibit 2** for my resume and my list of completed transactions. I have not testified as an expert at trial or by deposition in the last four years.

### d.    _Remuneration_

9.    I am being compensated for my work in this matter at my standard hourly rate of $1,000. I have utilized the support services of Chicago Partners LLC ("Chicago Partners") in preparing this report. All work performed by Chicago Partners has been under my direct supervision.

### e.    _Materials Considered_

10.    **Exhibit 3** lists the materials I have considered in preparation of this report.

## II.    Comments on Mr. Carron's Report

11.    Mr. Carron states in his expert report that he was asked to answer the following question: "As of the time of each Note issuance, if the Marvel Holding Companies had raised funds using a different market transaction that was secured by the same Marvel shares but did not require the Indenture Covenants and that, like the Marvel Notes, had no recourse to assets of any other entities, would the proceeds have been materially different from the actual proceeds of that Note issuance?"[8] Mr. Carron concludes that the Marvel Holding Companies could have entered into a zero coupon, secured convertible note issuance similar to the LYONs notes entered into by Coleman Worldwide Corporation ("Coleman Worldwide"), but would have raised $156.7 million less than was raised from the Marvel Holding Company note issuances.[9] Mr. Carron calculates what the terms of the theoretical issues of LYONs by the Marvel

---

[8] Expert Report of Andrew S. Carron, January 13, 2006, ¶2.
[9] Expert Report of Andrew S. Carron, January 13, 2006, ¶3 and 34.

4

Holding Company would be and adjusts for the call options to reach his conclusion.

12.     I have reviewed Mr. Carron's expert report and disagree with his conclusions for the following reasons, which are discussed in detail in the remainder of this report:

- Mr. Carron's analysis is unreliable and does not match how the market structures, values and prices these securities.

- Mr. Carron ignores the fact that Coleman Holdings actually issued a relevant security in the same time period. Both the Coleman Holdings and the Coleman Worldwide LYONs issues were essentially the same structures (5-year zero coupon notes secured solely by Coleman common stock), with the primary difference being that the Coleman Worldwide LYONs issue gave the investors upside participation in the growth of Coleman's stock price. In effect, the Coleman Worldwide LYONs offered the same structural protection for investors that Mr. Carron assumes were provided in the Restrictions, only through a put structure, rather than covenants;

- Investors will pay for call options (a feature of LYONs that was absent from the Holding Company Notes) and thus, Coleman Worldwide (or the Marvel Holding Companies) could raise more proceeds through a LYONs issue than from a straight debt issue, assuming the same number of shares of underlying common stock collateral and the same debt structure;

- Mr. Carron's methodology is unreliable because it fails under testing of real world examples. Mr. Carron utilizes a methodology to impute the pricing that Marvel Holding Companies would achieve in his hypothetical LYONs offerings (and thus the proceeds the Marvel

Holding Companies would receive though a different market transaction absent the Restrictions). That methodology is fundamentally unreliable as it does not match the actual market pricing observable in this case. Mr. Carron imputes a secured, zero-coupon holding company straight debt pricing for the Coleman Worldwide LYONs and the hypothetical Marvel Holding Companies' LYONs issues that is materially inconsistent with the actual transactions that Coleman Holdings and the three Marvel Holding Companies did almost simultaneously;

- These problems render his analysis unreliable.

13.     The remainder of this report sets out the reasons for my disagreements with Mr. Carron's methodology and conclusions, as well as the support for my opinion regarding the outcome of a hypothetical negotiation between the Marvel Holding Companies and Marvel regarding the compensation for including the Restrictions in the Holding Company Notes.


III.    **Costs to Marvel from the Restrictions**

14.     As part of this negotiation, Marvel would have determined its estimate of the costs, both actual cash costs and theoretical incremental costs, of the Restrictions being in place. I have evaluated Marvel and its financial condition and have determined what I think Marvel's estimated costs and negotiating position would have been.

        *a.*     *Effects on Marvel of the Restrictions – Cash Costs & Financial Flexibility*

15.     Marvel had its own financial restrictions from its outstanding debt. According to the expert report of Professor Robert W. Holthausen, these

covenants were more restrictive than the financial covenants in the notes issued by the Marvel Holding Companies.[10]  Specifically, the bank covenant for the Marvel Fleer loan required Marvel to maintain an interest coverage ratio (the ratio of operating cash flow to interest expense) of at least 4.0, while the Holding Company Notes contained a less restrictive EBITDA coverage ratio (the ratio of earnings before interest, taxes, depreciation and amortization, or EBITDA, to interest expense) of 2.0 - 2.25 which applied only to the Marvel's ability to issue additional indebtedness.[11]  It is important to note that the Marvel covenant was a more restrictive "maintenance" covenant (which means the Marvel needed to be in compliance every calendar quarter) while the Marvel Holding Companies used a less restrictive "incurrence" covenant (which means that Marvel needed to be in compliance only when Marvel was issuing debt).  The lower the required interest coverage ratio, the higher the amount of debt a company can incur or maintain while being in compliance with this ratio.

16.    Based on my review of Marvel's agreements for the bank financings completed during the time period the Holding Company Notes were issued, there were no additional cash costs incurred by Marvel when the Marvel Holding Companies issued the Holding Company Notes (1992-1994).[12]  In addition, none of these bank financing agreements referenced the notes issued by the Marvel Holding Companies or restricted Marvel because of the issuance of the Holding Company Notes.  Based on a telephone interview that I had with Mr. Irwin Engelman, the former CFO of M&F Holdings, the ultimate parent of the Marvel Holding Companies, I understand that Marvel's bank lenders were

---

[10] Expert Report of Robert W. Holthausen, March 15, 2002, ¶5-6.

[11] Marvel Entertainment Group - Fleer Credit and Guarantee Agreement, September 17, 1992, §8.1(b) and Marvel Holding Company Indentures, §4.04.

[12] Marvel Entertainment Group - Fleer Credit and Guarantee Agreement, September 17, 1992; Marvel Entertainment Group - Fleer Amended and Restated Credit and Guarantee Agreement, August 30, 1994;  Marvel Comics Italia and Marvel Entertainment Group Term Loan and Guarantee Agreement, August 30, 1994.

.

not in any way concerned with the issuance of the notes by the Marvel Holding Companies. I also understand that Mr. Engelman worked with these banks with respect to Marvel and the other companies that M&F Holdings invested in.

17.     The covenants contained in the Holding Company Notes, in particular the interest coverage covenant, did not constrain Marvel in a significant way. As I mentioned, Marvel's bank covenants were more restrictive. I examined the debt capacity of Marvel under the covenants of the Holding Company Notes and found that, based on Marvel's financial performance in 1993, Marvel could issue an additional $800 to $2,600 million in debt,[13] based on a range of acquisition multiples and debt costs, to fund acquisitions without being constrained by the Holding Company Notes' interest coverage covenant. This left Marvel with very significant financial flexibility at the time. See **Exhibit 4** for this debt capacity analysis.

### b.     _Marvel Credit Rating and Credit Rating Agency Issues_

18.     Based on my analysis, I believe that Marvel's credit quality at the time of the issuance of the Holding Company Notes was non-investment grade (see **Exhibit 5**). I believe that if Marvel had been rated by the major rating agencies (Moody's and S&P) as a separate entity during 1993-1994, and assuming that the Holding Company Notes had not been issued, its rating would be in the double-B category for its senior debt.[14] I understand that S&P assigned an implied senior debt rating of BB- in August 1993, when they rated the Marvel

---

[13] The debt capacity analysis is performed at one point in time, as of year-end 1993, but I also examined Marvel's debt capacity on a quarterly basis between December 31, 1992 and December 31, 1994.

[14] Standard & Poor's defines a double-B rated issuance as follows: "An obligation rated 'BB' is less vulnerable to nonpayment than other speculative issues. However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions that could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation." (Standard & Poor's Corporate Ratings Criteria 2006, p. 12) Based on my experience as an investment banker, the rating agencies used similar criteria in generating their credit ratings during the 1992-1994 time period.

8

Holdings and Marvel Parent issues.[15]  Marvel's first formal credit rating was received in July 1995 when Moody's and S&P rated Marvel's shelf registration statement for senior debt as B1/B+, respectively[16]

19.    The rating agencies would have looked at a number of factors in rating Marvel, including the underlying business risks of the comics and trading card businesses, the historical credit statistics of Marvel in comparison to its industry counterparts, its size and diversification of revenues, its financial strategy and its use of debt in its financing strategy, its acquisition strategy, its owner and the owner's history of using financial leverage in other investments.[17] Because Marvel was relatively small in revenues and earnings, concentrated relative to its industry counterparts, aggressive in its acquisition strategy, had a history of using debt to finance its acquisitions, and was owned by an investor who aggressively used leverage and acquisitions to grow his investments, I believe that the rating agencies would have concluded that Marvel was in the mid double-B quality credit range.[18]

20.    The rating agencies noted in their reports issued in 1993 and 1994 that they looked at the credit of Marvel and the holding companies on a consolidated basis.[19]  In addition, according to the testimony of William C. Bevins, the CEO of Marvel, Marvel's rating was affected by the rating agencies'

---

[15] S&P CreditWeek reports for Marvel Holding Companies, August 9, 1993 and June 13, 1994. This implied senior rating is what S&P now refers to as its issuer rating or corporate credit rating. (Standard & Poor's Corporate Ratings Criteria 2006, p. 45)

[16] S&P rated the Marvel shelf rating as B+ and B- ratings for the senior and subordinated debt, respectively (DEF 008125-26), while Moody's provided ratings of B1 and B2 for the senior and subordinated debt, respectively (DEF 8132-8133).

[17] Standard & Poor's Corporate Ratings Criteria 2006, pp. 9-11.

[18] Although Marvel was not formally rated by Moody's or S&P, it apparently was viewed as a double-B credit during this time period. ("Marvel Sweeping into High Yield Market with $200 Mil 144A," Private Placement Reporter Vol. 4; No. 28; Pg. 1, July 18, 1994)

[19] S&P noted in rating the Marvel III offering that "[r]atings on the holding company, Marvel III Holdings Inc., and its two subsidiaries are strongly affected by the underlying creditworthiness of Marvel Entertainment Group Inc. (operating company) and the ultimate parent of all the Marvel units, Mafco Holding Inc." (S&P CreditWire Ratings Rationale - Marvel III Holdings, September 29, 1994 (DEF 006378))

view that Marvel could not be rated higher than its parent, Mafco Holdings.[20]  As such, the issuance of the Holding Company Notes indirectly increased the leverage of Marvel in the eyes of the rating agencies, which could have arguably increased Marvel's cost of debt.  It is important to note that the credit rating agencies would evaluate the effect upon Marvel of any debt issued by the Marvel Holding Companies in a similar manner, whether the debt had the Restrictions, other structures or were structured as LYONs.  Thus, it is not the Restrictions that affect the credit rating, but the existence of any parent company debt.

21.    I examined the relative pricing of "BB" and "B" debt offerings during 1993 and 1994 to estimate what the incremental cost of this theoretical incremental leverage might be.  Based on the material Merrill Lynch prepared on the high-yield market conditions in 1994 in a presentation to Marvel management,[21] I observe that "BB" rated issues traded approximately 150 basis points lower in yield than "B" rated issues.  As such, I estimate that this incremental theoretical cost would have been approximately 50 basis points for Marvel.  It is important to note that Marvel could have faced this cost with or without the Restrictions.

22.    As a double-B credit, Marvel would likely have needed to have financial covenants restricting their issuance of debt whether it continued to finance in the bank market or in the high-yield market.  I believe that such financial covenants would have been at least as restrictive as those in the Holding Company Notes.

---

[20] Deposition of William Bevins, March 7, 2002, p. 67.  This view is confirmed by S&P's formal ratings criteria. (Standard & Poor's Corporate Ratings Criteria 2006, p. 85)
[21] Merrill Lynch Presentation to Marvel Entertainment Group, Inc. Regarding Financing Alternative, February 28, 1995 (M-JB10 1179)

### c.    _Restricted Payment and Ownership Covenants_

23.    I have evaluated the restrictions on payments covenant in the Holding Company Notes.[22]  This covenant restricts the holding company from making distributions to its shareholders, but does not affect dividends or distributions made by Marvel (either to the Holding Companies or its outside shareholders) as long as those distributions are made on a pro rata basis.[23]  Thus, I did not find this covenant to be restrictive on Marvel.

24.    I have also evaluated the majority ownership requirement covenant in the Holding Company Notes.[24]  In my experience, that this covenant was very common in the high-yield market.  I examined a sample of high-yield debt issuances by holding companies during the period 1992-1994.  Most of these holding company issuances were secured by the stock held by the holding company in an operating subsidiary.  In addition, each issuance required the holding company to maintain at least a majority ownership of the operating subsidiary's capital stock. (See **Exhibit 6**)  I understand from the expert report of Professor Lawrence A. Hamermesh that a company's directors would not expect to be able to eliminate a majority shareholder's control through the issuance of shares.[25]  In addition, according to the expert report of Professor Robert Holthausen, Marvel would have been able to issue non-voting or limited voting

---

[22]  Section 4.05 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).

[23]  Marvel's existing bank debt also contained a covenant limiting restricted payments unless Marvel maintained certain financial ratios. (Marvel Entertainment Group - Fleer Credit and Guarantee Agreement, September 17, 1992, §8.7)

[24]  Section 4.09 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).

[25]  Expert Report of Lawrence A. Hamermesh, January 13, 2006, ¶9.

11

common stock if it desired to raise equity capital, without violating this covenant.[26] Thus, I did not find this covenant to be restrictive on Marvel.

## IV.    Benefits to the Marvel Holding Companies of the Restrictions

25.    I have examined the benefits of the restrictions in the Marvel Holding Company Notes to M&F Holdings.  As part of this analysis, I have examined, among other things, the importance of these restrictions in marketing and selling the Notes, the alternative ways to structure the debt securities, the other financing options available to M&F Holdings and the market conditions at the time of issuance.

### a.    *Investors' view of risk in the Holding Company Notes*

26.    The Holding Company Notes were secured by Marvel common stock, and the Marvel Holding Companies had no assets other than this common stock.[27]  As stated in the prospectuses, cash flow from Marvel was not available to service the notes and the notes would be repaid by "borrowing funds, selling its equity securities or equity securities of Marvel, or seeking capital contributions or loans from MacAndrews & Forbes or other affiliates."[28]  I believe investors viewed these securities as a form of intermediate term margin loans, as the notes were secured by marketable securities (i.e., Marvel stock) and had no other sources of repayment from the issuer.  From an investor's perspective, I believe that the Restrictions acted as monitoring triggers that could provide a method by which the note-holders would receive incremental rights if the financial position of Marvel, their only collateral, changed significantly.  If these

---

[26] Expert Rebuttal Report of Robert W. Holthausen, March 29, 2002, ¶14.
[27] Marvel Holdings Inc. Prospectus, July 9, 1993; Marvel Parent Holdings Prospectus, October 13, 1993; Marvel III Prospectus, May 11, 1994.
[28] Marvel Holdings Prospectus, July 9, 1993, pp. 12-13. See, also, Marvel (Parent) Holdings Prospectus, October 13, 1993, p. 13 and Marvel III Prospectus, May 11, 1994, p.17.

notes had been structured as a margin loan, the monitoring triggers would have been based on the market value of the Marvel stock. This was not the case with the Holding Company Notes.

> **b.** _Role of the Restrictions in marketing the Holding Company Notes_

27.    I believe that key attributes of the securities in marketing and selling the Holding Company Notes included the over-collateralization ratio (the market value of the underlying Marvel common stock in relation to the principal amount of the notes), monitoring devices concerning M&F Holdings' continued control of the operating companies, and the financial position of Marvel. The Restrictions themselves would not have been necessary to market the notes provided that investors received alternative monitoring devices that accomplished the same purpose. Investors looked to the collateral to provide the value to be repaid (or incentivize the Marvel Holding Companies to find some other source of repayment), and they wanted the block of Marvel stock pledged as collateral to be a control position so it would be more valuable than a minority position. Moreover, based on my discussion with Mr. Engelman, I understand that the investors were relying on Ronald Perelman's reputation (Mr. Perelman was the ultimate owner of the Marvel Holding Companies), and they wanted to be sure that their investment would continue to be controlled by him. For each of the issues, investors looked at the collateral value of the Marvel stock at the time of issuance and at its value relative to both the outstanding amount of the debt at issuance and the principal amount of the notes due at maturity. I believe that the pricing of the Holding Company Notes and the proceeds raised were principally tied to the price of Marvel's stock at the time and its prospects in the eyes of investors.

28.    I will now examine how the Holding Company Notes were priced by the market. **Exhibit 7** summarizes the level of collateralization for each of the

Holding Company Notes. At the time of the Marvel Holdings deal, the value of the Marvel stock was 2.0x the note proceeds and 1.1x the principal amount of the notes at maturity. With a yield of 11.25%, the notes were priced at 624 basis points over the 5-year Treasury (5.01%).[29]    Between April 1993 (the Marvel Holdings issuance date) and October 1993 (the Marvel Parent issuance date), the value of Marvel's stock increased 88%. At the time of the issuance of the Marvel Parent deal, the value of the Marvel stock collateral was 3.1x the notes proceeds at issuance and 1.8x the principal amount of the notes at maturity. With a yield of 12.25%, the Marvel Parent notes were priced at 762 basis points over the 5-year Treasury (4.63%).[30]    With a cash-pay yield of 9.125%, the Marvel III offering had collateral valued at 2.0x the note principal amount at both issuance and maturity, and were priced at 380 basis points over the 5-year Treasury (5.33%).[31]    Clearly, the terms of the securities varied widely as interest rates changed and the credit quality of the issuer began to change.[32]    Similarly, the amount of collateral required varied depending on Marvel's stock price and its perceived future performance.

29.    Investors used a break-even pricing model to help price these securities. A break-even price is that future stock price which Marvel's stock must be equal to or above so that the value of the collateral is equal to the principal amount of the notes at maturity. **Exhibit 7** illustrates that the note investors required only a slightly higher break-even stock price for each successive Holding Company Note issuance even though Marvel's stock price

---

[29] 5-year U.S. Treasury yield as of April 22, 1993 (Bloomberg, LP). The high-yield market typically prices new issues off the Treasury market.

[30] 5-year U.S. Treasury yield as of October 20, 1993 (Bloomberg, LP). The spread would increase to 776 basis points if one were to interpolate between the 3 and 5-year Treasury yields (4.49%) in order to match the 4.5 year duration of the Marvel Parent notes.

[31] 5-year U.S. Treasury yield as of February 15, 1994 (Bloomberg, LP). The spread would increase to 407 basis points if one were to interpolate between the 3 and 5-year Treasury yields (5.06%) in order to match the 4.0 year duration of the Marvel Parent notes.

[32] S&P downgraded its outlook for the Marvel Holding Companies from "Stable" in August 1993 to "Negative" in June 1994, when Marvel III's debt financing was registered with the SEC. (S&P CreditWeek reports for Marvel Holding Companies, August 9, 1993 and June 13, 1994)

14

appreciated significantly during that time period. Investors were betting that Marvel's stock price needed to be above $10.78, $12.58 and $13.44, respectively, for the Marvel Holdings, Marvel (Parent) and Marvel III notes, respectively, to be repaid. I have not included any transaction or liquidity discount costs in this analysis. These break-even prices were lower than the stock price at issuance and gave investors some margin for Marvel's stock to fall, while still having enough collateral to be repaid.

30. A review of the research reports published by high-yield fixed income research analysts reveals that they evaluated the Holding Company Notes similarly based on collateral value and break-even analyses.[33] In addition, the investment banking memos prepared by Merrill Lynch and Bear Stearns used this framework to analyze the notes.[34] This confirms that investors evaluated the Holding Company Notes as similar to a margin loan and that they were primarily interested in the value of the collateral, not in their ability to control the operations of Marvel. None of these reports mentioned the Restrictions as an element of their analysis.

31. It is useful to examine how a margin loan works in comparison to the Holding Company Notes. Banks make cash-pay margin loans, in their normal course of business, to holders of liquid, marketable common stock in the amount of approximately 50% against the value of the common stock, which equates to a 2.0x collateral ratio. The high-yield investors made an intermediate-term loan and in the cases of Marvel Holdings and Marvel Parent, they made a zero–coupon loan. In a margin loan, the collateral is marked-to-market and the borrower would be required to maintain the over-collateralization ratio, typically

---

[33] See, for example, Bear Stearns High Yield Research Report for Marvel Entertainment Group, November 15, 1994 (BS039508-19) and Nationsbank High Yield Research Entertainment for Marvel, April 27, 1994 (BS039990-40017).

[34] See, for example, Merrill Lynch memo re: Marvel Holdings Notes Collateral Coverage Analysis, November 8, 1996 (ML 3814-3818); Bear Sterns memo re: $150 Million (Gross Proceeds) Offering of Senior Secured Discount Notes Due 2003 for Marvel (Parent) Holdings, Inc., July 23, 1993 (BS 035949-035960)

2.0x, if the value of the common stock goes down, by posting additional collateral or repaying the loan. The Holding Company Notes had a similar 2.0x collateral coverage at the date of issuance but did not have marked-to-market protections. Instead, the Restrictions in the notes were the provision that allowed the investors to "monitor" the value of the collateral. The Restrictions, therefore, replaced the concept of the marked–to–market protection in the margin loans. However, the Restrictions were not the only way to provide this protection. A put option, like that in the Coleman Worldwide LYONs offering, provided protection to the investor similar to the protection in the margin loan, as investors could require the issuer to repurchase the Coleman Worldwide LYONS, if a financial ratio at the operating company was not met, just as lenders could require an issuer to repay the margin loan, if the value of the collateral fell.

32.     Based on my experience, I believe that some form of monitoring provisions would have been required to be imbedded in the securities in order to market and sell the notes, but it was not necessary that they be in the form of restrictive covenants. In fact, the put feature may have been preferable to an investor, since each single investor could exercise their put right, but if a covenant was breached, then either the trustee or 25% of the holders had to declare a default.[35] In addition, under the covenant structure, even if a default was declared, a majority of holders could waive a default caused by breach of the covenants.[36] Investors typically prefer more individual control over their investment decisions.

---

[35] Section 6.01 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).
[36] Section 6.04 of each of the Holding Company Notes indentures (Marvel Holdings Indenture, April 15, 1993; Marvel Parent Indenture, October 1, 1993; Marvel III Indenture, February 15, 1994).

### c.     *M&F Holdings Financing Strategies*

33.     Based on my discussion with Mr. Engelman, I understand that the objectives of M&F Holdings were to raise capital from their equity investments (in Marvel, Coleman, Revlon, etc.) and to maintain tax consolidation in order to take advantage of the operating earnings of the investments and tax losses at the holding companies.  The Holding Companies would have had other potential ways to achieve their objectives – margin loans from banks and issuing convertible securities.  Based on my discussion with Mr. Greg Woodland, a Senior Vice President of M&F Holdings concentrating in corporate finance, I understand that M&F Holdings evaluated a number of different financing alternatives for each of their investments (Revlon, Marvel, Coleman, etc.), and chose a different financing strategy for monetizing these investments in each case.  M&F Holdings issued over $5 billion of debt securities in the various investments and holding companies over 1992-1994.  They were very active, very innovative and used a variety of structures in executing these financings.  (See **Exhibit 8**)  In particular, I understand that M&F Holdings evaluated a LYONs financing for their investment in Marvel, but chose not to execute this financing because they had a strong opinion that Marvel's stock price would increase substantially in the medium term and they did not want to sell a security that gave investors the right to participate in this appreciation.  M&F Holdings did take advantage of the issuance of convertibles at Coleman Worldwide when they issued LYONs in May 1993.

34.     Based on my discussion with Mr. Engelman, I understand that M&F Holdings did not view the issuance of debt to the banks, structured as a margin loan, as an attractive alternative, as M&F Holdings' concentrated ownership position in Marvel's stock made these borrowings less efficient than other alternatives.  This means that M&F Holdings could have raised less proceeds for a given amount of collateral using a margin loan.

17

### d.  *Holding Company structures in the high-yield market*

35.    The holding company / common stock collateralization structure of the Holding Company Notes was used for the first time in 1993.  Prior to the Marvel issuances, Mr. Perelman used the structure in an offering for Revlon through Revlon Worldwide in March 1993.[37]  In addition, M&F Holdings used a similar structure with Coleman Holdings in October 1993.[38]  Each of these issuances used a similar structure.  The notes were secured by stock in the operating company and the stock over-collateralized the Notes.

36.    I also examined a sample of holding company debt issuances during the time period 1992 - 1994.[39]  In most circumstances, the holding company securities were secured by holdings in the operating company and included restrictions on the operating company's ability to issue debt and make certain payments (see **Exhibit 6**).

37.    Given that the structure of the Marvel Holding Company Notes was new to the high-yield market, I believe that M&F Holdings would have evaluated the benefits of creating a structure that was more similar to the existing high-yield holding company issues, which utilized covenants to protect the investors versus utilizing a structure that did not make representations about how Marvel would conduct its operations, such as the put structure to protect the investors.  A key discussion point would have been whether the investors would charge the issuer a different interest rate for the two structures.  As I

---

[37] The Revlon offering was secured by Revlon Inc. shares, which were 100% owned by Revlon Worldwide.  The provisions of the Revlon offering required that the holding company could not make a public offering for any of the shares unless the remaining collateral (less the price of any notes redeemed) exceeded $2 billion.  (Revlon Worldwide Corporation Senior Secured Discount Notes Prospectus, April 2, 1993, p. 9)

[38] Coleman Holdings, Inc. Senior Secured Discount Notes Prospectus, October 7, 1993.

[39] I selected these transactions from all high yield debt offerings made during 1992-1994 according to the Thompson Financial SDC database, and for which there was a debt offering by both the holding company and one of its operating subsidiaries within the same year and for which I could obtain the prospectuses.

18

mentioned before in ¶33, there are some reasons to believe that investors would have preferred a put right to covenants.

### e.    *Alternative Structures for the Holding Company Notes*

38.    As discussed above, I believe the investors looked at the Holding Company Notes as a form of margin loan and the covenants provided monitoring protection. I believe that there was another way to structure the notes while giving the investors the monitoring mechanisms they desired without having a specific restriction on Marvel's financial position or its ownership structure.

39.    I examined the zero-coupon convertible notes, trade-named LYONs by Merrill Lynch, issue completed by Coleman Worldwide Corporation ("Coleman Worldwide") in May 1993.[40] Coleman Worldwide, a wholly-owned subsidiary of M & F Holdings, owned 82% of the operating company, The Coleman Company, Inc. ("Coleman"), at the time.[41] The Coleman Worldwide LYONs issue contained a provision that allowed the investors to put the securities back to the issuer under certain conditions. Two of the conditions which triggered the LYONs put provision were quite similar to the indentures in the Marvel Holding Company Notes – a requirement for M&F Holdings to hold a majority of the voting stock and a maximum consolidated debt to capitalization ratio required for Coleman of 75%.[42,43] By including these restrictions as a put provision, Coleman Worldwide provided the investor with a monitoring mechanism without committing that the operating company (Coleman) would

---

[40] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993.
[41] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, p. 4.
[42] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, "Additional Purchase Right Event," pp. 63-64 (Indenture §3.13) and p. 69 (definition of "permitted holders").
[43] The indentures of the Coleman Worldwide LYONs offering also contained additional restrictions on the ability of Coleman Worldwide (but not its operating unit Coleman) to issue debt and make certain payments. (Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, "Additional Purchase Right Event," pp. 65-66 (Indentures §4.06 and 4.08))

maintain the debt to capitalization ratio.  Thus the operating company could make its own decisions without being constrained in any way by a particular financial or ownership covenant in the holding company security.

40.     I believe that Marvel could have included the ownership requirement and the debt issuance restrictions in the form of a put provision to accomplish what the investors desired without placing these restrictions on the operating company.   As a result, M&F Holdings had an alternative to the Restrictions.

41.     Since the Holding Company Notes utilized novel structures, there are no precedents for addressing these restrictions through a put option in the high-yield market as they were addressed in the convertible market with the Coleman Worldwide issuance.   As part of this negotiation, the parties would have debated the incremental cost, if any, of a put structure versus the covenant structure that was used.

### f.     *Analysis of Mr. Carron's report and LYONs as alternative structure*

42.     The Holding Companies had another financing alternative at the time – issuing convertible securities. As I previously mentioned, another M&F Holdings subsidiary, Coleman Worldwide, issued LYONs in May 1993.  Another Coleman holding company, Coleman Holdings, Inc.   ("Coleman Holdings") issued notes very similar to the Marvel Holding Company Notes in July 1993.

43.     It is useful to examine the two Coleman holding company issues, as they demonstrate the structures and terms available in the market and provide a roadmap for what Marvel could have issued.

44.     See **Exhibit 9** for a comparison of the Coleman Worldwide and Coleman Holdings debt issues.  Key elements include:

- Both issues were done by holding companies above Coleman, the operating company.

- Both effectively had 5-year maturities - the Coleman Holdings issue was a 5-year note and the Coleman Worldwide issue allowed the investor to put the securities back to the issuer after 5-years.

- Both issuers' sole asset was common stock of Coleman, and the stock was the sole security for the notes.

- In both cases, the investors took on the risk that a decline in Coleman's common stock could impair the value of the notes.

- Neither issuer had access to the cash flow of Coleman and relied on the value of the Coleman stock securing the notes or other actions by M&F Holdings to be repaid.

- Both issues had provisions which allowed the investors to effectively monitor the credit of Coleman and the value of their collateral. Both Coleman Holdings and Coleman Worldwide limited the debt issued by Coleman such that it maintained a debt to capitalization ratio less than 75% and required the issuer to maintain a majority ownership of Coleman's voting stock.[44]    Coleman Holdings included these provisions as covenants and Coleman Worldwide included the provisions in the investor put right.[45]

- The principal difference between the issues was that Coleman Worldwide allowed investors to participate in the upside of Coleman's

---

[44] Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, "Additional Purchase Right Event," pp. 63-64 (Indenture §3.13) and p. 69 (definition of "permitted holders"); Coleman Holdings, Inc. Senior Secured Discount Notes Indentures, July 15, 1993, §4.04 and 4.10.

[45] In addition, both offerings contained covenants restricting certain payments and limiting the issuance of debt by the issuer. Coleman Worldwide Corp. LYONs Prospectus, May 20, 1993, "Additional Purchase Right Event," pp. 65-66 (Indentures §4.06 and 4.08); Coleman Holdings, Inc. Senior Secured Discount Notes Indentures, July 15, 1993, §4.03 and 4.05.

stock through a call option while Coleman Holdings allowed no upside participation in Coleman's stock.

45.    At this point it is useful to review Mr. Carron's analysis in more detail and to point out what I believe the flaws are in his report.   His methodology:

- Uses the Coleman Worldwide LYONs offering as a proxy for a financing that had a similar structure without the Restrictions;

- Adjusts for the embedded call options in the LYONs to create a straight debt pricing for Coleman Worldwide;

- Uses this debt pricing for Coleman Worldwide as a proxy for pricing a hypothetical Marvel Holdings LYONS offering;

- Adjusts the hypothetical Marvel Holdings LYONs for the imbedded call options to create the straight debt issue for Marvel  Holdings without the Restrictions.

46.    I believe that his analysis is fundamentally unreliable since the Coleman Worldwide LYONs structure offered the same protection as the Restrictions, only through a put structure, not as covenants.  Both the Coleman Holdings and the Coleman Worldwide LYONs issues were essentially the same structures (5-year zero coupon notes secured by Coleman common stock), with the primary difference being that the Coleman Worldwide LYONs issue gave the investors upside participation in the growth of Coleman's stock price.

47.    Mr. Carron utilizes an unreliable methodology to impute the pricing that Marvel Holding Companies would achieve in their LYONs offerings (and thus the proceeds the Marvel Holding Companies would receive though this hypothetical market transaction without the Restrictions).  I will show that it does not work here.

48.     Mr. Carron reconstructs the component values of a LYON security in a way that is unreliable and does not follow market practice or match market examples. He breaks the LYONs into three pieces – an unsecured straight note, an imputed put option where the issuer can put shares of collateral back to the noteholder, and a call option for the noteholder to share in the upside appreciation of the stock. In my analysis, which follows market convention, I separate the LYONs components into two pieces, a straight debt note collateralized by the underlying common shares, and a call option. Essentially I combine his first two pieces into one piece. The difference may seem to be subtle, but in fact it is quite material if any portion of Mr. Carron's analysis is incorrect. In my experience as an investment banker at CSFB in working with the convertible security specialists on pricing prospective LYONs type issues, we used two pieces in the analysis – we started with the 5-year debt costs and considered equity volatility data to value the call options in the convertible securities.

49.     Here, I examined whether Mr. Carron's methods match the real world results found in the pricing of debt issued at the same time. I took Mr. Carron's theoretical secured debt elements in the Coleman Worldwide LYONs analysis and compared it to the actual Coleman Holdings secured debt offering (see **Exhibit 10**). His imputed pricing for the Coleman notes was 982 basis points ("BPs") above the swap curve, while the actual pricing of the Coleman Holdings issue was 533 BPs above the swap curve. For the theoretical Marvel Holdings, Marvel Parent and Marvel III offerings, Mr. Carron calculated yields that were 1,913 BPs, 898 BPs and 1,146 BPs above the swap curve while the actual offering priced at 595 BPs, 753 BPs, and 379 BPs above the swap curve. This means Mr. Carron's cost estimates were inaccurate by 449 BPs for the Coleman LYONs analysis and by 1,318 BPs, 145 BPs and 767 BPs for the three respective Marvel Holding Company Notes offerings.

50.     Mr. Carron then uses this unreliable method to determine what pricing the Marvel Holding Companies would have enjoyed for a LYONs issue, and then, adjusting for the call options, imputes his version of standalone debt proceeds without the Restrictions. His mistake flows through his analysis and renders it unreliable. He should have been alerted to his mistake by understanding my earlier simple observation – investors will pay for call options and thus, Coleman (or the Marvel Holding Companies) could raise more proceeds through a LYONs issue than from a straight debt issue, assuming the same number of shares of underlying common stock collateral.

51.     I will show below how the elements of the Coleman LYONs should be analyzed and how the market data of the Coleman options and the Coleman Holdings debt offering confirm the validity of the Coleman Worldwide LYONs pricing.

52.     In **Exhibit 11**, I reconstruct the Coleman holding company offerings.  I used two methods. In both I started with the premise that the LYONs should be priced as a combination of a 5-year zero-coupon collateralized bond plus call options.

- In the first instance, I used the actual debt pricing from the Coleman Holdings debt offering and solved for the implied volatility of the call options, to match the actual proceeds that the Coleman Worldwide LYONs generated.  This implied volatility was 29.8% which compared to the actual Coleman 12 month (250 day) historic volatility of 31.4%. This result suggests that the market used these values, which were closely tied to actual market values, to price the Coleman Worldwide LYONs.

- In the second instance, I started with the actual Coleman equity volatility and then solved for the implied debt pricing. Again, the implied debt pricing imbedded in the Coleman Worldwide LYONs

offering calculated out at 598 basis points over the risk free rate, versus the actual market pricing of 566 basis points for the Coleman Holdings offering. This is just another way of confirming that this method reasonably reflects the market pricing.

- It is important to note that my two methods come to almost precisely the same conclusion so I believe that this test confirms that my method is much more accurate than Mr. Carron's. In this case, the conventional market model is much more accurate than the theoretical, academic model.

- In practice, the convertible market prices a package of debt and equity components in one security, so it is impossible to precisely extract how each component piece is valued.

53.    It is very important to note the difference in over-collateralization for the two Coleman holding company issues (see **Exhibit 7**). The convertible market for  Coleman Worldwide required less Coleman common stock as security (only 1.6x at issuance and 1.1x at the 5-year maturity), while the debt market required Coleman Holdings to over-collateralize the issue 2.0x at issuance and 1.2x at maturity. This makes logical sense since the convertible investors also got the upside potential in Coleman's stock so they were willing to give up some downside protection. Thus, a LYONs offering allowed Coleman Worldwide to raise more proceeds for the same amount of collateral of Coleman common shares.

54.    Given that these issues were effectively done simultaneously with the Marvel Holding Company Notes issuances in 1993, and the fact that, based on my discussion with Mr. Woodland, M&F Holdings actually discussed a LYONs offering with Merrill Lynch as a potential financing alternative for the Marvel Holding Companies, I believe that the Marvel Holding Companies could have completed a LYONs offering as a viable alternative.

55.    Using the same framework that I used in the Coleman LYONs analysis, I will illustrate what I believe the terms of the various LYONs transactions would have been for the Marvel Holding Companies. See **Exhibit 12**. This shows that the Marvel Holding Companies could have used the same structure as Coleman Worldwide and could have raised more proceeds from the LYONs market relative to the debt market issues than it actually did, if M&F Holdings was willing to give up the equity upside in the Marvel stock.

56.    As the chart shows, the debt components are priced as the independent debt issues actually behaved in the market. I then added the call option values to create the LYONs securities. I calculate that the Marvel Holding Companies could have raised an additional $204 million if they had used the LYONs structure.

57.    Now, look at the over-collateralization from our Marvel Holding Company LYONs pricing. It shows that Marvel Holdings, Marvel Parent and Marvel III had over-collateralization at issuance of 1.4x, 2.4x and 1.6x, less than the straight debt over-collateralization of 2.0x, 3.1x, and 2.0x at issuance. At maturity Marvel Holdings, Marvel Parent and Marvel III had over-collateralization of 1.1x, 1.9x and 1.4x, versus the straight debt over-collateralization of 1.1x, 1.8x, and 2.0x. Again this is consistent with the Coleman holding company example.

58.    This analysis conclusively shows that Mr. Carron's analysis and conclusions are inaccurate. I believe that the restrictions did not materially create value in the debt structures and his analysis methodology is fundamentally unreliable.

### V.    Outcome of the Arms-length Negotiation

59.    My judgment is that Marvel and M&F Holdings would have covered all of these points discussed above in their negotiation.  The negotiation would likely occur through a series of back and forth exchanges between the parties in which each side asserted its arguments regarding the benefits of the Restrictions to the Marvel Holding Companies and the costs incurred by Marvel. The following illustrative series of exchanges summarize my view as to the key issues each side would assert in the negotiation:

#### Exchange 1

Marvel:

    a.    The Restrictions hinder our ability to operate Marvel.

M & F Holdings:

    a.    Marvel has over $1 billion of debt capacity without being effected by the debt incurrence test (see ¶17).

    b.    Marvel's bank covenants are more restrictive (see ¶15).

    c.    The Restrictions are incurrence tests while Marvel's bank covenants are maintenance tests (see ¶15).

#### Exchange 2

Marvel:

    a.    The Restrictions are critical to marketing the Holding Company Notes (see ¶22).

M & F Holdings:

    a.    The collateral value, ownership of Mr. Perelman and some monitoring provisions are critical to the marketing (see ¶27).

27

     b.     Investors know they do not have access to the cash flow or assets of Marvel (see ¶26).

     c.     Read the research reports – investors focus on the collateral value and Marvel's prospects (see ¶30).

     d.     The Marvel stock price is much more important – see how the Marvel Parent deal priced when the stock price went up 88% in a few months -- investors wanted more collateral to give them downside protection. The Restrictions were not even discussed. (see ¶28).

     e.     Investors really care where Marvel's stock will be in five years – look at the breakeven analysis they perform (see ¶29-30).

*Exchange 3*

Marvel:

     a.     The Restrictions and this new holding company debt hurt Marvel's credit rating and increase its cost of debt (see ¶20).

M & F Holdings:

     a.     Marvel is a "BB" credit already (see ¶18).

     b.     There is no cash cost to the restrictions, now or in any new bank agreement (see ¶16).

     c.     The theoretical cost is very small – only up to 50 basis points if you ever borrow and the lenders actually charge for it (see ¶21).

     d.     Marvel knows that being part of M&F Holdings has a cost anyway since the rating agencies look at the operating company and its parents as a consolidated credit (see ¶20).

*Exchange 4 :*

Marvel:

    a.    The Restrictions make it hard for me to make distributions to my shareholders.

M & F Holdings:

    a.    Marvel has restrictions already in its bank agreement and allowed amounts must be paid pro-rata (see ¶23).

*Exchange 5:*

Marvel:

    a.    M&F must pay Marvel for the Restrictions in the notes.

M&F Holdings:

    a.    M&F has other options – we could issue LYONs or use puts instead of a covenant package format (see ¶39-40).

    b.    With the LYONs we could raise even more money – if we want to share the upside, but we like the upside in Marvel now (see ¶33).

    c.    Any issuance by M&F at the holding company level will hurt Marvel's credit – you will only get a payment if we do it as a deal with the Restrictions, and we don't have to do that format (see ¶20, 30).

*Exchange 6:*

Marvel:

    a.    The ownership covenant restricts Marvel

M&F Holdings:

    a.    Marvel's Board does not expect to be able to dilute the majority shareholder, and besides, Marvel can always issue

non-voting or limited voting stock if the Board decides to (see ¶24).

*Exchange 7:*

Marvel:

    a.   M&F Holdings should pay us a fee based on the amount of proceeds raised by M&F Holdings.

M&F Holdings:

    a.   We should pay you, if we pay any fee, based on the amount of Marvel debt outstanding today.

60.    I assume that M&F Holdings would have chosen to issue the notes in the structure as they were issued, and I believe that, as a result of a negotiation process similar to those described above, Marvel would have been successful in having the holding companies pay 25-50 basis points per year for the right to include the restrictions.   I equate this in some ways to a waiver that an issuer pays to a bank when the issuer breaches a covenant.   Even in circumstances when an issuer makes a minor infraction, the issuer's lenders usually extract a fee for waiving a breach of a covenant.   I believe that the two parties would have debated the debt amount on which to calculate this payment.   If they had based the payments on the amount of debt issued by the holding companies and if these payments were made upfront at the time of the issuance, then the payments to Marvel would have been $3.8 - $7.6 million for the Marvel Holding notes, $1.7 - $3.4 million for the Marvel Parent notes and $0.9 - $1.7 million for the Marvel III notes, for a total of $6.3 - $12.6 million.   If the payments were based on the amount of outstanding debt for Marvel at the time, the payment would have been $2.4 - $4.8 million (see **Exhibit 13**).

Peter A. Fowler

March 3, 2006