# SCHEDULE A-2

# Part 3 of 4

# Parsons

# Parsons

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RONALD CANTOR; IVAN SNYDER
JAMES A. SCARPONE, as Trustees of the
MAFCO Litigation Trust,

Plaintiffs,

v.

RONALD O. PERELMAN; MAFCO
HOLDINGS, INC.; MACANDREWS &
FORBES HOLDINGS, INC.; ANDREWS
GROUP INCORPORATED; WILLIAM C.
BEVINS; DONALD G. DRAPKIN,

Defendants.

Civil Action No. 97-586 (KAJ)

EXPERT REPORT OF JOHN E. PARSONS

## I. **Qualifications**

1.      My name is John E. Parsons. I am a Senior Lecturer at the Massachusetts Institute

of Technology's Sloan School of Management where I teach Advanced Corporate Risk

Management. I am the Executive Director of the Sloan School's Center for Energy and

Environmental Policy Research. I received my A.B. degree in economics from Princeton

University in 1980, my M.A. degree in economics from Northwestern University in

1982, and my Ph.D. degree in economics from Northwestern University in 1986. I was an

Assistant Professor of Finance at the Sloan School from 1984 to 1990, where I taught

corporate finance. I was an Associate Professor of Finance at the City University of New

York's Baruch College, School of Business and Public Administration from 1990 to 1993, where I also taught corporate finance. I was a Visiting Associate Professor of Finance at Columbia University's Graduate School of Business from 1993 to 1995 where I taught investments. From 1995 to 2005 I was a member of the Finance Practice at the economics consulting firm Charles River Associates, now CRA International, directing the Corporate Finance Advisory sub-practice. I have also taught finance as an adjunct faculty member at the Graduate School of Management at Boston University. I am a member of the Board of Advisers to the Applied Corporate Finance program at the School of Business at the University of Wisconsin in Madison. I have published a number of articles on finance and economics. These are listed on my curriculum vitae, which is attached as Exhibit 1. Also included in Exhibit 1 is a list of all expert testimony I have given in the past 4 years.

## II. **Retention**

2.     I have been asked by counsel for the defendants to review the expert report of Andrew S. Carron ("Carron") dated January 13, 2006, in which Carron purports to determine the difference in the amount of proceeds that the Marvel Holdings Companies[1] actually received for three issuances of Notes[2] and the amount that the Marvel Holding Companies would have received in a hypothetical alternative transaction that did not

---

[1]  The "Marvel Holding Companies" are Marvel Holdings Inc. ("Holdings"), Marvel (Parent) Holdings Inc. ("Parent"), and Marvel III Holdings Inc. ("Marvel III").

[2]  The "Notes" are the Senior Secured Discount Notes issued by Holdings on April 15, 1993, by Parent on October 1, 1993 and by Marvel III on February 15, 1994.

include the Restrictions[3] in the indentures for the Notes, but was secured by the same amount of Marvel[4] shares. Carron seeks to determine this difference through a methodology that uses the LYONs (Liquid Yield Option Notes) issued by Coleman Worldwide Corporation ("Coleman Worldwide") as a comparable security. I have been asked by counsel for defendants to analyze and test the methodology used by Carron to determine whether it provides reliable and accurate results. The documents and materials I reviewed or relied upon in formulating my opinions are listed in Exhibit 2. My billing rate in this matter is $575 per hour.

### III. **Summary of Opinion**

3.     My opinions in this matter can be summarized as follows:

- Carron's analysis assumes that the volatility of Marvel stock is unaffected by the Restrictions, and this contradicts Baliban's claims;
- Carron's methodology produces negative spreads on the debt component of two of the three Notes, which is an absurd result demonstrating that large estimation errors are embedded in his valuation; his methodology attributes to the Restrictions very different improvements on the spreads of the different Notes, without any foundation, further evidencing a lack of reliability;
- Carron's methodology of loading all pricing differences onto the debt component biases the results to producing larger dollar values because of the larger share of the debt component in the total value of the Notes as compared to Carron's comparable;
- Correcting Carron's volatility estimate dramatically reduces the differences Carron attributes to the Restrictions, in one case reversing it;

---

[3] The "Restrictions" are the four covenants in the indentures for the Notes that are the focus of Carron's report: (i) Section 4.04(a) and (b), in which the issuer agreed to not permit Marvel or any of its subsidiaries to issue debt, with the exception of certain categories, unless certain financial ratios were met, (ii) Section 4.04(c), in which the issuer agreed not to permit Marvel to issue any preferred stock except under specified circumstances, (iii) Section 4.05, in which the issuer agreed not to permit Marvel to make certain restrictive payments and (iv) Section 4.09(a), in which the Marvel Holding Companies agreed that they collectively would continue to hold a majority of the Marvel voting stock.

[4] "Marvel" is Marvel Entertainment Group, Inc.

- Carron provides no logical connection between the differences in proceeds he measures and the Restrictions he purports to value; without such a connection it is inappropriate to attribute these differences in proceeds to the Restrictions;
- this is reinforced by the flaws in the methodology previously cited, leading to the conclusion that Carron's valuation is unreliable.

## IV. Carron's Model

4.      Carron attempts to determine the amount of proceeds that the Marvel Holdings Companies would have received for the Notes had they been issued without the Restrictions.  Carron attempts to make this determination by looking to the LYONs issued by Coleman Worldwide (the "Coleman LYONs"), which was then a holding company ultimately owned by MacAndrews & Forbes Holdings Inc. ("MacAndrews"). MacAndrews was also the ultimate parent corporation of the Marvel Holding Companies and Marvel.   The Coleman LYONs were secured by shares of stock in The Coleman Company, Inc. ("Coleman"), a publicly traded operating company.

5.      The central premise of Carron's analysis is that the Notes contain the Restrictions, while the Coleman LYONs do not have those provisions.  Carron purports to have identified a difference between how the market prices the Notes and the Coleman LYONs and he attributes that difference to the Restrictions.

6.      Carron estimates the proceeds that would have been received on the Holdings Notes, the Parent Notes, and the Marvel III Notes had they been issued without the Restrictions. For each of the Notes, he constructs Hypothetical Marvel LYONs which have both a put and a call like the Coleman LYONs. He claims to price these as the market priced the Coleman LYONs, i.e., how they would have been priced but for the Restrictions. Then for each of the three sets of Notes, he constructs Alternative

Page 4

Hypothetical Marvel LYONs which have only a put, and so the terms correspond to the terms of the actual Notes. Carron again prices these as the market would have priced the Coleman LYONs, i.e., as they would have been priced but for the Restrictions. According to Carron, this last step gives the proceeds that the Marvel Holding Companies would have received on the Notes had they been issued without the Restrictions. He then compares his hypothetical proceeds to the actual proceeds received on the Notes and calculates the difference.

7.      In the material that follows I analyze Carron's methodology to determine whether it provides reliable and accurate results.  As explained below, Carron's methodology provides illogical results, and contains other significant flaws and inconsistencies which strongly suggest that it is not a reliable model. To simplify the discussion, I focus on one of the Notes, the Holdings Notes. I then briefly summarize how the same analysis applies—or does not apply—to the cases of the Parent Notes and the Marvel III Notes.

## A. Carron's Analysis Contradicts Baliban's Assertions

8.      Although Carron claims to measure the value attributable to the Restrictions of the Notes, he never actually identifies what he claims to be the ultimate source of the value. There are many possible ultimate sources of value associated with various terms and features of securities. For example, certain terms and features of a security may increase the marketability or liquidity of a security, or they may increase the collateral and lower the loss in event of default, or they may reshape the incentives of and range of choices facing management and so alter the probability of default, or they may change

the tax treatment of the security, or they may change the control value of a security. Each of these is a different ultimate source of value. Carron never directly attributes the increased proceeds he associates with the Restrictions to any of these different possible ultimate sources of value.

9.      In contrast, the Report of Jeffrey L. Baliban ("Baliban"), another expert retained by the plaintiffs, makes clear and explicit claims about how the Restrictions reshaped the financial decisions of Marvel. For example, Baliban claims that the Restrictions caused Marvel to use more debt and less equity financing than it would otherwise have chosen to do.[5]

10.      These claims by Baliban entail certain conclusions about how the Restrictions affected the dynamics of Marvel stock. For example, Baliban's claim about the increased reliance on debt financing implies that the volatility of Marvel stock was greater than it would have been but for the Restrictions. The volatility of a stock is a function of two things: (i) the volatility of the underlying assets of the business, and (ii) the degree of leverage, i.e., the debt-to-equity ratio. A higher debt-to-equity ratio implies a higher volatility of the stock. So if, as Baliban asserts, the Restrictions caused Marvel to choose more debt financing and operate at a higher debt-to-equity ratio, then the Restrictions also raised the volatility of Marvel's stock.

11.      Although Carron never explicitly identifies the ultimate source of the value he attributes to the Restrictions, his calculations implicitly rule out certain sources, including

---

[5] Report of Jeffrey L. Baliban dated January 13, 2006, p. 3.

the change in volatility of the stock implied by Baliban's assertions. To see this requires reviewing certain features of Carron's valuation methodology.

12.    Carron says that from an investor perspective the Coleman LYONs can be described as having three components: (i) a debt instrument, (ii) an implied put option, and (iii) a call option.[6] A put option is the right to surrender the shares of stock of Coleman in exchange for receipt of the exercise price of the put. Carron says that investors in the LYONs have sold to the issuer an implied put option. If the value of the collateral shares of Coleman stock falls below the accreted maturity value of the LYONs, then it may be in the issuer's interest to default on the debt payment and instead surrender the collateral shares. So the issuer's default decision looks similar to a put holder's exercise decision, with the exercise price equal to the amount due at maturity. Where the issuer fails to make the debt payment and so saves on that expense, the put holder receives back the exercise price. The value of the implied put option captures the risk that the issuer may default on the debt and leave the investor with the collateral shares worth less than the maturity value of the debt. The default risk in the Coleman LYONs is measured by the value of the put, and the value of this put is a function of the dynamics of Coleman stock.

13.    In parallel fashion, Carron models the Notes as having two components, (i) a debt instrument, (ii) a put option.[7] If the value of the collateral Marvel shares falls below the accreted maturity value of the Notes, then it may be in the issuer's interest to default on

---

[6] Expert Report of Andrew S. Carron dated January 13, 2006, p. 7.

[7] Expert Report of Andrew S. Carron dated January 13, 2006, p. 10 and p. 12.

the Notes and instead surrender the collateral shares. The default risk in the Notes is measured by the value of the put. The value of this put is a function of the dynamics of Marvel stock.

14.    When Carron values the Notes' puts in the 'but for' world of his Alternative Hypothetical Marvel LYONs, he employs the forecast of the dynamics of Marvel stock from the actual world where the Restrictions are in place. Therefore, according to Carron's calculations, the presence or absence of the Restrictions do not change the value of the Notes' puts, i.e., the presence or absence of the Restrictions do not change the default risk of the Notes. So Carron has eliminated default risk as one driver of value of the covenants.

15.    This is most simply seen in the fact that Carron uses a volatility parameter based on the implied volatility derived from the market price of options on actual Marvel stock.[8] This implied volatility reflects the expected effect of the Restrictions on Marvel stock. So Carron calculates 'but for' put and call option values using the volatility of the stock with the Restrictions. This can only make sense if the volatility of Marvel stock is the same both with and without the Restrictions.

16.    It cannot be true that both (i) the Restrictions cause Marvel to pursue a financing policy using more debt and less equity financing, which produces a higher volatility for Marvel stock, as Baliban argues, and (ii) the volatility of Marvel stock is the same whether the Notes do or do not have the Restrictions, as Carron models them. Carron's calculation eliminates changes in volatility and changes in financial policy incentives at

Marvel as possible ultimate sources of value for the Restrictions. Therefore, Carron's

calculations implicitly contradict Baliban's assertion about the effect of the Restrictions

on the financing policy of Marvel.

## B. Carron's Methodology Produces Absurd Results

17.     Carron handles the three components of the Coleman LYONs—the debt

instrument, the put option, and the call option—in fundamentally different ways. He

values the latter two components directly, and values the debt component as the residual.

One could have also valued the debt component directly, but Carron does not do this.

Instead, he explains:

> Note that the total proceeds of the LYONs and the values of the options are
> related to the value of the debt component by the following equation:
> *LYONs Proceeds =*
> *Value of Debt Component – Value of Put Options + Value of Call Options*
> An estimate of the value of the debt component can, therefore, be obtained by
> adding the value of the put options to and subtracting the value of the
> conversion (call) options from the proceeds of the Coleman LYONs.[9]

He values the debt component as a residual, using the equation:

> *Value of Debt Component =*
>
> *LYONs Proceeds + Value of Put Options – Value of Call Options*

18.     Carron then uses this residual value of the debt component of the Coleman

LYONs to calculate a 7.68% debt yield. The debt yield is the discount rate which sets the

present value of the debt payments equal to the residual value. He subtracts from this

---

[8] Expert Report of Andrew S. Carron dated January 13, 2006, Exhibit 6.

[9] Expert Report of Andrew S. Carron dated January 13, 2006, p. 10.

debt yield the 5.55% 5-year swap interest rate to arrive at the 2.13% spread.[10] The swap interest rate is a rate quoted in the market for swaps. Different rates are quoted for swaps of different maturities and the 5-year rate is the rate quoted for a 5-year swap. Swaps are very low risk contracts. Therefore, the interest rate in the swap market is used as a benchmark.[11] A spread relative to the swap interest rate—the difference between a discount rate and the swap rate—is often used to measure the premium paid for risk, although it may also measure the premium paid for liquidity or some other benefit.

19.    Carron's method of valuing the debt component as a residual is prone to significant error. The quickest way to see this is to apply the identical methodology to the Holdings Notes where the error is so large that it stands out irrefutably as such. Applying Carron's methodology, I use the following equation to estimate the value of the debt component of the Holdings Notes:

*Value of Debt Component = Holdings Note Proceeds + Value of Put Options*

Consistent with Carron's methodology for the Coleman LYONs, I use the actual notes proceeds on the Holdings Notes of $288.0 million and Carron's estimate of the value of the put option of $195.6 million. Therefore, the value of the debt component estimated as a residual is $483.6 million = $288.0 million + $195.6 million.[12]

---

[10] Expert Report of Andrew S. Carron dated January 13, 2006, Exhibit 4.

[11] Hull, J., M. Predescu, and A. White, 2004, "The Relationship between Credit Default Swap Spreads, Bond Yields, and Credit Rating Announcements," Journal of Banking and Finance 28, 2789–2811. Using swap rates as a benchmark is a relatively new phenomenon only gradually gaining widespread practice. Formerly, one would have quoted a Treasury rate as a benchmark. Treasuries are also considered close to riskless, but they also offer special liquidity advantages which mean the quoted rate may actually be less than a pure riskless rate.

[12] Exhibit 3.

20.    Next, following Carron's methodology, I use this residual value of the debt component of the Holdings Notes to calculate the debt yield of 1.36%. According to Carron, one subtracts the 5-year swap interest rate as of the Holdings Notes issuance date of 5.30% from this debt yield to arrive at an estimate of the yield spread relative to the swap curve. This gives a spread of -3.94%.[13]

21.    This is an illogical result, indicating a significant flaw in Carron's methodology. No corporate security of this sort ought to trade at a negative spread to the swap curve. Carron mentions that "Yields for interest rate swap transactions are commonly used benchmarks for pricing debt securities issued by nongovernmental entities."[14] Swap rates are a benchmark because they are considered to provide the closest proxy to a riskless interest rate. A negative spread on the debt component of the Holdings Notes would imply that this debt component is better than a benchmark riskless security! Carron does not perform this calculation in his report, so it does not contain any explanation for his willingness to overlook this troubling result.  In my opinion, this result calls into question the reliability and usefulness of his methodology.

22.    What explains this absurd result? Carron did not directly value the debt, but assigned the residual value remaining after he valued the put features of the debt.  This places all of his estimation errors into his estimate of the spread on the debt component. To see this point, I have rewritten Carron's equation for relating the proceeds of the Notes to the values of its components by adding an error term in the estimates:

---

[13] Exhibit 3.

[14] Expert Report of Andrew S. Carron dated January 13, 2006, p. 10.

*Notes Proceeds =*

> *Est. Value of Debt Component – Est. Value of Put Options + Valuation Error*

Carron's residual valuation methodology amounts to rewriting the above equation as follows:

*Est. Value of Debt Component =*

> *Notes Proceeds + Est. Value of Put Options – Valuation Error*

As this equation shows, any error in the valuation of the put option is pushed into Carron's residual estimate of the value of the Notes' debt component. For example, Carron may have misestimated the value of the option by using too high a volatility parameter. This would overvalue the put option and, in turn, result in overvaluing the debt component, which, in turn, leads to the absurd negative spread.

23.    Carron's decision to push all of his estimation errors onto the value of the debt causes those errors to greatly increase the amount of his result.  Focusing on the Holdings Notes, Carron attributes a $123.8 million difference in the proceeds of his hypothetical transaction to the Restrictions.  A significant portion of that difference is attributable to the negative spread, i.e., by what must be an error in his debt valuation. Carron never directly reports the negative spread, but it actually drives his analysis. To see this, note that Carron's estimated value of the debt component for his Alternative Hypothetical Holdings LYONs is $359.7 million, while the estimated value of the debt component of the actual Holdings Notes, according to Carron's residual valuation methodology, is

$483.6 million. The difference between these is the $123.8 million difference in proceeds Carron attributes to the Restrictions.[15]

24.     This $123.8 million difference in proceeds can also be calculated by the spreads to the swap curve implied by Carron's analysis of the debt component. The $123.8 million is the difference between the debt component of the Holdings Notes priced at the 2.13% spread implied by Carron's residual valuation of the Coleman LYONs, and at the -3.94% spread implied by a residual valuation of the actual Holdings Notes. Carron's comparables methodology can be restated as follows: but for the Restrictions, the debt component of the Holdings Notes would have been priced at a spread of 2.13%. With the Restrictions in place, the debt component was actually priced at a spread of -3.94%. Therefore the Restrictions improved the spread by a total of 6.07%.[16] This improved spread increases the proceeds by $123.8 million. This is shown graphically in Exhibit 4.

25.     The Holdings Notes are not the only Notes that generate this illogical result in Carron's methodology.   In the case of the Marvel III Notes, Carron's methodology implies a spread of –2.59%.   In the case of the Parent Notes, Carron's methodology implies a spread of 1.40% on the debt portion. Since this is positive, I cannot conclude by this test that it is clearly erroneous, although it may be.[17]

26.     The three Notes have strikingly different spreads on the debt components. The spread on the Holdings Notes is -3.94%, on the Parent Notes is 1.40%, and on the Marvel

---

[15] Exhibit 3. Expert Report of Andrew S. Carron dated January 13, 2006, Exhibits 6 and 8.

[16] Exhibit 3 and Exhibit 6.  Expert Report of Andrew S. Carron dated January 13, 2006, Exhibits 6 and 8.

[17] Exhibit 3.

III Notes is -2.59%. This provides another reason to doubt the reliability and accuracy of Carron's methodology. And yet the comparable against which all three are compared is a uniform 2.13% derived from the Coleman LYONs. Carron's residual valuation methodology implies very different improvements in spread for the three different notes: the Restrictions improve the spread on the Holdings Notes by 6.07%, but only improve the spread on the Parent Notes by 0.73%, and improve the spread on the Marvel III Notes by 4.72%.[18] This wide variation in effect should be seen in the light of Carron's failure to explain the ultimate source of the value he attributes to the Restrictions. Why should the value attributable to the Restrictions have such a high degree of variability across the different sets of Notes? A plausible explanation is that the Restrictions do not in fact have such a high degree of variability in their value, but that this variation simply reflects the different errors in valuation that the residual valuation methodology pushes into the value of the debt components of each Note.

27.    In the case of the Marvel III Notes, I have been able to identify one factor producing Carron's negative spread. To calculate the value of the put, Carron needs the amount due at maturity. This is used to determine the exercise price of the put option. The Coleman LYONs, the Holdings Notes, and the Parent Notes are all zero coupon instruments, so the amount due at maturity is the accreted value at maturity. However, the Marvel III Notes bear a $9^1/_8$% coupon.[19] The correct value to use for this Note is the principal plus the last semi-annual coupon. As shown in his Exhibit 3, Carron instead

---

[18] Exhibit 6.

[19] Expert Report of Andrew S. Carron dated January 13, 2006, Exhibit 3 and Exhibit 4.

constructs an "Equiv. Zero Coupon Value at Maturity" which he uses to obtain the exercise price on the put. The "Equiv. Zero Coupon Value at Maturity" is calculated by assuming that the coupon payments are never made but rather accreted to the amount due at maturity. Therefore for the Marvel III Notes Carron's "Equiv. Zero Coupon Value at Maturity" is greater than the amount actually due at maturity. This exaggerates the exercise price of the put. Substituting the correct exercise price into his put valuation equation lowers the value of the put. Having made this correction, when I return again to use Carron's residual methodology in order to obtain a spread on the debt component of the actual Marvel III Note, I find that the corrected spread is 0.06%.[20] Making this correction lowers the difference in proceeds between Carron's Alternative Hypothetical Marvel III LYONs and the actual Marvel III Notes by $17.4 million.[21]

28.     The purely mathematical error Carron made in the valuation of the Marvel III Notes is but one source of possible error. The negative spread on the Holdings Notes remains unexplained. Carron's estimate of the difference in proceeds of $123.8 million amounts to a claim that it is the Restrictions that generated a negative spread. As noted earlier, this is implausible. The methodology of valuation by residual has produced an estimated spread on the Holdings Notes that is in error. We don't know the exact size of the error, but we know that the estimate is off by at least -3.94%. The obvious place to look is the inputs to the put valuation. Volatility, for example, is not easily estimated, especially for a security with a five year life.

_____

[20] Exhibit 5.

[21] Exhibit 6.

29.     An easy fix would be to simply adjust the put value so that we eliminate the negative spread. This is equivalent to saying that the estimated value of the debt component of the actual Holdings Notes is exaggerated by at least $84.8 million. The value of the debt component of the actual Holdings Notes must be $398.8 million or less so that the yield spread is at least 0.00%. Correcting for this estimation error reduces Carron's estimated difference in proceeds attributable to the Restrictions by at least $84.8 million, bringing the difference down from $123.8 million to no more than $39.0 million.[22] But making this minimal adjustment papers over the weakness of the residual valuation model revealed by the negative spread in the first place. There is no reason to peg the spread on the actual Holding Notes at 0.00%. The correct spread may be higher.

## C.  Carron's Loading on the Debt Component Exaggerates the Value of the Restrictions

30.     Paragraph 25 above notes that the difference in proceeds Carron attributes to the Restrictions is the difference between the debt component of the Notes priced with and without the Restrictions. The implicit assumption is that the Restrictions do not in any way affect the value of the put option. In section A above I explained how this excludes the very effects Baliban claims about the Restrictions. It also excludes other effects. Any benefit that the Restrictions confer on the value of the Notes *as a whole* is excluded by Carron's implicit assumption. For example, suppose that the Restrictions improved the

---

[22] Exhibit 6.

value of the Notes by improving their marketability. The benefit of marketability accrues to the value of the Notes as a whole and should not be allocated just to the value of the debt component. Marketability is an attribute of all types of securities, not just debt obligations. The value of both a put option and a call option can be increased by marketability. The usual way to measure the value of marketability is a contribution to the return on the total investment in a security.

31.    Coincidentally, attributing all of the effects of the Restrictions to the debt component and none of the effects to the option components produces a higher estimate of the difference in proceeds on the Notes due to the Restrictions. This is because in Carron's separation of each security into its components, the portion of the proceeds accounted for by the debt component is larger in the Notes than in the Coleman LYONs.[23] If, instead, the effect of the Restrictions is attributed to the total security, the difference in proceeds is reduced.

32.    In the paragraphs that follow, I reproduce Carron's comparables methodology, but drop his implicit assumption that the Restrictions affect the value through the debt component alone.

33.    For the Coleman LYONs I use the following equation:

*Coleman LYONs Proceeds = Value of Debt Component −*

*Value of Put Options + Value of Call Options − Discount*

The discount reflects the sum total effect of various factors not accounted for in the direct valuation of the three components, factors such as liquidity, marketability, tax

---

[23] Expert Report of Andrew S. Carron dated January 13, 2006, Exhibit 6 and Exhibit 8.

considerations, and control rights. The presence or absence of the Restrictions in this case is presumed to affect the size of this discount.

34.     Consistent with the criticism made in the earlier section, I also eliminate the valuation of the debt component as a residual. Instead, I value the debt component directly, using the prevailing swap rate at the date each security was issued.[24] It is the discount that is calculated as the remainder, i.e., as a residual:

$$Discount = Value \ of \ Debt \ Component - Value \ of \ Put \ Options +$$
$$Value \ of \ Call \ Options - Coleman \ LYONs \ Proceeds$$

The Coleman LYONs net proceeds were $115.7 million. The direct valuation of the debt component using the swap rate is $130.7 million. I use Carron's $35.9 million valuation of the put and $33.7 million valuation of the call. The discount is therefore $12.8 million, i.e., $130.7 million – $35.9 million + $33.7 million – $115.7 million. The total proceeds net of the discount, $115.7 million, are 90.04% of the gross proceeds, so there is a 9.96% discount. Expressed as a rate of return over the 5-year assumed life of the Coleman LYONs, the discount represents a 2.11% return discount.[25]

35.     Continuing along the path Carron pursued, I constructed the Alternative Hypothetical Holdings LYONs consisting of (i) a debt component, and (ii) a put option,

---

[24] Valuing the debt using the swap rate is, in fact, the only method that is consistent with separating each security into components as Carron has done. Although his terminology for the debt component suppresses the fact, the debt component created by Carron's separation is supposed to be a risk-free security that should be priced using a riskless interest rate. See Brealey, R., and S. Myers, *Principles of Corporate Finance*, Sixth Edition, New York: McGraw Hill, pp. 592-594.

[25] Exhibit 7.

and estimated the proceeds if the discount applied were the same 2.11% as for the Coleman LYONs:

*Alternative Hypothetical Holdings LYONs Proceeds = Value of Debt Component –*

*Value of Put Options – Discount*

The value of the debt component calculated directly using the swap rate is $398.8 million. We already know that either Carron's valuation of the put option is in error by $84.8 million, or that his division of the security into these two components misses some element of value worth $84.8 million. The choice between these alternatives doesn't change my final result, so for simplicity I use an adjusted put option value of $110.8 million. Using the 2.11% rate of return discount calculated for the Coleman LYONs over the life of the Holdings Notes gives a total discount of $28.6 million. Therefore the estimated proceeds for the Alternative Hypothetical Holdings LYONs is $259.4 million, i.e., $398.8 million – $110.8 million – $28.6 million.[26]

36.     The difference in proceeds calculated for the Alternative Hypothetical Holdings LYONs and the actual proceeds is $28.6 million, i.e., $288.0 million – $259.4 million. This is the full amount of the discount estimated for the Alternative Hypothetical Holdings LYONs, so the implication is that the Restrictions eliminate the entire discount. This reflects the fact that in correcting for the obvious valuation error in the Holdings Notes, we made the minimum correction. A larger correction would result in the

---

[26] Exhibit 7.

calculation of a smaller difference in proceeds, i.e., a difference reflecting the fact that the Restrictions only partially eliminate the discount.[27]

37.    Repeating this calculation for the Parent Notes yields a difference in proceeds of $2.0 million. Repeating it for the Marvel III Notes, using the corrected put valuation, yields a difference in proceeds of $9.4 million.[28]

38.    I should go one step further and point out that determining the difference between the Notes priced with and without the Restrictions as Carron does by calculating a difference in spreads on the debt component alone is entirely inconsistent with Carron's own decomposition of the Notes into the debt and put components. Riskier debt instruments often pay a higher interest rate as compensation for default risk. Consequently, the various spreads Carron calculates for the debt component of the Coleman LYONs and implicitly for the debt components of the Notes invite the interpretation that these measure the different amount of risk, and that this different amount of risk is due to the Restrictions. But this is an erroneous interpretation. A changing risk of default changes the value of the put, not the value of the debt component. So Carron's calculated spreads on the debt components cannot measure default risk, nor the impact of the Restrictions on default risk. Once Carron decomposes each security into a debt component and a put component, it makes no sense to measure the effect of the Restrictions by calculating differential spreads on the debt components.

---

[27] Exhibit 7.

[28] Exhibit 7.

### D. Correcting the Coleman Volatility Parameters

39.      As noted in Section B, Carron's residual valuation methodology is subject to

significant error. In Section B, I noted the obvious error revealed by the negative spread

calculated on the Holdings Notes and the Marvel III Notes. I explained that one possible

source of the error was Carron's estimate of the value of the Marvel put options.

40.      Carron's evaluation of the Coleman LYONs benchmark is equally subject to

errors in the valuation of the put and the call. In particular, Carron makes the untenable

assumption that the volatility is the same for the put and the call. The standard Black-

Scholes option pricing equation does contain a single volatility parameter for pricing all

options, whether puts or calls and independent of maturity or the degree of moneyness.[29]

However, financial analysts have long understood this as a restrictive assumption that is

in conflict with what we observe from market prices on options.[30] Consequently, in

practice financial analysts often estimate different volatility parameters for a put and a

call on the same stock. These estimates are conditioned by the degree of moneyness and

the maturity of the option. For example, using the coefficients estimated by Peter Carr

and Liuren Wu, I estimate that the appropriate volatility for the Coleman LYONs call is

---

[29] Moneyness measures the level of the stock price relative to the exercise price. When the stock price is above the exercise price, a call option is in-the-money, when the stock price equals the exercise price, a call option is at-the-money, and when the stock price is below the exercise price, a call option is out-of-the-money. For put options the relations are reversed: when the stock price is above the exercise price, a put option is out-of-the-money, when the stock price equals the exercise price, a put option is at-the-money, and when the stock price is below the strike price, a put option is in-the-money.

[30] Hull, J. C., *Options, Futures, and Other Derivatives*, Fourth Edition, pp. 438-440.

likely to be 10.0% less than the appropriate volatility on the put. Keeping the put volatility at Carron's 45.0% estimate, this implies a call volatility of 35.0%.[31]

41.    Revising the volatility estimates for the Coleman LYONs options changes the value of the options and, by Carron's residual methodology, changes the value of the debt component. The revised Coleman LYONs call value is $24.4 million. The revised Coleman LYONs gross proceeds are $119.2 million. This implies a discount of 2.94% which corresponds to a rate of return of 0.60% over the five year life of the LYONs.[32]

42.    This revised yield is now lower than the 1.40% yield on the Parent Notes, which has the counterintuitive implication that in this case the Restrictions lowered the proceeds on that note by $8.0 million. I take this curious result as a demonstration of the inherent troubles with Carron's methodology. For the Holdings Notes this revised spread brings the total difference in proceeds down to $8.4 million. For the corrected Marvel III Notes this revised spread brings the difference in proceeds down to $2.6 million.[33]

## V.  Interpreting the Difference in Spreads Between the Coleman LYONs and the Notes

43.    Carron identifies a security, the Coleman LYONs, that is priced differently than the Notes. Is this difference in pricing attributable to the fact that the Coleman LYONs do not have the Restrictions, while the Notes do? Or is it attributable to the different option

---

[31] Carr, P., and L. Wu, 2003, "The Finite Moment Log Stable Process and Option Pricing", Journal of Finance 58, 753-777. Exhibit 8.

[32] Exhibit 8 and Exhibit 9.

[33] Exhibit 3 and Exhibit 9.

features—the Coleman LYONs have a call, while the Notes do not? Or is it attributable to the characteristics of the stocks underlying the options in the respective securities— Coleman stock in the one and Marvel stock in the other—and the specific terms of the options—such as the exercise price—which differ between the Coleman LYONs and the Notes? Or is it attributable to some other factor not identified? Carron attempts to control for some of these factors and presumes that any remaining difference is attributable to the Restrictions. I believe there is strong reason to doubt this presumption.

44.    As I noted in paragraph 9, Carron provides no theory as to why investors perceive the Restrictions to be valuable. I believe an explanation of the benefits they provide is needed because it provides a reality check on whether the results are reasonable and reliable. I believe that to attribute a difference in pricing to a specific cause, a financial analyst must establish a meaningful tie between the distinction between the securities and the size of the pricing difference. Carron never takes on that burden, which causes me to doubt that the difference in proceeds he measures has any relationship to the presence or absence of the Restrictions.

45.    The fact that Coleman LYONs have provisions similar to the Restrictions in the Notes reinforces my doubts.[34] For example, the Coleman LYONs give the investor the option to force the repurchase of the LYONs by the issuer if "the Issuer ceases to be the holder of a majority of the voting power and outstanding Coleman Common Stock," or if "Coleman incurs any indebtedness if, after giving effect to such incurrence, Coleman's

---

[34] Expert Report of Andrew S. Carron dated January 13, 2006, p. 1.

Page 23

consolidated ratio of debt to total capitalization (as defined) would exceed 75%."[35] Given that such provisions exist in the Coleman LYONs, I am troubled by the fact that Carron never mentions them. Does Carron believe that these affect the pricing of the Coleman LYONs? If so, what is the meaning of the difference between the pricing of the Coleman LYONs with these provisions and the pricing of the Notes with similarly worded Restrictions? And if not, why do these provisions have no effect on the pricing of the Coleman LYONS while the Restrictions are claimed to have an effect on the pricing of the Notes? These questions should have been addressed if one wished to sensibly associate the difference in Carron's calculated spreads with the Restrictions in the Notes.

John E. Parsons
March 3, 2006

---

[35] Prospectus for Coleman Worldwide Corporation Liquid Yield Option Notes due 2013, May 20, 1993, pp. 6-7.

**Exhibit 1**

**JOHN E. PARSONS**

**CONTACT INFORMATION**

Massachusetts Institute of Technology
Center for Energy and Environmental Policy Research
E40-428
77 Massachusetts Avenue
Cambridge, MA 02139-4307
T 617 324 3745
F 617 253 4307
E jparsons@mit.edu

**EDUCATION**

Ph.D.   Economics, Northwestern University, 1986
M.A.   Economics, Northwestern University, 1982
A.B.   Economics, Princeton University, 1980

**PROFESSIONAL EXPERIENCE**

MIT - Sloan School of Management
    2005–present, *Executive Director of the Center for Energy and Environmental Policy Research, Executive Director of the Joint Program on the Science and Policy of Global Change, Senior Lecturer*

CRA International (formerly Charles River Associates)
    1997–2005 *Vice President*
    1995–1997 *Principal*
    1995 *Senior Associate*

Columbia University
    1993–1995 *Visiting Assoc. Professor of Finance*, Graduate School of Business

City University of New York
    1990–1993 *Associate Professor of Finance*, Baruch College, School of Business and Public Administration

Massachusetts Institute of Technology
    1984–1990 *Assistant Professor of Finance*, Sloan School of Management,

**JOHN E. PARSONS** — Page 2

**PROFESSIONAL EXPERIENCE (cont)**

University of Wisconsin—Madison
   1998–present *Board of Advisers*, Applied Corporate Finance Program, School of Business

Boston University
   1999–2001 *Adjunct Faculty*, School of Management

Humboldt Universität zu Berlin
   1983 & 1986 *Visiting Scholar*

Hochschule für Ökonomie, Berlin
   1987 *Visiting Scholar*

**PROFESSIONAL ACTIVITIES**

Member, American Economics Association, American Finance Association.
Referee: *Journal of Finance*, *Journal of Financial Economics*, *RAND Journal of Economics*, *Energy Journal*, *Journal of Applied Corporate Finance*, *Economic Journal*, *Journal of Corporate Finance*, and *Journal of Development Economics*.

**CURRENT RESEARCH**

"Future Carbon Regulations and Current Investments in Alternative Coal-Fired Power Plant Designs." With Ram C. Sekar, Howard J. Herzog and Henry D. Jacoby. Forthcoming in *Energy Policy*.

**ACADEMIC PUBLICATIONS**

"Hedging and Liquidity." With Antonio S. Mello. *Review of Financial Studies* 13, No. 1 (Spring 2000): 127–53.

"Strategic Hedging."  With Antonio S. Mello. *Journal of Applied Corporate Finance* 12, No. 3 (Fall 1999): 43–62.

"Going Public and the Ownership Structure of the Firm." With Antonio S. Mello. *Journal of Financial Economics* 49 (1998). Reprinted in B. Biais and M. Pagano (eds.) *Corporate Finance and Banking: a Reader*, Oxford:Oxford University Press (2001).

**JOHN E. PARSONS** — Page 3

"Alternative Models of Uncertain Commodity Prices for Use with Modern Asset Pricing Methods." With Malcolm P. Baker and E. Scott Mayfield. *Energy Journal* 19, No. 1 (January 1998).

"A Note on Bankruptcy Costs and the Theory of Oligopoly," *Canadian Journal of Economics* (May 1997).

"An Integrated Model of Multinational Flexibility and Financial Hedging." With A. Mello and A. Triantis. *Journal of International Economics* 39, Nos. 1/2 (August 1995): 27–52.

"Hedging a Flow of Commodity Deliveries with Futures: Problems with a Rolling Stack." With A. Mello. *Derivatives Quarterly* 1, No. 4 (Summer 1995): 16–19.

"The Maturity Structure of a Hedge Matters: Lessons from the Metallgesellschaft Debacle." With A. Mello. *Journal of Applied Corporate Finance* 8, No. 1 (Spring 1995): 106–120. Reprinted, R. Schwartz and C. Smith (eds.) *Derivatives Handbook: Risk Management and Control*, New York: John Wiley (1997) and in C. Culp and M. Miller (eds.) *Corporate Hedging in Theory and Practice*, London: RISK Books (1999).

"Measuring the Agency Cost of Debt." With A. Mello. *Journal of Finance* 47 (1992).

"The Design of Optimal Production Sharing Rules in a Petroleum Exploration Venture." With P. Hampson and C. Blitzer. *Journal of Financial Economics* 30 (1991).

"The Efficient Design of Contracts to Purchase Cogenerated Power." With E. Hall. *Energy Journal* 11, No. 2 (April 1990).

"Estimating the Strategic Value of Long-Term Forward Purchase Contracts Using Auction Models." *Journal of Finance* 4, No. 4 (September 1989).

"The Riddle of the Limited Liability Corporation." In D. Lucina and A. Mello (eds.), *Privatization: Economic Policy Essays.* Lisbon: Verbo (1989).

"Underpricing of Seasoned Issues." With A. Raviv. *Journal of Financial Economics* 14, No. 3 (1985).


**OTHER PUBLICATIONS**

"Short Sales, Damages, and Class Certification in 10b-5 Actions." With Robert C. Apfel, G. William Schwert and Geoffrey S. Stewart. *NBER Working Paper* No. 8618, (December 2001).

**JOHN E. PARSONS** — Page 4

"Price Behavior in Electricity Futures: the Story So Far." With A. Godlewska and A. Mello. *Public Utitlities Fortnightly* 135, No. 1 (January 1997): 32–35.

"Flexibility or Hedging." With A. Mello and A. Triantis. *RISK* 9, No. 10 (October 1996): 18–19.

"Rolling the Dice." With A. Mello. *RISK* 8, No. 5 (May 1995): 49–50.

"Commentary" to "Implicit Options in Forward Contracts: Empirical Estimates from the Petroleum Market." *Review of Futures Markets*, 9, 15-18 (1990)

**PRIOR TESTIMONY (LAST FOUR YEARS)**

In re Reliant Securities Litigation (all consolidated cases)
United States District Court, Southern District of Texas, Houston Division
Master File No. C.A. No. H-02-1810
Declaration, July 28, 2004

Western Asbestos Company, Western MacArthur Company and MacArthur Company, Debtors
United States Bankruptcy Court, Northern District of California, Oakland Division
Case No. 02-46284-T, 02-46285-T, and 02-46286-T
Declaration, June 23, 2003
Expert Report, August 27, 2003
Declaration,  November 17, 2003
Trial Testimony, November 18, 2003

Heller Ehrman White & McAuliffe, LLP, Plaintiff, vs. Benjamin Friewald, an individual, et al., Defendants.
Superior Court of the State of California for the County of Los Angeles
Case No. BC 270 849
Deposition, August 20, 2003

## Exhibit 2

## Documents Considered

Expert Report of Andrew S. Carron, NERA Economic Consulting, dated January 13, 2006

Report of Jeffrey L. Baliban, dated January 13, 2006

Carr, P. and L. Wu, 2003, "The Finite Moment Log Stable Process and Option Pricing", Volume: 58, Issue: 2, pp. 753 - 777

Hull, J., M. Predescu, and A. White, 2004, "The Relationship between Credit Default Swap Spreads, Bond Yields, and Credit Rating Announcements," Journal of Banking and Finance 28, 2789–2811

Brealey R. and S. Myers, *Principles of Corporate Finance*, Sixth Edition, Irwin McGraw-Hill

Hull, J. C., *Options, Futures, and Other Derivatives*, Fourth Edition, Prentice Hall, Upper Saddle River, NJ 07458

Prospectus for Coleman Worldwide Corporation Liquid Yield Option Notes due 2013, May 20, 1993

Marvel Holdings Inc., Senior Secured Discount Notes due 1998, Offering Memorandum, dated April 16, 1993

Marvel (Parent) Holdings Inc., Senior Secured Discount Notes due 1998, Prospectus dated October 13, 1993

Marvel III Holdings Inc., 9 1/8% Senior Secured Notes due 1998, Offering Memorandum dated February 8, 1994

Marvel Holdings Inc., Senior Secured Discount Notes due 1998 and Series B Senior Secured Discount Notes due 1998, Indenture, Dated as of April 15, 1993

Marvel (Parent) Holdings Inc., Senior Secured Discount Notes due 1998, Indenture, Dated as of October 1, 1993

Marvel III Holdings Inc., 9 1/8% Senior Secured Notes due 1998 and 9 1/8% Series B Senior Secured Notes due 1998, Indenture, Dated as of February 15, 1994

**Exhibit 3**
**Computation of Notes' Yield Spreads Using Carron's Methodology**

| | Marvel Holdings Notes | Marvel Parent Notes | Marvel III Notes |
|---|---|---|---|
| | [a] | [b] | [c] |
| [1] Equiv. Zero Coupon Value at Maturity | $517,447,000 | $251,678,000 | $178,614,898 |
| [2] Actual Notes Proceeds | $288,000,247 | $144,870,085 | $120,600,000 |
| [3] Maturity in Years | 4.98 | 4.49 | 4.00 |
| [4] Value of All Put Options Sold by Investors | $195,579,899 | $47,123,805 | $39,527,160 |
| [5] Value of Debt Component | $483,580,146 | $191,993,890 | $160,127,160 |
| [6] Debt Yield | 1.36% | 6.12% | 2.75% |
| [7] Swap Rate | 5.30% | 4.72% | 5.34% |
| [8] Spread to Swap Curve | -3.94% | 1.40% | -2.59% |

**Notes and Sources:**
Expert Report of Andrew S. Carron, NERA Economic Consulting, dated January 13, 2006. Referred to as "Carron Report".
[1]  Exhibit 3 of Carron Report
[2]  Exhibit 3 of Carron Report - Referred to as "Net Proceeds to Issuer"
[3]  Exhibit 3 of Carron Report
[4]  Exhibit 6 of Carron Report
[5]  = [2] + [4]
[6]  = 2*(([1]/[5])^(1/(2*[3])) -1). Yield to Maturity of a Zero Coupon Bond with semi-annual compounding and maturity in [3]
[7]  Exhibit 6 of Carron Report
[8]  = [6] - [7]



Exhibit 4
Decomposition of Covenant Values Implied by Carron's Methodology
(Values in Millions $)

**Exhibit 5**
**Correction of Carron's Methodology as Applied to Marvel III Notes**

| Notes Data | Marvel III<br>Per Carron's Methodology | Marvel III<br>Corrected |
|---|---|---|
| | [a] | [b] |
| [1] Prospectus Date | 2/8/1994 | 2/8/1994 |
| [2] Settlement Date | 2/15/1994 | 2/15/1994 |
| [3] Maturity Date | 2/15/1998 | 2/15/1998 |
| [4] Accreted Value at Maturity | $125,000,000 | $125,000,000 |
| [5] Coupon | 9.13% | 9.13% |
| [6] Equiv. Zero Coupon Value at Maturity | $178,614,898 | $178,614,898 |
| [7] Amount Due at Maturity Date | $178,614,898 | $130,703,125 |
| [8] Actual Notes Proceeds | $120,600,000 | $120,600,000 |
| [9] Shares as Collateral | 9,302,326 | 9,302,326 |
| [10] Share Price on Prospectus Date | $26.88 | $26.88 |
| [11] Maturity in Years | 4 | 4 |
| **Put Option Valuation** | | |
| [12] Volatility | 55.00% | 55.00% |
| [13] Risk-Free Rate (Annual) | 5.06% | 5.06% |
| [14] Dividend Yield | 0.00% | 0.00% |
| [15] Put Strike Price | $19.20 | $14.05 |
| [16] Price Per Put | $4.25 | $2.25 |
| [17] Number of Puts | 9,302,326 | 9,302,326 |
| [18] Value of All Put Options Sold by Investors | $39,527,160 | $20,947,214 |
| [19] Value of Debt Component | $160,127,160 | $141,547,214 |
| [20] Debt Yield | 2.75% | 5.40% |
| [21] Swap Rate | 5.34% | 5.34% |
| [22] Spread to Swap Curve | -2.59% | 0.06% |

**Notes and Sources:**
Expert Report of Andrew S. Carron, NERA Economic Consulting, dated January 13, 2006. Referred to as "Carron Report".

| | |
|---|---|
| [1] | Exhibit 3 of Carron Report |
| [2] | Exhibit 3 of Carron Report |
| [3] | Exhibit 3 of Carron Report |
| [4] | Exhibit 3 of Carron Report |
| [5] | Exhibit 3 of Carron Report |
| [6] | Exhibit 3 of Carron Report |
| [7][a] | = [6] |
| [7][b] | = [4] + [4]*[5]/2 |
| [8] | Exhibit 3 of Carron Report - Referred to as "Net Proceeds to Issuer" |
| [9] | Exhibit 3 of Carron Report |
| [10] | Exhibit 3 of Carron Report |
| [11] | Exhibit 3 of Carron Report |
| [12] | Exhibit 6 of Carron Report |
| [13] | Exhibit 6 of Carron Report |
| [14] | Exhibit 6 of Carron Report |
| [15][a] | Exhibit 6 of Carron Report |
| [15][b] | = [7][b]/[9][d] |
| [16][a] | Exhibit 6 of Carron Report |
| [16][b] | Call Option price computed with Black-Scholes option pricing formula. Inputs are in [10][b] through [15][b] |
| [17] | = [9] |
| [18][a] | Exhibit 6 of Carron Report |
| [18][b] | = [16] * [17] |
| [19] | = [8] + [18] |
| [20][a] | = (([6]/[19])^(1/(2*[11]))-1)*2. Yield to Maturity of a Zero Coupon Bond with face value in [6], maturity in [11], and price in [19] |
| [20][b] | Yield to Maturity of a bond with face value in [4], maturity in [11], semi-annual coupon in [5] and price in [19][b] |
| [21] | Exhibit 6 of Carron Report |
| [22] | = [20] - [21] |

Exhibit 6
Decomposition of Covenant Values Implied by Carron's Methodology

| | Marvel Holdings Notes | Marvel Parent Notes | Marvel III Notes Per Carron's Methodology | Marvel III Notes Corrected |
|---|---|---|---|---|
| | [a] | [b] | [c] | [d] |
| [1] Swap Rate | 5.30% | 4.72% | 5.34% | 5.34% |
| [2] Spread to Swap Rate [Carron Report] | 2.13% | 2.13% | 2.13% | 2.13% |
| [3] Spread from Carron Methodology Applied to Notes | -3.94% | 1.40% | -2.59% | 0.06% |
| [4] Improvement in Spread Implied per Carron | 6.07% | 0.73% | 4.72% | 2.07% |
| [5] Discount Rate [Carron Methodology Applied to Notes] | 1.36% | 6.12% | 2.75% | 5.40% |
| [6] Discount Rate [Carron Report] | 7.43% | 6.85% | 7.47% | 7.47% |
| [7] Maturity (Years) | 4.98 | 4.49 | 4.00 | 4.00 |
| [8] Amount Due at Maturity Date | $517,447,000 | $251,678,000 | $178,614,888 | $130,703,125 |
| Value of Debt Component, Discount Rate Based On: | | | | |
| [9] Carron Methodology Applied to Notes | $483,580,146 | $191,993,890 | $160,127,160 | $160,127,160 |
| [10] Carron Methodology Applied to Notes [Corrected Treatment of Coupon Security] | $388,777,544 | $185,997,882 | $144,666,903 | $141,547,214 |
| [11] Zero Spread (0.00%) | $859,818,774 | | $133,203,363 | $133,203,363 |
| [12] Carron Report | | | | |
| [13] Carron Report [Corrected Treatment of Coupon Security] | | | | $132,041,025 |
| [14] Value of Covenants [Carron Report] | $123,761,372 | $5,996,008 | $26,923,797 | $26,923,797 |
| [15] Overstatement due to Implied Negative Spread | $84,802,602 | | $15,460,257 | $17,417,608 |
| [16] Overstatement due to Treatment of Coupon Security | | | | |
| [17] Adjusted Value of Covenants | $38,958,770 | $5,996,008 | $11,463,540 | $9,506,189 |

Notes and Sources:
Expert Report of Andrew S. Carron, NERA Economic Consulting, dated January 13, 2006. Referred to as "Carron Report".

| | |
|---|---|
| [1] | Exhibit 6 of Carron Report |
| [2][a], [3][b], [3][c] | Exhibit 6 of Carron Report |
| [3][d] | Exhibit 3, [9][a], [9][b], [9][c] |
| | Exhibit 5, [22][b] |
| [4] | = [2] - [3] |
| [5] | = [1] + [3] |
| [6] | = [1] + [2] |
| [7] | Exhibit 3 of Carron Report |
| [9][a], [8][b], [8][c] | Exhibit 3 of Carron Report |
| [8][d] | Exhibit 5, [7][b] |
| [9] | = [8]/((1+[5]/2)^(2*[7][I])) |
| [10][c]/[d] | |
| [11] | = [8]/((1+[1]/2)^(2*[7][I])) |
| [12] | = [8]/((1+[6]/2)^(2*[7][I])) |
| [13][d] | Present Value of a bond with face value of 125 million, maturity in [7][d] and semi-annual coupon of 9.125% at the rate in [6][d] |
| [14] | = [9] - [12] |
| [15][a] and [15][c] | = [9] - [11] |
| [16][d] | = [9] - [12] - ([10] - [13]) |
| [17][a] | = [14][a] - [15][a] |
| [17][b] | = [14][b] |
| [17][c] | = [14][c] - [15][c] |
| [17][d] | = [14][d] - [15][d] |

Exhibit 7
Covenant Values with Spread Applied to Entire Security

| | Coleman LYONs | Marvel Holdings Notes | Marvel Parent Notes | Marvel III Notes Per Carron's Methodology | Marvel III Notes Corrected |
|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d] | [e] |
| [1] Accreted Value at Effective Maturity Date | $171,805,000 | | | | |
| [2] Time to Effective Maturity Date (Years) | 5 | | | | |
| [3] Swap Rate (5 Years) | 5.55% | | | | |
| | | | | | |
| [4] Value of Debt Component with Zero Spread | $130,665,503 | | | | |
| [5] Value of All Put Options Sold by Investors | $35,906,031 | | | | |
| [6] Value of All Call Options Bought by Investors | $33,743,360 | | | | |
| [7] Gross Proceeds | $128,502,832 | | | | |
| [8] Proceeds Net of Discount | $115,700,000 | | | | |
| [9] Discount | $12,802,832 | | | | |
| | | | | | |
| [10] Proceeds Net of Discount as % of Gross Proceeds | 90.04% | | | | |
| [11] Discount as a % of Gross Proceeds | 9.96% | | | | |
| [12] Discount (Annualized Rate) | 2.11% | 2.11% | 2.11% | 2.11% | 2.11% |
| | | | | | |
| [13] Amount Due at Maturity Date | | $517,447,000 | $251,878,000 | $178,614,898 | $130,703,125 |
| [14] Time to Effective Maturity Date (Years) | | 4.98 | 4.49 | 4 | 4 |
| [15] Swap Rate | | 5.30% | 4.72% | 5.34% | 5.34% |
| | | | | | |
| [16] Value of Debt Component with Zero Spread | | $398,777,544 | $204,115,208 | $144,666,903 | $141,839,574 |
| | | | | | |
| [17] Value of All Put Options Sold by Investors | | $195,579,899 | $47,123,805 | $39,527,160 | $20,947,214 |
| [18] Overstatement due to Implied Negative Spread | | $84,802,602 | | $15,460,257 | |
| [19] Value of Put Options Adjusted for Overstatement | | $110,777,297 | $47,123,805 | $24,066,903 | $20,947,214 |
| | | | | | |
| [20] Gross Proceeds for Notes at Zero Spread | | $288,000,247 | $156,991,403 | $120,600,000 | $120,892,360 |
| [21] Discount | | $28,584,797 | $14,119,887 | $9,712,182 | $9,735,727 |
| [22] Proceeds Net of Discount | | $259,415,450 | $142,871,507 | $110,887,818 | $111,156,633 |
| | | | | | |
| [23] Actual Notes Proceeds | | $288,000,247 | $144,870,085 | $120,600,000 | $120,600,000 |
| [24] Proceeds Net of Discount | | $259,415,450 | $142,871,507 | $110,887,818 | $111,156,633 |
| [25] Difference | | $28,584,797 | $1,998,578 | $9,712,182 | $9,443,367 |

Exhibit 7

Covenant Values with Spread Applied to Entire Security

Notes and Sources:

Expert Report of Andrew S. Carron, NERA Economic Consulting, dated January 13, 2006. Referred to as "Carron Report".

[a]:

| | |
|---|---|
| [1], [2], [3] | Exhibit 4 of Carron Report |
| [4] | = [1] / (1+([3]/2))^([2]*2). Present Value of Zero Coupon Payment in [1] at maturity in [2], discounted at the rate in [3] |
| [5], [6] | Exhibit 4 of Carron Report |
| [7] | = [4]-[5]+[6] |
| [8] | Exhibit 4 of Carron Report |
| [9] | = [7] - [8] |
| [10] | = [8] / [7] |
| [11] | = [9] / [7] |
| [12] | = (([7]/[8])^(1/(2*[2]))-1)^2 |

[b], [c], [d]

| | |
|---|---|
| [12] | = [12][a] |
| [13], [14] | Exhibit 3 of Carron Report |
| [16] | Exhibit 6 of Carron Report |
| [17] | = [13] / (1+([15]/2)^([2*[14]). Present Value of Zero Coupon Payment in [13] at maturity in [14], discounted at the rate in [15] |
| [18] | Exhibit 6 of Carron Report |
| [19] | Exhibit 6, line [15] |
| [20] | = [17] - [18] |
| [21] | = [16] - [19] |
| [22] | =[20] - [20]/((1+[12]/2)^(2*[14])) |
| [23] | = [20] - [21] |
| [24] | Exhibit 3 of Carron Report - Referred to as "Net Proceeds to Issuer" |
| [25] | = [22] |
| | = [23] - [24] |

[e]

| | |
|---|---|
| [12] | = [12][a] |
| [13] | Exhibit 5 [7][b] |
| [14] | Exhibit 3 of Carron Report |
| [15] | Exhibit 6 of Carron Report |
| [16] | Present Value of a bond with face value of 125 million, maturity in [14][e] and semi-annual coupon of 9.125% discounted at the rate in [15][e]. |
| [17] | Exhibit 5 [18][b] |
| [19] | = [17] |
| [20] | = [16] - [19] |
| [21] | =[20] - [20]/((1+[12]/2)^(2*[14])) |
| [22] | = [20] - [21] |
| [23] | Exhibit 3 of Carron Report - Referred to as "Net Proceeds to Issuer" |
| [24] | = [22] |
| [25] | = [23] - [24] |

Exhibit 8
Coleman L'YON Option Valuation Adjusted for Volatility Smile

| | Put | Call |
|---|---|---|
| | [a] | [b] |
| **Moneyness of Options** | | |
| [1] Time to Maturity | 5 | 5 |
| [2] Sigma | 27.4% | 27.4% |
| [3] Interest Rate (Annual) | 5.4% | 5.4% |
| [4] Share Price on Prospectus Date | $27.00 | $27.00 |
| [5] Futures Price Corresponding to Maturity | $35.04 | $35.04 |
| [6] Strike Price | $23.80 | $43.76 |
| [7] Moneyness | -63.12% | 36.28% |
| | | |
| **Volatility of Options** | | |
| [8] c1 | -6.14 | -6.14 |
| [9] c2 | 2.42 | 2.42 |
| [10] c3 | -0.79 | -0.79 |
| [11] Volatility of Put Option | 45.00% | |
| [12] c0 Implied by Volatility of Put Option | 26.53 | 26.53 |
| [13] Volatility of Call Option | | 34.97% |
| | | |
| [14] Dividend Yield | | 0.00% |
| [15] Price Per Call | | $6.23 |
| [16] Number of Calls | | 3,926,500 |
| [17] Value of All Call Options Sold by Investors | | $24,442,463 |

**Notes and Sources:**
Expert Report of Andrew S. Carron, NERA Economic Consulting, dated January 13, 2006. Referred to as "Carron Report".
Carr, P. and Wu, L., 2003, "The Finite Moment Log Stable Process and Option Pricing", Volume: 58, Issue: 2, pp. 753 - 777. Referred to as "Carr and Wu (2003)"
[1]        Exhibit 4 of Carron Report
[2]        Carr and Wu (2003), p. 757
[3]        Exhibit 4 of Carron Report
[4]        Exhibit 4 of Carron Report
[5]        = [4] * EXP(LN(1+[3])*[1])
[6]        Exhibit 4 of Carron Report
[7]        = LN([6]/[5])/([2]*sqrt([1])), As defined in Carr and Wu (2003), p. 757
[8] through [10]   Carr and Wu (2003), p. 759
[11]       = 45%, Per Exhibit 4 of Carron Report.
[12][a]    = 100*([11][a] - ([8]*[7]+[9]*[1]*[10]*[1]*[7])/100)
[12][b]    = [12][a]
[13][b]    = [12][b]+[8]*[7]+[9]*[1]+[10]*[1]*[7]. As defined in Carr and Wu (2003), p. 759
[14]       Exhibit 4 of Carron Report
[15]       Call Option price computed with Black-Scholes option pricing formula. Inputs are in [1], [3], [4], [6], [13], [14]
[16]       Exhibit 4 of Carron Report
[17]       = [15] * [16]

Exhibit 9
Covenant Values with Spread Applied to Entire Security Using Adjusted Call Option Value

| | Coleman LYONs | Marvel Holdings Notes | Marvel Parent Notes | Marvel III Notes Per Carron's Methodology | Marvel III Notes Corrected |
|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d] | [e] |
| [1] Accreted Value at Effective Maturity Date | $171,805,000 | | | | |
| [2] Time to Effective Maturity Date (Years) | 5 | | | | |
| [3] Swap Rate (5 Years) | 5.55% | | | | |
| [4] Value of Debt Component with Zero Spread | $130,665,503 | | | | |
| [5] Value of All Put Options Sold by Investors | $35,906,031 | | | | |
| [6] Adjusted Value of All Call Options Bought by Investors | $24,442,463 | | | | |
| [7] Gross Proceeds | $119,201,934 | | | | |
| [8] Proceeds Net of Discount | $115,700,000 | | | | |
| [9] Discount | $3,501,934 | | | | |
| [10] Proceeds Net of Discount as % of Gross Proceeds | 97.06% | | | | |
| [11] Discount as a % of Gross Proceeds | 2.94% | | | | |
| [12] Discount (Annualized Rate) | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% |
| [13] Amount Due at Maturity Date | | $517,447,000 | $251,678,000 | $178,614,898 | $130,703,125 |
| [14] Time to Effective Maturity Date (Years) | | 4.98 | 4.49 | 4 | 4 |
| [15] Swap Rate | | 5.30% | 4.72% | 5.34% | 5.34% |
| [16] Value of Debt Component with Zero Spread | | $398,777,544 | $204,115,208 | $144,666,903 | $141,839,574 |
| [17] Value of All Put Options Sold by Investors | | $195,579,899 | $47,123,805 | $39,527,160 | $20,947,214 |
| [18] Overstatement due to Implied Negative Spread | | $84,802,602 | | $15,460,257 | |
| [19] Value of Put Options Adjusted for Overstatement | | $110,777,297 | $47,123,805 | $24,066,903 | $20,947,214 |
| [20] Gross Proceeds for Notes at Zero Spread | | $288,000,247 | $156,991,403 | $120,600,000 | $120,892,360 |
| [21] Discount | | $8,427,576 | $4,147,957 | $2,842,832 | $2,849,724 |
| [22] Proceeds Net of Discount | | $279,572,671 | $152,843,446 | $117,757,168 | $118,042,636 |
| [23] Actual Notes Proceeds | | $288,000,247 | $144,870,085 | $120,600,000 | $120,600,000 |
| [24] Proceeds Net of Discount | | $279,572,671 | $152,843,446 | $117,757,168 | $118,042,636 |
| [25] Difference | | $8,427,576 | ($7,973,361) | $2,842,832 | $2,557,364 |

**Exhibit 9**

Covenant Values with Spread Applied to Entire Security Using Adjusted Call Option Value

Notes and Sources:

Expert Report of Andrew S. Carron, NERA Economic Consulting, dated January 13, 2006. Referred to as "Carron Report".

[a]:

| | |
|---|---|
| [1], [2], [3] | Exhibit 4 of Carron Report |
| [4] | = [1] / (1+([3]/2)^([2]*2)). Present Value of Zero Coupon Payment in [1] at maturity in [2], discounted at the rate in [3] |
| [5] | Exhibit 4 of Carron Report |
| [6] | Exhibit 8, [17][b] |
| [7] | =[4]-[5]*[6] |
| [8] | Exhibit 4 of Carron Report |
| [9] | = [7] - [8] |
| [10] | = [8] / [7] |
| [11] | = [9] / [7] |
| [12] | = (([7]/[8])^(1/(2*[2])))-1)*2 |

[b], [c], [d]

| | |
|---|---|
| [12] | = [12][a] |
| [13], [14] | Exhibit 3 of Carron Report |
| [15] | Exhibit 6 of Carron Report |
| [16] | = [13] / (1+([15]/2)^([2]*[14])). Present Value of Zero Coupon Payment in [13] at maturity in [14], discounted at the rate in [15] |
| [17] | Exhibit 6 of Carron Report |
| [18] | Exhibit 6, line [15] |
| [19] | = [17] - [18] |
| [20] | = [16] - [19] |
| [21] | =[20] - [20]/((1+[12]/2)^(2*[14])) |
| [22] | = [20] - [21] |
| [23] | Exhibit 3 of Carron Report - Referred to as "Net Proceeds to Issuer" |
| [24] | = [22] |
| [25] | = [23] - [24] |

[e]

| | |
|---|---|
| [12] | = [12][a] |
| [13] | Exhibit 5 [7][b] |
| [14] | Exhibit 3 of Carron Report |
| [15] | Exhibit 6 of Carron Report |
| [16] | Present Value of a bond with face value of 125 million, maturity in [14][e] and semi-annual coupon of 9.125% discounted at the rate in [15][e]. |
| [17] | Exhibit 5 [18][b] |
| [19] | = [17] |
| [20] | = [16] - [19] |
| [21] | =[20] - [20]/((1+[12]/2)^(2*[14])) |
| [22] | = [20] - [21] |
| [23] | Exhibit 3 of Carron Report - Referred to as "Net Proceeds to Issuer" |
| [24] | = [22] |
| [25] | = [23] - [24] |