SCHEDULE D-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD CANTOR, et al., | : | |
| | : | |
| Plaintiffs, | : | No. 97-586-KAJ |
| | : | |
| v. | : | |
| | : | |
| RONALD O. PERELMAN, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MOTIONS IN LIMINE**

Defendants hereby move in limine to preclude plaintiffs from introducing or relying on the following evidence: (i) evidence relating to the tax sharing arrangement among Marvel, Marvel III and Mafco; (ii) evidence that the Marvel Holding Companies did not repay the notes; and (iii) testimony from Defendants' expert, Peter A. Fowler, as a lay witness in their case-in-chief.  The grounds for these motions are set forth herein.

**DEFENDANTS' MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING TO THE TAX SHARING ARRANGEMENT AMONG MARVEL, MARVEL III AND MAFCO**

In support of their motion in limine to preclude Plaintiffs from introducing evidence relating to the tax sharing arrangement among Marvel, Marvel III and Mafco, Defendants aver as follows:

**I.      Plaintiffs Belatedly Recast Their Case To Focus On Tax Sharing Issues**

Plaintiffs have recently recast their case in order to pursue at trial claims relating to a tax sharing agreement between Mafco and Marvel dated May 18, 1993, and amended and restated on January 1, 1994.  Plaintiffs' latest theory is that Defendants made financing decisions for Marvel in a manner designed to satisfy Marvel's obligation under the tax sharing agreement to make payments to Marvel III so that Marvel III maintained a source of funds to pay interest on its Notes.  In support of this new claim, they intend to introduce evidence regarding the tax sharing agreement, its purported role in the Marvel III Note offering, and its alleged influence on Marvel's subsequent capital structure.  (See, pp. 2-4 , infra)

**II.     Plaintiffs Do Not Own The Tax Sharing Claims**

Plaintiffs should be prohibited from introducing any evidence of the tax sharing arrangement among Marvel, Marvel III and Mafco because Marvel has no right to any claims relating to the tax sharing agreement.  The Trust has only those rights and claims grounded in the language of the MAFCO Litigation Trust Agreement. (D.I. 457, Hearing Tr. at 26, Jan. 10, 2006.)  Under the trust agreement,

Marvel "agreed to contribute to the MAFCO Litigation Trustees in trust . . . (A) all of their interests in any Causes of Action against any of the MAFCO Defendants asserted in the District Court Complaint or which could have been asserted in the District Court Complaint (exclusive of all Causes of Action . . . (y) relating to any tax sharing or other similar agreement . . . .) (Trust Agreement at 1, emphasis added). The Third Circuit broadly interprets the terms "relating to" a contract to apply to any claims concerning the same subject matter as the contract, or claims having a logical or causal connection to the contract. See Salovaara v. Jackson Nat'l Life Ins. Co., 246 F.3d 289, 300 (3d Cir. 2001) (clause containing the phrase "any claim related directly or indirectly to this agreement" applies to any lawsuit that "involves that subject matter . . . ."); John Wyeth & Bros. Ltd v. CIGNA Int'l Corp., 119 F.3d 1070, 1074 (3d Cir. 1997) (holding the language "arise[s] in relation to" means having some "logical or causal connection"). Thus, any claims concerning the subject matter of Marvel's tax sharing relationship with Mafco fall within the broad terms "relating to any tax sharing or other similar agreement."

This broadly worded exclusion plainly covers Plaintiffs' new claim that Defendants made financing decisions for Marvel in order to maintain tax consolidation and satisfy Marvel's obligations to make payments to Marvel III pursuant to the tax sharing agreement. Yet Plaintiffs apparently intend to litigate the following issues, all of which are covered by their exclusions, at trial:

- "On or about May 18, 1993, Marvel entered into a tax sharing agreement with Mafco Holdings Inc. pursuant to which it would make tax sharing payments to Mafco Holdings in amounts equal to the taxes it would have paid if it were to

file separate consolidated tax returns for itself and its subsidiaries." (Pls.' Draft PTO at ¶ 45)

- "On or about January 1, 1994, the tax sharing agreement was amended and restated to provide that Marvel would make the tax sharing payments to Marvel III instead of Mafco Holdings for 1994 and subsequent years." (Id. at ¶ 46)

- "Under the Marvel III Indentures, Marvel III was required to retain out of the tax sharing payment immediately preceding each interest payment date on the Marvel III Notes, all amounts so received up to the aggregate amount of interest due under the Marvel III Notes on such interest payment date." (Id. at ¶ 47)

- "Under Section 4.14 of the Marvel III Indenture (entitled Tax Deconsolidation Event), if Marvel ceased to be a member of an affiliated group of corporations including Marvel III for purposes of filing a consolidated Federal income tax return, holders of the Marvel III Notes would have the right to require Marvel III to repurchase all or any part of such holder's Marvel III Notes at a repurchase price equal to 101 percent of the principal amount thereof plus accrued and unpaid interest (if any) to the date of repurchase." (Id. at ¶ 48)

- "In order for Marvel to issue any new common equity and not trigger a tax deconsolidation event under Section 4.14 of the Marvel III Indenture, the affiliated group of corporations including Marvel III would have had to purchase a sufficient amount of any new equity issued by Marvel in order to maintain an 80 percent ownership stake." (Id. at ¶ 49)

- "The POM pointed out that the obligation of Marvel to make tax sharing payments would terminate if less than 80% of Marvel's outstanding common stock were owned by the consolidated group, and that the consolidated group's ownership stood at approximately 80%. Accordingly, Marvel could not issue common stock to third parties (unless the consolidated group correspondingly increased its stake) without causing (a) a loss of the right to consolidate Marvel with Perelman's wholly-owned holding companies, and, importantly, (b) a loss of Marvel's duty to make the tax sharing payments that were being counted on to service interest due on the Marvel III Notes." (Longstreth 1/12/06 Rept. at 4)

- "As a practical consequence of the Marvel III note issuance, in order for Marvel to issue any new equity and, in doing so, not trigger a tax deconsolidation event and other consequences under section 4.14, Marvel's controlling shareholders would have had to buy a sufficient amount of any new equity in order to maintain an 80 percent ownership stake." (Baliban Rpt. at ¶ 15)

Based on these pretrial proffers, it is clear that Plaintiffs intend to submit evidence at trial concerning causes of action that do not belong to the Trust.[1] In fact, not only did Marvel retain causes of action relating to the tax sharing agreement, it vigorously pursued such claims in a separate lawsuit heard by Judge McKelvie. See Marvel Entm't Group, Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Group, Inc.), 273 B.R. 58, 62 (D. Del. 2002) (granting summary judgment as to "[a]ll of [Marvel's] claims relat[ing] to a tax sharing agreement that was entered into between Mafco and Marvel Entertainment, under which Mafco used the operating losses of Marvel Entertainment in its federal income tax returns for periods when both were members of the same consolidated tax group.") To resolve that other litigation, Defendants here and Marvel entered into a settlement and release agreement dated March 7, 2003, which released all of Marvel's claims related to the tax sharing agreement (and all other claims).[2]

---

[1] Plaintiffs' tax sharing arguments concern an entirely new issue injected into the case after the remand from the Third Circuit. In the prior summary judgment briefing and the appeal before the Third Circuit, Plaintiffs did not raise the issue of tax consolidation and Marvel III's reliance on payments under the tax sharing agreement. In addition, there is no mention of Section 4.14 of the Marvel III indenture, which concerns the tax sharing agreement, in Plaintiffs' Second Amended Complaint. (See D.I. 149)

[2] The theories Marvel chose to advance concerning the tax sharing arrangement were not identical to the new claim Plaintiff has come up with here, but Marvel could have pursued such claims in that prior litigation, so they would be barred by res judicata if Marvel asserted them now. See Neoplan USA Corp. v. Taylor, 604 F. Supp. 1540, 1544 (D. Del. 1985) ("The modern view of res judicata in Delaware . . . bars later litigation of any claim arising out of the same transaction that formed the basis for the prior adjudication.") (citation omitted); Orloff v. Shulman, C.A. No. 852-N, 2005 WL 3272355, at *7 (Del. Ch. Nov. 23, 2005) ("Although courts formerly limited res judicata to actions that were actually already litigated and determined, the modern view of the
*(cont'd)*

As Marvel, the rightful owner of the claims relating to the tax sharing agreement, has settled and released such claims, Plaintiffs in this action should be precluded from relying on the core nucleus of operative facts concerning those claims in prosecuting this action.  See In re Prudential Ins. Sec. Litig., 261 F.3d 355, 367 (3d Cir. 2001) (holding members of settlement class were "preclud[ed] from relying upon the common nucleus of operative facts underlying [the claims subject to a class wide release] to fashion a separate remedy against [the defendant]" in subsequent litigation).  Thus, Plaintiffs should be precluded from introducing facts to support their new claim relating to the tax sharing agreement, including any facts concerning Defendants' purported incentive to avoid tax deconsolidation because it would provide the Marvel III noteholders with a put right due to the loss of payments from Marvel to Marvel III under the tax sharing agreement.

Put simply, the trial should focus on the claims that Plaintiffs actually own and have been litigating for the past eight years, and not this new claim that they do not own.  Allowing Plaintiffs to raise the tax sharing issues at trial would be confusing, potentially misleading, and bog down an already lengthy trial on an irrelevant side issue.   Accordingly, Defendants' motion in limine should be granted.

_____

*(cont'd from previous page)*
doctrine is . . . [that] [c]auses of action that arise out of the same transaction are precluded if brought in a subsequent action.").  Certainly, Plaintiffs, who do not even own the claims, should not be permitted to re-litigate tax sharing issues that Marvel cannot relitigate.

## DEFENDANTS' MOTION IN LIMINE TO PRECLUDE EVIDENCE THAT THE MARVEL HOLDING COMPANIES DID NOT REPAY THE NOTES

In support of their motion in limine to preclude evidence that the Marvel Holding Companies did not repay the Notes, Defendants aver as follows:

### I.     Background

In 1993 and 1994, when the Marvel Holding Companies sold their Notes secured by a majority of the Marvel stock, Marvel's business was thriving, it had a market capitalization measured in the billions, and the value of the stock securing the Notes was more than double the proceeds of the Notes.  In the years following the offerings, Marvel's fortunes turned downward due to several unexpected events, and the Marvel Holding Companies were unable to repay the Notes, except for certain interest payments made by Marvel III.

Plaintiffs in this action assert claims on behalf of Marvel, which was not a party to the Note offerings.  Marvel neither loaned the funds for the Notes, nor had any obligation to make any payments on the Notes.  Yet Plaintiffs have repeatedly sought to prejudice Defendants in this action by asserting – in inflammatory language – that the Notes were not repaid:

- "The bottom line is that Perelman received over $550 million, in cash . . . and to date neither he nor the Holding Companies have paid back even $1 of principal, and they have paid no more than the first couple of years interest on the Marvel III Notes only."  (D.I. 268, Pl. Op. Br. In Supp. Of S.J. at 14-15).

- "Unlike the hypothetical fiduciary who collateralizes a personal loan with a corporate asset and then pays back the money, Perelman and the Holding Companies have never paid back the Note proceeds.  Rather Perelman has walked away from his worthless Marvel stock and kept all the money – over half a billion dollars, plus hundreds of millions of dollars of unpaid interest – for himself."  (Id. at 21).

- "Perelman is liable for the full amount of his personal benefit from the Notes. To date, none of the principal and almost none of the interest on the Notes has been repaid."  (Id. at 23).

- "To date, none of the principal and almost none of the interest on the Notes has been repaid."  (D.I. 288, Pl. Ans. Br. In Opp. To S.J. at 26).

- "Perelman has profited tremendously from his wrong-doing, since he received all of the Note proceeds and never paid back any."  (Id. at 27).

- "The entire $553.5 million in Note proceeds was distributed upstream in Perelman's corporate hierarchy to be used for his personal benefit, and no part of the $553.5 million has ever been paid back."  (D.I. 304, Reply Br. in Supp. Of S.J. at 7-8).

- "Perelman's unjust enrichment is equal to the full amount of the note proceeds he received and never paid back -- $553.5 million plus interest."  (Pl. Appellate Br. at 9).

- "Neither Perelman nor the Holding Companies ever repaid any of the Note proceeds.  In the bankruptcy, Marvel's unsecured creditors received less than 10 cents on the dollar, and Marvel's shareholders received nothing.  Perelman . . . received hundreds of millions of dollars in cash, and has paid back none of it."  (Id. at 25-26).

- "To date, [Perelman] has reaped an extraordinary benefit and enrichment because he has retained the entire principal amount of the Notes, and has paid virtually none of the interest."  (Id. at 56).

- "[T]he $553.5 million obtained by Perelman – no part of which was ever paid back – was a direct result of defendants' breaches of fiduciary duty and should be disgorged."  (Pl. Appellate Reply Br. at 20).

**II.     Plaintiffs Should Be Barred From Invoking The Failure To Repay The Notes Pursuant To Rules 401, 402 And 403**

Plaintiffs' blatant attempt to prejudice Defendants by injecting into the case the fact that the Marvel Holding Companies did not repay their Notes should be precluded because the Third Circuit held this fact is not relevant:  "We reject plaintiffs' argument that the amount of unjust enrichment defendants received should take into account the fact that the subsequent bankruptcies of defendants resulted in their not having to repay the loans evidenced by the Notes."  Cantor v. Perelman, 414

2

F.3d 430, 437 n.5 (3d Cir. 2005).  Instead, the Third Circuit held that "[a]ny unjust enrichment occurred at the time of the issuance of the Notes and must be evaluated as of that point in time."  Id. (emphasis added).

In addition, there are at least three reasons why the Court should not allow Plaintiffs to raise the misleading, prejudicial and irrelevant issue of the non-repayment of the Notes:  (i) Plaintiffs (and their assignee, Marvel) were never owed repayment on the Notes; (ii) the issuers of the Notes – the Marvel Holding Companies – are not Defendants in this action; and (iii) the noteholders who did make the loans brought suit seeking to force Defendants to repay the Notes, and Judge McKelvie rejected that claim, holding that Defendants had no contractual, fiduciary or common law obligation to undertake the Marvel Holding Companies' obligations to repay the Notes.  LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 291, 295 (D. Del. 2000).   Specifically, Judge McKelvie held:

- "it is not unjust for defendants to retain the proceeds of the note sale. . .[;]"

- "the undisputed facts d[id] not show any fraud or similar injustice" justifying piercing the corporate veil to require Defendants to satisfy the Notes; and

- the defendants had properly disclosed the risks of the investment to the noteholders before they purchased the Notes.

LaSalle, 82 F. Supp. 2d at 291, 295.

In sum, Plaintiffs' persistent effort to disparage Defendants for the Marvel Holding Companies' inability to repay their Notes was directly rejected by the Third Circuit on relevance grounds.  Admission of this irrelevant evidence at trial will confuse the issues, mislead the trier of fact and prejudice Defendants.

Accordingly, Plaintiffs should be precluded from referring to the failure to repay the notes at trial.  <u>See</u> Fed. R. Evid. 401, 402, 403.

**DEFENDANTS' MOTION IN LIMINE TO PRECLUDE PLAINTIFFS
FROM CALLING DEFENDANTS' EXPERT, PETER A. FOWLER,
AS A LAY WITNESS IN THEIR CASE-IN-CHIEF**

In support of their motion in limine to preclude Plaintiffs from calling Defendants' expert, Peter A. Fowler, as a lay witness, Defendants aver as follows:

**I.     Introduction**

For undisclosed reasons, Plaintiffs intend to call defense expert Peter A. Fowler as a lay witness. (Pls.' Draft PTO at 32) Mr. Fowler's only knowledge of the events in dispute in this case comes from his review of documents and testimony as an expert witness, which began in January 2006, a decade after the events in dispute. Because Mr. Fowler lacks personal knowledge of the events at issue, Rules 602 and 701 of the Federal Rules of Evidence preclude Plaintiffs from calling him as a lay witness to testify about those events.

**II.    Calling Mr. Fowler to Provide Lay Testimony Violates Rule 602**

Rule 602 of the Federal Rules of Evidence forbids a lay witness from testifying to a matter unless "the witness has personal knowledge of the matter." Fed. R. Evid. 602. A lay witness has personal knowledge of an event if the witness perceived the event with his senses. Fed. R. Evid. 602, Advisory Committee's Note; 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 602.02[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2006) ("The witness's testimony must be based on events perceived by the witness through one of the five senses."). As Mr. Fowler never perceived an event at issue here, Rule 602 bars him from testifying about any of those events as a lay witness for Plaintiffs.

### III. Calling Mr. Fowler to Provide Lay Opinion Testimony Violates Rule 701

To the extent Plaintiffs are calling Mr. Fowler to give a lay opinion, such testimony would violate Rule 701 of the Federal Rules of Evidence. Rule 701 limits a lay witness's opinion testimony to those opinions "which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "The requirement that a lay opinion be rationally based on the witness' perception requires that the witness have firsthand knowledge of the factual predicates that form the basis for the opinion." Virgin Islands v. Knight, 989 F.2d 619, 629 (3d Cir. 1993) (citing Rule 701's advisory committee's note as a basis for finding that "[t]he district court properly excluded the investigating police officer's opinion because he did not observe the assault"); see also SEC v. Infinity Group Co., 212 F.3d 180, 198 (3d Cir. 2000) (holding, under Rule 701, that the district court properly barred the testimony of a witness who "had no personal knowledge of the investments in question"). Thus, the Court should preclude Plaintiffs from calling Mr. Fowler to provide a lay opinion under Rule 701 because he lacks personal knowledge of the events at issue.

### IV. Plaintiffs' Appropriate Recourse Is Cross-Examination

Mr. Fowler is an expert witness in this case, and the only testimony that he is qualified to give is expert testimony. Plaintiffs cannot use Mr. Fowler as an expert in their case-in-chief because they did not identify him as their expert, and they have not paid him for his work. If Plaintiffs believe they have some point to score based on Mr. Fowler's deposition testimony, then the proper method for

2

making such a point is through cross-examination following Defendants' presentation of Mr. Fowler's expert testimony, if appropriate.

## V. Conclusion

For the foregoing reasons, the Court should grant Defendants' motion to preclude the testimony of Peter A. Fowler as a lay witness for Plaintiffs.