IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RONALD CANTOR, *et al.*,          :
                                  :
            Plaintiffs,           :
                                  :
      v.                          :      No. 97-586-KAJ
                                  :
RONALD O. PERELMAN, *et al.*,     :
                                  :
            Defendants.           :


**DEFENDANTS' PRE-TRIAL BRIEF**


SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
 (302) 651-3000

Attorneys for Defendants


DATED:  December 15, 2006

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

    A.    The Parties ....................................................................................4

    B.    Marvel Expands Its Operations Through A Series Of Acquisitions...............4

    C.    The Holding Companies Borrowed Money In Three Note Offerings ............5

        1.    The Holdings Note Offering ....................................................6

        2.    The Parent Note Offering.......................................................7

        3.    The Marvel III Note Offering ................................................8

    D.    The Covenants Had No Impact On Marvel ....................................9

        1.    Sections 4.04, 4.05 and 4.09 .................................................9

            (a)    Section 4.04........................................................9

            (b)    Section 4.05........................................................10

            (c)    Section 4.09........................................................10

        2.    Section 4.14........................................................................11

    E.    The Terms Of The Notes Did Not Bind Marvel ...........................12

    F.    The Covenants Did Not Impede Marvel From Aggressively Pursuing Its Acquisition Strategy.................................................................13

    G.    The Covenants Did Not Enrich The Holding Companies ............................14

    H.    Marvel's Core Businesses Collapsed ...........................................15

        1.    Comic Books........................................................................15

        2.    Trading Cards......................................................................16

        3.    Movie Licenses ...................................................................17

I.  Marvel's Deteriorating Financial Condition, Not The Covenants, Caused Its Insolvency ...................................................................19

J.  The Covenants Did Not Prohibit Proposals To Restructure Marvel.............19

K.  The Noteholders' Failure To Consummate The Icahn Proposal Had Nothing To Do With The Terms Of The Notes...........................................21

L.  The MAFCO Litigation Trust Agreement Prohibits Claims Relating To The Tax Sharing Agreement ....................................................21

ARGUMENT........................................................................................22

I.  DEFENDANTS DID NOT BREACH FIDUCIARY DUTIES OR AID AND ABET A BREACH. ......................................................................22

A.  The Director Defendants Did Not Exploit Their Fiduciary Positions For Personal Gain In Connection With The Note Issuances. ......................23

B.  The Director Defendants Did Not Exploit Their Fiduciary Positions For Personal Gain Through Marvel's Participation In Marketing The Notes. .....................................................................................25

II.  DEFENDANTS DID NOT HARM MARVEL OR UNJUSTLY ENRICH THEMSELVES...................................................................................26

A.  The Covenants Did Not Harm Marvel...........................................27

1.  The Parent and Marvel III Indentures could not have harmed Marvel because they merely repeated covenants that were already in place. ..................................................27

2.  Plaintiffs cannot challenge Section 4.14 of the Marvel III Indenture. ...........................................................29

(a)  Plaintiffs do not have standing to complain about Section 4.14 of the Marvel III Indenture. ................................29

(b)  Section 4.14 did not harm Marvel................................30

3.  Even ignoring the fact that the Holdings Indenture was already in place, the Parent and Marvel III Indentures did not harm Marvel........................................................32

(a)  The Covenants did not affect Marvel's financing decisions or capital structure........................................32

(b)  The Covenants did not prevent Marvel from restructuring. ........................................................33

B.    The Covenants Did Not Unjustly Enrich Defendants...................................35

III.    THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIMS
        BASED ON THE HOLDINGS AND PARENT INDENTURES. ........................36

        A.    Plaintiffs' Damage Claims Arising From The Holdings And Parent
              Indentures Are Barred By The Statute Of Limitations. ................................36

        B.    Plaintiffs' Unjust Enrichment Claims Arising From The Holdings
              And Parent Indentures Are Barred By The Statute Of Limitations. .............38

CONCLUSION.................................................................................................................40

## TABLE OF CASES AND AUTHORITIES

**CASES(S)**                                                                                    **PAGE NO.(S)**

*Africa v. City of Philadelphia (In re Philadelphia Litig.)*,
    158 F.3d 711 (3d Cir. 1998)................................................................................ 38-39

*Cantor v. Perelman*,
    414 F.3d 430 (3d Cir. 2005)..............................................................7, 25, 35, 37, 38

*Delgrosso v. Spang & Co.*,
    903 F.2d 234 (3d Cir. 1990).............................................................................38

*Gotham Partners L.P. v. Hallwood Realty Partners, L.P.*,
    817 A.2d 160 (Del. 2002) ...............................................................................23

*Hayman Cash Register Co. v. Sarokin*,
    669 F.2d 162 (3d Cir. 1982).............................................................................39

*John Wyeth & Bros. Ltd v. CIGNA Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997)...........................................................................30

*In re Marvel Entm't Group, Inc.*,
    C.A. No. 97-638-RRM (D. Del. Dec. 16, 1997).........................................................21

*Marvel Entm't Group, Inc. v. Mafco Holdings, Inc.*
    *(In re Marvel Entm't Group, Inc.)*, 273 B.R. 58 (D. Del. 2002) .....................21, 29-30

*Pomeranz v. Museum Partners, L.P.*,
    C.A. No. 20211, 2005 WL 217039 (Del. Ch. Jan. 24, 2005) ...............................37, 38

*Quern v. Jordan*,
    440 U.S. 332 (1979)......................................................................................38

*Rudnitsky v. Rudnitsky*,
    C.A. No. 17446, 2000 WL 1724234 (Del. Ch. Nov. 14, 2000)...................................37

*Rutledge v. Wood*,
    C.A. No. 01C-12-007, 2003 WL 139758 (Del. Super. Ct. Jan. 17, 2003)..................27

*Salovaara v. Jackson Nat'l Life Ins. Co.*,
    246 F.3d 289 (3d Cir. 2001)............................................................................30

*Shultz v. Delaware Trust Co.*,
    360 A.2d 576 (Del. Super. Ct. 1976) ................................................................23

*Smith v. McGee,*
    C.A. No. 2101-S, 2006 WL 3000363 (Del. Ch. Oct. 16, 2006) .....................36, 38, 39

*Teachers' Retirement Sys. Of La. v. Aidinoff,*
    900 A.2d 654 (Del. Ch. 2006).......................................................................36, 38, 39

*Thorpe v. CERBCO, Inc.,*
    676 A.2d 436 (Del. 1996) .............................................................................24, 27, 28

*United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,*
    677 A.2d 497 (Del. 1996) ...........................................................................................37

*Wilmington Country Club v. Cowee,*
    747 A.2d 1087 (Del. 2000) ........................................................................................27

479514-Wilmington Server 1A - MSW

## PRELIMINARY STATEMENT

In 1993 and 1994, Marvel Holdings Inc. ("Holdings"), Marvel (Parent) Holdings

Inc. ("Parent") and Marvel III Holdings Inc. ("Marvel III") (collectively, the "Holding

Companies") sold a series of high-yield bonds (the "Notes") secured by stock of their

subsidiary, Marvel Entertainment Group, Inc. ("Marvel"). During this period, Marvel's

business was thriving, its stock was soaring and it had a market capitalization measured

in the billions. When the Notes were issued, the value of the Marvel stock collateral

vastly exceeded the amount that was borrowed in the Note offerings.

In the years following these offerings, Marvel's fortunes turned downward due to

several unexpected events, including the sudden collapse in the market for comic books

and a baseball strike that devastated Marvel's trading card business. Marvel had taken on

enormous debt pursuing an acquisition strategy in the early nineties but, by late 1996, it

was unable to meet its debt obligations. On December 27, 1996 – 3 ½ years after the first

Note offering – Marvel filed petitions for relief under Chapter 11 of the United States

Bankruptcy Code.

Plaintiffs allege that three of Marvel's then-directors breached their fiduciary du-

ties to Marvel by permitting the Holding Companies to issue the Notes. Plaintiffs claim

that in order to issue the Notes, the Holding Companies agreed to indentures (the "Inden-

tures") that contained covenants (the "Covenants") that restricted Marvel's financing ac-

tivities and ultimately led to its bankruptcy. At the conclusion of discovery, this Court

granted summary judgment to Defendants on the ground that there was no evidence that

Defendants had ever caused Marvel to take any action to its detriment. On appeal, the

Third Circuit reversed, holding that it would be sufficient to establish a breach of fiduci-

ary duty if Defendants had exploited their fiduciary positions for personal gain, regard-

less of whether Marvel had suffered any harm. The Third Circuit found a material dispute of fact as to whether Defendants had exploited their fiduciary positions for personal gain, and remanded the case for trial.

The evidence at trial will offer several independent grounds to reinstate judgment for Defendants. First, the motive that Plaintiffs attribute to Defendants makes no sense. Plaintiffs contend that defendant Ronald O. Perelman damaged his $2 billion investment in Marvel by forcing Marvel to act against its financial interest in order to allow the Holding Companies to borrow $553 million, which they were obligated to repay, along with high yield interest. Not only did the value of Mr. Perelman's investment in Marvel far exceed the value of the temporary use of $553 million, but the proceeds of the first offering of Notes ($288 million) were used to buy more Marvel stock. In light of Mr. Perelman's indirect ownership of 80% of Marvel, he and the other Defendants were incentivized to maximize the value of Marvel, not to harm Marvel.

Second, the evidence will show that Defendants did not exploit their fiduciary positions when the Holding Companies entered into the Covenants. The Covenants merely prescribed certain results for the Holding Companies if certain triggering events occurred, some of which involved actions by Marvel. Specifically, the Covenants subjected the Holding Companies (not Marvel) to an event of default if the Holding Companies (not Marvel) violated their terms. The Indentures further provided that a default would permit the holders of the applicable Notes (the "Noteholders") to seize the Marvel shares that served as their collateral. Because Defendants were not parties to the Indentures and never bound themselves in any fiduciary capacity, and because they never caused Marvel to be bound by the Indentures, they never exploited their fiduciary positions. It was

therefore not a breach of duty for Defendants to permit the Holding Companies to issue the Notes and enter into the Indentures.

Third, Plaintiffs cannot establish an entitlement to monetary relief. Plaintiffs cannot show that the Indentures caused Marvel any injury or provided Defendants any unjust enrichment. The Notes: (i) did not cause Marvel to do, or refrain from doing, anything; (ii) were not more restrictive than Marvel's own credit agreements; and (iii) did not impair Marvel's access to the capital it needed to finance its acquisition strategy. To the contrary, Marvel raised $665 million to finance its acquisitions, with more than $400 million borrowed after the Notes were issued and the Covenants were in place.

Moreover, because Plaintiffs' claim arising from the first issuance of Notes has already been barred by the statute of limitations, Plaintiffs' burden is even greater. If the Covenants caused any damage (and they did not), the damage was caused by the indenture for the first issuance (by Holdings). Plaintiffs cannot prove that identical covenants in the second or third issuances caused any additional damage to Marvel.

Likewise, Plaintiffs cannot prove that Defendants obtained any unjust enrichment from the Covenants. At trial, Defendants' experts will establish that the Holding Companies could have raised just as much money, on similar financial terms, by using debt instruments that did not contain the Covenants.

Fourth, the evidence will not support Plaintiffs' request for equitable tolling of their claims arising from the second issuance of Notes. As a result, Plaintiffs' request for damages and disgorgement of unjust enrichment arising from the first and second issuances must be rejected on the additional ground that they are time-barred.

For all of these reasons, judgment should be entered for Defendants after trial.

3

## STATEMENT OF FACTS

### A.    The Parties

Plaintiffs Ronald Cantor, James Scarpone and Ivan Snyder are the Trustees of the

MAFCO Litigation Trust (the "Trust"), created on October 1, 1998 pursuant to the

MAFCO Litigation Trust Agreement.  The beneficiaries of the Trust include holders of

Allowed Unsecured Claims, Allowed Class Securities Litigation Claims and Allowed

Equity interests in Marvel (as these terms are defined in the Plan of Reorganization).

Until the bankruptcy, Defendants Mafco Holdings Inc. (now known as MacAn-

drews & Forbes Holdings, Inc., "Mafco"), MacAndrews & Forbes Holdings Inc. (now

known as MacAndrews & Forbes Inc. "MacAndrews"), Andrews Group Incorporated

("Andrews") (collectively, the "Parent Companies") and, ultimately, Mr. Perelman, indi-

rectly and wholly owned the Holding Companies.  Mr. Perelman, along with Defendants

William C. Bevins, Jr. and Donald G. Drapkin (the "Director Defendants"), served as di-

rectors of Marvel and each of the Holding Companies.  Plaintiffs did not sue Marvel's

other former directors, who comprised the majority of the board.

### B.    Marvel Expands Its Operations Through A Series Of Acquisitions

For more than 50 years, Marvel has published comic books featuring heroes in-

cluding Spider-Man, X-Men, Incredible Hulk and the Fantastic Four.  In January 1989,

New World Entertainment Ltd. sold Marvel to Parent.  In July 1991, following an initial

public offering of Marvel's stock at $16.50 per share (equal to $2.0625 per share after ad-

justing for three subsequent stock splits), Parent's stake in Marvel was reduced to 60%.

Soon after Parent acquired Marvel, Marvel decided to diversify its business into a

youth-based entertainment company.  Marvel's board sought to grow the company by ac-

quiring businesses that would complement it.  In September 1992, Marvel entered the

4

sports trading card market by acquiring Fleer Corp. for $286 million. In April 1993,
Marvel acquired a 46% interest in toy manufacturer Toy Biz, Inc. in exchange for a cash
contribution and a perpetual, royalty-free license to make toys using Marvel characters.
In August 1994, Marvel acquired Panini S.p.A. ("Panini") for $158 million. Panini was
the largest manufacturer and distributor of children's activity sticker collections in Europe,
and the acquisition opened up new distribution channels for Marvel's products. In April
1995, Marvel acquired an entertainment trading card company, SkyBox International Inc.
("SkyBox"), for $165 million. Marvel also acquired several smaller comic book busi-
nesses and a comic book distributor. These acquisitions achieved Marvel's goal of im-
proving its operating performance and increasing its cash flow. Marvel's net revenue
grew from $223.8 in 1993 to $828.9 million in 1995.

### C.    The Holding Companies Borrowed Money In Three Note Offerings

During the period of Marvel's expansion, the Holding Companies borrowed
money in three separate Note offerings, secured by their Marvel stock. Plaintiffs concede
that Marvel was not a party to the Note offerings, that Marvel did not issue the Notes,
that Marvel was not a party to any agreement in connection with these offerings, and that
Marvel's assets were not used to secure the offerings. Marvel was as much a bystander in
these offerings as in any other situation where a stockholder pledges shares for a personal
loan. The only difference was degree.

Defendants also were not parties. The Director Defendants made no covenant or
promise of any sort in the Note offerings; nor did the Parent Companies.

The Holding Companies pledged $2 billion worth of stock in the three Note offer-
ings in order to borrow $553.5 million. Of the money borrowed, the Holding Companies

spent $288 million to purchase additional Marvel stock in a tender offer and dividended $265.5 million for Mafco's use in other businesses.

### 1.    The Holdings Note Offering

On March 26, 1993, Parent commenced a tender offer to increase its ownership in Marvel. Defendants believed that the additional shares represented an attractive investment, and that they would also permit the Parent Companies to consolidate Marvel's results into their own for tax purposes. To ensure an independent evaluation of the tender offer, the Marvel board created a committee of independent directors. Over the course of four meetings, the Special Committee, with independent financial and legal advice, reviewed the proposal in detail before deciding not to make a recommendation concerning the offer. (DX 75, 85, 86, 140)

Parent financed the tender offer using the net proceeds of a zero-coupon note issuance by Holdings, which was secured by 50.1% of Marvel's stock contributed by Parent to Holdings.[1] The fair value of the Marvel stock pledged for the Notes was $594 million – more than twice the proceeds of the issuance and about $77 million more than the face amount of the Notes. Holdings received net proceeds of $289 million from the sale of the Notes and declared a dividend of $288 million to Parent, which Parent used to fund the purchase of 10 million (28.9%) Marvel shares at $30 per share in the tender offer (equal to 20 million shares at $15 per share after adjusting for a subsequent stock split).

The terms of the Holdings Notes are set forth in the Holdings Indenture. The Indenture had four covenants referencing Marvel. Plaintiffs charge that three of those were

---

[1]    Zero coupon notes have a face value that is their maturity value. They are issued at a discount from that face value, and pay no interest.

6

breaches of fiduciary duty: sections 4.04, 4.05, and 4.09.[2]  Section 4.04 – the debt provision – provided for an event of default if Marvel issued certain types of debt at a time when the ratio of its cash flow to its interest expense was below a specified level.  Section 4.05 – the restricted payments provision – restricted Holdings' ability to declare pro rata dividends, retire debt early and buy back stock.  Section 4.09 provided that Parent and Holdings together would continue to own a majority of Marvel's voting stock.

The terms of the Holdings Indenture were publicly disclosed on April 16, 1993 in tender offer materials sent to Marvel's stockholders and filed with the SEC.  The Third Circuit held that Plaintiffs' claim for damages arising from the Holdings Notes was time-barred because Plaintiffs failed to file suit before the three-year statute of limitations expired.  *Cantor v. Perelman*, 414 F.3d 430, 440 (3d Cir. 2005).

## 2.    The Parent Note Offering

As Parent's Marvel stock continued to increase in value, Parent elected to offer its own Notes secured by Marvel stock.  On July 2, 1993, Parent publicly filed a registration statement on Form S-1, which described and attached the Parent Indenture.  Sections 4.04, 4.05 and 4.09 of the Parent Indenture were nearly identical to the corresponding sections in the Holdings Indenture, and created no event of default that would not already have been an event of default under the Holdings Indenture.  In the fall of 1993, Parent conducted public road shows and distributed a prospectus dated October 13, 1993 that summarized the covenants in the Parent Indenture.  As a result, the Parent Note offering (like the Holdings Note offering before it) received extensive press coverage.

---

[2]    The fourth covenant required any transaction between Marvel and any of Mr. Perelman's affiliates to be conducted in a manner that would ensure fairness.  *See* Section 4.06(b).

On October 20, 1993, Parent issued $252 million face amount in zero-coupon notes, which Parent secured with 10 million shares of Marvel stock (approximately 21% of Marvel's outstanding stock, or the equivalent of 20 million shares after adjusting for the subsequent stock split) and all of the stock of Holdings. Those Notes yielded net proceeds of approximately $145 million to Parent. The fair value of the Marvel shares pledged as collateral for the Notes was $489 million, more than triple the amount received by Parent and $237 million more than the face amount of the Parent Notes.

### 3.    The Marvel III Note Offering

The last of the Note sales occurred in February 1994. Prior to the final sale, Four Star Holdings Inc., a subsidiary of Andrews, formed a new wholly-owned subsidiary, Marvel III, and contributed 100% of Parent's outstanding common stock to Marvel III. On February 18, 1994, Marvel III issued notes with a face amount of $125 million that paid semi-annual interest at 9-1/8%. The Marvel III Notes were secured by the outstanding stock of Parent and, through a non-recourse guarantee from Parent, 9.3 million shares of Marvel stock owned by Parent. The 9.3 million shares represented approximately 9.5% of Marvel's outstanding common stock. Marvel III intended to pay the semi-annual interest payments using the payments that Marvel was going to make to it pursuant to the terms of a tax-sharing agreement (the "Tax Sharing Agreement"). Marvel III received net proceeds of approximately $121 million from the sale, which it dividended to its sole stockholder, Four Star. Based on the closing price for the stock on February 7, 1994, the fair value of the Marvel shares pledged as collateral for the Parent guarantee was $250 million, or double the face amount of the Marvel III Notes.

8

**D.      The Covenants Had No Impact On Marvel**

Even though Marvel was not a party to either the Notes or the Indentures, Plaintiffs allege that the Covenants in the Indentures restricted Marvel's financing activities. The evidence does not support these allegations.

### 1.      Sections 4.04, 4.05 and 4.09

To begin with, if Sections 4.04, 4.05 and 4.09 harmed Marvel, that harm had already happened before the transactions that the Third Circuit has permitted Plaintiffs to continue to challenge. As noted above, these sections of the Parent and Marvel III Indentures merely repeated covenants made in the Holdings Indenture. Plaintiffs have no evidence or expert testimony that Sections 4.04, 4.05 and 4.09 of the Parent or Marvel III Indentures harmed Marvel beyond any alleged harm that had already been caused by the Holdings Indenture. That absence of evidence, by itself, defeats their claims.

#### (a)      Section 4.04

In any event, even including the Holdings Indenture, Section 4.04 had "absolutely no impact on Marvel." (Drapkin Dep. at 41)  Regardless of Marvel's financial condition, it could issue any of seven broad categories of debt specified in Section 4.04 without triggering a default on the Notes.  Despite years of discovery, Plaintiffs have no evidence that the Indentures caused Marvel to refrain from issuing debt or preferred stock that it otherwise would have issued.  In fact, Marvel's board authorized the issuance of debt in a shelf offering in 1995, and Section 4.04 never came into play.  (DX 520, 517)

Moreover, as this Court found, the ban on incurring new debt in Marvel's own pre-existing credit agreements was far more restrictive than anything in Section 4.04. (D.I. 384 at 11-12).  The plain language of Marvel's credit agreements is unmistakable. Those agreements barred Marvel from incurring any new debt at all, subject to a very few

9

limited exceptions. (DX 29 at 70) ("The Company will not . . . create, incur, assume or suffer to exist any Indebtedness, except for [nine minor exceptions].").

Marvel was not at all limited in its ability to borrow. As it turned out, Marvel borrowed too much, not too little. Marvel borrowed more than $400 million after the Notes were issued to fund its acquisitions. When Marvel's business unexpectedly and drastically declined, its cash flows became insufficient to cover its debt, and borrowing more money was out of the question.

### (b)    Section 4.05

Similarly, even including the Holdings Indenture, Section 4.05 never harmed Marvel. It restricted the Holding Companies' ability to make certain payments. Contrary to Plaintiffs' assertion, however, Marvel could do each of the things that were allegedly prohibited by the restriction without triggering a default on the Notes. For example, while Section 4.05 restricts the Holding Companies from making distributions to its shareholders, it does not affect dividends or distributions made by Marvel to either the Holding Companies or its outside shareholders as long as those distributions are made on a pro rata basis. (DX 113 at SKA 04783)

### (c)    Section 4.09

Section 4.09 of the Holdings Indenture created an event of default if Holdings failed to own a majority of Marvel's voting stock. Similarly, Section 4.09 of the Parent and Marvel III Indentures provided an event of default if Parent and Holdings together failed to own a majority of Marvel's voting stock. As with the other two sections, there is no evidence that Section 4.09 had any effect on Marvel – much less, that the inclusion of Section 4.09 in the Parent and Marvel III Indentures caused any harm, since a more re-strictive provision was already in place in the Holdings Indenture.

10

First, Section 4.09 does not contain any promise by the Holding Companies that caused Marvel to refrain from issuing voting equity. Section 4.09 merely reflects a commitment on the part of the issuers to use their lawful voting power as stockholders to protect their property right in their status as majority shareholders of Marvel. It does not presume that Marvel will do, or not do, anything.[3]

Second, there is no evidence that the Parent Companies would have, but for this provision, considered diluting their interest in Marvel. To the contrary, the evidence shows the Parent Companies never intended to dilute their 80% interest in Marvel: (i) the proceeds of the Holdings Notes were used to increase the Parent Companies' indirect position to 80%; (ii) affiliates of the Parent Companies continued to buy more Marvel shares through June 1996; (iii) neither Mafco nor any of its affiliates ever sold any Marvel stock after the 1991 IPO; and (iv) in November 1996, Andrews offered to provide capital to Marvel through an equity infusion that would have eliminated the Notes but maintained the Parent Companies' indirect 80% interest in Marvel.

## 2.    Section 4.14

Only one of the covenants Plaintiffs challenge was not in the Holdings Indenture. Section 4.14 of the Marvel III Indenture gave holders of Marvel III Notes the right to require Marvel III to "repurchase all or any part of [its] [s]ecurities at a purchase price in

---

[3]    Section 4.09 of the Parent Indenture provides that "[t]he Company shall at all times be, or cause [Holdings] together with the Company to be, the legal and beneficial owner in the aggregate of at least a majority of the Voting Stock of Marvel (including the Marvel Pledged Shares). The Company shall at all times be the legal and beneficial owner of 100% of the Capital Stock of [Holdings]. All the foregoing Pledged Shares and such additional shares of Voting Stock of Marvel as are necessary to ensure that collectively the Company and [Holdings] beneficially and legally own a majority of the Voting Stock of Marvel shall be referred to as the 'Restricted Shares.'" (DX 236 at 43-44)

11

cash equal to 101% of the principal amount thereof plus accrued and unpaid interest (if any) to the date of repurchase" if Marvel ceased to be a member of Mafco's consolidated federal tax filing group (which would occur if Mafco ceased to own at least an 80% indirect interest in Marvel).  (DX 324 at 57)

Plaintiffs assert that Section 4.14 affected Marvel's capital structure because it required the Holding Companies to buy, in the event that Marvel issued new equity, enough of that equity to maintain 80% ownership and avoid tax deconsolidation.  While that may be true, nothing in Section 4.14 restrained Marvel from issuing equity.  Moreover, even if a tax deconsolidation event were triggered, Plaintiffs have no evidence that Defendants had any reason to think that a material number of Marvel III Noteholders would have exercised their put rights.  And even if the put rights were exercised, Plaintiffs cannot show that it would have had any material effect on Defendants.  Section 4.14 only required Marvel III to pay one percent more than what they were otherwise obligated to pay the Noteholders – a grand total of $1.5 million – if a tax deconsolidation event occurred.

### E.    The Terms Of The Notes Did Not Bind Marvel

It is undisputed that Noteholders did not have the right to force Marvel or Marvel's directors (including the Director Defendants) to comply with the Indentures.  Therefore, in the event that the Holding Companies violated the covenants, there was no consequence to Marvel.  The only effect permitted by the Indentures due to an uncured default was a change in ownership of Marvel stock.  Thus, the import of the Covenants is that they set forth future conditions under which the Noteholders may seize the collateral.

Plaintiffs have no evidence that the Covenants actually impinged on Marvel or limited its directors' freedom to manage Marvel in any way.  On the contrary, the evidence shows:

12

- "Marvel Entertainment didn't have to be in compliance with the notes . . . [t]hat was a matter for the issuers." (Bevins Dep. at 54-55)

- The Marvel board was "not limited by what [Parent] did." (Perelman Dep. at 71)

- The Indentures did not have "any negative impact on Marvel" and the Indentures were not "contrary to the interests of Marvel." (Perelman Dep. at 67-68)

- "Everyone thought that these restrictions would have absolutely no impact on Marvel, and indeed they never did." (Drapkin Dep. at 41)

- The Indentures were "binding on the holding company," not Marvel. (Jenkins Dep. at 62)

- "Marvel was governed by its credit agreement," not by the Notes Indentures. (Jenkins Dep. at 63)

Even Plaintiffs' own expert, Bevis Longstreth, admitted that "as a strict legal matter, [Marvel was] not bound" by the Notes. (4/13/2006 Longstreth Dep. at 76)  There is also no evidence that anyone expected that the Marvel board would do anything but function in its fiduciary capacity if it was confronted with a decision touching on the subjects of the covenants.  In fact, the Marvel board did act independently with respect to both the tender offer in 1993 and the receipt of competing proposals to restructure Marvel when financial misfortune struck in 1996.

Even if Plaintiffs could prove that the Notes were binding on Marvel (and they cannot), the evidence will show that Marvel would have received a few million dollars at most for agreeing to be bound by the Covenants.

### F.    The Covenants Did Not Impede Marvel From Aggressively Pursuing Its Acquisition Strategy

The evidence further shows that the Covenants did not impair Marvel's access to capital.  On the contrary, Marvel borrowed $665 million to finance three large acquisitions – Fleer, Panini and SkyBox – from 1992 through 1995.  Marvel's directors decided

13

to finance those acquisitions with debt because they "had a strong opinion that Marvel's stock price would increase substantially in the medium term and they did not want to sell a security that gave investors the right to participate in this appreciation." (Fowler Rpt. at 17) Plaintiffs have no contrary evidence.

In any event, if Marvel's directors had wanted to finance their acquisitions with equity rather than debt, they were free to do so. Marvel could have issued preferred stock without triggering a default under Section 4.04 of the Indentures. Marvel also could have financed all of its acquisitions with non-voting or limited voting stock without triggering a default under Section 4.09 of the Indentures. (3/29/02 Holthausen Rpt. at 9) ("Marvel could have also issued common stock with limited voting rights.").

### G.    The Covenants Did Not Enrich The Holding Companies

The Covenants also did not "materially create value in the debt structures." (Fowler Rpt. at 26) The Holding Companies could have raised at least the same amount of money without Sections 4.04, 4.05 or 4.09 by providing the purchasers of the Notes with similar protections in the form of put rights. While "some form of monitoring provisions would have been required to be imbedded in the securities in order to market and sell the notes, . . . it was not necessary that they be in the form of restrictive covenants." (*Id.* at 16) Instead, a put feature could have accomplished what the investors desired without any restrictive covenants, and "may have been preferable to an investor, since each single investor could exercise their put right, but if a covenant was breached, then either the trustee or 25% of the holders had to declare a default." (*Id.* at 16, 20)

In fact, if the Holding Companies had issued alternative debt instruments that did not contain restrictive covenants, such as Liquid Yield Option Notes ("LYONs"), they might have even been able to raise more money than the proceeds of the Notes. Mr.

14

Fowler explained that "[T]he Marvel Holding Companies . . . could have raised more proceeds from the LYONs market relative to the debt market issues than it actually did, if M&F Holdings was willing to give up the equity upside in the Marvel stock." (Fowler Rpt. at 26) Mr. Fowler calculated that the Holding Companies "could have raised an additional $204 million if they had used the LYONs structure." (*Id.*)

## H.    Marvel's Core Businesses Collapsed

Plaintiffs contend that the Covenants caused Marvel's failure. The truth is that Marvel's core businesses collapsed simply from adverse market conditions.

### 1.    Comic Books

In 1994, Marvel's operations began to deteriorate because of an unexpected decline in the comic book market. From 1991 to 1993, Marvel sold a high volume of comic books to specialty stores on a non-returnable basis. Although those specialty shops did not sell most of the comic books that they purchased, they continued to place large purchase orders because they believed that their unsold inventory was valuable as collectors' items. At the time, Marvel did not fully understand that this comic book boom was being driven by speculative collectors. Because Marvel sold to distributors, Defendants did not have direct contact with the stores themselves and was thus not fully aware of the degree to which sales were being fuelled by speculation.

When some owners of the specialty comic book stores began selling their excess inventory in 1994, the market collapsed. Supply began to vastly exceed demand and the owners were no longer content to stockpile comic books. Without those collectors, not only did Marvel's revenues plummet, but its business model failed. In the early nineties, Marvel was able to sell the same comic book several times over by merely changing the

cover. When the collectors refused to purchase each "new" comic book, that sales practice was no longer viable. Marvel's comic book business was decimated.

### 2.    Trading Cards

Shortly after Marvel's comic book business began to deteriorate, the Major League Baseball ("MLB") strike devastated Marvel's trading card business. MLB players went on strike in August 1994. The rest of the season was cancelled, including over 900 regular season games, the playoffs and, for the first time in ninety years, the World Series.

When the strike started, Marvel and industry analysts did not expect that its trading card business would be affected, let alone destroyed. Merrill Lynch reported that "it is uncertain what the financial impact will be on Marvel of the premature demise of the baseball season; [but] we do not expect the impact to be that great." (DX 441 at 1880) Merrill Lynch and several other analysts continued to recommend Marvel's stock. (DX 309, 314, 322) In hindsight, Marvel and the analysts were wrong about the strike.

The strike lasted much longer and had a much greater effect than anticipated. When play resumed on April 2, 1995, the players and owners did so without a collective bargaining agreement. As a result, both sides continually threatened to stop play while they negotiated a new agreement. These events turned fans away from the game. Attendance was down at virtually all ballparks from 1994 to 1995. But fan disaffection affected not only baseball itself; it "cut into the collateral products of baseball, such as [Marvel's] trading cards." (DX 584 at 1383) Labor problems in the National Hockey League and National Basketball Association during the same period compounded fan dissatisfaction with professional sports in general and added to Marvel's woes.

Unfortunately for Marvel, it wasn't just comic books and trading cards that had gone out of favor in the mid-nineties. The entire kids-collectibles market experienced a

severe contraction, which seriously harmed the business of Panini and SkyBox. Nor were these temporary corrections. The children's entertainment market had fundamentally shifted from comic books and trading cards to video games, and the businesses Marvel had purchased for hundred of millions of dollars would never be the same again. By the end of 1996, the decline in Marvel's business rendered Marvel unable to satisfy certain financial covenants in Marvel's credit agreements with its secured bank lenders.[4] A major restructuring of Marvel's balance sheet was needed for it to survive.

### 3.    Movie Licenses

The motion picture studios' failure to produce movies based on Marvel's superhero characters, particularly Spider-Man, also contributed to Marvel's collapse. Licensing revenue was a significant part of Marvel's income and has always been critical to realizing Marvel's full potential. In the early 1990s, Marvel licensed the television rights for Spider-Man, the X-Men, and the Incredible Hulk, while the Fantastic Four and Iron Man played in syndication. When combined with the comic book boom, this television exposure enabled Marvel to sell licensing rights to merchandisers who wanted to use images of Marvel's characters. The release of a major motion picture, along with the massive marketing campaign that a studio would commence to support a movie, would have greatly increased the value of Marvel's business. Indeed, the success of present-day Marvel is largely driven by the Spider-Man and X-Men movies of recent years.

Unfortunately for Marvel, it had no control over the release of those movies during the 1993-96 period. Before Parent acquired Marvel in 1989, Marvel had licensed the

---

[4]    In 1996, Marvel reported a net operating loss of $464 million and a loss of $256.3 million in shareholder equity.

film rights of several of its characters, including Spider-Man and X-Men, to 21st Century Film Corporation ("21[st] Film"). In the early 1990s, 21st Film transferred those licenses to Carolco Pictures, Inc. ("Carolco"). Carolco went bankrupt shortly thereafter and the rights to make the Spider-Man movie were involved in protracted litigation.

Marvel asserted that all rights to produce and/or distribute a Spider-Man film re-verted to Marvel because of Carolco's bankruptcy. 21st Film and Carolco (and Metro Goldwyn Mayer Inc., which succeeded to the litigation position of both 21st Film and Carolco) asserted that they still possessed the rights to produce and distribute a live action film based on the Spider-Man character. Columbia Tristar Home Video alleged that 21st Film had licensed to it the videocassette rights before 21st Film assigned its remaining rights to Carolco. Viacom International, Inc. claimed that 21st Film had licensed to it the television rights. (DX 863) Twentieth Century Fox got involved because it owned the animation rights to Spider-Man and X-Men and viewed those properties as "something they would like very much to have as a corner stone." (Bevins Dep. at 82) Because of the legal wrangling among Marvel and the movie studios, a live-action film based on the Spider-Man character did not get made before Marvel declared bankruptcy.

Spider-Man was eventually produced, as were X-Men, Hulk, Daredevil and the Fantastic Four, but not until at least three years after Marvel emerged from bankruptcy. The post-bankruptcy Marvel made tens of millions of dollars from the licensing driven by those movies. The Parent Companies, on the other hand, lost billions of actual and poten-tial dollars when the value of their indirect ownership interest in Marvel vanished.

### I.    Marvel's Deteriorating Financial Condition, Not The Covenants, Caused Its Insolvency

After March 1996, Marvel's problem was simple – it "did not have sufficient earnings to support its senior debt." (3/25/02 Gittis Dep. at 23)  "The earnings of the company were constantly going down; the business was disappearing in front of your eyes; you had a fixed amount of debt [; so Marvel c]ouldn't service [its] bank debt." (*Id.*) Marvel was not in a position to take on any new debt because it had too much already.

Plaintiffs contend that the debt restrictions in the Notes had become more onerous than the restrictions in Marvel's own credit agreements by the summer of 1996, when Marvel negotiated for reduced maintenance coverage ratios in its credit agreements in order to avoid a default.  Plaintiffs are comparing apples and oranges.  The maintenance coverage ratios did not ban the incurrence of new debt if Marvel was below the ratio; they required Marvel to be always above the ratio or suffer a default.  At all times the ban on new debt in the credit agreements remained in place.  Moreover, regardless of any legal restrictions, Marvel's financial condition precluded it from issuing new debt.  Defendants' expert's testimony that Marvel's financial condition in mid-to late 1996 prevented it from issuing new debt will not be rebutted at trial.  In fact, even Plaintiffs' expert concedes that Marvel's banks would not lend it more money during the period of its financial crisis in 1996.  (Baliban Dep. at 90)  Moreover, in sworn interrogatory responses, Plaintiffs assert that Marvel should have abandoned any efforts to borrow more money and filed for bankruptcy in March 1996.  (Pl. Resp. to Interrog. No. 8)

### J.    The Covenants Did Not Prohibit Proposals To Restructure Marvel

In late 1996, Mr. Perelman proposed a plan (the "Andrews Proposal") to rescue Marvel from its financial crisis.  Under this proposal, Andrews would contribute new

capital to Marvel in exchange for newly issued equity. Andrews would contribute $350 million (later increased to $365 million) in new equity funding to Marvel, Marvel and Toy Biz would be combined, and Andrews would end up owning 80.1% of the combined entity. Although the Andrews Proposal would have caused the Holding Companies to be in breach of Section 4.09 (which required Holdings and Parent, rather than Andrews, to own at least 50.1% of Marvel's voting stock) by diluting the pledged shares to approximately 16% of Marvel's voting stock, the Andrews Proposal did not require Marvel to address the potential conflict between Marvel and the Holding Companies because the Noteholders were concurrently asked to waive their rights under the Indentures. Nonetheless, the Marvel board formed a special committee of independent directors, with independent legal and financial advisors, to deal with the Andrews Proposal at arm's-length.

The Andrews Proposal was never implemented because Carl Icahn, a well-known "vulture" investor who bought a large quantity of the Notes at a discount, made a rival proposal. On December 10, 1996, Icahn proposed to invest $350 million (later also increased) in Marvel through a rights offering in which Marvel's minority stockholders and the Noteholders could participate (the "Icahn Proposal"). The Icahn Proposal contained no requirement that the Noteholders give up any right under the Indentures because neither Icahn nor Marvel would be affected by a violation of Section 4.09. A violation allowed the Noteholders to take control of the shares that were pledged as collateral for the Notes, which would have benefited Icahn, a substantial Noteholder. For this reason, none of Icahn's four written proposals had a condition requiring waiver or modification of any term of the Indentures. Thus, Plaintiffs' theory that Section 4.09 prohibited Marvel from accepting proposals to restructure its debts with an equity infusion is simply wrong.

### K.    The Noteholders' Failure To Consummate The Icahn Proposal Had Nothing To Do With The Terms Of The Notes

To advance the restructuring of its balance sheet, Marvel filed for bankruptcy on December 27, 1996. A Noteholders committee was formed, led by Icahn and his lieutenant, Vincent Intrieri. The Noteholders committee renewed the Icahn Proposal, still with no condition that any provision of the Indentures be modified.

In the end, no version of the Icahn Proposal was consummated, but that failure had nothing to do with the Indentures. As Intrieri explained at deposition, the Icahn Proposal was rejected by Marvel's secured creditors. (12/6/02 Intrieri Dep. at 132-35)  Indeed, Icahn and the secured lenders fought bitterly for more than a year after Defendants had left the scene. Intrieri blamed the fight on bad-faith bargaining by the secured creditors. Judge McKelvie oversaw the process and found that Icahn and Intrieri were equally blameworthy. *See In re Marvel Entm't Group, Inc.*, C.A. No. 97-638-RRM, slip op. at 11 (D. Del. Dec. 16, 1997).  One thing is clear, however: the Indentures were not a factor.

### L.    The MAFCO Litigation Trust Agreement Prohibits Claims Relating To The Tax Sharing Agreement

After abandoning the Icahn Proposal, Icahn and the secured creditors agreed to a plan that gave stockholders little more than the right to sue Mr. Perelman (while also giving Icahn and others a release). The Trust was formed, and Marvel assigned specific rights to it. Those rights do not include claims relating to the Tax Sharing Agreement, which were explicitly excluded. Marvel retained the rights to any claims relating to the tax sharing agreement, and in fact, has already pursued them. *See Marvel Entm't Group, Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Group, Inc.),* 273 B.R. 58, 62 (D. Del. 2002) (McKelvie, J.).  Defendants and Marvel entered into an agreement in March 2003 releasing all of Marvel's claims related to the Tax Sharing Agreement.

**ARGUMENT**

**I.    DEFENDANTS DID NOT BREACH FIDUCIARY DUTIES OR AID AND ABET A BREACH.**

Plaintiffs allege that the Director Defendants each breached his duty of loyalty to Marvel by causing or permitting the Holding Companies to enter into indentures that accelerated their debt in the event Marvel took certain actions or they ceased to own a majority of its shares. Plaintiffs allege that these contracts amounted to a sale of the Director Defendants' fiduciary duties to act in Marvel's best interest.

This Court previously granted Defendants summary judgment on this claim, holding that Delaware law required Plaintiffs to prove that Defendants had "caused Marvel to take action which benefited [Mr.] Perelman and harmed Marvel." (D.I. 384 at 10)  This Court found that there was no evidence to support such a finding, and that Mr. Perelman's "potential conflicting loyalties between Marvel and the holding companies 'never materialized . . . .'"  (*Id.*; D.I. 404 at 4)

The Third Circuit reversed this Court's judgment in part. The Third Circuit did not disturb this Court's factual finding that Defendants had never caused Marvel to take any action to its detriment. Rather, the Third Circuit held that that factual finding was insufficient, by itself, to defeat Plaintiffs' claims as a matter of law. The Third Circuit held that a director may also breach his fiduciary duty if he exploits his fiduciary position for personal gain, even if he did not cause the corporation to act to its detriment. The Third Circuit concluded that, in this case, there was a material dispute of fact as to whether such exploitation had occurred.

The evidence at trial will establish that the Director Defendants never exploited their fiduciary positions for personal gain. As a result, even on the broader basis for po-

22

tential liability established by the Third Circuit, this Court must reject Plaintiffs' claim

and enter judgment for Defendants.

### A.    The Director Defendants Did Not Exploit Their Fiduciary Positions For Personal Gain In Connection With The Note Issuances.

Plaintiffs claim that Mr. Perelman obtained a personal benefit (and Messrs.

Bevins and Drapkin went along) by "promising to restrict Marvel's financing activi-

ties . . . ." (D.I. 486 at 2)  In a nutshell, Plaintiffs claim that the Director Defendants sold

their votes as directors, and should disgorge the sale price regardless of whether they ever

actually cast a sold vote.  That theory fails for lack of evidence.

First, the Director Defendants did not exploit their fiduciary positions because

they never bound Marvel or themselves in any way.  Marvel was not a party to any of the

three Indentures.  Messrs. Perelman, Bevins and Drapkin also were not parties to the In-

dentures.  As a matter of law, therefore, none of them was bound by the terms of those

contracts.  *See Gotham Partners L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160,

172 (Del. 2002) (holding that defendants were not liable for breach of an agreement "be-

cause they were not parties to it"); *Shultz v. Delaware Trust Co.*, 360 A.2d 576, 578 (Del.

Super. Ct. 1976) (holding that third party cannot be bound by contract even if that person

had knowledge of it).  Because none of them was bound by the Indentures, Marvel re-

tained the unfettered ability to act as it wished, and the Director Defendants retained the

unfettered ability to vote in their business judgment consistent with their duties to Marvel.

(And Plaintiffs do not even attempt to claim that Marvel's other directors were somehow

bound by the Indentures.  Those other directors comprised at all relevant times a large

majority of the board with the power to direct Marvel's business and affairs regardless of

the views of the Director Defendants.)

Thus, if Mr. Perelman "exploited" anything, it was his stock, not his fiduciary position. Indeed, the issuers could not have exploited the Director Defendants' fiduciary positions in connection with the Notes because those fiduciary positions were not any part of the bargain. Nothing in any of the Indentures required the Director Defendants to take any action or refrain from any action as directors of Marvel. Indeed, the Indentures did not even require that any of the Director Defendants remain directors of Marvel. So far as the Indentures are concerned, the Director Defendants' directorships were completely irrelevant. Instead, the Indentures focused on the issuers' ownership of Marvel stock. And Mr. Perelman had every right to "exploit" his ownership of Marvel stock. It is undisputed that he had the right under Delaware law to sell his stock, to pledge his stock, to vote his stock in his self-interest, and to promise another that he would vote his stock in a particular way, all unfettered by any fiduciary duty. *E.g.*, *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996). Thus, the evidence will show that the Director Defendants did not exploit their fiduciary positions for personal gain, and therefore did not breach their fiduciary duties.

Second, not only were Marvel and its directors completely unfettered by the Indentures, but the evidence shows that no one involved in the Note issuances ever intended or understood anything to the contrary: Messrs. Perelman, Bevins and Drapkin will each testify that he clearly understood that the Indentures bound the issuers and not Marvel or its directors, that a breach of the Indentures would affect only the issuers, and that, as Marvel directors, their duty was to act in Marvel's best interest.

Specifically, the evidence shows that the participants in the Note issuances recognized that the Covenants served only as triggers for a default by the issuers. The Third

24

Circuit explicitly recognized the merit of this argument in affirming this Court's denial of Plaintiffs' motion for partial summary judgment, and held that if the evidence at trial supported the argument, Defendants would win:

> The only significance of the covenants, Perelman insists, is that any violation constituted an event of default which, if left uncured, would entitle the Notes holders to take control of Marvel. The reality of the matter, Perelman contends, is that potential Note purchasers would insist upon having the covenants not because the covenants provided assurance that Marvel would refrain from taking the stipulated actions, but rather because they provided assurance that the Note holders could seize control if Marvel did. Under this view, there was no expectation that the Marvel board would do anything other than function as an independent body, and the sole potential effect of the covenants on Marvel was the possibility that they might occasion a change in its stockholders.

*Cantor*, 414 F.3d at 441. The testimony of Intrieri, whose companies were Noteholders and are now large beneficiaries of the Trust, also confirms this view. Intrieri explained that "the bargain that the notes indicated that you had . . . was that in the event of a default you would foreclose on the stock and take over the operating company immediately . . . ." (12/6/02 Intrieri Dep. at 103-04) The evidence at trial will show that this view is correct.

**B.    The Director Defendants Did Not Exploit Their Fiduciary Positions For Personal Gain Through Marvel's Participation In Marketing The Notes.**

Plaintiffs also allege that the Director Defendants each breached his fiduciary duty by using Marvel resources to effectuate the Note transactions. This allegation also is not supported by evidence.

To begin with, there is no evidence that the Director Defendants used their directorships to cause Marvel employees to participate in roadshows when they otherwise would have refused. On the contrary, the evidence establishes without contradiction that

the Marvel employees who participated in the roadshows believed that the roadshows provided an excellent opportunity for Marvel to tell its story to the market.[5]

In any event, Plaintiffs' implicit demand that subsidiaries refuse basic cooperation with parents is simply foolish. (Indeed, the evidence will show that employees of Mafco and its subsidiaries regularly provided support to Marvel without compensation.) Public corporations regularly (and properly) devote entire investor relations departments to assisting their stockholders with matters affecting their investment. Furthermore, the federal tax laws compel cooperation among parent corporations and public subsidiaries by allowing the filing of consolidated tax returns, which in turn requires the public subsidiary to provide extensive financial information to the parent corporation. That Marvel would facilitate its 80% stockholder's efforts to issue securities based on Marvel's prospects is neither out of the ordinary nor a breach of fiduciary duty.

## II.    DEFENDANTS DID NOT HARM MARVEL OR UNJUSTLY ENRICH THEMSELVES.

Even if Plaintiffs could prove a breach of fiduciary duty – and they cannot – judgment must still be entered for Defendants because the evidence shows that the Covenants neither harmed Marvel nor unjustly enriched Defendants. Moreover, because Plaintiffs' challenge to the Covenants in the first Indenture (the Holdings Indenture) has already been dismissed on statute of limitations grounds, their burden is even greater. By the time the second Indenture (the Parent Indenture) was entered into, the Covenants in Sections 4.04, 4.05 and 4.09 were already in place in the Holdings Indenture, and Hold-

---

[5]    Remarkably, Plaintiffs also complain that Marvel's general counsel provided the issuers with a "10b-5 letter" – but it can hardly be much of a burden for a public company to provide its largest stockholder with a letter representing that it is not engaged in securities fraud.

ings owned a majority of Marvel's stock. Any harm allegedly caused by the Covenants

had already occurred. Accordingly, to be entitled to money damages, Plaintiffs would

have to prove not merely that the Covenants harmed Marvel, but that the Covenants in

the Parent and Marvel III Indentures harmed Marvel above and beyond any harm that had

already been caused by the Covenants in the Holdings Indenture.[6] They cannot.

### A.    The Covenants Did Not Harm Marvel.

#### 1.    The Parent and Marvel III Indentures could not have harmed Marvel because they merely repeated covenants that were already in place.

A plaintiff seeking an award of damages as compensation for a wrong is only en-

titled to recover for injuries proximately caused by the wrong. Delaware follows the tra-

ditional 'but for' test for proximate cause: "proximate cause exists if a natural and con-

tinuous sequence, unbroken by any efficient intervening cause, produces the injury and

*without which the result would not have occurred.*" *Wilmington Country Club v. Cowee*,

747 A.2d 1087, 1097 (Del. 2000) (emphasis added; footnote omitted). *See also Rutledge*

*v. Wood*, C.A. No. 01C-12-007, 2003 WL 139758, at *2 (Del. Super. Ct. Jan. 17, 2003)

("proximate cause . . . is that direct cause without which an accident would not have oc-

curred") (citation omitted). In other words, if the injury would have occurred even with-

out the alleged wrong, then the alleged wrong is not a proximate cause.

This fundamental doctrine applies to claims involving an alleged breach of fiduci-

ary duty. For example, in *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996), the

---

[6]    Indeed, because (as set forth below) the evidence at trial will not support Plaintiffs' request for equitable tolling of their untimely challenge to the second indenture (the Parent Indenture), Plaintiffs' burden will be greater still: Plaintiffs will be required to prove that the Marvel III Indenture harmed Marvel above and beyond any harm that had already been caused by the Holdings and Parent Indentures.

Delaware Supreme Court held that controlling stockholders who had breached their fiduciary duties were not liable for transactional damages because they also had the power to block the transaction through the legal exercise of their voting rights. The Court held that the defendants' breach could not have been the proximate cause of the non-consummation of the transaction because the defendants "still could have rightfully vetoed a sale" "[e]ven if [they] had behaved faithfully to their duties."

Here, the Third Circuit has already ruled that any damage claim based on the Holdings Indenture is barred by the statute of limitations. (As set forth below, any claim based on the Parent Indenture is barred by the statute of limitations as well because the evidence does not support Plaintiffs' request for equitable tolling.) Plaintiffs cannot prove that the Marvel III Indenture (or the Parent Indenture, for that matter) was the proximate cause of any harm. As in *Thorpe*, the Covenants in the Marvel III Indenture (or the Parent Indenture) could not have been the proximate cause of any harm to Marvel because the Covenants in the Holdings Indenture would still have been in place even if the Parent and Marvel III Indentures had never been executed. Indeed, none of Plaintiffs' experts have opined that the Marvel III Indenture caused any additional harm to Marvel.[7] Accordingly, Plaintiffs cannot prove an entitlement to an award of damages.

---

[7]  Mr. Baliban opines that the Marvel III Indenture would have been "sufficient" by itself to cause all of the harm he purports to measure. (Baliban Rpt. at 7) Sufficiency is not relevant. The relevant question is whether the Marvel III Indenture proximately caused harm given that the Holdings and Parent Indentures were already in place, not whether the Marvel III Indenture would have been "sufficient" to cause harm if the Holdings and Parent Indentures had never existed.

2.     **Plaintiffs cannot challenge Section 4.14 of the Marvel III Indenture.**

Plaintiffs understand that the Third Circuit's ruling eviscerates their damage claim. As a result, on remand, Plaintiffs for the first time complained about Section 4.14 of the Marvel III Indenture, for which there was no analogous covenant in the Holdings or Parent Indentures. Section 4.14 provided that if Marvel ceased to be in a tax consolidation group with Marvel III or the Tax Sharing Agreement ceased to be in full force and effect, each holder of Marvel III Notes could put their notes to Marvel III for 101% of the principal amount. Plaintiffs now argue that Section 4.14 created a conflict of interest because Defendants would not want Marvel to issue equity or terminate the Tax Sharing Agreement. This new argument does not save Plaintiffs' claims, for at least two reasons.

(a)     **Plaintiffs do not have standing to complain about Section 4.14 of the Marvel III Indenture.**

First, Plaintiffs have no right to complain about Section 4.14 because that claim "relates to" the Tax Sharing Agreement and, therefore, falls outside the scope of the Trust's claims. Plaintiffs sue on behalf of, and have only the claims of, the MAFCO Litigation Trust. The MAFCO Litigation Trust was created by the Trust Agreement and has only the claims given to it in the Trust Agreement. In the Trust Agreement, Marvel "agreed to contribute to the MAFCO Litigation Trustees in trust . . . (A) all of their interests in any Causes of Action against any of the MAFCO Defendants asserted in the District Court Complaint or which could have been asserted in the District Court Complaint (*exclusive of all Causes of Action . . . (y) relating to any tax sharing or other similar agreement. . . .*)." (DX 921 at 1). Indeed, Marvel not only retained all causes of action relating to the Tax Sharing Agreement, but it vigorously pursued those claims in a separate lawsuit heard by Judge McKelvie. *See In re Marvel Entm't Group, Inc.,* 273 B.R. at

29

62, *Marvel Entm't Group, Inc. v. Mafco Holdings Inc.*, C.A. No. 02-1702 (Settlement Agreement), Pre-Trial Conference (admission by Plaintiffs that the claims relating to the tax sharing agreement "were asserted by other parties in another action and adjudicated by the Court") (D.I. 497 at 17-18).

In this context, the Third Circuit interprets the phrase "relating to" very broadly. Any claims concerning the same subject matter as a contract, or claims having a logical or causal connection to a contract, are "related to" the contract. *See Salovaara v. Jackson Nat'l Life Ins. Co.*, 246 F.3d 289, 300 (3d Cir. 2001) (holding that clause containing the phrase "any claim related directly or indirectly to this agreement" applies to any lawsuit that "involves that subject matter . . . ."); *John Wyeth & Bros. Ltd v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (holding the language "arise[s] in relation to" means having some "logical or causal connection").

Here, Plaintiffs' new claim "relates to" the Tax Sharing Agreement. Plaintiffs' portion of the Pre-Trial Order setting forth the purported issues to be litigated in support of this claim repeatedly refers to the Tax Sharing Agreement. (PTO at ¶¶ 45-49) Indeed, Mr. Longstreth's new report specifically identifies the threat of "a loss of Marvel's duty to make the tax sharing payments" under Section 4.14 as one of the reasons why Marvel III would not want Marvel to issue additional common stock. (1/12/06 Longstreth Rpt. at 4) Thus, a claim that a Director Defendant breached a duty by permitting Marvel III to agree to Section 4.14 "involves the subject matter of" and has a "logical or causal connection" to the Tax Sharing Agreement, and does not belong to the Trust.

### (b)    Section 4.14 did not harm Marvel.

Second, even if Plaintiffs could complain about Section 4.14, there is no evidence that Section 4.14 caused Marvel any harm. Plaintiffs contend that Section 4.14 caused

Marvel to finance its acquisitions with debt rather than equity, in order to avoid diluting Mr. Perelman's affiliates below 80%. That argument fails for several reasons.

To begin with, there is no evidence that in the absence of Section 4.14 Marvel would have had any interest in financing its acquisitions with equity. On the contrary, the evidence shows that Marvel financed its acquisitions with debt because, at the time, it was enthusiastic about its future prospects and believed that borrowing would be better for all stockholders than diluting them by issuing more equity.

Moreover, as Plaintiffs and their experts recognize, if for some reason Marvel had wanted to issue new equity, Mr. Perelman and his affiliates could have avoided any risk of triggering a put right by simply buying enough of the new shares to maintain their aggregate 80% ownership. Nothing in the record suggests that would have been a burden for Mr. Perelman. Moreover, even if the put right were triggered, the consequence to Marvel III would only be an obligation to pay a 1% premium to those holders of Marvel III notes who chose to exercise the put right. Even if every single Marvel III noteholder were to give up their right to future interest payments by exercising the put right, the 1% premium would still have amounted to only $1.25 million. It would be unreasonable to infer that Mr. Perelman would have attempted to cause material harm to his *$2 billion* investment in Marvel in order to avoid a $1.25 million loss to Marvel III.

Furthermore, even if Marvel had had any interest in issuing new equity, and even if Mr. Perelman had somehow prevented it from doing so, Section 4.14 could not have been the proximate cause. The tax laws, and the benefits they create for entities entitled to tax consolidation, provided a much greater incentive to Mr. Perelman to maintain 80% ownership of Marvel than the risk of a mere $1.25 million premium payment.

3. **Even ignoring the fact that the Holdings Indenture was already in place, the Parent and Marvel III Indentures did not harm Marvel.**

Even if one were to ignore the fact that the Parent and Marvel III Indentures could not have been the proximate cause of any harm to Marvel because the Holdings Indenture was already in place, Plaintiffs' claim would still fail because there is no evidence that *any* of the Indentures ever caused Marvel harm. Through their expert witnesses, Purcell and Baliban, Plaintiffs contend that the Indentures caused hundreds of millions of dollars of harm to Marvel by causing it to finance its acquisitions with bank debt rather than equity or public debt, and by preventing it from achieving a restructuring that would have avoided bankruptcy. The evidence at trial will disprove this contention.

(a) **The Covenants did not affect Marvel's financing decisions or capital structure.**

First, there is no evidence that Marvel would or should have used equity rather than debt. As discussed above with respect to Section 4.14, the evidence shows that Marvel financed its acquisitions with debt rather than equity because it was very optimistic about its future prospects and, in particular, the cash flow growth that it believed would come from the acquisitions. Plaintiffs' experts concede (as they must), that a company with bright prospects will earn a greater return for stockholders by financing with debt rather than equity. Marvel financed its acquisitions with debt because its majority-independent board believed that was the right thing to do, not because of any constraint on its ability to issue equity.

Second, there is no evidence that Marvel would or should have used public debt rather than bank debt to finance its acquisitions. Plaintiffs' experts seem to suggest that the existence of the Notes made public debt prohibitively expensive for Marvel. But

32

Plaintiffs do not (and cannot) challenge the existence of the Notes; they only challenge the existence of the Covenants. Any putative impact that the Notes had on Marvel's ability to issue public debt would have occurred regardless of the Covenants. (Plaintiffs halfheartedly argue that the Notes could not have existed without the Covenants, but their own expert, Carron, premises his analysis on the understanding that Holdings, Parent and Marvel III could have issued debt securities without the Covenants. (Carron Rpt. at 2))

Moreover, the evidence will show that Marvel had good reason to prefer bank debt to public debt regardless of the existence of the Notes. To begin with, bank debt gave Marvel greater flexibility. Marvel had good relations with its banks and preferred to be in a position to negotiate amendments or waivers with one party rather than hundreds or thousands of public bondholders. Furthermore, Marvel financed the Panini acquisition with bank debt because it wanted to hedge the currency risk inherent in buying a European company by financing the transaction with debt denominated in Lira (which was available from a bank but not from the U.S. public markets). By the time Marvel bought SkyBox in 1995, its declining financial performance likely would not have permitted a market for public debt. Thus, the evidence at trial will establish that the Indentures had no impact on Marvel's capital structure or financing decisions.

### (b)    The Covenants did not prevent Marvel from restructuring.

Plaintiffs also argue that the Covenants caused Marvel's bankruptcy filing by precluding a restructuring outside of bankruptcy when Marvel hit financial distress in 1996. Baliban and Purcell argue that, if not for Sections 4.09 and 4.14, Marvel could have is-

33

sued more common stock for a capital infusion.[8]  In support of this argument, Plaintiffs

and their experts point to the fact that the restructuring proposal made by Mr. Perelman's

affiliate, Andrews Group, was conditioned upon the Noteholders' waiver of the majority-

ownership covenant (Section 4.09).

To begin with, Plaintiffs' arguments ignore the fact that Mr. Icahn later made a

superior restructuring proposal that was not conditioned upon any covenant waiver by

Noteholders.  In any event, the evidence at trial will prove conclusively that Marvel's

downfall was caused by factors completely unrelated to the Notes, the Indentures or the

Covenants.  In 1994, the comic book collectibles market collapsed.  Later that year, Ma-

jor League Baseball players went on strike.  Hundreds of games were cancelled, includ-

ing the World Series.  The strike soured fans' interest in the game and caused catastrophic

losses at Marvel's trading card business.  At the same time, unrelated factors caused de-

lays in the production of movies based on Marvel's characters.  The lack of cash flow

made Marvel unable to service its debt and forced it to file for bankruptcy protection.

Finally, Plaintiffs have no evidence that buyers existed in 1996 willing to pur-

chase hundreds of millions of dollars of new Marvel equity.  Even if there had been buy-

ers, and Marvel were interested in selling equity, an equity issuance of the size needed

would have required a change to Marvel's certificate of incorporation in order to increase

the number of authorized shares.  Any such change would have required the approval of

---

[8]     Baliban also suggests that Marvel could have issued additional debt or preferred stock.  But
in the very same paragraph, he acknowledges that because "the current bank debt was in or
near default, additional debt financing would have been unlikely outside of a bankruptcy."
(Baliban Rpt. at 19)

Marvel's existing stockholders, and neither Mr. Perelman nor the Parent Companies had any fiduciary duty to vote their shares of stock for such a change.

**B.    The Covenants Did Not Unjustly Enrich Defendants.**

Because Plaintiffs have no evidence that the Covenants caused Marvel any harm, they also pursue a theory of "equitable disgorgement." The Third Circuit held that, in the event Defendants are found to have exploited their fiduciary positions for personal bene-fit, they may be required to disgorge the amount of that benefit under a theory of unjust enrichment. The Third Circuit made clear, however, that any such benefit must be meas-ured at the time of issuance of the Notes, and not in hindsight.

The evidence will establish that Defendants did not obtain any benefit from the Covenants. Specifically, Defendants' experts Fowler and Parsons will explain that securi-ties without the Covenants could also have been issued and accepted by the market with identical financial terms, raising just as much money for the issuers. Because Defendants obtained no benefit from the Covenants, they have not been unjustly enriched, and no disgorgement is appropriate.

As discussed above, neither Marvel nor any of Director Defendants was ever bound by any of the Indentures because they were not parties to them. However, in the event the Court concludes that the Covenants somehow imposed restrictions on Marvel (as opposed to the issuers), the Third Circuit has defined a hypothetical question to frame the analysis of unjust enrichment, if any: "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." *Cantor*, 414 F.3d at 437. The expert testimony will establish that the answer to that hypothetical question is a very small number.

Specifically, Mr. Fowler will testify that a hypothetical negotiation between Marvel and the Holding Companies would have yielded Marvel compensation of 25-50 basis points per year for the Holding Companies' right to include the restrictions. (Fowler Rpt. at 30) These payments to Marvel would have been $3.8-$7.6 million for the Holdings Notes, $1.7-$3.4 million for the Parent Notes and $0.9-$1.7 million for the Marvel III Notes, for a total of $6.3-$12.6 million. (Fowler Rpt. at 30)

In opposition to Mr. Fowler's detailed analysis of this hypothetical negotiation, Plaintiffs offer only Mr. Longstreth's unexplained guess that, if he were a Marvel director, what he would have demanded "would likely have been in the order of magnitude of $150 million." The thought that the issuers would have paid Marvel $150 million merely to facilitate borrowing $553 million (which still had to be paid back, after all) is ludicrous.

## III.    THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIMS BASED ON THE HOLDINGS AND PARENT INDENTURES.

Under Delaware law, a three-year statute of limitations applies to breach of fiduciary duty claims seeking an award of money, regardless of whether the relief sought is characterized as damages, unjust enrichment or equitable disgorgement. *See Smith v. McGee*, C.A. No. 2101-S, 2006 WL 3000363 (Del. Ch. Oct. 16, 2006); *Teachers' Retirement Sys. Of La. v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006). Because Plaintiffs were on notice of both the Holdings and Parent Indentures more than three years before Marvel filed a Chapter 11 petition, Plaintiffs' claims arising from the Holdings and Parent Indentures are barred by the statute of limitations.

### A.    Plaintiffs' Damage Claims Arising From The Holdings And Parent Indentures Are Barred By The Statute Of Limitations.

Plaintiffs concede (and the Third Circuit acknowledged) that a three-year statute of limitations applies to their claims to the extent they seek an award of money damages.

36

*Cantor*, 414 F.3d at 440. The Third Circuit held that Marvel stockholders were on inquiry notice of the Holdings Indenture no later than April 16, 1993, when they were notified of its terms, and accordingly affirmed summary judgment for Defendants on Plaintiffs' damage claim arising from the Holdings Indenture. As a result, any claim for damages arising from the Holdings Indenture is out of the case.

The same result should apply after trial to the Parent Indenture. The Third Circuit declined to affirm summary judgment on Plaintiffs' damage claim arising from the Parent Indenture, finding instead that material disputes of fact precluded summary judgment on the question of equitable tolling. However, the evidence at trial will prove that equitable tolling should not apply.

Even where equitable tolling applies, it applies only until the plaintiff is on inquiry notice – *i.e.*, when a fair and prudent person using ordinary care would make further inquiries. *Rudnitsky v. Rudnitsky*, C.A. No. 17446, 2000 WL 1724234, at *7 (Del. Ch. Nov. 14, 2000). *See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 503 (Del. 1996) (holding that equitable tolling does not apply where the plaintiff "had reason to know" of the alleged breach); *Pomeranz v. Museum Partners, L.P.*, C.A. No. 20211, 2005 WL 217039 (Del. Ch. Jan. 24, 2005) (holding that equitable tolling functions "'only until the plaintiff discovers (or [by] exercising reasonable diligence should have discovered) his injury'"). Here, Plaintiffs "had reason to know" about the Parent Indenture no later than July 2, 1993, when Parent filed it with the SEC. In 1993, any Marvel stockholder of ordinary care would have known that Marvel was controlled by a group of affiliated entities (whose only assets were their shares of Marvel)

and would have reviewed their public filings for matters that might pertain to Marvel. As a result, Plaintiffs' damage claim arising from the Parent Indenture is also time-barred.

### B.  Plaintiffs' Unjust Enrichment Claims Arising From The Holdings And Parent Indentures Are Barred By The Statute Of Limitations.

Delaware also applies a three-year statute of limitations by analogy to claims seeking equitable disgorgement or challenging unjust enrichment. *Smith*, 2006 WL 3000363, at *3; *Teachers'*, 900 A.2d at 667; *Pomeranz*, 2005 WL 217039, at *2 n.7. Accordingly, for the reasons just described, Plaintiffs' requests for disgorgement of benefit allegedly obtained from the Holdings and Parent Indentures are also time-barred.

Plaintiffs may attempt to argue that the doctrine of 'law of the case' compels a contrary conclusion because the Third Circuit predicted that Delaware would not apply the statute of limitations to claims seeking equitable disgorgement. *Cantor*, 414 F.3d at 439 ("Our survey of the Delaware cases decided since *Laventhol* provides no persuasive basis for believing that the *Bovay* exception to the general rule is no longer viable....")) That argument is not correct because the Third Circuit's prediction has turned out to be incorrect, as subsequent Delaware cases have made clear.

Even assuming that the Third Circuit's refusal to adopt an alternative ground for summary judgment counted as 'law of the case' (and it does not),[9] the "law of the case" doctrine does not apply where "a supervening new law has been announced...." *Africa v.*

---

[9]    The denial of summary judgment is not a final conclusion that qualifies as law of the case. *See Quern v. Jordan*, 440 U.S. 332, 348 n.18 (1979) (stating that the "doctrine of law of the case comes into play only with respect to issues previously determined.... On remand, the 'Circuit Court may consider and decide any matters left open by the mandate of this court'"); *Delgrosso v. Spang & Co.*, 903 F.2d 234, 240 (3d Cir. 1990) (holding that "the district court 'may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision'.... Thus, the court is free to make any order not inconsistent with the appellate decision as to any question not settled by that decision") (citations omitted).

*City of Philadelphia (In re Philadelphia Litig.)*, 158 F.3d 711, 718 (3d Cir. 1998).  Indeed, "every court 'ha[s] a duty to apply a supervening rule of law despite its prior decisions to the contrary when a new legal rule is valid and applicable to the issues of the case.'" *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 170 (3d Cir. 1982).

   The Court of Chancery's opinions in *Smith* and *Teachers'*, issued after the Third Circuit's opinion in this case, apply the three-year statute of limitations to claims alleging unjust enrichment and seeking disgorgement.  In *Teachers'*, the plaintiffs attacked "the allegedly disloyal and self-enriching decision" of the defendant's managers to "perpetuate an unfair relationship" with another company.  *Teachers'*, 900 A.2d at 666.  In addressing this claim, the Court of Chancery applied and referred only to "the three-year limitations period."  *Id.* at 667.  Similarly, in *Smith*, a minority stockholder complained of self-dealing and sought disgorgement, among other remedies.  *Smith*, 2006 WL 3000363, at *1.  The Court of Chancery again found that a breach of fiduciary duty claim requesting disgorgement was subject to a three-year statute of limitations.  *Id.* at *3.

   Because Delaware courts have made clear that the Third Circuit's prediction was incorrect, the 'law of the case' doctrine does not apply.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that Plaintiffs will not be able to demonstrate at trial that they are entitled to the relief they have requested.

/s/ Thomas J. Allingham II
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
 (302) 651-3000
Attorneys for Defendants

DATED:  December 15, 2006