IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD CANTOR, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 97-586-KAJ |
| | : | |
| RONALD O. PERELMAN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**COMPENDIUM OF UNREPORTED OPINIONS TO
DEFENDANTS' PRE-TRIAL BRIEF**

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2051)
Paul J. Lockwood (I.D. No. 3369)
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
 (302) 651-3000

Attorneys for Defendants

DATED:  December 15, 2006

# INDEX

**CASE(S)**                                                                **TAB NO.**

In re Marvel Entm't Group, Inc.,
   C.A. No. 97-638-RRM (D. Del. Dec. 16, 1997)............................................................1

Pomeranz v. Museum Partners, L.P.,
   C.A. No. 20211, 2005 WL 217039 (Del. Ch. Jan. 24, 2005) ........................................2

Rudnitsky v. Rudnitsky,
   C.A. No. 17446, 2000 WL 1724234 (Del. Ch. Nov. 14, 2000)....................................3

Rutledge v. Wood,
   C.A. No. 01C-12-007, 2003 WL 139758 (Del. Super. Ct. Jan. 17, 2003)....................4

Smith v. McGee,
   C.A. No. 2101-S, 2006 WL 3000363 (Del. Ch. Oct. 16, 2006) ....................................5

# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**FILED**

**DEC 16 1997**

CLERK, U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN RE:

MARVEL ENTERTAINMENT GROUP, INC.; THE
ASHER CANDY COMPANY; FLEER CORP.;
FRANK H. FLEER CORP.; HEROES WORLD
DISTRIBUTION, INC.; MALIBU COMICS
ENTERTAINMENT, INC.; MARVEL
CHARACTERS, INC.; MARVEL DIRECT
MARKETING INC.; and SKYBOX
INTERNATIONAL, INC.,

Debtors.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 97-638-RRM

---

## OPINION

---

James L. Patton, Jr., Esquire, Laura Davis Jones, Esquire, Brendan Linehan Shannon,
Esquire, Edward J. Harron, Esquire, and Matthew G. Zaleski, III, Esquire, Young,
Conaway, Stargatt & Taylor, Wilmington, Delaware; Thomas E. Lauria, Esquire, White
& Case, New York, New York; counsel for Debtors.

James L. Patton, Jr., Esquire, Laura Davis Jones, Esquire, Brendan Linehan Shannon,
Esquire, Edward J. Harron, Esquire, and Matthew G. Zaleski, III, Esquire, Young,
Conaway, Stargatt & Taylor, Wilmington, Delaware; Edward S. Weisfelner, Esquire, and
Bari J. Mattes, Esquire, Berlack, Israels & Liberman LLP, New York, New York; counsel
for Standby Purchasers.

Thomas L. Ambro, Esquire, Mark D. Collins, Esquire, Daniel J. DeFranceschi, Esquire,
and Margaret H. Morgan, Esquire, Richards, Layton & Finger, Wilmington, Delaware;
Chaim J. Fortgang, Esquire, Douglas S. Liebhafsky, Esquire, Amy R. Wolf, Esquire,
Douglas K. Mayer, Esquire, and David C. Bryan, Esquire, Wachtell, Lipton, Rosen &
Katz, New York, New York; counsel for the Secured Lenders.

Jeffrey C. Wisler, Esquire, Williams, Hershman & Wisler, P.A., Wilmington, Delaware;



Richard S. Toder, Esquire, and Andrew D. Gottfried, Esquire, Zalkin, Rodin & Goodman LLP, New York, New York; counsel for The Chase Manhattan Bank, as DIP Agent.

David B. Stratton, Esquire, and David M. Fournier, Esquire, Pepper, Hamilton & Scheetz, LLP, Wilmington, Delaware; Lawrence C. Ashby, Esquire, Ashby & Geddes, Wilmington, Delaware; Lawrence Mittman, Esquire, Douglas L. Furth, Esquire, David Fleischer, Esquire, and Madlyn Gleich Primoff, Esquire, Battle Fowler, LLP, New York, New York; counsel for Toy Biz, Inc.

Teresa Currier, Esquire, and Adam G. Landis, Esquire, Duane, Morris & Heckscher, LLP, Wilmington, Delaware; Gary M. Schildhorn, Esquire, Steven D. Usdin, Esquire, and Gary D. Bressler, Esquire, Adelman Lavine Gold and Levin, Philadelphia, Pennsylvania; counsel for the Official Committee of Equity Security Holders.

Norman L. Pernick, Esquire, Saul, Ewing, Remick & Saul, Wilmington, Delaware; counsel for Marvel Holdings.

Joanne Wills, Esquire, and David S. Eagle, Esquire, Klehr, Harrison, Harvey Branzburg & Ellers LLP, Wilmington, Delaware; James E. Spiotto, Esquire, Ann Acker, Esquire, Franklin H. Top, III, Esquire, and Timothy T. Finley, Esquire, Chapman & Cutler, Chicago, Illinois; counsel for LaSalle National Bank as Indenture Trustee.

Michael B. Joseph, Esquire, and Theodore J. Tacconelli, Esquire, Ferry & Joseph, Wilmington, Delaware; Tonny K. Ho, Esquire, Francis J. Menton, Jr., Esquire, Elvin Esteves, Esquire, and Catherine E. Larocca, Esquire, Willkie Farr & Gallagher, New York, New York; counsel for the Official Committee of Unsecured Creditors.

Patricia A. Staiano, Esquire, Frederick J. Baker, Esquire, and John D. McLaughlin, Jr., Esquire, Office of the U.S. Trustee, Philadelphia, Pennsylvania; United States Trustee.

---

Dated: December 16, 1997

McKELVIE, District Judge.

This is a bankruptcy case. Marvel Entertainment Group, Inc. ("Marvel") and certain of its subsidiaries (collectively "the Debtors") are debtors-in-possession ("DIP") in Chapter 11 proceedings. Chase Manhattan Bank ("Chase"), along with pre-petition secured lenders and post-petition DIP lenders, (collectively "the Lenders") have filed a motion to appoint a trustee. This is the court's decision on that motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the record of the proceedings in this matter, and the parties briefs and accompanying evidentiary submissions in connection with this motion.

Approximately 80% of Marvel's common stock is owned or controlled by three holding companies: Marvel Holdings Inc., Marvel (Parent) Holdings Inc., and Marvel III Holdings, Inc. (collectively "the Holding Companies"). All three of the Holding Companies used to be owned by Ronald O. Perelman. The balance of Marvel's common stock was held by public stockholders and entities controlled or owned by Perelman. In 1993 and 1994, the Holding Companies raised $894 million through the issuance of bonds. The bonds were issued pursuant to three separate indentures. The Holding Companies pledged their Marvel stock as security for the bonds.

On December 27, 1996, the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code ("the Code") in the United States

Bankruptcy Court for the District of Delaware. On the same day, the Holding Companies also filed petitions for relief pursuant to Chapter 11 in the bankruptcy court. After filing, the Debtors continued in possession of their properties and the management and operation of their businesses, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

During late 1996 and early 1997, High River Limited Partnership, which is indirectly owned by Carl C. Icahn, and Westgate International, L.P. (collectively "the Icahn interests") purchased a substantial number of the bonds issued by the Holding Companies, at prices substantially below par. The Icahn interests also began buying up debt claims against the Debtors at a discount. As of May 1997, the Icahn interests had acquired between $50 and $60 million in pre-petition claims.

On January 9, 1997, the United States Trustee for the District of Delaware ("the U.S. Trustee") appointed an Official Committee of Creditors ("the Bondholders' Committee") to represent those parties holding the bonds issued by the Holding Companies. On February 12, 1997, the U.S. Trustee appointed an Official Committee of Equity Security Holders ("the Equity Committee") in the Debtors' cases. On October 22, 1997, the U.S. Trustee appointed an Official Committee of Unsecured Creditors ("the Creditors' Committee") in the Debtors' cases.

On January 13, 1997, the Bondholders' Committee and LaSalle National Bank ("LaSalle"), as indenture trustee for the bondholders, moved to lift the automatic stay

2

imposed by § 362(a)(3) of the Code[1] in the Holding Companies' cases. The Bondholders' Committee and LaSalle wished to foreclose on and vote the pledged shares of stock, as a result of the Holding Companies' default under the indentures. On February 26, 1997, the bankruptcy court granted this motion, but noted that the issue of whether any subsequent action by the bondholders with respect to the pledged shares would implicate the automatic stay in the Debtors' bankruptcy cases was not yet before the court.

On March 24, 1997, Debtors filed an adversary proceeding in the Debtors' cases, seeking declaratory and injunctive relief, a temporary restraining order, and a preliminary injunction enjoining the bondholders from voting the pledged shares to replace Marvel's board of directors. On the same day, the bankruptcy court granted the temporary restraining order, finding that §362(a)(3) barred the bondholders from voting the shares so as to replace Marvel's board without first obtaining relief in court from the automatic stay.

On March 24, 1997, the Lenders also filed a motion in the bankruptcy court, for an order appointing a responsible officer, or in the alternative an order appointing a trustee.

On May 14, 1997, upon appeal, this court vacated the bankruptcy court's order for

---

[1] 11 U.S.C. § 362(a)(3) states in relevant part:
(a) . . . a petition filed under section 301 . . . of this title . . . operates as a stay, applicable to all entities, of

. . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

3

a temporary restraining order. A copy of the court's opinion is reported at In re Marvel
Entertainment Group, Inc., 209 B.R. 832 (D. Del. 1997). On June 20, 1997, the
bondholders, led by the Icahn interests, replaced the board of Marvel with their designees.

The same day that the Icahn interests took control of the Marvel board, the
bankruptcy court issued an order sua sponte, vacating the administrative order of
December 27, 1996. The court had indicated on June 5, 1997, in a hearing, that if the
parties did not make an effort to stop all of the litigation, and participate in "appropriate
discussion," it would put a cap on attorney's fees. The administrative order had
established the procedures for interim compensation and reimbursement of expenses of
professionals.

The Debtors, through their new board, engaged in negotiations with the Lenders,
leading to a proposed settlement ("the Settlement") in which the Icahn interests agreed to
purchase most of the claims and liens of the Lenders, and the Icahn interests would gain
full control of the board.

The Settlement was never consummated. However, on the eve of a September 16,
1997 hearing on the parties' pending motions, including the motion to appoint a trustee,
Chase, acting separately from the other Lenders, again reached an agreement ("the
Second Settlement") in principle with the Icahn interests to sell its debt. However, once
again the deal was never consummated. The deadline for Chase to obtain a specified
amount of support for the Second Settlement, a precondition for satisfaction of the deal,

4

passed on October 7, 1997.

Just over three weeks later, on October 30, 1997, the Debtors filed suit in this court ("the Perelman litigation"), and named as defendants, among others, Chase and the other Lenders with whom they had been so close to settling. The action was filed on behalf of Marvel by counsel who had not previously entered an appearance in this matter. Prior to filing the action, Marvel had not sought approval from the bankruptcy court to retain that counsel, nor had it sought approval to file the action. In the Debtors' complaint, they named as defendants the Perelman entities, the DIP Lenders, every current holder of pre-petition debt, and Toy Biz, Inc., ("Toy Biz"). Toy Biz is a licensee of Marvel, and Marvel owns 27% of Toy Biz's stock.

The eighty-two page complaint asserts nineteen causes of action against thirty-three named defendants. The causes of action include claims alleging breach of fiduciary duty, fraudulent conveyance, preferential transfer, and breach of contract. The complaint alleges that defendants conspired, to the detriment of Marvel and its shareholders, by granting a valuable license to Toy Biz, and by securing certain debt owed to Lenders less than a year before the bankruptcy filing.

On the same day that the Debtors filed their complaint in the Perelman litigation, they filed a motion for a temporary restraining order, seeking to prevent the board of directors of Toy Biz from continuing to exercise control over the company. The Debtors alleged that the Toy Biz board was attempting to sabotage Marvel's reorganization efforts

through its control over the properties Marvel had licensed to Toy Biz, and through its

cooperation with the Lenders to create a reorganization plan for Marvel. The Debtors

further alleged that they had properly exercised Marvel's voting rights in Toy Biz, and

had replaced eight members of the present board. Thus, the Debtors claimed that the Toy

Biz board were wrongfully refusing to step down.

Also on October 30, 1997, the Debtors filed a motion in the bankruptcy cases, to

withdraw the reference of the Debtors' cases to the bankruptcy court, and have those

cases heard in this court.

On November 3, 1997, the court held a telephone conference with the parties in the

Perelman litigation, and indicated that the issues raised in that proceeding all appeared to

relate to the bankruptcy cases, and that in light of the reference of those cases to the

bankruptcy court, the court did not believe it had jurisdiction over the Perelman litigation.

The court invited parties to submit papers on the jurisdictional issue, but made clear that it

did not want to interfere with the bankruptcy court's ability to resolve the underlying

dispute.

On November 4, 1997, Debtors' counsel sent a letter to Chief Judge Balick in the

bankruptcy court, indicating that they had moved to withdraw the reference. The letter

also incorrectly stated that while that motion was pending, the bankruptcy court was

required to refrain from taking further action. The letter made no reference to the

telephone conference held with this court the day before. Judge Balick responded on the

same day, November 4, 1997, by sending a letter to all parties in the bankruptcy cases. In that letter, Judge Balick canceled a motion hearing that had been scheduled for November 19, 1997, which was to include argument on the motion to appoint a trustee.

On November 13, 1997, this court held a hearing to review its jurisdiction in the Perelman litigation, and to address the concerns expressed by the Lenders that the action had effectively barred them from proceeding in the bankruptcy cases. At that hearing, the Lenders agreed not to oppose the motion to withdraw the reference. On November 17, 1997, this court entered an order withdrawing the reference to the bankruptcy court of the Debtors' cases. In a November 20, 1997 scheduling conference, the court invited the Lenders to renew their motion for the appointment of a trustee, that had been originally made on March 24, 1997, and renewed on May 21, 1997.

On November 20, 1997, the Debtors filed a proposed plan for reorganization. On November 21, 1997, the Lenders and Toy Biz also filed a proposed reorganization plan.

In the briefs submitted by the various parties, addressing the question of whether the court should order that a trustee be appointed, the parties exchange numerous allegations. In opposing the motion, the Debtors accuse the Lenders, and specifically Chase, of flip-flopping on positions throughout the life of this proceeding, whenever it suits their purposes. The Debtors describe the reorganization plan of the Lenders and Toy Biz as illegal, and claim that the Lenders have no desire that a neutral trustee be appointed. Rather, the Debtors argue, the Lenders seek to replace the board of directors

7

so that they can control the trustee and force liquidation of Marvel. They claim that the Lenders have put a strangle-hold on the Debtor's financing, and that the Lenders are responsible for failure of both the Settlement and the Second Settlement. They also repeat many of the allegations made in the Perelman litigation.

The Equity Committee also opposes the motion to appoint a trustee. It echoes the Debtors in expressing concern about possible liquidation.

While the Creditors' Committee opposes the appointment of a trustee, the basis for its position is that the amount of misbehavior by different parties is still "uncertain." The Creditors Committee describes the relationship between the Icahn interests and the Lenders as having reached an "impasse." It suggests that the court should allow more time for investigation of both the Debtors' and the Lenders' allegations.

In support of their motion, the Lenders accuse the Icahn interests of an elaborate scheme to take over Marvel at a discount price while diminishing the value of the Lender's claims on the company as creditors. They claim that the Perelman litigation is part of that scheme, and was brought, at least in part, as a weapon to punish the Lenders for not consummating the two Settlements. They also claim that the Icahn interests originally promised that the Lenders' claims would be paid in full, but that in recent settlement discussions the Debtors have only offered payment of claims at a significant discount. The Lenders claim that the present board is incapable of neutrality, and is guilty of breaching its fiduciary duties to creditors.

8

The U.S. Trustee supports the motion for the appointment of a trustee. The U.S. Trustee indicates that the Lenders and the Debtors have demonstrated an "apparent inability . . . to reach a consensus."

On December 12, 1997, the court held a hearing on the trustee motion. At the end of the hearing, the court indicated that it would issue an order granting the motion. In order to formally commence the selection of a trustee, the U.S. Trustee requires a written order from the court authorizing such appointment. Thus, on the day of the hearing, the court issued a written order, but indicated that it would issue a written opinion detailing its reasons promptly thereafter. This is that written opinion.

## II. DISCUSSION

### A.   Standard for Appointment of a Trustee

11 U.S.C. § 1104(a) provides that the court may appoint a trustee, at any time after the commencement of the case but before confirmation of a reorganization plan, for the following reasons:

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate.

There is a strong presumption in Chapter 11 cases that the debtor should continue

9

in control and possession of the business. See In re Aardvark, Inc., 1997 WL 129346, *3 (D. Del. March 4, 1997). The appointment of a trustee has been described as "an extraordinary remedy," In re Petit, 182 B.R. 64, 68 (D. Me. 1995); Aardvark, at *3, and the "exception rather than the rule." In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3d Cir. 1989).

However, the determination of whether to appoint a trustee has also been found to face a "flexible standard," Sharon Steel, 871 F.2d at 1228, and should be considered on a "case-by-case basis." Id. at 1226; Petit, 182 B.R. at 69.

### B.    Is There "Cause" for Appointment of a Trustee?

The circumstances that qualify as cause under subsection (a)(1) are not limited to the examples listed in the statute, such as fraud, dishonesty, etc. Cause has been found where courts have found the debtor-in-possession unable to resolve conflicts with other interested parties. See, e.g., In re Cajun Elec. Power Coop., Inc., 74 F.3d 599 (5th Cir. 1996) (on rehearing, withdrawing the opinion in part of In re Cajun Elec., 69 F.3d 746, and adopting the reasoning of the dissenting opinion, which argued in favor of affirming the appointment of a trustee).

In the present case, there can be no question that the debtor-in-possession has demonstrated difficulty resolving its conflicts with other parties, such as the Lenders. The Perelman litigation alone is proof that the Debtors, as controlled by the Icahn interests, and the Lenders, take dramatically different stances on many issues. The U.S.

10

Trustee has indicated that the parties seem to be unable to reach a consensus.

A review of the proceedings and papers filed to date in this case demonstrates that the parties are sharply divided on many issues, and are presently incapable of resolving them. Furthermore, the court's perception of the parties' positions, after holding several hearings and telephone conferences, is that there is no reasonable likelihood of any cooperation between the parties in the near future. Thus, the court finds that cause exists, pursuant to 11 U.S.C. § 1104(a)(2), for the appointment of a trustee.

### C.    Is the Appointment of a Trustee in the Interests of the Appropriate Parties?

Even if the court did not find cause under (a)(1) for the appointment of a trustee, the court would still grant the Lenders' motion, on the ground that such appointment is in the interests of the parties involved, pursuant to subsection (a)(2).

In Petit, 182 B.R. at 70, the court noted that a trustee can be appointed, pursuant to (a)(2), on the basis of "deep-seeded conflict and animosity between a debtor and its creditors." No statement could more precisely sum up the circumstances of the present case.

As mentioned above, the Debtors and the Lenders have flung accusations at each other, and have failed to demonstrate any ability to resolve matters cooperatively. Two different attempts to reach a settlement were unsuccessful, and in response to the second failure, the Debtors proceeded to file a lawsuit alleging that Lenders and other parties had

11

conspired to take important assets away from Marvel.

The Code provides that, once a trustee is appointed, "[a]ny party in interest . . . may file a plan." 11 U.S.C. 1121(c). The Code also provides that the trustee shall, "as soon as practicable, file a plan under section 1121 of this title [or] file a report of why the trustee will not file a plan." 11 U.S.C. § 1106(a)(5).

Implementing an orderly procedure under which a reorganization plan will be selected quickly is clearly in the best interests of all parties involved. A trustee will be able to offer a neutral assessment of the different plans already proposed, and will be able to invite different plans if necessary. The trustee will also be able to independently evaluate the merits of the Perelman litigation, and determine whether it is in Marvel's interest to pursue some, all, or none of those claims. This evaluation will be an important and necessary component of the trustee's assessment of the reorganization plans, since the value of the Perelman litigation is one of the assumptions made in the Debtors' proposed plan.

Overall, the court finds that the process of approving a reorganization plan will be greatly facilitated by the placement of an impartial party in control of Marvel. While all of the parties are understandably concerned about the details of whatever plan is chosen, the court finds that the selection of a plan, whatever its details, is in the best interests of all parties, and the best way to achieve that result is to appoint a trustee. Thus, as indicated in the court's December 12, 1997 order, the court grants the motion for

12

appointment of a trustee.

# TAB 2

Westlaw.

Not Reported in A.2d                                                      Page 1

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**C**
Pomeranz        v.        Museum        Partners,
L.P.Del.Ch.,2005.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Jacques POMERANZ, Amalgamated Sludge LLC,
formerly known as Sludge Management, LLC, a
Nevada Limited Liability company, Eric Nettere,
Alan W. Steinberg Partners, LP, a New York
Limited Partnership, David Scott Associates, LP, a
Virginia Limited Partnership, Robert Goldfein, E.A.
Moose Co., LP, a Delaware Limited Partnership
Robert Gilman, Steven Chaleff, ICMC Paramount
Fund, LP, a Texas Limited Partnership, Richard and
Teresa Lillibridge, Plaintiffs,
v.
MUSEUM PARTNERS, L.P., a Delaware Limited
Partnership, Asher B. Edelman, Northstar
Partnership, L.P., a Delaware Limited Partnership,
Presidio Capital Corp., a British Virgin Islands
Corporation, and Gerald Agranoff, Defendants.
**No. Civ.A. 20211.**

Submitted Oct. 27, 2004.
Decided Jan. 24, 2005.

David J. Margules, and Joanne P. Pinckney,
Bouchard        Margules        &        Friedlander,        P.A.,
Wilmington, Delaware; Joshua L. Dratel, and Mark
J. Eberle, Joshua L. Dratel, P.C., New York, New
York, for Plaintiffs.
Gregory P. Williams, and Peter B. Ladig, Richards,
Layton & Finger, P.A., Wilmington, Delaware;
Barbara L. Moore, and John J. Tumilty, Edwards &
Angell,        LLP,        Boston,        Massachusetts,        for
Defendants NorthStar Partnership, L.P. and
Presidio Capital Corp.
Kurt M. Heyman, and Patricia L. Enerio, the
Bayard        Firm,        Wilmington,        Delaware,        for
Defendants Museum Partners, L.P. and Asher B.
Edelman.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
*1 This case centers on the coordinated withdrawal
of two affiliated limited partners, NorthStar
Partnership, L.P. and Presidio Capital Corp.,
NorthStar's subsidiary, from two related limited
partnerships, Museum Partners, L.P. and Musee
Partners L.P. Defendant Asher Edelman was the
general partner of both Museum Partners and
Musee. Defendant NorthStar held the largest
number of units in Museum Partners. The goal of
both partnerships was to acquire shares of Societe
du Louvre ("Societe"), a French conglomerate, and
to pressure its management into a sale of assets or
other value-maximizing transaction.

In June 1999, Edelman informed the unitholders of
Museum Partners that the entity's life was being
extended through June 30, 2000 by vote of
NorthStar, which held a majority of the LP units.
But, on February 10, 2000, NorthStar exercised its
purported right to withdraw from Museum Partners,
arguably triggering a right to a payment equivalent
to its share of the entity's liquidation value. At the
same time, Presidio purportedly withdrew from
Musee.

In this action, the plaintiffs, Jacques Pomeranz and
other remaining limited partners of Museum
Partners, allege that these withdrawals and the
contract compromising NorthStar and Presidio's
demands for payment (the "Withdrawal Agreement"
), breached the limited partnership agreement ("LP
Agreement"), [FN1] were consummated in violation
of fiduciary duties owed to Museum Partners and its
limited partners, gutted Museum Partners
financially, and caused them cognizable damage. In
response, on March 12, 2003, NorthStar and
Presidio moved to dismiss the complaints against
them, arguing, among other things, that the
plaintiffs' claims are barred by applicable statutes of
limitations and the doctrine of laches. Because the
resolution of the timeliness of the plaintiffs' various
claims in their First Amended Complaint ("

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint") [FN2] disposes of those claims, I need not reach their argument that the complaint fails to state a claim against them. Instead, this opinion addresses only NorthStar and Presidio's argument that the plaintiffs' claims against them were not timely filed.

> FN1. References to the Withdrawal Agreement attached as Exhibit E to the Complaint, will be cited as "Withdrawal Agreement at ___." Similarly, references to the Museum Partners Limited Partnership Agreement, attached as Exhibit A to the Complaint, will be indicated as " LP Agreement at § ___." All of the other exhibits cited were attached to the Complaint and will be cited simply as "Ex. ___."

> FN2. The plaintiffs' claims include: 1) breach of contract; 2) tortious interference with contract; 3) breach of fiduciary duty; 4) aiding and abetting of a breach of fiduciary duty; and 5) unjust enrichment.

The analysis is straightforward. The plaintiffs filed their initial complaint in this matter on March 26, 2003 but did not name NorthStar and Presidio as defendants until they filed an amended complaint on January 9, 2004. Because the allegedly wrongful conduct of NorthStar and Presidio occurred in 2000, each of the plaintiffs' claims accrued more than three years before January 9, 2004. The analogous statutes of limitations all have three year filing periods. The plaintiffs were keenly aware that a statute of limitations issue might arise, and therefore attempted to plead facts that would allow for tolling of the relevant statutes of limitations, making their claims timely. Put simply, the plaintiffs must prevail on the tolling question or their claims are barred. The plaintiffs bear the burden of showing that tolling is appropriate.

*2 For reasons that I will explain, the plaintiffs do not plead facts excusing the untimeliness of their filing. The plaintiffs had sufficient notification by October 2000, at the latest, of both the withdrawal of NorthStar and the possibly injurious effect of that event on the viability of Museum Partners, to be put on inquiry notice of the claims alleged in the Complaint. As a result, the plaintiffs' claims are time-barred.

No inequity is worked by this conclusion. Had the plaintiffs commenced their investigation in a timely manner, they would have discovered all the relevant details sooner. Even after missing the starting gun triggered by inquiry notice, plaintiffs were in possession of all major pieces of the puzzle by July 2001. They filed the initial complaint in this matter well after receiving this material and chose not to include NorthStar and Presidio as defendants despite challenging the validity of the Withdrawal Agreement in that original pleading, waiting almost three years from receiving the information to amend their complaint. In light of these facts, I grant NorthStar and Presidio's motion to dismiss.

### I. Analytical Framework

#### A. Procedural Standard

A statute of limitations defense may be raised and decided on a motion to dismiss.[FN3] As this court has made clear, "[w]hen it is clear from the face of the Complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired." [FN4]

> FN3. *United States Cellular Investment Co. of Allentown v. Bell Atlantic Mobile Systems, Inc.,* 677 A.2d 497, 502 (Del.1996).

> FN4. *In re Dean Witter Partnership Litig.,* 1998 WL 442456, at *6 n. 44 (Del. Ch. July 17, 1998), *aff'd,* 725 A.2d 441 (Del.1999) (Table); *see also Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del. Ch.1993) (noting that it is "well settled that where the complaint itself alleges facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

that show that the complaint is filed too late, the matter may be raised on a motion to dismiss").

Because over three years elapsed between the major events alleged in the Complaint to constitute wrongdoing by NorthStar and Presidio and the filing of that pleading, NorthStar and Presidio have appropriately raised, at this juncture, the question of whether the plaintiffs' claims are time-barred. As will be explained, the most efficient manner to dispose of the dismissal motion is to determine whether the Complaint sufficiently supports their contention that their tardy filing was excused by relevant tolling doctrines, and, in particular, their more specific assertion that they did not receive inquiry notice of their claims until after January 9, 2001.

To obtain the benefit of tolling, the plaintiffs must allege facts that support the applicability of an equitable exception to laches and the relevant statutes of limitations because "the party asserting that tolling applies ... bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled." FN5 In this regard, I accept well-pled facts alleged in the Complaint as true and view them in the light most favorable to the plaintiffs, but I do not accept conclusory allegations without specific factual allegations to support them. FN6

> FN5. *Dean Witter,* 1998 WL 442456, at *6 (citing *United States Cellular,* 677 A.2d at 504).

> FN6. *In re Tri-Star Pictures, Inc., Litig.,* 634 A.2d 319, 326 (Del.1993); *Dean Witter,* 1998 WL 442456, at *4.

B. *The Relevant Statutes Of Limitations And The Impact Of Tolling*

All parties generally agree that three years is the relevant limitations period for each of the plaintiffs' substantive claims,FN7 and that this court typically applies the limitations period at law by analogy to equitable claims in order to apply the doctrine of

laches. Therefore, the critical question is when to start counting the three year period for each of the plaintiffs' claims.

> FN7. The plaintiffs make various claims against NorthStar and Presidio. As to the plaintiffs' claim for breach of fiduciary duty, see *Dean Witter,* 1998 WL 442456, at *4; *Fike v. Ruger,* 754 A .2d 254, 260 (Del. Ch.1999), *aff'd* 752 A.2d 112 (Del.2000); as to the plaintiffs' claim for breach of contract, see 10 *Del. C.* § 8106; *Fike,* 754 A.2d at 260; as to the plaintiffs' claim for tortious interference, see *Williams v. Caruso,* 966 F.Supp. 287, 293 (D.Del.1997); as to plaintiffs' claim for unjust enrichment, see *Merck & Co. v. SmithKline Beecham Pharms. Co.,* 1999 WL 669354, at *42 (Del. Ch. Aug. 5, 1999) , *aff'd,* 766 A.2d 442 (Del.2000). *See generally Kahn v. Seaboard Corp.,* 625 A.2d 269, 272 (Del. Ch.1993) ("where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter."). As is discussed later, there is an argument that some or all of the plaintiffs' claims are governed by 6 *Del. C.* § 17-607 of the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), which states in pertinent part that "[u]nless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of distribution." As I find, however, even if § 17-607 were applicable, the outcome would not change.

**\*3** As a general matter, it is well-settled that "a cause of action 'accrues' [for purposes of a statute of limitations] ... at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action. " FN8 The courts of this state have repeatedly emphasized that this is the prevailing rule.FN9 Thus, to the extent that the claims against NorthStar

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

and Presidio were based on wrongful acts occurring before January 9, 2001, the claims against them would, absent extraordinary circumstances, be time-barred. As it turns out, and as discussed in greater detail below, the wrongful acts alleged in the Complaint occurred during the year 2000. Therefore, to prevent their claims from being time-barred, the plaintiffs must demonstrate a basis for tolling the various limitations periods.[FN10]

> FN8. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004).

> FN9. *See, e.g., SmithKline Beecham Pharms. Co. v. Merck & Co.,* 766 A.2d 442, 450 (Del.2000) ("This statute [10 *Del. C.* § 8106], ... is not a 'discovery statute' and the limitations period begins to run from the time the cause of action accrues. This is so 'even if the plaintiff is ignorant of the cause of action." ') (citing *Dean Witter,* 1998 WL 442456, at *4).

> FN10. *Dean Witter,* 1998 WL 442456, at *6.

Various theories exist under which a plaintiff may seek tolling of the statute of limitations.[FN11] But any possible tolling exception to the strict application of the statute of limitations tolls the statute *"only until* the plaintiff discovers (or [by] exercising reasonable diligence should have discovered) his injury."[FN12] When plaintiffs are on inquiry notice, the statute of limitations begins to run.[FN13] Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury.[FN14]

> FN11. The parties debate whether any of the tolling justifications available to plaintiffs-1) that their injuries were inherently unknowable, 2) that the facts of

their injuries were fraudulently concealed from them, or 3) that equitable tolling applies because they justifiably relied on Edelman's disclosures because he was a fiduciary-are actually applicable against NorthStar and Presidio. But I need not and do not decide which, if any, of these doctrines applies, recognizing that the defendants contend that none do.

Inherently unknowable injuries typically involve acts of malpractice or fraud of the kind that are not alleged with respect to NorthStar and Presidio. *See Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del.1982) (quoting *Omaha Paper Stock Co. v. Martin K. Eby Constr. Co.,* 230 N.W.2d 87, 89-90 (Neb.1975)); *see also In re ML/EQ Real Estate Partnership Litig.,* 1999 WL 1271885, at *2 n. 12 (Del. Ch. Dec. 21, 1999) (noting that the inherently unknowable doctrine rarely, if ever, should apply in the entity law context). The doctrine of fraudulent concealment arguably does not apply because plaintiffs have not pled any "affirmative act of concealment" by either NorthStar or Presidio that was "intended to put a plaintiff off the trail of inquiry." *Dean Witter,* 1998 WL 442456, at *5. Of the plaintiffs' theories, equitable tolling is the most logical. Equitable tolling usually applies to claims involving self dealing " where a plaintiff reasonably relies on the competence and good faith of a fiduciary," and the plaintiffs here say they relied on Edelman. *Dean Witter,* 1998 WL 442456, at *6. The plaintiffs also make a very strained, if extensively pressed, argument that NorthStar was a fiduciary simply because it owned a majority of the Partnership's units. I need not address that less-than-convincing contention.

> FN12. *Dean Witter,* 1998 WL 442456, at *6 (emphasis in original); *see In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. 527, 554 (D.Del.1994) (discussing inherently unknowable injuries); *United States Cellular,* 677 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

at 503 (discussing equitable tolling);
*Litman v. Prudential-Bache Properties,
Inc.,* 1994 WL 30529, at *8 (Del. Ch. Jan.
14, 1994) (discussing fraudulent
concealment).

FN13. *See Dean Witter,* 1998 WL 442456,
at *6 n. 43 (collecting cases showing that
the statute of limitations runs from the
point of inquiry notice under several
tolling theories).

FN14. *Dean Witter,* 1998 WL 442456, at
*7.

Because all of the plaintiffs' tolling arguments
depend for their vitality on the question of when the
plaintiffs were on inquiry notice, I have
concentrated my analysis on that question. As I will
explain, the plaintiffs' Complaint demonstrates that
they were on inquiry notice no later than October
2000-more than three years before the Complaint
was filed. That conclusion obviates the need to
consider any other elements of the plaintiffs' tolling
arguments.

## II. *Factual Background*[FN15]

FN15. As alluded to above, on this motion
to dismiss, the facts are drawn from the
Complaint and attached exhibits, and all
reasonable inferences are drawn in favor of
the plaintiffs.

### A. *Formation And Purpose Of The Museum
Partners And Musee Partnerships*

Edelman formed Museum Partners (or the "
Partnership") in 1996. Both Museum Partners and
Musee were formed as "special single purpose
investment vehicles," specifically to purchase
shares of Societe, a French conglomerate owning a
variety of companies from luxury hotels and
perfume and crystal manufacturers to a
money-management firm. Societe was and
continues to be controlled by the Taittinger family.
Edelman's plan was to combine the efforts of

Museum Partners, the onshore vehicle, and Musee,
the offshore vehicle, with two other
Edelman-controlled entities, together obtaining
enough voting and non-voting stock of Societe to
pressure the Taittingers to break up or restructure
the company and realize what Edelman believed to
be an exploitable disparity between Societe's stock
trading value and its break-up value.

*4 Museum Partners collected approximately $35.5
million in capital contributions. NorthStar
contributed $25 million of this amount, fully 70%
of the initial capitalization of the Partnership and
more than double the contributions of all other
limited partners combined. The relative size of
NorthStar's contribution was known to the other
limited partners; NorthStar was described to the
other limited partners as having the "
Majority-in-Interest" of the limited partners,[FN16] a
term defined in the LP Agreement as meaning that
NorthStar had contributed more then 50% of all
limited partner capital. [FN17] NorthStar's controlled
affiliate, Presidio, also invested in Musee, the
offshore vehicle.

FN16. *See, e.g.,* Ex. D.

FN17. *See* LP Agreement at § 14.2.

When formed, according to the terms of the LP
Agreement, Museum Partners was to continue
through June 30, 1998 with Edelman retaining the
right (which he exercised) to extend the Partnership
through December 31, 1998. Thereafter, the
Partnership could only be extended by agreement of
the general partner, Edelman, and the
Majority-in-Interest of the limited partners.[FN18]

FN18. There is no specific provision
relating to extension of the term of the
Partnership in the LP Agreement.
Presumably, extension was accomplished
via amendment of § 8.1(d) which sets the
date of dissolution at June 30, 1998. An
amendment of the LP Agreement, pursuant
to § 14.2, may be accomplished in a
writing signed by the general partner and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 6

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

by the Majority-in-Interest of the Limited Partners, that is "Limited Partners whose Capital Accounts constitute more then 50% of the aggregate value of the Capital Accounts of all Limited Partner[s]." LP Agreement at § 14.2.

### B. *The 1999-2000 Renewal Of Museum Partners*

On June 9, 1999, Edelman sent a letter to the limited partners urging them to continue to participate in the Partnership for another year. NorthStar had already agreed with Edelman to extend under the terms of the LP Agreement. Because NorthStar itself was the Majority-in-Interest limited partner, NorthStar's agreement with Edelman was sufficient to effect the extension; therefore the extension was presented to the other limited partners as a fait accompli.[FN19] In the letter, Edelman offered several positive comments on the state of Museum Partners' health and suggested, without promising, that the Partnership might soon realize profits based on the estimated 60% difference between Societe's trading price and its break-up value.

> FN19. Ex. D; *see* LP Agreement at § 14.2. The plaintiffs have alleged that NorthStar's agreement to extend the Partnership from 1999 to 2000 was accompanied by a side agreement between NorthStar and Edelman that has never been produced to plaintiffs despite repeated requests for its production. As disturbing as this allegation is, it does not salvage plaintiffs' claims because, as explained below, plaintiffs were aware of sufficient other facts to put them on inquiry notice before January 9, 2001. Similarly, the plaintiffs' recent submission relating to NorthStar's subscription agreement does not affect the timeliness of their claims. *See infra* note 73.

### C. *The Withdrawal of NorthStar And Presidio On February 10, 2000 And The Withdrawal Agreement Dated April 19, 2000*

The Complaint alleges that NorthStar effected its withdrawal on February 10, 2000, after it reviewed a financial report, allegedly prepared for its sole benefit and dated the same day, covering the period from January 1, 2000 to February 10, 2000.[FN20] The report showed that the Partnership had suffered substantial losses for the year.[FN21] Although it had agreed to extend the term of the Partnership through July 31, 2000, NorthStar demanded exit from Museum Partners on February 10, 2000. NorthStar premised its request for a withdrawal distribution on § 7.2 of the LP Agreement, which it read as authorizing its request to withdraw and as entitling it to receive the value of its interest in the Partnership, as of February 10, 2000, within 30 days of its request for withdrawal, i.e., by March 9, 2000.[FN22] Presidio made a comparable demand on Musee at the same time.

> FN20. Complaint at ¶ 33; Ex. G (financials, dated February 10, 2000, allegedly prepared for NorthStar's review).

> FN21. *See* Ex. G (showing that the Partnership had lost $7.8 million dollars for the year and, on the attached schedule, attributing all $7.8 million of that loss to the limited partners).

> FN22. *See* Ex. F. (referring to the withdrawal notice that NorthStar provided to Edelman on February 10, 2000 and claiming default).
> Section 7.2(b) of the LP Agreement provides, in relevant part:
> If the Partnership is continued after the Withdrawal Date, such Limited Partner shall be entitled to receive within 30 days thereafter, in accordance with this Section 7.2, the value of such Limited Partner's interest in the Partnership as of the applicable Withdrawal Date....

In the Complaint, the plaintiffs contend that NorthStar had no right to demand withdrawal from Museum Partners under the Partnership Agreement and that it breached the LP Agreement by doing so. Nevertheless, Edelman, as general partner,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 7

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

acknowledged that NorthStar had the right to withdraw and that NorthStar had a right to receive the distribution equal to its pro rata share of Museum Partners' liquidation value on March 9, 2001.[FN23]

> FN23. Section 7.2(c) of the LP Agreement provides, in relevant part:
> The value of a withdrawing Limited Partner's interest in the Partnership shall be that amount that the Limited Partner would have received had the Partnership been dissolved as of the Withdrawal Date, its debts and liabilities paid or provided for and its assets distributed in the order of priority set forth in Section 8.3. Such value shall be determined in the manner provided in Section 10.4.

**\*5** But Museum Partners and Musee did not have readily available currency to pay NorthStar and Presidio, presumably because their assets were tied up in pursuing their mutual goal of pressuring the Taittingers through block-holdings in Societe. In other words, if Museum Partners and Musee sold enough Societe shares to satisfy the demand for withdrawal, they would thereby lose much of whatever leverage they had to exercise over Societe. Additionally, the Societe shares could not be transferred directly to NorthStar or Presidio to pay the debt because transfers were prohibited by existing loan agreements between Museum Partners and Musee and Banque de Credit Agricole (Swiss) SA and Great American Insurance Company. To resolve this dilemma, Edelman entered into the Withdrawal Agreement with NorthStar and Presidio on behalf of Museum Partners and Musee on April 19, 2000.[FN24]

> FN24. The Withdrawal Agreement was later revised on October 25, 2000 to extend the Agreement's Outside Date, when all payments and additional distributions were due, from September 30, 2000 to December 31, 2000.

In the Withdrawal Agreement, Museum Partners

and Musee acknowledged that NorthStar and Presidio had the right to withdraw and that they were entitled to withdrawal distributions of $12,057,565 and $11,701,595 respectively. Museum Partners and Musee also agreed that they would pay NorthStar and Presidio an additional $250,000 for each 30 day period during which the distributions had not been paid. This new debt, the " Additional Distribution Amount", would also accrue interest at 8% per annum, compounded monthly, until it was paid. The Withdrawal Agreement also provided an upside for NorthStar and Presidio by entitling them to an increased payment if the value of the Societe shares held by the partnerships increased before they were paid, while guaranteeing that they would not receive less than their original claims for distributions, plus the Additional Distribution Amounts. Thus, under the Withdrawal Agreement, NorthStar and Presidio retained the upside benefits of limited partner status while mitigating much, if not all, of the downside risk.

The Withdrawal Agreement also gave NorthStar and Presidio absolute priority in recovery of their capital, as against other limited partners (i.e., the plaintiffs) who might later withdraw. The provision suggests that before Museum could pay any other Museum Partners limited partner, Museum Partners first had to pay off its entire debt to NorthStar *and* Musee had to pay off its entire debt to Presidio.

### D. *The Limited Partners Receive Unaudited Partnership Financials For The Period Ending March 31, 2000*

At about the same time that Edelman and NorthStar (and Presidio) were negotiating the Withdrawal Agreement in April 2000, the Limited Partners received unaudited financial statements for the Partnership for the period beginning January 1, 2000 and ending March 31, 2000. The March 2000 financials, for the first time, split the schedule listing Partnership interests into two intra-period schedules, a pre-February 10, 2000 schedule dealing with the period January 1, 2000 through February 10, 2000 (or "March Schedule 1"), and a post-February 10, 2000 schedule dealing with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 8

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

period February 11, 2000 through March 31, 2000 (or "March Schedule 2").[FN25] Importantly, March Schedule 1 appears to show the exactly the same financial information that was depicted in the February 10, 2000 financials that were allegedly provided only to NorthStar.[FN26]

> FN25. Ex. I.

> FN26. *Compare* Ex. G at 3 (financials allegedly prepared exclusively for NorthStar), *with* Ex. I at 3 (March 31, 2000 financials distributed to the limited partners). It should be noted that March Schedule 1 embodies the same information that the plaintiffs allege was disclosed only to NorthStar in the February 10, 2000 financials, including the negative $7,772,766 attributable as a loss to partner capital in column 6, P & L ALLOC. *Compare* Ex. G at 3 of 3 (financials allegedly prepared exclusively for NorthStar on February 10, 2000), *with* Ex. I at 3 of 4 (March Schedule 1, distributed to the limited partners). The names of the limited partners have been removed in Exhibit I, but the financial information is identical.

*6 Taken together, March Schedules 1 and 2 show the reduction of four capital accounts, totaling $25 million of initial contribution, to zero. [FN27] The plaintiffs have conceded that a rational investor, upon receiving these schedules, would have concluded that NorthStar had withdrawn. [FN28] The reason why that is so obvious is because the $12,057,565 withdrawal shown on March Schedule 2 represented the departure of 66% of Museum Partners' $18,370,157 capital as of February 11, 2000-a diminution that could only have been attributable to the withdrawal of the limited partner holding over a majority of the units, NorthStar.

> FN27. *Id.*

> FN28. Pl. Rep. Br. at 27; *see also* Tr. of Oral Argument at 47-48, 99.

But the plaintiffs note that March Schedule 2 also shows $4.1 million in allocated profit and results in a balance sheet for the entire period that shows $10.4 million remaining in the Partnership's capital accounts.[FN29] The plaintiffs contend that this balance sheet fraudulently inflated the value of the Partnership, and moreover, falsely reported that NorthStar had received its $12.1 million upon withdrawal. For Pomeranz, for example, this allegedly inflated result implied that his initial investment of $250,000, worth $302,692 on January 1, 2000, was worth $338,267 on March 31, 2000. In the big picture, the March Schedules suggest that even though the Partnership had only $18.4 million in capital when NorthStar withdrew its $12.1 million in February, somehow the remaining capital had increased between February 10, 2000 and March 31, 2000, a period of about seven weeks, from $6.3 million ($18.370 million-$12.058 million = $6.312 million) on February 11, 2000 to $10.4 million on March 31, 2000.[FN30]

> FN29. Ex. I.

> FN30. *Id.* One wonders if, upon receiving the March Schedules, the plaintiffs speculated that NorthStar had exited at precisely the *wrong* moment, that is, just before the Partnership's $6.3 million became $10.4 million, a 65% return in seven weeks.

In sum, the plaintiffs essentially concede that they were on notice as of April 2000 of NorthStar's withdrawal. Although they premise a claim explicitly on the contention that the withdrawal was, in itself, a breach of the LP Agreement, the plaintiffs argue that this violation of their contractual rights did not matter to them then because they were told by Edelman that the overall condition of Museum Partners was healthy.

### E. *The 2000-2001 Renewal Of Museum Partners*

On June 9, 2000, Edelman wrote to the limited partners seeking another extension of Museum Partners. In that letter, Edelman failed to disclose:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

1) that the $12.1 million represented in the March Schedules as a withdrawal had not in fact been paid; 2) that the Withdrawal Agreement had been reached and the material terms of that Agreement; 3) that, in particular, substantial interest penalties under the terms of that Agreement were continuing to accrue; and 4) that the Withdrawal Agreement was executed because Museum Partners could not afford to pay NorthStar. Instead, Edelman stressed (or invented) the positive and told the limited partners that their investments had increased in value and that Edelman had confidence that the Partnership's strategy would triumph within the year.

In one respect, the June 2000 letter differed materially from its 1999 counterpart. In June 1999, Edelman had informed the other limited partners that NorthStar had chosen, with him, to extend the life of Museum Partners for another year. In contrast, the June 2000 letter clearly makes renewal of the Partnership contingent on the agreement of the limited partners and does not mention NorthStar. [FN31] By making the renewal of the Partnership contingent upon plaintiffs' consent, the letter signaled that NorthStar's dominant position had changed from the year before.

> FN31. Ex. K ("In order to move forward, I must once again ask you to extend the partnership from its June 30[th] expiration date for another year.... I am asking you to sign the enclosed document so that we can affect [sic] the extension of the partnership.").

*7 Based on the disclosures that the other limited partners had received, several of them, including plaintiffs, voted in June of 2000 to extend the life of Museum Partners for another year. Unbeknownst to those limited partners voting to extend, seven other limited partners chose at that time to withdraw, and were paid the value of their capital accounts as of July 1, 2000.

F. *Disclosures Following The Vote To Extend Through Year End 2000*

Although not attached to the Complaint, the June 2000 financials apparently reaffirmed the impression of vitality suggested by the March Schedules. [FN32] The September 30, 2000 financials, however, were considerably less upbeat. The $10.4 million in assumed ending capital in March 2000, which reportedly had grown to $15.3 million by the end of June, fell drastically to $8.9 million in September, while allocated profits and losses showed a $6.4 million loss for the period. Overall, the Partnership balance sheet reflected a net loss of $5.1 million. The financials still did not reflect the growing debt owed to NorthStar, nor did they reflect the withdrawal of the seven limited partners at the end of June, 2000. What they did show, however, according to the Complaint, was that "the Partnership's allocated profits [had] been *devalued by $15.4 million since June 30, 2000.*" [FN33]

> FN32. Ex. L (suggesting that Partnership capital at the end of June was in excess of $15 million).

> FN33. Complaint at ¶ 42 (emphasis in the original).

G. *2001-NorthStar Finally Gets Paid; The Partnership Restates Its June 2000 Financials To Report the Payment To NorthStar; and The Plaintiffs Finally Learn About and Obtain A Copy Of The Withdrawal Agreement*

On or about January 14, 2001, NorthStar was finally paid the $12,057,565 that it was allegedly entitled to receive as of March 9, 2000 under the LP Agreement and that, by virtue of the Withdrawal Agreement, Museum Partners had promised to pay. Together with this sum, NorthStar received $1,296,109 as an Additional Distribution Amount, and $2,615,630.86 as a result of the upside protection provided by the Withdrawal Agreement; together, these additional payments totaled $3,911,739.86.[FN34]

> FN34. Complaint at ¶¶ 27-28, 44.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

In March 2001, following an audit for the year 2000 (and the payment of almost $16 million in total to NorthStar), Museum Partners restated its June 30, 2000 financials to show, for the first time, the payment to NorthStar, with penalties, and to reduce allocated profit by $3 million, as of February 11, 2000, as a "realized loss on securities" to "account for the withdrawal and escrow established with the securities used to pay out NorthStar." [FN35]

FN35. Complaint at ¶ 53.

Upon receiving the restated financials, the plaintiffs begin demanding copies of all agreements surrounding NorthStar's withdrawal from the Partnership, including the Withdrawal Agreement. The plaintiffs obtained a copy of the Withdrawal Agreement on July 11, 2001.

In the meantime, Museum Partners' strategy to pressure Societe disintegrated. All of the Societe shares were sold, leaving Museum Partners as a mere vehicle for litigation between the Partnership and Societe. According to the plaintiffs, they have been left holding the bag for the departing limited partners and have received, on a per unit basis, a mere pittance compared to the value received by NorthStar.

### H. *The Plaintiffs File Suit In This Court*

**\*8** Nearly two years after securing a copy of the Withdrawal Agreement, the plaintiffs filed their original complaint in this action on March 26, 2003. In that complaint, the plaintiffs accused Edelman of exceeding his authority in agreeing to a Withdrawal Agreement that directly violated the LP Agreement in several respects. But in that initial complaint, the plaintiffs did not name NorthStar and Presidio as defendants. Moreover, despite being dissatisfied with Museum Partners' response to their informal requests for information, the plaintiffs waited until September 23, 2002 to formally demand to inspect the books and records of the Partnership. Unsatisfied with Edelman's response to that demand, the plaintiffs pursued a books and records action in this court, filed January 21, 2003. The

plaintiffs received the fruits of that litigation on February 11, 2003 but waited until January 9, 2004 to amend their complaint and to plead claims for the first time against NorthStar and Presidio.

### III. *LEGAL ANALYSIS*

#### A. *The Accrual of The Plaintiffs' Claims*

To determine when the plaintiffs had inquiry notice of their claims, it is necessary to briefly identify the nature of those claims. The plaintiffs allege that NorthStar breached the LP Agreement by demanding to withdraw when the LP Agreement denied them that right, and also by securing certain contractual benefits through the Withdrawal Agreement that conflict with LP Agreement provisions. By participating in this course of conduct, Presidio is alleged to have tortiously interfered with the LP Agreement. Alternatively, NorthStar and Presidio are alleged to have been unjustly enriched by receiving excessive payments under the Withdrawal Agreement.

Relatedly, the plaintiffs argue that by demanding withdrawal and securing the Withdrawal Agreement, NorthStar either breached the fiduciary duties that it owed to plaintiffs (supposedly because it owned a majority of the limited partner units) or aided and abetted Edelman's breaches of fiduciary duty. Presidio is also alleged to have aided and abetted breaches of fiduciary duty. In these respects, it is alleged that NorthStar and Presidio had access to financial information other limited partners did not and sought an excessive withdrawal payment.

As to all these claims, it is clear that the plaintiffs contend that the execution of the Withdrawal Agreement caused them injury and constituted a breach of contract, tortious interference with contract, a breach of fiduciary duty or aiding and abetting a breach of fiduciary duty, and unjust enrichment. Absent their ability to prove that the Withdrawal Agreement is invalid on some legal or equitable basis, the plaintiffs have no grounds to challenge any later payments made in accordance with that Agreement. In other words, the plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

claims accrued on April 19, 2000, the date that the allegedly wrongful Withdrawal Agreement was executed, and an argument can be made that some of their claims accrued earlier, on February 10, 2000, at the time of NorthStar's allegedly improper withdrawal.

*9 I so conclude even if § 17-607 of DRULPA applies to the plaintiffs' claims. That statute provides in pertinent part that:
[u]nless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of distribution.[FN36]

> FN36. 6 *Del. C.* § 17-607(c).

The plaintiffs argue that § 17-607 applies and that the January 9, 2004 Complaint is timely (albeit barely) because NorthStar did not receive the payments provided for in the Withdrawal Agreement until January 14, 2001. These payments, they allege, are distributions for purposes of § 17-607. By contrast, NorthStar contends that, to the extent that § 17-607 applies, it received its " distribution" on April 19, 2000 when the Withdrawal Agreement was executed.

Candidly, the briefing addressing the scope of § 17-607's applicability was sparse and the relevant commentators [FN37] provide little insight into how broadly that section's sweep should be in situations like this one. Fortunately, however, the breadth of § 17-607's applicability is not important for this opinion because I conclude that it is inapplicable on the facts presented in this case or, if applicable, does not affect the question of whether the plaintiffs claims are time-barred.

> FN37. *E.g.,* Martin I. Lubaroff & Paul M. Altman, *Lubaroff and Altman on Delaware Limited Partnerships,* § 6.7 (2004).

Rather than receiving a distribution in strict accordance with § 17-607 of the LP Agreement, NorthStar accepted in compromise a new set of rights, articulated in the Withdrawal Agreement. That the Withdrawal Agreement required Museum Partners, as part of its total obligations to NorthStar, to make a payment equal to NorthStar's calculation of its distributional entitlement under the LP Agreement and subject to § 17-607, does not alter the fact that NorthStar had accepted a new contractual form of consideration, in lieu of payment under the LP Agreement on the date due. As a result, I conclude that § 17-607 does not apply; instead the plaintiffs are challenging the validity of a payment under a contract with a party that had become a creditor by virtue of that agreement.

Even if § 17-607 applies, I would conclude that the three year period began to run on the date the Withdrawal Agreement was originally signed, at the latest.[FN38] The "distribution" would have to be deemed the Withdrawal Agreement itself, which was the payment that Museum Partners made to NorthStar in response to its demand to withdrawal. In this regard, I perceive nothing in § 17-607 that suggests an intention to permit a plaintiff, who claims that a limited partner's demand for withdrawal was a per se breach of the LP Agreement and that the contract compromising that demand for payment was invalid, to sit on its rights until payments under that supposedly invalid contract are actually made.

> FN38. An argument can also be made that it ran from March 9, 2000, when NorthStar was arguably due its withdrawal payment under § 7.2(c) of the LP Agreement.

For all these reasons, I conclude that the determinative question on this motion, as to all claims, is whether the plaintiffs were on inquiry notice before January 9, 2001.[FN39] I answer that question next.

> FN39. The defendants have not argued that the statute of limitations established under 6 *Del. C.* § 17-607(c) cannot be subject to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

equitable tolling and nothing in this opinion should be read as a holding on that question. Based on the lack of arguments to this effect, I therefore assume, without deciding, that § 17-607(c) of DRULPA may be tolled when appropriate under the Delaware jurisprudence developed under other statutes of limitations.

### B. *When Were The Plaintiffs On Inquiry Notice?*

**\*10**  The plaintiffs assert that the information required to bring the Complaint was withheld from them and invoke principles of equitable tolling in support of the timeliness of their action.[FN40] In particular, they contend that they relied on Edelman as a fiduciary to provide them with the material facts about the status of Museum Partners and that his non-disclosures of key facts, such as the execution and terms of the Withdrawal Agreement, tolled the running of the limitation periods for their claims. By contrast, NorthStar and Presidio contend that the plaintiffs were on inquiry notice as to their claims as early as April 2000 and no later than October 2000.[FN41] For the following reasons, I conclude that the defendants have the better of the argument.

> FN40. Pl. Br. at 24-27; *see* Eberle Affidavit at ¶ 7 (alleging that plaintiffs did not know of Presidio until production of the Withdrawal Agreement on July 11, 2001).

> FN41. Def. Br. at 16-17; *see Merck & Co. v. SmithKline Beecham Pharms. Co.,* 1999 WL 669354 (Del. Ch. Aug. 5, 1999).

### 1. *Plaintiffs Were On Inquiry Notice Of NorthStar's Purported Withdrawal In April 2000*

In support of their contention that the plaintiffs received inquiry notice in April 2000, NorthStar and Presidio point to the March Schedules sent to the plaintiffs that month. As noted, in those statements, there is a breakdown of the partners' capital into two intra-period schedules, one covering January 1, 2000 through February 10,

2000 (i.e., March Schedule 1) and a second covering February 11, 2000 through March 31, 2000 (i.e., March Schedule 2). This breakdown, the defendants quite rationally contend, indicates that an important event occurred on that date. March Schedule 2 shows that four unitholders, representing investors who had made $25 million in initial contributions, were removing the $12.1 million remaining in their capital accounts, and reducing the value of their capital accounts to zero. [FN42]

> FN42. Ex. I at 4.

No matter how the plaintiffs slice this information, it reveals that a withdrawal had occurred that was extremely large relative to the size of Museum Partners. First, March Schedule 2 clearly reports that the total capital of the Partnership dropped 66% on February 11, when the capital of $18,370,157 was reduced by a $12,057,565 withdrawal to a mere $6,312,592.[FN43] And, of course, the plaintiffs have alleged in their Complaint that such a withdrawal was a per se breach of the LP Agreement.[FN44] The plaintiffs attempt to slight the significant of the withdrawal's size by contending that they were lulled by the healthy profits recorded on March Schedule 2. But even taking into account the allegedly misleading allocation of $4.1 million in profits shown on March Schedule 2, the plaintiffs cannot avoid the conclusion that the March Schedules still should have raised their eyebrows regarding what was happening to the financial strength of the Partnership. Taken together, the March Schedules depicted the Partnership reporting an aggregate allocated loss of $3,663,876 for the period January 1, 2000 through March 31, 2000. [FN45] During this same period, the Partnership's assumed capital fell for the total period from $26,342,923 to $10,421,482. That represented a diminution of 60% in the Partnership's capital.[FN46]

> FN43. *Id.*

> FN44. Complaint at ¶¶ 26, 91. These portions of the Complaint were added when the original complaint was amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

to name NorthStar and Presidio as defendants. The original complaint alleges a similar theory: that NorthStar and Presidio demanded withdrawal without having any right to do so, that Edelman exceeded his authority in agreeing to the Withdrawal Agreement, and that the Withdrawal Agreement directly violated the LP Agreement for various reasons, including that NorthStar: 1) demanded more than its liquidation value in its calculation of its withdrawal distribution; 2) secured an entitlement to receive excessive payments on top of that allegedly excessive withdrawal distribution; and 3) secured unfair priority for itself and Presidio over other limited partners.

FN45. This loss for the entire period is derived by adding the $4,108,890 of reported allocated profit on March Schedule 2 to the initial allocated loss for the period of $7,772,766 reported on March Schedule 1.

FN46. Ex. I.

*11 A rational limited partner investor in a single purpose entity, where the goal is to bring pressure on another company to force its management to negotiate with your entity, should have suspected that the loss of 60% of the Partnership's available capital very well might endanger that business strategy. Why? The reason is obvious: the strategy was premised on having a large block of Societe shares to exert pressure on the Taittinger family. Less capital leads to owning fewer shares which, in turn, leads to less pressure which thus calls the whole strategy into question. The plaintiffs, as rational investors, should have begun asking questions.

Critically, at oral argument, their counsel candidly admitted that the plaintiffs were on inquiry notice as of April 2000 of the fact that NorthStar was the limited partner that had withdrawn:

THE COURT: But when your clients got this thing [the March 31, 2000 financials], they might have

known that somebody large withdrew.
[PLAINTIFFS' COUNSEL]: That's correct, Your Honor. They did know. I mean, I can't argue that looking at this, you don't know it's NorthStar.
THE COURT: But what you are saying is you get-you are assuming that NorthStar has been paid.
[PLAINTIFFS' COUNSEL]: Correct.[FN47]

> FN47. Tr. of Oral Argument at 47-48; *see also* Pl. Br. at 27 ("Plaintiffs might have deduced during 2000 that the withdrawing limited partner was NorthStar....").

So the plaintiffs knew, sometime in 2000 and as early as April of 2000 not only that someone had wi thdrawn, but that NorthStar had withdrawn, allegedly in breach of the LP Agreement.

Thus, at least with respect to this particular breach of contract claim, plaintiffs were on inquiry notice, upon receiving the March 31, 2000 Schedules in April 2000, that NorthStar had breached the LP agreement and should have suspected that the breach, because of the sheer size of the withdrawal, would jeopardize the Partnership's ability to pressure the Taittinger family and realize the break-up value of Societe, the stated purpose of the Partnership. For rational investors, this in and of itself is probably enough "that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to discovery of the injury." [FN48] But this is not the only indication that plaintiff had of NorthStar's withdrawal in breach of the LP Agreement or the harm that arose as a result.

> FN48. *Dean Witter,* 1998 WL 442456, at *7 (emphasis in original).

### 2. The Renewal Letter In June 2000 Also Implied That NorthStar Had Withdrawn

In contrast to the 1999 extension letter informing the limited partners that NorthStar and Edelman had decided to extend the Partnership, the 2000 extension letter made extension contingent upon the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
(Cite as: Not Reported in A.2d)

limited partners' agreement to extend and never mentioned NorthStar.[FN49] If NorthStar had retained its Majority-in-Interest position, the Partnership could only be extended by and with its consent-the other limited partners' agreement was irrelevant. The absence of any mention of NorthStar sharply contrasted with the prior year's notice and constituted further inquiry notice of NorthStar's withdrawal. [FN50]

> FN49. *Compare* Ex. D, *with* Ex. K.

> FN50. Recall that seven partners chose not to extend their interest in the Partnership in June 2000, and received the value of their interest as of that time.

*3. The Bleaker Picture Of The Partnership's Financial Condition Reported In October 2000, Should Have Prompted Inquiry By The Plaintiffs*

**\*12** Having conceded that inquiry notice of NorthStar's withdrawal existed as early as April 2000, the plaintiffs have attempted to change the focus of their argument to emphasize that although they had inquiry notice of their claims that NorthStar's demand to withdraw, and Edelman's acceptance of that demand, were improper under the LP Agreement and under fiduciary principles, they were lulled into believing that Museum Partners was thriving irrespective of the departure of its largest unitholder and that the pressure strategy would succeed despite a drastic reduction in the Partnership's capital. As a result, the plaintiffs were supposedly excused from acting upon their claim that NorthStar's withdrawal was a per se breach of the LP Agreement, on the basis of a novel "no harm, no foul" exception to the statute of limitations.

The problems with their argument are several. First of all, their argument rests on the dubious proposition that a plaintiff can know of causes of action that she thereafter asserts but argue that the statute was tolled until she understood the economic impact that the wrongful acts had caused her. That is, as to the plaintiffs' claim that NorthStar's demand for withdrawal, and Edelman's acknowledgement of

the validity of that demand, breached the LP Agreement, the plaintiff is arguing that inquiry notice does not run until it had notice of the full economic impact of the wrong. That is not the law-" having all the facts necessary to articulate the wrong is not required." [FN51]

> FN51. *In re Dean Witter Partnership Litigation,* 1998 WL 442456, at *7 n. 49 (the " 'statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme.' ... It may have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required.") (*citing McCoy v. Goldberg,* 748 F.Supp. 146, 158 (S.D.N.Y.1990) (emphasis in original).

The plaintiffs, even if they relied on a fiduciary, only receive the benefit of tolling until they "had reason to know that a wrong has been committed." [FN52] Here plaintiffs believed that NorthStar had breached the LP agreement by withdrawing. As our Supreme Court expressly held in an analogous case, the "doctrine of equitable tolling does not apply [when plaintiffs] had reason to know of the breach of the Agreement." [FN53]

> FN52. *Id.* at *5.

> FN53. *United States Cellular,* 677 A.2d at 503.

Contrary to the plaintiffs' assertion here, they may not simply wait until the details of the harm are provided to them before the statute begins to run. [FN54] Knowing of a wrong is sufficient to require action to preserve one's rights.[FN55] Delaware law expects some initiative from plaintiffs, even those who rely on fiduciaries.[FN56]

> FN54. *Dean Witter,* 1998 WL 442456, at *7 ("Inquiry notice does *not* require *actual* discovery of the reason for the injury.") (emphasis in original).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN55. *In re USACafes, L.P. Litig.,* 1993 WL 18769, at *6 (Del. Ch. Jan. 21, 1993) ( "when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights. ").

FN56. *See Adams v. Jankouskas,* 452 A.2d 148, 157 (Del.1982) ( "Equity aids the vigilant, not those who slumber on their rights.").

Second, and as important, the Complaint itself indicates that the plaintiffs were on inquiry notice as to the economic impact of NorthStar's demand for withdrawal no later than October 2000 when they received the September 30, 2000 financials which provided a striking contrast to the comparatively sunnier, earlier disclosures. According to the plaintiffs, the September financials depicted that " the Partnership's allocated profits [had] been *devalued by $15,397,107 since June 30, 2000.* " FN57

FN57. Complaint at ¶ 42 (emphasis in the original). I must confess that I cannot follow the plaintiffs' math on this particular point. As I read the financials, the assumed ending capital of the limited partners was reportedly $10.4 million at the end of March (Ex. I), $15.3 million at the end of June, and $8.9 million at the end of September (Ex. L). This implies a $6.4 million loss for the period of June 30-September 30, 2000. *Id.* Such a loss, approximately 42% in three months, is certainly material, but, as far as I can tell, not on the order of magnitude of a $15.4 million devaluation. In any event, the message that the September financials gave, and that plaintiffs received at the time, was exceptionally negative, and that alone is sufficient to support the conclusion that they were on inquiry notice.

Now, it is of course true that the plaintiffs argue that the September financials did not constitute adequate notice of the impact of NorthStar's withdrawal

because those financials attributed the devaluation to events post-dating the withdrawal indicated in the March financials. According to the plaintiffs, they did not receive inquiry notice until at least March 2001 because the causal link had not been provided to them. In March 2001, the Partnership: 1) restated its results for the quarter ending on June 30, 2000; 2) showed, for the first time, the nearly $16 million that NorthStar actually received in January 2001, pursuant to the Withdrawal Agreement; and 3) revealed the fact that NorthStar had not, in fact, been paid roughly $12.1 million in February of 2000 as the earlier financials had implied. It was only then that the plaintiffs supposedly realized that the downward shift in the Partnership's fortunes had anything to do with NorthStar's withdrawal. Moreover, it was only at that time that they were aware of the need to track down the Withdrawal Agreement itself, the document that gave them notice of Presidio's role.

**\*13** The difficulty for the plaintiffs is that their argument depends on the premise that inquiry notice only exists once they were aware of all material facts relevant to their claims. That is not the case. Equitable exceptions to statutes of limitations are narrow and designed to prevent injustice.FN58 Once a plaintiff is on notice of facts that ought to make her suspect wrongdoing, she is obliged to diligently investigate and to file within the limitations period as measured from that time. FN59

FN58. *Ambase Corp. v. City Investing Co.,* 2001 WL 167698, at *6 (Del. Ch. Feb. 7, 2001) ("Equitable tolling doctrines are an exception to the normal rule, and should not be lightly invoked."); *see also United States v. All Funds Distributed To Weiss,* 345 F.3d 49, 54-55 (2d Cir.2003) (equitable tolling is a narrow exception reserved for extraordinary situations in order to prevent injustice); *Olson v. Mobil Oil Co.,* 904 F.2d 198, 201 (4th Cir.1990) ( "Equitable tolling is a narrow limitations exception, however. Courts cannot countenance ad hoc litigation for every missed deadline. The repose that statutes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

of limitations provide will be lost if their applicability is up for grabs in every case." ) (quotations omitted).

FN59. *E.g., Dean Witter,* 1998 WL 442456, at *8 (" '[W]hen facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.' ... It is not too much to ask investors ... to read past the rosy forecasts and actually look at the cold, hard figures provided to them.... [The contradiction between the two] should prompt[ ] an inquiry by plaintiff into the health of their investments ") (citing *In re USACafes,* 1993 WL 18769, at *6); *see also Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990) ( "Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies.... We have generally been much less forgiving ... where the claimant failed to exercise due diligence in preserving his legal rights."); *Johnson v. Nyack Hospital,* 86 F .3d 8, 12 (2d Cir.1996) (affirming that plaintiffs' claims were time barred when plaintiffs' delay was "excessive and occasioned by plaintiffs' lack of diligence").

Although the plaintiffs have, as a pleading matter, demonstrated that Edelman did not disclose all the material facts that he should have in 2000, their own complaint demonstrates that, no later than the beginning of October 2000, they were on inquiry notice that NorthStar had purportedly withdrawn, that the withdrawal substantially reduced the capital of the Partnership, and that the Partnership's value had plummeted for no apparent reason as of September 2000. Given that Societe shares were publicly traded and the complaint does not allege that their per share value had decreased, a rational investor should have been suspicious that the reported withdrawal of 66% of the Partnership's capital in mid-February 2000-or over $12 million-had injured the Partnership.

Indeed, the Complaint itself makes this very assertion:

Instead, at the time of extension [June 2000], Plaintiffs believed, based on explicit representations by defendant Edelman, that their investments in the Partnership had appreciated. It was not until the end of September 2000, however, that Plaintiffs were first alerted to the fact that even as of Spring 2000, when they decided to extend the Partnership, their interests were worth significantly less than what was reported to them contemporaneously (at the time they made the decision to extend the Partnership), and that they had borne the draconian financial burden of the Withdrawal Agreement.

Recognizing that by its plain terms, the Complaint admits knowledge of the Withdrawal Agreement as of the end of September 2000,[FN60] one of the plaintiffs' lawyers filed an affidavit taking back this statement and indicating that although plaintiffs knew of the financial straits of the Partnership in early October, they did not know of the link between this financial collapse and NorthStar's withdrawal until it was revealed to them in March 2001. Unfortunately for plaintiffs the fact that they did not know, in these circumstances, only highlights the fact that they did not ask, either about the allegedly improper withdrawal or the inexplicable reversal of the Partnership's fortunes-and, as rational investors, they should have.

> FN60. I assume that the reference to the " end of September 2000" refers a receipt of the information contained in the September 30, 2000 financials, therefore while the plaintiffs may have been alerted by the Partnership at the end of September, they would not have been on notice of this information until they received it, sometime in October of 2000.

Although I am willing to decide this motion on the basis that the plaintiffs did not become aware of the Withdrawal Agreement until March 2001, the Complaint was not inaccurate about the plaintiffs' understanding, as of early October 2000, of the Partnership's decidedly bleaker financial status. Rather, paragraph 37 of the Complaint is properly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 17

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

read as an acknowledgement of the importance of the September financials and their obvious provision of inquiry notice. The dramatic devaluation and losses reported in the September financials provided reason to suspect that the huge withdrawal reported in the March 2000 financials had harmed the Partnership. At the very least, the September financials ought to have raised plaintiffs' suspicions, and this is all that is required for inquiry notice. "Once a plaintiff is in possession of facts that make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." FN61

> FN61. *See Dean Witter,* 1998 WL 442456, at *7 n. 49 (quoting *Harner v. Prudential Sec. Inc.,* 785 F.Supp. 626, 633 (E.D.Mich.1992), *aff'd,* 35 F.3d 565 (6th Cir.1994)).

**\*14** Nor does the fact that Edelman was a fiduciary excuse the plaintiffs' torpor. Although reliance on fiduciaries may toll the statute of limitations in appropriate circumstances, "the trusting plaintiff must still be reasonably attentive to his interest." FN62 Plaintiffs must remain alert to red-flags that should prompt "an inquiry by plaintiffs into the health of their investments" even when those red-flags are "accompanied by optimistic projections." FN63 Here, the plaintiffs were on inquiry notice of the per se breach of the LP Agreement represented by the withdrawal, the massive size of the withdrawal in relation to the value of the Partnership as a whole, the difficulty of achieving the Partnership's goals if the size of its Societe holdings had to be downsized by at least 60% as implied by the March Schedules, and of the possible relation between that withdrawal and the drastic and unexplained reduction of the Partnership's value as reported by Edelman in the September financials. However distorting Edelman's prior words might have been, by October 2000, it was unreasonable for the plaintiffs to ignore the obvious warnings because, by that time, Edelman's previous optimism, standing in stark contradiction to the bleak financial reality, should have, if anything, deepened, and not dampened, their suspicions.

> FN62. *Dean Witter,* 1998 WL 442456, at *8.

> FN63. *Id.* at *8-9; *see also Fike,* 754 A.2d at 262 ("[Plaintiff], however trusting he may have been that his partners would act in good faith, had some obligation to be ' reasonably attentive' to his investment interests.") (citations omitted).

In so ruling, I necessarily reject the plaintiffs' untenable suggestion that they were not "actually" on inquiry notice until they acquired the Withdrawal Agreement itself.FN64 Only at that time, say the plaintiffs, were they aware of the precise terms of that Agreement, including the formula for determining the payout to NorthStar, and the provisions giving NorthStar a priority position over other limited partners, not only for itself, but also for its affiliate Presidio, which was not even a limited partner in Museum Partners.FN65 But to credit plaintiffs' argument would subvert the concept of inquiry notice, by providing a ready excuse for untimely filing whenever a plaintiff was not aware of all material facts relating to its claims, not only as to their possible existence, but as to the extent of the harm they caused.

> FN64. Pl. Br. 26 n. 12.

> FN65. Pl. Br. 27.

Our law, as was well described by Chancellor Chandler in *In re Dean Witter Partnership Litig.,* sharply contrasts with the views advocated by the plaintiffs:

[T]he limitations period is tolled until such time that persons of average intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to discovery of the injury. Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all aspects of the alleged wrongful conduct. Rather the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.FN66

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

> FN66. *Dean Witter,* 1998 WL 442456, at *7 (emphasis in original) (citations omitted).

Likewise, our Supreme Court has aptly stated that " whatever is notice calling for inquiry is notice of everything to which such inquiry might have led," [FN67] including, in this case, the causal link between NorthStar's withdrawal and the consequent damage to the Partnership.

> FN67. *United States Cellular,* 677 A.2d at 504 n. 7 (citing with approval *Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del. Ch.1993), and its adoption of the federal standard from *Tobacco and Allied Stocks, Inc. v. Transamerica Corp.,* 143 F.Supp. 323, 328-29 (D.Del.1956)).

**\*15** In deciding this case, the relatively generous approach our state has taken to tolling doctrines must be borne in mind. In general, Delaware law does not begin the running of the statute of limitations at all when a tolling doctrine applies-even one not involving any fraudulent concealment-until the plaintiff is on inquiry notice, giving the plaintiff the full limitations period to file after receiving that notice.[FN68] Arguably, it would be more faithful to the statutory intent behind statutes of limitations for Delaware common law to permit plaintiffs to rely upon tolling exceptions only when inquiry notice of their claims was either received at a time too close to the expiration of the limitations period to reasonably expect a timely filing or after the limitations period had already. expired. Even in those circumstances, the statute should arguably be tolled only for a period reasonably necessary to enable the filing of a complaint.[FN69]

> FN68. *E.g., Dean Witter,* 1998 WL 442456, at *5-7.

> FN69. In the case of equitable tolling, Judge Posner of the Seventh Circuit has expressed support for an approach of that kind, stating:

> > We do not think equitable tolling should bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term. It is, after all, an equitable doctrine. It gives the plaintiff extra time, if he needs it. If he doesn't need it, there is no reason for depriving the defendants of the protection of the statute of limitations. Statutes of limitation are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy and repose... . When as here the necessary information is gathered after the claim arose but before the statute of limitations has run, the presumption should be that the plaintiff could bring the suit within the statutory period and should have done so. The presumption will be more easily rebuttable the nearer the date of obtaining the information is to the date at which the statutory period runs out.
> > *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 452-53 (7th Cir.1990), *cert. den'd,* 501 U.S. 1261 (1991).

Given the generosity of our approach to equitable tolling-which gives the plaintiff the full measure of the limitations period running from the date when inquiry notice was first received [FN70]-our courts should be careful to apply the concept of inquiry notice as Chancellor Chandler did in *Dean Witter* [FN71] and expect plaintiffs to act with reasonable alacrity once they have reason to suspect that their rights were injured. By any reasonable measure, the plaintiffs' antenna should have been raised no later than October 2000.[FN72] They had a full three years after that to file suit against NorthStar and Presidio and failed to do so. By acting too slowly, the plaintiffs, by tactical choice, forfeited their right to seek relief from NorthStar and Presidio and must look for relief only against Edelman and the other defendants they sued with the required promptness.

> FN70. *E.g., Dean Witter,* 1998 WL 442456, at *5-7.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN71. *See generally Dean Witter,* 1998 WL 442456, *passim.*

FN72. The plaintiffs concede that they received a copy of the Withdrawal Agreement in July 2001 but waited over two years after that to sue NorthStar and Presidio. By contrast, in the *Cada* case cited in note 69, Judge Posner found that the plaintiff had the necessary information to bring suit eight months before the end of the statutory period and affirmed a finding that his claims were time-barred.

### IV. *Conclusion*

For all the foregoing reasons, I find that all of the plaintiffs' claims against NorthStar and Presidio are time-barred and therefore grant the motion to dismiss the claims against them.[FN73]

FN73. A week or so ago, the plaintiffs wrote a letter alerting the court to the existence of a subscription agreement between Museum Partners and NorthStar that purportedly gave NorthStar the right to withdraw at any time. The plaintiffs, however, had expressly agreed not to use ongoing discovery in connection with this motion, the briefing for which was completed. Thus, I conclude that the plaintiffs should not have submitted this document and do not consider it. As important, by their own arguments, the plaintiffs adhere to the view that, irrespective of the document, NorthStar had no right to withdraw. Therefore, the emergence of this document does nothing to undermine the conclusion that, as to their claim that the withdrawal was a per se breach of the LP Agreement and as to their related claims concerning the circumstances of NorthStar's withdrawal, plaintiffs were on inquiry notice no later than October 2000.

IT IS SO ORDERED.

Del.Ch.,2005.
Pomeranz v. Museum Partners, L.P.
Not Reported in A.2d, 2005 WL 217039 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3



Not Reported in A.2d                                                          Page 1

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

**H**
Rudnitsky v. RudnitskyDel.Ch.,2000.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Claire G. RUDNITSKY and C.M.S. Associates, a
general partnership of the State of Delaware,
Plaintiffs,
v.
Steven H. RUDNITSKY, Joseph D. Kulesza, Jr.,
Joseph W. Benson, P.A. and Howard M. Hyman,
Defendants.
No. 17446.

Submitted Sept. 15, 2000.
Decided Nov. 14, 2000.

Richard E. Franta, Wilmington, Delaware; for
Plaintiffs.
Steven H. Rudnitsky, Wilmington, Delaware;
Defendants, pro se.
Joseph D. Kulesza, Jr., Agostini, Levitsky, Isaacs &
Kulesza, Wilmington, Delaware; Defendants, pro se.
Andrew G. Ahern, III, Joseph W. Benson, P.A.,
Wilmington, Delaware; for Joseph W. Benson, P.A.
R. Karl Hill, Seitz, Van Ogtrop & Green, P.A.,
Wilmington, Delaware; for Defendant Howard M.
Hyman.

*MEMORANDUM OPINION*
JACOBS, Vice Chancellor.
*1 Pending is a motion for summary judgment by
the plaintiffs, Claire Rudnitsky ("Claire") and
C.M.S. Associates ("CMS") (collectively, the "
plaintiffs"). By means of this motion, the plaintiffs
seek the judicial invalidation of three allegedly
unauthorized mortgages placed on a commercial
property that is owned by CMS and located at 1624
Delaware Avenue in Wilmington, Delaware (the "
Building").[FN1] The grounds for the motion are that
(i) there was no bargained for consideration flowing
to the partnership (CMS) for the mortgages, and (ii)
the partner who executed the mortgages on behalf

of CMS lacked the authority to do so. For the
reasons discussed below, the Court concludes that
the plaintiffs have demonstrated their entitlement to
summary judgment and to cancellation of the
mortgages on both of those grounds.[FN2]

> FN1. The Building is owned by C.M.S.
> Associates, a Delaware general partnership
> in which Claire owns the majority interest.

> FN2. The plaintiffs also assert other claims
> related to the dissolution and winding up
> of CMS. With respect to those latter
> claims, summary judgment will be granted
> in part and denied in part.

### I. FACTS

The material facts recited below are undisputed. In
1985, Claire, her husband, Martin Rudnitsky ("
Martin"), and their son, Steven Rudnitsky ("Steven"
), formed CMS, a Delaware general partnership
whose purpose was to own and manage the
Building. CMS, as the fee simple owner, rented the
Building to another Rudnitsky entity called Normar,
Inc., ("NORMAR") under a "net-net-net" lease. [FN3]
NORMAR is a Delaware corporation that the
Rudnitskys formed to operate their family
business-a tobacco and newspaper store called the "
Smoke Shop." At all times the Smoke Shop
conducted its business in the Building.

> FN3. That lease provided that the tenant,
> NORMAR, would be responsible for
> paying expenses above and beyond rent,
> including real estate taxes and assessments,
> maintenance, and repairs.
> (CMS-NORMAR lease of July 21, 1989).
> Thus, the rent received by CMS was "net"
> of all expenses.

The original CMS partnership agreement was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

prepared by Joseph W. Benson, Esquire ("Benson"), a Delaware attorney who is one of the defendant-mortgagees in this action. Under the original partnership agreement, Claire and Martin were equal equity partners. As such, they were also equal owners of the building. Steven was an income (but not an equity) partner of CMS and, thus, had no equity interest in the Building.

From the outset, Claire, Martin, and Steven all participated in the day-to-day operation of the business. Claire tended to the customers, Martin kept the books, and Steven worked in the Smoke Shop as a NORMAR employee. Several years later, Martin became ill and Steven took over the management of CMS's finances. After Martin died on May 30, 1989, Steven continued to manage the finances with Claire's consent.

After Martin's death, Claire and Steven executed a second partnership agreement that was also prepared by Benson. Under that second agreement, Claire was the sole equity partner of CMS, and in that capacity, had full (albeit indirect) ownership of the Building. Steven continued as a CMS income partner. Importantly, under both of the Benson-prepared partnership agreements, CMS's partners were expressly prohibited from lending, spending, or giving away any part of the partnership property and from drawing any bill, note, or other security in the name of the partnership without the consent of a "majority of the partners." [FN4]

> FN4. Article 10, 1985 CMS Partnership Agreement; Article 10, 1992 Partnership Agreement.

A year or so after Martin died, the business began struggling financially under Steven's management. Because of insufficient funds, NORMAR stopped making the payments to Claire on a debt that NORMAR owed to Martin. NORMAR also discontinued paying directors' fees to Claire.

**\*2** On December 31, 1992, Claire and Steven executed a third-and the current-partnership agreement (the "Partnership Agreement"), which was drafted by an attorney not involved in this action. The current Partnership Agreement requires the "prior written unanimous approval of all of the partners" to "mortgage any or all of the partnership property." [FN5] At the time the Partnership Agreement was executed, Claire gifted a 45% ownership interest in NORMAR, and also a 33% equity interest in CMS, to Steven. Claire later transferred the balance of her NORMAR stock to Steven,[FN6] but she remained at all times the 2/3 equity owner of CMS, with Steven being a 1/3 equity owner.

> FN5. Partnership Agreement, Article 8(d). The Partnership Agreement, like its predecessors, also expressly prohibits CMS's *managing* partner from borrowing and also from executing any mortgage, security agreement, bond, or lease on behalf of the partnership. Partnership Agreement, Article 8(b). There is no evidence that Steven was selected as the managing partner, but in any event, that is of no consequence to the outcome of this motion.

> FN6. This transfer occurred in August 1997.

NORMAR's financial troubles continued to worsen: its checks were dishonored with increasing frequency, and its suppliers went unpaid, as did NORMAR's accountant and tax preparer, who eventually resigned for that reason. In the spring of 1994, NORMAR's unpaid taxes reached a level that NORMAR was required to take out a $65,000 loan from PNC Bank, Delaware ("PNC"). The PNC loan was personally guaranteed by Claire, and it was secured by a mortgage on the Building. Although the purpose of the mortgage was to raise funds for NORMAR (as opposed to CMS), the loan and mortgage instruments were executed by Steven and also by Claire, who was CMS's majority owner. Steven then used the loan proceeds to pay down NORMAR's debts.

At some point, however, NORMAR stopped making payments on the PNC loan. PNC responded by deducting the loan installment payments from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

Claire's accounts at PNC. Although Steven promised to reimburse Claire for the amount of those payment deductions, he never did so. In an effort to force NORMAR to resume making the loan payments, Claire closed her PNC accounts. On February 10, 1998, PNC declared the loan in default, accelerated the balance due, and threatened to foreclose on the Building. To save the Building from foreclosure, Claire was forced to pay off the PNC loan and pay PNC's attorney's fees out of her personal assets.

In July 1998, Claire received a Notice of Judgment that had been entered against her personally for NORMAR's unpaid state taxes for certain tax periods before August 8, 1997. During those tax periods Claire had been a NORMAR stockholder and officer and also its sole director. After receiving the Notice of Judgment, Claire obtained a lien search on the Building. As a result, she discovered that beginning in January 1997, Steven, without her knowledge or consent, had caused several mortgages to be placed on the Building.

The first of these was a $60,000 mortgage (the "Kulesza Mortgage") in favor of co-defendant Joseph D. Kulesza, Esquire ("Kulesza") a Delaware attorney, on January 14, 1997. That mortgage was granted to secure the repayment of Steven's personal debt to Kulesza for legal fees Steven had incurred in his divorce proceeding. The second mortgage, for $35,000, was granted in favor of defendant Benson (the "Benson Mortgage") on June 19, 1998 to secure Steven's personal obligation to pay both his legal fees to Benson and an obligation of NORMAR. [FN7] Lastly, Steven had executed a fourth mortgage on behalf of CMS, for $25,000 (the "Hyman Mortgage"), on November 20, 1999, in favor of defendant Howard M. Hyman, Esquire ("Hyman"), a Philadelphia attorney and Steven's cousin. The purported consideration for that mortgage was a business loan that Hyman had made to Steven.

> FN7. Steven executed another mortgage in October 1998 in favor of C.D.B. Finance Corporation ("CDB") in the amount of $17,000. After Claire discovered this

mortgage as a result of the lien search, she purchased the judgment note from CDB.

**\*3** After discovering the existence of these mortgages, Claire called a meeting of the CMS partners for May 20, 1999.[FN8] At that meeting, Claire directed Steven to liquidate the business or relocate the Smoke Shop but, in either event, to clean out the Building and then allow the Building to be appraised and then sold to pay creditors and taxes while some positive equity remained. At that meeting, Claire also voted to dissolve the partnership (CMS). Thereafter, on behalf of CMS, she sent notice to NORMAR and Steven terminating NORMAR's tenancy of the Building, effective August 31, 1999.

> FN8. Steven and Claire were the only CMS partners, holding a 1/3 and a 2/3 interest, respectively.

By that point, however, this Court had entered an injunction in an action brought by the Delaware Division of Revenue, restraining NORMAR and Steven from transacting business at the Building. The basis for the injunction was that The Smoke Shop had been operating without a valid permit due to nonpayment of its state income and withholding taxes. Two contempt orders were required to enforce that injunction. The contempt order entered on September 7, 1999, directed Steven to abandon the Building and remove all inventory before 5:00 p.m. on September 10, 1999. Steven did not comply with that Order. As a result, the Justice of the Peace Court, at the insistence of the Department of Finance, ordered that the Building be padlocked, with access allowed only to persons approved by that Department.

After much legal wrangling, the Justice of the Peace Court awarded possession of the Building to CMS on November 22, 1999. By then Steven had sold the contents of the Building, which constituted most of NORMAR's assets, to Hyman's Delaware corporation, Moishe, Inc. ("Moishe"), for one dollar ($1). Claire reacted by filing a distress action in the Justice of the Peace Court, to prevent Moishe from selling the marketable inventory, absconding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

with the proceeds, and then leaving the Building full of unmarketable contents and trash. Claire's distress action resulted in a stipulated Order under which (1) Moishe would auction the contents of the Building at any time before January 31, 2000; (2) the proceeds of the auction (after payment of auction expenses) would be placed into escrow, with counsel for CMS being the escrow agent; (3) up to $25,000 of the proceeds would be distributed to Moishe, and (4) any excess proceeds would be paid to CMS.

The auction took place on January 28, 2000, but no auction proceeds were escrowed. Because the proceeds of the auction were under $5,000, the Justice of the Peace, on March 9, 2000, ordered that Moishe would retain those monies remaining after paying the auctioneer's fees. That Order also required the parties to exchange mutual releases and dismissed the case with prejudice.

After the auction, Claire paid out of her personal funds all unpaid taxes, utility charges, and insurance premiums on the Building. She also paid the Department of Finance judgment that had been entered, including penalties and interest. Although Claire has personally paid all of these costs and other costs incurred to remove the cloud from the Building's title, the Building still cannot be sold until its title is finally cleared of the three remaining encumbrances, specifically, the Kulesza, Benson, and Hyman mortgages. This action was brought primarily to invalidate those mortgages.

## II. THE PARTIES' CONTENTIONS AND THE APPLICABLE STANDARD

**\*4** On a motion for summary judgment, the Court must consider all the evidence in the light most favorable to the non-moving party and determine whether any material issues of fact remain to be decided.[FN9] The Court also assumes the truth of uncontroverted facts as stated in the record. [FN10] If the moving party shows that there has been a " complete failure of proof on an essential element of a claim" by the non-moving party, the burden shifts to the non-moving party to raise material issues of fact that would preclude summary judgment.[FN11]

FN9. *See Cincinnati Bell Cellular Systems Co. v. Ameritech Mobile Phone Service of Cincinnati, Inc.,* Del. Ch., C.A. No. 13389, Chandler, V.C., Mem. Op. at 3-4 (Sept. 3, 1996) (requiring that no material issues of fact exist); *Oliver B. Cannon & Sons v. Dorr-Oliver, Inc.,* Del.Super., 312 A.2d 322 (1973) (requiring the court to look at the evidence in a light favoring the non-moving party).

FN10. *Cincinnati Bell,* at 4, *citing Tanzer v. Int'l Gen. Indus., Inc.,* Del. Ch., 402 A.2d 382 (1979).

FN11. *See Cincinnati Bell,* at 4, *citing State v. Regency Group, Inc.,* Del.Super., 598 A.2d 1123, 1129 (1991).

This motion raises two sets of claims. The first is whether the mortgages executed by Steven in favor of the defendant-mortgagees are valid. The plaintiffs contend that they are not because (i) Steven had no authority to bind the partnership to these mortgages, and (ii) the mortgages were not supported by consideration flowing to CMS or for CMS's benefit. The defendant-mortgagees respond that the mortgages are valid because (i) even if Steven had no actual authority to execute the mortgages on behalf of CMS, he had the apparent authority to do so; and (ii) the mortgages were supported by consideration flowing to CMS.

The second set of claims involves the dissolution and "winding up" of the CMS partnership. The first of this set of claims on which the plaintiffs have moved for summary judgment raises the question of whether CMS has been dissolved. The plaintiffs contend that it has; defendant Hyman argues that that determination cannot be made as a matter of law at the summary judgment stage.

Second, the plaintiffs ask the Court to "adjust" the partnership accounts to reflect the sums that Claire personally expended on the partnership's behalf. Third, the plaintiffs seek an order appointing Claire as the managing partner of CMS, so that she can complete the winding up process without any interference by Steven. Fourth, the plaintiffs seek

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

summary judgment on their claim against Steven and Hyman for slander of title, based on the contention that those defendants intentionally clouded the Building's title. Hyman opposes the motion on the grounds that this claim was not adequately pled in the complaint, and even if it was, the plaintiffs have not supported their slander of title claim factually.

Fifth, and finally, the plaintiffs seek a money judgment in favor of Claire, and against Steven personally, for the monies that Claire was required to pay to purchase the CDB mortgage.

The mortgage validity issues are treated in Section III of this Opinion. The remaining issues are addressed in Section IV.

### III. THE MORTGAGE VALIDITY ISSUES

As earlier noted, the plaintiffs seek the invalidation and cancellation of the mortgages granted by Steven on the Building on two separate grounds. First, the plaintiffs contend that Steven had no authority to execute the mortgages on CMS's behalf. Second, they argue that even if Steven did have such authority, the mortgages are invalid, because no consideration was bargained for or passed to CMS. The defendant-mortgagees respond that, although they were unaware that Steven had no actual authority to bind CMS to the mortgages, they reasonably believed that Steven had authority, for which reason CMS is bound by Steven's acts under the doctrine of apparent authority.

*5 I conclude, for the reasons discussed below, that (i) Steven lacked both actual and apparent authority to bind CMS when he purported to execute the mortgages on CMS's behalf, and (ii) CMS received no consideration for the three mortgages that currently encumber its primary asset, the Building. Accordingly, all three mortgages are determined to be invalid *ab initio.*

### A. Steven's Lack of Authority to Bind CMS to the Mortgages

It is undisputed that the Partnership Agreement prohibited Steven from mortgaging the building without the "prior written unanimous approval of all of the partners." [FN12] It also is undisputed that Claire, as the majority partner, never authorized the mortgages. On that basis alone, the mortgages would normally be invalid as against the partnership and the Building.

> FN12. As earlier stated, the Partnership Agreement prohibited any CMS partner from executing any mortgage on behalf of the partnership without the prior written unanimous approval of all partners. Partnership Agreement, Article 8(d).

The three defendant-mortgagees claim, however, that they did not know that Steven lacked the authority to bind CMS. Moreover, the defendants argue that they had reason to believe that Steven did have the authority to execute the mortgages on CMS's behalf. Specifically, the defendants argue that, because Claire allowed Steven to hold himself out as having the requisite authority to execute the mortgages, those mortgages must be found valid and binding upon CMS under the common law doctrine of apparent authority. At the very least, the defendant-mortgagees contend, a trial is needed to resolve the question of Steven's apparent authority to execute the mortgages.

The issue presented is whether there exists a triable dispute of fact as to whether Steven had the apparent authority to execute the three mortgages on behalf of CMS. Based on the undisputed facts of record, I conclude as a matter of law that Steven did not.

The doctrine of apparent authority operates to bind a principal for acts of its agent in circumstances where the agent had no authority at all. The policy rationale for that seemingly odd result is that, where a principal enables its agent to hold himself out to the public as having the requisite authority, and thereby leads persons dealing with the agent reasonably to believe that agent was authorized, it is fair to hold the principal liable for the agent's unauthorized acts. As between the innocent third

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

party plaintiff and the principal, the law holds that the principal who is in the best position to prevent the agent's wrongful acts should bear the loss.[FN13]

> FN13. *See Grand Ventures Inc. v. Whaley,* Del.Super., 622 A.2d 655, 664 (1992), aff'd, Del.Supr., 632 A.2d 63 (1993); *International Boiler Works Co. v. General Waterworks Corp.,* Del.Supr., 372 A.2d 176, 177 (1976).

In the general partnership context, the common law doctrine of apparent authority has been codified in the Delaware Uniform Partnership Act (the "DUPA" ). Under the DUPA, although agency principles continue to apply, [FN14] a partner has authority to bind the partnership only with respect to acts the partner performs within the ordinary course of the partnership business.[FN15] Thus, the acts of a partner "for apparently carrying on in the usual way the business of the partnership" will bind the partnership, unless the partner "has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing had knowledge of the fact that he has no such authority." [FN16] But, "[a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." [FN17]

> FN14. See 6 *Del.C.* § 1504 (stating that in Delaware, agency law principles apply under partnership law).

> FN15. *See* 6 *Del.C.* § 1509 (stating that " [a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners."); *Miller v. Gilbert,* Del. Ch., C.A. No. 5567, Brown, V.C. Mem. Op. at 18-19 (May 11, 1979); *see also* 59A Am.Jur.2d *Partnership* § 250 (1987) (stating that agency law continues to apply under the Uniform Partnership Act); 59A Am.Jur.2d

*Partnership* § 258 (1987) ("the apparent scope of a partnership business primarily depends on the conduct of the partnership and its partners and what they cause third parties to believe about the partners' authority."). In addition, on July 1, 1999, a Revised Delaware Partnership Act went into effect. See 6 *Del.C.* § 15-1206. Until January 1, 2002, the Revised Act will only govern partnerships formed after July 1, 1999 and partnerships formed before that date which elect, in their partnership agreement, to adopt it. *See id.* The premise of 6 *Del.C.* § 1509 has, however, been preserved in the new Delaware Partnership Act. 6 *Del.C.* § 15-301 of the new Act provides that "an act of a partner which is not apparently for carrying on in the ordinary course of the partnership business, purposes or activities of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners."

> FN16. 6 *Del.C.* § 1509(a).

> FN17. 6 *Del.C.* § 1509(b).

**\*6** These principles, as applied to the undisputed facts, compel the conclusion that Steven did not have apparent authority to bind CMS to the mortgages.

### 1. The Mortgages Were Not in the Ordinary Course of CMS's Business

In determining what is "carrying on in the usual way" or "ordinary course," of a partnership's business, the Court may consider the partnership's stated purposes, the precedent set by the partnership's prior "custom or course of dealing" and "the general custom" of analogous partnerships.[FN18] Thus, in a case where the stated purpose of a partnership was to own and operate a building, a contract to compensate a third party for services in finding investors for a partnership, was not " carrying on the business of the partnership" within the meaning of 6 *Del. C.* § 1509(b).[FN19]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
(Cite as: Not Reported in A.2d)

> FN18. *See* 59A Am Jur.2d, *Partnership* § 264 (1987).

> FN19. *See Abt v. Harmony Mill Ltd. Partnership,* Del. Ch., C.A. No. 12435, Chandler, V.C., Mem. Op. at 6 (Dec. 18, 1992) (holding that remunerating a third party for services in finding investors to fund the partnership was not carrying out the partnership's business).

In this case, the business of CMS was to own and operate the Building. Encumbering the Building to procure funds for unrelated purposes did not fall within the ordinary course of CMS's business. Although mortgaging the Building was included within the stated purposes in CMS's Partnership Agreement, that activity would fall within the ordinary course of CMS's business only if the mortgage proceeds were used to further the business of CMS. Otherwise, Claire's prior approval would be required, which occurred in 1994 when the Building was mortgaged to raise funds to pay a debt of NORMAR.

In this case the mortgage proceeds were not used to further the business of CMS. Rather, the Benson and Kulesza mortgages were executed to secure *Steven's* personal debt to those mortgagees. And, the Hyman mortgage proceeds went to NORMAR (which did not own the Building), not to CMS (which did). For these reasons, the mortgages cannot be deemed to have been in the "ordinary course" of CMS's business, and are therefore invalid under 6 *Del. C.* § 1509(b). [FN20]

> FN20. That section provides: "An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." In this case, it is clear that Claire did not authorize the execution of the mortgages.

Even if the grant of the mortgages was within the ordinary course of CMS's business, the Benson and Kulesza Mortgages were invalid under 6 *Del. C.* § 1509(a), because Messrs. Benson and Kulesza knew that Steven lacked the authority to execute the mortgages on the partnership's behalf.

It is an established principle of Delaware law that apparent authority cannot be asserted by a party who knew, at the time of the transaction, that the agent lacked actual authority.[FN21] This Court has held that where a partner executes an obligation for his own personal benefit in the partnership's name, and the payee knows that the partner lacks the authority to act for the partnership, the partnership is not liable on the obligation.[FN22]

> FN21. *See International Boiler Works Co.,* 372 A.2d at 177 (requiring that the asserting party "act with 'ordinary prudence and reasonable diligence" ' to ascertain whether the agent is authorized to act on the behalf of the principal).

> FN22. *See Abt v. Harmony Mill Ltd. Partnership,* Del. Ch., C.A. No. 12435, Chandler, V.C., Mem. Op. at 6-7, (Dec. 18, 1992); *Terry v. Platt,* Del, Super., 40 A. 243, 244 (1898).

In this case, all three defendant-mortgagees are attorneys who are versed in the nuances of agency and partnership law. There is, moreover, ample basis in the record to conclude that all three were acquainted with the terms of the CMS partnership agreement in effect at the time their mortgages on the Building were executed. Benson drafted the first two CMS Partnership Agreements, both of which expressly prohibited any CMS partner from lending, spending, or giving any part of the partnership property, or drawing any bill, note, or other security in the name of the partnership without the consent of a majority of the partners.[FN23] The long-standing existence of that clause in the CMS partnership agreements that Benson drafted, precludes Benson from assuming (without making further inquiry) that Steven-a minority partner-was duly authorized to mortgage the Building under the current Partnership Agreement. At the very least, Benson's earlier involvement as the Rudnitskys' lawyer created a duty to inquire of Claire whether

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 8

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
(Cite as: Not Reported in A.2d)

she had consented to the mortgage.

> FN23. *See* 1985 Partnership Agreement,
> Article 10; 1989 Partnership Agreement,
> Article 10.

*7 Kulesza also had prior exposure to the nature of
Steven's partnership authority. Kulesza was an
associate in Benson's firm at the time Benson
drafted the second CMS partnership agreement.
Kulesza had also been a witness to the execution of
CMS's latest lease with NORMAR on June 21,
1989. That exposure, coupled with the fact that
Steven was using a *partnership* (CMS) asset to
discharge a personal, *non-partnership* debt, created
a similar duty on Kulesza's part to inquire into
Steven's authority to bind CMS.

Finally, Hyman, who is also an attorney, can hardly
claim unfamiliarity with the CMS Partnership
Agreement. Hyman had attended an earlier trial in
the Justice of the Peace Court on September 15,
1999. At that trial the propriety of Steven's
independent mortgaging of the Building was
litigated. In that trial, the current CMS Partnership
Agreement was an exhibit [FN24] and in addition,
Steven's role as a minority partner was discussed.
[FN25] The plaintiffs cite these facts to show that
Hyman had, at the very least, inquiry notice that the
Partnership Agreement prevented Steven from
executing a mortgage on behalf of CMS without
Claire's consent. Hyman argues, nonetheless, that he
did not know that Steven lacked authority to
execute the Hyman mortgage on November 20,
1999.

> FN24. Plaintiff's Opening Brief at 36.
> Indeed, Claire claims that Hyman was
> furnished a copy of the current CMS
> Partnership Agreement at that time. *Id.* at
> 19.

> FN25. Transcript of Justice of the Peace
> Trial at 92-93.

Hyman's claim of ignorance that the Partnership
Agreement prohibited Steven from validly

executing the Hyman Mortgage, although of
questionable credibility, raises a triable issue of
whether Hyman had inquiry notice of that fact.
Inquiry notice "exists where a person has
knowledge of such facts as would lead a fair and
prudent person using ordinary care to make further
inquiries." [FN26] A person who fails to take those
further steps is chargeable with whatever knowledge
he would have acquired had he taken such steps. [FN27]
Whether or not such a duty has arisen in a
specific case is ordinarily a question of fact.[FN28] I
conclude, although with some reluctance, that with
respect to the Hyman mortgage there is a question
of material fact that cannot be decided at the
summary judgment stage.[FN29]

> FN26. 58 Am.Jur.2d *Notice* § 15 (1987).

> FN27. *See Amjems, Inc. v. F.R. Orr
> Constr. Co., Inc.,* 617 F.Supp 273
> (S.D.Fla, 1985).

> FN28. 58 Am.Jur.2d *Notice* § 17 (1987).

> FN29. This fact dispute is of no moment,
> however, because the Hyman mortgage is
> found invalid because it was not in the
> ordinary course of CMS's business and
> because it is unsupported by consideration
> flowing to CMS.

With respect to the Benson and Kulesza mortgages,
there is no triable fact issue. Given their
professional and/or personal relationships with the
Rudnitskys, and their knowledge of the earlier
and/or current partnership agreements, Benson and
Kulesza cannot be heard to argue that they had valid
reason to believe that Steven had the authority to
bind CMS without Claire's consent. Accordingly, I
conclude that Steven lacked the apparent authority
to act on behalf of CMS in executing the Benson
and Kulesza mortgages.

### B. The Mortgages Were Not Supported By
### Consideration Flowing To CMS

Apart from the issue of whether the mortgages were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 9

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

authorized, the plaintiffs contend that all three mortgages-including the Hyman mortgage-are invalid on the separate and independent ground that they were unsupported by consideration flowing to CMS. I agree.

To be enforceable, a mortgage must be supported by mutually-bargained-for consideration.[FN30] Here, the consideration for the mortgages neither flowed to nor benefited CMS. Rather, the consideration flowed to and benefited Steven and NORMAR. At oral argument, Mr. Kulesza conceded that his mortgage was granted to secure *Steven's* personal legal fee obligation to Kulesza for work Kulesza had done in connection with Steven's divorce proceedings, and also for work Kulesza had done for *NORMAR.*[FN31] Hyman's mortgage was granted to secure a $25,000 loan to *Steven* that later became the consideration for the sale of NORMAR's assets to Moishe.[FN32] Finally, Benson's mortgage was granted to secure an obligation to pay legal fees incurred by *Steven* personally, and by *NORMAR,* not CMS.[FN33]

FN30. *See Continental Ins. Co. v. Rutledge and Co., Inc.,* Del. Ch., 750 A.2d 1219, 1232 (2000) (stating that Delaware courts "define consideration as a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request").

FN31. Transcript of September 18, 2000 hearing at 70; Defendant Kulesza's Response to Plaintiff's First Request for Admissions, No. 3.

FN32. Plaintiffs' Opening Brief at 36-37; Hyman Answering Brief at 5. Hyman asserts that the $25,000 was "used to pay off tax obligations of Claire Rudnitsky and Steven Rudnitsky and also, to begin to replace the air conditioner." The CMS-NORMAR lease, however, provides that NORMAR, not CMS, was responsible for taxes and building repair and maintenance.

FN33. Defendant Benson's Response to

Plaintiff's First Request for Admissions, Nos. 15 & 18.

**\*8** For these reasons, the Court finds that all three mortgages are invalid on the basis that CMS neither received nor bargained for the consideration that was given in exchange for the mortgage.

The invalidity of the mortgages having been established, I next turn to the appropriate remedy.

### C. The Appropriate Remedy

#### 1. Cancellation

Plaintiffs argue that a decree canceling the mortgages is a necessary and appropriate remedy. Even though declared invalid, the mortgages, unless canceled, will continue to cloud the Building's title and make the Building difficult to sell. To prevent the transfer of the mortgages to bona fide purchasers for value, the plaintiffs contend that the Benson, Kulesza, and Hyman mortgages must be canceled and removed from the public record by satisfaction or other appropriate means; and that the notes secured by the Benson and Kulesza mortgages must be reformed and re-executed to reflect Steven as the sole obligor.

Defendant Kulesza opposes the cancellation remedy because (he contends) the mortgages were intended to bind only Steven's interest in the partnership. Accordingly, Kulesza argues, the mortgages should remain of record but encumber only Steven's share of the partnership assets.

I cannot agree. Nothing in the mortgage instruments limits their scope to Steven's partnership interest. Without cancellation, CMS will remain exposed to potential liability to any bona fide purchaser for value of the notes and mortgages. Kulesza's argument also fails to give any meaningful effect to the fact that the mortgages have been declared invalid in their entirety.

This Court has recognized that "[c]ancellation is the ordinary remedy in removing clouds [on title]."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

FN34 Where a lien or encumbrance on title to real property appears valid on its face but is shown by extrinsic evidence to be void, "a court of equity may intervene and set it aside as a cloud upon the real title to the land." [FN35] Cancellation or equitable rescission has been found appropriate where, "in addition to a judicial declaration that a contract is invalid and a judicial award of money or property to restore plaintiff to his original condition is made, further equitable relief is required ... [as where] the plaintiff would be exposed to liability to third parties not appearing in the action." [FN36] Indeed, this Court has held that cancellation is "the only remedy that is adequate" in cases where a note may be transferred to a bona fide purchaser "who could then recover from the plaintiff under the note." [FN37]

> FN34. *Gregg v. Rowles,* Del. Ch., C.A. No 1541-S, Allen, C., Mem. Op. at 4 (Dec. 2, 1992), citing 4 *Pomeroy's Equity Jurisprudence* 1398 (5th Ed.1941) (stating that cancellation is appropriate where title is clouded).

> FN35. *Wilkes v. State Highway Dept.,* Del. Ch., 265 A.2d 421, 423-424 (1970), citations omitted.

> FN36. *Id;Levinson v. Continental Insurance Services, Inc.,* C.A. No. 7962, Hartnett, V.C., Mem. Op. at 4 (April 4, 1991), citing *E.I. DuPont De Nemours and Co. v. HEM Research, Inc.,* Del. Ch., C.A. No. 10747, Allen, C., Mem. Op. (October 13, 1989).

> FN37. *E.I. DuPont De Nemours and Co.,* at 7, citation omitted; *See also Levinson,* at 8 (holding the same).

In this case, the Court has found each of the three disputed mortgages to be invalid. The mortgages operate as liens that continue to cloud the Building's title. Absent cancellation, the mortgagees could transfer their notes and mortgages to bona fide purchasers without notice of the invalidity "who could then recover from [plaintiffs] under the note."

Cancellation of the Benson, Kulesza, and Hyman Mortgages is the "only remedy that is adequate" to avoid exposing CMS to liability to such potential bona fide purchasers.

*9 Kulesza's argument also ignores the fact that the three mortgages have been declared invalid, as a summary judgment matter, for lack of consideration and for lack of execution authority. For that reason, they are not enforceable even against Steven's interest in the CMS partnership. Accordingly, a decree will be entered canceling all three mortgages and making the cancellation a matter of public record by appropriate recordation.

### 2. *Reformation of the Benson & Kulesza Notes*

Plaintiffs acknowledge that, because Steven is legitimately indebted to Benson and Kulesza, it is equitable and just that the notes secured by those mortgages be reformed and re-executed to reflect the fact that Steven is the sole obligor.[FN38]

> FN38. The plaintiffs argue that Hyman is not entitled to reformation of his note because that relief is not necessary to secure Steven's indebtedness to Hyman. Hyman retains two notes, totaling $25,000, that obligate Steven individually. Both are guaranteed by NORMAR. As a result, Hyman already has what reformation is needed to give Benson and Kulesza-a means of collecting the debts owed by Steven.

Reformation allows a court of equity "to make an erroneous instrument express correctly the real agreement between parties." [FN39] That relief is appropriate in cases of fraud, a mutual mistake of both parties to the contract, or the unilateral mistake of one party coupled with knowing silence by the other.[FN40]

> FN39. *Colvocoresses v. W.S. Wasserman Co.,* Del. Ch., 28 A.2d 588, 589 (1942).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 11

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
(Cite as: Not Reported in A.2d)

FN40. *Id.*

Steven's execution of the Benson and Kulesza notes on behalf of CMS makes reformation appropriate under either theory. If both Steven and the defendant-mortgagees knew that Steven lacked the authority to execute the notes or to bargain on behalf of CMS, the execution of those notes operated as a fraud on CMS by all the parties thereto. If, on the other hand, only Steven knew that he lacked the authority to act on behalf of CMS, but he allowed the defendant mortgagees to proceed in ignorance of that fact, at the very least the mistake requirement is satisfied. In either event, reformation of the Benson and Kulesza notes to reflect Steven as the sole obligor is warranted.

I turn next to the second set of claims, which relate to the dissolution and winding up of CMS.

## V. CLAIMS RELATING TO THE WINDING UP OF CMS

### A. The Dissolution of the Partnership

Claire first seeks summary judgment under 10 *Del. C.* § 6501, declaring that the partnership, CMS, was and is dissolved. Defendant Hyman argues that an order of dissolution cannot be granted as a matter of law at the summary judgment stage. He argues that that relief may be granted only after a final hearing. I disagree.

On May 20, 1999, at a duly called partners' meeting, Claire voted her two-thirds partnership interest in favor of dissolution. She was entitled to do that under Article 19(a)(ii) of the Partnership Agreement.[FN41] Once that was done, nothing more was contractually required to dissolve the partnership. Hyman has presented no facts or law that suggest otherwise. The undisputed facts establish that CMS was dissolved as a result of the action taken at the May 20, 1999 partners' meeting, and Claire is entitled to a judgment so declaring.

FN41. Article 19(a)(ii) reads in relevant

part:
(a) *Dissolution Events.* The partnership shall be dissolved only by:
(ii) The vote of the partners owning a majority of the capital accounts of the partnership;

### B. "Adjustment" of the Capital Accounts

#### 1. *The Expenses*

The plaintiffs next argue that they are entitled to summary judgment declaring that the capital accounts of CMS should be "adjusted" to credit Claire with the amount of the expenses that she paid personally on behalf of CMS. It is not clear what the plaintiffs mean by "adjust." What is clear is that Claire wants to be reimbursed in some appropriate way for her payments of the CMS debts out of her personal assets. The debts that Claire now claims to have paid personally are set forth in the chart below:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

| Debt Paid by Claire | Amount Paid |
|---|---|
| (1) Payment of PNC loan to save Building from f oreclosure | $52,242.68 |
| (2) New Castle County Real Estate Taxes owed by NORMAR. | $6,683.60 |
| (3) City of Wilmi ngton Real Estate Taxes owed by NORMAR. | $7,330.65 |
| (4) City of Wilmi ngton water & sewer charges owed by NORMAR | $532.99 |
| (5) Paid to the Division of Revenue to release CMS Building from State's judgment for NORMAR withho lding taxes. | $979.00 |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

| | |
|---|---|
| (6) Hazard insurance premiums paid for the Building following lapse in coverage by NORMAR | $9,885.69 |
| TOTAL | $77,654.61 |

*10 In response, the defendants argue that certain of these debts were not debts of CMS and therefore are not reimbursable. That response frames the issue presented.

The PNC loan became a liability of CMS because CMS guaranteed NORMAR's payment of that loan. When NORMAR defaulted on the loan, PNC became entitled to look to CMS as the guarantor and mortgagor, and the Building, as the sole asset of CMS, was put at risk of foreclosure. Claire's payment of that loan was therefore the payment of a liability of CMS.

The taxes paid by Claire stand on the same footing. Although the lease for the Building made the tenant, NORMAR, responsible to pay all taxes, insurance, and utilities,[FN42] the taxing authorities were entitled to look to the owner-lessor (CMS) if the lessee (NORMAR) defaulted. For that reason, when NORMAR did not pay the County taxes, a judgment was entered against CMS as the landowner. Had Claire not paid those taxes, the Building would again have been at risk of foreclosure.[FN43]

> FN42. CMS-NORMAR Lease dated July 21, 1989.

> FN43. Praecipe of Dennis J. Siebold, New Castle County Finance Legal Officer, filed with Prothonotary of New Castle County, August 12, 1999. The same is true for the City of Wilmington property taxes and water/sewer charges. By letter dated January 7, 2000 the City informed CMS

that if the property taxes and water/sewer charges were not paid immediately, the Building would become subject to a Sheriff Sale. Letter of January 7, 2000 from Aileen Mandigma, Esquire, Assistant City Solicitor, to CMS Associates.

Claire also paid the Delaware Division of Revenue's $9,885.69 judgment, which, she claims, had been entered against CMS as a consequence of NORMAR's failure to pay withholding taxes. Claire did that to release the Building from that judgment and the attendant risk of foreclosure. This claim is problematic, however, because it was not pled in the complaint and was never raised until the plaintiffs' Opening Brief, and also because nothing of record establishes that a judgment was entered against CMS for the NORMAR withholding taxes. What the record does show is that Claire received a tax bill and that she paid $9885.69 to the State of Delaware. But, that bill was sent to Claire addressed in *her* name, whereas the other bills that she paid were sent to Claire addressed in *CMS's* name. These gaps in the record preclude a grant of summary judgment to Claire on this claim for reimbursement for her payment of the NORMAR tax bill.

Finally, Claire seeks to recover the insurance premiums she paid to maintain the insurance on the Building.[FN44] Insurance was a contractual obligation of NORMAR under the lease. Despite that, and even though Claire was not required by law to purchase insurance, no reasonable business person would allow the sole asset of her business to go uninsured. Accordingly, although insurance was the contractual responsibility of NORMAR under the lease, once NORMAR (owned by Steven) failed to pay the insurance premiums, Claire properly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

assumed financial responsibility to protect the Building for the benefit of CMS. On that basis, Claire is entitled to reimbursement of the insurance premiums she paid to maintain in effect the insurance on the Building.

> FN44. On September 20, 1999 Claire paid $586 and on March 23, 2000 she paid $393. These were payments of premiums on a Nationwide policy for the coverage period of October 2, 1999 through October 2, 2000. Plaintiff's Exhibit F.

*2. The Mechanics of Reimbursement*

Although Claire is entitled to be compensated for some of the payments she made on behalf of CMS, it is not altogether clear by what procedure or mechanic that will be accomplished. The plaintiffs, in their brief, simply ask the Court to enter a judgment declaring that Claire's CMS capital accounts be increased ("adjusted") by the amounts that she expended personally on behalf of the partnership,[FN45] and correspondingly, that Steven's CMS capital account be reduced by those amounts.[FN46] But what the plaintiffs have not explained or shown is the legal basis under the Partnership Agreement or the DUPA for this Court making such an "adjustment." "For this Court to rewrite the Partnership Agreement to alter a partner's ownership interest without any legal basis, would clearly overreach." [FN47]

> FN45. Plaintiffs' Opening Brief at 45.

> FN46. Amended Complaint at ¶ 4, page 13.

> FN47. *Cole v. Kershaw,* Del. Ch., C.A. No. 13904, Jacobs, V.C., Mem. Op. at 34 (Aug. 15, 2000).

**\*11** Because "Capital Account" is a term used in the Partnership Agreement, that Agreement is a potential source of authority for a judicially-compelled "adjustment" of a partner's capital account. Unfortunately, however, nothing in

the Partnership Agreement authorizes such an adjustment. Section 5 of the Partnership Agreement concerns capital accounts. Subparagraph (c) creates separate capital accounts for each partner and addresses how increases to those accounts can be made in certain circumstances. But, none of the circumstances described in Section (c) is relevant here. Thus, the plaintiffs have not pointed to any provision in the Partnership Agreement that legally authorizes judicial relief in this form.

It appears that what the plaintiffs are truly seeking is a money judgment against Steven for the amount he would have been required to contribute to CMS for the various taxes, insurance, and other charges that Claire was forced to pay out of her own pocket. Thus, the claim is in the nature of equitable indemnification or contribution. If such a money judgment were entered, the plaintiffs could execute on that judgment at law against Steven's personal property, which would include his CMS capital account. The plaintiffs have not sought the entry of a money judgment against Steven on this motion, nor have they advanced a principled legal argument for judicially "adjusting" the Capital Accounts of the partnership. For these reasons, the plaintiffs' current motion for summary judgment granting this specific form of relief must be denied.

*C. Winding Up The Partnership Without Steven*

The plaintiffs also seek an order permitting Claire, as CMS's controlling partner, to complete the winding up of CMS, including selling the Building, without the participation of Steven. Under the Partnership Agreement, the authority to wind up the affairs of CMS is given to "the partners," [FN48] which would include Steven. The plaintiffs argue that, if Steven is allowed to participate, the winding up process will never succeed, because Article 8(d) of the Partnership Agreement requires the "prior written unanimous approval of all of the partners" for any conveyance of partnership property. The plaintiffs contend that, based on past experience, Steven will consistently refuse to give his approval. Thus, absent an Order from this Court precluding his participation, Steven will make the winding up process an impossibility.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

FN48. Partnership Agreement, Article 19(e).

Again, however, the plaintiffs point to no statutory or contractual provision upon which to ground their requested preclusion remedy. Under *6 Del. C.* § 15-803, this Court, upon a showing of good cause, may appoint a receiver to wind up a partnership under judicial supervision. But, the plaintiffs do not seek the appointment of a receiver under § 15-803. Moreover, in *Paciaroni v. Crane,*[FN49] this Court empowered two partners of a three person partnership to wind up the partnership's affairs to the exclusion of the third partner, conditioned upon the posting of a bond. Again, however, the plaintiffs have not grounded their application on that or any other specific legal basis. Because the plaintiffs have not demonstrated a specific legal basis for entitlement to the relief they request, their summary judgment motion must be denied in this respect on the present record.

FN49. Del. Ch., 408 A.2d 946, 957 (1979).

### D. Slander of Title

*12 The plaintiffs also seek summary judgment against Hyman and Steven on their claim of slander of title. The elements of a slander of title claim are: "(1) the malicious (2) publication of (3) false matter concerning the state of title of property which (4) causes special damages." [FN50] Because there exist genuine issues of material fact, the record at this stage precludes summary judgment. The plaintiffs claim that Hyman altered or fabricated documents to support the sale of the Smoke Shop assets to Moishe. Hyman contends that the documents were genuine, and that, moreover, Claire was solely responsible for the delay in cleaning out the Building by filing her distress action in the Justice of the Peace Court. Those fact issues must be resolved before the element of "maliciousness" can be determined. If only for that reason, the plaintiffs' motion for summary judgment on their slander of title claim must be denied.[FN51]

FN50. *In re Application of Motivational*

*Center Inc.,* Del. Ch., Mem. Op. at 6, Allen, C. (Nov. 3, 1987) (citing 50 Am.Jur.2d, *Libel & Slander* § 541).

FN51. For that reason it is premature to consider whether the defendants' slander of title claim merits an award of the costs (including attorney's fees) of securing (i) the cancellation of the Hyman mortgage and its removal from the record, (ii) the cancellation of the note secured by the Hyman Mortgage and of any deed in lieu of foreclosure executed incident to that mortgages, (iii) obtaining possession of the Building in the Justice of the Peace Court, and (iv) forcing the clean-out of the Building by means of the distress sale ordered by the Justice of the Peace Court. Moreover, those costs were not quantified or established.

### E. The CDB Mortgage

Lastly, Claire seeks a summary judgment award reimbursing her for the monies she paid to acquire the CDB mortgage. On July 25, 2000, Claire purchased Steven's entire mortgage obligation to CDB.[FN52] In the purchase agreement, CDB assigned to Claire "all of CDB's right, title and interest in and to the original Judgment Note and Mortgage, all of Assignor's (CDB) causes of action (asserted or unasserted) arising therefrom, and the entries of judgment entered in favor of Assignor.... [FN53] As part of that assignment, CDB submitted and certified to Claire the payment history of the loan. That history reflects that no payment has been made on that loan since May 28, 1999. Indeed, before Claire purchased the note, CDB had asserted a cross-claim against Steven for $22,535.19, representing the balance due on CDB's judgment note as of November 5, 1999. Steven did not answer that cross-claim, nor has he disputed the amount of that claim in this action.

FN52. On October 5, 1998, Steven executed a mortgage against the Building in favor of CDB for $17,000. As with the other three mortgages, this was also done

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 16

Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706
**(Cite as: Not Reported in A.2d)**

> without Claire's knowledge or consent.
>
> FN53. Agreement for Purchase of Lender's Position of July 25, 2000 between CDB and Claire, at 1-2.

The undisputed facts establish that Steven did not have the authority to bind CMS to the CDB mortgage. The issue is whether Claire is entitled to a money judgment against Steven for the amounts presently due and upon which interest will continue to accrue until the debt is paid. I conclude that she is. The mortgage obligates both Steven individually and CMS. As CDB's assignee, Claire has the right to enforce the instrument against Steven. The mortgage obligation is now in default and is enforceable by a judgment note. For that reason Claire is entitled to a money judgment against Steven in the amount of the unpaid principal, plus accrued interest, plus whatever costs of reducing the claim to judgment are made recoverable by the CDB note and mortgage instruments.

## VII. CONCLUSION

Counsel for the parties shall confer and submit a form of Order that implements the rulings made in this Opinion.

Del.Ch.,2000.
Rudnitsky v. Rudnitsky
Not Reported in A.2d, 2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4



Not Reported in A.2d                                                                                          Page 1

Not Reported in A.2d, 2003 WL 139758 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**C**
Rutledge    v.    WoodDel.Super.,2003.Only    the
Westlaw citation is currently available.
UNPUBLISHED   OPINION.   CHECK   COURT
RULES BEFORE CITING.
Superior Court of Delaware.
RUTLEDGE
v.
WOOD and Chandler
**No. C.A. 01C-12-007.**

Submitted Dec. 16, 2002.
Jan. 17, 2003.

Dear Counsel:
GRAVES, J.
**\*1** This case comes before the Court for
consideration of Defendant-Chandler's Motion for
Summary Judgment. The motion is denied for the
reasons stated herein.

I. Facts

On July 3, 2002, Edward Rutledge ("Rutledge"),
driving a Ford Ranger pickup truck, was traveling
south on Route 1 near Milford, Delaware. Stephen
Wood ("Wood"), driving a Pontiac Grand Am,
attempted to pass Rutledge on the right shoulder of
the highway. At some point, Wood lost control of
his vehicle and veered back into the right hand lane
of the highway, where he collided with Rutledge's
vehicle. The impact forced Rutledge into the left
hand lane and into another vehicle. Rutledge
glanced off of this car and sailed back into and
across the right hand lane. His car flipped over at
least once before coming to a rest on the side of the
road.

Police reports filed subsequent to the accident
revealed that Wood had been in pursuit of a black
Acura, driven by Jeffrey Chandler ("Chandler").
Wood and Chandler had engaged in inappropriate
driving conduct that resulted in a collision between
the two vehicles, neither of which stopped.

Testimony differs as to whether Wood sought to
obtain Chandler's license plate number or to further
antagonize him but all parties agree that Wood was
chasing Chandler at the time of Wood's collision
with Rutledge. Testimony reveals that both cars
were weaving in and out of traffic and were
traveling at speeds between 65 and 100 miles per
hour.

Rutledge sued both Wood and Chandler, jointly and
severally, for the damages he and his vehicle
sustained as a result of the collision between
Rutledge and Wood. Chandler moves for summary
judgment as to the counts against him because his
negligence, if any, did not cause the accident
between Wood and Rutledge.

II. Discussion

*A. Standard of Review*

Summary judgment may be granted only when no
material issues of fact exist, and the moving party
bears the burden of establishing the non-existence
of material issues of fact. *Moore v. Sizemore,* 405
A.2d 679, 680 (Del.1979). Once the moving party
meets its burden, then the burden shifts to the
non-moving party to establish the existence of
material issues of fact. *Id.* at 681. Where the
moving party produces an affidavit or other
evidence sufficient under Superior Court Civil Rule
56 in support of its motion and the burden shifts,
then the non-moving party may not rest on its own
pleadings, but must provide evidence showing a
genuine issue of material fact for trial. Super. Ct.
Civ. R. 56(e); *Celotex Corp. v.. Catrett,* 477 U.S.
317, 322-23 (1986). If, after discovery, the
non-moving party cannot make a sufficient showing
of the existence of an essential element of his or her
case, then summary judgment must be granted.
*Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991),
*cert. denied,* 504 U.S. 912 (1992); *Celotex Corp. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 139758 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Catrett, supra.* If however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962).

### B. Causation

*2 Rutledge's theory of recovery against Chandler is premised upon negligent driving, precipitated by the earlier accident and failing to stop following the Wood-Chandler collision. Rutledge alleges that Chandler traveled at an unreasonable speed, drove in a careless and distracted manner, made erratic lane changes, drove aggressively, and drove with wilful and wanton disregard for the safety of persons and property. Chandler was stopped by the police soon after the accident and later pled guilty to reckless driving.

Chandler correctly notes that a finding of negligence on behalf of a defendant, alone, will not sustain an action for damages; rather, a plaintiff must also prove that the defendant's negligence was the proximate cause of his injuries. *See Duphily v. Delaware Elec. Co-op.,* 662 A.2d 821, 828 (Del.1995). "Proximate cause exists if a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Wilmington Country Club v. Cowee,* 747 A.2d 1087, 1097 (Del.2000).

The Supreme Court's discussion of causation in negligence cases in *Duphily* is instructive:
Delaware recognizes the traditional "but for" definition of proximate causation. *Laws v. Webb,* 658 A.2d 1000 (Del.1995); *Moffitt v. Carroll,* 640 A.2d 169, 174 (Del.1994); *Culver v. Bennett,* 588 A.2d 1094, 1097 (Del.1991). "Our time-honored definition of proximate cause ... is that direct cause without which an accident would not have occurred. " *Chudnofsky v. Edwards,* 208 A.2d 516, 518 (Del.1965) (quoted in *Laws,* 658 A.2d at 1007; *Moffitt,* 640 A.2d at 174; *Culver,* 588 A.2d at 1097*).* In other words, a proximate cause is one "which in natural and continuous sequence, *unbroken by any*

*efficient intervening cause,* produces the injury and without which the result would not have occurred." *Culver,* 588 A.2d at 1097 (quoting *James v. Krause,* 75 A.2d 237, 241 (Del.Super.1950)*)* (emphasis added).
An intervening cause is one which comes into active operation in producing an injury *subsequent* to the negligence of the defendant. *Restatement (Second) of Torts* § 440 (1965); W. Page Keeton, *et al., Prosser and Keeton on Torts,* § 44 (5th ed.1984). The mere occurrence of an intervening cause, however, does not automatically break the chain of causation stemming from the original tortious conduct. This Court has long recognized that there may be more than one proximate cause of an injury. *Laws,* 658 A.2d at 1007; *Moffitt,* 640 A.2d at 174; *McKeon v. Goldstein,* 164 A.2d 260, 262 (Del.1960) . In order to break the causal chain, the intervening cause must also be a superseding cause, that is, the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor. *Stucker v. American Stores Corp.,* 171 A. 230, 233 (Del.1934); 1 J.D. Lee & Barry A. Lindahl, *Modern Tort Law: Liability & Litigation,* § 4.07 (1994).
*3 In a case of negligent conduct followed by an intervening act causing injury, liability of the [original] tortfeasor should turn on whether the risk of particular consequences is sufficiently great to lead a reasonable [person] ... to anticipate them, and to guard against them.
*Sirmans v. Penn,* 588 A.2d 1103, 1107 (Del.1991) (quoting *Delmarva Power & Light Co. v. Burrows,* 435 A.2d 716, 719 (Del.1981); W. Prosser, *The Law of Torts* 145 (4th ed.1971)); *see also Nutt v. GAF Corp.,* 526 A.2d 564, 567 (Del.Super.1987) (holding that original tortfeasor remains liable if the intervening act "ought to have been foreseen, or if, according to the usual experience of mankind, the result ought to have been apprehended"); *McKeon,* 164 A.2d at 262 (holding that liability of original tortfeasor depends upon "whether or not the negligence of the [third party] under the circumstances was something which should have been reasonably foreseeable or reasonably anticipated by the [defendant]"); *Szymanska v. Equitable Life Ins. Co.,* 183 A. 309, 312 (Del.Super.1936) (holding that "in the field of negligence, the intervening negligent act of a third

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 3

Not Reported in A.2d, 2003 WL 139758 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

party does not relieve a defendant from liability for his own negligence, if the former was reasonably to be anticipated.").
In short, a superseding cause is a new and independent act, itself a proximate cause of an injury, which breaks the causal connection between the original tortious conduct and the injury. If the intervening negligence of a third party was reasonably foreseeable, the original tortfeasor is liable for his negligence because the causal connection between the original tortious act and the resulting injury remains unbroken. 57A Am.Jur.2d *Negligence* § 621 (1989). If, however, the intervening negligence was not reasonably foreseeable, the intervening act supersedes and becomes the *sole* proximate cause of the plaintiff's injuries, thus relieving the original tortfeasor of liability. *See Sears, Roebuck & Co. v. Huang,* 652 A.2d 568, 573 (Del.1995) (holding that "if one defendant's negligence is found to be the sole proximate cause of the plaintiff's injury, it is a superseding cause which shields the other defendants from liability.").

*Duphily,* 662 A.2d at 828-29 (footnote omitted).

Generally, the issue of proximate causation is a question of fact, which must be determined by the trier of fact. *Id.* at 830 (citing authorities). Indeed, the issue of proximate cause "is to be determined, on the facts, upon mixed considerations of logic, common sense, justice, policy and precedent." *Chudnofsky,* 208 A .2d at 518. Where, as here, another's actions lead to the injury, "only where there can be no reasonable difference of opinion as to the conclusion to be reached on the question of whether an intervening cause is abnormal, unforeseeable, or extraordinary negligent, should the question [of proximate causation] be determined by the Court as a matter of law." *Duphily,* 622 A.2d at 831.

*4  Chandler argues that Wood's actions were independent of Chandler's. In support of this contention, he points to facts in the record which support the conclusions that Chandler's vehicle was "several seconds" ahead of Wood's and that Chandler's vehicle was "probably a tenth of a mile" from the actual accident. Thus, Chandler argues,

even in the event Chandler's actions were negligent, Wood's actions constituted an supervening cause and broke the chain of causation. This argument is unpersuasive.

Under the facts presented, Chandler was operating his vehicle in such a fashion that a trier of fact could conclude that defensive and offensive reactions of his fellow motorists were foreseeable. The fact-finder could conclude that Chandler was aware, or should have been aware of, the chaos he left in his wake and the repercussions his actions would have. On the other hand, the trier of fact could find that Chandler was sufficiently removed from the accident in both time and space to relieve him of responsibility for Rutledge's injuries.

An event is considered foreseeable if "a defendant should have recognized the risk of injury under the circumstances. It is irrelevant whether the particular circumstances were foreseeable." *Delaware Elec. Co-op. v. Pitts,* 633 A.2d 369, 1993 LEXIS 409, at *4, Horsey, J. (Del.1993) (ORDER). Reasonable minds could differ as to whether Chandler's actions were negligent and whether they were a legal cause of the injuries sustained by Rutledge. Thus, the issue of causation may not be determined as a matter of law.

IV. Conclusion

Because the issue of proximate causation is typically a question reserved for a trier of fact and Chandler has failed to rebut this presumption with sufficient evidence, his Motion for Summary Judgment is denied.

IT IS SO ORDERED.

Del.Super.,2003.
Rutledge v. Wood
Not Reported in A.2d, 2003 WL 139758 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5



Not Reported in A.2d

Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

Smith v. McGeeDel.Ch.,2006.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
SMITH
v.
MCGEE and Smitty McGee's, Inc.
No. Civ.A. 2101-S.

Submitted Sept. 7, 2006.
Decided Oct. 16, 2006.
Dear Counsel:
CHANDLER, J.
*1 For the reasons set forth below, after carefully examining the arguments presented by counsel, I grant the motion for partial summary judgment in favor of defendants Dawn McGee and Smitty McGee's, Inc. ("Smitty McGee's").

I. BACKGROUND

This case involves a classic claim of minority shareholder oppression replete with allegations of wrongful withholding of income, excessive officer compensation, denial of access to corporate records, self-dealing, conversion, and fraud. Smith seeks a declaration stating that McGee breached her fiduciary duties of due care, loyalty and good faith to both Smith and the company; a complete and accurate accounting of all monies received; removal of McGee as the sole director of the company; disgorgement of ill-gotten gains; a constructive trust on ill-gotten gains and the fruits of ill-gotten gains; and an equitable lien on all shares of the company owned by McGee. Before I discuss the merits of Smith's claims in the context of this motion for partial summary judgment, however, it may be helpful to first examine the factual background and procedural posture of this case.

In April 1989, Smith and Ronald ("Rick") McGee,

Dawn McGee's ex-husband, invested personal capital and formed Smitty McGee's, a private, closely-held corporation. Shortly thereafter, they sold a 20% interest in the company to Alvah Price and each retained a 40% interest. In June 1989, Smith, Rick McGee and Price opened Smitty McGee's Raw Bar & Restaurant. Although the Restaurant met with great success, the business relationship seemed to have deteriorated by 1992. Rick McGee, without Smith's knowledge, purchased Price's 20% interest, giving Rick McGee a 60% controlling interest in the company. Two years later, Rick McGee called a special stockholders meeting at which he removed Smith as a director, accepted Price's resignation as a director, and elected himself the sole director of the company. Rick McGee also voted to amend the company's by-laws to reduce the whole board to one director and to permit corporate action through written consent of the majority holder of the company's outstanding stock. In the mid-1990s, Dawn McGee became a 60% owner of the company as a result of her divorce settlement and has remained the company's sole director and majority shareholder.

Smith asserts that McGee runs the business for her personal benefit and to Smith's detriment since she obtained control. Specifically, Smith alleges that McGee precludes him completely from recognizing any benefit from his investment in the company. For example, he has not received any dividends in over fifteen years, with the exception of a nominal dividend issued on the eve of this litigation, nor has he been an employee in over ten years. Further, McGee blocks Smith's access to company records and information by failing to hold shareholders meetings and by largely rejecting Smith's demand under 8 *Del. C.* § 220. From 2001-2004, however, McGee paid to herself $884,811 in executive compensation for running the single location, seasonal restaurant and bar; granted interest free loans to herself and Rick McGee; and acquired at least six company owned vehicles for a business that does no off-site catering.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*2** In 1997, Smith commenced a suit in his individual and derivative capacity against Rick McGee, Dawn McGee, and Smitty McGee's. Smith alleged breach of fiduciary duty, conversion of company funds, improper use of funds, fraud, unjust enrichment, and racketeering against Rick McGee. He asserted claims against Dawn McGee for negligent management, unjust enrichment, conspiracy to commit racketeering, and aiding and abetting Rick McGee's breaches of fiduciary duties. All of these claims arose as a result of the McGees' alleged mismanagement and misappropriation of Smitty McGee's corporate assets. In May 1998, then-Vice Chancellor Steele dismissed Smith's RICO and common law fraud claims and denied Smith's motion to amend his complaint to assert claims for failure to declare dividends.[FN1] Then, on August 27, 2002, Vice Chancellor Noble dismissed the entire complaint pursuant to Court of Chancery Rule 41(e) for failure to prosecute.

> FN1. *Smith v. Smitty McGee's, Inc.,* 1998 Del. Ch. LEXIS 87 (May 8, 1998).

In 2003, suspicions of improper behavior motivated Smith to make a books and records demand under 8 *Del. C.* § 220. Smith received documents as a result of this demand, but he did not initiate any litigation. Then in 2005, Smith demanded to review the company's books and records. The company, however, rejected this request, and I granted a partial judgment in Smith's favor regarding this demand.[FN2] Smith contends that the documents produced pursuant to that court order put him on notice of McGee's mismanagement and self-dealing and form the basis of the current lawsuit.

> FN2. *Smith v. McGee,* Del. Ch., C.A. No. 1295 (June 21, 2005).

Broadly, the crux of this dispute is whether McGee mismanaged the company and breached numerous fiduciary duties making her liable to both the corporation and Smith. Smith seeks relief pursuant to six counts. First, Smith claims that by virtue of McGee's domination of the company, she has oppressed his reasonable shareholder expectations in the company. Second, Smith alleges breach of loyalty and good faith. Third, Smith contends that McGee breached her duty of due care. Further, he contends that McGee wrongfully converted funds and committed fraud. Smith insists that both he and the company suffered economic injuries as a result of McGee's actions and, thus, both are entitled to monetary damages. Defendants McGee and Smitty McGee's respond with a motion for partial summary judgment stating that Smith is barred from asserting claims arising prior to April 25, 2003, on the grounds of laches and the statute of limitations or, alternatively, that Smith is barred from asserting claims arising prior to August 27, 2002, under the doctrine of *res judicata.* Today, I rule on this motion for partial summary judgment.

## II. MOTION FOR SUMMARY JUDGMENT [FN3]

> FN3. Smith requests that this Court treat defendant's motion for summary judgment as a motion to dismiss because plaintiff has not been afforded the benefits of discovery. Court of Chancery Rule 56(f) provides an avenue by which Smith may have challenged application of the summary judgment standard. Specifically, he should have filed an affidavit pursuant to Rule 56(f) outlining what facts, if proven by discovery, would make summary judgment impossible. This action would have halted the motion for summary judgment and first allowed discovery. Smith's failure to utilize Rule 56(f) precludes the application of the motion to dismiss standard.

The standard for reviewing a Court of Chancery Rule 56 motion for summary judgment is well-settled in Delaware law. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [FN4] Justice demands that the court view the facts in the "light most favorable to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 3

Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)
(Cite as: Not Reported in A.2d)

nonmoving party, and the moving party has the burden of demonstrating that there is no material question of fact." [FN5] The nonmoving party, however, "may not rest upon mere allegations or denials of [their] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." [FN6]

> FN4. *Korn v. New Castle County,* 2005 Del. Ch. LEXIS 25, at *13 (Feb. 14, 2005).

> FN5. *Elite Cleaning Co. v. Walter Capel and Artesian Water Co.,* 2006 Del. Ch. LEXIS 105, at *8 (June 2, 2006).

> FN6. *Id.*

### III. STATUTE OF LIMITATIONS

*3 Smith asserts claims of breach of fiduciary duty, fraud, and conversion, all of which are subject to a three-year statute of limitations that begins to run at the time the alleged wrongful act is committed.[FN7] This limitations period, which would preclude all claims arising before April 25, 2003, may be suspended under several tolling theories. Smith alleges that Dawn McGee's actions impeded his access to the information that gave rise to this suit until 2005 and, thus, the limitations period is tolled under three tolling theories: (1) inherently unknowable injuries; (2) equitable tolling; and (3) fraudulent concealment. As the party seeking to toll the limitations period, Smith bears the burden of pleading specific facts to demonstrate that the facts were so hidden that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint within the statute of limitations. Further, "if the limitations period is tolled under any of these theories, it is tolled only until the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury"-that is to say, until plaintiff is on inquiry notice.[FN8] Plaintiff is on inquiry notice if he "is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious." [FN9] Thus, Smith must convince this Court that he was not on inquiry notice-not in possession of facts sufficient to make him suspicious of injury resulting from McGee's

behavior-before April 25, 2003.

> FN7. 10 *Del. C.* § 3106. The statue of limitations, of course, applies to equitable claims only by analogy. *See Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999) (applying the three-year limitations period of 10 *Del. C.* § 3106 to breach of fiduciary duty by analogy); *see also State ex rel. Brady v. Pettinaro,* 870 A.2d 513, 531 (Del. Ch.2005) (applying the three-year limitations period to a claim of fraud); *Blake v. Town of Delaware City,* 441 F.Supp. 1189, 1205 n. 62 (D.Del.1977) (applying the three-year limitations period to a conversion claim).

> FN8. *In re Dean Witter P'ship Litig.,* 1998 Del. Ch. LEXIS 133, at *20 (July 17, 1998) (citations omitted).

> FN9. *Id.* at *31 n. 49.

A limitations period may be tolled under the inherently unknowable doctrine so long as "the discovery of the existence of a cause of action is a practical impossibility." [FN10] Specifically, "there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury." [FN11] Plaintiffs may establish "blameless ignorance" by showing justifiable reliance on a person whom they have "no ostensible reason to suspect of deception." [FN12] Such proof tolls the limitations period until a plaintiff had "reason to know" of a wrong.[FN13]

> FN10. *Id.* at *19-20.

> FN11. *Id.*

> FN12. *Id.*

> FN13. *Id.*

Equitable tolling is appropriate "where a plaintiff reasonably relies on the competence and good faith

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

of a fiduciary." [FN14] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." [FN15] This doctrine also tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.[FN16]

> FN14. *Id.* at *21-22.

> FN15. *Id.*

> FN16. *Id.*

Fraudulent concealment, unlike the doctrines of inherently unknowable injuries and equitable tolling, "requires an affirmative act of concealment by a defendant-an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." [FN17] Nevertheless, "mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute." [FN18] Like the previously mentioned doctrines, tolling exists only "until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence." [FN19]

> FN17. *Id.* at *20-21.

> FN18. *Id.*

> FN19. *Id.*

**\*4** Neither of these tolling theories can suspend the limitations period here because Smith was on inquiry notice of McGee's wrongdoing as of 1997. Setting aside what notice failure to be paid dividends for seven years may have provided, Smith filed a lawsuit against Rick and Dawn McGee that alleged breaches of fiduciary duty, conversion, fraud, RICO violations, and mismanagement of the company and its assets. Specifically, Smith alleged that Dawn McGee was an active and knowing

participant in illegal transactions whereby she and her husband converted money from the company and committed fraud against Smith. Additionally, Dawn McGee was aware of, assisted in, and benefited from Rick McGee's breaches of his fiduciary duties. In the current complaint, Smith contends that Dawn McGee was involved in self-dealing, numerous breaches of fiduciary duties, conversion, and fraud, all of which are the same types of claims present in the 1997 action. The allegations in both the 1997 complaint and the present complaint are based on the same type of behavior-mismanagement and misuse of the company's assets-and, in some instances, the same incidents.

Thus, Smith cannot rely on the inherently unknowable doctrine because allegations in the 1997 complaint show that Smith had actual knowledge of improper and illegal activity and injuries to Smith and the company. This theory also fails because Smith cannot establish that he was blamelessly ignorant. He was rightfully suspicious of his only other partner; thus, there is no one in the company upon which he could justifiably rely. Equitable tolling is inappropriate because Smith cannot say that he reasonably relied on the competence and good faith of Dawn McGee since he has been in and out of nine years of litigation alleging numerous claims of wrongful conduct including breaches of fiduciary duties. Finally, the theory of fraudulent concealment provides no relief for two reasons. First, Smith alleged fraudulent activity in the 1997 action. He cannot now say that he was unaware of the same activity. Second, Smith does not specifically allege any actual artifice or affirmative acts of concealment that were intended to put him off the trail of an injury. Thus, he cannot rely on that theory. Since Smith was on inquiry notice of McGee's activities and the resulting injuries, the tolling theories are unavailable and the statute of limitations applies.

As such, Smith was on inquiry notice of injuries and wrongdoing as early as 1997. Further, nothing has occurred to allay any of his suspicions such that it would be unfair to state that he has remained on inquiry notice since 1997. The case lasted from 1997-2002 and nothing changed. McGee continued

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 5

Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

and continues to exclude Smith from the company, and to date has not been forced to rectify any of the alleged ills. Thus, Smith is precluded from bringing claims that arose before April 25, 2003. This, of course, does not include any wrongful actions that occurred after April 25, 2003. Similarly, it does not include actions where the injuries did not occur until after April 25, 2003. For example, while Smith may not include claims regarding pre-April 25, 2003, loans that McGee granted to herself and her ex-husband, he may seek damages that he and the company suffered and continue to suffer as a result of the continued nonpayment of those loans. Smith failed to distinguish the claims by date; therefore, I will not detail the barred claims. The parties should instead be advised that all claims arising before April 25, 2003, are barred by the statute of limitations and may not be litigated.[FN20]

> FN20. Dawn McGee asserts, in the alternative, that the doctrine of *res judicata* bars all claims arising before August 27, 2002. *Res judicata* would certainly bar all claims that were raised or should have been raised by Smith against McGee in the 1997 complaint. On the other hand, it would not bar any claims arising after the 41(e) dismissal of that action or any different claims that should not or could not have been included in the 1997 complaint. Since I am ruling in favor of defendant Dawn McGee based on the statute of limitations defense, however, there is no need to further discuss the applicability and effect of the *res judicata* defense.

### IV. CONCLUSION

*5 In sum, the three-year statute of limitations operates to bar all claims arising prior to April 25, 2003.

IT IS SO ORDERED.

Del.Ch.,2006.
Smith v. McGee
Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.