IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                          :

RONALD CANTOR, IVAN SNYDER and   :
JAMES A. SCARPONE, as TRUSTEES OF   :
THE MAFCO LITIGATION TRUST,   :
                          :  No. 97-CIV-586-***

           Plaintiffs,   :
                          :

      - against -   :
                          :

RONALD O. PERELMAN,   :
MAFCO HOLDINGS INC.,   :
MacANDREWS & FORBES HOLDINGS INC.,   :
ANDREWS GROUP INCORPORATED,   :
WILLIAM C. BEVINS and   :
DONALD G. DRAPKIN,   :
                          :

           Defendants.   :
                          :
------------------------------------------------------------x

## PLAINTIFFS' PRETRIAL MEMORANDUM

Lawrence C. Ashby (I.D. 468)        Edward A. Friedman
Philip Trainer, Jr. (I.D. 2788)        Andrew W. Goldwater
Tiffany Geyer Lydon (I.D. 3950)        Daniel B. Rapport
ASHBY & GEDDES        Jonathan Gottfried
222 Delaware Avenue        FRIEDMAN KAPLAN SEILER
Wilmington, Delaware 19899          & ADELMAN LLP
(302) 654-1888        1633 Broadway
       New York, New York 10019-6708
       (212) 833-1100

       *Attorneys for Plaintiffs*

Dated:   December 15, 2006

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

PRIOR PROCEEDINGS ....................................................................................................4

EVIDENCE PLAINTIFFS  INTEND TO PRESENT AT TRIAL.....................................6

SUMMARY OF EVIDENCE CONCERNING CERTAIN DISPUTED ISSUES
OF FACT IDENTIFIED BY PLAINTIFFS IN THE PRETRIAL ORDER......................19

SUMMARY OF ARGUMENT WITH RESPECT TO ISSUES OF LAW
IDENTIFIED BY PLAINTIFFS IN THE PRETRIAL ORDER ......................................27

PLAINTIFFS' EXPERTS AND THIS COURT'S *DAUBERT* DECISION.....................35

CONCLUSION.................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ................................................................28

*Berckeley Inv. Group, Ltd v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006)............................................................39

*Bomarko v. International Telecharge, Inc.*,
  794 A.2d 1161 (Del. Ch. 1999)................................................ *passim*

*Boyer v. Wilmington Materials, Inc.*,
  754 A.2d 881 (*Del. Ch. 1999*)........................................................32

*Brophy v. Cities Serv. Co.*,
  70 A.2d 5 (Del. Ch. 1949).........................................................28, 32

*Cantor et al. v. Perelman et al.*,
  414 F.3d 430 (3d Cir. 2005)...................................................... *passim*

*Cede & Co. v. Technicolor*,
  634 A.2d 345 (Del. 1993) ......................................................3, 27-28

*Citron v. E.I. du Pont & Co.*,
  584 A.2d 490 (Del. Ch. 1990).........................................................28

*Citron v. Steego Corp.*,
  C.A. No. 10171, 1988 WL 94738 (Del. Ch. Sept. 9, 1988)...........28, 32

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).................................................................35, 38

*Emerald Partners v. Berlin*,
  787 A.2d 85 (Del. 2001) ................................................................27

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
  817 A.2d 160 (Del. 2002) ..............................................................34

*Guth v. Loft, Inc.*,
  5 A.2d 503 (Del. 1939) .......................................................3-4, 28, 32

*In re Emerging Communications, Inc. Shareholders Litig.*,
  No. Civ. A. 16415, 2004 WL 1305745................................................34

*In re USACafes, L.P. Litig.*,
    600 A.2d 43 (Del. Ch. 1991) ..................................................................................27

*Kahn v. Lynch Communications Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ...................................................................................27

*Oberly v. Kirby*,
    592 A.2d 445 (Del. 1991) .....................................................................................28

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) .....................................................................................28

*Strougo v. Carroll*,
    C.A. No. 8040, 1991 Del. Ch. LEXIS 11 (Del. Ch. Jan. 29, 1991) ......................32

*Thorpe v. CERBCO, Inc.*,
    676 A.2d 436 (Del. 1996) ........................................................................ 27-28, 32

*United States v. Leo*,
    941 F.2d 181 (3d. Cir. 1991) ...............................................................................39

*Wallace v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999) ............................................................................34

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) .....................................................................................27

In accordance with the Revised Stipulated Order of August 23, 2006, plaintiffs respectfully submit this pretrial memorandum. The trial in this action has been postponed pending reassignment of this case.

## PRELIMINARY STATEMENT

This is an action for breach of fiduciary duty against three directors and the controlling shareholder of a now-bankrupt public company, who exploited their positions of trust to benefit themselves (through financial transactions that resulted in unjust enrichment to Ronald O. Perelman ("Perelman"), and damages to Marvel Entertainment Group, Inc. ("Marvel"), in excess of $1 billion).

Plaintiffs are Ronald Cantor, Ivan Snyder and James Scarpone, as trustees of the MAFCO Litigation Trust (the "Trust"). The Trust was created in or about July 1998 pursuant to the order of this Court confirming the plan of reorganization in the bankruptcy cases of Marvel and its affiliates. Under that order and plan, the Trust is the assignee of Marvel's claims asserted herein against the defendants. Marvel had originally asserted these claims and commenced this action as debtor-in-possession. The beneficiaries of the Trust are the former unsecured creditors and shareholders of Marvel as of the time the Trust was created. (PX 335; PX 336.)[1]

At all relevant times, defendant Perelman, through corporations he wholly owned directly or indirectly, owned at least a majority of Marvel's outstanding voting stock. As Marvel consistently disclosed in its proxy statements, Perelman was able to

---

[1] "PX __" refers to plaintiffs' exhibits as listed in the Proposed Pretrial Order which the parties have stipulated are admissible in evidence.

425680.9

control Marvel and elect its entire Board of Directors.  (PX 247 at 18; PX 264 at 19; PX 278 at 14.)  Perelman himself was a director of Marvel and Chairman of the Marvel Board of Directors as well as the owner of, and a director of, the holding companies that issued the Notes described herein.

In addition to Perelman, the defendants are three corporations wholly owned directly or indirectly by Perelman – Mafco Holdings Inc., MacAndrews & Forbes Holdings Inc. and Andrews Group Inc. – and two individuals – William C. Bevins ("Bevins") and Donald G. Drapkin ("Drapkin").  Bevins and Drapkin were senior executives and directors of various companies in Perelman's corporate hierarchy (including the holding companies that issued the Notes described herein) and also directors of Marvel during the time that Perelman controlled Marvel.  Bevins was the CEO of Marvel at all relevant times.

In 1993 and 1994, Perelman and the other defendants caused the companies that held his Marvel stock (the "Holding Companies"[2]) to sell three tranches of notes (the "Notes"), raising $553.5 million for Perelman's sole benefit.  Plaintiffs allege that defendants breached their fiduciary duties to Marvel in multiple respects: *first*, by promising to restrict Marvel's financing activities in order to implement transactions that provided significant benefit to Perelman and no benefit whatsoever to Marvel; *second*, by causing Marvel to participate in the transactions -- for example by providing the underwriters with free access to Marvel for their due diligence, by

---

[2] The Holding Companies were Marvel Holdings Inc., Marvel (Parent) Holdings Inc., and Marvel III Holdings Inc.

delivering opinion letters from Marvel's general counsel to the underwriters and by causing Marvel personnel to help market and sell the Notes at the road shows for potential investors; and third, by failing to consider and avoid the actual, adverse consequences to Marvel of the Note transactions and Indenture restrictions.

Simply put, in violation of Delaware law, defendants (and Perelman in particular) used their fiduciary positions for personal gain. In making these promises and taking these actions, defendants breached their fiduciary duty because "*corporate officers and directors are not permitted to use their positions of trust and confidence to further their private interests…*." *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) (emphasis added). Perelman let his personal interest take precedence over Marvel's interest. Under settled Delaware law, this is a breach of fiduciary duty. As the Delaware Supreme Court has said, the "*duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally*." *Cede*, 634 A.2d, at 361 (emphasis added, citations omitted). Perelman, Bevins and Drapkin failed to fulfill their most fundamental fiduciary duty, which is to act in the best interest of Marvel and protect Marvel and all of its shareholders.

Moreover, with respect to Marvel's actions and decisions to facilitate the Note transactions and acknowledge the Indenture restrictions, Perelman, Bevins and Drapkin were clearly "interested directors." This is because their interests differed from Marvel's. Perelman received all the benefits of the Note transactions; Marvel received none, and indeed, the transactions resulted in costs and burdens for Marvel. Thus, to

avoid a judgment for breach of fiduciary duty, defendants have the burden of proving that

Marvel's participation in the Note transactions was on terms "entirely fair" to Marvel.

Defendants cannot possibly meet this burden.

Where the evidence establishes that a breach of fiduciary duty has

occurred, the law and public policy in Delaware are clear:

> The rule, inveterate and uncompromising in its rigidity,
> does not rest upon the narrow ground of injury or damage
> to the corporation resulting from a betrayal of confidence,
> but upon a broader foundation of a wise public policy that,
> for the purpose of removing all temptation, *extinguishes all
> possibility of profit flowing from a breach of the confidence
> imposed by the fiduciary relationships*."

*Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939) (emphasis added), quoted in *Cantor et al. v.

Perelman et al.*, 414 F.3d at 436.  Here, as explained below, the evidence at trial will

show that plaintiffs are entitled to a judgment of approximately $1.1 billion (including

pre-judgment interest) based on Perelman's unjust enrichment *measured as of the time of

the Note issuances* or based on actual damages suffered by Marvel as a result of

defendants' breaches of fiduciary duty.

## **PRIOR PROCEEDINGS**

This action was originally assigned to Judge Roderick R. McKelvie.  The

scheduling order of February 7, 2002 (D.I. 201) set March 22, 2002 as the deadline for

filing dispositive motions and May 13, 2002 as the date for trial.  Judge McKelvie,

however, announced his retirement in or about March 2002, and by order dated March

21, 2002, the District Court referred this action to the Magistrate Judge Thynge pursuant

to 28 U.S.C. § 636(b), pending reassignment to a new judge.  On March 22, 2002,

defendants moved for summary judgment seeking dismissal of all claims, and plaintiffs

moved for partial summary judgment against defendant Perelman.

On December 9, 2002, the Magistrate Judge issued a report recommending

that the District Court dismiss plaintiffs' claims in their entirety.  In her report, the

Magistrate Judge accepted defendants' argument that the Note transactions merely

amounted to "potential" breaches of fiduciary duty and that an actual conflict "never

materialized."

On February 18, 2004, the District Court (Jordan, J.) issued a

Memorandum Order adopting the report of the Magistrate Judge "in all respects."  The

District Court agreed with defendants that it was plaintiffs' burden to show that

"Perelman had caused Marvel 'to act in such a way' that he benefited at Marvel's

expense,"  and that "Perelman's potential conflicting loyalties between Marvel and the

holding companies 'never materialized and cannot form the basis for a breach of

fiduciary duty.'"  The District Court entered final judgment in favor of defendants, and

plaintiffs appealed.

In an opinion dated July 12, 2005, the United States Court of Appeals for

the Third Circuit reversed the grant of summary judgment with respect to plaintiffs'

claim for unjust enrichment, stating:

> The record before us would support a finding that
> Perelman's companies received $553.5 million in financing
> they would not otherwise have been able to secure by
> committing to prevent Marvel from taking certain actions
> and by utilizing Marvel's corporate resources to market that
> financing.  And, given the nature of the restrictions
> imposed, the commitment was one that could be
> effectuated only by exercising the defendants' control of
> Marvel's board of directors.

425680.9

5

*Cantor v. Perelman*, 414 F.3d 430, 435 (3d Cir. 2005).  The Third Circuit rejected

defendants' argument that the statute of limitations could provide a defense to plaintiffs'

unjust enrichment claim:  "In brief, the benefit of the statute of limitations will be denied

to a corporate fiduciary who has engaged in fraudulent self-dealing."  (*Id*. at 439.)

With respect to plaintiffs' claims for compensatory damages, the Third

Circuit also reversed the grant of summary judgment to defendants, except as to

plaintiffs' damage claim concerning the earliest tranche of Notes, which was dismissed

on the basis of the statute of limitations.

In explaining the issues to be resolved at trial, the Third Circuit stated:

> In the prospectuses necessary to market the Notes, the
> defendants not only described the restrictions, which are
> said to "limit … Marvel," but also stressed that Perelman
> was "able to direct and control the policies of" Marvel.
> *See, e.g.,* App. At 1037, 1137, 1166.  A trier of fact could
> well view this as a recognition by the defendants that their
> promises to prevent Marvel from taking the actions in the
> restrictive covenants were credible and would be relied
> upon by Note purchasers only because Perelman had the
> power to carry out those promises and had committed
> himself to do so.  Based on the fact that defendants were
> advised by their underwriters that the restrictions were
> necessary to the success of the issuances and the fact that
> the Notes were successfully marketed, a trier of fact could
> further conclude that the defendants were successful in
> convincing the marketplace that they would in fact
> "prevent" Marvel from taking the forbidden actions.  The
> success of these offerings tends to show that it was not
> necessary to the financing for Marvel to be a party to the
> Indentures or for the Note holders to be able to sue Marvel
> for specific performance of the restrictions.

(414 F.3d at 436-37.)  The Court also stated:

> A trier of fact could well conclude on this record that the
> restrictions began to affect Marvel when the Notes were
> issued, *that measures to deal with the conflict of interest*

> *should have been taken before the restrictions were*
> *proposed*, and that the restrictions were responsible for the
> fact that no proposal for their violation ever came before
> the Marvel board.

(*Id.* at 437, emphasis added.)

Although the Court "conclude[s] that plaintiffs may be able to require the defendants to account for their unjust enrichment at the time of issuance of the respective Notes," the Court notes that that does not "necessarily" mean that defendants should be required to pay the entire $553 million." (*Id.* at 437.) The Court explains that "an unjust enrichment award of $553 million *could* result in a windfall." (*Id.*) However, contrary to defendants' contentions, the Third Circuit does not hold that that an award for the full $553.5 million *would* be improper. On the contrary, the Third Circuit does not reach that issue and states:

> …the extent of any unjust enrichment is …not before us.
> For that reason, it would not be appropriate for us to restrict
> plaintiffs' proof on remand.

(*Id.*)

As to plaintiffs' claim for damages, the Third Circuit holds that there are numerous "material disputes of fact regarding the issue of whether Marvel was injured by the restrictions." (*Id.* at 438.) For example, the Court notes:

> …there is evidence in the record from which a trier of fact
> could conclude that, but for the Indenture restrictions, a
> Marvel management acting in its best interest would have
> had a different and more favorable capital structure.

(*Id.* at 437.)

**EVIDENCE PLAINTIFFS
INTEND TO PRESENT AT TRIAL**

There is no dispute about the terms of the Indentures for the Notes issued

by the Marvel Holding Companies.  For example, Section 4.04 of each Indenture is

entitled "Limitation on Debt of Marvel and Its Subsidiaries and Limitation on Preferred

Stock of Marvel."  Section 4.04(a) of each Indenture provides that "The Company

[i.e., Holdings, Parent or Marvel III, respectively] shall not permit Marvel or any

Subsidiary of Marvel to Issue, directly or indirectly, any Debt unless" certain financial

ratios are met.  Section 4.04(c) of each Indenture provides that "The Company [i.e.,

Marvel Holdings, Marvel Parent or Marvel III, respectively] shall not permit Marvel to

Issue any Preferred Stock" except under certain enumerated circumstances.  (PX 1 at 34-

35; PX 10 at 36; PX 15 at 39.)  Section 4.05 of each Indenture provides that the Marvel

Holding Companies "shall not permit Marvel" or "shall not permit any of its Subsidiaries

[including Marvel]" to make "Restricted Payments" (including dividends and stock

buybacks), engage in transactions with affiliates, and sell assets, except under certain

enumerated circumstances.  (PX 1 at 35; PX 10 at 37; PX 15 at 39-40.)  Section 4.09(a)

of each Indenture provides that the Marvel Holding Companies shall hold a majority of

Marvel's voting shares.  (PX 1 at 41; PX 10 at 43-44; PX 15 at 48.)[3]

There is also no dispute that Marvel is not a signatory to the Indentures.

Each Indenture is signed by one of the Marvel Holding Companies and an Indenture

---

[3] Defendants argue that Section 4.09 is worded differently from the other restrictions
and does not literally say that Issuer will not permit Marvel from issuing voting stock.
The Third Circuit, however, interprets this section as "restricting Marvel's ability to issue
stock that might dilute Perelman's stake."  (414 F.3d at 434.)

Trustee.  However, the plain words of the Indentures provide that Perelman's holding

companies are promising to restrict Marvel's financing activities.  The offering

memorandum for each tranche of Notes proclaims Perelman's control over Marvel,

without in any way suggesting that Marvel's Board of Directors is free to disregard the

restrictions applicable to Marvel or free to determine Marvel's financing activities and

capital structure without regard to the terms of the Indentures.  For example, each

offering memorandum and/or prospectus for each Note issuance assures the prospective

Note purchasers that "MacAndrews & Forbes will be able to direct and control the

policies of the Issuer and its subsidiaries [i.e., Marvel], including mergers, sales of assets

and similar transactions."  And each offering memorandum and/or prospectus goes on to

say that "no vote [would] be cast, and no consent, waiver or ratification given or action

taken, which would be inconsistent with or violate any provision of the Indenture or the

Notes."[4]  (PX 5 at 55, PX 11 at 51, PX 16 at 66.)

---

[4] Marvel's own proxy statements, before and after the Note issuances, consistently
disclose that Perelman controls Marvel and that Perelman can elect Marvel's entire board
of directors.  For example, Marvel's annual proxy statements for the years 1994, 1995
and 1996 state:

> The Company [Marvel] is an indirect approximately 80%
> owned subsidiary of MacAndrews & Forbes.  As a result,
> MacAndrews & Forbes is able to *direct and control the
> policies of the Company and its subsidiaries*, including
> mergers, sales of assets and similar transactions.
> MacAndrews & Forbes is wholly owned by Ronald O.
> Perelman.

(Emphasis added.)  Similarly, in the prospectus for Marvel's 1991 public equity offering,
Perelman stated that, as owner (through MacAndrews & Forbes) of 60% of Marvel's
stock, he would "continue to be able to control the Company and elect the entire board of
directors."  (PX 247 at 18, PX 264 at 19, PX 278 at 14.)

In this lawsuit, defendants argue that the Indentures did not impose limitations on what Marvel could do, and that Marvel was always free to disregard the Indenture restrictions without consequence to it.  In fact, defendants' argument is contrary to the evidence that will be presented at trial -- including defendants' and Marvel's own statements in SEC filings and elsewhere while the Notes were outstanding.

For example, in an SEC filing in 1993, describing the soon-to-be effective Holdings Indenture, defendant MacAndrews & Forbes stated:  "The indenture will contain certain covenants that …*will impose limitations* on (i) the issuance of additional debt by Marvel Holdings and its subsidiaries (including [Marvel] and its subsidiaries); (ii) the issuance of preferred stock by [Marvel]…."  (PX 46 at p. 2 of Supplement, emphasis added.)  This statement by MacAndrews & Forbes is presented as a statement of fact.  It is not qualified by language such as, "if the Marvel Board chooses to comply with such limitations."  It is not ambiguous.  MacAndrews & Forbes says unequivocally that the Indentures will impose limitations on the issuance of debt and preferred stock by Marvel.

Similarly, after all the Notes had been issued, Marvel itself, in an S-3 registration statement signed by Bevins and other executives, provided a detailed explanation concerning the Indenture restrictions in a section entitled "Holding Company Indebtedness: Restrictions Imposed and Consequences of Failure to Comply."  Marvel does not say the restrictions are not binding on it, nor that the Marvel Board is free to disregard the restrictions.  On the contrary, Marvel explains that certain covenants in the Indentures "restrict the Company [i.e., Marvel]," that "the ability of [Marvel and Marvel's parents] to comply with such covenants can be affected by events beyond [Marvel's or Marvel's parents'] control" and that a breach of such covenants could result

10

in a default by Marvel under its own credit agreements.  (PX 28 at 4.)  Moreover, each

and every Marvel 10-K, as well as other periodic Marvel SEC filings, from the issuance

of the first tranche of Notes in 1993 to Marvel's bankruptcy filing in 1996, all signed by

Perelman, Bevins and Drapkin, describe the Holding Company Indentures as containing

"various covenants relating to [Marvel], including certain limitations on [Marvel's]

indebtedness."  (*E.g.*, PX 24, PX 29 and PX 34.)  Not one of these SEC filings states, or

even hints, that the Marvel Board is free to disregard the "limitations on [Marvel's]

indebtedness" in the Indentures.  If Marvel had believed that the Indenture restrictions

had no effect on Marvel, it would have been materially misleading for Marvel to describe

the restrictions in its own SEC filings, which are required by law to provide accurate

information about Marvel.

        In response to this factual record and to plaintiffs' claims in this lawsuit,

defendants now come into this Court and say the opposite of what the Holding

Companies and Marvel had promised and publicly stated for years.  They contend that

the Indentures did not restrict Marvel, and that a "violation of those covenants would

have only affected the rights of the Marvel Holding Companies, and, indirectly, Mr.

Perelman."  (D.I. 275 at 40, Defs.' Opening Brief in Support of Motion for Summary

Judgment, Mar. 22, 2002.)  Defendants try to explain away their SEC filings by saying,

"These public filings alerted investors to the existence of the Indenture provisions but do

not say that these provisions were legally binding on Marvel or that a breach of these

provisions by the Issuers would have any effect on Marvel."  (D.I. 291 at 10, Defs.' Brief

in Opposition to Pls.' Motion for Partial Summary Judgment, Apr. 5, 2002.)  In fact,

defendants' assertion is simply false.  As noted above, Marvel's own SEC filings (PX 28

at 4) do say that breach of these provisions would have consequences for Marvel.
Moreover, if in fact the Indentures were not binding on Marvel and Marvel were free to
disregard the restrictions -- as defendants maintain in this lawsuit -- then the disclosures
in defendants' and Marvel's SEC filings about the limitations imposed on Marvel and
consequences for Marvel of failure to comply would have been patently misleading.

Not only did Marvel and defendants state in their SEC filings that the
Notes and Indentures could and would have consequences for Marvel, but also the
evidence at trial will show that the Note Issuances and Indentures in fact had actual
adverse consequences for Marvel.[5]  Defendants nonetheless maintain in this lawsuit that
"the Marvel Holding Companies' covenants never had any impact on Marvel."  (D.I. 275
at 3, emphasis in original, Defs.' Opening Brief in Support of Motion for Summary
Judgment, Mar. 22, 2002.)  The facts are otherwise.  On the day Marvel filed for

---

[5] Even in the absence of such evidence, Perelman would be liable for breach of
fiduciary duty and required to disgorge his entire unjust enrichment.  The evidence that
the Notes and Indenture restrictions actually harmed Marvel provides an alternative basis
for recovery measured by Marvel's actual damages.  The Third Circuit decision in this
case expressly addresses plaintiffs' entitlement to monetary relief even in the absence of
actual damage:

> A corporate fiduciary receiving a "personal benefit not
> received by the shareholders generally" is a "classic"
> example of a breach of the duty of loyalty.
>
> *               *               *
>
> "[T]he absence of specific damage to a beneficiary is not
> the sole test for determining disloyalty by one occupying a
> fiduciary position."

(414 F.3d at 436, citations omitted.)

bankruptcy, Marvel issued a press release stating, "The filing was necessitated *by the failure of the holders of bonds issued by Marvel's holding companies* to reach agreement regarding any alternative plans for the Company's future."  (PX 39, Marvel 8-K with attached press release, emphasis added.)  This press release, as well as substantial evidence, show that the premise for Perelman's defense in this case -- that the Notes and Indentures did not affect Marvel -- is false.

In the weeks leading up to Marvel's bankruptcy filing, Perelman and the other defendants repeatedly acknowledged that Marvel's ability to obtain financing and pursue a restructuring were being impeded by the Notes and Indentures.  For example, on December 26, 1996, the day before Marvel filed for bankruptcy, Perelman explained to the Marvel Board:

> In that perspective and *the inability to expeditiously effect a restructuring of the financial obligations of certain parent companies of the Corporation that would enable the recapitalization of the Corporation*, it was appropriate to consider the commencement of a case under Chapter 11 of the United States Bankruptcy Code on behalf of the Corporation.

(PX 169, emphasis added.)  Two weeks earlier, Perelman had told the Marvel Board that:

> As of today, the present [Holding Company] bondholders have not organized and, therefore, Andrews Group has not been able to negotiate with the bondholders for their consent to the proposed investment by Andrews Group in the Corporation [i.e., Marvel].  Mr. Perelman stated that a delay in implementing the restructuring would have a negative impact on the Corporation's liquidity needs.

(PX 168.)

Howard Gittis, the Vice Chairman of defendant MacAndrews & Forbes, explained to Marvel's banks in November 1996 that it was not just Andrews Group that

was unwilling to invest in Marvel without concessions from the Holding Company
Noteholders. According to Gittis, Marvel could not obtain desperately-needed financing
from anyone without renegotiating or eliminating the restrictions in the Holding
Company Indentures. (PX 314; Gittis Tr. 9:8 - 13:24.) Gittis explained to *Marvel's* bank
lenders that Perelman was planning to file a bankruptcy for the *Marvel Holding
Companies*, and, pursuant to that bankruptcy, would make "certain changes" - and that
sections 4.04 and 4.09 in the Indentures "were among those things that had to be
changed." (*Id.*) Gittis, at his deposition, goes on to explain why he was telling Marvel's
banks that provisions in the Holding Company Indentures needed to be changed: "no one
would put the kind of money necessary to restructure Marvel up without owning a
majority of shares free of these [Holding Company] bond offerings." (Gittis Tr. 13:15-
18.)

       Defendants also try to avoid liability for their breaches of fiduciary duty
by arguing that the Indenture restrictions were not really necessary to sell the Notes and
that Perelman could have obtained the $553.5 million (or something close to that amount)
without promising to restrict Marvel's financing activities. In the first place, plaintiffs
submit, this argument is a non-sequitur. It is not the law in Delaware -- or in any other
jurisdiction -- that a corporate director who reaps a personal benefit by breaching his
fiduciary duty can escape liability by arguing, after the fact, that he could have obtained a
similar benefit by taking different actions that might not have been in violation of his
fiduciary duty.

       In the second place, defendants' argument defies common sense -- that
Perelman and the underwriters and their counsel all agreed on the terms of the Indenture

restrictions applicable to Marvel, in a transaction where Marvel common stock was the

sole collateral for the Noteholders, but the restrictions were not really necessary.

Moreover, the evidence at trial will show that, in fact, the Indenture restrictions were

necessary to effectuate the successful sale of the Notes which resulted in $553.5 million

for Perelman's sole benefit.  For example, Robert Kramer of Merrill Lynch, underwriter

for the Marvel Holdings Notes and Marvel III, testified at his deposition (which will be

offered at trial) that the restrictions on Marvel were designed to protect the Noteholder's

security, and to ensure that Perelman would continue to control Marvel so he could

enforce the restrictions to which the Marvel Holding Companies had agreed.  (Kramer Tr.

at 20:22-21:2).  Similarly, defendant Drapkin testified that the underwriters felt that the

restrictions on Marvel were "necessary" to market the Notes to potential investors.

(Drapkin Tr. at 35:22-36:4; *see also* Bevins Tr. at 42:25-43:14 and 54:20-56:50.)[6]

   In sum, the evidence at trial will show that the Holding Company Notes

and Indentures did have actual adverse consequences for Marvel -- and, from the time of

the issuance of those Notes, defendants and Marvel repeatedly acknowledged that the

Indenture restrictions were applicable to Marvel, without ever suggesting (as they now do

in this lawsuit) that the Indentures were of no consequence for Marvel.

   In light of the clear evidence that Perelman's promises to impose

restrictions on Marvel did have actual consequences for Marvel, it is extraordinary that

defendants maintain in this action that there was no role for the Marvel Board to play in

---

[6] The testimony of plaintiffs' corporate finance expert William Purcell will also explain that that the Notes could not have been marketed without the restrictive covenants on Marvel.  (Purcell Report at 2-3).

connection with the Note issuances by the Marvel Holding Companies.  Even though there was no authorization by Marvel's independent directors or a special committee, it is a fact that Marvel played a significant role in facilitating the transactions and enabling the Holding Companies to market and sell the Notes.  The underwriters for the Holding Companies were given "free access" to Marvel's operating management for their due diligence (Bevins Tr. 24:23-25:4), and Marvel senior management participated in "road shows" for prospective investors in all three Note issuances where "the main focus of the presentation …was the business of Marvel …."  (Bevins Tr. 35:3-6.)  For each tranche of Notes, Marvel's general counsel reviewed the offering memorandum, the Indenture and numerous other documents, and provided his written opinion to the underwriters that "no facts have come to my attention that have led me to believe that the offering memorandum…contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein…not misleading …" (PX 210, PX 229, PX 246.)

So, in these Note transactions, not only was Perelman using his fiduciary position for personal gain -- by promising to restrict Marvel's financing activities in order to obtain benefits (i.e., $553 million) for himself -- but also Marvel was helping him do it. Why?  Who decided that Marvel should facilitate transactions that resulted in limitations on Marvel's ability to issue debt and equity?  Who decided that Marvel should help market and sell Notes that would effectively transfer power over Marvel's financial destiny away from the Marvel Board and to the Holding Company Noteholders?  And who decided that Marvel should do all of this -- and incur costs, burdens and risks --- without receiving any benefit, payment or compensation?

425680.9                                   16

The fact is that defendants decided.  Perelman, Bevins and Drapkin were directors of Marvel and directors of the Marvel Holding Companies.  They simply commandeered Marvel's resources and cooperation for the benefit of Perelman.  There was no committee of independent directors, no special counsel, no financial advisor to determine whether it would be consistent with Marvel's interests to facilitate the Note transactions, and, if so, on what terms.

Yet, on the question of whether Marvel should help Perelman effectuate the Note transactions, Perelman stood on both sides of the matter.  He was the 100% owner of the Note issuers and all the proceeds were for his sole benefit.  At the same time, he was a Marvel director, chairman of the Marvel board, and controlling shareholder.  Thus, in order to determine whether Perelman's use of Marvel's corporate resources to benefit himself was a breach of his fiduciary duty to Marvel, the legal standard is "entire fairness."  In other words, was Marvel's economic participation on terms that were entirely fair to Marvel and was the process for arriving at those terms entirely fair and untainted by self-interest on the part of the Marvel directors who were acting on behalf of Marvel?  Perelman, who was obviously a self-interested director, has the burden of proof on this issue.

Plaintiffs submit that Marvel's participation was clearly *not* on terms that were fair to Marvel.  With respect to the process component of the entire fairness test, there was none; there was no deliberation by a committee of independent directors of Marvel to consider whether Marvel should facilitate the Note transactions, and, if so, on what terms.  With respect to the economic terms or the price component of the entire fairness test, Marvel did not receive any compensation at all for its assistance and

425680.9

17

participation.  Perelman reaped all the benefits of the Note transactions, while Marvel, which facilitated those transactions and incurred costs and burdens, received no compensation or payment.  By definition, this was not entirely fair to Marvel.

If a large Marvel shareholder other than Perelman had wanted to monetize his shares as Perelman did, Marvel's directors (including Perelman) never would have authorized the expenditure of Marvel's resources, acquiesced in restrictions on Marvel's financing activities, or proffered the substantial support and assistance that Perelman obtained for himself.  Thus, plaintiffs submit that the evidence will show that Perelman (and Bevins and Drapkin) breached their fiduciary duties to Marvel.

Under Delaware law, in the case of a breach of fiduciary duty this Court has broad power to fashion a remedy to ensure that defendants are not unjustly enriched and plaintiffs are fairly compensated.  Courts look at various factors, including (i) the enrichment to the defendants resulting from the breach, (ii) the damages to the plaintiffs resulting from the breach and (iii) what would have been the result of arm's-length bargaining, if, instead of breaching his duty, the wrongdoing fiduciary had negotiated with independent directors to seek to persuade the corporation to agree to do what he wanted it to do.

Not all of these factors apply in all cases, and not all of these factors are weighted the same way where they do apply.  But one thing is clear, as shown in the discussion of the case law below: the overriding legal principle is to ensure that disloyal fiduciaries do not benefit from their breaches.  The rule serves the fundamental principle of Delaware law that a disloyal fiduciary must not benefit from his breach, and is designed to protect the injured party rather then the breaching fiduciary.  Where the

outcome of arm's-length bargaining is speculative, where damages are uncertain, the Court will fashion a remedy that places the burden of that uncertainty on the disloyal fiduciary, that avoids short-changing the plaintiffs, and ensures that defendants do not retain any benefit or profit from their disloyal conduct.

## SUMMARY OF EVIDENCE CONCERNING CERTAIN DISPUTED ISSUES OF FACT IDENTIFIED BY PLAINTIFFS IN THE PRETRIAL ORDER

Plaintiffs set forth below certain issues of fact identified by plaintiffs in the Pretrial Order, and a summary of the evidence that plaintiffs intend to offer at trial with respect to each issue.

1.      *Whether (i) the restrictions applicable to Marvel in the Note Indentures and/or (ii) Marvel's assistance and participation in the process of marketing and selling the Notes, either separately or together, facilitated in a material way the ability of the Marvel Holding Companies to sell the Notes and obtain proceeds of $553.5 million?* Plaintiffs submit the answer is, *yes*. Plaintiffs' expected evidence as to the importance of the restrictions will include: testimony of defendant Donald Drapkin (who was a director of the Marvel Holding Companies and a director of Marvel) that the underwriters felt that Indenture restrictions concerning Marvel's issuance of debt and Marvel's issuance of preferred stock were "necessary" to market the Notes; testimony from plaintiffs' expert William H. Purcell, an investment banker with experience underwriting debt offerings, that the Note Indentures and restrictions were a substantial reason why the Marvel Holding Companies were able to issue the Notes; and evidence that in connection with the Marvel Parent Note offering, the issuer promised the underwriter that for a period of ninety days after the issuance of Marvel Parent Notes,

425680.9

19

Marvel would not issue any securities, absent the consent of the underwriter.  Plaintiffs'

expected evidence as to the importance of Marvel's assistance and participation will

include evidence that Marvel granted the underwriters access to Marvel personnel and

information for due diligence in connection with the Note issuances, Marvel was the

main focus of the due diligence, Marvel's general counsel and auditors provided opinion

and comfort letters in support of the Note transactions, and Marvel's principal officers

were participants in the road shows for potential investors in the Notes.

        2.     *Whether defendants had interests that differed from and/or*

*conflicted with the interests of Marvel with respect to the Note transactions?*  Plaintiffs

submit the answer is, *yes*.  Plaintiffs will present evidence that defendants' interests

differed from and conflicted with Marvel's interests because the defendants received all

of the benefits of the Note transactions and Marvel received none; the entire proceeds of

$553.5 million was paid as dividends upstream in Perelman's corporate hierarchy to

Perelman or corporations he owned 100% directly or indirectly; and Marvel received no

part of the proceeds; in order to obtain the benefits of the Note issuances, defendants

agreed to restrictions applicable to Marvel and utilized Marvel's corporate resources; and

the issuance of the Notes had adverse effects on Marvel's financing capability and cost of

capital.

        3.     *Whether the Note transactions were entirely fair to Marvel?*

Plaintiffs submit the answer is, *no*.  Plaintiffs submit that the Note transactions were not

entirely fair to Marvel because:  (1) as a matter of process, the decision to go forward

with the transactions was made by defendants Perelman, Bevins and Drapkin who were

directors of the Marvel Holding Companies and directors of Marvel at the same time; and

there was no determination by independent directors of Marvel that it would be in

Marvel's interest for Marvel to assist, participate in and acquiesce in the transactions as it

did; (2) defendants received all of the benefits from the Notes; (3) Marvel received no

benefit from the Notes; and (4) the issuance of the Notes and the terms contained in the

Indentures were contrary to Marvel's interests, and injurious to Marvel.  See, for

example, Fowler Report ¶¶ 20-21.

       4.    *Whether defendants exploited their fiduciary positions for personal*

*gain?*  Plaintiffs submit the answer is, *yes*.  Plaintiffs' evidence will include evidence that

defendants received $553.5 million they would not otherwise have been able to obtain by

committing to prevent Marvel from taking certain actions and by utilizing Marvel's

corporate resources to market the Notes; and in light of the nature of the restrictions

applicable to Marvel, the commitment was one that could be meaningful only by trading

upon defendants' ability to control Marvel.

       5.    *Whether defendants' contention is correct, that the Indenture*

*restrictions were of no consequence to Marvel because Marvel was not a signatory to the*

*Indentures?*  Plaintiffs submit that defendants' contention is *not correct*.  Plaintiffs'

expected evidence will include defendants' own statements concerning the Indenture

restrictions and statements in the Note prospectuses that MacAndrews & Forbes would be

able to direct and control the policies of Marvel; evidence that the underwriters required

the restrictions in order to market the Notes and that the Notes were successfully

marketed; the fact that Marvel never disavowed the restrictions; and, to the contrary, in

numerous filings with the SEC (signed by Perelman, Bevins and Drapkin) Marvel

repeatedly acknowledged that the restrictions were applicable to Marvel; and, when

425680.9                                      21

Marvel filed for bankruptcy in December 1996, Marvel acknowledged that the filing "was necessitated by the failure of the holders of bonds issued by Marvel's holding companies to reach agreement regarding any alternative plans for the Company's future." (PX 39 at BS009934-35.)

      6.     *Whether, as a result of the Notes and the restrictions applicable to Marvel in the Note Indentures, defendants had interests that differed from and/or conflicted with the interests of Marvel with respect to decisions concerning Marvel's financing and capital structure in the period following the Note issuances?* Plaintiffs submit that the answer is *yes*; defendants had interests that differed and conflicted from Marvel's interests. Plaintiffs' expected evidence includes evidence that: (1) prior to the first tranche of the Note issuances, Marvel had approved an increase in the authorized common and preferred shares of the company for the purpose of making additional shares available for financings, acquisitions, and other general corporate purposes (*see* Marvel Board minutes dated March 18, 1993); (2) Marvel had a need to raise additional capital after the Notes were issued in order to implement its business strategy; (3) based on a review of Marvel Board minutes after the Note issuances, the Marvel Board did not consider any significant equity financing despite Marvel's excessive debt/equity ratio in comparison to comparable companies; and (4) under the terms of the Note Indentures, defendants faced burdens and costs if Marvel had issued equity that would dilute defendants' interest in Marvel. Under section 4.14 of the Marvel III Indenture, for example, if Marvel issued any significant amount of equity, Perelman's holding companies would either have to purchase 80% of such new equity or else there would be a tax deconsolidation event (as defined in the Indenture) that would result in

(i) Marvel III facing the obligation to repurchase $125 million in outstanding Notes at a premium, and (ii) Marvel III no longer being eligible to receive tax-sharing payments from Marvel that were Marvel III's sole source of revenue to pay interest on the Marvel III Notes.

7.      *Whether a special committee of independent Marvel directors was ever formed (or should have been formed) to consider Marvel's financing options and capital structure in light of the conflict between, on the one hand, Marvel's interest in obtaining financing and having a capital structure that was in Marvel's best interests and, on the other hand, defendants' interest in avoiding the burdens, costs and risks that defendants would face if Marvel issued additional equity?*  Plaintiffs submit that no committee was formed, but should have been.  Plaintiffs' expected evidence will include evidence that no such special committee of the Marvel board was formed; to the extent that financing and capital structure alternatives were considered by Marvel's board, Marvel's board minutes demonstrate that defendants dominated and controlled such decisions; and that the only time a special committee was formed after the issuance of the Notes was in the fall of 1996, when Marvel faced a financial crisis and desperately needed a cash infusion, and then only to address a proposal by affiliates of defendants themselves to buy more equity.

8.      *Whether defendants can prove by a preponderance of the evidence that, following the Note issuances, (i) Marvel's financing decisions and capital structure were entirely fair to Marvel, and (ii) the Notes and the restrictions did not interfere with or impede the ability of any independent Marvel directors to make financing decisions that were in Marvel's best interests?*  Plaintiffs submit that the answer is, *no*.  Plaintiffs'

425680.9                                    23

expected evidence will include evidence that Marvel's capital structure was not the product of consideration by independent Marvel directors; Marvel's financing decisions were made in a manner consistent with the restrictions in the Note Indentures and defendants' interests thereunder; in the absence of the Note restrictions, Marvel would not have relied exclusively on bank debt as a source of financing, and would have had a different and more favorable capital structure, including additional equity; and, the Notes and restrictions did interfere with Marvel's ability to make financing decisions that were in Marvel's best interests (as demonstrated by the facts surrounding Marvel's inability to obtain desperately needed financing in late 1996, as discussed below).

9.    *Whether the Notes and restrictions interfered with Marvel's ability to obtain desperately needed financing in late 1996 when Marvel was facing a liquidity crisis?*  Plaintiffs submit that the answer is, *yes*.  Plaintiffs' evidence will include evidence that defendants acknowledged that "no one" would put up the kind of money necessary to restructure Marvel unless the restrictions were amended; defendants' own proposal to inject capital into Marvel was conditioned upon amendment of the restrictions; defendants told Marvel's bankers that § 4.04(a) of the Indentures would have to be amended; Perelman advised the Marvel board that a delay in implementing a restructuring of Marvel on account of inability to obtain Noteholder consent to a capital infusion would negatively impact Marvel's liquidity, and that, as a result, Marvel was considering a bankruptcy filing; and, when Marvel shortly thereafter did file for bankruptcy, the company acknowledged that the "filing was necessitated by the failure of the holders of bonds issued by Marvel's holding companies to reach agreement regarding any alternative plans for the Company's future."  (PX at BS009934-35.)

10.    *To the extent that defendants contend that Marvel was prevented from obtaining the financing it needed to overcome its liquidity crisis in the fall of 1996 for reasons other than the Notes and restrictions, whether defendants can show by a preponderance of the evidence that Marvel would not have been able to obtain necessary financing even in the absence of the Notes and restrictions?*  Plaintiffs submit that defendants will not be able to do so.  Plaintiffs' evidence will include evidence that Marvel, under defendants' control, did not seek out potential sources of equity capital from anyone other than defendants' own companies, and, for the reasons discussed above, no one would have put up the money necessary for Marvel's survival and financial viability unless the restrictions on Marvel in the Note Indentures were amended.

11.    *Whether the Notes and restrictions caused Marvel to be worth less than it would have been worth in the absence of the Notes and restrictions?*  Plaintiffs submit that the answer is *yes*.  Plaintiffs' evidence will include testimony of plaintiffs' expert Jeffrey Baliban that the decline in the value of Marvel after the issuance of the Marvel III Notes (the final tranche), that was proximately caused by the issuance and terms of the Notes and Indentures, in comparison to its value at the time the Marvel III Notes were issued, was in the range of $308 to $617 million (before pre-judgment interest); and that a part of that loss of value can be measured by the decrease in Marvel's market capitalization on November 12, 1996, when defendants announced that their proposal to restructure Marvel required the approval of the Noteholders.

12.    *Whether defendants can show by a preponderance of the evidence that any part of the $553.5 million defendants received from the Note transactions was obtained independently of the restrictions in the Note Indentures and Marvel's*

*participation in the issuance of the Notes?*  Plaintiffs submit that the answer is *no*. Plaintiffs' evidence will include evidence that the entire amount of the Note proceeds was obtained as a result of the restrictions on Marvel and Marvel's participation in the issuance of the Notes; no part of the $553.5 million in proceeds was obtained independently of the restrictions on Marvel or Marvel's assistance and participation; and that defendants considered but rejected alternatives to the Notes – such as obtaining a margin loan or issuing LYONs secured by Perelman's Marvel stock – and those options would have had significant disadvantages for Perelman.

13.    *Without conceding that the amount of defendants' unjust enrichment is less than the total amount of Note proceeds, what would have been the outcome of an arms'-length negotiation between defendants and a hypothetical special committee of independent Marvel directors in which defendants bargained for Marvel's voluntary acceptance of the restrictions contained in the Note Indentures and Marvel's assistance and participation in the issuance of the Notes?*  Plaintiffs will present evidence that if hypothetical independent directors could have overcome a concern that the Indenture restrictions and the issuance of the Notes presented an unacceptable risk of cataclysmic effects on Marvel, the result of such an arms'-length negotiation would have included a payment by defendants to Marvel in excess of $150 million; and that figure, with prejudgment interest, would result in a judgment in favor of plaintiffs in the amount of approximately $300 million.  To put this figure in perspective in the context of the Note issuances that are the subject of this litigation, plaintiffs note that $150 million is roughly three years of interest alone on the $553.5 million that Perelman obtained for his sole benefit more than twelve years ago.  Plaintiffs' evidence will include analysis by

plaintiffs' expert Andrew Carron of an alternative market transaction without the Indenture restrictions that would have resulted in Perelman receiving $156.7 million less than he received, and Mr. Carron's opinion that $156.7 million represents the value to defendants of Marvel's consent to the restrictions; and the testimony of plaintiffs' expert, Bevis Longstreth concerning hypothetical negotiations that would have occurred if Perelman had sought approval from Marvel's independent directors for Marvel's participation in the Note transactions. (Plaintiffs note that a judgment of $156.7 million would underestimate the actual unjust enrichment Perelman obtained from the Note issuances; even in an alternative market transaction, defendants would have needed Marvel's assistance and participation.)

## SUMMARY OF ARGUMENT WITH RESPECT TO ISSUES OF LAW IDENTIFIED BY PLAINTIFFS IN THE PRETRIAL ORDER

Plaintiffs set forth below certain legal issues they identified in the Pretrial Order, and a summary of the applicable legal authorities with respect to each issue.

1.    *Whether defendants Perelman, Bevins and Drapkin owed fiduciary obligations to Marvel?* Plaintiffs submit that they did. *See Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *Kahn v. Lynch Communications Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991).

2.    *Whether defendants have the burden of proving the entire fairness to Marvel of the Note transactions?* Plaintiffs submit that because defendants' interests differed from Marvel's interests with respect to the Note transactions, defendants have

the burden of proving that such transactions were entirely fair to Marvel. *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Bomarko v. International Telecharge, Inc.*, 794 A.2d 1161, 1188 (Del. Ch. 1999); *Citron v. E.I. du Pont & Co.*, 584 A.2d 490, 500 n.13 (Del. Ch. 1990); *Citron v. Steego Corp.*, C.A. No. 10171, 1988 WL 94738, at *8 (Del. Ch. Sept. 9, 1988); *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949).

        3.     *Whether defendants have the burden of proving that, following the Note issuances, decisions concerning Marvel's financing were entirely fair to Marvel?* Plaintiffs submit that because defendants dominated and controlled Marvel's decisions, and defendants' interests differed from Marvel's interests with respect to Marvel's financing options, defendants do have such a burden. *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Bomarko v. International Telecharge, Inc.*, 794 A.2d 1161, 1188 (Del. Ch. 1999); *Citron v. E.I. du Pont & Co.*, 584 A.2d 490, 500 n.13 (Del. Ch. 1990); *Citron v. Steego Corp.*, C.A. No. 10171, 1988 WL 94738, at *8 (Del. Ch. Sept. 9, 1988); *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949).

        4.     *Whether the Marvel board's inaction and failure to consider the best capital structure for Marvel, or the abdication of their responsibilities in this regard to defendants, is entitled to the protection of the business judgment rule?* Plaintiffs submit that it is not. *See Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984).

5.      *Whether defendants have the burden of proving that Marvel would not have been able to obtain the financing necessary to overcome its liquidity crisis in the fourth quarter of 1996 even in the absence of the Notes and restrictions applicable to Marvel?*  Plaintiffs submit that defendants have such a burden of proof.  *See Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161, 1179 & 1185 (Del. Ch. 1999) (". . . value is inherently unknowable because there is no way to learn what financing arrangements ITI might have made in the absence of [the defendant's] disloyal conduct." Nonetheless, "to prevail [defendant] must show by a preponderance of the evidence that Bell Atlantic and ITI would not have come to terms on financing had he not improperly interfered in that relationship.").

6.      *In a case involving a defendant fiduciary's breach of his duty of loyalty, what are the guiding legal principles in a court of equity for determining the relief to be awarded to plaintiffs?*

A.      Plaintiffs submit that the starting point for analysis is the bedrock principle that is the holding of the Delaware Supreme Court in *Guth v. Loft*, requiring disgorgement of all gains, quoted by the Third Circuit in its decision in this case:

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, *extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation*."

(*Guth*, emphasis added).  *See Cantor et al. v. Perelman et al.*, 414 F.3d at 436.

B.    As the defendants in this case argued in their motion to strike plaintiffs' jury demand:

> . . . significant discretion is given to the Court in fashioning an appropriate remedy, the Court must consider the full range of potential equitable or monetary relief before selecting a remedy. . . .
>
>         *            *            *
>
> [T]he damages that may be awarded for a breach of fiduciary duty under Delaware law require determinations that differ substantially from the type of compensatory relief awarded by a jury.

(Def. Reply. Br. at 3 and 5, *quoting* from *Bomarko*, emphasis added).  Defendants then quote from *Bomarko* (which is quoting *Weinberger*) when they say, "In determining damages, the Court's powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . ."  (*Id*. at 5.)

C.    As the Delaware Chancery Court makes clear in *Bomarko*, where there has been a breach of fiduciary duty, the broad powers of the court in equity are to be exercised to ensure that defendants do not retain any benefits from their wrongdoing and to ensure that plaintiffs are not shortchanged.  Indeed, in *Bomarko*, the Court specifically said that monetary relief would be awarded to plaintiffs based on the value of their shares absent a breach of duty even though such "value is inherently unknowable" and the approximation of such value "removes these uncertainties and might overcompensate plaintiffs" -- but, says the Court, "the potentially harsh nature of this remedy is both appropriate, given the nature of [defendant]'s misconduct, and necessary to avoid shortchanging plaintiffs."  (*Bomarko,* 794 A.2d 881 at 1184-85.)  In other words, in using its powers to fashion a remedy, it is *necessary* for a court in equity

to "avoid short-changing plaintiffs."  It is neither necessary, nor appropriate under Delaware law, to protect the wrongdoing fiduciary and limit disgorgement in a precise way where the appropriate amount may be "inherently unknowable."

       D.     One form of relief that may be appropriate in cases involving breach of fiduciary duty is a monetary award based on the amount of compensation that would have been paid by defendants to plaintiffs if there had been arm's-length negotiations at the time of the breach.  There is no legal authority suggesting that the nature and measure of relief held appropriate in *Boyer* based on the evidence in that case may be awarded if such award would be inconsistent with the fundamental principle established in *Guth* that there must be complete disgorgement of all benefits resulting from the breach so as to "extinguish all possibility of profit flowing from the breach."  In other words, there is no legal authority suggesting that a wrongdoing fiduciary may retain some benefit from his breach of fiduciary duty by showing that if there had been arms'-length negotiations at the time of the breach, some lesser amount would have been agreed upon.

       E.     The decision of the Third Circuit Court of Appeals in this case specifically states that plaintiffs should "at least" be entitled to present evidence as to what would have been the result of arm's-length negotiations.  The Third Circuit does not say that plaintiffs should be limited to such measure of relief.  On the contrary, the Third Circuit explains that it is not addressing or limiting the evidence to be presented at trial.  While noting that disgorgement of the entire proceeds of $553.5 million obtained by Perelman could be a windfall, the Third Circuit does not say it would be, and leaves

the determination in the first instance to this Court based on the applicable principles of Delaware law.

       7.    *In measuring the extent of unjust enrichment, whether a disloyal fiduciary is allowed to offset the gain obtained from his disloyal conduct by the amount he could have obtained had he chosen a course of action that did not involve breaching his duty of loyalty?* Plaintiffs submit that to allow such an offset to a disloyal fiduciary based upon an after-the-fact assessment of what he could have done had he chosen not to act disloyally would be inconsistent with the rule -- "inveterate and uncompromising in its rigidity" -- that a disloyal fiduciary is liable for any gain acquired by reason of his breach of duty, based upon "wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." *Guth*, 5 A.2d at 510. *See also Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d at 1179. ("I realize that before [the defendant officer] acted disloyally there was uncertainty whether or not ITI could secure financing and restructure its debt and, also, that the measure of damages I mean to allow removes these uncertainties and might overcompensate plaintiffs for that reason. Nevertheless, I conclude that the potentially harsh nature of this remedy is both appropriate, given the nature of [the defendant's] misconduct, and necessary to avoid short-changing plaintiffs."); *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *Strougo v. Carroll*, C.A. No. 8040, 1991 Del. Ch. LEXIS 11, at *10 (Del. Ch. Jan. 29, 1991); *Citron v. Steego Corp.*, C.A. No. 10171, 1988 WL 94738, at *8 (Del. Ch. Sept. 9, 1988); *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949).

8.      *Where a disloyal fiduciary obtains a benefit as a result of his breach of duty, whether Boyer v. Wilmington Materials, Inc., 754 A.2d 881 (Del. Ch. 1999), holds that an unjust enrichment award should be limited to that which the company would have been able to obtain as a result of an arms'-length negotiation with the fiduciary?*  Plaintiffs submit that *Boyer* does not require such a limitation which would reward the wrongdoing fiduciary.  In *Boyer*, the principal issue was the value of the assets of a corporation called WMI in which plaintiff was a minority shareholder. The defendant directors had caused the sale of such assets to another company they controlled.  In addition, the defendant directors had sold their interest in yet another company, DRPI (in which plaintiff did not have an interest), and as part of the sale, a portion of the proceeds were held back by the buyer, to be released when DRPI concluded a certain lease amendment with WMI.  The defendant directors failed to disclose to the WMI board their interest, on behalf of DRPI, in such an amendment. Based on the evidence, the court held that the defendants' interest in DRPI (and, correspondingly, their interest in the holdback as part of the consideration for their interest in DRPI) was unrelated to their positions as directors of WMI.  In that context, the court considered what WMI would have been able to obtain from the defendants had the defendants bargained with WMI to obtain its approval for the lease amendment. Here, by contrast, defendants' ability to issue the Notes and obtain $553.5 million in proceeds is directly attributable to their positions as directors and controlling shareholder of Marvel and their conduct in agreeing to cause Marvel to act in accordance with the Indenture restrictions, and in causing Marvel to participate in and support the Note issuances.  *Cf. Cantor v. Perelman*, 414 F.3d at 437 (while the Court noted that an unjust

enrichment award of $553 million "could" result in a windfall, and that plaintiff should "at least" have the opportunity to present evidence concerning what defendants would have had to pay Marvel, the Court said that "the issue of the extent of any unjust enrichment is . . . not before us," and, accordingly, "it would not be appropriate for us to limit plaintiffs' proof on remand.").

9.      *Assuming the $553.5 million in Note proceeds was obtained because of disloyal conduct by defendants, whether defendants have the burden of proving that they were unjustly enriched by an amount less than $553.5 million?* Plaintiffs submit that defendants bear that burden.  *See Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d at 1179 & 1184.  ("Thus, to prevail, [defendant] must show by a preponderance of the evidence that Bell Atlantic and ITI would not have come to terms on financing had he not improperly interfered in that relationship.").

10.      *Whether defendants Mafco Holdings Inc., MacAndrews & Forbes Holdings Inc. and Andrews Group Incorporated aided and abetted breaches of fiduciary duty by Perelman, Bevins and Drapkin?*  Plaintiffs state they did; they participated in such breaches and accepted the benefits thereof.  *See In re Emerging Communications, Inc. Shareholders Litig.*, No. Civ. A. 16415, 2004 WL 1305745, at *38; *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172-73 (Del. 2002); *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

11.      *Should pre-judgment interest be awarded in favor of plaintiffs on any judgment, and what should the interest rate(s) be, and from what date(s) should interest run?*  Plaintiffs submit that pre-judgment interest showed is awarded at the

applicable rate under Delaware law from the dates that defendant Perelman (or any

corporation he wholly owned directly or indirectly) obtained Note proceeds.

## PLAINTIFFS' EXPERTS
## AND THIS COURT'S *DAUBERT* DECISION

On October 18, 2005, this Court entered a scheduling order (D.I. 430)

providing that:

> Either party may identify additional expert testimony on or
> before January 13, 2006 by filing additional reports in
> accordance with Federal Rule 26(a)(2).  The parties shall
> file rebuttal expert reports on or before March 3, 2006.

In that same order, the Court required that objections to expert testimony on the basis of

the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993),

shall be made by motion no later than June 1, 2006.

On January 13, 2006, plaintiffs served two expert reports prepared by

economists -- Andrew Carron, President of National Economic Research Associates

("NERA") and Jeffrey Baliban, a Senior Vice President in NERA's Securities and

Finance Practice -- and one expert report prepared by former SEC Commissioner and

Debevoise & Plimpton partner Bevis Longstreth.  Dr. Carron's report concerns plaintiffs'

claim for unjust enrichment and sets forth his opinion concerning the value to Perelman

of the Indenture restrictions applicable to Marvel.  Mr. Baliban's report concerns the

actual damages suffered by Marvel and sets forth his opinion that the harm to Marvel as a

result of the issuance of the Marvel Parent and Marvel III Notes was in the range of $308

to $617 million before interest.[7]  The report of Mr. Longstreth, who has served on numerous boards of directors throughout his career, provides Mr. Longstreth's opinion as to the nature of the arm's-length bargaining that would have been conducted by Marvel with Mr. Perelman if Mr. Perelman had presented to the independent directors of Marvel a request that Marvel assist and acquiesce in the Note transactions as it did.  Mr. Longstreth also submitted a rebuttal report.

Also on January 13, 2006, defendants served one expert report -- prepared by Professor Lawrence A. Hamermesh -- setting forth Professor Hamermesh's opinion concerning "the practice and effect of Delaware corporate law as of the period from 1993 to 1996" as it relates to Section 4.09(a) of the Indentures.  That is the Indenture provision limiting Marvel's ability to issue shares that would reduce the Marvel Holding Companies' ownership of Marvel voting stock to less than a majority.  Professor Hamermesh expressed the opinion that such restriction duplicated the effect of Delaware law, because, he opined, a Board could not issue stock -- even for proper corporate purposes -- if such issuance would dilute a majority stockholder without his consent.

On March 3, 2006, without waiving their right to challenge Professor Hamermesh's opinion as inadmissible testimony on matters of domestic law, plaintiffs served a Rebuttal Report prepared by the former Delaware Supreme Court Justice Joseph T. Walsh.  Justice (Ret.) Walsh disagreed with Professor Hamermesh and pointed out that

---

[7] Mr. Baliban's opinion concerning damages is limited to damages caused to Marvel by the issuance of the Marvel Parent and Marvel III Notes because the claim for damages, in contrast to the claim for unjust enrichment, is limited by the statute of limitations.

Professor Hamermesh was relying on Delaware case law involving Board action that had as its *primary purpose* the dilution of a majority shareholder's control. Where, however, Justice (Ret.) Walsh explained, "directors are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control."

Also on March 3, 2006, defendants served three rebuttal reports -- two with respect to Dr. Carron's report, and one with respect to Mr. Baliban's report. Defendants did not serve a rebuttal report with respect to plaintiffs' Bevis Longstreth Report

All of the plaintiffs' and defendants' experts were deposed after their reports were served, and Mr. Longstreth was deposed a second time by defendants' counsel after service of his rebuttal report.

On June 1, 2006, defendants moved pursuant to *Daubert* to exclude the testimony of every one of plaintiffs' five experts. In response, plaintiffs argued that defendants' motion should be denied in light of the law -- *see e.g.* the Advisory Committee Note to Rule 702 ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule . . . this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert.") -- and in light of the substance of the opinions offered by plaintiffs' experts, as well as how distinguished each of plaintiffs' experts is: Bevis Longstreth (a former commissioner of the SEC, a corporate lawyer for over 40 years at Debevoise & Plimpton, Advisor to the American Law Institute, member of numerous boards of directors), Joseph

T. Walsh (former Justice of the Delaware Supreme Court), Andrew Carron (president of

National Economic Research Associates), Jeffrey Baliban (senior vice-president at

NERA), and William Purcell (whose opinions are quoted at length in the Third Circuit

decision in this case).

         Also on June 1, 2006, plaintiffs moved pursuant to *Daubert* to exclude: (a)

the proposed testimony of defendants' expert Professor Hamermesh on the ground that

Professor Hamermesh was offering an opinion as to matters of Delaware law, which is

not a proper subject for expert testimony, and (b) certain portions of the Rebuttal Report

of defendants' expert Robert W. Holthausen.  Plaintiffs conceded that if the Court

granted their motion as to Mr. Hamermesh, then the opinions of plaintiffs' rebuttal

expert, former Supreme Court Justice Walsh, should be excluded on the same basis.

         On November 30, 2006, Judge Jordan issued his decision on the parties'

*Daubert*  motions.  The Court agreed with plaintiffs that Professor Hamermesh was

simply expressing an opinion as to Delaware law, and thus granted plaintiffs' motion to

exclude Professor Hamermesh's proposed testimony and defendants' motion to exclude

Justice (Ret.) Walsh's proposed testimony.  (D.I. 494 and 495.)

         The Court denied defendants' motion to exclude the testimony of Purcell,

Carron and Baliban, as well as plaintiffs' motion to exclude portions of Holthausen's

proposed testimony.

         At pp. 9-18 of his decision, Judge Jordan rejected virtually all of

defendants' arguments concerning Bevis Longstreth's proposed testimony.  The Court

explained:

> Defendants' position is that Longstreth attempted "to dress up legal conclusions as facts." (*Id*. at 19.) In response, Plaintiffs argue that Longstreth provided permissible testimony regarding the customs and practices of the directors of a Delaware corporation. (D.I. 478 at 21.)
>
> Plaintiffs have identified a proper, if somewhat subtle and occasionally difficult, distinction. While a witness cannot testify as to the law governing a case, expert testimony concerning business customs and practices is allowed. *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991). However, given that the present case involves allegations that Defendants breached their fiduciary duties, it is important to note that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley,* 455 F.3d at 218.
>
> In general, the portions of Longstreth's initial report that are being challenged by Defendants discuss the process by which a company such as Marvel would handle a transaction involving an interested director. (See *id.* at A181-85, A187.) *This is permissible testimony concerning the business customs and practices of a corporation.*

(D.I. 494 at 10, emphasis added.)

The Court went on to say that, "On at least one occasion, though, Longstreth comes too close to offering a legal opinion" -- *i.e.*, an opinion concerning breach of fiduciary duty, as opposed to an opinion concerning the process by which a company such as Marvel would handle a transaction involving an interested director. Thus, the Court concludes that Mr. Longstreth will not be permitted to opine regarding breaches of fiduciary duty, but in all other respects defendants' motion is denied. Among other things, the Court rejects defendants' arguments that Longstreth was unqualified to discuss the financial aspects of Marvel's hypothetical bargaining process. (*Id*. at 17-18.)

## CONCLUSION

In light of the foregoing and the evidence to be submitted at trial, and all post-trial proceedings to be had herein, plaintiffs respectfully request the entry of judgment in their favor holding defendant Perelman and the other defendants liable for breaches of fiduciary duty and awarding monetary relief in favor of plaintiffs in an amount to be determined by the Court. Plaintiffs respectfully submit that the judgment, including pre-judgment interest, should be the greater of $1.1 billion (representing the unjust enrichment of defendant Ronald O. Perelman) or Marvel's actual damages resulting from defendants' breaches of fiduciary duty.

Dated:    December 15, 2006

Respectfully submitted,

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*
Lawrence C. Ashby (I.D. 468)
Philip Trainer, Jr. (I.D. 2788)
Tiffany Geyer Lydon (I.D. 3950)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888

-and-

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP
Edward A. Friedman
Andrew W. Goldwater
Daniel B. Rapport
Jonathan Gottfried
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Plaintiffs*

425680.9

40